```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF ALABAMA
    RECEIVED       MONTGOMERY DIVISION


UNITED STATES OF AMERICA,    §
            Respondent,      §    Civil No. 2:10CV1106-MHT
                             §
     vs.                     §
                             §    Crim. No.: 2:03-CR-00259-MHT
                             §
LEON CARMICHAEL, SR.,        §
            Movant.          §
```

---

### AFFIDAVIT OF LEON CARMICHAEL, SR.

---

I, Leon Carmichael, Sr., hereby make this affidavit under penalty of perjury pursuant to Title 28 U.S.C. § 1746, and state the following to the best of my recollections:

(1)   That I am the defendant in the criminal matter of U.S. v. Carmichael, case #2:03-CR-00259-MHT, and make this affidavit in support of my motion to vacate filed under 28 U.S.C. § 2255;

(2)   That after my arrest in the criminal case referrenced in ¶1 above, I was released on bond in November of 2003. After my release I was advised by my then criminal lawyer, Mr. Stephen Glassroth, that I could retrieve some personal property seized at time of my arrest from the DEA's Montgomery feild office. Attorney Glassroth advised me that it would be appropriate for me to retrieve the property and meet with agents without presence of an attorney. Attorney Glassroth never indicated that he should accompany me, nor did he suggest that there would be any problems with my going to meet agents and retrieve my belongings;

(3)   That I did meet with DEA agents DeJohn and Greenwood on December 4, 2003, at the Montgomery DEA's office to retrieve my personal property, however I did not at any time discuss my case with agents or make any incriminating statements to the agents. The only thing I recall saying were everyday pleasantries;

(4)   That in the later part of 2003 or early 2004, there was a meeting held with attorneys Glassroth, Bruce Maddox, Ronald Wise and myself to discuss measures that could be taken to counter some of the misinformation being leaked to the media by federal authorities related to my arrest in November or 2003;

(5)   That it was decided to create a website that would serve to provide accurate and updated information to the public about my case and the individuals associated with it. The purpose of the website was to serve as a public relations tool in order to minimize affects

*L.C.*

Carmichael affidavit (Cont'd)
Page 2 or 9
_____

of, and prevent the prosecution and law enforcement from disseminating false and misleading information into the public domain that was going unresponded to. The website would be a counter measure to the lies and unduly prejudicial and inflammatory information being released into the community where potential jurors for my trial would be drawn. The negative publicity was causing prejudice against me and contaminating the jury pool;

(6)   That I was specifically advised by my lawyers that the website was a lawful and legitimate public relations and defense strategy tool for my criminal case. The website proceeded with federal court sanction insomuch as the U.S. District Court for the Middle District of Alabama upheld the legality of the website when it was challenged by federal authorities;

(7)   That the website was never intended to harass, intimidate, or otherwise offend any private individuals or law enforcement agents. I would not have agreed to start and operate the website if I had any indication from lawyers that it was unethical, unlawful or in violation of any laws or citizens' rights;

(8)   That sometime in the middle or end of 2004 I was represented by attorneys Glassroth, Lisa Wayne, and Marion Chartoff. During this time I asked Glassroth to talk to the U.S. Attorney's Office about the possibility of negotiating a plea agreement. Attorney Glassroth advised me that he would not talk to the prosecution at that time because he wanted to get all the discovery before negotiating any plea deals. It was Glassroth's opinion that having the ability to review all the evidence completly would allow us to make an informed decision whether to plead guilty or take case to trial. However, Glassroth was forced off my case before any negotiations took place. Lisa Wayne took-over as my lead defense attorney after Glassroth was removed;

(9)   That I hired Susan James to assist attorneys Wayne and Chartoff. I asked Attorney James about seeking plea negotiations and she advised me to discuss the matter with attorney Wayne because she (James) was new on the case and needed to get up-to-speed on the facts of the case. I then contacted attorney Wayne who told me that she had yet to review the material in may case and needed to do that before advising me about the case. Attorney Wayne further advised that she would contact attorney Glassroth and discuss the matter of plea negotiations with him since he was lead attorney and she was newly assigned to that position;

(10)  That Attorney Wayne told me that she would be coming to Montgomery in about two weeks to go over the case with attorney James, Chartoff and myself. Attorney Wayne never showed up. When I contacted attorneys James and Chartoff about attorney Wayne's failure to come to Montgomery and what the status of my case was, they told me that attorney Wayne directed them that they (attorneys Chartoff and James) were not to do anything on my case unless she (Wayne)

L.C.

instructed them to do something. In response I called attorney Wayne again concerning my case and whether we should pursue plea agreement, but she would not talk case strategy on the phone, and she went on to say that she felt that attorney Glassroth would be getting back on the case. I told her that I was firing her at that time. She told me that was fine with her, but she was not going to return any of my $50,000 retainer fee, so I did not follow through with relieving her at that time. Attorney Wayne promised me she would make (3) three trips to Montgomery and spend two to three days each trip to work on my case with attorneys James and Chartoff, and would meet with the government to negotiate a plea agreement if possible;

(11) Attorney Wayne never did make the promised trips to Montgomery and only came two days before my trial started. When I met with her just before trial attorney Wayne seemed uninformed about my case and never mentioned any plea agreement discussions or any offers by the government. Over time I assumed, in absence of word from attorneys to the contrary, that the government did not want to negotiate a plea. I found out later that the government did offer plea deals in my case. I was advised by attorney James that attorney Wayne somehow thought that she (attorney James) was communicating plea negotiation information with me because James was local counsel and Wayne was in Colorado. Attorney James stated that attorney Wayne must have forgot that she (Wayne) was lead counsel and had instructed attorneys Chartoff and James not to do anything on my case without attorney Wayne's specific approval and directions;

(12) That I was never advised by any of my lawyers that I would actually get 40-years if convicted for the marijuana and money laundery charges. According to the discussions I did have with lawyers it was my understanding that, at the worst, I could get "around ten years" give or take. None of the lawyers ever discussed any federal sentencing guidelines with me, they never told me about enhancements for drug quantity, weapons, leadership or any other provision. On the other hand, I was never advised about sentence reduction for acceptance of responsibilty or any other guidelines provisions that allowed for sentence reduction for first-time drug offenders. When attorney Wayne talked to me about case days before the trial she assured me that she had a solid defense strategy and that the government's case was based on circumstantial evidence only and that I had a good chance of prevailing with her assistance at trial. I was never told about any plea deal offers prior to the trial;

(13) That I feel as though I was never fully advised about the case, possible sentences, or the guidelines and plea offers because each of my lawyers thought the others were discussing such matters with me. Attorney Ron Brunson was retained solely for the money laundering charges and he never discussed any aspects of the case with me, nor did he tell me about any plea agreement offers prior to trial;

(14) That counsels never informed me that the prosecution could use certain evidence and witnesses against me at trial. Specifically,

*L.C.*

attorneys failed to advise me that evidence of Sanda Jones' (and others) activities and illegal conduct would be used at my trial against me, nor did attorneys inform me that any defense "strategy" would open the door for the government to use such evidence. The lawyers never advised me (much less discussed with me) any strategy that would allow DEA Agents to testify at my trial that Moses Williams discontinued "cooperating" with law enforcement because he was afraid that I would kill him, or was otherwise in fear for his life because of me. The lawyers never mentioned the prospect of Jimmy Timmons testifying that I ordered a hit on him which resulted in his being wounded in the head from gun fire. I was never told that Eric Peagler and Richard Thomas could testify against me at trial about alleged criminal conduct unrelated to the charges alleged in the indictment I was tried for. In fact, attorney James told me that Peagler was a former client and his case did not involve me at all, and she was supposed to take care of matter. I didn't know government could introduce evidence of my infidelity, my son's past criminal arrest/charges, or my past criminal history. I was never advised that the government would introduce evidence/testimony related to truck driver Joe McGill's apparent illegal possession of drugs at the El Paso, TX, check-point. The lawyers never informed me that statements made to law enforcement by my codefendant (Freddie Williams) would be used at my trial to suggest that Freddie was afraid that I would harm him and/or his family if he implicated me in his drug trafficking activities. Finally, the lawyer never advised that the prosecution would be able to introduce <u>legally</u> possessed firearms seized from me at the time of my arrest;

(15) That had I been properly advised and informed by counsels of the potential forty-year prison term, the sentencing guidelines, the government's evidence and other important factors related to my criminal case, I would have been more diligent in my attempts to have the lawyers negotiate a plea agreement and would have pled guilty to avoid spending the remainder of my life in prison. Had I known that the prosecution could and would use the evidence and witnesses setfforth in ¶14 above, I would not have gone to trial but rather pleaded guilty and received a much lesser sentence as opposed to going to trial;

(16) That I was specifically advised by attorney Lisa Wayne that I had a viable defense based on the government's prior investigations of me that ended without criminal charges. Attorney Wayne was confident that the extended investigations of me that did not result in any evidence of criminal wrong-doing on my part would be a very compelling defense strategy that (according to her) had worked for her in other criminal cases. Attorney Wayne never mentioned any adverse consequences of such a defense strategy, nor did I understand the law well enough to understand the ramifications of such a defense. I considered attorney Wayne's advice and judgment in this regard when I made my decision how to proceed with my criminal case;

(17) That I was contacted in early 2004 by an individual who informed me that an old acquaintance of mine by the name of Willie DeWhart

*L.C.*

Carmichael Affidavit (Cont'd)
Page 5 of 9

---

was at Edgefield Federal Correctional Institution (FCI) in South Carolina with another inmate named Eric Peagler and that Peagler had confided in DeWhart about his (Peagler's) intentions to "cooperate" against me in an effort to get himself a sentence reduction. Peagler told DeWhart that he did not know anything about me, but had read some Alabama newspapers and that the DEA told him I brought-up his name to them, so he would use such information to testify against me;

(18)  That I immediately informed attorney James about what I had discovered about Peagler. Attorney James advised me that Peagler was a former client of her's and that she would investigate the matter further;

(19)  That I was again contacted by an individual named Arthur Covane in 2005 and Covane informed me that Peagler had been calling him from Edgefield FCI. According to Covane, Peagler was going to testify falsely against me in order to get a reduction of his federal prison sentence. Peagler told Covane that he did not have any knowledge of me based on personal contacts, but that he was going to fabricate testimony to serve as a basis for his sentence reduction.

(20)  That I again immediately contacted attorney James and advised her of my communications with Mr. Covane about Peagler's intentions. I provided attorney James with Covane's phone number and dates of the calls and instructed her to file necessary court pleadings to procure the phone records and to request a hearing related to such. Attorney James was supposed to get the phone records to prove that Peagler was making the calls, but she failed to get them as instructed;

(21)  That prior to trial, and during trial, I requested that the attorneys investigate, interview and call as witnesses certain individuals that I thought would be helpful in my defense and serve to counter the government's witnesses and evidence. In particular, I wanted the following individuals interviewed and called as witnesses: Sandra Jones (who would have testified, among other things, that she was involved in illegal drug activities prior to meeting me and would have told the jury that I was not a party to her activities. Also, Jones could have empeached government witnesses that implicated me in activities alleged to have been done by Jones); Moses Williams (who would have testified that he was not afraid of me and was trying to deceive law enforcement about my involvement in illegal drug activities); Arthur Covane (who would have testified that Eric Peagler was fabricating testimony against me to get a sentence reduction); Willie DeWhart (who would have testified that he was in prison with Peagler when Peagler conceived the idea to testify falsely against me and tried to recruit DeWhart in his scheme for sentence reduction); Mr. Bruce Maddox (who would have testified with respect to the circumstances surrounding Sandra Jones' prior drug prosecution and whether there was any evidence of my involvement with such); Mexican codefendants involved in Eric Peagler's federal drug conspiracy case for which he was serving time when he testified against me (these individuals would have testified that the gas tank in truck would not

*L.C.*

hold 80 lbs. of marijuana as testified by Peagler, and they would've empeached Peagler's testimony related to delivery dates, weights of drugs delivered and manner of transportation of drugs); Joseph "Pie" Lacey would have testified that he did not meet Sandra Jones until 2000-01, and that she could not have been delivering marijuana to him and Jimmy "School Boy" Timmons in 1994 as testified by Timmons. Lacey would have testified exposing Timmons' lies about being supplied marijuana by me through Jones prior to June of 1994, or anytime after that. Furthermore, Lacey would have testified that Timmons was merely embellishing and supplementing facts of their drug dealing to include me in order to receive benefit in his own case(s);

(22)   That I initially agreed with defense attorneys about the need to keep any evidence of my website from the jury because it could distract and confuse them and possibly prejudice my case. However, when DEA Agent DeJohn revealed that he had filed a civil action complaint against most of lawyers and myself, I suggested (based on Judge Thompson's advice) that we re-evaluate our strategy to keep out website evidence in light of DeJohn's lawsuit, and the fact that prosecution witness Sherry Pettus had testified about the website and also because the jury knew about the website anyway. I wanted to call Agent DeJohn as witness in order to question him about his bias against me and the animosity DeJohn had towards me, thus attacking his credibility and objectivity as a federal agent and witness against me and thereby create reasonable doubt before the jury. It was my impression that my lawyers resented Judge Thompson's unsolicited legal advice and it appeared to me that the lawyers refused to change the website strategy because Judge Thompson instructed them to;

(23)   That attorney James knew that Eric Peagler was going to testify at my trial and failed to take appropriate actions related to such. I specifically informed attorneys (including James) that I did not want any conflicts of interest to affect my criminal case, and that I was adamant about not waiving any conflicts created by the attorneys on my case. Furthermore, I warned attorney James about Eric Peagler (and others) that were housed at the Elmore Co. jail and waiting to be called as prosecution witnesses in my case. I was lead to believe that my attorneys would take appropriate action to prepare for Peagler's and other's testimony at my trial and deal with the conflict of interest created by attorney James former representation of Peagler as criminal attorney;

(24)   That attorney James convinced me to allow her to cross-examine Erice Peagler by assuring me that she could effectively discredit his testimony. I agreed to allow attorney James to cross-examine Peagler, however, reluctantly. When attorney James did cross-examine Peagler she failed to question him about certain inconsistancies with respect to his prior statements regarding dates, times, amounts and types of drugs involved with his drug trafficking activies. The vehicle used to allegedly smuggled drugs in (Ford F-150) did not have a gas tack big enough to contain 80 lbs. of marijuana as testified by Peagler. Moreover, Peagler's testimony with respect to marijuana amounts was inconsistent with DEA reports

*L.C*

documented in regards to Peagler's drug trafficking investigation and prosecution. When attorney James seemed to have caught Peagler testifying inconsistantly with prior statements and DEA reports she backed-off and changed the course of cross-examination. It is my belief that attorney James was protecting Peagler and did not want to jeopardize his reciept of sentence reduction under Rule 35(b), F.R. Crim.P., and therefore did not exploit knowledge that she had that could have empeached Peagler's credibility. Attorney James refused to question Peagler about his discussions with others in which he stated he was going to fabricate testimony against me to get a sentence reduction--there was absolutely no excuse for attorney James' failure to cross-examine Peagler along these lines based on the information attorney James had at the time;

(25) That after it was revealed that DEA Agent DeJohn had filed a civil lawsuit against me and the lawyers, I felt an immediate divergence of interests with attorneys James and Wayne vis-a-vis myself. Attorney Wayne was adamant that I address the Court and admit that the website was all my fault and apologize for creating the problems associated with the website and attending lawsuit. Attorney Wayne advised me that by accepting the responsibility for website and telling the Court I was sorry, that such would "help" my case and serve to relieve some of the hostility between parties. Based on counsel's advice I reluctantly addressed the Court and admitted that the website was all my fault and the attorneys had nothing to do with it although my statement was not factually accurate or sincere;

(26) That Judge Thompson was openly critical of my lawyer's performance during my trial and this caused me to have problems with my attorneys insomuch as I questioned their performance which created discord between myself and the lawyers which adversally affected the attorney/client relationship. I began to lose confidence in my attorneys and question their actions based on Judge Thompson's statements critical of my lawyers' handling of my trial;

(27) That there came a point during my trial when both attorneys Wayne and James were visibly distraught and emotionally upset about an in-chambers confrontation with Judge Thompson. I felt as though attorneys Wayne and James experianced a chilling-effect subsequent to the in-chambers discussion. Both attorneys Wayne and James, along with attorney Chartoff, advised me that they believed that Judge Thompson was obviously bias against me and I was being deprived a fair trial because of such. I did not know what action to take in this regard and my lawyers seemed to be without resolve to deal with Judge Thompson's behavior;

(28) That after the jury verdict in my case, I was party to a conversation between AUSA Feaga and my attorney Susan James. I overheard AUSA Feaga allude to a plea agreement offer of five years that was made. When I asked attorney James about the five year offer she would not answer the question, but instead deferred me to attorney Wayne who advised me that she understood that "local" counsel would take care of such matters and be responsible for any and all plea

*L.C.*

negotiations process. I was never told about any five year plea agreement offer by any of my attorneys, and was surprised by ASUA Feaga's mention of such an offer. I would have most certainly considered taking a five year plea offer, and would probably have executed such offer had I been provided competent legal representation;

(29) That after the verdict in my case I was informed by counsels that the government had made a plea agreement offer during the time that the jury was deliberating my case, but that I was not immediately conveyed the offer because I was visiting my sick mother at the hospital at the time. The jury had reached a verdict of guilty by the time I was informed of the plea offer. I would have most definately taken any reasonable deal at that juncture because I had no doubt that the jury would convict me after sitting through the trial and realizing all the mistakes made, the unduly prejudical evidence/testimony presented against me and the lack of effective assistance of counsel;

(30) That I never authorized, nor did I know about, attorney Bruson's plans to call IRS Agent Louie Wilson and examine him about whether the U.S. currency handled by Sherry Pettus was illegal drug proceeds. And I certainly did not know Agent Wilson was going to testify that it was his opinion that the U.S. currency in my case was illegal drug proceeds and therefore a violation of federal money laundering statutes. I would never had allowed attorney Brunson to pursue this line of questioning with Agent Wilson had I been advised before hand. Agent Wilson's testimony served to help prove the government's money laundering case against me and all my lawyers were deficient for allowing such testimony to prejudice my criminal trial proceedings;

(31) That I was well aware of Judge Thompson's criticism of my legal defense team and the lawyers' performance during my trial and the Judge's criticism caused problems between myself and the lawyers. I recall questioning attorneys Wayne and James about the Court's comments critical of their performance which caused the attorneys to seem indignant towards me and that caused friction and discord between us as attorney/client. When Judge Thompson advised the lawyers that they should reassess their strategy with respect to the website and possibly recall Agent DeJohn as a witness, I was in agreement with the Judge's advice, but attorneys Wayne and James were noticably irritated by my agreement with Judge Thompson's advice, and they were clearly being intransigent; refusing to implement the advice of Judge Thompson. In the end, I sincerely believe that Judge Thompson's unsolicited criticism and legal advice disrupted my attorney/client realtions and adversally affected my criminal proceedings;

(32) That I sensed a large measure of dysfunction and lack of coordination between attorneys Wayne, James and Chartoff. It seemed as though they were spending more time disputing and arguing among themselves when they should have been focused on my criminal case.

*L.C.*

Carmichael Affidavit (Cont'd)
Page 9 of 9

---

Additionally, the attorneys' disorganization allowed very important information and advice to fall through the cracks and not make it to me in order for me to make informed decisions related to my criminal case. For example, the apparent plea agreements that were offered by the government that were never conveyed to me until too late to act on them. I should have been advised of numerous aspects of my case but was not because the lawyers were not on the same page and my criminal proceedings were prejudiced as a result;

(33)  That attorney Wayne showed-up for my criminal trial on the Friday before proceedings began and was noticably not prepared for the trial. The other lawyers (especially attorney James) had consistantly deferred many of my questions about the case to attorney Wayne who was not available for discussion due to her practice in Colorado and refusal to visit Montgomery as she agreed to as part of our retainment agreement;

(34)  That I believe my lawyers should have followed through with attorney Wayne's intentions of filing motion to recuse Judge Thompson because he was clearly bias against me and the lawyers had essentially destroyed my chances of a fair and impartial court by antagonizing the Judge.

Affiant Sayeth Nothing Further.

SWORN to under penalty of PERJURY

this __28th__ day of __December__, 2010.          (28 U.S.C. § 1746)

/s/ _Leon Carmichael, Sr._
Leon Carmichael, Sr.
Affiant