UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

UNITED STATES OF AMERICA,
            Respondent,

vs.

LEON CARMICHAEL, SR.,
            Movant.

§
§
§
§
§
§
§
§

Civil Case No.: 2:10CV1106-MHT

Crim. Case No.:2:03-CR-259-MHT-1

28 U.S.C. § 2255 Proceeding

--------------------------------------------------------------------------------

MOVANT'S MEMORANDUM OF LAW AND FACTS
IN SUPPORT OF SECTION 2255 MOTION

--------------------------------------------------------------------------------

COMES NOW, Leon Carmichael, Sr., the Movant in the above-styled case, and respectfully submits this memorandum of law and facts in support of his Motion to Vacate, Set Aside or Correct Federal Sentence under 28 U.S.C. § 2255. Such motion being filed simultaneously with this memorandum and is incorporated by reference herein.

For GOOD CAUSE in this Honorable Court granting relief under § 2255, the Movant would show as follows:

## I.  JURISDICTION OF THE COURT

This Court has proper subject matter and personal jurisdiction of parties to entertain and rule on this motion pursuant to Title 28 U.S.C. § 2255(a). U.S. v. Jordan, 915 F.2d 622, 629 (11th Cir. 1990).

## II. ABREVIATED BACKGROUND OF THE CASE

### 1.  Proceduarl History:

On November 19, 2003, a Federal Grand Jury sitting in the Middle District of Alabama (Montgomery) returned a single count indictment charging the Movant and codefendant, Freddie Williams, with Conspiracy to Posses and Distribute over 3,000 kilograms of Marijuana in violation of Title 21 U.S.C. §§ 841(a)(1), 846. DE.#8.  The Movant

was arrested the same day. DE#10-1.

A superseding indictment issued on December 17, 2003, adding
forfeiture allegations. DE#48.  On January 21, 2004, a second super-
seding indictment issued. DE#86.  A third and final superseding
indictment issued on August 17, 2004, realleging drug conspiracy
in Count One and added a Count Two charging Movant with Money Laun-
dering. DE#227.

On June 6, 2005, a jury trial commenced for Movant and codefen-
dant Williams before the Honorable Myron H. Thompson, U.S. District
Court Judge.  After ten days of trial proceedings the jury returned
guilty verdicts against both Movant and Williams on June 17, 2005.
DE#601.  Following the finding of guilt, the proceedings continued
with respect to forfeiture allegations; however, on June 20, 2005,
the parties agreed to settle forfeiture counts without further jury
determination. DE#486.

In response to Movant's Motion Challenging Jury Venire [DE#400]
the District Court (Magistrate Delores R. Boyd) conducted five days
of evidentiary hearings begining April 26, through May 2, 2006.  On
December 18, 2006, Judge Thompson issued a published opinion denying
Movant's challenge to jury selection process. DE#806.   See U.S. v.
Carmichael, 467 F.Supp.2d 1282 (M.D. Ala. 2006).

On March 28, 2007—after hearing two days of proceedings on
March 21 and 22, 2007—Judge Thompson sentenced the Movant to 480
months on Count One (Conspiracy to Possess and Distribute Marijuana)
and 240 months on Count Two (Money Laundering) with five years of
supervised release and a $100 assessment fee. DE#853.

A timely Notice of Appeal was docketed on March 29, 2007. DE#

2

854.  The Eleventh Circuit Court of Appeals subsequently affirmed
Movant's conviction and sentence in a published opinion dated March
5, 2009.  See U.S. v. Carmichael, 560 F.3d 1270 (11th Cir. 2009).  The
United States Supreme Court denied Movant's pro se petition for a
writ of certiorari on January 11, 2010.  See Leon Carmichael v. U.S.,
175 L.Ed.2d 912 (2010).

## 2. Alleged Criminal Conduct.[1]

In its case-in-chief, the prosecution presented several witnesses,
including two admitted drug traffickers (Gary Wayne George  and
Patrick Denton) who allegedly repackaged and sold marijuana for
Movant.  By the time of his arrest by Drug Enforcement Administrat-
ion ("DEA") Agents on November 17, 2003, Denton testififed that he
was packaging and selling between 200 and 500 pounds of marijuana
per week and giving the proceeds to Movant.

DEA Agents arrested Denton at his home, where they had gone for
the purpose of executing a search warrant.  While the agents were
executing the warrant, the Movant allegedly telephoned Denton to say
that he was coming over.  At this point, Denton decided to cooperate
with agents.  After giving Denton some instructions, agents left the
residence to set up serveillance.  The Movant arrived at Denton's
residence shortly therafter and supposedly instructed Denton to go
to codefendant Freddie Williams' house to help Williams repackage
marijuana.  Denton left for Williams' house, arriving there  after
first meeting with the DEA Agents, who equipped him with audio and

---

[1]   It should be noted that Movant exercised his right to a jury
    trial and vehemently contests the Government's criminal alleg-
    ations, but will accept the jury's verdict for purposes of
    this section and recite the "facts" as proffered by the Gov-
    ernment.  For a more detailed version of case see various
    published opinions issued in this matter.

3

video devices.  Once at Williams' house, Denton joined Williams in
repackaging marijuana.  The worked until Williams received a phone
call and left.  After Williams departed, agents entered the residence
with a search warrant and seized 574 pounds of marijuana.  Later
in the day the agents arrested Movant and Williams and charged them
with controlled substances offenses related to marijuana trafficking.

<u>III.  STATEMENT AS TO WAIVER, CAUSE AND PREJUDICE</u>

Movan did not raise the following claims on direct appeal because
the facts set forth in his § 2255 motion were and are material to
the claims of ineffective assistance of counsel, but were not part
of the record for direct appeal.

"Cause" is therefore established for Movant's failure to raise
the claims prior to this motion. See <u>Massaro v. U.S.</u>, 538 U.S. 500
(2003).  Cause exist for the failure of Movant to raise the instant
claims of ineffective assistance of counsel in his direct appeal
because such claims should not be brought in direct appeal even
if the record is or was sufficient to raise the claims. id. 538
U.S. 508-10; <u>U.S. v. Hardamon</u>, 188 F.3d 843 (7th Cir. 1999).

The Movant has properly pleaded "prejudice" by the "fundamental
defect" in conviction and sentence as setforth herein. <u>Ward v. U.S.</u>
995 F.2d 1317, 1321 (6th Cir. 1993).  "Prejudice" to the Movant,
within the meaning  of  <u>U.S. v. Frady,</u> 456 US 152 (1982), as
contrued in case law such as <u>U.S. v. De La Fuente</u>, 8 F.3d 1333,
1336-37 (9th Cir. 1993), is established by the fact that absent
relief by the Court, the Movant's conviction and sentence is in
violation of the Constitution and the laws of the United States.
id. See also <u>Isabel v. U.S.</u>, 980 F.2d 60, 64 (1st Cir. 1992)("pre-
judice" established, for purposes of "procedural bypass question"

4

where § 2255 movant's "sentencing range would be reduced" if
successful on claim).

Based on the foregoing, and the absence of any knowing and
intelligent  waiver by the Movant of his right to bring this § 2255
motion, this Court is not precluded by the "cause and prejudice"
principle from entertaining, ruling on the merits, and granting
the relief requested.

### IV. STANDARD OF REVIEW--OBJECTIVE REASONABLE STANDARD

**A.  The Performance of Counsels for Movant Fell Below an Objective
Standard of Reasonableness During Pre-Trial, Trial, Sentencing and
Appellate Phases of Criminal Proceedings.**

In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court
established a two prong test to govern ineffective assistance  of
counsel claims.  To obtain reversal of a conviction or to vacate a
sentence based on ineffective assistance of counsel the defendant
must show: (1) that counsel's performance fell below an objective
standard of reasonableness; and (2) that there is a reasonable pro-
bability that, but for counsel's objectively unreasonable preform-
ance, the result of the proceeding would have been different. id.
at 688-89; Williams v. Taylor,  120 S.Ct. 1495 (2000).

The Court stated that, "judicial scrutiny of counsel's perf-
ormance must be highly deferential" and added "a court must indulge
a strong presumption that consel's conduct falls within the wide
range of reasonable professional assistance". id.  The Court went
on to clarify that this reference to "highly deferential scrutiny"
referred only to the first, or preformance prong of the test and
meant that, "...the defendant must overcome the presumption that,
under the circumstances, the challenged action "might be considered

5

sound trial strategy.'" id. at 689-91.  Two years after its
holding in Strickland, the Court reaffirmed that the "plausible
options" standard of the decision sets forth what test can be
made in evaluating whether counsel was within the range of "reas-
able professional assistance", or fell below an objective standard
of reasonableness. See Kimmelman v. Morrison, 477 U.S. 365, 385-
87 (1986); Williams, at 1512-16.

The Supreme Court noted that "a single, serious error may
support a claim of ineffective assistance of counsel." id. Kimm-
elman, at 384.  The Court added that this "single serious error"
could cause counsel's performance to fall "below the level of reas-
onable professional assistance", even where, "counsel's performance
at trial was "generally creditable enough", and even where counsel
had made "vigorous cross-examination, attempts to discredit witn-
esses, and [an] effort to establish a different version of  the
facts." id. 386.

The State argued, and the Court agreed that the determining
factor was whether or not counsel's "single serious error" or
"failure" was the result of, or attributable to, a trial "strategy"
id. 384-86; Williams, at 1512-16.   The Court then found that no
"strategy" was involved in that case and that counsel's performance
thereby fell below the Strickland objective standard because the
lawyer's failure was based "on [his] mistaken beliefs" as to the
laws governing discovery. id. at 385.

In Kimmelman the Court held that counsel's omissions were
not part of any "strategy" or trial tactic because they had not
been taken after thorough investigation of the law and facts rel-
evant to all plausible options available to counsel.  From this

the Court determined that the omissions were professionally unreasonable and had caused counsel's performance to fall below the objective standard of <u>Strickland</u>. id. at 385-87.  In short, no deference is due to counsel's actions, and the performance of counsel falls below the <u>Strickland</u> objective standard or reasonableness if counsel's specific acts or omissions are not demonstraably the result of actual strategic choices made between or among all plausable options "after thorough investigation of law and facts relevant to all possible options." <u>Strickland</u>, at 691.  Where a convicted defendant is making a claim of ineffective assistance of counsel, the defendant:

> must identify the acts or omissions of counsel
> that are alleged not to have been the result of
> reasonable professional judgment.
> <u>Strickland</u>, at 690.

    If the record does not "conclusively" demonstrate "strategic reasons" for counsel's failure, the district court entertaining a motion under § 2255 must hold an evidentiary hearing.  And a subsequent affidavit from counsel will not suffice to establish a trail strategy, nor absolve the district court from the requirement of holding an evidenctiary hearing.

    In the instant case, the Movant had made specific, sworn, factual allegations which this Court should accept as true for the purpose of considering whether to hold an evidentiary hearing, because they are not conclusively disputed by the files and the records of this case.

B.    Standard of Review -- Prejudice.

In writing for the majority in <u>Strickland</u>, <u>supra</u>, Justice O'Connor stated the general rule that, actual ineffectiveness claims

7

alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove "prejudice" id. at 693.  More specifically, Justice O'Connor set forth the now well known statement of the test for "prejudice" in claims of actual ineffectiveness of counsel as:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, at 695.

While the Court noted the government's, perhaps natural, inclination to argue that attorney error is harmless unless the defendant can show that "counsel's deficient conduct more likely than not altered the outcome of the case", the Court specifically and explicity rejected this argument by the government. The Court further specifically rejected the application of the "actual pre-udice" standard of U.S. v. Frady, 456 U.S. 152 (1982), to claims of ineffective assistance of counsel, with the following admonishment:

> The principles governing inffectiveness claims should apply in federal collaterail proceedings as they do on direct appeal or in motions for a new trial.  As indicated by the "cause and prejudice" test for overcoming procedural waivers of claims of error, the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment. [] And ineffectiveness claim, however, as our articulation of the standard that govern decision of such claims make clear, is an attack on the fundamental fairness of the proceedings whose result is challenged. Since fundamental fairness is the central concern of the writ of habeas corpus,... no special standard ought to apply to ineffectiveness claims made in a habeas proceedings.

Strickland, supra, at 697-98

The Court hearing an ineffectiveness claim should consider

the totality of the factors which guided the decision maker in the challenged proceeding, then try to determine which factors were, or were not "affected" by consel's errors. id. at 696.

### V.   GROUNDS FOR RELIEF

A.   MOVANT CARMICHAEL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.   <u>Strickland v. Washington,</u> 466 U.S. 688 (1984); <u>Holosomback v. White</u>, 133 F.3d 1382 (11th Cir. 1998).

1.   <u>Counsels Were Ineffective When they Failed to Advise the Movant with Respect to The Federal Guidelines Provisions Relating to "Relevant Conduct" and its Overall Affect on Movant's sentence.</u>

The Movant alleges that at no time during the preparation of his case did any of the lawyers ever take the time to consider and explain if there was an alternate solution to the case instead of proceeding with full litigation.

The case was a complicated web of events that took months of litigation to prepare and present. However, at no stage during the trial preparation  did any of the Movant's lawyers ever take the opportunity to explain to the Movant the intricacies of the federal Guidelines and how they would affect his overall term of incarceration.  There was never any explanation of the relevant conduct portions of the Guidelines and how Movant could be enhanced based on "uncharged" drug quantities presented by cooperating witnesses.  There was never a "stop and concider this" moment, for the Movant to concider an alternate resolution to the criminal charges against him.  From the beginning of the case, the strategy considered by all defense attorneys was nothing more than proceed to trial at all costs.  Had any of the lawyers taken an opportunity

9

to resolve the matter via alternative manners, he would have
not proceed to trial and would have found a solution via plea
negotiations. (See Leon Carmichael Affidavit, ¶¶ 15,16,28). There
was never any explanation in the simplest terms of the federal
Guidelines application to Movant's case.

As an alalogy, in U.S. v. McCoy, 215 F.3d 102 (D.C. 2000)
counsel advised the client of an incorrect application of the
Sentencing Guidelines . On appeal, McCoy argued that his plea
was unconstitutional bacause it was based on ineffective assist-
ance of counsel. The Court of Appeals agreed; it found that
McCoy's guilty plea had not been knowingly and voluntarily made.
Following the same analogy, Movant argues that his decision to
proceed to trial was based on his attorneys' gross misadvise of
the application of  the relevant conduct of sentencing Guidelines.
(id. Carmichael Aff. ¶¶ 16, 28).

The McCoy Court noted that "[W]hile not every error made in
calculating and applying the Guidelines would constitute deficient
performance under Strickland, the Court emphasized that 'famili-
arity with eth structure and basic content of the Guidelines had
become a necessity for counsel who seek to give effective rep-
resentation.'" id. at 508. The Court further found that the pre-
judice prong of Strickland test was satified, in that the diff-
erence between the sentencing ranges was so significant that
there was a reasonable probability that McCory had been given
correct information would have entered a guilty plea.[*]  Counsels'
failure to familiarize themselves with the relevant portions of

---

[*]   Although the Movant proceeded to trail based on counsels'
      misinformation of the relevant conduct portions of the USSG's
      the same analogy as that presented by McCoy Court can be
      reached in Movant's case. Had it not been for counsels'
      misinformation, Movant would have accepted a plea of guilt
      and avoided a 40 year prison term.

the Sentencing Guidelines cause their actions to fall below a reas-
onable standard of performance because a "[c]riminal defense att-
orneys practicing in the federal courst are expected to keep abreast
of issues that affect his client's case." <u>U.S. v. Loughnery</u>, 908 F.
2d 1014 (D.C. Cir. 1990).

   In Movant's case, he must only show that there is a "reasonable
probability" that the results of his decision to proceed to trial
would have been different, and based on the difference in sentencing
Guideline ranges, there could be no doubt that a different outcome
is evident.  Had counsels properly taken the time to advise Movant
how the relevant conduct provisions of the Sentencing Guidelines
applied to his case, Movant would have accepted a plea of guilty
and would have utimately resulted in a lower Guideline range.

   Based on the record and the files before this Court, there is
a reasonable probability that counsels' actions have reached a level
of ineffectiveness as enumerated in <u>Strickland</u>.   Furthermore, there
could be no strategic reason why counsels can justify their failure
to explain the implications of the Guidelines relevant conduct sect-
ions to the Movant. <u>U.S. v. Acklen</u>, 47 F.3d 739, 743-44 (5th Cir.
1995)(remanding for evidentiary hearing where there was nothing in
record to indicate counsel's failures were attributed to strategic
choice amoung all plausible alternatives available for defense).

<u>2.  Counsel Were Ineffective For Failing to Challenge the Use of
    Non-testifying Codefend Williams' Out-of-Court Statements to
    Law  Enforcement as a Crawford Violation as Opposed to a
    Bruton Violation.</u>

During the preparation for trial, counsels filed a motion <u>in limine</u>
to exclude custodial statements made by Movant's co-defendant Freddie
Williams when he was initially arrest and in custody.  During trial

the prosecution nevertheless proffered the testimony of DEA
Agent Greenwood who testified how they had arrested Williams
and the Movant.  Agent Greenwood detailed how they were both
detained in a holding cell area at the DEA's Office and how the
door was maintained ajar where Williams was able to hear any
individuals talking outside of the room he was held in. (Tr.
Vol.6/9/05, pgs. 221-25).

According to Agent Greenwood's testimony, Williams stated
that he know the Movant and that if "I name names, my children
will get killed." (id.) Williams' statement is what prompted the
motion in limine initially, under the position that the statement
violated the Supreme Court's holding in Bruton v. U.S., 391 U.S
123 (1968).  Although Williams did not testify, the government
used the tactic of the interview to introduce the statement of
violence.  The violation actually falls under a Crawford v. Wash-
ington, 541 U.S. 36 (2004) violation under the Supreme Court's
vast interpretation of Crawford.

Instead of objecting to Williams' statements coming in by
way of Agent Greenwood's testimony based on Bruton, consels should
have predicated thier objection on Crawford as a violation of the
Confronation Clause. The Court made its ruling to allow the Will-
iams' statements by utilizing Bruton analysis when counsels
should have clarified that the prejudicial statements introduced
were not presented from a Bruton violation, but the perspective
of Crawford violation.

The Confrontation Clause  imposes three basic condictions on
testimony offered against an accused: First, it must be given in

12

the presece of the accused; Second, the accused must have an
opportunity to cross-examine the witness. Crawford, at 53-54.
Third, the witness must give the testimony at trial unless she
is unable to testify there.   To decide this case, then, the Court
need go no further than adopt a simple principle: A statement made
for a known DEA agent and directly implicating the accused is
testimonial within the meaning of Crawford. The statement that
was introduced was: "if I name names, my children will get killed."
immediately followed by whether he would cooperate against Movant
is clearly a violation of Crawford.   It is evident that the state-
ment  of "family killed" and "cooperation" was used in tandem with
the prosecution of Movant.   The authorities (DEA) were securing
information and evidence for the presentation at Movant's criminal
trial.

The problem arises in this particular case where the statement
of the cooperating witness's action are also introduced.   Specif-
ically, "seeing Mr. Williams' reaction, I asked him, 'how long
have you known him?'" (Tr. id)  It is evident that Williams was
implicated in this ancident and the Agents reactions to Williams
acknowledging Movant's voice prompted the statements on cooperat-
ion.  The statements of cooperation  directly strikes at an involv-
ement in the charged offense.  Any statement directed at Williams
actions or expressions when he hears Movant's voice becomes con-
frontational from that point forward.  There is only one reason
the Williams' statements were introduced at trial and that was for
the prosecution of the Movant for criminal charges.   Therefore,
the Sixth Amendment's Confrontation Clause is implicated.

13

3.    Counsels Were Ineffective for Failing to Object, or
      Preserve For Appellate Review, the Prosecution's Use
      of Feddie Williams' Reactions to Movant's Voice as a
      Violation of Confrontation Clause.

The Confrontation Clause provides that "[i]n all criminal prosecu-
tions, the accused shall enjoy the right... to be confronted with
the witnesses against him."  Unlike some clauses of the Constitu-
tion, this one does not merely prohibit a given procedure.  Rather,
like the rest of the Sixth Amendment, it provides an affirmative
guarantee of the procedkure described.  Witnesses against the accused
must give their testimony subject to confrontation by the accused—
in his presence, subject to an opportunity for cross-examination and
at trial if reasonably possible.  Assuming the accused has not waived
or forfeited the right; no other way of giving testimony is permiss-
ible.  Thus, the Confrontation Clause would be violated if a prose-
cution witness's testimony according to a Williams' reactions and
statements is presented to the jury without confrontation and the
accuser that provided the statement is not "available" for cross
examination.  The Supreme Court in Davis v. Washington, 126 S.Ct.
2266 (2006) clarified that the Sixth Amendment confrontation clause
ruling presented in the Crawford decision applies to statements made
to law enforcement officers via an affidavit prepared at a scene.
In essence, the Davis decision has extended the Crawford opinion not
only to confrontational statements, but to tangible items, such as
sworn documents, and reactions to a defendants voice that can be
authenicated by law enforcement officer's should the witness become
"unavailable" before trial. The authenication is met when the agent
follows through with the statements on cooperation.  The Supreme
Court in Davis, supra determined that it is entirely clear from

14

the circumstances that the interrogation was part of an investigation into possible criminal past conduct, as indeed, the testifying officer expressly acknowledged.  Similarly, the DEA acknowleged that the questioned Williams on cooperation only after he heard Carmichaels voice being in the adjacent room.

The statement in the Davis opinion, was a tangible item that was used to introduce evidence against the accused without the safeguards of the confrontation clause.  The confrontation clause is violated when the accused is not able to confront the party who, as in Davis wrote the affidavit, or in  Movant's  case indirectly provided a statement of fear when hearing  Movant's  voice.  The statement introduced via law enforcement officer becomes confrontational at this stage.

In this case just as in Davis there was no emergency in progress.  The sole purpose of questioning Williams on cooperation after his reactionwas for future prosecution. "The text of the Confrontation Clause reflectsthis focus [on testimonial hearsay]. It applies to 'witnesses' against the accused–in other words, those who 'bear testimony.'  It is evident that the purpose of inquiring on the statement and requesting cooperation, was to "bear indirect testimony" against Movant.

Since the Supreme Court has left the possibility that other situations may arise that may entail the application of the confrontational clause, the Court in Johnson v. State, 929 So.2d 4 (Fla. App. 2 Dist. 2005)[*] extended the Crawford position rightfully

---

[*]   Although Johnson is state case and has no binding precedent in this Court, the case shows how the Supreme Court's Crawford decision extends to tangible items that can provide indirect accusatory statements.

15

to the admittance of an FDLE Laboratory Report that was submitted
to establish the "result" of a charged offense at trial. In that
case, the FDLE Report was admitted at trial to establish the results
of a lab report on whether a substance was in fact a narcotic. In
remanding, the State concluded the FDLE report is testimonial and
subject to the confrontation clause in light of Crawford and Davis.

Accordingly, this Court should agree that the sole purpose of
presenting the statements made by Williams was to establish "past
events." The District Court's blanket admission of the statements
that were made at the direction of the DEA, should have been sup-
pressed as they are a clear violation of Movant's Sixth Amendment
Constitutional Rights and are in direct coflict with the Supreme
Court's decision in Crawford.

4.   Attorney Stephen Robert Glassroth was Ineffective For
     Advising Movant to Meet With Federal Agents Without
     Counsel's Presence.

After being arrested on the instant charges and released on bail,
the Movant was notified by defense counsel Stephen Glassroth that he
(Movant) could retrieve his briefcase and documents seized from the
Movant at time of arrest (See Affidavit of Leon Carmichael, Sr.,
pg.1 ¶2). Prior to meeting with DEA Agents for purpose of retrieving
his property, Movant consulted with Attorney Glassroth about the
matter (id. pg.1 ¶2). Attorney Glassroth advised Movant to meet with
DEA Agents at the DEA's Montgomery office, and that Movant would not
require attendance of attorney for the meeting (id. pg.1 ¶2).

Following counsel's advice, the Movant drove to the DEA's Mont-
gomery office on December 4, 2003, to retrieve his personal property.
At the location Movant was met by DEA Task Force Agent David DeJohn
and DEA SA Bob Greenwood (id. pg.1 ¶3). After waiting in the room for

16

a few minutes Movant retrieved his property and exited the premises. Movant did not have any conversation with agents aside from general courtesies (id. pg.1 ¶3).

Subsequent to his meeting at DEA's office, Movant learned that the agents were claiming that Movant had made incriminating state- ments during retrieval of property. Specifically, agents alleged that Movant expressed discontent about negative publicity and its affect on his business; that Movant could not trust his attorneys; that Movant would be in prison for life; and had stated to agents that "you got me." The prosecution ultimately used Movant's alleged statements as evidence during Movant's trial (Tr. Vol. 6/9/08, pgs. 83-87; 6/13/08, pgs. 264-66).[2] And, not surprizingly, the prose- cution beat the "you got me" drum all the way through Movant's trial which unduly prejudiced Movant's criminal proceedings, as any alleged "confession" would do.

Movant contends that Attorney Glassroth's advice instructing the Movant to meet with DEA agents in absence of counsel or witness was deficient performance which resulted in prejudice to Movant's criminal proceedings depriving him of effective assistance of counsel and a fair trial.[3] Attorney Glassroth's instructions advising the Movant to engage with law enforcement agents without the presence of witnesses or counsel was objectively unreasonable advice resulting

---

[2]  The District Court did not allow Movant's putative comments related to dissatisfaction with defense attorneys to be intro- duced in evidence.

[3]  When the District Court addressed this issue prior to Movant's conviction it found that such claim was premature, and that the record was not developed sufficiently to make a determination on the merits of Movant's ineffective assistance of counsel claims. See U.S. v. Carmichael, 372 F. Supp.2d 1331 (M.D. Ala. 2005)(DE#407).

in Movant's supposed incriminating statements to law enforcement.
Huckelbury v. Dugger, 847 F2d 732 (11th Cir. 1998)(assuming that
counsel's conduct advising defendant to be cooperative with law
enforcement may be ineffective, but not in the facts of present
case); U.S. v. Lewis, 117 F.3d 980 (7th Cir. 1997)(counsel's advice
that defendant talk with law enforcement reasonable strategy con-
sidering facts of case). Unlike the facts presented in Dugger or
Lewis, Attorney Glassroth's decision to allow Movant to meet with
law enforcement agents alone was not objectively reasonable strategy
under the circumstance, and therefore counsel's actions amounted to
deficient performance, which ultimately prejudiced Movant's criminal
proceedings by allowing agents to claim Movant "confessed" to the
charges.

5.  Counsels Failed to Adequately Advise Movant Related to
    Case, Sentence Exposure, Nor Diligently Pursue and/or
    Convey Plea Negotiations.

Movant alleges that counsels collectively failed to provide him with
adequate and complete legal advice related to the facts and law of
Movant's criminal case. In absence of effective legal advice Movant
was unable to make an informed and intelligent decision whether to
plead guilty or risk a jury trial. Consequently, Movant's criminal
proceedings were prejudiced insomuch as Movant most probably could
have disposed of this case through plea negotiations instead of an
ill-advised jury trial resulting in a 40 year prison sentence.

At no time did any of Movant's defense attorneys explain the
nature of the criminal charges, the weight and extent of prosecu-
tion's evidence, and failed to advise Movant of law and exposure
related to applicable sentence if Movant was convicted as charged

18

(Carmichael Aff. pgs.3,4 ¶¶12-15).

Instead of giving Movant an adequate and comprehensive assess-
ment of the charges against him, and the available options, counsels
ran headlong into the case with only one strategy in mind, which was
take the case to trial no matter what. The Movant asserts that the
case should have been resolved through plea negotiations instead of
turning a run-of-the-mill marijuana case into a nightmare of nega-
tive publicity, conflict, and 40 year sentence for Movant.

Had counsels informed Movant of the prosecution's possession of
—and ability to use at trial—certain evidence/testimony, Movant
would have given much more thought to the option of pleading guilty
instead of going to trial (id. Aff. pgs.3,4 ¶¶14-15).[4/] Whenever the
Movant raised the possibility of a plea deal with attorney James,
she would defer the matter to Attorney Wayne and nothing was done on
plea negotiations (id. Aff. pgs. 2-3 ¶¶9-10, pg.9 ¶33). Further,
counsels failed to explain to Movant applicable sentence exposure
and application of Federal Sentencing Guidelines (i.e. enhancement
provisions)(id. pg.3, ¶¶12-13). At no time was Movant informed that
a guilty verdict after jury trial could result in a 40 year prison
sentence (id. pg.3, ¶12). On the contrary, Movant was specifically
advised that he faced at the most "around ten years" if found guilty
(id. pg.3 ¶12). The Movant had expressed a desire for counsels to
attempt plea negotiations, and it seemed unusual that the United

---

4/    Movant's attorneys never advised him of the prosecution's
      ability to introduce at trial hearsay testimony, state-
      ments made by non-testifying codefendant (Freddie Williams),
      evidence of other criminal conduct not alleged in the
      indictment, and statements made by others not intrinsic
      to case. Moreover, counsels failed to advise Movant that
      the government could use pardoned conviction to increase
      his sentence.

States Attorney's Office never offered to resolve this case short of trial (id. pgs.2-4 ¶¶8-15).

To be sure, the Movant would most likely have pled guilty and agreed to settlement of forfeiture had the Government made any reasonable offers (id. pg.4 ¶15). Although Movant personally felt that the criminal charges were unfounded, a guilty plea may well have been the best course of action under the circumstances. See North Carolina v. Alford, 400 U.S. 25, 33 (1970)("reasons other than the fact that he is guilty may induce a defendant to so plead... and he must be permitted to judge for himself in this respect"); Lalani v. U.S., 2009 U.S. App. LEXIS 3847 (11th Cir. 2009)(rejecting district court's finding that claim of innocence belies allegation that defendant would have pled guilty).

It seems that counsels' interests conflicted with the Movant's insomuch as it was in Movant's best interest to minimize notoriety of case and seek plea negotiations towards amicable resolution of criminal charges. On the other hand, it was in the lawyers' best interest to fan the flames of publicity and milk the case for all it was worth. An attorney with the Movant's best interest in mind would have,among other things: (1) advised Movant against creating adverse publicity with the infamous Carmichael website instead of enabling such folly; (2) sought to minimize antagonism between the defense and the United States Attorney's Office in order to engage in plea agreement negotiations towards favorable resolution of case; and (3) been forthcoming with Movant about the facts and law of case instead of exploiting Movant's predicament to seek inconscionable reward. Alternatively, counsels were unbelievably incompetent.

Had counsels provided the Movant with effective assistance there is a reasonable likelihood that Movant would have pled guilty. cf. Trejo v. U.S., 66 F.Supp.2d 1274, 1285-86 (S.D. Fla. 1999)(defendant "detrimentally relied" on counsel's advice, and there was reasonable probability that defendant would have pled guilty to a lesser term of imprisonment)[See id. Aff. pg.4 ¶15].

Finally, after the criminal proceedings and jury verdict, it was revealed that the prosecution had previously offered Movant a five year plea deal (See id. Aff. pg.7 ¶¶28-29). During the asset forfeiture proceedings AUSA Feaga and Attorney Susan James were discussing a previous deal/offer having Movant testify at trial against former Montgomery police Lt. George David Salum, III, which Movant never heard before. During the discussion Movant heard attorney James mention a previous offer of five years in exchange for Movant's guilty plea (id. pg.7 ¶¶28-29). When Movant asked James about the offer, she deferred the issue to Lead Attorney Lisa Wayne (id. pg.7 ¶28). At no time did any attorneys convey to Movant a five year plea agreement offer prior to trial (id. pgs.7,8 ¶¶28-30).[5/] Had counsels provided effective representation and informed Movant of a five year plea agreement offer, there is little doubt that Movant would have accepted that offer instead of risking a jury trial (id. Aff. pg.4 ¶15; pg.8 ¶¶29-30). Diaz v. U.S., 930 F.2d 832, 835 (11th Cir. 1991) ("counsel has an obligation to consult with client on important decisions and to keep [client] informed of important developments in the course of the prosecution"). The attorney's obligation

---

5/   It appears that the Government also made an offer while the jury was out deliberating and Movant was not informed of that until after the jury had reached a verdict (id. Aff. pg.8 ¶29).

includes informing a client about plea offers by the government. Prez v. U.S., 277 Fed. Appx. 966, 968 (11th Cir. 2008); Ramirez v. U.S., 260 Fed. Appx. 185 (11th Cir. 2007)(remanding case for evidentiary hearing on § 2255 allegations that counsel failed to convey plea offer).

6.   **Counsels Failed to Move For Bill of Particulars and Failed to Properly Procure Pretrial Notification and Discovery.**

A bill of particulars under Rule 7(f), F.R.Crim.P., serves to inform the defendant of the charges against him with sufficient precision to allow him to prepare his defense and to minimize the dangers of surprise at time of trial. U.S. v. Warren, 722 F.2d 827, 828-29 (11th Cir. 1985). Counsels for the Movant did not move for a bill of particulars which resulted in prejudice to Movant's criminal case.

Not only was Movant not apprised of certain evidence by his attorneys (See Issue 2 above), the prosecution apparently failed to notify Movant's attorneys as to a large amount of evidence until the middle of trial. Counsels for the Movant complained to the Court numerous times about being "ambushed" by the Government's midtrial disclosure of evidence/testimony against the Movant.[6] For example, the prosecution did not disclose until trial allegations that the Movant had ordered the attempted murder of cooperating witness Jimmy Timmons (Tr. Vol. 6/13/05, pp. 96-178); that the Movant engaged in marijuana trafficking with Richard Thomas and Eric Peagler (Tr. Vol. 6/13/05, pp. 62-74; 6/14/05, pp. 70-151 respectively); that the

_____

[6]   See Tr. Vol. 6/13/05, p. 80 (Attorney Wayne accused Government of "trial by ambush"); 6/14/05, pp. 23-34, p. 138 (attorneys again complain about Government's "ambush" practices related to late disclosure).

Movant was connected with seizures of controlled substances and
large amounts of U.S. currency by others (Tr. Vol. 6/10/05, pp. 217
- Vol. 6/13/05, p. 60); that the Movant was adulterous and fathered
children with an underaged woman (Tr. Vol. 6/7/05, pp. 295-300);
that Movant and his son were murderers; and that Movant had threat-
ened individuals associated with the case (Tr. Vol. 6/8/05, p.165,
ln. 14, 6/9/05, pp. 284-85).

Movant alleges that counsels were not only deficient for failing
to advise him of the Government's ability to use all of the above
"evidence", but also were deficient for not taking any measures to
discover such evidence by filing appropriate motions under Rules 7(f)
and 16(a)(1)(E)(i)(ii), F.R.Crim.P., and properly arguing issue when
Government failed to comply with discovery rules. Movant should have,
but was not, apprised of all evidence that could have affected the
outcome of his criminal trial—which may have persuaded the Movant
to plead guilty instead of risking trial and 40-year sentence (id.
Aff. pg.8 ¶29).

Assuming that counsels were aware of the evidence/discovery
they claimed to be "ambushed" by, then Movant contends that coun-
sels were ineffective for not apprising him of such prior to his
decision to exercise his right to jury trial in this case. A defen-
dant "has a right to expect at least that his attorney will review
the charges with him explaining the elements necessary for the
Government to secure a conviction, disscuss all the evidence as it
bears on those elements..." Smith v. U.S., 348 F.3d 545, 553 (6th
Cir. 2003)(emphasis added). To be sure, the Movant was most cert-
ainly "ambushed" at trial with "evidence" that he should have been

23

advised of prior to going to trial (id. Aff. pgs.3-4 ¶14).

7.   Counsels Failed to Adequately Investigate Case, Review
     Available Information and Properly Use Favorable Evidence
     to Formulate Defense Strategy and Effectively Defend
     Movant at Trial.

Movant's attorneys formulated a defense strategy around the fact that
law enforcement had thoroughly investigated Movant for several years
without bringing criminal charges.  According to Attorney Lisa Wayne
this "strategy" had been effective in the past with other clients
(See id. Aff. pg.4 ¶16).

     Not long after the criminal trial commenced it was apparent that
counsels' "strategy" was not adequately founded in law or fact, and
ultimately became a strategy for the Government to convict Movant.
Because of counsels' long-investigation-with-out-charge strategy the
door was left wide open for the Government to admit highly prejudicial
evidence/testimony that otherwise would not have come into evidence.
The first sign of trouble came when DEA Agent Tom Halasz was allowed,
over objections, to testify that the first investigation of Movant
ended because the cooperating informant ("CI") was in fear of his
life and afraid the Movant might kill him (Tr. Vol. 6/9/05, pgs.255-
256; 283-84).  Counsels' strategy in this regard may have been objec-
tively reasonable had counsel not failed to review the record and
know that the CI's fear of being killed by Movant was revealed at
Movant's detention hearing on November 24, 2003.  The AUSA argued
that defense opened the door for the testimony by pursuing the long-
investigation-without-charges defense theory, and the threat issues
were brought out during Agent Halasz' testimony at Movant's detention
hearing (id. pgs. 262-63).  The District Court agreed with the AUSA
and found that the defense had opened door for evidence (id. pg. 264).

After denying defense counsel's motion for mistrial because of Agent Halasz' reference to CI's fears, the Court asked Movant's attorney (Lisa Wayne) why she was going into the area of past investigations (id. pg. 268-69).  Attorney Wayne responded by stating that in her twenty years of experience the strategy worked with juries (id. pg. 271).  Counsel later conceded that the information about CI was indeed revealed at the Movant's detention hearing (id. pg. 278). The record shows that counsels pursued the risky defense without first doing adequate preparation.  Consequently, Movant's criminal proceedings were prejudiced and Movant was denied effective assistance of counsel as guaranteed by the Sixth Amendment cf. Holsomback, 133 F.3d at 1387-88 ("informed tactical decision" could not be made without adequate investigation and prepatations).[7]

Finally, assuming that counsel's long-investigation-without-charges theory was a valid defense strategy—and Movant argues that it was not— there existed compelling evidence available that counsels did not use.  For example, United States Attorney Louis Franklin authorized the official close of IRS investigation of  Movant, and made reference in agency documents that there was no evidence of any illegal drug activity by Movant.   Counsels failed to use  United States Attorney Franklin's compelling statements, or the documents pertaining to such.  Counsels' lack of preparation with respect to the long-investigation-without-charges strategy clearly prejudiced the Movant's criminal proceedings under Strickland, supra.

---

[7]   Incredulously, Attorney Wayne tried to argue her own ineffectiveness in this regard.  See Tr. Vol. 6/10/05, pgs. 37-38.  Attorney Wayne moved for mistrial based on her own ineffectiveness for pursuing strategy that opened door for highly prejudicial evidence/testimony against Movant.

8.   Counsels Pursued a Fundamentally Flawed Defense Strategy
     That Lacked Necessary Trial Preparation, or Objectively
     Reasonable Basis in Law, and Opened the Door for Unduly
     Prejudicial Evidence by the Government.

As previously stated in Issue 7 above, counsels pursued a defense
strategy formulated around the Government's previous multi-years
investigation of the Movant that ended without criminal charges.
The Movant alleges that counsels pursued the long-investigation-
without-charges strategy without adequate preparation (See Issue 7
above), and such strategy prejudiced the Movant's criminal proceed-
ings because it opened the door for the prosecution to introduce
evidence/testimony that was otherwise inadmissable.

     Due to counsels' failure to adequately investigate and research
the long-investigation-without-charges strategy (See Issue 7 above)
the Movant's criminal proceedings were prejudiced because the Gov-
ernment was allowed to introduce prejudicial testimony/evidence that
otherwise would not have been allowed into evidence.  For example,
as touched upon in Issue 7 above, the Government brought in evidence
that the CI refused to continue cooperating because he feared for
his life. (Tr. Vol. 6/9/05, pgs. 255-56; 283-84).  Additionally, the
Government brought out evidence and witnesses suggesting that Movant
was involved in drug trafficking during the time that the previous
investigations were being conducted but somehow was not considered
incriminating against Movant at the time.

     Although related to Issue 7 above, this claim specifically add-
resses the consequences of counsels' flawed strategy rather than
counsels' deficient performance researching, investigating and pre-
senting the defense.

9.   Counsels Failed to Interview Potential Witnesses and Failed
      to Call Favorable Witnesses in Movant's Defense.

Movant alleges that he was denied effective assistance of counsel

because counsels failed to interview and call to testify individuals

who possessed favorable information and knowledge material to Movant's

defense case.

    Prior to trial counsels should have known that the prosecution

would use evidence Movant was involved in drug trafficking based on

drug trafficking activities of others connected to Movant.   In par-

ticular Sandra Jones, among others.   In fact, the prosecution's case

against Movant was founded primarily on activities of other people,

especially Sandra Jones' criminal activities. (See Tr. Vol. 6/10/05,

pp. 217-  ; Vol. 6/13/05, pg. 50, pp. 96-178).   By  introducing

evidence of Ms. Jones' and others' drug trafficking activities the

prosecution established a circumstantial case of Movant's involvement

in such conduct.  Ms. Jones had been arrested in  Mississippi  for

having approximately 62 kilograms of marijuana in a commercial truck

she was driving that was owned by Movant. (id. Tr. 6/10/05, pp. 268-

314).  Also, Ms. Jones was stopped at El Paso, Texas, airport with a

large amount of United States currency which the prosecution implied

belonged to the Movant (id. pgs.217-58).

    Counsels should have, but inexplicably did not, call Ms. Jones

to testify at Movant's trial.  Ms. Jones would have testified that

she was acting on her own accord; without the Movant's knowledge or

consent, when she had the above referenced interactions with law

enforcement in Mississippi and Texas. (Affidavit of Sandra Jones,

pgs. 1-2).

    Additionally, Attorney Susan James was specifically advised

by Movant prior to trial that one of her former clients (Eric Peagler) was planning to "cooperate" with law enforcement on Movant's case in order to get a sentence reduction. (Carmichael Aff. pg.5 ¶18-20). More specifically, the Movant informed Attorney James in early part of 2005, that an individual named Willie DeWhart was at Edgefield FCI in South Carolina with Peagler and that Peagler had told DeWhart that he (Peagler) did not know the Movant personally, but had read some local newspapers from Montgomery, Alabama, area and was going to testify at Movant's trial for a sentence reduction (id. Aff. pgs. 4-5 ¶¶17-20).  Peagler had attempted to recruit DeWhart in his scheme to "cooperate" against Movant in order for DeWhart to also get a sentence reduction.[8]

After Movant notified Attorney James about DeWhart and Peagler, another individual named Authur Covane contacted the Movant and told him that Peagler had been calling him (Covane) from Edgefield FCI. During these conversations Peagler told Covane that he (Peagler) did not know the Movant, however DEA Agents told Peagler that Carmichael had told them that Peagler was involved in drug trafficking.  Therefore, Peagler was going to "cooperate" against  the Movant to get a sentence reduction (id. Aff. pgs.4-5 ¶17).

Ultimately, Peagler did testify against Movant. (Tr. Vol. 6/14/05, pp. 70-151).  Peagler's testimony was highly prejudical to Movant's criminal case because Peagler's testimony served to put fifty pounds of marijuana in Movant's hands—something none of the Government's other witnesses except Richard Thomas, who colluded with Peagler to

---

[8]   Peagler eventually did testify at Movant's trial and did receive a sentence reduction under Rule 35(b), F.R.Crim.P. U.S. v. Peagler, 2007 U.S. Dist. LEXIS 66847 (M.D.Ala. 2007).

provide perjured testimony, could do for the prosecution's case.

Counsels should have called available witnesses to impeach and discredit Peagler's testimony. Specifically, counsels could have called Peagler's Mexican coconspirators involved with Peagler's drug case. Movant has reason to believe that Mexicans would have testified contrary to Peagler's testimony. Further, counsel failed to call (or interview) Arthur Covane or Willie DeWhart who would have testified that Peagler told them he (Peagler) was going to fabricate testimony against Movant for sentence reduction (id.Aff.pgs.5-6,¶21).

Further, counsels failed to call Joseph "Pie" Lacey to testify at Movant's trial. Lacey would have testified that he met Sandra Jones in 2000-01 and could not have been getting marijuana from the Movant through Jones in 1994 as testified to by Jimmy "School Boy" Timmons (id. Aff. pgs.5-6 ¶21; Sandra Jones Aff. pgs.1-3). Also, Lacey could have presented informative testimony with respect to circumstances occuring at J&L Fashions before Lacey's arrest and otherwise empeached Timmons' testimony (id. Aff. pgs.5-6, ¶21).

Although called to testify at Movant's trial, counsels failed to have Bruce Maddox—former Alabama State Prosecutor who prosecuted Sandra Jones in a state drug case—testify about the circumstances related to Jones' drug charges. Maddox would have testified that Movant was not in any way involved in that case, and that Jones was involved with drugs long before meeting Movant in 1993 (Jones Aff. pgs.1-3).

Finally, counsel failed to call Moses Williams to testify to his involvement with DEA related to Movant. Williams would have testified to the circumstances related to his involvement with the

29

DEA.  Specifically, he would have testified that he basically lied to the DEA in an effort to get money from them and he lied about Movant's involvement in illegal drug trafficking.  Also, Williams would have testified that he was not afraid of Movant, but told the DEA this to justify backing-out of his "cooperation" scheme (Tr. Vol. 6/9/05, pgs. 315-321; id. Aff. pg.5 ¶21).  The prosecution had pre-sented DEA Agents' testimony suggesting that the only reason the DEA discontinued investigation of Movant was because the cooperating witness (Moses Williams) stopped "cooperating" due to his fear of Movant (id. Tr. pgs.283-285).  Counsels should have called Williams as a defense witness to show that the original DEA investigation was founded on false statements by Williams, and there was no genuine fear as cause for Williams' decision to discontinue his "cooperation" with authorities.

10.  Counsels Failed to Properly File Motions to Suppress
     Alleged Incriminating Statements and Illegally Seized
     Firearms During Unlawful Traffic Stop and Arrest of
     Movant.

The Movant alleges that he was deprived of effective assistance of counsel when counsels failed to properly litigate motions to suppress certain incriminating statements that Movant allegedly made to DEA Agents and evidence (firearms) and documents seized during an unlaw-ful traffic stop and arrest of the Movant.

In its case-in-chief the prosecution introduced—through two DEA Agents—statements purportedly made by the Movant  during a meeting with the agents on December 4, 2003.  DEA Agent Greenwood testified that the Movant came to the DEA Office in Montgomery on December 4, 2003, in order to retrieve some property being returned and said, among other incriminating statements, that "you got me."

(Tr. Vol. 6/9/05, pp. 83-87).  Also, Task Force Agent DeJohn testi-
fied to the same alleged incriminating statements (Tr. Vol. 6/13/05,
pp. 264-66).  These alleged statements to law enforcement agents
caused substantial prejudice to Movant's criminal case.

Additionally, the Government introduced at the Movant's trial
evidence of several legal firearms seized from the Movant's vehicle
on the day of his arrest on November 17, 2003 (Tr. Vol. 6/9/05, pp.
161-66).  The  firearms were seized as a result  of  an  unlawful
traffic stop and arrest by local police.[9/]

Officers did not have probable cause to stop or make arrest of
Movant, and therefore any evidence seized or statements made as a
result of the stop/arrest should have been suppressed.  And counsels
were ineffective for not properly seeking to have firearms seized
from his vehicle on November 17, 2003, and alleged statements made
to the police on December 4, 2003, suppressed as fruits of an illegal
search/seizure and arrest.  Kimmelman v. Morrison, 477 U.S. 365, 375
(1986)("where defense counsel's failure to litigate a Fourth Amend-
ment claim competently is the principle allegation of effectiveness,
[Movant] must further prove his Fourth Amendment claim was meritor-
ious").[10/]

With regard to the alleged statements made by the Movant at the

---

9/   Although Attorney Glassroth filed a motion to suppress
     (DK #71), the Movant alleges that such motion failed to
     argue for suppression of evidence based on unlawful arrest
     and failed to properly argue for suppression based on
     illegal stop.  The same applies to Attorney Chartoff's
     motion in limine filed later (DK #278).

10/  It should be noted that the District Court observed on
     the record that police did not have any reason to arrest
     the Movant on November 17, 2003 (Tr. Vol. 6/9/05, pg.
     176).  See infra.

DEA Office, counsel failed to effectively litigate the issue and
develop facts during the suppression hearing before Magistrate Boyd
on March 1, 2004.  During the trial, Movant reminded Attorney Wayne
about the circumstances of the visit, which caused counsel to ask
DEA Agent Bob Greenwood to perform a demonstration with chairs (Tr.
Vol. 6/9/05, pp. 87-89).  As a result of the demonstration, which
supported the improbability of the Agent's story related to the
Movant's visit to the DEA Office, counsel moved to renew the motion
to suppress statements (id. pg.151).  Unfortunately, the Court denied
motion, finding that counsels could have brought the matter to the
attention of Magistrate Boyd during the suppression hearing (id. pp.
151-52).  Had counsels adequately prepared for and effectively liti-
gated the Movant's suppression motion/hearing, there is a reasonable
probability that Magistrate Boyd would have suppressed prejudicial
statements. Kimmelman, supra.  Alternatively, newly retained counsel
(Wayne & Co.) should have sought to re-open suppression motion/hear-
ing issues due to Attorney Glassroth's ineffectiveness related to
those proceedings.

With regard to the November 17th traffic stop, counsels never
even attempted to seek suppression of the firearms seized from the
Movant's vehicle that day based on an unlawful arrrest.  The Gov-
ernment used the guns as evidence against the Movant at his trial.
(Tr. Vol. 6/9/05, pp. 161-66).  The weapons included a Taurus .40
cal. handgun, Beretta shotgun, Springfield .45 cal. handgun and
ammunition (id). Additionally, the Government used documents that
connected the Movant to another alleged conspirator found in the
vehicle, as well as a large amount of United States currency (id.)

None of this highly prejudicial and inflammatory "evidence" should have never seen the light of day at the Movant's trial. Even assuming that the November 17th stop was not a violation of the Fourth Amendment's protection from unreasonable search and seizures, the Movant's arrest on November 17th was unlawful. The following colloquy occurred between the AUSA and the Court related to the Movant's arrest:

> AUSA: Well, Your Honor, the inference for the jury is that they had absolutely no reason to make the arrest--
>
> COURT: As far as I'm concerned, they didn't have a reason.  He was pardoned.
>
> (Tr. Vol. 6/9/05, pg. 176, lns. 1-5).

Had counsels filed a motion to suppress evidence seized on November 17th based on unlawful arrest, there is reasonable probability that the District Court would have ruled to exclude guns, documents, and money as fruits of an illegal search and arrest. Eleventh Circuit Criminal Handbook, Donald F. Samuel (2005), §§ 115, 127; Moore's Federal Practice (Criminal), § 604.06 Consequence of Unlawful Arrest (Remedy for unlawful arrest is suppression of evidence or statements subject of unlawful arrest).

Furthermore, Movant could argue that any alleged statements to law enforcement officers made subsequent to an unlawful arrest should also have been suppressed.  Consequently, the alleged statements to DEA Agents on December 4, 2003, should not have been used during the Movant's trial. So, counsels were ineffective for not making an argument for suppression of the December 4th statement to DEA Agents as they were the  fruits of Movant's unlawful arrest on November 17, 2003.

Finally, counsels were ineffective for failing to properly and

timely move to suppress statements and gestures made by Movant's codefendant, Freddie Williams. At the time of Movant's booking process the DEA testified that Williams' demeanor changed when he heard Movant's voice in the other room (Tr. Vol. 6/9/05, pgs.221-25). And then, according to DEA Agent Halasz, Williams stated that "if I name names my kids will be murdered" (id. Tr. pgs.222-25). Kimmelman, supra 477 U.S. at 374-76.

11. Counsels Were Ineffective for Opening Door to Highly Prejudicial Evidence and Failed to Reconsider Trial Strategy Accordingly.

In December of 2003, shortly after his arrest, the Movant set up a website (www.Carmichael.com) as a public relations device and to gather information for investigative purposes related to the criminal case. In April 2004 the site added the names of people associated with case, including DEA Agent David DeJohn. The website included photographs of individuals involved with the case and it invited public imput and comment on the case. Movant also ran similar type articles in the Montgomery Westside Weekly, a local newspaper. The Movant agreed with defense attorneys' advice that they should not expose the website to the jury as a seemingly reasonable defense strategy (Carmichael Aff. pg.4 ¶17).

Initially, it may have been prudent to keep the website and related matters away from the jury to prevent confusion, distraction and possible prejudice against the Movant; however, as the case progressed the lawyers should have re-evaluated the "keep-website-from-jury" strategy. Three significant events occurred prior to and during the trial that should have, but did not, cause defense counsels to reassess the defense strategy related to website.

34

First, it was discovered through voir dire examination that most, if not all, of the jurors had some exposure to the website via media coverage prior to Movant's criminal trial. Next, Attorney Brunson violated the cardinal rule of cross-examination of witness by asking a question he did not know the answer to, or should have, but foolishly asked it anyway. During the cross-examination of Sherry Pettus (Tr. Vol. 6/10/05, pgs. 50-216), Attorney Brunson asked Ms. Pettus how come she "hated" Movant Carmichael, which immediately brought the 800 pound gorilla of the website to jurors' attention (id. pg.193). The Court was not pleased about the website being brought out during trial after precautions were taken to prevent such. The Court advised defense counsel (Brunson) that even the Court expected Ms. Pettus' answer and couldn't understand why counsel didn't also (id. pg.194). Despite the jury's obvious knowledge of the website through Pettus testimony, no curative actions were taken and examination of Ms. Pettus continued.

Finally, it was discovered in the midst of the criminal proceedings that DEA Agent DeJohn had filed a lawsuit naming Movant and most of his attorneys as defendants related to the website which depicted Agent DeJohn as being associated with Movant's criminal case (Tr. Vol. 6/14/05, pgs.262-74). Agent DeJohn's lawsuit precipitated an in-chambers discussion between the Court, defense attorneys and defendants during which time the Court suggested that defense attorneys reassess their strategy:

> COURT: I probably think you do need time to reassess
> your strategy. If you want to go into the
> website, I think that is a clear issue in this
> case now in light of your--of the lawsuit by
> Mr. DeJohn. You may want to call him back.

> You may want to go into does he [DeJohn] hold
> a bias against Mr. Carmichael because of this
> lawsuit. I think he probably does, and I
> think that's probably something that is rel-
> evant just like Miss Pettus spurted out of bias.
>
> (Tr. Vol. 6/15/05, pg.40, ln.17-pg.41, ln.2).

Attorneys Wayne and James may have been too distraught from the
rancorous exchange that preceded the Court's advice that they maybe
reassess their strategy.[11]

Movant alleges that counsels were deficient in their perform-
ance for not reassessing their strategy and deciding to "go into
website" issue and recall Agent DeJohn to question him about his
bias against Movant. had counsels taken this course of action they
could have presented the website issue in less nefarious terms than
the jury was allowed to infer, and the defense could have severely
damaged—if not completely impeached—the Government's principal law
enforcement witness's credibility at trial. Therefore, it is rea-
sonably possible that Movant's criminal proceedings would have
ended differently but for counsels' deficient performance. Strick-
land, 466 U.S. at 690-93; cf. U.S. v. Scheer, 168 F.3d 445, 452
(11th Cir. 1999)("the jury's estimate of the truthfulness and the
reliability of a given witness may well be determinative of guilt
or innocence, and it is upon such subtle factors as possible
interest of the witness in testifying false that a defendant's life
or liberty may depend"). The jury should have been informed of
Agent DeJohn's personal interest in the case and his bias against

---

11/   Prior to the Court's urging of attorneys to reassess the website
      strategy, Attorney Wayne accused Judge Thompson of being bias
      against Movant, losing his composure, and requesting that the
      Judge recuse himself from the case. (Tr. Vol. 1/15/05, pgs. 31-
      37). Attorney James thought the incident was "upsetting" and
      requested a recess (id. pg.40).

the Movant, and counsels were ineffective for not bringing such
information to the jury's attention, notwithstanding the fact that
the website would come completely into the adjudicatory lights.

12.  Counsel Susan James Labored Under a Conflict of Interest
     That Adversely Affected Movant's Criminal Proceedings.

On the fifth day the Movant's criminal trial, Attorney Susan
James made a record that Eric Peagler was on the Government's wit-
ness list (Tr. Vol. 6/13/05, pp. 52-54).  Further, Attorney James
advised the Court that she had represented Mr. Peagler related to
criminal matters in the past (id. pp. 52-53).[12/]  Movant alleges
that Attorney James labored under a conflict of interest as Peagler's
former (and possibly future) attorney representing the Movant, and
that such conflict adversely affected Movant's criminal proceedings.

     The District Court purported to resolve the conflict of inter-
est related to Peagler by having Peagler waive the conflict, then
directing Peagler not mention Attorney James' previous representa-
tion of him (Tr. Vol. 6/14/05, pp. 62-68). According to the District
Court's approach, the Movant had no interest in conflict created by
Peagler's previous representation by Attorney James.  And then James
pursuaded the Movant to allow her to conduct the cross-examination
of witness Peagler (Carmichael Aff. pg.6-7 ¶24; Tr. id. pg.68).
Conspicuously absent from Attorney James' cross-examination is any
questioning about Peagler's substantial criminal record, nor was
Peagler subject to any vigorous cross-examination.  Specifically,
questions as to drug quantities (i.e., how 80 lbs. of marijuana

---

12/  Apparently co-defendant Williams' attorney, Barry Teague, also
     represented Mr. Peagler at some point before, but the record
     does not contain specifics related to Teague's representation
     of Peagler (Tr. Vol. 6/13/05, pp. 54-55).

could fit into gas tank big enough for 30 lbs. maximum); types and
manner of contraband deliveries; phone calls Peagler made in 2004-05 from
prison to Authur Covane about fabricating testimony against Movant
to get a time cut; talks with fellow prisoner Willie DeWhart about
testifying falsely against Movant for time cut; and other questions going
to Peagler's credibility.   Attorney James appears to have protected
Peagler's interests by assuring her former client's ability to get
a sentence reduction. U.S. v. Infante, 404 F.3d 376 (5th Cir. 2005).[13]
The Fifth Circuit's holding in Infante is worth quoting here:

> Where defendant's trial attorney represented
> [witness] who testified against defendant, trial
> attorney labored under conflict of interest in
> violation of defendant's Sixth Amendment Rights
> because, once witness[] took stand to testify
> against defendant, trial attorney had to choose
> between vigorously cross-examining witness, which
> might have jeopardized their  chances of govern-
> ment filing F.R.Crim.P. 35 motion on their behalf,
> and not vigorously cross-examining them, which
> would risk allowing government to establish through
> their testimony that conspiracy did exist.

Infante, 404 F.3d at

Attorney James clearly had an interest to protect her former client's
ability to get a sentence reduction, and that interest directly con-
flicted with Movant's interest. cf. U.S V. Iorizzo, 786 F.2d 52 (2nd
Cir. 1986)(counsel's former representation of prosecution witness
created conflict of interest which lead counsel to forgo relevant
line of inquiry in questioning the witness).

To establish actual conflict for the purpose of Sixth Amendment
violation, the Movant must show that counsel's prior representation

---

13/   Attorney James had previously expressed her concerns about affect-
ing a former client's benefits under Rule 35(b) when she addressed
the Court about former client Salery. (Tr. Vol. 6/10/05, pg. 18,
lns. 6-13). Although  Attorney James did not raise this particular
concern with respect to former client Peagler, the conflict of
interest on this point is applicable to both.

of witness was substantially and particularly related to counsel's later representation of Movant. Smith v. White, 815 F.2d 1401 (11th Cir. 1987).   To establish adverse affect the Movant must show that there was (1) alternative strategy that was (2) reasonable under facts of case and (3) a link between conflict and alternative strategy. Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir. 1999).

Attorney James' previous representation of Peagler was most definately related to her later representation of the Movant.   In fact, Attorney James was notified by Movant of Peagler's possible cooperation against Movant as early as January/February of 2005 when Movant told counsel that Peagler was intending to testify against Movant (Carmichael Aff. pgs.4-5 ¶¶17-20).   Attorney James had available to her information that Peagler had told other individuals —while he was incarcerated at Edgefield FCI—that he did not have any personal knowledge about Movant but was going to testify against him anyway (id. pgs.4-5 ¶¶17-18).   There can be no reasonable excuse for Attorney James not to challenge Peagler's credibility, it was reasonable under the facts of Movant's case to vigorously attack Peagler's credibility, however counsel failed to do so and that omission was linked to the conflict of interest Attorney James labored under.

Considering the significance of Peagler's testimony, which put marijuana directly in the Movant's hands, the lawyers should have used any and all information to attack his credibility. Why Attorney James failed to use the information she had to discredit Peagler's testimony remains a question that the record before the Court fails to conclusively resolve, therefore an evidentiary hearing should be

conducted. <u>Burden v. Zant</u>, 871 F.2d 959 (11th Cir. 1989); <u>U.S. v.</u>
<u>Bowie</u>, 892 F.2d 1494 (10th Cir. 1990); <u>Perillo v. Johnson</u>, 79 F.3d
441 (5th Cir. 1996).

Interestingly, Attorney James had previously advised the Court
during trial that she contacted the Alabama Bar Association which
instructed her that a waiver from <u>both</u> former client <u>and</u> present
client was required (Tr. Vol. 6/10/05, pg.7, lns.28-pg.8, ln.1; pg.
16, lns.5-8). Nevertheless, the District Court ruled that it would
suffice for only Peagler to waive conflict (Tr. Vol. 6/13/05, pgs.
273-74). The Movant did not, and would not, waive the conflict of
interest that was created by Attorney James' prior representation of
Peagler (Carmichael Aff. pg.6 ¶23), and the fact that Peagler waived
the conflict did not protect <u>Movant's</u> Constitutional Right to con-
flict free representation.

## 13. <u>Counsels Labored Under Conflict of Interest that Adversely</u>
    <u>Affected Movant's Criminal Proceedings.</u>

On June 10, 2005, DEA Taskforce Agent DeJohn caused to be filed a
state civil action complaint naming Movant and some of his attorneys
as defendants in a lawsuit related to the Carmichael Website (Tr.
Vol. 6/14/05, pgs.262-70). The DeJohn lawsuit precipitated extended
in-chamber discussions (Tr. Vol. 6/15/05, pgs.5-42). Judge Thompson
acknowledged there being a problem "But, I don't think this Court
is at any obligation to remedy <u>your problem</u>.... we're going to fin-
ish this trial. And that's where it sits." (id. pg. 30, lns.17-25).
The Court went on to tell Movant's lawyers "Now, I just want you
to know, though, that <u>you all have to suffer</u> through this." (id.
pg.36, lns.8-9). Emphasis Added

Although DeJohn agreed to voluntarily dismiss the lawsuit

without prejudice during the trial, Movant contends that the spector

of the lawsuit created a conflict of interest between the Movant

and his attorneys because they were named as codefendants in the

lawsuit.  Attorney Lisa Wayne made a record related to the conflict

of interest presented by the prospects of lawsuit shadowing  the

defense lawyers (Tr. Vol. 6/15/05, pgs. 20-24).  And there was no

doubt in the Court's mind that a conflict existed when it observed:

> COURT: I think that what has happened to you as
> lawyers, if I were in your situation I
> would be <u>very concerned</u>.  You notice I have
> never said that you all did anything.  It
> was Mr. Carmichael.  If I was you as his
> lawyers, I would be very, very concerned.
> (Tr. Vol. 6/15/05, pg.40, lns. 10-15)
> Emphisis Added
>
> *     *     *
>
> COURT: If I were a practicing lawyer, I would not
> be want (sic) to be in your shoes.
> (Tr. id. pg.42, lns.9-11).

One of the most telling indications that Movant's interests

had diverged from those of his defense team would be Attorney Wayne's

urging the Movant to make a statement on the record to the  Court

(Carmichael Aff. pg.7 ¶25).  Attorney Wayne encouraged Movant to

make a statement that the website (with its ramifications)  was

solely the Movant's fault, and accepting responsibility for the

situation.  Attorney Wayne (or co-counsels) should never allowed

Movant to make the following statement before the Court:

> WAYNE: Go ahead.
>
> MOVANT: What I wanted to say, I take full respons-
> ibility for the website, the results what-
> ever happened.  I just hope it wouldn't
> have nothing to do with the attorneys or
> anyone else because it was my idea and I
> take full responsibility for it.
> (Tr. Vol. 6/15/05, pg.126, lns.9-12).

The only explanation for counsels allowing Movant to make the foregoing statement was because counsels' interest conflicted with that of Movant's with respect to DeJohn lawsuit vis-a-vis Movant's criminal proceedings.  When Movant attempted to argue there was a conflict of interest created by DeJohn lawsuit (DK#504) the District Court used the Movant's in-court statements referenced above as evidence of the lack of conflict of interest and waiver of  conflict-free  representation. U.S. v. Carmichael, 381 F.Supp.2d 1317, 1327 (MD Ala 2005).[14/]

Obviouly, Movant's attorneys were trying to protect their interest—at Movant's expense—during the criminal proceedings. By advising Movant to admit to the Court that the website was all his (Movant's) fault, counsels were protecting their own interests (i.e. to stay on case and avoid any future liability).  Attorney James certainly admitted as much in the Motion for New Trial she signed on August 15, 2005 (DK#504).  According to Attorney James, "In order to place defendant's attorneys in the best posture to defend against [DeJohn] civil lawsuit, blame for any problems claimed by DeJohn should have been directed to Carmichael" (id. pg.19).  And Attorney Wayne made sure there was a record made establishing all the blame for website on the Movant by advising Movant to inform the Court that website was all Movant's fault (Tr. Vol. 6/15/05, pg.126, lns.1-15).

In this case, the conflict of interest created by DeJohn's lawsuit—which was not cured by dismissal because threat of litigation

---

[14/]   It should be noted further that the Court observed in its opinion that Movant was not "yet in a procedural posture to properly alleged a violation of his Sixth Amendment right to effective assistance of counsel," id. pg.1322.  The Movant is now in the procedural posture (§ 2255) to address issue.

lingered—caused adverse affect on the lawyers' performance. Specif-
ically, as admitted by Attorney James in post-trial motions (DK#504)
the conflict caused attorneys James and Wayne to forego any further
cross-examination of Agent DeJohn (id. pg.18). Presumably, attorneys
James and Wayne were certainly not going to recall DeJohn and attack
his credibility with the evidence attorneys possessed, nor explore
DeJohn's bias against the Movant.[15/] The lawyers' decision not to
attack Agent DeJohn on the witness stand, and not bring-out the web-
site issue, was a strategy pursued to protect the <u>attorneys'</u> interest
not the Movant's. The alternative strategy (to recall DeJohn and
vigorously attack his credibility and explore his bias against Movant)
was far more reasonable under facts of the case, and the attorneys'
choice of strategy was directly linked to the conflict of interest.
<u>Freund</u>, 165 F.3d at 860; <u>McConico v. Alabama</u>, 914 F.2d 1543 (11th
Cir. 1990); <u>Eleventh Circuit Criminal Handbook</u> (2005), § 251(a), pgs.
600-02.

Attorney Wayne's statements during Movant's trial demonstrate
clear conflict—at least in counsels' position. Attorney Wayne
explained to the Court:

> WAYNE: Just because they now moved to dismiss a case
> without prejudice, that simply means she's
> going to file after the case is finished. That
> doesn't remove the taint in terms of what's
> gone on in the thought process of a potential
> defendant like myself and Miss James.
>
> *     *     *
>
> The reason it is an actual conflict is now I
> have knowledge that I will be sued as a defend-
> ant along with my client, Mr. Carmichael. The [cont'd...]

---

15/   The lawyers had ample ammunition to attack DeJohn with
(i.e. evidence of DeJohn's litigious nature, negative
police employment conduct, evidence of witnesses dis-
avowing the contents of DeJohn's DEA 6 Forms, etc....)

[...cont'd] reason that's important is that the actual
conflict is that there is not now (sic) a
financial stake of a conflict between Mr.
Carmichael and myself.

         \*        \*        \*

Mr. Carmichael knows that I now feel that
I'm going to be pointing the finger at him
possibly down the line in a civil suit say-
ing I have nothing do with this, this was
at the direction of my lawyers.

            (Tr. Vol. 6/15/05, pgs.20-22).

To be sure, Attorney Wayne eliminated the "other scenario" by having

Movant admit on the record that the website was all his fault—thus

protecting <u>her</u> diverging and conflicting interests.

Finally, setting aside Ms. Wayne's comments, and relying exclus-

ively on Attorney James' statements made in post-judgment motion (DK#

504), an objective reader would conclude Attorney James preceived a

substantial conflict of interest which influenced her strategical

choices in the case.  She admitted that there was a duty to <u>protect</u>

<u>herself</u> that competed with her duty to protect her client, the Movant

(id. pg.19).  Therefore, this Court should grant the Movant a new

trial accordingly.

<u>14.</u>  <u>Counsels Were Ineffective for Not Properly Objecting,</u>
    <u>Moving for Continuance and Arguing Issue Related to</u>
    <u>Prosecution's  Late Disclosure of Discovery Material</u>
    <u>and Brady-Type Evidence.</u>

According to Movant's attorneys the prosecution "ambushed" them all

the way through its case-in-chief by late disclosure of evidence,

witnesses and discovery material.  Movant alleges counsels were

deficient for not <u>effectively</u> arguing the matter related to the pro-

secution's numerous late disclosures during trial.

One egregious instance of late disclosure was the prosecution's

use of Government witnesses Richard Thomas and Eric Peagler who

44

testified to Movant's alleged involvement in prior marujuana trans-

actions.  Attorneys argued—unsuccessfully—for a continuance to

investigate Thomas and Peagler's history and testimony (Tr. 6/13/05,

pp.57-60; 6/14/05, pp.23-24).  Not once did counsel cite any case

law to support the request for continuance due to late disclosure.[16/]

Every time the prosecution "ambushed" the defense with late

disclosure the Court ruled that the defense was not entitled to the

disclosure of the material in question (id. pg.57).  Contrary to the

Court's ruling in this regard, a defendant is entitled to disclosure

of the type of witnesses and evidence used by the prosecution. Rule

16(a)(1)(E), F.R.Crim.P. (government must disclose evidence material

to the preparation of the defendant's defense); Eleventh Circuit

Criminal Handbook, (2005) § 205(a) Discovery, pg.498.

Had counsels properly researched the issue related tolate dis-

closure of discovery and continuances to allow for investigation of

late discovery, there is a reasonable probability that Movant could

have discovered—through investigation—that Government witnesses

Thomas and Peagler were not credible witnesses.  Of course, as Movant

has alleged in the foregoing claims that counsel knew, or should

have known, about the possibility of Thomas and Peaglers' testimony

prior to trial (Carmichael Aff. pgs.4-5 ¶¶17-20).  The Movant warned

Attorney James about Peagler's possible testimony, and even told her

that Peagler was located in th Elmoe County Jail waiting to testify

against Movant (id. Aff. p.6 ¶23).

---

16/   There is case law supporting defense requests for continuance
      because of the Government's failure to give timely notice.
      U.S. v. Verderrane, 51 F.3d 249 (11th Cir. 1995).

15.  Counsels Failed to Properly Object and Argue for Exclusion
     of Unduly Prejudicial Evidence of Prior Bad Acts Committed
     by the Movant.

On November 3, 2004, the District Court docketed Movant's "Motion in
Limine Regarding General Character Evidence" seeking to get disclos-
ure of any character evidence that the prosecution intended to use
(DK#279).  In response, the Government did not indicate that it would
introduce any instances related to the Movant's general character,
but did warn that evidence of Movant's involvement in a shooting
would be used (DK#317).[17/]

     As portended in its pretrial pleadings, the prosecution intent-
ionally introduced testimony and evidence of the Movant's prior bad
acts which had explosively inflammatory and unduly prejudicial impact
on the jury.  Specifically, the prosecution called to the stand
Jimmy Timmons who testified to, among other things, being shot in
the head by Sandra Jones at the direction of Movant (Tr. Vol. 6/13/05
pgs. 96-178).

     The prosecution also introduced evidence that the Movant was
unfaithful to his wife, contributed to the delinquency of minors,
and threatened individuals with violence if they cooperated with
authorities to implicate him in criminal conduct.  Presumably, coun-
sels had knowledge of the prosecution's intent to introduce all of
this inflammatory and prejudicial evidence at trial but failed to
inform the Movant of such (Carmichael Aff. pgs.2-3 ¶9). On the other
hand, if in fact counsels were not aware of the prosecution's intent

---

17/  The record does not reflect any reply ot the prosecution's notice
     related to shooting incident, but a hearing was held on June 3,
     2005, to resolve the matters.  Counsel never informed the Movant
     about the prosecution's intent to use evidence that he had ordered
     the shooting of Jimmy Timmons (Carmichael Aff. pgs.3-4 ¶14).

to use bad acts evidence, then they were ineffective for not <u>properly</u> arguing for disclosure which prejudiced Movant's criminal proceedings (Issue 11, supra).

16. <u>Counsels Were Ineffective for Calling IRS Agent Louie</u>
    <u>Wilson as Defense Witness.</u>

As a part of Movant's defense case counsels called IRS Agent Louie Wilson to the stand (Tr. 6/14/05, pg.321-Vol. 6/15/05, pg.84). Agent Wilson's testimony was anything except defense testimony, and was indistinguishable from that of a prosecution witness insomuch as defense witness Wilson testified that the proceeds deposited in bank account by Ms. Pettus was drug money, and essentially that Movant's conduct violated the law (id. pgs. 326-337). Movant alleges that counsels were ineffective for using Agent Wilson as a "defense wit-ness" because Wilson's testimony served to further the prosecution's case which prejudiced Movant's criminal proceedings.

Agent Wilson's testimony did not go unnoticed by the District Court which compared Wilson's testimony to that of a Government's summary witness (Tr. Vol. 6/15/05, pgs.5,6).

> COURT: A couple of things I would like to take up.
> The first one is Mr. Brunson's examination
> of this witness [IRS Agent Wilson] yesterday
> I found a little bit disturbing. You were
> asking him why he thought the evidence was
> adequate of the money laundering and things
> like that. And if it's a trial strategy,
> that's fine, but I'll just be very frank
> with you, to me you're letting the witness
> essentially give the government's closing
> argument while he's on the stand.
>
> *       *       *
>
> [t]his witness is just giving very conclu-
> sory comments as to how the government's
> case is adequate.
>
> (id. Tr. pg.5, lns.9-24).

The Court went on to question defense attorneys about calling Wilson;

observing that the Court would not allow the prosecution to present a witness who testifies in summary fashion validating the Govenment's case (id. pgs.3-12). To further lend credibility to defense witness Wilson's testimony—and hurt Movant—the prosecution had Wilson sit as advisor during defense expert's testimony (id. pgs.86-89).

Despite the District Court's attempt to characterize defense counsels' use of Agent Wilson as trial "strategy" (id. pgs.6-13), the use of the phrase "trial strategy" does not insulate attorneys from claims of ineffective assistance. Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992)(federal court of appeals observing that the mere incantation of the word "strategy does not insulate attorney's behavior from judicial review");Griffin v. Warden, Myld. Corr. Ctr., 970 F.2d 1355, 1358 (4th Cir. 1992)("Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another"). Attorney Brunson's direct examination of defense witness Agent Louie Wilson was clearly deficient performance. And Wilson's testimony most certainly prejudiced Movant's criminal proceedings insomuch as witness Wilson testified that the currency deposited into bank account by Sherry Pettus—at Movant's direction—was drug money proceeds in his opinion (Tr. Vol. 6/14/05, pgs.326-28). It can not get any worse for a defense witness to testify that the defendant committed the illegal conduct alleged in the indictment.

### 17. Counsels Were Ineffective for Failing to Properly Object, Move for Mistrial, and Preserve Issue of District Court's Open Criticism of Defense Counsels' Performance Defending the Movant.

During the Movant's criminal trial Judge Thompson repeatedly criticized the Movant's defense counsels related to their representation of the Movant. It started with Judge Thompson's criticism of Attorney

Wayne's opening statement then her questioning of DEA SA Halasz about the length of previous DEA investigation and its results (Tr. Vol. 6/9/05, pp.269-71). Attorney Wayne was left to defend her "strategy" in front of the Movant and other lawyers (id. pp.270-71; Vol. 6/15/05, pgs.9-10).

The Movant contends that Judge Thompson's open criticism of defense attorneys was improper and prejudiced the Movant's criminal proceedings by affecting the morale of the defense team generally and the Movant in particular. Moreover, such judicial criticism of defense attorneys' performance calls into question the confidence that the Movant had in his lawyers. Attorney Wayne made objection to the Court's open criticism of her opening statements specifically and the lawyers' handling of Movant's criminal case generally, however, Attorney Wayne's objection was a general objection in response to the Judge's criticism of the lawyers' decision to call IRS Agent Louie Wilson to testify (Tr. Vol. 6/15/05, pgs.5-12). Without articulating a specific objection, and supporting legal premise, Attorney Wayne's objection is no better than no objection being made.

To be sure, Judge Thompson's open criticism of attorneys caused a profound psychological effect for the Movant which lead to his loss of confidence and frustration with his own defense attorneys. The Movant could sense a palpable sense of uncertainty and disorientation among the defense attorneys in the wake of Judge Thompson's questioning of their performance (Carmichael Aff. pg.7 ¶26).

As with the Court's giving of strategical advice to Movant's defense attorneys (Issue 11 above), the Court's open criticism of the Movant's attorneys turns the trial judge's role as impartial observer

and giver of the law into an advocate of sorts for the litigants. Because of Judge Thompson's criticism and legal advice, the Movant started questioning his own defense attorneys which precipitated discord and conflict, not to mention distrust and animus. When Judge Thompson advised defense attorneys to reassess their position about website and possibly calling DEA Agent DeJohn back to testify, the Movant was in agreement with the Court's position (id. Aff. pg. 7, ¶26).[18]/

**18.  Counsels Were Ineffective for Not Following Through With Motion for New Trial and Recusal of Honorable Judge Myron H. Thompson.**

During an in-chamber discussion Attorney Lisa Wayne rightfully moved to recuse Judge Thompson from Movant's criminal case (Tr. Vol. 6/15/ 05, pgs.31-36).  It is Movant's contention Judge Thompson allowed himself to become personally involved in Movant's criminal case. Consequently, Judge Thompson lost his sense of impartiality depriving Movant of a fair trial.

The record speaks for itself in regard to this issue—when the following discussion occurred in Judge Thompson's chambers on June 15, 2005:

> JAMES: Judge, in all due respect, I think what the court, even in all due respect with what the court has just said, I think you have clearly made yourself a witness in the civil case that will be brought.
>
> COURT: Well, whatever it is.
>
> JAMES: You cannot stay on this case.
>                         (Tr. Vol. 6/15/05, pg. 31,lns. 18-24)

---

[18]/  The Movant's suggestion that the attorneys follow the Judge's "advice" did not go over well with attorneys Wayne and James who would not have taken the Court's advice no matter the wisdom of such (id. Aff. pg.7 ¶26).

WAYNE:  Judge, if I may just for the recore, because
        I need to clear this up.  We are going to file
        a motion to recuse.  The courthas raised its
        voice, you've turned red, your lips are trem-
        bling, you're pointing your finger at Mr.
        Carmichael and you clearly--

                              (id. pg.34, lns.4-9).

WAYNE:  Judge, I think the record is clear.  My sense
        is, though, as his defense attorney you've
        expressed a clear enmity and bias toward this
        defendant, period, and that's what I want on
        the record.  That's my opinion, and I think
        we have a right to put that on the record.

COURT:  You have a right to put it on the record.

WAYNE:  And we ask that you recuse yourself.

                              (id pg.35, lns.3-12).

COURT:  Now I would like the record to reflect that
        when you [AUSA] said the court had no bias,
        Miss Wayne did "Hmm" as if to show smirking
        disrespect for the court.

AUSA:   Yes, Sir.

COURT:  Go ahead.

WAYNE:  I was commenting on...

COURT:  No, you were showing a smirking disrespect
        to the court when he [AUSA] said the court
        had no bias, Ms. Wayne.  I heard it, and I
        heard it. [sic] Now proceed.  And I will
        take that up with you later, Ms. Wayne.

                              (id. pg.37, lns.1-13).

Once counsels crossed the Rubicon towards moving for Judge Thompson's recusal, not to mention antagonizing the Judge, they should have went on to Rome because not doing so left the Movant exposed to the Court's obvious bias against him—a bias that was made worse due to the hostility between Judge Thompson and Movant's attorneys—especially Attorney Wayne's conflict with Judge Thompson. cf. Tejeda v. Dubois, 142 F.3d 18 (1st Cir. 1998).

The Movant's observations of attorneys subsequent to the in-chambers conference showed a visible chilling effect (Carmichael Aff. pg. 7 ¶27).  Attorneys Wayne and James were most clearly disturbed

by the confrontation with Judge Thompson (id. pg.7 ¶27).  Counsels
were deficient for antaginizing the Judge and threatening recusal
but not following through with such when the facts and circumstances
supported disqualification of Judge Thompson. U.S. v. Amedeo, 487
F.3d 823, 823 (11th Cir. 2007)("recusal is appropriate only if an
objective, disinterested, lay observer fully informed of the facts
underlying the grounds on which recusal was sought would entertain
a significant doubt about the judge's impartiality."); U.S. v. Ala-
bama, 828 F.2d 1532, 1540 (11th Cir. 1987).

   Any objective, disinterested lay observer would easily enter-
tain significant doubt about Judge Thompson's impartiality after
being apprised of the facts related to grounds for recusal in this
case.  Therefore, counsels were deficient for not following through
with motion to recuse which necessarily prejudiced the Movant's
criminal proceedings.

19.  The Cumulative Impact of Counsels' Deficient Performance as
     Alleged Herein Require Vacatur of Movant's Conviction and Sentence
     and/or an Evidentiary Hearing.

Movant contends that each of the errors addressed herein was suff-
iciently prejudicial to require a reversal of his conviction and
sentence; however, should the Court disagree, then the cumulative
effect of these errors deprived Movant of a fair and just assistance
of counsel.  "Individual errors, insufficient in themselves to nec-
essitate a new trial, may in the aggregate have a more debilitating
effect...so as to deny due process." U.S. v. Fernandez, 145 F.3d 59,
66 (1st Cir. 1998); U.S. v. Hands, 184 F.3d 1322, 1334 (11th Cir.
1999); U.S. v. Munoz, 150 F.3d 401, 418 (5th Cir. 1998).

   The errors here were many, they were all interrelated, and

their cumulative impact was devastating to the Movant's right to due process of law and a clear violation of his Sixth Amendment right to effective assistance of counsel.

Wherefore, the Movant respectfully prays this Honorable Court vacate his conviction and sentence due to the cumulative effect of counsels' deficient performance. In the alternative, Movant requests that an evidentiary hearing be granted to allow the Movant an opportunity to develop and address the facts of the issues raised and further develop the record before the Court.

B.   MOVANT WAS DEPRIVED EFFECTIVE ASSISTANCE OF APPELLATE
     COUNSEL AS GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS
     TO THE UNITED STATES CONSTITUTION. Evitts v. Lucey, 469
     U.S. 387 (1985); Cannon v. Berry, 727 F.2d 1020 (11th
     Cir. 1984).

Movant alleges that appellate counsels (G. Richard Strafer and James K. Jenkins) were ineffective for failing to brief and argue certain meritoreous issues on direct appeal and failed to adequately argue and present issues raised on appeal.

Trial counsels preserved certain meritoreous issues during the district court proceedings that should have, but were not, briefed and argued on appeal. Specifically, trial counsels preserved, however appellate counsels did not argue on appeal:

1.   Burton violation involving Movant's co-defendant Freddie
     Williams (Tr. Vol. 6/8/05, pgs. 331-334). The Court's ruling
     related to this issue would have been error had appellate
     counsels presented it on appeal. U.S. v. Schwartz, 541 F.3d
     1331 (11th Cir. 2008).

2.   Sandra Jones' statements to law enforcement as hearsay (Tr.
     Vol. 6/10/05, pgs.4-5).

3.   Trial by ambush. Late discovery. Brady violations. This
     issue was preserved at numerous points in the Movant's crim-
     inal trial where lawyers objected to the prosecution's
     repeated instances of late disclosure.

4.   Motion to strike Agent DeJohn's testimony due to bias, website
     lawsuit and related factors (Tr. Vol. 6/15/05, pgs.20-29.

5.   Conflict of interest created by Government calling Eric Peagler
     as witness when Movant's counsel (Susan James) represented
     Peagler in other criminal matters (Tr. Vol. 6/13/05, pgs.51-60).

6.   Denial of continuance to investigate late disclosure witness/
     evidence (Passim).

7.   Conflict of interest between Movant and attorneys created by
     DEA Agent DeJohn's lawsuit (DK#504).

8.   Insufficient evidence to support marijuana conspiracy and money
     laundering charges (DK#504).

9.   District Court's open criticism of defense attorneys' handling
     of Movant's criminal case (Tr. Vol. 6/15/05, pgs.9-11).

### VI. AN EVIDENTIARY HEARING IS NECESSARY IN THIS CASE

Title 28 U.S.C. § 2255 provides that a prisoner in custody under

sentence of a court established by Act of Congress claiming the

right to be released or for reduction of sentence may move the court

which imposed the sentence to vacate, set aside or correct the sen-

tence.  This section also provides as follows:

> Unless the  motion and the files and records of the
> case conclusively show that the prisoner is entitled
> to no relief, the court shall cause notice thereof
> to be served upon the United States attorney, grant
> a prompt hearing thereon, determine the issues and
> make findings of fact and conclusion of law with
> respectf thereto.
>                     28 U.S.C. § 2255

In the instant case as set forth above, the Movant has plead-

ed, presented evidence, and argued that applicable law to demon-

strate that his conviction and sentence is violative of his Sixth

Amendment right to effective assistance of counsel in the pretrial,

trial, and post-trial processes.  The Movant has also pleaded, pre-

sented evidence, and argued the applicable law to demonstrate that

his conviction  and sentence are violative of his Sixth Amendment

right to effective representation by counsel in the sentencing and appellate phases.

While many of the allegations are already well established by the files and records of this case, many of the material allegations concern events which took place outside the courtroom and are not, therefore, part of the "files and records". These allegations require an evidentiary hearing under well settled law. See Anderson v. United States, 948 F.2d 704, 706-09 (11th Cir. 1991)(movant was entitled to evidentiary hearing because "record does not conclusively show that [his] contentions are without merit"); Fontaine v. United States, 411 U.S. 213, 215-16 (1973)(reversing summary dismissal and remanding for hearing because "motion and the files and records of the case [did not] conclusively show that the petitioner is entitled to no relief"); Federal Habeas Corpus Practice and Procedure, 5th Ed., § 41.6d, pp. 1951.

Based on all the foregoing, the Movant respectfully requests this Honorable Court to ORDER an evidentiary hearing where he can develop and prove his claims for relief.

### IV.   RELIEF REQUESTED

WHEREFORE, the Movant would respectfully request that the Honorable Court grant the following forms of relief:

1.   Issue an Order to show cause directing the Respondent to answer Movant's § 2255 claims;

2.   Allow Movant (45) days to submit a Reply to the Respondent's Answer to § 2255 motion;

3.   Conduct fact development proceedings to include evidentiary hearing and discovery proceedings;

4.   Ultimately, vacate Movant's criminal convictions and sentence based on the foregoing claims of ineffective assistance of counsel;

5.   Any further relief this Court deems appropriate and serves

justice in this case.

Respectfully prayed for this <u>28th</u> day of December, 2010.

/s/ *Leon Carmichael, Sr.*
Leon Carmichael, Sr.
Movant

### AFFIRMATION OF TRUTH

I, Leon Carmichael have read the foregoing memorandum and state under penalty of perjury that it is the truth of matters asserted to the best of my recollections. 28 U.S.C. § 1746.

Done this <u>28th</u> day of December, 2010.

/s/ *Leon Carmichael, Sr.*
Leon Carmichael, Sr.
Movant

### CERTIFICATE OF MAILING

I, Leon Carmichael, Sr., do hereby state under the penalty of per-jury pursuant to 28 U.S.C. § 1746 that I have this day placed this motion in the prison legal mail with first-class prepaid postage attached addressed as follows:

      U.S. District Court
      Middle District of Alabama
      Office of the Clerk of Court
      Frank M. Johnson, Jr., Fed. Courthouse
      One Church Street, Suite B-110
      Montgomery, AL  36104

Done this <u>28th</u> day of December, 2010.

/s/ *Leon Carmichael, Sr.*
Leon Carmichael, Sr.
Movant, Pro Se
FCI Talladega Alabama