```
        IN THE DISTRICT COURT OF THE UNITED STATES
          FOR THE MIDDLE DISTRICT OF ALABAMA
                   NORTHERN DIVISION
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| v. | * | CASE NO. 2:10cv01106-MHT-WC |
| | * | |
| LEON CARMICHAEL, SR., | * | |
| DEFENDANT. | * | |

Comes now Susan G. James, Attorney at Law, and files this affidavit in response to the 28 U.S.C. §2255 filed by Leon Carmichael, Sr..

## AFFIDAVIT OF SUSAN G. JAMES

I, Susan G. James, am a licensed attorney in the State of Alabama and former counsel to Leon Carmichael, Sr.. This affidavit is being provided in response to a court order in response to a 28 U.S.C. §2255 filed by Carmichael. This affidavit is true to the best of my knowledge, information, and belief.

Leon Carmichael was denied his right to the effective assistance of counsel for numerous reasons to be outlined as follows:

After arrest Carmichael hired the Honorable Ron Wise, Honorable Bruce Maddox, and the Honorable Steve Glassroth. Carmichael wanted a female on his defense team and a female lawyer from Birmingham was hired for a brief period of time

and later substituted by the Honorable Lisa Wayne, a Denver, Colorado attorney. The Honorable Marion Chartoff was also hired to represent Carmichael. Her initial role was to handle pretrial motions.

A controversial website was created at Carmichael's direction and as a result his defense was undermined and compromised. Ron Wise, withdrew, Bruce Maddox became a trial witness, and Steve Glassroth, after being threatened with indictment, withdrew. Sometime shortly after Glassroth's withdrawal, the undersigned was retained.

Lisa Wayne elevated herself to lead counsel without protest from Carmichael, Chartoff moved into a more active role than her previous role preparing pretrial motions, and the Honorable Ron Brunson, former AUSA from Birmingham, was hired to handle only the money laundering aspects of Carmichael's case.

The undersigned understood from Wayne that all aspects of the defense would be at Wayne's direction. Although Carmichael was involved in his defense, he was busy running his business and dealing with his family.

The undersigned first met Wayne in Denver while the undersigned was there for oral argument before the Tenth Circuit Court of Appeals. Wayne had previously been provided the file and we discussed aspects of the case. The

undersigned spoke to Wayne on several occasions regarding the progress of the case and to some extent the division of work. The undersigned personally saw Wayne for the second time when she arrived in Montgomery a few days before the trial.

The undersigned had been preparing for trial which included developing impeachment evidence to use against the Government witnesses. One in particular was Gary George. George, a convicted sex offender, had been involved in the criminal justice system for years and as a result I was able to accumulate substantial impeachment to discredit him. When Wayne arrived for trial, she had picked George as one of the witnesses she would examine. Despite my work pretrial, Wayne elected not to use the bulk of the impeachment evidence against George. This was detrimental to Carmichael's case as George was an important witness for law enforcement as he was the first one to bring Carmichael's name up to law enforcement as being a large scale marijuana distributor.

George led law enforcement to star Government witness Patrick Denton whose testimony was extremely damning to Carmichael's case. George and Denton actually put Carmichael at the center of a large scale marijuana distribution ring which was critical to the Government's

case, particularly since Carmichael was never caught with any marijuana. Hurting their credibility was essential for Carmichael's success.

The irony of Carmichael's fall was that he had four extremely competent lawyers defend him at trial, and yet, still suffered from ineffective assistance. The problem was there was no cohesiveness in the defense and no theory of defense. This resulted in large part because of the transition Carmichael had from the beginning with his lawyers and Lisa Wayne's living and practicing law over 1,000 miles away.

Although the undersigned is not certain why Wayne did not make the trips to Alabama to work on Carmichael's case as he said she had promised, it is true that she did not come. This left the other defense team members to unilaterally prepare without any significant direction from Wayne, the team leader. While each team member was fully capable of preparing, much was lost in the effectiveness of using the material gathered pretrial and the ultimate delivery at trial. In other words, there were no strategy meetings, no master plan as to how the witnesses would be handled, no discussions on anticipated evidentiary issues or problems, and no real and meaningful delegation of assignments in Wayne's absence. The undersigned was left to

4

do the bulk of the investigative work although not actually given the go ahead from Wayne as to leading the other team members present in Alabama with preparing for the defense of Carmichael.

The week-end before trial, after Wayne arrived, was spent in large part trying to bring her up to speed on the case status, working with Mike Callahan, a defense retained private investigator, and looking at the physical evidence. Quite frankly, the weekend should have been spent fine tuning the defense, not trying to formulate one.

Callahan was helpful, but his efforts were too late. My recollection is that he was not hired until close to trial and the volume of work assigned to him was substantial. Even though he was able to assist in the interviewing of some witnesses, there was virtually no time to validate his information or follow up on leads derived from his work.

The undersigned is almost certain that none of the other team members had little, if any, knowledge as to how Attorney Brunson was handling the money laundering side of the case. This ultimately had a very harmful effect on Carmichael's defense, in particular, because of the very damaging impact of the Sherri Pettus' testimony. Any favorable aspect of her testimony was destroyed by the cross examination of Pettus by the Honorable Terry Moorer, former

AUSA, and now United States Magistrate Judge. Brunson made the ill advised call to use Louie Wilson, Criminal Investigator for the Internal Revenue Service, as a defense witness. None of the other team members were aware of Brunson's plans on how the money laundering defense would be mounted nor were there discussions regarding the potential negative consequences of the Pettus and Wilson testimony.

Again, Wayne, a very capable lawyer, by her absence, was similar to a stateside General in command of soldiers fighting a war in a foreign land. It was just not possible that the team could utilize their individual skills collectively at trial as no game plan was developed prior to trial.

As a result Carmichael suffered and he was denied his Sixth Amendment right to the effective assistance of counsel not as to one lawyer but four. He was denied a fair trial as a result. His sentence was negatively impacted because of the way the trial was handled and he will now be forced to spend the rest of his life in prison if this Court fails to grant him the relief requested in his 28 U.S.C. §2255.

As to the specific issues raised in his 2255, they will be addressed in the order in which they were raised by Carmichael.

**Paragraph 10** - James concedes that Wayne directed her to

6

obtain approval from Wayne before making decisions or taking action on Carmichael's behalf.

**Paragraph 11** - James concedes.

**Paragraph 12** - James concedes that she never advised Carmichael that he would receive a 40 year sentence. James handled the sentencing. She did discuss the guidelines with Carmichael prior to sentencing.

**Paragraph 13** - James concedes that because there was never a cohesive defense strategy Carmichael was probably never fully apprised of all aspects of his case.

**Paragraph 14** - James does not have a clear recollection of what was discussed with Carmichael regarding evidence the Government would use at trial. Because the Government tried to portray Carmichael as a violent and dangerous man coupled with the manner in which the jury was treated,[1] any evidence to bolster that image (i.e., Mose Williams information referenced by Carmichael) was extremely damaging to Carmichael.

As relates to the testimony of Eric Peagler and Richard Thomas, Carmichael nor his lawyers knew the substance of their testimony at trial given that Carmichael did not know them or have any dealings with them.

---

[1] The jury was handled in a manner which suggested they were in an uncomfortable or dangerous situation created in part by their partial sequestration and anonymity.

As to Carmichael's other assertions in paragraph 15, it is highly possible that all the matters he addressed were never specifically discussed with him. Although undersigned counsel had frequent contact with Carmichael, there was never a time that all four of his lawyers were present with him at the same time until the weekend before his trial. Therefore, the type dialogue Carmichael is addressing to my knowledge never occurred.

**Paragraph 15** - James does not recall telling Carmichael that he **would** receive a sentence of forty years or anything close to that if he was convicted.

**Paragraph 16** - James is unaware of defense strategies Attorney Wayne may have discussed with Carmichael. Wayne did not discuss this defense strategy with James; however, the previous investigation of Carmichael which did not result in charges was known to James.

**Paragraph 18** - James concedes.

**Paragraph 19** - James concedes Carmichael advised her of these facts.

**Paragraph 20** - James concedes. When James attempted to retrieve the phone records, she was advised by the prison they are only kept for a brief period. James was unable to obtain these records as instructed by Carmichael. This hurt Carmichael's defense.

**Paragraph 21** - Carmichael did discuss bringing certain witnesses to trial.

**Sandra Jones** - had a substance abuse problem and calling her did not seem like a good idea as information in reference to her prior arrest came in through other sources.

**Mose Williams** - did not became an issue until trial. James has no recollection as to why he was not called to testify. As James recalls, Attorney Wayne was actually dealing with the issue of alleged threats to Williams by Carmichael. The Court agreed with the Government that Attorney Wayne had opened the door for this damaging testimony. As I recall, Wayne argued to the Court that she had been ineffective as a result.

**Arthur Covan** - James did interview Covan, but is not certain why he was not called. That may have been a call made by lead counsel, Lisa Wayne.

**Willie Dewhart** - James is not certain that Dewhart was specifically named by Carmichael.

**Bruce Maddox** - was called as a trial witness, but not questioned about Sandra Jones.

**Mexican Co-defendant's** of Peagler. These would have been helpful witnesses for Carmichael. However, they were incarcerated and it would have been nearly impossible to secure them for trial given that it was not known until

9

during the trial that Peagler would testify or until he testified, what he would say.

**Joseph Pie Lacey** - Counsel has no recollection of why he was not called. It is possible his testimony, as referenced by Carmichael, would have helped his defense.

**Paragraph 22** - The DeJohn lawsuit was a serious blow for Carmichael's defense as it was learned while DeJohn was on the stand that he had sued Attorney James and Attorney Wayne. James and Wayne advised the Court that a conflict had arisen regarding DeJohn's lawsuit and their divided loyalty issue. Adequately defending Carmichael as to DeJohn became harmful to James and Wayne as relates to the lawsuit.

James has no recollection as to changing strategy regarding the website. Attorney Wayne or Chartoff may have a better recollection. The Judge did seem to suggest this as a solution to the conflict issue. James and Wayne did not follow the Court's suggestions after the conflict issue surfaced.

**Paragraph 23** - James knew Peagler might be a witness. However, after the issue of conflict was raised with former AUSA Moorer (James had previously represented Peagler). Moorer acted as though Peagler would not be called. The Government made a last minute decision to call Peagler which left everyone off guard and not fully prepared for his cross

10

examination.

**Paragraph 24** - James acknowledges there was a conflict which was waived by Peagler at trial. It was hoped that the conflict would dissuade the Government from calling Peagler. The cross examination of Peagler was hindered by the Government's failure to promptly provide the DEA 6's on Peagler when he cooperated in his own case. These were exculpatory to Carmichael. A motion for mistrial was made but denied as a result of Peagler's testimony. A substantial recess should have been sought in order to gather the needed impeachment to be used against Peagler which Carmichael has addressed in his 2255.

James was not trying to protect Peagler. James was not involved in an effort to obtain Peagler credit for his cooperation against Carmichael. The record in Peagler's case would indicate that after the Carmichael trial, Peagler attempted, as a pro se litigant, to force the Government to credit him for his testimony against Carmichael. It is important to note his reference a promise made to him which was not delivered by the Government. This was inconsistent with his trial testimony in the Carmichael case. Carmichael omitted this from his 2255. James, however, believes the Court should consider this portion of Peagler's testimony (i.e., benefits from his testimony) as perjury regarding

promises made by the Government and as such grant Carmichael a new trial.

Again, the failure of adequate cross examination of Peagler as complained of by Carmichael resulted from the Government's failure to provide discovery and the Government's ambivalence regarding calling Peagler or not. James did the cross because at the point Peagler was called by the Government none of the lawyers but James knew anything at all about Peagler.

**Paragraph 25** - James concedes in part. Counsel, however, was unaware of what motivation Carmichael had in addressing the Court or that his statements were false.

**Paragraph 26** - James concedes.

**Paragraph 27** - James concedes the statement about the in-chambers conversation. Wayne comments to the Court in chambers caused the Judge to anger and did make it appear the Judge did not like Carmichael or Wayne. However, I think Judge Thompson always tries to follow the law and be fair to criminal defendants.

**Paragraph 28** - James remembers AUSA Feaga saying the weekend before trial that he could run a plea offer "up the flag pole" with his supervisors if Carmichael would be so inclined to take it. It seems that forfeiture of the Carmichael Center was going to be part of any plea and I

think it was mentioned to Carmichael. He was adamant he did not want to forfeit the Carmichael Center. No further action was taken in that regard.

I agree if Carmichael had been offered a straight five year sentence with no strings attached, he would have taken the offer.

**Paragraph 29** - James has no actual recollection of a plea offer during jury deliberations. However, counsel vaguely recalls talking with the prosecutors at some point about a 20 year deal. Counsel does not recall whether any plea offer during jury deliberations was made known to Carmichael. He at that time had four lawyers in Court.

**Paragraph 30** - James was not made aware of Brunson's strategy as relates to the money laundering charges. James had advised Carmichael to hire Jeff Duffey for that portion of the trial as Duffey and James have separate law practices but practice in the same building. This would have made for a better and move cohesive defense. Instead Carmichael took the advice of Murray Argo, a defense expert on tax matters, and hired Brunson.

James agrees with Carmichael that Wilson's testimony and the mishandling of Sherry Pettus at trial caused his convictions on the money laundering counts and ultimately helped the Government leverage their position on the

Carmichael Center forfeiture.

**Paragraph 31** - James again concedes that the DeJohn lawsuit created a conflict of interest and totally distracted and disrupted James and Wayne in performing at trial after the lawsuit was revealed. These concerns were made crystal clear to the Court. The lawyers did not follow Judge Thompson's suggestion on how the conflict might be minimized.

**Paragraph 32** - James concedes and could not agree more. An example was that Carmichael hired James in large part to do his closing argument. Attorney Wayne refused to split the argument with James as she believed this was poor strategy and inappropriate. Wayne said James could do all the argument or none. Carmichael suggested firing Wayne during the trial and before closing so James could do the argument. The case was so messed up at that point that James refused to take the case over and, therefore, Wayne did the closing.

Wayne is extremely competent. However, she failed to utilize critical facts and points in her closing which had been made during trial for that specific purpose.

There was clearly tension between Wayne and Carmichael. Wayne would not listen to any of Carmichael's suggestions about his defense. She did not believe they would benefit

14

his case. In fact, the defense investigator, Callahan, suggested that Carmichael go the bank and get one dollar bills consistent with the amount of money Patrick Denton said he handled in his alleged dealings with Carmichael during specific drug transactions. Callahan, a lawyer, and former FBI agent said this would demonstratively show that Denton was lying as that amount of currency could not have possibly been concealed by Denton as he described. This small fact would have been a major factor in pointing out that Denton was lying against Carmichael to gain leniency. Wayne absolutely refused this suggestion. It is James opinion that this demonstration would have substantially helped Carmichael as Denton was the Government's star witness.

James felt it was unreasonable for Wayne to take such a position on this and other matters but never told her. James concedes her own ineffective assistance as she could have asserted a more forceful role in Carmichael's defense and believes if she had things would have turned out more favorable for Carmichael.

**Paragraph 33** - James concedes that she deferred the decisions in the case to Wayne as instructed by Wayne as she said she was lead counsel and in charge of the case. That was a condition of Wayne agreeing with Carmichael to hire

James after Glassroth withdrew.

**Paragraph 34** - James does not recall this specifically. Wayne may have mentioned a motion to recuse but no one acted on it.

## CONCLUSION

Again, James believes that Carmichael was denied the effective assistance of counsel for all of the above stated reasons and that he should receive a new trial as a result.

This information is provided freely and voluntarily and is true to the best of my knowledge, information and belief.

Respectfully submitted this 11th day of May 2011.

_____
Susan G. James

Address of Counsel:
Law Office of
Susan G. James and Associates
600 South McDonough Street
Montgomery, Alabama 36104
334-269-3330
Fax: 334-263-4888

**NOTARY PUBLIC**

Sworn and subscribed before me this 11th day of May 2011.

_____
Sharion S. Mims

My commission expires 05/13/2011

**CERTIFICATE OF SERVICE**

    I hereby certify that on May 11, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Louis Franklin, AUSA, P. O. Box 197, Montgomery, Alabama 36101, and mailed a copy via United States mail, first class, postage prepaid to Leon Carmichael, Reg. No. 11330-002, FCI Talladega, P. O. Box 1000, Talladega, AL 35160.

_____
of counsel