## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

LEON CARMICHAEL, SR.,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
Petitioner,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　**Civil Action No. 2:10-cv-1106-MHT**
　　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,
　　　　　　　　　　　　　　　　　　
Respondent　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

## AFFIDAVIT OF LISA M. WAYNE PURSUANT TO COURT ORDER

Undersigned counsel files this affidavit pursuant to this Court's Order issued on January 4, 2011 (Doc. #5), and in response to Petitioner Carmichael's 28 U. S. C. § 2255. I have not been contacted or interviewed by the Government, who stands as the Respondent in this case. This affidavit is true to the best of my knowledge, information, and belief.

1. I am a licensed attorney in the State of Colorado.

2. I was retained by Mr. Carmichael after meeting with Mr. Carmichael and his lead counsel, Stephen Glassroth, in May 2004.   I was retained to act as a trial lawyer to assist lead counsel, Mr. Glassroth, in the presentation of the defense to the jury during the trial phase.   I am informed and believe that Mr. Glassroth advised Mr. Carmichael to retain my services for these limited purposes.

3. I was retained by Mr. Carmichael with the explicit understanding that Mr. Glassroth would remain lead counsel.   It was my understanding at the time I was retained, based upon representations made by Mr. Glassroth, that the vast majority of the pre-trial litigation and investigation had been completed in the case and that my role primarily would be to (1) familiarize myself with the case by reviewing the discovery, litigation, and investigation to date, (2) explore outstanding discovery issues, (3) strategize regarding future litigation, including motions in limine, expert witness issues, and jury instructions, and (4) act as trial counsel in proceedings before the jury.

1

4. I first appeared in this Court on behalf of Mr. Carmichael on June 30, 2004 pursuant to a Pro Hac Vice motion filed by me that I be admitted to represent Mr. Carmichael.

5. Because the case had been pending months before my involvement, a great deal of "catching up" time was contemplated in my being retained.   Mr. Glassroth explained the need for this process to Mr. Carmichael who, in any case, was involved in the discussions regarding my role.

6. The fee agreement in this case, executed by Mr. Carmichael, clearly sets forth my fee for my role as trial counsel assisting Mr. Glassroth.

7. At no time did Mr. Carmichael fire me, request that I withdraw, or indicate any concern about my representation of him.

8. A website had been created prior to my entry of appearance. I was not involved with, or privy to the creation of the website.   Nor, was I involved in discussion with Mr. Carmichael on this issue as those were left to lead counsel.

9. Subsequent to my having been retained by Mr. Carmichael, and in reviewing the file, I was made aware of Judge Thompson's ruling regarding the use of the website.   My advice to Mr. Carmichael regarding the website was consistent with Judge Thompson's ruling.

10. Mr. Carmichael never indicated to me that the website was being used for intimidation, harassment, or to offend, and I had no reason to believe that he was using it for any illegitimate purpose

11. On November 8, 2004 Stephen Glassroth was removed from Mr. Carmichael's case. Mr. Glassroth indicated to me that he had been ordered not to discuss the reasons for his removal from the case, and that I would have to try the case without his assistance, or presence. In the weeks leading up to Mr. Glassroths' forced withdrawal from the case, he had become distant and uncommunicative with me.   To this date I remain concerned about Mr. Glassroth, and I remain in the dark as to what has happened to Mr. Glassroth.

12. As a result of this surprising and troubling turn of events resulting in the loss of lead and local counsel, Mr. Carmichael was forced to regroup and attempt to put together a defense team, without the lead lawyer of his choice.   I believe that he was unprepared for the loss of Mr. Glassroth as his lead counsel and was

forced to make choices regarding representation that he would not otherwise had made including his decision to request that I continue to represent him.

13. Mr. Carmichael requested that I remain on the case, and without my advice, he hired additional lawyers that he believed necessary to his defense presumably because he felt that they were well-respected and experienced trial lawyers.

14. Ms. James, who Mr. Carmichael believed to be one of the best lawyers in Alabama, was hired as co-counsel.   Because, Ms. James was local, it was agreed that she would meet with Mr. Carmichael, continue to coordinate investigation, and strategize for trial.   Ms. James and I discussed the case over the phone when necessary and Ms. James came to Colorado at least once to spend time with me reviewing files, and strategizing for trial.

15. My inability to travel to Montgomery Alabama from Denver, Colorado was limited by the financial resources available to Mr. Carmichael.   In this regard, he had led me to believe that there would be resources available for my travel. In the absence of these resources, I conducted numerous phone calls with Mr. Carmichael, Marion Chartoff, and Ms. James over the course of the pre-trial proceedings.

16. I was not hired to direct other lawyers, did not agree to do so, and was never asked to do so.   Ms. Chartoff, due to her inexperience at the time, was the only attorney who received direction from me.   At no time did I direct Ms. James, or any other lawyer, that s/he could not work on the case, strategize, or perform services as they saw fit.   In fact, Ms. James was as at least experienced as I was and, given Mr. Carmichael's decision to retain her, I placed a great amount of trust in her reputation and experience.   I do not recall Ms. James ever requesting my direction or approval on any matter and believe that, if any such thing had occurred, it would have stood out in my mind.

17. Mr. Glassroth discussed with me, on numerous occasions, the fact that Mr. Carmichael knew and understood the consequences he faced as a result of any conviction including the forfeiture of his property. The loss of the Carmichael Entertainment center was the focus of numerous conversations with Mr. Carmichael.   Many conversations took place with Mr. Carmichael about the possible sentence and consequences as a result of trial strategy, including the potential guidelines (role in the offense, weight of the drugs, and criminal

history) and the impact of certain evidence in his case. I recall a conversation Mr. Carmichael had with Mr. Glassroth about a disposition not involving the forfeiture of Mr. Carmichael's property, mainly the Entertainment Center. Because, I was never in the position of communicating about a disposition while Mr. Glassroth represented Mr. Carmichael I can only assume a favorable negotiation never occurred.

18. Mr. Carmichael maintained his innocence throughout my representation.

19. I had numerous conversations with Mr. Carmichael about the Government's evidence that may or may not be used against him at trial. This occurred over the phone, phone conferences with Ms. James present, and in person prior to trial.

20. As it relates to the government witness Eric Peagler, it is my recollection that Ms. James made all parties aware of her previous representation of Mr. Peagler from the beginning.   The Court was apprised of the potential conflict, and Mr. Peagler was advised accordingly by the Court on the record.   I don't recall Mr. Carmichael ever being advised by the Court of any conflict relating to Ms. James prior representation of the witness.

21. There was disagreement with Mr. Carmichael prior to trial of witnesses to call in support of his defense. The defense team made strategic choices as to which witnesses supported the defendant's theory of the case prior to and during the trial.

22. The defense team learned, during my cross-examination of Detective DeJohn, that a civil lawsuit had been filed. The matter was immediately brought to the attention of Judge Thompson. As a result of my request for a mistrial, and my request to withdraw from representation of Mr. Carmichael, the lawsuit was withdrawn during the pendency of the proceedings. A civil lawsuit was filed against me immediately after the trial.

23. At one point during the trial there was a heated exchange between the Honorable Myron Thompson and I regarding what I perceived to be unfair treatment of Mr. Carmichael and his lawyers.   During this conference, held in the presence of Mr. Carmichael, the Court criticized in extreme terms, the strategic choices and tactics of the defense team.

24. In my opinion, the Court's attitude toward defense counsel during this conference irreparably damaged Mr. Carmichael's confidence in my abilities and, consequently, undermined the attorney-client relationship. The damage was so severe that I felt compelled to withdraw from the case prior to the sentencing hearing -- something I had never been asked to do before this case, or after this case, in 25 years of representing individuals accused of crimes.

25. I agree with Mr. Carmichael that he believed his lawyers were being treated unfairly and that his trust in his lawyers was substantially undermined. I believe that the erosion of trust affected his willingness to consider our advice regarding his right to testify, and any other critical strategy choices we made during the rest of the trial.

26. The defense team was aware that a lawsuit would likely be filed against at least me, if not all of us, at the termination of my representation of Mr. Carmichael, as a direct result of my representation of Mr. Carmichael. I believe that this was an intentional strategy made by a government witness for the sole purpose of intimidating Mr. Carmichael and counsel during trial, and resulted in chilling Mr. Carmichael's right to a fair trial, and effective representation.

27. I do not recall asking that Mr. Carmichael make any unsolicited statement on the record. I have not been provided with any trial transcripts. Any statement made by Mr. Carmichael would have been at his insistence.

28. Mr. Carmichael's demeanor and mental state changed as a result of the colloquy between Judge Thompson and his defense team. Mr. Carmichael morphed from a defendant confident that his defense team would finally bring to light his innocence, to a defendant who doubted each and every step of his lawyers.

29. I am unaware of any conversation had between Ms. James and AUSA Feaga regarding a 5 year offer.

30. I was unaware of Attorney Brunson's strategy, advice to Mr. Carmichael, or advice by Ms. James regarding retention of other counsel.

31. I agree with Mr. Carmichael that there existed discord between Ms. James and myself as a result of the in chambers discussion, as well as disagreements in investigation and trial strategy.

Respectfully submitted,

*s/ Lisa M. Wayne*
Lisa M. Wayne
Law Offices of Lisa M. Wayne
Denver Financial Building
1775 Sherman Street Suite 1650
Denver, CO 80203
Telephone: (303) 860-1661
Fax: 303.832.4552
lmonet20@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on this June 13, 2011 I electronically filed
the foregoing Affidavit of Lisa M. Wayne with the Clerk of Court
using the CM/ECF system which will send notification of such filing to all listed parties, and
mailed the same to:

**Leon Carmichael, Sr.**
**Registration # 11330-002**
**FCI Talladega**
**Federal Correctional Institution**
**P.O.Box 1000**
**Talladega, AL 35160**


 *Wendy S. Anderson*
*Wendy S. Anderson*
Para-legal for Attorney Lisa M. Wayne

Sworn and subscribed before me
on this 13th day of June, 2011 in
Denver County, Denver, Colorado
and State of Colorado.

DIANNE R. NOAH
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 08/05/2015

Notary Public