# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **LEON CARMICHAEL, SR.,** | ) |
| | ) |
| **Movant/Defendant,** | ) |
| | ) **Civil Action No. 2:10cv1106-MHT-WC** |
| **v.** | )    **(CR No. 2:03cr259-MHT-DRB)** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

## UNITED STATES'S RESPONSE TO § 2255 MOTION

COMES NOW the United States of America ("the Government") by and through its attorneys, George L. Beck, Jr., United States Attorney, and Sandra J. Stewart, First Assistant United States Attorney, and in compliance with this Court's January 4, 2011 order (Doc. 5), as subsequently amended (Docs. 7, 12, 15, 17, 21, 23, 27, 29, 33, 34, 40, 45, 47, 52, 54, 60, 68, 70, 72, 80, 82), responds to Movant/Defendant Leon Carmichael, Sr.'s Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody, as twice supplemented (Docs. 62 and 69), as follows:

## I. INTRODUCTION

Movant Leon Carmichael, Sr., was convicted of a 10-year marijuana distributing conspiracy and a money laundering conspiracy arising from his marijuana distributing activities.  During pretrial, trial, and appellate proceedings

1

Carmichael was represented at different times by the following retained attorneys,

some of whom are or were considered among the best criminal defense attorneys in

Montgomery, where Carmichael was tried and convicted: Amardo Wesley Pitters,

Ronald W. Wise, Bruce Maddox, Steven Glassroth,[1] Mary Elizabeth Anthony, Lisa

Monet Wayne, Marion Chartoff, Susan James, Ron Brunson, James. K. Jenkins,

Carmen D. Hernandez, and G. Richard Strafer. Lead counsel for Carmichael

initially was Steven Glassroth, who served in that role for approximately one year.

When he departed as lead counsel, Lisa Monet Wayne, a Denver, Colorado,

criminal defense attorney of some renown, assumed that role and she served as

lead counsel throughout trial until conviction.[2] Susan James, another expert

criminal defense attorney, from Montgomery, also had a very active role as a

member of Carmichael's defense team from the time she was retained until after

Carmichael was sentenced. Other active members of the team were Marion

Chartoff, who prepared many of the defense motions and argued them to the Court,

and Ron Brunson, a former Assistant United States Attorney, who was hired to

---

[1] This Court directed the Government to undertake reasonable efforts to contact Stephen Glassroth and to obtain an affidavit addressing the claims of ineffective assistance of counsel presented against him. AUSA Clark Morris did make contact with Mr. Glassroth, but he declined to provide any affidavit in relation to the case. *See* Affidavit of A. Clark Morris, GX ?.

[2] Ms. Wayne denies in her affidavit that she was ever designated as lead counsel or directed the defense for Carmichael, but at least two other attorneys on the case, Ms. James and Ms. Chartoff, assert in their affidavits that she did assume that role and, during trial, she represented that she was lead counsel for Carmichael. *See* Affidavit of Lisa M. Wayne Pursuant To Court Order at 3, ¶ 16; Affidavit of Susan G. James at 2; Affidavit of Marion Chartoff at 1, ¶2; and GX 5B-V-21; 5C-VII-139. The Court also referred to Ms. Wayne as lead counsel. *See* GX 5C-VII-162.

handle the money laundering aspects of the case. Finally, Carmen Hernandez took the leading role at Carmichael's sentencing, with Ms. James and Mr. Brunson serving in supporting roles, and Mr. Jenkins and Mr. Strafer represented Carmichael on appeal.

The Government has identified 51 claims of ineffective assistance of counsel raised by Carmichael in his § 2255 motion, and an additional three issues involving the presentation by the Government of allegedly perjured testimony and the recantation by two witnesses of their trial testimony. The exhaustive response provided here is presented to this Court because counsel, in their responsive affidavits, do not address many of the allegations raised by Carmichael and because some of them insist that their representation of Carmichael was hampered by the Court and other circumstances arising before and at trial, and that they were, as a result, constitutionally ineffective. As the record demonstrates, however, and as is demonstrated below, counsel for Carmichael did an effective and thorough job of protecting their client and of presenting a defense for him. They doggedly pursued the relevant issues and attempted to keep the Government from presenting evidence at every turn. They did not stop fighting to protect Carmichael's rights throughout the proceedings, despite their claims of conflicts of interest, nor did they hesitate in the face of criticism of their efforts by the Court. Carmichael was convicted and sentenced based on the evidence presented in his case, not because

of anything counsel did or did not do or because of any actions of the Court. For

the reasons that follow, most of Carmichael's claims of ineffective assistance of

counsel should be denied without a hearing. Those claims that require a hearing

will be identified in the response below.

## II. PROCEDURAL HISTORY AND RELEVANT FACTS

### A.   Initial Indictment, Counsel For Carmichael, And Discovery

Carmichael was originally charged on November 19, 2003, in a one-count

indictment, with conspiracy to distribute 100 kilograms or more of marijuana. *See*

GX 1A, a copy of the initial indictment. Specifically, the initial indictment

charged that, from on or about a date unknown to the grand jury continuing to on

or about November 17, 2003, in Montgomery County, within the Middle District

of Alabama, Carmichael and Codefendant Freddie Williams knowingly and

intentionally conspired, combined, and agreed with each other and with other

persons both known and unknown to the grand jury to possess with the intent to

distribute 100 kilograms or more of marijuana, a Schedule I controlled substance,

the exact amount being unknown to the grand jury, in violation of 21 U.S.C. §§

841(a)(1) and 846. *See* GX 1A.

On the day of his indictment, Carmichael retained Amardo Wesley Pitters

and Ronald W. Wise as counsel. *See* GX 1B and GX 1C, the notices of appearance

of Mr. Pitters and Mr. Wise, respectively. Less than one week later, two additional

attorneys entered their notices of appearances as counsel for Carmichael, Bruce Maddox and Stephen R. Glassroth. *See* GX 1D and GX 1E, the notices of appearance of Mr. Maddox and Mr. Glassroth, respectively. At his arraignment on December 4, 2003, Carmichael entered a plea of not guilty. *See* GX 1F, a copy of the December 8, 2003, Order On Arraignment.

On December 12, 2003, counsel for the Government, AUSA A. Clark Morris, provided Mr. Glassroth a letter and enclosed a copy of the discovery gathered thus far in the case. *See* GX 1G, a copy of the letter noting discovery was being provided to defense counsel. The Government also filed a Motion To Amend Standing Order On Discovery in which it indicated that transcripts of the audio and videotapes in the case had not yet been completed nor had the chemists reports, and it asked for an extension of the time for completing its discovery obligations. *See* GX 1H, a copy of the Government's Motion To Amend Standing Order On Discovery. United States Magistrate Judge Delores R. Boyd granted the Government's request for an extension. *See* GX 1I, a copy of Judge Boyd's order granting the request for an extension of the discovery deadline.

**B.**    **1st Superseding Indictment And Mr. Maddox's Conflict Of Interest**

A first superseding indictment charging Carmichael and Codefendant Freddie Williams with a marijuana distribution conspiracy was returned against Carmichael and his codefendant, Freddie Williams, on December 17, 2003. *See*

GX 1J, a copy of the first superseding indictment. The superseding indictment charged the same offenses charged in the initial indictment, but expanded the charged conspiracy to include actions occurring within the Southern District of Texas and elsewhere, and it added a forfeiture count requiring Carmichael to forfeit his home at 3226 Brookwood Drive, in Montgomery, Alabama, 36116; the Carmichael Center on Fleming Road; and money equal to the amount Carmichael and Williams received as a result of the conspiracy in the amount of not less than $1 million. *Id.* The initial indictment was dismissed on motion of the Government. *See* GX 1K, a copy of the Motion For Leave To Dismiss Indictment with accompanying order dismissing same.

Carmichael was arraigned on the first superseding indictment on January 7, 2004. *See* GX 1O, a copy of the January 13, 2004, Order On Arraignment. He again entered a plea of not guilty. *Id.*

After the first superseding indictment was returned, Mr. Maddox, one of Carmichael's attorneys, filed a Notice Of Potential Conflict And Request For Hearing. *See* GX 1L, a copy of that notice. In the notice, Mr. Maddox noted that he represented a civil client who might become a witness in Carmichael's case and he asked for a hearing to determine whether a conflict of interest existed in his representing both Carmichael and his other client and whether he could continue as counsel for Carmichael. *Id.* The matter of Mr. Maddox's possible conflict was set

for a hearing. *See* GX 1M, a copy of the order setting the matter for a hearing.
After that hearing, Judge Boyd ordered that the Government provide defense
counsel a copy of the DEA Form 6 regarding any interviews of Mr. Maddox's civil
client, that Mr. Maddox confer separately with each client to provide full
disclosure of the possible conflict, and that the matter be set for further hearing.
*See* GX 1P, a copy of the order on the Notice Of Potential Conflict And Request
For Hearing. After further investigating the potential conflict and conferring with
Carmichael, Mr. Maddox asked to withdraw from his representation of
Carmichael. *See* GX 1T, a copy of Motion To Withdraw And Motion To Cancel
Hearing. That motion was granted, and Mr. Maddox withdrew from his
representation of Carmichael. *See* GX 1U, a copy of the order granting the motion
to withdraw.

## C.    2nd Superseding Indictment

The grand jury returned a second superseding indictment in this case on
January 21, 2004. *See* GX 1R, a copy of the second superseding indictment. The
second superseding indictment added a second money laundering conspiracy
charge against Carmichael alone. *Id.* Count two of the second superseding
indictment charged that, from on or about May 28, 2002, and continuing up until
on or about February 24, 2003, in the Middle District of Alabama, Carmichael
knowingly and willfully combined, conspired, and confederated with other

7

persons, both known and unknown to the grand jury to knowingly conduct, attempt to conduct, and cause to be conducted financial transactions affecting interstate commerce, specifically, he directed that money be placed in a Compass Bank account in a nominee name, that money being the proceeds of specified unlawful activity, that is, the conspiracy with the intent to distribute and distributing a controlled substance as charged in count one of the indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(h). *See* GX 1R at 2. On motion of the Government, the first superseding indictment was dismissed, *see* GX 1S, a copy of the Motion For Leave To Dismiss and accompanying order granting it, and Carmichael was arraigned on February 4, 2004, on the second superseding indictment, *see* GX V, a copy of the February 6, 2004, Order On Arraignment. At his arraignment on the second superseding indictment, Carmichael entered pleas of not guilty to the charges. *Id.*

Subsequently, on February 20, 2004, the Government filed a Bill of Particulars with regard to the forfeiture allegations. *See* GX 1X, a copy of United States' Bill Of Particulars For Forfeiture Of Property. In that bill of particulars, the Government specifically identified certain currency as being subject to forfeiture as well as Carmichael's 2001 Honda Accord EX. *Id.*

8

**D.    Motion To Suppress**

On January 7, 2004, before the second superseding indictment was returned,

counsel for Carmichael, Mr. Glassroth, filed a motion to suppress any statements

made by Carmichael on November 17, 2003, and December 4, 2003, and any

evidence seized from him on November 17, 2003. *See* GX 1N, a copy of

Defendant Carmichael's Motion To Suppress Evidence And Motion Pursuant To

Fed. R. Crim. P. 41(g). In support of the motion, Carmichael argued: (1) that his

stop by law enforcement on November 17, 2003, was not supported by reasonable

suspicion or probable cause; (2) therefore, the fruits of the stop consisting of any

statements made by Carmichael or any evidence seized from him, should be

suppressed; (3) the alleged statements made by Carmichael to federal agents on

December 4, 2003, when he went to retrieve his illegally seized property, were

obtained in violation of Carmichael's Fifth and Sixth Amendment rights; and (4)

the alleged statements Carmichael made to federal agents on December 4, 2003,

should be suppressed as the fruits of the illegal initial stop because none of the

property seized by law enforcement would have been taken by law enforcement

absent the illegal stop and Carmichael, thus, would not have had to retrieve his

property and would not have made any statements to law enforcement in relation to

that retrieval. *See* GX 1N at 2. Pursuant to Judge Boyd's order, *see* GX 1Q, the

Government filed a response to the motion to suppress, *see* GX 1W, a copy of

United States' Response In Opposition To "Defendant Carmichael's Motion To Suppress Evidence And Motion Pursuant To Fed. R. Crim. P. 41(G)".

A hearing on the motion to suppress was conducted before Judge Boyd on March 1, 2004. *See* GX 1Y, a copy of the March 1, 2004, suppression hearing transcript. Carmichael was represented at that hearing by Mr. Glassroth and Mr. Wise. *See* GX 1Y at 2. The Government presented two witnesses at the hearing, DEA Special Agent David DeJohn, *see* GX 1Y at 7-53, 72-99, and DEA Special Agent Thomas Halasz, *see id.* at 54-71, and counsel for Carmichael thoroughly and effectively cross-examined both witnesses, *see id.* at 30-51, 62-71, 82-94, 99. At the end of the hearing, the Court set a schedule for post-hearing briefs, indicating it was especially interested in whether the initial stop, which was based on information provided by other conspirators and some corroboration of that information, was lawful. *Id.* at 101-05.

On March 11, 2004, the Government filed Government's Post-Hearing Response To Defendant's Motion To Suppress. *See* GX 1Z, a copy of that response. In the response, the Government argued that the information provided by other conspirators in Carmichael's marijuana distribution conspiracy, and corroboration of some of that information, provided the reasonable suspicion necessary to support Carmichael's initial stop by law enforcement. *Id.* On March 24, 2004, Carmichael, through Mr. Glassroth, filed Defendant's Reply To The

Government's Post-Hearing Response To Defendant's Motion To Suppress And

Objection To The Government's Request For Leave To Reply. *See* GX 2A, a copy

of that motion.  Relying on testimony from the suppression hearing, Carmichael

argued that there was inconsistency in the testimony presented and that, therefore,

the Court should conclude that the reason articulated for the stop was merely

pretextual and that no valid reason for his initial stop existed. *See* GX 2A at 3.

Although the Government initially requested permission to reply to Carmichael's

post-hearing suppression argument, it later withdrew that request and did not file

any additional pleadings with regard to the suppression issue before the Court

ruled. *See* GX 2B, Government's Motion For Leave To Reply To Defendant's

Post-Hearing Suppression Argument, and GX 2E, Withdrawal Of Government's

Motion For Leave To Reply To Defendant's Post-Hearing Suppression Argument,

On April 15, 2004, Judge Boyd filed her Recommendation Of The

Magistrate Judge on the motion to suppress. *See* GX 2G, a copy of the

recommendation.  Before analyzing the issues presented, Judge Boyd made the

following detailed findings of fact:

### B.    Relevant Facts: November 17, 2003 Stop

Two DEA agents provided the only testimony at the evidentiary
hearing on March 1, 2004:  R. David DeJohn ("Agent DeJohn"), a
Prattville Police Department investigator cross-assigned as a DEA
Task Force Agent, who also provided the supporting [sic.] for the
warrant to search Williams' residence on November 17, 2003, and

Special DEA Agent Thomas Halasz ("Agent Halasz"), who effected the stop of Carmichael's car and his investigative detention.

The relevant facts occurred in 2003 between November 13 and November 17. On November 13 Agent DeJohn interviewed Gary Wayne George ("George"), a convicted felon who described himself as a member of the "Leon Carmichael Drug Trafficking Organization," following his arrest on "drug charges" by the Prattville Police Department. Agreeing to provide information regarding Carmichael's organization and otherwise to serve as an informant, George identified Robert Patrick Denton ("Denton") as his partner with the "job [of] process[ing] marijuana as it come into Montgomery from out of state for Leon Carmichael."... George related that he had performed this processing job [on] "numerous occasions ... like 30 times," identified the processing sites as Denton's residence on Fleming Road and another Montgomery residence and also reported that the marijuana shipments involved "as little as 200 pounds, as high as 800 pounds on a weekly basis." ... George also admitted his own sales of marijuana supplied by Denton, and though George "had seen [Carmichael] but never really talked to him," Denton told him [Carmichael's] who he got the marijuana from and ... when they collected money back up, that's who the money would go back to."...

On November 15 George called Agent DeJohn with a report that he and Denton were enroute to the Shoney's on Montgomery's West South Boulevard for a sale of marijuana to Charlotte Hensarlinger ("Hensarlinger")[3], a Huntsville resident to whom Denton had been "regularly selling marijuana." Pursuant to instructions from Agent DeJohn, George called back with the color, make, model, and license tag for the sports utility-type vehicle (SUV) being driven by Hensarlinger on her trip down Interstate-65 south from Huntsville. Upon notice of the completed transaction, Agent DeJohn stationed himself at the interstate's Millbrook-Prattville exit and followed the northbound SUV into Chilton Co., where he relayed to the Chilton Co. Sheriff's Department identification data for the SUV. Sheriff's deputies made a "traffic stop" of the SUV; a consensual search produced approximately 26 pounds of marijuana; and Hensarlinger

---

[3] Charlotte "Hensarlinger" is the same person identified as Charlotte "Hensarling," at Carmichael's trial. See GX 5A-II-215-42.

admitted that she had just bought the marijuana from George and Denton….

Based on George's report on November 16 of approximately ten pounds of marijuana inside Denton's residence, Agent DeJohn secured and executed in the early morning hours of November 17 a search warrant which yielded no marijuana but, instead, an interview with Denton, who agreed to cooperate as an informant. Denton advised "that he had been getting marijuana from Leon Carmichael, that a shipment was due in on that evening, Sunday night, Monday morning, but he had told Leon Carmichael that he did not want to take shipment of that marijuana" because of Hensarlinger's arrest after his admitted sale to her of marijuana in the transaction already detailed by George. Denton confirmed his weekly "processing" job -- "get[ting] the marijuana from William Bolding, a truck driver for Leon Carmichael" and "help[ing] "break it down and repackage it into gallon-size bags" – on instructions from Carmichael. He returned the processed marijuana – "an average of 500 to 600 pounds per load" to Carmichael or to Bolding and "was paid by Carmichael in the form of marijuana … given pounds to sell."…

After completing Denton's interview, DEA agents drove him around "to corroborate his information," and Denton identified Carmichael's residence and those for "other players within the organization, including Carmichael's co-defendant, Williams, whose 949 Ridgecrest Drive house he speculated would be the processing site for the marijuana shipment expected on that day. When officers returned Denton to his residence, around 2:45 on this November 17 morning, Denton's cell phone rang as Agent DeJohn held it in his hand, and it displayed "Leon", a name confirmed by Denton to be "Leon Carmichael." Listening to their conversation, Agent DeJohn heard a voice he later identified as Carmichael's tell Denton that he "need[ed] to talk to [him] and was "five minutes away.[6] Officers left Denton's house and set u[p] surveillance on Fleming Road to watch the inbound traffic; shortly they saw Carmichael's black Honda – the same vehicle previously seen at his residence – turn into Denton's residence and leave after the driver spent about five minutes inside. Denton confirmed Carmichael as the driver and also related his instructions that he report to Williams' Ridgecrest house at 8:00 a.m.

13

to help break down the marijuana shipment.  Officers left with plans to meet again with Denton at 7:30 a.m....

> [6]Present with Agent DeJohn at the time, Agent Halasz heard the phone ring and also saw the name displayed; as he had rushed to his vehicle for a tape recorder, he heard only the "tail end" of the conversation between Denton and Carmichael....

When they met as scheduled, officers equipped Denton with audio and video transmitting devices for his trip to the Williams residence.  Officers again met Denton when he left the Williams residence for a grocery store to secure, at Williams' instructions, some gallon-size, ziplock-type bags.  Upon his return, Williams was no longer inside the residence but advised by cell phone of his location five minutes away; back inside the residence Williams and Denton "began retrieving bags from inside of a hidden wall that was in the bedroom."  When Denton left the residence again, to secure a scale in lieu of one Williams thought was broken, he confirmed to Agent DeJohn by cell phone that the bags contained "500 to 600 pounds of marijuana", and he also related Williams' reported anger with Carmichael for personally counting "each block of marijuana" placed inside as he suspected Williams' girlfriend of taking some....

After securing scales provided by the agents, Denton returned to the residence and continued to assist Williams in processing the marijuana until Williams placed or received a phone call regarding the imminent death of his then-hospitalized wife.  Denton used his audio transmitting device to alert officers of Williams' planned departure, reporting "he's fixing to leave – you need to go ahead and stop him."  Officers responded with the intent "to secure the residence and take Williams into custody before he left" but as Williams had already left, they managed only to secure the residence while "some agents went out looking for Williams" and others for Carmichael....

Agent Halasz had been apprised on November 16 of the narcotics investigation centering on Williams and Carmichael, and on November 17 DEA agent Sherry Gonzalez notified him that "an individual fitting Leon Carmichael's description had passed in front of the scene of the search warrant" in execution at Williams' house.[10]

14

She advised him "to detain ... Carmichael when and if [he] saw him."
From his station in front of the Carmichael Center on Fleming Road,
Agent Halasz saw Carmichael's black Honda pass him, followed it,
and contacted the Montgomery Police Department for a marked police
vehicle to effect a stop on the Southern Boulevard.  As Agent Halasz
approached the car, Carmichael had already exited, leaving open his
driver's door; with Carmichael already handcuffed by other officers,
Agent Halasz "stuck [his] head in the vehicle" and viewed on the front
passenger's seat a pistol and a black leather bag, and in the middle of
the back seat, a briefcase which he opened to reveal a money bag."...

> [10]Before his encounter with Carmichael on November 17,
> Agent Halasz knew specifically that Carmichael "had
> been identified as a person responsible for bringing
> multiple loads of marijuana to Montgomery in excess of
> 500 pounds and distributing that marijuana in
> Montgomery;" he also [knew] that "the information led
> to the seizure of the excess of 500 pounds of marijuana
> ... during the investigation that morning prior to the
> vehicle stop." ...

The Agent then "read Carmichael his rights and spoke to him,"
inquiring first about the gun.  Carmichael acknowledged his prior
conviction for murder but said that he had been pardoned and had a
pistol permit.  Agent Halasz "also told him that ... the reason he was
stopped is because we believed he was involved in a marijuana case –
a marijuana investigation"; when the agent "mentioned the name
Freddie, [Carmichael] indicated that he knew a Freddie that drove for
him."...  Advised as well that officers "knew that he had met ... that
morning between 2:00 and 3:00 a.m. – with one of the individuals
who was at the location where the marijuana was seized," Carmichael
responded that "at that period of time he was in a hotel with a woman
and that she would testify to that."

Officers transported Carmichael to headquarters while Agent
DeJohn presented his affidavit to the Chief Magistrate Judge in
support of a Criminal Complaint and arrest warrant charging
Carmichael with being a convicted felon in unlawful possession of the
pistol seized from his car.  Though that complaint was dismissed,
Carmichael was rearrested on November 19, 2003, pursuant to his

15

joint Indictment with Williams on the same day for conspiring to
distribute marijuana illegally.

## C.    Relevant Facts: December 4, 2003 Statements

Pursuant to arrangements his counsel made with the
government's prosecutor and Agent DeJohn, Carmichael – free on a
pre-trial bond and other conditions imposed after his initial indictment
– reported alone to the DEA office on December 4, 2003, to retrieve
his briefcase, credit cards, checkbooks, and other belongings seized
following his arrest. Escorted through the foyer to a side interview
room, Carmichael waited with another agent while Agent DeJohn left
for "no more than 30 seconds" to secure the items…. Upon his return,
he heard Carmichael complaining about the news media's portrayal of
his arrest and, in particular, false reports that 575 pounds of marijuana
were located inside the Carmichael Center. Carmichael then declared
that "he had already resigned himself to the fact that he was going to
do 10, 15, 20 years in prison and that would be a life sentence to him."
"Shocked" that he considered a 10-year sentence a life sentence,
Agent DeJohn asked him, "why do you say that?"; Carmichael
responded, "because you got me." Agent DeJohn then reminded
Carmichael of his "opportunity … to cooperate with law
enforcement", prompting Carmichael's statements: "I can't even trust
my own attorneys. I have one attorney that is telling the U.S.
Attorney's office that they have a client that wants to talk about [me],
and the others got their hands reached out for money."… Carmichael
also commented "that most of the people talking about him – most of
the people would be lying."

*See* GX 2G at 2-9 (most footnotes omitted).

After outlining the above facts, Judge Boyd found that that "evidence amply

establish[ed] the requisite degree of 'reasonable suspicion of criminal activity' to

justify, within the authority of *Terry v. Ohio*, 292 U.S. 1 (1968), the officers'

warrantless stop and detention of Carmichael on November 17, 2003." *Id.* at 10.

In reaching this conclusion, Judge Boyd relied on several pertinent facts. First, she

16

found relevant that "the officers grounded their reasonable suspicion on both reported and observed events – including criminal acts – which transpired almost continuously during the preceding period of four days, and these events followed an investigation spanning several years." *Id.* at 12. Second, she found noteworthy that following their arrests for drug crimes, the two principal informants, Denton and George, "each linked their crimes directly to a marijuana distribution organization headed by Carmichael and each acknowledged not only their specific roles in the criminal conspiracy but also their personal knowledge or other basis for attributing to Carmichael a leadership role." *Id.* Third, Judge Boyd found pertinent the fact that two of the reports made by George were corroborated – his report that he and Denton were expected to process a large load of marijuana arriving the next day at Denton's Fleming Road residence and his report that Charlotte Hensarlinger was on her way from Huntsville to purchase marijuana from Denton. *Id.* at 13. Fourth, Judge Boyd found it of note that the officers corroborated for the most part the reports of the informants through their personal observations and their equipping Denton with audio and video equipment to monitor the planned acts of the coconspirators in furtherance of their marijuana distribution. *Id.* at 13-14. Based on her findings that the officers had reasonable suspicion to stop Carmichael, Judge Boyd also found that Carmichael's statements to officers after being stopped were admissible. *Id.* at 15.

17

Judge Boyd also rejected Carmichael's argument that his statements made to Agent DeJohn on December 4, 2003, when he went to retrieve his property from the DEA office, should be suppressed. *Id.* at 15-16. Judge Boyd noted that, because the initial stop was based on reasonable suspicion, the later statements were not the fruit of the poisonous tree. *Id.* at 15. She further found that "the evidence [was] compelling that Carmichael casually volunteered his statements without being subjected to an unduly coercive atmosphere or any custodial interrogation of the character requiring prior *Miranda*[4] warnings." *Id.* at 16.

Based on her detailed findings, Judge Boyd recommended Carmichael's motion to suppress be denied. *Id.*

Carmichael, through counsel, Mr. Wise, filed Objections To Recommendation Of Magistrate Judge. *See* GX 2K, a copy of those objections. "After an independent and de novo review of the entire record," United States District Court Judge Myron H. Thompson adopted Judge Boyd's recommendation that the motion to suppress be denied, overruled Carmichael's objections, and denied the motion to suppress. *See* GX 2M, a copy of the Court's order denying the motion to suppress.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966).

**E.     Additional Counsel For Carmichael, Discovery Motions, Motion To Continue**

On March 25, 2004, Elizabeth Anthony entered a Notice Of Appearance Of Counsel as additional counsel for Carmichael. *See* GX 2C, a copy of that notice of appearance.

Counsel for Carmichael, Mr. Glassroth, then filed a motion to compel discovery. *See* GX 2D, a copy of Defendant Carmichael's Motion To Compel Discovery. In that motion, Carmichael asked the Court to order the Government to: (1) specify what documents it intended to introduce at trial; (2) reveal the identity of the witnesses who provided information to the Government and who received "promises, benefits, leniency, or any other inducement or benefit of whatever kind"; (3) reveal the identity of all witnesses it intended to call at trial; (4) produce informant files on all cooperating individuals or persons who supplied information to the Government in the case; and (5) produce the results of any tests conducted on the firearms seized from the home of Patrick Denton on June 13, 2002. *Id.* The Government filed a response in opposition to the motion to compel discovery. *See* GX 2F, a copy of United States' Response In Opposition To Defendant Carmichael's Motion To Compel Discovery.

On April 20, 2004, apparently in response to a discovery request from Carmichael's counsel, Judge Boyd entered an order directing the Government to show cause why Carmichael was "not entitled to production of any *Memorandum*

*of Understanding ["MOU"], or similar agency memorandum*, for the High

Intensity Drug Trafficking Area Task Force (HIDTA) involved in this case." *See*

GX 2J, a copy of Judge Boyd's show cause order on the MOU. On April 26, 2004,

the Government responded objecting to the production of the document on the

grounds there was no one MOU for the HIDTA, any MOU was irrelevant and

immaterial, and counsel for Carmichael were on a fishing expedition. *See* GX 2L,

a copy of Response To Show Cause Order. Carmichael replied to the

Government's objection. *See* GX 2N, a copy of Defendant Carmichael's Reply To

Government's Response To Order To Show Cause.

On May 5, 2004, Judge Boyd entered an order on Carmichael's motion to

compel discovery, denying Carmichael's request that the Government be required

to produce a trial exhibit list, a trial witness list, informant files, and to produce

firearms fingerprint tests on guns found at Denton's residence. *See* GX 2O, a copy

of Judge Boyd's order denying the motion to compel.

On April 16, 2004, Mr. Glassroth filed Defendant Carmichael's Unopposed

Motion To Continue. *See* GX 2H, a copy of the motion to continue. As grounds

for that continuance, Carmichael asserted he needed more time to obtain an expert,

as the Government had that date noticed its own expert with regard to the money

laundering count of the indictment, and for that expert to review and analyze the

thousands of pages of financial records in the case. *Id.* at 1. Counsel also raised as

grounds the Government's April 13, 2004, production of 2000 additional pages of discovery that the defense needed time to review and analyze. *Id.* at 2. That motion to continue was granted in the interests of justice. *See* GX 2I, a copy of the order granting the continuance. Trial was reset from May 3, 2004, to July 12, 2004. *See* GX 2H at 1 and GX 2I at 3-4.

**F.  Additional Counsel For Carmichael And Carmichael's Website**

On June 30, 2004, Mr. Lisa Monet Wayne filed a Motion For Admission Pro Hac Vice Pursuant To Federal Local Rule 83.1(b), *see* GX 2P, and an Entry Of Appearance as counsel for Carmichael, *see* GX 2Q. Ms. Wayne's pro hac vice motion was granted. *See* GX 2R, a copy of the order granting pro hac vice admission.

An issue that was of importance throughout the pretrial process in this case involved an internet website established by Carmichael that the Government contended was threatening and harassing to its witnesses and agents, but that Carmichael contended was a permissible exercise of his First Amendment rights and an avenue of communication he needed to prepare his case. In his § 2255 motion, Carmichael raises one issue about his counsels' performance with regard to the website and several other peripheral issues about that website. A copy of Judge Thompsons July 20, 2004, initial order resolving the pretrial website issues and denying the Government's motion for a protective order relating to that

website is provided as GX 2S. That order outlines the facts surrounding the

website and Judge Thompson's reasons for permitting Carmichael to maintain that

website. *See* GX 2S. Judge Thompson issued a subsequent order also denying the

Government's motion for a protective order as it related to that website and matters

"outside of cyberspace." *See* GX 2T, a copy of that subsequent order. The

Government's requests for protective orders pertaining to the website were denied

by the Court because the Court believed Carmichael had a First Amendment right

to establish and maintain that website. *Id.*

## G.    3rd Superseding Indictment And Motion To Strike Surplusage From 3rd Superseding Indictment

On August 17, 2004, the grand jury returned a third superseding indictment

against Carmichael and Codefendant Freddie Williams. *See* GX 2V, a copy of the

third superseding indictment. This third superseding indictment made several

changes to the previous indictment. Count one of the indictment was altered to

charge that from on or about 1993, a more specific date being unknown to the

grand jury, and continuing until on or about November 17, 2003, in Montgomery

County, within the Middle District of Alabama and elsewhere, Carmichael and

Williams knowingly and intentionally conspired, combined, and agreed with each

other and with other persons both known and unknown to the grand jury to possess

with intent to distribute more than 3000 kilograms of marijuana, a Schedule I

controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *See* GX 2V
at 1.

Count two of the third superseding indictment remained unchanged,
charging that from on or about May 28, 2002, and continuing up until on or about
February 24, 2003, in the Middle District of Alabama, Carmichael knowingly and
willfully combined, conspired, and confederated with other persons, both known
and unknown to the grand jury to knowingly conduct, attempt to conduct, and
cause to be conducted financial transactions affecting interstate commerce,
specifically, he directed that money be placed in a Compass Bank account in a
nominee name, that money being the proceeds of specified unlawful activity, that
is, the conspiracy with the intent to distribute and distributing a controlled
substance charged in count one of the indictment, knowing that the transactions
were designed in whole and in part to conceal and disguise the nature, location,
source, ownership, and control of the proceeds of the specified unlawful activity, in
violation of 18 U.S.C. § 1956(h). *See* GX 2V at 1-2.

The third superseding indictment also contained a "Notice Of Additional
Factors." *See* GX 2V at 2-3. That notice alleged factors that would elevate
Carmichael's offense level at sentencing once established. Those factors included
that (a) Carmichael was an organizer and leader of the criminal activity in count
one and that that criminal activity involved five or more participants and was

otherwise extensive, as described in U.S.S.G. § 3B1.1(a); (b) Carmichael

committed an offense in which he used or attempted to use a person less than 18

years of age to commit that offenses and assist in avoiding detection and

apprehension, as described in U.S.S.G. § 3B1.4; (c) Carmichael recklessly created

a substantial risk of death and serious bodily injury to another person while fleeing

from law enforcement, as described in U.S.S.G. § 3C1.2; and (d) that four firearms

were possessed during the commission of the offense, as described in U.S.S.G. §

2D1.1(b)(1). *See* GX 2V at 2-3.

Finally, the third superseding indictment provided that, on conviction,

Carmichael would be required to forfeit all property derived from the criminal

enterprise, including his residence at 3226 Brookwood Drive in Montgomery,

Alabama; the Carmichael Center at Fleming Road in Montgomery, Alabama; cash

proceeds of not less than $ 1 million; $5000 in currency seized on or about

November 17, 2003; $1781 in currency seized on or about November 17, 2003;

one 2001 Honda Accord EX; and all substitute assets. *Id*. at 3-6.

The Government filed a Motion For Leave To Dismiss The Indictment on

the ground the superseding indictment was filed. *See* GX 2U, a copy of that

motion. The previous indictment was dismissed. *See* GX 2W, a copy of the order

granting the motion to dismiss the previous indictment. And Carmichael was

arraigned on the third superseding indictment on August 27, 2004. *See* GX 2X, a copy of the August 27, 2004, Order On Arraignment.

Thereafter, on September 24, 2004, counsel for Carmichael, Mr. Glassroth, filed Defendant Carmichael's Motion To Strike Surplusage From Superseding Indictment Pursuant To Fed. R. Crim. P. 7(d). *See* GX 3B. He also filed a Memorandum Of Law In Support Of Defendant Leon Carmichael's Motion To Strike Surplusage From Superseding Indictment. *See* GX 3C. The motion to strike surplusage was aimed at the portion of the third superseding indictment that contained the Notice of Additional Factors. *See* GX 3B and GX 3C.

The Government filed two responses to the motion to strike. First, it filed the Government's Response To Defendant's Motion To Strike Notice Of Additional Factors As Surplusage, *see* GX 3J, and then later it filed Response To Defendant's Motion To Strike Surplusage From The Indictment, *see* GX 4J. In its initial response, the Government represented that it believed, based on the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), the notice of additional facts was a necessary component of an indictment where the Government intended to introduce facts at sentencing that would increase the base offense level. *See* GX 3J at 2-4, 8. In its subsequent response, the Government noted that the Supreme Court, in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2004), decided the issue left open in *Blakely* about alleging

25

sentencing enhancements in an indictment and proving them to a jury, and it removed any objection to striking the notice as surplusage. *See* GX 4J.

Carmichael also filed a supplemental brief on his motion to strike the notice surplusage from the indictment. *See* GX 4K, a copy of Defendant Leon Carmichael's Supplemental Brief In Support Of Motion To Strike Surplusage. In that supplemental brief, Carmichael again asked the Court to strike the notice of additional sentencing factors language from the indictment as it amounted to surplusage that was prejudicial to Carmichael. *Id*. at 3.

On April 19, 2005, Judge Thompson granted Carmichael's motion to strike surplusage from the superseding indictment. *See* GX 4N, a copy of the order granting the motion to strike.

## H.   Motion To Intervene And Motion To Remove Photograph From Website

As noted above, Carmichael was involved in the posting of a website that sought information about witnesses and Government agents in Carmichael's case. *See* GX 2S. After the Government's unsuccessful attempts to have the Court order the website taken down, DEA Agent David DeJohn filed a Motion To Intervene And Motion To Remove Photograph From Website and a Memorandum In Support Of Motion To Intervene And Motion To Remove Photograph From Web Site. *See* GX 2Y, a copy of the motion and memorandum to intervene. Agent DeJohn asked the Court to allow him to intervene for the purpose of having his

26

photograph removed from Carmichael's website on the grounds the photograph had been illegally obtained. *Id.* On September 22, 2004, Judge Thompson ordered the parties to show cause why Agent DeJohn's motion should not be granted. *See* GX 2Z, a copy of that show cause order.

On September 26, 2004, Carmichael, through counsel, Mr. Glassroth, filed a response to the show cause order. *See* GX 3G, a copy of Defendant Carmichael's Response To Order To Show Cause.  Carmichael argued in the response that Agent DeJohn had not established intervention was appropriate in this criminal case and that, even if he had, his motion to order his photograph taken down from Carmichael's website should be denied on the merits. *Id.*

On November 12, 2004, Judge Thompson denied Agent DeJohn's motion to intervene and his motion to remove the photograph from Carmichael's website, with prejudice. *See* GX 3Y, a copy of the order denying the motion to intervene and to remove the photograph.

## I.     Motion To Compel Additional Discovery And Motion For Hearing On Admissibility Of Expert Testimony

Carmichael, through Mr. Glassroth, also filed Defendant Carmichael's Motion To Compel Additional Discovery Relating To Expert Opinion Testimony. *See* GX 3A, a copy of that motion.  In the motion, Carmichael asked the Court to order the Government to supply the defense with "a further detailed explanation of any opinions the witnesses whom the government may call as experts will render,

27

and the bases and reasons for those opinions, as well as each witness' qualifications." *Id*. at 1.

Carmichael also filed a Motion For Hearing On Admissibility Of Expert Testimony. *See* GX 3D. In that motion, Carmichael asked for a *Daubert*[5] hearing on the basis for Internal Revenue Service ("IRS") Special Agent Louie Wilson's opinion that "the deposits and disbursements that were made into and out of the defendant, Carmichael's, 16 bank accounts are evidence of money laundering and financial practices of drug dealers." *Id*. at 2-3. Carmichael's motion for a hearing was denied without leave to renew. *See* GX 3H, a copy of the order denying the motion for a hearing.

**J.  Counsel Ronald W. Wise's Motion To Withdraw, Counsel Mary Elizabeth Anthony's Motion To Withdraw, Counsel Steven R. Glassroth's Motion To Withdraw, Counsel Marion Chartoff's Notice of Appearance, Counsel Susan R. James's Notice Of Appearance, Counsel Ronald R. Brunson's Notice Of Appearance, And Counsel Amardo Pitters's Motion To Withdraw**

On September 29, 2004, Ronald W. Wise, one of the attorneys retained by Carmichael, filed a motion to withdraw as counsel for Carmichael after consultation with and the agreement of Carmichael. *See* GX 3E, a copy of the Motion To Withdraw. That motion was granted on September 30, 2004. *See* GX 3F, a copy of the order granting the motion to withdraw.

---

[5] *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

28

On October 14, 2004, Marion Chartoff entered her Notice of Appearance as counsel for Carmichael. *See* GX 3I, a copy of that notice.

On November 2, 2004, Mary Elizabeth Anthony, another of the attorneys retained by Carmichael, filed a Motion To Withdraw as counsel for Carmichael. *See* GX 3K, a copy of Ms. Anthony's motion to withdraw. That motion was granted on November 8, 2004. *See* GX 3W, a copy of the Court's order granting the motion.

On November 4, 2004, Stephen R. Glassroth, Carmichael's lead counsel, filed a Motion For Leave To Withdraw as counsel for Carmichael. *See* GX 3U, a copy of that motion.

On November 8, 2004, Susan R. James entered a Notice Of Appearance on behalf of Carmichael. *See* GX 3X, a copy of that notice. And on November 12, 2004, Ronald R. Brunson entered a Notice of Appearance on behalf of Carmichael. *See* GX 3X-1.

On April 12, 2005, Amardo Wesley Pitters filed a Motion For Leave To Withdraw as counsel for Carmichael. *See* GX 4L, a copy of the motion to withdraw. That motion was granted by order of the Court on April 18, 2003. *See* GX 4M, a copy of the order.

## K.   **Carmichael's Motions In Limine**

Next, Carmichael, through new counsel, Marion Chartoff, filed ten motions

in limine.  Carmichael filed:

1.   Leon Carmichael's Motion In Limine Regarding Alleged
     Statements To Law Enforcement.  *See* GX 3L.

2.   Defendant Leon Carmichael's Motion In Limine Regarding
     General Character Evidence.  *See* GX 3M.

3.   Defendant Leon Carmichael's Motion In Limine Regarding
     Website And Alleged Intimidation.  *See* GX 3N.

4.   Defendant Leon Carmichael's Motion In Limine Regarding
     References To Alleged Drug-Trafficking Organizations.  *See*
     GX 3O.

5.   Leon Carmichael's Motion In Limine Regarding Remote Acts.
     *See* GX 3P.

6.   Leon Carmichael's Motion In Limine Regarding Prior
     Conviction And Incarceration.  *See* GX 3Q.

7.   Defendant Leon Carmichael's Motion In Limine Regarding Tax
     Returns.  *See* GX 3R.

8.   Defendant Leon Carmichael's Motion In Limine Regarding
     Statements Of Co-Defendant.  *See* GX 3S.

9.   Defendant Leon Carmichael's Motion In Limine Regarding
     Course Of Investigation Testimony.  *See* GX 3T.

10.  Leon Carmichael's Motion In Limine Regarding Alleged Co-
     Conspirator/Participant Statements.  *See* GX 3V.

The Government filed responses to those motion in limine as follows:

1.   Response To Defendant's Motion In Limine To Preclude

Reference To The Term "Carmichael Drug Trafficking Organization." *See* GX 3Z.

2.  Response To Defendant's Motion In Limine To Preclude Evidence That The Defendant Failed To File Tax Returns. *See* GX 4A.

3.  Response To Defendant's Motion In Limine To Preclude Evidence That The Defendant Was Engaged In Drug Dealing Outside The Scope Of The Conspiracy. *See* GX 4B.

4.  Response To Defendant's Motion In Limine To Preclude Evidence That The Defendant Was Convicted Of Murder. *See* GX 4C.

5.  Response To Defendant's Motion In Limine To Preclude Evidence Regarding The Website And Intimidation Of Witnesses. *See* GX 4D.

6.  Response To Defendant's Motion In Limine To Preclude Co-Conspirator Statements. *See* GX 4E.

7.  Response To Defendant's Motion In Limine To Preclude Admission Of Evidence Regarding Any Course Of The Investigation Testimony. *See* GX 4F.

8.  Response To Defendant's Motion In Limine [] Precluding General Character Evidence. *See* GX 4G.

9.  United States' Response In Opposition To Defendant Carmichael's Motion *In Limine* Regarding Alleged Statements To Law Enforcement. *See* GX 4H.

10. United States' Response In Opposition To Defendant Carmichael's Motion *In Limine* Regarding Statements Of Co-Defendant. *See* GX 4I.

Judge Thompson conducted a hearing on the motions in limine on June 3, 2005. *See* GX 4T, a copy of the June 3, 2005, Motions In Limine hearing transcript, at 33-87. First, the Court heard argument on Carmichael's motion in limine regarding his statements on December 4, 2003, to Agent DeJohn when he went to retrieve his property from the DEA Office. *See* GX 3L; GX 4T at 33-43. The Court identified three specific arguments Carmichael was making in that motion: (1) the prejudice of Carmichael's statements outweighed their probative value; (2) his Sixth Amendment right to counsel was violated because the statements were custodial statements made without the presence of retained counsel; and (3) retained counsel, Stephen Glassroth, provided constitutionally ineffective assistance of counsel under the Sixth Amendment when he allowed, and actually sent, Carmichael down to the DEA office, unaccompanied by counsel, to retrieve his seized property. *Id.* at 35-36. After hearing argument from counsel for Carmichael and clarifying the statements that were the subject of the motion in limine, Judge Thompson (1) rejected the more prejudicial than probative argument under Fed. R. Evid. 403; (2) rejected the Sixth Amendment claim that the statement was a custodial statement taken without the presence of counsel; and (3) withheld ruling on the Sixth Amendment ineffective assistance of counsel claim, giving Carmichael's counsel additional time to provide him with legal authority on the issue. *Id.* at 43. Carmichael subsequently filed supplemental authority with the

Court, but the denial of the motion in limine remained the Court's ruling. *See* GX

4W, a copy of Defendant Leon Carmichael's Submission Of Supplemental

Authority In Support Of Motion In Limine Regarding Alleged Statements Of

Defendant.

Next, Judge Thompson took up Carmichael's motion in limine regarding

general character evidence. *See* GX 3M; GX 4T at 43-54. In that motion,

Carmichael sought "to exclude evidence or testimony that he had extramarital

relationships and engaged in other sexual improprieties, such as fathering children

outside of marriage and impregnating a woman who later had an abortion;" that he

"allegedly engaged in violent conduct, such as beating an unindicted coconspirator,

Sandra Jones;" that "he was allegedly responsible for the suicide of an employee;"

that "he was also involved in uncharged crimes;" and that "he brought juveniles

with him while conducting drug related business." *See* GX 4T at 44. To the extent

that Carmichael's motion asked to exclude evidence of Carmichael's general

character, his beating of Sandra Jones, or his contributing to the suicide of another,

the Government did not oppose the motion, unless Carmichael made that evidence

relevant, and the Court granted the motion in limine to the extent that, before the

Government introduced any such evidence, it show its relevance to the Court and

obtain a ruling. *See* GX 4T at 44. As to the testimony concerning Sandra Jones's

participation in marijuana distribution with Carmichael and her shooting of Mr.

Timmons, the Court directed the Government to first ask the Court to consider her testimony outside the presence of the jury because it did not know whether Ms. Jones intended to invoke her Fifth Amendment rights. *See* GX 4T at 45-56. As to Mr. Timmons's testimony about the sexual relationship between Ms. Jones and Mr. Carmichael, the Court also ruled that it would have to see how his testimony transpired and rule on the objection then, finding that the testimony seemed "highly relevant" from what the Government had represented. *See* GX 4T at 57-58. As to the evidence from Mr. Timmons regarding Ms. Jones's shooting Timmons, the Court once again instructed the Government to alert the Court to the testimony so he could hear Mr. Timmons's testimony outside the presence of the jury first. *See* GX 4T at 58-60. Finally, as to testimony that Carmichael began an intimate relationship with one of the witnesses, Latoya Davis, when she was 14 years old, the Court instructed the Government to alert it to the fact such testimony was about to be revealed so that the Court could first hear and rule on that testimony outside the presence of the jury. *See* GX 4T at 60-64.

Next, the Court addressed Carmichael's motion in limine regarding any testimony or evidence related to the website searching for information on the witnesses in his case or related to intimidation of witnesses. *See* GX 3N; GX 4T at 64-68. As to that motion in limine, the Government represented that it had no intent of eliciting any such testimony in its case-in-chief, but it reserved the right to

question such witnesses if the defense opened the door to such testimony. *See* GX 4T at 65. The Court again cautioned the Government to take the matter up with the Court outside the presence of the jury if it believed such testimony was due to come in. *See* GX 4T at 65-66. The Court also instructed the Government to admonish its witnesses not to mention the website before the Government takes that issue up with the Court. *See* GX 4T at 66. The Court included in its ruling that matters first be taken up outside the presence of the jury that had to do with any evidence or testimony about an alleged assault on Gary Wayne George; the protection the Government provided to Sherry Pettus and Sandra Jones because of the website; and any statements Ms. Jones made to the bail bondsman who bailed her out of jail in Mississippi. *See* GX 4T at 66-68.

The Court then addressed Carmichael's motion in limine to exclude any references by the Government or its witnesses to Carmichael's "drug trafficking organization." *See* GX 3O; GX 4T at 68-74. As to that motion, the Court heard argument from both sides and ruled that, unless the defense could show the Court where a particular witness seemed to be going out of his or her way to characterize Carmichael as being involved in a drug trafficking organization, it did not think there was any real issue on which to rule, and it denied the motion unless the defense could show the Court that it was an issue. *See* GX 4T at 73-74.

The next motion in limine the Court addressed was the motion to exclude

evidence of remote acts committed outside the conspiracy time period charged in

the indictment. *See* GX 3Q; GX 4T at 74. The motion was denied as moot, with

the Government instructed to advise the Court outside the presence of the jury if it

believed that the defense had raised some issue that made acts outside the

conspiracy time-period relevant and therefore it intended to introduce evidence

related to those acts. *Id.*

Carmichael's motion in limine to exclude evidence regarding his prior

conviction and incarceration was addressed next. *See* GX 3Q; GX 4T at 74-75.

The Government represented that it did not intend to introduce any such testimony

or evidence unless the defense raised the issue, and the Court instructed the

Government to take the issue up with the Court outside the presence of the jury

should it decide the defense opened the door to such testimony and therefore the

Government was going to present such evidence. *See* GX 4T at 74-75. The

Government was also instructed to caution its witnesses about any mention of

Carmichael's prior conviction and time in prison. *Id.* at 75.

The next motion in limine that the Court addressed was Carmichael's motion

in limine to exclude any evidence regarding Carmichael's tax returns and his

failure to file tax returns. *See* GX 3R; GX 4T at 75-78. With regard to both

Carmichael's tax returns and his failure to file tax returns, the Government

represented that it might introduce evidence of both Carmichael's filed tax returns and evidence of his failure to file tax returns, but before doing so it would alert the Court that it was going to do so outside the presence of the jury. *See* GX 4T at 76-77. With that understanding, the Court ruled that it would decided that issue at trial, if the Government indicated it was to introduce such evidence. *See* GX 4T at 76-77.

The Court then addressed Carmichael's motion in limine to exclude statements made by Codefendant Freddie Williams, statements which had been made by Williams at the time of his arrest and that had been the subject of a rejected motion to suppress. *See* GX 3S; GX 4T at 78-81. Carmichael's written motion in limine included arguments based on Federal Rules of Evidence 402 and 404, and on the Supreme Court's confrontation rights decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), and he expanded that motion at the hearing to include an argument based on *Bruton*.[6] *See* GX 3S; GX 4T at 79-80. Carmichael's counsel argued all of the bases for the motion at the hearing, and the Court rejected all of them, with the Court granting Carmichael permission to revisit the *Bruton* argument if he wished to do so. *See* GX 4T at 80-81.

Next, the Court addressed Carmichael's motion in limine to exclude testimony or evidence regarding the course of the investigation. *See* GX 3T; GX

---

[6] *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968).

37

4T at 81. Carmichael explained that the purpose of that motion was to prevent the Government from using an explanation of the history of the investigation as a vehicle for introducing otherwise inadmissible hearsay statements of individuals who had been spoken to during the investigation but who were not being called as witnesses at trial. *See* GX 4T at 81. With regard to that motion, the Court ruled that, not all investigation and background evidence violated *Crawford*, and it could not make a blanket ruling at that time and would have to hear objections to the testimony as it came in. *See* GX 4T at 81-83.

And finally, the Court addressed Carmichael's request for a *James*[7] hearing on whether there was a conspiracy and who was involved in the alleged conspiracy. *See* GX 4T at 83-85. In denying that request, the Court held that it was not going to conduct a *James* hearing, but it would "make the appropriate determination at the end of the Government's case as well as at the end of the case-in-chief as to whether the evidence has been established that would warrant the admissibility of the alleged coconspirators' statements, or whether there's been some undue prejudice to the defendant that would warrant a mistrial." *Id.* at 84.

On June 3, 2005, Judge Thompson entered an order granting and denying the motions in limine to the extent and for the reasons cited at the motions in limine hearing. *See* GX 4V.

---

[7] *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc).

After the Court ruled on the motions in limine, Carmichael filed Defendant

Leon Carmichael's Submission Of Supplemental Authority In Support Of Motion

In Limine Regarding Alleged Statements Of Defendant. *See* GX 4W. In that

submission of supplemental authority, Carmichael argued that his statements to

DEA Agent DeJohn on December 4, 2003, should be suppressed because

Carmichael's counsel, Stephen Glassroth, provided constitutionally ineffective

assistance when he permitted Carmichael to pick up his belongings from law

enforcement unaccompanied by counsel. *Id.*

## L.     Carmichael's Request For The Disclosure Of The Identity Of Alleged Coconspirators

Carmichael continued his attempts to obtain the identity of all individuals

the Government contended were coconspirators with him in his marijuana

distribution enterprise, and to that end he filed, through counsel, Ms. Chartoff,

Defendant's Request For Disclosure Of Identity Of Alleged Co-Conspirators. *See*

GX 4O. In that motion, Carmichael asked that the Court order the Government to

reveal, under seal, by May 9, 2005, the identity of the alleged coconspirators "for

each count of the indictment and all alleged statements made in furtherance of the

alleged conspiracy." *See* GX 4O at 1. On May 11, 2005, Judge Boyd denied the

motion, finding no "*compelling* reason ... for [the] court to allow the filing of a bill

of particulars designed to compel the United States to identify *now,* and provide

statements *now* for, any unindicted co-conspirators who may be summoned as prosecution witnesses." *See* GX 4P at 6.

## M.    Motion Based On Prejudicial Pretrial Publicity

On June 1, 2005, just four days before trial was set to begin, counsel for Carmichael and Codefendant Williams filed Defendants' Joint Motion For Continuance Or Change Of Venue Due To Prejudicial Pretrial Publicity, And Motion For Gag Order To Prevent Future Press Releases By The Government. *See* GX 4Q, a copy of the motion based on pretrial publicity. In support of the motion, Carmichael and Williams complained about the publicity surrounding the indictment of George David Salum, III, a retired Montgomery Police Department lieutenant, for obstructing justice in Mr. Carmichael's case. *See* GX 4Q at 1, ¶ 3. According to the defense, the Government waited until less than two weeks before Carmichael's trial to obtain the indictment of Salum, even though it had been investigating him since the summer of 2004. *Id.* Carmichael and Williams criticized not only the timing of the indictment, but also the Government's issuance of a press release in relation to the case, which was picked up by the Associated Press and other, local media outlets. *Id.* at 1-3, ¶ 4-5. Carmichael and Williams alleged that the news coverage was "highly inflammatory and prejudicial to Mr. Carmichael and Mr. Williams," and they blamed the Government for this inflammatory publicity because, according to them:

6.   ... The coverage insinuates that the Defendants were involved with crime outside the scope of the trial allegations, specifically, using illegal means to intimidate witnesses and government agents. This publicity, in addition to all prior publicity regarding this case, have impeded severely the Defendants' ability to obtain a fair trial at this time and in this venue.

7.   The news coverage created by the United States' press release is also highly prejudicial in that it suggests that Mr. Carmichael's current lawyers were involved in wrongdoing. ... Because this coverage does not make clear which lawyers have been accused of wrongdoing, it leaves the impression that Mr. Carmichael's current lawyers have engaged in criminal conduct.....

*Id.* at 2-3, ¶¶ 6-7.  Counsel requested that the trial be continued for a brief period to permit a cooling-off period or that venue be changed, and that the Government be forbidden to issue future press releases during the pendency of Carmichael's and Williams's trial. *Id.* at 3-4, ¶¶ 9-10.

The Government filed a response to Carmichael's and Williams's motion in which it denied any orchestration of publicity in the Salum case or intention to impair Carmichael's right to a fair trial. *See* GX 4R, a copy of United States' Response To Defendants' Joint Motion For Continuance Or Change Of Venue, at 1. It also asserted that Carmichael's and Williams's rights to a fair trial had not, in fact, been impaired by the publicity surrounding Salum's indictment. *Id.* at 1-2. The Government asked the Court to deny Carmichael and Williams the relief they sought. *Id.* at 3.

Carmichael and Williams followed with a brief in support of their motion.

*See* GX 4S, a copy of Defendants' Brief In Support Of Defendants' Joint Motion

For Continuance Or Change Of Venue Due To Prejudicial Pretrial Publicity, And

Motion For Gag Order To Prevent Future Press Releases By The Government.

After a motions hearing on June 3, 2005, Judge Thompson denied the motion,

except as to the Government not mentioning anything about the Salum case during

Carmichael's trial, *see* GX 4T at 31, finding that Carmichael and Williams had not

presented sufficient evidence to establish such pervasive pretrial publicity from

which prejudice should be presumed and "the proper course of action in this case is

to proceed with voir dire examination to ascertain what effect, if any, the pretrial

publicity has had on the jury venire." *See* GX 4U at 2-3.

**N.    Trial**

**1.    1st Day Of Trial (June 6, 2005) (GX 5A-1):  Late disclosure
of phone records; December 4, 2003, "you got me" statement
by Carmichael, including claim of ineffective assistance of counsel**

Carmichael's trial before Judge Thompson and a jury began on June 6, 2005.

*See* GX 5A-I.  Carmichael was represented at trial by four attorneys:  Lisa Monet

Wayne, Susan James, Marion Chartoff, and Ronald R. Brunson. *See* GX 5A-I-1.

Before the jury was selected, the Court heard from Carmichael's attorneys on their

objections to the composition of the jury venire, the method of selection of the jury

venire, and the motion to dismiss the indictment for failure to comply with the Jury

Selection Service Act, and decided to withhold its ruling on the objections and motion in abeyance until after the trial was completed. *See* GX 5A-I-2-11.

Next, the Court heard from Carmichael on the late disclosure of phone records by the Government; the Government disclosed the records two days before trial, a Saturday. *See* GX 5A-I-11-12. The Court held it would take that matter up after the selection of the jury. *Id.* at 12.

Then, the Court addressed Carmichael's motion to suppress Carmichael's December 4, 2003, statements to Agent DeJohn when he went to retrieve his property, on grounds Carmichael had received constitutionally ineffective assistance of counsel from Mr. Glassroth. *See* GX 4W; GX 5A-I-13. The Court rejected the motion to suppress at that time finding that: (1) Carmichael had four attorneys at the time in question but Carmichael only alleged the ineffective assistance of one of those four attorneys, Mr. Glassroth; (2) because Carmichael had not been tried yet, it was impossible to determine if he was prejudiced by anything his counsel did pretrial because it could not determine whether, but for counsels' actions, the outcome of the trial would have been different; (3) under Eleventh Circuit caselaw, where the record is not sufficiently developed, which it was not here, and in general, ineffective assistance of counsel claims were better handled in collateral proceedings; and (4) the Court would have to hold a hearing

on the claim before ruling, and it was not going to do so at that time. *See* GX 5A-I-14-18.

The rest of the first day of trial was consumed with jury selection. *Id.* at 18-320. Carmichael has raised no issues related to the jury selection or voir dire process in his case.

### 2. 2nd Day Of Trial (June 7, 2005) (GX 5A-II): Hearsay objections; alleged discovery violations; coconspirator statements; Carmichael's girlfriends

Before the Court's preliminary instructions to the jury and opening statements, the Court heard from the Government on a motion in limine it had raised concerning one of its witnesses for that day, Chilton County Sheriff's Deputy Steven Brock. *See* GX 5A-II-7-9. According to the Government, Deputy Brock had been in a bar fight where another individual was hurt and the Chilton County Sheriff's Office was investigating the matter. *Id.* The Court withheld ruling on the motion until Deputy Brock was presented as a witness. *Id.* The Court instructed defense counsel to take up with the Court outside the presence of the jury any cross-examination of Deputy Brock on the bar fight before examining Deputy Brock on that matter. *Id.* at 9.

The jury was instructed and opening statements were made. *See* GX 5A-II-9-63. There were no objections made by either party during those proceedings.

The Government then began its case-in-chief, calling as its first witness,

Gary Wayne George. *Id.* Mr. George was the original cooperator who led law

enforcement and their investigation to Mr. Carmichael and told them about

Carmichael's involvement in marijuana trafficking and distribution in the

Montgomery, Alabama, area. *Id.* at 64-169. During the direct examination of Mr.

George, Ms. Wayne, as counsel for Carmichael, made three objections, once on

relevance grounds (*id.* at 65-66), once on hearsay grounds (*id.* at 76-77), and once

on lack of foundation (*id.* at 110). The last of those objections was sustained. *Id.*

at 110. Ms. Wayne also thoroughly cross-examined Mr. George on behalf of

Carmichael. *Id.* at 114. 46, 168.

The Government's second witness was Barbara Cooper, a records custodian

for T-Mobile. *See* GX 5A-II-17-73. When the Government made a motion to

admit the phone records that it had subpoenaed from T-Mobile, Ms. Wayne, on

behalf of Carmichael, objected to the admission of those records at that time on the

grounds the Government had not established relevance. *Id.* at 172. The Court

admitted the records for purposes of identification, but with the understanding that

the Government would establish their relevance. *Id.*

Next, the Government called as its third witness Chilton County Sheriff's

Deputy Steven Brock. *See* GX 5A-II-173-207. Deputy Brock was on patrol as a

part of a DEA task force on November 15, 2003, when he stopped Charlotte

Hensarling on I-65 with approximately 26 pounds, or 12 kilograms, of marijuana in her vehicle. *Id.* After the Government completed its direct examination, at the request of Susan James, one of Carmichael's attorneys, the Court excused the jury and allowed Ms. James to take Deputy Brock on voir dire about the investigation into his conduct during a bar fight in which another individual was harmed. *Id.* at 182. After the voir dire examination, Ms. James represented that the testimony about Deputy Brock's participation in the bar fight was relevant to impeach his credibility. *Id.* at 187. After the Court pointed out that Deputy Brock could not properly be impeached on his credibility through such evidence under Federal Rules of Evidence 608 and 609, because there had been no conviction or finding of misconduct, it considered whether the evidence was admissible under Federal Rule of Evidence 403, finding it was also inadmissible under that rule because it was a waste of time. *Id.* at 188-92. After chastising the Government and defense counsel for not making arguments based on the applicable Federal Rules of Evidence, the Court held the testimony was inadmissible. *Id.* at 192. When Ms. James asked the Court if it was denying her permission to ask Deputy Brock the single question if he was on administrative status and what his current duties were, the Court, after further inquiry, ruled in Carmichael's favor. *Id.* at 193-96.

Carmichael, through counsel, Marion Chartoff, then argued under Federal Rules of Evidence 401, 402, and 403 for a standing objection, or motion in limine,

to the Government's improper vouching for the credibility of its witnesses by bringing in evidence of their good character, for example, that one of their witnesses was a Special Forces veteran. *Id.* at 193, 196-98. The Court ruled in Carmichael's favor, instructing the Government not to elicit testimony from any of its witnesses about their military backgrounds. *Id.* at 200-01.

Ms. James then thoroughly cross-examined Deputy Brock on behalf of Mr. Carmichael. *Id.* at 201-07.

The Government's fourth witness was Maria White, a forensic drug chemist with the Alabama Department of Forensic Sciences. *See* GX 5A-II-207-14. Ms. White tested the marijuana seized from Charlotte Hensarling and determined it was 23.61 pounds, or 10.723 kilograms, of marijuana. *Id.* Although there were no objections during Ms. White's testimony, Carmichael, through counsel, Ms. Wayne, briefly cross-examined Ms. White about whether there was any fingerprint powder on the package of marijuana that she analyzed, and Ms. White replied there was not. *Id.* at 214.

Charlotte Hensarling was the Government's fifth witness. *See* GX 5A-II-215-42. Ms. Hensarling testified about her marijuana distribution activities, which involved buying marijuana from Patrick Denton and Gary Wayne George and distributing it for them in the Huntsville area along with her husband. *Id.* Before her testimony, counsel for Carmichael, Lisa Wayne, interposed an objection, and

the objection was heard outside the presence of the jury. *Id*. at 215. Ms Wayne objected to Ms. Hensarling's testimony on the grounds the testimony was cumulative and a waste of time under Federal Rule of Evidence 403, and on the grounds that the Government had not provided it with the required discovery under Federal Rule of Criminal Procedure 16(a)(2)(b) and (c) regarding any testimony by Ms. Hensarling about other trips that she had made to pick up marijuana as a part of the Carmichael marijuana distribution conspiracy. *Id*. at 216-21. The Government disputed Ms. Wayne's contention that it had not provided the defense discovery on Ms. Hensarling's other trips to pick up marijuana. *Id*. at 217. The Court found the testimony was not cumulative, it was relevant, and there was no discovery violation with regard to the testimony, and that, therefore, it was admissible. *Id*. at 221.

During Ms. Hensarling's testimony, Ms. James, on behalf of Carmichael, objected on hearsay grounds to a question about whether Denton or George ever talked to her about where they were getting their marijuana. *Id*. at 227. The Court allowed the Government to elicit testimony about whether Hensarling had ever talked to Denton or George about the source of their marijuana. *Id*. When the Government attempted to elicit what they told her, Ms. James objected on hearsay grounds again, but the Court allowed Ms. Hensarling to answer, overruling the objection conditionally, stating it would resolve whether the statement was the

statement of a coconspirator made during the conspiracy at the end of the case. *Id.*
at 227-28. Ms. Hensarling testified that Denton told her he was getting the
marijuana from a guy named Leon, whom he had known for a long time and who
owned a trucking company. *Id.* at 228. Ms. James then thoroughly cross-
examined Ms. Hensarling on behalf of Carmichael. *Id.* at 228-40.

The Government's sixth witness was Prattville Police Sergeant David
Williams. *See* GX 5A-II-242-96. Sergeant Williams was involved in the
undercover operation in which Patrick Denton was wired up to meet with Freddie
Williams and in the search of Freddie Williams's residence on November 17,
2003. *Id.* Sergeant Williams was not cross-examined by counsel for Carmichael.
*Id.* at 262.

The Government's seventh and final witness that day was Patrick Denton.
*See* GX 5A-II-264-96. Mr. Denton was involved with buying and selling
marijuana with Carmichael from 1999 until 2003. *Id.* During Mr. Denton's
testimony, Ms. James, counsel for Carmichael, objected twice to the narrative
nature of Mr. Denton's testimony, and both times the objections were sustained.
*Id.* at 276, 279. She also objected when the Government asked Mr. Denton where
he would take the money to pay Carmichael for the marijuana, and Mr. Denton
answered, "[t]o his house, his office, girlfriend's house," and "[t]o his office or
either to his personal house or he had a girlfriend that lived right down the road –."

*Id.* at 295-96. The objection was grounded on Rules 401 and 403 of the Federal
Rules of Evidence, and counsel pointed out it had been the subject of a motion in
limine. *Id.* at 298. The Court overruled the objection on the grounds that it was
appropriate for Mr. Denton to testify about his intimate knowledge of Carmichael's
life, because it went to Mr. Denton's credibility. *Id.* at 300-01.

### 3.   3rd Day Of Trial (June 8, 2005) (GX 5A-III):  Coconspirator statements; alleged discovery violations; Carmichael's dangerousness; juror fear; publicity; Codefendant Williams's statement about fear that children would be killed if he cooperated

On the third day of trial, before testimony resumed, Ms. James, counsel for
Carmichael, renewed Carmichael's motion in limine regarding the alleged
coconspirator statements under Federal Rule of Evidence 801(d)(2)(b). *See* GX
5A-III-4, 9-13, 14-16, 19-21. The grounds for the motion were that the admission
of the statements would violate Carmichael's confrontation rights as outlined in
*Crawford. Id.* at 10. The Court held that the statements in further of the
conspiracy were admissible, but it directed the Government to be circumspect in its
questions regarding any statements by coconspirators after the date of
Carmichael's arrest, November 17, 2003. *Id.* at 10-11. Ms. James asked the Court
to make the same ruling with regard to any coconspirator statements predating the
dates in the conspiracy, but the Court reserved ruling on that particular issue,
finding a ruling in Carmichael's favor that coconspirator statements made in

furtherance of the conspiracy are inadmissible under *Crawford* would be a
dramatic change in the law. *Id.* at 12. The Court clarified that defense counsel
would still be required to object to a statement if the grounds were that the
statement was not a statement by a coconspirator in furtherance of the conspiracy,
but it would not have to object on *Crawford* grounds, as that objection was
continuing as to any statement elicited and admitted. *Id.* at 19-20.

Counsel for Carmichael, Ron Brunson, and the Government also informed
the Court that, although the parties had reached an agreement on the admissibility
of phone records and were willing to stipulate to their admissibility, Carmichael
was not willing to stipulate to the admissibility of the bank records unless the
Government put them in a particular format and order. *Id.* at 6-9.

Patrick Denton, the Government's seventh witness, then continued with his
testimony. *See* GX 5A-III-22-280. During Mr. Denton's testimony, Carmichael's
counsel, Ms. Wayne, objected to a reference made by the Government about a list
or chart created by Ms. Wayne of the coconspirators as an inappropriate
characterization of the people on the list as "coconspirators." *Id.* at 25. Ms.
Wayne contended it was not her characterization that the list was of coconspirators.
*Id.* The Court did not sustain the objection, but it did instruct the jury that
statements by counsel were not evidence, and characterizations of the testimony
and evidence by counsel were not evidence. *Id.* at 25-26. Several minor

objections by Ms. James – two on the grounds of leading, one on the grounds that

the testimony constituted an improper comment, one on the grounds the reply was

non-responsive, one on the grounds of relevance, and one on the grounds of

hearsay – during Mr. Denton's direct testimony were overruled by the Court. *Id.* at

29, 36, 44, 47, 78. Two other objections – one on the grounds the testimony had

become narrative and one on the grounds of relevance – were sustained. *Id.* at 48,

65. And another objection to the testimony – testimony about Gary George being

beaten up by some black guys – on the grounds of relevance and on the grounds

the subject of the testimony had not been disclosed to the defense team and was,

therefore, a *Gigolo*[8] violation, was overruled. *Id.* at 64.

During the direct examination of Mr. Denton, Carmichael, through counsel,

Ms. James, made his first motion for mistrial outside the presence of the jury. *Id.*

at 84-86. The motion for mistrial was based on testimony from Mr. Denton

implying that Carmichael had something to do with the death of Denton's friend

"Ike." *Id.* at 84-85. Carmichael argued that the testimony was highly prejudicial

and was not admissible under Federal Rules of Evidence 401, 403, and 404(b). *Id.*

Finding that the testimony could be clarified and was not overly prejudicial, the

Court overruled the motion for a mistrial. *Id.* at 86.

---

[8] *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972).

When Mr. Denton's testimony continued, Ms. James made additional objections to his testimony. She objected to a question on the grounds it sought information about what Carmichael thought, and it was sustained. *Id*. at 97. She did not object to the admission of the first videotape, GX 3(a), that Denton clandestinely recorded of his interaction with Freddie Williams, but she did ask that the Government be required to play the entire tape for the jury. *Id*. at 114-16. That request was denied. *Id*. at 116. Ms. James made the same request as to the second videotape, GX 3(b), but that request was also denied, the Court ruling that Carmichael could play the entire tape during cross-examination if he wished to do so. *Id*. at 118. When the Government asked the question whether there was anything else on the third videotape, GX 3(c), that Mr. Denton thought would be helpful to anybody, Ms. James objected on the grounds the tapes themselves were the best evidence. *Id*. at 129. The Court overruled that objection. *Id*.

Ms. James thoroughly cross-examined Mr. Denton on behalf of Carmichael, that cross-examination consisting of 70 pages of transcript. *Id*. at 162-232.

During Mr. Teague's cross-examination of Mr. Denton on behalf of Codefendant Freddie Williams, the Court took a recess and, during the recess, conducted an in-chambers hearing on possible jury tampering. *Id*. at 250-60. One of the jurors received a phone call during the night before and it scared her. *Id*. at 250-52. After consulting each other, counsel for Carmichael, through Ms. Wayne,

represented to the Court that it believed the juror should be excused. *Id.* at 253-56.

The defense's position was that the middle-of-the-night phone call, when coupled

with testimony from Patrick Denton that Carmichael's son was accused of murder

and Denton's friend and fellow marijuana-distributor "Ike" had been murdered,

and the pretrial publicity in the case, rendered the juror biased and unable to be

impartial. *Id.* After the juror was questioned further by the Court, counsel for

Carmichael insisted that the juror had to be removed. *Id.* at 259.

The juror who received the middle-of-the-night phone call told the Court

during her examination by the Court that there was another juror who had

expressed concerns for his safety, and that juror had told the other juror about her

middle-of-the-night phone call. *Id.* at 257-58. The Court questioned the juror the

first juror had discussed her fears with as well. *Id.* at 260-64. That juror told the

Court that his daughters had expressed their concern to him, but that he was not

concerned and could be fair and impartial in the case. *Id.* at 260-61. He also told

the Court that other jurors had been in the room when the juror who received the

call in the middle of the night had expressed her concern for her safety, although

he was not certain how many or who they were. *Id.* at 261-63.

Ms. Wayne then made a motion for mistrial on behalf of Carmichael on the

grounds of juror misconduct and the jury was hopelessly tainted. *Id.* at 265-66.

The Court denied the motion for mistrial, but it agreed that the juror who received

54

the call in the middle of the night should be removed from the jury. *Id.* at 259, 267, 269. The Court also offered to instruct the other jurors to disregard anything that the juror who received the call in the middle of the night might have said, but it did not do so. *Id.* at 267.

Ms. Wayne then made a renewed motion for a change of venue due to the prejudice against Carmichael in the community. *Id.* at 267-68. The Court took that motion under submission. *Id.* at 268.

The Government's eighth witness was Etherine Taylor, Codefendant Freddie Williams's neighbor in the duplex where he lived, and the owner of the home. *See* GX 5A-III-281-93. There were no objections by counsel for Carmichael during Ms. Taylor's direct or redirect examination, and counsel for Carmichael did not cross-examine her. *Id.*

Barbour County Deputy Sheriff Larry Hubbard was the Government's next witness. *See* GX 5A-III-293-313. Deputy Hubbard was the evidence custodian for the evidence seized during the search of Codefendant Freddie Williams's residence. *Id.* at 295-96. There were no objections by Carmichael's counsel during Deputy Hubbard's direct examination, but he was cross-examined on issues pertinent to Carmichael's defense by Ms. Wayne. *Id.* at 304-13.

The Government's ninth witness was Paul Galat. *See* GX 5A-III-313-19. Mr. Galat was a forensic chemist at DEA who tested evidence presented to him in

this case and determined it was marijuana. *Id.* Agent Galat testified without any

objections from counsel for Carmichael, and he was not cross-examined. *Id.*

The Government's tenth witness, the last witness of the second full day of

testimony, was DEA Special Agent Robert ("Bob") Lindsey Greenwood. *See* GX

5A-III-320-31; GX 5B-IV-76-134. Agent Greenwood assisted lead DEA Agent

David DeJohn in many aspects of the investigation in this case. *Id.* One of the

things Agent Greenwood did in relation to this case was to sit in on the interview

of Freddie Williams on November 17, 2003, in the early morning hours when

Williams and Carmichael were arrested and booked. *Id.* at 329-32. When Agent

Greenwood began to testify to what Freddie Williams said when he heard Mr.

Carmichael's voice that night, Ms. Wayne, counsel for Carmichael, objected and

the jury was removed from the courtroom. *Id.* at 332-33. Ms. Wayne represented

to the Court that the basis of Carmichael's objection had been contained in the

pretrial motion in limine, and that motion in limine was not one the Court had

ruled on pretrial. *Id.* at 33-34. When the Court asserted that it remembered that

Carmichael had not raised a *Bruton* argument with respect to the motion, Ms.

James, other counsel for Carmichael, reminded the Court that she had orally

amended the motion to include a *Bruton* argument. *Id.* at 334-35. The Court

allowed voir dire on the statements Codefendant Freddie Williams made in

response to Carmichael's voice, and held the statements were admissible because

they were neutral and, under *Richardson*,[9] they were therefore admissible. *Id.* at

335-42. The Court then agreed to hear more on the redaction issue the next

morning. *Id.* at 342-44.

### 4. 4th Day Of Trial (June 9, 2005) (GX 5B-IV): Publicity; Codefendant Williams's statement that children would be killed if cooperated; Carmichael's dangerousness; December 4, 2003, "you got me" statement by Carmichael; coconspirator statements; hearsay objections; criticism of defense strategy; Moses Williams testimony

When trial commenced the next day, the Court addressed, outside the

presence of the jury, Carmichael's renewed motion for change of venue and

motion for mistrial on the grounds of pretrial publicity. *See* GX 5B-IV-6-10.

Counsel for Carmichael asked, at a minimum, the jurors be polled about any

outside influence any publicity might have had on each of them or if any of them

had been tainted by anything the excused juror might have said. *Id.* at 10-13. The

Court agreed to poll the jury on the issues and to instruct the jurors about why the

one juror had been dismissed. *Id.* at 12-14. The Court also denied the request that

each juror be individually questioned, but it permitted counsel for both parties to

submit any follow-up questions they might have for the Court to ask the jurors,

should that be necessary. *Id.* at 16-20. After polling the jury and individually

questioning two of them, the Court denied the motions for mistrial and for change

---

[9] *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702 (1987).

of venue. *Id*. at 33. The Court further instructed the jury and polled its members individually to see if each of them could be fair and impartial and could ignore anything he or she might have heard that had nothing to do with the facts of the case. *Id*. at 34-48. All of them said that they could and no other jurors were removed from the jury. *Id*. at 48.

Next, the Court addressed Carmichael's request that the statement of Codefendant Freddie Williams indicating he feared for himself and the lives of his children, made after his arrest at the DEA office when he heard Carmichael's voice, be redacted on the grounds it violated Carmichael's confrontation rights under *Crawford* and *Bruton*, and it was more prejudicial than probative. *Id*. at 48-50, 57-58. Counsel for Carmichael asked that the statement be excluded or that the codefendants' trials be severed. *Id*. The Court rejected Carmichael's arguments and found the statements admissible in their entirety. *Id*. at 60-61. Carmichael asked for a limiting instruction before the statement was admitted into evidence, and the Court agreed to give it. *Id*. at 64-66.

After the Court ruled on the statements of Codefendant Freddie Williams, Carmichael, through counsel Susan James, made another motion for a mistrial. *Id*. at 61-62. The grounds of this motion for a mistrial were that, during his testimony, Government witness Patrick Denton made an unsolicited remark about Carmichael's son being convicted of murder. *Id*. The Court denied the motion at

that time, with the reservation that Carmichael could raise the issue as a part of his

motion for judgment of acquittal. *Id.* at 62-63. Carmichael asked for a curative

instruction on Denton's comment, and the Court agreed to give it if counsel for

Carmichael drafted it. *Id.* at 67. That instruction was never given, because defense

counsel determined it was too late to give it by the time they remembered the Court

had not given it. *See* GX 5C-VII-246-47.

Next, the Government asked that it be able to call Sherry Pettus as an

adverse witness and that it be permitted to lead her. *Id.* at 67-70. Carmichael,

through counsel Ron Brunson, objected to that request, and the Court reserved

ruling on the issue, stating it would take the issue up outside the presence of the

jury before Ms. Pettus testified. *Id.* at 71-73.

Agent Bob Greenwood then resumed his testimony. *Id.* at 76-134. Before

Agent Greenwood testified about Codefendant Freddie Williams's reaction and

statements on hearing Carmichael's voice at the DEA office after his arrest, the

Court gave the promised limiting instruction that the testimony was only to be

considered against Williams, repeating the instruction once before the statement

was elicited. *Id.* at 80, 81. Ms. Wayne, counsel for Carmichael, thoroughly cross-

examined Agent Greenwood on all critical matters to which he testified,

specifically she cross-examined him on Codefendant Williams's statements about