his children being killed and Carmichael's "you got me" statement. *Id*. at 87-111, 132-33.

The Government's eleventh witness was DEA Special Agent Sherry Gonzales, the DEA Group Supervisor for the Montgomery area on November 16, 2003; she participated in the search of Denton's residence, heard the conversation between Denton and Carmichael the night of the search, and she saw Carmichael pass Denton's house the night of the search of Williams's residence. *See* GX 5B-IV-135-207.  During Agent Gonzales's testimony, Ms. James, counsel for Carmichael, objected several times to Agent Gonzales's references to the "drug trafficking organization of Mr. Carmichael, the Carmichael "organization."  The objections were sustained by the Court and it instructed the jury that "[w]hether there was such an organization or not [was] up for [the jury] to decide." *Id*. at 137, 138.

Later, when Agent Gonzales was asked what Patrick Denton told her and other law enforcement agents about Denton's drug trafficking activity, Ms James, on behalf of Carmichael, objected on the grounds of hearsay and cumulativeness. *Id*. at 142.  That objection was overruled. *Id*. at 143.  Carmichael, through James, also later argued that Denton's statements to law enforcement were not admissible because they were not true. *Id*. at 144-45.  That objection was denied because the truthfulness of the statements was for the jury to decide. *Id*. at 145-46.

When the Court dismissed the jury for a break, Ms. Wayne, on behalf of

Carmichael, renewed Carmichael's motion to suppress the statements Carmichael

made to Agent DeJohn when he went to retrieve his property from DEA. *Id.* at

150-51. The Court again denied the motion for two reasons. *Id.* at 151-52. First,

it denied the renewed motion because it found the issues Carmichael was raising

then could have been raised before Magistrate Judge Boyd, but they were not. *Id.*

And second, it denied the renewed motion because it had heard the additional

evidence and it thought Judge Boyd's decision was still correct. *Id.*

During Agent Gonzales's resumed testimony, Ms James objected on hearsay

and foundational grounds to testimony about whether the Honda automobile in a

photograph being introduced by the Government was Carmichael's car. *Id.* at 157-

58. Those objections were overruled. *Id.* at 158.

Before she began her cross-examination of Agent Gonzales, Ms. James

asked the Court to take a matter up outside the presence of the jury. *Id.* at 171.

Ms. James stated that she wished to present testimony indicating the real reason for

Carmichael's arrest – allegedly because he was a felon in possession of a firearm –

but she did not want to open the door for testimony on Carmichael's prior

conviction for murder. *Id.* at 171-72. The Court ruled in Carmichael's favor,

stating that counsel could ask Agent Gonzales if Carmichael was arrested on a

charge that was later determined to be unfounded, and the charge was dropped, and

61

that he was not arrested for any of the charges in this case initially. *Id.* at 174-75. It also instructed the Government that it could not ask about Carmichael's prior conviction for murder or that he had been pardoned for it. *Id.* at 175-76. Ms. James, on behalf of Carmichael, then thoroughly cross-examined Agent Gonzales. *Id.* at 176-92, 205, 207.

The Government's twelfth witness was DEA Special Agent Thomas Halasz. *See* GX 5B-IV-208-94. Agent Halasz participated in the search at Patrick Denton's house, the search of Codefendant Freddie Williams's residence, and he observed Codefendant Williams react to Carmichael's voice at the DEA office and he heard him make the comment about his children being killed if he cooperated. *Id.* at 221-25. Before Agent Halasz testified about Codefendant Williams's statements, the Court gave a limiting instruction that that evidence could only be used against Williams, not Carmichael. *Id.* at 223. Ms. Wayne, on behalf of Carmichael, thoroughly cross-examined Agent Halasz. *Id.* at 227-46, 287-91.

During Agent Halasz's redirect examination, in response to the implication that previous investigations of Carmichael had gone nowhere, the Government asked Agent Halasz why it closed the 2002-2003 investigation of Carmichael. *Id.* at 255. Agent Halasz responded that it was because his cooperator in that investigation had stopped cooperating because "[h]e was afraid that Leon Carmichael would kill him." *Id.* at 255. Ms. Wayne objected and asked for a

mistrial because of Agent Halasz's response, and the matter was taken up outside

the presence of the jury. *Id.* at 255-56. Outside the presence of the jury, Ms.

Wayne explained her objection as being based on the fact that the information

elicited had never been disclosed to the defense in discovery, the answer was more

prejudicial than probative, it was hearsay, and it was improper Federal Rule of

Evidence 404(b) character evidence. *Id.* at 258-61, 264-65, 274.

During discussions with Ms. Wayne on this issue, the Court asked her why

she was eliciting information from the witness about the investigation before 2003

back into the 1990s, and she explained that the charged conspiracy included

conduct going back 10 years, back to 1993. *Id.* at 268-69. The Court continued its

inquiry asking Ms. Wayne why she was eliciting testimony about the reasons the

previous investigation about Carmichael was dropped. *Id.* at 270. Ms. Wayne

explained that "[t]he quality of evidence and the lack of evidence which goes to the

investigation and how it was compromised, or the integrity of the investigation,

goes to reasonable doubt." *Id.* She further argued that the evidence concerning the

closing of the previous investigation went to the bias and integrity of the

investigation in the case before the jury; it indicated a desire to get Carmichael at

any cost. *Id.* at 270-71. When the Court continued to question Ms. Wayne's about

her reasons for the line of inquiry, Ms. Wayne stated "[t]he bottom line is this, is

that I have been doing it a long time and it appears to have been a successful way to deal with cases.  And a credible way for jurors over twenty years." *Id.* at 271. The cooperator in the previous investigation who refused to continue to cooperate because he was afraid that "[i]f Leon finds out, he would kill me," was Moses Williams, who the Government represented it would be calling as a witness in the case. *Id.* at 273-74, 275-76.

After a brief recess, the Court denied Codefendant Williams's motion for a severance because of the evidence of the cooperator's statements about Carmichael, and it conditionally denied the motion for mistrial on that issue, stating it might reconsider it in the morning after it had some additional time to research the issue. *Id.* at 277-78.  In denying the motion, the Court made the following observations:

> … It seems to me that the evidence regarding Moses Williams will come in anyway. He's part of the conspiracy, or allegedly part of the conspiracy.
>
> So it's going to be critical to my decision, at least one part of my decision, it may not be critical to the ultimate decision, but the government better go find Mr. Williams and get him here forthwith.
> …
>
> So I think it's actually evidence that would come in as just part of the ten year conspiracy since it's supposed to have gone back to 1993. And if he can testify, or if he will testify that Mr. Carmichael threatened to kill him, that's it, and I think it would be admissible anyway.

> Now I want to look at Ms. Wayne's argument about this
> investigation. I do remember her making that argument in opening
> statement, and I think the government can respond to opening
> statements or arguments, and she did go into the adequacy of the
> investigation on her cross. But I'd like to look at that a little bit
> further.

*Id.* at 277-78.

Counsel for Carmichael, Ms. Chartoff, also made an oral motion for mistrial

on the grounds that, during his testimony, Agent Halasz stated that Patrick Denton

was not a "hardened criminal," because hardened criminals are people who will not

cooperate. *Id.* at 276-77. The motion for mistrial was denied, but the Court did

offer to give an instruction to the jury to ignore the comment. *Id.* at 277, 281.

When the Government continued its cross-examination of Agent Halasz, Ms.

Wayne objected to the Government's question to him on whether it was unusual

for a drug trafficking investigation like the one involving Carmichael to be lengthy

on the grounds the question lacked foundation and was irrelevant. *Id.* at 283-84.

Those objections were overruled, but a subsequent objection to a more detailed

answer about bits and pieces of evidence that law enforcement received from time

to time that did not lead to search warrants and indictments was sustained. *Id.* at

284-85. Another objection by Ms. Wayne to a question from the Government

about whether Agent Halasz was aware of trucks belonging to Carmichael hauling

marijuana being intercepted during the conspiracy time period was also sustained

on the grounds the question elicited hearsay. *Id.* at 286. The Court instructed the jury to disregard Agent Halasz's response to that question. *Id.* at 287.

Later, the Court had Moses Williams brought into the courtroom and he was voir dired outside the presence of the jury. *Id.* at 316-27. During that questioning, he admitted that he told Agent Halasz in 2002 that he had heard that Carmichael was involved in drug trafficking and that he was willing to try to infiltrate that drug trafficking organization if Halasz would pay him a certain amount of money. *Id.* at 316-17. Mr. Williams told Agent Halasz that he needed the money because he owed Carmichael money for drugs, but Williams testified that was not the truth. *Id.* at 318. Mr. Williams also testified that he could have told Halasz that he was afraid to wear a wire because if Carmichael found out, Carmichael would kill Williams, but that was not a truthful statement. *Id.* at 319. Moses Williams was not called as a witness at trial.

The Government's thirteenth witness was Mona George, a district services and operations manager at Compass Bank. *See* GX 5B-VI-294-312. Ms. George testified about subpoenaed bank records indicating deposits and withdrawals of cash into and from a personal checking account in the name of Sherry Pettus that was opened on May 28, 2002, and closed on May 14, 2003. *Id.* During the eight months the checking account was open, the total cash deposited into the account was $249,293. *Id.* at 308. Many of the checks indicated they were for "Multi-

Investment," "Carmichael Center," Leon Carmichael," and "Leon." *Id*. at 311-12.

There were no objections during Ms. George's testimony.

> **5.    5th Day Of Trial (June 10, 2005) (GX 5B-V):  Coconspirator statements; December 4, 2003, "you got me" statement by Carmichael; Wallace Salery and James conflict issue; Sherry Pettus testimony; Moses Williams testimony on previous investigation and Carmichael's dangerousness; criticism of defense strategy; Carmichael's dangerousness; Carmichael's website**

On June 10, 2005, Carmichael, through counsel, Marion Chartoff, filed Leon

Carmichael's Supplemental Brief Regarding The Admissibility Of Co-Conspirator

Statements Under The Confrontation Clause. *See* GX 6A, a copy of the

supplemental brief.  In that supplemental brief, Carmichael argued that none of the

non-testifying coconspirator's statements were admissible under *Crawford v.*

*Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).  The Government filed the

United States' Response In Opposition To Defendant Carmichael's Confrontation

Clause Objection To Coconspirator's Statements. *See* GX 6B, a copy of that

response.

Also on June 10, 2005, the Court entered a written order denying

Carmichael's motion in limine to exclude the "you got me" statement that

Carmichael made to Agent DeJohn at the DEA office when he went to retrieve his

belongings. *See* GX 6C, a copy of that order.  That order specifically addressed

Carmichael's argument that that statement should be excluded because his counsel

at that time, Steven Glassroth, had provided constitutionally ineffective assistance in advising or allowing him to go to the DEA office unaccompanied by counsel. *Id.* at 2. The Court concluded that Carmichael's claim of ineffective assistance of counsel was premature, but even if it was not, "based on the evidence in the record, … his Sixth Amendment right to effective assistance of counsel was [not] violated in any way." *Id.* at 11.

Also, the Court orally denied unconditionally, *see* GX 5B-V-34, and later issued a written opinion in which it unconditionally denied, Carmichael's motion for a mistrial and motion for a severance based on Agent Halasz's testimony that the 2002-2003 investigation of Carmichael was abandoned when the cooperator in that case (Moses Williams) refused to continue to cooperate because he was afraid Carmichael would kill him. *See* GX 6G, a copy of the Court's order on the motion for mistrial and severance. In that order, the Court rejected all four of Carmichael's four grounds of objection. *Id.*

Before testimony resumed on the fifth day of trial, a number of matters were taken up outside the presence of the jury. First, the Government again asked that Sherry Pettus be declared an adverse witness and that it be able to ask her leading questions as a result. *See* GX 5B-V at 4-5. The Court stated it would take that matter up after Ms. Pettus began her testimony and the Court determine if she was indeed adverse. *Id.* at 5.

Then, the Government represented to the Court that another witness it would be presenting that day, Wallace Salery, was previously represented by Carmichael's counsel, Susan James. *Id.* at 5-6. The Government spoke with Mr. Salery and told him that Ms. James was representing Carmichael, and Mr. Salery told the Government that he was willing to waive any conflict of interest caused by the previous representation. *Id.* at 6. The Government informed Ms. James of its conversation with Mr. Salery. *Id.*

Ms. James then explained to the Court her role in representing Mr. Salery and how, after his appeal was completed, Mr. Salery contacted her and asked her to represent him in cooperating with the Government concerning some information he had about Carmichael. *Id.* at 7. At that point, Ms. James became concerned that she might have a conflict, so she told Ron Wise, a former counsel for Carmichael, about Mr. Salery's interest in providing information to the Government on Carmichael, and she told Salery he would have to talk to the Government on his own because she had had communications with Carmichael. *Id.* at 7. Carmichael had not hired Ms. James when she had this conversation with Mr. Salery and Mr. Wise, but she had had conversations with him about representing him in this case. *Id.* Because of her representation of Mr. Salery, Ms. James told Carmichael she would need to get a waiver from both him and Mr. Salery before she could agree to represent Carmichael. *Id.* at 7-8. Ms. James

prepared a written conflict waiver and discussed it with both Mr. Salery and Mr.

Carmichael, but Mr. Carmichael decided not to hire Ms. James at that time. When

Mr. Carmichael did hire Ms. James later, in November of 2004, she consulted with

Government counsel and was told that Mr. Salery would not be a witness in the

case against Carmichael. *Id*. at 8. Ms. James told Carmichael that Mr. Salery

would not be a witness against him based on that representation. *Id*.

Ms. James argued that the entire defense team relied on the representation of

Government counsel that Mr. Salery would not be called as a witness and, as a

result, Ms. James had remained in the case and none of defense counsel were

prepared to examine him. *Id*. at 9. Also, based on the representation made by

Government counsel, the defense ceased certain lines of investigation. *Id*. at 9-10.

Government counsel admitted that the conversation Ms. James described

concerning Mr. Salery had occurred, but that as the trial date approached, the

Government had determined that Salery would be a witness for the Government.

*Id*. at 12. Thereafter, the Court had an *ex parte* discussion with defense counsel

about the Salery matter. *Id*. at 13-21.

On returning to the courtroom, still outside the presence of the jury, Ms.

Wayne, lead counsel for Carmichael, indicated that the defense had detrimentally

relied on the representation of Government counsel, and its investigation of the

case had been compromised by the representation that Mr. Salery would not be a

Government witness. *Id.* at 21. Defense counsel had not pursued impeachment

evidence because of the representations. *Id.* Further, Ms. Wayne told the Court

that Carmichael "unequivocally would not waive any conflict as to Miss James

having represented Mr. Salery and being a part of this case, the prosecution's case

at this point." *Id.* Ms. Wayne also informed the Court that, when Mr. Carmichael

hired Ms. James as part of the defense team, she, as lead counsel, would not have

allowed Mr. Carmichael to hire Ms. James because of the appearance of

impropriety or potential conflict with regard to Mr. Salery. *Id.* Carmichael hired

Ms. James only after her assurances about Mr. Salery not being a witness in the

Government's case. *Id.* at 21-22.

Ms. Wayne, on behalf of Carmichael, then asked that the Court exclude the

testimony of Wallace Salery on the grounds the defense had been misled by the

Government and had detrimentally relied on the representations of Government

counsel, and if Mr. Salery were permitted to testify, she represented Carmichael

would ask for a mistrial. *Id.* at 21-22. Ms. Chartoff, on behalf of Carmichael,

further contended that the Government's conduct in misinforming the defense

about calling Mr. Salery as a witness amounted to prosecutorial misconduct. *Id.* at

25. The Court then heard further from defense counsel *ex parte. Id.* at 25-29.

When proceedings resumed on the record, there was more discussion about

why the defense did not object sooner to Mr. Salery appearing as a Government

witness, and the Court asked Carmichael personally if he was waiving any potential conflict that Ms. James may have in terms of representing him and her prior representation of Mr. Salery. *Id.* at 29-30. Carmichael stated that he was not. *Id.* at 30. The Court took the matter under advisement, directing the parties to brief the issues, if the Government continued to want to present Ms. Salery as a witness. *Id.* at 31-34.

The next issue taken up with the Court was the motion for mistrial that defense counsel had made the previous day on the testimony that Moses Williams told Agent Halasz he could not continue to cooperate with law enforcement, wear a wire, and have conversations with Carmichael about drug dealing because he was afraid. *Id.* at 33-48. When the Court indicated it was going to make its previous conditional ruling on the motion unconditional, Ms. Wayne, on behalf of Carmichael, reiterated the bases of her motion as including both hearsay and inadmissible character evidence under Rule 404(b) of the Federal Rules of Evidence. *Id.* at 34-36. She also argued the Government's failure to disclose the evidence amounted to a *Giglio* violation. *Id.* at 36. The Court indicated that it believed Carmichael opened the door to the hearsay testimony by eliciting hearsay himself on cross-examination of Agent Halasz. *Id.* 35-36. Ms. Chartoff, on behalf of Carmichael, further clarified the bases for the motion for mistrial asserting that the evidence was "inadmissible hearsay, highly prejudicial and a bad act that we

should have been provided notice with but were not…. It also violated our client's

confrontation clause rights." *Id.* at 38-39.

After the exchange between Ms. Wayne and the Court about *Giglio*, Ms.

Wayne, on behalf of Carmichael, made another motion for mistrial, this time based

on her own ineffectiveness. *Id.* at 37. In response, the Court made the following

comments and findings:

> THE COURT: You can't declare yourself ineffective. You chose this
> as a strategy. You have to live with it. Now we can't do that. Any
> lawyer can stand up in court and declare themselves ineffective and
> get a mistrial? I think you can see the illogic in that in itself.
>
> But you chose this as a strategy, you have to live with it. I will
> decide whether you were ineffective in a collateral post-trial hearing.
> But you can't do that in the middle of a trial. I don't think any court
> would agree to that; otherwise, a defense lawyer could sink a case
> summarily at any time.
>
> MS. WAYNE: And I understand what the Court is saying, but –
>
> THE COURT: So you may be ineffective, but that will be determined
> in a collateral proceeding if Mr. Carmichael is convicted and
> represented by another lawyer.
>
> MS. WAYNE: I understand.
>
> THE COURT: But you can't do that yourself.
>
> MS. WAYNE: I understand, Judge, and I'm simply responding to the
> Court's ruling and I want the record to be clear what that is based
> upon.
>
> THE COURT: Certainly. But I'll issue an order, and you'll get that
> probably Monday morning.

*Id.* at 37-38.  The Court continued its comments on the defense strategy in

response to arguments on the motion for mistrial by Ms. Chartoff, another attorney

for Carmichael:

> THE COURT:  You know, you keep putting the burden on the
> government.  This was brought about by you.  It was not brought
> about by Mr. Moorer, it was not brought about by Ms. Morris, it was
> not brought about by Mr. Feaga.  It was brought about by the defense
> team.  Now all these rights that you asserted were brought, about to
> the degree they were infringed, were brought about by you.
>
> Miss Wayne stood up in court in her opening statement and
> made the adequacy of the government's evidence your defense.  She
> has consistently pursued that on her cross examination of witnesses.
> The government never, as far as I can remember, introduced any
> evidence on direct that even alluded to these issues.  Now you are
> complaining, but all of this was brought out by you.
>
> MS. CHARTOFF:  Your Honor, I respectfully disagree.  I think the
> government's indictment spans from 1993 to 2003 –
>
> THE COURT:  Tell me one time when the government put on
> evidence in their direct testimony that raised the adequacy of the
> evidence.  One time.
>
> MS. CHARTOFF:  They wouldn't, Your Honor.  And furthermore,
> we had to go in and create an opening argument and a defense
> strategy assuming that the government was going to put on evidence
> of a conspiracy lasting from 1993 to 2003.  We had to come up with
> a strategy that would address that.  And that is what we did, Your
> Honor.
>
> THE COURT:  Yes.  You did it, but you have to live with the result.
> You can't have half of the defense in and then, you know, tie the
> government's hands and say you can't put in the bad part of the
> evidence.  You opened that door.  You have to live with the result,
> and that's all I'm saying.

MS. CHARTOFF: Well, I understand that.

THE COURT: You dug your own hole.

MS. CHARTOFF: Your Honor, we also respectfully disagree that this opening the door analysis throws the hearsay rules out the window. That's just a brief statement of the law in my humble opinion.

THE COURT: Well, I agree with you. You know I was going to write in my order, and I'll just give you a part of it, I was going to write in my order, "A challenge to the adequacy of the government's evidence may be relevant as, for example, there is a question about whether certain tests run by experts are reliable or whether a witness's testimony was coerced by law enforcement officers. But this does not mean in any way that all aspects of the government's investigation are relevant and admissible.

"Whether a testifying agent personally believes that the evidence he has against a defendant at the time of the indictment is sufficient, would seem in most instances, if not all, to be irrelevant. Whether the evidence is adequate is solely for the jury to decide. Whether an agent does not have any expertise any more than anyone off the street that his personal beliefs would be helpful to the jury. The agent's beliefs about whether the evidence was sufficient a year or two before the indictment when the agent decided not to close the case would even be more irrelevant.

"Moreover, delving into an agent's thoughts about the adequacy of the evidence is fraught with land mines. Not only does it involve delving in such soft evidence as the subject thoughts of the agent, it also opens up the possibility of the introduction of such unreliable evidence as unsubstantiated leads and hearsay, which are the mainstay of an ongoing investigation but not the mainstay of the trial. Nevertheless, Defendant Carmichael decided, apparently for reasons of strategy, to pursue a defense as a defense a challenge to the adequacy of the government's evidence at various stages of its investigation."

You can't have it one way and not have the whole thing. That's essentially my thinking. Now if you have anything else to put on the record –

MS. CHARTOFF: I do, Your Honor.

THE COURT: -- I'll hear it.

MS. CHARTOFF: We also base our motion for a mistrial on the fact that the government, in putting on this statement, they did not – they committed a prosecutorial misconduct because they knew Williams was a convicted felon and they could not trust his word and his reasons for why he wasn't going to cooperate. This man in his own words has been committing murder since he was thirteen years old.

This is not somebody the government should have relied on, and we believe they knew he was unreliable. They purposefully put this what they knew not to be reliable testimony on the stand and it's prosecutorial misconduct.

THE COURT: How did the government engage in prosecutorial misconduct when they didn't bring out –

MS. CHARTOFF: Your Honor, they could have just asked the question –

THE COURT: But that question was critical. I couldn't let that witness say and give the jury the impression that the reason the government closed out its case was because the government felt that the evidence – well for some spurious reason, the government had a valid reason.

MS. CHARTOFF: The government –

THE COURT: Let me finish.

You raised the question as to why the government closed its case in 2002. You wanted to leave the jury with the impression that the government improperly closed out the case, that it did so because

it wanted to do something bad to Mr. Carmichael. The government had a right at that time to inform the jury that it had neutral reasons for closing out the case; that it had an informant who would no longer cooperate. And the reason he wouldn't cooperate was because he felt threatened by Mr. Carmichael.

The jury had to have the whole story. You can't have the jury assuming that the government acted improperly in closing out the case. You can't have half the story. Once you bring that issue before the jury, why did the government close out the case, and you want to give the jury the impression that it was a bad reason, then the government has the right to counter it with a good reason. You opened that door.

MS. CHARTOFF: And I understand your position, Your Honor. We just feel that the government could have put the witness on to testify, we closed the case before the informant refused to cooperate and not elicited the extremely prejudicial, probably unreliable, based on Mr. Williams' testimony yesterday, comment that –

THE COURT: You know, as I said in my opening comments here, none of this should have come in. All of it is irrelevant. I don't think that what that agent felt about this case has anything to do with Mr. Carmichael's innocence or guilt. I would love to have kept it all out. And that's been my position from the beginning of this trial. That is just fraught – you're just delving into hearsay. You're delving into personal opinions by an agent that has nothing to do with whether your client is guilty or innocent. But you decided to pursue it.

If there would have been an option I would have sustained it. I would have said this has nothing to do with this case. The adequacy of the government's case is just not relevant, and secondly leads – how are leads relevant to this defendant's guilt [or] innocence? How is whether a confidential informant reliable relevant to the issue of this defendant's guilt[] or innocence? But you all went into that.

I fully agree with you, Ms. Chartoff, it is totally irrelevant. I think that agent's opinion about this case has nothing to do with it.

> We shouldn't have gone down that path to begin with. I don't care
> whether they had a[] confidential informant who is credible or not,
> so what? The question is, is the evidence today sufficient. It
> shouldn't have come in to begin with. I fully agree.
>
>    Let's move on.

*Id.* at 40-46.

Next, Ms. Chartoff made another motion for a mistrial, this one based on
the cumulative effect of the prejudicial comment by Moses Williams that
Carmichael would kill him coupled with the testimony that Carmichael's son was
convicted of murder, the murder of "Ike," Patrick Denton's friend, the partial
sequestration order, and the presence of police officers outside the courthouse.
*Id.* at 46-48. The Court held that that motion sounded like an appropriate matter
for a motion for judgment of acquittal at the end of the Government's case, and
the Court agreed to hear Carmichael's argument on the cumulative effect of the
alleged prejudicial matters at the end of the Government's case-in-chief. *Id.* at
48.

The Government's fourteenth witness was Sherry Pettus, the individual
who worked for Carmichael and helped him launder his drug proceeds. *Id.* at 50-
132. During Ms. Pettus's testimony, Mr. Brunson, on behalf of Carmichael,
objected to a question by the Government about why she was living in hotels in
Montgomery after she met with DEA Agent David DeJohn about the Carmichael
case. *Id.* at 56. Outside the presence of the jury, counsel explained that he made

the objection because the answer would refer to the internet website, evidence

about which the Court ruled pretrial should not be admitted. *Id.* at 57-58. Voir

dire was conducted outside the presence of the jury to determine what Ms.

Pettus's answer to the question would be. *Id.* at 58-66. During that voir dire, the

Court instructed Ms. Pettus not to mention anything about the website in front of

the jury. *Id.* It also informed the Government that any testimony from Ms. Pettus

about threatening phone calls she may have received were inadmissible hearsay.

*Id.* at 61. The Court further stated that it would permit the Government to ask

Ms. Pettus the sole question if she told Agent DeJohn that she had been

threatened, but when the Government attempted to elicit that information from

Ms. Pettus, the Court sustained counsel's objection. *Id.* at 63-68.

Later, during Ms. Pettus's testimony, counsel for Carmichael objected on

hearsay grounds when the Government attempted to elicit testimony from Ms.

Pettus about something Keena [Whisenant] said to her about Carmichael's arrest.

*Id.* at 99-100. Carmichael argued that the there was no evidence that either Ms.

Pettus or Ms. Whisenant were involved in the conspiracy or that the statements

were in furtherance of that conspiracy because the statements were made after

Carmichael was arrested and the conspiracy ended. *Id.* at 100-01. In response,

the Government represented that Ms. Whisenant was a coconspirator and the

statement was, therefore, not hearsay. *Id.* at 100. The Court accepted the Government's representation and overruled the objection. *Id.* at 101.

The Court sustained a defense objection to Ms. Pettus about whether she knew who fathered Keena Whisenant's children, finding that Ms. Pettus's answer was based on gossip. *Id.* at 102-07. It overruled a second hearsay objection to a question from the Government about what Keena Whisenant told Ms. Pettus on a different issue, the Government again representing that any statement Ms. Whisenant made were statements of a coconspirator in furtherance of the conspiracy. *Id.* at 109. The Court briefly went off the record and asked the Government to explain how Ms. Whisenant was a member of the conspiracy and how the statement was in furtherance of the conspiracy, which the Government briefly did. *Id.* at 111-14. The Court again overruled the hearsay objection, with the caveat that the Government present the Court with the written statement it requested about the scope of the conspiracy, who was involved, and how any statements were in furtherance of the conspiracy. *Id.* at 114. Two additional objections were made on hearsay grounds, one to another statement by Ms. Whisenant and one to a statement by Mantel Watson, Carmichael's brother-in-law, and overruled. *Id.* at 118, 123-25. A third objection to a conversation Ms. Pettus had with Valerie Carmichael led to a discussion on the coconspirators in the case, which occurred outside the presence of the jury. *Id.* at 134.

During the ensuing discussion, the Government identified the members of the conspiracy: Patrick Denton, Charlotte Hensarling, Steve Hensarling, Gary George, Montel Watson, William "Cadillac" Bolding, Keena Whisenant, Fred Thomas, Calvin "Ike" Dudley, Willie "Romeo," Smith, Valeria Carmichael, Lisa Jones, Emanuel Jones, Freddie Phelan, Sherry Pettus, Sandra Jones, Matthew Molette, Gabrielle Lord, Freddie Williams, and Leon Carmichael, Sr. *Id.* at 135-39. The Court then had the Government explain what role the Government contended Sherry Pettus, Keena Whisenant, Montel Watson, and Valerie Carmichael played in the conspiracy, and what statements they made in furtherance of the conspiracy, before letting the Government go into what those individuals said. *Id.* at 139-48. After the lunch break, the Court announced its decision that it was going to admit the statements of coconspirators Keena Whisenant, Valerie Carmichael, and Montel Watson as statements of coconspirators in furtherance of the conspiracy, subject to reconsidering its ruling at the conclusion of the case. *Id.* at 152, 153-58.

Next, Ms. James argued that some of the individuals the Government named were simply buyers and sellers, not participants in a conspiracy, specifically mentioning Steve and Charlotte Hensarling. *Id.* at 148. The Court agreed to consider the issue during the lunch break. *Id.*

After the lunch break, the discussion returned to the testimony of Wallace Salery and the conflict from Ms. James's previous representation of Mr. Salery. *Id*. at 150-51. Because of the representations of defense counsel that they relied to their detriment on the Government's representations that it was not going to call Mr. Salery as a witness, the Government informed the Court that it would not be calling Mr. Salery as a witness in this case. *Id*. at 151-52.

During cross-examination of Ms. Pettus, Mr. Brunson asked Ms. Pettus why she hated Carmichael at the time she testified before the grand jury and said what she said to the grand jury, and she responded, "Because he had put up a website, and I was on the website." *Id*. at 193. The Court then excused the jury because of the mention of Carmichael's website and had Mr. Brunson voir dire Ms. Pettus outside the presence of the jury about why she hated Carmichael around the time the grand jury met. *Id*. at 193-99. The Court noted that it had admonished the witness not to mention the website. *Id*. at 194. When the Government requested permission to question Ms. Pettus further about the website and how it affected her relationship with Carmichael, the Court found the prejudice outweighed the probative value and it did not allow the Government to explore that issue with her. *Id*. at 198-99.

During redirect of Ms. Pettus, Ms. Pettus lost her composure and the Court took a brief recess to permit her time to calm down. *Id*. at 204. During that

recess, Mr. Brunson, counsel for Carmichael, informed the Court that, during his

cross-examination of Ms. Pettus, he wanted to question her about another sworn

statement that she made that was inconsistent with her grand jury testimony, but

he did not want by doing so to open the door to questioning by the Government

about Carmichael's website. *Id.* at 206-10. After hearing from both the

Government and defense counsel, the Court held that Mr. Brunson could cross-

examine Ms. Pettus on her inconsistent statement, but the Government could not

question her about the website, finding again that evidence of the website was so

prejudicial that the Court did not think its probative value was outweighed by that

prejudice. *Id.* at 210.

The Government's fifteenth witness was Detective Robert Chavez with the

El Paso, Texas, Police Department, who worked with the DEA Airport Task

Force in November 1995, when he stopped Sandra Jones coming off of an

airplane with a large amount of cash, $42,000. *Id.* at 217-27. After Ms. Wayne,

on behalf of Mr. Carmichael made several hearsay and relevancy objections, the

Court excused the jury to determine whether the testimony the Government was

presenting through Detective Chavez was admissible. *Id.* at 220-21, 222, 223-24,

225-27. The Government then explained how Sandra Jones was a member of the

conspiracy and why her statements were statements in furtherance of the

conspiracy. *Id.* at 227-32, 233-34-35. Ms. Wayne followed with her hearsay

objections, also specifically arguing that the statements were inadmissible under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). *Id*. at 233-34. The Court allowed both parties to make their arguments as to whether *Crawford* applied to coconspirator statements made in furtherance of the conspiracy, and it overruled both the hearsay and *Crawford* objections. *Id*. at 237-38.

After Carmichael stipulated to the next witness's testimony that his dog alerted on the money Ms. Jones was carrying on November 11, 1995, indicating the presence of narcotics, so that witness did not have to be called, *id*. at 259-60, Carmichael raised another issue with the Court, through counsel, Ms. Wayne, that had to be addressed outside the presence of the jury, *id*. at 261. The issue was the admissibility of statements by Sandra Jones as a coconspirator and whether such statements were in furtherance of the conspiracy. *Id*. at 261-63. Also discussed was the admissibility of an address book belonging to Ms. Jones that was found on her person during a traffic stop of a truck she was driving belonging to Carmichael and containing marijuana. *Id*. at 263-65. Ms. Wayne objected on the grounds of hearsay and foundation. *Id*. at 164-65. The Court reserved ruling on the admissibility of the address book at that time. *Id*. at 265-66.

The Government's eighteenth witness was Officer Curtis Jones with the Mississippi Bureau of Narcotics. *Id*. at 268-307. Officer Jones testified about the traffic stop and arrest of Sandra Jones on July 27, 1997, when she was found to be

hauling about 137 pounds of marijuana in a truck with the name Multi-

Investments, Inc., written on it, a company owned by Carmichael. *Id.* at 269-85,

309-10. Outside the presence of the jury, the Court ruled that the address book

found in Sandra Jones's possession was admissible; the book and its contents

were not hearsay. *Id.* at 285-87.

The final two Government witnesses that day were Jamie Johnson

(nineteenth witness) and Mikey Shea (twentieth witness). *Id.* at 307-313. Jamie

Johnson was the Mississippi Crime Laboratory forensic scientist who tested the

substance found in the Carmichael truck Sandra Jones was driving on July 27,

1997. *Id.* at 307-11. Mr. Johnson determined that substance to be approximately

137 pounds or 62 kilograms of marijuana. *Id.* at 309-10. Mr. Shea was simply a

chain of custody witness. *Id.* at 312-13.

> **6.     6th Day Of Trial (June 13, 2005) (GX 5B-IV):  Sandra Jones's
> statements; James Conflict from prior representation of Eric
> Peagler; discovery on Eric Peagler and Richmond Thomas;
> Richmond Thomas testimony; Jimmy Timmons testimony;
> alleged discovery violation**

On June 13, 2005, the Government complied with the Court's order to file a

brief on the issue of whether Coconspirator Sandra Jones's statement to Detective

Chavez that she was afraid to tell Detective Chavez who owned the currency found

in her possession was admissible as the statement of a coconspirator in furtherance

of the conspiracy. *See* GX 6D, a copy of Response To Court Regarding Whether

Coconspirator Statement Made To Law Enforcement During And [In] Furtherance

Of Conspiracy Is Admissible.  On that same day, counsel for Carmichael, Marion

Chartoff, filed a Brief On The Admissibility Of Alleged Statements Of Sandra

Jones To Law Enforcement about being afraid to disclose the name of the owner of

the currency found in her possession. *See* GX 6F, a copy of Carmichael's brief on

Sandra Jones's statement.  In that response, Carmichael argued that Jones's

statement was not admissible as the statement of a coconspirator in furtherance of

the conspiracy because there was no indication it was made in furtherance of the

charged conspiracy and it was also inadmissible under *Crawford v. Washington*,

541 U.S. 36, 124 S. Ct. 1354 (2004). *Id.*

The Government also filed its Response Regarding Coconspirator

Statements in which it argued that it had established a conspiracy existed and that

the statements of Patrick Denton, Kena Whisenant, Valerie Carmichael, Sandra

Jones, and Santiago Hernandez were admissible as the statements of coconspirators

in furtherance of the conspiracy. *See* GX 6E, a copy of the Government's motion

on the existence of a conspiracy and admissibility of coconspirators' statements.

Carmichael, through counsel, Marion Chartoff, also filed a brief addressing the

issue of the admissibility of the coconspirator statements. *See* GX 6H, a copy of

Leon Carmichael's Brief On The Admissibility Of Co-Conspirator Statements.  In

that brief, Carmichael argued that the statements, offered by the Government as the

statements of coconspirators in furtherance of the conspiracy, were inadmissible because the Government had not established a conspiracy existed and that each of the statements offered were made in furtherance of the conspiracy.

Trial resumed with the Government's twenty-first witness, Stanley Wash, the Mississippi Bureau of Narcotics Officer who took possession of the marijuana seized from Sandra Jones on July 29, 1997, and turned it over to the crime lab for analysis. *See* GX 5B-VI-6-11.

The Government's twenty-second witness was Agent Brett Pachciarz, a supervisor with the United States Border Patrol at Fort Brown Station in Brownsville, Texas. *See* GX 5B-VI-12-13. On July 11, 1998, while working at the Sierra Blanco border, Agent Pachciarz stopped a tractor-trailer truck registered to Carmichael as it was crossing the border, and he found it to be hauling a large amount of marijuana. *Id.* at12-23. Agent Angel Gomez, another United States Border Patrol Agent stationed at the Sierra Blanca, Texas, station, on July 11, 1998, was the Government's twenty-third witness. *Id.* at 23-28. Agent Gomez was also involved in the stop of a tracker-trailer truck belonging to Carmichael on that day; his dog alerted to marijuana in that truck; and marijuana and cocaine were found in that truck during that stop. *Id.* at 23-28. DEA Forensic Chemist Victor Brevenec, the Government's twenty-fourth witness, examined the marijuana found in the truck stopped and searched on July 11, 1998, by Agents Pachciarz and

87

Gomez, and determined there was 92.76 pounds of marijuana seized from that truck that day. *Id.* at 28-35. In addition, 2.7 grams of cocaine, with an 83% purity, were seized from that same tractor-trailer truck. *Id.* at 33-34.

The Government's next witness, Kenneth Henley, a bail bondsman from Meridian, Mississippi, was the Government's twenty-fifth witness. *Id.* at 36-51. Mr. Henley posted bond for Sandra Jones when she was arrested in Mississippi driving a tractor-trailer truck belonging to Multi-Investments, Inc. (a trucking company owned by Carmichael), containing a large quantity of marijuana. *Id.* Carmichael met with Mr. Henley and arranged the bail for Sandra Jones. *Id.* During Mr. Henley's testimony, counsel for Carmichael, Ms. James, made an oral motion for mistrial on the grounds the Government commented on Carmichael's failure to testify when, in stating its grounds for objection to a question asked by Mr. James, the Government stated the question was improper because what it asked "would also go to what we could only tell by delving into the mind of the defendant, which none of us can do." *Id.* at 43, 46. The Court denied the motion for a mistrial, finding Government counsel was not commenting on Carmichael's failure to testify, but it agreed to give a cautionary instruction to the jury, if the defense wanted it to do so, which the defense indicated it did. *Id.* at 47-48. The Court asked counsel to draft the instruction, and the instruction was given to the jury. *Id.* at 48-49.

During a recess following this testimony, Ms. James notified the Court of a potential conflict she had with a witness the Government was going to be presenting, Eric Peagler. *See* GX 5B-VI-52-62. During discussions on that issue, Ms. James represented that she had previously represented Mr. Peagler in a federal criminal matter in 1994, related to his parole from custody, and that Mr. Peagler had frequently been represented by another attorney with whom she shared an office building, Jeff Duffy. *Id.* at 52. Ms. James represented that she did not know of the Government's intent to call Mr. Peagler as a witness until the first day of trial, when it listed its witnesses for the jury. *Id.* at 53. Mr. James stated that, based on the discovery provided pretrial, she had no reason to believe that Mr. Peagler would be called as a witness, although she admitted he was named in a DEA Form 6 statement the defense had received, and because she did not know to what Mr. Peagler was going to testify, she could not determine if a conflict actually existed. *Id.* If Ms. James did have a conflict and was required as a result to withdraw from the case, the entire defense team believed it also had a conflict. *Id.*

Ms. Wayne then indicated that Carmichael was not willing to waive any conflict of interest that existed from Ms. James's previous representation of Eric Peagler. *Id.* at 54. She also informed the Court that the defense had attempted to talk to Mr. Peagler, but he refused, indicating he was represented by counsel at that time, Mr. Duffy. *Id.*

Mr. Teague, counsel for Codefendant Freddie Williams, also indicated that he had previously represented Mr. Peagler, but that representation was not in connection with anything involving this case. *Id.* at 54-55. Mr. Teague represented that "[f]rom the day I got the first discovery indicating Eric Peagler might be a witness," he had explored whether he needed to be concerned about Mr. Peagler's testimony and his prior representation of Peagler, and decided he had no conflict. *Id.* at 55. Further, Mr. Teague represented that he had discussed the matter with his client, and Codefendant Williams "saw no conflict and waives any potential adverse interest there." *Id.*

The Court then had the Government make a proffer concerning the testimony that Mr. Peagler was expected to provide, which it did. *Id.* at 55-56. The Government also informed the Court that Mr. Peagler's testimony would not include anything that involved Ms. James's prior representation of him, and that Mr. Peagler was willing to waive any conflict he might have. *Id.* at 56. It was the Government's position that no conflict existed. *Id.*

When it came the defense's time to address the issue further, Ms. James first complained about the Government's presentation of the testimony of Richmond Thomas on the grounds it had never heard anything with regard to Mr. Thomas before that day, and that constituted a due process problem for Carmichael. *Id.* at 57, 58. The Court explained that the Government did not have an obligation under

90

the law to inform counsel of its witnesses and evidence, and instructed the Court to

move on to the Peagler matter. *Id*. at 57-58.

Ms. James then explained to the Court that, not only had she previously

represented Peagler, but she also had a more familiar relationship with him:

> … Not only have I represented Mr. [Peagler] in a criminal matter, I
> have fairly extensive knowledge of Mr. [Peagler's] background, his
> finances, all sorts of things of that nature.
>
> Mr. [Peagler] did work on our office for probably almost a year.
> We had daily contact with him.  I think that I have gained confidences
> in relation to my involvement with Mr. [Peagler].

*Id*. at 58. Ms. James represented to the Court that she believed that both Mr.

Peagler and Carmichael would have to waive any conflict arising from the prior

representation of Mr. Peagler and she explained why she thought Mr. Carmichael

would be prejudiced from the previous representation as follows:

> MS. JAMES:  Well I still think that Mr. Carmichael could have
> and would have assessed that scenario with regard to who he wanted
> to represent him.  Because it would be inherently unfair for Mr.
> Carmichael to have to sit here and question my cross examination, or
> the cross-examination of any of the defense team of Mr. [Peagler]
> because we were trying to, quote, protect ourselves from some sort of
> disciplinary action or Bar action as a result of that.
>
> I mean I realize conflicts develop in a lot of cases, Judge, but
> conflicts that we can't see until the second week of trial are
> problematic, not only just for our own status with the State Bar and
> our ethical obligations, but for a client who has looked at discovery,
> has discussed the discovery with us and now we have two individuals
> that purport to have been engaged in illegal conduct with Mr.
> Carmichael that we don't even have time to investigate.

*Id.* at 59.  The Court reserved ruling on the testimony of Eric Peagler.  *Id.* at 60, 61.

When the Court indicated it was going to go forward with the testimony of Richmond Thomas, counsel for Carmichael asked for a continuance so that it could investigate Mr. Thomas.  *Id.* at 60.  The Court denied that request at that time, subject to re-examining the issue if the defense could show it some law that demonstrated their entitlement to a continuance.  *Id.* at 61.

Richmond Thomas testified as the Government's twenty-sixth witness.  *Id.* at 62-74.  Mr. Thomas testified that, up until December of 2001, he permitted Eric Peagler, Erma Lazano, and Cesar Lazano, to unload marijuana from trucks at his warehouse in Montgomery.  *Id.* at 64-66.  The marijuana belonged to Eric Peagler. *Id.* at 66.  On one occasion, Thomas drove Eric Peagler to Carmichael's house in June of 2001, after unloading a load of approximately 78 pounds of marijuana at Thomas's warehouse.  *Id.* at 66-70.  Peagler delivered to Carmichael a portion of the marijuana Thomas and the Lazanos had unloaded from the truck.  *Id.* at 68-73. Peagler told Thomas that there were 50 pounds of marijuana in the one bag he was taking to Carmichael that he owed to Carmichael, and the rest of the marijuana was in another bag.  *Id.* at 66-73.  Peagler took the 50-pound bag of marijuana to Carmichael to repay Carmichael for marijuana he had obtained from Carmichael earlier that week.  *Id.* at 73-74.

Before cross-examining Thomas, counsel for Carmichael, Ms. Wayne,

argued that the Government had violated its discovery obligations by not turning

over evidence to impeach several of its witnesses, arguing its failures violated the

Jencks Act, 18 U.S.C. § 3500; *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194

(1963); and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972). *See* GX

5B-VI-75-77. In response to the argument, the Government represented that it did

not have any Jencks Act material in relation to Mr. Thomas, and that it had

disclosed the only *Brady* or *Giglio* material it had on him, a NCIC report of his

criminal history. *Id*. at 77. The Court denied the motion under *Brady* and *Giglio*,

indicating Carmichael's counsel had not produced any evidence that the

Government had allegedly withheld, so it had failed to demonstrate a *Brady* or

*Giglio* violation. *Id*. at 80-81. It also directed the Government to turn over any

DEA Form 6s or any other *Brady* or *Giglio* material it had on Mr. Thomas,

instructing the Government to check with its agents to be certain. *Id*. at 81-82.

In response, the Government turned over a plea agreement with Mr. Thomas

and a plea agreement with Mr. Peagler in cases unrelated to Carmichael's case. *Id*.

at 83-84.

Next, the Court asked the Government why it was going to call Mr. Peagler

as a witness in light of the possible conflict that might exist in the case, when it did

not need Mr. Peagler to testify because Mr. Thomas had just testified to the same

93

things Mr. Peagler was going to testify to. *Id*. at 84. The Court indicated it was

merely wondering why the Government would risk its case on the unnecessary

testimony. *Id*. at 85.

After the Government briefly examined Mr. Thomas further about a plea

agreement he entered with the Government in an unrelated case, the Government

granted Carmichael's counsel more time to investigate Mr. Thomas before having

to cross-examine him. *Id.* at 83-87. It also ordered the Government to turn over to

it for in camera inspection any statements made by Mr. Thomas and Mr. Peagler

related to their previous convictions for their 2001 drug distribution to determine if

there was any *Brady* or *Giglio* material related to this case in those statements. *Id.*

at 87-89.

The next issue addressed was the testimony of Jimmy Timmons. *Id*. at 89.

Counsel for Carmichael, Ms. James, reminded the Court that the defense had filed

a motion in limine asking the Court to preclude any testimony from Mr. Timmons

that, in 1995, he was shot in the head by Sandra Jones, an alleged coconspirator, at

the direction of Carmichael. *Id*. at 89-90. Carmichael directed Ms. Jones to shoot

Mr. Timmons because Joseph "Pie" Lacey had been busted and Carmichael was

afraid that Mr. Timmons was going to cooperate. *Id*. at 90. Ms. James first argued

the testimony was not true and was unfounded, and the Government could not

prove it, therefore it should be excluded. *Id*. at 89-90. After hearing the

94

Government's proffer, the Court asked the Government why the testimony was relevant. *Id*. at 90-92. The Government represented that the shooting was relevant because it was an act in furtherance of the charged conspiracy. *Id*. at 92. After hearing further argument from Ms. James on why the testimony should be excluded, including the reason that it violated Carmichael's right to confrontation, the Court held the testimony was admissible, and overruled Carmichael's objection. *Id*. at 93-95. Ms. James also argued that Mr. Timmons's testimony was more, cumulative evidence of Carmichael's dangerousness, and it should be excluded for that reason as well. *Id*. at 95. The Court also rejected that argument and overruled that objection, finding that the evidence was evidence of acts in furtherance of the conspiracy, and was admissible. *Id*.

Mr. Timmons was the Government's twenty-seventh witness. *Id*. at 96-178. Mr. Timmons testified about his drug distributing activities with Carmichael and about an incident in which Sandra Jones tried to shoot him, he believed, at the direction of Carmichael. *Id*. Mr. Timmons testified to direct knowledge that Carmichael was present when marijuana distribution was occurring. *Id*. at 111. Ms. James thoroughly cross-examined Mr. Timmons, that cross-examination covering approximately 55 pages of the transcript. *Id*. at 120-74.

The Government's twenty-eighth witness was Officer Michael Drummond, a member of the Montgomery Police Department, Special Operations Department,

Narcotics Division. *Id.* at 179-90. Officer Drummond testified about his investigation into drug distribution by Jimmy Timmons and others, and what Mr. Timmons told him about those operations. *Id.* During Officer Drummond's testimony, when the Government tried to elicit testimony about what Mr. Timmons or others told Officer Drummond, counsel for Carmichael, Ms. James, objected on hearsay grounds and on confrontation rights grounds. *Id.* at 182-83. The objection was overruled.

The twenty-eighth witness for the Government was Prattville Police Officer/DEA Agent David DeJohn; Agent DeJohn had worked for the DEA previously as a part of the High Intensity Drug Trafficking Area task force in Montgomery, Alabama, and was doing so on November 13, 2003, when Carmichael came to the attention of law enforcement through Gary Wayne George. *Id.* at 190-270, 283-363. Counsel for Carmichael, Ms. Wayne, made numerous objections on various grounds throughout Agent DeJohn's testimony, and she cross-examined him thoroughly. *Id.*

During a break in Agent DeJohn's testimony, the Court addressed the issue of the admissibility of Eric Peagler's testimony, finding that because Mr. Peagler was willing to waive any conflict of interest, his testimony was admissible at Carmichael's trial. *Id.* at 272-74.

The admissibility of some subpoenaed documents that Carmichael's

company, Multi-Investments, Inc., produced, through his attorney, was addressed

next. *Id*. at 274-81. Those documents were to be introduced by the Government to

establish that the truck stopped by Border Patrol agents in Sierra Blanca, Texas, in

1998, was a truck belonging to Multi-Investments, Inc. *Id*.

Finally, after testimony was completed for the day, Ms. Wayne took another

issue up outside the presence of the jury. *Id*. at 367. Ms. Wayne informed the

Court that, through its investigation, the defense had discovered that, on his

application for employment with law enforcement, Agent DeJohn admitted he

smoked marijuana, and she wanted to question him about that. *Id*. at 367-68. The

court agreed to review Agent DeJohn's personnel file before it ruled on the

admissibility of the testimony Ms. Wayne sought to elicit. *Id*.

> 7.    **7th Day Of Trial (June 14, 2005) (GX 5C-VII):  Prior statements
>       of Peagler and Thomas; Richmond Thomas cross-examination;
>       coconspirator statement on money laundering conspiracy;
>       testimony of Eric Peagler; alleged late disclosure of evidence;
>       DeJohn lawsuit**

Before trial resumed on June 14th, the seventh day of trial, the Court ruled

on various issues the parties had previously raised. *See* GX 5C-VII- 5-36.  First,

the Court took up the matter of the admissibility of the testimony of Eric Peagler

and Richmond Thomas in light of the issues defense counsel had raised. *Id*. at 5.

The Court, with the Government's agreement, provided the DEA Form 6

statements of both Peagler and Thomas to counsel for Carmichael, and the Court held, therefore, that there were no *Brady* or *Giglio* issues for the Court to decide. *Id.* at 5, 10. After reviewing the documents, counsel for Carmichael, Ms. Wayne, further objected to the failure of the Government to previously disclose the statements under *Brady*. *Id.* at 23-33. As to the Thomas statement, Ms. Wayne pointed out that Mr. Thomas identified another source of marijuana coming into Montgomery, "the Mexicans," Maria Erma Lazano, Juan Ruiz, and Cesar Lazano. *Id.* at 23-28. However, the Government argued that it was never required to turn over the DEA Form 6 statements themselves, and because the statements made were in relation to other drug trafficking activity, not the crimes charged in this case, they were not exculpatory. *Id.* at 26-28. As to the Peagler statement, counsel for Carmichael, Ms. James, argued that the complete omission by Peagler in his statement of any mention of Carmichael was exculpatory evidence. *Id.* at 28-31. After hearing the arguments, the Court denied the motion to continue so counsel could further investigate and to grant relief under *Brady*, finding "[e]ven assuming that the government failed to turn these documents over, … in a timely manner, I don't reach that issue at this time. All I have is speculative prejudice. This is clearly the type of matter that I will take up on either a post-trial or 2255 later. It's not a basis for either declaring a mistrial or anything else. It's just time to move on." *Id.* at 33. A final objection to the admissibility of Mr. Peagler's and Mr.

Thomas's testimony on the grounds of a denial of the right to confrontation was also denied. *Id.* at 33-34.

The Court also addressed the issue of cross-examination of Agent DeJohn on his admission of having smoked marijuana. *Id.* at 11-15. Agent DeJohn's personnel file indicated that he last smoked marijuana when he was 16 years old, and counsel for Carmichael agreed with the Court that the evidence in the personnel file was, therefore, not relevant. *Id.* at 15.

The Court then turned to the issue of the subpoena to Multi-Investments, Inc., concerning the records on the trucks stopped in Sierra Bianca, Texas, hauling marijuana. *Id.* at 6-7, 16-22. The Court held that the records were inadmissible without the testimony of a records custodian to authenticate them. *Id.* at 21-23. The Government later represented to the Court that, if called to testify, Johnny Hardwick would testify that he received the records at issue from Carmichael in response to a subpoena issued to Multi-Investments, Inc., and he turned those records over to the grand jury in response to that subpoena. *Id.* at 35.

After ruling on the outstanding motions, Carmichael, through Ms. Wayne, cross-examined Richmond Thomas, and his testimony was completed. *Id.* at 36-50, 58-59.

The Court had a brief discussion with Government counsel about whether it would be introducing any statements of coconspirators in furtherance of the money

laundering conspiracy, and it indicated it would, a statement Sherry Pettus made to a bank teller at Compass Bank. *Id.* at 59-60. The Government contended that Ms. Pettus was a member of the money laundering conspiracy. *Id.* at 60.

Before Eric Peagler testified, Ms. James further argued that his testimony should be inadmissible. *Id.* at 60-62. Ms. James argued that information contained in the DEA Form 6 statements the Government produced reflected an inculpatory statement related to Carmichael; the statement was actually produced by the Government during discovery. *Id.* at 61. The Court denied the motion under *Brady*, without prejudice. *Id.* The Court then asked Mr. Peagler on the record if he wished to waive any conflicts he might have with Ms. James or Mr. Teague, and he did. *Id.* at 65-67. The Court also granted Ms. James's motion in limine that the Government not elicit any testimony from Mr. Peagler, or that Peagler testify, about Ms. James's prior representation of him. *Id.* at 68. Ms. James also made certain that Carmichael was questioned on the record about whether he wanted Ms. James, as opposed to one of his other attorneys, to cross-examine Mr. Peagler, and Carmichael stated he wanted Ms. James to do the cross-examination. *Id.* at 68-69.

Eric Peagler, the Government's twenty-ninth witness, was a marijuana distributor in the Montgomery area, and he was permitted to testify about his marijuana distributing activities with Carmichael. *Id.* at 72-124, 134. Ms. James interjected numerous objections during Mr. Peagler's testimony and conducted a

100

thorough cross-examination of Mr. Peagler. *Id.* at 87-108, 134-35. When the

Government began to elicit testimony from Mr. Peagler on redirect examination

about his dealings with a person known as Big Al, who put Carmichael and Mr.

Peagler together to transact some drug business, counsel for Carmichael objected

on hearsay grounds; *Crawford* confrontation rights grounds; the late discovery

hampered the defense's investigation and amounted to a *Brady* violation grounds;

grounds it was inherently unfair and amounted to trial by ambush; and on the

grounds it denied Carmichael his Fifth and Sixth Amendment rights. *Id.* at 123-24.

In the alternative, counsel asked that the trial be continued so that the defense

could further investigate Mr. Peagler and his accusations against Carmichael. *Id.*

at 125. The Court denied the motions. *Id.* The Court then ruled that Big Al was a

member of the conspiracy, and that the Government could elicit testimony from

Mr. Peagler about transactions with Carmichael, but it could not elicit testimony

from Mr. Peagler that either Big Al or Carmichael were drug dealers. *Id.* at 132-

33.

Carmichael, through counsel, Mr. Brunson, then continued their complaints

about the Government's failure to meet its discovery obligations, arguing that

counsel would need more time to review the records that had just been delivered to

them. *Id.* at 125-32. The Government had just been handed the same documents

by its next witness, who brought the documents to trial in compliance with a trial

subpoena. *Id*. at 126-27, 128-29, 131. Mr. Brunson made a motion that the

probate records be suppressed, but the Court reserved ruling on that motion until

Mr. Estes, the custodian of the records from the Probate Court, testified. *Id*. at 32.

The Court denied the objection. *Id*. at 135. Later, after chastising defense counsel

for providing its objections seriatim and disrupting the trial, the Court permitted

Carmichael to make further arguments on the motion. *Id*. at 135-44.

As noted, the Court, outside the presence of the jury, criticized defense

counsel, and there was an exchange between counsel and the Court as follows:

THE COURT: These seriatim objections are disrupting the trial, and
I'm making that as a finding. I gave you an opportunity to make your
objections when you came back in. I heard your arguments. Now
you want to go back and make another one.

This has been repeated throughout the trial. It has to stop. I
send the jury out, you make your objections, I rule. Then we keep the
trial going on. We're not going to constantly have people saying I
want to make an additional objection. I want to make additional
argument.

Miss James, you have done it. You haven't necessarily done it,
Miss Wayne. And, Ms. Chartoff, you've done it. It has to stop. The
trial has to [continue] moving smoothly. Now I'm going to say you
make your objections, those are the objections, I rule on them, that's
it. I'll hear it this time, but from now on your objections have to be
made, we don't just sit back and casually come up with additional
objections and then the Court hears them. It disrupts the progress of
the trial.

I research things. I look at them. When you come back with
additional objections I have to go back to the drawing board. I should
be able to rule on something and get it behind me. Now I'll hear your

objections, Miss Chartoff, but no more seriatim objections. Now what is this objection?

    ...

MS. WAYNE:  Judge, at this point I'm going to interject as lead counsel. The Court has indicated that I'm not one of the lawyers that have been doing this, but let me tell you something, okay? Because I'm just sitting here and I'm stewing. I understand that this Court needs to get this case going. We have done everything in our power in terms of what has been disclosed to us to have it here, notebooked, organized and ready to go. The government has continuously, over our objection, and we're angry about it and the Court seems to be blaming us –

THE COURT:  I'm not blaming you for that, but I am blaming you that I cannot handle four lawyers making objections all the time. No judge can handle that. And I've been very liberal about it.

MS. WAYNE:  I agree, Judge.

THE COURT:  You cannot conduct a trial with four lawyers standing up and saying I object to this on A, next lawyer says I object to it on B, the next lawyer says I object to it on C and then sometimes even a fourth lawyer who will say I object to it on X. And sometimes you even make objections that conflict with each other. That is the problem.

MS. WAYNE:  I agree, Judge. And if this Court would look at the government and say no more, you'r stopping now, if they don't have it, you're stopping you can't –

THE COURT:  I don't know whether the government has violated any rule here, Miss Wayne. There is nothing before me to show that they have done anything wrong. I understand your sense of unfairness. I understand that in a criminal case you're not supposed to be ambushed. But the law says that. If I were on the U.S. Supreme Court I will tell you quite candidly I would change that law. I would change it tomorrow. But I am not on the Supreme Court and I cannot change it.

Now unless you have rules, you know – In fact, when it was within my discretion I turn over everything that they gave me because I have strong beliefs that the defense needs it. But I can only do what the law allows me to do. And unless you can show me a rule that says that the government has disobeyed a particular provision, I follow the law and that's it. Whether I think it's even a fair law. And I've already told you.

MS. WAYNE: Right.

THE COURT: I think the Supreme Court's decision that says you don't get the same discovery that you should get in civil cases is wrong. But that's my private view, it's not my view as a judge. And I have to comply. And that's why I keep asking you, tie this to a provision. Let me know where they have engaged in something wrong and I will give you the full breadth of what the rule requires, because I have strong beliefs that you should get as much discovery before trial as possible.

MS. WAYNE: And what I would ask the Court, based upon that, is that you've asked us to look at the committee notes so that we can respond as one lawyer. I'd ask that we be able to look at these committee notes so that we can address this effectively for Mr. Carmichael as one lawyer and be able to look at this point. Because it was new, we can't get WestLaw, we don't have access and we need to be able to respond.

THE COURT: Very good.

*See* GX 5C-VII-136-41.

Judge Johnny Hardwick was the next Government witness, the

Government's thirtieth witness. *See* GX 5C-VII-153. Before he testified, a voir

dire examination was conducted of Judge Hardwick, outside the presence of the

jury. *Id.* at 144-50. Judge Hardwick testified that he was retained as counsel for

Multi-Investments, Inc., to handle compliance with a federal grand jury subpoena

in this case. *Id.* at 148. The records Judge Hardwick turned over to the grand jury

were provided to him by Carmichael, the Chief Executive Officer of Multi-

Investments, Inc. *Id.* at 148-49. Based on Judge Hardwick's representations, the

Court ruled the records were admissible as admissions of a party under Federal

Rule of Evidence 801(d)(2)(b) and under the residual hearsay rule of Federal Rule

of Evidence 807; some were also admissible as public documents. *Id.* at 149 -51.

All of Carmichael's objections to the admissibility of the documents were

overruled. *Id.* at 152. Judge Hardwick's testimony was consistent with his voir

dire testimony. *Id.* at 152-59.

The Court denied Carmichael's objection to the admissibility of the probate

records and other documents, finding the Government did not violate Rule 16 of

the Federal Rules of Criminal Procedure in not supplying those documents to

defense counsel at an earlier time. *Id.* at 166-68. However, the Court did sustain

an objection by defense counsel and denied the Government permission to use

summary charts of telephone calls that it intended to use later in its case-in-chief,

unless the Government made its spreadsheet related to those calls available to

defense counsel. *Id.* at 168-78.

The Government's next witness (thirty-first witness) was Burt Estes, the

Chief Clerk of Probate for Montgomery County, Alabama. *See* GX 5C-VII-178-

207. Mr. Estes testified about probate records on file in his office reflecting property owned by Carmichael. *Id.* Following Mr. Estes was Priscilla Luster (thirty-second witness), a teller at Compass Bank at the Normandale Branch in Montgomery, Alabama. *Id.* at 208-14. Ms. Luster testified about Sherry Pettus coming into her bank branch and making large cash deposits of money that smelled bad. *Id.* Alice Oree (witness thirty-two), a former teller at Compass Bank at the Normandale Branch in Montgomery, Alabama, also testified about large cash deposits of malodorous money made by Sherry Pettus at that location in 2002. *Id.* at 215-21.

Next, the Government called DEA Special Agent Devin Whittle, who was the Government's thirty-third witness. *Id.* at 222-61. Agent Whittle was involved in the investigation of Carmichael, specifically he participated in the search warrant at Patrick Denton's house on November 17, 2003, and he testified about phone records that supported testimony that Carmichael called Denton during the search of Denton's residence, and demonstrated other phone calls between Carmichael and other coconspirators on that night/early morning. *Id.* at 224-44.

Carmichael made another motion for mistrial and for a change of venue after a reporter informed Ms. James and Ms. Wayne, during the previous break in trial, that Agent David DeJohn had filed a lawsuit against Carmichael and his attorneys based on the internet website posting his personal information and photograph. *Id.*

at 262, 266.  The reporter asked Ms. James and Ms. Wayne if they knew that

Agent DeJohn had filed a lawsuit against them, as well as Mr. Glassroth, Ms.

Chartoff, Mr. Brunson, and Carmichael in state court because of the use of his

photograph on Carmichael's internet website.  *Id.* at 262-63.  The basis for the

motion for mistrial was that the lawsuit further poisoned the jury against

Carmichael and his attorneys, implying they did something wrong; it denied

Carmichael a fair trial; denied him the effective assistance of counsel; and the

filing of the lawsuit created a conflict of interest for counsel.  *Id.* at 263-64.  Ms.

James then stated that she felt compelled to file a motion to withdraw as counsel

for Carmichael because of the conflict.  *Id.* at 264.  Ms. Wayne also stated her

concerns as counsel for Carmichael, because she was in the process of cross-

examining Agent DeJohn.  *Id.* at 270.  None of the attorneys at that time knew for

certain that Agent DeJohn had filed the lawsuit.  *Id.* at 267, 269.  After some

discussion back and forth, the Court told counsel for Carmichael to put their

requests in writing, and the Court would take those requests up later.  *Id.* at 268.

The request to withdraw as counsel for Carmichael, however, was denied, subject

to the Court's reconsideration.  *Id.*  Ms. Wayne's cross-examination of Agent

DeJohn was brief, but effective.  *Id.* at 280-82.

    The Government then rested its case and the Court took up the defendants'

motions for judgment of acquittal.  *Id.*  Counsel for Carmichael objected on the

grounds that the Government had not presented sufficient evidence on either the marijuana conspiracy count or the money laundering conspiracy count for the case to go to the jury. *Id.* at 284-85. Carmichael's motion for judgment of acquittal was denied, as was Codefendant Freddie Williams's motion. *Id.* at 285.

Outside the presence of the jury, counsel for Carmichael, Ms. Chartoff, made a motion to dismiss the indictment on the grounds of prosecutorial misconduct. *Id.* at 284-90. Specifically, Ms. Chartoff argued that Agent Halasz's testimony about the threat Carmichael made to Moses Williams was untrue and painted an inaccurate picture of the actual threat, and the Government had an affirmative duty to call Moses Williams to testify and correct that inaccurate portrait. *Id.* at 286.

The next issue raised with the Court was a request for a ruling on whether Carmichael's pardoned conviction could be used against him if he testified. *Id.* at 291. Carmichael's counsel contended the conviction was too old to be used against him – it was more than 10 years old – and he had not been provided proper notice. *Id.* at 291-300. The Court found the conviction was more than 10 years old, but that Carmichael had been provided notice of the conviction. Next, the Court turned to whether Carmichael had been pardoned for the offense, finding he had been, and found the conviction could not be used by the Government as substantive evidence under Federal Rule of Evidence 404(b). *Id.* at 300-02.

Finally, the Court found the prejudice outweighed any probative value the conviction might have. *Id.* at 302. The Court held the prior conviction could not be used to impeach Carmichael if he testified. *Id.* at 302.

Carmichael then began the presentation of his case. *Id.* at 303. His first witness was Lisa George, Gary Wayne George's ex-wife and Patrick Denton's first cousin. *Id.* at 303-04. Ms. George did not know Carmichael, but she had heard of him and he lived next door to her grandparents. *Id.* at 304. Ms. George testified about her ex-husband's and her cousins' involvement in buying and selling illegal drugs and getting into trouble with the law. *Id.* at 304-21.

Carmichael's second witness was IRS Agent Louie Wilson, who worked for IRS, Criminal Investigation Division. *Id.* at 321-41; GX 5C-VIII-44-84. Agent Wilson testified that he had been involved in two criminal investigations of Carmichael, one in late 1997, and the other one involving this case. *Id.* at 322,324. During his previous investigation of Carmichael, Carmichael was cooperative. *Id.* at 333. Agent Wilson also testified that some of Carmichael's businesses were primarily cash businesses. *Id.* at 33-35. He also testified about the bank records he obtained from Compass Bank in relation to the investigation in this case. *Id.* at 324.

After the jury was released for the day, the matter of Agent DeJohn's state lawsuit was discussed in chambers. *Id.* at 342-52. Counsel for Carmichael, Ms.

James, had obtained a copy of the lawsuit and she provided it to the Court. *Id.* at

343. The lawsuit was filed on June 10, 2005, and it named among its defendants

Leon Carmichael, Steven R. Glassroth, Lisa Monet Wayne, and Susan James. *Id.*

Based on the lawsuit, Ms. James argued that Agent DeJohn's testimony should be

stricken or, in the alternative, the more drastic remedy of mistrial and dismissal of

counsel from the case due to a conflict. *Id.* at 343-44. The Court then asked the

parties to present it with law on the issue and, agreeing with the Government that

the lawsuit was a direct result of Carmichael's own actions, stated:

> THE COURT: Let me get the law on it and we'll see where we are
> and the cards will fall where they fall. This website has been a part of
> this case. It's been very difficult to handle. I've kept it out of the
> case. I'll be very candid with you, about halfway through it I thought
> it should not have been kept out because I think that perhaps Mr.
> Carmichael should just live with the consequences of having put up
> the website. In light of this I'm kind of happy I did keep it out.
>
> But when the government first asked me to keep [it] out I was
> moving cautiously and I almost decided to let it in because I really
> couldn't think of an unfair reason to keep it out. It's just pure
> evidence, and it is evidence of intimidation. I think you have a
> constitutional right to put it up, which I wrote about, but you have to
> live with those results, too.
>
> MS. JAMES: Judge, why is it any more intimidation than the board
> right down in front of the Clerk's Office where the government is
> seeking information and leads and various things on other people? I
> mean, it was an informational seeking device.
>
> THE COURT: I'm not saying that I necessarily would draw the
> conclusion that it's intimidation, but I think it could come in to show
> he put those agents up on it and the jury can draw its own conclusions.
> I just think it's evidence, I didn't say it was conclusive evidence.

110

But anyway, that's neither here nor there. I have tried to keep the website out of this litigation. As I said, fortunately, I think I may have made the right decision, it's almost as if I knew this lawsuit was coming, but I didn't.

...

THE COURT: No, no, no. I actually wrote in an opinion when Mr. DeJohn tried to intervene in this case that his remedy was to file another lawsuit against Mr. Carmichael. I didn't say the attorneys. I agree with the government, this website is a constitutional First Amendment right. But I have to admit that the results have been drawn on by Mr. Carmichael and whoever did it with him.

I fully agree with you about it. But he had a right to do it, and I will protect it. But he can't avoid the consequences of his actions.

*Id.* at 348-51.

### 8. 8th Day Of Trial (June 15, 2005) (GX 5C-VIII): Defense's Use of Louie Wilson as witness; Agent DeJohn's lawsuit; criticisms of counsel

The eighth day of trial began with several matters taken up outside the presence of the jury. *See* GX 5C-VIII. First, the Court questioned defense counsel about Mr. Brunson's examination of IRS Agent Louie Wilson, stating that he found that examination "a little bit disturbing." *Id.* at 5-6. The Court explained that the questioning might be a part of the defense's trial strategy, and that was fine, but it was concerned that that testimony seemed helpful to the Government because it included conclusory views on the Government's case. *Id.* Mr. Brunson stated that he appreciated the Court's comments and concerns. *Id.* at 6, 8. Ms.

111

Wayne objected to the Court's questioning of the defense strategy, and the Court stated that it "just want to make sure on the record that it is your trial strategy." *Id.* at 9. The Court made clear that it was "not discouraging you from pursuing it," and that "lawyers quite often pursues things that I would consider detrimental to their case, but they have their own private reasons for doing it." *Id.* at 9-10.

After the Court further explained why it felt the need to raise its concerns – its responsibility to ensure a defendant gets a fair trial – and assured defense counsel it was not trying to get them to change their trial strategy or anything else, and the Government asked to be able to question IRS Agent Louie Wilson about some particular matters, *id.* at 11-15, Mr. Brunson explained his strategy to the Court:

> MR. BRUNSON: Your Honor, the Government in our Rule 29 motion yesterday, had we been able to expand upon it, the Government has not proven that this money came from drug sources. They are going to be required to prove beyond a reasonable doubt that this cash that went in this one bank account came from drug proceeds. The point of my questioning Mr. Wilson yesterday was that he, and nobody else, can tell whether the money was cash, whether it smelled or – whether that money was drug proceeds. He or nobody else can tell where that money came from, that it was drug proceeds.
>
> Whether it smelled or whether it glowed, nobody knows whether that came from a bar, from a trucking business, from concessions, from anything. It could have been buried for fifteen years. He could have earned it selling a truck.
>
> …

> THE COURT: Louie Wilson's thoughts about this seems to have no relevance.
>
> MR. BRUNSON: Your Honor, his last statement before we ended yesterday is that he could not tell beyond a reasonable doubt whether this cash was drug proceeds or not.
>
> THE COURT: What does his view about whether he can tell –
>
> MR. BRUNSON: If he can't tell, nobody can tell. That's my point.

*Id.* at 15-18.

Next, the Government presented the Court with a motion indicating that Agent DeJohn filed a motion to dismiss his lawsuit against Carmichael and counsel, without prejudice. *Id.* at 8-9. Carmichael, through counsel, Ms. Wayne represented that she did not feel that the dismissal of the lawsuit by Agent DeJohn made any difference in assessing the conflict of interest based on the lawsuit. *Id.* at 20. Ms. Wayne insisted that the filing of the lawsuit created an actual conflict of interest that could not be cured. *Id.* at 20-22.

Ms. James also addressed the filing of the lawsuit, because she was also a named defendant in the suit. *Id.* at 24-25. Ms. James alleged that the filing of the lawsuit potentially changed their trial strategy, and that the filing of the lawsuit indicated Agent DeJohn's bias, and it went to the credibility of his testimony. *Id.*

During discussions of the lawsuit filed by Agent DeJohn and its effect on Carmichael's trial and any attorney conflict as a result of the lawsuit, counsel for

Carmichael, Ms. Wayne, indicated that the defense was going to file a motion to

recuse Judge Thompson based on her description of Judge Thompson's appearance

during the discussion, stating, "The Court has raised its voice, you've turned red,

your lips are trembling, you're pointing your finger at Mr. Carmichael and you

clearly….." *Id.* at 34. In responding to Ms. Wayne, Judge Thompson stated on the

record:

> THE COURT: Now wait a minute now. I am not turning red. If I put
> on the record every time you raised your voice at me or did certain
> things – Now I want to say one thing her for sure. Now I am totally
> neutral in this case. I have bent over backwards to protect your client,
> and you're not going to get me off the case by trying to make some
> spurious record. I have issued neutral orders after a deliberative
> process and I will do it again. Now, I just want to make that clear to
> you, Miss Lisa Wayne.
>
> I want you to understand that is not going to be a basis. If any
> appellate court looks at this, it will be in an order that will be issued in
> a neutral environment. I have had no ex parte contacts in this case.
> Nothing. And the fact that I might get concerned and so forth, that is
> true, but I just want to emphasize to you that it was based on Mr.
> Carmichael's own actions.
>
> MS. WAYNE: Judge, I think the record is clear. My sense is,
> though, as his defense lawyer you've expressed a clear enmity and
> bias toward this defendant, period, and that's what I want on the
> record. That's my opinion, and I think we have a right to put that on
> the record.
>
> THE COURT: You have a right to put it on the record.
>
> MS. WAYNE: And we'd ask that you remove yourself.
>
> THE COURT: I will not do it. I definitely will not do it. And if
> anybody I have expressed a bias against, I think it's been against the

government. I've done everything to keep that website out of here.
I've even brought you back here to make sure that you were pursuing
your defense appropriately because you were going to go down an
avenue that I thought would result in the type of evidence that you got
up and asked for a mistrial on. And I wanted to cut that off in the bud.

. . .

MR. FEAGA [AUSA]: I want to say on behalf of the United States
saying that we very much disagree with Miss Wayne and her
comments that she made about the Court's demeanor. The Court is
telling the lawyers in a forceful way what its position is, and the fact
that any belief expressed on the record I want us on the record … that
the Court has done nothing to indicate that the Court ha[s] to get off of
this case or has some bias against the defendant.

THE COURT: Now I would like the record to reflect that when you
said the Court had no bias, Miss Wayne did "Hmm" as if to show a
smirking disrespect to the Court.

…

THE COURT: No, you were showing a smirking disrespect to the
Court when he said the Court had no bias, Ms. Wayne. I heard it, and
I heard it.

Now proceed.

And I will take that up with you later, Ms. Wayne.

*See* GX 5C-VIII-34-37. After a break in the proceedings, Ms. Wayne apologized

to the Court. *Id*. at 41.

The jury trial resumed with Mr. Brunson continuing his examination of IRS

Agent Louie Wilson. *Id*. at 44. During that testimony, Agent Wilson testified that

a previous tax investigation of Carmichael, in which the IRS tried to track the

source of Carmichael's cash, did not lead to any charges. *Id*. at 44-56, 78-82.

Before Carmichael's third witness was presented, Bruce Maddox, another

matter was discussed outside the presence of the jury. *Id*. at 90-95. Mr. Maddox

served as counsel for Carmichael in this case for a brief time, before he discovered

he had a conflict of interest and was permitted to withdraw. *See* GX 1D; 1L; 1M;

1P; 1T; 1U. As a result of that previous representation of Carmichael by Mr.

Maddox, Ms. Wayne believed it was appropriate to have Carmichael waive any

privilege he had on the record. *See* GX 5C-VIII-90. Mr. Carmichael waived the

privilege he had to any communications he made to Mr. Maddox during the brief

representation. *Id*. at 90-95. Mr. Maddox then testified for the defense on the

previous IRS investigation of Carmichael and the advice he provided Carmichael

in relation to that investigation. *Id*. at 95-119.

Next, additional conversations were held in chambers on the Court's

comments on the Agent DeJohn lawsuit and any conflicts of counsel that might

have arisen because of it. *Id*. at 121-25. During that in camera discussion, at

Carmichael's insistence, he made a statement to the Court taking full responsibility

for the idea for the website and establishment of that website. *Id*. at 126.

Carmichael's fourth witness was Alan Gunn, who designed and built the

Carmichael Center. *Id*. at 128-149. His fifth witness was Pickett Reese, another

individual who worked at the Carmichael Center during its construction. *Id.* at 149-61.

### 9.     8th Day of Trial Continued (June 15, 2005) (GX 5C-VIII-B): Defense witnesses

The eighth day of trial resumed after there was a glitch with the court reporter's equipment, with the Government objecting to the late disclosure by defense counsel of Carmichael's tax returns and documents related thereto. *See* GX 5C-VIII-B-4-10. The Court admitted the documents even though there was a violation of Rule 16 of the Federal Rules of Criminal Procedure. *Id.* at 8. The Court did not rule on the issue of whether those documents were relevant at that time.

Carmichael's sixth witness was Alvin Anderson, who asserted he had never met Eric Peagler and he never introduced Carmichael to Eric Peagler. *Id.* at 11-20. His seventh witness was Charles Philip Kelser, the director of the Carmichael Center. *Id.* at 22-42. His eighth witness was Murray Argo, an income tax consultant who testified about tax returns for Multi-Investments Inc., and Carmichael. *Id.* at 43-47. The Government objected to the tax returns on the grounds they contained hearsay. *Id.* at 47-54.

Before the Court permitted Judge Johnny Hardwick to take the stand as Carmichael's ninth witness, the Court held a colloquy with Carmichael to see if he waived the privilege on behalf of Multi-Investments, Inc.; Carmichael did waive

117

the privilege. *Id*. at 54. Judge Hardwick, formerly counsel for Carmichael, testified about his advice to Carmichael about his response to the Government's subpoena for records. *Id*. at 55-63. After that testimony, the Court, after permitting defense counsel to take Mr. Argo on voir dire to determine if he relied on the tax returns, and documents related thereto, in reaching his expert opinions, the Court admitted the documents and the testimony based thereon. *Id*. at 64-70. Mr. Murray continued his expert testimony before the Court. *Id.* at 70-100.

The Court then heard testimony from witnesses for Codefendant Freddie Williams: James D. DeBardelaben, Sheffield Henderson, Leland Watts, Timothy Williams. *Id*. at 100-142. During that witness testimony, both the Government and counsel for Carmichael cross-examined the witnesses. *Id*. At the end of that testimony, Codefendant Williams rested. *Id.* at 142. Codefendant Williams stated during a colloquy that it was his decision not to take the stand as a witness in his own defense. *Id*. at 147-50.

### 10. 9th Day Of Trial (June 16, 2005) (GX 5D-IX): Exclusion of statements from Sandra Jones about being afraid; motions for judgment of acquittal; closing arguments; jury charge

On the ninth day of trial, the Court excluded any statements made by Sandra Jones to a police officer that she was afraid, and indicated it would give a limiting instruction to the jury to ignore that comment. *See* GX 5D-IX-4-6, 8, 10.

Carmichael's tenth witness was Knox Argo, a Montgomery attorney who represented Carmichael in some loan closings in which Carmichael was the borrower. *Id.* at 11-19. His eleventh witness was Lloyd Prescott, an individual who knew Carmichael because they transacted business together related to Carmichael's trucking business. *Id.* at 19-27. Carmichael's twelfth witness was Joseph Lapinsky, another individual who worked in the trucking business with Carmichael and who described how the trucking business worked. *Id.* at 27-47. Carmichael's final witness was Tommy Moore, an insurance agent who conducted business with Carmichael. *Id.* at 48-56. Carmichael then rested. *Id.* at 56. Carmichael stated during a colloquy that it was his decision not to take the stand as a witness in his own defense. *Id.* at 57-58.

The Government presented four rebuttal witnesses: Terry Grace, Georgia Wise, George Ingals, and Louie Wilson. *Id.* at 59-120. These witnesses testified primarily to taxes and Mr. Carmichael and Multi-Investments, Inc. *Id.*

The Court then heard arguments on the motions for judgment of acquittal by Carmichael and Codefendant Williams. *Id.* at 122-169. Those motions were denied. *Id.* at 169. Thereafter, the Court held a jury charge conference, *id.* at 170-184, and closing arguments were made, *id.* at 185-302. Carmichael's counsel, Ms. Wayne, made another motion for a mistrial after closing arguments on the grounds the Government vouched for their witnesses during its closing arguments. *Id.* at

308. That motion was denied in light of the Court's instructions to the jury that the comments of counsel were not evidence, and when the arguments were considered as a whole. *Id.* at 308-09.

### 11. 10th Day Of Trial (June 17, 2005)(GX 5D-X): Jury instructions; verdict

The next day, June 17, 2005, the Court instructed the jury, without objection, and the case was given to the jury for decision. *See* GX 5D-X-3-30. About 4 1/2 hours later, the jury returned a verdict of guilty on counts one and two of Carmichael's indictment. *Id.* at 33-34; *see also* GX 6O, a copy of the verdict form. After a detention hearing, Carmichael was ordered detained, with the exception that he be permitted to visit his dying mother. *Id.* at 128-29.

### 12. 11th Day Of Trial (June 20, 2005) (GX 5D-VI): Forfeiture

On the last day of trial proceedings, June 20, 2005, the parties resolved the forfeiture issues in the case. *See* GX 5D-XI. Carmichael agreed to forfeit the Carmichael Center and the property surrounding the Carmichael Center, up to a million dollars in value, and his Honda automobile. *Id.* at 7-8, 9. In exchange, the Government agreed to not proceed on the other property named in the indictment, and specifically, not to seek to forfeit Carmichael's residence or any rental property, and to return the seized cash to Carmichael. *Id.* at 9-10. The jury was released. *Id.* at 13-14. A Final Order Of Forfeiture ("The Carmichael Center") was entered on April 21, 2008.

In a corrected written order entered on June 22, 2005, the Court found that

there was overwhelming evidence of a drug trafficking conspiracy in this case, and

that in fact, the Government had established the existence of such a conspiracy

beyond a reasonable doubt. *See* GX 6I, noting the Court was issuing a substituted

order, and GX 6J, a copy of the Court's order on the existence of a conspiracy and

the admissibility of coconspirator statements, at 1-2, 5. The Court also found that

the Government had established a money laundering conspiracy by a

preponderance of the evidence. *See* GX 6J at 16. And, it also found that the

statements of the coconspirators that the Government offered were made in

furtherance of the conspiracies, and were admissible. *Id.* at 6-14.

**O.    Order On Carmichael's Motions Concerning The Filing Of The
       Civil Lawsuit By Government Witness, DEA Agent DeJohn, Against
       Carmichael And Two Of His Attorneys, Lisa Wayne And Susan James**

After Carmichael was convicted, the Court issued a detailed written order

setting forth its factual findings and analysis on why it denied Carmichael's

various motions concerning the filing of the civil lawsuit by Government witness,

DEA Agent DeJohn, against Carmichael and two of his attorneys, Lisa Wayne and

Susan James. *See* GX 6K. In that order, the Court denied Wayne's oral motions

for a mistrial and change of venue that were grounded on the civil lawsuit, and

denied James's motion to withdraw. *Id.* at 32-33. In doing so, the Court found

that Carmichael's conflict of interest argument was framed in two different ways.

*Id.* at 10. First, he alleged he was "denied his Sixth Amendment right to effective

assistance of counsel because DeJohn's filing of the lawsuit, or the prospect

thereof, created an incurable conflict of interest between him and his attorneys."

*Id.* Second, "he argued that the filing of the civil suit implicated his Sixth

Amendment right to conflict-free counsel by creating what he deemed an 'actual'

conflict of interest in the midst of trial." *Id.* at 10-11. The Court then rejected the

ineffective assistance of counsel claim as premature, *id.* at 11-14, and rejected the

conflict-free counsel claim on the grounds no actual or potential conflict existed

between Carmichael and his attorneys as a result of the filing of the civil suit, *id.* at

34-36. Finally, the Court found that, to the extent a conflict existed, Carmichael

both created and invited the conflict by creating the website in the first place. *Id.*

at 34-36.

## P.   Motion For Judgment Of Acquittal, Or In The Alternative Motion For New Trial

On August 16, 2005, Carmichael filed a Motion For Judgment Of Acquittal,

Or In The Alternative Motion For New Trial through counsel, Susan James. *See*

GX 6L, a copy of the motion for judgment of acquittal or new trial. In that motion,

Carmichael raised the following issues: (1) the evidence was insufficient to

establish a conspiracy; (2) the evidence was insufficient to establish Carmichael

had engaged in money laundering; (3) Carmichael was denied a fair trial and the

jury convicted him because they were afraid of him based on all of the prejudicial

hints at trial that he was violent; (4) the Government violated *Giglio* when it failed

to disclose to Carmichael that Government witness, DEA Agent DeJohn, had filed

a civil lawsuit against Carmichael and his lawyers; (5) Carmichael's right to

conflict-free counsel was violated when he was forced to continue with trial

despite discovering that a Government witness, DEA Agent DeJohn, had filed a

civil lawsuit against Carmichael and his attorneys, Lisa Wayne and Susan James;

and (6) Carmichael was denied a fair trial when the Court failed to grant him a

change of venue or a mistrial after juror misconduct was revealed. *Id.* The

Government filed Government's Response To Defendant's Motion For A

Judgment Of Acquittal And Motion For New Trial. *See* GX 6M, a copy of the

Government's response. Carmichael filed a reply to the Government's response to

the motion for judgment of acquittal or motion for new trial. *See* GX 6N, a copy of

Carmichael's Answer To Government's Response To His Motion For Judgment Of

Acquittal And Motion For New Trial.

On June 20, 2006, the Court denied the motion for judgment of acquittal or

motion for new trial primarily based on the Court's "series of written opinions and

orders as well as in pronouncements in open court" in which the Court had

addressed the issues raised by Carmichael in detail. *See* GX S, a copy of the

court's order on the motion for judgment of acquittal or motion for new trial, at 1.

## Q.    Additional Counsel For Carmichael, James K. Jenkins And Carmen D. Hernandez

On March 6, 2006, counsel for Carmichael filed a Motion For Pro Hac Vice Admission Of James K. Jenkins As Counsel For Leon Carmichael. *See* GX 6P, a copy of that motion. The motion was granted. *See* GX 6Q, a copy of the order granting Jenkins pro hack vice admission.

On July 19, 2006, Carmen D. Hernandez filed a Motion For Leave To Appear Pro Hac Vice On Behalf Of Leon Carmichael, Sr. *See* GX 6V, a copy of the motion for admission. The motion of Ms. Hernandez was also granted. *See* GX 6Y,  a copy of the order granting Hernandez pro hac vice admission.

## R.    Sentencing Memoranda And Motions For Downward Departure

Before sentencing, counsel for Carmichael, Ms. James, filed a Motion For Extension Of Time Within Which To File Notice Of Request For Sentencing Below The Guideline Range. *See* GX 6R, a copy of the extension motion.

The Government filed its initial Sentencing Memorandum on July 14, 2006. *See* GX 6T, a copy of the Government's sentencing memorandum.  In that memorandum, the Government contended that it established a single drug trafficking conspiracy at trial; Carmichael's base offense level was properly based on the 7000 pounds of marijuana attributable to him; Carmichael should be sentenced at the high end of the Sentencing Guidelines range of 360 months to life; Carmichael's base offense level should be increased by two levels because he was

124

found in possession of firearms; Carmichael's base offense level should be increased two levels because firearms were found in his coconspirator's/ codefendant's residence; Carmichael's base offense level should be increased two levels based on his obstruction of justice; and Carmichael should not receive any downward departure based on his age. *Id.*

Carmichael also filed his initial Memorandum In Aid Of Sentencing, Motion For Downward Departure on July 14, 2006. *See* GX 6U, a copy of Carmichael's initial sentencing memorandum and motion for downward departure. According to Carmichael, the Sentencing Guidelines calculation was incorrect because: (1) it was not based on the jury verdict, the evidence established more than a single conspiracy, and the proper maximum sentence for Carmichael was therefore only five years; (2) the Timmons/Lacey conduct should not have been included in the relevant conduct analysis in determining the quantity of marijuana attributable to Carmichael; (3) the Court should not assess a two-level increase to Carmichael's offense level because he lawfully possessed the firearm in his possession when he was arrested; (4) the Court should not assess a four-level increase to Carmichael's offense level because he was not an organizer or leader; (5) the Court should not assess a two-level increase to Carmichael's offense level for obstruction of justice; and (6) his criminal history was not properly calculated, or he should receive a downward departure, because his prior conviction was too old to count. *Id.* at 2-

14. Carmichael also argued for a sentence at the low end of the Sentencing Guidelines range because of his charitable good works, his family circumstances, and other mitigating circumstances. *Id.* at 14-17.

A few days later, on July 19, 2006, Carmichael, through counsel, Ms. James, filed a Motion For Downward Departure At Sentencing and a Memorandum In Aid Of Sentencing, Incorporating Request For Downward Departure. *See* GX 6W, a copy of the downward departure motion, and GX 6X, a copy of the memorandum in aid of sentencing. The motion and memorandum raised all of the same arguments that Carmichael's memorandum in aid of sentencing raised. *Id.*

Also, in response to the Court's order, the Government filed a Response To Court's Order Regarding The Treatment Of The Website At Sentencing. *See* GX 7B, a copy of the Government's response on the use of the website evidence at sentencing. The Government argued that the website evidence should not result in Carmichael receiving a two-level increase to his base offense level under U.S.S.G. § 3C1.1, n.2 (obstruction of justice), but that it was relevant to sentencing and it should otherwise be taken into account at sentencing. *Id.* at 2-3.

## S. Investigation Into Alleged Threat By Carmichael To His Counsel And Motions Regarding Conflicts Caused By Those Threats And The Investigation, And Ms. Chartoff's Motion To Withdraw

On July 24, 2006, Carmichael, through counsel, Ms. James, filed a Motion To Continue his sentencing that was set for four days away. *See* GX 6Z, a copy of

126

the continuance motion. The continuance motion was based on the grounds that

the FBI was investigating a threat allegedly made by Carmichael to Ms. James and

Ms. Chartoff, and she needed more time to investigate the matter to provide a

rebuttal to the admission of any such evidence at sentencing. *Id.* That motion to

continue was granted by the Court, and the Court advised counsel for Carmichael

that they may want to seek a third-party assessment of the matter due to their

vested interest in their client and the case. *See* GX 7A, a copy of the Court order

continuing sentencing.

On July 28, 2006, Ms. Chartoff filed a Motion To Withdraw As Counsel for

Carmichael, in which she represented the motion was supported by Carmichael.

*See* GX 7C, a copy of the withdrawal motion. The Court granted the motion. *See*

GX 7D, a copy of the order granting the withdrawal motion.

Next, the Court set a date for a hearing on the issue regarding the alleged

threat Carmichael made to his counsel. *See* GX 7E, a copy of the order setting an

evidentiary hearing. The Court outlined three issues to be addressed at the hearing:

(1) whether there was a real or potential conflict of interest caused by the alleged

threat and/or the investigation into the alleged threat; (2) if there was a real or

potential conflict, whether it could be waived; and (3) whether Carmichael wanted

to waive the conflict. *See* GX 7E at 2.

127

Before the hearing, Carmichael, through counsel, Ms. James, filed

Defendant's Response To Government's Notice Of Conflict Of Counsel. *See* GX

7F, a copy of the response on the conflict. In that response, Ms. James represented

that, "based upon her own investigation and personal observations of Carmichael,

that the alleged death threat [was] no more than opportunistic inmates conspiring

to capitalize on Carmichael's notoriety as currency for their freedom by providing

seemingly favorable testimony for the Government against him." *See* GX 7F at 1,

¶ 3. Further, Ms. James represented that she believed no conflict existed; that

Carmichael was prepared to make any necessary waivers; she had consulted with

the Alabama State Bar about the matter, and it advised she could continue

representing Carmichael; she did not believe the alleged threat was credible; and

she would object to her removal from the case. *Id.* at 4, ¶ 11, at 6, ¶ 16.

The Court conducted a two-day hearing on the threat issue. *See* GX 7G-I

and GX 7G-II. At that hearing, the Government presented the testimony of Marcus

Smith and Kendall Watson, who testified they heard Carmichael make death

threats against Ms. James and Ms. Chartoff. *See* GX 7G-I-9-165. It also presented

the testimony of three law enforcement officers who were involved in the

investigation of the alleged threats, DEA Agent Tom Halasz, FBI Agent Michael

Gavin, and FBI Agent Tyler McCurdy. *See* GX 7G-I-165-90 and GX 7G-II-5-46.

Ms. James, on behalf of Carmichael, called FBI Agent Tom Hetrick, who was also

involved in the investigation of the murder-for-hire by Carmichael of his counsel;

Marion Chartoff, former counsel for Carmichael who was allegedly also the

subject of a murder-for-hire by Carmichael; and Kevin Butler, the husband of Ms.

Chartoff. *See* GX 7G-II-51-76. Ms. Chartoff, like Ms. James, did not believe the

threat to her life was credible. *Id.* at 58. At the hearing, Ms. James also let it be

known to the Court that there had been no breakdown in communications between

her and Carmichael. *Id.* at 92, 105. Finally, the Court determined that Carmichael

was competent to waive his right to conflict-free counsel and it conducted the

following colloquy with Carmichael and Ms. James to determine if any waiver was

knowing and voluntary:

> THE COURT: …
>
>     …
>
> … Now you understand that under the United States Constitution, you have the right to effective assistance of counsel?
>
> THE DEFENDANT [CARMICHAEL]: Yes, sir.
>
> THE COURT: Do you further understand that in addition, the Constitution gives you the right to conflict-free counsel; that is, a lawyer whose own interests do not conflict with the interests – that is your from [sic.]?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you further understand that when credible a defendant's death threats against his own lawyers or lawyer could create an actual conflict of interest?
>
> THE DEFENDANT: Yes, sir.

THE COURT: This is because a lawyer who has been threatened may not have her client's best interests at heart, but rather may have her own best interests at heart. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: In other words, as I think I explained earlier, it could be that Ms. James, because she feels threatened, even though you may not have made those threats, it's just the fact that somebody said you made those threats, she may feel that because of that you are a threat to her and, therefore, she would have an interest in keeping you in jail rather than you getting you free. Do you understand that?

A: Yes, sir.

THE COURT: And as a result, she might actually work against your interest because of these threats. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Those are threats she might be a little afraid of you, therefore her interest would be to make sure that you stayed in jail, have a life sentence or whatever, rather than getting you out of jail. And that would be against your interest. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: That's what I mean by "conflict." Do you have any questions about it?

THE DEFENDANT: No, sir.

THE COURT: In other words, a lawyer who feels threatened may no longer have an incentive to seek the shortest possible sentence for a client, but rather in fact might have an incentive to seek the longest possible sentence. Do you understand that?

THE DEFENDANT: Yes, sir.

130

THE COURT:  Now, Ms. James, I have a question for you.  Ms. James do you reasonably believe that your representation will not be adversely affected by the knowledge of the alleged threats?

MS. JAMES:  I do.

THE COURT:  Rather than saying "I do," why don't you give me an affirmative answer?

MS. JAMES:  Yes.

THE COURT:  I mean explain it.  Sometimes I know a yes could be ambiguous.

MS. JAMES:  Are you saying explain why?

THE COURT:  No, just repeat back to me that you don't think it would be.  Sometimes yes and no can be ambiguous.

MS. JAMES:  There is nothing that I've heard in this case, in court and through my own investigations, that will hinder my ability to zealously represent Mr. Carmichael.

THE COURT:  Now, Mr. Carmichael, do you understand that you can waive your right to have an attorney who does not have a conflict?

A:  Yes, sir.

THE COURT:  Do you further understand that you also have a right to the attorney of your choice?

A:  Yes, sir.

THE COURT:  Do you further understand that if you do not want Ms. James to represent you because of the conflict, I can discharge her?

A:  Yes, sir.

131

THE COURT: Now, do you believe that Ms. James, despite the evidence that you yourself have heard here today, still represents your best interests?

A: Yes, sir, I do.

THE COURT: Now have you consulted with Ms. Hernandez, or any other independent lawyer, about the wisdom of waiving your right?

A: Yes, sir, I have.

THE COURT: Do you wish to talk to her any more in light of the questions I've asked and the information that I've given?

A: No, I fully understand.

THE COURT: Now has anyone threatened you or forced you in any way or threatened anyone else to get you to waive your right to conflict free counsel?

A: No, sir.

THE COURT: I ask you at this time do you wish to waive your right to conflict-free counsel and continue having Ms. James as your attorney?

A: Yes, sir, I do.

*See* GX 7G-II at 97-102. The Court then accepted Carmichael's waiver of any

conflict, and Ms. James was permitted to continue to represent Carmichael. *Id.* at

107; *see also*, GX 7H, a copy of the written order on the conflict issue.

## T.    Sentencing Discovery And Additional Sentencing Memoranda

After the conflict issue was resolved, Ms. James, on behalf of Carmichael

filed a Motion To Compel Government To Provide Discovery. *See* GX 7I, a copy

of the motion to compel. In that motion, Carmichael asked the Court to compel the Government to disclose all information related to Carmichael's alleged death threats to his counsel, and specifically, to reveal all *Giglio* material related to the two informants, Marcus RaShawn Smith and Kendall Watson, and the phone number of the alleged hit man that FBI agents passed to Smith to give to Carmichael and the service provider of such number. *Id.* The Government filed a response to the motion to compel in which it represented to the Court that it had provided Carmichael with all discovery in its possession related to the death threats by Carmichael to his attorneys. *See* GX 7J, a copy of Government's Response To The Court's Order To Show Cause. The Court denied the motion to compel in a written order before sentencing. *See* GX 7N, a copy of that order.

The Government filed a response to the Court's order to inform it whether it intended to present any evidence of the death threats by Carmichael to counsel at Carmichael's sentencing hearing. *See* GX7K, a copy of Government's Response To Court's Order. The Government represented in that response that it did not contend that the death threat evidence should be considered at sentencing. *Id.*

Also in response to another pre-sentencing order of the Court, the Government filed Government's Response To Court's Order That The Government File A Statement Regarding The Subject Matter Of The Evidence That The Government Intends To Present At The Sentencing Hearing. *See* GX 7O,

133

a copy of that response.  Carmichael, through counsel, Ms. James, also filed a

notice of the evidence Carmichael intended to present at sentencing, indicating that

he primarily would be presenting evidence to rebut the Government's evidence and

would also be presenting evidence regarding the dangerous criminal conduct of

cooperating Government witness Gary George, through the testimony of his wife;

evidence regarding any rewards given to the sentencing witnesses for their

cooperation; testimony from two of Carmichael's children regarding Carmichael's

parental efforts; and five or six character witnesses.  *See* GX 7P, a copy of

Carmichael's Notice Of Intent To Use Evidence At Sentencing.

Before sentencing Carmichael, through counsel, Ms. Hernandez, filed a

Supplemental Sentencing Memorandum In Opposition To Consideration Of The

Defendant's Investigative Website As An Aggravating Factor For Purposes Of

Sentencing.  *See* GX 7L, a copy of the supplemental sentencing memorandum.  In

that supplemental sentencing memorandum, Carmichael argued the Court should

not consider the website evidence to impose a more severe sentence on Carmichael

because it had previously found that Carmichael's establishment and use of the

website was constitutionally protected activity.  *Id.*  Further, Carmichael argued

that the website should not be considered to support a sentencing enhancement

under U.S.S.G § 3C1.1 for obstruction of justice; the Court should not punish

Carmichael for use of the website when his former counsel had fully supported its

134

use; and the website evidence should not be considered at sentencing because no injury occurred as a result of Carmichael's use of the website. *Id.*

Carmichael also filed Amended Supplemental Sentencing Memorandum In Opposition To Consideration Of The Defendant's Investigative Website As An Aggravating Factor For Purposes Of Sentencing. *See* GX 7M, a copy of the amended supplemental sentencing memorandum. In that amended sentencing memorandum, Carmichael further argued that the website evidence should not be considered in sentencing Carmichael because: (1) U.S.S.G. § 3C1.1 was not intended to punish a defendant for the exercise of a constitutional right, and Carmichael was exercising his constitutional rights in establishing and using the website to aid in his defense; (2) imposing a more severe sentence based on the website would violate Carmichael's right to due process and the doctrine of finality, and would place an undue burden on his constitutional rights, in light of the fact that the Court had upheld use of the website after a full and fair litigation of the issue; and (3) no enhancement for witness intimidation was permissible in this case because Carmichael had not been charged with that crime. *Id.*

## U.  **Sentencing**

A two-day sentencing hearing was held in Carmichael's criminal case beginning on March 21, 2007, and continuing on March 22, 2007. *See* GX 7Q-I and GX 7Q-II. Carmichael was represented at sentencing, by Carmen Hernandez,

Susan James, and Ron Brunson. At that hearing, the Court first resolved the issue

of whether it would hear evidence consisting of recorded phone calls and

testimony about those calls from the Government concerning Carmichael's

continuing involvement in criminal activity after being jailed on the charges in this

case. *See* GX 7Q-I-4-46. The Court resolved that issue in the Government's favor

overruling Carmichael's objection and finding that, if the evidence was relevant,

the Court had no basis to exclude it and would be willing to consider it in

"determining a sentence within the guidelines or for determining a sentence under

three five five three." *Id.* at 46, 51-52.

The Court then addressed Carmichael's six objections to the presentence

report. *Id.* at 53. The first objection was to the base offense level of 34, which was

based on the jury finding that at least 7000 pounds of marijuana were attributable

to Carmichael as a result of the drug trafficking conspiracy. *Id.* at 53-65. The

Court rejected Carmichael's arguments that (1) the jury never made a finding as to

when the conspiracy for which Carmichael was convicted began; (2) that the

amount found by the jury was not the correct amount to attribute to Carmichael

because it was based on two separate conspiracies and was based, in part, on

relevant conduct, not merely on Carmichael's own conduct in the conspiracy; and

(3) the 7000 pounds found by the jury was just an estimate that could not be used

by the Court to determine Carmichael's base offense level. *Id.* at 53-63. Based on

its analysis, the Court then determined that the jury could, and did, reasonably find

beyond a reasonable doubt that Carmichael was responsible for 7000 pounds, or

3175.20 kilograms, of marijuana. *Id.* at 63. Based on that finding, Carmichael's

base offense level was 34. *Id.* at 65.

Carmichael's second objection addressed by the Court was the two-level

enhancement for possession of a dangerous weapon in connection with the offense.

*See* GX 7Q-I-65; U.S.S.G. § 2D1.1(b)(1). This enhancement was based on both

Carmichael having a gun in his possession in his car when he was stopped in

connection with this offense and the possession of guns by his codefendant,

Freddie Williams, found in the house where he bagged marijuana for Carmichael.

*See* GX 7Q-I-65-71. After hearing argument from both parties on this issue, the

Court found the two-level enhancement applied based on the evidence it heard at

trial. *Id.* at 70-72.

Next, the Court heard argument on Carmichael's role as an organizer or

leader of criminal activity that involved five or more individuals. *See* GX 7Q-I-72-

77; U.S.S.G. § 3B1.1(a). After hearing argument from the parties, the Court found

that Carmichael was a leader or organizer of the conspiracy and that the members

of the conspiracy included Gary Wayne George, Patrick Denton, Kena Whisenant,

Valerie Carmichael, Sandra Jones, Santiago Hernandez, Jimmy Timmons, Fred

Thomas, Mantel Watson, Cadillac Bolding, Moses Williams, and Freddie

Williams. *Id*. at 76-77. Based on that finding, Carmichael's offense level was increased another four levels.

Carmichael's fourth objection was to the application of the two-level obstruction of justice enhancement, which was urged by the Government based on Carmichael's presentation of false tax returns as evidence at this trial. *Id*. at 77-80; *see* U.S.S.G. § 3C1.1. Carmichael argued that the obstruction of justice enhancement should not apply because the tax returns were not false; because introduction of the tax returns was a tactical decision of counsel that should not be attributed to Carmichael; and Carmichael had not been convicted of obstruction, so that conduct could not be used to sentence him. *Id.* at 77-80. After noting that it would not matter how the Court ruled on the obstruction of justice enhancement – that Carmichael's adjusted offense level would change from 42 to 40, but the Sentencing Guidelines range of from 360 months to life in prison would remain the same, *id.* at 95-96 – the Court overruled Carmichael's objection to application of the enhancement. *Id*. at 97-98.

The Court then proceeded to consider Carmichael's objection to the criminal history category. *Id*. at 98-124. Carmichael argued that he should not be placed in a criminal history category of III because his prior conviction was too old to count for his current offense, which occurred fifteen years after that prior conviction; because he had been pardoned for that prior offense; and because his prior

138

conviction for contraband should have simply been treated as a disciplinary

violation rather than a criminal offense. *Id.* at 98-101. After hearing the

arguments of counsel and explaining its reasoning for rejecting Carmichael's

arguments, the Court concluded "that [Carmichael] should be given six criminal

history points for his prior convictions, and should therefore be placed in a

criminal history three." *Id.* at 125.

Lastly, the Court turned to Carmichael's objection to the mandatory

minimum of 10 years and a maximum of life in prison. *Id.* at 125-31. The Court

found that no conclusion could be made from the jury's verdict based on its

instructions and the evidence other than it had found 7000 pounds was attributable

to the conspiracy charged in count one of Carmichael's indictment, and it rejected

Carmichael's argument on the application of the mandatory minimum of 10 years

in his case. *Id.* at 130-31.

After hearing the objections to the presentence report, the Court turned its

attention to Carmichael's motion for a downward departure. *Id.* at 133.

Carmichael argued that he should receive a downward departure from his

Sentencing Guidelines range due to his good character; the application of

overlapping enhancements; because Carmichael's criminal history overstated his

likelihood of committing other crimes; and because a life sentence was rarely

imposed for marijuana offenses. *Id.* at 133-34. The Court decided to reserve

ruling on the downward departure motion until it heard from Carmichael's

character witnesses. *Id.* at 137.

The Court then indicated it would hear the evidence the Government wanted

to introduce before deciding whether to consider Carmichael's establishment and

use of the internet website as a factor in sentencing him. *Id.* at 137-42. The

Government represented that it did not intend to present any evidence on the death

threats Carmichael made to his lawyers. *Id.* at 142.

The Government first presented the testimony of Codefendant Freddie

Williams. *Id.* at 152-217. Williams testified about Carmichael's marijuana

trafficking and his continuing criminal activity while in jail, and about

Carmichael's violent tendencies. *Id.* DEA Agent Thomas Halasz testified for the

Government next. *Id.* at 222- Agent Halasz testified about taped phone calls

between Carmichael and some other individuals, one a girl with whom Carmichael

fathered a child when she was under-age. *Id.* The court found the Government

had not established by a preponderance of the evidence that Carmichael was the

father of the child at issue. *Id.* at 246; GX 7Q-II-66-92.

When sentencing commenced the next day, the Court heard from counsel on

a number of issues, one of them being the issue of whether it would consider the

conduct of Carmichael's establishing the internet website in sentencing him. *See*

GX 7Q-II-10-11. At that time, the Court noted the mere fact that it had found

Carmichael had a constitutionally protected right under the First Amendment to put up the website, did not preclude it from considering that conduct in sentencing. *Id.* However, the Court still did not rule on the issue, stating it wanted to wait to hear the context in which Carmichael's objection was being made. *Id.* at 11-15.

Carmichael then presented the witnesses in support of his downward departure motion and the sentencing factors in 18 U.S.C. § 3553(a). Carmichael's witnesses included Carmen Fluker, Gary Wayne George's former mother-in-law, who testified about George's violent and dangerous character and Carmichael's good character, *id.* at 18-39; Jeremy Kelly, one of Carmichael's sons, *id.* at 39-47; Sharion Mims, an employee of Susan James and Associates, *id.* at 47-50; R. E. Hernandez, a Montgomery pastor, *id.* at 51-58; Clarence Shines, a heating and air conditioning man who had done work at Carmichael's home in the late 1980s or early 1990s, *id.* at 58-66, 110-12; Patrice McClammy, an attorney in Montgomery, *id.* at 92-110; Codefendant Freddie Williams, *id.* at 113-119; Patrick Cottrell, a drywall installer, *id.* at 120-34; and Felando Carmichael, another one of Carmichael's sons; *id.* at 134-52.

The Court then turned to the issues that it had previously left unresolved. *Id.* at 161. First, it decided it would not consider Carmichael's use of the internet website in determining his sentence. *Id.* Then, it decided it would not grant the motion for a downward departure, although it had the authority to grant the

departure. *Id.* After hearing all arguments from the probation officer, *id.* at 160-172, the Government, *id.* at 172-75, and Carmichael's counsel, *id.* at 175-208, 213-14, on the appropriate sentence, the Court orally pronounced sentence. *Id.* at 216. The Court found Carmichael's offense level was 42 and his criminal history category was III, resulting in a Sentencing Guidelines range of from 360 months to life in prison. *Id.* at 217. It then sentenced Carmichael to 480 months in prison, consisting of 240 months on count one of his indictment to be served concurrently with 240 months in prison on count two of his indictment. *Id.* at 218. The Court also ordered that Carmichael be placed on supervised release for a term of five years on his release from prison, subject to mandatory, standard, and special conditions, and that he pay a special assessment fee of $200. *Id.* at 218-19. No restitution was ordered on the grounds there was no identifiable victim who incurred a financial loss as a result of Carmichael's offenses. *Id.* at 219.

After the hearing, the Court entered a written order denying Carmichael's motion for a downward departure. *See* GX 7R, a copy of that order.

A final judgment was entered in Carmichael's case on March 28, 2007. *See* GX 7S. Carmichael appealed from this final judgment. *See* GX 7T, a copy of that final order.

## V.   Appeal

Carmichael appealed his conviction and sentence to the United States Court

of Appeals for the Eleventh Circuit. He was represented in that appeal by James

K. Jenkins and G. Richard Strafer. *See* GX 8A, a copy of Carmichael's opening

brief on appeal. In his brief, Carmichael raised the following issues:

     I.     Whether the district court undermined Carmichael's right to a
presumption of innocence and violated Fed. R. Evid. 401, 403,
404(b), and the Fifth and Sixth Amendments by:

          A.     imposing unjustified security measures on a jury exposed
to prejudicial pretrial publicity, most of which was
generated by the Government's press releases, frivolous
motions, and other tactics;

          B.     failing to grant a mistrial in the face of evidence that
most jurors had been exposed to extrinsic accusations
that falsely painted Carmichael as "dangerous;" and

          C.     allowing the Government to introduce a steady stream of
collateral evidence of violence that had little to do with
Carmichael but effectively heightened the jurors' fears
and beliefs that he was dangerous[.]

     II.     Whether the jury selection procedures used by the Middle
District of Alabama substantially violated the Jury Selection
and Service Act and Carmichael's Sixth Amendment right to a
jury selected from a fair cross-section of the community[.]

     III.     Whether the district court erred in sentencing Carmichael to
480 months by increasing his criminal history score based on
Alabama convictions for which he had received a total
pardon[.]

*See* GX 8A at 1.

Carmichael also filed Appellant's Request To File A Pro Se Supplemental

Brief For Appeal Purposes along with a copy of the *pro se* Appellant's

Supplemental Brief. *See* GX 8B, a copy of the *pro se* request and supplemental.

In that *pro se* supplemental brief, Carmichael attempted to raise two more issues:

(1) Whether the district court committed constitutional error by increasing his

sentence based on extra-verdict facts; and (2) whether he had been erroneously

convicted and sentenced for conspiracy to commit money laundering. *Id.*,

supplemental brief at viii. The Eleventh Circuit did not grant Carmichael's request

to file the *pro se* supplemental brief.

After the Government filed its corrected brief in response, *see* GX 8C, a

copy of the Brief of Appellee, and Carmichael filed his reply brief, *see* GX 8D, a

copy of the Reply Brief, the Eleventh Circuit held oral argument in the case. After

argument, the Court issued an opinion affirming Carmichael's convictions and

sentence. *See* GX 8E, a copy of the Eleventh Circuit's opinion in Carmichael's

criminal case, *United States v. Carmichael*, 560 F.3d 1270 (11th Cir. 2009). In

that decision, the Eleventh Circuit only addressed the jury composition issues, and

it affirmed the remaining issues with brief comments in a footnote. *See* GX 8E,

*United States v. Carmichael*, 560 F.3d at 1274-75 n.4.

The Eleventh Circuit denied Carmichael's petition for rehearing on May 21,

2009. *See* GX 8F, a copy of the decision denying rehearing, *United States v.*

*Carmichael*, 347 Fed.Appx. 556 (11th Cir. May 21, 2009) (TABLE).  And the

United States Supreme Court denied his petition for a writ of certiorari on January

11, 2010.  *See* GX 8G, a copy of the decision denying certiorari, *Carmichael v.

United States*, 130 S. Ct. 1093 (2010).

**W.     The § 22555 Motion To Vacate, Set Aside, Or Correct Sentence**

Carmichael filed his motion to vacate, set aside, or correct sentence pursuant

to 28 U.S.C. § 2255 on December 28, 2010, the date he certified he placed that

motion in the prison system for mailing.  *See Houston v. Lack*, 487 U.S. 266, 275,

108 S. Ct. 2379, 2385 (1988); *accord Adams v. United States*, 173 F.3d 1339, 1341

(11th Cir. 1999).

### III.  ISSUES RAISED IN THE § 2255 MOTION

1.    Counsel was ineffective for failing to advise Carmichael that he
      could be held responsible at sentencing under the Sentencing
      Guidelines for uncharged drug quantities presented by
      cooperating witnesses.

2.    Counsel was ineffective for failing to challenge the use of non-
      testifying Codefendant Williams's out-of-court statements
      under *Crawford* instead of *Bruton*.

3.    Counsel was ineffective for failing to object to the
      prosecution's use of Codefendant Williams's reaction to
      Carmichael's voice, in violation of the Confrontation Clause.

4.    Counsel Steve Glassroth was ineffective for advising
      Carmichael to meet with federal agents, DEA Agents DeJohn
      and Greenwood, without a witness and/or an attorney present.

5.    Counsel were ineffective for failing to properly advise

Carmichael about his case.

6.   Counsel were ineffective for failing to advise Carmichael about his "sentencing exposure," and application of the United States Sentencing Guidelines, and specifically about the enhancement provisions applicable to him under the Sentencing Guidelines.

7.   Counsel were ineffective for never explaining the nature of the criminal charges to Carmichael.

8.   Counsel were ineffective for never explaining the weight and extent of the prosecution's evidence to Carmichael.

9.   Counsel were ineffective for failing to pursue plea negotiations or convey plea deal offers to Carmichael.

10.   Counsel were ineffective for running headlong into the case with the only strategy to take the case to trial.

11.   Counsel were ineffective for turning a run-of-the-mill marijuana case into a nightmare of negative publicity, conflict, and a 40-year sentence.

12.   Counsel were ineffective for never advising Carmichael of the Government's ability to introduce hearsay testimony at trial, including the statements made by non-testifying Codefendant Williams, and evidence of other criminal conduct not alleged in the indictment, statements made by others not intrinsic to the case, nor that the Government could use pardoned convictions to increase Carmichael's sentence.

13.   Counsel were ineffective for never telling Carmichael that a guilty verdict after trial could result in a 40-year sentence, and to the contrary, telling Carmichael that he faced, at most, "around ten years" if found guilty.

14.   Counsel were ineffective for failing to follow through on plea negotiations when Carmichael directed them to attempt plea negotiations, and if they had, he would have most likely agreed to a settlement of forfeiture.

15.    Counsel's interests conflicted with Carmichael's interests
       because it was in Carmichael's best interest to minimize the
       notoriety of the case and to seek plea negotiations, unlike
       counsels' interests, which were to fan the flames of publicity
       and milk the case for all it was worth.

16.    Counsel were ineffective for never relaying to Carmichael a
       five-year plea deal offered by the Government before trial and
       while the jury was deliberating.

17.    Counsel were ineffective for failing to request a Bill of
       Particulars.

18.    Counsel were ineffective for failing to apprise Carmichael
       about certain evidence the Government possessed until the
       middle of trial.

19.    Counsel were ineffective for failing to procure discovery.

20.    Counsel were ineffective for failing to properly object to
       discovery violations and the Government's failure to comply
       with discovery rules.

21.    Counsel were ineffective for failing to file appropriate
       discovery motions under Rules 7(f) and 16(a)(1)(e)(i) and (ii) of
       the Federal Rules of Criminal Procedure.

22.    Counsel were ineffective for failing to prepare and investigate
       before formulating a defense strategy based on the
       Government's "long-investigation-without-charge" theory.

23.    Counsel were ineffective for failing to adequately investigate
       the case, review available information, and properly use
       favorable evidence to formulate a defense strategy and did not
       effectively defend Carmichael at trial.

24.    Counsel were ineffective for pursuing a fundamentally flawed
       defense strategy that had no basis in the law and that opened the
       door for unduly prejudicial evidence by the Government.

147

25.    Counsel were ineffective for failing to submit compelling evidence at trial, for example, statements by IRS Agent Louie Wilson that there was no evidence of illegal drug activity by Carmichael and documents in support.

26.    Counsel were ineffective for failing to interview and call to testify favorable witnesses in defense of Carmichael, specifically Sandra Jones; Moses Williams; two witnesses, Arthur Covane and Dewhart, who would have impeached and discredited the testimony of Eric Peagler; Joseph "Pie" Lacey to refute the testimony of Jimmy Timmons; and Bruce Maddox to testify about Sandra Jones's drug charges.

27.    Counsel were ineffective for failing to properly file a motion for suppression of Carmichael's incriminating statements.

28.    Counsel were ineffective for failing to properly file a motion for suppression of illegally seized evidence during Carmichael's traffic stop and arrest.

29.    Counsel were ineffective for failing to properly litigate the motions to suppress and develop relevant facts in the hearing on those motions on certain incriminating statements that Carmichael made to DEA agents and evidence seized during his stop and arrest.

30.    Counsel Lisa Wayne was ineffective for failing to seek to re-open the suppression hearing based on counsel Steve Glassroth's ineffective assistance.

31.    Counsel were ineffective because they failed to properly and timely move to suppress statements and gestures made by Codefendant Freddie Williams while he was being booked.

32.    Counsel were ineffective for failing to reconsider trial strategy in light of events that occurred during trial.

33.    Counsel Susan James labored under a conflict of interest that adversely affected Carmichael's case.

34.   Trial counsel labored under a conflict of interest due to the filing of a civil action by a key Government witness, DEA Agent DeJohn, against counsel and that conflict adversely affected Carmichael's criminal trial.

35.   Counsel were ineffective for not properly objecting, moving for a continuance, and arguing the issue related to the Government's late disclosure of discovery material and *Brady*[10]-

type evidence.

36.   Counsel were ineffective for failing to properly object to the introduction of unduly prejudicial evidence of prior bad acts.

37.   Counsel were ineffective for failing to inform Carmichael that the Government intended to introduce evidence against Carmichael that he had ordered the shooting of Jimmy Timmons, he was unfaithful to his wife, he contributed to the delinquency of minors, and he threatened individuals with violence if they cooperated with authorities to implicate him in criminal conduct.

38.   Counsel were ineffective for calling as a defense witness IRS Agent Louie Wilson, who testified that the proceeds deposited into Carmichael's bank account was drug money and essentially that Carmichael's conduct violated the law.

39.   Counsel were ineffective for failing to properly object, move for a mistrial, and preserve for appeal the issue of the district court's open criticism of defense counsels' performance defending Carmichael and their trial strategy.

40.   Counsel were ineffective for not following through with a motion for mistrial and to recuse Judge Thompson.

41.   The cumulative effect of all of trial counsel's errors denied Carmichael a fair trial.

---

[10] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

42. Appellate counsel were ineffective because they failed to brief on appeal the district court's *Bruton* ruling on the statement made by Codefendant Freddie Williams.

43. Appellate counsel was ineffective because they failed to brief on appeal the issue of the Government's use at trial of the improper hearsay statements of Sandra Jones to law enforcement.

44. Appellate counsel was ineffective for failing to brief on appeal the "trial by ambush" issues.

45. Appellate counsel was ineffective for failing to raise on appeal issues related to the Government's late disclosure of exculpatory evidence.

46. Appellate counsel was ineffective for failing to brief on appeal the issue of the district court's refusal to strike DEA Agent DeJohn's testimony due to his bias, his website lawsuit, and related matters.

47. Appellate counsel was ineffective for failing to brief on appeal the conflict of interest created by the Government's use of Eric Peagler as a witness, Peagler being a former client of one of Carmichael's counsel, Susan James.

48. Appellate counsel was ineffective for failing to brief on appeal the issue of the district court's denial of a continuance so that counsel could investigate the late disclosure by the Government of witnesses and evidence.

49. Appellate counsel was ineffective for failing to argue on appeal that a conflict of interest was created by DEA Agent DeJohn's filing of a lawsuit against Carmichael's attorneys during the trial.

50. Appellate counsel was ineffective for failing to argue on appeal the insufficiency of the evidence to support Carmichael's drug conspiracy and money laundering convictions.

51.    Appellate counsel was ineffective for failing to argue on appeal that Carmichael was denied a fair trial by Judge Thompson's open criticism of defense counsels' handling of Carmichael's case.

52.    Cooperating Government witness Eric Peagler offered perjured testimony during Carmichael's trial, which deprived Carmichael of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment.

53.    The Government knew, or should have known, that Eric Peagler's testimony at Carmichael's trial was false and it failed to correct that false testimony in violation of Carmichael's due proves rights guaranteed by the Fifth Amendment.

54.    Carmichael is entitled to a new trial because he has discovered evidence that Government witness Jimmy Timmons has allegedly recanted his trial testimony

## IV.  RESPONSE TO CLAIMS FOR RELIEF

**A.    Carmichael Has Met The One-Year Statute Of Limitations Under 28 U.S.C. § 2255.**

Carmichael filed his § 2255 motion in a timely manner under 28 U.S.C. § 2255(f), which provides a one-year period of time in which to seek relief under the rule.  Section 2255 states that a motion must be filed within one year from:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution and laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the

151

> Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). The relevant date for purposes of Carmichael's § 2255 motion is paragraph (f)(1), the date on which the judgment of conviction became final.

The final judgment in Carmichael's criminal case was entered on March 28, 2007. *See* GX 6E. Carmichael appealed his convictions and sentence to the United States Court of Appeals for the Eleventh Circuit, which affirmed on March 5, 2009, after briefing and oral argument. *See* GX 7D, a copy of the Eleventh Circuit opinion in Carmichael's case, *United States v. Carmichael*, 560 F.3d 1270 (11th Cir. 2009). That Court denied rehearing *en banc*, *see* GX 7E, a copy of Eleventh Circuit's denial of rehearing *en banc*, *United States v. Carmichael*, 347 Fed.Appx. 556 (May 21, 2009), and Carmichael then filed a petition for a writ of certiorari in the United States Supreme Court, which that court denied on January 22, 2010, *see* GX 7F, a copy of the Supreme Court's decision in *Carmichael v. United States*, 130 S. Ct t. 1093 (2010). Carmichael's conviction became final on the date certiorari was denied by the Supreme Court, January 22, 2010. *See, e.g., Drury v. United States*, 507 F.3d 1295, 1296 (11th Cir. 2007) (a conviction becomes final on denial of a petition for a writ of certiorari by the Supreme Court).

152

Under § 2255, Carmichael had until January 22, 2011 – one year later – to file his

motion in this Court. He filed the instant motion on December 28, 2010, the date

he certified he placed it in the prison mail system for delivery. It is, therefore,

timely under the limitation period in § 2255(f).

**B.**  **All Of Carmichael's Claims Of Ineffective Assistance Of Counsel
Should Be Denied Because, As To Each Claim, He Has Failed To
Demonstrate Both Deficient Performance And Prejudice.**

Carmichael raises somewhere in the neighborhood of 51 claims of

ineffective assistance of counsel ranging throughout his pretrial, trial, sentencing,

and appellate proceedings. Because Carmichael has not demonstrated the

necessary deficient performance and prejudice as to each of those claims of

ineffective assistance, they should all be denied.

To succeed on a claim of ineffective assistance of counsel, a petitioner must

prove both that his counsel's performance was deficient and that that deficient

performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 694

(1984); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005) ("Ineffective

assistance under *Strickland* is deficient performance by counsel resulting in

prejudice."). More specifically, Carmichael must show: "(1) that counsel's

performance was deficient because it fell below an objective standard of

reasonableness; and (2) the deficient performance prejudiced the defense." *Stewart

v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

In reviewing counsel's performance to determine whether it meets

constitutional requirements, a reviewing court must engage in a " 'highly

deferential' review of counsel's performance and 'indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the [petitioner] must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy.' "

*Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007), *citing Strickland v.*

*Washington*, 466 U.S. at 689. "As a result of this presumption, a petitioner must

show that no competent counsel would have taken the action that his counsel did

take," and where the record is incomplete or unclear about why counsel acted as he

did, the reviewing court must "presume that he did what he should have done, and

that he exercised reasonable professional judgment." *Jennings v. McDonough*, 490

F.3d at 1243 (internal quotation marks and citations omitted).

The standard for judging counsel's performance is "reasonableness under

prevailing professional norms." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d at 1209

(internal quotation marks and citations omitted); *see also Rompilla v. Beard*, 545

U.S. at 380. Moreover, the test for whether counsel's actions or inactions were

reasonable "is not whether counsel could have done something different; instead,

[the court] must consider whether the performance fell within the broad range of

reasonable assistance...." *Id.* "The burden of persuasion is on the petitioner to

prove by a preponderance of the evidence that counsel's performance was

unreasonable." *Id.*

The Eleventh Circuit has described a petitioner's burden with regard to the

deficient performance prong of an ineffective assistance of counsel claim as

follows:

> Because there is such a wide range of constitutionally acceptable
> performance, a petitioner seeking to rebut the presumption of
> adequate performance must bear a heavy burden:
>
>> The test has nothing to do with what the best lawyers
>> would have done. Nor is the test even what most good lawyers
>> would have done. We ask only whether some reasonable
>> lawyer at the trial could have acted, in the circumstances, as
>> defense counsel acted at trial…. We are not interested in
>> grading lawyers' performances; we are interested in whether the
>> adversarial process at trial, in fact, worked adequately.
>
> … Thus, in order to show that counsel's performance was
> unreasonable, the petitioner must establish that *no competent counsel
> would have taken the action that his counsel did take*….

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations

omitted); *accord Grossman v. McDonough*, 466 F.3d 1325, 1345 (11th Cir. 2006).

To succeed on an ineffective assistance of counsel claim, the petitioner must

not only show deficient performance, but must also show that, but for counsel's

unprofessional errors, the outcome of the proceeding would have been different.

*See Jennings v. McDonough*, 490 F.3d at 1243. The Eleventh Circuit has

described a petitioner's burden in demonstrating that his counsel's deficient

performance prejudiced his case as "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. *See Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d at 1209; *Robinson v. Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002).

"It is well established that a [§ 2255] petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343. The reviewing court "can evaluate either the prejudice or the performance prong first and, if either one cannot be met, [the petitioner's] claim must fail." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).

"Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*." *Philmore v. NcNeil*, 575 F.3d 1251, 1264 (11th Cir. 2009). In evaluating such claims, the Court should be mindful that the Sixth Amendment does not require an attorney to raise every non-frivolous issue on appeal. *Id., citing Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). Instead, the effective attorney will winnow out weaker arguments and focus on the central, most important issues, even though other issues may have merit. *Id.; see also Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3313 (1983).

**1.    Failing to advise Carmichael that he could be held responsible for uncharged drug quantities presented by cooperating witnesses**

Carmichael first argues that his counsel never advised him that he could be held responsible for uncharged drug quantities based on the testimony presented by cooperating witnesses at trial. *See* Carmichael's "Movant's Memorandum of Law And Facts In Support of Section 2255 Motion at 9-11 ("Carmichael's Memorandum of Law"). Carmichael's counsel do not address this allegation in their affidavits. However, the sentencing memoranda filed by counsel for the Government and by Carmichael addressed the issue of the drug quantities that could be attributable to Carmichael, and Carmichael's counsel objected to inclusion in that drug quantity calculation the use of any testimony by coconspirators, especially testimony related to the Timmons/Lacy conduct. *See* GX 6T, 6U, 6W, 7O, 7P. Counsel also objected to the drug quantity amounts to be used in calculating Carmichael's sentence at the sentencing hearing. See GX 7Q-I-52-65.

Although counsel do not address this issue in their affidavits and, therefore, this Court cannot determine whether counsel was deficient in not so informing Carmichael, this Court should reject Carmichael's claim that his counsel were ineffective for failing to advise him that uncharged drug quantities could be used to enhance his sentence, because Carmichael has not and cannot establish prejudice.

157

In resolving the issue of the drug quantities it was going to use in determining

Carmichael's offense level, the Court only relied on evidence of the charged

conspiracy conduct. *See* GX 7Q-I-61-63. The Court specifically found that, "even

if it based its sentencing only on the Denton portion of the conspiracy, the total

amount of marijuana attributable to that conduct is well over three thousand

kilograms for a base offense level of 34". *Id.* at 61. The Court also found:

> … [T]rial testimony support[ed] a total amount of marijuana in
> excess of three thousand kilograms, for a base offense level of thirty-
> four. In fact, the Court finds beyond a reasonable doubt that the
> conspiracy consisted of both Timmons' and Denton's involvement,
> and the Court finds beyond a reasonable doubt that the amount
> involved as calculated by Probation was eight thousand eight hundred
> seventy-four point sixty-three kilograms.
>
> The Court therefore concludes that the jury itself could
> reasonably find beyond a reasonable doubt that Carmichael was
> responsible for seven thousand pounds, which I believe translates into
> three thousand one hundred and seventy-five point two kilograms. In
> fact, I guess if you look at seven thousand pounds, three thousand
> kilograms, it's almost twice what's required.

*See* GX 7Q-I-63. Because the Court did not use any uncharged conduct in

sentencing Carmichael, he was not prejudiced, even if his attorneys did not tell him

that such conduct could be used in sentencing him. And because Carmichael has

not demonstrated prejudice, he is entitled to no relief on this claim. He also is not

entitled to an evidentiary hearing on the claim because this Court can resolve the

issue on the prejudice prong of *Strickland* without any hearing.

## 2.    Failing to challenge the use of non-testifying Codefendant Williams's out-of-court statements under *Crawford* instead of *Bruton*

Carmichael's next claim is that his attorneys were ineffective because they

failed to challenge the use of non-testifying Codefendant Freddie Williams's out-

of-court statements under the Supreme Court's decision in *Crawford v.*

*Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), instead of under *Bruton v.*

*United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968). *See* Carmichael Memorandum

of Law at 11-13. At trial, the Government was permitted to elicit testimony from

two law enforcement agents (DEA agents Greenwood and Halasz) to the effect

that, when Codefendant Freddie Williams was sitting in an interview room after his

arrest and he heard Carmichael's voice, he stated that he could not cooperate with

law enforcement because his children would be killed. The problem for

Carmichael is two-fold, and this Court should reject this second claim of

ineffective assistance of counsel for the following two reasons.

First, counsel for Carmichael did challenge the admissibility of non-

testifying Codefendant Williams's out-of-court statements on *Crawford* grounds,

as well as on *Bruton* grounds. *See* GX GS at 3, ¶ 7; GX 4T at 79-80; GX 5B-IV-

48-50, 57-58. Therefore, there was no deficient performance by his counsel.

Second, the Court, in rejecting the motions, appropriately analyzed the issue

under *Crawford* and found that the statements were admissible, holding that

159

*Crawford* had not revised the legal landscape in that regard. *See* GX 4T at 80-81;

4T. Although not in a published opinion, the Eleventh Circuit, relying on the

analysis of the Seventh Circuit in *United States v. Jenkins*, 419 F.3d 614, (7th Cir.

618), which it found persuasive, has found that the "statements of co-conspirators

are expressly excluded from the definition of hearsay under Rule 801(d)(2)(E),"

and that under *Crawford*, they are still admissible against a fellow conspirator if

made in furtherance of the conspiracy. *See United States v. Abram*, No. 05-11249,

at *6, 171 Fed.Appx. 304, 311-12 (11th Cir. Mar. 20, 2006). Because the issue

was properly rejected by this Court and there is no merit to the claim that the

statements of Coconspirator Freddie Williams were inadmissible under *Crawford*,

Carmichael has suffered no prejudice. Therefore, his ineffective assistance of

counsel claim should be rejected on this grounds as well. Also, no hearing is

necessary on this claim because Carmichael the claim of ineffective assistance of

counsel can be resolved based on the record before this Court.

### 3. Failing to object to the prosecution's use of Codefendant Williams's reaction to Carmichael's voice, in violation of the Confrontation Clause

Carmichael's next claim of ineffective assistance of counsel is similar to the

previous one, but to be certain that it has addressed all claims raised by

Carmichael, the Government has listed it as a separate claim. In this third claim of

ineffective assistance of counsel, Carmichael argues that his counsel were

ineffective for not arguing that the prosecution's use of Codefendant Williams's *reaction* to Carmichael's voice was a violation of his Confrontation Clause rights. *See* Carmichael Memorandum of Law at 13. This claim of ineffective assistance of counsel should be rejected because it is without merit, and therefore, Carmichael cannot demonstrate he was prejudiced by any failure of counsel.

At trial, DEA Agents Greenwood and Halasz testified about Williams's reaction on hearing Carmichael's voice at DEA headquarters in Montgomery on the night of their arrest, and the statements he made on hearing it. *See* GX 5A-III-331; 5B-IV at 80, 81, 221-25. The testimony about Carmichael's reaction was not hearsay and the two witnesses who observed Carmichael's reaction – Agents Greenwood and Halasz – testified to what they observed, not to what they heard. Both agents were there to be cross-examined about what they saw, and they were. Therefore, Carmichael was not denied his right to confront any witnesses against him.

Because Carmichael was not denied any right to confrontation as to how Codefendant Freddie Williams reacted in response to hearing Carmichael's voice at DEA headquarters on the night of their both his and Carmichael's arrests, Carmichael has failed to demonstrate he was prejudice by counsel's failure to challenge this reaction testimony. Because he has not demonstrated prejudice, this

Court should reject this claim of ineffective assistance of counsel. No hearing is necessary to resolve this claim.

### 4.    Advising Carmichael to meet with federal agents, DEA Agents DeJohn and Greenwood, without a witness and/or an attorney present

Shortly after his arrest and indictment, Carmichael went to the DEA office, unaccompanied by counsel, to retrieve some property that had been seized from him on the night of his arrest. *See* GX 1Y-72-81; GX 2G at 8-9. During that visit, Carmichael made an incriminating statement to the agents present, "you got me." *Id.* Carmichael argues that his counsel at that time, Steven Glassroth, was ineffective for advising him to meet with the federal agents without a witness or without one of his attorneys being present. *See* Carmichael Memorandum of Law at 16-18. The statement was introduced in evidence against Carmichael at trial. *See* GX 5B-IV-86.

Mr. Glassroth has not presented this Court with an affidavit, so it is impossible to know for certain what Mr. Glassroth told Carmichael about retrieving his property. But regardless of what Mr. Glassroth advised Carmichael, Carmichael's ineffective assistance of counsel claim based on that advice should be rejected because Carmichael cannot demonstrate prejudice.

In *Kirby v. Illinois*, 406 U.S. 682, 92 S. Ct. 1877 (1972), the Supreme Court held that an accused's Sixth Amendment right to counsel attaches at the time of

arraignment. Carmichael was indicted on November 19, 2003, on charges of

marijuana trafficking, *see* GX 1A, he was arraigned on that charge on December 4,

2003, *see* GX 1F, and he went to retrieve his property and made the incriminating

statement sometime on December 4, 2003, s*ee* GX 1A; GX 1Y-72-81; GX 2G-8-9.

Therefore, it is unclear whether Carmichael's Sixth Amendment right to counsel

had even attached at the time he went to retrieve his property.

Further, Carmichael's retrieval of his property was not a critical stage of the

proceedings, and the Sixth Amendment right to counsel only extends to "critical"

stages of the pretrial adversarial process. *See, e.g., United States v. Mendoza*, 963

F.2d 1467, 1473 (11th Cir. 1992) ("An accused's right to counsel extends to those

'critical' pretrial proceedings in which 'the accused is confronted, just as at trial,

by the procedural system, or by his expert adversary, or by both ... in a situation

where the results of the confrontation might well settle the accused's fate and

reduce the trial itself to a mere formality.' ") (internal citation and quotation marks

omitted). Although interrogation by the officers might have risen to the level of a

critical stage, the mere fact that Carmichael talked to law enforcement officers

when he went to retrieve his property and volunteered the statements does not turn

this non-critical stage of the proceedings into one that was critical.

In his orders denying Carmichael's motion in limine concerning his

December 4, 2003, statements to law enforcement, Judge Thompson noted that he

could not, at that time, resolve the ineffective assistance of counsel issue, because

to do so was premature; the outcome of Carmichael's trial had not yet been

decided. *See* GX 4W; GX 5A-I-13; GX 6C. Additionally, in her order denying the

motion to suppress the statements, Judge Boyd made findings relevant to the

inquiry as to whether law enforcement took advantage of Carmichael's

uncounseled status at that time, finding "the evidence [was] compelling that

Carmichael casually volunteered his statements without being subjected to an

unduly coercive atmosphere or any custodial interrogation of the character

requiring prior *Miranda* warnings." *See* GX 2G at 16. Judge Thompson also

found that, even if the claim of ineffective assistance was not premature, "based on

the evidence in the record, … [Carmichael's] Sixth Amendment right to effective

assistance of counsel was [not] violated in any way." *See* GX 6C at 11. Because,

as both Judge Boyd and Judge Thompson indicated, there was nothing critical

about the criminal proceedings at the time Carmichael made his statements, except

that he made them in the presence of his adversaries, his Sixth Amendment right to

counsel did not attach, and therefore, there could be no ineffective assistance of

counsel. For that reason, Carmichael's claim should be denied.

However, even if this Court finds the right to counsel had attached at the

time Carmichael made his "you got me" statement, Carmichael is still not entitled

to relief on this ineffective assistance of counsel claim, because he has not and

cannot establish the necessary prejudice. The evidence presented against

Carmichael at his trial was overwhelming. *See* GX 6J at 2, 15 (Judge Thompson

noting the conspiracy evidence presented by the Government was "overwhelming"

and that there was a "mountain of evidence" presented by the Government against

Carmichael). Carmichael's vague statement to law enforcement officers that "you

got me," even if it should have been excluded because counsel performed

deficiently in permitting him to go to the DEA office without representation or a

witness, was not so prejudicial that, but for the statement, Carmichael would have

been acquitted or the outcome of his trial would otherwise have been different.

Because there was no prejudice, this ineffective assistance of counsel claim should

be rejected. Also, because Carmichael has not sufficiently pleaded both deficient

performance and prejudice, he is not entitled to an evidentiary hearing on this

claim.

### 5.    Failing to properly advise Carmichael about his case

Carmichael also complains about the advice counsel provided him about his

case, alleging that they collectively failed in their representation of him. *See*

Carmichael Memorandum of Law at 18-22. He makes a general complaint about

counsel's advice to him, and he specifically lists a number of ways in which

counsel did not properly advise him, which are addressed in the next eleven

subparts below. To the extent that Carmichael alleges his counsel were ineffective

in general in their advice to him and in any other ways than those identified, he has

not sufficiently pleaded those claims so that the Government can properly respond.

However, because the burden of proof is on Carmichael to demonstrate both cause

and prejudice as to each claim of ineffective assistance of counsel, and he has not

done so with his general and non-specific claims concerning the advice counsel

provided him, this Court should deny any such claims.

To the extent this claim is broader that the eleven independent claims

addressed below, it cannot properly be resolved without an evidentiary hearing at

which counsel testify about what advice the provided to Carmichael

**6.    Failing to advise Carmichael about his "sentencing
exposure," and application of the United States Sentencing
Guidelines, and specifically about the enhancement provisions
applicable to him under the Sentencing Guidelines**

The first way in which Carmichael alleges his counsel were ineffective in

advising him is that they failed to advise him about his "sentencing exposure" and

application of the United States Sentencing Guidelines, and specifically about the

enhancement provisions applicable to him under the Sentencing Guidelines. *See*

Carmichael Memorandum of Law at 19.  In her affidavit, Ms. Wayne contradicts

Carmichael and asserts that she did advise Carmichael about his "sentencing

exposure" and about the specific enhancement provisions that applied to him, and

Ms. James states in her affidavit that she "discussed the guidelines with

Carmichael prior to sentencing." *See* Affidavit of Lisa M. Wayne at 3-4, ¶ 17;

Affidavit of Susan G. James at 7, "Paragraph 12." The extent of these conversations is unknown and what specific advice was given is equally unknown, as counsel do not state what advice they gave Carmichael. The conflict in these affidavits would have to be resolved at a hearing, but for the fact that Carmichael has not demonstrated prejudice with regard to this claim.[1] But because he cannot prove prejudice, this Court should reject this claim without a hearing. It can, and it should, deny this ineffective assistance of counsel claim, because regardless of the advice Carmichael received about sentencing, he was not prejudiced.

Carmichael appears to argue that he was prejudiced by counsel's failures because, if he had known of his sentencing exposure and how the Sentencing Guidelines would affect his sentence, he would have chosen to enter into plea negotiations with the Government and would have received a lesser sentence. Carmichael received a 480-month, or 40-year, sentence of imprisonment. *See* GX 7Q-II-218; GX 7S at 2. His Sentencing Guidelines range, after all adjustments, was from 360 months to life imprisonment, based on an adjusted offense level of 42 and a criminal history category of III. *See* GX 7Q-II-217.

---

[1] If any evidentiary hearing is held, the Government should be permitted to explore the advice counsel provided Carmichael regarding the sentencing issues with all of Carmichael's attorneys. By filing his ineffective assistance of counsel claims, as to those claims, Carmichael has waived any attorney-client privilege. *See Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001) ("[A] party waives its attorney-client privilege when it injects into … litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct.") (internal citation and quotation marks omitted).

167

Contrary to the assertions in his brief, the Government never offered Carmichael a five-year deal, and it did not make any other specific plea offer to him, and Carmichael's counsel do not recall otherwise. *See* Affidavit of A. Clark Morris; Affidavit of Stephen P. Feaga; Wayne Affidavit at 3-4, ¶ 17, and 5, ¶ 29; James Affidavit at 12-13, "Paragraph 28."

Further, both of Carmichael's primary counsel remember that Carmichael refused to include forfeiture of the Carmichael Center as a part of any plea deal, and the Government was insisting on such as a part of any plea deal. *Id.* Carmichael has not presented this Court with any evidence that a plea deal was on the table that he could have accepted if he had been better advised by his counsel about his sentencing exposure and application of the Sentencing Guidelines. Nor has he demonstrated or argued that this Court would have accepted such a plea deal. The burden of proof is on Carmichael to establish his ineffective assistance of counsel claim, and one of the things he must establish is prejudice – that but for the error or omission of counsel, he would have accepted an offered plea deal and received a lesser sentence. Carmichael has not done so.[2]  Because Carmichael has

---

[2] This is not a case in which counsel is alleged to be ineffective for failing to relay a favorable plea deal to a defendant, an issue which is currently before the Supreme Court on certiorari. *See Missouri v. Frye*, 131 S. Ct. 856 (Jan. 7, 2011) (certiorari granted to decide issue of whether an attorney provides ineffective assistance if he fails to relay a favorable plea deal to his client and that client is thereafter sentenced to a harsher sentence than that offered in the plea deal).