IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2004 FEB 18 P 4: 35

FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     CR. NO. 03-259-N |
| | ) |
| LEON CARMICHAEL, SR., | ) |
| also known as, BEAVER LEON | ) |
| CARMICHAEL, and | ) |
| FREDDIE WILLIAMS | ) |

FEB 18 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA

## UNITED STATES' RESPONSE IN OPPOSITION
## TO "DEFENDANT CARMICHAEL'S MOTION TO SUPPRESS
## EVIDENCE AND MOTION PURSUANT TO FED. R. CRIM. P. 41(G)"

COMES NOW the United States of America, by and through Leura Garrett Canary,

United States Attorney for the Middle District of Alabama, and files this response in opposition

to "Defendant's Carmichael's Motion to Suppress Evidence and Motion Pursuant to Fed. R.

Crim. P. 41(g)." Defendant's Motion is nothing more than a scant three-page collection of

conclusory allegations that are unsupported by citation to law or fact. Those allegations that do

exist fail to advise the Court of the salient facts predating and underlying Defendant's arrest.

Such facts were plainly stated in the discovery produced to Defendant on December 12, 2003.

(Govt's Discovery Ltr., Ex. A.) Nevertheless, Defendant does not mention such facts. Indeed,

he does not even try to contest or distinguish such facts from the controlling case law, which is

also notably absent from Defendant's motion.

At its core, Defendant's Motion is a boilerplate challenge to evidence and statements

derived from two events: (1) Defendant's detention and arrest on November 17, 2003, which

were predicated on Defendant's possession of handgun subsequent to a felony conviction and his

involvement in a marijuana distribution conspiracy; and (2) Defendant's voluntary visit to the



117

Drug Enforcement Administration ("DEA") District Office in Montgomery, Alabama on

December 4, 2003, which was arranged by his own counsel, Stephen Glassroth. With no

elaboration, Defendant claims that law enforcement officers violated Defendant's Fourth, Fifth,

and Sixth Amendment rights by arresting Defendant and "obtaining statements from him" during

his voluntary visit to the DEA District Office.

As detailed below, Defendant's bare-boned pleading has no merit. Defendant's detention

and arrest were predicated on ample probable cause. Accordingly, evidence derived from his

arrest was lawfully obtained. Additionally, Defendant's visit to the DEA District Office weeks

after his arrest was voluntary and, indeed, was arranged by his own counsel. Law enforcement

can hardly be charged with any wrongdoing when Defendant appeared voluntarily at the DEA

District Office on the advice of counsel and proceeded to make statements about the accuracy of

media reports, the trustworthiness of his own lawyers, and – most importantly – his own liability

for the charged drug conspiracy.

## I.   Factual Background

During a DEA investigation in mid-November 2003, the DEA learned that Leon

Carmichael was the principal player in a marijuana distribution conspiracy in the Montgomery,

Alabama area. This information was discovered during a series of search warrants and witness

interviews, discussed below:

1.   On November 13, 2003, a man named Gary Wayne George was arrested

following the execution of a search warrant at his residence in Prattville,

Alabama. (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B at 1.) During a

post-arrest interview, Mr. George told DEA Task Force Agent ("TFA") David

-2-

DeJohn that he was a member of the Leon Carmichael drug trafficking organization. Id. Mr. George's job, along with another man, Robert Patrick Denton, was to break down large amounts of marijuana brought into the Montgomery area by Carmichael's couriers, and then to prepare such marijuana for distribution. Id. According to Mr. George, the organization imports approximately 500 to 600 lbs of marijuana into the Montgomery area every 7 to 9 days. Id. Mr. George stated that both he and Mr. Denton are paid by Leon Carmichael with marijuana. Id.

2.      Based upon a tip from Mr. George, the Chilton County Sheriff's Department stopped a car containing approximately 26 lbs of marijuana on November 15, 2003. (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B at 3.) The car was driven by Charlotte Hensarling, a woman from Huntsville. Id. Mr. George had earlier told TFA DeJohn that he and Mr. Denton were meeting with Ms. Henserling to sell her marijuana. Id. This fact was confirmed not only by the traffic stop, but also by Ms. Hensarling herself, who stated that she had made 8 trips to Montgomery buy marijuana over the prior 2 months. Id.

3.      Based upon the above information, the fact that Mr. George had seen marijuana in Mr. Denton's residence, and the fact that a new shipment of marijuana was reportedly coming into the Montgomery area, the Honorable Charles Coody of this Court issued a search warrant for Mr. Denton's residence on November 16, 2003. (Search Warrant for 808 W. Flemming Rd., Montgomery, AL (M-03-71-N) and Application and Aff. for Warrant, Ex. C.)

4.      When the search warrant was executed on Mr. Denton's house in the early

morning hours of November 17, 2003, Mr. Denton was present.  (DeJohn Aff. for

Search Warrant (M-03-70-N), Ex. B at 4.)  He was interviewed by law

enforcement and confessed to being a member of the Leon Carmichael drug

trafficking organization.  Id.  Mr. Denton confirmed that his job was to break the

large amounts of marijuana in each shipment into smaller quantities for

distribution.  Id.  He also stated that, based upon Charlotte Hensarling's arrest, he

had called Leon Carmichael to have him redirect a shipment that was originally

due to come to Denton's house.  Id.  Mr. Denton then explained that the marijuana

would be at 949 Ridgecrest Drive, Montgomery, Alabama – the home of Freddy

Williams,[1] Defendant Carmichael's co-defendant in this case.  Id.

5.      At approximately 2:45 a.m., while law enforcement was still meeting with Mr.

Denton, Leon Carmichael called Mr. Denton to tell him that he would be stopping

by Mr. Denton's residence in about 5 minutes to talk.  (DeJohn Aff. for Search

Warrant (M-03-70-N), Ex. B at 4.)  The agents at the residence retreated from the

home and watched what unfolded.  Id. at 4-5.  Defendant Carmichael arrived a

few minutes later in his Honda Accord and went inside Denton's residence for

approximately 5 minutes.  Id. at 5.  After Defendant Carmichael left, Mr. Denton

told the agents that Carmichael confirmed that the marijuana shipment was, in

fact, at 949 Ridgecrest Drive.  Id.  According to Denton, Carmichael also told

---

[1]      Defendant Williams's last name was apparently not known to Denton or law
enforcement at this time.  See id. (listing the residence as "Freddy (LNU's) residence").

Denton that he wanted Denton to help Freddy Williams "break down" the marijuana shipment.  Id.

6.   Later that morning, Mr. Denton went to Freddy Williams's home wearing an audio transmitting device.  (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B at 5.)  Denton confirmed that the marijuana was present in the home.  Id.  Through the audio transmitting device, law enforcement agents were able to hear Denton and Williams discussing the marijuana and the need for scales to weigh the marijuana.  Id.  When Denton left to get the scales, he told TFA DeJohn that there were approximately 11 duffel bags with marijuana inside of Williams's home.  Id.  Video equipment carried by Denton recorded the existence of a number of duffel bags on a bed in Williams's residence.  (TFA DeJohn Report, Ex. D at 3, ¶ 13.)

7.   After Williams left his home that morning, law enforcement secured the residence, and TFA DeJohn left to obtain a search warrant.  (TFA DeJohn Report, Ex. D at 4, ¶ 16.)  While securing the residence, agents observed numerous duffel bags, three large bricks of marijuana on a cutting board, and an open duffel bag filled with suspected marijuana wrapped in clear plastic wrap and tape.  Id.  A search warrant was issued that afternoon and approximately 575 lbs of marijuana was recovered along with assorted firearms, ammunition, and items of drug paraphernalia.  Id. at 1, 6-11.

8.   While agents were waiting for the issuance of the search warrant, just before 11:00 a.m., Defendant Carmichael drove by Williams's residence in his Honda Accord.  (TFA DeJohn Report, Ex. D at 4, ¶ 18.)  It appeared to the agents that

Defendant Carmichael noticed the agents outside of the residence.  Id.  One of the agents attempted to follow and stop Defendant Carmichael, but Carmichael was able to speed away before the agent could catch him.  Id.

9.      At approximately 11:00 a.m., DEA Special Agent ("SA") Thomas Halasz, along with other law enforcement personnel, stopped Defendant Carmichael's Honda Accord on South Boulevard in Montgomery, Alabama.  (Report of SA Halasz, Ex. E at 1, ¶ 1.)  Defendant Carmichael had a pistol in plain view on the front seat of his car.  Id.  SA Halasz knew that Defendant Carmichael had previously been convicted of murder.  See id.  In fact, after being advised of his Miranda rights, Defendant Carmichael admitted both to possessing the gun and to his prior murder conviction, although he claimed that he had been pardoned for the murder.  Id. at 1-2, ¶ 2.  Therefore, in addition to having probable cause to believe that Defendant Carmichael was involved in a marijuana distribution conspiracy, SA Halasz now had probable cause to believe that Defendant Carmichael had violated 18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm.

10.     After he was stopped and read his Miranda rights, Defendant was advised that he had been implicated in the seizure of over 500 pounds of drugs at "Freddy's" residence.  (Report of SA Halasz, Ex. E at 2, ¶ 3.)  Defendant admitted that he knows a "Freddy" that drives for him.  Id.  He further stated that he had no knowledge of the drugs seized.  Id.  Defendant later asked what kinds of drugs were seized.  Id. at 2, ¶6.  When told it was over 500 pounds of marijuana, Defendant continued to maintain that he knew nothing about it.  Id.  When told by

SA Halasz that he (Carmichael) had been seen meeting with another person between 2:00 a.m. and 3:00 a.m. that morning, Defendant "said that he was in a hotel with a woman during the early morning hours including 2:00 a.m. and 3:00 a.m. and that she would testify to that." Id.

11.    At the time of his arrest, Defendant Carmichael had approximately $1,781 in cash rolled up in his pocket, as well as additional firearms (1 shotgun, 2 pistols) in the trunk of his car, and $5,000 from a zippered bank bag in a briefcase found on the rear seat of the car.  (Report of SA Halasz, Ex. E at 2 (¶¶ 3, 5) and 5.)

12.    Defendant Carmichael was charged with violating Title 18, United States Code, Section 922(g)(1) pursuant to a Criminal Complaint filed with this Court. (Compl. (M-03-66-N), Doc. 1.)  The decision to charge Defendant with only a Section 922(g)(1) violation at that time – and not the drug conspiracy – was a matter of prosecutorial discretion.

13.    The Criminal Complaint against Defendant Carmichael was dismissed on November 19, 2003, when Defendant Carmichael was indicted for conspiring to distribute marijuana.  The United States elected not to pursue a charge under Section 922(g)(1) because of evidence that Defendant had been pardoned for his prior murder conviction.

14.    On or about December 4, 2003, Assistant U.S. Attorney Clark Morris spoke with Defendant's Carmichael's attorney, Stephen Glassroth about the return of some of the evidence found in Defendant's vehicle on November 17, 2003.  Assistant U.S. Attorney Morris advised Mr. Glassroth that he should make arrangements with the

DEA District Office to retrieve these materials.[2]

15.   On December 4, 2003, Defendant Carmichael came to the DEA District Office to retrieve some of the materials that were not being retained as evidence. (TFA DeJohn Report II, Ex. F at 1, ¶ 1.) According to the TFA DeJohn's report of this visit, "[t]his was part of an arrangement between TFA DeJohn and Attorney Glassroth to return seized items to Carmichael that was [sic] not being held as evidence." Id. Attorney Glassroth did not accompany his client; nor did any of Defendant's other attorneys. See id. In fact, Defendant Carmichael came to the DEA District Office by himself. See id.

16.   While at the DEA District Office, Defendant began to complain about media reports that 575 lbs of marijuana had been found at his place of business, the Carmichael Center. (TFA DeJohn Report II, Ex. F at 1, ¶ 2.) TFA DeJohn told Defendant that law enforcement knew such reports to be false and that "[we] would not present anything that we did not believe to be the truth." Id.

17.   Carmichael continued by stating that he had resigned himself to the fact that he was going to prison for the rest of his life and that he considered a 10, 15, 20 year sentence to be a life sentence for him. (TFA DeJohn Report II, Ex. F at 1-2, ¶ 3.) When asked why he would say such a thing, Carmichael "advised 'You got me.'" Id. at 2, ¶ 3. TFA DeJohn then told Carmichael that he [Carmichael] would have

---

[2]        The foregoing factual allegation is based upon a description of facts Assistant U.S. Attorney Morris related to the undersigned Assistant U.S. Attorney at the time this response was drafted.

to talk to his lawyers before cooperating with agents.  Id.  Nevertheless, Carmichael continued, stating that he could not trust his own attorneys.  Id.  He asserted that one of his attorneys had called the United States Attorney's Office to offer the cooperation of another client against Carmichael.  Id.  Carmichael then insinuated that his other attorneys just had their hands out for his money.  Id.

18.  Carmichael then began to talk about matters that his attorney had told him, including information about witnesses who were coming forward.  (TFA DeJohn Report II, Ex. F at 2, ¶ 4.)  TFA DeJohn again advised Carmichael to talk to his attorneys if he wished to cooperate with law enforcement.  Id.

## II.  Argument

### A.  The Court Should Deny Defendant's Motion Without a Hearing, or at a Minimum, Order Defendant to File a Comprehensive Motion That Complies with the *Richardson* Case.

Defendant's Motion should be summarily denied because it does not meet the requirements required for a suppression hearing under United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985).  Defendant's team of retained counsel has had weeks to review the nearly three thousand of pages of discovery in this case.  If a substantial issue meriting suppression actually existed, one would think that a team of qualified counsel could do better than a few paragraphs of conclusory allegations that ignore the facts clearly stated in discovery. Defendant's many lawyers, all experienced federal court practitioners, are certainly aware that the Eleventh Circuit requires them to "allege facts which, if proven, would provide a basis for relief."  Richardson, 764 F.2d at 1527.  They should also be aware that the Eleventh Circuit in Richardson clearly explained that scant allegations will not carry the Defendant's burden in a

suppression hearing:

> Yet allegations . . . alone will not suffice to obtain an evidentiary hearing or the suppression of evidence. A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. In short, the motion must allege facts which, if proven, would provide a basis for relief. A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing. Once a defendant has failed to make a proper pretrial request for suppression, the opportunity is waived unless the district court grants relief for good cause shown.

Id. (internal citations omitted).

Although Defendant's conclusory allegations may mimic the standards for suppression, they do not inform the Court of anything. For example, the allegations do not tell the Court why Defendant's car was stopped, where it was stopped, why Defendant was arrested, or what Defendant was eventually charged with by Complaint and later Indictment. Such facts are plainly borne out in the discovery in this case, as well as in the initial charging instruments.

Defendant's Motion completely fails to mention that on the same day as Defendant's arrest, numerous search warrants were executed by the Honorable Charles C. Coody, United States Magistrate Judge, for searches of Defendant's residence, business, and the residences of others, including Defendant's co-defendant. Such warrants were, of course, predicated upon a finding by Judge Coody of probable cause that evidence of a crime was present at those locations. Defendant's Motion also fails to mention that the affidavits for those warrants set forth Defendant's suspected involvement in a narcotics conspiracy.

In sum, Defendant's Motion fails to comply with the requirements of Richardson. Insofar as Defendant's Motion is deficient, it also fails to comply with this Court's original Order on Arraignment (Doc. 37) which expressly warned Defendant that "[t]his [C]ourt will summarily

-10-

dismiss suppression motions which are supported only by general or conclusory assertions founded on mere suspicion or conjecture." Id. The United States asks this Court to enforce its Order and "summarily dismiss" Defendant's deficient pleading.

**B.      Defendant's Detention and Arrest Were Lawful and Supported By Probable Cause.**

Defendant's detention and arrest were completely lawful and were supported by ample probable cause. As shown supra, Defendant was not arrested until after law enforcement corroborated the claims of two individuals, Gary Wayne George and Robert Patrick Denton, who both unequivocally stated in post-arrest interviews that they were participants in Defendant Carmichael's drug organization. Law enforcement officers tracked marijuana deals that were linked to the Carmichael organization. They arrested a woman who was coming to Montgomery to buy marijuana from that organization. They also confirmed through audio and video surveillance, as well as what was seen in Freddy Williams's home during the security sweep, that the hundreds of pounds of marijuana that was coming to Montgomery as part of Defendant's organization was, in fact, where Mr. Denton reported that it would be. Further corroborating the stories of George and Denton was Defendant Carmichael's nighttime call and visit to Denton's home in the early morning hours of November 17, 2003, when Carmichael told Denton to go to Freddy Williams's house to help repackage the newest shipment of marijuana. Finally, law enforcement agents observed Defendant Carmichael's appearance at Freddy Williams's residence after they had secured the premises. This appearance cannot be viewed as coincidental. After all, Defendant Carmichael had already been identified as the head of the drug organization that caused over 550 pounds of marijuana to be delivered to Freddy Williams's house. He had

already been seen visiting Denton earlier that morning when Denton was told to meet Williams to repackage the marijuana. Simply put, Defendant Carmichael came by Freddy Williams's home to check on his business investment, and he did so with four guns and over $6,500 in cash.

Officers had ample probable cause to arrest Defendant Carmichael. Indeed, they had ample evidence to convict Defendant Carmichael – a quantum of evidence far greater than the probable cause standard requires. Cf. United States v. Broadwell, 870 F.2d 594, 601 (11th Cir. 1989) ("Testimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction."). As the Eleventh Circuit explained in United States v. Herzbrun, 723 F.2d 773 (11th Cir. 1984), "[t]he arresting officer need not have in hand sufficient evidence to convict, because when assessing probable cause 'we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 775 (quoting Draper v. United States, 358 U.S. 307, 313 (1959)). The United States Supreme Court has similarly explained that probable cause is "a practical, nontechnical conception" that allows officers "fair leeway for enforcing the law. . . . Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for mistakes on their part." Brinegar v. United States, 338 U.S. 160, 176 (1948). Based on these concerns, evidence should be viewed "in light of the recognition that probable cause itself is a doctrine of reasonable probability and not certainty." United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

As noted above, however, probable cause should not seriously be in dispute insofar as law enforcement officers had sufficient evidence to *convict* Defendant Carmichael when he was arrested. After all, by the time of Defendant Carmichael's arrest, two of Defendant Carmichael's

-12-

criminal coconspirators had confessed and implicated Carmichael.   As the Eleventh Circuit,

sitting en banc, clearly stated in explaining the significance of coconspirator confessions in the

probable cause context:

> For the past forty years, an unbroken stream of precedent in this circuit has
> established that the uncorroborated testimony of a co-conspirator or accomplice is
> sufficient to prove guilt beyond a reasonable doubt. . . . It would be anomalous
> for us to hold that even though a co[-]defendant's uncorroborated testimony can
> prove guilt beyond a reasonable doubt, the confession of a co-defendant that he
> and the suspect committed the crime is insufficient to establish probable cause.

Craig v. Singletary, 127 F.3d 1030, 1044-45 (11th Cir. 1997).  Although the Craig court was

careful to say that completely implausible accomplice confessions, such as those by mental

patients, may not be sufficient in individual cases, the court was clear to say that most

accomplice confessions will be sufficient to establish probable cause for an arrest. Id. at 1045.

Moreover, the court explained that even accomplice confessions that seek to shift some blame to

another party are sufficient to provide probable cause as to that other party. Id. ("However, even

when a co-defendant confession seeks to shift some of the blame to another, the co-defendant's

admission of guilt is enough indication of 'reasonably trustworthy information' to satisfy

probable cause.").  In sum, the en banc court in Craig, announced that "[o]rdinarily, unless it is

incredible or contradicts known facts to such an extent no reasonable officer would believe it, a

co-defendant's confession that he and the suspect committed the crime can supply probable cause

to arrest the suspect." Id. at 1045-46; see also United States v. Patterson, 150 F.3d 382, 386 (11th

Cir. 1998) ("This Court agrees with the Eleventh Circuit that it would be contradictory to allow a

defendant to be convicted based on the uncorroborated testimony of his co-perpetrator while

refusing to find that the same statement would be sufficient to support probable cause.").

Accordingly, law enforcement had sufficient probable cause to arrest Defendant

Carmichael based upon nothing more than the information provided by Carmichael's

coconspirators, Gary Wayne George and Robert Patrick Denton.  As noted above, law

enforcement had corroborated much of what George and Denton had revealed, including

intercepting a 26 pound shipment of marijuana and seeing large quantities of marijuana in Freddy

Williams's house.  Additionally, Defendant Carmichael was stopped with a handgun in plain

view on the seat of his car.  Special Agent Halasz knew that Carmichael had previously been

convicted of murder.  Although it was later confirmed that Defendant Carmichael had been

pardoned for that murder, the arresting agents on the scene fully believed that Defendant had

committed a violation of 18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm.[3]  Cf.

United States v. Bonilla Romero, 836 F.2d 39, 46 (1st Cir. 1987) ("To require police officers to

---

[3]      To the extent Defendant seeks to argue at his suppression hearing that the pardon
for his murder somehow undercuts SA Halasz's probable cause to arrest him, he should be
mindful of two facts.  First, probable cause is determined based upon the quantum of information
known to law enforcement at the time of arrest.  See Ornelas v. United States, 517 U.S. 696-97
(1996) (discussing how "[t]he principal components of a determination of reasonable suspicion
or probable cause will be the events leading up to the stop or search, and then the decision
whether these historical facts, viewed from the standpoint of an objectively reasonable police
officer, amount to reasonable suspicion or probable cause.").  SA Halasz had no reason to believe
that Defendant had been pardoned for his prior murder conviction, notwithstanding Defendant's
roadside claim that he had been pardoned.  Cf. United States v. Bonilla Romero, 836 F.2d 39, 46
(1st Cir. 1987) (finding that officers did not need to investigate various possible defenses
convicted felon may have for possessing firearm prior to arrest).  After all, Defendant had proved
to be dishonest when he lied to claim that he had not visited Robert Patrick Denton's house
earlier that morning.  (Report of SA Halasz, Ex. E at 2, ¶ 6.)  Second, the existence of a pardon is
an affirmative defense that a defendant must establish with proof at trial.  See United States v.
Jackson, 57 F.3d 1012, 1016-17 (11th Cir. 1995) (finding that the government did not need to
disprove the existence of a pardon or expungement of a conviction in a Section 922(g)(1) case,
and putting the burden on the defendant to come forward with evidence of any pardon or
expungement).  In Jackson, the Eleventh Circuit made clear that the government does not have
the burden of disproving the existence of a pardon at trial.  Id. at 1017.  The government should
not, therefore, be tasked with disproving the existence of a pardon during a roadside arrest.

-14-

investigate every *possibility* of innocence prior to effectuating the arrest of a known felon carrying a clearly dangerous weapon would be an undue burden on the police force's efforts to protect the safety of the public." (emphasis in original)).  Based on these facts, there can be no doubt that law enforcement had sufficient information to arrest Defendant Carmichael.  See Craig, 127 F.3d at 1042 ("Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense.").  Accordingly, Defendant's arrest and the so-called "fruits" from that arrest should be upheld and deemed admissible at trial.

**C.   Defendant's Statements at the DEA District Office were Volunteered After Defendant Appeared at that Office According to his own Attorney's Arrangements.**

Defendant's volunteered statements to TFA DeJohn on December 4, 2003, constitute neither fruit of an unlawful arrest, nor statements obtained in violation of Defendant's right to counsel under the Fifth and Sixth Amendments.  As discussed <u>supra</u> in the Factual Background section, Defendant Carmichael showed up by himself at the DEA District Office on December 4, 2003, to retrieve some of the items taken from his car on the date of his arrest.  While at the District Office, Defendant Carmichael complained to TFA DeJohn about media reports, his own attorneys, and the amount of time he would be spending in jail.  At least twice, when Defendant Carmichael began volunteering potentially inculpatory information, TFA DeJohn stopped to explain that Defendant should first talk to his lawyer if he intended to cooperate.  At one point during the conversation, Defendant Carmichael stated, "you got me."  (TFA DeJohn Report II, Ex. F at 2, ¶ 3.)

Defendant Carmichael's visit to the DEA District Office occurred after Defendant's attorney, Stephen Glassroth, was contacted by Assistant U.S. Attorney Clark Morris. Mr. Glassroth was told that he or some designee could come to the DEA District Office to pick up some of the items seized from Defendant during his arrest two weeks earlier. Although the United States is clearly not privy to Attorney Glassroth's communications with his client, it appears that Attorney Glassroth sent his client to the DEA District Office unaccompanied on December 4. This assumption is confirmed by TFA DeJohn's conversation with Attorney Glassroth prior to Defendant Carmichael's appearance at the DEA District Office on December 4.[4]

### 1. Defendant's Visit to the DEA District Office was not the Fruit of an Unlawful Arrest.

Defendant's Voluntary Appearance at the DEA District Office cannot be viewed as the fruit of an unlawful arrest because (1) Defendant was not unlawfully arrested on November 17; and (2) Defendant came to the DEA District Office voluntarily over two weeks after his arrest. With respect to Defendant's arrest, the United States will not rehash the unlawful arrest argument, addressed above. There was ample probable cause for Defendant's arrest. His lawful arrest did not, therefore, create any impermissible evidence.

Moreover, even if Defendant's earlier arrest could be deemed improper, Defendant's

---

[4]    TFA DeJohn informed the undersigned Assistant U.S. Attorney that he called Attorney Glassroth to make arrangements for the return of the seized items. According to TFA DeJohn, this call was made pursuant to the direction of either Assistant U.S. Attorney Clark Morris or TFA DeJohn's supervisor. During the conversation, Attorney Glassroth told TFA DeJohn that he (Glassroth) would be sending Defendant Carmichael to the District Office. TFA DeJohn then asked Attorney Glassroth if such an arrangement would be appropriate. Attorney Glassroth confirmed that it would be.

voluntary visit to the DEA District Office was sufficiently attenuated from the arrest to lift any possible taint.  See, e.g., Agee v. White, 809 F.2d 1487, 1490 (11th Cir. 1987) ("To succeed on his [F]ourth [A]mendment claim, appellant must demonstrate not only that his initial arrest was illegal, but also that the connection between the initial police illegality and the second confession was not 'so attenuated as to dissipate the taint' of the arrest." (quoting Wong Sun v. United States, 371 U.S. 471, 491 (1963))).  After all, Defendant did not make his statements at the DEA District Office until over two weeks had passed following his arrest.  He was not in custody and came to the DEA District Office voluntarily after being advised by his own lawyer.  Accordingly, pursuant to the United States Supreme Court's holding in Wong Sun, "the connection between the arrest and the statement[s] had 'become so attenuated as to dissipate the taint.'" Wong Sun, 371 U.S. at 491 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

In Wong Sun, the Supreme Court found that a defendant had been arrested without probable cause. Id. at 491.  Several days later, the defendant came to the narcotics bureau office and confessed to law enforcement. Id.  The Court found that the defendant's prior, unlawful arrest did not taint his later confession due to "evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement. . . ." Id.

The Eleventh Circuit has followed the attenuation doctrine first announced in Wong Sun on a number of occasions, finding confessions free of any possible taint where anywhere from four days to less than an hour had passed between the challenged confession and the purportedly unlawful police conduct.  See, e.g., Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir. 1993) (finding that any taint from an prior unlawful detention "had been completely attenuated by the time of

-17-

his eventual confession four days later" where the defendant was "able to return home" in the interim and had "more than ample opportunity to enlist legal assistance"); United States v. Edmondson, 791 F.2d 1512, 1515-16 (11th Cir. 1986) (finding that defendant's confession, "which began approximately forty-five minutes after his arrest, away from the scene of the arrest, made after twice being advised of his Miranda rights, and initiated by him[,] was sufficiently attenuated."). Here, over two weeks passed. During that time, Defendant was released on bond, was able to return home to friends and family, and had access to counsel. See Devier v. Zant, 3 F.3d at 1459 (noting that defendant "was able to return home" and "[i]n those four days [between defendant's detention and confession], [defendant] had access to the aid and comfort of friends and family" and time to enlist an attorney). Accordingly, Defendant's voluntary visit to the DEA District Office cannot be viewed as the "fruit" of any poisonous tree in this case.

## 2.   Defendant's Statements at the DEA District Office did not Violate the Fifth Amendment Insofar as Defendant was not in Custody.

Defendant's voluntary statements to TFA DeJohn also did not run afoul of the Fifth Amendment's prohibitions against self-incrimination. The Fifth Amendment protects against compelled testimony and statements. See U.S. Const. amend. V ("nor shall [any person] be compelled in any criminal case to be a witness against himself"). Defendant cannot show – and has not even attempted to show – how he was compelled to give a statement to TFA DeJohn. Defendant was not in custody when he came to the DEA District Office. Indeed, he came to the Office on his own and left in the same manner. See, e.g., Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (finding that the defendant was not in custody where "[h]e came voluntarily to the police station, where he was immediately informed that he was not under arrest[,]" and where he

-18-

"did in fact leave the police station without hindrance."). He was not required to come to the Office. His attorney decided to send him. The facts of this case simply do not support Defendant's conclusory claim of a Fifth Amendment violation.[5]

### 3. Defendant's Statements on December 4 did not Violate or Invade his Sixth Amendment Right to Counsel Because Defendant's own Lawyer Sent him to the DEA Office.

Defendant similarly cannot claim that his voluntary appearance and statements to TFA DeJohn violated the Sixth Amendment's right to counsel. Cf. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."). Although law enforcement faces many restrictions when dealing with represented parties after those parties have been formally charged, such restrictions simply do not apply where a defendant, after being advised by counsel, voluntarily appears at law enforcement's doorstep and begins complaining. See United States v. Grimes, 911 F. Supp. 1485, 1491 (M.D.

---

[5]     The law is clear that not all incriminating statements are prohibited by the Fifth Amendment or protected by the rule expressed in Miranda v. Arizona, 384 U.S. 436 (1966). As the Supreme Court has explained: "The Fifth Amendment itself does not prohibit all incriminating admissions; '[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.'" New York v. Quarles, 467 U.S. 649, 654 (1984) (quoting United States v. Washington, 431 U.S. 181, 187 (1977)). For the Fifth Amendment protections explained in Miranda to be triggered, the facts of a case must show that "at the time the statements were made, [the defendant] was unwarned and was both (a) in custody and (b) being interrogated." United States v. Grimes, 142 F.3d 1342, 1349 (11ᵗʰ Cir. 1998) (emphasis added).

"Custodial interrogation" is a term of art that has been defined by the Supreme Court. In Miranda, the Supreme Court defined that term when it explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. The premise of the Miranda decision was "that the danger of coercion results from the interaction of custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 297 (1990). Conversely, the concerns expressed in Miranda do not exist absent evidence of both official custody and interrogation by law enforcement. See id.

Fla. 1996) ("An individual's invocation of his right to counsel under either the Fifth or Sixth Amendment bars subsequent interrogation by law enforcement officers outside of the presence of an attorney <u>unless the exchange is prompted by the defendant</u>." (emphasis added)), <u>aff'd</u>, 142 F.3d 1342 (11th Cir. 1998). Had TFA DeJohn approached Defendant Carmichael at his home or business on December 4 and asked him questions, the United States would stipulate to a Sixth Amendment violation. The facts of this case are clearly different and do not support a Sixth Amendment violation.

First, Defendant was at no point denied his right to counsel. Prior to Defendant's December 4 visit to the DEA District Office, Assistant U.S. Attorney Morris and TFA DeJohn each independently contacted Defendant's attorney, Stephen Glassroth, to make arrangements for the return of seized property. Attorney Glassroth elected to send his client unaccompanied to the DEA District Office. Accordingly, Defendant had access to counsel prior to his December 4 visit, and his counsel advised him to come alone to the DEA District Office. It defies common sense to suggest that the United States deprived Defendant of his right to an attorney when the United States contacted Defendant's attorney <u>twice</u>, yet the attorney decided to send his client to the DEA District Office alone. What more was the United States required to do?

Yet even setting Attorney Glassroth's involvement to the side, the fact remains that Defendant appeared voluntarily at the DEA District Office and began to complain. After the Sixth Amendment right to counsel attaches at initial appearance or arraignment, law enforcement may generally not initiate contact to "deliberately elicit" information. <u>See</u> <u>United States v.</u> <u>Henry</u>, 447 U.S. 264 (1980) ("The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from [the defendant] within

-20-

the meaning of <u>Massiah</u>."). The situation is, however, markedly different when a defendant initiates contact or conversation. <u>See, e.g.</u>, <u>United States v. Walls</u>, 70 F.3d 1323, 1326 (D.C. Cir. 1995) (finding no Sixth Amendment violation where the defendant "initiated the conversation by asking [DEA agents to identify] to whom he allegedly sold crack."). The Eleventh Circuit has twice addressed the situation of a defendant, post-arraignment, initiating contact or conversation with law enforcement. <u>See United States v. Gonzalez</u>, 183 F.3d 1315, 1324 (11th Cir. 1999), <u>partial abrogation on other grounds recognized by</u> <u>United States v. Diaz</u>, 248 F.3d 1065 (11th Cir. 2002); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1312-13 (11th Cir. 1990). In both cases the court concluded that such contact did not violate the Sixth Amendment because the defendants initiated communication with law enforcement. <u>See</u> <u>Gonzalez</u>, 183 F.3d. at 1324; <u>Gaddy</u>, 894 F.2d at 1313.

In <u>Gonzalez</u>, the Eleventh Circuit found no Sixth Amendment issue where the defendant, who was in custody, initiated contact with the police through his wife. <u>Gonzalez</u>, 183 F.3d at 1323-24. Specifically, the defendant had his wife tell the arresting officer that the defendant "wanted to speak with him immediately." <u>Id.</u> at 1323. The police then met with the defendant at the jail, advised him of his custodial rights, and proceeded to ask him questions. <u>Id.</u> at 1324. In finding no Sixth Amendment violation, the court explained that "only a defendant, not the police, can reinitiate questioning once the defendant has asserted his Sixth Amendment right to counsel. We find no police initiation under the facts of this case." <u>Id.</u>

In <u>Gaddy</u>, the Eleventh Circuit reached the same conclusion where the police approached the defendant's aunt, a police department employee, and told her that it would be in her nephew's best interests to speak to the police. <u>Gaddy</u>, 894 F.2d at 1309-10. The aunt communicated this

to the defendant, who then agreed to meet with the police. Id. at 1310. As in Gonzalez, the police in Gaddy then met with the defendant, who was in custody, advised him of his custodial rights, and proceeded to ask him questions. Id. at 1310-11. Based on these facts, the court found no Sixth Amendment violation:

> We have already concluded that [defendant's] statements were not made as a result of police-initiated interrogation; they occurred because [defendant's] aunt, in her private capacity, urged him to speak and he agreed. Therefore, the circumstances under which the government obtained statements from [defendant] were not the functional equivalent of government interrogation. Since [defendant's] statements were not given at the urging of or due to the exploitation by a federal agent, the district court properly denied the suppression of the statements offered in the absence of counsel.

Id. at 1313.

As in Gonzalez and Gaddy, there was no Sixth Amendment violation in this case. Defendant voluntarily appeared at the DEA District Office and "himself initiate[d] further communication, exchanges, or conversations" by complaining to TFA DeJohn. Arizona v. Mauro, 481 U.S. 520, 526 (1987) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)); cf. United States v. Walls, 70 F.3d 1323, 1325-26 (D.C. Cir. 1995) (finding no Sixth Amendment violation where defendant incriminated himself by asking questions and making unsolicited comments to DEA during booking procedure). He continued talking even after TFA DeJohn twice told him that he should confer with his lawyer before cooperating. See Walls, 70 F.3d at 1326 (finding no Sixth Amendment violation where defendant "continued talking despite agents' warning that he was entitled to have an attorney present.").

In sum, TFA DeJohn did nothing to compromise Defendant's right to counsel. TFA DeJohn called Defendant's counsel to make arrangements for the return of evidence prior to

Defendant's contested visit to the DEA District Office.  Thereafter, Defendant arrived alone and initiated communication.  No Sixth Amendment violation occurred.  Consequently, this Court should reject Defendant's attempt to suppress the statements he voluntarily made to TFA DeJohn.

WHEREFORE, the United States respectfully submits that the Court should deny Defendant Carmichael's Motion without a hearing and allow for the admissibility of the evidence and statements discovered after Defendant's lawful arrest, including his voluntary statements to TFA DeJohn.

Respectfully submitted this the 18th day of February, 2004.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Matthew S. Miner
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Matthew S. Miner, Assistant United States Attorney, hereby certify that I have served a copy of the foregoing via first-class mail on Defendant's counsel, Stephen Glassroth, Esq., at the following address: 615 South McDonough Street, Post Office Box 910, Montgomery, Alabama 36101, on this the 18th day of February, 2004.

Assistant United States Attorney



**U.S. Department of Justice**

*United States Attorney*
*Middle District of Alabama*

_____

One Court Square, Suite 201
Post Office Box 197
Montgomery, Alabama 36101-0197

Telephone: 334/223-7280
Fax: 334/223-7560
Fin Lit Fax: 334/223-7201
Civil Fax 334/223-7418
Criminal Fax: 334/223-7135

December 12, 2003

Steven Glassroth
Montgomery, Alabama

RE:   United States v. Leon Carmichael

Dear Steve,

1. Pursuant to Rule 16(a), Fed. R. Crim. P., the Standing Order on Criminal Discovery issued February 4, 1999, and as otherwise required by law (e.g. Brady v. Maryland, 373 U.S. 83, United States v. Giglio, 405 U.S. 150), the United States Attorney hereby provides all available discovery to you as Defendant's counsel of record. Physical evidence, if any, is in the custody of the investigating law enforcement agency, the Alabama Department of Forensic Sciences, or any other agency who may be conducting examinations or tests of such physical evidence. Arrangements to inspect physical evidence collected during the investigation may be made by contacting the undersigned Assistant United States Attorney.

2. Enclosed is a copy of the discovery in this case. This material is page numbered sequentially. Any pages that have not been provided are either work product, or are prohibited from or not required to be disclosed according to federal law or court rules. The United States considers this discovery material to have been received in its entirety unless promptly notified in writing of any discrepancies.

3. The United States intends to use at trial any and all prior convictions, crimes, wrongs or acts of Defendant for those uses permitted by Rules 404(b) and 609, Fed. R. Evid., and as otherwise allowed by law. At this time, the government knows of no "prior crimes" in which it intends to use at trial.

4. The United States intends to elicit testimony at trial from two informants, Patrick Denton and Gary George. The record of prior convictions of these informants is included in the discovery materials. Patrick Denton became an informant after a search warrant was executed at his residence. No illegal contraband was found as a result of said search warrant, however, Denton began cooperating at that time. Denton has pending charges for marijuana possession in Madison County. Denton has requested that the government speak to the Madison County DA's office in an effort to reduce his sentence. The government has not agreed to speak to the Madison County DA's office

at the time of filing this discovery response. George was arrested on two counts of distribution of marijuana and one count of possession of marijuana in the first degree. All agreements made between the government and George were captured on the video tape labeled N-1.

5. The United States intends to call expert witnesses at trial. The experts are DEA Task Force Officer David DeJohn, who will testify regarding his knowledge of narcotics investigations based on his training and experience in law enforcement and narcotics investigations; and, the DEA chemist who examines the alleged marijuana who will testify regarding narcotics toxicology. The curriculum vitae for Agent DeJohn is enclosed. Upon completion of the drug analysis, the government will obtain and forward to defense counsel a curriculum vitae for the DEA chemist.

6. Transcripts have not been provided. The government has moved in a separate filing for an additional seven days within which to complete the transcripts.

7. Pursuant to Rules 16(b), (c), and (d), Fed. R. Crim. P., the Standing Order on Criminal Discovery issued February 4, 1999, and as otherwise provided by law, the United States requests a copy of all discovery to which it is entitled.

8. Pursuant to Rules 16(e) and 12.1, Fed. R. Crim. P., and as otherwise provided by law, the United States requests notice of any intent to use an alibi defense and the specific details surrounding the alibi defense. Pursuant to Rule 16(c), the United States requests this information be provided as soon as Defendant becomes aware of its existence, under the continuing duty to disclose this information. The specific time(s) and date(s) of the offense is/are listed in the discovery material provided.

9. The undersigned Assistant United States Attorney is aware of and intends to comply with the continuing duty to disclose discoverable information as required by Rule 16(c), Fed. R. Crim. P. and the Standing Order on Criminal Discovery issued February 4, 1999.

Please feel free to contact me at any time to discuss this case or if you have any questions about the discovery provided.

Respectfully submitted,

LEURA GARRETT CANARY
United States Attorney

by: *Clark Morris*

A. Clark Morris
Assistant United States Attorney

cc:   U. S. Magistrate Judge
       Case Agent

FILED

# *United States District Court*

NOV 20 2003

_____MIDDLE_____   DISTRICT OF   _____ALABAMA_____

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

In the matter of the Search of

**949 Ridgecrest Drive
Montgomery, Alabama**

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: *M03-70-N*

I,____R. David DeJohn_____ being duly sworn depose and say:

I am a(n) __Task Force Agent, Drug Enforcement Administration____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as

**949 Ridgecrest Drive, Montgomery, Alabama, more specifically described as a white wood frame residential
duplex green trim, burglar bars on the windows, and a brick encased mailbox**

in the _____Middle_____ District of ____Alabama_____

there is now concealed a certain person or property, namely

**See  Exhibit A**

which is contraband, the fruits of a crime, or things otherwise criminally possessed

concerning violations of Titles 18 USC §§ 924(c), 1956 and 1957;  21 USC §§ 841(a)(1) and 846.
_____

The facts to support the issuance of a Search Warrant are as follows:

**SEE THE ATTACHED AFFIDAVIT WHICH IS INCORPORATED BY REFERENCE HEREIN**

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
R. David DeJohn

Sworn to before me and subscribed in my presence,
November 17, 2003_____ at
Date

_____Charles S. Coody, U.S. Magistrate Judge___
Name & Title of Judicial Officer

_____Montgomery, Alabama_____
City and State

_____
Signature of Judicial Officer

## AFFIDAVIT

I, R. David DeJohn, being duly sworn, state that I am an Investigator with the Prattville Police Department and cross-designated as a Task Force Agent with the United States Drug Enforcement Administration (DEA) assigned to the District Office in Montgomery, Alabama. I have been in Law Enforcement for over 13 years including eight years with the Montgomery Police Department serving as a Patrol Officer and a Narcotics Investigator. The affiant is currently participating in a Marijuana investigation. This investigation targets Marijuana distribution activities in the Montgomery, Alabama area and other locations. This investigation has identified Robert Patrick DENTON JR and Beaver Leon CARMICHAEL as a distributor of Marijuana.

The following facts were either told to me by fellow officers or are known personally by me:

On or about 11/13/2003, officers of the Prattville Police Department arrested Gary Wayne GEORGE during the execution of a search warrant in Prattville, Alabama. GEORGE was under investigation as being a distributor of Marijuana as Prattville Police Department had previously conducted 2 controlled purchases of Marijuana from GEORGE. During a post arrest interview, GEORGE indicated to TFA David DeJohn that he was a member of the Leon CARMICHAEL Drug Trafficking Organization. GEORGE stated that he and an individual by the name of Robert Patrick DENTON JR's job within the organization was to "breakdown" large packages of Marijuana, that was brought in by CARMICHAEL's Couriers, to prepare for distribution into the Montgomery, Alabama area. Through this affiant's training and experience, "Break-down" is defined as opening the Marijuana packages, weigh-out, and repackage for distribution. GEORGE added that the average amount of Marijuana would be 500 to 600 lbs of Marijuana every 7 to 9 days. GEORGE stated that the last shipment had occurred on 11/09/2003, which would leave them due for another shipment of Marijuana on or about 11/16/2003. GEORGE advised TFA DeJohn that the location in which he and DENTON would "breakdown" the Marijuana would be at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama or a residence that is provided to them by CARMICHAEL. GEORGE provided TFA DeJohn with a map to this residence, which was found to be located at 23 Second Street, Montgomery, Alabama. GEORGE added that both he and DENTON are paid by CARMICHAEL with Marijuana. GEORGE stated that CARMICHAEL would also "front" large amounts of Marijuana to them of which they would sell and return the required amount of money to

1

CARMICHAEL. TFA DeJohn obtained information from GEORGE that both he and DENTON would sell Marijuana in and around the Montgomery, Alabama area as well as supply individuals in Huntsville, Alabama. GEORGE stated that both he and DENTON would supply Marijuana to Charlotte and Steve HENSARLING, of Huntsville, Alabama. GEORGE stated that the HENSARLING's would receive Marijuana from DENTON once or twice per week. GEORGE advised TFA DeJohn that approximately 15 months ago, DENTON was arrested in Huntsville, Alabama after officials found DENTON in possession of approximately 10 pounds of Marijuana.

An investigation into DENTON found that on or about 06/13/2002, DENTON had been arrested in Huntsville, Alabama for Trafficking in Marijuana after he was found to be in possession of approximately 10 lbs of Marijuana. On or about 06/13/2003, a subsequent search warrant was executed at his residence, located at 808 W. Fleming Rd, Montgomery, Alabama. During the search of his residence, agents located a quantity of Marijuana and suspected Cocaine along with $7,980.00 and 3 handguns.

On or about 11/14/2003, TFA DeJohn received a call from GEORGE, who stated that he was at DENTON's residence and had observed DENTON counting out money that was to go to CARMICHAEL. GEORGE stated that he estimated the money to total approximately $20,000. GEORGE added that he believed that DENTON was about to depart in approximately 20 minutes and possibly meet with CARMICHAEL at the CARMICHAEL CENTER, located at 150 E. Fleming Rd, Montgomery, Alabama. Approximately 20 minutes later, agents observed DENTON, travel east on W. Fleming Rd. DENTON traveled to M&L Car wash, located on Buckingham Rd near the corner of Norman Bridge Rd, Montgomery, Alabama. There, DENTON met with some unknown individuals briefly and departed. At this time, DENTON traveled back to the area of his residence, located at 808 W. Fleming Rd. GEORGE later contacted TFA DeJohn and advised that DENTON had not yet made the money delivery to CARMICHAEL. GEORGE stated that DENTON had picked up money instead of delivering money when he (GEORGE) had called TFA DeJohn earlier. GEORGE stated that he estimated the money to total $25,000 to $30,000. GEORGE added that DENTON should be transferring the money to CARMICHAEL at CARMICHAEL's residence. Through previous investigations, TFA DeJohn knew CARMICHAEL to reside at 3226 Brookwood Drive, Montgomery, Alabama.

On or about 11/15/2003, TFA David DeJohn and Sgt. David Williams, of the Prattville Police Department, met with GEORGE in Prattville, Alabama. GEORGE stated that during the late evening hours of 11/14/2003, he spoke with DENTON, who advised that on

2

Sunday (11/16/2003) is when the next load of Marijuana is expected in Montgomery, Alabama.  GEORGE stated that he also learned from DENTON that it was to be closer to 1,000 lbs of Marijuana.  Again, GEORGE stated that both he and DENTON were going to "break-down" the Marijuana at either DENTON's residence or at the residence that TFA DeJohn had previously identified as 23 Second Street, Montgomery, Alabama.  GEORGE stated that on today's date, DENTON was expected to sell some Marijuana to Charlotte HENSERLING. GEORGE stated that when HENSERLING arrives from Huntsville, Alabama, both he and DENTON will meet her at Shoney's on the Southern Blvd, Montgomery, Alabama.  GEORGE advised that he would provide TFA DeJohn with a vehicle description and tag number after DENTON meets with HENSERLING.  A short time, later TFA DeJohn learned from GEORGE that both he and DENTON met with HENSERLING. During this time, DENTON provided HENSERLING with what GEORGE believed to be 10 to 15 pounds of Marijuana.  GEORGE stated that HENSARLING was driving a Black Chevy S-10 Blazer, 2dr (Ala Tag#476324C).  At this time, TFA DeJohn set up surveillance on I-65 at the Pine Level Exit, watching northbound traffic.  A short time later, TFA DeJohn observed a Black GMC Jimmy, 2dr (Ala tag#47G324C).  Due to the fact that a GMC Jimmy and a Chevy S-10 Blazer are similar vehicles, TFA DeJohn believed this to be the vehicle occupied by HENSERLING.  TFA DeJohn made contact with Sgt. Steve Brock, of the Chilton County Sheriff's Office.  TFA DeJohn advised Sgt. Brock of what had transpired in Montgomery, Alabama. Sgt. Brock later conducted a traffic stop of the GMC Jimmy after it crossed the Chilton County Line.  Sgt. Brock advised that he stopped the vehicle after he observed the vehicle change lanes improperly.  Sgt. Brock approached the vehicle and asked the driver, identified as Charlotte HENSARLING.  The vehicle was found to be registered to James S. HENSARLING, 1063 Macedonia Rd, Ardmore, Alabama.  During the stop, SGT Brock detected the strong odor of Marijuana in and about the vehicle.  During a consent to search of the vehicle, Sgt. Brock, located approximately 26 lbs of Marijuana.  HENSARLING was placed under arrest and transported to the Chilton County Jail.  During a post arrest interview, HENSARLING advised agents that she had purchased the Marijuana from DENTON and GEORGE while in Montgomery, Alabama.  HENSARLING advised that she had met with GEORGE and DENTON at the Shoney's Restaurant, located on the Southern Blvd in Montgomery, Alabama and gave DENTON $15,000 for the Marijuana.  HENSARLING stated that she has made 8 trips to pick-up Marijuana over a 2 month period. HENSARLING will be charged under State of Alabama Charge, Trafficking in Marijuana.

During the traffic stop of HENSARLING, TFA DeJohn received a call from GEORGE, who stated that DENTON had received a call from

3

Charlotte HENSARLING's husband, Steve HENSARLING.   GEORGE advised that DENTON had become informed that Charlotte HENSARLING had been stopped for improper lane change.   GEORGE also advised that as Charlotte HENSARLING was being stopped, she had placed a call to Steve HENSARLING advising him of her being pulled over by the police.

On or about 11/16/2003, TFA David DeJohn met with GEORGE, who advised that the amount of Marijuana that CARMICHAEL's courier would be bringing to Montgomery, Alabama, on today's date, was reduced to approximately 550 lbs.   GEORGE also stated that this was according to DENTON.   GEORGE added that this was most likely to be taken to the residence on Second Street, Montgomery, Alabama.   During this time, GEORGE also advised that TFA DeJohn that on today's this day's he had seen approximately 10 lbs of Marijuana at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama.

On 11/17/2003 at approximately 12:50am, this affiant, along with other agents, executed a Federal Search Warrant at the residence of DENTON, located at 808 W. Fleming Rd, Montgomery, Alabama.   Upon securing the residence, agents located DENTON inside the residence.   This affiant conducted an interview with DENTON, who admitted to being involved with the CARMICHAEL Drug Trafficking Organization.   DENTON stated that he was supposed to break-down the Marijuana after CARMICHAEL's shipment of Drugs would come to Montgomery, Alabama.   DENTON advised that he was supposed to receive a shipment of approximately 500 lbs of Marijuana from CARMICHAEL during the late evening hours of 11/16/2003.   DENTON stated that he had called CARMICHAEL and advised that he did not want to take possession of the Marijuana because someone he knows had been arrested and wanted to make sure everything was going to be okay.   DENTON also advised that the person who had been arrested was a woman from Huntsville, Alabama who was arrested during a traffic stop in Chilton County on 11/15/2003.   DENTON added that he had sold that woman Marijuana on the same date.   This affiant knew the woman to be Charlotte HENSARLING.   Next, DENTON advised TFA DeJohn that since he did not received the Marijuana, it would be at Freddy (LNU's) residence. DENTON later led agents to Freddy (LNU's) residence, which was located at 949 Ridgecrest Drive, Montgomery, Alabama.

At approximately 2:45am on 11/17/2003,   DENTON received a phone call from CARMICHAEL.   CARMICHAEL advised that he was about 5 minutes away from DENTON's residence and wanted to talk.   At this time, this affiant and all other agents at the residence departed and set up surveillance in the surrounding neighborhood.

4

At approximately 2:50am, CARMICHAEL arrived driving his Black Honda Accord. After approximately 5 minutes, CARMICHAEL departed DENTON's residence. This affiant and other agents met with DENTON who stated that CARMICHAEL advised that the load of Marijuana was at Freddy (LNU)'s residence. This affiant knew this to be the residence identified at 949 Ridgecrest Drive, Montgomery, Alabama. DENTON continued by stating that CARMICHAEL wanted DENTON to help Freddy (LNU) "Break-Down" the Marijuana on this morning (11/17/2003).

On or about 11/17/2003, this affiant, along with other agents met with DENTON at a predetermined location. This affiant provided DENTON with an audio transmitting device and instructed him to meet with Freddy (LNU) at 949 Ridgecrest Drive, Montgomery, Alabama for the purpose of verifying if there was a large amount of Marijuana in the residence. At that time, DENTON departed enroute to 949 Ridgecrest Drive, Montgomery, Alabama.

At approximately 9:30am, DENTON arrived at 949 Ridgecrest Drive, Montgomery, Alabama. DENTON went inside the residence and met with Freddy (LNU). During this time, DENTON indicated that CARMICHAEL's load of Marijuana was present inside the residence. Through the audio transmitting device, agents overheard Freddy and DENTON discussing the fact that they did not have scales with which to weigh the marijuana. It was decided that DENTON would leave the residence to obtain a scale. While in route to obtain the scale, DENTON spoke with your Affiant via cellular phone. During said conversation, DENTON told your Affiant that located inside 949 Ridgecrest Drive, Montgomery, Alabama is approximately 11 duffle bags containing marijuana.

Based on the aforementioned facts and circumstances, your Affiant submits that probable cause exists to believe that the following items (Attachment "A") are located at the premises known as 949 Ridgecrest Drive, Montgomery, Alabama including all residences, structures and outbuildings thereon and all vehicles located thereon;

Executed on this ___17___ day of November 2003.

_____
Affiant

5

Sworn to and subscribed before me this *17*ᵗʰ day of November 2003.

_____
United State Magistrate Judge

6

# *United States District Court*

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the matter of the Search of                           **SEARCH WARRANT**

808 West Flemming Road                    CASE NUMBER: *MO3-71-N*
Montgomery, Alabama

TO: _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _DEA Task Force Agent, R. David DeJohn_ who has reason to
                                                        **Affiant**

believe that ☐ on the person of or ☒ on the property or premises known as

**808 West Flemming Road, Montgomery, Alabama, more specifically described as a two-story white, single
family dwelling, with a front porch, an outbuilding sitting on the right side of the residence, a privacy fence
surrounding three sides of the property and a chain-link fence following the road in the front of the property
with a double chain-link gate that accesses the driveway**

in the _____ Middle _____ District of _____ Alabama _____ there is now

concealed a certain person or property, namely (describe the person or property)

### See Exhibit A

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _November 26, 2003_
                                                                  Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search at any time in the day or night as I find reasonable cause has been established and if the
person or property be found there to seize the same, leaving a copy of this warrant and receipt for the person or
property taken, and prepare a written inventory of the person or property seized and promptly return this warrant
to _Charles S. Coody, U.S. Magistrate Judge_ as required by law.
       U. S. Judge or Magistrate Judge

_November 16, 2003_    _11:04 p.m._    at    Montgomery, Alabama
Date and Time Issued                              City and State

_Charles S. Coody, U.S. Magistrate Judge_
Name & Title of Judicial Officer                  Signature of Judicial Officer