IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


UNITED STATES OF AMERICA

V.                                    CR-03-259-N

LEON CARMICHAEL,

      Defendant.

* * * * * * * * * * * * * * * *

MOTION HEARING TO SUPPRESS EVIDENCE

* * * * * * * * * * * * * * * *

     BEFORE THE HONORABLE DELORES R. BOYD,

UNITED STATES MAGISTRATE JUDGE, at Montgomery,

Alabama, on March 1, 2004, commencing at 10:00

A.M.

APPEARANCES:

FOR THE GOVERNMENT:

MR. MATTHEW S. MINER
MS. CLARK MORRIS
Assistant United States Attorney
OFFICE OF THE UNITED STATES ATTORNEY
One Court Square, Suite 201
Montgomery, Alabama  36104

FOR THE DEFENDANT:
STEPHEN R. GLASSROTH
615 South McDonough Street
Montgomery, Alabama  36101

RONALD W. WISE
2000 Interstate Park Drive, Suite 105
Montgomery, Alabama  36109

GOVERNMENT
EXHIBIT
1 Y
PENGAD 800-631-6989

1          Proceedings reported stenographically;
            transcript produced by computer.

2

3    (The following proceedings were heard by the

4    Honorable Delores R. Boyd, United States

5    Magistrate Judge, at Montgomery, Alabama, on

6    the 1st day of March 2004, commencing at

7    10:00 a.m.)

8          THE COURT:  Good morning.  We are

9    convened for a scheduled evidentiary hearing

10    on the Defendant's motion to suppress, the

11    United States of America versus Leon

12    Carmichael, Sr., criminal case 03-259-N.  The

13    Defendant is present with counsel of Record,

14    Mr. Wise and Mr. Glassroth.  The Government is

15    represented by Assistant U.S. Attorneys Morris

16    and Miner.

17          Are we all ready to proceed?

18          MS. MORRIS:  We are, Your Honor.

19          THE COURT:  Let me take care of some

20    preliminary matters initially.

21          The Government's motion -- excuse me --

22    the Government's response in opposition to

23    Defendant Carmichael's motion to suppress

24    includes a motion that the Court summarily

25    deny the motion for failure to comply with

1   United States versus Richardson.  That's

2   included on page 9 of the Government's

3   argument.  The Court has duly considered that

4   motion, and the motion is due to be denied and

5   hereby is denied.

6        The Court notes that the issue before

7   us for this hearing is the sufficiency of

8   probable cause for the stop of the vehicle of

9   the Defendant.  There being the warrant for

10  his arrest.  The Defendants have stated facts

11  sufficient for that issue to be before the

12  Court.  Whether or not probable cause existed

13  for charging the Defendant for a narcotics

14  conspiracy or for any matters relating to

15  investigations up to the stop is not the issue

16  before the Court.  The issue before the Court

17  is whether the stop itself was a legitimate

18  stop.  To the extent the Government desires to

19  legitimate the stop by referencing the

20  sufficiency of probable cause to arrest,

21  indeed, to convict him as the Government

22  argues, will be a matter for the Government to

23  put on.  But the legal issue, the Fourth

24  Amendment issue, is whether at the time the

25  vehicle was stopped by officers, that is the

vehicle being driven by Mr. Carmichael, the

Government had cause to stop.  Since there was

not a warrant for his arrest for any purpose,

the burden is on the Government to establish

the legality of the stop.

Is the Government ready to proceed?

MR. MINER:  Yes, Your Honor.  I was

going to be asked to be heard on the

Richardson point because, frankly, Your Honor,

I'm concerned that if all the Defendant has to

do in this case, or in any case, is simply

write that there was neither reasonable

suspicion nor probable cause for a stop and

omit any reference to the facts in the report

-- and by that I do not mean adopt the facts

in the report -- whatever the reports may be,

then at that point, Your Honor, the Government

doesn't know whether there are any facts in

issue.  And in order to come to a hearing, the

Government -- and to brief the issue, it is

very useful, I think, to the Government, to

the Court, and to limit the number of cases

that come to suppression hearings -- because

Richardson does try to dwindle that down -- to

know what facts are in dispute.  Because if --

1    Your Honor referenced the argument in the

2    Government's response brief if, as is

3    referenced not only in the brief but in

4    discovery, two coconspirators came forward

5    with information saying that we conspired with

6    Mr. Carmichael to commit this crime.  The 11th

7    Circuit has said that is sufficient for

8    probable cause.  So as a matter of law, that

9    is sufficient.  If the facts are not

10   challenged for the basis for the probable

11   cause for the arrest, Your Honor, then there's

12   no need for a hearing.

13            THE COURT:  Mr. Miner, that may be

14   sufficient for probable cause for an arrest

15   warrant.  If the Government had an arrest

16   warrant, they had a right to stop him and

17   effect an arrest.  That evidence or those

18   reported facts from the coconspirators may be

19   sufficient for an indictment.  If an

20   indictment had issued and the Government had

21   cause to stop the vehicle to effect an arrest

22   pursuant to this indictment, that is fine.

23   But surely you are not proposing to this court

24   that officers have the right to stop a

25   motorist at any time without a warrant,

1   without a crime being committed in the

2   presence of the officers solely because he is

3   reported to have participated in a crime.

4         MR. MINER:  Yes, Your Honor, I am

5   saying that because if there's probable cause

6   as the 11th Circuit has determined it and the

7   11th Circuit has said that if coconspirators

8   have told law enforcement that we conspired

9   with another person, then that is probable

10  cause for the arrest.  Then, yes, Your Honor,

11  I would say that is then grounds to stop a

12  vehicle on the public streets of Montgomery.

13        THE COURT:  Your motion is denied,

14  and the matter can be reviewed on appeal.

15        MR. MINER:  Yes, Your Honor.

16        THE COURT:  Are you ready to

17  proceed?

18        MR. MINER:  Yes, Your Honor.

19        THE COURT:  Call your first witness.

20        MS. MORRIS:  The Government calls

21  DEA task force agent David DeJohn.

22        MR. GLASSROTH:  Your Honor, we'd

23  like to invoke the Rule.

24        THE COURT:  The Rule has been

25  invoked.  Are there persons who intend to

1   testify as witnesses here?  If so, please go

2   to one of the rooms on the right.

3                    AGENT DAVID DeJOHN

4   the witness, after having been first duly

5   sworn to speak the truth, the whole truth, and

6   nothing but the truth, testified as follows:

7              MS. MORRIS:  Your Honor, if I may,

8   also, my plan is, just to let the Court know,

9   just to call Agent DeJohn for the purposes of

10  the stop, and then at a later time, in order

11  to keep it chronological for ease of the

12  Court, to re-call him for the purposes of the

13  statements.

14             THE COURT:  That is acceptable.

15  Thank you.

16                  DIRECT EXAMINATION

17  BY MS. MORRIS:

18  Q.   Agent DeJohn, you are a task force agent with

19       the Drug Enforcement Administration; is that

20       correct?

21  A.   Yes, I am.

22  Q.   And you're also a Prattville police officer;

23       is that right?

24  A.   That is correct.

25  Q.   And you're detailed to DEA?

1    A.   That is correct.

2    Q.   And in the course of your duties as a task

3         force officer with Drug Enforcement

4         Administration, as well as with the Prattville

5         PD, did you come into contact with a Mr. Gary

6         George?

7    A.   Yes.

8    Q.   And how did you meet Mr. George?

9    A.   I was called by Lieutenant Townsend of the

10        Prattville Police Department drug enforcement

11        bureau.  He had advised me that they had an

12        individual by the name of Gary George under

13        arrest who wanted to speak with a

14        representative of DEA.

15   Q.   And why was Mr. George under arrest?

16   A.   Drug charges.

17   Q.   Had Prattville made controlled purchases of

18        drugs from Mr. George?

19   A.   To my knowledge, yes.

20   Q.   How many times, if you know?

21   A.   I was advised two -- on two occasions.

22   Q.   And did you then go interview Mr. George?

23   A.   Yes.

24   Q.   And what, if anything, did he tell you?

25   A.   He told me that himself and an individual by

1    the name of Robert Patrick Denton was -- their

2    job was to process marijuana as it come into

3    Montgomery from out of state for Leon

4    Carmichael.

5    Q.   When you say process marijuana, did he explain

6         to you what exactly that meant?

7    A.   Yes.  He would repackage the marijuana, break

8         it down from its form that it was transported

9         in wrapped up in duct tape, and break it down,

10        put it in gallon-size, Ziplock-type bags.

11   Q.   And did he tell you how much -- or how often

12        he'd done this?

13   A.   Numerous occasions.  At least, I believe he

14        said, like thirty times.

15   Q.   And how much marijuana was coming in at a

16        time, if he told you?

17   A.   He advised that it had been as little as two

18        hundred pounds, as high as eight hundred

19        pounds on a weekly basis.

20   Q.   Did he tell you where they would break it

21        down?

22   A.   He said they would either break it down -- the

23        times that he's participated, they would break

24        it down at Denton's residence located on

25        Fleming Road, as well as a residence on

1     2nd Street off Bell Street in Montgomery.

2   Q.   Okay.  Did he also explain to you that he sold

3     marijuana?

4   A.   Yes.

5   Q.   Did he tell you who -- where he got the

6     marijuana he sold?

7   A.   He got it from Denton.

8   Q.   Okay.  Did he explain to you -- well, while he

9     was cooperating, at some point, did he call

10     you and tell you that they were about to sell

11     some marijuana?

12   A.   Yes.

13   Q.   When was that?

14   A.   It was Saturday the 15th of November 2003.

15   Q.   And where were you at this time?

16   A.   I was -- I was at home at that time.

17   Q.   And when he called you, what did he tell you?

18   A.   He had told me that himself and Denton was

19     about to meet a Charlotte Hensarlinger at the

20     Shoney's on the West South Boulevard in

21     Montgomery; that she was from Huntsville,

22     Alabama; and that Denton had been regularly

23     selling marijuana to her.

24   Q.   And what did you do with this information?

25   A.   I instructed him that as soon as he could get

1      a vehicle description of who Denton was

2      meeting with and call me back as quickly as he

3      could.  At that time, they were on their way

4      to Charlotte Hensarlinger at that time.

5   Q.   And did he call you back?

6   A.   Yes.

7   Q.   What did he tell you?

8   A.   He told me that she was driving a black -- he

9      called it a Chevy S-10 SUV-type vehicle.

10  Q.   Could he give you a license plate?

11  A.   Yes.

12  Q.   And what did you do with this information?

13  A.   I had -- I, in turn -- once he said that they

14     had just departed from her, I went to the

15     Millbrook-Prattville exit of I-65 and waited

16     for this vehicle with a Huntsville -- a

17     Madison County tag to come northbound.  At

18     which time, I did pick up surveillance of the

19     vehicle, and also, I relayed that information

20     to Chilton County Sheriff's Department.

21  Q.   Let me back you up.  Did Mr. George also tell

22     you how much marijuana they'd sold to

23     Ms. Hensarlinger?

24  A.   I don't recall the exact amount at this time,

25     but it was usually somewhere in the area of

1       fifteen to thirty-five pounds at a time.

2  Q.  And I may not have been clear on this either.

3       Did Mr. George also tell you that they did,

4       indeed, finish the sale to Ms. Hensarlinger --

5  A.  Yes.

6  Q.  -- on that date?

7  A.  Yes.

8  Q.  Okay.  So you said -- I believe you just said

9       you spotted the SUV with Madison County

10      plates?

11  A.  Yes.

12  Q.  And what did you do then?

13  A.  I followed it to Chilton County where a

14      Chilton County deputy ended up doing a traffic

15      stop on the vehicle.

16  Q.  And was there a consensual search of the

17      vehicle?

18  A.  During the stop, there was a consensual search

19      of the vehicle and officers located

20      approximately twenty-six pounds of marijuana.

21  Q.  At this time, was -- did Ms. Hensarlinger

22      cooperate?

23  A.  I was advised that she did cooperate with

24      agents -- or excuse me -- deputies.

25  Q.  Did you interview her?

1   A.   I did not.

2   Q.   Did another agent interview her?

3   A.   Deputies with Chilton County drug enforcement

4        unit did.

5   Q.   Did she admit that she had actually bought

6        that dope from Mr. George and Mr. Denton?

7   A.   Yes.

8   Q.   According to Mr. George, had he ever met

9        Mr. Carmichael?

10  A.   I believe he said -- stated that he had seen

11       him but never really talked with him.

12  Q.   How, then, did he know that -- or think that

13       this marijuana was coming from Mr. Carmichael?

14            MR. GLASSROTH:   Object, Your Honor.

15       Asking for speculation on how someone would

16       know --

17            THE COURT:   Sustained.   Please

18       rephrase your question.

19            MS. MORRIS:   Yes, Your Honor.

20  Q.   Agent DeJohn, did Mr. George tell you why he

21       thought that the marijuana was coming from

22       Mr. Carmichael?

23  A.   Through Denton.

24  Q.   What do you mean by that?

25  A.   Denton would tell him that's who he got the

1     marijuana from and that that's who the money

2     -- when they collected money back up, that's

3     who the money would go back to.

4    Q.   Okay.  Did Mr. George also give you

5     information about some marijuana located at

6     Mr. Denton's house?

7    A.   Yes.

8    Q.   What exactly did he tell you?

9    A.   He told me that there was approximately ten

10    pounds of marijuana -- this was on Sunday, the

11    16th -- that there was about ten pounds of

12    marijuana that he had last seen at the

13    residence.

14   Q.   Okay.  And what did you do with that

15    information?

16   A.   I made application for a search warrant.

17   Q.   And was it signed?

18   A.   Yes.

19   Q.   By whom?

20   A.   Judge Coody.

21   Q.   And did you execute that search warrant?

22   A.   Yes.

23   Q.   Did you find the marijuana?

24   A.   No.

25   Q.   As a result of that search warrant, did you

```
 1        interview Mr. Denton?

 2   A.   Yes.

 3   Q.   Let me back you up for one second before I

 4        forget.  After Mr. George gave you this

 5        information about the marijuana at

 6        Mr. Denton's house, did Mr. George get

 7        rearrested?

 8   A.   Yes.

 9   Q.   And why?

10   A.   Apparently, he was in Prattville, got involved

11        in an accident from which he fled the scene.

12        Officers traced it back to -- found him at his

13        house.  He was intoxicated.  I believe they --

14        they may have followed him to the house -- I

15        don't know the exact circumstances behind it

16        -- and he was arrested for, I believe it was,

17        DUI and leaving the scene of the accident.

18   Q.   Okay.  Now, back to Mr. Denton.  So you

19        interviewed Mr. Denton after the execution of

20        the search warrant at his house?

21   A.   Yes.

22   Q.   And what did Mr. Denton tell you?

23   A.   He advised me that he had been getting

24        marijuana from Leon Carmichael, that a

25        shipment was due in on that evening, Sunday
```

1   night, Monday morning, but he had told Leon

2   Carmichael that he did not want to take

3   shipment of that marijuana.

4   Q.   And why did he not want to take shipment of

5   the marijuana, if he told you?

6   A.   Because he -- because of the arrest of

7   Charlotte Hensarlinger.  He knew that she had

8   been arrested and that he told Leon Carmichael

9   about that arrest.

10   Q.   During the course of this interview, I assume

11   by what you just stated, that Mr. Denton

12   admitted that he sold the marijuana to

13   Ms. Hensarlinger?

14   A.   Yes.

15   Q.   And did he tell you where it happened, where

16   he sold the marijuana to Ms. Hensarlinger?

17   A.   Yes.

18   Q.   Where was that?

19   A.   Shoney's on the West South Boulevard in

20   Montgomery.

21   Q.   Did he describe the vehicle to you?

22   A.   Yes, he did.

23   Q.   Okay.  And all of that corroborated

24   Mr. George's testimony to your interview to

25   you?

1        MR. GLASSROTH:  Object to the

2   leading of the witness, Your Honor.

3        THE COURT:  All right.  That was

4   sustained.  Please be careful.  You're

5   leading.

6        MS. MORRIS:  Yes, Your Honor.

7   Q.   Did Mr. Denton explain to you how exactly he

8        was involved with Mr. Carmichael?

9   A.   He advised that he was involved in -- once the

10       marijuana would come in, he would help break

11       it down, or he would break it down.  And he

12       would repackage it into gallon-size bags.

13  Q.   Where would he get the marijuana?

14  A.   He would get the marijuana from William

15       Bolding, who was a truck driver for Leon

16       Carmichael.

17  Q.   Who instructed him to break down the

18       marijuana?

19  A.   Leon Carmichael would instruct him to break

20       down the marijuana.

21  Q.   And what would he do with the marijuana once

22       it was broken down?

23  A.   He would return and -- return it to Leon

24       Carmichael, either on -- there has been

25       occasions where he did meet with Leon and

1    there was other occasions where he met back

2    with Cadillac.

3  Q.  And that being who?

4  A.  William Bolding.

5  Q.  And how often did he break down this

6    marijuana?

7  A.  It got to a point where it was on a weekly

8    basis.  Usually on weekends, Sunday nights,

9    Monday mornings.

10          THE COURT:  Excuse me a second.

11  What is the date of this interview with

12  Mr. Denton?  The date of this interview?

13  November 16th?

14          THE WITNESS:  No, ma'am.  It was

15  November 17th, early morning hours.

16          THE COURT:  Thank you.  Proceed.

17  Q.  And how much marijuana was coming in per load,

18    according to Mr. Denton?

19  A.  An average of five to six hundred pounds per

20    load.

21  Q.  When Mr. Denton broke it down -- well, how was

22    Mr. Denton paid for breaking down this

23    marijuana?

24  A.  He was paid in the form of marijuana.  He was

25    given pounds to sell.

1    Q.    By whom?

2    A.    By Leon Carmichael.

3    Q.    Was he also -- so he was selling marijuana.

4          What would he do with the money once the

5          marijuana was sold?

6    A.    He would keep his portion or his profit, and

7          then he would turn what he owed Leon

8          Carmichael, whatever they had set up to -- for

9          the payment of the marijuana, he would give

10         that to Leon Carmichael.

11   Q.    Other than the -- okay.  As part of his

12         interview, did the agents involved in the

13         interview with Mr. Denton drive Mr. Denton

14         around?

15   A.    Yes.

16   Q.    For what purpose?

17   A.    To corroborate his information.  He was going

18         to show us where Leon Carmichael lived, as

19         well as other players within the organization.

20   Q.    And did he take you by the house you thought

21         was Leon Carmichael's?

22   A.    Yes.

23   Q.    And what is the address?

24   A.    I can't recall the numbers right off, but it's

25         on Brookwood.  He showed us that house, which

1        was a house known to me as belonging to Leon

2        Carmichael.  He also showed us a residence of

3        a brother-in-law of Leon Carmichael by the

4        name of Martell Watson.  That was 2730 Argyle

5        in Montgomery, as well as he showed us the

6        residence of Freddie, which he didn't know his

7        last name at the time, but later identified as

8        Freddie Williams.

9   Q.   Why did he show you the residence of Freddie

10       Williams?

11   A.   Well, after he had told Mr. Carmichael that he

12       was not going to take shipment of the

13       marijuana on that evening because of Charlotte

14       Hensarlinger being arrested, he wasn't quite

15       sure where the marijuana -- it was still

16       coming in, but he wasn't quite sure of where

17       it would go.  He thought if he had to guess it

18       would probably end up going to Freddie's

19       house.  So he showed us where Freddie Williams

20       lived, which was 949 Ridgecrest.

21   Q.   Now, Agent DeJohn, when you got back to

22       Mr. Denton's house after he -- showing you all

23       these residences, did Mr. Denton's cell phone

24       ring?

25   A.   Yes.

1  Q.  And where was his cell phone when it rang?

2  A.  In my hand.

3  Q.  Did you see the -- I mean, did it pop up, or

4      did it light up, I guess I should say, when it

5      rang?

6  A.  Yes.  It lit up, and on the screen, it

7      displayed the name Leon.

8  Q.  And what did you do then?

9  A.  I handed the phone to -- well, at first, I

10     said to Denton, Leon; who's Leon.  He said

11     that would be Leon Carmichael.  And I handed

12     the phone at that time to Denton and told him

13     to talk to him.

14 Q.  And did you listen to the conversation as it

15     was occurring?

16 A.  Yes, I did.

17 Q.  And what was the substance of that

18     conversation?

19 A.  Mr. Denton answered the phone.  He said

20     hello.  The subject on the other line -- on

21     the other side of the call had -- referred to

22     Denton as Pat, which his middle name is

23     Patrick.  He said, Pat, what are you doing.

24     Denton said, what's up, Leon.  He said, I'm

25     trying to sleep.  He went on -- he said, well,

```
 1        I need to talk to you.  Denton again told him,

 2        well, I'm trying to sleep.  He says, I'm five

 3        minutes away; I need to talk to you.  This was

 4        at roughly about two forty-five in the

 5        morning.

 6   Q.   And what did y'all do then?

 7   A.   At that time, the phone call was ended, and we

 8        got officers out of the area.  And we set up

 9        officers on surveillance on Fleming Road to

10        watch the inbound traffic.

11   Q.   Now, let me back up one other time.  Since

12        that time, have you heard Leon Carmichael's

13        voice?

14   A.   Yes.

15   Q.   And can you identify the voice on the other

16        end of the phone as Leon Carmichael?

17   A.   Yes.

18   Q.   So you set up surveillance on the house and

19        what happened then?

20   A.   I was just a little ways down from the house

21        towards the dead end of Fleming Road when we

22        observed a vehicle known to us as being Leon

23        Carmichael's vehicle, a black Honda, drive

24        down the road and turn into Denton's

25        residence.
```

```
 1   Q.   And how long did it stay at Mr. Denton's
 2        residence?
 3   A.   No more than five minutes.
 4   Q.   And did you see the vehicle leave the
 5        residence?
 6   A.   Yes, I did.
 7   Q.   Could you see inside the vehicle?
 8   A.   I could not, no.
 9   Q.   Have you spoken with other agents that relayed
10        to you that they could see inside the vehicle?
11   A.   Yes.
12   Q.   And did they identify the person inside the
13        vehicle as Mr. Carmichael?
14   A.   They could just say it was a single black male
15        inside the vehicle.
16   Q.   Once the vehicle left the residence, did y'all
17        go back into Mr. Denton's residence?
18   A.   Yes.
19   Q.   Did you ask him who was there?
20   A.   Yes.
21   Q.   And who did he tell you was visiting him at
22        two forty-five in the morning?
23   A.   He said it was Leon Carmichael, and it was --
24        he appeared to be by himself.
25   Q.   Did he tell you the substance of their
```

1    conversation?

2  A.   Yes.  He advised that Leon told him to go to

3       Freddie, which is Freddie Williams' house on

4       Ridgecrest, told him to go to the house and to

5       be there at eight o'clock in the morning to

6       help break down the marijuana.

7  Q.   So what did y'all do then?

8  A.   At that time, we left Denton's residence.  I

9       did a couple -- well, surveillances, drove by

10      Freddie Williams' residence, didn't see any

11      activity at that time, and then we met back up

12      with Denton at approximately seven-thirty in

13      the morning.

14  Q.   And you met back up with him.  What was the

15      purpose of that meeting?

16  A.   The purpose of meeting back up with Denton was

17      to wire him up or provide him with an audio

18      transmitting device and send him to Freddie

19      Williams' residence.

20  Q.   And did you provide him with an audio

21      transmitting device as well as a video

22      transmitting device?

23  A.   Yes, I did.

24  Q.   And did he then go to Mr. Williams' residence?

25  A.   Yes.

1   Q.   And what occurred at Mr. Williams' residence?

2   A.   Upon him arriving at Mr. Williams' residence,

3        he went inside; they had some conversation.

4        Freddie Williams instructed Denton to go ahead

5        and leave the residence, that he needed some

6        gallon-size, Ziplock-type bags.

7   Q.   And at that point, did Mr. Denton leave?

8   A.   Mr. Denton left.  We followed him from the

9        area and met with him at a grocery store where

10       he purchased the Ziplock bags as instructed by

11       Freddie Williams.

12  Q.   And did he then go back to Mr. Williams'

13       residence?

14  A.   Yes.

15  Q.   And what occurred when he got back to

16       Mr. Williams' residence?

17  A.   When he got back to Mr. Williams' residence,

18       he knocked on the door, and Freddie wasn't

19       there.  He made a phone call to Freddie and

20       asked him where he was at, and Freddie said he

21       was about five minutes away.  Denton went back

22       and sat back in his vehicle and waited for

23       Freddie to return.  Within a couple of

24       minutes, they did return.  They went inside

25       the residence and began retrieving bags from

1       inside of a hidden wall that was in the

2       bedroom of Freddie Williams' residence.

3   Q.  Have you reviewed the tape -- the audiotape

4       that Mr. Denton -- of the conversation between

5       Mr. Williams and Mr. Denton?

6   A.  Yes.

7   Q.  And during their conversation, was

8       Mr. Carmichael mentioned?

9   A.  Not that I recall, no.

10  Q.  Upon your interview with Mr. Denton, did he

11      tell you that Mr. Williams and Mr. Denton were

12      discussing Mr. Carmichael?

13  A.  Yes.

14  Q.  And what did he tell you?

15  A.  He stated that Mr. Williams -- Mr. Williams

16      was mad at Leon because he had come by the

17      residence when the marijuana was taken over

18      there and he had put the -- he had counted

19      each block of marijuana personally because,

20      apparently, Freddie Williams' girlfriend,

21      Faith -- a girl named Faith.  We don't know

22      her last name for sure at this point -- but

23      Mr. Carmichael accused her of taking some

24      marijuana.  So he was accounting for each

25      block of marijuana.

Q.   Okay.  When Mr. Williams got back to the house
     after -- well, when Mr. Williams and
     Mr. Denton got back to Mr. Williams' house
     after obtaining the baggies, did Mr. Denton
     leave again?

A.   Yes.  As they were retrieving the bags out and
     Mr. Denton confirmed that there was a large
     amount of marijuana in these bags inside
     Freddie Williams' residence, they came to the
     realization -- Freddie Williams -- that they
     didn't have a scale.  They had a scale, but he
     felt it was broken.  He didn't know how to use
     it.  So he instructed Denton to leave the
     residence and go get a scale.

Q.   And at that point when Mr. Denton left, did he
     call you on your cellular phone?

A.   Yes.

Q.   And what did he tell you?

A.   He advised me that the marijuana was there;
     that it was going to be five to six hundred
     pounds; and that Freddie had instructed him to
     go get a scale.

Q.   At that point when Mr. Denton left, did agents
     who were working the tech for this case on
     surveillance, did they exchange out the tapes,

28

1      the audiotapes --

2  A.   Yes.

3  Q.   -- from Mr. Denton?

4  A.   As in the first time as well the tapes was

5       changed out.

6  Q.   You say the first time.  Let me back you up.

7       You mean the first time he left?

8  A.   Yes.

9  Q.   And what did they do when Mr. Denton left the

10      first time?

11 A.   The first time that he left upon meeting him

12      to purchase the bags, we retrieved the

13      videotape from the first meeting with Freddie

14      Williams.  Then on the second occasion, I

15      instructed him to meet with Sherry Gonzalez,

16      which is our group supervisor with DEA, as

17      well as Lieutenant Townsend, who was the tech

18      -- Prattville Police Department, Lieutenant

19      Townsend, he was the tech on this occasion --

20      and I told him to meet with them.  On that

21      occasion, they did remove the tape as well

22      where they reviewed the tape and they observed

23      large bags coming out of this hidden room.

24 Q.   Okay.  Now, when Mr. -- after Mr. Denton had

25      been provided scales -- by the agents;

1    correct?

2  A.  Yes.

3  Q.  -- and he -- when he got back to Mr. Williams'

4      residence, what happened then?

5  A.  He went back.  They brought the scales into

6      the residence.  They continued to -- they

7      started to break down the marijuana.  At some

8      point, Freddie got on the phone or received a

9      call and was telling somebody to go to the

10      hospital, that their mama was dying.  At the

11      same time, Denton is trying to relay to us

12      through way of the audio transmitting device,

13      as well as on a cell phone -- he called me.

14      He stepped off to the side or something -- he

15      called and said, he's fixing to leave; you

16      need to go ahead and stop him; he's fixing to

17      leave.

18  Q.  Meaning who?

19  A.  Freddie Williams.

20  Q.  Okay.  And what did y'all do then?

21  A.  At that time, agents moved in in effort to

22      secure the residence and take Freddie Williams

23      into custody before he left.

24  Q.  And did y'all secure the residence and take

25      Freddie Williams into custody?

1   A.   Yes -- no.  The residence was secured, but

2        Freddie Williams was not taken into custody.

3        He got out of there before agents could

4        converge on the house.

5   Q.   Okay.  Once the house was secured, what did

6        agents do then?

7   A.   Once the house was secured, some agents went

8        out looking for Freddie Williams.

9   Q.   Did other agents go out looking for

10       Mr. Carmichael?

11  A.   Yes.

12              MS. MORRIS:  One second, Your

13       Honor.

14              That's all I have for this witness at

15       this time.  Your Honor, again, we would

16       reserve the right to re-call him.

17              THE COURT:  Certainly.  On the

18       matter this witness can be re-called.  He is

19       now subject to cross-examination on the stop.

20              Mr. Glassroth.

21              MR. GLASSROTH:  Yes, Your Honor.

22              <u>CROSS-EXAMINATION</u>

23  <u>BY MR. GLASSROTH</u>:

24  Q.   Mr. DeJohn, you had recording devices

25       available to you?

1  A.   Yes.

2  Q.   And you equipped Mr. Denton with those?

3  A.   Yes.

4  Q.   And according to the information that

5      Mr. Denton had given you early in the morning

6      of November 17th, Mr. Carmichael had called

7      him?

8  A.   That is correct.

9  Q.   And as a matter of fact, you saw the name Leon

10     come up on the screen of Mr. Denton's cell

11     phone?

12  A.   That is correct.

13  Q.   And when the conversation ended, Mr. Denton

14     told you that he was supposedly speaking with

15     Leon Carmichael; right?

16  A.   That is correct.

17  Q.   So that established in your mind that there

18     was a relationship between Mr. Carmichael and

19     Mr. Denton?

20  A.   Well, that backed up that there was a

21     relationship between the two because he told

22     me before the phone conversation that they had

23     a relationship.

24  Q.   And it was a relationship that was close

25     enough that Mr. Carmichael, according to

1       Mr. Denton, called him?

2  A.   Yes.  When the shipments of marijuana would

3       come in.

4  Q.   So he would speak to him on the phone?

5  A.   Yes.

6  Q.   Now, going back to Mr. George.  You first

7       encountered him when Lieutenant Townsend made

8       the call to you?

9  A.   Yes.

10  Q.   And Lieutenant Townsend told you that

11       Mr. George had been busted on drug charges,

12       you said?

13  A.   That is correct.

14  Q.   And that he wanted to cooperate?

15  A.   Yes.

16  Q.   Now, you went and you interviewed Mr. George;

17       right?

18  A.   Right.

19  Q.   And you got the information about the

20       Hensarlinger sale; right?

21  A.   Right.

22  Q.   And the Hensarlinger stop showed that she had

23       marijuana with her?

24  A.   Right.

25  Q.   You also got information from Mr. George about

```
 1        there being marijuana on the premises of
 2        Mr. Denton's house; right?
 3   A.   That is correct.
 4   Q.   And you used the information you got from
 5        Mr. George -- whom you had never met before;
 6        am I correct?
 7   A.   That's correct.
 8   Q.   Okay.  You used the information from
 9        Mr. George to support an application for a
10        search warrant?
11   A.   Yes.
12   Q.   And you got the warrant?
13   A.   Right.
14   Q.   And you executed the warrant?
15   A.   That is correct.
16   Q.   And you found nothing -- no contraband that
17        Mr. George told you would be at Mr. Denton's
18        house; right?
19   A.   That is correct.
20   Q.   Okay.  So I guess we have Mr. George one for
21        two?
22   A.   Explain.
23   Q.   The information he gave you about Hensarlinger
24        checked out; right?
25   A.   Right.
```

1   Q.   The information he gave you about Denton

2        didn't?

3   A.   It did, but it didn't.  And if I can explain

4        to the Court.

5   Q.   Well, he told you that there was marijuana at

6        Mr. Denton's home; right?

7   A.   Yes.

8   Q.   And you searched the home?

9   A.   Right.  And if I can explain to the Court.

10  Q.   You conducted a thorough search of the house?

11       Sir?

12               THE COURT:  You can answer the

13       question, and I'll allow you to explain.

14  A.   Yes, I conducted a thorough search of the

15       house, along with other agents.

16  Q.   And it was a typical search that you do?

17  A.   Right.

18  Q.   According to your rules?

19  A.   Right.

20  Q.   Thorough?

21  A.   Right.

22  Q.   And found nothing?

23  A.   Right.

24  Q.   Now --

25               THE COURT:  Hold on a second.  I

1       will allow the witness, as he requested, to

2       explain his response.

3  A.  The reason why we didn't find anything there

4       is because Denton told us that Charlotte

5       Hensarlinger had got busted.  He was worried

6       about all this coming back to him.  He even

7       told Leon Carmichael that he didn't -- you

8       know, he was worried about it coming back to

9       him.  That's why we didn't find anything

10      there.  That's why he told me we didn't find

11      anything there because he got rid of

12      everything.

13  Q.  Okay.  Are you finished?

14  A.  Yes.

15  Q.  And these are important facts to you; right?

16  A.  Yes.

17  Q.  So you put all of those in your reports,

18      didn't you?

19  A.  I try to put every fact that I have available.

20  Q.  Well, the fact -- you had available to you

21      what Mr. Denton claimed -- or you claim

22      Mr. Denton told you; right?

23  A.  Yes.

24  Q.  That he got rid of everything because of the

25      Hensarlinger arrest?

1    A.   Right.

2    Q.   And that he had marijuana there but he got rid

3         of it?

4    A.   Right.

5    Q.   And that's an important fact to you, isn't it?

6    A.   Right.

7    Q.   And you would have put that in your report,

8         wouldn't you?

9    A.   I could have.  I may have not.

10   Q.   You may not have?

11   A.   I may not have.

12   Q.   Because you do put important things in your

13        report?

14   A.   I try to put everything that -- at that time

15        that I -- you know, as I'm typing it out that

16        I can recall.

17   Q.   And that's an important fact to you, isn't it?

18   A.   Yes.  But I do know that it says in there that

19        he was worried -- he knew that Charlotte

20        Hensarlinger had been busted.

21   Q.   Well, you're relying on the information

22        provided to you by Mr. George; right?

23   A.   Right.

24   Q.   And it turns out that the information he gave

25        you didn't quite pan out the way he said it

1      would; right?

2   A.   Right.  And for reasons that I explained.

3   Q.   Right.  So the reasons that it wouldn't pan

4        out would be important, wouldn't it?

5   A.   Right.

6   Q.   And you would expect that you would put that

7        in a report, wouldn't you?

8   A.   I probably should have if it's not in there.

9   Q.   Now, Mr. Denton sits down with you -- or I

10       guess he doesn't sit down with you -- you go

11       visit him in the early morning hours of the

12       17th of November; right?

13  A.   That is correct.

14  Q.   Okay.  And he tells you all of this

15       information; right?

16  A.   Right.

17  Q.   And he tells you about Leon Carmichael; right?

18  A.   Right.

19  Q.   And you had known about Mr. Denton, hadn't

20       you?

21  A.   That -- yes.

22  Q.   You had known about him before November 17th?

23  A.   Just through information that George provided

24       to me.

25  Q.   Okay.  Well, what did -- what was it that

```
 1             George had provided to you?
 2   A.   That George -- excuse me -- that he had been
 3        working with Denton breaking down marijuana
 4        and that Denton had been arrested in the past
 5        in Huntsville.  Some of that was -- that was
 6        Leon's marijuana.
 7   Q.   This is what George was telling you?
 8   A.   Yes.  And then I confirmed that information.
 9   Q.   Okay.  And so what George told you was
10        correct, too; right?
11   A.   Right.
12   Q.   And you also knew that back in June of 2002
13        Denton -- a search warrant had been run at
14        Denton's house; right?
15   A.   That's correct.
16   Q.   June of 2002 now?
17   A.   Right.
18   Q.   The same house that you searched on November
19        17th?
20   A.   Right.
21   Q.   808 West Fleming?
22   A.   Right.
23   Q.   And what you found back in June of '02 was a
24        quantity of marijuana?
25   A.   I did not find --
```

1   Q.   Well, what was found there; right?

2   A.   Right.  Well, it was reported.

3   Q.   Okay.  Well, agents that you work in concert

4        with?

5   A.   Yes and no.  They're not part of our group, so

6        it wasn't nobody in our office that was even

7        there.

8   Q.   But the information came to your attention, of

9        course?

10  A.   Right.

11  Q.   And so there was suspected marijuana; right?

12  A.   I don't recall the exact items that was

13       located at his residence.  I do know that he

14       was arrested with approximately ten pounds of

15       marijuana in Huntsville.

16  Q.   Okay.  Well, let me see if I'm talking to the

17       right person.  I'm going to --

18            MR. GLASSROTH:  May I approach, Your

19       Honor?

20            THE COURT:  You may.  Is that

21       something that you can put on the screen so

22       all of us can see?

23            MR. GLASSROTH:  You know, I might be

24       able to do that.

25            THE COURT:  And for the Record, tell

1    us from what document this page is lifted.

2              MR. GLASSROTH:  Yes, Your Honor.

3    For the Record, Your Honor, I'm referring the

4    witness to an attachment to the Government's

5    response that appears at tab C, and it is the

6    signature page of that document.

7    Q.   Mr. DeJohn, is that your signature on there?

8    A.   Yes, it is.

9    Q.   If you will just look up, that is -- do you

10   recall what that was assigned to?

11             MR. GLASSROTH:  For the Record, Your

12   Honor, I will simply state that is a

13   application for the search warrant.  It's the

14   affidavit for the search warrant for the

15   premises located at 808 West Fleming Road in

16   Montgomery.

17   A.   Yes.

18   Q.   You remember signing that; right?

19   A.   Yes.

20   Q.   Now, part of that affidavit, you had

21   information in there -- and I'll refer you to

22   the second paragraph on -- the pages are not

23   numbered in your affidavit.  It would be page

24   2 of your affidavit -- the paragraph that

25   begins an investigation.