41

1   A.   Right.

2   Q.   And you state there what he had; right?

3   A.   Right.   And that's according to reports

4        generated by officers that had done that

5        search warrant.

6   Q.   And you have no reason to doubt that?

7   A.   No reason to doubt it.

8   Q.   And you believe that the information was true

9        and correct?

10  A.   Yes.

11  Q.   And that's why you included it in your

12       affidavit?

13  A.   That is correct.

14  Q.   And that's why you were able to swear to it?

15  A.   Yes.

16  Q.   Because you knew it?

17  A.   Right.

18  Q.   And so the information that's contained there

19       is that was he was found with a quantity of

20       marijuana?

21  A.   Right.

22  Q.   Suspected cocaine; right?

23  A.   Right.

24  Q.   Nearly eight thousand dollars in cash?

25  A.   Right.

1   Q.   And three handguns?

2   A.   That is correct.

3   Q.   Okay.  And that was some, what, five months,

4        five and a half months before the second

5        search warrant was run?

6   A.   No.  That's over a year.

7   Q.   Oh, I'm sorry.  Seventeen months?

8   A.   Yeah.

9   Q.   So Mr. Denton was on the radar seventeen

10        months before then?

11  A.   He was on someone's radar.  It wasn't mine,

12        but...

13  Q.   And he had been charged, to your knowledge?

14  A.   To my knowledge, yes, he had.

15  Q.   Okay.  And it wasn't until November the 17th

16        that the name Leon Carmichael was mentioned to

17        you by Mr. Denton; right?  Of 2003?

18  A.   No.  The name Leon Carmichael was mentioned to

19        me on November 13th by George.

20  Q.   No.  By Denton?

21  A.   Correct.  Upon approaching him, yes.

22  Q.   And that was the first time the name Leon

23        Carmichael ever passed Mr. Denton's lips to

24        you?

25  A.   That is correct.

1    Q.    Or to anyone else that you're aware of?

2    A.    That I'm aware of, yes.

3    Q.    Okay.  So Mr. Denton had not worked with any

4          law enforcement agency that you're aware of

5          providing information before you met him on

6          November 17, 2003?

7    A.    That is correct.

8    Q.    Now, you outfitted Mr. Denton with audio and

9          video equipment; right?

10   A.    That is correct.

11   Q.    And Mr. Denton was aware that he was going to

12         break down marijuana; right?

13   A.    Yes.

14   Q.    And according to what he told you, he was

15         going to do it on behalf of Leon Carmichael?

16   A.    Right.

17   Q.    And he was going to meet Freddie Williams at

18         the Ridgecrest house; right?

19   A.    Right.

20   Q.    And Freddie William was going to do that as

21         well; right?

22   A.    Right.

23   Q.    And Mr. Denton told you that Freddie Williams

24         was also doing it at the behest or on behalf

25         of Mr. Carmichael?

1   A.   Right.

2   Q.   So the two people that were in that or were

3        going to be working on this operation

4        supposedly were breaking down Leon

5        Carmichael's marijuana?

6   A.   Right.

7   Q.   Now, in the course of the conversations within

8        the house at Ridgecrest, you were monitoring

9        it; right?

10   A.   I was not monitoring it.

11   Q.   It was another agent that was monitoring?

12   A.   That's correct.

13   Q.   So it was an open mike?

14   A.   Right.

15   Q.   You were able to listen in real-time as the

16        conversations were occurring?

17   A.   They were able to listen.

18   Q.   Well, whoever was monitoring?

19   A.   Right.

20   Q.   So you had someone that was detailed

21        specifically for the purpose of listening to

22        the conversation?

23   A.   Right.

24   Q.   And someone did that?

25   A.   Right.

1    Q.   And in the course of the discussions with

2         these duffle bags that were found there, the

3         name Leon Carmichael was not mentioned; right?

4    A.   Not to my knowledge, no.

5    Q.   And the name Leon was not mentioned?

6    A.   Not to my knowledge.

7    Q.   The name Beaver wasn't mentioned, was it?

8    A.   Not to my knowledge.

9    Q.   And as a matter of fact, nothing linking

10        Mr. Carmichael to that marijuana was uttered

11        by either Mr. Williams or Mr. Denton when they

12        were in that house and the conversations were

13        being monitored?

14   A.   Just what was later relayed to me by Denton.

15   Q.   Just what was later relayed to you.  So it's

16        the story according to Denton; right?

17   A.   Correct.

18   Q.   Okay.  Now, there were no -- let me make sure

19        I understand this.  There were no consensually

20        monitored telephone calls that occurred

21        between Mr. Carmichael and Mr. Denton, other

22        than the one you mentioned where you were

23        listening in and heard him say he was five

24        minutes away?

25   A.   Right.

```
 1   Q.   You didn't have Mr. Denton call Leon
 2        Carmichael at any other time?
 3   A.   No.
 4   Q.   You didn't have Mr. Denton call Mr. Williams
 5        and talk about Mr. Carmichael at any time?
 6   A.   No.
 7   Q.   And you did not outfit Mr. Denton with any
 8        body wires, other than what you talked about
 9        at the Ridgecrest house?
10   A.   No.
11   Q.   Okay.  Now, you knew going in that Mr. Denton
12        told you that he was going to package
13        marijuana; right?
14   A.   Yes.
15   Q.   And you knew going in that he had told you
16        that this was Mr. Carmichael's; right?
17   A.   Yes.
18   Q.   I guess you set up your surveillance of
19        Ridgecrest in such a way so that you wouldn't
20        be too close but you would be close enough.
21        Is that a fair statement?
22   A.   Yes.
23   Q.   And nevertheless, Mr. Williams was able to
24        depart and escape the grasp of your agents;
25        right?
```

1    A.   That is correct.

2    Q.   Okay.  You then were able to get warrants to

3         search the place based on probable cause, you

4         say, was created by Denton going in there;

5         right?

6    A.   That is correct.

7    Q.   And you also decided that you were going to

8         stop Mr. Carmichael; right?

9    A.   Yes.

10   Q.   And you were going to stop Mr. Carmichael, I

11        believe Mr. Halasz said at the detention

12        hearing, based on this drug offense that

13        occurred, the duffle bags with the marijuana,

14        based on the information you got from Denton?

15   A.   Yes.

16   Q.   So it wasn't for a traffic stop; right?

17   A.   No.  Not -- I don't know if he committed a

18        traffic violation.  I wasn't there.

19   Q.   Now, based on your understanding of how this

20        was all unfolding, Mr. Carmichael was not

21        aware on the 17th of November that Mr. Denton

22        had agreed to cooperate with the DEA, was he?

23   A.   No.

24   Q.   Mr. Denton certainly didn't tell

25        Mr. Carmichael; right?

48

| | | |
|---|---|---|
| 1 | A. | That is correct. |
| 2 | Q. | And nobody that you're aware of on your task |
| 3 | | force told Mr. Carmichael? |
| 4 | A. | Right. |
| 5 | Q. | So for all that anyone knew and for all that |
| 6 | | Mr. Carmichael knew, he was completely in the |
| 7 | | dark about what was going on; right? |
| 8 | A. | As far as? |
| 9 | Q. | As far as anything to do with Mr. Denton |
| 10 | | cooperating or there being any sort of |
| 11 | | intervention with this supposed transaction |
| 12 | | that Denton was telling you about? |
| 13 | A. | Right.  He wasn't familiar with the fact that |
| 14 | | -- that Denton was cooperating. |
| 15 | Q. | And he wasn't familiar with the fact that |
| 16 | | there was an operation done to gather evidence |
| 17 | | about that; right? |
| 18 | A. | Not to my knowledge, no. |
| 19 | Q. | You don't know that Denton called him, right, |
| 20 | | to tell him or tip him off? |
| 21 | A. | Not that I'm aware of. |
| 22 | Q. | And you wouldn't suspect that he did, would |
| 23 | | you? |
| 24 | A. | No. |
| 25 | Q. | So the word went out that you were going to |

```
 1              stop Leon's car and to get Freddie Williams;

 2              right?

 3     A.       Yes.

 4     Q.       And this is even though the name Leon

 5              Carmichael never came up in the course of the

 6              breakdown; right?

 7     A.       That is correct.

 8     Q.       And even though we had two people supposedly

 9              breaking it down on behalf of Mr. Carmichael;

10              right?

11     A.       Right.

12     Q.       It wouldn't have been very difficult for

13              Mr. Denton to engage in conversation with

14              Mr. Williams about Mr. Carmichael; right?

15     A.       He indicated to us that he had.

16     Q.       But there was nothing that came across that

17              was being monitored in real-time that

18              indicated that?

19     A.       Not that I'm aware of.

20     Q.       And not that any of your agents are aware of;

21              right?

22                   MS. MORRIS:  Your Honor, objection.

23              He can't testify to what the agents -- or

24              other agents are aware of.

25                   MR. GLASSROTH:  Your Honor, I
```

1       believe he can because he's testified about

2       what agents have discussed, and they're part

3       of the task force there.

4                   THE COURT:  I'll allow you to ask if

5       he's aware based upon reports from any other

6       agents.

7   Q.  You can answer the question.

8   A.  I'm not aware of what exactly was said and

9       what exactly each -- or the tech agents heard

10      during the conversation.

11  Q.  Well, let me ask you this:  No agents on your

12      task force has told you that there was

13      discussion inside the Ridgecrest house between

14      Mr. Williams and Mr. Denton about

15      Mr. Carmichael?

16  A.  No.  Not that I recall, no.

17                  MR. GLASSROTH:  May I have a moment,

18      Your Honor?

19                  THE COURT:  Yes.

20  Q.  Now, let's go back to Mr. Denton for a minute

21      on the early morning hours when you ran the

22      search warrant at his house.  The marijuana

23      was gone because he told you he got nervous;

24      right?

25  A.  He said he had either sold it or he got rid of

1       it because he knew Charlotte Hensarlinger had

2       gotten busted.

3  Q.  So somehow he got rid of it between the time

4       of the Hensarlinger arrest and the time you

5       ran the search warrant at his house?

6  A.  Right.

7  Q.  Did you make any effort to retrieve the

8       marijuana?

9  A.  I asked him if there was any other marijuana

10      that he had access to or where was it at.  He

11      said he didn't have it anymore.

12  Q.  Did he tell you who he sold it to?

13  A.  I believe he did -- may have told us.  I think

14      he just said it was gone.

15  Q.  He just said it was gone and that was good

16      enough for you?

17  A.  At that time, yes, sir.

18          MR. GLASSROTH:  One more moment,

19     Your Honor, if I may.

20         Nothing further for this witness.

21          THE COURT:  Any redirect at this

22     time?

23          MS. MORRIS:  Very, very briefly.

24  Q.  Agent DeJohn, how many times prior to the

25      search warrant at Mr. Denton's house had you

1        spoken with Mr. Denton?

2   A.   Prior to the search warrant, none.

3   Q.   Okay.  And I believe you answered

4        Mr. Glassroth that Mr. -- the agents were out

5        looking for Mr. Carmichael based on

6        information from Mr. Denton.  Is that the only

7        reason they were looking for Mr. Carmichael?

8   A.   No.

9   Q.   Why were they looking for Mr. Carmichael?

10  A.   Because we knew he was involved in a drug

11       conspiracy.

12  Q.   And how did you know that?

13  A.   Well, because of information that we obtained

14       in the past during previous investigations, as

15       well as the phone call at two forty-five in

16       the morning that stated that he needed to talk

17       to Denton; he was five minutes away.  We

18       observed the arrival of Leon Carmichael's

19       vehicle.  We observed the vehicle leave and

20       Denton telling us that it was, in fact, Leon

21       and that he had instructed him to go break

22       down that marijuana that was going to be at

23       Freddie Williams' house at eight o'clock in

24       the morning.

25           MS. MORRIS:  I have nothing

1    further.

2                    THE COURT:  Thank you.  May this

3    witness be excused at this time with leave to

4    re-call him on the matter of the statement?

5                    MS. MORRIS:  Yes, Your Honor.

6                    THE COURT:  All right.  We're done

7    with Agent DeJohn at this time?

8                    MR. GLASSROTH:  Nothing further.

9    Yes, Your Honor.

10                   THE COURT:  Does the Government

11   desire to offer any other witnesses on the

12   stop, or you desire now to question him on the

13   other issues in controversy?

14                   MS. MORRIS:  Your Honor, the

15   Government at this time would call Agent Tom

16   Halasz and then would like to re-call Agent

17   DeJohn.

18                   THE COURT:  You may do that.  You

19   may step down Agent DeJohn.

20                   <u>AGENT THOMAS HALASZ</u>

21   the witness, after having been first duly

22   sworn to speak the truth, the whole truth, and

23   nothing but the truth, testified as follows:

24                   <u>DIRECT EXAMINATION</u>

25   <u>BY MS. MORRIS:</u>

```
 1    Q.    Could you state your name and spell your last
 2          name?
 3    A.    Thomas Halasz.  Last name is spelled
 4          H-A-L-A-S-Z.
 5    Q.    And, Agent Halasz, you are a special agent for
 6          the Drug Enforcement Administration; is that
 7          correct?
 8    A.    That's correct.
 9    Q.    And in the course of your duties with the DEA,
10          did you effect an arrest of Leon Carmichael on
11          the 17th of November of last year?
12    A.    Yes, I did.
13    Q.    Tell me how that arrest happened.
14    A.    I had received information during that day and
15          the prior morning from David DeJohn, as well
16          as Sherry Gonzalez, regarding Leon
17          Carmichael's involvement in a marijuana
18          investigation.  During the course of that
19          investigation, there was a search warrant
20          executed, in excess of five hundred pounds of
21          marijuana was seized, and I was advised by
22          Sherry Gonzalez that an individual fitting
23          Leon Carmichael's description had passed in
24          front of the scene of the search warrant.  And
25          I was advised to detain Leon Carmichael when I
```

```
 1              -- when and if I saw him.
 2    Q.    And did you see his car pass you?
 3    A.    Yes, I did.
 4    Q.    And where were you?
 5    A.    That was on -- in front of the Carmichael
 6          Center on Fleming Road in Montgomery.
 7    Q.    And what did you do when you saw his car pass
 8          you?
 9    A.    I followed it, and I contacted the Montgomery
10          Police Department unit to get a marked police
11          vehicle to effect a stop.
12    Q.    And did they stop him?
13    A.    Yes.
14    Q.    And did you stop right behind him?
15    A.    Yes.
16    Q.    And what did you do then?
17    A.    I approached the black Honda which Leon
18          Carmichael was driving at the time.
19    Q.    And was he still in the Honda?
20    A.    No.  He had gotten out almost immediately upon
21          the stop by the marked vehicle.
22    Q.    And when you approached the Honda, what did
23          you see?
24    A.    I looked inside.  The front driver's door was
25          open.  I looked inside the vehicle, and I saw
```

1        a pistol lying on the passenger's seat.

2   Q.   At that point, what you do?

3   A.   At that point, other law enforcement people

4        had handcuffed Leon Carmichael.  At that

5        point, I stuck my head in the vehicle, looked

6        at the -- at the pistol which was on the

7        seat.  There was also a black leather jacket

8        on the passenger's seat.  I moved it to see if

9        there was anything underneath it.  And there

10       was a briefcase that was lying in the middle

11       of the back seat.  I opened it up, and in it

12       was a money bag that was -- contained five

13       thousand dollars which was later counted.  I

14       didn't count it at that time, of course.

15       After that, I went and read Leon Carmichael

16       his rights and spoke to him.

17  Q.   Did he make any statements after being read

18       his rights?

19  A.   Yes, he did.  He indicated that he had a

20       pistol permit and that the -- I asked him if

21       he had not been convicted of a murder prior,

22       and he said he had but that he had been

23       pardoned and that he had a pistol permit.  I

24       also told him that he was -- the reason he was

25       stopped is because we believed he was involved

1        in a marijuana case -- a marijuana

2        investigation.  I mentioned the name Freddie,

3        and he indicated that he knew a Freddie that

4        drove for him.

5    Q.  And what did you take that to mean, a Freddie

6        that drove for him?

7    A.  I didn't know if it was the same Freddie as

8        Freddie Williams or a different Freddie.  I

9        didn't know.

10   Q.  I guess what I'm asking you, Agent Halasz,

11       what did you take it to mean drove for him?

12   A.  Oh, drove a truck.  I took it to mean drove a

13       tractor-trailer.

14   Q.  And at that point because you knew

15       Mr. Carmichael owned a trucking company; is

16       that correct?

17   A.  Yes.  That's why I assumed that drove for him

18       meant be a truck driver for him.

19   Q.  Prior to your effecting the arrest of

20       Mr. Carmichael, had you done surveillance of

21       Mr. Carmichael's house?

22   A.  Yes, I did.

23   Q.  And that house is where?

24   A.  It's on Brookwood.  I believe 3226 Brookwood.

25       I'm not sure about the numbers.

1   Q.   And what did you see -- when did you do this

2        surveillance?

3   A.   On Sunday evening and then again on Monday

4        morning, the 17th.

5   Q.   And what did you see at that house?

6   A.   Sunday evening, I saw the black Honda parked

7        in the driveway, or a black Honda parked in

8        the driveway Sunday evening.  And, again,

9        Monday morning, I saw a black Honda, as well

10       as an SUV and a white van parked at that

11       residence.

12                  MS. MORRIS:  Just one second, Your

13       Honor.

14  Q.   Did you mention to Mr. Carmichael after he was

15       Mirandized that he was spotted going to

16       Mr. Denton's house?

17  A.   I didn't specifically say Denton's house.

18  Q.   What exactly did you say?

19  A.   I told him that we knew that he had met the

20       previous morning -- well, actually, it would

21       have been that morning between two and three

22       a.m. -- with one of the individuals who was at

23       the location where the marijuana was seized.

24  Q.   And did he respond to that statement you made?

25  A.   Yes, he did.

59

1   Q.   What did he say?

2   A.   He said that at that period of time he was in

3        a hotel with a woman and that she would

4        testify to that.

5             MS. MORRIS:  One moment, Your

6        Honor.

7   Q.   Agent Halasz, aside from the fact that

8        everyone was out looking for Mr. Carmichael,

9        what did you know about why everyone was

10       looking for him?

11  A.   Because he had been implicated by

12       coconspirators that were interviewed prior to

13       the seizure of the marijuana by David DeJohn

14       in a marijuana conspiracy -- in a marijuana --

15       in our marijuana investigation, that

16       information led to the seizure of the excess

17       of five hundred pounds of marijuana prior to

18       that morning, or during the investigation that

19       morning prior to the vehicle stop.

20  Q.   When you say he had been implicated, how was

21       he implicated, if you know?

22  A.   He was identified as a person responsible for

23       bringing multiple loads of marijuana to

24       Montgomery in excess of five hundred pounds

25       and distributing that marijuana in Montgomery.

60

```
 1    Q.   Now, Agent Halasz, there has been some
 2         overtures, I guess, regarding Mr. Carmichael
 3         going to Mr. Denton's house, I think, the
 4         morning of the 17th.  Were you present at
 5         Mr. Denton's house the morning of the 17th?
 6    A.   Yes, I was.
 7    Q.   And were you present when Mr. Denton obtained
 8         -- or received a phone call?
 9    A.   Yes, I was.
10    Q.   Where were you?
11    A.   Standing on the front porch, the front
12         entrance way to Denton's house.
13    Q.   Did you hear the phone ring?
14    A.   Yes, I did.
15    Q.   What happened after the phone rang?
16    A.   The phone rang, and I had initially gone to my
17         vehicle to get a recorder.  What happened is,
18         the phone rang, Denton showed it to Agent
19         DeJohn and I --
20    Q.   Let me back you up.  Why were you going to
21         your vehicle?
22    A.   To try and tape the phone call.
23    Q.   Which phone call?
24    A.   The phone call that was just coming in.
25    Q.   Go ahead.  I'm sorry.
```

61

```
 1    A.   The phone displayed Leon on the display window

 2         of the phone.  Denton had showed that to

 3         DeJohn and I, and I had gone to my vehicle to

 4         get a recorder to attempt to come back to

 5         record the phone call.

 6    Q.   Were you present during the phone call?

 7    A.   During the tail end of it.

 8    Q.   Okay.  And what happened after the phone call?

 9    A.   Denton had stated that Carmichael told him

10         that he needed to talk to him and that he

11         would be over in five minutes.

12    Q.   And what did y'all do then?

13    A.   At that point, we vacated the property

14         anticipating within a few minutes Carmichael

15         would be arriving to speak with Denton.

16    Q.   Were you also surveilling the property?

17    A.   Yes.

18    Q.   Did you view -- well, did you view a black

19         Honda entering Mr. Denton's property?

20    A.   Yes, I did.

21    Q.   Could you see inside of it?

22    A.   No, I couldn't.

23    Q.   How long did the vehicle stay there?

24    A.   Just a few minutes.  Five, maybe ten minutes.

25    Q.   Did you see it leave?
```

62

```
 1    A.    Yes.

 2    Q.    Did it look like it was the same vehicle you

 3          had witnessed at Mr. Carmichael's house?

 4    A.    It appeared to be the same vehicle.

 5    Q.    And that was the same vehicle that you stopped

 6          on the Southern Bypass with Mr. Carmichael

 7          inside of it?

 8    A.    Yes, it appeared to be.

 9                  MS. MORRIS:  I have no further

10          questions.

11                  THE COURT:  Cross-examination for

12          Agent Halasz?

13                  MR. GLASSROTH:  Yes, ma'am.

14                  CROSS-EXAMINATION

15    BY MR. GLASSROTH:

16    Q.    Mr. Halasz, Mr. Carmichael was going to be

17          stopped on the 17th no matter that he had a

18          gun or not; right?

19    A.    Correct.

20    Q.    And the reason you just detailed was his

21          involvement or his alleged involvement in this

22          bringing in of marijuana into Montgomery?

23    A.    Yes.

24    Q.    Now, you didn't actually effect the stop, did

25          you?
```

63

1    A.   No.   A marked police unit did.

2    Q.   But you gave the instruction or one of the

3         agents gave the instruction to the marked

4         police car to stop it?

5    A.   Yes.

6    Q.   And you came on the scene shortly after the

7         stop; right?

8    A.   I was in close proximity to the stop.   I could

9         see the entire incident.

10   Q.   So you saw the black-and-white put the

11        emergency lights on?

12   A.   Right.

13   Q.   And then you saw him pull over.   He made no

14        attempt to flee; right?

15   A.   No.

16   Q.   And when he got pulled over, by the time you

17        got there, he was out of the Honda?

18   A.   As I was getting out of my vehicle, he was

19        stepping out of his.

20   Q.   And then the two of you had a conversation;

21        right?

22   A.   Yes.

23   Q.   Now, who initiated the conversation?

24   A.   I did.

25   Q.   And what did you say?

1    A.    I told him that the reason that he was stopped
2          was because we believed he was involved in an
3          investigation that resulted in a seizure of
4          over five hundred pounds of dope is what I
5          said.
6    Q.    So he was not stopped for a traffic violation?
7    A.    No.
8    Q.    And he was, in fact, not written any ticket
9          for a traffic violation?
10   A.    No.
11   Q.    So the reason is just as you just explained;
12         right?
13   A.    Yes.
14   Q.    Okay.  And what was his response to what you
15         said?
16   A.    I read him his Miranda rights at that point,
17         and at that point, I told him that we had just
18         seized over five hundred pounds of dope from
19         Freddie.
20   Q.    Okay.  And then you said you looked in the
21         car; right?
22   A.    I looked in the car prior to this.
23   Q.    And when you looked in the car, you saw
24         something; right?
25   A.    Yes, sir.

1   Q.   What was it that you saw?

2   A.   I saw a pistol lying on the passenger's seat.

3   Q.   And that kind of sent alarms off to you;

4        right?

5   A.   Yes.

6   Q.   Because you had done a -- or at least had

7        information that Mr. Carmichael had previously

8        been convicted of a murder?

9   A.   I was aware of that.

10  Q.   Because you check your background of the

11       people you have under investigation, don't

12       you?

13  A.   Yes.

14  Q.   And you acquire as much information about the

15       subject or target as you can?

16  A.   Yes.

17  Q.   So you saw the pistol there and you saw some

18       other things in the car, too?

19  A.   Yes.

20  Q.   You saw the leather jacket; right?

21  A.   Yes.

22  Q.   And there was a -- I think you described it as

23       a money bag?

24  A.   The money bag was in a briefcase that was

25       lying in the middle of the rear seat.

1   Q.   Now, when you describe the money bag, is that

2        sort of like a bank bag that you take to

3        the bank that the bank issues?

4   A.   Yes.  A zippered -- I guess it would be best

5        described as rubberized cloth.

6   Q.   Okay.  And let me see if I could describe it

7        for the Record.  It's rectangular in shape and

8        has a zipper at the top?

9   A.   Yes.

10  Q.   And then whatever banking business is placed

11       inside and can be closed with the zipper?

12  A.   Yes.

13  Q.   Okay.  Do you remember what bank had issued

14       that bag?

15  A.   No, I don't.  I don't know if there was a bank

16       name on it or not.

17  Q.   But it appeared to be one of those

18       banking-type bags, whether it had a name or

19       not?

20  A.   Yes.

21  Q.   Okay.  And when you opened it, you found

22       money?

23  A.   Yes, sir.

24  Q.   And you asked Mr. Carmichael about that money?

25  A.   I don't remember if I specifically asked him

1    about the money in the briefcase.  He had

2    money in both back pockets.

3  Q.  Okay.

4  A.  I know we -- that was recovered from him, the

5    money in his back pockets, by Montgomery

6    Police Detective Tom Conway.  And apparently,

7    he had told Detective Conway that was

8    walking-around money, or something to that

9    effect.

10  Q.  Okay.

11  A.  I don't remember if I spoke to him about the

12    money in the briefcase or not.

13  Q.  So --

14  A.  I might have told him that it was there and we

15    had custody of it.

16  Q.  So at any rate, if you did have a conversation

17    about it, it's not a remarkable one that you

18    recall?

19  A.  Yes.

20  Q.  There's no substance of any conversation that

21    you remember, if there were one?

22  A.  No.

23  Q.  Okay.  And the money that was in

24    Mr. Carmichael's pants pockets, were they?

25  A.  Yes.

1   Q.   This was -- you said that Mr. Conway was told

2        that was walking-around money?

3   A.   I believe that's what Detective Conway had

4        told me, something to that effect that it

5        was...

6   Q.   Now, you never saw Mr. Carmichael commit any

7        offense; right?

8   A.   No.

9   Q.   And you never saw -- or none of the officers

10       that you were working with saw Mr. Carmichael

11       commit any offense?

12            MS. MORRIS:   Objection, Your Honor.

13       He can testify as to what he was told, but I

14       don't know that he can testify in general as

15       to what the other officers saw.

16            THE COURT:   Sustained.   Rephrase

17       your question, please.   Objection sustained.

18            MR. GLASSROTH:   Yes, ma'am.

19   Q.   To your knowledge, none of your -- well, none

20       of the officers that you work with in the task

21       force have told you that they saw

22       Mr. Carmichael commit any offense; right?

23   A.   I don't know what you mean by an offense.   As

24       an overt act?

25   Q.   No.   I'm talking about an offense that he

1          could be arrested for.  Something committed in

2          the presence of any of the officers.

3    A.    If you're referring to an actual possession or

4          a distribution, no.

5    Q.    Well, I'm talking about any offense.

6    A.    I would possibly consider an overt act an

7          offense.

8    Q.    Well, I mean an overt act could be driving a

9          car; right?

10   A.    Yes.

11   Q.    But people drive cars all the time?

12   A.    Yes.

13   Q.    And that's not a crime?

14   A.    Not in itself, no.

15   Q.    Only in the context of when a conspiracy is

16         charged might driving a car being an overt

17         act; right?

18   A.    Yes.

19   Q.    But in terms of a criminal offense or a

20         traffic offense or anything like that, you

21         were aware of nothing that Mr. Carmichael did

22         on the 16th or 17th of November 2003 that

23         would constitute a crime?

24   A.    I wouldn't say that, no, sir.

25   Q.    So you are aware that he committed a crime?

1   A.   I believe he did, yes, sir.

2   Q.   And when you say that, you're referring to

3        overt acts that you believe he committed as

4        part of this charge of conspiracy?

5   A.   Yes, sir.

6   Q.   But at the time he was stopped, he hadn't been

7        charged with anything, had he?

8   A.   No, he hadn't been charged yet.

9   Q.   And he had not committed anything other than

10       what you believed may be an overt act; right?

11   A.   Yes.

12   Q.   So independent of this, the rubric of the

13       conspiracy, you're aware of nothing else that

14       Mr. Carmichael may have engaged in?

15   A.   Other than conspiracy, no.

16   Q.   Okay.  Now, you had agents that applied for

17       various warrants related to this case; right?

18   A.   Agents did, yes.

19   Q.   They were for search warrants, right, of

20       various locations?

21   A.   Yes.

22   Q.   But you're not aware of any agents applying

23       for any arrest warrants, are you?

24   A.   No.

25   Q.   And it would be the same probable cause that

1     agents used to get the search warrants that

2     would constitute probable cause to get an

3     arrest warrant, wouldn't it?

4   A.   Can be.

5   Q.   But none of the agents did that?

6   A.   No.

7           MR. GLASSROTH:  Nothing further at

8     this time, Your Honor.

9           THE COURT:  Any redirect for Agent

10    Halasz?

11          MS. MORRIS:  No, Your Honor.

12          THE COURT:  Thank you very much.

13   May Agent Halasz be excused?

14          MS. MORRIS:  Yes, Your Honor.

15          THE COURT:  Thank you, Agent.

16     We're going to take a break very

17   shortly.  Tell me how many more witnesses you

18   have.

19          MS. MORRIS:  Agent DeJohn.  I'm

20   expecting just to call Agent DeJohn barring --

21          THE COURT:  Let's take a break until

22   eleven-thirty before you call Agent DeJohn

23   again.

24          MS. MORRIS:  Yes, Your Honor.

25          THE COURT:  Thank you.

72

```
 1                    (A short recess was had in the
 2               proceeding.)
 3                    THE COURT:  All right.  Agent DeJohn
 4          remains under oath.
 5               Ms. Morris.
 6                    MS. MORRIS:  Yes, Your Honor.
 7                    DIRECT EXAMINATION
 8          BY MS. MORRIS:
 9     Q.   Agent DeJohn, after Mr. Carmichael's arrest,
10          did you, in fact, draft and swear to an
11          affidavit in support of a complaint against
12          Mr. Carmichael?
13     A.   Yes.
14     Q.   And this was in front of whom?
15     A.   Judge Coody.
16     Q.   Had you heard at that point, or somewhere
17          around that time, that Mr. Carmichael claimed
18          to have been pardoned and his rights restored?
19     A.   Yes.
20     Q.   And what did you do with this information?
21     A.   I'd called the Board of Pardons and Paroles
22          asking if there had been a pardon.  They said
23          they weren't sure if there had been a pardon
24          for sure or not, but they would have to check
25          the archives.  I explained to them the
```

73

1   situation a little bit, and they found it

2   shocking that an individual who had been

3   previously --

4           MR. GLASSROTH:  Your Honor, I'm

5   going to object and move to strike what -- his

6   mental impressions or what others may have

7   told him about --

8           THE COURT:  That's sustained.  You

9   have answered the question.

10          Ask another question, please.

11          MS. MORRIS:  Yes, Your Honor.

12  Q.  After the arrest of Mr. Carmichael, were

13  arrangements made with Attorney Glassroth for

14  Mr. Carmichael to obtain some of his

15  belongings taken from his vehicle?

16  A.  Yes.

17  Q.  Who made those arrangements?  Before you

18  answer that --

19          MS. MORRIS:  Your Honor, let me stop

20  here and explain something to the Court for

21  the Record.  I spoke with Mr. Glassroth.

22  Agent DeJohn spoke with Mr. Glassroth.  In an

23  effort not to make myself a witness and

24  Mr. Glassroth a witness, quite frankly, I'm

25  going to attempt to limit this to his

1    communications with Mr. Glassroth.

2              THE COURT:  I understand.  I got

3    that impression from the Government's

4    submission.  However, it will assist the Court

5    to make sure we have the time in context.  You

6    began this direct by inquiring about a

7    criminal complaint drafted after

8    Mr. Carmichael's arrest.  I assume that we are

9    talking about his arrest on the November 17,

10   2003?

11             MS. MORRIS:  That is correct, Your

12   Honor.

13             THE COURT:  Now, what is the

14   Government's position on what he was arrested

15   for since your agent has testified that he was

16   not arrested for a gun-related charge or any

17   other offense but that he was arrested because

18   we had information that he was involved in a

19   drug conspiracy?  I want to make sure I have a

20   context between arrest on November 17th and

21   any statements that you are now about to go

22   into.

23             MS. MORRIS:  Your Honor, it's my

24   understanding that the agent testified that he

25   was stopped or pulled over based on

```
 1          information obtained from these sources.  Once

 2     the gun was found -- once the gun -- and I can

 3     re-call Agent Halasz, who is still in the

 4     courthouse -- but once the gun was found, he

 5     was then arrested for felon in possession of a

 6     firearm.

 7                    THE COURT:  All right.  So on

 8     November 17th, we have an arrest for being a

 9     felon in possession of a firearm?

10                    MS. MORRIS:  Yes, Your Honor.

11                    THE COURT:  All right.  Proceed.

12                    MS. MORRIS:  And again, I can

13     re-call Agent Halasz --

14                    THE COURT:  I simply needed to

15     clarify the arrest that you're talking about

16     now so that I'll understand the statements

17     that follow.

18                    MS. MORRIS:  Yes, Your Honor.

19   Q.  Now, Agent DeJohn, did you make arrangements

20     with Mr. Glassroth in order for Mr. Carmichael

21     to obtain some of his belongings from the

22     vehicle that were taken as a result of his

23     arrest on the 17th of November?

24   A.  Yes.

25   Q.  And who called whom?
```

1   A.   I was initially called by my supervisor who

2        instructed me to contact Carmichael's

3        attorneys.  I was provided with a number, and

4        I called.  So I initiated the call with -- at

5        that point, I called Attorney Glassroth.

6             THE COURT:  What is the date now

7        that we're discussing?  November 17th still?

8             THE WITNESS:  No, Your Honor.  It's

9        going to be, I believe -- December 4th, I

10       believe.

11            THE COURT:  Thank you.

12  Q.   Well, Agent DeJohn -- correct me if I'm wrong

13       -- but December 4th is the date that

14       Mr. Carmichael came to the DEA office to

15       retrieve his belongings; is that correct?

16  A.   That's correct.

17  Q.   And are you saying that you spoke with

18       Mr. Glassroth on the same date?

19  A.   I believe it was the same date.  It was the

20       morning -- I was on my way in to work, and I

21       called.  And I believe it was later that

22       morning when Mr. Carmichael showed up.

23  Q.   And again, what was the substance of that

24       conversation?

25  A.   There was some items that Mr. Carmichael

1       needed related to his business that we had

2       taken during his arrest, and he wanted to know

3       if we were not using it for evidence or if

4       there were things that we could make

5       photocopies of and return the actual items to

6       Mr. Carmichael.  And we did discuss that, and

7       I told him we would be returning some items to

8       him.

9   Q.   Did you discuss how you were going to return

10      these items to him?

11  A.   I believe during the conversation we asked who

12      was going to be coming to pick it up and if he

13      was going to be coming or if he was going to

14      be sending someone else from the office.  In

15      which case, I was told that Mr. Carmichael

16      would be coming to the office himself.  I, you

17      know, wondered if that was appropriate or not,

18      and it was indicated to me that it was fine.

19  Q.   And indicated to you by whom?

20  A.   His attorney.

21  Q.   And did Mr. Carmichael come to your office

22      that date?

23  A.   Yes.

24  Q.   Did anyone come with him?

25  A.   No.  I don't know if somebody was waiting out

```
 1        in the car, but nobody came up to our office

 2        with him.

 3   Q.   And when he got to your office, was he patted

 4        down?

 5   A.   No.

 6   Q.   Do you have one of those scanners that scans

 7        your purses and so forth?

 8   A.   Yes.

 9   Q.   Was anything on him scanned?

10   A.   No.

11   Q.   Did he walk through a magtomiter (phonetic)?

12   A.   No.

13   Q.   Was he brought into your office?

14   A.   He was brought in through the foyer of the

15        office and then off to a side interview room.

16   Q.   When he was in this interview room, was it

17        locked?

18   A.   No.

19   Q.   Could he have left at any time?

20   A.   Yes.

21   Q.   And at that point, what happened in this

22        interview room?

23   A.   Myself and Agent Greenwood met with him.  We

24        brought him into the interview room.  I went

25        and retrieved the items that we were going to
```

```
1              give back to him.

2     Q.       How long were you gone?

3     A.       Probably no more than thirty seconds.

4     Q.       And when you got back into the interview room,

5              what transpired?

6     A.       As I walked back in, Mr. Carmichael was saying

7              that -- how the media had portrayed this whole

8              incident, that, apparently, I guess one of the

9              news stations had said that there was five

10             hundred and seventy-five pounds of marijuana

11             located inside the Carmichael Center.  Both

12             Agent Greenwood and myself we said, well, we

13             know that's not the case, and we're not going

14             to present anything that is not the truth.

15    Q.       Did he make any other statements to you?

16    A.       He -- immediately he began to say, well, he

17             had already resigned himself to the fact that

18             he was going to do ten, fifteen, twenty years

19             in prison and that would be a life sentence to

20             him.

21    Q.       And what did you do then?

22    A.       Hearing him say that, you know, a ten-year

23             sentence would be considered a life sentence,

24             I was shocked, and I asked him, why do you say

25             that.
```