IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CR NO. 03-0259-T |
| | ) |
| LEON CARMICHAEL, SR., aka | ) |
| BEAVER LEON CARMICHAEL, et al. | ) |

# RECOMMENDATION OF THE MAGISTRATE JUDGE

Following an evidentiary hearing and due consideration of the arguments and applicable law, the Magistrate Judge concludes, as herein explained, that *Defendant Carmichael's Motion to Suppress Evidence and Motion Pursuant to Fed.R.Crim P.41(g)* (Doc.71, filed January 7, 2004), should be denied.

## I. FACTUAL BACKGROUND

### A. Relevant Chronology

On the morning of November 17, 2003, narcotics officers kept surveillance on the 949 Ridgecrest Drive, Montgomery, Alabama residence of Freddie Williams ("Williams") before executing in the afternoon a federal search warrant which resulted in the seizure of approximately 575 pounds of marijuana stored in duffel bags inside the home. On the same day, acting on instructions from officers who suspected Carmichael's involvement with Williams in a conspiracy for illegal distributions of the marijuana, a special agent for the Drug Enforcement Administration (DEA) summoned Montgomery Police Department to assist him in effecting a stop of the defendant Leon Carmichael, Sr. ("Carmichael") as he drove his car on the Southern Boulevard. Carmichael made statements in response to the DEA agent's investigative detention regarding the suspected marijuana conspiracy, and those statements are the subject of this suppression motion. Carmichael



GOVERNMENT EXHIBIT 2G

was arrested on November 17 solely for suspicion of being a convicted felon in possession of a firearm. After officers confirmed his initial report of receiving a pardon which restored his right to carry a firearm, he was released without being charged then for any offense related to the seizure of marijuana from the Williams' residence.

Two days later, on November 19, 2003, a Grand Jury indicted Williams and Carmichael as joint conspirators for illegal marijuana possession for distributions. (Doc.8). On December 4, 2003, Carmichael made a scheduled visit to the narcotics office – prearranged by counsel who did not accompany him – to secure personal property seized following his arrest on November 17; his suppression motion also targets statements he made to another DEA agent on this occasion.

The Grand Jury filed superseding indictments initially on December 17, 2003 (Doc. 48) and the present indictment on January 21, 2004 (Doc. 86). *Count 1* indicts Carmichael and Williams as joint conspirators with others in a scheme commencing "in or about 1993" and continuing through November 17, 2003, "in Montgomery County, within the Middle District of Alabama, within the Southern District of Texas, and elsewhere" to distribute "1000 kilograms or more" of marijuana," in violation of 21 U.S.C. § 841 (a) (1) and § 846. *Count 2* indicts Carmichael alone for money laundering illegal drug proceeds through financial transactions in a Compass Bank account, between May 27, 2002, and February 24, 2003, in violation of 18 U.S.C. § 1956(h).

B. **Relevant Facts: November 17, 2003 Stop**

Two DEA agents provided the only testimony at the evidentiary hearing on March1, 2004: R. David DeJohn ("Agent DeJohn"), a Prattville Police Department investigator cross-assigned as a DEA Task Force Agent, who also provided the supporting for the warrant to search Williams'

2

residence on November 17, 2003, and Special DEA Agent Thomas Halasz ("Agent Halasz"), who effected the stop of Carmichael's car and his investigative detention.

The relevant facts occurred in 2003 between November 13 and November 17. On November 13 Agent DeJohn interviewed Gary Wayne George ("George"), a convicted felon who described himself as a member of the "Leon Carmichael Drug Trafficking Organization," following his arrest on "drug charges" by the Prattville Police Department. Agreeing to provide information regarding Carmichael's organization and otherwise to serve as an informant, George identified Robert Patrick Denton ("Denton") as his partner with the "job [of] process[ing] marijuana as it come into Montgomery from out of state for Leon Carmichael."[1] George related that he had performed this processing job "numerous occasions ...like 30 times," identified the processing sites as Denton's residence on Fleming Road and another Montgomery residence and also reported that the marijuana shipments involved "as little as 200 pounds, as high as 800 pounds on a weekly basis."[2] George also admitted his own sales of marijuana supplied by Denton, and though George "had seen [Carmichael] but never really talked to him," Denton told him [Carmichael's] who he got the marijuana from and ... when they collected money back up, that's who the money would go back to."[3]

On November 15 George called Agent DeJohn with a report that he and Denton were enroute to the Shoney's on Montgomery's West South Boulevard for a sale of marijuana to Charlotte

---

[1] As explained to Agent DeJohn, "processing" required George and Denton to "repackage the marijuana, break it down from its form that it was transported in wrapped up in duct tape, and break it down, put it in gallon-size, Ziplock-type bags." *Tr.* at 8-9:7-10.

[2] *Tr.* at 10.

[3] *Tr.* at 13: 8-25; 14: 1-3.

3

Hensarlinger ("Hensarlinger"), a Huntsville resident to whom Denton had been "regularly selling marijuana." Pursuant to instructions from Agent DeJohn, George called back with the color, make, model, and license tag for the sports utility-type vehicle (SUV) being driven by Hensarlinger on her trip down Interstate-65 south from Huntsville. Upon notice of the completed transaction, Agent DeJohn stationed himself at the interstate's Millbrook-Prattville exit and followed the northbound SUV into Chilton Co., where he relayed to the Chilton Co. Sheriff's Department identification data for the SUV. Sheriff's deputies made a "traffic stop" of the SUV; a consensual search produced approximately 26 pounds of marijuana; and Hensarlinger admitted that she had just bought the marijuana from George and Denton.[4]

Based on George's report on November 16 of approximately ten pounds of marijuana inside Denton's residence, Agent DeJohn secured and executed in the early morning hours of November 17 a search warrant which yielded no marijuana but, instead, an interview with Denton, who agreed to cooperate as an informant. Denton advised "that he had been getting marijuana from Leon Carmichael, that a shipment was due in on that evening, Sunday night, Monday morning, but he had told Leon Carmichael that he did not want to take shipment of that marijuana" because of Hensarlinger's arrest after his admitted sale to her of marijuana in the transaction already detailed by George. Denton confirmed his weekly "processing" job – "get[ting] the marijuana from William Bolding, a truck driver for Leon Carmichael" and "help [ing] "break it down and repackage it into gallon-size bags" – on instructions from Carmichael. He returned the processed marijuana – "an average of 500 to 600 pounds per load" to Carmichael or to Bolding and "was paid by Carmichael

---

[4] *Tr.* at 10-13.

4

in the form of marijuana ... given pounds to sell."[5]

After completing Denton's interview, DEA agents drove him around "to corroborate his information", and Denton identified Carmichael's residence and those for "other players within the organization, including Carmichael's co-defendant, Williams, whose 949 Ridgecrest Drive house he speculated would be the processing site for the marijuana shipment expected on that day. When officers returned Denton to his residence, around 2:45 on this November 17 morning, Denton's cell phone rang as Agent DeJohn held it in his hand, and it displayed "Leon", a name confirmed by Denton to be "Leon Carmichael." Listening to their conversation, Agent DeJohn heard a voice he later identified as Carmichael's tell Denton that he "need[ed] to talk to [him]" and was "five minutes away."[6] Officers left Denton's house and set us surveillance on Fleming Road to watch the inbound traffic; shortly, they saw Carmichael's black Honda – the same vehicle previously seen at his residence – turn into Denton's residence and leave after the driver spent about five minutes inside. Denton confirmed Carmichael as the driver and also related his instructions that he report to Williams' Ridgecrest house at 8:00 a.m. to help break down the marijuana shipment. Officers left with plans to meet again with Denton at 7:30 a.m.[7]

When they met as scheduled, officers equipped Denton with audio and video transmitting devices for his trip to the Williams residence. Officers again met Denton when he left the Williams residence for a grocery store to secure, at Williams' instructions, some gallon-size, ziplock-type

---

[5]     *Tr.* at 15-19.

[6]     Present with Agent DeJohn at the time, Agent Halasz heard the phone ring and also saw the name displayed; as he had rushed to his vehicle for a tape recorder, he heard only the "tail end" of the conversation between Denton and Carmichael. *Tr.* at 60-61.

[7]     *Tr.* at 19-24:1-3.

5

bags. Upon his return, Williams was no longer inside the residence but advised by cell phone of his location five minutes away; back inside the residence Williams and Denton "began retrieving bags from inside of a hidden wall that was in the bedroom." When Denton left the residence again, to secure a scale in lieu of one Williams thought was broken, he confirmed to Agent DeJohn by cell phone that the bags contained "500 to 600 pounds of marijuana", and he also related Williams' reported anger with Carmichael for personally counting "each block of marijuana" placed inside as he suspected Williams' girlfriend of taking some.[8]

After securing scales provided by the agents, Denton returned to the residence and continued to assist Williams in processing the marijuana until Williams placed or received a phone call regarding the imminent death of his then-hospitalized wife. Denton used his audio transmitting device to alert officers of Williams' planned departure, reporting "he's fixing to leave - you need to go ahead and stop him." Officers responded with the intent "to secure the residence and take Williams into custody before he left" but as Williams had already left, they managed only to secure the residence while "some agents went out looking for Williams" and others for Carmichael.[9]

Agent Halatz had been apprised on November 16 of the narcotics investigation centering on Williams and Carmichael, and on November 17 DEA agent Sherry Gonzalez notified him that "an individual fitting Leon Carmichael's description had passed in front of the scene of the search warrant" in execution at Williams' house.[10] She advised him "to detain ... Carmichael when and if

---

[8] *Tr.* at 19-27. Officers secured from Denton the videotapes when he left the Williams residence to secure the bags and again to secure a scale. Thus, they were able to view Williams and Denton handling the bags of marijuana.

[9] *Tr.* at 29-30.

[10] Before his encounter with Carmichael on November 17, Agent Halatz knew specifically that
(continued...)

6

[he] saw him." From his station in front of the Carmichael Center on Fleming Road, Agent Halatz saw Carmichael's black Honda pass him, followed it, and contacted the Montgomery Police Department for a marked police vehicle to effect a stop on the Southern Boulevard. As Agent Halatz approached the car, Carmichael had already exited, leaving open his driver's door; with Carmichael already handcuffed by other officers, Agent Halatz "stuck [his] head in the vehicle" and viewed on the front passenger's seat a pistol and a black leather bag, and in the middle of the back seat, a briefcase which he opened to reveal a money bag"[11]

The Agent then "read ...Carmichael his rights and spoke to him," inquiring first about the gun. Carmichael acknowledged his prior conviction for murder but said that he had been pardoned and had a pistol permit. Agent Halatz "also told him that . . . the reason he was stopped is because we believed he was involved in a marijuana case – a marijuana investigation"; when the agent "mentioned the name Freddie, [Carmichael] indicated that he knew a Freddie that drove for him."[12] Advised as well that officers "knew that he had met ... that morning between 2:00 and 3:00 a.m. – with one of the individuals who was at the location where the marijuana was seized," Carmichael responded that "at that period of time he was in a hotel with a woman and that she would testify to that."

---

[10] (...continued) Carmichael "had been identified as a person responsible for bringing multiple loads of marijuana to Montgomery in excess of 500 pounds and distributing that marijuana in Montgomery;" he also that "that information led to the seizure of the excess of 500 pounds of marijuana ... during the investigation that morning prior to the vehicle stop." Tr. at 59.

[11] Counted later, the currency totaled $5,000.00. Tr. at 54-56.

[12] Tr, at 56-67. From his participation in the case investigation, Agent Halatz knew that Carmichael owned a trucking company and took Carmichael's reference that Williams drove for him to mean that Williams worked as one of his truck drivers.

7

Officers transported Carmichael to headquarters while Agent DeJohn presented his affidavit to the Chief Magistrate Judge in support of a Criminal Complaint and arrest warrant charging Carmichael with being a convicted felon in unlawful possession of the pistol seized from his car. Though that complaint was dismissed, Carmichael was rearrested on November 19, 2003, pursuant to his joint Indictment with Williams on the same day for conspiring to distribute marijuana illegally.

### C. Relevant Facts: December 4, 2003 Statements

Pursuant to arrangements his counsel made with the government's prosecutor and Agent DeJohn, Carmichael – free on a pre-trial bond and other conditions imposed after his initial indictment – reported alone to the DEA office on December 4, 2003, to retrieve his briefcase, credit cards, checkbooks, and other belongings seized following his arrest. Escorted through the foyer to a side interview room, Carmichael waited with another agent while Agent DeJohn left for "no more than 30 seconds" to secure the items.[13] Upon his return, he heard Carmichael complaining about the news media's portrayal of his arrest and, in particular, false reports that 575 pounds of marijuana were located inside the Carmichael Center. Carmichael then declared that "he had already resigned himself to the fact that he was going to do 10, 15, 20 years in prison and that would be a life sentence to him." "Shocked" that he considered a 10-year sentence a life sentence, Agent DeJohn asked him, "why do you say that?"; Carmichael responded, "because you got me." Agent DeJohn

---

[13] *Tr.* at 76-77, 90. In addition to the foyer/waiting area, the DEA office has two interview rooms, an officer area, a conference room, the supervisor's office, and a processing area. The side interview room used for Carmichael is "maybe" an 8x8 area, equipped with a table and some chairs, and one door leading to the foyer and a second into the main part of the office. Agent DeJohn chose an interview room instead of the waiting area to minimize any interaction between Carmichael and other visitors to the DEA office and to ensure privacy in the event Carmichael chose to cooperate; the table inside this room also facilitated Carmichael's signing of paperwork to document the property retrieved. *Tr.* at 88, 91, 95-96.

8

then reminded Carmichael of his "opportunity ...to cooperate with law enforcement", prompting Carmichael's statements: "I can't even trust my own attorneys. I have one attorney that is telling the U.S. Attorney's office that they have a client that wants to talk about [me], and the others got their hands reached out for money."[14] Carmichael also commented "that most of the people talking about him – most of the people would be lying." [15]

## II. DISCUSSION

### A. Vehicular Stop and Statements on November 17, 2003

#### 1. Contentions

The Government contends that officers effected a lawful stop of Carmichael in his car on November 17, 2003 based on their reasonable suspicion of his involvement in a criminal conspiracy for the illegal possession and distribution of marijuana; they maintain as well that at the point of the stop, officers also had probable cause to arrest him for that crime. Because they declined to effect his arrest for that offense, and instead pursued a grand jury assessment of probable cause two days later, the court properly declines to evaluate the sufficiency of probable cause on November 17, 2003, to arrest Carmichael for his involvement in that conspiracy.[16] Carmichael

---

[14]   *Tr.* at 78-80.

[15]   *Tr.* at 81. For these statements attributed to Carmichael, Agent DeJohn made no notes during or immediately after his conversation with Carmichael and could not recall when he actually completed a DEA -6 form, bearing a top date of December 6, 2003, used to refresh his memory of the last statement referenced; he noted the possibility that it may have been completed on December 6 but not printed until the December 16, 2003 date indicated by his signature.

[16]   Indeed, the Magistrate Judge's pointed inquiries to the government prosecutor arose from the fact that notwithstanding the contention of sufficient probable cause for such an arrest, officers did not do so, and instead, effected a warrantless arrest for an apparent crime – having possession of a pistol notwithstanding a felony conviction – which could be authorized only if officers viewing the pistol lawfully stopped the car in the first instance.
(continued...)

disputes the Government's alternative contentions and emphasizes both in written submissions and through examinations at the evidentiary hearing that Carmichael committed no traffic offense and no criminal act witnessed by the officers who effected the stop.

### 2. Analysis

This court finds that the evidence amply establishes the requisite degree of "reasonable suspicion of criminal activity" to justify, within the authority of *Terry v Ohio*, 392 U.S. 1 (1968), the officers' warrantless stop and detention of Carmichael on November 17, 2003. Because the evidence also is clear that Carmichael's statements were responsive to investigative inquiries within the permissible scope of that investigative detention, they are not subject to suppression.[17]

While *Terry* authorizes investigative detentions which are incident to traffic stops, see *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), *cert. denied*, 534 U.S. 830 (2001), and *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003), *Terry* also clearly authorizes the stop

---

[16] (...continued)
The court readily acknowledges the legal authority for stops and detentions warranted by reasonable suspicion that the detainee has committed, or is committing, a crime. However, it is reticent to accept an independent theory which justifies post-arrest seizures and statements when the evidence is clear that no arrest occurred for the reason indicated.

[17] Carmichael's motion seeks the suppression not only of statements but also of all properties seized from him on November 17, 2003. The parties failed to establish a clear record which distinguishes any property taken prior to or after Carmichael's mistaken arrest for being a convicted felon in possession of a firearm; while Agent Halasz referenced money in Carmichael's pocket and money in a briefcase – both observed immediately after the stop, neither he nor any other witness clarified whether officers seized the currency and briefcase promptly upon detaining Carmichael, inventoried it from his car upon his arrest, allowed him to keep the money or kept it until December 4, when they returned his brief case, checkbooks, credit cards, and other belongings. Nor did the government seek to admit at the evidentiary hearing any physical evidence seized from Carmichael on November 17, 2003. Accordingly, the court is unable to particularize any physical evidence subject to this order but the finding which validates Carmichael's statements made in connection with the lawful Terry stop necessarily means that any physical evidence also seized in that connection is similarly not subject to suppression.

10

of a motorist for a non-traffic related offense if officers have reasonable suspicion of his involvement in criminal activity. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-1221 (11th Cir. 1993) (citations omitted).

As recently stated in *United States v. Acosta*, 2004 WL 584572, at *3 (11th Cir. Mar. 25, 2004), *Terry* requires "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (*citing Terry*, 392 U.S. at 20); *see also United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000):

> Under *Terry's* two-part inquiry, we first examine "'whether the officer's action was justified at its inception.'" *Powell*, 222 F.3d at 917 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime, *id.* In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" (quoting *Terry*, 391 U.S. at 20, 88 S.Ct. at 1879).

On this record, neither the duration nor the scope of the *Terry* stop is challenged; instead, the disputed issue is the first *Terry* inquiry – whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. "Reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). As noted by the Eleventh Circuit in *United States v. Acosta*, 2004 WL 584572*3, and *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000), "[reasonable suspicion] does not require officers to catch the suspect in a

11

crime."

In determining the reasonableness of an officers' reasonable suspicion of criminal activity, the court is bound to consider the "totality of the circumstances", *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989), "from the collective knowledge of the officers involved in the stop." *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989). "This process allows the officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002), *quoting United States v. Cortez*, 449 U.S. 411, 418 (1981).

Informed by these governing principles, the court's analysis of the reasonable suspicion articulated for Carmichael's criminal activity leads inevitably to a finding which affirms the officers' investigative stop. First, it is relevant that the officers grounded their reasonable suspicion on both reported and observed events – including criminal acts– which transpired almost continuously during the preceding period of four days, and these events followed an investigation spanning several years.[18] A second noteworthy fact is that following their arrests for, or discovery committing, drug offenses, the principal informants for the "reported" events and crimes – George and Denton – each linked their crimes directly to a marijuana distribution organization headed by Carmichael and each acknowledged not only their specific roles in the criminal conspiracy but also their personal knowledge or other basis for attributing to Carmichael a leadership role. Though George provided no evidence of his direct contacts with Carmichael for the marijuana admittedly

---

[18] The superseding indictments filed December 17, 2003 (Doc. 48) and January 21, 2004 (Doc. 86), expanded both the *dates* – to an onset date in or about 1993– and the *amounts* – from "100 kilograms or more" to "1000 kilograms or more" of marijuana – for the marijuana drug distributions alleged in the initial indictment on November 19, 2003.

12

sold by him, he reported that his direct supplier, Denton, related Carmichael not only as his source but also as the person to whom he returned the sales proceeds, receiving as consideration more marijuana for his personal sales.

A third pertinent fact is that George made two relevant reports on November 15. He first related Denton's report that he and George were expected to process for Carmichael a large load of marijuana arriving in Montgomery the next day, and he identified Denton's Fleming Road residence as one possible site for the job. Officers garnered a third source of "reported facts", Charlotte Hensaraling, with George's second report, an alert to Agent DeJohn regarding her trip from Huntsville to buy marijuana from Denton, her regular supplier. After corroborating the details reported by George, officers effected a traffic stop which netted, through a consensual search of her SUV, the just-purchased marijuana and her confession that she purchased it from Denton. The court does not find George's credibility impeached by reason of his arrest for drunken driving on November 16 – prompting Agent DeJohn to cease using him as an informant – or by the fact that officers uncovered no marijuana at Denton's residence when they executed a search warrant in reliance on George's report; indeed, Denton himself volunteered an explanation for the missing marijuana – his uneasiness after hearing of Hensaraling's arrest – and also confirmed the sales transaction which had been reported initially by George.

Independent of reliance on an informant's reports – corroborated for the most part – officers facilitated their personal observations to expand the knowledge base for their reasonable suspicion of Carmichael's crimes by equipping Denton with audio and video transmitters in order to monitor a planned act by the co-conspirators in furtherance of their marijuana distributions. The evidence is undisputed that Carmichael assumed the leadership role in that act – the delivery to him and

13

processing by Denton and Williams of 500 to 600 pounds of marijuana. Officers were with Denton in the early morning hours of November 17 when he received from Carmichael a call to his cell phone, the substance of which Denton confirmed; shortly afterwards, around 2:45 a.m., officers discreetly watched Carmichael's car park in Denton's residence, and when it left within five minutes or so, Denton confirmed Carmichael's identity as well as his instructions to report at 8:00 a.m. to Williams' house for the purpose of processing the marijuana shipment delivered there. At the appointed hour, officers began monitoring Denton's activities inside with Williams, securing from him at two intervals the videotapes which allowed them to see the bags of marijuana inside. During one of those intervals, Denton also communicated Williams' statements which identified Carmichael as the owner of the marijuana who personally hand-counted the marijuana bales.

The officers' stop of Carmichael's car followed within hours agents' spotting of Carmichael suspiciously passing Williams' house as officers kept it secured while awaiting a search warrant after Williams managed to exit before they could effect his arrest. Though officers did not arrest Carmichael immediately for the crimes dictated by their reasonable suspicion, the evidence establishes their authorization to detain and arrest both Williams and Carmichael; it appears that these instructions influenced Agent Halasz, who approached Carmichael after the stop, to have him handcuffed and to provide *Miranda* advice to him before making investigative inquiries. Agent Halasz then promptly related to Carmichael the specific purpose of the stop – officers' investigation of Carmichael's involvement in the marijuana distributions evidenced by the seizure of marijuana from Williams' home and officers' surveillance of Carmichael earlier that morning at the residence of another conspirator.

The agent focused his representations and questions to Carmichael on the stated purpose

14

of the stop, and the court finds no factual basis for any suggestion that his inquiries went beyond the permissible scope of a *Terry* investigative detention. The Magistrate Judge readily concludes that Carmichael's responses are not inadmissible and this stop did not offend the Fourth Amendment.[19]

### B. Statements on December 4, 2003

Carmichael contends that his statements to Agent DeJohn approximately 17 days after the November 17 stop "should be suppressed as the fruits of the illegal initial stop since none of the property that was seized by the government would have been taken by the government absent that illegal stop and Mr. Carmichael would, thus, not have had to retrieve the illegally obtained property. (*Mot. to Suppress* at 2).[20] This contention merits short shrift in view of the court's reasoned conclusion that officers did not illegally stop his car on November 17.

As defense counsel's questioning at the evidentiary hearing suggested that Carmichael's statements resulted from an unnecessarily coercive environment – a theory not advanced in pre-

---

[19] *See, e.g., United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-1221 (11th Cir. 1993)

[20] Carmichael's post-hearing submission is similarly limited to the "fruit of the poisonous tree" theory articulated in *Wong Sun v. United States*, 371 U.S. 471 (1963), and it is argued, in total, as follows: "Had the improper warrantless stop of Mr. Carmichael not occurred, the government would have never come into possession of the property which Mr. Carmichael called for at the DEA office on December 4, 2003. Thus, the property being in the possession of the DEA was a direct result of the illegal stop. A clear nexus between the illegal stop and the appearance of Mr. Carmichael at the DEA office for the express purpose of claiming property which should have not been seized in the first place is thus shown. Given the direct nexus between the illegal stop and the property having to be claimed at the DEA office by Mr. Carmichael, any purported statements made are properly categorized as the tree's poisonous fruits. If the illegal stop had never occurred, the government would never have had the property in its possession and Mr. Carmichael would not have had to retrieve it. He never would have to appear at the DEA office and would never have encountered Mr. DeJohn for any purpose, much less for conversation." (*Def's. Reply to the Gov't.'s Post-Hrg Response* at 5, Doc. 132, filed March 24, 2004).

15

hearing or post-hearing submissions – it bears note that uncontradicted evidence attributes to counsel prior approval for Carmichael's trip unaccompanied by counsel. Moreover, the evidence is compelling that Carmichael casually volunteered his statements without being subjected to an unduly coercive atmosphere or any custodial interrogation of the character requiring prior *Miranda* warnings.[21]

### III.  CONCLUSION

Based upon the foregoing findings and conclusions, it is the *Recommendation of the Magistrate Judge* that the District Judge **DENY** Defendant's *Motion to Suppress* (*Doc 71*, filed January 7, 2004).

Done this 15th day of April, 2004.

/s/ Delores R. Boyd
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

---

[21] Suspects who are "in custody" cannot be questioned without first receiving the warnings outlined in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *United States v. Torkington*, 874 F.2d 1441, 1445 (11th Cir. 1989). A suspect is not in custody unless "there is a restraint on the suspect's freedom of movement of the degree associated with formal arrest." *United States v. Phillips*, 821 F.2d 1355, 1359 (11th Cir. 1987) (citation omitted). *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("Interrogation", as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."); *see also United States v. Grimes*, 142 F.3d 1342, 1349 (11th Cir. 1998) ("We find the reasoning of our fellow circuits persuasive and hold that Miranda rights may be invoked only during custodial interrogation or when interrogation is imminent.")

CASE NO. 03-cr-259-T

# ORDER

The clerk of the court is ORDERED to file the Recommendation of the Magistrate Judge and to serve by mail a copy thereof on the parties to this action. The parties are DIRECTED to file any objections to the said Recommendation **NOT LATER THAN APRIL 23, 2004.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (11th Cir. Unit B. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 15th day of April, 2004.

/s/ Delores R. Boyd
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE