IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. ACTION NO. |
| | ) | 2:03cr259-T |
| LEON CARMICHAEL, SR. | ) | |

ORDER

The interesting issue presented in this criminal case is

whether the court, at the request of the government, may

order the defendant to take down an internet website that

the government contends is threatening and harassing its

witnesses and agents but that the defendant contends is not

only a permissible exercise of his First Amendment right to

talk about his case but is needed to prepare his defense.

To summarize briefly what follows, defendant Leon

Carmichael, Sr. is charged in the United States District

Court for the Middle District of Alabama with drug

conspiracy and money laundering. Shortly after his arrest,

Carmichael set up a website related to this case. Currently

before the court is the government's renewed motion for a

protective order directing Carmichael to remove his website



GOVERNMENT
EXHIBIT
2 S

from the internet on the ground that it is threatening to witnesses and government agents.

The court finds that it is has the authority--by virtue of federal statute and its inherent power--to restrict or shut down a website.  However, the court cannot grant the government's motion for three reasons grounded in the protections granted to Carmichael by the Bill of Rights. First, even though the website's content taken as a whole is not at the core of the First Amendment, the site constitutes protected speech.   Second, the government's proposed protective order would be a prior restraint on Carmichael's protected speech, and the government has not convinced the court that such drastic relief is warranted.   Third, the harm posed by the website does not warrant restricting Carmichael's Fifth and Sixth Amendment right to investigate his case by using the website to gather evidence. Accordingly, the government's renewed motion for a protective order will be denied.

2

## I.  BACKGROUND

### A.  The Case

Carmichael was arrested in November 2003 in Montgomery, Alabama, after Gary Wayne George and Robert Patrick Denton-- themselves under arrest for marijuana distribution--informed Drug Enforcement Administration (DEA) Task Force Agent R. David DeJohn that Carmichael had employed them to assist in his marijuana-distribution activities.  On the day of his arrest, Denton told Agent DeJohn that Carmichael had been expecting a shipment of several hundred pounds of marijuana the previous day and that Carmichael had told him to assist Freddie Williams with re-packaging the marijuana.  Denton's information led to a search of Williams's residence later that day; the search turned up eleven duffle bags filled with marijuana.[1]  Carmichael was arrested the same day by DEA Agent Thomas Halasz.

---

1.  The events leading up to Carmichael's arrest are set out more fully in United States v. Williams, 2004 WL 936340 (M.D. Ala. 2004) (Thompson, J.).

3

As stated, Carmichael is charged with one count of conspiracy to possess marijuana with the intent to distribute, 21 U.S.C.A. §§ 841 & 846, and one count of conspiracy to commit money laundering, 18 U.S.C.A. § 1956(h). The conspiracy count alleges that, since 1993, Carmichael and others have conspired to possess with the intent to distribute 1000 kilograms or more of marijuana. Williams, Carmichael's co-defendant, is also named in the conspiracy count.

## B.   The Website

The internet website at issue in this case is www.carmichaelcase.com. At one point, Carmichael argued that the government had not established that he is responsible for the website, but he has not pursued this argument. Evidence submitted by the government shows that the site is registered to Cubie Rae Hayes and an entity known as "Eye For an Eye,"[2] and that Hayes currently works

_____

2.   Government's renewed motion, etc., filed April 27,
(continued...)

4

for the Carmichael Center, a business owned by Carmichael.[3] Without question, Carmichael has control over the website.

The website first appeared in December 2003 and first came to the attention of law enforcement in January 2004. The site has gone through roughly three versions.  The original version contained a picture of the Montgomery federal courthouse, and it stated that the media had misrepresented the case.  The site allowed users to post comments about the case, and it contained links to articles about the case, including an article from a local weekly newspaper that identified Denton by name and listed his home address.  The site also included a statement to the effect that Denton had been charged with six felonies.[4]

_____

2.   (...continued)
2004 (govt's renewed motion), exh. A.

3.   Id., exh. B (Hayes's resume).

4.   Neither party has produced a print-out of the website as it first appeared.  This description of the first version of the website is taken from Agent DeJohn's testimony at the March 1, 2004, evidentiary hearing before United States Magistrate Judge Delores Boyd.  Tr. of March 1, 2004 evidentiary hearing, pp. 10-16.

Sometime in February 2004, the website was changed.  The second version showed a picture of the scales of justice on the left side of the page below the words "we are under construction."[5]  On the right side of the page, the site displayed the statement, "Look for a new look at this very important case.  We will have photos and information on all of the courtroom participants: Defendant, Defense Attorneys, U.S. Attorneys, DEA Agents, Informants."[6]  At some point prior to the end of February, this version of the site was amended to include a picture of Carmichael and the statement, "Only public records will be published on this site.  This includes all participants, in this case, including their names, pictures, and statements."[7]

Sometime around the beginning of April 2004, the website was changed to its current format.  At the top of the site is the word "Wanted" in large, red letters, beneath which

_____

    5.   Govt's renewed motion, exh. C.

    6.   <u>Id</u>.

    7.   <u>Id</u>.

are the words "Information on these Informants and Agents."[8]
Underneath this header are eight boxes, each containing the
name of a witness or agent involved in the case and, in
parentheses, the word "Agent" or "Informant."[9]  The four
"informants" listed are Denton, Gorege, Sherry D. Pettis,
and Walace Salery.[10]  The four "agents" listed are DeJohn,
Halasz, Devin Whittle, and Robert Greenwood.[11]  As the site
appeared on April 27, 2004, three of the eight boxes
contained pictures of the named individuals; the individuals
pictured were Denton, Pettis, and George.[12]  Currently, a
fourth "informant"--Salery--is pictured as well.[13]  In the

---

8.  <u>See</u> govt's renewed motion, exhs. D-G.

9.  <u>See id</u>.

10.  <u>See id</u>.

11.  <u>See id</u>.

12.  Govt's renewed motion, exh. G.

13.  Carmichael's response in opposition, etc., filed
May 12, 2004 (Carmichael's response), exh. 1.

boxes without pictures, the words "Picture Coming" appear in parentheses.[14]

Beneath the eight boxes, this statement appears: "If you have any information about these informants and agents, regardless of how insignificant you may feel it is, Please contact"; the statement is followed by a list of Carmichael's attorneys and their telephone numbers.[15] At one point, only one of Carmichael's attorneys was listed.[16] Currently, four of his attorneys are listed.[17]

This latest version of the site was modified in the middle of April to include, at the bottom of the page, the following language:

> "This website, or any posters and advertisements concerning the Carmichael Case, is definitely not an attempt to intimidate or harass any informants or agents, but is simply an attempt to seek

---

14. See id.

15. See id.

16. See govt's renewed motion, exh. E.

17. See Carmichael's response, exh. 1.

8

information.  The Carmichael Case will not
be a '<u>closed door</u>' case.

"Pictures (when available), names and
testimonies of informants, agents and
witnesses will be on television, on the
web site, on the radio and published in
newspapers.  Carmichael maintains his
innocence, and wants the public to know
all the facts as well as the participants
in this case."[18]

This disclaimer was removed around the end of April.[19]  The
current version of the website, however, now contains a
similarly worded disclaimer.[20]  The current version is
attached as an appendix to this order.

It also came to the court's attention that the content
of the website has appeared at least once as a full-page
newspaper advertisement in a local weekly newspaper, the
Montgomery Westside Weekly.[21]  The advertisement is an exact
reproduction of the website as it existed as of April 27,

_____

18. Govt's renewed motion, exh. F.

19. <u>See</u> <u>id</u>., exh. G.

20. <u>See</u> Carmichael's response, exh. 1.

21. <u>See</u> Order, filed May 7, 2004.

9

2004. The advertisement also includes the internet address for the website. Hayes, the apparent creator of the www.carmichaelcase.com website, works for the Westside Weekly.[22]

### C.  The Government's First Motion for a Protective Order

The government first filed a motion for a protective order on February 4, 2004.[23] The government sought an order restricting Carmichael from posting on his website "[s]tatements concerning the identity, testimony or credibility of prospective witnesses, including informants," "[t]he names, addresses and any other personal information regarding the informants, U.S. Attorneys' [sic], or law enforcement officials involved in this case," "[o]bservations about a prospective witness, informant, U.S. Attorney or law enforcement official's character or

---

22. Govt's renewed motion, exh. B.

23. Motion for a protective order, filed February 4, 2004.

10

activities," and "[s]tatements concerning evidence or
arguments in this case, whether or not it is anticipated
that such evidence or argument will be used at trial."[24] The
government modified its request slightly during a March 1,
2004, evidentiary hearing to limit Carmichael to posting
information already in the record and barring him from
posting photographs or addresses of any trial participant.[25]

The government's original motion cited 18 U.S.C.A.
§ 1514 as authority for the court to issue a protective
order.  Section 1514(b)(1) provides:

> "A United States district court, upon
> motion of the attorney for the Government,
> shall issue a protective order prohibiting
> harassment of a victim or witness in a
> Federal criminal case if the court, after
> a hearing, finds by a preponderance of the
> evidence that harassment of an identified
> victim or witness in a Federal criminal
> case exists or that such order is
> necessary to prevent and restrain an
> offense under section 1512 of this title,
> other than an offense consisting of

---

24. _Id_. at 5.

25. Tr. of March 1, 2004 evidentiary hearing, pp. 65-
66.

11

misleading conduct, or under section 1513
of this title."

Specifically, the government argued that a protective order
under § 1514 was needed to prevent a violation of 18
U.S.C.A. § 1512(b)(1), which provides:

> "Whoever knowingly uses intimidation,
> threatens, or corruptly persuades another
> person, or attempts to do so, or engages
> in misleading conduct toward another
> person, with intent to--influence, delay,
> or prevent the testimony of any person in
> an official proceeding ... shall be fined
> under this title or imprisoned not more
> than ten years, or both."

United States Magistrate Judge Delores Boyd held an
evidentiary hearing on the government's first motion on
March 1, 2004.   The government presented two witnesses in
support of its motion.   DEA Agent DeJohn testified that he
became aware of the website when Pettis called him in
January 2004.   DeJohn testified that Pettis sounded nervous
and upset on the telephone.   The government's second witness
was DEA Agent Whittle, who testified that, based on his
experience, the website could have several consequences
harmful to law enforcement: (1) the site could increase the

12

possibility that witnesses could be retaliated against or intimidated; (2) the site could hinder the government in getting additional witnesses to come forward; and (3) if the site posted photographs of law-enforcement agents, it could hinder their ability to work undercover, and it would increase the possibility that those agents would be retaliated against or harassed.

Judge Boyd denied the government's first motion for the reason that the government did not present sufficient evidence to meet § 1514(b)(1)'s requirements.  First, the magistrate judge noted that the statute authorizes the court to issue a protective order to prevent "harassment of an identified victim or witness."  However, she found that there was no evidence presented of harassment, defined by the statute as "a course of conduct directed at a specific person that (A) causes substantial emotional distress in such person; and (B) serves no legitimate purpose."  18 U.S.C.A. § 1514(c).

13

Second, Judge Boyd found that there was insufficient evidence for the court to act under § 1514(b)(1)'s second prong. The statute authorizes the court to act to "prevent and restrain an offense under" § 1512(b)(1), but the magistrate judge found that there was not enough evidence to find the required "intent to ... influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C.A. § 1512(b)(1). Judge Boyd found that the website itself (only the second version was before her) did not evidence the required intent, and she found that the following statement on the web-page could be reasonably construed as negating any criminal intent: "Only public records will be published on this site. This includes all participants, in this case, including their names, pictures, and statements."

Judge Boyd did note her concerns about the website. She observed that the planned "website publication of photos and information on the prosecuting attorneys appears

14

particularly unsound and otherwise inappropriate."[26]   She
also noted that "[t]he DEA agents who testified provided
good, sound, logical, and even compelling reasons for
limiting dissemination of photographs and addresses of
informants, other witnesses, and agents involved in
narcotics cases."[27]   In the end, however, the magistrate
judge held that the government had not presented sufficient
evidence for the court to act under § 1514(b).

The government did not appeal Judge Boyd's ruling to the
district judge.


####     D.   The Government's Renewed Motion for a
Protective Order

With the appearance of the third version of Carmichael's
website, the government renewed its motion for a protective
order; the renewed motion is being presented directly to a
district judge rather than to Judge Boyd.  The government
seeks "a protective order that directs Defendant to remove

-----------------

26.  Order, filed March 8, 2004, p. 9.

27.  Id.

his case-related web page from the internet due to its intimidating and obstructive content."[28]   In its current motion, the government cites as the court's authority to issue such an order not only § 1514 but also "the Court's inherent authority to control actions of parties, attorneys, and witnesses that impact proceedings before the Court."[29]

In support of its renewed motion, the government has filed DEA reports regarding conversations DEA Agent Whittle has had with Pettis and Denton.  According to the reports, both Pettis and Denton expressed concern to Agent Whittle about their safety.  In addition, the government's motion includes references to (1) an incident almost five years ago involving one of Carmichael's attorneys; (2) a threatening remark reportedly made several years ago by Carmichael about a possible witness against him in an unrelated matter; and (3) co-defendant Williams's statement to the effect that his children will be killed if he testifies in this case.

_____

28.  Govt's renewed motion at 1.

29.  Id.

16

This court held an evidentiary hearing in this matter on
May 21, 2004, and the government offered several witnesses.
Greg Borland, a supervising DEA agent, testified that if
photographs of agents were put up on the site, it could
compromise the agents' ability to work undercover and put
them in peril and that the website could make it less likely
that witnesses will come forward in this case.   Agent
Borland made clear that he is concerned with the use of
photographs on the website, the site's format, and the broad
availability of the website.   Borland testified that the use
of the terms 'wanted' and 'informant' is threatening.
'Informant,' Borland testified, has a bad connotation among
criminals and is considered equivalent to 'snitch.'

The government also offered the testimony of two of its
witnesses pictured on www.carmichaelcase.com.   Pettis
testified that she has known Carmichael since 1994 but that
she knows of nothing illegal done by Carmichael.   She
testified that the website has made her fearful of what
people might do to her and that she has left Alabama because

17

of her uncertainty; she did not specify who the people are who worry her.  Pettis testified on cross-examination that she has not received any threats from Carmichael and that she decided on her own to leave Alabama.  She also testified that she had received threatening words; again, she did not specify from whom she had received these words.

Denton testified that the website's appearance--and the newspaper advertisement reproducing the website--has changed his life dramatically.  He testified that he is scared to let his children leave his house and that someone approached him in a restaurant and told him that Carmichael was trying to get him killed.  Much of Denton's testimony concerned the appearance of his name and address in newspaper articles in the Montgomery Westside Weekly and the Montgomery-Tuskegee Times.

The government offered witnesses who testified about two of the incidents referred to in its motion.  DEA Agent Greenwood testified to the statement made by Carmichael's co-defendant Williams that he could not cooperate because,

18

if he did, his children would be killed.  DEA Agent J.W.
Barnes testified that, in 1997, Carmichael paid the bond for
a woman arrested in Mississippi while driving a truck
containing 200 pounds of marijuana.  According to Barnes,
the bondsman told him that Carmichael had called his
secretary to ask if he would get his money back if the woman
were dead.

Finally, the government offered the testimony of DEA
Agent DeJohn to show that an atmosphere of intimidation
surrounds this case.[30]  DeJohn testified to three witnesses
who initially agreed to testify and then decided not to
testify.  Each of the three witnesses informed the
government of his or her decision not to testify after the
website was put on the internet; none of the witnesses
mentioned the webs-site as his or her reason for deciding
not to testify.

_____

30. DeJohn provided additional testimony in a
deposition taken several days after the court's May 21,
2004, hearing.

19

Carmichael has moved to strike the three references to events unrelated to the website in the government's renewed motion.[31]  In addition, Carmichael argues that any protective order would infringe his right to free speech under the First Amendment and his right to present his defense under the Fifth and Sixth Amendments; that the court does not have the inherent authority to issue the proposed protective order; and that the government has not met the evidentiary requirements of § 1514.

Carmichael called one witness at the May 21 evidentiary hearing: Dr. Mark Hickson, a professor of communications at the University of Alabama at Birmingham.  Hickson testified that he did not see anything harassing or intimidating about the website, and he characterized the use of the 'wanted poster' format as an attention-getting technique.

---

31.  Carmichael's response at 1-4.

## II.   OBJECTIONS TO EVIDENCE

Carmichael has moved to strike three sections of the government's motion.  This court generally treats motions to strike as notice of the moving party's objection to the evidence.  See, e.g., Norman v. Southern Guar. Ins. Co., 191 F. Supp. 2d 1321, 1328 (M.D. Ala. 2002) (Thompson, J.).  The court thus construes Carmichael's motion as an objection to the relevance of three issues raised in the government's motion.

Carmichael first objects to what he characterizes as an unethical attack on one of his attorneys, Stephen R. Glassroth.  To lay out the bizarre factual background to this dispute and to describe the contentions of the two sides would be to accord the issue far more significance than it warrants.  Suffice it to say that Glassroth's conduct in a case involving a different defendant nearly five years ago is not relevant to this matter.

Carmichael next objects to the government's assertion that, in the past, he has suggested that a potential witness

against him might be killed. In its motion, the government

recounts how an employee of Carmichael's trucking company

was arrested in 1997 while driving a truck containing 200

pounds of marijuana and how Carmichael paid the employee's

bond. The government's motion then claims that "[a]fter

paying for the bond, [Carmichael] called the bail bondsman,

spoke to a clerical worker, and asked if he would get his

money back if the [employee] were killed after being

released from jail."[32] Carmichael objects that the

government has mis-characterized this event.

The court makes the following observation about the

government's claim. First, the DEA report from which the

government draws its facts does not actually state that

Carmichael asked the bondsman whether he would get his money

back if his employee "were killed"; rather, the report

states that Carmichael "asked what would happen if [the

employee] was dead."[33] Agent Barnes testified similarly at

_____

32. Govt's renewed motion at 8.

33. United States' Notice of Clarification, filed April

(continued...)

22

the hearing. Second, Carmichael's comment is being introduced via triple hearsay: Barnes heard from the bail bondsman that his secretary told him that Carmichael asked her about what would happen if his employee were dead. The court has serious concerns about the probative value, let alone reliability, of such testimony. Third, the DEA report reveals that before Carmichael asked if he would get his money back if his employee were dead, he asked whether he would get his money back if the employee disappeared. Read in context, Carmichael's actual question is susceptible to a number of interpretations. Viewed in the worst light, his question suggests that he was considering the economic cost of murdering his employee. Viewed in the most innocent light, Carmichael was merely asking a series of hypothetical questions about the conditions under which he would get his money back. The court will duly weigh these considerations in considering the government's evidence.

_____

33. (...continued)
28, 2004, Exh. 3, Drug Enforcement Administration Report of Investigation, p. 2.

Finally, Carmichael takes issue with the government's statement that co-defendant Williams has been threatened to prevent him from testifying.  In its motion, the government notes that Williams told Agent Halasz "that if he 'named names' his children would be killed."[34]  From this statement, the government concludes that Williams was clearly threatened.  Carmichael points out that Williams's statement is not conclusive evidence that a threat was actually made against Williams and, if so, that there is no evidence that he was the one who threatened Williams.  Agent Greenwood's testimony confirms that Williams did not say by whom he had been threatened.  Carmichael's objections are noted.

### III.  DISCUSSION

The government's renewed motion for a protective order presents the court with a conflict between the government's interest in protecting its witnesses and agents involved in a criminal investigation and Carmichael's right to speak

_____

34. Govt's renewed motion, Exh. J, Drug Enforcement Administration Report of Investigation, p. 1.

about his case and prepare his defense.  The government's
motion raises three specific questions.  First, what is the
nature of the court's authority to issue the protective
order sought by the government?  Second, would the
protective order sought by the government impermissibly
infringe Carmichael's First Amendment right to freedom of
speech?  Third, would the order infringe Carmichael's Fifth
and Sixth Amendment right to prepare and present a defense
in this case?

### A.   The Court's Authority to Issue
the Protective Order

The court has the authority, under appropriate
circumstances, to issue a protective order that would direct
a defendant to remove a website from the internet so as to
protect the government's witnesses and agents from threats
or intimidation.  The court's authority derives from the
United States Code, 18 U.S.C.A. § 1514(b)(1), and from its
inherent authority, United States v. Noriega, 917 F.2d 1543,

25

1548 (11th Cir. 1990); <u>United States v. Gurney</u>, 558 F.2d 1202, 1209-1210 (5th Cir. 1977).[35]

The court's statutory authority is both based on, and limited by, the terms of § 1514(b)(1). Under this provision, which is set forth in full above, the court can issue a protective order if the government proves by a preponderance of the evidence either (1) that "harassment of an identified victim or witness ... exists" or (2) "that such order is necessary to prevent and restrain an offense under" 18 U.S.C.A. § 1512(b)(1).[36]

To establish that "harassment ... exists," the government must prove the existence of the statutory elements of "harassment." "Harassment" is defined as "a

_____

35. In <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

36. Section 1514(b)(1) also provides that the court shall issue a protective order if it finds that "such order is necessary to prevent and restrain an offense ... under Section 1513 of [Title 18]." The government, however, has at no point raised this provision as a ground for a protective order in this case.

course of conduct directed at a specific person that causes
substantial emotional distress in such person; and serves no
legitimate purpose" and defines "course of conduct" to mean
"a series of acts over a period of time, however short,
indicating a continuity of purpose." 18 U.S.C.A. § 1514(c).
The dictionary definition of harassment similarly emphasizes
the continuing or repeated nature of the distressing
conduct. Webster's Third New International Dictionary,
Unabridged 1031 (1976) ("to vex, trouble, or annoy
<u>continually</u> or <u>chronically</u>") (emphasis added).

The www.carmichaelcase.com website is not harassment as
defined by the statute. While the website's continuous
presence on the internet could arguably be equivalent to "a
series of acts over a period of time," 18 U.S.C.A.
§ 1514(c)(2), the court cannot find that the website "serves
no legitimate purpose." § 1514(c)(1)(B). It may be that
the website only barely advances a legitimate purpose, but
it cannot be said that it advances "no legitimate purpose."
Accordingly, the court finds that a protective order is not

27

warranted under the "harassment" prong of § 1514(b)(1)
because the elements of the statute are not met here.[37]

Therefore, if the court is going to rely on § 1514, it
must find that a protective order is necessary to prevent a
violation of § 1512(b)(1).  To establish a violation of §
1512(b)(1), which is set forth in part above, the government
must prove (1) that Carmichael knowingly intimidated or
threatened another person and (2) that he did so with the
intent to "influence, delay, or prevent" that person's
testimony.  See United States v. Lara, 181 F.3d 183, 200
(1st Cir. 1999); United States v. Gabriel, 125 F.3d 89, 104
(2d Cir. 1997); United States v. Johnson, 903 F.2d 1084,
1087 (7th Cir. 1990).[38]

---

37. Even if the government established that the
statutory definition of "harassment" were met here, the
court would still deny the government's motion on the ground
that Carmichael's Fifth and Sixth Amendment right  to
investigate his case by using the website outweighs the
government's interest in protecting witnesses and agents
from harassment.  See infra at pp. 99-108.

38. The government argues that it should not be
required to prove the intent element or that it should be
held to a lower standard of proof with respect to the intent
(continued...)

28

The court's authority to act under § 1512 is, of course, cabined by the United States Constitution. "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245, 122 S.Ct. 1389, 1399 (2002); see also NAACP v. Claiborne Hardware Co., 458

---

38. (...continued)
element.  The government's contention is that, while a rigorous examination of intent is appropriate in a criminal prosecution under § 1512, the court should focus on the effect of the defendant's conduct when applying § 1512 in connection with a motion under § 1514, because § 1514 is preventive.

The court ultimately does not reach § 1512's intent requirement, but it is not persuaded by the government's argument.  First, the court cannot see its way around the plain language of § 1512.  Section 1514 authorizes the court to act to prevent a violation of § 1512, which in turn requires the government to show that it is the defendant's intent to "influence, delay, or prevent the testimony of any person in an official proceeding."  Second, to the extent that the government argues that a lower evidentiary standard should apply because an action under § 1514 is preventive, § 1514 already accounts for that concern by specifying that the government need only show a violation of § 1512 by a preponderance of the evidence.  Finally, the intent requirement in § 1512 serves the important purpose of reining in the statute's potentially unconstitutional breadth.  See United States v. Tyler, 281 F.3d 84, 91 (3d Cir. 2002); United States v. Kelly, 91 F. Supp. 2d 580, 582 (S.D.N.Y. 2000).

29

U.S. 886, 907, 102 S.Ct. 3409, 3422 (1982).  Thus, the court

may limit or shut down Carmichael's website on the ground

that it is a threat under § 1512 only if the site is a

constitutionally unprotected 'true threat' and not protected

speech.  Watts v. United States, 394 U.S. 705, 707, 89 S.Ct.

1399, 1401 (1969) (per curiam) ("What is a threat must be

distinguished from what is constitutionally protected

speech."); United States v. Callahan, 702 F.2d 964, 966

(11th Cir. 1983).  The court's authority under § 1512 is

also limited by Carmichael's Fifth and Sixth Amendment

rights to gather evidence and prepare his defense.  See

United States v. Valenzuela-Bernal, 458 U.S. 858, 873, 102

S.Ct. 3440, 3449 (1982).

    The court's inherent authority or discretion to regulate

the actions of trial participants is similarly limited by

the constitutional rights of the parties.  In Gurney, upon

which the government relies, the United States Court of

Appeals for the Eleventh Circuit's strong language about a

court's authority to restrict trial participants "despite

30

the fact that such restrictions might affect First Amendment
considerations," 558 F.2d at 1210, is best understood as a
"more modest assertion[] to the effect that the courtroom
setting may provide justifications for placing limits on
speech that would not otherwise exist in the general
marketplace." 1 Rodney A. Smolla <u>Smolla & Nimmer on Freedom
of Speech</u> § 15:42 (2004). Thus, if the website is protected
speech, the court can issue the protective order only if the
government proves that its interest in protecting its
witnesses and agents outweigh's Carmichael's free-speech
interest. <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539,
562, 96 S.Ct. 2791, 2804 (1976). In <u>Gurney</u>, the Fifth
Circuit explicitly recognized that the court's discretion is
bounded by the Sixth Amendment. <u>See</u> <u>Gurney</u>, 558 F.2d at
1210 ("Sixth Amendment rights of the accused must be
protected always").

Thus, before the court can act under either source of
its authority (statutory or inherent) it must consider
whether the protective order sought by the government can be

31

imposed on Carmichael consistent with the United States Constitution.  The court now turns to this inquiry.


### B.   First Amendment

Carmichael argues that the protective order sought by the government would infringe his free-speech rights under the First Amendment.[39]  The first question is whether Carmichael's website is protected speech.  Because threats are not protected by the First Amendment, the court can issue a protective order shutting the site down or otherwise restricting it if the site is a 'true threat.'  If the site is protected by the First Amendment, the court can issue the protective order sought by the government only if the government satisfies the constitutional rules for imposing prior restraints on the speech of trial participants.

---

39.  "Congress shall make no law ... abridging the freedom of speech."  U.S. Const. amend. I.

### 1.   Is the Website a 'True Threat'?

As stated, 'true threats' are not protected by the First Amendment. <u>Virginia v. Black</u>, 538 U.S. 343, 359, 123 S.Ct. 1536, 1547-48 (2003); <u>Watts v. United States</u>, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401 (1969) (per curiam). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." <u>Black</u>, 538 U.S. at 359, 123 S.Ct. at 1548. The "prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." <u>Id</u>. at 360, 123 S.Ct. at 1548 (internal quotations omitted).

<u>Watts</u> is the origin of the 'true threat' doctrine. In <u>Watts</u>, the petitioner appealed his conviction for violating 18 U.S.C.A. § 871, which prohibits any person from "knowingly and willfully ... [making] any threat to take the life of or to inflict bodily harm upon the President of the

United States." 394 U.S. at 705-05, 89 S.Ct. at 1400-01.

The basis of petitioner's conviction was a statement he made

during a 1966 anti-Vietnam War rally on the mall in

Washington: "They always holler at us to get an education.

And now I have already received my draft classification as

1-A and I have got to report for my physical this Monday

coming.  I am not going.  If they ever make me carry a rifle

the first man I want to get in my sights is L.B.J." Id. at

706, 89 S.Ct. at 1401.

The Supreme Court, per curiam, reversed on the ground

that petitioner's speech was not a threat.  After noting

that the government's valid, "even overwhelming," interest

in the life of the President, the Court wrote:

> "Nevertheless, a statute such as this one,
> which makes criminal a form of pure
> speech, must be interpreted with the
> commands of the First Amendment clearly in
> mind.   What is a threat must be
> distinguished   from   what   is
> constitutionally protected speech."

Id. at 707, 89 S.Ct. at 1401. "Against the background of a

profound national commitment to the principle that debate on

34

public issues should be uninhibited, robust, and wideopen,
and that it may well include vehement, caustic, and
sometimes unpleasantly sharp attacks on government and
public officials," the Court interpreted § 871 not to reach
"the kind of political hyperbole indulged in by petitioner."
Id. at 708, 89 S.Ct. at 1401.   The Court held that the
petitioner's speech was not a "true 'threat'" and was thus
protected by the First Amendment.

The Supreme Court has not settled on a definition of a
'true threat,' but the United States Court of Appeals for
the Eleventh Circuit has:

> "A communication is a threat when in its
> context it would have a reasonable
> tendency to create apprehension that its
> originator will act according to its
> tenor.   In other words, the inquiry is
> whether there was sufficient evidence to
> prove beyond a reasonable doubt that the
> defendant intentionally made the statement
> under such circumstances that a reasonable
> person would construe them as a serious
> expression of an intention to inflict
> bodily harm.   Thus, the offending remarks
> must be measured by an objective
> standard."

35

United States v. Alaboud, 347 F.3d 1293, 1296-97 (11th Cir.
2003) (internal citations, quotations, and alterations
omitted).  The Eleventh Circuit's objective approach accords
with that taken by the majority of the United States Courts
of Appeals.  See, e.g., United States v. Hartbarger, 148
F.3d 777, 782-83 (7th Cir. 1998); United States v. Kosma,
951 F.2d 549, 556-57 (3d Cir. 1991).

A number of factors are relevant to determine whether
speech is a threat proscribable under the First Amendment.
First, the court must consider the language itself.  See,
e.g., Watts, 394 U.S. at 708, 89 S.Ct. at 1402 (considering
the conditional nature of the threat in the petitioner's
speech).  Second, the court "must look at the context in
which the communication was made to determine if [it] would
cause a reasonable person to construe it as a serious
intention to inflict bodily harm."  Alaboud, 347 F.3d at
1297.  Third, testimony by the recipient of the
communication is relevant to determining whether it is a
threat or an act of intimidation.  Id. at 1298.

36

### a.   The Website Itself

The language of Carmichael's website does not make out a threat.   There is no explicit threat on the site, and neither the request for information nor the list of Carmichael's attorneys is threatening or intimidating.   The statement that "Mr. Carmichael maintains his innocence and wants the public to know all the facts as well as all the participants in this case" is similarly unmenacing.[40] Furthermore, the site actually disclaims any intent to threaten; the site includes the following statement at the bottom of the page: "This web site, or any posters, and advertisements concerning the Carmichael Case, is definitely not an attempt to intimidate or harass any informants or agents, but is simply an attempt to seek information."[41] Indeed, these elements make the site appear to be just what Carmichael maintains it is: another way of gathering information to prepare his defense.

---

40.  Carmichael's response, exh. 1.

41.  Id.

It is instructive to compare this case to another case involving a 'wanted poster.'  In <u>United States v. Khorrami</u>, 895 F.2d 1186, 1189 (7th Cir. 1990), the court affirmed the defendant's conviction for violating 18 U.S.C.A. § 876, which prohibits the mailing of threatening communications. Khorrami mailed to the Jewish National Fund, a non-profit organization that raises money for public projects in Israel, a "poster-like paper that state[d] at its top 'Wanted for crimes against humanity and Palestinians for fifty years.'"  895 F.2d at 1189.  The poster featured photographs of then-current Israeli political figures including Yitzhak Shamir and Shimon Peres along with the Israeli President and the mayors of Jerusalem and Tel Aviv, and it also included photographs of the president, executive vice-president, and director of communications of the Jewish National Fund.  <u>Id</u>.  The photographs were disfigured with swastikas and epithets, and the statements "His blood need," "Must be killed," and "Execute now!" were written next to some of the photographs.  <u>Id</u>.  In addition to mailing the

38

'wanted poster,' Khorrami repeatedly called the Jewish National Fund over a six-month period and left obscene and threatening telephone messages, and he sent another threatening letter to the fund.  <u>Id</u>. at 1188-90.  Applying the same test as the Eleventh Circuit for threats, the <u>Khorrami</u> court held that, in light of the defendant's other actions, "there was more than sufficient evidence to support the jury's conclusion that [the defendant's] 'wanted poster' constituted a 'true threat.'"  <u>Id</u>. at 1193.

Carmichael's website is not nearly as threatening as the 'wanted poster' in <u>Khorrami</u>.  The www.carmicahaelcase.com site contains no references to killing, execution, or blood; the photographs on the site are not disfigured, and no epithets appear on the site; nor is there anything on the website otherwise comparable to such references and epithets.  Moreover, there is no evidence that Carmichael has called the individuals featured on his site, nor is there evidence that he has sent them threatening letters.

It is true that the term 'informant,' by which the

www.carmichaelcase.com site refers to four government

witnesses in this case, generally carries a negative

connotation.   The first sentence of a recent law review

article nicely summarizes the word's connotation:

> "To mobsters, he is a 'rat'; to drug
> dealers, a 'snitch.' To school children,
> he is a 'tattletale'; to corporate
> executives, a 'whistle-blower.' To cops,
> he is an 'informant'; to prosecutors, a
> 'cooperator.'  By whatever name he is
> known, the person who betrays his
> associates to the authorities is almost
> universally reviled.   In movies, on
> television, in literature, the cooperator
> embodies all that society holds in
> contempt: he is disloyal, deceitful,
> greedy, selfish, and weak."

Michael A. Simons, Retribution for Rats: Cooperation,

Punishment, and Atonement, 56 Vand. L. Rev. 1, 2 (2003).

DEA Agent Borland testified similarly that 'informant' is

equivalent to the derogatory term 'snitch,' and even

Carmichael's counsel admitted during this court's hearing

that 'informant' is more than just a synonym for 'witness.'

The First Amendment, however, does not prohibit name-calling.  The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks" as well as language that is "vituperative, abusive, and inexact."  Watts, 394 U.S. at 708, 89 S.Ct. at 1401-02.  Further, the First Amendment protects such speech even when it is designed to embarrass or otherwise coerce another into action.  NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 102 S.Ct. 3409, 3424 (1982). Thus, "threats of vilification or social ostracism" are protected by the First Amendment and outside the reach of § 1512.  Id.  It is only when speech crosses the line separating insults from 'true threats' that it loses its First Amendment protection.  The court cannot find that the www.carmichaelcase.com site--standing alone--crosses that line.

### b.  Context

The court must also consider the context in which the website operates in order to determine whether the

reasonable viewer would see it as a threat.   <u>Alaboud</u>, 347

F.3d at 1297.   The importance of context is vividly

illustrated by two cases arising under the Freedom of Access

to Clinics Entrances Act (FACE), 18 U.S.C.A. § 248.   FACE

provides criminal penalties for

>"[w]hoever by force or threat of force or
>by physical obstruction, intentionally
>injures, intimidates or interferes with or
>attempts to injure, intimidate or
>interfere with any person because that
>person is or has been, or in order to
>intimidate such person or any other person
>or any class of persons from, obtaining or
>providing reproductive health services."

18 U.S.C.A. § 248(a)(1).   FACE also provides for a private

right of action for "[a]ny person aggrieved by reason of the

conduct prohibited by subsection (a)."   18 U.S.C.A.

§ 248(c)(1)(A).   These two cases are helpful because they

involve statements which surely lie at the outside edge of

the definition of 'true threats.'

     In <u>Planned Parenthood of the Columbia/Willamette, Inc.

v. American Coalition of Life Activists</u>, 290 F.3d 1058 (9th

Cir. 2002) (en banc), four doctors who provide abortions--

Drs. Hern, Crist, Elizabeth Newhall, and James Newhall--and
two abortion clinics brought a lawsuit under FACE's private
cause-of-action provision against the American Coalition of
Life Activists, Advocates of Life Ministries, and a number
of individuals associated with these two groups.   The
plaintiffs' claim was that two posters and an internet
website produced by the defendants constituted "threat[s] of
force" under FACE.   A jury found for the plaintiffs and
awarded them substantial damages, including nearly $80
million in punitive damages.   290 F.3d at 1066 n.4.   The
trial court also permanently enjoined the defendants from
publishing or distributing its posters and from providing
material to the website.   Id. at 1066.   On appeal, the
defendants argued that the posters and website were not
'true threats' and were thus protected by the First
Amendment.

Like the www.carmichaelcase.com website, neither the
posters nor the website in Planned Parenthood expressly
threatened the plaintiffs.   The first poster, published in

43

January 1995, was captioned "GUILTY," beneath which were the
words "OF CRIMES AGAINST HUMANITY."  Under the heading "THE
DEADLY DOZEN," the poster identified 13 doctors, including
three of the plaintiffs, and listed their home addresses.
290 F.3d at 1064-65.  At the bottom, the poster bore the
legend "ABORTIONIST" in large, bold typeface.  Id. at 1065.
The second poster, released in August 1995, identified one
of the plaintiff doctors and bore the word "GUILTY" in large
bold letters at the top followed by the words "OF CRIMES
AGAINST HUMANITY."  Id.  The poster gave the doctor's home
and work address, and it also bore the legend "ABORTIONIST"
in large bold type at the bottom.  Id.

The website at issue was put up on the internet in
January 1997.  Id.  It was called the "Nuremberg Files" in
reference to the location of the post-World War II Nazi war
crimes trial, and it listed information on abortion-
providers, judges and politicians, and prominent abortion-
rights supporters.  Id.  The website listed the names of
approximately 400 individuals and provided the following

44

legend to interpret the font in which each name was listed:
"Black font (working); Greyed-out Name (wounded);
Strikethrough (fatality)." Id. The names of three abortion
providers who had been murdered between March 1993 and July
1994--Drs. Gunn, Patterson, and Britton--were struck
through. Id.

Applying roughly the same standard for determining when
speech is a threat that the Eleventh Circuit applies, the
United States Court of Appeals for the Ninth Circuit,
sitting en banc, held that the two posters and the
"Nuremberg Files" website constituted 'true threats' and
affirmed the jury's verdict in favor of the plaintiffs. Id.
at 1085-86. The court's reasoning was based on the history
of violence directed against abortion-providers prior to the
defendants' creation of the posters and the website. Id. at
1079, 1085-86. The court described how in the two years
prior to January 1995, when the defendants produced the
first poster, three abortion providers--Drs. Gunn,
Patterson, and Britton--were killed after they appeared on

45

similar posters which gave information about them and bore headings like "WANTED" and "unWANTED." The court described its reasoning this way:

> "[I]t is use of the 'wanted'-type format in the context of the poster pattern--poster followed by murder--that constitutes the threat. Because of the pattern, a 'wanted'-type poster naming a specific doctor who provides abortions was perceived by physicians, who are providers of reproductive health services, as a serious threat of death or bodily harm. After a 'WANTED' poster on Dr. David Gunn appeared, he was shot and killed. After a 'WANTED' poster on Dr. George Patterson appeared, he was shot and killed. After a 'WANTED' poster on Dr. John Britton appeared, he was shot and killed. None of these 'WANTED' posters contained threatening language, either. Neither did they identify who would pull the trigger. But knowing this pattern, knowing that unlawful action had followed 'WANTED' posters on Gunn, Patterson and Britton, and knowing that 'wanted'-type posters were intimidating and caused fear of serious harm to those named on them, ACLA published a 'GUILTY' poster in essentially the same format on Dr. Crist and a Deadly Dozen 'GUILTY' poster in similar format naming Dr. Hern, Dr. Elizabeth Newhall and Dr. James Newhall because they perform abortions. Physicians could well believe that ACLA would make good on the threat. One of the other doctors on the Deadly

46

> Dozen poster had in fact been shot before
> the poster was published.  ...  In the
> context of the poster pattern, the posters
> were precise in their meaning to those in
> the relevant community of reproductive
> health service providers.  They were a
> true threat."

Id. at 1085.  Thus, even though the defendants were

responsible neither for the earlier 'wanted posters' nor the

earlier killings, the context created by those posters and

killings gave the defendants' posters and website a

threatening meaning.

The present case is obviously different because

Carmichael's website was not put up in the context of a

recent string of murders linked to similar publications.

The crucial circumstance for the court in Planned Parenthood

was the pattern of posters followed by murders that pre-

dated the defendants' publication of their posters.  The

analogous situation in this case would be if there were a

history of witnesses or government agents being threatened

or killed after the release of 'wanted-style' posters on

which they were pictured.  Such a pattern does not exist

47

here, so the case that www.carmichaelcase.com is a threat is not in any way as strong as that in Planned Parenthood.

This case is not totally dissimilar from Planned Parenthood, however. Just as the court in Planned Parenthood considered the history of violence against abortion providers, this court considers the history of violence committed against informants in drug-distribution cases generally. A brief search of recent reported decisions in the Federal Reporter reveals numerous cases involving the murder of informants in drug-conspiracy cases. See, e.g., United States v. Waggoner, 339 F.3d 915, 916 (9th Cir. 2003) (DEA informant murdered by defendant's friends); United States v. Gadson, 74 Fed. Appx. 245, 247-248 (4th Cir. 2003) (informant who provided evidence that led to seizure of drug shipment murdered by drug defendant); United States v. Bryce, 287 F.3d 249, 252 (2d Cir. 2002) (confidential informant who assisted investigation of drug conspiracy investigation murdered); United States v. Thompson, 286 F.3d 950, 956 (7th Cir. 2002) (informant in