drug conspiracy case murdered).  This is the broad context in which Carmichael's site exists.

The facts of the present case are similar to those in the cases cited above.  Carmichael is accused of heading a far-flung, long-running drug-distribution conspiracy. Denton and George--two of the 'informants' pictured on the site--have admitted to involvement in such a drug conspiracy, and marijuana and firearms have already been seized in this case.  <u>United States v. Williams</u>, Crim. Action No. 2:03cr259-T, 2004 WL 936340, at *1-3 (M.D. Ala. Apr. 8, 2004) (Thompson, J.) (describing results of search of co-defendant Williams's residence).[42]

---

42. Statements at the court's hearing reveal that Carmichael himself is a convicted murderer. These statements, however, also revealed that Carmichael was subsequently pardoned and had his civil rights restored. No evidence was presented regarding the murder for which Carmichael was convicted, that is, whether it was drug-related or had nothing to do with drugs at all, and no evidence was presented regarding his pardon. The court is thus reluctant to rely heavily on Carmichael's murder conviction in its analysis given the almost complete lack of facts in the record.

Viewed in light of the general history of informants being killed in drug conspiracy cases and the evidence of a drug-conspiracy and other criminal activity in this case, www.carmichaelcase.com looks more like a threat.  Indeed it may be that it is <u>only</u> this context that gives the site a threatening meaning.  To illustrate how much of the website's threatening meaning is derived from the factual context of this case, imagine the same website put up by a defendant in a securities-fraud case.  In the context of a white-collar crime prosecution, the same site might be an annoyance, but, absent other circumstances, it would be nearly impossible to conclude that it is a threat.

Nevertheless, it is important to recall that the inquiry here is whether a reasonable person would view Carmichael's <u>website</u> as "a serious expression of an intention to inflict bodily harm," <u>Alaboud</u>, 347 F.3d 1293 at 1297, not whether the site calls to mind other cases in which harm has come to government informants, not whether it would be reasonable to think that Carmichael would threaten an informant, and not

whether Carmichael himself is somehow threatening.  Context can help explain the website's meaning, but it is the website that is the focus of the court's inquiry.  Although the broad social context makes the case closer, the background facts described above are too general to make the Carmichael case site a 'true threat.'

Neither is the government's evidence offered to show that an atmosphere of intimidation exists enough to conclude that Carmichael's site is a threat.  If the court had solid evidence that Carmichael had threatened other witnesses in an unambiguous way, that might create a context in which the court could conclude that his website is reasonably construed as a threat.  However, the government's evidence is not solid.  The court has already expressed its reservations about the government's evidence regarding Carmichael's alleged threatening remark to the Mississippi bail bondsman's secretary and Williams's alleged statement that his children would be killed if he cooperated with the government.  Agent DeJohn's testimony establishes that three

51

potential witnesses who had previously agreed to help the
government--Sandra Jones, Shermaine German, and Moses
Williams--subsequently decided not to cooperate, and there
is some evidence that Carmichael threatened Jones. However,
there is no evidence that anyone--much less Carmichael--
threatened German, and the only evidence that anyone
threatened Williams is his statement to government agents
that he was not going let them get him "fucked up."[43]  Again,
the evidence of an atmosphere of general intimidation is not
enough to find that the website is a 'true threat.'

Context was also the determinative factor in <u>United
States v. Hart</u>, 212 F.3d 1067 (8th Cir. 2000), in which the
United States Court of Appeals for the Eighth Circuit upheld
the defendant's criminal conviction under FACE.  Hart, "a
self-declared anti-abortion activist," rented two Ryder
trucks and parked them in the driveways of two abortion
clinics in Little Rock, Arkansas.  212 F.2d at 1069.  The
court described what happened the next day:

---

43.  Deposition of Raymond David DeJohn, p. 17.

> "[E]mployees arriving at the clinics were
> alarmed by the presence of the trucks.
> Reminded of the catastrophic 1995 bombing
> of a federal office building in Oklahoma
> City, Oklahoma, involving a Ryder truck,
> employees of the clinics feared that the
> trucks contained bombs.  They immediately
> left the buildings and notified the
> police.  At each clinic, the area was
> evacuated, and a bomb squad was called in
> to investigate.  The authorities
> determined, however, that the trucks
> contained no explosive materials."

Id. at 1069-70.  Hart was indicted on two counts of violating FACE and was convicted by a jury.  Id. at 1070.

The Eighth Circuit affirmed Hart's conviction over his argument that "individual cultural inferences and speculation regarding the meaning of the placement of the Ryder trucks and their association with the Oklahoma City bombing do not suffice to render the trucks a 'threat of force.'"  Id. at 1072.  The court cited a number of factors that contributed to an atmosphere in which the Ryder trucks would seem more threatening: abortion clinics are often sites of protests and violence; "the placement of the trucks coincided with a visit to Little Rock from President

53

Clinton"; and "Hart offered no legitimate reason for leaving the trucks." Id. The court concluded that "[t]hese circumstances, coupled with the similarity to the well-known events of the Oklahoma City bombing, were reasonably interpreted by clinic staff and police officers as a threat to injury." Id. Thus, the court held that a reasonable person would interpret the Ryder trucks in Hart as a threat, not because of anything about the trucks themselves, but because historical events gave them a threatening meaning.

The present case contains an analogue to the Ryder trucks in Hart: the 'wanted poster' format. Such posters, of course, call to mind the "Wanted: Dead or Alive" posters of the old American west, and the 'wanted poster' format suggests that the individual pictured must be apprehended or punished and that some kind of reward awaits the person who carries out the apprehension or punishment. The 'wanted poster's' threatening meaning is muted on Carmichael's website by the words "Information on these Informants and Agents," but the dominant image is still the word "Wanted"

54

in large, red font at the top of the page.  Thus, just like
Hart, Carmichael has chosen a form of expression with a
historically threatening connotation.

The 'wanted poster' format is not enough like the Ryder
trucks, though, to find that Carmichael's site is a threat.
None of the other circumstances cited in <u>Hart</u>, or something
comparable to them, is present here.  Most importantly,
while Hart could offer no legitimate reason to park the
Ryder trucks where he did, Carmichael has offered a
legitimate use for his site, to solicit evidence regarding
his case.  Further, Carmichael's site explicitly explains
its legitimate purpose and disclaims any intent to threaten
or harass; no such explanation or disclaimer was present in
<u>Hart</u>.

The government's strongest argument based on context may
not be that the Carmichael site is a direct threat that he
will inflict harm on the 'informants' and 'agents,' but that
the website is meant to encourage others to inflict harm on
them.   Agent   Borland   of   the   DEA   suggested   this

55

interpretation when he testified that the website looked to him like a solicitation for others to inflict harm on the witnesses and agents.

The problem with this argument is that implicates the Supreme Court's stringent 'incitement' doctrine. Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829 (1969). Brandenburg stands for the proposition that, as a general rule, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation." Id.; see also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927, 102 S.Ct. 3409, 3433 (1982) ("mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment"). To fall outside the First Amendment's protection, advocacy of violence must be "directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action." Brandenburg, 395 U.S. at 447, 89 S.Ct. at 1829. There is no evidence that Carmichael's site meets the imminency

56

requirement of <u>Brandenburg</u>.  Indeed, in <u>Planned Parenthood</u>,

Judge Kozinski in dissent noted that there was so little

chance of proving that the posters and website in that case

met the imminency requirement in <u>Brandenburg</u> that the

plaintiffs did not even raise the argument.  290 F.2d at

1092 n. 5 (Kozinski, J., dissenting).  Thus, the court

cannot proscribe Carmichael's site as constitutionally

unprotected advocacy of violence.

Another case comparison is helpful here.  In <u>NAACP v. Claiborne Hardware</u>, the Supreme Court applied <u>Brandenburg</u> in

a case involving a threatening speech made in a highly

charged environment.  <u>Claiborne</u> arose out of a boycott of

white-owned business in Claiborne County, Mississippi that

began in the mid-1960s.  <u>See</u> 458 U.S. at 898-906, 102 S.Ct.

at 3418-22 (factual background).  The case reached the

Supreme Court in 1982 after the Mississippi Supreme Court

affirmed a jury verdict against organizations and

individuals involved in planning and implementing the

boycott on the basis of common-law malicious interference

with business.  Id. at 894, 102 S.Ct. at 3416.  "[T]he basis

on which the Mississippi Supreme Court held that the

[defendants] were liable for damages was the agreed use of

illegal force, violence, and threats."  Id. at 896 n.19, 102

S.Ct. at 3417 n.19.

The evidence in Claiborne showed that leaders of the

boycott used a variety of tools to urge members of the black

community to abide by the boycott.  A group of 'store

watchers' wrote down the names of persons who violated the

boycott, which list was read aloud at NAACP meetings and

published in a local newspaper.  Id. at 903-04, 102 S.Ct.

3420-21.  Furthermore, the trial court identified a number

of incidents where persons who did not comply with the

boycott were victimized; three of the incidents involved

shots being fired at the victims' houses.  Id. at 904-05,

102 S.Ct. at 3421.

One of the individuals found liable was Charles Evers,

the Field Secretary of the NAACP in Mississippi, who played

a leadership role in organizing the boycott.  Plaintiffs

urged that two speeches Evers gave in furtherance of the
boycott formed a basis for imposing liability on him.  Id.
at 926-27, 102 S.Ct. at 3433.   On April 19, 1969, Evers
delivered a speech in which he warned that individuals who
did not abide by the boycott would be "disciplined," and he
gave a speech two days later at which he said to an audience
of black residents of the county: "If we catch any of you
going in any of them racist stores, we're going to break
your damn necks."  Id. at 902, 102 S.Ct. at 3420.

Citing Brandenburg, the Supreme Court held that "Evers's
addresses did not exceed the bounds of protected speech,"
id. at 928, 102 S.Ct. at 3434, and thus he could not be held
liable because of them.  The Court wrote that, "[i]f there
were other evidence of his authorization of wrongful
conduct, the references to discipline in the speeches could
be used to corroborate that evidence.  But any such theory
fails for the simple reason that there is no evidence--apart
from the speeches themselves--that Evers authorized,

59

ratified, or directly threatened acts of violence." Id. at

929, 102 S.Ct. at 3434.

In one important respect, this case is analogous to

Claiborne. Like Evers, Carmichael has used language with a

threatening connotation, and, as with Evers, there is no

evidence that he has "authorized, ratified, or directly

threatened acts of violence." Id. If Evers's literal

threat--"If we catch any of you going in any of them racist

stores, we're going to break your damn necks," id. at 902,

102 S.Ct. at 3420--was not outside the First Amendment's

protection, it is hard to see how Carmichael's use of

language with at most only non-specific threatening

connotations could be unprotected.

Moreover, there was more evidence that Evers's speeches

were threats than that Carmichael's site is a threat. In

Claiborne, there was a history of actual acts of retaliation

committed by boycott supporters against people who did not

abide by the boycott. Such a history makes it more likely

that a reasonable reading of Evers's speeches was that they

were meant to create a fear of harm or to incite imminent violence.   Here, while there is some evidence that Carmichael may have issued <u>threats</u> in the past, there is almost no evidence of actual retaliatory <u>acts</u> against witnesses or DEA agents involved in this case, and certainly no evidence linked to Carmichael or his supporters.[44]   If Evers's speeches--containing explicit threats of physical harm and made in a context of actual acts of retaliation-- were protected by the First Amendment, then Carmichael's website should similarly be protected by the First Amendment.

A final piece of 'context' evidence relevant to determining if the www.carmichaelcase.com website is a threat is the very fact that it is a website posted on the internet.   Courts and commentators have noted the unique

_____

44. The only evidence regarding an actual act of retaliation against any witness or agent in this case came from Denton, who testified that his house was broken into shortly after he agreed to be a witness in this case. Denton interpreted the break-in as a threat.   The circumstances of the break-in may be suspicious, but there is no evidence that Carmichael had anything to do with it.

features of the internet, <u>see, e.g.</u> <u>Reno v. American Civil</u>
<u>Liberties Union</u>, 521 U.S. 844, 851, 117 S.Ct. 2329, 2334-35
(1997); Scott Hammack, <u>The Internet Loophole: Why</u>
<u>Threatening Speech On-Line Requires a Modification of the</u>
<u>Courts' Approach to True Threats and Incitement</u>, 36 Colum.
J.L. & Soc. Probs. 65, 81-86 (2002), and a number of
commentators have argued that these features make content
posted on the internet more likely to be threatening, <u>see,</u>
<u>e.g.</u>, Hammack, <u>supra</u>; Jennifer L. Brenner, <u>True Threats--A</u>
<u>More Appropriate Standard for Analyzing First Amendment</u>
<u>Protection and Free Speech When Violence is Perpetuated over</u>
<u>the Internet</u>, 78 N.D. L. Rev. 753, 763-64 (2002). In fact,
DEA Agent Borland testified at this court's hearing that one
of his concerns about Carmichael's 'wanted poster' is that
it is posted on the world-wide web.

That Carmichael's 'wanted poster' is on the internet,
however, is not enough to transform it into a 'true threat.'
First, notwithstanding the commentary cited above, the
Supreme Court has held that speech on the internet is

62

subject to no greater or lesser constitutional protection than speech in more traditional media. <u>Reno</u>, 521 U.S. at 870, 117 S.Ct. at 2344. Second, the general rule in the case law is that speech that is broadcast to a broad audience is less likely to be a 'true threat,' not more. <u>United States v. Bellrichard</u>, 994 F.2d 1318, 1321 (8th Cir. 1993) ("correspondence ... delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering"); <u>Planned Parenthood</u>, 290 F.2d at 1099 (Kozinski, J., dissenting) ("[S]tatements communicated directly to the target are much more likely to be true threats than those ... communicated as part of a public protest."). Thus, to the extent that the government's concern is that Carmichael's website will be seen by a lot of people, that fact makes the site look less like a 'true threat,' not more.

c.   Testimony of Alleged Victims

The court also considers the testimony of Denton and Pettis, both of whom are featured on the website as 'informants.' <u>Alaboud</u>, 347 F.3d at 1298. Pettis testified that Carmichael's site made her so fearful that she left Alabama, although she did not specify of whom she was afraid.  Denton testified that the site changed his life dramatically, making him afraid to let his children outside. Evidence submitted by the government indicates that Denton and Pettis reported feeling threatened to DEA Agent Devin Whittle in the beginning of April.  Pettis and Denton's testimony is certainly some evidence that the www.carmichaelcase.com website is a threat.

Testimony by government witnesses and by Pettis and Denton themselves, however, suggests that there may be other causes of Pettis and Denton's fear.  First, the government offered evidence of other potential witnesses who chose not to cooperate to show an atmosphere of intimidation surrounding this case.  To the extent that there is a

64

general atmosphere of intimidation, however, it is less likely that it is the www.carmichaelcase.com website that is worrying Denton and Pettis. Indeed it seems likely in any big drug-conspiracy case like this that witnesses would be anxious and possibly afraid. Second, Denton's testimony indicated that much of his concern is related to the appearance of his name and address in two newspaper articles which were almost completely unrelated to the website.

The court does not find Agent DeJohn's testimony about the other three witnesses--German, Williams, and Jones--to be indicative that the website is a threat. None of these three would-be witnesses said that his or her decision not to testify had anything to do with the site. There is some evidence that German felt threatened by the site; after Agent DeJohn showed him a print-out of the web-page, he reported feeling concerned, and he wrote to DeJohn the next day to say that he did not want to cooperate with the government. However, while Jones and Williams informed agents of their decision not to testify after the site was

posted, that fact is not sufficient for the court to conclude that their decisions were related to the website.

The court finds the testimony of the various DEA agents even less probative of whether the website amounts to a threat. The agents' testimony largely focused on their belief that Carmichael's website could compromise agents' safety in future investigations or compromise agents' ability to work undercover. This is not evidence that the site is a threat, however. Moreover, in considering the testimony of the DEA agents--and Pettis and Denton--the court must keep in mind that the Eleventh Circuit's standard is an objective one. Alaboud, 347 F.3d at 1296-97. Thus, the testimony of witnesses and agents pictured on the site is persuasive, but it is not determinative.

Based on all of the above factors and the evidence presented, the court holds that Carmichael's website is not a 'true threat' and is thus protected by the First Amendment.

The court adds that, while Carmichael's site is
protected, not all of its content is at the heart of the
First Amendment. To be sure, Carmichael's expressed intent
to publicize his trial and his statement of innocence
implicate weighty First Amendment concerns. See Globe
Newspaper Co. v. Superior Court, 457 U.S. 596, 605-06, 102
S.Ct. 2613, 2619-20 (1982) (describing importance of public
scrutiny of criminal trials); United States v. Ford, 830
F.2d 596, 599 (6th Cir. 1987) ("The accused has a First
Amendment right to reply publicly to the prosecutor's
charges, and the public has a right to hear that reply.")
(internal quotation omitted). Furthermore, to the extent
that Carmichael's website is a criticism of the government's
prosecution of him, it is surely core First Amendment
speech. Gentile v. State Bar of Nevada, 501 U.S. 1030,
1034, 111 S.Ct. 2720, 2724 (1991) (Kennedy, J.) ("There is
no question that speech critical of the exercise of the
State's power lies at the very center of the First
Amendment.").

67

However, other parts of the site are further from the core of the First Amendment.  Carmichael's request for information about his case, the list of his attorneys' names and telephone numbers, and the names and photographs of the witness and government agents are not political advocacy, cf. Watts, 294 U.S. at 708, 89 S.Ct. at 1401-02, and do even not speak to public affairs, cf. Claiborne, 458 U.S. at 913, 102 S.Ct. at 3425 ("expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values"), much less to "a matter of current moral and political importance." Planned Parenthood, 290 F.2d at 1102 (Berzon, J., dissenting).  The court thus finds that Carmichael's First Amendment interest is not particularly strong.

Nonetheless, speech is presumptively protected by the First Amendment.  Free Speech Coalition, 535 U.S. at 245, 122 S.Ct. at 1399.  The burden is on the government to show that Carmichael's website is within one of the narrow categories of unprotected speech.  This the government has

not done. Because the court holds that the website is not

a 'true threat,' it is outside of the reach of § 1512, and

the court cannot grant the government's motion on that

ground.

### 2.  Is the Protective Order a Valid Prior Restraint?

The fact that Carmichael's website is protected speech

does not end the court's First Amendment inquiry. Under

some circumstances, First Amendment rights must give way

during a criminal proceeding in order to preserve a fair

trial. <u>See</u> <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030,

1075, 111 S.Ct. 2720, 2745 (1991); <u>Nebraska Press Ass'n v.</u>

<u>Stuart</u>, 427 U.S. 539, 562, 96 S.Ct. 2791, 2804 (1976);

<u>Sheppard v. Maxwell</u>, 384 U.S. 333, 350-51, 86 S.Ct. 1507,

1516 (1966). To determine whether Carmichael's speech may

be restricted, the court must answer two questions. First,

what is the appropriate legal standard against which to

evaluate the government's proposed protective order?

69

Second, under that standard, is the protective order
warranted?

### a.  Legal Standard

The government asks this court to impose "a protective
order that directs Defendant to remove his case-related web
page from the internet due to its intimidating and
obstructive content."[45]  The government has suggested that it
would be satisfied with an order limiting Carmichael to
posting information already in the record and prohibiting
him from posting photographs or personal information about
witnesses and agents.

"An order that prohibits the utterance or publication of
particular information or commentary imposes a 'prior
restraint' on speech."  United States v. Salameh, 992 F.2d
445, 446 (2d Cir. 1993).  More specifically, a trial court's
order that prohibits or limits the speech of lawyers or
parties before the court, a so-called 'gag order,' is a

---

45.  Govt's renewed motion at 1.

prior restraint.  <u>See, e.g.</u>, <u>United States v. Brown</u>, 218
F.3d 415, 424 (5th Cir. 2000) (order prohibiting parties,
lawyers, and potential witnesses from making extrajudicial
statements to media treated as prior restraint); <u>Levine v.
United States District Court</u>, 764 F.2d 590, 595 (9th Cir.
1985).  Because the protective order sought by the
government would prohibit Carmichael from publishing
particular content on his website, the court treats the
proposed order as a prior restraint.

"[P]rior restraints on speech and publication are the
most serious and the least tolerable infringement on First
Amendment rights." <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S.
539, 559, 96 S.Ct. 2791, 2803 (1976).  Indeed, the Supreme
Court has written that "it has been generally, if not
universally, considered that it is the chief purpose of [the
First Amendment] to prevent previous restraints upon
publication."  <u>Near v. Minnesota ex rel. Olson</u>, 283 U.S.
697, 713-14, 51 S.Ct. 625, 630 (1931).  Thus, "[a]ny prior
restraint on expression comes ... with a heavy presumption

71

against its constitutional validity." <u>Organization for a</u>
<u>Better Austin v. Keefe</u>, 402 U.S. 415, 419, 91 S.Ct. 1575,
1578 (1971) (internal quotation omitted).

The exercise of First Amendment rights, however, can
sometimes imperil the administration of fair criminal
trials. "Few, if any, interests under the Constitution are
more fundamental than the right to a fair trial by
'impartial' jurors, and an outcome affected by extrajudicial
statements would violate that fundamental right." <u>Gentile</u>
<u>v. State Bar of Nevada</u>, 501 U.S. 1030, 1075, 111 S.Ct. 2720,
2745 (1991); <u>see also</u> <u>Patterson v. Colorado ex rel. Attorney</u>
<u>General</u>, 205 U.S. 454, 462, 27 S.Ct. 556, 558 (1907)
(Holmes, J.) ("The theory of our system is that the
conclusions to be reached in a case will be induced only by
evidence and argument in open court, and not by any outside
influence, whether of private talk or public print." ).
"Due process requires that the accused receive a fair trial
by an impartial jury free from outside influences. Given
the pervasiveness of modern communications and the

72

difficulty of effacing prejudicial publicity from the minds of jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."  Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522 (1966).

The fact that it is the government that seeks a fair trial in this matter does not change the court's analysis. While the Sixth Amendment does not explicitly protect the government, the government still has a strong interest in a fair trial.[46]  Levine, 764 F.2d at 596-97; United States v. Tijernia, 412 F.2d 661, 666 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect fair trials designed to end in just judgments.") (internal quotation omitted).  Thus,

_____

46.  "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.

the court "must consider the fundamental interest of the
government and the public in insuring the integrity of the
judicial process.  Society has the right to expect that the
judicial system will be fair and impartial to all who come
before it." Levine, 764 F.2d at 596-97.

     Two Supreme Court cases establish relevant principles
for striking the balance between free-speech rights, on the
one hand, and the need for a fair trial, on the other.  In
Nebraska Press Ass'n, the Supreme Court struck down a 'gag
order' issued in a murder trial, in which the defendant was
accused of killing six members of a family in the small
community in Nebraska where the trial was taking place.  The
trial court found "because of the nature of the crimes
charged in the complaint that there is a clear and present
danger that pre-trial publicity could impinge upon the
defendant's right to a fair trial." 427 U.S. at 543; 96
S.Ct. at 2795.  The trial court's order was directed at the
media, and it prohibited the press from reporting on five
specific subjects, including an alleged confession and

74

statements made by the defendant and the contents of a note written by the defendant.  <u>Id</u>.

After noting the presumption against prior restraints, the Court described its task as determining "whether ... 'the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'" <u>Id</u>. at 562, 96 S.Ct. at 2804 (quoting <u>United States v. Dennis</u>, 183 F.2d 201, 212 (2d Cir. 1950) (Hand, J.)).  The Court listed four factors as relevant to making this determination: "the nature and extent of pretrial news coverage"; "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"; "how effectively a restraining order would operate to prevent the threatened danger"; and "the precise terms of the restraining order."  <u>Id</u>.  Applying these factors, the Court held that the trial court's findings did not support imposition of the gag order against the media. <u>Id</u>. at 570, 96 S.Ct. at 2808.

75

In **Gentile**, the Supreme Court considered the constitutionality of Nevada's rule that prohibits an attorney from making extrajudicial statements that have "a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U.S. at 1033, 111 S.Ct. at 2723 (quoting Nevada Supreme Court Rules, Rule 177(1)). Following his client's indictment, Gentile gave a press conference in which he made statements to the effect that the evidence would demonstrate his client's innocence, that the likely culprit was a police officer, and that the purported victims were not credible. Id. at 1045, 111 S.Ct. at 2729. Gentile gave the press conference in the belief that he was within Rule 177's 'safe harbor provision,' which lists a number of topics about which an attorney can speak publically. Id. at 1044, 111 S.Ct. at 2729. While his client was found innocent, Gentile was found to have violated Rule 177 and was disciplined, a decision upheld by the Nevada Supreme Court. Id. at 1033, 111 S.Ct. at 2723. The United States Supreme Court, by a 5-4 margin, held that

76

the 'safe harbor provision' in Rule 177 was void for
vagueness and reversed. Id. at 1038, 111 S.Ct. at 2731.

A different five-justice majority separately upheld
Nevada's use of the "substantial likelihood" standard. Id.
at 1075, 111 S.Ct. at 2745. Gentile argued that the more
rigorous "clear and present danger" standard applied to
restrictions on the media in Nebraska Press Ass'n should
apply to restrictions on an attorney's speech. Chief
Justice Rehnquist, however, concluded that "the speech of
lawyers representing clients in pending cases may be
regulated under a less demanding standard than that
established for regulation of the press." Id. at 1074, 111
S.Ct. at 2744. The Chief Justice concluded that "the
'substantial likelihood of material prejudice standard
constitutes a constitutionally permissible balance between
the First Amendment rights of attorneys in pending cases and
the State's interest in fair trials." Id. at 1075, 111
S.Ct. at 2745.

Neither <u>Nebraska Press Ass'n</u> nor <u>Gentile</u> provides a clear rule to apply in this case.  <u>Nebraska Press Ass'n</u> considered a 'gag order' issued to the media, and <u>Gentile</u> did not consider a 'gag order' at all.  Neither case is on all fours with the facts of this case.  Furthermore, while the Supreme Court in <u>Gentile</u> approved the use of the "substantial likelihood" standard, it did not compel the use of that standard.  Put another way, the Court held that the "clear and present" danger standard is not required, but it did not hold that it is prohibited.

The Courts of Appeals have heard First Amendment challenges to more analogous 'gag orders' issued to attorneys and parties.  There is broad agreement among the circuits about two relevant factors that trial courts must consider before issuing such an order.  First, the court must consider whether the requested order is narrowly tailored.  <u>E.g.</u>, <u>Salameh</u>, 992 F.2d at 447; <u>United States v. Ford</u>, 830 F.2d 596, 600 (6th Cir. 1987); <u>Levine</u>, 764 at 595; <u>see also</u> <u>Nebraska Press Ass'n</u>, 427 U.S. at 567, 96 S.Ct. at

2807.  Second, the court must consider whether less
burdensome alternatives would achieve the government's
objective.  Ford, 830 F.2d at 600; Levine, 764 F.2d at 595;
see also Nebraska Press Ass'n, 427 U.S. at 567, 96 S.Ct. at
2807.

A three-way circuit split exists with respect to the
third, and most important, factor to be considered: the
threshold standard for imposing a prior restraint.  See
Brown, 218 F.3d at 426-27 (noting circuit split).  The
United States Courts of Appeals for the Sixth, Seventh, and
Ninth Circuits have held that, before the court may issue an
order restricting the speech of trial participants, it must
find that the speech at issue presents a "clear and present
danger" or a "serious and imminent threat" to a fair trial.
See Ford, 830 F.2d at 598, 600; Levine, 764 F.2d at 595;
Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 249 (7th
Cir. 1975).  The Courts of Appeals for the Third and Fifth
Circuits have adopted the "substantial likelihood of
material prejudice" standard.  United States v. Scarfo, 263

79

F.3d 80, 94 (3d Cir. 2001); <u>Brown</u>, 218 F.3d at 427.   The
Fourth and Tenth Circuits have held that the appropriate
standard is   "reasonable likelihood" of prejudice.   <u>In re</u>
<u>Russell</u>, 726 F.2d 1007, 1010 (4th Cir. 1984); <u>United States</u>
<u>v. Tijernia</u>, 412 F.2d 661, 666 (10th Cir. 1969).   The
Eleventh Circuit has not addressed this issue.   <u>See</u> <u>United</u>
<u>States v. Scrushy</u>, 2004 WL 848221, at *2 (N.D. Ala. 2004)
(Bowdre, J.).

The present case is different from all but one of the
above-cited cases because the restraint of speech requested
by the government would fall not on both sides equally but
on the defendant alone.   <u>See, e.g.</u>, <u>Brown</u>, 218 F.3d at 418-
19; <u>Levine</u>, 764 F.2d at 593; <u>Russell</u>, 726 F.2d at 1008;
<u>Tijernia</u>, 412 F.2d at 663 n.1.   The only analogous case is
<u>Ford</u>, in which the Sixth Circuit applied the "clear and
present danger" standard to strike down a 'gag order'

applicable only to the defendant, a sitting United States

Congressman.  830 F.2d at 597.[47]

The fact that the protective order in this case would

burden only the defense calls for a higher threshold

standard of proof.   Even the wealthiest of criminal

defendants is at a substantial disadvantage compared to the

government.   As the Sixth Circuit wrote in Ford, "[a]

criminal defendant awaiting trial in a controversial case

has the full power of the government arrayed against him and

the full spotlight of the media attention focused on him."

830 F.2d at 599.  In light of this imbalance of power, the

criminal defendant should have some leeway in addressing the

public, and, at the very least, should not be more limited

_____

47.  The fact that the protective order would apply only
to Carmichael also distinguishes this case from United
States v. Scrushy, 2004 WL 848221, at * 4 (N.D. Ala. 2004),
in which Judge Bowdre adopted the "substantial likelihood"
standard for determining when a protective order is properly
imposed on the parties.  Not only did the protective order
in Scrushy apply to both the defendant and the government,
but the parties jointly moved for the protective order.
Scrushy, 2004 WL 848221, at * 1.  In such a case there is
less need for the court to vigorously investigate the
government's asserted need for a speech-restrictive order.

than the government.  Accordingly, the court finds that the
"serious and imminent threat" standard is appropriate in
this case.

This case is also different from most of the 'gag order'
cases because the restraint would apply to Carmichael
himself and not to his attorneys.  Thus, the Supreme Court's
conclusion in Gentile that attorneys are subject to greater
restrictions on their speech is inapposite.  In Gentile, the
court gave a number of reasons for its conclusion that "the
speech of lawyers representing clients in pending cases may
be regulated under a less demanding standard than
established for the regulation of the press."  501 U.S. at
1074, 111 S.Ct. at 2744.  The court cited the fact that
States have historically regulated admission to the bar and
exercised authority to discipline attorneys; the fact that
attorneys have access to non-public information and are
viewed as authoritative, both of which pose a greater
potential risk to the fairness of a trial; and the fact that
attorneys are officers of the court.  Id. at 1066, 1074, 111

82

S.Ct. at 2740, 2744-45.   These reasons, however, do not apply to a criminal defendant.   Thus, the court is not persuaded by Gentile that a lower threshold of proof is appropriate under these factual circumstances.

After considering the above, the court holds that it cannot issue the protective order sought by the United States unless (1) Carmichael's website poses a serious and imminent risk to the court's ability to conduct a fair trial, (2) the proposed protective order is narrowly tailored, (3) alternatives to the protective order would not be effective, and (4) the order would be effective in achieving the government's objective.

"This analysis must acknowledge the quality of [F]irst [A]mendment interests which are threatened by the restraints at issue."   United States v. Lehder-Rivas, 669 F. Supp. 1563, 1567 (M.D. Fla. 1987).   "Free speech rights reach their zenith when the benefits enure to the public," but "[t]he barest minimum of free speech rights are involved" when the speech's benefit runs only to the speaker.   Id.   As

discussed above, Carmichael's website touches both on issues
of public concern and on issues of benefit only to him.  The
court keeps this in mind.


### b.  Application

The government has raised two types of concerns about
Carmichael's website that it believes warrant the imposition
of the protective order.  First, the government argues that
the website could taint potential jurors.  Second, the
government argues that the site poses a threat to its
witnesses and agents.


### i.  Jury Pool

The government's proposed protective order is not the
least restrictive means for addressing the possibility that
www.carmichaelcase.com will taint the jury pool.  Two of the
alternatives to 'gag orders' posed by the Supreme Court in
<u>Nebraska Press Ass'n</u> are "searching questioning of potential
jurors" and "the use of emphatic and clear instructions" to

the jury.  427 U.S. at 564, 96 S.Ct. at 2805.  "[S]earching

questioning" of potential jury members about whether they

have viewed Carmichael's website--either on the internet or

as a newspaper advertisement--combined with an "emphatic and

clear instruction[]" that empaneled jury members are not to

view the site during the trial will address the government's

concern with far less imposition on First Amendment

freedoms.

The nature of Carmichael's site distinguishes this case

from cases involving 'gag orders' directed against general

pre-trial publicity.  See, e.g., Brown, 218 F.3d at 431;

Levine, 764 F.2d at 599-600.  While it might be unrealistic

to think that voir-dire questions and instructions to the

jury can adequately counter the "increasingly widespread

media coverage of criminal trials," Brown, 218 F.3d at 431

(quoting Gentile, 501 U.S. at 1075, 111 S.Ct. at 2745), that

is not at issue here.  Carmichael's website is unique, so

potential jurors will remember if they have seen it or heard

about it.  Furthermore, it is unlikely jurors will come

**85**

across the site by accident, so an instruction to avoid the
site should be effective.  Accordingly, the restriction on
speech proposed by the government is not justified by its
concern about a tainted jury.

### ii.  Witnesses and Agents

The government's asserted interest with respect to its
witnesses and agents is different from the fair trial
interests typically asserted in support of 'gag orders.'  In
Sheppard, Nebraska Press Ass'n, and Gentile, the Court held
that speech could be restricted to protect the fundamental
right to a trial by impartial jurors.  Here, the government
is concerned that Carmichael's website will result in harm
to the witnesses pictured on the site and that the site will
deter witnesses from coming forward in this case and future
cases.  The government is also concerned that the site could
lead to harm to its agents and that it could make it more
difficult for the agents to work undercover in the future.
Nonetheless,  the  government  has  a  valid  interest  in

**86**

protecting witnesses and agents and encouraging witnesses to
come forward.[48]

The government's protective order is not necessary to
prevent a serious and imminent risk of either harm to its
witnesses or deterring future witnesses from cooperating
with the government.  The court recognizes that Robert
Denton and Pettis are uncomfortable with their names and
photographs appearing on the website; that is
understandable.  However, there is insufficient evidence to
find that the site poses an actual risk to Denton or Pettis.
Furthermore, as discussed above, the court finds it likely
that the anxiety felt by both Denton and Pettis is the
result of participating as witnesses in this case (which has
been, and most certainly will continue to be, attended by
much publicity) and not a result of the website.

The government's evidence in support of its claim that
the site will deter witnesses from cooperating in this case
is scant.  Agent DeJohn testified that three witnesses who

---

48.  See infra, p. 100.

87

initially expressed interest in cooperating subsequently
decided not to cooperate; yet, as discussed above, it is
only with respect to one witness--German--that the evidence
supports the claim that he was influenced by Carmichael's
site. Even then, there is only weak circumstantial evidence
that German decided not to testify because of the website.
There is no evidence that Jones or Williams was scared off
by the site.   There is also no evidence to support the
government's contention that the site could have a deterrent
effect on future witnesses.

Similarly, there is insufficient evidence to conclude
that the website poses a serious and imminent risk to the
safety of government agents or to their future work as
undercover officers.   As discussed above, most of the
agents' testimony focused on the danger that would result
from their photographs appearing on the website, and no such
pictures are currently on the site.   More significantly, the
DEA agents who testified all did so in person in open court
as they have done in other cases.   This fact alone calls

into question the extent to which their names and faces must be jealously guarded to protect their safety.

For the above reasons, the court is not convinced that the imposition on Carmichael's First Amendment interests-- minimal though they may be--that would result from the government's proposed protective order is warranted by the evidence.  In other words, while the court has the inherent authority to issue such an order, it will not do so in this case.  Accordingly, the government's renewed motion for a protective order will be denied.


## C.  Fifth and Sixth Amendments

Carmichael also contends that the protective order sought by the government would infringe his right to a fair trial and his right to present a defense, rights protected by the Fifth[49] and Sixth Amendments.[50]

---

49. "No person shall be ... deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

50. "In all criminal prosecutions, the accused shall
(continued...)

### 1.   Carmichael's Fifth and Sixth
Amendment Interests

"Whether rooted in the Due Process Clause ... or in the

Compulsory Process or Confrontation clauses of the Sixth

Amendment, the Constitution guarantees criminal defendants

a meaningful opportunity to present a complete defense."

Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146

(1986) (citations omitted).   Here, Carmichael argues that

the protective order requested by the government would step

on his right to present a complete defense by preventing him

from using his website to investigate his case.

Carmichael's interest in investigating his case sounds

in the rights protected by the Sixth Amendment's Compulsory

Process Clause.   The Compulsory Process Clause protects a

criminal defendant's right to call witnesses who can offer

_____

50.  (...continued)
enjoy the right to a speedy and public trial, by an
impartial jury ... and to be informed of the nature and
cause of the accusation; to be confronted with the witnesses
against him; to have compulsory process for obtaining
witnesses in his favor, and to have the Assistance of
Counsel for his defence."   U.S. Const. amend. VI.

90

material testimony.  Washington v. Texas, 388 U.S. 14, 23,

87 S.Ct. 1920, 1915 (1967).   A defendant's Compulsory

Process Clause rights can be offended when the government

arbitrarily prevents him from calling such a witness, id.,

when the government intervenes to deport such a witness,

United States v. Valenzuela-Bernal, 458 U.S. 858, 873, 102

S.Ct. 3440, 3449 (1982), or when a court denies a defendant

a reasonable continuance for the purpose of obtaining such

a witness, Dickerson v. Alabama, 667 F.2d 1364, 1370 (11th

Cir. 1982).   The Compulsory Process Clause encompasses more

than the right to call witnesses, though.

> "The right to compel a witness' presence
> in the courtroom could not protect the
> integrity of the adversary process if it
> did not embrace the right to have the
> witness' testimony heard by the trier of
> fact.   The right to offer testimony is
> thus grounded in the Sixth Amendment even
> though it is not expressly described in so
> many words: 'The right to offer the
> testimony of witnesses, and to compel
> their attendance, if necessary, is in
> plain terms the right to present a
> defense, the right to present the
> defendant's version of the facts as well
> as the prosecution's to the jury so it may
> decide where the truth lies.  Just as an

91

accused has the right to confront the
prosecution's witnesses for the purpose of
challenging their testimony, he has the
right to present his own witnesses to
establish a defense.    This right is a
fundamental element of due process of
law.'"

Taylor v. Illinois, 484 U.S. 400, 409, 108 S.Ct. 646, 653

(1988) (quoting Washington, 388 U.S. at 19, 87 S.Ct. at 1923

(1967)).

    Carmichael also has a Fifth Amendment Due Process Clause

interest in evidence that is material to his guilt or

innocence.   See Napue v. Illinois, 360 U.S. 264, 269, 79

S.Ct. 1173, 1177 (1959) (government must inform the

defendant if it knows that one of its witnesses has perjured

himself); Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194,

1196-97 (1963) ("The suppression by the prosecution of

evidence favorable to an accused upon request violates due

process where the evidence is material to guilt or to

punishment."); Giglio v. United States, 405 U.S. 150, 154,

92 S.Ct. 763, 766 (1972) (government must disclose promises

92

of leniency it makes to its witnesses where such promises
are material to the defendant's case).

The Supreme Court has also recognized a criminal
defendant's interest in obtaining information about
confidential informants.  In Roviaro v. United States, 353
U.S. 53, 59, 77 S.Ct. 623, 627 (1957), the Court wrote that
the government generally has the "privilege to withhold from
disclosure the identity of persons who furnish information
of violations of law to officers charged with enforcement of
that law."  However, the Court wrote, "[w]here the
disclosure of an informer's identity, or of the contents of
his communication, is relevant and helpful to the defense of
an accused, or is essential to a fair determination of a
cause, the privilege must give way."  353 U.S. at 60, 77
S.Ct. at 628.[51]

_____

51. "While Roviaro was not decided on the basis of
constitutional claims, its subsequent affirmation in McCray
v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62
(1967), where both due process and confrontation claims were
considered by the Court, suggests that Roviaro would not
have been decided differently if those claims had actually
(continued...)