## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )    CR. NO. 2:03-cr-259-T
    )
LEON CARMICHAEL, SR.,    )
also known as, BEAVER LEON    )
CARMICHAEL, et al.    )

### UNITED STATES' RESPONSE IN OPPOSITION
### TO DEFENDANT CARMICHAEL'S MOTION *IN LIMINE*
### REGARDING ALLEGED STATEMENTS TO LAW ENFORCEMENT

COMES NOW the United States of America, by and through Leura Garrett Canary,

United States Attorney for the Middle District of Alabama, and hereby responds in opposition to

Defendant Carmichael's Motion *in Limine* Regarding Alleged Statements to Law Enforcement.

Defendant's Motion challenges two sets of statements Defendant Carmichael made to Task Force

Agent David DeJohn during a visit to the Drug Enforcement Administration Montgomery Office.

The first set of statements Defendant challenges includes Defendant's "you got me"

confession to Mr. DeJohn, along with the short conversation that immediately preceded it.

Defendant challenges the admissibility of his statement "you got me" to Mr. DeJohn on the same

Sixth Amendment grounds that he raised in his earlier suppression motion – a motion denied in

full by this Court.  Defendant also challenges the "you got me" confession on general relevance

and prejudice grounds, despite the fact that Defendant's statement appears to be a highly

probative admission of guilt.

The second set of statements Defendant challenges includes statements about his counsel,

his counsel's motives, and a statement about cooperators.  He bases this second set of challenges

on both the grounds set forth in his earlier suppression motion and the prejudice concerns



memorialized in Federal Rule of Evidence 403. Because the United States does not intend to introduce any evidence regarding this second set of statements in its case in chief at trial, the United States will address its response to Defendant's challenge to the "you got me" statement and the related statements immediately surrounding it. As set forth below, that challenge constitutes nothing more than an effort to re-litigate the suppression motion this Court denied earlier in this case. The United States has already once defended and rebutted the Sixth Amendment challenges raised in Defendant's Motion. Additionally, this Court has already once rejected such arguments and ruled that the challenged statements do not violate the Sixth Amendment. Accordingly, Defendant's Motion should be denied in full.

## I.   **The Challenged Statements**

As mentioned supra, this Court has already rejected arguments similar to those advanced in Defendant's Motion *in Limine* in a prior suppression motion. In the Report and Recommendation adopted by this Court on April 27, 2004, the Court described the setting and content of the challenged statements. Insofar as the Court's description constitutes factual findings making up the law of the case in this matter, the United States will rely upon the Court's description in addressing Defendant's instant challenge:

> Pursuant to arrangements his counsel made with the government's prosecutor and Agent DeJohn, Carmichael – free on a pre-trial bond and other conditions imposed after his initial indictment – reported alone to the DEA office on December 4, 2003, to retrieve his briefcase, credit cards, checkbooks, and other belongings seized following his arrest. Escorted through the foyer to a side interview room, Carmichael waited with another agent while Agent DeJohn left for "no more than 30 seconds" to secure the items. Upon his return, he [DeJohn] heard Carmichael complaining about the news media's portrayal of his arrest and, in particular, false reports that 575 pounds of marijuana were located inside the Carmichael Center. Carmichael then declared that "he had already resigned himself to the fact that he was going to do 10, 15, 20 years in prison and that

-2-

would be a life sentence to him." "Shocked" that he [Carmichael] considered a
10-year sentence a life sentence, Agent DeJohn asked him, "why do you say
that?"; Carmichael responded, "because you got me." Agent DeJohn then
reminded Carmichael of his "opportunity . . . to cooperate with law enforcement"
prompting Carmichael's statements: "I can't even trust my own attorneys. I have
one attorney that is telling the U.S. Attorney's office that they have a client that
wants to talk about [me], and the others got their hands reached out for money."
Carmichael also commented "that most of the people talking about him – most of
the people would be lying."

(Report and Recommendation, Doc. 151 at 8-9.)

## II.   This Court Should Not Allow Defendant to Re-litigate His Suppression Motion

In attacking the admissibility of his exchange with Task Force Agent DeJohn, Defendant

has reiterated the arguments he advanced – and lost – in the earlier suppression proceedings in

this case. The United States responded in full to those arguments at that time, including four

pages of argument addressed specifically to Defendant's Sixth Amendment claims. See United

States' Resp. to Supp. Mot., Doc. 117 at 15-23 (a copy of which is attached hereto as Exhibit A).

Accordingly, the United States does not feel that it is appropriate to re-litigate an issue already

briefed, argued, and already once resolved by this Court.

In the Report and Recommendation that was adopted by this Court, Magistrate Judge

Delores Boyd rejected Defendant's suppression arguments. See Report and Recommendation,

Doc. 151 at 15-16 (a copy of which is attached hereto as Exhibit B). Judge Boyd expressly noted

"that uncontradicted evidence attributes to counsel prior approval for Carmichael's trip

unaccompanied by counsel." Id. at 16. Additionally, Judge Boyd found that "the evidence is

compelling that Carmichael casually volunteered his statements without being subjected to an

unduly coercive atmosphere or any custodial interrogation of the character requiring prior

Miranda warnings." Id.

The foregoing decision by this Court should stand as the law of this case.  Defendant has

offered no new facts or intervening legal decisions which would call into question this Court's

earlier decision on the suppression issue.  Indeed, Defendant does not even mention the Court's

prior suppression decision, much less give any reason why that decision should now be called

into question.  Absent any reason to change the law-of-the-case, this Court should stand on its

prior decision and avoid the waste of resources and lack of repose that would come from a rehash

of the suppression decision.  As this Court wrote earlier this year in a civil case in which a

litigant tried to raise a matter already decided before Magistrate Judge Susan Russ Walker:

> The law-of-the-case doctrine holds that "when a court decides upon a rule of law,
> that decision should continue to govern the same issues in subsequent stages of
> the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816,
> 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (internal citations omitted).  The
> rule "promotes the finality and efficiency of the judicial process by protecting
> against the agitation of settled disputes." Id. (internal citations omitted).  The
> doctrine "directs a court's discretion, it does not limit the tribunal's power."
> Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318
> (1983).

Sophocleus v. Ala. Dept. of Trans., 305 F. Supp.2d 1238, 1244 (2004), aff'd, ___ F.3d ___ (11th

Cir. Aug. 2, 2004).  Although this Court was careful to point out that a court always has the

power to revisit its own prior decisions, the decision made clear that "as a rule courts should be

loath to do so in the absence of extraordinary circumstances such as where the initial decision

was clearly erroneous and would work a manifest injustice." Id. (quoting Christianson, 486 U.S.

at 817).  Insofar as Defendant has failed to cite any circumstance, extraordinary or otherwise, that

would call into question the Court's prior ruling, the United States respectfully asks this Court to

reject Defendant's Sixth Amendment arguments in accordance with the original suppression

ruling and for the reasons expressed in the United States' original response to the suppression

motion.

**III.     The "You Got Me" Exchange is Highly Probative – Indeed, it is a Confession**

In addition to his reiteration of his failed suppression arguments, Defendant has pinned his hopes of concealing his "you got me" confession on the narrow, judicially disfavored restrictions of Federal Rule of Evidence 403.   The Eleventh Circuit, however, has been clear in announcing that "Rule 403 is an extraordinary remedy . . . 'which should be used only sparingly since it permits the trial court to exclude concededly probative evidence.'" United States v. Fallon, 256 F.3d 1082, 1091 (11th Cir. 2001) (quoting United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992)).   This same language was used by United States District Judge Myron Thompson, sitting by designation, when he wrote the panel decision of the Eleventh Circuit in United States v. Cross, 928 F.2d 1030 (11th Cir. 1991).   There, Judge Thompson, speaking for the Eleventh Circuit, gave the following explanation of Rule 403 in the context of prior correspondence evidence that was probative of the defendant's intent:

> Indeed, Rule 403 is "an extraordinary remedy which should be used sparingly," and the trial court's discretion to exclude evidence as unduly prejudicial is "narrowly circumscribed."  The "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."

Id. at 1048 (citations omitted).  The Cross court rejected the defendant's challenge to the allegedly unfairly prejudicial evidence on appeal because such evidence was "of considerable probative value" regarding intent and, as well, because there was "ample other evidence offered at trial" which showed material of a similar nature which would make it "unlikely" that any "unfair prejudice" would result from the challenged evidence.   Id.

Defendant's argument appears to suggest that the "you got me" exchange is prejudicial

simply because it is too probative.  As the Eleventh Circuit explained in reversing a lower court's erroneous exclusion of evidence under Rule 403: "[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion." United States. v. King, 713 F.2d 627, 631 (11th Cir. 1983). Although the challenged evidence is obviously detrimental to Defendant's case, it is not unfairly prejudicial.  Cf. United States v. Grimmond, 137 F.3d 823, 833 (4th Cir. 1998) (explaining that "damage to a defendant's case is not a basis for excluding probative evidence.  And for good reason.  Evidence that is highly probative invariably will be prejudicial to the defense.").

Defendant's sole remaining prejudice argument, aside from the suggestion that the "you got me" exchange is too probative, is an argument that the confession is subject to multiple meanings.  Such an argument clearly goes to weight and not admissibility, and the Defendant is free to make his spin on the evidence clear at trial.  Defendant can argue to the jury that he meant something innocuous when he told agent DeJohn "you got me."   The United States will argue that "you got me" means exactly what it sounds like in context – a confession to the marijuana conspiracy charged in this case.  The high probative value of such a statement should be abundantly clear and should render the exchange admissible under the relevance principles expressed in Federal Rules of Evidence 402 and 403.

## IV.   **Conclusion**

Based on the foregoing, Defendant's Motion *in Limine* Regarding Alleged Statements to Law Enforcement should be denied.  Defendant's arguments under the Sixth Amendment should be rejected because they present nothing more than a rehash of the arguments already raised and rejected in Defendant's suppression motion.  Issues of judicial economy, finality, and law-of-the-

case suggest that Defendant's renewed Sixth Amendment challenge should not be considered.

Moreover, even if the arguments were reconsidered, the United States submits that they should

be rejected for the same reasons argued in the United States' response to the suppression motion,

which is attached hereto as Exhibit A.  Defendant's arguments regarding relevance and prejudice

should be rejected, as well.  Defendant's confession is highly probative, and the only argument

for prejudice Defendant advances is one that goes to the weight of the evidence, not its

admissibility.  Accordingly, Defendant's motion should be denied in full.

     Respectfully submitted this the 22nd day of November, 2004.

     LEURA GARRETT CANARY
     UNITED STATES ATTORNEY

     s/Matthew S. Miner
     MATTHEW S. MINER
     Assistant United States Attorney
     One Court Square, Suite 201
     Montgomery, Alabama 36104
     Phone: (334) 223-7280
     Fax: (334) 223-7135
     E-mail: matthew.miner@usdoj.gov
     PA 80737

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 22, 2004, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following:

Counsel for Defendant Carmichael: Susan G. James, Esq., Lisa Monet Wayne, Esq., Marion

Chartoff, Esq., Wesley Pitters, Esq., and Ronald Brunson, Esq.; and counsel for Defendant Williams,

Barry E. Teague, Esq.

Respectfully submitted,

s/Matthew S. Miner
MATTHEW S. MINER
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: matthew.miner@usdoj.gov
PA 80737



GOVERNMENT
EXHIBIT
A

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED

FEB 18 P 4: 35

UNITED STATES OF AMERICA )
)
v. ) CR. NO. 03-259-N
)
LEON CARMICHAEL, SR., )
also known as, BEAVER LEON )
CARMICHAEL, and )
FREDDIE WILLIAMS )

FEB 18

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA

**UNITED STATES' RESPONSE IN OPPOSITION
TO "DEFENDANT CARMICHAEL'S MOTION TO SUPPRESS
EVIDENCE AND MOTION PURSUANT TO FED. R. CRIM. P. 41(G)"**

COMES NOW the United States of America, by and through Leura Garrett Canary,

United States Attorney for the Middle District of Alabama, and files this response in opposition

to "Defendant's Carmichael's Motion to Suppress Evidence and Motion Pursuant to Fed. R.

Crim. P. 41(g)." Defendant's Motion is nothing more than a scant three-page collection of

conclusory allegations that are unsupported by citation to law or fact. Those allegations that do

exist fail to advise the Court of the salient facts predating and underlying Defendant's arrest.

Such facts were plainly stated in the discovery provided to Defendant on December 12, 2003.

(Gov't's Discovery Ltr., Ex. A.) Nevertheless, Defendant does not mention such facts. Indeed,

he does not even try to contest or distinguish such facts from the controlling case law, which is

also notably absent from Defendant's motion.

At its core, Defendant's Motion is a boilerplate challenge to evidence and statements

derived from two events: (1) Defendant's detention and arrest on November 17, 2003, which

were predicated on Defendant's possession of handgun subsequent to a felony conviction and his

involvement in a marijuana distribution conspiracy; and (2) Defendant's voluntary visit to the

(11)

Drug Enforcement Administration ("DEA") District Office in Montgomery, Alabama on

December 4, 2003, which was arranged by his own counsel, Stephen Glassroth. With no

elaboration, Defendant claims that law enforcement officers violated Defendant's Fourth, Fifth,

and Sixth Amendment rights by arresting Defendant and "obtaining statements from him" during

his voluntary visit to the DEA District Office.

As detailed below, Defendant's bare-boned pleading has no merit. Defendant's detention

and arrest were predicated on ample probable cause. Accordingly, evidence derived from his

arrest was lawfully obtained. Additionally, Defendant's visit to the DEA District Office weeks

after his arrest was voluntary and, indeed, was arranged by his own counsel. Law enforcement

can hardly be charged with any wrongdoing when Defendant appeared voluntarily at the DEA

District Office on the advice of counsel and proceeded to make statements about the accuracy of

media reports, the trustworthiness of his own lawyers, and most importantly – his own liability

for the charged drug conspiracy.

I.   **Factual Background**

During a DEA investigation in mid-November 2003, the DEA learned that Leon

Carmichael was the principal player in a marijuana distribution conspiracy in the Montgomery,

Alabama area. This information was discovered during a series of search warrants and witness

interviews, discussed below:

  1.   On November 13, 2003, a man named Gary Wayne George was arrested

       following the execution of a search warrant at his residence in Prattville,

       Alabama. (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B at 1.) During a

       post-arrest interview, Mr. George told DEA Task Force Agent ("TFA") David

-2-

DeJohn that he was a member of the Leon Carmichael drug trafficking

organization. Id. Mr. George's job, along with another man, Robert Patrick

Denton, was to break down large amounts of marijuana brought into the

Montgomery area by Carmichael's couriers, and then to prepare such marijuana

for distribution. Id. According to Mr. George, the organization imports

approximately 500 to 600 lbs of marijuana into the Montgomery area every 7 to 9

days. Id. Mr. George stated that both he and Mr. Denton are paid by Leon

Carmichael with marijuana. Id.

  2.   Based upon a tip from Mr. George, the Chilton County Sheriff's Department

       stopped a car containing approximately 26 lbs of marijuana on November 15,

       2003. (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B at 3.) The car was

       driven by Charlotte Hensarling, a woman from Huntsville. Id. Mr. George had

       earlier told TFA DeJohn that he and Mr. Denton were meeting with Ms.

       Hensarling to sell her marijuana. Id. This fact was confirmed not only by the

       traffic stop, but also by Ms. Hensarling herself, who stated that she had made 8

       trips to Montgomery buy marijuana over the prior 2 months. Id.

  3.   Based upon the above information, the fact that Mr. George had seen marijuana in

       Mr. Denton's residence, and the fact that a new shipment of marijuana was

       reportedly coming into the Montgomery area, the Honorable Charles Coody of

       this Court issued a search warrant for Mr. Denton's residence on November 16,

       2003. (Search Warrant for 808 W. Flemming Rd., Montgomery, AL (M-03-71-N)

       and Application and Aff. for Warrant, Ex. C.)

-3-

  4.   When the search warrant was executed on Mr. Denton's house in the early

       morning hours of November 17, 2003, Mr. Denton was present. (DeJohn Aff. for

       Search Warrant (M-03-70-N), Ex. B at 4.) He was interviewed by law

       enforcement and confessed to being a member of the Leon Carmichael drug

       trafficking organization. Id. He also stated that, based upon Charlotte Hensarling's arrest, he

       had called Leon Carmichael to have him redirect a shipment that was originally

       due to come to Denton's house. Id. Mr. Denton then explained that the marijuana

       would be at 949 Ridgecrest Drive, Montgomery, Alabama – the home of Freddy

       Williams,[1] Defendant Carmichael's co-defendant in this case. Id.

  5.   At approximately 2:45 a.m., while law enforcement was still meeting with Mr.

       Denton, Leon Carmichael called Mr. Denton to tell him that he would be stopping

       by Mr. Denton's residence in about 5 minutes to talk. (DeJohn Aff. for Search

       Warrant (M-03-70-N), Ex. B at 4.) The agents at the residence retreated from the

       home and watched what unfolded. Id. at 4-5. Defendant Carmichael arrived a

       few minutes later in his Honda Accord and went inside Denton's residence for

       approximately 5 minutes. Id. at 5. After Defendant Carmichael left, Mr. Denton

       told the agents that Carmichael confirmed that the marijuana shipment was, in

       fact, at 949 Ridgecrest Drive. Id. According to Denton, Carmichael also told

_____

[1]   Defendant Williams' last name was apparently not known to Denton or law
enforcement at this time. See id. (listing the residence as "Freddy (LNU's) residence").

-4-

Denton that he wanted Denton to help Freddy Williams "break down" the
marijuana shipment. Id.

6.  Later that morning, Mr. Denton went to Freddy Williams's home wearing an
audio transmitting device. (DeJohn Aff. for Search Warrant (M-03-70-N), Ex. B
at 5.) Denton confirmed that the marijuana was present in the home. Id. Through
the audio transmitting device, law enforcement agents were able to hear Denton
and Williams discussing the marijuana and the need for scales to weigh the
marijuana. Id. When Denton left to get the scales, he told TFA DeJohn that there
were approximately 11 duffel bags with marijuana inside of Williams's home. Id.
Video equipment carried by Denton recorded the existence of a number of duffel
bags on a bed in Williams's residence. (TFA DeJohn Report, Ex. D at 3, ¶ 13.)

7.  After Williams left his home that morning, law enforcement secured the
residence, and TFA DeJohn left to obtain a search warrant. (TFA DeJohn Report,
Ex. D at 4, ¶ 16.) While securing the residence, agents observed numerous duffel
bags, three large bricks of marijuana on a cutting board, and an open duffel bag
filled with suspected marijuana wrapped in clear plastic wrap and tape. Id. A
search warrant was issued that afternoon and approximately 575 lbs of marijuana
was recovered along with assorted firearms, ammunition, and items of drug
paraphernalia. Id. at 1, 6-11.

8.  While agents were waiting for the issuance of the search warrant, just before
11:00 a.m., Defendant Carmichael drove by Williams's residence in his Honda
Accord. (TFA DeJohn Report, Ex. D at 4, ¶ 18.) It appeared to the agents that

-5-

Defendant Carmichael noticed the agents outside of the residence. Id. One of the
agents attempted to follow and stop Defendant Carmichael, but Carmichael was
able to speed away before the agent could catch him. Id.

9.  At approximately 11:00 a.m., DEA Special Agent ("SA") Thomas Halasz, along
with other law enforcement personnel, stopped Defendant Carmichael's Honda
Accord on South Boulevard in Montgomery, Alabama. (Report of SA Halasz, Ex.
E at 1, ¶ 1.) Defendant Carmichael had a pistol in plain view on the front seat of
his car. SA Halasz knew that Defendant Carmichael had previously been
convicted of murder. See id. In fact, after being advised of his Miranda rights,
Defendant Carmichael admitted both to possessing the gun and to his prior murder
conviction, although he claimed that he had been pardoned for the murder. Id. at
1-2, ¶ 2. Therefore, in addition to having probable cause to believe that
Defendant Carmichael was involved in a marijuana distribution conspiracy, SA
Halasz now had probable cause to believe that Defendant Carmichael had violated
18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm.

10.  After he was stopped and read his Miranda rights, Defendant was advised that he
had been implicated in the seizure of over 500 pounds of drugs at "Freddy's"
residence. (Report of SA Halasz, Ex. E at 2, ¶ 3.) Defendant admitted that he
knows a "Freddy" that drives for him. Id. He further stated that he had no
knowledge of the drugs seized. Id. Defendant later asked what kinds of drugs
were seized. Id. at 2, ¶ 6. When told it was over 500 pounds of marijuana,
Defendant continued to maintain that he knew nothing about it. Id. When told by

-6-

SA Halasz that he (Carmichael) had been seen meeting with another person
between 2:00 a.m. and 3:00 a.m. that morning, Defendant "said that he was in a
hotel with a woman during the early morning hours including 2:00 a.m. and 3:00
a.m. and that she would testify to that." Id.

11.  At the time of his arrest, Defendant Carmichael had approximately $1,781 in cash
rolled up in his pocket, as well as additional firearms (1 shotgun, 2 pistols) in the
trunk of his car, and $5,000 from a zippered bank bag in a briefcase found on the
rear seat of the car. (Report of SA Halasz, Ex. E at 2 (¶¶ 3, 5) and 5.)

12.  Defendant Carmichael was charged with violating Title 18, United States Code,
Section 922(g)(1) pursuant to a Criminal Complaint filed with this Court.
(Compl. (M-03-66-N), Doc. 1.) The decision to charge Defendant with only a
Section 922(g)(1) violation at that time – and not the drug conspiracy – was a
matter of prosecutorial discretion.

13.  The Criminal Complaint against Defendant Carmichael was dismissed on
November 19, 2003, when Defendant Carmichael was indicted for conspiring to
distribute marijuana. The United States elected not to pursue a charge under
Section 922(g)(1) because of evidence that Defendant had been pardoned for his
prior murder conviction.

14.  On or about December 4, 2003, Assistant U.S. Attorney Clark Morris spoke with
Defendant's Carmichael's attorney, Stephen Glassroth about the return of some of
the evidence found in Defendant's vehicle on November 17, 2003. Assistant U.S.
Attorney Morris advised Mr. Glassroth that he should make arrangements with the

-7-

DEA District Office to retrieve these materials.[2]

15.  On December 4, 2003, Defendant Carmichael came to the DEA District Office to
retrieve some of the materials that were not being retained as evidence. (TFA
DeJohn Report II, Ex. F at 1, ¶ 1.) According to the TFA DeJohn's report of this
visit, "[t]his was part of an arrangement between TFA DeJohn and Attorney
Glassroth to return seized items to Carmichael that was [sic] not being held as
evidence." Id. Attorney Glassroth did not accompany his client; nor did any of
Defendant's other attorneys. See id. In fact, Defendant Carmichael came to the
DEA District Office by himself. See id.

16.  While at the DEA District Office, Defendant began to complain about media
reports that 575 lbs of marijuana had been found at his place of business, the
Carmichael Center. (TFA DeJohn Report II, Ex. F at 1, ¶ 2.) TFA DeJohn told
Defendant that law enforcement knew such reports to be false and that "[we]
would not present anything that we did not believe to be the truth." Id.

17.  Carmichael continued by stating that he had resigned himself to the fact that he
was going to prison for the rest of his life and that he considered a 10, 15, 20 year
sentence to be a life sentence for him. (TFA DeJohn Report II, Ex. F at 1-2, ¶ 3.)
When asked why he would say such a thing, Carmichael "advised 'You got me.'"
Id. at 2, ¶ 3. TFA DeJohn then told Carmichael that he [Carmichael] would have

---
[2]  The foregoing factual allegation is based upon a description of facts Assistant
U.S. Attorney Morris related to the undersigned Assistant U.S. Attorney at the time this response
was drafted.

-8-

to talk to his lawyers before cooperating with agents. Id. Nevertheless, Carmichael continued, stating that he could not trust his own attorneys. Id. He asserted that one of his attorneys had called the United States Attorney's Office to offer the cooperation of another client against Carmichael. Id. Carmichael then insinuated that his other attorneys just had their hands out for his money. Id.

18.   Carmichael then began to talk about matters that his attorney had told him, including information about witnesses who were coming forward. (TFA DeJohn Report II, Ex. F at 2, ¶ 4.) TFA DeJohn again advised Carmichael to talk to his attorneys if he wished to cooperate with law enforcement. Id.

## II.   Argument

### A.   The Court Should Deny Defendant's Motion Without a Hearing, or at a Minimum, Order Defendant to File a Comprehensive Motion That Complies with the Richardson Case.

Defendant's Motion should be summarily denied because it does not meet the requirements required for a suppression hearing under United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985). Defendant's team of retained counsel has had weeks to review the nearly three thousand of pages of discovery in this case.  If a substantial issue meriting suppression actually existed, one would think that a team of qualified counsel could do better than a few paragraphs of conclusory allegations that ignore the facts clearly stated in discovery. Defendant's many lawyers, all experienced federal court practitioners, are certainly aware that the Eleventh Circuit requires them to "allege facts which, if proven, would provide a basis for relief." Richardson, 764 F.2d at 1527.  They should also be aware that the Eleventh Circuit in Richardson clearly explained that scant allegations will not carry the Defendant's burden in a

suppression hearing:

Yet allegations . . . alone will not suffice to obtain an evidentiary hearing or the suppression of evidence.  A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented.  In short, the motion must allege facts which, if proven, would provide a basis for relief.  A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing.  Once a defendant has failed to make a proper pretrial request for suppression, the opportunity is waived unless the district court grants relief for good cause shown.

Id. (internal citations omitted).

Although Defendant's conclusory allegations may mimic the standards for suppression, they do not inform the Court of anything.  For example, the allegations do not tell the Court why Defendant's car was stopped, where it was stopped, why Defendant was arrested, or what Defendant was eventually charged with by Complaint and later Indictment.  Such facts are plainly borne out in the discovery in this case, as well as in the initial charging instruments.

Defendant's Motion completely fails to mention that on the same day as Defendant's arrest, numerous search warrants were executed by the Honorable Charles C. Coody, United States Magistrate Judge, for searches of Defendant's residence, business, and the residences of others, including Defendant's co-defendant.  Such warrants were, of course, predicated upon a finding by Judge Coody of probable cause that evidence of a crime was present at those locations.  Defendant's Motion also fails to mention that the affidavits for those warrants set forth Defendant's suspected involvement in a narcotics conspiracy.

In sum, Defendant's Motion fails to comply with the requirements of Richardson.  Insofar as Defendant's Motion is deficient, it also fails to comply with this Court's original Order on Arraignment (Doc. 37) that expressly warned Defendant that "[t]his [C]ourt will summarily

dismiss suppression motions which are supported only by general or conclusory assertions founded on mere suspicion or conjecture." Id. The United States asks this Court to enforce its Order and "summarily dismiss" Defendant's deficient pleading.

### B.   Defendant's Detention and Arrest Were Lawful and Supported By Probable Cause.

Defendant's detention and arrest were completely lawful and were supported by ample probable cause.  As shown supra, Defendant was not arrested until after law enforcement corroborated the claims of two individuals, Gary Wayne George and Robert Patrick Denton, who both unequivocally stated in post-arrest interviews that they were participants in Defendant Carmichael's drug organization.  Law enforcement officers tracked marijuana deals that were linked to the Carmichael organization.  They arrested a woman who was coming to Montgomery to buy marijuana from that organization.  They also confirmed through audio and video surveillance, as well as what was seen in Freddy Williams's home during the security sweep, that the hundreds of pounds of marijuana that was coming to Montgomery as part of Defendant's organization was, in fact, where Mr. Denton reported that it would be.  Further corroborating the stories of George and Denton was Defendant Carmichael's nighttime call and visit to Denton's home in the early morning hours of November 17, 2003, when Carmichael told Denton to go to Freddy Williams's house to help repackage the newest shipment of marijuana.  Finally, law enforcement agents observed Defendant Carmichael's appearance at Freddy Williams's residence after they had secured the premises.  This appearance cannot be viewed as coincidental.  After all, Defendant Carmichael had already been identified as the head of the drug organization that caused over 550 pounds of marijuana to be delivered to Freddy Williams's house.  He had

already been seen visiting Denton earlier that morning when Denton was told to meet Williams to repackage the marijuana.  Simply put, Defendant Carmichael came by Freddy Williams's home to check on his business investment, and he did so with four guns and over $6,500 in cash.

Officers had ample probable cause to arrest Defendant Carmichael.  Indeed, they had ample evidence to convict Defendant Carmichael – a quantum of evidence far greater than the probable cause standard requires. Cf. United States v. Broadwell, 870 F.2d 594, 601 (11th Cir. 1989) ("Testimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction.").  As the Eleventh Circuit explained in United States v. Herzbrun, 723 F.2d 773 (11th Cir. 1984), "[t]he arresting officer need not have in hand sufficient evidence to convict, because when assessing probable cause 'we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 775 (quoting Draper v. United States, 358 U.S. 307, 313 (1959)).  The United States Supreme Court has similarly explained that probable cause is "a practical, nontechnical conception" that allows officers "fair leeway for enforcing the law. . . . Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for mistakes on their part." Brinegar v. United States, 338 U.S. 160, 176 (1948).  Based on these concerns, evidence should be viewed "in light of the recognition that probable cause itself is a doctrine of reasonable probability and not certainty." United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

As noted above, however, probable cause should not seriously be in dispute insofar as law enforcement officers had sufficient evidence to convict Defendant Carmichael when he was arrested.  After all, by the time of Defendant Carmichael's arrest, two of Defendant Carmichael's

criminal coconspirators had confessed and implicated Carmichael.   As the Eleventh Circuit,

sitting en banc, clearly stated in explaining the significance of coconspirator confessions in the

probable cause context:

> For the past forty years, an unbroken stream of precedent in this circuit has
> established that the uncorroborated testimony of a co-conspirator or accomplice is
> sufficient to prove guilt beyond a reasonable doubt. . . . It would be anomalous
> for us to hold that even though a co[-]defendant's uncorroborated testimony can
> prove guilt beyond a reasonable doubt, the confession of a co-defendant that he
> and the suspect committed the crime is insufficient to establish probable cause.

Craig v. Singletary, 127 F.3d 1030, 1044-45 (11ᵗʰ Cir. 1997).   Although the Craig court was

careful to say that completely implausible accomplice confessions, such as those by mental

patients, may not be sufficient in individual cases, the court was clear to say that most

accomplice confessions will be sufficient to establish probable cause for an arrest. Id. at 1045.

Moreover, the court explained that even accomplice confessions that seek to shift some blame to

another party are sufficient to provide probable cause as to that other party.  Id. ("However, even

when a co-defendant confession seeks to shift some of the blame to another, the co-defendant's

admission of guilt is enough indication of 'reasonably trustworthy information' to satisfy

probable cause.").   In sum, the en banc court in Craig, announced that "[o]rdinarily, unless it is

incredible or contradicts known facts to such an extent no reasonable officer would believe it, a

co-defendant's confession that he and the suspect committed the crime can supply probable cause

to arrest the suspect." Id. at 1045-46; see also United States v. Patterson, 150 F.3d 382, 386 (11ᵗʰ

Cir. 1998) ("This Court agrees with the Eleventh Circuit that it would be contradictory to allow a

defendant to be convicted based on the uncorroborated testimony of his co-perpetrator while

refusing to find that the same statement would be sufficient to support probable cause.").

-13-

Accordingly, law enforcement had sufficient probable cause to arrest Defendant

Carmichael based upon nothing more than the information provided by Carmichael's

coconspirators, Gary Wayne George and Robert Patrick Denton.   As noted above, law

enforcement had corroborated much of what George and Denton had revealed, including

intercepting a 26 pound shipment of marijuana and seeing large quantities of marijuana in Freddy

Williams's house. Additionally, Defendant Carmichael was stopped with a handgun in plain

view on the seat of his car. Special Agent Halasz knew that Carmichael had previously been

convicted of murder.  Although it was later confirmed that Defendant Carmichael had been

pardoned for that murder, the arresting agents on the scene fairly believed that Defendant had

committed a violation of 18 U.S.C. § 922(g)(1) by being a felon in possession of a firearm.[3]   Cf.

United States v. Bonilla Romero, 836 F.2d 39, 46 (1ˢᵗ Cir. 1987) ("To require police officers to

---

[3]    To the extent Defendant seeks to argue at his suppression hearing that the pardon
for his murder somehow undercuts SA Halasz's probable cause to arrest him, he should be
mindful of two facts.  First, probable cause is determined based upon the quantum of information
known to law enforcement at the time of arrest.  See Ornelas v. United States, 517 U.S. 696-97
(1996) (discussing how "[t]he principal components of a determination of reasonable suspicion
or probable cause will be the events leading up to the stop or search, and then the decision
whether these historical facts, viewed from the standpoint of an objectively reasonable police
officer, amount to reasonable suspicion or probable cause.").  SA Halasz had no reason to believe
that Defendant had been pardoned for his prior murder conviction, notwithstanding Defendant's
roadside claim that he had been pardoned. Cf. United States v. Bonilla Romero, 836 F.2d 39, 46
(1ˢᵗ Cir. 1987) (finding that officers did not need to investigate various possible defenses
convicted felon may have for possessing firearm prior to arrest).  After all, Defendant had proved
to be dishonest when he lied to claim that he had not visited Robert Patrick Denton's house
earlier that morning. (Report of SA Halasz, Ex. E at 2, ¶ 6.) Second, the existence of a pardon is
an affirmative defense that a defendant must establish with proof at trial.  See United States v.
Jackson, 57 F.3d 1012, 1016-17 (11ᵗʰ Cir. 1995) (finding that the government did not need to
disprove the existence of a pardon or expungement of a conviction in a Section 922(g)(1) case,
and putting the burden on the defendant to come forward with evidence of any pardon or
expungement).  In Jackson, the Eleventh Circuit made clear that the government does not have
the burden of disproving the existence of a pardon at trial. Id. at 1017. The government should
not, therefore, be tasked with disproving the existence of a pardon during a roadside arrest.

-14-

investigate every possibility of innocence prior to effectuating the arrest of a known felon

carrying a clearly dangerous weapon would be an undue burden on the police force's efforts to

protect the safety of the public." (emphasis in original)).  Based on these facts, there can be no

doubt that law enforcement had sufficient information to arrest Defendant Carmichael.  See

Craig, 127 F.3d at 1042 ("Probable cause to arrest exists when the facts and circumstances within

the collective knowledge of law enforcement officers, or of which they have reasonably

trustworthy information, would cause a prudent person to believe that the suspect has committed

or is committing an offense.").  Accordingly, Defendant's arrest and the so-called 'fruits' from

that arrest should be upheld and deemed admissible at trial.

**C.     Defendant's Statements at the DEA District Office were
Volunteered After Defendant Appeared at that Office
According to his own Attorney's Arrangements.**

Defendant's volunteered statements to TFA DeJohn on December 4, 2003, constitute

neither fruit of an unlawful arrest, nor statements obtained in violation of Defendant's right to

counsel under the Fifth and Sixth Amendments.  As discussed supra in the Factual Background

section, Defendant Carmichael showed up by himself at the DEA District Office on December 4,

2003, to retrieve some of the items taken from his car on the date of his arrest.  While at the

District Office, Defendant Carmichael complained to TFA DeJohn about media reports, his own

attorneys, and the amount of time he would be spending in jail.   At least twice, when Defendant

Carmichael began volunteering potentially inculpatory information, TFA DeJohn stopped to

explain that Defendant should first talk to his lawyer if he intended to cooperate.  At one point

during the conversation, Defendant Carmichael stated, "you got me." (TFA DeJohn Report II,

Ex. F at 2, ¶ 3.)

-15-

Defendant Carmichael's visit to the DEA District Office occurred after Defendant's

attorney, Stephen Glassroth, was contacted by Assistant U.S. Attorney Clark Morris.  Mr.

Glassroth was told that he or some designee could come to the DEA District Office to pick up

some of the items seized from Defendant during his arrest two weeks earlier.  Although the

United States is clearly not privy to Attorney Glassroth's communications with his client, it

appears that Attorney Glassroth sent his client to the DEA District Office unaccompanied on

December 4.  This assumption is confirmed by TFA DeJohn's conversation with Attorney

Glassroth prior to Defendant Carmichael's appearance at the DEA District Office on December

4.[4]

**1.    Defendant's Visit to the DEA District Office was not the Fruit of an
Unlawful Arrest.**

Defendant's Voluntary Appearance at the DEA District Office cannot be viewed as the

fruit of an unlawful arrest because (1) Defendant was not unlawfully arrested on November 17;

and (2) Defendant came to the DEA District Office voluntarily over two weeks after his arrest.

With respect to Defendant's arrest, the United States will not rehash the unlawful arrest

argument, addressed above.  There was ample probable cause for Defendant's arrest.  His lawful

arrest did not, therefore, create any impermissible evidence.

Moreover, even if Defendant's earlier arrest could be deemed improper, Defendant's

---

[4]    TFA DeJohn informed the undersigned Assistant U.S. Attorney that he called
Attorney Glassroth to make arrangements for the return of the seized items. According to TFA
DeJohn, this call was made pursuant to the direction of either Assistant U.S. Attorney Clark
Morris or TFA DeJohn's supervisor.  During the conversation, Attorney Glassroth told TFA
DeJohn that he (Glassroth) would be sending Defendant Carmichael to the District Office.  TFA
DeJohn then asked Attorney Glassroth if such an arrangement would be appropriate.  Attorney
Glassroth confirmed that it would be.

-16-

voluntary visit to the DEA District Office was sufficiently attenuated from the arrest to lift any possible taint. See, e.g., Agee v. White, 809 F.2d 1487, 1490 (11th Cir. 1987) ("To succeed on his [F]ourth [A]mendment claim, appellant must demonstrate not only that his initial arrest was illegal, but also that the connection between the initial police illegality and the second confession was not 'so attenuated as to dissipate the taint' of the arrest." (quoting Wong Sun v. United States, 371 U.S. 471, 491 (1963))). After all, Defendant did not make his statements at the DEA District Office until over two weeks had passed following his arrest. He was not in custody and came to the DEA District Office voluntarily after being advised by his own lawyer. Accordingly, pursuant to the United States Supreme Court's holding in Wong Sun, "the connection between the arrest and the statement[s] had 'become so attenuated as to dissipate the taint.'" Wong Sun, 371 U.S. at 491 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

In Wong Sun, the Supreme Court found that a defendant had been arrested without probable cause. Id. at 491. Several days later, the defendant came to the narcotics bureau office and confessed to law enforcement. Id. The Court found that the defendant's prior, unlawful arrest did not taint his later confession due to "evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement. . . ." Id.

The Eleventh Circuit has followed the attenuation doctrine first announced in Wong Sun on a number of occasions, finding confessions free of any possible taint where anywhere from four days to less than an hour had passed between the unlawful detention and the purportedly unlawful police conduct. See, e.g., Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir. 1993) (finding that any taint from an prior unlawful detention "had been completely attenuated by the time of

-17-

his eventual confession four days later" where the defendant was "able to return home" in the interim and had "more than ample opportunity to enlist legal assistance"); United States v. Edmondson, 791 F.2d 1512, 1515-16 (11th Cir. 1986) (finding that defendant's confession, "which began approximately forty-five minutes after his arrest, away from the scene of the arrest, made after twice being advised of his Miranda rights, and initiated by him[,] was sufficiently attenuated."). Here, over two weeks passed. During that time, Defendant was released on bond, was able to return home to friends and family, and had access to counsel. See Devier v. Zant, 3 F.3d at 1459 (noting that defendant "was able to return home" and "[i]n those four days [between defendant's detention and confession], [defendant] had access to the aid and comfort of friends and family" and time to enlist an attorney). Accordingly, Defendant's voluntary visit to the DEA District Office cannot be viewed as the "fruit" of any poisonous tree in this case.

    **2.**    **Defendant's Statements at the DEA District Office did not Violate the Fifth Amendment Insofar as Defendant was not in Custody.**

Defendant's voluntary statements to TFA DeJohn also did not run afoul of the Fifth Amendment's prohibitions against self-incrimination. The Fifth Amendment protects against compelled testimony and statements. See U.S. Const. amend. V ("nor shall [any person] be compelled in any criminal case to be a witness against himself"). Defendant cannot show – and has not even attempted to show – how he was compelled to give a statement to TFA DeJohn. Defendant was not in custody when he came to the DEA District Office. Indeed, he came to the Office on his own and left in the same manner. See, e.g., Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (finding that the defendant was not in custody where "[h]e came voluntarily to the police station, where he was immediately informed that he was not under arrest[,]" and where he

-18-

"did in fact leave the police station without hindrance."). He was not required to come to the Office. His attorney decided to send him. The facts of this case simply do not support Defendant's conclusory claim of a Fifth Amendment violation.[5]

    **3.**    **Defendant's Statements on December 4 did not Violate or Invade his Sixth Amendment Right to Counsel Because Defendant's own Lawyer Sent him to the DEA Office.**

Defendant similarly cannot claim that his voluntary appearance and statements to TFA DeJohn violated the Sixth Amendment's right to counsel. Cf. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."). Although law enforcement faces many restrictions when dealing with represented parties after those parties have been formally charged, such restrictions simply do not apply where a defendant, after being advised by counsel, voluntarily appears at law enforcement's doorstep and begins complaining. See United States v. Grimes, 911 F. Supp. 1485, 1491 (M.D.

--------------------------------

    [5]    The law is clear that not all incriminating statements are prohibited by the Fifth Amendment or protected by the rule expressed in Miranda v. Arizona, 384 U.S. 436 (1966). As the Supreme Court has explained: "The Fifth Amendment itself does not prohibit all incriminating admissions; '[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.'" New York v. Quarles, 467 U.S. 649, 654 (1984) (quoting United States v. Washington, 431 U.S. 181, 187 (1977)). For the Fifth Amendment protections explained in Miranda to be triggered, the facts of a case must show that "at the time the statements were made, [the defendant] was unwarned and was both (a) in custody and (b) being interrogated." United States v. Grimes, 142 F.3d 1342, 1349 (11th Cir. 1998) (emphasis added).
    "Custodial interrogation" is a term of art that has been defined by the Supreme Court. In Miranda, the Supreme Court defined that term when it explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. The premise of the Miranda decision was "that the danger of coercion results from the interaction of custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 297 (1990). Conversely, the concerns expressed in Miranda do not exist absent evidence of both official custody and interrogation by law enforcement. See id.

-19-

Fla. 1996) ("An individual's invocation of his right to counsel under either the Fifth or Sixth Amendment bars subsequent interrogation by law enforcement officers outside of the presence of an attorney unless the exchange is prompted by the defendant." (emphasis added)), aff'd, 142 F.3d 1342 (11th Cir. 1998). Had TFA DeJohn approached Defendant Carmichael at his home or business on December 4 and asked him questions, the United States would stipulate to a Sixth Amendment violation. The facts of this case are clearly different and do not support a Sixth Amendment violation.

First, Defendant was at no point denied his right to counsel. Prior to Defendant's December 4 visit to the DEA District Office, Assistant U.S. Attorney Morris and TFA DeJohn each independently contacted Defendant's attorney, Stephen Glassroth, to make arrangements for the return of seized property. Attorney Glassroth elected to send his client unaccompanied to the DEA District Office. Accordingly, Defendant had access to counsel prior to his December 4 visit, and his counsel advised him to come alone to the DEA District Office. It defies common sense to suggest that the United States deprived Defendant of his right to an attorney when the United States contacted Defendant's attorney twice, yet the attorney decided to send his client to the DEA District Office alone. What more was the United States required to do?

Yet even setting Attorney Glassroth's involvement to the side, the fact remains that Defendant appeared voluntarily at the DEA District Office and began to complain. After the Sixth Amendment right to counsel attaches at initial appearance or arraignment, law enforcement may generally not initiate contact to "deliberately elicit" information. See United States v. Henry, 447 U.S. 264 (1980) ("The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from [the defendant] within

-20-

the meaning of Massiah."). The situation is, however, markedly different when a defendant initiates contact or conversation. See, e.g., United States v. Walls, 70 F.3d 1323, 1326 (D.C. Cir. 1995) (finding no Sixth Amendment violation where the defendant "initiated the conversation by asking [DEA agents to identify] to whom he allegedly sold crack."). The Eleventh Circuit has twice addressed the situation of a defendant, post-arraignment, initiating contact or conversation with law enforcement. See United States v. Gonzalez, 183 F.3d 1315, 1324 (11th Cir. 1999), partial abrogation on other grounds recognized by United States v. Diaz, 248 F.3d 1065 (11th Cir. 2002); United States v. Gaddy, 894 F.2d 1307, 1312-13 (11th Cir. 1990). In both cases the court concluded that such contact did not violate the Sixth Amendment because the defendants initiated communication with law enforcement. See Gonzalez, 183 F.3d. at 1324; Gaddy, 894 F.2d at 1313.

In Gonzalez, the Eleventh Circuit found no Sixth Amendment issue where the defendant, who was in custody, initiated contact with the police through his wife. Gonzalez, 183 F.3d at 1323-24. Specifically, the defendant had his wife tell the arresting officer that the defendant "wanted to speak with him immediately." Id. at 1323. The police then met with the defendant at the jail, advised him of his custodial rights, and proceeded to ask him questions. Id. at 1324. In finding no Sixth Amendment violation, the court explained that "only a defendant, not the police, can reinitiate questioning once the defendant has asserted his Sixth Amendment right to counsel. We find no police initiation under the facts of this case." Id.

In Gaddy, the Eleventh Circuit reached the same conclusion where the police approached the defendant's aunt, a police department employee, and told her that it would be in her nephew's best interests to speak to the police. Gaddy, 894 F.2d at 1309-10. The aunt communicated this

-21-

to the defendant, who then agreed to meet with the police. Id. at 1310. As in Gonzalez, the police in Gaddy then met with the defendant, who was in custody, advised him of his custodial rights, and proceeded to ask him questions. Id. at 1310-11. Based on these facts, the court found no Sixth Amendment violation:

> We have already concluded that [defendant's] statements were not made as a result of police-initiated interrogation; they occurred because [defendant's] aunt, in her private capacity, urged him to speak and he agreed. Therefore, the circumstances under which the government obtained statements from [defendant] were not the functional equivalent of government interrogation. Since [defendant's] statements were not given at the urging of or due to the exploitation by a federal agent, the district court properly denied the suppression of the statements offered in the absence of counsel.

Id. at 1313.

As in Gonzalez and Gaddy, there was no Sixth Amendment violation in this case. Defendant voluntarily appeared at the DEA District Office and "himself initiate[d] further communication, exchanges, or conversations" by complaining to TFA DeJohn. Arizona v. Mauro, 481 U.S. 520, 526 (1987) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)); cf. United States v. Walls, 70 F.3d 1323, 1325-26 (D.C. Cir. 1995) (finding no Sixth Amendment violation where defendant incriminated himself by asking questions and making unsolicited comments to DEA during booking procedure). He continued talking even after TFA DeJohn twice told him that he should confer with his lawyer before cooperating. See Walls, 70 F.3d at 1326 (finding no Sixth Amendment violation where defendant "continued talking despite agents' warning that he was entitled to have an attorney present.").

In sum, TFA DeJohn did nothing to compromise Defendant's right to counsel. TFA DeJohn called Defendant's counsel to make arrangements for the return of evidence prior to

-22-

Defendant's contested visit to the DEA District Office. Thereafter, Defendant arrived alone and initiated communication. No Sixth Amendment violation occurred. Consequently, this Court should reject Defendant's attempt to suppress the statements he voluntarily made to TFA DeJohn.

WHEREFORE, the United States respectfully submits that the Court should deny Defendant Carmichael's Motion without a hearing and allow for the admissibility of the evidence and statements discovered after Defendant's lawful arrest, including his voluntary statements to TFA DeJohn.

Respectfully submitted this the 18th day of February, 2004.

> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
> Matthew S. Miner
> Assistant United States Attorney

-23-

## CERTIFICATE OF SERVICE

I, Matthew S. Miner, Assistant United States Attorney, hereby certify that I have served a copy of the foregoing via first-class mail on Defendant's counsel, Stephen Glassroth, Esq., at the following address: 615 South McDonough Street, Post Office Box 910, Montgomery, Alabama 36101, on this the 18th day of February, 2004.

> Assistant United States Attorney

-24-



# U.S. Department of Justice

*United States Attorney*
*Middle District of Alabama*

| | |
|---|---|
| One Court Square, Suite 201 | Telephone: 334/223-7280 |
| Post Office Box 197 | Fax: 334/223-7560 |
| Montgomery, Alabama 36101-0197 | File LR Fax: 334/223-7291 |
| | Civil Fax 334/223-7418 |
| | Criminal Fax: 334/223-7135 |

December 12, 2003

Steven Glassroth
Montgomery, Alabama

RE: United States v. Leon Carmichael

Dear Steve,

1. Pursuant to Rule 16(a), Fed. R. Crim. P., the Standing Order on Criminal Discovery issued February 4, 1999, and as otherwise required by law (e.g., Brady v. Maryland, 373 U.S. 83, United States v. Giglio, 405 U.S. 150), the United States Attorney hereby provides all available discovery to you as Defendant's counsel of record. Physical evidence, if any, is in the custody of the investigating law enforcement agency, the Alabama Department of Forensic Sciences, or any other agency who may be conducting examinations or tests of such physical evidence. Arrangements to inspect physical evidence collected during the investigation may be made by contacting the undersigned Assistant United States Attorney.

2. Enclosed is a copy of the discovery in this case. This material is page numbered sequentially. Any pages that have not been provided are either work product, or are prohibited from or not required to be disclosed according to federal law or court rules. The United States considers this discovery material to have been received in its entirety unless promptly notified in writing of any discrepancies.

3. The United States intends to use at trial any and all prior convictions, crimes, wrongs or acts of Defendant for those uses permitted by Rules 404(b) and 609, Fed. R. Evid., and as otherwise allowed by law. At this time, the government knows of no "prior crimes" in which it intends to use at trial.

4. The United States intends to elicit testimony at trial from two informants, Patrick Denton and Gary George. The record of prior convictions of these informants is included in the discovery materials. Patrick Denton became an informant after a search warrant was executed at his residence. No illegal contraband was found as a result of said search warrant, however, Denton began cooperating at that time. Denton has pending charges for marijuana possession in Madison County. Denton has requested that the government speak to the Madison County DA's office in an effort to reduce his sentence. The government has not agreed to speak to the Madison County DA's office

---

at the time of filing this discovery response. George was arrested on two counts of distribution of marijuana and one count of possession of marijuana in the first degree. All agreements made between the government and George were captured on the video tape labeled N-1.

5. The United States intends to call expert witnesses at trial. The experts are DEA Task Force Officer David DeJohn, who will testify regarding his knowledge of narcotics investigations based on his training and experience in law enforcement and narcotics investigations; and, the DEA chemist who examines the alleged marijuana who will testify regarding narcotics toxicology. The curriculum vitae for Agent DeJohn is enclosed. Upon completion of the drug analysis, the government will obtain and forward to defense counsel a curriculum vitae for the DEA chemist.

6. Transcripts have not been provided. The government has moved in a separate filing for an additional seven days within which to complete the transcripts.

7. Pursuant to Rules 16(b), (c), and (d), Fed. R. Crim. P., the Standing Order on Criminal Discovery issued February 4, 1999, and as otherwise provided by law, the United States requests a copy of all discovery to which it is entitled.

8. Pursuant to Rules 16(e) and 12.1, Fed. R. Crim. P., and as otherwise provided by law, the United States requests notice of any intent to use an alibi defense and the specific details surrounding the alibi defense. Pursuant to Rule 16(c), the United States requests this information be provided as soon as Defendant becomes aware of its existence, under the continuing duty to disclose this information. The specific time(s) and date(s) of the offense is/are listed in the discovery material provided.

9. The undersigned Assistant United States Attorney is aware of and intends to comply with the continuing duty to disclose discoverable information as required by Rule 16(c), Fed. R. Crim. P. and the Standing Order on Criminal Discovery issued February 4, 1999.

Please feel free to contact me at any time to discuss this case or if you have any questions about the discovery provided.

Respectfully submitted,

LEURA GARRETT CANARY
United States Attorney

by: *Clark Morris*

A. Clark Morris
Assistant United States Attorney

cc: U. S. Magistrate Judge
     Case Agent

---

FILED

# United States District Court

NOV 2 0 2003

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

MIDDLE DISTRICT OF ALABAMA

In the matter of the Search of

949 Ridgecrest Drive
Montgomery, Alabama

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: *M03-70-N*

I, R. David DeJohn _____ being duly sworn depose and say:

I am a(n) Task Force Agent, Drug Enforcement Administration _____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as

949 Ridgecrest Drive, Montgomery, Alabama, more specifically described as a white wood frame residential duplex green trim, burglar bars on the windows, and a brick encased mailbox

in the     Middle     District of     Alabama

there is now concealed a certain person or property, namely

**See Exhibit A**

which is contraband, the fruits of a crime, or things otherwise criminally possessed

concerning violations of Titles 18 USC §§ 924(c), 1956 and 1957; 21 USC §§ 841(a)(1) and 846.

The facts to support the issuance of a Search Warrant are as follows:

SEE THE ATTACHED AFFIDAVIT WHICH IS INCORPORATED BY REFERENCE HEREIN

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_____
R. David DeJohn

Sworn to before me and subscribed in my presence,

November 17, 2003                    at     Montgomery, Alabama
Date                                          City and State

Charles S. Coody, U.S. Magistrate Judge       _____
Name & Title of Judicial Officer                 Signature of Judicial Officer

---

# AFFIDAVIT

I, R. David DeJohn, being duly sworn, state that I am an Investigator with the Prattville Police Department and cross-designated as a Task Force Agent with the United States Drug Enforcement Administration (DEA) assigned to the District Office in Montgomery, Alabama. I have been in Law Enforcement for over 13 years including eight years with the Montgomery Police Department serving as a Patrol Officer and a Narcotics Investigator. The affiant is currently participating in a Marijuana investigation. This investigation targets Marijuana distribution activities in the Montgomery, Alabama area and other locations. This investigation has identified Robert Patrick DENTON JR and Beaver Leon CARMICHAEL as a distributor of Marijuana.

The following facts were either told to me by fellow officers or are known personally by me:

On or about 11/13/2003, officers of the Prattville Police Department arrested Gary Wayne GEORGE during the execution of a search warrant in Prattville, Alabama. GEORGE was under investigation as being a distributor of Marijuana as Prattville Police Department had previously conducted 2 controlled purchases of Marijuana from GEORGE. During a post arrest interview, GEORGE indicated to TFA David DeJohn that he was a member of the Leon CARMICHAEL Drug Trafficking Organization. GEORGE stated that he and an individual by the name of Robert Patrick DENTON JR's job within the organization was to "breakdown" large packages of Marijuana, that was brought in by CARMICHAEL's Couriers, to prepare for distribution into the Montgomery, Alabama area. Through this affiant's training and experience, "Break-down" is defined as opening the Marijuana packages, weigh-out, and repackage for distribution. GEORGE added that the average amount of Marijuana would be 500 to 600 lbs of Marijuana every 7 to 9 days. GEORGE stated that the last shipment had occurred on 11/09/2003, which would leave them due for another shipment of Marijuana on or about 11/16/2003. GEORGE advised TFA DeJohn that the location in which he and DENTON would "breakdown" the Marijuana would be at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama or a residence that is provided to them by CARMICHAEL. GEORGE provided TFA DeJohn with a map to this residence, which was found to be located at 23 Second Street, Montgomery, Alabama. GEORGE added that both he and DENTON are paid by CARMICHAEL with Marijuana. GEORGE stated that CARMICHAEL would also "front" large amounts of Marijuana to them of which they would sell and return the required amount of money to

1

CARMICHAEL. TFA DeJohn obtained information from GEORGE that both he and DENTON would sell Marijuana in and around the Montgomery, Alabama area as well as supply individuals in Huntsville, Alabama. GEORGE stated that both he and DENTON would supply Marijuana to Charlotte and Steve HENSARLING, of Huntsville, Alabama. GEORGE stated that the HENSARLING's would receive Marijuana from DENTON once or twice per week. GEORGE advised TFA DeJohn that approximately 15 months ago, DENTON was arrested in Huntsville, Alabama after officials found DENTON in possession of approximately 10 pounds of Marijuana.

An investigation DeJohn found that on or about 06/13/2002, DENTON had been arrested in Huntsville, Alabama for Trafficking in Marijuana after he was found to be in possession of approximately 10 lbs of Marijuana. On or about 06/13/2003, a subsequent search warrant was executed at his residence, located at 808 W. Fleming Rd, Montgomery, Alabama. During the search of his residence, agents located a quantity of Marijuana and suspected Cocaine along with $7,980.00 and 3 handguns.

On or about 11/14/2003, TFA DeJohn received a call from GEORGE, who stated that he was at DENTON's residence and had observed DENTON counting out money that was to go to CARMICHAEL. GEORGE stated that he estimated the money to total approximately $20,000. GEORGE added that he believed that DENTON was about to depart in approximately 20 minutes and possibly meet with CARMICHAEL at the CARMICHAEL CENTER, located at 150 E. Fleming Rd, Montgomery, Alabama. Approximately 20 minutes later, agents observed DENTON, travel east on W. Fleming Rd. DENTON traveled to M&L Car wash, located on Buckingham Rd near the corner of Norman Bridge Rd, Montgomery, Alabama. There, DENTON met with some unknown individuals briefly and departed. At this time, DENTON traveled back to the area of his residence, located at 808 W. Fleming Rd. GEORGE later contacted TFA DeJohn and advised that DENTON had not yet made the money delivery to CARMICHAEL. GEORGE stated that DENTON had picked up money instead of delivering money when he (GEORGE) had called TFA DeJohn earlier. GEORGE stated that he estimated the money to total $25,000 to $30,000. GEORGE added that DENTON should be transferring the money to CARMICHAEL at CARMICHAEL's residence. Through previous investigations, TFA DeJohn knew CARMICHAEL to reside at 3226 Brookwood Drive, Montgomery, Alabama.

On or about 11/15/2003, TFA David DeJohn and Sgt. David Williams, of the Prattville Police Department, met with GEORGE in Prattville, Alabama. GEORGE stated that during the late evening hours of 11/14/2003, he spoke with DENTON, who advised that on

2

Sunday (11/16/2003) is when the next load of Marijuana is expected in Montgomery, Alabama. GEORGE stated that he also learned from DENTON that it was to be closer to 1,000 lbs of Marijuana. Again, GEORGE stated that both he and DENTON were going to "break-down" the Marijuana at either DENTON's residence or at the residence that TFA DeJohn had previously identified as 23 Second Street, Montgomery, Alabama. GEORGE stated that on today's date, DENTON was expected to sell some Marijuana to Charlotte HENSARLING. GEORGE stated that when HENSARLING arrives from Huntsville, Alabama, both he and DENTON will meet her at Shoney's on the Southern Blvd, Montgomery, Alabama. GEORGE advised that he would provide TFA DeJohn with a vehicle description and tag number after DENTON meets with HENSARLING. A short time later TFA DeJohn learned from GEORGE that both he and DENTON met with HENSARLING. During this time, DENTON provided HENSARLING with what GEORGE believed to be 10 to 15 pounds of Marijuana. GEORGE stated that HENSARLING was driving a Black Chevy S-10 Blazer, 2dr (Ala Tag#476324C). At this time, TFA DeJohn set up surveillance on I-65 at the Pine Level Exit, watching northbound traffic. A short time later, TFA DeJohn observed a Black GMC Jimmy, 2dr (Ala tag#47G324C). Due to the fact that a GMC Jimmy and a Chevy S-10 Blazer are similar vehicles, TFA DeJohn believed this to be the vehicle occupied by HENSARLING. TFA DeJohn made contact with Sgt. Steve Brock, of the Chilton County Sheriff's Office. TFA DeJohn advised Sgt. Brock of what had transpired in Montgomery, Alabama. Sgt. Brock later conducted a traffic stop of the GMC Jimmy after it crossed the Chilton County line. Sgt. Brock advised that he stopped the vehicle after he observed the vehicle change lanes improperly. Sgt. Brock approached the vehicle and asked the driver, identified as Charlotte HENSARLING. The vehicle was found to be registered to James S. HENSARLING, 1063 Macedonia Rd, Ardmore, Alabama. During the atop, SGT Brock detected the strong odor of Marijuana in and about the vehicle. During a consent to search of the vehicle, Sgt. Brock, located approximately 26 lbs of Marijuana. HENSARLING was placed under arrest and transported to the Chilton County Jail. During a post arrest interview, HENSARLING advised agents that she had purchased the Marijuana from DENTON and GEORGE while in Montgomery, Alabama. HENSARLING advised that she had met with GEORGE and DENTON at the Shoney's Restaurant, located on the Southern Blvd in Montgomery, Alabama and gave DENTON $15,000 for the Marijuana. HENSARLING stated that she has made 8 trips to pick-up Marijuana over a 2 month period. HENSARLING will be charged under State of Alabama Charge, Trafficking in Marijuana.

During the traffic stop of HENSARLING, TFA DeJohn received a call from GEORGE, who stated that DENTON had received a call from

3

Charlotte HENSARLING's husband, Steve HENSARLING. GEORGE advised that DENTON had become informed that Charlotte HENSARLING had been stopped for improper lane change. GEORGE also advised that as Charlotte HENSARLING was being stopped, she had placed a call to Steve HENSARLING advising him of her being pulled over by the police.

On or about 11/16/2003, TFA David DeJohn met with GEORGE, who advised that the amount of Marijuana that CARMICHAEL's courier would be bringing to Montgomery, Alabama, on today's date, was reduced to approximately 550 lbs. GEORGE also stated that this was according to DENTON. GEORGE added that this was most likely to be taken to the residence on Second Street, Montgomery, Alabama. During this time, GEORGE also advised that TFA DeJohn that on today's this day's he had seen approximately 10 lbs of Marijuana at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama.

On 11/17/2003 at approximately 12:50am, this affiant, along with other agents, executed a Federal Search Warrant at the residence of DENTON, located at 808 W. Fleming Rd, Montgomery, Alabama. Upon securing the residence, agents located DENTON inside the residence. This affiant conducted an interview with DENTON, who admitted to being involved with the CARMICHAEL Drug Trafficking Organization. DENTON stated that he was supposed to break-down the Marijuana after CARMICHAEL's shipment of Drugs would come to Montgomery, Alabama. DENTON advised that he was supposed to receive a shipment of approximately 500 lbs of Marijuana from CARMICHAEL during the late evening hours of 11/16/2003. DENTON stated that he had called CARMICHAEL and advised that he did not want to take possession of the Marijuana because someone he knew had been arrested and wanted to make sure everything was going to be okay. DENTON also advised that the person who had been arrested was a woman from Huntsville, Alabama who was arrested during a traffic stop in Chilton County on 11/15/2003. DENTON added that he had sold that woman Marijuana on the same date. This affiant knew the woman to be Charlotte HENSARLING. Next, DENTON advised TFA DeJohn that since he did not received the Marijuana, it would be at Freddy (LNU's) residence. DENTON later led agents to Freddy (LNU's) residence, which was located at 949 Ridgecrest Drive, Montgomery, Alabama.

At approximately 2:45am on 11/17/2003, DENTON received a phone call from CARMICHAEL. CARMICHAEL advised that he was about 5 minutes away from DENTON's residence and wanted to talk. At this time, this affiant and all other agents at the residence departed and set up surveillance in the surrounding neighborhood.

4

At approximately 2:50am, CARMICHAEL arrived driving his Black Honda Accord. After approximately 5 minutes, CARMICHAEL departed DENTON's residence. This affiant and other agents met with DENTON who stated that CARMICHAEL advised that the load of Marijuana was at Freddy (LNU's) residence. This affiant knew this to be the residence identified at 949 Ridgecrest Drive, Montgomery, Alabama. DENTON continued by stating that CARMICHAEL wanted DENTON to help Freddy (LNU) "Break-Down" the Marijuana on this morning (11/17/2003).

On or about 11/17/2003, this affiant, along with other agents met with DENTON at a predetermined location. This affiant provided DENTON with an audio transmitting device and instructed him to meet with Freddy (LNU) at 949 Ridgecrest Drive, Montgomery, Alabama for the purpose of verifying if there was a large amount of Marijuana in the residence. At that time, DENTON departed enroute to 949 Ridgecrest Drive, Montgomery, Alabama.

At approximately 9:30am, DENTON arrived at 949 Ridgecrest Drive, Montgomery, Alabama. DENTON went inside the residence and met with Freddy (LNU). During this time, DENTON indicated that CARMICHAEL's load of Marijuana was present inside the residence. Through the audio transmitting device, agents overheard Freddy and DENTON discussing the fact that they did not have scales with which to weigh the marijuana. It was decided that DENTON would leave the residence to obtain a scale. While in route to obtain the scale, DENTON spoke with your Affiant via cellular phone. During said conversation, DENTON told your Affiant that located inside 949 Ridgecrest Drive, Montgomery, Alabama is approximately 11 duffle bags containing marijuana.

Based on the aforementioned facts and circumstances, your Affiant submits that probable cause exists to believe that the following items (Attachment "A") are located at the premises known as 949 Ridgecrest Drive, Montgomery, Alabama including all residences, structures and outbuildings thereon and all vehicles located thereon;

Executed on this ___ day of November 2003.



Affiant

5

Sworn to and subscribed before me this 19th day of November 2003.

_____
United States Magistrate Judge

6

---

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the matter of the Search of                    SEARCH WARRANT

808 West Flemming Road                    CASE NUMBER: M03-71-N
Montgomery, Alabama

TO: _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by  DEA Task Force Agent, R. David DeJohn  who has reason to
                                            Affiant
believe that □ on the person of or ☒ on the property or premises known as

808 West Flemming Road, Montgomery, Alabama, more specifically described as a two-story white, single
family dwelling, with a front porch, an outbuilding sitting on the right side of the residence, a privacy fence
surrounding three sides of the property and a chain-link fence following the road in the front of the property
with a double chain-link gate that accesses the driveway

in the     Middle                     District of         Alabama                there is now

concealed a certain person or property, namely (describe the person or property)

See Exhibit A

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before  November 26, 2003
                                                 Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search at any time in the day or night as I find reasonable cause has been established and if the
person or property be found there to seize the same, leaving a copy of this warrant and receipt for the person or
property taken, and prepare a written inventory of the person or property seized and promptly return this warrant
to  Charles S. Coody, U.S. Magistrate Judge       as required by law.
    U. S. Judge or Magistrate Judge

November 16, 2003     11:04 p.m.      at     Montgomery, Alabama
Date and Time Issued                          City and State

Charles S. Coody, U.S. Magistrate Judge
Name & Title of Judicial Officer              Signature of Judicial Officer

---

AO 93 (Rev. 5/85) Search Warrant

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| 11-16-03 | 11-17-03 at 8:08 AM | Robert Patrick Denton Jr |

INVENTORY MADE IN PRESENCE OF
TFA Larry Hubbard / TFA D. DeJohn

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

No items seized

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by
me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____      11/20/03
U. S. Judge or Magistrate Judge         Date

---

Exhibit A

1.    Marijuana and all other controlled substances.

2.    Paraphernalia and other objects and substances used in the packaging, weighing, cutting, use and
distribution of controlled substances, including, but no limited to, scales and baggies.

3.    Retrieve latent fingerprints which may have been left at this location.

4.    Books, records, receipts, notes, ledgers and other papers or documents relating to the
importation, transportation, ordering, purchasing, storing, and distributing of controlled substances;

5.    Books, records, receipts, banks statements and records, money drafts, letters of credit, money
orders, cashiers checks, safe deposit box keys, passbooks, and other items evidencing the acquisition,
secreting, transfer, storage, concealment, and/or expenditure of money or other commodity which is used
or intended to be used as the proceeds of, or to facilitate the importation, transportation, storage and
distribution of controlled substances. Safes, vaults and other type of locked boxes or containers.

6.    Address books, telephone books, utility records, toll records, date books, diaries, and other
documents reflecting and/or containing the names, addresses, telephone numbers, or other pertinent
information as to the identity and roles of subjects, both known and unknown, involved in the
importation, transportation, storage, and distribution of controlled substances and/or the proceeds of
these activities.

7.    Papers, tickets, notes, maps, travel documents, schedules, receipts, credit card statements, and
other documents or items relating to domestic and international travel.

8.    United States currency, precious metals, jewelry and financial documents which reflect an
accumulation of profit and/or wealth from the trafficking of controlled substances.

9.    Indicia of occupancy, residency, ownership, dominion or control of the premises and property
described in the Search Warrant, including, but not limited to, titles, deeds, mortgage statements, utility
bills, keys and any other documentary or other evidence of the above.

10.   Books, records, deeds, titles mortgage statements, utility records and bills, bills of sale, and other
documents or items reflecting the acquisition, purchase, ownership, dominion, or control of apartments,
condominiums, property, vehicles, and other property that represent the profits or proceeds of narcotics
trafficking.

11.   Photographs, videotapes, or other visual evidence showing co-conspirators, assets, and controlled
substances.

12.   Weapons, including, but not limited to, handguns, shotguns and rifles.

13.   Computers, electronic organizers, caller-ID devices, facsimile machines, computer disks, and
other electronic devices which contain evidence of narcotics trafficking, the identities, telephone
numbers, and addresses of co-conspirators, and the descriptions and locations of assets; including, the
means necessary to make the information contained in these devices legible to humans. Cellular phones,
pagers, two-way radios, any other communication devices and all stored numbers contained therein.

FILED

# United States District Court

NOV 20 2003

MIDDLE _____ DISTRICT OF _____ ALABAMA _____

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| In the matter of the Search of | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT** |
| 808 West Flemming Road Montgomery, Alabama | |
| | CASE NUMBER: M03-71-N |

I, R. David DeJohn _____ being duly sworn depose and say:

I am a(n) Task Force Agent, Drug Enforcement Administration _____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as

808 West Flemming Road, Montgomery, Alabama, more specifically described as a two-story white, single family dwelling, with a front porch, an outbuilding sitting on the right side of the residence, a privacy fence surrounding three sides of the property and a chain-link fence following the road in the front of the property with a double chain-link gate that accesses the driveway

in the _____ Middle _____ District of _____ Alabama _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Exhibit A**

which is contraband, the fruits of a crime, or things otherwise criminally possessed

concerning violations of Titles 18 USC §§ 924(c), 1956 and 1957; 21 USC §§ 841(a)(1) and 846.

The facts to support the issuance of a Search Warrant are as follows:

**SEE THE ATTACHED AFFIDAVIT WHICH IS INCORPORATED BY REFERENCE HEREIN**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_____ [signature] _____
R. David DeJohn

Sworn to before me and subscribed in my presence,

November 16, 2003 _____ at _____ Montgomery, Alabama
Date                                                                    City and State

Charles S. Coody, U.S. Magistrate Judge _____ [signature] _____
Name & Title of Judicial Officer                Signature of Judicial Officer

---

**AFFIDAVIT**

I, R. David DeJohn, being duly sworn, state that I am an Investigator with the Prattville Police Department and cross-designated as a Task Force Agent with the United States Drug Enforcement Administration (DEA) assigned to the District Office in Montgomery, Alabama. I have been in Law Enforcement for over 13 years including eight years with the Montgomery Police Department serving as a Patrol Officer and a Narcotics Investigator. The affiant is currently participating in a Marijuana investigation. This investigation targets Marijuana distribution activities in the Montgomery, Alabama area and other locations. This investigation has identified Robert Patrick DENTON JR and Beaver Leon CARMICHAEL as a distributor of Marijuana.

The following facts were either told to me by fellow officers or are known personally by me:

On or about 11/13/2003, officers of the Prattville Police Department arrested Gary Wayne GEORGE during the execution of a search warrant in Prattville, Alabama. GEORGE was under investigation as being a distributor of Marijuana as Prattville Police Department had previously conducted 2 controlled purchases of Marijuana from GEORGE. During a post arrest interview, GEORGE indicated to TFA David DeJohn that he was a member of the Leon CARMICHAEL Drug Trafficking Organization. GEORGE stated that he and an individual by the name of Robert Patrick DENTON JR's job within the organization was to "breakdown" large packages of Marijuana, that was brought in by CARMICHAEL's Couriers, to prepare for distribution into the Montgomery, Alabama area. Through this affiant's training and experience, "Break-down" is defined as opening the Marijuana packages, weigh-out, and repackage for distribution. GEORGE stated that on average the organization gets approximately 500 to 600 lbs of Marijuana every 7 to 9 days. GEORGE stated that the last shipment had occurred on 11/09/2003, which would leave them due for another shipment of Marijuana on or about 11/16/2003. GEORGE advised TFA DeJohn that the location in which he and DENTON would "breakdown" the Marijuana would be at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama or a residence that is provided to them by CARMICHAEL. GEORGE provided TFA DeJohn with a map to this residence, which was found to be located at 23 Second Street, Montgomery, Alabama. GEORGE added that both he and DENTON are paid by CARMICHAEL with Marijuana. GEORGE stated that CARMICHAEL

---

would also "front" large amounts of Marijuana to them of which they would sell and return the required amount of money to CARMICHAEL. TFA DeJohn obtained information from GEORGE that both he and DENTON would sell Marijuana in and around the Montgomery, Alabama area as well as supply individuals in Huntsville, Alabama. GEORGE stated that both he and DENTON would supply Marijuana to Charlotte and Steve HENSARLING, of Huntsville, Alabama. GEORGE stated that the HENSARLING's would receive Marijuana from DENTON once or twice per week. GEORGE advised TFA DeJohn that approximately 15 months ago, DENTON was arrested in Huntsville, Alabama after officials found DENTON in possession of approximately 10 pounds of Marijuana.

An investigation into DENTON found that on or about 06/13/2002, DENTON had been arrested in Huntsville, Alabama for Trafficking in Marijuana after he was found to be in possession of approximately 10 lbs of Marijuana. On or about 06/14/2002, a subsequent search warrant was executed at his residence, located at 808 W. Fleming Rd, Montgomery, Alabama. During the search of his residence, agents located a quantity of Marijuana and suspected Cocaine along with $7,980.00 and 3 handguns.

On or about 06/14/2003, TFA DeJohn received a call from GEORGE, who stated that he was at DENTON's residence and had observed DENTON counting out money that was to go to CARMICHAEL. GEORGE stated that he estimated the money to total approximately $20,000. GEORGE added that he believed that DENTON was about to depart at approximately 20 minutes and possibly meet with CARMICHAEL at the CARMICHAEL CENTER, located at 150 E. Fleming Rd, Montgomery, Alabama. Approximately 20 minutes later, agents observed DENTON, travel east on W. Fleming Rd. DENTON traveled to M&L Car wash, located on Buckingham Rd near the corner of Norman Bridge Rd, Montgomery, Alabama. There, DENTON met with some unknown individuals briefly and departed. At this time, DENTON traveled back to the area of his residence, located at 808 W. Fleming Rd. GEORGE later contacted TFA DeJohn and advised that DENTON had not yet made the money delivery to CARMICHAEL. GEORGE stated that DENTON had picked up money instead of delivering money when he (GEORGE) had called TFA DeJohn earlier. GEORGE stated that he estimated the money to total $25,000 to $30,000. GEORGE added that DENTON should be transferring the money to CARMICHAEL at CARMICHAEL's residence. Through previous investigations, TFA DeJohn knew CARMICHAEL to reside at 3226 Brookwood Drive, Montgomery, Alabama.

On or about 06/15/2003, TFA David DeJohn and Sgt. David Williams, of the Prattville Police Department, met with GEORGE in

---

Prattville, Alabama. GEORGE stated that during the late evening hours of 06/14/2003, he spoke with DENTON, who advised that on Sunday (06/15/2003) is when the next load of Marijuana is expected in Montgomery, Alabama. GEORGE stated that he also learned from DENTON that it was to be closer to 1,000 lbs of Marijuana. Again, GEORGE stated that both he and DENTON were going to "break-down" the Marijuana at either DENTON's residence at 808 West Fleming Road, Montgomery, Alabama or at the residence that TFA DeJohn had previously identified as 23 Second Street, Montgomery, Alabama. GEORGE was expected to sell some Marijuana to Charlotte HENSARLING. GEORGE stated that when HENSARLING arrives from Huntsville, Alabama, both he and DENTON will meet her at Shoney's on the Southern Blvd, Montgomery, Alabama. GEORGE advised that he would provide TFA DeJohn with a vehicle description and tag number after DENTON meets with HENSARLING. A short time, later TFA DeJohn learned from GEORGE that both he and DENTON met with HENSARLING. During this time, DENTON provided HENSARLING with what GEORGE believed to be 10 to 15 pounds of Marijuana. GEORGE stated that HENSARLING was driving 15 pounds of Marijuana. GEORGE stated that HENSARLING was driving a Black Chevy S-10 Blazer, 2dr (Ala tag#47624C). At this time, TFA DeJohn set up surveillance on I-65 at the Pine Level Exit, watching northbound traffic. A short time later, TFA DeJohn observed a Black GMC Jimmy, 2dr (Ala tag#476324C). Due to the fact that a GMC Jimmy and a Chevy S-10 Blazer are similar vehicles, TFA DeJohn believed this to be the vehicle occupied by HENSARLING. TFA DeJohn made contact with Sgt. Steve Brock, of the Chilton County Sheriff's Office. TFA DeJohn advised Sgt. Brock of what had transpired in Montgomery, Alabama. Sgt. Brock later conducted a traffic stop of the GMC Jimmy after it crossed the Chilton County Line. Sgt. Brock advised that he stopped the vehicle after he observed the vehicle change lanes improperly. Sgt. Brock approached the vehicle and asked the driver, identified as Charlotte HENSARLING. The vehicle was found to be registered to James S. HENSARLING, 1063 Macedonia Rd, Ardmore, Alabama. During the stop, SGT Brock detected the strong odor of Marijuana in and about the vehicle. HENSARLING consented to the search of the vehicle. During the search of the vehicle, Sgt. Brock, located approximately 26 lbs of Marijuana. HENSARLING was placed under arrest and transported to the Chilton County Jail. During a post arrest interview, HENSARLING advised agents that she had purchased the Marijuana from DENTON and GEORGE while in Montgomery, Alabama. HENSARLING advised that she had met with GEORGE and DENTON at the Shoney's Restaurant, located on the Southern Blvd in Montgomery, Alabama and gave DENTON $15,000 for the Marijuana. HENSARLING stated that she made 3 trips to pickup Marijuana over a 2 month period. HENSARLING will be charged under State of Alabama Charge, Trafficking in Marijuana.

During the traffic stop of HENSARLING, TFA DeJohn received a call from GEORGE, who stated that DENTON had received a call from Charlotte HENSARLING's husband, Steve HENSARLING. GEORGE advised that DENTON had become informed that Charlotte HENSARLING had been stopped for improper lane change. GEORGE also advised that as Charlotte HENSARLING was being stopped, she had placed a call to Steve HENSARLING advising him of her being pulled over by the police.

On or about 11/16/2003, TFA David DeJohn met with GEORGE, who advised that the amount of Marijuana that CARMICHAEL's courier would be bringing to Montgomery, Alabama, on today's date, was reduced to approximately 550 lbs. GEORGE also stated that this was according to DENTON. GEORGE added that this was most likely to be taken to the residence on Second Street, Montgomery, Alabama. GEORGE further added that this should occur around mid-night on today's date. During this time, GEORGE also advised TFA DeJohn that today (11/16/2003) GEORGE had seen approximately 10 lbs of Marijuana at DENTON's residence, located at 808 W. Fleming Rd, Montgomery, Alabama.

Based on the aforementioned facts and circumstances, your affiant submits that probable cause exists to believe that the following items (Exhibit "A") are located at the premises known as 808 West Fleming Road, Montgomery, Alabama including all residences, structures and outbuildings thereon and all vehicles located thereon;

This affiant also respectfully request permission to execute the search warrant at night because, based on my training and experience, drug traffickers such as DENTON attempt to sell their narcotics as quickly as possible to prevent detection by law enforcement officers. Furthermore, drug traffickers such as DENTON often conduct transactions, when possible at night.

Executed on this _16th_ day of November 2003.

Affiant

---

Sworn to and subscribed before me this _16th_ day of February 2003.

United State Magistrate Judge

---

**REPORT OF INVESTIGATION**                    Page 1 of 12

| 1. Program Code | 2. Cross | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| H10100 | File | | 5. File Title | |

5. By: TFA R. David DeJohn
At Montgomery DO

7. ☐ Closed ☐ Requested Action Completed
   ☐ Action Requested By:

8. Date Prepared
11/21/03

9. Other Officers: See Last Paragraph

10. Report Re: Execution of Federal Search Warrant at 949 Ridgecrest Dr, Montgomery, Alabama on 11/17/2003 which led to the seizure of approx. 574.0 lbs of Marijuana (Ex #1)

**SYNOPSIS**

On 11/17/2003 at approximately 4:30pm, TFA Larry Hubbard, of the DEA Montgomery District Office, along with other law enforcement officers, executed a lawful Federal Document Search Warrant at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. The search of the residence led to the seizure of approximately 575.0 lbs of Marijuana (Exhibit #1) as well as the acquisition of Exhibits N-14 to N-29 and N-31 to N-33a.

**DETAILS**

1. On 11/17/2003 at approximately 7:30am, TFA David DeJohn, of the DEA Montgomery DO, along with Lt Todd Townson and Sgt David Williams, both of the Prattville Police Department, met with Robert Patrick DENTON Jr at a predetermined location.

2. TFA DeJohn had gained the cooperation of DENTON during an earlier search warrant at his (DENTON) residence, located at 808 W. Fleming Rd, Montgomery, Alabama. During an earlier interview, DENTON had advised agents that he was a member of the Leon CARMICHAEL Marijuana Trafficking Organization. DENTON also stated that there was approximately 550 pounds of Marijuana, belonging to CARMICHAEL, and was being stored at Freddie (LNU)'s residence, located at 949 Ridgecrest Drive, Montgomery, Alabama. DENTON had been instructed by CARMICHAEL to go to Freddie (LNU)'s residence and help Freddie (LNU)

11. Division: HQTD
    District:
    Other: SARI

12. Signature (Agent)
    TFA R. David DeJohn

13. Date
    12-9-03

14. Approved (Name and Title)
    Sheri_ Gonzales
    Group_ Gonzalez

15. Date
    12-10-03

DEA Form - 6
(Jul. 1996)

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/94 may be used.

1 - Prosecutor

---

**REPORT OF INVESTIGATION**
*(Continuation)*

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |

Page 2 of 12
5. Program Code
H10100

6. Date Prepared
11/21/03

break-down the Marijuana. See DEA 6 written to this case file by TFA DeJohn regarding the Execution of a Federal Search Warrant at 808 W. Fleming Rd, Montgomery, Alabama on 11/17/2003.

3. Upon meeting with DENTON, TFA DeJohn instructed DENTON to go to Freddie (LNU)'s residence, later identified as Freddie WILLIAMS, and verify if the Marijuana was present. DENTON was also advised that he would work at repackaging the Marijuana as he would normally do so when instructed by CARMICHAEL.

4. DENTON's person and vehicle was search for weapons, drugs, or contraband. None of which were located. DENTON was then provided with an audio and video recording/transmitting device.

5. At this time, DENTON departed, while under surveillance, to WILLIAMS residence.

6. At approximately 8:06am, DENTON arrived at 949 Ridgecrest Drive and was met by WILLIAMS. Also present at the residence was a black female only known as Faith (LNU). During this time, WILLIAMS instructed DENTON to go buy 400, gallon size, "zip lock" type bags.

7. At approximately 8:28am, DENTON departed the residence and met with TFA DeJohn at a predetermined location. TFA DeJohn then provided DENTON with $50.00 U.S. Currency for the purchase of the plastic baggies. Also during this time, audio & video tapes were recovered and was later marked as Exhibits N-31 (Audio) and N-32(8mm Video). DENTON then obtained numerous plastic baggies as ordered by WILLIAMS. While DENTON was completing this, Exhibits N-31 and N-32 were replaced with new audio/video tapes. DENTON then traveled, while under surveillance, back to WILLIAMS residence.

8. At approximately 9:13am, DENTON arrived back at WILLIAMS residence via cell phone, and advised him (WILLIAMS) that he was at the back door of the residence. WILLIAMS stated that he was not at the residence and that he would be returning in 10 minutes.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/94 may be used.

1 - Prosecutor

## Panel 1 (Page 21)

U.S. Department of Justice
Drug Enforcement Administration

Case 2:03-cv-00259-MHT-WC   Document 318-1   Filed 11/29/04   Page 45 of 61

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
3. File Title

4.
Page 3 of 12
5. Program Code
HID100
6. Date Prepared
11/21/03

9.  Approximately 10 minutes later, WILLIAMS arrived back at the residence and met with DENTON.  Both WILLIAMS and DENTON then went inside.

10.  While inside the residence, DENTON and WILLIAMS engage in conversation.  During this time, DENTON indicates over the audio transmission that the Marijuana is in WILLIAMS residence.

11.  At approximately 9:33am, DENTON departs the residence and enters his vehicle.  DENTON advised the residence and enters his set of scales so he and WILLIAMS could weigh the Marijuana.  DENTON also tells TFA DeJohn that the Marijuana is in the residence in 11 black duffel bags and is close to 500 lbs.  TFA DeJohn then instructed DENTON to meet with G/S Sherri Gonzalez, of the DEA Montgomery DO, at a predetermined location.

12.  Upon DENTON meeting with G/S Gonzalez, DENTON advised G/S Gonzalez of the events that had transpired.  Lt Townson and Sgt Williams retrieved the audio and video tapes that were later marked as Exhibit N-31a (Audio) and Exhibit N-32a (8mm Video).  Exhibits N-31a and N-32a were replaced with new audio/video tapes.  DENTON was provided with a set of scales, at which time, he departed and traveled back to WILLIAMS' residence.

13.  At this time, Lt Townson reviews the 8mm Video tape (Exhibit N-32a) and finds that the video captured several black duffel bags' on a bed as well as WILLIAMS.

14.  At approximately 10:00am, the CS arrived back at WILLIAMS' residence and went inside.  During this time, audio transmissions revealed that WILLIAMS was talking to an unknown individual on the phone advise them that their momma was dying.  DENTON began to advise monitoring agents that WILLIAMS is going to leave the residence.

15.  At approximately 10:18am, DENTON advised TFA DeJohn, via cell phone, that WILLIAMS had left the residence for the hospital because someone was sick.  At this time, agents moved in to arrest WILLIAMS and secure the residence.

DEA Form - 6a
(Jul. 1996)
DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition dated 8/94 may be used.
1 - Prosecutor
21

## Panel 2 (Page 22)

Drug Enforcement Administration
Case 2:03-cv-00259-MHT-WC   Document 318-1   Filed 11/29/04   Page 46 of 61

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
3. File Title

4.
Page 4 of 12
5. Program Code
HID100
6. Date Prepared
11/21/03

16.  At approximately 10:20am, agents entered the residence and secured DENTON, the audio/video equipment, as well as the residence.  Other agents began to canvas the neighborhood and the roadways in an attempt to locate and arrest WILLIAMS.  While securing the residence, agents observed several large black duffel bags, (3) three large bricks of suspected Marijuana on a "cutting board", and a open large duffel bag that contained suspected Marijuana wrapped in brown packing tape and clear plastic wrap.  The residence was secured and the scene "frozen" pending the authorization of a Federal Search Warrant.  Lt Townson retrieved the final set of Audio/Video tapes that were later marked as Exhibit N-31b (Audio) and N-32b (8mm Video).  It should be noted that regarding the camera's time generator used to record Exhibits N-32, N-32a, and N-32b, was inaccurate as it was not adjusted for daylight savings time.  Therefore, the actual time is an hour different or "behind" that of what was displayed.

17.  At this time, DENTON was then removed from the scene and later released.  Meanwhile, TFA DeJohn arrived at the United States Attorney's Office to prepare a Search Warrant Affidavit with the assistance of AUSA Clark Morris.

18.  A short time later, G/S Gonzalez and Lt Townson observed CARMICHAEL drive by WILLIAMS residence in his black Honda Accord.  It appeared to the agents that CARMICHAEL noticed agents outside the residence as he drove by.  G/S Gonzalez attempted to get behind CARMICHAEL in an effort to follow and stop him.  CARMICHAEL was able to speed away before G/S GONZALEZ was able to catch up.

19.  Agents would later stop CARMICHAEL and place him under arrest pursuant to discovering a loaded firearm on the front passenger seat.  It was known to agents that CARMICHAEL had been previously convicted for murder in 1976.  See DEA 6 written to this case file S/A Thomas Halasz on 11/25/2003 regarding the arrest of CARMICHAEL and his post arrest statement.

20.  Agents would also later arrest WILLIAMS as he was departing Baptist Hospital, located on the Southern Blvd in Montgomery, Alabama.  See

DEA Form - 6a
(Jul. 1996)
DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition dated 8/94 may be used.
1 - Prosecutor
22

## Panel 3 (Page 23)

U.S. Department of Justice
Drug Enforcement Administration
Case 2:03-cv-00259-MHT-WC   Document 318-1   Filed 11/29/04   Page 47 of 61

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
3. File Title

4.
Page 5 of 12
5. Program Code
HID100
6. Date Prepared
11/21/03

DEA 6 written to this case file by S/A Halasz on 11/25/2003 regarding the arrest of WILLIAMS and his post arrest statements.

21.  At approximately 4:10pm, TFA DeJohn, with the assistance of AUSA Clark Morris, presented (3) three applications for Federal Search Warrants to a United States Magistrate Judge for the Middle District of Alabama, Judge Charles S. Coody.  The search was to be for the residence of WILLIAMS, the CARMICHAEL CENTER, located at 150 E. Fleming Rd, Montgomery, Alabama, and CARMICHAEL's residence, located at 3226 Brookwood Drive, Montgomery, Alabama.

22.  At this time, Judge Coody authorized searches of all three locations.  For details regarding the Execution of Search Warrants at the CARMICHAEL CENTER and CARMICHAEL's residence, refer to this case and the appropriate DEA 6.

23.  At approximately 4:30pm, members of the Montgomery DO executed a search warrant for WILLIAMS residence.

24.  During the search, agents located (11) eleven duffel bags that contained an approximately 294 bundles of suspected Marijuana (Exhibit #1), weapons, ammo, drug paraphernalia, and paper documents(Exhibits N-14 to N-29).

25.  All seized items were transported and secured at the DEA Montgomery DO.

### LIST OF PERSONEL

DEA Montgomery DO  - S/A Thomas Halasz, G/S Sherri Gonzalez, & S/A Devin Whittle, TFA David DeJohn, TFA Larry Hubbard, and S/A Robert Greenwood.

Alabama HIDTA  - S/A Marshal Simons, TFA Gene Sisson, TFA Joe Herman, TFA Phil Sanders, TFA Charles Odom.

DEA Form - 6a
(Jul. 1996)
DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition dated 8/94 may be used.
1 - Prosecutor
23

## Panel 4 (Page 24)

Case 2:03-cv-00259-MHT-WC   Document 318-1   Filed 11/29/04   Page 48 of 61

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
3. File Title

4.
Page 6 of 12
5. Program Code
HID100
6. Date Prepared
11/21/03

Montgomery PD  - CPL Tommy Conway and CPL D. Alexander

Montgomery County SO  - Inv Randy Pollard and Inv Dennis Smithee.

### CUSTODY OF DRUG EVIDENCE

1.  Exhibits 1a-1k are representative samples of exhibit 1 (Approx 261.27 Kilograms of Marijuana), which was seized during a search warrant execution at 949 Ridgecrest Dr., Montgomery Alabama on 11/17/2003.  TFA Larry D. Hubbard obtained Exhibit 1 on 11/17/2003, while at 949 Ridgecrest Dr., Montgomery Alabama.  TFA Hubbard maintained custody of the exhibit and secured it at the Montgomery D.O. until such time as it could be processed, sealed, and submitted to the DEA South Central Lab for analysis.  Exhibit 1 was field tested with positive results for Marijuana.  Exhibit 1 and the original packaging will be maintained at the Montgomery D.O.

### CUSTODY OF NON-DRUG EVIDENCE

1.  Ex N-14 is a Nokia Cellular Phone w/assigned cell #(334)320-1803 and was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama.  On 11/17/2003, TFA David DeJohn obtained Ex N-14 and secured it at the Montgomery DO.  On 11/21/2003, TFA DeJohn packaged Ex N-14.  TFA DeJohn later transferred custody of Ex N-14 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

2.  Ex N-15 is a set of Triple Beam Scales that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama.  On 11/17/2003, TFA David DeJohn obtained Ex N-15 and secured it at the Montgomery DO.  On 11/21/2003, TFA DeJohn packaged Ex N-15.  TFA DeJohn later transferred custody of Ex N-15 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

DEA Form - 6a
(Jul. 1996)
DEA SENSITIVE
Drug Enforcement Administration
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition dated 8/94 may be used.
1 - Prosecutor
24

---

**REPORT OF INVESTIGATION**
*(Continuation)*

Page 7 of 12
5. Program Code
RID100
6. Date Prepared
11/21/03

3. Ex N-16 are [19] nineteen boxes of gallon size "Ziplock" type bags seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-16 and secured them at the Montgomery DO. On 11/21/2003, TFA David DeJohn packaged Ex N-16. TFA DeJohn later transferred custody of Ex N-16 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

4. Ex N-17 is a piece of "Formica" board used to cut Marijuana that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-17 and secured it at the Montgomery DO. On 12/01/2003, TFA David DeJohn packaged Ex N-17. TFA DeJohn later transferred custody of Ex N-17 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

5. Ex N-18 is assorted ammunition and clips that were seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-18 and secured them at the Montgomery DO. On 11/21/2003, TFA David DeJohn packaged Ex N-18. TFA DeJohn later transferred custody of Ex N-18 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

6. Ex N-19 are [19] nineteen empty duffel bags that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-19 and secured them at the Montgomery DO. On 12/01/2003, TFA David DeJohn packaged Ex N-19. TFA DeJohn later transferred custody of Ex N-19 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

7. Ex N-20 is assorted packing materials & newspapers that were seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-20 and secured it at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

25

---

**REPORT OF INVESTIGATION**
*(Continuation)*

Page 8 of 12
5. Program Code
RID100
6. Date Prepared
11/21/03

Ex N-20. TFA DeJohn later transferred custody of Ex N-20 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

8. Ex N-21 is assorted knives and cutting tools that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-21 and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-21. TFA DeJohn later transferred custody of Ex N-21 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

9. Ex N-22 are assorted paper documents that were seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-22 and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-22. TFA DeJohn later transferred custody of Ex N-22 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

10. Ex N-23 is a Walther P38 9mm Handgun, Ser#318527 w/mag and was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-23 and secured it at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-23. TFA DeJohn later transferred custody of Ex N-23 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

11. Ex N-23a is [7] seven Rounds of 9mm ammo seized with Ex N-23 during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-23a and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-23a. TFA DeJohn later transferred custody of Ex N-23a to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

12. Ex N-24 is a Rohm Model 63 .38 cal pistol. Serial #Hf111478 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive,

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

26

---

**REPORT OF INVESTIGATION**
*(Continuation)*

Page 9 of 12
5. Program Code
RID100
6. Date Prepared
11/21/03

Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-24 and secured it at the Montgomery DO. On 12/01/2003, TFA David DeJohn packaged Ex N-24. TFA DeJohn later transferred custody of Ex N-24 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

13. Ex N-24a is [6] .38 cal rounds that were found with Ex N-24 and was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-24a and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-24a. TFA DeJohn later transferred custody of Ex N-24a to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

14. Ex N-25 is a Mossberg Model 500A .12 GA Shotgun, Ser#K403013 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-25 and secured it at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-25. TFA DeJohn later transferred custody of Ex N-25 to the Non-Drug Evidence Custodian, for storage and safekeeping.

15. Ex N-26 is a Marlin Model 9mm Carbine w/scope SER#11576665 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-26 and secured it at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-26. TFA DeJohn later transferred custody of Ex N-26 to the Non-Drug Evidence Custodian for storage and safekeeping.

16. Ex N-27 is a Winchester Model 94E .30-.30 Rifle, SER#5347159 SER#11576665 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-27 and secured it at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-27. TFA DeJohn later transferred custody of Ex N-27 to the Non-Drug Evidence Custodian, for storage and safekeeping.

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

27

---

**REPORT OF INVESTIGATION**
*(Continuation)*

Page 10 of 12
5. Program Code
RID100
6. Date Prepared
11/21/03

17. Ex N-28 is a British Enfield .303 cal Rifle, SER#3561 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-28 and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-28. TFA DeJohn later transferred custody of Ex N-28 to the Non-Drug Evidence Custodian for storage and safekeeping.

18. Ex N-29 is a CETME .308 cal (7.62mm) Assault Rifle, SER#C05099 that was seized during execution of a Federal Search Warrant on 11/17/2003 at the residence of Freddie WILLIAMS, located at 949 Ridgecrest Drive, Montgomery, Alabama. On 11/17/2003, TFA David DeJohn obtained Ex N-29 and secured them at the Montgomery DO. On 12/01/2003, TFA DeJohn packaged Ex N-29. TFA DeJohn later transferred custody of Ex N-29 to the Non-Drug Evidence Custodian for storage and safekeeping.

19. Ex N-31 is an Audio Cassette Tape. N-31 contains a recorded meeting & conversation between Robert DENTON Jr and Freddie WILLIAMS on 11/17/2003. On 11/17/2003, LT. Todd Townson obtained Ex N-31 and turned it over to TFA David DeJohn who secured it at the Montgomery DO. On 12/04/2003, TFA DeJohn packaged Ex N-31. TFA DeJohn later transferred custody of Ex N-31 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

20. Ex N-31a is an Audio Cassette Tape. Ex N-31a contains a recorded meeting & conversation between Robert DENTON Jr and Freddie WILLIAMS on 11/17/2003. On 11/17/2003, LT. Todd Townson obtained Ex N-31a and turned it over to TFA David DeJohn who secured it at the Montgomery DO. On 12/04/2003, TFA DeJohn packaged Ex N-31a. TFA DeJohn later transferred custody of Ex N-31a to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

21. Ex N-31b is an Audio Cassette Tape. Ex N-31b contains a recorded meeting & conversation between Robert DENTON Jr and Freddie WILLIAMS on 11/17/2003. On 11/17/2003, LT. Todd Townson obtained Ex N-31b and turned it over to TFA David DeJohn who secured it at the Montgomery DO. On 12/04/2003, TFA DeJohn packaged Ex N-31b. TFA DeJohn later

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

28

## Top-left document

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
| --- | --- |

| 3. File Title |
| --- |

4.
Page  11  of  12

| 5. Program Code
HID100 | 6. Date Prepared
11/21/03 |

transferred custody of Ex N-31b to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

22. Ex N-32 is an 8mm Video Tape.  Ex N-32 contains a recorded meeting & conversation between Robert WILLIAMS Jr and Freddie WILLIAMS on 11/17/2003.  On 11/17/2003, LT. Todd Townson obtained Ex N-32 and turned it over to TFA David DeJohn who secured it at the Montgomery DO.  On 12/04/2003, TFA DeJohn packaged Ex N-32.  TFA DeJohn later transferred custody of Ex N-32 to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

23. Ex N-32a is an 8mm Video Tape.  Ex N-32a contains a recorded meeting & conversation between Robert DENTON Jr and Freddie WILLIAMS on 11/17/2003.  On 11/17/2003, LT. Todd Townson obtained Ex N-32a and turned it over to TFA David DeJohn who secured it at the Montgomery DO.  On 12/04/2003, TFA DeJohn packaged Ex N-32a.  TFA DeJohn later transferred custody of Ex N-32a to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

24. Ex N-32b is an 8mm Video Tape.  Ex N-32b contains a recorded meeting & conversation between Robert DENTON Jr and Freddie WILLIAMS on 11/17/2003.  On 11/17/2003, LT. Todd Townson obtained Ex N-32b. and turned it over to TFA David DeJohn who secured it at the Montgomery DO.  On 12/04/2003, TFA DeJohn packaged Ex N-32b.  TFA DeJohn later transferred custody of Ex N-32b to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

25. Ex N-33 is (11) eleven black duffel bags that was used to contain Ex #1.  Ex N-33 was obtained on 11/17/2003 by TFA David DeJohn, who then secured them at the Montgomery DO.  On 12/04/2003, TFA DeJohn packaged Exhibit N-33 and later transferred it to the Montgomery DO Non-Drug Evidence Custodian, for storage and safekeeping.

26. Ex N-33a is assorted pieces of paper displaying hand written numbers.  Ex N-33a was located inside of Ex N-33.  Ex N-33a was obtained on 11/17/2003 by TFA David DeJohn, who then secured them at the Montgomery DO.  On 12/04/2003, TFA DeJohn packaged Exhibit N-33a and later

| DEA Form - 6a
(Jul. 1996) | **DEA SENSITIVE**
Drug Enforcement Administration | |
| --- | --- | --- |
| | This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned. | 1 - Prosecutor |
| | Previous edition dated 8/94 may be used. | |

29

## Top-right document

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
| --- | --- |

| 3. File Title |
| --- |

4.
Page  12  of  12

| 5. Program Code
HID100 | 6. Date Prepared
11/21/03 |

transferred it to the Alabama Department of Public Safety for finger print analysis.

**INDEXING**

1.  CARMICHAEL, Leon        - NADDIS ████████ NFI.

2.  WILLIAMS, Freddie      - NADDIS ██████████████

3.  DENTON, Robert Patrick Jr  - NADDIS ████████ NFI.

| DEA Form - 6a
(Jul. 1996) | **DEA SENSITIVE**
Drug Enforcement Administration | |
| --- | --- | --- |
| | This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned. | 1 - Prosecutor |
| | Previous edition dated 8/94 may be used. | |

30

## Bottom-left document

**REPORT OF INVESTIGATION**

Page 1 of 5

| 5. By: SA Thomas Halasz
At Montgomery D.O. | Cross
File | Related Files | 3. File No. | 2. G-DEP Identifier |
| --- | --- | --- | --- | --- |

| 7. ☐ Closed  ☐ Requested Action Completed
☐ Action Requested by: | 8. Date Prepared
11/25/03 |
| --- | --- |

9. Other Officers: Montgomery PD Cpl. Tom Conway, Cpl. Gene Sisson, SA Robert Greenwood, GS Sherri Gonzalez

10. Report Re: Arrest of Leon CARMICHAEL, Post Arrest Statements and Acquisition of Non-Drug Evidence

**DETAILS**

**SYNOPSIS**

On November 17, 2003 Montgomery D.O. Agents and Montgomery PD Officers arrested Leon CARMICHAEL for Conspiracy to Distribute Marijuana and weapons violations in Montgomery, AL. Several items of Non-Drug evidence were obtained pursuant to the arrest.

1. On November 17, 2003 at approximately 11:00 AM Leon CARMICHAEL was observed by SA Thomas Halasz driving a black Honda Accord, AL registration 3A3691L, in the vicinity of the Carmichael Center on Fleming Road in Montgomery, AL. CARMICHAEL was followed by SA Halasz and other law enforcement personnel to South Boulevard where his vehicle was stopped pursuant to this investigation by a marked Montgomery PD patrol car. CARMICHAEL exited his vehicle and led away from the vehicle by Cpl. Tom Conway. SA Thomas Halasz approached CARMICHAEL's vehicle and observed a pistol laying on the front seat. Simultaneously CARMICHAEL was asked by Cpl. Tom Conway if he had any weapons. CARMICHAEL responded that there was a gun on the front seat.

2. SA Halasz read CARMICHAEL his Miranda Rights which he verbally acknowledged. SA Halasz asked CARMICHAEL if he had been convicted of murder in the past. CARMICHAEL said that he had and that he had served

| 11. Distribution:
Division: MOFD
District:
Other SARI | 12. Signature (Agent)
Thomas Halasz | 13. Date
12-08-03 |
| --- | --- | --- |
| | 14. Approved (Name and Title)
Sherri Gonzalez
Group Supervisor | 15. Date
12-10-03 |

| DEA Form - 6
(Jul. 1996) | **DEA SENSITIVE**
Drug Enforcement Administration | |
| --- | --- | --- |
1 - Prosecutor
| | This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned. | |
| | Previous edition dated 8/94 may be used. | |

37

## Bottom-right document

**REPORT OF INVESTIGATION**
(Continuation)

| 1. File No. | 2. G-DEP Identifier |
| --- | --- |

| 3. File Title |
| --- |

4.
Page  2  of  5

| 5. Program Code | 6. Date Prepared
11/25/03 |

eleven years in prison for murder. CARMICHAEL further said he had been pardoned.

3. At this time CARMICHAEL was patted down by Cpl. Conway and both back pants pockets were found to contain rolls of cash. SA Halasz took possession of the currency as Exhibit N-11. SA Halasz informed CARMICHAEL that he had been stopped pursuant to an investigation in at "Freddie's" residence. CARMICHAEL responded that he knows "Freddie" that drives for him. CARMICHAEL further said that he has no knowledge of the drug seizure.

4. GS Sherri Gonzalez responded to the scene and visually identified CARMICHAEL as the person she had observed drive past 949 Ridgecrest Drive, Montgomery, AL a short time earlier.

5. Prior to transporting the Honda Accord to the Montgomery D.O. to be seized pending administrative forfeiture, an inventory of the vehicle was conducted. A blue zippered bag was observed on a brief case on the rear seat which contained an amount of cash. Additionally, the trunk was found to contain a shotgun, two pistols and ammunition. At the time, the above items were left in the vehicle which was driven to the Montgomery D.O. by GS Sherri Gonzalez.

6. CARMICHAEL was transported to the Montgomery D.O. CARMICHAEL asked SA Halasz what kind of drugs people were saying he was involved with. SA Halasz told CARMICHAEL that over 500 pounds of marijuana was seized. CARMICHAEL maintained that he knew nothing about it. SA Halasz told CARMICHAEL that he met with a person between 2:00 AM and 3:00 AM that the person he met was with the marijuana that morning. CARMICHAEL said that he was in a hotel with a woman during the early morning hours including 2:00 AM to 3:00 AM and that she would testify to that.

7. CARMICHAEL was processed and transported to the Montgomery City Jail by SAs Halasz and Robert Greenwood.

8. The following items were obtained from the above referenced black Honda Accord by GS Sherri Gonzalez at the Montgomery D.O; One Nokia cell

| DEA Form - 6a
(Jul. 1996) | **DEA SENSITIVE**
Drug Enforcement Administration | |
| --- | --- | --- |
| | This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned. | 1 - Prosecutor |
| | Previous edition dated 8/94 may be used. | |

38

---

**Top-left quadrant (page 39)**

Case 2:03-cr-00259-MHT-WC   Document 318-1   Filed 12/22/04   Page 57 of 61

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| Page 3 of 5 | |
| 5. Program Code | 6. Date Prepared |
| | 11/25/03 |

phone (Exhibit N-2), assorted paper documents (Exhibit N-3), Taurus
PT140 .40 cal. pistol s/n SVA39286 and magazine (Exhibit N-4), 10
rounds of .40 caliber ammunition from Exhibit N-4, (Exhibit N-4a),
Springfield Armory V10 .45 caliber pistol s/n N467060 and magazine
(Exhibit N-5), 6 rounds of .45 caliber ammunition from Exhibit N-5
with magazine (Exhibit N-5a), Colt Combat Commander .45 caliber pistol s/n FC22273E
A2822SL (Exhibit N-7), assorted paper documents (Exhibit N-8), assorted
.40 caliber, .45 caliber and 12 gauge ammunition (Exhibit N-9), AmSouth
bank bag (Exhibit N-10) and $5,000.00 US currency removed from Exhibit
N-10 (Exhibit N-10a).

### Custody of Evidence:

Exhibit N-2 is a Nokia cell phone 334-221-2300, IMEI #01021000/554896/4
which was obtained by GS Sherri Gonzalez on 11-17-03 from the front seat
area of a Honda Accord, AL reg. 3A3691L. GS Gonzalez maintained custody
until later on 11-17-03 when the exhibit was provided to TFA David DeJohn.
TFA DeJohn maintained custody until submission to the MDO NDEC for
safekeeping.

Exhibit N-3 is assorted paper documents which were obtained by GS Sherri
Gonzalez on 11-17-03 from a briefcase on the rear seat of the Honda
Accord. GS Gonzalez maintained custody of the exhibit until later on 11-
17-03 when the exhibit was provided to TFA David DeJohn. TFA DeJohn
maintained custody until submission to the MDO NDEC for safekeeping.

Exhibit N-4 is a Taurus model PT140 .40 caliber pistol s/n SVA39286 which
was obtained by GS Sherri Gonzalez on 11-17-03 from the front
seat of the Honda Accord. GS Gonzalez unloaded the weapon and maintained
custody of the exhibit until later on 11-17-03 when custody was
transferred to TFA David DeJohn. TFA DeJohn maintained custody until
submission to the MDO NDEC for safekeeping.

Exhibit N-4a is 10 rounds of .40 caliber ammunition which was obtained on
11-17-03 by GS Sherri Gonzalez as part of Exhibit 4. GS Gonzalez removed

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

39

---

**Top-right quadrant (page 40)**

Case 2:03-cr-00259-MHT-WC   Document 318-1   Filed 12/22/04   Page 58 of 61

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| Page 4 of 5 | |
| 5. Program Code | 6. Date Prepared |
| | 11/25/03 |

Exhibit N-4a and maintained custody until later on 11-17-03 when the
exhibit was provided to TFA David DeJohn. TFA David DeJohn maintained
custody until submission to the MDO NDEC.

Exhibit N-5 is a Springfield Armory model V10 .45 caliber pistol s/n
N467060 which was obtained by GS Sherri Gonzalez on 11-17-03 from the
trunk of the Honda Accord. GS Gonzalez maintained custody of the exhibit
until later on 11-17-03 when custody was transferred to TFA David DeJohn.
TFA DeJohn maintained custody until submission to the MDO NDEC for
safekeeping.

Exhibit N-5a is 6 rounds of .45 caliber ammunition which was obtained on
11-17-03 by GS Sherri Gonzalez as part of Exhibit N-5. GS Gonzalez removed
Exhibit N-5a and maintained custody of the exhibit until later on 11-17-03
when the exhibit was provided to TFA David DeJohn. TFA DeJohn maintained
custody until submission tot he MDO NDEC for safekeeping.

Exhibit N-6 is a Colt Combat Commander .45 caliber pistol s/n FC22273E
which was obtained by GS Sherri Gonzalez on 11-17-03 from the trunk of the
Honda Accord. GS Gonzalez maintained custody until later on 11-17-03 when
the exhibit was provided to TFA David DeJohn. TFA DeJohn maintained
custody until submission to the MDO NDEC for safekeeping.

Exhibit N-7 is a Beretta model 1201FP 12 gauge shotgun s/n A28225L which
was obtained by GS Sherri Gonzalez on 11-17-03 from the trunk of the Honda
Accord. GS Gonzalez maintained custody until later on 11-17-03 when the
exhibit was provided to TFA David DeJohn. TFA DeJohn maintained custody
until submission to the MDO NDEC for safekeeping.

Exhibit N-8 is assorted paper documents which were obtained by GS Sherri
Gonzalez from the glove compartment of the Honda Accord. GS
Gonzalez maintained custody of the exhibit until later on 11-17-03 when
the exhibit was provided to TFA David DeJohn. TFA DeJohn maintained
custody until submission to the MDO NDEC for safekeeping.

Exhibit N-9 is assorted .40 caliber, .45 caliber and 12 gauge ammunition
which was obtained by GS Sherri Gonzalez on 11-17-03 from the trunk of the
Honda Accord. GS Gonzalez maintained custody of the exhibit until later on

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

40

---

**Bottom-left quadrant (page 41)**

Case 2:03-cr-00259-MHT-WC   Document 318-1   Filed 12/22/04   Page 59 of 61

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| Page 5 of 5 | |
| 5. Program Code | 6. Date Prepared |
| | 11/25/03 |

11-17-03 when custody was transferred to TFA David DeJohn. TFA DeJohn
maintained custody until submission to the MDO NDEC for safekeeping.

Exhibit N-10 is an AmSouth bank bag which was obtained by GS Sherri
Gonzalez from a briefcase on the back seat of the Honda Accord. GS
Gonzalez maintained custody of the exhibit until later on 11-17-03 when
custody was transferred to TFA David DeJohn. TFA DeJohn maintained custody
until submission to the MDO NDEC for safekeeping.

Exhibit N-10a is $5,000.00 US currency which was obtained by GS Sherri
Gonzalez as part of Exhibit N-10 on 11-17-03. GS Gonzalez removed Exhibit
N-10a and maintained custody of the exhibit until later on 11-17-03 when
the exhibit was provided to SA Thomas Halasz. SA Halasz placed the exhibit in a sealed
evidence bag and secured it in the MDO MBO drop safe. On 11-18-03 TFA
Larry Hubbard took custody of the exhibit and on 11-18-03 TFA
cashier's check payable to the US Marshal's Service pursuant to DEA policy
for administrative forfeiture.

Exhibit N-11 is $1,781.00 US currency which was obtained by SA Thomas
Halasz and Cpl. Tom Conway on 11-17-03 from Leon CARMICHAEL in Montgomery,
AL. SA Halasz maintained custody of the exhibit until later on 11-17-03
non-drug evidence drop safe. On November 18, 2003 TFA Larry Hubbard took
custody of the exhibit and converted the currency to a cashier's check
payable to the US Marshal's Service pursuant to DEA policy for
administrative forfeiture.

### INDEXING

1. CARMICHAEL, Leon                          NADDIS

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

41

---

**Bottom-right quadrant (page 60)**

Case 2:03-cr-00259-MHT-WC   Document 318-1   Filed 12/22/04   Page 60 of 61

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| Page 2 of 2 | |
| 5. Program Code | 6. Date Prepared |
| KID100 | 12/06/03 |

for him. TFA DeJohn asked CARMICHAEL as to why did he say that.
CARMICHAEL advised "You got me." Agents explained to CARMICHAEL that
they were extending an opportunity to him (CARMICHAEL) to cooperate
with law enforcement. TFA DeJohn added that CARMICHAEL would have to
talk with his attorneys before cooperating with agents. CARMICHAEL
advised that he could not trust his own attorneys. CARMICHAEL
continued by stating that he had an attorney that called the United
States Attorney's Office and stated that he had a client that wanted
to provided information about CARMICHAEL. CARMICHAEL also insinuated
that his other attorneys just had their hands out for his money.

4.   During the conversation CARMICHAEL stated that his attorney explained
that several individuals were coming forward and providing information
about him (CARMICHAEL). CARMICHAEL advised that most of those people
would be lying, indicating that individuals would not be lying. TFA
DeJohn advised CARMICHAEL to talk with his attorneys if he wished
to cooperate with law enforcement.

5.   At this time, CARMICHAEL's property was signed over to him and he
departed. See DEA-12 forwarded to this case file reflecting the
transfer of property.

### INDEXING

1. CARMICHAEL, Leon                          NADDIS

DEA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

3 - Originating Office

Case 2:03cr-00259-███-WC   Document 318-1   Filed 1█/██/04   Page 61 of 61

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 81D100 | | | 6. File Title | |
| 5. By: TFA R. David DeJohn | | | | |
| At Montgomery DO | | | | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 12/06/03 | |
| 9. Other Officers: S/A Robert Greenwood | | | | |

10. Report Re: Conversation with Leon CARMICHAEL on 12/04/2003

### SYNOPSIS

On 12/04/2003, TFA David DeJohn and S/A Robert Greenwood, of the DEA Montgomery District Office, had a conversation with Defendant Leon CARMICHAEL at the Montgomery District Office.  This report details the conversation with CARMICHAEL.

### DETAILS

1.  On 12/04/2003, Defendant Leon CARMICHAEL arrived at the Montgomery DO under the direction of his attorney Steven Glassroth.  This was part of an arrangement between TFA DeJohn and Attorney Glassroth to return seized items to CARMICHAEL that was not being held as evidence.

2.  During the meeting, CARMICHAEL began to complain to S/A Greenwood about the News Media inaccurately reporting that 575.00 lbs of Marijuana (Exhibit #1) had been seized by agents at the CARMICHAEL CENTER.  The CARMICHAEL CENTER is CARMICHAEL's place of business, located at 150 E. Fleming Rd, Montgomery, Alabama.  S/A Greenwood and TFA DeJohn explained to CARMICHAEL that we knew that to not be the truth and would not present anything that we did not believe to be the truth.

3.  CARMICHAEL continued by stating that he had already resigned himself to the fact that he was going to prison for the rest of his life and that he considered a 10, 15, 20 year sentence to be a life sentence

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division NOFD | TFA R/David DeJohn | 12-16-03 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other SARI | Shelly Gonzales Group Supervisor | 12-17-03 |

DEA Form - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA ⟩
⟩
v. ⟩       CR NO. 03-0259-T
⟩
LEON CARMICHAEL, SR., aka ⟩
BEAVER LEON CARMICHAEL, et al. ⟩

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Following an evidentiary hearing and due consideration of the arguments and applicable law,
the Magistrate Judge concludes, as herein explained, that *Defendant Carmichael's Motion to
Suppress Evidence and Motion Pursuant to Fed.R.Crim.P.41(g)* (Doc.71, filed January 7, 2004),
should be denied.

**I.   FACTUAL BACKGROUND**

**A.   Relevant Chronology**

On the morning of November 17, 2003, narcotics officers kept surveillance on the 949
Ridgecrest Drive, Montgomery, Alabama residence of Freddie Williams ("Williams") before
executing in the afternoon a federal search warrant which resulted in the seizure of approximately
575 pounds of marijuana stored in duffel bags inside the home.  On the same day, acting on
instructions from officers who suspected Carmichael's involvement with Williams in a conspiracy
for illegal distributions of the marijuana, a special agent for the Drug Enforcement Administration
(DEA) summoned Montgomery Police Department to assist him in executing the stop of the defendant
Leon Carmichael, Sr. (Carmichael) as he drove his car on the Southern Boulevard. Carmichael
made statements in response to the DEA agent's investigative detention regarding the suspected
marijuana conspiracy, and those statements are the subject of this suppression motion. Carmichael

was arrested on November 17 solely for suspicion of being a convicted felon in possession of a
firearm. After officers confirmed his initial report of receiving a pardon which restored his right
to carry a firearm, he was released without being charged then for any offense related to the seizure
of marijuana from the Williams' residence.

Two days later, on November 19, 2003, a Grand Jury indicted Williams and Carmichael as
joint conspirators for illegal marijuana possession for distributions. (Doc.8).  On December 4,
2003, Carmichael made a scheduled visit to the narcotics office -- prearranged by counsel who did
not accompany him to secure personal property seized following his arrest on November 17; his
suppression motion also targets statements he made to another DEA agent on this occasion.

The Grand Jury filed superseding indictments initially on December 17, 2003 (Doc. 48) and
the present indictment on January 21, 2004 (Doc. 86).  *Count 1* indicts Carmichael and Williams
as joint conspirators with others in a scheme commencing "in or about 1993" and continuing
through November 17, 2003, "in Montgomery County, within the Middle District of Alabama,
within the Southern District of Texas, and elsewhere" to distribute "1000 kilograms or more" of
marijuana," in violation of 21 U.S.C. § 841 (a) (1) and § 846.  *Count 2* indicts Carmichael alone
for money laundering illegal drug proceeds through financial transactions in a Compass Bank
account, between May 27, 2002, and February 24, 2003, in violation of 18 U.S.C. § 1956(h).

**B.   Relevant Facts: November 17, 2003 Stop**

Two DEA agents provided the only testimony at the evidentiary hearing on March1, 2004:
R. David DeJohn ("Agent DeJohn"), a Prattville Police Department investigator cross-assigned as
a DEA Task Force Agent, who also provided the supporting for the warrant to search Williams'

residence on November 17, 2003, and Special DEA Agent Thomas Halasz ("Agent Halasz"), who
effected the stop of Carmichael's car and his investigative detention.

The relevant facts occurred in 2003 between November 13 and November 17. On November
13 Agent DeJohn interviewed Gary Wayne George ("George"), a convicted felon who described
himself as a member of the "Leon Carmichael Drug Trafficking Organization," following his arrest
on "drug charges" by the Prattville Police Department. Agreeing to provide information regarding
Carmichael's organization and otherwise to serve as an informant, George identified Robert Patrick
Denton ("Denton") as his partner with the "job [of] process[ing] marijuana as it come into
Montgomery from out of state for Leon Carmichael."[1] George related that he had performed this
processing job "numerous occasions ...like 30 times," identified the processing sites as Denton's
residence on Fleming Road and another Montgomery residence and also reported that the marijuana
shipments involved "as little as 200 pounds, as high as 800 pounds on a weekly basis."[2] George
also admitted his own sales of marijuana supplied by Denton, and though George"had seen
[Carmichael] but never really talked to him," Denton told him [Carmichael's] who he got the
marijuana from and ... when they collected money back up, that's who the money would go back
to."[3]

On November 15 George called Agent DeJohn with a report that he and Denton were enroute
to the Shoney's on Montgomery's West South Boulevard for a sale of marijuana to Charlotte

Hensarlinger ("Hensarlinger"), a Huntsville resident to whom Denton had been "regularly selling
marijuana." Pursuant to instructions from Agent DeJohn, George called back with the color, make,
model, and license tag for the sports utility-type vehicle (SUV) being driven by Hensarlinger on her
trip down Interstate-65 south from Huntsville. Upon notice of the completed transaction, Agent
DeJohn stationed himself at the interstate's Millbrook-Prattville exit and followed the northbound
SUV into Chilton Co., where he relayed to the Chilton Co. Sheriff's Department identification data
for the SUV. Sheriff's deputies made a "traffic stop" of the SUV; a consensual search produced
approximately 26 pounds of marijuana; and Hensarlinger admitted that she had just bought the
marijuana from George and Denton.[4]

Based on George's report on November 16 of approximately ten pounds of marijuana inside
Denton's residence, Agent DeJohn secured and executed in the early morning hours of November
17 a search warrant which yielded no marijuana but, instead, an interview with Denton, who agreed
to cooperate as an informant. Denton advised "that he had been getting marijuana from Leon
Carmichael, that a shipment was due in on that evening, Sunday night, Monday morning, but he had
told Leon Carmichael that he did not want to take shipment of that marijuana" because of
Hensarlinger's arrest after his admitted sale for her of marijuana in the transaction already detailed
by George. Denton confirmed his weekly "processing" job-- "get[ting] the marijuana from William
Bolding, a truck driver for Leon Carmichael" and "help [ing]" "break it down and repackage it into
gallon-size bags" -- on instructions from Carmichael. He returned the processed marijuana -- "an
average of 500 to 600 pounds per load" to Carmichael or to Bolding and "was paid by Carmichael

---

[1]   As explained to Agent DeJohn, "processing" required George and Denton to "repackage the
marijuana, break it down from its form that it was transported in wrapped up in duct tape,
and break it down, put it in gallon-size, Ziplock-type bags." *Tr.* at 8:9-7:10.

[2]   *Tr.* at 10.

[3]   *Tr.* at 13: 8-25; 14: 1-3.

---

[4]   *Tr.* at 10-13.

in the form of marijuana ... given pounds to sell."⁸

After completing Denton's interview, DEA agents drove him around "to corroborate his information", and Denton identified Carmichael's residence and those for "other players within the organization, including Carmichael's co-defendant, Williams, whose 949 Ridgecrest Drive house he speculated would be the processing site for the marijuana shipment expected on that day. When officers returned Denton to his residence, around 2:45 on this November 17 morning, Denton's cell phone rang as Agent DeJohn held it in his hand, and it displayed "Leon", a name confirmed by Denton to be "Leon Carmichael." Listening to their conversation, Agent DeJohn heard a voice he later identified as Carmichael's tell Denton that he "need[ed] to talk to [him]" and was "five minutes away."⁹ Officers left Denton's house and set up surveillance on Fleming Road to watch the inbound traffic; shortly, they saw Carmichael's black Honda – the same vehicle previously seen at his residence – turn into Denton's residence and leave after the driver spent about five minutes inside. Denton confirmed Carmichael as the driver and also related his instructions that he report to Williams' Ridgecrest house at 8:00 a.m. to help break down the marijuana shipment. Officers left with plans to meet again with Denton at 7:30 a.m.¹⁰

When they met as scheduled, officers equipped Denton with audio and video transmitting devices for his trip to the Williams residence. Officers met Denton when he left the Williams residence for a grocery store to secure, at Williams' instructions, some gallon-size, ziplock-type

---

⁸   Tr. at 15-19.

⁹   Present with Agent DeJohn at the time, Agent Halatz heard the phone ring and also saw the name displayed; as he had rushed to his vehicle for a tape recorder, he heard only the "tail end" of the conversation between Denton and Carmichael. Tr. at 60-61.

¹⁰   Tr. at 19-24:1-3.

5

bags. Upon his return, Williams was no longer inside the residence but advised by cell phone of his location five minutes away; back inside the residence Williams and Denton "began retrieving bags from inside of a hidden wall that was in the bedroom." When Denton left the residence again, to secure a scale in lieu of one Williams thought was broken, he confirmed to Agent DeJohn by cell phone that the bags contained "500 to 600 pounds of marijuana", and he also related Williams' reported anger with Carmichael for personally counting "each block of marijuana" placed inside as he suspected Williams' girlfriend of taking some.⁸

After securing scales provided by the agents, Denton returned to the residence and continued to assist Williams in processing the marijuana until Williams placed or received a phone call regarding the imminent death of his then-hospitalized wife. Denton used his audio transmitting device to alert officers of Williams' planned departure, reporting "he's fixing to leave - you need to go ahead and stop him." Officers responded with the intent "to secure the residence and take Williams into custody before he left" but as Williams had already left, they managed only to secure the residence while "some agents went out looking for Williams" and others for Carmichael.⁹

Agent Halatz had been apprised on November 16 of the narcotics investigation centering on Williams and Carmichael, and on November 17 DEA agent Sherry Gonzalez notified him that "an individual fitting Leon Carmichael's description had passed in front of the scene of the search warrant" in execution at Williams' house.¹⁰ He advised him to detain ... Carmichael when and if

---

⁸   Tr. at 19-27.  Officers secured from Denton the videotapes when he left the Williams residence to secure the bags and again to secure a scale.  Thus, they were able to view Williams and Denton handling the bags of marijuana.

⁹   Tr. at 29-30.

¹⁰   Before his encounter with Carmichael on November 17, Agent Halatz knew specifically that
(continued...)

6

[he] saw him." From his station in front of the Carmichael Center on Fleming Road, Agent Halatz saw Carmichael's black Honda pass him, followed it, and contacted the Montgomery Police Department for a marked police vehicle to effect a stop on the Southern Boulevard.  As Agent Halatz approached the car, Carmichael had already exited, leaving open his driver's door; with Carmichael already handcuffed by other officers, Agent Halatz "stuck [his] head in the vehicle" and viewed on the front passenger's seat a pistol and a black leather bag, and in the middle of the back seat, a briefcase which he opened to reveal a money bag."¹¹

The Agent then "read ...Carmichael his rights and spoke to him," inquiring first about the gun. Carmichael acknowledged his prior conviction for murder but said that he had been pardoned and had a pistol permit.  Agent Halatz "also told him that ... the reason he was stopped is because we believed he was involved in a marijuana case – a marijuana investigation"; when the agent "mentioned the name Freddie, [Carmichael] indicated that he knew a Freddie that drove for him."¹² Advised as well that officers "knew that he had met ... that morning between 2:00 and 3:00 a.m. – with one of the individuals who were at the location where the marijuana was seized," Carmichael responded that "at that period of time he was in a hotel with a woman and that she would testify to that."

---

¹⁰   (...continued)
Carmichael "had been identified as a person responsible for bringing multiple loads of marijuana to Montgomery in excess of 500 pounds and distributing that marijuana in Montgomery," he also that "that information led to the seizure of the excess of 500 pounds of marijuana ... during the investigation that morning prior to the vehicle stop." Tr. at 59.

¹¹   Counted later, the currency totaled $5,000.00. Tr. at 54-56.

¹²   Tr. at 56-67.  From his participation in the case investigation, Agent Halatz knew that Carmichael owned a trucking company and took Carmichael's reference that Williams drove for him to mean that Williams worked as one of his truck drivers.

7

Officers transported Carmichael to headquarters where Agent DeJohn presented his affidavit to the Chief Magistrate Judge in support of a Criminal Complaint and arrest warrant charging Carmichael with being a convicted felon in unlawful possession of the pistol seized from his car. Though that complaint was dismissed, Carmichael was rearrested on November 19, 2003, pursuant to his joint Indictment with Williams on the same day for conspiring to distribute marijuana illegally.

**C.   Relevant Facts: December 4, 2003 Statements**

Pursuant to arrangements his counsel made with the government's prosecutor and Agent DeJohn, Carmichael – free on a pre-trial bond and other conditions imposed after his initial indictment – reported alone to the DEA office on December 4, 2003, to retrieve his briefcase, credit cards, checkbooks, and other belongings seized following his arrest. Escorted through the foyer to a side interview room, Carmichael waited with another agent while Agent DeJohn left for "no more than 30 seconds" to secure the items.¹³  Upon his return, he heard Carmichael complaining about the news media's portrayal of his arrest and, in particular, false reports that 575 pounds of marijuana were located inside the Carmichael Center. Carmichael then declared that "he had already resigned himself to the fact that he was going to do 10, 15, 20 years in prison and that would be a life sentence to him." "Shocked" that he considered a 10-year sentence a life sentence, Agent DeJohn asked him, "why do you say that?"; Carmichael responded, "because you got me." Agent DeJohn

---

¹³   Tr. at 76-77, 90.  In addition to the foyer/waiting area, the DEA office has two interview rooms, an office area, a conference room, the supervisor's office, and a processing area. The side interview room used for Carmichael is "maybe" an 8x8 area, equipped with a table and some chairs, and one door leading to the foyer and a second into the main part of the office.  Agent DeJohn chose an interview room instead of the waiting area to minimize any interaction between Carmichael and other visitors to the DEA office and to ensure privacy in the event Carmichael chose to cooperate; the table inside this room also facilitated Carmichael's signing of paperwork to document the property retrieved. Tr. at 88, 91, 95-96.

8

then reminded Carmichael of his "opportunity ...to cooperate with law enforcement", prompting Carmichael's statement: "I can't trust my own attorneys. I have one attorney that is telling the U.S. Attorney's office that they have a client that wants to talk about [me], and the others got their hands reached out for money."[14] Carmichael also commented "that most of the people talking about him – most of the people would be lying." [15]

## II. DISCUSSION

### A. Vehicular Stop and Statements on November 17, 2003

#### 1. Contentions

The Government contends that officers effected a lawful stop of Carmichael in his car on November 17, 2003 based on their reasonable suspicion of his involvement in a criminal conspiracy for the illegal possession and distribution of marijuana; they maintain as well that at the point of the stop, officers also had probable cause to arrest him for that crime. Because they declined to effect his arrest for that offense, and instead pursued a grand jury assessment of probable cause two days later, the court properly declines to evaluate the sufficiency of probable cause on November 17, 2003, to arrest Carmichael for his involvement in that conspiracy.[16] Carmichael

---

[14]   Tr. at 78-80.

[15]   Tr. at 81. For these statements attributed to Carmichael, Agent DeJohn made no notes during or immediately after his conversation with Carmichael and could not recall when he actually completed a DEA -6 form, bearing a top date of December 6, 2003, used to refresh his memory of the last statement referenced; he noted the possibility that it may have been completed on December 6 but not printed until the December 16, 2003 date indicated by his signature.

[16]   Indeed, the Magistrate Judge's pointed inquiries to the government prosecutor arose from the fact that notwithstanding the contention of sufficient probable cause for such an arrest, officers did not do so, and instead, effected a warrantless arrest for an apparent crime having possession of a pistol notwithstanding a felony conviction – which could be authorized only if officers viewing the pistol lawfully stopped the car in the first instance.
       (continued...)

9

---

disputes the Government's alternative contentions and emphasizes both in written submissions and through examinations at the evidentiary hearing that Carmichael committed no traffic offense and no criminal act witnessed by the officers who effected the stop.

#### 2. Analysis

This court finds that the evidence amply establishes the requisite degree of "reasonable suspicion of criminal activity" to justify, within the authority of *Terry v Ohio*, 392 U.S. 1 (1968), the officers' warrantless stop and detention of Carmichael on November 17, 2003. Because the evidence also is clear that Carmichael's statements were responsive to investigative inquiries within the permissible scope of that investigative detention, they are not subject to suppression.[17]

While *Terry* authorizes investigative detentions which are incident to traffic stops, see *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), *cert. denied*, 534 U.S. 830 (2001), and *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003), *Terry* also clearly authorizes the stop

---

[16]   (...continued)
       The court readily acknowledges the legal authority for stops and detentions warranted by reasonable suspicion that the detainee has committed, or is committing, a crime. However, it is reticent to accept an independent theory which justifies post-arrest seizures and statements when the evidence is clear that no arrest occurred for the reason indicated.

[17]   Carmichael's motion seeks the suppression not only of statements but also of all properties seized from him on November 17, 2003. The parties failed to establish a clear record which distinguishes any property taken prior to or after Carmichael's mistaken arrest for being a convicted felon in possession of a firearm; while Agent Halasz referenced money in Carmichael's pocket and money in a briefcase – both observed immediately after the stop, neither he nor any other witness clarified whether officers seized the currency and briefcase promptly upon detaining Carmichael, inventoried it from his car upon his arrest, allowed him to keep the money or kept it until December 4, when they returned his brief case, checkbooks, credit cards, and other belongings. Nor did the government seek to admit at the evidentiary hearing any physical evidence seized from Carmichael on November 17, 2003. Accordingly, the court is unable to particularize any physical evidence subject to this order but the finding which validates Carmichael's statements made in connection with the lawful Terry stop necessarily means that any physical evidence also seized in that connection is similarly not subject to suppression.

10

---

of a motorist for a non-traffic related offense if officers have reasonable suspicion of his involvement in criminal activity. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-1221 (11th Cir. 1993) (citations omitted).

As recently stated in *United States v. Acosta*, 2004 WL 584572, at *3 (11th Cir. Mar. 25, 2004), *Terry* requires "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (*citing Terry*, 392 U.S. at 20); *see also United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000):

> Under *Terry's* two-part inquiry, we first examine " whether the officer's action was justified at its inception." *Powell*, 222 F.3d at 917 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime, *id.* In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" (quoting *Terry*, 391 U.S. at 20, 88 S.Ct. at 1879).

On this record, neither the duration nor the scope of the *Terry* stop is challenged; instead, the disputed issue is the first *Terry* inquiry – whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. "Reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). As noted by the Eleventh Circuit in *United States v. Acosta*, 2004 WL 584572*3, and *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000), "[reasonable suspicion] does not require officers to catch the suspect in a

11

---

crime."

In determining the reasonableness of an officers' reasonable suspicion of criminal activity, the court is bound to consider the "totality of the circumstances", *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989), "from the collective knowledge of the officers involved in the stop." *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989). This process allows the officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002), *quoting United States v. Cortez*, 449 U.S. 411, 418 (1981).

Informed by these governing principles, the court's analysis of the reasonable suspicion articulated for Carmichael's criminal activity leads inevitably to a finding which affirms the officers' investigative stop. First, it is relevant that the officers grounded their reasonable suspicion on both reported and observed events – including criminal acts– which transpired almost continuously during the preceding period of four days, and these events followed an investigation spanning several years.[18] A second noteworthy fact is that following their arrests for, or discovery committing, drug offenses, the principal informants for the "reported" events and crimes – George and Denton – each linked their crimes directly to a marijuana distribution organization headed by Carmichael and each acknowledged not only their specific roles in the criminal conspiracy but also their personal knowledge or other basis for attributing to Carmichael a leadership role. Though George provided no evidence of his direct contacts with Carmichael for the marijuana admittedly

---

[18]   The superseding indictments filed December 17, 2003 (Doc. 48) and January 21, 2004 (Doc. 86), expanded both the dates – to an onset date in or about 1993– and the amounts – from "100 kilograms or more" to "1000 kilograms or more" of marijuana – for the marijuana drug distributions alleged in the initial indictment on November 17, 2003.

12

sold by him, he reported that his direct supplier, Denton, related Carmichael not only as his source but also as the person to whom he returned the sales proceeds, receiving as consideration more marijuana for his personal sales.

A third pertinent fact is that George made two relevant reports on November 15. He first related Denton's report that he and George were expected to process for Carmichael a large load of marijuana arriving in Montgomery the next day, and he identified Denton's Fleming Road residence as one possible site for the job. Officers garnered a third piece of "reported facts", Charlotte Hensarling, with George's second report, an alert to Agent DeJohn regarding her trip from Huntsville to buy marijuana from Denton, her regular supplier. After corroborating the details reported by George, officers effected a traffic stop which netted, through a consensual search of her SUV, the just-purchased marijuana and her confession that she purchased it from Denton. The court does not find George's credibility impeached by reason of his arrest for drunken driving on November 16 – prompting Agent DeJohn to cease using him as an informant – or by the fact that officers uncovered no marijuana at Denton's residence when they executed a search warrant in reliance on George's report; indeed, Denton himself volunteered an explanation for the missing marijuana – his uneasiness after hearing of Hensarling's arrest – and also confirmed the sales transaction which had been reported initially by George.

Independent of reliance on an informant's reports – corroborated for the most part – officers facilitated their personal observations to expand the knowledge base for their reasonable suspicion of Carmichael's crimes by equipping Denton with audio and video transmitters in order to monitor a planned act by the co- conspirators in furtherance of their marijuana distributions. The evidence is undisputed that Carmichael assumed the leadership role in that act – the delivery to him and

13

processing by Denton and Williams of 500 to 600 pounds of marijuana. Officers were with Denton in the early morning hours of November 17 when he received from Carmichael a call to his cell phone, the substance of which Denton confirmed; shortly afterwards, around 2:45 a.m., officers discreetly watched  Carmichael's car park in Denton's residence, about which left within five minutes or so, Denton confirmed Carmichael's identity as well as his instructions to report at 8:00 a.m. to Williams' house for the purpose of processing the marijuana shipment delivered there.  At the appointed hour, officers began monitoring Denton's activities inside with Williams, securing from him at two intervals the videotapes which allowed them to see the bags of marijuana inside. During one of those intervals, Denton also communicated Williams' statements which identified Carmichael as the owner of the marijuana who personally hand-counted the marijuana bales.

The officers' stop of Carmichael's car followed within hours agents' spotting of Carmichael suspiciously passing Williams' house as officers kept it secured while awaiting a search warrant after Williams managed to exit before they could effect his arrest.  Though officers did not arrest Carmichael immediately for the crimes dictated by their reasonable suspicion, the evidence establishes their authorization to detain and arrest both Williams and Carmichael; it appears that these instructions influenced Agent Halasz, who approached Carmichael after the stop, to have him handcuffed and to provide Miranda advice to him before making investigative inquiries. Agent Halasz then promptly related to Carmichael the specific purpose of the stop – officers' investigation of Carmichael's involvement in the marijuana distributions evidenced by the seizure of marijuana from Williams' home and officers' surveillance of Carmichael earlier that morning at the residence of another conspirator.

The agent focused his representations and questions to Carmichael on the stated purpose

14

of the stop, and the court finds no factual basis for any suggestion that his inquiries went beyond the permissible scope of a Terry investigative detention.  The Magistrate Judge readily concludes that  Carmichael's responses are not inadmissible and  this stop did not offend the Fourth Amendment.[19]

### B.  Statements on December 4, 2003

Carmichael contends that  his statements to Agent DeJohn approximately 17 days after the November 17 stop "should be suppressed as the fruits of the illegal initial stop since none of the property that was seized by the government would have been taken by the government absent that illegal stop and Mr. Carmichael would, thus, not have had to retrieve the illegally obtained property. (Mot. to Suppress at 2).[20]  This contention merits then shrift in view of the court's reasoned conclusion that officers did not illegally stop his car on November 17.

As defense counsel's questioning at the evidentiary hearing suggested that Carmichael's statements resulted from an unnecessarily coercive environment – a theory not advanced in pre-

---
[19]   See, e.g., United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220-1221 (11th Cir. 1993)

[20]   Carmichael's post-hearing submission is similarly limited to the "fruit of the poisonous tree" theory articulated in Wong Sun v. United States, 371 U.S. 471 (1963), in it is argued, in total, as follows: "Had the improper warrantless stop of Mr. Carmichael not occurred, the government would have never come into possession of the property which Mr. Carmichael called for at the DEA office on December 4, 2003. Thus, the property being in the possession of the DEA was a direct result of the illegal stop. A clear nexus between the illegal stop and the appearance of Mr. Carmichael at the DEA office for the express purpose of claiming property which should have not been seized in the first place is thus shown. Given the direct nexus between the illegal stop and the property having to be claimed at the DEA office by Mr. Carmichael, any purported statements made are properly categorized as the tree's poisonous fruits.  If the illegal stop had never occurred, the government would never have had the property in its possession and Mr. Carmichael would not have had to retrieve it.  He never would have to appear at the DEA office, where he would never have encountered Mr. DeJohn for any purpose, much less for conversation."  (Def's. Reply to the Gov't.'s Post-Hrg Response at 5, Doc. 132, filed March 24, 2004).

15

hearing or post-hearing submissions –  it bears note that uncontradicted evidence attributes to counsel prior approval for Carmichael's trip unaccompanied by counsel.  Moreover, the evidence is compelling that Carmichael casually  volunteered his statements without being subjected to an  unduly coercive atmosphere or any custodial interrogation of the character requiring prior Miranda warnings.[21]

### III.  CONCLUSION

Based upon the foregoing findings and conclusions, it is the Recommendation of the Magistrate Judge that the District Judge DENY Defendant's Motion to Suppress (Doc 71, filed January 7, 2004).

Done this 15th day of April, 2004.

/s/ Delores R. Boyd
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

---
[21]   Suspects who are "in custody" cannot be questioned without first receiving the warnings outlined in Miranda v. Arizona, 384 U.S. 436, 479 (1966); Dickerson v. United States, 530 U.S. 428, 435 (2000);  United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir. 1989).  A suspect is not in custody unless "there is a restraint on the suspect's freedom of movement of the degree associated with formal arrest." United States v. Phillips, 821 F.2d 1355, 1359 (11th Cir. 1987) (citation omitted). See Rhode Island v. Innis, 446 U.S. 291,300 (1980) ("Interrogation", as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."); see also United States v. Grimes, 142 F.3d 1342, 1349 (11th Cir. 1998) ("We find the reasoning of our fellow circuits persuasive and hold that Miranda rights may be invoked only during custodial interrogation or when interrogation is imminent.")

16

CASE   NO.   03-cr-259-T

## O R D E R

The clerk of the court is ORDERED to file the Recommendation of the Magistrate Judge and to serve by mail a copy thereof on the parties to this action. The parties are DIRECTED to file any objections to the said Recommendation **NOT LATER THAN APRIL 23, 2004.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *Nettles* v. *Wainwright*, 677 F.2d 404 (11th Cir. Unit B. 1982). *See Stein* v. *Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 15th day of April, 2004.

/s/ Delores R. Boyd
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE

17