

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

15

THE UNITED STATES OF AMERICA

vs.

LEON CARMICHAEL and FREDDIE WILLIAMS

CRIMINAL ACTION NO. 2:03-CR-259-T

MOTIONS IN LIMINE

* * * * * * * * * *

BEFORE: The Hon. Myron H. Thompson

HEARD AT: Montgomery, Alabama

HEARD ON: June 3, 2005

APPEARANCES: Stephen Feaga, Esq.
Clark Morris, Esq.
Ronald R. Brunson, Esq.
Susan James, Esq.
Lisa Wayne, Esq.
Barry Teague, Esq.
Matthew Miner, Esq.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Total Computerized Litigation Support

GOVERNMENT
EXHIBIT
4T
PENGAD 800-631-6989

TABLE OF CONTENTS

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Lawrence Labarge - Sua Sponte Examination by the Court | 3 |
| Lawrence Labarge - Cross Examination by Ms. James | 9 |
| Court Reporter's Certification | 89 |

-o0o-

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON JUNE 3, 2005 AT THE UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

THE COURT: The Court calls the case of United States of America vs. Carmichael and Williams, criminal action number 2:03-CR-259. We're here on a number of matters.

The first matter I'd like to take up is the objection to the partial sequestration order. I have the deputy marshal here to testify as to why the marshal wanted that order, and I think the first thing to do is to put him on and let him testify and then we'll hear arguments.

LAWRENCE LABARGE,

the witness herein, having first been duly sworn or affirmed to tell the truth, was examined and testified as follows:

MR. FEAGA: Will the Court make inquiry for itself, or --

THE COURT: Why don't I just ask him if he requested the order, and if so, why.

SUA SPONTE EXAMINATION

BY THE COURT OF LAWRENCE LABARGE:

First give us your full name.

MS. JAMES: Judge, I don't know that there are any media in the courtroom, but some of these matters might, depending on how the Court rules, if there are media personnel in the courtroom, could they be excluded until you make your ruling?

THE COURT: I don't know if there are any. Do you want to check?

MS. JAMES: I don't see anyone from the media. I don't know the gentleman in the back.

Oh, okay, that's fine. No, one is in here.

THE COURT: First give us your name.

THE WITNESS: Lawrence L. Labarge. L-a-b-a-r-g-e.

THE COURT: And what is your position?

THE WITNESS: I am the judicial security inspector for the United States Marshals Service in the Middle District of Alabama.

THE COURT: I believe that you and Marshal Seroyer requested the partial sequestration order?

THE WITNESS: Yes, sir.

THE COURT: Would you tell us why.

THE WITNESS: One of the primary missions of the Marshals Service is to ensure the safety and the integrity of the court proceedings, the protection of the judges, the judiciary and the jurors. Marshal Seroyer and I, along with other staff members of the marshal's office discussed this case.

Because of the media interest, the public interest, we sets up a meeting with Judge Thompson and discussed security in the courtroom. And at that time we asked the judge if he would consider a partial sequestration of the jury to sequester the jury while they're in the courthouse, to allow us to park them at a secure location, bring them in in the morning and take them back to that location in the afternoon when the Court proceedings were over.

This was done to keep the jurors from being exposed on a daily basis to the media and to any outside potential influences. Conversations in the courthouse of people -- We felt like there was a lot of public interest based on -- I listened to talk radio in the morning when I come in and I heard callers call in and try to get people to say look, "We have to come out and support brother Carmichael in his upcoming trial," and I felt that was a message to people to get them to come down here for the trial. We felt like we had a lot of people outside around the building.

There is no secure place for the jury to park. They have to park either a block away or two blocks away. We felt just like to eliminate any

potential problems, that we should go with this partial sequestration order. And that's what we asked the judge to consider, and that's the way we wanted to proceed on the 3rd of May.

THE COURT: I believe you said that the jurors would park a distance away and they would have to walk to the courthouse and, therefore, could be exposed to the media and other things.

THE WITNESS: Yes, sir.

THE COURT: And I think, at least I understood, that one of the reasons was that you could bring them through the back and they could avoid any media exposure by just walking up to the courthouse.

THE WITNESS: Yes, sir.

THE COURT: But I'll let you cross-examine him now. Government?

MR. FEAGA: Your Honor, I didn't have any questions of Mr. Labarge. I think he's made the position of the U. S. Marshals Service clear to the Court. We would be prepared to argue at some point, but we did not ask for this because we didn't want to have to deal with the attendant, you know, allegations that we were up to something that we felt certain to come. But we are gratified in a sense that someone in an official position, such as the U. S. Marshal, has

made the position to the Court that we think is a reasonable and rational one.

THE COURT: Right. I would just note for the record as well that the marshal approached me about this, not the converse.

MR. FEAGA: Yes, sir.

THE COURT: He was the one who made the suggestion.

MR. FEAGA: We think that the information that they share with the Court and the decision that they made is a rational one, Your Honor. You know, there is going to be evidence adduced at this trial, I believe, that from which, you know, one, maybe even a juror might fairly infer that Mr. Carmichael is a person who is dangerous. We know from his past, whether it comes before the Court or not, that he is a person who has at least killed one other human being.

THE COURT: That was not the reason for the sequestration order.

MR. FEAGA: Yes, sir, I understand. But we think that the position that the marshal has taken is a way of ensuring that the best that we can without in any way infringing on Mr. Carmichael's rights, that the jury is not subjected to any influences that might in any way, shape or form cause them to be unable to

render a fair and impartial verdict.

THE COURT: I want to make this clear, though, that we were not concerned that Mr. Carmichael would necessarily contact the juror, it was the fact that there might be a lot of people here and someone inadvertently, in light of just the circumstances around the courthouse, would have some contact with the jury. And also while they were in this building. We have an eating place downstairs, and we didn't want the media in particular to contact them today or just anybody walking to and from the courthouse.

MR. FEAGA: Yes, sir. I didn't mean to infer that Mr. Carmichael would be a threat to the jury.

THE COURT: Right.

MR. FEAGA: But just based on the information that they'll hear during the trial, they will be more comfortable with the plan the marshal has laid out.

THE COURT: We also had considered full sequestration where the jury was to stay overnight, but we decided not to do that. Primarily leaving and coming to the Court.

But go ahead.

CROSS EXAMINATION

BY MS. JAMES OF LAWRENCE LABARGE:

Q Mr. Labarge, how long have you been with the Marshals Service?

A Twenty years.

Q And how long have you been in the Middle District of Alabama?

A Since 1994.

Q So what, over --

A Over ten years.

Q Over ten years.

How many times have you personally, or to your knowledge, has such a request been made of a district judge?

A If I recall, the Oscar Andrews trial.

THE COURT: But that was for full sequestraion.

THE WITNESS: That was for full sequestration.

A And I believe probably in 1994 we did that for another case where we parked the jury at a secure location and brought them in. I tried to get with the Court and pull up what case that was in, but most of the deputies that were here prior to '94 -- it had to be either early '94 or possibly '93 was the case where they parked the jury at another location.

Page 10

THE COURT: I think there's an order on line in the Scrushy case where there is partial sequestration as well. I don't know if that's full or partial. But there was some sequestration I know. If you would like to read it, it's -- I'm sorry, the Scrushy case might have been about another point. I'm sorry. That was about -- it was just a totally different matter. In fact, it was more intrusive than this one.

MS. JAMES: May continue, Judge?

THE COURT: Yes.

Q Now one of your concerns you testified was the fact that you do not have a secure parking setup, if you will, for jurors. Is that right?

A That's correct.

Q Don't most of them park over kind of across the street from where I'm pointing? Aren't they parking over there?

A It's my understanding there are several places where they can park. One of them is directly across the street on the other side of the abandoned building across from the post office, and the other one is on the other side of the post office. There is a corner there used to be a transmission place, and they can park down there.

Page 11

Q Would it be possible, if the Court decides that that is something that's necessary in terms of where they park as in bringing them in the back like you suggested, would that be possible --

THE COURT: What are you suggesting?

MS. JAMES: Well, he's saying that he can put them in a secure parking situation and then bring them through the back. That's the way I understood what he said. Okay?

Q Is there not an alternative available to that? Let's say a marshal, just or someone from your office being out in the parking lot just to kind of observe rather than escort?

A Well that would probably eliminate one problem of them being able to come from their cars to the courthouse and back, but, you know, while they're here in the courthouse it's like the judge said, there's a snack bar downstairs. One of our concerns was the number of people in the courthouse that could carry on private conversations may be talking in a loud manner discussing the court proceedings and the jury may be exposed to that.

Q Okay. Well, and what are the other precautions that you suggested?

A Certainly picking them up from a secure location

Page 12

and bringing them back so they don't have that exposure in walking from their cars to and from the building. They would be secured while they were in the courthouse. They would probably take their meals in the jury room.

THE COURT: We're only talking about one meal, which is lunch. They won't be sequestered for breakfast. They're on their own then.

Q Now what is it, with all these concerns you're saying you have, concerns because there's been radio publicity about the trial, correct, that's one of your concerns?

A Yes, ma'am.

THE COURT: I don't know if that's the concern. The concern is that people may come to the trial because of the radio.

Q But you expect the media will also cover this, don't you?

A That's correct.

Q We're talking about radio, we're talking about television, right?

A That's right.

Q And you would agree with me that once those people get into their cars and drive home, they have the potential to listen to the radio if they don't

Page 13

following the Court's orders, correct?

A That's correct.

Q And they also have the potential to go home and if they don't following the Court's order, turn on the T V and listen to exactly why they're being treated differently than ninety-nine percent of the other juries in this Middle District.

A Well what we're trying to do is to keep them from being exposed to the media around the building --

THE COURT: It seems you're making a very good argument for full sequestration.

MS. JAMES: And I would prefer that over partial.

THE COURT: You want full sequestration?

MS. JAMES: Let me discuss this with co-counsel.

THE COURT: I thought about that, but I thought that would be terribly intrusive. I've looked at the law on that and I'll have to engage in another balance, but with full sequestration you think of gangsters and stuff sometimes.

MS. JAMES: Well my concern, Judge, is --

THE COURT: But if you want that I'll take it up with the marshal.

MS. JAMES: May I discuss it with

Page 14

co-counsel?

THE COURT: Yes, I think you need to.

(Whereupon, Ms. James conferred with Ms. Chartoff, Mr. Teague and Mr. Brunson off the record and out of the hearing of the other courtroom participants.)

THE COURT: I considered that and I turned it down.

I assume the government would have no objection to full sequestration.

MR. FEAGA: None whatsoever, Your Honor.

THE COURT: Miss James, if one of the jurors reads or listens about this case, that's going to violate a court order, period. They're not supposed to listen to any news. In fact, I will probably tell them not to listen to any local news broadcast at all because of the history of this case.

MS. JAMES: Judge, after consultation with co-counsel and the defendant, we're in agreement that we do not want full sequestration. However -- And we have not objected to the Court's order as relates to the courthouse while in the courthouse, in other words the lunch and those type things. Our concern primarily is that if these people are escorted from the parking lot in a van with U. S. marshals with, you

Page 15

know, they're certainly going to be armed, now whether or not they will know that --

THE COURT: Let me say this. I will be very happy to tell the jury why we're doing this, purely because of the number of people who may be attending the trial and my concern that they have no contact whatsoever and the limited nature of our courthouse. You know, if we had parking that was nearby, we don't have it, you know in the courthouse itself parking, we just don't have that kind of adequate parking.

If you would like to draw up an instruction, I'd be happy to let the jury know.

MS. JAMES: Judge, this is my concern. It's kind of like having your cake and eat it too?

THE COURT: Right.

MS. JAMES: We're assuming by the Court's order, we're assuming that they cannot follow the Court's instructions with regard to no contact. If there were contact, improper contact by any spectator and/or the media, they would be -- this could be covered because they could immediately, if they followed the Court's order, immediately report it to the Court.

THE COURT: Well that is true, we run the risk that someone might mention the case in their

Page 16

presence. There are a lot of people out in the halls where the jurors are, and the lunchroom, it's not so much that they would necessarily intentionally or consciously contact someone, or that anyone else would intentionally contact them, it's just they may overhear things because of the large number of people. If it ends up, Ms. James, that this trial has a handful of people, or even a moderate number of people, there is no reason why I can't lift the partial sequestration.

This order is simply taken as a precautionary measure in case we have large numbers of people.

MS. JAMES: Well, and I know the Court is being very careful to say this has nothing to do with, quote, Mr. Carmichael and his potential dangerousness, but you heard Mr. Feaga, the first words out of his mouth was, you know, that he's killed somebody before. And our conern is if you treat them differently like that, first and foremost I don't know how often they really abide by the Court's orders, but --

THE COURT: Well, if you have that concern about abiding by the Court's order, that's a pretty good argument for a full sequestration. If there's going to be a lot of media attention and your concern

Page 17

is that they are not going to abide by the Court's order, then I've got a real problem on my hands. My concern is not them, but other people coming into contact with them as they come up to the courthouse, or the media out there taking pictures as they come in, maybe pictures of them.

I want to make sure that they concentrate on one thing alone, and that's this case. If it ends up that our concerns do not play out, I will vacate the sequestration or modify it.

MS. JAMES: All right. And we appreciate that willingness to do that, but we do not, you know, we don't concede and waive our objections.

THE COURT: Certainly.

MS. JAMES: Our concern primarily is it's going to give the appearance to this jury that there is some risk to them, and that's our concern. Because when they're being escorted like that, number one there are potentially people on the jury, that will be on the jury that has served as federal jurors here before. They're going to know whether or not that's normal or not normal. You've got people that probably have served on state court juries; they're going to know whether that's normal or not normal.

THE COURT: If you would like, as I said

Page 18

before, I will definitely instruct the jury on the fact that these precautions are taken purely because our courthouse has limited capacity to keep the jurors from coming into contact with others. If you would like me to instruct the jury, if you submit such a charge I'll consider it.

MS. JAMES: May I consult?

THE COURT: Yes. You can get it to me on Monday. You don't have to submit it right now.

But I balanced everything. I think this case could even justify a full sequestration, but I haven't done that. Judge A'laimo, had -- I don't know if you were in the Oscar Andrews case --

MS. JAMES: I was in the third one.

THE COURT: There were three?

MS. JAMES: Yeah. That was the Starks case.

THE COURT: Okay. You mean my case.

MS. JAMES: Judge A'laimo tried it.

THE COURT: Right. But he had full sequestration, and I think this would be on all fours with Oscar Andrews. So far I don't see that's necessary. I can't promise you, however, once we start the trial, depending on the extent of the media coverage and the extent of the people here, that I may move to that order. But as of now, I'm moving very

Page 19

cautiously and with restraint. And I think that on balance here, at least for the reasons the marshal has given, the deputy marshal and the reasons I've articulated as well, that I think at least a partial sequestration is warranted at the beginning of the trial.

MS. JAMES: All right. May I consult with co-counsel with regard to whether I need to examine Mr. Labarge any further?

THE COURT: Yes.

(Whereupon, Ms. James conferred with Mr. Brunson, Mr. Teague and Ms. Chartoff off the record and out of the hearing of the other courtroom participants.)

MS. JAMES: Judge, I don't have any further questions of the witness. We would, however, plan on submitting a proposed instruction for you.

THE COURT: You need to get that to me before jury selection on Monday. I'd like to -- Whatever panel is finally selected, I would like to instruct them.

MS. JAMES: Judge, I know, and I guess this is putting the cart before the horse but, you know, oftentimes we as lawyers become lax with what the Court tells the jury when they go out they do this and

Page 20

they do that, but given the Court's concerns that have been articulated here today, I'm hopeful that the Court will just overdo the instruction of don't talk, don't consult.

THE COURT: I usually tell that several times.

MS. JAMES: And don't watch T V, that kind of thing.

THE COURT: It also depends on the kind of coverage.

You know, I have also been in trials where we expected the whole world would show up and no one showed up.

MS. JAMES: Right.

THE COURT: So we don't know what will happen. You know, I will definitely be flexible depending on what happens during the trial. It may end up that the media abandons the case after two or three days. But I'll still tell the jury not to watch or listen to the media.

MS. JAMES: Thank you.

THE COURT: So that objection will be overruled and the motion will be denied. And I'll give a written opinion to that effect sometime between now and the end of trial.

Page 21

You may step down. I'm sorry.

(Whereupon the witness, Lawrence Labarge, stepped down from the stand.)

THE COURT: Now the next matter we'll take up is the motion to continue, and I think that's an alternative motion. I think it was a motion to continue, motion for a change of venue and also a motion for gag order. Is there any evidence anyone wants to put on?

MR. FEAGA: None from the United States, Your Honor.

MS. JAMES: Judge, in all candor the lawyers have consulted in this case, and it was our preference to try to put on some evidence in support of our change of venue and some demographics and things of that nature.

THE COURT: Where do you want to change it to, Birmingham or Mobile? Because you realize our jury comes from the whole district, so while this case is being tried in Montgomery, we'll actually have jurors from Dothan and places like that. And I'll be very frank with you, I doubt that any of these people will have heard about this case. I have been on the bench for twenty-five years and I'm often surprised how a case with large coverage, a lot more than this

one, to be very honest with you they won't even know Mr. Carmichael or read anything about him. And that would apply even here in Montgomery.

The Advertiser gets one article here and there, but you'd be surprised how many people don't read it.

MS. JAMES: And, Judge, I'm assuming that during voir dire we would have an opportunity to fully examine them with regard to this. And should it appear that the venire has been tainted, even more reason in support of a renewed, assuming you rule against us, a renewed change of venue motion.

THE COURT: Right. In fact, that is what the case law says. I think first of all there is a, what is it, a per se presumption of prejudice, and I don't think we have that here by any stretch. This is not the Michael Jackson trial.

But absent that, the way to determine whether there is prejudice is during the voir dire. If it ends up that I cannot get a fair jury, then I will consider continuing the case and moving to it a different location. I was trying to find the case that says that. There's United States of America vs. Leher-Rivas, 955 F.2d 1510 at page 1524. That's a 1992 Eleventh Circuit case finding no presumptive

prejudice where the publicity included characterizations of the defendant as a drug kingpin, or narco terrorist. There was no presumptive prejudice there.

And then there is case law that says that it is during the impaneling of the jury that of course you can then demonstrate what we call actual prejudice. And I cite one case there is United States v. Rodriguez-Carona, 705 F. Supp. 70 at page 72. It's a 1979 case from Rhode Island. Puerto Rico, I'm sorry.

Let's see here -- Yes. And then there's the Fourth Circuit case, United States of America vs. Jones, 542 F.2d 186 at page 193, a 1976 case in which the Court said that, "The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through voir dire examination." And there the Court upheld a denial of the motion to continue due to negative pretrial publicity.

MS. JAMES: Judge, given more time, because the most recent problem developed I guess Thursday was a week ago with the indictment --

THE COURT: Right. You're talking about the, what's his name --

MS. JAMES: Salem.

THE COURT: Salem?

MS. JAMES: Yes.

THE COURT: Right. I think you're going to be quite surprised that no one has heard about that case. And I read the article too, and it's so technical, to be honest with you I doubt the relationship would be self-evident. But we'll see what happens at your voir dire.

MS. JAMES: Right. But my point is, given more time it was our desire to pull together some people to do some polling in the community so we could put on evidence. And given the short time frame from the event to now this hearing and the trial on Monday, we were unable to do that.

THE COURT: Right.

MS. JAMES: In addition to that, we've got this motion --

THE COURT: I think the real test is going to be the voir dire itself. We don't need to do polling, we can do the actual thing now.

MS. JAMES: And of course we respectfully disagree. But the other thing, Judge, is we have asked for a continuance of the trial, and in the alternative a change of venue, because we believe that

there should be at least some period between the article on Thursday a week ago and the trial.

THE COURT: Well, if it ends up that the jury is tainted by the article, I will reconsider that request.

MS. JAMES: And we have one additional argument.

MS. CHARTOFF: One additional concern we have, Your Honor, is that given Mr. Carmichael's reputation here in the Montgomery area and the racial makeup of the Middle District of Alabama, we are concerned, and we'd like Your Honor to keep in mind as we are selecting the jury, that the prejudicial publicity may serve -- may end up kicking all the African-Americans off the jury, Your Honor, and denying Mr. Carmichael the right to be tried by a jury of his peers.

THE COURT: Well we'll have to see what happens. All of these are things that we'll just have to see how it plays out at the jury selection. As I said, the panel comes from the entire district. So not only African-Americans that come from Montgomery, but obviously depending upon the lottery as to who gets selected to appear for jury service, there are African-Americans who come from Dothan, Opelika, other

places. I've never met Mr. Carmichael. To be honest with you I would not have known who he was.

MS. CHARTOFF: I certainly didn't mean to suggest that all African-Americans in Montgomery --

THE COURT: Right. So I think you may find that a lot of African-Americans, even here in Montgomery, don't know about the case. And if they do know about the charges, that does not disqualify them, whether they are African-American or white, or of any other nationality. They're to put that out of their mind.

I often hear cases where someone has read something but they still were alright to sit on the jury. All of they've heard were the charges. So for those who stand up and say they have heard about the case, of course we'll individually voir dire them to find out what they have heard. Okay?

MS. JAMES: So are you overruling the motion?

THE COURT: Yes, that motion is overruled as well, subject to reconsideration after the jury is questioned on Monday.

What about the gag order request?

MS. JAMES: We certainly stand with that.

THE COURT: Okay.

MR. FEAGA: Your Honor, would it help if Miss James would articulate what it is she is asking the Court to do with specificity in terms of the gag order?

MS. CHARTOFF: Your Honor, we're asking the Court to order the United States of America not to issue any further press releases related to the David Salem matter or -- sorry, George David Salem matter, or any other unindicted codefendants in that case, to not issue any press releases with regard to this case, which they have done in the past. They issued a press release when this case was indicted. And to avoid any statements to the media about this case.

MR. FEAGA: Your Honor, we are aware of our obligations under the -- basically the rules of this Court, the Alabama Bar Association rules about making comments to the press. We would submit to the Court that it's not necessary for the Court to issue an order directing us not to --

THE COURT: Well, let me just get an understanding from both sides. Neither side is going to be making any comments to the press, is that correct?

MS. JAMES: We don't anticipate making any comments.

THE COURT: I don't question about don't anticipate. Neither side is going to be making any comments to the press starting today, is that correct?

MR. FEAGA: Your Honor, I'm hearing the Court say they don't want us to. And if the Court says it does not want us to we won't. But we would ask the Court, then, to require the defense --

THE COURT: I said "neither side".

MR. FEAGA: Yes, sir, but they're doing something already, and have been every day, to publicize this case. And so if we're going to have that, and we think it's a fair and appropriate thing for the Court to do, we think that the Court should also instruct them that now that the Court is about to start trying, not to say anything more about the case on the Westside Weekly and to shut their website down, because those are both publicizing this case.

THE COURT: Now I don't know what the lawyers -- Have the lawyers done anything?

MS. CHARTOFF: No, Your Honor.

THE COURT: I can't control the media on this.

MR. FEAGA: Their names are on the website. There is information about the case on the website. They're putting things on the website on a regular

basis asking for information about the case. And, Your Honor, that's publicity. I mean if they're concerned about publicity during the trial, we share that with them. We want a fair and impartial jury. We don't want the jury being subjected to any outside press, any outside comments that would affect them.

But they are doing this every day and we would ask that now is the time, then, if they want this and they're sincere about it, for them to shut these downs and let's quit talking about this case publicly and let's come in here and try it next week.

THE COURT: What's your response?

MS. CHARTOFF: Your Honor, we have nothing to do with whatever it is he's talking about. The website, I know what he's talking about, and the lawyers have nothing to do with that. The Westside Weekly, that's an independent publication, as far as I know. We are willing not to make any statements during the trial.

THE COURT: What about Mr. Carmichael and Mr. Williams, are they going to be making statements?

MS. JAMES: Not Mr. Carmichael.

MS. CHARTOFF: No Your Honor.

MR. TEAGUE: Your Honor, Mr. Williams will not be.

Page 30

MS. JAMES: Judge, as I understand it the purpose, and I wasn't in the case when the website issue was on the forefront, but as I understand it, it is an information seeking method. And to shut that down now simply because the trial has started would be potentially problematic in terms of the goal and the purpose that as I understand it was set up for.

THE COURT: I don't see any basis to shut down the website. However, both sides, and I will rely on their promises, will not discuss the case, and that includes their parties and representatives, will not discuss the case to the press.

MS. CHARTOFF: Yes, sir.

THE COURT: With that understanding I'll deny the motion for a gag order.

MS. JAMES: Well, Judge, there is one other potential problem. And that is that, you know, as regards there is a separate Salem matter, there is a separate United States Attorney's Office handling that case. And although it's separate, the press release goes out Associated Press, and obviously our paper picked it up. And so while this office is agreeing not to discuss it, our request for gag order included the Northern District of Florida as relates to matters that are of interest in the Middle District of

Page 31

Alabama.

THE COURT: Okay. I'm going to ask that you inform the Northern District of Florida not to mention anything about the Salem case during the time this trial is in progress.

MR. FEAGA: Yes, sir.

MS. JAMES: To also include a press release, because let's assume that further indictments were to come out during the course of the two weeks, could you extend that to --

THE COURT: Yes. Unless without checking with the Court first.

MR. FEAGA: I'll let them know.

THE COURT: If there is an indictment that comes down, before they issue a press release they need to let me know. I won't say they can't do it, but I need to know what it is.

MR. FEAGA: I understand, Your Honor, and I will do that.

Your Honor, I just want to go back if I may one second and revisit something. Now they have two things going over there that are publicizing this case. They're in here telling the Court they're concerned about things we may do to publicize the case, and yet they are refusing to stop doing it on

Page 32

the Internet. As the Court has already indicated, and I understand it's not going to revisit it at this time, but the Court won't order them to either stop mentioning the case in the way that they are on the Westside Weekly and to stop --

THE COURT: What have they done in the Westside Weekly?

MS. JAMES: What is the Westside Weekly?

THE COURT: I think it's a publication that basically is directed to the black community in Montgomery.

Is there anything that the lawyers have said in the Westside Weekly, or that Mr. Carmichael has said in the Westside Weekly?

MR. FEAGA: Your Honor, I understand them that they're saying the lawyers are not talking through this website. I believe that that --

THE COURT: Well let's talk about the Westside Weekly first. Is there any evidence that Mr. Carmichael is making comments to the Westside Weekly?

MR. FEAGA: Yes, sir, there is evidence that he is making comments because on the website, there is basically a picture of it is in the Westside Weekly and the editor of that publication, Cubie Red Gilmer I believe, is his spokesperson.

Page 33

So what I'm asking the Court to do is okay, we've been dealing with that for a year and-a-half, or for however long we've been dealing with it, let's at least, I think it's appropriate and fair to order them not to make any modifications in it between now and the conclusion of this trial unless they decide to take it down. In other words, there shouldn't be new information getting their position in there. Because that is doing exactly what they're in here complaining to the Court they're concerned is going to happen.

THE COURT: Well if they publish new information I will reconsider taking it down, because I have reconsidered it every time it's changed. So I don't think they're going to be making -- I'll say this: Don't make any changes without notifying the U. S. Attorney and me.

MR. FEAGA: Thank you, Your Honor.

THE COURT: Anything else, Counsel?

I think we're taken care of two matters. We'll take up the motions in limine now. That's going to take awhile. So how do we start here?

The first matter is motion in limine number two seventy-eight, which is a motion to exclude alleged statements to law enforcement. Now wasn't this already the subject of a motion to suppress or

motions to suppress?

MS. JAMES: Yes, Your Honor, in part.

THE COURT: Now how does your motion in limine differ from the motions to suppress?

MS. JAMES: Well, Judge, let me say from the outset so I don't have to say it with regard to every motion, but obviously we rely on the arguments and the citations to authority in each of our motions.

The only additional comments we have with regard to the first docket entry two seventy-eight regarding Mr. Carmichael's alleged statement to law enforcement is, it is emphasized in the motion but to articulate it again, and that is that the "You've got me" is subject to a number of different interpretations. And given the context in which the government plans to use it as they have noted in their response that it is, quote, a confession, it could be very misleading to the jury. And that is one of our concerns.

The other concern, and this has not been raised before and it's fairly self-evident why it has not been raised before, Mr. Glassroth, who was former counsel for Mr. Carmichael, actually participated in the filing of the motion to suppress and the hearing on the motion to suppress. The new defense team,

however, has a concern that has not been previously raised, and that is that it was ineffective assistance of counsel for Mr. Glassroth to allow and to actually send Mr. Carmichael uncounseled to the Drug Enforcement Agency for purposes of acquiring some property that had been taken by the government.

THE COURT: Now this occurred before the indictment, wasn't it?

MS. JAMES: No.

THE COURT: Had the indictment come down? I never heard an ineffective assistance of counsel before he was even charged.

MS. JAMES: He was indicted. He had been released from jail.

THE COURT: Indicted by whom?

MS. JAMES: By the Middle District of Alabama, the U. S. Attorney's Office.

THE COURT: This was on December 4, 2003, he had already been indicted?

MS. JAMES: Yes, sir.

THE COURT: So you're making three arguments. The first one, if I remember correctly from reading your motion, is that the prejudice outweighs the probative value?

MS. JAMES: Yes, sir.

THE COURT: And I think your second argument, which I don't know if I quite understand, is a Sixth Amendment argument? Is that the same as your ineffective assistance of counsel argument?

MS. JAMES: Excuse me, Judge.

(Whereupon Ms. James conferred with Ms. Chartoff off the record and out of the hearing of the other courtroom participants.)

MS. JAMES: Judge, there are two Sixth Amendment arguments.

THE COURT: Right. The first one he didn't have a lawyer present when he made the statement, and now you're saying ineffective assistance of counsel?

MS. JAMES: Yes, sir, those are the two things.

THE COURT: Okay. I'll hear the government's response to all three arguments. The first one being that the prejudice outweighs the probative value under Rule 403; the second one being the Sixth Amendment argument that Mr. Carmichael was interrogated without -- in the absence of counsel; and the third argument being that his counsel was ineffective.

MR. FEAGA: Your Honor, in regards to whether or not the prejudicial effect outweighs the

probative value, as the Court well knows any time the government introduces any evidence that's indicative or probative as to the guilt or innocence of the accused, it prejudices the accused. This is a statement that he made to law enforcement agents and of course it's going to, in terms of whether or not a jury might believe he's guilty or not, we're going to urge them to believe that that's indicative of his guilt of the offense and that it is on his part an admission to his knowledge of the fact that he's guilty.

So it's going to prejudice him. But whether or not its prejudicial effect outweighs its prejudicial value, we think it's clear that the probative value of that statement would outweigh any prejudicial effect. And really the only prejudicial effect we're talking about here is prejudicial effects that it comes from the fact that it's indicative of his guilt of the offense. And so that's not the type of prejudice that I think is being contemplated.

Secondly, in regards to whether or not there was ineffective assistance associated with this, I'm relying back to, and I'll confess to the Court I wasn't prepared to address that argument in detail today on the ineffective assistance claim, except to

the extent that I know that U. S. vs. Strickland, I think, would control, whether or not there was ineffective assistance in that. And to me, there's nothing uncommon or unusual at all about an attorney allowing his client to go collect belongings that he's going to be given back that the Government is not going to keep in the course --

THE COURT: Isn't there a more fundamental question here?

MR. FEAGA: I'm not sure what the Court means, Your Honor.

THE COURT: Does ineffective assistance of counsel apply at that stage of the proceeding?

MR. FEAGA: Oh. If I can have just a moment Your Honor.

THE COURT: I was going to ask Miss James if she has case law that says, you know, sending your client down to talk to the police even raises a Sixth Amendment ineffective assistance of counsel claim. I know you have ineffective assistance of counsel during the trial, but I have to admit I've never heard of it being applied to a pretrial scenario where you just merely, you know, send your client to talk. I'm not saying it doesn't, but I'm asking do you have case law to support that?

MS. JAMES: Judge, I would rely on Strickland vs. Washington.

THE COURT: Do you have case law that specifically addresses that question?

MS. JAMES: No, Judge. And I don't think that -- In all due respect, I don't think that even if there was one it would trump. I mean, he is entitled to effective counsel from the moment -- I mean he's entitled to effective counsel from the moment the representation begins. And the fact that it was pretrial -- And I mean anything that the lawyer does or does not do --

THE COURT: You can get case law to me by Monday morning addressing that issue. I want to know where a court has applied ineffective assistance of counsel outside the trial itself. Now I know that you could be ineffective by not gathering evidence to put on at trial but, you know, just sending someone down to the police station and so forth and the government ends up getting incriminating statements, I'd like to know whether ineffective assistance would apply in that scenario.

MS. JAMES: Judge, we will certainly look for that, but I expect we won't have an opportunity to make further argument on Monday. But if I might

simply finish what I was saying, I think he's entitled to adequate representation by the Sixth Amendment from the beginning of the lawyer's representation. And anything that that lawyer does or does not do that adversely affects the client would fall under that umbrella of ineffective assistance as outlined in Strickland versus Washington.

THE COURT: Okay. Do you wish to put on any evidence other than what was presented to the magistrate judge on the motion to suppress?

(Whereupon, Ms. James conferred with Ms. Chartoff off the record and out of the hearing of the other courtroom participants.)

MS. JAMES: No, Your Honor, we don't.

THE COURT: Well I'll need to review that transcript because I obviously don't remember word for word how he happened to have come down to the station and so forth. But I'll look at that transcript again and make that determination.

MS. JAMES: Judge, I would like to point this out. Judge, the other thing that I would like to point out, because most of the Government's response to this particular motion is that this is a law of the case, this has already been decided, and I think that the threshold issue has been decided, which obviously

would be subject to appeal, but for purposes of this trial, and that is that it is an admissible statement. But the Court still has to, on the basis of our motion at least in part, is make that balance between probative versus prejudicial.

THE COURT: Yes. Right.

Now by the way, we're only talking about one statement. And I call it "one statement," I think that's the statement where he says, "You got me," Mr. Carmichael does, and the other statement where he said he had resigned himself to the fact that he was going to prison for the rest of his life.

MS. JAMES: Right.

THE COURT: Those are the two statements that are at issue. I think the government agreed that it was not going to introduce statements about -- statements that he allegedly made about his attorneys. I think those statements were that he could not trust his own attorneys, and that he had an attorney that called the U. S. Attorney's Office and stated that he had a client that wanted to provide information about him. And also his statement that his other attorneys just had their hands out for his money. I don't think the government wishes to introduce those statements so the issue is moot as to those.

Then there are also the statements that he stated that his attorney explained that several individuals were coming forward and providing information about him, and he advised that most of those people would be lying, indicating that individuals would not be lying. I don't think the government seeks to introduce that statement as well.

I think we're only talking about two statements about "You got me," and that he resigned himself to the fact that he could be going to prison for life, or was going to prison for life.

MS. JAMES: That's our understanding as well, Judge.

THE COURT: So that's the focus on those two statements I just mentioned.

And I've considered the responses, and I do find that the probative value clearly outweighs the prejudicial value. I understand that "You got me" could be interpreted several ways, but that's true of everything you say. And the question is context and, you know, we'll hear what Dejohn says and get the context, and the jury can draw its own inferences as to what Mr. Carmichael meant.

The argument that he was denied his Sixth Amendment right also fails, because if I remember

correctly from the hearing, Mr. Glassroth had merely made arrangements for Mr. Carmichael to retrieve his personal belongings and Mr. Carmichael was not in custody or anything like that. And as a result, I don't think that he was entitled to have a lawyer there.

Furthermore, Mr. Carmichael initiated the conversation and volunteered the incriminating information. And based on which is 911 F. Supp. at 1845, the mere question for Mr. Dejohn as to why after the initial comment there is nothing to engage the voluntary nature of Mr. Carmichael's statement.

So I reject your 403 argument, and I reject your first Sixth Amendment argument, and that is that he did not have an attorney. And I will reconsider your argument regarding ineffective assistance of counsel after you get me case law on that.

MS. JAMES: Thank you, Your Honor.

THE COURT: You can get that to me first thing Monday morning, but no later than eight-thirty.

And the government, you can submit something if you would like to as well.

MR. FEAGA: Thank you, Your Honor.

THE COURT: Carmichael's motion to exclude general character evidence, document number two

seventy-nine, seeks to -- that is Carmichael seeks to exclude evidence or testimony that he had extramarital relationships and engaged in other sexual improprieties, such as fathering children outside of marriage and impregnating a woman who later had an abortion. Also he allegedly engaged in violent conduct, such as beating an unindicted coconspirator, Sandra Jones. Also, he was allegedly responsible for the suicide of an employee. And finally -- Well that he was also involved in uncharged crimes, and finally he brought juveniles with him while conducting drug related business.

I believe the government says that you don't intend to use evidence of general character, nor do you intend to introduce evidence that Carmichael beat Sandra Jones or contributed to the suicide of another person unless the defendant makes the evidence relevant, is that correct?

MR. FEAGA: That's correct, Your Honor.

THE COURT: So I'll grant the motion in limine to the extent that before you introduce such evidence you need to get a ruling from the Court to show me how it's relevant.

MR. FEAGA: Yes, sir.

And, Your Honor, in regards to the matters

regarding Sandra Jones and the suicide, yes, sir.

THE COURT: Yes.

Now you also say that you want to introduce evidence that he was involved in a shooting for which he was not charged, and that he brought a juvenile with him while distributing drugs.

MS. JAMES: Judge, may we make inquiry as to -- We're not clear on what that --

THE COURT: Yeah, I was actually going to ask that myself. I can't determine how that's relevant without more context, factual context.

MR. FEAGA: Yes, sir, I can provide that. With regards to the shooting, I believe where that's potentially going to become an issue, Your Honor, is with regards to the testimony of an individual named Jimmy Timmons. Mr. Timmons, I expect will testify, to a lengthy relationship with the accused wherein they were involved in the distribution of controlled substances, mostly marijuana.

He will testify to knowing a number of Mr. Carmichael's other associates and coconspirators in this marijuana distribution conspiracy, one of whom is an individual named Sandra Jones. There's going to be evidence that Miss Jones was an associate of Mr. Carmichael's. This is one of the things where we

think we may inextricably get into sexual information as well, or an intimate relationship.

We believe he had an intimate relationship with Miss Jones, and we think that's going to come out in the course of discussing their relationship in the drug business, and --

THE COURT: Is she going to testify?

MR. FEAGA: We expect to have her subpoenaed to testify, Your Honor. It may well be that we will get into some issues with her that I don't know whether she's going to voluntarily agree to testify or whether she's going to get up and assert her rights and if so whether we're going to be in a position where we're going to be trying to impeach her with prior statements she may have made. But that takes us into another issue that I think we probably won't be able to address until we get to trial and find out what she's going to do.

But in regards to her, Your Honor, the evidence is going to establish that she was caught in Texas with forty-two thousand dollars that we believe the evidence is going to fairly raise the inference that belonged to him and she was there in El Paso to buy drugs. The money got taken away from her. That's the evidence in this case.

We'll see evidence in this case that she was later caught in Mississippi driving a truck that belonged to the defendants. And all of the evidence that we intend to introduce is that he was bringing this extensive quantity of marijuana that we think the evidence is going to establish he was distributing back up here in large measure in the back of trucks. And it was associated with his trucking business. She was caught driving one of those trucks in Mississippi with a large quantity of marijuana in the back of it.

And we believe that the evidence -- In other words, what's going to happen is we think the evidence is going to fairly establish through witness testimony and other factual events that Miss Jones was in fact a conspirator with him in this drug distribution business, and then the evidence will establish through Mr. Timmons that Miss Jones, after Mr. Timmons' associate who he was working with Mr. Carmichael was arrested, that Mr. Carmichael, we believe the evidence is going to fairly raise the inference had Miss Jones contact Mr. Timmons and lure him over to Tuskegee with the allegation they were going to go to pick up some marijuana. It will put Mr. Timmons together with Miss Jones.

There will be some testimony about

Miss Jones having made some sales of marijuana to undercover police officers during this time frame, and what Mr. Timmons is going to be, I think ultimately testifying to, Your Honor, one way or the other is that when they got over to Macon County they he turned his back on Miss Jones, she made the statement, "Lord forgive me for what I'm about to do," put a pistol to the back of his head and shot him in the back of the head. And we believe that the evidence will fairly raise the inference that Miss Jones shot Mr. Timmons in an effort to keep him quiet.

But that's not why the evidence is going to come in necessarily. The evidence needs to come in because it shows that she was, in fact, as Mr. Timmons is testifying, involved with Mr. Carmichael in the death and drug distribution business. It shows Mr. Timmons' connection and contacts with Mr. Carmichael. And when you combine that with the fact that she was picked up in Texas with the money and picked up in Mississippi with the drugs, that we just think this evidence is going to wind up being found by the Court to be admissible because it shows that she was, in fact, in fact beyond any question, involved with Mr. Carmichael in his drug distribution business.

And it becomes very important to us and is

extremely probative of his guilt because it ties her being in Texas, because we don't necessarily know what she's going to say when she goes on the stand, we know what she's said in the past, that that money was Leon's and she was down there to buy dope.

THE COURT: Say that again now.

MR. FEAGA: We believe the evidence will fairly raise the inference that Miss Jones shot Mr. Timmons in an effort to keep him quiet, but that's not why the evidence will come in necessarily. The evidence needs to come in because it shows that she was in fact, as Mr. Timmons is testifying, involved with Mr. Carmichael in the drug distribution business. It shows Mr. Timmons' connection to her and Mr. Carmichael.

And when you combine that with the fact that she was picked up in Texas with the money, picked up in Mississippi with the drugs, that we just think this evidence is going to end up being found by the Court to be admissible because it shows that she was in fact, in fact beyond any question, involved with Mr. Carmichael in his drug distribution business. And it becomes very important to us, extremely probative of his guilt, because it ties her being in Texas because we don't necessarily know what she's going to say when

we put her on the stand.

We know what needs the past, that that money was Leon's and she was down there to buy dope, but we don't know what she's going to say when she gets here in the courtroom next week. So I just think it will all tie together and it will be necessary that it come out.

In any event, when they cross-examine Mr. Timmons, which I assume they will do vigorously and attack his credibility, this contact with Miss Jones shows that what he's saying about her and her involvement with the defendant is truthful. I think just the context of the entire series of events the Court is going to find that the probative value of that outweighs any prejudice to him that can occur from it. It's a fact. It happened in the life of this case, and we think the Court's going to let it in. But I do think the Court will probably be in a better position to make a final ruling on that when it has heard the evidence in the case up to the point in time that Mr. Timmons gets on the stand.

THE COURT: Yes?

MS. JAMES: Judge, in response to that, it brings up something that we were going to deal with at some point with the Court. Mr. Timmons does not have

federal charges. The government has represented that to us, but has been in federal custody, the custody of the United States marshals for a significant period of time. In the course of our investigation we've explored the criminal files at the Montgomery County courthouse to try to determine if he had pending charges there.

Mr. Timmons had some relatively minor state charges. The Montgomery County personnel is under the belief that he has been released from there on an appeal bond, but yet he's in the United States Marshal's custody and he had nothing to appeal from. There is no conviction, there is only these pending charges from. But he's been in the custody of the marshals, and the we've tried to locate him as we have other witnesses for our investigator to interview for the pumps of trial.

Mr. Timmons, we asked the government to produce him for our possible interview. The government said that they would produce him during the course of the trial in the holding area. We told the government that was inadequate and insufficient and would be a distraction for us and the defense team during the course of the trying. And then we asked he be brought over for purposes of our interview.

My point, I'm making all this to show the Court that we don't even have -- we've not even had an opportunity to ask him if he would talk to us or not. And Mr. Feaga has represented he will not talk to us, that he's indicated he will not talk to us, and that he is fearful. This is just like, you know, something just out there in the air because there's no indication on anything that we've been given that he made a police report as to this alleged shooting, that he made any prior accusations with regard to who shot him. This is just information, very one-sided information that the Government has and we don't have access based on his essentially being kept away from us throughout the course of the pendency of this trial.

We have no way, given the nebulous nature of that information, to even begin to investigate it or do anything with regard to verifying or confirming any of that. Of course Mr. Carmichael vehemently denies that if it did happen, that he had any involvement in that.

And I would also point out that with regard to Miss Jones, she has given the government information -- Or let me say this: There is information contained on a D. E. A. Six that does

purport to say some of the things that Mr. Feaga has argued. But specifically with regard to the seizure of money from her in Texas, and with regard to the incident that occurred in Mississippi, there is sworn testimony, at least as it relates to Mississippi, that she disavows any involvement, not only with Mr. Carmichael but anyone in this city.

Her testimony under oath to the judge in Mississippi was that she was on a mission of her own, and that she was traveling from Texas to Florida when she was arrested in Mississippi. And the government knows that, knows that she made that testimony, and I think to put her on the stand, and quite frankly any other witness on the stand knowing that they are going to either take the Fifth Amendment, certainly that doesn't need to be done in the presence of the jury. And that's the first time that's been raised, but that would be something that would be of concern to us.

MR. FEAGA: Your Honor, no doubt when we get Miss Jones on the stand the Court's going to want to excuse the jury before that happens and we'll want to work these things out.

THE COURT: When you decide to call the Miss Jones, you really need to say we're ready to call the witness that we spoke about earlier, Judge, or you

can just say we'd like to take up something outside the presence of the jury.

MR. FEAGA: Yes, sir.

THE COURT: That's all you need to say. And then we can see what she's going to do.

MR. FEAGA: Yes, sir.

A couple of things on the other matters, Your Honor. With regard to Mr. Timmons, we have turned over the D. E. A. Sixes that contains any statements he's made to us that I think contains this information. We also have turned over Bates number seventeen three ninety-nine which is a police report, incident report from the Tuskegee Police Department that details Mr. Timmons's statements that he was shot by Sandra Jones over there. So they do have it.

THE COURT: I want to make something clear. I'm hearing motions in limine now. Discovery and your access to this person should have been taken up with Judge Boyd. I'm not hearing things about how you want information now. That's something you should have taken up with Judge Boyd months ago. If you had a problem talking to a witness or if you had problems with Mr. Feaga making a witness available, all of those things were for Judge Boyd to resolve.

I'm here today to decide what testimony is

going to be admitted at trial on motions in limine, and that's all I'm here today to decide. If you've got a problem, I leave you to contact Judge Boyd. I don't know whether it's timely or not. She's set up her own orders on that, but you need to discuss that with her.

MS. JAMES: Judge, the only thing that I would say in that regard is this has been an ongoing saga, and we were not advised until the most recent -- we thought we were going to have it resolved by last Friday, and we were told this week by Mr. Feaga that the government would not produce him. In fact, Miss Morris said, "Talk to the marshals, and if you can get them to bring him over you all can interview him or try to interview him."

I contacted the U. S. Marshals Service and they wouldn't do it. But my point is, we haven't had an opportunity. We've been looking for him. We didn't know he was being --

THE COURT: Again, take that up with Judge Boyd. Right now I want to talk about what evidence is going to be admitted at trial. I've got to stay focused. I have motions in limine before me.

MR. FEAGA: Yes, sir. And if the Court will indulge me for just one second, I want to put

something on the record in regard to that. And that is in my conversation with Miss James, I told her that I had just met Mr. Timmons and Mr. Timmons had informed me when I asked him was he willing to talk to the defense, and he said that he was not. He did not talk to them, would not talk to them and was not going to talk to them and was afraid of them.

THE COURT: You take that up with Judge Boyd.

MR. FEAGA: Yes, sir. I just wanted that on the record to say that I told her that the thing to do, I think, would be to have to take it up with the judge, Judge Boyd or this Court, talk to the witness and see if the witness wanted to talk. I didn't want to be put in the position of blocking their access, but I also didn't want to be put in the position of forcing the witness to talk with them.

THE COURT: Okay. With regard to the statements that are at issue as to Miss Jones, as I said the government is first going to ask the Court to consider any of her testimony outside the presence of the jury because we don't know whether she's going to take the Fifth or whatever.

As to Mr. Timmons, I'll have really just to see how his testimony goes. If the government

suddenly says did Miss Jones have a sexual relationship with Mr. Carmichael, you know, without any context, I might sustain the objection. But if he goes up to it, I'll just have to see how the evidence goes.

MS. JAMES: Judge, and that's precisely the reason for our motion in limine. Because once it's out, the question --

THE COURT: I'll be very honest with you, so far it seems highly relevant. The prejudice is clearly outweighed by its relevance. From what Mr. Feaga has said, unless what he's telling me proves to be untrue, I think it surely should come in because it shows the relationship. Otherwise, you just think two strangers are entering into a deal, and that gives a totally false picture.

If the relationship was intimate and there were in fact drug transactions going on, that gives more credibility to the fact that there were drug activities going on. So I think the evidence is highly relevant, and the prejudice is only for prejudice the defendant should receive because it proves his guilt.

But anyway, we'll take that up again at trial. I assume Mr. Feaga is making a fair

Page 58

representation.

MS. JAMES: Judge, I see these as two separate issues. One, the sexual -- the alleged sexual relationship. And, secondly, the shooting. And certainly even though --

THE COURT: Well it depends on what Mr. Timmons is going to say about the shooting. I assume that there will be evidence that his relationship with Mr. Carmichael, and we'll just have to hear what he says when he was on that trip with Miss Jones and what was said between them.

What will happen, can you give us a summary?

MR. FEAGA: Yes, sir, Your Honor. I want to make it clear that Mr. Timmons did not travel to Texas with Miss Jones, nor did he travel to Mississippi with her. But he did have extensive involvement with her in the trafficking of marijuana of Mr. Carmichael's.

THE COURT: What's the evidence going to be as to how the shooting allegedly occurred?

MR. FEAGA: The evidence would be that, and let me see if I can date time this because I think that's the best way to do it, Your Honor, the evidence will be that sometime in June or July of 1994, a fellow named Joseph Lacey, who was selling Leon Carmichael's marijuana along with Mr. Timmons, was

Page 59

arrested by the police and charged with his conduct involved in that scheme.

That about nine or ten the months went by and he was convicted. The police were still investigating out there, and I can't recall -- oh, here we are. That on May the 9th -- it was June the 3rd '94 that Mr. Lacey was busted at this place selling marijuana and charged with selling it out of a place called J and L Thrift.

On May the 9th of '95, which would be eleven months later, Mr. Timmons was lured out to Macon County by Miss Jones who there will be already I think at that point in time evidence that she and Mr. Carmichael were involved in this trafficking of marijuana along with Mr. Timmons and along with Mr. Lacey. Mr. Timmons was lured out there and shot.

On June the 8th of '95, Timmons was arrested and then began to cooperate with the police, made two buys from Miss Jones in August -- July and August -- yeah, he made one buy and an undercover officer made another buy. He may have been with her at that one.

Then in November of '95 Miss Jones is caught out in Texas with the forty-two thousand dollars. Then in July of '97 she stopped in Mississippi driving a Multi Investments truck belonging to the defendant

Page 60

with a large quantity of marijuana on it. So the evidence is going to flow that way.

The detailed specifics of exactly what Mr. Timmons will testify to that went on during the process that these key the events happened that I think the Court is interested in today will, we believe, fairly establish that from his perspective and his testimony that he was, along with Mr. Lacey, along with Miss Jones, involved with Mr. Carmichael --

THE COURT: I'll say this. When you're ready to introduce the evidence regarding the alleged shooting, ask me to stop the trial and I'll hear what he says first.

MR. FEAGA: Yes, sir, will do.

THE COURT: Okay, very good. So the motion two seventy-nine is granted to the extent already stated.

MS. JAMES: Judge, we didn't deal with part of it.

THE COURT: What is that?

MS. JAMES: And that is the sex with the fourteen year old.

THE COURT: Oh, okay. Is that in that motion? Right. Yes. There's the allegation that Carmichael began an intimate relationship with one of

Page 61

the witnesses when she was fourteen years old. I really can't make that determination without knowing the context. You'll have to tell me what it is you plan on doing.

Will this witness be called, this fourteen year old be called as a witness? I assume -- Is she fourteen today?

MR. FEAGA: No, sir, Your Honor, she's not. The witness is Miss Latoya Davis, I think they're talking about. And what she's going to do is she's going to detail her involvement with the defendant in the distribution of marijuana. Riding with him to distribute it, participating in the distribution of it, being with him when he was preparing to go distribute it, and she's going to talk about how she met the accused. And she met him when she was fourteen years old.

She began going with him, riding with him, participating with him in the distribution of marijuana and she's going to say if attacked about how she could have been in a position to do these things and be around these things with the defendant, that she had an intimate sexual relationship with him starting when she was fourteen years old.

THE COURT: Do you intend to bring that out?

MR. FEAGA: Your Honor, I can say this. I will, before I do it at trial, again, ask the Court if I can go there. If I decide to -- I'd like to hear her testimony and how it unfolds.

THE COURT: Very good, then. Before you go and ask her about the intimate sexual relationship, ask for a recess and let me hear what she's going to say before I decide to.

MR. FEAGA: Yes, sir.

MS. JAMES: Judge, there is one additional factor that has occurred since the filing of this motion, and that is that the Montgomery County grand jury no billed this precise matter.

THE COURT: No billed what?

MS. JAMES: The allegation that she and Mr. Carmichael had had sex when she was fourteen years old.

THE COURT: Well what does that mean, though?

MS. JAMES: I'm just saying that's an additional fact that we didn't put in our motion because it's just happened within the course of the past month.

THE COURT: So you're saying I shouldn't allow it in because it just came in?

MS. JAMES: I'm just saying that's an additional fact that the Court should consider.

THE COURT: I'll hear it when we hear the testimony.

MS. CHARTOFF: Your Honor, I would just ask, you know, I don't think there is any reason for them to elicit in any way any facts that would indicate that she was a young girl. I mean she can testify to what happened without in any way saying I was, you know, if that was the case, that oh, I took off from school that day or anything that would indicate her age. And we would just ask Your Honor to preclude -- to ensure that they don't purposefully elicit her age, because that's completely irrelevant. And he's not charged with statutory rape here, he's charged with marijuana trafficking.

THE COURT: Do you intend to elicit her age?

MR. FEAGA: Yes, sir, Your Honor, because I think, as I do with almost every witness I call, I elicit information about their background, where they came from, because I think it's helpful to the jury in evaluating their testimony. This young woman is going to come out I believe on cross examination is in prison doing life based on a murder she subsequently

committed. They're going to attack her, and when they do that her age and all those things --

THE COURT: I think her level of maturity at the time and so forth is relevant.

MS. JAMES: But, Judge, one of the problems there is basically kind of in an indirect back doorway the government is putting before the jury allegations that our client is guilty of statutory rape, a matter which has been presented to the Montgomery County grand jury --

THE COURT: I'm not going to let him go into the evidence about the sexual relationship without taking that up with me first outside the presence of the jury.

MS. JAMES: Okay.

THE COURT: But I think her age at the time of the offense is relevant, because I think her level of maturity, you know, what a fourteen year old would do or may not do --

MS. JAMES: You mean with regard to the allegations of drug distribution.

THE COURT: Right, yes.

MS. JAMES: All right.

THE COURT: Let's take up the motion regarding the website. I understand the government

does not intend to introduce any evidence regarding the website in its case-in-chief unless the defense makes that an issue?

MR. FEAGA: That's right, Your Honor.

THE COURT: Okay. Well, again, should you decide to introduce that evidence, make sure you first bring it to my attention outside the presence of the jury.

MR. FEAGA: Yes, sir. Your Honor, the only thing I would ask for the Court some indulgence, because I have some fear that a lot of this information is going to be elicited by the defense when they cross-examine a witness.

THE COURT: Well when they do that and you say they have opened the door, let me know.

MR. FEAGA: Yes, sir, I'm just asking if a witness, in response to some question they ask, throws this out, before I get up, I'll do my best on that, Judge. I think I can prevent it on direct for sure.

THE COURT: Well if the defendant raises the issue, we'll just deal with it at the time.

MR. FEAGA: Yes, sir.

MS. JAMES: Judge, I'm a little unclear on exactly where he's going with how we might open the door to that.

Page 66

I mean, I don't want to sound stupid, but I'm not sure exactly what you're saying.

MR. FEAGA: I'm not that good, Judge. I have no idea what they will ask these witness. But I just have my knowledge of this case and how trials unfold, and they may very well in the course of the testimony of these witnesses get a spontaneous statement about some of this stuff that it would be too late for me to stop. I just think we'll have to see how that happens when we get there. I think I can stop it on direct. I know I can.

MS. JAMES: Judge, in light of what he's just said, that certainly the Court should admonish the government to admonish their witnesses that they should not volunteer any spontaneous statements with regard to intimidation and/or the website.

THE COURT: I will say this. That you should tell your witnesses not to mention the website.

MR. FEAGA: Yes, sir.

THE COURT: Unless the witness thinks that he or she needs to mention it, and at that point they should turn to me and say Judge, I need to say something to you.

MR. FEAGA: Yes, sir.

THE COURT: And I will excuse the jury at

Page 67

that time. And that would also include the alleged assault of Gary Wayne George.

MS. JAMES: Judge, there is also a matter included in there with regard to Miss Pettus.

THE COURT: What about Miss Pettus?

MS. JAMES: That in our motion, the government -- The government has indicated that they provided some protection to Miss Pettus because of her placement of a photograph on the website. I guess that's in general. There are specific things with regard to Pettus and Jones --

THE COURT: I see no reason to get into protection of Pettus and Jones unless it becomes relevant.

MS. JAMES: Okay.

THE COURT: And I'll take that up when either side decides to go into it. And I understand the government does intend to introduce evidence regarding a conversation between Mr. Carmichael and a person at the bail bondsman's office that bonded Jones out of jail. Is that correct?

MR. FEAGA: Your Honor, just in fairness to defense counsel I'll tell you we haven't been able to find this person. And if we find them and we intend to bring that out, I'll make it known to them and make

Page 68

it known to the Court so we can get --

THE COURT: As of now you haven't been able to find the bail bondsman?

MR. FEAGA: That's what I'm told by co-counsel, Your Honor.

THE COURT: If you are going to introduce it, let us know outside the presence of the jury.

MR. FEAGA: Yes, sir.

THE COURT: And I think that takes care of that motion.

The next motion is document number two eighty-one regarding references to alleged Carmichael's drug trafficking organization. I think he wished to exclude any evidence referring to Carmichael's drug trafficking organization, or evidence that suggests the existence of an illegal organization.

MS. CHARTOFF: Well, Your Honor, I think that's stating our motion a little more broadly than we intended it.

THE COURT: Well what is it, then?

MS. CHARTOFF: The purpose of this motion is to prevent testimony -- is to prevent basically a repeated incantation throughout the presentation of evidence of the drug, the Leon Carmichael drug

Page 69

trafficking organization. What we would like is for the Court to preclude testimony that basically concludes that this organization exists, and to require testimony about the underlying facts that would form the basis for such a conclusion.

It's our position that that's the ultimate question before the jury. And that if the government parades a bunch of witnesses up who over and over state this mantra, the Carmichael drug trafficking organization, it's going to in and of itself -- the use of that term is going to have an effect on the jury that won't necessarily be supported by any evidence. It's just the kind of thing where you hear it talked about so much that it sort of starts to take on sort of an evidentiary weight of its own in the minds of the jurors.

So we would ask them not to -- we would ask the Court to preclude them and to instruct their client -- I'm sorry, their witnesses not to speak in those kind of conclusory terms but instead to just testify to the underlying facts, because that kind of testimony is a conclusion that invades the province of the jury and it's basically the ultimate question that we're here to determine.

THE COURT: Government?

MR. FEAGA: Your Honor, I have been involved in a number of criminal trials over the years. I know this Court has probably tried more than I have by many, many, many, so there is little I can tell the Court about how witnesses testify and how they choose to characterize things. But there are limits to what the government can do without, you know, restricting the flow of information so extremely as to make it appear that something is amiss, or that there is something wrong with what's going on.

These types of statements may or may not get made. I know of no particular witness that will use any particular combination of words that Miss Chartoff is concerned about, but we believe that the jury is going to hear the evidence in the case. They are going to, as they always do, make up their own minds about that evidence. It has not been my practice, and it won't be at this trial, to try to use words that are not supported by the evidence during the course of this trial.

THE COURT: I don't think they're talking about your language, I think they're talking about the witnesses' language.

MR. FEAGA: Yes, sir. But, I mean, if a witness is asked a question and they say well in

response, well, I don't have anybody primed to walk in and start saying that over and over again, but if they choose to use some combination of words that Ms. Chartoff -- I mean, this is so broad -- that might in some way indicate to the jury their belief that he has a drug trafficking organization, of course they're going to be saying things that indicate a belief like that.

How they might choose to characterize some comment, I couldn't even begin to say. I think that that's what objections are about. If she hears some witness say something, she can certainly object to it and that of course will have the effect of pointing out if she believes they have unfairly characterized their prior testimony in some way and knowledge of the evidence of this case, she can object to it and if it's an improper comment the Court can sustain it and I would think that that whole flow of that is going to stop what she's trying to keep from happening. And that's the way it's supposed to work.

To try to tell witnesses that there's this idea or thought process that they can't say anything that might create an inference of that, that's an impossible task and a fool's errand.

MS. CHARTOFF: Your Honor, just a few

points. First of all, the reason for this motion is because in every single D. E. A. Six, well, I perhaps shouldn't say "every single," but a short one or two, the term "Leon Carmichael drug trafficking organization" appears.

THE COURT: Why don't you show me them.

MS. CHARTOFF: I'm sorry, we didn't bring them, Your Honor.

MS. CHARTOFF: May I approach, Your Honor?

THE COURT: Yes.

(Whereupon, the Court examined said documents.)

THE COURT: Now looking at this statement which says "date prepared January 9, 2004," and then it's with "Sherry" at the top, where is this?

MS. CHARTOFF: In the first paragraph, Your Honor, I haven't looked through it, I'm not sure that's a particularly great example --

THE COURT: Well that's the synopsis.

MS. CHARTOFF: Yes. There are --

THE COURT: It says on December 16, 2003 Lejohn and Devin Whittle met with blank at the Montgomery D. O. The purpose of the meeting was for an interview with blank. The interview was in regards to blank and her involvement with Carmichael and his

drug trafficking organization. This report details the interview with blank.

That's the statement by whoever did this report. This is Dejohn.

MS. CHARTOFF: Yes, Your Honor.

THE COURT: However does blank ever say drug trafficking organization?

MS. CHARTOFF: Your Honor, honestly I just grabbed that. I haven't looked through the whole thing.

THE COURT: Right. Well unless you can show me where a particular witness seems to be going out of his or her way to characterize Mr. Carmichael's involvement as a drug trafficking organization, I don't think this is an issue. I think that's just Mr. Dejohn's characterization of what the interview subject matter was.

I guess you could -- I would have just said Mr. Carmichael's alleged marketing marijuana trafficking organization. But a police officer doesn't have to do that. But the question is did the statement -- I don't see anything in the statement that raises that concern.

MS. CHARTOFF: Well in that particular statement, as I said --

Page 74

THE COURT: Well you show me a statement that has it. And if you find such a statement I'll take it up with that particular witness. Otherwise the motion in limine is denied.

What's next? Motion in limine regarding remote acts committed outside the period of time charged in the indictment, docket number two eighty-two. I believe the government does not intend to introduce any evidence of drug related or other criminal activities outside the period of time charged in the indictment. Is that correct?

MR. FEAGA: That's correct, Your Honor.

THE COURT: With that understanding the motion is denied as moot.

MR. FEAGA: With the proviso that if they raise it in the defense, then in some way we have to rebut it.

THE COURT: If you decide to do it, let me know outside the presence of the jury.

MR. FEAGA: Yes, sir.

THE COURT: Next motion is two eighty-three. Motion in limine regarding prior conviction and incarceration. I understand, again, the government does not intend to introduce such evidence unless the defendant raises it. With that understanding, that it

Page 75

won't be raised unless the defendant does, and also subject to the government taking it up with me outside the presence of the jury first.

Yes?

MR. BRUNSON: Good morning, Your Honor. Ron Brunson.

THE COURT: Good morning. Yes, Mr. Brunson.

MR. BRUNSON: Your Honor, I guess the only caveat to that would involve the fact that some of the witnesses may testify that they might have met or been with Mr. Carmichael in jail or in prison at some point. I assume the Court is covering that in its limiting order.

THE COURT: Does anyone intend to testify about meeting Mr. Carmichael in prison?

MR. FEAGA: No, sir, not that I know of.

THE COURT: Very good.

MR. BRUNSON: Thank you, Your Honor.

THE COURT: Make sure you caution your witnesses about talking about that.

MR. FEAGA: Yes, sir.

THE COURT: Next motion is tax returns. Carmichael's tax returns. I understand the government does not wish to introduce evidence regarding his tax returns unless the defense raises it?

Page 76

MR. FEAGA: Your Honor, if I may, in the last week and-a-half as I've begun to focus on this particular case and prepare for trial, it has come to my attention that we are obviously in the possession of Mr. Carmichael's tax returns. I can't represent to the Court any longer that it won't become necessary as this trial unfolds and as I see it probably unfolding to go there at some point in our case-in-chief.

I can represent to the Court that I won't do it without letting the Court know that I think that the door is now opened or the need has arisen for us to go there, because Mr. Carmichael's finances I believe are going to become relevant in this case. And I just simply can't predict when. Back when we filed this response, I think it was our position that it wouldn't happen unless it happened on rebuttal after they did something.

I have not -- I'll tell you now, I'm working now with people on that very subject of just how those finances come into play, and I think it is possible.

THE COURT: Well if you decide to use them, let me know outside the presence of the jury.

MR. FEAGA: I will.

And Ms. Morris has just pointed out something to me. That their motion in limine related

Page 77

to asking the Court to preclude us from introducing evidence that he failed to file tax returns.

THE COURT: Okay.

MR. FEAGA: And if we go there, it will be because, as I think they know, we have seized in the course of either doing searches or we have subpoenaed from Mr. Carmichael and are in possession of tax returns that were prepared but were never filed. And in fact there are some years when he didn't file. And it's become clear to me now that at some point in time in this trial it is highly likely that those unfiled returns and/or filed returns and this whole subject of return filing may become a matter of contention.

I think it will be fairly done by the virtue of the way the defense conducts the defense of this case, and I believe on information and belief on my knowledge of how these things work, it will happen as they cross-examine some of our witnesses. So I think it is fair to believe now that it may happen in our case-in-chief that this subject comes up.

I think I can represent to the Court that we can let the Court know and the Defense counsel know before we have anything about that come up in front of the jury, hey, we're about to go here and get a ruling from the Court on it.

THE COURT: Very good. The next issue is statements by codefendants or a codefendant, Freddy Williams.

MR. BRUNSON: Your Honor, I believe the particular statements that are at issue here are ones made by Mr. Williams, and the Court has already ruled in a suppression hearing regarding their admissibility. Therefore, it would be the defendant's position, Mr. Carmichael at least, that the Court give some limiting instruction, if those admissions are admitted against Mr. Williams, that the Court consider a limiting instruction to the jury regarding Mr. Carmichael.

MR. FEAGA: We certainly wouldn't object to the Court giving any appropriate limiting instruction regarding any evidence --

THE COURT: Get that to me as soon as possible, then, your proposed limiting instruction.

Anything else on that motion?

MR. BRUNSON: Excuse me, Your Honor, if we may have a moment?

(Whereupon all defense counsel conferred off the record and out of the hearing of the other courtroom participants.)

MS. JAMES: Judge, as I understand the

statement, is a statement that was made purportedly made by Mr. Williams at the time of his arrest something to the effect that his children would be in danger and this, that and the other. And the inference that the government I think chooses to make there is that the person that he was afraid of was in fact Mr. Carmichael.

I think that if, and I'm not certain and you never know I guess until the trial is underway and the government has rested, whether or not Mr. Williams is going to testify. But assuming that Mr. Williams does not testify, and if the government is allowed to bring that statement in through one of its agents in its case-in-chief and we're not allowed to cross-examine Mr. Williams about that if he chooses not to testify, it would seem to me that that would implicate Bruton.

THE COURT: You don't make a Bruton argument. In fact, the government notes in its response that you don't make a Bruton argument.

MS. JAMES: Well it's certainly not too late to make it.

THE COURT: Well, you'll have to show me how you get around Richardson, then.

MS. JAMES: Well may we look into that further and revisit it with the Court?

THE COURT: Yes, but you'll need to read Richardson because Richardson severely limits Bruton. I think the government assumes, and I assume, because of Richardson you don't have a Bruton argument.

MS. JAMES: Well we'd just request an opportunity to revisit that.

THE COURT: Yes.

MS. CHARTOFF: Your Honor, I'd just like to make the argument under 403 that this statement would be extremely prejudicial to Mr. Carmichael in that the government --

THE COURT: Well I thought there was a limiting instruction as to Mr. Carmichael. Otherwise all you're talking to me about is Richardson all over again.

MS. CHARTOFF: It was my impression that the limiting argument was to address the Richardson issue, that it should be taken as evidence that Mr. Carmichael is guilty of the marijuana trafficking.

THE COURT: Right.

MS. CHARTOFF: However, it could also be taken as evidence that Mr. Carmichael is a violent person, that he's someone who would kill Mr. Williams' children. And that aspect of it renders it extremely prejudicial and much more -- and it's not probative

really of any facts.

THE COURT: I think it's highly probative, though, of Mr. Williams's connection to, alleged connection to drugs and so forth. So I find the probative value outweighs the prejudice subject to any Richardson argument.

The next motion is two eighty-six, Carmichael's motion in limine regarding course of investigation testimony. Anything else you wish to say on that?

MS. CHARTOFF: Well, Your Honor, we rely on the arguments in the motion, but just to explain a little bit more. The purpose of this motion is to prevent the government from using sort of an explanation of the history of the investigation as a vehicle to get in otherwise inadmissible hearsay statements from various people who have been talked to in the course of their investigation.

THE COURT: Well, it depends upon the questions that are posed at trial. Sometimes you have to show how events happened, and it may be relevant. But you may be right, it doesn't mean it's a door through which you can introduce a lot of hearsay.

I'll just have to hear the questions to see where the government goes. If you lay a foundation to

an event, we'll just have to see what that foundation is and how far back it goes. I don't think I can give you any blanket ruling. I think that's almost an impossibility. In fact, I think it is an impossibility.

MS. JAMES: Judge, I think one of the things that we're concerned about is that the government has obviously interviewed the Agent Dejohn and Whittle, and obviously have interviewed a number of people that the government may or may not call at trial. And our concern is that they don't attempt to elicit through Agent Dejohn what these other people may have said who aren't testifying.

THE COURT: Oh, I'll just have to hear it. That's grits in the morning for me in a criminal case and a civil case, in whether to get in inadmissible hearsay. So we'll just see what happens.

MS. CHARTOFF: Well, and, Your Honor, just to --

THE COURT: Of course the government knows it shouldn't be introducing any inadmissible hearsay intentionally just to get it before the jury, just as you know that.

MS. CHARTOFF: Well, Your Honor, I'd just like to point out that the cases cited in the motion

stand for the proposition that why an investigator spoke with a certain person or did a certain thing is really not at all relevant in a criminal case.

THE COURT: Well it may or may not be relevant. As Crawford itself says, all course of investigation and background evidence does not violate Crawford. I'll just have to hear it. So there is no blanket rule on that, that it automatically violates the rules of evidence. Let's just hear what it says. It depends on what the context is.

The last matter is you want a James hearing, is that correct?

MR. BRUNSON: Your Honor, I recognize that rarely does the Court employ a James hearing in order to determine whether a conspiracy exists or whether a testifying witness is part of that conspiracy. I just want the Court to recognize also we asked the magistrate judge approximately a month ago or so to ask the government to identify coconspirators to us. And we have -- the judge ruled against us, I think mainly on the grounds of timeliness even though I think we asked for it early on in the matter and just got around to attempting to enforce our request.

THE COURT: I don't think there was an appeal to me, was there?

MR. BRUNSON: No it was not, Your Honor. But the issue, therefore, is we are not aware of who the coconspirators are in this case, which witnesses that will be alleged to be coconspirators and those that will not. So at this point in time as they call witnesses to testify, those witnesses, things may have to develop. Now we have D. E. A. Sixes much like the one that have been provided to the Court that have been redacted --

THE COURT: Yes.

MR. BRUNSON: The redactions, particularly in that one --

THE COURT: Well we'll see what happens at trial. But I'm not going to hold a James hearing. But I will make the appropriate determination at the end of the Government's case as well as at the end of the case-in-chief as to whether the evidence has been established that would warrant the admissibility of the alleged coconspirators' statements, or whether there's been some undue prejudice to the defendant that would warrant a mistrial. We'll see.

MR. BRUNSON: Just to point out to the Court. One of the methods I believe the government might employ would be some sort of statement made by a coconspirator to an agent after being interviewed

about his participation in the crime. Not necessarily a statement in furtherance of the conspiracy as opposed to some sort of confession implicating the two defendants.

THE COURT: Well, when the statement, that's presented at trial, you can obviously if the agent is saying you know this person told me during after I arrested him and so forth blank blank blank, then you may have a valid motion or objection to the evidence because it was not in furtherance of the conspiracy. We'll excuse the jury and I'll make that determination.

MR. BRUNSON: Thank you, Your Honor.

THE COURT: All right. Anything else, Counsel? I think I've covered everything.

MR. FEAGA: Nothing from the United States Your Honor.

THE COURT: Yes?

MS. JAMES: Judge, we do need some guidance with regard to the jury questionnaires. We know that those are provided this afternoon. We plan to pick them up. However, there are jury consultants involved with the defense team that are actually out of state, and we would like to request permission of the Court to allow them to actually duplicate the questionnaires

for the purpose of sending them to them so that --

THE COURT: How do you propose to get it to them?

MS. JAMES: Fed Ex. They deliver tomorrow. And we just don't want to violate any sort of concerns of the Court's. And so we can certainly instruct them to return them to us and give them back to the Court just --

THE COURT: You make a representation that you're going to copy these and they will not be copies by anybody else?

MS. JAMES: Yes, sir.

THE COURT: And I want you to return both the originals and the copies to the Court.

MS. JAMES: Yes, sir.

MR. FEAGA: Just, of course, you know, the United States has a large number of witnesses that will be coming to court. Does the Court anticipate that we will actually start trial Monday or --

THE COURT: Yes.

MR. FEAGA: Okay. So we should be ready to go Monday?

THE COURT: I can't say that but, you know, it may end up that, you know, few if any people have really read about this case. I have been quite

surprised about cases. And it may end up that everybody has read about it, I don't know. So we might get a jury pretty quickly. And we might not get one until late tomorrow afternoon, we may start on Tuesday. I just don't know. We'll have to wait and see.

MR. FEAGA: Yes, sir. For what it's worth, we share your view that I think the jury will get struck fairly quickly here. And that means then we would start Monday.

THE COURT: Yes. If we strike the jury, you should be ready to go on Monday.

MR. FEAGA: Yes, sir.

THE COURT: How long do you need for your opening statements?

MR. FEAGA: I think the United States needs twenty minutes, Your Honor.

MS. JAMES: Judge, I would only ask for thirty. I probably won't use it all.

THE COURT: You want thirty and you want twenty?

MR. FEAGA: Well, then I'd ask thirty too, Judge.

THE COURT: Thirty is fine. I don't think we have any other pretrial matters to take up, so

we'll be able to start the trial immediately after --

MR. TEAGUE: Your Honor, could I inquire, will I be given a little extra time in addition to --

THE COURT: Oh, that's right. You sat so quietly, I forgot about you, Mr. Teague.

MR. TEAGUE: We're hoping everybody will forget us in this matter.

THE COURT: I'll give you all forty minutes, and you can divide it how you want. The government has thirty. You can divide the forty between Mr. Williams and Mr. James.

(Whereupon the proceedings were concluded.)

* * * * * * * * * *

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter as prepared by me to the best of my ability.

I further certify that I am not related to any of the parties hereto, nor their counsel, and I have no interest in the outcome of said cause.

Dated this 3rd day of June 2005.

MITCHELL P. REISNER, CM, CRR,
Official US Dist. Court Reporter
Registered Professional Reporter
Certified Real-Time Reporter