IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LEON CARMICHAEL, SR.,           )
                                )
        Movant/Defendant,       )
                                ) Civil Action No. 2:10cv1106-MHT-WC
    v.                          )    (CR No. 2:03cr259-MHT-DRB)
                                )
UNITED STATES OF AMERICA,       )
                                )
        Respondent.             )

## EXHIBITS TO
## UNITED STATES'S RESPONSE TO § 2255 MOTION

### VOLUME 5A OF 8
(Exhibits 5A-I to 5A-III)

GEORGE L. BECK, JR.
UNITED STATES ATTORNEY

SANDRA J. STEWART
FIRST ASSISTANT UNITED STATES ATTORNEY

ATTORNEYS FOR RESPONDENT
UNITED STATES OF AMERICA

United States Attorney's Office
131 Clayton Street
Montgomery, AL  36104
(334) 223-7280

## <u>INDEX TO VOLUME 5A OF RESPONDENT'S EXHIBITS</u>

|  | *Exhibit #  (Crim. Doc. #)* |
|---|---|
| Volume I of Trial Transcript (June 6, 2005) | 5A-I |
| Volume II of Trial Transcript (June 7, 2005) | 5A-II |
| Volume III of Trial Transcript (June 8, 2005) | 5A-III |

1              IN THE UNITED STATES DISTRICT COURT
                              FOR
2                 THE MIDDLE DISTRICT OF ALABAMA

3

4

5   THE UNITED STATES
       OF AMERICA
6
           vs.                    CRIMINAL ACTION NO.
7                                 2:03-cr-259-T
    LEON CARMICHAEL
8

9

10

11

12

13
                       VOLUME I OF XI
14                      1ST DAY OF:
                    JURY TRIAL PROCEEDINGS
15

16

17               *  *  *  *  *  *  *  *  *  *

18

19   BEFORE:        The Hon. Myron H. Thompson

    HEARD AT:       Montgomery, Alabama
20
    HEARD ON:       June 6, 2005
21
    APPEARANCES:    Terry Moorer, Esq.
22                  Stephen Feaga, Esq.
                    Clark Morris, Esq.
23                  Matthew Miner, Esq.
                    Susan James, Esq.
24                  Marion Chartoff, Esq.
                    Lisa Monet Wayne, Esq.
25                  Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
5A-I

Multi-Page™

**Page 2**

## TABLE OF CONTENTS

ITEM DESCRIPTION                                  PAGE NO.

Title Page ..................................... 1

Table of Contents ............................. 2

Pretrial Motions .............................. 4

General Jury Drawing
    In Open Court ............................ 19

Calling of the General Jury
    Panel Roll ............................... 25

Counsels' Recitation of Their Case
    and Further Voir Dire Questions ......... 45

Government Counsel's Recitation of
    Their Potential Witnesses ............... 50

Further Voir Dire Questions
    by the Court ............................ 64

Voir Dire Questions
    by Counsel .............................. 68

Defense Counsel's Recitation of
    Their Potential Witnesses ............... 68

Further Voir Dire Questions
    by Mr. Teague ........................... 72

Further Voir Dire Questions
    by Ms. Wayne ............................ 81

In-chambers Segregated Voir Dire
    of Those Jurors Who Served
    on Grand Juries ......................... 110

In-chambers Segregated Voir Dire
    of Those Jurors With
    Undue Hardships ......................... 123

**Page 3**

## TABLE OF CONTENTS

ITEM DESCRIPTION                    PAGE NO.

In-chambers Individual Segregated
    Voir Dire of Those Jurors
    Who Might Be Biased if the
    Defendant(s) Did Not Testify .......... 183

In-chambers Individual Segregated
    Voir Dire of Those Jurors
    Who Might Have Heard or
    Read About the Case ................... 193

Batson Challenge Argument
    In Open Court
    (The Jury Is Not Present) ............. 301

Filling of the Jury Box
    In Open Court ......................... 320

Court Reporter's Certification ........... 325

-oOo-

**Page 4**

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON JUNE 6, 2005 AT THE

2  UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4        PRETRIAL MOTIONS:

5        THE COURT: This is United States of America

6  versus Leon Carmichael and Freddie Williams, criminal

7  action 2:03-CR-259-T.

8        I wanted to have had this pre-jury selection

9  hearing because I just received Carmichael's objection

10  to the composition of the jury venire and the method

11  of selection of the jury venire, and a motion to

12  dismiss the indictment or stay the proceedings because

13  of failure to comply with the provisions of the Jury

14  Selection Service Act. This is document number four

15  hundred. And I think you relied on that earlier

16  opinion in United States versus Clay, 159 F. Supp. 2d,

17  1357, a 2001 opinion.

18        My preliminary assessment is, I'm assuming

19  you've looked at the jury venire? Who will speak for

20  Mr. Carmichael?

21        MS. CHARTOFF: I will, Your Honor.

22        THE COURT: I assume you've looked at the

23  venire and you've drawn some conclusions from the

24  current venire, is that correct?

25        MS. CHARTOFF: Yes, Your Honor.

**Page 5**

1        THE COURT: You realize that you're not

2  entitled to a percentage of a racial group on the

3  actual jury venire that's selected. What happens is

4  sometimes we get jury venires that are nine percent

5  and then sometimes we got them that are thirty

6  percent. I mean, it depends on the results of the

7  random draw. It's not that we get X percentage each

8  time, and I don't think you're entitled to X

9  percentage each time; as long as the overall system is

10  adequately reflective.

11        Do you have any evidence that the entire

12  jury selection process, that is how we fill the box

13  and everything else, is defective in some way?

14        MS. CHARTOFF: Well, Your Honor, just -- I

15  have gathered some information, and that would be from

16  talking with other lawyers who have more experience

17  than me in trying jury cases here, that there does

18  seem to be a pattern of not getting thirty-two percent

19  certainly African-Americans in the jury pool, and

20  often significantly less than that. So there does

21  appear to be a pattern of underrepresentation.

22        In addition, Your Honor, I, in this brief

23  weekend, I actually haven't had access to the jury

24  rules that you -- the rules that you use to create the

25  wheel and all that information. But it does appear to

1 me that there are some rules that raise concerns,
2 particularly the rule where people with children under
3 ten and no child care can automatically be excused
4 from the venire. That would seem to at least raise
5 the possibility that a significant number of
6 African-American women would be excused from the
7 venire under that rule. And of course I haven't
8 looked at the --
9     THE COURT: Right. Well what I typically do
10 is, and I did in the Clay case and several other
11 cases, is to deny your motion to stay the trial, deny
12 your motion to dismiss the indictment, and then after
13 the trial and if your client is convicted you would
14 like to challenge the jury venire, we will do it at
15 that time. Obviously, we can't do it in fifteen
16 minutes, which it is, before jury selection. We have
17 to have an evidentiary hearing. Obviously, you have
18 to gather your evidence, which can take weeks. So
19 what I will do, then, unless the government has an
20 objection, is to just delay this until after the
21 trial.
22     MR. MOORER: Your Honor, as a matter of fact
23 I was one of the prosecutors assigned to the Clay
24 matter, and there are several reasons that we would
25 object to that. Number one, the Jury Selection Act is

1 a very drastic remedy, as I found out at the
2 conclusion of the Clay matter. And even if the
3 government, the prosecution has no involvement
4 whatsoever in creating some problem with the selection
5 of the jury, we bear the brunt and the consequence of
6 that in the event that we obtain a conviction, Your
7 Honor. And I think that with judicial economy
8 considerations in mind, that we would ask that this
9 matter be disposed of decisively before trial.
10     THE COURT: How can I do that? I have to
11 have a hearing. We'd have to call in the courtroom
12 clerk. We'd have to spend hours going over the means
13 by which juries are selected. And I'm really shooting
14 from the hip here. I think is some presumptions that
15 go with it. The law is very complex. You're talking
16 about a mammoth undertaking and we couldn't even begin
17 discussing it in the fifteen minutes that we have
18 before jury selection.
19     MR. MOORER: Your Honor, there are
20 procedures by which the Middle District selects juries
21 is not secret. Defense Counsel, if there was a
22 problem from the point of indictment to today, has
23 been a rather lengthy period of time, Your Honor. If
24 there was a problem, she could have raised that before
25 now on behalf of her client.

1     THE COURT: That can be part of your
2 argument later.
3     MR. MOORER: And, Your Honor, on behalf of
4 my client it is not fair to the government to have
5 this potential risk hanging out there and then we
6 would have two weeks for, or possibly more, of trial,
7 Your Honor, that --
8     THE COURT: What you are arguing for, if I'm
9 understanding you correctly, is for a continuance
10 because even if I were to deny the relief, it's still
11 out there. I can't deny this on the current record.
12 It's just not going to go away. You know, if they
13 have the evidence, it's still out there.
14     MR. MOORER: Then, Your Honor, I suggest we
15 go ahead and we do what we need to in order to address
16 this issue.
17     THE COURT: Well the only thing is, you're
18 talking about a significant delay in the trial. Not
19 weeks, but perhaps a month or so.
20     MR. MOORER: Your Honor, I'm going to confer
21 with my co-counsel, but I think we may prefer to do
22 just that, Your Honor, because --
23     THE COURT: Well let me hear from you right
24 now, then.
25     MR. MOORER: Yes, Your Honor. If I may have

1 a moment to confer?
2     ( Whereupon, Mr. Moorer conferred with Mr.
3 Feaga and Ms. Morris off the record and out of the
4 hearing of the other courtroom participants.)
5     MR. FEAGA: Your Honor, could we have five
6 minutes? I'd like to just call back to the office to
7 check, if I may, with the chief of our criminal
8 division.
9     THE COURT: I will say this: In the wake of
10 Clay, this can be froth with problems.
11     MR. MOORER: And I think that we --
12     THE COURT: Now that's, I guess, all I can
13 say.
14     MR. FEAGA: Yes, sir.
15     THE COURT: Now whether there are any other
16 problems there, I don't know.
17     MR. FEAGA: I'm inclined to go forward and
18 Mr. Moorer has explained to me what happened in Clay,
19 and I'd like to call back to the office at our
20 criminal division and see --
21     THE COURT: I'll give you five minutes.
22 We'll take a recess.
23     But before that, Mr. Teague had something he
24 wanted to say.
25     MR. TEAGUE: Yes, Your Honor. We, on behalf

**Page 10**

1  of defendant Freddie Williams, I would request leave
2  to adopt the motion that has been filed on behalf of
3  Leon Carmichael.
4      THE COURT: And I would also add, that after
5  Clay there were other challenges to the jury process.
6  They were sent to Judge Coody and they were all
7  denied.
8      All right, very good.
9      ( Whereupon, a recess was taken.)
10      THE COURT: Yes, who wishes to speak first?
11      MR. MOORER: Your Honor, we further
12  conferred and have decided that if the Court wishes to
13  hold the matter in abeyance until the end of the
14  proceedings, that we would be satisfied with that,
15  Your Honor.
16      THE COURT: Anything else from the
17  defendants?
18      MS. CHARTOFF: No, Your Honor.
19      THE COURT: Okay. Then the objection to the
20  overall jury selection process will be held in
21  abeyance. And if there is a conviction, then we'll
22  take that up.
23      MS. CHARTOFF: Yes, Your Honor.
24      THE COURT: Typically, what I do is, and
25  that was done in Clay as well, is to refer it to one

**Page 11**

1  of the magistrate judges. In this case that would be
2  Judge Boyd. And she would conduct the preliminary
3  matters. It may go to Judge Coody because he's the
4  one who did Clay, and in the past we have referred
5  things back to him because he's familiar with the
6  area. But we'll find out about that later. Okay?
7      Now is this Miss Wayne?
8      MS. WAYNE: It is, Your Honor. Good
9  morning.
10      THE COURT: Good morning.
11      MS. WAYNE: I wanted to introduce myself
12  since I have not actually been in front of the Court.
13  I am Lisa Wayne. Before we actually went into other
14  chambers to start picking the jury, I wanted to do a
15  couple of housekeeping matters.
16      THE COURT: Certainly.
17      MS. WAYNE: We received discovery on Friday
18  after the court appearance, and I wanted to bring that
19  to the Court's attention. Miss Chartoff corrects me,
20  we actually received it on Saturday.
21      THE COURT: What discovery is this?
22      MS. WAYNE: It would have been June 4.
23      THE COURT: No, what discovery?
24      MS. WAYNE: Discovery in the case, Bates
25  stamped seventeen eight nine two, to Bates stamp

**Page 12**

1  eighteen one one.
2      THE COURT: What is it?
3      MS. WAYNE: It's a bunch of phone records,
4  Judge. It appears to be some reports out of Texas on
5  a Texas arrest of a number of suspects and a number of
6  phone records. Bottom line is this, Judge, we
7  received it Saturday. We have not had an opportunity
8  to go over it in depth because it is new discovery.
9  Frankly, there are seventeen thousand pages of
10  discovery we've had to already digest and make sure we
11  have it for this trial. So we're objecting to the
12  discovery being laid under the standing order of the
13  Court.
14      THE COURT: I'll take that up later. We'll
15  take that up after we select the jury.
16      MS. WAYNE: Judge, in terms of just a couple
17  of other things and I know that can be happen when you
18  have lawyers who are from out of town, and I don't
19  think that the government would do this intentionally,
20  I just want to make sure it's limited, we're that out
21  of town lawyers, Mr. Brunson and I, and sometime
22  home-towning with the jury, I'm not from Alabama and
23  Mr. Brunson is not from Montgomery.
24      THE COURT: I'm sure they won't do that.
25      MS. WAYNE: Thank you, Judge.

**Page 13**

1      Also, I have recognized and become cognizant
2  that there are U. S. Attorneys who are actively
3  engaged -- or they're in the military and serving this
4  country, and I just want to make sure none of those
5  kind of things slip out during jury selection as
6  those.
7      THE COURT: Yes, they will not be. The
8  capacity of the attorneys for both sides should not be
9  an issue in this case. The only issue is the
10  defendants' conduct.
11      MS. WAYNE: I appreciate that, Your Honor.
12      THE COURT: Now there was a matter that came
13  up when I believe we spoke up on Friday. I believe
14  that was a request to suppress statements by
15  Carmichael under the allegation that Mr. Glassroth
16  provided ineffective assistance of counsel. I just
17  had a couple of questions for you on that.
18      MS. WAYNE: Miss Chartoff will address that,
19  Your Honor.
20      THE COURT: Okay.
21      At the time that Mr. Carmichael went down to
22  speak to Agent DeJohn, was Mr. Glassroth the only
23  lawyer in this case or was Miss Wayne involved at that
24  time?
25      MS. CHARTOFF: I believe Ron Wise was also

Multi-Page™

Page 14

1 counsel.
2    THE COURT: Ron Wise was also counsel.
3    MS. JAMES: And Bruce Maddox.
4    THE COURT: Bruce Maddox, Ron Wise --
5    MS. MORRIS: And Wesley Pitters.
6    THE COURT: Wesley Pitters. I think you
7 have to show they were all ineffective. You can't
8 just rely on Mr. Glassroth. But I want to get to a
9 more important point. Strickland says that in order to
10 prevail on an ineffective assistance of counsel claim,
11 a plaintiff must show that an error by counsel was
12 professionally unreasonable; and, second, there is a
13 reasonable probably that but for counsel's
14 unprofessional errors, the result of the proceedings
15 would be different.
16    We don't have a result yet. And in fact,
17 based on that premise out of Strickland, several
18 circuits have held that ineffective assistance of
19 counsel claims are usually handled as a collateral
20 claim after the proceeding, and I'll give you the
21 cites to those cases. Well there is the Eleventh
22 Circuit case, United States versus Teague, 953 F.2d
23 1525, it's a 1992 case. And then there is the
24 Eleventh Circuit case, United States versus Lee, 374
25 F.3d 637, it's a 2004 case. And then there is a Third

Page 15

1 Circuit case, United States versus Thomas, 389 F.3d
2 424, which is a 2004 case. And essentially all of
3 these cases say that it is well established that
4 ineffective assistance of counsel claims are generally
5 not entertained on direct appeal but, rather, are
6 presented as collateral relief.
7    In effect, you'd also to some degree -- well
8 for one thing I'd have to hold a hearing on it. But
9 I'll issue an order to that effect and set out those
10 reasons in more detail.
11    MS. CHARTOFF: Your Honor, could I make a
12 record on this?
13    THE COURT: Certainly. I have your brief as
14 well.
15    MS. CHARTOFF: Just in response to the
16 Court's statements, I think that the Strickland
17 standard -- First of all, the Strickland standard does
18 not apply pretrial. I have been involved in several
19 cases that have challenged indigent defense at the
20 pretrial stage and there are a number of cases that
21 say at the pretrial stage Strickland is inapplicable
22 because, of course, it can't be -- you know, you can't
23 apply, as the Court recognizes, you can't apply the
24 Strickland standard until the case is over. However,
25 these cases have held that ineffective assistance of

Page 16

1 counsel analysis is available in the pretrial stage
2 and I would refer you to Lucky vs. Harris.
3    THE COURT: Are those cases cited in your
4 briefs and so forth?
5    MS. CHARTOFF: They're not, Your Honor.
6    THE COURT: Okay. Is this an ineffective
7 assistance of counsel claim during the case itself?
8    MS. CHARTOFF: Yes, Your Honor.
9    THE COURT: And you're saying Strickland.
10 And the Court did not apply Strickland?
11    MS. CHARTOFF: No. I believe it was an
12 opinion by -- it may have been by the district --
13 Actually, I think it was the Eleventh Circuit held
14 that when the district judge threw out the claim
15 challenging Georgia's indigent defense system, say,
16 you couldn't litigate this before the people had been
17 convicted. I believe the Eleventh Circuit reversed
18 and said yes, you can. And that Strickland --
19    THE COURT: Okay. Was that an ineffective
20 assistance of counsel claim?
21    MS. CHARTOFF: It was, Your Honor.
22    THE COURT: What's the cite again?
23    MS. CHARTOFF: I believe it's Lucky vs.
24 Harris or Lucky versus Miller. Ultimately, the case
25 was thrown out on abstention grounds, but there are

Page 17

1 several panel opinions.
2    THE COURT: Okay. Well, we'll look at
3 those, then.
4    MS. CHARTOFF: In addition, Your Honor,
5 clearly this error by counsel could be outcome
6 determinative here. Confession is -- an alleged
7 confession is a major -- could have a very serious
8 impact on the outcome of the case and, therefore, it
9 would be our contention that a Strickland type
10 analysis, if not the Strickland analysis per se, is
11 applicable because --
12    THE COURT: Well suppose what if there is
13 overwhelming evidence of your client's guilt, then
14 this might very well be not outcome determinative. I
15 won't know that until I hear all of the evidence, all
16 of the evidence in the case. I mean, it could be
17 totally harmless. Even assuming -- First of all, I
18 have to reach the issue of whether it's constituted
19 ineffective representation. Then I've got to decide
20 whether it could have affected the outcome. There are
21 cases where lawyers' conduct are arguably prejudicial
22 and still it's harmless prejudice. I won't know that
23 until I hear the evidence.
24    But anyway, I'll look at your cases as well,
25 too.

Page 18

1    Yes?
2        MR. FEAGA: Your Honor, and I apologize to
3    cocounsel for not bringing this up earlier with all
4    that was going on this morning, I was informed when I
5    got back from Atlanta from a drill, and I won't
6    mention it in front of the jury, I promise the Court,
7    but late last evening about nine o'clock, the defense
8    had approached one of the attorneys in our office, I
9    think it was our criminal chief, and told him that
10   they had an affidavit -- and this is I'm getting this
11   secondhand, but they can correct me -- that indicated
12   that we had something in our possession that was
13   exculpatory that we had not turned over.
14       Apparently, what it related to was an
15   allegation that we had tape-recorded a conversation
16   between a sister of Latoya Davis named Tara, and I
17   don't know her last name, and another sister named
18   Tina who I think is involved in some way with the
19   accused. We got to digging and found a tape-recorded
20   conversation between those two. We're not intending
21   to offer it.
22       I've listened to it. It's certainly not
23   exculpatory. I'd invite the defense to listen to it.
24   I mean, if we could get this into evidence, I'd love
25   to. So I'll give them each a copy, and if they want

Page 19

1    to raise this --
2        THE COURT: Right. Let them have it and
3    let's proceed with jury selection.
4        (Whereupon, a recess was taken.)
5        GENERAL JURY DRAWING:
6        THE COURT: The Court calls the case of
7    United States of America vs. Leon Carmichael and
8    Freddie Williams, criminal action number
9    2:03-CR-259-T.
10       Is the Government ready to proceed?
11       MR. FEAGA: We are, Your Honor.
12       THE COURT: And are the defendants ready to
13   proceed?
14       MS. WAYNE: On behalf of Mr. Carmichael we
15   are, Your Honor.
16       MR. TEAGUE: On behalf of Freddie Williams
17   we are, Your Honor.
18       THE COURT: Very good.
19       As soon as the courtroom deputy gets back
20   we'll get started.
21       Members of the jury venire, you are the jury
22   in this case for which we will select fourteen jurors.
23   I'm going to ask that you all stand. Please stand,
24   and the clerk will swear you in.
25       (Whereupon, the general jury panel was duly

Page 20

1    sworn by the courtroom deputy clerk.)
2        THE COURT: You may all be seated.
3        Now, members of the jury panel, I'm going to
4    ask you a series of questions. Should any question
5    apply to you, please stand and give us your name and
6    then respond to the question.
7        Is there any member of the jury panel who
8    cannot read, write or speak the English language?
9        (Whereupon, there was no response.)
10       THE COURT: Is there any member of the jury
11   panel who has been convicted of, or has a charge
12   pending against you of a felony, that is a crime
13   carrying a sentence of more than one year and you have
14   not had your civil rights restored?
15       (Whereupon, there was no response.)
16       THE COURT: Is there any member of the jury
17   panel who is under eighteen years of age?
18       (Whereupon, there was no response.)
19       THE COURT: Is there any member of the jury
20   panel who is over seventy? If you are over seventy,
21   please stand.
22   A  I'm over seventy.
23       THE COURT: Okay, just a minute. We'll
24   start here. Will you give us your name?
25   A  Earl Fain.

Page 21

1        THE COURT: Now because you are over
2    seventy, unlike the other jurors you are not required
3    to serve. They are required. However, you are
4    welcome to serve. Would you like to certain on this
5    case?
6    A  That's fine with me, sir.
7        THE COURT: Thank you very much.
8        Someone else stood in the back?
9    A  I'm over seventy.
10       THE COURT: First give us your name.
11   A  James M. Barkley.
12       THE COURT: And as I said, because you're
13   over seventy you are not required to serve on a jury
14   panel; however, you are welcome to do so. Would you
15   like to do so?
16   A  I will serve.
17       THE COURT: Thank you.
18       Anyone else over seventy?
19       (Whereupon, there was no response.)
20       THE COURT: Is there any member of the jury
21   panel who has not resided in the Middle District of
22   Alabama for at least one year?
23       (Whereupon, there was no response.)
24       THE COURT: Is there any member of the jury
25   panel who is incapable by reason of mental or physical

## Page 22

1 infirmity to render satisfactory jury service?
2     (Whereupon, there was no response.)
3     THE COURT:  Is there any member of the jury
4 panel who is not a citizen of the United States?
5     (Whereupon, there was no response.)
6     THE COURT:  Is there any member of the jury
7 panel who has served within the last two years, or is
8 now serving, on a state or federal grand jury?  Not a
9 jury, but a grand jury.
10     (One juror indicated.)
11     THE COURT:  Yes.  Please stand and give us
12 your name.
13 A  My name is Willie Aldridge, and I have served
14 about the last -- about two years ago.
15     THE COURT:  You were on a grand jury or just
16 a jury?
17 A  Just a jury.
18     THE COURT:  A trial jury?
19 A  Right.
20     THE COURT:  Okay.  I'm not asking about
21 that.  I'm talking about a grand jury.
22     (Whereupon, a juror indicated.)
23     THE COURT:  Yes, sir, you stood?
24 A  Oscar Vaughn.  I served last year.
25     THE COURT:  On a state or federal grand

## Page 23

1 jury?
2 A  Federal, sir.
3     THE COURT:  A federal grand jury?  Okay.
4 We'll have to ask you some questions later, then.
5     Did you get his name?
6     THE COURTROOM DEPUTY CLERK:  Is that Oscar
7 Vaughn?
8 A  Correct.
9     THE COURT:  Actually, this case is 2003.
10 I'm going to ask, has anyone served on a state or
11 federal grand jury within four years, rather than two
12 years?  Anyone other than the gentlemen who stood?
13     Now only a grand jury.
14     Yes, sir?  Have you served on a grand jury?
15 A  I think it was state.  I'm not certain.
16     THE COURT:  What is your name?
17 A  Brad Rigsby.
18     THE COURT:  You're not sure whether you
19 served on a grand jury --
20 A  It was not a grand jury.
21     THE COURT:  It was not?  Okay.
22     Yes, ma'am, in the back?
23 A  Gwenda Ingram.  I served here two years ago.
24     THE COURT:  Two years ago on a federal grand
25 jury?

## Page 24

1 A  Mm-hmm.
2     THE COURT:  Very good.
3     Did counsel get her name?
4     Ms. Carnes, did you get her name?
5     THE COURTROOM DEPUTY CLERK:  Gwenda Ingram?
6 A  Yes.
7     THE COURT:  And the lady back here.
8 A  Barbara Scott.  I served on a state grand jury
9 about four years ago.
10     THE COURT:  Four years ago?  Thank you very
11 much.
12 A  My name Martha Bryant.  I served here, too.  I
13 can't remember if it was a grand or federal.  I'm not
14 sure.
15     THE COURT:  If it was a trial where, you
16 know, you had the lawyers and the defendant and so
17 forth, that's not a grand jury.  That's what we call a
18 petit jury.  A grand jury is a jury that determines
19 whether to indict someone and it meets in private.
20 Now did you serve on a grand jury?
21 A  It was federal.
22     THE COURT:  Okay.  Was it a grand jury or
23 just a regular trial?
24 A  It was just a regular trial.
25     THE COURT:  Trial.  Okay, thank you.

## Page 25

1     CALLING OF THE GENERAL PANEL ROLL:
2     Now at this time I'm going to ask the Clerk
3 of the Court to call the roll.  As your name is called
4 please provide the following information.  First of
5 all, give us your full name.  Then give us the full
6 name of your spouse.  Tell us where you live.  Then
7 tell us what you do, and then tell us what your spouse
8 does.  Now if either you or your spouse is retired,
9 tell us what you did or tell us what your spouse did
10 before your retirement or your spouse's retirement.
11     The clerk will call the roll.
12     COURTROOM DEPUTY CLERK:  Earl Fain, Junior.
13     THE COURT:  First I was give us your name.
14 A  Earl H. Fain.
15     THE COURT:  And your wife's name?
16 A  Betty B. Fain.
17     THE COURT:  And where do you live?
18 A  Troy, Alabama.
19     THE COURT:  Will you tell us what you do or
20 did and what your spouse does or did.
21 A  I'm retired Air Force officer.  My wife is a
22 retired housewife.
23     THE COURT:  Okay, thank you.
24     COURTROOM DEPUTY CLERK:  Janet Payne.
25 A  Yes, ma'am.  Janet Styron Payne.  My husband is

Multi-Page™

## Page 26

1 Charles Rayfield Payne. I live in Ledahachee,
2 Alabama. I'm a dental hygienist and a dental
3 assistant here in Montgomery. And my husband is a
4 cattle farmer.
5     THE COURT: Thank you.
6 Q Leah Whitman.
7 A My name is Leah Gentry Whitman. My husband is
8 Travis Whitman. I live in Eufaula. I'm
9 vice-president of finance for a trucking company. My
10 husband loads paper at a paper company.
11 Q Helen Blackburn Sansom.
12 A I'm Helen Blackburn Sansom. My husband is Thomas
13 Sansom, Junior. We live in Wetumpka, Alabama. I'm
14 retired from the City of Montgomery Parks and
15 Recreation. My husband is a commercial salesman.
16 Q Mary Ann Addison.
17 A I'm Mary Ann Addison. My husband is Donald C.
18 Addison. We live in Greenville. I deliver mail with
19 the Postal Service in the rural areas. My husband is
20 a student at Reed State in Evergreen.
21 Q Walter Degrasse, Junior.
22 A My name is Walter Degrasse, Junior. I'm
23 divorced. I'm previously (sic.) unemployed and I live
24 in Autaugaville, Alabama.
25     THE COURT: Thank you.

## Page 27

1 Q Katherine Ellen Hanna.
2 A My name is Katherine Ellen Hanna. I'm retired.
3 Divorced. I was an accounting clerk before
4 retirement.
5 Q Cindy B. Yancey.
6 A I'm Cindy Yancey. My husband is deceased. I'm
7 the insurance claims filing manager for the orthopedic
8 clinic in Opelika, Alabama. I live in Valley,
9 Alabama.
10 Q Charlie M. Melton.
11 A Name is Charlie M. Melton. My wife is Dorothy
12 Melton. I'm a construction worker and I live in
13 Ariton, Alabama.
14 Q Mary Phillips Loy?
15 A I'm Mary Phillips Loy. My husband is Maynard L.
16 Loy, the Third. We live in Prattville. I teach at
17 Montessori Academy. He's retired from Norfolk
18 Southern Railway.
19     THE COURT: Retired from what?
20 A Norfalk Southern Railway.
21 Q Mary (sic.) Regina Bryant.
22 A My name is Martha Regina Bryant. My husband is
23 Vensel Bryant. We live in Dozier, Alabama, and we're
24 both employed with Hyundai, Montgomery.
25 Q Lowell Meek McGown.

## Page 28

1 A I'm Lowell Meek McGown. My wife is Marilyn Sue
2 Patterson McGown. I work as a welder for the county
3 in Autauga County. She works in Clanton, Alabama as a
4 forklift operator.
5 Q Johnny Len Coodey.
6 A Johnny Len Coodey. My wife is Betty Joyce
7 Coodey. We live in Clanton, Alabama. I'm a propane
8 salesman and she's an office administrator.
9 Q Carol Davolt Murray.
10 A My name is Carol Davolt Murray. My husband is
11 John Franklin Murray. I own Step Ahead Educational
12 Center here in Montgomery, Alabama with my husband,
13 and he works for International Business Machines.
14 Q Michael Brian Arrington.
15 A Michael Brian Arrington. Single. Conductor for
16 C. H. S. Railroad and personal trainer.
17 Q Robert Gene Adcock?
18 A I'm Robert Gene Adcock. My wife is Holly Bush
19 Adcock. I work for Bell South Communications. My
20 wife works for Alabama Power and we live in Dothan.
21 Q James Richard Mills.
22 A My name is James Richard Mills. My wife is Jenna
23 Darnell (ph.) Mills from Montgomery. I'm a professor
24 of fine arts at Auburn University Montgomery. My wife
25 is a kindergarten teacher at East Tallassee

## Page 29

1 Elementary.
2 Q Joel Jolonida Denesa Lovejoy?
3 A My name is Jolonida Denesa Lovejoy. I work at
4 Martin's in Laverne.
5 Q Lorna Yvonne Valentine.
6 A My name is Lorna Yvonne Valentine. My husband is
7 Richard A. Valentine. He's a family physician. We
8 live in Phenix City, Alabama, and I help with the
9 health insurance.
10 Q Candy Diane Latham.
11 A My name is Candy Diane Latham. I'm married to
12 Gary Wayne Latham. I'm an account manager for a
13 conferencing company, and he's a truck driver and we
14 live in Wedowee, Alabama.
15 Q Eva Baker.
16 A My name is Eva Camelia Baker. My husband's name
17 is Roger Louis Baker. We living in Newell, Alabama.
18 He works for the Gold Kiss Factory, and I work for a
19 company called Deco Star as an inspector.
20 Q Sharon Strickland?
21 A I'm Sharon Fisher Strickland. My husband is Fred
22 Strickland. I'm a substitute teacher for the
23 Montgomery school system. My husband is frequency
24 manager for headquarters for the Civil Air Patrol.
25 Q Kathy Coker.

Multi-Page™

**Page 30**

1  A  My name is Kathy Coker.  My husband's name is
2  Archie Coker.  We live in Valley, Alabama.  I am a
3  reservation manager at Intercall Telecommunications
4  Company, and my husband is a teacher with Chambers
5  County Board of Education.
6  Q  Willie Pearl Day.
7  A  I'm Willie pearl Day.  I'm single from Phenix
8  City, Alabama.  I'm employed with the State Farm
9  Insurance Agent King Curry as an L. S. A.
10  Q  Jessie L. Duck.
11  A  Yes.  My name is Jessie L. Duck.  My wife's name
12  is Sandra M. Duck.  I work for the City of Alexander
13  City as a welder, and my wife is a student in
14  Alexander City Junior College.
15  Q  Charles Allen Siggers.
16  A  I'm Charles Allen Siggers.  My wife is Denise
17  Faris Siggers.  I'm a rubber worker, and she is a
18  teacher.  We're from Valley, Alabama.
19  Q  Melissa Ann Nelson.
20  A  I am Melissa Ann Nelson.  I'm married to Donnie
21  Nelson.  I'm a paraprofessional with the Daleville
22  city school system.  I work with special needs
23  children and my husband is a maintenance technician
24  with Sony Corporation and we're from Daleville.
25  Q  Anne Freeman.

**Page 31**

1  A  Anne Marie Freeman.  My husband is Elisha Jacob
2  Freeman.  We live in Greenville.  He's currently a
3  student at Faulkner University and I'm currently
4  seeking an education position.
5  Q  Margaret Sue Palmer.
6  A  Margaret Sue Palmer.  I work for catalogues in
7  Columbus, Georgia.  My husband is Joseph D. Palmer and
8  he works for Wesco Plumbing Company as a plumber.
9  Q  Jennifer Hatfield?
10  A  I'm Jennifer Jones Hatfield.  My husband is
11  Lawrence E. Hatfield.  I work as project leader for
12  research and development in American Buildings in
13  Eufaula.  My husband is self-employed, owns his own
14  business.
15  Q  Steven Lane Ferris, Senior.
16  A  Steven Lane Ferris, Senior.  My wife is Wanda Lew
17  Ferris.  I'm a retired Air Force medic.  She's an R.
18  N. and we live in Pine Level.
19  Q  Patricia Hodges Maryanow?
20  A  Patricia Hodges Maryanow.  My husband is Maurice
21  Maryanow.  We live in Montgomery.  I teach music at A.
22  U. M. And Troy University here in Montgomery.  My
23  husband is a reading and writing specialist here in
24  Montgomery.
25  Q  Melinda Laurie Makowsky.

**Page 32**

1  A  Melinda Lauri Makowsky.  I'm a teacher at Kala
2  Christian Academy here in Montgomery, and I live in
3  Montgomery.
4  Q  Janet Willis Floyd?
5  A  Janet Willis Floyd.  My husband is Curtis C.
6  Floyd.  I'm retired from the Dothan Housing Authority,
7  and he's a self-employed wallpaper hanger.
8  Q  Katherine C. Seymour?
9  A  I'm Katherine Colvin Seymour.  My husband is
10  Louis Seymour.  I'm from Prattville, Alabama.  I sell
11  real estate, and he is retired Air Force and works at
12  the post office.
13  Q  Johnnie O. Taylor.
14  A  I'm Johnnie O. Taylor.  I am a retired -- I
15  living in Headland, Alabama.  I'm a
16  schoolteacher and presently work part time at a child
17  development center at the First Baptist Church in
18  Headland.
19  Q  Oscar L. Vaughn.
20  A  Oscar L. Vaughn.  My wife is Louise G. Vaughn.  I
21  work at Fort Rucker Civil Service in the engineering
22  department.  My wife is a schoolteacher.  We live in
23  Geneva, Alabama.
24  Q  Willie Aldridge.
25  A  My name is Willie Aldridge.  My wife is Nellie

**Page 33**

1  Aldridge.  I work for Uniroyal Goodrich.  I live in
2  Auburn, Alabama.  My wife is a hairstylist.
3  Q  Lorraine Marie Haats.
4  A  I'm Lorraine Marie Haats.  My husband is Joseph
5  Edward Haats.  I reside in Montgomery, Alabama.  I'm a
6  bookkeeper at Capital Tractor, and my husband is a
7  production manager.
8  Q  Donald Edward Davis?
9  A  My name is Donald Edward Davis.  I work for the
10  Board of Education.  My wife works for Colonial Bank,
11  and I reside here in Montgomery.
12  Q  Randy Norman Baron.
13  A  I'm Randy Norman Baron.  I'm retired.  I work for
14  Uniroyal Goodrich in Opelika, and I living in Opelika.
15  And I'm single.
16  Q  Donald Wayne Osborne.
17  A  Donald Wayne Osborne.  I live in Tallassee.  I
18  work as a restaurant manager in Tallassee.
19  Q  Jennifer Anne Scott.
20  A  I'm Jennifer Anne Scott.  My husband's name is
21  Shawn Scott.  We live in Prattville, Alabama.  I'm a
22  stay at home Mom and he's a Civil Service employee
23  with the Army National Guard.  I think his title is
24  product manager.
25  Q  Bradley Glenn Rigsby?

Multi-Page™

## Page 34

1 A  My name is Bradley Glenn Rigsby.  My wife's name
2 is Claudia Forsey Rigsby.  I work at UNYSIS
3 Corporation.  I am a system analyst.  My wife works at
4 the Elmore County humane shelter and she is a kennel
5 helper.  And we live in Wetumpka, Alabama.
6 Q  Wanda A. Lee.
7 A  My name is Wanda A. Lee and I'm a divorcee.  I
8 work at Michelin Tire, and I reside in Dothan,
9 Alabama.
10 Q  Russell Brian Hicks?
11 A  My name is Russell Brian Hicks.  My wife is Amy
12 Sue Hicks from Clanton, Alabama.  I'm an administrator
13 with Dixon Hughes, and my wife; is a stay-at-home mom.
14 Q  Kathy McDonald Brand.
15 A  Kathy McDonald Brand.  My husband is Ellis Reed
16 Brand.  We live in Auburn, Alabama.  I'm employed with
17 the Auburn City schools, and he's employed with
18 Alabama Power.
19 Q  Robert E. young.
20 A  My name is Robert E. Young.  My wife's name is
21 Charlotte Ann Young.  We live in Eufaula.  She's a
22 housewife and I work at the paper mill.
23 Q  Alice L. Washington.
24 A  I'm Alice L. Washington, Abbeville, Alabama.  No
25 husband.  Recently retired from Southeast Alabama

## Page 35

1 Medical Center as a nurse.
2 Q  Sharon R. Goodson.
3 A  I'm Sharon Rene Goodson.  I'm married to Randall
4 Goodson.  We living in Prattville, Alabama.  I'm an
5 administrative specialist at International Paper and
6 he's a truck driver.
7 Q  Tonya Louise Saxer.
8 A  I'm Tonya Saxer.  My husband's name is Richard
9 Saxer.  We live in Millbrook.  I'm a project manager
10 and he's an architectural designer.
11 Q  Marvin Luther Cherry, Jr.
12 A  Marvin L. Cherry, Junior.  My wife is Joanne
13 Shelton Cherry.  I work full-time for the Alabama Army
14 National Guard.  My wife is a surgical nurse and we're
15 from Montgomery.
16 Q  Janice L. Taylor.
17 A  I'm Janice L. Taylor.  I'm a divorcee.  I'm a C.
18 S. R. for Brewster here in Montgomery, and I live in
19 Luverne, Alabama.
20 Q  Henry M. Craig.
21 A  Henry Craig.  Fort Deposit.  I'm single.
22 Q  Melody Robertson.
23 A  I'm Melody Robertson.  My husband is Gary
24 Robertson.  We live in Alexander City.  We own and
25 operate Piggly-Wiggly of Alexander City.

## Page 36

1 Q  Domer Slater Kemp.
2 A  My name is Domer Slater Kemp.  My wife's name is
3 Helen Sue Kemp.  We live in Dothan and I work for
4 Lockeed Martin -- or retired form Lockeed Martin, and
5 she's a retired schoolteacher.
6 Q  Johnny Kirkland Oates, Junior.
7 A  My name is Johnny Kirkland Oates, Jr.  My wife is
8 Jenny D. Oates.  We own and operate the Long Run Press
9 in Montgomery, Alabama and we live in Deatsville.
10 Q  Ronnie J. Cooper.
11 A  My name is Ronnie J. Cooper.  I'm single.  I
12 living in Elba, Alabama I work for the Elba Parks and
13 Recreation.
14 Q  Robbie Allen.
15 A  I'm Robbie Sharp Allen.  My husband's name is
16 John Anthony Allen.  I'm an accountant for a trade
17 association.
18 Q  Willo Davis.
19 A  I'm Willo Jean Davis.  Housewife.  My husband is
20 Hubert C. Davis.  He's a farmer.
21 Q  Edward Joseph Steen.
22 A  My name is Edward Joseph Steen.  My wife's name
23 is Crystal Darlene Steen.  We living in Prattville,
24 Alabama.  I'm a manager for software development at
25 Health Care Systems, Inc., and she's a programmer for

## Page 37

1 the State of Alabama Department of Public Health.
2 Q  Cynthia McMichael?
3 A  I'm Cynthia McMichael.  My husband's name is
4 David L. McMichael.  We're from Jackson's Gap,
5 Alabama.  I'm the sole proprietor of a trophy shop and
6 horse ribbon shop.  He works for Spillman's
7 Technologies out of Utah.
8 Q  Barbara Scott.
9 A  I'm Barbara J. Scott.  My husband is William T.
10 Scott, Senior.  We live on Lake Jordon.  He's retired
11 from International Paper and I work for the Department
12 of Transportation.
13 Q  Cathy C. Mitchell.
14 A  My name is Cathy C. Mitchell.  My husband's name
15 is John Timothy Mitchell.  I'm from Woodland, Alabama.
16 I'm a produce clerk for Publix, and he works at
17 Aratrix as a supervisor.
18 Q  Sandra Evans.
19 A  My name is Sandra Evans.  I'm a schoolteacher
20 with Dothan city schools.  My husband is warehouse
21 supervisor for a nuclear plant in Columbia, Alabama.
22 We reside in Headland.
23 Q  David Kelly Kolar.
24 A  My name is David Kelly Kolar.  My wife is Wanda
25 K. Kolar.  I work I live in Cottonwood, Alabama.

Page 38

1 Q  Dannette Lynn Plath.
2 A  My name is Dannette Plath.  My husband is Jerry
3 Plath.  We live in Opelika, Alabama and we own and
4 manage a plastic injection molding plant.
5 Q  Janet Bibb.
6 A  I'm Janet Como Bibb.  My husband is John Crawford
7 Bibb.  We live in Wetumpka.  My husband works for the
8 Alabama Department of Environmental Management, and I
9 take care of my seven month old grandson while his
10 parents go to work.
11 Q  Valerie Chapman Garrett.
12 A  My name is Valerie Garrett.  My husband is Ronald
13 Garrett.  I'm a marketing secretary at Dunbarton in
14 Dothan.  He's a machine operator at G. E. Investments
15 and we live in Ashford, Alabama.
16 Q  Sharon Johnston.
17 A  My name is Sharon Denise Johnston.  My husband is
18 Anthony Van Johnston.  We living in Malverne, Alabama.
19 I'm a Wal-Mart invoice associate, and my husband is a
20 butcher.
21 Q  Joyce Foreman.
22 A  Joyce Rita Foreman.  My husband's name is James
23 Foreman.  He works for the State of Alabama.  I'm a
24 registered nurse.  I work for Dr. Winn Crawford at
25 Montgomery Cardiovascular.  We living in Hope Hull,

Page 39

1 Alabama.
2 Q  Paul Anderson, Jr.
3 A  Paul Jackson Anderson, Jr.  My wife is Foy
4 Domonique Anderson.  I'm a semiretired diagnostic
5 radiologist.  My wife is a homemaker.  We maintain
6 homes at Enterprise and at Point Clear, Alabama.
7 Q  Margaret Pippin?
8 A  I'm Margaret Pippin.  My husband is James Pippin.
9 I'm a teacher at Trinity Presbyterian School.  He's a
10 salesman.
11 Q  Keith Francis Rukvina?
12 A  I'm Keith Frances Rukvina.  My wife's name is
13 Rhonda Rukvina.  I'm an engineer, and she's a nurse at
14 Wesley Manner and we reside in Dothan.
15 Q  Lynn Baggett.
16 A  My name is Lynn Baggett.  I live in Wadley,
17 Alabama.  I'm a schoolteacher employed by Randolph
18 county school system.  My husband is Danny S. Baggett,
19 and he's a forester.
20 Q  Danetta Evans.
21 A  I'm Danyetta Evans.  I'm single.  I live here in
22 Montgomery, Alabama.  I'm a sales coordinator for the
23 Montgomery Biscuits.
24 Q  Wendy Trokey.
25 A  I'm Wendy Trokey.  My husband is Timothy Trokey.

Page 40

1 We reside in Montgomery.  I'm currently the owner and
2 director of East Learning Center, and he's a teacher
3 and coach at Catholic High School.
4 Q  Leonard Earl, Junior.
5 A  My name is Leonard E. Earl, Junior.  My wife is
6 Barbara Jean Earl.  We live in Roanoke, Alabama, and
7 I'm employed with Wood Tree out of Knoxville,
8 Tennessee.
9 Q  Owen Clancy?
10 A  My name is Owen R. Clancy.  My wife's name is
11 Jane Michelle Clancy.  I am a retired twenty-two years
12 of service since 1976 from the U. S. Army.  Between
13 '76 and '82 I was a restaurant owner.  '82 I went to
14 Saudi Arabia and spent eight years working for the
15 Vanell Corporation.  Came back and owned property in
16 Kingsport, Tennessee.  I owned a twenty-five mobile
17 home court, twenty-five places.  When I moved back to
18 Alabama I spent six years in Alabama in Fort Rucker
19 Alabama.  When I moved back here where my children all
20 survived, I retired.
21       My wife's name is Jane Michelle Clancy.  She
22 is a -- I met her in Saudi Arabia by the way.  She is
23 an R. N.  She is now working as a part-time medical
24 transcriptionist and, um, what did I forget?
25       THE COURT:  I think you got it all.

Page 41

1 A  When you're living all these years you have a lot
2 to say.
3 Q  Mary McGhee Scott.
4 A  Mary McGhee Scott.  I live in Clanton.  I'm a
5 cashier at Wal-Mart.
6 Q  Kalim Jones.
7 A  I'm Kalim McGiven Jones.  My husband is Marcus
8 Jones.  He is employed with Sabel Steel as operations
9 manager.  I'm retired Alabama Power, clean houses on
10 the side and we live in Headland.
11 Q  Joseph Walden.
12 A  I'm Joseph Walden.  I'm from Dozier, Alabama.
13 I'm self-employed as a farmer.
14 Q  Donnie Lynn.
15 A  Donnie Wayne Lynn.  My wife is Brenda Joyce Lynn.
16 We're from Eufaula, Alabama.  I'm a project leader for
17 American Buildings for the A. M. S. division, and
18 she's a housewife.
19 Q  Thea Sherman.
20 A  Thea Sherman.  My husband's name  is Douglas
21 Sherman.  We live in Fort Mitchell, Alabama.  And I
22 work for Blue Cross/Blue Shield of Georgia, and he's a
23 self-employed truck driver.
24 Q  Christina Kirkland.
25 A  I'm Christina Kirkland.  My husband is Joel

Multi-Page™

<table>
<tr><td>

Page 42

1 Kirkland. We live in Jack, Alabama, which is Coffee
2 County. We both are educators. I'm a sixth grade
3 teacher; he is a seventh grade teacher in Enterprise.
4 Q Sherry Mayes Harris.
5 A Sherry Mayes Harris. I'm separated. I live here
6 in Montgomery. I'm a driver for Montgomery Shuttles
7 and a dispatcher for the Yellow Cab Company.
8 Q William L. Blankenship?
9 A My name is William L. Blankenship. I work at
10 West Point Stevens. My wife works in Headland
11 part-time.
12 Q Kenneth Edwin Baker.
13 A Kenneth Baker. I'm not married. I live here in
14 Montgomery and I'm a landscape designer,
15 self-employed.
16 Q Marilyn Chancey.
17 A Marilyn Cherry Chancey. My husband is Scott
18 Chancey. He's the general manager of Williams Boat
19 Country, and I'm the office manager at Johnston Hines
20 and Flowers in Dothan.
21 Q Joseph Gauntt.
22 A Joseph Burton Gauntt. Not married. Work here in
23 Montgomery as a maintenance technician, and I reside
24 just outside of Tallassee up in Elmore County.
25 Q Gwenda Ingram?

</td><td>

Page 44

1 A Richard Andrew Stumpf. My wife is Mary Melissa
2 Stumpf. We live in Ozark, Alabama. I'm a commuter
3 software engineer, and my wife is a secretary.
4 Q Irvin Travis.
5 A I'm Irvin Lance Travis. My wife is Edith Travis.
6 We live in Dothan, Alabama. I'm a retired army
7 officer. I'm currently employed as a helicopter
8 flight instructor aviation training center in Fort
9 Rucker, Alabama. My wife is a homemaker.
10 Q Wilmer Angel.
11 A My names is Wilmer Claude Angel. Retired from
12 EXXON. My wife's name is Mary Joyce and she works for
13 Auburn University.
14 Q Casey Williams.
15 A I'm Casey Marie Williams. I live in Opp. I'm
16 not married. I am a singer in a southern gospel
17 group, and I also work at a summer camp which is in
18 Andalusia.
19 Q William Cook?
20 A I'm William Don Cook. My wife is Diane Rollins
21 Cook. We live in Montgomery. I'm an independent
22 insurance agent. She works for T. P. A. as a workers
23 comp claim supervisor.
24 Q Ramona Price.
25 A I'm Ramona Price. I live in Clanton. My husband

</td></tr>
<tr><td>

Page 43

1 A My name is Gwenda Ingram. I'm divorced and I
2 live in Dadeville. I'm on disability, and before that
3 I was a welder of wrought iron furniture and a quality
4 control inspector of computer parts.
5 Q Barbara Arant.
6 A I'm Barbara Arant. I live in Wetumpka. My
7 husband is William B. Arant, Junior. He is retired
8 from the U. S. Postal Service, and I'm a project
9 director for the Elmore County Family Resource Center.
10 Q Janice Ardis.
11 A My name is Janice Ardis. My husband's name is
12 Albert Ardis. I am an office manager at Grey Link
13 Wire, and he's a production worker at McLane's. We
14 live in Dothan, Alabama.
15 Q James Barkley.
16 A James Melton Barkley, Senior. I'm retired sales.
17 My wife is Dixie Condrith Barkley. She is retired
18 from the Coca-Cola Bottling Company here in
19 Montgomery. We reside in or at Hope Hull, Alabama.
20 Q Cynthia Yeomans.
21 A Cynthia Yeomans. My husband is George Yeomans.
22 We live in Dothan, Alabama. I teach at Dale County
23 High School as a business education teacher. My
24 husband is a machine operator at General Electric.
25 Q Richard Stumpf.

</td><td>

Page 45

1 is Stacey Price. I work in AmSouth, and he works here
2 in Montgomery at H. K. Systems.
3       COURTROOM DEPUTY CLERK: And that is it,
4 Your Honor.
5       THE COURT: Thank you.
6           COUNSEL'S RECITATION OF
7       THE SUMMARY OF THEIR CASE AND FURTHER
8           VOIR DIRE QUESTIONS:
9       I'm going to ask one of the attorneys for
10 the United States to stand and introduce himself or
11 herself and all counsel who will be assisting you, and
12 anyone else who will being assisting you.
13       MR. FEAGA: Yes, sir, Your Honor.
14       Good morning, ladies and gentlemen. My name
15 is Steve Feaga. I'm an Assistant United States
16 Attorney. Working with me is co-counsel on this case
17 will be Assistant United States Attorney Terry Moorer,
18 Assistant United States Attorney Clark Morris, and
19 then we are allowed to have an investigator or police
20 officer that worked our case sit with us, and that
21 will be Officer David DeJohn with the Prattville
22 Police Department.
23       THE COURT: Does anyone know any of these
24 persons, or is anyone related to any of these persons?
25 Please stand.

</td></tr>
</table>

Multi-Page™

Page 46

1    Okay. Whenever you stand, first tell us
2 your name. So we'll start here with the gentleman in
3 the back.
4 A Kenneth Baker.
5    THE COURT: And whom do you know?
6 A Mr. Terry Moorer.
7    THE COURT: Okay. How do you know him?
8 A We attended church together for several years,
9 and I know his wife and children and we have mutual
10 friends.
11    THE COURT: Could you be fair and impartial
12 in a case in which he's representing one of the
13 parties?
14 A Yes.
15    THE COURT: Thank you.
16    Yes, ma'am? First give us your name.
17 A Barbara Arant.
18    THE COURT: Whom do you know?
19 A Steve Feaga.
20    THE COURT: How do you know him?
21 A We went to church together. His wife and I are
22 friends, and I know his family.
23    THE COURT: Okay. Could you be fair and
24 impartial in a case in which he's representing one of
25 the parties?

Page 47

1 A Yes, sir.
2    THE COURT: Thank you very much.
3    Anyone else?
4    (Whereupon, there was no response.)
5    THE COURT: Now, defense counsel, do you
6 want the U.S. Attorneys to qualify the jury as to
7 everyone in the U.S. Attorney's Office or just these
8 here?
9    MR. TEAGUE: Your Honor, we would like to
10 have everyone identified.
11    THE COURT: Please call out the names of
12 everyone in the U.S. Attorney's Office.
13    MR. FEAGA: Yes, sir, Your Honor. Other
14 lawyers that work in our office are Tommy Hardwick,
15 Susan Redmond, Louis Franklin, Todd Brown, Andy
16 Schiff, Verne Speirs, Kent Brunson, J. B. Perrine,
17 Matt Miner, John Harmon, Linda Bray (ph.), Rand
18 Neeley, Steve Doyle, James Dubois, Patricia Snider,
19 Leura Canary (ph.) and Patricia Conover.
20    THE COURT: Does anyone know any of these
21 persons and you have not stood before?
22    (Whereupon, there was no response.)
23    THE COURT: Now, Mr. Feaga, would you tell
24 us what the charges are against the defendants.
25    MR. FEAGA: Yes, sir, Your Honor.

Page 48

1    Ladies and gentlemen, there are two charges
2 in this case. One of them, the first charge is
3 basically a two count indictment that charges that
4 Leon Carmichael, one of the defendants in this case,
5 and Freddie Williams, the other defendant in this
6 case, conspired together and with others, known and
7 unknown to the grand jury, to distribute and to
8 possess with the intent to distribute a controlled
9 substance. And the evidence will be that that
10 controlled substance, the indictment alleges, is
11 marijuana.
12    The indictment alleges that it's over a
13 thousand kilograms of marijuana. That the life of
14 this conspiracy occurred over from 1993 up to the time
15 of the indictment, which is roughly in November of
16 2003. So about ten years. That's the first count.
17    The second count of the indictment charges
18 that these two same individuals, Mr. Carmichael and
19 Mr. Williams, conspired with each other --
20    MR. TEAGUE: Excuse me, Your Honor.
21    MR. FEAGA: I apologize for that. Mr.
22 Williams is not named in the second count, it's Mr.
23 Carmichael who is charged with a conspiracy with
24 others known and unknown to the grand jury to engage
25 in money laundering. And that would be that he took

Page 49

1 the proceeds of specified unlawful activity, that
2 unlawful activity being the distribution of a
3 controlled substance, marijuana, that he took the
4 proceeds of the specified unlawful activity and he
5 engaged in a financial transaction with it. And that
6 basically is the second count of the indictment. A
7 conspiracy to launder money.
8    THE COURT: Now has anyone heard or read
9 anything about this case? If so, please stand. All
10 of those who have heard or read anything about this
11 case.
12    I will tell you there has been something on
13 the news and in the newspaper about it. If you think
14 you have, please stand.
15    Now we'll go around and get the names of the
16 persons who are standing. Don't tell us what you've
17 heard or read because obviously we don't want the
18 other jurors to hear it, but we'll get your name.
19 Start right here and we'll go across. First give us
20 your name.
21 A Helen Blackburn Sansom.
22    THE COURT: Thank you. You may have a seat.
23 A Mary P. Loy.
24 Q Carol Davolt Murray.
25 A Robert Gene Adcock.

Multi-Page™

Page 50

1 Q  James Richard Mills.
2 A  Jolonida Denise Lovejoy.
3 Q  Johnny Kirkland Oates, Junior.
4 A  Robbie S. Allen.
5 Q  Edward Joseph Steen.
6 A  Ann Marie Freeman.
7 Q  Jennifer Hatfield.
8 A  Patricia Anne Maryanow.
9 Q  Robert E. Young.
10 A  Sharon Goodson.
11 Q  Margaret Pippin.
12 A  Danyetta Evans.
13 Q  Kenneth Baker.
14 A  Joseph Burton Gauntt.
15 Q  Barbara Porter Arant.
16 A  James Melton Barkley, Senior.
17 Q  William Don Cook.
18      THE COURT:  Thank you very much.
19          GOVERNMENT COUNSEL'S ANNOUNCEMENT
20              OF POTENTIAL WITNESSES:
21      THE COURT:  Now I'm going to ask the
22 government attorneys to now qualify the jury as to any
23 witnesses you may call.
24      MR. FEAGA:  Yes, sir, Your Honor.
25          Ladies and gentlemen, the government may

Page 51

1 call --
2      THE COURT:  Now why don't we go ten
3 witnesses and then we'll ask does anyone know them and
4 then ten more witnesses.
5      MR. FEAGA:  Yes, sir.
6          We may call at this trial the following
7 people.  Steve Brock with the Chilton County Sheriff's
8 Office.  Corporal Todd Brooks, M. P. D., Montgomery
9 Police Department.  Ted Chapman, a D. E. A. chemist
10 from Dallas, Texas.  Robert Chavez, a police
11 department officer from El Paso, Texas.  Wendell Cloud
12 with the Tuskegee Police Department.  Clyde Koker with
13 the Mississippi Department of Transportation.  Tommy
14 Conway with the Montgomery Police Department.  David
15 DeJohn with the Prattville Police Department and a
16 member of the D. E. A. Drug Task Force for this area.
17 Patrick Denton.  Mike Drummond with the Montgomery
18 Police Department.
19          I think that's ten, your Honor.
20      THE COURT:  Okay.  Does anyone know any of
21 these persons?  If so, please stand.  First give us
22 your name.
23 A  Johnny Coodey.
24      THE COURT:  And whom do you know?
25 A  Steve Brock.

Page 52

1      THE COURT:  How do you know him?
2 A  He growed (sic.) up about a mile from where I
3 live, and I know him and do business with his brother.
4      THE COURT:  Could you be fair and impartial
5 in a case in which he may be a witness?
6 A  Yes, sir.
7      THE COURT:  Thank you.
8          The lady in the back?
9 A  Barbara Arant.
10      THE COURT:  And whom do you know?
11 A  Steve Brock.
12      THE COURT:  How do you know him?
13 A  I worked for the District Attorney's Office for
14 Autauga, Chilton and Elmore Counties for four years.
15      THE COURT:  You knew him in that
16 professional capacity?
17 A  Right.
18      THE COURT:  What did you do for them?
19 A  I was in the domestic violence unit, but I helped
20 get the cases ready for prosecution.
21      THE COURT:  Okay, then.  So you did what,
22 were you an attorney?
23 A  No, sir, I was a victims service officer.
24      THE COURT:  Very good.  Could you be fair
25 and impartial in a case in which he may be a witness?

Page 53

1 A  Yes, sir.
2      THE COURT:  Thank you.
3          Go ahead.
4      MR. FEAGA:  Yes, sir, Your Honor.
5          Curtis Forte with the Montgomery Police
6 Department.  Shane Folmar, an Alabama State trooper.
7 Gary Wayne George.  Jermain German.  Angel Gomez.
8 Sherry Gonzoles with the Drug Enforcement
9 Administration.  Bob Greenwood with the Drug
10 Enforcement Administration.  Tom Halasz with the Drug
11 Enforcement Administration.  Johnny Hardwick, who is a
12 judge here in Montgomery.  Ken Henley.
13          I believe that's ten more, Your Honor.
14      THE COURT:  Does anyone know any of these
15 persons?  If so, please stand.
16          Yes, tell us your name.
17 A  Danyetta Evans.
18      THE COURT:  And whom do you know?
19 A  Johnny Hardwick.
20      THE COURT:  How do you know Judge Hardwick?
21 A  I'm his nephew's friend.
22      THE COURT:  Okay.  And could you be fair and
23 impartial in which Judge Hardwick may be a witness?
24 A  Yes, sir.
25      THE COURT:  Thank you.

Page 54

1     MR. FEAGA: Charlotte Henserling. Steve
2 Henserling. Larry Hubbard with the D. E. A. Curtis
3 Jones with the Mississippi Bureau of Narcotics.
4 Sandra Jones. Tex Jones with the Mississippi
5 Department of Transportation. Benjamin Larkin.
6 Priscilla Luster. Shane Mayfield. And Alicia Oree
7 (ph.).
8     THE COURT: Does anyone know any of these
9 persons? Yes, give us your name again.
10 A  Johnny Coodey.
11     THE COURT: And whom do you know, Mr.
12 Coodey?
13 A  Jane Mayfield, Chilton County Sheriff's
14 Department.
15     MR. FEAGA: I believe he is, and I apologize
16 for that, Your Honor.
17     THE COURT: How do you know him?
18 A  Just acquaintances.
19     THE COURT: Could you be fair and impartial
20 in a case in which he may be a witness?
21 A  Yes, sir.
22     THE COURT: Okay. And the lady in the back?
23 Would you give us your name again.
24 A  Barbara Arant.
25     THE COURT: Whom do you know?

Page 55

1 A  Shane Mayfield. He was at the Chilton County
2 Sheriff's Department when I worked for the District
3 Attorney's Office.
4     THE COURT: You know him in a professional
5 capacity only, not socially?
6 A  No, sir, I don't know him socially.
7     THE COURT: Again, could you be fair and
8 impartial?
9 A  Yes, sir.
10     THE COURT: Thank you.
11     MR. FEAGA: Eric Pigler. Sherry Pettus.
12 Mikey Shea with the Mississippi Department of
13 Transportation. Jean Sisson with the Montgomery
14 Police Department. And Britt Tachars (ph.) with the
15 U. S. Border Patrol.
16     THE COURT: Again, please stand if you know
17 any of these persons.
18     (Whereupon, there was no response.)
19     THE COURT: Is that it? Anymore witnesses,
20 Mr. Feaga?
21     MR. FEAGA: No, sir, Your Honor.
22     THE COURT: Okay, Thank you.
23     We will now move to the defendants. Will
24 counsel for Mr. Carmichael please stand, introduce
25 yourself and then introduce anyone who will be

Page 56

1 assisting you and also introduce Mr. Carmichael.
2     MS. WAYNE: Thank you, Your Honor.
3     Good morning, ladies and gentlemen of the
4 jury. My name Lisa Wayne and I have the privilege of
5 representing Mr. Carmichael. This is Mr. Carmichael
6 right over there, one of the named defendants. As far
7 as the rest of us, this is Marion Chartoff, Ron
8 Brunson, Susan James. We also represent Mr.
9 Carmichael. We also will have an advisory witness
10 during the course of these proceedings by the name of
11 Murray Argo.
12     THE COURT: Does anyone know any of these
13 persons? If so, please stand.
14     Okay. We'll start back here. And first
15 give us your name again.
16 A  Barbara Arant.
17     THE COURT: And whom do you know?
18 A  Susan James.
19     THE COURT: And how do you know Miss James?
20 A  When I was at the District Attorney's Office
21 Susan was often a defense attorney, and as I was
22 working on the prosecution part she was the defense
23 attorney.
24     THE COURT: Could you be fair and impartial
25 in a case in which she may be a lawyer?

Page 57

1 A  Certainly.
2     THE COURT: Thank you.
3     Was there someone else on this side who
4 stood up? Okay, we'll go over here, then.
5 A  Michael Arrington.
6     THE COURT: And whom do you know?
7 A  Miss James.
8     THE COURT: And how do you know her?
9 A  I got some legal advice from her on a divorce
10 five or six years ago.
11     THE COURT: Okay. Could you be fair and
12 impartial in a case in which she is an attorney?
13 A  Yes, sir.
14     THE COURT: Thank you.
15     Yes?
16 A  I'm Kathy Seymour, and I know Miss James.
17     THE COURT: And how do you know her?
18 A  We grew up in the same area.
19     THE COURT: Okay. Could you be fair and
20 impartial in a case in which she is an attorney?
21 A  I think so.
22     THE COURT: Thank you.
23     Anyone else?
24     (Whereupon, there was no response.)
25     THE COURT: Now does anyone know Mr.

Multi-Page™

**Page 58**

1 Carmichael?
2      (Whereupon, there was no response.)
3      THE COURT: Now why don't you describe Mr.
4 Carmichael's business just in case someone knows about
5 that.
6      MS. WAYNE: Mr. Carmichael owns a center
7 here in Montgomery called Carmichael Events Center.
8 He also owns a trucking company, Multi-Investment
9 Trucking Company and has resided here as a businessman
10 here in Montgomery for many, many years.
11      THE COURT: Now has anyone -- Does anyone
12 have any financial interest in any of these
13 businesses?
14      (Whereupon, there was no response.)
15      THE COURT: Has anyone ever been to the
16 Carmichael Center? If you have been to the Carmichael
17 Center, please stand.
18      Your name?
19 A My name is Donald Davis.
20      THE COURT: Thank you.
21 A Danyetta Evans.
22      THE COURT: Thank you.
23      Yes?
24 A Wanda Lee.
25 A Martha Bryant.

**Page 59**

1      THE COURT: Anyone else?
2      (Whereupon, there was no response.)
3      THE COURT: Now, Mr. Teague, would you
4 introduce yourself and your client.
5      MR. TEAGUE: Yes, Your Honor.
6      I'm Barry Teague, and I represent the
7 defendant Freddie Williams.
8      THE COURT: Does anyone know either of these
9 persons?
10      Please stand. First give us your name.
11 A Margaret Pippin.
12      THE COURT: And whom do you know?
13 A Mr. Teague.
14      THE COURT: And how do you know him?
15 A Just a friend through mutual friends.
16      THE COURT: Could you be fair and impartial
17 in a case in which he's representing one of the
18 parties?
19 A Yes, sir.
20      THE COURT: Again?
21 A Barbara Arant. Mr. Teague was often a defense
22 attorney when I was working on the prosecution at the
23 District Attorney's Office.
24      THE COURT: Could you be fair and impartial
25 in a case in which he is an attorney?

**Page 60**

1 A Yes.
2      THE COURT: Okay. Anyone else know either
3 of these persons?
4      (Whereupon, there was no response.)
5      THE COURT: We'll qualify the jury as to any
6 witnesses you may call. Counsel for the defendants,
7 Mr. Carmichael or Mr. Williams. Do you have any
8 additional witnesses you'd like to qualify?
9      MS. WAYNE: Judge, on behalf of Mr.
10 Carmichael I have already named Murray Argo, who would
11 be our advisory witness. We have Investigator -- let
12 me make sure I spell this correctly -- Resendez,
13 R-e-s-e-n-d-e-z, who is also our investigator. And
14 Mr. Calahan, Mike Calahan, who is also an investigator
15 for the defense.
16      THE COURT: Does anyone know any of these
17 persons?
18      (Whereupon, there was no response.)
19      THE COURT: Mr. Teague, do you have any
20 additional witnesses whose names have not been called?
21      MR. TEAGUE: I do, Your Honor.
22      THE COURT: Go ahead.
23      MR. TEAGUE: Potential witnesses for my
24 client, Freddie Williams, would be C. T. Costery,
25 Sheffield Henderson, Jimmy Jones, Brenda W. Galloway,

**Page 61**

1 James Debardelaben, Leeman Watts, Faye Holly, Timothy
2 Lee Williams.
3      THE COURT: Does anyone know any of these
4 persons? If so, please stand.
5      (Whereupon, there was no response.)
6      MS. WAYNE: Judge, if I may, if counsel for
7 the government, if one of us could approach, I just
8 have a matter in terms of the witnesses that I would
9 like to qualify.
10      THE COURT: Okay, certainly.
11      (Whereupon, an off-the-record bench
12 conference was held between all counsel and the
13 Court.)
14      MR. FEAGA: We have one more witness.
15      Your Honor, while they're conferring, Ms.
16 Morris reminded me of one more witness that will be --
17      THE COURT: Go ahead. Call out their name.
18      MS. MORRIS: There's going to be one more
19 Her name is Ethereen (ph.) Taylor. She's from
20 Montgomery. Does anyone know her?
21      (Whereupon, there was no response.)
22      THE COURT: Okay. Anyone else, Miss James?
23      MS. JAMES: May we approach, Your Honor?
24      THE COURT: Yes.
25      (Whereupon, an off-the-record bench

Multi-Page™

Page 62

1 conference was held between all counsel and the
2 Court.)
3    MR. FEAGA: Your Honor, there are three more
4 now.
5    THE COURT: Go ahead.
6    MR. FEAGA: Geneva Davis. Letoya Davis.
7 Wallace Salery.
8    THE COURT: Again, if you know any of these
9 persons, please stand.
10    (Whereupon, there was no response.)
11    MR. FEAGA: One more, Your Honor. Dora
12 Woods.
13    THE COURT: Yes, ma'am? Please give us your
14 name again.
15 A Danyetta Evans.
16    THE COURT: And whom do you know?
17 A Wallace Salery.
18    THE COURT: And how do you know him?
19 A I'm a family friend.
20    THE COURT: Family friend? Could you be
21 fair and impartial in a case in which he may testify?
22 A Yes, sir.
23    THE COURT: Thank you.
24    Now, is there any member of the jury panel
25 who has had an unpleasant experience involving law

Page 63

1 enforcement? You know, obviously we get traffic
2 tickets and things like that, but you felt that you
3 were treated unfairly is what we're talking about. If
4 you have been in an instance where you felt you were
5 treated unfairly by someone in law enforcement please
6 stand.
7    (Whereupon, there was no response.)
8    THE COURT: Is there any member of the jury
9 panel who has ever worked for a law firm or
10 participated in the defense of a criminal case and you
11 have not provided this information already?
12    Yes?
13 A Bradley Glen Rigsby. It's been about eight
14 years, but I used to work for the Elmore County
15 Sheriff's Department as a jailer.
16    THE COURT: Thank you.
17    Anyone else ever done any work for law
18 enforcement? First give us your name.
19 A Marilyn Chancey. I worked for a tax law firm in
20 Dothan, but we do do a few federal criminal charges.
21    THE COURT: Thank you.
22    Anyone else? Yes?
23 A Harold H. Fain, Junior. I was an air policeman
24 from 1950 to 1954, and reserve air police from 1954 to
25 1962.

Page 64

1    THE COURT: I think another gentleman stood.
2 Yes?
3 A My name is Don Davis. I was an M. P. in the
4 United States Army.
5    THE COURT: Thank you.
6 A My name is David Kolar. I was a military police
7 with the Alabama National Guard from 1972 to 1978.
8    THE COURT: Thank you.
9    Yes?
10 A Maryann Addison. Not law enforcement, I worked
11 for attorneys about seventeen, eighteen years ago.
12    THE COURT: What type of work did those
13 attorneys do?
14 A I believe there were some criminal cases.
15    THE COURT: Just sort of did everything?
16 A And real estate, yes. It was family law.
17    THE COURT: Okay, thank you.
18    FURTHER VOIR DIRE
19    QUESTIONS BY THE COURT:
20    THE COURT: Is there any member -- Well, let
21 me ask this question: As you know, the defendants
22 here are charged with violating certain drug laws.
23 Now is there any member of the jury who has an
24 experience, personal experience or something that
25 happened to a friend of yours, or something that

Page 65

1 happened to a member of your family that you feel that
2 you could not be fair and impartial?
3    Sometimes people have things that happen in
4 their own lives, or in the lives of persons who are
5 close to them, and as a result they don't think they
6 can be fair and impartial in a case in which charges
7 or allegations of made regarding drugs, illegal drugs.
8 If you have that, please stand.
9    (Whereupon, there was no response.)
10    THE COURT: Now is there any member of the
11 jury panel who feels that he or she could not be fair
12 and impartial for either moral, religious or
13 philosophical reasons that would prevent you from
14 sitting in judgment on someone else and rendering a
15 fair and impartial verdict? If you have that problem,
16 please stand.
17    Yes?
18 A Steven A. Faris (ph.), Senior, and I guess you'd
19 call it moral.
20    THE COURT: Okay. Do you feel that you
21 could follow the Court's instruction and render a fair
22 and impartial verdict in this case?
23 A No, sir, I don't.
24    THE COURT: Okay. Thank you very much.
25 Anyone else?

Multi-Page™

Page 66

1        (Whereupon, there was no response.)
2        THE COURT: Is there any member of the jury
3  panel who harbors any type of racial bias such that
4  you could not be fair and impartial as to both sides
5  in this case?
6        (Whereupon, there was no response.)
7        THE COURT: Is there any member of the jury
8  panel who is a member of a group such as NORML, that's
9  N-O-R-M-L, that advocates the legalization of
10  marijuana or other drugs, illegal drugs?
11        (Whereupon, there was no response.)
12        THE COURT: Is there any member of the jury
13  panel who feels that either she or he or a close
14  friend or a family member has been falsely accused of
15  a crime?
16        (Whereupon, there was no response.)
17        THE COURT: Has anyone ever worked for
18  either of the defendants, that is Mr. Williams or Mr.
19  Carmichael?
20        (Whereupon, there was no response.)
21        THE COURT: Is there any member of the jury
22  panel who has ever worked for or volunteered time or
23  money to a group or organization that assists or
24  supports victims of crimes?
25        Yes? First give us your name again.

Page 67

1  A Barbara Arant.
2        THE COURT: And for whom have you worked?
3  A I worked for the District Attorney's Office and I
4  was a victim's service officer.
5        THE COURT: Thank you.
6        Anyone else?
7        (Whereupon, there was no response.)
8        THE COURT: Is there any member of the jury
9  panel who has ever worked for a business or owned a
10  business that operated primarily on a cash basis?
11        Yes?
12  A You wouldn't count a restaurant as a cash basis?
13        THE COURT: Well you told us. That's fine.
14  A Oh, I did, didn't I?
15        THE COURT: Yes?
16  A Carol Murray. My business could be considered a
17  cash business.
18        THE COURT: Okay. And that is?
19  A Step Ahead Educational Supply.
20        THE COURT: And in the back again?
21  A My name is Linda Faye Ingram. I don't know
22  whether this matters or not, but my mother had a bait
23  and tackle shop, and I helped her run the cash
24  register.
25        THE COURT: Okay.

Page 68

1  A I guess my husband --
2        THE COURT: First give us your name.
3  A Jennifer Hatfield. My husband is self-employed
4  and it's a small business, so --
5        THE COURT: Okay, thank you.
6        VOIR DIRE QUESTIONS
7        BY COUNSEL:
8        I will allow counsel now to ask any
9  questions. Government attorneys?
10        MR. MOORER: Your Honor, there are some
11  questions that were answered in the questionnaires
12  that I think should be gone into in individual voir
13  dire --
14        THE COURT: Fine. You don't want to do it
15  in public?
16        MR. MOORER: That's correct.
17        THE COURT: Right. We'll take that up
18  later, then.
19        Any other questions from defense counsel?
20        DEFENSE'S ANNOUNCEMENT OF
21        POTENTIAL WITNESSES:
22        MS. WAYNE: Yes, Judge. First I wanted to
23  read the list of witnesses the Court asked me about.
24        THE COURT: Very good.
25        MS. WAYNE: The defense may choose to call

Page 69

1  these witnesses, some of whom may be in addition to
2  the list of witnesses that the government has already
3  read to you.
4        Bruce Maddox, who is an attorney here in
5  town. Judge Thomas, who is a judge in Mississippi.
6  Cheyenne Chrisburg. Lucious Trimble. Chuck Kelser.
7  Knox Argo, who is also an attorney. Buena Browder.
8  William Cook. Pastor Richardson, who is at the
9  Hutchison Street Baptist Church here in town. Cheryl
10  Sling Hartley from Montgomery. Pastor Linda Brown,
11  here in Montgomery. Texana Howard, here in
12  Montgomery. Gloria Jean Bennett, here in Montgomery,
13  Bertha Smith, here in Montgomery. Reverend Al Dixon,
14  who is affiliated with the Anderson Chapel Ministries
15  here in Montgomery. Pastor Timothy Bass, at the Grace
16  Tabernacle Baptist Church here in Montgomery. Monty
17  Grant. Syrenthia Purdue, here in Montgomery. Felecia
18  Carmichael. Evelyn Hinkle. Mark Gilmore. Farrell
19  Prescott. Tommy Moore. Coleman Yarborough. Terrance
20  Dawson. Chuck Gibson. Clarence Lucas.
21        THE COURT: Does anyone know any of these
22  persons? If so, please stand. First give us your
23  name.
24  A Helen Blackburn Sansom. Ferrell Prescott and my
25  husband are employed together.

Multi-Page™

Page 70

1    THE COURT: Okay. Again, could you be fair
2  and impartial?
3  A  Yes.
4  A  Donald Davis. Mark Gimmel.
5    THE COURT: How do you know Mr. Gimmel?
6  A  We served on the same board in church.
7    THE COURT: Okay. Could you be fair and
8  impartial in a case in which he may be a witness?
9  A  Yes, sir.
10    THE COURT: Thank you.
11    Yes?
12  A  Danyetta Evans. And I know Lucious. I don't
13  remember his last name.
14    MS. WAYNE: Trimble?
15    THE COURT: How do you know him?
16  A  We were in a play together.
17    THE COURT: Could you be fair and impartial?
18  A  Yes, sir.
19  A  Kenneth Baker. Knox Argo has represented me in
20  the past.
21    THE COURT: Could you be fair and impartial
22  in a case in which he may be a witness?
23  A  Yes.
24    THE COURT: Anyone else?
25    Yes?

Page 71

1    MR. FEAGA: Can I read some more that we may
2  call?
3    THE COURT: Yes.
4    MR. FEAGA: Officer Tatum with the M. P. D.
5  Ethereen Taylor. Sherry Pettus. Fred Thomas.
6  Richmond Thomas. Jimmy Timmons. Todd Townsend.
7  Carolyn Walters. Stanley Walsch. Tara Wysinan.
8  David Williams. Moses Williams. Louie Wilson. And
9  Vanessa Wright.
10    THE COURT: Yes?
11  A  Barbara Arant. Todd Townsend with the Prattville
12  Police Department when I was in Autauga County with
13  the District Attorney's attorney office.
14    And also he named David Williams. He's was
15  also with the Prattville Police Department when I was
16  in Autauga County.
17    THE COURT: And, again, again could you be
18  fair and impartial?
19  A  Yes, sir.
20    THE COURT: Thank you.
21    Now, do you have any additional questions,
22  Miss Wayne?
23    MS. WAYNE: Just a moment, Judge, our
24  computer is down.
25    THE COURT: Okay.

Page 72

1    FURTHER VOIR DIRE QUESTIONS
2    BY MR. TEAGUE:
3    THE COURT: Do you have some Mr. Teague?
4    MR. TEAGUE: I had, yes.
5    THE COURT: Why don't you go ahead.
6    MR. TEAGUE: I can cover these very shortly.
7  Thank you, Your Honor.
8    What we would like to know is, we've seen
9  your questionnaires, we know who of you have had law
10  enforcement experience, we'd like to know who of you
11  have had any family member who has ever been employed
12  by any law enforcement agency.
13    THE COURT: How would you like them to
14  answer that question, Mr. Teague? We can go around
15  the room and get their names, or --
16    MR. TEAGUE: Yes, I think I'd like to know
17  who it is that is the relative and what agency they
18  worked for, Your Honor.
19    THE COURT: Okay. First give your name,
20  then tell us who the relative is, that is what nature
21  of the relationship is, and then what type of work.
22  And we'll just start here and go back and then we'll
23  start over here and go back.
24  A  Katherine Hanna. My two younger brothers both
25  were policemen on the Montgomery Police Department and

Page 73

1  both of them are retired.
2    THE COURT: Thank you.
3    We'll just go back. Straight across and go
4  back.
5  A  Tammy Latham, and my son-in-law is a canine
6  officer at Randolph County.
7  A  Kathy Coker. My ex-husband is a Lanett
8  policeman.
9  A  Willie Pearl Day. I have a cousin works with the
10  Phenix City Police Department.
11  A  Jessie Duck. I got an uncle that works for the
12  Alexander City Police Department.
13  A  This may not qualify. I think you said police
14  department, I have an uncle that's a lawyer.
15    THE COURT: Your name again, now?
16  A  Melissa Ann Nelson. His name is Bill Howell.
17  He's in Birmingham.
18    THE COURT: Thank you.
19    MR. TEAGUE: Your Honor, if I may elaborate?
20    Ladies and gentlemen of the jury, now the
21  question is as to any aspect of law enforcement. And
22  we'd rather you err on the side of letting us know
23  what you think might be. So that includes any federal
24  agency, any county agency, any police department, if
25  you have been an M. P. for instance, we already heard

Page 74

1 from some on that. If you think it's anything that
2 may be law enforcement, we'd·ask you to tell us.
3        THE COURT: Yes?
4 A  Lorraine Hunt. My brother-in-law is retired
5 narcotics in Omaha. Twenty-six years narcotics. Mark
6 Lane.
7 A  Jennifer Scott. My father-in-law was a trooper
8 mechanic here in Montgomery until January of this
9 year. He retired.
10 A  My name is Bradley Glen Rigsby. My cousin works
11 as a D. A. in North Carolina. I don't have much -- we
12 don't talk much.
13 A  Cynthia McMichael. My husband, David McMichael,
14 Alexander City police officer, investigator,
15 Tallapoosa County jailer, chief deputy, investigator,
16 then jail administrator.
17        THE COURT: Thank you.
18 A  Paul Jackson Anderson, Junior. My son Tom is a
19 full-time assistant District Attorney in Coffee
20 County, Alabama.
21 A  I'm Keith Ravina. My son is employed with the
22 Coast Guard Department of Homeland Security, container
23 inspector.
24 A  Janice Ardis. I have a nephew that is with the
25 Gainesville, Florida Police Department.

Page 75

1 A  Barbara Arant. My daughter works for the
2 District Attorney for the nineteenth judicial system
3 which is Chilton, Autauga and Elmore County as a grand
4 jury coordinator. And my son-in-law is a deputy
5 sheriff for Elmore County.
6 A  Gwenda Faye Ingram. I had a cousin that was a
7 police officer here in Montgomery, and his son is a
8 police officer now here in Montgomery. But I only see
9 them, you know, like family reunions and things like
10 that.
11 A  Marilyn Chancey. My grandfather, Edward Cherry,
12 was a detective with the Dothan Police Department. My
13 uncle, Kenneth Cherry, was with the A. B. C. Board out
14 of Wetumpka. And his son, Brian Cherry, is now an
15 investigator with the juvenile division with the city
16 of Dothan Police Department. My sister also works for
17 the Southeast Alabama Youth Services division as an
18 intake officer.
19 A  Lowell McGown. My oldest brother Bobby was with
20 the Prattville Police Department for probably twenty
21 years back in the sixties, seventies.
22 A  Johnny Coodey. My brother-in-law worked with the
23 Montgomery Police Department, and his brother still
24 works there. And I have a brother-in-law that's a
25 lawyer.

Page 76

1 A  Jolonida Denise Lovejoy. Two of my uncles were
2 police officers from Luverne.
3 A  Steven Lang Ferris, Senior. I have a cousin with
4 the Autauga County sheriffs.
5 A  Janette Floyd. I had a nephew that worked with
6 the S. W. A. T. T. team in Tallahassee, Florida for
7 several years and is now in Atlanta.
8        MR. TEAGUE: Excuse me, Your Honor, I didn't
9 get her name.
10        What was your name again, please, ma'am?
11 A  Jenette Floyd.
12        MR. TEAGUE: Thank you, Ms. Floyd.
13 A  Alice Washington. I have a son that was with the
14 United States Air Force military police.
15 A  Barbara Scott, and I had a nephew with Montgomery
16 Police Department.
17 A  Janet Bibb. My son used to be a District
18 Attorney.
19 A  Valerie Garrett. One of my sisters is a
20 secretary for the detective division in Titusville,
21 Florida. Another sister works for the D. A.'s office
22 in Florida. I have a brother-in-law who is a police
23 officer in Titusville, Florida, and a brother-in-law
24 that used to be a policeman in Dothan, Alabama.
25 A  My name is Sharon Johnston. I had a niece that

Page 77

1 worked with the city of Slocomb Police Department.
2 She also worked for Ozark. She's no longer employed
3 with either office any longer. I have a nephew-in-law
4 who is a deputy sheriff for Geneva County.
5 A  Joyce Foreman. My husband, James Foreman, worked
6 as a reserve deputy for Elmore County. His father was
7 -- worked with the State of Alabama Department of
8 Corrections for Draper, as well as Brankley and now is
9 retired.
10 A  My name is Thea Sherman, and my father was a
11 deputy sheriff for Russell County for twenty-eight
12 years. My uncle, Marvin Thrasher, was a state trooper
13 for Alabama. And my cousin-in-law is a detective for
14 the District Attorney's Office in Atlanta.
15 A  Jay Jay Yeomans. My cousin works for the Houston
16 County Sheriff's Department.
17 A  Richard Stumpf. I have two brother-in-laws who
18 work with the Houston County Sheriff's Department.
19 A  Casey Williams. My uncle worked for the Kingston
20 Police Department.
21 A  Ramona Price. I have a first cousin that was
22 employed with the Chilton County Police Department.
23 He's now employed with Alabaster Police Department.
24        THE COURT: Proceed, Mr. Teague.
25        MR. TEAGUE: Thank you, Your Honor.

Multi-Page™

Page 78

1 The next question has to do with the
2 presumption of innocence that is given to each
3 defendant when they are accused and brought to court.
4 We expect this honorable and learned judge to tell you
5 and charge you that the fact of an indictment is not
6 any evidence of guilt. With those principles in mind
7 -- and take those from the judge, he will admonish you
8 about those later -- are there any of you who believe
9 that one who is accused by indictment must be guilty
10 purely because he has been indicted by a grand jury.
11 If any of you feel that you would be inclined to feel
12 that way, please stand and be candid and forthright
13 with me.
14 THE COURT: I believe this is the gentleman
15 who said you couldn't pass judgment on others?
16 A No, I could pass judgment, and my judgment is I
17 would feel they're guilty. I served on a grand jury
18 and there's enough evidence --
19 THE COURT: Well just a minute, just a
20 minute. That's enough.
21 A Steven Lang Ferris, Senior.
22 THE COURT: Members of the jury panel, the
23 fact that someone has been indicted is not evidence of
24 guilt. And that's an instruction on the law. Now if
25 is there anyone in here who can't follow that, please

Page 79

1 stand, other than the gentleman who already stood.
2 (Whereupon, there was no response.)
3 THE COURT: Yes, any other questions,
4 Mr. Teague?
5 MR. TEAGUE: One final question, Your Honor,
6 thank you.
7 As Mr. Feaga has pointed out, there will be
8 numerous law enforcement people potentially called to
9 testify. Is there anyone here who has an inclination
10 to feel that the testimony of a law enforcement
11 officer is entitled, by virtue of the fact the person
12 testifying is a law enforcement officer, that that
13 testimony would be entitled to more believability than
14 the testimony of any other civilian witness?
15 MR. FEAGA: Your Honor, we don't object to
16 the question per se, but maybe as framed as long as he
17 adds like he did with the last one that the Court will
18 be instructing them that they shouldn't give it any
19 more weight than they do any other witness. And with
20 that caveat, we don't object to that question.
21 THE COURT: Yes.
22 MR. TEAGUE: Is there anyone who would be
23 inclined to believe a law enforcement officer over
24 another witness if they testified to things that
25 conflicted?

Page 80

1 THE COURT: Yes?
2 A Lowell McGown. I probably would.
3 THE COURT: Any more questions, Mr. Teague?
4 MR. TEAGUE: Anyone else who feels that they
5 would be more inclined to believe a law enforcement
6 officer than they would any other witness who is not
7 law enforcement?
8 A Edward Steen. Yes, sir, I would say I would,
9 too.
10 MR. FEAGA: I'm objecting to the question as
11 framed because I think if he tells them that you will
12 instruct them that they shouldn't give it anymore
13 weight just because of that, can they follow your
14 instruction.
15 THE COURT: Right. We can ask them that in
16 a minute.
17 MR. TEAGUE: Anyone else?
18 (Whereupon, there was no response.)
19 MR. TEAGUE: Your Honor, those are all the
20 questions.
21 THE COURT: Now for those of you who stood,
22 if I should give you instructions that are counter to
23 what you've said, is there anyone who could not follow
24 the instructions of the Court? And that would follow
25 for everything, actually. Sometimes during a trial I

Page 81

1 may giving you instructions that you may disagree
2 with. But is there anyone who could not follow the
3 Court's instructions even if you disagree with my
4 instructions on the law?
5 (Whereupon, there was no response.)
6 THE COURT: Go ahead. Anymore questions
7 from defense counsel?
8 FURTHER VOIR DIRE QUESTIONS
9 BY MS. WAYNE:
10 MS. WAYNE: I do, Judge.
11 THE COURT: Yes.
12 MS. WAYNE: I'd like to follow up on with
13 what the judge just told you, because a lot of you
14 will come in here with notions and preconceptions
15 about the law and what you think the law should be.
16 And what we're trying to do is that it's not against
17 the law to let the judge know you know what, you have
18 some gut feelings that you disagree with the law, and
19 regardless of whether he instructs you, you just can't
20 follow them. And that's what we need to know from you
21 all, and it's all right to say I can't do it, Judge.
22 And I'm wondering is there anybody out there that just
23 feels that way, that even if the judge tells you
24 you've got to do something, your feeling is I don't
25 agree with that particular tenet of law? Anyone feel

Page 82

1 that way? You need to let us know now.
2     THE COURT: And if you can't follow that
3 law, you need to let us know.
4     MS. WAYNE: Sir?
5 A My. Name is James M. Barkley, Senior. I don't
6 agree with a lot of laws, and I don't agree with a lot
7 of the way a lot of cases are -- I think the law
8 should be based on common sense. And I think you
9 lawyers have got fixed where you all can make a lot of
10 money. I could go on, but I won't. I'll sit down.
11     THE COURT: Let me ask you this, though,
12 sir.
13 A Yes?
14     THE COURT: Could you put aside those
15 personal feelings and decide this case based solely on
16 the evidence that you hear during the trial and the
17 law as stated by the Court?
18 A I got to believe I could, unless you come up with
19 something wild that I don't agree with that I can do
20 the wall thing which I heard judges do on T V, you
21 know. But I consider myself maybe very intelligent,
22 and I don't need a judge telling me what to do.
23     THE COURT: Okay. Well the problem is,
24 though, sir, even if you disagree with what I say --
25 A Well if you don't like it, just don't put me on

Page 83

1 the jury.
2     THE COURT: Well what I have no to know from
3 you, though, is there are instances where you may
4 disagree with the law. In fact, you may not have
5 voted for that law when it was passed. But the
6 question is, now that it's the law, can you comply
7 with that law as given to you by the Court, even
8 though you may now disagree or still disagree with
9 that law?
10 A I don't believe I could.
11     THE COURT: Okay. Thank you very much.
12     Is there anyone else?
13     (Whereupon, there was no response.)
14     THE COURT: Go ahead.
15     MS. WAYNE: Thank you.
16     And a lot of us are laughing because some of
17 the things that we hear are funny in the courtroom
18 but, you know, what we need to know is do any of the
19 rest of you feel that way about defense lawyers?
20     I mean a lot of people come in and say if
21 you're a criminal defense lawyer we have some
22 feelings. And those feelings might interfere with
23 your ability to be fair as a juror in this case. And
24 we want to know that. If you just don't like us,
25 don't like any of us sitting here, please let us know

Page 84

1 because we don't want that to interfere with Mr.
2 Carmichael's right to a fair trial. Does that make
3 sense?
4     Does anyone feel that way, they just can't
5 set aside they came in here and they looked at us and
6 they said uh, I don't like them? You're laughing, but
7 it could be true, right?
8     Okay. I want to follow up in terms of what
9 we were talking about police officers, and a lot of
10 you said you had family members who are police
11 officers and so forth. What we really need to know is
12 whether or not you have a feeling toward one side or
13 the other when you come in this courtroom. Whether
14 you are aligned with the government at this point that
15 would not make you a fair juror. That's what we need
16 to know. And I'm wondering, does anybody feel like
17 they belong more on this side or they're closer to
18 this side as they come into this courtroom and they
19 hear the charges in this case? Does anyone feel that
20 way?
21     MR. FEAGA: Your Honor, we're getting into
22 questions that give part of what the Court is going to
23 be instructing the jury about what their duties and
24 responsibilities are without giving all of it, and I
25 think it runs the risk of just confusing someone.

Page 85

1     THE COURT: I think she just wants to know
2 does anyone have a bias in favor of the Government and
3 against a defendant in general.
4     MR. FEAGA: Yes, sir.
5     MS. WAYNE: Anyone feel that way as you come
6 in here? What I'm wondering is when Mr. Feaga, he
7 read the charges to you, did you all look at Mr.
8 Carmichael and say how innocent is he? Anybody feel
9 that way?
10     MR. FEAGA: We object to that question.
11     THE COURT: Well actually, Mr. Carmichael,
12 until the jury decides otherwise, is innocent.
13     MS. WAYNE: That's correct, Judge.
14     THE COURT: He comes in this Court cloaked
15 in innocence. He is innocent until you are convinced
16 by the evidence otherwise. And it's up to the jury to
17 decide that. And I think what we're asking you is,
18 has anyone sort of prejudged him before you heard any
19 of the evidence in favor of government or even in
20 favor of the defendant? Can any of you put aside
21 personal feelings, wait until you hear the evidence
22 and wait until you hear my instruction on the law
23 before you make up your mind?
24     MS. WAYNE: Does that sit right with you
25 all?

Multi-Page™

**Page 86**

1  The other thing is, does anybody disagree
2 with the statement that what Mr. Feaga read, that it
3 is simply an accusation. It's no more than that, an
4 accusation and a piece of paper. Does anyone think
5 that it carries more weight because the government has
6 charged Mr. Carmichael?
7      MR. FEAGA: Your Honor, here again, I hate
8 to keep doing this but if she would tell them up front
9 that you're going to be instructing them of that and
10 do any of them have a problem following that
11 instruction we don't have a problem. But if it comes
12 from her, they don't know if it's the law.
13      THE COURT: Well think I already told them
14 that an indictment is not evidence in a case at all.
15 Only what you hear from the witness stand and from
16 documents. That's the only evidence and that's all
17 you should consider during your deliberations.
18      Is there anyone who can't do that?
19      MS. WAYNE: And just so y'all know, defense
20 lawyers are also officers of the Court. So what I'm
21 saying in terms of instructions in the court, it's the
22 same as the government. Okay? We're no different.
23 They represent one side, we represent one side. We're
24 officers of the Court as well. Okay?
25      Now in terms of when you came in here and

**Page 87**

1 you heard about -- well a lot of you are coming in from a
2 long way, and we're wondering whether or not any of
3 you have any hardships that might not have been in the
4 forms that you filled out that you think might
5 interfere with your ability to sit here for a couple
6 of weeks, or even more if that's what's required? If
7 anybody is going to have work on their mind?
8      I mean, I know some of you are going yeah, I
9 would rather not be here, but if that's going to
10 interfere with your ability to sit as a juror. Anyone
11 feeling that way and wanting to express that to us?
12 If you would stand up and let us know.
13      MS. WAYNE: Judge, do you want me to start
14 on this?
15      THE COURT: Yes.
16 A Janett Styron Payne. It's not a hardship for me
17 this week at work because the doctor I work for is on
18 vacation, but next week if I'm not in my room
19 producing eight thousand dollars a day, that's a
20 hardship on a small business. I work for a dentist
21 here in Montgomery.
22      MS. WAYNE: I think the judge will probably
23 follow up, but I'm wondering if you got sick or if
24 something like that happened, do you have someone who
25 can replace you or come in or help you out in those

**Page 88**

1 same kind of situations?
2 A No.
3      THE COURT: I think the jurors were
4 informed, though, that this would be a two week term
5 when you first were notified of jury duty.
6 A Possibly.
7      THE COURT: Go ahead.
8      MS. WAYNE: Well we're certainly -- We're
9 all writing down notes, so we'll make sure --
10      THE COURT: Right. I want to emphasize one
11 thing, too. You know, there are many ways to serve
12 our country, and serving on jury duty is, when you
13 think about, its a very minor inconvenience. So keep
14 that in mind as you stand and say you have a burden.
15      But go ahead.
16 A Cindy Yancey. The girl who I cover for has been
17 out on sick leave for about a month, and our doctor's
18 charges haven't been in since April 22nd, so you ask
19 would that be on my mind. That is on my mind, because
20 I know that money is not getting charged to get out
21 there to get paid. So that will be on my mind.
22      MS. WAYNE: All right. When I say "on your
23 mind," is it to the point where it would really
24 interfere with your ability to listen? To, you know,
25 sit here and come to a conclusion if that's necessary?

**Page 89**

1 That's what we wonder. Because a lot of people are
2 going to have a lot of things on their mind.
3 A It would be on my mind, but I don't think it
4 would interfere with my making an impartial decision.
5      MS. WAYNE: Okay, we appreciate that.
6 A I'm Mary Loy. I have a previous commitment for
7 June 15th, 16th and 17th, and I called and she advised
8 me to come on down. I have paid some money down.
9      THE COURT: You have a trip?
10 A Yes, it's a non-refundable trip.
11      THE COURT: Thank you. What is your name?
12 A Mary Loy.
13      THE COURT: Thank you, Ms. Loy.
14      MS. WAYNE: Over here, ma'am?
15 A Alice Washington. I have a ninety-two year old
16 mother at home that I am responsible for. Right now
17 she's up and able to, you know, to do a few things
18 but, you know, I am concerned about being away from
19 her.
20      MS. WAYNE: Can you arrange to have someone
21 there with her if you were here for two weeks?
22 A Well I have called my brother and let him know
23 that I had been subpoenaed to come here, and he's
24 going to wait and see what's going to happen.
25      MS. WAYNE: All right. All right.

Multi-Page™

Page 90

1  A  I'm Sharon Strickland.  I'm sorry, I'm addressing
2  the possibility it could be longer than two weeks.
3  I'm okay for this week and next week, but after that
4  my husband and I are scheduled for surgery, and that
5  would be an inconvenience.  So if it's past the 17th,
6  you know, I'm facing oral surgery and my husband is
7  facing surgery.  So if it's longer than two weeks, I'm
8  sorry, it would be --
9        THE COURT:  An inconvenience?
10 A  Right.  But I've got these two weeks free.
11       MS. WAYNE:  All right.  And let me explain
12 something, too.  When we talk about two weeks, it
13 could be less than that.  What we can't tell you is
14 how long a jury would deliberate.
15 A  You said it could be longer than two weeks.
16       MS. WAYNE:  Right.
17 A  If it's longer than two weeks, yes, since I'm a
18 schoolteacher and the way the surgery is and what not,
19 it would be an inconvenience if I tried to reschedule
20 the surgery because it would run into the school term.
21       THE COURT:  Thank you.
22 A  My name is Johnny Oates and what I have, I'm an
23 owner of a small a printing shop.  We have four
24 employees.  I got one that's going on vacation next
25 week and I do all the placing and deliveries, you know

Page 91

1  all the measurings for the company.  So if it lasts
2  longer than two weeks, it would be a real hardship.
3        I been here before and I figured, you know,
4  normally two or three days, so I was taking a gamble
5  if I got chose it would be two or three days.  But if
6  it were two weeks I think I could concentrate and do
7  the right thing, but after that I'd really be
8  concerned about deliveries.  So if it lasts longer
9  than two weeks I would have some real hardship on
10 that.  I have been here before and I figured normally
11 two to three days so I was taking a gamble if I got
12 chose it would be those two or three days.  But nor
13 the two weeks I could concentrate and do the fair
14 thing.  But after that I would really be concerned
15 about my company.
16       THE COURT:  Would you give us your name
17 again, sir?
18 A  Johnny Kirkland Oates Junior.
19       THE COURT:  Mr. Oates.
20 A  My name is Lynn Bailey Garrett and this week
21 would be okay but next week I'll be in Venezuela on a
22 mission trip and I won't be able to be here then.
23       MS. WAYNE:  Do you hear her, Judge?
24       THE COURT:  Yes, I heard her.
25       MS. WAYNE:  I just have a question.  When

Page 92

1  you say you'll be in Venezuela, I know on your jury
2  questionnaire this is with your missionary work, is
3  it?
4  A  That's right.
5        MS. WAYNE:  Okay.  And so that's
6  prescheduled and paid for?
7  A  It has already been, yes.
8        MS. WAYNE:  Thank you.
9  A  Joseph Burton Gauntt.  I wouldn't have a problem
10 with it unless the jury was, what do you call it,
11 sequestered?  You know, if we were put away.
12       MS. WAYNE:  Don't say it like that.
13 A  That's what I would have a problem with.
14       THE COURT:  No, the jury will not be
15 sequestered.
16       MS. WAYNE:  We won't put you away.
17 A  Edward Steen.  And you framed it the other than
18 two weeks thing.  I manage a team of four people for
19 software development; two weeks, three weeks, that
20 would be okay, but more than that would be difficult
21 to come back to.
22       THE COURT:  Okay.
23 A  My name is Donald Davis, and I'm scheduled to --
24 I'm over the Montgomery County school bus, and I'm
25 scheduled to take a group people to Anniston, Alabama

Page 93

1  for the new school buses that we're going to purchase.
2  So I really need to be there.  And that's on the 15th,
3  16th and 17th that I'm going to take the group up
4  there.  But other than that, I'm good to go.
5        MS. WAYNE:  Mr. Davis, can that be
6  rescheduled, or can someone else do that for you?
7  A  See, this is the whole state doing this.  This is
8  the whole state of Alabama.  Everybody in the state of
9  Alabama who has school buses has to be there too.
10 A  Valerie Garrett.  I have a thirty year old
11 handicapped retarded stepdaughter that lives with me,
12 and I and my mother-in-law, who is over seventy, are
13 the only ones who really know how to care for her.
14 And even today I had to make special arrangements.  So
15 being here like a week or two weeks even would be very
16 hard on her.
17 A  My name is Sandra Evans.  My husband is scheduled
18 to have surgery next week.  When I realized there was
19 a conflict I did call prior to and I was told to come
20 today.  But it would necessitate a couple of days in
21 the hospital, and I'm just not sure about that yet.
22       MS. WAYNE:  All right.  And that's scheduled
23 for next week?
24 A  Next Monday.
25       MS. WAYNE:  All right.

Page 94

1  A  I'm Richard Stumpf. I'm one-half of a
2  partnership, and anything more than about two weeks
3  would be very hard on the business.
4      MS. WAYNE: Thank you, sir.
5  A  My name is Christina Kirkland. This is very
6  minor, but I just wanted to mention it. I'm a
7  schoolteacher during the year. I'm in graduate school
8  full-time this summer. My employment is geared toward
9  certification; it hinges on me getting these two
10  summer courses I'm enrolled in now. I'm aware the
11  university would have to excuse this of course, but if
12  it was lengthy I don't know if they would give me full
13  credit for the courses. So that's just a concern.
14  A  I'm Willo Jean Davis. I keep my grandchildren
15  every day, and I have six. And if I don't keep them
16  they will have to stay out of work to keep them.
17      MS. WAYNE: Don't you want a break, six of
18  them?
19  A  No, I enjoy them.
20      MS. WAYNE: Okay. And you can't arrange
21  someone to --
22  A  I would have to get somebody else. But I keep
23  them every day and that's the summertime.
24      THE COURT: Okay. What is your name?
25  A  Willo Jean Davis.

Page 95

1  A  I'm Donald Osborne. With my restaurant I have
2  myself as a manager and an assistant manager. If it
3  doesn't go past the five-thirty that it said on the
4  instructions, I'll be fine with that. But I have to
5  get back and I have to work at least the night shift.
6      MS. WAYNE: I suspect that the judge keeps
7  that schedule.
8      THE COURT: Yes.
9  A  My name is Tonya Saxer. I can serve on the jury
10  up until June the 22nd, and I'll be having knee
11  surgery.
12      THE COURT: Thank you.
13  A  I'm Melody Robertson. As I said, my husband and
14  I are owners of a supermarket and I manage the office.
15  There are only two of us, and she's scheduled for
16  vacation at the end of June. We have one other girl
17  that can help us in the office, but I'm not sure if
18  she can handle it on her own.
19      MS. WAYNE: Okay. All right.
20  A  Melinda McKowsky. I anticipated two or three
21  days, not the full two weeks, and I'm scheduled to
22  start teaching summer school next week.
23      THE COURT: Where is this?
24  A  Summer school.
25      THE COURT: Where is this?

Page 96

1  A  Calvary Christian Academy. And there's not
2  anyone else who can do that.
3      MS. WAYNE: All right. I think that's
4  everyone. I appreciate y'all letting us know.
5      As you can see, there are a lot of us who
6  have different things going on. What I ask that you
7  keep in mind for both sides is that if you feel that
8  what you've expressed to us and you end up on this
9  jury is something that you would hold it against the
10  defense side because this case goes two weeks and
11  you're angry at us, that's what I really am concerned
12  with.
13      So I know you've expressed these hardships,
14  we will make sure we have written this down, but if
15  you think that hardship carries over to the point that
16  you're just mad because this case has been going a
17  little longer than you expected and you'll hold it
18  against us, you need to let me know that now. Okay?
19  Does that make sense to y'all?
20  A  Melissa Anne Nelson. I don't want to be away
21  from my children more than two weeks. My husband
22  works twelve hour nights, and that would be a problem.
23  I mean, I would get angry and missing them terribly.
24      MS. WAYNE: And thank you, Miss Nelson. I
25  can tell by your demeanor and what you're saying that

Page 97

1  it's something that's very important to you. And my
2  concern, again, to you is I know there are a lot of
3  way who might feel that way too, but do you feel that
4  you would hold it against us, the defense?
5  A  Well you would lose my attention. I would be
6  focused on my home.
7      MS. WAYNE: Okay. All right. I appreciate
8  you telling us.
9  A  Jolonida Lovejoy. I'm going to start working for
10  in Luverne, Alabama. And they're real strict on the
11  policies for missing days.
12      MS. WAYNE: They cannot punish you for jury
13  service. Okay? That's the law. It's your civic duty
14  and they can't do that. So you just make us aware of
15  that and I can tell you that you're protected in terms
16  of that. Okay? Because you're not out playing,
17  you're working for the United States. So that's
18  important, okay?
19      Ma'am?
20  A  Valerie Garrett. I don't think I would be angry,
21  I just can't figure out how I'm going to have care for
22  my daughter-in-law.
23      MS. WAYNE: Yeah. And I understand your
24  situation, and I know we've written that down.
25      Now I know it's the lunch hour and plus the

Multi-Page™

Page 98

1 court reporter is going to be mad if I don't be quiet,
2 so my last question to y'all is that you will hear
3 instructions on the law in terms of burden of proof,
4 the presumption of innocence, those things that the
5 judge has talked to them that y'all have heard. We
6 see your questionnaires, we see you watch C. S. I.,
7 Law and Order, you love all that stuff. And what I
8 want to ask you is that everybody has heard a
9 defendant's right to remain silent, okay? Everybody
10 has heard that, right? Everybody familiar with that?
11 And I'm wondering, and you've got to be up front with
12 me on this, how many of you truly believe if the
13 defendant decides, chooses not to testify, which is
14 his right, and the judge will read that instruction,
15 how many of you will believe that he must be hiding
16 something? That you're going to hold that against him
17 despite the instruction that the Court gives?
18      How many of you feel that way? Because, you
19 know, the natural feeling is you want to hear both
20 sides. Everybody wants to hear that. Mr. Carmichael
21 pled not guilty, that's one side, now they have to do
22 the proving. But I want to know if those of you who
23 are sitting there are going to say I want to hear from
24 the defendant.
25      (Whereupon, there was no response.)

Page 99

1      MS. WAYNE: Nobody? I can't believe that.
2 Nobody feels that way?
3 A  I have to admit I would have a hard time.
4      MS. WAYNE: Thank you.
5      THE COURT: What is your name?
6 A  I'm Jennifer Scott.
7      THE COURT: Yes, Mr. Feaga?
8      MR. FEAGA: I want to object to the question
9 because, again, it's the way it's framed. It almost
10 asks for an answer that's going to be inconsistent
11 with what the Court is instructing.
12      THE COURT: How so?
13      MR. FEAGA: Well, I think if she phrases it
14 as she did initially before she went on at the end
15 there, if she just asks them if the Court instructs
16 you --
17      MS. WAYNE: You know, Judge, I'm going to
18 object, because Mr. Feaga had all the chances in the
19 world to ask the same questions I am.
20      THE COURT: I think he just wants to make
21 sure the questions are properly phrased.
22      Go ahead, Mr. Feaga.
23      MR. FEAGA: If she instructs them, if the
24 Court is going to be instructing them that the law is
25 a certain thing, will you have any problem following

Page 100

1 the Court's instruction on that, that's one thing.
2 But it's another thing to say, you know, will you have
3 some feeling in your gut that you just want to hear
4 even though -- you know, I think that just goes on too
5 much. I think the proper question is will they, after
6 the Court instructs them what the law is, follow the
7 law. And the Court has already asked that question,
8 and it's been answered by all of them that they would
9 follow the Court's instruction.
10      MS. WAYNE: Judge, what I'm attempting to
11 find out is whether or not these jurors have
12 preconceived feelings or gut feelings that are against
13 the law despite the Court's instruction. We have a
14 right to know whether or not they have that
15 predisposition, because that goes into their ability
16 to ultimately be fair as a juror. And this Court
17 knows that.
18      I'm not telling them not to follow your
19 instructions. I'm saying can they -- is there
20 something else that they believe is different than the
21 Court's instruction.
22      THE COURT: Well the question really is even
23 if you believe something different from the Court's
24 instruction, would you have any difficulty putting
25 aside those beliefs and follow only the Court's

Page 101

1 instructions. And that would include the presumption
2 of innocence. In other words, a defendant is not
3 obligated to testify. And in fact you cannot even
4 consider that during your deliberations. The fact
5 that a defendant elects not to testify. You can't
6 even consider that. The burden of proof is upon the
7 government. And if you can't follow those
8 instructions, you need let us know.
9 A  I can try to follow those instructions, but I
10 can't promise that I wouldn't be thinking in the back
11 of my mind he must be hiding something because he
12 didn't defend himself.
13      MS. WAYNE: Okay. And that's exactly what
14 we need to know. Thank you.
15      Anybody else feel the same way? She said
16 she could follow those instruction but she can't help
17 but tell us that in the back of her mind she would be
18 thinking of it. Anybody else feel that way?
19      MR. FEAGA: Object again, Your Honor. What
20 she's thinking of is not the relevant issue. The
21 issue is can they follow the Court's instructions.
22 Everyone is allowed to be human.
23      MS. WAYNE: Judge, the relevant issue is
24 whether or not I'm trying to find out if they feel
25 that way. I have a right to know if they feel that

Page 102

1  way.
2      THE COURT: Feel what way, now?
3      MS. WAYNE: The way she just indicated,
4  which is she knows that she can follow the Court's
5  instruction, but she can't help but feel that she'll
6  be sitting there still thinking about it.
7      THE COURT: Ma'am, did you say you could
8  follow the Court's instructions on the law?
9  A  I said I would try.
10     THE COURT: The question is can you follow
11 the Court's instructions?
12 A  I think so.
13     MS. WAYNE: Sir?
14 A  Johnny Kirkland Oates, Junior. I would have
15 serious problems with it. I'll be blatantly honest
16 with you. I would just have a big problem with it.
17     THE COURT: Serious problem with what, sir?
18 A  With the defense not testifying.
19     THE COURT: Thank you very much.
20     MS. WAYNE: Anyone else feel the same way as
21 Mr. Oates does? Because it's all right, and we need
22 to know ahead of time. Do you understand why we need
23 to know? Okay.
24     THE COURT: Because that is the law. That's
25 the law of the land. The defendant is not required to

Page 103

1  testify and you cannot hold that against the
2  defendant. That's part of your obligation as a jury.
3      MR. FEAGA: Yes, sir, but they're not
4  required to not, you know, have it cross their mind.
5  They're just required not to hold it against him and
6  follow your instruction.
7      THE COURT: Yes. Well, by mentioning it to
8  them, obviously they're going to think about it. But
9  the thing is they cannot hold that against the
10 defendant. And in fact it can't play any role in your
11 deliberations.
12     MS. WAYNE: Judge, if I may have a moment?
13     THE COURT: Yes.
14     (Whereupon, Ms. Wayne conferred with other
15 defense counsel off the record and out of the hearing
16 of the other courtroom participants.)
17     MS. WAYNE: Judge, thank you very much. I
18 have no further questions.
19     THE COURT: Anything else from the
20 government?
21     MR. FEAGA: No, sir, Your Honor.
22     THE COURT: It's now fifteen after noon.
23 We'll take a lunch break until one-fifteen.
24     Now, Counsel, when we come back what we will
25 do is we'll ask the jurors who said they had served on

Page 104

1  a grand jury first, find out whether that has any
2  relationship to this case. Then we will go to the
3  jurors who said they had heard or read something about
4  the case. Then we'll take up other matters like that.
5      Now, members of the jury, when you come back
6  please sit where you are now so that we can easily
7  identify you. We'll go to lunch.
8      Oh, by the way, one other very important
9  instruction. While you are at lunch do not discuss
10 the case among yourselves or with anyone else. Nor
11 should you have any contact with the attorneys or
12 parties involved in this litigation. Do not discuss
13 the case.
14     We'll see you back here at one-fifteen.
15     Counsel, if you will remain for just a
16 second, we'll take up a couple of other matters.
17     (Whereupon, the general jury panel was
18 escorted out of the courtroom and the following
19 colloquy ensued:)
20     THE COURT: Counsel, I believe there are
21 some jurors who clearly indicated that they could not
22 serve on this case for personal beliefs. For
23 instance, there was a juror who said he could judge
24 others but couldn't follow the Court's instructions.
25 I think it was the gentleman who believed that an

Page 105

1  indictment meant that you were guilty.
2      What was his name?
3      MR. TEAGUE: Mr. Ferris, Your Honor.
4      THE COURT: Okay, Mr. Ferris is excused.
5      Are there any others we'd like to take up at
6  this time? I think there might have been a couple of
7  others.
8      MR. TEAGUE: There was a James Barkley who
9  said something very similar to that, Your Honor. On
10 behalf of Defendant Williams, we would --
11     THE COURT: Now Mr. Barkley, what did he
12 say?
13     MS. JAMES: He was the one who began arguing
14 with the Court about that if he didn't like what you
15 said, he would --
16     THE COURT: Oh, he was in the back of the
17 room. Yes, I do remember. Yes, he did have extreme
18 problems. In fact, I think he resolved that he might
19 just disagree with the Court. I'll excuse him as
20 well. Mr. Barkley.
21     MR. TEAGUE: Thank you, Your Honor.
22     THE COURT: Anyone else?
23     MR. BRUNSON: There's a couple of others
24 that stated they would believe law enforcement
25 officers over regular witnesses that I think the Court

Multi-Page™

Page 106

1  should consider. First of all, Edward Steen.
2       THE COURT: I'll ask him more about what he
3  said. I think Mr. Feaga raised an important point.
4  The question is could he follow the Court's
5  instructions.
6       MR. BRUNSON: Yes, Your Honor.
7       There is one other for the Court's
8  consideration. Lowell McGown.
9       THE COURT: What did Mr. McGown say?
10      MR. BRUNSON: He said the same thing.
11      THE COURT: Okay. We'll talk to him in
12 private.
13      Yes?
14      MR. TEAGUE: Your Honor, I had two other
15 motions to strike for cause. Jennifer Scott and
16 Johnny Oates, Junior both stood and indicated that
17 notwithstanding -- as I read it, notwithstanding the
18 Court's admonishment about the defendant's right to
19 remain silent and not take the witness stand --
20      THE COURT: Yeah, there was one that said
21 she could not or he could not put that aside.
22      MR. TEAGUE: There were two.
23      THE COURT: Who are they?
24      MR. TEAGUE: Jennifer Scott is the woman.
25      MR. FEAGA: She didn't say she couldn't, she

Page 107

1  said that she would have trouble with that.
2       THE COURT: The gentleman said that he
3  couldn't.
4       MS. CHARTOFF: Johnny Kirkland Oates.
5       THE COURT: Yes, Mr. Oates is excused.
6       MS. JAMES: Judge, with regard to the
7  female, you repeatedly tried to --
8       THE COURT: Right. I'll interrogate her in
9  private and just make sure what her feelings are.
10      Anyone else who unequivocally said they
11 could not be a fair juror? I just want to get the
12 unequivocals out first, then we'll take some of the
13 more ambiguous ones up.
14      MS. JAMES: Judge, do you want us to hold
15 the others that we would have on the hardships and
16 things of that nature?
17      THE COURT: Yes, we'll take that up later as
18 well.
19      Are there any hardships you can agree on?
20      MS. WAYNE: The woman that has the child,
21 the thirty year old retarded child that she says only
22 she and her mother are able to take care of her.
23      MR. FEAGA: I think my question about that
24 was that there were just a few that said -- that most
25 of them were saying if it was over a week or two weeks

Page 108

1  it could become a problem.
2       THE COURT: There was a woman who stood and
3  said that she had the child.
4       MS. JAMES: That was Miss Nelson. She said
5  that -- She just really was adamant she didn't want to
6  be away from her children, and that --
7       THE COURT: Now wait a minute, that's a
8  different woman here who talked about her children.
9  There was a woman over here who said she had the
10 retarded child, and we can ask her more about that.
11      MS. MORRIS: Mr. Jonathan, juror number one
12 forty-eight.
13      THE COURT: Yes. And there was the woman
14 who I also thought started school. She was the
15 teacher. She needed credit and she wasn't sure if she
16 could get credit if she served on the jury panel.
17      MS. JAMES: That was Miss Kirkland.
18      MR. FEAGA: But that, Judge, was if it went
19 on for lengthy period of time.
20      THE COURT: Well we'll take those up after
21 lunch, then.
22      Okay. I've excused I think two or three
23 already, Miss Carnes?
24      COURTROOM DEPUTY CLERK: Yes, sir. Juror
25 Ferris, Barkley and Johnny Oates.

Page 109

1       THE COURT: Very good.
2       We'll take up the rest at one-fifteen. So
3  we can call them back and clarify some of these
4  issues.
5       Court's in recess until one-fifteen.
6       (Whereupon, the luncheon recess was
7  taken.)
8       THE COURT: Do we have all the jurors back?
9       COURTROOM DEPUTY CLERK: I believe so, Your
10 Honor.
11      THE COURT: Now there were several jurors
12 who mentioned that they had served on the grand
13 juries. Who are they? Do you remember, Counsel who
14 they are? I think there were three. Two or three?
15      COURTROOM DEPUTY CLERK: Yes, sir.
16      MR. BRUNSON: Miss Ingram.
17      Would those jurors please stand who served
18 on grand juries. Not juries, but grand juries. Not
19 regular juries, but grand juries. What was your name
20 again?
21 A  Oscar Vaughn.
22 A  Gwenda Ingram. I may have misunderstood because
23 it was a trial jury.
24      THE COURT: It wasn't a grand jury it was a
25 trial jury? Okay, I'm talking about a grand jury now.

Multi-Page™

Page 110

1 And you served on a grand jury?
2 A  Barbara Scott.  I think it was the Elmore County
3 grand jury.
4     THE COURT:  Right.  Okay.  Counsel, we will
5 take these two jurors up in the back room.  If you'll
6 come forward.  Counsel, I'll see you back here.
7         IN-CHAMBERS INDIVIDUAL SEGREGATED
8         VOIR DIRE OF THOSE JURORS WHO
9         SERVED ON GRAND JURIES:
10     (In-chambers segregated voir dire of Barbara
11 Scott.)
12     THE COURT:  Would you give us your name
13 again?
14 A  Barbara J. Scott.
15     THE COURT:  Okay.  Now you served on a grand
16 jury, is that correct?
17 A  The Elmore County.
18     THE COURT:  Elmore County grand jury.
19 A  Mm-hmm.
20     THE COURT:  From what you've heard today,
21 nothing involving this case came before the Elmore
22 County grand jury?
23 A  That's right.
24     THE COURT:  Thank you very much.
25     Do you all have any other questions

Page 111

1 regarding just this matter?
2     MR. FEAGA:  None from the United States.
3     MR. TEAGUE:  I wanted to ask her one little
4 short question.
5     THE COURT:  Yes.
6     MR. TEAGUE:  You went to the Elmore County
7 courthouse for that service, didn't you?
8 A  That's right.
9     MR. TEAGUE:  Okay, thank you.
10     MS. WAYNE:  How long did you serve?
11 A  For two weeks.
12     MS. WAYNE:  And do you recall what the case
13 involved?
14 A  I mean there were several of them.
15     THE COURT:  Yeah, I'm sure there were a ton
16 of them.
17     MS. WAYNE:  Did any of those cases involve
18 drug cases?
19 A  Yes.
20     MS. WAYNE:  And you recall hearing testimony
21 on those cases?
22 A  Yes.
23     MS. WAYNE:  Mainly from police officers?
24 A  Yes.
25     MS. WAYNE:  Do you recall ever not bringing

Page 112

1 back an indictment on any of those?
2 A  No.  We did on everything.
3     MS. WAYNE:  You indicted everybody?
4 A  Mm-hmm.
5     MS. WAYNE:  Were you the foreperson of the
6 grand jury?
7 A  No.
8     MS. WAYNE:  Okay.  And I'm sorry, how long
9 ago was that?
10 A  That's been about four years.
11     MS. WAYNE:  Okay.  In this case you're going
12 to hear that the defendants were indicted by a grand
13 jury.  How do you feel about that in terms of the
14 evidence?
15 A  I'm not really sure because, I mean, it seemed
16 like enough evidence, you know, that when we brought
17 our, so --
18     MS. WAYNE:  And that's our concern, is your
19 experience is obviously going to be different as a
20 juror if you were a juror than other jurors because
21 you have a little bit more knowledge about kind of the
22 inside workings.  And I'm wondering whether or not
23 that might influence the fact that -- Your experience
24 is you brought back true bills.
25     MR. FEAGA:  Your Honor, we object to that.

Page 113

1 Of course everything somebody does in their life will
2 influence them.
3     THE COURT:  I think she's entitled to find
4 out if she can put aside, you know, that experience.
5     MS. WAYNE:  Yeah, and that's what I'm trying
6 to get at.
7 A  Yeah, the experience we had, I mean, it would
8 look like we had enough evidence, you know, to go on
9 with it.  That's what we were is there for.
10     MS. MORRIS:  Ms. Scott, You would agree
11 though that often, or sometimes, there might not have
12 been enough evidence.  And at that time y'all wouldn't
13 just have automatically true billed it, right?
14 A  That's correct.
15     THE COURT:  But the really important issue
16 here is, the fact that there has been an indictment
17 should not affect your deliberations in this case.
18 You will base it solely on the evidence that's
19 presented.  Will you do that?
20 A  I mean I will try, but I mean, you know, like I
21 said the experience I had there, it might be hard to.
22     THE COURT:  Might be hard to what, now?
23 A  To put that aside because most everybody, you
24 know, we had enough evidence for them to go on.
25     THE COURT:  Right.  But you have to put that

Multi-Page™

<table>
<tr><td>

Page 114

1 aside. Can you put that aside and decide this case
2 based solely on the evidence you hear in this court
3 and not consider the fact that he was indicted by
4 another grand jury? That's not a factor in your
5 decision in this case. You'll have to decide this
6 case based solely on the evidence. Can you do that?
7 If you have some hesitancy about it you need to tell
8 us now.
9 A Well I do.
10    THE COURT: Okay.
11 A But I mean I feel like I could, but I mean I
12 couldn't be positive that -- It's just hard, you know,
13 when you set in there and served and you've seen the
14 evidence. And I know you're talking about him. I
15 mean I haven't seen it, so --
16    THE COURT: Right, you haven't seen the
17 evidence against from Carmichael, whatever evidence
18 there is. What I'm asking you to do, can you put out
19 of your mind the fact that he's been indicted by a
20 grand jury and not let that play any role in your
21 decision?
22 A I don't think I can.
23    THE COURT: Okay. Thank you very much.
24    (Whereupon, Juror Scott was escorted out of
25 chambers.)

</td><td>

Page 116

1 A Six months.
2    MS. WAYNE: Here in Montgomery?
3 A Right.
4    MS. WAYNE: How long ago was that?
5 A I believe the term ended in October.
6    THE COURT: Of last year?
7 A Yeah, right.
8    MS. WAYNE: So it's just been recently.
9 A Right.
10    MS. WAYNE: Okay. And in your service, did
11 you have the opportunity to indict?
12 A Yes.
13    MS. WAYNE: Did you ever not indict?
14 A Yes.
15    MS. WAYNE: Okay. And do you recall how
16 many times you did not indict?
17    MR. FEAGA: Your Honor, I'll object.
18    THE COURT: I'll sustain that. We don't
19 need to get into that.
20    MS. WAYNE: How would you characterize the
21 majority of the cases that you sat on?
22    MR. FEAGA: Your Honor, object to that
23 question.
24    THE COURT: Did you do drug cases? Cases
25 involving drugs?

</td></tr>
<tr><td>

Page 115

1    THE COURT: Miss Scott is excused for cause.
2    Who is next?
3    COURTROOM DEPUTY CLERK: Ingram.
4    (Whereupon, Juror Vaughn escorted into
5 courtroom.)
6    THE COURT: Would you give us your name.
7 A Oscar Vaughn.
8    THE COURT: Okay. Now You said you had
9 served on a grand jury here before.
10 A Here in federal court.
11    THE COURT: Here in federal court? Okay.
12 Could you completely put aside your experience there
13 and the fact that you had served there and decide this
14 case based solely on the evidence that's presented
15 during the trial?
16 A Sure.
17    THE COURT: So in other words the fact that
18 these defendants have been indicted would not play a
19 role in your decision as to whether they're guilty or
20 innocent?
21 A Absolutely not.
22    THE COURT: Great.
23    Any more questions?
24    MS. WAYNE: Mr. Vaughn, how long did you
25 serve as a grand juror?

</td><td>

Page 117

1 A Right.
2    THE COURT: One other clear question. You
3 did not hear anything about this case, did you?
4 A No, I didn't.
5    THE COURT: Okay. Very good.
6    MS. WAYNE: And in terms of your sitting,
7 were any United States Attorneys, did you recognize
8 any of the names of any of the individuals in the
9 office that were involved in your grand jury service?
10 A The names?
11    MS. WAYNE: Mm-hmm, that presented the
12 cases.
13 A Right. I didn't recognize any names. I
14 recognized faces.
15    MS. WAYNE: You did?
16 A Mm-hmm.
17    MS. WAYNE: Any that are involved in the
18 case now?
19 A This gentleman here is the only one.
20    MS. WAYNE: Okay. And when you're talking
21 about Mr. Feaga, you're talking about he was actually
22 a U. S. Attorney that was presenting the case that you
23 were a grand juror on?
24 A Right.
25    MS. WAYNE: Okay. Do you remember how many

</td></tr>
</table>

Page 118

1 of those cases?
2 A They alternated. I have no idea.
3 MS. WAYNE: Okay. Let me ask you this. On
4 the case that he presented on, did you return an
5 indictment?
6 A I don't remember that.
7 MS. WAYNE: Okay. Anybody else?
8 Miss Morris or Mr. Moorer?
9 THE COURT: Where is Mr. Moorer? Do you
10 remember Mr. Moorer?
11 A No, I don't. The other juror gentleman that was
12 sitting with them? No, I don't remember him.
13 THE COURT: Now in light of the fact that
14 you remember their presenting cases to you while you
15 were on the grand jury, can you completely put that
16 out of your mind and decide this case based only on
17 the evidence?
18 A It would have nothing to do with it. Yes, sir.
19 THE COURT: Very good. Thank you.
20 Anything else?
21 MS. WAYNE: I guess the only other question,
22 any of the other officers that we've talked to, a lot
23 of names went out today, you've had a chance to now
24 think about them over lunch, do you recognize any of
25 those officers or police officers that were involved

Page 119

1 in any of your cases?
2 A No.
3 MS. WAYNE: Okay. How would you describe
4 your experience as a grand juror?
5 MR. FEAGA: Your Honor, we object to that.
6 THE COURT: I'll allow that.
7 You mean was it a pleasant experience?
8 MS. WAYNE: Yeah.
9 THE COURT: Do you harbor any strong
10 feelings?
11 A No. It was enlightening, the process.
12 MS. WAYNE: You learned a lot about the
13 system?
14 A I sure did. Sure did.
15 THE COURT: Anything else?
16 (Whereupon, there was no response.)
17 THE COURT: Thank you very much, sir.
18 (Whereupon, Juror Vaughn was escorted out of
19 chambers.)
20 THE COURT: Now we had some hardship cases
21 that we wanted to take up.
22 MS. WAYNE: Judge, I'm going to challenge
23 Mr. Vaughn for cause.
24 THE COURT: What's the basis?
25 MS. WAYNE: The basis is that this is not an

Page 120

1 impartial juror. This is someone who sat on a grand
2 jury recently, as late as October, for six months in
3 many drug cases with one of the prosecutors who is the
4 lead prosecutor in this case. And regardless of
5 whether he can say he set that aside, there's a
6 hundred other jurors out there who have not had that
7 same experience who don't bring the same thing to the
8 table.
9 It's taking a huge chance. He's been
10 involved in the system. He knows a lot more about the
11 system. The grand jury indictment in this case is a
12 big deal. The prejudice would be that they're going
13 to hear about Mr. Dejohn, Mr. Timmons and a number of
14 other witnesses who appeared in many grand jury
15 proceedings and he will have inside knowledge as to
16 how the grand jury brings back a bill, what happens in
17 the grand jury, and that clearly goes to their ability
18 to prove this case beyond a reasonable doubt.
19 So it alleviates their burden. The
20 presumption of innocence and it affects all of those
21 things. And we would strenuously object and ask that
22 he be challenged for cause.
23 THE COURT: Let me hear from the government.
24 MR. FEAGA: Your Honor, we simply disagree.
25 I don't remember this gentleman and he didn't remember

Page 121

1 the cases that I presented. Nothing has changed other
2 than the fact that he sat on the grand jury. They
3 know that ever one of the Assistant United States
4 Attorneys that came in there presented cases to the
5 grand jury. But there is nothing different about this
6 case than any other case, and the mere fact that he
7 sat on a grand jury where I presented a case doesn't
8 present a challenge for cause.
9 THE COURT: I'd like to look at something
10 while we complete this, and you may want to have one
11 of your people who are working with you do that.
12 That question about whether he sat on a
13 grand jury within the last two years, I'm not quite
14 sure what the purpose of that question is. And I'm
15 concerned there may be an automatic disqualification
16 and I'd like to research that first.
17 (Whereupon, Mr. Moorer entered chambers.)
18 THE COURT: So my law clerk will be looking
19 at it right now. You all can look at that issue too,
20 but I'll reserve for right now.
21 MR. FEAGA: All right, sir.
22 MS. CHARTOFF: Your Honor, I had a question,
23 and I don't know if this needs to be a part of the
24 record. Is there somewhere that I can get on line
25 here in the courthouse to do research?

Multi-Page™

| Page 122 | Page 124 |

**Page 122**

1  THE COURT: That I don't know. You'll have
2  to ask Miss Carnes.
3  MS. WAYNE: We have a wireless, Judge, and I
4  was trying to get on Westlaw.
5  THE COURT: There is an attorney conference
6  room.
7  COURTROOM DEPUTY CLERK: There is an
8  attorney room and I believe it has a computer in it.
9  THE COURT: I think so. I think it has a
10 computer outlet.
11 COURTROOM DEPUTY CLERK: Should have, if
12 it's operative.
13 THE COURT: You all should look at that as
14 well. But that is a fairly standard question, and I
15 don't know whether that's a disqualification question
16 or not.
17 Okay. We'll start with the undue burdens.
18 Who do we have first?
19 MS. WAYNE: I didn't bring that notebook in.
20 I'm sorry, Judge. Let me just run and get my list,
21 Judge.
22 (Whereupon Ms. Wayne exited chambers and
23 returned shortly thereafter.)
24 MS. WAYNE: Okay, Judge.
25 IN-CHAMBERS SEGREGATED VOIR DIRE

**Page 123**

1  OF JURORS WITH UNDUE PERSONAL HARDSHIPS:
2  THE COURT: Who are the hardships?
3  COURTROOM DEPUTY CLERK: Personal hardship,
4  Sidney Yancey.
5  (Whereupon, there was an off-the-record
6  discussion.)
7  THE COURT: We'll start down the list. Who
8  do you have, Miss Carnes, first?
9  COURTROOM DEPUTY CLERK: Sidney Yancey.
10 THE COURT: Does anyone remember what Yancey
11 said?
12 MS. MORRIS: I wrote down "work on her
13 mind."
14 THE COURT: I think she said it would just
15 be in the back of her mind.
16 MS. JAMES: She said she worked for a
17 doctor. Wasn't she over here, like in the very first
18 pew? She said she worked for a doctor and she does
19 billing and she wouldn't be able to get the billing
20 out and she'd worry about the money not coming in.
21 MS. MORRIS: If I recall correctly, and
22 y'all correct me, I recall her saying that two weeks
23 would be okay, but after two weeks she was going to
24 have an issue. So ---
25 MS. JAMES: A lot of them said that.

**Page 124**

1  MS. MORRIS: Yeah, but like, hey --
2  MS. JAMES: But the dilemma with those, of
3  course, is if it goes over into that week then you
4  have half your jury saying --
5  THE COURT: Well, we may not have half the
6  jury; that's why we have alternates, too. This trial
7  isn't going to last but two weeks.
8  Do you wish to bring her in?
9  MS. WAYNE: Do you promise?
10 MS. MORRIS: I'm on his team.
11 THE COURT: Do you wish to bring her in?
12 Anything else you want to bring out about her? I
13 don't see any reason to disqualify her.
14 (Whereupon, there was no response.)
15 THE COURT: Okay, who is next?
16 COURTROOM DEPUTY CLERK: Janet Payne.
17 THE COURT: What did Miss Payne say?
18 MS. JAMES: She's the dental hygienist who
19 is worried about her dentist not making eight thousand
20 dollars a day if she's not there.
21 THE COURT: Okay. They should have been
22 aware that we were going to have a two week term.
23 They were told that. Do you wish to bring her back?
24 MS. JAMES: No, sir.
25 THE COURT: Does anyone wish to inquire

**Page 125**

1  further? I see no reason to disqualify her.
2  (Whereupon, there was no response.)
3  THE COURT: Go down the list.
4  COURTROOM DEPUTY CLERK: Mary Loy. She had
5  a trip or something.
6  MS. JAMES: She's more problematic.
7  THE COURT: Yeah, she's the one who had the
8  tickets.
9  MS. JAMES: Nonrefundable.
10 THE COURT: Yes. Why don't we inquire about
11 that a little bit more. Bring her back, Ms. Carnes.
12 MS. MORRIS: Does anybody have a number on
13 here?
14 MR. FEAGA: Nineteen.
15 MS. MORRIS: Thank you.
16 MR. BRUNSON: Judge, I think she also
17 acknowledged the fact that she had seen publicity.
18 Did the Court want to take up --
19 THE COURT: Oh, okay.
20 MS. JAMES: We have a lot of those.
21 THE COURT: If there's an overlap there
22 let's go head and do it.
23 (Whereupon, Juror Loy was escorted into
24 chambers.)
25 THE COURT: Would tell us your name?

Page 126

1 A Mary B. Loy.
2     THE COURT: Now I believe you said that you
3 might have a hardship even for the two weeks that the
4 case is --
5 A Yes, starting the 15th.
6     THE COURT: Okay. And you have
7 nonrefundable tickets?
8 A Yes I do.
9     THE COURT: Okay. Where are these tickets
10 to?
11 A It's in Mobile. Out of Mobile. I'm not out of
12 state, no.
13     THE COURT: It's to mobile?
14 A Yes.
15     THE COURT: Where are the tickets, though?
16 A It's not tickets. It's a registration fee I had
17 to pay and a hotel reservation.
18     THE COURT: What is this for?
19 A It's a state tennis tournament.
20     THE COURT: You're on the tennis team
21 itself?
22 A Yes.
23     THE COURT: And it starts on the 15th and
24 goes until when?
25 A Until the 19th.

Page 127

1     THE COURT: How much money did you have to
2 submit?
3 A Probably a couple of hundred dollars.
4     THE COURT: You were informed, though,
5 weren't you, that --
6 A Yes, I called but they told me to come anyway.
7     THE COURT: I see. Okay.
8     Now I believe you stood and said you heard
9 something about --
10 A Yes, I heard.
11     THE COURT: Would you tell us what you heard
12 or read.
13 A I heard the T V and news, I've read a lot about
14 the case.
15     THE COURT: Do you remember sort of
16 generally what you read?
17 A I know that -- I vaguely remember that DeJohn was
18 somehow connected with it. His cover was over, was
19 blown or something like that.
20     THE COURT: Do you know DeJohn?
21 A No, just read.
22     THE COURT: You just read about it?
23 A Yeah.
24     THE COURT: Could you completely put out of
25 your mind what you heard or read on the news and

Page 128

1 decide this case based solely on the evidence
2 presented?
3 A It would be very hard because it's been all over.
4 You know, I guess I would be a little biased because
5 I've read so much in the newspaper and on the T V
6 also.
7     THE COURT: What do you mean by "biased"?
8 A Well, I mean it's more, you know, like I guess I
9 kind of had formed an opinion.
10     THE COURT: You did form an opinion?
11 A Yes.
12     THE COURT: And what was your opinion?
13 A That he was guilty.
14     THE COURT: Okay. Could you put aside that
15 opinion?
16 A I would try.
17     THE COURT: You would try. But you
18 understand he's innocent until the government proves
19 otherwise?
20 A Yes, I understand.
21     THE COURT: Any other questions?
22     MS. JAMES: May I ask a couple?
23     THE COURT: Yes.
24     MS. JAMES: You said you had read a good bit
25 about it and you specifically said that you read about

Page 129

1 DeJohn's cover being blown.
2 A And I read about the drug trafficking also.
3     MS. JAMES: I'm not going to tell you
4 anything else. If you will, if there were other
5 things that you read, like other topics, would you
6 tell us about that, too? Like any other topic that
7 might have been related to Mr. Carmichael.
8 A I couldn't tell you.
9     MS. JAMES: Okay. So you've just basically
10 read about the charges and Agent DeJohn.
11 A Mm-hmm, yeah.
12     MS. JAMES: Okay.
13     THE COURT: Now if you were to sit on the
14 jury and while hearing the evidence you suddenly
15 remembered that there was something else that you had
16 read, would you be able to completely put that out of
17 your mind? Sometimes things trigger our memories --
18 A I know what you mean. I don't know. I don't
19 know.
20     THE COURT: Okay. Thank you very much.
21     Did anyone have any questions?
22     MS. JAMES: We did have a follow-up, if we
23 may.
24     THE COURT: Yes.
25     MS. JAMES: Do you remember when was the

Multi-Page™

Page 130

1 last article that you may have read, or the last T V
2 coverage you may have heard or radio coverage?
3 A  Probably a couple of months ago.  A month ago.  I
4 kind of -- The last couple of months I have been at
5 work.
6     MS. JAMES:  And when you said you had kind
7 of formed an opinion about guilt, do you know how long
8 ago you may have formed that opinion?
9 A  Probably, you know, I read and seen about it
10 before then so, you know, it just kind of was all
11 leading up to that.
12     MS. JAMES:  How long before you came in
13 here, though, today would you say it had been since
14 you had is that opinion?
15 A  A couple of months.
16     MS. JAMES:  Okay.  Thank you.
17     MR. TEAGUE:  Your Honor, may I ask?
18     THE COURT:  Yes.
19     MR. TEAGUE:  Do you have any recollection of
20 any news you may have seen, heard, read concerning
21 codefendant Freddie Williams?
22 A  Not really.
23     MR. TEAGUE:  Thank you.
24     THE COURT:  Thank you very much.
25     (Whereupon, Juror Loy was escorted out of

Page 131

1 chambers.)
2     THE COURT:  Anything else about this juror?
3 Any requests?
4     MS. JAMES:  Judge, I do have a request
5 because this is going to be a long process.  If you
6 could mention to these people that they're not to
7 discuss anything that they have heard or read with the
8 other jurors when they go back out there.
9     THE COURT:  Yes, that's a good idea.
10     MS. WAYNE:  But I'm going to challenge her
11 for cause, but let me tell you why.  Because based
12 upon the case law in terms of if they formed an
13 opinion how long they have had that opinion and how
14 long before they came to court did they have that
15 opinion based upon what they have read and saw, and
16 she said she's had an opinion, she formed it and it's
17 been several months and the opinion was of guilt.  And
18 that's based upon what she's seen.
19     We're taking a chance when we say to her can
20 you put that aside despite the fact that what happens
21 is that they try to put it aside, then they hear the
22 evidence, it's in conflict with what they saw and they
23 read --
24     THE COURT:  I understand.  What does the
25 government say?

Page 132

1     MR. FEAGA:  We don't think that her opinion
2 was so firmly held that -- She indicated to the Court
3 she could put it aside.  She said she could put the
4 opinion aside.  And also the questions that were asked
5 were directed towards the publicity associated with
6 Detective DeJohn.  That's what she said she heard.
7 She was talking about Detective DeJohn and whether or
8 not his cover had been blown, which relates to that
9 other case.
10     THE COURT:  I thought her last answer,
11 though, was she didn't know, when I asked her if she
12 could put it aside.
13     MR. BRUNSON:  It was.
14     MS. JAMES:  She also said she had read about
15 the drug organization.
16     THE COURT:  Cumulatively I think I'm going
17 to grant the disqualification, not only for the
18 disqualification but I think she has formed an
19 opinion.  And even in the instance where she said, and
20 I note at the beginning that she thought she could put
21 aside her opinions, she hesitated dramatically and at
22 the end she just said she didn't know whether she
23 could do it.
24     MR. FEAGA:  My concern is, just for the
25 record, was that some of that may have been motivated

Page 133

1 by the fact that she wanted to go to the tennis
2 tournament.
3     THE COURT:  To be honest with you, I have I
4 feeling that that's true, but that may be a good
5 reason to let her off too.  I thought about maybe she
6 was trying to get off of jury duty.  Unfortunately, I
7 have to rely on her answers.  I think your instincts
8 may be correct, but I don't know whether they're true.
9 Bring in the next juror.
10     COURTROOM DEPUTY CLERK:  Alice Washington.
11     THE COURT:  So what is her hardship?
12     MS. JAMES:  She has a ninety-two year old
13 mother.
14     THE COURT:  Right.
15     MS. JAMES:  That she cares for.
16     THE COURT:  She and her grandmother -- no,
17 I'm thinking of another.
18     MS. CHARTOFF:  She and her brother.
19     MS. JAMES:  She's called her brother, but --
20     (Whereupon, Juror Alice Washington was
21 escorted into chambers.)
22     THE COURT:  How are you doing, ma'am?
23 A  Hi.  How are you?
24     THE COURT:  Would you give us your name.
25 A  Alice Washington.

Multi-Page™

Page 134

1    THE COURT: Miss Washington, you said that
2 you had a ninety-two year old mother?
3 A Yes, sir.
4    THE COURT: And you said that you had talked
5 to your brother about taking care of her?
6 A Right.
7    THE COURT: Now you understand this trial
8 will last two weeks. Can you make arrangements for
9 your brother to take care of your mother? Or
10 grandmother, is it?
11 A My mother. He lives in Atlanta, and I would have
12 to just let him know tonight.
13    THE COURT: But otherwise you could
14 accommodate that hardship?
15 A Right.
16    THE COURT: Thank you very much.
17    Now had you read or heard anything about
18 this case?
19 A No, I hadn't.
20    THE COURT: Okay. Thank you very much.
21    Any other questions?
22    MR. MOORER: Your Honor, there is a
23 follow-up question related to that.
24    THE COURT: Let's go ahead and ask her all
25 the questions while she's back here.

Page 135

1    MR. MOORER: There was an answer to one of
2 your questions in your profile that I wanted to get --
3 I can't recall the precise question, but the question
4 was -- I can't recall your precise answer, but your
5 answer to the question on the questionnaire about do
6 you have any close member of your family or yourself
7 who ever had a problem you would attribute to drugs or
8 alcohol.
9 A I answered yes, I do.
10    THE COURT: Would you tell us about that.
11 A I have a son that had a drug problem, and he's
12 been in rehab. As a matter of fact, he had a relapse.
13 He was clear for five years and he relapsed January of
14 this year. He's back into the program and he's doing
15 fine now.
16    THE COURT: Could you completely put out of
17 your mind that personal experience and decide this
18 case based only on the evidence?
19 A I think I can.
20    THE COURT: Okay. And you wouldn't take
21 what happened to your son either against the
22 government or the defendants? You wouldn't hold it
23 against them?
24 A No.
25    THE COURT: Do you all have any questions?

Page 136

1    MS. MORRIS: He wasn't arrested for
2 possession or anything like that?
3 A No. He's just a user.
4    MS. MORRIS: And he's better now?
5 A Yes, he is.
6    MS. MORRIS: Do you know what kind of drugs?
7 A I think some or all of it he was exposed to.
8    MS. MORRIS: Okay.
9 A I don't know directly. I think it was -- I know
10 he had marijuana, crack, and I think he had some
11 cocaine.
12    MS. MORRIS: Okay, that's fine.
13    MS. WAYNE: Miss Washington, my client
14 obviously has been accused of distributing drugs. And
15 our concern is because of your experience with your
16 son, is that accusation may bring up these feelings of
17 looking over at Mr. Carmichael and feeling like, you
18 know, I'm going to hold that against him because of
19 what happened to my son.
20 A No, I wouldn't personally hold him responsible
21 for him.
22    MS. WAYNE: Okay. I just -- What we want to
23 make sure is you don't have an axe to grind. Because
24 of what happened to your son, my client is accused of
25 distribution and you're going to say I don't care who

Page 137

1 it is, my son -- somebody needs to pay for what
2 happened to my son.
3 A I don't think so.
4    MS. WAYNE: Okay.
5 A I do have feelings, you know, that are -- I feel
6 bad, you know, because my son was caught up in the
7 drugs, but, you know, I can't just go out and
8 personally label everybody as being responsible.
9    MS. WAYNE: All right, thank you.
10    THE COURT: Thank you very much.
11    (Whereupon, Juror Washington was escorted
12 out of chambers.)
13    THE COURT: Who is next?
14    COURTROOM DEPUTY CLERK: Sharon Strickland.
15    THE COURT: Ms. Strickland.
16    MS. MORRIS: Anybody have a number on
17 Strickland?
18    MS. WAYNE: Number forty-three.
19    MS. MORRIS: Thank you.
20    (Whereupon, Juror Sharon Strickland was
21 escorted into chambers.)
22    THE COURT: How are you doing, Ms.
23 Strickland?
24 A Fine.
25    THE COURT: Would you give us your full

Page 138

1 name?
2 A Sharon Fisher Strickland.
3     THE COURT: Now, Ms. Strickland, I believe
4 you said that you had a hardship problem, is that
5 correct?
6 A Yeah. I'm facing oral surgery.
7     THE COURT: When is that?
8 A June the 29th.
9     THE COURT: How many days away is that?
10     MS. MORRIS: Three weeks.
11 A Yeah. I said if this is -- I deliberately
12 cleared for this two weeks. I'm prepared for these
13 two weeks. My grandmother is ninety-five years old,
14 I've made arrangements for that. My husband's work
15 area has agreed to let him go home early and let him
16 finish work.
17     So if it's just this week and that week I
18 have absolutely no problem.
19     THE COURT: Now the third week, what is your
20 problem with the third week?
21 A I have other medical issues and I have to go
22 through something through my eyes. My husband is also
23 facing surgery.
24     THE COURT: Now you said the 29th?
25 A Yeah, for me. But I am going to have other --

Page 139

1 You know, my husband is going to be facing surgery and
2 he at the end of July has to go away for a week.
3     THE COURT: This is July or June?
4 A At the end every July he goes away for a week.
5 But you figure his surgery, I still have to go in for,
6 you know, the annual female thing and trying to do
7 that within a month will make it a little tough.
8     I did plan for these two weeks. I was
9 prepared for it. I even packed a bag in case we got
10 sequestered. I was perfectly willing, but when she
11 said more than two weeks, I'm going, um --
12     THE COURT: Have you heard or read anything
13 about this case?
14 A No. In fact, it was surprising because I always
15 listen to the evening news. I was surprised I hadn't
16 even heard about it.
17     THE COURT: Where are you from?
18 A Montgomery.
19     THE COURT: Any other questions?
20     MS. CHARTOFF: Which newscast do you listen
21 to, ma'am?
22 A I listen to Channel Eleven.
23     MS. CHARTOFF: W. S. F. A.?
24 A Mm-hmm.
25     MS. CHARTOFF: How often do you listen to

Page 140

1 it?
2 A I always listen to the ten o'clock news.
3     MS. CHARTOFF: Every night?
4 A Every night because I want to know how the
5 weather is going to be and how the Biscuits are doing.
6 We have season tickets.
7     THE COURT: If you were selected to serve on
8 this jury and some evidence triggered your memory of
9 what you heard on the news, could you completely put
10 out of your mind what you heard on the news and decide
11 this case based only the evidence you hear here in
12 court?
13 A Your Honor, I believe in the Constitution
14 strongly, and the Constitution says they are innocent
15 until proven guilty. And that's exactly, you know --
16 If that's what we've got is the Constitution, and if
17 we can't follow the Constitution -- I strongly believe
18 in the Constitution.
19     THE COURT: Thank you very much. Okay.
20     Any other questions?
21     MR. FEAGA: Not from the United States, Your
22 Honor.
23     THE COURT: Thank you.
24     (Whereupon, Juror Strickland was escorted
25 out of chambers.)

Page 141

1     THE COURT: Does anyone have any problems
2 with her third week?
3     MS. JAMES: I think she's into actually the
4 fourth week by the 29th.
5     THE COURT: Well she said there was a
6 problem with that third week, too.
7     MS. MORRIS: Quite honestly, I've got a
8 trial specially set with Judge Albritton in the third
9 week with Judge Albritton.
10     THE COURT: Well, I'll hold you in contempt.
11 Either way you go to jail.
12     Who is next, Ms. Carnes?
13     COURTROOM DEPUTY CLERK: Joseph Gauntt.
14     THE COURT: What is with Mr. Gauntt?
15     MS. JAMES: He said he'd have a problem if
16 he was sequestered.
17     THE COURT: Oh. I told him we were not
18 being sequestered. Is that all he said?
19     MS. WAYNE: I think so.
20     (Whereupon, an off-the-record discussion was
21 held.)
22     (Whereupon, Juror Guantt was escorted into
23 chambers):
24     THE COURT: How are you doing?
25 A All right.

Multi-Page™

## Page 142

1     THE COURT: And you are Mr.--
2 A Joseph Gauntt.
3     THE COURT: Now, Mr. Gauntt, I believe you
4 said -- Were you the one who was concerned about being
5 sequestered?
6 A No. I made a comment about it, yes.
7     THE COURT: You said that might be a problem
8 if you were sequestered?
9 A Right.
10     THE COURT: You understand you are not going
11 to be sequestered?
12 A Right.
13     THE COURT: You can go home every night and
14 so forth.
15     Did you have any other hardship problems?
16 A No, sir.
17     THE COURT: Have you heard or read anything
18 about this case?
19 A I was just watching W. F. S. A. one time. And it
20 was -- I don't even remember how long ago it was.
21 Maybe a couple of months ago.
22     THE COURT: Do you remember what you heard?
23 A It was just something about it was a drug case.
24 And I remember marijuana drug case. I don't remember
25 very much.

## Page 143

1     THE COURT: Could you completely put out of
2 your mind what you heard or what you -- If something
3 should trigger your mind later, could you put that out
4 of your mind and decide this case based solely on the
5 evidence you hear in the courtroom?
6 A Sure. I mean, I don't think I have a problem
7 with that.
8     THE COURT: Okay. Any other questions for
9 this juror?
10     MS. JAMES: I do.
11     MR. FEAGA: None from the United States.
12     MS. JAMES: Mr. Gauntt, you said you heard
13 something on W. S. F. S. A. about a drug case. Did
14 you specifically hear anything referencing Mr.
15 Carmichael?
16 A Yes, ma'am. I remember his name mentioned with,
17 you know, just some kind of drug case. I don't even
18 remember the details. I just remember, you know, it
19 rang a bell when you asked the question.
20     MS. JAMES: So you don't remember if it
21 mentioned any other people, or --
22 A No, ma'am.
23     MS. JAMES: Did the fact that you heard
24 that, would that -- did that cause you to form any
25 opinion about guilt or innocence?

## Page 144

1 A From the question this morning or from when I
2 watched it on the news?
3     MS. JAMES: From when you watched it on the
4 news.
5 A Oh, on the news?
6     MS. JAMES: Yes.
7 A I didn't really form an opinion one way or
8 another. I mean, I just saw it on the news. I just
9 happened to catch it. It's like anything else, you
10 know, it kind of goes in one ear and out the other.
11 But when you asked the question, it just kind of rings
12 a bell.
13     THE COURT: Have you formed any opinion
14 about this case?
15 A No, sir.
16     THE COURT: Okay. Thank you.
17     (Whereupon, Juror Gauntt was escorted out of
18 chambers.)
19     OPEN COURT:
20     THE COURT: Members of the jury panel, I
21 just want to say to you when we call you back here and
22 we ask you questions, when you come back out you
23 should not tell the other members of the jury panel
24 what we talked about back here. I think the reason is
25 obvious, that's why we're having it back here is

## Page 145

1 because we don't want the other members to know about
2 it.
3     (Laughter.)
4     THE COURT: So don't talk about the
5 questions or answers that you gave back here in the
6 back room.
7     Thank you.
8     IN-CHAMBERS SEGREGATED
9     INDIVIDUAL VOIR DIRE (CONTINUING):
10     (Whereupon, Juror Lynn Bailey Baggett was
11 escorted into chambers):
12     THE COURT: I believe you said you had a
13 hardship?
14 A I am supposed to go to Venezuela on a mission
15 trip leaving this Saturday.
16     THE COURT: Right. Did someone tell you,
17 though, that this was a two week term?
18 A I misunderstood that, and I'm sorry. It was my
19 own fault. I did have that in my letter, but I
20 misunderstood that. So I apologize.
21     THE COURT: And are these tickets
22 nonrefundable?
23 A Yes, sir, they are. And it's been made for like
24 a year.
25     THE COURT: I see.

Multi-Page™

**Page 146**

1 A  Since last summer, This would be our third time
2 to go.
3      THE COURT:  Any other questions?
4      MR. TEAGUE:  So you had the tickets
5 purchased before you ever got the letter talking about
6 the two weeks.
7 A  Right.  When I got the letter I knew that I was
8 going to be going the 1st through the 18th.
9      THE COURT:  You had already paid for the
10 tickets?
11 A  Right.
12      MR. TEAGUE:  Okay.
13      THE COURT:  Any other questions?
14      MS. MORRIS:  No, Your Honor.
15      THE COURT:  Okay.  Thank you very much.
16      (Whereupon, Juror Baggett was escorted out
17 of chambers.)
18      THE COURT:  She's excused.
19      Next one, Sheila?
20      COURTROOM DEPUTY CLERK:  Mr. Steen.
21      MS. JAMES:  I believe he had a law
22 enforcement question, too.
23      (Whereupon Juror Steen was escorted into
24 chambers.)
25      THE COURT:  Would you tell us your name?

**Page 147**

1 A  My name is Edward Steen.
2      THE COURT:  Now I believe you said that you
3 had a hardship problem, is that correct?
4 A  Well, sir, I can -- two or three weeks is not a
5 problem.
6      THE COURT:  That's fine.  I think the
7 attorneys had some other questions for you.  By the
8 way, have you heard or read anything about this case?
9 A  A couple of years back it was in all the papers.
10 The most I heard was the Carmichael Center and Mr.
11 Carmichael.
12      THE COURT:  Could you completely put out of
13 your mind what you heard or read in the paper and
14 decide this case based only on the evidence that you
15 hear?
16 A  Oh, yes, sir.
17      THE COURT:  Okay.
18      MS. JAMES:  Mr. Steen, do you recall, you
19 said "a couple of years ago," do you recall the nature
20 of the information that you heard?  I mean, you say
21 Mr. Carmichael or the Carmichael Center, do you recall
22 the nature of it?
23 A  There was something about drugs being involved,
24 but, really, I don't keep up real well with current
25 events so it was just vague memories, since it was

**Page 148**

1 about two years ago.
2      MS. JAMES:  And you don't really recall
3 hearing anything since about two years ago?
4 A  I don't think so.
5      MS. JAMES:  Okay.  And, Judge, may I ask
6 other question?
7      THE COURT:  Yes.
8      MS. JAMES:  Did you form an opinion about
9 the information, about Mr. Carmichael, any opinion
10 about Mr. Carmichael after having heard that report?
11 A  No.  I don't believe I did at all.
12      MS. JAMES:  Okay.
13      MR. BRUNSON:  May I ask another question on
14 a subject, Your Honor?
15      THE COURT:  Mm-hmm.
16      MR. BRUNSON:  Mr. Steen, you were questioned
17 about the potential for the credibility of a law
18 enforcement officer versus that of a regular witness
19 that may be testifying.  Did you respond that you may
20 accept the testimony of a law enforcement officer with
21 more credibility than you would a regular witness
22 testifying?
23      THE COURT:  Or just a non-law enforcement
24 person.
25      MR. BRUNSON:  Your Honor asked that question

**Page 149**

1 before.
2 A  I have a military background, and just people who
3 have been through certain training, you have a certain
4 responsibility to, I guess, be more forthright than
5 other folks.  And that's where that came from.  And
6 that was the question being centered around a feeling
7 versus the order of Your Honor saying but in this
8 court you need to evaluate it strictly on the facts.
9 And given that, even though it's a gut feeling, I
10 believe that it wouldn't influence my ability to --
11 or, you know, it wouldn't influence any of my
12 decisions in the case.
13      There are two separate issues.  One is a gut
14 feeling versus this is how it is.  That's the other
15 part of my military background.
16      THE COURT:  So if a law enforcement officer
17 came in, it would be a level playing field for you?
18 In other words, you would just base it only on the
19 evidence you hear and their credibility versus someone
20 else's based on all the evidence.
21      MS. MORRIS:  Just as the judge would
22 instruct you.
23 A  Yes, sir, if that's how the Court rules, yes.
24      MS. JAMES:  Judge, may I just make one final
25 inquiry --

Multi-Page™

Page 150

1     THE COURT: Yes.
2        MS. JAMES: Was there something that formed
3 the basis of your having that gut feeling?
4        THE COURT: I thought that's what he just
5 explained.
6        MS. JAMES: Well he said to follow the law,
7 is what I'm hearing him say. But I'm talking about
8 the gut feeling where he said he might have the
9 tendency to believe the testimony of a law enforcement
10 officer as opposed to someone else. That was his gut,
11 if I understood him correctly.
12       THE COURT: Go ahead.
13       MS. JAMES: I'm just saying, is there
14 anything in your background that necessarily caused
15 you to have that gut feeling?
16 A   Yes, ma'am. Four years in the Army and four
17 years in the Air Force, and people who take an oath to
18 do more.
19       MS. JAMES: Okay, great. That's fine.
20 Thank you.
21       THE COURT: Anything else?
22       MS. MORRIS: No.
23       THE COURT: Thank you.
24       (Whereupon, Juror Steen was escorted out of
25 chambers.)

Page 151

1        THE COURT: Anything else, Counsel?
2        (Whereupon, there was no response.)
3        THE COURT: Next one, Ms. Carnes.
4 He's still on.
5        (Whereupon, Juror Davis was escorted into
6 chambers.)
7        THE COURT: How are you doing, sir? What is
8 your name again?
9 A   Donald Davis.
10       THE COURT: And, Mr. Davis, I believe you
11 stood up and said you might have a hardship problem of
12 some kind?
13 A   Sir, I work for the Board of Education.
14       THE COURT: Right. You said you had to go
15 to the buses, something with the statewide buses?
16 A   Yes, sir. We go the 15th of next month -- I mean
17 the 1th of this month. But other than that, you
18 know --
19       THE COURT: Didn't you understand, though,
20 that this would be a two week term? Didn't the notice
21 inform you of that?
22 A   I understood that, sir. I just had to make some
23 other arrangements or something if I have to do that.
24       THE COURT: So you can make other
25 arrangements?

Page 152

1 A   I'm going to try to.
2        THE COURT: Okay. It's really your
3 obligation to serve. You understand that?
4 A   I understand that.
5        THE COURT: Have you read or heard anything
6 about this case?
7 A   I have seen it on the news on T V because they
8 had it on T V this morning.
9        THE COURT: What did you hear this morning?
10 A   Just said the Carmichael trial starts or
11 something.
12       THE COURT: Could you completely put out of
13 your mind what you heard or read and decide this case
14 based only on the evidence?
15 A   Oh, yes.
16       THE COURT: Now even during the trial, if
17 you might hear something during the trial triggers
18 what you heard on television, you won't rely on what
19 you heard on television because that's inadmissible
20 evidence in a court. You can't rely on it.
21 A   I know T V is not allowed.
22       THE COURT: Any other questions from the
23 lawyers?
24       MR. MOORER: Yes, Your Honor. There is a
25 question that I wanted to ask based on his profile.

Page 153

1        Mr. Davis, in your questionnaire -- I'm
2 sorry, I got the juror mixed up with somebody else.
3        THE COURT: Okay. Anything else from this
4 juror?
5        MS. WAYNE: I did.
6        It's Donald Davis, right?
7 A   Right, Donald Davis.
8        MS. WAYNE: And, Mr. Davis, you had also
9 indicated in your questionnaire that you had been it
10 looks like affiliated with the military police at one
11 time.
12 A   That's right, I'm retired military.
13       MS. WAYNE: And how long were you a military
14 officer?
15 A   Twenty years. I'm retired.
16       MS. WAYNE: All right. Let me ask this
17 because you're going to hear from a lot of police
18 officers in this case, and my concern is because of
19 your experience having been a police officer, retired
20 police officer, whether or not you're going to align
21 yourself with those witnesses because of your own
22 experience.
23       MR. FEAGA: Your Honor, could we ask the
24 courts to get that to be asked in -- and I'm not
25 saying counsel is doing it intentionally, but when you

Multi-Page™

Page 154

1 leave off the fact that it is the law that they have
2 to do this and the Court will instruct them and can
3 they follow the Court's instructions --
4        THE COURT: Well I think she can ask the
5 question. Overruled.
6        MS. JAMES: And may I say this? Could she
7 ask those questions and then if they have got a
8 problem then they can --
9        THE COURT: Well sometimes the question
10 itself can be a problem.
11 A You've got corrupt police officers, too. Which I
12 know, because we had that problem with us one time.
13       THE COURT: But otherwise you'll be neutral?
14 A As the facts show.
15       THE COURT: Okay, good. Anything else?
16       (Whereupon, there was no response.)
17       THE COURT: Thank you.
18       (Whereupon, Juror Davis was escorted out of
19 chambers.)
20       COURTROOM DEPUTY CLERK: Next one is Valerie
21 Garrett.
22       (Whereupon, Juror Garrett was escorted into
23 chambers.)
24       THE COURT: How you doing Miss Garrett?
25 Would you give us your full name, Ms. Garrett?

Page 155

1 A Valerie Chapman Garrett.
2        THE COURT: I believe you said you had a
3 disabled child?
4 A Yes, sir.
5        THE COURT: Okay. Was it the child of a --
6 A It's my stepdaughter. She's thirty years old.
7 She's handicapped and retarded.
8        THE COURT: And who is taking care of her
9 now?
10 A She's at my mother-in-law's house today.
11       THE COURT: Now you understood that this
12 term would be for two weeks?
13 A Mm-hmm.
14       THE COURT: Do you have a problem with the
15 two week term?
16 A Well actually I do, because her biological
17 mother, I thought she might be able to spend some time
18 with her but she's ill. She's got M. S. and some
19 other health problems and she's actually gotten sick
20 since I turned in my questionnaire that I sent back to
21 you. So I didn't -- I didn't know she'd be down at
22 the time.
23       THE COURT: And your mother can't take scare
24 of her?
25 A My mother-in-law. Well she's over seventy and

Page 156

1 there is lifting involved because we still have to
2 change her diaper and things like, so there's not too
3 many people that can do that, or that would be allowed
4 to do that.
5        THE COURT: Anything else, Counsel?
6        (Whereupon, there was no response.)
7        THE COURT: Okay. Thank you very much.
8        (Whereupon, Ms. Garrett was escorted out of
9 chambers.)
10       THE COURT: She's excused.
11       Who is next, Miss Carnes?
12       COURTROOM DEPUTY CLERK: Sandra Evans.
13       THE COURT: Miss Evans.
14       (Whereupon, Juror Evans was escorted into
15 chambers.)
16       THE COURT: How are you doing, Ms. Evans?
17 Would you give us your full name?
18 A Sandra A Evans.
19       THE COURT: I believe you mentioned a
20 hardship that you had?
21 A My husband has had pancreatitis a number of
22 times, and they haven't been able to establish the
23 reason for it, so he's got to go have a test. And I
24 can't remember what the name of it is. It's a big,
25 long name. They give it an acronym but I can't

Page 157

1 remember what that is, either. But they're going to
2 go in, it's an invasive type surgery, to see --
3        THE COURT: You said he might be
4 hospitalized for two days?
5 A It can cause pancreatitis and he might have to
6 stay overnight.
7        THE COURT: When is this, now?
8 A That's next Monday. That is the 13th. I didn't
9 realize at the time. I had my dates mixed up. I was
10 thinking it was the following week.
11       THE COURT: Oh, I see.
12 A But I called and talked to them last week.
13       THE COURT: While this is going on could you
14 concentrate on the case, that is while what is going
15 on with your husband?
16 A Yes. That's not really a problem. He's not sick
17 right now. This is to determine the cause, so he will
18 not have any episodes with pancreatitis hopefully in
19 the future.
20       THE COURT: Okay. So this is this coming
21 Monday?
22 A Yes, it is.
23       THE COURT: And it may be overnight, you're
24 saying?
25 A Yes.

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**

Multi-Page™

Page 158

1    THE COURT: Would you need to be with him on
2 Monday?
3 A  Absolutely.  They're going to put him to sleep.
4    THE COURT: Okay.  And then you could be
5 back on Tuesday, though, absent some extraordinary
6 circumstances?
7 A  I'm not sure.  I just couldn't tell you
8 positively about that.  It may be.  I don't know when
9 they would dismiss him, and I would have to take him
10 home.  We live in Headland.  It's a good two hours
11 from here.  But I could serve -- I possibly could.  I
12 couldn't tell you no I can't, I just don't know until
13 we get up there.  But it can stimulate the pancreas
14 and cause pancreatitis, and if that's the case then
15 they're going to have to hospitalize him.  If he feels
16 any instances of pain --
17    THE COURT: Have you heard or read anything
18 this case?
19 A  No, sir.
20    THE COURT: Questions, Counsel?  Any other
21 questions for this juror?
22    MS. JAMES: Do we have more than one Evans,
23 Ms. Carnes?
24 A  Yes, you do.  I can't remember who the other
25 person was, but I was surprised.

Page 159

1    THE COURT: Okay.  Thank you very much.
2    (Juror Evans was escorted out of
3 chambers.)
4    THE COURT: She said she has a problem with
5 her husband going into the hospital next Monday.
6 We're actually going to recess part of Monday at
7 least.
8    MS. WAYNE: Judge, I'm going to ask that she
9 be excused, and this is the reason why.  I think she
10 was one of the most honest people I've ever seen talk
11 about it because she said I'll do it but I just can't
12 promise you because I'm unsure which, frankly, there
13 is the chance that something might happen and then
14 would need to be in with her husband on Tuesday and
15 that's not having the time.  So --
16    THE COURT: What does the government say?
17    MR. FEAGA: Your Honor, it sounds to me like
18 she's not going to be able to be here on Monday.
19    THE COURT: Okay.  Well let's excuse her,
20 then.  Which Evans?
21    COURTROOM DEPUTY CLERK: Sandra Evans.
22    THE COURT: Who is next, Ms. Carnes?
23    COURTROOM DEPUTY CLERK: Mr. Stumpf.
24    (Whereupon, Juror Stumpf was escorted into
25 chambers.)

Page 160

1    THE COURT: Mr. Stumpf, how are you doing?
2 A  Fine, sir.
3    THE COURT: Would you give us your full
4 name.
5 A  Richard Anderson Stumpf.
6    THE COURT: I believe you mentioned a
7 hardship that you might have?
8 A  Yes.  A business partner and I, a small software
9 development company.
10    THE COURT: Now You realize you were
11 supposed to serve for two weeks at least.
12 A  I did not understand that when I got the
13 information packet at home.  I must have missed that
14 or I would have called.
15    THE COURT: Now what's the hardship, though?
16 A  Fort Rucker, Brack (ph.).  One of our contracts
17 is out of the technical test center.  That's moving to
18 Huntsville, so we're in the midst of negotiating with
19 several different companies to find out how we're
20 going to be affected by that.  We're supposed to go to
21 Huntsville later this week, in fact.
22    THE COURT: Later this week?
23 A  Yes.
24    THE COURT: Now who is "we"?
25 A  My partner and I.

Page 161

1    THE COURT: Are there just two of you?
2 A  Yes.
3    THE COURT: Why can't he do it?
4 A  He could without me.  That would be okay, if I
5 got selected.  It would be best if we both went.
6    THE COURT: What about next week?
7 A  Next week is better than this week, in fact.
8    THE COURT: Okay.  Thank you very much.
9    MR. FEAGA: Judge, could I just ask one
10 thing?
11    THE COURT: Yes.
12    MR. FEAGA: Did I hear you right when we
13 were out there, that you said that other than this
14 issue here you basically could serve for two weeks?
15 A  Yes.
16    THE COURT: Have you heard or read anything
17 about this case?
18 A  I live in a news vacuum.  I'm in Ozark.  I
19 haven't heard anything about it.
20    THE COURT: Thank you very much.
21    MS. MORRIS: I do, too, and I live in
22 Montgomery.
23    (Whereupon, Juror Stumpf was escorted out of
24 chambers.)
25    THE COURT: Anything else with this juror?

Multi-Page™

**Page 166**

1  THE COURT: Could you tell us what you heard
2  or read?
3  A  Well, about the Carmichael Center and stuff that
4  he run that or something. I don't know.
5  THE COURT: Do you know did they mention any
6  charges against him or anything like that?
7  A  I don't remember. It's been a good while back.
8  THE COURT: If you were selected as a juror
9  and suddenly some evidence presented during the trying
10  should trigger your memory what you heard on the news,
11  could you completely put out of your mind what you
12  heard on the news and decide this case based solely on
13  the evidence presented here in court?
14  A  I think so.
15  THE COURT: Any other questions?
16  MS. CHARTOFF: Ma'am, where do you get your
17  news from?
18  A  Channel Twelve and Channel Eight and Thirty-two
19  and the paper.
20  MS. CHARTOFF: Which paper?
21  A  It's in the Montgomery Advertiser.
22  MS. CHARTOFF: How often do you read the
23  paper?
24  A  I don't read it that much. I have to watch after
25  those grandchildren. I don't have time to look at the

**Page 167**

1  paper much. But I do watch the news.
2  MS. CHARTOFF: How often do you watch the
3  news?
4  A  I watch it every day.
5  MS. CHARTOFF: Okay. And what's your
6  favorite news channel?
7  A  Channel Twelve.
8  MS. CHARTOFF: What time do you watch the
9  news?
10  A  I watch the morning show, then I watch the twelve
11  o'clock and then I watch the six and ten.
12  MS. CHARTOFF: Okay.
13  THE COURT: Anything else of this juror?
14  MR. FEAGA: Not from the United States, Your
15  Honor.
16  THE COURT: Thank you very much.
17  (Whereupon, Juror Davis was escorted out of
18  chambers.)
19  THE COURT: I think she can make
20  arrangements, so she's still on.
21  Miss Carnes, who is next?
22  COURTROOM DEPUTY CLERK: Donald Osborne. He
23  said he could not serve after five-thirty.
24  THE COURT: That's not a problem.
25  COURTROOM DEPUTY CLERK: Tonya Saxer.

**Page 168**

1  THE COURT: Ms. Saxer.
2  (Whereupon, Juror Saxer was escorted into
3  chambers.)
4  THE COURT: Would you please come in.
5  Would you give us your full name?
6  A  Tonya Louise Saxer.
7  THE COURT: I believe you mentioned a
8  hardship that you might have if you were to serve on
9  this jury?
10  A  Yes. I have knee surgery scheduled June the
11  22nd.
12  THE COURT: June 22nd.
13  A  So if it's before then I'm okay.
14  THE COURT: June 22nd, that would be --
15  MS. MORRIS: A wednesday.
16  MR. FEAGA: Two and-a-half weeks, Judge.
17  THE COURT: Have you heard or read anything
18  about this case?
19  A  Well, when they first started talking about it I
20  didn't think I knew, but I might know something about
21  it after we kept talking about it.
22  THE COURT: Right. When you say you might
23  know something --
24  A  Because of T V, but at first I did not realize if
25  I did.

**Page 169**

1  THE COURT: Do you remember what you read or
2  heard?
3  A  I'm not sure of all the details, so I don't know.
4  THE COURT: Could you completely put out of
5  your mind what you heard or read and decide this case
6  based on the evidence presented?
7  A  Oh sure, definitely.
8  THE COURT: Anything else?
9  MR. FEAGA: Not from the United States.
10  MS. WAYNE: We do.
11  MR. MOORER: Just one question. Does your
12  knee problem cause you problems for sitting?
13  A  No. I'm good as long as I have my brace on.
14  This thing.
15  MS. WAYNE: Miss Saxer, when you say you
16  remember some stuff, what was it that you actually
17  remember? It doesn't matter if it's right or wrong,
18  just what do you remember?
19  A  Just when y'all started talking about the
20  Carmichael Center, that's the only thing. But don't
21  know anything that's associated with it. I just --
22  When you started asking questions about the Carmichael
23  Center and stuff, I know there was something going on
24  with that but I'm not certain.
25  MS. WAYNE: Okay. So when we talked about

Multi-Page™

Page 170

1  that you had a memory, you connected with something
2  you had heard on the news that you heard or read?
3  A  Yes, but I don't know the details of anything.
4       MS. WAYNE:  All right.  If, in fact, you sit
5  as a juror and you remember something that you've
6  heard on the news that might inconsistent or
7  conflicting, would you be able to listen to the
8  evidence in the case and decide just it on the case?
9  A  Sure.
10      MS. WAYNE:  I have no further questions.
11      MS. MORRIS:  Am I reading this right, you
12 have been married two weeks?
13 A  Well, it's been a month.
14      MS. MORRIS:  Congratulations.
15 A  Thank you.
16      THE COURT:  Thank you very much.
17      (Whereupon, Juror Saxer was escorted out of
18 chambers.)
19      THE COURT:  Who is next, Ms. Carnes?
20      COURTROOM DEPUTY CLERK:  Melony Robertson.
21      THE COURT:  Miss Robertson.
22      How many more do we have?
23      COURTROOM DEPUTY CLERK:  Three.
24      THE COURT:  Okay, good.
25      MS. MORRIS:  One-fifteen.

Page 171

1       (Whereupon, Juror Robertson was escorted
2  into chambers.)
3       THE COURT:  Would you giving us your name?
4  A  Melony Robertson.
5       THE COURT:  I believe you mentioned a
6  hardship that you might have?
7  A  I don't mind doing this.  I'm honored to.  But we
8  own our own business.  My sister-in-law and I manage
9  our office, and she has paid for vacation at the end
10 of June.  I'd have to call and find out the exact
11 date.
12      THE COURT:  When at the end of June?
13 A  I believe it's the last week of June.
14      THE COURT:  So your problem really doesn't
15 arise until the last of June?
16 A  Exactly.
17      THE COURT:  Anything else?
18 A  No, sir.
19      THE COURT:  Have you heard or read anything
20 about this case?
21 A  No, sir.
22      THE COURT:  Any other questions of this
23 juror?
24      MR. FEAGA:  Not from the United States.
25      THE COURT:  Thank you very much.

Page 172

1       (Whereupon, Juror Robertson was escorted out
2  of chambers.)
3       THE COURT:  She's on.
4       COURTROOM DEPUTY CLERK:  Mrs. McKowsky is
5  next.
6       (Whereupon, Juror McKowsky was escorted into
7  chambers):
8       THE COURT:  How are you doing?
9  A  Good.
10      THE COURT:  Would you give us your name?
11 A  Melinda McKowsky.
12      THE COURT:  I believe you mentioned a
13 hardship that you might have?
14 A  I was supposed to start teaching summer school
15 next week, and if he could have somebody just a couple
16 of days where somebody could fill in, but then you
17 were saying it might be several weeks --
18      THE COURT:  Would you have any problems with
19 a two week period?
20 A  Probably not for two weeks, no.
21      THE COURT:  And you're a teacher of summer
22 school?
23 A  Right.
24      THE COURT:  Where is this?
25 A  At Calvary Christian academy.

Page 173

1       THE COURT:  Right, I remember you saying
2  that.
3       And someone would be substituting for you
4  that second week?
5  A  Right.  We might get somebody that week.  It was
6  just when they were saying it was going to be -- it
7  might be several weeks --
8       THE COURT:  What grade do you teach?
9  A  I teach elementary summer school.
10      THE COURT:  What do you teach?
11 A  Fourth grade.
12      THE COURT:  What does that include, all the
13 subjects?
14 A  Yes, sir.
15      THE COURT:  They would have a substitute
16 teacher during that second week?
17 A  Right.
18      THE COURT:  Your first week --
19 A  The first week, yes.  They would get someone to
20 come in.
21      THE COURT:  How good is it to have someone
22 else come in?
23 A  It would be much better if I could start off and
24 do the whole thing, the whole term, but --
25      THE COURT:  Now you were aware, though, that

Multi-Page™

## Page 174

1 you had the period of two weeks here, did you know
2 about that at first?
3 A Right, right. But I didn't anticipate it being
4 -- I thought we would be in the first three days.
5       THE COURT: I see. Okay. Have you heard or
6 read anything about this case?
7 A After we talked about it for a few minutes I
8 remember hearing something about it, but not --
9       THE COURT: Could you completely put out of
10 your mind what you heard or read and decide the case
11 based only on the evidence presented?
12 A Yes.
13       THE COURT: Any questions?
14       MS. JAMES: I had a couple of questions.
15       Is your class small?
16 A Yes, ma'am.
17       MS. JAMES: And are they kids that have
18 already had trouble in the school year and difficulty?
19 A Yes, ma'am.
20       MS. JAMES: Okay.
21       THE COURT: Thank you very much.
22       (Whereupon, Juror McKowsky was escorted out
23 of chambers.)
24       THE COURT: My inclination is to excuse her.
25 I don't think that a substitute is adequate for a real

## Page 175

1 teacher. Unless you all have some strong feelings one
2 way or the other?
3       (Whereupon, there was no response.)
4       THE COURT: I'll excuse her, then.
5       COURTROOM DEPUTY CLERK: Next person is
6 Melissa Nelson.
7       (Whereupon, Juror Nelson was escorted into
8 chambers.)
9       THE COURT: How are you doing, Ms. Nelson?
10 A Fine.
11       THE COURT: Would you give us your full name
12 again?
13 A Melissa Anne Nelson.
14       THE COURT: Now I believe you mentioned a
15 hardship that you might have.
16 A Well, I don't mind serving as long as it's not
17 over two weeks. I don't want to be up here for a
18 lengthy time because I have two young children with a
19 husband that works at night.
20       THE COURT: How old are they?
21 A Ten and twelve.
22       THE COURT: And your husband works at night?
23 A Right.
24       THE COURT: And who is taking care of the
25 kids while you're up here?

## Page 176

1 A It would be grandparents.
2       THE COURT: Now have you heard or read
3 anything about this case?
4 A No, sir.
5       THE COURT: Do you all have any questions?
6       MR. FEAGA: Not from the United States.
7       MS. JAMES: I had just a couple.
8       You know, being a mother I understand, but
9 you seem very attached. We're all attached to our
10 children, but just like, you know, are you not away
11 from them very much?
12 A I'm not.
13       MS. JAMES: And you would probably worry
14 about them even though they were with their
15 grandparents?
16 A Oh, I would, because they have been with me a
17 lot. Hardly ever does anybody else have to take care
18 of them.
19 Q Do you think it would be problematic and you
20 would worry about that?
21 A Oh yeah, I would worry about that situation.
22       MS. JAMES: Okay, thank you.
23       THE COURT: Could you concentrate on the
24 case? Would that pose a problem with your
25 concentrating on the evidence in this case?

## Page 177

1 A It would.
2       MR. FEAGA: I've got a couple, Judge.
3       Ma'am, you had indicated when you first came
4 in that you could serve for two weeks and you had made
5 arrangements for the kids to stay with the
6 grandparents. If the trial only lasts two weeks and
7 that's the extent of it, would you have you any
8 problem listening to the evidence and giving both the
9 government and Mr. Carmichael a fair trial, a fair
10 read on the evidence and decide the case based on
11 those facts as long as it doesn't take more than two
12 weeks?
13 A I could.
14       MR. FEAGA: Thank you.
15       THE COURT: Anything else?
16       MS. WAYNE: No, sir.
17       THE COURT: Thank you.
18       (Whereupon, Juror Nelson was escorted out of
19 chambers.)
20       COURTROOM DEPUTY CLERK: Miss Lovejoy.
21       (Whereupon, Juror Lovejoy was escorted into
22 chambers.)
23       THE COURT: Ms. Lovejoy, how are you doing?
24       Would you give us your name.
25 A Jolonida Denesa Lovejoy.

Page 178

1  THE COURT: Now you said that you might have
2 a hardship if this trial lasted more than two weeks?
3 A My job.
4  THE COURT: Right, your job. Did you inform
5 your job that you were serving on --
6 A Yes, I told them for today. I didn't know how
7 long it would be.
8  THE COURT: It's for two weeks. If you have
9 a problem, would you let me know?
10 A Yes, sir.
11  THE COURT: And other than that do you have
12 a problem?
13 A No, sir.
14  THE COURT: Have you heard or read anything
15 about this case?
16 A I saw it on T V.
17  THE COURT: When was this?
18 A Well I ain't sort of up-to-date, but it was like
19 when it first happened.
20  THE COURT: Was this a year or two ago, or
21 six months ago, or six weeks ago?
22 A Probably a year.
23  THE COURT: A year ago? Could you
24 completely put out of your mind what you heard or read
25 and decide this case based only on the evidence?

Page 179

1 A Yes, sir.
2  THE COURT: Questions from the attorneys?
3  MS. WAYNE: Miss Lovejoy, when you saw it,
4 did you form an opinion about what they were talking
5 about, feel like you --
6 A No, sir -- I mean no, ma'am. I'm sorry.
7  MS. WAYNE: That's okay. Maybe I look bad
8 right now.
9  So you didn't think much about it since you
10 saw the news reports?
11 A No, ma'am.
12  MS. WAYNE: All right.
13  MR. BRUNSON: Miss Lovejoy, did you say your
14 two brothers are policemen?
15 A No, my two uncles and an aunt.
16  MR. BRUNSON: With whom do they work?
17 A In Luverne, Alabama.
18  MS. JAMES: Would you GIVE us their names?
19 A Okay. Robert E. Brantley and Nelson May.
20  THE COURT: Anything else of this juror?
21  MR. FEAGA: Not from the United States.
22  THE COURT: Thank you very much, ma'am.
23  (Whereupon, Juror Lovejoy was escorted out
24 of chambers.)
25  COURTROOM DEPUTY CLERK: Those are the only

Page 180

1 names I have, Your Honor.
2  MS. WAYNE: Judge, we're not going to
3 challenge Miss Lovejoy but, you know, we went so
4 quickly want to challenge Nelson.
5  THE COURT: Who is Nelson, now?
6  MS. WAYNE: She was the mother who just came
7 in before Miss Lovejoy and we didn't have an
8 opportunity. The reason we're challenging her is I'd
9 note for the record that initially when I talked to
10 her she was actually tearing up as she was talking
11 about her children and being away from them. Normally
12 I think you got to tough up in terms of jury service,
13 but her emotional reaction I think is pretty unusual
14 and the fact that she hasn't been away from her kids
15 much and I'm concerned about it being distracting. So
16 I would ask that Ms. Nelson --
17  THE COURT: Well she did say according to
18 Mr. Feaga's question that she could do it.
19  MS. WAYNE: I understand, Judge. I
20 understand that.
21  MS. CHARTOFF: Your Honor, she also said
22 twice, once earlier and once in here, that she would
23 have trouble paying attention because she'd be
24 thinking about her kids.
25  MR. FEAGA: But even out there it was tied

Page 181

1 to the thought that it might be more than two weeks.
2  THE COURT: I'll overrule that objection.
3  MS. JAMES: Judge, one other thing for the
4 record. I'd note that she has a hundred mile
5 round-trip as well, which is not as long as some, but
6 under her circumstances I think that just adds to the
7 problem.
8  THE COURT: Overruled.
9  Who do we have next?
10  COURTROOM DEPUTY CLERK: Those are all the
11 names I have on my list.
12  THE COURT: Now we have people who read or
13 heard about the case.
14  By the way, who was the one -- That's right.
15 If it ends up that that requirement -- I asked that
16 question because they're entitled to a deferral if
17 they have been on a jury within that two year period.
18 It's not a disqualification.
19  And You said you had case law about
20 something if they have served on a grand jury within
21 the last two years?
22  MS. WAYNE: Your Honor, you brought it up,
23 Judge. I actually said --
24  THE COURT: I thought you said, though --
25  MS. WAYNE: Oh no, my argument was simply

**Multi-Page™**

Page 182

1  that it's too close.
2        THE COURT: That's right. I thought you
3  said you had case law on that.
4        MS. WAYNE: No, I don't have anything,
5  unless you let me get on WestLaw and get that secret
6  password so I can get the case.
7        THE COURT: What case is this?
8        MS. WAYNE: I don't know. I'm sure there's
9  a case, because --
10        THE COURT: Okay, well I don't know of any
11 reason to disqualify him, so the objection is
12 overruled.
13        I believe that was -- was that was Mr.
14 Steen?
15        MR. BRUNSON: Mr. Steen has been in.
16        THE COURT: No, Scott?
17        MS. MORRIS: Ms. Scott is the woman who --
18        MS. WAYNE: No no, he's talking about the
19 juror that we were talking about, the grand juror.
20        COURTROOM DEPUTY CLERK: Vaughn.
21        MS. WAYNE: Vaughn.
22        THE COURT: Mr. Vaughn, that's who it is.
23 The objection to Mr. Vaughn is overruled.
24        Who is next?
25        MS. JAMES: You remember we had Mr. Oates

Page 183

1  and Miss Scott. You excused him, I think, already for
2  cause. He said he really had a problem if the
3  defendant didn't testify. And she was a little, I
4  guess --
5        THE COURT: I don't need to go back to
6  people I've already excused.
7        MS. JAMES: I know, but I'm just saying
8  those two were together. You were going to revisit
9  her.
10        THE COURT: Did she come back?
11        MS. JAMES: Not that I know of.
12        THE COURT: Let's get her back here.
13        IN-CHAMBERS INDIVIDUAL SEGREGATED VOIR DIRE
14          REGARDING THE QUESTION OF
15        WHETHER JURORS MIGHT BE BIASED IF THE
16          DEFENDANT(s) DID NOT TESTIFY:
17        (Whereupon, Juror Jennifer Scott was
18 escorted into chambers.)
19        THE COURT: How are you doing?
20 A  All right.
21        THE COURT: Would you give us your name?
22 A  Jennifer Scott.
23        THE COURT: Now you said you would have a
24 problem if a defendant did not testify in completely
25 putting that out of your mind and deciding whether

Page 184

1  he's guilty or not.
2  A  Yes, sir.
3        THE COURT: Would you have a problem?
4  A  I think I would. I really do.
5        THE COURT: You really do.
6        Any other questions?
7        MS. JAMES: No.
8        THE COURT: Thank you very much. Have you
9  read or heard anything about the case?
10 A  Not that I know of.
11        MR. FEAGA: Let me just ask one, Judge?
12        THE COURT: Yes.
13        MR. FEAGA: Miss Scott, if the Court were to
14 give you instructions, let's say you were selected to
15 sit on this jury and the Court were to read to you and
16 tell you this is the law, and you're required to
17 follow the law, and if the Court instructed you that
18 an accused comes into a courtroom with a presumption
19 of innocence, that you can't infer anything against
20 that accused if they elect not to testify because we
21 all have a constitutional right not to do that, and
22 that the burden of proof is on the United States to
23 prove his guilt to you and that he remains innocent
24 until the trial is over and you with your fellow
25 jurors then evaluate that evidence and you make a

Page 185

1  finding we believe establishes guilt, if the Court
2  were to give you those instructions and tell you you
3  had to follow them, would you be able to follow the
4  Court's instructions and do the job as a juror?
5        In other words, would you be able to put
6  aside that feeling that you have?
7  A  I still believe that I would feel like because he
8  didn't defend himself, he must be either hiding
9  something or there is something he didn't want us to
10 know because he didn't get up there and say I didn't
11 do this.
12        MR. FEAGA: Recognizing that you might as a
13 human being or a person feel that way, would you be
14 able to put the Court's instruction to you aside that
15 you had to put it aside, and you had to decide it
16 without considering that, would you be able to put
17 that out of your mind and decide the case based only
18 on the facts?
19 A  I really don't know.
20        MR. FEAGA: Okay.
21        THE COURT: Thank you very much.
22        (Whereupon, Juror Scott was escorted out of
23 chambers.)
24        MS. CHARTOFF: Valiant efforts.
25        THE COURT: She's off.