1      IN THE UNITED STATES DISTRICT COURT
                        FOR
2          THE MIDDLE DISTRICT OF ALABAMA

3

4

5   THE UNITED STATES
       OF AMERICA
6
          vs.                        CRIMINAL ACTION NO.
7                                     2:03-cr-259-T
    LEON CARMICHAEL
8

9

10

11

12

13                   VOLUME II OF XI
14                     2nd DAY OF:
                 JURY TRIAL PROCEEDINGS
15

16

17              *  *  *  *  *  *  *  *  *

18
    BEFORE:        The Hon. Myron H. Thompson
19
    HEARD AT:      Montgomery, Alabama
20
    HEARD ON:      June 7, 2005
21
    APPEARANCES:   Terry Moorer, Esq.
22                 Stephen Feaga, Esq.
                   Clark Morris, Esq.
23                 Matthew Miner, Esq.
                   Susan James, Esq.
24                 Marion Chartoff, Esq.
                   Lisa Monet Wayne, Esq.
25                 Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT

5A-II

PENGAD 800-631-6989

Page 2

TABLE OF CONTENTS

1

2

3 ITEM DESCRIPTION                                    PAGE NO.

4

5 Title Page .......................................  1

6 Table of Contents ...............................  2

7

Preliminary Discussion In Open Court
8 (The Jury Is Not Present) ......................  4

9 Motion In Limine
Re:  Deputy Brock .............................  7
10

Pretrial Jury Charge
11 by the Court .................................. 10

12 Opening Statements
by Mr. Feaga .................................. 15
13

Opening Statements
14 by Ms. Wayne .................................. 36

15 Opening Statements
by Mr. Teague ................................. 52
16

Gary George - Direct Examination
17 by Mr. Feaga .................................. 64

18 Gary George - Cross Examination
by Ms. Wayne .................................. 114
19

Gary George - Cross Examination
20 by Mr. Teague ................................. 146

21 Gary George - Redirect Examination
22 by Mr. Feaga .................................. 166

23 Gary George - Recross Examination
by Ms. Wayne .................................. 168
24

Gary George - Recross Examinatin
25 by Mr. Teague ................................. 169

Page 3

TABLE OF CONTENTS

1

2

3 ITEM DESCRIPTION                          PAGE NO.

4

5 Barbara Cooper - Direct Examination
by Mr. Feaga ........................... 170
6
Steven Brock - Direct Examination
7 by Ms. Morris .......................... 174

8 Steven Brock - Cross Examination
by Ms. James ........................... 201
9
Maria White - Direct Examination
10 by Miss Morris ......................... 208

11 Maria White - Cross Examination
by Ms. Wayne ........................... 214
12
Charlotte Hensarling - Direct Examination
13 by Mr. Festa ........................... 215

14 Charlotte Hensarling - Cross Examinatin
by Ms. James ........................... 228
15
Charlotte Hensarling - Redirect Examination
16 by Mr. Feaga ........................... 240

17 David Williams - Direct Examination
by Ms. Morris .......................... 243

18
David Williams - Cross Examination
19 by Mr. Teague .......................... 262

20 Patrick Denton - Direct Examination
by Mr. Feaga ........................... 264
21

22
Court Reporter's Certification ........... 301
23

24                    -oOo-

25

Page 4

1 WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
THE HON. MYRON H. THOMPSON ON JUNE 7, 2005 AT THE

2 UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4      PRELIMINARY DISCUSSION IN OPEN COURT

5           (THE JURY IS NOT PRESENT):

6      THE COURT: This is a continuation of United

7 States of America vs. Carmichael and Williams.

8      Counsel, I understand that Miss Whitman

9 called a little before eight and said that she had

10 overslept and that she was on her way from Eufaula,

11 which is perhaps anywhere from an hour to an hour

12 and-a-half because it's not interstate. So I suspect

13 that she probably won't get here until sometime

14 between nine-fifteen and nine-thirty.

15      I'll hear from the government first as to

16 what you would like to do, and then I'll hear from the

17 defendants.

18      MR. FEAGA: Your Honor, it would be our

19 suggestion that we wait for her.

20      THE COURT: Okay. I'll hear from the

21 defendants.

22      MS. WAYNE: The defense agrees, Judge.

23      THE COURT: Okay. Why don't we swear in

24 witnesses at this time.

25      MR. FEAGA: Now, Your Honor, I want the

Page 5

1 Court to know that we brought as many as we thought we

2 could get to in the next day or two. There are some

3 who we may have to swear in later.

4      THE COURT: That will be fine. You just

5 keep track of those who have been sworn and those who

6 haven't.

7      MR. FEAGA: Yes, Your Honor.

8      Will all the people who expect to testify

9 today for the United States, come forward and be

10 sworn.

11      COURTROOM DEPUTY CLERK: Witnesses come

12 forward, please.

13      THE COURT: Why don't we go ahead and swear

14 in Mr. Carmichael and Mr. Mr. Williams. So the

15 defendants stand, as well.

16      MS. WAYNE: Judge, I am also asking that our

17 adviser witness/investigator under Rule 615, I'd ask

18 that he be sworn in as well.

19      THE COURT: Okay.

20      MR. FEAGA: Without objection from the

21 United States, Your Honor. We're doing the same thing

22 with Investigator David DeJohn.

23      COURTROOM DEPUTY CLERK: Witnesses, please

24 raise your right hand for the witness oath.

25      (Whereupon, all prospective witnesses

Multi-Page™

**Page 6**

1 currently present were duly sworn by the courtroom
2 deputy clerk.)
3     THE COURT: Okay. Now does either side
4 desire the rule?
5     MS. WAYNE: Yes, Judge.
6     THE COURT: All witnesses except those who
7 are representatives or parties will go to the witness
8 room.
9     Now, counsel, both the government and the
10 defendants remind me at the end of the case if the
11 defendants elect not to testify, to put on the record
12 that it is a voluntary decision and you will examine
13 your own clients to make sure of that.
14     MR. FEAGA: Yes, sir.
15     THE COURT: Don't let me forget.
16     MR. FEAGA: Yes, sir.
17     THE COURT: Don't let me forget that
18 Mr. Teague.
19     MR. TEAGUE: Yes, Your Honor.
20     THE COURT: Anything else before we wait for
21 Miss Whitman?
22     MR. FEAGA: Not from the United States, Your
23 Honor.
24     THE COURT: Court's in recess until
25 Miss Whitman arriving.

**Page 7**

1     (Whereupon, a recess was taken.)
2     MOTION IN LIMINE
3     IN OPEN COURT
4     (THE JURY IS NOT PRESENT):
5     THE COURT: I understand that you have
6 something you would like to take up with the Court?
7     MS. MORRIS: I would, Your Honor.
8     As the government's second witness the
9 government intends to call Chilton County Deputy
10 Sheriff Steven Brock.
11     THE COURT: Okay.
12     MS. MORRIS: Deputy Brock is -- or there is
13 an investigation, I guess, pending. He was in a bar
14 slash restaurant in Clanton, and the allegation is
15 that there was a fight and the person with whom he
16 fought was hurt. My understanding, and quite frankly
17 I can't tell you that I have all the details of the
18 investigation, but my understanding is that there is
19 an internal investigation pending.
20     The fact of that investigation, the fact
21 that he was off-duty in a bar and after someone groped
22 his girlfriend, is my understanding, there was some
23 altercation.
24     THE COURT: Groped his what?
25     MS. MORRIS: Groped his girlfriend. There

**Page 8**

1 was some altercation. I don't know the specifics of
2 it, but these are the allegations. I can't tell you
3 that this is true; however, the fact that there is
4 this investigation is irrelevant to Mr. Brock or to
5 anything in this trial, and it has no bearing on Mr.
6 Brock's correct. And, thus, we would just ask the
7 Court to preclude the defense --
8     THE COURT: So this is really a motion in
9 limine.
10     MS. MORRIS: I more or less is, Your Honor.
11     THE COURT: What's the defense's position?
12     MS. JAMES: Judge, I was aware of the
13 situation just by hearing this in the community. I
14 didn't realize that this was the person involved, so
15 we're both kind of speculating. But what I had heard
16 was that -- I believe the bar is called Big Time Wings
17 in Chilton County. It's right there in Clanton. And
18 it's my understanding that the sheriff has there has
19 some sort of interest in that bar, which concerns me
20 with regard to the conclusion of the investigation or
21 the progress of the investigation.
22     Putting that aside, we think it's
23 particularly relevant and should be able to inquire
24 because whether he is charged or not, the fact that he
25 is a law enforcement officer, and I understand that

**Page 9**

1 the victim of this assault, this is again based on
2 matters not provided -- or not even related really to
3 my involvement in this case, but that the victim was
4 seriously injured.
5     THE COURT: Let me say this. I really can't
6 tell the relevance or irrelevance of this testimony.
7 I would like to first hear your opening statements so
8 I can understand what your evidence is and I can
9 understand what your contentions are and what your
10 evidence might be. Then I'd like to hear his
11 testimony when he's called and then I can determine
12 whether it's relevant or not relevant.
13     MS. MORRIS: Your Honor, we would just
14 request that prior to them going into this --
15     THE COURT: Definitely. Yes. It should be
16 taken up before you ask any questions of Deputy Brock
17 about any off-duty altercation or of the fact that
18 he's charged with any offense. You should -- we
19 should take that up immediately outside the presence
20 of the jury. You need to bring that to my attention.
21 I fully agree with that.
22     MS. JAMES: Okay.
23     THE COURT: Anything else, COUNSEL?
24     MS. MORRIS: No, Your Honor.
25     THE COURT: Anything else on our juror,

1 Miss Carnes?
2      COURTROOM DEPUTY CLERK: No, sir. There is
3 a marshal waiting for her.
4      THE COURT: Okay. We're in recess, then,
5 until we get our juror.
6      MS. MORRIS: Thank you, Your Honor.
7      (Whereupon, a recess was taken.)
8      THE COURT: Members of the jury, as I said
9 to you yesterday, you are the jury that will try the
10 case of United States versus Leon Carmichael and
11 Freddie Williams.
12      The clerk is now handing out to you pads and
13 pencils. I'm going to ask that you put your names at
14 the top of the pads so that they can be returned to
15 you each day in the morning.
16      Now at this time I'm going to ask that you
17 stand and the clerk will swear you in.
18      (Whereupon, the petit jury was duly sworn by
19 the courtroom deputy clerk.)
20           PRETRIAL JURY CHARGE:
21      THE COURT: You may all be seated.
22      Now, members of the jury, you have been
23 sworn as the jury to try this case. By your verdicts,
24 you will decide disputed issues of fact. I will
25 decide all questions of law that arise during the

1 trial, and before you retire to deliberate at the
2 close of the case I will instruct you on the rules of
3 law that you must follow and apply in reaching your
4 decision in this case -- that is your verdicts.
5      Now because you will be called upon to
6 decide the facts in the case you should give careful
7 attention to the testimony and evidence presented for
8 your consideration during the trial, but you should
9 keep an open mind and should not form or state any
10 opinion about the case one way or the other until you
11 have heard all of the evidence in the case and until
12 you've had the benefit of the closing arguments of the
13 attorneys and my instructions to you on the applicable
14 law.
15      Now during the trial you must not discuss
16 the case in any manner among yourselves or with anyone
17 else, nor should you permit anyone to discuss the case
18 in your presence. And insofar as the attorneys are
19 concerned, as well as others whom you may come to
20 recognize as having some connection with this case, in
21 order to avoid even the appearance of impropriety you
22 should have no contact whatsoever with these persons
23 while you are serving on this jury.
24      Now you must also avoid reading any
25 newspaper articles that might be published about the

1 case now that the trial has begun. You must also
2 avoid listening to or observing any broadcast news
3 programs on either television or radio because of the
4 possibility that some mention might be made of the
5 case during such a broadcast now that the trial is in
6 progress.
7      Now the reason for these cautions lies in
8 the fact that it would be your duty to decide this
9 case only on the basis of the testimony and evidence
10 presented during the trial without consideration of
11 any other matters whatsoever.
12      Now a question sometimes arises as to
13 whether individual members of the jury will be
14 permitted to take notes during the trial. If you
15 would like to take notes, you may. On the other hand,
16 you are not required to take notes if you do not want
17 to. That will be left up to you individually. If you
18 do decide to take notes, be careful not to get so
19 involved in note-taking that you become distracted
20 from the ongoing proceedings. Also, your notes should
21 be used only as aids to your memory, and if your
22 memory should later differ from your notes, you should
23 rely upon your memory and not necessarily your notes.
24      If you do not take notes you should rely
25 upon your own independent recollection or memory of

1 what the testimony was, and you should not be unduly
2 influenced by the notes of other jurors. Notes are
3 not entitled to any greater weight than the
4 recollection or impression of each juror as to what
5 the testimony was.
6      Now from time to time during the trial I may
7 be called upon to make rulings of law on objections or
8 motions made by the attorneys. You should not infer
9 or conclude from any ruling that I make, or any other
10 comment that I may make during the trial, that I have
11 any opinion on the merits of this case favoring one
12 side or the other. And if I sustain an objection to a
13 question that goes unanswered by a witness, you should
14 not speculate as to what the answer might have been if
15 given, nor should you draw any inferences or
16 conclusions from the unanswered question itself.
17      Now during the trial it may be necessary for
18 me to confer with the attorneys out of your presence
19 with regard, again, to matters of law or procedure
20 that require consideration by the Court alone. On
21 some occasions you may even be excused from the
22 courtroom for this purpose as a convenience to us.
23 Now I will try to limit these interruptions as much as
24 possible, but I ask that you remember at all times the
25 importance of the matter that you are here to decide,

1 and I further ask that you be patient, even though the
2 case may seem to go slowly at times.
3     Now we will begin by affording the attorneys
4 for each side an opportunity to make their opening
5 statements in which they may explain the issues in the
6 case and summarize the facts that they expect that the
7 evidence will show. Now after all of the testimony
8 and evidence has been presented, the attorneys will
9 then be given another opportunity to address you at
10 the end of the trial and make their summations, or
11 final arguments, in the case.
12     Now the statements that the attorneys make
13 now, as well as the arguments that they present at the
14 end of the trial, are not to be considered by you as
15 evidence, which will come only from witnesses and
16 exhibits, or as your instructions on the law, which
17 will come only from me. That is the Court.
18 Nevertheless, these statements and arguments are
19 intended to help you understand the issues and the
20 evidence as it comes in, as well as the positions
21 taken by both sides.
22     Now I'm going to ask that you give your
23 close attention to the attorneys as I recognize them
24 for the purpose of making their opening statements.
25     Government.

1     OPENING STATEMENTS:
2     MR. FEAGA: May it please the Court?
3     Good morning, ladies and gentlemen.
4     We thank you very much for being here today.
5 The Court's just gotten through on instructing you on
6 some of your duties, and we had a long day yesterday.
7 We thank you for your patience in regard to that.
8     We've got a brief moment before the trial
9 starts to lay out basically what we expect the
10 evidence to show you. That's helpful to you, because
11 it lets you know when you're hearing from one witness
12 that there may be some more coming, that there will be
13 somebody else coming who will be testifying about
14 something else. I think it helps you follow the
15 progression of the evidence.
16     I think it's helpful to us for that very
17 reason, because what the United States is here to do
18 today, myself, Steve Feaga, who I introduced to you
19 yesterday, my co-counsel as well, Miss Morris and
20 Mr. Moorer, and sitting with us at the table is
21 Detective David DeJohn. What we are here to do is to
22 get the facts of this case, the United States versus
23 Leon Carmichael and Freddie Williams, before you so
24 that you can go back and deliberate and determine
25 whether or not they are guilty of the offenses that

1 they are charged with.
2     What I'd like to do first is tell you about
3 the charging instrument. Now the Court will tell you,
4 and I'll tell you right now, that this is not evidence
5 against either of these people. This is your roadmap.
6 This is what you're going to be asked to go back and
7 determine whether or not the facts support this.
8 Okay? So I want to read it to you, and then I'll just
9 very briefly explain it to you. And I'll kind of skip
10 through it and not read the whole thing, but there are
11 two counts in it as I told you yesterday.
12     The first count alleges that from on or
13 about 1993, a more specific date being unknown to the
14 grand jury, but continuing up to on or about the 17th
15 day of November 2003, so we're talking about a ten
16 year period, in Montgomery County within the Middle
17 District of Alabama, and Montgomery is in the Middle
18 District of Alabama, the defendants, Leon Carmichael
19 and Freddie Williams, knowingly and intentionally
20 conspired, combined and agreed with each other and
21 other persons both known and unknown to the grand
22 jury, to possess with the intent to distribute and
23 distribute more than three thousand kilograms of
24 marijuana.
25     Now it is not necessary -- Let me just -- In

1 terms of talking about the conspiracy, the Court will
2 explain to you what the law is on that. But what
3 we're going to be asking you to do is to determine
4 from the evidence that's presented from that witness
5 stand whether or not these two fellows together, and
6 with other people, some of whom will be testifying
7 about their involvement in this conspiracy, whether or
8 not they got together and agreed to violate the law by
9 agreeing to work together to distribute marijuana.
10     If they did that during this time frame --
11 and, again, the time frame is just the best allegation
12 that the grand jury had of what that time is. You may
13 find it's different. The exact time frame is not
14 something that will be a final determinative factor
15 for you.
16     In other words, if you find that a
17 conspiracy existed within this time, even if you find
18 it's a little shorter or a little longer, that's not
19 going to be something that would cause you to say
20 these individuals are not guilty. Okay? That's just
21 the best that the grand jury had. You'll determine
22 what the length of that conspiracy was from what you
23 hear from this witness stand.
24     The second charge, count two, alleges that
25 "From on or before the 28th day of May 2002 --" note

1 we've come forward from '93 to 2002 -- "the 20th day
2 of May 2002, continuing to on or about the 24th day of
3 February 2003 in the Middle District of Alabama --" so
4 we're talking about a one year period, roughly,
5 slightly shy of a year -- "the defendant, Leon
6 Carmichael --" the second count only charges Mr.
7 Carmichael -- "did knowingly and willfully combine,
8 conspire and confederate with other persons --" it's a
9 conspiracy charge again -- "both known and unknown to
10 the grand jury, to knowingly conduct or attempt to
11 conduct or cause to be conducted financial
12 transactions affecting interstate commerce."
13      And it alleges that, to wit, he directed
14 that money be placed in a Compass Bank account in a
15 nominee name. And you're going to find that the
16 evidence is going to support that that's Sherry
17 Pettus. And it was money, cash money, placed in a
18 Compass Bank account in a nominee name, "said money
19 being the proceeds of specified unlawful activity."
20      So what we're asking you to find here is
21 that he had the money put in a nominee account, in the
22 name of someone else, and that the money that he put
23 in there was proceeds of drugs sales. Okay? And that
24 he did that -- the indictment goes on further to say
25 that he did it "with the intent, in whole or in part,

1 to conceal or disguise the nature, location, source,
2 ownership or control of those proceeds." In essence,
3 that he had that done so that nobody would know that
4 that was his money. Okay?
5      Now those are the two charges that are going
6 to be in front of you.
7      Let me talk about what we expect the
8 evidence to show. We're going to be calling
9 witnesses. We expect an individual named Gary George
10 to get on the stand. We expect Mr. George to tell you
11 about a lengthy criminal history that he has. Let me
12 tell you, some of the witness that we're going to be
13 putting on the stand in this case are people who are
14 going to admit to you that they're criminals. People
15 who witness this type of activity are generally not
16 people like the common folks that we normally engage
17 with and interact with in our lives. They are people
18 who are criminals.
19      It is oftentimes the case that another
20 criminal is the witness to a crime. But you're going
21 to have an opportunity to look at them. You're going
22 to get to see them up on that witness stand, and we
23 invite you, we ask you, the judge is going to instruct
24 you that you're supposed to apply your everyday common
25 sense about life and about people. You watch those

1 people testify. You listen to what they say, and
2 you're going to find that they're telling you the
3 truth.
4      You're going to find from their demeanor and
5 their knowledge of this man and this man and what was
6 going on in their lives, that these people had to have
7 known him. And we believe that when you get through
8 listening to that testimony, you're going to believe
9 those witnesses in spite of the fact that they're
10 criminals because their testimony is going to be
11 believable not only from the way they present it, but
12 because it will be supported by other facts that you
13 can know for a fact. Things like phone calls. Okay?
14 Things like bank deposits being made. So when these
15 people testify about these things, you're going to
16 have other information.
17      So let's talk about that. Mr. George will
18 tell you that on November the 13th, 2003 he got
19 arrested for the distribution of marijuana, and that
20 he decided to flip and cooperate and testify about
21 what he knew about dope to the Prattville Police
22 Department, and that Detective David DeJohn was
23 contacted and he was brought in and he talked to Mr.
24 George. Mr. George told him that he was involved in a
25 marijuana distribution conspiracy with Patrick Denton,

1 Leon Carmichael and Freddie Williams, and that what
2 they would do is that Mr. Carmichael would have the
3 dope brought in and that he would deliver the dope to
4 Patrick Denton and/or Freddie Williams and that he and
5 Patrick Denton would get the dope and it would come in
6 in one of those quantities.
7      You're going to see one of those quantities,
8 because we seized one out of Freddie Williams' house.
9 That's what the evidence is going to show you. Five
10 hundred and fifty pounds. You're going to get to look
11 at it. You're going to see what they were doing.
12 They would break this stuff down into one pound
13 quantities and then they would distribute it. He's
14 going to tell you about having that happened. Okay?
15      So that's what Gary George is going to talk
16 to you about. And that starts this chain. You see,
17 the evidence is going to show you that Mr. George gets
18 busted. Okay? And now he's starting to talk about
19 what he knows. And he tells them these things. Well
20 guess what, the facts bear out what he's telling the
21 truth when he's telling us this because the next
22 person who's going to testify is going to be a deputy,
23 Steve Brock, with the Chilton County's Sheriff's
24 Office.
25      Deputy Brock is going to tell you that based

1  on a tip that he got from Detective DeJohn, based on
2  what he heard from Gary George because Gary George
3  told him something else, he said, "Part of how we're
4  distributing this marijuana, we're distributing it to
5  a lady named Charlotte Hensarling and her husband
6  Steve Hensarling in Huntsville." He's going to say
7  that he contacted Detective DeJohn and told him that
8  they were getting ready to come down and he and Pat
9  were going to deliver twenty pounds of marijuana to
10 these people.
11      Detective DeJohn got the information so late
12 he couldn't get down there, so he said, "Go ahead and
13 do the deal." And he told him where the car was going
14 to be coming back. So he waited for it on sixty-five.
15 When he saw a car meeting that description, he had a
16 deputy -- excuse me, Deputy Brock -- pull the car over
17 and Miss Hensarling agreed to consent to a search,
18 she'll testify to, and they found, sure enough, the
19 twenty pounds of marijuana in the car. And you'll see
20 that evidence. You'll see it.
21      Then you're going to have a chemist, because
22 one of the things we're going to be doing is
23 establishing that this marijuana is in fact marijuana,
24 so we'll have a chemist to come in from a lab that
25 will tell you they tested it and that's what it was.

1      Then we're going to call David Williams,
2  because David Williams is going to tell you that after
3  the police got this information from Mr. George and
4  then went to -- and arrested Miss Hensarling and
5  caught her with the marijuana, she also talked and
6  told us what her involvement was, that they then got a
7  search warrant and went to Pat Denton's house and they
8  served that search warrant at thirty minutes past
9  midnight on the 17th of November, 2003. And at that
10 time Pat Denton agreed to flip and cooperate with
11 them.
12      You're going to hear evidence that while Pat
13 Denton was in -- while the police were in that house
14 that morning while Denton was trying to decide what he
15 wanted to do, his cell phone rang. And on his cell
16 phone the name Leon popped up. And you're going to
17 have cell phone records that are going to establish
18 the fact that that call did come in.
19      Denton is going to tell you that he helped
20 with it. "What do you want me to do?" "Leon, what do
21 you want me to do?" And there's information now that
22 George has given them -- that Denton has also given at
23 this point that another shipment is due in right now,
24 and they're waiting on Leon to tell them where it is.
25 So Denton doesn't answer the phone quick enough, the

1  evidence is going to show you.
2      But he called right back to Leon, and the
3  cell phone records will establish that this happened.
4  Okay? And then he held the phone up. And you're
5  going to hear Detective DeJohn and another D. E. A.
6  agent tell you that they listened. They held the
7  phone up while he was talking to the voice on the
8  other end, and that Leon Carmichael told Denton that
9  the shipment was in and he wanted to come over. He
10 wanted to come meet with him. Okay?
11      And of course there were a bunch of police
12 officers at Denton's house. This is all happening
13 fast. They've to get out of there because they hear
14 the voice and he says, "I'll be there in five
15 minutes." So they go get out and hide as best they
16 can in finding places. You'll see pictures of this
17 location, testimony about where it was hard to find a
18 place to hide because of where it was.
19      Anyway, you'll find out that a dark colored
20 Honda automobile, which records will show that Leon
21 Carmichael owns one, pulled in that street and went
22 into the driveway to Denton's house and left. And
23 then the police came back in and Denton said, "He told
24 me that the shipment is in, it's at Freddie Williams'
25 house." And he, then, Leon Carmichael, told Denton

1  that he wanted him to go over there at eight o'clock
2  the next morning and help Freddie break it up.
3      Then you're going to hear that he was wired
4  up, and I'll just tell you that the electronics don't
5  always work too good. The police were in a hurry, but
6  we got what we need here. Although some of those
7  tapes are garbled and a lot of it is static and you
8  can't see what happening for one reason or another,
9  you will see on two of those tapes all you need to see
10 to know that Pat Denton was telling the police the
11 truth that night.
12      You're going to see this man on the
13 videotape in a room with the five hundred and fifty
14 pounds of marijuana that they have removed from the
15 secret room that was in his house that had an exhaust
16 fan in it. It was paneling, the testimony will be.
17 That they opened it up, and when they did, they had
18 hid the dope back behind there. He and Williams got
19 the dope out. And then Williams -- Denton had to
20 leave once or twice during this time frame. He had to
21 go buy baggies. He also had to go and get some scales
22 because this defendant's triple beam scales were
23 broken and you'll see those scales.
24      But Denton comes back. And you'll see on
25 the videotape he and this defendant, right here, Mr.

Multi-Page™

1  Williams preparing to break that dope up. They get a
2  cutting board out and start. You'll be able to see
3  it, okay? And then he gets a call, Mr. Williams gets
4  a call that someone in his family is ill and so he
5  leaves. Police come in trying to get in before he
6  goes, but they don't make it. He gets out. You'll
7  see him on the videotape there, though. You'll see
8  when he leaves there. They come in and they seize
9  five hundred and fifty pounds of marijuana out of that
10 house that was packaged in black duffel bags like
11 you'll see in this videotape. Okay?
12       So that, so far, is what we expect the
13 evidence to be. All right?
14       Then you're going to hear some testimony
15 from some of the agents that were involved in the
16 operation that day. Bob Greenwood is going to be the
17 guy to tell you that he saw the dark colored Honda
18 automobile pull in. David DeJohn is going to be
19 telling you that he saw it pull into the driveway.
20       Then you'll hear Larry Hubbard who is going
21 to testify that he is on the D. E. A. task force here.
22 He's going to testify that he went into the house
23 along with other agents, but he took custody of the
24 drug evidence. And he's going to testify, and we'll
25 introduce it at that time so you can actually see the

1  marijuana that was ease seized out of the house.
2       We're hear from a lady named Ethereen Taylor
3  that's going to tell you that that house, a duplex,
4  was being leased to this man. That side of the duplex
5  where the marijuana was found was this man's, and that
6  she didn't know anything about that secret room being
7  in there or that exhaust fan.
8       Then we're going to call Sherry Gonzales.
9  Sherry Gonzales is going to say she's a D. E. A.
10 supervisor. She was out on the operation, and while
11 they were out in the house, a Honda automobile, a
12 Honda Accord, pictures of it will be introduced into
13 evidence, with this defendant right here drives right
14 by the house, looks down, sees the activity, sees her
15 and takes off at a high rate of speed. She turns
16 around -- When I say "this defendant," I'm talking
17 about Mr. Carmichael is in that car. And because
18 she's facing the wrong direction, he gets away and she
19 loses him.
20       She'll testify she was new to the area at
21 this time, but she radios and another D. E. A. agent,
22 Tom Halasz, will testify that he ultimately located,
23 and he'll tell you where and how, this defendant,
24 pulled him over and found inside of his car a
25 briefcase that has some information in it, such as

1  Patrick Denton's phone numbers, Freddie Williams'
2  phone numbers, that he found four pistols in the car,
3  a shotgun, ammunition, five thousand dollars in a bank
4  bag and another twelve hundred bucks in the car.
5  Okay?
6       Then you'll hear testimony that that having
7  been done, that at sometime later Mr. Carmichael came
8  over to D. E. A. in order to obtain back some of the
9  property that we weren't going to keep as evidence for
10 this case. And that while he was over there he made a
11 statement to Detective DeJohn and D. E. A. Agent Bob
12 Greenwood about the fact that he was facing ten -- you
13 know, in his opinion he was facing ten to fifteen to
14 twenty years, is what they're going to tell you he
15 said to them. And he said to me, "That's a life
16 sentence." And they're going to tell you "We don't
17 know why he's saying that, why was that a life
18 sentence, is he sick or something?" And when asked
19 about it, he said, "You got me." Okay?
20       Now you're going to hear all these people
21 testifying. And again, I want to remind you that we
22 invite you to watch them testify, to examine their
23 demeanor and to see how their testimony is supported
24 by the facts. Because this case is in large measure
25 testimonial. And it's going to be important for you

1  to evaluate the credibility of these witnesses. Okay?
2  We want you to do that.
3       You're going to hear other evidence to
4  support the testimony of Pat Denton that he was
5  involved in this lengthy conspiracy. What he's going
6  to tell about is that from 2000 on he got involved
7  with Leon, and he'll tell you how. He'll tell you a
8  lot about Leon. But he'll tell you that he got
9  involved with him. It started out small and
10 eventually it got up to where they were dealing three
11 hundred pounds, sometimes up to five hundred and fifty
12 would come in. But Denton himself was moving
13 something like two hundred and fifty to three hundred
14 pounds.
15      Some of it was going back to Mr. Carmichael,
16 he'll say. How that was moving, we don't know. But
17 he'll tell you about his role in it. Okay? So you're
18 going to hear about the fact that he and this
19 defendant were dealing dope from 2000 on. Okay? And
20 you're going to hear it in I think great detail. We
21 think you'll find Patrick Denton to be a very credible
22 witness. Okay?
23      Now, you're also going to hear other
24 testimony that supports the fact that he's been a long
25 time distributor of marijuana. You're going to hear

Page 30

1 testimony that a lady named Sandra -- well first of
2 all, Jimmy Timmons is going to testify. And he's
3 going to tell you that he was dealing dope for Mr.
4 Carmichael. And he was working with a guy named
5 Lacey, Joseph Lacey, and a woman named Sandra Jones.
6 Sandra Jones was connected to Leon Carmichael.
7 Closely connected to him.
8       Now what you're going to hear is that Sandra
9 Jones got caught by the El Paso Police Department.
10 She got caught on November the 2nd, 1995 by Officer
11 Robert Chavez with forty-two thousand dollars in cash
12 strapped around her. And that he called back up here,
13 and when he found out that some buys had been made
14 from her using Timmons and an undercover officer, and
15 you'll hear that testimony, that he elected that he
16 could seize that money. Now you'll have to decide
17 whose money that was, but the evidence is going to
18 help you in that.
19       You're already going to have her connected
20 to Leon with forty-two thousand dollars, and you're
21 going to know he's dealing dope.
22       You're also going to find out that on July
23 29th, 1997, about a year and-a-half after that, Sandra
24 Jones gets caught by Mississippi Highway Patrol people
25 who will come up here and talk about it, driving a

Page 31

1 truck loaded with oranges. You'll hear that this man
2 has a trucking business, and we don't deny that he has
3 a trucking business. What we're arguing, and what we
4 think the facts will support is, that the money that
5 was involved with this count and significant other
6 sums of money were from coming in from drugs and they
7 weren't coming in from that business.
8       Now we expect that they're going to contest
9 that, but at the end of the day we believe that you're
10 going to find that these proceeds are proceeds from
11 drug activity. Now you're going to hear that he's
12 moving these drugs on these trucks. Okay? That
13 that's how he's getting the marijuana here, and you're
14 going to hear some evidence of that. You're going to
15 see a truck owned by him pulled over in Mississippi
16 with this same Sandra Jones in it with a hundred and
17 fifty pounds of marijuana in the back of it loaded up
18 hidden in a bunch of oranges. Okay?
19       Then you're going to hear testimony that on
20 January the 11th, '98, about six months later, another
21 truck operated by Leon Carmichael is pulled over
22 driving from Idaho down to the Texas border supposedly
23 on its way to Florida and it's caught with in excess
24 of a hundred pounds of marijuana in the back of it.
25 Okay? So you're going to see evidence to support

Page 32

1 these witnesses that he's hauling dope on his trucks.
2 Okay? And that that's how he's getting that drug
3 here.
4       Then you're going to hear -- We're going to
5 switch over now to the money, because you're going to
6 have heard what we believe is sufficient evidence from
7 which you could conclude beyond any shadow of a doubt,
8 much less than a reasonable doubt, that this man is a
9 dope dealer and that this man conspired with him to
10 distribute that marijuana from the testimony that you
11 will have heard.
12       We're going to go and we're going to show
13 you that a bank account got created at Compass Bank in
14 May of 2003 and that a woman by the name of Sherry
15 Pettus owned it up. The testimony is going to be that
16 Sherry Pettus was working over at Leon's place,
17 Multi-investments, Carmichael Center later. But
18 during the life of this, we're not sure exactly what
19 her status was. You'll have to determine that from
20 the evidence. But the bottom line is she was
21 associated with Leon. Okay? And the evidence will
22 establish that through witnesses that will tie her to
23 him. Okay?
24       Bottom line is she opens up an account at
25 Compass Bank and starts putting cash deposits in it.

Page 33

1 You're going to hear from a Compass Bank employee and
2 maybe another witness, but at least one witness will
3 tell you about something called a cash transaction
4 report. If you put more than ten thousand dollars in
5 the bank, the bank has to generate a report for the
6 government. Okay? And that helps the government
7 monitor for tax purposes and also it's used to
8 determine whether or not people may be doing that for
9 drug. Okay?
10       You are going to find that there are a
11 litany of cash deposits. I mean, there are
12 forty-eight total deposits in this account in less
13 than a year, and many of them are between nine and ten
14 thousand dollars cash. Something else funny about
15 that. You're going to be wondering why would Leon
16 Carmichael have somebody putting cash in an account in
17 their name. And you're going to see that the money
18 all gets spent on these kind of checks on things
19 associated with Mr. Carmichael's interests. You'll
20 see the checks all come into evidence.
21       Although it's going into Sherry's account,
22 you'll see that it's being spent on Mr. Carmichael.
23 Okay? So it's his money, and you're going to hear
24 direct testimony that that money belongs to Leon
25 Carmichael. And you're going to hear something else

Multi-Page™

## Page 34

1 funny that I think is going to help you make the
2 determination that that is the proceeds of the
3 unlawful marijuana distribution.
4        The money stinks. The tellers that took
5 these deposits remember it. And they'll describe it
6 to you. They'll tell you about it. They will tell
7 you how everybody ran for cover whenever they saw
8 Miss Pettus come in because they knew this money was
9 going to be so foul. Okay?
10       Now finally, having heard that, you're going
11 to hear evidence, as I told you earlier, that there
12 are a litany of phone calls, cell phone calls going
13 back and forth between Freddie Williams, Leon
14 Carmichael and Patrick Denton. Lots and lots of phone
15 calls that will support Mr. Denton's statement that he
16 was a close associate in the drug distribution
17 business with these two gentlemen. Okay?
18       And lastly, you're going to hear evidence
19 that after obtaining records through searches and/or
20 through subpoena, that the government went out and
21 found out about every bank account referenced in the
22 records that Mr. Carmichael had, and that there was
23 not sufficient cash coming out of any of the
24 legitimate bank accounts he may have had where he was
25 putting his business proceeds in to warrant the

## Page 35

1 creation of an account that could take two hundred and
2 forty-eight thousand dollars in cash deposits, which
3 is what that money laundering account got. Okay?
4        From the totality of the evidence, ladies
5 and gentlemen of the jury, we're satisfied that you're
6 going to be satisfied that they're not only guilty
7 beyond a reasonable doubt, but they're guilty
8 absolutely to a certainty.
9        Now we know, as has already been stated to
10 you, that the burden of proof is on the United States.
11 It is our burden to prove to you beyond a reasonable
12 doubt that these two gentlemen are guilty of the
13 offense that he's charged with and the offenses that
14 he's charged with. We accept that burden. It's the
15 same burden we have in every criminal case in every
16 courtroom in America.
17       And juries just like you make decisions
18 about that. And people get convicted and sometimes
19 they get acquitted. But it is not a burden that
20 cannot be met. And don't be afraid of it. Respect
21 it, but don't be afraid of it, because all that's
22 required is that the you find beyond a reasonable
23 doubt that these individuals, based on the evidence
24 that comes from that stand, are guilty. And if you so
25 find, then we're going to ask you to convict them, and

## Page 36

1 we believe that you will.
2        Once again, we ask that you very carefully
3 -- This case is not about me, not about my co-counsel,
4 it's not about Detective DeJohn, it's not about the
5 these fine lawyers that are here with both of these
6 defendants. It's about whether or not these
7 defendants broke the law. And what I say and what
8 Miss Wayne says, that's not evidence.
9        We can argue inferences, and we will at the
10 conclusion of this case. We ask, what we want you to
11 do, if anybody wants to know what the United States
12 wants you to do in this case, we want you to listen to
13 those witnesses, evaluate their credibility and look
14 at the evidence that comes in. And then we ask you to
15 return a verdict of guilty as charged to these two
16 counts.
17       Thank you.
18       OPENING STATEMENTS:
19       MS. WAYNE: Sometimes the government can be
20 wrong, and in this case the government is dead wrong.
21 Leon Carmichael is a successful, enterprising
22 capitalist that lives in Montgomery, Alabama. You'll
23 hear from this case that this is a successful man who
24 is committed to his community, who gives back to his
25 community, and built the Carmichael Events Center in

## Page 37

1 his community based on his hard work.
2        If you don't have a case, you just point.
3 And you talk about the instructions. But you don't
4 talk about the lack of evidence. The Court will
5 instruct you that the lack of evidence is something
6 that you can consider in terms of their case and proof
7 beyond a reasonable doubt. This is their evidence.
8 You'll see a lot of drugs. You'll see a lot of guns.
9 You'll hear from a lot of snitches. You'll hear from
10 a murderer, a sex offender, drug dealers that Mr.
11 Carmichael somehow is guilty of what they're trying to
12 accuse him of. But you won't see any hard evidence.
13       The government in this case had ten years to
14 get something on Mr. Carmichael in this case. Ten
15 years. They got the dope. No fingerprints, no
16 surveillance, no photographs, no under wiretaps, no
17 videos, nothing on Mr. Carmichael. You know why?
18 Because he's an innocent man. After ten years the
19 government had a dismal case. A dismal case because
20 you can't put together something when there isn't
21 anything there. They're going to bring in a lot of
22 stuff that looks bad, but your job in this case is to
23 scrutinize that evidence and ask yourself can they
24 link it to this man or can they simply sling a lot of
25 mud in this courtroom.

Multi-Page™

---

**Page 38**

1 Look at the evidence. The evidence in this
2 case they're going to bring you, first they talk about
3 Gary Wayne George, a convicted sex offender. A
4 predator. He's going to come in here and they're
5 going to ask you to rely on his testimony to convict
6 Leon Carmichael. Mr. George will tell you it got hot
7 for him sometime in '93. It got hot for him because
8 he had a long history and he knew how the system
9 worked. The cops came out to him to check on him
10 because he was on probation. And when they checked on
11 him, he had marijuana in his house.
12 He knew he was in trouble. He was on
13 probation. He had been in the system and he knew how
14 it worked. He knew what the government needed to get
15 out from under his own problems. So he goes to jail,
16 and the first thing he does is they tell him, "What
17 can you tell us about who gave you the marijuana?"
18 Because he knew that they had been looking at Mr.
19 Carmichael. They had been looking at Mr. Carmichael
20 since '93. And believe me, you're going to hear how
21 they scrutinized Mr. Carmichael.
22 Not only were the feds after him, the D. E.
23 A and all of their resources in this case, but the I.
24 R. S. was after Mr. Carmichael as well. They were
25 subpoenaing his bank records. They were looking at

---

**Page 39**

1 every single thing that man did on a daily basis. And
2 you know what you'll hear from their own agent? They
3 had to keep closing their case because they did not
4 have anything.
5 They were watching him. They were
6 scrutinizing him and everybody in this town knew it.
7 They knew that the feds wanted Leon Carmichael. So
8 Mr. George says to them, "Well, you know, I don't want
9 to go back to jail, so let me give you somebody."
10 Because, you know, in the system if you're the small
11 fish you've got to give them who they believe, whether
12 or not it's true or not, who they believe to be the
13 bigger fish. So he says to DeJohn, he says to him,
14 "Look, I'm telling you that this load is coming in.
15 That Mr. Denton --" Mr. Denton who they also use to
16 rely upon in this case, "that he's breaking down this
17 stuff and these people, the Hensarlings, are going to
18 be picking it up."
19 Now interestingly enough they don't get Mr.
20 Carmichael having anything to do with the Hensarlings
21 in load. They missed Patrick Denton breaking down
22 this stuff, but they catch the Hensarlings and the
23 Hensarlings have marijuana on them. Nothing in that
24 arrest or that bust is connected to Leon Carmichael.
25 Nothing. There's a lot connected to Patrick Denton.

---

**Page 40**

1 Now Mr. Denton finds out the heat is now on
2 him and he has some problems. Because you're going to
3 find out that when they go to his house, Patrick
4 Denton's house, and you're here -- he has a pretty
5 nice house -- and when they go to his house, he knows
6 he has some problems because he has a pending case
7 because he got busted in 2002 right before all of this
8 happens. It's pending. And guess what? It's still
9 pending. He hasn't been sentenced on that case. And
10 he never gets indicted in this case, although he
11 supposedly is a conspirator.
12 Remember, in this case the defense has no
13 power to give witnesses leniency or to give them
14 deals. Don't be fooled that Mr. Carmichael might have
15 the resources to hire attorneys to defend him. But he
16 doesn't have the resources of the Government. Mr.
17 Denton tells them when they come to the house because
18 he knows the heat's on, he has a pending case, and
19 they're asking him immediately about Leon Carmichael.
20 They don't make it a secret. They don't go to Denton
21 and say what can you give me. They say, "We want to
22 know about Leon Carmichael."
23 They know that Patrick Denton knows Mr.
24 Carmichael. He grew up around him. His grandparents
25 still live next door to him, because you'll hear that

---

**Page 41**

1 Leon Carmichael has lived in the same house, drives a
2 Honda, an older car, drives an older Lexus, lives in
3 the same house and lives next door to Patrick Denton's
4 grandparents. Patrick Denton has used Mr. Carmichael
5 for years. Whenever he's gotten into trouble, he's
6 gone to the man who will help him out, who has helped
7 out a number of people in this community much to his
8 own demise. His trusted people in this community who
9 he knew had problems, but he knew that he had grown up
10 with them and he felt he owed that back to his
11 community to help these people out.
12 So Mr. Denton, who he's helped out, who has
13 been calling him all day on November 17th for a loan,
14 all day, and there is no disagreement that they call
15 each other and that they're associates, because Mr.
16 Denton helps him in his business. Mr. Carmichael,
17 you'll hear, owns nightclubs, a flea market,
18 restaurants, a trucking company and his dream, which
19 is The Carmichael Center.
20 You'll hear that he's an enterprising
21 capitalist in this community, and that he's made a lot
22 of money and a lot of people look up to him and they
23 know he's made the money. So there's the phone call
24 after Mr. Carmichael leaves the Carmichael Center.
25 And you'll hear that the Carmichael Center is a place

---

**Page 42**

1  that has a lot of events that lasts through the night
2  and he's there and he's a hardworking man and this is
3  his business. And it's not unusual for him to be
4  leaving the Carmichael Center early in the mornings
5  after events.
6         Now what happens is the next morning, now
7  Mr. Denton realizes that the heat's on and he feels
8  like I got to get out of this. I've got to offer them
9  someone else. So he tells them about the Freddie
10 Williams situation. Now interestingly enough no one
11 will tell you that Mr. Denton isn't a big drug dealer.
12 He is a big drug dealer. Everybody knows that. He is
13 the big drug dealer in this case. And the evidence
14 will indicate to you that when he goes over to Mr.
15 Williams' house, who he is also trying to give up
16 because he needs to get out of this, that Mr.
17 Williams, the alleged drug dealer, doesn't even have
18 the stuff to break it down.
19        Patrick Denton has to go to the grocery
20 store and bring it back to Mr. Williams' house. Then
21 he has to go get the scales. And why is that? It's
22 the setup. The ongoing setup, because Mr. Denton
23 needs to get out from under from where he's at.
24        You'll hear that when Leon Carmichael again
25 drives by Mr. Williams' house, somebody that he knows,

**Page 43**

1  going back to the Carmichael Center, that when the
2  police pull him over -- and, again, this is a man who
3  knows he's been under the scrutiny of the police for
4  ten years -- they pull him over and he says to them
5  voluntarily, "I got a gun in the car. There are guns
6  in the trunk." He's not charged with anything illegal
7  about the guns. They're just telling you that because
8  they want to dirty it up. Because they think if you
9  think he's a bad guy, then he must have done it. But
10 that's not evidence.
11        He tells them, "I got a gun." They take the
12 guns, they take the cash, they're looking for
13 something. There's nothing there. Nothing.
14        Now they're going to bring in Sandra Jones.
15 Sandra Jones is someone who again is an associate of
16 Mr. Carmichael. She knows him. They had a romantic
17 relationship. She's a crackhead. She's the kind of
18 woman who not only is she a crackhead, but she's such
19 a crackhead she can't even take care of her own
20 children. You'll hear that Mr. Carmichael had two
21 children by this woman and he has raised the children.
22 He took the children. This is a woman who has been in
23 and out of jail her whole life. The only thing she
24 cares about is getting her next fix. The only thing
25 Sandra Jones cares about in terms of her truth, their

**Page 44**

1  truth, is what's good for her at the moment to get her
2  next fix. And they rely on that and they want you to.
3  That's Sandra Jones.
4         They will bring another felon in, Mr.
5  Timmons, who says he knows something about Mr.
6  Carmichael and drugs when he's busted with his own
7  case. Every single person that they bring in here,
8  none of them are clean. All of them are in trouble at
9  the time they tell the authorities that Mr. Carmichael
10 has something to do with drugs. The problem is this,
11 they have ten years of notice. They're going to ask
12 you to believe that Mr. Carmichael in his trucking
13 business was bringing hundreds and hundreds of pounds
14 into Montgomery on a weekly basis. But yet they don't
15 have the resources to get him on tape? To get him
16 under surveillance?
17        You'll hear about dozens and dozens of
18 surveillances of this man because that's the right
19 thing. You know why they do that? They do that so
20 you don't have to rely upon the testimony of snitches
21 and unreliable people. The government uses
22 independent hard evidence so you don't have to guess,
23 so you don't have to speculate and so you don't have
24 to say I can't rely on them. They can't do it in this
25 case. They couldn't do it because Mr. Carmichael was

**Page 45**

1  not doing anything wrong.
2         They surveilled him time and time again.
3  They were good surveillances. Mr. Carmichael had no
4  idea who was watching him, when he was being watched,
5  but they watched him. They watched his trucks. Now
6  they want to tell you because one trucker, Sandra
7  Jones the crackhead, got busted in 1997 in
8  Mississippi, that somehow Mr. Carmichael should have
9  known what all of his truckers were doing all of the
10 time. Sandra Jones, she stood up in front of a judge
11 in Mississippi in 1997 and she said, "It's my stuff.
12 I did it." She didn't name anybody else.
13        She didn't say let me Mr. Carmichael take
14 the hit on this, I'm not going down for this. She
15 didn't say anything like it.
16        Now they're going to want to tell you that
17 she took the hit because that's what they do in the
18 organization of drugs. Well you know what? Look at
19 what Sandra Jones tells you when she comes in here and
20 testifies what her motive was. She tells them a
21 couple of years later when she -- First she gets
22 probation when she pleads guilty in Mississippi, and
23 then guess what, Sandra Jones can't meet her probation
24 because she's a crackhead. Because she doesn't care
25 anybody but herself. She gets violated. She goes to

Multi-Page™

1 prison.
2      Hell hath no fury like a woman's scorn.
3 She's mad at Mr. Carmichael at that point. At that
4 point they have broken up. There is no romantic
5 relationship, but he's still taking care of her
6 children. His children. She doesn't see them. She
7 doesn't have anything to do with them. She goes back
8 to prison and she's mad. She's mad because she knows
9 he has the financial means to get her out of this. He
10 doesn't. She goes to prison. They come to visit her.
11      Guess what she says at that point. I know
12 you want Mr. Carmichael. Everybody knows it. I'll
13 give you some stuff. Believe me when I tell you these
14 things. I am now telling you the truth. And she
15 weaves a tale, a tale that can't be corroborated by
16 anything else except Sandra Jones's story. Then she
17 gets out and she changes the story. I have no idea
18 what she'll tell you when she comes into this
19 courtroom, frankly. I have no idea. She has told so
20 many different stories depending upon what the fix is
21 that she needs next. They may have the fix, we don't.
22 We can't tell you what she'll tell you.
23      You'll hear about Sherry Pettus, and
24 Miss Pettus is going to tell you about these bank
25 accounts and the fact that she worked for Mr.

1 Carmichael. And she knows him. And, again, you'll
2 hear about people that Mr. Carmichael let work for
3 him, people that he grew up with, people from his
4 neighborhood that he didn't turn his back on. People
5 who he's known who have been in and out of prison.
6 People who he had known had been in trouble, but
7 people he thought he'd give another chance to.
8 Miss Pettus was one of those people.
9      Now what is interesting about this cash
10 deposits and what they want to spin the tale on in
11 regards to this money laundering is you'll hear that
12 Mr. Carmichael does this interesting thing where he
13 buys all of these Nike tennis shoes and Timberlane
14 tennis shoes. And this is a couple of months before
15 Sherry Pettus opens this bank account. And he has
16 this idea that he's going to buy actually a tractor
17 load of shoes and he brings them back to Montgomery,
18 and he sells them, and he makes a huge profit between
19 two hundred and four hundred thousand dollars.
20      That's the kind of stuff that he did. And
21 he was doing that to make more money to build and
22 improve the Carmichael Center. And you'll see
23 pictures of this beautiful community center that he
24 put all of his hard earned money into and built. He
25 sells the shoes, and they have a receipt for it in the

1 property that they took from his house showing that he
2 got these shoes and how much he paid for them. It's
3 the money that he gave Sherry Pettus.
4      You'll also hear that he dealt a lot in
5 cash. There is no question about that. And you'll
6 hear that he dealt in cash because after the I. R. S.
7 had been scrutinizing him and auditing him, you'll
8 hear that his lawyers' advice, and they will come in
9 and testify, to Mr. Carmichael was, "You'll never know
10 when your accounts might get frozen, because the I. R.
11 S., they can be wrong and they will still freeze your
12 accounts. You need to keep your trucks going. You
13 need to be dealing in cash."
14      You'll also hear that Mr. Carmichael comes
15 from the kind of background where you just didn't
16 always trust the banks on everything. So he had a lot
17 of cash. There is no question about that. That's not
18 a crime. That's not a crime in this country. And you
19 may choose to use the A. T. M. and your debit card,
20 but there are people in this country who use cash and
21 it's not a crime. They want to make it a crime
22 because they don't have any evidence.
23      If you are telling the truth, you don't have
24 to try to remember what your story is because it's the
25 truth, right? And Mr. Feaga said a number of times

1 "we believe." The beauty of the system is it doesn't
2 matter anything about what they believe, it's what you
3 all believe in this case when you scrutinize this
4 case. When you hear from a lot of witnesses who have
5 an axe to grind, a grudge to bear and a reason to save
6 their own necks in this case, a lot of drugs, a lot of
7 guns, what is that testimony worth?
8      You're going to see these generic bags, too.
9 These generic gym bags that were used and the trucks,
10 and you'll see some bags that were taken from Mr.
11 Williams' house. No unique identifying
12 characteristics. Nothing in it that says it belongs
13 to Mr. Carmichael. No fingerprints. No forensic
14 evidence at all to connect him to it. And the reason
15 they're going to tell you is that their argument is
16 going to be because you can't win in this situation,
17 you're between a hard rock -- whatever the saying is.
18 You just can't win.
19      And they're going to tell you that the
20 reason there is no physical evidence to connect Mr.
21 Carmichael is because he's a really savvy smart guy.
22 He's so savvy and smart he outsmarted the entire D. E.
23 A agency. That's why they couldn't get him on tape.
24 That's why they couldn't get a fingerprint. That's
25 why they couldn't wire up Sandra Jones who supposedly

## Page 50

1 has intimate knowledge with him. Sherry Pettus. Mr.
2 Denton who will tell you that he was close friends and
3 a drug associate. They couldn't wire him up and get a
4 tape-recorded conversation with Mr. Carmichael ever
5 saying anything about drugs? It's just because he's
6 so smart.
7    He's so smart that Agent DeJohn will have
8 you believe that after ten years of being under the
9 scrutiny of the Government, the I. R. S. and the D. E.
10 A., that this man comes in after he's arrested --
11    MR. FEAGA: Your Honor, I hate to interrupt,
12 but I think we're running a little far afield of what
13 the evidence is going to be. It sounds to me like
14 counsel is making her closing argument right now.
15    THE COURT: You really are supposed to be
16 summarize rising your evidence.
17    MS. WAYNE: I will, Judge.
18    The evidence will show you that after all
19 those years this man has come in to the property
20 bureau to retrieve his property, who has had countless
21 dealings with Detective DeJohn, and Detective DeJohn
22 will tell you that, they know each other well, and
23 says to him after all these years, "You got me."
24 Detective DeJohn will tell you that's not tape
25 recorded. It's not documented in any form. And you

## Page 51

1 know why they need that statement? They need you to
2 believe that statement because they don't have
3 anything else. So believe that he confessed at the
4 end, because they can't show it any other way.
5    So they want to bring in lots of phone
6 records and lots of phone calls. None of them
7 recorded, by the way, and nothing precludes them from
8 trying to do that. They're the government. They can
9 surveil you until the end of time, okay? Nothing.
10 But they're going to bring you a lot of paperwork,
11 because if there is lots of paperwork to suggest
12 somehow that it must be true, then it must be true.
13 But listen to what Denton tells you. Listen to what
14 Sandra Jones, Timmons, Gary George all tell you. And
15 listen to what their original statements were at the
16 time when they were talking about Mr. Carmichael and
17 what they were thinking they might get in return.
18    A successful businessman continues to live
19 and thrive in Montgomery, Alabama. Mr. Carmichael. A
20 hardworking man who pursues the American dream.
21 Remember, it doesn't matter what they believe, it's
22 who you believe and whether they have the proof beyond
23 a reasonable doubt.
24    THE COURT: Mr. Teague?
25    MR. TEAGUE: Thank you, Your Honor.

## Page 52

1    OPENING STATEMENTS:
2    MR. TEAGUE: May it please the Court,
3 counsel, Mr. Feaga.
4    Ladies and gentlemen of the jury, I am Barry
5 Teague and I represent Freddie Williams.
6    I want to remind you of one important thing,
7 and that is that there are two counts in the
8 indictment. Of course I want to remind you that as
9 the judge has already charged you and you learned
10 yesterday as well as today, the indictment is not any
11 evidence of guilt. It's just an instrument by which
12 the government is required to prove what the grand
13 jury has alleged. And they must prove that beyond a
14 reasonable doubt.
15    It's a pretty high standard. It's not
16 supposed to be based upon your having to do guesswork
17 and speculation and surmise. It's supposed to be
18 beyond a reasonable doubt.
19    Now, it says that Freddie Williams, and I'm
20 reading you the very words of this indictment,
21 "intentionally conspired, combined, agreed with each
22 other". I submit to you, ladies and gentlemen, the
23 lack of evidence is just as important for you to
24 consider in using your common sense in determining
25 this case. There will not be one witness who will

## Page 53

1 testify, I submit, by the end of this trial who will
2 be able to say yes, Leon Carmichael and Freddie
3 Williams sat down and said well, look, I will do this,
4 I'll use my trucks, and you do this, Freddie. There
5 won't be any of that.
6    There will not be any evidence, I submit,
7 that will show that they ever agreed on anything. And
8 that's something that the grand jury has put in this
9 indictment, and they must prove it beyond a reasonable
10 doubt. They cannot do it. They won't do it. And at
11 the end of the trial I want you to go back and
12 remember what I have said here.
13    Now, "conspire, combine". Now you have
14 heard a biographical sketch of Mr. Carmichael. Let me
15 give you a biographical sketch as you will find
16 concerning Freddie Williams. Freddie Williams is not
17 a wealthy businessman. He is a man who all of his
18 life was a sheetrocker.
19    For many years he worked for other people
20 who did sheetrocking business. And then later on he
21 was able to start his own sheetrocking company where,
22 you know, he would get a job here and there and he
23 would pull a crew together and they would go sheetrock
24 a house. He has been doing that for years. He had
25 his own company at one time, but he's never gotten

Page 54

1 rich. He's never even got to where he could own his
2 own house, I submit. And his company, such as it was,
3 is now owned and run by his son. Freddie has gotten
4 on up in age a little bit and you'll frequently hear
5 him cough. He's breathed a lot of dust.
6        Unlike the government's witnesses, who I
7 submit Gary Wayne George and Patrick Denton, who are
8 going to be the principal witnesses against my client
9 and against Mr. Carmichael, I doubt seriously they can
10 lay claim to ever doing a hard day's work.
11        Now this is going to be a case of contrasts.
12 You're going to find that the evidence is going to
13 show from numerous people in this community that
14 Freddie Williams is known to be a good man, have a
15 good general reputation in this community as a hard
16 worker. A good general reputation in the community
17 for honesty and truthfulness. Unlike Mr. Denton.
18 Unlike Gary Wayne George. The government's witnesses.
19 There will be severe contrasts.
20        Suggestions are made by the prosecution that
21 my client agreed to be a trafficker. Now the
22 traffickers are Gary Wayne George and Patrick Denton.
23 We expect the evidence will show that Gary Wayne
24 George, as has already been suggested by co-counsel,
25 that Gary Wayne George has been in prison an awful

Page 55

1 lot. And he knows the best way to kind of pad the
2 problems that he gets into when he gets busted over in
3 Prattville in November of 2003 is oh, you just start
4 talking about people you think the government may
5 want.
6        Patrick Denton is that smart, too. We
7 expect the evidence to show that Mr. Denton -- Gary
8 Wayne George of course is an ex-felon. He's a con, so
9 to speak. Well I expect the evidence will show that
10 their witness, Patrick Denton, is a hardened criminal
11 as well. Ladies and gentlemen, here's exactly what
12 the evidence will show. It's going to show that on
13 June the 13th, 2002, Mr. Denton got arrested and
14 busted for trafficking as a pusher of controlled
15 substances up in Huntsville, Alabama. Now more than a
16 year later in November 2003 when they bust his
17 confederate in crime, Mr. Gary Wayne George, here he
18 is still in the business.
19        They stopped Charlotte Hensarling on
20 November the 13th, I believe it is. She immediately
21 says, "Oh, I've just been to Montgomery. I bought
22 these twenty-five pounds," or whatever it is, "from
23 Mr. Denton and Mr. George." Now somehow Charlotte
24 Hensarling will tell from you this witness stand she
25 was able to get a phone call to her husband.

Page 56

1        I think the evidence is going to show that
2 Gary Wayne George and her husband, Steve Hensarling up
3 in Huntsville, had spent time in prison together. And
4 he immediately calls Denton, and Denton gets wise oh
5 oh, Charlotte's been busted, hmm, what do I do?
6 There's five hundred pounds of marijuana coming to my
7 house, I better do something about it. And he does.
8 And before this case is over you're going to find out
9 how it is he is able to get that five hundred pounds
10 diverted from his place over to Freddie Williams'
11 place. And you will hear that.
12        Now, there will be a search warrant that
13 Agent DeJohn will testify about, and in there he will
14 swear before a judge of this Court, not Judge Thompson
15 but another judge, that five hundred pounds of
16 marijuana is headed to A. O. eight, which is -- the
17 road escapes me right this second. I'm nervous and
18 upset if you can't tell. That it's headed to that
19 nice home of Patrick Denton. But he gets it to go
20 somewhere else.
21        Now some interesting things. This man is
22 alleged by the prosecution to be a trafficker, Freddie
23 Williams. He is supposed to be the breakdown man.
24 That's supposed to mean you take it, you know, you
25 break these bags down, put them into smaller plastic

Page 57

1 bags, you sell them to the public. The drug using
2 public. Well, you know, one thing you got to have to
3 do that properly is you have to have plastic bags.
4 Guess what? Drug trafficker Freddie Williams
5 allegedly doesn't even have bags.
6        It gets kind of cute. I want you to listen
7 closely to this evidence. Detective DeJohn is going
8 to have to acknowledge that he gets -- that after they
9 go down to search the nice house of Patrick Denton,
10 Denton says, "Oh, there's nothing here but, you know,
11 let me tell you I can tell you all about who you want
12 to know about. And oh, I'll tell you about Leon
13 Carmichael." But he knows all along where he's put
14 it. But he claims that Leon Carmichael, who he has
15 gotten to come over there and supposedly told him it
16 would be over Freddie Williams'. Well we submit that
17 won't be the facts.
18        The facts will be that he goes over there,
19 and this alleged trafficker, Freddie Williams, doesn't
20 have bags. And we expect the evidence to show that
21 Denton gets in his car and goes and meets with Agent
22 DeJohn, who is staked out on all of this. He says
23 "Wow, there's no bags over there. I've got to have
24 some bags to break it down. I don't even have any
25 money on me."

Page 58

1 So I expect the evidence is going to show
2 that the Government in all its resources, he hands him
3 a fifty dollar bill and he goes and buys bags. Oh oh,
4 another tool that has -- and this happens, I can
5 guess, about twenty minutes, maybe less, maybe a
6 little more, later he gets back over there and guess
7 what, this alleged drug dealer drug packager doesn't
8 even have any scales. You've got to have scales to be
9 in that business.
10 Guess what? And I expect you to be given
11 some transcripts of some tapes. I expect the
12 transcripts to show at the bottom of the very first
13 page of one of these transcripts when it says "R. P.
14 D.," and you'll be hearing the tapes, you will hear
15 Patrick Denton say -- it's Robert Patrick Denton,
16 that's who R. P. D. is -- "Damn, I didn't bring my
17 scales." That's what he'll say. "I didn't bring my
18 sails." So he leaves and has to meet with the agent
19 again and get some drug trafficker tools. Guess what?
20 He's got them. Oh yeah, he goes and gets them.
21 Ladies and gentlemen, I submit to you the
22 evidence just won't stack up to turn Freddie Williams,
23 who has a good reputation, he is in his sixties, and
24 that is evidence the judge will tell you can even be
25 evidence of such character that you can raise a

Page 59

1 reasonable doubt that a man who has lived sixty years
2 who has for the first time in November after they go
3 over there and find this stuff that Denton has put in
4 his house, lo and behold they put him in jail for the
5 first time in his life. That good reputation counts
6 for a lot, and the judge will tell you that in his
7 charge at the end of case.
8 Ladies and gentlemen, there are no
9 fingerprints to tie my client with any of this, I
10 submit.
11 Another interesting thing in another one of
12 the tapes, they send him over there to see two or
13 three times to my client's house. My client is not
14 even there one of the first times he goes over there.
15 Freddie Williams won't even be there. Well I submit
16 to you that's part of the evidence as to how Patrick
17 Denton is able to get the stuff in there. My client
18 is not even there. And we submit that Denton was able
19 to get in the house when he wanted to and the D. E. A.
20 is not watching him.
21 But while he's there, he immediately in
22 about the first tape, a woman speaks to him and she
23 says, "Hey, darling, how are you doing?" "Hey,
24 darling, how are you doing?" There's another person
25 that lives over there, and we expect that to be a very

Page 60

1 important piece of evidence.
2 Ladies and gentlemen, my time is going to be
3 very short here and I can't outline everything that
4 will come out in the way of proof. I merely urge you
5 and beg you to keep an open mind because there is two
6 sides to every story.
7 I want you to keep in mind the judge will
8 charge you that, you know, you are the sole judges of
9 the credibility of witnesses, and I submit to you you
10 would not trust Gary Wayne George with your child, you
11 would not trust Patrick Wayne Denton with ten cents of
12 your money, and I don't think you'd rely on anything
13 in your personal life that was important to you based
14 on what they said. And I submit to you that you
15 should treat their testimony no differently than you
16 would. Don't let it just simply be Freddie Williams'
17 life that's at stake. I submit to you think about
18 what you would do if your life was at stake. Would
19 you rely on this person? And I submit to you that you
20 will not do that.
21 A man like Denton on June 13th of 2002, more
22 than a year later still in the same business, as that
23 of a hardened criminal? I submit to you that's who
24 the evidence is going to show who he is. He's very
25 cunning. He's learned how to make his living that

Page 61

1 way. He didn't get that nice house from being a
2 sheetrocker. Believe me. I submit to you that I want
3 you to remember that the grand jury has not charged
4 Freddie Williams with possession of marijuana.
5 The grand jury charged him with conspiring.
6 And I submit to you when this case is over, you will
7 not find evidence that my client agreed or combined or
8 conspired with Leon Carmichael. I think all you're
9 going to find is he's a hardworking sheetrocker who
10 has come on to some pretty tough times as far as his
11 physical health goes, and on this particular day when
12 they arrested him and put him in jail for the first
13 time, my client was in the midst of a real crisis.
14 His wife, and you'll hear him calling, when
15 he discovers that all this marijuana has been put in
16 his house -- And by the way we expect the evidence
17 will show that many people who are not so rich, will
18 sometimes, particularly if they have some sheetrock
19 and the ability to wall off part of the place and not
20 heat it, they do so.
21 Now I submit to you that my client, his wife
22 died in this very same time frame. And you'll hear
23 him talking on the phone telling his various children,
24 "Come on, son, go get your brother. Go get your
25 sister. Y'all come on. Get on down here. She's

Page 62

1  about to die." And Patrick Denton goes over there
2  talking to Agent DeJohn saying, "Hey, he's about to
3  leave, you better get on over here. He's about to
4  leave." And the D. E. A., they all come hoarding in
5  and somehow the D. E. A. in all of its resources, they
6  totally miss my client. He goes on down to the
7  hospital and he's there. And he meets his children
8  down there and they go in to see his wife on her death
9  bed.
10      COURTROOM DEPUTY CLERK: Two minutes.
11      MR. TEAGUE: And when he comes back out, the
12  D. E. A. is standing right there and they arrest
13  Freddie Williams. It's an unfortunate circumstance,
14  ladies and gentlemen. These tapes that the government
15  wants you to utilize to, quote, corroborate Patrick
16  Denton, to make him believable? Well I submit to you
17  you're going to hear more
18      (Counsel phonetically indicating static)
19  and in the transcripts you're going to see so much
20  "unintelligible" -- In fact, there are some things
21  that's written out that I'm not sure you're even going
22  to be able to make out. And don't rely so much on the
23  transcript, you rely what you hear from the tapes.
24  And there's a lot of unintelligible that Freddie had
25  to say to Mr. Denton. Unfortunately, it was not the

Page 63

1  time where he could really tend to him the way he
2  needed to, because he had to leave and go to the
3  hospital and meet his children. And they go right
4  down and arrest him.
5      Now, ladies and gentlemen, that's just some
6  vignettes of what we expect the evidence will show.
7  You understand you have sworn and said that you will
8  respect the presumption of innocence. The presumption
9  of innocence, the only way for that piece of
10  jurisprudence to live in your heart is for you, if you
11  were to be asked right now is Freddie Williams guilty
12  of conspiracy? If your answer were to be well,
13  Mr. Teague, I don't know, then you have already
14  breached your sworn oath before Judge Thompson. You
15  should say he's not guilty. That's the only way you
16  make that truly be an American piece of our
17  jurisprudence.
18      The presumptions belong in other countries
19  like France, for instance. It doesn't belong in this
20  country. I ask for your attention, close attention to
21  everything that happens. I submit to you if you do,
22  your verdict on count one, the only one in which my
23  client is charged, will be not guilty.
24      Thank you very much.
25      THE COURT: First witness.

Page 64

1      MR. FEAGA: Gary George, Your Honor.
2      THE COURT: Gary George.
3          G A R Y   G E O R G E,
4  the witness herein, having first been duly sworn or
5  affirmed to tell the truth, was examined and testified
6  as follows:
7          DIRECT EXAMINATION
8      BY MR. FEAGA OF GARY GEORGE:
9  Q  Sir, would you tell the ladies and gentlemen of
10  the jury your name, please.
11  A  Gary Wayne George.
12  Q  And, Mr. George, where do you currently reside?
13  A  I'm currently incarcerated at the Autauga County
14  Jail.
15  Q  Now, sir, I wanted to direct your attention back
16  to a day, November the 13th, 2003, and ask you if you
17  recall being arrested on that day.
18  A  Yes, sir.
19  Q  Would you tell the ladies and gentlemen of the
20  jury why you were arrested that day?
21  A  I had two charges of distribution of marijuana.
22  Q  Now that's not the first time you've ever been
23  arrested, is it?
24  A  No, sir.
25  Q  How old are you, Mr. George?

Page 65

1  A  Forty-one.
2  Q  Where were you raised?
3  A  In Birmingham and Florida.
4  Q  Where were you born?
5  A  In Bibb County, central Alabama.
6  Q  And how long did you live there?
7  A  Up until about my teens.
8  Q  And then you mentioned that you had gone to
9  Florida from Bibb County. How did you wind up in
10  Florida?
11      MS. WAYNE: Objection, relevance.
12      THE COURT: How is that relevant?
13      MR. FEAGA: Your Honor, it's relevant
14  because they have made an issue of the fact in their
15  opening statements, and we expect on cross examination
16  that they will make an issue of his background, and
17  whether or not they've talked to the jury, they told
18  them they shouldn't believe him and I want the jury to
19  hear about him, to hear a little bit about his
20  background and find out how he got here to this
21  courtroom here today.
22      MS. WAYNE: Judge, my argument is his
23  criminal background is what we care about, not his
24  entire growing up period.
25      MR. FEAGA: Well they may not care about it,

Page 66

1 Your Honor, but I think this jury will find it very
2 helpful in deciding whether or not to believe his
3 testimony, to hear a little bit about him and as to
4 how he got here today.
5     THE COURT: I'll allow limited questioning
6 about how he got here.
7 Q Mr. George, how did you wind up in Florida from
8 Bibb County? You said you moved there as a teenager?
9 A Yes, sir.
10 Q How did that happen?
11 A My grandfather moved there in his early
12 seventies, so we moved following him.
13 Q "We moved"?
14 A My mother and me.
15 Q Where was your Daddy?
16 A They were separated.
17 Q I got to not talk when you're talking or the
18 court reporter can't get it down. That's my fault.
19 I'll try to do it better. But you said you moved to
20 the state of Florida with your grandfather?
21 A Me and my mother moved.
22 Q Where was your Daddy?
23 A They were separated.
24 Q And where did he live?
25 A He lived in Selma, Alabama.

Page 67

1 Q Now how far did you go in school?
2 A Tenth grade.
3 Q And where was the last place you went to school?
4 A Naples, Florida.
5 Q And one thing I'm going to want you to do --
6     MR. FEAGA: Your Honor, may I approach
7 briefly? I notice he has the cuffs on.
8     THE COURT: Yes.
9 Q I'm going to move the microphone. If you can, I
10 want you to lean up into it and speak loudly. I want
11 to make sure everybody can hear you.
12     You said you went through the tenth grade in
13 Naples, Florida?
14 A Yes, sir.
15 Q What did you do after you left school?
16 A I started working.
17 Q Why did you leave school?
18 A To help support my mother and half sister.
19 Q What did you do when you left school?
20 A Started mechanic work.
21 Q What kind of work?
22 A Mechanic.
23 Q And how did you -- You said you started mechanic
24 work. Would you describe the work you were doing.
25 A Me and my cousin, we went in together and bought

Page 68

1 a service station and started working on cars, and he
2 was a certified mechanic.
3 Q Now where was that that you were doing that?
4 A I had come back to Alabama in Bibb County.
5 Q And where were you staying when you came back to
6 Alabama?
7 A In Centreville.
8 Q Who were you living with?
9 A My granddaddy. I mean my granddaddy off my
10 father's side.
11 Q Off your father's side?
12 A Yes, sir.
13 Q And you and a cousin started a mechanic's
14 business?
15 A Yes, sir.
16 Q How long did you stay with that?
17 A About a year and-a-half.
18 Q Okay. And why did you quit doing that?
19 A I moved back to Florida.
20 Q And what did you do when you got back to Florida?
21 A I got into some trouble.
22 Q Okay. What kind of trouble did you get into?
23 A A robbery with a firearm. Robbery with a deadly
24 weapon.
25 Q And did you get convicted of that?

Page 69

1 A Yes, sir.
2 Q And what kind of sentence did you get?
3 A I was under the youthful offender. I got four
4 years in prison and two on probation.
5 Q Did anybody get hurt in those robberies?
6 A No, sir.
7 Q How much money did you get?
8 A I never knew because I was just in the car.
9 Q Now how much time did you get from that?
10 A Six years total.
11 Q Did you go to prison?
12 A Yes, sir.
13 Q How long?
14 A A little over two years.
15 Q Okay. And where did you do that?
16 A In Lavar Correctional in Florida.
17 Q And how old were you when you got out?
18 A When I got out, around twenty-two, I think.
19 Q Okay. And what did you do after you got out of
20 that period of incarceration?
21 A I did some odd jobs working. I also went to
22 trade school and took a barbering class while I was
23 there. So I started barbering when I first got out.
24 Q Barbering?
25 A Yes, sir.

Page 70

1 Q  What do you mean when you say "barbering"?
2 A  Cutting hair.
3 Q  Okay.  How long did you do that after you got
4 out?
5 A  About two years.
6 Q  Why did you quit barbering?
7 A  I got into some more trouble.
8 Q  What kind of -- How old were you when got into
9 some more trouble?
10 A  Twenty-three, I think.
11 Q  And what kind of trouble was it this time?
12 A  Receiving stolen property and some burglaries.
13 Q  Did anybody get hurt?
14 A  No, sir.
15 Q  How much did you get out of it?  How much did you
16 make off of that?
17 A  About seventeen thousand.
18 Q  Now did you go to prison for that?
19 A  Yes, sir.
20 Q  And how long were you in prison this time?
21 A  Seven years and four months.
22 Q  And where did you do that time?
23 A  West Jefferson.
24 Q  Where is West Jefferson?
25 A  In Jefferson County.

Page 71

1 Q  When did you get out of prison from that period
2 of incarceration?
3 A  In 1992.
4 Q  And how long -- What did you do after you got out
5 of prison?
6 A  I went back to cutting hair.
7 Q  And how long did you cut hair?
8 A  Until '95.  The end of '95.
9 Q  And why did you quit cutting hair after doing
10 that for about three years in 1995?
11 A  I had an attempted sexual abuse, and I got a year
12 on it.  And they revoked my parole.
13 Q  And what was the sexual abuse?
14 A  It was -- I touched a female that was in the
15 vehicle with me on her breast after she said not to.
16 Q  And so what happened to you as a result of that?
17 A  I got a year in jail for it.  I was on parole so
18 they violated my parole.
19 Q  And how long were you back in, a year you say?
20 A  About sixteen months.
21 Q  Where did you go?
22 A  Stayton.
23 Q  Where is that?
24 A  It's in Montgomery.
25 Q  Okay.  And when did you get out of Stayton?

Page 72

1 A  I want to say around the end of '96.
2 Q  All right.  And what did you do after you got out
3 of Stayton in '96?
4 A  Moved to Prattville.
5 Q  And what did you do in Prattville?
6 A  I was barbering.
7 Q  And how long did you barber?
8 A  About six months.
9 Q  Okay.  And why did you quit barbering at that
10 time?
11 A  I caught some marijuana charges.
12 Q  What do you mean when you say you "caught some
13 marijuana charges"?
14 A  I was found to have some marijuana.
15 Q  Say that again?
16 A  I was caught with some marijuana.
17 Q  And this was in what year?
18 A  1997.
19 Q  And how much marijuana did you get caught with in
20 1997?
21 A  About a half ounce.
22 Q  And what happened to you as a result of that?
23 A  I got fifteen years.
24 Q  And where did you get fifteen years?
25 A  From Prattville.

Page 73

1 Q  And did you go back to prison?
2 A  Yes, sir.
3 Q  Where did you go?
4 A  I went to Stayton.  Kilby, then Stayton.
5 Q  Okay.  And how long were you in Stayton that
6 time?
7 A  Until 2001.
8 Q  Okay.  And what did you do after you got out of
9 prison that time?
10 A  I started barbering.
11 Q  All right.  Now I want to ask you, have you ever
12 heard the name Charlotte Hensarling?
13 A  Yes, sir.
14 Q  Have you ever heard the name Steve Hensarling?
15 A  Yes, sir.
16 Q  Do you know them?
17 A  Yes, sir.
18 Q  Would you tell the ladies and gentlemen of the
19 jury how you met Charlotte and Steven Hensarling?
20 A  I met Steve Hensarling when the first time I did
21 -- I was incarcerated in Alabama at West Jefferson.
22 And then I didn't see him no more until 1999, I think
23 it was, at Stayton.  And we was together at Stayton
24 for about a year.  And then when I went up for parole
25 he went to my parole hearing, and after that when I

**Page 74**

1 got out not long after that, and we went and visited,
2 went to Huntsville and visited several times.
3 Q  Now you said after you got out you went to
4 Huntsville and visited.  When are you talking about?
5 A  The first part of 2001.
6 Q  Now this is after you got out the most recent
7 time?
8 A  Yes, sir.
9 Q  Before going back in where you are now?
10 A  Yes, sir.
11 Q  Were you out until you went back in this time?
12 You know, you testified at the beginning that you had
13 gotten arrested in Autauga County and charged with two
14 counts of distribution of marijuana.
15 A  Yes, sir.
16 Q  And that's what got you back in this time?
17 A  Yes, sir.
18 Q  How long were you out from 2001 -- well you said
19 it happened on November 13th, 2003, right?
20 A  Yes, sir.
21 Q  So you were out about two years?
22 A  A little over two years.
23 Q  Now on November the 13th, 2003, you said you got
24 arrested.
25 A  Yes, sir.

**Page 75**

1 Q  I want to pick back up there, now, then.  Who
2 arrested you?  How did you get arrested?  What police
3 agency?
4 A  Prattville Drug Task Force.  It was Todd Townsend
5 was over it.
6 Q  Did you ask to speak to anyone after you were
7 arrested?
8 A  Yes, sir.
9 Q  What did you tell Detective Townsend?  Who did
10 you tell him you wanted to speak to?
11 A  I asked him if I could speak to someone from the
12 D. E. A. or the federal unit.
13 Q  And did someone show up to talk to you?
14 A  Yes, sir.
15 Q  Who was it?
16 A  David DeJohn.
17 Q  Why did you ask Detective Townsend to let you
18 speak to someone from D. E. A. that day?
19 A  I had some information to give him about some
20 marijuana.
21 Q  Now was there any particular reason you wanted to
22 give them information about marijuana?
23 A  Yes, sir.
24 Q  What was that?
25 A  For one, I wanted to see if I could get some

**Page 76**

1 leniency; and, two, I was just tired of things I had
2 been doing.
3 Q  So you did talk to Investigator David DeJohn?
4 A  Yes, sir.
5 Q  What, if anything, did you tell Investigator
6 DeJohn that you knew about drug trafficking activity?
7 A  Before he would come and talk to me he stated to
8 Todd Townsend --
9      MS. WAYNE:  Objection, hearsay.
10      MR. FEAGA:  Your Honor, we're not offering
11 it to prove the truth of the matter asserted.  Just
12 merely to go to what he said to the grand jury so they
13 can put it in context.
14      THE COURT:  I really don't know what he's
15 going to say.  Ask your question again.
16      MR. FEAGA:  Well, I think I can move this
17 along, Judge.
18 Q  Why don't you just tell the ladies and gentlemen
19 of the jury what it is you told Detective DeJohn
20 without saying what he asked you.  Okay?
21      THE COURT:  There is nothing wrong with
22 saying what DeJohn asked him, because the question is
23 not hearsay.  I just didn't hear what you asked him.
24      MR. FEAGA:  Oh, I'm sorry, Your Honor.  Well
25 let me try that again, then.

**Page 77**

1 Q  You said that you talked to Detective DeJohn,
2 correct?
3 A  Prior to me talking to him, Todd Townsend asked
4 me did DeJohn said --
5      MS. WAYNE:  Judge, I'm objecting because
6 that's double hearsay.
7      THE COURT:  No, he's saying what the
8 question is.  I'll allow it in.
9      MR. FEAGA:  Okay.  Thank you, Your Honor.
10 Q  What did he ask you?
11 A  He asked me who was the name of who I was talking
12 about.  He needed a name.
13 Q  And when he said he needs a name of who you were
14 talking about, why would he say that to you?
15      MS. WAYNE:  Objection.  Speculation of why
16 he would say that to him?
17 Q  Well had you said something to him prior to the
18 that?
19 A  To DeJohn?
20 Q  No, to whoever it was that asked you we need a
21 name before I'm going to do this of who you're talking
22 about.
23 A  To Officer Townsend.
24 Q  Right.  What had you said to him that caused him
25 to say that to you?

### Page 78

1  A  Because I wanted to talk to someone on a higher
2  echelon, I guess.
3  Q  You wanted to talk to someone higher up than him
4  about what?
5  A  The information I had.
6  Q  And he told you he needed a name first?
7  A  Yes.
8  Q  Did you give him a name?
9  A  Yes, sir.
10  Q  What name did you give him?
11  A  Carmichael.
12  Q  Is that the name?  Is that what you said,
13  "Carmichael"?
14  A  I said, "Carmichael."  And he sent back word to
15  me and he said, "Is it Leon Carmichael?"  And I told
16  him, "Yes."
17  Q  I'm sorry, I couldn't hear that.  I'm going to
18  need you to lean up to that mic.
19  A  He asked me if it was Leon Carmichael, and I
20  said, "Yes."
21  Q  At that point in time the next thing that
22  happened, was that when Officer or Detective DeJohn
23  showed up?
24  A  Yes, sir, about forty-five minutes later.
25  Q  Okay.  Now what, if anything, did you tell

### Page 79

1  Investigator DeJohn on that day?
2  A  That I had some information for him and I'd like
3  to talk with him by his self.
4  Q  Okay.  And did you?
5  A  Yes, sir.  We went to the Prattville City Police
6  Department.
7  Q  And what, if anything, did you tell him?
8  A  I told him the scenario that how I became
9  involved with the marijuana that Leon was supplying
10  from for Montgomery.
11  Q  Tell us how you became involved in it.
12      THE WITNESS:  Excuse me.  Can I get some
13  water?
14      THE COURT:  Definitely.
15      Miss Carnes?
16  A  I told him that after I got out of the
17  penitentiary, that my wife's cousin, Pat Denton, and I
18  were friends and that Pat had been doing a lot of
19  business dealings with him.
20  Q  With who?
21  A  Leon Carmichael.
22  Q  Okay.
23  A  And that Pat and I usually cut it up when it come
24  into town.  We'd cut it out of the wrappers and weigh
25  it up into pounds and distribute it out to wherever he

### Page 80

1  would tell us or wherever Pat would go.  We'd keep
2  some of it, probably several hundred pounds, and
3  deliver the rest back to Leon and his people.
4  Q  Where would you deliver it back to when you
5  delivered some back?
6  A  Usually to a guy that worked for him named
7  Freddie.  He lived just off Rosa Parks.  Or either --
8  There's been a couple of times, he had an old car lot
9  and we took some down there for him.
10  Q  Did you know this Freddie?
11  A  No, I didn't know him personally, just by his
12  van, mainly.
13  Q  What do you know about his van?
14  A  It was an old gray van.
15  Q  Did you ever see this Freddie?
16  A  I just drive, but never up close.
17  Q  So you can or can you not identify this Freddie?
18  A  Probably not.
19  Q  Okay.  What about Carmichael?  You said -- Well I
20  was asking you the question was you said you delivered
21  some of this back.  You would deliver it back where?
22  A  To Freddie's house.
23  Q  Okay.  And let me show you, if I can, I'm going
24  to show you what's been marked for identification
25  purposes as government's exhibit 7(d).

### Page 81

1      MR. FEAGA:  May I approach, Your Honor?
2      THE COURT:  Yes.
3  Q  I'd ask you if you would to examine government's
4  exhibit 7(d).
5  A  Yes, sir.
6  Q  Do you recognize that?
7  A  Yes, sir.
8  Q  Would you tell the ladies and gentlemen of the
9  jury what government's exhibit 7(d) is.
10  A  The house on the right-hand side is where Freddie
11  lived.
12  Q  Okay.  Is this a duplex?
13  A  Yes, sir, it is.
14  Q  I see.  And the one on the right-hand side of
15  this photograph --
16  A  Yes, sir.
17  Q  -- is his place?
18  A  Yes.
19      MR. FEAGA:  Your Honor, permission to
20  publish this?
21      THE COURT:  Yes.
22      Now do you wish to have it admitted?
23      MR. FEAGA:  Yes, sir, I would also like to
24  offer it into evidence.
25      THE COURT:  You really need to offer it

Page 82

1  before you publish it.
2       MR. FEAGA:  Oh, yes, sir, I apologize for
3  that.
4       THE COURT:  It's admitted.
5       MR. FEAGA:  Thank you.
6  Q  This is the house where you would take the
7  marijuana that was left over after you and Pat cut it
8  up?
9  A  Yes, sir.
10  Q  Okay.  Now where would you and Mr. Denton cut
11  this marijuana up?
12  A  At a couple of different places.  One of them was
13  in his garage built onto his house, or either in his
14  garage out behind his house, or either at a house that
15  his uncle owned.
16  Q  And where was the house that his uncle owned?
17  A  Over by Maxwell.
18  Q  Now when you would cut this marijuana up, would
19  you describe for the ladies and gentlemen of the jury
20  -- First of all, how often would this happen?
21  A  I'd probably say from ten to fourteen days.
22  Q  Every ten to fourteen days?
23  A  Yes, sir.
24  Q  And how much would you have to cut up?
25  A  It varied.  On the average, usually no less than

Page 83

1  four hundred dollar and fifty pounds, but usually it
2  was more around like six-fifty to seven hundred.
3  Q  All right.  And how would you describe for them
4  what you would do with it?  How would it arrive?  What
5  did it look like when it came?
6  A  It came in back duffel bags about three foot
7  long, about a foot-and-a-half tall, and each one of
8  them would have, I don't know, sixty-seven pounds in
9  them or more.  And it's usually six to seven duffel
10  bags.  Sometimes it's been up to ten.  And it was all
11  wrapped up in plastic.
12      You'd have to take knives and cut through
13  the plastic, brown plastic, and then there was another
14  layer of plastic that had grease in between two layers
15  of plastic.  You have to cut through that, and then
16  there was another thick layer of white plastic.
17  Q  And what would be inside all this plastic?
18  A  Marijuana.  It would be different sizes.  Some of
19  them would be four pounds.  Some of them would be
20  seven or eight pounds.  You take a machete and a
21  hatchet and just start cutting them up.
22  Q  Was it loose?
23  A  No, sir.
24  Q  Describe it.
25  A  It was very compressed and very exact.

Page 84

1  Q  And that's why you had to have a hatchet?
2  A  It was like bricks, really.
3  Q  Okay.  And what would you all do with it when you
4  were breaking it up?
5  A  We'd put it in pound bags, weigh it up to the
6  marijuana was four forty-six, plus the baggies would
7  weigh thirteen grams.  We'd make it around four-sixty,
8  and that'd be -- every bag would have four hundred and
9  sixty grams worth.
10  Q  Four hundred and sixty grams is how much?
11  A  Well counting the bag, that would be one pound.
12  Q  Okay.  Now where did this marijuana that you were
13  cutting up at these three different locations come
14  from?
15  A  Leon Carmichael.
16  Q  Were you ever present when Leon Carmichael
17  delivered that dope to Denton?
18  A  Usually he would follow Freddie when Freddie
19  would deliver it.  And once he got there safe, then
20  Leon would leave, once it was taken out of Freddie's
21  van.  And I've only known Leon to drop it off one
22  time.
23  Q  All right.  Tell us about the one time he dropped
24  it off.
25  A  I was at Pat's house and he got a call from Leon

Page 85

1  that has Leon on his phone and he said he'd be here in
2  about five minutes.  He said okay.  So we were looking
3  for him and watching him and didn't see him.  So he
4  waited about another five minutes and he called and
5  said I had to stop for a minute.  I'm on the way and
6  I'll be there in two minutes.  So we seen the van
7  coming down the road, so we turned off the light in
8  the garage because he didn't want to see you in there,
9  didn't want anyone to know about it.
10  Q  Who didn't want to see you in there?  What do you
11  mean by that?
12  A  Well I was in the garage, and he just didn't want
13  Leon to know that I was in there.
14  Q  Who didn't want Leon to know that you were in
15  there?
16  A  Pat.
17  Q  Why?
18  A  I guess, you know, just keep their business
19  affairs to themself.
20  Q  So what, if anything, did you see happen in the
21  -- Before we go there, when did this happen?
22  A  That was probably early 2002.
23  Q  Okay.  Early 2002.
24  A  I'd say around February, March.
25  Q  Around February or March 2002?

---

Multi-Page™

Page 90

1 A  Yes, sir.
2 Q  And when you say "used car lot," that's what
3 you're talking about?
4 A  Yes, sir.
5 Q  Did you see Leon Carmichael that day?
6 A  Yes, sir.
7 Q  How did that happen?
8 A  Because when we first got there Leon wasn't there
9 and he pulled up while we were waiting on him.
10 Q  And what happened?
11 A  Pats went inside.
12 Q  Did Pat take anything with him?
13 A  He carried a bag that had the money in with him.
14 Q  All right.  And at some point did he come back
15 out?
16 A  Yes, sir.
17 Q  Did he still have the bag with the money when he
18 come back out?
19 A  No, sir.
20 Q  Now were there any other occasions where you had
21 occasion to see Leon Carmichael?
22 A  One other time that I seen him was we went to his
23 house one evening.
24 Q  You went to his house?
25 A  Yes, sir.

Page 91

1 Q  Why did you go to his house?
2 A  To carry some money.
3 Q  Okay.  And who was with you?  If anybody.
4 A  Pat Denton and I.
5 Q  Okay.  And do you remember how much you were
6 taking that time?
7 A  I think it was sixty-five thousand.
8 Q  And let me show you --
9      MR. FEAGA:  Your Honor, may I approach the
10 witness?
11      THE COURT:  Yes.
12 Q  Let me show you what's been marked for
13 identification purposes as government's exhibit 7(q)
14 and ask you if you would examine it.
15      MR. TEAGUE:  May I see that?
16      THE COURT:  Definitely.
17      MR. FEAGA:  My apologies.
18 Q  I'm going to show you what's been marked as
19 government's exhibit 7(1) for identification purposes
20 and would ask you if you would look at it.  Have you
21 had a chance to look at it?
22 A  Yes, sir.
23 Q  Do you know what that is a picture of?
24 A  Leon Carmichael's house.
25 Q  Is that where you took that sixty-five thousand

Page 92

1 dollars?
2 A  Yes, sir.
3      MR. FEAGA:  Your Honor, we'd like to offer
4 government's exhibit 7(q) into evidence.
5      THE COURT:  It's admitted.
6      MR. FEAGA:  Permission to publish to the
7 jury, Your Honor?
8      THE COURT:  Yes, you may.
9 Q  Now did you see Mr. Carmichael that day?
10 A  Not until he came back out.  When Pat came back
11 out to the car is when he came back out.
12 Q  So Pat went in the house?
13 A  Yes, he was carrying a brief case.
14 Q  What was in the briefcase?  If you know.
15 A  The money.
16 Q  And how do you know it was in there?
17 A  Because I helped count it.
18 Q  And Pat went in the house with it?
19 A  Yes, sir.
20 Q  And when he came back out?
21 A  He just had the briefcase.  There was no money in
22 it.
23 Q  How do you know there was no money in it?
24 A  Because we opened it up and got some rubber bands
25 in it.

Page 93

1 Q  All right.  Now you said that you didn't see Mr.
2 Carmichael before Pat went in.  Did you see him after
3 he went in?
4 A  Yes, sir.
5 Q  Okay.  And how did that happen?
6 A  When we first went up, he told me to lay back in
7 the car.  So I put the seat back and laid down sort
8 of, and he just rang the doorbell.  And then he went
9 in.  Somebody come to the door and I couldn't tell who
10 came to the door.  And then Pat went in.
11      When he come out, Pat and Mr. Carmichael
12 come out, and they stood on the porch probably five
13 minutes at the most, and then Pat come on and got in
14 the car.
15 Q  Okay.  Now was that individual the same
16 individual that you've identified to the jury as Leon
17 Carmichael?
18 A  Yes, sir.
19 Q  Now you said that there was something called the
20 Carmichael Center where that place that you delivered
21 money to Leon earlier at was.  You called it "the car
22 lot."
23 A  Yes, sir.
24 Q  I want to show you, if I may, what's been marked
25 government's exhibit 7(s) for identification purposes

Page 94

1 and ask you if you would take a look at 7(s).
2 A Mm-hmm.
3 Q Have you had a chance to look at it?
4 A Yes, sir.
5 Q Do you recognize what's depicted in that
6 photograph?
7 A The Carmichael Center.
8    MR. FEAGA: Your Honor, we'd like to offer
9 this into evidence as government's exhibit 7(s).
10    THE COURT: Admitted.
11    MR. FEAGA: May I publish?
12    THE COURT: Yes, you may publish it to the
13 jury.
14 Q Now, sir, let me show you another photograph that
15 has been marked for identification purposes as
16 government's exhibit 7(c) and ask you, if you would,
17 take a look at government's exhibit 7(c).
18 A That's Pat Denton's house.
19    MR. FEAGA: Your Honor, we'd like to offer
20 government's exhibit 7(c) into evidence.
21    THE COURT: It's admitted.
22    MR. FEAGA: Permission to publish?
23    THE COURT: You may publish it to the jury.
24 Q Now is Pat Denton's house, government's exhibit
25 7(c), this picture, is this one of the places that you

Page 95

1 said you would cut up this marijuana?
2 A Yes, sir.
3 Q Now the other place that you said you cut it up
4 was some house his uncle owned, is that right?
5 A Yes, sir.
6 Q And there were two locations, I think you said,
7 at government's exhibit 7(c) where you did it.
8 A Yes, sir.
9 Q Can you see in government's exhibit 7(c) where
10 you would do that?
11 A The one is right here. That's where the garage
12 is.
13    MR. FEAGA: The record should reflect that
14 he's pointing to the right side, the far most window
15 of the house.
16 Q And?
17 A And the other one is over here.
18    MR. FEAGA: And he's pointing to an area
19 that's fenced in that's really off the photograph on
20 the right side.
21 Q Now having told Investigator DeJohn these things
22 that you've just now told the jury, what, if anything,
23 happened after that?
24 A I told him -- He wanted to know -- I told him
25 there was more coming in very soon. He asked me was I

Page 96

1 sure about it, and I said yes. He asked me when it
2 was supposed to be coming in, and I said it was either
3 Saturday night or Sunday night.
4 Q Now you said that you were talking to him on the
5 13th of November of 2003?
6 A Yes, sir.
7 Q Was that a Thursday?
8 A Yes, sir.
9 Q Okay. And then you said then this other shipment
10 you just testified to was going to be coming in either
11 Saturday or Sunday night you thought?
12 A Yes, sir.
13 Q Okay. Tell us what you told Investigator DeJohn.
14 A Earlier, I talked with Pat, and he told me it was
15 going to be Friday night. But something happened and
16 it didn't make it on Friday night, so he said it's
17 going to be Saturday night or Sunday. So I relayed
18 that to Officer DeJohn.
19 Q Did you meet with him again after the 13th?
20 A Yes, sir.
21 Q Did you meet with him the next day on the 14th?
22 A Yes, sir.
23 Q Did you meet with him the next day on the 15th?
24 A Yes, sir.
25 Q And was it during one of these conversations that

Page 97

1 you relayed this information to him?
2 A I called him and told him and met with him and
3 another gentleman in Prattville.
4 Q And what is it you him when you met with him in
5 Prattville?
6 A The exact day it was supposed to be coming in,
7 and I gave him some money -- or he took some serial
8 numbers of some money I had.
9    THE COURT: It's now lunch.
10    MR. FEAGA: Yes, sir.
11    THE COURT: Is this a good place to stop?
12    MR. FEAGA: That's fine with us, Your Honor.
13 We've got quite a bit more.
14    THE COURT: Members of the jury, we're going
15 to recess until one o'clock. You're under the
16 instructions that I've given you several times about
17 of course not discussing the case among yourselves or
18 with anyone else, and having no contact with the
19 parties involved.
20    Please write your names on your pads. Even
21 if you've written nothing write your names on your
22 pads and turn them over in your chairs so that no one
23 can see if you've written nothing. It's none of our
24 business.
25    See you back here at one.

Multi-Page™

**Page 98**

1  Court's in recess until one o'clock.
2  (Whereupon, the luncheon recess was
3  taken.)
4  THE COURT: Mr. Feaga, ready to proceed?
5  MR. FEAGA: Yes, sir, Your Honor.
6  Q  Mr. George, I believe when we stopped you were
7  talking about having -- you were at a meeting that you
8  were having with Detective -- Investigator DeJohn on
9  Saturday the 15th of November. And you were talking
10  about -- you were getting ready I think to tell them
11  about some deliveries that were coming in, and I think
12  you said something about giving them some money that
13  you had.
14  A  Yes, sir.
15  Q  Would you pick up there? What did you tell
16  Investigator DeJohn? And do you remember who was with
17  him?
18  A  I don't remember the gentleman's name, but he
19  told me who it was and someone within his branch where
20  he works.
21  Q  All right. What did you tell them at that time?
22  What time of day was this on Saturday the 15th?
23  A  It was around two o'clock. Two or three o'clock
24  in the evening.
25  Q  Where is this? It's in Prattville you said?

**Page 99**

1  A  Yes, sir.
2  Q  Where in Prattville?
3  A  Up in the old part of Prattville. Up on what
4  they call Pratt Hill. It leads up to where the water
5  tower is, or a water tank rather. And it's just a
6  vacant road that's closed off so no one can go to the
7  water tower. And we met right there on that road.
8  Q  All right. And what, if anything, did you tell
9  them at that time?
10  A  I let them know that marijuana was supposed to be
11  in Sunday night, and where we was going to cut it up
12  at. And also that I had some money. They took some
13  serial numbers off I think seven hundred dollar bills.
14  Q  Why did he take that money from you?
15  A  Because I was paying it to Pat that night.
16  Q  And what did you tell them? You said a load was
17  coming in, did you tell them where?
18  A  Yeah. I said it would come to Pat's house.
19  Q  Okay. And you told them this Saturday the 15th?
20  A  Yes, sir.
21  Q  Okay. And when did you tell them this load was
22  going to come in?
23  A  Sunday night.
24  Q  So that would be the next day, sometime that
25  night?

**Page 100**

1  A  Yes, sir.
2  Q  All right. Okay. Did you at that time tell them
3  anything else?
4  A  Not that I remember.
5  Q  All right. Now you said earlier that you knew
6  somebody named Charlotte Hensarling and Steve
7  Hensarling.
8  A  Yes, sir.
9  Q  And would you, just to get me back, what was the
10  nature of your relationship with the Hensarlings after
11  you got out of prison? I think you said you met Mr.
12  Hensarling in prison.
13  A  I supplied the marijuana for them.
14  Q  Okay. When did you start supplying marijuana to
15  the Hensarlings?
16  A  Probably around March. Maybe April, 2002,
17  Q  Okay. And would you tell us how that got
18  started?
19  A  I went up to visit him one weekend, and I carried
20  a quarter pound of marijuana up there.
21  Q  What for?
22  A  For him to sell.
23  Q  Okay.
24  A  And just to see if he could sell it, if he could
25  get a clientele for it.

**Page 101**

1  Q  Where did you get the marijuana?
2  A  From Pat.
3  Q  Okay.
4  A  And he sold it all in a day and-a-half, which is
5  not much. And I brought the money back and then I
6  talked to him and asked him if he thought he could get
7  rid of more than that on a regular basis.
8  Q  All right. Stop there a second. You said that
9  he called a quarter pound of marijuana in a day
10  and-a-half. How much did he get for it?
11  A  Well just -- It wasn't even a day and-a-half, it
12  was probably less than twenty-four hours. We went up
13  on a Saturday during lunch, and me, and my wife came
14  back on Sunday evening.
15  Q  It was you and your wife?
16  A  Yes, sir.
17  Q  Did you make him pay you for that two hundred and
18  fifty -- excuse me, for that quarter pound of
19  marijuana?
20  A  Yes, sir.
21  Q  And how much did you charge him for it?
22  A  I think it was like two seventy-five.
23  Q  Okay. When y'all would sell a pound of this
24  stuff, you and Pat, how much would you charge for it?
25  A  On the average probably twenty-five to fifty

Multi-Page™

Page 102

1 dollars more than what we got for it, what we had to
2 pay for it.
3 Q  All right.  And How much were you paying for it?
4 A  At the last, right before I got charged and
5 locked up, six hundred a pound.
6 Q  And who were you paying that to?
7 A  I did pay it to Pat, and he paid it to Leon.
8 Q  Okay.  And you talked earlier about your
9 connection and contacts with Leon.
10        Let's go back to the Hensarlings.  So he
11 turned that around in less than twenty-four hours?
12 A  Yes, sir.
13 Q  And you came home with the money then?
14 A  Yes, sir.
15 Q  Okay.  And did you have further contact with him
16 after that?
17 A  Yes, sir.
18 Q  Tell us how your relationship with them developed
19 in regards to the marijuana business.
20 A  The next week he come down to Montgomery and let
21 him get a half a pound.  And he took it back, and he
22 sold it and he come back and wanted some more probably
23 in the middle of the week.  And so we decided to let
24 him get enough to keep him having to come back and
25 forth so often.  So we let him get three pounds to

Page 103

1 begin with.
2 Q  All right.  Let me ask you something.  You said
3 "let him get," did he have to pay you for that?
4 A  We fronted it to him.
5 Q  What is "fronting"?
6 A  We give it to you, you sell it and then you pay
7 us.
8 Q  Okay.  So after you sell it and you have the
9 money, then you pay?
10 A  Yeah.
11 Q  Well, now what's in it for the person that you're
12 fronting it to if they're just selling it and giving
13 you the money back?
14 A  They're making a profit off of it.
15 Q  So they only have to pay you a set amount?
16 A  Yes, sir.
17 Q  I see.  All right.  So you say you got it for
18 three pounds.  What happened after that?
19 A  Then it went to five, and it wasn't long,
20 probably about not even a month he was getting twenty
21 to twenty-five pounds per week.
22 Q  Okay.  Now how much would he pay for twenty or
23 twenty-five pounds per week?
24 A  Then we wasn't getting it real cheap.  He would
25 have to pay around nine-fifty, nine hundred or

Page 104

1 nine-fifty because we was only getting it for like
2 eight hundred or eight twenty-five.
3 Q  Okay.  This was at what time again?
4 A  This was in 2002.
5 Q  Okay.  Did the amount that you were charging him
6 change over time?
7 A  Yes, sir.  As it got cheaper for us, we lowered
8 the prices on them.
9 Q  Now did you get your marijuana that you were
10 selling to Mr. Hensarling, and was it also being sold
11 to his wife?
12 A  No, sir.
13 Q  It was for him.  Was she involved in the
14 transactions?
15 A  On occasions, yes, sir.
16 Q  Okay.  Now you said the prices changed over time
17 sometimes.
18 A  Yes, sir.
19 Q  Would you tell us about that.
20 A  Well, as time went on and we started selling more
21 and more of it, Mr. Carmichael dropped the price on
22 it.
23 Q  Okay.  And how much were you paying when he
24 dropped the price?
25 A  He started dropping it gradually.  To begin with

Page 105

1 we were taking eight hundred for it, or eight
2 twenty-five.  Then it went down to seven-fifty, seven
3 hundred, six-fifty.  The lowest was six hundred.
4 Q  All right.  And did that alter the price you were
5 charging the Hensarlings?
6 A  Yes, sir.
7 Q  Okay.  On November the 15th, 2003 between the
8 13th of November 200d and the 15th, did you talk to
9 Investigator DeJohn about the Hensarlings?
10 A  Yes, sir.  I called him on the telephone, on my
11 cell phone.
12 Q  When did you do that?
13 A  I think that was Saturday night.  I think it was
14 Saturday evening I talked to him and I explained to
15 him that -- I'm sorry, it was Friday evening, and I
16 told him that Saturday evening someone was coming down
17 to pick up some marijuana from Huntsville.
18 Q  When you say "evening," would you tell the jury
19 what time of day you're talking about when you say
20 "evening"?
21 A  Five or six o'clock in the evening.
22 Q  So you made this call you think Friday evening
23 the 14th?
24 A  Mm-hmm.
25 Q  And what did you tell Investigator DeJohn?

1  A  That because he wanted me to keep him posted on
2  my whereabouts and what I was doing, especially if it
3  had to do with any marijuana, selling or buying.  So I
4  called him and I let him know that someone was coming
5  down to get twenty pounds.  But it turned out he got
6  twenty-five pounds instead of twenty.
7  Q  Who did you tell him was coming down to get
8  between twenty and twenty-five pounds?
9  A  Charlotte Hensarling, Steve's wife.
10  Q  Okay.  And what, if anything, did you tell him
11  about that?
12  A  I told him that she was coming to pick up some
13  marijuana.  I didn't really know how much it was.  I
14  thought it was supposed to be twenty pounds.  And he
15  said, "When?"  And I said, "I don't really know the
16  time, but as soon as I do I'll call you."
17  Q  All right.  And did that end that conversation?
18  A  Yes, sir.
19  Q  And did you subsequently call him again?
20  A  Yes, sir.  I called him, I want to say probably
21  an hour before we gave it to her.
22  Q  Okay.  And what day would that have been?  Would
23  that have been Friday still?
24  A  I think that was Saturday.
25  Q  All right.  And you said it was an hour before

1  you were going to get it?
2  A  Yes, sir.
3  Q  Had you found out that she was coming at that
4  point in time?
5  A  Yes, sir.
6  Q  And you contacted Investigator DeJohn?
7  A  Yes, sir.
8  Q  What, if anything, did you do after notifying him
9  of this?
10  A  We went ahead and we asked what she was driving
11  and what we were driving and where we'd meet at.  I
12  told him it would be behind Shoney's on the Southern
13  Boulevard, and he said, "Okay."
14  Q  Did you meet with him?
15  A  Yes, sir.
16  Q  And at that time, if you would, when you met with
17  her you said this was at the Shoney's?
18  A  Yes, sir.
19  Q  And this is in where, what city?
20  A  Montgomery.
21  Q  Okay.  And do you know where in Montgomery that
22  Shoney's is?
23  A  On the Southern Boulevard.
24  Q  Okay.  What, if anything, happened when you got
25  to the Shoney's?  And before you go there, were you

1  with Pat when you went there?
2  A  We both drove different vehicles.
3  Q  That would be Pat Denton?
4  A  Yes, sir.
5  Q  You went in different vehicles?
6  A  Yes.
7  Q  But you both went there?
8  A  Yeah.  One was driving and the other was
9  following.
10  Q  Okay.  Why did you all do that?
11  A  Because the one who was driving up front would
12  have like an escort behind him.  So if we got pulled
13  over, the one behind him would be more logical to be
14  the one to get pulled over.
15  Q  Okay.  Now, so you get there; did you meet with
16  Miss Hensarling?
17  A  Yes, sir.
18  Q  Okay.  What, if anything, happened at that time?
19  A  We gave her the marijuana and put it in her
20  Blazer and she gave us some money.
21  Q  Okay.  I want to show you something.
22      MR. FEAGA:  Your Honor, may I approach the
23  witness?
24      THE COURT:  Yes.
25  Q  This is marked as government's exhibit 1 for

1  identification purposes.  I'd ask you, if you would,
2  to take a look at it.
3      Have you had a chance to take a look at
4  government's exhibit 1?  I know your hands are not
5  available.  I'm going to open it and ask if you would
6  to look inside.  Have you seen government's exhibit 1
7  and its contents before?
8  A  Yes, sir.
9  Q  Would you tell the ladies and gentlemen of the
10  jury where you saw that?
11  A  Pat Denton's house, and that's what we gave -- we
12  put in for Charlotte, in her Blazer.
13  Q  You put the entire physical object that's there
14  in her car?
15  A  Yes.
16  Q  And did it have the contents of what's in it now?
17  A  Yes, sir.
18  Q  What is it that's in there?
19  A  Marijuana.
20  Q  And you said how much marijuana is that?
21  A  Twenty-five pounds.
22  Q  Okay.  And did Miss -- Now was this marijuana
23  fronted?
24  A  Yes, sir.
25  Q  At the time that you met with Miss Hensarling,

Page 110

1  did she give you any money?
2  A  Yes, sir.
3  Q  How much money did she give you?
4  A  I don't remember. Pat got it and I didn't count
5  it. I didn't help him count it.
6  Q  Okay. Now what was that money for?
7  A  The previous amount that they got.
8      MR. FEAGA: Your Honor, we'd like to move
9  for introduction into evidence what's been marked as
10  government's exhibit 1 as government's exhibit 1.
11      THE COURT: Admitted.
12      MS. WAYNE: Judge, I'm going to object.
13  There's a lack of foundation; there's no chain of
14  custody. It looks like the same, but clearly in terms
15  of the chain of custody it can't be admitted at this
16  point.
17      MR. FEAGA: Well we can tie it up later,
18  Judge.
19      THE COURT: I think you should tie it up.
20      MR. FEAGA: Yes, sir.
21  Q  What, if anything, did you do after making this
22  delivery to Miss Hensarling?
23  A  Notified Mr. DeJohn.
24  Q  All right. And you said -- What, if anything,
25  did you tell him when you notified him?

Page 111

1  A  What she was driving.
2  Q  And what did you tell him she was driving, do you
3  remember?
4  A  A black Blazer.
5  Q  And did you tell him anything else about
6  Miss Hensarling or the black Blazer?
7  A  Other than that she had the marijuana? No, sir.
8  Q  All right. Did you know where she was going to
9  go with that marijuana?
10  A  Yes, sir.
11  Q  Okay. Did you discuss that with Investigator
12  DeJohn?
13  A  I let him know she'd be going Sixty-five North.
14  Q  Okay. Did you know where she was ultimately
15  headed?
16  A  Going to Huntsville.
17  Q  From Montgomery?
18  A  Yes, sir.
19  Q  Have you driven from Montgomery to Huntsville?
20  A  Yes, sir.
21  Q  We've got people on the jury that are from all
22  over, south Alabama, and so would you just say for the
23  record what's the most direct route to go from
24  Montgomery to Huntsville?
25  A  Sixty-five North.

Page 112

1  Q  Did you, after relaying this information to
2  Detective DeJohn --
3      MR. FEAGA: And I apologize, Your Honor, I
4  keep calling him "Detective" and "Investigator" and
5  for the record his correct title is Investigator and
6  he'll testify to that.
7  Q  Did you, after relaying that information to him,
8  have any further conversations with Steve Hensarling?
9  A  No, sir.
10  Q  Okay. Do you remember getting any phone calls
11  from Steve Hensarling after that?
12  A  No, sir.
13  Q  Okay. How about did you get a phone call from
14  Pat Denton after that?
15  A  Yes, sir.
16  Q  Okay. And what, if anything, did you and Pat
17  talk about?
18  A  Pat told me that Charlotte had got pulled over
19  the other side of Prattville.
20  Q  Was this the same day that you guys delivered the
21  marijuana to her?
22  A  It was that evening.
23  Q  Did Pat Denton tell you how he knew?
24  A  He said that Steve had called him and told him
25  that she got pulled over and was at the Clanton jail,

Page 113

1  I think.
2  Q  Did you tell Pat at that time that you had
3  informed the police that that marijuana was going to
4  be delivered to Charlotte?
5  A  No, sir.
6  Q  So Mr. Denton did not know?
7  A  No, sir.
8  Q  At least from you how this had happened?
9  A  No, sir.
10  Q  But he knew it had happened.
11  A  Yes, sir.
12  Q  Saturday the 15th, 2003 in the evening Pat Denton
13  knew that twenty-five pounds of marijuana he just sold
14  had been -- basically Charlotte had been stopped with
15  it on the Interstate?
16  A  No, he didn't know that.
17  Q  What did he know?
18  A  I mean then he did. I thought -- He didn't know
19  I told Mr. DeJohn.
20  Q  I got you. But he knew about it somehow?
21  A  After she got pulled over and locked up.
22  Q  Okay. And your conversation with him where he
23  told you that he had heard this had happened, again,
24  when was that?
25  A  Later on that evening. Probably maybe five, six

Multi-Page™

| Page 114 |
| --- |

1 o'clock.
2 Q  All right.  And you said earlier you had told
3 Detective DeJohn -- Investigator DeJohn that the
4 marijuana that Leon was going to be bringing in was
5 coming in the next day, Sunday evening, is that right?
6 A  Yes, sir.
7        MR. FEAGA:  Your Honor, we have no further
8 questions for this witness at this time.
9        THE COURT:  Cross?
10                CROSS EXAMINATION
11           BY MS. WAYNE OF GARY GEORGE:
12 Q  Mr. George, how many times have you had an
13 opportunity to talk to the government about your
14 prepared testimony here today?
15        MR. FEAGA:  Your Honor, we'd object to the
16 format of the question.  She can ask him how many
17 times he's talked to us, but she's arguing when she
18 says "prepared testimony".
19        THE COURT:  Your question did have an
20 implicit conclusion in it.
21 Q  Have you talked to the government before today?
22 A  Yes, ma'am.
23 Q  Talked to the government in regards to your
24 preparation for testimony?
25 A  Yes, ma'am.

| Page 115 |
| --- |

1 Q  How many times?
2 A  One.
3 Q  And when was that?
4 A  Last Sunday.
5 Q  And how much time did you spend with them?
6 A  At least seven or eight minutes.
7 Q  You spent seven or eight minutes with them?
8        Okay.  And that was simply to tell you that
9 you were going to come to testify?
10 A  That I was going to testify, and he was going to
11 ask me if I had a criminal background.
12 Q  They didn't know that at that point?
13 A  I don't know.
14 Q  So you told them about your criminal background?
15 A  Yes, ma'am.
16 Q  They knew to contact you in jail, though, right?
17 A  Yes, ma'am.
18 Q  So they knew that you were in jail last Sunday?
19 A  Yes, ma'am.
20 Q  You have been back in jail for some time, right?
21 A  Yes, ma'am.
22 Q  Why are you back in jail?
23 A  Distribution of marijuana.  Possession of
24 marijuana.
25 Q  You also have something else pending, correct?

| Page 116 |
| --- |

1 A  I have a possession of cocaine and a failure to
2 register the notification act.
3 Q  When you say "failure to register notification,"
4 you're talking about failure to register as a sex
5 offender?
6 A  Yes, ma'am.
7 Q  The reason you have to register as a sex offender
8 is because you have been previously convicted as a sex
9 offender, correct?
10 A  Yes, ma'am.
11 Q  And that's a felony when you forget to register,
12 correct?
13 A  That's what they're saying.
14 A  That's what they're saying, you failed to
15 register?
16 A  I failed to register with my new address.
17 Q  That's against the law?
18 A  Yes, ma'am.
19 Q  Because they want to keep track of you because
20 you're a sex offender.
21 A  Yes, ma'am.
22 Q  Now when you say that you've talked to the
23 government just last Sunday, you had an opportunity to
24 talk to Agent or Investigator DeJohn several times
25 back when this occurred when you got arrested on this,

| Page 117 |
| --- |

1 correct?
2 A  Yes, ma'am.
3 Q  You talked to him a number of times because you
4 wanted to make sure that you could somehow get out
5 from under what was going to happen to you, right?
6 A  No, ma'am.
7 Q  No?
8 A  No, ma'am.
9 Q  Well you recall when you talked to Investigator
10 DeJohn that one of the things that you were concerned
11 about was whether or not you could get a deal and
12 cooperate with the agents.
13 A  I asked for leniency.
14 Q  Okay.  "Leniency" means that you were concerned
15 about what could happen to you as a result of this new
16 charge.
17 A  Yes, ma'am.
18 Q  You knew this time you were going to be in a lot
19 of trouble, correct?
20 A  Yes, ma'am.
21 Q  And you knew you were going to be in a lot of
22 trouble because you had been in a lot of trouble
23 throughout your life.
24 A  Yes, ma'am.
25 Q  You're someone who has been in and out of prison

Page 118

1 most of your life.
2 A  Yes, ma'am.
3 Q  Now when we're talking about being in and out of
4 prison -- Stand up for me, if you can.  I would note
5 for the record that you appear in prison clothes,
6 correct?
7 A  Yes, ma'am.
8 Q  And you're shackled?
9 A  Yes, ma'am.
10 Q  And the marshals brought you in.
11 A  Yes, ma'am.
12 Q  Go ahead and sit down, if you would.
13      Being in prison means that you don't get to
14 wear your own clothes, right?
15 A  Yes, ma'am.
16 Q  It means that you can't just make your own
17 decisions about when you want to eat, go to sleep,
18 watch television?
19 A  Yes, ma'am.
20 Q  It means that you're supervised twenty-four
21 seven.
22 A  Basically.
23 Q  You live in a pretty small space, the jail,
24 right?
25 A  Yes.

Page 119

1 Q  Have a pretty crummy bed?
2 A  Jail or prison?
3 Q  In prison.
4 A  Yes, ma'am.
5 Q  You consider jail a better place than prison?
6 A  No, ma'am, prison is a better place than jail.
7 Q  So you prefer to be in prison than in jail?
8 A  Yes, ma'am.
9 Q  Either way you're locked up.
10 A  Yes, ma'am.
11 Q  Now when you saw Investigator DeJohn in 2003 when
12 you had been arrested November 13th, 2003, the first
13 thing you do is you had told us about Officer
14 Townsend, right?
15 A  Yes, ma'am.
16 Q  Officer Townsend is actually the officer that was
17 involved with the Prattville Police Department.
18 A  Yes, ma'am.
19 Q  Now you knew to ask Officer Townsend pretty
20 quickly that hey, I got to get myself out of this, I
21 need to talk to the federal agents, right?
22 A  Yes, ma'am.
23 Q  Because you knew they were going to come down
24 hard on you this time, right?
25 A  In the same as last time.

Page 120

1 Q  Well you didn't want to go back, though.
2 A  I knew I was going.
3 Q  But you wanted to cut your time and get leniency.
4 A  Yes, ma'am.
5 Q  And you knew because of your history of getting
6 busted that if you turned somebody else in, that that
7 might help you out.
8 A  I never done that.
9 Q  You knew to ask for an agent, right?
10 A  Yes, ma'am.
11 Q  And the purpose of asking for an agent was so you
12 could get leniency.
13 A  Yes, ma'am.
14 Q  And the reason to get leniency is to turn someone
15 else in.
16 A  Yes, ma'am.
17 Q  That takes the heat away from yourself.
18 A  Yes, ma'am.
19 Q  You knew that when you asked for Investigator
20 DeJohn.
21 A  Yes, ma'am.
22 Q  Because you weren't asking for him because you
23 just wanted to have a chat with him, right?
24 A  No.
25      MR. FEAGA:  Can the record reflect he said,

Page 121

1 "No"?  Because I'm not sure I heard him and I wanted
2 to make certain the record reflected the answer.
3 Q  Now you meet with Investigator DeJohn and you
4 tell him these things, and then, you know, he doesn't
5 charge with you anything.  You get to get out of jail
6 after that, right?  You actually get out after this
7 arrest.
8 A  Yes, ma'am.
9 Q  So based upon what you told the investigator,
10 they let you out of jail to go back into our
11 community, right?
12 A  Yes, ma'am.
13 Q  So you're at that point just free to roam around
14 but check in with him on the cell phone, right?
15 A  Yes, ma'am.
16 Q  And you're calling him on the cell phone and
17 checking in, and you tell him about the Hensarlings.
18 A  Yes, ma'am.
19 Q  Now the Hensarlings are someone you've told us
20 that you had already a drug relationship with them.
21 A  Yes, ma'am.
22 Q  So you had this drug relationship with them and
23 you decided I'm going to set them up, right?
24 A  No, ma'am.  He told me to make sure I contact him
25 on any dealings or anything that I had -- or we had.

Multi-Page™

Page 122

1 Q  All right.  And the Hensarlings was the next deal
2 that you had.
3 A  Yes, ma'am.
4 Q  So you set them up.
5 A  No, ma'am, I didn't set them up, it just happened
6 that way.
7 Q  Well it didn't happen that way because you're the
8 one who told law enforcement about it, right?
9 A  Yes, ma'am.
10 Q  It wasn't Mr. Denton telling them anything.
11 A  No, ma'am.
12 Q  It wasn't your wife telling them anything, right?
13 A  No, ma'am.
14 Q  It was you, right?
15 A  Yes, ma'am.
16 Q  You set them up because you believed if you could
17 give law enforcement something, that would help you in
18 terms of leniency, right?
19 A  Yes, ma'am.
20 Q  So the Hensarlings had no idea that you were
21 working for law enforcement at that point, right?
22 A  No, ma'am.
23 Q  Because if they obviously knew, then the deal
24 wouldn't have gone through.
25 A  Yes, ma'am.

Page 123

1 Q  So when they're doing these deals, you have to
2 play a pretty good role, would you agree with me?
3 A  Yes, ma'am.
4 Q  You can't let on to whoever you're setting up
5 that you're in fact working for the government.  You
6 can't do that, right?
7 A  Yes, ma'am.
8 Q  So you got to be pretty good at this, right?
9 A  Yes, ma'am.
10 Q  They had no idea that you were setting them up.
11 A  No, ma'am.
12 Q  Now you told us that you actually met Mr.
13 Hensarling in prison.
14 A  Yes, ma'am.
15 Q  Okay.  He had the contacts and it kind of sounds
16 like you formed some kind of friendship with him.
17 A  Yes, ma'am.
18 Q  In fact, you went visited him in Huntsville?
19 A  Yes, ma'am.
20 Q  Okay.  Would you consider at that point that he
21 was a friend of yours?
22 A  Yes, ma'am, somewhat.
23 Q  Well I'm sure Mr. Hensarling at this point
24 doesn't consider you a friend, but you consider him a
25 friend, right?

Page 124

1 A  His wife and my wife were better friends than me
2 and him was.
3 Q  Well you set Charlotte Hensarling up, right?
4 She's the one who got arrested.
5 A  Yes, ma'am.
6 Q  And when Steve Hensarling, you said, called your
7 buddy Pat to tell him that Charlotte had been
8 arrested, right?
9 A  Yes, ma'am.
10 Q  Did Steve say why he's calling and telling you?
11 A  Why he's calling and telling me?
12 Q  Yeah.
13 A  He called Pat.
14 Q  He wanted you to call Pat.
15 A  No.  He didn't call me he called Pat.  Pat told
16 me.
17 Q  Okay.  So you never spoke to Steve Hensarling
18 A  Not then.  Maybe later on that night, but not
19 then.
20 Q  All right.  Later on that night did you tell Mr.
21 Hensarling that, in fact, you were the one who set
22 Charlotte up?
23 A  No, ma'am.
24 Q  So you hid that from him?
25 A  Yes, ma'am.

Page 125

1 Q  You never found out about that until later?
2 A  Yes, ma'am.
3 Q  Now Charlotte Hensarling, you're aware, was
4 arrested and charged.
5 A  Yes, ma'am.
6 Q  She was arrested and charged with this marijuana
7 that you're telling this jury that you and Mr. Denton
8 brought in and broke down and sold to them?
9 A  Yes, ma'am.
10 Q  You get charged with that marijuana?
11 A  No, ma'am.
12 Q  You didn't?  But you told them that you were
13 involved in it, right?
14 A  Yes, ma'am.
15 Q  In fact, you were the one who supplied the
16 marijuana, right?
17 A  So to speak, yes, ma'am.
18 Q  Well "so to speak," you brought it to her, right?
19 A  Yes, ma'am.
20 Q  You didn't get charged for that.
21 A  No.
22 Q  So you got out of that scot-free.
23 A  Yes, ma'am.
24 Q  That's a pretty good deal, would you agree with
25 me?

Multi-Page™

Page 126

1  A  I was already charged.
2  Q  That wasn't my question. My question was, that
3  was a pretty good deal.
4  A  Yes, ma'am.
5  Q  You considered it a good deal, right?
6  A  Yes, ma'am.
7  Q  And you say you were already charged, but the
8  bottom line is you were already charged, and if you
9  had stacked that to your already charged you would
10  have been doing a lot more time, correct?
11  A  Yes, ma'am.
12  Q  Now, again, you had an opportunity to talk to
13  Investigator DeJohn where you actually had a really
14  long conversation with him. And I think that was on
15  the Saturday date, do you recall that?
16  A  Yes, ma'am.
17  Q  Where you actually were videotaped, right? Have
18  you had a chance to see that videotape?
19  A  No, ma'am.
20  Q  Okay. You actually asked Investigator DeJohn
21  during that interview, you asked him, "You're not
22  taping me," right?
23  A  No.
24  Q  You don't remembering telling him that?
25  A  No, ma'am.

Page 127

1  Q  The bottom line is they told you that "Now you're
2  on videotape," right?
3  A  Yes, ma'am.
4  Q  And then during that conversation with him, you
5  tell him that -- you tell Investigator DeJohn that
6  "Either you can help me or you can't." That's almost
7  at the very beginning of the interview. Do you
8  remember telling him that?
9  A  Yes, ma'am.
10  Q  Do you remember telling him that, "I mean I've
11  got a girl, I've got kids, I need some help here." Do
12  you remember talking about that?
13  A  Yes, ma'am.
14  Q  That was the focus of your concern when you first
15  went in and talked to Investigator DeJohn, do you
16  remember that?
17  A  Yes, ma'am.
18  Q  And in fact, later on in this conversation,
19  that's about an hour and twenty minutes, you actually
20  talk about going to Vegas, do you remember that?
21  A  No, ma'am.
22  Q  You don't remember saying you wanted to relocate
23  to Vegas?
24  A  No, ma'am. I remember saying Texas or Tennessee.
25  Q  Okay. You wanted to get out of Alabama.

Page 128

1  A  Yes, ma'am.
2  Q  Now do you recall in your conversation with
3  Investigator DeJohn talking about his power as law
4  enforcement in terms of his ability to give you a
5  deal, do you remember that?
6  A  Yes, ma'am.
7  Q  And do you remember him saying to you that you've
8  got to give him something in order for him to give you
9  something back, do you recall that?
10  A  Yes, ma'am.
11  Q  He says, you know, "If you just throw out names
12  or you're just giving me empty information, that's not
13  going to be helpful to me." Do you remember that?
14  A  Yes, ma'am.
15  Q  He needed something that he could go after,
16  right?
17  A  Yes, ma'am.
18  Q  And you had told him early on about you had
19  information supposedly about Leon Carmichael, right?
20  A  Yes, ma'am.
21  Q  Now you tell Investigator DeJohn that, and I
22  quote, "You want to make sure that they look out for
23  Pat the best you can." Do you remember telling them
24  that?
25  A  Yes, ma'am.

Page 129

1  Q  And the reason that you told him that is because
2  you have -- there's a relationship with Patrick Denton
3  outside of friends, he's your wife's cousin.
4  A  Yes, ma'am.
5  Q  You considered him close.
6  A  Yes, ma'am.
7  Q  You two had been dealing drugs for a long time
8  together.
9  A  Yes, ma'am.
10  Q  You had been making quite a profit dealing drugs
11  with him.
12  A  Yes, ma'am.
13  Q  And out of anyone, you wanted to make sure he
14  knew I want you to protect Patrick Denton.
15  A  Yes, ma'am.
16  Q  So when you were trying to get leniency for
17  yourself, you also had in your mind that you needed to
18  protect Patrick Denton.
19  A  Yes, ma'am.
20  Q  You didn't want him going down.
21  A  No, ma'am.
22  Q  Because you also told Investigator DeJohn that
23  Patrick Denton had a pending case. He had been popped
24  before.
25  A  Yes, ma'am.

Page 130

1 Q The case was still pending, right?
2 A Yes, ma'am.
3 Q You knew that, right?
4 A Yes, ma'am.
5 Q You told the investigator that, right?
6 A Yes, ma'am.
7 Q So you knew that Patrick Denton was in the same
8 situation as you, right?
9 A Yes, ma'am.
10 Q You both had drug cases pending, right?
11 A Yes, ma'am.
12 Q Another drug case would have sent you away for a
13 long time, right?
14 A No more than what I have now.
15 Q Well you didn't know that now because then, in
16 2003, you hadn't gotten the new fifteen years, right?
17 A I knew that was the sentence that I could get.
18 Q You told Investigator DeJohn you were trying to
19 give him some information about the supposed load that
20 was coming in on Mr. Carmichael's trucks the next day,
21 right?
22 A Yes, ma'am.
23 Q You told him a big old load. Five or six hundred
24 pounds was coming through the streets of Montgomery in
25 Mr. Carmichael's marked trucks, right?

Page 131

1 A Yes, ma'am.
2 Q You gave him that information so they could go
3 out and get it, right?
4 A Yes, ma'am.
5 Q And you even said something to him about, "Why
6 don't you put some tracking devices in these trucks or
7 these bags so you can catch them red-handed?" Do you
8 remember talking about that?
9 A Vaguely.
10 Q Okay. Because you're saying you've got to get
11 him. You've got to get him there, right?
12 A I don't remember saying that.
13 Q Do you recall that? Do you recall Investigator
14 DeJohn asking you, when he's asking about trying to
15 get Mr. Carmichael to the place and saying, "How
16 about does he sell cocaine," do you remember him
17 asking you that?
18 A No, ma'am.
19 Q Do you remember him asking, "Well how about Leon
20 Carmichael? He sells guns." Do you remember that?
21 A No, ma'am.
22     MR. FEAGA: Your Honor, we're going to
23 object. She's talking about a statement that was
24 taken a long time ago. He's not saying he didn't say
25 it, he's saying he doesn't remember it. If she has a

Page 132

1 transcript or something, she can show it to him to
2 refresh his recollection.
3     MS. WAYNE: I appreciate counsel's help. I
4 know how to refresh. I know how to impeach. If I
5 want to do that, Judge, I obviously can do it. I
6 haven't done that at this point.
7     THE COURT: Go ahead.
8     MS. WAYNE: Thank you.
9 Q You know, I would like to, though, just so we can
10 make sure the jury -- All right.
11     MR. FEAGA: Your Honor, we don't mind Ms.
12 Wayne using that. We brought it over. I just want to
13 put her on notice that when we get ready to use it
14 we'll have to peel off what she's put on there so we
15 can use it.
16     MS. WAYNE: I appreciate that, Judge. I'm
17 sorry, Your Honor, I thought that was the courtroom's.
18     I'll pay you back.
19     MR. FEAGA: Not a problem.
20 Q Mr. George, I just wanted to write down some
21 names you've given us in terms of who was involved in
22 this when Charlotte Hensarling got busted, okay?
23 A Yes, ma'am.
24 Q So you said that -- And let me just put "C" and
25 I'll put "Hensarling". Now according to you

Page 133

1 Miss Hensarling got arrested on the marijuana that was
2 found in the car, correct?
3 A Yes, ma'am.
4 Q And her husband also was arrested or are you
5 aware of that?
6 A I'm not aware of that.
7 Q But your testimony is that the husband, Steve,
8 certainly knew what was going on in terms of drug --
9 dealing drugs.
10 A Yes, ma'am.
11 Q Okay. And then there's yourself, and you said
12 that you didn't get charged in terms of this case or
13 that case, right?
14 A No, ma'am.
15 Q Okay. And then you're aware that Mr. Denton also
16 didn't get charged, correct?
17 A No, ma'am.
18 Q So in terms of the marijuana that was found in
19 the car, Miss Hensarling got charged.
20 A Yes, ma'am.
21 Q In terms of being involved and supposedly in an
22 agreement with Mr. Carmichael to distribute drugs,
23 none of them were charged, to the best of your
24 knowledge.
25 A No, ma'am.

Page 134

1  Q  All right.  I'll move that out of the way.
2       I'm wondering, Mr. George, if you can tell
3  me were there others that you and Mr. Denton were
4  selling to at this period of time that you haven't
5  talked about?
6  A  Yes, ma'am.
7  Q  You had a lot of customers, correct?
8  A  Yes, ma'am.
9  Q  That's how you make a good living as a drug
10 dealer, you have to have a good customer base.
11 A  That's right.
12 Q  So there were a lot of people that you talked
13 about that were buying marijuana from you, but you
14 just haven't disclosed today.
15 A  They didn't ask me about that.
16 Q  They said they didn't need that information from
17 you, is that what you're saying?
18 A  No, ma'am.  I'm saying the only ones that called
19 wanting some marijuana was Steve Hensarling.
20 Q  And again, though, you had a lot more of other
21 customers than that.
22 A  Yes, ma'am.
23 Q  And you gave Investigator DeJohn your entire
24 customer list so that he would know, right?
25 A  Yes, ma'am.

Page 135

1  Q  Now in this interview, again, that occurred in
2  the taped interview, you recall that Investigator
3  DeJohn, he emphasizes to you and he tells you about
4  "You need to jump on the team before other people in
5  this organization jump on it before you."  Do you
6  recall that?
7  A  I think so.
8  Q  Okay.  He was emphasizing to you the need for you
9  to hurry up and quickly get on this and go so that he
10 could have something early on.
11 A  He already had information that I had told him.
12 That's all I gave him.
13 Q  But I'm talking about in the beginning of the
14 conversation when you're talking about doing a deal,
15 getting leniency, he tells you, "You need to hurry up
16 because someone will snitch on you."  Do you recall
17 that?
18 A  In the very first conversation I had with him?
19 Q  Yes.
20 A  I don't think he said I needed to hurry up.  He
21 might have asked how soon it was going to be before it
22 happened.
23 Q  All right.  Now I want to talk to you about the
24 fact that you get out, you're calling Investigator
25 DeJohn, and I think you returned back to the police

Page 136

1  department a couple of times, right?  It's not just
2  once, or do you recall?
3  A  Just once after that.
4  Q  Okay.  So the rest of the conversations are on
5  the cell phone.
6  A  Yes, ma'am.
7  Q  Okay.  Now the day that this load is supposed to
8  come in, this Sunday that this big old load is
9  supposed to be come into Montgomery, you remember that
10 you get rearrested.
11 A  Yes, ma'am.
12 Q  Now Investigator DeJohn says to you, you know,
13 "I'm trusting you here."  Okay?  "I'm letting you out,
14 you're going to roam the streets," and you go back and
15 pick up another arrest, right?  Within two days.
16 A  Yes, ma'am.
17 Q  And you know that you have this leniency deal
18 going on, right?
19 A  Yes, ma'am.
20 Q  And in this you actually get into a hit and run,
21 you run from the cops, put yourself into a house so
22 that they can't get you, they have to bust in to get
23 you and arrest you Sunday night.
24 A  No, ma'am.
25 Q  So if the police reports say that you were

Page 137

1  eluding, that you locked yourself in a house, that it
2  was a hit and run and that you were drunk, that
3  wouldn't be correct?
4  A  No, ma'am.
5  Q  You got arrested for D. U. I.
6  A  I got pulled over.  Subsequently arrested for it,
7  but I didn't elude the police.  I got pulled over and
8  I didn't lock myself in no house, I was in a parking
9  lot.
10 Q  You were drunk.
11 A  Yes, ma'am, I was drinking.
12 Q  And they arrested you for a D. U. I.
13 A  Yes, ma'am.
14 Q  So you go back to jail.
15 A  Yes, ma'am.
16 Q  And this is after you told us and you told
17 Investigator DeJohn, "I promise you aren't going to
18 see me again, I'm going to stay clean and I'm going to
19 stay out of jail."  Do you remember telling him that?
20 A  No, ma'am.
21 Q  You don't remember trying to convince him that
22 they aren't going to have to deal with you anymore at
23 all?
24 A  Probably I did.
25 Q  Because you wanted to tell him you were finished

Page 138

1 with your criminal ways, right?
2 A  Yes, ma'am.
3 Q  But you weren't, because you went back two days
4 later, right?
5 A  Yes, ma'am.
6 Q  And in fact you went back again after that.
7 A  Yes, ma'am.
8 Q  You still haven't stopped, have you?
9 A  Yes, ma'am.
10 Q  Now you tell Investigator DeJohn, he's telling
11 you, "You've got to give me truthful information."
12 And when you're talking to him about your so-called
13 friend that you said you want to protect, you tell him
14 that, "If you go to his house Sunday, you're going to
15 find ten pounds of marijuana."  Right?
16 A  Ten pounds?
17 Q  Yeah.
18 A  I don't recall that.  I may have.
19 Q  All right.  You told him, "If you go to Patrick
20 Denton's house you'll find some marijuana."
21 A  Probably.
22 Q  Okay.  Well it wasn't probably, that's what you
23 told him, right?
24 A  If you have it on --
25 Q  Well, do you remember that that's what you said,

Page 139

1 or is that something you didn't say?
2 A  I probably did.
3 Q  You probably did?
4 A  That's a long time ago.
5 Q  You told him that Patrick Denton had marijuana in
6 his house and you knew that was a lie, right?
7 A  No, ma'am.  If I said it, it wasn't a lie.
8 Q  Well you knew that when the law enforcement
9 executed a search warrant on Mr. Denton's house there
10 were no drugs there at the house.  You were aware of
11 that, right?
12 A  No, ma'am.
13 Q  Okay.  Did you call Patrick Denton after you had
14 misled Investigator DeJohn and said get the marijuana
15 out of your house?
16 A  No, ma'am.
17 Q  You called Patrick Denton after the Hensarlings
18 were busted and say guess what, you better watch out,
19 the Hensarlings got busted?
20 A  No, ma'a.
21 Q  Did you tell them that?
22 A  No.
23 Q  No, it was Steve who told it, is that what you're
24 telling us?
25 A  Pat is the one who told me.

Page 140

1 Q  And he found out from Steve, not you?
2 A  Yes, ma'am.
3 Q  You told us that you saw Mr. Carmichael at his
4 home, and you know about the Carmichael Center, but
5 the bottom line is you had been to Montgomery several
6 times with Patrick, right?
7 A  To Montgomery?
8 Q  Yes.
9 A  I lived in Montgomery.
10 Q  Okay.  You had been here.  You knew the place,
11 right?
12 A  Yes, ma'am.
13 Q  Patrick knew Mr. Carmichael, right?
14 A  Yes, ma'am.
15 Q  You knew that Mr. Denton knew Mr. Carmichael.
16 You had been out to his house, you had been to the
17 Carmichael Center, right?
18 A  Yes, ma'am.
19 Q  Mr. Carmichael had seen you with Patrick Denton
20 many times in Montgomery.
21 A  Several times.
22 Q  You knew that Patrick Denton's grandparents live
23 right next door to Mr. Carmichael.
24 A  Yes, ma'am.
25 Q  Still do live right next door to Mr. Carmichael,

Page 141

1 right?
2 A  I guess so.
3      MS. WAYNE:  Judge, if I may just have one
4 moment here?
5      THE COURT:  Yes.
6      (Whereupon, Ms. Wayne conferred with Ms.
7 Chartoff and Mr. Brunson off the record and out of the
8 hearing of the other courtroom participants.)
9 Q  Mr. George, I want to talk to you about your
10 knowledge about making money and the profits that you
11 indicated to the jury.  You went into detail about how
12 much it cost to sell marijuana, how much profit you
13 would make, all of those things, right?
14 A  Yes, ma'am.
15 Q  You learned that during the course of your drug
16 dealing.
17 A  Yes, ma'am.
18 Q  And, again, you kept pretty good track in terms
19 of the mathematics of drug dealing to know how much a
20 pound sold for, a half ounce, things like that?
21 A  Yes, ma'am.
22 Q  Because knowing that means that you're able to
23 make a better profit.
24 A  Yes, ma'am.
25 Q  And you and Patrick Denton together were making a

**Multi-Page™**

| Page 142 |
| --- |

1 good profit.
2 A  Decent.  Not good.
3 Q  Well it was decent enough not to quit, right?
4 A  Right.
5 Q  Decent enough to get you in trouble.  Decent
6 enough in fact to take a risk to go back to jail for
7 fifteen years, right?
8 A  Yes, ma'am.
9      MS. WAYNE:  Judge, if I may have just a
10 moment?
11      THE COURT:  Yes.
12      (Whereupon, Ms. Wayne conferred with Mr.
13 Brunson and Ms. Chartoff off the record and out of the
14 hearing of the other courtroom participants.)
15      THE COURT:  Are we ready to proceed,
16 counsel?
17      MS. WAYNE:  Yes, Judge, I am.
18 Q  Mr. George, I have been handed by my colleagues
19 this statement about the hit and run.  I wanted to go
20 into that.
21      When you got arrested on that Sunday, you
22 told Investigator DeJohn that you had been involved in
23 a hit and run, right?
24 A  No.
25 Q  Or you made a report about a hit and run, do you

| Page 143 |
| --- |

1 recall that?
2 A  No, ma'am.
3 Q  Do you recall actually telling Investigator
4 DeJohn that you had been beat up by some unknown black
5 men?
6 A  Yes, ma'am.
7 Q  Okay.  You told him that you had been beat up by
8 some unknown black men, and that you were in pain and
9 they had really done a number on you, do you recall
10 that?
11 A  Yes, ma'am.
12 Q  So when you told the police that you -- or you
13 made a report that you had actually been involved in a
14 hit and run, that was incorrect.
15 A  You mean a hit and run that I had hit someone and
16 left?
17 Q  Yeah.
18 A  No, ma'am.
19 Q  Well, when Investigator DeJohn is asking you
20 about these unknown black men, you go into the fact
21 that actually these guys had run you off the road.
22 A  They had stopped in front of me.
23 Q  Right.  And you lost your cell phone as a result
24 of it, right?
25 A  Yes, ma'am.

| Page 144 |
| --- |

1 Q  Do you recall telling him that?
2 A  Yes, ma'am.
3 Q  And that the officers actually tried to assist
4 you and go back and find these unknown black men and
5 find the cell phone.  Do you remember that?
6 A  They said it probably done left there by now, but
7 they would have someone go by.
8 Q  And, so, today you're going to tell this jury
9 that the reason that you were rearrested on Sunday is
10 because you got beat up by these unknown black males?
11 A  No, ma'am.
12 Q  It's because you committed a crime yourself.
13 A  Yes, ma'am.
14 Q  And that's what you're telling us was the D. U.
15 I., right?
16 A  Yes, ma'am.
17 Q  Lastly, Mr. George, just so the jurors are clear
18 because I'm not sure we clarified this, you had
19 indicated to us, and Mr. Feaga had talked about the
20 fact that you had received a, I think you indicated to
21 us in your history, your criminal history, that your
22 last conviction had been for fifteen years, correct?
23 A  Yes, ma'am.
24 Q  But in 2004, last year, you were actually
25 violated and given another fifteen year sentence,

| Page 145 |
| --- |

1 right?
2 A  Yes, ma'am.
3 Q  Okay.  What was that for?
4 A  2004?
5 Q  Yes.
6 A  Possession of marijuana.  Distribution of
7 marijuana.
8 Q  Okay.  So you end up even as recently as last
9 year after all this, after this man says he's trusting
10 you, you pick up another drug case.
11 A  No, ma'am.  Them charge was already preexisting.
12 Q  So there were preexisting drug charges?
13 A  One is from 2002, another was from 2003.
14 Q  And what about the 2004 case?
15 A  No, ma'am.  I just got sentenced on that 2004.
16 Q  Okay.  And that sentence was fifteen years?
17 A  Yes, ma'am.
18 Q  And do you have anything else pending at this
19 time, Mr. George?
20 A  I think I have a contempt of court.
21 Q  You think?
22 A  Yes, ma'am.
23 Q  Contempt of court means you didn't obey a court
24 order?
25 A  Yes, ma'am.

Page 146

1 Q  So that's still pending to this day?
2 A  I think so.
3        MS. WAYNE:  I have no further questions.
4            CROSS EXAMINATION
5        BY MR. TEAGUE OF GARY GEORGE:
6 Q  Contempt of court, did that involve even ignoring
7 what a judge has told you to do?
8 A  Yes, sir.
9 Q  So you don't respect any authority, do you, Mr.
10 George?
11 A  Yes, sir.
12 Q  "Yes, sir"?  Well contempt of court says you
13 didn't respect a judge, doesn't it?
14 A  Yes, sir.
15 Q  So you are very capable of that, are you not?
16 A  Yes, sir.
17 Q  But you wouldn't say otherwise here today in the
18 face here of Judge Thompson, would you, sir?
19 A  Yes, sir.
20 Q  Oh, you would say that?
21 A  At times I have been.
22 Q  In other words if you're allowed to walk out of
23 here today, you might even go to contrary to what
24 Judge Thompson tells you what to do.
25 A  No, sir.

Page 147

1 Q  Oh, you're going straight from now on?
2 A  As best I can.
3 Q  Well, as best you can?  That hasn't been too
4 good, has it?
5 A  No, sir.
6 Q  How old are you now?
7 A  Forty-one.
8 Q  Since you became old enough to drink alcohol, you
9 spent just about as much time in jail and
10 penitentiaries as you have outside, haven't you, sir?
11 A  Yes, sir.
12 Q  Would it be fair to say that we could call that a
13 hardened criminal?
14 A  Maybe.
15 Q  Maybe.
16 A  Depends on you're outlook.
17 Q  You don't consider yourself a hardened criminal,
18 you're a pretty good, respectable citizen?
19 A  I'm a criminal.
20 Q  And, well, tell the jury again now, how many
21 prior felonies do you have, Mr. George?
22 A  Probably fifteen.
23 Q  And how many more do you have to get before you
24 get over into what we call hardened criminal?
25 A  Some have less.

Page 148

1 Q  That's people who have had fewer crimes than that
2 should be called hardened criminals, you agree with me
3 on that?
4 A  Yes, sir, to an extent.
5 Q  You still got charges pending, and having
6 numerous prior felonies you're very well aware that
7 under Alabama law, when you got busted in Prattville
8 for two distribution charges, that is selling drugs,
9 you knew that you had problems under the Alabama
10 Habitual Offender Act, didn't you?
11 A  Yes, sir.
12 Q  You knew well that third time is a charm, and
13 you've had more than that, and it calls for life
14 imprisonment, doesn't it, at least?
15 A  No, sir.
16 Q  Well tell the jury this, is not the highest
17 felony in Alabama a Class A felony?
18 A  Yes, sir.
19 Q  And you have learned that a - Class A --
20 trafficking drugs is a Class A felony, isn't it, sir?
21 A  Yes, sir.
22 Q  So you knew if a judge were to get to look at you
23 again without somebody interceding for you, you likely
24 were facing life without, or at least life in the
25 penitentiary, is that correct?

Page 149

1 A  No, sir, because I didn't have a Class A felony.
2 Q  Oh.  In other words, you weren't charged with
3 trafficking you were charged with distribution?
4 A  Yes, sir.
5 Q  But the judge would have the opportunity under
6 the Habitual Offender Act to give you a life sentence,
7 wouldn't he?
8 A  Yes, sir.
9 Q  So life is something that was very much -- And
10 would it not be fair to say that's probably what you
11 deserved?
12 A  No, sir.
13 Q  In other words, you're saying that once you get
14 through helping out Agent DeJohn and the government
15 and Detective Townsend and others, you should be
16 allowed to get back out on the streets with us law
17 abiding citizens, is that your position?
18 A  Not until I do my time.
19 Q  But you think a life sentence would not be
20 reasonable considering what a nice guy you are, is
21 that your position?
22 A  No, sir.
23 Q  Well would you agree with me that it would be
24 reasonable for you to do a life sentence?
25 A  In some eyes maybe.