Multi-Page™

Page 150

1  Q  What about your eyes?
2  A  No, sir.
3  Q  We're interested in knowing about you.  What
4  about your eyes?
5  A  No, sir.
6  Q  Now do I understand that in your testimony on
7  direct when Mr. Feaga was questioning you, you said
8  that Mr. Denton is related to you by marriage?
9  A  Yes, sir.
10 Q  And how is that?  Identify that again for the
11 jury, please, sir.
12 A  My ex-wife is his cousin.
13 Q  Your ex-wife is his cousin?
14 A  Yes, sir.
15 Q  Did you and that ex-wife have children?
16 A  No, sir.
17 Q  Were you married to your wife in 2003 before all
18 this came about?
19 A  Yes, sir.
20 Q  Okay.
21 A  No, sir, I'm sorry, I was divorced when I got
22 these charges.
23 Q  I wanted to ask you something about what you said
24 there.  You said typically you and Mr. Denton, when
25 Denton would get the supply of marijuana, you and he

Page 151

1  would take axes and machetes and cut it up for further
2  distribution, is that correct?
3  A  Yes, sir.
4  Q  Okay.  Now did Mr. Denton's wife have anything to
5  do with what you were doing with Mr. Denton?
6  A  No, sir.
7  Q  Did his wife ever help y'all out in any way?
8  A  No, sir.
9  Q  What about your former wife?
10 A  No, sir.
11 Q  They didn't know anything about this?
12 A  My wife knew about it.  She wasn't helping out
13 with it.
14 Q  By the way, is this exhibit --
15    MR. TEAGUE:  Your Honor, may I approach the
16 witness?
17    THE COURT:  Yes.
18 Q  Is this exhibit 7(c), is that Mr. Denton's house?
19 A  Yes, sir.
20 Q  It's a nicer house than you had, wasn't it?
21 A  Yes, sir.
22 Q  And he was your source of supply, was he not?
23 A  Yes, sir.
24 Q  And would it be fair to describe you as one of
25 his major distributors?

Page 152

1  A  In the top two or three.
2  Q  Top two or three.
3      Now who did Mr. -- Well let me ask you this:
4  Mr. Hensarling was one of his distributors, wasn't he?
5  A  Yes, sir.
6  Q  And Mr. Hensarling's source was Mr. Patrick
7  Denton, is that right?  His full name is fully Robert
8  Patrick Denton, how did you know him?
9  A  Pat Denton.
10 Q  Pat Denton.  So any time anybody calls him "Pat
11 Denton" they're referring to the same person who is
12 Robert Patrick Denton?
13 A  Yes, sir.
14 Q  And your name is Gary Wayne George?
15 A  Yes, sir.
16 Q  Now would it be fair to say, then, that you were
17 certainly, Mr. George, you were certainly a bigger
18 distributor than was Mr. Hensarling, weren't you?
19 A  No, sir.
20 Q  You weren't?
21 A  No, sir.
22 Q  Well didn't you testify and didn't you also tell
23 Agent DeJohn that you were getting marijuana from
24 Patrick Denton?
25 A  Yes, sir.

Page 153

1  Q  In fact, that you and he were in business
2  together?
3  A  Yes, sir.
4  Q  And didn't you use the pronoun "we" when you said
5  "we gave Hensarling"?
6  A  Yes, sir.
7  Q  Twenty-five pounds at a time?
8  A  Yes, sir.
9  Q  Would it be fair to say, then, that y'all had a
10 drug trafficking organization?
11 A  Yes, sir.
12 Q  You were organized, weren't you?
13 A  Yes, sir.
14 Q  And do you want to tell the jury where you and
15 Mr. -- Well let me strike that question.
16     Let me ask you this.  Would it be fair to
17 say, then, based upon what we've heard just from you
18 about Mr. and Mrs. Hensarling, that if this man was a
19 distributor, then y'all were doing drug distribution
20 statewide, is that correct?
21 A  Yes, sir.
22 Q  There were other places other than Huntsville,
23 weren't there?
24 A  Yes, sir.
25 Q  Would that be why Mr. Denton, when he comes in

Multi-Page™

Page 154

1 here to testify, will have to say that he had been
2 busted in June of 2002 for marijuana trafficking up in
3 Huntsville?
4 A  Yes, sir.
5 Q  It was a part of his distribution activities,
6 wasn't it?
7 A  Yes, sir.
8 Q  Drug distribution organization, that's what y'all
9 were, wasn't it?
10 A  Yes, sir.
11 Q  Well where else were you distributing other than
12 Montgomery, Alabama and Huntsville, Alabama if it were
13 statewide?
14 A  Sir?
15 Q  Where else were you distributing?
16 A  Mobile and Montgomery.  Prattville.
17 Q  Mobile, Montgomery and Prattville.  You had to do
18 so much traveling, I guess you had gotten tired of
19 that life, hmm?
20 A  We seldom traveled out of Montgomery.
21 Q  "We" being you and Mr. Denton?
22 A  Yes, sir.
23 Q  So if we were going to really give this drug
24 trafficking organization a dot, we would have to put
25 Mr. Denton up here at the top, wouldn't we?

Page 155

1 A  Yes, sir.
2 Q  Well let's just do that.
3     Was it Denton's organization, or yours, or
4 the two of yours?
5 A  It was his.
6 Q  He was the boss, wasn't he?
7 A  Yes, sir.
8 Q  And you say y'all were dealing in Mobile,
9 Huntsville -- Where else did you say?
10 A  Prattville.
11 Q  What about Birmingham?
12 A  No, sir.
13 Q  Where else?
14 A  That's it.
15 Q  That's it.
16 A  Sometimes out of Elmore, Wetumpka.
17 Q  You got busted in Prattville, Denton got busted
18 in Huntsville.  Never got busted in Mobile, did you?
19 A  No, sir.
20 Q  But you had done other deals in Elmore County, is
21 that right?
22 A  Yes, sir.
23 Q  And while you're doing all these things, you're
24 on parole, aren't you, Mr. George?
25 A  No, sir.

Page 156

1 Q  Excuse me?
2 A  No, sir.
3 Q  Well, are you back on parole violations or
4 probation violations now?
5 A  No, sir.
6 Q  You're not?
7 A  No.
8 Q  Okay.  And you told Agent DeJohn that this load
9 of marijuana was going to -- When you talked to him on
10 the 15th, you met him out there by the water tower in
11 Prattville, is that correct?
12 A  Yes, sir.
13 Q  And you told him that load of marijuana is going
14 to Denton's house, didn't you?
15 A  Yes, sir, eventually.
16 Q  That pretty house down there that's in exhibit
17 7(c), correct?
18 A  Yes, sir.
19 Q  You didn't tell him it was going to Freddie
20 Williams' house, did you?
21 A  No, sir.
22 Q  In fact, you didn't even know Freddie Williams'
23 name, did you?
24 A  Yes, sir.
25 Q  You couldn't give him a name, could you?

Page 157

1 A  Sir?
2 Q  You couldn't give him a name Freddie Williams,
3 could you?
4 A  Yes, sir.
5 Q  Well now you didn't even pick Mr. Freddie
6 Williams out as somebody you knew today, did you?
7 A  When?
8 Q  Today.  When you testified you said you had never
9 seen Freddie Williams, didn't you?
10 A  Yes, sir.
11 Q  That is what you said, isn't it?
12 A  Yes, sir.
13 Q  Being a vice-president of this organization or a
14 partner with Mr. Denton, if Freddie were a part of
15 your drug trafficking organization, you would have
16 known it, wouldn't you?
17 A  No, sir.
18 Q  Oh, you wouldn't have necessarily known it?
19 A  I didn't supply to Freddie, only received from --
20 Q  No, no, no --
21     MR. FEAGA:  Objection, Your Honor, he needs
22 to let the witness answer the question.  He shouldn't
23 interrupt him.
24 Q  You never saw --
25     MR. FEAGA:  He needs to let the witness

1 finish his answer, Your Honor.
2      THE COURT: Did you finish your answer?
3      THE WITNESS: No, sir.
4      THE COURT: You can finish your answer.
5 A I said I never supplied to Freddie. He would
6 only get it from Freddie --
7      MR. TEAGUE: Your Honor, we would request --
8      MR. FEAGA: Objection. He again --
9      THE COURT: Just a minute.
10     Is this what you personally knew?
11     THE WITNESS: Yes, sir.
12     THE COURT: Overruled. Go ahead.
13     MR. TEAGUE: Your Honor, I submit he's
14 talking about he heard from Mr. Denton, perhaps.
15     THE COURT: Ask him that.
16 Q Are the things you're getting ready to say,
17 things that you heard from Mr. Denton? Not things
18 that you saw.
19 A Well I've seen his van he drove, and then Pat
20 would say, "Well there's Freddie there." And I knew
21 to get out of his eyesight so he couldn't see me.
22 Q Now let me ask you this. You had never seen this
23 man before today, had you, sir?
24 A No, sir, not up close.
25 Q And that's what you said under oath, isn't that

1 right?
2 A Yop.
3 Q And you're having to speculate that it was
4 Freddie Williams that was distributed to whenever you
5 say these things, aren't you?
6 A Yes, sir, from Pat Denton.
7 Q So we're going to have to listen to Pat Denton in
8 order to believe any of this, aren't we?
9 A No, sir.
10 Q Do you choose to believe Pat Denton?
11 A Yes, sir.
12 Q Do you think he's an honest man?
13 A Pretty much.
14 Q Just like you're an honest man?
15 A And to go --
16 Q You would never break a rule?
17     MR. FEAGA: I'm going to object if he's -- I
18 don't mind the cross examination, but he needs to let
19 the witness answer the question before he interrupts
20 him.
21     MR. TEAGUE: Excuse me.
22     THE COURT: Yes, you need to let him answer
23 the question.
24     MR. TEAGUE: Excuse me.
25 Q Tell the jury over what period you supplied Steve

1 Hensarling. How long were you supplying him?
2 A I was supplying Hensarling after probably a
3 couple of months, because he got to where he was using
4 some of the money that he was gaining off the
5 marijuana and his money would come up short. So I
6 would quit using him. And then Pat -- Because I
7 didn't want to take the risk because I didn't have the
8 money to lose. So Pat started dealing with him, he
9 had more money than me, to let him set back his self.
10     Sometimes he would be a thousand or two
11 thousand dollars short, and he'd just try to make it
12 up as he went along, which he never did. And that's
13 how Pat got busted, by carrying it up there because I
14 would never carry it up there. He was just being
15 greedy about the money.
16 Q You're talking about Mr. Hensarling not being
17 straight up with you?
18 A Yes, sir.
19 Q Sort of like no honor among crooks, right?
20 A Yes, sir.
21 Q Mr. Denton is a crook, isn't he?
22 A Yes, sir.
23 Q He doesn't abide by the law, does he?
24 A No, sir.
25 Q And neither do you.

1 A No, sir.
2 Q Okay. Now as I understand your testimony, you
3 had not taken the trouble to let Mr. Hensarling know
4 anything about the heat being on, right?
5 A No, sir.
6 Q You didn't do that. But he called his source,
7 Mr. Denton, and Mr. Denton became wise all of a sudden
8 that his drug trafficking organization was about to
9 come to light, correct?
10 A I don't know.
11 Q Because if Charlotte Hensarling told everything
12 she knew -- and she did, didn't she?
13 A I'm not aware.
14 Q You don't know that?
15 A No, sir.
16 Q We'll wait for her, then.
17     But Mr. Denton was smart enough to know that
18 law enforcement might be all over him. And now the
19 marijuana that he had lined up to come to his house on
20 November the 16th had to go somewhere else, didn't it?
21 A Yes, sir.
22 Q That was his decision, wasn't it, sir?
23 A No, sir, it was both of ours.
24 Q You just didn't want it anywhere around you, did
25 you?

Multi-Page™

**Page 162**

1 A  No, we was going to do it over to the other house
2 that his uncle owned.
3 Q  To the other house.  Now that would not be a
4 house that would belong to Freddie Williams, would it,
5 sir?
6 A  No, sir.
7 Q  Tell the jury about the other house.  Y'all had
8 another place that you would cut up marijuana, is that
9 right?
10 A  Yes, sir.
11 Q  Tell the jury, where was that?
12 A  Over by the Gunter Air Force Base.
13 Q  Okay.  If I were to proceed, if anyone were to be
14 familiar with Montgomery, if I were to proceed from
15 here, I'd have to go right down the street here and
16 catch Bell Street and turn left and go over to the
17 gate of Gunter, wouldn't I?
18 A  Yes, sir.
19 Q  It wouldn't be Gunter, it would be Maxwell Air
20 Force Base.  You've got me doing it.
21 A  Maxwell.
22 Q  And there was a place that used to be there
23 called Buckeye Cotton Seed Oil Place, a big old
24 factory looking thing?
25 A  Yes, sir.

**Page 163**

1 Q  If you turn left there and you go back there,
2 there's an old abandoned looking house, isn't there?
3 A  There's two of them back there.
4 Q  Yeah.  And they're real ramshackled and run down,
5 right?
6 A  Those two are, right.
7 Q  They're uninhabitable, right?
8 A  Yes, sir.
9 Q  But a neat place for you to go into where nobody
10 would bother you.  You and Denton to go in there and
11 be cutting up with your machetes and axes all that
12 stuff, right?
13 A  It wasn't one of those run down house, it was one
14 that had been remodeled.
15 Q  Okay.  But nobody did it there, right?
16 A  No, sir.
17 Q  So and Mr. Denton could go over there any time
18 you got ready to.
19 A  Yes, sir.
20 Q  But if the heat is on, you can't let it go over
21 there, can you?
22 A  Yeah, you could go there because didn't no one
23 know about that house.
24 Q  Okay.  Nobody knew about it.
25      Now at the time Mr. Denton got this call

**Page 164**

1 from Mr. Hensarling, he knew he was on bond for a
2 crime he had committed and been arrested for in
3 Huntsville a year before in 2002, didn't he?
4 A  Yes, sir.
5 Q  And getting in trouble and catching another
6 charge could cause him to have his bond revoked and
7 he'd sit in jail until his time for trial in
8 Huntsville.  He was aware of that, wasn't he?
9 A  Yes, sir, I'm sure.
10 Q  And so he had to get it somewhere else.  It just
11 couldn't come to his house, correct?
12 A  Yes, sir.
13 Q  I want to ask you this question, Mr. George.
14 Have you ever seen defendant Leon Carmichael get with
15 Freddie Williams and agree to distribute marijuana?
16 A  No, sir.
17 Q  You've never seen that, have you?
18 A  No, sir.
19 Q  Have you ever seen them conspire or combine?
20 You've never seen that, have you, sir?
21 A  You say "combine" --
22 Q  Yeah.  Whatever that means.
23 A  I've seen Freddie's van and Leon's van going in
24 unison coming to Pat's house.
25 Q  My question is, did you ever see them sit down

**Page 165**

1 and agree to do any distribution?
2 A  No, sir.
3 Q  Okay.  And you do not have any evidence that you
4 could tell this jury that you know beyond a reasonable
5 doubt that those two got together and agreed.  You
6 never saw that, did you, sir?
7 A  By their actions it would be agreement.
8 Q  Well, but I thought you said that Mr. Denton was
9 your supplier.
10 A  Yes.
11 Q  Okay.  We'll wait to hear from Mr. Denton.  Thank
12 you very much.
13            REDIRECT EXAMINATION
14      BY MR. FEAGA OF GARY GEORGE:
15      THE COURT: Any further direct?
16      MR. MOORER: Yes, but it was a lengthy
17 cross.
18      THE COURT: We need to keep the case moving
19 though.
20      Do you anticipate any further cross?
21      MS. WAYNE: I have one question, yes.
22      THE COURT: Okay.
23      (Whereupon, Mr. Feaga conferred with Ms.
24 Morris and Mr. Moorer off the record and out of the
25 hearing of the other courtroom participants.)

Page 166

1  THE COURT: Counsel, we need to keep the
2  case moving. You all should be doing this while the
3  examination is going on. We have a jury here, they're
4  waiting.
5  Q Mr. George, we had, I think, both Miss Wayne and
6  Mr. Teague ask you about different people that you
7  were supplying.
8  A Yes, sir.
9  Q Let me ask you. Where were you and Mr. Denton
10 getting the marijuana that you were supplying to
11 people?
12 A Where was he getting it?
13 Q Yeah. Where was he getting it? Who was he
14 getting it from?
15 A Delivered from Freddie and Mr. Leon.
16 Q The Leon Carmichael you testified about earlier?
17 A Yes, sir.
18 Q So we need to add a name to this list of what
19 Mr. Teague characterized as "a drug trafficking
20 organization," don't we?
21 A Yes, sir.
22 Q All right. He was talking about who the bosses
23 are. You said as far as your level goes, Denton was
24 the boss, is that right?
25 A Yes, sir.

Page 167

1  Q Who was Denton's boss?
2  A Mr. Carmichael.
3  Q Now you said that you had seen both -- When he
4  was asking you if you had seen Mr. Carmichael and Mr.
5  Williams combining and conspiring and confederate, I
6  think he might have been reading from the indictment,
7  and you said that you had seen them together, isn't
8  that right?
9  A Not together. Setting two by two just in the
10 vans.
11 Q Okay. So that indicates -- There were how many
12 vans, two?
13 A Two.
14 Q Okay. And are you saying Mr. Carmichael had a
15 van?
16 A Yes, sir.
17 Q Can you describe it?
18 A White van with some pin striping on it. It's a
19 conversion van.
20 Q Okay. And do you know approximately what year it
21 might have been?
22 A I'd say it was mid nineties.
23 Q Okay. What about Mr. Williams, could you
24 describe his van to the jury?
25 A Sort of like a gray primer color. Probably about

Page 168

1  mid to late seventies.
2  Q And Mr. Leon would follow Mr. Williams when Mr.
3  Williams did what?
4  A Drop it off at Pat's house.
5  Q Other than the time that Mr. Leon did it himself?
6  A Yes, sir.
7  MR. FEAGA: No further questions, Your
8  Honor.
9  THE COURT: Any further cross?
10 RECROSS EXAMINATION
11 BY MS. WAYNE OF GARY WAYNE GEORGE:
12 Q Mr. George, this van that you described in detail
13 that you say Mr. Carmichael was in, you told
14 Investigator DeJohn about that van, correct?
15 A I don't think so.
16 Q Well Investigator DeJohn was asking you all of
17 the things that you could tell him about Mr.
18 Carmichael so they could watch Mr. Carmichael, right?
19 A I don't remember that now.
20 Q All right. So you don't know if you've ever
21 talked about this van ever until today?
22 A Yes, ma'am.
23 MS. WAYNE: I don't have any further
24 questions.
25 MR. TEAGUE: Can I ask one quick question?

Page 169

1  THE COURT: Yes, Mr. Teague.
2  REDIRECT EXAMINATION
3  BY MR. TEAGUE OF GARY GEORGE:
4  Q You never told Agent DeJohn this little fact that
5  you didn't remember that until today about supposedly
6  a couple of vans together, one of them had Mr.
7  Carmichael in it? You didn't remember that until
8  today?
9  A Well our conversation was about the marijuana
10 that we were going to be cutting up.
11 Q Okay. Now for you to say that well I saw these
12 two vans together, one of them had a man you couldn't
13 even recognize today and so testified, for us to
14 believe that there had ever been any combining or
15 conspiring we'd have to believe you and your word,
16 don't we, sir?
17 A Yes, sir.
18 Q Thank you.
19 MR. FEAGA: Nothing further from the United
20 States, Your Honor.
21 THE COURT: Any further cross in light of
22 Mr. Teague?
23 MS. WAYNE: No further cross, Judge.
24 THE COURT: Thank you. You may step down.
25 (Whereupon the witness, Gary George, stepped

Page 170

1  down from the stand.)
2      THE COURT: Next witness.
3      MS. WAYNE: I'd ask that Mr. George not be
4  released from his subpoena.
5      MR. TEAGUE: We'd also ask that.
6      THE COURT: He's not released.
7      MR. FEAGA: Your Honor, we'd like to call a
8  witness out of order, just a records custodian for
9  some telephone records so we can get her back on the
10 road and back home, and then we'll go back and --
11     THE COURT: That's fine.
12     MR. FEAGA: Your Honor, we're just calling
13 her to authenticate the records.
14     THE COURT: Very good.
15        B A R B A R A   C O O P E R,
16 the witness herein, having first been duly sworn or
17 affirmed to tell the truth, was examined and testified
18 as follows:
19        DIRECT EXAMINATION
20     BY MS. MORRIS OF BARBARA COOPER:
21 Q  Could you state your name for the record, please.
22 A  Barbara Cooper.
23 Q  And, Miss Cooper, how are you employed?
24 A  I'm employed with T-Mobile as a legal compliance
25 agent.

Page 171

1      THE COURT: Her name is probably easy to
2  spell, but if they could all spell their last name so
3  the court reporter has it.
4  Q  Could you go ahead and spell your last name?
5  A  C-o-o-p-e-r.
6  Q  And you're here today under a subpoena, is that
7  correct?
8  A  That's correct.
9  Q  Acting as the custodian of records for T-Mobile?
10 A  Yes.
11 Q  And we subpoenaed these records that I have in my
12 hand?
13 A  Yes.
14     MS. MORRIS: May I approach, Your Honor?
15     THE COURT: Yes.
16 Q  I'm showing you what has been premarked as
17 government's exhibit 25. Do you recognize those?
18 A  Yes, I do.
19 Q  And have you reviewed those records here today,
20 actually?
21 A  Yes, I have.
22 Q  And are these records the records that are
23 northerly kept in the course of T-Mobile's everyday
24 business?
25 A  That's correct.

Page 172

1      MS. MORRIS: At this time, Your Honor, we
2  would move to admit government's exhibit 25 into
3  evidence.
4      THE COURT: They are admitted.
5      MS. WAYNE: Judge --
6      THE COURT: I'm sorry, do you want to
7  object?
8      MS. WAYNE: Judge, I am objecting only
9  because they don't have relevance at this point. I
10 understand they're trying to lay a foundation --
11     THE COURT: I see. Okay, then. You will
12 have to show relevance.
13     MS. MORRIS: Well that's fine. We'll do it
14 for identification purposes only at this point.
15     MR. FEAGA: Your Honor, we have a ruling
16 that they are properly authenticated subject to it
17 being tied up?
18     THE COURT: Yes. The only issue remaining
19 is relevance.
20     Do you agree to that?
21     MS. WAYNE: Yes, Your Honor.
22     THE COURT: Do you agree to that,
23 Mr. Teague, the only issue is relevance?
24     MR. TEAGUE: Yes, Your Honor.
25     THE COURT: Thank you. The issue is

Page 173

1  relevance.
2      Do you have any other documents that we
3  could clear the issue as being relevance?
4      MR. FEAGA: We do have other documents, yes,
5  sir.
6      THE COURT: Why don't you get with defense
7  counsel during the next break and see if they will
8  agree to the authenticity of the telephone records and
9  the only issue being relevance.
10     MR. FEAGA: Yes, sir, we'll be happy to. If
11 the defense will stipulate, we'll be happy to do it.
12     THE COURT: Do it on the next break.
13     MS. MORRIS: I think that's all we have for
14 this witness, Your Honor.
15     THE COURT: Very good. You're free to go.
16     (Whereupon the witness, Barbara Cooper,
17 stepped down from the stand.)
18     THE COURT: Next witness.
19     MS. MORRIS: Government calls Steven Brock.
20        S T E V E N   B R O C K,
21 the witness herein, having first been duly sworn or
22 affirmed to tell the truth, was examined and testified
23 as follows:
24        DIRECT EXAMINATION
25     BY MS. MORRIS OF STEVEN BROCK:

**Page 174**

1 Q  Could you state your name and spell your last
2 name for the record, please.
3 A  Steven Brock. B-r-o-c-k.
4      THE COURT: I thought you had an issue to
5 take up about this witness. We can take it up before
6 cross.
7 Q  And, Mr. Brock, how are you employed?
8 A  With the Chilton County Sheriff's Department.
9 Q  As a Sheriff's deputy, is that right?
10 A  Yes, ma'am.
11 Q  How long have you been a sheriff's deputy?
12 A  For approximately five years.
13 Q  What did you do before you were a sheriff's
14 deputy?
15 A  I was in the military.
16 Q  What did you do in the military?
17 A  I was with the Twentieth Special Forces out of
18 Mobile, Alabama.
19 Q  What branch of the military is that?
20 A  That's the Army.
21 Q  How long were you in the military?
22 A  Approximately fourteen years.
23 Q  Okay. And from the military you came straight to
24 the Chilton County Sheriff's Office, is that correct?
25 A  Yes, ma'am.

**Page 175**

1 Q  And what are your duties and responsibilities at
2 the Chilton County Sheriff's Department?
3 A  Currently I'm assigned to the D. E. A. task force
4 here in Montgomery.
5 Q  And how long have you had that assignment?
6 A  Since November of 2004.
7 Q  Okay. So that's not quite -- not even close to a
8 year, about seven months?
9 A  Yes, ma'am.
10 Q  Okay. And what do you do as a D. E. A. task
11 force officer?
12 A  Work narcotic cases.
13 Q  Okay. Before you were assigned to the D. E. A.,
14 did you have another assignment within the Sheriff's
15 Department?
16 A  Yes, ma'am.
17 Q  And what was that?
18 A  I was a road deputy. Then I was assigned to
19 Narcotics for the Chilton County Sheriff's Department.
20 And then I was assigned as the third shift supervisor
21 on patrol.
22 Q  Back in November of 2003 what was your assignment
23 with the Chilton County Sheriff's Department?
24 A  I was third shift supervisor on patrol.
25 Q  On patrol?

**Page 176**

1 A  Yes, ma'am.
2 Q  So you were working patrol?
3 A  Yes, ma'am.
4 Q  Which means you were what, doing what?
5 A  A patrol deputy.
6 Q  Giving out tickets, patrolling the streets, that
7 sort of thing?
8 A  Yes, ma'am.
9 Q  Okay. And were you working on November 15th of
10 2003?
11 A  Yes, ma'am, I was.
12 Q  Did you have occasion to come into contact with a
13 Charlotte Hensarling?
14 A  Yes, ma'am, I did.
15 Q  Tell the jury how that occurred.
16 A  I had received a call from Agent David DeJohn and
17 asked to obtain probable cause to stop a vehicle.
18 Q  And did he give you a description of the vehicle?
19 A  Yes, ma'am he did.
20 Q  What did he tell you?
21 A  It was a black Chevrolet Tahoe or a Blazer with a
22 Huntsville tag license plate.
23 Q  Deputy Brock, there's probably quite a few
24 Chevrolet Blazers, black, with Huntsville plates. Was
25 there anything else identifying that you could

**Page 177**

1 pinpoint this particular vehicle?
2 A  Yes, ma'am. Agent DeJohn was trailing the
3 vehicle.
4 Q  And did you indeed stop that vehicle?
5 A  Yes, ma'am, I did.
6 Q  What did you stop it for?
7 A  For improper lane change and failure to use the
8 turn signal.
9 Q  Okay. And when you stopped it, what happened
10 then?
11 A  I approached the vehicle on the passenger's side,
12 spoke with the driver and I could smell the odor of
13 marijuana coming from within the vehicle.
14 Q  So you smelled marijuana immediately?
15 A  While I was speaking to the driver, yes, ma'am.
16 Q  Let me back up a minute, Agent Brock. Where were
17 you when you stopped this vehicle?
18 A  Where was I sitting when I saw the vehicle,
19 or --
20 Q  Sure. Where was your patrol car sitting when you
21 first saw the vehicle?
22 A  It was in the median at the one ninety-eight mile
23 marker at I-65 northbound.
24 Q  One ninety-eight mile marker on I-65?
25 A  Yes, ma'am.

| Page 178 |
|---|

1  Q  Going which way?
2  A  Northbound.
3  Q  And where is that?
4  A  It's at the Chilton/Autauga County line.
5  Q  When you saw the vehicle, what did you do?
6  A  As I saw the vehicle approaching, I observed it
7  to make an improper lane change.  I pulled out behind
8  her and I turned on my lights and sirens and pulled
9  her over.
10  Q  That's when you approached and smelled the
11  marijuana?
12  A  Yes, ma'am.
13  Q  After you smelled the marijuana what did you do
14  then?
15  A  I went back to my vehicle, I wrote her a warning
16  ticket for the improper lane change, and I called her
17  back to my vehicle to get her to sign the ticket.
18  Q  And when she came back to your vehicle, did you
19  ask her for consent at that point?
20  A  Yes, ma'am, that's when I asked for consent to
21  search her vehicle.
22  Q  Did she give it to you?
23  A  Yes, ma'am, she gave verbal consent.
24  Q  So you then did what?
25  A  I then conducted a search of the vehicle of her

| Page 179 |
|---|

1  vehicle and --
2  Q  What did you find?
3  A  I found a green plastic container in the cargo
4  area of her vehicle containing what was suspected as
5  marijuana.
6     MS. MORRIS:  Your Honor, may I approach?
7     THE COURT:  Yes.
8  Q  Agent Brock, I'm showing you what's been
9  premarked as government's exhibit 1.  Would you take a
10  look at that for me?  And I'll let you look at it and
11  let you take a look at it inside, as well.  Do you
12  recognize this?
13  A  Yes, ma'am.
14  Q  How do you recognize it?
15  A  That's the green plastic container in the cargo
16  area of her vehicle.
17  Q  How do you know that this is the green plastic
18  container from that vehicle?
19  A  Because it contains the red evidence tape from
20  where I sealed it with my initials on it.
21  Q  Are these your initials on it right here, S. B.?
22  A  Yes, ma'am.
23  Q  Once you found this green plastic container with
24  the suspected marijuana, what did you do then?
25  A  We searched the rest of the vehicle, waited on a

| Page 180 |
|---|

1  wrecker and we towed the vehicle to our impound lot at
2  the county jail.
3  Q  And when you towed the vehicle back to the
4  impound lot, did you then look more closely inside of
5  the container?
6  A  Yes, ma'am.  I trailed the wrecker, never losing
7  sight of the vehicle.  Once we got to the impound lot
8  at the jail I did a detailed search of the vehicle and
9  then pulled the plastic bags from within that green
10  container.
11  Q  At that point did you weigh the plastic bags and
12  the marijuana?
13  A  Yes, ma'am, individually.
14  Q  And what was the total weight?
15  A  Approximately twenty-six pounds.
16  Q  Okay.  Agent Brock, do you know how many pounds
17  in a kilo?
18  A  Two point two pounds.
19  Q  Do you know roughly how many kilos twenty-six
20  pounds is?  I'm not asking for an exact --
21  A  Approximately twelve.
22  Q  Okay.  Once you weighed the dope, Deputy Brock,
23  what did you then do?
24  A  I sealed the container with the evidence tape.
25  Q  With this red evidence tape right here?

| Page 181 |
|---|

1  A  Yes, ma'am.
2  Q  Okay.
3  A  Placed my initials on it.
4  Q  The "S. B." right here?
5  A  Yes, ma'am.
6  Q  Okay.
7  A  And then it was placed in the evidence locker at
8  the county jail.
9  Q  And eventually did you take this green container
10  to the forensics lab?
11  A  Yes, ma'am, I did.
12  Q  When did you do that?
13  A  I believe it was July of 2004.
14  Q  Okay.  And where from November 15th to July of
15  2004, where was this container?
16  A  In our evidence locker.
17  Q  In the drug evidence locker?
18  A  In our drug evidence locker.
19  Q  Locked up?
20  A  Yes, ma'am.
21     MS. MORRIS:  Your Honor, I have nothing
22  further at this time.
23     THE COURT:  Cross?
24     MS. JAMES:  May we approach?
25     THE COURT:  Okay.  Are we ready Now?  Yes.

Page 194

1 all let me clarify that I think Miss James is saying
2 he's on administrative status as a task force officer
3 with the Drug Enforcement Administration, and I don't
4 think is he. Actually, I think I'd have to defer to
5 the witness.
6     THE COURT: Are you on administrative
7 status?
8     THE WITNESS: Through the Sheriff's
9 Department, yes, sir.
10     MS. MORRIS: But not through the D. E. A.
11 And I think that's what Ms. James' argument was.
12     THE COURT: What is it?
13     THE WITNESS: It's kind of hard to explain,
14 Your Honor.
15     THE COURT: Why don't you make an attempt to
16 explain it.
17 A They don't want me to be on any kind of hold as a
18 resident as far as the other counties. I can still go
19 out on buys and/or surveillance, I just can't do any
20 arrests. They don't want me to have any involvement
21 with arrests.
22     MS. JAMES: During the examination that I
23 conducted I asked him if he still had arrest powers
24 and he said yes. And I asked him if he could do the
25 normal things, and he said he has to stay in the

Page 195

1 office all day long.
2     THE WITNESS: I still have arrest powers, I
3 just can't go out and arrest.
4     THE COURT: Right. The problem I'm having
5 with the evidence you want to introduce is it's purely
6 accusatory. There's been no finding by any agency, by
7 any court or anybody else that what he did, when was
8 it at this nightclub or something, was improper.
9 Until there is such a finding whereby it becomes a
10 fact, it's not relevant because I am not going to have
11 the jury spend time determining whether he engaged in
12 improper conduct or not.
13     It's just merely an accusation. It's just
14 like an indictment. You couldn't use an indictment
15 against someone, you can't use an accusation. It's
16 just a waste of time.
17     MS. JAMES: I understand. And in all due
18 respect, Your Honor, all I'm saying is that the status
19 that he's on administrative status, that's my only
20 question.
21     THE COURT: You can ask him if he's on
22 administrative status and what his current duties are
23 and that's it.
24     MS. MORRIS: Your Honor, may I object to
25 that under 608 and 609? Because it's not probative of

Page 196

1 truthfulness or untruthfulness and it's improper
2 impeachment under both of those. He hasn't been
3 convicted of anything --
4     THE COURT: Well I will just allow him to
5 say what his current status in the department is. But
6 no implications are to be made from that.
7     MS. JAMES: Yes, sir.
8     MS. MORRIS: Your Honor, can you limit it to
9 administrative duty instead of administrative leave
10 time thing?
11     THE COURT: What is your current status now
12 again?
13     THE WITNESS: Administrative duty.
14     THE COURT: Administrative duty. That's the
15 only thing that comes out. And you can't argue what
16 led to that administrative duty because those are only
17 accusations.
18     Now, Miss Chartoff, what did you want to
19 say?
20     MS. CHARTOFF: Well, what I was objecting to
21 what the government has done with the last two
22 witnesses, which is to bring in irrelevant evidence
23 pursuant to Rule 401 about the person's background and
24 character, it does not prove anything relevant to
25 this. It does not have any tendency to make the

Page 197

1 existence, for example, it does not have any tendency
2 to make the existence of any fact that is of
3 consequence to the determination of the action more
4 probable or less probable than it would be without the
5 evidence.
6     Instead, and under Rule 402, that evidence
7 is therefore inadmissible. Now this evidence also is
8 basically character evidence under 404.
9     THE COURT: This is about this witness.
10     MS. CHARTOFF: Yes, Your Honor. But --
11     THE COURT: Now earlier witnesses could
12 explain the convictions and the circumstances that
13 surround those convictions as long as the government
14 knew he was going to challenge him because of that.
15     MS. CHARTOFF: And We don't have a problem
16 with that, Your Honor. What we did have a problem
17 with was his touching story about -- I can't remember
18 what it was, about his parents divorcing and so forth.
19     THE COURT: He can lead up to what led to
20 his first conviction. He can do that. He can explain
21 why he did it and so forth.
22     But this witness you're saying what did he
23 do now? I don't think I heard an objection, though.
24     MS. CHARTOFF: There was no objection, Your
25 Honor, and I'm making a motion in limine from here on

Page 198

1 out.
2        THE COURT: Okay.
3        MS. CHARTOFF: That when I'm sure a lot of
4 the law enforcement officers they're going to bring in
5 have very impressive military backgrounds. It's our
6 position that they're bringing out these military
7 backgrounds only to vouch for the credibility of the
8 witnesses and to basically build them up as super
9 credible people. Now that's totally improper. It's
10 irrelevant, and I just had the rule here --
11       THE COURT: While you're searching for the
12 rule, what does the government say?
13       MR. FEAGA: Your Honor, we've got two issues
14 that she's raising. I would start my argument BY
15 this. I recollect yesterday, again, it's a little
16 like the little boy crying wolf here, yesterday when
17 we were striking the jury one of them told the juror
18 that she was a Mom spontaneously, let them know she's
19 a mother, one of them told them that she's got an aunt
20 who is a tax lawyer.
21       THE COURT: This is nothing what's before me
22 now.
23       MR. FEAGA: Yes, sir, and I didn't object to
24 it is because what she's talking with is so trivial.
25 It borders on the ridiculous.

Page 199

1        THE COURT: All I want to know is, she's
2 objecting to you going into evidence about a police
3 officer's military background. That's the only issue
4 that's before me. What happened in voir dire, there
5 is no objection, that doesn't mean that it's the law.
6        MR. FEAGA: Yes, sir, I understand.
7        THE COURT: The question is now is, how does
8 going into an officer's military background, how is
9 that relevant?
10       MR. FEAGA: Rule 401, your Honor, of the
11 Rules of Evidence says "'relevant evidence' means
12 evidence having any tendency to make the existence of
13 any fact that is of consequence to the determination
14 of the action more probable or less probable than it
15 would be without the evidence."
16       The fact of a law enforcement officer's
17 background and training is relevant, Your Honor, to a
18 jury that is assessing the ability of the officer to
19 observe and remember the events that he is testifying
20 about. It is relevant to his background and training
21 in regards to the job he's out there doing, and is
22 very helpful in terms of helping the jury decide
23 whether or not the existence of any fact that is of
24 consequence to the determination of the action is more
25 or less probable than it would --

Page 200

1        THE COURT: Sounds to me like you're putting
2 him forward as an expert witness.
3        MR. FEAGA: No, sir. We just are trying to
4 let the jury know what the individual's background is
5 before they start testifying to events. The defense,
6 I know, would love to sterilize this case where the
7 only thing we're allowed to ask any witness is direct
8 questions that relate directly to evidence so that
9 they can then come in and do exactly what they are
10 trying to set up to do, which is why they're objecting
11 to this.
12       They want to argue to the jury that these
13 people couldn't possibly have seen and done these
14 things that they did, when I go back to the first
15 witness we were talking about where she -- the whole
16 idea here is absolutely to establish that this is a
17 person who is exactly what he says he is, has seen the
18 things that he's seen. When I call --
19       THE COURT: Well there was no objection, but
20 I don't see any need to go into any extensive military
21 background. If they're police officers, call them,
22 and let them testify.
23       Anything else?
24       MS. CHARTOFF: Yes, Your Honor. I would
25 simply add that as you're going to instruct the jury,

Page 201

1 these officers are supposed to be treated as witnesses
2 like anybody else and, therefore, the fact they
3 they're experienced, unless they're calling them as
4 expert witnesses, is really not relevant. They can
5 say what their position is.
6        MR. FEAGA: It goes to show their
7 background, their training, the ability to do the job
8 that they're do that they're testifying about. And it
9 clearly is probative to a jury to be aware of those
10 things rather than to just hear somebody walking in.
11 The next thing they will be saying is that we're not
12 allowed to tell them they're police officers.
13       THE COURT: We don't need to get into all of
14 their military background. We don't need to show
15 their medals in court.
16       Let's proceed. Bring in the jury.
17       (Whereupon, the jury was escorted into the
18 courtroom.)
19           CROSS EXAMINATION
20       BY MS. JAMES OF STEVEN BROCK:
21       THE COURT: Proceed, Miss James.
22       MS. JAMES: Thank you.
23 Q  Good afternoon.
24       Is it Agent Brock?
25 A  Yes, ma'am.

Page 202

1  Q  My name is Susan James and I'm one of Mr.
2  Carmichael's attorneys and I have a few questions for
3  you.
4         You testified that you're actually employed
5  with the Chilton County Sheriff's Department, is that
6  correct?
7  A  Yes, ma'am.
8  Q  And your present assignment is with the Drug
9  Enforcement Administration as a task force officer?
10  A  Yes, ma'am.
11  Q  And what is your present status?
12  A  I'm on administrative duty.
13  Q  Okay.  Now you've testified about events
14  involving a traffic stop or a stop that you made on
15  Interstate 65 in Chilton County, is that correct?
16  A  Yes, ma'am.
17  Q  And you've been shown government's exhibit --
18         MS. JAMES:  May I?
19         THE COURT:  Yes.
20  Q  You've been shown government's exhibit 1 and
21  asked if you could identify that.  Is that the item
22  that you seized from Miss Hensarling?
23  A  Yes, ma'am.
24  Q  Okay.  And you really made that stop after you
25  had received a telephone call from Agent DeJohn, is

Page 203

1  that correct?
2  A  Could you repeat that, please?
3  Q  You made the stop subsequent to having received
4  information from Agent DeJohn?
5  A  Yes, ma'am.
6  Q  And were you working in your task force capacity
7  on that day?
8  A  No, ma'am.
9  Q  Were you working as a regular patrol type
10  situation?
11  A  Yes, ma'am, patrol deputy.
12  Q  So you were a patrol deputy when this occurred?
13  A  Yes, ma'am.
14         MS. JAMES:  May I approach the witness, Your
15  Honor?
16         THE COURT:  Yes.
17  Q  Let me show you what's been marked for
18  identification purposes as defendant's exhibit 4 and
19  ask if you recognize that.
20  A  Yes, ma'am.
21  Q  And what is it, sir?
22  A  The first is an incident and offense report.
23  Q  Okay.  And it appears to bear the date one
24  sixteen oh three -- or excuse me -- eleven sixteen oh
25  three, is that correct?

Page 204

1  A  That's the date that the report was completed,
2  yes.
3  Q  All right.  And it appears to -- It doesn't
4  appear to have a signature, but it does appear to have
5  the name "Steve Brock" on it.
6  A  Yes, ma'am.
7  Q  Would that be a report that you prepared in
8  conjunction with the stop that you made and the
9  seizure of what's in government's exhibit 1?
10  A  Yes, ma'am, it is.
11  Q  Now the purpose of these reports, Agent Brock, is
12  to memorialize what happens when you do something in
13  your official capacity as a law enforcement officer,
14  is that right?
15  A  Yes, ma'am.
16  Q  And it's important when you prepare these reports
17  that you're completely truthful, would you agree?
18  A  Yes, ma'am.
19  Q  Now in this particular report do you recall what
20  you put in the report as to what happened on this day
21  in question?
22  A  Yes, ma'am.
23  Q  Okay.  Do you recall having put in the report
24  that you were making a traffic stop?  In fact, that
25  you conducted a traffic stop that the offender was

Page 205

1  following too close and improper lane change, do you
2  remember putting that in the report?
3  A  Yes, ma'am.
4  Q  In fact, though, you made the stop -- you were
5  going to make the stop regardless of whether there was
6  a lane change or whether they were following too
7  close, weren't you?
8  A  No, ma'am.
9  Q  You were not?
10  A  No, ma'am.
11  Q  Where was it that you actually saw the subject
12  vehicle?  Where were you stationed?
13  A  I was at the one ninety-eight mile marker of I-65
14  northbound.
15  Q  Okay.  Were you actually parked there in the
16  median?
17  A  Yes, ma'am, I was parked sideways in the median.
18  Q  And at that point you had been given the
19  information about the description of the subject
20  vehicle by Agent DeJohn?
21  A  Yes, ma'am.
22  Q  And Agent DeJohn had told you at that time what
23  he expected to be contained within that vehicle,
24  correct?
25  A  Yes, ma'am.

Multi-Page™

Page 206

1 Q All right. After you actually identified the
2 subject vehicle, did you begin to follow the vehicle?
3 A No, ma'am.
4 Q You actually saw the lane change?
5 A Yes, ma'am. When she observed -- She was in the
6 left-hand lane, the passing lane when she observed me
7 sitting sideways in the median. She made a lane
8 change into the right-hand lane.
9 Q Okay. And what was proper -- She was on the
10 Interstate, correct?
11 A Yes, ma'am.
12 Q And people change lanes all the time on the
13 Interstate, don't they?
14 A Yes, ma'am.
15 Q And was there anything unusual about the way that
16 she made the lane change?
17 A Yes, ma'am, she didn't use a turn signal.
18 Q Okay. And did you give her a citation for her
19 lane change violation and her following too close?
20 A No, ma'am, I didn't.
21    MS. JAMES: May I have a moment?
22    THE COURT: Yes.
23    (Whereupon, Ms. James conferred with Ms.
24 Wayne off the record and out of the hearing of the
25 other courtroom participants.)

Page 207

1    MS. JAMES: That's all, thank you.
2    THE COURT: Mr. Teague?
3    MR. TEAGUE: No questions, Your Honor.
4    THE COURT: Any redirect?
5    MS. MORRIS: No, Your Honor.
6    THE COURT: Thank you. You may step down.
7    (Whereupon the witness, Steven Brock,
8 stepped down from the stand.)
9    THE COURT: Next witness.
10    By the way, did you all reach any agreements
11 on authenticity of documents so we don't need to call
12 those witnesses?
13    MS. MORRIS: We're working on it, Your
14 Honor.
15    THE COURT: You're working on it? Okay,
16 good.
17    MS. MORRIS: Your Honor, the government
18 calls Maria White.
19    THE COURT: Maria White.
20    M A R I A   W H I T E,
21 the witness herein, having first been duly sworn or
22 affirmed to tell the truth, was examined and testified
23 as follows:
24    DIRECT EXAMINATION
25    BY MS. MORRIS OF MARIA WHITE:

Page 208

1    THE COURT: And ask her to spell her last
2 name.
3 Q Could you state your name and spell your last
4 name for the record.
5 A Maria White. W-h-i-t-e.
6 Q And, Miss White, how are you employed?
7 A I am employed by the State of Alabama in the
8 Department of Forensic Sciences as a forensic drug
9 chemist.
10 Q Okay. And what training or education have you
11 had to be a forensic drug chemist?
12 A I have a Bachelor of Science degree from Auburn
13 University in Montgomery, and I went through the Drug
14 Chemistry Training Center in Auburn, Alabama.
15 Q All right. You have a Bachelor's degree from A.
16 U. M., I think you said, or Auburn University
17 Montgomery. What is your degree in?
18 A It's in biology medical technology.
19 Q Okay. And you just referenced you had some
20 training from Auburn University. Is that in Auburn or
21 is that here in Montgomery, some further training?
22 A Further training in the Drug Chemistry Training
23 Center in Auburn, Alabama in the drug -- with the
24 Department of Forensic Sciences.
25 Q Okay. And how long was that training?

Page 209

1 A That training lasted until October 2004. I
2 started in March '04.
3 Q So you start in March of '04, you had six months
4 training and then roughly you started testing
5 substances, is that correct?
6 A That is correct.
7 Q Okay. And during those six months what exactly
8 -- well tell us a little bit about that training.
9 A We had training in controlled substances. We
10 learned about the history of and the analyses of
11 controlled substances. We trained with the
12 instruments. We had theory and application on the
13 instruments that we test our drugs on. We also did
14 training on the chemical color tests that we do, that
15 we can test certain controlled substances with.
16 Q Now, Miss White, I am going to show you what has
17 been premarked as government's exhibit 1. Take a look
18 at it. Do you recognize this?
19 A Yes, I do.
20 Q And what is it?
21 A It is a piece of evidence that I received -- that
22 we received in the Department of Forensic Sciences in
23 the Montgomery lab and that I analyzed.
24 Q And how do you know that this is something that
25 you analyzed? And you can get up and point if you

Multi-Page™

**Page 214**

BY MS. WAYNE OF MARIA WHITE:

1  Q  Good afternoon, Miss White.

3  Turning to the exhibit that you've looked
4  at, the condition that it's in in terms of the tape on
5  the outside and all of that, that's exactly how it was
6  when you looked at it?

7  A  That is correct.

8  Q  There was no orange powder, fingerprint powder
9  anywhere on the outside or the inside?

10  A  No.

11  Q  Is that something that you would note in your
12  report?

13  A  That is correct.

14  Q  Thank you very much, Miss White. No further
15  questions.

16  THE COURT: Mr. Teague?

17  MR. TEAGUE: No questions, Your Honor.

18  THE COURT: Any further direct?

19  MS. MORRIS: No, Your Honor.

20  THE COURT: You may step down.

21  (Whereupon the witness, Maria White, stepped
22  down from the stand.)

23  THE COURT: Next witness.

24  MR. FEAGA: Charlotte Hensarling, Your
25  Honor.

**Page 215**

1  THE COURT: Charlotte Hensarling.

2  C H A R L O T T E   H E N S A R L I N G,
3  the witness herein, having first been duly
4  sworn or affirmed to tell the truth, was examined and
5  testified as follows:

6  DIRECT EXAMINATION

7  BY MR. FEAGA OF CHARLOTTE HENSARLING:

8  MS. WAYNE: Judge, I have an objection
9  before she takes the stand.

10  THE COURT: Why don't you tell Mr. Feaga
11  first and see. I'd like to keep everything on the
12  record, but --

13  MR. FEAGA: I certainly don't agree with the
14  objection.

15  THE COURT: I'll have to excuse the jury.

16  Members of the jury, don't forget, this is
17  an important case to both sides, so these
18  interruptions you'll just have to bear with us.

19  (Whereupon, the jury was escorted out of the
20  courtroom, and the following colloquy ensued):

21  MS. WAYNE: Judge, my objection is based on
22  Rule 403. This is Miss Hensarling who the Court has
23  heard about who was involved in the arrest and
24  marijuana bust.

25  THE COURT: Yes.

**Page 216**

1  MS. WAYNE: Judge, I think they have heard
2  in detail about this arrest. We're not disputing that
3  there was an arrest, that Miss Hensarling was
4  arrested. I think pursuant to 403 I think at this
5  point it's cumulative and it's a waste of time and I
6  don't think it's necessary, unless there is stuff that
7  we haven't been provided with.

8  THE COURT: Are you going to be challenging
9  the credibility of the officer who testified before
10  her?

11  MS. WAYNE: In terms of the actual arrest?

12  No. Nothing that was said other than what was already
13  brought out on cross examination.

14  MR. FEAGA: Your Honor, it is relevant
15  evidence, and it is under Rule 401 and it is not
16  cumulative. She'll be testifying about not just the
17  day of the bust, but also other trips down to pick up
18  marijuana and the part of this conspiracy that the
19  defense has started laying out for us here.

20  It's clearly relevant, and it goes back to
21  what I've told the Court. I've seen a pattern here in
22  an effort to sterilize this case.

23  THE COURT: There is no effort to sterilize
24  the case. The question is only whether this evidence
25  is relevant.

**Page 217**

1  Anything else, counsel?

2  MS. WAYNE: Judge, if it's something else
3  that goes to other connections or other things that
4  have not been provided to us in the discovery, then
5  it's a discovery violation. If she's going to talk
6  about other trips or other things that we haven't been
7  provided with, then it goes outside discovery.

8  MR. FEAGA: Your Honor, all can I tell you
9  is we've turned over everything we have in terms of D.
10  E. A. Sixes. When I met with this witness and
11  prepared her for trial, we interviewed her and we
12  didn't ask her questions about that. If it's not in
13  the Six because it wasn't known before then, you know,
14  I don't know.

15  MS. WAYNE: You don't know if it was in a
16  Six?

17  MR. FEAGA: You're saying -- she's
18  indicating --

19  THE COURT: He's saying that he's given you
20  all of the Jenks material.

21  MS. WAYNE: And I agree with that, Judge.
22  The problem with Jenks is this: If in fact in
23  addition or different to what has been disclosed to
24  us, that's still Jenks. And I'm telling you --

25  THE COURT: You mean even if it's not in a

Multi-Page™

Page 218

1 document?
2      MS. WAYNE: Well, because they know about
3 it. Once they learn about it they have a duty to
4 disclose it to us if it's different or in addition to
5 what's been --
6      THE COURT: Even if it's not in a document?
7      MS. WAYNE: Yes, Judge.
8      THE COURT: You show me in the law that says
9 that.
10      MS. WAYNE: I think it's just an ongoing a
11 Rule 16 violation.
12      THE COURT: Show me where it's in Rule 16,
13 then.
14      MS. WAYNE: Judge, I'm looking at Rule 16.
15      THE COURT: Let me turn to Rule 16.  16
16 what?
17      MS. WAYNE: I'm looking at Rule 16 -- There
18 are so many numbers.  I'm looking at Rule 16(2) under
19 "information not subject to disclosure," and then you
20 go further on under parens (b).
21      THE COURT: Okay.  Information subject to
22 disclosure?  Oh, I see it.  And information not
23 subject to the disclosure?
24      MS. WAYNE: Right.  And then you go on
25 further into the rule, Judge.  Paren (b), a statement

Page 219

1 made to the defendant or to the defendant's attorney
2 or agent by parens the defendant, a government or
3 defense witness or prospective witness government or
4 defense witness.
5      THE COURT: Read the beginning of the rule.
6      MS. WAYNE: Well, again, it goes to (c),
7 which I think is a duty to disclose.  A party who
8 discovers additional evidence, so I don't think it
9 just goes to the defense but it goes to the
10 prosecution.  A party who discovers additional
11 evidence or material --
12      THE COURT: Okay.  Now that (c) goes back up
13 to -- I believe the (c) goes back up to (a), which is
14 the Government's disclosure; (b), the defendant's
15 disclosure; and then (c), continuing duty to disclose.
16      MS. WAYNE: Right.
17      THE COURT: But what I'm saying, though, is
18 look at two, which is what you want me to refer to.
19 And what does the opening paragraph say?  That's all
20 I'm asking.
21      MS. WAYNE: Information not subject to
22 disclosure.
23      THE COURT: Right.  What does the opening
24 paragraph say?  "Except --"
25      MS. WAYNE: "Except for scientific or

Page 220

1 medical reports --"
2      THE COURT: Right.
3      MS. WAYNE: "-- does not authorize discovery
4 inspection of --" and then you go to (a), (b),
5      THE COURT: Right.  "does not authorize
6 inspection of a statement made to the defendant or the
7 defendant's attorney or agent by the defendant."
8      MS. WAYNE: Right.
9      THE COURT: So it doesn't authorize
10 discovery of that.
11      MS. WAYNE: Right.  I agree.  I don't think
12 she falls under that.
13      THE COURT: Why are we talking about 2(b),
14 then?
15      MS. WAYNE: I was just tracking down.  I'm
16 sorry, Judge.
17      THE COURT: Well if you're talking about a
18 continuing duty, that's true.  But you have to first
19 have the duty.  Where is the duty?  It just says you
20 have a continuing duty to disclose information.
21      MS. WAYNE: Okay.
22      THE COURT: But first you have to show me
23 where the duty arises either under A, B or C.
24      MS. WAYNE: All right, Judge.  And perhaps
25 this jurisdiction is a little different in terms of

Page 221

1 discovery.
2      THE COURT: These are the rules that cover
3 the entire United States.
4      MS. WAYNE: Right.  And that's what I'm used
5 to, Judge, is that this is information, because it's a
6 witness that is going to testify, it's a government
7 witness, and I believe that the government has a
8 continuing duty to disclose when they learn of
9 additional or different information.
10      THE COURT: All you have to do is show me
11 where the original duty arises, and then I'll
12 determine whether the duty is continuing.  That's all
13 I'm asking.
14      Do you have anything else?
15      MR. FEAGA: Your Honor, I just wanted the
16 Court to know, all I did was interview the witness and
17 made notes of my interview.
18      THE COURT: I've heard that, but unless you
19 have something else that I haven't heard --
20      MR. FEAGA: No, sir.
21      THE COURT: Okay.  I'm ready to rule.  The
22 evidence comes in.  It's not cumulative.  I think it
23 is relevant, and I don't see any violation of
24 discovery.
25      Bring in the jury.

Multi-Page™

Page 222

1  (Whereupon, the jury was escorted into the
2  courtroom.)
3  THE COURT: Be seated.
4  Proceed with your direct examination,
5  Mr. Feaga.
6  MR. FEAGA: Yes, sir, Your Honor.
7  Q Ma'am, would you tell the ladies and gentlemen of
8  the jury your name.
9  A Charlotte Hensarling.
10  Q And where are you from, Miss Hensarling?
11  A Huntsville, Alabama.
12  Q How long have you been living in Huntsville?
13  A About five years.
14  Q Do you know a fellow named Steve Hensarling?
15  A Yes, I do.
16  Q Who is Steve Hensarling?
17  A That's my husband.
18  THE COURT: You'll have to speak up.
19  Members of the jury, if at any time during
20  the trial you cannot hear a witness, please raise your
21  hand. And in fact, you can say I can't hear, Judge.
22  It's very important that each of you hear all the
23  testimony. You can't determine the facts if you can't
24  hear what's being said. So this is not a time to be
25  shy.

Page 223

1  Just let us know. Say I can't hear this
2  witness, I didn't hear that answer. It's very
3  important that you all hear all the evidence. We're
4  like a family here now, this is no time to be shy.
5  Just raise your hand and say I couldn't hear it and
6  I'll make them repeat it.
7  Proceed.
8  Q Ma'am, you said -- I think I was asking you who
9  Steve Hensarling was.
10  A He is my husband.
11  Q And how long have you been married to Steve
12  Hensarling?
13  A Eleven years.
14  Q Do you know a fellow named Gary Wayne George?
15  A Yes, I do.
16  Q And how is it that you came to know Gary Wayne
17  George?
18  A He was in prison with my husband.
19  Q And how is the fact that he was in prison with
20  your husband, how does that shed light on you having
21  gotten to know him?
22  A During visitation he and his wife would sit with
23  us.
24  Q Did you get to know his wife also?
25  A Yes.

Page 224

1  Q What's her name?
2  A Diane.
3  Q At some point in time did your husband get out of
4  prison?
5  A Yes, he did.
6  Q How about Mr. George?
7  A About a year afterwards.
8  Q Okay. Did you and your husband at some point in
9  time begin to engage in a course of dealing in regards
10  to any business activity with Mr. Gary Wayne George?
11  A Yes, we did.
12  Q Did you -- Was anyone else involved in that
13  business activity that you were engaged in with Mr.
14  George and your husband?
15  A Yes. Pat Denton.
16  Q And would you tell the ladies and gentlemen of
17  the jury what that activity was that was going on
18  between you all?
19  A We would pick up marijuana from Pat, and take it
20  back to Huntsville.
21  Q Who is "we"?
22  A I did, most of the time.
23  Q All right. And would you describe how that would
24  happen? What would you do? How would you pick up
25  marijuana from Pat?

Page 225

1  A I would come down and meet him at various places,
2  and go back in my car and go back to Huntsville.
3  Q Okay. And when you came down to meet with him,
4  did he provide you with anything?
5  A Yes. He would put packages in the back of my car
6  and I would take it back.
7  Q Okay. And what was it that he was putting in the
8  back of your car?
9  A Pot.
10  Q Okay. And is pot -- Does it have another name?
11  A Marijuana.
12  Q And were you paying for this marijuana?
13  A Yes.
14  Q Now when did this activity start?
15  A About six months after Gary George got out of
16  prison.
17  Q And would you approximate, if you would for us,
18  about when that was?
19  A About two and-a-half years ago. Or about three
20  and-a-half years ago now.
21  Q And we're now in 2005, May, so three years ago
22  would be 2002. And you said about another half a way?
23  A Yeah.
24  Q So probably the first part of 2002 or the latter
25  part of --

**Page 226**

1  A  The first part.
2  Q  Okay.  So that would be the first part of 2002.
3  A  Right.
4  Q  And how much would y'all -- How often would you
5  pick up marijuana from Pat Denton?
6  A  Sometimes once a week, sometimes twice a week.
7  Q  And how much marijuana would you pick up?
8  A  At first small amounts.  Five pounds.  And then
9  at the end of the two years it got up to about twenty
10  to twenty-five pounds each trip.
11  Q  And the first time you said it was like how much?
12  A  Five.
13  Q  Okay.  And then the next time how much would it
14  be?
15  A  Well, after a few months it went up to ten
16  pounds, and then fifteen, and twenty and then
17  twenty-five.
18  Q  All right.  And how much were you paying for the
19  marijuana?
20  A  We paid seven to eight hundred dollars a pound.
21  Q  Have you ever heard the term "fronting"?
22  A  Yes.
23  Q  Would you tell the ladies and gentlemen of the
24  jury what "fronting" is.
25  A  You get the marijuana, and then you bring the

**Page 227**

1  money back the next trip.
2  Q  Then do you pick up more and do the same thing
3  again?
4  A  Yes.
5  Q  Now did you also deal with Mr. George in these
6  activities and transactions?
7  A  Yes.
8  Q  Did you ever have an opportunity to talk to Pat
9  Denton or Gary Wayne George about where they were
10  getting the marijuana?
11  A  No, not at first.
12      MS. JAMES:  Objection, Your Honor, hearsay.
13      THE COURT:  I'll allow her to testify as to
14  whether she talked, and then I'll determine whether or
15  not what was said was hearsay or not.
16      Go ahead.
17  A  Yes.  Not at first, but after a long period of
18  time, yes.
19  Q  All right.  And which one of them did you talk to
20  about where they were getting the marijuana?
21  A  Pat.
22  Q  Okay.  What, if anything, did Mr. Denton tell you
23  about where he was getting the marijuana?
24      MS. JAMES:  Objection, Your Honor, hearsay.
25      MR. FEAGA:  Your Honor, I would argue that

**Page 228**

1  it's the statement of a coconspirator made during the
2  time of the conspiracy.
3      THE COURT:  I'll resolve this at the end of
4  the case.  Overruled conditionally.
5  Q  Where did Mr. Denton tell you, when you were
6  dealing with him, he was getting the marijuana?
7  A  At first he said from a guy he had known a long
8  time who owned a trucking company.  And just he simply
9  said his name was Leon.
10  Q  Okay.  Now, was this statement that he made to
11  you about where he was getting this marijuana, made
12  before you were arrested?
13  A  Yes.
14      MR. FEAGA:  Nothing further for this
15  witness, Your Honor.
16          CROSS EXAMINATION
17      BY MS. JAMES OF CHARLOTTE HENSARLING:
18  Q  Miss Hensarling, my name is Susan James.  I'm one
19  of Mr. Carmichael's attorneys and I have some
20  questions for you.
21      You indicated that you and your husband and
22  Mr. George and his wife became friends while the two
23  men were incarcerated, is that right?
24  A  That's correct.
25  Q  That was when they were at Donaldson up at West

**Page 229**

1  Jefferson?
2  A  No.
3  Q  Stayton?
4  A  Stayton.
5  Q  Stayton.  Okay.
6      But your husband had been at Donaldson
7  previously, hadn't he?
8  A  Yes.
9  Q  Okay.  And was it your understanding that the two
10  of them had met at Donaldson?
11  A  Yes.
12  Q  Did you have occasion to visit your husband at
13  Donaldson?
14  A  No.
15  Q  He wasn't your husband then?
16  A  No.
17  Q  Okay.  Now have you had some prior convictions,
18  felony convictions?
19  A  No.
20  Q  I'm assuming that you were doing most of these
21  trips because you would probably not be as noticeable,
22  possibly, as your husband traveling and meeting Mr.
23  George, would that be right?
24  A  Correct.
25  Q  And you took a number of these trips, right?

Multi-Page™

**Page 230**

1 A Yes.
2 Q Now you've subsequently been charged as a result
3 of this situation that you've just described. You
4 were arrested and placed in the Chilton County jail,
5 right?
6 A Correct.
7 Q And what is the status of your case in Chilton
8 County?
9 A It's still pending.
10 Q Okay. So you were arrested in November of 2003
11 and we're now in 2005 and you haven't been -- the case
12 is not complete?
13 A No.
14 Q And what's your understanding about why your case
15 has taken so long to be disposed of?
16 A I don't know.
17 Q Well, have you had a chance to go to court any
18 since November of 2003?
19 A No.
20 Q You have not?
21 A No.
22 Q So you just got arrested and you know that you
23 were charged with drug trafficking, correct?
24 A Yes.
25 Q And so other than that, have you gone to court

**Page 231**

1 even one time?
2 A No.
3 Q Okay. And is it your understanding that the case
4 might go away as a result of your cooperation in this
5 trial?
6 A Not go away, no.
7 Q Well is it your understanding that your charges
8 might be reduced to something less than drug
9 trafficking?
10 A Possibly.
11 Q Okay. And you understand, don't you, that if in
12 fact you are convicted of drug trafficking, because of
13 the quantity of marijuana that's contained within this
14 exhibit 1, that you would have to serve at least a
15 minimum sentence of at least three years, do you
16 understand that?
17 A Yes.
18 Q And it could be more than that, do you understand
19 that?
20 A Yes.
21 Q And your husband, has he been charged?
22 A No.
23 Q Okay. But your husband was actually involved
24 with you on all of these transactions that you had
25 with Mr. Denton and Mr. George, right?

**Page 232**

1    THE WITNESS: Do I have to answer that?
2    THE COURT: Yes.
3 A Yes.
4 Q Okay. In fact, you and your husband were
5 distributing marijuana up in the Huntsville area,
6 right?
7 A Yes.
8 Q And I think you all actually live in Ardmore,
9 don't you?
10 A Right.
11 Q And Ardmore is closer to the Tennessee line.
12 It's further north that Huntsville, right?
13 A Yes.
14 Q Okay. And you all had your own customers there
15 in your community that you would distribute marijuana
16 to, right?
17 A Right.
18 Q You had people who were waiting on you to get
19 that marijuana, and you would sell it to them for a
20 profit?
21 A Right.
22 Q Okay. And did you have a group of people as
23 customers?
24 A Yes.
25 Q Would it be more than ten?

**Page 233**

1 A No.
2 Q You had less than ten?
3 A Yes.
4 Q More than five?
5 A About five, yes.
6 Q Now did you tell -- Let me back up a minute.
7    You were interviewed in the Chilton County
8 Jail after your arrest, weren't you?
9 A Yes.
10 Q And you were asked about your involvement and
11 where this marijuana came from, right?
12 A Yes.
13 Q What, if anything, did you tell law enforcement
14 on that day, or any time following that day, about the
15 people that you were selling drugs to in Madison
16 County and Ardmore?
17 A Nothing.
18 Q You never gave them their names, did you?
19 A I don't think so. I'm not sure.
20 Q I'm sorry?
21 A I don't remember but I don't think so.
22 Q Okay. And were you ever asked their names?
23 A I don't think so.
24 Q Okay. Now back to your husband. Your husband
25 has how many prior felonies? If you know.

Page 246

1  Q  And where were these devices transmitting to?
2  A  The one that was transmitting and recording the
3  audio and video was transmitting to a receiver in Mr.
4  Denton's trunk that was being recorded on an eight
5  millimeter videotape recorder.  The audio transmitter
6  that strictly transmitted audio was being received in
7  the vehicle that I was in, and that information was
8  being recorded on audio cassette tapes.
9  Q  Why were these two recordings or two transmitter
10  recordings being recorded at different locations?
11  A  Well the audio and video transmission is
12  obviously, it's the same type of signal, but it's
13  loaded with a lot more information; so, therefore, it
14  goes shorter distances.  The audio transmitter, you're
15  able to send it further distances, and it's really for
16  safety, for the safety of the informant or undercover
17  officer, whoever the individual may be.
18  Q  Explain to me how that would be for safety.
19  A  Well the drug trade is a very dangerous trade.  So
20  therefore we're listening for any help that may be
21  needed or anything like that.
22  Q  So you can hear the conversations as they're
23  ongoing from your vehicle?
24  A  Yes.
25  Q  Now, Agent Williams, I'm going to back up a

Page 247

1  little bit.  Before you wired Mr. Denton up, did you
2  do anything else?
3  A  Yes, we did.  Before we do any type of operation
4  with someone, we always search their person and their
5  vehicle for any other narcotics or weapons or currency
6  of any kind.
7  Q  And did you find any?
8  A  No, we did not.
9  Q  Okay.  Now once you wired him up with these audio
10  and video transmitting devices and equipped his car
11  and your vehicle with the recording devices, what did
12  y'all do then?
13  A  We gave Mr. Denton some specific instructions
14  about where to go and what to do.  And when we
15  departed that particular location, we surveilled him
16  to Nine forty-nine Ridgecrest Drive and he did not go
17  anywhere else or do anything other than what he was
18  instructed at that time.
19  Q  Did he go inside?
20  A  Yes, he did.
21  Q  And roughly how long was he in there?
22  A  Just a few minutes.  I would say maybe no longer
23  than ten or fifteen minutes at the most.
24  Q  Do you know why he left?
25  A  Yes.  We were able to determine that he did leave

Page 248

1  after the initial contact, and was instructed to go in
2  to purchase approximately four hundred gallon Ziploc
3  bags.
4  Q  Instructed by whom?
5  A  Mr. Freddie Williams.
6  Q  Now after Mr. Denton left to go purchase these
7  gallon bags, did you do anything with the recording
8  devices?
9  A  Yes, we did.  We met with Mr. Denton at another
10  undisclosed location, and we placed new videotapes in
11  the audio/video recording device, and we also placed
12  new, fresh audio cassette tapes in the audio recording
13  device.
14  Q  Why did you do that?
15  A  Well, we really didn't know how long the contact
16  was going to take.  We wanted to be sure that we had
17  enough tape to record, you know, what was necessary
18  during the contact.  So we wanted to be sure we had
19  fresh tapes since we had the opportunity to do it.
20  Q  Once you replaced the tapes, what did y'all do
21  then?
22  A  Mr. Denton was provided with some currency.  We
23  went to a couple of different stores under
24  surveillance, purchased Ziploc bags and returned to
25  Nine forty-nine Ridgecrest Drive.

Page 249

1  Q  How long was he there at Nine forty-nine
2  Ridgecrest Drive that time?
3  A  He was there the second time just a few minutes.
4  I'd say no longer than ten or fifteen minutes.  And
5  then left again.
6  Q  Do you know why he left?
7  A  This particular time there was some conversation
8  we heard about some scales.  Apparently they did not
9  have any scales, and so he was leaving again and
10  contacting us by cell phone about some scales.  So we
11  met with him again at an undisclosed location, changed
12  out the video and audiotapes again for the third time,
13  and provided Mr. Denton with a set of digital scales.
14  Q  Okay.  Now have you watched these tapes?
15  A  Yes, I have.
16  Q  The originals?
17  A  Yes.
18  Q  Is there any mistake on these tapes that you have
19  been able to decipher?
20  A  The only thing that I could detective is that the
21  time -- There's a time date stamp on the tape that
22  shows November 17th, 2003.  But the time is incorrect.
23  The time is approximately an hour different because of
24  Dalight Savings Time, the internal clock in the
25  recording device was not adjusted for Dalight Savings

Page 250

1  Time. So the actual time on the tape is an hour later
2  than the actual time that it is.
3  Q  Sergeant Williams, I'm going to show you what has
4  been premarked as government's exhibit 3(a) through
5  (c).
6      MS. MORRIS: May I approach, Your Honor?
7      THE COURT: Yes.
8  Q  Do you recognize that?
9  A  Yes, I do.
10  Q  And what are they?
11  A  These are the three eight millimeter videotapes
12  that were retrieved from the video recording equipment
13  on November 17th.
14  Q  How do you recognize them?
15  A  Because it's the ones that we changed out of the
16  equipment, and they have been initialed by my partner
17  who was in the vehicle with me who took them out of
18  the equipment.
19  Q  At some point did you transfer custody of those
20  to someone else?
21  A  Yes, I did.
22  Q  Who?
23  A  To Agent DeJohn with the D. E. A. Drug Task
24  Force.
25  Q  And I'm now the showing you what's been premarked

Page 251

1  as government's exhibit 4(a), (b) and (c). Do you
2  recognize those?
3  A  Yes, I do.
4  Q  And what are they?
5  A  These are the three audio cassette tapes that
6  were taken out of the audio receiver in the vehicle
7  that I was in and placed in the cases.
8  Q  And again, do they have the same initials on
9  them?
10  A  Yes.
11  Q  And did you transfer custody of those tapes to
12  Agent DeJohn at some point?
13  A  Yes, I did.
14  Q  Now, Sergeant Williams, were you also present at
15  the search warrant at Nine forty-nine Ridgecrest
16  Drive?
17  A  Yes, I was.
18  Q  And did you participate in the execution of the
19  search?
20  A  Yes, I did.
21  Q  Did you find anything?
22  A  Yes.
23  Q  Okay. Let's start there. What did you find?
24  A  I found some documents. A phone bill, some
25  documents of that sort. Found a loaded thirty-eight

Page 252

1  revolver.
2  Q  Let me stop you there. Sergeant Williams, I'm
3  going to show you what has previously been marked as
4  government's exhibit 19(b).
5      MS. MORRIS: Your Honor, may I approach?
6      THE COURT: Yes.
7  Q  Do you recognize that?
8  A  Yes.
9  Q  And what is it?
10  A  It appears to be the revolver that was found at
11  the house at Nine forty-nine Ridgecrest.
12  Q  And when you found this revolver, what did you do
13  with it?
14  A  Unloaded it and took it to the evidence tech.
15  Q  And who was that?
16  A  That would be Agent Hubbard.
17  Q  What else did you find in the house?
18  A  Found some empty duffel bags.
19  Q  Let's talk about those empty duffel bags. Where
20  did you find the empty duffel bags?
21  A  I found some of them in the bedroom, the back
22  right bedroom. They were on the floor between the bed
23  and the wall. It's a narrow space between the bed and
24  the wall. Found about ten of them there. And there
25  was a false or a hidden or secret closet, very narrow

Page 253

1  closet or room that was in that bedroom behind the
2  right-hand wall if you went in the door. And there
3  was some of those black duffel bags that were also in
4  there.
5  Q  Okay.
6      MS. MORRIS: Your Honor, may I approach?
7      THE COURT: Yes.
8  Q  Showing you what has previously been marked as
9  government's exhibit 7(f). Do you recognize that?
10  A  Yes, I do.
11  Q  What is it?
12  A  That is the entrance to the false or secret room
13  or secret closet that was located in the bedroom where
14  I found the other black duffel bags.
15  Q  Does this picture fairly and accurately depict
16  that secret closet or secret room as you saw it on
17  November 17th, 2003?
18  A  Yes, it does.
19      MS. MORRIS: Your Honor, at this time we'd
20  move to admit government's exhibit 7(f) into evidence.
21      THE COURT: Admitted.
22      MS. MORRIS: May I publish?
23      THE COURT: Yes, you may publish it to the
24  jury.
25  Q  Now you mentioned that you found some empty

Multi-Page™

**Page 254**

1 duffel bags. I'm showing you one of what has been
2 premarked as government's exhibit 11(a). Does this
3 appear to be one of the duffel bags -- without pulling
4 out all nineteen of them -- that you found?
5 A Yes. Just basic black canvas duffel bag.
6 Q What else did you find in the search warrant,
7 Sergeant Williams?
8 A Found on the bed was a piece of plywood that had
9 been covered in Formica that was obviously being used
10 as a cutting board.
11     MS. MORRIS: Your Honor, may I approach?
12     THE COURT: Yes.
13 Q Sergeant Williams, I'm slowing you what's been
14 previously marked as government's 7(e). Do you
15 recognize that?
16 A Yes.
17 Q And what is it?
18 A It's a piece of Formica covered, plywood, or what
19 you would call fiberboard. It's actually the cutoff
20 of a countertop. It's Formica covered plywood, is
21 what it is.
22 Q And what is on top of it?
23 A It appears to be bricks of marijuana and a knife,
24 and a straight knife, a utility knife.
25 Q Does this picture fairly and accurately depict

**Page 255**

1 the scene as you saw it on the 17th of November 2003?
2 A Yes.
3     MS. MORRIS: Your Honor, at this time we'd
4 move to admit government's 7(e) into evidence.
5     THE COURT: Admitted.
6     MS. MORRIS: Publish, Your Honor?
7     THE COURT: Yes, you may publish it.
8     MS. MORRIS: Permission to approach, Your
9 Honor?
10     THE COURT: Yes.
11 Q Sergeant Williams, now I'm going to show you
12 what's been premarked as government's exhibit 10(a).
13 Do you recognize this?
14 A Yes, I do.
15 Q And what is it?
16 A It's a piece of Formica covered plywood that was
17 found on the bed that is in that picture over there.
18 Q Okay. And you found this?
19 A Yes.
20 Q And what did you do with it when you found it?
21 A I took it to the evidence tech.
22 Q Okay. Sergeant Williams, did you find anything
23 else at Nine forty-nine Ridgecrest?
24 A Yes, I did.
25 Q What was it?

**Page 256**

1 A I found eleven more black canvas duffel bags.
2 Q What was different than the nineteen duffel bags
3 you spoke of earlier?
4 A Those particular eleven contained what appeared
5 to be wrapped bricks of marijuana.
6 Q When you say "wrapped bricks," describe that a
7 little further, if you don't mind. What did it look
8 like?
9 A Can I refer to another photograph?
10 Q Sure.
11 A They were just like this right here. They were
12 wrapped in some type of brown plastic wrapper with
13 packing tape, and there was eleven of those large
14 canvas duffel bags that were full of those blocks.
15     MR. FEAGA: Can the record reflect that the
16 witness was pointing at a --
17     THE COURT: One lawyer per witness.
18     MR. FEAGA: Yes, sir.
19     THE COURT: Now if Miss Morris wants to ask
20 for that I'll hear it.
21     MS. MORRIS: Your Honor, may the record
22 reflect that the witness was pointing to a brown taped
23 brick on top of a corkboard?
24     THE COURT: Yes. Go ahead.
25     MS. MORRIS: Your Honor, may I approach?

**Page 257**

1     THE COURT: Yes.
2 Q Sergeant Williams, I'm showing you what's been
3 previously marked as government's exhibit 7(h). What
4 is this?
5 A Just inside the entrance to the bedroom where we
6 saw the cutting board, there is a picture just to the
7 left next to the chest of drawers. There was two or
8 three of the black canvas duffel bags filled with the
9 bricks of suspected marijuana that had been wrapped in
10 brown packing tape sitting next to the chest of
11 drawers there. And that's exactly what the other
12 duffel bags looked like that contained those bricks of
13 suspected marijuana.
14 Q Does this picture fairly and accurately depict
15 what you saw on November 17th, 2003?
16 A Yes.
17     MS. MORRIS: Your Honor, at this time we'd
18 move to admit government's exhibit 7(h) into evidence.
19     THE COURT: It's admitted.
20     MS. MORRIS: May I publish?
21     THE COURT: Yes.
22 Q Sergeant Williams, what else did you find in the
23 house?
24 A Found some packing materials. Newspaper and a
25 black plastic bag that contained newspaper and some

Page 266

1 Q  You said you have known Leon Carmichael for
2 fifteen years?
3 A  Yes.
4 Q  Would you tell the ladies and gentlemen of the
5 jury how you met Leon Carmichael.
6 A  My grandparents lived next door to him, and he
7 had a son about the same age as me.  We grew up
8 together.
9 Q  Okay.  Now what did your grandparents living next
10 to him have to do with that, did you stay there?
11 A  Yes.  I stayed there pretty much all my teenage
12 years.
13 Q  And how far did you go in school?
14 A  Ninth grade.
15 Q  Why did you leave school, Mr. Denton?
16 A  I wanted to work and get me a car.
17 Q  Did you do that?
18 A  Yes.
19 Q  Where did you go to work?
20 A  Family Mart.
21 Q  Now how long did you work for Family Mart?
22 A  About five years.  Five or six years.
23 Q  How old were you when you started there?
24 A  Just turned sixteen.
25 Q  And so what did you start out doing?

Page 267

1 A  Bagging groceries.
2 Q  And at the end of the five year point before you
3 left there, what were you doing then?
4 A  I was the comanager of the store.
5 Q  Where was Family Mart?
6 A  Corner of Woodley Road and the Southern Bypass.
7 Q  Is that still open today?
8 A  No, sir.
9 Q  Why did you leave Family Mart?
10 A  It went out of business.
11 Q  During the five years you worked at Family Mart,
12 did you have occasion to see Mr. Carmichael?
13 A  Just periodically coming in and out of the house
14 or something like that.  I'd see his son or something.
15 That was it.
16 Q  I want to show you a photograph that's been
17 admitted into evidence in this trial as government's
18 exhibit 7(c) and ask you, sir, if you would examine
19 that photograph.
20 A  That's my house.
21 Q  Okay.  And let me show you what's been marked as,
22 and admitted into evidence as government's exhibit,
23 7(q) and ask you if you would examine that photograph.
24 A  That's Leon's house.
25 Q  And your grandparents live next door to this

Page 268

1 house?
2 A  Yes, on the right as you're facing it.
3 Q  Have you ever been in this house?
4 A  Yes.
5 Q  What did you do after Family Mart went out of
6 business?
7 A  Went to work for Big B Drugs shortly, briefly.
8 Q  How long were you at Big B?
9 A  I wasn't there but three or four months.
10 Q  And why did you leave Big B?
11 A  Got a better job offer with Bruno's.
12 Q  Okay.  And what were you doing at Big B when you
13 left?
14 A  Assistant manager.
15 Q  Okay.  And where was that store?
16 A  It was Norman Bridge Road.
17 Q  Is that near where you and Mr. Carmichael live?
18 A  No.  He lived on Brookwood Drive, I lived on
19 Fleming Road.
20 Q  You're not at your grandparents' house anymore at
21 this point, are you?
22 A  No I had moved out at that point.
23 Q  Okay.  Had you moved to this house that you just
24 identified as the one that was yours?
25 A  Yes, I had been there approximately nine years

Page 269

1 now.
2 Q  Okay.  What were you doing when you moved to that
3 house?
4 A  At that time I went back to work with A & P, the
5 company that owned Family Mart.  They had one store
6 left in Montgomery, I was working for them.  So they
7 decided to downsize and close that store, so I went to
8 work with Sunday Dinner.
9 Q  I may have created a break there.  You said you
10 went from Big B to where?
11 A  Bruno's.
12 Q  And what did you do at Bruno's?
13 A  Assistant manager of the store.
14 Q  All right.  And what did you do when you left
15 Bruno's?
16 A  From Bruno's I went back to A & P.  The company,
17 that owned one store left in Montgomery, and they
18 offered me a job for them.  But then they closed it so
19 then I went to Sunday Dinner, the company that went
20 into the store where A & P was at.
21 Q  Do you own the home that's in that picture?
22 A  Yes.
23 Q  You identified that as being your?
24 A  Yes.
25 Q  How much did you pay for it?

Multi-Page™

Page 270

1 A  Fifty-five thousand.
2 Q  And what were you doing for a living when you
3 bought that house?
4 A  I was the assistant manager at Sunday Dinner at
5 that time.  With A & P briefly, and then I went to
6 work for Sunday Dinner.
7 Q  Now did you continue during the time of
8 employment that you're talking about to have contact
9 with Leon Carmichael?
10 A  No major contact.  I really got to know him
11 better in late '99.
12 Q  What happened in late '99 that caused your
13 relationship with Leon to be where you said you got to
14 know him better?
15 A  In late '99 -- His office is at the East Fleming
16 Road and I live at West Fleming Road, and he had some
17 rocks put in.  And I stopped by there to ask him how
18 much he paid for the rocks, if he got a good deal on
19 them or something and I needed some at my house.
20       Then we just got to talking from there.  He
21 was telling me that he had to buy a whole truck load
22 or something, so I ended up not getting the rocks.  He
23 just asked me how I been doing and stuff like that,
24 and we generally talked about the past.  That was it.
25 Q  I see.  Now you said these rocks, what kind of

Page 276

1 again?
2 A  Yes.  He owns all that property from East Fleming
3 back to South Court, a good distance.  And he owns a
4 pond back there.  And I asked him is there any way I
5 could go fishing back there in the pond, and he said
6 sure, any time.
7 Q  Did you go?
8 A  Yes, I went several occasions.  And one
9 particular occasion I got out there and got stuck and
10 had to call my Dad to come pull me out.  He pulled me
11 out, I think it was just me and him he pulled us out.
12 We went to the car wash to wash the truck off because
13 it was full of mud and stuff, and a gentleman came up
14 to me and said we were dumping trash down there.  And
15 I just looked at him --
16       MS. JAMES:  This is in narrative form.
17 Objection.
18       THE COURT:  Yes, I'll sustain that.  You
19 really need to put a question to him so they can
20 predict what he's going to say.
21       MR. FEAGA:  Sure.
22 Q  Where were you?
23 A  I was at the pond at that time.
24 Q  Okay.  What, if anything, happened after you got
25 to the pond?

Page 271

1 rocks, are you talking about crushed stone?
2 A  Just crushed stone, gravel you put in driveways.
3 Q  Now this place where stopped in to meet with Mr.
4 Carmichael, I want to show you a copy of a photograph
5 that's been admitted as government's exhibit 7(s) and
6 ask you if you would take a look at government's
7 exhibit 7(s).
8 A  It's the Carmichael Center.
9 Q  Okay.  Is this place that you met with Leon about
10 the crushed stone ~~~~~~~~~~~~~~ it anywhere near this
11 place?
12 A  It was in the far end of it on the corner of
13 Fleming and Norman Bridge.  They tore it down when
14 they built that.  There was a little office building
15 right there on the corner.
16 Q  Do you know what Mr. Carmichael was doing out of
17 that little office building?
18 A  He owned a trucking business.  He parked his
19 trucks there.  I think that was the office for the
20 trucks.
21 Q  Now after you had this conversation with Mr.
22 Carmichael about crushed stone at this place of
23 business -- and this was in '99?
24 A  Yes.
25 Q  Did you have occasion to see Mr. Carmichael

Page 273

1 A  I went to the car wash.  A gentleman approached
2 us and said we were dumping trash down there and I
3 told him no, we had been fishing.
4 Q  Did you know this gentleman?
5 A  No, I did not.
6 Q  What, if anything, happened after he told you --
7 What did he tell you?
8 A  He said, "Y'all been dumping trash down there and
9 we're having problems with people dumping trash."
10       I told him I been fishing and that "I know
11 the guy that owns the place."
12       And he says, "Well my Daddy owns it."
13       And I said, "Your Daddy is Leon, right?"
14       And he says, "Yeah," and he has Daddy on the
15 phone.
16 Q  What happened after that?
17 A  He let me speak to him.  I told him that it was
18 me, and he said, "Oh, that's fine.  That's all right."
19 They were having problem with people dumping trash
20 down there and they were just watching out for the
21 place.
22 Q  So when, if at all, did you see Mr. Carmichael
23 again after the time you asked him to go fishing and
24 the events you just described?
25 A  At that time on phone he told me there was

**Page 278**

1 Q   Okay.  And so when you took it to Ike, how much
2 did Ike give you back for it?
3 A   He ended up giving me fourteen hundred because I
4 just wanted to prove to Leon that I could get rid of
5 it.  So I wasn't trying to really make nothing off of
6 it.  At that time I just wanted to get rid of it
7 quick.
8 Q   How long did it take you to get rid of it?
9 A   It took about four days.
10 Q   That includes the time it took you to get your
11 money back?
12 A   Yes.
13 Q   Then what did you do?
14 A   I called Leon and told him I had the money.  He
15 told me to meet him at his house.  He pulled in his
16 garage and he had two more pounds with him.
17 Q   And what happened to that two pounds?
18 A   He gave it to me.  It went back to Ike, and it
19 went even quicker, you know, like two days.  I called
20 Leon and told him I had the money, or went by his
21 office, I can't remember which one if I went by there
22 or called, and ended up giving him that money at his
23 office.  And he said, "Man, that was quick."  So he
24 was like, "That was awful fast.  It was good.  You
25 want some more of it?"  So the next time he brought me

**Page 279**

1 some --
2       MS. JAMES:  Objection, Your Honor.  I'm
3 going to have to make the same objection again.  We're
4 just going on and on without a question.
5       MR. FEAGA:  Your Honor, I can keep asking
6 him what happened next.
7       THE COURT:  The problem is if he's giving a
8 narrative they don't know what's going to come up next
9 and he may say something that's improper.
10       MR. FEAGA:  I understand, Your Honor.
11       THE COURT:  So your questions also give them
12 an opportunity to object.
13       MR. FEAGA:  Yes, sir.
14 Q   So you now have turned around the second two
15 pounds and he's told you, "That went quick"?
16 A   Yes.
17 Q   And you've told him it was good?
18 A   Yes.
19 Q   So how much time was there between the first time
20 and the second time?
21 A   The first time took four days.  The second time
22 probably took two at the most.  Quicker than the first
23 time.
24 Q   And did you have any further dealings with
25 marijuana with Mr. Carmichael?

**Page 280**

1 A   Yes.  He brought me five pounds.  I went by took
2 him the money, and he showed up at my house the next
3 day with five pounds.
4 Q   Now is this the house that you've identified as
5 being your home?
6 A   Correct.
7 Q   Okay.  And what, if anything, happened when he
8 brought the five pounds to your house?
9 A   He just gave it to me and told me to get back
10 with him when I got rid of it.
11 Q   Okay.  And did you get rid of it?
12 A   Yes.  It went fairly quick, too.  I think it was
13 within a week.  Five days.
14 Q   How did you get rid of it?
15 A   Ike got rid of most of it.  I knew a few people,
16 and between the both of us it was gone in five days.
17 Q   All right.  And what did Mr. Carmichael want for
18 that five pounds?
19 A   Seven hundred dollars a pound.
20 Q   So he gave you thirty-five hundred dollars back
21 when you sold it?
22 A   Correct.
23 Q   Now were you able to make any money off of that
24 five pounds?
25 A   I may have made a hundred, hundred and fifty at

**Page 281**

1 the most.
2 Q   Off of that five pounds?
3 A   Yeah.
4 Q   Okay.  What, if anything -- Did you have any
5 further dealings with Mr. Carmichael and marijuana?
6 A   Yes, sir.  I took him that money there.  He got
7 the money from the five pounds and he said, "I'm going
8 to have to bring more because I can't be making these
9 trips, I can't be riding with it."  So I think the
10 next time was ten pounds, and that went fairly quick.
11 Q   What's "fairly quick"?
12 A   Oh, a week.  Two weeks at the most.
13 Q   Okay.  Did you have any further marijuana
14 dealings with Mr. Carmichael?
15 A   After the ten pounds he brought twenty-five
16 pounds.  He said, "Take your time.  You know, I just
17 can't be riding with it taking all these chances.  So
18 you can get rid of it, just as long as it takes."
19 Q   And were you able to get rid of that?
20 A   Yes.
21 Q   How long was it before you had another marijuana
22 dealing with Mr. Carmichael?
23 A   After the twenty-five it started picking up
24 fairly quick.  It got to the point where we were doing
25 about, I think where twenty-five probably went within

**Page 282**

1 a couple of weeks, and then I'd get twenty-five more
2 and it would get to where it was twenty-five a week
3 and from there on it graduated up as time went on.
4 Q  Okay.  And when you got rid of twenty-five pounds
5 that you're doing for a week, how much do you have to
6 give Mr. Carmichael for twenty-five pounds?
7 A  At the time it was seven hundred dollars a pound.
8 If he gave me twenty-five, most of the time I'd have
9 the money for twenty and I would take him the money
10 for the twenty and I'd still owe him for the five
11 because I'd still have some out, more or less.  He'd
12 give me twenty-five more and it was always kind of
13 carried over.
14 Q  So how much money were you providing at this
15 point in time when you're doing twenty-five pounds a
16 week?  How much money were you providing to Mr.
17 Carmichael?
18 A  Averaging fourteen thousand a wee.
19 Q  At this time?
20 A  At this time.
21 Q  Now how much time did it take from the time you
22 started to get to the twenty-five pounds a week?
23 A  The twenty-five quickly.  Around probably
24 February and March of 2000 it stayed around
25 twenty-five up until the end, and then graduated up

**Page 283**

1 until fifty and then it was seventy-five throughout.
2 And as time went on it picked up.
3 Q  Can you see this easel, Mr. Denton?
4 A  Yes.
5 Q  Now how long did you say it was before you said
6 you were dealing twenty-five pounds a week?  You said
7 you started in what, November of '99?
8 A  November in '99, and probably around February or
9 March of 2000 for twenty-five pounds a week.
10 Q  How long a period of time did you deal
11 twenty-five pounds a week?
12 A  It went on from February probably up until maybe
13 June.  Then it got where it was fifty, and --
14 Q  Okay, hold right there.
15 So in June of 2000 it started being roughly
16 fifty pounds a week, is that right?
17 A  Yes.
18 Q  Now you said you were giving him fourteen
19 thousand dollars for the twenty-five pounds, is that
20 right?
21 A  Yes.
22 Q  How much were you giving him a week for fifty
23 pounds?
24 A  Fifty?  It was averaging seven hundred dollars a
25 pound, and if I didn't have the whole money for the

**Page 284**

1 fifty pounds it would be anywhere from twenty-five to
2 thirty thousand dollars a week.
3 Q  All right.  Is this rolling over like the other
4 one was, too?
5 A  Correct.
6 Q  So we'll just put twenty-five thousand in, then.
7 Is that all right with you?
8 A  Yes.
9 Q  Now how long did you continue selling fifty
10 pounds a week?  And by the way, with this fifty, how
11 did you get the fifty delivered?  How is that coming?
12 A  Leon had a guy working with him named Fred.
13 Q  And do you know Fred's last name?
14 A  I cannot remember his last name.  Thomas or
15 Thompson I think.  I'm not sure.
16 Q  All right.  Now you identified an individual
17 named Freddie Williams earlier today.
18 A  Correct.
19 Q  Are we talking about the same person?
20 A  No, it wasn't Freddie Williams.
21 Q  So somebody named Fred, and you think it was
22 Thomas or Thompson?
23 A  I think it was Thomas.
24 Q  Was bringing dope over for Leon?
25 A  Correct.

**Page 285**

1 Q  Now how would he do it?  What would happen there?
2 Can you describe what would happen when the fifty
3 pounds a week was coming over?
4 A  I would call Leon, tell him I had some money.  He
5 would send Fred either to my job when I was working at
6 Sunday Dinner or he would come to my house early in
7 the morning.
8 Q  Okay.  And what would happen when he came to your
9 job or he came to your house early in the morning?
10 A  If he came to the job I would have the money
11 ready inside the car.  I'd see him pull up and I'd go
12 out there and unlock it and give him the money and he
13 would throw the dope in the car.
14 Q  So how long did that go on?  Where -- Let me just
15 ask you, when you're selling fifty pounds a week
16 starting in June of 2000, how long did that continue?
17 A  From fifty to late 2000 it probably jumped up
18 because the new remittance a hundred pounds a week.
19 Q  Late 2000?
20 A  Yes.
21 Q  Can we say, then, December would be good end
22 of 2000?
23 A  Yes.
24 Q  No later than that anyway?
25 A  No later than that.

**Page 286**

1 Q  Now you said we're at seventy-five to a hundred,
2 so can we put seventy-five here?
3 A  Correct.
4 Q  And how much are you providing to Mr. Carmichael
5 when you're selling seventy-five pounds of marijuana a
6 week?
7 A  It would average, because sometimes I would still
8 owe him some from the last, but it would always end up
9 being at least from thirty to fifty thousand dollars.
10 Q  So we can say thirty thousand at least, maybe
11 fifty?
12 A  Yes.
13 Q  Now was this the same process?  Was it still Fred
14 Thomas?  Not Freddie Williams.  I want to make that
15 clear.
16 A  Correct.
17 Q  Was that Fred Thomas who was bringing this over
18 and was he still picking up the money?
19 A  Correct.
20 Q  So how long did that go on?
21 A  Within some period of time, I don't remember the
22 exact date, Leon called me and said, "Don't give Fred
23 any more money.  He has a real bad gambling problem.
24 It would screw up the money, so I'll get the money
25 from you.  I don't know if you'll see him that much

**Page 287**

1 anymore."
2 Q  When did that happen?
3 A  I want to say maybe December of 2000, but it
4 could have been early 2001.
5 Q  All right.  So, now, after Mr. Carmichael tells
6 you that Fred Thomas isn't going to be the man
7 anymore, and he's going to be the man, did it continue
8 to be seventy-five to a hundred pounds a week?
9 A  In 2001 it had averaged I know a hundred pounds a
10 week.  It was a hundred pounds a week, average.  It
11 might have been a little more, but it was at least a
12 hundred pounds a week.
13 Q  When did this go?
14 A  Probably January of 2001.
15 Q  Okay.  And this is now a hundred.  And how much
16 money is changing hands now?
17 A  He went down because he started moving so much.
18 He went down to six hundred dollars a pound.  So it
19 was roughly sixty thousand dollars a week.
20 Q  Now somewhere in here did you -- Do you know a
21 fellow named Gary George?
22 A  Correct.
23 Q  Did you ever involve Mr. George in this marijuana
24 distribution that's going on, involving you and Mr.
25 Carmichael and Fred Thomas?

**Page 288**

1 A  Gary, when he graduated up to the hundred pounds
2 a week --
3 Q  When who graduated?
4 A  When I got up to a hundred pounds a week, it was
5 shortly after that that Leon wanted and my start
6 cutting it up.  I used to get it from him prebagged in
7 one pound bags.
8 Q  Prebagged in one pound bags?  When you say
9 "prebagged in one pound bags," what do you mean by
10 that?
11 A  Gallon Ziploc bags already broken down in
12 individual pounds.
13 Q  Would they be bags that looked like this one?
14 A  Just like that one.
15 Q  That's a gallon bag?
16 A  Yes, gallon bags.
17 Q  Does it look like a pound of marijuana to you, or
18 more than a pound?
19 A  Looks pretty close.
20 Q  Okay.  And is this how Mr. Carmichael would bring
21 it to you?
22 A  That's how I was getting it at that time.
23 Q  And Fred Thomas would bring it to you that way,
24 too?
25 A  Correct.

**Page 289**

1 Q  Now you said at sometime something happened where
2 you started cutting it up.  What happened?
3 A  In 2001 when it got to where it was a hundred
4 pounds a week, he said, "I'm going to let you meet
5 Freddie Williams because Freddie was the one getting
6 it in.  He was the one handling it when I came in.
7 Freddie was obviously the one cutting it up into the
8 one pound bags.  And he said, "I'm going to start
9 letting you cutting it up since you're moving most of
10 it.  You can cut it up and keep what you want and give
11 Fred back the rest of it and he'll get rid of the
12 rest."
13 Q  All right.  Now you said that up until this time
14 Freddie had been the guy that had been cutting it up?
15 A  I believe Freddie was the one cutting it up.
16 Q  Do you know whether he was or not?
17 A  No.
18 Q  Okay.  Why do you believe he was?
19 A  I had heard him talk about Freddie.
20 Q  You heard who talk about Freddie?
21 A  Leon and the other Fred.
22 Q  Okay.  You heard them talk about Freddie
23 Williams?
24 A  Yes.
25 Q  And what would they say about Freddie Williams?

Multi-Page™

**Page 290**

1 What would Mr. Carmichael say about Freddie Williams
2 that would let you know that Freddie Williams had ben
3 the guy cutting the stuff up?
4 A He just said, "Eventually I'm going to let you
5 meet Freddie, and you can go straight through Freddie
6 and cut out everybody else."
7 Q And did that happen?
8 A Yes.
9 Q Tell us about how that started working, then.
10 A Fred would bring -- Freddie Williams would bring
11 the dope. It was already in duffel bags and block
12 form, and I would cut it up and divide it up into one
13 pound bags.
14 Q Is this the Freddie Williams you're talking about
15 that was doing that?
16 A Yes.
17 Q And when did that start?
18 A That started in 2001.
19 Q Okay. And how much was he bringing over when it
20 first started?
21 A At times it would vary from week to week. He
22 would bring two hundred to five hundred pounds.
23 Q And you would cut it up?
24 A Yes.
25 Q Let me show you something and ask you, if you

**Page 291**

1 would, to just take a look at it.
2      MR. FEAGA: May I approach, Your Honor?
3      THE COURT: Yes.
4 Q I've removed an object from bulk exhibit 6(a) and
5 I'm handing it to you, Mr. Denton. It's wrapped in
6 tape. It appears to be a brown tape. Would you
7 examine that.
8 A This is how it came. It was wrapped in tape or
9 cellophane plastic.
10 Q And when you say you would "cut it up," what
11 would you do to it?
12 A Cut the tape off of it and break it down so it
13 weighed a pound even into gallon size bags.
14 Q Like the bags I showed you that are in this tub?
15 A Yes.
16 Q Now where would you do this?
17 A In the garage at my house.
18 Q And did you have any help doing it?
19 A Yes. I got Gary George to help me when he
20 started bringing it over and it needed to be cut up.
21 I couldn't cut it up by myself in a reasonable length
22 of time, so I got Gary to help me.
23 Q How long does it take you to cut up, say, a
24 package that way of two hundred pounds of marijuana?
25 A With two people you could do it in four hours.

**Page 292**

1 Q And if you had five hundred pounds of marijuana,
2 how long would it take you to cut it up?
3 A It might take you the whole day. It just depends
4 on what size it is, because it all comes in different
5 sizes, shapes and forms.
6 Q When you say "all day," are you saying you could
7 do it yourself in a day?
8 A No, it'd take two people to do it in a day. I
9 might take one person two days, probably.
10 Q Now when Mr. Williams started bringing you the
11 two hundred pounds a week to cut up, tell us
12 physically what would happen. How would he bring it
13 to you? What would happen?
14 A He had a van at the time, and he would bring it
15 back up to the door of the garage, and it would be
16 most of the time in duffel bags. Sometimes garbage
17 bags. He would drop it off. We'd grab it. Leon
18 would follow him over and we would meet him over there
19 and make sure he had dropped it off, unload it and
20 they would leave.
21 Q Leon would follow him over?
22 A A few times, not every time.
23 Q Now what was Freddie driving when he'd bring this
24 marijuana over to your place?
25 A He had an old gray van at the time.

**Page 293**

1 Q And what about Mr. Carmichael, do you know what
2 he was driving when he would come and do these things?
3 A He was either in his van or his Lexus.
4 Q Mr. Carmichael owns a van?
5 A Yes.
6 Q What kind of van does he have?
7 A White Chevrolet nice full size van.
8 Q Conversion van?
9 A Conversion type van.
10 Q Now, so Freddie comes some of the time, a few of
11 the times Leon followed him over.
12 A Yes.
13      THE COURT: Now this is Freddie --
14      MR. FEAGA: This Freddie Williams would
15 bring it.
16 Q Is that right?
17 A Correct.
18 Q And tell us what would happen when he would get
19 there?
20 A We would unload it out of the van and Freddie
21 would go on and leave. He didn't stay long.
22 Q You said earlier it was in some kind of a duffel
23 bag. Would you describe the color of the bags it
24 would come in?
25 A It would be black, blue, green. It had every

**Page 294**

1 color.

2 Q  Let me show you --

3 A  Most of the time it was solid black, but some of

4 the time it was solid green or blue ones.

5 Q  Let me show you some bags that the record should

6 reflect I'm removing from government's exhibit 11(a)

7 for identification purposes and I'll put it back.

8 Does this look like the kind of bags that this stuff

9 was coming in?

10 A  Yes.

11 Q  So do you know where Freddie Williams at this

12 time when he started bringing this over to you, do you

13 know where he was getting it before he would bring it

14 to you?

15 A  I know he said he had to go get it from the

16 trucks. Wherever the trucks were parked out at the

17 time, he would go get it and he'd bring it straight to

18 me.

19 Q  Were there ever any occasions, if you know, when

20 he brought the marijuana to his house first and then

21 to you?

22 A  Yes.

23 Q  How do you know that?

24 A  After he started bringing it to my house and I

25 was cutting it up, it would be sometimes if I wanted

**Page 295**

1 -- whatever I wanted to keep Leon would tell me to

2 keep it and take the rest to Freddie or get it to

3 Freddie and Freddie would get it, he would keep the

4 rest of it. And Freddie came to pick it up a few

5 times, and then as me and Freddie got more acquainted,

6 he let me come to my house and I would take it to his

7 house so he wouldn't have to come.

8 Q  You're talking about after you cut it up?

9 A  Yes.

10 Q  Now how was the money that you were generating,

11 this sixty thousand dollars a week and up, how was it

12 being delivered?

13 A  Periodically, having given Freddie Williams, then

14 I think Freddie started getting mad because he started

15 seeing all this money coming in and he wasn't getting

16 enough. Most of the time he'd call and have me meet

17 him somewhere and I would take it to Leon.

18 Q  Where would you take the money to Leon?

19 A  To his house, his office, girlfriend's house.

20 Q  Were there ever any occasions -- When you said to

21 "his office," are you talking about the trucking

22 business?

23 A  I took it there and to the Carmichael Center,

24 both.

25 Q  Okay. Now, when you first started doing this in

**Page 296**

1 2000, 2001, was the Carmichael Center open then?

2 A  No.

3 Q  So where were you taking the money to him and

4 dope and those sorts of things at this time?

5 A  To his office or either to his personal house or

6 he had a girlfriend that lived right down the road --

7 MS. JAMES: Objection, Your Honor. May we

8 approach?

9 THE COURT: It's something we need to hear

10 outside the presence of the jury?

11 MS. JAMES: Yes, Your Honor.

12 THE COURT: It's now almost five-thirty, so

13 I'm going to go ahead and excuse the jury for the day

14 and we'll take this up.

15 Members of the jury, we'd like to start

16 promptly at eight-thirty tomorrow. It will be really

17 important we start at eight-thirty. I know these

18 hours are long, but I really would like to try to

19 finish this case within the period of time that I

20 promised you, which was two weeks, and that includes

21 an opportunity for you to deliberate even though you

22 can deliberate beyond the two weeks. But I would like

23 to make sure we finish the evidence and the closing

24 arguments.

25 So be here promptly at eight-thirty and

**Page 297**

1 we'll put in our full days and try to get the evidence

2 complete.

3 Again, do not discuss the case among

4 yourselves or with anyone else. Do not listen to any

5 local broadcast or read any local newspapers.

6 Put your pads in your chairs. Don't forget

7 to turn them over.

8 (Whereupon, the jury was escorted out of the

9 courtroom and the following colloquy ensued):

10 THE COURT: What is your last question?

11 Will you ask it again?

12 MR. FEAGA: Yes, sir, Your Honor. I asked

13 where he was taking the money and/or dope that he

14 would bring back to Mr. Carmichael. I think he said

15 he would take it to his business, and I asked early on

16 before if the Carmichael Center was open. And he said

17 to his place of business and he said he had a

18 girlfriend, they objected, and that's where --

19 THE COURT: You took it to his girlfriend?

20 THE WITNESS: Yes, to his girlfriend's

21 house. He usually was there.

22 THE COURT: Who was his girlfriend?

23 THE WITNESS: I think her name was Takeena

24 (ph.) or Tina.

25 THE COURT: You're not quite sure?

1    THE WITNESS: Not quite sure.
2    MS. JAMES: Your Honor, my objection is
3 relevance under 401 and 402, and also objecting under
4 403, the prejudice outweighs the probative value.
5 This was the subject of the motion in limine that we
6 filed and court had hearings on. I was under the
7 impression that the Court told the government before
8 they got into anything like this that he should give a
9 heads up on it.
10    THE COURT: Remind me now why it's unfairly
11 prejudicial.
12    MS. JAMES: Well, number one, there is no
13 relevance and it just goes to try to show their
14 character. You also cautioned the government to
15 admonish their witnesses to be careful about what they
16 said. And he's already done it. This is the second
17 time he's done it. I just let it go not to draw
18 attention to it.
19    THE COURT: Again, why is it unfairly
20 prejudicial to -- You need to remind me. Is this the
21 young girl, or what?
22    MS. JAMES: No, sir.
23    THE COURT: So this is just the fact that
24 it's about the girlfriend?
25    MS. JAMES: Well he's already testified

1 about his wife, first of all. He's said he went --
2 the wife went and got two pounds and now we follow
3 that up with the girlfriend. It has no relevance
4 whatsoever to what they're trying to prove.
5    THE COURT: So you're saying the fact that
6 he mentions a girlfriend when he's also discussed why
7 it prejudices your client because it shows bad
8 character that he would have a girlfriend while he has
9 a wife.
10    MS. JAMES: Yes, Your Honor.
11    THE COURT: I'll hear from the government.
12    MR. FEAGA: Yes, sir. Your Honor, first of
13 all, I apologize to the Court for mentioning the
14 girlfriend. I frankly was not -- I didn't intend my
15 question to go there. But it did.
16    I do think that having been able to stop and
17 I'll now make the argument I would have made, what he
18 was about to testify to is that he was taking money to
19 Leon from the sale of the drug proceeds to a house.
20 And this house was occupied by a woman who was a
21 girlfriend of Leon's. I think that fairly --
22    THE COURT: How do you know this was his
23 girlfriend?
24    THE WITNESS: Because he told me his wife
25 just had a kid, he had another kid by her. He told me

1 it was a girlfriend.
2    THE COURT: Is she going to testify?
3    MR. FEAGA: Your Honor, not for the United
4 States, I don't believe. Not because we wouldn't like
5 to call her, I just don't think she's willing.
6    THE COURT: How does the probative value
7 outweigh the prejudice?
8    MR. FEAGA: Well, Your Honor, what we're
9 trying to establish is that Mr. Carmichael was running
10 a drug trafficking organization, drug distribution
11 business in the Montgomery area. It establishes this
12 witness's knowledge of that. It establishes where the
13 money was being delivered. It shows intimate
14 familiarity on his part with the defendant. It
15 establishes that he would be in a position to know
16 these things.
17    We submit to the Court that all those things
18 make it highly probative, and as with all evidence, of
19 course there is prejudice associated with it.
20    THE COURT: Now are you going to be
21 challenging his credibility?
22    MS. JAMES: Yes, Your Honor.
23    THE COURT: Then the objection is overruled.
24 It's clearly proper that he testify about his intimate
25 knowledge of Mr. Carmichael's life, which goes to, you

1 know, his credibility. He would know these things.
2 Objection is overruled.
3    MR. FEAGA: Thank you Your Honor.
4    THE COURT: I think the probative value
5 outweighs the prejudice.
6    We'll start back at eight-thirty tomorrow.
7    (Whereupon, court was adjourned at
8 five-thirty five p.m.)
9    * * * * * * * * *
10    COURT REPORTER'S CERTIFICATE
11    I certify that the foregoing is a correct
12 transcript from the record of proceedings in the
13 above-entitled matter as prepared by me to the best of
14 my ability.
15    I further certify that I am not related to
16 any of the parties hereto, nor their counsel, and I
17 have no interest in the outcome of said cause.
18    Dated this 1st day of August 2005.
19
20
21    MITCHELL P. REISNER, CM, CRR,
    Official US Dist. Court Reporter
    Registered Professional Reporter
22    Certified Real-Time Reporter
23
24
25