1        IN THE UNITED STATES DISTRICT COURT
                         FOR
2           THE MIDDLE DISTRICT OF ALABAMA

3

4

5    THE UNITED STATES
         OF AMERICA
6                                    CRIMINAL ACTION NO.
         vs.                         2:03-cr-259-T
7    LEON CARMICHAEL

8

9

10

11

12

13               VOLUME III OF XI
14                3rd DAY OF:
              JURY TRIAL PROCEEDINGS
15

16

17          *  *  *  *  *  *  *  *  *  *

18
     BEFORE:       The Hon. Myron H. Thompson
19
     HEARD AT:     Montgomery, Alabama
20
     HEARD ON:     June 8, 2005
21
     APPEARANCES:  Terry Moorer, Esq.
22                 Stephen Feaga, Esq.
                   Clark Morris, Esq.
23                 Matthew Miner, Esq.
                   Susan James, Esq.
24                 Marion Chartoff, Esq.
                   Lisa Monet Wayne, Esq.
25                 Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
5A - III

Multi-Page™

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

vs.                          CRIMINAL ACTION NO.
2:03-CR-259-T

LEON CARMICHAEL

VOLUME III OF X
3rd DAY OF:
JURY TRIAL PROCEEDINGS

* * * * * * * * * *

BEFORE:        The Hon. Myron H. Thompson

HEARD AT:      Montgomery, Alabama

HEARD ON:      June 8, 2005

APPEARANCES:   Terry Moorer, Esq.
               Stephen Feaga, Esq.
               Clark Morris, Esq.
               Matthew Miner, Esq.
               Susan James, Esq.
               Marion Chartoff, Esq.
               Lisa Monet Wayne, Esq.
               Ronald R. Brunson, Esq.

**Multi-Page™**

---

Page 2

```
1      T A B L E   O F   C O N T E N T S

2

3  ITEM DESCRIPTION                          PAGE NO.

4
```

5  Title Page ...................................   1

6  Table of Contents ...........................   2

7  Discussion In Open Court
        (The Jury Is Not Present) .............   4

9  Patrick Denton - Direct Examination
        by Mr. Feaga
        (continuing from 6/7/05) .............   21

10 Motion For Mistrial In Open Court
11      (The Jury Is Not Present) .............   84

12 Patrick Denton - Direct Examination
        by Mr. Feaga
13      (continuing) ..........................   86

14 Patrick Denton - Cross Examination
15      by Ms. James ..........................  162

    Patrick Denton - Cross Examination
16      by Mr. Teague .........................  232

17 In-chambers Conference
        re: Two Jurors' Concerns .............  250
18
    Motion For Mistrial
19      by Ms. Wayne ..........................  264

20 Motion For Change Of Venue
        by Ms. Wayne ..........................  267
21
    Patrick Denton - Cross Examination
22      by Mr. Teague (continuing) ...........  269

23 Patrick Denton - Redirect Examination
        by Mr. Feaga ..........................  276
24
    Patrick Denton - Recross Examination
25      by Mr. Teague .........................  280
```

---

Page 3

```
1      TABLE OF CONTENTS

2

3  ITEM DESCRIPTION              PAGE NO.

4
```

5  Etherine Taylor - Direct Examination
        by Mr. Moorer ...............  281
6
    Etherine Taylor - Cross Examination
7       by Mr. Teague ...............  288

8  Etherine Taylor - Redirect Examination
        by Mr. Moorer ...............  292
9
    Etherine Taylor - Recross Examination
10      by Mr. Teague ...............  293

11 Larry Hubbard - Direct Examination
        by Ms. Morris ...............  293
12
    Larry Hubbard - Cross Examination
13      by Ms. Wayne ................  304

14 Paul Galst - Direct Examination
        by Ms. Morris ...............  313
15
    Bob Greenwood - Direct Examination
16      by Mr. Moorer ...............  320

17

18

19

20

21 Court Reporter's Certification .......  345

22

23

24           -oOo-

25
```

---

Page 4

```
   WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
 1 THE HON. MYRON H. THOMPSON ON JUNE 8, 2005 AT THE

 2 UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

 3

 4          DISCUSSION IN OPEN COURT

 5          (THE JURY IS NOT PRESENT):

 6      THE COURT: Now I understand, Miss James,

 7 you have something take up with me?

 8      MS. JAMES: Actually, Judge, it's

 9 Miss Wayne.

10      THE COURT: Ms. Wayne. Certainly.

11      MS. WAYNE: Judge, I apologize because we

12 didn't let the Court know until a few minutes ago.

13 But --

14      THE COURT: Yes, it's very important that

15 you let Mr. Carnes know before she brings in the jury.

16      MS. WAYNE: I'm sorry, we were just bringing

17 in so much stuff in the morning, I forgot to tell

18 them.

19      But in terms of Mr. Denton, Judge, we are

20 renewing our motion in limine regarding the alleged

21 coconspirator 801(d)(2)(b) statement. And let me tell

22 you what's troubling to me.

23      THE COURT: Okay, go ahead.

24      MS. WAYNE: We went back and we looked over

25 this. In light of Crawford, I don't think it's so
```

---

Page 5

```
 1 clear, and frankly there haven't been a lot of

 2 opinions, but in terms of Mr. Denton --

 3      THE COURT: Wait a minute, now. I thought

 4 Miss James was Mr. Denton's lawyer.

 5      MS. WAYNE: She is --

 6      THE COURT: I only hear one lawyer on one

 7 witness. I hate to do this, but I really am

 8 particular that whoever has the witness on the stand

 9 may call make all the arguments and do all the

10 examination.

11      MS. WAYNE: The problem with that, Judge, is

12 because this is a voluminous witness, I went back and

13 did --

14      THE COURT: You need to tell Miss James.

15 But it's very important that I apply that rule to both

16 sides. I don't want two lawyers jumping up on the

17 same witness. You need to tell Ms. James.

18      MS. WAYNE: May I confer with her, then?

19      THE COURT: Yes.

20      MR. FEAGA: Your Honor, while we're doing

21 that, there is something I could take up with Mr.

22 Brunson in court.

23      THE COURT: Great.

24      MR. FEAGA: I wanted to let the Court know,

25 the Court asked us to try and reach a stipulation, if
```

---

Multi-Page™

Page 6

1 we could, that would keep us to see if we could reach
2 agreement that we would not be required to call in
3 various records custodians in order to authenticate
4 records.
5 THE COURT: Right.
6 MR. FEAGA: We have reached an agreement
7 regarding the phone records, and so we will not have
8 to call in a records custodian on the phones. It was
9 my understanding from what I was told this morning by
10 Mr. Brunson, that the defendants will only stipulate
11 to the bank records if we agree to put them in the
12 format and order that I made a workup with my witness
13 when I get ready to have him testify, rather than
14 giving them just a bald copy of the bank records,
15 statements and exhibits.
16 THE COURT: I think you have to show through
17 testimony how the items are relevant.
18 MR. FEAGA: Oh, and I intend to do that, but
19 I'm not going to give them the final form I'm going to
20 give with my witness, because that telegraphs to them
21 what I'm going to do with an expert. I think they're
22 entitled to have a copy of the records, and if they
23 don't question the authenticity of those records, I
24 think that they should stipulate to them, but they're
25 apparently not going to stipulate to that unless I

Page 7

1 give them my work product, and I'm not willing to do
2 that.
3 THE COURT: I'm not sure I understand what
4 the issue is here. They just want the records in
5 order in which you're going to be using them?
6 MR. FEAGA: I'll let Mr. Brunson explain to
7 you what he told me. What I'm saying is, I think
8 they're entitled to bank records --
9 THE COURT: Let me just hear Mr. Brunson
10 articulate his reason.
11 MR. FEAGA: Okay.
12 MR. BRUNSON: Good morning, Your Honor.
13 THE COURT: Good morning.
14 MR. BRUNSON: Your Honor, we recognize the
15 fact that a stipulation would be useful in this case,
16 and we were fully willing to do that. We sent our
17 investigator over yesterday just to see which records
18 counsel --
19 THE COURT: What is it that you want,
20 though?
21 MR. BRUNSON: We simply want to know what
22 records we're stipulating to. And all I've asked is
23 that counsel bring the records in some final form,
24 identify which banks the records are coming from and
25 simply show us what we're stipulating to. We're happy

Page 8

1 to stipulate if we know what we're stipulating to.
2 THE COURT: So you just want to know which
3 banks they came from, and what was the other item?
4 MR. BRUNSON: Just which accounts, which
5 banks they're coming from --
6 THE COURT: What do you mean by "which
7 accounts"?
8 MR. BRUNSON: Well, which accounts from each
9 bank.
10 THE COURT: Oh, you can't tell that from the
11 records.
12 MR. BRUNSON: Well we can if we can see the
13 records, and that's all we're asking to do. And in my
14 understanding, is the agent can bring the records, put
15 them on a table in one of the rooms, we can walk in
16 and just make sure these are the records that -- just
17 make sure what we're stipulating to.
18 THE COURT: You just want to make sure that
19 you haven't stipulated to something you haven't seen
20 yet.
21 MR. BRUNSON: Exactly.
22 THE COURT: I think that's fair.
23 MR. FEAGA: I do too, Judge, but that's not
24 what he told me this morning.
25 THE COURT: Well that's what he's saying

Page 9

1 now. Get your agent to lay it out and let them know
2 what you have.
3 Now let's move back over here.
4 MR. FEAGA: I just want to tell you that we
5 just did that last night. We took their agent out and
6 showed them the records. So I don't understand what
7 they're asking me to do.
8 MR. BRUNSON: Your Honor, and we were
9 surprised by one account. And all we need --
10 THE COURT: During the next break, lay the
11 records out on, you can use this room back here if you
12 like, lay the records out, let them see them and then
13 if you have a problem I'll take it up then. You get
14 with him and just ask him to exactly how he wants them
15 laid out. We'll take that up later. You all just
16 need to be communicating.
17 Now what do we have here, Miss James?
18 MS. JAMES: Thank you, Your Honor. We filed
19 a motion in limine pretrial regarding alleged
20 coconspirator participants' statements, and that was
21 subject to the hearing on Friday. I believe the Court
22 indicated you would deal with these things as they
23 developed. We anticipate that the government will
24 elicit statements from Mr. Denton regarding statements
25 of other codefendants, alleged codefendants either as

Page 10

1 part of the conspiracy or in furtherance of the
2 conspiracy. Example, possibly Fred Thomas, you know,
3 Mr. George, other people.
4         THE COURT: Yes.
5         MS. JAMES: And we believe that under
6 Crawford, we are entitled to confrontation. If they
7 wanted to use those statements, then they should bring
8 those witnesses in so that we'd have an opportunity to
9 cross examine them.
10         THE COURT: So you're saying that Crawford
11 covers coconspirator statements, essentially?
12         MS. JAMES: Yes, sir.
13         THE COURT: You get a brief on that to me
14 tomorrow morning.
15         MS. JAMES: Okay.
16         THE COURT: I'm going to allow this in. I
17 don't think you're right, and I might have to declare
18 a mistrial on it, but I'll expect a brief on it
19 tomorrow.
20         MS. JAMES: Judge, I guess in light of that,
21 our other request is going to be that the government
22 proffer what they expect to elicit with regard --
23         THE COURT: I think you'll be able to tell
24 that from the questions. I'm keep him on a short
25 leash in asking questions for the witness. I think we

Page 11

1 can do that.
2         I think that before you try to elicit
3 something that was made after the day of the arrest, I
4 think I need to be careful to listen to that because I
5 think you -- I'm just saying arguably, is that was not
6 in furtherance of the conspiracy. What's that date?
7         MS. JAMES: November 17th.
8         THE COURT: November 17th. I would like to
9 take up any statements you want to elicit from
10 coconspirators that were made after the date of the
11 arrest.
12         MR. FEAGA: After the date of the arrest.
13         THE COURT: What is that date?
14         MR. FEAGA: That date would be November the
15 17th, 2003.
16         THE COURT: Right. I'm not saying they're
17 not admissible, but I'm saying there might be an
18 arguable question as to whether it was in furtherance
19 of the conspiracy. It might be obvious that it is. I
20 mean I --
21         MR. FEAGA: Yes, sir. I don't think I have
22 any.
23         THE COURT: Okay. Well let's move on, then.
24         MS. JAMES: Judge, this may or may not be a
25 problem, but we would ask for the same ruling with

Page 12

1 regard to any statements that would predate the
2 allegation of the beginning of the alleged conspiracy.
3         THE COURT: The conspiracy date is supposed
4 to be on or about, so the question is how far out does
5 he go. So we'll have to take that up.
6         MS. JAMES: Judge, I have one question for
7 the Court. Given your ruling that you're going to go
8 ahead with this trial and deal with this matter later,
9 then don't have to make a continuing objection every
10 time --
11         THE COURT: I think that will go to a lot of
12 the case if you're right on Crawford. I'll just have
13 to look at that very carefully. I'm just not ready to
14 stop the case.
15         MS. JAMES: Yes, sir.
16         THE COURT: I think that would be such a
17 dramatic change in the law, that I'd just have to
18 really think about it. You may be ultimately right,
19 but I want to keep the trial moving. And in fact if
20 you are right, then it might affect the government's
21 case significantly. Anyway --
22         MS. CHARTOFF: Your Honor, just briefly. I
23 don't know that you've ever made a formal ruling on
24 the motion in limine regarding the alleged statements
25 of the defendant?

Page 13

1         THE COURT: Yes, I was going to actually
2 take that up later today regarding "You got me" and
3 related statements. Yes, the objection is overruled
4 and I will actually issue an order on that.
5         MS. CHARTOFF: Thank you.
6         THE COURT: So that does come out.
7         Ready to proceed?
8         MR. FEAGA: We are, Your Honor.
9         THE COURT: Very good. Don't forget I'll
10 expect the briefs tomorrow. During the next recess --
11 Well, since the jury is out, why don't we take it up
12 right now. We'll go ahead and take these up. I think
13 you may need your pens and paper.
14         There are a number of items we need to take
15 up in preparation for the end of the trial. The first
16 one is for the government I have a question. If these
17 defendants are convicted, will they be having been
18 convicted of crimes that would need their
19 incarceration?
20         MR. FEAGA: Yes, sir, they will.
21         THE COURT: So your clients need to be ready
22 for the possibility that they will be incarcerated
23 immediately after the conviction, if there is a
24 conviction, unless you can show me otherwise. And
25 there is specific law on that and you should be

Multi-Page™

Page 14

1  prepared to address both the law and the facts on
2  that.
3        I assume the Government will move for
4  immediate incarceration?
5        MR. FEAGA: We will, Your Honor.
6        THE COURT: You should be prepared on both
7  the facts and the law as to that.
8        MR. FEAGA: Yes, sir.
9        THE COURT: So let's not shoot from the hip.
10       Also, Miss Carnes, would you make sure that
11 Pretrial Services is aware that I will want to hear
12 from them immediately after the jury verdict, if there
13 is a conviction.
14       COURTROOM DEPUTY CLERK: Certainly.
15       THE COURT: Now, the second matter is as you
16 know at the end of the Government's case, and I think
17 it is only at the end of the Government's case, the
18 Court has to make a finding as to whether there was a
19 conspiracy and related matters. I will expect from
20 the government a day or two before it closes its case
21 a brief setting forth what evidence they contend
22 support the admissibility of the coconspirator
23 statements.
24       This brief should, first of all, relate in
25 detail evidence of the existence of the conspiracy,

Page 15

1  who the members of the conspiracy were so that I can
2  determine whether the statements come in, that both
3  defendants were part of the conspiracy, the beginning
4  and end of the conspiracy so that I can then make
5  findings as to whether or not statements I've admitted
6  were in fact in furtherance of the conspiracy and
7  during the conspiracy. Now I need that in writing so
8  that I can make findings in court and even prepare a
9  written order setting forth my findings as required by
10 law.
11       I believe I apply a preponderance of
12 evidence standard according to Bourjaily, and I think
13 under recent -- not that recent anymore, Supreme Court
14 law I can use the statements themselves in determining
15 whether or not the conspiracy exists and whether or
16 not the statements were made in furtherance of the
17 conspiracy. I'm trying to remember what that Supreme
18 Court case was that said that. I know that Bourjaily
19 is a primary case, B-o-u-r-j-a-i-l-y, and there was a
20 case that came later from the Supreme Court that said
21 you could use the statements themselves in making
22 these findings. I'm sure you'll find it. It's a
23 pretty well-known case.
24       Anyway, I'm sure you'll find it. If I find
25 it, I'll have my law clerk tell you because I have

Page 16

1  been reading the law on this.
2        With regard to the right of confrontation to
3  coconspirator statements, just looking here I think
4  the law is that no inquiry concerning the
5  confrontation clause need be made concerning a
6  proposed coconspirator's statement if the evidence has
7  established that the statement is in fact a
8  coconspirator's statement, which is your Crawford
9  issue. I think the Supreme Court may have already
10 settled that issue, and I'm going to give you the cite
11 but I'll be happy to revisit it.
12       The case is United States versus Inadi, 475
13 U.S. 387, a 1986 case. And I think they resolve the
14 confrontation clause issue there unless Crawford
15 overrules it in Inadi.
16       Anyway, also Bourjaily says that the trial
17 Court need not make a further inquiry as to whether
18 the statement met the confrontation clause requirement
19 if the statement met all the other evidentiary
20 requirements as a coconspirator statement. That's
21 under Rule, I think it's 803. So both of those cases
22 probably relate to your Crawford or confrontation
23 clause issues or issue.
24       The next matter I'd like to take up is
25 aren't there some forfeiture allegations in this case?

Page 17

1        MR. FEAGA: There are, Your Honor.
2        THE COURT: Do you plan on a bifurcated
3  trial or will the defendants concede the forfeiture?
4  What are you seeking to have forfeited? Are you
5  seeking to have the Carmichael Center forfeited?
6        MS. MORRIS: Yes, Your Honor.
7        MR. FEAGA: Ms. Morris will speak as to the
8  forfeiture, Your Honor.
9        MS. MORRIS: In the forfeiture count, the
10 government is seeking to have forfeited the
11 defendant's house at 3226 Brookwood Drive, the
12 Carmichael Center, any cash proceeds --
13       THE COURT: Right, but I'm assuming, though,
14 you're talking about a lot of property. I'm assuming
15 the defendants, even if there is a conviction, will
16 challenge the forfeiture so then we'll need to
17 bifurcate the proceedings. So the jury if it
18 convicts, we will have another trial on the
19 forfeiture. Okay. I just want to make sure we were
20 on the same track on that.
21       I believe the trial should be bifurcated for
22 that, if I remember correctly.
23       MS. MORRIS: That is correct.
24       MR. FEAGA: Your Honor, we've done this one
25 time with this Court.

Page 18

1   THE COURT: Right.
2   MR. FEAGA: That was in another case, and we
3   broke for a week and then we came back.
4   THE COURT: Right. Quite often in these
5   forfeiture cases the defendant would concede it's a
6   gun or a drug deal or like that, but I assuming you're
7   not going to do that here. Is that correct, Ms.
8   James?
9   MS. JAMES: Yes, Your Honor.
10  MS. MORRIS: It looks like we'll have the
11  forfeiture proceeding if there is a conviction.
12  MS. MORRIS: May I ask for scheduling
13  purposes, if there is a conviction would the court
14  recess for a week or so?
15  THE COURT: Oh no, I have a jury here. Plus
16  the jury will want to rely on the evidence it just
17  heard. You know, the whole trial evidence. The
18  forfeiture proceeding is supplemental evidence, if you
19  have any.
20  MS. MORRIS: Right.
21  THE COURT: We may already have all the
22  evidence in the main case.
23  MS. MORRIS: That is correct, Your Honor.
24  MR. FEAGA: Your Honor, recollecting in the
25  Faulk case, I think the defense may waive the jury and

Page 19

1   give it to the judge so we could let the jury go home.
2   THE COURT: That's up to the defendant.
3   MR. FEAGA: Yes, sir.
4   THE COURT: Oh. The verdict form. I'm
5   assuming that the jury will have to find certain
6   levels of drugs if they convict so that we'll meet the
7   statutory requirements. Is that correct?
8   MS. MORRIS: That's correct, Your Honor.
9   THE COURT: I think I've given a charge on
10  that in prior cases. Do you have a charge ready on
11  the different levels? It would have to be like if you
12  file a hundred kilograms or less, or five hundred
13  kilograms or less, then we'll know which statute it's
14  in.
15  MS. MORRIS: We can have a charge to the
16  Court.
17  THE COURT: Very good. I've think I covered
18  everything. If I think of anything else, I'll let you
19  know.
20  Yes?
21  MS. CHARTOFF: Your Honor, just one matter
22  for clarification. I may be a little dense, but in
23  terms of the standing objection to the cocosnpirator
24  statements, if we believe that the statements actually
25  don't fall within the rule itself because they're not

Page 20

1   in furtherance of the conspiracy, do we need to raise
2   that at the time?
3   THE COURT: Yes. You need to stand and
4   raise that. And I may just have to hear it. You can
5   -- I don't want to constantly send the jury in and
6   out, but if you think a statement clearly falls
7   outside, for instance I think everything he's
8   testified so far involves in furtherance of the
9   conspiracy, to be very honest with you, I've chosen
10  that date only because that's sort of a red flag to me
11  that I may need to make some specific findings, the
12  date of arrest.
13  Yes, Ms. James?
14  MS. JAMES: But with regard to the Court's
15  ruling about the Crawford matter, we've got a
16  continuing objection without --
17  THE COURT: You have a continuing objection
18  on Crawford. In fact, even at the end of the trial,
19  you can raise all of these things again at the end of
20  the trial. You can raise all of these things at the
21  end because I'll have to make findings about the
22  breadth of the conspiracy, about -- You know, if I
23  find, for instance, that the conspiracy ended a year
24  before then I may have to declare a mistrial because
25  of his statements weren't in furtherance of.

Page 21

1   And the law is pretty clear on that. At the
2   end of the trial I have to find if certain statements
3   were improperly admitted, I'll have to then decide
4   whether the prejudice from the erroneous admission can
5   be cured by a charge to the jury, telling the jury
6   they should disregard certain statements, or whether a
7   mistrial should be declared. So at the end of the
8   case you get to raise all these objections again.
9   Ready to proceed?
10  MR. FEAGA: We are, Your Honor.
11  THE COURT: Good. Bring in the jury.
12  (Whereupon, the jury was escorted into the
13  courtroom.)
14      DIRECT EXAMINATION
15  BY MR. FEAGA OF PATRICK DENTON
16  (CONTINUING FROM JUNE 7, 2005)
17  THE COURT: By the way, counsel, remember I
18  asked the government to get me something?
19  MR. FEAGA: Yes, sir.
20  THE COURT: You should do the same, arguing
21  why. We'll take this up outside the jury.
22  MS. WAYNE: All right, I'll bring that up
23  later.
24  THE COURT: Proceed.
25  MR. FEAGA: May it please the Court.

**Page 22**

```
1        Good morning.
2  Q  Mr. Denton, yesterday when we were recessed by
3  the Court you had just been asked a question, and you
4  were responding that you had taken some money to Mr.
5  Carmichael at his girlfriend's house.
6  A  Correct.
7  Q  Would you complete your response?  Because I
8  believe I asked you where you took money to him, and
9  would you complete the response that you were giving.
10 A  I took money to his girlfriend's house, his
11 house, his office, Carmichael Center.  Several
12 locations.  His club.
13 Q  Okay.  Now you said -- Let me go back through
14 those.  You said you took drug proceeds.  These are
15 all proceeds from these marijuana sales?
16 A  Correct.
17 Q  You took them to his club.  Do you know the name
18 of his club?
19 A  Unique Entertainment.
20 Q  Okay.  And you delivered drug proceeds to Mr.
21 Carmichael at Unique Entertainment?
22 A  Yes.
23 Q  You said you delivered them at his girlfriend's
24 house.  Where is that?
25 A  On Ridgecrest Drive.
```

**Page 23**

```
1  Q  Okay.  And the club, Unique Entertainment, where
2  was that that you delivered them?
3  A  The corner of Fleming Road and Rosa Parks.
4  Q  How far from your house is that club?
5  A  Two minutes away, probably.  Half a mile at the
6  most.
7  Q  How far away is the Carmichael Center from your
8  house?
9  A  Probably two miles.  A mile and-a-half, two
10 miles.  Not far at all.
11 Q  And how about Mr. Carmichael's house, his home?
12 A  The house is probably five, seven miles away from
13 my home.
14 Q  And you delivered the proceeds of these drug
15 sales to him at all four of those locations?
16 A  Correct.
17 Q  Who lives at the girlfriend's house?
18 A  I believe her name was Tina, Katina or something
19 like that.
20 Q  Now was Mr. Carmichael there when you delivered
21 the drug proceeds at the house?
22 A  Yes.  He would always meet me on the back porch.
23 Q  Now we were talking at the time that we did this
24 about the progression of your sales activity with Leon
25 Carmichael.  I believe you had gotten to the point
```

**Page 24**

```
1  where we were in January 2001 and it was up to roughly
2  a hundred pounds a week and sixty thousand dollars,
3  roughly, a week was moving from the dope moving from
4  Mr. Carmichael to you.
5        I want to ask you again.  At this point in
6  time, how is this hundred pounds of marijuana getting
7  to you?  How is the marijuana that you are selling for
8  Mr. Carmichael being delivered to you at this time?
9  A  Through Freddie Williams.
10 Q  Is that this Freddie Williams right here?
11 A  Correct.
12       MR. FEAGA:  Your Honor, the record should
13 reflect that I'm writing Mr. Williams' name on the
14 sheet that Miss Wayne started up for cocoespirators.
15 Q  Now you said earlier in your testimony that early
16 on in this that when you went to Mr. Carmichael's
17 house and he gave you two pounds marijuana to get rid
18 of, you said that his wife, Val, had gone and gotten
19 the dope and brought it back and gave it to you, is
20 that right?
21 A  She gave to it him, and he gave it to me.
22 Q  Okay.  And you were there when this happened?
23 A  Correct.
24 Q  He sent her to go get it, is that right?
25 A  Correct.
```

**Page 25**

```
1        MR. FEAGA:  Your Honor, the record should
2  reflect that I'm adding the name Val to the list of
3  cocoespirators created by Miss Wayne.
4        MS. WAYNE:  Judge, I'm going to object to
5  the characterization of the chart I created.  I simply
6  wrote that up there; I didn't characterize it at all.
7        THE COURT:  He said the chart that you
8  created?
9        MS. WAYNE:  And that I characterized them as
10 cocoespirators.  I don't think there is a conspiracy,
11 so it's his characterization of cocoespirators.
12       THE COURT:  Let me caution you of one thing,
13 members of the jury.  Obviously, what the attorneys
14 say is not evidence.  So how the attorneys
15 characterize anything is pure argument.  It is not
16 evidence.  You know the evidence comes only from only
17 one place, and I think I already told you this, that's
18 the witnesses and the exhibits.
19       So during the trial the attorneys will
20 characterize certain things like whether somebody is a
21 cocoespirator or not a cocoespirator.  It only comes
22 from that witness stand and documents and not based on
23 what the lawyers say.  They can point out those things
24 that would be helpful to you, but the lawyers are not
25 the fact finders.  I am not the factfinder.  You are
```

Multi-Page™

Page 26

1 the factfinder.
2        Go ahead.
3        MR. FEAGA: Thank you, Your Honor.
4 Q Sir, I want to show you a photograph that's been
5 admitted into evidence as government's exhibit 7(d).
6 I think yesterday I had shown you 7(c) and (q), you
7 identified those as Mr. Carmichael's house and your
8 house, did you not?
9 A Yes.
10 Q I want to show you another picture admitted into
11 evidence as government's exhibit 7(d).
12        MR. FEAGA: May I approach, Your Honor?
13        THE COURT: Yes.
14 Q Would you take a look at that one?
15 A Yes.
16 Q Okay. And do you recognize that?
17 A It's Freddie Williams' home.
18 Q Okay. Now is there more than one home depicted
19 in this photo?
20 A It's a duplex. He lives on the right side, if
21 you're facing it.
22 Q If you would, I'm going to stand up behind you a
23 second. I want you to point so the jurors can see it
24 what side Freddie Williams lives on.
25 A Right here.

Page 27

1 Q Okay. And that's this Freddie Williams right
2 over here?
3 A Correct.
4 Q Now I asked you yesterday how much you made off
5 the first sale of the two pounds, the very first two
6 pounds that you sold. And you indicated nothing, that
7 you just wanted to show him that you could turn that
8 around. I'd like to ask you, if we can, we know how
9 much you were delivering to Mr. Carmichael up through
10 January of 2001, and I'd like to ask you if we can get
11 some idea of how much you were making.
12        Now let's do it this way. When you first
13 started selling for Mr. Carmichael you said you were
14 selling it for seven hundred a pound -- or he was
15 selling it to you for seven hundred, roughly, a pound?
16 A Correct.
17 Q Would you make money -- And this would be when we
18 were doing the twenty-five pounds?
19 A Mm-hmm.
20 Q Okay. Would you make money when you would
21 deliver him the fourteen thousand per week that you
22 were making off of that, were you making money?
23 A It would vary from the quality of it. Most of
24 the time he had good stuff. He would sell it for more
25 and make more. So most I probably made was fifty

Page 28

1 dollars a pound. I'd make anywhere from twenty-five
2 to fifty dollars a pound.
3 Q Okay. You'd make anywhere from twenty-five to
4 fifty. Let's just assume you were making, then, fifty
5 dollars a pound.
6 A Mm-hmm.
7 Q All right? So you would have been making --
8 Would that have been true all the way through this, or
9 did you make more sometimes?
10 A Periodically I would break even on it because
11 sometimes he might get some in that wasn't that great
12 and I would get rid of it for him and sell that at the
13 cost he was given it to me for. So sometimes I
14 wouldn't make anything off of it. Sometimes I would
15 make four or five thousand dollars a week.
16 Q Were there occasions when, like in any business
17 that you engage in, that you had losses in this
18 business?
19 A Always.
20 Q Did that impact your profits?
21 A Yes, because anything could happen as far as
22 someone you deal with get robbed or get busted and
23 they lose it, and he's not going to absorb the cost,
24 you have to.
25 Q So in your dealings with Mr. Carmichael when you

Page 29

1 did --
2        MS. JAMES: Objection to the leading, Your
3 Honor.
4        THE COURT: It depends upon what the
5 question is. I think the first comments are not
6 leading.
7 Q In your dealings with Mr. Carmichael, did you
8 experience losses on your end of it?
9 A Several times.
10 Q And who would absorb the cost when that would
11 happen?
12 A I would, because he was too greedy to.
13        MS. JAMES: Objection, Your Honor. That's
14 an inappropriate comment.
15        THE COURT: Overruled.
16 Q In other words, whatever he delivered to you, you
17 had to pay him for.
18 A Correct.
19 Q And you had to pay him the price.
20 A Correct.
21 Q Now describe for the ladies and gentlemen of the
22 jury how you could experience a loss in this business.
23 A Someone you deal with, because I'm getting it
24 fronted to me from him, I'm fronting it out to other
25 people, if somebody robs one of them, they get busted,

Multi-Page™

Page 30

1 the dope is gone and you have to, you know, still pay
2 him his money and it's gone.
3 Q  Are you saying you have customers in this
4 business that may not pay you?
5 A  Correct.
6 Q  But when you were doing well, you were making
7 twenty-five to fifty dollars a pound yourself?
8 A  Correct.
9 Q  I want to bring us forward, and then I'm going to
10 try to, if I remember to do it, go back and ask you
11 what the best you ever did was and at what time.  But
12 we started in January of 2001, and you're at a hundred
13 pounds now per week and sixty thousand dollars.  This
14 is roughly January 2001.  Do you recall testifying to
15 that?
16 A  Yes.
17 Q  How long did it stay that the way at roughly a
18 hundred pounds and -- well I may be confusing things.
19 Did you indicate Mr. Williams was bringing this up at
20 this time?
21 A  Yes.
22 Q  Was he bringing more than the amount that you
23 were selling?
24 A  Yes.
25 Q  Tell us how that worked.

Page 31

1 A  It would vary from week to week.  Sometimes he'd
2 bring two hundred pounds, three hundred pounds, four
3 hundred pounds, and I would cut it up, get it into
4 individual gallon bags and I would usually keep
5 whatever amount I wanted and I would return the rest
6 to Freddie Williams and he would distribute it to
7 whoever else they were dealing with.
8 Q  Do you know who all else they were dealing with?
9 A  No, not specifics.
10 Q  Now, we're at January 2001.  How long did it
11 state like that where you're selling a hundred and
12 giving back to Freddie that which you don't keep after
13 you cut it up and bag it up?
14 A  Until September of 2001.
15 Q  Okay.  And what happened in September of 2001?
16 A  In September 2001 when nine eleven happened, he
17 was unable to get any more because of I assume the
18 tighter borders and all that because of all the
19 terrorism that was going on.
20 Q  Are you saying that the tragedy that befell our
21 nation on nine eleven impacted your drug sales?
22 A  Dramatically.
23 Q  Could you tell us how?
24 A  Unable to get anything.  There was nothing around
25 nowhere.

Page 32

1 Q  Did you talk to Leon Carmichael about that?
2 A  Oh, yes.  At the time I was about fifteen
3 thousand dollars in debt to him.
4 Q  How did you get fifteen thousand dollars in debt
5 to Leon Carmichael?
6 A  It was getting fronted to me, and like I would
7 sell a hundred pounds a week or more and I would take
8 him so much money and get more, so I was always ahead.
9 I always owed him for some.  And situations happened
10 where one guy got robbed, one guy got beat out of it
11 or something, and over time, you know, I accumulated
12 that debt.  And when it ended, there was no way I
13 could catch up the money.
14 Q  So you were fifteen thousand in the hole on nine
15 eleven.  Did you talk to Mr. Carmichael about the
16 fifteen thousand that you were in the hole?
17 A  Yes.
18 Q  What was his position on that?
19 A  He needed his money.
20 Q  So in September 2001 you're saying we go back to
21 zippo, zero?
22 A  Zero.
23 Q  Did Leon Carmichael tell you how it was that nine
24 eleven had caused him to be unable to provide you with
25 any more marijuana?

Page 33

1 A  Because of the tighter border security.
2 Q  The tight what security?
3 A  Border security.
4 Q  Now did things change after this drop to zero in
5 September of 2001?
6 A  If I remember correctly, it wasn't able to get
7 some until the end of October or the first of
8 November.
9 Q  Okay.  And when you say he wasn't able to get
10 some until -- when did you say?  The end --
11 A  The end of October, the first of November.
12 Q  Okay.  And this is still 2001?
13 A  Correct.
14 Q  Okay.  And you were able to get some then, is
15 that what you're saying?
16 A  Yes.
17 Q  What happened then?  Tell the ladies and
18 gentlemen of the jury about that.
19 A  When he got some in, I think the first person
20 around Montgomery or the whole state to get some, it
21 went as fast as he could get it.
22      MS. JAMES:  Objection, Your Honor, he's
23 speculating.  He said, "I think".
24      THE COURT:  Sustained.
25 Q  Let me ask you from your perspective, was this

Multi-Page™

Page 34

1 the first you were able to get?
2 A  Correct.
3 Q  Okay.  And do you know from your own knowledge of
4 anyone else that was able to get any?
5 A  I do not.
6 Q  All right.  So let me ask you, in late October
7 early November did Leon Carmichael bring you more
8 marijuana?
9 A  He and Freddie Williams both brought that.  He
10 followed Freddie.
11 Q  Okay.  And what were they driving when they came
12 that time?
13 A  Leon was driving his van, Freddie was in his van.
14 Q  Okay.  And tell the ladies and gentlemen of the
15 jury about that delivery, the first one after nine
16 eleven.
17 A  It was roughly three hundred and some-odd pounds
18 and it went within four or five days it was gone.
19 Q  Okay.  It was how many pounds?
20 A  It was between three and three-fifty.
21 Q  Three hundred and three hundred and fifty pounds?
22    Now, did you keep some of that and give some
23 back to Freddie Williams, or did you sell all of that?
24 A  I sold roughly two-fifty, and he probably got
25 fifty to seventy-five pounds back, it went so fast.

Page 35

1 Q  All right.  Can you give us, if you could -- Now
2 what did you have -- Do you recall what you paid for
3 that?
4 A  It went up to eight hundred dollars because he
5 said it costs more because of all the border security
6 he had to pay more.
7 Q  All right.  And what did -- So how much did you
8 have to give Mr. Carmichael after moving that within
9 five days?
10 A  It was eight hundred dollars a pound, so for
11 every hundred pounds it was eight thousand.
12 Q  So two hundred and forty thousand dollars -- no,
13 you said you moved two hundred and --
14 A  Two hundred and some-odd pounds.  I remember
15 giving him about a hundred and sixty thousand dollars.
16 Q  One hundred and sixty thousand?
17 A  One hundred and sixty thousand.
18 Q  Now what happened?  You said Mr. Carmichael and
19 he brought it.  Tell us about that actual event when
20 that came out.  What did Carmichael do and what did
21 Freddie Williams do?
22 A  They -- Leon called me and told me everything was
23 back, and asked me what would be a good time.  And I
24 don't remember the exact time.  And Freddie showed up
25 and Leon was following him, and Leon helped us unload

Page 36

1 it.
2 Q  Okay.  And how was it packaged?
3 A  In duffel bags.
4 Q  Do you remember what color they were?
5 A  Black and blue, green.  They would vary.
6 Q  Like the duffel bags I showed you -- did I show
7 you some duffel bags yesterday?
8 A  Yes.
9    MS. JAMES:  He's directing the witness.
10 Leading.
11    THE COURT:  I think he is, yes.  You need to
12 be specific to some degree with your questions.  Why
13 don't you show him, though -- Just ask him whether
14 they look like this.
15 Q  Were they duffel bags like these?
16 A  Yes.
17 Q  Only you said some of them were blue?
18 A  They had some blue, black, green.  It varied from
19 week to week.
20    MR. FEAGA:  Your Honor, the record should
21 reflect that I removed both of those objects from
22 government's exhibit 11(a).
23    THE COURT:  Very good.  Go ahead.
24 Q  Now you say Mr. Carmichael helped unload this?
25 A  Yes.

Page 37

1 Q  You testified about the conversation you had.
2 And what, if anything, happened next after you sold
3 this three hundred and fifty pounds?  How did the
4 course of dealing go after that?
5 A  When I finished it I called and gave him some
6 money, and he said he would get some more as soon as
7 he could.  He didn't expect it to go that fast.
8 Q  Okay.  And so was there another occasion when you
9 moved marijuana for Mr. Carmichael and Mr. Williams?
10 A  Yes.  After that initial one I think it went so
11 quick, I think it was a week and-a-half, two weeks, he
12 was able to get some more and it stayed pretty stable
13 for awhile.
14 Q  How much was this "some more"?  Let's say middle
15 of November?
16 A  Correct.
17 Q  And what happened then?  You say he was able to
18 get some more, what amounts are we talking about now?
19 A  It would vary from week to week.  Some weeks he
20 might not be able to get a hundred pounds.  The next
21 week he might get three hundred.  The next week he
22 might get four hundred.
23 Q  So it varied after that.  But a minimum of a
24 hundred pounds?
25 A  Yes.

Page 38

1 Q Per week?
2 A Per week.
3 Q And what were you having to provide to him for
4 that marijuana?
5 A It was eight hundred dollars a pound at the time.
6 Q Okay. So that would be eighty thousand dollars?
7 A Yes.
8 Q And did you in fact pay Mr. Carmichael eighty
9 thousand dollars every time he provided you with a
10 hundred pounds of marijuana?
11 A Yes.
12 Q From this point. Okay.
13      Now, at some point in time did anything
14 change? When I say "anything," I mean did the
15 quantity change? Did the daily delivery -- I mean did
16 the weekly delivery time change or did the price you
17 were being charged by Mr. Carmichael change?
18 A At the time when they came back in he went back
19 up to eight hundred, I was actually giving eight-fifty
20 a pound because I was trying to make up the fifteen
21 thousand I owed him also.
22 Q Did you ever make up that fifteen thousand?
23 A Very quickly.
24 Q Okay. Now all this time that you were doing
25 this, are you still getting basically your profit is

Page 39

1 twenty-five to fifty dollars a pound?
2 A For a short period of time there I hardly made
3 anything because I was trying to get his fifteen
4 thousand out of the way.
5 Q Okay. But if you're making let's say fifty
6 dollars a pound, you could be making on a hundred
7 pounds of marijuana, what is that --
8 A Five thousand.
9 Q Five thousand dollars a week?
10 A Correct.
11 Q And so was there a period of time during which
12 you were making five thousand dollars a week?
13 A Yes.
14 Q Would that include losses that you might incur?
15 A On the losses it varies. Some weeks I might make
16 the five thousand, the next week I might have a loss
17 and lose two thousand. I might lose five thousand.
18 Q Okay. But during the good times you were making
19 at least three thousand dollars a week then, is that
20 what you're saying?
21 A Yes.
22 Q And there were many weeks when you made five
23 thousand?
24 A Yes.
25 Q So it would just depend on the amount that you

Page 40

1 moved.
2 A Correct.
3 Q Now you testified about November the 15th, 2001.
4 You said at that point it became anywhere from a
5 hundred to four hundred pounds a week, whatever he
6 could get.
7 A Correct.
8 Q Did that change at any point in time?
9 A In November when it was kind of still slow, he
10 might get a hundred he might get three hundred, and in
11 January it kind of averaged back out to roughly three
12 hundred pounds a week.
13 Q Okay. So now we're in January of 2002?
14 A Correct.
15 Q Okay. And what's happening in January of 2002?
16 A January of 2002 he's getting from two to three
17 hundred pounds a week.
18 Q And are you moving all of that?
19 A No.
20 Q Is it being brought to you to be cut up?
21 A Correct.
22 Q Who is bringing it to you?
23 A Freddie Williams.
24 Q This Freddie Williams?
25 A Yes.

Page 41

1 Q And you said you weren't keeping all of it?
2 A No.
3 Q How much of it were you keeping?
4 A I kept at least a hundred, maybe a hundred and
5 fifty. I usually kept a hundred.
6 Q Okay. And after you cut it up how would you get
7 -- how would Leon retrieve the stuff that you said he
8 was taking back?
9 A I would call Freddie, and me and Freddie would
10 make arrangements to get it.
11 Q All right. And what would those arrangements
12 entail?
13 A Sometimes he would come to me and get it, and
14 sometimes I would take it to his house.
15 Q This being the house, the two houses over here,
16 your house and his in these two government exhibits,
17 they being 7(d) and 7(c)?
18 A Yes.
19 Q And the money that you're paying Mr. Carmichael,
20 how was he getting that money?
21 A He would meet me, call me. I'd run up to the
22 Center or -- I mean to the club right there are up the
23 road, or to the girlfriend's house or his house.
24 Q And you'd pay him?
25 A Yes.

Multi-Page™

**Page 42**

1 Q  Did anything happen to change this two to three
2 hundred pounds a week that you're keeping at least a
3 hundred of that started January of 2002?
4 A  June of 2002 it stopped.
5 Q  What happened in June of 2002?
6 A  I got arrested in Huntsville for trafficking.
7 Q  Okay.  Tell the ladies and gentlemen of the jury
8 what happened to you in June of 2002.
9 A  I was on my way to Huntsville up to meet Steve
10 Hensarling's girlfriend.
11 Q  Are we talking about his wife or his girlfriend?
12 A  His girlfriend.
13 Q  Okay.  And what happened?
14 A  She called me and told me her car broke down.  I
15 went to jump her off and the police surrounded me.
16 Q  Okay.  And what did they find you with?
17 A  Ten pounds of marijuana and some Lortab pills and
18 some small gram of cocaine.
19 Q  Were you arrested?
20 A  Yes.
21 Q  Have you been charged with that crime?
22 A  Yes.
23 Q  Has it been disposed of yet?
24 A  No.
25 Q  Is that the first crime you've ever committed?

**Page 43**

1 A  Yes.
2 Q  The first time you've been charged with a serious
3 crime?
4 A  Yes.
5 Q  Got traffic tickets before?
6 A  Traffic tickets, and I think I was arrested for
7 harassment one time.
8 Q  When did that happen?
9 A  That was probably the early nineties, mid
10 nineties.  I don't remember.
11 Q  And what was that about?
12 A  Me and my wife had an argument and she got mad at
13 me and signed a warrant out on me.
14 Q  All right.  Now, so you got arrested in June of
15 2002.  What was your status with -- Was this ten
16 pounds you got caught with, whose dope was it?
17 A  Mine.  I had got it from Leon.
18 Q  Okay.  And what happened after June of 2002, did
19 you continue in the marijuana business?
20 A  In June of 2002 when I got arrested, I owed him
21 for roughly a hundred pounds at that time.  And when I
22 got arrested he didn't want to get me out of jail.  He
23 said he'd let me sit there for a couple of weeks until
24 they reduced my bond and he would see what he could
25 do.  So at that time I was thinking I'm making this

**Page 44**

1 man all this money, why am I getting to sit here?  I
2 mean, I know he can't come --
3      MS. JAMES:  Objection, Your Honor,
4 non-responsive.
5      MR. FEAGA:  I think it's very responsive.
6      THE COURT:  Ask your question again.
7 Q  What happened after you got arrested in terms of
8 your dealing with Mr. Carmichael?  And you were
9 explaining about the fact that you got put in jail and
10 he said wait until your bond got reduced, what, if
11 anything, happened next in your relationship with Mr.
12 Carmichael about this matter?
13      THE COURT:  Go ahead.
14 A  He ended up not having anything to do with me
15 getting out of jail, my wife ended up putting up our
16 house and my Dad's house and a good friend of mine,
17 Ike and Erica's house.
18 Q  Now this Ike, was he involved in your marijuana
19 distribution business with Mr. Carmichael and Mr.
20 Williams?
21 A  Yes.
22 Q  Do you know Ike's real name?
23 A  Calvin Dudley.
24 Q  Was Mr. Calvin Dudley alive at the time that you
25 were arrested in June of 2002?

**Page 45**

1 A  Yes, he was.
2 Q  Is he still alive today?
3 A  No, he's not.
4 Q  What happened to Mr. Ike Dudley?
5 A  He was murdered in July of 2002.
6 Q  A month after you got arrested?
7 A  Correct.
8 Q  Now you said you sat in jail for two weeks?
9 A  No, it was about three or four days.
10 Q  I see.  And then how did you get out of jail?
11 A  My wife put up our house, my Dad put up his house
12 and Calvin and Erica put up their house.
13 Q  And you said that you owed Mr. Carmichael money
14 at this time also, is that right?
15 A  I owed him four hundred pounds of dope.
16 Q  Okay.  What, if anything, happened after you got
17 out of jail?
18 A  When I got out of jail he told me to get what I
19 needed, pay my attorney, help for my bond, but he
20 needed to get the rest of the dope back.  He had
21 somebody else who needed it.
22 Q  Did you say that Ike and his wife helped you get
23 your bond to get out?
24 A  Correct.
25 Q  And I'm sorry I missed it.  What did you just

Page 46

1 say?
2 A  That when I got out of jail, got back to
3 Montgomery, Leon wanted to get the hundred pounds of
4 dope back, which it wasn't quite a hundred, it was
5 probably ninety pounds or somewhere around in there
6 because I owed him for a hundred but I only had like
7 ninety pounds.  He said he needed, you know, to "Take
8 some money out for your lawyer and your bond, but I
9 need to get the rest of the dope back."
10 Q  And what did you say back to him?
11 A  I told him, "Give me some money for it and you
12 can have it, because that's the only lifeline I got
13 for money right now.  I just got arrested.  That's the
14 only thing I got for some money right now."
15 Q  And what, if anything, did he say back to you
16 about that?
17 A  No, I'm not going to give you no money for it,
18 but he could get plenty more if I needed it.  But he
19 wasn't going to give me no money for it.
20 Q  And what did you do?
21 A  Personally, I don't want to mess with it because
22 I just got arrested.  I didn't want to come back and
23 mess with any dope.  But I ended up not getting it to
24 him and I ended up messing with Ike and that was it.
25 That was the only person I was messing with, the only

Page 47

1 person I trusted.  And then in July 15th he got
2 murdered.  He probably had fifteen to twenty pounds of
3 it, plus the money.  So I lost that plus the money I
4 paid for my attorney.
5 Q  How much did you have to pay for your attorney?
6 A  Ten thousand.
7 Q  Where did you get the money to do that?
8 A  I sold some of the ninety pounds I had left.
9 Q  Okay.  And so what, if anything, happened next in
10 regards to this whole incident of your arrest?
11 A  When after he got -- After Ike got killed, then
12 his wife couldn't live in the house anymore because he
13 got murdered in the backyard so she didn't want to
14 live there.
15     MS. JAMES:  Relevance, I object.
16     THE COURT:  How is this relevant?
17     MR. FEAGA:  I'm about to go into an area
18 where he's going to talk about his involvement with
19 the defendant and trying to get Ike's wife's house
20 sold, and it goes to show his intimate relationship
21 with Leon Carmichael.
22     THE COURT:  Go ahead.  Overruled.
23 Q  Would you go ahead.
24 A  And so she had to get out of the house, and like
25 I said I had to pay bondsman ten thousand, the lawyer

Page 48

1 ten thousand, that was twenty thousand.  And then the
2 money and dope I had, he lost.  So Leon, he gave me
3 like eight thousand dollars.  He didn't give me no
4 money, he let me keep some dope that he probably
5 didn't have four thousand dollars in it.  So he acted
6 like he gave me eighty thousand dollars to help me
7 out, which he didn't give me nothing.  I had to end up
8 selling that still to make the money I made.
9     And then when she wanted to get out of the
10 house and stuff, so she had to get an apartment, and
11 she couldn't sell the house because the house was on
12 my bond.
13     MS. JAMES:  Objection, Your Honor.  Could he
14 put a question to him?  We're back to a narration.
15     THE COURT:  Yes, you need to ask him
16 questions because otherwise they don't know where
17 you're going.  More importantly, they don't know where
18 the witness is going.
19     MR. FEAGA:  Yes, sir.
20 Q  What, if anything, happened next?
21 A  The house was on my bond, so Erica could not sell
22 it but she didn't want to live in it because her
23 husband got killed in the backyard.
24 Q  What, if anything, happened next?
25 A  She got an apartment, and I was trying to help

Page 49

1 her pay her bills at the house, pay my bills and help
2 her with the bills because she was eight months
3 pregnant at the time.
4 Q  What, if anything, happened next?
5 A  I was running out of money because the stuff I
6 did, I had to practically just give it away just to
7 get something off of it, the stuff I had.  So I knew
8 Leon owned a bunch of real estate property and stuff,
9 so --
10 Q  Did you talk to him about that fact?
11 A  Correct.
12 Q  What did you and he talk about?
13 A  I asked him about if he could give the house,
14 rent it out or whatever because he rents a lot of
15 houses out, if he would buy the house so it could stay
16 on my bond because if she didn't pay for the house and
17 it came off my bond I would have to go back to jail.
18 Q  What, if anything, did he say when you asked him
19 about it?
20 A  He said his daughter was interested in a house
21 and he said he would send his daughter by there.
22 Q  What, if anything, happened next?
23 A  His daughter did like the house, so he said he
24 could see about getting the house rented out.
25 Q  What happened after that?

Multi-Page™

Page 50

1 A  A couple of weeks he avoided me.  Didn't say
2 nothing else to me about it.  I called him, wasn't
3 really getting no answer.  And finally one day I
4 stopped by there to ask him about it.
5 Q  What did you ask him about?
6 A  If he was going to get the house.  He said he was
7 unable to get the house.  He didn't have the money.
8 He was putting all his money in trying to get the
9 Center started building.
10 Q  Okay.  What, if anything, happened after that?
11 A  There wasn't really much I could say to him, so I
12 left.  Probably about two weeks, three weeks later I
13 came back to him and asked him, you know, is there any
14 way he could get any more dope because I needed to
15 make some money.  And I explained to him that I need
16 some money.  I know I'll probably have to do some time
17 because of the charge I had there, I needed to put up
18 some money for my family.
19 Q  And about when is this that this conversation was
20 taking place?
21 A  It had to happen in August of 2002.
22 Q  Okay.  And what, if anything, happened then after
23 -- Let me ask you what, if anything, did Mr.
24 Carmichael say to you after you said to him that you
25 would like to start selling marijuana for him again?

Page 51

1 A  He told me I need to get out of it, leave it
2 alone.  There is no future in it, and look what
3 happened to your friend and there is no future in it.
4 And we were standing out at the old office before they
5 tore it down.
6 Q  This is the office where the Center is now?
7 A  Yes.
8        MR. FEAGA:  Your Honor, the record should
9 reflect that I showed him government's exhibit 7(c).
10 Q  So what, if anything, happened after that?  What
11 did you say back to him?
12 A  He continued on telling me, because they started
13 laying the foundation, about when they finished this
14 everything was going to be all right, that, you know,
15 he would give me some money, set me up in a business
16 and, you know, I would be okay.
17 Q  In August of 2002 they were laying the foundation
18 for the Carmichael Center?
19 A  They had started on the dirt and the foundation.
20 I'm not sure if they had the concrete laid.  They had
21 started building it up.
22 Q  You said earlier he had told you he was putting
23 all of his money into that?
24 A  Yes.
25 Q  Okay.  So in August of 2002 you had this

Page 52

1 conversation with Mr. Carmichael?
2 A  Yes.
3 Q  Did you see Mr. Carmichael again after that?
4 A  Yes.
5 Q  About when was that?
6 A  It was late December, November.  Somewhere in
7 November or December of 2002.
8 Q  All right.  And what happened then?
9 A  He came back to me and told me he had to get it
10 started up again.
11 Q  Had to get what started up again?
12 A  The dope.  He said he had to get some dope in and
13 make some money because he, you know, didn't have
14 enough money to finish it.  It was going to cost a lot
15 more than he thought to build the Center.
16 Q  I'm sorry, I missed that response.
17 A  He said that he had to get the dope business
18 started back up again because he needed some more
19 money.  He didn't have enough money to finish the
20 Center.  He thought he would have enough to complete
21 it, but it was going to cost more money than he
22 thought.
23 Q  Okay.  And so what was the result of him saying
24 that to you?
25 A  I told him, "Two months ago, you know, two or

Page 53

1 three months ago I was begging you, and you told me
2 'No, leave it alone.'"
3        And he said, "I know I got to eat my words.
4 I got to have the money.  I need the money to finish
5 it.  He said, 'I got to get this finished.'"
6 Q  And then what did you say back to him?
7 A  I said, "Yes, okay."
8 Q  In the course of your dealing marijuana start
9 back up with Mr. Carmichael at that time?
10 A  Yes.
11 Q  Would you tell the ladies and gentlemen of the
12 jury how it started back up?
13 A  After we had that conversation he told me he was
14 trying to get some in on a Sunday.  I think it was the
15 following Sunday.  I don't remember what day we was
16 talking about.  It was one day during the week.  And
17 he said he was going to try to get some in that
18 Sunday, to be ready.
19 Q  And this was sometime in November or December of
20 2002?
21 A  Yes.
22 Q  Okay.  And he said to be ready on Sunday?
23 A  Yes.
24 Q  Were you ready?
25 A  I was ready.

Multi-Page™

Page 54

1 Q  What happened?
2 A  Freddie, he called me and told me to get with
3 Freddie, that Freddie would get with me.  And Freddie
4 called me, and when he came in Freddie brought it to
5 me and I cut it up.
6 Q  This is the Freddie Williams that's sitting in
7 this courtroom?
8 A  Yes.
9 Q  And so he called you, told you Freddie would
10 bring it.  Did Freddie bring it?
11 A  Yes.  Me and Freddie talked on the phone.
12 Freddie told me he would be around five o'clock that
13 morning.
14 Q  And did he show up?
15 A  Yes.
16 Q  And tell the ladies and gentlemen of the jury
17 about that delivery.
18 A  I don't remember the exact weight.  I think it
19 had to be at least two hundred pounds, and I cut it up
20 and it was real slow because I had stayed out of it
21 for, you know, that period of time and I kind of lost
22 contact with people.  It was slow go at first.
23 Q  Well, and you said that Ike had been killed in
24 July?
25 A  Yes.

Page 55

1 Q  Would you tell the ladies and gentlemen of the
2 jury if Ike was involved in yours and Mr. Carmichael's
3 and Mr. Williams' marijuana distribution business.
4 A  Yes, he was the main person I dealt with.  He got
5 rid of most it, everything I was getting from Leon.
6 Q  Did his death impact your ability when you
7 started back up in November of 2002 to get rid of
8 marijuana?
9 A  Yes.
10 Q  So what happened?  You said two hundred pounds
11 came in.  What did you do with that two hundred
12 pounds?
13 A  Cut it up and bag it in individual pounds.  And I
14 ended up keeping maybe twenty-five pounds and sent the
15 rest back to Freddie's.
16 Q  And when you say "sent the rest back to Freddie,"
17 how did that get back to Freddie?
18 A  I took it to Freddie's house.
19 Q  That's the house depicted in these government's
20 exhibits I previously had shown you?
21 A  Correct.
22 Q  What happened after that first delivery by
23 Freddie and Mr. Carmichael and the delivery back to
24 you?
25 A  In --

Page 56

1 Q  Excuse me, and your delivery back to them?
2 A  When I got -- Like I said, I didn't keep but
3 twenty-five pounds of it.  It was real slow.  I think
4 I probably sold four or five pounds in a week.  I know
5 the month of December and probably January also.  And
6 when Leon came to my house, he said, "Don't be in a
7 hurry, take your time.  I don't need to rush it
8 because I don't want no attention on me because I'm
9 building this Center        So it was real slow and
10 called me back and he said, "What can we do to speed
11 it up?"
12         And I said, "It's too high."
13 Q  What's too high?
14 A  It was seven hundred dollars at that time.
15 Q  Okay.  And what do you mean when you told him it
16 was "too high"?
17 A  I told him that people got it out on the streets
18 now for six, six-fifty.  There's no way if you give it
19 to me at seven hundred that I can sell it and make any
20 money.
21 Q  So what did he say back to you?
22 A  He told me he would go down.  If we went down
23 fifty dollars what would happen.  So he went down to
24 six-fifty and it was still slow.  So probably the end
25 of January he said, "What about six hundred?"  And I

Page 57

1 told him, "We could probably do more with six
2 hundred."
3 Q  Okay.  And did you?
4 A  Yes, it picked back up.
5 Q  What did it pick back up to?  Describe the
6 process, if you would, of it picking back up.
7 A  From February 2003 to November 2003 it was a
8 hundred pounds a week again, average.
9 Q  A hundred pounds a week.  And how much were you
10 paying him for it?  And this was until when?
11 A  November of 2003.
12 Q  Did something happen in November of 2003?
13 A  Yes, that's when we were busted.
14 Q  "We were busted."  Who was busted?
15 A  Me, Gary, everybody.
16 Q  Who else besides you and Gary?
17 A  Charlotte Hensarling.
18 Q  Who else besides Charlotte?
19 A  Leon.
20 Q  Who else besides Leon?
21 A  Freddie.
22 Q  Okay.  So when you say "we," are you talking
23 about all those folks?
24 A  Correct.
25 Q  In November 2003.

Page 58

1 A  Correct.
2 Q  From February of 2003 to November of 2003 it was
3 a hundred pounds a week?
4 A  Correct.
5 Q  And how much were you paying him for it?
6 A  Six hundred dollars a pound.
7 Q  And you were moving how much?
8 A  A hundred pounds a weeks.
9 Q  A hundred pounds a week?  So how much were you
10 giving Mr. Carmichael at that time for that marijuana?
11 A  Sixty thousand dollars a week.
12 Q  And were you making good money off of it?
13 A  Yes.  I had to sell it for six-fifty, so I
14 finally started making some money off of it
15 consistently.
16 Q  You're getting fifty a pound yourself?
17 A  Yes.
18 Q  So you're making five thousand a week again?
19 A  Correct.
20 Q  For that entire time frame?
21 A  Yes.
22 Q  Okay.  Now let's talk about the events of
23 November 2003.  Do you recall making any sales of
24 marijuana to Charlotte Hensarling at or near this
25 time?

Page 59

1 A  Yes.
2 Q  Okay.  Would you tell the ladies and gentlemen of
3 the jury about the last sale of marijuana that you
4 made to Charlotte Hensarling.
5 A  Me and Gary George took her twenty-five pounds at
6 Shoney's on the west South Boulevard.
7 Q  Did she -- Was she there when you got there?
8 A  Yes.
9 Q  And tell the ladies and gentlemen of the jury
10 what happened when you got to the Shoney's.
11 A  She was there waiting, and Gary took out of the
12 back of the truck we were in and set it in the back of
13 her, I think she was driving a Blazer.
14 Q  Okay.  Would this have been on or about November
15 13th, 2003?
16 A  This was on a Saturday.  I think that was
17 November the 13th.
18 Q  Describe that transaction that day at the
19 Shoney's.  What happened?
20 A  Gary got out, gave her the dope, she drove off,
21 and maybe forty-five minutes later her husband called
22 me and said, "Charlotte got pulled over on the
23 Interstate."  He had a two way radio; he was talking
24 to her and said, "She got pulled over for illegal lane
25 change by a sheriff and a state trooper."

Page 60

1      I told him, you know, something wasn't
2 right.  There is no way a sheriff and a state trooper
3 is going to pull someone over for an illegal lane
4 change on the Interstate.  And he lost contact with
5 her after that.
6 Q  Okay.  Now what, if anything, did you do after
7 that happened?
8 A  That Saturday I got worried about her talking,
9 and I went and stayed in a hotel Saturday night
10 because I didn't want nobody coming to my house and be
11 there.
12 Q  Let me ask you something.  If November the 13th,
13 2003 was on the calendar a Thursday, could you be
14 wrong on the day of the week?
15 A  I feel pretty sure it was Saturday.  It was a
16 Saturday.  I might be wrong about the date, but it was
17 a Saturday.
18 Q  All right.  Let's continue describing the events
19 and see if you still think it's Saturday when you get
20 through explaining what happened to the jury.
21      Your recollection is that after the bust you
22 went to a hotel?
23 A  Yes.
24 Q  Okay.  And why did you go to a hotel?
25 A  Because I was scared the house was going to get

Page 61

1 raided.
2 Q  What house?
3 A  My house.
4 Q  Okay.  Why were you scared it was going to get
5 raided?
6 A  Because I was supplying her with dope and she got
7 busted.  I was scared she might talk.
8 Q  And, so, from your recollection it was Saturday
9 that this happened.
10 A  Yes.
11 Q  You went to a hotel.
12 A  Yes.
13 Q  You heard she had been busted from her husband.
14 A  Yes.
15 Q  Okay.  And had your house ever been raided
16 before?
17 A  When I was arrested in Huntsville it was.
18 Q  Did that have anything to do with your concern
19 about being raided this time?
20 A  Yes.
21 Q  So what hotel did you go to Saturday night?
22 A  A Holiday Inn Express on Troy Highway.
23      MR. FEAGA:  Your Honor, I apologize.  I want
24 to correct the record.  The 15th of November was a
25 Saturday, I had the wrong day.  The 13th, I think that

Multi-Page™

Page 62

1 was the day that Mr. George said he was arrested.
2       THE COURT: Very good.
3 Q  Now what, if anything, happened that night at the
4 hotel?  What did you do?
5 A  I called Leon and Leon -- I told him I needed to
6 talk to him.  He came by the hotel, and I told him
7 about the situation with Charlotte getting pulled
8 over.  And he said, you know, "Don't worry bit.  It's
9 her word against yours.  They can't prove nothing."
10      I said I was worried about fingerprints on
11 it, or something like that, and he said, "They're not
12 going to fingerprint it.  They don't to nothing like
13 that in nothing but murders.  And they don't
14 fingerprint no dope, so it's just your word against
15 hers."
16 Q  All right.  What, if anything, happened during
17 this time?  Did you continue this conversation with
18 him?
19 A  Yes.
20 Q  Tell the ladies and gentlemen of the jury about
21 that conversation.
22 A  He told me he had some -- supposed to have a big
23 shipment Sunday night coming in.  It was five hundred
24 and some-odd pounds.
25 Q  Okay.  And what did you say to him about that?

Page 63

1 A  I told him, "Okay." Because at the time, you
2 know, I wasn't sure and he said, you know, "It's
3 coming in Sunday." He said, "Don't worry about it.
4 Everything is going to be all right." And Sunday, me
5 and Gary George got into a big argument and --
6 Q  Let's talk about that.  What happened Sunday that
7 got you and Gary George into a big argument?
8 A  We had went to a local restaurant and we were
9 sitting there drinking.
10 Q  What local restaurant?
11 A  Capitol Oyster Bar.
12 Q  This is the next morning after the Saturday night
13 when you spent the night in the hotel and then talked
14 to Leon?
15 A  Yes.
16 Q  Okay.  What happened at the Capitol Oyster Bar?
17 A  Gary had started drinking some whiskey and he
18 couldn't handle drinking whiskey.  He got about drunk,
19 and me, him and my brother was there and we got ready
20 to leave.
21      And I told Gary, you know, "Let Willie
22 drive." That's my brother's name.  To let him drive
23 "because you're in no shape to drive." So he jumped
24 in his truck and took off.  And we followed him going
25 to my house.  Going towards my house there's a park on

Page 64

1 the right, and there was some young guys walking
2 across the street to the park and Gary hollered out
3 the window at them some obscene stuff, I don't know
4 what he said.
5       They like turned around and come back, and
6 so he went down a little ways further and there was
7 some guy parked in a car and Gary obviously stopped
8 and said something to the guy and the guy was trying
9 to make him stop, too.  And Gary, he kept going, and
10 there's a circle where he could come back around to
11 where he was at.  So we're following Gary and Gary
12 gets to the circle and he takes off and goes around,
13 and my brother asked me, "Do you want to turn around
14 and follow him?" And I said, "No, he's drunk."
15      MS. JAMES: Objection, Your Honor,
16 relevance.
17      MR. FEAGA: It's relevant, Your Honor.  They
18 talked to Mr. George about this incident where he got
19 beat up by some black guys, and he's explaining what
20 happened.  They brought it out on cross.
21      MS. JAMES: It's Giglio that we don't have,
22 it's new, and in addition to that Mr. George testified
23 that that's not what happened yesterday.
24      THE COURT: Overruled.
25 Q  Tell the ladies and gentlemen of the jury about

Page 65

1 this -- By the way, Mr. Denton, do you live in a
2 predominantly white or black neighborhood?
3 A  Predominantly black.
4 Q  Okay.  And these people that Mr. George was
5 encountering in this intoxicated state, were they
6 black or white?
7 A  Black.
8 Q  Okay.  Would you continue with the story to the
9 point where he's now confronted another one of -- Were
10 these people neighbors of yours?
11 A  I had seen the guy in the neighborhood before.
12 He just would ride around slow all the time.  I don't
13 know, I thought he was probably a crack dealer or
14 something because he always had all the working girls
15 walk around with him or riding in his car from --
16      MS. JAMES: Objection, Your Honor.  Again,
17 it's relevance.
18      MR. FEAGA: We can move on.
19      THE COURT: Yes, sustained.
20 Q  So what happened after Mr. George encounters
21 another, you said -- Take us there.  What were you
22 describing?  You said he ran by the first group and
23 there was an exchange and he kept going.  What
24 happened next?
25 A  Me and my brother went on.  He asked me, "Do you

1 want to follow him?" And I said, "No, he's drunk. If
2 he wants to go back and act like Super Man, let him
3 act like Super Man." I said, "He's not going to do
4 nothing but go around the block anyway, he'll be right
5 back." And we pulled out in the driveway and we stood
6 out there for no longer than ten or fifteen minutes
7 and there was Gary running down the street chasing his
8 truck. His truck is going by itself he was chasing it
9 with his shirt off.
10 Q  What condition was he in?
11 A  From a distance he looked all bloody. The closer
12 he got, the truck was going by itself and eventually
13 ran off in a ditch at the neighbor's house next to
14 mine. And he got in the truck and jumped in the truck
15 and tried to get out of the ditch and went back and
16 forth and finally got it out of the ditch and came out
17 to the house.
18 Q  What happened then?
19 A  He was like, "Where the hell were y'all at? What
20 were y'all doing? You were supposed to be with me,"
21 or whatever.
22      I said, "They didn't do nothing to you. You
23 went back trying to act like a damn hero to them. You
24 was the one trying to act like a tough guy."
25      He said, "Open the house so I can go in

1 there, wash up and get cleaned up."
2      And I said, "Go over to the water faucet and
3 get out of here. You can go over to the hydrant and
4 wash yourself off and leave." I said, "I don't
5 need all this other stuff that just happened Saturday.
6 I don't need this at my house."
7      And so he's like, "I'm going to kick your
8 ass" and this and that.
9 Q  And what happened then?
10 A  He left and went to his girlfriend's house, I
11 believe, because she called and said he was cut all
12 up. And he called back told me he was going to kill
13 me and this and that. And during this time Sunday,
14 that had happened late Sunday evening and the dope was
15 supposed to come in Sunday night and Gary, being the
16 main guy to help me, I called Leon and me and Leon met
17 at a hotel parking lot somewhere off the Eastern
18 Bypass and I told him I didn't feel good about getting
19 it tonight.
20 Q  This is on Sunday the 16th of November?
21 A  Yes.
22      THE COURT: We need to take a ten minute
23 recess.
24      The jury is under the same instructions.
25      (Whereupon, a recess was taken.)

1      THE COURT: Proceed.
2 Q  Mr. Denton, before we broke you said that you
3 learned of Miss Hensarling's arrest on Saturday the
4 15th and went to a motel.
5 A  Yes.
6 Q  The next morning you had also met with Mr.
7 Carmichael that evening?
8 A  Yes.
9 Q  Okay. And the next morning you had the incident
10 involving Mr. George where he got cut up.
11 A  Correct.
12 Q  Okay. And that's where I think we were when we
13 broke. He had left your house, he had called back.
14 What, if anything, happened after that point on Sunday
15 the 16th?
16 A  After that incident had happened with him, it was
17 sometime Sunday evening, and I called Leon and we met
18 at a hotel and I told him, you know -- reminded him
19 about Charlotte getting arrested. And I said, "The
20 guy, Gary, that helped me cut it up, me and him got
21 into a big argument and he left mad." So I was kind
22 of leery about getting it in that Sunday night. I
23 told him I didn't feel comfortable getting it.
24 Q  And what hotel did this conversation take place
25 at where you told him you didn't feel comfortable

1 getting it?
2 A  The one on Carmichael Road right there off the
3 Eastern Bypass. I'm not sure if it was Country Inns
4 or Best Inns or one of those.
5 Q  It was on Carmichael Road in Montgomery?
6 A  Yes.
7 Q  Okay. You told him you didn't want it brought to
8 your house?
9 A  Correct.
10 Q  What, if anything, did he say?
11 A  He was like, "Oh, you know, damn, I'm going to
12 have to ask Freddie." Because he had had an argument
13 with Freddie a couple of weeks ago and he didn't -- he
14 kind of cut Freddie out of it.
15 Q  Okay. And so what, if anything, happened after
16 that?
17 A  I left him that night at whatever time that
18 evening, late or early that night, whatever time it
19 was.
20 Q  Approximately what time was it on Sunday the
21 16th?
22 A  Probably between six-thirty and eight-thirty p.m.
23 Q  Between six-thirty and eight-thirty.
24      What, if anything, happened after that?
25 A  During the time I spoke with him, we left,

Multi-Page™

**Page 70**

1  separated, and I was headed back home. And Cadillac,
2  his driver, from what I understand most of the time
3  brought it in.
4  Q  Who is Cadillac?
5  A  He's an associate of Leon's, a truck driver for
6  him.
7  Q  And did you ever talk to Leon about Cadillac?
8  A  Cadillac was supposed to call me when he came in,
9  and I was going to meet him at the truck yard where
10 they parked the trucks at to get the dope.
11 Q  Do you have any idea what Cadillac's real name
12 is?
13 A  William, is all I know. I don't know if that's
14 his first or last name.
15 Q  How do you know his name is William?
16 A  I've heard him answer the phone "William" every
17 time I have been around him. He's always answered the
18 phone "William".
19 Q  Can you describe him?
20 A  He's probably about six one, black male, fairly
21 dark complected, probably late fifties.
22 Q  Now you say you were at the point where you were
23 talking to Mr. Carmichael and asked you what happened
24 next and you said you brought up the name Cadillac.
25 Can you pick up there? What happened regarding the

**Page 71**

1  name Cadillac and this William?
2  A  I believe he was on the way to see Leon.
3  Cadillac called me and told me he was in. He said,
4  "I'm almost there. I'm here." And I told him to,
5  "Call Long Hair." Because that's what we say about
6  Leon; he didn't want me to say his name on the phone.
7  Q  Why did you call him Long Hair?
8  A  Leon used to have long hair at one time, real
9  long and straight.
10 Q  Okay. So what happened? You said you may have
11 heard from Cadillac before you met with Leon.
12 A  If my memory is correct, I think he called me on
13 the way to meet Leon, or he called me shortly after I
14 left Leon, I'm not sure which way it was.
15 Q  Not sure which it was?
16 A  No.
17 Q  All right. So you talked to Leon, told him you
18 don't want it wrought to your house.
19 A  Yeah.
20 Q  What did you and Cadillac talk about, whenever it
21 was?
22 A  He told me it was here, and I was real short with
23 him, and told him to call Long Hair because I didn't
24 want to talk on the phone about it.
25 Q  And why were you short with him?

**Page 72**

1  A  Because the incident had just happened with Gary
2  and stuff, and I just didn't want to talk on the phone
3  about it.
4  Q  You said "Gary and stuff." What stuff?
5  A  The Charlotte Hensarling thing and the Gary thing
6  Sunday.
7  Q  Okay. So what happened next?
8  A  I was leaving, going back home, and going home I
9  went by the Center and I saw where Cadillac was pulled
10 in. They were opening the gate, him and another
11 driver named Lisa.
12 Q  Who is Lisa?
13 A  She's a driver for Leon.
14 Q  How do you know that?
15 A  One time before -- Freddie used to always talk
16 about, every time he had to go get it, he had to go
17 see "that bitch" because he couldn't stand her.
18 Q  Okay. And what did he tell you about, if
19 anything, having to see her?
20 A  Said she was a "dike bitch" and he didn't like
21 her because she was always screwing with him.
22 Q  Okay. And where did he have to see her, did he
23 tell you?
24 A  When he would pick up the dope, wherever the
25 points were where they picked it up at. From what he

**Page 73**

1  said most of the time it was at the truck yard.
2  Q  Okay. And you said, "Lisa"?
3  A  Yeah.
4  Q  You said she worked for Leon. How do you know
5  that she worked for Leon?
6  A  Any time I go to the office to see him, she would
7  be over there getting out of her truck, in the office
8  hanging out.
9  Q  Did you ever, while you were over there, ever see
10 any marijuana on any of Mr. Carmichael's trucks?
11 A  Yes.
12 Q  Tell the ladies and gentlemen of the jury when,
13 approximately, that was.
14 A  Two weeks before the actual bust happened in
15 November, I had gotten it from the truck yard off a
16 truck and loaded it from one of his eighteen wheelers
17 into the back of my truck.
18 Q  How did that happen? Tell us how that
19 transaction took place.
20 A  Cadillac had called me and told me he was in.
21 He'd be over there in five minutes. I'd go up there
22 and pull to the back of the truck and him and one time
23 another guy named Romeo would --
24 Q  Romeo?
25 A  Yes.

Multi-Page™

Page 74

1 Q  Okay.  All right.  And what happened when you
2 pulled up to the back of this truck?  Would you
3 describe the truck?  What kind of truck was it?
4 A  It was an eighteen wheeler with probably a
5 fifty-two foot trailer.
6 Q  And what happened after you pulled up to the back
7 of it?
8 A  Romeo and Cadillac would hand it -- I would stand
9 at the back of the truck and they would hand it to me.
10 I would load it in the back of my truck.
11 Q  Load it in what truck?
12 A  My truck.
13 Q  Okay.  What kind of truck were you driving?
14 A  An older Chevy.  Probably ninety something.
15 Q  Did you own it?
16 A  Yes.
17 Q  What color was it?
18 A  It was blue and gray.  It was two tone.
19 Q  You're talking about "it was".  What happened to
20 it?
21 A  I sold it.
22 Q  Okay.  And how much did you load in the back of
23 your truck out of that semi?
24 A  The first particular time it was close to three
25 hundred.  The second time it had to be, I don't think

Page 75

1 it was quite as much as three hundred.  It was
2 twenty-two or three hundred.
3 Q  Do you remember if there was anything else in the
4 back of that truck when you went in it?
5 A  It was dark, as far as I could see.  Because they
6 were walking around and it wasn't going around
7 anything and it was empty.
8 Q  Now we're talking about Sunday the 16th.  You've
9 talked to Freddie -- excuse me, you've talked to Leon
10 and you've talked to Cadillac on the phone, and you
11 said I believe you were going home.
12 A  Yes.
13 Q  What, if anything, happened next?
14 A  I saw Cadillac and Lisa pulling in the yard.  She
15 was opening the gate and Cadillac was driving in the
16 yard.
17 Q  Why would you go by the Carmichael Center at that
18 time?
19 A  I always went by there on the way home.  Just
20 habit, and I wanted to see if they were there.
21 Q  Is it on the way to your house?
22 A  Correct.
23 Q  And you said it's about how far away?
24 A  Two miles.
25 Q  All right.  And you see Cadillac and Lisa at the

Page 76

1 Carmichael Center opening the gate?
2 A  They were actually at the yard down from the
3 Carmichael Center.  The Carmichael Center sits here,
4 there's a couple of businesses and there's the truck
5 yard going down from it.
6 Q  Is the truck yard located on the parking lot of
7 this building depicted in government's exhibit 7(s)?
8 A  No, it's separate from that parking lot.
9 Q  Okay.  But the old building Multi-Investments was
10 in, the truck building that was torn down, was it on
11 the parking lot?
12 A  Yes, it was.
13 Q  So is the truck yard different from the building?
14 A  Where the old building was there was a truck yard
15 and the office at one time.  When they tore it down,
16 they put the Center there and the truck yard they
17 moved it up here.
18 Q  I see.  Okay.  So you see him at the truck yard
19 and what are they doing?
20 A  Lisa was opening the gate and Cadillac was
21 getting in the truck to drive it through.
22 Q  And what kind of truck were they driving?
23 A  It was a white Multi-Investment truck.
24 Q  Would you describe it for the ladies and
25 gentlemen of the jury, please.

Page 77

1 A  White eighteen wheeler with a trailer on it.  The
2 trailer had two stripes on it and a blank spot in the
3 middle, like it used to be an old grocery store truck
4 or something, trailer.
5 Q  Now why do you say it was a Multi-Investments
6 truck?
7 A  Because the name was on the side of it.
8 Q  Let me show you again -- So what happened after
9 you see them in this -- Where is the Multi-Investments
10 painted on it?  You said it's painted on there.  Where
11 is it?
12 A  The door.
13 Q  Okay.  All right.  And what did you do?  You are
14 riding by and you see this and what happened next?
15 A  I continued on and went home.  And later on that
16 night as probably ten or ten-thirty, I heard somebody
17 honking the horn, just laying on the horn, and I
18 looked out the window and it was somebody -- I live at
19 the end of a road, and Gary George, somebody almost
20 ran into him and they were honking the horn at him
21 because I guess he almost ran into them and they
22 almost ran into them.  And he's creeping by with his
23 lights off.  I looked out the window and he was going
24 by with his lights off.  So, you know, I was thinking,
25 I told my wife then, I said, "He's going to end up in

Page 78

1 jail, drunk, or somebody is going to kill him."
2 Q At that time did you have any idea that he had
3 been arrested on the 13th of November and charged with
4 distribution?
5 A No idea at all.
6 Q Did you know that when you and he met with
7 Charlotte Hensarling on the 15th?
8 A No idea at all.
9 Q Didn't know it on Sunday when you were talking to
10 your wife?
11 A No idea at all.
12 Q Okay. What happened next?
13 A His girlfriend called me shortly after that,
14 ten-thirty, eleven, twelve, eleven-thirty, somewhere
15 around in there, and said --
16 Q Whose girlfriend?
17 A Gary George's.
18 Q Okay.
19     MS. JAMES: Objection to the hearsay, Your
20 Honor. What some girlfriend said.
21     MR. FEAGA: I'm not offering it to prove the
22 truth of the matter asserted, Your Honor, I'm just
23 offering it to show why he did what he did next.
24     THE COURT: I'll allow it.
25 A She said that he had got arrested in front of the

Page 79

1 trailer for D. U. I., and I asked her, "How could he
2 get arrested for D. U. I. if he made it home?" And
3 she said that they had arrested him. And I didn't
4 really understand what he had been arrested for
5 because how could he be arrested for D. U. I. if he
6 had already parked? And she said he was trying to get
7 into the house or something and they arrested him.
8 Q And you're at home when you get this call?
9 A Correct.
10 Q What time of the day on Sunday was this?
11 A It was Sunday night. I'd say it could have been
12 around ten, ten-thirty, eleven.
13 Q Okay. What, if anything, did you do next?
14 A It didn't surprise me because, like I said, he
15 was drunk. Acting drunk. He got into that big thing
16 Sunday, so I went back to sleep and -- or tried to go
17 back to sleep, and approximately around one-thirty,
18 two o'clock that morning the D. E. A. raided my house.
19 Q Okay. I want to show you -- I was about to ask
20 you a question. I want to show you what's been marked
21 as government's exhibits 32(a) and (b) for
22 identification purposes. I'm going to show you what's
23 been marked as government's exhibits 32(a) and (b) for
24 identification purposes only and ask you if you would
25 take a look at that.

Page 80

1 A That's the side of one of Leon's trucks.
2 Q Both of them?
3 A Yes.
4     MR. FEAGA: Your Honor, I'm going to
5 withhold offering these until later, but I just wanted
6 to show them to the witness.
7 Q Mr. Denton, when you unloaded the truck at the
8 Carmichael Center a couple of weeks before all this
9 happened, how was that marijuana packaged?
10 A It was in the duffel bags like it normally came
11 from Freddie.
12 Q All right. Now we're at ten-thirty, eleven
13 o'clock Sunday night. You said the D. E. A. -- I'm
14 sorry, I skipped -- You said sometime, to your
15 recollection it was around one-thirty in the morning?
16 A Yes.
17 Q Who came to your house? This is now on the 17th,
18 Monday morning, early hours of the morning, right?
19 A Correct.
20 Q Excuse me, early morning hours of the 18th, is
21 that right, on Monday?
22 A It started Sunday night.
23 Q That's right, the 17th. If Saturday was the
24 15th, Sunday would be the 16th and Monday would be the
25 17th, is that right?

Page 81

1 A Yes, technically so, the 17th.
2 Q I'll try to get it right.
3     MR. FEAGA: I apologize to the Court and to
4 counsel and to the jury about that.
5 Q We're talking about the early morning hours of
6 Monday the 17th of November.
7 A Yes.
8 Q The police came to your house.
9 A Correct.
10 Q What happened then?
11 A They secured the house, started talking to me,
12 took me outside, started talking to me about some
13 things that were going on and I started wondering how
14 did they know all this. You know, they knew a lot of
15 information that there is no way they could have known
16 unless somebody who was close to me that had told
17 them. They proceeded on to tell me the evidence they
18 had against me.
19 Q And what kind of stuff did they tell you about,
20 do you remember?
21 A They told me about Gary, what Gary had done, and
22 how he had tried to set me up and they were working
23 with him to bust me. And how he's the one told on
24 Charlotte Hensarling and she done flipped on me.
25 Q Did you get any phone calls while they were

Page 82

1 there?
2 A  Yes.  Leon called me.
3 Q  Would you tell the ladies and gentlemen of the
4 jury about that phone call.
5 A  Called me, it was probably around two-thirty,
6 three o'clock in the morning.  Not too long, an hour
7 probably after the agents were there.
8 Q  Okay.  And how do you know it was Leon calling?
9 A  It had his name and number programmed into my
10 phone.
11 Q  Now the police are standing right there?
12 A  Correct.
13 Q  Could they see your phone?
14 A  Yes.
15 Q  How do you know they could see your phone?
16 A  They had it in their hand when it started
17 ringing.
18 Q  Okay.  And do you know whether or not -- Were you
19 in a position to observe them when this phone rang?
20 A  Yes.
21 Q  Did it make an audible noise when it rang?
22 A  Yes.
23 Q  Okay.  And did you have an opportunity to watch
24 what they did when it rang?
25 A  They hold it and told me, "It's Leon calling,

Page 83

1 what does he want?"  I said, "I don't know."
2 Q  Did they show it to you?  Did you see it on the
3 screen?
4 A  Yes.
5 Q  And what did you see?
6 A  "Leon."
7 Q  On the screen?
8 A  Correct.
9 Q  Okay.  And What did they say to you?
10 A  They said, "It's Leon calling.  What does he
11 want?"
12 Q  And what did you say?
13 A  I said, "I have no idea."
14 Q  Okay.  And what happened then?
15 A  They told me to answer the phone.  And I said,
16 "Well what do you want me to tell him, that y'all are
17 here?"  And they just, you know, looked at me and they
18 said, "Call him back and see what he wants."
19 Q  Okay.  At this point in time had you made a
20 decision about what you were going to do at this
21 point?  They're asking you questions, you don't know
22 what's going on.  What's your state of mind?  Tell the
23 ladies and gentlemen of the jury what your state of
24 mind is right now.
25 A  They told me about the evidence they had with

Page 84

1 Gary and Charlotte, and they knew about Leon and
2 everything that was going on.  It was all going
3 through my mind at that time, you know, why should I
4 go to jail for them?  Because he done prove to me at
5 one time that he wasn't going to do nothing for me.
6 When my friend lost his life behind it he went buy the
7 house and lied to me about that, let me sit in jail
8 and wouldn't get me out --
9       MS. JAMES:  May we approach, Your Honor?
10      THE COURT:  I'll have the jury step out for
11 just a moment.  I have to have it on the record.
12 Would you mind stepping out for just a moment?
13      (Whereupon, the jury was escorted out of the
14 courtroom, and the following colloquy ensued):
15      THE COURT:  Yes.
16           MOTION FOR MISTRIAL
17           IN OPEN COURT
18      (THE JURY IS NOT PRESENT):
19      MS. JAMES:  Thank you, Your Honor.
20      We would move for a mistrial on behalf of
21 Mr. Carmichael pursuant to 401, 403, 404(b).  We were
22 not given any notice of this.  The witness just
23 testified that because of "my friend losing his life
24 behind it."  We had all that murder stuff about Ike
25 and his buddy Ike who was killed in the yard.

Page 85

1      I objected to it before and now he's just
2 gratuitously suggested that Ike was killed behind
3 something that Mr. Carmichael had to do with.  There
4 is absolutely no evidence of that, and we have not
5 been given any notice of that whatsoever, and it is
6 clearly something that a limiting and curative
7 instruction cannot fix in this case.
8      THE COURT:  I'll hear from the government.
9      MR. FEAGA:  Your Honor, I think in cross
10 examine she can ask the witness as to what he meant by
11 "killed behind it" --
12      THE COURT:  Why don't you ask him.
13 Q  What did you mean by "killed behind it"?
14 A  He was killed behind selling drugs.  That's the
15 reason he was killed.
16      MR. FEAGA:  Okay.
17      THE COURT:  Are you saying Mr. Carmichael
18 did that?
19      THE WITNESS:  No, I am not.  I was just
20 saying he was killed because of dealing drugs, and
21 that's why he was killed.
22      MS. JAMES:  Judge, just to direct you back
23 to the testimony, he was talking about why should I do
24 anything for him, he's done this and he's done that,
25 and my friend Ike was killed up behind this, which

Multi-Page™

Page 86

1 certainly left the logical believe that Mr. Carmichael
2 had something to do with it.
3     MR. FEAGA: Your Honor, if they'd like, I
4 can clear it up in the next question.
5     THE COURT: I think it can be cleared. The
6 motion for mistrial is denied. I don't think it's
7 overly prejudicial.
8     Bring the jury back in.
9     (Whereupon, the jury was escorted into the
10 courtroom.)
11     DIRECT EXAMINATION
12     BY MR. FEAGA OF PATRICK DENTON
13     (CONTINUING)
14 Q Mr. Denton, I had asked you a question to
15 describe your state of mind at this point in time.
16 This call has come in, it's Leon. You tried to answer
17 it, he was gone. You were describing your state of
18 mind; would you continue to describe your state of
19 mind, please? What's going on in the mind of Patrick
20 Denton at this point in time in your life?
21 A At this time I was thinking about the things that
22 went on. Leon not helping me get out of jail,
23 thinking about the money I had made. You know, why
24 should I have to sit there. And, you know, I told him
25 I was going to have to end up going to jail behind

Page 87

1 this stuff in Huntsville. I needed to put up some
2 money for my family. He never gave me an opportunity
3 to make some real money for the type of the amount of
4 dope I was selling for him.
5     And the situation where I asked him to buy
6 the house of Ike and Erica's, he didn't. He avoided
7 me on that. He had the money to buy the house and he
8 wouldn't. So I felt like if I went down for him, if
9 he's going to turn his back on me once he realized his
10 name, you know, once he was in the clear he wasn't
11 going to do anything for me because he already proved
12 it to me.
13 Q Now you made a statement earlier that Ike was
14 "killed behind it." Would you tell the ladies and
15 gentlemen of the jury what you meant by "killed behind
16 it"? What did you mean by that?
17 A He was killed behind doing drugs, selling drugs.
18 Q Are you saying that as a result of being involved
19 in the drug business you think that led to his death?
20 A Correct.
21     THE COURT: You're not saying that any of
22 the defendants had anything to do about his death?
23     THE WITNESS: No, sir.
24 Q Now -- So what, if anything, happened next?
25 A The D. E. A. told me to call him back, see what

Page 88

1 he wanted. I called him back. He told me he was on
2 the way to my house.
3 Q Had you made a decision at this point in time,
4 then, about how you were going to conduct your future?
5 A Correct.
6 Q And what was that decision?
7 A I was going to work with them because he wasn't
8 worth me going to prison for anymore. I felt like I
9 already had to go for the stuff in Huntsville, I
10 didn't want to do no more time for him.
11 Q Let me ask you about that. Do you have an
12 agreement right now with the Government about what's
13 going to happen to you in Huntsville?
14 A No.
15 Q What, are you hoping that anything is going to
16 happen?
17 A Yes I'm hoping, but if not, you know, that's all
18 I have to worry about. I don't have to worry any time
19 about this, so I can't complain.
20 Q So what did you do? You made this decision that
21 you're going to begin to assist the United States in
22 its investigation of marijuana distributing. What did
23 you do having made that decision?
24 A I called Leon back, and he told me he was on the
25 way to my house.

Page 89

1     He asked me, "What are you doing?"
2     I said, "I'm sleeping."
3     And he said, "Well I'm on the way."
4 Q Now, was anyone else present when you made this
5 call back?
6 A It was about three agents standing around me.
7 They're all listening to the phone call.
8 Q If you can --
9     MR. FEAGA: Your Honor, can I approach the
10 witness?
11     THE COURT: Yes.
12 Q If you would, I'm going to come up with this cell
13 phone and I'm going to be you. And I'm assuming that
14 -- and I shouldn't assume. Let me ask you, if I say
15 I'm making a call, am I doing it like this when you
16 called Leon back? Show them how you did it.
17     By the way, what kind of phone did you have?
18 A It was one similar to this. It was a Sprint
19 phone.
20 Q Was it a flip phone?
21 A Yes.
22 Q And that's a flip phone you're holding, but
23 that's not the phone, right?
24 A No, that's not the phone.
25 Q Show the ladies and gentlemen of the jury how you

**Multi-Page™**

Page 90

1 made this call to Leon.
2 A  Just like this.
3 Q  All right.  And where was the nearest agent to
4 you when you made that call?
5 A  Right here.
6 Q  I'm going to get in here and you tell me if I'm
7 getting too close, okay?
8 A  They were literally that close.
9 Q  All right.  And why were they there?  Do you know
10 why they were sitting that close?
11 A  To hear the conversation.
12 Q  And there were three of them hanging in that
13 close?
14 A  There was one right here, one behind me and one
15 standing next to the one behind me, too.
16 Q  And they wanted to hear this conversation if they
17 could, is that right?
18 A  Correct.
19 Q  Okay.  You just described what Leon said to you.
20 He said he was coming over?
21 A  Yes.
22 Q  Did he tell you how soon?
23 A  He said he was on his way.  He was on the Bypass,
24 he was real close.
25 Q  Okay.  And what, if anything, happened next?

Page 91

1 A  They assumed I knew what he wanted.  They said,
2 "What do you think he wants?"
3       I said, "I have no idea."
4       And they said, "Well talk to him and see
5 what he wants."
6       They scrambled and left.  Went down the dirt
7 road, and probably five to ten minutes at the most
8 Leon pulls up.
9 Q  Now would you describe the state of activity in
10 your house?  How many agents do you remember being
11 there when these two calls took place?
12 A  A whole lot.  I'd say fifteen agents, probably,
13 at least.
14 Q  So you've gotten this call.  Describe the
15 activity at your house that was going on when they
16 told you meet with him and talk with him, I think you
17 said, and they split.  Is that happening fast?
18 A  Very fast.  After they heard him say he was on
19 his way, he told the rest of them, "He's on his way,
20 let's get out of here."  They jumped in the cars, took
21 off and went down the dirt road.
22 Q  Were they moving out?
23 A  They were moving fairly quick.
24 Q  Okay.  What happened next?
25 A  Like I said, five to ten minutes at the most Leon

Page 92

1 pulls up.  I come outside and he said --
2 Q  Do you remember what he was driving?
3 A  He was driving a Honda Accord, I think is his
4 wife's car.  A black Honda Accord.
5 Q  And what happened when he got there?
6 A  He pulled up and got out of the car.  I walked
7 out and met him in the driveway.  He said, "What's
8 going on, man?"
9       I said, "Nothing."
10       And he said, "Well they came in.  I found
11 Freddie.  I had to beg Freddie to get it, but Freddie
12 got it."  Then he said, "Anyway, when you go over
13 there tomorrow, help Freddie cut it up, because he
14 can't do it by his self.  And that way y'all can do it
15 over there and everything will be all right."
16       And I said, "Yes."
17 Q  Okay.  And what, if anything, happened after
18 that?
19 A  He said something about, "What's wrong?  You look
20 worried or something."
21       And I said, "Well, I'm worried about, you
22 know, the stuff and Gary" and this, this and that.
23       And he said, "Oh, man, don't worry about it.
24 You worry too damn much."
25 Q  What happened next?

Page 93

1 A  He left.
2 Q  What happened after he left?
3 A  The agents came back up, wanted to know what the
4 conversation was about and I told them what he said
5 where the dope was at.
6 Q  Okay.  And what did you tell them about where the
7 dope was at?
8 A  I told them it was at Freddie's house and he
9 wanted me to help him cut it up the next morning.
10 Q  Okay.  When you told them "Freddie's house," were
11 you talking about the right side of this duplex
12 depicted in government's exhibit 7(d)?
13 A  Yes.
14 Q  And what, if anything, happened then?
15 A  They told me they needed me to ask him what time
16 he wanted me to get over there, and I said, "Around
17 eight o'clock."  And he said --
18 Q  You said "he said," and I'll just ask you who is
19 "he"?
20 A  Leon said he wanted me to try to get there as
21 early as I could so we could get started on it.  They
22 asked me what time I needed to get over there, and I
23 told them, "Around eight o'clock."  And they told me
24 they needed me to wear a wire and camera if I go.
25 Q  Did you agree to do that?

Multi-Page™

**Page 94**

1 A Yes.

2 Q And did you do that?

3 A Yes.

4 Q How did that come about, you wearing the wire? I

5 mean -- Well all right. Let me go back. They're

6 there, you're telling them what's happening, you said

7 they have told you need to wear a wire. What happened

8 next?

9 A After they explained it to me and told me about

10 the wire and everything I need to do and stuff, it was

11 probably an hour after that, I think, if that long. I

12 think they left about four-thirty that morning and

13 told me to call -- they would call me first thing in

14 the morning, Monday morning or the same day. They

15 would call me first thing in the morning to get me

16 wired up before I went over there.

17 Q Did they?

18 A Yes.

19 Q And how did they wire you up? Where did that

20 happen?

21 A At Bruno's parking lot on Perry Hill Road, they

22 met me behind there.

23 Q Okay. And somebody put equipment on you or gave

24 you -- Tell the ladies and gentlemen of the jury what

25 happened.

**Page 95**

1 A It was two or three of them involved in actually

2 setting me up. I think one guy put the camera,

3 explained to me about the camera phone, how, you know,

4 how it worked and had the lens on the end of it and I

5 needed to keep it with me. That was the camera.

6     They put a pager type device to wear on my

7 belt. I think that was the audio transmitter.

8 Q Okay?

9 A And they wired up my trunk with the transmitters,

10 which I guess relay the messages to them.

11 Q And what kind of car were you driving?

12 A A Honda Accord.

13 Q What color was it?

14 A Maroon.

15 Q Okay. And what happened after they got you set

16 up to record?

17 A They got me set up, and I left and I called

18 Freddie or went on to Freddie's house, I'm not sure if

19 I called him before I went but I think I went on over

20 there. I got to Freddie's house and went in, and

21 walked on to the front porch because Freddie's truck

22 was parked close to the side of the house so I had to

23 park kind of back. So I walked to the front porch and

24 his girlfriend was there, Faye. I think that was her

25 name. That's what I heard Freddie call her. And she

**Page 96**

1 said, "Hi, darling, how you doing?"

2     I said, "Fine."

3     And Freddie said, "What's up, man?" Me and

4 Freddie walked on inside and sat down at his kitchen

5 table and carried on a conversation.

6 Q And what happened then?

7 A Freddie was talking about how, "Last night that

8 bastard found me at Fairview getting some chicken at

9 Kentucky Fried Chicken, on Fairview and he called

10 pulled up, caught me at it." Because he had a new

11 cell phone. Freddie got his cell phone number changed

12 about two weeks ago, two or three weeks ago because he

13 got mad at Leon so they got mad at each other. So

14 Freddie said, "Yeah he found me on Fairview last night

15 and asked me to get it. You know, I told you he had

16 to come back to me. He'd always need me because he

17 trusts me."

18 Q And what happened next?

19 A And Freddie had a room in his house, back room,

20 and Freddie said, "He came here last night and counted

21 every one of them." He said, "Leon came in here and

22 counted every block, bag and everything."

23     I said, "He counted individual blocks out of

24 the bag?"

25     He said, "The son-of-a-bitch counted

**Page 97**

1 everything because Leon was afraid that somebody,

2 Freddie or his girlfriend, was stealing from him."

3     MS. JAMES: Objection, Your Honor, to what

4 Mr. Carmichael may have thought.

5     THE COURT: Sustained.

6 Q Now was this statement that you made about Mr.

7 Carmichael thinking the girlfriend, was that something

8 that you just thought or was that something that Mr.

9 Williams here told you?

10 A Mr. Williams and Mr. Carmichael both had told me.

11 Q What did they tell you?

12 A When I would send it back it was always

13 twenty-five pounds in a duffel bag or fifty pounds in

14 a duffel bag. It was always even numbers. Depending

15 on the size of the bag, it was between twenty-five and

16 fifty pounds in there. And we always took a piece of

17 masking tape and wrote the number on there,

18 twenty-five or fifty.

19     Obviously somebody had gotten one of the

20 bags from Freddie and they were short five pounds.

21 And I knew -- Leon asked me about it, and I knew when

22 it left my possession when Freddie got it was right.

23 I know it was twenty-five pounds, because with five

24 pounds, you don't make a mistake like that. And he

25 said, "That bitch is stealing with me and living with

Multi-Page™

Page 98

1 Freddie. She's stealing from me. I know she did it
2 because he wouldn't steal nothing. I know he
3 wouldn't, she's doing it."
4 Q  Who said that to you?
5 A  Leon.
6 Q  Okay.
7 A  Me and Freddie had talked about it and said, "She
8 didn't steal it, she doesn't really know a lot about
9 what's going on here. I try to keep it from her
10 knowing about it as much as I can. She didn't go in
11 there and steal nothing, he just done come in, grab
12 some or got some money from somebody else and screwed
13 up and don't know he did it, trying to blame somebody
14 else."
15 Q  What happened next?
16 A  We went into the room and there was some duffel
17 bags on the floor, on the bed, and some was in the
18 secret room behind the dresser.
19 Q  Okay. Let's talk about this secret room behind
20 the dresser. What are you talking about?
21 A  There's a room built into the bedroom with a
22 paneling wall all the around it. It has a false door
23 on it. You move the dresser out, take the molding
24 down and pull the door, it's part of the wall, and it
25 comes out. And it's a nice side of the room there.

Page 99

1 Q  Okay. About how big is that room that you're
2 talking about behind that false wall?
3 A  The room is probably -- the room is probably
4 eight by ten, or probably maybe eight feet long, three
5 or four feet deep, maybe three feet deep.
6 Q  So three feet deep and about eight feet wide, is
7 that your best recollection of it?
8 A  Yes.
9 Q  All right. Is this a big room?
10 A  This is big enough for a man to get in there and
11 stand and move around.
12 Q  Are you talking about the false room?
13 A  Yes.
14 Q  What about the rest of the room?
15 A  It's not that big. It's just average size
16 bedroom. A small house type bedroom.
17 Q  Can you tell from looking at this picture of the
18 -- You said that Mr. Williams lived on the right side
19 of this duplex as it's depicted in the picture.
20 A  Yes.
21 Q  This side over here?
22 A  Yes.
23 Q  Do you know which -- can you tell from looking at
24 the front of the house where the room is?
25 A  It's the room right behind that window behind the

Page 100

1 chair.
2 Q  Okay. This room?
3 A  Yes.
4        MR. FEAGA:  Your Honor, may I show the jury
5 where I'm pointing?
6        THE COURT:  Yes.
7 Q  This one right here?
8 A  Yes.
9 Q  Okay. Now I want to show you, and I was
10 referring to government's exhibit 7(d) when I made the
11 point and I pointed to the window on the far right
12 side of the house as you visualize it in the picture.
13 But let me show you what's been admitted into evidence
14 as government's exhibit 7(f). Would you take a look
15 at government's exhibit 7(f).
16 A  Yes.
17 Q  Okay. And from examining government's exhibit
18 7(f), do you recognize what that depicts?
19 A  Yes. To the left is a door that pulls away from
20 the wall and that's the room where --
21 Q  I want you, if you would, to stand up and show
22 the ladies and gentlemen of the jury what you're
23 seeing when you're looking at this picture that's
24 contained in government's exhibit 7(f).
25 A  The door when you walk into the room, this is the

Page 101

1 wall. This right here is pulled from here. That's
2 the back side of the door.
3 Q  Has it got hinges on it right here?
4 A  Yes, a spring.
5 Q  And it goes back like that?
6 A  Yes.
7 Q  Now when you close that door it comes back,
8 swings around from left to right back over this?
9 A  Yes.
10 Q  And you said there was some molding that comes
11 down. What are you talking about?
12 A  There's molding throughout the room. Strips of
13 molding that comes down. There's one right there so
14 you can't tell if there is anything different.
15 Q  Do you know what is back in here?
16 A  That's duffel bags full of dope and garbage bags
17 and stuff we use to cut it up.
18 Q  Now you're in the house. You're talking to
19 Freddie. What happened next?
20 A  Freddie -- We realized we didn't have enough
21 bags. Freddie had a few bags in his house, Ziploc
22 bags, so I had to go get some bags. I told him I
23 figured you know Leon knew he was coming into the
24 house maybe he'd go get some, but he was too cheap to
25 buy them. He would never buy them. He would always

Multi-Page™

Page 102

1 make whoever was cutting them up buy them. So I told
2 Freddie I had to go get some bags.
3 Q  Okay.  You said he had a few.  What's a few?
4 A  Probably a couple of boxes.  There's twenty-five
5 in a box.  He probably had two or three maybe, at the
6 most, and we needed five hundred and something.
7 Q  You needed five hundred?
8 A  Yes.
9 Q  Okay.  Why did you need five hundred bags that
10 day?
11 A  There's supposed to be five hundred and some-odd
12 pounds of dope there.
13 Q  Okay.  So at that point in time had you seen any
14 dope there?
15 A  No.  At that point I had seen the duffel bags,
16 but I hadn't opened them and actually seen the dope
17 inside of them.  But that's the way I had always seen
18 them, so I felt sure they were in there.
19 Q  Where were the duffel bags?
20 A  They were on the bed, on the floor, in the secret
21 room, they were everywhere.
22 Q  Okay.  Now -- So the duffel bags are where?
23 A  On the bed, on the floor, in the room.  They're
24 everywhere.
25 Q  In this room where the secret room is?

Page 103

1 A  Yes.
2 Q  Okay.  So you had seen the duffel bags but you
3 hadn't actually seen what was in them yet.
4 A  Correct.
5 Q  Okay.  You said you needed baggies.  What did you
6 do?
7 A  I -- The agents could hear me talking.  I assume
8 they could hear me talking, and I told them I had to
9 leave and go get some bags.  I think I called them on
10 the phone once I got out of the house and told them I
11 had to get some bags.  They asked me, "Had you seen
12 the dope?"
13      And I said, "I seen the bags."
14      And they said, "Did you actually see the
15 dope?"
16      And I said, "I hadn't actually seen the
17 dope, I saw the duffel bags that it comes in."  And I
18 told them I had to take some bags back or Freddie
19 would get suspicious.
20 Q  So what happened?
21 A  I went to meet Agent DeJohn and another agent I
22 think at Calhoun Foods at Fairview and I had twenty
23 dollars on me.  They asked me how much they cost, and
24 I told them they're three dollars a box.  I didn't
25 have enough money to get them.  And went into Calhoun

Page 104

1 Foods with the twenty dollars I had and bought some,
2 and they were scraping up some more money.
3 Q  "They" being who?
4 A  Agents.
5 Q  What agents are you talking about?
6 A  DeJohn and he called someone, I think someone
7 else had some cash them and brought some money over.
8 I'm not sure who.
9 Q  Is Agent DeJohn this person you're talking about,
10 is he present in the room today?
11 A  Yes, he's the middle person at the table right
12 there.
13 Q  Okay.  Would that be the individual standing up?
14 A  Yes.
15 Q  At the government's table?
16 A  Yes.
17 Q  So you said they were scrounging around trying to
18 get some money up for you to get these bags?
19 A  Yes.
20 Q  Okay.  Did you get the money?
21 A  Yes.  I went into Calhoun's and bought --
22 Calhoun's didn't have enough of them, so I told them I
23 had to go to South Lawn Winn-Dixie and get some.  That
24 was the closest place.  And there was a Dollar General
25 in the same shopping center.  I said, "Between both of

Page 105

1 them they would probably have enough."
2 Q  Did they?
3 A  Yes.
4 Q  Okay.  So what did you do after you went to these
5 two stores?
6 A  I got the bags, went back to Freddie's house, and
7 Freddie started -- We were looking for scales.
8 Freddie had a set of scales there.  I usually brought
9 my scales when I went to Freddie's house because
10 Freddie had some old scales that were wore out and
11 weren't any good.  And I realized I didn't have the
12 scales.  So I told Freddie I'd have to go get the
13 scales, too.  And Freddie is like, "Okay."
14      So I left.  Called in, told him I forgot the
15 scales.  I said, "I just forgot the damn things."
16      And they said, "You got some."
17      And I said, "I threw mine away.  I don't
18 have any."
19      And they said, "Well, we'll have to find you
20 some.  What kind do you need?"
21      And I said, "Like a postal scale from Office
22 Depot or something like that."
23 Q  And so what happened?
24 A  They told me to meet them behind the old Sears
25 building on Fairview.  There's a Rite-Aid drug store

Multi-Page™

1 right there. I met them back there and they had me a
2 set of scales.
3 Q Okay. What did they look like?
4 A They were black, square scales. Just solid black
5 square size.
6 Q And what, if anything, happened then?
7 A They told me to go back to the house. So I went
8 back to the house, I had the scales.
9 Q Did you still have this camera with you?
10 A Correct.
11 Q Did you still have the audio, the thing that
12 could pick up what people were saying with you?
13 A Yes.
14 Q Okay. And so you went back to the house. What
15 happened next?
16 A Got back to the house and Freddie, we went into
17 the room, Freddie pulled the dresser out, opened up
18 the secret door. And Freddie had mentioned to me,
19 "You have a new phone, don't you?" That's a different
20 phone because the camera phone is actually a blue
21 phone. It wasn't a flip top. He had always seen me
22 with a flip top.
23      So Freddie started kind of looking at the
24 phone, so I'm thinking, you know, he thinks something
25 so I'm getting nervous. So I stuck the phone in my

1 pocket trying to cover it up from him. Then he turns
2 around and I lay it on the dresser drawer in the room
3 and he moves the dresser out, opens the door, gets
4 some newspapers, plastic bags and a cutting board with
5 some knives and razor blades and lays on the bed,
6 because he was going to cut it up on the bed. And he
7 would hand it to me and I would bag it and get the
8 weight right.
9 Q Let me show you a couple of photographs that have
10 been admitted into evidence. Government's exhibit
11 7(g) and 7(e). Can you see them from there?
12 A Yes.
13 Q Okay. The one I have in my right hand, would you
14 describe what that depicts? Do you recognize that?
15 A Yes. That's the room -- that's the window you
16 see from the front covered up. And that's the bed
17 right there in the middle of the room with the dope
18 stacked on top of it.
19 Q Is that pretty much what it looked like while you
20 were in there?
21 A Yes.
22 Q And what about this picture I'm holding,
23 government's exhibit 7(e)?
24 A That's the cutting board Freddie always used to
25 cut it up on his bed. I don't think he slept in

1 there, that's just a spare room. And that's newspaper
2 and stuff so all the crumbs and shake, you could just
3 pick it up and throw it away. You don't have to worry
4 about it.
5 Q Have you seen Freddie use this board before?
6 A Yes.
7 Q Okay. Now how did that happen?
8 A I went to Freddie's house once or twice before to
9 help him cut it up because he was always so slow about
10 doing it.
11 Q So were there occasions when you cut it up at
12 Freddie's house instead of yours besides this one?
13 A Yes.
14 Q But that wasn't the norm?
15 A No.
16 Q So what happened next? You said Freddie was
17 getting the board out. What happened next?
18 A Freddie was getting the board out, setting the
19 paper up on the thing, on the bed, spreading it out
20 and he gets a call I think from his son. His son's
21 Mama was dying in the hospital and he gets a call
22 saying that he had to talk to his son or something. I
23 heard him say, "Your mother is dying, you need to get
24 to the hospital," or something to that effect.
25 Q And what are you doing?

1 A I'm standing there getting ready to cut some open
2 sitting there waiting on him to get off the phone,
3 standing there with some in my hand getting ready to
4 cut it open.
5 Q Now you said you're getting ready to cut it open.
6 Let me show you again government's exhibit 7(e). I
7 see there are some objects on this board. Would you
8 describe for the ladies and gentlemen of the grand
9 jury, can you see it from where you are?
10 A Yes.
11      MR. FEAGA: Excuse me, ladies and gentlemen
12 of the jury. I apologize to Your Honor and to the
13 jury?
14 Q Can you see what this picture -- You said this
15 was the cutting board earlier, right?
16 A Yes.
17 Q That I'm pointing to, this is the white object in
18 there?
19 A Correct.
20 Q And then there is something with tape around it
21 on top of it, brown tape?
22 A Yes.
23 Q What is that?
24 A It's a block of dope.
25 Q Okay. Now what is this, then, over here, the

1 green three blocks of green that are over there?
2 A That's dope that the tape has been cut off, and
3 that's how it looks when it's not in that tape right
4 there.
5 Q Okay. Now how do you get the tape off and get it
6 where it looks like the stuff over here that you said
7 was the dope with the tape off?
8 A You use a razor blade. The box cutter type
9 object right there behind the plastic wrapped dope to
10 cut plastic off. You take the knife and split the
11 block into -- they usually come apart pretty easily --
12 threes like that.
13 Q Is that what had happened to this?
14 A Yes.
15 Q Who did that to this?
16 A I did.
17 Q And did you do it like you just described to the
18 grand -- to the jury?
19 A Yes.
20 Q Okay. And you did it that day?
21 A Yes.
22 Q You were doing it while he was on the phone, Mr.
23 Williams?
24 A I think at that time he told me he had to leave.
25 He had to get to the hospital and go pick up one of

1 his kids, take him to the hospital. And I was cutting
2 up when he was on the phone and when he was walking
3 out the door.
4 Q Okay. And what, if anything, did you do when he
5 told you this?
6 A He said he had to leave. I said, "You got to
7 leave?"
8 He said, "Yeah, ain't nobody supposed to be
9 in here but Faye. I don't let nobody else in the
10 house. I'll be back as soon as I can."
11 Q Okay. And what did you do?
12 A I was like, "Y'all come on in here." Telling the
13 agents to "come on inside, he's getting ready to
14 leave." I wave my hand at the camera for them to come
15 on in.
16 Q And how can you be talking to them if you're in
17 the house?
18 A The device they put on me, they could hear me
19 talking.
20 Q How is it could you do that if Mr. Williams was
21 there?
22 A He walked out of the house to go to the hospital
23 at that time and I was telling them to "Come on."
24 When he was still in the house I was going like this
25 when he turned his back to me --

1 Q Why were you going like this when he turned his
2 back to you?
3 A Telling them to come on in because he was getting
4 ready to leave.
5 Q Well how are you thinking they're going to see
6 you? You're in this room, aren't you?
7 A I'm assuming the camera was working, I hope.
8 They could see me telling them to come on.
9 Q All right. And what happened next?
10 A Freddie left and I told them to "Come on in.
11 Where you all at?" And shortly after that I answered,
12 five or ten minutes they stormed in the house and
13 Freddie had already left.
14 Q All right. What happened then?
15 A They asked me what was Freddie driving. I told
16 them a beige Chevrolet truck with green door, a white
17 door on it. Then they was trying to find him and they
18 took me out of the house.
19         MR. FEAGA: Your Honor, may I approach the
20 witness?
21         THE COURT: Yes.
22 Q Now you said that law enforcement came in.
23 A Correct.
24 Q Okay. And what happened then?
25 A They came in and took me -- handcuffed me and

1 took me out of the house.
2 Q And where did they take you?
3 A They took me -- They drove my car somewhere, took
4 the equipment and stuff out of it and I think they let
5 me go, then.
6 Q Did they take the stuff off of you?
7 A Yes.
8 Q All right. Now, Mr. Denton, I want to show you
9 what's been previously marked for identification
10 purposes government's exhibit 3(a), which is a plastic
11 -- clear plastic envelope containing what appears to
12 be some sort of recording tape. I want to ask you to
13 take a look at the object contained in the clear
14 envelope marked 3(a) and ask you if you would take a
15 look at it.
16         (Whereupon, the witness complied.)
17 A Videotape.
18 Q Have you seen that before?
19 A Yes.
20 Q How do you know you've seen it before?
21 A I had to sign it where I had looked at it.
22 Q Okay. Did you actually have an opportunity to
23 view the information that's contained on that
24 videotape?
25 A Yes.

Multi-Page™

Page 114

1 Q Okay. And does that information, to the extent
2 that it was able to record, does it record the events
3 that were happening to you that you've described to
4 this jury that happened on Monday the 17th of November
5 2003?
6 A Yes, it does.
7 Q Now that particular tape does not have much on
8 it, does it?
9 A No, it's very vague.
10 Q Okay. And do you have any idea why this tape
11 would not have much on it?
12 A That's the first tape when I went into the house
13 and he noticed the phone, and I think I was nervous
14 because of the situation that was going on. I stuck
15 it in my pocket and I didn't even think about it not
16 picking up anything recording.
17 Q Okay.
18      MR. FEAGA: Can we play just a little bit of
19 this tape, Your Honor? At this time I'd like to offer
20 it into evidence and then I'd like to play part of it.
21      THE COURT: Very good.
22      MS. WAYNE: Judge, we don't object to the
23 admission of it.
24      MS. JAMES: Your Honor, we don't object to
25 the admission, but we would request that the entire

Page 115

1 tape be played.
2      MR. FEAGA: They can play the entire tape if
3 they want to.
4      THE COURT: How long is the entire tape?
5      MR. FEAGA: Your Honor, there is nothing on
6 it. They can play it if they want to. I'm going to
7 admit it into evidence. The jury can look at it later
8 if they want to, but I'm going to play just a little
9 piece of it so they can see there is nothing on it.
10      THE COURT: How long is the entire tape?
11      MR. FEAGA: The entire tape? It's probably
12 fifteen to twenty-five minutes of nothing.
13      THE COURT: And how much do you wish to
14 play?
15      MR. FEAGA: I just want to play enough of it
16 so I can ask the witness does most of it look like
17 this when he says --
18      THE COURT: Look like what?
19      MR. FEAGA: Like what it's going to appear
20 on it. In other words, we didn't get anything on the
21 tape, but I wanted to put it into evidence in case
22 somebody wants to look at it.
23      THE COURT: Now, you wish to play the whole
24 tape?
25      MS. JAMES: Of any conversations, yes,

Page 116

1 Judge. If there is no conversations, then there is no
2 need to play the whole tape. But --
3      · THE COURT: Does the tape have
4 conversations?
5      MR. FEAGA: Your Honor, it is my
6 understanding that the video device that he took in
7 there with him also does have audio on it, but I just
8 -- it's our position that there is nothing of
9 evidentiary value on it. But I'm putting it in
10 because of this very thing in case they want to play
11 it or the jury might want to see it or listen to --
12      THE COURT: I'll allow you to play a few
13 parts or all of it later.
14      MS. JAMES: Yes, sir.
15      MR. FEAGA: I just don't want to waste the
16 Court's time.
17      THE COURT: Very good. Go ahead.
18      MR. FEAGA: Thank you.
19      (Whereupon, said videotape was played before
20 the Court and jury.)
21      MR. FEAGA: Your Honor, for the record, I
22 should advise the Court that the -- Well, that's all
23 right.
24 Q Can you see the screen in front of you?
25 A Yes.

Page 117

1 Q What is depicted on that screen?
2 A The inside of my car where the camera was
3 actually sitting on the seat. And all it shows for a
4 long period of time was me driving and the inside of
5 the dashboard.
6 Q You've seen this whole tape?
7 A Correct.
8 Q And virtually the entire tape is you driving
9 around and/or nothingness?
10 A Right.
11 Q We'll play it a little bit longer.
12      (Whereupon, said videotape continued to be
13 played before the Court and jury.)
14 Q Let's put it on fast forward.
15      What are we seeing now?
16 A The seat in the dash and the car.
17 Q Okay. Go ahead.
18      (Whereupon, said videotape continued to be
19 played before the Court and jury.)
20      MR. FEAGA: If you would, Detective DeJohn,
21 go ahead and take that tape out of the recorder.
22 Q Now I'm going to show you what's been marked as
23 government's exhibit 3(b) for identification purposes.
24      MR. FEAGA: Is 3(a) admitted, Your Honor?
25      THE COURT: Yes, it's admitted.

Multi-Page™

Page 118

1 Q  And ask you if you would examine the contents of
2 that clear plastic envelope.
3 A  It's a tape, too.
4 Q  How do you recognize that tape?
5 A  I had to sign it after I watched it.
6 Q  Okay.  And you've watched that tape?
7 A  Yes, sir.
8 Q  Okay.  Now does this tape have on it some visual
9 recording of what was going on inside that house that
10 day?
11 A  It might have a little.  I think tape three had
12 the most that you could actually see.
13        MR. FEAGA:  Your Honor, permission to play
14 this for the jury?  And I'd offer it into evidence as
15 government's exhibit 3(b).
16        MS. JAMES:  We'd make the same request.
17        THE COURT:  You may play the entire tape
18 when your turn comes up.
19        (Whereupon, said audiotape was played before
20 the Court and jury.)
21 Q  What's going on in this second tape right now?
22 A  I think at this time, I think I'm leaving getting
23 the scales or the bags, one or the other.  I think
24 it's the scales.
25 Q  Now this is the second tape?

Page 119

1 A  It's the scale or the bags, one.  I left and got
2 them.
3 Q  Let's watch some more of this tape now.
4        (Whereupon, said videotape continued to be
5 played before the Court and jury.)
6 Q  Is the first tape the tape you went in the first
7 time?
8 A  Yes.
9 Q  All right.  Now You came back out to get baggies
10 you said, is that right?
11 A  Yes.
12 Q  Okay.  You were not responsible for switching
13 these tapes, were you?
14 A  No.
15 Q  You're not really the person that would know when
16 one was replaced and when it wasn't?
17 A  No.
18 Q  Okay.  But you did go in and come back out to buy
19 baggies, is that right?
20 A  Yes.
21        MR. FEAGA:  Let's fast forward it.  And if
22 something gets stuck on that seat, would you please
23 stop the tape.
24        (Whereupon, said videotape continued to be
25 played before the Court and jury.)

Page 120

1 Q  Just so we'll know while this is going on, what's
2 happening here, Mr. Denton?
3 A  Driving back to Freddie's house.
4 Q  You're driving anyway?
5 A  Yes.
6 Q  Do you know for sure whether you're going back to
7 or where now?
8 A  Yes, I'm going back to Freddie's.
9 Q  Okay.  From where?
10 A  I think this is when I was on my way back with
11 the scales because there's not any bags on the front
12 seat.
13 Q  All right.  Now some bags hit that front seat,
14 could this, then, be the trip where you were going to
15 get the baggies?
16 A  Yes, it could.
17 Q  So we'll just have to wait and see, is that
18 right?
19 A  Yea.
20 Q  Okay.
21        (Whereupon, said videotape continued to be
22 played before the Court and jury.)
23 Q  Okay.  What's going on right here, do you know?
24 A  Getting out of the car approaching the door of
25 Freddie's house.

Page 121

1 Q  And what are you doing?
2 A  I'm closing the door.  I just got the scales
3 stuck under my shirt and was walking up to the door.
4 Q  Okay.  We'll fast forward here.
5        So your recollection is that this tape would
6 be after the scales?
7 A  Yes.
8 Q  Okay.
9        (Whereupon, said videotape continued to be
10 played before the Court and jury.)
11 Q  What's going on?
12 A  I think the phone was actually in my pocket at
13 this time.
14 Q  So you're not getting anything on it, though, are
15 you?
16 A  No.
17 Q  Okay.  We'll move forward to ten twenty-nine, I
18 think.
19        (Whereupon, said videotape continued to be
20 played before the Court and jury.)
21 A  At this time I went back to the car because
22 Freddie wasn't there.  He had left to take his
23 girlfriend somewhere.  I had to go back to the car and
24 sit down and wait for him to get there because I
25 couldn't get in until he got back.

Multi-Page™

Page 122

1 Q  All right.  Now when did he go somewhere to take
2 his girlfriend somewhere?
3 A  I went to get the scales.  He must have left
4 right after me to take her.
5 Q  When you got back from getting the scales back,
6 he wasn't there?
7 A  He wasn't there.
8 Q  And what happened?
9 A  I called him on the phone.  He said, "I'm ten
10 minutes away, I'll be there in a minute."  So I went
11 back to the car and sat down and waited for him.
12 Q  Okay.  We'll roll that forward.
13      (Whereupon, said videotape continued to be
14 played before the Court and jury.)
15 Q  Okay.  What's happening here?
16 A  Got in the house and got to the room where the
17 dope was kept at.
18 Q  Okay.  Are you alone at this time?
19 A  No, Freddie is in there with me.
20 Q  Okay.  Whose back is it that we see with the
21 shirt there?
22 A  That's mine.
23 Q  Okay.  Do you see those little lines on the walls
24 where the paneling is?
25 A  Yes.

Page 123

1 Q  Is that the stripping you're talking about that
2 hides the secret door?
3 A  Yes.
4 Q  Can you see the dresser that's in front of it
5 right now?
6 A  No, it's if you're standing where I'm at, it
7 would be on your right side.
8 Q  The camera is where right now?
9 A  It's on the dresser drawer thing that was sitting
10 at the end of the bed.
11 Q  Okay.  And what is that that you can see sort of
12 in front there now on the right side of the lamp?
13 A  It's a fan on the bed.
14 Q  Okay.  And that's a bed it's sitting on?
15 A  Yes.
16 Q  What about that blanket that's in the far
17 right-hand side, what's that?
18 A  That's over the window so nobody can see.
19 Q  Okay.  What are you doing right now?
20 A  Clearing off the bed.
21 Q  What's that bag you just picked up?
22 A  Some of the Ziploc bags.
23 Q  Okay.  So you had already gotten those?
24 A  Yes.
25 Q  All right.

Page 124

1      (Whereupon, said videotape continued to be
2 played before the Court and jury.)
3 Q  Do you see the gray shirt that's taken up the
4 better part of the view there?
5 A  Yes.
6 Q  Who is that?
7 A  That's my back.
8 Q  Okay.  Who is that standing on the far right
9 corner?
10 A  Freddie Williams.
11 Q  Okay.  And what is that blanket that's between
12 you and he?
13 A  The blanket's on the window to keep anyone from
14 looking in if they got close enough to the window to
15 see what was going on.
16 Q  Okay.  And if you look down, Mr. Williams -- You
17 said the individual in the white or yellow shirt or
18 whatever it is, that's Mr. Williams?
19 A  Yes.
20 Q  Is that this Mr. Williams right here sitting in
21 this chair?
22 A  Correct.
23 Q  The one that you identified that was involved
24 with you and Mr. Carmichael in moving this dope?
25 A  Yes.

Page 125

1 Q  Now what's that right in front of his knees, that
2 little object you see between your shirt and his
3 knees?  You see a little piece of something.
4 A  Black duffel bags.
5 Q  Okay.  Let me go up to the big screen.
6      You're saying the black duffel bags.
7 Actually, if you'll point to your screen, Mr. Denton,
8 I believe you can mark on it.
9 A  Right there.
10 Q  Okay.  That's the black duffel bags.  What is
11 this object that's down here?  I don't know if you can
12 see this screen, down here lower yet, the lower
13 corner, I'll point to you, what is this right here?
14 A  That's the bed, some duffel bags on the bed right
15 here and some stacked beside the bed.
16      MR. FEAGA:  Go ahead and play the tape,
17 please.
18      (Whereupon, said videotape continued to be
19 played before the Court and jury.)
20 Q  What is that now that is right dead in the middle
21 of the screen sitting on what you said was the bed?
22 A  The duffel bags and dope.
23 Q  Okay.
24      (Whereupon, said videotape continued to be
25 played before the Court and jury.)

Multi-Page™

Page 126

1 Q  We just heard a cough.  Was that you coughing?
2 A  That was Freddie coughing.
3 Q  Okay.
4     (Whereupon, said videotape continued to be
5 played before the Court and jury.)
6 Q  Now let me ask you again.  You said you had to go
7 out of that house twice.
8 A  Yes.
9 Q  Once to get baggies and once to get scales.
10 A  Yes.
11 Q  Now earlier on this tape you said you thought you
12 must have been going to get the scales, is that right?
13 A  Yes.
14 Q  But now later on the tape we're hearing you with
15 all of this rustling again, you're now talking to --
16 Did you hear that voice on there?
17 A  DeJohn.
18 Q  Was that you?
19 A  Yes.
20 Q  And what were you telling him?
21 A  I needed the scales.  I guess the first time I
22 came back in is when I had the bags.  When I came back
23 into the room and set the camera on the dresser
24 drawer, and this time I'm going to leave to get the
25 scales.

Page 127

1 Q  So you were incorrect when you said that earlier
2 business was you getting scales.
3 A  Yes, that was the bags.
4 Q  That was bags.  Okay.
5     MR. FEAGA:  Your Honor, this tape is
6 admitted into evidence if anybody wants to look at it,
7 is that right?
8     THE COURT:  Very good, it's admitted.
9 Q  Mr. Denton, I'd like to show you what's been
10 marked as government's exhibit 3(c) for identification
11 purposes and ask you if you would take a look at it.
12 A  Tape three.
13 Q  And how do you know it's tape three?
14 A  I signed it after I watched it.
15 Q  Now when you're doing all this that day, did you
16 know there were three different tapes involved?
17 A  No.
18 Q  Do you know how there happened to become three
19 different tapes involved?
20 A  Every time I left, they changed the tapes,
21 obviously because they were scared it was going to run
22 out of tape.  So they didn't want it to run out, so
23 every time they had a chance to change it, they
24 changed it.
25 Q  And it wasn't until later after these events that

Page 128

1 you had an opportunity to review these tapes, is that
2 right?
3 A  Correct.
4     MR. FEAGA:  Your Honor, I'd like to offer
5 what's been previously marked as government's exhibit
6 3(c) for identification as 3(c).
7     THE COURT:  Admitted.  Oh, You want to just
8 offer it as identification?
9     MR. FEAGA:  Oh, no, sir, I want to offer it
10 into evidence.  I apologize.
11     THE COURT:  Okay, it's admitted.
12     MR. FEAGA:  May I play it to the jury, Your
13 Honor?
14     THE COURT:  Yes.
15 Q  Before we start it, Mr. Denton, these tapes we've
16 skipped tape one.  You looked at the whole tape.
17 A  Yes.
18 Q  Did you see anything on it that you think would
19 help the jury see what was going on that day?
20 A  No, it's pretty messed up.  It's in my pocket, so
21 you can't see anything or really hear any good
22 conversation.
23 Q  Now the second time, we just watched a portion of
24 it where you could see something.
25 A  Yes.

Page 129

1 Q  You've watched that entire tape.
2 A  Yes.
3 Q  Is there anything else on it that you think would
4 be helpful to anybody?
5 A  Yes.
6     MS. JAMES:  Objection, Your Honor, the tapes
7 are in evidence and that would be the best evidence.
8     THE COURT:  It is the best evidence, but he
9 can describe what's on them.
10     Go ahead.
11 Q  Is there anything else on there that we should
12 play for the jury if we want to see what you were
13 doing in there that day?
14 A  No, it would probably bore them.
15 Q  Okay.  Let's start tape three.
16     (Whereupon, said videotape was played before
17 the Court and jury.)
18 Q  What's happening here?
19 A  That's getting the scales there.  That's when I
20 met them behind the old Sears building.
21     (Whereupon, said videotape continued to be
22 played before the Court and jury.)
23 Q  This is where you're getting the scales?
24 A  Yes.
25 Q  Who are those other people that you're seeing in

Multi-Page™

| Page 130 |
| --- |

1 there?
2 A  D. E. A. agents and other law enforcement people.
3 Q  Okay.
4       (Whereupon, said videotape continued to be
5 played before the Court and jury.)
6 Q  What did you say?
7 A  I told them, "Don't beat the hell out of me when
8 they raid the house."
9       (Whereupon, said videotape continued to be
10 played before the Court and jury.)
11 Q  What's going on now?
12 A  Driving back to Freddie's house.
13 Q  All right.  We'll go forward to eleven oh five.
14       (Whereupon, said videotape continued to be
15 played before the Court and jury.)
16 Q  What's happening now?  And you watch it and when
17 you figure it out you let us know.
18 A  That's to move the camera off the seat.  I must
19 have had it turned around and laid it up on the seat.
20 Q  So you're driving?
21 A  Yes.
22 Q  Okay.  We'll keep going forward to eleven oh
23 five.
24       (Whereupon, said videotape continued to be
25 played before the Court and jury.)

| Page 131 |
| --- |

1 Q  Where are you driving back to?
2 A  Back to Freddie's house.
3 Q  All right.
4       (Whereupon, said videotape continued to be
5 played before the Court and jury.)
6 Q  What's happening now?
7 A  I'm getting out of the car here.
8       (Whereupon, said videotape continued to be
9 played before the Court and jury.)
10 Q  What are we seeing?
11 A  This is inside the room where the dope is kept.
12 Q  So you're back in there?
13 A  Yes.
14 Q  Okay.
15       (Whereupon, said videotape continued to be
16 played before the Court and jury.)
17 Q  What's that?
18 A  Scales I got.
19 Q  Those are the D. E. A. scales?
20 A  Yes.
21 Q  Not that triple beam?
22 A  Correct.  Those are D. E. A.
23 Q  Sir, have you ever seen what's called a triple
24 beam scale?
25 A  Yes.

| Page 132 |
| --- |

1 Q  I'm going to show you what's been marked as
2 government's exhibit 10(b) and ask you if you know
3 what it is.
4 A  Triple beam scales.
5 Q  Okay.  Did you bring these back to the house?
6 A  No, they were left there at Freddie's.
7 Q  These are Freddie's?
8 A  Yes.
9 Q  How do you know they were Freddie's?
10 A  They were always there.
11 Q  Okay.  Do they work?
12 A  I never used them.  I never liked them.  It took
13 too long to get them perfect.  I used a postal scale
14 because they were fast.
15       MR. FEAGA:  Your Honor, I'd like to offer
16 what's been marked government's exhibit 10(b) for
17 identification purposes as government's exhibit 10(b).
18       THE COURT:  It's admitted.
19       (Whereupon, said videotape continued to be
20 played before the Court and jury.)
21 Q  What's going on right there?
22 A  Waiting for Freddie to come in there.
23 Q  What is that object on the right side of the
24 picture right here?
25 A  That's the dresser that sits in front of the wall

| Page 133 |
| --- |

1 where the door is that opens up.
2 Q  Can you show us from your screen where the hidden
3 door is?
4 A  It sits directly behind, right here, at the
5 dresser.
6 Q  Now how do you get in there with that thing in
7 the way?
8 A  All you have to do is slide the dresser out from
9 the wall and squeeze back in there.
10 Q  Which side do you slide out from the wall?
11 A  This side right here.
12 Q  Okay.  And you're talking about like swinging it
13 around?
14 A  Yes.
15 Q  And that would give the door room to swing?
16 A  It would give enough room for someone to squeeze
17 in the door.
18 Q  Okay?
19 A  Or you could move it all the way, the door wide
20 open.  But most of the time it just slid out just
21 enough to pull the door open.
22 Q  Now this picture that I showed you, is it slid
23 out all the way on that one?
24 A  I think on that one it's pushed all the way open,
25 held open.

Multi-Page™

Page 134

1 Q  Okay.  So the paneling would be on the back side
2 of this plywood right here?
3 A  Yes.
4 Q  If we could continue playing the tape.
5      (Whereupon, said videotape continued to be
6 played before the Court and jury.)
7 Q  Those duffel bags are on the left?
8 A  Yes.
9 Q  Are those the duffel bags you have been talking
10 about?
11 A  Yes.
12 Q  Okay.  Now they're not in the secret room right
13 now, is that right?
14 A  They're sitting outside on the bed.
15 Q  Okay.  And who is that?
16 A  That's me.
17 Q  Where did you just come from?  If you remember.
18 A  I was standing right there by the door of the
19 room where you come in the room at.
20 Q  Okay.
21      (Whereupon, said videotape continued to be
22 played before the Court and jury.)
23 Q  There's going to be some more activity in here in
24 just a little bit, isn't there?
25 A  Yes.

Page 135

1      (Whereupon, said videotape continued to be
2 played before the Court and jury.)
3 Q  What is that?
4 A  That's my cell phone ringing.
5      (Whereupon, said videotape continued to be
6 played before the Court and jury.)
7 Q  Who was it, do you remember?
8 A  I don't remember who it was.
9 Q  Okay.  But somebody called you, it wasn't Mr.
10 Carmichael?
11 A  No.
12 Q  It wasn't Mr. Williams?
13 A  No.
14 Q  Where is Mr. Williams right now?
15 A  He just walked in the room right here.
16 Q  Okay.  Sir, during the time that you were out
17 going to get the baggies or the scales, did you
18 receive any phone calls from Mr. Carmichael?
19 A  Yes.
20 Q  Would you tell the ladies and gentlemen of the
21 jury about that.
22 A  I was walking in the Dollar General.
23 Q  And why were you in the Dollar General?
24 A  To get some more bags.  I left Winn-Dixie, they
25 didn't have enough so I walked next door to the Dollar

Page 136

1 General and got some.
2 Q  Did he talk to you?
3 A  Yes.  He asked me how everything was going.  "Is
4 Freddie there?"  I told him I was out getting some
5 plastic now.  And he said, "Everything okay?"  And I
6 said, "Yeah."  And that's basically all the
7 conversation.
8 Q  Okay.
9      (Whereupon, said videotape continued to be
10 played before the Court and jury.)
11 Q  Who is that in back?
12 A  That's me.
13      (Whereupon, said videotape continued to be
14 played before the Court and jury.)
15 Q  Whose voice is that?
16 A  It's Freddie.
17      (Whereupon, said videotape continued to be
18 played before the Court and jury.)
19 Q  What's he telling you there?
20 A  That nobody else is supposed to come in there.
21 Q  Now the conversation we heard going on before
22 that, before he told you what you said was, "Don't
23 want anybody else in here," what was that
24 conversation?
25 A  About his kids' Mom, his wife or somebody was at

Page 137

1 the hospital dying.
2 Q  Okay.
3 A  He was talking to one of his kids.
4 Q  All right.
5      (Whereupon, said videotape continued to be
6 played before the Court and jury.)
7 Q  What's he doing right now?
8 A  Getting the knife and box cutter out of the
9 drawer.
10      (Whereupon, said videotape continued to be
11 played before the Court and jury.)
12 Q  What are you doing?
13 A  Moving some bags out of the way so he could move
14 the dresser out.
15 Q  And you're moving bags —
16 A  Yes.
17 Q  — so he can move the dresser out?
18 A  Yes.
19 Q  Okay.  Is that what he's doing right there?
20 A  Yes, that's why it's at the angle right there.
21 Q  All right.
22      (Whereupon, said videotape continued to be
23 played before the Court and jury.)
24 Q  What was that?
25 A  I was telling them to come on in.  Trying to

Page 138

1 motion them to come on because he was getting ready to
2 leave.
3        (Whereupon, said videotape continued to be
4 played before the Court and jury.)
5 Q  Are you waving at them again?
6 A  Yes.
7        JUROR:  Excuse me, Judge.  He's going to
8 have to speak a little louder over the white noise.
9        THE COURT:  Yes.  Would you ask the question
10 again.
11 Q  I saw your arm do something, what was that?
12 A  Waving at them for the police to come on in.
13 Q  At this time what's your thought about that
14 camera?  Why are you waving at it?
15 A  I'm hoping they can see me and they will come on
16 in when they see the notion my hand because he's
17 getting ready to leave.
18 Q  Okay.  All right.  And then I think I asked you,
19 the next question was what are you doing right there,
20 and you said --
21 A  If you rewind it I can look and see.  Yeah.
22        (Whereupon, said videotape continued to be
23 played before the Court and jury.)
24 Q  What are you doing right there?
25 A  Grabbing the bag with something that Freddie gave

Page 139

1 me.  You can see him right there handing it to me.
2 Q  What's he doing now?
3 A  He's getting large bags, plastic bags, garbage
4 bags and newspaper out of that room.
5 Q  Let me show you what's been marked government's
6 exhibit 13 for identification purposes.  In fact, I'll
7 just set it up here.  Would you tell the ladies and
8 gentlemen of the jury what this stuff is that's coming
9 out of government's exhibit 13?
10 A  The stuff he was going to spread out over the bed
11 to keep crumbs and shake from getting all over the
12 bed.
13 Q  Is this the stuff that you see in his hand right
14 there?
15 A  Correct.
16 Q  Okay.  And what's in the bag?  Would you take it
17 out?
18 A  Gallon sized Ziploc bags.
19 Q  Okay.  Are those the kind of bags you guys used
20 to put this stuff in?
21 A  Yes.
22 Q  Are those the ones you bought, or were they
23 already there or do you know?
24 A  These look like they were already there.
25 Q  How many are in there?

Page 140

1 A  It says twenty-five on each one.
2 Q  And how many are in there?
3 A  There's two boxes.
4 Q  Okay.  And what's this I'm holding in my hand
5 right here?
6 A  It's another box.
7 Q  Okay.
8        MR. FEAGA:  Your Honor, I'd like to move to
9 admit into evidence government's exhibit 13.
10        THE COURT:  Admitted.
11 Q  Okay.  We'll play the tape.
12        (Whereupon, said videotape continued to be played
13 before the Court and jury.)
14 Q  Who is holding that bag?
15 A  Freddie.
16 Q  That's Freddie, this Freddie right here --
17 A  Yes.
18 Q  -- that you previously identified?
19 A  Yes.
20 Q  Okay.  Let's play the tape.
21        (Whereupon, said videotape continued to be
22 played before the Court and jury.)
23 Q  Now that phone you got right there, is that your
24 phone?
25 A  Yes.

Page 141

1 Q  What kind of phone is that?
2 A  It's a Sprint phone, Motorola Sprint phone.
3 Q  It looks like it's opened up.
4 A  A flip phone.
5 Q  Okay.
6        (Whereupon, said videotape continued to be
7 played before the Court and jury.)
8 Q  What are you doing right there when you've got
9 your phone out?
10 A  I believe I was calling DeJohn's phone number to
11 tell them come on, Freddie turned his back or
12 something.
13 Q  Okay.
14        (Whereupon, said videotape continued to be
15 played before the Court and jury.)
16 Q  We just heard a voice on there.  Did you hear it?
17 A  Yes.
18 Q  Whose voice was that?
19 A  Freddie's.
20 Q  Okay.
21        (Whereupon, said videotape continued to be
22 played before the Court and jury.)
23 Q  I want you to listen closely to that voice again.
24        (Whereupon, said videotape continued to be
25 played before the Court and jury.)

Multi-Page™

Page 142

1 A  It must be me talking on the phone.  It sounds
2 like my voice.
3 Q  Who are you talking to?
4 A  I thought I was trying to call DeJohn to tell him
5 that Freddie was leaving, but I couldn't really hear
6 it.
7 Q  All right.  Let's play it again so can you hear
8 it.
9      (Whereupon, said videotape continued to be
10 played before the Court and jury.)
11 Q  Okay, stop it.
12      Let me ask you again.  Was that Freddie's
13 voice we heard, or was it yours?
14 A  I believe it was mine.
15 Q  And what were you doing there?
16 A  I think I was calling DeJohn telling him that
17 Freddie was getting ready to leave, to come on in, if
18 I'm not mistaken.
19 Q  Okay.
20      (Whereupon, said videotape continued to be
21 played before the Court and jury.)
22 Q  What are you doing right now?
23 A  Getting something out of the bag.
24 Q  Okay.
25      (Whereupon, said videotape continued to be

Page 143

1 played before the Court and jury.)
2 Q  What were you doing right there?
3 A  Like unzipping the bag.
4 Q  All right.  We'll play the tape.
5      (Whereupon, said videotape continued to be
6 played before the Court and jury.)
7 Q  What are we seeing right there?
8 A  Freddie putting out the cutting board.
9 Q  Okay.  Let me show you what's been marked as
10 government's exhibit 10(a) for identification purposes
11 and ask you if you recognize it.
12 A  Yes.  That's the board in the video he's laid on
13 the bed.
14      MR. FEAGA:  Your Honor, we'd move to admit
15 what's been marked as government's exhibit 10(a) into
16 evidence as government's exhibit 10(a).
17      THE COURT:  Admitted.
18 Q  Now why is he doing that?
19 A  Because once you cut it open you have to split
20 them apart.  You have to take a knife and jab it down
21 in there, and you have to have some hard surface up
22 under there to split it open.
23 Q  Do you know where that came from?
24 A  Out of the room behind the dresser.
25 Q  All right.

Page 144

1      (Whereupon, said videotape continued to be
2 played before the Court and jury.)
3 Q  What are you doing now?
4 A  Laying a pound of block of dope on the board.
5 Q  Okay.
6      (Whereupon, said videotape continued to be
7 played before the Court and jury.)
8 Q  What's Mr. Williams doing right there?
9 A  Handing me a box cutter, a knife or something.
10 Q  Okay.
11      (Whereupon, said videotape continued to be
12 played before the Court and jury.)
13 Q  What was that he just put on down?
14 A  Razor blade or box cutter, knife, one of them.
15 I'm not sure which one it was.
16 Q  All right.
17      (Whereupon, said videotape continued to be
18 played before the Court and jury.)
19 Q  What are you doing right now?
20 A  Looks like I'm still cutting the plastic and
21 taking the plastic off.
22 Q  Okay.  Play it.
23      (Whereupon, said videotape continued to be
24 played before the Court and jury.)
25 Q  What was that violent movement of your arm there?

Page 145

1 A  Like slicing the plastic.
2 Q  Okay.  Go.
3      (Whereupon, said videotape continued to be
4 played before the Court and jury.)
5 Q  What have you got in your hand there?
6 A  Some dope.
7 Q  Okay.  Some objects, two of them that I'm
8 removing from government's exhibit 6(a), a bulk
9 exhibit, and ask you, if you could, would you tell us,
10 do you recognize these objects?
11 A  Yes.  That's what the dope looks like after you
12 get the brown tape off of it.
13 Q  Okay.  And is the brown tape and this plastic
14 that's on these objects, is that what you're cutting
15 off?
16 A  Yes.
17 Q  What's inside here?
18 A  Marijuana.
19 Q  Okay.  Go ahead and play the tape.
20      (Whereupon, said videotape continued to be
21 played before the Court and jury.)
22 Q  What did you just say?
23 A  "Where you at, DeJohn?"
24 Q  Okay.  Go ahead.
25      (Whereupon, said videotape continued to be

Multi-Page™

Page 146

1 played before the Court and jury.)
2 Q  What's that voice in the background?
3 A  Freddie talking.
4 Q  Okay.  Go.
5        (Whereupon, said videotape continued to be
6 played before the Court and jury.)
7 Q  What was that?
8 A  Me getting ready to try to call him and see where
9 he's at.
10 Q  Where is Freddie right now?
11 A  He's walking out of the house.
12 Q  And what did you just say, do you know?
13 A  I think I said, "Where you at, DeJohn?  Come in."
14 Q  Okay.
15        (Whereupon, said videotape continued to be
16 played before the Court and jury.)
17 Q  Who are you talking to?
18 A  DeJohn.
19 Q  What are you telling him?
20 A  "Freddie just left."
21        He asked me, "Where he's going?"
22        And I said, "His wife's in the hospital."
23 Q  Okay.
24        (Whereupon, said videotape continued to be
25 played before the Court and jury.)

Page 147

1 Q  What are you doing here?  You left, came back;
2 what's going on?
3 A  I walked in the front of the house looking to see
4 and make sure nobody else was in there, that he was
5 gone, waiting on the police to get there.
6 Q  What's going through your mind right now?
7 A  Where are they at?  Hurry up.
8 Q  Okay.
9        (Whereupon, said videotape continued to be
10 played before the Court and jury.)
11 Q  Do you remember getting that call?
12 A  Vaguely.  I remember who it was.
13 Q  What's going on in your mind right now?
14 A  What's taking so long.  Hurry up.
15 Q  Okay.  What do you think that call was?  You said
16 you vaguely recall, what was it?
17 A  Is there anybody calling saying I'll call you
18 back.  I don't know what it was.
19 Q  It wasn't Carmichael?
20 A  No.
21 Q  It wasn't Williams?
22 A  No.
23 Q  It wasn't DeJohn?
24 A  I don't think so.
25 Q  All right.

Page 148

1        (Whereupon, said videotape continued to be
2 played before the Court and jury.)
3 Q  What's just happened?
4 A  The police just came in the side door.
5 Q  All right.
6        (Whereupon, said videotape continued to be
7 played before the Court and jury.)
8 Q  You viewed this entire tape?
9 A  Yes, sir.
10 Q  Did you see anything else on it after this that
11 you think would be useful to the jury in any way?
12 A  No.
13 Q  Okay.
14        MR. FEAGA:  Your Honor, government's exhibit
15 3(c), I believe I offered and the Court admitted it.
16        THE COURT:  Okay, admitted.
17 Q  Mr. Denton, I'm going to show you what's been
18 marked government's exhibit 4(a) for identification
19 purposes and ask you, if you would, to take a look at
20 the cassette that's contained inside that clear
21 plastic envelope.
22 A  An audiotape.
23 Q  Have you seen it before?
24 A  Yes.
25 Q  And have you listened to it?

Page 149

1 A  Yes.
2 Q  How do you know you've seen it before and
3 listened to it?
4 A  I signed it.
5 Q  Okay.  All right.  Now is that an audiotape that
6 was taken during the time that you went in the house
7 the first time and before you came back out to get the
8 baggies?
9 A  Yes, that's when I was wired up from the
10 beginning until I went back to get the bags.
11 Q  All right.  And you've listened to it?
12 A  Yes.
13 Q  Do you think that someone else listening to it is
14 going to be able to hear anything that would be useful
15 to them?
16 A  No.  The reception is --
17        MS. JAMES:  Objection, Your Honor.
18        THE COURT:  Well just ask him if it has
19 anything in the remaining part of the conversation
20 that has anything to do with his relationship with the
21 defendants.
22        MR. FEAGA:  What I'm trying to say, Judge,
23 is that you can't hear it.  It's unintelligible.
24        THE COURT:  Well ask him that.
25        MR. FEAGA:  Okay.

Multi-Page™

| Page 150 |
|---|

1 Q Is it ineligible?
2 A Very.
3     MR. FEAGA: Your Honor, I'd like to offer it
4 anyway just in case the jury wants to listen to it
5 themselves.
6     THE COURT: Very good. Let's move on.
7     MR. FEAGA: That is government's exhibit
8 4(a).
9     Your Honor, the record should reflect that
10 Miss Clark is removing -- I'm sorry, Miss Morris is
11 removing the plastic envelope and just leaving the
12 tape with the exhibit number on it up there.
13 Q Now I want to offer what's been marked as
14 government's exhibit 4(b). Excuse me, I want to show
15 you what's been marked government's exhibit 4(b) for
16 identification purposes and ask you if you would take
17 a look at it.
18 A Yes, it's another audiotape.
19 Q Okay. And have you listened to that audiotape?
20 A Yes.
21 Q How do you know that?
22 A I signed it.
23 Q Okay. Now on both these audiotapes, Mr. Denton,
24 are there bits and pieces of words you can pick up?
25 A Very vaguely. It's hardly --

| Page 151 |
|---|

1 Q Okay. Most of it is just unintelligible and you
2 can't make it out?
3 A Yeah, static.
4     MR. FEAGA: We'd offer 4(b), Judge.
5     THE COURT: Admitted.
6 Q I want to show you 4(c) and ask you if would
7 examine that.
8 A Audiotape.
9 Q Have you seen that one before?
10 A Yes.
11 Q Have you listened to it?
12 A Yes.
13 Q Okay. And can you pick up bits and pieces of the
14 conversation on that?
15 A On this one here you can hear one part where he
16 says, "I wish you would wear a long shirt, a dark
17 shirt and a hat." And that's about the only thing on
18 it that's intelligible.
19 Q Other than that there is not much else on it that
20 you can listen to?
21 A No.
22     MR. FEAGA: Your Honor, we'd offer
23 government's exhibit 4(c).
24     THE COURT: Admitted.
25     Are we just about through?

| Page 152 |
|---|

1     MR. FEAGA: Your Honor, if the Court is
2 concerned about breaking for lunch I have a while yet,
3 but I think maybe if we could break I wouldn't take
4 long to get back. It might be a good time to take a
5 break.
6     THE COURT: Very good. We'll recess, then,
7 until one o'clock. You're under the same cautionary
8 instructions.
9     Counsel, I would like to take up a few
10 matters with you outside the presence of the jury. If
11 you would remain.
12     (Whereupon, the jury was escorted out of the
13 courtroom, and the following colloquy ensued):
14     THE COURT: How are we progressing with the
15 case?
16     MR. FEAGA: Pardon me, Your Honor?
17     THE COURT: How are we progressing with the
18 case?
19     MR. FEAGA: Your Honor, I think we're
20 progressing well. We will finish with him shortly
21 after lunch and tender him to the defense. I have no
22 idea how long they will be, but once that goes I think
23 the witnesses will be shorter. We'll be calling a
24 number of law enforcement officers and they should go
25 much quicker.

| Page 153 |
|---|

1     THE COURT: So we may be able to finish your
2 case this week?
3     MR. FEAGA: I think that's possible,
4 depending on the cross examination. I think it's
5 beyond possible, I think it's likely.
6     MS. WAYNE: Judge, I'd like to chime in, but
7 they haven't given us a list so I can't give a --
8     MR. FEAGA: I'm making up my mind as we go,
9 Judge.
10     THE COURT: I think we can move a lot faster
11 if you let them know who you're going to call one
12 witness ahead. So, in other words, you should let
13 them know who the next witness is.
14     MR. FEAGA: All right.
15     THE COURT: Now, Miss Wayne, you had raised
16 the question about when they file their brief on what
17 findings the Court should make for them with regard to
18 the conspiracy and the admissibility of the
19 coconspirators' statements, you had raised a question
20 about that?
21     MS. WAYNE: Judge, you were just going to
22 clarify because when I was looking at this it's really
23 them making their proffer, kind of a James proffer
24 regarding evidence supporting. And clearly I can't
25 anticipate what they think their evidence is

Multi-Page™

1 supporting.
2     THE COURT: Well you can anticipate, at
3 least as the case goes along, where they're deficient.
4 Of course we'll have to make a judgment call at the
5 end of the case, but you need to show me why their
6 case is deficient. In other words, you know, how have
7 they failed to establish a conspiracy.
8     MS. WAYNE: All right.
9     THE COURT: What do you suggest be done?
10 Let me put it that way.
11     MS. WAYNE: That we be able to have time to
12 respond once they file it.
13     THE COURT: When did I request that they
14 file it?
15     MS. WAYNE: You said you would like it a
16 couple of days before the closing of their case.
17     THE COURT: If I'm correct, I think it's
18 actually the closing of the entire case.
19     MS. WAYNE: Right.
20     MR. FEAGA: Moreover, Your Honor, it would
21 be very difficult for us to know what's going to
22 happen --
23     THE COURT: Well you can pretty much get to
24 me what's in your case.
25     MR. FEAGA: Not two days before we finish,

1 though. We can do it before the trial is over, but
2 not two days before our case is over.
3     THE COURT: How long do you think your case
4 is going to take after they finish their case?
5     MS. WAYNE: Judge, at least we think two to
6 four days.
7     THE COURT: Two to four days?
8     MS. WAYNE: Yeah.
9     THE COURT: Let me have the government's
10 statement by no later than -- what's today, Wednesday?
11     MR. FEAGA: Yes, sir.
12     THE COURT: Friday morning.
13     MR. FEAGA: Our statement as to what, Your
14 Honor?
15     THE COURT: As to the evidence that you have
16 that supports the conspiracy.
17     MR. FEAGA: Your Honor, we won't be finished
18 putting on our case. How can we tell the Court what's
19 been put into evidence --
20     THE COURT: You can anticipate what's going
21 to happen. And I think you've put on the bulk of it.
22 But anyway --
23     MR. FEAGA: We can put it on up to that
24 point, Your Honor.
25     THE COURT: Right. That and what you

1 clearly are going to put on. And then we can
2 supplement it later. I just need an outline of what
3 you're going to do.
4     MR. FEAGA: Yes, sir. I think it puts us at
5 a tremendous disadvantage to predict what's going to
6 happen and have them have it in their hands while
7 we're --
8     THE COURT: Well you know what you've put on
9 here.
10     MR. FEAGA: Yes, sir.
11     THE COURT: I'm going to have this on a J.
12 N. O. V. anyway, and you're going to have to
13 articulate why it's adequate.
14     And then I'd like yours twenty-four hours
15 later.
16     MS. WAYNE: Yes.
17     THE COURT: If it's a weekend, it would be
18 the following Monday.
19     MR. FEAGA: Your Honor, we're going to put
20 our next witness up. I wanted to let them know. But
21 I wanted to -- Can we get a commitment that they will
22 do the same thing when they go to their case?
23     MS. WAYNE: Of course.
24     THE COURT: Yes.
25     MR. FEAGA: Larry Hubbard will probably be

1 the next case.
2     MS. WAYNE: We don't have any problem giving
3 you that.
4     THE COURT: Okay, counsel. Thank you very
5 much. I'll see you at one o'clock.
6     Oh, yes, counsel, I forgot one other thing.
7 Do you anticipate that your forfeiture evidence will
8 differ from your evidence during this main trial?
9     MR. FEAGA: Not in any significant way, Your
10 Honor.
11     THE COURT: Do you intend to put on any new
12 evidence?
13     MR. FEAGA: May I confer with co-counsel
14 during the break?
15     THE COURT: Okay. It may be that it can all
16 go to the jury at the same time during the main case,
17 unless something thinks there may be some different
18 evidence. A forfeiture is bifurcated if there is
19 additional evidence that you want to present. There
20 also may be forfeiture evidence that you don't want to
21 put on in your main case as it may not be admissible.
22     MR. FEAGA: I'm virtually certain there will
23 be, Your Honor, because we'll have to get with our
24 assets forfeiture counsel.
25     I know there are some things that would go

Multi-Page™

Page 158

1 on with that that wouldn't be right -- We would prefer
2 to have a finding of guilt or innocence and then go
3 into the forfeiture.
4       THE COURT: Well, but if it's not going to
5 be some different evidence, I hate to bring the jury
6 out and --
7       MR. FEAGA: There will be some different
8 things, Your Honor. I can tell you that now.
9       THE COURT: Okay. If you are certain of
10 that --
11       And the same thing applies to the
12 defendants.
13       MS. WAYNE: Right.
14       THE COURT: If you think you're going to
15 have evidence that will be in addition to the main
16 evidence that you'd want to introduce in the
17 forfeiture proceeding, then we'll have to have
18 findings.
19       MS. WAYNE: I think I can tell the Court
20 that the defense would be introducing different
21 evidence things to negate certain things if there was
22 a conviction. So --
23       THE COURT: All right. Then I'll prepare to
24 have a bifurcated proceeding.
25       (Whereupon, the luncheon recess was

Page 159

1 taken.)
2       THE COURT: Proceed, Mr. Feaga.
3       MR. FEAGA: Yes, sir.
4 Q  Mr. Denton, you were identified, and it has been
5 admitted into evidence as government's exhibit 13, as
6 a bunch of bags and newspaper and Hefty bags and some
7 trash bags. You saw the video up there where Freddie
8 Williams was -- threw that bag out and he started
9 opening it up, the newspaper, and you could see him --
10 well, everyone can remember what they saw, but I
11 believe what I saw was somebody putting newspaper
12 down, it looked like on that bed. What was going on
13 that?
14 A  Putting newspaper down to keep the shake and the
15 extra crumbs from getting all over the bed.
16 Q  What's "shake"?
17 A  Left over parts of the marijuana that looks like
18 little small stuff. Seeds and stuff like that.
19 Q  Okay. And you're not putting that in these one
20 pound bags?
21 A  You try to put in as much as you can, but you
22 can't get it all up.
23 Q  And so this is like the debris?
24 A  Yes.
25 Q  Why the cutting board? Does this board go on top

Page 160

1 of that paper after down there?
2 A  Yes.
3 Q  I got you.
4       Okay. Let me show you, if I can, what had
5 been marked as government's exhibits 8 and 9 for
6 identification.
7       MR. FEAGA: May I approach, Your Honor?
8       THE COURT: Yes.
9 Q  I'll hand you government's exhibit 8 first and
10 ask you if you recognize that.
11 A  It's a box cutter used to cut the plastic off.
12 Q  Okay. Let me show you government's exhibit 7(e).
13 Let me see that one again. Well, let me show you
14 what's been marked as government's exhibit 47 for
15 identification purposes and ask you if you'd take a
16 look at that.
17 A  It's a razor blade used to cut the plastic off
18 the blocks of dope.
19 Q  Okay. Now you identified government's exhibit
20 7(e) earlier in your testimony, did you not?
21 A  Yes.
22 Q  Do you see the object you're holding in your
23 hand, government's exhibit 47 depicted in government's
24 exhibit 7(e)?
25 A  Yes.

Page 161

1 Q  Okay. Would you point for the ladies and
2 gentlemen of the jury where it is?
3 A  Right there.
4       MR. FEAGA: The record should reflect that
5 he's pointed to a gray object on top of the cutting
6 board between the tan taped object and the green block
7 objects.
8 Q  Let me show you what's been marked government's
9 exhibit 9 for identification purposes and ask you if
10 you would examine it. Do you see that depicted on
11 government's exhibit 7(e)? And if so --
12 A  Right here.
13 Q  Okay.
14       MR. FEAGA: The record should reflect he's
15 pointed to the object with a brownish colored handle
16 on top of the cutting board in government's exhibit
17 7(e).
18       Your Honor, I'd like to move to introduce
19 into evidence what has been marked government's
20 exhibit 47 and 9 as those exhibits.
21       THE COURT: Very good. They're admitted.
22 Q  Mr. Denton, have you ever had occasion to discuss
23 with Mr. Carmichael whether or not any of his truck
24 drivers or people involved with him in the drug
25 business have been arrested?

Multi-Page™

## Page 162

1 A At one time -- I'm not sure, I think she was a
2 driver but I'm not a hundred percent sure she was a
3 driver -- he told me about the time we were talking
4 about Charlie Hensarling getting arrested. I asked
5 him about fingerprints, he said, "Don't worry about
6 that, they only do that in murder trials" or whatever,
7 because he said, "because I had a lady at the airport
8 get caught with forty some thousand dollars and I was
9 scared to death that they were going to get my
10 fingerprints off it and they didn't fingerprint it."
11 I assume she was the driver, or carrier, whatever.
12 Q Where did she say she got caught?
13 A She said at the airport. I thought it was here.
14 Either here, or -- She was flying to Houston or got
15 caught in El Paso, I think. It was either here or El
16 Paso.
17 Q Okay.
18      MR. FEAGA: Your Honor, we have no further
19 questions at this time for Mr. Denton.
20          CROSS EXAMINATION
21      BY MS. JAMES OF PAT DENTON:
22 Q Good afternoon.
23 A Good afternoon.
24 Q Mr. Denton, my name is Susan James and I have
25 quite a few questions for you this afternoon.

## Page 163

1      I'm one of Mr. Carmichael's attorneys, by
2 the way.
3      In your direct examination today I took down
4 a sentence that you said, and I think that I took it
5 down verbatim, where you said, "I don't have to worry
6 about any time for this." Do you remember making that
7 statement?
8 A Yes.
9 Q And what you were meaning there was you weren't
10 going to be looking at any charges, or any prison
11 time, or any consequences for all of this activity
12 that you've described for us over the past two days,
13 is that right?
14 A Hopefully not, yes.
15 Q Okay. Because based on your testimony here
16 today, you have been involved for a number of years in
17 the illicit distribution of controlled substances,
18 correct?
19 A About four or five years.
20 Q Four or five years. In fact, you were involved
21 with drugs before you actually say you became involved
22 with Mr. Carmichael in this alleged endeavor.
23 A What do you mean "involved" with drugs?
24 Q Well, based on information that you provided, you
25 said Mr. Carmichael came to you I think in the year

## Page 164

1 2000. Is that -- You're saying you had no involvement
2 with drugs --
3 A It was in '99 was when me and Mr. Carmichael got
4 together.
5 Q Okay. And your story yesterday was Mr.
6 Carmichael called you to inquire as to what a pound
7 would go for on the street, do you remember that?
8 A He didn't call me. I stopped by there and we had
9 a general conversation.
10 Q Okay. And he asked you that, if he did, because
11 he thought you had special knowledge of what drugs
12 would sell for on the street, correct?
13 A I can't tell you what he thought.
14 Q Okay. Well you gave him the information that he
15 asked, right?
16 A I told him a number, yes.
17 Q All right. And it was after that that you began
18 to have these dealings that you've described, is that
19 right?
20 A Shortly after that, correct.
21 Q Okay. Now so that we can get this into
22 perspective, you actually were semi-raised by your
23 grandparents, right?
24 A Correct.
25 Q And your grandparents were actually the next door

## Page 165

1 neighbor of Mr. Carmichael, correct?
2 A Correct.
3 Q And so as a small child you played with Mr.
4 Carmichael's children, right?
5 A Not real small. Early teenage years. Probably
6 twelve or thirteen.
7 Q Okay. But you were in and out of the home.
8 You've admitted that.
9 A Right.
10 Q And you have grown up knowing Mr. Carmichael and
11 knowing his family, right?
12 A Not really knowing them, just knowing who he was.
13 I didn't know his real personal life. I knew his son,
14 and his son got arrested for murder or something and I
15 kind of lost contact. I seen him coming in and out of
16 the house --
17 Q Is that the one you played with?
18 A Correct.
19 Q Okay. Now you live on Fleming Road, right?
20 A Correct.
21 Q And let me back up a minute. Your grandparents
22 have not, throughout the course of all of this since
23 your arrest, they haven't moved, have they?
24 A No, they cannot afford to. I wish they could
25 have.

**Multi-Page™**

## Page 166

1 Q  Okay.  And you go still over there to visit them,
2 don't you?
3 A  Yes.
4 Q  Now Fleming Road is actually the road where the
5 Carmichael Center is located, right?
6 A  It's on East Fleming.
7 Q  That's where you live, right?
8 A  I live on West Flemiong.
9 Q  The same road, just different ends, is that
10 right?
11 A  Correct.
12 Q  And as a matter of course, when you leave home
13 and go down that road, for years you've either stopped
14 at the building that used to be there before the
15 Carmichael Center, you stopped and visited numerous
16 times, haven't you?
17 A  No, not numerous.
18 Q  Well, I thought you said you went by there a lot,
19 is that --
20 A  A couple of times.  I asked about the rocks, I
21 asked about going fishing.  I wouldn't say a whole
22 lot.  Maybe a handful at the most.  If you want to
23 call it numerous, you can say numerous.
24 Q  So what you're saying is you stopped by there
25 about three times in what, five years?

## Page 167

1 A  No.  Before I started selling the dope I stopped
2 by there three to five times.
3 Q  Okay.  Well certainly by virtue of your knowing
4 Mr. Carmichael and you going by there and living on
5 that road, you've had occasion to see people come and
6 go, right?
7 A  Probably, yes.
8 Q  And some of these people that you've described
9 here for us over the course of the past two days,
10 people that you know know Mr. Carmichael, you know
11 that they have other responsibilities there at the
12 Center and in the trucking business and everything
13 else, right?
14 A  My understanding is yes, there is real estate
15 involved.  And that's basically all I know.
16 Q  Okay.  With regard to your arrest, and I'm
17 talking about the most recent of your arrest, that
18 would be November the 17th of 2003, am I right on
19 that, that's your most current arrest?
20 A  I was never officially arrested, I don't think.
21 Q  Okay.  Well let's just say you were, what would
22 you say, a subject of interest to the Drug Enforcement
23 Agency?
24 A  Correct.
25 Q  Because at that point on the early morning hours

## Page 168

1 between twelve and one o'clock a.m. on November 17th
2 of 2003 when you were at home in bed and awakened by
3 the D. E. A., that was at your residence, right?
4 A  Correct.
5 Q  And they were there to execute a search warrant
6 looking for controlled substances, guns, money and
7 things of that nature, right?
8 A  Correct.
9 Q  And you had no doubt in your mind when they came
10 in your house they meant business, did you?
11 A  Oh, no doubt.
12 Q  And they actually served you with a search
13 warrant, didn't they?
14 A  Yes.
15 Q  And on that search warrant they told you that
16 they were interested in looking at your activity as
17 relates to drug conspiracy, right?
18 A  What do you mean "activity"?
19 Q  Well, they were -- Do you remember seeing the
20 search warrant?
21 A  Vaguely.  I wasn't real worried about a search
22 warrant.  They were in the house, I didn't care what
23 it said at the time.
24 Q  Well you said they told you what you were facing.
25 Didn't you say that awhile ago?

## Page 169

1 A  Yes.
2 Q  They told you you were looking at possibly -- or
3 not possibly, but they told you that you were looking
4 at being charged with a federal drug conspiracy,
5 right?
6 A  Correct.
7 Q  They told you you were looking at being charged
8 with money laundering in the federal system.
9 A  I don't remember all the exact charges.  I know
10 the conspiracy and -- I can't detail it, no.
11 Q  All right.  Did they tell you you were also
12 looking at the possibility of being charged with
13 possessing a firearm in connection with a drug
14 trafficking offense?
15 A  No.
16 Q  They didn't tell you that?
17 A  No.
18 Q  Okay.  Now, when you went over for us today your
19 feelings about your life when you were doing your
20 reflecting on that evening while they were there
21 talking about what you were facing, you said you kind
22 of went back and thought things over and decided that
23 you weren't going to go to prison, or didn't want to
24 go to prison, for somebody who hadn't done you right.
25 A  Correct.

**Multi-Page™**

Page 170

1 Q  And in fact, when they approached you at that
2 point you were in a pretty desperate situation,
3 weren't you?
4 A  Well, describe "desperate" for me.
5 Q  Well desperate in that you were on a hundred and
6 twenty thousand dollar bond from your arrest on June
7 the 13th of 2002 in Madison County in Huntsville,
8 right?
9 A  Yes.
10 Q  You were on that bond.
11 A  Correct.
12 Q  You had certain conditions of bond that you had
13 to comply with or you would be put back in jail,
14 right?
15 A  Correct.
16 Q  And one of those conditions was that you would
17 not violate the law.  Yes, or no?
18 A  It's if it's on there, yes.  I can't remember
19 reading the details.
20 Q  If you don't understand or don't remember, would
21 you just agree --
22 A  I don't remember.
23 Q  Well, given that answer, would you agree with me
24 that common sense would say if you're already on the
25 bond, you're out at the Court's really discretion,

Page 171

1 that the Court would expect that you would not go out
2 and continue to sell drugs?
3 A  Correct.
4 Q  Okay.  So you're on a hundred and twenty thousand
5 dollar bond.  You know you've got that problem, right?
6 A  Correct.
7 Q  The second problem you've got is you know at that
8 point that Charlotte Hensarling, you know that
9 Charlotte Hensarling has been arrested with twenty
10 plus pounds of dope that you gave her just two days
11 before, correct?
12 A  Correct.
13 Q  And you know and have every reason to believe
14 when they came to you that she had told them that you
15 had given her the drugs.
16 A  I felt like that, yes.
17 Q  So we know you've got that potential charge
18 hanging over you, right?
19 A  Correct.
20 Q  And then they told you what Gary George had told
21 them about your reported drug activity in the
22 Montgomer-Mobile-Huntsville-Prattville area, right?
23 A  What are you talking about Mobile?  I don't know
24 anything about Mobile.
25 Q  So you and Mr. George didn't do any drug business

Page 172

1 in Mobile?
2 A  Not to my recollection, no.
3 Q  Okay.  Well, you did know, though, that Mr.
4 George had told them that you were involved in drug
5 distribution, right?
6 A  I found out that night, yes.
7 Q  Okay.  So you have the case in Huntsville where
8 you got busted on June the 13th of 2002, you actually
9 traveled from Montgomery and you went up there to sell
10 some drugs, you said today, to Mr. Hensarling's
11 girlfriend.
12 A  Correct.
13 Q  Now would Mr. Hensarling's girlfriend be someone
14 other than Charlotte?
15 A  Yes, her name was Susan.
16 Q  So Charlotte, the woman who testified here
17 yesterday, is his wife?  If you know.
18 A  Correct.
19 Q  And so you were dealing with Charlotte and her
20 husband, you were dealing them drugs, and then you
21 were dealing Mr. Hensarling's girlfriend drugs too,
22 right?
23 A  Well, he would sometimes come or Charlotte would
24 come or he would send Susan.  Susan was a friend of
25 theirs.  I'm not sure the wife knew that they were

Page 173

1 boyfriend and girlfriend.  I never saw them actually
2 sleep together, I just assumed they were.
3 Q  All right.  But the drugs that you had in your
4 possession, you said today that you pulled over for
5 something on the side of the road and you got busted,
6 right?
7 A  Correct.
8 Q  And they told you in Huntsville, the Drug Task
9 Force there told you that you had been set up by
10 somebody who had been busted earlier.
11 A  Yes.
12 Q  And now you understand that to be Susan?
13 A  I don't have a hundred percent confirmation, but
14 I was assuming it was her.
15 Q  But you don't think it was Charlotte and you
16 don't think it was her husband?
17 A  I don't know what to think at this time.  I don't
18 know who it was.
19 Q  Well what's Charlotte's husband's name?
20 A  Steve.
21 Q  Steve.  So you don't think Steve was involved in
22 the setup?
23 A  At the time I didn't think, but now I don't know.
24 Q  All right.  Well when you got stopped there you
25 were driving a big, old, Mercury Marquis, weren't you?