1 A  Correct.
2 Q  Older model?
3 A  '93.
4 Q  And the reason you were driving that big, old
5 Mercury was because it had a big, old, wide trunk,
6 right?
7 A  I was driving it because it was the only car I
8 had.  The trunk had nothing to do with me driving the
9 car, no.
10 Q  Well it's convenient, isn't it, though, if you
11 wanted to put big boxes of marijuana in your trunk you
12 would have room in a car like that, wouldn't you?
13 A  I assume you would.  You could put big boxes of
14 anything in there.  You could.
15 Q  Well, when you got stopped, the police not only
16 arrested you, they arrested you, they took your car,
17 right?
18 A  Correct.
19 Q  They took your money, which was six hundred and
20 something dollars, right?
21 A  Yes.
22 Q  And they found you in possession of twenty-three
23 Lorcet, right?
24 A  Correct.
25 Q  And that's a controlled substance?  If you know.

1 A  Correct, yes.
2 Q  That's kind of a pain pill, isn't it?
3 A  Correct.
4 Q  And you had them in two separate bottles, and
5 neither of those bottles said Patrick Denton on there,
6 did they?
7 A  I thought it was in one bottle.  I'm not sure if
8 it was in two, but one.
9 Q  But you got indicted for that up there?
10 A  Yes.
11 Q  And also they found you in possession of cocaine,
12 correct?
13 A  Correct.
14 Q  And you got indicted for that, too.
15 A  Correct.
16 Q  And they also found you in possession of
17 approximately ten pounds of marijuana, right?
18 A  Correct.
19 Q  And you got indicted for that.
20 A  Correct.
21 Q  But your immediate concern, of course, when all
22 of this happened and they took you to jail, your
23 immediate concern was getting out of jail.
24 A  Yeah.  Nobody wants to stay in jail.
25 Q  Right.  You didn't want to go to jail then,

1 right?
2 A  I was in jail.  I didn't want to go to prison.  I
3 wanted to get out.
4 Q  And when they came to your house in November of
5 2003 you didn't want to go to jail that night.
6 A  Of course not.
7 Q  And as you sit here today you still don't want to
8 go to jail.
9 A  No.
10 Q  Okay.  So you're in jail in Madison County, and
11 the only people you've got up there is the Hensarlings
12 and this Susan girl.  Did you have other people up
13 there that you were dealing drugs to?
14 A  No.
15 Q  Okay.  Well you weren't going to get any
16 Hensarling to go on your bond, I don't believe, were
17 you?
18 A  What do you mean?  I wouldn't think so.
19 Q  Okay.  Now do you remember, and I'm sure that was
20 an important date that would stick in your mind, were
21 you arrested on the 12th or the 13th of June?
22 A  It was the 12th.
23 Q  You were arrested on the 12th.
24 A  Mm-hmm.
25 Q  So you were arrested on the 12th and you were

1 placed in the Madison County Jail.  You got a good
2 view of the city up there don't you?  Up the top up
3 there?
4 A  You've got some good people up there.  I didn't
5 get a good window view when I was there.
6 Q  You didn't?
7 A  No.
8 Q  Okay.  Well you go up there and you're in jail,
9 you're in there as of the 12th, and you don't get out
10 until the 14th, do you?
11 A  That might be the day.  I'm not sure.  I know
12 it's two or three days.  Somewhere around in there.
13 If you say it was the 14th, I'll believe you.
14 Q  Well, let me just make sure of something real
15 quick.
16      MS. JAMES:  Judge, may I approach the
17 witness?
18      THE COURT:  Yes.
19 Q  I'm going to show you what I've marked for
20 identification purposes as defendant's exhibit 7.
21 Does that appear to be a document that you're familiar
22 with?
23 A  Yes, it looks like a Circuit Court appearance
24 bond.
25 Q  Okay.  It says, Consolidated Appearance Bond,

Multi-Page™

1  "Robert Patrick Denton," and it has some information
2  here and appears to be a document that dealt with your
3  release from jail, right?
4  A  Correct.
5  Q  And the date signed here where it says "deputy
6  sheriff," it says, "6/14/02," right?
7  A  Yes.
8  Q  Okay.  So you would agree with me that it was the
9  14th of June of 2002 when you were released from the
10  Madison County Jail?
11  A  Yes.
12  Q  Now when they took you into custody, did they
13  take your personal belongings?
14  A  What do you -- Describe "personal belongings".
15  Clothes, or --
16  Q  Did they let you take your wallet into your jail
17  cell?
18  A  No, they didn't.
19  Q  Did they let you take your cell phone into your
20  jail cell?
21  A  I think they kept it, too.
22  Q  Okay.  Now how was it that you began to get in
23  touch with people to let them know that you were in
24  jail and needed to get out?
25  A  Use the jail phone.

1  Q  You did use the jail phone?
2  A  Yes.
3  Q  What was your cell phone number at the time?
4  A  Honestly, I can't remember.
5  Q  Well let me ask you this:  Have you ever had a
6  cell phone with the number seven one seven six eight
7  oh three as the number?
8  A  Either my wife had one.  Mine was six eight oh
9  two, hers was six eight oh three.  I'm not sure.
10  Q  So you're not sure about that?
11  A  It sounds like mine or hers, but I can't remember
12  if it was mine or hers.
13  Q  Okay.  Now while you were in custody on the 13th,
14  you were using jail phones to contact your family and
15  get somebody to make a bond, right?
16  A  Correct.
17  Q  Because Mr. Carmichael would not make the bond
18  for you, would he?
19  A  I didn't want to call his house, and I knew the
20  jail records, like you have his name and number would
21  be on there and I didn't want to do that.
22  Q  Well I thought you said earlier that Mr.
23  Carmichael would not make your bond and you were mad
24  about that.
25  A  I didn't know about that at the time.  I didn't

1  find out about that until later.
2  Q  Okay.  So you didn't call Mr. Carmichael from the
3  jail cell?
4  A  No.
5  Q  But did you call your familiar from the jail?
6  A  Correct.
7  Q  Okay.  Now you say that you really took a loss on
8  this endeavor, and that's because you lost the drugs
9  you had, right?
10  A  Correct.
11  Q  And you say you had to pay ten thousand for your
12  lawyer, right?
13  A  Correct.
14  Q  Now your lawyer is Mr. William Burgess, correct?
15  A  Correct.
16  Q  And you went and hired Mr. Burgess because he's a
17  very well-known criminal lawyer in Madison County,
18  right?
19  A  That and he was four thousand dollars cheaper
20  than anybody else I talked to.
21  Q  Okay.  But you had no reason to believe that you
22  would entrust your life to somebody who wouldn't do a
23  good job.
24  A  I had no reason not to believe that.
25  Q  So you say your paid him ten?

1  A  Yes.
2  Q  And you say your bond was ten?
3  A  Yes.
4  Q  Okay.  Was your bond actually twelve, do you
5  remember?
6  A  It was ten, twelve.  You had ninety days to pay
7  the ten or it was twelve, something to that effect.
8  Q  Okay.  And you paid four thousand dollars down,
9  didn't you?
10  A  I'm not sure.  I think it was on a credit card.
11  I don't remember how much it was.  I think it was
12  three thousand.
13     MS. JAMES:  May I approach the witness, Your
14  Honor?
15     THE COURT:  Yes.
16  Q  Mr. Denton, let me show you what I've marked for
17  identification purposes as defendant's exhibit 5 and
18  ask you if that's a document that you're familiar
19  with.  I'm sorry, Carmichael 5.
20  A  Looks like a discount bonding company.
21  Q  Okay.  Would that be the company that handled
22  your bond?
23  A  It was two separate companies.  Triple A and
24  another one.
25  Q  Okay.  Well in looking at the document, does it

Page 182

1 appear to have some personal information relevant to
2 your situation and the people that went on your bond?
3 A Correct.
4 Q And there is a listing here of Robert P. Denton,
5 Senior at Twenty-three second Street, is that a
6 relative of yours?
7 A That's my father's name. That's where his Mom
8 used to live. His mailing address, he lives out in
9 the country.
10 Q But Twenty-three second Street is an address
11 that's associated with your family?
12 A Correct.
13 Q Okay. Now Mr. George, he went on your bond,
14 didn't he?
15 A No, he didn't go on my bond.
16 Q Had how about Diane George, did she go on your
17 bond?
18 A No.
19 Q Okay. Taking you back to June the 13th of 2002
20 when you were -- or June the 12th, excuse me -- do you
21 remember having told your family that you were
22 actually taking those drugs up to Huntsville for Mr.
23 George?
24 A The marijuana I was taking for Steve, Charlotte
25 and Susan. The pills and cocaine Gary had asked me to

Page 183

1 give them to Susan. She was going to pay him so he
2 could make him some money off of them. That's why I
3 said that.
4 Q So you did tell your family you were taking stuff
5 up there for Mr. George?
6 A No, I don't think I went into detail with my
7 family about everything I did, no.
8 Q Okay. While you were sitting in that jail up in
9 Huntsville, the drug enforcement task force got
10 together and got a search warrant to go into your
11 house here in Montgomery, didn't they?
12 A Yes.
13 Q And they did that while you were in custody but
14 your wife was still at home, wasn't she?
15 A Correct.
16 Q And Mr. George and his wife were at your house,
17 all three of them, outside when they came to serve
18 that warrant, weren't they?
19 A That's what they said, yes.
20 Q Okay. They went in the house. I know you
21 weren't there but I know you should know this because
22 it was important to you, wasn't it?
23 A Yeah, it was important that they were in my
24 house.
25 Q Okay. And when they went in your house they took

Page 184

1 certain items that belonged to you, didn't they?
2 A Yes.
3 Q When they went in your house they took some of
4 your guns, didn't they?
5 A Yes.
6 Q And when they went in your house they found a
7 hidden safe. Now this is 2002, right?
8 A Yes.
9 Q You're laughing at that. Does that mean you
10 don't think it was a hidden safe?
11 A It wasn't a hidden safe, it was a metal box.
12 Q Well, wasn't the metal box I'm referring to as a
13 safe, wasn't that hidden in a crawl space in the
14 attic?
15 A It wasn't a crawl space. You could open the door
16 and walk in there and look at it.
17 Q Was it in the attic?
18 A Yes.
19 Q And inside that safe, box or whatever we want to
20 call it, was about close to eight thousand dollars in
21 U. S. currency, wasn't there?
22 A Correct.
23 Q It was in ones, fives, tens, twenties, fifties
24 and one hundreds, correct?
25 A If you say it was. I don't remember exactly.

Page 185

1 But I know it was money.
2 Q Well you know you didn't get a chance to look at
3 it again, don't you?
4 A Sure didn't.
5 Q Because they took it?
6 A Correct.
7 Q The U. S. government forfeited it, right?
8 A Correct.
9 Q Because they thought they thought that money had
10 something to do with you and your drug business,
11 right?
12 A Yes.
13 Q And you didn't mention that on your direct
14 examination, but when we were totaling up your losses
15 I'm assuming that we could put the eight thousand
16 dollars that they got in the June of 2002.
17 A Yes, could you.
18 Q Okay. That's another business loss you had.
19 A Yeah.
20 Q Okay. So you're out on bond, you are obviously
21 at that point looking at least a state of Alabama
22 charge of drug trafficking, correct?
23 A Correct.
24 Q Now you had about what, nineteen months since
25 your arrest in November of 2003 until today?

Multi-Page™

1 A  Yes.
2 Q  Okay.  And so you had a lot of time over the
3 course of the past nineteen months to think about that
4 case in Huntsville, haven't you?
5 A  Yes.
6 Q  And I don't want to know what your lawyer said to
7 you so I'm not trying to go there, but I want to know
8 surely you've had conversations with your lawyer about
9 the seriousness of the charges that you faced in
10 Huntsville.
11 A  Yes.
12 Q  And you understood from your own research and
13 what your lawyer told you that you were seriously
14 looking at going to an Alabama state prison for at
15 least three years if not a minimum of fifteen years.
16 A  Yes.  He felt the most like I would have to do
17 was three years.
18 Q  Okay.  Well either way he told you no parole,
19 you're going to do that time.
20 A  He wasn't a hundred percent sure but he, you
21 know, voiced his opinion.
22 Q  He didn't tell you that there was a minimum
23 mandatory provision?
24 A  He told me there was a minimum mandatory, but
25 that didn't mean something freak might happen.  I

1 might get probation.  I might do a year and-a-half and
2 get probation.
3 Q  All right.  Well when you were questioned by law
4 enforcement there, do you remember having made some
5 statement to him?
6 A  What was the statement?
7 Q  I don't know, I'm asking you, do you remember
8 your lawyer filing a motion to try to throw out
9 evidence in the case?
10 A  I remember a motion being filed, but I don't
11 remember what the statement and all that was.
12 Q  Okay.  Well we know one thing for sure, and that
13 is you didn't begin to tell them about all your goings
14 on down here in Montgomery that you've described to
15 this jury, did you?
16 A  I didn't what, now?
17 Q  You didn't tell the people in Huntsville what you
18 told us here today and yesterday.
19 A  About what?  What are you saying?
20 Q  All of this drug activity that you say you have
21 been involved with.
22 A  If they had me in Huntsville I figured they knew
23 that.
24 Q  Well you weren't interviewed by any person
25 associated with law enforcement in Huntsville, were

1 you?
2 A  No.
3 Q  Okay.  So if you weren't interviewed with law
4 enforcement, it would be fair to assume that you did
5 not tell them about all this, right?
6 A  About me selling drugs in Montgomery and all
7 that?
8 Q  Right.
9 A  No, I did not.
10 Q  Everything you described to us for the past two
11 days.
12 A  No.
13 Q  You didn't begin to tell them well, you know,
14 that I worked for Leon.  You didn't tell them you
15 worked for Leon, did you?
16 A  No.
17 Q  And you didn't tell them about all this money
18 that you've come in here and told this jury that you
19 made?
20 A  No.
21 Q  And you didn't tell them that Mr. Carmichael is
22 so greedy and he's so cheap that he won't get me out
23 of jail despite the fact that I've made him millions
24 of dollars.  You didn't tell them that, did you?
25 A  No.

1 Q  It wasn't until they caught you red-handed in
2 Montgomery with another trafficking case that you
3 decided you would see the light.  You would change
4 your ways, right?
5 A  Correct.
6 Q  Because we know based on your admissions here
7 today, if they're true, you got right back in it no
8 quicker than you got home to get money to pay your
9 lawyer and to recoup all these losses you say you had.
10 A  Like I said, I owed Leon four hundred pounds when
11 I got back, so I got back to business.
12 Q  Okay.  So you got back to business in a hurry.
13 A  Not in a hurry, but I was scared.  I didn't want
14 to get right back into it the next day.  You know.
15 Q  Okay.  Well it didn't take you long, based on
16 what you told us here.
17 A  I had no choice.  I had to pay a lawyer and a
18 bondsman.
19 Q  You have been very specific, Mr. Denton, not only
20 in statements we've been provided by the government,
21 but also in what you've told here today about where
22 you took money and where you picked up money from
23 where you allege involved with Mr. Carmichael, right?
24 A  Correct.
25 Q  The way I heard it, you said you picked up money

Multi-Page™

Page 190

1 at his house, right?
2 A  Took money to his house.
3 Q  Took money to his right, right?
4 A  Yes.
5 Q  You said you took money to the Carmichael Center,
6 right?
7 A  Correct.
8 Q  And you also said you took money to him at a
9 hotel, didn't you?
10 A  Did I say I took money to him at a motel?  I
11 don't recall that statement.  I think I said I met him
12 at a hotel and talked to him.  I don't think I gave
13 him any money at a motel.
14 Q  You didn't give him any money?
15 A  I don't think I paid no money at no hotel.  I
16 think it was his house, the Carmichael Center, the
17 club, the girlfriend's house, gas stations.
18 Q  Well let me ask you this.
19        MR. FEAGA:  Your Honor, I would just want to
20 impose one objection, and that is if his counsel is
21 going to ask him about his prior testimony, that she
22 not tell him that he said something that he in fact
23 didn't say.  That she correctly state what he
24 testified in the past.
25        THE COURT:  He can correct something, too.

Page 191

1 If he feels she's mischaracterizing her testimony, he
2 can say that.
3        MR. FEAGA:  Yes, sir.
4        THE COURT:  Go ahead.
5 Q  Now, Mr. Denton, you understood, did you not,
6 that it was very important that those places that you
7 took the money for you to recollect, that was very
8 important to the Government's case.  You understood
9 that, didn't you?
10 A  Yes.
11 Q  And you knew in part that was important because
12 if they could connect the money to some of Mr.
13 Carmichael's property they might attempt to seize it.
14 You understood that, didn't you?
15 A  Yes.
16 Q  And you know the government is trying to take the
17 Carmichael Center, don't you?
18 A  That doesn't affect me what they take.
19 Q  It doesn't, I know.  And you knew they were
20 trying to take his house, right?
21 A  No, I didn't know what all they were trying to
22 get.  I wasn't aware of that.
23        MS. JAMES:  Judge, may I approach?
24        THE COURT:  Yes.
25        MR. FEAGA:  Your Honor, we're going to

Page 192

1 object to her going into any issues about forfeiture
2 at this stage of the proceedings.  I think she's
3 outside the --
4        MS. JAMES:  It's not for that purpose.
5        THE COURT:  Overruled.  Go ahead.
6        MR. FEAGA:  I was talking about the
7 question.  If she's going to go further into the
8 issues of forfeiture --
9        THE COURT:  She said she's not going into
10 that.
11        MR. FEAGA:  Okay.
12        MS. JAMES:  May I approach the witness, Your
13 Honor?
14        THE COURT:  Yes.
15 Q  I'm going to show you what's now in evidence as
16 government's exhibit 7(c), Mr. Denton.  And you've
17 identified this as your house, haven't you?
18 A  Correct.
19 Q  The house you say you paid fifty-five thousand
20 for?
21 A  That's what it's financed for, yes.
22 Q  Right?
23 A  It's not paid for.
24 Q  But you have reason to believe now -- It's on a
25 spacious lot, isn't it?

Page 193

1 A  Yes.
2 Q  You have reason to believe now that this house is
3 worth close to a hundred thousand dollars, isn't it?
4 A  I don't know.  Is it?  I haven't had it
5 appraised.
6 Q  Well tell me today, so that we all understand,
7 what the United States Government has done about
8 forfeiting this house, taking your house.
9 A  As far as I know, nothing.
10 Q  Now you told us that you had dope delivered there
11 many times and broken it down, haven't you?
12 A  Correct.
13 Q  And you know that's illegal, don't you?
14 A  Correct.
15 Q  And you know that the government, if they wanted
16 to, could take your house.
17 A  If they wanted to I'm sure they could.
18 Q  Now you said that you weren't worried about the
19 time in this case because you're not going to be
20 charged, right?
21 A  I don't have anything in the writing.  I hope I'm
22 not going to be charged.
23 Q  Okay.  But you did say when I quoted you, you
24 don't have to worry about any time for this, and you
25 meant this case.

Page 194

1  A  That's what I said, yes.
2  Q  Okay.  And you said you didn't really know what
3  you're doing here would have any impact on your case
4  in Huntsville, right?
5  A  Correct.
6      MS. JAMES:  Judge, may I approach the
7  witness?
8      THE COURT:  Yes.
9  Q  I'm going to show you two documents that purport
10 to have your name in case number two thousand four,
11 one eighteen, and ask you if these two documents, if
12 you know, relate to the case that you have pending in
13 Huntsville.
14 A  I'd have to read it.
15 Q  Okay, please do.
16     (Whereupon, the witness examined said
17 documents.)
18 A  It appears to be a continuance request.
19 Q  Right.  And it's got your name and it appears to
20 be your case, doesn't it?
21 A  Yes.
22 Q  And it's signed, or appears to bear the signature
23 of your lawyer, Mr. William Burgess, correct?
24 A  Correct.
25 Q  And in that motion where your lawyer in September

Page 195

1  of 2004 requested a continuance, he indicated that,
2  "The defendant is a material witness in a federal
3  criminal case involving Defendant Leon Carmichael,"
4  didn't he?
5  A  Yes.
6  Q  And he asked that the continuance -- that the
7  case be continued until the federal proceedings in
8  Montgomery are over, right?
9  A  Correct.
10 Q  And those proceedings would be the proceedings
11 that we're involved in here today, correct?
12 A  Correct.
13 Q  And the judge granted that continuance based on
14 that order in front of you, correct?
15 A  Yes.
16     MS. JAMES:  Your Honor, at this time I would
17 move for the admission of Carmichael's 1.
18     THE COURT:  Admitted.
19     MS. JAMES:  May I retrieve it, Judge?
20     THE COURT:  Yes.
21     MS. JAMES:  And permission to publish?
22     THE COURT:  Yes.
23 Q  Mr. Denton, there before you on the screen is
24 that order which is now in evidence as defendant
25 Carmichael's exhibit 1.  That second paragraph signed

Page 196

1  by Bruce E. Williams, the circuit judge, says,
2  "Further, the case is placed on the Court's
3  administrative docket until such time as the federal
4  proceedings as outlined in defendant's request are
5  completed with either of the attorneys notifying the
6  Court when this case may be rescheduled for trial."
7  Is that what it says, sir?
8  A  Yes.
9  Q  Now you won't know until after you leave here and
10 get back up there what's going to happen to that case,
11 will you?
12 A  Correct.
13 Q  But you would certainly expect that somebody from
14 the government, Mr. DeJohn or one of these lawyers or
15 somebody, would let those folks up there, including
16 Judge Bruce Williams, know that you had been here
17 testifying in open court against Mr. Carmichael,
18 right?
19 A  Yes, I hope so.
20 Q  And that case has now been pending for what,
21 right at two years?  Just next week it will be two
22 years, right?
23 A  Correct.
24 Q  All right.  Now, I would imagine that you and Mr.
25 George had a number of opportunities to talk between

Page 197

1  the time of his arrest and the time of your arrest,
2  correct?
3  A  No.
4  Q  Well I thought you had described all of those
5  events today where he was running down the road, you
6  were at the Capitol Oyster Bar and he was drunk.
7  A  Are you talking about when he started cooperating
8  with the --
9  Q  Yeah.  I'm talking about from his arrest on the
10 13th of November until your arrest on the 17th of
11 November.
12 A  I talked to him, yes.
13 Q  Right.  I mean you didn't know he was
14 cooperating.
15 A  No.
16 Q  At least that's what you said here today, you
17 didn't know that?
18 A  That's what I meant.
19 Q  Okay.  So you know now for sure that he was
20 cooperating.
21 A  Yes.
22 Q  But you talked to him the 13th, you talked to him
23 the 14th of November of 2003, you talked to him the
24 15th and you talked to him the 16th, right?
25 A  What was the 16th?

Multi-Page™

Page 198

1 Q  That would have been the Sunday before your
2 arrest on Monday, right?
3 A  Yes, mm-hmm.
4 Q  And he told you -- Y'all discussed the fact that
5 Charlotte Hensarling had been arrested, right?
6 A  Yes.
7 Q  And you were so nervous about that, that you
8 actually went and left your house and went to a motel,
9 right?
10 A  Correct.
11 Q  And you were very careful because you had
12 experience with the federal government coming in and
13 taking your stuff.  You were very careful not to leave
14 anything of value or any incriminating information in
15 your house just on chance that they would come.
16 A  What do you mean by "incriminating" evidence?
17 Q  Well you didn't leave your scales because you
18 said awhile ago you got rid of your scales.
19 A  Of course I did.
20 Q  Okay.  So you got rid of your scales.
21 A  Yes.
22 Q  And you didn't have any dope in your house when
23 they finally came, right?
24 A  Correct.
25 Q  And despite what you say where Mr. Carmichael's

Page 199

1 assurances that nothing would happen, you certainly
2 took great care not to leave anything in that house
3 like your guns or your money and your scales, things
4 like that that they got before.
5 A  They took the guns.  I didn't have anymore guns
6 after that.
7 Q  Didn't have any guns left?
8 A  After 2002, no, they took the guns.
9 Q  But you took the dope, the evidence that was
10 going to show that you were involved in the dope
11 business.
12 A  Correct.
13 Q  You got rid of the scales because you had to go
14 borrow scales from Agent DeJohn before you could weigh
15 up the dope at Freddie's house.
16 A  Yes.
17 Q  Now they come to your house on the 17th, early
18 morning, and just out of the blue Mr. Carmichael gives
19 you a call, two something, two-forty in the morning,
20 right?
21 A  Correct.
22 Q  Now Mr. Carmichael at that Center puts on
23 concerts, doesn't he?
24 A  Yes.
25 Q  You, in fact, previously invested some of your

Page 200

1 money with Mr. Carmichael to do a promotion of Aaron
2 Tippit (ph.), the country singer, to come there to the
3 Center, didn't you?
4 A  Yes.
5 Q  You put some -- The agreement was that you were
6 going to put close to thirteen thousand dollars into
7 that promotion, right?
8 A  Yes, correct.
9 Q  You didn't put all that in, did you?
10 A  No.
11 Q  Because the thing didn't work.
12 A  No.
13 Q  So you lost money on that, too, didn't you?
14 A  No, I made it up, too.  Yes, ma'am.
15 Q  But you lost money on it, right?
16 A  Yes, mm-hmm.
17 Q  And on Sunday, and that was a Sunday, you knew
18 Mr. Carmichael in addition to other things had a
19 gospel singing going on at the Center, didn't you?
20 A  I don't know what he had going on on what day,
21 no.
22 Q  Well, let me ask you this.  When they do have
23 some of those things going at the Center, you know
24 this because you live in the neighborhood, it's not
25 unusual that they're over close to midnight?

Page 201

1 A  Yeah, I guess.  I don't know what time they get
2 over.  It might be midnight, it might be earlier, it
3 might be later.  I don't know.  I didn't see all times
4 of night.
5 Q  Well, when you decided to invest your money with
6 Mr. Carmichael in this promotion of Aaron Tippin
7 (ph.), certainly you inquired of Mr. Carmichael what
8 the circumstances were, how you do this, what is
9 likely for you to expect.  Didn't you do that?
10 A  Oh, yes.
11 Q  Okay.  And I'm sure you got a little bit of
12 insight into concerts and how that whole process
13 worked, correct?
14 A  Yes.
15 Q  Okay.  So if you're going to put a band on or
16 something like, people don't want to come and see them
17 at four o'clock in the afternoon usually, do they?
18 A  I wouldn't think so.
19 Q  Usually the band comes on, or the star comes on
20 later at night, sometimes eight, nine, ten o'clock at
21 night, right?
22 A  Yeah.  Every time is different, I assume.  I
23 don't know.  I'm not a promoter.
24 Q  Well, have you ever been to a concert yourself?
25 A  Not too many, no.  I probably been to one or two.

Multi-Page™

Page 202

1  I'm not a concert goer.
2  Q  Okay.  Well you don't know what was going on at
3  the Center on that Sunday, do you?
4  A  No.
5  Q  Okay.  So Mr. Carmichael, his Center is about two
6  miles from where you live, right?
7  A  Correct.
8  Q  He calls you and he says, "Hey, I'll be by there
9  in five minutes," right?
10  A  "I'm on the Bypass.  I'll be by there in a few
11  minutes."
12  Q  It didn't take him but a few minutes to get
13  there?
14  A  Yeah.
15  Q  And you say at that point the police are there
16  and everybody just scrambles, right?
17  A  Correct.
18  Q  And so you had a conversation with Mr. Carmichael
19  right?
20  A  Yes.
21  Q  But because you didn't at that time have an audio
22  recording device, or a camera like you did with Mr.
23  Williams, the only thing that we know about that
24  conversation and what happened there is relying on
25  what you tell us.

Page 203

1  A  Correct.
2  Q  Okay.  But we know that -- Well, let me ask you
3  this:  When they all scrambled and you have the
4  conversation with Mr. Carmichael and he leaves, he's
5  only there for a few minutes, right?
6  A  Yes.
7  Q  At that point the police come back?
8  A  Yes.
9  Q  Okay.  And so then that's when y'all devised the
10  plan that you'll go over to Mr. Williams' house the
11  next morning, right?
12  A  Yes.
13  Q  They told you to plan to meet them about seven
14  o'clock the next morning because y'all wanted to get
15  an early start on this, right?
16  A  Yes.
17  Q  Now, that's about -- Mr. Carmichael swings by
18  your house close to two-forty a.m., two-fifty a.m.,
19  and you've got what, four or five hours left before
20  you have to meet them?
21  A  Yes.
22  Q  And you've got a swarm of law enforcement people
23  there.  You've got Agent DeJohn and all his help,
24  right?
25  A  Yes.

Page 204

1  Q  So many earlier that you couldn't even count
2  them, right?
3  A  Correct.
4  Q  And we know that they had, at least earlier -- or
5  later that morning, the capacity to put a
6  sophisticated piece of equipment on you that would
7  record sound, right?
8  A  Yes.
9  Q  Sophisticated piece of equipment that was a fake
10  camera phone that -- I mean a fake cell phone that had
11  a camera in it.
12  A  Yes.
13  Q  And they had skilled technicians capable of
14  putting that equipment on you so that you would not be
15  noticed, right?
16  A  Yes.
17  Q  And that is the subject of, or what facilitated
18  the making of these audio and videotapes that we've
19  seen today, right?
20  A  Yes.
21  Q  Now they gave you specific instructions about
22  what to do, didn't they?
23  A  What do you mean "specific instructions"?
24  Q  Well they told you how the equipment would work?
25  A  They said it had a camera on it and this records

Page 205

1  everything and how to hold it in a certain way.
2  Q  Well at least at that point, though in addition
3  to the instructions, it's no secret that they are
4  interested in anything that you can say or do that
5  would help them try to get something on Mr.
6  Carmichael.  That's no secret.
7  A  Yeah, sure it would be helpful.
8  Q  Right.  And although you said you only went to
9  the ninth grade, I mean you've been around the block,
10  you can talk the talk and walk the talk as far as dope
11  dealing.
12  A  If that's what you say.
13  Q  Well, I mean you have been in the business.
14  A  I have been in the business, yes, I don't deny
15  it.
16  Q  Well you made a lot of money?
17  A  I didn't make a whole lot, I made some.  I didn't
18  make a whole lot.
19  Q  Well isn't it important, Mr. Denton, when you're
20  going to be in the drug business and sell drugs that
21  you try to make the folks that you're dealing with
22  think you know about drugs?
23  A  Oh, yes, definitely.
24  Q  And you don't want the folks that you're dealing
25  with to think that you're a cop or working with Agent

**Page 206**

1 DeJohn or someone like that.
2 A  If they thought you were a cop they would be
3 stupid to deal with you.
4 Q  Right.  And at that point you don't want Mr.
5 Williams to know that you were working for law
6 enforcement, right?
7 A  No, correct.
8 Q  And you wouldn't want Mr. Carmichael to know.
9 A  No.
10 Q  Now between the time they executed the search,
11 Mr. Denton, at your house until you actually got to
12 Mr. Williams' house, that was about eight o'clock the
13 next morning, right?
14 A  Yes.
15 Q  The same day, just later in the morning?
16 A  Yes.
17 Q  And if the time on those tapes that we've seen
18 today is correct, it looked like you were still there
19 in that house after ten o'clock close to eleven
20 o'clock a.m.
21 A  That's what they say.  I don't remember the exact
22 time.
23 Q  The people that determined what time you would go
24 over to Freddie Williams' house was Agent DeJohn and
25 his people, wasn't it?

**Page 207**

1 A  Yeah.  Me and Leon had talked, we wanted to get
2 started early.
3 Q  Right.
4 A  I told him I needed to get there by eight
5 o'clock.
6 Q  Okay.  You told them that?
7 A  Yes.
8 Q  But they were in charge of when they would let
9 you go over there, right?
10 A  Yes.
11 Q  Okay.  Now you say that Mr. Carmichael called you
12 sometime while you were over getting your baggies.  Do
13 you remember that?
14 A  Yes.
15 Q  You actually had the fake phone and you had your
16 real phone, didn't you?
17 A  I didn't have the fake phone on me at that time.
18 Q  You didn't have a camera phone on you?
19 A  Not in the store, no.
20 Q  So you had it on you when you were at Mr.
21 Williams' house, right?
22 A  Yes.
23 Q  And you had it on you when you were in the car
24 driving along because we just see the dash, don't we?
25 A  Yes.

**Page 208**

1 Q  But interestingly when Mr. Carmichael called you,
2 obviously based on what you're saying, with
3 information that might be helpful to Agent DeJohn
4 about this case, you left it in the car.
5 A  I didn't leave it in the car.  They were changing
6 the batteries on it.  They wanted to make sure the
7 batteries was good, because they didn't know how long
8 it was going to take.
9 Q  So it was just sheer coincidence that when Mr.
10 Leon Carmichael calls you to inquire about the status
11 of this big shipment of drugs, your camera phone and
12 audio and all that is inoperable, right?
13 A  It's not on me, correct.
14 Q  Okay.  Well, your phone had Mr. Carmichael's
15 number programmed in it, didn't it?
16 A  Yes.
17 Q  So it wasn't a situation where you couldn't have
18 dialed him up and let those agents listen just like
19 you did the night before or that earlier that morning,
20 was it?
21 A  I was in the store, the agents were outside.
22 Q  Well I don't mean then.  I mean any time between
23 when they came to your house and you had your
24 conversion after one o'clock to turn your life around,
25 any time between then and earlier that morning --

**Page 209**

1 later that morning when you're trying to get
2 incriminating evidence for the United States
3 Government, you could have dialed Leon Carmichael's
4 number, right?
5 A  Yes.
6 Q  And it wouldn't have been bizarre or out of the
7 ordinary when Freddie has his crisis, an emergency,
8 his wife is dying, for you to have used that as a
9 reason to call and say hey Leon -- because you're
10 working with them, they're all outside with their high
11 powered equipment, aren't they?
12 A  Yes.
13 Q  Hey Leon, we got a problem over here, man.  I'm
14 sitting here with five hundred pounds of marijuana --
15 or you wouldn't say that on the phone, would you?
16 Dope dealers wouldn't talk "marijuana" on the phone,
17 right?
18 A  You're correct.
19 Q  But you would say hey, man, we got a problem.
20 A  Correct.
21 Q  Freddie's wife is dying.  He is on his way to the
22 hospital, I'm here, what do I do with all these
23 whatever, towels, doorknobs, what do I do?  You could
24 have done that.
25 A  Yes.

Multi-Page™

**Page 210**

1 Q Now I really kind of want to talk to you about
2 the money. Well let me back up a minute. I'm a
3 little A. D. D. so I jump around.
4       We talked about the possible federal
5 punishment -- I mean the state punishment that you
6 faced. Did anyone talk to you about the federal
7 punishment that you face if you didn't cooperate,
8 other than just you were in big trouble.
9 A Basically. That was all that was said,
10 basically.
11 Q Well you got the sense, didn't you, that you
12 could be looking at a life sentence either in state
13 custody or a very substantial federal sentence if you
14 didn't cooperate with them?
15 A I didn't get the sense of a life sentence, no.
16 Q Okay. I don't want to know, again, what you
17 your lawyer discussed, but I do want to know this:
18 You used Mr. Burgess in Huntsville as your legal
19 counsel, right?
20 A Correct.
21 Q You haven't used Mr. Burgess in any way in this
22 situation in the Middle District of Alabama, have you?
23 A Correct.
24 Q You don't have a lawyer down here, do you?
25 A No, I do not.

**Page 211**

1 Q Didn't feel like I needed a layer down here, did
2 you?
3 A No, I did not.
4 Q All right. Let's talk a little bit about the
5 money. There have been a lot of figures thrown around
6 up here. And what I heard you say, going
7 conservatively was that at the end of all of this, and
8 I'm referring to the end, would you agree, November of
9 2003?
10 A Yes.
11 Q I heard you say yesterday that from January '01,
12 in January '01 you started moving a hundred pounds per
13 week. Do you remember saying that?
14 A Yes.
15 Q At sixty thousand dollars a pop. Sixty thousand
16 you were selling -- You were buying it for six hundred
17 dollars. You said Mr. Carmichael was buying it for
18 six hundred a pound?
19 A No, Mr. Carmichael was paying three hundred. Two
20 seventy-five and three hundred. He was giving it to
21 me for six hundred dollars.
22 Q Okay. So you were paying six hundred dollars a
23 pound.
24 A Yes.
25 Q So you're paying six hundred dollars a pound,

**Page 212**

1 which would be for a hundred pounds sixty thousand
2 dollars, right?
3 A Yes.
4 Q And you said that you were making conservatively,
5 I thought you said yesterday -- Well let's just go
6 with what you said today. I thought that you said you
7 were making between twenty-five and fifty dollars a
8 pound.
9 A It varied from week to week. Some weeks I might
10 make twenty-five. Some weeks I might make fifty.
11 Some weeks might sell less than six hundred because
12 you couldn't get no more for it. Just to help get rid
13 of it.
14 Q Okay. Well sometimes you could make more,
15 depending on how you broke it down, right?
16 A Not really, because I wasn't into the breaking
17 down business. I sold it by the pound. I didn't
18 break nothing down, hardly. Correct.
19 Q All right. But if you're selling a hundred
20 pounds a week, is that what you said you were doing,
21 selling a hundred pounds a week?
22 A Yes.
23 Q And if you were making fifty dollars a pound,
24 we're talking -- Were you ever selling two hundred a
25 week?

**Page 213**

1 A Probably sometimes. A good week it might jump up
2 there. It might jump down. It might jump up. It
3 varied from week to week.
4 Q Well, let me ask you this. No question if you
5 were selling a hundred pounds a week and making a
6 fifty dollar profit, that would be five thousand a
7 week, right?
8 A Yes.
9 Q Okay. You'd would agree with me and stick with
10 your testimony that you said yesterday that in January
11 '01 you were selling a hundred pounds a week?
12 A Yes.
13       MS. JAMES: Your Honor, may I use the chart?
14       THE COURT: Yes.
15 Q All right. Okay. So you said here today you're
16 talking about February of 2003 until November of 2003,
17 that you're selling a hundred pounds a week, right?
18 A Yes.
19 Q That would be February to March, March to April,
20 April to May, May to June, June to July to August to
21 September, September to October and almost all of
22 November, right?
23 A Correct.
24 Q Almost nine months.
25 A Correct.

Multi-Page™

Page 214

1 Q  And if you take nine months and do four -- what
2 is it, four weeks in a month?  Let's see, that would
3 be two thousand -- two oh three through eleven oh
4 three.  I figure that eight and-a-half to nine months.
5 If we went with nine months, that would be thirty-six
6 weeks, wouldn't it?  Okay.  So we got thirty-six weeks
7 times, if we say fifty dollars a pound, right?  Times
8 fifty a pound, that's going to be five thousand
9 dollars a week, right?  Am I right, sir?
10 A  Yes.
11 Q  And you said here today some of those weeks you
12 were saying you were making five thousand a week,
13 right?
14 A  Some of those weeks.
15 Q  And I didn't hear you waver in your testimony,
16 that since February of 2003, a hundred pounds a week,
17 and I'm going with fifty dollars a pound as an
18 average, okay?  I know you say you were saying
19 twenty-five, but it appeared that you were in your
20 heyday during that period of eight to nine months,
21 right?
22 A  What do you mean by "heyday"?
23 Q  Well things were going good for your business.
24 A  It wasn't going that great.  I was trying -- I
25 was making money, but I was trying to help Leon get

Page 215

1 money the Center finished.  Some went for six hundred a
2 pound, some for six-fifty --
3     MR. FEAGA:  Your Honor, I'm going to object.
4 She needs to let him finish his answer before she
5 starts asking another question.
6     MS. JAMES:  He's non-responsive.
7     THE COURT:  How is he non-responsive?
8     MS. JAMES:  He was just rambling.  And he
9 wasn't answering the question.
10     MR. FEAGA:  Judge, she wasn't letting him --
11     THE COURT:  What is your question again?
12     MS. JAMES:  I'll try to rephrase it, Judge.
13     THE COURT:  Okay.
14 Q  Things were going good for your business?
15 A  Semi good, yes.  Could have been better.
16 Q  Now, if we take thirty-six weeks times fifty
17 dollars, five thousand dollars a week, we would have,
18 if you take thirty-six weeks times five thousand, what
19 do we get, Miss Wayne, don't we get a hundred and
20 eighty thousand?  We get one hundred and eighty
21 thousand dollars.  Okay?  And these figures aren't --
22 figures that relate purportedly to Mr. Carmichael, are
23 they?  These figures are your figures.
24 A  Those figures are not accurate.
25 Q  Okay.  But you'll agree with me that my math is

Page 216

1 right?
2 A  If you want to go by fifty a pound, that would be
3 right.
4 Q  Okay.  And you were unwavering on your direct
5 exam that from February of 2003 until the time of your
6 arrest on the 17th, that you were selling a hundred
7 pounds a week.
8 A  Yes.
9 Q  And you said earlier, you know, that you were
10 moving it so quick, I mean things were really going
11 good.  I know you had a slump nine eleven, but things
12 were going good after that when you got back rolling
13 again, weren't they?
14 A  Yes, but like I said, I owed Leon the fifteen
15 thousand, so you have to subtract that out.
16 Q  I understand.  I heard everything you said about
17 Leon, but I'm asking about Pat Denton right now.
18 A  Okay.  What do you want to know?
19 Q  I want to know, and I'm trying to be conservative
20 here, but you let's just say my figures are a little
21 over, okay?  If you divided it and you went with your
22 twenty-five dollars a pound we'd still have what,
23 ninety thousand dollars?  Wouldn't it be half?  So
24 if it's twenty-five dollars, that would still be
25 ninety thousand dollars.  Right?

Page 217

1 A  Yes.
2 Q  And if we went in the middle if we just said
3 let's split the difference, what would we add to that?
4 Another thirty thousand?
5     MS. CHARTOFF:  It would be a hundred and
6 thirty-five thousand.
7 Q  It would be a hundred and thirty-five thousand if
8 we split the difference, right?
9 A  Yes.
10     MR. FEAGA:  Your Honor, we're going to
11 object to Mr. Chartoff answering her questions for her
12 and ask the Court to instruct them not to do that.
13     MS. JAMES:  I apologize, Judge.  I'm just
14 not good with math.
15     MR. FEAGA:  Your Honor, I didn't hear the
16 Court rule.
17     THE COURT:  Now what is it, now?
18     MR. FEAGA:  Miss Chartoff answered the
19 question for Miss James.  And I'm asking the Court to
20 instruct the lawyers at counsel table --
21     THE COURT:  Yes, that's true.  That's very
22 true.
23     MS. JAMES:  Your Honor, I was just asking
24 co-counsel for the math help.
25     THE COURT:  Okay.  You need to whisper it.

Multi-Page™

Page 218

1 Only one lawyer per witness. You're absolutely right.
2      MS. JAMES: I apologize, Judge.
3 Q  Now, Mr. Denton, so if we split the difference
4 we'd be at about at a hundred and thirty-five
5 thousand, right?
6 A  Yes.
7 Q  Okay. So even with the lowest number or the
8 highest number, you accumulated in that very short
9 period of time a lot of money. A lot of money passed
10 through your hands, didn't it?
11 A  Yeah, A lot of money passed through my hands,
12 you're right.
13 Q  It passed through there. And I'm certain that on
14 each one of your tax returns you reported every penny
15 of that, didn't you?
16 A  Of course not.
17 Q  You didn't pay income tax on it?
18 A  No, not on drug money, no.
19 Q  Okay. Well, you weren't doing any other business
20 other than drug business back at that time, were you?
21 A  I had a lawn service business.
22 Q  Okay. Whose lawns did you cut?
23 A  I would have to find the records, if I still have
24 them. I don't know. Different addresses. Different
25 people. I cut Leon's grass one time. Two or three

Page 219

1 times. He didn't pay me for that either because he
2 thought I like I owed that to him.
3 Q  You sure did, you cut his grass, didn't you?
4 A  Yes.
5 Q  Can you tell me any businesses where you cut
6 grass?
7 A  Johnny's Garage. There was a church right there
8 beside it. Southern Cartage, which is a trucking
9 company out on Highway 80. I could probably get some
10 more for you if you want.
11 Q  Okay. Just what was -- If you cut a church, what
12 kind of money would you make cutting a church?
13 A  Depends on the size of the yard.
14 Q  Well give me a high dollar. I mean, what would
15 it cost for somebody to get the church lot cut?
16 A  The church, we always gave a good deal to a
17 church, so anywhere from seventy-five to a hundred and
18 fifty, depending on the lot.
19 Q  Okay. That was Extreme Lawn Care, right?
20 A  Correct.
21 Q  And did you have a business license?
22 A  Yes, I did.
23 Q  And so are you telling me that you were paying
24 your income tax on that business?
25 A  Yes.

Page 220

1 Q  But not on this business?
2 A  No. Correct.
3 Q  All right. Subsequent to your arrest in November
4 of 2003 when Agent DeJohn came to you and you had
5 accumulated between ninety and a hundred and eighty
6 thousand dollars, or had earned that from your drug
7 sales, did the government say where's your money, we
8 want to take it, we want to forfeit it because you got
9 it from the illegal sale of drugs?
10 A  I didn't have that much money. That's an
11 incorrect figure.
12 Q  Did they ask you?
13 A  They looked for it. They looked for anything
14 they could find in the house.
15 Q  Right. But at that point in time you had already
16 cleared everything out of your house, hadn't you?
17 A  Yes, there wasn't any money to clear out.
18 Q  And, again, the only information that we have in
19 that regard is what you tell us.
20 A  Correct.
21 Q  Now, did you have occasion in preparation for
22 this trial -- I know you've looked and listened to the
23 tapes, you've acknowledged that, right?
24 A  Yes.
25 Q  Have you had occasion to look at any reports that

Page 221

1 the government prepared about information that you had
2 given?
3 A  No, I hadn't seen any reports.
4 Q  You didn't see any reports about kind of what you
5 had told them in previous interviews and things like
6 that?
7 A  No.
8 Q  Forms called D. E. A. Sixes?
9 A  No.
10 Q  Okay. Well let me go through a scenario with you
11 and see if you remember any of this. Okay? Not
12 necessarily it's in a report, but just see if you
13 remember it.
14      I be correct in saying that you told the
15 government about two -- well you told them about a
16 lot, but I'm going from your arrest back in time,
17 okay? You told the government that there was a
18 shipment of drugs that came in on November the 9th of
19 2003, didn't you?
20 A  I'd have to remember the notes.
21 Q  You said a couple of weeks before your arrest.
22 A  Yes.
23 Q  Okay. And that that was about five hundred and
24 twenty to five hundred and fifty pounds, right?
25 A  Correct.

Multi-Page™

Page 222

1 Q And you told them at that point in time you were
2 paying about six hundred dollars per pound.
3 A If that's in the notes, yes. I don't remember
4 the exact words, no.
5 Q And my math says that five hundred and twenty
6 pounds, if we went with the low end at six hundred
7 dollars a pound, would be about three hundred and
8 twelve thousand dollars that you would have owed Mr.
9 Carmichael.
10 A That I would owe?
11 Q Yeah. Because do you remember ever having told
12 Agent DeJohn that you took the whole load, and you
13 broke it down, you packaged it and you distributed it?
14 A I didn't keep the whole load.
15 Q Okay. So you don't -- You never said that to
16 anybody?
17 A No, I didn't keep the whole load. I cut it,
18 packaged it, gave back what he needed to his
19 brother-in-law, Montel. At that time it was Montel
20 getting it then.
21 Q So then on that particular load you're saying you
22 didn't get it all?
23 A I got it all, but I did not sell it all.
24 Q Okay. Well, you say that you gave Mr. Carmichael
25 on November the 14th sixty thousand dollars. Do you

Page 223

1 remember that?
2 A Yes.
3 Q Okay. And in what sort of -- were you just
4 taking it in a bundle, or were you putting it in a
5 paper sack? What were you doing?
6 A It would vary. I'd put it in a bag, a vanilla
7 envelope. I'd put it in a cereal box. I'd put it in
8 a Rice Crispy box. Anything that -- a cracker box.
9 Anything that you wouldn't think had money in it.
10 Q Okay. I don't know that I've seen sixty thousand
11 cash, have you? Have you seen sixty thousand in cash?
12 A Yes.
13 Q Okay. Well tell me how big a bundle it would be.
14 A If it's all ones you would be looking at this.
15 If it's all hundreds you might be looking at this. If
16 it's all twenties, it's going to be like this. It
17 could be a little stack, a big stack, an in between
18 stack.
19 Q Well if it's money coming from you it's going to
20 be in ones, fives, tens, twenties, fifties and maybe
21 some hundreds, right?
22 A Yes.
23 Q Which means when you got all that mixed in there
24 it's a bigger stack.
25 A Not necessarily, because it might -- you might

Page 224

1 have a lot of ones, you might have a lot of tens, you
2 might have a lot of hundreds.
3 Q But it's your testimony here today that it would
4 fit in a manila envelope?
5 A Yeah.
6 Q How big a manila envelope?
7 A An average size that you could slip a legal piece
8 of paper in.
9 Q Like eight and-a-half by eleven?
10 A Yes.
11 Q Okay. And so you're saying that on occasion
12 you're saying could fit sixty thousand dollars in cash
13 in an envelope like that.
14 A Very easily.
15 Q But back on this November 9th load that you have
16 said occurred, if it were five hundred and twenty
17 pounds at six hundred dollar a pound, that would three
18 hundred and twelve thousand.
19 A Yes.
20 Q And the sixty thousand would come -- at those
21 figures, that sixty thousand would have come from the
22 sale of a hundred pounds, right?
23 A Correct.
24 Q At that point in time?
25 A Correct.

Page 225

1 Q And I believe you previously stated that six
2 thousand came from Mr. George, right?
3 A That six thousand came from Mr. George?
4 Q Mm-hmm. Did you ever say that George gave you
5 six thousand?
6 A I don't remember.
7 Q You don't remember that?
8 A No.
9 Q Okay. And then you've made reference to another
10 fifty-four thousand dollar payment, do you remember
11 that?
12 A I believe that was the one I made Sunday for the
13 17th.
14 Q But that would still be from that alleged load
15 that you say you got on November the 9th.
16 A It might be from that load, it might be from a
17 load in between there, I don't remember. There's a
18 lot of loads coming in and out. I can't detail the
19 loads.
20 Q Okay. All right. And, by the way, if we go back
21 to these figures, you say you were involved with Mr.
22 Carmichael from 1999 to 2000, up to 2003 to your
23 arrest, right?
24 A Yes.
25 Q And during that period of time some days were

Multi-Page™

Page 226

1 better than others with regard to your profit, right?
2 A  Yes.
3 Q  But I have not heard you yet say that you ever
4 made less than twenty-five dollars a pound, right?
5 A  You didn't listen because I said sometimes when I
6 gave him six hundred, I sold it for the six hundred I
7 got it for.
8 Q  But if you sold it to make a profit, I have not
9 heard you say in the two days you've been were
10 testifying that you ever sold it for lest than twelve
11 five dollars.
12 A  Sometimes I sold it for six hundred and sometimes
13 I didn't make a profit.  I didn't make a profit every
14 time I sold it.
15 Q  All right.  But even in your bad years, '99,
16 2000, 2001 and 2002, you made some profit, didn't you?
17 A  Yes.
18 Q  And even if we went with the low number over here
19 at twenty-five dollars a pound, you didn't have a
20 hundred pounds a week, I understand that, but even if
21 we said let's cut the ninety thousand in half for
22 these lean years, that would have been what, four
23 years at let's say forty thousand, forty-five thousand
24 dollars profit?
25 A  You could assume that, yes.  Like you said, it's

Page 227

1 a business.  You have to take in losses along the way.
2 It's bogus figures.
3      MS. JAMES:  May I have just a minute, Judge?
4      THE COURT:  All right.
5      (Whereupon, Ms. James conferred other
6 defense counsel off the record and out of the hearing
7 of the other courtroom participants.)
8 Q  Now how did your relationship with Mr. George
9 begin?
10 A  He was married to my cousin.
11 Q  And that cousin would be who?
12 A  Diane George.
13 Q  And do you know if they're still married?
14 A  They're divorced.
15 Q  Did you become friends with Mr. George?
16 A  Yes.
17 Q  And were you aware at that time of all of his
18 criminal history?
19 A  Not all of it, no.
20 Q  But you and Mr. George actually were partners in
21 the drug business, weren't you?
22 A  No, not really.  We wasn't partners.  He more or
23 less worked for me.  We weren't partners like that.
24 Q  He did work for you?
25 A  Yes.

Page 228

1 Q  You didn't hold yourself out to your customers as
2 being partners?
3 A  We wasn't partners to nobody.  I mean we were
4 associates and did business together.  It wasn't like
5 here split this or nothing like partners.
6 Q  And you say y'all had a falling out after this
7 whole scenario at the Capitol Oyster Bar and all of
8 that?
9 A  Yes, that's correct.
10 Q  And have you and Mr. George ever had any
11 relationship or conversation since that time?
12 A  No.  I think he called my house maybe that
13 Monday, and that was it.  I haven't talked to him
14 since then.
15      MS. JAMES:  May I consult with co-counsel
16 for just a minute, Judge?
17      THE COURT:  Yes.
18      (Whereupon, Ms. James conferred with other
19 defense counsel off the record and out of the hearing
20 of the other courtroom participants.)
21 Q  Let me just ask you a couple more questions,
22 Mr. Denton.  The neighborhood where you live, I think
23 Mr. Feaga asked you if it was predominantly -- it's
24 predominantly an African-American neighborhood, is it
25 not?

Page 229

1 A  That's correct.
2 Q  And that's really pretty much your community.  I
3 mean that's where your friends come from, I think your
4 wife is African-American, is that correct?
5 A  That's correct.
6 Q  And so you know people in that neighborhood, is
7 that right?
8 A  I know my neighbors.
9 Q  You know your neighbors.
10      And you know people that hung out at the
11 Carmichael Center after it got built, right?
12 A  What do you mean "people that hung out at the
13 Carmichael Center"?  Explain that.
14 Q  Well le me ask you this:  You said on your direct
15 examination that Mr. Carmichael owned the land where
16 the Carmichael Center was and all the land back behind
17 it, or a bunch of land, remember?
18 A  Correct.
19 Q  In fact, if you're going down, is three-thirty
20 one, is that the road that runs by the pond?
21 A  Yes.
22 Q  He has a big old pond down there, doesn't he,
23 that's on that land?
24 A  Right.
25 Q  Would you agree with me that it's probably in

## Page 230

1 excess of three hundred acres right between the
2 Center, or do you know?
3 A I don't know, honestly.
4 Q But it's a big pond?
5 A Yes.
6 Q And it's a much bigger pond than when you were a
7 young boy trying to go down there and fish, isn't it?
8 A When I was a young boy?
9 Q Did you ever go down there as a child and fish?
10 A No.
11 Q But you've gone down there sometime in your adult
12 life and fish?
13 A Yes.
14 Q And you know that Mr. Carmichael, in order to
15 build the Center, bought a number of pieces of heavy
16 equipment, right?
17 A Yes.
18 Q And in order to cut the cost of building that
19 Center he actually had people, and he helped himself,
20 they would go down there and they would dig out in
21 that pond with that heavy equipment and get dirt to
22 bring up and do the foundation for the Carmichael
23 Center.
24 A Yes.
25 Q You knew that.

## Page 231

1 A Yes.
2 Q And given that you were a neighbor and had known
3 Mr. Carmichael since you were what, thirteen, fourteen
4 years old?
5 A Mm-hmm.
6 Q You called on him for help when you wanted to do
7 some excavation at your own house on Fleming Road.
8 A Yes.
9 Q And Mr. Carmichael said sure, Pat, I don't mind
10 helping you. You can borrow the equipment.
11 A He sent his brother to do it.
12 Q But he helped you?
13 A Yeah.
14 Q And in fact, you let Mr. Carmichael keep that
15 equipment in your yard for a significant period of
16 time, didn't you?
17 A Yes.
18 Q And you got to know some of his workers at the
19 Center and in the trucking business as a result of Mr.
20 Carmichael doing you favors.
21 A What kind of favors? What all did he do beside
22 digging the holes? What are you talking about,
23 favors?
24 Q Well if you had to pay for that, would that have
25 cost you some money?

## Page 232

1 A It wouldn't have been free.
2 Q Right. You would have had to pay somebody to do
3 it?
4 A He wanted me to pay him fuel to do it too, as
5 much money as I made him.
6 Q Well you know, Mr. Denton, I've heard you say on
7 more than one occasion today that how much money you
8 had made Mr. Carmichael and he was greedy and he was
9 cheap. I get the sense that maybe you're a little
10 jealous of Mr. Carmichael.
11 A Me saying he's cheap has nothing to do with me
12 being jealous of him. Why would I be jealous of him?
13 Q The truck yard, you've seen it at night, haven't
14 you?
15 A Yes.
16 Q And it's pretty well lighted, isn't it?
17 A Yes.
18 Q In fact, the whole Carmichael Center is very well
19 lighted, isn't it?
20 A Yes.
21      MS. JAMES: I have no further questions.
22 Thank you.
23      CROSS EXAMINATION
24      BY MR. TEAGUE OF PAT DENTON:
25 Q Mr. Denton, I'm Barry Teague. I wanted to ask

## Page 233

1 you some questions, as well. I represent Freddie
2 Williams.
3      You left school in the ninth grade?
4 A Correct.
5 Q And I tried to keep up, this is yesterday's
6 testimony. You worked for quite a few firms and
7 became comanagers and assistant managers?
8 A Yes.
9 Q And the first one I got was Family Mart?
10 A Yes.
11 Q And you ended up as assistant manager there,
12 correct?
13 A Correct.
14 Q Would you name the other places. I didn't get
15 them all down and I apologize.
16 A Big B was briefly Bruno's and Sunday Dinner.
17 Q Those are all pretty good sized firms, aren't
18 they?
19 A Yes.
20 Q What was your salary when you left Family Mart?
21 A Family Mart was roughly, I think, between
22 twenty-five and thirty thousand.
23 Q Where did you next go?
24 A I went to Big B.
25 Q And how much did they pay you?

Multi-Page™

Page 234

1 A  I wasn't there probably three or four months.  It
2 was about four hundred dollars, four-fifty a week,
3 something like that.
4 Q  Four-fifty a week?
5 A  Yes.
6 Q  And what was your position when you did leave
7 there?
8 A  I was the assistant manager there.
9 Q  Assistant manager.  And then you left there to go
10 to a better job?
11 A  Yes, Bruno's offered me fifty dollars a week
12 more.
13 Q  And how long did you stay with them?
14 A  It wasn't long I stayed with them because A & P
15 called me back and they offered me more than what
16 Bruno's was paying.
17 Q  They didn't hire you to come in and be a bagger
18 of groceries.  I mean they brought you in at the top
19 level of management, didn't they?
20 A  Correct.
21 Q  What was your salary then with Bruno's?
22 A  It was probably four seventy-five maybe.
23 Q  What would that be annually, say?
24 A  Roughly twenty-four thousand dollars a year.  You
25 might get a bonus or something.

Page 235

1 Q  Okay.  And then where did you go after Bruno's?
2 A  I think Bruno's was A & P, then Sunday Dinner
3 bought the building A & P left, so I went to work for
4 Sunday Dinner.
5 Q  Now if I understand Sunday Dinner, Sunday Dinner
6 is a pretty good sized place.  Are you talking about
7 the place down on Mobile Highway?
8 A  No, they had a cash and carry store.
9 Q  And was that the one that was next door to the
10 Montgomery Mall?
11 A  No, that was on South Court Street.
12 Q  So that was in recent years, then.
13 A  Yes.
14 Q  How long were you with them?
15 A  I think five, maybe six years.
16 Q  You stayed with them a good while.  What was your
17 salary when you left them?
18 A  It roughly thirty thousand dollars a year.
19 Q  Thirty thousand dollars a year.  And you're
20 married.  You have children?
21 A  Yes.
22 Q  How many children?
23 A  Two.
24 Q  Two?  How old are your children, if I may ask?
25 A  Eleven and nine.

Page 236

1 Q  So for the years we're talking about going back
2 to 1999, you felt you had to have more money than you
3 were getting paid as manager, comanager, whatever your
4 position was.
5 A  Yes.
6 Q  And for all those firms to hire you, I don't
7 think any of them ever fired you, did they?
8 A  No.
9 Q  Okay.  You must have had some pretty good
10 management skills, organizational skills and whatnot?
11 A  Yes.
12 Q  Sunday Dinner is a pretty big outfit, isn't it?
13 A  Yes.
14 Q  So you know how to organize things and keep it
15 running fairly smoothly?
16 A  Yes.
17 Q  Now when we're talking about your lawn service,
18 we're not really talking about any money at all, are
19 we?
20 A  When I broke my shoulder when I got it started,
21 that --
22 Q  That a really --
23      MR. FEAGA:  Your Honor, we're going to again
24 object to Mr. Teague interrupting the witness.  He
25 needs to allow the witness to answer his question.

Page 237

1 Q  Okay.  I think you were saying that no, you broke
2 your shoulder, so you didn't do too much of that?
3 A  No, not like when I wanted to.
4 Q  And when you did it, it really was like a
5 cover, wasn't it?
6 A  No, it was a legitimate business.
7 Q  Legitimate.  In other words, you reported the
8 taxes on it?
9 A  Yes, the little I made.
10 Q  Tell the jury how much money did you make doing
11 the yard business as opposed to --
12 A  I don't have my tax returns in front of me.  I'd
13 actually have to get them to tell you.  I don't know.
14 Q  Can't even make a wild guess?
15 A  I don't even know how much we reported that year.
16 Q  It's been so many years back you can't even begin
17 to remember?
18 A  It's not that, taxes you don't keep in your head
19 all the time.
20 Q  When it came to figures like Miss James went over
21 with you over there, you never thought like boy, I
22 sure would like to get back to where I was, you know,
23 mowing lawns and making that money again?
24 A  I never what, now.
25 Q  You never did want to be a lawn man, did you?

Page 238

1 A I started out with a legitimate business and
2 wanted to do that.
3 Q But as I understand your testimony yesterday, you
4 claim that you went to Mr. Carmichael and said I want
5 to get in this business.
6 A Get into what business?
7 Q Did you get in the business before 1999?
8 A No.
9 Q Your connection with Gary Wayne George was
10 through your wife's cousin?
11 A My cousin.
12 Q Your cousin?
13 A Yes.
14 Q And what year did they marry?
15 A I have no idea.
16 Q Before 1999?
17 A I'm pretty sure it was before then.
18 Q You hung out with him, then, before 1999?
19 A We weren't hanging out pals. We weren't best of
20 buds.
21 Q Did you think he was a nice guy?
22 A He was decent. He never did nothing to me.
23 Q Let me ask you this: When it came to your
24 organization that you and Mr. George had, did he bring
25 in any business to your organization?

Page 239

1 A He had his own customers.
2 Q And were the Hensarlings customers that he
3 brought in, so to speak?
4 A Yes, I met them through him.
5 Q Okay. Well you had taken his customers and were
6 dealing with them directly, weren't you, and cutting
7 Mr. George out?
8 A No, I wasn't cutting him out. He got a piece of
9 the pie.
10 Q Well what were you doing out there in Huntsville
11 delivering drugs to the Hensarlings if they were
12 actually his business?
13 A I was taking it to them because he couldn't
14 handle that.
15 Q He couldn't handle that?
16 A No.
17 Q Well that's an interesting word. What do you
18 mean, he couldn't handle what? Weren't you loading on
19 to them?
20 A No. He rode with me most of the time, just about
21 all the time. But everybody liked to ride all the
22 time. He used to stay home sometime. Sometimes he
23 would go without me. Sometimes I would go without
24 him.
25 Q So your position is, you didn't bird dog his

Page 240

1 clients away from him?
2 A No, by no means.
3 Q It sounds as though if your relationship with Mr.
4 George was anything like the last two days before he
5 got arrested. Sounds like it was pretty stormy all
6 the time. Would that be a fair characterization?
7 A No, it wasn't like that all the time.
8 Q Is it fair to say that if the police hadn't come
9 to see you on the night of November the 17th, 2003,
10 you would still be in the business, wouldn't you, sir?
11 A Possibly.
12 Q Possibly? Assuming things had gone as they had
13 in the past you would still be in the business. The
14 money was good.
15 A Yeah.
16 Q Did you not say on the record yesterday that it
17 was good?
18 A Yes.
19 Q Fred Thomas. I think we last talked about Fred
20 Thomas yesterday. Was Fred Thomas maybe a source of
21 yours?
22 A A what?
23 Q Well, was Fred Thomas a drug dealer?
24 A He delivered drugs to Leon. I don't know if he
25 was -- I know he was a courier, a deliveryman.

Page 241

1 Q You said he was a courier?
2 A Yes, he carried drugs and moneybags back and
3 forth for Leon.
4 Q And did you ever buy anything from this Fred
5 Thomas?
6 A No.
7 Q Now when you got in trouble with the police in
8 Huntsville in June of 2002, you got arrested and
9 charged with trafficking, two counts, correct?
10 A Correct.
11 Q So you could get -- Now your attorney advised you
12 that's a Class A felony, or you found out it was a
13 Class A felony. The range of punishment on a Class A
14 felony is from ten years all the way up to life
15 imprisonment, isn't it?
16 A You know the law better than me.
17 Q No, I'm asking you.
18 A He told me the most I'm looking at was a
19 mandatory of three years for the trafficking and that
20 was it.
21 Q He guaranteed you that?
22     MR. FEAGA: Your Honor, he's interrupting
23 him again.
24     THE COURT: You did interrupt him.
25     MR. TEAGUE: Yes. He starts dropping his

**Multi-Page™**

Page 242

1 voice, Judge, and I thought he was finished.
2     THE COURT: Did you complete your answer?
3     THE WITNESS: No, sir.
4 A Like I said, he explained to me the worst I was
5 probably looking at was the mandatory three years for
6 the trafficking charge. And he felt like that would
7 be the worse I would be facing.
8 Q Well let's not talk about what you were facing.
9 Did he ever tell you what the parameters were of the
10 punishments, possible punishments?
11 A I don't remember the details of years and all
12 that, if we went into all of that.
13 Q If he had told you a life sentence you would have
14 remembered that, wouldn't you?
15 A I don't think he told me a life sentence. I'm
16 sure I would probably would have remembered a life
17 sentence.
18 Q Your deceased friend Ike, was he a dealer?
19 A Yes.
20 Q Did you ever buy from him?
21 A No.
22 Q You only sold to him?
23 A Yes.
24 Q So he was a part of your distribution
25 organization?

Page 243

1 A Correct.
2 Q Most dealers, it seems, usually try to keep more
3 than one source because if one source doesn't have
4 drugs available for them to get, they were able to go
5 to another source. Did you ever have any other source
6 than what you claimed to be Leon Carmichael?
7 A I had the best. I didn't no others.
8 Q You had the best?
9 A Yes.
10 Q Let me ask you this: Did you ever explore the
11 possibility of sources for marijuana at the port of
12 Mobile, Alabama?
13 A No. I don't understand what you're talking about
14 Mobile. I don't remember nothing about Mobile.
15 Q You don't remember anything about Mobile?
16 A Not to my knowledge, no.
17 Q Never went there on any kind of illegal, illicit
18 adventure seeking or to sell or to distribute drugs?
19 A Not to my knowledge. No, I don't remember
20 anything about Mobile, no.
21 Q Well, I think you've made it clear that you don't
22 have anything to worry about with regard to this case,
23 and I'm assuming that is your sale of dope to the
24 Hensarlings on November the what was it, the 12th,
25 13th, 14th?

Page 244

1 A Yes.
2 Q And you haven't been arrested for that, have you,
3 sir?
4 A No, I have not.
5 Q And who has told you don't need to worry about
6 that?
7 A Nobody has told me I don't need to worry about
8 anything.
9 Q Nobody for the U. S. Attorney's Office, nobody
10 with the D. E. A. has said you don't need to worry
11 about this, we'll just let you face only the state
12 charges that are already pending?
13 A No, they have not went into detail and expressed
14 none of that.
15 Q But you did use the word yesterday, you know, I
16 don't have to worry about this case?
17 A I hope I don't have to worry. Maybe I phrased
18 that wrong. I should have said hope in front of that.
19 Q So now you want to change that from --
20 A If you want to change it, you can change it. If
21 I said that, I said that.
22 Q Sure. Would it be a fair statement to say that
23 if one intends when they get clear of their charges to
24 go back to the same business, they certainly wouldn't
25 want to give the source that will bring in that kind

Page 245

1 of money away to the government, would they?
2 A Explain that question again.
3 Q Well a good smart businessman like you who has
4 good management skills, a guy with a ninth grade
5 education who can jump into management in some of the
6 major companies in this town, you know what a good
7 business it can be, vis-a-vis these figures over here,
8 is that correct?
9 A Yes, it could be lucrative, yes.
10 Q Could be? Could be?
11 A Could be.
12 Q That's why you got in it, wasn't it?
13 A Exactly.
14 Q That's why you stayed in it, wasn't it?
15 A Got trapped in it more or less.
16 Q Oh my goodness, we should have pity on you.
17 A You don't have to have pity on me. I don't care
18 about your pity.
19 Q Well did you get trapped in it when you got
20 arrested in June of 2003 or 2002?
21 A Did I get what?
22 Q In June of 2002?
23 A Did I get trapped in it?
24 Q Well you certainly were in a mess, weren't you?
25 A Oh, no doubt.

Multi-Page™

## Page 246

1 Q  Okay.  You get out, you get out these kinds of
2 monies at the low end, you're able to pay that ten Gs
3 to your lawyer pretty easily with the money you were
4 making, weren't you?
5 A  I didn't actually get the money I was making; I
6 got that off the hundred pounds that I had.  I owed
7 Leon for that, so it was like I had to make fifty
8 dollars off of it.  I could go sell ten pounds, that's
9 six thousand dollars.
10 Q  Let's take the middle figure there, the one
11 hundred and thirty-five thousand.  Give, as you claim,
12 give fifteen thousand of that to Leon Carmichael, what
13 does that leave you?
14 A  If I did what, now?
15 Q  Let's say out of that one hundred and thirty-five
16 thousand you give fifteen thousand to Leon Carmichael.
17 If my math is correct, we've got a hundred and twenty
18 thousand left, haven't we?
19 A  Yes.
20 Q  Let's give your lawyer, what's his name up in
21 Huntsville, Mr. Burgess?
22 A  Ten thousand.
23 Q  Yeah.  We got a hundred and ten thousand left,
24 haven't we?  The business can be good, can't it?
25 A  Yes.

## Page 247

1 Q  And you've already been told by Mr. Burgess the
2 worst you're looking at is three years, and you said
3 yesterday you're not worried about this case.  You
4 could be right back in the business within three years
5 if not sooner, isn't that correct?
6 A  No, that's not correct.
7 Q  Well, in other words you would never ever go back
8 to that business, is that what you're suggesting?
9 A  Not after all of this.  I been through with this,
10 that's correct.
11 Q  That was fairly traumatic in June of 2002, wasn't
12 it?
13 A  Not nearly as traumatic as this.
14 Q  And come June of 2003 you are right still in the
15 business, aren't you, right on up to November of 2003,
16 nearly eighteen months?
17 A  Correct.
18 Q  You're not about to give your true sources away,
19 are you?
20 A  My true sources?
21 Q  Yes, sir, of your marijuana.
22 A  Of what now?  Give my true sources away?  I
23 already have.
24 Q  Ike was a drug dealer, but he's deceased now.
25 You couldn't give him up, could you?

## Page 248

1 A  No, he was my friend.  I wouldn't do that.  He
2 worked for me.  He didn't supply me with anything, I
3 supplied him.  How I could give him up?
4 Q  Okay.  In other words, these were people you were
5 supplying.  How did you get to know all these people
6 so well so that you could supply them?  How did you
7 get to know Ike?
8 A  Me and his wife worked together.  I met him
9 through her.
10 Q  How did you know they even used drugs?
11 A  She always talked that Ike had to wake up in the
12 morning and smoke a joint, and go to bed in the
13 evening smoking a joint.
14 Q  And what did you have to say about that?
15 A  In conversation with people you work with, you
16 talk about different things.  Their family, whatever.
17 Q  So you thought it might be a good idea to start
18 supplying somebody who needed it as bad as Ike did?
19 A  No.  When me and Leon got together, I knew Ike
20 knew more about it than I did.
21 Q  So you had Ike teach you a few things about it?
22 A  Yeah, no doubt.
23 Q  Did he teach you how to be a distributor like
24 maybe experiences he had as a distributor?
25 A  Did he teach me how to be a distributor?

## Page 249

1 Q  Yeah.
2 A  No, we worked together and he sold most of it.  I
3 supplied him with what he needed.  I met other people
4 along the way.
5 Q  Yesterday you said that your job, as you claim,
6 was that when the marijuana came in, wherever it came
7 from, that your job was to eventually get it in your
8 house and cut it up.  And as I recall your testimony,
9 it got to be so time-consuming that you had to get
10 Gary Wayne George to help you, is that correct?
11 A  Yes.
12 Q  Okay.  So you and Gary Wayne were the ones who
13 would cut up the marijuana that you would ultimately
14 sell within your organization.
15 A  Correct.
16 Q  Now, you knew the police were possibly going to
17 come on November the 17th, didn't you, sir?
18 A  I felt like that, yes.
19 Q  You felt like it.  You're a smart man in spite of
20 your ninth grade education.  You worked for big
21 corporations --
22    THE COURT:  How much longer are you going to
23 be, Mr. Teague?
24    MR. TEAGUE:  It may be a while yet, Your
25 Honor.

Multi-Page™

Page 250

1   THE COURT: I think we've been at it now an
2 hour and forty minutes.  We'll take a fifteen minute
3 recess.
4   MR. TEAGUE:  That would be fine, Your Honor.
5   (Whereupon, a recess was taken.)
6      IN-CHAMBERS CONFERENCE HELD:
7   THE COURT:  Counsel, I just received a
8 message that the jury had some concerns, two members,
9 and I just wanted to question the jurors about that to
10 make sure there was nothing improper.  So I'm going to
11 bring them in.
12   Sheila, let's do Miss Murray first.
13   Miss Murray said that she had received a
14 phone call around one o'clock this morning from a
15 number she didn't recognize and she was just concerned
16 about it.  She said it may have been kids calling or
17 just a wrong number, and I just wanted to make sure if
18 anyone did try to contact her she would let us know
19 immediately.  I just wanted to make sure there was
20 nothing improper here.
21   MR. FEAGA:  Yes, sir.
22   MS. JAMES:  We have no reason to think it
23 has anything to do with this case.
24   THE COURT:  I don't know what she's going to
25 say.  I want to make sure it has nothing to do with

Page 251

1 this case.
2   (Whereupon, Juror Murray was escorted into
3 chambers.)
4   THE COURT:  Come on in.
5   Miss Murray, how are you doing?
6   Melissa said that you had asked this morning
7 about a phone call that you had received last night?
8   JUROR:  I just said my cell phone rang late
9 and, you know, I am a little nervous and a little
10 concerned about all this.
11   THE COURT:  Okay.  When you say you're
12 "concerned about all this," what do you mean?
13   JUROR:  Just kind of, you know -- This is a
14 pretty large case, and it makes you really kind of
15 nervous, concerned.
16   THE COURT:  Okay.  Is there any indication
17 that you've gotten any improper phone call?
18   JUROR:  No, I didn't answer it.
19   THE COURT:  You didn't answer it?
20   JUROR:  No.
21   THE COURT:  Now you know that if anyone
22 contacts you, either the press or anybody should ever
23 contact you, or the non-press, you know to let me know
24 immediately.
25   JUROR:  Yes, sir.

Page 252

1   THE COURT:  Okay, then.  Do you feel okay
2 continuing as a juror?
3   JUROR:  I'm fine.  It's really a lot of
4 pressure, and it's really very, very nerve-racking.
5   THE COURT:  Okay.  What do you mean by
6 "nerve-racking"?
7   JUROR:  Well, I mean it's just -- what can I
8 say, it's scary.
9   THE COURT:  Okay.  Okay.  But do you feel
10 you can be impartial as a juror?
11   JUROR:  Yeah.  I mean I don't have any
12 problem being impartial with it, it's just, you know,
13 I felt like y'all needed to know that it's extremely
14 nerve-racking.  You know, and it's extremely makes you
15 very nervous and, you know, it's a big case,
16 obviously.
17   THE COURT:  Okay.  But you do feel you can
18 be impartial?
19   JUROR:  Oh, yes.  I don't have a problem
20 with being impartial.
21   THE COURT:  Very good.  Thank you very much.
22   (Whereupon, Juror Murray escorted out of
23 chambers.)
24   THE COURT:  Now I'll hear from Counsel.
25   MR. MOORER:  I don't think there is anything

Page 253

1 to say, Your Honor.
2   MS. MORRIS:  She said she could be
3 impartial.
4   MS. CHARTOFF:  She said she was scared.  I
5 thought that might be a problem.
6   THE COURT:  Would you all like to confer
7 first?
8   MS. WAYNE:  Yes.  It's unusual.
9   THE COURT:  Very good.  Why don't you all
10 confer and we'll be back here in two minutes.
11   MS. WAYNE:  All right.
12   (Whereupon, a recess was taken.)
13      IN-CHAMBERS CONFERENCE
14      (CONTINUING):
15   THE COURT:  Okay.  Where is Mr. Teague?
16   COURTROOM DEPUTY CLERK:  Here he is.
17   THE COURT:  Okay.  Now?
18   MS. WAYNE:  All right, Judge.  I'm going to
19 make a record, Judge, because this is unusual we have
20 not had a chance to look at the case law, frankly, but
21 it goes obviously to the core of whether this juror
22 can truly still sit as a fair juror.  She's indicated
23 to the Court that it's scary.  Frankly, that
24 presumption is, it's the defendants that she's scared
25 of, not the government.  So she's not thinking the

Multi-Page™

**Page 254**

1 government is calling her at one o'clock in the
2 morning. She's believing that somebody from the
3 defense or the defendants.
4        They have brought out the fact today that
5 our client, Mr. Carmichael's son was accused of murder
6 through Mr. Denton.
7        MR. FEAGA: Actually, they brought it out.
8        MS. JAMES: Well I didn't bring it out, he
9 volunteered.
10       MS. WAYNE: He volunteered it. We did not
11 ask a direct question. Mr. Denton knew exactly where
12 it was going. He brought it out himself.
13       Then we heard this murder about Ike, who
14 also Mr. Denton brought out. We've had the inferences
15 to murders, we have a juror now that says she's afraid
16 or that she's scared, scared enough to tell this Court
17 about it. She's also a juror who saw some publicity.
18       THE COURT: I don't know if she saw any
19 publicity.
20       MR. BRUNSON: She did.
21       MS. WAYNE: She did. We voir dired her.
22 She said she could -- She was one of the jurors we
23 brought back and questioned who indicated --
24       THE COURT: Oh, you mean pretrial publicity?
25       MS. WAYNE: Yes, pretrial publicity. I'm

**Page 255**

1 sorry.
2        THE COURT: Okay.
3        MS. WAYNE: And she said she had seen some,
4 but when questioned about it she said she could be
5 fair. But the concern we have is that she did see it.
6 Now we're wondering has that been triggered.
7        And then all the police officers that were
8 outside the first couple of days. Frankly, Judge, the
9 first day --
10       THE COURT: Well, what if we do this: I
11 think that the way to proceed, and I think you may be
12 right, we may need to look into this a little bit
13 more, is to caution her not to discuss her concerns
14 with any of the other jurors and we'll just leave her
15 on and at most as an alternate and we'll resolve this.
16       MS. JAMES: Judge, I've got some real
17 concerns about that, because if she's this afraid and
18 she is communicating frequently with another juror as
19 they sit and listen to the evidence, you can see that
20 there is some connection there, and they're traveling
21 together and everything else, and I think the
22 possibility of a taint is very real because even if
23 she's doesn't say anything, you know, this is making
24 me a wreck and I'm very scared, we could create a
25 whole hysteria among all those that are --

**Page 256**

1        THE COURT: Well I'm saying she's not to
2 convey that to any other juror.
3        MS. CHARTOFF: She may have already.
4        THE COURT: Well we can find that out.
5        MS. MORRIS: Judge, she was unequivocal that
6 she could be impartial.
7        THE COURT: I'm trying to find out now what
8 the evidence is. So let's bring her back in and let's
9 ask that question.
10       MR. FEAGA: Judge, is it possible that the
11 Court could do that without all of us in here and not
12 make it worse in terms of intimidating her?
13       THE COURT: I don't think I can do that
14 without the lawyers and the defendant being present.
15 I don't discuss things ex parte with a juror --
16       MR. MOORER: I think Judge Varner did that
17 in a case.
18       THE COURT: He sure did, and there was an
19 automatic reversal.
20       MR. FEAGA: Given the fact that I think
21 you've already made up your mind, Judge, and my track
22 record isn't --
23       THE COURT: Unfortunately, you have to have
24 the lawyers and the client. I don't think any ex
25 parte discussions, especially with a jury, I think of

**Page 257**

1 all people that's the one you don't do it with.
2        MR. FEAGA: I wasn't objecting that, I was
3 objecting to doing it at all. I think it's a mistake.
4        THE COURT: Well, she has expressed some
5 concern. I think we have to clear it.
6        (Whereupon, Juror Murray was escorted in
7 chambers.)
8        THE COURT: Ms. Murray, I just want to ask
9 you a couple more questions. You expressed some
10 concerns. You said that something was scary to you.
11 Now you're talking about -- are you in any way afraid
12 of the defendants themselves? I mean I want to know
13 if you can be impartial on this jury.
14       JUROR: Oh yeah, I mean yes, sir, I can be
15 impartial.
16       THE COURT: Okay. Have you conveyed any of
17 your concerns to any of the other jurors?
18       JUROR: There is another juror who is very
19 concerned.
20       THE COURT: Who is very concerned? Have you
21 discussed it with this other juror?
22       JUROR: Just to say I'm concerned.
23       THE COURT: What have you said other than
24 I'm concerned?
25       JUROR: Just basically that.

**Multi-Page™**

Page 258

1    THE COURT: Who is the other juror?
2    JUROR: He's a male. I don't know his name.
3    THE COURT: Is that Mr. Miller? Is he at
4 the far end?
5    JUROR: Yes, sir.
6    THE COURT: Okay. I'm going to call him
7 back here, too. He's the only one?
8    JUROR: Yes, sir.
9    THE COURT: Okay. Do not convey your
10 thoughts or concerns with anyone else on the jury.
11    JUROR: Yes, sir.
12    THE COURT: Okay. Now I'm going to ask
13 again, do you have any concerns or fears for these
14 defendants, though? You haven't heard all the
15 evidence yet.
16    JUROR: No, sir.
17    THE COURT: Do you have any concerns or
18 fears about Mr. Carmichael and Mr. Williams?
19    JUROR: No, not really, sir.
20    THE COURT: Where is your fear coming from?
21 Where is your "scary" coming from?
22    JUROR: I think it's probably the total --
23 just the total situation of, you know, coming off the
24 street and, you know, being -- If you put yourself in
25 my shoes, and I know that's hard to do because this is

Page 259

1 your jobs, it's your professions and everything, but
2 as a lay person, not knowing and having to step
3 forward, and this in itself is extremely intimidating,
4 extremely intimidating --
5    THE COURT: You mean calling you back in
6 here?
7    JUROR: Yes. My blood pressure is probably
8 a hundred and eighty-nine.
9    (Whereupon, Juror Murray became emotional.)
10    JUROR: This is intimidating. And, you
11 know, it gets extremely nerve-racking.
12    THE COURT: Yeah, sure. All right. Thank
13 you very much.
14    (Whereupon, Juror Murray was escorted out of
15 chambers.)
16    THE COURT: I think she has to go.
17    MS. WAYNE: She has to go. Judge, I mean it
18 sounds like I don't need to make a record, but she's
19 looking directly at Mr. Carmichael --
20    THE COURT: I just said she had to go.
21    MS. WAYNE: Okay.
22    THE COURT: I do think this is intimidating,
23 but I also think the whole case has been intimidating.
24    MS. MORRIS: Judge, quite frankly drug
25 dealing in general is scary to a normal, lay person.

Page 260

1 It's not Mr. Carmichael or Mr. Williams --
2    THE COURT: Yeah, but none of the other
3 jurors, according to Melissa, has brought this up.
4 And I got a sense that she was very, very concerned.
5    MS. MORRIS: I think the normal, average Joe
6 would be very concerned.
7    MR. FEAGA: She said she could be fine.
8 Could we bring her back here? It is clear that that
9 process was --
10    THE COURT: She was overwhelmed.
11    MS. CHARTOFF: She also hesitated the first
12 time when Your Honor asked --
13    THE COURT: Well I'm going to let her go.
14 Now we'll talk to Mr. Mills.
15    (Whereupon, Juror Mills was escorted into
16 chambers.)
17    THE COURT: How're you doing, Mr. Mills?
18    JUROR: Fine. How are you?
19    THE COURT: Melissa said that you had
20 conveyed to her some concerns? What were the
21 concerns?
22    JUROR: Well there were no concerns that
23 were based on anything that happened, but I've had
24 family, two daughters that came to me and said, you
25 know, "This is kind of scary." So that's all.

Page 261

1    THE COURT: What did you want her to -- I
2 think you said in your thing that your daughters had
3 put together that "You must be on this case."
4    JUROR: Yes.
5    THE COURT: They sort of put two and two
6 together?
7    JUROR: Yes. And they're here in town.
8    THE COURT: Could you be fair and impartial?
9    JUROR: Oh sure.
10    THE COURT: Okay. Anything else from this
11 juror?
12    MR. MOORER: And you still haven't heard
13 anything outside of the courtroom about the case from
14 your daughters have you?
15    JUROR: No.
16    THE COURT: By the way, Miss Murray
17 mentioned that she had conveyed her concerns to you.
18 What did she say to you?
19    JUROR: Is she the juror?
20    THE COURT: Yes.
21    JUROR: She suggested that since she and I
22 were both here in Montgomery, that -- well she asked
23 me to mention it to Melissa, and so I did.
24    THE COURT: Okay.
25    JUROR: But she said something to the effect

Multi-Page™

Page 262

1 she had gotten a phone call or something late at
2 night.
3      THE COURT: Do you know that phone call had
4 nothing to do with this case as far as we know?
5      JUROR: She wasn't sure it did anyway.
6      THE COURT: But you can be impartial and
7 fair?
8      JUROR: Yes.
9      THE COURT: Very good.
10      MS. CHARTOFF: Your Honor, can I ask a few
11 more questions?
12      THE COURT: Yes.
13      MS. CHARTOFF: Do you know if Miss Murray
14 told anyone else on the jury about that phone call?
15      JUROR: There were several people in the
16 room when she mentioned it. But I don't know if they
17 were paying attention.
18      MS. CHARTOFF: Okay. And --
19      THE COURT: What did she say, exactly? She
20 just said she got a phone call?
21      JUROR: Yeah, she said her cell phone rang
22 late at night, and she wasn't aware of the number she
23 saw on it. It was not a number she knew.
24      THE COURT: Any questions?
25      MR. MOORER: Was she talking to you when she

Page 263

1 said that and there were other people around, or did
2 she say it in general?
3      JUROR: Well she probably did say it in my
4 direction, but there were other people around.
5      MS. CHARTOFF: How many other people?
6      JUROR: Well, some were in the bathroom,
7 some were out smoking.
8      THE COURT: That's actually what Melissa
9 said.
10      JUROR: I can't be sure how many. Probably
11 three or four.
12      MS. CHARTOFF: What was the tenor of her
13 comments? Did she just say I got a phone call last
14 night, or what was the context?
15      JUROR: Well she suggested that she had some
16 security concerns. And that she had gotten a phone
17 call early in the morning, or late at night, that it
18 was on her cell phone of a number that she wasn't
19 familiar with. And that was basically all she said.
20      MS. CHARTOFF: And with regards to you and
21 her living in Montgomery, what was the relevance of
22 that?
23      JUROR: Well, there's an assumption that
24 this is a high profile case here, and that it could
25 be, you know, she thought it might be dangerous for

Page 264

1 jurors. So did my daughters, for that matter.
2      MS. CHARTOFF: What, exactly, did your
3 daughters say to you?
4      JUROR: "Are you on that case?"
5      MR. FEAGA: Your Honor, we would
6 respectfully request the Court that that's enough.
7      THE COURT: Okay. Thank you very much.
8      (Whereupon, Juror Mills was escorted out of
9 chambers.)
10      THE COURT: Yes?
11      MR. BRUNSON: Judge, we have concerns about
12 the juror. And I'm not sure what her name is --
13      THE COURT: Ms Murray.
14      MR. BRUNSON: She sat on the other side of
15 Miss Murray.
16      THE COURT: Well, I think I've gone into it
17 enough, and I think I'm going to tell the jury that
18 whatever Ms. Murray said that should not affect their
19 verdict. And I'll be happy to say that, and I'm going
20 to let Ms. Murray go.
21      MOTION FOR MISTRIAL:
22      MS. WAYNE: All right. And I'm going to
23 make a motion, Judge.
24      THE COURT: Right.
25      MS. WAYNE: Because this is Mr. Carmichael's

Page 265

1 life.
2      THE COURT: Certainly. I can understand
3 that.
4      MS. WAYNE: And this is very scary in my
5 opinion, because now we have knowledge that there
6 could be a potential taint of other jurors, and
7 they're talking about something that clearly, again,
8 it doesn't impact then, they could dare less, they
9 know exactly who they're talking about here. And I
10 have grave concerns about it, Judge. I'm going to ask
11 for a mistrial.
12      I think it's juror misconduct. I don't
13 think you can cure this no matter how much you try,
14 Judge. I know you are trying to be fair and you'd
15 love to remove this taint, but I think it's scary and
16 I think they're talking about it back there. They're
17 talking about the security and they're talking about
18 these defendants. I've tried hundreds of drug cases
19 with guns and drugs and everything else and they're
20 not talking about the defendants.
21      So I'm going to ask for a mistrial. I don't
22 think we can clear this taint, and I think we cannot
23 take a chance. I don't want a mistrial. I don't want
24 to have to do this all over, Judge, because I think
25 they're a good panel, but I think the taint has gone

Multi-Page™

**Page 266**

1 outside these two jurors.
2       THE COURT:  Okay, I'll hear from you.
3       MR. TEAGUE:  Your Honor, could I, on behalf
4 of Defendant Williams?
5       THE COURT:  Certainly.
6       MR. TEAGUE:  We also would join in the
7 motion for a mistrial.  I'm concerned about the
8 gentleman who was just in here.  For him to have his
9 daughters tell him, "Are you on that case?"  He lives
10 in Montgomery, he disclosed, and he knows the news.
11 He says everyone knows it's a high profile case.  Your
12 Honor, that has to affect him.  And so therefore we
13 likewise move for a mistrial.
14      THE COURT:  I'll hear from the government.
15      MR. FEAGA:  Your Honor, there has been
16 nothing presented to the Court that would in any way,
17 shape or form warrant the Court granting a mistrial at
18 this point in time.  You've had one juror who you have
19 excused, that's why you've got extra jurors in the
20 first place we would presume, and you've got another
21 one come back here and say she mentioned it to me, I
22 was the only one she talked to, I don't know if anyone
23 else heard it, and he said it's not bothering me and
24 I'm fine.  We think we can go forward with this case.
25      THE COURT:  The motion for mistrial is

**Page 267**

1 denied.  However, I am going to research the issue.  I
2 think, though, and I agree with Ms. Morris on this,
3 this is inherent in this case.  It's inherent in any
4 drug case.  It's inherent in any high profile case.
5 The fact that he said it's a high profile case, I mean
6 he knew that.  He knew that from the beginning and you
7 couldn't get a jury that didn't know that.  You can't
8 get a jury that doesn't know that it's a high profile
9 case.  You can't get a jury that won't hear this
10 evidence.
11      I excused Ms. Murray because I just think
12 she was emotionally wrought.  I thought it was clear
13 from my observations that she was emotionally wrought.
14 And I think the question is can the jury hear this
15 evidence and be fair and impartial.  And I'm going to
16 ask them out there whether they can do it.  And I'm
17 going to tell them I'm excusing Ms. Murray, and if you
18 heard her say anything you're to disregard it and not
19 to let it enter into their deliberations.  And that's
20 it.  Because I think any case we have, you're going to
21 have the same thing.
22      MOTION FOR CHANGE OF VENUE:
23      MS. WAYNE:  Judge, we're going to renew our
24 motion for change of venue.  This is the reason why we
25 filed it in the first place.  I've got to renew it.  I

**Page 268**

1 think this is exactly the reason why.  I think it's
2 appropriate at this point.  We wanted it before we
3 picked the jury, now we definitely need it.
4       We need to get this case out of here.  We
5 don't have people calling up that know this case, that
6 have read about it.  Daughters, sons, whatever.  You
7 know, send us to Birmingham or send us to someplace
8 else, but remove the taint from this jury.
9       THE COURT:  I'll take the motion for change
10 of venue under submission.
11      MS. CHARTOFF:  And, Your Honor, if I could
12 add one more thing.  I'm no expert on jury misconduct,
13 but I do believe --
14      THE COURT:  Well that's what we have to look
15 at.
16      MS. CHARTOFF:  We'll look at it.
17      THE COURT:  Yeah.  You all let me know
18 something.  If you have something you want me to look
19 at, let me know in the morning.
20      MS. CHARTOFF:  But I do believe there is
21 case law that says you need to pull the potentially
22 tainted jurors.
23      THE COURT:  Okay, good.  Just bring her back
24 and I'll explain it to her.
25      I'm going to go ahead and let her go.

**Page 269**

1       (Whereupon, Juror Murray was escorted into
2 chambers.)
3       THE COURT:  Miss Murray, I think I'm going
4 to have to let you go.  I think even this was
5 intimidating, you coming back here, and I think you'd
6 probably be more comfortable.  Your blood pressure you
7 said was going up and so forth.  And I know it is
8 intimidating.
9       JUROR:  It is intimidating.
10      THE COURT:  And I'd like to thank you very
11 much for your service.
12      JUROR:  If you all put yourself in my
13 position and I was in a position of authority and
14 everything, I could intimidate you.
15      THE COURT:  Right.  Well thank you very
16 much.  Okay.
17      (Whereupon, Juror Murray was escorted out of
18 chambers.)
19      THE COURT:  Okay, let's go back out, and
20 we'll take this up in the morning.
21             IN OPEN COURT:
22             CROSS EXAMINATION
23      BY MR. TEAGUE OF PAT DENTON:
24             (CONTINUING):
25      THE COURT:  Members of the jury, I want to

**Page 270**

1 caution you again about not discussing the case among
2 yourselves. Nothing about the case among yourselves.
3      Go ahead.
4      MR. FEAGA: Your Honor, I think Mr. Teague
5 had the floor.
6      THE COURT: Yes, Mr. Teague.
7 Q  I think before we took our break, Mr. Denton, we
8 were discussing that from the point where you learned
9 from Steve Hensarling that Charlotte Hensarling had
10 been arrested at the Autauga County / Chilton County
11 line along I-65, that you determined right then that
12 it was just a matter of time until they were coming to
13 your house, is that correct?
14 A  Yes.
15 Q  And so, therefore, you sanitized the place, is
16 that correct?
17 A  What do you mean by "sanitized"?
18 Q  Well, you just got through telling these ladies
19 and gentlemen of the jury that you and Denton would
20 break down the marijuana when you got it, is that
21 right?
22 A  Me and Denton, you mean George?
23 Q  Excuse me, I meant George. Thank you.
24 A  Yes.
25 Q  And you had to have tools to do that with, didn't

**Page 271**

1 you?
2 A  Correct.
3 Q  What did you and Mr. George typically use to
4 break down?
5 A  Knives, box cutters, box cutter knives.
6 Q  What about machetes?
7 A  We used -- you can call a machete a long knife.
8 Q  It wasn't a knife such as pictured here in
9 government's exhibit 7(e), I believe that is. You
10 didn't use any such as that, did you?
11 A  No, I used some that were bigger.
12 Q  You used machetes and hatchets sometimes?
13 A  Yeah. Hatchets, hammer.
14 Q  You didn't have those things when the
15 police came to see you on the evening -- or in the
16 early morning hours of the 17th?
17 A  Hatchets and hammers and general tools, yeah.
18 Q  Well you had to have a cutting board too, didn't
19 you?
20 A  No, you didn't have to have a cutting board.
21 That's what Freddie preferred to use, because he did
22 it on his bed.
23 Q  Is that your cutting board?
24 A  No.
25 Q  That wasn't sanitized out of your house before

**Page 272**

1 the police came?
2 A  No.
3 Q  You had access to Freddie's house, didn't you?
4 A  I had access.
5 Q  Yes, sir?
6 A  When Freddie was there, yes.
7 Q  Well tell the jury, what was that woman's name
8 who in the transcripts, and I believe you even
9 testified about, it said that "Hey, darling, how are
10 you doing?"
11 A  I think her name is Faye. Faith.
12 Q  Faith Holly, is that correct?
13 A  I don't know her last name.
14 Q  Did you ever give Faith any money?
15 A  Money? No.
16 Q  Did you ever loan her any?
17 A  No.
18 Q  Did you ever give her any marijuana?
19 A  No.
20 Q  Well your response was interesting. I said, "Did
21 you ever give her any money?"
22      And you said, "Money? No."
23      Well what did you give her, then?
24 A  Not a thing.
25 Q  Okay. Well how is it she would have come to call

**Page 273**

1 you "Hey, darling"?
2 A  Something I guess she called people. She might
3 call you that if she saw you.
4 Q  She might.
5 A  She might.
6 Q  And let me ask you this. Was there ever a time
7 when she told you that Freddie's house needed to be
8 rekeyed?
9 A  No.
10 Q  She never talked to you and you didn't go over
11 there and rekey those doors?
12 A  No, never.
13 Q  You didn't have a key to get in there?
14 A  No, I did not.
15 Q  Now I believe your testimony was as to all of
16 these tapes that were made from a recorder that was
17 right on you, correct?
18 A  It's my understanding that the pager device was
19 actually the recorder.
20 Q  Okay. And you're standing in that small room as
21 close to Freddie as I am to Mr. Reisner, the court
22 reporter here, is that right?
23 A  Correct.
24 Q  And yet you're saying that if the jury listens to
25 every one of those tapes, they won't be able to hear

Multi-Page™

**Page 274**

1 anything that will be helpful to them?
2 A I don't think so. It's mainly static. You can't
3 understand anything being said.
4 Q Was there any point when Freddie came in from --
5 It was sort of a flurry of activity that evening. His
6 wife had had the plug pulled on her at the hospital
7 because all kinds of organs were failing. Did he
8 share any of that with you?
9 A No, he didn't go into detail what was wrong with
10 her.
11 Q And he had to be getting kids together. That
12 didn't just happen in one second, did it?
13 A It happened I guess throughout the night. I
14 don't know when it started happening.
15 Q Okay. And so you had access to his house, could
16 have been access to his house all during his evening
17 before the police finally came, is that right?
18 A The only time I had access was when he was there
19 until the point when he left to go to the hospital.
20 Q Tell the jury this, how many days was it between
21 the call from Steve Hensarling, "Hey, Charlotte's been
22 busted," until the police actually came to your house,
23 was it two days?
24 A The call from Steve actually happened Saturday.
25 They came I'd say late Sunday night. I guess you

**Page 275**

1 could call it early Monday morning.
2 Q So you had at least a day to sanitize the house.
3 A I didn't have to sanitize. Any time I cut up any
4 dope up in my house it was cleaned up right then. It
5 wasn't laying around.
6 Q All the places you worked before you -- as you
7 testified -- before you became a full-time drug
8 dealer, all those places were supplied by eighteen
9 wheelers and big trucks, weren't they?
10 A Yes, mainly. Yes.
11 Q And independent owner/operators drive those
12 trucks the vast majority of the time, don't they, sir?
13 A No. They're mainly company trucks, every place I
14 worked.
15 Q But a shady driver can bring in things in
16 addition to what's in the normal consist or the normal
17 load, can't they?
18 A I don't know what a shady driver was, so I can't
19 tell you.
20 Q Well say somebody might bring in bags of
21 marijuana, that happens in this world doesn't it, sir?
22 A I'm not aware of anybody bringing me any bags, if
23 that's what you're assuming.
24 Q Yeah. And you're not aware that Leon Carmichael
25 does that either, are you?

**Page 276**

1 A Yes, he does.
2 Q Oh. Well I thought you just said I'm not aware
3 of anybody who does that.
4 A You just said a "shady driver". I didn't know
5 Leon drove a truck.
6 Q Well he owns a truck lot?
7 A You said "a shady driver," you didn't specify.
8 Q You're telling this jury he didn't learn the
9 business from those drivers that would come to the
10 various stores. And you worked at a lot of them,
11 didn't you?
12 A Yes.
13 Q Got to know a lot of drivers, didn't you?
14 A Yes.
15     MR. TEAGUE: Thank you. That's all.
16     THE COURT: Any further direct? Any
17 redirect?
18     MR. FEAGA: Very briefly, Your Honor.
19     REDIRECT EXAMINATION
20     BY MR. FEAGA OF PAT DENTON:
21 Q When Miss James was questioning you, she talked
22 to you about when you were in your heyday. She used
23 that word about the money. And you said -- you
24 started to answer her question about it wasn't as much
25 of a heyday, and you used the words you were "trying

**Page 277**

1 to help Leon to get enough money to finish the
2 Center." She focused this in the middle part of 2003
3 I believe, is that right? Do you remember that?
4 A Yes.
5 Q And you were trying to answer a question and she
6 stopped you and then she rephrased the question, and I
7 wanted to give you a chance to finish your answer.
8 When she asked you about you being in your heyday and
9 making all kinds of money in the middle of 2003, what
10 were you trying to tell this jury when you said
11 "trying to help Leon to get enough money to finish the
12 Center"?
13 A The main thing when we started back up in late
14 2002 was because he didn't have enough money to finish
15 the Center. And the goal was to try to sell as much
16 as you can, make as much as you can so he could hurry
17 up and get that done. And once he got that done,
18 everything would be better. You know, he would
19 financially help me out with a business and this and
20 that.
21 Q So in the first part of 2003, Mr. Carmichael was
22 still building the Carmichael Center?
23 A Yes.
24 Q Do you know approximately when he finished
25 constructing the Carmichael Center?

**Multi-Page™**

Page 278

1 A No, I'm not completely sure. I want to say May,
2 maybe June, somewhere in there.
3 Q Of 2003?
4 A Yes.
5 Q Now May, maybe June of 2003?
6 A Yeah, I'm not sure what month.
7 Q Okay, sir. Now Miss James was also questioning
8 you about the period of time about two weeks before
9 you were arrested on November the 17th, 2004. And you
10 started to answer a question of hers, and I think
11 again you were interrupted before you finished your
12 answer and I wanted to ask you, do you recall
13 beginning to respond, "I was giving it to Montel at
14 that time," when you were talking about where you were
15 taking the dope two weeks prior to the time you were
16 arrested?
17 A Yes. Like I said, Leon and Freddie had an
18 argument, so he was mad at Freddie. And everything I
19 didn't keep, Montel got.
20 Q Who is Montel?
21 A I think it's Leon's brother-in-law through
22 marriage.
23 Q Okay. And what were you taking to Montel?
24 A The leftover, five hundred pounds or whatever. I
25 divided and kept what I wanted and gave Montel the

Page 279

1 rest.
2 Q Montel. All right. Do you know what Montel was
3 doing with it?
4 A Selling it.
5 Q Do you know his last name?
6 A No, I do not.
7 Q Why did you take it to Montel?
8 A Because like I said, he was trying to hurry up
9 and get the Center done. He was selling a lot of it,
10 and between the both of us we were selling a lot of it
11 to try to hurry up and get the Center finished and
12 done.
13 Q Who told you to take it to Montel, if anyone did?
14 A Leon.
15 Q You've talked about a fellow named Fred Thomas,
16 who was somebody involved earlier in this in bringing
17 the dope before Mr. Williams got involved?
18 A Yes.
19 Q Do you know where Mr. Fred Thomas lives?
20 A At one particular time he lived in the club on
21 the corner of Rosa Parks and Fleming Road. There was
22 an apartment in there. He lived there.
23 Q Do you know what that the name of that club is?
24 A Unique Entertainment.
25 Q Do you know who owns it?

Page 280

1 A Leon Carmichael.
2 Q Nothing further, Your Honor.
3 THE COURT: Any further cross, Miss James?
4 Mr. Teague?
5 MS. JAMES: No, Your Honor.
6 MR. TEAGUE: I have one other question, Your
7 Honor.
8 THE COURT: Go ahead.
9 RECROSS EXAMINATION
10 BY MR. TEAGUE OF PAT DENTON:
11 Q In all those tapes that are inaudible that you're
12 standing so close to Mr. Williams, at the very
13 beginning of that did he not tell you get this S-h out
14 of my house?
15 A No, he did not.
16 Q He didn't?
17 A No.
18 Q Well he was not in a position to be getting it
19 out of there himself, was he, given the circumstance
20 with his wife, was he?
21 A If he didn't want dope in his house, I'm sure he
22 could have found a way to get it out.
23 Q And just leave his wife there and his children?
24 A His wife wasn't there. His wife was in the
25 hospital. He was at home anyway then, so obviously he

Page 281

1 wasn't too concerned.
2 Q Okay. Thank you.
3 MR. FEAGA: Nothing further from the United
4 States, Your Honor.
5 THE COURT: Anything from Miss James?
6 MS. JAMES: No, sir.
7 THE COURT: Thank you. You may step down.
8 (Whereupon the witness, Pat Denton, stepped
9 down from the stand.)
10 THE COURT: Next witness.
11 MR. MOORER: Etherine Taylor.
12 THE COURT: Etherine Taylor.
13 E T H E R I N E    T A Y L O R,
14 the witness herein, having first been duly sworn or
15 affirmed to tell the truth, was examined and testified
16 as follows:
17 DIRECT EXAMINATION
18 BY MR. MOORER OF ETHERINE TAYLOR:
19 Q Would you state your name, please, ma'am.
20 A Etherine Taylor.
21 Q Miss Taylor, you kind of have a little bit of a
22 soft voice, so if you'll pull that microphone a little
23 bit toward you. And please try to speak up, if you
24 will.
25 A All right.

Multi-Page™

1 Q  Miss Taylor, where do you live?
2 A  Nine forty-seven Ridgecrest Street.
3 Q  Miss Taylor, I'm going to show you what has been
4 previously marked and entered into evidence as
5 government's exhibit 7(d).  Can you see this from
6 where you're seated?
7 A  Yes, I can.
8 Q  What is government's exhibit 7(d) that I'm
9 holding in my hand?
10 A  Beg pardon?
11 Q  What is this that I'm holding in my hand?
12 A  Pictures of my house.
13 Q  And how long have you lived at this location,
14 ma'am?
15 A  Since 1971.
16 Q  Now I notice in looking at this photograph of
17 this house that it has what appears to be two
18 different sides to it.
19 A  It do.
20 Q  Is this a duplex, ma'am?
21 A  Yes, it is.
22 Q  Which side of the duplex do you live on?
23 A  I live on the Nine forty-seven side.  Nine
24 forty-nine is rented out.
25 Q  Okay.  Now the Nine forty-seven side, which side

1 of the photograph is that?
2 A  The one on this side.
3 Q  This side here?
4 A  Right, that side.  Right.
5 Q  And the other side of it, which side is that?
6 What's the street address there?
7 A  Nine forty-nine.
8 Q  And you say you've had that rented out?
9 A  Yes, I did.
10 Q  How many times have you had that rented out,
11 ma'am?
12 A  Oh, a lot of times.
13 Q  Now do you recall who, if anyone, might have
14 rented that side in February of 2001?
15 A  Yes, I do.
16 Q  And who was that, ma'am?
17 A  Freddie Williams.
18 Q  Is the person that you're referring to as Freddie
19 Williams in the courtroom today, ma'am?
20 A  Yes, he is.
21 Q  If you can, please point him out and describe him
22 for the record.
23 A  Right there.
24 Q  Are you pointing to the gentleman who is seated
25 at the end of the counsel table here?

1 A  Yes, I am.
2    MR. MOORER:  For the record, Your Honor,
3 she's identified the defendant, Freddie Williams.
4 Q  How did you, if at all, advertise the duplex
5 being for rent back in '01?
6 A  Put a rent sign on the front saying "For rent."
7 Q  And after you put the rent sign out front, how is
8 it that Mr. Williams came to live there?
9 A  Because he did some work in the hall for me.  He
10 patched the top of the hall, I had for work for him to
11 do.  And he saw the sign and he asked me was it for
12 rent.  I said, "Yes," and he wanted to look at it.
13 And I let him look at it and then he rented the
14 apartment.
15 Q  And how much did you rent it to him for, ma'am?
16 A  Two-fifty a month.
17 Q  And after you rented to him, did he or anyone
18 else move into it?
19 A  He moved into it.
20 Q  And when he moved in -- And the "he" that you're
21 referring to again is who, ma'am?
22 A  Freddie Williams.
23 Q  When Mr. Williams moved into it, was there anyone
24 else to your knowledge living there?
25 A  For a long time, no.  He was the only one.

1 Q  Was there a time when that changed, ma'am?
2 A  He was the only one living there.
3 Q  Did there come a time when that changed when
4 anybody else was living there?
5 A  When I saw I guess there was his friend, a lady,
6 coming in and out.  So I guess she would have stayed
7 there sometimes.
8 Q  Do you know about when that occurred?
9 A  No, I didn't, because I was working and I didn't
10 see who was going in and out of his house.
11 Q  Now after you rented it to him, do you recall in
12 2003, November of 2003 any activity taking place in
13 Mr. Williams's side of the duplex in relation to law
14 enforcement?
15 A  Well, they called me at work and told me
16 something was going on at the house that I needed to
17 come home.  So the lady across the street, one of the
18 neighbors called me.  So I went home and sit on the
19 porch, but nobody has ever come and said nothing to me
20 about what was going on, and I didn't know what was
21 going on until I looked at the news and saw it on the
22 news.
23 Q  Now, after you found out about it through your
24 neighbor and on the news, did you have occasion to go
25 back inside the side of the duplex you had rented to

Page 286

1 the defendant, Mr. Williams?
2 A  No.  Until I saw him, and I asked him to move.
3 And that's when I went back inside the duplex.
4 Q  And when did you ask him to move, ma'am?
5 A  That when rent due at the first of the month.
6 Q  And what month was it that you asked him to move,
7 ma'am?
8 A  Well, it was the same time that the accident
9 happened I asked him the next month to move out.
10 Q  And did he move out, ma'am?
11 A  Yes he did.
12 Q  And after he moved out, did you ever have
13 occasion to go inside the duplex yourself?
14 A  Yes, I did.
15 Q  And did you notice any modifications to the
16 duplex?
17 A  Yes, I did.
18 Q  And what, if any, modifications were there to Mr.
19 Williams's side of the duplex?
20 A  Well I had a lot of cleaning up to do.  When I
21 went into the bedroom I saw he had built a wall that
22 was not there when I rented him the apartment.
23 Q  And would you describe the wall that you're
24 referring to, ma'am.
25 A  The wall in the front bedroom.

Page 287

1 Q  Yes, ma'am.  What was the modification?  Can you
2 describe the modification to the bedroom?
3 A  It was a closet all the way across the bedroom.
4 Q  And can you recall about the dimensions of the
5 closet that you're talking about, ma'am?
6 A  It was just a closet.  He had built all the way
7 across one side of the bedroom.
8 Q  When you first came into that side of the duplex,
9 did you notice the modification?
10 A  No, I didn't.
11 Q  And why was that?
12 A  When we started cleaning it up, that's when we
13 saw it.
14 Q  And why was it that you didn't notice it
15 immediately, ma'am?
16 A  Because it wasn't noticeable.
17 Q  It wasn't noticeable?
18 A  No, it wasn't.
19 Q  Was there any type of fan inside the room where
20 the modification was made, ma'am?
21 A  Yes.  When we started cleaning up we saw up in
22 the attic he had a fan.
23 Q  A ventilation type fan, ma'am?
24 A  Right.
25 Q  And was the ventilation fan there at the time

Page 288

1 that you rented the duplex to him?
2 A  No, it was not.
3      MR. MOORER:  I don't have any further
4 questions, Your Honor.
5          CROSS EXAMINATION
6      BY MR. TEAGUE OF ETHERINE TAYLOR:
7      MR. TEAGUE:  Your Honor, may I approach
8 Miss Taylor?
9      THE COURT:  Yes.
10 Q  Miss Taylor, if I may, I'm going to stand up here
11 by you and hold this picture so you and I and the jury
12 can all get a good look at it.
13 A  Okay.
14 Q  If I understand the testimony, the room we're
15 talking about is this room right here?
16 A  Yes.
17 Q  Okay.  How much of the house do you live in, if
18 you would?
19 A  I live on this side.
20 Q  Okay.  Where would be the dividing line?  What's
21 behind this window, is this your house?
22 A  Yes, that's my house.
23 Q  Is this on Mr. Williams' side?
24 A  Yes, that's his living room.
25 Q  Okay.  This would be a bedroom then, wouldn't it?

Page 289

1 A  Right.
2      MR. FEAGA:  Your Honor, just for the record,
3 it might be best if Mr. Teague would describe for the
4 court reporter what he's pointing to and where on that
5 photo.
6      MR. TEAGUE:  Thank you, good point.
7 Q  Looking at the photograph of your home, if you
8 look at the left side there's a window that seems to
9 be up under a small porch.
10 A  Right.
11 Q  Okay.  That's the room where the room was divided
12 and you had this -- it would be inside this window
13 what you were describing as a closet would be, is that
14 right?
15 A  Right, inside that room.
16 Q  Okay.  Now did it appear to you that most of the
17 time in November, the winter cold months, that Mr.
18 Williams, rather than using curtains, used a blanket
19 to cover the window?
20 A  I didn't pay no attention whether there was a
21 blanket or not.
22 Q  Okay.  But some people do that in order to buffer
23 from --
24      MR. MOORER:  Objection, Your Honor.
25 Relevance as to what "some people" do.  She said she

Multi-Page™

Page 290

1 doesn't know what Mr. Williams was doing, which I
2 think is the relevant inquiry, Your Honor.
3     MR. TEAGUE: Your Honor, they have paraded
4 around pictures of blankets and what they have
5 subjectively called a "secret room" this whole trial,
6 Your Honor, and I'm trying to reach the issues they
7 have raised.
8     THE COURT: What is your question again?
9     MR. TEAGUE: My question was, have you seen
10 people who have used blankets to buffer, you know, big
11 windows like this to keep the cold from coming in and
12 to conserve --
13     THE COURT: You mean in her apartment?
14     MR. TEAGUE: In anyone's house.
15     THE COURT: What difference does her
16 testimony make about that?
17     MR. TEAGUE: Well, I'm just asking her if
18 she noticed has anyone ever done that before, in her
19 knowledge.
20 A I guess they have. I don't know.
21 Q Thank you.
22     THE COURT: Go ahead.
23 Q He was a good renter and always paid you on time,
24 wasn't he?
25 A Sure did.

Page 291

1 Q As far as you knew, he was a man of good
2 character; that's why you rented him the house?
3 A He always paid his rent on time.
4 Q Okay. And the way you got to know him was you
5 had had him do some work at your house, is that
6 correct? That's how you got to know him?
7 A Yes. Not when he was living there.
8 Q Right. He could repair anything concerning the
9 place because he was good at it, wasn't he?
10 A I guess he was. He said every time I asked him
11 he said there wasn't nothing wrong.
12 Q Okay. Now if I understood your testimony when
13 you were being questioned by the government, was that
14 the way he got to know about your place being for rent
15 was that you had called him over there to do some work
16 on it, is that correct?
17 A On my side he come to put a top in the closet --
18 in the hall. And when he come to put a top in my
19 hall, then that's when he saw that I had a sign for
20 rent.
21 Q So he was there doing some work on your side of
22 the house?
23 A Right.
24 Q And he did good work, didn't he?
25 A Right.

Page 292

1 Q Thank you, ma'am.
2     REDIRECT EXAMINATION
3     BY MR. MOORER OF EHTERINE TAYLOR:
4 Q Miss Taylor, Mr. Teague asked you about maybe
5 blankets being put up to block out the cold. Did you
6 ever go visit Mr. Williams in his side of the duplex
7 after you rented it to him?
8 A No, I never did.
9 Q Do you know what he would be doing in his duplex,
10 other than living there?
11 A No, I didn't.
12 Q Were you aware of him having any marijuana there
13 prior to the police coming on the day that they came
14 to do the search warrant?
15 A No, I didn't know that.
16 Q And what was the condition of the rest of the
17 house, aside from the room that you said had been
18 modified? What was the condition of the rest of the
19 house when you did go in after you had evicted the
20 Defendant Williams?
21 A Well, I had to repad the bathroom. I had to take
22 out trash, I had to clean it up.
23 Q Was it in shipshape order, so to speak?
24 A No, it wasn't.
25     MR. MOORER: No further questions.

Page 293

1     RECROSS EXAMINATION
2     BY MR. TEAGUE OF ETHERINE TAYLOR:
3 Q Ms. Taylor, have you ever before been in a house
4 after a squad of police come in to do a search to see
5 what it looks like?
6 A No, I haven't.
7 Q It could be a mess after a bunch of men come in
8 and tear out things looking for things, couldn't it?
9 A It could be.
10 Q Thank you.
11     MR. MOORER: I have no further questions.
12     THE COURT: Thank you. You may step down.
13     (Whereupon the witness, Etherine Taylor,
14 stepped down from the stand.)
15     THE COURT: Next witness.
16     MS. MORRIS: The government calls Larry
17 Hubbard.
18     L A R R Y    H U B B A R D,
19 the witness herein, having first been duly sworn or
20 affirmed to tell the truth, was examined and testified
21 as follows:
22     DIRECT EXAMINATION
23     BY MS. MORRIS OF LARRY HUBBARD:
24 Q Would you state your name and spell your last
25 name.

Multi-Page™

Page 294

1 A  Larry Hubbard.  H-u-b-b-a-r-d.
2 Q  And how are you employed?
3 A  I'm a deputy sheriff, Barbour County Sheriff's
4 Department.
5 Q  How long have you been with the Barbour County
6 Sheriff's Department?
7 A  A little over five years.
8 Q  And as a sheriff's deputy I assume, is that
9 correct?
10 A  Yes, ma'am.
11 Q  And as a sheriff's deputy, what duties and
12 responsibilities do you have presently?
13 A  I'm assigned as a task force agent with the Drug
14 Enforcement Administration here in Montgomery.
15 Q  Okay.  So do you drive from Barbour County every
16 day?
17 A  Yes, ma'am.
18 Q  How far is that?
19 A  Sixty-nine miles.
20 Q  Okay.  So as a D. E. A. agent -- Well how long
21 have you been with the D. E. A. task force?
22 A  It will be three years in October.
23 Q  What did you do as a sheriff's deputy before you
24 were with the D. E. A. task force?
25 A  For two years I was on the state funded task

Page 295

1 force, narcotics task force.
2 Q  Narcotics task force?
3 A  Yes, ma'am.
4 Q  And what did you do before that?
5 A  I was a road deputy.
6 Q  Okay.  And before you went to the Barbour County
7 Sheriff's Department what did you do?
8 A  I was a police officer with the City of Clayton.
9 Q  And do you have any other law enforcement
10 experience besides being a police office with the City
11 of Clayton?
12 A  No, ma'am.  The Department of Corrections.
13 Q  How long were you with the Department of
14 Corrections?
15 A  Approximately two and-a-half years.
16 Q  Now, Deputy Hubbard, were you working with the D.
17 E. A. task force on November 17th of 2003?
18 A  Yes, ma'am.
19 Q  And did you participates in a search warrant --
20 in the execution of a search warrant at Nine
21 forty-nine Ridgecrest Drive?
22 A  Yes, ma'am.
23 Q  Did you have any special duties or
24 responsibilities with that search warrant?
25 A  I was the evidence custodian logging in the

Page 296

1 evidence.
2 Q  What is an evidence custodian?
3 A  Basically, I sat in the living room and as the
4 other officers found something they deemed to be
5 evidence, they would bring it to me and I'd write it
6 down on a little piece of paper what it was.
7 Q  Did you then take custody of that evidence?
8 A  Yes, ma'am.
9 Q  And eventually all of this evidence that was
10 found -- you took custody of all the evidence that was
11 found at Nine forty-nine Ridgecrest, is that right?
12 A  Yes, ma'am.
13 Q  Did you eventually pass custody of that evidence
14 over to someone else?
15 A  Yes, ma'am.
16 Q  Who is that?
17 A  David DeJohn.
18 Q  Now the evidence that was found at Nine
19 forty-nine Ridgecrest, did you also take custody of
20 the drug evidence?
21 A  Yes, ma'am.
22 Q  Okay.  Let's go through that.
23      Agent Hubbard, I am showing you what has
24 been premarked as bulk evidence -- well, government's
25 exhibit 6(a).

Page 297

1 A  Yes, ma'am.
2 Q  Do you know what this is?
3 A  Yes, ma'am.  That's one of the boxes of
4 marijuana.
5 Q  One of how many boxes, do you know?
6 A  I'm not sure of the number of boxes.
7 Q  If I represent to you that it's one of fifteen,
8 would that sound correct to you?
9 A  Yes, ma'am.
10 Q  Okay.  And you recognize this how?
11 A  I helped package it.
12 Q  Okay.  Package it for what?
13 A  To place in the evidence locker.
14 Q  Okay.  And was this brought to you on the 17th?
15 Not in this box, but was this marijuana brought to you
16 on the 17th?
17 A  In the house?  Yes, ma'am.
18 Q  Okay.  And who brought it to you, Agent Hubbard?
19 A  During the search warrant you're talking about?
20 Q  Yes.
21 A  It would be Officer David Williams of the
22 Prattville Police Department.
23 Q  And once he brought it to you, you logged it in,
24 is that correct?
25 A  Yes, ma'am.

Multi-Page™

**Page 298**

1  Q  And at that point -- Okay.  And at some point did
2  you turn that evidence, or this drug evidence, over to
3  Agent DeJohn?
4  A  Yes, ma'am.
5  Q  I'm showing you, Agent Hubbard, what has been
6  premarked as government's exhibit -- they have been
7  lumped together, so government's exhibit 11(b).  Do
8  you recognize these bags?
9  A  Yes, ma'am.
10 Q  Were these bags found at Nine forty-nine
11 Ridgecrest?
12 A  Yes, ma'am.
13 Q  And they were given to you and you logged them
14 in, is that correct?
15 A  That's correct.
16 Q  And did you eventually turn over custody of these
17 bags?
18 A  Yes, I did.
19 Q  And who did you turn them over to?
20 A  David DeJohn.
21 Q  Let me just steer clear of this.  Did you turn
22 over all the evidence to Agent DeJohn?
23 A  Yes, ma'am.
24 Q  Now, Deputy Hubbard, I'm going to show you a
25 series of exhibits.  Showing you exhibit 19(d  ), (d) as

**Page 299**

1  in dog, 19(a) as in apple, 19(b) as in boy, 19(f) as
2  in Frank, 19(g) as in Greg, 19(c) as in Clark and
3  19(e) as in ever.  Do you recognize these firearms?
4  A  Yes, ma'am, I do.
5  Q  How do you recognize them?
6  A  They're the weapons we took out of the house at
7  Freddie Williams' house.
8  Q  Did you log these in as evidence custodian that
9  day?
10 A  Yes, ma'am, I did.
11 Q  And, again, did you turn them over to Agent
12 DeJohn as well, is that correct?
13 A  That's correct.
14 Q  Okay.  Agent Hubbard, Agent DeJohn is bringing
15 you up there some more duffel bags.  Do you recognize
16 those?  And for the record those duffel bags have been
17 marked as government's exhibit 11(a) as in apple.
18 A  Yes, ma'am.
19 Q  And did you find these or did someone bring them
20 to you as the custodian of evidence?
21 A  Yes, ma'am.
22 Q  I'm showing you what's been previously marked as
23 government's exhibit 12.  You probably need to look
24 inside in here, to the best of your ability.  Do you
25 recognize that?

**Page 300**

1  A  Yes, ma'am.
2  Q  Are those boxes of baggies that were found at
3  Nine forty-nine Ridgecrest Drive?
4  A  Yes, ma'am.
5  Q  Okay.  Did you log those into evidence as well?
6  A  Yes, ma'am, I did.
7  Q  Okay.  Agent Hubbard, once you had logged all of
8  this stuff into evidence at Nine forty-nine
9  Ridgecrest, did you then take the evidence back to the
10 Drug Enforcement Administration?
11 A  That's correct.
12 Q  And that includes the marijuana that was found
13 there, is that right?
14 A  Yes, ma'am.
15 Q  Okay.  Once you got back to the D. E. A. task
16 force office, or the D. E. A. office, what did you do
17 -- or did you do anything specific with the marijuana
18 that was found?
19 A  The night of the search warrant we locked it in
20 the evidence vault.
21 Q  Okay.  And eventually did you prepare it for the
22 lab?
23 A  Yes, ma'am.  I took representative samples.
24 Q  Okay.  Let's talk about that a second.  You said
25 you took representative samples.  Why did you take

**Page 301**

1  representative samples?
2  A  It was policy.
3  Q  What policy?
4  A  With bulk evidence, we take a representative
5  sample, which means at random we'll pick out exhibits
6  A through K to send to the lab.  A very small portion.
7  It costs too much to send the bulk evidence to the lab
8  plus the storage at the lab.
9  Q  So you take a representative sample.  You said it
10 was A through K?
11 A  A through K.
12 Q  So how many representative samples did you send
13 to the lab?
14 A  Eleven.
15 Q  Eleven?  Okay.
16    When you say you take a representative
17 sample, what do you do to the representative sample?
18 Or how do you come up with one?
19 A  I really don't understand the question.  I can
20 tell you what I do.
21 Q  Yeah.  And I'm going to show you this brick.  And
22 if you'll just demonstrate for the jury how you go
23 about taking a representative sample.
24 A  In this case I picked out eleven bricks, bricks
25 of marijuana, and I cut a V in it because I cut Vs.

**Multi-Page™**

### Page 302

1 And I peeled it back and I took approximately an ounce
2 I believe it was of the material, and I sealed it in
3 an evidence bag and sent it to the lab.
4 Q Okay. Agent Hubbard, I'm showing you what's been
5 premarked as government's exhibit 6(b) as in boy. Do
6 you recognize that?
7 A Yes, ma'am.
8 Q What is it?
9 A These are the samples that I sent to the lab.
10 Q How do you know that they're your samples?
11 A My name and signature is on them.
12 Q Okay. And I notice there, Agent Hubbard, that
13 there is a brick with these smaller amounts. Why is
14 that?
15 A One of the samples they request, approximately
16 one kilo or two point two pounds, and that's as close
17 as you can get. And then the other ten are the small
18 samples. I left out the big sample, I'm sorry.
19 Q Agent Hubbard, before you sent these
20 representative samples to the lab and before you
21 helped tape up these boxes of marijuana, did you weigh
22 the marijuana?
23 A Yes, ma'am.
24 Q And do you know how much it ended up weighing?
25 A Seventy-four point something, I believe.

### Page 303

1 Q And you weighed it up because you had to put that
2 on a form, is that correct?
3 A That's correct.
4 Q And what did you do with the form you had to put
5 that on?
6 A That's the form that goes to the lab.
7 Q Agent Hubbard, I'm going to show you what's been
8 previously marked as government's exhibit 10(a) and
9 (b). Do you recognize these?
10 A Yes, ma'am.
11 Q And what are they?
12 A It's a set of scales that were found at Freddie
13 Williams' residence, and I call it a countertop. It's
14 a countertop.
15 Q That was found where?
16 A At Freddie Williams' house.
17 Q And these are pieces of evidence that you logged
18 in on that day, on the 17th of November as well?
19 A Yes, ma'am.
20      MS. MORRIS: I have nothing further at this
21 time, except to move all this back.
22      Oh, one moment, Your Honor.
23      (Whereupon, Ms. Morris conferred with Mr.
24 Feaga off the record and out of the hearing of the
25 other courtroom participants.)

### Page 304

1 Q Officer Hubbard, showing you what's been
2 premarked as government's exhibit 9 and 47. Do you
3 recognize those?
4 A Yes, ma'am.
5 Q And what are they?
6 A They would be the knives that were found at
7 Freddie Williams' house on the cutting board.
8 Q That were located on the cutting board that I
9 just saw?
10 A Yes, ma'am, I believe so.
11 Q This right here?
12 A Yes, ma'am.
13 Q And did you log those in as well?
14 A Yes, I did.
15      MS. MORRIS: Nothing further, Your Honor.
16      MR. FEAGA: Your Honor, just a moment.
17      (Whereupon, Mr. Feaga conferred with Ms.
18 Morris off the record and out of the hearing of the
19 other courtroom participants.)
20      MS. MORRIS: Nothing further.
21            CROSS EXAMINATION
22         MS BY. WAYNE OF LARRY HUBBARD:
23      MS. MORRIS: Your Honor, at this time we'd
24 move to admit all of the exhibits that have been
25 identified by Agent Hubbard.

### Page 305

1      THE COURT: Any problems?
2      MS. WAYNE: I don't think we have standing.
3      THE COURT: Actually, everybody has
4 standing.
5      MS. WAYNE: No objections.
6      THE COURT: Mr. Teague?
7      MR. TEAGUE: No objection, Your Honor.
8      THE COURT: Then they're admitted.
9 Q Good afternoon, Deputy Hubbard. It's Deputy
10 Hubbard?
11 A Yes, ma'am.
12 Q I just want to talk to you a little bit about the
13 significance of your job in terms of actually logging
14 in the evidence. When you did this search at Nine
15 forty-nine Ridgecrest, my understanding is you
16 considered this a crime scene.
17 A Yes, ma'am.
18 Q Well a crime had occurred because there was
19 illegal substances at the residence, right?
20 A Yes, ma'am.
21 Q So in terms of your job and assessing the crime
22 scene, you have a very significant job because you
23 have to not only log in this evidence, but you have to
24 say where it came from when you're logging it in.
25 A Yes, ma'am.

Multi-Page™

Page 306

1 Q  And that might have some significance later in an
2 investigation in terms of determining who was in
3 possession of it or who it might belong to or things
4 like that?
5 A  Yes, ma'am.
6 Q  So the evidentiary value of things found at the
7 scene can have a very significant value in a case
8 later on.
9 A  Yes, ma'am.
10 Q  And so how you handle that evidence is also
11 significant in terms of how it's handled at the scene.
12 A  Yes, ma'am.
13 Q  Because you have no idea when you're first
14 getting it and collecting it what it might mean later
15 on down the line.
16 A  Yes, ma'am.
17 Q  And you're certainly familiar with sanitizing the
18 scene and making sure that there isn't later
19 contamination on any physical evidence that you might
20 log in.
21 A  I'm not sure what you're asking me.  Each case
22 would be different.  In this case contamination, I
23 don't know what you're referring to.
24 Q  Well let me give you an example, Deputy Hubbard.
25 When you have things that have been logged in from the

Page 307

1 scene that are clearly surfaces that you might be able
2 to -- or not you, or your department, might be able to
3 lift prints, you're cognizant of that.  You're aware
4 of that and you handle that property appropriately,
5 correct?
6 A  Yes, ma'am.
7 Q  And you're taught to do that at the academy and
8 all the training that you have.
9 A  Yes, ma'am.
10 Q  The Department of Justice, the Montgomery Police
11 Department, the D. E. A. all have standards of
12 protocol on how to take evidence in.
13 A  Yes, ma'am.
14 Q  Because what you don't want to happen is later on
15 down the line someone say to you, you didn't handle
16 that, we could have gotten something of evidentiary
17 value from it and you screwed it up.  You don't want
18 that to happen.
19 A  That's correct.
20 Q  Okay.  And you handled evidence in this
21 particular case exactly how you would in any case, you
22 made sure to make sure that didn't happen.
23 A  Yes, ma'am.
24 Q  Okay.  Now when you're logging in this evidence,
25 are you actually directing the officers at the scene,

Page 308

1 how to do things?  Are you in charge of that, or are
2 they just handing it to you?
3 A  They're bringing it to me.
4 Q  Are you telling them that looks important, you
5 better get me that?
6 A  Not in this case, no.
7 Q  Okay.  Now in terms of making sure there isn't
8 contamination, I'm assuming that y'all have the gloves
9 on and people were changing the gloves as you're
10 handing over the property?
11 A  Were they wearing gloves?
12 Q  Yeah?
13 A  I'm not sure.
14 Q  Okay.  All right.  Well let's talk about the
15 significance of gloves because you certainly are aware
16 of using gloves, these rubber gloves at the scene of a
17 crime.
18 A  Yes, ma'am.
19 Q  And the reason you do that is that you don't want
20 your prints, obviously, to interfere, or any of the
21 other officers' to interfere on things that might have
22 prints on them.
23 A  Certain objects, yes, ma'am.
24 Q  Yeah.  Well, for example, Miss Clark handed to
25 you what's been previously marked as government's

Page 309

1 exhibit A, and this is certainly the kind of surface
2 that you might be able to get prints off of.
3 A  I would think so.
4 Q  Okay.  She handed -- We've seen this exhibit
5 10(b), this scale that was taken out of the house.
6 There are certainly a number of surfaces on this
7 particular item that you might be able to get prints
8 off of.
9 A  I believe that would be correct.
10 Q  I'm looking at government's exhibit 9 and
11 government's exhibit 47; again, surfaces that you
12 might be able to lift prints off.
13 A  Yes, ma'am.
14 Q  Okay.  All those guns that we just saw had a lot
15 of surfaces that you might be able to lift prints off.
16 A  Yes, ma'am.
17 Q  And I'm obviously not telling you something you
18 didn't know.  When you took that evidence in, you were
19 aware of that and you took steps to assure that you
20 might be able to do that in the future.
21 A  Yes, ma'am.
22 Q  Because surely if you could identify who had put
23 their fingers and hands on some of this valuable
24 evidence, it ultimately might tell you who was
25 handling it.

Multi-Page™

Page 310

1 A  Yes, ma'am.
2 Q  Okay.  Now I'm wondering, Deputy Hubbard, in the
3 stuff -- I saw Ms. Clark, she was kind of dusting off
4 stuff, and I'm wondering is there any fingerprint, I
5 think it's that orange powder that usually they use or
6 some kind of powder, is there any of that powder on
7 any of those items that you were looking at from Nine
8 forty-nine?
9 A  Yes, ma'am.
10 Q  Which items were they, do you remember, or do I
11 need to bring them up to you?
12 A  I believe the bundles of marijuana.
13 Q  Okay.  And those bundles of marijuana, there were
14 a number of boxes that were taken, you recall seeing
15 some what looks like fingerprint dust?
16 A  No, ma'am.
17 Q  Okay.  You didn't see any?
18 A  No, ma'am.
19 Q  Okay.  I'm sorry.  That's what I'm wondering.  As
20 you look at the evidence today, do you see any of that
21 fingerprint evidence that sometimes is left after
22 y'all try to get prints?
23 A  No, ma'am, I do not.
24 Q  All right.  Now, again, that wouldn't be your
25 job, though, you don't do the fingerprint part.

Page 311

1 A  Not in this case, no, ma'am.
2 Q  Do you do that sometimes?
3 A  When I'm case agent.
4 Q  And you were not, again, in charge -- you weren't
5 the case agent, so you didn't do that here?
6 A  That's correct.  It would be my responsibility as
7 case agent if I was going to gather the fingerprints.
8 Q  Okay.  Now in terms of the preservation and, you
9 know, we're collecting, we're preserving, we're
10 inventorying all of this stuff because you send it
11 over to a particular place where it can be kept safe
12 until you go to trial or something else happens in the
13 case, right?  It's disposed of somehow?  So you keep
14 it safe, you all keep it safe.
15 A  Yes, ma'am.
16 Q  And there are steps or quality assurances I'm
17 going to call it to make sure that the evidence, while
18 a case may be pending or until it's disposed of, that
19 it's preserved so that all of these contamination
20 things that we talked about cannot happen, right?
21      (Whereupon, the witness paused.)
22 Q  Let me ask you this:  You guys don't keep it out
23 in some open space where it can be contaminated by
24 anyone?
25 A  No, ma'am.

Page 312

1 Q  The property bureau that it's kept in is a place
2 that's secure, right?
3 A  Yes, ma'am.
4 Q  People have to check in and out this property?
5 A  Yes, ma'am.
6 Q  And you don't have people that can just come in
7 and handle the property unless there is the proper
8 chain of command.
9 A  That's correct.
10 Q  And your understanding is on this particular
11 evidence it was kept that way?
12 A  Yes, ma'am, I would assume so.
13 Q  Okay.  Nobody has told you anything different?
14 A  No, ma'am.
15 Q  All right.
16      MS. WAYNE:  Judge, if I may just have a
17 moment?
18      (Whereupon, Ms. Wayne conferred with Ms.
19 James and Ms. Chartoff off the record and out of the
20 hearing of the other courtroom participants.)
21 Q  Thank you, Deputy Hubbard.  I have no further
22 questions.
23      THE COURT:  Mr. Teague?
24      MR. TEAGUE:  No, we have no questions.
25      THE COURT:  Redirect?

Page 313

1      MS. MORRIS:  No, Your Honor.
2      THE COURT:  Thank you.  You may step down.
3      (Whereupon the witness, Larry Hubbard,
4 stepped down from the stand.)
5      THE COURT:  Next witness.
6      MR. MOORER:  The United States calls Bob
7 Greenwood.
8      Your Honor, we need to call a witness out of
9 the order that we had intended, so if we can have him
10 step off we're going to bring in a chemist.
11      MR. FEAGA:  The lab tech.
12      MS. MORRIS:  He needs to get out tonight.
13      MS. WAYNE:  No objection.
14      THE COURT:  Very good.
15      MS. MORRIS:  Paul Galat.
16        P A U L    G A L A T,
17 the witness herein, having first been duly sworn or
18 affirmed to tell the truth, was examined and testified
19 as follows:
20        DIRECT EXAMINATION
21      BY MS. MORRIS OF PAUL GALAT:
22 Q  Mr. Galat, how are you employed?
23 A  I am a forensic chemist with the Drug Enforcement
24 Administration in Dallas, Texas.
25 Q  Could you give the jury the benefit of your

Multi-Page™

Page 314

1 education and qualifications, please.
2 A  I have a Bachelor's in chemistry from Michigan
3 State University.  I also have a Master's of Science
4 in criminal justice with specialization in forensic
5 science from Michigan State University.  I completed
6 an in-house forensic training program at the D. E. A.
7 in Dallas, and I've had several other classes in
8 instrumental analysis at the Drug Enforcement
9 Administration.
10 Q  Now, Mr. Galat, you say you're a D. E. A.
11 chemist, correct?
12 A  Yes, ma'am.
13 Q  How long have you been with the Drug Enforcement
14 Administration?
15 A  Almost seven years.
16 Q  Your duties and responsibilities with the D. E.
17 A as a D. E. A. chemist are what?
18 A  Well, I receive various forms of evidence
19 submitted by state or federal agencies, and I test
20 those pieces of evidence for the presence of
21 controlled substances.  Those are such things like
22 marijuana, heroin, methamphetamine, cocaine.  And then
23 I prepare written reports on those findings.
24        I also assist in laboratory seizures,
25 clandestine labs, along with the D. E. A. agents when

Page 315

1 they happen to do an arrest on those type of
2 laboratories.
3 Q  Now we're not here today dealing with clandestine
4 labs, though, correct?
5 A  No, ma'am.
6 Q  We're here today talking about your tests on
7 substances in determining whether they're illegal
8 substances I suppose.
9 A  Yes, ma'am.
10 Q  Okay.  And were you asked in this case to test
11 some substances?
12 A  Yes, ma'am.
13      MS. MORRIS:  Your Honor, may I approach?
14      THE COURT:  Yes.
15 Q  Mr. Galat, I am showing you what's been
16 previously marked as government's exhibit 6(b) as in
17 boy.  Do you recognize this?
18 A  Yes, ma'am.
19 Q  And what is it?
20 A  This was evidence submitted to our laboratory for
21 testing.  I recognize it because my seals are on all
22 eleven pieces of evidence.
23 Q  And did you indeed test these bags of evidence?
24 A  Yes, ma'am.
25 Q  What tests did you run on these?

Page 316

1 A  Well, I first attained a gross weight of the
2 evidence.  That's the evidence with all the packaging.
3 Then I obtained a net weight of the evidence.  That is
4 just the net weight of the powder or in this case
5 plant material.  And then I did a series of three
6 tests on each -- on the evidence.
7 Q  Let me stop you, first of all.  What was the net
8 weight of that evidence?
9 A  The net weight is seven hundred and twenty-nine
10 point nine grams.
11 Q  Okay.  And you said you did a series of three
12 tests on this?
13 A  Yes, ma'am.
14 Q  And what tests were those?
15 A  Well, first I pulled a sample from each one of
16 the bags and I performed a microscopic examination.  I
17 examined each sample underneath the microscope looking
18 for characteristics of the plant material.  And in
19 this case I saw cystolithic hairs on each one of the
20 samples.
21 Q  And what does that indicate to you?
22 A  That the substance could be marijuana.
23 Q  Okay.  And did you do another test on the
24 substance?
25 A  Yes, ma'am.

Page 317

1 Q  And what test was that?
2 A  Then I performed a color test on eleven samples,
3 or on one sample from each of the eleven bags.  And
4 the color tests is called a Modified Duconoid Levine
5 test, and it's a color test that will turn a purple
6 color in the presence of marijuana.
7 Q  And when you did that test, did it turn a purple
8 color?
9 A  Yes, ma'am.
10 Q  Indicating what to you?
11 A  That the substance could contain marijuana.
12 Q  But again did you do a third test?
13 A  Yes, ma'am, I did a final and confirmatory test.
14 This test is a conclusive test which will prove --
15 it's conclusive for the presence of the drug in the
16 plant material.
17 Q  When you say it's "conclusive," what do you mean?
18 A  That it couldn't be anything other than what the
19 test is.  Like, for example, the color test, certain
20 other chemicals could change that same color, so it's
21 a non-conclusive test.  In order to confirm the
22 presence of a controlled substance in this we have to
23 do a conclusive test.
24 Q  And what test is that?
25 A  It's called gas chromatography mass spectrometry.

Multi-Page™

Page 318

1 Q  Is it called G. C. M. S. for short?
2 A  Yes.
3 Q  Do you mind calling it that for us?
4 A  Sure.
5 Q  Okay.  And did you run G. C. M. S. on these
6 substances?
7 A  Yes, ma'am.
8 Q  And what did the G. C. M. S. -- or what was the
9 outcome of that test?
10 A  That the substance contains Delta nine tetro
11 canabinal, which is the main ingredient in marijuana.
12 Q  And based on all of these tests, did you
13 formulate an opinion as to what the substance that you
14 tested in those eleven bags was?
15 A  Yes, ma'am.
16 Q  And what was it?
17 A  That government's exhibit 6(b) contains
18 marijuana.
19 Q  Now, Mr. Galat, I'm showing you what's been
20 previously marked as government's exhibit 21.  Do you
21 recognize that?
22 A  Yes, ma'am.
23 Q  And what is it?
24 A  This is a copy of the D. E. A. Form Seven.  It's
25 a drug enforcement form.  The bottom half is the lab

Page 319

1 report, and the top half is the form used when
2 evidence is submitted to our laboratory.
3 Q  Okay.  And did you fill out the bottom half of
4 that?
5 A  Yes, ma'am.
6 Q  Is your signature on it?
7 A  Yes, ma'am.
8 Q  Has it been changed or altered in any way?
9 A  No, ma'am.
10    MS. MORRIS:  At this time, Your Honor, we'd
11 move to admit government's exhibits 6(b), 21 and 6(a)
12 into evidence.
13    THE COURT:  Admitted.
14 Q  Just to be clear, Mr. Galat, every envelope that
15 I handed you contained marijuana?
16 A  Yes, ma'am.
17    MS. MORRIS:  Nothing further.
18    MS. WAYNE:  Judge, we pass this witness.
19    THE COURT:  Okay.
20    MR. TEAGUE:  No questions, Your Honor.
21    THE COURT:  Thank you.  You are free to go.
22    (Whereupon the witness, Paul Galat, stepped
23 down from the stand.)
24    THE COURT:  Next witness.
25    MR. MOORER:  The United States calls Bob

Page 320

1 Greenwood.
2       B O B   G R E E N W O O D,
3 the witness herein, having first been duly sworn or
4 affirmed to tell the truth, was examined and testified
5 as follows:
6          DIRECT EXAMINATION
7       BY MR. MOORER OF BOB GREENWOOD:
8 Q  For the record, would you state your name,
9 please.
10 A  Robert Lindsey Greenwood.
11 Q  Mr. Greenwood, what do you do for a living?
12 A  I'm a special agent with the Drug Enforcement
13 Administration here in Montgomery, Alabama.
14 Q  Would you briefly relate to the jury your
15 background, your training and your experience that
16 qualifies you to serve as a special agent of the Drug
17 Enforcement Administration.
18 A  I have been employed with the D. E. A. for
19 approximately a little over eight years.  I attended
20 the D. E. A. academy at Quantico, Virginia.  I
21 completed the academy which encompasses all the areas
22 involved with drug enforcement.
23 Q  Do you recall November the 16th of 2003?
24 A  Yes, I do.
25 Q  Would you tell the jury what you were doing on

Page 321

1 that evening of the 16th?
2 A  On November 16th, 2003 I became involved in an
3 investigation assisting Task Force Agent David DeJohn.
4 Q  And what did you have to do first in connection
5 with assisting him?
6 A  Well, we met at the drug enforcement office to
7 talk about what we were going to be doing that night.
8 And then we conducted surveillance prior to doing a
9 search warrant later that night.
10 Q  Now where was the search warrant going to be
11 done?
12 A  The search warrant that was executed later that
13 night, which was actually after midnight, was at Mr.
14 Denton's residence off of Fleming Road.
15 Q  Did you participate in the execution of the
16 search warrant at Mr. Denton's house?
17 A  Yes, I did.
18 Q  And what did you do -- Let me back up.
19     About what time was it that you and the
20 other agents executed the search warrant at Mr.
21 Denton's house?
22 A  It was after midnight.  It was about
23 twelve-forty, twelve-fifty, which would have been a.m.
24 after midnight.
25 Q  And what did you do first in connection with the

Multi-Page™

Page 322

1 execution of that search warrant?
2 A  As far as first?
3 Q  Yes.
4 A  I participated in the actual execution as far as
5 entry into the residence.  Assisted at the residence.
6 Q  Now as you were there helping to execute the
7 search warrant, did you or anyone else who was helping
8 you to execute the search warrant, have any
9 conversation with Mr. Denton?
10 A  Task Force Agent David DeJohn did.
11 Q  And did these conversations occur between Mr.
12 DeJohn or Agent DeJohn and Mr. Denton, did they occur
13 in your presence?
14 A  Not in my presence.  As far as I could observe
15 them together, but not in earshot.
16 Q  And as you were there and the two of them were
17 engaged in conversation, did anything occur?
18 A  After their conversation, this was approximately
19 about two forty-five a.m., a Task Force Agent DeJohn
20 notified us that Mr. Denton had received a phone call
21 from Mr. Carmichael and that Mr. Carmichael was on his
22 way to the residence.
23 Q  Once he notified you and the other agents of Mr.
24 Carmichael's planned appearance there, what, if
25 anything, did you do?

Page 323

1 A  At that point I drove away from the scene and
2 took a perimeter position away from the house.
3 Basically I went down Fleming, probably about three
4 tenths of a mile, and turned on a cross street so that
5 I could observe traffic coming in and out on Fleming
6 Drive.
7 Q  Now, I'm going to show to you what has been
8 previously marked as government's exhibit 7(c).
9        MR. MOORER:  If I may approach the witness,
10 Your Honor?
11        THE COURT:  Yes.
12 Q  What is government's exhibit 7(c)?
13 A  That's going to be Mr. Denton's residence.
14 Q  And where in relation to this photograph did you
15 go and take up a position?
16 A  Okay.  If you're looking at the house, you're
17 looking east to west on this photo.  So when I pulled
18 out of the driveway I went to the east of the
19 residence.  Like I said, it's approximately three
20 tenths of a mile to the next cross street.  So I would
21 be east of the house and just a little bit to the
22 north.
23 Q  And why did you go there?
24 A  I moved to a position where I could see Fleming.
25 I wanted to be able to see cars coming in and out.

Page 324

1 Q  Did you have any indication as to any general
2 direction Mr. Carmichael might be traveling on that
3 evening if you were to come to that location?
4 A  Well it's pretty much a one-way-in, so I knew he
5 was coming from the east driving west coming to the
6 residence.
7 Q  So to get to the house, he would have to pass by
8 your location?
9 A  Yes, sir.
10 Q  And do you recall about what time it was that
11 this occurred where you took up this position on
12 Fleming?
13 A  It was about two forty-five in the morning.
14 Q  And what, if anything, happened after you got in
15 position?
16 A  Well about five minutes after I left the house I
17 saw a vehicle coming from east to west on Fleming that
18 passed in front of me.  I was back off the road, but I
19 could tell it was a dark colored Honda like vehicle.
20 When I saw across my -- in front of me, I called on
21 the radio that there was a vehicle coming into the
22 area now.
23 Q  Were you expecting to see a Honda on that
24 evening?
25 A  Yes, sir.  We were looking for a black Honda.

Page 325

1 Q  And why was that?
2 A  That was a description that was given for a
3 vehicle that Mr. Carmichael drives.
4 Q  Now after the car passed you, what, if anything,
5 did you do?
6 A  Basically, I just held my position there.  I did
7 not move.  The vehicle crossed, and then several
8 minutes later the vehicle came back across my path and
9 left in an eastern direction.
10 Q  Now after that occurred, did you have further
11 involvement in the investigation?
12 A  Yes, I did.
13 Q  And what was the next bit of involvement that you
14 had?
15 A  Basically, we regrouped after we left Mr.
16 Denton's residence and started planning for the next
17 day to set up on a house and to eventually execute a
18 search warrant.
19 Q  And where was the search warrant going to be
20 executed?
21 A  We were looking at Mr. Williams' residence, which
22 was off Ridgecrest.
23 Q  And what was the general plan or the general
24 consensus and plan that you came to during your
25 meeting where you regrouped?

Multi-Page™

Page 326

1  A  Well we set up to execute a search warrant at
2  that residence, is what we were doing.
3  Q  And were you going to participate in that at all?
4  A  Yes, I was.
5  Q  And did it come about that you or the other
6  agents had an opportunity to do the search warrant
7  that you planned on doing?
8  A  Yes, we did.
9  Q  And where were you going to do the search
10  warrant?
11  A  That was at Nine forty-nine Ridgecrest.
12  Q  And whose residence was that?
13  A  Mr. Williams'.
14  Q  And did you participate in that?
15  A  Yes, I did.
16  Q  And what, if at all, did you do first in
17  connection with the execution of the search warrant at
18  the Defendant Williams's residence?
19  A  Well at the point we were told we were going to
20  move in and execute the contact of that residence, it
21  was approximately ten-thirty, which would be on
22  November 17th.  As I arrived at the house there were
23  agents who were ahead of me.  It came out to us that
24  Mr. Williams had already left the residence.  So I
25  never actually entered the house.  I went ahead and

Page 327

1  started circulating the area trying to look for Mr.
2  Williams.
3  Q  Did you find Mr. Williams?
4  A  I did not.
5  Q  And what did you do thereafter after you tried
6  unsuccessfully to find Mr. Williams?
7  A  My next contact with anyone was I ended up
8  meeting with Special Agent Tom Halasz near the
9  Carmichael Center off Fleming.  And at approximately
10  five minutes to eleven, Mr. Carmichael drove past in
11  the black Honda and Agent Halasz observed him and
12  identified him at that point.
13  Q  And what, if anything, happened after you saw --
14  the two of you saw him at the Carmichael Center, or
15  drive past the Carmichael Center?
16  A  Mr. Carmichael was driving in a western direction
17  on Fleming.  We pulled out behind Mr. Carmichael and
18  began surveiling him.  And what we were trying to do,
19  and eventually what we did do, was contact a
20  Montgomery police officer marked unit to do a traffic
21  stop on Mr. Carmichael, which is what we ended up
22  doing.
23  Q  Now after the traffic stop of Defendant
24  Carmichael, what, if anything, did you do next?
25  A  Once Mr. Carmichael was stopped and taken into

Page 328

1  custody, we moved back to the Montgomery district
2  office, the D. E. A. office here in Montgomery.
3  Q  And who is the "we" that you're referring to?
4  A  Myself, Special Agent Tom Halasz.  Tom Halasz was
5  given the assignment to interview and process the
6  individuals as we brought them back to the office.
7  Q  Now once you got back to the office, what, if
8  anything, did you do next?
9  A  Basically I stood by with Agent Halasz as he
10  processed Mr. Carmichael at that point.
11  Q  And what does processing entail, generally?
12  A  Basically obtaining biographical information.
13  Height, weight, where they live, phone numbers,
14  fingerprinting, photographing prior to transferring
15  them to the U. S. Marshals.
16  Q  And at your district office are there any
17  facilities where you can put your person that you're
18  going to turn over to the marshals for a period of
19  time until you actually have an opportunity to turn
20  them over to the marshal?
21  A  Yes, we do.  We have basically two holding cells
22  within our office.
23  Q  And is that where the Defendant Carmichael was
24  placed after his arrest?
25  A  Yes, he was.

Page 329

1  Q  And is Defendant Carmichael in the courtroom
2  today?
3  A  Yes, he is.
4  Q  Would you point him out and describe what he's
5  wearing.
6  A  Mr. Carmichael is this first male here to the
7  left of the female at the front table here.  Coat and
8  tie.
9      MR. MOORER:  For the record he's identified
10  Defendant Carmichael.
11  Q  Now, at this point when you're at the district
12  office and Mr. Carmichael is there and Agent Halasz is
13  there, is Mr. Williams in custody at this point,
14  Defendant Williams?
15  A  Not initially, no.
16  Q  And at some point thereafter is he taken into
17  custody?
18  A  Yes.  Mr. Williams was taken into custody by two
19  Montgomery police officers.  It was approximately
20  twelve-fifty on the 17th.  And at that point he was
21  brought to the district office.
22  Q  And what, if anything, happened once he was
23  brought to the district office?
24  A  Once Mr. Williams was brought to the office, Mr.
25  Williams was fingerprinted, photographed and we

Page 330

1 obtained information from him. Agent Tom Halasz
2 advised Mr. Williams of his rights and interviewed him
3 at that point.
4        MR. MOORER: If I may have a moment, Your
5 Honor?
6        THE COURT: Yes.
7 Q  Okay. Agent Greenwood, from what you said,
8 Defendant Williams was brought in by Montgomery police
9 officers for processing at the district office, the D.
10 E. A. office?
11 A  Yes, sir.
12 Q  And did he give the information that was
13 requested of him as to his biographical information
14 you described earlier?
15 A  Yes, Mr. Williams did.
16 Q  And what, if anything, did he say as to his
17 residence, where his residence is or was at that time?
18 A  When I asked him where he lived, what his address
19 was, he told me Nine forty-nine Ridgecrest was his
20 address.
21 Q  And that was the place where you and the other
22 agents executed the search warrant that morning?
23 A  Yes, sir.
24 Q  Now was there any point at the office where you
25 and Defendant Williams were in each other's presence

Page 331

1 alone?
2 A  Yes, sir.
3 Q  Would you describe to the jury what caused that
4 to come about.
5 A  We have a small room which we call our "booking
6 area". When we bring defendants in we set them down
7 in there, and that's where we obtain our information.
8 Agent Halasz interviewed Mr. Williams, and once he
9 completed that interview Agent Halasz stepped up out
10 of the room and walked out into the open area. So
11 there is a door to the small room. It's about an
12 eight by eight room. As he stepped out he left the
13 door slightly ajar because I was still sitting there
14 with Mr. Williams.
15 Q  When you say "slightly ajar," how far, using your
16 hands if you can, would you say the door was ajar?
17 A  I'd probably say four to six inches.
18 Q  And you were in the room with Defendant Williams
19 at that point?
20 A  Yes, I was. I was still seated -- We have a
21 small table, and I was still seated at the table with
22 Mr. Williams.
23 Q  And would Mr. Williams be able to see outside the
24 room from where he was seated?
25 A  Only a couple inches, because what happens is

Page 332

1 when the door opens there's a wall that runs right
2 along here. So that the door -- Actually, the door
3 opens. There's about a four to six inch gap and you
4 really can't see out into the booking area, you can
5 only see down the wall.
6 Q  And what, if anything, happened as the two of you
7 were in the in the room next to the booking area?
8 A  When Agent Halasz stepped outside there was a
9 contact between him and Mr. Carmichael. They began
10 speaking to each other. While sitting there at the
11 table, I noticed that Mr. Williams all of a sudden
12 lifted his head up and looked towards the door.
13 Q  And what had happened just immediately before he
14 lifted up his head and looked towards the door?
15 A  Hearing Mr. Carmichael. Mr. Carmichael's voice.
16 Q  And what, if anything, happened once he set up
17 and looked toward the door or looked toward the area
18 where the voice came from of Mr. Carmichael?
19 A  From my observation, because I was looking right
20 at Mr. Williams, and like I said, when I heard Mr.
21 Carmichael's voice I watched Mr. Williams lift his
22 head up and look right towards the door. And My
23 observation --
24        MS. WAYNE: Judge, we have an objection at
25 this point and I believe the Court hasn't ruled on

Page 333

1 this --
2        THE COURT: Just a minute now. I'm not
3 quite sure what we're talking about.
4        I'll have to excuse the jury for just a
5 minute.
6        (Whereupon, the jury was escorted out of the
7 courtroom, and the following colloquy ensued):
8        THE COURT: Yes?
9        MS. WAYNE: I was waiting until the end.
10 What I anticipate Agent Greenwood is going to testify
11 is about this statement that Mr. Williams supposedly
12 made identifying Mr. Carmichael's voice and making
13 this statement about Mr. Carmichael, and then making
14 some statements about fearing for his family and
15 children.
16        THE COURT: Where did you raise this before
17 trial? You said I hadn't ruled on it?
18        MS. WAYNE: My understanding is we raised it
19 in a motion in limine.
20        THE COURT: I thought I had ruled on all the
21 motions.
22        MS. WAYNE: Not this one.
23        I don't believe so, because we don't know if
24 Mr. Williams was going to testify.
25        THE COURT: In which motion in limine is

Multi-Page™

Page 334

1 this raised?
2      MS. WAYNE: I'm going to have to look at all
3 the motions, Judge.
4      THE COURT: Yes, I remember this now.
5 Actually, I thought that you did not assert a Bruton
6 -- Bruton argument in your motion.
7      MS. JAMES: I didn't. I'm trying to find it
8 in the transcript, but I did orally because you made
9 the comment that the government in their response had
10 indicated that we had not raised a Bruton issue.
11      THE COURT: You had not, either. So I
12 thought that it was perhaps, in fact I thought it was
13 intentional that the Bruton issue was not raised.
14      MS. WAYNE: Judge, can I defer to counsel
15 who was actually here with you?
16      THE COURT: Yes.
17      MS. WAYNE: Okay. Thank you.
18      THE COURT: Yes, Miss James?
19      MS. CHARTOFF: I'm going to handle the
20 argument, if that's all right, Your Honor.
21      Let me just refer Your Honor to --
22      THE COURT: Well let's go ahead. What is
23 your Bruton argument?
24      MS. CHARTOFF: Well the argument is that
25 under Bruton, the right to cross examination is

Page 335

1 secured by the confrontation clause by the Sixth
2 Amendment violated the jury presented with a
3 non-testifying codefendant's confession or others'
4 inculpatory statement that also implicates your
5 client.
6      THE COURT: That's right. But I think I
7 said during the motion in limine hearing that to meet
8 critical issue was Richardson, and you all were
9 supposed to tell me how you get around Richardson.
10 And to me, and I'm reading Richardson again and I
11 still think it essentially crushes your argument.
12      I told Miss James, I said, "Miss James,
13 Richardson is the case. Richardson limits Bruton.
14 Richardson comes after Bruton."
15      MS. JAMES: You did.
16      THE COURT: And if I remember correctly, I
17 said -- yeah, I think on page seventy-nine, I say at
18 the bottom of page seventy-nine, "Well, you have to
19 show me how you get around Richardson." Richardson,
20 to me, is the case.
21      MS. CHARTOFF: Well, Your Honor, it appears
22 to me that what Richardson stands for is the
23 proposition that if you can redact the statement to
24 edit out any statement --
25      THE COURT: That's not the heart of

Page 336

1 Richardson. There's more critical language in
2 Richardson. It does talk about that, but that's not
3 the part of Richardson that I'm talking about. The
4 part that limits Bruton.
5      Have you all read Richardson?
6      MS. JAMES: I haven't since you suggested
7 that, Judge. I have been on other matters.
8      THE COURT: You need to read Richardson.
9      Well I'm not supposed to do this, but I will
10 tell you what it says. Richardson says, "The
11 statement must be clearly inculpatory standing alone
12 in order to fall within the coverage of Bruton." Then
13 there is the Eleventh Circuit case of United States
14 versus Sadafield, 743 F.2d 827, it's a 1994 case at
15 page 849.
16      There has to be a direct implication of the
17 defendant's guilt standing alone by the statement.
18 And I believe the statement here is -- Why don't we
19 ask the defendant what the statement is.
20      MR. MOORER: That's what it says, and I
21 think we need to put this on the record.
22      THE COURT: Right. In other words, it has
23 to be like Mr. Carmichael sold drugs. Something that
24 -- in neutral nouns. In fact, in the Sadderfield case
25 it says, "Neutral nouns are not enough."

Page 337

1      But go ahead. Ask him what he said.
2      MR. MOORER: Yes, sir.
3          VOIR DIRE EXAMINATION
4      BY MR. MOORER OF BOB GREENWOOD
5      (THE JURY IS NOT PRESENT:)
6 Q  What did Mr. Williams say after -- or what did
7 you say after you heard Mr. Carmichael speak?
8 A  Seeing Mr. Williams' reaction, I asked him, "How
9 long have you known him?"
10      And Mr. Williams responded, "For several
11 years."
12 Q  And then after that, and I think their objection
13 goes to the second part of what he said?
14      THE COURT: Yes. Well go ahead and ask him
15 so can I hear it.
16 Q  After you asked him that, were there any
17 conversations between you and Mr. Williams, or any of
18 the other agents, about him potentially cooperating
19 with you and the other agents in furthering your
20 investigation?
21 A  Those questions were before this observation.
22 Q  Okay.
23 A  I said that Agent Halasz had interviewed him, and
24 as far as I knew, and that interview is what you were
25 talking about, and that was prior to hearing Mr.

Multi-Page™

Page 338

1 Carmichael's voice.
2 Q And did you overhear Agent Halasz say words to
3 that effect to Mr. Williams?
4 A As far as cooperating, yes.
5 Q And what, if any, response did Mr. Williams give
6 to Agent Halasz's request for Mr. Williams's
7 cooperation in furthering the investigation?
8 A Mr. Williams first said that, "If I get out on
9 this, you're going to have some real charges to arrest
10 me for."
11        Agent Halasz asked him what did he mean by
12 that, and he said, "I can't say anything else about
13 that." But then he followed that and said that, "If I
14 name names, my children will get killed."
15 Q And did he ever call Mr. Carmichael's name in the
16 course of any of those three statements that we've
17 talked about during this recess here?
18 A No, he did not.
19        THE COURT: Did he say he feared Mr.
20 Carmichael?
21        THE WITNESS: No, he did not.
22        MS. CHARTOFF: Your Honor, may I ask him
23 some questions?
24        THE COURT: Yes.
25             VOIR DIRE EXAMINATION

Page 339

1             BY MS. CHARTOFF OF BOB GREENWOOD
2             (THE JURY IS NOT PRESENT):
3 Q You were asking him if he would cooperate, or
4 Agent Halasz was asking him if he would cooperate --
5        THE COURT: Your voice is very soft. You
6 need to stand at the lectern.
7        Now Richardson says if you have to draw
8 inferences, then you don't have a Bruton problem. I
9 really strongly suggest you read the case. But go
10 ahead.
11 Q Was the question posed to him whether he would
12 cooperate against Mr. Carmichael?
13 A He was asked if he would cooperate. Mr.
14 Carmichael's name was not said.
15 Q Mr. Carmichael was standing directly outside the
16 room?
17 A Mr. Carmichael -- When the interview was
18 occurring, Mr. Carmichael was actually in a holding
19 cell just outside the room.
20        MS. CHARTOFF: Your Honor, it's our position
21 that this is -- it's clear what the implication was.
22 It's no inference to make here. I mean, it's clear
23 that he is making a statement about --
24        THE COURT: Well you have to infer that Mr.
25 Carmichael is guilty and involved in a drug gang and

Page 340

1 he would be afraid of him for that reason. I think
2 Richardson just condemns your argument.
3        So I'll overrule the objection.
4        Why don't we take five minutes and then
5 we'll come back and bring the jury back, okay?
6        MR. MOORER: Your Honor, what time are you
7 planning for us to end?
8        THE COURT: Five-thirty. We're going to
9 recess at five-thirty. We'll go about another
10 twenty-five, thirty minutes.
11        (Whereupon, a recess was taken.)
12             IN OPEN COURT
13        (THE JURY IS NOT PRESENT):
14        THE COURT: This is outside the presence of
15 the jury.
16        With regard to the Bruton Richardson issue,
17 I think the most compelling reason as to why
18 Richardson applies is from Mr. Carmichael's own brief
19 at pages two through three, document number two
20 eighty-five. And I'm going to read from that brief.
21        The government cannot show that Mr.
22 Carmichael is in any way responsible for, or referred
23 to in, the alleged statement. The statement does not
24 make clear why Mr. Williams said what he allegedly
25 said. There are many possible explanations. Perhaps

Page 341

1 he said it because he wanted to be left alone.
2 Perhaps he said it because of a baseless fear.
3 Perhaps he said it because someone other than Mr.
4 Carmichael had threatened him, or because of
5 generalized fears regarding dangers in cooperating
6 witnesses.
7        In sum, the government cannot produce
8 sufficient evidence for the jury to find Mr.
9 Carmichael engaged in witness intimidation.
10        So the defendants' own brief makes a classic
11 Richardson argument.
12        I rest there.
13        Bring in the jury.
14        MS. WAYNE: Judge, we need to make a record.
15 In terms of that, first of all when the brief was
16 written that was before their case-in-chief started.
17 Because of the statements that have come out, as we've
18 indicated, about the murder, Mr. Carmichael's son
19 having been arrested for murder and, frankly, the
20 concerns of the jurors, that was all before and there
21 was no reason to anticipate --
22        THE COURT: But all that is a Richardson
23 argument. Richardson says if you have to look at the
24 rest of the case, you don't have a Bruton argument.
25        You're also making essentially a Richardson

Multi-Page™

Page 342

1 argument. You're saying you have to look at all this
2 other evidence to implicate Mr. Carmichael. That's
3 what Richardson says. It's not a Bruton issue.
4     MS. WAYNE: I understand, Judge, and I would
5 respectfully disagree. If you would redact the
6 statement that he talks to Mr. Williams and refers to
7 being afraid for his kids and the children, it's
8 irrelevant. And I do think it should be redacted.
9     THE COURT: Now redaction is a totally
10 different matter. I'll hear from you on redaction.
11     MS. WAYNE: What I was asking Mr. Moorer is
12 the statement that Mr. Williams makes and the agent
13 has referred to that Mr. Williams talks about being in
14 fear for his children -- if he names names his
15 children would be killed, that that's irrelevant. It
16 has nothing do with the presentation of your case in
17 terms of your proof, and that it is simply so
18 prejudicial that it outweighs any probative effect and
19 it should be redacted.
20     MR. MOORER: I think it goes back to what we
21 discussed earlier, Your Honor, that the drug trade is
22 inherently dangerous, and I think it lends some
23 credence to what some of the other witnesses who are
24 cooperating witnesses have said about the nature of
25 the trade that they were engaged in.

Page 343

1     So I think it kind of in a way back doors
2 that, buttresses that.
3     It's also not more prejudicial than
4 probative, it goes to show that he believed that he
5 had information to give, but he simply could not give
6 it because of these other considerations. In other
7 words, it's almost a tacit admission that I do know
8 about what you are investigating, and I just simply
9 refuse to help you because of the injuries that could
10 occur to the ones I love, which goes to show that he
11 was participating in the conspiracy.
12     THE COURT: Now there was a redaction part
13 of Richardson. Does anybody have that part of
14 Richardson, the case itself?
15     MS. WAYNE: We don't have the case, Judge,
16 but --
17     THE COURT: I would just like to look at it
18 again.
19     MS. CHARTOFF: I don't have the actual case,
20 Your Honor.
21     THE COURT: I just want to look at
22 Richardson with regard to redaction and see what it
23 says.
24     MS. WAYNE: He wants the case.
25     THE COURT: I want the case.

Page 344

1     MS. CHARTOFF: I could go get that.
2     THE COURT: We can download it.
3     Counsel, I'm just going to, since we're
4 going to take up this jury matter in the morning too,
5 I'll just take this up at the same time, too. I'm
6 going to let the jury go. It's now five-fifteen. By
7 the time I bring them in -- I'll see you here at eight
8 o'clock tomorrow so we can take up all these matters.
9 I'll have them come in at eight-thirty.
10     (Whereupon, the jury was escorted into the
11 courtroom.)
12     THE COURT: If you'll stand there across the
13 back there facing me will be fine. I just wanted you
14 to stand there because I'm going let you go until
15 tomorrow morning. There is no sense in keeping you
16 for fifteen more minutes, and we have a couple more
17 matters to take up. So I'll see you back here at
18 eight-thirty tomorrow.
19     Counsel I'll see you tomorrow at eight
20 o'clock.
21     Don't forget, do not discuss the case among
22 yourselves or with anyone else. The jury is excused.
23     (Whereupon, the jury was escorted out of the
24 courtroom.)
25     THE COURT: Counsel, anything you want me to

Page 345

1 read, if you'll deliver a hard copy to my chambers
2 before eight o'clock I will look at it. Otherwise,
3 you can still file it. In fact, you should still file
4 it and it will just take a while to work its way
5 through the system.
6     Okay, thank you very much. See you at eight
7 o'clock.
8     (Whereupon, court was adjourned at
9 five-fifteen p.m.)
10     * * * * * * * * *
11     COURT REPORTER'S CERTIFICATE
12     I certify that the foregoing is a correct
13 transcript from the record of proceedings in the
14 above-entitled matter as prepared by me to the best of
15 my ability.
16     I further certify that I am not related to
17 any of the parties hereto, nor their counsel, and I
18 have no interest in the outcome of said cause.
19     Dated this 4th day of August 2005.
20
21
22     MITCHELL P. REISNER, CM, CRR,
      Official US Dist. Court Reporter
23     Registered Professional Reporter
      Certified Real-Time Reporter
24
25