**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LEON CARMICHAEL, SR.,** | ) | |
| | ) | |
| **Movant/Defendant,** | ) | |
| | ) | **Civil Action No. 2:10cv1106-MHT-WC** |
| **v.** | ) | **(CR No. 2:03cr259-MHT-DRB)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**EXHIBITS TO**
**UNITED STATES'S RESPONSE TO § 2255 MOTION**

**VOLUME 5B OF 8**
**(Exhibits 5B-IV to 5B-VI)**

**GEORGE L. BECK, JR.**
**UNITED STATES ATTORNEY**

**SANDRA J. STEWART**
**FIRST ASSISTANT UNITED STATES ATTORNEY**

**ATTORNEYS FOR RESPONDENT**
**UNITED STATES OF AMERICA**

**United States Attorney's Office**
**131 Clayton Street**
**Montgomery, AL 36104**
**(334) 223-7280**

# INDEX TO VOLUME 5B OF RESPONDENT'S EXHIBITS

| | *Exhibit # (Crim. Doc. #)* |
|---|---|
| Volume IV of Trial Transcript (June 9, 2005) | 5B-IV |
| Volume V of Trial Transcript (June 10, 2005) | 5B-V |
| Volume VI of Trial Transcript (June 13, 2005) | 5B-VI |



IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

vs.

LEON CARMICHAEL

CRIMINAL ACTION NO.
2:03-cr-259-T

VOLUME IV OF XI
4th DAY OF:
JURY TRIAL PROCEEDINGS

* * * * * * * * * *

BEFORE: The Hon. Myron H. Thompson

HEARD AT: Montgomery, Alabama

HEARD ON: June 9, 2005

APPEARANCES: Terry Moorer, Esq.
Stephen Feaga, Esq.
Clark Morris, Esq.
Matthew Miner, Esq.
Susan James, Esq.
Marion Chartoff, Esq.
Lisa Monet Wayne, Esq.
Ronald R. Brunson, Esq.

GOVERNMENT EXHIBIT 5B - IV
PENGAD 800-631-6989

Multi-Page™

TABLE OF CONTENTS

ITEM DESCRIPTION PAGE NO.

Title Page .................................... 1

Table of Contents ............................. 2

Motions In Open Court (The Jury Is Not Present) ................ 6

Individual Segregated Voir Dire of Juror Lathem ......................... 22

Individual Segregated Voir Dire of Juror Freeman ........................ 23

Individual Segregated Voir Dire of Juror Whitman ........................ 35

Individual Segregated Voir Dire of Juror Degrasse ....................... 36

Individual Segregated Voir Dire of Juror Melton ......................... 37

Individual Segregated Voir Dire of Juror Bryant ......................... 37

Individual Segregated Voir Dire of Juror Arrington ...................... 38

Individual Segregated Voir Dire of Juror Mills .......................... 39

Individual Segregated Voir Dire of Juror Lovejoy ........................ 40

Individual Segregated Voir Dire Of Juror Lathram ........................ 41

Individual Segregated Voir Dire of Juror Baker .......................... 41

Individual Segregated Voir Dire of Juror Coker .......................... 43

TABLE OF CONTENTS

ITEM DESCRIPTION PAGE NO.

Individual Segregated Voir Dire of Juror Willie Pearl Day .............. 44

Individual Segregated Voir Dire of Juror Jesse Duck .................... 45

Individual Segregated Voir Dire of Juror Charles Siggers ............... 46

Individual Segregated Voir Dire of Juror Anne Freeman .................. 47

Further Discussion In Open Court (The Jury Is Not Present) .............. 48

Motion For Mistrial by Defendant Carmichael ................ 61

Bob Greenwood - Direct Examination by Mr. Moorer (Continuing from 6/8/05) ............... 76

Bob Greenwood - Cross Examination by Ms. Wayne .......................... 87

Bob Greenwood - Cross Examination by Mr. Teague .......................... 111

Bob Greenwood - Redirect Examination by Mr. Moorer .......................... 120

Bob Greenwood - Recross Examination by Ms. Wayne .......................... 132

Bob Greenwood - Further Redirect Examination by Mr. Moorer .......................... 134

Sherry Gonzales - Direct Examination by Mr. Moorer .......................... 135

Sherry Gonzales - Cross Examination by Ms. James .......................... 176

TABLE OF CONTENTS

ITEM DESCRIPTION PAGE NO.

Sherry Gonzales - Redirect Examination by Mr. Moorer .......................... 199

Sherry Gonzales - Recross Examination by Ms. James .......................... 205

Sherry Gonzales - Further Redirect Examination by Mr. Moorer .......................... 206

Sherry Gonzales - Further Recross Examination by Ms. James .......................... 207

Tom Halasz - Direct Examination by Mr. Moorer .......................... 208

Tom Halasz - Cross Examination by Ms. Wayne .......................... 226

Tom Halasz - Cross Examination by Mr. Teague .......................... 247

Tom Halasz - Redirect Examination by Mr. Moorer .......................... 254

Motion for Mistrial by Ms. Wayne .......................... 256

Tom Halasz - Redirect Examination (continuing) by Mr. Moorer .......................... 283

Tom Halasz - Recross Examinatin by Ms. Wayne .......................... 287

Tom Halasz - Recross Examination by Mr. Teague .......................... 291

Tom Halasz - Further Redirect Examination by Mr. Moorer .......................... 291

Mona George - Direct Examination by Mr. Feaga .......................... 295

TABLE OF CONTENTS

ITEM DESCRIPTION PAGE NO.

Moses Williams - Voir Dire Examination by Mr. Moorer .......................... 316

Mona George - Direct Examination by Mr. Feaga (Continuing) .......................... 327

Mona George - Cross Examination by Mr. Brunson .......................... 331

Mona George - Cross Examination by Mr. Teague .......................... 340

Mona George - Redirect Examination by Mr. Feaga .......................... 341

Mona George - Recross Examination by Mr. Brunson .......................... 344

Court Reporter's Certification .............. 346

-o0o-

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON JUNE 9, 2005 AT THE UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

MOTIONS IN OPEN COURT

(THE JURY IS NOT PRESENT):

THE COURT: Counsel, I wanted to hold this proceeding obviously outside the presence of the jury, and also the press, because we may be talking about private matters involving the jurors. I'd like to take up the jury issue first, and then I'll hear from the defendants first. Just make your argument and your suggestions, and then I'll hear from the government and then I'll rule.

MS. WAYNE: Judge, just to place a couple of factual things on the record, as well. There was coverage, media coverage last night. I know the Court has admonished the jurors not to read the newspapers, the news coverage. After other juror Miss Murray's and Mr. Mills' conversation, it appears that outside people such as family and friends are contacting the jurors. We're aware of at least those two jurors serving on this jury.

The paper this morning talked about witness threats and the testimony of yesterday, and apparently the news coverage covered that, as well. So I think

that is important in terms of its extraneous influence or potential.

THE COURT: Right. You know, I think I should mention this. If I were to declare a mistrial, and even if I were to remove venue, what you're telling me is a strong justification for total sequestration as well as an anonymous jury.

MS. WAYNE: That may be true, Judge.

THE COURT: I just wanted you to realize that there is a downside for your clients in such a matter, too.

MS. WAYNE: I agree with the Court. This is a difficult one, Judge, because we knew about this case, obviously, being a bit of a high profile case but believed that we could still do it.

THE COURT: Right. To that degree I want to make this clear, too. Your motion for change of venue is not based on the jurors feeling threatened, your motion for change of venue was based on pretrial publicity.

MS. WAYNE: I agree.

THE COURT: So we really have a different ground here. But even if I were to change venue, from what you're saying, I would have to totally sequester the jury.

But go ahead.

MS. WAYNE: I understand.

I also want to put on the record that, and it simply goes again to this fear situation, and that is this morning I asked my colleague's son, William James, to take my sandwich over to the jury room -- or to the lawyer room to put it in the refrigerator. As he was coming down the hall he related to us the marshals were bringing in the jurors and yelling in a very loud voice, "Everyone get out of the way. Get out of the way." He was the only one in the hall, and he's probably, you know, maybe five feet tall and clearly a child. So, you know, that's concerning.

THE COURT: Well let me respond to that. That's very common. When we are in Opelika and Dothan because of small quarters, when the jurors enter and leave the courtroom everyone has to get out of the hall. And the marshals do yell, "Everyone out of the hall. Everyone out of the hall." So that is not unique to this jury.

MS. WAYNE: I understand. But I think taken together it's a consideration.

I have received the government's response to our motion for mistrial, Judge, and I agree with Ms. Morris in terms of the cases that she cited. Those

cases stand for that point.

THE COURT: Okay. What point are you trying to make?

MS. WAYNE: The point we're trying to make, Judge, is what do we do at this point? I think the leading case is United States of America vs. Remmer, R-e-m-m-e-r, found at 347, it's a Supreme Court case in 1954.

THE COURT: Right.

MS. WAYNE: And I agree that that is the leading case; the problem is, that it doesn't really address this. It gives us kind of an outline of what should we do at this point.

THE COURT: Now Remmer involved an actual improper conduct.

MS. WAYNE: Exactly.

THE COURT: Here there is actual no evidence of improper conduct.

MS. WAYNE: Well, and I agree with the Court in terms of at this point there may not be. And my review of the case law, Judge, in terms of what happened I didn't see a case on point. I saw an analogy of cases where what you have to look at is whether it's external or internal. And I'm going to argue here that this is external, because we have a

juror who has appeared to have made statements to other jurors based upon her external contact of this phone call that she believes somehow was significant to this case. So, therefore, it is external.

Review of the cases say that at this point, I think at the minimum unfortunately this Court, and we're requesting it, has to do a polling of the jurors or individual questioning. The reason for that is because if -- we have to show that there is evidence, and we can't do that unless we talk to them.

THE COURT: Right.

MS. WAYNE: So I guess the bottom line is without going through all of the cases, that's what we need to do and that's what we're requesting now.

THE COURT: Mr. Teague?

MR. TEAGUE: Your Honor, we would adopt the arguments of counsel.

THE COURT: Miss Wayne?

MR. TEAGUE: Yes.

THE COURT: Ms. Morris?

MS. MORRIS: Your Honor, the government's position would be there is no need for any further investigation as outlined in the --

THE COURT: I've actually read your brief.

MS. MORRIS: That I filed this morning?

However, if the Court does decide to poll the jury or voir dire the jury further, we would just request that the Court do all of the questioning. That all the lawyers --

THE COURT: I think in the future I really should do all of the questioning. I fully agree with you on that one. We're in the middle of a trial and the lawyers really shouldn't be talking to -- You can ask me to ask the questions, but I think I should be the one who does it.

MS. MORRIS: And that would be, you know, again, I want to make clear that our position is that further investigation is unnecessary into this. However, that would be our only stipulation if the Court does --

THE COURT: I have looked at the case law too, and I've looked at Remmer. There has been no external contact with this jury. That's the bottom line. However, Miss Murray perceived that there might be external contact, and if she conveyed that perception to the other jurors, then I think I have to treat it as if there actually was external contact because the question is, you know, do the jurors think there has been external contact. And that in itself I think warrants some further inquiry.

I thought about it over the evening, and I'm very delighted with one ruling I'm made, which was to discharge Miss Murray. I think she was unraveling before our eyes, and I think that unraveling started with the call. And I think if I had kept her on the jury, I think she could have tainted the rest of our case.

I think she was really losing it. As they say in the parlance, I think she was becoming so nervous that anyone who would think that an unknown number on their cell phone is someone contacting them is really unraveling. Anyone who owns a cell phone knows that you get wrong numbers all the time. And that she would even think -- Her name hasn't been in the paper, I mean on her cell phone that someone was contacting her? It shows she was unraveling.

I will say this to the government. I really do think she could have tainted the jury for the rest of the case. I don't know what she's told them already, but if she stayed on this jury she might have destroyed this case for us. But I partially agree with Miss Wayne, and I partially agree with you.

What I propose to do is to bring the jury in here, ask them whether any of them heard a conversation between Mr. Mills and Miss Murray

yesterday morning. If anyone should raise his or her hand, I will then individually voir dire that juror just to find out what the nature of what it was that was overheard.

The second thing I will do is, and I understand this from the case law too, just in case someone thinks that something happened improperly with Miss Murray, I'm going to explain to the jury that she was excused for reasons that had nothing to do with this case, nothing to do with the defendants and for personal reasons. And personal reasons really were. I think she was just unraveling, and I will be telling the truth because I don't think there was any improper contact.

So those are the two points I'd like to make. So when the jury comes in at eight o'clock, I will seat them here, not in the open court. And I don't think I'm going to bring them in that back room. I agree with Mr. Feaga, I think that is a little bit intimidating. I'll bring them in here in open court, and I will ask them whether they overheard any conversations yesterday morning between -- I won't tell them what the conversation was -- but between Mr. Mills and Miss Murray. If one or two should raise their hand, then I will find out what they overheard.

Even if they overheard it, I don't think that warrants a mistrial. I just think I just need to make that inquiry under Remmer.

MS. WAYNE: Judge, in addition, I'm glad the Court is going to clear up the impression that her having left might have left with them, so I was concerned about that, and there are many cases. However, I would ask that they be individually voir dired. And the reason for that is group dynamics suggest that if you simply ask them in a group has anybody, they're going to be less forward in terms of what may have happened and be less likely to talk about it. So that's our first position.

Secondly, we believe that you really have to ask open-ended question of these jurors. I recognize the government wants --

THE COURT: Well no, I can't do that because I cannot enter into their thoughts about this case so far. The law is clear on that. Can't do that. Only have to be very careful with your questions. They have to be very pointed, and I'm not going to be asking them about any fear or so forth, because that will elicit their thoughts. Miss Murray volunteered that information. That's a different story. But I won't do that.

Yes?

MS. WAYNE: I'm not finished, Judge, sorry.

THE COURT: Oh, sorry.

MS. WAYNE: The last thing is Mr. Mills, he said to us that his external contact was the daughters that had called about him being on the Carmichael case. What we didn't find out yesterday, and I'm really curious, is when did this conversation come up with Miss Murray? How was it initiated? Was it initiated as a result of her saying, you know, I received this phone call and him going yeah, my daughters called me and they were concerned, too? Because that goes together and I'm concerned about that and we need to ask about that.

THE COURT: I'll take that up later.

Yes, do you have anything else?

MR. TEAGUE: On that issue, I would only say, Your Honor, those conversations between those two just about, I won't say totally, but just about fly in the face of your strict instructions not to discuss the case. And that includes publicity.

THE COURT: Well, I'm not so sure of that. I think if a juror gets a call they really should report it. I think she acted quite properly in saying that she had gotten the call.

MR. TEAGUE: Well that's fine, but to start discussing it with another juror --

THE COURT: Well, I think she was asking him what to do about it. I don't think that was discussing the merits of the case.

MS. MORRIS: Your Honor, we would have one other request. That if defense counsel or the government for that matter has any questions on the individual voir dire, if it comes to that, that we then --

THE COURT: I'm going to do it right in here.

MS. MORRIS: I understand.

THE COURT: I think that back room may be a little bit intimidating. I think I'll just bring the juror in and have her standing right there at the door. That's what I've done in other cases.

MS. MORRIS: Right. But if defense counsel has any questions for example for the juror, that they then -- the juror be removed from the courtroom, we discuss it, we have an opportunity to object to the question.

THE COURT: Definitely. If you have a question for me I'll send the juror out. I've done this before, too. You then give me your questions. I

may reject the questions or accept the questions or I may come up with an alternative question. And of course both sides can object to whatever I do. And of course your objections should be outside the presence of the jury. They shouldn't know you're making objections.

So anyway, that's the way we'll proceed this morning. I'll let you know whether I'm going to do it by just asking them whether they overheard anything or not, and individually ask them that. I'll have to think about that.

Yes, Mr. Teague?

MR. TEAGUE: Your Honor, it was my understanding we were also going to take up the issue of whether or not codefendant Carmichael's statement was --

THE COURT: Oh, that's a totally different matter. I just want to take up the jury matter now. You're talking about the Crawford issue? We've got other stuff to take up. We've got Crawford, we've got, what else, the redaction issue.

MR. TEAGUE: I was afraid that that might come up with Agent Greenwood when we get to the testimony.

THE COURT: Right. We'll take that up. We

can do that in open court.

MR. TEAGUE: Okay.

MR. MOORER: And I have another issue we need to discuss as well, this morning. So are we doing all of these things --

THE COURT: We'll do all the other non-jury matters in open court where it should be.

MR. MOORER: Okay.

THE COURT: I understand the jury is back there now, so let me think about Miss Wayne's other suggestion and I'll let you know that before I bring in the jury.

(Whereupon, a recess was taken.)

THE COURT: Good morning.

If I have a sleeping juror, first you all need to bring it to my attention subtly by telling it to Sheila or writing it on a document. She will then tell me and then we recess. And then I'll probably, you know -- or I can do something that tells the jury -- sometimes I tell them to stand up. I say, "Why don't you stand up and stretch."

The second thing we do is, if the juror continues to sleep, that juror becomes the alternate. But another thing, sometimes you think a juror is sleeping and they're not necessarily sleeping. But

they may be sleeping. Sometimes they just close their eyes but are actually listening. I find it hard to believe that jurors sleep through something like this.

MS. JAMES: I've had judges sleep.

THE COURT: Pardon me?

MS. JAMES: I've had judges sleep.

THE COURT: I hope you're not talking about me, are you?

MS. JAMES: I was in Florida and I had a senior retired judge, and I asked him, "Your Honor, may I approach?" And he had just nodded off. He was about eighty, and I said, [in a raised voice] "Your Honor, may I approach?"

THE COURT: Well I had my law clerks looking through the window up there and they came rushing down to make sure I hadn't fallen sleep. I had not fallen asleep.

I want to say one other thing. Miss Wayne mentioned Richardson yesterday, and she said whenever I bring up Richardson I think most lawyers are just so surprised about the case. The first time I read Richardson I was shocked. I just think it's an unusual case from the Supreme Court. But I know we have to live with it. I think it's so illogical, but it is the law.

So I am going to actually ask the juror en banc, I'm going to overrule your objection on individual voir dire unless one of the jurors raises his or her hand. But you have your record.

MR. TEAGUE: I am glad to hear an admission from the Court that there are some illogical things in the law. Particularly coming from the Supreme Court.

THE COURT: They even overrule themselves once in awhile. Richardson is a very odd case, I'll say that. But it is the law, and I follow the law.

MR. TEAGUE: The Supreme Court case that put Marnel Washington away for forty years.

THE COURT: Okay. Bring in the jury.

(Whereupon, the jury was escorted into the courtroom.)

THE COURT: Counsel, so the jury doesn't have to keep going in and out, I may take you back here with Mitchell and just leave them in the box.

Do we have all fourteen?

JUROR: Yeah. Do we need to sit in the same order as we were?

THE COURT: No, sit wherever you'd like. Sitting in the front row would be fine.

Members of the jury, I just want to make an inquiry just with you. Did any of you overhear a

conversation between Miss Murray, the lady who was here yesterday but who has been excused, and Mr. Mills? Where is Mr. Mills?

JUROR MILLS: Right here.

THE COURT: Did any of you overhear a conversation yesterday morning between the two of them? If so, please stand up. It's very important that if you think you overheard any conversation between Miss Murray and Mr. Mills, please stand and tell us.

JUROR: The only thing I think I heard --

THE COURT: No, don't tell us what you heard. You think you may have heard something?

JUROR: Nothing --

THE COURT: Just tell me just between them.

JUROR: Part of theirs across the table, yes.

THE COURT: You mean in front of everybody?

JUROR: Yes.

THE COURT: Okay. But not just between them privately?

JUROR: No.

THE COURT: What is your name, then?

JUROR: Candy Latham.

THE COURT: Would all of you step out for

just a minute, but Ms. Latham. If you'll stay in for just a minute.

INDIVIDUAL SEGREGATED VOIR DIRE OF JUROR LATHAM:

THE COURT: Okay. What were you going to say?

JUROR: I'm so sorry.

THE COURT: That's okay.

JUROR: They were talking across the table about some concerns because they were residents here in Montgomery. It being a high profile trial. That's all I overheard.

THE COURT: That's all you recall?

JUROR: I happened to key into that, and she had said something about she had gotten a phone call on her cell phone from a number she didn't recognize the night before. And that's all.

THE COURT: And they said that while everyone was sitting across the table?

THE JUROR: I'm awful positive there were some in the restroom, but I didn't take a head count. But quite a few of them was sitting around the table.

THE COURT: Okay, very good. Thank you very much.

JUROR: You're welcome.

(Whereupon, Juror Latham was escorted out of the courtroom)

THE COURT: I understand there was another lady who nodded her head?

MS. WAYNE: Judge, you know, the problem --

THE COURT: No, no, first I want to get into the information she gave. I'll hear from you all later. Who the other juror who nodded her head?

MS. WAYNE: She had brown and black, and she sat over in this case and I don't have her name.

THE COURT: Do you know who she is?

COURTROOM DEPUTY CLERK: I didn't see the nod, so I can't tell you.

MS. WAYNE: She had the tiger print.

MS. CHARTOFF: Brown shirt.

THE COURT: Kristen and Sheila, would you go in and bring her out.

(Whereupon, Juror Freeman was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE OF JUROR FREEMAN:

THE COURT: How are you doing?

JUROR: I'm fine.

THE COURT: Give us your name.

JUROR: Anne Freeman.

THE COURT: Now, Miss Freeman, I thought I saw you nod your head, is that correct?

JUROR: Yes.

THE COURT: Then you did hear something between Miss Mills and --

JUROR: When they were all talking.

THE COURT: What did you hear?

JUROR: Just general stuff.

THE COURT: Do you remember anything? Any of the subject matter?

(Indicating negatively.)

THE COURT: Okay. You don't remember what they said or anything like that? Just take a moment to think. If you can remember any of the subject, even the subject they were talking about.

JUROR: Just something about being afraid because of being in Montgomery.

THE COURT: Okay. Thank you very much.

(Whereupon, Juror Freeman was escorted out of the courtroom.)

THE COURT: Okay. Now I'll hear from the lawyers. I'll hear from you now, Miss Wayne.

MS. WAYNE: Thank you, Judge.

Both jurors have indicated this actually took place as they were all seated, with the exception

of maybe someone in the bathroom. That means they were all seated around the table. I think that the Court --

THE COURT: Well I'm not so sure of that, but go ahead.

MS. WAYNE: The first juror said we were all seated around. And clearly the conversation came up, it sounds like to me, in front of all of them. I think that the Court has the obligation at this point to find out -- My concern is how it came up, who is involving themselves in the conversation and clearly the impact of it. You have a conversation based upon fear.

The government in this case, and this is the prejudice to the defendant, the government in this case will argue that the nature of drugs and drug dealing is fearful, and it's fearful and there are guns and all of the other things, and clearly that's going to sit with these jurors who have already talked about being in this city and have reached a conclusion that there needs to be a concern of fear in Montgomery and the result of that is because of the allegations that take place in Montgomery.

It's too intricately and inextricably intertwined with each other, and I think that it

clearly has inflamed this jury and prejudiced this jury and I'm asking the Court to ask all of them and then go into further development of them.

THE COURT: What about totally sequestering the jury at this time?

MS. WAYNE: I think at this point that sends a message that there needs to be a is a reason for the fear. That puts us in a double bind. It's too late.

THE COURT: Okay. Let me hear from Mr. Teague?

MR. TEAGUE: Your Honor, I agree and adopt co-counsel's argument, but would add one other thing. We also heard testimony from Robert Patrick Denton that Ike died. Mr. Dudley died. And all of that I think was irrelevant, but it has added to the atmosphere that is generating this concern about, you know, particularly with local jurors, we're talking about well yeah, you know, my daughters are concerned for me.

We weren't there but, Your Honor, I get the impression that it's gotten pretty bad back there. When it comes to a fair trial for Freddie Williams, or Leon Carmichael for that matter.

THE COURT: Okay. I'll hear from the government.

MS. MORRIS: Your Honor, I submit to the Court that this doesn't have anything to do with publicity, it doesn't have anything to do with being in Montgomery, it has to do with the nature of this case. If this case were moved to Birmingham or Washington State, this case would still involve drug dealing, and drug dealing is inherently dangerous. The evidence in this case, we put in seven guns into evidence yesterday.

Guns are inherently dangerous. Everything that involves the facts of this case that will not change, cannot change, and should you not change, if the jury is sequestered if this case is mistried, if the venue is changed, none of that changes. And this jury is no better or no worse off than any other twelve people that sit in this box and hear that evidence. There is still going to be concern. Their kids are still going to hear about the guns, about the drugs and this inherently dangerous lifestyle and business. And there is nothing that's going to change that.

If you sequester the jury, I actually -- The government is not in favor of sequestering this jury. I mean I think they're going through enough being partially sequestered. So, you know, our contention

would be that it's inherent.

THE COURT: Anything else? Yes?

MS. JAMES: I have been practicing in this Court since 1987 and I do practice and do criminal drug trials in other jurisdictions. Most of them have guns, most of them have some bad evidence and I have never had this situation happen. I was involved --

THE COURT: What do you mean you have never had this situation happen?

MS. JAMES: Where jurors actually expressed fear. They may have had fear, but they didn't express it.

THE COURT: Right.

MS. JAMES: And we didn't have knowledge that they discussed it. And I would note that I was involved in part of the Oscar Andrews case, the Starks case, the John Riley case with Miss Moncrief and they just go on and on and on.

THE COURT: Right.

MS. JAMES: So I think it's different. I think if you go back to the cumulative effect of all the publicity that has led us to here, it's just spiraled out of control.

THE COURT: Okay. Yes?

MS. MORRIS: I would just add for the Court

that I tried a case in this district not a month ago, and the jurors -- it was a hung jury, and they came to me afterwards, approached me, I'll say that, and they were afraid and wanted this person off the street. And they were scared and they expressed fear.

THE COURT: Okay. I think I've heard the arguments. This is what I'm going to do. First of all, to be very honest with you this case is not atypical. I fully agree with the Government. Guns and drugs, juries hear this stuff day in and day out. I've tried cases similar to this one before. It just happens to be a high profile case because it involves a high profile person. So I think wherever you're going to try it you'll have essentially the same issues.

It's really not a question of publicity, it's a question of what Miss Wayne calls "fear". I don't think this jury itself is afraid. I think the fear is Miss Murray's, and that's why I put her off the jury. I think her fear was unfounded. I think she was unraveling. I think that for whatever reasons in her personal life she suddenly created this fear, and I think it was clearly unfounded because anyone who thinks that getting a call on your cell phone that you don't recognize suddenly means that you're sitting

in a trial and someone is out to get you. I think it's just really gone beyond what's reasonable.

However, the concern is that she conveyed this concern to at least one other member -- well, perhaps three members of the jury and maybe more, I don't know. I don't think, however, that this warrants a mistrial. I think the whole matter is inherent to the case.

Secondly, I only have two jurors who are here from Montgomery. Mr. Mills and Miss Murray. One has been removed. I am willing to make Mr. Murray (sic.) an alternate --

MS. WAYNE: Mr. Mills.

THE COURT: Sorry, Mr. Mills an alternate. I'm willing to make Mr. Mills an alternate. Therefore, we won't have any jurors from Montgomery. The jurors come from Dothan, from Opelika, all over our Middle District. I think probably the ones who are in the outlying areas may have heard less but something about the case, and I think I will charge the jury that Miss Murray was excused for reasons unconnected with the case and they should ignore anything she may have said or she may have heard throughout the case.

I will then individually ask them whether

they can be fair and impartial for the rest of this case, and that will be the only question. That's what I'm going to do.

Now can you state your objections.

MR. MOORER: Your Honor, I don't have an objection but I do have a suggestion. I know you have given them the general instruction several times not to discuss the case among themselves.

THE COURT: Yes.

MR. MOORER: I think it might be helpful for the Court to give them a little bit more of a layman friendly definition of that to the extent of if you go to lunch and one of you might want to talk about a particular witness who just testified, or what did he say in regards to that, letting them know that that would be improper. That they have to wait until the case is over before they can say anything to each other about anything that occurs inside the courtroom.

THE COURT: Okay. Yes, Mr. Teague?

MR. TEAGUE: Your Honor, on behalf of Defendant Williams I would agree with the Court. We would like to see the gentleman become an alternate. I think that's a good remedy, and we would request the Court to do that.

THE COURT: Okay. Miss Wayne, any

objections and additional requests?

MS. WAYNE: Yes, Judge. Again, we would renew our request to poll them individually. It appears to us based upon the jurors' responses that they may all have heard the conversation and responded to it. So that's our first request.

In terms of Mr. Mills, Judge, I ask that he not be made an alternate. We'd be asking that he be excused. I don't want to take a chance that his conversation be followed up, or that he even be around these jurors to be able to discuss any of this or to go into it any further despite the Court's instruction.

THE COURT: I will tell him that, too. You remind me to tell him not to discuss with them anything that he discussed with us to the remaining jurors.

Anything else you want to say?

MS. WAYNE: Well, Judge --

MR. MOORER: You told him that the other day, Your Honor.

THE COURT: I don't know, but I'll repeat it when I bring them in and ask them if they can be fair and impartial. You all need to remind me to ask that question, or to tell them that.

MS. WAYNE: And lastly, Judge, we would renew the motion for change of venue. The Court has indicated that Mr. Carmichael, and I think you're referring to him being the high profile individual in the case, would be known outside this jurisdiction. There is no evidence at all on the record to indicate that if we went outside this jurisdiction that anybody would know him at all, and that it would be considered anything other than a drug and gun case outside of Montgomery.

THE COURT: Okay. Well as I said, I don't know if anyone who is outside the jurisdiction heard about the case anyway of the people who are on the jury.

But go ahead, Mr. Teague.

MR. TEAGUE: One last thing. My remarks concerning Mr. Mills becoming an alternate, I don't want it to be construed on the record as meaning --

THE COURT: Okay, you still adopt their objections?

MR. TEAGUE: Well, yes. We still move for a mistrial and we still ask for a change of venue.

THE COURT: Motion for change of venue is denied. Most for mistrial is denied.

And if you'll bring the jurors in

individually -- well, first bring them in as a group and then we'll ask them individually.

(Whereupon, the jury was escorted into the courtroom.)

THE COURT: Members of the jury, I just want to tell you two things. Number one, if you happen --

COURTROOM DEPUTY CLERK: Judge, hold on.

THE COURT: Oh, we have a missing juror?

(Whereupon, said missing juror was escorted into the courtroom.)

THE COURT: Okay. I just want to tell you two things. If you happen to have heard any conversation between Mr. Mills and Miss Murray, you should ignore that and decide this case based solely on the evidence that's presented.

And the second thing I'd like to tell you is Miss Murray was excused for reasons unconnected with this case. Unconnected with the defendants. It was due to personal reasons that had nothing to do with this case and you should draw no inferences one way or the other about that.

And I'd like you to step out again for just a second, and we'll call you in individually.

(Whereupon, the jury was escorted out of the courtroom.)

THE COURT: Now, Counsel, I will ask each juror if he or she can be fair and impartial; and, secondly, can they ignore anything they may have heard that had nothing to do with the facts of this case in reaching their verdict.

Any other suggestions on that?

(Whereupon, there was no response.)

THE COURT: Very good. Bring in each juror as Ms. Carnes calls them in.

COURTROOM DEPUTY CLERK: Leah Whitman.

(Whereupon, Juror Whitman was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR LEAH WHITMAN:

THE COURT: This is Miss Whitman?

JUROR: Yes.

THE COURT: Miss Whitman, can you be fair and impartial in this case, and decide this case based solely on the evidence and my instructions on the law and totally not consider anything else that's external to what you hear in this courtroom?

JUROR: Yes.

THE COURT: You think you can do that?

JUROR: Yes.

THE COURT: Okay. Thank you very much.

(Whereupon, Juror Whitman escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Walter Degrasse.

(Whereupon, Juror Degrasse was escorted not courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR WALTER DEGRASSE:

THE COURT: Mr. Degrasse, do you think that you can be fair and impartial in hearing this case, and consider this case based solely on the evidence that's presented in court and not consider any comments from anyone else, even other jurors, that have nothing to do with what you hear in open court and my instructions on the law?

JUROR: Yes, sir, I do.

THE COURT: Thank you very much.

(Whereupon, Juror Degrasse was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Charlie Melton.

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR CHARLIE MELTON:

(Whereupon, Juror Charlie Melton was escorted into the courtroom.)

THE COURT: Mr. Melton, do you think that you can be fair and impartial in this case as to both

sides, and base your verdict only on the evidence and the law as I -- based only on the evidence presented in court and the law that I give you, and not consider any outside comments, including any comments by other jurors? That has nothing to do with what occurs in open court, but based only on the evidence in open court?

JUROR: Yes, Your Honor.

THE COURT: Thank you very much.

(Whereupon, Juror Melton was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Martha Bryant.

(Whereupon, Juror Martha Bryant was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR MARTHA BRYANT:

THE COURT: Miss Bryant, do you think that you can be fair and impartial in this case and base your verdict only on the evidence that's presented in open court and not on any external evidence, or evidence outside what occurs in open court, and not even based on what other jurors may or may not say to you? Just base your verdict solely on the evidence and be fair and impartial?

JUROR: Yes, sir.

THE COURT: You think you can do that?

JUROR: Yes, sir.

THE COURT: Thank you.

(Whereupon, Juror Bryant was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Michael Arrington.

(Whereupon, Juror Michael Arrington was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR MICHAEL ARRINGTON:

THE COURT: Mr. Arrington, do you think that you can continue to be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: Do you think that you can base your verdict only on the evidence that's presented in court and based on the law as I give it to you and not consider any external evidence -- not external evidence, but external statements or anything that may be said to you outside the courtroom, even among the jurors?

JUROR: Yes, sir.

THE COURT: And you can base your verdict only on the evidence in court?

JUROR: Yes, sir.

THE COURT: Thank you.

(Whereupon, Juror Arrington was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: James Mills.

(Whereupon, Juror James Mills was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR JAMES MILLS:

THE COURT: Mr. Mills, do you think that you can base your verdict only on the evidence in the court and not consider anything that may have occurred outside the Court, even among your discussions with other jurors unless it has to do during your deliberations with evidence in the Court and based on the law?

JUROR: I do.

THE COURT: Now when we spoke to you yesterday, I don't know if I cautioned you, but you should not discuss with the other jurors what happened in your meeting with me. And I believe Miss Carnes already told you that, is that correct?

JUROR: Yes.

THE COURT: Thank you very much.

(Whereupon, Juror Mills was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Jololinda Lovejoy.

(Whereupon, Juror Jololinda Lovejoy was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR JOLOLINDA LOVEJOY:

THE COURT: Miss Lovejoy, how are you doing?

JUROR: Fine.

THE COURT: Do you think that you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: Do you think that you can base your verdict only on the evidence that is presented in open court and based on the law?

JUROR: Yes, sir.

THE COURT: And not consider anything that occurs outside the Court, including any conversations among the jurors that has nothing to do with the evidence in the court?

JUROR: Yes, sir.

THE COURT: Okay, thank you very much.

(Whereupon, Juror Lovejoy was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Candy Lathram.

(Whereupon, Juror Candy Lathram was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR CANDY LATHRAM:

THE COURT: Do you think that you can be fair and impartial in this case?

JUROR: Yes, I do.

THE COURT: And base your verdict only on the evidence in the court that's presented in court and based on the law, and not consider any exchanges between jurors and that would not factor into your deliberations at all? Do you think you can do that?

JUROR: Yes, I do.

THE COURT: You know that you're not to discuss with the other jurors what happened when you were here alone.

JUROR: Yes, I do.

THE COURT: Thank you.

(Whereupon, Juror Latham was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Eva Baker.

(Whereupon, Juror Eva Baker was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR EVA BAKER:

THE COURT: Right there, Miss Baker, is fine.

How are you?

JUROR: Fine, how are you?

THE COURT: Do you think you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: And base your verdict only on the evidence that's presented in court?

JUROR: Yes, sir.

THE COURT: And based on the law?

JUROR: Yes, sir.

THE COURT: And not consider anything that may occur outside the courtroom in your deliberations?

JUROR: Yes, sir.

THE COURT: Including any exchange among the jurors, only when you discuss the case at the end of the case?

JUROR: Yes, sir.

THE COURT: You can do that?

JUROR: Yes, sir.

THE COURT: Thank you.

(Whereupon, Juror Baker was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Kathy Coker.

(Whereupon, Juror Kathy Coker was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR KATHY COKER:

THE COURT: Miss Coker, do you think you can continue to be fair and impartial in this case?

JUROR: Absolutely.

THE COURT: And can you base your verdict and your deliberations only on the evidence that's presented in court?

JUROR: Yes.

THE COURT: And on the law and not consider any outside statements, or what you may see, or even conversations with the other jurors that have nothing to do with the evidence that's presented in court?

JUROR: Yes, sir.

THE COURT: And limit your verdict and deliberations to just the evidence that's in court?

JUROR: Yes, sir.

THE COURT: And you think you can be fair and impartial?

JUROR: I can.

THE COURT: Thank you very much.

(Whereupon, Juror Coker was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Willie Pearl Day.

(Whereupon, Juror Willie Pearl Day was

escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR WILLIE PEARL DAY:

THE COURT: Miss Day, how are you doing?

JUROR: Just fine. Thank you, sir.

THE COURT: Now do you think that you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: And base your verdict only on the evidence that's presented here in court?

A Yes, Your Honor.

THE COURT: And not consider any statements or things you may hear outside the Court, or even conversations among you while the trial is in progress, and during your deliberations consider only the evidence that's presented to you in open court?

JUROR: Yes, sir.

THE COURT: And you can be fair and impartial?

JUROR: Yes, sir.

THE COURT: Thank you very much.

(Whereupon, Juror Day was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Jesse Duck.

(Whereupon, Juror Jesse Duck was escorted

into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE
OF JUROR JESSE DUCK:

THE COURT: How are you doing, Mr. Duck? Do you think that you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: And base your verdict only on the evidence that you hear in open court?

JUROR: Yes, sir.

THE COURT: And the law as I give it to you?

JUROR: Yes, sir.

THE COURT: And not consider anything you may hear or see outside the courtroom?

JUROR: Correct.

THE COURT: Or something you may hear or see that was not presented in open court?

JUROR: Correct.

THE COURT: And that would include even conversations among the jurors while the trial was in progress.

JUROR: Correct.

THE COURT: And you can limit yourself in your deliberations to just the evidence in court?

JUROR: Yes, sir.

THE COURT: Thank you very much.

(Whereupon, Juror Duck was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Charles Siggers.

(Whereupon, Juror Charles Siggers was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE OF JUROR CHARLES SIGGERS:

THE COURT: Is this Mr. Siggers?

JUROR: Yes, sir.

THE COURT: Do you think that you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: And base your verdict only upon the evidence that's presented in open court?

JUROR: Yes, sir.

THE COURT: And not consider anything you may hear or see outside what occurs in open court?

JUROR: Yes, sir.

THE COURT: And that would include even conversations among the jurors, not consider anything about that? Of course until you reach your deliberations, but those will be based only on what occurs in open court. Do you think you can do that?

JUROR: Yes, sir.

THE COURT: Thank you.

(Whereupon, Juror Siggers was escorted out of the courtroom.)

COURTROOM DEPUTY CLERK: Anne Freeman.

THE COURT: Is this the last one, Sheila?

COURTROOM DEPUTY CLERK: This is the last one, sir.

(Whereupon, Juror Anne Freeman was escorted into the courtroom.)

INDIVIDUAL SEGREGATED VOIR DIRE OF ANNE FREEMAN:

THE COURT: Ms. Freeman, do you think you can be fair and impartial in this case?

JUROR: Yes, sir.

THE COURT: And base your verdict only on the evidence that's presented in open court and the law as I give it to you?

JUROR: Yes, sir.

THE COURT: And not consider anything that's said outside of court in reaching your verdict and during your deliberations?

And secondly, do you think you can be fair and impartial?

JUROR: Yes, sir.

THE COURT: You will only base your verdict

upon what occurs in open court and the evidence that's presented?

JUROR: Yes.

THE COURT: And not even consider comments among jurors while the trial is in progress. Do you think you can do that?

JUROR: Yes, sir.

THE COURT: Now you came out here and answered a few questions for me. You're not to discuss what occurred out here with the other members of the jury.

JUROR: Yes, sir.

THE COURT: Thank you very much.

(Whereupon, Juror Freeman was escorted out of the courtroom.)

THE COURT: Now anyone else want to put anything on the record before we go back into open court?

(Whereupon, there was no response.)

THE COURT: Okay.

(Whereupon, a recess was taken.)

FURTHER DISCUSSION IN OPEN COURT (THE JURY IS NOT PRESENT):

THE COURT: Now, Counsel, we'll take up some other matters. The first one is, I believe, the

Crawford -- the redaction issue. Let's take that up first. Now what is it you want redacted again?

MS. WAYNE: All right. This was Freddie Williams' statement, and the first part of it, and I'll break it down into part one and two, in the first part of the statement that indicated when he was talking about responding to cooperating in the case, he indicated fear for his children and his family.

THE COURT: Right. Let me get the statement myself. Let's just make sure we're on the same page of the statement.

MS. WAYNE: All right, Judge. I'm looking now at the statement which is Bates stamp forty-two on the government's discovery disclosure. Paragraph two, Special Agent Greenwood's report indicates part one was Williams had been informed of why he had been taken into custody. Williams stated, and I quote, "If I ever get out, you'll have real charges to arrest me for." Obviously, that's no concern of ours.

Williams was asked what he meant, and he replied that was all he was going to say about it. This is part two. Williams also said that if, and I quote, "named names," his children would be killed and therefore could not cooperate in this investigation. That was the part that we wanted redacted.

THE COURT: You want the whole statement redacted, or just parts of the statement?

MS. WAYNE: That part of the statement.

THE COURT: When you say "that part"?

MS. WAYNE: That whole statement.

THE COURT: I didn't know whether you wanted certain words redacted, like children or something like that.

So really you want the whole statement out.

MS. WAYNE: Yes.

THE COURT: Mr. Teague?

MR. TEAGUE: Your Honor, we had already raised the issue as to that statement in our motion to suppress. We would renew that at this time.

THE COURT: That is denied for reasons I've already given.

The government.

MR. MOORER: Your Honor, as to the redaction issue as raised by Defendant Carmichael, Richardson, I believe, answers their concerns. The statement is made in a context and in a way that it does not implicate Mr. Carmichael directly. You have to infer from other things that he was saying that he was --

THE COURT: I think, and I may be wrong on one thing earlier, I think they're actually raising

two issues for redaction. One is Richardson and the other I think they're saying is it's too prejudicial.

MR. MOORER: Your Honor, it's not prejudicial --

THE COURT: You might as well address both. All right. Go ahead.

MR. MOORER: As to the Richardson part of the argument, Your Honor, what is said is said in the context that he could be afraid of other people aside from Mr. Leon Carmichael. He does not say if I'd say anything to you, Mr. Carmichael is going to do something to me or my family. So it self -- redacts itself in the sense that he has not named specifically in the statement.

Secondly, even in the context of where the question or the offer was made to him to cooperate, it was not made in the context of we need your help against Leon Carmichael specifically, it was a general offer of we would like to have the information that you have. And so his name not being called, you have to even further to infer that he was afraid of Mr. Carmichael.

In addition, Your Honor, I believe it constitutes an admission, and an admission of a person's guilt is inherently prejudicial but it is

also inherently probative. In fact, it's probably the strongest form of proof we know of in the law when an individual makes a statement that they have been involved in something that's potentially criminal. And his statement tacitly an admission that he has been involved in criminal activity.

In other words, if his response had been I know nothing about anything, then that would have been one thing. But where a person --

THE COURT: I think I understand.

What about the -- Are you arguing 403 now?

MR. MOORER: Yes, Your Honor, I'm going to the prejudice outweighing --

THE COURT: Anything else, Mr? Teague, do you have anything else?

MR. TEAGUE: Yes. I do want, on behalf of Defendant Freddie Williams, to raise a Federal Rules of Evidence 403 issue. We say that it should not come in against Mr. Williams because, among other things, it does have unfair prejudice but more so it has confusion of the issues. I don't think his statement statements actually go to the issues in this case. And I think they can mislead the jury, and I just don't see it going to the issues that are before the jury.

THE COURT: Anything else from anyone?

MS. CHARTOFF: Yes, Your Honor.

THE COURT: Yes?

MS. CHARTOFF: I just wanted to clarify. Our primary argument against this statement is that it violates -- And there are the two statements here. I think Mr. Teague was just speaking also to the statement regarding, you know, he'll give him some real charges, or something, that that would be irrelevant, I'm just talking about the second statement.

Our primary argument is that's a testimonial statement under Crawford and, therefore, violates the Sixth Amendment. It was made to a police officer under questioning under circumstances where the defendant would know that it was likely to be used in a criminal investigation. Therefore, under the plain language of Crawford, that's a testimonial statement that is -- the admission of which would violate Mr. Carmichael's Sixth Amendment rights. And I can read you a quote here, Your Honor.

THE COURT: To be honest with you, I'm not sure I understand this Crawford argument you keep making. I hate to move to that, but you've brought that up again. I really don't know what you're

talking about. Crawford and Anidi, -- If you follow from Richardson, though, the Court is not introducing this statement against Mr. Carmichael. It's only against Mr. Williams. And I can charge the jury to that effect.

MS. CHARTOFF: Your Honor, I believe there are three separate arguments going on here.

THE COURT: Okay.

MS. CHARTOFF: One is the -- one was the Bruton issue.

THE COURT: Right. And I've resolved that.

MS. CHARTOFF: It was all that Richardson case. I agree, that the Bruton error doesn't follow.

However, we're making a separate argument under the Crawford versus Washington. In Crawford versus Washington, the U. S. Supreme Court established a per se bar on the admission of out of court testimonial statements made by unavailable declarants where there was no prior opportunity for cross examination. Now the Court did not clearly delimit the term of testimonial statements but gave several descriptive paragraphs of what might be testimonial.

And it said in addition to actual testimony, the category testimonial statements would include, and I quote, "pretrial statements that declarants would

reasonably expect to be used prosecutorially." Now Mr. Williams said this after being given his Miranda rights to a police officer who was questioning him. He had to -- Any reasonable person would expect that to be used prosecutorially. Therefore, it falls in the category of testimonial statements, the admission of which was banned under Crawford.

Now the Court also talks about --

THE COURT: How do you define "testimonial"?

MS. CHARTOFF: Excuse me?

THE COURT: How do you define "testimonial"?

MS. CHARTOFF: Your Honor, I would define it as statements made to -- well, not exclusively, but statements made to law enforcement or courts that someone would expect to be used in a prosecution. And I think the language -- I'm taking that from the language the Supreme Court used in the Crawford decision. The Court also talked about --

THE COURT: I should come off on one issue. The statement is only being used against Mr. Williams, I don't see why Mr. Carmichael has grounds to complain under Richardson. I'm back on Richardson again. Richardson says, and I believe in Richardson wasn't there a limiting instruction on the use of a statement?

MR. MOORER: I believe there was as well, Your Honor.

THE COURT: Yes. As long as the Court limits the impact of the statement to just the one defendant, and assuming Richardson covers the case, then I don't know why Mr. Carmichael has any basis to complain.

MS. CHARTOFF: Well, Your Honor, it's our position that Richardson does not cover the case. Richardson involved a confession that detailed what had happened in the crime. Okay? It was a statement that was explaining the very facts of the case. This is not like that. This is a statement that alleges that given all the evidence here could be interpreted to mean that Mr. Williams believed that my client would, you know, threaten his children if he were to talk.

THE COURT: That's why I'm supposed to give a limiting instruction.

MS. CHARTOFF: Well, Your Honor, the Supreme Court has repeatedly recognized that it's a basic premise of the confrontation clause that certain kinds of hearsay are at once, and I'm quoting in Bruton here, "at once so damaging, so suspect and yet so difficult to discount that jurors cannot be trusted to

give such evidence the minimal weight it logically deserves whatever instructions the trial court may give." And "whatever" was emphasized in the Bruton opinion, it was in italics. This is at page 138 of 391 U. S. 123.

THE COURT: In Richardson what was the statement that was at issue?

MS. CHARTOFF: It was an extensive confession detailing the facts of how a murder was committed.

Now, Your Honor, it's our position that there is an independent Sixth Amendment issue here that is not really covered by Richardson. Furthermore, it's our position, and I don't know if you want me to go on to this yet, Your Honor --

THE COURT: Go ahead, yes.

MS. CHARTOFF: -- but that Mr. Williams' concern, arguably you could say, and I would suggest if the Court doesn't want to eliminate the whole statement, that the Court could basically do a motion in limine where he allows the -- or an order on a motion in limine where the officer is allowed to testify Mr. Williams said that he didn't want to cooperate but, you know -- I took his statement to indicate that he knew something about it.

Without going into the details about why he didn't want to cooperate. Because, Your Honor, the details about why he didn't want to cooperate are completely irrelevant. They have no probative value as to the issues that need to be proven by the government in this case. Mr. Carmichael is not on trial for witness intimidation, for R. I. C. O., he is merely charged with drug trafficking and money laundering.

So whether this allusion to Mr. Carmichael possibly threatening witnesses is totally irrelevant and, therefore, it should be excised and we believe that that's based on 403 and also on 401, 402 and on the confrontation clause of the Sixth Amendment to the United States Constitution. And, Your Honor, if this statement were to come in, we will move to sever the case, because --

THE COURT: Sever, you mean, the two defendants?

MS. CHARTOFF: Yeah, because it's so damaging to our client and it has absolutely no probative value as to him.

THE COURT: Now anything else from the government that I haven't heard? Well first you, Mr. Teague.

MR. TEAGUE: Your Honor, I wanted to elaborate a little more on my 403 objection to the admission of the statement. Your Honor, I submit the two portions of the statement, the second portion first concerning what would happen to his children, if my client said that, I submit, Your Honor, I don't see how it is probative that would outweigh the prejudicial value which Rule 403 bans from jury consideration.

THE COURT: Right.

MR. TEAGUE: And the first portion of it, I think the Court has heard all the evidence over the past three days leading into this, the morning of the fourth day, that there were actions taken by a person who should be a codefendant but is not, Patrick Denton, causing circumstances to arise wherein Freddie Williams ends up in jail for the first time in his entire life, which is now sixty-one years.

We submit, Your Honor, these are things that are just sort of an outrage that has to do with nothing that goes to the facts or the merits of the case. And we think there, also, the prejudicial value, the confusion of the issues is undo and just does not weigh up in the way of probative evidence that does not confuse the issues. The jury gets the

idea this is a violent man.

Judge, we're going to have proof at the end of this case when we get to our case that this man has been an honorable, hardworking sheetrocker all of his adult life and that he has done nothing, he has nothing in his past to indicate any kind of violence. And, therefore, we would ask that the Court to consider a 403 objection to exclude these statements, based upon --

THE COURT: The prejudice.

MR. TEAGUE: Yes, sir.

THE COURT: Okay. I want to first address Mr. Teague's argument about the prejudice. I think this statement is highly prejudicial, including even the statement about the children. It just shows the depth of your defendant's concern about the information that he had and the implication in that information. So I think to delete the word "children" or to keep the statement out altogether would take away part of the evidence.

I think it's clearly relevant to your client and it does clearly prejudice him, but it prejudices him in a fair way.

With regard to Miss Wayne and Miss Chartoff's arguments about the confrontation

clause, again, I'm willing to give a charge that the statement should be limited to Mr. Williams and be considered only with regard to Mr. Williams and, therefore, I don't see a confrontation clause problem with Mr. Carmichael.

As to the request for a separate trial, or that is a severance, I think that also came up in Richardson. Maybe it did, but anyway, I think the limiting charge would take care of that as well. So the statement comes in its entirety.

Now if you'd like to draft a charge, and I believe usually what I do with defendants is to allow them, I'll give the charge either immediately after the statement or I'll give it later in the trial. Now I understand that that puts you all between a rock and a hard place, but that's the way the law is. Sometimes giving the charge right after the statement highlights the statement, but that's the way it is under the law. You have to make up your mind.

MS. JAMES: Judge, I have an additional motion.

THE COURT: Yes?

MOTION FOR MISTRIAL:

MS. JAMES: Your Honor, at this time we'd move for a mistrial on behalf of Mr. Carmichael based

on the unsolicited remark made by Mr. Denton yesterday during the course of his testimony. You may remember on cross examination I was asking him about his familiarity with Mr. Carmichael and his family because he had said on direct examination the previous day that he had played with his children. And I said to him something in substance you have been in and out of the home and you played with his children, you know his children, and he just spontaneously offered, and I think deliberately offered, yeah, his son that was convicted of murder.

I think given the posture of the case now and all the matters that have gone on that are already in the record, I think it's highly prejudicial. I think it was -- I don't think it can be cured with a curative instruction by the Court because in the context of his testimony, both on direct examination yesterday and my cross examination, he talks about two separate murders totally unrelated to the evidence in this case.

THE COURT: What was you've question to him?

MS. JAMES: I can't remember exactly, Judge, but it was something in substance, I mean certainly I wasn't eliciting that, I was just trying to show --

THE COURT: Well, what I'm going to do is

I'm going to deny your motion for a mistrial, but you can raise your meetings J. N. O. V. and I'll look at it again.

MS. JAMES: Ms. Chartoff reminds me, Your Honor, that it was something -- some question about he played with his children.

And also I would point this out, Judge. The Court has allowed the government to offer evidence that we've objected to through Mr. Denton regarding his intimate knowledge of Mr. Carmichael, which supported some of the government's claims, or at least the Court so ruled. And my purpose in eliciting that type testimony from Mr. Denton was to show that there were other legitimate ways that he had intimate knowledge of Mr. Carmichael's life, and that being next door neighbor kind of situation and familiarity with the children.

THE COURT: Right. The motion for a mistrial is denied. Again, if you want me to, I'll ask the jury to ignore the statement. I don't think that it's that critical in this case.

Yes?

MR. TEAGUE: Your Honor, I would urge you to reconsider your ruling as to this thing about my wife and my children --

THE COURT: I've heard your argument. I'm not going to reconsider. That's one ruling I'm pretty confident on, Mr. Teague.

MR. TEAGUE: If I could have one second to make a record, then?

THE COURT: Well, unless it's something you haven't said, I'll give you time to make it.

MR. TEAGUE: It's something I haven't said.

THE COURT: We just don't need to keep repeating things.

MR. TEAGUE: I won't be repetitive.

I want to add the fact that we feel that the unsolicited testimony of Mr. Denton yesterday saying in response to Ms. James' question until Leon's son got charged with murder, or words to that effect, I think all of that is further prejudicing Freddie Williams' right to a fair trial and we would renew the motion under 403.

THE COURT: Motion is denied.

And anything else we need to take up, other than the Crawford matter regarding all the coconspirators?

MS. WAYNE: Judge, just in response to you asking about the limiting instruction --

THE COURT: Right.

MS. WAYNE: -- I think that if we don't ask it to be contemporaneous we may waive that issue, so I don't want to have to even do it, but I think under the law I'd ask --

THE COURT: Why don't you draft it for me.

MS. WAYNE: Right now?

THE COURT: Yes.

MS. WAYNE: The Court doesn't have one, a limited purpose one that it normally gives?

THE COURT: I think I do. I'll tell you what I'd be happy to say. You won't waive your objection, but I can tell right after the statement is made, or before the statement is made, I'm going to say the following evidence can be used only against Mr. Williams, it cannot be used against Mr. Crawford (sic.) -- Mr. Crawford, Mr. Carmichael, and in determining the case as to Mr. Carmichael you may not consider this in your deliberations at all.

MS. WAYNE: That's the limited purpose instruction that I'm used to, Judge, so that's fine.

MR. TEAGUE: Your Honor, well as to that issue, if the government has statements to make --

THE COURT: Do you wish that charge to be given before or after the statement is made?

MS. WAYNE: Before the statement, Judge.

THE COURT: Before the statement. So when you're ready to ask that statement, stop and I will charge the jury. You can just say Judge, I think you are going to make a charge to the jury at this time and that will be fine.

Now we have the Crawford and coconspirator statements. Do you have your briefs in on that?

MS. CHARTOFF: Your Honor, in my case to research a million different issues I did not complete a brief. However --

THE COURT: Well we've already got in coconspirator statements. I'm not going to declare a mistrial just on that. I think your argument is rather novel anyway. But I would like to look at it. So you can get your brief in by tomorrow morning.

MS. CHARTOFF: Yes, Your Honor.

THE COURT: I'll expect it in by tomorrow.

MS. CHARTOFF: I just wanted to say one thing. We would request that in a ruling on the admissibility of the coconspirator's statement, that the Court pay special attention to whether, and I'm sure, I don't mean to disrespect the Court in any way, but the Court pay special attention to whether the statements were actually made in furtherance of the conspiracy or were just conversation amongst

coconspirators.

THE COURT: Right. That's an essential qualification, and that's the brief they're going to give me a day or two before.

Yes, Ms. James?

MS. JAMES: Judge, without waving our objection to the Court's ruling on my specific motion for a mistrial regarding the spontaneous testimony of Mr. Denton, I would ask the Court for a curative instruction. I know the testimony has passed, but you did one on your own yesterday with regard to the Ike murder, and at some point, and I don't want to --

THE COURT: Why don't you draft it and let me see.

MS. JAMES: Okay. I don't want to do it on the heels of this because I think it compounds the problem.

THE COURT: You can even write it, you don't have to type it.

MS. JAMES: Yes, sir.

Yes?

MR. MOORER: Your Honor, I have an issue that I need to raise. The United States has two or three witnesses that we're going to call after Agent Greenwood, whom I don't think will be very lengthy.

And then the United States would intend to call Sherry Pettus. Miss Pettus is somebody that I am moving the Court for at this time to call as a witness in this case as a Court witness.

The reason for the request, Your Honor, is that Miss Pettus in a nutshell came to Agent DeJohn and gave him certain information about Mr. Carmichael and Mr. Carmichael's activities. She then testified before a grand jury fairly consistent with what she had told him during her interview. I, subsequent to that point, have had an opportunity to sit and meet with her to try to get her prepared to testify in this matter, and she was very hostile.

THE COURT: You can always call a hostile witness and have the Court declare the witness as a hostile witness.

MR. MOORER: That's correct, Your Honor, but this is a witness that I think under the authority of the case of Leslie, it's best called by the Court because she has already indicated her hostility to the United States and its representatives.

THE COURT: Let me see your case.

MR. MOORER: Yes, sir. It's United States of America vs. Leslie.

THE COURT: Do you have a copy?

MR. MOORER: Yes, Your Honor.

THE COURT: May I read it?

MR. MOORER: Yes, sir.

It's 542 F.2d 285.

THE COURT: Well, let me read your case.

MR. MOORER: Yes, sir.

THE COURT: Now do you know whether she's going to invoke the Fifth?

MR. MOORER: Your Honor, because she has testified before the grand jury there is authority that she does not have a privilege anymore. And I will give you the Leslie case.

THE COURT: All right. If I call the witness, I will do it outside the presence of the jury, though. I'm not going to let the jury hear me call the witness.

MR. MOORER: Your Honor, may I finish making my presentation as to why I would like this witness called as a hostile witness by the Court?

THE COURT: Yes.

MR. MOORER: In addition, she is now employed by Mr. Carmichael at the Carmichael Center. And when you look at the Leslie case, and if you also look at the Myzell case which is at 744 F.2d 1467, and the case calls Perkins versus Volkswagen, 596 F.2d

681, which is a Fifth Circuit case, they are good authority for her being declared adverse and authority for the Court under the provisions of Rule 611(c) to call this witness as a Court witness.

THE COURT: What you're really talking about is an adverse witness anyway. You just want to be able to lead her.

MR. MOORER: I want to be able to lead her, but I also, under the same rationale as under the Perkins case, it is natural when a witness is called to testify by a party that the jury would associate that witness with that party. And when you've got an adverse witness going in -- there are times, and this is, I submit, one of those times, Your Honor -- where the Court should protect the parties from that particular concern by calling the witness itself.

THE COURT: You want me to examine her?

MR. MOORER: Sir?

THE COURT: Are you asking me to examine her?

MR. MOORER: No, Your Honor, just call her as a witness to the stand, and you can explain to the jury that this witness is not being called by the United States or the defense.

THE COURT: What difference does that make?

I still don't understand why I need to explain to the jury who is calling her.

MR. MOORER: Because it would be different than the other witnesses who are going to be called by one party or the other. In other words, the concern that's set forth in Leslie is that when a witness is called by one party or the other, then the jury tends to associate that witness with the party that has called them. So that if that witness's testimony because of their adversity comes across to the jury negatively, it comes off as the party that called them, even their own witness --

THE COURT: Okay. I'll hear from the defendants. Mr. Teague?

MR. TEAGUE: I was not standing to raise that.

THE COURT: Mr. Brunson?

MR. BRUNSON: Yes, Your Honor. Your Honor, this witness, Miss Pettus, is the only coconspirator that the government is calling in their case that they do not have an agreement with. She is the only -- apparently the only coconspirator in count two. In other words, the two conspirators in count two are Miss Pettus, the witness, and Mr. Carmichael, my client.

Now Miss Pettus has never been apprised of the fact that she was a target of this investigation. She was brought before Mr. DeJohn. She did give apparent statements to Mr. DeJohn. We're not exactly sure what she told him. He of course wrote it up in his memorandum. She was brought before the grand jury. And when brought before the grand jury the U. S. Attorney's Office is required to read a target her rights. She was not read her rights. She was not apprised of the fact that she could have an attorney present with her. She has never been told you're a target of the investigation.

Well, apparently since those events, Miss Pettus has learned that potentially she might have exposure in this case, and that being the case, I assume she has become less responsive to the government's request to tell her story. I can understand that, Your Honor, and I certainly would oppose any labeling of this witness as a Court witness. And there may be issues that need to be taken up regarding her rights.

THE COURT: Well I'm going to reserve this. But when you call her as a witness I'd like to take her up outside the presence of the jury. Let's proceed.

MR. MOORER: Yes, Your Honor.

MR. TEAGUE: Your Honor?

THE COURT: Yes, Mr. Teague?

MR. TEAGUE: While we're here, hopefully in conserving the Court's time, we expect shortly that there will be witnesses among Mr. Moorer's coming witnesses that will testify as to statements made by Codefendant Carmichael, though this particular statement concerning "You got me," which could be deemed an admission as to the charge in this case, conspiracy with my client. We would like to raise the same Crawford issue as to Mr. Carmichael's statement and ask that it be suppressed. And I just wanted to let the Court know we wanted to be heard on that. If you want to hear it now --

THE COURT: The statement hasn't come before the jury yet?

MR. MOORER: We did it in the offer of proof. I believe we got to it then.

MR. TEAGUE: It's not been before the jury.

THE COURT: You're making a Crawford offer on the "You got me" statement by Mr. Carmichael.

MR. TEAGUE: Correct.

THE COURT: Very good. Thank you.

MR. MOORER: Your Honor, Agent Halasz -- not

Halasz, but Agent Greenwood who is on the stand is going to testify about that, I would anticipate, in the next few minutes. So you may want to address that issue now, I don't know.

THE COURT: Well are you intending to use that statement against Mr. Williams?

MR. MOORER: No. That goes to Mr. Carmichael.

THE COURT: Do you intend to use it against Mr. Williams?

MR. MOORER: Your Honor, this is a statement of Mr. Carmichael that "You got me." He doesn't say anything about --

THE COURT: I understand that. My question is, do you intend to use the statement against Mr. Williams?

MR. MOORER: Oh no. That's just his admission of --

THE COURT: I'll give the same limiting instruction again, and with understanding I'll overrule your objection.

MR. TEAGUE: Your Honor, we would request that inasmuch as you're overruling our objection based on Crawford, we would ask that you at least give a limiting instruction --

THE COURT: I just said I'll give a limiting instruction.

MR. TEAGUE: Excuse me, Your Honor. There are distractions at times and I didn't hear that.

THE COURT: So when you elicit that statement -- Do you want it before or after the statement?

MR. TEAGUE: I think before.

THE COURT: Okay, very good.

MR. MOORER: I was simply going to say could we have just a few minutes? Because we've been in the back doing things and we just need to have just a minute or two before the jury comes in to get some things -- some exhibits lined up.

THE COURT: Who is this you are going to be examining with regard to both of these statements that are at issue?

MR. MOORER: Agent Greenwood.

THE COURT: Where is he?

MR. MOORER: He's in the witness room, Your Honor.

THE COURT: You probably need to tell Agent Greenwood before he blurts these things out, that the Court is going to give an instructions. You need to bring Agent Greenwood in here and tell him that the

Court, that before he makes those two statements, the Court will give instructions.

Okay? We'll take five minutes.

Yes, Mr. Teague, anything else?

MR. TEAGUE: I didn't realize -- That's what I was going to ask for, was five minutes.

(Whereupon, a recess was taken.)

THE COURT: Proceed.

B O B G R E E N W O O D,

the witness herein, having already been duly sworn or affirmed to tell the truth, was examined and testified further as follows:

DIRECT EXAMINATION

MR BY. MOORER OF BOB GREENWOOD

(CONTINUING FROM 6/8/05 ):

Q Agent Greenwood, when we left off yesterday you were talking about Mr. Williams being there at the district office of the D. E. A. seated in a room with you with the door slightly ajar?

A Yes, sir.

Q Now at the point that you were seated in the room with Mr. Williams with the door slightly ajar, did Mr. Williams know that Mr. Carmichael had been brought to the D. E. A. office prior to that point?

MS. WAYNE: Judge, I'm going to object to

the lack of foundation, unless the agent can tell us why he would if he would know anything.

THE COURT: Yes, he can't know hearsay.

Q Do you know whether or not Mr. Williams had seen Mr. Carmichael there at the D. E. A. office prior to this point in time?

MR. TEAGUE: Your Honor, we're going to object. That calls for subjective --

THE COURT: Well is it something you observed? Did you see something?

THE WITNESS: No. To the best of my knowledge, Mr. Williams did not know that he was there.

THE COURT: That's just to the best of your knowledge. You didn't see it, is what you're saying?

THE WITNESS: Yes, sir.

THE COURT: Okay, go ahead.

Q Did Mr. Williams see Mr. Carmichael there at the D. E. A. office prior to that point?

A No, he did not.

Q And what was his reaction when Mr. Carmichael began to speak on the other side of the door?

A I observed Mr. Williams in reaction to hearing the voice lift his head, look towards the door --

MR. TEAGUE: Excuse me. Your Honor, I would

Page 78

like to renew our objection at this point if I could. It hadn't been proven that my client supposedly knows who is on the other side of the door.

THE COURT: All he can say is --

You were going to say what he did?

THE WITNESS: Yes, sir, and then I asked him a question.

THE COURT: Okay. Overruled.

Q So when Mr. Carmichael began to speak, Mr. Williams, you said, perked up, so to speak?

A I observed Mr. Williams react to the voice, and when he did then I asked him a question.

Q And what did you ask him?

A I asked him how long had he known him.

Q And what was his response, if at all, to that question?

A He responded, "For years. Several years."

Q Now, prior to the point that that occurred at the D. E. A. office, this particular conversation inside that room, I believe you said that he had been asked some booking questions earlier?

A Yes, I did.

Q And he was at the D. E. A. office when you asked those booking questions?

A Yes, sir, within the same room.

Page 79

Q And he indicated that his address was the same one that you and other agents had searched earlier that morning?

A Yes. Mr. Williams told me it was Nine forty-nine Ridgecrest.

Q Now while you were there and doing the booking of Defendant Williams, was there anybody else there?

A Agent Halasz was there as well.

Q And by "there," I mean there within the presence of Mr. Williams as he was being booked.

A Yes.

Q And was Agent Halasz present there as well within Mr. Williams's presence while he was being booked?

A Yes, he was.

Q And during the time that he was being booked, did either you or Agent Halasz or anyone else offer him the opportunity to cooperate any further in your investigation?

A Yes.

MR. MOORER: Your Honor, I believe now might be an appropriate time for the Court to give --

THE COURT: This is a limiting instruction to be used against which defendant?

MR. MOORER: Your Honor --

MS. WAYNE: Judge, it's my request.

Page 80

THE COURT: Okay. So you want me to instruct the jury about using the evidence only as to Mr. Williams.

MS. WAYNE: Yes.

MR. MOORER: Yes.

THE COURT: This witness is just about to give testimony that should be used only against Defendant Williams. It should not be used against Defendant Carmichael. And during your deliberations and in reaching your verdict, you may not consider this evidence against Defendant Carmichael. You can only consider it against or for Defendant Williams.

Go ahead.

MR. MOORER: Yes, Your Honor.

Q Was Defendant Williams given the opportunity to cooperate in furthering your investigation?

A Yes, he was.

Q And how was that done?

A Agent Halasz and myself were seated in the same room, which is about an eight by eight room, interview room. Agent Halasz --

Q Would you speak up? I'm having a hard time hearing you.

A Yes. Agent Halasz advised Mr. Williams of his legal Miranda rights and asked him at that point if he

Page 81

wanted to cooperate.

Q And what, if anything, did Mr. Williams say in response to Agent Halasz's question about whether or not Mr. Williams would cooperate?

A Mr. Williams started by saying -- the first thing that he said was, "If I get out, you're really going to have something to arrest me for."

Q And did he make any further statements after he said that?

A Yes, he did. Agent Halasz asked him what he meant by that, and he said that's all he was going to say at that point. But then he followed up with that by saying that, "Look, if I name names --"

MR. MOORER: Your Honor, I think -- I'm sorry.

Q He said, "If I name names --"

A Mr. Williams said, "If I name names, my children will be killed."

THE COURT: Now again, members of the jury, that can only be used as to Defendant Williams. It cannot be used in any way in you reaching a verdict as to Defendant Carmichael.

Q Now I believe you said earlier when you were at Mr. Denton's residence that you were there when the call came in that Mr. Carmichael was on his way to the

residence, and then you took up a position further down on Fleming Road. I believe you said it was at the intersection of what street?
A It's about three tenths down Fleming. I can't remember the name of the street myself that runs north and south. Before Rosa Parks, though.
Q And I believe you said that you saw a Honda type car come towards your location?
A Yes, I did. It crossed my path.
Q Now I'm going to show to you what has been previously marked, and I believe introduced, as government's exhibit 7(k). Can you see this from where you're seated?
A Yes, I can.
Q What is government's exhibit 7(k)?
A It's Mr. Carmichael's car.
Q And is this photograph of this car one -- I'm sorry. Does the car that's shown in government's exhibit 7(k), is it consistent with the car that you saw that evening as you took up your post?
A Yes, it is.
Q Now the things you testified to about your interaction with Defendant Williams and Defendant Carmichael, was that on the day of their arrest, the things you testified to so far?

A Yes, which was November 17th, 2003.
Q Now were you on duty on December the 4th of 2003?
A Yes, I was.
Q And what were you doing on that particular day, if at all, in relation to this case?
A Agent DeJohn approached me and asked me if I would assist him as a witness in returning some property to Mr. Carmichael at the Montgomery office.
Q Now by way of background, in your capacity as an agent investigating narcotics cases, do you or other agents from time to time return items to defendants?
A Yes, we do.
Q Would you explain to the jury in what context that's generally done, what causes you to do that type of thing.
A For the most part once you look at evidence that you seized that you believed was evidence at the time and you evaluate it, and if it's of no longer use to you we will return it to the owner.
Q And is that what Agent DeJohn was asking you to assist in on that particular day?
A Yes, he did.
Q And to whom, if anyone, was Agent DeJohn going to return some items to?
A The property on that day was being returned to

Mr. Carmichael.
Q And can you tell us generally what it was that he was going to return to Mr. Carmichael on that day?
A Basically it was a briefcase containing documents that Mr. Carmichael needed.
Q And did you and Agent DeJohn subsequently actually make a return of some items to Mr. Carmichael?
A Yes, we did.
Q When Mr. Carmichael came, was there anyone with him?
A No. Mr. Carmichael was by himself.

MR. MOORER: And, Your Honor, I believe now might be an appropriate time for to you --

THE COURT: Right. This witness is about to give testimony that should be used against only Defendant Carmichael. It should not be used -- or I should say against or for Defendant Carmichael. It shouldn't be used in connection with you reaching your decision with Defendant Williams.

MR. TEAGUE: We would like to make an objection for Defendant Williams under you Rule 402 and 403 and renew our objection.

THE COURT: You already made that objection. Your objection is overruled.

Counsel, when you make objections outside, you don't really need to renew them.

MR. TEAGUE: I was afraid I had not made that objection.

THE COURT: Oh, okay. Very good.

Q Agent Greenwood, I believe you said that Mr. Carmichael was alone at that point?
A Yes, I did.
Q Would you tell the jury what happened first in Agent DeJohn's efforts to return property to Defendant Carmichael?
A Basically, we have a small room towards the front of our office that's a meeting place where anyone can walk in and speak with us. In this case Mr. Carmichael, when he came to our office, he was seated within this room. Myself and Task Force Agent DeJohn met with him in this room.

Task Force Agent DeJohn obtained the property that he was returning to Mr. Carmichael and brought it to this room, and during this time we had a conversation with Mr. Carmichael.
Q And would you tell us what was first said in the course of the conversation and by whom it was said?
A Basically, Mr. Carmichael was -- he was telling us that he was upset about the news media and how they

had inaccurately put out that five hundred and seventy-five pounds of marijuana had been seized from the Carmichael Center.
Q And after he said that, what, if anything, was said back to him and by whom?
A Task Force Agent DeJohn told Mr. Carmichael that that was nothing that we put out. We knew what the truth was. The D. E. A. did not put that out inaccurately.
Q Now, Agent Greenwood, did that investigation, or this investigation at that point generate media coverage and interest?
A Yes, there was.
Q Was it significant?
A Yes, sir.
Q And after you had that conversation, or that part of the conversation with him, what, if anything, happened next?
A Mr. Carmichael talked about how that was damaging his business, and then he went into the fact that he believed that he was going to be going to prison for the rest of his life. He made a statement that at ten-fifteen, twenty years to him was a life sentence.
Q Did he make any further statements?
A Well Task Force Agent DeJohn asked him why he

said that. And his next response to Task Force Agent DeJohn was, "You got me."
MR. MOORER: If I may have one moment, Your Honor?
THE COURT: Yes.
(Whereupon, Mr. Moorer conferred with Mr. Feaga and Ms. Morris off the record and out of the hearing of the other courtroom participants.)
MR. MOORER: No further questions, Your Honor.
THE COURT: Cross?
CROSS EXAMINATION
BY MS. WAYNE OF BOB GREENWOOD:
Q Agent Greenwood, if I may, I want to start with this alleged statement Mr. Carmichael made. And just so the jury has a feeling about this room that you talked about, if you can, get down from the witness stand and I want to give the jury a sense of this room. If you would please come down here.
A The room on December 4th?
Q Yes, please.
(Whereupon, the witness complied.)
Q So you've told the jury that Mr. Carmichael was actually seated in this room with you and Investigator DeJohn.

A Yes.
Q How many chairs are there in this room?
A I'd say probably four or five chairs.
Q Okay. I'm going to get a couple of chairs. If you might help me here.
MS. WAYNE: Judge, and if I might have your permission here?
THE COURT: Yes.
Q And if you would, simply place for the jury approximately -- Was there a table in the room as well?
A Yes, ma'am.
Q All right. We'll pretend there is a table there and place the chairs as you recalled them.
You said there were four chairs. You think there were three?
A Well as far as the table itself, there were three chairs and the table, that I remember. There are two entrances to the room. There might have been a chair off to the side and there might have been a chair off here where no one was seated in.
Q Okay. In terms of how big that room is, how big would you describe it? What are the dimensions?
A I think it's a little bit -- slightly bigger than the room towards the rear. So it's probably -- The

one towards the rear is like an eight by eight, so this one is maybe ten by ten.
Q So if you were to pace off for the jury approximately, if would you pace off for them around these chairs about how big that room is.
A Well, this looks pretty comfortable to me as far as, I'm trying to square off this little area right here. If you can picture a round table right here in the middle of this. That's probably about right. That table maybe would go back a little bit further. The wall is here.
Q For the record, Agent Greenwood, what you're using in terms of the space is the prosecution's table here at the end, there are three chairs in this space between the lectern and the jury front part of their sitting area, and then to where the court reporter is, approximately.
A Approximately.
Q Okay. All right. Now in terms of where the parties were seated, where was Mr. Carmichael seated?
A Carmichael would be sitting here.
Q Okay. And that's this first chair that the back would actually be toward the doors -- or the rear of the courtroom.
And where were you and Investigator DeJohn

seated?
A I was seated here.
Q Okay.
A Task Force Agent DeJohn was here.
Q All right. So in terms of the record, you and Agent DeJohn were seated on the same side of the table opposite of Mr. Carmichael.
A Yes.
Q Okay. Now was he seated in this seat before you all came in, or were one of you already in the room?
A We met him together in the room. When we met him together in the room, Task Force Agent DeJohn stepped out, got the property, came back in and sat down.
Q Okay. All right. Agent Greenwood, I'm wondering, is there the availability of any kind of tape recording or audio ability in this room? Some of the rooms have the camera through one of the walls or something like that. Is that available in this particular room?
A No.
Q Okay. Thank you very much, Agent Greenwood. You can go ahead and have your seat.
(Whereupon, the witness returned to the stand.)
Q Now, Agent Greenwood, in terms of the purpose of

Mr. Carmichael coming down on December 4th, your understanding was he was simply coming to retrieve property.
A Yes, ma'am.
Q He had not indicated that he was coming down to be interrogated, correct?
A As far as I knew, yes.
Q Okay. And Investigator DeJohn hadn't called you and said please assist me in some kind of interview interrogation of Mr. Carmichael?
A Correct.
Q Your understanding of the sole purpose of him coming down there was to retrieve this property.
A Yes.
Q You were aware that he had actually hired a lawyer at that point?
A It was my understanding that his lawyer sent him there.
Q Okay. And when you say it was your understanding it was his lawyer that sent him there, that he had in fact had gotten permission or that his lawyer said you can go get your property?
A Yes, that was my understanding.
Q Okay. Now in terms of the protocol within the agency, it's your understanding that a person, suspect

or witness or whatever, if they're coming down to receive property, you put them in this room?
A We use that room, yes, we do.
Q Okay. My question to you, though, was in any other case if someone was coming down to retrieve their property, do you put them in this room before they get their property?
A Generally, yes, because it's an entryway office, a room that we can utilize. It's very easy to get to and it also has a door that allows anyone to come in and out. It's not a lockdown room.
Q It's not a lockdown room?
A Yes, ma'am.
Q Now when you come over to the agency, though, there is also a place where there is just an entry or foyer where someone can come into without going into any rooms and talking to someone there, is that right?
A Yes, ma'am.
Q Okay. So there is the ability that someone can just come get their property without having to go back into a room or sit down anywhere?
A Could it be done? Yes.
Q Okay. Now in terms of your experience, you have been with the agency for how long? I'm sorry.
A Over eight years.

Q Okay. And in your experience of eight years, you recognize the significance of a confession from a suspect or a defendant in a case.
A Yes.
Q That can play a huge part in the determination of what might happen in a case, if you can get a confession.
A Yes, it could.
Q And the reason that that -- I'm asking about the significance of that is that you've also learned in your experience the importance of documenting any kind of statements, particularly a confession, by a defendant.
A Yes, ma'am.
Q Okay. And in fact, you have learned at the academy and other police places, in terms of taking a statement and memorializing that statement?
A Yes, ma'am.
Q The reason for that is so that in fact if you ever have to go to trial and you have jurors, that you have a document or something to indicate or show that there was a statement made by a suspect.
A Yes, ma'am.
Q Okay. It's independent corroboration other than you simply saying it happened, right?

A Well it's documenting the event, and it also gives you something to go back and review to refresh your memory on.
Q Right. Exactly. Refresh your memory in terms of the particulars of the statement, right?
A Yes, ma'am.
Q The context of the statement?
A Yes, ma'am.
Q And to be exact about how the statement might have been made.
A As close as you can be.
Q Okay. The other things that you have available to you in terms of documenting or memorializing statements are audiotapes. You can tape record a statement.
A Yes, you could record one.
Q Okay. And now, actually, within most agencies you can actually videotape someone's statement.
A Yes, ma'am, agencies do do that.
Q Okay. And videotaping is nice because not only can you hear the person, but you can actually see them, correct?
A Yes, ma'am.
Q And that's important to you in terms of being able to assess the demeanor of somebody when they're

making a particular statement.
A Well it's recording an actual moment, ma'am.
Q And that's important because it's not subjective. Then you don't have to say I think it looked like or it appeared to me like he or she was doing certain things, you can just -- the evidence speaks for itself.
A I agree with that.
Q Okay. Now in this particular case when Mr. Carmichael supposedly made these statements in front of you and Investigator DeJohn, you didn't have a -- it was not audiotaped?
A No, there was no audiotape.
Q It was not videotaped?
A No video.
Q And it was memorialized in a D. E. A. Six report that was -- it appears to me that both you and Investigator DeJohn did one, but maybe just Investigator DeJohn, I'm not sure.
A Task Force Agent DeJohn did document this in what we call a D. E. A. Six report, and he lists me as a witness.
Q All right. And this happened on -- supposedly happened on December 4th, but the date the report was actually prepared was two days later on December 6th.

Or do you know that?
A If it's printed on the report, ma'am, then that's when it was done.
Q All right. Now, Agent Greenwood, I'm assuming that -- and I know you keep calling him "Task Force Agent," we've been using "Investigator DeJohn" -- but Investigator DeJohn I'm assuming relayed to you some factual -- some facts about what they believe Mr. Carmichael had been involved in. Did you have any knowledge about the investigation of the case?
A I'm sorry, do you want to try that again? As far as other than what I've testified to?
Q Right. That this had been an ongoing investigation and that Investigator DeJohn believed that my client, Mr. Carmichael, was a drug distributor in Montgomery.
A Well I knew that myself from my initial testimony that I was involved with this case since November 16th.
Q Okay. Would it be fair to characterize this as being a pretty big investigation, or significant investigation to the department?
A I believe it's a significant investigation to this area.
Q Okay. And when Mr. Carmichael, who you all

believe to be the big guy comes in, you were anticipating having conversation with him.
A I wouldn't say that we anticipated in planning this out. He was coming to pick up property and we had a conversation.
Q Well you certainly knew that you got to have some contact with this guy without his lawyer, and he was what you believed to be a significant distributor in the Montgomery area. You knew that, right?
A Oh yes, I understand that. He did have permission of his attorney, is what I was advised.
Q And, Agent Greenwood, what I'm attempting to get to here is that you must have -- the both of you must have been prepared to get some incriminating stuff if you could from Mr. Carmichael when he came in on December 4th?
A I would disagree with you. We did not sit down with Mr. Carmichael to interview or interrogate him.
Q Well you couldn't do that because --
MR. MOORER: Objection, Your Honor. She interrupted the witness as he was in the middle of his answer.
THE COURT: Had you finish your response?
THE WITNESS: No, sir.
THE COURT: Go ahead. Finish it.

Page 98

MS. WAYNE: I apologize.
A Mr. Carmichael was coming to the office to pick up his property. We had a contact with Mr. Carmichael during this, which was a short period of time, and it was not a premeditated, it was not a planned event.
Q All right. Let me ask you this, Agent Greenwood. You were aware of the fact that there was no evidence, direct evidence such as forensic evidence, fingerprints, identifying information, anything against Mr. Carmichael on December 4th other than a bunch of snitches. You knew that, right?
A I have a problem with your question there. I was not aware of the forensics. I do know based on what I saw and what I heard on the initial two days that Mr. Carmichael was very much involved in this investigation.
Q I understand what your feeling was about it. I'm asking you the facts, okay? The facts were on December 4th you knew that all you had against Mr. Carmichael were snitches or informants.
MR. MOORER: Objection, Your Honor.
THE COURT: Yes?
MR. MOORER: Your Honor, the objection goes to the fact that she's very much beyond the scope of the direct testimony that this witness was asked

Page 99

about.
Second of all, all the facts that may be presented are the facts that are going to be presented on the witness stand, and what his recollection of what facts they had at that moment, some of that may or may not be facts that are admissible. It goes into collateral matters, Your Honor.
THE COURT: I'll allow her to do this to a limited degree.
Go ahead.
Q You can answer that question.
A As best as I can remember your question, not being a lead investigator in this investigation I did not -- I was not aware of all the facts involved with this. I do know there were cooperating individuals that provided information against Mr. Carmichael in this investigation.
Q All right. Well, let me just ask you this, Agent Greenwood. In your experience, you know that if you can get a confession it might be helpful to the case. You would agree with that?
A Yes, I would agree with that.
Q Now you tell us that Mr. Carmichael when he's simply there to get some property that you all agreed should be released to him, that he volunteers this

Page 100

conversation about ten, fifteen, twenty year sentence was a life sentence for him, correct?
A Yes, that's what he said.
Q All right. So he volunteered that information. That wasn't based upon any questioning that was going on of him at that point.
A No. That was basically a spontaneous question that came out of him which, to be honest, it surprised me.
Q All right. And based upon you being surprised, then, you were even more surprised when Investigator DeJohn who knew that this wasn't supposed to be an interrogation without his lawyer present, said to him "Well, what do you mean by that," asking him further questions, right?
A No. That would be a common response to that type of a statement from somebody. That was the first thing that come out of his mouth, was, "What did you mean by that?"
Q All right. Well, Agent Greenwood, that's not very fair. Is it my --
MR. MOORER: She's arguing with the witness.
THE COURT: I'll sustain that. Just ask a question.
Q Agent Greenwood, you said it's a common response,

Page 101

but it's not a common response for a police officer who is trained in terms of interrogation, correct? If someone says that, you know the next lead question by an officer of law enforcement, that's interrogation, right?
A No, I don't believe that this was interrogation.
Q So your position is that as a law enforcement officer you can ask a suspect follow-up questions that are not interrogation?
MR. MOORER: Objection, Your Honor. This is going into matters that would be legal conclusions that have nothing to do with the facts, Your Honor.
MS. WAYNE: That wasn't a request for a legal conclusion. That was in his law enforcement opinion --
THE COURT: I think she's going into what his practice is, and I'll allow her to do that.
Q You can answer that question.
A Would you restate it?
Q Yes. In terms of law enforcement, a follow-up question like that in your opinion is not interrogation?
A Given the circumstances of the contact with Mr. Carmichael and the reason why we were there, I believe that that would be a normal response. I do not

believe that that was an interrogation. Mr. Carmichael was not bound to answer any questions. He made a spontaneous statement in a conversation, and like I said, I would have asked the same question.
Q Well, Agent Greenwood, when you say he was not bound to ask the question, you didn't read him his Miranda rights at that point. You didn't tell him he didn't have to speak to you, right?
A Right.
Q You didn't interject, what you know the law is, you don't have to say anything to us without your lawyer present. Nothing like that, right?
A No, it was not said to him.
Q Never came up, actually, during the course of the conversation, right?
A That's correct.
Q And when Mr. Carmichael was talking to you, I'm assuming that you had a pad and a paper there, that you were taking notes?
A No.
Q Investigator DeJohn had a pad and a paper there taking notes?
A No.
Q Mr. Carmichael get his property back that day?
A Yes, he did.

Q If I can, I'd like to turn your attention to the 7th -- excuse me, the 17th when Mr. Williams was having a conversation with you. Can we go to that? You've indicated to us that when Mr. Williams was sitting there, that it was your opinion that he did not know that Mr. Carmichael was present in the office, that he was actually being detained.
A Yes, that's what I testified to.
Q All right. And that you noticed that Mr. Williams' reaction was that he appeared to you to be familiar with Mr. Carmichael's voice, and as a result you asked him a question about that.
A Yes, I did.
Q And in fact, I think you said, and I quote, that without even saying anything about Mr. Carmichael you simply said, and I quote, "How long had have you known him?"
A Yes, I did.
Q Okay. And so your memory was you didn't even say that's Mr. Carmichael, or do you recognize Mr. Carmichael, it was simply how long have you known him?
A That's correct.
Q And his response was "Several years."
A Yes, ma'am.
Q Now he also made this statement to you about his

children and his safety, do you recall that?
A Yes, I do.
Q And did you question him about the fact that who was he referring to?
A No, we didn't.
Q Weren't you concerned about who he might be referring to?
A During those statements, Special Agent Tom Halasz was the lead investigator who was actually conducting the interview.
Q So you didn't interject?
A No, ma'am.
Q Did he ever say to you that he was concerned about Mr. Denton?
A No, ma'am.
Q You were aware of the fact that when Mr. Williams was arrested, that Mr. Denton had been present in a house where there had been a lot of guns?
A Yes, ma'am.
Q And you were aware of the fact that in this -- that Mr. Denton had been arrested previously in 2002 in a place, a house where there had been guns?
A To be honest with you, I don't recall that.
Q Bottom line is you don't know why Mr. Williams made that statement because no one asked about it.

A Mr. Williams told us that he couldn't cooperate, so we didn't proceed with questioning.
Q Right. Agent Greenwood, if I can I'd like to talk to you about surveillance. You indicated to us that you became involved on November the 16th, 2003 in this investigation because that was the fist time that you conducted surveillance.
A Yes, ma'am.
Q Okay. I want to talk to the jury a little bit about what surveillance means, because we hear about it on T V but I want to talk about what it really means. In terms of your training in this case and surveillance, let's specifically talk about when you're in a car looking at a, like you were here, on a road or looking at a house. What are you trained to do in that situation?
A Well do you want that in the context of what I testified to, or what I actually did, or --
Q Overall surveillances.
A Depending upon what the object is of your surveillance. If you're watching a house, you're watching a house to identify some type of activity that you're looking at.
Q Okay. The purpose of surveillance is to see whether or not you can observe, and I'm assuming

criminal activity, but activity that may be significant to an investigation?
A Yes, ma'am.
Q And there are certain things that you employ in surveillance, such as what you said, like by sitting on the road and watching. That's one of the things that you might do in surveillance?
A Yes, ma'am.
Q Sometimes you can sit for a long, long time in surveillance situations.
A Yes, you could.
Q Now surveillance also can -- you can employ using someone to be what we call wired up or using a wire where you sit someplace and send somebody into a situation and listen to what's going on, that can be considered part of surveillance?
A I guess in my definition, because other than conducting some type of further investigation, you could use a transmitter on somebody that's assisting you and to go in and gain intelligence from whatever location you're looking at.
Q Okay. And when you say "a transmitter," again, is it the same thing as wiring somebody up, is that --
A Well used in that context, wiring. I mean that's a generic term. I mean you could be handing them a

recorder. You could be handing them some type of transmitting device that will transmit an audio signal that can electronically be recorded. There's a whole range.
Q So we have recordings, we have an electronic device that you just talked about. You can also use in surveillance you can use cameras?
A Yes, you could.
Q You can use video cameras?
A Sure.
Q And I don't know if you all have the ability to do -- Well what other kind of surveillances are there?
A Well you've pretty much covered the range. But basically you're just watching yourself, to the team out there, audio and video equipment.
Q Now on November 16th, 2003 in terms of your surveillance, did you have in your car video, a video camera, regular camera or anything like that?
A No, I did not.
Q And when you say to us that at the point that you were actually positioned on Fleming and you see what you believed to be Mr. Carmichael's car drive up, you didn't have an opportunity to take a photograph or anything like that?
A Well you asked me, I didn't have any of that

equipment with me.
Q Any of the backup agents have a little camera? A video camera or anything like that with them?
A I don't know if they did or didn't.
Q Okay. When you all are doing surveillance, though, would you agree with me knowing that you're looking for things or making observations, that it's great to have just a little camera, a little video camera so you can document it?
A Given what you're asking, if it's a planned event, yes, it would be very helpful if it's a planned event.
Q Well you never know what might happen on a surveillance, right?
A Yes, ma'am.
Q Now when you were on surveillance on this Fleming Road, and you've indicated that you believe Mr. Carmichael's car drove up, were you ever in a position to actually see this car being parked?
A No, I was not.
Q So you were too far away from that?
A Yeah. As I testified, I was about three tenths of a mile from the house.
Q It appeared to you this car came back pretty quickly, within minutes, I think you said, back down

Fleming Road.
A Yes, it did.
Q And do you recall whether or not if you were in a position where it appeared to you that the driver of the car recognized you by looking towards you, or seeing you in any way from your position?
A No. I could not see the occupant of the vehicle.
Q Okay.
MS. WAYNE: If I may have just one moment, Judge.
(Whereupon, Ms. Wayne conferred with Ms. James and Mr. Brunson off the record and out of the hearing of the other courtroom participants.)
Q Agent Greenwood, if I may just very briefly go back to this December 4th day. My understanding is that Mr. Carmichael actually, when he came to your office, picked up his property first and then came into this room, do you recall that?
A No, ma'am, that's not what I testified to.
Q Okay. So your recollection is he did not have his property with him when he was sitting in this chair?
A Not when he first got there, no, ma'am.
Q Okay. And do you recall that Mr. Carmichael was present on that day for approximately an hour?

A No, I don't remember any period of time elapsed like an hour.
Q Your report doesn't indicate how long Mr. Carmichael was there, or the report doesn't indicate it. Do you have any independent recollection that Mr. Carmichael was actually made to sit in this room by himself for quite some time before you all came into the room?
A I have no knowledge of that. At the point that I came up there, Task Force Agent or Agent DeJohn or Investigator DeJohn, however you want to address him, came back and asked me to assist him. And when I came to the front, Mr. Carmichael was there. So I'm not sure what period of time other than our contact with him was I'm thinking somewhere ten, fifteen minutes.
Q Okay. And, Agent Greenwood, you've already said we don't have a video or an audio to tell us about the time, but do you have an independent report indicating how long Mr. Carmichael was there that day?
A No. I believe that you already referred it to Mr. DeJohn before.
Q Agent Greenwood, I'm asking you about you. Not what you believe somebody else confirmed. Did you do a report independently?
A No, ma'am.

Q About the time?
A No.
MS. WAYNE: All right. I have no further questions. Thank you very much, Agent Greenwood.

CROSS EXAMINATION

BY MR. TEAGUE OF BOB GREENWOOD:

Q Agent Greenwood, you were one of the investigators on this case from the time when you got the first information, say about the 13th of November through the search of Freddie Williams' home on the 17th of November?
A As best that I can remember, the first that I became involved with this was the 16th of November, the best that I can remember.
Q You were briefed as to where you were in the scheme of things and what all was going on and what you were trying to achieve, is that correct?
A Yes, sir.
Q You weren't just thrown into it cold, you were briefed, were you not?
A I was briefed prior to the execution of the search warrant into the residence, yes.
Q Now, were you aware that the government's -- Agent DeJohn's discussions with a couple of people, one Gary Wayne George and the other Robert Patrick

Denton, you were aware that those conversations had been going on, weren't you?
A I was aware that Agent DeJohn had spoken with those subjects, yes.
Q And you knew somewhat the sum and substance of what Mr. Denton and what Gary Wayne George had to say, is that correct?
A I don't remember if I -- I don't recall what that substance was, other than that we were planning to execute a search warrant at Mr. Denton's residence to obtain further evidence.
Q Based on what Mr. Denton and what Mr. George had said.
A I would agree with that.
Q Okay. So did you read the affidavit Agent DeJohn made in order to get that search warrant?
A No, sir, not to my memory. I don't remember reading that document.
Q Now, with regard to the statement you claim that my client made about wife and children being killed, had you come to learn that as recent as November the 16th Gary Wayne George had threatened to kill Robert Patrick Denton?
A I don't remember that information, no, sir.
Q If Mr. Denton has testified to that to this jury,

you wouldn't dispute that, would you, Agent Greenwood?
A If he testified to it, I'm not aware of that.
Q In your judgment, is Gary Wayne George capable of violence?
MR. MOORER: Objection, Your Honor.
THE COURT: When you say "capable," I guess rather than that, that would be a subjective statement, but you can rephrase your question. Is there anything that George has done that would indicate, you know, that he could do violence. Something that he observed.
Q If the jury has already heard testimony that Gary Wayne George threatened his life the very evening or the day leading up to the arrest of Freddie Williams, would that indicate to you that he's capable of violence?
MR. MOORER: Objection, Your Honor.
THE COURT: Yes?
MR. MOORER: And I don't know if you heard the question.
THE COURT: No I didn't, actually.
MR. MOORER: Your Honor, as I understood the question --
THE COURT: Why don't you restate the question again.

Q Agent Greenwood, if the jury has heard undisputed testimony from Mr. Denton yesterday that Gary Wayne George had threatened his life on Sunday the 16th leading up to the raid of Freddie Williams' house on Monday the 16th in the wee hours of the morning, would that indicate to you that Gary Wayne George would be capable of violence?

THE COURT: Okay. Now I'll sustain that objection. He cannot comment on the believability or not believability of another witness. First of all, he wasn't here. He didn't hear it. And secondly, it doesn't make any difference what his opinion is about whether George's statement reflects violence or not. You know, anybody sitting in the courtroom can make that opinion, but the only people whose opinion counts are those that are in the jury box. That's it.

MR. TEAGUE: That's what I'm endeavoring to communicate.

THE COURT: The jurors make up their own mind about what to believe and what not to believe and what inferences to draw. Another witness's opinion about it is not going to help them. They're the ones who heard it, they're the ones who can judge the credibility.

Q Now you were present, then, when the raid took

place at Freddie Williams' house?

A Outside the residence. I never entered the house.

Q Okay. But you have been involved in the investigation in other ways since that time, is that correct?

A Since the execution of the search warrant?

Q Yes, sir.

A What I've testified to, yes, sir.

Q Let me ask you this. Are you aware of whether or not, did you, or anyone to your knowledge, did anyone else within the D. E. A. or the task force endeavor to trace the weapons that were supposedly taken out of Freddie Williams' house? Did you ever do that?

A No, sir, I did not.

Q And that is something -- That is a tool that's available to the D. E. A., isn't it, sir?

A Sure. The weapons could be checked, yes, sir.

Q You can find out where they were manufactured. You can find out what wholesaler bought them from the manufacturer. And based upon gun control laws you can find out who bought those guns, can't you, sir?

A Yes, you can.

Q To your knowledge as an agent in this case, has that been done with regard to those weapons?

A I do not know if it was done or not.

Q Did you know in any affidavit or in any other piece of paper or in any conversation with the D. E. A on the 16th that Patrick Denton's house had been raided in June of 2002 and they found three weapons in that house? Were you aware of that?

A I don't recall.

Q Now as to the things you allege that Freddie Williams said on that day of his arrest, were you a part of the team that arrested him down at the hospital where his wife was on her deathbed?

A No, I was not. It was two uniformed Montgomery police officers.

Q Were you there, then, at the D. E. A. office when you endeavored to interrogate him?

A Yes, I was.

Q Agent Greenwood, does the D. E. A. ever make use of written forms? That is, a piece of paper that sets out what a man's rights are so that he can read them and then sign that understands those are his rights, the right to remain silent, and that what he says can and possibly will be used against him in a court of law? All those rights? Do you use any forms where that's written out?

A Do I personally, or does the agency?

Q Does the agency have those available to you or Agent Halasz or anybody else?

A As I was instructed in the academy, we give a verbal rights, there is a rights form --

Q My question simply was, do you have those rights forms available?

A Yes, they were available.

Q Did you, or anyone else, use those when you endeavored to talk to Freddie Williams?

A No.

Q You did not. So there is no rights form that -- where Freddie Williams documented that he was given his rights in a proper manner then. There is no document to that effect, it's purely your word and Agent Halasz' word, correct?

A It is. Agent Halasz advised him of his rights, and my word as a witness that Agent Halasz did that.

Q All right. Now let's go to the point where --

MR. TEAGUE: Your Honor, if I may approach?

THE COURT: Yes.

Q When you sent Mr. Denton over there, you sent him over there with the capability of your being able to record everything, every word if possible that is said between Robert Wayne Denton and Freddie Williams, or whoever else might be around over there, correct?

That's why you use these, isn't it?
A You're asking me questions that I didn't participate in, so you're asking me --
Q Well you don't dispute that they wired up Robert Patrick Denton, do you?
A That's correct, they did.
Q And you know they did, don't you?
A Yes, sir.
Q And the idea is let a factfinder some day when we go to court hear exactly what was said. That's the whole idea for these things, isn't it?
A Yes, sir, it is.
Q Now that's out there where you're in a strange environment and maybe you can't get good control of what's said and people that are trained, but when it comes down to bringing Mr. Williams to the D. E. A. office, to this room or a room something like it, you have total control over their circumstances, don't you, Agent Greenwood?
A Yes, sir. Once we have them in custody.
Q Do you have tape recorders available to take down exactly what Freddie Williams may say?
A Yes, there are tape recorders available.
Q Did you use a tape recorder?
A No, we did not.

Q But you were there for the very purpose of getting a statement from him if you could, weren't you?
A Yes, sir.
Q And you knew that if he said anything, some day you wanted a factfinder to know exactly what he said, is that correct?
A Yes, I did.
Q And is it not true that in the English language what a person may say with the addition of one word, or the subtraction of one word, could totally change what was being communicated? Would that be correct?
A That's possible.
Q How far did you go in school, Agent Greenwood?
A I graduated from college, sir.
Q Did you get any training beyond college?
A As far as what type of training, sir?
Q What you do.
A I have been a law enforcement officer for over twenty years. I've had a lot of training.
Q And you have been to a lot of academies, a lot of schools, a lot of refresher courses, seminars?
A Yes, I have.
Q Okay. Now sometimes when you deal with a person who has maybe not majored so much on education in his

life but good, hard, sweaty work like doing sheetrock, he may not communicate the way a college educated man such as you would communicate, is that correct?
A That could be correct, yes, sir.
Q And sometimes what a man may say could easily be misunderstood and certainly misconstrued. People have misunderstandings all the time, don't they?
A Yes.
Q Have you ever had to apologize even to a friend for saying something they resent that you said and maybe you made it clear to them that they misunderstood you?
A Yes, sir, I have.
Q And you've had your friends and other people and even strangers you've come into contact with apologize to you about everybody had a miscommunication; that happens, doesn't it?
A Yes, it does.

MR. TEAGUE: I believe that's all. Thanks.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. MOORER OF BOB GREENWOOD:

Q Agent Greenwood, to follow up on what you just testified to Mr. Teague, did you have any difficulty understanding what it was Mr. Freddie Williams said to

you in the room that you were seated in when Mr. Carmichael spoke on the other side of the door?
A I had no problem understanding him.
Q Did you have any difficulties understanding what he said to you when you were asking him the booking questions about where he lived?
A No, sir, I had no problem understanding him.
Q And did you have any problem understanding what he said to you when he said to Agent Halasz that he couldn't cooperate in the investigation for fear of the safety of his loved ones?
A Yes, sir, I understood him.
Q Now you were asked questions by both of these attorneys for the defendants about the fact that you didn't record those statements that both Mr. Carmichael and Mr. Williams made. Do you recall those questions?
A Yes, sir.
Q Despite the fact that you didn't tape it, were the things that you testified to today and yesterday said by Defendant Carmichael and Defendant Williams?
A Yes, they were.
Q You were asked by counsel for Mr. Carmichael about the different types of surveillance. Do you recall those questions?

A Yes, sir, I do.
Q And the tools that you might employ to conduct your surveillance, do you recall those questions that she asked?
A Yes, I do.
Q When you went out to do surveillance on Mr. Denton's house, or when you went out to assist in the search warrant on Mr. Denton's house, did you or the other agents, when you went out and left your office to go do the search warrant, did you expect that you were going to have to do surveillance on anybody else as quickly as you did?
A No, I did not.
Q Before you went to Patrick Denton's house to do the search warrant, did Mr. Denton or anybody else tell you that Mr. Denton was going to receive a call from Mr. Carmichael?
A No.
Q Did you have any way to know that would happen?
A No, sir.
Q And to your knowledge did any other agent have any way to know that that would happen on that evening?
A No, sir.
Q Now you were asked a question by counsel for Mr.

Carmichael about the interrogation of Mr. Carmichael when he came to pick up those items that were going to be returned to him. Do you recall those questions?
A Yes, sir.
Q And specifically she asked you about him -- follow-up questions after he had initially made the first statement to you and Agent DeJohn. Do you recall that question?
A Yes, I do.
Q When he came to pick up his property at the D. E. Aoffice, was he under arrest?
A No, he was not.
Q Was he cuffed?
A No, he was not.
Q Did he have to come out there and pick up those items?
A No, he did not.
Q Could his attorney have come out there and picked up those items?
A Yes, he could.
Q Could somebody else other than his attorney, maybe a family or someone else who was authorized to pick up those items?
A Yes. With Mr. Carmichael's permission he could have sent a friend.

Q And was there ever any time where anybody said to him before we give these things back to you, you've got to say something to us about this case and your involvement in it?
A No one said that to him.
Q And had he been previously Miranda-ized when he was initially arrested and booked at your office?
A He had been Miranda-ized on the date of his arrest, which was November 17th.
Q And you were asked questions by counsel for Mr. Carmichael about his attorney not being present. Could Mr. Carmichael's attorney have come to the D. E. Aoffice that day with Mr. Carmichael to pick up those items if he had chosen to?
A Yes, that's very common for them to do that.
Q And you were asked by counsel for Mr. Carmichael about the fact that that statement wasn't recorded either. Do you recall those questions?
A Yes, sir, about Mr. Carmichael.
Q Yes. And where he told you, "You got me," and those types of comments?
A Right, on December 4th, yes, sir.
Q Now, were you expecting him to say the things that he said during that encounter that you testified about today?

A No, I did not.
Q And you were asked by counsel for him about whether or not you would have a recorder to prevent any subjective interpretation of what somebody might have said. Do you recall those questions?
A Yes, I do.
Q Is what you testified to today about what Mr. Carmichael said to you, your subjective interpretation of what he meant when he talked to you?
A No, I'm testifying to what he said.
Q And you remember what he said?
A Yes, sir.
Q Now at the time he said, "You got me" and those other statements that he may have made in connection with picking up his wallet, did you, or any of the other people who were present in the room, say anything about him having an opportunity to bring his attorney in?

MR. MOORER: Your Honor, before we go into this, may we approach? I think we need to cover a matter that --

THE COURT: Check with opposing counsel and let me know if you need to meet with me.

(Whereupon, Mr. Moorer conferred with Ms. Wayne off the record and out of the hearing of the

other courtroom participants.)

MR. MOORER: Thank you, Your Honor.

THE COURT: Very good.

MR. MOORER: Your Honor, I believe we do need to take this matter up.

THE COURT: All right, I'll excuse the jury. Don't forget to turn over your pads. You're under the same cautionary instructions as always.

(Whereupon, the jury was escorted out of the courtroom.)

THE COURT: Yes, Mr. Moorer, Mr. Teague and Ms. Wayne?

MR. MOORER: Yes, Your Honor. Your Honor, the reason I had asked that we have this hearing outside the presence of the jury was that I was going to go into something that I think that prior to this cross examination we would have been foreclosed from going into. She cross examined Agent Greenwood to the extent that it gave the impression that they were talking to him without counsel and acting improperly in that regard.

So I was going to ask him next if he, Mr. Carmichael, had been advised that if he wanted to cooperate and to give information to them in connection with the "You got me" statement, that he

said, "Well, I really cannot trust my attorney to work on my behalf," words to that effect. And that is where I was going to go.

And I was also going to get him to state that his attorney at that time was Mr. Glassroth.

THE COURT: I think the prejudice of that outweighs its probative value. I'm not going to let it in.

Bring the jury back in.

It's marginally helpful and it's highly prejudicial.

Why don't we go ahead and take a ten minute recess ourselves.

(Whereupon, a recess was taken.)

IN OPEN COURT

(THE JURY IS NOT PRESENT:

THE COURT: I understand Ms. Wayne has something she wants to take up with me?

MS. WAYNE: Just very quickly, Judge, I wanted to alert the Court to the fact that I anticipate on recross asking Agent Greenwood this question: Agent Greenwood, you've indicated that you're aware that Mr. Carmichael had an attorney, looking at the defense table, that that attorney is not present. I don't think it opens the door to this

other stuff, it simply talks about what he talked about, the attorney that he's testified about it. And period.

I just wanted the jury to know that that lawyer is not here, because there's clearly been an inference of what that lawyer was been telling him and directing Mr. Carmichael to do.

MR. MOORER: Your Honor, I think I would ask the Court to revisit its last ruling to the extent that this witness should be at least allowed to say that they told Mr. Carmichael that if he wants to cooperate, he needs to go through his attorney. I think he should be at least allowed --

THE COURT: You want him to say that he told Mr. Carmichael that?

MR. MOORER: Yes. That when Mr. Carmichael said, "You got me," then they said, "Well if you want to cooperate with the investigation, now that you have an attorney you need to go through your attorney." And that's when Mr. Carmichael said, "Well, I can't trust my attorney." So --

THE COURT: What's your response to that?

MS. WAYNE: I think it's the same thing that we just addressed.

THE COURT: Mr. Teague?

MR. TEAGUE: Your Honor, I don't have a position.

THE COURT: I have no problems with that. It's the comment about the quality of his attorney that was of concern to me, and you may ask your question as well.

MS. WAYNE: All right.

THE COURT: Bring in the jury.

(Whereupon, the jury was escorted into the courtroom.)

THE COURT: Proceed.

MR. MOORER: Thank you, Your Honor.

Q Agent Greenwood, when we last broke you were discussing what had happened when you were -- you and Agent DeJohn were returning the personal items of Defendant Carmichael. So I'm going to pick up my questioning there, okay?

A Yes.

Q You were asked on cross examination by counsel for Mr. Carmichael about the fact that you asked a follow-up question when you knew that his attorney was not present at that time. Do you recall that line of questioning?

A Yes, I do.

Q Was there any offer made by either you or Agent

MS. WAYNE: I have no further questions. Thank you, Agent.

REDIRECT EXAMINATION

BY MR. MOORER OF BOB GREENWOOD:

Q Did a suspect wander up during your time out at the Patrick Denton search warrant?

MS. WAYNE: Judge, I'm going to object. That's been asked and answered and has nothing to do with the recross.

MR. MOORER: She asked him about what you can expect, and --

THE COURT: Overruled. Go ahead.

Q Did a suspect come into the scene as you and other agents were doing the search warrant at Patrick Denton's house?

A Not during the search warrant, no.

Q Later did someone come in?

A Yes, they did.

Q Thank you.

THE COURT: Anything else from this witness?

(Whereupon, there was no response.)

THE COURT: You may step down.

(Whereupon the witness, Bob Greenwood, stepped down from the stand.)

THE COURT: Next witness.

MR. MOORER: Sherry Gonzales.

SHERRY GONZALES,

the witness herein, having first been duly sworn or affirmed to tell the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MOORER OF SHERRY GONZALES:

Q Would you state your full name, please.

A Sherry Gonzales.

Q Miss Gonzales, you have kind of a soft voice, so if you will speak up a little bit, please, ma'am.

A Sherry Gonzales.

Q Miss Gonzales, what do you do for a living?

A I'm a drug enforcement agent.

Q Do you have any specific duties and titles other than drug enforce agent?

A I'm a group supervisor with the Drug Enforcement Administration.

Q And would you briefly relate to the jury your background, your training and your experience that qualifies you to hold the position that you are serving in.

A Yes, sir. Before I came with the D. E. A., I was a special agent with the Georgia Bureau of Investigation. I have been with D. E. A. for fifteen years. I was with G. B. I. for five years.

Q Miss Gonzales -- or Agent Gonzales, were you on duty on November the 16th of 2003?

A Yes, I was.

Q Would you tell the jury what you were doing on that day in connection with the investigation of the defendants.

A As a group supervisor I was on that particular day, Sunday, we had gathered at the D. E. A. office to gather a plan, an operation plan to execute a search warrant at Mr. Robert Denton's house.

Q And did you subsequently conduct a search at Mr. Patrick Denton's house?

A Yes, we did.

Q When did you and the other agents conduct a search at Patrick Denton's house?

A We entered Mr. Denton's house approximately at twelve-fifty a.m. It was actually on the 17th of November that we entered his residence.

Q So just a few minutes into the next day?

A Well actually we started at three that afternoon, and after getting everything together it was later on that evening.

Q Okay. So twelve-fifty?

A Yes, sir.

Q Now what, if anything, did you do in the execution of the search warrant?

A My role, I participated with the agents. When we entered the residence I went to the back of the residence, secured the residence and then I went into the residence. I secured Mr. Denton's wife, and then we proceeded to talk with Mr. Denton about his involvement in the drug trafficking organization of Mr. Carmichael.

MS. JAMES: Objection, Your Honor. There's been no tie. She referred to the Carmichael organization.

THE COURT: Sustained.

Q What did you begin -- Let me back up.

Who, if anyone, engaged in the conversation with Mr. Denton?

A Myself, Agent DeJohn, David DeJohn, Agent Tom Halasz and I believe Agent Bob Greenwood.

Q And what was the topic of the conversation between and among the group of people that you met?

A What we were trying to do is we had information, obviously, that Mr. Denton was involved in drug trafficking. He was involved with an individual by the name of Leon Carmichael. We were trying to get Mr. Denton to cooperate with us and get him to

cooperate with the Government and law enforcement and give us information on Mr. Carmichael.
Q And were you also interested in the other individuals who might be involved with Mr. Carmichael and Mr. Denton?
A Yes, sir. When I say Leon Carmichael's organization, I mean any individual, not just Mr. Carmichael but any individual that is involved in that organization.
MS. JAMES: Objection, Your Honor, same type answer.
THE COURT: I'm not quite sure -- Members of the jury, she's made some statement about an organization. Whether there was such an organization or not is up for you to decide. That's just what she -- that's just language she's using. But there may or may not have been an organization based on the evidence that you hear here in open court. So I'll allow it with that limiting instruction.
MR. MOORER: Yes, Your Honor.
Q As you and the other agents were talking with Mr. Denton, did he make any decision as to whether or not he would try to assist you and the other agents to try to further your investigation?
A Yes, sir, he did. He agreed to cooperate with



law enforcement.
Q And do you know about when it was that this came about? You said you entered about twelve-fifty to begin the search warrant, do you know about what time it was that he indicated to you and the other agents that he would help you?
A Yes. We got there at about twelve-fifty, this is probably around two o'clock, two-thirty in the morning, after we had searched the residence, started talking to Mr. Denton. Around two-thirty I'd say that he agreed to cooperate.
Q And as you and the other agents were talking with him, what, if anything, happened?
A We were standing on Mr. Denton's front porch, front area, what I call a "porch," just a little area that leads into his residence, and it was myself and Agent DeJohn and Agent Halasz and Mr. Denton's phone rang.
Q And where was his phone at this point, Mr. Denton's phone?
A I believe Mr. Denton was holding it in his hand. It may have been in his pocket, but it was in his possession.
Q And what, if anything, happened as the phone rang?



A Well, when the phone rang it kind of startled us because it was like two-thirty in the morning. And we all looked at the phone and on the phone appeared the name "Leon". At this time Agent Halasz went to his vehicle to get some recording equipment so we could record the phone call. We believed it was an important phone call, so we wanted to record the call.
Mr. Denton answered the phone call and proceeded to talk to the person on the other end.
Q Now were you able to overhear the conversation at that point?
A Just bits and pieces of the conversation. Mr. Denton was between myself and Mr. DeJohn, and we were trying to get to overhear on the phone. But just bits and pieces and her voice.
Q And what, if anything, was said between Mr. Denton and the person who had called on the phone?
A The only thing that I could make out the voice saying was that was the words "five minutes." And then the phone call was rather short, and then Mr. Denton hung up the phone.
Q And after he hung up the phone what, if anything, happened next?
A Well Mr. Denton hung up the phone. He explained to us that that was Leon Carmichael on the phone. He



was on his way to Mr. Denton's residence, which is where we were, and that he would be there in five minutes.
Q At the time that this occurred, were you expecting Mr. Carmichael to call Mr. Denton?
A No, sir, we were not expecting that phone call at all.
Q Were you expect Mr. Carmichael to show up while you were doing the search warrant?
A No, sir, we were not expecting Mr. Carmichael.
Q And what, if anything, did you and the other agents do when you were told that Mr. Carmichael would be there in about five minutes?
A Well, what we did is we got into our vehicles and got out of the way. We went to a covert location to hide. Mr. Denton remained in his residence to meet with Mr. Carmichael, and we went down the road to get out of the way.
We went to a place where at least some of the agents could keep the house in visual and see the vehicle arriving at Mr. Denton's residence, but we wanted to get out of the way so Mr. Carmichael could not see us.
Q Were there a lot of places for you and other agents to hide while you were out there?

A No, sir, there was not.
Q And when you and the other agents disbursed to your various locations, were you all in a hurry to get to where you were going to hide?
A Yes, sir. We were told -- Mr. Carmichael said he would be there in five minutes. We knew we had to get out of the way pretty quickly.
Q And where did you go to?
A I went out of Mr. Denton's residence and took a right at the end of the road. It was a dirt road. I hid down in a wooded area away from the residence out of the way.
Q Now let's back up a little bit and go to before the phone call came in. Had you and other agents have the opportunity to question Mr. Denton about this drug trafficking activity?
A Yes, sir, we had.
Q Could you tell the jury in sum what it was that Mr. Denton told you and the other agents as you were asking him about his drug trafficking activity?
MS. JAMES: Objection, Your Honor. This testimony would be purely cumulative based on what happened yesterday. He's asking her -- and hearsay. He's asking her to say what Denton told him.
MR. MOORER: Your Honor, it's not hearsay

because they attacked his credibility and it's to show it's not a recent fabrication and it's consistent with what he testified to, Your Honor.
MS. JAMES: That's not a prior statement. I mean, he testified -- he's asking her to testify to corroborate what Denton said yesterday.
THE COURT: Right. What about his argument that it's to counter any challenge on your part that it's a recent fabrication? Isn't that an exception to 803? What does 803 say?
MR. MOORER: 801(b)(1), Your Honor. And also -- I withdraw that.
MS. JAMES: Judge, it would be our position that they can use this witness to rehabilitate only the statements on which he was impeached, not his total testimony.
THE COURT: Okay. Well what were those?
MS. JAMES: That would be for the government to choose.
MR. MOORER: Your Honor, certainly they tried to attack his credibility to the extent that he has implicated both of these defendants in the narcotics activity.
THE COURT: Overruled.
Q You may answer, if you recall the question.

A Mr. Denton had told us that he had been working for Mr. Carmichael, and in fact that evening on the 16th he expected approximately five hundred pounds of marijuana to be delivered to Montgomery. He had had a conversation with Mr. Carmichael, and he did not want to take possession of that marijuana because a friend of his, or a lady he knew, had been stopped by Chilton County police. He knew the marijuana then was going to be delivered to Freddie's residence.
At the time, Mr. Denton did not know Freddie's last name. He then -- We then later found out it was Freddie Williams. Mr. Denton explained all of that to us before the phone call came in.
Q So you then went and took up your surveillance post after the phone call came in?
A Yes, sir, we did.
Q And what, if anything, happened next?
A From my vantage point, I could not see anything but taillights going into the residence of Mr. Denton. Agent Greenwood, I believe, called out a black Honda going into Mr. Denton's residence. The car stayed maybe five or ten minutes and then left. After the car left we went back to Mr. Denton's residence and we met with Mr. Denton.
MS. JAMES: Excuse me, Your Honor, may I

impose another objection?
THE COURT: Yes. Go ahead.
MS. JAMES: We are not challenging the fact that Mr. Denton made these statements. What we challenge with regard to our impeachment of him was that the statements were not true. And she appears to be just rehashing what he said.
THE COURT: So you don't challenge that the statements were made.
MS. JAMES: No, sir.
THE COURT: No sense of going over it, then. The jury has heard it. They're not challenging that. Let's move on.
MR. MOORER: Yes, Your Honor, but they are challenging the truthfulness --
THE COURT: Well first her reciting the statements doesn't make it any more true. The jury will have to make that assessment on its own.
MR. MOORER: Yes, Your Honor, but it goes to show that it is not something that's just a recent fabrication.
THE COURT: Well, that's right. They have agreed that the statements were made. So they agreed the fact that he made the statements is not a recent fabrication. Whether he told the truth or not is up