Page 146

1 to the jury to decide. In other words, he gave the
2 statements twice. He gave them here in open court and
3 he gave them back then, and the defendants don't
4 dispute that. What they do dispute is whether they're
5 true, and that's up to the jury to decide.
6     MR. MOORER: Yes, Your Honor.
7 Q I'm sorry. You were saying, before the
8 objection, we were at the point of you went back to
9 meet with him after Mr. Carmichael left?
10 A Yes, sir, we did.
11 Q And what was your purpose in meeting with him?
12 A The purpose of meeting with Mr. Denton afterwards
13 was to find out what occurred between him and Mr.
14 Carmichael, or the person in the black Honda, which
15 was Mr. Leon Carmichael. Mr. Denton stated that Mr.
16 Leon Carmichael had come to his residence to tell him
17 to be at Freddie's house tomorrow or the next day
18 which would be the 17th of November, and to help
19 Freddie break down the marijuana, to cut up the
20 marijuana and repackage the marijuana.
21 Q Now before we go into what had happened next, you
22 testified a moment ago about the telephone
23 conversation that occurred between Mr. Denton and
24 Defendant Carmichael. When you are investigating drug
25 trafficking activities, are cell phones an item of

Page 147

1 significance that you try to use to further your
2 investigations?
3 A Yes, sir, they are.
4 Q Will you explain to the jury why those items,
5 cell phones, have significance to you, and what you
6 attempt to do once you discover those in the course of
7 an investigation?
8 A Usually if we have a cell phone, if for example
9 in this case in Mr. Denton's cell phone when the name
10 Leon came up, what we can do is take the number that
11 came up from the cell phone and track it back to the
12 owner of that number. The subscriber, if you will.
13 We can use that subscriber, get the toll information,
14 and we can glean information from those tolls.
15     We can also take Mr. Denton's cell phone
16 number and we can track his activity on his phones.
17 That's helpful to us when someone is cooperating to
18 corroborate their information. It also helps us to
19 track information from in this case Mr. Carmichael who
20 called that number. It helps us corroborate
21 information from informants. It helps us to track
22 activities from drug individuals.
23     There is different things that we can do
24 with it, but in that case that's what we did.
25 Q Now after you met with Mr. Denton and he told you

Page 148

1 about what Mr. Carmichael expected him to do later,
2 what, if anything, did you and the other agents do at
3 that point?
4 A Myself personally what I did was, I went -- I got
5 a change of clothes, went back to the office and then
6 at seven a.m. that morning I went back to the D. E. A.
7 office, met with Agent DeJohn who met with Mr. Denton,
8 and then we proceeded to wire Mr. Denton up and send
9 him into Freddie Williams' residence where he would
10 begin packaging up the marijuana.
11 Q And after you met with Agent DeJohn and Mr.
12 Denton, what, if anything, did you do thereafter?
13 A I met with another group of agents who would be
14 the agents that would go in on the residence of
15 Freddie Williams which is at Nine forty-nine
16 Ridgecrest, and we went to an obscure location near
17 Ridgecrest Avenue and waited for Agent DeJohn to give
18 me the okay to go in. Agent DeJohn was monitoring the
19 recorder that Mr. Denton was wearing, and he would be
20 the one that would tell us when Mr. Denton was ready
21 for us to enter the house. We stayed in that location
22 until Mr. Denton was ready for us to enter the
23 residence.
24     MR. MOORER: And, Your Honor, I see it's
25 noon. This may be a place --

Page 149

1     THE COURT: Yes. How much longer do you
2 think you'll be with this witness?
3     MR. MOORER: I think it will be a few more
4 minutes, Your Honor, and we're about to start into
5 another incident, so to speak, so this might be a good
6 time to take our break.
7     THE COURT: Okay, good. So that the jury
8 has an idea as to how the trial is progressing, how
9 long does the government think its case can take? I
10 know you can't predict cross but --
11     MR. FEAGA: Your Honor, that's the problem.
12 We don't know how long the cross will take.
13     THE COURT: Well how many witnesses do you
14 have?
15     MR. FEAGA: I think it's conceivable that we
16 can finish up, I'm thinking right now it's going to be
17 Monday.
18     THE COURT: Monday?
19     MR. FEAGA: Yes, sir.
20     THE COURT: So you anticipate another full
21 day on Friday?
22     MR. FEAGA: Yes, sir.
23     THE COURT: How many more witnesses are we
24 talking about?
25     MR. FEAGA: Your Honor, I think somewhere in

Multi-Page™

Page 150

1 the neighborhood of, I'm thinking about -- Maybe no
2 more than twenty more witnesses, Your Honor.
3     THE COURT: Will we have any witnesses as
4 extensive as George and Denton?
5     MR. FEAGA: I don't believe that we will,
6 Your Honor. There are probably two or three more that
7 could go a long time. Again, depending on the cross.
8     THE COURT: Right. I understand that.
9     MR. FEAGA: Yes, sir.
10     THE COURT: Okay, thank you very much. I
11 think we're progressing pretty well, then.
12     Again, do not discuss the case among
13 yourselves or with anyone else, and don't forget to
14 turn your notes over in your chairs.
15     (Whereupon, the luncheon recess was
16 taken.)
17             IN OPEN COURT
18         THE JURY IS NOT PRESENT:
19     THE COURT: I believe you have something to
20 take up out of the presence of the jury?
21     MS. WAYNE: Very briefly, Judge.
22     THE COURT: Yes?
23     MS. WAYNE: On behalf of Mr. Carmichael, I
24 would simply reraise our motion to suppress the
25 statement of Mr. Carmichael that has already been

Page 151

1 denied, but based on the cumulative evidence that was
2 elicited here today in terms of the contact with Mr.
3 Carmichael and what was said, I think there have been
4 some new facts in terms of --
5     THE COURT: What are the new facts?
6     MS. WAYNE: The size of the room, where the
7 officers were seated and the more specific
8 determination of where they were seated and how the
9 follow-up to the alleged voluntary statement was done.
10 It's just a lot more detailed, and I'm simply --
11     THE COURT: You're talking about the motion
12 to suppress hearing that Judge Boyd had?
13     MS. WAYNE: It was Judge Boyd.
14     THE COURT: Right.
15     MS. WAYNE: So I'm just incorporating all
16 that and asking the Court to reconsider her ruling and
17 reraising it.
18     THE COURT: I'll deny it for two reasons.
19 First, I'll deny it because these are things you could
20 have brought up before Judge Boyd, so they're really
21 untimely.
22     Second, I'll deny it because I've heard the
23 additional evidence and I think the result is still
24 correct.
25     MS. WAYNE: Just so we're clear, I couldn't

Page 152

1 have brought it up before Magistrate Judge Boyd
2 because it hadn't happened.
3     THE COURT: What couldn't have happened?
4     MS. WAYNE: Today's hearing.
5     THE COURT: No, that's something you shown
6 in Judge Boyd's hearing. You could have called a
7 witness and done everything you did.
8     MS. WAYNE: Okay. I just wanted to make
9 sure that -- I thought you were saying that I would
10 have known this would have happened.
11     THE COURT: No, you could have asked those
12 questions before Judge Boyd and made the same
13 demonstration.
14     Okay. Bring in the jury.
15     (Whereupon, the jury was escorted into the
16 courtroom.)
17     THE COURT: Be seated.
18     Proceed, Mr. Moorer.
19     MR. MOORER: Yes, sir.
20 Q Agent Gonzales, we were talking about, when we
21 last broke, about the execution of the search warrant
22 at Patrick Denton's house. And you had said -- you
23 had told the jury about him answering a phone call
24 from Mr. Carmichael. Do you recall that?
25 A Yes, sir, I do.

Page 153

1 Q Now during the break did you have occasion to
2 look at some phone records?
3 A Yes, sir, I did.
4 Q And did that refresh your recollection as to the
5 sequence of events surrounding when Mr. Denton
6 received the phone call?
7 A Yes, sir, I did.
8 Q And what was that sequence of events?
9 A Mr. Denton received a phone call from an
10 individual with the name "Leon" on the phone. He did
11 not answer the phone call. Immediately afterwards he
12 returned the phone call.
13 Q So he called back the person who had called him?
14 A Yes, sir.
15 Q Now I believe you said a few minutes ago also
16 that when you and the other agents were questioning
17 Mr. Denton about Freddie, that he said he did not know
18 Mr. Williams's last name?
19 A Yes, sir, that's exactly what I said.
20 Q And did he later on learn the last name of Mr.
21 Williams to be Freddie Williams?
22 A Yes, sir. At the time he did not know Freddie's
23 last name was Williams.
24 Q Now did you and the other agents subsequently
25 then prepare to execute a search warrant at Mr.

Page 154

1 Freddie Williams's house?
2 A Yes, sir, we did.
3 Q Now, did you play any role in executing the
4 search warrant at Mr. Williams's house?
5 A Yes, sir, I did.
6 Q And would you tell the jury what it was that you
7 did in connection with the execution of the search
8 warrant at Mr. Williams's house?
9 A Yes, sir. Myself and the team of agents, we had
10 gathered at a Lakeview Street or Lakeview Avenue,
11 which is near Nine forty-nine Ridgecrest. And as I
12 had testified before, we were waiting for Agent DeJohn
13 to give me the go ahead. When Agent DeJohn advised us
14 that Mr. Denton want us to go ahead and enter the
15 residence at Nine forty-nine Ridgecrest, we moved
16 forward.
17     We went not Nine forty-nine Ridgecrest and
18 we secured the residence. Myself and Agent Halasz
19 went to the rear of the residence to secure it and
20 make sure there was nobody coming out of the
21 residence. We secured the residence, I think it was
22 around ten-twenty or ten-forty in the morning and
23 waited until we got the search warrant.
24 Q And as you say you waited for a search warrant to
25 be issued for the house. Where were you waiting?

Page 155

1 A Myself, I was in and out of the residence. I
2 went not residence just to make sure that there was
3 nobody searching anything, make sure there was nobody
4 else besides Mr. Denton in the house. We took Mr.
5 Denton out of the residence and then I came out of the
6 residence.
7 Q And where did you go after you came out of the
8 residence?
9 A We had gotten information from Mr. Denton that
10 while he was in the residence with Mr. Williams, Mr.
11 Williams had received a phone call that Mr. Williams'
12 wife, I believe it was, or it may have been his mother
13 was in the hospital sick and was possibly dying. So
14 Mr. Williams left the residence. We had put out a
15 lookout for Mr. Williams' vehicle, which was a small
16 truck. I don't remember the exact description.
17     I went out to Agent Larry Hubbard's vehicle,
18 which was a brown Tahoe parked in front of Nine
19 forty-nine Ridgecrest, sat in the vehicle to talk on
20 the radio to the other agents to see when -- found the
21 vehicle of Mr. Williams', and also we had put out a
22 lookout on the black Honda driven by Leon Carmichael.
23 So I was coordinating the surveillance of the two
24 vehicles.
25 Q And what, if anything -- Well, before I go

Page 156

1 further, I'm showing to you what's been previously
2 introduced as government's exhibit 7(d) as in Delta.
3 Can you see from where you sit?
4 A Yes, sir.
5 Q And is this the location where you and other
6 officers had searched that you described as Mr.
7 Williams's house?
8 A Yes, sir. That's Nine forty-nine Ridgecrest.
9 Q And if you can, using this 7(d), tell us where
10 you would have been in relation to the house.
11 A If I'm not mistaken the driveway goes right up
12 into the mailbox, and the brown Tahoe that I was
13 sitting in was parked right in front of the mailbox.
14 I was facing, I'm not sure if that's east, but I was
15 facing that way.
16 Q Okay. Toward the left of the photograph?
17 A Yes, sir.
18 Q I'm sorry, to your right as you face it?
19 A Yes, sir.
20 Q And what, if anything, happened as you were
21 sitting there?
22 A When I was sitting there in front of the
23 residence talking on the radio, I noticed a black
24 Honda with a black male driving approaching the
25 residence. I immediately recognized the driver to be

Page 157

1 Leon Carmichael.
2 Q If you would, hold on for just one moment. I'm
3 showing to you what has been previously marked for
4 identification as government's exhibit 7(k) as in
5 kilo. Can you see government's exhibit 7(k) from
6 where you sit?
7 A Yes, sir.
8 Q And what is government's 7(k)?
9 A That's a black Honda driven by Mr. Carmichael.
10 Q And does this photograph accurately depict the
11 car that you saw on that particular day as you were
12 sitting in front of Mr. Williams's residence?
13 A Yes, sir, it does.
14     MR. MOORER: I offer government's exhibit
15 7(k), Your Honor.
16     THE COURT: Admitted.
17     MS. JAMES: Objection, Your Honor. There is
18 no foundation that it's Mr. Carmichael's car.
19     THE COURT: How do you know? Do we have any
20 evidence?
21 Q How do you know this is a photograph of Mr.
22 Carmichael's car?
23 A I believe we have a tag --
24     MS. JAMES: Object to what she believes.
25 And it's based on hearsay, in addition, Your Honor.

Page 158

1  A  This vehicle was seized from Mr. Carmichael when
2  we arrested Mr. Carmichael.  We had the tag
3  registration of the vehicle.
4       THE COURT:  Did you see him driving it?
5       THE WITNESS:  Yes, sir, I did.
6       THE COURT:  Go ahead.
7       MR. MOORER:  Your Honor, therefore I offer
8  it since she saw him driving it.
9       THE COURT:  It's admitted.
10  Q  Now, you say it was being driven by the
11  defendant, Leon Carmichael?
12  A  Yes, sir.
13  Q  Is Mr. Carmichael in the courtroom today?
14  A  Yes, sir he is.
15  Q  Would you point him out and drive him for us,
16  please?
17  A  He's the black gentleman at the defense table.
18  He's wearing a black suit with a white shirt and a
19  multicolored tie.
20       MR. MOORER:  For the record, she's
21  identified the defendant, Leon Carmichael.
22  Q  Now, when you saw Defendant Carmichael traveling
23  in the black Honda, in which direction was he going in
24  relation to you where you were seated, the direction
25  you were facing?

Page 159

1  A  He was coming towards me, the opposite direction.
2  Q  And what, if anything, was he doing as he came
3  towards where you were in your other agent's car?
4  A  Mr. Carmichael approached me.  He was initially
5  looking at the residence.  He was facing towards the
6  residence.  He then turned towards me and we made eye
7  contact.  When we made eye contact he immediately sped
8  up and went past me.
9  Q  Now would you describe the scene as Mr.
10  Carmichael drove up.  Were there other agents around
11  and about?
12  A  Yes, sir, there was a police officer next to me.
13  And we are in raid gear.  I have on a raid D. E. A.
14  jacket with a police vest.  The police officer who was
15  sitting next to me has on police attire or a police
16  jacket that is clearly marked as "Police".  There are
17  other agents, I couldn't testify to how many were
18  outside of the residence, but there were other
19  officers outside of the residence.
20  Q  Was it obvious from where you sat that there was
21  a police presence there around the area where you were
22  searching --
23  A  Yes, sir.
24  Q  -- that would have been visible to persons
25  passing by on the street driving or walking?

Page 160

1  A  Yes, sir.
2  Q  And you say you made contact with Mr. Carmichael
3  and then he sped away?
4  A  Yes, sir he did.
5  Q  And what, if anything, happened next as he sped
6  away?
7  A  When he went past me I immediately got in the
8  car, or put the car in drive, and I turned around in
9  the driveway at Ridgecrest and I tried to follow him.
10  We went down Ridgecrest and he turned right onto Rosa
11  Parks.  I turned right onto Rosa Parks and I lost him.
12  During this time I was making contact on the radio or
13  the cell phone during the direct connect with Agent
14  Tom Halasz and Agent Phil Sanders which was another
15  agent that was out there who had been looking for Mr.
16  Carmichael and also Mr. Williams.
17       I advised them of my location on Ridgecrest,
18  that I was in pursuit of or following Mr. Carmichael
19  down Ridgecrest.  I had taken a right on Rosa Parks.
20  I was not familiar with the area that well, so I
21  advised Agent Halasz where I was and then I lost Mr.
22  Carmichael.
23  Q  Now, after you lost sight of Mr. Carmichael that
24  particular day, did you have occasion to make contact
25  with him again on that day?

Page 161

1  A  Yes, sir.  After I lost Mr. Carmichael, I
2  returned to Nine forty-nine Ridgecrest.  Possibly ten
3  minutes, somewhere between five and ten minutes later
4  Agent Halasz called me on the radio and advised me
5  that Mr. Halasz (sic.) had been stopped on the
6  Southern Boulevard and they wanted me to come up to
7  the location.
8       I drove up to the Southern Boulevard where
9  Mr. Carmichael was, and I identified Mr. Carmichael as
10  being the same individual that had driven by Nine
11  forty-nine Ridgecrest.
12  Q  When you got to the scene where Mr. Carmichael
13  was where, if at all, was the black Honda?
14  A  The black Honda was at the location on Southern
15  Boulevard.
16  Q  Where Mr. Carmichael was?
17  A  Yes, sir.
18  Q  And did you take custody of the black Honda?
19  A  Yes, sir.  I drove the black Honda to the D. E.
20  A office here in Montgomery.
21  Q  And did you and other agents conduct any search
22  of the Honda?
23  A  Yes, sir.  I searched the Honda back at the D. E.
24  A office myself, and our National Guard officer
25  that's assigned to the D. E. A. office took pictures

Page 162

1 of all the evidence, took pictures of the vehicle,
2 took pictures of all the weapons that were in the
3 vehicle, all the currency that was in the vehicle, and
4 took possession of all the evidence that was in the
5 vehicle.
6 Q  Now, I'm going to show to you what I'm showing to
7 defense counsel and had marked as government's exhibit
8 7(l) as in Lima.  And can you see government's exhibit
9 7(l) from where you're seated?
10 A  Yes, sir, I can.
11 Q  And what is government's exhibit 7(l)?
12 A  That is the rear end of the Honda Accord.
13 Q  The one that you saw Mr. Carmichael driving?
14 A  Yes, sir.
15     MR. MOORER:  Your Honor, I offer
16 government's exhibit 7(l).
17     THE COURT:  Admitted.
18 Q  Now I'm going to show to you what I'm now showing
19 to defense counsel and have previously marked as
20 government's exhibit 7(m) as in Mike.  Can you see
21 government's exhibit 7(m) from where you are seated?
22 A  Could I have it a little bit closer?
23     MR. MOORER:  Sure.
24     If I may approach, Your Honor?
25     THE COURT:  Yes.

Page 163

1 Q  What is government's exhibit 7(m)?
2 A  It's the picture that depicts the front seat of
3 Mr. Carmichael's Honda Accord.  It contains a Nokia
4 cell phone and a Taurus forty caliber pistol.
5 Q  Does government's exhibit 7(m) fairly and
6 accurately depict the interior of the Honda as it
7 existed on the day that you and the other agents took
8 Mr. Carmichael into custody?
9 A  Yes, sir, it does.
10     MR. MOORER:  Your Honor, I offer
11 government's exhibit 7(m) and request permission to
12 publish it to the jury.
13     THE COURT:  Admitted, and you may do so.
14     MR. MOORER:  If I may approach the witness
15 closer so that she can see certain other exhibits,
16 Your Honor.
17     THE COURT:  Yes.
18 Q  Agent Gonzales, I'm showing to you government's
19 exhibit 7(n) as in November.  Can you see what
20 government's exhibit 7(n) is?
21 A  Yes, I can.
22 Q  And what is government's exhibit 7(n)?
23 A  This is Mr. Carmichael's briefcase that was
24 located in the back seat of the Honda Accord.  It
25 contains a briefcase with an AmSouth Bank bag, which

Page 164

1 contained five thousand dollars in U. S. currency and
2 other miscellaneous documents.
3 Q  Does government's exhibit 7(n) fairly and
4 accurately depict the back seat of the interior of the
5 accord that the defendant, Mr. Carmichael, was driving
6 that day?
7 A  Yes, it does.
8     MR. MOORER:  Your Honor, I offer
9 government's exhibit 7(n).
10     THE COURT:  Admitted.
11     MR. MOORER:  And request permission to
12 publish it.
13     THE COURT:  Very good.
14 Q  You say the bank bag contains approximately five
15 thousand dollars?
16 A  Yes, sir.
17 Q  Now I'm going to show to you what's been
18 previously marked as government's exhibit 7(o) as in
19 Oscar.  Can you see it from where you sit?
20 A  Yes, sir.
21 Q  Can you identify what is shown in government's
22 exhibit 7(o)?
23 A  Yes, sir.  It's the trunk of the Honda Accord.
24 It contains a Beretta shotgun, a Sprinfield forty-five
25 caliber pistol and a Colt Commander forty-five caliber

Page 165

1 pistol and some ammunition for the weapon.
2 Q  Does government's exhibit 7(o) fairly and
3 accurately depict the contents of the trunk of the car
4 that Mr. Carmichael was driving on that day?
5 A  Yes, it does.
6     MR. MOORER:  Your Honor, I offer
7 government's exhibit 7(o).
8     THE COURT:  Admitted.
9     MR. MOORER:  And request permission to
10 publish it.
11     THE COURT:  You may.
12 Q  And I'm showing to you government's exhibit 7(p).
13 Can you see government's exhibit 7(p) as in Papa from
14 where you're seated?
15 A  Yes, I can.
16 Q  And what is government's exhibit 7(p)?
17 A  Again, that is the Beretta shotgun, I believe
18 that's a Colt Commander the forty-five caliber pistol,
19 and the ammunition for the pistols.
20 Q  Does government's exhibit 7(p) fairly and
21 accurately depict the items that were in the trunk of
22 the car that Defendant Carmichael was driving that
23 day?
24 A  Yes, it does.
25     MR. MOORER:  Your Honor, I would offer

Multi-Page™

Page 166

1  government's exhibit 7(p).
2       THE COURT: Admitted.
3       MR. MOORER: And request permission to
4  publish it, Your Honor.
5       THE COURT: You may do so.
6  Q  Now the items that are shown in the photographs
7  that we've just introduced --
8       MR. MOORER: If I may approach the witness
9  over here, Your Honor?
10      THE COURT: Yes.
11 Q  Are the actual items that were shown in those
12 photographs present here?
13 A  Yes, sir, they are.
14 Q  Specifically --
15      MS. JAMES: Objection, Your Honor, this is
16 cumulative. They're already in the photographs.
17      MR. MOORER: Your Honor, I think the jury is
18 entitled to see the actual evidence.
19      MS. JAMES: In addition, 403, Your Honor.
20      THE COURT: The objection is overruled.
21 Q  What is government's exhibit 22(d) as in Delta?
22 A  This is the Beretta shotgun.
23 Q  Is it in the same or substantially similar
24 condition as when you encountered it in the trunk of
25 the car?

Page 167

1  A  Yes, sir, it is.
2       MR. MOORER: Your Honor, I offer 22(d) as in
3  delta.
4       THE COURT: Admitted.
5  Q  And I also have what has been marked as
6  government's exhibit 22(b) as in bravo. What is
7  government's exhibit 22(b)?
8  A  This is the Springfield Armory V Ten.
9  Q  Is government's exhibit 2(b) as in bravo in the
10 same or substantially similar condition as it was when
11 you encountered it in this car?
12 A  Yes, it is.
13      MR. MOORER: I offer government's exhibit
14 22(b) as in bravo.
15      THE COURT: Admitted.
16 Q  And I have before me government's exhibit 23.
17 Can you identify government's exhibit 23(b)?
18 A  Yes, sir. That's ammunition for, I'm sure, for
19 all the weapons. I'd have to look at each
20 individually to tell for exactly each weapon.
21 Q  And were these, the items within the trunk -- or
22 not trunk but the car that was driven by Mr.
23 Carmichael on the day that you testified to earlier?
24 A  Yes, sir, it was.
25 Q  And they're in substantially the same or similar

Page 168

1  condition as when you encountered them?
2  A  Yes, sir.
3       MR. MOORER: I offer government's exhibit
4  23, Your Honor.
5       MR. FEAGA: Your Honor, may I approach
6  Mr. Moorer for just one second?
7       THE COURT: Yes.
8       (Whereupon, Mr. Feaga conferred with Mr.
9  Moorer off the record and out of the hearing of the
10 other courtroom participants.)
11      THE COURT: You can say that out loud. You
12 said you couldn't hear them?
13      MR. FEAGA: Yes, sir.
14      THE COURT: I heard you say it.
15      (Laughter.)
16 Q  I just handed you government's exhibit 22(c) as
17 in Charlie.
18 A  This is a Colt forty-five automatic.
19 Q  And was this found within the car that Mr.
20 Carmichael was driving on that day?
21 A  Yes, it was.
22 Q  And is government's exhibit 22(c) in the same or
23 substantially similar condition as when you found it?
24 A  Yes, it was.
25      MR. MOORER: I offer government's exhibit

Page 169

1  22(c), Your Honor.
2       THE COURT: Admitted.
3  Q  And finally I have government's exhibit 22(a) as
4  in apple. What is government's exhibit 22(a)?
5  A  This is the Taurus forty caliber weapon.
6  Q  And did you find that also in the car that was
7  driven by Defendant Carmichael on the day that you had
8  been describing?
9  A  Yes, I did.
10 Q  And is government's exhibit 22(a) in the same or
11 substantially similar condition as when you found it?
12 A  Yes, it is.
13      MR. MOORER: I offer government's exhibit
14 22(a), Your Honor.
15      THE COURT: Admitted.
16      MR. MOORER: And, Your Honor, I would ask to
17 publish these items briefly to the jury.
18      THE COURT: Yes, you may do so.
19      Mr. Moorer, you may pick them up.
20      MR. MOORER: Thank you, Your Honor.
21      THE COURT: You want to get the gun there,
22 too. You don't want to leave it there.
23      MR. MOORER: Yes, sir.
24 Q  Agent Gonzales, you said earlier that when you
25 talked to Patrick Denton at first, that he did not

Multi-Page™

Page 170

1 know Defendant Williams's last name.
2 A Yes, sir, that's correct.
3 Q Is it unusual for you when you are investigating
4 drug people -- people involved in drug trafficking,
5 that an individual might not know the full name of an
6 individual that they have dealt with?
7 A No, that is not unusual.
8    MS. JAMES: Objection, Your Honor.
9    THE COURT: Sustained.
10    MS. JAMES: And move to strike the question.
11    THE COURT: The question is struck. The
12 jury should not consider the answer.
13    MR. MOORER: Yes, Your Honor.
14    If I may have just a moment, Your Honor.
15    (Whereupon, Mr. Moorer conferred with Mr.
16 Feaga off the record and outside the hearing of the
17 other courtroom participants.)
18    MR. MOORER: I have no further questions,
19 Your Honor.
20    MS. JAMES: Judge, may I consult with
21 co-counsel before I begin my cross examination?
22    THE COURT: Yes.
23    (Whereupon, Ms. James conferred with Ms.
24 Wayne, Mr. Brunson and Ms. Chartoff off the record and
25 outside the hearing of the other participants.)

Page 171

1    MS. JAMES: Judge, we have a matter that we
2 need to take up with the Court before we begin.
3    THE COURT: Certainly. I'll have to excuse
4 the jury for a moment.
5    (Whereupon, the jury was escorted out of the
6 courtroom, and the following colloquy ensued:)
7    MS. JAMES: Judge, because of the matter I
8 wanted to bring up, could we take it up at the side
9 bar with the government lawyers? If you'll let me
10 approach.
11    THE COURT: Okay, come up.
12    (Whereupon, an off-the-record bench
13 conference was held between all counsel and the
14 Court.)
15    THE COURT: We'll take this up in the back.
16    (Whereupon, a recess was taken.)
17    IN-CHAMBERS CONFERENCE:
18    THE COURT: Yes?
19    MS. JAMES: Your Honor, the matter that I
20 approached the Court on at the bench that I wanted to
21 take up outside the open courtroom deals with the
22 actual arrest of Mr. Carmichael which occurred on
23 November 17th of 2003. Agent Gonzales' testimony gave
24 the sequence of events in terms of how he was seen
25 passing the residence, and how he was stopped and

Page 172

1 she's gone through the evidence that was found. The
2 uncontroverted facts will be that Mr. Carmichael was
3 arrested, and under the belief that he was a felon in
4 possession of a firearm, which would have been a
5 federal crime. At the time of his stop he indicated
6 to the officers that that was his gun and that he had
7 a permit for the gun and he had been pardoned. He was
8 still arrested and taken to jail.
9    THE COURT: Now also the reason he was a
10 felon was because of an earlier murder conviction.
11    MS. JAMES: Murder conviction. Right. And
12 that is the matter, while it has been reported in the
13 paper before, it's not been reported this week. And
14 my concern is if the media hears us talking about it,
15 I think we have the potential for further problems
16 with regard to the taint and extrinsic evidence
17 possibly coming before the jury. That's why I didn't
18 want to make it in the open courtroom, The fact that
19 he had been previously convicted of murder.
20    What I would propose to do, because it gives
21 the appearance the way the testimony went was that he
22 had been seen passing and that he was in fact being
23 sought in conjunction with what went on at Freddie's
24 house. Now candidly, I mean I think that's probably
25 what they thought, but that's not what they charged

Page 173

1 him with. They didn't say we're taking you in for
2 conspiracy or whatever, they just simply charged him
3 with that. It wasn't until two days later that they
4 went to the grand jury and got the indictment on the
5 first indictment for conspiracy.
6    THE COURT: And the charge --
7    MS. MORRIS: You mean the first indictment
8 for felon in possession.
9    MS. JAMES: There wasn't one.
10    THE COURT: I think that charge was dropped.
11    MS. JAMES: Right. It was dropped, and the
12 grand jury two days later --
13    THE COURT: What you want to do is to ask
14 the witness when you stopped him you arrested him for
15 something other than the charges that are before this
16 Court. And the charges for which you arrested him
17 were later dropped because they were found to be
18 unfounded.
19    MS. JAMES: Right. I don't want to open the
20 door. And my point is --
21    THE COURT: What's wrong with that?
22    MR. MOORER: Because, Your Honor, every
23 person that law enforcement encounters that has a
24 previous felony conviction is not arrested right then.
25 And I think it's important to show the reason why they

Multi-Page™

| Page 174 |
|---|
| 1 took his possession of a firearm at that moment to be |
| 2 quite serious and they arrested him on the thing that |
| 3 was, you know, the murder conviction.  It made it more |
| 4 urgent for them in their own minds to arrest him than |
| 5 it might be if somebody had maybe been previously |
| 6 convicted of, let's say a fraud offense, or some other |
| 7 felony. |
| 8        And, therefore, they took him into custody |
| 9 immediately because it was an obvious crime complete, |
| 10 based on what they saw right then, him having been |
| 11 convicted and the firearm. |
| 12        THE COURT:  Right. |
| 13        MR. MOORER: So I think it's important to |
| 14 show why they did what they did if they're going to go |
| 15 into the area of him being arrested at all. |
| 16        THE COURT:  Well I do think that it's |
| 17 important to clarify for the jury that he was arrested |
| 18 but not for the offenses charged here.  I think that |
| 19 should be clarified.  I absolutely see no reason to go |
| 20 into anything about him having been convicted of |
| 21 murder.  I see absolutely no reason to go into the |
| 22 charge of felon in possession, which was later |
| 23 dropped, because none of that was true.  He was not a |
| 24 felon in possession in fact, and to bring it out and |
| 25 then try to undo it just complicates the case. |

| Page 175 |
|---|
| 1        And I think the murder conviction is highly |
| 2 prejudicial, and the reason you want to get it in is |
| 3 just overly prejudicial and of no value, as far as I'm |
| 4 concerned.  So I think you can ask the questions the |
| 5 way I framed them.  So you can say he was made a |
| 6 charge that was later found to be unfounded, and the |
| 7 charge was dropped, but he was not arrested for any of |
| 8 the charges in this case and that's it.  And you can |
| 9 tell the witness that's the way she's to respond. |
| 10        MS. JAMES: Okay, Judge, the defendant was |
| 11 arrested for a charge for which he's not on trial. |
| 12        THE COURT:  Yes. |
| 13        MS. JAMES:  And that charge was later |
| 14 dropped. |
| 15        THE COURT:  Right.  And you can even say |
| 16 because it was unfounded. |
| 17        MS. JAMES:  And stop it there. |
| 18        THE COURT:  Right. |
| 19        MR. MOORER:  Your Honor, I think, then, we |
| 20 need to be able to at least say that because he had |
| 21 been pardoned after having been previously convicted |
| 22 of -- |
| 23        THE COURT:  No, I'm not going to get into |
| 24 that. |
| 25        Let's go out. |

| Page 176 |
|---|
| 1        MR. MOORER: Well, Your Honor, the inference |
| 2 for the jury is that they had absolutely no reason to |
| 3 make the arrest -- |
| 4        THE COURT:  As far as I'm concerned they |
| 5 didn't have a reason.  He was pardoned. |
| 6        Let's go back in. |
| 7        (Whereupon, the in-chambers conference was |
| 8 concluded.) |
| 9             IN OPEN COURT: |
| 10        MS. JAMES:  Okay, Judge, I think we've got |
| 11 it resolved. |
| 12        THE COURT:  Very good. |
| 13        Bring in the jury. |
| 14        (Whereupon, the jury was escorted into the |
| 15 courtroom.) |
| 16          CROSS EXAMINATION |
| 17        BY MS. JAMES OF SHERRY GONZALES: |
| 18        THE COURT:  Proceed, Miss James. |
| 19        MS. JAMES:  Thank you. |
| 20 Q  Agent Gonzales, I'm Susan James and I'm one of |
| 21 Mr. Carmichael's attorneys.  I have a couple of |
| 22 questions for you. |
| 23        On November the 17th of 2003 when Mr. |
| 24 Carmichael was arrested, he was not arrested for the |
| 25 offense for which he's charged or on trial in this |

| Page 177 |
|---|
| 1 case. |
| 2 A  No, ma'am. |
| 3 Q  And that particular charge was later dropped and |
| 4 it was established that it was unfounded, correct? |
| 5 A  Yes, ma'am. |
| 6 Q  Okay.  Now you described having been, I guess, |
| 7 located somewhere near the residence that's been |
| 8 identified as Freddie Williams' at Nine forty-nine |
| 9 Ridgecrest on November the 17th, is that correct, of |
| 10 2003? |
| 11 A  Yes, ma'am. |
| 12 Q  And you observed this vehicle that you identified |
| 13 Mr. Carmichael was driving actually pass by that |
| 14 residence, right? |
| 15 A  Yes, ma'am. |
| 16 Q  And you said that when the vehicle passed by and |
| 17 you said that the driver, I guess Mr. Carmichael, |
| 18 looked your way and you said it sped off, right? |
| 19 A  Yes, ma'am. |
| 20 Q  And at that point in time, it was your testimony |
| 21 that there were law enforcement swarming the area, |
| 22 correct? |
| 23 A  I don't believe I said swarming, but there were |
| 24 law enforcement agents there, yes. |
| 25 Q  Okay.  I mean, you said there were people -- well |

Page 178

1 they were identified and you could clearly see that
2 they were law enforcement.
3 A  Yes, ma'am.
4 Q  And there were a lot of them?
5 A  Yes, ma'am.
6 Q  Was that the only car to pass down the street
7 while this was going on?
8 A  That was the only car that passed while I was
9 sitting in the car on the radio, yes, ma'am.
10 Q  Okay.  And in terms of what the driver of the car
11 may have thought was going on, you wouldn't have any
12 way to know.
13 A  No, ma'am.
14 Q  Okay.  And you indicate that Agent Halasz
15 actually located the vehicle and stopped the car
16 on that day subsequent to your having seen the
17 vehicle, correct?
18 A  Yes, ma'am.
19 Q  And you know from your, I guess supervisory role
20 in this case, that when asked, Mr. Carmichael exited
21 the vehicle very promptly.
22 A  Yes, ma'am.
23 Q  And that with regard to the pistol that you've
24 identified that was found in the front of the vehicle,
25 that Mr. Carmichael indicated he had a permit for the

Page 179

1 pistol.
2 A  Yes, ma'am.
3 Q  Okay.  Now the other weapons that you've
4 identified that were found in this car were actually
5 located in the trunk, were they not?
6 A  Yes, ma'am.
7 Q  The other weapons and the ammunition, right?
8 A  Yes, ma'am.
9 Q  Now in your capacity with the Drug Enforcement
10 Administration, you have access to other government
11 agencies and information that they possess, correct?
12 A  Yes, ma'am.
13 Q  And one of those agencies would be the Alcohol,
14 Tobacco and Firearms section, right?
15 A  Yes, ma'am.
16 Q  And that's an agency, a federal agency that's
17 charged with the responsibility of trying to keep up
18 with ownership and transfers of weapons, right?
19 A  Yes, ma'am, it is.
20 Q  Now in this case what did you learn in terms of
21 the registration or ownership of these particular
22 weapons?
23 A  Miss Harris I did not --
24 Q  It's Miss James.
25 A  I'm sorry.

Page 180

1     I did not personally run these weapons.  I
2 believe Agent DeJohn did.  I cannot testify to what
3 that information is.
4 Q  Okay.  Well let me ask you, that brings up a good
5 point.  Now you are actually the supervising agent of
6 the Montgomery office, right?
7 A  Of Group Forty-one Task Force office, yes.
8 Q  And that would be -- is that just the agents here
9 in Montgomery, or is that I guess it's all the task
10 force around the counties?
11 A  Just the group here in Montgomery, yes, ma'am.
12 Q  And as a supervisor you try to keep up with
13 what's going on with the people that work for you.
14 A  Yes, ma'am, I do.
15 Q  But in this case you are not the case agent, but
16 you're still the supervisor, right?
17 A  Yes, ma'am, I am.
18 Q  And with regard to this case, you would be higher
19 in the chain of command than Agent DeJohn, correct?
20 A  Yes, ma'am, I would.
21 Q  And you just testified that when Agent DeJohn, if
22 he ran the checks, you're not sure, you think he maybe
23 did but you're not sure what he did in that regard,
24 right?
25 A  I know he ran the checks, Ms. James.  If you ask

Page 181

1 me today or showed me the checks, I could tell you.
2 If you asked me what my recollection is of the checks,
3 at this moment in time I cannot tell you what that
4 recollection is.
5 Q  Okay.  Well let me take it one step further.
6 When you send your agents out on assignment, let's say
7 you send out Agent DeJohn and you say I want you to go
8 to Greenville and set up surveillance at the -- I'm
9 trying to think of a place down there -- let's say the
10 Cracker Barrel, if you sent him out on that particular
11 assignment you wouldn't necessarily know what he did
12 between here and Greenville, would you, unless he was
13 radioing you and telling you every sign he saw and
14 every stop he made?
15 A  No, ma'am, I would not.
16 Q  Okay.  Now you talked about the search of Patrick
17 Denton's house at Eight oh eight Fleming.  That's an
18 address that you know as his address, right?
19 A  Yes, ma'am.
20 Q  And you referenced a particular search.  But the
21 search you're talking about is that actually the
22 search that occurred November 17th of 2003.
23 A  Yes, ma'am.
24 Q  You are also aware, are you not, that there was
25 another search of Patrick Denton's residence in June

Page 182

1  of 2002?
2  A  Yes, I'm aware that search.
3  Q  Were you the agent in charge back in 2002?
4  A  No, ma'am, I was not assigned to the Montgomery
5  office at that time.
6  Q  How long have you been assigned here?
7  A  I reported to the Montgomery office in October of
8  2003.
9  Q  Okay.  Well let me ask you this.  Even though you
10  were not involved, are you aware as a result of your
11  involvement in this case of certain items that were
12  found in his house during that 2002 search?
13  A  No, ma'am, I am not aware of that.
14  Q  Okay.  Well let me ask you this.  Are you
15  familiar with a form used by your agency referenced D.
16  E. A. Sixes?
17  A  Yes, ma'am, I am.
18  Q  And what is a D. E. A. Six, Agent Gonzales?
19  A  A D. E. A. Six is a report of an investigation
20  that we fill out when we do any type of activity.
21  Q  Okay.  And in those particular D. E. A. Sixes you
22  would -- if you have a subject of interest or an
23  incident that occurs, that's your way and your agents'
24  way, a way of memorializing what happened, correct?
25  A  Yes, ma'am, it is.

Page 183

1  Q  And that's for the benefit of you, the other
2  agents and other people who I guess have a need to
3  know, right?
4  A  Yes, ma'am.
5  Q  Not necessarily that's something available to the
6  public.
7  A  No, ma'am.
8  Q  But on those reports you attempt to index people
9  that have some involvement with the particular case if
10  you know that may be connected with the case, right?
11  And I'm saying other suspects, other targets?
12  A  Actually, the index section in a D. E. A. Six
13  refers to people that are mentioned in that particular
14  report.
15  Q  Okay.  So it's a way that you all can cross
16  reference and go back and kind of track what happens
17  in cases?
18  A  It's a way to -- Yes, ma'am.  If you refer to a
19  person in a report, it is a way to maintain the names
20  in a database so that we can go back at a later date
21  and keep up with those names, yes.
22  Q  All right.  Let me ask you this.  When you all go
23  in and you let's say make a seizure of drugs, money,
24  weapons that you think are involved with some illicit
25  drug activity, you frequently photograph it, don't

Page 184

1  you?
2  A  Yes, ma'am, we should.
3  Q  And you do that particularly with the money,
4  because normally when you all seize the money you
5  actually turn it in and you don't maintain the money,
6  y'all just don't stack it up over at your office, do
7  you?
8  A  No, ma'am, we do not.
9  Q  It's important that when you're going to have the
10  money involved in one of your seizures, that you
11  photograph it just for proof and also for purposes of
12  court hearings later, right?
13  A  Yes, ma'am.
14  Q  And y'all have done some of that in this case,
15  correct?
16  A  Done some of what?
17  Q  Photographed money and guns and different things
18  that you think are related to this case.
19  A  We've taken photographs of the pertinent
20  evidence, yes, ma'am.
21  Q  And that's important.
22  A  Yes, ma'am.
23  Q  And it's important to maintain that evidence in
24  the event that these isolated events all connect up
25  together for a case such as this.

Page 185

1  A  Yes, ma'am.
2  Q  Now the cash that you found in the vehicle in
3  which Mr. Carmichael was traveling, you said there was
4  five thousand dollars in a bank bag, correct?
5  A  Yes, ma'am.  I believe the amount was five
6  thousand dollars.
7  Q  It was contained within an AmSouth Bank bag,
8  correct?
9  A  Right, yes, ma'am.
10  Q  And you know through the course of your
11  investigation in this case and your supervision of
12  these various agents, that Mr. Carmichael had bank
13  accounts with AmSouth Bank, correct?
14  A  Yes, ma'am.
15  Q  And let me take you back to November the 13th of
16  2003.  That was when your agency became aware of or
17  interviewed Gary Wayne George.
18  A  Yes, ma'am.
19  Q  And subsequent to that interview in Prattville in
20  Autauga County with Mr. George, you or your agents
21  began this investigation that culminated in the search
22  and seizure of Freddie Williams' house on November the
23  17th of 2003, correct?
24  A  Can you repeat that?
25  Q  Yeah.  This investigation, I mean there was a

Page 186

1 series of events right there within three or four
2 days, right, when Gary George began cooperating and
3 when the evidence was seized at Mr. Williams'?
4 A  Yes.
5 Q  And I'm assuming you being the supervisor and
6 what you testified here today about your involvement,
7 that you were obviously being contacted and involved
8 in all of the goings on, right?
9 A  Yes, ma'am.
10 Q  And you've indicated here that y'all had planning
11 sessions and different things about certain things you
12 were going to do, right?
13 A  Yes, ma'am.
14 Q  That's not unusual.  In fact, that's pretty
15 customary in your line of work, isn't it?
16 A  Yes, ma'am.
17 Q  But now certainly after you all had spoken, and I
18 don't mean you personally because I know you have
19 other people working, but after Mr. DeJohn or Agent
20 DeJohn interviewed Mr. George, you all had reason to
21 believe that a fairly large shipment of marijuana was
22 going to be coming into this area, right?
23 A  Yes, ma'am.
24 Q  And certainly it was your goal if you could do
25 anything to intercept that, that you would, right?  I

Page 187

1 mean, you wanted to seize the drugs if they came in.
2 A  Yes, ma'am.
3 Q  And in this particular case --
4      THE COURT:  Could I interrupt you just a
5 minute, Mr. James?
6      MS. JAMES:  Yes, sir.
7      THE COURT:  I have to excuse the jury for
8 just a moment.
9      (Whereupon, the jury was escorted out of the
10 courtroom, and the following colloquy ensued.)
11      THE COURT:  Miss James and Mr. Moorer, could
12 I see you for just a second?
13      (Whereupon, an off-the-record bench
14 conference was held between Mr. Moorer, Ms. James and
15 the Court.)
16      THE COURT:  We'll take a recess for just a
17 moment.  Ms. James, let Mr. Teague know what we talked
18 about.
19      (Whereupon, a recess was taken.)
20      THE COURT:  Miss Carnes, we're missing
21 lawyers now.  We have to be more attentive, counsel.
22 Where is Mr. Teague and his client and Mr. Carmichael?
23      MS. JAMES:  They're down in the bathroom,
24 Your Honor.
25      THE COURT:  Members of the jury, we'll have

Page 188

1 Ms. Carnes find them.
2      (Whereupon, said individuals entered the
3 courtroom.)
4 Q  Now, Agent Gonzales, when we took the break I was
5 asking you about these several days from November the
6 13th to November the 17th between the time you spoke
7 with Gary George and the time that you all seized the
8 marijuana at Nine forty-nine Ridgecrest.
9 A  Yes, ma'am.
10 Q  During that period of time you all were very
11 interested in locating the drugs that Mr. George had
12 predicted would be coming to Montgomery, correct?
13 A  Yes, ma'am.
14 Q  And that happened, I think, on the 13th and the
15 early morning of November the 17th of 2003 that you
16 all actually got Mr. Denton to cooperate, correct?
17 A  On the 17th, yes, ma'am.
18 Q  And between that time period you all were
19 communicating, and I'm talking generally about you and
20 your agents, were communicating with Mr. George and he
21 was kind of giving you all updates about information
22 he was receiving from Mr. Denton, wasn't he?
23 A  Yes, ma'am.
24 Q  Including the incident involving Miss Hensarling
25 on the way up to Huntsville, right?

Page 189

1 A  Yes, ma'am.
2 Q  Okay.  So you all had reason to believe that this
3 controlled substance was coming into town from
4 somewhere else, right?  I mean, you didn't think it
5 was already here in Montgomery.
6 A  No, ma'am, we knew there was going to be
7 marijuana in town.  We just did not know the exact
8 date.  My recollection is that we did not have the
9 specific information.
10 Q  Okay.  But at that time based on the testimony
11 that we've been hearing here, Mr. George had said
12 something about Leon Carmichael, and Mr. Denton had
13 said something about Leon Carmichael at least by the
14 early morning of November 17th, right?
15 A  Yes, ma'am.
16 Q  So you all knew where Mr. Carmichael's Center was
17 located, right?
18 A  Yes, ma'am.
19 Q  And you also knew where his truck lot was, right?
20 A  Yes, ma'am.
21 Q  And I'm sure that you all had surveillance on
22 both of those places during the course of these four
23 days.
24 A  Off and on, yes, ma'am.
25 Q  Because you were interested to see if Mr.

**Multi-Page™**

Page 190

1 Carmichael's trucks were going to be used in any of
2 this endeavor.
3 A  We were interested in different aspects of the
4 case, yes.
5 Q  But certainly if drugs were coming in on a truck
6 that belonged to Mr. Carmichael, you all would have
7 wanted to intercept that truck.
8 A  Absolutely.
9 Q  And you were also, over the course of those few
10 days even before you made contact with Mr. Denton, you
11 were concerned with Mr. Carmichael's activities and
12 Mr. Denton's activities, would that be a fair
13 statement?
14 A  Yes, ma'am.
15 Q  And do you know which specific agent you had
16 watching the Center?
17 A  No, I do not.  Agent DeJohn was the case agent.
18 He had other agents working with him.  I cannot recall
19 what agent did what specific activity.
20 Q  Okay.  And I guess that would be the same answer
21 with regard to what agent was watching the truck lot.
22 A  Yes, ma'am, it would.
23 Q  Okay.  Now when Mr. Denton -- You all executed
24 the search at his house.  You didn't find any guns,
25 did you?

Page 191

1 A  No, ma'am.
2 Q  You didn't find any scales?
3 A  No, ma'am.
4 Q  Didn't find any drugs?
5 A  No, ma'am.
6 Q  Didn't find any money?
7 A  No, ma'am.
8 Q  But you do know now based on Mr. Denton's
9 cooperation and Mr. George's cooperation, that Mr.
10 Denton had knowledge that Miss Hensarling had been
11 arrested a couple of days earlier.
12 A  Yes, ma'am.
13 Q  And so you would agree with me certainly that
14 someone in your business is in possession of
15 contraband and they know the cops are coming, it's not
16 unusual that they would try to dispose of something
17 that would be illegal or support a case that you might
18 make.
19 A  No, it is not unusual.
20 Q  Okay.  Now you indicated that you all had no idea
21 when you went to serve your warrant on Mr. Denton of
22 the search warrant that he would cooperate, right?
23 A  Can you repeat that question?
24 Q  You didn't know when you went out there, I
25 thought you said, maybe it was the agent before you,

Page 192

1 but that y'all didn't know that he was going to --
2 that Mr. Carmichael was going to come by or call.
3 A  No, ma'am, we did not know that.
4 Q  But you all did know that in this investigation,
5 or any other investigation, it's possible that
6 anything could happen, right?
7 A  Anything is possible, ma'am.
8 Q  And that's why y'all take your cameras, right?
9 A  Yes, ma'am.
10 Q  To pick up evidence you want to photograph.
11 That's why you take your recorders, right?
12 A  Yes, ma'am.
13 Q  And it's always important in your line of work
14 when you can, you said, wire somebody up, that's
15 pretty important when you can actually get the
16 conversations of two people doing something illegal.
17 A  Yes, ma'am.
18 Q  If it's part of your investigation, right?
19 A  Yes, ma'am.
20 Q  And in this case Mr. Denton, you all did go to
21 the extent of wiring Mr. Denton on the morning of
22 November the 17th so that he would have a camera and
23 an audio recording device so that you all could
24 capture what he was seeing, what he was doing and the
25 conversations that were occurring.

Page 193

1 A  Yes, ma'am.
2 Q  And it's always when you're looking -- If you've
3 got someone who is cooperating and you're looking to
4 gain incriminating information on someone that they're
5 talking to, certainly you want them to try to generate
6 some sort of conversation that would produce something
7 incriminating if it were possible, right?
8 A  Yes, ma'am.
9 Q  And that's kind of the goal, right?
10 A  Yes, ma'am.
11 Q  All right.  And when you do your planning as the
12 supervisor and you get your agents in and you all say
13 we're going to go to Nine forty-nine Ridgecrest and
14 we're going to set up surveillance here, this is going
15 to be the entry team, I mean all of these things, and
16 I may not be using the terminology, but all of these
17 things are things that you all consider before you
18 actually go out and execute a warrant, correct?
19 A  Yes, ma'am.
20 Q  And do you that because you want to make sure
21 everything is handled right, and everybody is safe,
22 and that you get what you're going for, actually.  I
23 mean you want to be able to do things the right way.
24 A  Yes, ma'am.
25 Q  But the timing of that, that's something in some

Page 194

1 cases that you can control. And when I say timing of
2 it, I mean if it's like we're going to go out there
3 and we're going to be there at eight o'clock in the
4 morning, I mean you could say well, we're going at
5 nine o'clock or we're going to go at seven-thirty. I
6 mean you have, and I know not always, but sometimes
7 you have the opportunity to actually dictate, you
8 either as the supervisor or the case agent, when
9 you're going to go and actually execute a warrant.
10 A  Yes, ma'am.
11 Q  Now if you all were surveiling, and you
12 say you were surveiling Mr. Carmichael's Center and
13 the truck lot and these various things during the
14 course of these several days, surely you learned in
15 the course of your surveillance, and I'm speaking
16 generally of you and your people, that there was a
17 concert at the Carmichael Center on the 16th which
18 would have been the evening before the wee hours of
19 the morning when Mr. Carmichael stopped by to speak to
20 Mr. Denton.
21 A  Miss James, I don't recall that information.
22 Q  You don't?
23 A  Yes, ma'am, I don't know that.
24 Q  All right. Do you know that concerts are
25 conducted at the Carmichael Center?

Page 195

1 A  Yes, I am aware of that.
2 Q  And do you know, and I'm sure you've probably
3 heard adds on the radio about different events that
4 are going to be at the Carmichael Center? Did you
5 ever hear those?
6 A  Yes, ma'am, I've heard them.
7 Q  Okay. And you may or may not know this, but for
8 concerts, probably including the Carmichael Center,
9 you put people to buy tickets to go, would you agree
10 with that?
11 A  Yes, ma'am.
12 Q  Okay. And you probably don't have any personal
13 knowledge as to how much a ticket would cost for a
14 particular concert, but probably based on your years
15 in law enforcement you may know that, but if you do
16 know, concerts, let's say -- let me think who might
17 come -- let's say George Straight or somebody like
18 that, people go up to the window and buy tickets for
19 cash amounts, don't they, typically? Would you know
20 that?
21 A  Yes, ma'am.
22 Q  You've probably bought some yourself for
23 concerts, right?
24 A  Yes, ma'am.
25 Q  I mean, some people do it on credit cards, but a

Page 196

1 lot of times people just go up to the window like you
2 do for the fair or like you do for the circus,
3 Biscuits ball games, you go up and pay at the window
4 with cash, would you agree?
5 A  Yes, ma'am.
6 Q  And so a business that's generating a number of
7 concerts and things of that nature might have occasion
8 to take in a good bit of small cash. Tickets, fifteen
9 dollars; tickets, twenty-five dollars. If you're
10 selling tickets for concerts at cash. Do you agree?
11 A  Yes, ma'am.
12 Q  Okay. And it wouldn't be hard for someone --
13 Well, I'm not even going to go there. Let me withdraw
14 that.
15      Now you've talked about Mr. Carmichael
16 passing by the residence where the search was ongoing.
17 He was actually driving down a public street, wasn't
18 he?
19 A  Yes, ma'am, he was.
20 Q  And you've learned during the course of your
21 investigation subsequent to November the 13th --
22 excuse me, November 17th of 2003 that Mr. Carmichael
23 in fact owns a house down the street from Mr.
24 Williams' house.
25 A  Yes, ma'am, I believe he does.

Page 197

1 Q  And given the fact of where you were positioned,
2 you don't know if Mr. Carmichael, I mean you may have
3 an opinion but you don't know for sure whether he was
4 going or coming from that house.
5 A  No, I do not.
6 Q  And with regard to the telephone, cell phones,
7 Mr. Moorer asked you, he said can you explain -- Cell
8 phones are important to your business, right?
9 A  Yes, ma'am.
10 Q  Because you can get a phone, you can check the
11 numbers and it helps you kind of catalog who their
12 people are that they're talking to, or at least the
13 phone going from one number to another, right?
14 A  Yes, ma'am.
15 Q  And when you find these phones and you find
16 numbers and you look at phone records and it says
17 phone A called phone B, all that really tells you is
18 people are communicating, doesn't it, unless you're
19 listening into a call?
20 A  Yes, ma'am.
21 Q  In other words, just the fact that one number
22 called another number, and if they call them ten times
23 a day or a hundred times a day, that in and of itself
24 doesn't mean that the conversations deal with
25 something illegal, does it?

Page 198

1  A  No, ma'am, it does not.
2  Q  In fact, you in your business, have a way to
3  really know what people are saying.  I mean there's a
4  way that if you really want to know what people are
5  saying, that you could, through your agency, petition
6  the U. S. Attorney's Office to petition the Court to
7  get a wiretap.  That is a possibility in your
8  business, isn't it?
9  A  Yes, ma'am.
10  Q  And that would be, and I understand there are
11  special conditions for that, but that would be a
12  situation if you all had a wiretap that you could
13  actually listen in to certain conversations that were
14  coming into a particular phone, right?
15  A  Yes, ma'am.
16  Q  And in this particular case, in the pictures that
17  y'all took of the items that were contained within Mr.
18  Carmichael's vehicle, did you happen to get a picture
19  of a pistol permit?
20  A  Miss James, it may be in evidence.  I don't have
21  that recollection at this moment.
22      MS. JAMES:  May I consult, Judge, with
23  co-counsel?
24      THE COURT:  Yes.
25      (Whereupon, Ms. James conferred with Ms.

Page 199

1  Wayne off the record and out of the hearing of the
2  other courtroom participants.)
3      MS. JAMES:  That's all.  Thank you so much.
4      MR. TEAGUE:  No questions, Your Honor.
5      REDIRECT EXAMINATION
6      BY MR. MOORER OF SHERRY GONZALES:
7  Q  Agent Gonzales, you were asked on cross
8  examination just a moment ago about wiretaps and the
9  ability of your office to conduct wiretaps.  Do you
10  recall those questions Miss James asked you?
11  A  Yes, sir, I do.
12  Q  Are wiretaps something that are a last resort
13  option for law enforcement?
14  A  Yes, sir.
15  Q  Is that required by the law for it to be a matter
16  of last resort?
17  A  Yes, sir, they are.  Yes, it is.
18  Q  And Miss James asked you about the fact that
19  supposedly Mr. Carmichael owns a house down the street
20  from Defendant Freddie Williams's house, do you recall
21  those questions?
22  A  Yes, sir.
23  Q  The day that you saw Defendant Carmichael driving
24  down that street, did he go to any house up the street
25  from Defendant Freddie Williams's house?

Page 200

1  A  Not that I saw, sir.
2  Q  As a matter of fact, how far past —
3      MS. JAMES:  Judge, he's leading her now.
4  He's got her on redirect, not cross.
5      THE COURT:  What's your next question?
6  Q  As a matter of fact, how far past Defendant
7  Williams's house did you chase Defendant Carmichael
8  before you lost sight of him?
9  A  He completely left the Ridgecrest area.
10  Ridgecrest Avenue.  I lost him on Rosa Parks, which is
11  at least a mile, mile and-a-half from the Nine
12  forty-nine Ridgecrest Avenue house where we were.
13  Q  And Miss James asked you about ticket sales from
14  concerts generating cash.  Do you recall those
15  questions that she asked you?
16  A  Yes, sir.
17  Q  Is the drug business a cash business as well?
18  A  Absolutely.
19  Q  Miss James asked you some questions about you or
20  your agents or your agency using recording equipment.
21  Do you recall those questions that she asked you?
22  A  Yes, sir.
23  Q  When you do wire somebody up to try to send them
24  in to record buys or other contacts with people that
25  you're investigating, is that always successful?

Page 201

1  A  No, sir, it isn't.
2  Q  And she asked you about the possibilities of
3  doing different types of surveillance and recordings
4  and that type of thing when you are going out to do
5  the search warrants.  Do you recall those questions?
6  A  Yes, sir.
7  Q  When you're going out to do law enforcement
8  operations, do you plan for every possibility?
9  A  I wish.  No, sir, we don't.  We can't plan for
10  every scenario.
11  Q  What do you plan on?
12  A  Basically, we plan on the information that we
13  have, the intelligence that we receive.  We use that
14  intelligence and we plan based on that intelligence.
15  Q  Is that related to whatever is most likely to
16  occur?
17  A  Yes, sir.
18  Q  Miss James asked you about whether or not you or
19  other agents had gone out to try to intercept
20  different trucks after you got information that the
21  load was coming in, after you got that information.
22  Do you recall those questions?
23  A  Yes, sir.
24  Q  How many trucks do you estimate pass through the
25  Middle District of Alabama, say, in a day?

Page 202

1  A  If I had to hazard a guess, Mr. Moorer, I would
2  say maybe --
3      MS. JAMES:  Objection, Your Honor.  It's
4  totally guessing and speculating.
5      THE COURT:  Sustained, if it's just a guess.
6      MR. MOORER:  No, I asked her for an
7  estimate, Your Honor.
8  A  Maybe two or three hundred.
9      THE COURT:  What would you base your
10  estimate on?
11      THE WITNESS:  Your Honor, just seeing them
12  on the road.
13      THE COURT:  I'll allow her to do that.
14  Overruled.
15  A  Maybe two or three hundred a day.
16  Q  And Mr. Carmichael's trucks, did you have
17  information about a specific truck that Mr. Carmichael
18  might own that this load might be on this particular
19  day?
20  A  No, sir, we did not.
21  Q  If you had gone out and directed your agents to
22  start intercepting Mr. Carmichael's trucks and didn't
23  find marijuana on any of the particular trucks you
24  happened to stop that day, would that have caused you
25  concerns as to tipping him off as to the attention of

Page 203

1  law enforcement being upon him?
2  A  Yes, sir, it definitely would have.
3  Q  Did that play any role in you deciding to take
4  another tact such as the one you did choose to try to
5  uncover Mr. Carmichael's activities on that day?
6  A  Yes, sir.
7  Q  And do you remember Miss James asking you about
8  when you saw Mr. Carmichael make contact with you, eye
9  contact with you, that there was no way for you to
10  know what he was thinking?  Do you recall those
11  questions?
12  A  Yes, sir.
13  Q  While you were seated there, did you have to
14  chase any other cars that came through the area where
15  you were waiting?
16  A  No, sir.  We didn't have a lookout for any other
17  cars except for Mr. Williams' vehicle.
18  Q  Did you see any other cars that came through by
19  Mr. Williams's house speed away like you saw Mr.
20  Carmichael's car?
21      MS. JAMES:  Objection, Your Honor, asked and
22  answered.
23      MR. MOORER:  Your Honor, she asked him on
24  cross examination about not knowing what Mr.
25  Carmichael was thinking as to why he sped away.  I'm

Page 204

1  trying to establish that he was the only vehicle she
2  saw --
3      THE COURT:  Okay.  Overruled.
4  Q  Did you see any other cars pass by Mr. Williams's
5  house while you were out there speed away like
6  Defendant Carmichael's Honda did on that day?
7  A  No, sir, I did not.
8  Q  When you and the other officers got the
9  information from Mr. Denton that a load was going to
10  be coming in, coming in very soon, did you know
11  precisely how the dope was going to get to the Middle
12  District of Alabama?
13  A  No, we did not.
14  Q  Did you know whether or not it might go to a
15  location for temporary storage before it actually got
16  to Mr. Williams or not?
17  A  No, we did not.
18  Q  And what do you call those kind of locations,
19  temporary storage locations in your business?
20  A  Stash houses.
21      MR. MOORER:  I don't have any further
22  questions, Your Honor.
23      MS. JAMES:  Judge, I have just a couple of
24  follow-up.
25      RECROSS EXAMINATION

Page 205

1      BY MS. JAMES OF SHERRY GONZALES:
2  Q  Agent Gonzales, you had indicated that wiretaps
3  are kind of a last resort, last option?
4  A  Yes, ma'am.
5  Q  But you would agree with me that consensually
6  monitored telephone calls are fairly easy to do?
7  A  Yes, ma'am.
8  Q  If you have a cooperating person, it's fairly
9  easy if you want the cooperator to call a target, it's
10  pretty easy to set that up mechanically, is it not?
11  A  Yes, ma'am.
12  Q  And when that cooperator is requested by you or
13  your agents to call a target, the goal is to get them
14  to communicate about illegal conduct in most
15  instances, isn't it?
16  A  Yes, ma'am.
17  Q  And in this case we know for a fact that Mr.
18  Denton, based on your testimony, was cooperating from
19  two-thirty in the morning on November 17th of 2003 up
20  through the time that is shown on these audiotapes
21  when Freddie Williams left and you all got to come in,
22  signal and seize this marijuana, right?
23  A  Yes, ma'am.
24  Q  So we had a period of a number of hours that a
25  consensually monitored call could have been directed

Page 206

1 by you or Agent DeJohn from Mr. Denton to Mr.
2 Carmichael.
3 A  Can you repeat that?
4 Q  You had the time and you had the equipment to
5 have Mr. Denton make a consensually monitored call to
6 Mr. Carmichael.
7 A  Yes, ma'am.
8       MS. JAMES:  No further questions.
9           FURTHER REDIRECT EXAMINATION
10         BY MR. MOORER OF SHERRY GONZALES:
11 Q  And in fact, did you and the other agents
12 consensually monitor the conversation between
13 Defendant Carmichael and Mr. Denton at Mr. Denton's
14 house?
15 A  Yes.
16 Q  And your enforcement activities, do you try to do
17 those in such a way as to not tip off the person that
18 you're trying to investigate?
19 A  Yes, sir.
20 Q  Is that, again, why some of the things that might
21 have been done were not done in this particular case?
22 A  Yes, sir.
23 Q  And would you tell the jury how y'all did the
24 consensually monitored call that you did between
25 Denton and Defendant Carmichael.

Page 207

1 A  Well Mr. Denton received the call and returned
2 the call to Mr. Carmichael.  I was on one side of him
3 and Mr. DeJohn was on the other side so we were
4 listening to the phone call.  We could not -- We did
5 not have recording equipment on it, but Mr. DeJohn
6 could hear the voice and I could hear the voice so we
7 were on both sides of Mr. Denton when he was placing
8 the phone call.
9       MR. MOORER:  No further questions, Your
10 Honor.
11       MS. JAMES:  I hate to keep this going, but
12 may I ask just a quick --
13       THE COURT:  Yes.
14           FURTHER RECROSS EXAMINATION
15         BY MS. JAMES OF SHERRY GONZALES:
16 Q  In that conversation, you're talking about
17 two-thirty in the morning when y'all were listening in
18 when he was holding his phone out?
19 A  Yes, ma'am.
20 Q  And the only information you got from that call
21 was that Mr. Carmichael said I'm going to stop by.
22 A  He said, "I'll be by in five minutes."  Five
23 minutes, which he was.
24 Q  And that's the only consensually monitored call
25 that you have.

Page 208

1 A  Yes, ma'am.
2 Q  Thank you.
3       MR. MOORER:  No further questions, Your
4 Honor.
5       THE COURT:  Thank you.  You may step down.
6       (Whereupon the witness, Sherry Gonzales,
7 stepped down from the stand.)
8       MR. MOORER:  Agent Tom Halasz.
9         T O M    H A L A S Z,
10 the witness herein, having first been duly sworn or
11 affirmed to tell the truth, was examined and testified
12 as follows:
13           DIRECT EXAMINATION
14         BY MR. MOORER OF TOM HALASZ:
15       MR. MOORER:  Your Honor, may we briefly
16 approach you?
17       (Whereupon, there was an off-the-record
18 bench conference between all counsel and the Court.)
19 Q  You were sworn previously, were you not?
20 A  Yes, I was.
21 Q  Would you state your name, please.
22 A  Thomas Halasz.
23 Q  By whom are you employed, sir?
24 A  U. S. Drug Enforcement Administration.
25 Q  What is your job with the D. E. A.?

Page 209

1 A  I'm a special agent.
2 Q  Would you briefly relate to the jury your
3 background, your training and your experience that
4 qualifies you to serve as a D. E. A. agent.
5 A  I have been employed as a D. E. A. agent for
6 approximately eighteen years.  During that time I've
7 had numerous in-service trainings regarding different
8 topics involving narcotics law enforcement, as well as
9 our -- obviously our basic training back in 1987 when
10 I was hired.  Prior to that I was a municipal police
11 officer for eight years.
12 Q  Do you recall November the 16th of 2003?
13 A  Yes, I do.
14 Q  Would you tell the jury what you were doing on
15 that day at around three o'clock.
16 A  We were preparing to execute a search warrant at
17 Patrick Denton's residence on Fleming Road in
18 Montgomery.
19 Q  And did you participate in the execution of the
20 search warrant at Mr. Denton's house?
21 A  Yes, I did.
22 Q  Now, when you had your meeting at about three
23 o'clock, what, if anything, did you do immediately
24 after the meeting in connection with trying to do the
25 search warrant at this house that evening?

Page 210

1 A  Well we were conducting surveillance on locations
2 and persons that we believed were involved.
3 Q  And did you do any of those surveillances?
4 A  Yes, I did.
5 Q  And where did you go and what did you do on those
6 surveillances?
7 A  I was not directly but I drove past the Denton
8 residence on Fleming Road numerous times, as well as
9 Leon Carmichael's residence on Brookwood in
10 Montgomery.
11 Q  And what, if anything, did you note as you drove
12 by Defendant Carmichael's house or residence?
13 A  At about nine-thirty in the evening I observed a
14 black Honda sedan, and a silver S. U. V. van type
15 vehicle parked in the driveway there.
16 Q  And what, if anything, did you do next in the
17 course of the investigation after your surveillances?
18 A  We executed the search warrant on Patrick
19 Denton's residence sometime after midnight.
20 Q  And what was your job in the course of executing
21 the search warrant at Patrick Denton's house?
22 A  I was part of the initial entry team to gain
23 entrance to the house.  After that I participated in
24 the actual search of the house.
25 Q  And at some point did you conclude your duties of

Page 211

1 searching the house?
2 A  Yes.
3 Q  And what, if anything, happened after you had
4 concluded your participation in the search of the
5 house?
6 A  I was standing outside the front of Denton's
7 house.  Agent DeJohn and Patrick Denton were involved
8 in a discussion.
9 Q  And what was the topic of the discussion?
10 A  It was Denton's involvement in marijuana
11 distribution and trafficking activities, his
12 connections to other persons that he was telling us
13 about.
14 Q  And what names, if any, did he give you as to who
15 he was connected with?
16 A  Freddie, Leon Carmichael, the woman from
17 Huntsville and I believe Gary George also came up.
18 Q  Might there have been others but you can't
19 remember at this point?
20 A  That's very possible, yes.
21 Q  And what, if anything, happened as Mr. Denton was
22 giving this information to other law enforcement
23 officers?
24 A  A phone rang.
25 Q  Whose phone was it that rang?

Page 212

1 A  Well, it was Patrick Denton's phone, which at the
2 time was being held by Agent DeJohn.
3 Q  So what type of phone is this?
4 A  A cellular phone.
5     MS. WAYNE:  Judge, I'm going to object.  I
6 think this is cumulative.  We're not disputing that
7 the agents were there.  It's cumulative.
8     MR. MOORER:  Your Honor, I believe what he
9 is about to say, though, is not cumulative.
10     THE COURT:  Okay.  Go ahead.
11 Q  And when the call came in, what, if anything,
12 happened next?
13 A  Agent DeJohn held the phone out so that Denton
14 and myself could see it.  And --
15 Q  What, if anything, did you notice when he held
16 the phone out?
17 A  I was able to observe in the little window, the
18 display of the phone, "Leon".
19 Q  And after you saw that, what, if anything,
20 happened next?
21 A  At that point in time I turned and went off the
22 front porch.  It's like a concrete front porch.  I
23 went off of it and went to my truck to go get a tape
24 recorder.
25 Q  And how far was your truck from the porch that

Page 213

1 you described?
2 A  I would estimate fifteen or twenty yards.
3 Q  And what, if anything, happened next after you
4 went to your truck?
5 A  I had gotten the tape recorder, returned to the
6 front porch area of the house, and I just caught the
7 last few seconds of the phone conversation.
8 Q  And what was being said on the phone conversation
9 when you got back to the area where you were going to
10 try to record the conversation?
11 A  I heard the caller, the person on the other end
12 of the phone, saying "I need to talk to you.  I'll be
13 there in five minutes."
14 Q  And who was the person with who was calling and
15 saying they would be there in about five minutes?
16 A  I believe that was Leon Carmichael.
17 Q  And after this conversation took place between
18 Patrick Denton and Leon Carmichael, what, if anything,
19 happened next?
20 A  At that point we vacated the property expecting
21 within just a few minutes Leon Carmichael to arrive.
22 And I, myself, parked further down Fleming Road in a
23 pulloff in a wooded area where I could see the
24 driveway to Denton's residence.
25 Q  And what, if anything, did you see while you were

Page 214

1 there in your position?
2 A  I saw a black Honda sedan drive in the driveway.
3 Q  And what, if anything, happened next when the
4 sedan drove into Mr. Denton's driveway?
5 A  It remained there for a few minutes. From where
6 I was sitting I could see the driveway but not the
7 front door of the house. I saw the Honda go in the
8 driveway. It went out of my view as it approached the
9 front of the house. Just a few minutes past and I saw
10 the black Honda leave.
11 Q  After that happened, what, if anything, did you
12 do next?
13 A  We all went back to Denton's house. "We all"
14 meaning the agents.
15 Q  And what did you do once you got back to Denton's
16 house?
17 A  Again, Agent DeJohn questioned Denton about the
18 conversation, which I was able to overhear most of.
19 Q  And what was the substance said by Denton to
20 Agent DeJohn?
21 A  It was that Leon Carmichael wanted Denton to go
22 to Freddie's house the next morning to break down a
23 load of dope, a load of marijuana.
24 Q  And after the conversation between Denton and
25 Agent DeJohn, what, if anything, happened next in

Page 215

1 relation to your participation in this investigation?
2 A  Actually, my participation probably later on,
3 maybe two or three hours later on which would have
4 been shortly after sunrise, again began periodic
5 surveillance of Thirty-two twenty-six Brookwood, which
6 is Carmichael's residence.
7 Q  And what did you observe as you did surveillance
8 of Defendant Carmichael's house?
9 A  The black Honda sedan was parked in the driveway
10 there.
11 Q  And what, if anything, happened next after you
12 made those observations?
13 A  I had parked near the intersection of Woodley
14 Road. And Brookwood empties out into a little small
15 side street which goes to Woodley Road just south of
16 South Boulevard. I parked in a parking lot where I
17 could see Brookwood as well as Woodley Road. I saw
18 the black Honda Accord turn off of Brookwood going on
19 to Woodley Road and it was driven by Leon Carmichael.
20 Q  And what, if anything, happened next after you
21 saw that?
22 A  I radioed that to other law enforcement people
23 who were in the area for the purpose of conducting
24 surveillance let them know that the black Honda was
25 moving.

Page 216

1 Q  And what, if anything, happened next?
2 A  I was able to see the black Honda go out on
3 Woodley Road towards South Boulevard, and I was told
4 by the other surveillance agents that it traveled
5 south on South Boulevard. In other words made a left
6 turn. And that they lost it at a traffic light at
7 that point and weren't able to see it any further.
8 Q  And what, if anything, did you do after it was
9 reported to you that the surveillance teams had lost
10 sight of Defendant Carmichael?
11 A  We had driven around the area of South Boulevard,
12 Court Street, Woodley Road. It was that area of south
13 Montgomery attempting to locate the black Honda.
14 Q  And were you successful in doing that?
15 A  No, we were not.
16 Q  What, if anything, happened next?
17 A  I went to a -- There was a staging area where the
18 bulk of the people were on Fairview. I was behind, I
19 believe, an old Sears store. There was an old
20 shopping Center. We had a staging area there. I went
21 there and met with the other agents that were
22 involved.
23 Q  And what, if anything, happened next?
24 A  A short time after I arrived there, there was a
25 decision made. I knew Agent DeJohn had gone to get a

Page 217

1 search warrant for the Ridgeview (sic.) address, and
2 there was a decision made that we were going to secure
3 that residence on Ridgeview (sic.)
4 Q  And whose residence are you talking about?
5 A  Freddie Williams'.
6 Q  And so after they got the search warrant for
7 Ridgecrest what, if anything, did you do?
8 A  Well Agent DeJohn was in the process of getting
9 the search warrant. We secured the house before the
10 search warrant was signed, I believe. And I drove
11 over to Ridgecrest.
12      I'm not sure if the search warrant was
13 signed or not. I knew that Freddie, we got the
14 information Freddie Williams leaving and the
15 decision was made to go secure the house and arrest
16 Freddie.
17 Q  So what did you do then?
18 A  I drove over with a group of other agents and
19 police officers to secure Freddie Williams' residence.
20 Q  And what, if anything, happened next?
21 A  I went to the rear. Upon arriving there I went
22 to the rear of the house in the event that anybody ran
23 out. The house was secured. I walked back around to
24 the front and was told that Freddie Williams had
25 already left and was driving an old pickup truck. At

Page 218

1 that point I got back in my vehicle and attempted to
2 go find this pickup truck that was operated by Freddie
3 Williams.
4 Q  What, if anything, happened as you were on your
5 way to try to find Defendant Williams?
6 A  I received a radio communication from Sherry
7 Gonzales, the D. E. A. supervisor.  She stated that a
8 black Honda Accord had driven past Freddie Williams'
9 house and that she had attempted to catch it.  She
10 chased it and was unable to catch it.
11 Q  And what if anything did you do after you
12 received that radio contact?
13 A  Additionally she had said that you know the other
14 units were to look for it, and if you were to find
15 this black Honda that she believed was being driven by
16 Michael Carmichael to stop it and detain it so she
17 could make an identification of the driver.
18 Q  And so what, if anything, did you do?
19 A  I parked on Fleming Road.
20 Q  Why did you go park on Fleming Road?
21 A  I parked across the street from the Carmichael
22 Center.  I anticipated that if indeed it was Leon
23 Carmichael driving past Freddie Williams house, that
24 he may also drive past the Carmichael Center.
25 Q  And why did you do that?  What made you come to

Page 219

1 that conclusion?
2 A  I just thought that he may drive by there to see
3 if there was any police activity there as there was
4 none at Freddie Williams' house.
5 Q  And did he?
6 A  Yes.  He drove past the Carmichael Center.
7 Q  And what, if anything, happened as he was driving
8 past the Center of Carmichael?
9 A  He continued to drive past it.  At that point in
10 time we made arrangements for a marked Montgomery
11 Police Department car to make a traffic stop on the
12 black Honda.
13 Q  And did they?
14 A  Yes.
15 Q  And what, if anything, did you do after they
16 stopped the Honda?
17 A  I approached the black Honda.  Leon Carmichael
18 was the one and only occupant of the black Honda.  He
19 exited immediately upon stopping.  He got out of the
20 car.  As I approached the car, I was at the front
21 door, the driver's side door was open.  I looked in
22 the driver's side door.  On the passenger seat I saw a
23 pistol, semiautomatic pistol laying on the seat.  At
24 that point Carmichael moved away from the car.
25 Q  And was there any search of Mr. Carmichael's

Page 220

1 person at that point?
2 A  Yes, there was.  I stuck my head in the car again
3 and the pistol was on the passenger seat.  There was
4 also a black leather jacket.  And I stuck my head in
5 the car and moved the jacket, saw that there was
6 nothing underneath it.  I looked between the seats.
7 It has front bucket seats.  I looked between the seats
8 and there's a briefcase laying in the middle of the
9 back seat.  It was open, but it was, like,
10 overstuffed, is the best way I can describe it.  It
11 was open but ajar.  I looked in the briefcase and
12 there was a money bag in the briefcase that contained
13 I believe it was later determined to be five thousand
14 dollars.
15 Q  And after you found that five thousand dollars
16 and the firearm that you saw in the bvriefcase, did
17 you make any further search of the car?
18 A  I personally did not.  No, not at that time, no.
19 And I didn't search the car any further myself.
20 Q  Was there any search made of Mr. Carmichael's
21 person?
22 A  Yes, there was.
23 Q  Was there anything on his person that was taken
24 from him?
25 A  There was both of his rear pants pockets had

Page 221

1 rolls cash that was found.  It totaled, I believe, one
2 thousand seven hundred and eighty-one dollars, if my
3 memory serves me correctly.
4 Q  And after you found the money on his person and
5 the money in the car, what, if anything, did you do
6 next?
7 A  I read Leon Carmichael his rights, his Miranda
8 rights.  I told him why we had stopped him.
9 Q  And after you told him that, what, if anything,
10 did you do next with him?
11 A  He was secured there at the scene, and Supervisor
12 Sherry Gonzales came to the scene to view him.
13 Q  And what, if anything, happened after she got
14 there?
15 A  We transported Leon Carmichael back to the D. E.
16 Aoffice, and the vehicle with his contents was
17 transported back to the D. E. A. office.
18 Q  Did Agent Gonzales identify him there at the
19 scene?
20 A  Yes, she said that was the person and the vehicle
21 she saw driving past Freddie Williams' house.
22 Q  What, if anything, happened once you got back to
23 the D. E. A. office?
24 A  I had informed -- previously informed Leon
25 Carmichael why he had been arrested, and brought him

1 back to fingerprint and photograph him and fill out an
2 arrest report -- personal history arrest report.
3 Q And in it did he indicate where he lives?
4 A Leon Carmichael, I believe, indicated that he
5 lived at Thirty-two twenty-six Brookwood in
6 Montgomery.
7 Q And after you asked him the booking questions,
8 where was he placed?
9 A He was put in a temporary holding cell.
10 Q Now at this point when he was placed in the
11 holding cell, was Mr. Williams in custody?
12 A At that point, no, he was not in custody.
13 Q Did there come a time where that changed?
14 A Yes. Freddie Williams had been arrested
15 afterwards and brought to our office after Leon
16 Carmichael was put in the cell.
17 Q Now did you have any participation in the
18 processing of Defendant Williams after he was brought
19 to the D. E. A. office?
20 A Yes, I did.
21 Q And did you follow the same procedure with him as
22 you did earlier with Defendant Carmichael?
23 A Yes. I read him his Miranda rights and I
24 explained to him why he had been arrested. At that
25 point he stated --

1 Q Well, before we get into any statements that he
2 made, did he give you any information as to where he
3 lived?
4 A Yes, he did.
5 Q And did he indicate that he lived at the place
6 where you and the other officers had executed the
7 search?
8 A Yes, he did.
9 Q Now at the time that you were doing the booking
10 of him, did you have any conversation with him
11 concerning his potentially cooperating with your
12 investigation?
13 A Yes, I did.
14 MR. MOORER: Your Honor, at this point you
15 may want to give your instructions.
16 THE COURT: Limiting the --
17 MR. MOORER: Yes, Your Honor.
18 THE COURT: Which of the defendants?
19 MR. MOORER: To Mr. Williams.
20 THE COURT: Members of the jury, this will
21 be the same instruction that this evidence may only be
22 used as to Mr. Williams's case, the case that the
23 Government has against Mr. Williams. It may not be
24 used in any way in your deliberations as to Mr.
25 Carmichael.

1 Q And what, if anything, did you say in regards to
2 his potential cooperation to Mr. Williams?
3 A I told him that he had the opportunity to
4 cooperate to further the investigation.
5 Q And what, if anything, happened after you said
6 that to him?
7 A And he said that if he named names, his children
8 would be killed.
9 Q Now, after that what was done with Mr. Williams?
10 A He was kept in the interview room that he was in.
11 Immediately following that, this discussion took place
12 first and then the personal history report would have
13 been filled out later. The actual arrest report would
14 have been filled out later. So we had not done that,
15 and he was still in the interview room completing the
16 arrest report.
17 Q During the time that Defendant Williams was there
18 at the D. E. A. office on that day, was he kept
19 separate from Defendant Carmichael?
20 A Yes, he was.
21 Q After Defendant Williams was placed in the
22 holding cell there, did you have any further
23 conversations with Defendant Carmichael?
24 A Not after Williams was placed in the holding
25 cell, I don't believe. He was in the interview room.

1 Q I'm not talking about questioning, I'm talking
2 about just making conversation or anything where he
3 may have said anything to you.
4 A Oh, Carmichael?
5 Q Yes.
6 A Yes.
7 Q Now were you on duty on December the 4th of 2003?
8 A I'm sure I was.
9 MR. MOORER: I withdraw that.
10 Q Now you testified about Mr. Williams and Mr.
11 Carmichael. Are either of those individuals in this
12 courtroom today?
13 A Yes, they are.
14 Q Would you point them out and describe them for
15 the record, please.
16 A Freddie Williams is at the far right as I'm
17 looking at the defense table. And Leon Carmichael is
18 second from the left in a blue suit as I'm looking at
19 the defense table.
20 MR. MOORER: For the record, he's identified
21 Defendant Carmichael and Defendant Williams. And I
22 have no further questions.
23 THE COURT: Cross?
24 MS. WAYNE: Thank you, Judge.
25 CROSS EXAMINATION

Page 226

1        BY MS. WAYNE OF TOM HALASZ:
2 Q  Good afternoon, Agent Halasz.
3 A  Good afternoon.
4 Q  You have talked to us about the fact that you
5 were involved with surveillance of Mr. Carmichael on
6 November 17th, 2003, right?
7 A  That's correct.
8 Q  Now you have indicated to me, and I'm just
9 wondering, Agent Halasz, because there are a lot of
10 reports, when you talked about the fact that you had
11 actually been to or surveiling Mr. Carmichael's house
12 the evening before the 17th, so the 16th at about nine
13 or nine-thirty I think you said?
14 A  That's correct.
15 Q  And I am wondering where in the reports, where do
16 you put that?  Because I just can't find it.  I'm just
17 wondering where it is, if you know.
18 A  I don't know.  I didn't write any reports
19 pertaining to the sixteenth.  That information was put
20 out over the radio during the surveillance, and I
21 don't know if that made it into the report or not.
22 Q  I'm just wondering if it's correct that it may
23 just not even be in the report.
24 A  Possibly it is not, I don't know.
25 Q  So that was information that was the day before

Page 227

1 in terms of actually watching Mr. Carmichael's house.
2 A  Yes.  That would have been Sunday evening the
3 16th of November.
4 Q  All right.  And in terms of that, the reason for
5 that was that you had received information that had
6 been conveyed to you by either Investigator DeJohn or
7 someone who received information that Mr. Carmichael
8 might be involved in drug distribution.
9 A  That's correct.
10 Q  All right.  But even way before that, Agent
11 Halasz, you had been surveiling Mr. Carmichael's
12 business from the year 2002.
13 A  There was surveillance done during 2002, yes.
14 Q  All right.  The November 16th day was not a new
15 date, but the first time you ever heard Leon
16 Carmichael's name?
17 A  No.
18 Q  And in fact you had been surveiling his business
19 in attempts to determine whether or not you could
20 cooperate that he was involved in drug distribution.
21 A  We had -- Are you talking about the 2002?
22 Q  Yes.
23 A  It was done primarily to attempt to identify
24 persons involved.
25 Q  In drug distribution?

Page 228

1 A  Yes.
2 Q  And surveillance is a method employed by law
3 enforcement so that you can identify certain
4 individuals, correct?
5 A  Yes.
6 Q  And hopefully catch them in criminal activity.
7 A  Eventually.
8 Q  Okay.  And document that criminal activity before
9 it may occur?
10 A  Document the criminal activity before it may
11 occur?
12 Q  Right.  For example, drug dealers in your
13 experience a lot of times if they have a place of
14 business there will be a lot of people coming in and
15 out of the business.
16 A  Yes.
17 Q  If someone is selling drugs from their house or
18 their business, sometimes you get a lot of activity in
19 terms of people coming to buy drugs.
20 A  Yes.
21 Q  If you're somebody who brings drugs in, let's say
22 the source of drugs, there may be activity of people
23 going to the source to get the deliveries.
24 A  There may be, yes.
25 Q  And you believe that Mr. Carmichael's business

Page 229

1 was the trucking business could be a source of drug
2 activity.
3 A  Yes.
4 Q  That's why you did the surveillance.
5 A  Partially, yes.
6 Q  Okay.  Now I want to talk to you about all of
7 these surveillances that you did.  The first one that
8 I have a record of, Agent Halasz, is a report that is
9 signed off by you that talks about April 29th, 2002
10 that involved an individual by the name of William
11 Marquis (ph.) also.  It says "I. A. William Marquis,"
12 I'm not sure what that means.
13 A  Intelligence analyst.
14 Q  Okay.  Does he sound familiar to you?
15 A  Yes.
16 Q  Okay.  And in fact, that was a debriefing
17 involving information about that this person was
18 giving you that supposedly involved Mr. Carmichael's
19 trucking business, Thomas Trucking?
20 A  Yes.
21     THE COURT:  Members of the jury, if any of
22 you wants to stand up and stretch any time, feel free
23 to do it.  You can just stand up in the box there,
24 just stand.  No one will say anything.  I do it all
25 the time.  You may see me do it in just a minute.

Page 230

1 Sometimes I sit here and I get tired. So feel free to
2 do that.
3      Go ahead.
4      MS. WAYNE: Thank you, Judge.
5 Q Let's see if I can make it more exciting here.
6      All right. I just want to talk about the
7 dates, the reports that I have in terms of you doing
8 things that are supposedly involving Mr. Carmichael.
9 So again I was referring back to April the 29th, 2002,
10 And again I indicated that that was information that
11 was provided to you by an informant about Mr.
12 Carmichael and watching Thomas trucking which you
13 learned was the name for his trucking company.
14 A That sounds correct. I don't have the report in
15 front of me, but I will trust you.
16 Q All right. Well, let's do this. Agent Halasz,
17 have you had an opportunity to review your reports in
18 terms of preparing your testimony here today?
19 A Those reports, no. The 2002 case? No, I have
20 not.
21 Q All right. It would be fair to say that this has
22 been a long ongoing investigation of Mr. Carmichael.
23 A Well, there's been periods of time where there's
24 been intelligence information that's been gathered,
25 and a period of time that's gone by where there is no

Page 231

1 new information.
2 Q Well I'm going to talk to you about all of that,
3 but I'm just wondering for purposes of I have all of
4 your reports here, and I'm wondering if you would be
5 better prepared to be able to look over these reports
6 since you haven't had a chance to do that.
7 A Yes, that would be fine.
8      MS. WAYNE: Your Honor, Judge, I'm going to
9 ask the Court because I do want to have him look at
10 the reports, he can do it and sit here and have the
11 jury wait, I'm wondering if this might be a good time
12 to --
13      THE COURT: Let's see the reports. How long
14 are they?
15      MS. WAYNE: 2002.
16      THE COURT: How long?
17      MS. WAYNE: Well some of them are eight
18 pages, some of them are one page.
19      THE COURT: You want to ask him about the
20 reports?
21      MS. WAYNE: I do, Judge.
22      THE COURT: You haven't seen them?
23      THE WITNESS: Yes, sir, I've seen them. I
24 haven't reviewed them prior to --
25      THE COURT: If you want to refresh his

Page 232

1 memory quickly.
2      MS. WAYNE: I'm going to, Judge, and I want
3 to make sure I have all of them here.
4      THE COURT: Will you need to look at them to
5 save time?
6      MS. WAYNE: I have another copy. I'm going
7 to get both.
8 Q All right. I have all of this marked, so if I
9 may approach, Agent Halasz, and I'm handing you what
10 has been Bates stamped as pages sixty-one through
11 sixty-three.
12      MS. WAYNE: Judge, I'm not going to ask that
13 they be admitted. Does the Court want me to mark them
14 for purposes of identification?
15      THE COURT: Yes. Why don't you do that.
16 Just so that we'll know what document you're talking
17 about.
18      MS. WAYNE: I'm going to mark this as
19 Defendant Carmichael's 8. Is that correct,
20 Miss Carnes?
21      COURTROOM DEPUTY CLERK: That's correct.
22      MS. WAYNE: It's for purposes of
23 identification only. And if I may approach?
24      THE COURT: Yes.
25 Q If you would, Agent, go ahead and review that and

Page 233

1 just let me know when you're ready.
2      (Whereupon, the witness complied and
3 examined said document.)
4 A Yes.
5 Q Now in terms of what that report says, that again
6 was on the 29th. I think it was prepared on the 30th
7 but the actual interview took place on the 29th. And,
8 again, that was information that was related to you
9 from an informant involved with -- indicating Thomas
10 Trucking, which was Mr. Carmichael's business, and
11 again as it related to alleged drug activity.
12 A Yes.
13 Q Okay. If I may now go to another report which
14 was prepared by you on April the 30th. And again,
15 this is a report that talked about Mr. Carmichael
16 supposedly using tractor trailers or rigs to
17 supposedly transport drugs in Montgomery, do you
18 recall that?
19 A It sounds accurate, yes.
20 Q And that was information given to you on April
21 the 30th, 2002, that's?
22 A Again, if that's what's in the report, I will
23 trust you on that. I don't have the report in front
24 of me.
25 Q All right. Well you know, Agent, I guess I'm a

Page 234

1  little concerned because you were certainly given
2  notice of the fact that you would be testifying in a
3  pretty big case for the government today, right?
4  A  Yes, ma'am.
5  Q  And that it involved some pretty important
6  evidence and the lives of two defendants, Mr.
7  Carmichael and Mr. Williams, right?
8  A  Yes, ma'am.
9  Q  And you certainly had notice that we would be
10  talk to you about the reports that were promulgated by
11  you in this case, right?
12  A  Well this is another case.  I did not anticipate
13  that this information was going to be brought in on
14  this trial.  I knew that the Government was not going
15  to be offering it, therefore I did not familiarize
16  myself with the 2002 case.
17  Q  All right.  Well, Agent Halasz, in terms of the
18  government offering it, the government certainly made
19  you aware of the fact --
20      MR. MOORER: Objection, Your Honor.  What he
21  may have been made aware of is beside the point, your
22  Honor.  She should be asking him questions about what
23  he knows and doesn't know.
24      MS. WAYNE: Judge, he said the government
25  didn't tell me, and so I'm asking about that line of

Page 235

1  questioning.
2      THE COURT: Let me hear the answer.  Go
3  ahead.
4  Q  Agent Halasz, in terms of what the government
5  told you, they certainly made you aware of the fact
6  that they charged Mr. Carmichael and Mr. Williams with
7  supposedly a drug distribution over a ten year period
8  of time.
9  A  Yes, ma'am.
10  Q  So that would be including 2002.
11  A  Yes.
12  Q  They may have told you that it wasn't part of
13  their theory that you talk about this, correct?  They
14  didn't prep you on that.
15  A  That's correct.
16  Q  Okay?
17  A  I knew they weren't going to be presenting this.
18  Q  All right.  Well I'm going to hand to you what is
19  marked as Carmichael -- Defendant Carmichael's exhibit
20  9 for the purposes of identification only, and again
21  it was -- I was referring to a report that was put
22  together on April 30th, 2002.
23      MS. WAYNE: If I may approach?
24      THE COURT: Yes.
25  Q  And if you would take a look at that.

Page 236

1  A  Yes, ma'am.
2  Q  Now that's a report that was, again, related to
3  these alleged -- this tractor-trailer activity
4  supposedly going on with Mr. Carmichael, right?
5  A  That's correct.
6  Q  All right.  And as a result of this information
7  that is being related to you on April 30th, 2002, I'm
8  assuming that you took steps to corroborate whether or
9  not this activity was actually occurring with Mr.
10  Carmichael.
11  A  There was surveillance done based on that
12  information, yes.
13  Q  Okay.  And specifically there was surveillance
14  done of Mr. Carmichael's trucking company, and a
15  report that was done as a result of that on April the
16  7th, 2002 -- excuse me, May the 7th, 2002.  Do you
17  recall that?
18  A  Yes.
19  Q  And that was surveillance of Thomas Trucking, or
20  again, Unique Express was another name that the
21  trucking company went out here with.
22  A  Yes, I believe Unique Express was a former name
23  of that company.
24  Q  All right.  And just so the jury knows, when
25  you're talking about surveillance, again, this is

Page 237

1  something where you're actually going out and looking
2  to see if you can get something, criminal activity?
3  A  At that point we're going out looking for
4  registration tags, people, names.
5  Q  All right.  And it would be fair to say that
6  you're looking for things that could corroborate this
7  pretty damaging information that's being related to
8  you from this informant.
9  A  Yes.
10  Q  Okay.  So that's the purpose of this
11  surveillance?
12  A  Yes.
13  Q  Okay.  And that is April the 7th.
14      Now at this point in time it appears from
15  the reports that you're pretty dogged about going out
16  there because there is another surveillance that's
17  conducted on the trucking company on May 8, 2002.  Do
18  you recall that, the very next day?
19  A  Yes.
20  Q  Okay.  And it sounds from the reports that not
21  only is it perhaps you doing the surveillance, but
22  actually Investigator DeJohn is also accompanying you
23  at that point.
24  A  Yes.  I believe there was different people on the
25  different days also, yes.

**Page 238**

1 Q All right. And you are observing not only the
2 vehicle that Mr. Carmichael was driving on that day,
3 do you remember that?
4 A Yes.
5 Q You're observing any other people that might be
6 having contact with Mr. Carmichael on that day.
7 A That's correct.
8 Q Okay. And that is on May the 8th, the next day
9 that this occurs.
10      Okay. Now on May 30th, the same month, a
11 few days later there's a report generated that
12 indicated there's another surveillance done at Mr.
13 Carmichael's trucking company. Do you recall that?
14 A Yes.
15 Q Okay. And, again, it appears from the report
16 that Investigator DeJohn is also involved in that
17 surveillance as well.
18 A If that's what's indicated in the report then
19 that would be correct, yes.
20 Q Okay. And, again, there appears to be
21 surveillance. You're looking for stuff. Looking to
22 corroborate any information that this informant had
23 provided you.
24 A Yes.
25 Q And that is done on May the 30th.

**Page 239**

1      So in the month of May we've done three
2 surveillances at Mr. Carmichael's business, correct?
3 A That's correct.
4 Q You're watching him.
5 A Periodically, yes.
6 Q And nothing prevents you from watching him every
7 day. You watch him, right?
8 A Our other caseload does, yes.
9 Q When you think, though, you've got a main
10 criminal, other caseloads you do a triage in the
11 department. If you've got somebody big, you make the
12 time to make sure you're watching the big guy, right?
13 A If I had actionable information, yes.
14 Q All right. And you believed you had actionable
15 information because you were watching at least three
16 times during that month.
17 A No, I believe I had intelligence information.
18 Actionable information would be something happening
19 right now that needs to be acted upon.
20 Q Well, All right. Mr. Carmichael was never
21 arrested during any of this period of time, right?
22 A No.
23 Q Okay. Now it appears that you probably get
24 another report in June. And in that report, and maybe
25 you can recall, but it appears on June the 28th, the

**Page 240**

1 date prepared, it's actually signed on July 24th, but
2 the date prepared indicates that "Thirty days have
3 passed. No investigative activity regarding this
4 investigation. Case remains open pending further
5 investigation." Do you recall that?
6 A Yes.
7 Q So it sounds to me, Agent Halasz, that it's still
8 ongoing, that you all are attempting to get something
9 during this period of time, but you do a status report
10 or an update indicating there is nothing.
11 A Correct.
12 Q Okay. And that's June 28th.
13      Now it appears that it must be protocol
14 within the department, because, again, on July 26
15 there's again another report that's done by you
16 indicating the very same language, and I quote,
17 "During the past thirty days there has been no
18 investigative activity regarding this investigation.
19 Case remains open pending further investigation."
20 A Yes. During that period of time I believe there
21 was a thirty day case status report requirement.
22 Q Okay. All right, good. And, again, so you can
23 tell us again the same thing, nothing is going on.
24 Would that be fair to say, the same thing?
25 A Yes.

**Page 241**

1 Q So at this point it's a big zero in terms of your
2 investigation against Mr. Carmichael.
3 A Yes.
4 Q Then on August 26, the same thing. Another
5 report generated by you saying the same thing that I
6 just said before, correct?
7 A Thirty day status report, correct.
8 Q Now just so it's clear for the jury, during this
9 three month period of time when nothing is going on,
10 again, you certainly had the ability to conduct
11 surveillance.
12 A Yes.
13 Q To watch Mr. Carmichael's every move if you
14 wanted to?
15 A Yes.
16 Q Now there's a report that is signed off by you on
17 March the 3rd, 2003.
18      MS. WAYNE: Judge, do I need to mark that to
19 put it on the overhead?
20      THE COURT: Not necessarily, unless you want
21 it to go back to the jury or you want to make it part
22 of the record. Then it would need to be marked so the
23 record would show what you're talking about.
24      MR. MOORER: Your Honor, I would object to
25 the D. E. A. Six being shown to the jury, because it's

Page 242

1 got the type of information that's not admissible to
2 go back to the jury.
3        MS. WAYNE:  I wasn't asking that it be
4 admitted.
5        THE COURT:  Is there a part of it that you
6 want to show?
7        MS. WAYNE:  Yes.  I'm just using it for
8 illustrative purposes with this witness, Judge.
9        THE COURT:  Could I see what you're talking
10 about?
11        MS. WAYNE:  Yes.  The ones that I have been
12 reading.
13        (Whereupon, the Court examined said
14 document.)
15        THE COURT:  You just want to show this for
16 illustrative purposes?
17        MS. WAYNE:  Yes.
18        THE COURT:  I'll allow that.  Go ahead.
19        MS. WAYNE:  I've asked Ms. Carnes to help
20 me, Judge, just so I don't break it.
21 Q  Now I'm looking at the report and, again, that
22 indicates on March the 3rd, 2003 that, and I quote,
23 "No further information has been developed regarding
24 this investigation.  There has been no drug or
25 non-drug exhibits collected.  This investigative file

Page 243

1 is being administratively closed."  Correct?
2 A  Correct.
3 Q  And that is March the 3rd, 2003.  Right?
4 A  Correct.
5 Q  Just a few months before Gary Wayne George goes
6 to Investigator DeJohn.
7 A  Yes.  I believe November of '03 is when that
8 information was developed.
9 Q  All right.  Now, Agent Halasz, you had talked
10 about the search at -- on Fleming at Mr. Denton's
11 house and your participation in that.  And you said to
12 us that the situation where you actually went to go to
13 your truck to get this tape recorder.  Do you remember
14 that?
15 A  Yes.
16 Q  And, again, your feeling was immediately you had
17 a sense that if you could record this conversation, it
18 would be helpful information.
19 A  Yes.
20 Q  Okay.  And your sense was faster than it sounds
21 like anybody else, you immediately went to get
22 something so you could record it.
23 A  Yeah, I attempted to do that.
24 Q  Okay.  You carried a recording device in your
25 car.

Page 244

1 A  Yes.
2 Q  And would it be fair to say that as a tool of
3 surveillance, it's a normal thing for a surveillance
4 officer to have those tools like a recorder or a video
5 camera.
6 A  Sometimes yes, sometimes no.
7 Q  All right.
8 A  For instance, I have a recorder that I keep in my
9 truck, but not a video camera.
10 Q  Okay.  But a recording device is something these
11 days it's pretty easy to carry because they're small,
12 they're compact and they're easy to turn on.
13 A  Yes.
14 Q  Okay.  And in this case you had one and you went
15 to get it, correct?
16 A  Yes.
17 Q  You came back in and you learned that y'all
18 needed to get out of Mr. Denton's house pretty
19 quickly.
20 A  Yes.
21 Q  Because there was a belief based on this phone
22 conversation that Mr. Carmichael would be coming to
23 the house.
24 A  Yes.
25 Q  Okay.  Now at that point because you had the

Page 245

1 recording device, and it was there, and your
2 understanding is there had been an agreement with Mr.
3 Denton at that point that he wasn't going to tell Mr.
4 Carmichael you all had come to the house, right?
5 A  I don't know about that.
6 Q  You weren't aware that he had agreed to cooperate
7 at that point?
8 A  Oh, yes.
9 Q  Okay.  So you took the recording device, the tape
10 recorder and you said here, put this on yourself so
11 when you talk to him you can record the conversation.
12 A  It was a large -- You mean from when he came?
13 Q  Yeah.
14 A  It was a larger tape recorder.  It wasn't a
15 pocket size little microcassette recorder.  It was a
16 fairly large regular cassette.
17 Q  Okay.  How big are we talking?
18 A  We're talking probably six inches by four and
19 probably an inch and-a-half, two inches thick.
20 Q  So you didn't have a conversation with Mr. Denton
21 saying you could leave the recorder here by the porch
22 or put it in something, your coat pocket or anything
23 like that to record Mr. Carmichael, that just didn't
24 come up?
25 A  Well, no.  I wouldn't ask him to do that because

Page 246

1 recorders are simply too large to conceal on your
2 person in your pocket, and to leave it laying around I
3 don't think would be a smart move.
4 Q Did the conversation even come up with Mr. Denton
5 about that?
6 A No.
7 Q Okay. And your understanding is, Agent Halasz,
8 there were no other recording devices available?
9 A That's correct.
10    MS. WAYNE: Judge, if I just may have one
11 moment?
12    THE COURT: Yes.
13    (Whereupon, Ms. Wayne conferred with Ms.
14 James off the record and out of the hearing of the
15 other courtroom participants.)
16 Q Agent Halasz, in terms of these surveillances
17 that I've gone over with you in this closing of the
18 case, I'm wondering if in your participation of this
19 investigation whether or not you were aware of
20 surveillances also of Mr. Carmichael's business in
21 '97, '98 and '99.
22 A No.
23 Q You weren't involved in the case at that point?
24 A I got transferred to Montgomery in December of
25 2001.

Page 247

1    MS. WAYNE: I have no further questions,
2 Agent Halasz.
3    THE COURT: Mr. Teague?
4    MR. TEAGUE: Thank you, Your Honor.
5       CROSS EXAMINATION
6    BY MR. TEAGUE OF TOM HALASZ:
7    MR. TEAGUE: Your Honor, if I may, I'd like
8 to approach Agent Halasz.
9    THE COURT: Certainly.
10 Q Special Agent Halasz, if I could I'm going to
11 step up here right by you.
12    On these D. E. A. Six forms, any time you
13 receive what you call "actionable information," or any
14 kind of information at all, you have some down here --
15 something down here called "targets," is that correct?
16 A Yes.
17 Q And you put down as target Leon Carmichael, is
18 that correct?
19 A Yes.
20 Q And William Bolding also appears as a target.
21 A Correct.
22 Q All right. Now that's just in that one, for
23 example. Now is this the second page?
24 A Yes, sir.
25 Q Okay. And you also have a format on the D. E. A.

Page 248

1 Six whereby you automatically put in there what's
2 called "indexing," is that correct?
3 A That's correct.
4 Q An index is like the back side of a book. If,
5 say, you've got a four hundred page book and you want
6 to know whether or not Barry Teague is mentioned in
7 that book, you look in the index to see if he's in
8 there and it will tell you what page to go to, won't
9 it?
10 A Correct.
11 Q Is it not part of the theory of the D. E. A.
12 let's have indexing so that we can go to these
13 wonderful computer things, type in, say for instance,
14 right over there type in Barry Teague and if he's ever
15 been mentioned in a D. E. A. Six every last D. E. A.
16 Six is available and pops up by index.
17 A No, sir, it does not work that way.
18 Q It doesn't work that way?
19 A No, sir. What it will do is give me a very brief
20 synopsis of any reports, any investigations mentioning
21 that person within D. E. A. And it will also give a
22 D. E. A. case number from where that information came.
23 As far as the entire report, no, it does not do that.
24 Q Now Miss Wayne in her questioning had you look at
25 several of these, didn't she?

Page 249

1 A Yes.
2 Q Did you index or receive any information about an
3 agreement between Freddie Williams and Leon Carmichael
4 any time up to November 16th, 2003?
5 A An agreement?
6 Q Yeah. Or that they're conspiring.
7 A Well, by the last name of Williams, no. The
8 report which was brought to me first was the
9 debriefing of a source of information mentioned a man
10 by the name of Freddie. The last name was unknown to
11 that person.
12 Q But we've had a lot of Freds mentioned today as
13 people who had been drug dealers with whom Mr. Denton
14 has dealt with, is that correct?
15 A I don't know what Mr. Denton has testified to.
16 Q Okay. But if the jury has heard that, we've had
17 other -- well, for instance, Fred Smith, correct?
18 A Fred Smith means nothing to me.
19 Q Okay. You weren't a part of that part of the
20 investigation, then?
21 A Obviously not.
22 Q Okay. Now the -- with regard to the statement,
23 it's been pointed out that you are one of the agency
24 that was smart enough to have a tape recorder out
25 there when you went to Robert Patrick Denton's house

Page 250

1  on the evening of November 16th.
2  A  I had a tape recorder in my vehicle, yes.
3  Q  And you were present when an endeavor to talk to
4  Freddie Williams and get him to tell whatever he might
5  know, you had tape recorders available then too,
6  didn't you, sir?
7  A  Yes.
8  Q  You didn't use one, did you?
9  A  No.
10  Q  Okay.  Now -- But you're testifying here today
11  that he said to you if he named names, his children
12  might be killed.
13  A  I believe the exact quote is his "children would
14  be killed."
15  Q  But you didn't remember everything that was in
16  your reports over the last couple of years, did you
17  sir?
18  A  No, not everything I've written.
19  Q  And Miss Wayne ably pointed that out.  We tried
20  to get exactly what somebody says, but you weren't in
21  on that phone conversation that was purportedly
22  between Leon Carmichael and Mr. Denton.  That's why
23  you've got a tape recorder and find out exactly so
24  there is no question we've got it right here.
25  A  What you're asking me, sir, is do I remember

Page 251

1  Freddie Williams' statement about what would happen if
2  he named names?  Yes, I remember that specifically.
3  Q  There is no way you could forget any part of it
4  or misunderstand it?
5  A  No, I think that was rather important and I did
6  remember that.  And that is, I believe, in my report
7  in quotations.
8  Q  He didn't indicate who might kill them, did he?
9  A  No.
10  Q  Okay.  Now, according to your involvement in the
11  investigation, you had been over there trying to
12  arrest Freddie at the house, and you were part of that
13  team when he slipped through all of the D. E. A. and
14  went to the hospital where his wife was dying.
15  A  He left before we got there, yes.
16  Q  You were coming there to be a part of that,
17  weren't you?
18  A  We were going there to secure the house to arrest
19  him, yes.
20  Q  Okay.  Now -- So the last person he had been
21  around was Robert Patrick Denton, wasn't it?
22  A  Yes.
23  Q  And Robert Patrick Denton is a hardened criminal,
24  isn't he, sir?
25  A  I would not describe Patrick Denton has a

Page 252

1  hardened criminal, no, sir.
2  Q  Well, what would you describe a man who was
3  busted in June of 2002 for being a drug trafficker,
4  two counts, potentially facing two life sentences, and
5  he goes right back home and in a very short time is
6  right back in the very same business and nearly
7  eighteen months later in November of 2003 is still
8  involved in it?  Now that's someone who just doesn't
9  learn.  That's pretty hard, isn't it?
10  A  Again, he may not have made the best of choices
11  in what he did.  I would not describe him as a
12  hardened criminal, no, sir.  A hardened criminal would
13  not cooperate with us and would go to prison rather
14  than cooperate with us.
15  Q  Okay.  Well, if you turned your back on Mr.
16  Denton, are you telling these ladies and gentlemen you
17  could guarantee you wouldn't get right back in that
18  same business?
19      MR. MOORER:  Objection, Your Honor.  That
20  calls for all kinds of argumentative and speculative
21  presumptions --
22      MR. TEAGUE:  He just got into Mr. Denton's
23  reliability, and I think the --
24      THE COURT:  What's your question again?
25      MR. TEAGUE:  Whether or not he's telling

Page 253

1  these ladies and gentlemen if the D. E. A. turned
2  their back and didn't watch him closely, Mr. Denton,
3  that he would not go right back into it the way he did
4  right after his arrest in 2002.
5      THE COURT:  So you want him to do what, now?
6      MR. TEAGUE:  Is it his opinion that Mr.
7  Denton would --
8      THE COURT:  I'll sustain the objection.
9  There should be no vouching for the truthfulness of
10  witnesses, period.
11      The jury should make that decision based on
12  their own independent decision.
13      MR. TEAGUE:  Thank you, Your Honor.
14      THE COURT:  What a witness thinks, even what
15  lawyers may argue -- Witnesses don't decide, lawyers
16  don't decide, I don't decide.  It's for the jury to
17  decide based on the evidence.
18      MR. TEAGUE:  Thank you, Your Honor.
19      THE COURT:  Go ahead.
20  Q  Now, tell the ladies and gentlemen of the jury if
21  Freddie said, "If I named names my children might be
22  killed," the last crook he had been around just before
23  he left his house to go to the hospital just happened
24  to be Robert Patrick Denton, didn't it?
25  A  Yes.  That was the last person he was around,

Page 254

1  yes.
2  Q  And that's a possible person he might have been
3  thinking of because he didn't know whether you had
4  arrested him, did he?
5  A  I don't know what he knew.
6  Q  Okay. So you're working from guesswork to try to
7  interpret whatever Freddie might have said. We don't
8  have a tape recorder, but whatever he did say could
9  have been misunderstood and there is no way they would
10 interpret what he meant if he said it.
11 A  He said exactly what I said he said. As far as
12 interpreting who he was talking about, that I
13 cannot --
14 Q  You would have to make self-serving, subjective
15 guesses, wouldn't you, sir?
16 A  I would not care to guess who he was talking
17 about. It's not my choice.
18 Q  That's all we're asking to you do. Thank you.
19      MR. TEAGUE: Thank you, Your Honor.
20          REDIRECT EXAMINATION
21      BY MR. MOORER OF TOM HALASZ:
22 Q  Agent Halasz, I believe you were asked by
23 Mr. Teague about William Bowden's name being on one of
24 the D. E. A. Sixes. Do you recall one of his
25 questions in that regard?

Page 255

1  A  Yes.
2  Q  Does Mr. Bowden have a nickname, to your
3  knowledge?
4  A  Yes, he does.
5  Q  And what is it?
6  A  Cadillac.
7  Q  Now counsel for Mr. Carmichael asked you about
8  the investigation being closed at some point. I don't
9  know precisely where. I think it may have been '02 or
10 '03.
11 A  I believe it was March of '03, if I recall
12 correctly.
13 Q  Do you recall when it was that made you close
14 your investigation at that point?
15 A  Yes. The person who provided us the initial
16 information to initiate the investigation decided to
17 discontinue cooperating with the D. E. A.
18 Q  And why was it that he chose to discontinue
19 cooperating with you?
20 A  Because he was scared.
21 Q  And what was he afraid of?
22 A  He was afraid that Leon Carmichael would kill
23 him.
24      MOTION FOR MISTRIAL:
25      MS. WAYNE: Judge, I'm going to object. I'm

Page 256

1  going to have to ask for a mistrial. That is so
2  inappropriate --
3      THE COURT: Just a minute. No, you ask to
4  do this outside the presence of the jury. Always say
5  Judge, I have something to take up outside the
6  presence of the jury.
7      You should ignore that, and I'll excuse you
8  for a minute.
9      (Whereupon, the jury was escorted out of the
10 courtroom.)
11     THE COURT: Now I'll hear from you.
12     MS. WAYNE: Judge, I apologize.
13     And I'm sorry because what he did is
14 completely improper. He asked him information that
15 has never been provided in any D. E. A. Six about this
16 informant who supposedly stopped his cooperation
17 because Leon Carmichael was going to kill him. He
18 knew he was going to say it. We've been trying to
19 avoid that this entire trial. It's not information
20 that was provided to us ever, ever, and he elicited
21 only for the purpose of it prejudicing this jury.
22     And I'm sorry that I had the outburst in
23 front of the jury, but it's a mistrial. It goes
24 completely against everything we've attempted to
25 avoid. That's not in the report. Obviously if it had

Page 257

1  been in the report, Judge, I wouldn't have opened the
2  door to it. The D. E. A. Six indicates that he quit
3  cooperating, that was it. Not because Mr. Carmichael
4  now threatened him for some reason.
5      MR. TEAGUE: Your Honor, if I may? We adopt
6  and also join in the motion for a mistrial. We're
7  charged as being coconspirators with Mr. Carmichael.
8      THE COURT: Right.
9      MR. TEAGUE: This affects us, as well.
10 Whatever makes Mr. Carmichael look bad makes us look
11 bad in the jury's eyes.
12     THE COURT: Now let me just understand what
13 you're saying here. You're saying that it was not
14 furnished to you in the D. E. A. statement?
15     MS. WAYNE: No, judge. We have the D. E. A.
16 Six that I've read indicating that the investigation
17 was closed, which I talked about with Agent Halasz.
18     THE COURT: May I see the statement?
19     MS. WAYNE: Yes. If I may approach?
20     (Whereupon, the Court examined said
21 document.)
22     THE COURT: Mitchell, would you read that
23 question and answer back?
24     THE COURT'S REPORTER: Let me read two of
25 them for context.

**Page 258**

1     THE COURT: Good. Thank you.
2     (Whereupon, the court reporter so read the
3 material in question back from the record.)
4     MS. WAYNE: If I may, Judge? The question,
5 though, leading into this was why did the
6 investigation of Mr. Carmichael quit on March the
7 30th. That was his first question in this vein.
8     THE COURT: Why did he what? You want to go
9 back another question? I'll hear it.
10     MS. WAYNE: Please.
11     THE COURT: Go back two more questions,
12 Mitchell.
13     THE COURT'S REPORTER: Yes, sir.
14     (Whereupon, the material in question was
15 read back from the record.)
16     THE COURT: Okay. Now what is the basis of
17 your request for a mistrial?
18     MS. WAYNE: That, Judge — A couple of them.
19 One is obviously the 403 objection of this supposed
20 statement. It's hearsay based on what an informant
21 told him about what Mr. Carmichael would do to him.
22     Secondly, it's elicited for the sole purpose
23 of being prejudicial because, again, our reliance upon
24 the D. E. A. Six forms, I've known about the informant
25 obviously, as part of the investigation. He was

**Page 259**

1 providing information, but the reason for the closing
2 of the investigation, what's never been referred to
3 that the reason they did it was because of these
4 statements that the informant made. And in fact, on
5 cross examination Agent Halasz said to me when I asked
6 him the reason you closed it, and I read the report,
7 period. Now suddenly it's because of something else
8 that was said.
9     THE COURT: Let's take up each of your
10 grounds separately now.
11     Are you saying that the government had an
12 obligation to tell you about that information?
13     MS. WAYNE: About?
14     THE COURT: About his statement that they
15 closed the investigation because the informant was
16 afraid that Carmichael might kill him?
17     MS. WAYNE: Yes, Judge. If you're going to
18 — We, obviously to our detriment sometimes maybe, but
19 we rely on the information that's provided to us.
20     THE COURT: Oh, I understand that, but I'm
21 trying to understand the basis under which they were
22 obligated to disclose that to you.
23     MS. WAYNE: Well, Judge, clearly it goes to
24 the information that if you're going to provide us the
25 information, it can't be in part, it has to be in

**Page 260**

1 whole.
2     THE COURT: What do the rules say as to what
3 information they have to provide you?
4     MS. WAYNE: If I may, Judge, I'm looking for
5 the standing order.
6     THE COURT: Okay.
7     MS. WAYNE: Well I can't find the standing
8 order, Judge.
9     THE COURT: Ms. Carnes, do you have the
10 standing order?
11     COURTROOM DEPUTY CLERK: The standing order
12 on discovery, I gave it to them a couple of days ago,
13 but I have it here.
14     THE COURT: Thank you.
15     Do you have a copy of the standing order
16 yet?
17     MS. WAYNE: I don't, Judge.
18     THE COURT: You can look at this one.
19     MS. WAYNE: I'll save the Court time,
20 because my colleagues or my co-counsel is telling me
21 that it may not be covered under your Rule 16 rule.
22     THE COURT: Right, I didn't think so, that's
23 why I wanted to cover that.
24     MS. WAYNE: I wanted to make sure just
25 because I have to look back at it. But it clearly is

**Page 261**

1 403 in terms --
2     THE COURT: Now we'll talk about 403, then.
3 What does 403 says?
4     MS. WAYNE: It says, "Although relevant
5 evidence may be excluded if its probative value is
6 substantially outweighed by the danger of unfair
7 prejudice, confusion of the issues or misleading the
8 jury, or by considerations of undue delay, waste of
9 time or needless presentation of cumulative evidence."
10     Obviously our concern is the unfair
11 prejudice. And also the confusion of the issues. The
12 issues --
13     THE COURT: You asked him, the witness, why
14 he closed the case on your cross?
15     MS. WAYNE: No, I didn't ask him why, I told
16 him based upon the information provided to us that
17 based upon the surveillances and their inability to
18 corroborate the informant's information, the case was
19 closed. That was my question to him. He said yes.
20 He didn't say anything about informants and
21 allegations by Mr. Carmichael.
22     THE COURT: Now I'll hear from the
23 government.
24     MR. MOORER: Yes, Your Honor.
25     First of all, we have to go all the way back

Page 262

1  to the openings statements. But counsel for Mr.
2  Carmichael made the argument, and has proceeded to try
3  to elicit evidence, that for a number of years their
4  client has been under investigation and, in essence
5  and in sum, we haven't gotten anything over that
6  period of time.
7          Now when she cross examined this witness --
8  and I would note, Your Honor, she was the one who took
9  the line of inquiry down the road of things that we
10 didn't get during surveillances. She went way beyond
11 the questioning that I asked him. She asked him about
12 certain information having been given to them. I
13 didn't. She has tried to make a point that that
14 information that was given to him and information that
15 has been given to him over time, nothing came of it.
16 And so by her own words just a moment ago, Your Honor,
17 when she says that, and I can't recall precisely what
18 she said, but this is exactly why we could not
19 corroborate the information that was given by the
20 person who gave it.
21         Agent Halasz told me just a second ago that
22 he testified to this during the detention hearing. So
23 I don't see any surprise. She asked the question --
24         THE COURT: Was it in the detention hearing?
25         MR. MOORER: That's what Agent Halasz told

Page 263

1  me. I wasn't present.
2          AGENT HALASZ: This came up at the detention
3  hearing.
4          MS. MORRIS: Your Honor, as an officer of
5  the Court, I was at the detention hearing as well and
6  it did come up at the detention hearing.
7          THE COURT: Was Mr. Carmichael's lawyers
8  present?
9          MS. MORRIS: Oh, yes, sir.
10         THE COURT: Go ahead.
11         MR. MOORER: And I think it was fair
12 rebuttal to the inference that they're trying to lay.
13 And, Your Honor, I asked --
14         THE COURT: Now let me ask defense counsel
15 this: I do remember in your opening statements that,
16 or statement, that one of the issues that you rely on
17 significantly is that the officers did not do anything
18 for ten years, and that for some reason it seems odd
19 that they suddenly focus on him in 2003 and through
20 today. And here they had this ten years where nothing
21 happened. Why can't the government show why they
22 didn't do anything for those ten years if that's going
23 to be so important to your case?
24         MS. WAYNE: Judge, first of all my opening
25 is not evidence. Secondly, the theory is that they

Page 264

1  did a lot. That's why I was pointing out
2  surveillance. They were doing stuff and we're going
3  to show that --
4          THE COURT: But what I'm saying, though, is
5  you're saying they didn't bring any charges. You're
6  trying to show for some reason they decided to stop
7  Mr. Carmichael until 2003 when arguably you raised the
8  inference that they could have but didn't do something
9  for the ten years that preceded that. You've gone
10 through with all your surveillance, the issue is why
11 didn't they arrest him before that. Why did they
12 suddenly wait until 2003?
13         So this witness is explaining just why. So
14 you opened that whole thing up.
15         MS. WAYNE: Right, Judge. Well my response
16 to that is, again, my question was very pointed to him
17 in terms of what he did and why he closed the case.
18 Now suddenly on redirect you can now say something
19 differently than you said to me on cross examination
20 when asked by me --
21         THE COURT: That can go to impeachment, to
22 go back and say why didn't he tell me, but what I want
23 to go at now is why can't the government show why it
24 closed the case on Mr. Carmichael, why it decided not
25 to arrest him during the first ten years since you

Page 265

1  made that a part of your defense? And one of the
2  reasons is the informant wouldn't cooperate.
3          Now whether it's true or not is a different
4  story. But why can't the government put that forward
5  as a defense, or go to a rebuttal to your defense?
6          MS. WAYNE: Well I'll tell the Court, too,
7  that my biggest concern will obviously be 404(b).
8          THE COURT: Now what is 404(b)?
9          MS. WAYNE: It's character evidence not
10 admissible to prove conduct, other crimes, wrongs or
11 acts.
12         THE COURT: Let me turn to 404(b).
13         MS. WAYNE: Now under this rule, clearly,
14 notice is a prerequisite. Mr. Moorer is saying that
15 this specific questioning was asked at the detention
16 hearing, and in my very brief review of the detention
17 hearing I don't remember those questions being asked
18 of the agent. But, again, I'd have to look at the
19 transcript.
20         THE COURT: Let's go back to 404(b). I
21 don't quite understand how 404(b) comes in.
22         MS. WAYNE: "Evidence of other crimes,
23 wrongs or acts is not admissible to prove the
24 character of a person in order to show action in
25 conformity therewith."

Page 266

1 THE COURT: This is not being introduced to
2 show Mr. Carmichael's character.
3 MS. WAYNE: Oh yes, it is. What they're
4 saying is that if in fact he is someone who is
5 threatening people of murder, it ties totally into
6 their theory that that's what drug dealers do and it's
7 a violent distribution organization. It ties totally
8 in with their theory, and it is a prior bad act,
9 Judge. It totally little falls within this rule.
10 THE COURT: But I don't think they were
11 seeking to introduce it to rebut your defense that
12 nothing was done for suspicious reasons during the ten
13 years that preceded the indictment. That's not
14 introducing it to show character, it's just
15 introducing to it show why the government didn't
16 arrest him for that ten year period.
17 MS. WAYNE: Well, I disagree. I think that
18 it falls under them bootstrapping it in order to fall
19 within -- come up with new stuff with this agent and
20 bootstrap it to a 404(b).
21 THE COURT: Does the government wish to say
22 anything else?
23 MR. MOORER: No, Your Honor. I believe you
24 understand our position on it. He couldn't further
25 the investigation because the person who was going to

Page 267

1 further it got scared.
2 THE COURT: Let's take a recess.
3 MR. TEAGUE: Your Honor, I want to be heard.
4 THE COURT: Yes, I'm sorry, Mr. Teague.
5 Yes, go ahead.
6 MR. TEAGUE: Thank you, Your Honor.
7 Your Honor, I'm going to move, and I'm going
8 to join in the motion for a mistrial and adopt the
9 grounds stated already. But I wanted to elaborate a
10 little more on Rule 403.
11 Your Honor, Mr. Moorer knew what was coming.
12 I submit that counsel of the government should have
13 brought it to the attention of the Court at side bar
14 so that this could have been hashed out ahead of time,
15 rather than just doing it blatantly without advising
16 the Court of it.
17 Not only that, getting back to this involves
18 Freddie Williams, it appears to me that it would be
19 proper for me now to move for a severance, that Mr.
20 Williams be allowed to be tried separately from Mr.
21 Carmichael. It appears to me that it would be
22 appropriate. We feel like the issues have been so
23 confused, particularly, and I want to bring back to
24 the record everything we discussed this morning where
25 we brought in all the jurors and asked them, you know,

Page 268

1 about the possible fear that has invaded the jury box.
2 One juror left because --
3 THE COURT: There has been no invasion of
4 fear in the jury box.
5 MS. JAMES: Judge, that was all done
6 in-camera.
7 THE COURT: Yes. And, Mr. Teague, you're
8 misrepresenting what happened.
9 MR. TEAGUE: Okay. Your Honor, I only
10 wanted to reference that part of the record and I
11 apologize. I think I did misstate it. I agree with
12 the Court.
13 THE COURT: Yes, you did.
14 MR. MOORER: Your Honor, I think
15 Mr. Teague's concerns can be cleared up, particularly
16 when I think Agent DeJohn, when he testifies, and
17 maybe even this witness who will be able to say that
18 prior to Patrick Denton telling them about Mr.
19 Williams's involvement, which was shortly before the
20 searches, they were not -- well, if I may have one
21 moment, Your Honor.
22 (Whereupon, Mr. Moorer conferred with the
23 case agent off the record and out of the hearing of
24 the other courtroom participants.)
25 THE COURT: Let me ask Miss Wayne this. Why

Page 269

1 are you going into all of this information about the
2 investigation before 2003 back into 1990s? What's the
3 purpose of that?
4 MS. WAYNE: Judge, believe me, they're going
5 to go there. Okay?
6 THE COURT: But they didn't go there.
7 MS. WAYNE: But they will be. Okay? They
8 have to prove, Judge, this conduct that they have
9 alleged in the information. They have given us
10 discovery and notice --
11 THE COURT: I understand that, but the
12 breadth of the alleged conspiracy is what date?
13 MS. CHARTOFF: Ten years.
14 MS. WAYNE: Back to '93, Judge.
15 THE COURT: Is that the breadth of the
16 conspiracy in the indictment?
17 MS. MORRIS: It is, Your Honor.
18 THE COURT: '93 until when?
19 MS. WAYNE: 2003.
20 So this is clearly within it, Judge. So I'm
21 anticipating that, you know, that they want to try to
22 prove back then, and I'm anticipating that stuff is
23 going to come out. So I'm not bringing up unnecessary
24 stuff. It's clearly within that, and there's a lot of
25 stuff that went on in between. So it is ten years.

1    THE COURT: But why are you going into why
2 they dropped their investigation? Why is any of this
3 relevant?
4    MS. WAYNE: The quality of evidence and the
5 lack of evidence which goes to the investigation and
6 how it was compromised, or the integrity of the
7 investigation, goes to reasonable doubt.
8    THE COURT: How does that go to reasonable
9 doubt? Why isn't the only issue the adequacy of the
10 evidence as presented? Why does the fact that they
11 closed the investigation on day X, or they didn't
12 pursue the investigation on day Y, I mean how is any
13 of that relevant?
14    MS. WAYNE: Well, Judge, it's totally
15 relevant because it goes to the bias of this
16 investigation. It goes to their integrity, and the
17 jurors can assess that in terms of the quality of the
18 evidence in the presentation of this case. That's
19 totally relevant for these jurors. And they're
20 allowed to do that in terms of their ability to assess
21 reasonable doubt.
22    If you're looking at somebody and you're
23 going after them and you're going after them and
24 you're trying to get stuff and you don't have
25 anything, you're focused on that individual, you'll do

1 anything to get them. That's a totally relevant
2 determination for this jury to make in terms of their
3 presentation.
4    THE COURT: So you're saying you want to
5 show they were determined to get him.
6    MS. WAYNE: And that they were doing
7 everything that they could.
8    THE COURT: Right.
9    MS. WAYNE: And they didn't have anything
10 still.
11    THE COURT: Well, I mean if they don't have
12 anything, why do you need to go into all of this
13 stuff? I guess my question is, you know, if the
14 evidence isn't there, why do you have to show what
15 people did in order to get evidence that isn't there?
16 Why not just show the jury the evidence or comment on
17 the fact you just don't have the evidence? What does
18 the quality of their investigation have to do with
19 whether the evidence is either adequate or inadequate?
20    MS. WAYNE: Judge, you know, I'm not sure
21 what the Court wants me to say. The bottom line is
22 this, is that I have been doing it a long time and it
23 appears to have been a successful way to deal with
24 cases. And a credible way for jurors over twenty
25 years.

1    MR. TEAGUE: Inasmuch as the grand jury
2 charged us with being a part of a conspiracy that's
3 allegedly ten years long, I think it's important for
4 us to see what it is that they didn't have to support
5 a conspiracy. And I think Ms. Wayne's endeavoring to
6 show that is entirely appropriate from the defense
7 standpoint.
8    THE COURT: Just point that the out. But
9 I'm not quite sure I understand why you have to go
10 into the adequacy of the officers' investigation. The
11 question is not whether the investigation was
12 adequate, the question is did the information,
13 wherever it came from, does it prove guilt or
14 innocence.
15    MR. MOORER: And, Your Honor, I think
16 inherent with what Miss Wayne and Mr. Teague said
17 really answers the inquiry inasmuch as they are trying
18 to show the lack of evidence and trying to infer from
19 that lack of evidence means there is not enough to
20 convict. And we're simply trying to show why certain
21 activities that might normally have been done weren't
22 done, was because of fear generated by the defendant.
23    THE COURT: Well we'll just take five
24 minutes and I'll let you know something shortly.
25    MR. TEAGUE: Judge, just one last comment

1 and I'll be quiet. If Agent Halasz is subjectively
2 given what he's saying is reasons why Cadillac
3 supposedly decided not to --
4    MR. MOORER: No, it wasn't Cadillac.
5    MR. TEAGUE: Excuse me. Well whomever it
6 was. The unnamed person. We don't know that, Your
7 Honor.
8    THE COURT: He hasn't revealed who this
9 person is?
10    MR. MOORER: And I was going to ask him
11 that.
12    THE COURT: Why don't you ask him that now.
13    MR. MOORER: Who is the person that you were
14 going to use to further your investigation at the
15 point where you decided you had to close it?
16    THE WITNESS: Moses Williams.
17    MR. MOORER: Has he been subpoenaed to
18 testify here?
19    THE WITNESS: Yes.
20    THE COURT: Will he be here? Do you have
21 control over him, will he be here?
22    MR. MOORER: He's been subpoenaed. We
23 expect him to be here, Your Honor.
24    THE COURT: Okay. And he's the one who said
25 that Mr. Carmichael threatened him?

Page 274

1  MR. MOORER: That he was afraid of Mr.
2  Carmichael.
3  MS. WAYNE: Or that he was going to kill
4  him.
5  THE WITNESS: His exact words were, "If Leon
6  finds out, he will kill me."
7  THE COURT: Very good. I'll take a recess.
8  Is there anything else?
9  MS. WAYNE: Judge, I just want to refer you
10  to the detention hearing. I'm looking at the pages
11  one oh nine, one ten, one eleven.
12  THE COURT: What about those pages?
13  MS. WAYNE: And, Judge, in terms of them
14  giving us notice, even though under the rules, under
15  404(b) notice isn't it happened at a prior hearing,
16  notice is I'm giving you notice formally that we
17  intend to introduce it. But I'm looking at the
18  transcript of the detention hearing on page one oh
19  nine, one ten, and I got to read all of it, Judge,
20  quickly, but when the question comes up about this and
21  the question is out of the blue on one ten the guy
22  comes in and says, "I'm afraid. I owe Mr. Carmichael
23  money. I'm afraid he's going to do something. Help."
24  The answer: "Basically."
25  "And that's how he comes to you, and that's

Page 275

1  the first real tangible thing of something coming into
2  the D. E. A.'s lap?"
3  I'll read further, but I don't see anything
4  about his threatening to kill him.
5  MR. MOORER: Your Honor, I would also note
6  that notice provision under 404(b), when you're doing
7  things in rebuttal you can't give notice ahead of time
8  because you don't know what you're going to have to
9  rebut.
10  THE COURT: What is this mister what's his
11  name going to testify? What's his name?
12  MR. MOORER: Moses Williams.
13  THE COURT: What's he going to testify?
14  MR. MOORER: I'll let counsel who will
15  examine him answer that, Your Honor. He's not one of
16  mine.
17  MS. MORRIS: Honestly, Your Honor, we
18  subpoenaed him and he showed up and I have not seen
19  him the rest of the week. So I have --
20  THE COURT: What do you mean, you haven't
21  seen him, is he here?
22  MS. MORRIS: I haven't seen him today.
23  THE COURT: Is he under subpoena to be here
24  every day?
25  MS. MORRIS: He is, Your Honor. Having said

Page 276

1  that, Mr. Williams we expect would testify if he were
2  here that he was working for Mr. Carmichael for a
3  period of time and dealt drugs for Mr. Carmichael.
4  And it's during the course of the conspiracy.
5  THE COURT: Right. Okay. We need to -- Why
6  don't you find Mr. Williams for me forthwith.
7  MS. MORRIS: Yes, sir.
8  MS. CHARTOFF: Your Honor, we have separate
9  grounds for a mistrial, also.
10  THE COURT: Okay.
11  MS. CHARTOFF: While Agent Halasz was
12  testifying, he commented on that people who invoke
13  their right to trial are hardened criminals. This is
14  a clear violation of the Sixth Amendment right to a
15  jury trial.
16  THE COURT: What is this, now?
17  MS. CHARTOFF: He testified that no, Mr.
18  Denton isn't a hardened criminal, you know who
19  hardened criminals are, are the people who won't
20  cooperate --
21  THE COURT: Why didn't you bring that to my
22  attention at the time?
23  MS. CHARTOFF: Well, Your Honor, I wasn't
24  the lawyer who was handling it.
25  THE COURT: You should have told her. I

Page 277

1  can't be going back into evidence and hearing
2  objections that should have occurred earlier. That
3  motion is definitely denied.
4  Now I'll let you know something in five
5  minutes.
6  (Whereupon, a recess was taken.)
7  IN OPEN COURT
8  (THE JURY IS NOT PRESENT):
9  THE COURT: Mr. Teague, your motion for
10  severance is denied.
11  The motion for mistrial is conditionally
12  denied upon it being reconsidered in the morning after
13  I've had an opportunity to research it further.
14  However, I'll make these comments. It seems to me
15  that the evidence regarding Moses Williams will come
16  in anyway. He's part of the conspiracy, or allegedly
17  part of the conspiracy.
18  So it's going to be critical to my decision,
19  at least one part of my decision, it may not be
20  critical to the ultimate decision, but the government
21  better go find Mr. Williams and get him here
22  forthwith. If you need a bench warrant I'll give it
23  to you, but he has to be here so they can cross
24  examine him about this statement and his alleged
25  participation in the conspiracy. So I say you go do

## Page 278

1  it now.  And if you need a bench warrant from me or a
2  magistrate judge, let me know.
3       So I think it's actually evidence that would
4  come in as just part of the ten year conspiracy since
5  it's supposed to have gone back to 1993.  And if he
6  can testify, or if he will testify that Mr. Carmichael
7  threatened to kill him, that's it, and I think it
8  would be admissible anyway.
9       Now I want to look at Ms. Wayne's argument
10  about this investigation.  I do remember her making
11  that argument in opening statement, and I think the
12  government can respond to opening statements or
13  arguments, and she did go into the adequacy of the
14  investigation on her cross.  But I'd like to look at
15  that a little bit further.
16       But the bottom line is, I want Mr. Williams
17  here.  Okay?
18       And did you want to put something on the
19  record that you --
20       MS. WAYNE: I did, Judge.  I just didn't
21  want to appear as though I was misleading the Court.
22  I looked at it over the break and gave Miss Carnes
23  notice that I found the statement during the detention
24  hearing with Mr. Glassroth at page eighty-five, I
25  think that pointed that out, in terms of the --

## Page 279

1       THE COURT:  Right.  And Miss James said she
2  has something she wanted to put on the record?
3       MS. JAMES:  Actually, it's Miss Chartoff.
4  But may I consult with her for one minute?
5       THE COURT:  Certainly.
6       Did you have anything else, Mr. Teague, too?
7       MR. TEAGUE:  No, Your Honor.
8       (Whereupon, Ms. James conferred with Ms.
9  Wayne off the record and out of the hearing of the
10  other courtroom participants.)
11       THE COURT:  But you have Mr. Williams here
12  promptly tomorrow at nine, either voluntarily or
13  otherwise.
14       MR. MOORER:  Your Honor, I would just go
15  ahead and ask for the bench warrant because he had a
16  subpoena.  He was, as we said before, he was here
17  earlier and he was told to be here each day and he's
18  not here right now.
19       THE COURT:  Okay, I'll give you the bench
20  warrant, then.
21       Where are the marshals?
22       DEPUTY MARSHAL:  Right here, Your Honor.
23       THE COURT:  You have your oral bench
24  warrant.  We'll give you a written one shortly.  Pick
25  him up.

## Page 280

1       MS. CHARTOFF:  Your Honor, with regard to
2  the motion for a mistrial on the basis of the adverse
3  comment on the defendant's Sixth Amendment right for a
4  jury trial, to go to a jury trial, we believe that's
5  highly prejudicial and I would submit, Your Honor,
6  that the Court's ruling that only one lawyer can
7  object contemporaneously has denied this defendant the
8  right to counsel because I had that objection but I
9  could not communicate it to Miss Wayne.
10       THE COURT:  Why didn't you just walk up to
11  her like you've been doing through the trial?
12       MS. CHARTOFF:  I did.  But the conversation
13  -- the testimony, Your Honor, had moved well past it.
14       THE COURT:  Well you could say -- just walk
15  up to her and say blank blank blank.  But otherwise I
16  get essentially what I have been getting is arguments.
17  Quite often I apply that rule across the board.  Not
18  only as to witnesses but whoever is the witness, the
19  lawyer for the witness really should be making all the
20  arguments from them on in court until a new witness
21  comes forward.  Otherwise I'm getting these seriatim
22  arguments.  I get one from you, I get one from
23  Miss Wayne, I get one from Miss James and once in
24  awhile sometimes Mr. Brunson chimes in.
25       You know, then I have to go back and -- I've

## Page 281

1  got five different people making arguments.  And
2  sometimes your arguments even conflict.  It's an easy
3  thing to just walk over and tell her.
4       But let me hear that argument again.  You're
5  saying that he commented that only -- what is it?
6       MS. CHARTOFF:  He said that Mr. Denton is
7  not a hardened criminal; that hardened criminals are
8  the people who won't cooperate with the Government and
9  insists on going to trial.  This is clearly a highly
10  prejudicial adverse --
11       THE COURT:  Well, I don't think it's that
12  prejudicial.  I think the jury can take that as
13  puffing, which is what it is.  But I'll be happy to
14  tell the jury to ignore that comment.  I don't think
15  that comment is going to break or make this case by
16  any stretch of the imagination.  In fact, I bet the
17  jury can probably not even remember it because he was
18  just puffing.  But I will be happy to tell the jury to
19  ignore it.
20       MR. FEAGA:  Your Honor, before we do that, I
21  think she's misstated the comment.
22       THE COURT:  What was the comment?
23       MR. MOORER:  The comment was one of the
24  lawyers had crossed the agent about this gentleman
25  being a hardened criminal.  And Agent Halasz said no,

Page 282

1 I consider a hardened criminal to be those who would
2 not cooperate with the investigation, or words to that
3 effect. And --
4         THE COURT: Let me suggest this. Why don't
5 you all, after we finish today, check with my court
6 reporter and find out what was said, and if you want
7 me to I'll give the jury a curative instruction based
8 upon what you find.
9         But let's proceed with the trial right now.
10 The main thing is to get Mr. Williams here and keep
11 the trial going.

Page 284

1 lack of foundation. "Is it unusual." And it's not
2 relevant.
3         THE COURT: How is that even relevant?
4         MR. MOORER: Your Honor, she has been trying
5 to point out that these things took place over such a
6 long period of time --
7         MS. WAYNE: Judge, I'm going to object to
8 the speaking response objection in front of the jury.
9         THE COURT: Ask your question again. Let me
10 just hear it.
11 Q Counsel for Defendant Carmichael asked you about
12 the length of time that it has taken for you to

Page 282

1 I consider a hardened criminal to be those who would
2 not cooperate with the investigation, or words to that
3 effect. And --
4        THE COURT: Let me suggest this. Why don't
5 you all, after we finish today, check with my court
6 reporter and find out what was said, and if you want
7 me to I'll give the jury a curative instruction based
8 upon what you find.
9        But let's proceed with the trial right now.
10 The main thing is to get Mr. Williams here and keep
11 the trial going.
12        Bring in the jury.
13        And I'm going to tell the jury, too, that
14 quite often attorneys say something like stand up and
15 say I want a mistrial and they should not hold that
16 against your client. If you want me to, I'll be happy
17 to do that.
18        MS. WAYNE: I'm sorry. Please, Judge.
19        (Whereupon, the jury was escorted into the
20 courtroom.)
21        THE COURT: We're ready to begin again,
22 members of the jury.
23        You heard Miss Wayne stand up and burst out
24 with something that really shouldn't have been done in
25 your presence. But lawyers tend to do that. They do

Page 283

1 what they're supposed to do, to put on the best
2 defense they can for their client. I was a lawyer
3 once, I probably did what Miss Wayne did, too. That's
4 why I'm understanding. But you should ignore that
5 comment and you definitely shouldn't hold it against
6 her client. I think she was just trying to do the
7 best job she could and just slipped on that one.
8 Okay?
9              DIRECT EXAMINATION
10         BY MR. MOORER OF TOM HALASZ
11              (CONTINUING):
12 Q Now at the break you said -- Who was the person
13 that you were trying to use to further your
14 investigation at the point that you had to close it?
15 A His name was Moses Williams.
16 Q And he was the one who said that he was afraid of
17 Mr. Carmichael?
18 A That's correct.
19 Q Now you were asked some questions on cross
20 examination by counsel for Defendant Carmichael about
21 how long this investigation in part has taken place.
22 Do you recall those questions?
23 A Yes, sir.
24 Q Is that unusual in any way in your line of work?
25        MS. WAYNE: Judge, I'm going to object to

Page 284

1 lack of foundation. "Is it unusual." And it's not
2 relevant.
3        THE COURT: How is that even relevant?
4        MR. MOORER: Your Honor, she has been trying
5 to point out that these things took place over such a
6 long period of time --
7        MS. WAYNE: Judge, I'm going to object to
8 the speaking response objection in front of the jury.
9        THE COURT: Ask your question again. Let me
10 just hear it.
11 Q Counsel for Defendant Carmichael asked you about
12 the length of time that it has taken for you to
13 conduct this investigation in different parts. Do you
14 recall those questions?
15 A Yes, sir.
16 Q Is that in any way unusual in the course of what
17 you do in investigating drug activity?
18        MS. WAYNE: Objection; relevance.
19        THE COURT: Overruled. You have raised that
20 issue. Overruled.
21        Go ahead.
22 A No. From time to time we obtain intelligence
23 information, bits and pieces that aren't actionable.
24 Certainly not enough to seek an indictment. Certainly
25 not enough to get search warrants.

Page 285

1        MS. WAYNE: Your Honor, I'm going to object
2 to his legal conclusions and the inferences that he
3 would like the jury to draw from that. An indictment
4 and search warrant, that's --
5        THE COURT: I'll sustain that. I don't want
6 to go into this in detail, but he can say it's not an
7 unusual thing. That's fine.
8        Let's move on.
9 A It's not unusual for things to take that long.
10 Q And you were asked some questions on cross
11 examination by counsel for Defendant Carmichael about
12 your surveillance of various places such as the truck
13 yard and other places. Do you recall those questions?
14 A Yes.
15 Q Now she asked you specifically about whether or
16 not you had received information about these trucks
17 being used as part of Defendant Carmichael's drug
18 distribution activities?
19 A Yes.
20 Q Now do you know if in fact at different points
21 there were trucks intercepted by law enforcement that
22 belonged to Defendant Carmichael?
23 A Yes, there was.
24 Q And do you know if any of those trucks contained
25 marijuana?

Page 286

1  A  Yes.
2        MS. WAYNE:  Judge, I'm going to object to
3  the specifics of that, at any date, those trucks.  If
4  he can, if he can refer the witness to specific dates
5  and trucks --
6        THE COURT:  Yes.
7  Q  During the course of the time that's alleged in
8  the indictment, which would be 1993 to on or about the
9  17th of November of 2003, were there tractor trailers
10  or trucks intercepted containing marijuana?
11  A  Yes.
12  Q  During that period of time?
13  A  Yes, there were.
14  Q  That belonged to Mr. Carmichael?
15        MS. WAYNE:  Objection.  Lack of foundation.
16  Hearsay.
17        THE COURT:  How do you know these trucks
18  belonged to Mr. Carmichael?
19        THE WITNESS:  Again, without -- I believe
20  there will be additional witnesses --
21        THE COURT:  Well this isn't something you
22  know personally?
23        THE WITNESS:  That's correct.
24        THE COURT:  I'll sustain the objection.  You
25  can't tell us what somebody else knows.

Page 287

1        And the jury should ignore his answer, too.
2        MR. MOORER:  If I may have a moment, Your
3  Honor?
4        THE COURT:  Yes.
5        (Whereupon, Mr. Moorer conferred with Mr.
6  Feaga and Ms. Morris off the record and out of the
7  hearing of the other courtroom participants.)
8        MR. MOORER:  Your Honor, I tender the
9  witness.
10        THE COURT:  Cross?
11        MS. WAYNE:  Thank you, Judge.
12        CROSS EXAMINATION
13        BY MS. WAYNE OF TOM HALASZ:
14  Q  Agent Halasz, you were asked some questions about
15  the surveillance that you and I went over in detail,
16  and I want to ask you about Patrick Denton.  I would
17  assume that because Mr. Denton said he was at Mr.
18  Carmichael's during this period of time going to the
19  Carmichael Center, that he was somebody that you noted
20  in your surveillance.
21  A  No, I don't believe he was.
22  Q  You were aware in this investigation that during
23  the time of the surveillance that Mr. Denton, who is
24  from Montgomery, had been arrested in a possession and
25  trafficking case in Huntsville?

Page 288

1  A  I'm not aware of the exact date of that arrest.
2  I know there was a prior arrest in Huntsville.
3  Q  Okay.  You were aware that he was someone of
4  interest that you all were looking at in this
5  investigation.
6  A  Not during 2002, I did not know that.  As of
7  November of '03 is the first I heard of that.
8  Q  Okay.  All right.  Now in terms of Mr. Williams
9  and this statement that he made that he supposedly is
10  afraid of Mr. Carmichael, Mr. Williams is the
11  informant that I was referring to earlier in terms of
12  the Sixes that were made, is that correct?
13  A  That's right.
14  Q  That was the informant that was trying to give
15  you information that Mr. Carmichael was supposedly
16  involved in this distributing of drugs?
17  A  That's correct.
18  Q  That was the information that you were attempting
19  to corroborate in your surveillances.
20  A  Yes.
21  Q  Now Mr. Williams actually comes to you all and
22  says I'll help you infiltrate Mr. Carmichael's
23  business by giving you information and being an
24  informant for you, right?
25  A  He initially wanted to provide the information.

Page 289

1  He did agree to be an informant, yes.
2  Q  He wanted to be paid a lot of money by you all to
3  do that though, right?
4  A  He obviously wanted some money, yes.
5  Q  My understanding is he actually asked for
6  fourteen or fifteen thousand dollars.
7  A  No, he didn't ask for that.  It wasn't overtly
8  asking for that.
9  Q  If it wasn't overtly, how did you find out about
10  this money?
11  A  Well, there was an amount, I believe it was
12  twelve thousand dollars.  He stated that he owed
13  twelve thousand dollars to Leon Carmichael and that he
14  didn't have it.  He had been robbed.
15  Q  Okay.  And as a result of that he wanted you all
16  to pay him for working for you?
17  A  Yes, but not necessarily twelve thousand dollars.
18  Q  Okay.  Now in terms of that, in terms of getting
19  him or at least trying to get him to go to Mr.
20  Carmichael, your feeling was that if you could get
21  someone who supposedly was an insider who was having
22  frequent contact and conversations with Mr.
23  Carmichael, that would certainly be great evidence for
24  you.
25  A  Absolutely.

Page 290

1  Q  All right. And Mr. Williams never was able to do
2  that for you.
3  A  He chose not to do that, yes.
4  Q  And the reason he told you that he chose not to
5  do that for you was supposedly this threat by Mr.
6  Carmichael.
7  A  Well, it wasn't a threat that had already been
8  made, it was if he finds out.
9  Q  Okay. And that's what he told you was his reason
10  for not doing it.
11  A  Yes.
12  Q  Okay. Now Mr. Williams certainly did not stop
13  you, though, from attempting to continue surveillance
14  of Mr. Carmichael's residence and his business. That
15  didn't have anything to do with it?
16  A  Yes, it caused us to stop doing the surveillance.
17  Q  All right. So you're telling me that Mr.
18  Williams was the only reason that you stopped
19  surveillance of all of these businesses of Mr.
20  Carmichael's and his residence.
21  A  Well, he was the reason we started. He was the
22  reason we stopped when he discontinued the
23  cooperation.
24  Q  So the answer would be yes?
25  A  To --

Page 291

1  Q  That's the reason why?
2  A  The reason why we started and stopped, yes.
3  Q  Yes. Okay. So you're telling me that the D. E.
4  A here in Montgomery relied upon the word of Mr.
5  Williams in terms of stopping a major investigation of
6  an alleged drug dealer here in Montgomery.
7  A  That's correct.
8      MS. WAYNE: Your witness.
9          RECROSS EXAMINATION
10  BY MR. TEAGUE OF TOM HALASZ:
11  Q  Agent Halasz, you're not suggesting that Moses
12  Williams and Freddie Williams are related to each
13  other?
14  A  They are not, to my knowledge.
15  Q  Okay, Thank you.
16      FURTHER REDIRECT EXAMINATION
17  BY MR. MOORER OF TOM HALASZ:
18  Q  Counsel for Defendant Carmichael asked you about
19  Mr. Williams wanting money to cooperate with your
20  investigation. What was the money going to be used
21  for, or supposed to be for, that he wanted from you?
22      MS. WAYNE: Objection. Asked and answered
23  already on cross examination.
24      THE COURT: Overruled.
25  A  The money was to be for providing information and

Page 292

1  cooperation.
2  Q  And you said on cross examination that he told
3  you that he owed Mr. Carmichael approximately twelve
4  thousand dollars?
5      MS. WAYNE: Judge, I'm going to object to
6  the leading nature of the question. That's not a
7  question, and it's asked and answered.
8      THE COURT: Well I think he's leading up to
9  another question.
10      MR. MOORER: Which I am, Your Honor.
11  A  Yes, twelve thousand dollars is what I recall.
12  Q  And why was it that Mr. Williams owed twelve
13  thousand dollars to Mr. Carmichael?
14  A  For marijuana that had been stolen before it was
15  sold; therefore, Moses Williams was in debt for the
16  cash value of that marijuana.
17  Q  And what was your plan as to how you were going
18  to use him, Mr. Williams, before he decided that he
19  wasn't going to further cooperate?
20  A  It was to equip him with a concealed recording
21  device and have him discuss this loss, this robbery of
22  the marijuana with Leon Carmichael.
23  Q  And had you obtained that information that you
24  were going to send him to get, what would have been
25  your next step to try to further your investigation?

Page 293

1      MS. WAYNE: Objection, irrelevant. What
2  could have happened and did not happen is totally
3  speculative and it's irrelevant.
4      MR. MOORER: And, Your Honor, they have made
5  issue of things that were not done and that should
6  have been done or the allegation that it should have
7  been done, and --
8      THE COURT: Overruled.
9  A  It would have been to equip him with a concealed
10  recorder and send him to have a controlled meeting.
11  Q  And would you have sent him with the money to pay
12  off that debt?
13      MS. WAYNE: Judge, again, objection.
14      THE COURT: I'll sustain that. I think
15  we've gone into it enough. Let's get back to the
16  issues in this litigation.
17      MR. MOORER: Yes, Your Honor.
18  Q  You were asked on cross examination by counsel
19  for Defendant Carmichael about whether or not you saw
20  Patrick Denton as you were conducting surveillance.
21  Do you recall that?
22  A  Yes.
23  Q  Did you see Freddie Williams when you were
24  conducting surveillance?
25  A  Not that -- And, again, I take this to mean

**Page 294**

1 during the three dates where surveillance was
2 conducted of Thomas Trucking in 2002, if I understand
3 that correctly.
4 Q Yes.
5 A To my knowledge no, I did not see either Patrick
6 Denton or Freddie Williams.
7 Q And at that point did you know all of the
8 individuals who might be involved in the criminal
9 activity that you were investigating?
10 A No.
11 Q Did you even know who Patrick Denton was at that
12 point?
13 A No. The first time I heard Patrick Denton's name
14 was November of 2003.
15     MR. MOORER: No further questions, Your
16 Honor.
17     MS. WAYNE: I have nothing further.
18     THE COURT: Thank you. You may step down.
19     (Whereupon the witness, Tom Halasz, stepped
20 down from the stand.)
21     MR. FEAGA: Mona George, Your Honor.
22     THE COURT: Mona George.
23         M O N A   G E O R G E,
24 the witness herein, having first been duly sworn or
25 affirmed to tell the truth, was examined and testified

**Page 295**

1 as follows:
2         DIRECT EXAMINATION
3     BY MR. FEAGA OF MONA GEORGE:
4 Q Good morning, ma'am.
5 A Good morning. Afternoon.
6 Q Excuse me, good afternoon. It's been a long
7 week.
8     Would you tell the ladies and gentlemen of
9 the jury your name, please.
10 A Mona George.
11 Q And what do you do for a living?
12 A I work at Compass Bank.
13 Q What do you do at the Compass Bank?
14 A I'm the district service and operation manager.
15 Q And what are your duties and responsibilities?
16 A The day-to-day operation of the branches.
17 Security, fraud. You name it. Anything that has to
18 do inside the branch from opening to close.
19 Q Ma'am, did your bank get a subpoena from the
20 United States Government and ask you for records about
21 a certain bank account?
22 A Yes, we did.
23     MR. FEAGA: Your Honor, may I approach the
24 witness?
25     THE COURT: Yes.

**Page 296**

1     MR. FEAGA: If I could have just a minute,
2 Your Honor. We just got these records and I want to
3 put a sticker on them.
4     THE COURT: Fine.
5 Q Ma'am, I want to show you what's been marked as
6 -- Ma'am, I want to show you the contents of an
7 envelope that's now been marked as government's
8 exhibit 48 and ask you if you would take a look at it,
9 please.
10 A Okay.
11 Q Ma'am, just -- it might help you, I took the two
12 general memos that you put in there and they're not
13 stuck in the exact same place they were before, but
14 the rest of the documents are in the same order. That
15 might help you organize it.
16     Ma'am, have you seen the contents of the
17 envelope marked government's exhibit 48 for
18 identification purposes before?
19 A Yes, I have.
20 Q Ma'am, in your capacity at the bank as -- And,
21 again, your title is?
22 A District service and operation manager.
23 Q Is there a shortened version we can call you?
24 A D. S. O. M.
25 Q D. S. O. M. Okay. As the -- How about manager?

**Page 297**

1 A How about custodian?
2 Q Or manager.
3 A Manager is fine.
4 Q As a manager at Compass Bank are you a custodian
5 of the records at that bank?
6 A Yes.
7 Q Okay. And is it the usual practice of the bank
8 to maintain records like the ones that you brought
9 with you?
10 A Yes, absolutely.
11 Q And do you maintain them in the normal and
12 ordinary course of business?
13 A Yes.
14 Q And is the information that's recorded in those
15 records recorded by the bank at or near the time of
16 the transaction that's being recorded?
17 A Yes, sir, they are.
18     MR. FEAGA: Your Honor, can we get an
19 authentication ruling on those?
20     THE COURT: Yes. Is there any objection?
21     MR. BRUNSON: No objection.
22     THE COURT: They're authentic. Let's move
23 on.
24 Q Ma'am, would you tell the ladies and gentlemen of
25 the jury what those records are.

Page 298

1 A The first two are a summary of some checks and
2 some deposit slips.
3 Q All right. Can I take those from you?
4 A Sure.
5 Q Now what are the rest of those records that you
6 brought with you?
7 A Signature cards on a personal account. Bank
8 statements. Copies of deposits. And copies of
9 checks.
10 Q Okay. Now what is a -- Let me ask you, whose
11 name is that account in?
12 A Sherry Pettus.
13 Q Okay. And do your records reflect what type of
14 account that is?
15 A It's a personal checking account.
16 Q And do your records reflect when it was opened?
17 A Yes, sir, on May 28, 2002.
18 Q Was there a deposit made on that date, ma'am?
19 A Yes, sir, a hundred dollar deposit.
20 Q Let's see, someone has walked away with my Magic
21 Marker.
22     MS. JAMES: You can use mine.
23     MR. FEAGA: Thank you.
24 Q Okay. You said the account was opened when?
25 A May 28, 2002.

Page 299

1 Q May 28, 2002. And you said the opening deposit
2 into that account was how much?
3 A A hundred dollars.
4 Q One hundred dollars. So your records reflect
5 what the type of money that was used to open that was?
6 Was it cash, or check?
7 A Cash.
8 Q One hundred dollars in cash opened up that
9 account.
10     Now, ma'am, who had signature authority on
11 that account?
12 A Sherry Pettus.
13 Q And what is signature authority?
14 A She's the only one that can sign on that account.
15 Q Okay. And when you say "she's the only one that
16 can sign on that account," what do you mean?
17 A She's the only person authorized to make deposits
18 and withdrawals from that account.
19 Q Okay. Does that mean that based on the records
20 the bank has, she owns that account?
21 A Absolutely.
22 Q Does anyone else?
23 A She's the owner of that account.
24 Q Does anyone else own that account?
25 A No.

Page 300

1 Q Now, ma'am, you said that you prepared two
2 summary charts from that information.
3 A Yes, sir.
4 Q And what I'm going to do now is put up here --
5     MR. FEAGA: Your Honor, can we have moved
6 into evidence -- We want to move into evidence what's
7 been marked as government's exhibit 48 for
8 identification purposes as government's exhibit 48.
9     THE COURT: It's admitted.
10 Q Now, ma'am, I've laid up on the projector what's
11 been marked as government's exhibit 48(a) for
12 identification purposes. Do you recognize that?
13 A Yes, sir, I prepared it.
14 Q Okay. Now I'm going to lay up what's been marked
15 as government's exhibit 48(b) for identification
16 purposes. And I don't think we can get the whole
17 thing on at one time, so I'll use part of it at a
18 time. Now, ma'am, I see now up on the screen in front
19 of you, and I think it's on everyone's screen in the
20 courtroom, a document styled at the top "Deposits".
21 Do you recognize that? It's marked as government's
22 exhibit 48(b).
23 A Yes.
24 Q Okay. And how is it that you recognize that?
25 A I prepared that one.

Page 301

1 Q Okay. Now would you start at the very top of
2 that document? I see up there there's an entry that
3 says -- let me move it over, there we go -- that says
4 five twenty, what's that date on there?
5 A Five twenty-eight oh two.
6 Q Okay. And then it says under amount, one hundred
7 dollars. And then it has the amount, then it has cash
8 and check. And this one has a hundred dollars under
9 cash.
10 A That's correct.
11 Q Would you explain to the ladies and gentlemen of
12 the jury, since you created this chart, what these
13 entries are reflecting.
14 A In the first column is the date the deposit was
15 made. The second date is the date the transaction was
16 posted. For example, if it's on a weekend we don't
17 post it until -- if the deposit was made on a Saturday
18 it's not posted until Monday, so it will be a
19 different date. So I made a column for that.
20 Q Okay.
21 A The amount is the column for the total amount of
22 the deposit in that case. The cash column is how much
23 of that deposit was cashed. The check column was how
24 much was the check.
25 Q Okay. So for each one of these dates, and we

## Page 302

1 look at the amount, we can look over in the cash or
2 check column and we can determine if that deposit on
3 that date is either cash or check, is that right?
4 A  That's correct.
5 Q  Now do the records that you brought with you
6 contain the actual documents that back up what you've
7 put on your chart?
8 A  Yes, sir.
9 Q  So the deposit tickets are in that green envelope
10 marked government's exhibit 48?
11 A  Yes, sir, it has the deposit slip and the offset.
12 Q  Okay.  And how is it when you look at a deposit
13 slip can you tell whether it's cash or check?
14 A  Yes, it's cash.
15 Q  And that's how you did this?
16 A  Yes, sir.
17 Q  All right.  Ma'am, would you tell the ladies and
18 gentlemen of the jury, if you would, just the entries
19 that are there so far.  Would you mind telling them
20 the dates and the amounts of cash deposits that went
21 in this account starting on the day it was opened, May
22 28, 2002.
23 A  On May 28th a hundred dollar deposit was made
24 that was cash.  May 30th, three thousand dollar
25 deposit was made that was cash.  June 11th, '02, a

## Page 303

1 fifty-four hundred dollar deposit was made.  Four
2 thousand of it was cash and fourteen hundred dollars
3 of it was a check.  On June 11th, again, a hundred and
4 ten dollar deposit was made.  It was all cash.  A
5 hundred and ten dollars cash.
6 Q  Okay.  Now, ma'am, stop there so we can move
7 along.  And just for June, would you tell the ladies
8 and gentlemen of the jury just the amounts of the cash
9 deposits into that account in June of 2002, the second
10 month after it opened.
11 A  Fifty-four hundred, a hundred and ten, twelve
12 hundred, sixty-eight --
13       THE COURT:  No, you're giving the amounts.
14       MR. FEAGA:  That's what I want, just the
15 amounts for the month of June.  Yes, sir.
16 A  Sixty-eight seventy and sixty-eight sixty-two.
17 Q  All right.  And what about July, the third month?
18 A  It's a little fuzzy.  Can you move it up a little
19 bit?
20 Q  Oh, yes, ma'am.  Did I go too far?
21 A  No, that's fine.
22 Q  Great?
23 A  In July -- You want the total amount, or just
24 cash?
25 Q  Just the amount of cash.  And don't worry about

## Page 304

1 the dates.  They can look at the --
2       THE COURT:  Do you want the amount or the
3 cash amount?
4       MR. FEAGA:  The cash amount.  Yes, sir, Your
5 Honor.
6       THE COURT:  She read the total amount.
7       MR. FEAGA:  I'm sorry.
8 Q  Let's start that over.  Would you go to June and
9 read just the cash deposited into that account.
10 A  Okay.  Four thousand.  A hundred and ten.
11 Sixty-eight seventy.
12 Q  Okay.  And what about July?
13 A  Eighty-two sixteen.  Six thousand.  Six thousand.
14 Sixty-nine eighty-five.  Nine thousand.  Six hundred
15 dollars.  And nine thousand dollars.
16 Q  All right.  Let's go to August.  How much cash
17 got put in the account in August?
18 A  Seven thousand nine hundred and sixty.  Five
19 thousand five hundred and eighty.  Eight thousand
20 eight hundred and fifty.  Five thousand three hundred
21 and forty.
22 Q  All right.  How much cash got put in the account
23 in September of 2002?
24 A  Six thousand two hundred and one.
25 Q  And what about October?  And by the way what's

## Page 305

1 the first cash deposit in October?  What's the date of
2 it?
3 A  October 15th, '02.
4 Q  Okay.  Would you read the entries for just the
5 next twenty-two days, roughly, which would take us to
6 the bottom of the charts.  In twenty-two days, how
7 much cash was deposited into this account at Compass
8 Bank?
9 A  I'm sorry, the cash amount?
10 Q  Yes, ma'am.
11 A  Nine thousand seven hundred and thirty.  Nine
12 thousand.  Ninety-three hundred.  Nine thousand.  Six
13 thousand seven hundred and twenty-six.  Six thousand
14 six hundred.  One hundred.  Nine thousand five
15 hundred.
16 Q  All right.  Now I'm going to go to the second
17 page of government's exhibit 48(b).  Would you tell
18 the ladies and gentlemen of the jury how much cash was
19 deposited in that account in the next -- from the 8th
20 of November until the 27th of November, the rest of
21 November.  How much cash went in there?  That would be
22 roughly what, nineteen days?
23 A  Nine thousand seven hundred.  One thousand nine
24 hundred and ten.  Nine thousand.  Nine thousand eight
25 hundred.  Nine thousand four hundred and eighty-nine.

Multi-Page™

Page 306

1 Nine thousand eight hundred.
2 Q Let me stop you there, ma'am. Have you heard of
3 something called a cash transaction report?
4 A Yes, sir.
5 Q Would you tell the ladies and gentlemen of the
6 jury what a cash transaction report is.
7 A We are required by the federal government to fill
8 out any -- a report that's called Cash Transaction
9 Report, Large Currency Transaction Report for any cash
10 transaction over ten thousand and one penny.
11 Q Okay. Do you know why you are required to file
12 those cash transaction reports if it gets over ten
13 thousand?
14 A Yes, sir.
15 Q What is the reason?
16 A Different things. Money laundering. Terrorists
17 moving accounts. Any type of activity that is
18 illegal.
19 Q All right. Now I stopped you, I think -- well
20 let me just rather than guess where I stopped you,
21 would you pick back up on the 15th of November and
22 just read from there the cash deposits into this
23 account through the last entry at the bottom of the
24 page starting on the 15th of November. How much cash
25 went in from the 15th of November -- Well, yeah, let's

Page 307

1 take it through the end of December.
2 A Nine thousand four eighty-nine. Nine thousand
3 eight hundred. Nine thousand three hundred. Five
4 hundred. Seven thousand four hundred. Three thousand
5 one hundred and seventy. One thousand nine hundred
6 and sixty-five. Two thousand nine ninety-five. Four
7 thousand nine-fifty.
8 Q Okay. And are there any more cash deposits in
9 the month of January of '03?
10 A There was one.
11 Q Okay. Now maybe I'm reading it wrong. It looks
12 like there may be one on the 9th of January '03 and
13 one on the 13th.
14 A Yes, I'm sorry. January, nine thousand
15 twenty-six, and seven thousand four hundred.
16 Q So it would be nine hundred or nine thousand
17 twenty-six?
18 A Nine hundred and twenty-six.
19 Q All right, ma'am.
20     THE COURT: Can we speed this up? I think
21 the jury gets the gist of it.
22     MR. FEAGA: Yes, sir, I'm going right there,
23 Your Honor. Thank you, Your Honor.
24 Q Now what was the date of the last cash deposit
25 into that account?

Page 308

1 A January 13th, '03.
2 Q And, ma'am, can you tell me during the June,
3 July, August, September, October, November, December
4 time frame, and we'll just say another month for the
5 half of January there, during the eight months that
6 this account has cash being deposited into it, how
7 much total cash was deposited into that account?
8 A Can you move up the screen a little bit?
9 Q Yes, ma'am. Hold on one second. I went a little
10 too far there.
11     What's the total amount of the cash that
12 went into that account?
13 A Two hundred and forty-nine thousand two hundred
14 and ninety-eight dollars.
15 Q Can you say that again?
16 A Two hundred and forty-nine thousand two hundred
17 and ninety-eight dollars.
18     THE COURT: Can you, members of the jury,
19 see that? Do any of you have any difficulty? Maybe
20 one of you are as nearsighted as I am, you need to get
21 right up on it.
22 Q Do your records indicate when this account
23 closed, ma'am?
24 A May 14th, 2003.
25 Q May 14th, '03. Ma'am, I'm going to ask you, if

Page 309

1 you would, I'm going to hand you what's been marked
2 government's exhibit 48(b) for identification purposes
3 at this point. Would you write the dates that that
4 account opened and closed on the blank spot on the
5 first page of that exhibit that you created? Do you
6 have a pen?
7 A No, sir.
8 Q Here, use mine.
9 A Thank you.
10 Q Now if I may retrieve that from you.
11     MR. FEAGA: Your Honor, I'd like to offer
12 into evidence what's been marked as government's
13 exhibit 48(b) as government's exhibit 48(b).
14     THE COURT: Okay. Now that's one of your
15 charts?
16     MR. FEAGA: Yes, sir, it's a summary chart.
17     THE COURT: I allow it but I need to give a
18 charge to the jury about how they're to consider it.
19     MR. FEAGA: Yes, sir.
20     THE COURT: Members of the jury, I don't
21 know whether the defendants will have some, but if
22 they do and if the government has any, and in fact it
23 does, these charts have no independent evidentiary
24 value but are to be used merely to demonstrate and
25 summarize certain other evidence in the case that

Page 310

1 should have been already admitted. You are charged
2 that you should examine the basis on which the charts
3 or summaries rest and be satisfied that they
4 accurately reflect other evidence in the case.
5 If you conclude that they don't accurately
6 reflect other evidence in the case, then you should
7 disregard the charts or summaries to that extent. So
8 it's really the underlying evidence that you're
9 supposed to be considering. If the charts don't
10 accurately show the underlying evidence, then the
11 charts should be ignored. The charts have no
12 evidentiary value themselves.
13 With that understanding as to all charts, it
14 may be admitted. So 48(b) is admitted.
15 Q Now, ma'am, I'm going to put another exhibit up
16 that's been marked 48(a) and ask you if you would
17 examine that chart that I've now put up on the screen,
18 part of it anyway, and ask you do you recognize that?
19 A Yes, sir.
20 Q Would you tell the ladies and gentlemen of the
21 jury what that is.
22 A This is a summary of some of the checks that were
23 written on the account.
24 Q Okay. And when you say a check being written on
25 the account, what do you mean?

Page 311

1 A A check originated from the account signed by
2 Sherry Pettus.
3 Q What's the effect of a check originating on the
4 account being signed by Miss Pettus insofar as the
5 balance that's in this account?
6 A It comes out of the balance.
7 Q Okay. And is the money that you just testified
8 to as having gone into the account, the money that
9 then comes back out based on this chart?
10 A Yes, sir.
11 Q Okay. And did you prepare this chart?
12 A Yes, I did.
13 Q Are the exhibits that you brought with you in the
14 green envelope, do they contain the actual checks or
15 copies of them that were written out of this account?
16 A Yes, sir.
17 Q And they're the ones that you list on this?
18 A Yes, sir.
19 Q Now which ones of the checks did you pull from
20 the account to put on this chart?
21 A I pulled only the checks that had on the "For"
22 line "Multi-Investment" written, what the purpose of
23 that check is. It has -- There is a "For" line on the
24 check, and it says on here "For Multi-Investment" or
25 "For Carmichael Center" or "For Leon Carmichael" or

Page 312

1 "For Leon." Anything that has to do with Leon
2 Carmichael, Multi-Investment or the Carmichael Center.
3 Q And/or thirty-two --
4 THE COURT: I'm going to have to interrupt
5 you, Mr. Feaga. I'm going to have to excuse the jury
6 for just a moment.
7 (Whereupon, the jury was escorted out of the
8 courtroom, and the following colloquy ensued):
9 THE COURT: I understand they have Moses
10 Williams, and I'm concerned about keeping him
11 overnight. If you want to use him, I would like to
12 use him today. I don't want to just keep him in jail
13 overnight.
14 U. S. DEPUTY MARSHAL: He's on his way, Your
15 Honor.
16 THE COURT: Oh, he's not here yet?
17 U. S. DEPUTY MARSHAL: He's on his way.
18 He's not in the building yet. He should be here
19 shortly.
20 THE COURT: About how much longer?
21 U. S. DEPUTY MARSHAL: I would say in the
22 next five or ten minutes.
23 THE COURT: Okay.
24 MR. FEAGA: Your Honor, if I may, I'm not
25 sure how we got to this point. I know that

Page 313

1 Mr. Moorer, as I understand it, was attempting to
2 rebut attempted impeachment on their part.
3 THE COURT: Well the primary evidence that I
4 think the defendants took issue with was Mr.
5 Williams's comments that he was afraid of Mr.
6 Carmichael and all of this. And I said that without
7 reaching the issue of whether it should come in for
8 other reasons, if Mr. Williams is going to testify
9 anyway about the alleged conspiracy and what his role
10 allegedly was in the conspiracy, then it will come in,
11 period. It doesn't make any difference.
12 MR. FEAGA: It's my understanding, Your
13 Honor, that Mr. Williams' position right now is that
14 he is unwilling to testify. That's what I've been
15 told.
16 THE COURT: Then why am I getting him in
17 here? That's not what Mr. Moorer told me.
18 MR. FEAGA: Well, I'm not --
19 MR. MOORER: As I said, he was not my
20 witness, but I understood he was under subpoena and I
21 spoke out of ignorance to that effect, Your Honor.
22 But I have asked that we get the documentation that's
23 necessary to give him immunity, Your Honor, so that we
24 would be able to compel his testimony. And I expect
25 to have that tomorrow.

Page 314

1  THE COURT: You expect to have it testimony?
2  MR. MOORER: Yes, sir.
3  THE COURT: Then why don't we just wait, and
4  I'll just have to keep him, then. I know you have to
5  get that from D. C., is that correct?
6  MR. MOORER: Correct, Your Honor.
7  MS. WAYNE: I'm not Mr. Williams' lawyer,
8  Judge, but I have to tell you that that wreaks a bit
9  of governmental coercion. We're going to leave you in
10 jail, we're going to bring you in here and we're going
11 to give you immunity so you can testify for us, but
12 we're going to keep you in jail overnight to do that.
13 THE COURT: Well I'm concerned that with the
14 representations made that he's an unwilling witness,
15 I'm going to keep him. That's my decision.
16 MS. JAMES: Your Honor, may I chime in here
17 for a minute?
18 THE COURT: Yes.
19 MS. JAMES: He was here Monday.
20 THE COURT: Yes.
21 MS. JAMES: He was sitting out in the hall.
22 I think he may have been here yesterday, too. My
23 client indicates he saw him yesterday, too. I didn't
24 get the sense that he was trying to evade a subpoena
25 or anything like that. As I understand, he may have

Page 315

1  been or thought he was excused.
2  THE COURT: I don't know.
3  MR. FEAGA: Maybe we should bring him in and
4  find out.
5  MS. JAMES: Yeah, that would be good.
6  THE COURT: Is he here yet?
7  U. S. DEPUTY MARSHAL: He's on his way up
8  right now, Your Honor.
9  THE COURT: Well, then let's just wait.
10 You may step down.
11 (Whereupon the witness, Mona George, stepped
12 down from the stand.)
13 (Whereupon, Moses Williams was escorted into
14 the courtroom.)
15 THE COURT: The clerk will swear in Mr.
16 Williams.
17 M O S E S    W I L L I A M S,
18 the witness herein, having first been duly sworn or
19 affirmed to tell the truth, was examined and testified
20 as follows:
21 THE COURT: Proceed, Mr. Moorer.
22 MR. MOORER: Your Honor, we really need to
23 finish with Ms. George today?
24 THE COURT: Right.
25 VOIR DIRE EXAMINATION

Page 316

1  BY MR. MOORER OF MOSES WILLIAMS:
2  Q  For the record, would you state your name,
3  please.
4  A  Moses Williams.
5  Q  Mr. Williams, do you live here in Montgomery?
6  A  Right.
7  Q  Are you familiar with a D. E. A. agent by the
8  name of Tom Halasz?
9  A  I think so, yes.
10 Q  Did you have occasion to meet Agent Halasz back
11 in 2003 -- or no, I'm sorry, 2002 or that time frame?
12 A  Yes, I did.
13 Q  And at the time that you met with him, were you
14 meeting with him for purposes of giving him
15 information about drug trafficking in the Montgomery
16 area?
17 A  I'm under oath so I'm going to tell truth. I met
18 with him under the influence that I could sway him out
19 of tricking him out of some money in pretending with
20 him that I could give him some information. I heard
21 they did that pretty easy.
22 Q  Did you tell him at that time that you had
23 information related to drug trafficking in Montgomery?
24 A  Yes, I did.
25 Q  And at the time that you told him that you had

Page 317

1  information related to drug trafficking in Montgomery,
2  did you give him any names of individuals who were
3  involved with trafficking drugs here in Montgomery?
4  A  I gave him some names of some individuals, but I
5  gave him names of individuals that I knew for a fact
6  that was trafficking in drugs for a fact.
7  THE COURT: Did you know Mr. Carmichael was
8  trafficking in drugs?
9  THE WITNESS: No, I didn't.
10 Q  Did you tell Agent Halasz that Mr. Carmichael was
11 trafficking in drugs?
12 A  I told him I heard of such a thing, and I knew
13 him pretty well.
14 MS. JAMES: We can't hear him, Judge.
15 THE COURT: Okay. Speak up. Speak up.
16 A  I told him I heard of such a thing. I knew him
17 pretty well so, you know, if he would give me X-amount
18 of money I would see what I could do to infiltrate it
19 and things like that.
20 Q  And did you tell Agent Halasz that you were owed
21 -- that you owed money to Mr. Carmichael?
22 A  I told him something similar to that, yeah.
23 Q  And did he ask you to wear a wire and go in and
24 have a meeting with Mr. Carmichael?
25 A  He sure did.

### Page 318

1 Q And you told him, Halasz, that the reason that
2 you owed money to Mr. Carmichael was related to a drug
3 debt?
4 A I might have told him something similar to that.
5     THE COURT: Was that the truth?
6     THE WITNESS: No, it wasn't.
7     THE COURT: Go ahead.
8 Q And did Agent Halasz at some point begin to wire
9 you up to go meet with --
10 A I wouldn't dare, because I knew I couldn't do it
11 because I couldn't come to him and tell him, you know,
12 how could I --
13     My question was --
14     (Inaudible; two speaking at once.)
15     THE COURT: Just a minute. Just a minute.
16 A No, he didn't.
17 Q My question is -- And please just answer my
18 question. There may be other parts that you get to
19 explain, but just -- I'm going to get the questions
20 out and I need an answer to them, okay?
21 A Yeah.
22 Q Did Agent Halasz begin to wire you up for a
23 meeting with Mr. Carmichael?
24 A No.
25 Q Did he ask you to go in and meet about Mr.

### Page 319

1 Carmichael?
2 A Yes.
3 Q Did you tell Agent Halasz that you were afraid to
4 go do that?
5 A No.
6 Q Did you ever tell Agent Halasz that you were
7 afraid that if Mr. Carmichael found out about what you
8 did, that is going in to meet with him, that he would
9 then kill you?
10 A I told Mr. Halasz, or whoever his name is, so
11 many things, I don't know. At the time I was under
12 the influence --
13     THE COURT: Could you have told him that?
14     THE WITNESS: It's a possibility.
15     THE COURT: Okay. Would you have been
16 telling the truth?
17     THE WITNESS: No, I would not have been
18 telling the truth.
19     THE COURT: Anything else? Any cross?
20     MS. WAYNE: Judge, just for a little bit of
21 direction. We are attempting to establish that --
22     THE COURT: Well there are two things.
23 First we actually have his testimony now. I'll be
24 very frank with you, outside the presence of the jury
25 I assume you want to present him and not the

### Page 320

1 government. Or do you?
2     MS. WAYNE: Judge, I don't know because
3 we're hearing this now under oath so I haven't
4 assessed that, frankly.
5     THE COURT: Okay.
6     Well, actually one other issue is, why
7 weren't you here earlier today?
8     THE WITNESS: Well because I had been coming
9 here all week and I had heard from the prosecution
10 list that had been called out my name wasn't on it.
11 So I was missing a lot of days from work and I wasn't
12 getting paid so I went to work.
13     THE COURT: You were at work today?
14     THE WITNESS: You know when the trial first
15 started and the prosecution gives out a witness list
16 and stuff, and I was told I wasn't on it. So --
17     THE COURT: Who told you that?
18     THE WITNESS: I forget who it was, but it
19 might have been one of those ladies. I'm not sure.
20     THE COURT: Someone associated with the
21 prosecution?
22     THE WITNESS: Someone that had been in the
23 courtroom. That's all I know.
24     THE COURT: Okay. Do you have anymore
25 questions for him?

### Page 321

1     MR. MOORER: Yes, Your Honor.
2 Q Didn't Miss Morris, the lady who is seated here,
3 tell you that you had to be here each day?
4 A No, she did not. She told me she wanted me to be
5 back Tuesday.
6 Q And every day thereafter?
7 A No, she did not. I came and asked her, I said,
8 "I got a job. I need to attend my job because I need
9 to make the money."
10     She said, "We can work that out with your
11 employer," or something like that. "But I do want you
12 here tomorrow." And that's what she told me.
13     THE COURT: "Tomorrow" being?
14     THE WITNESS: Tuesday.
15 Q And you're being truthful about that?
16 A Yes, I'm being truthful.
17 Q To the same extent you are about everything else
18 you've said?
19 A The same thing about everything else.
20     THE COURT: Do you have any questions for
21 this witness?
22     VOIR DIRE EXAMINATION
23     BY MS. WAYNE OF MOSES WILLIAMS:
24 Q Mr. Williams, because you said "those ladies,"
25 when you indicated that you actually spoke to someone

Page 322

1  that --
2  A  It might have been one of the witnesses. I don't
3  know. Or whatever.
4  Q  It wasn't me?
5  A  No, it wasn't you.
6  Q  Okay. But you have had contact in terms of the
7  prosecution, your contact has been with Miss Morris?
8  A  When I was trying to get dismissed so I could go
9  to work, right.
10      MS. WAYNE: Judge, if I could just have a
11  moment.
12      MS. MORRIS: Your Honor, while she's doing
13  that, as an officer of the court, in Agent DeJohn's
14  presence we did speak with Mr. Williams and told him
15  he needed to be here each and every day until he was
16  called to testify.
17      THE COURT: Okay. I guess another question
18  is do you want him as a witness in light of his
19  testimony?
20      MR. MOORER: Your Honor, I don't know. It
21  may very well be that we decide to call him anyway. I
22  can't say that at this point, Your Honor.
23      THE COURT: You can't say that you will call
24  him?
25      MR. MOORER: I can't say that we won't.

Page 323

1      THE COURT: You can't say that you won't?
2      MR. MOORER: Correct.
3      MS. WAYNE: I mean, Judge, I don't think I
4  have any questions because, you know, he's here and
5  this is what he's going to say, and --
6      THE COURT: Well, I can keep him and I have
7  some concerns about his voluntariness. However, I'll
8  tell you this now -- Would you step out for a minute?
9      THE WITNESS: Yes, sir.
10      (Whereupon, Moses Williams was escorted out
11  of the courtroom and the following colloquy ensued):
12      THE COURT: I didn't want to say this in his
13  presence.
14      If I let him go and you've had an
15  opportunity to cross examine him, his testimony here
16  may be used in the trial. Because both sides have had
17  an opportunity to examine him.
18      MS. WAYNE: Judge --
19      THE COURT: I'm assuming if either side
20  wants to use it. It may be there is that possibility,
21  so I'm putting you on notice that I'm going to order
22  him back, but if he were to go to New York or to
23  Europe or to die, if he's just unavailable there is
24  that possibility. So I'm putting you on notice now
25  that if he's an unavailable witness who has given

Page 324

1  testimony under oath and both sides have had an
2  opportunity to examine him.
3      Now whether I would allow it in is a
4  different question, but I'm just saying there's the
5  possibility.
6      MS. WAYNE: I understand, Judge. I have to
7  tell the Court that I understand in terms of
8  unavailability. It seems to me, frankly, the man has
9  been around. He's gone to work and he's not hiding.
10  So frankly I don't care. He's their proffered witness
11  and we aren't calling him at this point.
12      THE COURT: Well I wanted to make sure that
13  you don't want to use him, because if he leaves, then
14  if you don't want to use him then the government may
15  not want him either.
16      MS. WAYNE: I understand. We've subpoenaed
17  all the witnesses we want.
18      THE COURT: So you will not be calling him,
19  I mean as far as you know?
20      MS. WAYNE: Based upon their case at this
21  point, it doesn't appear so. But we have subpoenaed
22  our witnesses.
23      THE COURT: Very good. So you don't need to
24  keep him?
25      MS. WAYNE: No, we don't want to keep him.

Page 325

1      THE COURT: You don't want to keep him?
2      MS. WAYNE: No.
3      THE COURT: What about you, Mr. Teague, do
4  you want to keep him?
5      MR. TEAGUE: No, Your Honor.
6      THE COURT: I think the government needs to
7  make a decision about him. I hate to keep him
8  overnight just based on speculation that you may want
9  to use him. The defendants don't want to use him. I
10  don't want to keep him for two or three days and then
11  you say you don't want to use him.
12      MR. MOORER: Yes, Your Honor. I agree. He
13  was at work, so apparently he doesn't plan to flee.
14  But we would ask that he be told to be here each day,
15  as he has already been instructed.
16      THE COURT: I will do that, then. Now if he
17  doesn't show, that will be the end of that.
18      MS. WAYNE: Now, Judge, what I want to find
19  out, because it's unusual, if they don't call him, is
20  the Court indicating that if I don't call him to
21  negate this statement that's out that we've objected
22  to that came out, that I am now waiving that if I
23  don't call him back?
24      THE COURT: I'm not sure what you're
25  waiving. I don't know if you're waiving at anything.

Page 326

1 I can't tell you you're waving at anything. All I can
2 tell you is when I rule on things I consider the total
3 actions of the lawyers and, you know, what's in the
4 record is now in the record. So you just have to make
5 that judgment call yourself. I can't help you.
6        MS. WAYNE: All right. I'll just indicate
7 for the record, Judge, though, that this is a
8 prosecution proffered witness that they read on their
9 witness list and intended to use to prove their case.
10 He was never read by us in the defense of our case.
11 So I think the record is pretty clear on that.
12        THE COURT: Okay, very good.
13        Well bring him back out and I'll just tell
14 him to appear tomorrow and every day on time.
15        (Whereupon, Moses Williams was escorted back
16 into the courtroom.)
17        THE COURT: Would you stand right there, Mr.
18 Williams. I'm going to let you go and go home and get
19 back to your job, but you must be here.
20        What time is he supposed to be here?
21        MS. MORRIS: I think it's nine o'clock every
22 day.
23        THE COURT: Nine o'clock every day until I
24 tell you to leave. You understand?
25        If you don't appear, then I'll have you

Page 327

1 picked up again.
2        MOSES WILLIAMS: I understand.
3        THE COURT: So you're to be here at nine
4 o'clock and to stay here at least until five-thirty
5 every day. You understand that?
6        MOSES WILLIAMS: I understand.
7        THE COURT: Now, can I trust you to do that?
8 Otherwise I'll have to have you picked up.
9        THE WITNESS: Most definitely.
10        THE COURT: Okay. Thank you very much.
11 You're excused.
12        (Whereupon, Moses Williams was escorted out
13 of the courtroom.)
14        THE COURT: Okay. Let's finish with this
15 last witness, because I understand she has a flight.
16        Bring in the jury.
17        (Whereupon, the jury was escorted into the
18 courtroom.)
19                DIRECT EXAMINATION
20           BY MR. FEAGA OF MONA GEORGE
21              (CONTINUING):
22        THE COURT: Members of the jury, we may go a
23 little bit lodger today because this witness has a
24 flight in the morning, unfortunately. For us, that
25 is.

Page 328

1 Q Ma'am, I'm putting government's exhibit 48 back
2 in front of you. I don't have too many more
3 questions, ma'am, but if you would, when we broke you
4 were telling the ladies and gentlemen of the jury that
5 this chart, and I'll summarize to be brief, was a
6 summary of the checks that came out of that account
7 that had on the purpose line something related to
8 somebody named Leon Carmichael, or Leon-Investments,
9 or The Carmichael Center, or Thirty-two twenty-six
10 Brookwood Drive, is that right?
11 A That's correct.
12 Q Okay. Now what is the total amount of checks
13 that were written out of that account that were made
14 payable that had on the purpose line of the check that
15 it had something to do with Leon Carmichael?
16 A Two hundred and eight thousand two oh one
17 thirteen.
18 Q Two oh eight --
19 A Two oh one thirteen.
20 Q Okay. Now if I could, just so we make sure we're
21 all on the same sheet of music, would you pull the
22 second check out of those materials and let me see it
23 when you have it for twelve thousand seven hundred and
24 seventy-five dollars for "Carmichael Center
25 materials."

Page 329

1 A Yes, sir, it's right there.
2 Q May I see it?
3        MR. FEAGA: Permission to publish, Your
4 Honor. I want to put it on the projector.
5        THE COURT: Yes.
6 Q Would you show the ladies and gentlemen of the
7 jury, if you point your screen it will make a mark,
8 where the notation is that let you know that this is
9 one of the checks that we asked you to look for.
10 A It's on the "For" line.
11 Q Would you point to it on your screen.
12 A Right there.
13 Q And what is that check made payable to you?
14 A Allied Fence Company.
15 Q And when was that check written?
16 A January 9, 2003.
17 Q And whose signature appears on it?
18 A Sherry Pettus.
19 Q Did that check deplete the funds, the cash money
20 that went into that account?
21 A Yes, sir.
22 Q Can we take a look at the check dated November
23 the 12th, 2002 for forty-six thousand one hundred
24 dollars that says "For Leon Carmichael"?
25 A What's the dollar amount?

## Page 330

1 Q  The dollar amount of the check would be forty-six
2 thousand one hundred dollars.
3 A  Okay.
4 Q  Ma'am, would you take a look at the check that
5 you removed from the bulk exhibit marked 48(a) and
6 tell the ladies and gentlemen of the jury, if you
7 would point on your screen or circle the part that
8 says -- it's got a notation on it that lets you know
9 that that was one of the checks we wanted you to look
10 for.
11        (Whereupon, the witness complied.)
12 Q  Okay.  Now, that check, ma'am, who is it made
13 payable to?
14 A  Bank Card Services.
15 Q  Does it have an account number on it?
16 A  Yes, sir.
17 Q  Okay.  And does it have a date on it, when it was
18 written?
19 A  November 7, 2002.
20 Q  And whose signature appears on that check?
21 A  Sherry Pettus.
22 Q  Ma'am, are all of the checks contained on
23 government's exhibit 48 going to be similar to this
24 one in terms of that if the jury wanted to, they could
25 take your list and pull out of your exhibit a check

## Page 331

1 just like this?
2 A  Yes, sir.
3 Q  And they could do the same thing with the deposit
4 tickets for the other exhibit, that would be 48(b)?
5 A  Yes, sir.
6     MR. FEAGA:  Okay.  Your Honor, we would move
7 to introduce into evidence what's been marked as
8 government's exhibit 48(a), the summary chart of the
9 checks out.
10    THE COURT:  It's admitted under the same
11 charging instructions that I gave you regarding all
12 charts and summaries.
13    MR. FEAGA  Your Honor, we tender the witness.
14          CROSS EXAMINATION
15    BY MR. BRUNSON OF MONA GEORGE:
16 Q  Miss George, I'm Ron Brunson.  I met you out in
17 the hall earlier yesterday.  I'm one of Mr.
18 Carmichael's attorneys.
19    I realize that the time is late, but I do
20 have a couple of questions about these charts and
21 about the bank records you brought.
22 A  Sure.
23 Q  As far as the charts go, you prepared these
24 charts at the direction of the prosecutor?
25 A  Yes.

## Page 332

1 Q  Did they call you and ask you what they wanted on
2 these charts?
3 A  Yes, sir.
4 Q  And they told you exactly what to put in each
5 column and so forth and go through the account?
6 A  No.  They just wanted to know the total amount of
7 the deposit.  I created the chart so I can read it the
8 way I know how.
9 Q  But the chart relating to the checks, those are
10 just selected checks.
11 A  That's correct.
12 Q  That's not all the checks?
13 A  No, that's not all the checks.
14 Q  And you testified that you were asked to find the
15 checks that had some notation in the memo section
16 relating to Mr. Carmichael or the Carmichael Center.
17 A  Yes, sir.
18 Q  Now in your opinion, if someone were trying to
19 hide the fact that these checks were not for them,
20 works they put the name of the person in the memo
21 section that the check is intended for?  In other
22 words if they were trying to hide it, would they write
23 that name in the memo section, in your opinion?
24 A  I wouldn't know.  I'm not sure what you're asking
25 me.

## Page 333

1     THE COURT:  The point you're trying to make
2 is if someone puts something in the memo section of
3 the check, that's for everybody to see.
4 A  That's correct.
5     THE COURT:  Okay.
6 Q  And in essence they're not -- They could have
7 dove left it blank.
8 A  Yes.
9 Q  Or they could have put some unintended purpose in
10 there and maybe hidden the fact that they were
11 involved with the check, is that right?
12 A  That's correct.
13 Q  When you looked at the deposit analysis on this
14 account you went through and identified certain
15 deposits that were made.  I assume that's all the
16 deposits that went in the account, is that correct?
17 A  That's correct.
18 Q  And you noted that there were many cash deposits
19 into the account.  Is there any way for you to know
20 what the denominations of the cash that went into the
21 account was?
22 A  Not from these copies, I can't.
23 Q  All you really have is a record is a deposit slip
24 that indicates that cash went in the account and a
25 cash-in ticket that would have accompanied that, is

Page 334

1  that right?
2  A  That is correct.
3  Q  You can't tell where the cash came from, can you?
4  A  No, sir.
5  Q  If it were a check, that would be different, you
6  can kind of follow back or go in the other direction
7  and find all that information out.
8  A  Yes, sir.
9  Q  But cash there's no way of telling where it came
10 from.
11 A  No, sir.
12 Q  You don't know of the denominations at this
13 point, nobody really made any record of that?
14 A  Not at this point.
15 Q  You don't know how the cash looked, whether it
16 was new or old or wadded up or stacked or any other
17 way, right?
18 A  No, sir.
19 Q  And at this point we don't even know how it
20 smelled, if it did smell.
21 A  No.
22 Q  That's an unusual question, but --
23 A  I can't.  Tellers can but I can't.
24 Q  Now are you familiar with cash items in a banking
25 sense?

Page 335

1  A  Yes, sir.
2  Q  Cash items are things like money orders, do you
3  consider that are a cash item, cashier's checks and
4  such?
5  A  Yes, sir.
6  Q  Have you ever heard the term com check?
7  A  Yes, sir.
8  Q  And a com check is a cash item, is it not?
9     MR. FEAGA:  Your Honor, we're going to
10 object to this being outside the scope of the direct
11 examination.  This witness has testified about an
12 account that was opened up, one person's name,
13 deposits were made in it that were cash deposits.
14    THE COURT:  We have her here.  I'll allow
15 it.  Go ahead.
16    MR. FEAGA:  There hasn't been any testimony
17 elicited about com checks.
18    THE COURT:  Overruled.  I assume you're
19 going to tie this in later.
20    MR. BRUNSON:  Yes.
21 Q  Does C O M, com checks stand for commercial
22 checks?
23 A  Usually used by truck drivers.
24 Q  By truck drivers to receive money for goods that
25 are shipped, is that right?

Page 336

1  A  That I don't know.
2  Q  But it could be a cash item.
3  A  Yes.
4  Q  Now these items that went into this account
5  aren't necessarily cash items, are they?  They're
6  currency.  Do you know any different?
7  A  One of them is.
8  Q  One of them is a com check, or --
9  A  No.  One of them is a cash item.
10 Q  Okay.  But you can tell the difference between
11 cash items and currency?
12 A  Absolutely.
13 Q  Because of the cash-in ticket.
14 A  Yes, sir.
15 Q  But you said there is no way to know where this
16 cash from.  In other words, if a person had a business
17 where he promoted concerts or owned nightclubs or --
18    MR. FEAGA:  We object to this unless he
19 establishes a foundation that this witness knows
20 anything about his client's alleged business
21 activities he shouldn't be asking her questions about
22 it.
23    THE COURT:  What is your question, though?
24    MR. BRUNSON:  I'm just asking about
25 customers about customers that they deal with --

Page 337

1     THE COURT:  What is your question?
2     MR. BRUNSON:  My question is do you have
3  customers that own place that deal in cash.  In other
4  words, retailers who receive currency for payment.
5  A  Yes, sir, we do.
6  Q  And it's not unusual for them to bring in
7  currency to pay or to make deposits to bank accounts,
8  is it?
9  A  No, sir.
10 Q  Now you mentioned before about C. T. R. law or
11 currency transaction reports.  Banks are required to
12 prepare it for over ten thousand in currency, is that
13 correct?
14 A  Yes, sir.
15 Q  And do you know where any C. T. R. forms
16 generated by Compass Bank relating to this account?
17 A  Not that I'm aware of.
18 Q  Because all of the deposits were less than ten
19 thousand?
20 A  That's correct.
21 Q  Now would it be appropriate for a bank employee,
22 one of the Compass Bank employees to tell a customer
23 who came in with more than ten thousand dollars that
24 they have to fill out this report?
25 A  I'm not sure what you're asking exactly.

**Page 338**

1 Q  I'm just asking do you have some sort of internal
2 control where you advise your employees that if
3 someone walks in with over ten thousand in currency,
4 you have to inform them that you've got to fill out
5 this lengthy I. R. S. report.
6 A  Yes, we infer the customer that we have a report
7 to fill out, because we require their identification.
8 Q  So it's the duty of the banker to infer the
9 customer about that obligation.
10 A  Not ahead of time.  When we're ready to fill out
11 at that point.  We will not warn you to not put in
12 over ten thousand and we have to put in a report.  But
13 if you put in over ten thousand we'll tell you that
14 sir we need to fill out a report.
15 Q  It's not proper procedure for a banker to warn a
16 customer, is that right?
17 A  That's absolutely right.
18 Q  Okay.  It's not proper for them to say wait,
19 don't bring in ten thousand, you better bring in five
20 today and five tomorrow?
21 A  No, sir.
22 Q  Because if they did that, then they wouldn't be
23 obligated to fill out the form, is that right?
24 A  We can't tell them that, right.
25 Q  The form is pretty extensive, though.  You have

**Page 339**

1 to put all kinds of personal information on there?
2 A  Yes, sir.
3 Q  About the person that has the account?
4 A  Yes, sir.
5 Q  And at this point in time not being long after
6 the nine eleven matter in '01, banks were put on extra
7 security at that point in time to be careful, look for
8 terrorists, look for people coming in with suspicious
9 activities, is that right?
10 A  That's correct.
11 Q  And some banks, and I'm not sure if your bank
12 did, but some banks tightened up those controls and
13 actually were going to fill out reports for monies
14 brought in for less than ten thousand dollars.
15 A  No, sir, we did not.
16 Q  And are you familiar with suspicious activity
17 reports and other reports you have to send to the
18 Government?
19 A  Yes, sir, we are.
20 Q  Is there a cutoff for currency relating to those
21 reports?
22 A  No.
23 Q  You said that the government had served a
24 subpoena on Compass Bank in order to get this
25 information.  Were you aware that subpoena was served?

**Page 340**

1 A  Yes, sir.
2 Q  And that subpoena indicates that these records
3 need to be turned over to the federal grand jury for
4 some sort of investigative purpose, is that right?
5 A  That's correct.
6 Q  Do you know if Compass Bank received any
7 subpoenas?  Were you employed there back in '97, '98,
8 '99 in any period along there where Compass also
9 received subpoenas for Mr. Carmichael's records?
10 A  Not that I can remember.
11 Q  But you were there at the time?
12 A  Oh, yes.
13     MR. BRUNSON:  No further questions.
14     MR. FEAGA:  Just a couple, Your Honor.
15     REDIRECT EXAMINATION
16     BY MR. TEAGUE OF MONA GEORGE:
17 Q  Ma'am, in all these records you didn't find
18 anything in the way of a check payable out of this
19 account to a Freddie Williams, did you?
20 A  Not that I can remember.  Sir, I was not looking
21 for Freddie Williams.
22 Q  And the Government didn't even ask you to look
23 for a Freddie Williams, did they?
24 A  No, sir.
25 Q  Okay.  That's all.

**Page 341**

1     REDIRECT EXAMINATION
2     BY MR. FEAGA OF MONA GEORGE:
3 Q  Ma'am, the other checks that came out of this
4 account, they're in that bulk exhibit, are they not,
5 number 48?
6 A  Yes, sir.
7 Q  They just don't have a notation what they're for,
8 or if they do they don't say directly something that
9 would tie them to this Leon Carmichael fellow that we
10 were asking you to look for, right?
11 A  That's correct.
12 Q  So we don't really know what they were for at
13 this point?
14 A  No.
15 Q  Okay.  Now Mr. Brunson asked you some questions
16 and I want to get some clarification so there's no
17 confusion.  You said there was one cash item in these
18 cash deposits.
19 A  In these deposits.
20 Q  But the items that are on your chart that are
21 listed as "cash," those are currency deposits, is that
22 right?
23 A  That's right.
24 Q  There's no confusion there.  That is, somebody
25 brought in greenbacks.

**Page 342**

1  A  That's exactly right.  It's currency.  It's cash
2  or currency.
3  Q  Two hundred and forty-nine thousand two hundred
4  and ninety-eight dollars worth of greenbacks?
5  A  That's correct.
6  Q  Not com checks?
7  A  No, sir.
8  Q  Not cash items?
9  A  No, sir.  Not included in that two forty-nine.
10  Q  Now he also asked you if it was unusual for
11  somebody to make deposits and cash checks.  And I want
12  to ask you about something, and that is is it unusual
13  in your experience as a banker for a customer to come
14  in and make these kinds of cash deposits?  If we look
15  at the months of October and November where we're
16  talking about starting on the 15th of October, I'll
17  just read them, seven thousand two hundred,
18  ninety-seven hundred, nine thousand, ninety-three
19  hundred, nine thousand, sixty-seven hundred, sixty-six
20  hundred, ninety-five hundred, in less than a month
21  making those kinds of cash deposits is it unusual in
22  your perspective for somebody to be opening up an
23  account, and if someone did in someone else's name and
24  putting cash in there at that rate and then having
25  that person whose name that account is in write checks

**Page 343**

1  to someone else's benefit, is that unusual?
2  A  Can you repeat your question?
3  Q  Yes, ma'am.  Having had an opportunity to examine
4  this account now, in your experience as a manager at
5  Compass is the activity that went on in this account
6  unusual from your perspective?
7  A  Yes.
8  Q  Very unusual?
9  A  Very unusual, because it's a personal account.
10  Q  And you got one individual making cash deposits,
11  many of them just under the C. T. R. limit --
12      THE COURT:  What makes this so unusual as a
13  personal account?
14      THE WITNESS:  Normally we expect businesses
15  to make that amount of cash deposits daily or weekly,
16  that many cash deposits.  We expect that out of
17  businesses, not out of individuals.  And they are --
18  they're putting it under the ten thousand dollar
19  limit.
20      MR. FEAGA:  No further questions, Your
21  Honor.
22      RECROSS EXAMINATION
23      BY MR. BRUNSON OF MONA GEORGE:
24  Q  Mr. Feaga used the word "unusual." he didn't use
25  the word "suspicious."  If the word "suspicious" had

**Page 344**

1  been used, there would have been some obligation by
2  the bank to report this to the Government, would there
3  not?
4  A  It's a yes-and-no question, sir.
5  Q  Suspicious activity reports?
6  A  Yes, sir, we would.  If she went to the same
7  teller every day, then the teller would have known. If
8  she went to different tellers or if the tellers
9  experienced or not, you know --
10  Q  But you didn't consider this suspiciously or
11  y'all would have filled out the report.
12  A  I'm not aware if one was filled out or not filled
13  not.
14  Q  You weren't asked to bring that?
15  A  No.
16  Q  Or look for that.
17      Also at the bottom of the record you made of
18  the checks, you made some statement down there.  Were
19  you asked to make that observation on your chart?
20  A  No, I made that for my benefit.
21  Q  Yeah.  You said out of thirty-nine checks,
22  twenty-three were written to Leon Carmichael.  That's
23  really not correct, is it, in banking terms,
24  Miss George?  There were no checks written to Leon
25  Carmichael?

**Page 345**

1  A  Well yes, you're correct.  That is not a correct
2  statement.  I did that for my benefit for me.
3  Q  And in the breakdown of the checks you weren't
4  asked to put the payee or the person to whom or the
5  business to whom the checks were written.
6  A  No, sir.  I developed this for me to be familiar
7  with it.
8  Q  Okay.  Thank you, ma'am.
9      MR. FEAGA:  Nothing further from the United
10  States, Your Honor.
11      May this witness be excused?
12      THE COURT:  Anything else from Mr. Teague?
13      MR. TEAGUE:  No, Your Honor.
14      THE COURT:  You are excused now.
15      (Whereupon the witness, Mona George, stepped
16  down from the stand.)
17      THE COURT:  We'll reconvene at eight-thirty
18  tomorrow morning.  Members of the jury, you are under
19  the same instructions.
20      (Whereupon, the proceedings were concluded.)

* * * * * * * * * *

Page 346

```
1
2              COURT REPORTER'S CERTIFICATE
3
4         I certify that the foregoing is a correct
5   transcript from the record of proceedings in the
6   above-entitled matter as prepared by me to the best of
7   my ability.
8
9         I further certify that I am not related to
10  any of the parties hereto, nor their counsel, and I
11  have no interest in the outcome of said cause.
12
13        Dated this 10th day of August 2005.
14
15
16              MITCHELL P. REISNER,   CM, CRR,
                Official US Dist. Court Reporter
17              Registered Professional Reporter
                Certified  Real-Time  Reporter
18
19
20
21
22
23
24
25
```