1           IN THE UNITED STATES DISTRICT COURT
                           FOR
2             THE MIDDLE DISTRICT OF ALABAMA

3

4

5   THE UNITED STATES
       OF AMERICA
6
          vs.                    CRIMINAL ACTION NO.
7                                2:03-cr-259-T
    LEON CARMICHAEL
8

9

10

11

12

13                     VOLUME V OF XI
14                      5th DAY OF:
                   JURY TRIAL PROCEEDINGS
15

16

17              *  *  *  *  *  *  *  *  *  *

18
    BEFORE:       The Hon. Myron H. Thompson
19
    HEARD AT:     Montgomery, Alabama
20
    HEARD ON:     June 10, 2005
21
    APPEARANCES:  Terry Moorer, Esq.
22                Stephen Feaga, Esq.
                  Clark Morris, Esq.
23                Matthew Miner, Esq.
                  Susan James, Esq.
24                Marion Chartoff, Esq.
                  Lisa Monet Wayne, Esq.
25                Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
5b-V

**Multi-Page™**

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA

THE UNITED STATES
OF AMERICA

vs.                              CRIMINAL ACTION NO.
                                 2:03-cr-259-T
LEON CARMICHAEL

VOLUME V OF X
5th DAY OF:
JURY TRIAL PROCEEDINGS

* * * * * * * * * *

BEFORE:      The Hon. Myron H. Thompson

HEARD AT:    Montgomery, Alabama

HEARD ON:    June 10, 2005

APPEARANCES: Terry Moorer, Esq.
             Stephen Feaga, Esq.
             Clark Morris, Esq.
             Matthew Miner, Esq.
             Susan James, Esq.
             Marion Chartoff, Esq.
             Lisa Monet Wayne, Esq.
             Ronald R. Brunson, Esq.

Page 2

T A B L E   O F   C O N T E N T S

1
2
3 ITEM DESCRIPTION                                    PAGE NO.
4
5 Title Page ............................        1
6 Table of Contents .....................        2
  Discussion In Open Court
7   (The Jury Is Not Present) ...........        4
8 Motion for Mistrial
    by Ms. Wayne .........................       40
9 Sherry Pettus - Direct Examination
10   by Mr. Moorer .......................        52
11 Sherry Pettus - Cross Examination
12   by Mr. Brunson ......................        169
13 Sherry Pettus - Redirect Examination
     by Mr. Moorer ......................         203
14 Sherry Pettus - Recross Examination
15   by Mr. Brunson ......................        217
16 Robert Chavez - Direct Examination
     by Ms. Morris .......................        219
17 Robert Chavez - Cross Examination
18   by Ms. Wayne ........................        255
19 Oscar Menchaca - Direct Examination
     by Ms. Morris .......................        262
20 Curtis Jones - Direct Examination
21   by Ms. Morris .......................        271
22 Curtis Jones - Cross Examination
     by Ms. Wayne ........................        303
23 Curtis Jones - Cross Examination
24   by Mr. Teague .......................        306
25 Curtis Jones - Redirect Examination
     by Ms. Morris .......................        307

Page 3

T A B L E   O F   C O N T E N T S

1
2
3 ITEM DESCRIPTION                    PAGE NO.
4
5 Curtis Jones - Recross Examination
   by Ms. Wayne ......................       307
6 Jamie Johnson - Direct Examination
7   by Ms. Morris ......................      310
  Mikey Shea - Direct Examination
8   by Ms. Morris ......................      315
9
10
11
12
13
14
15
16 Court Reporter's Certification ......... 319
17
18
19
20
21
22           -o0o-
23
24
25

Page 4

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
1 THE HON. MYRON H. THOMPSON ON JUNE 10, 2005 AT THE
2 UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:
3
4         DISCUSSION IN OPEN COURT
5         (THE JURY IS NOT PRESENT:
6         THE COURT: Okay, I understand you have some
7 matters to take up outside the presence of the jury?
8         MR. MOORER: Yes, Your Honor. We talked
9 about this briefly yesterday morning. The United
10 States intends to start the day by calling Sherry
11 Pettus to the stand.
12         THE COURT: Miss Pettus is the one with the
13 account?
14         MR. MOORER: Correct, Your Honor.
15         THE COURT: Right. And there is some
16 question as to whether she's going to be adverse or
17 not?
18         MR. MOORER: Your Honor, she is an adverse
19 witness.
20         THE COURT: Why don't we call her and just
21 find out?
22         MR. MOORER: Your Honor, I think we can
23 decide even without calling her. She is employed by
24 Mr. Carmichael presently --
25         THE COURT: What do you want me to do, then?

Page 5

1 I don't quite understand.
2         MR. MOORER: Your Honor, I would like to be
3 able to call her as an adverse witness so that I can
4 ask leading questions to her.
5         THE COURT: The way I usually do that is
6 just ask her a few questions and we'll just see how
7 she progresses. I think you'll probably be able to
8 lead her, but this is not a big deal. Just ask her a
9 few questions and if she becomes hostile and if they
10 object I'll just overrule it.
11         MR. MOORER: Your Honor, another issue that
12 the Court needs to consider is the United States
13 intends to call Wallace Salery soon after she would be
14 a witness. Wallace salary was convicted of a
15 narcotics offense.
16         THE COURT: I think I may have handled his
17 case, did I not?
18         MR. MOORER: I think you may very well have.
19 He was represented by Miss James.
20         THE COURT: Right.
21         MR. MOORER: And Miss James, of course, is
22 one of the co-counsel for Defendant Carmichael. I
23 spoke with Miss James --
24         THE COURT: Did I handle his case?
25         MR. MOORER: No, Your Honor, it was Judge

Page 6

1 Albritton.
2     THE COURT: Yeah, there was another Salery.
3     MS. JAMES: Nathaniel Salery.
4     THE COURT: That's who it was. Right.
5     MR. MOORER: But I talked with Mr. Wallace
6 Salery in preparation for his testimony, and I
7 explained to him that there would probably or possibly
8 be a conflict because of Miss James's representation
9 of him and his -- her representation of Defendant
10 Carmichael. He indicated that he was willing to waive
11 whatever conflict might exist and testify. And I
12 notified Miss James that I had had that conversation
13 with him --
14     THE COURT: I'm not so concerned about his
15 waiving the conflict as I am about Mr. Carmichael
16 waiving the conflict.
17     MS. JAMES: Your Honor, there are other
18 facts that the Court needs to hear once he finishes.
19     THE COURT: In other words, the question is
20 whether Miss James can remain in the case if there is
21 a conflict.
22     MS. JAMES: Here's the problem, Judge. When
23 Mr. Carmichael -- I represented Wallace Salery at
24 trial.
25     THE COURT: Right.

Page 7

1     MS. JAMES: I represented Wallace Salery on
2 the appeal to the Eleventh Circuit and I represented
3 him on a 2255. Certificate of appeal ability has been
4 denied. Mr. Salery -- I had consulted with Mr.
5 Carmichael early on in this case before I was ever
6 hired and we discussed possible representation.
7     Subsequent to that Mr. Salery I think wrote
8 me a letter and said that he wanted to -- he had some
9 cooperation with the government, which I guess was
10 previously, and he indicated that he had information
11 about Mr. Carmichael. Well I was concerned at that
12 point that I might have a conflict, and so I saw
13 former counsel for Mr. Carmichael, Ron Wise, and I
14 told him of Mr. Salery's interest in speaking with the
15 government. I suggested to Mr. Salery that if he
16 wanted to speak with the government that he should do
17 that on his own because I had had communications with
18 Mr. Carmichael.
19     At that point I told Mr. Wise I was in
20 federal court later that day, I saw Ms. Morris and I
21 told her. I was out of the loop at that point in
22 time. Mr. Carmichael did not hire me until November
23 of 2004. But we had talked about the possibility of
24 his hiring me prior to that. And I told him because
25 of my representation of Mr. Salery I would need to get

Page 8

1 a waiver from both the clients. I prepared a waiver,
2 discussed it with Mr. Salery and Mr. Carmichael did
3 not hire me.
4     When Mr. Carmichael did hire me in November
5 of 2004, I consulted with Ms. Morris with regard to
6 Mr. Salery. She told me that Mr. Salery would not be
7 called as a witness. She said we have plenty of
8 witnesses, we don't need him, or something to that
9 effect. I thought I remembered her saying he doesn't
10 have anything. I don't know what it was, it was a
11 long time ago. But nevertheless, I told Mr.
12 Carmichael Mr. Salery would not be called as a
13 witness. I've not looked at any D. E. A. Sixes, I've
14 not had any communication regard to Mr. Salery --
15     THE COURT: But I knew Mr. Salery was a
16 witness a while back. I don't know how I knew it. I
17 thought it was Nathaniel Salery, but --
18     MS. JAMES: He's on the website, that's why
19 you think that.
20     THE COURT: No, I saw other documents.
21 Maybe it was just a witness list that you gave early
22 on or something?
23     MS. JAMES: They gave a witness list. They
24 called his name out in court the other day as a
25 rebuttal witness.

Page 9

1     But here's the problem, Judge. Mr.
2 Carmichael, and the entire defense team, we have
3 relied that representation of the United States
4 Government now since November clearly that he was not
5 going to be called as a witness. It creates an issue
6 with me with the Alabama State Bar. I've already
7 spoken with them this morning and I'd prefer to deal
8 with that matter ex parte with the Court.
9     It also creates a problem in that none of
10 the defense team has prepared to examine him.
11 Miss Wayne -- I kept a file on him in my office. The
12 file was with Miss Wayne. In fact, when the
13 transition was made from Mr. Glassroth all of us, I
14 said, "I don't even want the file in my office. I
15 just don't want it because his name has come up as a
16 possible witness."
17     She hasn't even brought the file here with
18 her. No one is prepared to examine him, and it has
19 worked terribly to Mr. Carmichael's detriment.
20 Without going into the details of this, and I would
21 share it with the Court ex parte, there were requests
22 made of Mr. Carmichael to investigators and that --
23 regarding that particular witness, things that we
24 sought, records of which now have been destroyed
25 without going into what they are, and the

S E A L E D
FROM THE GOVERNMENT
BY ORDER OF THE COURT

EX-PARTE
IN-CHAMBERS CONFERENCES


Page 13 Line 22
through Page 20 line 23


Page 25 Line 15
through Page 29 Line 07

Page 10

1  investigation that the defense would have conducted
2  and we were requested to conduct on behalf of Mr.
3  Carmichael ceased as a result of our reliance on what
4  the government told us.
5       Now the government, as we're selecting a
6  jury, Mr. Feaga says we're probably going to call
7  Wallace Salery. And I told him at that time I was
8  going to object. When he listed had his witnesses, he
9  listed him as a rebuttal witness. So, again, we
10 relied on the fact that given the fact that whether
11 Mr. Carmichael testifies or not, that issue still
12 might not have surfaced. Now the government comes
13 yesterday and says we've talked to Wallace Salery, you
14 didn't go talk to him and I said, "I'm not going to
15 talk to Wallace Salery because it would be inherently
16 unfair at this point for me to be conflicted out of
17 this case based on the government's representation to
18 me, and I relied on it in good faith, that he would
19 not be a witness in this case."
20      MR. MOORER: Your Honor, first of all I
21 don't see that there is any conflict between the two
22 if Mr. Salery waives it. As I understand it, Ms.
23 James's representation of Mr. Salery is over. And so
24 he is willing to waive any potential conflict he might
25 have.

Page 11

1       THE COURT: When are you going to be calling
2  Mr. Salery?
3       MR. MOORER: I would expect he will be
4  called today, Your Honor, shortly after --
5       MR. FEAGA: We're not going to get to him.
6       MS. MORRIS: No, it will be Monday.
7       THE COURT: It will be Monday? Okay, very
8  good.
9       Is there anything else anybody wants to put
10 on the record on this issue?
11      MR. MOORER: Yes, Your Honor.
12      THE COURT: Go ahead.
13      MR. MOORER: Number one, when Mr. Feaga
14 listed his witnesses he did not list him as a rebuttal
15 witness, he listed him as a witness the United States
16 may call. I'm not familiar --
17      THE COURT: Where is the document? Let's
18 look at it so I can see whether it's a witness or a
19 rebuttal witness.
20      MR. FEAGA: I never used the word
21 "rebuttal," I just said, "We may call the following
22 witnesses."
23      MS. JAMES: Judge, if we could, I'm going to
24 ask Mitchell at one time to go back and look at that
25 because I specifically, in hearing that, I could have

Page 12

1  heard wrong, but I recall having heard it. And I told
2  Mr. Carmichael it was rebuttal and I explained that to
3  him.
4       THE COURT: Go ahead. You all can get that
5  to me later.
6       MS. MORRIS: Just for the record, Your
7  Honor, I did talk -- just to put this on the record --
8  I did talk to Miss James and she did come to me and
9  say, "Listen, I may have a possible conflict here."
10 And my words to her as I recall were, "We don't plan
11 on calling him as a witness. We have enough
12 witnesses," as Ms. James said.
13      However, as things progress and get closer
14 to trial, at that point it became evident that he
15 needed to be a witness when we were prepping for
16 trial. We provided all the reports to them through
17 discovery.
18      THE COURT: At what point did this happen,
19 that it became apparent he you needed Salery for
20 trial?
21      MS. MORRIS: Probably in the last few weeks,
22 quite honestly. I mean we provided all the discovery,
23 and that's when the decision was made.
24      THE COURT: Did you tell the defendants that
25 you were going to call Salery two weeks ago? When did

Page 13

1  you tell them that you were going to call him --
2       MR. FEAGA: I think it's fair to believe
3  that we wouldn't have put them on notice for sure if
4  we read the names that morning we were striking the
5  jury, Judge.
6       THE COURT: Okay. Very good, then.
7       MS. JAMES: Judge, I need to give you
8  something ex parte on the record.
9       THE COURT: Do you want the other attorneys
10 present?
11      MS. JAMES: Our defense team.
12      THE COURT: But you don't want the
13 government?
14      MS. JAMES: No.
15      THE COURT: I can't tell what it is until I
16 hear it, so I can't rule. But it will be on the
17 record, so I'll decide later whether to share it with
18 you. We'll go back here and do it.
19      (Whereupon, a recess was taken.)
20      EX PARTE IN-CHAMBERS CONFERENCE
21      BETWEEN DEFENSE COUNSEL AND THE COURT:
22
23
24
25

Page 18

1
2
3

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23     IN OPEN COURT
24     (THE JURY IS NOT PRESENT):
25     (Whereupon the witness, Sherry Pettus, was

Page 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 21

1  escorted out of the courtroom.)
2      THE COURT: Yes?  Go ahead, Miss Wayne.
3      MS. WAYNE: Yes, Judge.  I just wanted to
4  indicate that the things that we believe are
5  appropriate for open court is that there was a
6  compromise of the investigation of this case as a
7  result of what was conveyed to Miss James and our
8  detrimental reliance upon what was conveyed, and the
9  fact that we did not pursue specific impeachment
10 investigation as it related to Wallace Salery once
11 that representation was made.
12      Secondly, Mr. Carmichael unequivocally would
13 not waive any conflict as to Miss James having
14 represented Mr. Salery and being a part of this case,
15 the prosecution's case at this point.  I can tell the
16 Court that in my very specific conversations with
17 Miss James, that it was related to her by me, who
18 became lead counsel, that I would not have Mr.
19 Carmichael hire her on this case if the appearance of
20 impropriety or a potential conflict ever would exist
21 with respect to Mr. Salery because of the prior
22 problems that he had already had with counsel before.
23 And that my feeling was it might compromise this case
24 potentially.
25      She assured me, and Mr. Carmichael was in

S E A L E D
FROM THE GOVERNMENT
BY ORDER OF THE COURT

EX-PARTE
IN-CHAMBERS CONFERENCES


Page 13 Line 22
through Page 20 line 23

Page 25 Line 15
through Page 29 Line 07

Multi-Page™

Page 22

1  turn assured --
2          THE COURT: Who is "she" now?
3          MS. WAYNE: Miss James. I'm sorry. She
4  assured me that was not going to happen, that we could
5  trust the government and rely upon their
6  representations to us. And if in fact it became
7  apparent that Mr. Salery would become a witness, that
8  clearly notice would be given to us and at that time
9  we would take that situation up. Mr. Carmichael
10 unequivocally, and based upon that representation,
11 hired Miss James to his detriment and we're requesting
12 that the prosecution --
13         THE COURT: Potential detriment. We don't
14 know that yet.
15         MS. WAYNE: Yes, we're assuming because
16 they're calling him --
17         THE COURT: I haven't decided whether he'll
18 testify.
19         MS. WAYNE: We're asking that the government
20 be estopped on a detrimental reliance position. And,
21 again, if in fact the Court allows it to happen, then
22 we're going to ask for a mistrial so Miss James can
23 withdraw from this case so we can remedy this problem
24 and be prepared for Mr. Salery. So the Court also
25 knows in terms of leaving the file, the file is in

Page 23

1  Colorado and I have sent an E-mail to my office last
2  night when Mr. Moorer indicated to us his wanting to
3  call Mr. Salery, and I requested that the entire file
4  be sent to us. To me, specifically.
5          THE COURT: I just have one question for the
6  defense team. Why wasn't this raised on Monday after
7  jury selection when you learned that Salery might be
8  -- oh, the rebuttal thing?
9          MS. WAYNE: Right.
10         THE COURT: Even as a potential rebuttal
11 witness, didn't you think it was something that should
12 be raised to the Court?
13         MS. JAMES: I need to take that up outside
14 the presence of the government, and it's important
15 that I do.
16         THE COURT: It's something else I haven't
17 heard?
18         MS. JAMES: Yes.
19         MS. WAYNE: They named a lot of witnesses,
20 frankly, that they may not intend to call, Judge.
21         THE COURT: But that's a pretty serious
22 matter, to suddenly surface Salery again.
23         MS. WAYNE: That's specifically why we asked
24 in good faith that the government provide us a list of
25 witnesses even on Friday. We've been asking this.

Page 24

1  The government has continued to want to do this trial
2  by ambush, frankly, that I've never seen anywhere
3  else. I'm not sure what the secret is, tell us who
4  you're going to call, and they have never done this.
5          We asked before Judge Boyd several times
6  that we be provided with a witness list. They
7  declined to do it until the other day when you finally
8  said let them know, the other day.
9          THE COURT: I want to make a complete
10 record, so I'll have to hear Miss James again
11 in-camera. But my court reporter is going to
12 transcribe this proceeding. He said it shouldn't take
13 long. The proceedings that we've had here, in-camera,
14 will obviously be under seal. The government is not
15 to see that. But I would like briefs from all of you
16 by -- you're going to take up Salery potentially
17 Monday?
18         MR. MOORER: Yes, sir.
19         THE COURT: I'd like briefs all of you by
20 ten o'clock on Sunday and you can E file them on
21 Sunday and I will read them on Sunday morning on this
22 issue. I'll let Ms. James put her other matter in
23 court.
24         MS. CHARTOFF: I could add one thing?
25         THE COURT: Yes.

Page 25

1          MS. CHARTOFF: We contend that what the
2  government has done here constitutes prosecutorial his
3  conduct under the due process clause of the Fifth
4  Amendment to the United States Constitution under
5  burger versus the United States the prosecution has a
6  duty to do justice not just obtain convictions. It's
7  our position that what they have done here is
8  inconsistent.
9          THE COURT: You can address all that of that
10 in his briefs.
11         (Whereupon, a recess was taken.)
12         EX-PARTE IN-CHAMBERS CONFERENCE
13         BETWEEN DEFENSE COUNSEL
14         AND THE COURT:
15
16
17
18
19
20
21
22
23
24
25

Multi-Page™



**Page 29**

IN OPEN COURT
(THE JURY IS NOT PRESENT):

THE COURT:  What they told me, except for one item, really should be said in open court.  So they will repeat what they said to me.

MS. JAMES:  I said ex parte to the Court that my recollection was that Mr. Feaga approached me on Monday advising me that Wallace Salery might be called as a witness because I don't remember seeing Mr. Moorer that morning.  And I indicated to him that I would strenuously object to that.  And he said either that day or the next day that he would take it up with his boss later that evening, or something like that.  And then we just kind of had a lull period when we didn't talk about it.

My recollection was that they indicated that Mr. Salery would come in rebuttal, and then we didn't discuss it again, as I recall, until yesterday or the day before when Mr. Moorer said he was going to be

Multi-Page™

Page 30

1 called as a witness.
2     MR. FEAGA: Your Honor, I don't have any
3 dispute with that other than this subject of rebuttal.
4 I think when she said they may have a conflict -- I
5 think where we are with this, quite frankly, is if the
6 Court finds that Mr. Carmichael has a privilege here,
7 that he can exert. In other words, I think the way
8 the government viewed this all along is if Mr. Salery
9 is --
10     THE COURT: Before you speak to that, they
11 actually want to put something on the record by Mr.
12 Carmichael.
13     Mr. Carmichael, please stand.
14     MS. WAYNE: For the record, Mr. Carmichael,
15 would you at this time be waiving any potential
16 conflict that Miss James may have in terms of your
17 representation and her prior representation of Mr.
18 Salery?
19     THE DEFENDANT: No, I would not.
20     THE COURT: And I believe also, Miss Wayne,
21 that you have something you would like to put on the
22 record?
23     MS. WAYNE: I do, Judge. I had indicated to
24 the Court that in terms of this previous investigator,
25 and I have to tell the Court I'm a little unsure

Page 31

1 because there was a gag order as to a lot of this, I'm
2 assuming the Court is allowing me to --
3     THE COURT: I'm allowing you to do it.
4     MS. WAYNE: In terms of Mr. White and his
5 prior representation of Mr. Carmichael, there was an
6 investigation request made specifically as it has to
7 do with Mr. Salery. As a result of what occurred with
8 Mr. White, that investigation was never completed.
9 And in fact, was ceased with Mr. White and never
10 occurred.
11     Our belief is that if Mr. White had
12 continued to do his job with Mr. Carmichael and not
13 have gone to the government, that we would have gotten
14 the information that we believe is imperative to the
15 defense and an integral part of any impeachment of Mr.
16 Salery and would have been exculpatory and helpful to
17 Mr. Carmichael.
18     MR. FEAGA: If I may? What I want to make
19 clear is, as I understand what we're going to be
20 briefing this weekend is whether or not Mr. Carmichael
21 has a privilege.
22     THE COURT: Well, there are two issues,
23 really. The first one is if he has a privilege; and,
24 secondly, whether you should be estopped from calling
25 Mr. Salery.

Page 32

1     MR. FEAGA: Yes, sir. But if the Court
2 determines that he does have a privilege, then we
3 don't want a mistrial in this case. We simply will
4 not call the witness.
5     THE COURT: Well it may be -- You're
6 actually two steps ahead of me.
7     MR. FEAGA: Yes, sir.
8     THE COURT: If you decide between now and
9 Sunday morning that you're not going to call Mr.
10 Salery based on your own investigation -- I could
11 decide that Mr. Carmichael doesn't have a privilege,
12 but the Eleventh Circuit could disagree with me so
13 then you have a mistrial.
14     MR. FEAGA: Yes, sir.
15     THE COURT: So I don't have the final say in
16 this.
17     MR. FEAGA: Yes, sir.
18     THE COURT: So you may conclude for your own
19 reasons that you don't want to call Mr. Salery. And
20 if that's true, I think you need to let the defense
21 know and let the Court know forthwith. Either let us
22 know by the end of the day, maybe purely for strategy
23 reasons, you know, sometimes you want to protect the
24 record just as much as I do.
25     MR. FEAGA: Absolutely, Your Honor.

Page 33

1     THE COURT: So I've had many times where a
2 prosecutor knows he has a significant open question
3 and they want to make sure the record is adequate, and
4 you might decide by the end of the day Judge, we've
5 just decided to abandon Mr. Salery and we don't want
6 this issue in the record anymore.
7     MR. FEAGA: Yes, sir.
8     THE COURT: If that's true, you need to let
9 defense counsel know and let the Court know.
10     MR. FEAGA: Yes, sir.
11     THE COURT: Or if on Saturday you decide,
12 you need to let the defense counsel know and I'll let
13 you know how to let my law clerks know.
14     But if you do decide to pursue it, and I am
15 going to assume you are pursuing it, I need your
16 briefs by Sunday morning at ten o'clock. But if you
17 abandon that issue before then, let us know forthwith.
18 I suggest you give serious consideration by the end of
19 the day, just for strategy reasons, to let us know so
20 we can be pursuing other things over the weekend.
21     MR. FEAGA: Yes, sir, Your Honor.
22     THE COURT: Anything else?
23     MR. FEAGA: No, sir.
24     THE COURT: Now the court reporter will have
25 this transcribed, and I'll be studying that and

1 independently looking at this and looking forward to
2 your research Sunday. I'll let you know something
3 first thing Monday morning.
4 Anything else?
5 MS. WAYNE: Yes, Judge, we have the issue
6 form yesterday in terms of the Moses Williams matter.
7 THE COURT: Right. The motion for mistrial
8 I denied conditionally, and the motion for severance I
9 denied conditionally. I am denying them
10 unconditionally now and I'll issue an order on that.
11 MS. WAYNE: Judge, if I may make for the
12 record, because I think it needs to be clear on the
13 record, my objection to Mr. Williams was threefold. I
14 objected on a hearsay basis, I objected on a 403 basis
15 and I objected on a 404(b) basis.
16 THE COURT: I want to go back to the hearsay
17 basis now. You raised all this hearsay stuff when we
18 got into all of his subjective reasons and all of that
19 about his opinions and his confidential informant.
20 You opened the whole door to that hearsay, and you
21 didn't object until he said he threatened to kill him.
22 He was talking about that confidential informant and
23 his relationship. Before that you objected purely to
24 the matter that he threatened to kill me, or I thought
25 he was going to kill me. I don't remember the exact

1 words. Now you can't have hearsay partial and then
2 let other hearsay come in.
3 MS. WAYNE: No no, Judge, I disagree. If
4 the government doesn't object to me bringing in
5 hearsay, that's their problem. A hearsay statement by
6 another witness during their redirect does not negate
7 other hearsay that may have been brought in with their
8 no objection. They have a basis to object to anything
9 I'm doing.
10 THE COURT: Well I'll address that on my
11 motion. You can't have half of it and not have the
12 whole thing. If you want to go into their defense of
13 their case with hearsay, then we go into the defense
14 all the way. The adequacy of the evidence, you can't
15 have it halfway. And actually I'm going to address
16 that in my order.
17 No, that can't be. You open the door, you
18 get the results of what's in the door and you have to
19 live with those results. You can't present good
20 hearsay and keep out bad hearsay. If you're going to
21 go into hearsay, you're going to go into hearsay.
22 MS. WAYNE: Just for the Court's
23 recollection, I never asked the agent anything about
24 what the informant said to him ever in my cross
25 examination. I went to the absence of evidence based

1 upon the surveillances. Their redirect was you close
2 this investigation as a result of an informant Mr.
3 Williams what he said to you.
4 Now what I want to tell the Court is this
5 because, again, I raised this as hearsay and I did all
6 these things. But I'm telling the Court this, there
7 is an absence, and I reviewed these again last night,
8 in any D. E. A. Six form or at any hearing indicating
9 that Mr. Williams as a result of what he told Agent
10 Halasz, was the reason that any investigation as it
11 went to Mr. Carmichael was closed. That's nowhere in
12 anywhere.
13 THE COURT: But that's just something you
14 have to live with.
15 MS. WAYNE: No, Judge, I disagree.
16 THE COURT: You've not shown me anything in
17 any rule, any law, any order that says that the
18 government was obligated to furnish you with that
19 information. Until you do that, you live with what
20 you did on cross.
21 MS. WAYNE: All right. Judge, I believe
22 it's Giglio material. Because for the impeachment --
23 THE COURT: What does Giglio say?
24 MS. WAYNE: Giglio says that if it's
25 impeachment and to a prior inconsistent statement,

1 that statements that they've made about this
2 investigation all along in this case and all of these
3 prior transcripts and everything else that never
4 indicates, it's the absence of an indication that they
5 ever closed a case against Mr. Carmichael as a result
6 of any informant.
7 THE COURT: How is it Giglio material,
8 number one, when you brought it up on rebuttal? The
9 government never wanted to go down this avenue.
10 MOTION FOR MISTRIAL:
11 MS. WAYNE: All right. Well, Judge, then I
12 would indicate this to the Court: I'm asking for a
13 mistrial because based on this Court's ruling, I'm
14 ineffective. I've opened the door --
15 THE COURT: You can't declare yourself
16 ineffective. You chose this as a strategy. You have
17 to live with it. Now we can't do that. Any lawyer
18 can stand up in court and declare themselves
19 ineffective and get a mistrial? I think you can see
20 the illogic in that in itself.
21 But you chose this as a strategy, you have
22 to live with it. I will decide whether you were
23 ineffective in a collateral post-trial hearing. But
24 you can't do that in the middle of a trial. I don't
25 think any court would agree to that; otherwise, a

Page 38

1 defense lawyer could sink a case summarily at any
2 time.
3        MS. WAYNE: And I understand what the Court
4 is saying, but --
5        THE COURT: So you may be ineffective, but
6 that will be determined in a collateral proceeding if
7 Mr. Carmichael is convicted and represented by another
8 lawyer.
9        MS. WAYNE: I understand.
10       THE COURT: But you can't do that yourself.
11       MS. WAYNE: I understand, Judge, and I'm
12 simply responding to the Court's ruling and I want the
13 record to be clear what that is based upon.
14       THE COURT: Certainly. But I'll issue an
15 order, and you'll get that probably Monday morning.
16       Anything else?
17       MS. CHARTOFF: Yes, Your Honor, we need to
18 clarify the record with regard to the basis for the
19 motion for mistrial.
20       THE COURT: Okay.
21       MS. CHARTOFF: The basis for the motion for
22 mistrial is not only that Agent Halasz's statement
23 about what Mr. Williams supposedly said about Mr.
24 Carmichael threatening him was inadmissible hearsay,
25 highly prejudicial and a bad act that we should have

Page 39

1 been provided notice with but were not.
2        It also violated our client's confrontation
3 clause rights.
4        THE COURT: But the witness was here. The
5 confidential informant, Mr. Williams, Moses Williams
6 came here. I put him on the stand. You had a right
7 to cross examine him. You had a right to put his
8 evidence before the jury. I asked you on the record
9 do you want to cross examine him? You told me no. I
10 asked you do you want to call him as a witness so the
11 jury can hear his evidence? You told me no.
12       MS. CHARTOFF: I'm going to address that,
13 Your Honor.
14       THE COURT: Okay, very good.
15       MS. CHARTOFF: My argument is that that
16 saying that we can take the chance of putting this
17 lousy witness up there, this man who is not credible,
18 who knows what he's going to say under oath, that is
19 shifting the burden of proof to the defense. It is
20 destroying the presumption of innocence and destroying
21 Mr. Carmichael's right to a fair trial. And I commend
22 to you the dissent in United States versus Inidi by
23 Justice Marshall which explains.
24       THE COURT: You got a red flag because it's
25 a dissent, but --

Page 40

1        MS. CHARTOFF: It's not directly on point,
2 but I'm just commending you for the reasoning in that
3 dissent which explains that when the defendant is
4 required to call these lousy witnesses to confront
5 hearsay testimony, it shifts the burden of proof. It
6 violates --
7        THE COURT: You know, you keep putting the
8 burden on the government. This was brought about by
9 you. It was not brought about by Mr. Moorer, it was
10 not brought about by Ms. Morris, it was not brought
11 about by Mr. Feaga. It was brought about by the
12 defense team. Now all these rights that you asserted
13 were brought, about to the degree they were infringed,
14 were brought about by you.
15       Miss Wayne stood up in court in her opening
16 statement and made the adequacy of the government's
17 evidence your defense. She has consistently pursued
18 that on her cross examination of witnesses. The
19 government never, as far as I can remember, introduced
20 any evidence on direct that even alluded to these
21 issues. Now you are complaining, but all of this was
22 brought about by you.
23       MS. CHARTOFF: Your Honor, I respectfully
24 disagree. I think the government's indictment spans
25 from 1993 to 2003 --

Page 41

1        THE COURT: Tell me one time when the
2 government put on evidence in their direct testimony
3 that raised the adequacy of the evidence. One time.
4        MS. CHARTOFF: They wouldn't, Your Honor.
5 And furthermore, we had to go in and create an opening
6 argument and a defense strategy assuming that the
7 government was going to put on evidence of a
8 conspiracy lasting from 1993 to 2003. We had to come
9 up with a strategy that would address that. And that
10 is what we did, Your Honor.
11       THE COURT: Yes. You did it, but you have
12 to live with the result. You can't have half of the
13 defense in and then, you know, tie the government's
14 hands and say you can't put in the bad part of the
15 evidence. You opened that door. You have to live
16 with the result, and that's all I'm saying.
17       MS. CHARTOFF: Well, I understand that.
18       THE COURT: You dug your own hole.
19       MS. CHARTOFF: Your Honor, we also
20 respectfully disagree that this opening the door
21 analysis throws the hearsay rules out the window.
22 That's just a brief statement of the law in my humble
23 opinion.
24       THE COURT: Well, I agree with you. You
25 know I was going to write in my order, and I'll just

1 give you a part of it, I was going to write in my
2 order, "A challenge to the adequacy of the
3 government's evidence may be relevant as, for example,
4 there is a question about whether certain tests run by
5 experts are reliable or whether a witness's testimony
6 was coerced by law enforcement officers. But this
7 does not mean in any way that all aspects of the
8 government's investigation are relevant and
9 admissible.
10     "Whether a testifying agent personally
11 believes that the evidence he has against a defendant
12 at the time of the indictment is sufficient, would
13 seem in most instances, if not all, to be irrelevant.
14 Whether the evidence is adequate is solely for the
15 jury to decide. Whether an agent does not have any
16 expertise any more than anyone off the street that his
17 personal beliefs would be helpful to the jury. The
18 agent's beliefs about whether the evidence was
19 sufficient a year or two before the indictment when
20 the agent decided not to close the case would even be
21 more irrelevant.
22     "Moreover, delving into an agent's thoughts
23 about the adequacy of the evidence is fraught with
24 land mines. Not only does it involve delving in such
25 soft evidence as the subject thoughts of the agent, it

1 also opens up the possibility of the introduction of
2 such unreliable evidence as unsubstantiated leads and
3 hearsay, which are the mainstay of an ongoing
4 investigation but not the mainstay of the trial.
5 Nevertheless, Defendant Carmichael decided, apparently
6 for reasons of strategy, to pursue a defense as a
7 defense a challenge to the adequacy of the
8 government's evidence at various stages of its
9 investigation."
10     You can't have it one way and not have the
11 whole thing. That's essentially my thinking. Now if
12 you have anything else to put on the record --
13     MS. CHARTOFF: I do, Your Honor.
14     THE COURT: -- I'll hear it.
15     MS. CHARTOFF: We also base our motion for a
16 mistrial on the fact that the government, in putting
17 on this statement, they did not -- they committed a
18 prosecutorial misconduct because they knew Williams
19 was a convicted felon and they could not trust his
20 word and his reasons for why he wasn't going to
21 cooperate. This man in his own words has been
22 committing murder since he was thirteen years old.
23     This is not somebody the government should
24 have relied on, and we believe they knew he was
25 unreliable. They purposefully put this what they knew

1 not to be reliable testimony on the stand and it's
2 prosecutorial misconduct.
3     THE COURT: How did the government engage in
4 prosecutorial misconduct when they didn't bring out --
5     MS. CHARTOFF: Your Honor, they could have
6 just asked the question --
7     THE COURT: But that question was critical.
8 I couldn't let that witness say and give the jury the
9 impression that the reason the government closed out
10 its case was because the government felt that the
11 evidence -- well for some spurious reason, the
12 government had a valid reason.
13     MS. CHARTOFF: The government --
14     THE COURT: Let me finish.
15     You raised the question as to why the
16 government closed its case in 2002. You wanted to
17 leave the jury with the impression that the government
18 improperly closed out the case, that it did so because
19 it wanted to do something bad to Mr. Carmichael. The
20 government had a right at that time to inform the jury
21 that it had neutral reasons for closing out the case;
22 that it had an informant who would no longer
23 cooperate. And the reason he wouldn't cooperate was
24 because he felt threatened by Mr. Carmichael.
25     The jury had to have the whole story. You

1 can't have the jury assuming that the government acted
2 improperly in closing out the case. You can't have
3 half the story. Once you bring that issue before the
4 jury, why did the government close out the case, and
5 you want to give the jury the impression that it was a
6 bad reason, then the government has the right to
7 counter it was a good reason. You opened that door.
8     MS. CHARTOFF: And I understand your
9 position, Your Honor. We just feel that the
10 government could have put the witness on to testify,
11 we closed the case before the informant refused to
12 cooperate and not elicited the extremely prejudicial,
13 probably unreliable, based on Mr. Williams' testimony
14 yesterday, comment that --
15     THE COURT: You know, as I said in my
16 opening comments here, none of this should have come
17 in. All of it is irrelevant. I don't think that what
18 that agent felt about this case has anything to do
19 with Mr. Carmichael's innocence or guilt. I would
20 love to have kept it all out. And that's been my
21 position from the beginning of this trial. That is
22 just fraught -- you're just delving into hearsay.
23 You're delving into personal opinions by an agent that
24 has nothing to do with whether your client is guilty
25 or innocent. But you decided to pursue it.

Page 46

1   If there would have been an option I would
2 have sustained it. I would have said this has nothing
3 to do with this case. The adequacy of the
4 government's case is just not relevant, and secondly
5 leads -- how are leads relevant to this defendant's
6 guilt innocence? How is whether a confidential
7 informant is reliable relevant to the issue of this
8 defendant's guilty or innocence? But you all went
9 into that.
10   I fully agree with you, Ms. Chartoff, it is
11 totally irrelevant. I think that agent's opinion
12 about this case has nothing to do with it. We
13 shouldn't have gone down that path to begin with. I
14 don't care whether they had a confidential informant
15 who is credible or not, so what? The question is, is
16 the evidence today sufficient. It shouldn't have come
17 in to begin with. I fully agree.
18   Let's move on.
19   MS. CHARTOFF: Your Honor, I just have one
20 more litany to go through.
21   THE COURT: Yes?
22   MS. CHARTOFF: Our motion for mistrial is
23 also based on the cumulative impact of several things
24 that have occurred in the trial. Not only this
25 comment that came out, this very prejudicial comment

Page 47

1 about Moses Williams supposedly being threatened.
2 Furthermore, we've had the irrelevant testimony that
3 Mr. Carmichael's son was allegedly convicted of
4 murder, which gives the jury this sort of like father
5 like son kind of feeling. He must be a murderer too.
6 Totally irrelevant, totally prejudicial. It's all
7 building together, Your Honor.
8   There is also the testimony regarding Ike's
9 murder.
10   THE COURT: Ike's murder, right.
11   MS. CHARTOFF: There is the testimony --
12 Well, there is the partial sequestration of the jury
13 which we have previously raised, and we think this all
14 comes together with the partial sequestration, the
15 police presence outside the courthouse which was very
16 visible on the first few days of the trial, tons of
17 cops out there --
18   THE COURT: Well you were just telling me
19 earlier, though, that you thought that if we retried
20 it there should be full sequestration.
21   MS. CHARTOFF: We did not say that.
22   MS. WAYNE: I think Miss Wayne did agree
23 with that, yes.
24   MS. WAYNE: On a change of venue, Judge,
25 yes.

Page 48

1   THE COURT: Yes, but with a full
2 sequestration.
3   MS. CHARTOFF: In the alternative to a
4 change of venue.
5   THE COURT: No, I raised that, that if we
6 tried it somewhere else that it would be full
7 sequestration. Yes. Sure did.
8   That's what happens when I get two lawyers
9 crossing each other with argument. That's why I
10 usually only allow one. I've been very lenient with
11 you all.
12   MS. CHARTOFF: Well, I appreciate that, Your
13 Honor.
14   Also, there was the impact of the juror --
15   THE COURT: We really need to get started.
16 This sounds like a good motion for judgment of
17 acquittal and mistrial at the end of the government's
18 case. The cumulative effects of everything. You can
19 raise that at the end of the government's case, and
20 I'll hear it, and you can point out all the things
21 that you think may have been error by the government
22 and how they're cumulative and how I should declare a
23 mistrial or for judgment of acquittal. Why don't I
24 hear all the arguments then.
25   MS. CHARTOFF: Okay. Thank you.

Page 49

1   THE COURT: Let's proceed with the jury now.
2   Oh, I have one other thing. I'm sorry.
3 Juror profiles. Because there was an issue about the
4 jury selection process, I'd like to make the juror
5 profiles a part of the record under seal so that you
6 can use them should there be an appeal. Otherwise you
7 won't have any record.
8   MS. WAYNE: The questionnaires --
9   THE COURT: The questionnaires, yes.
10   MS. WAYNE: Oh, okay.
11   THE COURT: You need to get with Sheila if
12 you want to get all of the questionnaires made part of
13 the record or just some of them. If you want all of
14 them, let Ms. Carnes know, and they will need to be
15 put under seal.
16   MS. WAYNE: We want all of them.
17   THE COURT: Anything else?
18   Otherwise your record will be inadequate.
19 You won't be able to tell things about the jury
20 selection process.
21   Bring in the jury. Let's keep going.
22   (Whereupon, the jury was escorted into the
23 courtroom.)
24   MR. MOORER: The United States calls Sherry
25 Pettus as an adverse, hostile witness.

Page 50

1    S H E R R Y   P E T T U S,
2 the witness herein, having first been duly sworn or
3 affirmed to tell the truth, was examined and testified
4 as follows:
5           DIRECT EXAMINATION
6    BY MR. MOORER OF SHERRY PETTUS:
7 Q  Miss Pettus, would you tell the jury your name.
8 A  Sherry Diane Pettus.
9 Q  Miss Pettus, where do you live?
10 A  At Four three three one Bearsley.
11 Q  Are you employed, Miss Pettus?
12 A  Yes, I am.
13 Q  What do you do for a living?
14 A  I do promotions.
15 Q  And what kind of promotions is it that you do?
16 A  All types of promotions.
17 Q  Would you specifically name some of the types of
18 promotions that you do?
19 A  Gospel, blues, R. and B.  Any type of promotion.
20 Q  Were you finished?  I didn't mean to cut you off.
21 A  Yes.
22 Q  Are you talking about entertainment type
23 promotions?
24 A  Yes, ma'am -- yes, sir.
25 Q  And would you tell the jury what your job as a

Page 51

1 promoter entails that you do, just briefly.
2 A  Basically, if there's a concert that's coming,
3 use television advertisement, fliers, radio, whatever
4 it takes to promote the event that's coming.
5 Q  And for whom do you work now?
6 A  At the Carmichael Center.
7 Q  And who is in charge of running the Carmichael
8 Center?
9 A  Mr. Carmichael.
10 Q  Is Mr. Carmichael in the courtroom today?
11 A  Yes, he is.
12 Q  Would you point him out and describe him for the
13 record, please.
14 A  He's right over there in the tan suit with a
15 brown tie on.
16      MR. MOORER:  For the record, she's
17 identified the defendant, Leon Carmichael.
18 Q  And are you familiar with an individual by the
19 name of Freddie Williams?
20 A  Am I familiar with him?  I know of him, yes, sir.
21 Q  Do you know him enough to recognize him?
22 A  Yes, sir.
23 Q  Is he in the courtroom today?
24 A  Yes, sir.
25 Q  Would you point him out and describe him for the

Page 52

1 record, please.
2 A  Sitting there in the gray suit.
3 Q  On the end?
4 A  Yes, sir.
5      MR. MOORER:  For the record, she's
6 identified the defendant, Mr. Williams.
7 Q  Now, Miss Pettus, were you in Montgomery back in
8 December of 2003?
9 A  Yes.
10 Q  Are you originally from Montgomery?
11 A  No, I'm not.
12 Q  Where are you from originally?
13 A  I was born in Mobile County, but raised in
14 California.
15 Q  But in December of 2003 you were living here in
16 Montgomery?
17 A  Yes.
18 Q  Do you recall December the 16th of 2003?
19      Or let me ask you this:  Are you familiar
20 with this gentleman seated right here?
21 A  Yes.
22 Q  Would you have had occasion to meet him in
23 December of 2003?
24 A  Yes, I did.
25      MR. MOORER:  And for the record, I was

Page 53

1 pointing to --
2 Q  Do you know the name?
3 A  David DeJohn.
4 Q  Did you have an occasion to meet Agent DeJohn
5 back in December of 2003?
6 A  Yes, I did.
7 Q  Was that the first time that you had met him?
8 A  Yes.
9 Q  And when you met him, this was obviously after a
10 time in November of 2003 where various search warrants
11 might have been done at Mr. Williams's house.  When
12 you met Agent DeJohn, was that after Mr. Williams's
13 house had been searched?
14 A  Yes, sir.
15 Q  Now at the time that you first met with Agent
16 DeJohn, was there any warrant out for your arrest?
17 A  No, sir.
18 Q  Did he call you up and ask you to come in?
19 A  He didn't call me.
20 Q  So you made contact with Agent DeJohn?
21 A  No, sir.
22 Q  Well did you meet with him?
23 A  Yes, sir.
24 Q  And when you met with Agent DeJohn back in
25 December of 2003, would you dispute that it would have

Page 54

1 been December the 16th of 2003?
2 A  I believe it was because I was headed out to
3 California.
4 Q  Now at the time that you met with Agent DeJohn
5 you talked with him about various things, did you not?
6 A  Yes, sir.
7 Q  And the time that you talked with him, you talked
8 to him about a bank account that you had in your name?
9 A  Yes, sir.
10 Q  Did you discuss Defendant Leon Carmichael?
11 A  Yes.  I believe so, yes.
12 Q  Did you discuss his trucking company?
13 A  No.
14 Q  Did you discuss various individuals whom you knew
15 Mr. Carmichael to know?
16 A  I don't remember that.  I don't remember that.
17 Q  Did you mention to Agent DeJohn Martel Watson?
18 A  I may have.
19 Q  Is Martel Watson someone that Mr. Carmichael
20 knew, or knows?
21 A  He's someone I know.
22 Q  Do you know if he's somebody that Mr. Carmichael
23 knows?
24 A  Yes.
25 Q  And is he somebody that Mr. Carmichael knows?

Page 55

1 A  Yes.
2 Q  Patrick Denton, did you discuss him with Agent
3 DeJohn?
4 A  He asked me had I ever seen Patrick Denton, I
5 believe, yes.
6 Q  So you discussed him with Agent DeJohn, or there
7 was conversation about him to some extent?
8 A  Okay, yeah.  I guess, yeah.
9 Q  And is Patrick Denton someone who you know Mr.
10 Carmichael to also know?
11 A  Yes.
12 Q  And are you familiar with an individual by the
13 name -- who goes by the nickname of Cadillac?
14 A  Yes.
15 Q  Do you know his real name, his true name?
16 A  Yes, Mr. William Bowden.  I know him as William.
17 I don't know the last name.
18 Q  But you know him as Cadillac?
19 A  Yes, sir.
20 Q  Now at the time that you met with Agent DeJohn
21 you also discussed certain concerns that you had about
22 your own situation.
23 A  I don't understand that.  I don't understand what
24 you're saying.
25 Q  Did you express any concerns to Agent DeJohn

Page 56

1 about any fears that you had at that point in talking
2 with him about some of the things that you were going
3 to engage in conversation about?
4 A  I don't remember if I did or not.
5 Q  Well after your -- At some point after you met
6 with Agent DeJohn you did, in fact, end up staying in
7 certain hotels here in Montgomery, didn't you?
8 A  That was later on.
9 Q  Yes.  I think I had said after your meeting with
10 Agent DeJohn you did end up staying at certain hotels
11 here in Montgomery?
12 A  Yes, sir.
13 Q  And you were placed in those hotels because of
14 concerns that you had?
15 A  Because I had nowhere else to stay neither.
16 Q  But you also had concerns, did you not?
17       MR. BRUNSON:  Your Honor, I object to this
18 line of questioning.  It happens to be questions that
19 deal with an issue that the Court has already
20 instructed counsel not to delve into in our limiting
21 motion pretrial.
22       THE COURT:  I don't really remember that
23 now.
24       MS. CHARTOFF:  Your Honor --
25       THE COURT:  Just a minute.

Page 57

1       Why don't you go and discuss with Mr. Moorer
2 what your concern is.
3       (Whereupon, Mr. Brunson conferred with
4 Mr. Moorer off the record and out of the hearing of
5 the other courtroom participants.)
6       MR. BRUNSON:  Your Honor, I think we need to
7 take this matter up outside the presence of the jury.
8       THE COURT:  Why don't we go back in here
9 rather than sending out the jury.  We'll go out this
10 time.  I need to stand up.
11       (Whereupon, a recess was taken.)
12          IN CHAMBERS CONFERENCE:
13       THE COURT:  Mr. Brunson?
14       MR. BRUNSON:  Judge, this line of
15 questioning -- the answer to this question from the
16 witness would be the reason I was staying in hotels
17 was because of the fact that my photograph was on a
18 website.
19       THE COURT:  Oh.  Okay, then.
20       MR. BRUNSON:  And not that she had any fear
21 whatsoever --
22       THE COURT:  Are you sure that's what she's
23 going to say?
24       MR. BRUNSON:  Well having discussed that --
25       THE COURT:  Why don't we bring her back here

Page 58

1  now and ask her.
2       MR. MOORER:  Your Honor, my line of
3  questioning is trying to point her to the fact that
4  when she initially met with Agent DeJohn, that she had
5  some concerns about cooperating because of Defendant
6  Carmichael.
7       THE COURT:  Just a minute.
8       (Whereupon the witness, Sherry Pettus, was
9  escorted into chambers.)
10      THE COURT:  You can come right in here.
11      Mr. Moorer, why don't you ask Miss Pettus
12  your questions.
13              IN CHAMBERS
14          VOIR DIRE EXAMINATION
15      BY MR. MOORER OF SHERRY PETTUS:
16 Q  Miss Pettus, I had asked you about your initial
17 meeting with Agent DeJohn.
18 A  Yes, sir.
19 Q  And I had asked you about any concerns that you
20 had with Agent DeJohn about your safety and any fears
21 you might have had.  Do you recall those questions?
22 A  Right.
23 Q  Did you express to him any concerns for your
24 safety at the point that you met with him initially?
25 A  No, I didn't.

Page 59

1 Q  Did you later have some concerns for your safety?
2 A  I told him some rumors I had heard.
3 Q  Okay.  Which caused you concerns for your safety?
4       THE COURT:  What were the rumors?
5       THE WITNESS:  Different people calling me.
6  One of them saying that, "Your tongue could be cut
7  off."  A lot of stupid stuff.  I believed it because
8  there was a lot of stuff going on.
9 Q  Which you told Agent DeJohn were related to
10 things that Mr. Carmichael had said to the individuals
11 that you --
12 A  No, sir.  They were told -- They didn't say Mr.
13 Carmichael said the thing, they were just told to me,
14 things that were just said to me from different people
15 who was just at the time just -- wanted to cause a
16 division between him and I.  And I believed those
17 reports, and those reports caused me to go to
18 California.
19 Q  And those reports also caused you to go to Agent
20 DeJohn?
21 A  No, sir.  Those are not the reports that caused
22 me to go to Agent DeJohn.
23      THE COURT:  What caused you to go to Agent
24 DeJohn?
25 A  Another informant, Mr. Marty Blain told me that

Page 60

1  after this happened I needed to go and talk to them
2  because I had the account, and Mr. Carmichael was the
3  one that told him about it and he tried to say that
4  they used it and told me I was doing something illegal
5  and I needed to come to them.  Rather than to be
6  charged, I needed to come to them.  So I missed the
7  flight in order to talk to them because I figured I
8  had done something wrong based on them.
9       MR. MOORER:  Okay.  So, Your Honor, I don't
10 think we're going to implicate what he had raised as
11 his objection.
12      MR. BRUNSON:  Well the inference of the
13 question, Your Honor --
14      THE COURT:  Well, wait a minute, before we
15 get to that.
16      You know not to mention the website during
17 this trial in any question.  Do not mention the
18 website.
19      THE WITNESS:  Okay.
20      THE COURT:  Now, if she doesn't the website,
21 do you have any problems with this testimony?
22      MR. BRUNSON:  Your Honor, the problem is I
23 will have to go into that because the insinuation is
24 that she was afraid of Mr. Carmichael.
25      THE COURT:  She didn't give the website as

Page 61

1  her reason, though, I thought.  What do you mean?
2       MR. BRUNSON:  Well, the insinuation of the
3  questioning is that Mr. Carmichael was causing some
4  threatening or intimidating communications to go to
5  her.  And truth be known --
6       THE COURT:  Is that what you said?
7       THE WITNESS:  But when the website did come
8  up, the website did have a big part to play in it.
9       THE COURT:  Well let me get to a more
10 fundamental question.  Why is it relevant, Mr. Moorer,
11 about these calls she got from people other than Mr.
12 Carmichael?
13      MR. MOORER:  Because, Your Honor, I submit
14 that's not what she told, and I intend to impeach her
15 on that's not what she told Agent DeJohn.
16      THE COURT:  I don't want that evidence to
17 come in, period, to begin with.  That's just hearsay.
18      MR. MOORER:  I'm not going into the website.
19      THE COURT:  No, no, no, I'm talking about
20 the telephone calls.
21      You said you got telephone calls from people
22 who wanted to cut your tongue out?
23      THE WITNESS:  No, someone called me and told
24 me this is what they heard.
25      THE COURT:  That Mr. Carmichael said?

Multi-Page™

Page 62

1    THE WITNESS: They just told me that -- they
2 didn't tell me that Mr. Carmichael said it, it's just
3 something they said that they heard.
4    MR. MOORER: Right. And I intend to impeach
5 her with the fact that she told Agent DeJohn about
6 some specific threats that she attributed to --
7    THE COURT: Why don't you tell me now what
8 it is that you want to impeach her on. I don't see
9 any sense of getting the threats she received in
10 evidence.
11    MR. MOORER: The threats -- What I intend to
12 impeach her with, Your Honor, is that she told Agent
13 DeJohn that she had received threats which came from
14 Mr. Carmichael.
15    THE WITNESS: He's a liar. He's telling you
16 a lie. How are you going to impeach me on a lie?
17    THE COURT: Just a minute. Just a minute,
18 ma'am. You're going to have to control yourself. And
19 I don't want you to speak again until I tell you to.
20    Now, yes?
21    MR. MOORER: So that's why I intend to
22 impeach her, Your Honor, because that's what Agent
23 DeJohn said in his report as the reason that she had
24 come to him.
25    THE COURT: Right.

Page 63

1    MR. MOORER: Which is at odds with what she
2 just told us.
3    THE COURT: Do you wish to introduce that
4 statement as true?
5    MR. MOORER: Yes, Your Honor.
6    THE COURT: Show me under the rules how it
7 comes in under the truth, if you want to only impeach
8 her with it.
9    MR. MOORER: It comes in as --
10    THE COURT: Go show me the rules. Show me
11 that it comes in as the truth rather than just pure
12 impeachment.
13    MR. MOORER: Oh, I'm sorry. It just comes
14 in, you're right, as to impeach what she says here.
15 She can deny having said that, but I think that it's a
16 permissible question.
17    THE COURT: So you just want to ask her did
18 she tell Agent DeJohn that she was -- What was it now?
19    MR. MOORER: That she was afraid because of
20 some threats that had been related to her.
21    THE COURT: By Mr. Carmichael.
22    MR. MOORER: Correct.
23    THE COURT: That's the question you have to
24 ask her. Now whether I'll allow that question I'll
25 hear from Mr. Brunson.

Page 64

1    MR. BRUNSON: Your Honor, this is the same
2 plan by the government to go into the intimidation
3 factor rather than -- This lady had opened a bank
4 account, and the Court realizes she's the other
5 coconspirator in count two. She must be. And the
6 fact that counsel is, first of all, developing what
7 she said before, we don't even know what she's going
8 to say today yet. How can she be impeached on what
9 she said before --
10    THE COURT: No, he just wants to ask her
11 this question, and then have her -- I assume she's
12 going to do what she just did, which is deny that she
13 said it.
14    MR. MOORER: Yes.
15    MR. BRUNSON: And I think that's
16 permissible.
17    THE COURT: Well, then that's it, we'll go
18 on. Let's just go on.
19    MR. BRUNSON: But to continue to develop an
20 inference that Mr. Carmichael might have threatened
21 her, or caused her to --
22    THE COURT: Where is that? He's just going
23 to ask that one question and that's it, and she's
24 going to deny it. Do you have a problem with that?
25    MR. BRUNSON: No objection.

Page 65

1    THE COURT: Okay, then. That's the extent
2 of it. Let's move on.
3    MR. MOORER: I do think that I should be
4 able to go into certain things that were done based
5 upon -- There are some other things that I intend to
6 do to further impeach that, such as allowing her to go
7 to hotels, paying for her hotels.
8    THE COURT: Who paid for her hotels?
9    MR. MOORER: DeJohn and then the U. S.
10 Attorney's Office under -- for witness protection.
11    THE COURT: And you want to say that that
12 was done in order -- because Mr. Carmichael had done
13 something?
14    MR. MOORER: She indicated there was a
15 threat to her. What she related to Agent DeJohn came
16 through Mr. Carmichael. I know now she's disavowing
17 that --
18    THE COURT: Yes.
19    MR. MOORER: But based on certain things --
20    THE COURT: So you want it to come in for
21 the truth of the matter asserted, then. And if you
22 want it to come in for the truth of the matter
23 asserted, you've got to show me under the rules how it
24 comes in. All that other doesn't come in unless it
25 comes in for the truth of the matter asserted. So

**Multi-Page™**

1  otherwise we move on.
2      (Whereupon, the in-chambers conference was
3  concluded.)
4          IN OPEN COURT
5          (THE JURY IS PRESENT):
6      THE COURT: Proceed, Mr. Moorer.
7  Q  Miss Pettus, let me back up to something before
8  we took a break just a moment ago. You said where you
9  lived, and I've forgotten the address that you gave,
10 but was there a time when you ended up staying in some
11 hotels?
12 A  Yes, sir.
13 Q  About when was that?
14 A  After I came back from California when they flew
15 me back here.
16 Q  Who was the "they" you are referring to?
17 A  The D. E. A.
18 Q  And do you know about when that would have been?
19 A  It was, I think, the 19th.
20     THE COURT: I don't see any relevance to
21 this, unless you can show what I discussed in the back
22 room. Where she moved and what her actions were are
23 not relevant, unless you show the premise.
24     MR. MOORER: Yes, Your Honor.
25     THE COURT: Unless you can introduce

1  evidence, we don't need to go into why she moved
2  around and why she stayed where else unless you can
3  connect it with these defendants, and so far there is
4  nothing to show that.
5      MR. MOORER: Yes, Your Honor.
6  Q  Now, Miss Pettus, during your meeting with Agent
7  DeJohn did you express certain concerns for your
8  safety to Agent DeJohn?
9  A  At one point.
10 Q  During your initial meeting with him?
11 A  No, sir, at one point. At the point that when I
12 had left to go back to California, I was living in
13 California, and them bringing me back they had to put
14 me in a hotel because I no longer lived here. You
15 asked -- You asked about the address I'm living at
16 now. I didn't have an address then. I wasn't living
17 here.
18 Q  But at any point did you express a concern for
19 your safety to Agent DeJohn?
20     THE COURT: We're not going to get into
21 hearsay.
22     MR. MOORER: I asked her --
23     THE COURT: You can lead her with the
24 question we agreed to in the back room and that's it.
25 Q  Did you express to Agent DeJohn on your initial

1  meeting with him concerns that you had for your
2  safety?
3      MR. BRUNSON: Your Honor, this is the same
4  question --
5      THE WITNESS: There was a reason why I did
6  it --
7      THE COURT: Just a minute. Just a minute.
8  Yes?
9      MR. BRUNSON: This is the same question over
10 and over.
11     THE COURT: You were supposed to ask her the
12 question that we agreed to in the back room, and only
13 that question.
14 Q  Did you say to Agent DeJohn why you did want to
15 meet with him on December the 16th?
16 A  As I told you, I did not tell Agent DeJohn I
17 wanted to meet with him. Someone else went to him and
18 advised me that it would be best for me to meet with
19 him.
20 Q  And that's why you met with him?
21 A  That's why I met with him.
22 Q  And at that time did you discuss -- I believe you
23 said you had discussed different individuals, and you
24 named some of the names; did you during that meeting
25 have any conversations with Agent DeJohn about any

1  bank accounts that were in your name?
2  A  Yes, sir, one bank account.
3  Q  And where was that bank account?
4  A  Compass Bank.
5  Q  And what type of an account was it at Compass
6  Bank?
7  A  It was an account that I paid bills out of.
8  Q  Was it a savings bank?
9  A  No, sir, checking account.
10 Q  Now in addition to the bank account, the checking
11 account, did you have any conversation with Agent
12 DeJohn about the funding of the Carmichael Center in
13 its construction?
14 A  I don't understand the question.
15 Q  Did you, when you met with Agent DeJohn on the
16 first meeting with him, discuss the building of the
17 Carmichael Center and the funding of the building of
18 the Carmichael Center?
19 A  No, sir.
20 Q  Did you discuss with him, Mr. Carmichael, digging
21 up money during that meeting?
22 A  Yes, sir.
23 Q  And during that meeting did you discuss an
24 individual by the name of Sandra Jones?
25 A  They told me about Sandra Jones.

Multi-Page™

Page 70

1 Q  No, my question is did you discuss Sandra Jones?
2 A  I don't know her to discuss her.
3 Q  Did you identify her from a photo lineup?
4 A  They showed me a photo lineup of people, yes,
5 sir.
6 Q  And was she one of those people in the photo
7 lineup?
8 A  Yes, she was.
9 Q  Was Willie Smith, Junior in that lineup?
10 A  I don't know the name.
11 Q  What about Norbert Freeman?
12     (Whereupon, there was no response.)
13 Q  Let me back up.  Do you know an individual whose
14 nickname is Romeo?
15 A  Yes.
16 Q  Do you know that to be Willie Smith, or do you
17 know Romeo's real name?
18 A  No, sir, I don't.
19 Q  You don't know his real name?
20 A  No, sir.
21 Q  What about Norbert Freeman, can you identify him?
22 A  No, sir.  I don't know the name.
23 Q  What about Matthew Molette?
24 A  Yeah, I know Matt, yeah.
25 Q  And Sandra Jones, did you identify her?

Page 71

1 A  Right, mm-hmm.
2 Q  Emanuel James?  Did you identify Emanuel James?
3 A  I'm not sure of the name.
4 Q  Were there several photographs shown to you?
5 A  Yes, sir.
6 Q  Freddie Phelan, do you know that name?
7 A  No, sir.
8     MR. BRUNSON:  Your Honor, I object to this
9 line of questioning.  There is no relevance
10 whatsoever.
11     MR. MOORER:  Your Honor, I'm going to
12 connect it up shortly.
13     THE COURT:  Go ahead, then.  As long as you
14 connect it up.
15 Q  What about William Bolding, did they show you a
16 photograph of him?
17 A  Yes.
18 Q  And did they show you a photograph of Patrick
19 Denton?
20 A  Yes.
21 Q  Now, Miss Pettus, after your meeting on December
22 the 16th of 2003, did you have occasion in January of
23 2004 to come to this courthouse that we're in right
24 now?
25 A  Yes.

Page 72

1 Q  And your purpose in coming here was to do what?
2 A  I don't know.
3 Q  Did you -- Are you familiar with what a grand
4 jury is?
5 A  Yeah.  I came before this judge here, yeah.
6 Q  Well --
7     THE COURT:  That was a different matter and
8 we don't need to go into it.
9 Q  Did you go down to the basement?
10 A  I guess so, yeah.
11 Q  And --
12     THE COURT:  That was on a separate occasion.
13 You must have come in twice.
14     THE WITNESS:  Yeah.
15 Q  Did you go into a room where there was an
16 individual who was a court reporter like Mr. Reisner
17 here, and several different individuals to give
18 testimony?
19 A  Right.
20 Q  If I represent to you that that was a grand jury,
21 would you disagree with that?
22 A  No, that's right.
23 Q  Okay.  And would you disagree or would you agree
24 that that would have been, say, January the 21st or
25 sometime in January?

Page 73

1 A  I think so, yeah.
2 Q  And you testified before the grand jury that you
3 were working for the Carmichael Center at the time it
4 was being built, didn't you?
5 A  Yes, sir.
6 Q  And what did you do day-to-day in connection with
7 the building of the Carmichael Center?
8 A  Basically everything.  Helping with contractors,
9 getting prices on different equipment.  Just about
10 everything that went with the Carmichael Center.
11 Q  And where is the Carmichael Center physically
12 located?
13 A  On One-fifty Fleming Road.
14 Q  Now about when was the Carmichael Center being
15 built?
16 A  Probably starting in April.  I think it was
17 April.
18 Q  Now, Miss Pettus, during this time that the
19 Carmichael Center was being built, did you have the
20 bank account that you testified about earlier at
21 Compass Bank?
22 A  No, sir.
23 Q  When did you open that account?
24 A  In May.
25 Q  Of what year?

Multi-Page™

Page 74

1  A  2002. I believe it was 2002.
2  Q  And I don't know if I asked you this, but was
3  anybody's name on the account besides yours?
4  A  No, just my name.
5  Q  And who, if anyone, gave you the money to open
6  the account?
7  A  Mr. Carmichael.
8  Q  And the Carmichael that you're referring to is
9  the Leon Carmichael that you identified earlier?
10 A  Yes, sir.
11 Q  And what, if anything, did he give you to open
12 the account?
13 A  A hundred dollars.
14 Q  And do you know how long the account was open?
15 A  Not really. I don't know.
16 Q  How long would you estimate that the account was
17 open?
18 A  I'm not sure. It was open for awhile.
19 Q  Back at the time that you testified before the
20 grand jury, did you recollect then about how long it
21 was open? Did you know back then when you testified
22 before the grand jury?
23 A  I believe so I did then, because I had more
24 documents that I had present with me then, yeah.
25 Q  Okay. I have placed right there on that counter

Page 75

1  some documents. If you would, take a look at page
2  four, and particularly at lines eight, nine and eleven
3  and see if that refreshes your recollection to about
4  how long the account was open.
5      MR. BRUNSON: Your Honor, for the record
6  could we have some idea of what she's looking at?
7      THE COURT: Oh, definitely. You should have
8  a copy and everything.
9      MR. BRUNSON: I mean for purposes of the
10 record.
11     MR. MOORER: Oh, this is grand jury
12 testimony.
13     MR. BRUNSON: Is it marked?
14     MR. MOORER: No, it's not marked, it's
15 simply being used to refresh her recollection.
16     MR. BRUNSON: Okay, then.
17     THE COURT: Do you have it?
18     MR. BRUNSON: Yes, Your Honor.
19     THE COURT: Okay, good.
20 Q  Have you had an opportunity to review that?
21 A  Yes.
22 Q  Does that refresh your recollection as to about
23 how long it was open?
24 A  Mm-hmm.
25 Q  If you would close that document and set it back

Page 76

1  where it was and tell the jury approximately how long
2  the account was open?
3  A  It says to April or May 2003.
4  Q  Is that you believe accurate about how long it
5  was open?
6  A  Probably so.
7  Q  Now did you ever put any of your own money into
8  the account that you opened there at Compass Bank?
9  A  No.
10 Q  Whose money did you put in it?
11 A  Mr. Carmichael's.
12 Q  Do you recall what the single largest deposit was
13 that you placed into the account?
14 A  Nine something.
15 Q  I'm sorry?
16 A  Nine something. Probably nine thousand
17 something.
18 Q  Did you make any effort to keep the account --
19 I'm sorry, to keep your deposits under ten thousand
20 dollars?
21 A  I kept them under ten thousand.
22 Q  And why did you do that?
23 A  Because of the -- When I went to the bank, the
24 bank where I opened up the account, I was going to
25 make a deposit and the young man that worked there,

Page 77

1  they knew me from doing promotions, and he just told
2  me he said, "Sherry, if you don't put in -- if you do
3  nine ninety-nine or nine ninety-eight you don't have
4  to fill out the form for taxes." So I did it that
5  way.
6  Q  So you would have to do extra paperwork?
7  A  Right. So he told me to avoid the paperwork, he
8  said, "Just don't do over the ten thousand," so I
9  didn't.
10 Q  Miss Pettus, I neglected to ask you this early
11 on, but how far have you gone in school?
12 A  To the twelfth grade.
13 Q  Are you familiar with the term call
14 "structuring"?
15 A  Called who?
16 Q  "Structuring"?
17 A  "Structuring"?
18 Q  Yes.
19 A  No.
20 Q  Now during the time that this account was open,
21 did you have any other job besides working for Mr.
22 Carmichael?
23 A  No.
24 Q  And did you have any other sources of income
25 besides working?

Multi-Page™

Page 78

1 A No.
2 Q Now at any point did you ever win any money
3 gambling?
4 A Mm-hmm.
5 Q About how much money did you win?
6 A About eighteen thousand.
7 Q And did any of that money go into that bank
8 account that you opened at Compass Bank?
9 A No.
10 Q Now when you said that Mr. Carmichael gave you
11 the items to put into the account, in what form would
12 it be when it came to you from Mr. Carmichael?
13 A Cash.
14 Q Now where would you be when you would get the
15 cash from Mr. Carmichael to put into the account?
16 A At the office -- I mean at the building we were
17 at then. Norman Bridge Road.
18 Q Is that the same office where the Carmichael
19 Center is now?
20 A No, sir.
21 Q And where was it, then?
22 A At where our sign is now.
23 Q What was there at that location then, was that
24 the trucking office?
25 A It was the trucking office, yeah.

Page 79

1 Q Is there a name for the building that the
2 trucking office was in?
3 A Multi-investments. But one part of it was the
4 Carmichael Center also, inside.
5 Q Now when you would meet with Defendant Carmichael
6 to receive this money what, if anything, would the
7 money be contained in?
8 A It would be like in an envelope.
9 Q Would you describe it, the kind of envelope?
10 A Like a vanilla envelope.
11 Q Okay. What size manila envelope are you
12 referring to?
13 A Enough for me to see what bills I had to pay.
14 About this size, or all the bills listed on it that I
15 had to pay.
16 Q So would you say it would be bigger than a sheet
17 of typing paper?
18 A It would be about that size.
19 Q So it would be about eight and-a-half by eleven?
20 A Yeah.
21 Q And how much money would you get at a time from
22 him to go deposit?
23 A It was based upon what the bills were that I was
24 paying.
25 Q And what amounts of money would you get?

Page 80

1 A If I was paying nine thousand in bills, it would
2 be that. If I was paying lesser than that in bills it
3 would pay that amount. Whatever I needed to pay the
4 bills.
5 Q And sometimes it would be greater sums than nine
6 thousand dollars, wouldn't it?
7 A Yes, sir.
8 Q And sometimes it would be greater sums than even
9 ten thousand dollars, right?
10 A Yes, sir.
11 Q And when he would give you, say, more than ten
12 thousand dollars, would you put that into the account
13 all at one time?
14 A No, sir.
15 Q What would you do, then, if you didn't put it all
16 in at one time?
17 A I would just do it -- As long as -- I was
18 informed by the guy at the bank, as long as I did the
19 deposit every day, it didn't matter. I didn't have to
20 fill out more forms. So I would just do it to put it
21 in there.
22 Q So it might take you a period of days to deposit
23 all the money that you might have gotten from Mr.
24 Carmichael?
25 A Right.

Page 81

1 Q Now would the money be given to you always in a
2 manila envelope?
3 A No, sir. Sometimes it was like, you know, one
4 time I remember it was in a box. He just placed it in
5 a box and handed me the box.
6 Q Can you describe the box?
7 A No. Just a little box.
8 Q Well I'm saying the dimensions. I'm not talking
9 about the box itself, but can you use your hands to
10 describe about how big the box was?
11 A It was a little box. A little box.
12     (Whereupon, the witness indicated.)
13 Q So about five or six inches by about five inches,
14 would that be about right?
15 A I don't know. A box. A little box. Yeah, maybe
16 so.
17 Q Okay. And what denominations would the money be
18 in?
19 A Hundreds. Fifties. Twenties.
20 Q Were there any tens?
21 A Maybe sometimes, yeah.
22 Q Fives?
23 A Yeah, fives.
24 Q Were there any ones?
25 A No.



Page 82

1  Q  Were there some?
2  A  Yeah, I believe so.  I'm not sure.
3  Q  Was there ever a time when you came to believe
4  that this money that you were depositing was drug
5  money?
6  A  No, sir.
7  Q  Now when you testified at the grand jury you were
8  placed under oath, were you not?
9  A  Yes, sir.
10  Q  And you took the same oath then that was
11  administered to you now, didn't you?
12  A  That's right, sir.
13  Q  And at that time you promised to tell the truth
14  and the whole truth, correct?
15  A  Yes, sir.
16  Q  And nothing but the truth.
17  A  That's right.
18  Q  And at the time that you testified before the
19  grand jury you were questioned by Miss Morris, who is
20  seated here at counsel table, weren't you?
21  A  That's right.
22  Q  And at that time she asked you this question:
23  "Did you ever think this might be drug money?"  She
24  asked you that, didn't she?
25  A  Yes, she did.

Page 83

1  Q  And your answer to her at that time was, "Yes,
2  ma'am."
3  A  That's what I said.  Yes, it is.
4  Q  And at the time that you testified before the
5  grand jury, you were asked why you thought that money
6  was drug money.  Were you asked that question by Ms.
7  Morris?
8  A  Yes, I was.
9  Q  And under that same oath that you had taken
10  previously you answered that question, didn't you?
11  A  I answered according to me being taken to the
12  grand jury form her drilling it into me what it was.
13  Q  No, my question to you is, you answered that
14  question under oath, didn't you?
15  A  I sure did.
16  Q  And your answer to that question at that time was
17  what?
18  A  I believe I said yes.
19  Q  No, about the reason that you thought that the
20  money was drug money.  What was your answer at that
21  time?
22  A  Well because she told me because of the
23  denominations --
24      THE COURT:  No, what was your answer?  Do
25  you remember what your answer was?

Page 84

1      THE WITNESS:  No.
2  Q  If you would look at page eight of that document.
3  Look at lines five and six of page eight.  And you
4  were asked on line four, "Why did you think that?"
5  That's what was asked you, wasn't it?
6  A  Yes, sir.
7  Q  And that was the very next question that Ms.
8  Morris had asked you about you thinking this money was
9  drug money, isn't that so?
10  A  Yes, sir.
11  Q  And you said, your answer was, "Due to the
12  denominations of the money."
13  A  Yes, sir.
14  Q  You knew that something about drugs and because
15  you knew where that money had come from.  That was
16  your answer at that time, wasn't it?
17  A  Sir, if I said that, I lied.
18  Q  My question is, did you say that at that time?
19  A  It says I said that, but if I said that, I lied.
20  Q  Now, Ms. Morris further asked you later on on
21  that page, "Okay, when you say because of the
22  denominations of the money, what do you mean?"  She
23  asked you that question, didn't she?
24  A  Right.
25  Q  And then you answered, "That being twenty

Page 85

1  dollars, fives and tens, sometimes fifties and
2  hundreds, normally if people are buying drugs they buy
3  in twenties, tens and fives.  And if you get somebody
4  that's really fiend out, they pay dollars."  And that
5  was your answer at that time.
6  A  Mm-hmm.
7  Q  And then you were asked, "What do you mean by
8  fiend out?"  That was the next question to you, wasn't
9  it?
10  A  Right.
11  Q  And your answer was, "They don't really have the
12  money, but they're just, you know, getting by with a
13  piece of something or whatever.  You know?"  That was
14  your answer back in January, correct?
15  A  Right.
16  Q  And the very next question from Ms. Morris was,
17  "So you're saying, and correct me if I'm misstating
18  it, but you're saying that people who buy drugs use
19  smaller denominations of money?"  That was the next
20  question, wasn't it?  This is at the bottom of page
21  eight.
22  A  Yes, sir.
23  Q  That was the very next question, wasn't it?
24      (Whereupon the witness indicated.)
25  Q  You have to verbally answer.  I see you nodding

Page 86

1 your head.
2 A  Yes, sir.
3 Q  And your answer was, "Not smaller denominations
4 of money, but people who really like it when it gets
5 down to like a twenty dollar bag of something or a ten
6 dollar bag of something, be it a rock or whatever,
7 when you get down to people who are hussling who just
8 have to get a piece of something, it's smaller money.
9 They're just scrapping together five, five ones, tens
10 to make up their money."  That was your answer at that
11 time, wasn't it?
12 A  Mm-hmm, yes, sir.
13 Q  So the next question was, "So the fact was, the
14 fact that he was giving you smaller denominations made
15 you think this might be drug money."  That was the
16 next question, correct?
17 A  Yes, sir.
18 Q  And you said, "That was one of the factors,"
19 didn't you?
20 A  Yes.
21 Q  And then you were asked, "What were some of the
22 other factors," weren't you, by Miss Morris?  She
23 asked you, "What were some of the other factors,"
24 didn't she?
25 A  Right.

Page 87

1 Q  And then your answer to that was what?
2 A  I said, "Well, the money that I know that I was
3 depositing, I knew where the money -- where he told me
4 the money, I was aware of the money where it came
5 from".
6 Q  And at that time the "he" that you were referring
7 to was Leon Carmichael, correct?
8 A  I guess so.
9 Q  Because he was the only one who was giving you
10 money to put into this account, right?
11 A  Yes, sir.
12 Q  So the next question to you was, and let's back
13 up a second, we were talking about the denominations,
14 and you said you knew something about drug dealing.
15 That was the next question, correct?
16 A  Yes.
17 Q  And your answer to that was, "Yes," correct?
18 A  Right.
19 Q  And tell the jury what was the next -- well, let
20 me ask you this:  Had you previously been convicted of
21 any type of drug offense?
22 A  Not previously, but I had been before, yeah.
23 Q  And would you tell the jury what that was and
24 when it was?
25 A  1998.

Page 88

1 Q  And what were you convicted of?
2 A  Controlled substance, pain pills.
3 Q  And can you tell the jury briefly what it was
4 that you had done that caused you to be convicted?
5 A  Possession of a forged instrument.
6 Q  And what was the forged instrument that you're
7 referring to?
8 A  For pain pills.
9 Q  And what were you doing with the forged
10 prescription back in '98?
11 A  I mean that's not -- I'm not going to answer
12 that.  That's not even relevant to this.
13      THE COURT:  You have to answer the question.
14 You have to answer it.
15 A  I was picking up prescriptions for somebody.
16 Q  Were you delivering those pills to them?
17 A  Yes, I was.
18 Q  So were they for you to consume?
19 A  No, they wasn't.
20 Q  And so the next question later was, "But because
21 of your experience in prescription drugs, you knew
22 about drug dealing" at the end of the page.  And that
23 was asked to you?
24 A  Yes.
25 Q  And your answer at that time was what?

Page 89

1 A  "Yes."
2 Q  Now I believe a few moments ago you said that
3 when you initially met with Agent DeJohn you generally
4 discussed some money being dug up by Defendant Leon
5 Carmichael.  Do you recall having testified about
6 that?
7 A  Right.
8 Q  And you were asked about that at the grand jury,
9 were you not?
10 A  Right.
11 Q  And at some point did Mr. Carmichael tell you
12 about digging up some money?
13 A  Right.
14 Q  And what did he tell you?
15 A  What do you mean, what did he tell me?
16 Q  What did he tell you, Mr. Carmichael, about
17 digging up the money?
18 A  He just told me that he had some money that he
19 had put away and that he had went and got it.
20 Q  And where were you when he told you that?
21 A  We were at the office.
22 Q  And is this the Multi-Investment office that you
23 talked about?
24 A  Yes.
25 Q  Which was the old building?

**Multi-Page™**

Page 90

1  A  Yes.
2  Q  And why did he dig up the money on that occasion?
3       THE COURT: If you personally know.
4  A  He just went and dug it up. I mean there wasn't
5  a reason. He didn't give me a reason he was going to
6  get the money.
7  Q  Well you were asked at the grand jury under oath
8  by Ms. Morris at line fourteen about the incident
9  where Defendant Carmichael dug up the money.
10 A  Right.
11 Q  You were asked about that by her, were you not?
12 And your answer at that time for why he dug up the
13 money was what?
14 A  What page is that on?
15 Q  This is on page ten. I'm sorry. Page ten, line
16 sixteen, seventeen. And your answer was what?
17 A  Oh. That "The banks would not make him a loan."
18 Q  So he was having problems getting a loan from a
19 bank at that time?
20 A  Yeah.
21 Q  And what was he trying to borrow from the banks
22 for at that point?
23 A  It wasn't at that time, no, sir, not at that
24 time. This was all previous. Everything is running
25 together. This is all previous.

Page 91

1  Q  About when was it that he told you about digging
2  up the money?
3  A  It was sometime, I guess, in -- It was somewhere
4  down the line. I'm not sure of the month.
5  Q  Down the line from when?
6  A  Maybe around August. July, August, something
7  like that.
8  Q  What year?
9  A  2002.
10 Q  And how much money was it that he dug up?
11 A  I'm not sure how much money it was, but I did
12 give them a figure. But I'm not sure how much it was.
13 Q  Well you were sure back when the grand jury met
14 back in January, were you not?
15 A  I said some things, yes, sir.
16 Q  And in fact you said some pretty specific things,
17 didn't you, such as you were asked at line twenty on
18 that same page, page ten, "And if you dig it up," you
19 were asked that by Ms. Morris, weren't you?
20 A  Mm-hmm.
21 Q  And your answer was what?
22 A  "The first time he went it was a million."
23 Q  A million dollars?
24 A  A million dollars, yeah.
25 Q  And he told you that? You were asked that?

Page 92

1  A  That's what I said, yeah.
2  Q  And you were also asked on page eleven if you had
3  actually seen the money, weren't you?
4  A  Yes, sir.
5  Q  And your answer was -- your answer to that
6  question was?
7  A  Yes.
8  Q  Now where did that take place, this incident
9  about the money he dug up and him telling you about
10 it?
11 A  Where did it take place?
12 Q  Yes.
13 A  In the office. The old office.
14 Q  Could it have been at his house?
15 A  No.
16 Q  Well you were asked by Ms. Morris back in January
17 on page eleven line three, "Where did you see the
18 money?" You were asked that.
19 A  Okay, that's not what you just asked me. You
20 didn't ask me that. You didn't ask me -- you asked me
21 where did the conversation take place.
22 Q  Oh, okay, I'm sorry. I didn't mean to trick you.
23 You saw the money?
24 A  Yes, sir.
25 Q  And where did you see the money?

Page 93

1  A  At the house.
2  Q  Which house?
3  A  Mr. Carmichael's house.
4  Q  Where does Defendant Carmichael live?
5  A  On Brookwood Drive.
6  Q  Have you ever been to his house on Brookwood
7  Drive before that time?
8  A  Yes, sir.
9       THE COURT: We've actually been going in one
10 form or another I guess almost two hours, so we'll
11 take a morning recess at this time for fifteen
12 minutes.
13      Don't forget to turn over your notes and
14 you're under the same cautionary instructions.
15      (Whereupon, a recess was taken.)
16      THE COURT: Proceed, Mr. Moorer.
17      MR. MOORER: Yes, Your Honor.
18 Q  Just before the break, Miss Pettus, you were
19 talking about being at Defendant Carmichael's house
20 with the money that had been dug up by Mr. Carmichael.
21 Now I'm going to show to you what I've previously
22 shown to defense counsel and been admitted as
23 government's exhibit 7(q) as in Quebec. Can you see
24 that from where you are seated? And what is
25 government's exhibit 7(q)?

Multi-Page™

Page 94

1  A  Mr. Carmichael's house.
2  Q  Is this the house wherein you two got together to
3  count the money that he had dug up?
4  A  Yes, sir.
5  Q  Now who was there at the house while you were
6  counting the money?
7  A  It was just me and his wife.
8  Q  Did you count all the money?
9  A  No.
10  Q  How much of it did you count?
11  A  I don't remember that.
12  Q  Do you know about how much it was?
13  A  No.
14  Q  If you would, look on page eleven, line fifteen,
15  back when you testified before the grand jury you knew
16  approximately how much it was.
17  A  Okay.
18  Q  And you answered "He was counting whatever he
19  needed at that time.  It might have been, like, fifty,
20  sixty thousand."
21  A  Right, okay.
22  Q  So was that about how much he counted out, or
23  that you counted out?
24  A  Maybe so, yeah.
25  Q  And did some of that money that he dug up, did

Page 95

1  some of that go into that bank account that you had
2  opened at Compass Bank for Defendant Leon Carmichael?
3  A  Yes, sir.
4  Q  And did you deposit that money using the same
5  procedure that you testified to about earlier, putting
6  it in increments of less than ten thousand dollars?
7  A  Yes, sir.
8  Q  And at another point did you and Mr. Carmichael
9  talk about him digging up some different money than
10  that money that you have been testifying about?
11  A  No, sir.
12  Q  Well, you were asked at the grand jury under oath
13  by Miss Morris the question that's at the top of page
14  twelve, were you not?
15  A  Right.
16  Q  And that question was: "At some other -- at
17  another point, did Mr. Carmichael talk to you about
18  digging up some more money?"  That question was asked
19  to you, was it not?
20  A  Yes, it was.
21  Q  And your answer was, "Yes, he got the rest of it.
22  It was one point two million."  That was your answer
23  before the grand jury in January, was it not?
24  A  That's what it says.
25  Q  And that's what you said, correct?

Page 96

1  A  Right.
2  Q  And you were asked if you saw that money, were
3  you not?
4  A  Right.
5  Q  And you said you saw that money, didn't you?
6  A  Right.
7  Q  Now where was it when you saw that money?
8  A  At the house.
9  Q  And what house were you referring to?
10  A  Mr. Carmichael's.
11  Q  The one you just pointed out in the photograph,
12  7(q)?
13  A  Yes, sir.
14  Q  And who was there on that occasion?
15  A  Just his wife and myself.
16  Q  Was not Mr. Carmichael there, as well?
17  A  Yes, he came down.  Yeah.
18  Q  And were you counting the money then?
19  A  Yeah.
20  Q  And was there anything different about this money
21  as opposed to the other money that you had helped
22  count?
23  A  This was the only money that I counted.
24  Q  Well, was there something different about this
25  money?

Page 97

1  A  Yes, sir.
2  Q  And what was it about it that was different?
3  A  It had an odor to it.  It stunk.
4  Q  And did you ever receive any explanation from
5  anyone as to why it smelled?
6  A  Yes, sir.
7  Q  And from whom did you receive that explanation?
8  A  From Mr. Carmichael.
9  Q  And what did he tell you about it?
10  A  That the sewage had busted and the stink had got
11  on it.
12  Q  Had the money been buried for the sewage to get
13  the smell on?
14  A  He didn't say that.  I just knew it had the
15  sewage on it.
16  Q  Well your answer at the grand jury was, and this
17  is on page twelve at line eighteen, and the question
18  was asked, "And what did he tell you?"  And that
19  question was in connection with what you were told
20  about why the money stunk, correct?
21  A  Right.
22  Q  And your answer at that time was "The bag that it
23  was in, acid had ate it up from the sewage area and
24  that was if he hadn't gotten to it, it would have
25  ruined it."

Multi-Page™

Page 98

1 A Right.
2 Q And then the rest of the answer was, "The acid
3 had ate up through it, and it was -- the sewage smell
4 had come up through the money."
5 A Right.
6 Q And you said, "He washed it with some softener
7 and mothballs, but it did not help." That was your
8 answer, right?
9 A Right.
10 Q And who is the "he" that you referred to as being
11 the "he" who washed it with softener and mothballs?
12 A Mr. Carmichael.
13 Q And what, if anything, did you do with this
14 stinky money that he tried to wash to clean up?
15 A What did we do it with it?
16 Q Yeah, what did you do with it?
17 A I deposited it.
18 Q Now, this money that you deposited that had the
19 odor, was it different denominations or was it
20 predominantly fifties and twenties?
21 A It was different denominations, I believe. I
22 don't remember.
23 Q Now the bank account that you had for Mr.
24 Carmichael, what were you writing checks off of the
25 account for?

Page 99

1 A Bills.
2 Q And whose bills were these that you were paying
3 out of this account?
4 A Mr. Carmichael's.
5 Q And who, if anyone, would direct you as to who to
6 pay with this money that was in the account?
7 A Mr. Carmichael.
8 Q Now do you recall the day of Defendant
9 Carmichael's arrest?
10 A Yes.
11 Q And you were working on that day, were you not?
12 A Yes.
13 Q You were working at the Carmichael Center?
14 A Yes.
15 Q And your first indication that there was a
16 problem was what?
17 A I don't understand the question.
18 Q Okay. How did you first become aware that Mr.
19 Carmichael was arrested?
20 A I received a phone call.
21 Q And from whom did you receive a phone call?
22 A From a friend of Mr. Carmichael's.
23 Q And who was that friend?
24 A Keena.
25 Q And what, if anything, did she say when you

Page 100

1 received the phone call?
2     MR. BRUNSON: Objection, Your Honor. This
3 calls for hearsay. I'm objecting to the question
4 calling for a hearsay answer.
5     MR. MOORER: Yes, Your Honor. I had asked
6 this witness about how she had first become aware of
7 Mr. Carmichael's arrest, and she said that she had
8 received a phone call from Keena. I asked her who
9 Keena was. I believe she had responded to that, and I
10 asked her what, if anything, did she tell -- Kenna
11 tell to Miss Pettus. And Miss Pettus was about to
12 give the answer when the hearsay objection was made.
13     THE COURT: So you want to know what Keena
14 said to Miss Pettus.
15     MR. MOORER: Correct.
16     THE COURT: Yes?
17     MR. BRUNSON: Object to that.
18     THE COURT: Why isn't it hearsay?
19     MR. MOORER: Because it is coconspirator
20 testimony, Your Honor.
21     THE COURT: What evidence do I have that
22 she's a coconspirator?
23     MR. MOORER: Because you have testimony from
24 Patrick Denton that he had delivered the money which
25 came from the sale of narcotics. And then there's

Page 101

1 going to be further statements about what was done in
2 regards to this particular call, which I think further
3 shows her involvement in the conspiracy.
4     THE COURT: Go ahead.
5     MR. BRUNSON: Your Honor, neither of these
6 individuals have been shown to be part of the
7 conspiracy. Secondly, any conversation was not in
8 furtherance of the conspiracy. Both conspiracies had
9 terminated at that point.
10     THE COURT: This occurred the day of the
11 arrest?
12     MR. MOORER: Correct, Your Honor.
13     THE COURT: Overruled.
14 Q What, if anything, did Keena tell you?
15     THE COURT: Is it Keena or Tina?
16 Q Would you tell us, who was it that called you?
17 A Keena.
18 Q Okay. What did Keena tell you when you asked
19 her?
20 A She asked me was Leon at the office.
21 Q And after she asked you that what, if anything,
22 did you say?
23 A I told her, "No."
24 Q Do you know about what time of day it was when
25 she called you?

Page 102

1  A  It was that morning.  I don't remember.
2  Q  And after you told her that he was not in, what,
3  if anything, happened thereafter?  You told her that
4  he wasn't here?
5  A  Right.
6  Q  What did she say, if anything, next?
7  A  She hung up.
8  Q  Did you have any further conversation with her?
9  A  She called back.
10 Q  And about how long after the initial call to you
11 did she call back?
12 A  I think about twenty minutes.  Thirty minutes.
13 Q  Now did you know of any relationship between
14 Keena and Mr. Carmichael prior to Keena calling you on
15 this occasion?
16      MR. BRUNSON:  Objection, Your Honor.
17      THE COURT:  Does she know of any
18 relationship between Mr. Carmichael and Keena?
19      MR. MOORER:  Yes.
20      THE COURT:  Do you have personal knowledge,
21 something you observed?
22      THE WITNESS:  No, sir.
23      THE COURT:  Is it something Mr. Carmichael
24 told you?
25      THE WITNESS:  No, sir.

Page 103

1       THE COURT:  I'll sustain the objection.
2       MR. MOORER:  Your Honor, may I approach?
3       THE COURT:  Let the other side know.
4       (Whereupon, Mr. Moorer conferred with
5  Mr. Brunson off the record and out of the hearing of
6  the other courtroom participants.)
7       MR. MOORER:  Your Honor, may we approach?
8       THE COURT:  We need to put it on the record.
9  I'll let the jury step out for just a minute.
10      (Whereupon, the jury was escorted out of the
11 courtroom, and the following colloquy ensued):
12      THE COURT:  Okay, Mr. Moorer.  Why don't you
13 ask her the question.
14      MR. MOORER:  Okay.
15          VOIR DIRE EXAMINATION
16       BY MR. MOORER OF SHERRY PETTUS
17      (THE JURY IS NOT PRESENT):
18 Q  Did you know prior to this particular phone call
19 if Keena and Defendant Carmichael knew each other?
20 A  Yes.
21 Q  Did they have any personal relationship with each
22 other?
23 A  Yes.
24 Q  And what was that?
25 A  What was the personal relationship?

Page 104

1  Q  Yes.
2  A  What I was told the personal relationship was?
3  Q  Yes.
4  A  They were friends.
5  Q  They also share children, don't they?
6  A  That's the rumor.
7  Q  You know that to be a fact, don't you?
8  A  No, I don't know it to be a fact.
9  Q  She's represented it to you or you understood her
10 children were children that were fathered by Mr.
11 Carmichael?
12 A  I have been told that.
13      THE COURT:  Who told you that?
14      THE WITNESS:  There were people talking.
15      MR. MOORER:  And that's the basis on which I
16 was trying to elicit --
17      THE COURT:  I'll sustain the objection.
18 Q  Did Keena tell you that?
19 A  Keena told me that her children were Mr.
20 Carmichael's children?
21 Q  Yes.
22 A  No, sir.
23 Q  Well you testified at the grand jury that they
24 have children together, didn't you, on page fourteen?
25 A  Repeating what I had heard.

Page 105

1  Q  No, my question to you was, did you not tell the
2  grand jury that they had children together?
3  A  I repeated what I heard.
4       THE COURT:  Just answer the question.  Did
5  you tell the grand jury that?
6       THE WITNESS:  Yes, I did, yeah.
7  Q  In fact, you told them they had three children.
8  A  Yeah.
9  Q  And one was on the way.
10 A  Yeah.
11      MR. MOORER:  And, Your Honor, personal
12 relationship, familial relationship is not something
13 subject to the hearsay rule.
14      THE COURT:  What are you talking about?
15 Show me where that says that in the rule.  You mean
16 people can go ahead and make all kinds of hearsay
17 statements about other people's children and it's not
18 hearsay?
19      MR. MOORER:  I'm going to find the rule,
20 Your Honor.
21      (Whereupon, Mr. Moorer examined said
22 document.)
23      MR. MOORER:  Okay, look at --
24      THE COURT:  Where are you looking?  I have
25 803 before me now.

**Multi-Page™**

1 MR. MOORER: "The following are not excluded
2 by the hearsay rule --"
3 THE COURT: Are we looking at 803?
4 MR. MOORER: Yes, Your Honor. Nineteen. "A
5 reputation among a person's associates or in the
6 community concerning a person's birth, marriage,
7 divorce, death, legitimacy, relationship by blood,
8 adoption, marriage, et cetera or other similar facts
9 of personal family history." I believe she can
10 testify even if it's what she says.
11 THE COURT: What do the defendants say?
12 MR. BRUNSON: Your Honor, as she said, this
13 is not only hearsay, it's --
14 THE COURT: What about that rule? We follow
15 the rules.
16 MR. BRUNSON: Judge, I have never heard of
17 that rule.
18 THE COURT: Why don't you read it. The fact
19 that you haven't heard the rule doesn't mean the rule
20 doesn't apply.
21 MR. BRUNSON: Yes, Your Honor.
22 Okay, anything else on this?
23 MR. MOORER: Oh, and, Your Honor, it's also
24 probative of the fact as to why she would be concerned
25 enough to call.

1 THE COURT: Anything else on this?
2 MR. BRUNSON: Yes, Your Honor. This request
3 goes to a motion in limine that was before the Court
4 pretrial also.
5 THE COURT: What about Rule 803,
6 subparagraph nineteen?
7 MR. BRUNSON: Your Honor, I think prior to
8 that there is some reference in the rule that there
9 must be some firsthand knowledge.
10 THE COURT: Where does it say that?
11 MR. BRUNSON: I'm looking.
12 MR. MOORER: If that were the case, Your
13 Honor, one could never say in court that a certain
14 person is my parent because obviously you weren't
15 there at your -- you were not sentient at your, you
16 know --
17 THE COURT: Let's move on. Reputation may
18 come in. Gossip does not. Objection sustained.
19 Let's move on.
20 Bring in the jury.
21 (Whereupon, the jury was escorted into the
22 courtroom.)
23 Q Anyway, when we took the brief recess there you
24 said that Keena had called you a second time. Do you
25 recall that?

1 A Yes.
2 Q Now what did she say to you when she called on
3 the second occasion?
4 A She asked was Leon in the office.
5 Q And what was your response to that?
6 A I told her, "No."
7 Q And what, if anything, happened after you told
8 her "No"?
9 A She told me that they had busted Freddie's house.
10 Q Well before she told you that, she told you it
11 was very important that she make contact with Leon,
12 didn't she?
13 A Right.
14 Q And when she (sic.) had these conversations with
15 her, you understood her demeanor to be that it was
16 important, urgent, correct?
17 A Mm-hm.
18 Q You have to verbally answer.
19 A She appeared as it was important, yeah.
20 Q And she said what, then, after she told you it
21 was real important that she talk to him? Didn't she
22 tell you about the search of the Defendant Freddie
23 Williams' house?
24 A Right.
25 Q And you tried to find out who she was referring

1 to when she said "Freddie," right?
2 A Yes.
3 Q Because she said the police had just busted into
4 Freddie's house, right?
5 A Right.
6 Q And you were trying to figure out Freddie who
7 that she was referring to, correct?
8 A Right.
9 Q And then you asked her what the connection was
10 between Freddie and the search at his house and
11 Defendant Carmichael, didn't you?
12 A Right.
13 Q And what did she say?
14 MR. BRUNSON: Your Honor, another hearsay
15 objection.
16 MR. MOORER: Coconspirator statement, Your
17 Honor.
18 THE COURT: By who, now?
19 MR. MOORER: By Keena.
20 THE COURT: Ask the question again.
21 MR. MOORER: I asked her what did she say in
22 response to what the search warrant at Leon's house
23 had to do with Leon -- I'm sorry, Freddie's house had
24 to do with Leon.
25 THE COURT: I'll allow it. Overruled.

Multi-Page™

Page 110

1 Q And what did she say?
2 A She said, "It was Leon's stuff. It was Leon's
3 stuff." That's what they saw in the paper.
4 Q And that's what you told the grand jury?
5 A I don't -- I don't -- Yeah, I guess I did.
6 Q And the stuff that you were referring to that was
7 found at Leon's house was what? It was marijuana,
8 wasn't it?
9 A She didn't say what stuff at the time.
10 Q But from all that happened between your
11 conversation with her and the things you did later
12 that day, you understood it to be drugs, didn't you?
13 A Yes, sir.
14 Q And she told you who it was that had busted into
15 -- that she had claimed busted into Freddie's house,
16 right?
17 A Right.
18 Q It was the police, correct?
19 A Right.
20 Q Now where is your house in relation to Freddie
21 Williams' house? If you know.
22     THE COURT: I hate to interrupt. I'm going
23 to have to excuse the jury for just a minute. I
24 apologize, ladies and gentlemen of the jury, but this
25 is the way we have to do things. I ask that you be

Page 111

1 patient.
2     (Whereupon, the jury was escorted out of the
3 courtroom, and the following colloquy ensued):
4     THE COURT: To refresh my memory, now Keena
5 is the one you contend that Mr. Carmichael had
6 children by, is that correct?
7     MR. MOORER: Correct.
8     THE COURT: And also -- And what is her age
9 now?
10     MR. MOORER: She's eighteen at this time.
11     THE COURT: Eighteen at this time. And I
12 want to ask you two questions. Again, I know you said
13 before your contention that was she was a member of
14 the conspiracy; and, secondly, I want to know how this
15 is in furtherance of the conspiracy.
16     MR. MOORER: Because of that, she then takes
17 certain other acts.
18     THE COURT: Who does?
19     MR. MOORER: This witness does.
20     THE COURT: But how is this in furtherance
21 of the conspiracy what Keena says, though?
22     MR. MOORER: Because when a person -- When
23 individuals are involved in the drug trade in
24 particular but illegal activity in general, the law
25 enforcement activity such as search warrants and

Page 112

1 arrest are important to the organization of people who
2 are involved in that criminal activity. And she's
3 trying to contact Leon, and she indicated that it was
4 urgent that she contact Leon because of a search
5 warrant that had occurred at what we contend the
6 evidence is going to show was one of Leon's
7 associates.
8     THE COURT: You mean Freddie Williams.
9     MR. MOORER: Correct. So that furthered the
10 conspiracy by her attempts to alert the head of the
11 conspiracy about what's happening to one of his
12 underlings.
13     THE COURT: When you file your statement
14 with me, you're going to show me how Keena is a member
15 of the conspiracy and how all of these events
16 surrounding the arrest date were in furtherance of the
17 conspiracy, right?
18     MR. MOORER: And because Patrick Denton said
19 that he had brought the money to her house. And I may
20 be wrong about this, but I think there was money to
21 pay for drug debts to Leon Carmichael.
22     MR. BRUNSON: Just because he delivered the
23 money to the house, Judge, doesn't mean she was ever
24 involved. There has never been any evidence that she
25 was ever involved. Nor is this particular witness

Page 113

1 involved with the count one conspiracy.
2     THE COURT: Well actually it's Keena's
3 statement that's come in, but go ahead. Is all you
4 have is the money was delivered to Keena?
5     MR. MOORER: That it was delivered to her
6 house and facilitating drug transactions is against
7 the law. And then she's alerting him as to an
8 enforcement action that's taken, and she indicates
9 that it's urgent, and then subsequently because of
10 that information that was given to them other things
11 were done, Your Honor.
12     THE COURT: Okay. Now you realize, though,
13 that the statement itself can be come in as proof of
14 the conspiracy. I know it sounds like bootstrapping,
15 but that's what the Supreme Court of the United States
16 has said. So not only do you have evidence of the
17 delivery of the money, but you can actually use the
18 statement itself as evidence in determining whether
19 the statement should be considered part of the
20 conspiracy.
21     Don't argue me about whether that sounds
22 illogical, but that happens to be the law. But you'll
23 put all of that in your statement that you file with
24 the Court, is that correct?
25     MR. MOORER: Yes, Your Honor.

Page 114

1  THE COURT: Okay. The objection is
2  overruled, subject to what they're going to file with
3  the Court.
4  MR. BRUNSON: Your Honor --
5  THE COURT: Yes?
6  MR. BRUNSON: -- as we began this problem we
7  wanted you to be sensitive to the state that certain
8  statements will be coming in --
9  THE COURT: That's why I sent the jury out.
10  I suddenly realized that it was the day of the arrest.
11  Remember I said the arrest was a red flat.
12  MR. BRUNSON: Yes, Your Honor.
13  THE COURT: But I think this comes in,
14  assuming they can tie all of this up.
15  So bring the jury back in.
16  MR. BRUNSON: Your Honor, you're not
17  indicating he can backtrack into the relationship?
18  THE COURT: No, that's just gossip.
19  (Whereupon, the jury was escorted into the
20  courtroom.)
21  THE COURT: Proceed.
22  Q  I believe when we left off you had said that
23  Keena had told you that it was Leon's stuff at
24  Defendant Freddie Williams's house. After she told
25  you -- and by "she" I mean Keena -- told you about the

Page 115

1  search warrant and the drug bust at Freddie Williams's
2  house, was that the end of the conversation between
3  you and Keena? Was that the end of the conversation?
4  A  Yes.
5  Q  Now, during the second conversation that you had
6  with her -- and by "her" I'm referring to Keena -- did
7  she talk to you any about the arrest of Defendant Leon
8  Carmichael?
9  A  I'm not sure.
10  Q  Okay. Refer to page fifteen of the transcript,
11  the very top of the page. Maybe that will refresh
12  your recollection.
13  A  Okay. Right. She told me that he had been
14  arrested, and one of her neighbors had told her that.
15  Q  And her neighbor had told her that Leon had been
16  arrested after he had passed by Freddie Williams's
17  house?
18  A  Yes.
19  Q  Now this was the first that you knew of Freddie
20  Williams's arrest?
21  A  Yes.
22  Q  And I had asked you just before the break where
23  in relation to Freddie Williams's house do you live.
24  Y'all live in the same street? The same neighborhood?
25  A  No.

Page 116

1  Q  How far apart do y'all live, roughly?
2  A  At this time I was living in Hope Hull.
3  Q  Okay. So that would have been, for people not
4  from Montgomery, about what, twenty miles from
5  Montgomery?
6  A  Yes. I was at work.
7  Q  I understand, but how far is the Carmichael
8  Center where you work at that time from Freddie
9  Williams's house?
10  A  Maybe a mile. I don't know. I'm not sure. It's
11  not far.
12  Q  So you couldn't have seen it for yourself if you
13  just looked out the door of the Carmichael Center?
14  A  No, sir.
15  Q  It's too far away.
16  A  Yes.
17  Q  Now after she told you that, did you go over to
18  Ridgecrest?
19  A  Yes.
20  Q  To Freddie Williams's house?
21  A  No, sir.
22  Q  Where did you go on Ridgecrest?
23  A  Went over to Keena's.
24  Q  She lives on Ridgecrest, as well?
25  A  Yes, sir.

Page 117

1  Q  Do you know how close or far she lives from
2  Freddie Williams?
3  A  I'm not -- I don't remember. I'm not sure.
4  Q  Is it a few houses or is it miles?
5  A  No, there's some houses in between.
6  Q  Within the same block?
7  A  I'm not sure.
8  Q  Well after you got to her house what, if
9  anything, did you do?
10  A  We went around the corner to the gas station.
11  Q  And why did you go to the gas station?
12  A  Because she was in her car waiting and I followed
13  her to the gas station.
14  Q  Do you recall what gas station it was?
15  A  AMOCO.
16  Q  And did you have any conversations there at the
17  AMOCO with her?
18  A  I don't recall the conversation.
19  Q  Well, if you would look at the bottom of page
20  fifteen, line twenty-one. And what she told you was,
21  the house --
22  MR. BRUNSON: Your Honor, we still object to
23  this hearsay observation of this other individual. It
24  is a matter that there's no way of telling where she
25  came up with this information. It is past the time of

*See p. 120*

**Page 118**

1 the alleged conspiracy, and we have no right to
2 confront the witness on this issue, Your Honor.
3      MR. MOORER: Your Honor, a conspiracy is not
4 over until the individuals involved in the conspiracy
5 affirmatively drop at this point when these things are
6 being communicated with Miss Pettus, they have not
7 been a withdrawal by Keena who was a person who was
8 part of the conspiracy. As a matter of fact, I think
9 further testimony will show that she continued to be
10 involved in the conspiracy even beyond the date of the
11 arrest.
12      THE COURT: The objection is noted and
13 overruled.
14      Go ahead.
15 Q Now she told you, again at the meeting at the
16 AMOCO station, that the house where the search warrant
17 took place was Freddie's house, didn't she?
18 A Yes.
19 Q And you knew that to be Freddie Williams who is
20 on trial in this case, correct?
21 A Yes, sir.
22 Q And that she, Keena, told you that Leon was
23 dealing drugs, that he was selling drugs. She told
24 you that, didn't she, at the AMOCO station?
25 A I don't remember that.

**Page 119**

1 Q Well you remembered it at the time that you
2 testified at the grand jury, didn't you?
3      (Whereupon, the witness indicated.)
4 Q You have to verbally answer. A shake of your
5 head won't be taken down on the record.
6      You remember testifying to that at the grand
7 jury, don't you?
8 A I don't remember it.
9 Q Well you were asked by Miss Morris under oath and
10 what did she -- and the "she" is in connection with
11 the conversation you had with Keena at the AMOCO --
12 what did she tell you? And your answer was, "About
13 the house was Freddie's house, and Leon was dealing
14 drugs." That was your answer to that question at that
15 time, wasn't it?
16 A Yes.
17 Q And you were asked about her demeanor at that
18 time when she told you these things at the AMOCO
19 station. Were you asked about that, her demeanor?
20 A Yes.
21 Q And she -- and the "she" I'm referring to was
22 Keena -- was very upset at that time.
23 A Right.
24 Q And she, Keena, was upset because she thought,
25 Keena thought that her sister might have had something

**Page 120**

1 to do with the search warrants coming about.
2 A Right.
3 Q And she told you that at the AMOCO station.
4 A Yes.
5 Q Who is Keena's sister?
6 A I don't know. I don't know her.
7 Q Do you know her name?
8 A I'm not sure of her name. I heard it through
9 Detective DeJohn, but I don't remember it.
10 Q And you were asked by Miss Morris how far apart
11 Keena and Defendant Freddie Williams lived at the
12 grand jury, weren't you? Because that was the very
13 next question about your conversations at the AMOCO,
14 wasn't it?
15 A Right.
16 Q And you said that, "They live on opposite sides
17 of the street"?
18 A Right.
19 Q And you told them "It's about three or four
20 houses down from each other," right?
21 A Right.
22 Q And you said, "They live on the same block and
23 the same street," didn't you?
24 A Right.
25 Q And that is so, isn't it?

**Page 121**

1 A Yes, sir.
2 Q And you further testified before the grand jury
3 as to how Keena told you about her knowledge of
4 Defendant Carmichael dealing drugs. You were asked
5 about that, weren't you?
6      (Whereupon, there was no response.)
7 Q I'm going to make it easy for you, Miss Pettus.
8 The question is at line sixteen of page sixteen.
9 A Yes, sir.
10 Q And the question was, "Did she tell you --" and
11 the "she" she's referring to is Keena, "-- tell
12 you how she knew that Leon was selling drugs?" That
13 when was asked to you, wasn't it?
14 A Yes.
15 Q And you answered it, "She's seen him before,"
16 didn't you?
17 A Right.
18 Q And you further answered about their
19 relationship, didn't you?
20 A Right.
21 Q So after she told you about this at the AMOCO
22 station, what did you do?
23 A I went back to the office.
24 Q And you tried to calm her down too, didn't you?
25 A Yeah, probably did.

**Multi-Page™**

Page 122

```
 1  Q  Because she was kind of upset at the events that
 2  occurred at Mr. Williams' house?
 3  A  Right.
 4  Q  And at the time Keena was pregnant, wasn't she?
 5  A  Right.
 6  Q  And you felt it wasn't good for her to be upset
 7  being as pregnant as she was.
 8  A  Right.
 9  Q  Now as far as you know, there is no family
10  relationship between Keena and Defendant Williams, is
11  there?
12  A  No.
13  Q  And you went back to the Carmichael Center after
14  this encounter with Keena at the AMOCO?
15        Now once you got back to the Carmichael
16  Center you made contact with Montel, didn't you?
17  A  Yes.
18  Q  Who is Montel?
19  A  Montel Watson.
20  Q  And what is the relationship, if any, between
21  Montel Watson and Leon Carmichael?
22  A  He's his brother-in-law.
23  Q  And when you made contact with him, I said
24  Montel, it's Martel, right?
25  A  I say Montel too.  I'm not sure.
```

Page 123

```
 1  Q  But we're referring to Leon Carmichael's
 2  brother-in-law?
 3  A  Right.
 4  Q  Is he the brother of Mr. Carmichael's wife, or is
 5  he the brother of someone else?
 6  A  He's the brother of Miss Carmichael's sister.
 7  He's a husband of Mr. Carmichael's sister.
 8  Q  Now did you call him once you got back to the
 9  Carmichael Center?
10  A  I saw him.
11  Q  So you had a face-to-face meeting with him?
12  A  Yes.
13  Q  And during that meeting that you had with him,
14  did you have any conversations with him?
15  A  Yes, I told him what Keena had told me.
16  Q  And what she had told you about what in
17  particular?
18  A  Told him that Leon had been arrested.
19  Q  And when you told them that, what, if anything,
20  did his brother-in-law say to you?
21  A  He said to me --
22        MR. BRUNSON:  Objection, Your Honor.  Calls
23  for hearsay.
24        THE COURT:  Why isn't this hearsay,
25  Mr. Moorer?
```

Page 124

```
 1        MR. MOORER:  Your Honor, this isn't being
 2  offered -- This is offered to show why this witness
 3  did some of the things that she did later because this
 4  connects back to some other activities that she did
 5  with some other people whom we believe to be
 6  coconspirators in this case.
 7        THE COURT:  I don't know what her answer is
 8  going to be.  Ask your question again, though.  Or
 9  maybe you can rephrase it.
10        MR. MOORER:  Your Honor, he is also one of
11  the people whom we allege to be part of this
12  conspiracy.  He has been brought up earlier.  His name
13  was one of the ones on the list of people that have
14  been --
15        THE COURT:  This person is?
16        MR. MOORER:  The Defendant Carmichael's
17  brother-in-law, Mr. Watson.
18        THE COURT:  Watson.
19        MR. BRUNSON:  Your Honor, he's eliciting the
20  hearsay information provided by Keena to this witness,
21  and she's now said she's provided that hearsay
22  information to another person who then made a
23  response.  It's hearsay, your Honor.  It's
24  inadmissible.  It's not in furtherance of a
25  conspiracy.
```

Page 125

```
 1        MR. MOORER:  And, Your Honor, I'm reminded
 2  by one of my cocounsel that Mr. Denton testified about
 3  having taken money and drugs to this same person,
 4  which was money and drugs associated with Defendant
 5  Carmichael.
 6        THE COURT:  Overruled.  Go ahead.
 7  Q  So you told them about the arrest.  And what, if
 8  anything, did he say back to you?  You told them about
 9  the arrest of Mr. Carmichael; what, if anything, did
10  his brother-in-law say back to you?
11  A  He didn't say anything back to me.
12  Q  Did he ask you how you knew about it?
13  A  No, he didn't.  I told him that Keena had called
14  me.
15  Q  And what, if anything, did he do after you
16  informed him of the arrest of his brother-in-law and
17  Carmichael?
18  A  He left.
19  Q  And who did he leave with?
20  A  Him and Cadillac.
21  Q  How did they take off?
22  A  They took off.
23  Q  They walk away?  Did they drive away?
24  A  Yeah, they drove off, yeah.
25  Q  Now after you left his company and presence what,
```

**Multi-Page™**

Page 126

1  if anything, did you do?  Where did you go?
2  A  Into the office.
3  Q  And when you got to the office who, if anyone
4  else, was there?
5  A  Mrs. Carmichael.
6  Q  Do you know her name beyond Mrs. Carmichael?
7  A  Yeah, Valerie.
8  Q  Was it unusual for her to be at the Carmichael
9  Center prior to this day that you --
10 A  No.
11 Q  And did you have any conversation with her about
12 the arrest of her husband?
13 A  Yes.  I told her that he had been arrested.
14 Q  And to your knowledge prior to you telling her
15 that did she know about the arrest of Defendant
16 Carmichael?
17 A  No, sir.
18 Q  And after you told her about the arrest, what was
19 her demeanor?
20 A  What do you mean by her demeanor?
21 Q  Was she upset at the fact that he was arrested?
22 Did she seem concerned?
23 A  No, she didn't get upset.
24 Q  What was her demeanor, then?
25 A  She was okay.  She didn't get upset.

Page 127

1  Q  As far as you could tell.
2  A  Right.
3  Q  And so after you told her about Defendant
4  Carmichael's arrest, what, if anything, did you do?
5  A  What did we do?
6  Q  Yeah.  What did you do?
7  A  We went to her house.
8  Q  And why did you go to her house?  And who is the
9  "her" that you're referring to?
10 A  Valerie's.
11 Q  And why did you go to her house?
12 A  Because I asked her was there anything at her
13 house.
14 Q  And what were you asking her about?  Why did you
15 ask her if there was anything in her house?
16 A  Because of what I heard.  I asked her.
17 Q  And were you on your way there to remove any of
18 those things that might be at her house?
19 A  We went there to remove a box out of her house.
20 Q  Well your testimony before the grand was, looking
21 at the bottom of page seventeen, and you said in
22 response to the question about you telling her about
23 the arrest was, "I said, 'If there is anything in your
24 house that needs to be moved out, you need to move it
25 now,' and I took her home."  That was your testimony

Page 128

1  at the grand jury, wasn't it?
2  A  Right.
3  Q  And have the "her" that you were referring to as
4  having told that you needed to move it now if you were
5  going to move it was Valerie Carmichael, correct?
6  A  Yes.
7  Q  And how did you get to Valerie Carmichael's house
8  that day after you told her you need to move anything
9  that needed to moved now?
10 A  In my car.
11 Q  And once you got to the house -- Which house did
12 you go to, by the way?
13 A  Brookwood.
14 Q  The one we identified as 7(q) earlier today?
15 A  Yes.
16 Q  And once you got there, what did you find?
17 A  I didn't find anything there.
18 Q  Well, now, when you testified before the grand
19 jury under oath under the questioning of Ms. Morris,
20 you were asked, "When you got to her house what did
21 you find?"  And you answered --
22 A  We took out cash.
23 Q  And you moved it out of the house, didn't you?
24 A  Yes.
25 Q  Where was the money in the house when you got to

Page 129

1  the house?
2  A  Right inside the stereo.
3  Q  Describe it to the jury, how that came about.
4  You walked into the house; where within the house did
5  you go?
6  A  Right in the den.
7  Q  And in the den when did you see?
8  A  It was in there, just in the stereo.  Just
9  sitting up in the unit.
10 Q  And was it bundled up in any way?
11 A  I didn't even see the money.  I just saw a box.
12 I didn't see the money, I just saw a box.  I didn't
13 see it was money.
14 Q  Well, you were asked, "Was it in bundles?"
15 A  I had never seen the money.
16 Q  Did you ever see any bundles?
17 A  No, sir.
18 Q  Now you were asked at the grand jury how big was
19 it, weren't you?
20 A  That's not a bundle.
21 Q  No, my question to you was, were you not asked at
22 the grand jury, "When you saw it, how big was it?"
23 That was a question that was asked to you, wasn't it?
24 Line sixteen, that was the question that was asked.
25 A  I don't remember seeing that.

Multi-Page™

Page 130

1 Q No, my question was, were you asked that.
2 A I was asked that, but I don't remember seeing
3 that.
4 Q And you answered, "It was two bundles about like
5 this and about like that."
6 A Correct.
7 Q And you used your hands to indicate the size of
8 what you were talking about.
9 A Yeah.
10 Q And you were next asked, "How was wrapped?" You
11 were asked that question, weren't you?
12 A Right.
13 Q And you said, "It was wrapped, like boxed up."
14 That was your answer.
15 A Right.
16 Q And then the next question was, "And how did you
17 know it was money if you couldn't see it?" That was
18 the next question, wasn't it?
19 A Right.
20 Q And you said, "Because I knew it was money. I
21 knew it was money." That was your answer, right?
22 A No, I said I knew they kept money at home.
23 That's what I said.
24 Q Now Miss Carmichael told you what it was that you
25 were moving, didn't she?

Page 131

1 A Yes.
2 Q She told you that before you ever even got to the
3 house, didn't she?
4 A Yes, sir.
5 Q And you knew that from prior occasions of being
6 at the house that Leon Carmichael from time to time
7 would keep large sums of cash in the house that you
8 went to on that day.
9 A Yes.
10 Q And after you got the money, what, if anything,
11 did you do with the money?
12 A We went back and gave it to her brother.
13 Q And where did you all meet to meet to give it to
14 her brother?
15 A At the I. H. O. P.
16 Q Where is the I. H. O. P. that you're referring to
17 now?
18 A Atlanta Highway.
19 Q And after you handed the money off to her
20 brother-in-law -- and by the way, is this Montel or
21 Martel that you have referred to?
22 A No. This was Valerie's brother.
23 Q What's his name?
24 A I don't remember it.
25 Q Now after you made the delivery of the money --

Page 132

1 And by the way, who, if anyone besides you and Valerie
2 Carmichael, was there when the money was handed over?
3 A No one.
4 Q No one besides her brother?
5 A Right.
6 Q Now after the money transfer, what, if anything,
7 did you do next?
8 A Went back to the Carmichael Center.
9 Q But before you went to the Carmichael Center did
10 you do anything else, you and Valerie?
11 A No,
12 Q Well that's not what you answered at the grand
13 jury, is it?
14 A Which page?
15 Q Page twenty. That's what I'm referring to. But
16 that's not what you said at the grand jury, is it?
17 A Yes. What did we do? We went back to the
18 Carmichael Center.
19 Q But before you went to the Carmichael Center
20 y'all rode around a little bit, didn't you?
21 A I don't remember.
22 Q Well you've answered that in the grand jury
23 that --
24 A I don't remember that.
25     MR. BRUNSON: Object, Your Honor, another

Page 133

1 hearsay question. Relates to what Mrs. Carmichael
2 told this witness. Allegedly told this witness.
3     MR. MOORER: No, I'm asking her about what
4 they did.
5     THE COURT: Ask her what they did, then.
6 Q And y'all rode around together for a little bit
7 before you went to the Carmichael Center, didn't you?
8 A No, we rode back to the Carmichael Center.
9 Q Well your answer at the grand jury was, "Me and
10 her rode around talking." Isn't that what the answer
11 was that you gave at the grand jury?
12 A It might have been just loose language. We went
13 back to the Carmichael Center.
14 Q Well in any event, when you headed back to the
15 Carmichael Center, but it wasn't every day that
16 something like this happened to you as an employee at
17 the Carmichael Center, right?
18 A Right.
19 Q And so you and valley Carmichael had
20 conversations about what was going on in relation to
21 the searches and all the incidents that occurred to
22 that point, didn't you?
23 A I don't understand what you're saying.
24 Q Did y'all in any way, shape or fashion discuss
25 any of the things that happened that day that you

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**

Multi-Page™

Page 134

1  moved the money, searching Freddie Williams's house,
2  any of those things?
3  A  I don't understand what you're saying.
4  Q  Well you were asked about what happened when you
5  went back to the Carmichael Center with Valerie.  You
6  were asked that at the grand jury, weren't you?
7  A  Yes.
8  Q  And you answered at page twenty, line thirteen --
9      MR. BRUNSON:  Objection, Your Honor.  Again,
10  a hearsay objection relating to soliciting.
11     THE COURT:  How is it admissible?
12     MR. MOORER:  Because, Your Honor, this goes
13  into a coconspirator's statements.
14     THE COURT:  How is the part of the
15  conspiracy, and how is it in furtherance of it?
16     MR. BRUNSON:  Well, Your Honor, these kinds
17  of questions posed to him allows the jury to make very
18  conclusory type --
19     THE COURT:  Why don't I let the jury go
20  until one o'clock.
21     (Whereupon, the jury was escorted out of the
22  courtroom and the following colloquy ensued):
23     THE COURT:  Yes, Mr. Moorer.
24     MR. MOORER:  Yes, Your Honor.  It's our
25  contention that Valerie Carmichael is part of the

Page 135

1  conspiracy as well.  Patrick Denton testified about
2  his first interaction, or one of his first
3  interactions, with Defendant Leon Carmichael was where
4  Leon Carmichael sent his wife Valerie --
5      THE COURT:  Why don't I get a list of whom
6  you contend are members of the conspiracy.
7      MR. BRUNSON:  Your Honor, could we get that
8  list also?
9      MR. MOORER:  It's right here.  He's been
10  doing it during the trial.
11     THE COURT:  Let's go down it.  Would you
12  call out the names, Mr. Moorer.
13     MR. MOORER:  Patrick Denton.
14     THE COURT:  Wait a minute.  Hensarling, what
15  was her first name?
16     MR. MOORER:  Charlotte Hensarling.
17     THE COURT:  That's right, Charlotte.
18     MR. MOORER:  Steve Hensarling, her husband.
19  Patrick Denton.  Mr. George, Gary George.
20     THE COURT:  Right, Gary George.
21     MR. MOORER:  Patrick Denton.  Montel.
22     THE COURT:  Just a minute.  Montel.
23     MR. MOORER:  Montel Watson.
24     THE COURT:  Montel Watson.
25     MR. MOORER:  Yes, sir.

Page 136

1      THE COURT:  Okay.
2      MR. MOORER:  Cadillac.  William Bolding.
3      THE COURT:  Cadillac is William --
4      MR. MOORER:  Bolding.
5      MS. MORRIS:  No.  -- i-n-g.
6      MR. MOORER:  Oh, I'm sorry.  B-o-l-d-i-n-g.
7  Keena.
8      THE COURT:  What's Keena's last name?
9      MS. MORRIS:  Wysnant.
10     MR. FEAGA:  There's no direct evidence that
11 her name is Wysnant, but that's what we --
12     MR. BRUNSON:  Your Honor, there's been no
13 evidence that she knows any object of this conspiracy.
14     THE COURT:  We'll get to that in a minute.
15 I'll hear you as to each alleged coconspirator later.
16 Keena, we'll assume her name is Wysnant.
17 What's next?
18     MR. MOORER:  Fred Thomas.  Calvin Dudley.
19     THE COURT:  Calvin Dudley.  Okay.
20     MR. MOORER:  A person who goes by the name
21 of Romeo.  We said "Val," but we were referring to
22 Valerie Carmichael.
23     THE COURT:  Okay.
24     MR. MOORER:  An individual by the name of
25 Lisa.  I will try to give you a last name in a second.

Page 137

1      MS. MORRIS:  Jones.
2      THE COURT:  Lisa Jones?
3      MR. MOORER:  And then I've listed some names
4  here earlier that she indicated that she knew when she
5  met with Agent DeJohn so I'll have to get my list.
6      THE COURT:  Who was it after Lisa Jones?
7      MR. MOORER:  I'm getting them, Your Honor.
8  Okay.  Lisa Jones.  Emanuel James.
9      THE COURT:  Emanuel James?
10     MR. MOORER:  Yes, sir.
11     Willie Smith, who goes by the street name of
12 Romeo.
13     THE COURT:  Romeo is Willie Smith.
14     MR. MOORER:  Yes, Your Honor.  Willie Smith,
15 Junior.  Freddie Lee Phelan, P-h-e-l-a-n.
16     THE COURT:  Freddie?  Did you say "Freddie"
17 Phelan?
18     MR. MOORER:  Yes, sir, Freddie Phelan.
19     Do you contend Miss Pettus is a member of
20 the conspiracy or not?
21     MR. MOORER:  Yes, sir, though not an
22 indicted coconspirator.
23     THE COURT:  Well none of these people are
24 indicted.
25     MR. MOORER:  Correct.

**Multi-Page™**

1  THE COURT: Is Miss Pettus included or not?
2  MR. MOORER: Yes.
3  If I didn't call Sandra Jones's name, Sandra
4  Jones.
5  THE COURT: There's a Lisa Jones.
6  MR. MOORER: And there is Sandra Jones.
7  THE COURT: Anyone else?
8  MR. MOORER: Freddie Williams, if I didn't
9  mention him of course.
10  THE COURT: I have a Fred Thomas and a
11  Freddie Phelan. I don't know if I had a Freddie
12  Williams.
13  MR. MOORER: Of course the two defendants
14  that are on trial.
15  THE COURT: Oh. You're talking about the
16  defendant who is on trial and Mr. Carmichael.
17  MR. MOORER: Yes, sir.
18  And then Matthew Molette, M-o-l-e-t-t-e.
19  THE COURT: Matthew?
20  MR. MOORER: Yes, sir.
21  Emanuel James. Gabrielle Lord. Yes, sir,
22  it's a female, e-l-l-e.
23  THE COURT: Lord, L-o-r-d?
24  MR. MOORER: Yes, Your Honor, L-o-r-d.
25  THE COURT: Anyone else?

1  MR. MOORER: And, Your Honor, there may be
2  others whose names have not been mentioned.
3  THE COURT: Before you go into a witness as
4  to a name that has not been mentioned, you need to
5  bring it to my attention as well as the attention of
6  the defendants, otherwise we'll have to constantly be
7  sending the jury out.
8  MR. MOORER: Yes, sir. I think the
9  remainder of her testimony, though, will pretty much
10  cover the people --
11  THE COURT: You're actually excused until
12  one o'clock.
13  I want to go over the people whom she has
14  testified about in just a minute before we break for
15  lunch. That is who Ms. Pettus has testified to.
16  (Whereupon the witness, Ms. Pettus, was
17  escorted out of the courtroom.)
18  THE COURT: First I want to go over the list
19  I have, which is Charlotte and Steve Hensarling, Gary
20  George, Patrick Denton, Montel Watson, Cadillac also
21  known as William Bolding, Keena Wysnant, Fred Thomas,
22  Calvin Dudley, Romeo also known as Willie Smith,
23  Valerie Carmichael, Lisa Jones, Emanuel James, Freddie
24  Lee Phelan, Miss Pettus who was just testifying,
25  Sandra Jones, Matthew Molette and Gabriel Lord are the

1  names I have.
2  MR. MOORER: Oh, and Ike. We forgot about
3  Ike.
4  THE COURT: Who?
5  MS. MORRIS: Calvin Dudley is also known as
6  Ike.
7  THE COURT: Oh, okay. Now with regard to
8  whom Miss Pettus was testifying, we have Keena and who
9  else?
10  MR. MOORER: Valerie Carmichael.
11  THE COURT: Valerie Carmichael.
12  Now what evidence do I have that Valerie
13  Carmichael is a member of the conspiracy?
14  MR. MOORER: Mr. Denton testified early on
15  in one of his first transactions with Leon Carmichael
16  that he and Carmichael got together so that Mr.
17  Carmichael could get him some drugs. Mr. Carmichael
18  directed his wife Valerie to go get, I believe he said
19  it was two pounds of marijuana. And she did and she
20  brought it back and gave it to him, give it to Mr.
21  Carmichael and then Mr. Carmichael gave it to him.
22  And I think he testified that that happened on more
23  than one occasion.
24  THE COURT: Was she involved in counting
25  money at one time?

1  MR. MOORER: She was involved in the
2  counting of some money, the movement of some money
3  here and the counting of some money on the first
4  occasion. She's testified about counting money on two
5  occasions, one where the money didn't stink and
6  Valerie Carmichael kind of helped count that, and
7  money where it did stink and she did help count that.
8  THE COURT: Now with regard to Keena you
9  mentioned those two instances. Do you have any other
10  instances involving Keena?
11  MR. MOORER: We were talking about Valerie.
12  THE COURT: I know, I'm switching.
13  MR. MOORER: Okay. No.
14  THE COURT: Anything else on Valerie?
15  MR. MOORER: No, Your Honor.
16  THE COURT: Anything else on Keena that you
17  haven't mentioned?
18  MR. MOORER: No, Your Honor.
19  THE COURT: Anybody else that Miss Pettus is
20  going to be talking about other than Valerie and
21  Keena?
22  MR. MOORER: Montel Watson.
23  THE COURT: What evidence do I have that
24  Montel Watson was a member of the conspiracy?
25  MR. MOORER: Mr. Denton testified about

Multi-Page™

1  taking money to Denton, and --
2       THE COURT:  No, Montel Watson.
3       MR. MOORER:  I'm sorry.
4       MS. MORRIS:  If I could, I know we're
5  switching, Your Honor, but my recollection of the
6  evidence is Mr. Denton testified that he took money to
7  Montel Watson that he owed to Mr. Carmichael, and that
8  he picked up marijuana from Montel.  And on one or
9  more occasions he took dope that he could not sell
10  back to Montel that would then go to Mr. Carmichael.
11       THE COURT:  Right.  Anybody else that Pettus
12  is going to testify about?
13       MR. MOORER:  I don't believe there would be
14  any other ones that she would testify about.
15       THE COURT:  So we're talking about Watson,
16  Keena and Valerie.
17       I'll hear from Mr. Brunson.
18       MR. BRUNSON:  Your Honor, I guess it's
19  history relating to Keena.  That's already in.
20       THE COURT:  Well no, at the end of the trial
21  I have to decide whether to declare a mistrial or
22  whether it's harmless error.  That's what the law says
23  I'm supposed to do.  So if you want to make arguments,
24  let me hear now.
25       MR. BRUNSON:  Yes, Your Honor.  The factual

1  evidence that the only evidence that Keena was in any
2  way involved was the fact that alleged testimony that
3  money was delivered to a location where she lived.
4  There was no evidence that she knew about the money,
5  that Mr. Carmichael wasn't there or that she handled
6  the money, or she knew anything about the object of
7  this conspiracy just because it was delivered.  So we
8  don't think there is proof of that.  That's all I
9  would say.
10       THE COURT:  What about Valerie?
11       MR. BRUNSON:  Valerie, the two pieces of
12  evidence relating to her first off are the alleged
13  testimony of Mr. Denton that she took a pound of
14  marijuana.  That doesn't have anything to do with
15  trafficking marijuana.
16       THE COURT:  What do you mean, is it
17  pounding?
18       MR. BRUNSON:  That doesn't mean she didn't
19  know about any conspiracy or a connection between Leon
20  and Mr. Denton that they had some --
21       THE COURT:  Does anybody in a so-called
22  conspiracy have to know about anybody else?
23       MR. BRUNSON:  They do not, Your Honor, but
24  they do have no know the object of the conspiracy, and
25  that is to traffic drugs, to sell drugs.

1       THE COURT:  You said she pounded marijuana?
2  What do you mean by pounded?
3       MR. BRUNSON:  No, she took a pound of
4  marijuana.
5       MS. MORRIS:  Two pounds.
6       MR. BRUNSON:  Two pounds?
7       And, too, there is no testimony about him
8  that she knew what she was taking, that it was
9  enclosed and there is no testimony to that.
10       Second thing is regarding the money yes,
11  Miss Pettus just testified that she helped count
12  money.  Money that might have been buried.  That that
13  money has not been connected to any drug activity.
14       THE COURT:  Okay.  What about Montel or
15  Montel?
16       MR. MOORER:  Montel.
17       THE COURT:  Montel, right.
18       MR. BRUNSON:  I don't have any comment about
19  him, Your Honor.  I don't know the facts in that
20  situation.
21       THE COURT:  What about their argument that
22  only -- that it's just evidence that money was
23  delivered to Keena's house, that's it?  How does that
24  connect her to the conspiracy?
25       MR. MOORER:  Your Honor, the whole object of

1  dealing drugs is to generate currency.
2       THE COURT:  I realize that.  How does that
3  -- you know, somebody could deliver money to your
4  house, that doesn't mean you're part of the
5  conspiracy.
6       MR. MOORER:  Your Honor, when you have a
7  place that you maintain that helps facilitate a drug
8  trafficking organization, whether it's to store drugs
9  or store money that comes from drug dealing, that
10  shows your participation in the conspiracy.  Not
11  everybody in the conspiracy -- Not everybody in a drug
12  conspiracy has the same role.  Some people maintain
13  places where meetings can occur.
14       And the statements that she made to Sherry
15  Pettus that Leon was dealing drugs.  And that's why
16  she was concerned about Freddie Williams's house being
17  raided, and why she felt it urgent to get in touch
18  with Leon to let him know about it.
19       THE COURT:  Okay, thank you all very much.
20  I'll consider this over lunch.
21       MR. TEAGUE:  Your Honor --
22       THE COURT:  Yes?
23       MR. TEAGUE:  One thing on behalf of Mr.
24  Williams I'd like to inject into this, it sounds like
25  Keena's statements could potentially be limited to

Page 146

1  count two, which doesn't concern or involve Defendant
2  Freddie Williams.
3      THE COURT: Explain that now.
4      MR. TEAGUE: Well, say, for instance, if
5  they just asserted, if I understood what they said,
6  she's just storing money for him, I don't see --
7      THE COURT: Are you talking about Keena or
8  Miss Pettus?
9      MR. TEAGUE: Keena. That she may have been
10 a coconspirator as to count two, but I submit there is
11 not anything to tie her into count one where it's just
12 a blatant hearsay statement. And I'm reading from the
13 transcript of Sherry Pettus's testimony where she
14 talked about this before the grand jury back in
15 January of 2004. And she talks about the call from
16 Keena and she said -- well the question was asked,
17 "Miss Pettus, did she tell you who busted into
18 Freddie's house?"
19      "Yeah, the police."
20      "Okay. Drug bust."
21      And they get around and Miss Pettus says,
22 "Well, what does the busting of that have anything to
23 do with Leon Carmichael?"
24      And she said, "It was Leon's stuff."
25      Your Honor, I just don't see anything that

Page 147

1  ties her into the count one conspiracy.
2      THE COURT: So you want me to give a
3  limiting instruction that these evidence goes only
4  against Mr. Carmichael as to count two?
5      MR. TEAGUE: Yes, Your Honor, and is not to
6  be considered as to my client.
7      MR. MOORER: That doesn't square with the
8  evidence and the inferences from the evidence, Your
9  Honor. Keena calls to try to find Leon. She's very
10 insistent upon finding him because of the search that
11 was done at Mr. Williams's house.
12      It's our position, Your Honor, that she's
13 trying to alert him that one of his places has been
14 raided, and that is what people engaged in the drug
15 trade do, is when law enforcement turns its attention
16 to something and somebody else in the conspiracy is
17 not aware of it.
18      THE COURT: So you're saying it goes to not
19 only to count two, but it goes to count one, as well.
20      MR. MOORER: Correct, Your Honor.
21      THE COURT: Anything else on that?
22      MR. TEAGUE: As to that, Rule 801 says, "The
23 contents of the statement shall be considered, but are
24 not alone sufficient to establish the declarant's
25 authority." Your Honor, I think that's just too vague

Page 148

1  and nebulous to agree with the Government as to that.
2      THE COURT: You wanted to say something, Ms.
3  James?
4      MS. JAMES: Yes, Your Honor. I have two
5  comments, and I know we're dealing kind of with
6  Miss Pettus, but you also mentioned the Hensarlings.
7      THE COURT: The Hensarlings. Right.
8      MS. JAMES: The Hensarlings. Right. You
9  know, if the government says it's to be believed --
10     THE COURT: I actually -- Well at the end of
11 the case for the conspiracy I have to make a finding
12 by a preponderance of the evidence, so it's not that I
13 have to believe the government, I have to
14 independently find the conspiracy exists and I believe
15 it.
16     MS. JAMES: But just for argument purposes,
17 I mean there may be nothing more than a buyer/seller
18 relationship with some of these people, which is not a
19 conspiracy. You have some of that going on here.
20     In addition, the government is doing in this
21 case precisely what it did in United States versus
22 Tallee. And if you go and take a look at the Starks
23 opinion, the Eleventh Circuit said the government did
24 a throw-it-up-against-the-wall-and-see-if-it-sticks
25 kind of deal.

Page 149

1      THE COURT: Why don't you get that opinion
2  for me.
3      MS. JAMES: Melvin Starks was reversed for
4  resentencing. He was the third in Oscar Andrews, the
5  third trial.
6      THE COURT: Right. Resentenced so many of
7  those.
8      MS. JAMES: They found that he was convicted
9  of being a coconspirator.
10     THE COURT: Right. I think before you can
11 throw that at the government, you really need to put
12 the opinion in, because if I remember correctly it
13 wasn't published.
14     MS. JAMES: I think it was, but I'll get it.
15     THE COURT: Let me read that again. But
16 more importantly, what about their argument that
17 buyers are not necessarily part of a conspiracy?
18 We're talking about a trafficking conspiracy here.
19 Everybody who rubs up against it or are buyers are not
20 necessarily part of it.
21     MR. MOORER: Your Honor, part of the
22 conspiracy in essence is to possess and possess with
23 intent to distribute.
24     THE COURT: Right.
25     MR. MOORER: And some of the people who have

Page 150

1 bought have knowledge of the underlying conspiracy by
2 which they have been able to make purchases, Your
3 Honor. And so when you take into account people like
4 Mr. George, who was working with Mr. Denton by his own
5 admission, and they were developing customers, when
6 those customers know where the marijuana is coming
7 from that they obtained from the conspiracy, that
8 evidence is still admissible as part of the
9 conspiracy.
10     THE COURT: Okay. Well, I'll look at this
11 over lunch.
12     One other thing. Mr. Salery, have you all
13 made a decision on that? I'm kind of deciding whether
14 I need to look at that this weekend, my law clerks and
15 everything else.
16     MR. MOORER: We'll have to look at that over
17 the lunch hour.
18     THE COURT: Why don't you look at it over
19 the lunch hour. The earlier you can let us know, the
20 better. I'll say this, I think it's fraught with
21 problems.
22     MR. FEAGA: Yes, sir.
23     THE COURT: Okay. Thank you very much.
24     (Whereupon, the luncheon recess was
25 taken.)

Page 151

1         IN-CHAMBERS CONFERENCE:
2     THE COURT: First I want to take up Mr.
3 Salery. You have a representation to make, Mr. Feaga?
4     MR. FEAGA: Yes, sir, Your Honor. In light
5 of the defense's representation and in light of the
6 fact that we did not let them know that we would in
7 fact be calling him and the fact that they're at the
8 very best from our perspective there is confusion over
9 the subject of whether we were going call him or not,
10 we think it's fair that the defense relied on us, we
11 think it's clear that they say it was to their
12 detriment, and we accept that, we're not going to put
13 Mr. Wallace Salery on the stand in our case-in-chief.
14     THE COURT: But that still raises rebuttal,
15 though.
16     MR. FEAGA: Well, sir --
17     THE COURT: We still have the same problem
18 with Ms. James on rebuttal.
19     MR. FEAGA: I understand, and what I would
20 say to that, Your Honor, is I think it unlikely that
21 they would do anything to cause us to do that.
22     THE COURT: I hate to put this to you, but
23 that is such an issue fraught with problems, that if
24 you think it's going to happen I need to look at it
25 now. I can't -- I will not be able to rule on that,

Page 152

1 you know, within ten minutes or fifteen minutes even
2 while the jury --
3     MR. FEAGA: That would it still be a
4 problem, even if it was something that --
5     THE COURT: Rebuttal, definitely.
6     MS. JAMES: Yes.
7     MR. FEAGA: We just won't call him.
8     THE COURT: Okay. Good enough, then.
9     Now what's the other matter we need to take
10 up now? The alleged members of the conspiracy and
11 rather Keena, Valerie and Montel. Okay. I'm going to
12 go ahead and let those statements in, and I'll
13 reconsider them at the end of the case. Okay?
14     MS. JAMES: Judge, you wanted the Salery
15 opinion, and I didn't have anyone in my office to get
16 it, but --
17     THE COURT: Salery?
18     MS. JAMES: I mean Starks.
19     THE COURT: Starks. Right.
20     MS. JAMES: It's U. S. vs. Talley, and the
21 cite is 273 F.3d 396 Eleventh Circuit (2001). Okay.
22     THE COURT: We can pull it up.
23     MR. BRUNSON: Your Honor, continuing on the
24 subject about the hearsay statement. This next
25 statement that's going to be offered is one that

Page 153

1 essentially is not a statement in furtherance of the
2 conspiracy.
3     THE COURT: What next statement, now? This
4 is the statement by --
5     MR. BRUNSON: By Valerie.
6     THE COURT: Valerie, that's not in
7 furtherance -- What is the witness going to say?
8     MR. BRUNSON: The witness would say that she
9 and Valerie talked in the car, and that Valerie told
10 her that she knew that Leon was dealing drugs.
11     THE COURT: Okay. Let me get the witness
12 back here for just a minute, then. I hate to ask the
13 jury to leave.
14     This is after the arrest?
15     MR. BRUNSON: Yes, Judge.
16     (Whereupon, Sherry Pettus was escorted into
17 chambers.)
18     THE COURT: Ms. Pettus, come on in.
19     MR. MOORER: Miss Pettus, when we left off
20 right before the break I was asking you about you and
21 Miss Valerie Carmichael going back to the Carmichael
22 Center. Do you remember that?
23     MS. PETTUS: Mm-hmm.
24     THE COURT: You have to answer yes or no.
25     MS. PETTUS: Yes.

Page 154

1   MR. MOORER: And I was asking you about a
2  conversation that you had with Miss Carmichael as you
3  were in between dropping off the money and getting
4  back to the Carmichael Center. Specifically --
5      THE COURT: What money were you dropping
6  off, Ms. Pettus.
7      MS. PETTUS: The money we got from out of
8  the house.
9      THE COURT: Which was what, how much?
10     MS. PETTUS: I don't know, I didn't ask her.
11     THE COURT: Okay. Go ahead, then.
12     MR. MOORER: And during that conversation
13 that y'all had, did Valerie tell you how it was that
14 she came to know that Leon Carmichael was dealing
15 drugs?
16     MS. PETTUS: I asked her was he dealing
17 drugs, and she just said she walked in the house.
18     MR. MOORER: One Sunday after church?
19     MS. PETTUS: That's all she said.
20     MR. MOORER: And she saw him with drugs?
21     MS. PETTUS: She didn't say that. She said
22 she walked in the house.
23     MR. MOORER: Okay. And then I would go into
24 her testimony.
25     THE COURT: Let me see that.

Page 155

1      (Whereupon, the Court examined said
2  document.)
3      THE COURT: Okay, you may step out.
4      (Whereupon Sherry Pettus was escorted out of
5  chambers.)
6      THE COURT: Now how is this statement in
7  furtherance of the conspiracy?
8      MR. MOORER: Okay, Your Honor. First of
9  all, this is a statement made by one of the
10 coconspirators.
11     THE COURT: Let's take that for granted.
12     MR. MOORER: Valerie Carmichael was part of
13 the conspiracy. Part of the reason for the existence
14 of the conspiracy is to get money, so they had just
15 moved money and this goes to show --
16     THE COURT: What money?
17     MR. MOORER: The money they had moved. They
18 had just moved the money when this conversation takes
19 place.
20     THE COURT: Now why were they moving the
21 money?
22     MR. MOORER: They were moving the money so
23 law enforcement wouldn't get it, because she has
24 testified that when she heard about Mr. Williams's
25 place being raided, she told Miss Carmichael that if

Page 156

1  there was something in the house that needed to be
2  moved, she needed to move it now.
3      THE COURT: Right. Okay.
4      MR. MOORER: So they're fresh from having
5  done that, moved the money and met with another
6  coconspirator. And she's trying to determine --
7      THE COURT: Now who is this other
8  coconspirator?
9      MR. MOORER: The brother who picked up the
10 money.
11     THE COURT: Who was that?
12     MS. MORRIS: Montel.
13     MR. MOORER: No, this was Valerie's brother,
14 which is a different brother-in-law to Mr. Carmichael.
15     THE COURT: Who is he on the list that you
16 gave me?
17     MR. MOORER: She didn't call his name. She
18 just said "Valerie's brother."
19     THE COURT: It's not one of these names?
20     MR. MOORER: It's not one of these names,
21 no.
22     THE COURT: And so it's not one of those
23 that were on the list you gave me before.
24     MR. MOORER: Correct. It's not one of
25 those.

Page 157

1      It says, "We called her brother and asked
2  him to meet us at the International House of
3  Pancakes."
4      MR. MOORER: Okay. And that's when they
5  gave him the money. They were fresh off of giving him
6  the money, they were on the way back to the Carmichael
7  Center and she has a discussion with her about what
8  Leon Carmichael has been involved in. And it goes to
9  show her --
10     THE COURT: Dial her up.
11     MR. MOORER: Yes, sir.
12     MR. BRUNSON: Judge, again, it's not in
13 furtherance. That statement, although I don't have it
14 before me, just indicates that neither one of them
15 knew that he was involved with drugs. By saying I
16 walked in on him and learned of it doesn't mean she's
17 a coconspirator, number one, and doesn't mean that's
18 in furtherance of the conspiracy. It's just hearsay,
19 obviously, and --
20     THE COURT: This is after they delivered the
21 money?
22     MR. MOORER: Yes, Your Honor.
23     THE COURT: To Valerie's brother.
24     MR. MOORER: And this explains why they had
25 just done what they did.

**Multi-Page™**

Page 158

1  THE COURT: Right.
2  MR. BRUNSON: By the way, Judge, that money
3  has never been tied to the conspiracy in any way.
4  Obviously, he kept money. There's going to be more
5  money that he kept money all along. Some maybe from
6  promotions and some maybe not. But the money that has
7  not been tied. It's money hidden in a mattress. It
8  could be a cash hoard from something else.
9  MR. MOORER: Your Honor, there is ample law
10  in this circuit that unexplained wealth is indicia of
11  drug trafficking.
12  THE COURT: Okay. Anything else?
13  (Whereupon, there was no response.)
14  THE COURT: The objection is overruled. I
15  think it could be taken as by the jury as an effort to
16  cover up the conspiracy.
17  Let's go.
18  (Whereupon, the in-chambers conference was
19  concluded.)
20  IN OPEN COURT
21  (THE JURY IS PRESENT):
22  THE COURT: Proceed.
23  MR. MOORER: Thank you, Your Honor.
24  Q  Miss Pettus, when we broke last you were at that
25  point of telling us that you and Miss Carmichael,

Page 159

1  Miss Valerie Carmichael, had delivered some money to
2  Miss Carmichael's brother at the International House
3  of Pancakes, and that y'all traveled together back to
4  the Carmichael Center. Do you recall that testimony?
5  A  Yes.
6  Q  Now as you were on your way back to the
7  Carmichael Center, did you and Valerie Carmichael have
8  any conversation about the incidents that had occurred
9  that day with respect to Mr. Leon Carmichael?
10  A  Yes.
11  Q  And what was the nature of the conversation that
12  you had with her in the car on your way back to the
13  Carmichael Center?
14  A  I asked her did she know -- I mean was that true
15  about the drugs.
16  Q  And what, if anything, did she say in response to
17  your question?
18  A  She said that she -- She said yes, she walked in
19  the house, and that was it.
20  Q  And she said further that she walked in one
21  Sunday when she came back further from church, didn't
22  she?
23  A  Right.
24  Q  And she saw him, Leon Carmichael, with drugs?
25  A  She didn't say she saw him with drugs. She just

Page 160

1  said she saw him.
2  Q  Well when you testified at the grand jury you
3  were asked about the money meeting that happened at
4  the International House of Pancakes, right?
5  A  Yes.
6  Q  And then you were asked about the conversation
7  that you had with Miss Carmichael between dropping off
8  the money and getting back to the Carmichael Center,
9  weren't you?
10  A  Right.
11  Q  And your answer was, "I asked her about the
12  situation, and she told me that Leon was dealing drugs
13  because she had walked in on him. She had went to
14  church and came back home early one Sunday and walked
15  in on him with the drugs." And that's how she knew
16  and she told you. That's what you testified to under
17  oath at the grand jury.
18  A  Okay.
19  Q  Now did all the checks that you wrote out of the
20  account go for the building for the financing of the
21  Carmichael Center?
22  A  No, sir.
23  Q  Where did the biggest checks come from?
24  THE COURT: Come from?
25  MR. MOORER: Yes, Your Honor.

Page 161

1  THE COURT: Biggest checks for what come
2  from?
3  Q  Where did the biggest checks that you wrote,
4  where did they come from?
5  A  The biggest check I wrote was to the credit card.
6  Q  And whose credit card was that?
7  A  Mr. Carmichael's.
8  Q  Was this his personal credit card?
9  A  Yes. And insurance.
10  Q  Did you write any checks out of the
11  Multi-Investment account?
12  A  No.
13  Q  You were asked at the grand jury about checks
14  that you wrote, were you not?
15  A  Yes.
16  Q  And you responded in response to a question about
17  the checks that you wrote that not all of them, the
18  checks that you wrote, went for the financing of the
19  Carmichael Center, correct?
20  A  Right.
21  Q  You said the biggest checks came out of the
22  Multi-Investment account which was from the trucking
23  company.
24  A  Right.
25  Q  Did you write those checks out of the