**Page 162**

1 Multi-Investment or did somebody else?
2 A No, Mr. Carmichael.
3 Q Were you on the Multi-Investment account?
4 A No, sir.
5 Q Did you ever have to give any receipts to Mr.
6 Carmichael for the money that he was giving to you?
7 A Yes, sir, I gave receipts. And sometimes I might
8 have -- Most of the time I gave him all the receipts,
9 yeah.
10 Q Would those be the deposit slips when you
11 deposited money at the bank into the account?
12 A Yes, sir.
13 Q And at the times that you were doing these
14 things, the Carmichael Center wasn't in its present
15 form, it wasn't complete, right?
16 A Do what now?
17 Q At the time that you were writing money out of
18 the account, writing checks out of the account, was
19 the Carmichael Center complete and in its present
20 form?
21 A No.
22 Q Because initially the Carmichael Center was part
23 of the Multi-Investment building.
24 A I don't --
25 Q Okay. Well let me ask it this way. The

**Page 163**

1 Carmichael Center was built when, do you know?
2 A It was finished in 2003.
3 Q 2003. During the times that you were writing
4 these checks, was it in progress of being constructed?
5 A Yes.
6 Q Now I want to go back to your initial meeting
7 with Agent DeJohn. During the meeting that you had
8 with Agent DeJohn, I believe you said earlier this
9 morning that you and Agent DeJohn discussed Patrick
10 Denton. Do you recall that testimony?
11 A Yes.
12 Q And when you met with Agent DeJohn, did you tell
13 Agent DeJohn about Mr. Denton coming to the office
14 that you worked in over at the place where the
15 Carmichael Center was built?
16 A He came to the old building, yeah.
17 Q And during the times that he came to the old
18 building, you told Agent DeJohn about meetings between
19 Mr. Denton and Mr. Carmichael, correct?
20 A A meeting?
21 Q Yes, where Denton came to the building and Mr.
22 Carmichael would be there.
23 A That's where I first saw him at, right.
24 Q And sometimes Mr. Denton would come and bring
25 envelopes. Manila envelopes.

**Page 164**

1 A Yeah.
2 Q And give those to Mr. Carmichael.
3 A Yeah.
4 Q Now when you opened up the account at Compass
5 Bank, did you ever obtain any cashier's checks to
6 place into the account?
7 A Not to place -- I got the cashier's check, but I
8 put it back in the account. It was to purchase
9 something that we didn't purchase it.
10 Q Well, did you obtain cashier's checks from the
11 Compass Bank, Montgomery Mall branch?
12 A Probably so.
13 Q Did you obtain cashier's checks from the
14 SouthTrust Bank on Norman Bridge Road?
15 A On what date?
16 Q On any dates.
17 A Not during this time, no.
18 Q Did you obtain some from a check cashing business
19 on Southern Boulevard?
20 A Cashier's check?
21 Q Yes.
22 A No, money orders.
23 Q You got money orders from there?
24 A Yeah.
25 Q Did you get any money orders from other places?

**Page 165**

1 A I'm not sure. I don't remember.
2 Q Anyway, those checks that you obtained, did you
3 place those inside the Compass Bank account that you
4 opened?
5 A No, sir.
6     MR. MOORER: If I may have a moment, Your
7 Honor?
8     THE COURT: Yes.
9     (Whereupon, Mr. Moorer conferred with Mr.
10 Feaga and Ms. Morris off the record and out of the
11 hearing of the other courtroom participants.)
12     MR. MOORER: I tender the witness for cross,
13 Your Honor.
14     THE COURT: Cross?
15     MR. MOORER: Oh, Your Honor, before I do, I
16 have two questions I have forgotten to ask.
17     THE COURT: Go ahead.
18 Q Miss Pettus, where do you work even today?
19 A At the Carmichael Center.
20 Q And just prior to you coming into court today
21 during the lunch break, were you just right outside
22 the last set of doors here that lead into the
23 courtroom?
24 A Was I just out there?
25 Q Yeah, before you came in to testify during the

Multi-Page™

Page 166

1 lunch break.
2 A  I walked up, yeah.
3 Q  And were you engaged in conversation with
4 Defendant Freddie Williams prior to coming in here?
5 A  No, sir.  I was talking to the gentleman next to
6 Mr. Williams.  Not Mr. Williams, the man who was with
7 him, Mr. Sangkey.  Reverend Sangkey.
8       MR. TEAGUE:  Your Honor, Reverend Sangkey is
9 a well-known man in this community, and --
10      MR. MOORER:  Objection.
11      THE COURT:  Sustained.
12          CROSS EXAMINATION
13      BY MR. BRUNSON OF SHERRY PETTUS:
14 Q  Ms. Pettus, at the outset, the very first time
15 you talked to Agent DeJohn, were you aware that he was
16 writing down information that you were giving him?
17 A  I believe he was.  I'm not sure.
18 Q  Do you know where that conversation took place?
19 A  Yes, sir.
20 Q  Where was that?
21 A  At the D. E. A. agency.  The place off of
22 Independent Drive, or something like that.  I'm not
23 sure of the street.
24 Q  Who was present at that meeting?  This was on
25 December 16th?

Page 167

1 A  Yes, sir.
2       THE COURT:  What year?
3 Q  Of '03 or '04?
4 A  '03.
5 Q  That was after all of the matters went down that
6 you talked about, the arrest and Freddie's bust and
7 all of that?
8 A  Yes, sir.
9 Q  Who was present at the meeting?
10 A  David Whittle -- Devin Whittle, DeJohn and Marty
11 Glen and myself.
12 Q  Now at the very outset of that meeting, the agent
13 wrote that you had no personal knowledge of Carmichael
14 selling drugs --
15      MR. MOORER:  Objection, Your Honor.  She
16 can't testify as to what somebody may have wrote if
17 she hasn't been shown --
18      THE COURT:  Just ask her did she tell the
19 agent that she had no personal knowledge of selling
20 drugs.
21 Q  Miss Pettus, have you -- before this meeting and
22 before November of '03, did you have any idea that Mr.
23 Carmichael was involved somehow in selling drugs?
24 A  No, sir.
25 Q  And you had been involved with him for a number

Page 168

1 of years, hadn't you?
2 A  Yes, sir.
3 Q  Didn't you know him prior to building -- the
4 building of the Carmichael Center?
5 A  Yes, sir.
6 Q  Didn't you go back into the nineties with some
7 sort of relationship with him?
8 A  I met him in about '93, '94.
9 Q  And was that a business relationship during that
10 period?
11 A  I used to do when I brought in promotions,
12 brought in the gospel shows, yes.
13 Q  So you were a person that he knew did promotions
14 for shows, and then he builds a building that
15 functions for that purpose, is that correct?  He
16 builds the Carmichael Center.
17 A  Yes, sir.
18 Q  And you two connect more closely in a business
19 relationship, is that right?
20 A  No, sir.
21 Q  Well tell us about the relationship, Miss Pettus.
22 A  What had happened, I was the promoter and Mr.
23 Carmichael -- I used to do shows, and he would help
24 back the shows that I did.  And he told me he was
25 about to build the Carmichael Center, and he told me

Page 169

1 when he got ready to build it he wanted me to come on
2 board as a promoter because he thought I was one of
3 the best promoters in this city.
4 Q  So you established that relationship with him
5 early on in the nineties sometime.
6 A  Yes, sir.
7 Q  And then it came to fruition sometime in 2000 or
8 after 2000?
9 A  It was after 2000.  I was getting ready to do a
10 concert with Shirley Cesar, and I went to him about
11 doing the show and that's how -- and he told me he was
12 going to build the Center.  He said, "Don't forget, I
13 wanted you to be on board."  And he came back and he
14 brought me in like he said he was going to do.
15 Q  Well, now y'all must have spend a lot of time
16 together, didn't you?  Did y'all spend a lot of time
17 together in a business setting?
18 A  In a business setting?
19 Q  Yes, ma'am, building the Carmichael Center.
20 A  Oh, yes.  Yes, sir.
21 Q  And essentially you went to work for him and saw
22 him every day, didn't you?
23 A  Yes, sir.
24 Q  Now was there ever any discussion about drugs
25 with Mr. Carmichael?

Page 170

1 A  No, sir.  Never.  The only thing Mr. Carmichael
2 ever talked about drugs to me was it was stupid for
3 anybody to be doing them.
4 Q  Now, though, you told the prosecutor that you had
5 some issue with prescription drugs, is that right?
6 A  Yes, sir.
7 Q  And that issue involved the fact that you had
8 gone out and attempted to get some drugs for another
9 person, is that right?
10 A  Yes, sir.
11 Q  But you never tried to get any drugs for Mr.
12 Carmichael, did you?
13 A  No, sir.
14 Q  You had no idea about drugs or any allegation
15 about drugs, did you?
16 A  No, sir.
17 Q  Now this money that went into this Compass Bank
18 account, did you think that money was drug money?
19 A  No, sir.
20 Q  Did you have any idea that that money was coming
21 from anything except promotions you were working on,
22 or that Unique nightclub, or any other legitimate cash
23 business that Mr. Carmichael had?
24 A  I never thought of nothing negative about it.
25 Q  Now I want to talk to you about his businesses.



Page 171

1 When you were involved with him back in the nineties,
2 was that an opportunity for you to provide
3 entertainment for his nightclubs?  Tell me how that
4 came about.
5 A  No, sir, that was me personally.  That was
6 personal things.  I didn't do the other music at that
7 time.
8 Q  But you were aware he had clubs.  Did those clubs
9 also have some entertainment feature to them?
10 A  Yes, he had the club and Unique Entertainment,
11 yes.
12 Q  And had you ever gone to that club?
13 A  I had been down there.
14 Q  Was there more than one location or just one
15 location?
16 A  There was another one on Jeff Davis.
17 Q  So two locations?
18 A  Yes, sir.
19 Q  And where was the other one?
20 A  On Jeff Davis.
21 Q  But where was the original one?
22 A  Corner of Rosa Parks and Fleming Road.
23 Q  And those were in your mind successful cash
24 businesses that he had in the early nineties?
25   MR. MOORER:  Objection, Your Honor, as to

Page 172

1 her ability to say these were successful and what
2 she's thinking.
3   THE COURT:  Now were you familiar with the
4 workings of the business?
5   THE WITNESS:  I know it was successful.
6   THE COURT:  Okay.  You were working for the
7 business?
8   THE WITNESS:  I wasn't working for it, but
9 just by the amount of people that were there.
10   THE COURT:  I'll sustain the objection.
11 Q  Regarding the Compass Bank account, Miss Pettus,
12 there came a time when Mr. Carmichael asked you to go
13 to the bank and open an account up, is that right?
14 A  Yes, sir.
15 Q  You were employed by him at the time, were you
16 not?
17 A  Yes, sir.
18 Q  You were actually on a salary.  Was he paying you
19 a salary at the time?
20 A  Yeah, it was basically that, a salary, yeah.
21 Q  And he came to you and he said I need you to open
22 an account to do what, to pay bills?
23 A  To pay bills, yeah.
24 Q  Was there any discussion about what deposits were
25 supposed to go into this account?

Page 173

1 A  No, sir.
2 Q  And did there come a time that he started
3 providing you this cash to put in the account?
4 A  Yes, sir.
5 Q  Now you said that someone at the bank told you
6 it's important not to put over ten thousand dollars at
7 a time in the bank, is that right?
8 A  Right.
9 Q  Is that the motivation for putting the amounts
10 less than ten thousand dollars?
11 A  Yes, sir.
12 Q  And is that why you broke the money down in that
13 fashion?
14 A  Yes, sir.
15 Q  Now you wrote a lot of checks out of that account
16 too, did you not?
17 A  I did.
18 Q  And on the memo line of the checks you put
19 oftentimes "For Leon Carmichael."
20 A  He requested that.
21 Q  And you also put sometimes "For
22 Multi-Investments."  Whose idea was that?  Whose idea
23 was it to put something on the memo line in those
24 checks?
25 A  Mr. Carmichael.

Multi-Page™

**Page 174**

1 Q  Did he ever inform you that if anybody asked you
2 about --
3        MR. MOORER:  Objection, Your Honor.  I don't
4 see how that is admissible under the hearsay rule.
5        THE COURT:  What is admissible?
6        MR. MOORER:  The statements that he's trying
7 to elicit that Mr. Carmichael might have said to her.
8        THE COURT:  You put in part of his
9 instructions, I don't see why all of them could not go
10 in.
11        MR. MOORER:  I didn't go into any
12 instructions by him.  I simply asked her on direct --
13        THE COURT:  I think it comes in.  It's
14 basically how she operated the business.  I'll allow
15 it.  Go ahead.
16 Q  What instructions did he give you, Miss Pettus,
17 if somebody were to ask you whose account this was or
18 whose money this was?
19 A  He told me to tell them it was his money.
20 Q  Was there any effort on his part to separate
21 himself from that money if someone had asked?
22 A  No, sir.
23 Q  Now were you aware at the time that he had
24 problems with the I. R. S.?
25 A  No, I didn't.

**Page 175**

1 Q  You didn't know that he had been under
2 investigation by the I. R. S. during this period?
3 A  I had heard about it, yes, sir.
4        MR. MOORER:  Objection, Your Honor.
5        THE COURT:  I'll sustain what she heard.
6        MR. MOORER:  And, Your Honor, we'd ask the
7 jury to be told to disregard that.
8        THE COURT:  Disregard that.  That's right.
9 Q  I want to talk about the cash money that you went
10 over to his house a couple of times to count out.  Is
11 that what you told the prosecutor?
12 A  Yes.
13 Q  That you were invited over by Mr. Carmichael to
14 help him count some money, some stinky money.
15 A  Yeah, one time.
16 Q  But you testified that there was a million
17 dollars there.  I thought you said a million on one
18 occasion and one point two million on another
19 occasion.  Isn't that what you said?
20 A  Yes.
21 Q  Did you ever see a million dollars over there,
22 Miss Pettus?
23 A  No, sir.
24 Q  Did you ever see the one point two million
25 dollars you were talking about?

**Page 176**

1 A  No, sir.
2 Q  Now you said you counted out those sums of money,
3 and then took that money to the bank.  Did you put
4 some of that money in this account that you're talking
5 about?
6 A  Not right at that time, no, sir.
7 Q  You could tell it was that money because of the
8 way it smelled, is that right?
9 A  Yes, sir.
10 Q  And the business about the million and the one
11 point two million, you never did see money to that
12 effect ever, did you?
13 A  No, sir.
14        THE COURT:  How do you know it was a million
15 or one point two million?
16        THE WITNESS:  I quoted that.  I know that we
17 were talking, and Leon would be discussing stuff with
18 me, and I knew that within a bank there was some money
19 and I knew this and I think I just confused at the
20 time just a lot of numbers together.
21        THE COURT:  Okay.
22 Q  And there came a time that you left Alabama, you
23 said, and then you flew back to Alabama because the
24 government had subpoenaed you to go to the grand jury,
25 is that right?

**Page 177**

1 A  Right.
2 Q  And the day before the grand jury you had to go
3 meet with them.  Do you remember doing that, a meeting
4 with the prosecutor and Agent DeJohn again?  Do you
5 remember meeting them the day before going to the
6 grand jury, having another meeting with them?
7 A  I don't remember the day.
8 Q  Do you remember going to a meeting where Agent
9 DeJohn and Prosecutor Morris were there?
10 A  Right.
11 Q  And didn't you spend a lot of time with them in a
12 meeting before you went to the grand jury?
13 A  Yes.
14 Q  Now, Miss Pettus, at that meeting did you in fact
15 say things that indicated that because drug dealers
16 deal with small denominations of money, anybody that
17 does that must be in the drug business?
18 A  Did I say that?
19 Q  Yes, ma'am.
20 A  No, sir.
21 Q  Was that said to you?  Did somebody say that to
22 you at that meeting, that anybody that deals with
23 small denominations of money must be in the drug
24 business?
25 A  No, sir.  I was told that Leon was in the drug

Page 178

1 business.
2     MR. MOORER: Objection, Your Honor. That's
3 not responsive at all to the question.
4     THE COURT: Yes, just listen to his question
5 and just answer the question.
6     MR. MOORER: And I would ask that that last
7 response be stricken.
8     Go ahead. Ask your question again.
9     THE COURT: The last response is struck and
10 the jury should ignore it. Now go ahead and ask your
11 question again.
12 Q Was there discussions at that meeting about
13 denominations of money, and anybody that has that kind
14 of money must be a drug dealer?
15 A Yes.
16 Q And how did that discussion begin? Did you offer
17 that information or did somebody tell you that?
18 A No, Miss Morris started that conversation.
19 Q And was that some information that you came up
20 with that drug dealers have small amounts of currency
21 on hand? Was that in your brain that day?
22 A No, sir.
23 Q And none of your dealings in the past, your
24 problems with prescription drugs would give you that
25 information, would it, Miss Pettus?

Page 179

1 A No, sir.
2 Q And nothing else in your past would have given
3 you -- made you to have been able to observe that,
4 would there be something in your past?
5 A Yes, sir.
6 Q And what's that?
7 A I explained to them that I had a problem at one
8 time years ago with drugs, and they knew that. And
9 that's the conversation that I had with them
10 concerning me.
11 Q But you later said at the grand jury on the next
12 day that the reason you thought Mr. Carmichael was in
13 drugs was because the money you handled was in small
14 denominations.
15 A Because that's what we had been talking about the
16 whole time before I went to the grand jury.
17 Q And was that your idea?
18 A No, sir.
19 Q And, Miss Pettus, after you spoke about that at
20 the grand jury you went a step further and Ms. Morris
21 asked you what were some other factors, and then you
22 said something to the effect the money that I knew
23 that I was depositing I knew where the money -- I was
24 aware of the money, where it came from. Now was that
25 money that you're talking about where it came from the

Page 180

1 stinky money that you counted over at Carmichael's
2 house?
3 A Yes, sir.
4 Q You knew where that money came from.
5 A Yes, sir.
6 Q And was there any reason to believe that that
7 stinky money was any different than somebody hiding
8 legitimate money in a mattress for a rainy day?
9 A No, sir.
10 Q Miss Pettus, I want to focus you to another time
11 period, slightly different. This account was opened
12 on May 28 of '02. That's the date that you testified
13 earlier, with a hundred dollars. And you were
14 employed or dealing with Mr. Carmichael during this
15 time period, were you not? You were employed by him,
16 working in his business?
17 A Yeah.
18 Q And do you remember a couple of months before
19 this account was open that Mr. Carmichael in his
20 capitalistic efforts brought a truckload full of
21 shoes, tennis shoes and Timberland boots and so forth
22 into Montgomery? Do you remember that happening in
23 March of '02?
24 A Yes, sir.
25 Q Were you involved in him buying a truckload of

Page 181

1 shoes?
2 A I was over the whole thing. People separated
3 them, the big sale we had out on the boulevard,
4 everything.
5 Q All right. Let me ask you about the big sale you
6 had on the boulevard. This truckload of shoes that he
7 bought and paid money for, it came out of Florida,
8 didn't it?
9 A Yes, sir.
10 Q And he paid eighty thousand or so for the shoes?
11 A Yes, sir.
12 Q Twenty thousand pairs of shoes brought into
13 Montgomery?
14 A Yes, sir.
15     MR. MOORER: Objection, Your Honor, unless
16 she knows personally how much he paid for them, how
17 many pairs there were and how much he paid for them.
18     THE COURT: Only if you have personal
19 knowledge.
20     THE WITNESS: That's what it was supposed to
21 have been.
22     THE COURT: You said you were in charge?
23     THE WITNESS: Yes, I was in charge. I
24 didn't count every pair, but yes.
25     MR. MOORER: Did you pay for them?

Page 182

1    THE WITNESS: Did I pay for them?
2    MR. MOORER: Write the check?
3    THE WITNESS: No, I didn't.
4    THE COURT: I'll allow it. Go ahead.
5  Q  Mr. Carmichael paid for them, did he not?
6  A  Yes, he did.
7    MR. MOORER: Well Your Honor, if she wasn't
8  there when he paid for them, I don't know how she's
9  going to testify as to how much he paid for them.
10   THE COURT: Do you know how they were paid
11 for?
12   MR. BRUNSON: Your Honor, I'll withdraw that
13 question.
14   THE COURT: Go ahead, then.
15 Q  All right. We've got twenty thousand pairs of
16 shoes. Did y'all advertise in the newspaper on T V or
17 any other manner that these shoes were being brought
18 into town?
19 A  Yes.
20 Q  And, Miss Pettus, these shoes, where did they go,
21 were they still in a truck? And describe where the
22 truck went when the shoes came to Montgomery.
23 A  We took them to a warehouse over off of Sixth
24 Street to do the separation of them and to price them
25 and get them ready. And we loaded them back on the

Page 183

1  truck and took them to the flea market in front of the
2  flea market at Sam's flea market. And we set up a
3  table thing that we sold them out there.
4  Q  Advertising?
5  A  Advertising, yes, sir.
6  Q  Did you have a big banner?
7  A  Yes, across on the eighteen wheeler truck. Big
8  shoe sale or something.
9  Q  Big shoe sale, Montgomery. Cheap shoes. Nikes?
10 Timberlands?
11 A  Yeah, Timberlands. The shoes came from Sears.
12 It was a sellout from Sears, so they were all,
13 whatever shoes that Sears carried.
14 Q  And you even had to have security out there,
15 didn't you?
16 A  Yes, sir, we had police security.
17 Q  And the security, the police, you had to pay in
18 cash, is that right?
19 A  Yes, sir.
20 Q  Did you also provide security at the Carmichael
21 Center for some of the concerts?
22 A  Yes, sir.
23 Q  And were those cash expenditures to the security?
24 A  Yes, they require cash.
25 Q  Now tell me about the receipts for these shoes.

Page 184

1  Was that cash receipts that y'all received?
2  A  Yes, sir.
3  Q  Cash only for those shoes, wasn't it?
4  A  Yes, sir.
5  Q  And do you happen to recall the range of price
6  per pair that those shoes sold for? I assume they
7  were very discounted, were they not?
8  A  Yes, sir.
9  Q  But they still sold for twenty or thirty dollars
10 a pair, didn't they?
11 A  Right.
12 Q  And some even higher than that?
13 A  Yes.
14 Q  Now at twenty thousand pairs and an average of
15 thirty dollars a pair, did you realize that selling
16 that, all of those shoes could net you six hundred
17 thousand dollars, Miss Pettus? Did you realize that
18 much money came in?
19 A  No, sir.
20 Q  Were all those shoes sold?
21 A  The majority of them yes, they were sold, yes,
22 sir.
23 Q  Do you know what happened to the cash that came
24 in from those shoes sales?
25 A  Yes, Mr. Carmichael took it.

Page 185

1  Q  Now relating to your promotions, don't y'all have
2  some sort of concerts, or didn't y'all have some sort
3  of concert promotions that happened fairly often
4  beginning when you started work for him in 2000?
5  Didn't y'all have concerts from time to time?
6  A  Yes, sir, we did the B 2 K --
7  Q  Well, I don't really want to go through all of
8  them, but these were rather large events, were they
9  not?
10 A  Yes, sir.
11   THE COURT: You did what, now? B 2 K?
12   THE WITNESS: Yes.
13 Q  Tell me how you collected for ticket sales for
14 those concerts.
15 A  Cash.
16 Q  Those were cash concerts, were they not?
17 A  Yes, sir.
18 Q  And relating to Mr. Denton, didn't Mr. Denton
19 have some sort of investment in some of those
20 concerts?
21 A  Yes, sir.
22 Q  Do you know, did he have investments in more than
23 one concert?
24 A  I know of the one.
25 Q  And what was that? Was it a country western

Multi-Page™

1 store?

2 A  Yes, somebody Akins, I think, if I'm not
3 mistaken.

4 Q  Is that the only one you know about he had
5 investments in?

6 A  As far as I knew, yes, sir.

7 Q  And the Carmichael Center does a lot of other
8 functions, does it not, just besides concerts?

9 A  Yes, sir.

10 Q  And encompassed in the concerts, isn't there some
11 sort of gospel event that happens virtually every
12 weekend at the Carmichael Center?

13 A  It's not a gospel, it's more of something for the
14 kids, but not gospel.

15 Q  All right.  But you do have gospel concerts there
16 too, do you not?

17 A  Yes, sir.

18 Q  And what other events happen at the Carmichael
19 Center?

20 A  Banquets.

21 Q  And are those often cash type events that happen
22 where cash is collected at the door when people come
23 in?

24 A  Not at the banquets.

25 Q  But at concerts?

1 A  All concerts are cash.

2 Q  Okay.  And other events that happen out there.
3 In fact, isn't this year's bar exam at the Carmichael
4 Center?

5 A  Yes, sir.

6 Q  That's where the lawyers come and take their test
7 for being admitted to the Bar?

8 A  That's the second one.

9 Q  The second one.

10 A  Second one.

11 Q  And you have food give-aways there.  Are you
12 involved in food give-aways?

13 A  Yes, sir, I helped with the one when we were
14 building the Carmichael Center out on the grounds, we
15 fed about four thousand -- about four thousand-some
16 people we gave away food to.  And then I didn't go to
17 the one in Birmingham, but I was part of the --

18      MR. MOORER:  Objection, she's not --

19      THE COURT:  She didn't go.  Sustained.

20 Q  Now, Miss Pettus, I need to talk to you about
21 when you testified at the grand jury.  Do you ever
22 remember being advised of your Constitutional rights?

23      MR. MOORER:  Objection, Your Honor.

24      THE COURT:  Why?

25      MR. MOORER:  That has no relevance to this

1 at all.

2      THE COURT:  How is it relevant?

3      MR. BRUNSON:  Your Honor, if she's conspired
4 with Mr. Carmichael to commit this crime, it seems
5 that there should have been some advice of that fact.

6      THE COURT:  Isn't that something you should
7 take up with me?  Why is that relevant for the jury?

8      MR. BRUNSON:  Because she had no -- ever was
9 given any notice that she was an alleged conspirator
10 in this matter.

11      MR. MOORER:  Your Honor, even if that was --

12      THE COURT:  I don't understand how does that
13 help the jury determine whether she's telling the
14 truth or not?

15      MR. BRUNSON:  It just shows what mental
16 operation she had at the time.  I think that's
17 important.

18      THE COURT:  Were you told to tell the truth
19 on all occasions?

20      THE WITNESS:  Yes, sir.

21      THE COURT:  I think that's enough.

22      MR. BRUNSON:  Your Honor, I think it matters
23 with whatever offer or a plea offer or whatever.

24      THE COURT:  Was there a plea offered to her?

25      MR. BRUNSON:  I will ask her that.

1      THE COURT:  Ask her first, and then we can
2 go into it.

3 Q  Were you ever offered a deal to plead guilty to
4 something, Miss Pettus?

5 A  No.

6      MR. MOORER:  Your Honor, I object.  She
7 testified on direct that she wasn't charged with
8 anything.

9      THE COURT:  She said, "No."

10 Q  You didn't even know you could be charged with
11 anything, did you, Miss Pettus?

12 A  I did not.

13 Q  Because you didn't know there was any involvement
14 in drugs or drug money, isn't that true?

15 A  That's true.

16 Q  And even at the end when you got those phone
17 calls, you didn't even know who Freddie Williams was,
18 did you?  You had to ask, "Well who is that?"

19 A  Yes, I did.

20 Q  And all those questions you had to go, "Well
21 what's going on here?"  Isn't that right?

22 A  Yes.

23 Q  You didn't know what was going on, did you?

24 A  No, I did not.

25 Q  And when Keena called you and said that Leon was

Multi-Page™

Page 190

1 dealing drugs, that was selling drugs, and that
2 somebody had been shot, was that just some allegation,
3 something that she had picked up that was alleged at
4 the time? It wasn't that she was calling you
5 confirming that information, was it Miss Pettus?
6 A No, sir.
7 Q And you went over to the house and helped the
8 wife take out the cash, you said it was cash but you
9 never saw it as cash but you thought it was cash, is
10 that right?
11 A Yes, sir.
12 Q And I'm looking at your grand jury testimony,
13 Miss Pettus. You said that the wife, when y'all were
14 riding around at the end there, you said that she told
15 you she came home early one Sunday and walked in with
16 him with the drugs. Do you know what she was
17 referring to? Did you talk about what "with the
18 drugs" meant?
19 A No, I didn't.
20    MR. BRUNSON: Your Honor, if I could have a
21 moment?
22    THE COURT: Yes.
23    (Whereupon, Mr. Brunson examined various
24 documents at counsel table.)
25 Q Miss Pettus, y'all didn't remove anything else

Page 191

1 from the house, did you?
2 A No, sir.
3    THE COURT: Anything else, Mr. Brunson?
4    MR. BRUNSON: One moment, Your Honor. Thank
5 you.
6    (Whereupon, Mr. Brunson conferred with Ms.
7 James and Ms. Wayne off the record and out of the
8 hearing of the other courtroom participants.)
9    THE COURT: Anything else?
10    MR. BRUNSON: Yes, Your Honor.
11 Q Miss Pettus, do you not have a recollection of
12 having some conversation with Mr. Carmichael about his
13 problems with the I. R. S.?
14    MR. MOORER: Objection.
15    MR. BRUNSON: There was an objection to that
16 earlier. Why is that relevant?
17    MR. BRUNSON: Your Honor, it goes to why
18 somebody might want to put cash in a stereo.
19    THE COURT: In a stereo?
20    MR. BRUNSON: In a stereo or anywhere else.
21    THE COURT: I'll allow that.
22    MR. MOORER: Your Honor, it's still hearsay.
23 It's not hearsay within an exception to the rule.
24    THE COURT: How is it an exception to -- Why
25 isn't it just hearsay?

Page 192

1    MR. BRUNSON: Your Honor, again, it's an
2 alleged coconspirator's statement.
3    THE COURT: Are you saying this is in
4 furtherance of the conspiracy?
5    MR. BRUNSON: No, Your Honor.
6    THE COURT: Why don't you show me how it's
7 admissible under 803.
8    MR. BRUNSON: Your Honor, I think it just
9 goes to --
10    THE COURT: No. The question is, why isn't
11 it hearsay? Show me how it's not hearsay.
12    MR. BRUNSON: Your Honor, I withdraw that
13 question.
14    THE COURT: Okay. Move on.
15 Q Miss Pettus, you talked about the stinky money
16 and the fact that you helped count it and that you put
17 some of it in the bank account. Did you ever have a
18 discussion about where that money came from, the
19 source of that money?
20 A Mr. Carmichael, yeah.
21 Q And what did you discuss?
22 A Somewhere where he had put it away.
23 Q For a long period of time?
24 A Yes, sir.
25 Q And that's why it was stinky.

Page 193

1 A Yes, sir, sewage.
2 Q Miss Pettus, when you testified at the grand jury
3 in January of '04, what was your relationship with --
4    THE COURT: January of what?
5    MR. BRUNSON: January of '04, I believe,
6 Your Honor.
7    THE COURT: Okay.
8 Q What was your relationship with Mr. Carmichael,
9 were you working for him then?
10 A No, sir.
11 Q Did you have some sort of falling out with him?
12 A I hated him.
13 Q And would you want to describe why you hated him
14 at that time in your life?
15 A Yes, sir. Because he had put up a website, and I
16 was on the website.
17    MR. BRUNSON: Let me ask you something --
18    THE COURT: Just a minute. I'll excuse the
19 jury for just a moment.
20    (Whereupon, the jury was escorted out of the
21 courtroom, and the following colloquy ensued):
22    THE COURT: Didn't you know that she was
23 going to give that answer?
24    MR. BRUNSON: I did not, Your Honor.
25    THE COURT: I actually thought she was going

Multi-Page™

**Page 194**

1 to give it, and I was curious as to why you were
2 asking it.
3     MR. MOORER: I believe she's entitled to
4 finish her answer.
5     THE COURT: Just a minute, I'll get to that
6 in a second.
7     MR. BRUNSON: Let me begin, Your Honor, by
8 saying I thought she was going to say that she had
9 taken some of the money out of the bank account as her
10 own, which she had, and virtually taken some of the
11 money in this account for herself. And that they had
12 a falling out. I had no idea that the website issue
13 would come up. I thought that she had been admonished
14 about that.
15     THE COURT: Well I did admonish her, but I
16 actually did expect that answer when you asked it.
17     MR. BRUNSON: I apologize. I certainly
18 wouldn't have asked it had I known that would have
19 been the answer. Your Honor, I don't think that was
20 something that the jury would take to.
21     THE COURT: I'm not sure about that, either.
22 Why don't you just ask her everything you want to ask
23 her right now about this whole issue, why was she
24 angry with Mr. Carmichael.
25     MR. BRUNSON: All right.

**Page 195**

1 Q  You were angry with Mr. Carmichael and you said
2 because your picture came up on a website.
3     THE COURT: She just said "the website." I
4 don't know if she mentioned her picture.
5     MR. BRUNSON: No, she didn't.
6     THE COURT: Why don't you just answer his
7 question.
8 Q  Now didn't you have a problem or a falling out
9 with him prior to that?
10 A  Yes, sir.
11     MR. MOORER: Your Honor, if I may object
12 here, I think she's not completing out what she had
13 started to answer.
14     THE COURT: Why don't you just answer the
15 question as to why you were angry with Mr. Carmichael.
16 Q  There came a time --
17     THE COURT: No, I want her to answer it.
18     Just answer my question. Why were you angry
19 with Mr. Carmichael?
20     THE WITNESS: Okay. Because in 2003 I had
21 got into some trouble and I was in the county for a
22 failure to appear. And I had messed up some money of
23 Leon's, and Leon, you know, I knew not to ask him to
24 help me, but somebody else went to him on my behalf.
25 And when I talked back to them on the telephone from

**Page 196**

1 the county jail, the things that they said to me that
2 Leon had said to them upset me. So then when all of
3 this came about --
4     THE COURT: What is "this"?
5     THE WITNESS: All this case and all this,
6 the person who Leon, who came to Leon, Leon told them
7 that he was angry with me because I had some money and
8 I had spent some of it. And I said, "Did he tell you
9 I had gave it back to him?" And that's where this man
10 who was actually an informant took and ran with it.
11     THE COURT: Ran with what?
12     THE WITNESS: That I had an account in
13 Leon's name because they took it to David DeJohn then.
14 And that's how I came into this, because Marty was
15 trying to get off probation with the U. S. Government.
16     THE COURT: Right. Now you mentioned,
17 however, in your initial response to the question, you
18 said "the website."
19     THE WITNESS: Yes, all that led up to it.
20 It was that first.
21     THE COURT: What was first?
22     THE WITNESS: First was the thing with the
23 bank with me -- because when I got out of jail I went
24 back to work at the Carmichael Center.
25     THE COURT: Where does the website come in?

**Page 197**

1     THE WITNESS: The website came in after I
2 talked with these agents and my picture was
3 splattered. And it had no right to be on there. And
4 then I was angry, because I felt that Leon and them
5 knew that I knew nothing and I had no right to be
6 listed as an informant or a snitch, because it was not
7 good for me to be listed up there because I had no
8 part of it. I didn't know nothing about anything.
9     MR. MOORER: Therefore, Your Honor, I
10 believe based on that answer and what she said
11 earlier, that answer has to stand. He just has to
12 live with the answer she gave, a fair answer to the
13 question he asked.
14     THE COURT: Now I don't quite understand
15 what you're asking me to do.
16     MR. MOORER: That when we come back in, that
17 the jury not be told to disregard that about the
18 website being --
19     THE COURT: He hasn't asked for the jury to
20 disregard it.
21     MR. MOORER: That's why I thought we were
22 having the side bar.
23     THE COURT: No, I just knew that suddenly
24 something had happened suddenly that was different
25 from what I expected. You were going into an area

Multi-Page™

Page 198

1 that I didn't think you were going into. I thought
2 maybe you thought she was going to say something else,
3 but I thought she was going to mention the website and
4 not say something else.
5      MR. BRUNSON: And, Your Honor, as she just
6 stated, though, there was a full time period prior to
7 -- in fact, Your Honor, I don't even know the history
8 of the website. I just knew not to ask questions
9 about it and certainly wasn't intending to.
10      THE COURT: Well we'll just continue.
11      Yes?
12      MR. BRUNSON: Your Honor, some rulings,
13 first, though. That's not a situation where we're
14 opening the door to the website.
15      THE COURT: You mean to the website?
16      MR. BRUNSON: Yes, Your Honor.
17      MR. MOORER: I think he has. He asked the
18 question; it was a fair response to the question. And
19 now --
20      THE COURT: What do you want to ask her
21 about the website?
22      MR. MOORER: I'm going to simply ask her
23 what were you referring to about what website.
24      THE COURT: How is that relevant to this
25 case?

Page 199

1      MR. MOORER: Because he went into the bias
2 or motive that she had, and I've got at least a reason
3 her bias and motive was to tell the truth because of
4 what had been done to her.
5      MR. BRUNSON: I simply would like to follow
6 up with my intended question relating to the fact that
7 they had a falling out over the money in the account.
8      MR. MOORER: I think that's appropriate,
9 Your Honor, but I think we still get to explore the
10 rest of it.
11      THE COURT: Okay. I've considered the
12 argument about the website, and I do think that the
13 prejudice outweighs the probative value.
14      Bring the jury back in and let's move on.
15      (Whereupon, the jury was escorted into the
16 courtroom.)
17      THE COURT: Proceed.
18 Q Miss Pettus, there came a time when there was a
19 falling out between you and Mr. Carmichael about that
20 account at Compass Bank, is that right?
21 A Right.
22 Q At the end of the bank account being opened, was
23 there some allegation that maybe you had used some of
24 the funds for yourself without his permission?
25 A I did.

Page 200

1 Q Did you in fact do that?
2 A Yes, sir.
3 Q What did you do?
4 A I had spent some of the money gambling.
5 Q And was there later some discussion or finding
6 out about the fact that you had done that?
7 A Yes.
8 Q And therefore was there a falling out after that
9 regarding that issue?
10 A Yes, because I put it back, but I still owed him
11 some money that I didn't pay him.
12 Q But still there was a problem, was there not?
13 A Yes, sir.
14      MR. BRUNSON: No further questions.
15      THE COURT: Mr. Teague? Mr. Moorer?
16      MR. MOORER: Yes, Your Honor.
17      REDIRECT EXAMINATION
18      BY MR. MOORER OF SHERRY PETTUS:
19 Q You were first asked on cross examination by
20 Mr. Brunson, the gentleman standing there, about the
21 agent after his interview with you saying you had no
22 personal knowledge of Leon Carmichael dealing drugs.
23 Do you recall those questions?
24 A Yes, sir.
25 Q Now you never told the agents that you ever saw

Page 201

1 Mr. Carmichael do a hand-to-hand drug transaction, did
2 you?
3 A No, sir.
4 Q And you never testified to anything like that at
5 the grand jury, did you?
6 A No, sir.
7 Q Nor did you when you were interviewed by Agent
8 DeJohn on any of the occasions that he talked to you.
9 A No, sir.
10 Q But you did talk to the grand jury about the
11 things that happened between you and Keena on the
12 telephone, didn't you?
13 A Right.
14 Q And you talked to the grand jury about your
15 interaction with the account that you opened up at
16 Compass Bank, right?
17 A Right.
18 Q And you talked about how the defendant, Mr.
19 Carmichael, dug up some of that money that you put
20 into the account at the Compass Bank, right?
21 A Yes.
22 Q And you talked about how Valerie Carmichael had
23 talked to you about the incident where she walked in
24 and saw Defendant Leon Carmichael with some drugs in
25 her house when she came home early from church one

Multi-Page™

Page 202

1 day.
2 A  Yes, sir.
3      THE COURT:  Why are we going over this
4 again?
5      MR. MOORER:  Because, Your Honor, of the
6 cross examination he did about her not knowing about
7 any drug dealing.  I'm trying to point out through her
8 that she --
9      THE COURT:  Okay, but let's move quickly.
10 We don't need to hear evidence twice.
11 Q  Now you were asked about whether or not you had
12 obtained any drugs from Leon Carmichael by counsel for
13 Mr. Carmichael just a few minutes ago.  Do you recall
14 that question?
15 A  Had I obtained any drugs?
16 Q  Do you remember this gentleman over here asking
17 you if you had ever gotten any drugs yourself from
18 Leon Carmichael?  Do you remember him asking you about
19 that?
20 A  Yes.
21 Q  And, Miss Pettus, are you a marijuana user?
22 A  No, sir.
23 Q  So there would have been no reason for you to get
24 any marijuana from Leon Carmichael or anybody else,
25 correct?

Page 203

1 A  Correct.
2 Q  And counsel just asked you -- Counsel for Mr.
3 Carmichael just asked you whether or not you ever had
4 any reason to believe that the money that you got and
5 put into the account was from drug dealing and you
6 said, "No" just a few minutes ago.  Do you recall
7 that?
8 A  I recall that.
9 Q  But that's not what you said before the grand
10 jury, is it?
11      THE COURT:  You need to show her the page.
12      MR. MOORER:  Your Honor, I did.  She
13 remembers saying it.  I think she can --
14      THE COURT:  Okay.  Very good.  Go ahead.
15 You can answer it.
16 Q  Miss Pettus, when you testified at the grand jury
17 you testified differently about whether or not you
18 knew this money was from drugs, didn't you?
19 A  What page?
20 Q  Do you remember saying something, or not?
21 A  No, I don't.
22 Q  Look on page eight, line one.  And you were
23 asked, were you not, "All right.  Did you ever think
24 this might be drug money?"  You were asked that,
25 weren't you?

Page 204

1 A  Yes, sir.
2 Q  And you said, "Yes, ma'am."  That was your answer
3 to Ms. Morris at that time under oath, wasn't it?
4 A  Yes, it was.
5 Q  And that's different, a hundred and eighty
6 degrees different from what you just answered to
7 Mr. Brunson, isn't it?
8 A  Yes, it is --
9 Q  Did you lie to the grand jury?
10 A  Evidently I made a mistake.
11 Q  Did you say what it said there?
12 A  I don't even remember the grand jury.  But if
13 they said I said it, then -- but I don't remember
14 this.
15 Q  Well, there was a person just like this
16 gentleman, Mr. Reisner, sitting in that grand jury,
17 wasn't there?
18 A  I don't even remember that.
19 Q  Only it was a woman.
20 A  I don't even remember that.
21 Q  You don't even remember being told to take an
22 oath to tell the truth, the whole truth and nothing
23 but the truth?
24 A  You want to know what I remember?
25 Q  No, I'm asking you do you remember taking an oath

Page 205

1 that --
2 A  I remember that we wanted to get Leon Carmichael.
3 That's what I remember.
4      THE COURT:  No no, just a minute.
5 A  That's what I remember.
6      THE COURT:  I said just a minute.
7          Now do you want to take a recess and calm
8 down?
9      THE WITNESS:  Yes, sir.
10      THE COURT:  We'll just take a brief recess.
11      THE WITNESS:  He said --
12      THE COURT:  Ma'am, you sit down until I tell
13 you to leave.
14          The jury will step out for just a minute.
15          (Whereupon, a recess was taken.)
16      THE COURT:  Counsel, we're going to take a
17 minute and I'm going to let this witness calm down.
18 However, I'm going to have a marshal in this corner
19 over here from this point on.  This is the second time
20 this witness has become what I consider physically
21 volatile back there and up here.  I'm not going to sit
22 up here with her acting like this with her losing her
23 temper.  So a marshal will sit back here.  I just
24 wanted counsel to know that.
25          Now if you get emotional or stand up in a

Multi-Page™

## Page 206

1 threatening way like that again, I'll put you in jail.
2 Do you understand that?
3        THE WITNESS: Yes, sir.
4        MS. WAYNE: Judge, just for the record we
5 haven't offered this witness, so we don't --
6        THE COURT: I don't care. I'm just telling
7 both sides.
8        MS. WAYNE: You said defense counsel.
9        THE COURT: Oh, okay. I just wanted you to
10 know it and I wanted them to know.
11        MS. WAYNE: It's up to you, Judge.
12        THE COURT: Okay. We'll take a five minute
13 recess.
14        (Whereupon, a recess was taken.)
15             IN OPEN COURT
16          (JURY NOT PRESENT):
17 THE COURT: Now, Mr. Brunson?
18        MR. BRUNSON: Yes, Your Honor. In recross
19 of this witness, Your Honor, I would like to cover
20 another sworn statement that she gave on July 30th of
21 '04.
22        THE COURT: Okay.
23        MR. BRUNSON: The subject matter of that
24 hearing, which I don't have the front page so I'm not
25 sure whether it was before this Court or not --

## Page 207

1        MS. WAYNE: Yes.
2        MR. BRUNSON: It was before this Court, I
3 guess. It was of the subject of the website. Now I
4 don't want to go into that, obviously --
5        THE COURT: I remember that hearing.
6        MR. BRUNSON: Yes, Your Honor. And at that
7 hearing she made a couple of statements that she --
8 under oath -- about Mr. Carmichael and drug dealing
9 that she didn't know of anything illegal that was
10 going on with Mr. Carmichael. She reinforced that
11 under oath by stating --
12        THE COURT: How is it admissible? That's
13 all I want to ask.
14        MR. BRUNSON: Well, Your Honor, it's a sworn
15 statement that --
16        THE COURT: What do the rules say? All we
17 have to do is look at the rules. Quite often it
18 resolves it for us so fast. So what do the rules say?
19        MS. WAYNE: Judge, we're looking for prior
20 consistent statement.
21        THE COURT: I think that may be 801, I'm not
22 sure. 801(b)(1).
23        MR. BRUNSON: A prior consistent statement,
24 Your Honor.
25        THE COURT: Or a prior inconsistent

## Page 208

1 statement. It depends on which version you take of
2 her testimony.
3        MR. BRUNSON: Exactly.
4        THE COURT: I think you can clearly impeach
5 her.
6        MR. FEAGA: He's wanting to bolster her.
7        THE COURT: No, I think he wants to impeach
8 the testimony she gave at the grand jury.
9        MR. BRUNSON: Well it doesn't matter.
10        THE COURT: I think they're entitled to show
11 that she's giving inconsistent statements at various
12 times.
13        MR. MOORER: But, Your Honor, if he goes
14 into that I think we're entitled then to say -- to
15 bring out in front of the jury the context and the
16 motive she might have had to say that at that time.
17 And I think that might relate back to the very subject
18 of the hearing.
19        THE COURT: You mean the website.
20        MR. MOORER: Yes, sir.
21        THE COURT: Why can't they bring out the
22 website, then, to show that she was more than likely
23 telling the truth during the grand jury and perhaps
24 another hearing because she was concerned about the
25 website?

## Page 209

1        MR. BRUNSON: Well, Judge, again, I don't
2 think it's relevant. And I think --
3        THE COURT: Well doesn't that go to her
4 motive? In fact, she said it was her motive for at
5 least being angry.
6        MR. BRUNSON: But this is not an angry
7 statement and the website is still up.
8        THE COURT: What is she supposed to have
9 said, now?
10        MR. BRUNSON: She said, quote --
11        MR. FEAGA: Can we identify exactly what
12 transcript he's quoting from?
13        THE COURT: Yes, I think that's quite
14 appropriate.
15        By the way, counsel, the witness just leaned
16 over to me and apologized. So I thought I'd just put
17 that on the record.
18        MS. MORRIS: I've got it right here.
19        THE COURT: Anything else?
20        MR. BRUNSON: No, Your Honor, not from me.
21        MR. MOORER: Your Honor, I just want to put
22 him on notice that if he does do that, then I'm going
23 to ask questions that goes toward the website.
24        THE COURT: Any other argument on this
25 issue?

Page 210

1 MR. BRUNSON: I'm just asking for a ruling
2 regarding whether that potential is there, Your Honor.
3 THE COURT: I think it's very critical that
4 both sides be able to show that she's done
5 inconsistent statements on issues under oath. And so
6 I think it's quite appropriate for the defendants to
7 want to cross examine her about statements she gave on
8 other occasions that differed from her testimony at
9 the grand jury or on other occasions.
10 What is difficult now is this website thing,
11 and again, I just think it's so prejudicial I think
12 its probative value is outweighed by prejudice. So
13 I'll allow this to come in, but we're not get into the
14 website.
15 Bring the jury back in.
16 MR. TEAGUE: Your Honor, if you would
17 admonish the witness not to mention it?
18 THE COURT: Yes.
19 If you think you have to mention the
20 website, you turn to me and say Judge, I can't answer
21 that question without disobeying your order and then
22 I'll send the jury out. Okay?
23 Now bring the jury in.
24 MR. TEAGUE: Thank you, Your Honor.
25 (Whereupon, the jury was escorted into the

Page 211

1 courtroom.)
2 THE COURT: Proceed.
3 MR. MOORER: Yes, Your Honor.
4 Q Now when Mr. Brunson, counsel for Defendant
5 Carmichael, questioned you, he asked you if you had
6 ever at any point said on these two occasions where
7 Mr. Carmichael dug up money, he asked you whether or
8 not you ever said it was either a million or a million
9 point two dollars. Do you recall him asking you a
10 questions along that line?
11 A Yeah, I guess. Yeah.
12 Q And you told the grand jury that you had been
13 told by Mr. Carmichael that the total sum of money on
14 one occasion was one million dollars, and on another
15 occasion it was one point two. Is that what you told
16 the grand jury?
17 A That's what it says, yes, sir.
18 Q And that's completely different than what you
19 answered to his questions, Mr. Brunson's questions a
20 few minutes ago, isn't it?
21 A Yes.
22 Q Did you lie to the grand jury?
23 A Did I lie to the grand jury?
24 Q Yes.
25 A I don't think I lied. I think I might have just

Page 212

1 said more money than what I should have said. I don't
2 believe I lied.
3 Q So you're saying that he did tell you about
4 having dug up some money?
5 A That's true.
6 Q And you did see this money that he dug up.
7 A Yes, sir.
8 Q And it was a sizable sum of money.
9 A As far as I know, yes.
10 Q Well you were seeing it with your own eyes,
11 weren't you?
12 A Yes.
13 Q And it was a sizable sum of money, wasn't it?
14 A Yeah.
15 Q Now Mr. Brunson said to you -- or you said to
16 Mr. Brunson on cross examination that it was Ms.
17 Morris who told you that the small denominations of
18 the currency was because of drug dealing. Do you
19 recall having testifying to that effect on cross
20 examination by Mr. Brunson?
21 A Yes.
22 Q Now you saw the money that was dug up out of the
23 ground, correct?
24 A Yes.
25 Q And it was in small denominations, was it not?

Page 213

1 A Yes.
2 Q And you said before the grand jury that was
3 consistent with money from drug dealing, didn't you,
4 the denominations?
5 A I said in reference not to this, but I said it,
6 yes, of knowledge of drug dealing.
7 Q And the money he asked you about concerning the
8 quote, shoe sales, did you put any of that money in
9 your account at Compass?
10 A I don't know if I did or not.
11 Q Did any of it stink, the money from the shoes
12 sales?
13 A No, it didn't.
14 Q And you talked about, on cross examination by
15 Mr. Brunson, that there were several large events at
16 the Carmichael Center. Do you recall testifying about
17 that?
18 A Yes.
19 Q Now every event that occurred at the Carmichael
20 Center didn't make money, did it?
21 A No.
22 Q As a matter of fact, the event that you said
23 Patrick Denton was involved in, that didn't make any
24 money, did it?
25 A No, it lost.

Page 214

1  Q  And, in fact, he invested, and by "he" I mean
2  Patrick Denton, he invested about twelve thousand five
3  hundred dollars in that venture, didn't he?
4  A  I don't know what he invested.
5  Q  Well, when you were talking with Agent DeJohn
6  during one of your meetings, didn't you tell him that
7  Patrick Denton had lost about twelve thousand dollars
8  on a show, in that neighborhood?
9  A  I believe Pat had told me, yeah.  I had talked to
10  Pat.
11  Q  And Leon Carmichael never put his name on the
12  bank account that you had at Compass Bank.
13  A  Never put his name on it?
14  Q  Yes, so that he could sign checks off it.
15  A  No, sir.
16      MR. MOORER:  No further questions, Your
17  Honor.
18      THE COURT:  Any recross?
19      MR. BRUNSON:  Yes, Your Honor.
20          RECROSS EXAMINATION
21      BY MR. BRUNSON OF SHERRY PETTUS:
22  Q  Miss Pettus, you seemed a little upset.  Are you
23  okay here now?
24  A  Yes, sir.
25  Q  Now you were testifying to the prosecutor's

Page 215

1  question.  I don't want to upset you again, but you
2  said something to the effect that y'all were there to
3  get Leon Carmichael.
4  A  Yes, sir.
5  Q  What did you mean by that?
6      MR. MOORER:  Objection, Your Honor.
7      THE COURT:  How is this relevant?
8      MR. BRUNSON:  Your Honor, just the
9  atmosphere of the point in time when she was providing
10  information about Mr. Carmichael.
11      THE COURT:  Why is that relevant?
12      MR. BRUNSON:  Obviously her answer was
13  something that she wanted to say, that there was
14  something going on more than just providing
15  information at that time.
16      THE COURT:  I'm not sure that's a basis for
17  allowing it in, but I will allow her to explain why
18  her answers may or may not have varied from other
19  occasions.
20      MR. BRUNSON:  All right.  Thank you, Your
21  Honor.
22  Q  Miss Pettus, you came to this courtroom at some
23  point in time after you testified at the grand jury,
24  did you not?
25  A  Yes.

Page 216

1  Q  And you took an oath to tell the truth at that
2  point in time, did you not?
3  A  Yes.
4  Q  And at that time you were questioned, or you had
5  some comment under oath about the fact whether Mr.
6  Carmichael was dealing drugs or had done anything
7  whatsoever illegal relating to drugs, did you not?
8  A  Yes.
9  Q  And was that comment that he was or was not doing
10  drugs?
11  A  He was not, not to my knowledge.  I never knew
12  nothing that he was doing illegal.
13      MR. BRUNSON:  No further questions, Your
14  Honor.
15      THE COURT:  Mr. Teague?
16      MR. TEAGUE:  No questions for Mr. Williams.
17      THE COURT:  Any further direct?
18      MR. MOORER:  No, Your Honor.
19      THE COURT:  Thank you.  You may step down.
20      (Whereupon the witness, Sherry Pettus,
21  stepped down from the stand.)
22      THE COURT:  Next witness.
23      MS. MORRIS:  The government calls Robert
24  Chavez.
25      R O B E R T   C H A V E Z,

Page 217

1  the witness herein, having first been duly sworn or
2  affirmed to tell the truth, was examined and testified
3  as follows:
4          DIRECT EXAMINATION
5      BY MS. MORRIS OF ROBERT CHAVEZ:
6  Q  For the record, could you state your name for the
7  jury, please.
8  A  Yes.  My name is Robert Chavez.
9  Q  And it's Officer Chavez, isn't it?
10  A  Detective Chavez.
11  Q  And where are you employed, Detective?
12  A  I'm employed with the El Paso Police Department
13  in El Paso, Texas.
14  Q  How long have you been with the El Paso Police
15  Department?
16  A  I have been with the El Paso Police Department
17  for twenty years.
18  Q  Okay.  And where are you assigned within the El
19  Paso Police Department today?
20  A  Today I'm assigned in C. I. D. as a general
21  detective.
22  Q  And what does "C. I. D." stand for?
23  A  Criminal Investigations Division.
24  Q  And your a general detective.  What does that
25  mean that you do on a day-to-day basis?

Page 218

1 A What I do is I investigate, or I do follow-up
2 investigations on incidents reported to the El Paso
3 Police Department to include taking statements from
4 witnesses, statements from suspects, collecting
5 evidence and preparing a case for court presentation.
6 Q And what kind of crimes do you investigate?
7 A Right now I'm investigating, -- as a generalist
8 I'm investigating any crime short of murder and
9 aggravated sexual assault.
10 Q How long have been with the C. I. D. unit within
11 the El Paso Police Department?
12 A About two years.
13 Q Okay. And where were you assigned before then?
14 A Before then I was assigned to the Auto Theft Task
15 Force -- as a detective to the Auto Theft Task Force,
16 the Airport D. E. A. Task Force and Narcotics.
17 Q Okay. Now I want to take you to the time that
18 you were assigned to the D. E. A. Airport Task Force.
19 When were you assigned there?
20 A I was with the D. E. A. Task Force from '94 to
21 '99.
22 Q All right. And I think you said it was an
23 airport duty?
24 A Yes, ma'am.
25 Q And during that what, roughly five years that you

Page 219

1 were working at the airport with D. E. A., what were
2 you doing?
3 A Our investigations there with the D. E. A. Task
4 Force were to disrupt the flow of narcotics or
5 narcotic related currency being transported through
6 public transportation, mainly the airport.
7 Q And by that do you mean that you were basically
8 looking for drugs going out or coming into the
9 airport?
10 A Yes.
11 Q And is that especially important because of the
12 location of El Paso?
13 A Yes, it is.
14 Q Tell us about that. Or tell the jury why that's
15 more important or especially important.
16 A El Paso is a border town in Texas where we're
17 located right next to Jiuauas, Mexico. And basically
18 El Paso is considered a hub or a lot of narcotics are
19 flowing through El Paso and being distributed out
20 towards the East Coast.
21 Q Okay. And, Agent Chavez, you were working at the
22 airport prior to nine eleven, correct?
23 A Yes.
24 Q So was security as tight as it is today?
25 A No, not as tight as it is today.

Page 220

1 Q Okay. And were you working on November 11th of
2 1995 at the airport?
3 A You mean November 2nd of 1995?
4 Q Yes, I'm sorry, November 2nd, 1995. Were you
5 working at the airport?
6 A Yes.
7 Q And you were working as a D. E. A. Task Force
8 officer, is that correct?
9 A Yes.
10 Q And on that day did you receive a tip or some
11 information about a passenger on an airplane?
12 A Yes, I did.
13 Q What was the substance of that tip?
14 A I received information from a confidential source
15 advising of a possible narcotic carrying route to El
16 Paso, Texas.
17 Q What, specifically, did they tell you about this
18 money courier?
19       MS. WAYNE: I object to the rest of this as
20 being hearsay.
21       THE COURT: Why isn't this hearsay?
22       MS. MORRIS: Your Honor, it's not offered
23 for the truth of the matter asserted. It will simply
24 be offered as to what he did when the person came in.
25       THE COURT: So the confidential informant

Page 221

1 could have been wrong or right?
2       MS. MORRIS: Could have been. It will be
3 tied up, but at this point he got this tip it
4 could have been.
5       MS. WAYNE: Well that's the problem, Judge,
6 is that at the time of the tip the reliability of the
7 hearsay is not able to be confronted. We can't
8 confront whoever this informant is.
9       THE COURT: I think all they want to do is
10 to show whether they got it. Whether the tip was true
11 or not is another issue.
12       MS. WAYNE: But she was asking about the
13 substance of the information conveyed, what was told
14 him, and that is what my objection goes to.
15       MS. MORRIS: Your Honor, this is just in the
16 course of his investigation and how he came into
17 contact --
18       THE COURT: You want to show what he did
19 next?
20       MS. MORRIS: Sure.
21       THE COURT: Just ask him.
22 Q What did you do next?
23 A We set up surveillance based on a the tip that we
24 received.
25 Q Okay. And where did you surveil?

Page 222

1  A  We set up at the Delta Airlines gate at the
2  airport.
3  Q  And what were you looking for?
4  A  We were looking -- We set up surveillance, we
5  were looking for a Hispanic -- sorry, we were looking
6  for a female with luggage, is all the information we
7  had, coming in from a flight of Delta Airlines at
8  twelve-forty p.m. at Gate Two.
9  Q  Did you have information from where the flight
10  was originating?
11  A  Yes, the flight originating from Montgomery,
12  Alabama.
13       MS. WAYNE:  I'll object because the basis of
14  all of this is hearsay and it does ultimately go to
15  what happened here and it's from an unreliable source.
16       THE COURT:  He can tell what he did, yes,
17  overruled on that.  He's just explaining his actions
18  now.
19       Go ahead.
20  A  The flight originated from Montgomery, Alabama en
21  route to El Paso, Texas via Dallas/Fort Worth.  It was
22  arriving in El Paso, Texas around twelve-forty p.m. on
23  Delta Airlines.
24  Q  And, Investigator Chavez, when the flight arrived
25  in El Paso you were waiting on the flight, is that

Page 223

1  what I was understanding earlier?
2  A  Yes, ma'am.
3  Q  Okay.  And did you eventually follow someone off
4  of that flight?
5  A  Yes, we did.
6  Q  Why did you follow that person?
7  A  We observed a person come off, a female.  This
8  person was not carrying any luggage.  She appeared to
9  be pregnant, and --
10       THE COURT:  Appeared to be what?
11       THE WITNESS:  Pregnant.  Yes, sorry.
12       THE COURT:  Pregnant.
13  A  She was not carrying any luggage.  We watched
14  her.  We followed her down the concourse and noticed
15  that at times she would turn back and look over her
16  shoulder.  We followed her down the escalators to the
17  lower level of the airport.
18  Q  What's on the lower level of the airport?
19  A  We have a coffee shop as you come down at that
20  time, and you got a main, I guess hallway that leads
21  out to the baggage area and the exits.  I noticed that
22  this lady who was later identified as Sandra Jones --
23       MS. WAYNE:  Judge, I'm going to object.
24  Hearsay.
25       THE COURT:  Why isn't this hearsay?

Page 224

1       MS. MORRIS:  Your Honor, if he could be
2  instructed that -- We'll talk about who it was at the
3  time.
4  Q  At the time you didn't know who that person was,
5  did you?
6  A  No, I did not.
7  Q  So you continued to follow her, and then what
8  happened?
9  A  I noticed that she made eye contact with a
10  Hispanic male who was sitting at a cafe right next to
11  the escalator.  I noticed that she changed her
12  direction of travel and immediately turned and walked
13  towards the Hispanic male.  The Hispanic male stood up
14  and greeted this lady.
15  Q  And you watched this conversation going on as it
16  was occurring?
17  A  Yes.
18  Q  And then what did you see?
19  A  Both were talking when they left the cafe area
20  there and were walking down the main, well I guess
21  hallway.  And we observed the lady walking to the
22  woman's restroom.  And the Hispanic male waited
23  outside the front door for her.  The lady exited the
24  restroom, and again they met up again and continued
25  talking and walking down the hallway towards the

Page 225

1  lobby.
2  Q  At some point did you approach these two people?
3  A  Yes.
4  Q  Who was with you?
5  A  The person who was with me at the time was Task
6  Force Officer Menchaca, a canine officer.
7  Q  And did you and Task Force Officer Menchaca
8  approach these two individuals?
9  A  It was myself and Task Force Officer Bilo.
10  Q  Where was Task Force Officer Menchaca at the
11  time?
12  A  We were all just following each other, shadowing
13  them as they walked by.
14  Q  Okay.  And when you approached them, what did you
15  do?
16  A  I approached the couple because basically they
17  were leaving the airport.  They didn't go to the
18  baggage claim area.  And we identified ourselves as
19  Task Force Officer Bilbo and myself.  We identified
20  ourselves as D. E. A. airport task force officers to
21  them.
22  Q  Did you ask them any questions?
23  A  I asked them if they knew each other.
24       MS. WAYNE:  Judge, objection; hearsay.
25  Particularly from "them," but not identifying the

Page 226

1 speaker but it's hearsay.
2      MS. MORRIS: First of all it's a question,
3 not a statement.
4      THE COURT: But I think the response,
5 though, is what she's objecting to.
6      MS. WAYNE: Right.
7      MS. MORRIS: The fact that they knew each
8 other --
9      THE COURT: I think they're going to say
10 they knew each other or they're going to say they
11 didn't know each other. She's saying that's hearsay.
12      MS. MORRIS: At this point it's not, but
13 okay, we'll move to the next one.
14      THE COURT: Okay. Go ahead.
15      MS. WAYNE: I'm going to ask to strike. It
16 sounds like Ms. Morris was testifying a fact that
17 there is no evidence of. I'd ask to strike that.
18 That's what she was saying.
19      THE COURT: Well, whatever attorneys say is
20 not evidence anyway. Just argument.
21      Let's move on.
22      MS. MORRIS: Is there a ruling on that, Your
23 Honor?
24      THE COURT: Yeah, you said you were going to
25 move on. I thought you said you were moving on.

Page 227

1 Otherwise how is it not hearsay?
2      MS. MORRIS: It's a coconspirator's
3 statement in furtherance of the conspiracy, Your
4 Honor.
5      THE COURT: I don't even know who these
6 people are. You want me to excuse the jury?
7      MS. MORRIS: No, Your Honor. I'll cure that
8 right now.
9      MS. WAYNE: We do. I think it would be
10 better.
11      THE COURT: I'm sorry, I'll have to excuse
12 the jury.
13      (Whereupon, the jury was escorted out of the
14 courtroom, and the following colloquy ensued):
15      MS. WAYNE: Judge, my objection is hearsay.
16 And what I believe --
17      THE COURT: Well before I get to that, they
18 now contend it's a coconspirator's statement. Let me
19 understand what that are argument is and I'll get back
20 to you.
21      MS. WAYNE: Okay.
22      MS. MORRIS: The evidence will be very
23 shortly that Sandra Jones is a member of this
24 conspiracy.
25      THE COURT: This is Sandra Jones?

Page 228

1      MS. MORRIS: Yes, Your Honor.
2      THE COURT: And this is Sandra Jones who
3 we're talking about at the airport?
4      MS. MORRIS: Yes, Your Honor.
5      THE COURT: Who is the guy?
6      MS. MORRIS: Santiago Hernandez.
7      THE COURT: Okay. Now when you say they
8 knew each other, is this something Sandra Jones told
9 you?
10      THE WITNESS: No, sir. I asked them if they
11 knew each other.
12      THE COURT: What did Sandra Jones say?
13      THE WITNESS: Well the Hispanic male said he
14 did not know Ms. Jones at all and completely walked
15 away from her.
16      THE COURT: And then what happened?
17      THE WITNESS: Task Force Officer Menchaca
18 approached him and began talking with him and got a
19 picture I D. That's how we got the name Santiago
20 Hernandez and a business card from him.
21      I continued talking with Mrs. Jones. And
22 what happened was I asked the lady, at this time I
23 wasn't sure who it was at that time, I asked her if I
24 could talk to her. She said yes. She consented and I
25 spoke with her. I asked her if she had a plane ticket

Page 229

1 and she did. She handed me a plane ticket and it was
2 a ticket from Delta Airlines. I looked at the ticket
3 and the ticket was in the name of Sandra Jones, and I
4 noticed that the ticket was coming from Alabama to El
5 Paso. And that the ticket had been purchased cash,
6 the same day.
7      I noticed that Alabama now, it was a demand
8 city to a source city, El Paso, of narcotics and I
9 also noticed on the ticket that there was no checked
10 in luggage. So I handed the ticket back to Miss Jones
11 and then I asked her if she had a picture I D. At
12 which time she gave me an Alabama driver's license and
13 I looked at the license and it was the same name,
14 Sandra Jones and I handed the license back to her.
15      THE COURT: Okay. Now how was she allegedly
16 a member of the conspiracy? What evidence do you have
17 of that?
18      MS. MORRIS: Well first of all, Your Honor,
19 there's going to be other evidence later that she was
20 driving one of the defendant's trucks and was stopped
21 with marijuana driving a truck owned by the defendant.
22      THE COURT: Where?
23      MS. MORRIS: In Mississippi.
24      THE COURT: Okay. Is this the person who
25 went to jail and was eventually bailed out, or

Page 230

1  something like that?
2       MS. MORRIS: Yes, Your Honor.
3       THE COURT: Right. Okay, I do remember that
4  now from another hearing or something.
5       MS. MORRIS: Not only that, Your Honor, but
6  I mean to this point, if you'll recall Patrick Denton
7  testified as well that Mr. Carmichael told him that he
8  had a courier that was stopped with some money in
9  Texas and that he never got pinned for it, basically.
10      THE COURT: Now who will testify that she
11 was stopped in Mississippi?
12      MS. MORRIS: Mississippi Department of
13 Transportation.
14      THE COURT: And they will say that they
15 stopped this Miss Jones and that she had marijuana and
16 so forth?
17      MS. MORRIS: Yes, sir.
18      THE COURT: Okay. Now other than this
19 stopping her in El Paso, you said that she -- You just
20 stopped her in El Paso, that's it?
21      THE WITNESS: Yes, sir.
22      THE COURT: Did she say anything
23 incriminating?
24      MS. MORRIS: Your Honor, to be clear, she
25 had forty-two thousand dollars on her when they

Page 231

1  stopped her.
2       THE COURT: Oh, okay. She had forty-two
3  thousand dollars. Was there anything else?
4       THE WITNESS: No, sir.
5       MS. MORRIS: Your Honor, there was also a
6  drug dog hit on the money. So to say that she's not
7  tied in here --
8       THE COURT: I just want to get all of this
9  testimony out so Ms. Wayne can respond to all of it.
10 Anything else?
11      MS. MORRIS: I guess Santiago Hernandez
12 would also need to be added to the conspirators list
13 for this reason. When Santiago was being interviewed
14 by Officer Menchaca, he handed the officer a business
15 card with a phone number on it. After Santiago
16 Hernandez said that he did not know Miss Jones, this
17 business card phone number appeared in Mrs. Jones's
18 pager when Officer Chavez went through the pager.
19      THE COURT: Why does he have to be added as
20 a conspirator?
21      MS. MORRIS: Well it obviously shows that
22 the two of them know each other. Our inference would
23 be she had drug money on her, was going to a drug
24 source city to pick up drugs.
25      THE COURT: I'm not sure that the statement

Page 232

1  can't come in whether he's a conspirator or not,
2  because he's not coming in for the truth. In fact, he
3  was probably lying.
4       MS. MORRIS: The fact that they didn't know
5  each other?
6       THE COURT: Yes.
7       MS. MORRIS: At this point, correct. But
8  the statements about, you know, the car that he gave
9  and those, too, we're going to tie all that together.
10      THE COURT: Does this witness have personal
11 witness of that?
12      MS. MORRIS: No, but there is another
13 witness.
14      THE COURT: I'll take it up then when we
15 have the other witness. But now I'll hear from Ms.
16 Wayne. Now we have it all out.
17      MS. WAYNE: Thank you, Judge.
18      In terms of what Detective Chavez can
19 testify is, my first objection simply goes to the
20 identifying information about Sandra Jones and he read
21 off a ticket and a driver's license. That's hearsay.
22 When you read it off paper, that's hearsay. So that's
23 hearsay.
24      In terms of any statements that she made to
25 Detective Chavez, this is Crawford because it's

Page 233

1  interrogation. It's police questioning and therefore
2  testimonial and falls strictly under Crawford. And
3  unless they're going to bring her in and we can
4  confront this witness and cross examine her on her
5  statement, it's a clear violation of our ability to
6  confront the witness.
7       So I'm asking that under those provisions,
8  Judge, it's hearsay, it's unreliable and it's a
9  Crawford issue and that it should not be allowed in.
10 It's different than coconspirators in a different
11 situation.
12      THE COURT: Why isn't this Crawford?
13      MS. MORRIS: Your Honor, this was not an
14 interrogation, this was simply identifying -- I mean
15 -- Officer Chavez is not going to sit down and discuss
16 with -- this is not going to be testimony with him
17 discussing with Sandra Jones or her cooperating in
18 giving a voluntary statement. In fact, she refused to
19 make a statement. This is simply him going up to her
20 and obtaining basic information as in a booking
21 process or anything else.
22      THE COURT: How is it in furtherance of the
23 conspiracy?
24      MS. MORRIS: Well the fact -- I mean, he had
25 to have given a ticket, the ticket that she gave him

Page 234

1  and that sort of thing, the conversation that went on
2  between those. And then we took -- obviously they
3  forfeited this money because of the dog hit and other
4  indicators that it was drug related. All of that
5  shows the furtherance of the conspiracy. And the
6  statements she made that she didn't know this person,
7  or he didn't know this person. The denial, I should
8  say.
9       THE COURT: Anything else from either side?
10      MR. TEAGUE: Your Honor, inasmuch as a
11 conspiracy is alleged involving Freddie Williams, we
12 object and adopt a Crawford argument.
13      MS. WAYNE: Judge, and I'm simply going to
14 ask the Court if that's all the statements, if the
15 Court allows it, that they intend to elicit what
16 Sandra Jones said, what they told you at this point --
17      THE COURT: Which you consider to be what?
18      MS. WAYNE: To be hearsay and a violation --
19      THE COURT: No, no, what the statements are.
20      MS. WAYNE: Oh. The ones that they just
21 said that she made about the money and knowing Mr.
22 Hernandez.
23      MS. MORRIS: Your Honor, she also, when he
24 asked her whose money that was, she also made the
25 statement that she was afraid to tell him, or

Page 235

1  something to that effect. I might not have the
2  verbiage correct, but I think that's what Ms. Wayne is
3  alluding that she's attempting to keep out at this
4  point and we probably do need to take that up.
5       MS. WAYNE: Right.
6       MS. MORRIS: But, you know, that is
7  something that we would contend is in furtherance of
8  the conspiracy. She's obviously not going to tell him
9  -- she's concealing whose money it is in order to keep
10 the conspiracy going.
11      THE COURT: Okay. Now why isn't this --
12 Under Crawford, why isn't it really testimonial if
13 she's talking to an agent?
14      MS. MORRIS: Your Honor, again, it's not
15 interrogation from the standpoint of his cooperating.
16      THE COURT: Doesn't Crawford just -- I don't
17 have it before me, but doesn't it talk about things
18 that are to an agent, do you have to be in custody for
19 it to be testimonial?
20      MS. MORRIS: The Court decided it in Inidi
21 that the confrontation clause does not require a
22 showing of unavailability as a condition to admission
23 of an out-of-court statement of a non-testifying
24 coconspirator. And that's what we're talking about
25 here, is a non-testifying coconspirator.

Page 236

1       (Whereupon, the Court examined said case
2  law.)
3       THE COURT: Okay. I've had a chance to look
4  at Crawford again, and I have to admit its reach is
5  rather ambiguous. It does say that interrogations are
6  covered, and it specifically notes by interrogation
7  they don't necessarily mean formal interrogation.
8       But then I think you're right about Inidi
9  and other Supreme Court cases. I can't imagine the
10 Supreme Court in Crawford meant to overrule the other
11 cases.
12      MS. WAYNE: Judge, if I may, I think Inidi,
13 though, is really on point as to conversations between
14 coconspirators, not an alleged coconspirator with law
15 enforcement. To me that is a distinction. So I don't
16 think they're in conflict with each other. Crawford
17 simply addresses a different situation. This
18 situation.
19      THE COURT: Right.
20      MS. MORRIS: And, Your Honor, if I may be
21 heard.
22      THE COURT: Yes.
23      MS. MORRIS: If this was a general
24 statement, I think I'd agree with Miss Wayne, but
25 because this is a statement in order to conceal the

Page 237

1  source of the funds, that is made in furtherance of
2  the conspiracy.
3       MS. WAYNE: They can bring Sandra Jones in.
4  I mean, I think that's the point. Otherwise they can
5  just do all these cases put their agents on the stand
6  and never put any other people on.
7       THE COURT: Well as long as the statements
8  are made in furtherance of the conspiracy. If there
9  are statements otherwise, I think you're absolutely
10 right, I think Crawford would apply. But the reach of
11 Crawford, as I said, is so unclear, not only as to
12 coconspirator statements but as to hearsay generally,
13 the courts are wrestling with Crawford across the
14 country, I do know that.
15      But as I said, if the statement was made in
16 furtherance of the conspiracy, made by a
17 coconspirator, I'm not sure as to why there should be
18 any difference as to whether it's made to a police
19 officer or to anyone else as long as it's a
20 conspirator's statement.
21      So I will overrule the objection. But I
22 will say this, you may have an arguable claim here.
23      MS. CHARTOFF: Your Honor, can I make one
24 point?
25      THE COURT: Yes.

1      She really has the witness. I hate to apply
2 this rule, but I've got to. If you've got a witness
3 here, it really should be one counsel.
4      MS. CHARTOFF: I wrote this brief last
5 night.
6      THE COURT: Actually, I have your brief
7 here. I'm telling you now you may have an issue of an
8 expansion of Crawford. I don't think it's going to
9 prevail, but I'm going to overrule it.
10      Let's proceed. Bring in the jury.
11      (Whereupon, the jury was escorted into the
12 courtroom.)
13 Q Detective Chavez, when we left I think you were
14 telling us that you just approached these two
15 individuals, is that correct?
16 A Yes, I believe so.
17 Q Okay. And I believe -- Who did you say was with
18 you?
19 A Task Force Officer Bilbo, B-i-l-b-o, was with me.
20 I approached the couple, and --
21 Q What happened when you approached the couple, did
22 you ask them any questions?
23 A I asked them if -- I identified myself as a D. E.
24 A task force officer, and I asked them if they knew
25 each other.

1 Q And what was their response?
2 A The Hispanic male immediately walked away from
3 the female and stated he did not know her at all.
4 Q And did you then start to question the female?
5 A Yes.
6 Q And what did you do?
7 A I asked the female if I could speak with her and
8 she said yes, she consented. I went ahead and asked
9 her if she had a plane ticket. She handed me a plane
10 ticket from Delta Airlines. I looked at the ticket
11 and I noticed that the ticket was in the name of
12 Sandra Jones. I noticed that the ticket was purchased
13 in cash on the same day of flying, or the same day of
14 travel, and I noticed that the ticket, Miss Jones was
15 traveling from a demand city to a source city of
16 narcotics.
17 Q Let me stop you there. A couple of things I want
18 to go over with you. You said that she paid cash the
19 same day of travel.
20 A Yes.
21 Q Tell me why that was important to you.
22 A From our experience, we notice that --
23      MS. WAYNE: Excuse me, Detective Chavez.
24      Judge, I'm going to object and simply ask
25 that if they're going to ask these kind of questions,

1 that there be a foundation laid.
2      THE COURT: Yes.
3 Q Detective Chavez, how long at this point had you
4 worked at the airport?
5 A Up until that point I had been at the airport
6 about a year.
7 Q And you had worked at the airport with the Drug
8 Enforcement Administration, is that correct?
9 A Yes.
10 Q And through those times had you routinely -- or
11 had you stopped people?
12 A Yes.
13 Q And why did you stop people in the airport?
14 A We stopped people in the airport who are taking
15 drugs out of El Paso, and people coming into airport
16 with currency from out of state.
17 Q And through your experience, did you do -- did
18 you learn that oftentimes people who had currency or
19 were taking drugs out paid cash for tickets?
20      MR. TEAGUE: Your Honor, we object to the
21 blatant leading, if it please the Court.
22      THE COURT: Yes, you really shouldn't lead
23 him. You should say what did he learn with regard to
24 people either bringing drugs in or taking money out
25 and so forth.

1 Q If you could, just go ahead and tell the jury
2 what exactly you learned through those experiences.
3 A Well, through those experiences and through our
4 training we went through SKYNARC training. I had
5 attended conferences and training prior to going into
6 the unit.
7 Q Tell us about those conferences and training.
8 A Basically, my understanding, just what I learned
9 from the conferences, is that the D. E. A. had started
10 airport interdiction back in the seventies, and I
11 think the first airport that they tried this at the
12 time was at Detroit. And at that time Detroit, the D.
13 E. A. had determined that Detroit was a demand city,
14 or a source where narcotics was going in and out of
15 the airport. And this was since 1970.
16      So I came into the task force in 1994, so in
17 that time they had identified behavior which indicated
18 narcotic trafficking and of narcotics going out and
19 money coming in, and the things that had been
20 identified were things such as demand cities and
21 source cities. People paying cash at the last minute,
22 people traveling under the name of common names such
23 as Jones, such as people go to a motel room, I don't
24 know, Mr. and Mrs. Jones. They will use things of
25 last minute check-in, things along those natures.

Multi-Page™

1  Q  And did you learn that these things were --
2  Actually, did you also have some training on the job
3  during the year that you were at the airport?
4  A  Yes.
5  Q  And what did you learn through that time?
6  A  I learned from that training that it was
7  basically verified on the seizures that we had on the
8  narcotics school, that those were true.
9  Q  By those were true?
10  A  The indicators which I just spoke of.
11  Q  Okay.  So I'll again ask you, Detective Chavez,
12  why was it important to you that someone pay cash at
13  the last minute for their ticket?
14  A  That's important because they're waiting for the
15  last minute to get on.  If they come in earlier -- Say
16  if you have narcotics and you come in earlier and you
17  put your bag on -- well you pay cash, first of all,
18  because you have nothing to tie you back, like with a
19  credit card.  If you pay with a credit card, you would
20  have something to tie you back.
21  Q  What do you mean by "tie you back"?
22  A  They would have a paper trail, so to speak.
23  Q  Okay.
24  A  Paying cash last minute and everything is coming
25  in, they know the flight leaves, for example, at two

1  o'clock, they will show up at the last minute that
2  they will board their stuff because that's less
3  attention to what they're carrying.  People are in a
4  haste to get their suitcase put on the plane and not
5  miss their flight.
6  Q  So when you were looking at this individual's
7  ticket, and you -- What else?  Could you state that
8  again?  I'm sorry.  What did you determine.
9  A  I looked at the ticket she handed me from Delta
10  Airlines.  I noticed that it was in the name of Sandra
11  Jones.  I noticed that she was coming from a demand
12  city to a source city for narcotics.  She was coming
13  from Montgomery, Alabama to El Paso, Texas.
14         I noticed that the ticket was purchased in
15  cash, and I noticed it was purchased on the same day
16  of travel and that there was no checked-in luggage.
17  Q  And at that point did you ask Miss Jones for
18  anything else?
19  A  Yes.
20  Q  What?
21  A  I returned the ticket to her and asked her if she
22  had a picture I D.
23  Q  Did she show you a picture I D?
24  A  Yes, she did.
25  Q  Detective Chavez, I'm showing you what's been

1  previously marked as government's exhibit 44.  Do you
2  recognize the person in that picture?
3  A  This looks like Sandra Jones.
4  Q  Okay.  When you took the I D from Miss Jones on
5  November 2nd, 1995, did you record anything from that
6  I D?
7  A  On my D. E. A. Six, which is our report, I wrote
8  down Mrs. Jones' Alabama driver's license.
9  Q  Do you recall that driver's license number
10  sitting here today?
11  A  No.
12  Q  If I were to show you your D. E. A. Six to
13  refresh your recollection, would that help you?
14  A  Yes, ma'am.
15         MS. MORRIS:  May I approach, Your Honor?
16         THE COURT:  Yes.
17  Q  I am showing you a copy of some papers.  Do you
18  recognize those?
19  A  This is our investigator report from the D. E. A.
20  here in El Paso.
21  Q  Is that written by you?
22  A  Yes, I have my signature right here.
23  Q  And in that report did you record the driver's
24  license person of the Sandra Jones that you stopped in
25  the airport on November 2nd, 1995?

1  A  Yes, I did.
2  Q  And what was that driver's license number?
3  A  I have the driver's license number, it's an
4  Alabama number of five one zero four six one four.
5  Q  Detective Chavez, could you tell us what the
6  driver's license copy that I handed you a moment ago,
7  could you tell us what the driver's license number on
8  that is?
9  A  The number is five one zero four six one four.
10  Q  And that's for whom?
11  A  For Sandra Jones.  It's a commercial driver's
12  license from Alabama.
13  Q  And that's an Alabama's driver's license,
14  correct?
15  A  Yes, ma'am.
16         MS. MORRIS:  Your Honor, at this time we'd
17  move into evidence government's exhibit 44.
18         THE COURT:  Admitted.
19  Q  Detective Chavez, after you've looked at the
20  plane ticket and the driver's license, what did you do
21  then?
22  A  I handed her back her driver's license.
23  Q  Did you ask her any questions then?
24  A  Yes.  I asked her how long she was going to stay
25  in El Paso.

Page 246

1 Q And what was her response?
2 A Miss Jones stated that -- she nodded her head and
3 said she didn't know how long she was going to stay in
4 El Paso.
5 Q Did you ask her anything else?
6 A Yes, I did.
7 Q And what was that?
8 A I asked her how long she was going to stay in El
9 Paso, and she told me she didn't know. I noticed that
10 up to this point Miss Jones was pretty friendly and
11 talkative, so I advised Ms. Jones what we're doing is
12 we're looking for narcotics or narcotic related
13 currency. I asked Miss Jones if she had any currency
14 with her, and she reached into her pocket. I think
15 she pulled out a couple of hundred dollars and said
16 that was all she had.
17 Q Did you ask her if she had a job?
18 A I asked -- Well Miss Jones told me that she was a
19 truck driver for a G. E. D. Trucking Company, and
20 Miss Jones told me that she did not know Hernandez,
21 that was the Hispanic male that was with her, yet she
22 always looked towards his direction before answering
23 any questions. At that time Task Force Officer Bilbo
24 asked Miss Jones if she had anything under her shirt
25 along the waistline. Mrs. Jones said she did not.

Page 247

1         Task Force Officer Bilbo asked her if it was
2 okay if we got a female security guard to verify that.
3 At that point Miss Jones said that it was okay, she
4 consented to it so we flagged down a female security
5 guard. At that time it was I. T. S. Security at the
6 airport, and the female security guard patted down the
7 outer clothing of Mrs. Jones and she felt an
8 unidentified object under her shirt by the waistline.
9         The security guard asked Miss Jones what she
10 had under her shirt, and Miss Jones stated that she
11 had money. I then asked Miss Jones how much currency
12 she had, and Miss Jones told me she had forty-two
13 thousand dollars with her.
14 Q And at that point what did you do?
15 A I asked Miss Jones at that point, I asked
16 Miss Jones if she wouldn't mind following us to the
17 task force office so we could discuss the currency.
18 Q Let me back you up. Where were you when this
19 conversation was going on?
20 A We were right by the exit doors, I guess, right
21 as you're going out the airport and we're in the front
22 lobby.
23 Q Where is the airport task force office?
24 A It's in the airport. It's just -- well at that
25 time it was underneath, I believe, Continental

Page 248

1 Airlines. It's in the airport.
2 Q Okay. So did she consent to go with you to the
3 office?
4 A Yes, she did.
5 Q And what happened when you got there?
6 A We went to the office. I asked Miss Jones if she
7 would show me the currency. Miss Jones lifted up her
8 blouse and I saw six individually wrapped envelopes
9 tied with clear plastic tape. I asked Miss Jones how
10 much money she had in each envelope, and Miss Jones
11 stated she had seven thousand dollars in each
12 envelope.
13 Q Did you then ask her who the owner of the
14 currency was?
15 A I asked her who the owner of the currency was.
16 Miss Jones stated that she was the owner of the
17 currency, yet when I asked her specific questions
18 about the currency, Miss Jones would just stare down
19 at the ground and she'd squeeze her hands real tight,
20 you know, looking down and she wouldn't answer me.
21         I asked -- Miss Jones then told me that she
22 was afraid to tell me who the owner of the currency
23 was. I had asked Miss Jones if she had ever been
24 arrested, and Miss Jones stated that no, she had never
25 been arrested. I asked Miss Jones if I could take a

Page 249

1 look at her pager to see what phone numbers she had
2 contained in the pager, and Miss Jones handed me her
3 pager. I looked through the pager and I noticed one
4 of the phone numbers belonged to the Hispanic male,
5 Hernandez, who she denied knowing.
6         When I asked Miss Jones about that phone
7 number --
8 Q Wait a minute. Let me back you up.
9         Detective Chavez, you said that you found
10 one of the phone numbers, or a phone number, for Mr.
11 Hernandez in the pager, is that correct?
12 A Yes.
13 Q And do you recall what that phone number was?
14 A No.
15 Q If I show you your report, would that refresh
16 your recollection?
17 A Yes.
18         MS. MORRIS: May I approach, Your Honor?
19         THE COURT: Yes.
20 A The phone number was seven six four thirty-three
21 oh one.
22 Q That was the number for who?
23 A For Santiago or Sonny Hernandez. That was the
24 Hispanic male that she had met up with at the airport.
25 Q Detective Chavez, how did you know that was Mr.

Page 250

1  Hernandez's phone number?
2  A  That phone number was on the business card which
3  he had given us that day.
4  Q  "He" being?
5  A  The male Hispanic, Mr. Hernandez.
6  Q  Now, Detective Chavez, did you forfeit or did you
7  request that the forty-two thousand dollars be
8  forfeited?
9  A  Yes, I did.
10 Q  And was it indeed forfeited?
11 A  Yes.  The El Paso D. E. A. Task Force Office
12 seized the forty-two thousand dollars as narcotic
13 related currency based on the fact that Miss Jones was
14 traveling from a demand city to a source city of
15 narcotics, she had purchased her city in cash and
16 traveled on the same day.  Miss Jones had an
17 inconsistent statements to the origin of the currency.
18 The manner in which the currency was transported and
19 concealed was consistent with narcotic money carriers.
20       Miss Jones had a documented narcotic
21 history, and we had a canine alert from a drug dog or
22 narcotic detective canine that alerted on the currency
23 for narcotics.
24 Q  Now I want to talk to you a little bit about the
25 drug dog, the canine drug dog.  When you got back to

Page 251

1  the office with Miss Jones, tell us about -- well tell
2  us what happened there in relation to the drug dog.
3  A  We stepped outside of the office, and my --
4  Q  When you say "outside of the office," you mean is
5  that outside outside, or just inside but outside of
6  the office?
7  A  It's outside the office and it's actually outside
8  outside.  We have, myself and Task Force Officer
9  Menchaka who is the canine officer, we set up five
10 wooden boxes in a lineup form.  And I asked -- This
11 was all witnessed with Miss Jones.  And I asked
12 Miss Jones to individually inspect each of the boxes
13 to make sure that none of the boxes had anything in
14 them.  So Miss Jones walked up and looked inside each
15 box and saw that they were empty.
16       We then closed the lids to the boxes and
17 Task Force Officer Menchaca went and retrieved his
18 drug dog Butch, and he ran Butch past the boxes to see
19 if he could smell narcotics.  Butch ran past the five
20 boxes and did not alert.
21 Q  What did you then do?
22 A  Task Force Officer Menchaca and Butch then left
23 the area and I asked Miss Jones if she would pick a
24 box and place the currency inside the box.  Miss Jones
25 walked up to one of the boxes, put the currency in the

Page 252

1  box and closed the lid.  A little while later Task
2  Force Officer Menchaca returned with the same dog.  He
3  ran the dog on the boxes and the dog stopped and
4  aggressively alerted on the box which contained the
5  currency.  And that's what happened.
6  Q  Just to clarify one thing, Detective Chavez.  The
7  driver's license that I believe I wrote down from your
8  report, is that correct?
9  A  Yes.
10 Q  Is that the driver's license that's in your
11 report?  Do you need to refresh your recollection
12 again?
13 A  Yes.
14 Q  Okay.  I'm showing you government's exhibit 44
15 again.  Could you give me the driver's license number
16 that driver's license?
17 A  It's the same number.  Five one zero four six one
18 four.
19       MS. MORRIS:  Nothing further at this time,
20 Your Honor.
21            CROSS EXAMINATION
22       BY MS. WAYNE OF ROBERT CHAVEZ:
23 Q  Detective Chavez, in terms of this Hispanic male
24 who you have called Santiago Hernandez, in terms of
25 Mr. Hernandez it was clear to you that this person who

Page 253

1  called herself "Miss Jones" knew this person?
2  A  They appeared to know each other, yes, ma'am.
3  Q  Okay.  From what you observed, it appeared that
4  they knew each other based upon their eye contact and
5  her looking toward him?
6  A  And the talking and the fact that he waited for
7  her.
8  Q  Okay.  And in your experience you felt pretty
9  clear that it appeared to you that they did know each
10 other, regardless of her denial?
11 A  Yes, ma'am.
12 Q  Okay.  Now in terms of this woman who called
13 herself "Miss Jones," you indicated to us that that's
14 what she told you her name was and she had a driver's
15 license, correct?
16 A  That's correct.
17 Q  Now did you actually have an opportunity to run
18 an N. C. I. C. on her?
19 A  Yes, ma'am.
20 Q  And that was done subsequent to you actually
21 taking her into this room?
22 A  Yes, ma'am.
23 Q  Okay.  And the purpose for taking her into the
24 room is that you wanted to interrogate her more about
25 where she was coming from and this money that she had

Multi-Page™

Page 254

1  on her.
2  A  I wanted to talk to her about the currency, yes,
3  ma'am.
4  Q  Okay.  Your feeling was based upon your
5  experience at the airport was that this was money that
6  was related to drugs?
7  A  Yes, ma'am.
8  Q  And that she might even have drugs on her?
9  A  Not really, no.
10 Q  In the beginning I'm talking about.  Before she
11 actually went into the office and lifted her blouse
12 up.  You didn't know whether she had money on her or
13 whether she had drugs on her at that point.
14 A  No, I knew she had currency because she had told
15 us she had currency.
16 Q  Okay.  And I'm sorry, but just in the sequence of
17 events, before she told you that, because you said
18 when she stepped off the plane it appeared to you that
19 she was pregnant?
20 A  Yes, ma'am.
21 Q  Okay.  And based upon that, before there's a
22 conversation about currency you didn't know if she had
23 drugs or currency on her?
24 A  No, I did not.
25 Q  Okay.  You hadn't been provided with that

Page 255

1  information in your investigation?
2  A  No, ma'am.
3  Q  Now when you tell us that -- Well this other Mr.
4  Hernandez, what happened to him?
5  A  He left.  When he went to the office with us, he
6  said he didn't know Miss Jones, didn't know anything
7  about that and so he left.
8  Q  And I'm assuming that you conducted a search on
9  him as well, or requested that?
10 A  No, we talked to him and got him ID'd.
11 Q  Okay.  In terms of your investigation, Detective
12 Chavez, I'm assuming that someone followed him to the
13 parking lot or to his car to determine whether or not
14 he might have had drugs that she was coming to buy the
15 drugs or something?
16 A  No, ma'am.
17 Q  Okay.  Now in terms of the dog, Butch I think you
18 said, when Butch alerted, are you aware of at the time
19 of this stop with Miss Jones, are you aware of how
20 many false positives that Butch had alerted to?
21 A  I'm not aware of how many false positives, but I
22 know that Butch was one of the best drug dogs we had.
23 Q  Okay.  Well when you say "one of the best drug
24 dogs" you had, Butch certainly, though, had at times
25 made false positives where he alerted on something

Page 256

1  that hadn't been related to drugs.
2  A  Yes.
3  Q  Okay.  Because the dogs that are used and are
4  employed are trained to sniff out what they believe
5  are drugs but sometimes they're wrong.
6  A  Right.
7  Q  Okay.  Now when a dog alerts on money that they
8  believed or they give a positive alert, that simply
9  tells you that perhaps the money has been around
10 drugs, correct?
11 A  Yes.
12 Q  Somebody that had been handling drugs could have
13 touched the money, correct?
14 A  Yes.
15 Q  In fact, I might get money if I were -- if
16 someone were to give me money for something and if in
17 fact it had been passed through someone who had been
18 around drugs, I could have money that could be alerted
19 on, correct?
20 A  I guess.  I'm not a dog handler.  I don't know.
21 Q  All right.  Well I understand you're not a dog
22 handler, but you're used to money being transferred
23 and you know that that can happen.
24 A  Yes, ma'am.
25 Q  Okay.  So in terms of your investigation, my

Page 257

1  understanding is, from the D. E. A., is that that may
2  give you an indication but you certainly want to
3  follow up on that to get more evidence.
4  A  Yes, ma'am.
5  Q  And in this particular situation the money was
6  taken off Miss Jones and it was forfeited as you've
7  explained to us.
8  A  Yes, ma'am.
9  Q  Miss Jones never came back to you and asked for
10 the money?
11 A  To my knowledge, no, she did not.
12 Q  Okay.  And in your experience in terms of
13 forfeiture, sometimes someone will come back and claim
14 the money.
15 A  Yes.
16 Q  Sometimes that's done by being able to show
17 receipts or something else in terms of the money.
18 A  Yes, ma'am.
19 Q  And in terms of this money that was taken,
20 Detective Chavez, there was nothing unique in terms of
21 an identifying feature such as someone had written
22 their name on the money, it wasn't packaged with
23 someone's name on it or anything like that?
24 A  There was no name, but the manner in which it was
25 concealed and transported --

Multi-Page™

Page 258

1 Q  Okay. But I'm simply saying in terms of
2 identifying whose money it was, there wasn't anything
3 like that?
4 A  No, ma'am.
5 Q  Now sometimes, though, you can employ a technique
6 in terms of attempting to get identifying features off
7 of money. It was in an envelope, correct?
8 A  Yes, ma'am.
9 Q  Okay. You can lift fingerprints off the
10 envelopes to determine who has been handling those
11 envelopes.
12 A  Yes, ma'am.
13 Q  Are you aware of in this case whether or not
14 those particular envelopes were fingerprinted?
15 A  They weren't fingerprinted.
16 Q  Okay. I have no further questions. Thank you,
17 Detective Chavez.
18      THE COURT: Mr. Teague?
19      MR. TEAGUE: No questions, Your Honor.
20      THE COURT: Any redirect?
21      MS. MORRIS: I don't think so, Your Honor,
22 thank you.
23      THE COURT: Thank you. You may step down.
24      (Whereupon the witness, Robert Chavez,
25 stepped down from the stand.)

Page 259

1      MS. MORRIS: The government calls Oscar
2 Menchaca.
3      THE COURT: Oscar Menchaca.
4      O S C A R    M E N C H A C A,
5 the witness herein, having first been duly sworn or
6 affirmed to tell the truth, was examined and testified
7 as follows:
8           DIRECT EXAMINATION
9      BY MS. MORRIS OF OSCAR MENCHACA:
10      MS. WAYNE: Judge, before Agent Menchaca
11 actually testifies, I would object as it simply being
12 cumulative. I think it's going to be the same thing.
13 We're not disputing what the prior officer said with
14 what Ms. Jones supposedly told them. So I think that
15 it's cumulative and I would renew my prior --
16      THE COURT: Well subject to your objections
17 to the prior officer's testimony, other than that you
18 really don't --
19      MS. WAYNE: Exactly. And I'd renew the same
20 objection as to this.
21      THE COURT: Right.
22      MS. WAYNE: If they're not disputing
23 anything about the dog's credentials or anything like
24 that, quite frankly, we can go on to the next witness.
25      MS. WAYNE: Judge, I didn't say anything

Page 260

1 about the dog's credentials.
2      MS. MORRIS: Well whether he's been trained
3 and that sort of thing, because this is the dog
4 handler. If they're not disputing that, if they're
5 stipulating that the dog was a certified trained
6 canine that hit on the odor of drugs on the money --
7      MS. WAYNE: I thought he was going to go
8 into more statements, but hold on.
9      THE COURT: Okay.
10      (Whereupon, Ms. Wayne conferred with other
11 defense counsel off the record and out of the hearing
12 of the other courtroom participants.)
13      MS. WAYNE: Judge, no problem. We'd agree
14 to that.
15      THE COURT: Okay.
16      MS. MORRIS: Just to be clear, that the
17 defense will stipulate that the dog that hit on the
18 money on November 2nd, 1995 did smell or detect the
19 odor of narcotics on that money that day, that it was
20 a certified drug canine?
21      THE COURT: Yes. And of course they have a
22 contention that a lot of money will --
23      MS. MORRIS: And I understand that.
24      THE COURT: Right.
25      MS. WAYNE: Your Honor, no problem.

Page 261

1      THE COURT: Okay. Do you still wish this
2 witness?
3      MS. MORRIS: I think that's really it.
4      THE COURT: Great. You stay step down.
5 Let's move on.
6      (Whereupon the witness, Oscar Menchaca,
7 stepped down from the stand.)
8      MS. MORRIS: Sorry we made you come all this
9 way.
10      The government calls Curtis Jones.
11      MS. WAYNE: Judge, we're now going to go
12 into another incident, so I have to make another
13 objection outside the presence of the jury.
14      THE COURT: Okay. Sorry, members of the
15 jury. I know this seems exasperating to you, but as I
16 said it's important to both sides that things are done
17 properly. But this is important. Of course you all
18 get to stand and stretch, I don't.
19      (Whereupon, the jury was escorted out of the
20 courtroom and the following colloquy ensued):
21      MS. WAYNE: Thank you, Judge, I appreciate
22 it.
23      What I'm going to do is, I'm going to call
24 this portion of the Mississippi stop as related to --
25      THE COURT: What's he going to testify to?

**Page 262**

1  I have no idea.
2      MS. WAYNE: That's what I'm telling you.
3      THE COURT: Okay.
4      MS. WAYNE: This is the Mississippi stop
5  that we referred to in regards to Sandra Jones and
6  supposedly using Mr. Carmichael's truck. And that she
7  was arrested and prosecuted and pled guilty as a
8  result of this.
9      THE COURT: Right.
10     MS. WAYNE: The next set of witnesses have
11 to do with that stop and that arrest. She made a
12 number of statements. So I need to just renew this
13 objection, because there are a lot of detailed
14 statements. In fact she pleads guilty, and so forth.
15     THE COURT: These are statements made by
16 Miss Jones?
17     MS. WAYNE: Yes.
18     THE COURT: How are they in furtherance of
19 the conspiracy?
20     MS. MORRIS: I'm a little confused about
21 what statements counsel is referring to.
22     THE COURT: Why don't you tell me what he's
23 going to say.
24     MS. MORRIS: The gist of it in a nutshell is
25 that they pulled her over in one of the defendant's

**Page 263**

1  trucks and they found marijuana in it. They found
2  some other documents relating to the defendant, or
3  tying the truck back to the defendant, an address book
4  and there will be some pictures offered of the truck.
5  But I don't, in fact --
6      THE COURT: You don't expect the statements
7  by Ms. Jones to come in?
8      MS. MORRIS: I don't think so. If she's
9  talking about statements made when she pled guilty and
10 all of that sort of stuff, we don't plan on going into
11 any of that.
12     THE COURT: Right. Okay.
13     MS. WAYNE: That's perfect, because I didn't
14 know if there were going to be. But the documents
15 that were found in the truck, Judge there's an address
16 book that I know of and the other documents. I have a
17 hearsay objection to the documents being read or
18 admitted for any purpose because we don't know what
19 they stand for.
20     THE COURT: What documents?
21     MS. WAYNE: There's an address book that was
22 found as a result of the arrest of Miss Jones.
23     THE COURT: Are you intending to address
24 that address book?
25     MS. MORRIS: Yes, Your Honor. In that

**Page 264**

1  address book there is a number for Multi-Investments
2  and other coconspirators that actually haven't been
3  mentioned yet, but will be -- or one of the
4  coconspirators. Lisa Jones is in there, that's one
5  that has been mentioned. There is a person by the
6  name of Joseph Lacey who we may want to add to the
7  list that will be mentioned that's also in this
8  address book. So we do plan on offering it.
9      THE COURT: When did he get the address
10 book?
11     MS. MORRIS: Back in '97 when it came out of
12 the car.
13     THE COURT: This is what they found in the
14 car?
15     MS. MORRIS: In the truck. I'm sorry.
16     THE COURT: In the truck. And you want to
17 show that these names were in the address book.
18     MS. MORRIS: Right. It shows that this
19 person was -- that these people in the address book,
20 as well as the person that was driving Mr.
21 Carmichael's truck, are all associated and are all
22 part of this conspiracy.
23     THE COURT: What's your objection?
24     MS. WAYNE: My objection is hearsay. We
25 have no idea who the writer of the addresses are. Who

**Page 265**

1  they belong to. She didn't make any statements saying
2  that's my address book. There's never been any
3  handwriting analysis to show Sandra Jones wrote these
4  particular names, so they're not significant. They're
5  completely irrelevant. It's somebody's address book.
6      THE COURT: How does the address book
7  constitute hearsay, though?
8      MS. WAYNE: Well there are names of people
9  written for the purpose, because they're going to
10 argue for the purpose of showing connection. So they
11 are actually being --
12     THE COURT: Why isn't it just enough to show
13 that the names were in the book in the truck that she
14 was in and that's it?
15     MS. WAYNE: Well without being able to
16 actually confront the person who wrote the names out
17 and what the significance of writing those names are,
18 Judge, we don't get to confront. They don't have any
19 meaning. They don't speak for themselves. They want
20 to make it speak for themselves by using it as a
21 theory, but it does not speak for itself.
22     THE COURT: I'll reserve ruling on the
23 address book. I just need to think about it for a
24 moment. But we can go ahead and do everything except
25 the address book right now.

Page 266

1    MS. MORRIS: Your Honor, I mean --
2    THE COURT: I just need to think about it,
3  that's all. Unless there is something else you want
4  to say about that, that I haven't heard?
5    MS. MORRIS: I was just going to say, Your
6  Honor, that under Miss Wayne's theory, the person who
7  physically put the dope in the truck would have to be
8  here in order to, you know, testify that that's
9  actually the person that put the dope in the truck.
10  If we have to have the person who actually wrote the
11  address book to testify as to why they wrote it, then
12  why not -- I mean you take that back to the nth
13  degree, to infinity, and we'd never get anywhere.
14    THE COURT: Why isn't that true, Miss Wayne?
15  Why isn't it just evidence just like the dope?
16    MS. WAYNE: I think that when you're talking
17  about an illegal substance, there can be an inference
18  to it in terms of its illegality. An address is
19  nothing. It doesn't say anything, Judge. Again, it
20  doesn't speak for itself, it's simply a writing that
21  doesn't purport to be anything unless you have the
22  maker of the address book.
23    THE COURT: I'll let you know.
24    Bring the jury in.
25    Don't get to the address book yet. I need

Page 267

1  to think about it a bit.
2    Oh, could you hold the jury for just a
3  second?
4    Counsel, I think there is something you
5  definitely should look over the weekend, and I
6  would like your views on it. I read the defendant's
7  brief on Crawford. I don't think that -- My
8  preliminary assessment is I don't think Crawford
9  applies to coconspirator statements in general.
10  However, I do have some concerns about the application
11  of Crawford to a coconspirator's statement made to a
12  police officer.
13    Essentially, I see a conflict between
14  Crawford and the two cases, Inidi and Bourjaily, in
15  the sense that Crawford says statements made to the
16  police are subject to the confrontation clause, and
17  Inidi and Bourjaily say coconspirator's statements in
18  furtherance of the conspiracy are not subject to the
19  confrontation clause.
20    Now I'd like to know if there is a case out
21  there already. I wouldn't be surprise of the court
22  had looked at this already. I think it's a pretty
23  clear conflict, and I haven't had a chance to resolve
24  it. I've allowed the statement in, I just have to
25  know what to do with it if I'm wrong. But I would

Page 268

1  like something on Monday as to that. I see a clear
2  contradiction between the two cases. My clerks will
3  look at it too, but you can help us research it.
4    Anyway, we're ready to proceed?
5    Bring in the jury.
6    (Whereupon, the jury was escorted into the
7  courtroom.)
8        C U R T I S   J O N E S,
9  the witness herein, having first been duly sworn or
10  affirmed to tell the truth, was examined and testified
11  as follows:
12        DIRECT EXAMINATION
13    BY MS. MORRIS OF CURTIS JONES:
14  Q  Would you state your name for the jury and, I
15  guess, spell your last name.
16  A  My name is Curtis Jones. J-o-n-e-s.
17  Q  And, Mr. Jones, where are you employed presently?
18  A  I work for the Mississippi Bureau of Narcotics.
19  Q  How long have you been with the Mississippi
20  Bureau of Narcotics?
21  A  I have been there four years.
22  Q  Where were you before you were with the
23  Mississippi Bureau of Narcotics?
24  A  I was eight years with the Mississippi Department
25  of Transportation.

Page 269

1  Q  And were you with the Mississippi Department of
2  Transportation back in '97, more specifically on July
3  29th of 1997?
4  A  Yes, ma'am.
5  Q  And what were you doing, or what were your duties
6  when you were with the Mississippi Department of
7  Transportation at that time?
8  A  I was the chief investigator with the Mississippi
9  Department of Transportation taking care of Internal
10  Affairs, outside investigations, and I implemented and
11  ran the drug interdiction team that we started in
12  about '95.
13  Q  Let's talk about that drug interdiction team.
14  How many people did you have on your drug interdiction
15  team?
16  A  Not including myself there were seven.
17  Q  Were these all Mississippi Department of
18  Transportation agents?
19  A  Yes, they were all officers.
20  Q  And what exactly did this interdiction team do?
21  A  We were tasked with trying to take contraband off
22  of the highways.
23  Q  When you say "contraband," what do you mean
24  exactly?
25  A  Well, surely illegal drugs, the movement of large

Page 270

1  amounts of cash, other things that in and of
2  themselves are illegal.
3      THE COURT: Could I see counsel for just a
4  minute, Miss Morris? I have a question off the
5  record.
6      (Whereupon, Ms. Morris and Ms. Wayne
7  conferred with the Court at the bench off the record.)
8  Q Now I think we were discussing the drug
9  interdiction team that you spearheaded with the
10 Mississippi Department of Transportation. Did you
11 have at this time in '97, did you have any training in
12 interdiction?
13 A Yes, I did. In 1994 I attended a week long class
14 at the Regional Counter Drug Training Academy in
15 Meridian, Mississippi. And this taught us
16 interdiction on the highway and several other things,
17 but at that time they were talking about ninety
18 percent of it is cars and about ten percent of it is
19 big trucks. And since the Department of
20 Transportation Office of Enforcement is tasked with
21 only commercial vehicles --
22 Q So you only deal in commercial tractor-trailer
23 trucks basically?
24 A Right. Anything over twenty six thousand pounds,
25 and including U-Haul trucks, Ryder, things like that.

Page 271

1  So I looked around for a program that would teach our
2  department more about commercial vehicles. And I
3  found that in the U. S. Department of Transportation's
4  Drug Interdiction Assistance Program. They came in
5  and gave us two separate training classes.
6      And then in '96 they took me and several
7  other officers from around the country and Canada and
8  taught us for a week to be instructors in this
9  interdiction. So since then I have been a staff
10 instructor for this program that is a nonpaid
11 position.
12 Q And when you say an "instructor for this
13 program," this is an interdiction program only for
14 commercial tractor-trailer trucks?
15 A Correct.
16 Q Okay.
17 A We teach just the tractor-trailers, and we also
18 are a part of the D. E. A. Operation Pipeline convoy.
19 Q What is that?
20 A That is interdiction, legal -- It's a three day
21 program that they go through upon sponsored usually by
22 the U. S. Attorney's Office in the region where it's
23 given. And I'm an instructor for that, along with
24 several other officers.
25      Since '96 I've instructed over seven

Page 272

1  thousand police officers across the United States and
2  Canada in drug interdiction, including all of the
3  officers that were on the Mississippi Department of
4  Transportation during that time.
5  Q So you have been instructing the officers that
6  were working for you in 1997 as well?
7  A Yes, I did.
8  Q Now on July 29th of 1997 were you in fact working
9  an interdiction detail?
10 A Yes. There were three units, including myself.
11 A two person car with Officers Jones and Coker. A
12 canine unit with Officer Mica Shea and his canine
13 Major, and myself.
14 Q And when you say Officer Jones this is not you,
15 this is another Jones.
16 A This is another Jones and I'm not related to him.
17 Q Okay. Now where were y'all detailed?
18 A All right. We were working the I-20 and U. S. 80
19 corridor on the eastern side of the state, on the
20 eastern side of Meridian.
21 Q We're talking about Mississippi?
22 A We're talking about Mississippi right on the
23 Alabama line.
24 Q Okay?
25 A At that place there are two scales on Interstate

Page 273

1  20. These are truck weigh scales, and there is one on
2  old Highway 80.
3  Q Where does old Highway 80 go?
4  A At that point it runs from -- at that point it
5  runs from Keywani (ph.), Mississippi across to Cuba,
6  Alabama.
7      That night myself and the canine officer
8  stayed at the old scales on Highway 80 and sent the
9  other unit over to the Interstate scales to work. We
10 wanted to keep the canine out of sight of most of the
11 traffic because once they see the dog, then it's all
12 over the radio and it's all over. So we were working
13 that old scale which doesn't get a lot of traffic at
14 that time of night. This was about eight o'clock in
15 the evening.
16 Q Now while you were working on the Highway 80
17 scales, did you come into contact with a
18 tractor-trailer truck with "Multi-Investments, Inc."
19 on the side?
20 A Yes, we did. It came across and stopped at the
21 scales to be weighed. And while it was being weighed
22 I instructed the scale officer who was on duty to park
23 the truck across the road, tell the driver to park it
24 across the road because we wanted to look at it.
25 Q Why did you want to look at this particular

Multi-Page™

Page 274

1 truck?
2 A   When I saw the truck, Multi-Investments is not a
3 company at that time that I was familiar with. The
4 cab of the truck had looked like it had fingerpainting
5 or a hand-painted sign on the side of the door. It
6 was an older second or thirdhand looking tractor,
7 because you could see the older signs on the door
8 where they fade in. And on the trailer itself was a
9 secondhand because it had "Burgess" written all across
10 it that was real faded, and that Burgess was a company
11 at that time that had gone bankrupt I think.
12       So secondhand truck, secondhand trailer, a
13 company that I had never seen before and I was pretty
14 familiar with the traffic going through there because
15 we worked that corridor a lot. And the sign on the
16 side, that was unique.
17       MS. MORRIS: May I approach, Your Honor?
18       THE COURT: Yes.
19 Q   Agent Jones, I'm showing you what's been
20 previously marked as government's exhibit 32(a) and
21 32(b). Do you recognize these?
22 A   Yes, I do.
23 Q   And what are they?
24 A   They are the pictures that I took that night of
25 the cab and the door signs on the cab of the

Page 275

1 Multi-Investment truck that we stopped.
2 Q   Now are these two pictures of the same thing?
3 A   Yes. What I was trying to do, I always take --
4 try to take duplicates, especially at night because if
5 you're looking at one picture there is a flash right
6 in the Center of it and it makes it hard to read so I
7 moved it a little bit. With a thirty-five millimeter,
8 I wanted to make sure that I was getting good
9 pictures. I took a look at them like through a
10 digital camera.
11 Q   Do these pictures fairly and accurately depict, I
12 guess the cab of the truck as you saw it on that
13 night?
14 A   Yes, they depict the door of the cab, yes.
15       MS. MORRIS: At this time we'd move to admit
16 32(a) and 32(b) into evidence.
17       THE COURT: Admitted.
18       MS. MORRIS: Permission to publish, Your
19 Honor?
20       THE COURT: Yes.
21 Q   This is the side of the tractor-trailer truck, is
22 that correct?
23 A   Yes, it is.
24 Q   Now once you stopped the truck, did you go up to
25 the side of the truck?

Page 276

1 A   I didn't go at that time. Officer Shea went up
2 and talked with the driver.
3 Q   And eventually did you get the driver's license
4 and the bill of lading from the driver?
5 A   Yes, we did.
6 Q   Did you obtain that, or did Officer Shea?
7 A   Officer Shea obtained that.
8 Q   Have you seen the driver's license?
9 A   Yes, it was listed to Sandra Jones.
10       MS. MORRIS: May I approach, Your Honor?
11       THE COURT: Yes.
12 Q   I'm showing you what's been already admitted into
13 evidence as government's exhibit 44. Do you recognize
14 the person in that picture?
15 A   Yes. That is Sandra Jones. She was a lot
16 thinner faced seven years ago.
17 Q   Agent Jones, can you tell us what is the driver's
18 license number off of that particular exhibit?
19 A   Okay. Driver's license number is five one zero
20 four six one four.
21 Q   Now, Agent Jones, I'm showing you what's been
22 previously marked as government's exhibit 49(c).
23 Would you tell us what that is?
24 A   That is a xerox copy of the Alabama license that
25 we obtained from Sandra Jones that night.

Page 277

1 Q   Okay.
2 A   And a copy of the temporary driver's license that
3 was obtained at the same time in Sandra Jones's name.
4 Q   And what is the driver's license number off of
5 that copy?
6 A   Five one zero four six one four.
7 Q   Does that copy fairly and accurately depict the
8 driver's license that you took off of Miss Jones that
9 night?
10 A   Yes, it does.
11       MS. MORRIS: At this time we'd move to admit
12 government's exhibit 49(c) into evidence.
13       THE COURT: Admitted.
14 Q   Once you took the driver's license, and I believe
15 you said -- What else you take from her that night?
16 A   The bill of lading.
17 Q   And what is a bill of lading?
18 A   That is required by the Department of
19 Transportation. Each trailer has, if it's a
20 commercial carrier, has to show the contents of the
21 load being carried. And a bill of lading reflects
22 what's supposed to be in that trailer.
23 Q   Okay. I'm showing you what's been previously
24 marked as government's exhibit 49(d). Do you
25 recognize that?

Page 278

1 A  Yes, I do.
2 Q  And what is it?
3 A  That is the bill of lading that we obtained from
4 Sandra Jones that night.
5 Q  And is that the same -- it's a copy of what y'all
6 obtained from her?
7 A  Yes, it is a copy.
8 Q  Has it been changed or altered in any form or
9 fashion?
10 A  No, ma'am.
11      MS. MORRIS:  At this time we'd move to admit
12 government's exhibit 49(d) into evidence.
13      THE COURT:  Admitted.
14      MS. MORRIS:  Permission to publish?
15      THE COURT:  Yes, you may do so.
16 Q  According to this bill of lading, and I would say
17 that you're probably much more skilled at reading
18 these things than I am, what was supposed to be on
19 this shipment?
20 A  Oranges.
21 Q  Did you find oranges on the shipment?
22 A  Yes, we did.
23 Q  And where was this going?
24 A  This was going to Deerfield Beach, Florida.
25 Q  And did the bill of lading depict where the load

Page 279

1 was picked up?
2 A  Clovis, California.
3 Q  Okay.  And once y'all got the driver's license
4 and bill of lading from Miss Jones, what did you do
5 then?
6 A  We asked her for permission to look at her load.
7 When she gave us the bill of lading and told us that
8 she was hauling oranges to Florida, I became
9 suspicious because Florida has oranges.  I was unaware
10 at the time the difference between California eating
11 oranges and Florida's orange juice making oranges.
12 And also questioned why if she's going to Florida, why
13 is she on Interstate 20.
14      She came out of California.  Actually she
15 told us that she had swapped trailers in Las Crusas,
16 New Mexico with another driver.  And if you're going
17 to Florida, when you get east of El Paso, it splits,
18 I-10 and I-20, and the smartest way and the shortest
19 way is to go I-10 down along the coast and go through
20 Alabama, Mobile and go to Florida.  What was she doing
21 on Interstate 20?  And she said that she was going to
22 Montgomery where the company was located and another
23 person would take the load on to Florida.
24 Q  And did you then ask her for consent to search?
25 A  I did, and she gave us consent.  We walked to the

Page 280

1 back of the truck and she opened the doors for us,
2 myself and Officer Shea.
3 Q  Did you then begin a search of the rear of the
4 tractor-trailer truck?
5 A  Officer Shea did.  I stayed on the ground at the
6 back of the truck talking with Miss Jones.
7 Q  And what exactly did he find?
8 A  Up in the load about three-quarters the way up on
9 one side were suitcases.
10 Q  Let me back you up just a little bit, Officer
11 Jones.  When you opened the doors of the
12 tractor-trailer truck, did you see inside of the
13 truck?
14 A  Yes, I did.
15 Q  Did you see how the boxes were stacked?
16 A  The boxes were stacked in -- like a stadium
17 seating, higher down to lower as you get toward the
18 back.
19 Q  Let me back you up a little bit farther.  I'm
20 sorry to interrupt you again, but in your experience
21 working with the Department of Transportation and
22 working with these tractor-trailer trucks, do you know
23 how normal boxes or how often do you see boxes stacked
24 -- Let me back up.
25      How are boxes normally stacked in a

Page 281

1 tractor-trailer truck?
2 A  If they're hauling a refrigerated load, which
3 this was, they would not be stacked close to the
4 walls, they would be outside and on pallets outside of
5 the walls so that air could circulate from the
6 refrigerated unit in the front blowing toward the back
7 doors bouncing off them and circulating under the load
8 to keep all of the load at the same temperature.  And
9 when we saw these they were stacked solid and in stair
10 step fashion up.
11      Then there were on pallets, there were like
12 one or two pallets wide with spaces on either side on
13 up in the trailer, which would have been normal as you
14 get further in the trailer.  But the back end of the
15 truck was not stacked normally.
16 Q  Okay.  And did this clue you into anything
17 initially?
18 A  Yes.  My suspicions were further found that there
19 might be something that we needed to look at.  So
20 Officer Shea proceeded into the truck with a search
21 without the dog, and I stayed on the ground and talked
22 with Miss Jones.
23 Q  Did he eventually find anything?
24 A  Yes.  He found suitcases up in that void on the
25 side of the trailer.

Multi-Page™

1 Q  Okay.  I'm showing you what's been previously
2 marked as government's exhibit 32(e).  What is that?
3 A  That is the void in the boxes of oranges where
4 the suitcases with the marijuana was found.
5 Q  And does this picture fairly and accurately
6 depict the screen as you saw it on July 29th?
7 A  Yes, it does.
8        MS. MORRIS:  At this time we would move to
9 admit government's exhibit 32(e) into evidence.
10        THE COURT:  Admitted.
11        MS. MORRIS:  Permission to publish, Your
12 Honor?
13        THE COURT:  Yes.
14 Q  Now, Agent Jones, if you point to your screen
15 there will be an arrow or a green mark.  Could you
16 point roughly where the bags or the duffel bags were
17 found?
18 A  Right there on the floor.
19 Q  Right in that area?
20 A  Yes.
21 Q  Could you describe for the jury what the duffel
22 -- or what these bags looked like?
23 A  They were -- looked to be brand new suitcases or
24 duffel bags.  And when we took them out, they still
25 had the tags on them that looked like they had been

1 bought at Wal-Mart.
2 Q  What color were they?
3 A  They were black.
4        MS. MORRIS:  Your Honor, permission to
5 approach?
6        THE COURT:  Yes.
7 Q  Agent Jones, I'm showing you a series of
8 pictures, actually, 3(h), first of all.  Do you
9 recognize that?
10 A  Yes, that's me with the bags with the marijuana
11 in it.
12 Q  And this picture fairly and accurately depicts
13 the bags --
14 A  Yes, it does.
15 Q  -- as you saw them on the night of July 29th.
16 A  Yes.
17        MS. MORRIS:  At this time, Your Honor, we'd
18 move admit government's exhibit 32(h).
19        THE COURT:  Admitted.
20 Q  Now eventually did you open up these bags?
21 A  Yes, we did.
22 Q  And how did you determine what was in them?
23 A  We stuck a knife in the packages.  They were
24 double and triple wrapped with Saran Wrap, and I
25 believe they had grease on them within the layers, and

1 they were wrapped very tightly, three or four times.
2 So we just stuck a knife in it to determine what we
3 had.
4        The color of the packages I thought at one
5 time that it might have been cocaine, but we found
6 that it was marijuana.
7 Q  Okay.  Agent Jones I'm showing you what's been
8 previously marked as government's exhibit 32(f), 32(g)
9 and 32(i).  Do you recognize those?
10 A  Yes.
11 Q  What are they?
12 A  One is a picture of myself and Officer Shea.
13 Q  For the record, you're referring to?
14 A  32(f).  It's a picture of myself and Officer Shea
15 with the marijuana outside of the packaging, the
16 packaging behind us with the marijuana stacked up in
17 front of us.
18        32(g) is a picture of us opening the bags
19 wearing gloves to find out what was in them.
20        32(i) is a picture of the bag open with the
21 package of marijuana.
22 Q  And these pictures fairly and accurately depicts
23 the bags and the marijuana as you saw them on July
24 29th, 1995?
25 A  Yes, they do.

1 Q  I'm sorry, July 29th, 1997.
2 A  1997.
3 Q  Sorry about that.
4        MS. MORRIS:  At this time we'd move to admit
5 government's exhibits 32(i), 32(f) and 32(g) into
6 evidence.
7        THE COURT:  They're all admitted.
8        MS. MORRIS:  Permission to publish, Your
9 Honor?
10        THE COURT:  You may do so.
11        When you are ready to reach that other
12 matter, I'll have to excuse the jury for just a minute
13 to resolve it.
14        MS. MORRIS:  Okay, Your Honor.  This would
15 be as good time as any.  But as soon as they see the
16 pictures, though.
17        THE COURT:  Okay, as soon as they see the
18 pictures.
19        (Whereupon, said photographic exhibits were
20 published amongst the jurors.)
21        THE COURT:  Members of the jury, it will be
22 just a couple of minutes.  Very quick.
23        (Whereupon, the jury was escorted out of the
24 courtroom, and the following colloquy ensued):
25        THE COURT:  The question before the Court is

1 the admissibility of the address book, and in
2 particular the names in the address book. The names
3 in the address book are not hearsay for the same
4 reasons that names in a pager or cell phone are
5 typically not hearsay. The evidence is admissible
6 simply to show that the person possessing the address
7 book, the pager or the cell phone had the names, and
8 was thus connected in some way to the names.
9      In support of this ruling I cite a number of
10 cases. The first one is United States versus
11 Theodore, a Tenth Circuit case, (1993), at 995 F.2d
12 964 where the Court held that the trial court erred in
13 overruling objections to the admission of papers
14 containing a formula for making methamphetamine, a
15 list of precursor chemicals and a recipe to cook crack
16 cocaine, all of which were found in a briefcase. The
17 Court said that the papers were not hearsay because
18 they were not admitted for the purpose of proving the
19 truth of any matters asserted, they were admitted
20 solely to permit the inference to be drawn that Wicks,
21 W-i-c-k-s, was involved in drug trafficking.
22      While some amount of reading or
23 comprehending of the nature of the written material
24 was required in order to identify them as drug
25 related, no further use was made of the contents of

1 those materials.
2      And then in another case, United States vs.
3 Markopolus, M-a-r-k-o-p-o-l-u-s, a 1988 Tenth Circuit
4 case at 848 F.2d 1036, the Court held that a spiral
5 notebook which was used to log travel expenses was not
6 hearsay when admitted only to link the defendants
7 circumstantially to a conspiracy. Actually, this case
8 cites a whole slew of cases. I won't go into those.
9 You can read all the cases that are cited there for
10 the proposition about notebooks and whatever.
11      One other case I would cite, though, is
12 United States versus Jaramillo-Suarez, which is a
13 Ninth Circuit case, 950 F.2d 1378. It's a 1991 case.
14 And I won't go into that. It substantially stands for
15 the same proposition about documents that are merely
16 used to connect someone and show that they were just
17 knowledgeable about the person or the events or
18 whatever.
19      So the objection is overruled and you can
20 bring in the jury.
21      MS. MORRIS: Judge, could we take a couple
22 of minutes?
23      THE COURT: Surely. We'll take a five
24 minute recess.
25      (Whereupon, a recess was taken.)

1 Q Agent Jones, when we left off I believe we were
2 talking about the duffel bags of marijuana that were
3 found in this tractor-trailer truck. When y'all
4 obtained or got the duffel bags out of the
5 tractor-trailer truck, did you weigh the marijuana
6 inside of it?
7 A We weighed them as best we could. An agent with
8 the Mississippi Bureau of Narcotics responded to the
9 scene per our request, and we used the truck sales
10 themselves to weigh his truck empty and then put the
11 sacks or duffel bags of marijuana in the truck and
12 then weighed it again. Now those scales are only good
13 for about a fifty pounds difference because they don't
14 weigh exactly to the pound, so we thought it was about
15 two hundred pounds.
16 Q Okay. And eventually did you Miranda-ize Ms.
17 Jones?
18 A Yes, we did.
19 Q And did she sign a refusal?
20 A Yes, she refused to talk with us and I believe
21 also refused to sign.
22      MS. MORRIS: May I approach?
23      THE COURT: Yes.
24 Q Agent Jones, I'm showing you what's been
25 previously marked as government's exhibit 32(d) as in

1 David and (c) as in Charlie. Do you recognize those?
2 A Yes. Those are pictures of the Alabama tags on
3 the truck and the trailer that we stopped that night.
4 Q Okay. And could you for the record call out the
5 license plate.
6 A Exhibit 32(d) shows Alabama a portion license X
7 as in x-ray eight eight eight eight zero seven.
8 Q Three eights zero seven?
9 A There are actually four eights zero seven.
10 Q And that's for the tractor or the trailer?
11 A That is for the tractor.
12 Q Okay. And are there other license plates?
13 A Yes. There is another license plate below it and
14 it does not show the state. It says N as in Nora, V
15 Victor G George four zero nine.
16 Q Okay. And what is the license plate on the
17 trailer?
18 A Exhibit 32(c) Alabama license T as in Tom eight
19 zero nine two nine.
20 Q The pictures, do they accurately depict the
21 license plates as you saw them on the night that we're
22 discussing?
23 A Yes, they do.
24      MS. MORRIS: We'd move to admit 32(c) and
25 32(d) into evidence.

Multi-Page™

Page 290

1   THE COURT: Admitted.
2 Q   Now, Agent Jones, once you had found the
3 marijuana, did you then commence a search of the cab
4 of the truck?
5 A   Yes. I asked officers Tex Jones and Clyde Coker
6 to search the cab.
7 Q   And did y'all find some documents in the cab?
8 A   Yes, we did.
9 Q   Go ahead.
10 A   Officer Jones found an address book, which he
11 copied.
12 Q   Okay. I'm showing you what's been previously
13 marked as government's exhibit 49(a) as in apple.
14 Take a minute and look at that if you don't mind,
15 Agent Jones.
16 A   Yes.
17 Q   Do you recognize that?
18 A   Yes, I do. It's a copy of the address book that
19 was copied that night that we stopped them.
20 Q   Has that copy been changed or altered in any way?
21 A   No, it has not.
22 Q   And does it fairly and accurately depict the
23 actual address book as y'all saw it on that night?
24 A   Yes, it does. It does not show the outer covers,
25 the pictures that I have here, but the inside with the

Page 291

1 names and addresses are true, to the best of my
2 knowledge.
3      MS. MORRIS: Your Honor, at this time we'd
4 move to admit government's exhibit 49(a) into
5 evidence.
6      THE COURT: Admitted.
7 Q   Agent Jones, I'd like to direct your attention to
8 a couple of entries in this address book.
9      MS. WAYNE: Judge, I am going to object to
10 this. I think the agent, it's inappropriate for him
11 to testify about certain things and highlight certain
12 evidence over other evidence. I think the book is
13 admitted, the jury can look at it.
14      THE COURT: He can actually bring to the
15 jury's attention certain --
16      MS. WAYNE: But it's irrelevant, because he
17 can't -- there is no significance to it because he
18 doesn't have a linkup.
19      THE COURT: Well I assume they will link it
20 up. They can do that later.
21      Go ahead.
22 Q   Agent Jones, on the right side, I have
23 highlighted here a name and a number. Would you read
24 that name and number for me?
25 A   Lisa Jones.

Page 292

1 Q   And the number?
2 A   One eight eight eight four one five two two seven
3 nine.
4 Q   And the first name that's shown on the screen, if
5 you don't mind?
6 A   Joseph Lacey. Five one six three four six eight.
7 And below that eight three four four oh two eight.
8 Q   And, again, could you read what's on the screen
9 now for the jury, please?
10 A   Multi-Investment. One eight hundred nine nine
11 seven nine nine six one. Below that it's five three
12 six nine one six seven. Below that is two eight eight
13 five two, and I can't make that -- the last numeral is
14 nine, I'm not sure if that's a one or a nine next to
15 that. Five two something nine.
16 Q   Okay.
17 A   Below that is fax F X two eight eight five one
18 four six.
19 Q   Thank you, Agent Jones.
20      Now, Agent Jones, did you also take some
21 registrations out of the vehicle?
22 A   Yes, we did.
23 Q   Agent Jones, do you recall the V. I. N. numbers
24 on the tractor and the trailer from that night?
25 A   No, ma'am, I do not.

Page 293

1 Q   Would it help you if I handed you the report from
2 that night to refresh your recollection?
3 A   Yes.
4      MS. MORRIS: Your Honor, may I approach?
5      THE COURT: Yes.
6 Q   If you could hand it back to me so I can show
7 defense counsel.
8      Could you read off for me the V. I. N.
9 number from the tractor, first of all.
10 A   Four V as in victor, one W William, D David, B
11 boy, C Charles, H Henry, four, R Robert, N Nora, six
12 eight six seven four nine.
13 Q   Could you read off the V. I. N. number for the
14 trailer for me.
15 A   Yes. It's one P as in Paul, T Tom, zero one A
16 Adam, N Nora, H Henry, nine, K King, nine zero zero
17 three eight zero four.
18      MS. MORRIS: May I approach, Your Honor?
19      THE COURT: Yes.
20 Q   Agent Jones, I'm showing you what's been
21 previously marked as government's exhibit 49(f) and
22 49(e) as in Evan. F as in Frank and E as in Evan.
23 Just take a minute to look at those, if you don't
24 mind. What are those 49(e) and 49(f) that I handed to
25 you?

Page 294

1 A They are both copies of international
2 registration apportioned cab card.
3 Q And do you know what these are registrations to?
4 A 49(e) is the registration for the truck that was
5 stopped that night with the Alabama license plate
6 x-ray eight eight eight eight zero seven.
7     49(f) is the middle registration. There are
8 two on here, and one that is X'd out. The middle
9 registration goes for an '89 Great Dane trailer.
10 Q Does that trailer have the same V. I. N. number
11 as the trailer stopped in July?
12 A Yes, it does.
13 Q So the registration for the tractor is for V. I.
14 N. number -- Is it the same V. I. N. number?
15 A Yes.
16 Q Okay. For the record, I'm copying it.
17     And the same V. I. N. number for the
18 trailer, is that right?
19 A Yes.
20 Q Is 49(e) and 49(f), have they been changed or
21 altered in any way since y'all obtained them from the
22 vehicles?
23 A No, they have not been changed.
24 Q And do they accurately depict the registrations
25 as y'all found them on that night?

Page 295

1 A Yes, they do.
2     MS. MORRIS: At this time we move to admit
3 government's exhibits 49(e) and 49(f) into evidence.
4     THE COURT: Admitted.
5     MS. MORRIS: Permission to publish, Your
6 Honor?
7     THE COURT: You may do so.
8 Q I believe I'm showing you exhibit 49(f) which you
9 have already testified is the registration for the
10 trailer, is that correct, Agent Jones?
11 A Yes, that's correct.
12 Q And who is the titled owner of that trailer
13 according to this registration?
14 A Leon Carmichael, Senior.
15 Q And could you again give the address or the
16 mailing address for that person?
17 A Thirty-two twenty-six Brookwood Drive,
18 Montgomery, Alabama, three six one one six.
19 Q Thank you.
20     And I'm showing you, which has been
21 previously identified as government's exhibit 40(e) or
22 the registration for the tractor or the truck that was
23 stopped. Could you tell the grand jury --
24     THE COURT: Not "the grand jury".
25     MS. MORRIS: I'm sorry. Thank you.

Page 296

1 Q -- the jury the titled owner of this vehicle?
2 A Leon Carmichael, Senior.
3 Q And the registrant is who?
4 A Edward Lee Petway.
5 Q Agent Jones, I'm showing you what's been
6 previously marked as government's exhibit 49(g) as in
7 Gary. Do you recognize that?
8 A Yes, I do.
9 Q What is that?
10 A It's an international fuel tax agreement.
11 Q What is an international fuel tax agreement?
12 A In the old days of trucking every state wanted to
13 get their fair share of revenue, so you either had to
14 buy a sticker for each state or you had to pay the
15 mileage that you were going to travel through the
16 state. Say from state line in Vicksburg across to Key
17 Lane at the Alabama line. Several years ago the
18 international fuel tax agreement was put together by
19 all states, and apportioned whatever portion of the
20 fuel tax to each state, if you ran in five states,
21 five southern states, then if you ran five thousand
22 miles they would apportion the fuel taxes to the
23 number of miles per state within those five states.
24 Q So you didn't have to have an individual sticker
25 from each state?

Page 297

1 A That is correct. And you didn't have to stop at
2 the scales every time you came into a state. They
3 gave you two stickers with one showing the state of
4 registration and the year. You put one on each side
5 of the truck. That is the International Fuel Tax
6 Agreement.
7 Q So this vehicle had an International Fuel Tax
8 Agreement?
9 A Yes, it did.
10 Q And is this the International Fuel Tax Agreement
11 that you took out of the vehicle on the night we've
12 been discussing?
13 A Yes.
14 Q And has it been changed or altered in any way?
15 A No, it has not.
16     MS. MORRIS: At this time we'd move to admit
17 government's exhibit 49(g) into evidence.
18     THE COURT: Admitted.
19     MS. MORRIS: Permission to publish, Your
20 Honor?
21     THE COURT: Yes.
22 Q I'm showing you a portion of this International
23 Fuel Tax Agreement. Can you tell the jury who is the
24 licensee?
25 A Multi-Investments, Inc.

1 Q  And the location or the mailing address on that
2 is?
3 A  Two twenty-six Brookwood Drive, Montgomery,
4 Alabama, three six one one six dash three zero one
5 two.
6 Q  And Multi-Investments, Inc. is the same title
7 that you saw on the truck that you stopped, is that
8 right?
9 A  Yes, it is.
10 Q  Now I'm showing you what's been previously marked
11 as 49(h) as in Harry.
12 A  All right.
13 Q  And what is that?
14 A  This is a temporary permit for International Fuel
15 Tax Agreement issued by the state of Alabama.
16 Q  And is this what you took out of the truck on
17 that night?
18 A  Yes, it is.
19 Q  And has it been changed or altered in any way?
20 A  No, it has not.
21      MS. MORRIS: We move to admit government's
22 exhibit 49(h) into evidence.
23      THE COURT: Admitted.
24      MS. MORRIS: Permission to publish, Your
25 Honor?

1      THE COURT: Yes.
2 Q  In whose name is this I. F. T. A. agreement?
3 A  Leon Carmichael, Senior.
4 Q  And the address being?
5 A  Thirty-two twenty-six Brookwood, Montgomery,
6 Alabama, three six one one six.
7      MS. MORRIS: Any could I have one moment,
8 Your Honor?
9      THE COURT: Yes.
10      (Whereupon, Ms. Morris conferred with Mr.
11 Feaga off the record and out of the hearing of the
12 other courtroom participants.)
13 Q  Agent Jones, I'm showing you a portion or a
14 section of the I. F. T. A. Or the International Fuel
15 Tax Agreement. And I'm showing you -- this is a
16 listing, I believe, of all the states.
17 A  That's correct.
18 Q  Based on your experience in the trucking business
19 and your experience with the Mississippi Department of
20 Transportation, is there anything unusual about this?
21 A  Yes, ma'am. The fact that it only lists him as
22 having one truck.
23 Q  If where -- If you can point and show where it
24 only lists one truck.
25 A  In parentheses it shows in every state how many

1 trucks for that company are allowed and covered by the
2 I. F. T. A. sticker.
3 Q  And why is that unusual?
4 A  It's a one truck company.  If a large company
5 like J. B. Hunt, they might have five hundred units,
6 they would show five hundred units on their I. F. T.
7 Aagreement.  In this case one I. F. T. A. license
8 was purchased for one truck.
9 Q  And do you see this often?
10 A  Yes, on smaller companies.
11 Q  How often?  I mean --
12 A  An owner/operator who drives his own truck --
13      MS. WAYNE: Judge, I'm going to object
14 because of lack of foundation.  How often compared to
15 what?  There is no foundation.
16      MS. MORRIS: I'll withdraw it, Your Honor.
17      THE COURT: Okay.
18      MS. MORRIS: I have nothing further at this
19 time, Your Honor.
20          CROSS EXAMINATION
21      BY MS. WAYNE OF CURTIS JONES:
22 Q  Agent Jones, very briefly.
23      All these exhibits that have been admitted
24 appear to indicate a lot of paperwork showing that
25 this is Mr. Carmichael's truck.

1 A  Yes.
2 Q  And it appears to be in compliance with what the
3 regulations were in terms of having your registration,
4 your I. F. T. A., all of those things.
5 A  Correct.
6 Q  Okay.  And it appears from the pictures that have
7 been introduced of the side of the truck, that it was
8 clearly M. and L. investments.  It wasn't being shaded
9 over, it wasn't blackened out, there was clearly an
10 identifying name on the side of the truck.
11 A  Yes.
12 Q  Okay.  And in terms of this bill of lading about
13 hauling the oranges from California to Florida, you
14 indicated to us at the time clearly that seemed
15 suspicious, but it seems like you later found out that
16 hauling the type of oranges that were being hauled to
17 Florida was not that unusual.
18 A  Correct.
19 Q  That that was actually legitimate?
20 A  That's right.
21 Q  Okay.
22 A  I don't eat or partake of oranges so I don't know
23 the difference.  I drink orange juice.
24 Q  It seemed at first, though, that that was clearly
25 an indication that caused you suspicion, but you later

Page 302

1 found out that it was definitely legitimate in terms
2 of the actual hauling of oranges.
3 A  Yes, ma'am.
4 Q  Okay.  Now in terms of your experience in the
5 interdiction that you were doing in Mississippi at the
6 time, it would be fair to say that you ran across
7 truckers who were carrying drugs unknown to the owner
8 of the trucks.
9 A  On some occasions, yes.
10 Q  Sure.  Because what happens is that the owner of
11 the trucks, when the truck leaves their control with
12 these truckers, they trust them as to what they're
13 supposedly doing on the road, correct?
14      MS. MORRIS:  Objection, Your Honor.  This
15 witness can't testify as to what the owners think.
16      MS. WAYNE:  He can testify in his experience
17 about what happens.
18      THE COURT:  I'll allow him to testify in his
19 experience whether that's a common reason.
20 Q  Does that seem to be a fair statement?
21 A  Yes, ma'am.  They trust them with the truck and
22 the trailer, which is a major investment.
23 Q  Right.  And that was my next question.  These
24 trucks and trailers are major investments.  They're
25 pretty expensive.

Page 303

1 A  Yes.
2 Q  Okay.  And in your experience -- Well, let me
3 withdraw that.
4      MS. WAYNE:  I have no further questions.
5      THE COURT:  Anything else, Mr. Teague?
6      MR. TEAGUE:  Yes, Your Honor.
7           CROSS EXAMINATION
8      BY MR. TEAGUE OF CURTIS JONES:
9 Q  Agent Jones, you taught me a little bit about
10 oranges.  I don't know one from the other either.
11      You've found marijuana being hauled on
12 trucks, all types of trucks, like eighteen wheelers
13 that have compartments?
14 A  We found them with compartments in the cab of the
15 of the truck, we've found them with compartments in
16 the trailer, we found it as in this case just thrown
17 in, we have found it being hauled without any load at
18 all.  So it runs the gamut from A to Z.
19 Q  And the types of commercial trucks that are
20 carrying the marijuana in your experience, it could be
21 a truck going to any kind of firm anywhere, couldn't
22 it?
23 A  That's correct.
24 Q  In other words, say, for instance, a grocery
25 store truck, you find that at times, don't you?

Page 304

1 A  To my knowledge we've never found any in a major
2 grocery store chain truck.
3 Q  Okay.  But if that major chain uses independent
4 owner/operators, those people are able to do just
5 about anything they want to do, aren't they?
6 A  Yes, sir.
7 Q  And so while A & P may be a good, reputable
8 company, the independent owner/operator may feel he's
9 strapped for finances and might take on a few bags of
10 marijuana.  That could happen, couldn't it?
11 A  That is possible, yes.
12 Q  Yes, sir.  Thank you.
13      Now look through there very quickly and let
14 me know if you find the name of Freddie Williams in
15 that book anywhere.
16      THE COURT:  Is it in there or not?
17      MR. TEAGUE:  It's not in there, Your Honor.
18      THE COURT:  Well then let's not waste time
19 if you know it's not in there.
20      MR. TEAGUE:  Yes, Your Honor.  That's all,
21 Your Honor, thank you.
22      THE COURT:  Any further direct?
23      MS. MORRIS:  Very, very briefly.
24      THE COURT:  Okay.
25           REDIRECT EXAMINATION

Page 305

1      BY MS. MORRIS OF CURTIS JONES:
2 Q  Agent Jones, in your experience with the
3 Department of Transportation, have you found that many
4 times truck owners do know what's on their trucks?
5 A  Yes.
6 Q  And they do know when there's narcotics on their
7 trucks?
8 A  We have found instances where the owners, absent
9 owners not on the truck itself know exactly what is
10 going on.
11 Q  Thank you.  Nothing further.
12           RECROSS EXAMINATION
13      BY MS. WAYNE OF CURTIS JONES:
14 Q  When you said absent owners you're telling me
15 people who keep themselves out of the ownership?  What
16 does that mean?
17 A  If the owner is not driving the truck, the owner
18 is not present when the arrest or the seizure is made.
19 Q  And let me follow up with that because there are
20 also, and I don't know what the terminology is within
21 the department, but there are also mass owners or
22 owners that don't hold themselves out as owning the
23 companies and use somebody else to show ownership.  I
24 don't know what that's called in the department, but
25 when you can't find the real owner because they're

1 masked?

2 A  Yes.

3 Q  Okay.  What is that called?

4 A  Well it's like having an offshore account listed
5 to a bogus company.  It's registered so that the owner
6 cannot be found.

7 Q  Okay.

8      MS. WAYNE:  I have nothing further.  Thank
9 you.

10      THE COURT:  Okay.  Anything else of this
11 witness?

12      MS. MORRIS:  Nothing, Your Honor.

13      THE COURT:  Thank you.  You may step down.
14      Members of the jury, we'll quit for the day.
15 We'll come back at eight-thirty.

16      (Whereupon the witness, Curtis Jones,
17 stepped down from the stand.)

18      MR. FEAGA:  Judge, we do have a chemist that
19 we need to put on quickly.

20      THE COURT:  Why don't you get with the
21 defendants and see whether we need to put them on.

22      (Whereupon, Ms. Morris conferred with Ms.
23 Wayne off the record and out of the hearing of the
24 other courtroom participants.)

25      MS. WAYNE:  They need to call her, Your

1 Honor.

2      THE COURT:  Okay.  Will it take very long?

3      MS. WAYNE:  I think we can do it quickly.

4      THE COURT:  Okay.  Put her on.

5         J A M I E   J O H N S O N,
6 the witness herein, having first been duly sworn or
7 affirmed to tell the truth, was examined and testified
8 as follows:

9           DIRECT EXAMINATION

10      BY MS. MORRIS OF JAMIE JOHNSON:

11 Q  Could you state your name and tell the jury where
12 you're employed?

13 A  My name is Jamie Johnson.  I'm a forensic
14 scientist with the Mississippi Crime Laboratory and
15 I'm stationed in the Meridian regional lab.

16 Q  And how long have you -- Well, with the
17 Mississippi Crime Laboratory what do you do in your
18 day-to-day duties?

19 A  My duties are to examine items of evidence that
20 are submitted to the laboratory by law enforcement
21 agencies to determine the presence or absence of
22 controlled substances.

23 Q  And by "controlled substances" you mean illegal
24 narcotics?

25 A  That's part of it, yes, ma'am.

1 Q  Such as marijuana?

2 A  Yes, ma'am.

3 Q  How long have you worked for the Mississippi
4 crime lab?

5 A  For approximately ten and-a-half years.

6 Q  And were you asked to examine some marijuana back
7 in 1997?  Specifically, I think it was bought to your
8 lab on October 23rd of 1997?

9      THE WITNESS:  Could I review my notes, Your
10 Honor?

11      THE COURT:  Oh definitely, yes.

12 A  It was delivered on, I believe it was July 31st
13 of 1997.

14 Q  Okay.  And did you indeed test that substance?

15 A  I did.

16 Q  And what test did you run on those
17 substances?

18 A  The two examinations that I performed on the
19 leafy plant material were first a microscopic
20 examination where I take a sample of the substance and
21 examine it under a microscope and record the botanical
22 or plant characteristics that I happen to see.

23      The second examination is the gas
24 chromatography mass spectrometry where I have taken
25 the sample, extract any components that may be present

1 in the sample and analyze it using this
2 instrumentation.

3 Q  The first test you performed, is it conclusive?

4 A  No.  The microscopic examination is not
5 conclusive.

6 Q  The second test, which I think it's called the G.
7 C. M. S. for short, is that a conclusive test?

8 A  The G. C. mass spec or the G. C. M. S. is a
9 confirmatory test, but we base our results at the
10 Mississippi Crime Laboratory on the results that we
11 obtain from both of these examinations together.

12 Q  And based on the examinations that you performed
13 on this substance, the G. C. M. S. and what did you
14 say the first one was?

15 A  The microscopic examination.

16 Q  Microscopic examination.  Excuse me.  Did you
17 form an opinion as to what the substance was?

18 A  Yes, I did.

19 Q  And what was it?

20 A  I was able to determine that the substance was
21 marijuana.

22 Q  And did you weigh this substance?

23 A  Yes.

24 Q  And what was the weight of it?

25 A  The net weight of the marijuana without the

Page 310

1  wrappings was approximately sixty-two kilograms.
2  Q  Okay.  And do you know how many pounds that is?
3  A  That's approximately a hundred and thirty-seven
4  pounds.
5      THE COURT:  Did you say how many kilograms
6  that was?
7      THE WITNESS:  Fifty-two point four
8  kilograms.
9  Q  Okay.  And, Miss Johnson, I'm showing you what's
10 been premarked as government's exhibit 33.  Do you
11 recognize that?
12 A  Yes, I do.
13 Q  And what is it?
14 A  This is a photocopy of a certified report from
15 the Mississippi Crime Laboratory bearing the
16 Mississippi Crime Laboratory case number M nine seven
17 dash one four one eight dash zero seven with my
18 signature at the bottom.
19 Q  And is this your lab report from your tests of
20 those substances?
21 A  This is a xerox copy of my lab report, yes,
22 ma'am.
23 Q  And has it been changed or altered in any way?
24 A  It does not appear to be, no, ma'am.
25     MS. MORRIS:  At this time we'd move to admit

Page 311

1  government's exhibit 33 into evidence.
2      THE COURT:  Admitted.
3      MS. MORRIS:  I have nothing further at this
4  time, Your Honor.
5      Oh, I'm sorry, in my efforts to be quick, I
6  do have another one.
7  Q  Where did you obtain this substance?
8  A  The substance was delivered to the Mississippi
9  Crime Laboratory by an agent with the Mississippi
10 Bureau of Narcotics.
11 Q  And who would that be?
12 A  Agent Stanley Wash.
13     MS. MORRIS:  Okay.  I have nothing further,
14 Your Honor.
15     THE COURT:  Cross?
16     MS. WAYNE:  We pass this witness, Your
17 Honor.
18     THE COURT:  Mr. Teague?
19     MR. TEAGUE:  Nothing, Your Honor.
20     THE COURT:  Okay.  You may step down.
21     (Whereupon the witness, Jamie Johnson,
22 stepped down from the stand.)
23     THE COURT:  Are we through for the day?
24     MS. MORRIS:  If I could have one more
25 witness, I promise you like four questions.

Page 312

1      THE COURT:  Four questions?  Okay.
2      While she's getting this witness, how is
3  your case progressing, Mr. Feaga?
4      MR. FEAGA:  Your Honor, I think it's likely
5  that the United States will finish its case on Monday.
6      THE COURT:  On Monday?
7      MR. FEAGA:  Yes, sir.
8      THE COURT:  Very good.
9          M I K E Y   S H E A,
10 the witness herein, having first been duly sworn or
11 affirmed to tell the truth, was examined and testified
12 as follows:
13          DIRECT EXAMINATION
14     BY MS. MORRIS OF MIKE SHEA:
15 Q  Could you state your name and spell your last
16 name for the jury, please.
17 A  Mikey Shea.  S-h-e-a.
18 Q  And how are you employed?
19 A  Ma'am?
20 Q  How are you employed?
21 A  I'm employed with the Mississippi Department of
22 Transportation law enforcement.
23 Q  And were you so employed on July 29th, 1997?
24 A  Yes, ma'am.
25 Q  And were you involved in a seizure of some

Page 313

1  marijuana that night from a Miss Sandra Jones?
2  A  Yes, ma'am.
3  Q  And upon the seizure of that marijuana, did y'all
4  turn over custody, "you" being the Mississippi of
5  Transportation, turn over custody of that marijuana to
6  someone?
7  A  Yes, ma'am, turned it over to the Mississippi
8  Bureau of Narcotics.
9  Q  And who did you turn it over to with the
10 Mississippi Bureau of Narcotics?
11 A  Agent Stanley Wash.
12     MS. MORRIS:  That's all I have, Your Honor.
13     THE COURT:  Cross?
14     MS. WAYNE:  Judge, we pass this witness.
15     MR. TEAGUE:  Nothing.
16     THE COURT:  Okay, you may step down.
17     (Whereupon the witness, Mikey Shea, stepped
18 down from the stand.)
19     THE COURT:  Now how many witnesses do you
20 have left?  I know you said you'll finish on Monday.
21     MR. FEAGA:  I'm thinking right now we have
22 approximately five.
23     THE COURT:  Okay.  And defendants, do you
24 know about how much time you'll take?
25     MR. FEAGA:  There are a couple of records,

Page 314

1  custodian type things, but it should be quick.
2       THE COURT:  Right.
3       MS. WAYNE:  Can I speak with Mr. Teague?
4       THE COURT:  Certainly.  I just want to know
5  what we're talking about; two days, three days or one
6  day.  I'm trying to get an idea of how much longer
7  it's going to take.
8       (Whereupon, all COUNSEL conferred off the
9  record and out of the hearing of the other courtroom
10 participants.)
11      MR. FEAGA:  Your Honor, I think I'm right, I
12 think five witnesses.
13      THE COURT:  Five witnesses.
14      MS. WAYNE:  I'm going to say this and
15 hopefully you won't hold this against us, but I think
16 we'll be finished by Wednesday.
17      THE COURT:  By Wednesday?  Very good.  Thank
18 you.
19      Okay, members of the jury, you're excused
20 until eight-thirty on Monday with these cautions.
21 Over the weekend there may be articles in the paper or
22 on the T V about the case.  It's really important that
23 you don't listen to any news broadcasts or read any
24 newspapers.
25      Counsel would you mind if their families cut

Page 315

1  out articles in the paper about the case and they can
2  read the rest of the paper?
3       MR. FEAGA:  United States does not, Your
4  Honor.
5       THE COURT:  If you think it would be safer
6  not to read anything I have to problem with that, too.
7       MR. FEAGA:  I think the main thing is that
8  they know they're not to look at any of this until
9  this trial is over.  That's important I know to both
10 sides.
11      MS. WAYNE:  Right.
12      THE COURT:  Right.  If you want to, you can
13 obviously, you know, I'm sure your families know
14 you're on this case, but you can have them just cut
15 out any articles.  But it's critical that you not even
16 read the headlines about this case and not discuss the
17 merits.  When you go to church and you go to events
18 people may try to approach you about it.  You have to
19 walk away.  You can't even overhear anything about the
20 case.
21      It's very critical you let people know,
22 saying something like don't talk about that in my
23 presence.  No, you'd have to leave the party if
24 they're going to talk about that.
25      Okay?  See you back here at eight-thirty on

Page 316

1  Monday.
2       (Whereupon, the proceedings were concluded.)
3
4
5
6            . . . . . . . . . .
7
8
9            COURT REPORTER'S CERTIFICATE
10
11       I certify that the foregoing is a correct
12  transcript from the record of proceedings in the
13  above-entitled matter as prepared by me to the best of
14  my ability.
15
16       I further certify that I am not related to
17  any of the parties hereto, nor their counsel, and I
18  have no interest in the outcome of said cause.
19
20       Dated this 17th day of August 2005.
21
22
23       MITCHELL P. REISNER, CM, CRR,
         Official US Dist. Court Reporter
         Registered Professional Reporter
24       Certified  Real-Time  Reporter
25