1         IN THE UNITED STATES DISTRICT COURT
                     FOR

2       THE MIDDLE DISTRICT OF ALABAMA

3

4

5  THE UNITED STATES
     OF AMERICA

6
        vs.                 CRIMINAL ACTION NO.
7                       2:03-cr-259-T

   LEON CARMICHAEL
8

9

10

11

12

13

14             VOLUME VI OF XI
              6th DAY OF:
15         JURY TRIAL PROCEEDINGS

16

17        * * * * * * * * *

18

19  BEFORE:       The Hon. Myron H. Thompson

20  HEARD AT:     Montgomery, Alabama

21  HEARD ON:     June 13, 2005

   APPEARANCES:   Terry Moorer, Esq.
22              Stephen Feaga, Esq.
              Clark Morris, Esq.
23             Matthew Miner, Esq.
              Susan James, Esq.
24             Marion Chartoff, Esq.
              Lisa Monet Wayne, Esq.
25             Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
5B - VI
PENGAD 800-631-6989

Multi-Page™

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA


THE UNITED STATES
OF AMERICA

vs.                          CRIMINAL ACTION NO.
                             2:03-cr-259-T
LEON CARMICHAEL




VOLUME VI OF X
6th DAY OF:
JURY TRIAL PROCEEDINGS



* * * * * * * * * *


BEFORE:        The Hon. Myron H. Thompson

HEARD AT:      Montgomery, Alabama

HEARD ON:      June 13, 2005

APPEARANCES:   Terry Moorer, Esq.
               Stephen Feaga, Esq.
               Clark Morris, Esq.
               Matthew Miner, Esq.
               Susan James, Esq.
               Marion Chartoff, Esq.
               Lisa Monet Wayne, Esq.
               Ronald R. Brunson, Esq.

**Page 2**

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Title Page ...................................     1

Table of Contents ...........................     2

Discussion In Open Court
     (The Jury Is Not Present) .............     4

Stanley Nash - Direct Examination
     by Ms. Morris ..........................     6

Brett Pacheiarz - Direct Examination
     by Ms. Morris ..........................    12

Angel Gomez - Direct Examination
     by Ms. Morris ..........................    24

Angel Gomez - Cross Examination
     by Ms. Wayne ...........................    28

Victor Bravenec - Direct Examination
     by Ms. Morris ..........................    29

Kenneth Henley - Direct Examination
     by Mr. Moorer ..........................    37

Kenneth Henley - Cross Examination
     by Ms. James ...........................    42

Motion for Mistrial .........................    46

Kenneth Henley - Cross Examination
     by Mr. Teague ..........................    51

Kenneth Henley - Redirect Examination
     by Mr. Moorer ..........................    51

Richmond Thomas - Direct Examination
     by Mr. Feaga ...........................    62

Jimmy Timmons - Direct Examination
     by Mr. Feaga ...........................    96

**Page 3**

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Jimmy Timmons - Cross Examination
     by Ms. James ...........................   120

Jimmy Timmons - Cross Examination
     by Mr. Teague ..........................   174

Jimmy Timmons - Redirect Examination
     by Mr. Feaga ...........................   176

Mike Drummond - Direct Examination
     by Mr. Moorer ..........................   179

Mike Drummond - Cross Examination
     by Ms. James ...........................   188

Mike Drummond - Redirect Examination
     by Mr. Moorer ..........................   190

David DeJohn - Direct Examination
     by Mr. Feaga ...........................   190

David DeJohn - Cross Examination
     by Ms. Wayne ...........................   295

David DeJohn - Cross Examination
     by Mr. Teague ..........................   344

David DeJohn - Redirect Examination
     by Mr. Feaga ...........................   353

David DeJohn - Recross Examination
     by Ms. Wayne ...........................   362

David DeJohn - Further Redirect Examination
     by Mr. Feaga ...........................   362

In-chambers Conference ......................   367

Court Reporter's Certification ..............   371

                   -o0o-

**Page 4**

1   WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
1   THE HON. MYRON H. THOMPSON ON JUNE 13, 2005 AT THE

2   UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3              DISCUSSION IN OPEN COURT

4            (THE JURY IS NOT PRESENT):

5          THE COURT:  Do we have any matters to take

6   up outside the presence of the jury?

7          (Whereupon, there was no response.)

8          THE COURT:  Counsel, I assume your briefs

9   have been filed, is that correct?

10         MS. MORRIS:  Mine was filed this morning,

11  Your Honor.

12         THE COURT:  Great.

13         MS. MORRIS:  Mine were, there were, two.

14         COURT:  There were two?

15         MS. MORRIS:  Yes.

16         THE COURT:  Good.

17         Defense counsel?  Your brief on the

18  conspiracy issue is due tomorrow morning.

19         MS. CHARTOFF:  Yes.

20         THE COURT:  I thought the property issue was

21  due today, though.

22         MS. CHARTOFF:  It was our impression that

23  you only wanted cases -- if we could find cases on

24  point that already decided the issue.

25         THE COURT:  Could you find any cases?

**Page 5**

1          MS. CHARTOFF:  I could find any that had

2   decided the issues.  If you want me to submit legal

3   argument, I can do that, Your Honor.

4          THE COURT:  Well we're looking at it.  And

5   also purely on the question of what's her name?

6   Sandra Jones?

7          MS. MORRIS:  Yes, Your Honor.

8          THE COURT:  Right.

9          MS. MORRIS:  Her statements to law

10  enforcement officers.

11         THE COURT:  Right.  Because her statement

12  was made to a law enforcement officer, it might differ

13  from the other alleged coconspirator statements.

14         But anyway, let's bring in the jury.

15         MR. FEAGA:  Your Honor, just before you do,

16  I wanted to alert the Court to the fact that I'd like

17  to say, if I may, you sort of put me on the spot at

18  the tail end of things on Friday and asked me how many

19  witnesses we had.

20         THE COURT:  Yes.

21         MR. FEAGA:  And my cocounsel can correct me,

22  but we actually have about -- we only have five that

23  it would take any time, I think, Judge, but we

24  actually have about fifteen.  They're short.  Some of

25  them are very short people.  Records coming in and

Multi-Page™

**Page 6**

1 things like that.
2       THE COURT: Have you conferred with defense
3 counsel to see if some of these can be -- their need
4 to call them could be obviated?
5       MR. FEAGA: I don't think any of them can,
6 Your Honor, because we actually have to ask them
7 questions about the record.
8       THE COURT: Oh, okay.
9       MR. FEAGA: And they're not all that way,
10 but they should be relatively short witnesses. I
11 still think we'll finish today.
12       THE COURT: Okay. Very good.
13       Well let's get moving. Bring in the jury.
14       (Whereupon, the jury was escorted into the
15 courtroom.)
16       THE COURT: Proceed.
17       MS. MORRIS: Yes, Your Honor. The
18 government would call Stanley Wash.
19          S T A N L E Y   W A S H,
20 the witness herein, having first been duly sworn or
21 affirmed to tell the truth, was examined and testified
22 as follows:
23          DIRECT EXAMINATION
24       BY MS. MORRIS OF STANLEY WASH:
25 Q  Could you state your name and how you are

**Page 7**

1 employed?
2 A  My name is Stanley Wash. I'm employed with the
3 Mississippi Bureau of Narcotics.
4 Q  And how long have you been with the Bureau of
5 Narcotics, Mr. Wash?
6 A  Approximately fourteen years.
7 Q  And I guess that's Agent Wash, is that correct?
8 A  I'm Captain Wash now.
9 Q  Captain now. Okay.
10       And were you so employed on July 29th, 1997?
11 A  Yes, I was.
12 Q  Were you an agent back then?
13 A  Yes, I was.
14 Q  And were you working on that day?
15 A  Yes, I was.
16 Q  And what, if anything, did you do on that day
17 that would relate to this case?
18 A  On that particular day while located at my
19 district office I received a call from the Mississippi
20 Department of Transportation to assist them on a case
21 in Kewame in Lauderdale County, Mississippi.
22 Q  I believe you said you were called to assist the
23 Department of Transportation at the Kewame scales?
24 A  Yes.
25 Q  And that's in Lauderdale County, Mississippi?

**Page 8**

1 A  Right.
2 Q  And did you go to the Kewame scales?
3 A  I did.
4 Q  And what, if anything, did you do there?
5 A  Once I arrived at that location, I spoke with M.
6 D. O. T. Officer Curtis Jones and he explained the
7 situation, which he had a truck full of dope at the
8 time at the scales that had a quantity of dope on it.
9 Q  Okay. And do you know what kind of dope that
10 was?
11 A  Yes, it was marijuana.
12 Q  Did you take custody of that marijuana?
13 A  I did.
14       MS. MORRIS: May I approach, Your Honor?
15       THE COURT: Yes.
16 Q  Captain Wash, I'm showing you what's been
17 previously identified as government's exhibit 50. Do
18 you recognize that?
19 A  Yes I do.
20 Q  What is it?
21 A  It's a Mississippi Crime Laboratory report,
22 evidence submission form.
23 Q  And is it a submission form for what case number?
24 A  The case number B six dash one twenty-eight dash
25 one dash ninety-seven.

**Page 9**

1 Q  And is this -- Does it bear your signature?
2 A  Yes, it does.
3 Q  And has it been changed or altered in any way?
4 A  No.
5       MS. MORRIS: Your Honor, at this time we'd
6 move to admit government's exhibit 50 in evidence.
7       THE COURT: It's admitted.
8       MS. MORRIS: Permission to publish?
9 A  Yes, you may.
10 Q  According to this report, Captain Wash, what date
11 did you submit the marijuana to the lab?
12 A  It was July 31st, 1997.
13 Q  And who did you turn it over custody to?
14 A  The custody was turned over to Jamie Johnson.
15 Q  Okay. Agent Wash, I am showing you what's been
16 already admitted into evidence as government's exhibit
17 -- Oh, I'm sorry. I'm showing you what's already been
18 admitted into evidence as government's exhibit 33. Do
19 you recognize this?
20 A  Yes, I do.
21 Q  And what is it?
22 A  It's an analysis report, a crime lab analysis, a
23 certified report.
24 Q  And does this report bear the same case number as
25 your case number?

Page 10

1 A  Yes, it does.

2 Q  The same case number as the evidence submission
3 form?

4 A  Yes.

5 Q  And I believe your name is up top, is that
6 correct?

7 A  That's correct.

8 Q  And what does your name being in that location on
9 this piece of paper signify?

10 A  It signifies that I was the one that submitted
11 the evidence to the crime lab and that the report
12 would be returned to me as to whether it was actually
13 marijuana or not.

14 Q  And I believe it says "October 3rd, 1997" on
15 there.  Do you see that?

16 A  Yes.

17 Q  And based on your training and experience with
18 the Mississippi Bureau of Narcotics, do you know what
19 that date signifies?

20 A  I believe that it would be the date that the dope
21 was tested.

22 Q  I have nothing further.

23       THE COURT:  Cross?

24       MS. WAYNE:  I have no questions of this
25 witness.

Page 11

1       THE COURT:  Mr. Teague?

2       MR. TEAGUE:  No questions, Your Honor.

3       THE COURT:  Thank you.  You may step down.

4       (Whereupon the witness, Stanley Wash,
5 stepped down from the stand.)

6       THE COURT:  Next witness.

7       MR. MOORER:  The United States would call
8 Kenneth Henley.

9       THE COURT:  Have these witnesses been sworn?
10 Or do we have a lot of witnesses out there who haven't
11 been sworn?

12       MR. FEAGA:  That would be correct, Your
13 Honor.

14       THE COURT:  Bring them all in and we'll
15 swear them in now to save time.

16       MR. FEAGA:  Yes, sir.

17       THE COURT:  Bring them all in.

18       MR. FEAGA:  Your Honor, I think we've got
19 four out there.  As I told the Court earlier, I was
20 wrong Friday that we have more than five witnesses.
21 We have about ten other short ones, so about fifteen.

22       THE COURT:  Very good.

23       (Whereupon, all prospective witnesses were
24 duly sworn by the courtroom deputy clerk.)

25       THE COURT:  Now who is your next witness?

Page 12

1       MR. FEAGA:  Your Honor, we've just been
2 informed that Mr. Henley isn't here yet.  He's
3 supposed to be traveling over from Mississippi, so
4 we'll go ahead and call as the next witness Brett
5 Pachciarz.

6       B R E T T   P A C H C I A R Z,
7 the witness herein, having first been duly sworn or
8 affirmed to tell the truth, was examined and testified
9 as follows:

10       DIRECT EXAMINATION

11       BY MS. MORRIS OF BRETT PACHCIARZ:

12 Q  Agent Pachciarz, how are you employed?

13 A  I'm a supervisor for United States Border Patrol
14 agents.

15 Q  I believe you said you are a supervisory agent
16 with the United States Border Patrol?

17 A  Yes, ma'am.

18 Q  Where are you stationed right now?

19 A  I'm currently stationed at the Fort Brown station
20 in Brownsville, Texas.

21 Q  How long have you been at the Fort Brown station
22 in Brownsville, Texas?

23 A  At that station approximately four years.

24 Q  And where were you before that?

25 A  I was stationed at the Sierra Blanca station in

Page 13

1 Sierra Blanca, Texas.

2 Q  How long were you at Sierra Blanca?

3 A  Approximately six years.

4 Q  Okay.  How long, total, have you been with the
5 Border Patrol?

6 A  Ten years in July.

7 Q  So those are the only two places that you have
8 been in, the Fort Brown and Sierra Blanca stations, is
9 that correct?

10 A  Yes, ma'am.

11 Q  Are you stationed at Sierra Blanca on July 11th,
12 1998?

13 A  Yes, ma'am.

14 Q  And on that day do you recall stopping a
15 tractor-trailer truck?

16 A  Yes.

17 Q  How did that stop come about, Agent Pachciarz?

18 A  The semi tractor-trailer was traveling eastbound
19 away from El Paso.  Our checkpoint, our border patrol
20 checkpoint is approximately eighty miles —

21 Q  Let me back up.  Let's talk about that.

22       The Sierra Blanca checkpoint is located, I
23 think you just said, eighty miles from El Paso?

24 A  Yes, ma'am.

25 Q  Where exactly is it located, on what road?

Page 14

1 A Interstate 10 on the eastbound -- checking the
2 eastbound traffic.
3 Q Is there another checkpoint one on the westbound
4 going toward El Paso?
5 A No.
6 Q It's only going out. And why is that? If you
7 know.
8 A Originally the checkpoint was made up there kind
9 of like an umbrella for the type of duties we do. Our
10 main duties are immigration and interdicting
11 narcotics. And obviously we have -- along the border
12 we have border patrol stations, and the checkpoint was
13 kind of an umbrella to catch anything that the line
14 stations missed.
15 Q Are the line stations being those that are
16 located directly on the border?
17 A Yes, ma'am.
18 Q Okay. So how far is the Sierra Blanca checkpoint
19 from the border?
20 A As the crow flies, about twelve miles.
21 Q Okay. And I believe -- I backed you up there,
22 but I believe you said you were working on January
23 11th of 1998?
24 A Yes.
25 Q At the Sierra Blanca checkpoint?

Page 15

1 A Yes, ma'am.
2 Q And I think you just stated you pulled a truck
3 over?
4 A Right.
5 Q Tell us about that.
6 A Well, I was working the primary inspection area
7 at our permanent checkpoint.
8 Q When you say a "primary inspection area", what is
9 that?
10 A All traffic is diverted off of I-10, all traffice
11 is diverted off, and as they approach the stop sign,
12 which all traffic comes to a stop, and I was working
13 that area.
14 Q Okay. And what happened when you saw this truck?
15 A The driver came to a stop. I identified myself
16 to the driver, Mr. McGill, Joe McGill who was the only
17 visible occupant at the time, and I identified myself
18 as a United States Border Patrol agent.
19 Q Did you ask him any questions?
20 A Yes, ma'am.
21 Q What did you ask him?
22 A I asked him --
23      MS. WAYNE: Judge, I'm going to object to
24 hearsay. Same thing.
25      MS. MORRIS: Your Honor, we're not offering

Page 16

1 it to prove the truth of the matter asserted. We're
2 just offering it to show what he did next and why.
3      THE COURT: Overruled. Go ahead.
4 A I asked him if he was a United States citizen,
5 and he stated that he was. And then I asked him where
6 he was born, and he stated Orlando, Florida.
7 Q And what did you do then?
8 A When I was talking to him and he stated -- I
9 asked him if there was anybody else in the vehicle
10 with him, he stated there was. To me, in my opinion,
11 he was acting a little bit nervous.
12 Q And why do you say that? Describe for me why you
13 thought he was acting nervous.
14 A As he spoke to me, when I asked him if he was a
15 citizen he had like a broken, hesitant voice. He said
16 that he was. His lips started to tremble. After I
17 had asked him if there was anybody else in the
18 vehicle, he kind of avoided a little bit of eye
19 contact with me and I could see his fingers were
20 trembling.
21 Q Why did you ask if there was someone else in the
22 vehicle? And by that I mean, why didn't you know
23 whether there was someone else in the vehicle?
24 A Well the secret portion of the tractor-trailer
25 was closed, and like I say one of our primary jobs is

Page 17

1 to determine the legal status of people here in the
2 United States. And me asking if there is anybody else
3 is to make sure if there was anybody else that I
4 needed to talk to to determine if they were a United
5 States citizen with proper documents permitting them
6 to be here in the United States.
7 Q Okay. And you said that when he was smoking a
8 cigarette his hands were shaking. Was there anything
9 else that clued you in to the fact that he may be
10 overly nervous?
11 A His lips were trembling. He was hesitant to
12 answer at first. He avoided eye contact. In my
13 opinion Mr. McGill was pretty nervous when I was
14 speaking to him.
15 Q And so what did you do?
16 A I asked him to pull over to our secondary
17 inspection area so I could talk to him more.
18 Q And explain to the jury if you don't mind what
19 this secondary inspection area is.
20 A As you pull off to the right it's kind of an area
21 where, as you can think that more traffic is coming up
22 to the primary inspection area, traffic -- you can
23 continue to talk, otherwise traffic would be backed up
24 to El Paso. So basically we have them pull over to
25 the side and I walk over with them and keep talking to

Multi-Page™

| Page 18 | Page 20 |
|---|---|
| 1 them. | 1 A  Yes, ma'am. |
| 2 Q  And did you keep talking to him? | 2 Q  And what did you find there in there, if |
| 3 A  Yes, I did. | 3 anything? |
| 4 Q  And did you -- Well, go ahead.  What was the | 4 A  We found a total of -- in one tote bag we found a |
| 5 substance of those conversations? | 5 little over one pound of marijuana.  Another tote bag |
| 6 A  Once he pulled over to the right I went over and | 6 we found a little baggy worth of marijuana.  Throwing |
| 7 talked to him.  I asked him if he would step out and | 7 into the sleeper we found a baggy of cocaine, and we |
| 8 if his partner, or anybody else could step out with | 8 found a pistol quite in there. |
| 9 him.  His partner ended up stepping out was a Mr. | 9 Q  And did you question the occupants of the truck |
| 10 Kinsey.  I asked him if he was a United States citizen | 10 about these things that you found? |
| 11 and he stated he was. | 11 A  Yes, ma'am. |
| 12         After I did that, thinking something was | 12 Q  And did anyone claim ownership over the boxes of |
| 13 wrong with him being as nervous as he was, I asked if | 13 marijuana? |
| 14 a canine inspection could be formed around his | 14 A  The rear boxes?  No. |
| 15 vehicle, which he gave consent. | 15 Q  Did anyone claim ownership over the duffel bags |
| 16 Q  And at that point did you call your partner? | 16 found in the sleeper? |
| 17 A  Yes, ma'am. | 17 A  Yes, ma'am. |
| 18 Q  And who is that? | 18 Q  Let's talk about those.  I believe you said you |
| 19 A  That's Agent Angel Gomez and his canine partner | 19 found something in a red duffel bag, is that correct? |
| 20 Lyka. | 20 A  A gray and red tote bag, yes. |
| 21 Q  And did Agent Gomez walk his canine around the | 21 Q  And what was found in that, again? |
| 22 vehicle? | 22 A  The baggy of marijuana, and there was a small |
| 23 A  Yes.  He performed a canine inspection with his | 23 scale.  We also found a small weighing scale. |
| 24 canine.  After he completed it he let me know that his | 24 Q  And did anyone claim ownership over that? |
| 25 canine did alert positive to the rear of the trailer | 25 A  Mr. McGill did. |

| Page 19 | Page 21 |
|---|---|
| 1 and to the secret area of the trailer -- the tractor. | 1 Q  Okay.  And did you find anything that Mr. Kinsey |
| 2 Q  And what did you do then? | 2 claimed ownership of? |
| 3 A  Agent Gomez actually went to where the canine | 3 A  Yes.  He claimed the black tote bag which |
| 4 first alerted to.  There were three or four boxes | 4 contained the one point one pounds of marijuana. |
| 5 inside the semi trailer.  He opened those boxes and | 5 Q  And did anyone claim ownership over the firearm? |
| 6 found three bundles, one in each cardboard box with | 6 A  I believe Mr. McGill did. |
| 7 green cellophane wrapped around it. | 7 Q  Okay. |
| 8 Q  When you say "three bundles," how big are we | 8      MS. MORRIS:  May I approach, Your Honor? |
| 9 talking about here? | 9      THE COURT:  Yes. |
| 10 A  I would say approximately like two by two, I | 10 Q  Agent Pachciarz, I'm showing you what's been |
| 11 guess. | 11 previously marked as government's exhibit 51.  Do you |
| 12 Q  Two feet by two fee? | 12 recognize that? |
| 13 A  Yes. | 13 A  Yes, ma'am. |
| 14 Q  In a cube block -- | 14 Q  And what is it? |
| 15 A  Yes. | 15 A  It's a copy of the report I made on January 1, |
| 16 Q  -- or a rectangular box? | 16 1998. |
| 17 A  I guess it's kind of more like a cube oval type | 17 Q  And does that report, has it been changed or |
| 18 thing, I guess. | 18 altered in any way since the time that you made it? |
| 19 Q  Okay.  And then I think you just stated there was | 19 A  No, ma'am. |
| 20 one in each cardboard box? | 20 Q  Does it bear your signature? |
| 21 A  Yes, ma'am. | 21 A  Yes, ma'am. |
| 22 Q  And I believe you stated that the canine alerted | 22      MS. MORRIS:  At this point we'd move to |
| 23 on the sleeper area as well? | 23 admit government's 51 into evidence. |
| 24 A  Yes, ma'am. | 24      MS. WAYNE:  We'd object.  I don't know what |
| 25 Q  Did you search the sleeper area? | 25 the relevance is.  He's actually testified about the |

Multi-Page™

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  stop itself, what was said. It's simply hearsay at
2  this point.
3  THE COURT: Well let me see the report.
4  MS. MORRIS: It doesn't contain anything but
5  the identifiers.
6  THE COURT: What identifiers?
7  MS. MORRIS: The identifiers on the truck,
8  basically is what we're offering it for. But he can
9  testify to that as well, Your Honor.
10  THE COURT: Let him testify.
11  Q  Based on your report, could you tell the jury
12  what the V. I. N. number for the tractor was?
13  A  The V. I. N. number for the tractor is one
14  foxtrot uniform Papa Charlie x-ray yankee bravo six
15  tango hotel eight three six one nine.
16  Q  And that is for the tractor, is that correct?
17  A  Yes, ma'am.
18  Q  What was the license plate for the tractor?
19  A  The tractor was an Alabama tag of x-ray eight
20  nine one three nine one.
21  Q  And could you tell us what the V. I. N. number on
22  the trailer was?
23  A  The trailer was one uniform yankee victor Sierra
24  two four eight eight Papa Michael nine four four four
25  two one.

**Page 23**

1  Q  What was the license plates on the trailer?
2  A  Alabama tag of tango eight one three zero three.
3  Q  And was the license plate on the tractor Alabama
4  tag as well?
5  A  Yes, ma'am.
6  Q  Once you obtained all of this marijuana, did you
7  turn this marijuana over to someone else?
8  A  Yes, ma'am.
9  Q  And who was that?
10  A  We turned approximately -- well ninety-two point
11  seven six pounds of marijuana over to D. E. A.,
12  Michael Wright.
13  MS. MORRIS: I have nothing further at this
14  time, Your Honor.
15  THE COURT: Cross?
16  MS. WAYNE: I have no questions.
17  THE COURT: Mr. Teague?
18  MR. TEAGUE: None for Freddie Williams.
19  THE COURT: You may step down.
20  (Whereupon the witness, Brett Pachciarz,
21  stepped down from the stand.)
22  THE COURT: Next witness.
23  MS. MORRIS: Your Honor, the government next
24  calls Angel Gomez.
25  A N G E L   G O M E Z,

**Page 24**

1  the witness herein, having first been duly sworn or
2  affirmed to tell the truth, was examined and testified
3  as follows:
4  DIRECT EXAMINATION
5  BY MS. MORRIS OF ANGEL GOMEZ:
6  Q  Would you state your name and spell your last
7  name, please.
8  A  My name is Angel Gomez. G-o-m-e-z.
9  Q  And, Agent Gomez, how are you employed?
10  A  With the United States Border Patrol.
11  Q  How long have you been with the United States
12  Border Patrol?
13  A  Over nine and-a-half years.
14  Q  Where are you stationed right now?
15  A  Currently in Lyndon, Washington.
16  Q  That's in Washington state, correct?
17  A  Correct.
18  Q  How long have you been at Lyndon station in
19  Washington?
20  A  A year and-a-half.
21  Q  Where were you stationed before that?
22  A  Before I was stationed in Sierra Blanca, Texas.
23  Q  Okay. And how long were you stationed at Sierra
24  Blanca, Texas?
25  A  For nine years.

**Page 25**

1  Q  And were you so stationed on January 1st -- no,
2  January 11th, 1998?
3  A  Yes.
4  Q  Do you recall stopping a truck on that date?
5  A  Yes.
6  Q  Do you recall utilizing your dog to inspect the
7  truck?
8  A  Yes.
9  Q  What is your dog's name?
10  A  Canine Lyka.
11  Q  Canine Lyka? And has Lyka been trained for the
12  detection of narcotics?
13  A  Yes, ma'am.
14  Q  Could you tell the jury a little bit about Lyka's
15  training.
16  A  She's been trained to detective the odors of
17  marijuana, cocaine, methamphetamine and heroin. I
18  have been trained to read her alerts when she comes
19  into alert with the odors that she has been trained to
20  detect.
21  Q  Was she routinely re certified after being
22  trained?
23  A  Correct. We're recertified yearly.
24  Q  Okay. And at the time in January of 1998 had she
25  been recertified at that point?

Multi-Page™

Page 26

1 A Yes.
2 Q Now, Agent Gomez, I believe you said you utilized
3 Lyka for an inspection of the truck. Do you recall
4 that?
5 A Yes, m'am.
6 Q Do you recall who the drivers of the truck was?
7 A It was Kinsey and McGill were the last names.
8 Q And what, if anything, did Lyka detect through
9 her inspection, his inspection?
10 A Hers.
11 Q Her inspection. Sorry.
12 A She detected marijuana.
13 Q And where did she alert to this marijuana?
14 A She alerted to the rear of the trailer and to the
15 cab.
16 Q All right. And did you all then go in search the
17 rear and the cabin?
18 A Yes, ma'am.
19 Q Did you indeed find marijuana?
20 A Yes, ma'am.
21 Q During your stop with Agent Pachciarz, did y'all
22 determine where this truck was coming from?
23 A It's coming -- originated out of Idaho with the
24 load and it was going to Deerfield, Florida.
25 Q And, Agent Pachciarz (sic.), given the fact that

Page 27

1 you've lived in El Paso, correct?
2 A Yes.
3 Q And I think you said you now you live in
4 Washington state?
5 A Yes, ma'am.
6 Q Do you know the geography from, say, Idaho to
7 Florida?
8 A Yes, ma'am. I'm also a canine instructor, and
9 our canine school is located in El Paso and last time
10 I made the drive down from Washington to El Paso.
11 Q Based on your knowledge of the geography, do you
12 know any reason that you would go through Sierra
13 Blanca to go to Deerfield, Florida?
14 A No, ma'am. It's from coming -- When I drove
15 through Idaho, there is no really direct major highway
16 that runs down into El Paso. You have to take many of
17 the back highways which are two lanes.
18 Q So what would be the most direct route, if you
19 know, from Idaho to Florida?
20 A There's two other major highways that actually
21 connect down, or you take another one down into
22 Florida. But other than that, I wouldn't know.
23 Q Do either of these major highways take you
24 through or near Sierra Blanca?
25 A No.

Page 28

1    MS. MORRIS: I have nothing further at this
2 time.
3        CROSS EXAMINATION
4       BY MS. WAYNE OF ANGEL GOMEZ:
5 Q Agent Gomez, I have one question for you in terms
6 of transporting drugs. Trucking in 1998, trucking was
7 a frequent way that truckers would transport drugs
8 through the country?
9 A There's many ways. We apprehended many people
10 throughout the year with cars, trucks.
11 Q Okay. So it sounds like the answer to that is
12 yes, it was a frequent way?
13 A Yes, ma'am.
14 Q I have no further questions. Thank you.
15    THE COURT: Mr. Teague?
16    MR. TEAGUE: No questions, Your Honor.
17    THE COURT: You may step down.
18    (Whereupon the witness, Angel Gomez, stepped
19 down from the stand.)
20    THE COURT: Next witness.
21    MS. MORRIS: Government calls victor
22 Bravenec.
23       V I C T O R   B R A V E N E C,
24 the witness herein, having first been duly sworn or
25 affirmed to tell the truth, was examined and testified

Page 29

1 as follows:
2        DIRECT EXAMINATION
3       BY MS. MORRIS OF VICTOR BRAVENEC:
4 Q Could you state your name and spell your last
5 name, please.
6 A Victor A Bravenec. B-r-a-v-e-n-e-c.
7 Q Mr. Bravenec, how are you employed?
8 A I'm employed with the Drug Enforcement
9 Administration.
10 Q As what?
11 A As a senior forensic chemist.
12 Q And as a forensic chemist, what are your duties
13 and responsibilities?
14 A My primary duty is to analyze evidence through
15 the possible presence of controlled substances, write
16 a report and testify to that report if necessary.
17 Q How long have you been with the D. E. A. Forensic
18 Sciences?
19 A Approximately thirteen years.
20 Q Okay. And what training or experience have you
21 had in the training of the substances for the presence
22 of narcotics?
23 A I have a Bachelor of Science degree in chemistry
24 from Charlton State University in Stevenville, Texas I
25 participated in the D. E. A. internship program while

Multi-Page™

1 in college, and then I -- once graduated I was hired
2 by the D. E. A., went through their training program
3 at the south central laboratory and also the basic
4 forensic chem school in Quantico, Virginia.
5 Q  Okay.  Now in your employment with the D. E. A.,
6 did you come to examine -- well, let me put it this
7 way --
8        MS. MORRIS:  Just one moment, Your Honor.
9        May I approach, Your Honor?
10       THE COURT:  Yes.
11 Q  Mr. Bravenec, I'm showing you what's been
12 previously marked as government's exhibit 53, 54 and
13 55.  Do you recognize these?
14 A  Yes, I do.
15 Q  And what are they?
16 A  They're the reports that were prepared in my
17 laboratory.
18 Q  Did you prepare those reports?
19 A  Yes, I did.
20 Q  And you prepared those reports on a substance
21 from where, that you obtained from where?
22 A  Substance that was submitted to our laboratory
23 from Sierra Blanca, Texas, which is a checkpoint along
24 the Texas/Mexico border.
25 Q  Who brought you or who sent the substance to you,

1 according to your report?
2 A  The substance was sent to us via registered mail
3 by Michael Wright.
4 Q  Okay.  And did you test this substance?
5 A  Yes, I did.
6 Q  All right.  In fact, there are two substances or
7 three exhibits in this, is that correct?
8 A  That's correct.
9 Q  Okay.  Let's take them exhibit by exhibit if we
10 could.  Exhibit one purported to be what?
11 A  Marijuana.
12 Q  Okay.  And did you test the substance for the
13 presence of marijuana?
14 A  Yes, I did.
15 Q  What tests did you run on this?
16 A  I ran three tests.  The first test was a
17 microscope examination where I was looking for
18 specific characteristics of marijuana.  And I found
19 those characteristics in this particular exhibit.
20        The second test I did was called a modified
21 Duconoid Levine, which is a chemical test or a color
22 test, and it turns a purple color in the presence of
23 canabinoids, which is one of the active ingredients in
24 marijuana.
25 Q  And did you do a third test?

1 A  Yes, I did.  The third test I did was a gas
2 chromatograph mass spectrometer, and that is a
3 confirmatory test and I confirmed the presence of
4 tetra hydracanabinol, which is the active ingredient
5 in marijuana.
6 Q  And based on these three tests did you formulate
7 an opinion as to what the substance in exhibit one
8 was?
9 A  Yes.
10 Q  And what was that?
11 A  That the substance contained marijuana.
12 Q  And did you weigh the substance?
13 A  Yes.
14 Q  And what was the weight of the substance, of the
15 marijuana?
16 A  The net weight that was submitted to our
17 laboratory was three hundred and nineteen point eight
18 grams.
19 Q  Was the entire substance submitted to your
20 laboratory?
21 A  No, it was not.
22 Q  And why is that?
23 A  That is standard procedure for the agent to make
24 a sampling of the bundles and send only a
25 representative sample to the laboratory.

1 Q  Okay.  And exhibit 1, that is actually what, is
2 it three samples?
3 A  Well, it's actually -- exhibit 1 is the main
4 seizure of the total weight which was recorded as
5 ninety-two point seven six pounds.  Exhibit 1(a) is a
6 bulk -- a large amount of sample that they took.  And
7 1(b) through 1(c) are two smaller representative
8 samples that they send.
9 Q  Let me see you, you said ninety-two point what, now?
10 A  Ninety-two point seven six pounds.
11 Q  Okay.  And then the three hundred and nineteen
12 point eight is the sample sent to the lab, is that
13 correct?
14 A  That's correct.
15 Q  Let's 's talk about exhibit 2.  What does exhibit
16 2 purport to be?
17 A  Cocaine hydrochloride.
18 Q  And did you test exhibit 2?
19 A  Yes, I did.
20 Q  What test did you run on exhibit 2?
21 A  I ran a gas chromatograph mass spectrometer, and
22 I ran a four year transform infrared spectrometer, and
23 those are confirmatory tests for the presence of
24 various controlled substances and non-controlled
25 substances.  And I performed a quantitative analysis

Multi-Page™

Page 34

1  using an instrument called a high pressure liquid
2  chromatograph.
3  Q  And based on those tests, did you formulate an
4  opinion as to what the substance was?
5  A  Yes.  The substance was cocaine hydrochloride
6  with a net weight of two point seven grams, and a
7  purity of eighty-three percent.
8  Q  And that in fact was not sent to you as a sample,
9  is that correct?
10  A  No, the entire sample was sent to us.
11  Q  The entire sample or the entire amount found --
12  A  Yeah, the entire amount found or seized.
13  Q  Now exhibit 3 and 4, what did those exhibits
14  purport to be?
15  A  Marijuana as well.
16  Q  And did you perform the same tests that you just
17  described to the jury regarding exhibit 1 on these
18  samples?
19  A  Yes, I did.
20  Q  And did you formulate an opinion as to what those
21  substances were?
22  A  Yes.
23  Q  And what were they?
24  A  Exhibit 3 was found to contain marijuana with a
25  net weight of four hundred and forty grams.

Page 35

1      Exhibit 4 was also found to obtain
2  marijuana, with a net weight of seven point nine
3  grams.
4  Q  Now, Mr. Bravenec, were those samples sent to the
5  lab or was that the whole amount?
6  A  That was the whole amount.
7  Q  Okay.  And could you tell me again what the
8  amount was?
9  A  The first one, exhibit 3, was four hundred and
10  forty grams.
11      Exhibit number 4 was seven point nine grams.
12  Q  And that was exhibit 3 and 4, correct?
13  A  Correct.
14  Q  And exhibit 2 if you'll just repeat for me was
15  cocaine, correct?
16  A  Correct.
17  Q  And how much cocaine?
18  A  Two point seven grams.
19  Q  Mr. Bravenec these reports that you were just
20  were referring to, are these your reports?
21  A  Actually, the bottom half of the block,
22  twenty-five to block thirty-nine, is filled out by our
23  laboratory.
24  Q  And they're signed by you?
25  A  Yes.

Page 36

1  Q  Have they been changed or altered in any way
2  since you signed that report?
3  A  No, they have not.
4      MS. MORRIS:  At this time we move into
5  evidence government's exhibit 53, 54 and 55.
6      MS. WAYNE:  Judge, if I could just see them?
7  I'd like to check something.
8      THE COURT:  Certainly.
9      MS. WAYNE:  I don't have any objection.
10      THE COURT:  Very good.  They're both
11  admitted.  All three are admitted.
12      MS. MORRIS:  I have nothing further at this
13  time.
14      THE COURT:  Cross?
15      MS. WAYNE:  Nothing further.
16      THE COURT:  Mr. Teague?
17      MR. TEAGUE:  None, Your Honor.
18      THE COURT:  Thank you.  You may step down.
19      (Whereupon the witness, Victor Bravenec,
20  stepped down from the stand.)
21      THE COURT:  Next witness?
22      MR. MOORER:  United States calls Kenneth
23  Henley.
24      THE COURT:  Kenneth Henley.
25          K E N N E T H   H E N L E Y,

Page 37

1  the witness herein, having first been duly sworn or
2  affirmed to tell the truth, was examined and testified
3  as follows:
4          DIRECT EXAMINATION
5      BY MR. MOORER OF KENNETH HENLEY:
6  Q  Would you state your name for the record and
7  spell your last name, please, sir.
8  A  Kenneth Henley.  H-e-n-l-e-y.
9  Q  Mr. Henley, what city and state do you live?
10  A  Meridian, Mississippi.
11  Q  What do you do for a living?
12  A  I'm a bail bondsman.
13  Q  How long have you been a bail bondsman?
14  A  Since October of 1981.
15  Q  Mr. Henley, do you recall July the 31st of 1997?
16  A  Yes, sir, I do.
17  Q  Did you have any occasion to write any bonds
18  pertaining to any people who may have been mentioned
19  in this case?
20  A  Yes, sir, I did.
21  Q  And on whom, if at all, did you write a bond?
22  A  We caused a bond to be executed for a Sandra
23  Jones.
24  Q  Now did you have occasion to find out why it was
25  that Miss Jones needed a bond?

## Page 38

1 A  She had been arrested for transporting a hundred
2 and fifty pounds of marijuana and locked up in the
3 county jail.
4 Q  Would you tell us the first thing that happened
5 in regards to your involvement with becoming aware
6 that she had needed someone to provide a bond?
7 A  Miss Jones called me from the jail, and I wrote a
8 bond.
9 Q  How much was her bond set at?
10 A  A hundred and fifty thousand.
11 Q  And when she called you as a bondsman asking for
12 the services of a bondsman, what, if anything,
13 happened next?
14 A  She wanted us to bond her out and I told her what
15 it would cost.
16 Q  How much would it cost for a hundred and fifty
17 thousand dollar bond?
18 A  By law our fees are set by the State of
19 Mississippi, which is ten percent in Mississippi,
20 which is fifteen thousand dollars.
21 Q  After you quoted this fee that it would cost for
22 you and your agency to provide her bond, what, if
23 anything, happened next?
24 A  Miss Jones gave me the phone numbers to contact
25 some people about getting the money to get her out of

## Page 39

1 jail.
2 Q  Do you recall the name of the person that she
3 told you she wanted you to contact?
4 A  Leon Carmichael.
5 Q  Is the person that she asked you to make contact
6 with in the courtroom today?
7 A  Yes, sir.
8 Q  Would you point him out and describe him for the
9 record?
10 A  Over there.
11 Q  Are you pointing to the gentleman second from the
12 end?
13 A  Yes, sir.
14        MR. MOORER:  For the record, Your Honor,
15 he's identified the defendant, Leon Carmichael.
16 Q  Did you make contact with Mr. Carmichael?
17 A  Yes.  This was a few days before the 31st.  I
18 bonded her out on the 31st, but a few days before that
19 when I made phone contact with him the first time, I
20 had contact several times, but on the 31st is when we
21 got her out of jail.
22 Q  Now when Mr. Carmichael -- When you made contact
23 with Mr. Carmichael, I believe you said a moment ago
24 you first made contact with him over the phone?
25 A  Yes, sir.

## Page 40

1 Q  Now did he thereafter make any contact with you
2 in person?
3 A  Yes, sir, on the 31st.
4 Q  And where did that contact take place?
5 A  On Constitution Avenue in downtown Meridian.
6 Q  Is that where your office is?
7 A  No, sir, my office is about a block or so away.
8 Q  Why did you not meet at your office?
9 A  Mr. Carmichael didn't want to meet in my office.
10 Q  I'm sorry, I didn't hear you.
11 A  Mr. Carmichael didn't want to meet in my office.
12 Q  And this street that you referred to where you
13 met, how far is that from your office in relation to
14 where your office is?
15 A  It's about halfway between my office and the
16 jail, so it's about a block.  A block, a block
17 and-a-half.
18 Q  And did he pay you the bonding fee that you
19 required to post her bond?
20 A  Yes, sir.
21 Q  How was that payment made?
22 A  It was made by a bank check.  I don't remember
23 what bank.
24 Q  Now I'm going to show you what's been previously
25 marked as government's exhibit 44.  Can you see on the

## Page 41

1 screen in front of you government's exhibit 44?
2 A  Yes, sir.
3 Q  And what is shown on government's exhibit 44,
4 this portion that I'm showing to you on the screen?
5 A  That's the lady I bonded out of jail, Sandra
6 Jones.
7 Q  Now I'm going to show you what I've previously
8 shown to defense counsel marked government's exhibit
9 52.
10        MR. MOORER:  If I may approach the witness,
11 Your Honor, so I can show him government's exhibit 52?
12        THE COURT:  Yes, you may.
13 Q  What is government's exhibit 52 that I've just
14 shown you?
15 A  This is an NCR copy of our appearance bond.
16 Q  And is this the bond that you posted for Sandra
17 Jones pursuant to the payment by Defendant Carmichael?
18 A  Yes, sir.
19 Q  And is government's exhibit 52 an accurate copy
20 of the bond that you or your company signed?
21 A  That copy, yes, sir.
22        MR. MOORER:  We offer exhibit 52, Your
23 Honor.
24        THE COURT:  Admitted.
25        MR. MOORER:  I have no further questions,

Page 42

1 Your Honor, and tender the witness.
2      THE COURT: Cross?
3            CROSS EXAMINATION
4         BY MS. JAMES OF KENNETH HENLEY:
5 Q  Good morning, Mr. Henley.  How are you?
6 A  Fine.  How are you?
7 Q  I'm fine.
8      I'm Susan James.  I have a few questions for
9 you on behalf of Mr. Carmichael.
10 A  Yes, ma'am.
11 Q  You've only made one bond for Sandra Jones, is
12 that right?
13 A  That's right.
14 Q  And that was back in what year?
15 A  1997.
16 Q  1997?
17 A  Yes, ma'am.
18 Q  Now you've testified here today that you had some
19 contact with Mr. Carmichael in relation to that bond,
20 is that correct?
21 A  Yes, ma'am.
22 Q  Is there a requirement in your county dealing
23 with making bonds with truck drivers?  Is there some
24 sort of policy or procedure?
25 A  There are several.  The justice court judges

Page 43

1 which are the judges that set the bonds initially, we
2 have five justice court judges, so each one has a
3 different policy.  The standard among three of the
4 judges is your truck does not leave until the driver
5 leaves.
6 Q  Now so that we understand what you're saying by
7 that, I understand that's kind of the phrase or
8 terminology that you all use, does that mean that
9 unless the owner of the truck bonds the driver out,
10 the truck doesn't go back to the owner?
11 A  Yes, ma'am.  The truck does not leave until the
12 driver is out of jail.
13 Q  Okay.  In this particular case, in relation to
14 your conversations with Mr. Carmichael about this
15 bond, was it your understanding that he was primarily
16 going to —
17      MR. MOORER: Objection, Your Honor.  This
18 question that she's going to ask calls for a hearsay
19 answer, and it would also go to what we could only
20 tell by delving into the mind of the defendant, which
21 none of us can do.
22      THE COURT: I have no idea what she's going
23 to ask him.
24      MR. MOORER: Your Honor, I think the
25 question itself —

Page 44

1      THE COURT: Should I excuse the jury?
2      MR. MOORER: Yes, Your Honor.
3      THE COURT: I'll have to excuse the jury for
4 just a minute.
5      (Whereupon, the jury was escorted out of the
6 courtroom, and the following colloquy ensued):
7      MR. MOORER: Your Honor, the basis for my
8 objection was —
9      THE COURT: Well why don't I hear the
10 question first, and then let's see where we're going.
11      MS. JAMES: Judge, my question was —
12      THE COURT: No.  Just ask your question.
13 Q  Did you have conversations with Mr. Carmichael
14 about his motivation to make the bond?
15 A  Motivation?
16 Q  Why he was going to make the bond.
17 A  Motivation?
18 Q  All right.  Did Mr. Carmichael know that that was
19 — Did you tell Mr. Carmichael that that was the
20 requirement, that the bond had to be made in order to
21 get the truck?
22 A  Yes, ma'am.
23 Q  Did Mr. Carmichael ask you for your assistance in
24 helping him get his truck back?
25 A  Yes, ma'am.

Page 45

1 Q  And did you explain to Mr. Carmichael that this
2 was a requirement of your circuit judges or district
3 judges?
4 A  Yes, ma'am.
5 Q  And did you make telephone calls on his behalf to
6 try to get the truck back?
7 A  Yes, ma'am.  And also he asked me to get an
8 attorney involved to try to get his truck back.  I
9 called Suzanne Merchant, an attorney there in
10 Meridian.
11 Q  Okay.  And did you explain to Mr. Carmichael that
12 you would not be able to help him get his truck back
13 unless he made the bond for Sandra Jones?
14 A  Yes, ma'am.
15 Q  And that wasn't an unusual requirement of your
16 court there, was it?
17 A  No.  Judge Thompson set that bond, and that's
18 standard for him for any truck driver.
19 Q  And you've made a lot of bonds for truck drivers,
20 haven't you?
21 A  Yes, ma'am.
22      THE COURT: I think we've gone into this
23 enough.  What's your objection?
24      MR. MOORER: Your Honor, that wasn't the
25 question she asked.  The question that she asked —

Multi-Page™

Page 46

1    THE COURT: If he ends up he didn't hear Mr.
2  Carmichael give any motivation -- But what she's
3  asking now seems appropriate.
4    Bring the jury back in.
5    MOTION FOR MISTRIAL:
6    MS. JAMES: Judge, before you do that, I
7  have a motion for a mistrial.
8    THE COURT: Okay.
9    MS. JAMES: And it's on the basis of the
10  government commenting on the defendant's failure to
11  testify. When I posed that question, Mr. Moorer said
12  judge, that delves into the defendant's motivation, or
13  into the defendant's mind, and we can't speculate
14  about what's in his mind. And I think that puts a
15  logical leap for the jury to say well let him explain
16  what was in his mind. And I think that -- And
17  obviously we know that's just a fundamental basis for
18  denying a fair trial.
19    MR. MOORER: Your Honor, her question was in
20  substance, and I think it may almost be exact, did Mr.
21  Carmichael seem to be more concerned with getting the
22  truck than he did with bonding her out. And that
23  would go into what his own subjective reasons were to
24  try to post the bond. And that was why I was
25  objecting.

Page 47

1    She was trying to get in through the back
2  door what I don't think she could get in through the
3  front door, which is why he did what he did. She can
4  get him to say what he did and some of the things that
5  surround what he did to lay the inference for her to
6  argue that was his motivation, but when she flat out
7  asked him and attempted to ask him was that the reason
8  he did what he did, that I thought was improper and
9  that required me to comment upon the fact that nobody
10  can jump inside of his head and get that kind of
11  information out. That wasn't a comment upon his
12  testifying or not testifying.
13    THE COURT: Anything else?
14    MS. JAMES: Yes, Judge. We obviously
15  disagree. We believe it was in fact a comment on the
16  defendant's right to testify or not.
17    THE COURT: The motion for mistrial is
18  denied. In its proper context it's clear that the U.
19  S. Attorney was not commenting on the defendant's
20  ability to testify. But out of an extreme caution,
21  I'll be happy to tell the jury that they should ignore
22  his question; number two, that that he is not
23  obligated to testify and they should not infer any
24  obligation on the defendant to testify. If you want
25  that.

Page 48

1    MS. JAMES: Yes, please, sir.
2    THE COURT: Why don't you draft the charge
3  right now. I tell the jury that anyway in my closing
4  charge, but I'll be happy to do it right now.
5    Miss James, when do you want me to give the
6  other charge?
7    MS. JAMES: Judge, it might be after this
8  witness testifies.
9    THE COURT: You just let me know. I don't
10  want to forget it.
11    (Whereupon, all defense counsel conferred
12  off the record and out of the hearing of the other
13  courtroom participants.)
14    MR. MOORER: Your Honor, I see her response
15  to what you've asked her to draft. I think that the
16  idea --
17    THE COURT: Well, let me see it first. I
18  have no idea what you're talking about until I look at
19  a it.
20    (Whereupon, the Court examined said
21  document.)
22    THE COURT: Yes?
23    MR. MOORER: Your Honor, I think that
24  statement is improper. I was responding to why the
25  basis --

Page 49

1    THE COURT: Yeah, she can go into it. I
2  don't see any harm by saying this. It will all come
3  out. I'll essentially tell the jury to ignore the
4  last response.
5    Let's proceed. Bring the jury back in.
6    (Whereupon, the jury was escorted into the
7  courtroom.)
8    THE COURT: Members of the jury, the
9  government's response to the last question posed by
10  the defense cannot be considered in any way by you.
11    Proceed, Miss James.
12    MS. JAMES: Thank you.
13  Q  Mr. Henley, before we took the break I was asking
14  you about conversations you had with Mr. Carmichael in
15  relation to this bond. Do you remember that?
16  A  Yes, ma'am.
17  Q  You've explained for us here today that at least
18  three of your judges require that a truck not be
19  released -- a seized truck not be released until the
20  owner has made bond for the driver, is that correct?
21  A  Yes, ma'am, or anybody, as long as the driver is
22  gone.
23  Q  Did the judge in this case, was he one of the
24  ones who had that policy?
25  A  Yes, ma'am.

Multi-Page™

Page 50

1 Q  And did you explain that to Mr. Carmichael?
2 A  Yes, ma'am.
3 Q  Did Mr. Carmichael tell you he was concerned
4 about the release of the truck because there was a
5 perishable load of goods on the truck?
6        MR. MOORER:  Objection, Your Honor.  That's
7 hearsay without any exception, Your Honor.
8        THE COURT:  I'll allow the exchange between
9 them to come in.  Overruled.
10 Q  You can answer it.
11 A  I don't remember about what was on the truck or
12 anything like that.  He just wanted me to get the
13 truck released, and I couldn't do it without the
14 driver being bonded out.
15 Q  Okay.  Do you have any knowledge as to why that
16 particular policy has been implemented by your judges?
17        MR. MOORER:  Objection, Your Honor.
18        THE COURT:  Overruled.
19        If you know.
20 A  So our jail would not be full of truck drivers.
21 Q  When you say that, Mr. Henley, it seems to
22 indicate that there are a lot of truck drivers that
23 are stopped in your area and you process those with
24 bonds?
25        MR. MOORER:  Objection, Your Honor.

Page 51

1        THE COURT:  If he knows.  Overruled.
2 Q  Go ahead.
3 A  Could be.  Thank goodness.
4 Q  Does that mean "thank goodness" because that's
5 good for your business?
6 A  Good for my business, yeah.
7        MS. JAMES:  No further questions.  Thank you
8 Mr. Henley.
9        THE COURT:  Mr. Teague?
10        CROSS EXAMINATION
11 BY MR. TEAGUE OF KENNETH HENLEY:
12 Q  You have a lot of corporations, then, trying to
13 get their drivers that work for them out of jail, do
14 you not?
15 A  Yes, sir.
16 Q  Okay.  Thank you.
17        THE COURT:  Redirect?
18        REDIRECT EXAMINATION
19 BY MR. MOORER OF KENNETH HENLEY:
20 Q  So if I understand correctly, when the driver is
21 released the truck is also then free to go?
22 A  Yes, sir.
23        MR. MOORER:  No further questions, Your
24 Honor.
25        THE COURT:  Thank you.

Page 52

1        (Whereupon the witness, Kenneth Henley,
2 stepped down from the stand.)
3        THE COURT:  Next witness.
4        MR. FEAGA:  Eric Pigler, Your Honor.
5        THE COURT:  Eric Pigler.
6        MS. JAMES:  Judge, we have a matter we need
7 to take up before this witness comes in.
8        THE COURT:  Okay.  I'll have to excuse the
9 jury for a moment.
10        (Whereupon, the jury was escorted out of the
11 courtroom and the following colloquy ensued):
12        THE COURT:  Yes, Miss James?
13        MS. JAMES:  Your Honor, I need to notify the
14 Court that I have previously represented Mr. Pigler.
15 I believe it was the year that Opal came through,
16 which I think was 1994.  He was also represented very
17 frequently by a lawyer with whom I own an office
18 building, Jeff Duffy.
19        THE COURT:  Was this on a civil matter?
20        MS. JAMES:  No, criminal.  He has a fairly
21 extensive criminal history.  I represented him in a
22 matter relating to his parole from federal custody
23 because at one point he was serving a parole term
24 prior to 1997.
25        The government listed him.  We've received

Page 53

1 no D. E. A. Sixes specifically as related to Mr.
2 Pigler.  We received one D. E. A. Six where his name
3 was mentioned.  It's been redacted so I'm not exactly
4 sure even whose Six it is; however, the government did
5 not indicate that Mr. Pigler would be called as a
6 witness in any conversations that I had with them
7 until we heard his name mentioned at the first of this
8 trial.
9        THE COURT:  You mean on --
10        MS. JAMES:  On Monday of last week that he
11 was actually listed as a witness.
12        Based on the information that we were
13 provided in discovery, I certainly had no reason to
14 believe that Mr. Pigler might have been called as a
15 witness.  I think Mr. Teague also has represented Mr.
16 Pigler, which presents a problem.  Number one, we
17 can't even at this juncture, we're not even mindful of
18 what he might testify to, even any of the facts
19 relating to Eric Pigler in any alleged association
20 with Mr. Carmichael in order to assess where I might
21 stand in this.
22        I've spoken with co-counsel about this, and
23 I believe that their position is that if I'm
24 conflicted out, it might result in a conflict for the
25 entire defense team.

Page 54

1     MS. WAYNE: Judge, for the record, too, I
2 spoke to Ms. Morris last night. We had a phone
3 conversation about witnesses today and we talked about
4 the lineup. I indicated to her at the time that --
5 She indicated that -- I don't think she was even aware
6 that Miss James had represented Pigler, so it was the
7 first time that she had heard.
8     I indicated to her that Mr. Pigler might
9 waive, but in further discussions with my client he
10 is not going to waive. I can tell you that I told her
11 I thought he might, but I wasn't sure what he was
12 going to say.
13     We attempted to interview Mr. Pigler who
14 denied talking to us. He declined to talk to the
15 defense team and indicated that he had a lawyer at the
16 time -- this is this weekend -- who was Miss James,
17 the one she's referring to, the one she owns the
18 building with and, therefore, he declined to talk to
19 us. And that was the first that we had known about
20 that.
21     So I just wanted to put that on the record
22 as well.
23     THE COURT: Mr. Teague?
24     MR. TEAGUE: Your Honor, Ms. James brought
25 it up the fact that I had represented him before. It

Page 55

1 was not in connection with anything she has done.
2     THE COURT: Did you represent him in a
3 criminal or civil matter?
4     MR. TEAGUE: I think everything has been
5 criminal. I represented him in Montgomery County,
6 Shelby County and Elmore County on various and sundry
7 charges. I have -- From the day I got the first
8 discovery indicating Eric Pigler might be a witness,
9 I've talked with the prosecution and as recently as
10 just this morning, and the indications are that he
11 knows nothing about my client Freddie Williams, it's
12 not going to concern him in any way and I don't
13 anticipate there would be any cross examination by me
14 as counsel for Mr. Williams.
15     I see no conflict. I have discussed the
16 matter with Mr. Williams, and he sees no conflict and
17 waives any potential adverse interest there.
18     THE COURT: Okay. Let me hear from the
19 United States.
20     MR. FEAGA: Yes, sir. Your Honor, first of
21 all, Mr. Pigler is going to testify to basically one
22 event. He's going to testify that in June of 2001 he,
23 along with a fellow named Richmond Thomas who is also
24 going to testify after him, delivered fifty pounds of
25 marijuana to Mr. Carmichael. We believe the evidence

Page 56

1 will fairly be that it was the old truck office that
2 got torn down that was on the lot where they delivered
3 it to him.
4     They will say that they basically had an
5 arrangement with him and about they will bring him fifty
6 pounds of marijuana on that, and their deal was they
7 would bring it back, bring fifty pounds back or they
8 would pay him for it, and that they did delivery it
9 back and they both will testify that they in fact
10 delivered it back to Mr. Carmichael. Mr. Pigler will
11 say he actually got it from him and took it back.
12     Now that is the only thing he's going to be
13 testifying to other than admitting that he is, as they
14 say, does have a lengthy criminal record and that he
15 is in fact a marijuana distributor. That has nothing
16 to do with any of, that I'm aware of, any of Ms.
17 James' prior representations of Mr. Pigler. Mr.
18 Pigler is willing to waive any conflict that he has.
19 So we just don't see how this could create any sort of
20 conflict with their representation of Mr. Carmichael
21 and we think we should be able to put the witness on.
22     THE COURT: In light of Mr. Feaga's
23 representations, does the defense team see a conflict?
24     MS. JAMES: May I consult?
25     (Whereupon, Ms. James conferred with other

Page 57

1 defense counsel off the record and out of the hearing
2 of the other courtroom participants.)
3     MS. JAMES: Judge, first and foremost I
4 don't think that we ever heard anything with regard to
5 Richmond Thomas, and we believe that this creates a
6 due process problem.
7     THE COURT: What's this about Richmond
8 Thomas?
9     MS. JAMES: He just said this scenario with
10 Mr. Pigler involves a deal for distribution with Mr.
11 Carmichael of fifty pounds of marijuana with a
12 Richmond Thomas.
13     THE COURT: Well if you have something that
14 shows me that they're obligated to inform you of this
15 before trial, let me know.
16     MS. JAMES: Well, I just think pursuant to
17 Rule 16 --
18     THE COURT: Show me what's in Rule 16 that
19 requires that, otherwise let's move on.
20     MS. JAMES: Well, I mean I think it's
21 fundamental fairness, Judge.
22     THE COURT: In criminal cases, you know,
23 there's a Supreme Court case on this and, you know, if
24 I were making the law it might make a difference, but
25 the government is not required to disclose anything

Multi-Page™

1 other than what Rule 16 requires or Brady material or
2 other things. Unless it falls into one of those
3 categories, let's move on.
4 　　MS. JAMES: Well, Judge, I would just note
5 for the record, as the Court well knows this case has
6 been going on for eighteen months, so we were provided
7 some discovery which induces us to rely on their
8 representation as to what their case is, and we rely
9 on that, and then when we get to trial, we're in the
10 second week of trial and we hear something about
11 people who we never heard of, we don't have time at
12 this juncture to send an investigator to even find Mr.
13 Thomas.
14 　　But putting that aside, Judge, I'm not going
15 to belabor that point, putting that aside, this is the
16 problem with Mr. Pigler: Not only have I represented
17 Mr. Pigler in a criminal matter, I have fairly
18 extensive knowledge of Mr. Pigler's background, his
19 finances, all sorts of things of that nature.
20 　　Mr. Pigler did work on our office for
21 probably almost a year. We had daily contact with
22 him. I think that I have gained confidences in
23 relation to my involvement with Mr. Pigler.
24 　　THE COURT: Suppose Mr. Pigler is willing to
25 waive all of this.

1 　　MS. JAMES: Well I still have an issue with
2 the Alabama State Bar, and I know this from talking
3 with Mr. Robert Lust in relation to the Salery matter
4 because he indicated to me that I might -- with regard
5 to people I've represented, a confidence could simply
6 be just their demeanor.
7 　　THE COURT: I understand that, but if Mr.
8 Pigler is willing to waive any conflict or any
9 knowledge, where is the problem?
10 　　MS. JAMES: Well I think Mr. Carmichael
11 would have a say in it as well, because there is a
12 question in his mind as to whether or not my
13 relationship with Mr. Pigler, I didn't press the
14 envelope. I didn't push his buttons.
15 　　THE COURT: Well let somebody else examine
16 him.
17 　　MS. JAMES: There is no wall here, Judge.
18 　　THE COURT: I understand that, but I
19 understood with Mr. Salery the problem was that, you
20 know, you were -- there was a future proceeding. I
21 believe it was his Rule 35. But I don't understand if
22 Mr. Pigler is willing to waive, where the conflict
23 would be with Mr. Carmichael.
24 　　MS. JAMES: Well I still think that Mr.
25 Carmichael could have and would have assessed that

1 scenario with regard to who he wanted to represent
2 him. Because it would be inherently unfair for Mr.
3 Carmichael to have to sit here and question my cross
4 examination, or the cross examination of any of the
5 defense team of Mr. Pigler because we were trying to,
6 quote, protect ourselves from some sort of
7 disciplinary action or Bar action as a result of that.
8 　　I mean I realize conflicts develop in a lot
9 of cases, Judge, but conflicts that we can't see until
10 the second week of trial are problematic, not only
11 just for our own status with the State Bar and our
12 ethical obligations, but for a client who has looked
13 at the discovery, has discussed the discovery with us
14 and now we have two individuals that purport to have
15 been engaged in illegal conduct with Mr. Carmichael
16 that we don't even have time to investigate.
17 　　THE COURT: Is Mr. Thomas going to testify?
18 　　MR. FEAGA: Yes, sir.
19 　　THE COURT: Let's call Mr. Thomas first and
20 I'll let you know something later.
21 　　MS. JAMES: We've never heard of Mr. Thomas.
22 We would ask that you allow us a continuance so we can
23 check into Mr. Thomas and Mr. Pigler's background as
24 regards this particular scenario that Mr. Feaga has
25 just described.

1 　　THE COURT: Mr. Feaga?
2 　　MR. FEAGA: Your Honor, I think the Court
3 has correctly stated our obligation to the defense, is
4 to turn over the materials that Rule 16 requires us to
5 turn over. We have done that.
6 　　In addition, Mr. Thomas's testimony is going
7 to be about as exactly the same event as Mr. Pigler's.
8 He was with him when he delivered the dope back over
9 there that he was paying back to Mr. Carmichael. So
10 his testimony is going to be the same.
11 　　The idea that they need a continuance to
12 prepare for information that's going to come out
13 during a trial where we have accused their client of
14 being a distributor of marijuana over a ten year
15 period is, we think --
16 　　THE COURT: Well, what I'm going to do is
17 this: Let's go ahead and call Mr. Thomas, put him on
18 the stand. If you can show me some case law that
19 warrants such a continuance I'll look at it.
20 Otherwise, my understanding of the case law is clearly
21 that you're not entitled to a continuance. But unless
22 you can show me otherwise, call Mr. Thomas.
23 　　Bring in the jury.
24 　　(Whereupon, the jury was escorted into the
25 courtroom.)

Multi-Page™

## Page 62

1  THE COURT: Proceed.
2  MR. FEAGA: Richmond Thomas. He is with the
3 marshals.
4  THE COURT: Bring him in.
5  R I C H M O N D   T H O M A S,
6 the witness herein, having first been duly sworn or
7 affirmed to tell the truth, was examined and testified
8 as follows:
9  DIRECT EXAMINATION
10  BY MR. FEAGA OF RICHMOND THOMAS:
11 Q  Sir, would you tell the ladies and gentlemen of
12 the jury your name, please.
13 A  Richmond Thomas.
14 Q  And where do you currently live, Mr. Thomas?
15 A  My residence is in Montgomery.
16 Q  Okay. Are you living at your residence right
17 now?
18 A  No, sir.
19 Q  Where are you living right now?
20 A  Talladega Federal Prison.
21 Q  Now, Mr. Thomas, would you tell the ladies and
22 gentlemen of the jury why you're in prison?
23 A  Conspiracy to possess and distribute drugs.
24 Q  Okay. What kind of drugs did you get convicted
25 of a conspiracy to possess with intent to distribute?

## Page 63

1 A  Cocaine.
2 Q  And when did that happen?
3 A  In 2001.
4 Q  And what kind of sentence did you get?
5 A  Fifty-one month sentence.
6 Q  Now is that the only conviction you have of a
7 felony?
8 A  Yes.
9 Q  Okay. How old were you when that happened to
10 you?
11 A  Forty-two.
12 Q  And what were you doing for a living before that
13 happened to you?
14 A  Construction.
15 Q  And when you say "construction," would you tell
16 the ladies and gentlemen of the jury what you mean.
17 A  I had a small construction company. Remodeling
18 houses and doing some additions. Stuff like that.
19 Q  Where was it located?
20 A  In Montgomery, Troy Highway.
21 Q  Now do you know a fellow named Leon Carmichael?
22 A  Not really.
23 Q  Do you know who he is?
24 A  Yes, sir.
25 Q  Let me ask you, would you look around this

## Page 64

1 courtroom and see if the person that you think is Leon
2 Carmichael is in this courtroom. And if he is, would
3 point him out.
4 A  Yes, sir, over there.
5 Q  Okay. And would you tell the ladies and
6 gentlemen of the jury where "over there" you're
7 talking about?
8 A  Sitting between the lady and the man over there
9 on the side.
10 Q  Between the lady and the man over here?
11 A  Yes, sir.
12 Q  Can you be a little more specific?
13 A  With the black suit on.
14 Q  Would that be this individual right here?
15 A  Yes, sir.
16  MR. FEAGA: Your Honor, may the record
17 reflect that he's identified the Defendant Leon
18 Carmichael.
19 Q  Now, do you know a fellow named Eric Pigler?
20 A  Yes, sir.
21 Q  Now did you ever have occasion to be involved
22 with Eric Pigler in the distribution of any illegal
23 substances?
24 A  I was letting him use my warehouse to unload the
25 drugs.

## Page 65

1 Q  What kind of drugs were they unloading at your
2 warehouse?
3 A  Cocaine and marijuana.
4 Q  With regards to marijuana, would you tell the
5 ladies and gentlemen of the jury how it is that
6 marijuana would get unloaded at your place of
7 business?
8 A  You know, I would let them -- They would have
9 some Mexican friends in the town, and I would let them
10 use my warehouse and they would come in and pull the
11 doors down and take the bed off the truck and get it
12 out the gas tank. Unload it out the gas tank.
13 Q  Who were the Mexicans that were bringing it in,
14 do you know?
15 A  It was Erma Lazano and Cesar Lazano.
16 Q  Okay. And when you say "they" would bring it to
17 your shop and -- do what with it?
18 A  Well, they would just take the bed off the truck
19 and unload it.
20 Q  And who is "they?" Who would do this?
21 A  Me and them and a driver they was bringing with
22 them. There was four of us.
23 Q  Okay. "Me" and "them," who is "them"?
24 A  Erma Lazano, the driver and her husband.
25 Q  Okay.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Total Computerized Litigation Support

Page 62 - Page 65

Multi-Page™

Page 66

1 A  Eric would be present.  He would just help stand
2 them up.
3 Q  Whose marijuana was it that was being brought in
4 there?
5 A  Eric Pigler's.
6 Q  Now you said they were bringing cocaine in, too?
7 A  They brought cocaine the last time.
8 Q  But prior to the last had time what were they
9 bring in?
10 A  Just marijuana.
11 Q  Okay.  Now when was the last time?
12 A  December 2001.
13 Q  I want to direct your attention to a time around
14 June of 2001 and ask you if you had occasion on that
15 day to see the person that you thought was Leon
16 Carmichael?
17 A  Yes.
18 Q  Would you tell the ladies and gentlemen of the
19 jury how that came about?
20 A  Well I was at work, and the Mexicans came in and
21 they went by Eric.  Eric called me.  I was at work.
22 He called me and told me that his sister was in town
23 He called him his sister.
24 Q  Called who his sister?
25 A  The Mexican, Carmine.

Page 67

1 Q  Okay.
2 A  And would I meet him at the warehouse.  I said,
3 "Give me about an hour and I'll meet there."  And that
4 was bout three-thirty, and I met him over there about
5 four, four-twenty.
6 Q  What happened when you got there?
7 A  Well we pulled in.  I opened up and we pulled up
8 in it, and found a red Ford F-100.
9 Q  Who's "they"?
10 A  The Mexicans.
11 Q  Okay?
12 A  And we took the bed off.  I got the marijuana out
13 of the gas tank and we way done backed it up.  And we
14 throwed it on the back of my truck.
15 Q  All right.  You did what to the back of your
16 truck?
17 A  We put it on the back of my truck.
18 Q  Put what on the back of your truck?
19 A  The marijuana.
20 Q  Okay.  And what did you do with it after you --
21 How much marijuana was it?
22 A  About seventy-five, seventy-eight pounds,
23 somewhere like that that.
24 Q  And who is the "we" who put it on the back of the
25 truck?

Page 68

1 A  Eric and I and the Mexican driver.
2 Q  Okay.  What happened to the seventy-eight pounds
3 of marijuana after you put it on the back of your
4 truck?
5 A  Well Eric had rode over to my shop with the
6 Mexicans and he asked me if I would drop them off back
7 by home and I told him, "Yeah."
8      And he said, "Well I need to run by Leon's
9 shop, will you drive me by there?"
10      I said, "Yeah."
11      He said, "Well let me holler at him first
12 and make sure he's there."
13 Q  And how did you know where this fellow named Leon
14 had a shop?
15 A  Well I passed through there, you know.  I passed
16 around there doing work in Montgomery all over.
17 Q  So you didn't know Leon Carmichael as a friend,
18 you knew who he was?
19 A  Well I knew who he was, I knew where his shop
20 was.
21 Q  Okay.
22 A  I didn't really see him before that day.
23 Q  Okay.  Hadn't seen him before that day.
24 A  No, sir.
25 Q  Okay.  How did you know that he had a shop

Page 69

1 somewhere if you didn't know anything about him?
2 A  Because, you know, people would say, "That's
3 Carmichael's shop right there.  He's got a trucking
4 company right there."
5 Q  I got you.
6      So what you're saying is, you had never seen
7 him before that day?
8 A  No.
9 Q  You didn't know him?
10 A  No, sir.
11 Q  But you knew that somebody named Leon Carmichael
12 existed and had a shop over there?
13 A  Yeah.
14 Q  All right.  Now Mr. Pigler wanted you to drop him
15 by down over there?
16 A  Yeah.  He wanted me to take him by there and
17 holler if he was home.
18 Q  Okay.  And, why?
19 A  To take the marijuana from me, I guess.
20 Q  Well what happened?
21 A  Once we got there -- Well he called Leon first to
22 make sure he was there.  Once we got there he knocked
23 on the door.
24 Q  Knocked on the door of what?
25 A  The shop.

Multi-Page™

<table>
<tr><td>

Page 70

1 Q Okay.
2 A And I guess Carmichael answered the door and they
3 said if he was, then Eric came back and got the bag on
4 the back of my truck and they went back inside and
5 closed the door and that was it.
6 Q Now you're saying Eric went up and knocked on the
7 door.
8 A Yeah.
9 Q Okay. Now this shop that you went to, where was
10 it?
11 A It's along the Ridge Road. On the corner of
12 Norman Bridge and Fleming Road.
13 Q Are you familiar with something called the
14 Carmichael Center?
15 A Yeah.
16 Q Do you know where it is?
17 A It's on Fleming Road.
18 Q Okay. Is this place that you went to drop the --
19 to take Mr. Pigler to, is that in the same place that
20 the Carmichael Center is?
21 A No. The Carmichael Center is on Fleming Road,
22 but the shop is on Norman Bridge Road.
23 Q Were they near each other?
24 A The Carmichael Center is behind where the shop
25 used to be at.

</td><td>

Page 72

1 Q All right. What happened after that when they
2 went in?
3 A They was taking about five minutes or so. He
4 came out got in the truck and I went back with the
5 other marijuana.
6 Q All right. Now You told the jury you didn't
7 really know Leon Carmichael before that day, had never
8 him before.
9 A No, sir.
10 Q Okay. That you knew of him, that you knew he
11 existed and he had a place?
12 A Yes.
13 Q How do you know that the person that you saw that
14 day -- Well, let me ask you. Is the person you saw
15 that day the person you identified in here today?
16 A Yes, sir.
17 Q And is that how you're making the connection?
18 A Yes.
19 Q When Mr. Pigler came back out of the business --
20 and I assume he did come back out?
21 A Yes.
22 Q After about five minutes, you said?
23 A Yeah, about five or ten minutes. Somewhere in
24 there.
25 Q Let me ask you something. You said he went up

</td></tr>
<tr><td>

Page 71

1 Q Okay. You said "where the shop used to be at.
2 A Yeah.
3 Q What happened to the shop?
4 A I guess they tore it down, I guess.
5 Q Okay. Do you know what's there now, where the
6 shop was?
7 A No, I don't really know.
8 Q Okay. Now, again, you said Eric -- You pulled up
9 to this shop?
10 A Yes.
11 Q In your truck?
12 A Yes.
13 Q With the seventy-five pounds to seventy-eight
14 pounds of marijuana in the back?
15 A Yeah. He said we had fifty pounds in one bag
16 that he said he owed to Leon, and the other in another
17 bag.
18 Q Fifty pounds he said what about?
19 A That he owed to Leon.
20 Q Okay. And what happened when you got to Leon's
21 shop?
22 A Well he knocked on the door and Leon answered the
23 door. And he said something you can't hear, and he
24 came back and got the bag off the back of the truck
25 and they went back in.

</td><td>

Page 73

1 and knocked on the door. Where was the fifty pound
2 bag of marijuana when he knocked on the door?
3 A It was still on the back of the truck.
4 Q All right. And once Leon Carmichael opened the
5 door, what happened then?
6 A Eric said something to him, and then he came back
7 and got the bag off the truck and went on inside and
8 closed the door.
9 Q So he took the bag in with him?
10 A Yes.
11 Q When he came back out, did he have the bag with
12 him?
13 A No, sir.
14 Q Okay. And what did he do after he came back out?
15 A We got in the truck and I took him up the highway
16 toward his house.
17 Q All right. Did Eric Pigler tell you why he owed
18 Leon fifty pounds of marijuana?
19 A Yeah. He said he got some from him earlier.
20 'cause his sister, Erma, was supposed to be there, but
21 they weren't there that week and he needed to get some
22 from him.
23 Q Okay. And So he said he got some from Leon?
24 A Yeah.
25 Q Okay. And what did him having to get some from

</td></tr>
</table>

Multi-Page™

Page 74

1 earlier because Erma didn't come have to do with him
2 going back over there with fifty pounds later?
3 A  To give it back to him.
4      MR. FEAGA:  No further questions, Your
5 Honor.
6      THE COURT:  Cross?
7      MS. WAYNE:  Judge, we need to renew our
8 motion.
9      THE COURT:  Denied.
10     MS. WAYNE:  Judge, I need to make a record.
11 I have some case law.
12     THE COURT:  Oh, you have some case law?
13     MS. WAYNE:  Yes, I do.
14     THE COURT:  Oh.  Then I'll have to excuse
15 the jury.
16     (Whereupon, the jury was escorted out of the
17 courtroom, and the following colloquy ensued):
18     THE COURT:  What's your case law?
19     MS. WAYNE:  Judge, I want to tell the Court
20 that this is obviously an individual who is engaged in
21 criminal conduct according to his statement.  Under
22 the case law including Jenks, but I'm also citing
23 Giglio and Brady material, the government doesn't make
24 that determination, Judge.  It's clear from the case
25 law that the government cannot withhold a document

Page 75

1 just because a prosecutor has determined it is not a
2 statement as defined by Jenks.
3      The Court, not only the prosecutor, can make
4 this determination.  Enforcement of the Jencks Act is
5 an affirmative duty of the trial court, I'm quoting
6 United States versus McKinsey at 768 F.2d 602 found at
7 607, which is a Fifth Circuit Case.  See also United
8 States versus Brown, 303 F.3d 582, also Fifth Circuit
9 case 2002, talking about that, again, the government
10 can't make this determination.
11     So my argument is this, Judge, and in this
12 jurisdiction my understanding is that there is a
13 standing order that Brady and Giglio material are
14 required by the date of the pretrial conference.
15 Again, Brady and Giglio material just like Jencks Act
16 material is not something of a determination that the
17 government makes.  They clearly made a determination
18 about a number of witnesses in this case that are
19 alleged to be involved in criminal conduct.
20     THE COURT:  Well let's step back just a
21 little bit.  What is Giglio material?
22     MS. WAYNE:  Giglio material, Judge, is that
23 material that appears to be helpful to the defendant.
24 Statements that are exculpatory material that should
25 be provided to the defendant.

Page 76

1      THE COURT:  And what is Brady material?
2      MS. WAYNE:  Brady material are those
3 statements and evidence, as in reports and documents,
4 that needs to be produced to the defense before trial.
5      THE COURT:  How does Brady differ from
6 Giglio?
7      MS. WAYNE:  Because Brady doesn't always
8 have to be helpful or exculpatory, Judge.  Brady can
9 be material like the results of the chemist's test on
10 the marijuana and things like.
11     THE COURT:  Brady doesn't have to be
12 helpful?
13     MS. WAYNE:  They don't necessarily, in my
14 opinion, need to make that requirement.  Or maybe I
15 have it switched around, Judge, that Brady has to be
16 helpful and Giglio doesn't.
17     THE COURT:  And what is Jenks material?
18     MS. WAYNE:  The Jenks material, Judge, is
19 requirements are triggered by statements that under
20 Jenks that the Court can consider statements by
21 defendants or codefendants implicating the defendant
22 in criminal behavior, such as alleged coconspirator
23 acts.
24     THE COURT:  I thought the Jenks material was
25 just all statements that were made but they have to be

Page 77

1 produced prior to the witness testifying, not
2 necessarily weeks or months?
3      MS. WAYNE:  That's true, Judge.
4      THE COURT:  Is there Jenks material on this
5 witness?
6      MS. WAYNE:  Not that we're aware.  We have a
7 D. E. A. Six that redacted, that's been blacked out.
8 We requested that that material be redacted prior to
9 trial.  That was a request that we made.
10     THE COURT:  Is there any evidence that we
11 have any Jenks Act material here that's of concern?
12     MS. WAYNE:  Well, Judge, this witness has
13 just testified that Mr. Carmichael has made his
14 presence and that of Eric Pigler's that obviously
15 involved criminal conduct.
16     THE COURT:  I understand that, but I don't
17 know if it's Jencks Act material that's my concern.  I
18 haven't seen anything that constitutes Jenks Act
19 material.
20     Government, do you have any Jenks Act
21 material?
22     MR. FEAGA:  No, sir, Your Honor.  We don't
23 have any statements that haven't been turned over.
24     THE COURT:  Now what about Giglio and Brady?
25 How do you understand Giglio and Brady material?

Multi-Page™

Page 78

1    MR. FEAGA: Your Honor, it would be my
2 understanding that if we had something that was
3 exculpatory or helpful to the defense, or material to
4 them in some way that we haven't turned over. I don't
5 know that we have anything like that.
6    I mean, I've interviewed this witness; we
7 have no statements from him, no D. E. A. Sixes.
8 Nothing to turn over. If we had, we'd have given it
9 to them. As I understand it, there is one that
10 mentions his name, but I don't know -- We turned over
11 an N. C. I. C. on that, a report as to his criminal
12 history.
13    THE COURT: What Brady material or Giglio
14 material are you contending that should have been
15 turned over either to Judge Boyd, or to me or to you?
16    MS. WAYNE: What seems obvious, Judge, is
17 that this man indicates he had a criminal case that he
18 just got fifty-one months for. I'm assuming within
19 that case he must have made statements involving our
20 client, or referring to his association with Mr.
21 Pigler. If those statements had been turned over to
22 us we would have had time to interview him and find
23 potential impeachment material, which is what Giglio
24 talks about.
25    THE COURT: What are you talking about?

Page 79

1    MS. WAYNE: He had a case that he got
2 fifty-one months for, for distributing drugs that he
3 indicates he was involved with Mr. Pigler.
4    THE COURT: I understand that, but where was
5 this case?
6    MS. WAYNE: I'm sorry, what?
7    THE COURT: Where was this case?
8    MS. WAYNE: He indicated Montgomery on
9 direct examination.
10    THE COURT: Well it could have been
11 Montgomery state or federal court, and --
12    MS. WAYNE: We don't know because we
13 haven't had time to investigate that, Judge, and find
14 out exactly what the case involved, what he said, was
15 there material --
16    THE COURT: Let me ask you, were you
17 convicted in state or federal court?
18    THE WITNESS: Federal court.
19    MR. FEAGA: It was federal, Your Honor.
20    THE COURT: Was it this Court?
21    MR. FEAGA: I believe so, yes, sir.
22    THE COURT: And you say there may be
23 material in that case involving Mr. Carmichael?
24    MS. WAYNE: Or not, or statements that he's
25 made about that case that are inconsistent with what

Page 80

1 he's said in terms of what he said today to this jury.
2 And in addition, Judge, I'm not sure that in terms of
3 what he's saying about this case if he's gotten some
4 kind of agreement from the government to testify here
5 today in terms of that case.
6    THE COURT: Well everything you say may very
7 well be true, and if the jury convicts him, and
8 assuming you meet the standards for Giglio and Brady
9 I'll have to set aside the conviction. But I'll hear
10 it after you've had a chance to look at it, and if the
11 government hasn't lived up to its obligations under
12 Giglio and Brady, if they haven't lived up to it, then
13 I'll have to set aside the verdict. But until that's
14 been met, and until you can produce it, your motion is
15 denied without prejudice.
16    I'll just -- After you've had a chance to
17 check the other case and see if there is anything
18 there, you can present it either on a post-trial
19 motion or collateral relief.
20    MS. WAYNE: I understand, Judge. And it
21 seems to me that this having come up in this trial,
22 and it seems to me the purpose of the standing order
23 in this jurisdiction is, in terms of discovery, to
24 avoid surprise and avoid trial by ambush. I mean,
25 there is some fairness in this jurisdiction, I think.

Page 81

1    THE COURT: Well I don't know there is
2 anything they kept from you.
3    MS. WAYNE: Right. And the problem is --
4    THE COURT: And if it ends up that they have
5 kept something from you that they should have turned
6 over to you, bring it to my attention. But I don't
7 see any sense in stopping this trial.
8    MS. WAYNE: And I understand that. Again,
9 our position is if we had time to investigate like we
10 have every other witness that has come in here, Judge,
11 then we would have time to be able to tell you and
12 articulate to you, you know -- First of all, there
13 wouldn't have been a problem, but if it shouldn't be
14 that --
15    THE COURT: You really haven't waived his
16 right to pursue Giglio and Brady, even after the trial
17 is over. If it ends up the government has acted in
18 violation of those two Supreme Court cases, I will
19 give you appropriate relief. No question about it.
20 But absent that, I don't know of any case that says I
21 should continue the case.
22    MS. WAYNE: Judge, what I would ask for the
23 Court to do is, because the case is not over, that if
24 the government is in control or possession of any D.
25 E. A. Sixes as it relates to this witness or Mr.

Page 82

1 Pigler, that they be turned over before this trial
2 ends so that we can attempt, at least in this short
3 window here, to remedy the violations.
4    THE COURT: The government is under a
5 standing obligation to turn over Jenks, Giglio and
6 Brady material, and I'm directing them to turn it over
7 if it does exist. And it means checking your agents;
8 it doesn't mean you have to know about it.
9    MR. FEAGA: Yes, sir, I understand.
10   THE COURT: The law is clear on that.
11   MR. FEAGA: Yes, sir.
12   THE COURT: Your verdict will mean nothing
13 if you haven't complied with it.
14   MR. FEAGA: Yes, sir.
15   MS. WAYNE: Judge, I would indicate to the
16 Court that at this point Mr. Carmichael's defense team
17 is unable to cross examine. We had no idea what he
18 could say on cross examination. I don't intend to
19 open the door to anything he might say because I don't
20 know anything about it; therefore, we're forced -- our
21 hands are tied. We cannot cross examine.
22   THE COURT: Well what about this? I
23 understand your dilemma. I'm willing to let you cross
24 him right now outside the presence of the jury if you
25 would like.

Page 83

1    MS. WAYNE: Judge, can I have a second so I
2 can --
3    THE COURT: Well we're actually at a
4 breaking time. Why don't I give you fifteen minutes.
5 Also if you would like, you may actually talk to him
6 right now privately. I have no problems with that as
7 well.
8    MS. WAYNE: That would be great, Judge.
9    THE COURT: Okay. We'll take a fifteen
10 minute recess.
11   The marshal will make the witness available
12 to the defense team.
13   (Whereupon, a recess was taken.)
14   THE COURT: Miss Wayne?
15   MS. WAYNE: Yes, Judge. I've had an
16 opportunity to speak briefly with Mr. Thomas and ask
17 him some questions. And I have received a document
18 about two minutes ago from Mr. Feaga that appears to
19 be a plea agreement that Mr. Thomas entered into with
20 the U. S. Attorney's Office that is dated July 11th,
21 2002. It is an eleven page document that I have
22 briefly gone over.
23   THE COURT: Do you wish additional time?
24   MS. WAYNE: Frankly, Judge --
25   THE COURT: We can move to another witness

Page 84

1 and we can call him back for cross later if you'd
2 like.
3    MS. WAYNE: My co-counsel, Miss James,
4 indicates to me, Judge, that that would be great in
5 terms of both Mr. Thomas and Mr. Pigler, who I think
6 we've also received a plea agreement as to him as
7 well.
8    THE COURT: Very good.
9    Let me ask the government. I haven't had a
10 chance to look at this issue involving Mr. Pigler,
11 have you?
12   MR. FEAGA: No, sir.
13   THE COURT: Why do you want to call Mr.
14 Pigler since you have Mr. Thomas? Why introduce it in
15 the case? I'm going to look at it, but why raise that
16 spectre unless there's going to be some severe cross
17 examination of Mr. Thomas or something like that?
18   MR. FEAGA: Well, Your Honor, I think the
19 fact that Pigler does know Mr. Carmichael and is the
20 one who actually borrowed the marijuana from him that
21 he's now taking back is, you know, is substantially
22 different from just his testimony that he rode over
23 there with him and had heard of him and recognizes the
24 man sitting in this courtroom today the guy that he
25 saw that day. Pigler is going to say that he is, in

Page 85

1 fact, the guy that not only did I get it from, but I
2 had this agreement with him --
3    THE COURT: All I'm saying is, I'll look at
4 this issue, but if I allow it in, I think that it's
5 just introducing an unnecessary issue to the case.
6 You may want to reconsider that. But I really do need
7 to look at Pigler a little bit longer.
8    MR. FEAGA: Yes, sir.
9    THE COURT: And I'll excuse this witness and
10 I'll give the defense team until one to cross examine
11 him, if you want to cross examine him.
12   MR. FEAGA: Yes, sir. And if I may, when we
13 get him back in here, at the point in time that we do,
14 if I could ask him a couple of more questions on
15 direct. I want to ask him about the plea agreement.
16   THE COURT: Well why don't we do that now so
17 the defense team will know what's going to happen.
18   MR. FEAGA: Yes, sir.
19   THE COURT: Bring in the jury.
20   (Whereupon, the jury was escorted into the
21 courtroom.)
22   THE COURT: Proceed.
23   MR. FEAGA: May it please the Court?
24 Q Mr. Thomas, you're testifying before this jury
25 today pursuant to a plea agreement that you entered

Multi-Page™

Page 86

1 into with the United States, are you not?
2 A  Yes, sir.
3 Q  Okay.  And pursuant to that plea agreement you
4 entered a plea of guilty to the charge you testified
5 to about earlier, did you not?
6 A  Yes, sir.
7 Q  And as part of the agreement that we entered into
8 with you, you agreed to, when called upon to do so, to
9 testify truthfully about any matters that you know
10 about, is that right?
11 A  Yes, sir.
12 Q  Okay.  And the United States agreed that if you
13 would plead guilty and if you would testify truthfully
14 about matters -- about drug distribution that you knew
15 about, that the United States would recommend a
16 reduced sentence for you, is that right?
17 A  Yes, sir.
18 Q  And they did that and you're serving the sentence
19 you testified about, is that right?
20 A  Yes, sir.
21      MR. FEAGA:  No further questions, Your
22 Honor.
23      THE COURT:  Okay.  Now you are excused at
24 this time.
25      (Whereupon the witness, Richmond Thomas,

Page 87

1 stepped down from the stand.)
2      THE COURT:  Next witness.
3      MR. FEAGA:  Jimmy Timmons, Your Honor.
4      MS. JAMES:  Actually, Your Honor, and I do
5 apologize, but there is a matter we need to take up
6 outside the presence of the jury before he testifies.
7      THE COURT:  Ladies and gentlemen, I know it
8 does seem like there are a lot of interruptions, but
9 this is really important to both sides and I ask for
10 your patience.  Thank you very much.
11      (Whereupon, the jury was escorted out of the
12 courtroom and the following colloquy ensued):
13      MS. WAYNE:  Judge, it's relates to Mr.
14 Timmons and Mr. Thomas.  I appreciate the Court giving
15 me an opportunity to enter into cross, but I wanted to
16 tell the Court what I think would be helpful, and I'm
17 asking the Court to order the government to disclose
18 to the Court, not to us, all proffers as it relates to
19 Mr. Thomas and his prior case so the Court can make a
20 determination about what appears to be Giglio and
21 Brady material as it relates to this witness.
22      I think, and I'll tell the Court, that
23 Mr. Moorer, and this is my concern, Mr. Moorer was the
24 prosecutor on Mr. Thomas and Mr. Pigler.  He knows
25 exactly what was going on here, and is he privy to all

Page 88

1 of this information as the prosecutor on this case.
2 So I'm asking that it be turned over to you so you can
3 make an independent review of that.  I think it would
4 be helpful to you in your determination of your ruling
5 on this issue.
6      THE COURT:  Mr. Moorer?
7      MR. MOORER:  Your Honor, yes, I do know
8 about this case.  And what I do know is that when we
9 questioned both Mr. Thomas and Mr. Pigler, our focus
10 then was upon the load of drugs that had been found.
11 I think part of it was in Mr. Pigler's house and part
12 of it was in Mr. Thomas's storage area, warehouse or
13 whatever you call it.  And we did not discuss Leon
14 Carmichael with him, because our focus at that time --
15      THE COURT:  Do you have any materials
16 regarding statements by Mr. Thomas or Mr. Pigler,
17 Jenks material on them on that other case?
18      MR. MOORER:  I think we have, and correct me
19 if I'm wrong because Agent DeJohn was the agent in
20 that case, there were Sixes related to our, I believe,
21 Mr. --
22      THE COURT:  Why don't you go through your
23 records, turn those all other to me and let me make my
24 own independent judgment as to whether it's Brady or
25 Giglio material as to both Thomas and Pigler.

Page 89

1      MR. MOORER:  Yes, sir.
2      THE COURT:  Thank you very much.  When can
3 you get that to me?
4      MR. MOORER:  Your Honor, since we're in the
5 midst of trial --
6      THE COURT:  Get it to me tomorrow morning at
7 eight o'clock.
8      MR. MOORER:  Okay, Your Honor.
9      THE COURT:  Next witness.  You said you had
10 a problem with this witness?
11      MS. JAMES:  Can he be excused while we
12 discuss it?
13      THE COURT:  Yes.
14      (Whereupon the witness, Jimmy Timmons, was
15 escorted out of the courtroom.)
16      MS. JAMES:  Your Honor, we filed a motion in
17 limine to preclude the government from eliciting any
18 statements from -- Well, let me take that back.  The
19 government represented at our pretrial on the motions
20 in limine that they expected that Mr. Timmons would
21 testify that sometime in 1995 that he was shot in the
22 head by Sandra Jones, who is an alleged coconspirator
23 in this case, at the direction of Mr. Carmichael.
24      First, we contend it is totally unfounded
25 and they won't be able to establish that.  But simply

Multi-Page™

Page 90

1 eliciting that from this witness, as the state of the
2 evidence that even they have it, which is his word, I
3 can go into his history and I'll do that in cross
4 examination unless you don't want me to do it, but
5 that that would be highly prejudicial.
6     THE COURT: He's supposed to have -- Ms.
7 Jones is supposed to have shot him in the head?
8     MS. JAMES: Right.
9     THE COURT: At the direction of Carmichael?
10     MS. JAMES: Yes, in 1995.
11     THE COURT: 1995. For what reason?
12     MS. JAMES: He contends in some statement
13 that it was because Mr. Joseph Lacey, a/k/a Pie, had
14 been busted and that Mr. Carmichael was concerned that
15 he was going to cooperate. I would like to --
16     THE COURT: Now is Mr. Timmons considered to
17 be a coconspirator? He's not on my list.
18     MR. FEAGA: Yes, sir, he is.
19     THE COURT: You don't have him on my list.
20     MR. FEAGA: Your Honor, I apologize for
21 that.
22     THE COURT: Does defense counsel see his
23 name listed?
24     MR. FEAGA: Your Honor, I think the list we
25 had given you at that time was at the point -- I just

Page 91

1 think you did ask us for -- I just overlooked it. His
2 testimony will make it clear that he is, in fact, a
3 coconspirator and they have known this.
4     THE COURT: Now what is this thing about
5 shooting in the head?
6     MR. FEAGA: Your Honor, what he'll be
7 testifying about is that he and Joseph Lacey and
8 Sandra Jones, who there has been a great deal of
9 testimony about, getting caught down in Texas with
10 forty-two thousand dollars, getting caught in
11 Mississippi --
12     THE COURT: With Ms. Jones?
13     MR. FEAGA: Timmons will, yes, sir. He's
14 going to be testifying that he and Sandra Jones and
15 Joseph Lacey were involved in distributing marijuana
16 for the Defendant Leon Carmichael. Starting in 1994 I
17 believe is where his testimony will pick up and coming
18 forward through the time that he made some controlled
19 buys from Sandra Jones for the police after she shot
20 him and after Mr. Lacey got arrested by the police for
21 his role in the distribution.
22     About two months after Lacey got sentenced,
23 Miss Jones lured him over to Macon County, and after,
24 as I think I told the Court Friday --
25     THE COURT: Miss Jones isn't the eighteen

Page 92

1 year old?
2     MR. FEAGA: No, sir.
3     THE COURT: What's the eighteen year old?
4     MR. MOORER: Keena Wysinant.
5     THE COURT: Okay. Go ahead. Miss Jones is
6 the one in Mississippi?
7     MR. FEAGA: Yes, sir, and Texas.
8     THE COURT: And Texas. Okay, go ahead.
9     MR. FEAGA: And this witness is going to
10 testify that he and she and Joseph Lacey were
11 distributing marijuana for this defendant, Leon
12 Carmichael --
13     THE COURT: Okay. What's this thing about
14 shooting in the head? Why is it relevant? Is it
15 relevant at all?
16     MR. FEAGA: Oh, yes, sir, it is indeed.
17 Because it's an act in furtherance of the conspiracy
18 to silence a potential witness who they believed may
19 be going to testify against them. And it is so
20 prejudicial because it's so probative. It also shows
21 that --
22     THE COURT: How does this witness know that
23 Mr. Carmichael told Ms. Jones to shoot him?
24     MR. FEAGA: He's not going to say that Mr.
25 Carmichael told her to do it. He's going to say that

Page 93

1 it happened, and that he was questioned when Sandra
2 Jones told him "We got to go over Macon County to pick
3 up a load," and he in his own mind thought that was
4 odd because they didn't normally pick it up over
5 there. But the fact of the matter is that a
6 coconspirator of this defendant's did in fact lure him
7 over there and shoot him.
8     THE COURT: So Jones lured him over there
9 and shot him.
10     MR. FEAGA: Yes, sir.
11     THE COURT: Okay. But you're not going to
12 say that he has any personal knowledge that Carmichael
13 ordered it?
14     MR. FEAGA: No, sir, and he doesn't.
15     THE COURT: Ms. James?
16     MS. JAMES: Again, see, they had a problem
17 with Miss Jones and that's why we're showing her
18 picture and she's not coming to court. And so they're
19 trying to do everything possible through the back door
20 getting in all the Sandra Jones evidence. I think it
21 violates, as we argued previously, Crawford and our
22 Sixth Amendment right to confrontation. So what they
23 want to do is have him come in and talk about Sandra
24 Jones again and keep Sandra Jones out of the picture
25 in order to gain these incriminating, highly

Page 94

1 prejudicial statements.
2        And I will tell the Court I don't want to go
3 into it, I don't want to show my hand unless I'm
4 required to do so, but I will be more than happy
5 in-camera to tell you why, given the state of that
6 evidence, Judge, it's not even worthy of being
7 presented to this jury. And once the jury hears it,
8 even though I can effectively cross examine Mr.
9 Timmons, it's like the horse is out of the barn.
10       THE COURT: If there is something
11 prejudicial, the government is entitled to know it.
12 If you think it's something I need to rule on, then
13 you need to tell me and I think the government is
14 entitled to respond to it.
15       MS. JAMES: Judge, the case over there was
16 number one never prosecuted. Okay?
17       Number two, he was given information that it
18 was someone other than Miss Jones that shot him.
19       THE COURT: Right.
20       MS. JAMES: He is a highly, highly
21 unreliable witness.
22       THE COURT: You mean his credibility.
23       MS. JAMES: His credibility, right.
24       And before we get the jury back in I want to
25 deal with another matter regarding him with regard to

Page 95

1 prior convictions.
2        THE COURT: Okay. Go ahead. Well all of
3 that is not reasons to keep his testimony out. It
4 sounds like good cross examination.
5        MS. JAMES: Well, and I just need a ruling,
6 Judge.
7        THE COURT: Go ahead. Then your objection
8 is overruled.
9        MS. JAMES: And the only other thing we
10 would say, Judge, is that even though he I don't think
11 is to be believed, and I believe that we'll establish
12 that, it's the cumulative effect of all of these
13 little this one was threatened, this one was
14 threatened, this one was threatened.
15       There's also going to be evidence, Judge,
16 that he was not fearful of Mr. Carmichael or Sandra
17 Jones subsequent to this alleged offense because of
18 other dealings that the government I think will try to
19 present in this case.
20       THE COURT: All good cross examination. If
21 it was in furtherance of the conspiracy, and it sounds
22 like it was, if Mr. Feaga is making an accurate
23 representation, it clearly comes in.
24       MS. JAMES: I have a question, Your Honor.
25       THE COURT: Oh, another question. Yes.

Page 96

1        MS. JAMES: Judge, I would expect on cross
2 examination to elicit from Mr. Timmons information
3 regarding his prior criminal history, including arrest
4 and convictions dating back to 1981. And while I
5 recognize that there is typically a limitation --
6        THE COURT: What's the limitation?
7        MS. JAMES: Rule 609, Judge.
8        THE COURT: What does it say?
9        MS. JAMES: It says that ten years --
10       MR. FEAGA: Your Honor, I don't care. She
11 can go back as far as she wants.
12       THE COURT: Great. Bring in the jury.
13 Let's continue. Bring in Mr. Timmons.
14       (Whereupon, the jury was escorted into the
15 courtroom.)
16       MR. FEAGA: The United States would call
17 Jimmy Timmons.
18       THE COURT: Jimmy Timmons.
19       J I M M Y   T I M M O N S,
20 the witness herein, having first been duly sworn or
21 affirmed to tell the truth, was examined and testified
22 as follows:
23            DIRECT EXAMINATION
24       BY MR. FEAGA OF JIMMY TIMMONS:
25 Q Sir, would you tell the ladies and gentlemen of

Page 97

1 the jury your name?
2 A Jimmy Timmons.
3 Q All right. Sir, I'm going to need you to, if you
4 would, to lean up and get as close to that mic as you
5 can. And your voice is kind of soft. I want to make
6 sure that everyone can hear you. If you would lean
7 right up there and speak into that microphone. Let's
8 try that again.
9        Would you tell the ladies and gentlemen of
10 the jury your name, please.
11 A Timothy Timmons.
12 Q Where do you live, Mr. Timmons?
13 A 125 Edwards Lane.
14 Q And is that your residence when you're not in
15 jail?
16 A Yes.
17 Q Are you currently serving some time?
18 A No.
19 Q Okay. Why are you incarcerated right now?
20 A I got a forgery, use of a credit card.
21 Q Could you say that again?
22 A Forgery, use of a credit card.
23 Q Okay. And so what is it about that that caused
24 you to be put in the jail?
25 A They said I used a credit card I stole.

Multi-Page™

### Page 98

1 Q  All right.  And so are you pending resolution of
2 that right now?
3 A  Yes.
4 Q  Now let's, if you would, sir -- Is this the first
5 time you have been accused of a crime?
6 A  No, sir.
7 Q  Okay.  You've been accused of crimes more often
8 than this time.  If you would, would you just give the
9 ladies and gentlemen of the jury a little bit of a
10 rendition of your history in terms of criminal
11 activity.
12 A  I have been incarcerated for distribution of a
13 controlled substance, robbery, assault.
14 Q  When was the first time you were ever arrested
15 and charged with a crime?
16 A  In 1990.  '79 or '80.  Somewhere in there.
17 Q  '79 or '80 or '79 and --
18 A  '79 or '80.
19 Q  '79 or '80.  What did you get charged with at
20 that time?
21 A  Robbery and assault.
22 Q  Did you go to jail?
23 A  Yes.
24 Q  Okay.  And how much time did you do?
25 A  I did eight years.

### Page 99

1 Q  And so about when did you get out?
2 A  I can't remember.
3 Q  Well if it happened in '79 or '80 and you did
4 eight years --
5 A  It would have been a long time since I thought
6 about it.
7 Q  Would it have been sometime in the late eighties
8 that you got out of prison?
9 A  Yeah.
10 Q  Okay.  And how long were you out?
11 A  I stayed out twelve years before I caught another
12 case.
13 Q  And what did you do from the time that you -- How
14 did you go in school, Mr. Timmons?
15 A  Twelfth grade.
16 Q  Okay.  And when did you graduate from high
17 school?
18 A  '78.  My mind is fuzzy.
19 Q  Okay.  How long before you got arrested and went
20 to prison, would you say it was?
21 A  The second time?
22 Q  No, let's go back to that first one.  You said
23 '79 or 80 is the first you ever got charged.
24 A  Right.
25 Q  How long were you out of high school before that

### Page 100

1 happened?
2 A  Oh, about a year.
3 Q  Okay.  So how old were you when you went to jail
4 the first time?
5 A  Just turning nineteen.
6 Q  And you did about eight years?
7 A  Yeah.
8 Q  So you got out about when you were twenty-seven?
9 A  Right.
10 Q  And you said you were out for twelve years before
11 caught another case?
12 A  Right.
13 Q  And what case did you catch after twelve years?
14 A  Illegal possession of a controlled substance.
15 Q  And what kind of substance was it?
16 A  Cocaine.
17 Q  Did you do some time on that one?
18 A  Yeah.
19 Q  How much time did you do?
20 A  Fifteen split.  I did three year.
21 Q  You did three years?
22 A  Yeah.
23 Q  Is that in state court?
24 A  Yes, sir.
25 Q  How about that first one, burglary and robbery --

### Page 101

1 I'm sorry, robbery and assault, what did you get on
2 that?
3 A  I got twelve years on that.
4 Q  Was that state or federal?
5 A  State.
6 Q  So the state charges so far?
7 A  Sir.
8 Q  What you've talked about so far is state charges?
9 A  Yeah.
10 Q  And have you had any federal charges?
11 A  No.
12 Q  Now you said then you got convicted after twelve
13 years, so it would have been around 2000 that you got
14 in on the drug charge?
15 A  Right.
16 Q  And so you were out of prison during most of the
17 nineties?
18 A  Yes.
19 Q  All right.  Now I want to direct your attention
20 to a time frame in 1994 and ask you in 1994 did you
21 know a fellow named Joseph Lacey?
22 A  Yes.
23 Q  Tell the ladies and gentlemen of the jury who
24 Joseph Lacey is.
25 A  He was a friend of mine.  We sold weed together.

**Page 102**

1 Q  And you and him did what?
2 A  Sold weed together.
3 Q  What do you mean when you say you and Joseph
4 Lacey "sold weed together"?
5 A  We had a little spot where we sold weed from.
6 Q  And what was that little spot that you sold it
7 from?
8 A  J. and M. Manufacturing.
9 Q  I'm going to get you to lean up into that
10 microphone, Mr. Timmons.
11      And Would you describe for the ladies and
12 gentlemen of the jury how it is that you and he would
13 sell marijuana out of J. and L. Fashions.
14 A  We'd sell anything from a dime bag up to a pound
15 or whatever.
16 Q  Okay.  Where did you get the marijuana that you
17 were dealing?
18 A  We was getting it at that time from Leon
19 Carmichael.
20 Q  And how is it that you know you were getting it
21 from Leon Carmichael?
22 A  Because the girl that was distributing it to us
23 was his girlfriend or whatever at the time, and
24 sometimes we went by and he'll be around but he
25 wouldn't directly give it to us.

**Page 103**

1 Q  Okay.  And who was this girl that would give it
2 to you?
3 A  Sandra Jones.
4 Q  His girlfriend?
5 A  Yes.
6 Q  Now let me show you a copy of what's been
7 admitted into evidence in this trial as government's
8 exhibit 44.  I want you to take a look at that.  Is
9 that Sandra Jones?
10 A  Yes.
11 Q  Is that the same woman that was Leon Carmichael's
12 girlfriend that was bringing you dope from Leon
13 Carmichael to sell out of J. and L. Thrift?
14 A  Yes.
15 Q  In 1994?
16 A  Yes.
17 Q  Now did something happen to Mr. Lacey in 1994?
18 A  Yes.  The local narcotics agents kicked his door
19 in and came in.
20 Q  Okay.  And after they kicked his door in -- What
21 door did they kick in, do you know?
22 A  J. and L. Fashions.
23 Q  Okay.  Were you there that day?
24 A  Yes, sir.
25 Q  Okay.  What happened?

**Page 104**

1 A  They came in and Joseph wasn't there when they
2 came, and when they did he seen the police there and
3 he claimed everything that was in there.
4 Q  He claimed everything that was in there?
5 A  Yes.
6 Q  Okay.  And so did you see him again after that?
7 A  No.
8 Q  What happened to him?
9 A  He went to prison.
10 Q  Now I want to move you forward about a year to
11 May -- to like March of '95, from June.  Did Joseph
12 Lacey get sentenced and go to jail at that time?
13 A  Yes.
14 Q  Now a couple of months after Mr. Lacey got shot,
15 were you still hanging around at that time with Sandra
16 Jones?
17      MS. JAMES:  Objection, there has been no
18 evidence that Mr. Lacey was shot.
19      MR. FEAGA:  Excuse me, Mr. Lacey was
20 sentenced.  I apologize and withdraw that.
21      THE COURT:  Yes.
22 Q  After he was sentenced, did you continue to work
23 with Miss Jones in the marijuana distribution
24 business?
25 A  Yes.

**Page 105**

1 Q  Tell the ladies and gentlemen of the jury how
2 that would work.
3 A  Went over about eight o'clock every morning.
4 She'd come in and she'd bring the weed in and we'd
5 sack it up and do whatever, and then we'd sell it
6 through the day.
7 Q  Okay.  Now I want to direct your attention to the
8 time around May the 9th, 1995 and ask you did you see
9 Sandra Jones that day?
10 A  Yes.
11 Q  Okay.  And why did you see Sandra Jones that day?
12 A  We had opened the shop up and we closed that
13 night.  We were supposed to go to Tuskegee and pick up
14 some.
15 Q  How did you know you were supposed to go to
16 Tuskegee and pick up some?
17 A  She said Leon had told her to go up and pick up
18 some.
19 Q  She said Leon had told her to go up there and
20 pick up some?
21 A  Right.
22 Q  And who did you know her to mean when she said
23 "Leon"?
24 A  Leon Carmichael.
25 Q  Have you -- When you talk about Leon Carmichael,

Page 106

1 is he present in this courtroom today?
2 A Yes.
3 Q Would you point him out so the ladies and
4 gentlemen of the jury will you know who he is?
5 A Sitting right over there.
6 Q Right over where?
7 A Right over there.
8 Q Can you describe where he is?
9 A In the middle of the male and female.
10 Q Okay. Would that be this fellow in the black
11 suit right here?
12 A Yes, sir.
13 Q Okay.
14      MR. FEAGA: Your Honor, can the record
15 reflect he's identified the Defendant Leon Carmichael?
16      THE COURT: Yes.
17 Q Now when Miss Jones told you this, did you say
18 anything back to her?
19 A No.
20 Q Did you go with her?
21 A Yeah.
22 Q Did you find anything unusual about the fact that
23 she was asking you to go to Tuskegee in Macon County?
24 A No.
25 Q What happened?

Page 107

1 A She told me to drive my car, so we drove two cars
2 up there. I parked my car at the hotel and got in the
3 car with her.
4 Q Okay?
5 A And we rode around for a couple of hours. We
6 were supposed to be waiting on someone, but didn't no
7 one show so she pulled over to the side of the road
8 behind an old, abandoned filling station and she had
9 to use the restroom and she went behind it and used
10 the restroom.
11 Q She went behind an old, abandoned filling station
12 to use the restroom?
13 A Yes.
14 Q All right. Can you lean up into that mic?
15      Okay, and what happened then?
16 A Then she came back and I was sitting on the
17 outside on the passenger's side with my feets (sic.)
18 outside the car. And I kept hearing her say, "Lord,
19 forgive me for what I'm about to do. Lord forgive me
20 for what I'm about to do." Then she shot me.
21 Q Okay. Tell the ladies and gentlemen of the jury
22 what happened when she shot you. What happened?
23 A When she shot me I rolled over in a ditch and I
24 went up in the bushes. It was a wooded area and I
25 seen her just riding around looking for me.

Page 108

1 Q Now at the time that she shot you, you said that
2 right prior to that she was saying, "Lord, forgive me
3 for what I'm about to do"?
4 A Yes, sir.
5 Q Did you look at all over your shoulder? Did you
6 see anything?
7 A No. I didn't look back or nothing. I didn't
8 expect her to do that.
9 Q And where did she shoot you?
10 A Right behind the left side right here in the back
11 of the head.
12 Q In the back of the head.
13      Now you said you rolled out of the car down
14 into some bushes. What happened after that?
15 A I found my way to -- I went walking through the
16 woods, and the hotel was right on the other side of
17 the woods. It was like a separation in between just a
18 wooded area, then the other side of the wooded area it
19 was the hotel property. And I was right around from
20 the motel, and the people at the hotel called the
21 ambulance and stuff.
22 Q Okay. And did you go to the hospital?
23 A Yes, sir.
24 Q Okay. And do you know where the bullet that she
25 shot you with is right now?

Page 109

1 A Yes, it's in my head. It's still in my head.
2 Q Now after this happened, did you make a decision
3 that you wanted to cooperate with law enforcement?
4 A Yes, sir.
5 Q And did you do that?
6 A Yes, sir. A local narcotics officer came to see
7 me.
8 Q Do you remember his name?
9 A Mike Drummond.
10 Q And did you agree to assist him?
11 A Yeah.
12 Q Let me direct your attention to the date August
13 18th, 1995 about three months after you got shot. Did
14 you work with him at or near that time?
15 A Yes, sir.
16 Q Tell the ladies and gentlemen of the jury what
17 you did.
18 A He called me in and I went in and talked with
19 him, and we met with a D. E. A. agent.
20 Q All right. And what happened next?
21 A We talked.
22 Q Did you make any buys from Mr. Drummond?
23 A Yeah.
24 Q Tell the ladies and gentlemen of the jury about
25 that.

Multi-Page™

**Page 110**

1 A We went and bought some -- We went up to this
2 place and bought some weed.
3 Q Went up to what place and bought some weed?
4 A J. and L. Then we went to -- we wanted to get
5 something from Carmichael, but we couldn't get any
6 because he don't touch it.
7 Q He don't touch it?
8 A No, he don't touch anything.
9 Q What do you mean when you say "he don't touch
10 it"?
11 A He don't touch it.
12 Q What do you mean by that?
13 A He don't distribute it or nothing like that.
14 Q Okay. How does he get his marijuana to people
15 like you?
16     MS. JAMES: Objection, Your Honor. It calls
17 for speculation.
18     MR. FEAGA: If he knows, Your Honor.
19     THE COURT: Only if he has personal
20 knowledge.
21 Q Do you know how he gets his marijuana to people
22 like you?
23 A Yeah.
24 Q How?
25 A He has a person --

**Page 111**

1     THE COURT: How do you know?
2     THE WITNESS: How do I know?
3     THE COURT: Yes.
4     THE WITNESS: I seen the distributor, sir.
5     THE COURT: Pardon me?
6     THE WITNESS: I seen the distributor.
7     THE COURT: You've seen the distributor?
8     MS. JAMES: But, Judge, he's saying he
9 hasn't seen Mr. Carmichael distribute any. So he had
10 to --
11     MR. FEAGA: He didn't say that, Judge.
12     THE COURT: Just a minute.
13     Have you seen Mr. Carmichael distribute any?
14     THE WITNESS: Not directly, but he'll be
15 present as it's being distributed.
16     THE COURT: He can testify to the alleged
17 presence and things like that. Go ahead.
18 Q So go ahead, then. You were talking about how
19 you know that Mr. Carmichael was the person that's
20 responsible for distributing the marijuana.
21 A Because if it's a large amount, he'll be in the
22 presence of it and the other people will distribute
23 it. Like Sandra or Cadillac.
24 Q Who else?
25 A Those are the only two I knew that he would give

**Page 112**

1 to right here.
2 Q Do you know Cadillac's real name?
3 A No.
4 Q Okay. Now, who did you buy that marijuana from
5 at J. and L. Thrift when you were working with Mike
6 Drummond?
7 A Sandra.
8 Q And did you meet another undercover officer at
9 that time?
10 A The officer right there.
11 Q Officer who?
12 A I talked to -- I don't know his name.
13 Q Okay. Was there an occasion when the undercover
14 officer went in and made a buy from Miss Jones?
15 A Yes.
16 Q At J. and L. Thrift?
17 A Yes.
18 Q Now let me show you government's exhibit 49(a),
19 which has been previously admitted into evidence in
20 this trial. And I want to ask you, if you would, take
21 a look at this address book, at the name that's listed
22 in it, Joseph Lacey, and ask if that is the correct
23 spelling for Mr. Joseph Lacey, the one you said that
24 you knew, if that's the correct spelling for his name.
25 A Yes.

**Page 113**

1 Q All right. Now did Mr. Lacey have a nickname?
2 A Pi.
3 Q What was his nickname?
4 A Pie.
5 Q Can you spell that?
6 A P-i-e.
7 Q P-i-e, Pie.
8     Where is J. and L. Thrift located?
9 A Mobile Road.
10 Q And in what city?
11 A Montgomery.
12 Q Do you have a nickname?
13 A Yes.
14 Q What is it?
15 A School Boy.
16 Q School Boy.
17     Were you ever involved in helping take any
18 money from the sale of drugs to Leon Carmichael?
19 A We dropped some off from time to time at a place
20 on Fleming Road.
21 Q Do you remember the name of the place on Fleming
22 Road?
23 A Unique Entertainment.
24 Q And who is the "we" that would drop it off?
25 A Me and Joseph Lacey.

**Multi-Page™**

Page 114

1 Q  Okay.  And tell the ladies and gentlemen of the
2 jury how you would do that.
3 A  Me and Joseph, we would sell that day or that
4 week or whatever, and we'd calculate all the money up
5 that we'd have to pay and drop the money off, and we'd
6 put it in a bag and drop it off at Unique
7 Entertainment.
8 Q  What is Unique Entertainment?
9 A  It's a club.
10 Q  A club.  Do you know who owns it?
11 A  Mr. Carmichael, I think.
12 Q  Mr. Carmichael?
13       Let me show you what's been marked for
14 identification purposes as government's exhibit 7(r)
15 and ask you, if you would, take a look at it.  Do you
16 recognize the building that is depicted in
17 government's exhibit 7(r)?
18 A  Yes, sir.
19 Q  What is that?
20 A  That's Unique Entertainment.
21 Q  Is that where you would take drug proceeds and
22 drop it off to Mr. Carmichael?
23 A  Yes, sir.
24 Q  Was Mr. Carmichael there when you would drop it
25 off?

Page 115

1 A  More of the time, yes, sir.
2 Q  So you would give it to him?
3 A  Yes.  Joseph would.
4 Q  You saw this happen?
5 A  Yes.
6 Q  Did Mr. Carmichael ever say no no, don't give me
7 that, I can't have that?
8 A  No.
9 Q  Did he ever say oh, anybody that would mess with
10 drugs would have to be a fool?
11       MS. JAMES:  Your Honor, he's performing for
12 the jury and it's inappropriate.  He needs to ask
13 questions and get answers.
14       MR. FEAGA:  Your Honor, I'm trying to try my
15 case.  They asked a witness on cross examination, a
16 question Sherry Pettus --
17       MS. JAMES.  You don't have to perform for
18 the jury.
19       MR. FEAGA:  May I finish my question?
20       THE COURT:  Just ask your question.  What's
21 your question?
22 Q  Did he ever say to you oh no, anybody that would
23 get mixed up with drugs is a fool?
24 A  No.
25 Q  Did you ever have occasion to go over to Mr.

Page 116

1 Carmichael's trucking company?
2 A  Yes, sir.
3 Q  Okay.  And what was the reason that you would go
4 over to his trucking company?
5 A  Oh, I go there and sit down and talk with him.
6 Sometimes we'd go there and talk about different
7 things.  Just talk.
8 Q  Did you ever go over there and pick up any dope?
9 A  Not out of his truck lot, no.
10 Q  Did you ever see any dope on any of Mr.
11 Carmichael's trucks?
12 A  Once.
13 Q  Tell the ladies and gentlemen of the jury about
14 the one time you saw dope on one of his trucks.
15 A  Unique Entertainment, there was a trailer park on
16 the side.
17 Q  And tell the ladies and gentlemen of the jury
18 about it.  What happened?
19 A  We went up there and Joseph said he had to go up
20 there and pick up something.  And when Joseph got up
21 there, his stuff was on the truck and he had to go in
22 the truck and get it.
23 Q  And did you see him do that?
24 A  Yeah.
25 Q  What was on the truck besides the dope?

Page 117

1 A  Oranges.
2 Q  What?
3 A  Oranges.
4 Q  What did y'all do with the dope you got off the
5 truck?
6 A  We took it and weighed it up and got it ready to
7 put it on the street.
8 Q  I'm sorry, you did what with it?
9 A  Weighed it up and got it ready to put it on the
10 street.
11 Q  What was your spot?
12 A  During that time we was at the drug store.
13 Q  The what store?
14 A  Drug store?
15 Q  Was that different from J. and L.?
16 A  Yes, sir.
17 Q  Okay.  Did J. and L. have any legitimate business
18 besides being a place that you would distribute drugs
19 from?
20 A  Yes, sir.
21 Q  What was it?
22 A  Clothing store.
23 Q  Did you ever sell any clothing out of there in
24 addition to selling dope?
25 A  Yes, sir.

**Page 118**

1 Q You said earlier in response to a question that
2 after Pie was sentenced, Joseph Lacey, "We would
3 package weed." Who is "We"? Who is "We" that would
4 package weed?
5 A Me and Joseph.
6 Q No, after got arrested and sentenced.
7 A Oh, me and Sandra.
8 Q Okay. Before that you and Joseph did it?
9 A Right.
10 Q Did Sandra help you?
11 A No.
12 Q She just brought it to you?
13 A Yeah.
14 Q Okay. How much dope were you moving out of J.
15 and L. in '94 and '95 while this was going on?
16 A Each day no less than ten to fifteen pounds a
17 day.
18 Q About ten to fifteen pounds a day?
19 A Right.
20 Q And this went on for how long?
21 A Really, about a year.
22 Q About a year?
23 A Mm-hmm. Give or take.
24 Q Give or take.
25 A Yeah.

**Page 119**

1 Q Could it have been as much as two years?
2 A It could have been. It might have been less. I
3 can't --
4 Q All right. How many days a week were you
5 selling?
6 A Seven days a week.
7 Q Every day?
8 A Every day.
9 Q How often would you say you took drug proceeds
10 back to Leon Carmichael from the sale of these drugs?
11 A You talking per week, or per month, or --
12 Q Yeah, how often would you take money back to
13 Leon?
14 A It all depended upon how much we had sold per
15 day.
16 Q And how much did you sell it for?
17 A You talking about the --
18 Q Yeah. The marijuana you said --
19 A We sell dime bags, twenty bags, half ounce,
20 ounce, quarter pound, half a pound, pound.
21 Q Okay. What's a dime bag sell for?
22 A Ten dollar bag.
23 Q Okay. And What's the next quantity up from that?
24 A A twenty, which is a twenty dollar bag.
25 Q All right. And what goes up from there?

**Page 120**

1 A Half ounce.
2 Q And how much is a half ounce?
3 A A half ounce will run you from twenty, about
4 twenty-five, thirty dollars a bag.
5 Q Okay. And what's the next quantity up from that
6 you would sell, an ounce?
7 A An ounce.
8 Q What did you sell an ounce for?
9 A Eighty dollars.
10 Q And did people buy more than that?
11 A Yeah.
12 Q And how much would they buy?
13 A You can buy a quarter or half a pound. Half a
14 pound for about three-fifty. A pound, seven hundred,
15 seven-fifty to eight hundred.
16      MR. FEAGA: No further questions, Your
17 Honor.
18      THE COURT: Cross?
19          CROSS EXAMINATION
20      BY MS. JAMES OF JIMMY TIMMONS:
21 Q Mr. Timmons, I'm Susan James. I'm one of Mr.
22 Carmichael's lawyers and I have some questions for
23 you?
24 A Yes, ma'am.
25 Q Now your actual name is Jimmy Lee Timmons, right?

**Page 121**

1 A Yes.
2 Q But you're also known as School Boy. That's your
3 street name, right?
4 A Correct.
5 Q And you've also been known as James Allen Harris,
6 haven't you?
7 A Yes.
8 Q Because you were convicted under that name,
9 weren't you?
10 A No.
11 A Never got convicted under the name of James Allen
12 Harris?
13 A No.
14 Q Was Mr. Harris a real person?
15 A I wasn't convicted. It was on there, but I
16 wasn't convicted up under James Allen Harris. I was
17 convicted up under Jim Timmons.
18      MS. JAMES: May I have a moment to consult?
19      THE COURT: Yes.
20      (Whereupon, Ms. James conferred with Ms.
21 Wayne off the record and out of the hearing of the
22 other courtroom participants.)
23      MS. JAMES: May I approach the witness?
24      THE COURT: Yes.
25 Q Mr. Timmons, I'm going to show you a certified

### Page 122

1  copy of a case file in the Circuit Court of
2  Montgomery, Alabama, the State of Alabama versus James
3  Allen Harris. And it says here alias name is Jimmy
4  Timmons. Do you remember that as being your case?
5  A  What case is that?
6  Q  It was a credit card possession of forged
7  instrument?
8  A  They convicted me up under Jimmy Timmons. I got a
9  fifteen split three.
10 Q  Does it say --
11 A  I got a false statement for using James Allen
12 Harris when they converted my name to the right name,
13 Jim Timmons.
14 Q  Okay. Let me ask you this, Mr. Timmons. This
15 case, this is a certified copy. See right there it
16 says certified by Melissa Rhitenour, the Clerk of the
17 Court, and it says Jimmy -- James Allen Harris. Do
18 you see that?
19 A  Yes.
20 Q  And you also know that you made a bond on that
21 case, didn't you?
22 A  No, I didn't make no bond, I was released on my
23 own reconnaissance.
24 Q  And you were released into the community under
25 the name of James Allen Harris, weren't you?

### Page 123

1  A  No, I was released up under the name of Jimmy
2  Timmons. I'll repeat it again. During the time that
3  they got me, they took me to the city jail, they
4  processed me, they found my real name and they charged
5  me for false statement and they put my right name on
6  the documents.
7      MS. JAMES: Judge, may I approach the?
8      THE COURT: Yes.
9  Q  I'm going to show you included in the certified
10 copy of a file, Mr. Timmons, a document that's
11 entitled Appearance Bond. Do you see that? Can you
12 see that, Appearance Bond?
13 A  Mm-hmm.
14 Q  And it's got the "signature of defendant," do you
15 see that?
16 A  Mm-hmm.
17 Q  And it says "signature of defendant, James
18 Harris."
19 A  Mm-hmm.
20 Q  And you see that? That's the way you sign. When
21 you do an "I" you do a circle on the top for the dot,
22 don't you?
23 A  Mm-hmm.
24 Q  And so you signed that, didn't you?
25 A  Mm-hmm.

### Page 124

1  Q  All right. So you were released from custody and
2  the sheriff, Dan Jones, approved it and you were
3  released into the community under the name of James
4  Allen Harris, weren't you?
5  A  They told me I was sentenced up under Jimmy Lee
6  Timmons. If you get my sentencing paper it will be
7  sentenced up under Jimmy Lee Timmons.
8  Q  Mr. Timmons, do you remember, that was a
9  possession of forged instruments, right?
10 A  Right.
11 Q  And that was in 1997, wasn't it?
12 A  Yes.
13 Q  Did you remember that you told -- that you've
14 testified here today that you were involved with drugs
15 with Leon Carmichael in 1994 and 1995, right?
16 A  Correct.
17 Q  Do you remember writing a letter to the judge in
18 that case, the case I just showed you, the certified
19 copy, to Judge Greenhoff? She was your Judge, wasn't
20 she?
21 A  Right.
22 Q  Do you remember writing her a letter telling her
23 that you don't do drugs or drink and what you did was
24 wrong and you should be forgiven?
25 A  I don't drink and I do not do drugs.

### Page 125

1  Q  You just sold them?
2  A  Just sold them.
3  Q  Okay. But when you were talking to Judge
4  Greenhoff you wanted her to give you some lenient
5  treatment, didn't you?
6  A  Yeah, I wrote my judge, of course.
7  Q  Okay. But you continued on to be involved with
8  drugs, didn't you, after you wrote her that letter?
9  A  Yeah.
10 Q  And you remember Mr. Feaga, the prosecutor here,
11 he said to you awhile ago, "Did you ever hear Mr.
12 Carmichael say to someone 'Anybody that would get
13 involved with drugs was a fool,'" do you remember
14 that?
15 A  Yes.
16 Q  Have you ever made that statement or something
17 like that?
18 A  I might have.
19 Q  That you were against drugs?
20 A  I might have.
21 Q  Do you remember on one of your cases back in 1988
22 -- Let's talk about that for a minute. In 1988, that
23 was when you were nineteen or twenty, right?
24 A  Right.
25 Q  You were born in 1961?

Multi-Page™

Page 126

1 A  Right.
2 Q  Your first case was robbery and assault, right?
3 A  Correct.
4 Q  And that was the case where you and your
5 codefendants took a victim out and robbed him for
6 thirty-five dollars, isn't it?  Do you remember that?
7 A  Yes.
8 Q  Y'all robbed him for thirty-five dollars but that
9 wasn't good enough, was it, you shot him in the back.
10 A  No.
11 Q  He wasn't shot in the back?
12 A  No.  He was shot right by his forehead.
13 Q  Oh, excuse me.  He was shot in the head, right?
14 A  He wasn't shot, he was scraped by the head.
15 Q  So you're saying the bullet went in his head?
16 A  No, it didn't penetrate his head, no.
17 Q  All right.  Well, do you remember that you all
18 not only shot the man or shot at the man as you say,
19 but you beat him and you left him in the woods to die,
20 didn't you?
21 A  No, ain't nobody beat him.
22 Q  I'm going to show you a certified copy, sir, of
23 your criminal file in the Montgomery Circuit Court in
24 1988.  I'm going to show it to the government first.
25 1988.

Page 127

1    MS. JAMES:  May I approach the witness, Your
2 Honor?
3    THE COURT:  Yes.
4 Q  Tell me if this is you, Mr. Timmons.  State of
5 Alabama versus Jimmy Lee Timmons, case number
6 eighty-eight oh oh one six two five.  Does that appear
7 to be your case?
8 A  Mm-hmm.
9 Q  Okay.  And in that particular case you remember
10 you said you did about eight years in prison, right?
11 A  Yes.
12 Q  And you knew the then District Attorney, Charles
13 Craddock, opposed your parole, didn't he?  You know he
14 didn't want you out of prison.
15 A  No, I didn't know that.
16 Q  Well, let me show you, this is a certified copy
17 of that file, Miss Melissa Rhitenour directing your
18 attention back to this letter to the Alabama Board of
19 Pardons and Paroles from Charles Craddock, do you see
20 that?
21 A  Mm-hmm.
22 Q  Mr. Craddock was the prosecutor who prosecuted
23 you, wasn't he?  He was the D. A.
24 A  Who?
25 Q  Mr. Charlie Craddock.

Page 128

1 A  I don't know.
2 Q  Well when Mr. Craddock opposed your parole, he
3 said, "The defendant, along with other codefendants,
4 kidnapped the victim, robbed and severely beat him
5 then shot him in the back, took him to a wooded area
6 and left him for dead."  Part of your certified court
7 file.  Do you remember that?
8 A  I remember that.
9 Q  Is that not the way it happened?
10 A  No.
11 Q  You were indicted for shooting a man in the head,
12 weren't you?
13 A  Yes.
14 Q  And I don't need to show you your indictment --
15 A  No.
16 Q  -- for you to remember that, right?
17 A  No.
18 Q  For thirty-five dollars, right?
19 A  I don't know how much money was involved.
20    MS. JAMES:  May I approach the witness?
21    THE COURT:  Yes.
22 Q  Mr. Timmons, let me show you a document out of
23 that same court file, or out of the court file when
24 you got convicted, CC eighty-one four forty-three,
25 montgomery District Court, Montgomery County, and the

Page 129

1 details -- and this is part of your certified records
2 -- the details say on 12-15-80 at approximately
3 six-ten p.m., Jimmy Timmons, along with Rodney Junior,
4 Wayne Wilson and Ray Kelly, did forcibly take
5 approximately thirty-five dollars in U. S. currency
6 from Dan Wilson, Junior by use of a twenty-two caliber
7 pistol."
8    Does that refresh your recollection, sir, as
9 to how much money you got for shooting the man and
10 leaving him to die in the woods?  Does it refresh your
11 recollection?
12 A  We didn't leave anyone to die in the woods.
13 Q  Well did you take him to the hospital in an
14 ambulance?
15 A  Didn't no one know he was shot.
16 Q  Did you know the pistol had been fired?
17 A  The fellow that shot the pistol thought he had
18 shot in the air.  He didn't know he had been shot.
19 Q  Well you ended up going to the penitentiary for
20 it?
21 A  Correct, because we did something wrong.
22 Q  Well, now you did something wrong, you made
23 parole over the protest of the then District Attorney,
24 Charlie Craddock, right?
25 A  Correct.

**Multi-Page™**

### Page 130

1 Q So you got out of prison about what year, 1988?
2 A Somewhere about there.
3 Q And in 1988 you hadn't quite learned your lesson,
4 had you, Mr. Timmons, about not getting involved in
5 crime?
6 A No.
7 Q Well didn't you catch two drug cases, one in 1988
8 for unlawful distribution of controlled substance?
9 A Fifteen split three, yes.
10 Q In 1988. How long had you been out of prison
11 before you caught that drug case?
12 A Oh, I don't know.
13 Q Well if you went into prison in 1980, is that
14 what you said?
15 A Right.
16 Q And you did eight years --
17 A Well you already know the answer to the question.
18 I don't know. I don't remember the exact dates.
19 Q Well work with me.
20 A I'm trying. You taking me to a path on my
21 history where I don't know. I can't remember.
22 Q If you don't know, Mr. Timmons, say you don't
23 know.
24 A Okay.
25 Q Okay. Thank you.

### Page 131

1      You went to prison in 1980, right?
2 A I don't know.
3 Q Okay. You served eight years. You said that
4 today.
5 A Possibly.
6 Q Okay. So if you went to prison in 1980 and you
7 got out in 1988, you had not been out very long when
8 you caught this possession and sale of unlawful
9 distribution of controlled substance case, right?
10 A Correct.
11 Q And that's when Judge Greenhoff was kind to you
12 and she gave you fifteen split three, right?
13 A Correct.
14 Q In fact, she was so kind to you that she reversed
15 that split, didn't she? She let you do the probation
16 part of it first, didn't she?
17 A Not on the drug case, no. She reversed it on the
18 forged instrument there. I did three years on the
19 fifteen split three.
20 Q Okay. So you did do three years?
21 A Yes, I did.
22 Q So you got out at about 1991?
23 A Somewhere around there.
24 Q And so you were out from '91, and let's do this
25 chronologically because after you got out in '91 you

### Page 132

1 say that this is when you were involved with Sandra
2 Jones and Mr. Joseph Lacey, Pie, right?
3 A Right.
4 Q In '94 and '95, right?
5 A Something about that, yes.
6 Q Okay. You didn't catch your next case until
7 1996, did you?
8 A I don't know.
9 Q Well let me say this. You were still under
10 supervision; when you get a split and you go to prison
11 for three years, that means you're on probation for at
12 least five years, aren't you?
13 A Correct.
14 Q So when you got out of prison around 1991 you
15 were still having to be accountable to Judge
16 Greenhoff, weren't you?
17 A Correct.
18 Q Because you had court ordered monitoring and you
19 had to be on probation, do you remember that?
20 A Correct.
21 Q And so you weren't on parole at that time, but
22 you still had some parole left from the Parole Board,
23 didn't you?
24 A Correct.
25 Q So you're on probation and you're on parole,

### Page 133

1 right?
2 A Correct.
3 Q But it's your testimony here that you jumped
4 right back into the swing of things and got involved
5 selling drugs.
6 A I lived on the opposite side of the tracks. I
7 had to have a means of making money. And at the
8 present time, Joseph Lacey turned me on to something
9 that was good, true.
10 Q Let me stop you a minute.
11 A I ain't trying to claim to be no angel.
12      THE COURT: Just a minute. Just answer the
13 question. That's it.
14      THE WITNESS: Yes, sir.
15 Q Mr. Timmons, back in 1998 when you got that case
16 and Judge Greenhoff sent you to prison on that fifteen
17 split three, do you remember you writing her a letter
18 while you were in prison and telling her you wanted
19 her to -- get her to change her sentence so you could
20 get out early, do you remember that?
21 A Mm-hmm.
22 Q And you remember that you told her about the
23 prison programs that you had participated in?
24 A Mm-hmm.
25 Q Do you also remember that as an excuse, or a

**Multi-Page™**

1 reason that she should let you out of jail in 1988,
2 just four or five years before you say you were
3 involved with this man and Sandra Jones in drugs, that
4 you wanted to be released from prison so that you
5 could help other children not get into the same
6 incidents that made your life a living hell, but also
7 help change them?
8 A  Mm-hmm.
9 Q  You told the judge that, didn't you?
10 A  She didn't give it to me.
11 Q  But you lied to her, didn't you?  You told the
12 judge you wanted to get out of prison, you had seen
13 the light and you wanted to help children so they
14 wouldn't follow in those footsteps since you had been
15 walking in since you were nineteen or twenty years
16 old.  Yes, or no?
17 A  I don't know.
18         MS. JAMES: May I approach the witness?
19         THE COURT: Yes.
20 Q  Mr. Timmons, I'm going to show you a certified
21 copy of a 1988 Circuit Court file, Montgomery.  Now
22 this is a separate case of 1988 from what I just
23 showed you.  This is case number sixteen twenty-six,
24 okay?
25 A  Mm-hmm.

1 Q  State of Alabama versus Jimmy Lee Timmons.
2 That's you, isn't it?
3 A  Mm-hmm.
4 Q  Because Peachtree is where you used to live.
5 A  Mm-hmm.
6 Q  And in this case from the penitentiary you wrote
7 Judge Greenhoff, in fact you had it all typed up,
8 didn't you?  Do you remember that?  Is that your
9 signature?
10 A  Yes.
11 Q  Okay.  Dated May 17th, 1991, and I've highlighted
12 there that statement about what you told Judge
13 Greenhoff you wanted to do with children.  Do you see
14 it?
15 A  Mm-hmm.
16 Q  Is that what you told Judge Greenhoff?
17 A  Mm-hmm.
18 Q  But you didn't mean it, did you?
19 A  I meant it, but I just couldn't live it.
20         THE COURT: You just couldn't what?
21         THE WITNESS: Live it.
22         THE COURT: Live it?
23         THE WITNESS: No, sir.
24         THE COURT: Okay.
25 Q  Now during this period of time that you say you

1 were trying to change things, you got back out, you
2 know based upon your testimony, if we believe it, you
3 got back involved with drugs, right?
4 A  Yes.
5 Q  Just come off shooting a man, the robbery, two
6 drug cases and you get back out in the community and
7 you set up shop, right?
8 A  No, it wasn't quite like that.
9 Q  Okay.  But you say here today that you and Mr.
10 Lacey were selling drugs all day from ten o'clock
11 until closing.  You were selling ten to fifteen pounds
12 of drugs a day.
13 A  For Mr. Carmichael.
14 Q  That's what you say.
15 A  Yes.
16 Q  Now if you're selling -- I wrote down you said
17 you were selling dime bags, that's ten dollar bags,
18 how many dime bags are in a pound, sir?
19 A  How many dime bags in a pound?  It's according to
20 how you bag it.  You count it down you say sixteen
21 ounces to a pound.  You say you get eight dime bags
22 out of each ounce.  A bag would run around eighty
23 dollars per ounce.  So you multiply that by sixteen.
24 Q  So that's a lot.
25 A  That's a lot.

1 Q  So if you're selling dime bags from J. and L.
2 Thrift Store per day, you have customers coming in and
3 out that door --
4 A  Like a mall.
5 Q  You got them coming all day long.
6 A  All day long like a mini mall.
7 Q  So you're on parole, you're on probation and
8 you're sitting out there, might as well have a neon
9 sign, come in here and buy your drugs, because you
10 have steady traffic, don't you?
11 A  No, we've also got a clothing store there.  We
12 sold a lot of clothes, too.
13 Q  Well how did you have time, if you're selling
14 that much dope per day, how in the world did you even
15 have time to deal with the clothing customers if
16 you're selling ten to fifteen pounds a day, sometimes
17 ten and twenty dime bags?
18 A  Okay.  If you broke it down to the smallest
19 terms, to the dime bag.  Let's take it to the highest
20 terms, to the pounds.  Let's take it to the half a
21 pound.  Let's take it saying we got two people running
22 the store.  Okay, he sell, I run the store.  I sell,
23 he run the store.
24 Q  So these people were coming in and some of them
25 were buying as much as a pound.  How do you package

**Page 138**

1 that stuff to go out of that store so the clothing
2 customers don't see them?
3 A  Put them in a white or brown bag.
4 Q  You talked to us about how much dime bags cost
5 and twenty dollar bags and what you get.  You said you
6 were doing this for a year.
7 A  Give or take, yes.
8 Q  Mr. Feaga says it could have been two.  Now I
9 want to know what your profit was.
10 A  My profit?  Let's say we get -- Say you get a
11 pound, and according to the price he give, and you
12 sack up what you got to pay off that pound and the
13 remainder would be yours.
14 Q  I want to know what the remainder was.
15 A  It's according to how we deal.
16 Q  Just give me one day in the life.  Ten to fifteen
17 pounds a day.
18 A  Just say you get three hundred to three-fifty off
19 of each pound that you sell.
20 Q  So let's say that happened and that would be, you
21 and Mr. Lacey are selling ten to fifteen, if you're
22 getting three-fifty you're getting a hundred and
23 twenty-five per pound and he's getting the other
24 hundred and twenty-five?
25 A  No, it don't work like that.  He have so many

**Page 139**

1 that he sell, I have so many that I sell.
2 Q  Okay.  So would you sell more in a day than he
3 would?
4 A  I wouldn't know that.  I couldn't say.  I don't
5 keep up with it like that.
6 Q  But there is no question if you're selling ten
7 pounds a day, you yourself, and you're making three
8 hundred and fifty dollars a pound yourself, then
9 that's going to be what, about thirty-five hundred
10 dollars a day?
11 A  I can't see how you come up with thirty-five
12 hundred a day.
13 Q  Well three hundred and fifty times ten is
14 thirty-five hundred, isn't it, sir?
15 A  Yeah, but see it ain't guaranteed every day.
16 Q  I understand that.  But you're selling seven days
17 a week based on your direct examination.
18 A  Correct.
19 Q  And you're selling ten to fifteen pounds a day.
20 A  Every day is not the same.  I keep telling you,
21 it's like a business, just like a clothing business or
22 Wal-Mart, K-Mart, every day is not the same.  Some
23 days good days, some days bad days.
24 Q  Well let's take it like this.  Some days you
25 didn't make thirty-five hundred?

**Page 140**

1 A  Yeah, some days we did.  Some days we might not
2 have made a thousand dollars.  It's according to how
3 the traffic is.
4 Q  Well let's take just the facts.  Let's be fair to
5 you and say no more than a thousand.
6 A  Okay.
7 Q  Seven days a week would be seven thousand dollars
8 a week --
9 A  Correct.
10 Q  -- times fifty-two weeks a year.
11 A  Correct.
12 Q  For one year that you testified here, right?
13 A  Give or take.
14 Q  You said to Mr. Feaga it may have been two years.
15 A  Give or take.
16 Q  So if it was two years, or if it was one year,
17 you made a lot of money, Mr. Timmons?
18 A  And I blew a lot of money.
19 Q  Well tell me, how many houses did you buy with
20 that money?
21 A  How many houses did I buy?
22 Q  Zero, right?
23 A  No.
24 Q  You never had bought a house, had you?
25 A  No.

**Page 141**

1 Q  And what kind of car were you driving back then,
2 Mr. Timmons?
3 A  Oh, I had two or three cars.
4 Q  What were they?
5 A  I had a Dodge Dart, I had a Buick, I had a
6 LeSaber.
7 Q  Okay.  They weren't brand new cars, were they?
8 A  No, I couldn't afford to buy brand new cars.
9 Q  And you were making a thousand dollars --
10 A  If I were to buy a brand new car, they would be
11 at me.  How could I buy a brand new car with no job
12 and no income?  Be serious now.
13 Q  Where did you put your money?
14 A  I blew it.
15 Q  What were you blowing it on?
16 A  Partying.  Buying clothes.  Giving it to my
17 family.  Things like that.
18 Q  Well we know you didn't save any of that money
19 because when you got charged in 1996, Montgomery
20 County Circuit Court, possession of forged instruments
21 in 1996, a year after, you say this incident happened
22 with Sandra Jones over here in Tuskegee, you were
23 stealing from other folks, weren't you?
24 A  Stealing?
25 Q  Well you were possessing government checks,

**Multi-Page™**

Page 142

1 weren't you? Didn't you possess a government check
2 and forge it as if it were your own?
3 A  Was I convicted of that?
4 Q  Well, did you plead guilty to possession of a
5 forged instrument second degree?
6 A  That was not a check.
7 Q  What was it?
8 A  A credit card.
9 Q  Okay.  Were you stealing from somebody else?
10 A  No, I was selling crack cocaine and the prisoner
11 brought me a credit card, who I thought it was his and
12 it wasn't, and I traded him crack cocaine for that
13 credit card and I used it.
14 Q  And you got convicted --
15 A  I got convicted.
16 Q  -- for possession of a forged instrument of a
17 second degree.
18 A  Correct.
19 Q  That's when Judge Greenhoff wanted to be lenient
20 with you, right?
21 A  Correct.
22 Q  That's when she gave you a fifteen split three
23 reverse, right?
24 A  Right.
25 Q  And the reverse meant she didn't even put you in

Page 143

1 prison, she wanted to let you stay out for three years
2 to see if you would make it, right?
3 A  Right.
4 Q  And you continued to lie to Judge Greenhoff all
5 the while that you were under that supervision, didn't
6 you?
7 A  I made it.  I did not go to prison.  I paid all
8 my restitution and I fulfilled all my needs on that.
9 Q  Do you know how many times, sir, she extended
10 that probation?
11 A  Because I hadn't paid my restitution.
12 Q  Well you remember you didn't go to court a lot of
13 times when you were supposed to during that period of
14 time.
15 A  I didn't know when she said I had to come on my
16 review.  Other than that --
17 Q  You're agreeing with me that you weren't going to
18 court like she directed you to?
19 A  Correct.
20 Q  And you'd go to court and you'd say Judge, I'm
21 just waiting on my S. S. I.
22 A  Which I was.
23 Q  That S. S. I. was for what, a disability?
24 A  Correct.
25 Q  Was it a disability because you weren't going to

Page 144

1 sell drugs anymore?
2 A  No, it was a disability because I got shot in the
3 head, and my medical doctor told me that if I got hit
4 in the head or any hard blow or anything, I could have
5 a blood tumor, or whatever they called that stuff.
6 That's why I applied for disability.
7 Q  Okay.  While you were under supervision serving a
8 fifteen year split reverse with Judge Greenhoff.  In
9 1996 you went out the next year and this time you got
10 smarter, you got convicted under the name of Mr.
11 Harris, didn't you?
12 A  You just asked me that question, ma'am.
13 Q  Exactly.  You got convicted and you were
14 processed by Judge Randall Thomas, not Judge
15 Greenhoff.
16 A  I have never been in Mr. Thomas's courtroom, not
17 that I can remember.
18       MS. JAMES:  Judge, may I have a moment?
19       THE COURT:  Yes.
20       MS. JAMES:  May I approach the witness?
21       THE COURT:  Yes.
22 Q  I'm going to show you that file that I just
23 showed you a minute ago where it says State of Alabama
24 versus James Allen Harris, a/k/a Jimmy Timmons.  Do
25 you see that?

Page 145

1 A  Mm-hmm.
2 Q  You were on the expedited docket in that case,
3 weren't you?
4 A  I don't know what that is.
5 Q  Well, you see that signature, Honorable Randall
6 H. Thomas?  Do you see that?
7 A  Who sentenced me up on this case?
8 Q  Do you see it says here --
9 A  I said who sentenced me up under the case?
10 Q  Well it says here "Judge Randall Thomas"?
11 A  No, Judge Greenhoff convicted me up under that
12 case.
13 Q  Okay.  I want you to look through that,
14 Mr. Timmons.  Take your time, and I want you to tell
15 me where, at all, it references Judge Sally Greenhoff.
16 I want you to find her name in that document.
17 A  You already know what it is.  Like I'm telling
18 you, I understand you've got your document, but to the
19 best of my knowledge I have never been sentenced by
20 Reverend (sic.) Thomas.  Never.
21 Q  All right.  But you agree that's your case file,
22 a certified copy, right?  And you're agreeing me that
23 Judge Greenhoff's name is not in there?
24 A  Who is this for?
25 Q  That's the one you identified earlier, Mr.

Multi-Page™

Page 146

1 Timmons, I think it was possession of a forged
2 instrument or credit cards.
3 A  This the same where the case was suspended. This
4 is the case that Judge Greenhoff gave me that was
5 suspended, was one day in the custody of the
6 commissioner of the Alabama Department of Corrections.
7 He is placed for one year under the same conditions.
8 Isn't that the same case?  Ain't that the same case?
9 Q  Mr. Timmons, you've got a case in 1996.
10 A  I understand, but what I'm saying, isn't this the
11 same case that Miss Greenhoff telling me suspended and
12 gave me one year on supervised probation, right?
13 Q  Mr. Timmons, what's the case number on that case?
14 A  Okay, what I'm saying, one year one day in the
15 custody of the commissioner --
16       THE COURT:  Just a minute.  Wait for her to
17 ask a question and you give an answer.
18 Q  Mr. Timmons, does that case say State of Alabama
19 versus James Harris?
20 A  I don't know.
21 Q  Look at the top.
22 A  I'm trying, but what I'm saying is you taking me
23 through a change where you say I was sentenced by one
24 judge and then you say something about another judge.
25 You're confusing me.

Page 147

1 Q  Well I'm going to try to not confuse you.  I want
2 you to look at it and tell me on the top of that
3 document, does it say State of Alabama versus James
4 Harris?
5 A  Yes.
6 Q  And does it say at the bottom alias Jimmy Lee
7 Timmons?
8 A  Yes.
9 Q  And in that case does it say that it is case
10 number -- tell me the case number up there.  C C.  See
11 where it says "case number"?  Read that case number.
12       MS. JAMES:  May I approach, Judge?
13       THE COURT:  Yes.
14 Q  Let me show you, Mr. Timmons.
15 A  C C ninety-seven zero zero two three five one.
16 Q  Now you've already indicated and told us under
17 oath that that is you, that was your case.
18 A  Okay, yes.
19 Q  Okay.  Now, Judge Greenhoff, and let me show you
20 here where it says "Randall Thomas," it says the
21 defendant is sentenced to one year and one day, right?
22 A  Mm-hmm.
23 Q  And so that couldn't have been the fifteen year
24 split three reversed that Miss Greenhoff gave you the
25 year before, right?

Page 148

1 A  Okay.  Question, please.
2 Q  Yes, or no?
3 A  I don't know.
4 Q  Okay.  Right here you had a case with Judge
5 Greenhoff State of Alabama versus Jimmy Timmons and
6 that case number is ninety-six oh oh one two five
7 four, right?
8 A  Okay.
9 Q  But you agree?
10 A  I don't know.
11 Q  Well look at this because you've already said
12 this was your case.
13 A  Okay, this is my case, I know, but that's what
14 you said.  I never been in prison no one year and one
15 day.
16 Q  Whether you have been in prison for one year and
17 one day, you said this --
18       MR. FEAGA:  Judge, I would like to object at
19 this point.  The objection is that this is repetitive.
20 We're not offering this man as an angel.  He said
21 himself he's not holding himself out as one.  She's
22 going on and on about his record.  He has a long
23 criminal record.  We concede that.
24       THE COURT:  She's entitled to go over that
25 with the jury.

Page 149

1       MR. FEAGA:  Yes, sir.
2 Q  While you were under supervision and Judge
3 Greenhoff was trusting you to abide by her rules, you
4 went out and you caught another case and you were
5 sentenced by another judge, and Judge Greenhoff, you
6 never went in and said Judge, let me tell you about my
7 James Harris case down the hall, did you?
8 A  What I'm trying to tell you, I don't even
9 remember Mr. Thomas didn't give me no year and no day.
10 Q  Okay.  So if your certified court file says
11 otherwise, that would be incorrect?
12 A  Okay.  So what you trying to tell me, I went and
13 did a year and a day in a state penitentiary?
14 Q  Mr. Timmons --
15 A  This is what I'm asking.  I'm trying to get some
16 understanding.
17 Q  Mr. Timmons, did you just look at the documents
18 when I took them up there?
19 A  They don't tell you.  I don't do no year and no
20 day.
21       THE COURT:  I think we've gone into this
22 enough.  You all are arguing back and forth.  Just ask
23 him another question.
24       MS. JAMES:  All right.
25 Q  Mr. Timmons, you have testified here about --

Multi-Page™

Page 150

1 well let me take you to your -- we've got '96 and '97.
2 Presently you have a case pending in Montgomery County
3 Circuit Court, don't you?
4 A Ye.
5 Q Or District Court. And that case involves
6 charges of fraudulent use of credit card, right?
7 A Yes.
8 Q And on that case you were arrested in April. In
9 fact, you were arrested April the 28th of 2004,
10 weren't you, Mr. Timmons?
11 A Yes.
12 Q Now you remember when Mr. Carmichael got
13 arrested, don't you? You remember seeing it on the
14 news?
15 A I don't know. I don't remember when he exactly
16 arrested, no.
17 Q But you were aware -- You were free in the
18 community before your arrest on April the 28th of
19 2004, weren't you?
20 A Yes.
21 Q Okay. And at that point were you aware that Mr.
22 Carmichael's arrest had happened probably three or
23 four months earlier?
24 A I wasn't keeping up with nothing like that.
25 Q Okay. But you knew certainly before you were

Page 151

1 arrested in April of 2004 that Mr. Carmichael had this
2 case pending. You knew that.
3 A When I found out Mr. Carmichael had that case
4 pending, I saw it on T V.
5 Q Okay. But we know it was the day before you went
6 to jail, right?
7 A Yeah.
8 Q So during that period of time after you saw Mr.
9 Carmichael had been arrested and your arrest in April,
10 April 28th of 2004, you never went to Agent DeJohn and
11 said I got some stuff to tell you about Mr.
12 Carmichael, did you?
13 A You check the record back. This case, I was --
14 You asked me this question. I was what you say Mr.,
15 what's the officer's name?
16 Q Drummond.
17 A Mike Drummond. This case go all the way back
18 from there up to there.
19 Q I understand that.
20 A And I had talked to not him but another --
21 Q I understand, Mr. Timmons. But what I'm trying
22 to say is, that from the time that you learned on T V
23 of Mr. Carmichael's arrest until you went into custody
24 on April the 28th of 2004, between that period of time
25 you didn't go back to them and say I've got

Page 152

1 information to tell you about Leon Carmichael, did
2 you?
3 A No, I didn't.
4 Q Okay. So you're sitting in Montgomery County
5 Jail in April of 2004, April 28th, and you came in
6 contact with Mr. DeJohn -- well actually Mr. Drummond,
7 didn't you?
8 A Right.
9 Q Did Mr. Drummond call you or did you call Mr.
10 Drummond?
11 A I don't remember.
12 Q But we do know for sure that Mr. Drummond came to
13 see you and D. E. A. Agent Whittle came to see you in
14 the Montgomery County Jail, right?
15 A Yes.
16 Q You were sitting there for possession -- or
17 excuse me, for fraudulent use of credit cards and they
18 came to see you on May the 26th of 2004. Do you
19 remember that?
20 A Mm-hmm.
21 Q Almost a month later, right?
22 A Mm-hmm.
23 Q And at that point in time you decided that you
24 would again try to cooperate against Mr. Carmichael.
25 A I never stopped, ma'am.

Page 153

1 Q Well we know that your testimony here today says
2 that these things happened in '94 and '95, right?
3 A Mm-hmm.
4 Q Let me make sure I understand your testimony.
5 You say that on May the 9th of 1995, that Sandra Jones
6 lured you over to Macon County in order to shoot you
7 in the head.
8 A Exactly.
9 Q Okay. Sandra Jones goes over there and you take
10 your car, Sandra takes her car, right?
11 A Correct.
12 Q And it's at that point that you say she shoots
13 you in the head.
14 A No, not at that point.
15 Q You drove around a couple of hours and then she
16 shoots you in the head.
17 A Right. If I thought at any time that something
18 like that was going to happen, I had a brand new
19 pistol in my car with a hundred rounds in my back
20 seat. If I thought any time that she was going to
21 shoot me, do you think I would have left that in my
22 car?
23 Q Well at that point in 1995 you were already a
24 three time convicted felon, weren't you?
25 A Yes, ma'am.

Multi-Page™

Page 154

1 Q And you were a felon in possession of a firearm
2 and ammunition in that car that you left in Macon
3 County that the police seized, correct?
4 A Yes, ma'am.
5 Q And so that didn't phase you, that you were at
6 that time in violation of federal law, did it? Didn't
7 bother you.
8 A No, I ain't going to say it didn't bother me, but
9 like I say I had just purchased the pistol.
10 Q How was a three time convicted felon, how did you
11 purchase a pistol?
12 A I ordered it through a catalog through the mail.
13 Q You used a false name, I'm sure.
14 A No. You can get the gun book that you can get,
15 you ain't got to get them -- all you need to give them
16 is name address and money and they send you one.
17 Q All right. Well you made a report that you had
18 been shot in the head over in Tuskegee, didn't you?
19 A Yes.
20 Q And you told the police that it was Sandra Jones,
21 didn't you?
22 A Yes.
23 Q And you went to the hospital and then you lived
24 to go even to Baptist Hospital after that, didn't you?
25 A Yeah.

Page 155

1 Q You went to Baptist Hospital and they filled out
2 some information about you and what happened, do you
3 remember that?
4 A No.
5 Q You do not?
6 A No.
7    MS. JAMES: Judge, may I consult with the
8 government?
9    THE COURT: Yes.
10   (Whereupon, Ms. James conferred with Mr.
11 Feaga off the record and out of the hearing of the
12 other courtroom participants.)
13 Q Mr. Timmons, I'm going to show you what I've
14 marked for identification purposes as Carmichael's 8.
15   MS. JAMES: May I approach, Your Honor?
16   THE COURT: Yes.
17 Q I'll show you that this was a subpoena by the
18 government to Baptist Medical Center East regarding
19 medical records pertaining to you. Okay? Do you see
20 that, the first two pages?
21 A I don't see it.
22 Q I'm just showing you what the cover page is.
23 It's a subpoena to Baptist Medical Center asking for
24 records relating to Jimmy Lee Timmons, date of birth
25 1-10-61. That would be you, wouldn't it?

Page 156

1 A Mm-hmm.
2 Q Okay. And showing you that this particular
3 document came from Baptist relating to you having gone
4 there to seek treatment, I realize it's not a great
5 copy but can you see it at all?
6 A No, I can't see it.
7    MS. JAMES: Judge, I've got a poor copy here
8 and the government has a better copy.
9    MR. FEAGA: We've seen it. I don't know if
10 we have a better one, but if we do I'd be happy to let
11 her use it. But I'm not going to object to it on the
12 grounds it's a lousy copy.
13   THE COURT: Have you been able to see what
14 it says?
15   MS. JAMES: He might be.
16   MR. FEAGA: Ours is bad, too, Judge, but
17 we'll stipulate to whatever. She can read it, if she
18 wants to.
19   THE COURT: Why don't you read it.
20 Q All right, Mr. Timmons. I realize this is a bad
21 copy.
22   MS. JAMES: Again, may I approach, Judge?
23   THE COURT: Yes.
24 Q It says here "Jimmy Lee Timmons." Do you see
25 that, sir? Thirteen hundred Peach Street. That would

Page 157

1 be you, wouldn't it?
2 A Mm-hmm.
3 Q And it's talking about here that you were
4 thirty-five year old, looks like black male, was shot
5 in the neck on 5-9-95. That would be when you contend
6 you were shot, right?
7 A Mm-hmm.
8 Q Now on this document when they asked you who did
9 it, you put down "girlfriend," right? You told them
10 "girlfriend".
11 A What Baptist is this, is this Baptist East or the
12 Baptist in Montgomery?
13 Q It says Baptist Medical Center East.
14 A No, I told them Sandra Jones shot me.
15 Q Okay. But you did go in just a couple of days
16 after this. In fact, this is dated 5-12-95, isn't it?
17 A Well that's Baptist East in Montgomery.
18 Q Right. You went to Baptist East, right?
19 A Well that's Baptist East in Montgomery. I went
20 to Baptist East in Opelika -- I mean in Auburn when I
21 got shot originally. That's when they treated me.
22 A That's when I told them Sandra Jones shot me. Mr.
23 Carmichael came and talked to me, that's when I
24 changed it to "girlfriend".
25 Q When you put "girlfriend" down here, your

Multi-Page™

Page 158

1 girlfriend shot P. T., right?
2 A Mm-hmm.
3 Q And you just testified here today that Sandra
4 Jones was Mr. Carmichael's girlfriend, not yours,
5 right?
6 A Correct.
7 Q Now obviously if somebody shoots you in the head
8 you're a little bit frightened of them, aren't you?
9 A Yes.
10 Q Sandra Jones you say put a gun to your head or
11 your neck and pulled the trigger while saying Lord
12 forgive me for what I'm doing, right?
13 A Correct.
14 Q So you didn't really want to deal with Sandra
15 Jones any more, did you?
16 A No.
17 Q But based on your testimony here today, you did
18 go right back up in front of her face and try to set
19 her up on June the 29th of 1995, didn't you?
20     THE WITNESS: Your Honor --
21     THE COURT: Yes?
22     THE WITNESS: Could I clarify something
23 before we go any further?
24     THE COURT: Yes.
25     THE WITNESS: Okay, thank you.

Page 159

1 A Okay. What you got there, I'm going to explain
2 to you. When I went to Baptist East in Opelika,
3 Alabama, the police in Tuskegee --
4     MS. JAMES: Excuse me, Judge, that's not --
5     MR. FEAGA: We'd ask the Court to instruct
6 counsel to allow him to answer the question.
7     MS. JAMES: It's not responsive to my
8 question, Judges. That's not my question. My
9 question was, despite his concern for Sandra Jones,
10 that he went to her to try to set her up on a dope
11 sale with Officer Drummond that he testified on
12 direct. It's not about the shooting, it's about what
13 happened subsequent to the shooting.
14     They can do that on redirect if they want
15 to. But that's not the question before him. It's not
16 what I've asked.
17     THE COURT: Just answer her question.
18 Q Mr. Timmons, you testified on your direct
19 examination that subsequent to May the 9th of 1995
20 when you say Sandra Jones shot you, right?
21 A Correct.
22 Q That you got with Officer Drummond and you went
23 in wired to try to make a buy of drugs from Sandra
24 Jones, right?
25 A Correct.

Page 160

1 Q And you did the same thing with Sandra Jones the
2 following month -- excuse me, I take that back.
3 7-26-95 you also tried to make a buy from her, didn't
4 you?
5 A Right.
6 Q And the same thing on August the 17th of 1995,
7 right?
8 A Correct.
9 Q So all of that was all after the point in time
10 that you say that Miss Jones shot you.
11 A Correct.
12 Q So you just called it a clean slate, Sandra it's
13 okay you shot me, how about selling me some drugs
14 while you were wired for Officer Drummond?
15 A I had the police at the time. I had security.
16 Q Well they were in there with you when you went in
17 to make the buy?
18 A No, but they was at close range. If anything was
19 to happen, they was watching me the full-time.
20 Q Did you have a gun on you?
21 A No.
22 Q Did Officer Drummond go in there with you when
23 you went in there?
24 A No, but he was in a position where he was
25 watching you.

Page 161

1 Q Well, was Officer Drummond parked in a car right
2 in front of the place?
3 A He was parked in a car right -- J. and L. Fashion
4 right by some big tree. He could look directly in the
5 building, yes.
6 Q Okay. Five hundred feet away?
7 A I can't say how many feet it was, I don't know.
8 Q Now, do you remember having some contact with
9 Agent Les Moore? Do you remember him? He was one of
10 the guys you were dealing with back in '94, '95?
11 A Not offhand, no.
12 Q Do you remember being interviewed by Agent Les
13 Moore in 1997 where you told him that you were getting
14 about ten to thirty-five pounds every three weeks?
15 A Approximately.
16 Q Okay. But you testified here today that you were
17 getting ten to fifteen pounds seven days a week.
18 A That's what we was selling. You didn't ask me a
19 total, you asked me what we was selling.
20 Q Well, if you're selling ten to fifteen pounds a
21 day, you've got to go get more than three times every
22 three weeks. You've got to go. The math won't work,
23 will it?
24 A I ain't working no math. You working math. You
25 asked me a question. You asking me how much we were

Multi-Page™

**Page 162**

1 selling per day. I told you how much we were selling
2 per day. Now if you want to know all about it, how
3 much who was going at a time, we were getting anywhere
4 from twenty to fifty maybe sixty pounds at a time.
5 Q Okay. So if you in fact told that to Agent Moore
6 back in 1997, then that wasn't correct, you were
7 actually getting more, you were just mistaken in what
8 you were telling him?
9 A I was only predicting. I couldn't give him no
10 actual. Like I say, I wasn't the number one man. I
11 was the bird in behind.
12 Q Well, Mr. Timmons, this particular case that
13 you've told the government about all this goings on,
14 right? You told about it in '94 and '95, right? You
15 talked to them about then, Agent Drummond.
16 A Okay.
17 Q Right? Yes, or no?
18 A Yes.
19 Q You talked to someone, I think Les Moore, in
20 1997, do you remember that?
21 A No.
22 Q Okay. Well, nevertheless, they didn't charge you
23 in '94 or '95 with the conduct about which you
24 described here in court, did they?
25 A What conduct was that?

**Page 163**

1 Q That you were involved in some drug conspiracy
2 with Sandra Jones and Leon Carmichael. They didn't
3 prosecute you for that in '94 or '95, did they?
4 A They didn't have any choice.
5 Q By your own admission you were telling them what
6 you were doing.
7 A But at the same time they didn't have any
8 evidence of anything that I was doing.
9 Q So your confession to them just -- You told them
10 all this back then, didn't you?
11 A Yes.
12 Q Okay. And when you were sitting over in the
13 Montgomery County Jail on a ten thousand dollar bond
14 on your most recent stealing episode, this fraudulent
15 credit card use, right?
16 A Yes.
17 Q You told them about all this stuff then, didn't
18 you?
19 A Yeah.
20 Q And they didn't charge you still today, have
21 they?
22 A What reason would they have to charge me? I'm
23 trying to figure out why would they charge me.
24 Q Do you have immunity with the United States
25 Government?

**Page 164**

1 A No, I don't have immunity. If you seen a crime
2 happen, even though you participate in that crime you,
3 yourself, wouldn't you tell it?
4 Q Mr. Timmons, my question to you is, you'll agree
5 if you're to be believed that you have been involved
6 in all kinds of illegal activity regarding drugs.
7 A I'm not going to -- I wouldn't know. I'm sorry.
8 Q Well, is it legal or illegal to sell ten or
9 fifteen pounds of marijuana week -- excuse me, a day?
10 A Illegal.
11 Q It is illegal and you know that.
12 A Mm-hmm.
13 Q And you told the government that you did that
14 from one to two years, right?
15 A Approximately.
16 Q Okay. And my question to you is what if any
17 charges has a United States Government made against
18 you for what you've confessed to?
19 A None.
20 Q And you don't expect that they will.
21 A I don't know.
22 Q Well, do you have a formal agreement with them?
23 A No.
24 Q In fact, when you testified, you met with Agent
25 Whittle on May the 26th of 2004, do you remember at

**Page 165**

1 the Montgomery County jail?
2 A Mm-hmm.
3 Q Drummond and Whittle.
4    Within just a few days you came over and you
5 went before a federal grand jury didn't you?
6 A Yes.
7 Q And you admitted right then, even though you had
8 that pending charge, you confessed that you had
9 committed property crimes that you were charged with
10 over in the county, right?
11 A I admitted it here, too.
12 Q Right. And you didn't even have a lawyer and you
13 didn't want a lawyer, although Ms. Morris told you
14 that you had the right to a lawyer, didn't she?
15 A I had a lawyer. I had a state appointed lawyer.
16 Yes, I had a lawyer.
17 Q And that was Mr. Carter. Todd Carter, do you
18 remember him?
19 A Yeah.
20 Q But you didn't have Mr. Carter working with you
21 on this possible federal case, did you?
22 A No.
23 Q In fact --
24 A At the time I didn't think I needed a lawyer.
25 Q And you don't think you do today, do you?

Multi-Page™

Page 166

1  A  I don't know.
2       MS. JAMES:  Judge, it's twelve, and I'm
3  probably going to go a bit further with him.  Is this
4  a good time to break?
5       THE COURT:  Yes, we'll recess, then, until
6  one o'clock.
7       Counsel, will you remain for just a moment
8  so we can take up something else.
9       (Whereupon, the jury was escorted out of the
10  courtroom, and the following colloquy ensued):
11       THE COURT:  How are we progressing with the
12  government's case?
13       MR. FEAGA:  Your Honor, we were doing good
14  until this.  I think we'll be lucky to finish today at
15  this point.
16       THE COURT:  Okay.  How many more witnesses
17  do you have, lengthy witnesses similar to this one?
18       MR. FEAGA:  Yes, sir.  Let me count this
19  time so I don't --
20       THE COURT:  More fact witnesses rather than
21  records witnesses I'll call them.
22       MR. WAYNE:  Judge, if they will tell us who
23  they are, we can tell you what our cross will look at.
24       THE COURT:  Okay, good.
25       MR. FEAGA:  I think eight, Your Honor, is

Page 167

1  what I count right now.
2       THE COURT:  These are not records witnesses?
3       MR. FEAGA:  Well Burt Estes from the probate
4  office is going to introduce some records, but I'm
5  going to ask him some questions about them.
6       THE COURT:  Why don't we get the witnesses
7  out, so we'll --
8       MR. FEAGA:  Yes, sir.  No problem.  It will
9  be Mike Drummond with the Montgomery Police
10  Department; Eric Pigler, if the Court lets us call
11  him; I think they have to recall, they haven't done
12  their cross on Thomas yet; then we're going to have
13  David DeJohn; Burt Estes; Alicia Ori; Priscilla
14  Luster; and possibly another agent witness, Your
15  Honor.
16       THE COURT:  Who is that?
17       MR. FEAGA:  That would either be Devin
18  Whittle or Louie Wilson.
19       THE COURT:  Okay.  Do the defendants know
20  all of these witnesses?
21       MS. WAYNE:  Yes, sir.
22       THE COURT:  Very good.
23       I just wanted to bring up one thing.  If we
24  finish with the government's case today or tomorrow
25  morning, we'll start promptly on the defendant's case.

Page 168

1  And you said the defendant's case may last one to two
2  days, which means we may finish by Wednesday.  If
3  there is any brief that anyone wants to get me on the
4  issue of whether the defendant should be retained if
5  there is a conviction, you need to get it to me now
6  because I'll be looking at the law now.
7       Because we'll move right into the forfeiture
8  proceeding right after that if they're convicted.  And
9  if there is any law you want me to look at, I'm not
10  going to stop the case for examining the law.  So if
11  there is anything you want me to read, get it to me
12  before the jury comes back.  The earlier you get it to
13  me, the better.
14       MR. FEAGA:  Yes, sir.
15       THE COURT:  Okay?  I'm not going to be
16  shooting from the hip.  I'll have been looking at it
17  already.
18       MR. FEAGA:  Yes, sir.
19       (Whereupon, the luncheon recess was
20  taken.)
21       THE COURT:  Proceed.
22       MS. JAMES:  Thank you.
23  Q  Mr. Timmons, I was asking you, throwing out some
24  numbers earlier when I was examining you about the
25  money that you made and we kind of agreed that the low

Page 169

1  end money would have been about a thousand dollars a
2  day, and that you said give or take you were doing it
3  for a year, maybe two years in response to Mr. Feaga's
4  question --
5  A  It might have been a whole year.  I said give or
6  take.
7  Q  Okay.  So you're saying --
8  A  I'm not sure how long a period it was or how
9  short a period it was.  I can't give you no direct or
10  whatever.  Like the government said, it might have
11  been a year, it might have been less, I don't know.
12  Q  Okay.  Well I thought I heard you say on your
13  direct examination that it was for at least a year and
14  then Mr. Feaga said could it have been two and you
15  said two.
16  A  Give or take.  That's what I said, ma'am.
17  Q  All right.  Well let's say it was a thousand
18  dollars day for fifty-two weeks.  That would be three
19  hundred and Sixty-five days a year, right?
20       MR. FEAGA:  Your Honor, we're just going to
21  object to this on the basis that it's repetitive.
22  We've been down this road before.
23       THE COURT:  I thought we have been over this
24  a couple of times.  Unless --
25       MS. JAMES:  Not the totals, Judge.

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**