Page 170

1   THE COURT: Pardon me?
2   MS. JAMES: Not the totals.
3   THE COURT: Not the totals? Okay. Well go
4   ahead.
5   Q  Anyway, a thousand dollars a day for three
6   hundred and sixty-five days, would you agree with me
7   would be three hundred and sixty-five thousand,
8   wouldn't it, Mr. Timmons?
9   A  If you did the math I have to agree with you.
10  Q  All right. And if we took that high end number
11  of thirty-five hundred a day for three hundred and
12  sixty-five days, that would in excess of one point two
13  million dollars. Do you agree?
14  A  I don't know. I can't answer that question. I
15  didn't do the math.
16  Q  Well that would be a lot of money for a fellow
17  like you, wouldn't it?
18  A  It would be a lot of money for a lot of people,
19  yeah.
20  Q  And it would be a lot of money to blow as you
21  said, just to party it away in the course of a year,
22  right?
23  A  No, not really. If you, like you said, you went
24  to the oil feel, you looking at the short run it's a
25  thousand dollars a day. Okay, estimating, if you

Page 171

1   gambling, you got a household you live in, a high
2   expense life, a thousand dollars a day when you get
3   through, you break it down you going to spend three,
4   four, maybe five thousand dollars a day.
5   Q  Tell me where Peach Street is.
6   A  Up near Early Street.
7   Q  On the west side of town?
8   A  Yeah.
9   Q  And is that where your mama lived?
10  A  Yeah.
11  Q  So you, throughout these various convictions that
12  I directed your attention to today, you were still
13  living up here with your mama, weren't you?
14  A  No.
15  Q  In 1996 where were you living?
16  A  I was living alone.
17      MS. JAMES: May I approach the witness?
18      THE COURT: Yes.
19  Q  I'm going to show you what's been marked for
20  identification purposes as defendant's exhibit 9,
21  which is a certified file in 1996 of your Montgomery
22  County case. Do you see that?
23  A  Mm-hmm.
24  Q  You've identified it earlier. It says here Jimmy
25  Timmons, Thirteen hundred Peach Street.

Page 172

1   A  I used my mother's mail mailing address.
2   Q  Okay. So you weren't living --
3   A  I wasn't living with her, I was using her mailing
4   address. That way I know I get my mail.
5   Q  You said if you're living in a nice house and
6   you've already admitted that you didn't buy a house,
7   were you renting a house in Winn Lakes, or something
8   like that?
9   A  I wasn't living in Winn Lakes, I was living with
10  a girlfriend in Westview Gardens.
11  Q  Okay. And how much were you all paying for rent
12  over there?
13  A  Somewhere between five or six hundred dollars a
14  month.
15  Q  Okay. And your cars, you said you had three
16  older models cars?
17  A  No, I said three cars.
18  Q  Well you said they weren't brand new.
19  A  No, I didn't say they were old, either.
20  Q  Well what, in 1994 and '95 what were year --
21  A  A 1989 Buick Century.
22  Q  Okay. What else?
23  A  I had about a '79 Duster.
24  Q  Okay. What else? '79 Duster?
25  A  Somewhere around there, yeah.

Page 173

1   Q  Okay. So both of those would have been -- One of
2   them would have been five years old and one of them
3   would have been ten years old at that time in 1994?
4   A  Mm-hmm.
5   Q  Okay. And how much child support -- Did you have
6   children?
7   A  I don't have no child support.
8   Q  Did you have children in '94?
9   A  Yes.
10  Q  Were you paying child support?
11  A  No, I wasn't paying child support.
12  Q  Okay. Now you've talked about this situation
13  with Sandra Jones over in Macon County, and you did
14  file a police report, right?
15  A  Correct.
16  Q  And I'm sure that you were present when
17  Miss Jones was prosecuted. You were probably there at
18  her trial, weren't you?
19  A  No.
20  Q  Did she have a trial?
21  A  No. Not that I know of.
22  Q  Okay.
23  A  As a matter of fact, they just disappeared.
24  Q  You know she was interviewed, right?
25  A  No.

Page 174

1  Q  Don't even know that?
2  A  No.
3  Q  Do you remember who you dealt with over there in
4  Macon County when you made your complaint?
5  A  No, I don't.  I talked to a detective over there.
6  Then I turn around, I called a couple of times, but
7  they never could tell me nothing.
8       MS. JAMES: Judge, may I have just a moment?
9       THE COURT:  Yes.
10       (Whereupon, Ms. James conferred with Ms.
11  Wayne off the record and out of the hearing of the
12  other courtroom participants.)
13       MS. JAMES: I don't have any further
14  questions of this witness, but I would move for
15  admission of Defendant Carmichael's 9 and 10, which
16  are certified copies of the Court files regarding Mr.
17  Timmons in C C ninety-six twelve-fifty four and C C
18  ninety-seven twenty-three fifty-one.
19       MR. FEAGA: No objection, Your Honor.
20       THE COURT: Admitted.
21            CROSS EXAMINATION
22       BY MR. TEAGUE OF JIMMY TIMMONS:
23  Q  Mr. Timmons, I'm Barry Teague. Let me ask you a
24  couple of questions.
25       Talking about the time when you and Joseph

Page 175

1  Lacey, or Pie Lacey, were selling out of J. and L.,
2  was it J. and L. Fashions?
3  A  Yes.
4  Q  Okay.  I think you said each day y'all would come
5  in early and break down your marijuana for sale, is
6  that correct?
7  A  No, we broke it down at night.  No, I didn't say
8  that, sir.
9  Q  Oh, you broke it down at night.  That's what I'm
10  trying to get to.
11       And in what form did the marijuana come to
12  y'all when you broke it down for sale?
13  A  Some was in compressed and some came in black
14  plastic bags.
15  Q  You said some came in bricks?
16  A  Bricks, yes.
17  Q  And sometimes that's what you call compressed,
18  isn't it?
19  A  No.
20  Q  Those are not bricks?
21  A  No, that's not what we was getting.
22  Q  What were you getting?
23  A  We was getting bigger than that.  It was bigger
24  than that.
25  Q  Even bigger than these?

Page 176

1  A  Yeah.
2  Q  And tell the jury what would you do with them
3  when you broke them down.
4  A  Sometimes we'd just spray a little water on them
5  and let them bust out by themselves, and sometimes we
6  bust them open ourselves.
7  Q  And when you bust them open, what do you do with
8  them?
9  A  Weigh them up.  Pull it all apart, break it down,
10  yeah.
11  Q  You would use either these or something even
12  bigger than these?
13  A  Yeah.
14  Q  How much bigger than these would you typically be
15  getting, as big as two of them?
16  A  Yeah, something like that.
17  Q  Thank you, sir.
18  A  You're welcome.
19       THE COURT: Anything else from this witness?
20       MR. FEAGA: Yes, sir, Your Honor.  Just a
21  couple.
22            REDIRECT EXAMINATION
23       BY MR. FEAGA OF JIMMY TIMMONS:
24  Q  Sir, on cross examination earlier in your
25  testimony by Miss James, she asked you about a crime

Page 177

1  you had committed in the past involving somebody
2  getting shot, or I think you said grazed in the head
3  with a bullet.
4  A  Right.
5  Q  Would you agree that shooting somebody in the
6  head, or shooting at somebody's head, if that
7  happened, that's a bad thing?
8  A  Yeah.
9  Q  In fact, somebody did that to you, didn't they?
10  A  Yeah.
11  Q  Now you did -- You said you remembered telling
12  Judge Greenhoff back when another one of these
13  incidents that you were involved in, that you were
14  going to try to go straight, is that right?
15  A  Yes, sir.
16  Q  But then after that you met Leon Carmichael,
17  didn't you?
18  A  I met Pie who was associated with Mr. Carmichael,
19  yeah.
20  Q  Okay.  Now you were trying to explain an answer
21  and everybody in here can determine for themselves
22  what happened, but for whatever reason you weren't
23  allowed to finish answering that question.  And I'd
24  like to ask you, if you would, you were being asked
25  about buys that you made from Sandra Jones after you

**Page 178**

1 got shot in the head by her.
2 A Yeah.
3 Q And you were trying to explain how it was that
4 you could do that. And you said something about Leon
5 had talked to you. Would you explain -- Would you go
6 ahead and finish your answer now for the jury about
7 what happened?
8 A When I got shot, and I was up at the hospital in
9 Opelika, the next day Mr. Carmichael came up to the
10 hospital, to my room, saying, "Look, man, I didn't
11 have nothing to do with this. I didn't have nothing
12 to do with it." So from that point on by him being,
13 you know, all right, I'm thinking that she did it out
14 of spite. But then as I did more research I found out
15 that he had something to do with it.
16 Q All right. And was it the fact that --
17      MR. FEAGA: We don't have any further
18 questions, Your Honor.
19      THE COURT: Any more questions for this
20 witness?
21      MS. JAMES: No.
22      THE COURT: Okay. You may step down.
23      (Whereupon the witness, Jimmy Timmons,
24 stepped down from the stand.)
25      THE COURT: Next witness.

**Page 179**

1      MR. MOORER: United States calls Officer
2 Drummond.
3      THE COURT: Proceed.
4      M I C H A E L   D R U M M O N D,
5 the witness herein, having first been duly sworn or
6 affirmed to tell the truth, was examined and testified
7 as follows:
8           DIRECT EXAMINATION
9      BY MR. MOORER OF MIKE DRUMMOND:
10 Q Would you state your name, please.
11 A My name is Michael Drummond.
12 Q What do you do for a living?
13 A I'm employed with the City of Montgomery Police
14 Department, specifically the Special Operations
15 division, Narcotics Bureau.
16 Q Would you briefly tell the jury what your
17 background and your training and your experience is
18 that qualifies you to serve with the Special
19 Operations division.
20 A I have been with the Narcotics Bureau since
21 January of '94. I have been to an eighty hour class
22 that the D. E. A. puts on. It's basically on the
23 identification of drugs and investigations. I've also
24 been to another eighty hour class at the Regional
25 Counter Drug Training Academy in Mississippi which

**Page 180**

1 goes over undercover investigations and surveillance
2 equipment and several other schools.
3 Q And have you been actively engaged in the
4 enforcement of the narcotics laws both state and
5 federal?
6 A Yes, sir.
7 Q Do you recall June the 3rd of 1994?
8 A Yes, sir.
9 Q Were you engaged in the enforcement of the
10 narcotics laws at that time?
11 A Yes, sir, I was.
12 Q Would you tell the jury what, if anything, you
13 were doing on that day which has led you to being a
14 witness here today?
15 A Yes, sir. I conducted a search warrant along
16 with other members of the Montgomery Police Department
17 at Sixteen twenty-three Mobile Road, which was a
18 business called J. and L. Fashion and Thrift. The
19 search warrant was for illegal narcotics, mainly
20 marijuana, that we had already made previous
21 controlled drug buys from the business.
22 Q And in the course of executing the search
23 warrant, did you recover any narcotics evidence from
24 J. and L. Fashions?
25 A Yes, sir. Recovered approximately two pounds of

**Page 181**

1 marijuana.
2 Q And at the time that you recovered the marijuana,
3 did you subsequently -- were you subsequently able to
4 determine who the marijuana belonged to in part?
5 A Yes, sir. We arrested a subject named Joseph
6 Lacey.
7 Q Does Lacey have any aliases?
8 A Yes, sir. He goes by the nickname or street name
9 of Pie.
10 Q And were there any charges brought against Mr.
11 Lacey on that occasion for the drugs that were found
12 on that day?
13 A Yes, sir. He was charged that day with unlawful
14 possession of marijuana first degree.
15 Q And do you know what subsequently happened to him
16 as a result of those charges?
17 A He was convicted and sent to the Department of
18 Corrections.
19 Q Do you recall about when it was that he was sent
20 to the Department of Corrections to serve his
21 sentence?
22 A It had to be during 1995, I believe.
23 Q Did Mr. Lacey cooperate with you to tell you or
24 the other officers where he got the marijuana that you
25 found in J. and L. Fashions on June the 3rd of 1994?

Multi-Page™

1 A  No, sir. I took a statement from him, but he
2 refused to tell us who was supplying him.
3 Q  Now are you familiar with an individual by the
4 name of Jimmy Timmons?
5 A  Yes, sir.
6 Q  Do you recall June the 29th of 1995?
7 A  Yes, sir.
8 Q  Did you have occasion to meet with Mr. Timmons on
9 that day?
10 A  Yes, sir, I did.
11 Q  And what was -- Did you have occasion to question
12 Mr. Timmons about his involvement in the narcotics
13 trade?
14 A  Yes, sir.
15 Q  During your questioning of him, what, if
16 anything, did Mr. Timmons say to you in relation to
17 his connection with any of the persons who were
18 involved in J. and L. Fashions?
19 A  He advised that --
20       MS. JAMES: Objection, Your Honor, hearsay.
21 This is not even arguably in furtherance of anything.
22       MR. MOORER: Your Honor, it's designed to
23 rebut their tactic questioning that it was a recent
24 fabrication, the testimony of Mr. Timmons who just
25 testified a moment ago, which is not hearsay under the

1 rule.
2       MS. JAMES: Improper pursuant to Crawford.
3       THE COURT: Overruled on that basis.
4 Q  Did you have any discussions with Mr. Timmons
5 regarding his connection with others at J. and L.
6 Fashions and the drugs that you had intercepted at J.
7 and L. Fashions?
8 A  Yes, sir, I did.
9 Q  And what, if anything, did he say in relation to
10 his involvement with narcotics at J. and L. Fashions?
11 A  He advised that he was selling marijuana from the
12 business for Sandra Jones who was being supplied the
13 marijuana by Leon Carmichael.
14 Q  And are you familiar with Leon Carmichael?
15 A  Yes, sir.
16 Q  And is the Leon Carmichael that you discussed
17 with Mr. Timmons on that day, is he in the courtroom
18 now?
19 A  Yes, sir, he is.
20 Q  Would you point him out and describe him for the
21 record.
22 A  He's second from the end over here wearing the
23 black suit and white shirt.
24 Q  For the record, he's identified the defendant,
25 Mr. Carmichael.

1       Now, did you have any conversations with Mr.
2 Timmons regarding anyone else besides Sandra Jones and
3 J. and L. Fashions?
4 A  He advised about the dealings of, you know,
5 Joseph Lacey.
6 Q  And what did he tell you was his relationship
7 with Joseph Lacey --
8 A  He advised --
9 Q  -- who is also known as Pie?
10 A  Yes, sir.  He advised that they were -- that he
11 sold marijuana with Joseph Lacey, they had done it for
12 a while.  When they moved into Mobile Road, J. and L.
13 Thrift.  He advised also that he had gone with Mr.
14 Lacey, Pie, over to the Unique Entertainment club on
15 Fleming -- right there at the corner of Fleming and
16 Rosa Parks, went there to pick up marijuana.
17 Q  Now why did they go over there to pick up
18 marijuana?
19 A  That's where Lacey went to pick it up, and that's
20 where he was being supplied from.  He advised that
21 they went over there and met with Mr. Carmichael and
22 that the marijuana would be in a cooler, like a drink
23 cooler.
24 Q  And would the cooler itself be inside anything
25 else?

1 A  No, sir.
2 Q  Now did you ever have occasion to question him,
3 or did he ever have an occasion to talk with you about
4 any drugs being on any tractor-trailer?
5 A  He advised that Lacey had picked him up one time
6 and they had gone to the same club, the Unique
7 Entertainment club.  I believe he said that there's
8 another subject there, and they were told to move
9 boxes of oranges out of the way.  And once they did
10 that, they got to -- he described it as bales of
11 marijuana that was up against the back of the truck,
12 and unload the marijuana.
13 Q  And what, if anything, did he say he did with the
14 marijuana after they got it out of the truck?
15 A  I don't recall exactly.  I think they took it
16 into the business.
17 Q  Now after you had occasion to debrief him on this
18 occasion on June the 29th of 1995, did you have
19 occasion to use Mr. Timmons in a proactive manner?
20 A  Yes, sir, I did.
21 Q  Would you tell the jury what, if anything, you
22 did with Mr. Timmons after you had an opportunity to
23 debrief him.
24 A  Used him to go to J. and L. Thrift, and under a
25 controlled environment, controlled situation, and

**Multi-Page™**

1 purchase small quantities of marijuana from Sandra
2 Jones.
3 Q And do you recall how many times you made
4 controlled buys from Sandra Jones?
5 A I believe it was three.
6 Q Now during any of these controlled buys that you
7 made from Sandra Jones, can you describe any vehicles
8 that she might have been using?
9 A He came back from one of the buys and said that
10 she was driving a, I think it was a blue Mazda pickup
11 truck that we ran the tag. It was registered to Mr.
12 Carmichael.
13 Q Now back in November of 1995 -- Well, let me back
14 up. How many controlled purchases did you make using
15 Mr. Timmons?
16 A I believe it was three.
17 Q And were each of these purchases from Miss Jones?
18 A Yes, sir.
19 Q Now back in November of 1995 after you made your
20 controlled buys, did you have any further contact with
21 law enforcement about Miss Jones unrelated to the
22 controlled buys that you were making form her?
23 A Yes, sir. I was contacted by, I believe it was a
24 Detective Chavez in El Paso, Texas. He called me and
25 stated he had stopped Ms. Jones --

1 MS. JAMES: Objection to what Detective
2 Chavez said to him.
3 MR. MOORER: Your Honor, it goes to show the
4 testimony we had yesterday from Mr. Chavez, it goes to
5 complete that story, Your Honor.
6 MS. JAMES: Doesn't make it any less
7 hearsay.
8 THE COURT: Overruled.
9 Q You received a call from Chavez?
10 A Yes, sir. And he advised me that they had
11 stopped Sandra Jones leaving the airport in El Paso,
12 and I believe she had forty-two thousand dollars in
13 currency and a belt around her waist, or package
14 around her waist. He asked me if we had any
15 information on Sandra Jones, and that's when I advised
16 him that we had been making controlled drug buys from
17 her.
18 Q And did you do any checking on the business J.
19 and L. Fashions in the course of working on your
20 controlled purchases and the information that Mr.
21 Timmons had given you?
22 A Yes, sir.
23 Q And who was the owner of J. and L. Fashions?
24 A The business itself?
25 Q Yes.

1 A Or the building?
2 Q The building.
3 A The building, we could go back in '94 where the
4 taxes were paid by Mr. Leon Carmichael.
5 MR. MOORER: I don't have any further
6 questions. Tender the witness for cross, Your Honor.
7 CROSS EXAMINATION
8 BY MS. JAMES OF MIKE DRUMMOND:
9 Q Good afternoon, Sergeant Drummond. How are you?
10 A Fine, ma'am. How are you?
11 Q Fine.
12 On these three separate situations where you
13 say that Mr. Timmons actually went in, I guess at your
14 direction, to purchase controlled substances from
15 Miss Jones, you made audiotapes of those, didn't you?
16 A Yes, ma'am.
17 Q And where are those audiotapes today?
18 A I have not been able to locate them.
19 Q Okay. But you have been consistently employed
20 with the Montgomery Police Department since those
21 tapes were made in what, 1995?
22 A Yes, ma'am. And in 2001 I went back to Patrol
23 and did a year in Patrol, and then I came back over to
24 Narcotics.
25 Q Okay. But certainly you all, just because an

1 officer changes roles within the department, you don't
2 just destroy the evidence, do you?
3 A No, ma'am.
4 Q And did you participate in the prosecution of
5 Miss Jones for those three separate buys?
6 A No, I did not prosecute her.
7 Q And you testified about the taxes being paid on
8 this J. and L. Thrift store. You said the building --
9 or it appeared the taxes were paid by Mr. Carmichael,
10 is that correct?
11 A Yes, ma'am.
12 Q And did you do any further inquiry to see who
13 held the business license for J. and L. Thrift?
14 A It was Joseph Lacey.
15 Q Okay. And that was the Mr. Lacey that confessed
16 to the ownership of the substances when you executed
17 your search warrant, is that correct?
18 A Yes, ma'am.
19 Q And you were aware during the course of your
20 investigation, were you not, that Mr. Carmichael owned
21 a significant amount of property around this town?
22 A Yes, ma'am.
23 MS. JAMES: That's all I have. Thank you.
24 MR. MOORER: Sergeant Drummond -- Oh, I'm
25 sorry.

Multi-Page™

Page 190

1 THE COURT: Mr. Teague?
2 MR. TEAGUE: Sergeant Drummond, I have no
3 questions for you.
4 REDIRECT EXAMINATION
5 BY MR. MOORER OF MIKE DRUMMOND:
6 Q Was Mr. Lacey in jail at the time that you were
7 making your controlled buys with Mr. Timmons?
8 A I believe he was.
9 MR. MOORER: No further questions, Your
10 Honor.
11 THE COURT: You may step down.
12 (Whereupon the witness, Mike Drummond,
13 stepped down from the stand.)
14 MR. FEAGA: David DeJohn, Your Honor.
15 THE COURT: David DeJohn.
16 D A V I D   D E J O H N,
17 the witness herein, having first been duly sworn or
18 affirmed to tell the truth, was examined and testified
19 as follows:
20 DIRECT EXAMINATION
21 BY MR. FEAGA OF DAVID DEJOHN:
22 Q Sir, would you tell the ladies and gentlemen of
23 the jury your name.
24 A Raymond David DeJohn.
25 Q And what do you do for a living?

Page 191

1 A I'm an investigator with the City of Prattville
2 Police Department, assigned to the Special Operations
3 Drug Enforcement Bureau.
4 Q And how long have you been working for the
5 Prattville Police Department?
6 A I have been working for the Prattville Police
7 Department since January of 2001.
8 Q And how long have you been on the -- did you say
9 the Second Judicial Drug Task -- what did you call it?
10 A I hadn't stated yet, but I'm also cross
11 designated as a federal task force agent with the
12 United States Drug Enforcement Administration in
13 Montgomery, Alabama.
14 Q Okay. And prior to working on the -- Well how
15 long have you been on that Drug Task Force?
16 A Since February of 2001.
17 Q Okay. Prior to the time that you worked for the
18 Prattville P. D. and the drug task force, what were
19 you doing for a living?
20 A I was a police officer with the City of
21 Montgomery Police Department from 1992 until 2000.
22 Q Now, Detective DeJohn, you have been sitting
23 through this trial at counsel table with us and you've
24 heard a great deal of testimony, as have all of us,
25 about what happened over the course of 1994 to the

Page 192

1 present. I want to focus your attention to the date
2 November the 13th, 2003 and ask you if you were on
3 duty that day.
4 A Yes.
5 Q What were you doing that day?
6 A On that particular day I was just doing routine
7 duties around my office until it got towards the
8 evening.
9 Q Okay. Did you have occasion to meet with someone
10 named Gary Wayne George that day?
11 A Yes.
12 Q How did that happen?
13 A Again, that evening I had left the office and I
14 was out with other members of the D. E. A. Montgomery
15 district office and we were assisting another task
16 force, Alabama H. I. D. T. A., in setting up a deal
17 that they were anticipating doing.
18 Q Okay. And so what happened that caused you to
19 meet with Mr. George?
20 A I received a call from the Prattville Police
21 Department. They advised me that they had just placed
22 an individual under arrest by the name of Gary Wayne
23 George. They advised that he had some information
24 that he wanted to talk about, and I asked as to who
25 did he want to talk about and he advised Leon

Page 193

1 Carmichael and he wanted to speak to a representative
2 of the D. E. A.
3 Q All right. And, so, did you go meet with him?
4 A Yes, I did.
5 Q All right. Now did you talk with him?
6 A Yes.
7 Q Okay. And did you talk with him about his
8 knowledge of the distribution of controlled substances
9 in the Middle District of Alabama?
10 A Yes, I did.
11 Q Now you heard his testimony in here earlier, is
12 that right?
13 A That's correct.
14 Q Generally, are the things that he testified to
15 about the things that you talked to him about --
16 MS. WAYNE: Judge, I'm going to object.
17 That's an improper bolstering of a witness. If he's
18 using him to impeach Mr. George, that's different, but
19 he cannot use this witness to bolster his own witness.
20 MR. FEAGA: I really wasn't just trying to
21 do that. I was just trying to show the flow of events
22 and ask him if he talked with him about the same types
23 of things that he testified to about in here. Not did
24 he say this or did he say that.
25 THE COURT: You just want to know if he

Multi-Page™

1 talked about the same subject matter?

2     MR. FEAGA: Yes.

3     THE COURT: Do you have any problems with

4 that?

5     MS. WAYNE: That's a different question, so

6 that's fine.

7     THE COURT: All right. Let's ask him if he

8 talked about the same subjects.

9 Q Did you talk about the same subjects with him

10 that he testified to about in here?

11 A Yes.

12 Q Generally?

13 A Yes.

14 Q There may have been other things that you talked

15 with him about?

16 A Yes.

17 Q It was what it was that day.

18 A Yes.

19 Q Okay. Now on November the 15th of 2003, did you

20 have occasion to see him again?

21 A Yes, I did.

22 Q Okay. And how did that happen?

23 A Sometime early afternoon myself and Sergeant

24 David Williams of the Prattville Police Department

25 went and met with Gary George in reference to talking

1 about did he have any additional information about the

2 possible load of marijuana coming in through Leon

3 Carmichael.

4 Q This was about the load he told you in the first

5 consideration?

6 A That is correct.

7 Q Now Miss Wayne, when she was examining a witness

8 earlier in this proceeding, I believe it was Special

9 Agent Tom Halasz with the D. E. A., let me go back to

10 that, asked Agent Halasz a series of questions about

11 when he had a case file open and when he didn't and

12 when he was doing surveillance and when he wasn't, and

13 when he filed a no-activity report and when he didn't.

14 Do you remember that?

15 A Yes.

16 Q At the time that you got the call from the

17 Prattville Police Department telling you that Mr.

18 George wanted to talk to you, did you have a case

19 file, an active case file open on Leon Carmichael?

20 A No, I didn't.

21 Q So when Mr. Halasz said that the case was

22 currently closed and not being investigated on March

23 3rd, 2003, it was still closed from that closing?

24 A Yes.

25 Q Now I think Miss Wayne stopped asking about

1 activity reports. She said, I think, and let's just

2 go back to the first page --

3     MS. WAYNE: Judge, I'm going to have to

4 object to this. He's totally leading the witness. He

5 can simply ask the witness a question. This is his

6 witness on direct examination.

7     THE COURT: I think he just wants to point

8 out where he's going so the witness won't be in fact

9 say things that are improper.

10     MS. WAYNE: Judge, I don't object to that,

11 but he's recharacterizing entire chapters of cross

12 examination. That's improper.

13     THE COURT: That is improper.

14     And again, members of the jury, what the

15 lawyers say is not evidence.

16     MR. FEAGA: And, again, I am just trying to

17 set the stage for the question, Judge.

18     THE COURT: Okay. Go ahead.

19     MR. FEAGA: I could ask a hundred questions

20 to get there or I could summarize it.

21     THE COURT: Go ahead.

22 Q Now do you remember her asking about surveillance

23 that was done in May of 2002?

24 A Yes.

25 Q And she then asked him about no activity in June

1 of 2002, right?

2 A Yes.

3 Q Said he filed a no-activity report.

4     MS. WAYNE: Judge, I'm going to object

5 again. He still hasn't asked him a question. He can

6 just ask him a pointed question.

7     MR. FEAGA: I'm trying to get to --

8     THE COURT: Well you really shouldn't be

9 getting yes and no answers. You should say what

10 happened in June with regard to the report. You're

11 telling him whether he filed an activity report. I

12 think that's what she's saying.

13     MR. FEAGA: All right, Judge. I'm just

14 trying to move it along a little quicker.

15     THE COURT: Well she's objecting so you need

16 to give him the opportunity for himself to say whether

17 it's true or not, but not a yes or no.

18     MR. FEAGA: Yes, sir.

19 Q Was there a no-activity report filed in June of

20 2002?

21 A Yes.

22 Q Was there a no-activity report filed in July of

23 2002?

24 A Yes.

25     MS. WAYNE: Judge, again I'm going to

Page 198

1 object. It's leading and it's been asked and
2 answered. He's saying yes, no, --
3     THE COURT: Ask him what happened in June of
4 2002. What happened in blank of 2002, what happened
5 in blank. And he can tell us whether it was a
6 no-activity report filed or not.
7     MR. FEAGA: Yes, sir.
8 Q Okay. Detective DeJohn, what happened in August
9 of 2002?
10 A What was -- You wouldn't call it a no-activity
11 report. This is called a case status report, which
12 means there is no actionable intelligence during this
13 time period. You usually write a case report every
14 thirty days and there is no active intelligence during
15 that time.
16     It doesn't mean there is not something going
17 on, but what it means is you have nothing in
18 particular to act upon; i.e., an informant that -- you
19 no longer have an informant, or you haven't developed
20 an informant, or you don't anticipate making any
21 controlled buys during that time or you haven't.
22 Q Okay. How about September of 2002, what happened
23 in September of 2002?
24 A Again, I believe there may have possibly been a
25 case status report during that time.

Page 199

1 Q Did you go back at my request and check and see
2 between the time frames where Miss Wayne left off in
3 July of 2002 and March of 2003? Did you go back to
4 check and see if there was any activity?
5 A Yes. I scanned through it.
6 Q Was there any activity that justified making any
7 type of report the rest of the time between August of
8 2002 and March of 2003?
9 A No.
10 Q And then the file is closed, is that right?
11 A Correct. I believe the March D. E. A. Six that
12 was written in the case status was actually a case
13 closure report.
14 Q All right. Now you said that you met with Mr.
15 George again on the 15th.
16 A Yes, I did.
17 Q What, if anything, did you do after meeting with
18 Mr. George on the 15th?
19 A That was a Saturday after the meeting was
20 complete and he provided information to us regarding
21 the incoming shipment and some other information of an
22 event that was about to happen on that day. I went
23 back to my residence.
24 Q Okay. Now what was the event that he provided
25 you information about that was about to happen? And

Page 200

1 you say that happened on what day?
2 A November 15, 2003.
3 Q I'm going to write on here, I think your words
4 were "event been to happen"?
5 A Correct.
6 Q And what was that?
7     MS. WAYNE: Judge, again, I'm going to
8 object. Mr. George has already testified to all this.
9 This is hearsay coming from this witness. Mr. George
10 testified about what he told the agent.
11     MR. FEAGA: Your Honor, I'm only offering it
12 so that he can be clear as to why he did what he did
13 next.
14     THE COURT: Overruled. Go ahead.
15 Q What was about to happen that you were told about
16 on November the 15th, 2003?
17 A Gary George advised me that himself and Patrick
18 Denton would possibly be selling a quantity marijuana
19 to Charlotte and Steve Hensarling. That they would be
20 traveling from -- most likely Charlotte Hensarling
21 would be traveling from Huntsville, Alabama to
22 Montgomery, Alabama.
23 Q Now where were you when you got this information?
24 A We were in Prattville at the time when we were
25 speaking to him in person.

Page 201

1 Q Okay. Why didn't you -- or what did you do after
2 you heard this?
3 A Well when I first heard the information I
4 discussed it with Sergeant Williams, and then also Deputy
5 Chief Mayfield of Chilton County Sheriff's Department
6 of the possible actions that may be taking place that
7 afternoon.
8 Q Did Mr. George tell you where this was going to
9 happen?
10 A He told me it was going to be down in Montgomery
11 possibly on the Southern Boulevard.
12 Q Okay. Did you drive down there to observe it?
13 A No.
14 Q Why not?
15 A Again, it was Saturday. We didn't have any
16 available manpower at the time for that to happen. I
17 also instructed George that once he obtained some more
18 information regarding it, to call me and let me know.
19 Q Okay. Did he call you and let you know anything?
20 A Yes.
21 Q What was it that he told you when he called you
22 back?
23 A He called me and advised that him and Denton was
24 leaving Denton's residence that's located on West
25 Fleming. That they were they were en route to meet

Multi-Page™

1 Charlotte Hensarling at Shoney's on the Southern
2 Boulevard and they were traveling in separate
3 vehicles.
4      MS. WAYNE: Judge, again, I'm going to
5 object. We're talking about trying to save time.
6 Agent DeJohn is testifying again as to what Mr. George
7 has already testified to. If they want to impeach Mr.
8 George with what the agent knows, that was different
9 from what Mr. George testified, that's different. But
10 they can't bolster and continue to show consistent
11 statements, is what they're trying to do through the
12 back door.
13      MR. FEAGA: Your Honor, she keeps saying I'm
14 trying to bolster -- I'm merely trying to set this
15 case for why he did what he did next.
16      THE COURT: What he's doing is not hearsay.
17 It does come in.
18      MS. WAYNE: Only after he's been impeached
19 can he use a prior inconsistent statement --
20      THE COURT: No, are you telling me he didn't
21 impeach Mr. George?
22      MS. WAYNE: We may have impeached him as to
23 certain specific things, but you can only then bring a
24 prior inconsistent as to those statements that he has
25 been impeached with.

1      THE COURT: Well, overruled. I don't want
2 to spend a lot of time on this, but I do understand
3 you're trying to lay a foundation as to what George
4 said. Go ahead.
5 Q Now you got this call and he told you
6 specifically where they were going, is that right?
7 A That's correct.
8 Q Where were you when you got the call?
9 A I was in Elmore County.
10 Q And would you tell the ladies and gentlemen of
11 the jury how long it would have taken you, if you had
12 decided to do it, to drive from there to the Shoney's
13 from where you were?
14 A Probably twenty-five minutes.
15 Q Did you drive there?
16 A No.
17 Q Why not?
18 A I wouldn't have been able to make it within
19 twenty-five minutes from the area that they were
20 coming from, which they would have got there in
21 probably less than five minutes and I wouldn't have
22 been able to get to them on time. So I instructed
23 Gary George that once the meeting had taken place, to
24 get the best description possible of the vehicle that
25 the individual was driving, a tag number if he could,

1 and the last known direction that he had seen
2 Miss Hensarling traveling.
3 Q Okay. What did you do after that?
4 A I immediately began to get ready, and I left my
5 residence and traveled to the area of Sixty-five and
6 Highway Fourteen, which is exit one eighty-one.
7 Q Why did you go there?
8 A Due to the fact of the previous conversations
9 I've had with Gary George, he advised that Miss
10 Hensarlings and Steve Hensarling resided in the
11 Huntsville, Alabama area. I needed the most direct
12 route from the location that they were meeting her at,
13 and Huntsville would be I-65.
14 Q Okay. And what, if anything, happened after you
15 got there?
16 A Well before I got there, I was traveling there
17 and he had called me and advised me that the meeting
18 had taken place, that they had transferred marijuana
19 to her and she in fact had given them some money. He
20 gave me a description of the vehicle, which was a
21 black S-10 type Blazer vehicle, and it had a Madison
22 County tag.
23 Q Okay. And what, if anything, happened after
24 that?
25 A I was sitting in a stationary position at I-65

1 and Highway Fourteen, exit one eight-one on to the on
2 ramp on the northbound side of I-65 when I observed a
3 black S-10 Blazer driven by a female that matched the
4 description of Charlotte Hensarling drive by my
5 location. I got behind the vehicle and confirmed it
6 did have a Madison County tag, and I continued to
7 follow, surveil Ms. Hensarling as she traveled north
8 on I-65 toward Chilton County.
9 Q And what happened after that, if anything?
10 A I notified the Chilton County Sheriff's
11 Department, I was in contact with Sergeant Steve Brock
12 of the Chilton County Sheriff's Department of the
13 events that had just transpired. I was en route. I
14 was following Ms. Hensarling, and he said he would set
15 up just inside their county line.
16 Q Okay. And what, if anything, happened after
17 that?
18 A As we traveled into Chilton County, I observed
19 Agent Brock on the -- in the median inside Chilton
20 County, and he moved out and conducted a traffic stop
21 of Charlotte Hensarling.
22 Q Okay. And what, if anything, did you do as he
23 was conducting the traffic stop with Miss Hensarling?
24 A I went down to the next exit, turned around on
25 the southbound side and pulled over on the side of the

Page 206

1 road, approximately maybe a tenth of a mile away from
2 them, and observed the stop.
3 Q  Why did you do that?
4 A  Well I didn't want to get out on the traffic stop
5 itself and compromise an investigation. I wanted to
6 sit there and watch and see, you know, if they
7 actually came up with something on their own.
8 Q  What investigation were you concerned about not
9 compromising?
10 A  The investigation of Leon Carmichael and the
11 possible shipment of marijuana that was coming into
12 town that was expected possibly on Sunday night or
13 Monday morning.
14 Q  When did this investigation start?
15 A  This investigation started on November 13th,
16 2003, which is the Thursday before this Saturday.
17 Q  Okay. And the event that triggered the start of
18 this most recent investigation was what?
19 A  Was the arrest of Gary George in Prattville,
20 Alabama on November 13th.
21 Q  All right. Now you said you observed what was
22 going on. What, if anything, did you do next?
23 A  I was sitting there watching the traffic stop,
24 and once it was done they departed and transported her
25 to the Chilton County jail. And I traveled back to my

Page 207

1 residence and informed them to let me know, should she
2 be cooperating or providing any information to them.
3 Q  All right. Now this was on what day again?
4 A  This was on November 15th, Saturday.
5 Q  What, if anything, happened in regards to your
6 investigation after that?
7 A  Well, I received the information from Chilton
8 County Sheriff's Department that they had in fact
9 located some marijuana, and that Charlotte Hensarling
10 stated that she just picked it up from Gary George and
11 Pat Denton down on the Souther Boulevard in Shoney's
12 in Montgomery.
13 Q  So what did you do?
14 A  At that time I notified my supervisors of the
15 actions that had occurred, and we made a claim to go
16 ahead and bring everybody into the office early
17 afternoon on Sunday the 16th.
18 Q  Now stop there. Who are your supervisors you're
19 talking about that you informed?
20 A  I notified Group Two Supervisor Sherry Gonzales
21 of the D. E. A., and I believe the A. S. A. C. Greg
22 Boreland was also informed.
23 Q  The A. S. A. C. of what?
24 A  The D. E. A.  The A. S. A. C. is in charge of all
25 the D. E. A. offices in Alabama as the Assistant

Page 208

1 Special Agent in Charge.
2 Q  Okay. And you said having contact with them, a
3 decision was made to bring everybody in. Would you
4 finish that statement?
5 A  At that time we, after talking with Sherry
6 Gonzales, I decided I needed manpower to go ahead and
7 bring everybody in on the afternoon of Sunday the
8 16th, November 16th, so we could start getting some
9 people ready for possible search warrants or
10 surveillance, or anything that we may need.
11 Q  What do you mean when you say "bring everybody
12 in"?
13 A  Well, bring in the necessary manpower that it
14 would possibly take to conduct this type of operation.
15 Q  Are you talking about other law enforcement
16 agents?
17 A  Yes.
18 Q  Okay. And this decision to do that was made
19 Sunday afternoon, the 16th?
20 A  Yes. Actually, the decision was made on the
21 evening hours of the 15th, but we set the time for
22 everybody to report to the D. E. A. office early
23 afternoon of the 16th.
24 Q  Okay. So the decision is made the night before.
25 A  Yes.

Page 209

1 Q  Does everybody come in as you say, early in the
2 afternoon on the 16th?
3 A  Yes.
4 Q  And what, if anything, did you all do then?
5 A  We had officers -- Most of the officers stayed at
6 the D. E. A. office itself waiting to do what we
7 needed to do. I had a couple of officers do drive-bys
8 of the Carmichael Center, leon Carmichael's residence,
9 patrick Denton's residence. And then I had a two man
10 woods team, when I say "Woods team" they were dressed
11 in camouflage, in the area of a residence that Gary
12 George had told me about that was on Second Street in
13 northwest Montgomery.
14 Q  Let's break those down, if you would. If you
15 would start with the first one. Why did you have
16 people do a drive-by of -- and where did you say it
17 was?
18 A  Well, there was a couple of locations.
19 Q  Could you do it one more time and tell the jury
20 why you did that?
21 A  We had drive-by surveillances, like the
22 Carmichael Center and Leon Carmichael's residence just
23 to see what type of activity was going on, to see if
24 we see anything unusual, or see if we could put Leon
25 Carmichael at a particular location.

Multi-Page™

**Page 210**

1 Q  Why are you interested in what's going on at Mr.
2 Carmichael's home, his business or if you can look and
3 see and figure out where he is?  Why are you
4 interested in that at that time?
5 A  Well he is the subject of this investigation.
6 Q  What is the investigation?  Tell the ladies and
7 gentlemen of the jury at this time when you guys are
8 getting together all out there in the early afternoon
9 on Sunday, what is the investigation?  What is it
10 y'all looking at?
11 A  Well, we were looking at the possibility of
12 approximately five hundred some pounds of marijuana
13 coming into Montgomery, Alabama through Leon
14 Carmichael's trucking company.  And it was distributed
15 out to an individual by the name of Robert Patrick
16 Denton, or Gary George and Patrick Denton was to break
17 down this marijuana and set it up for local
18 distribution.
19 Q  Now at that time when y'all are meeting to talk
20 about all this, if you did think somewhere, where did
21 you think this marijuana was going to be found or
22 located?
23 A  Well the only place -- information that we had
24 that it would definitely come to would be either
25 Patrick Denton's residence or this residence on Second

**Page 211**

1 Street in Northwest Montgomery, which is right off
2 Bell Street adjacent to Maxwell Air Force Base.
3 Q  Okay.  And that was another place you said that
4 you had people riding by to check on, is that right?
5 A  Well that location actually had two people on the
6 ground hidden in an abandoned house that was watching
7 that residence.
8 Q  How come you didn't somebody to set up and watch
9 someplace stationed at the Carmichael Center?
10 A  Setting up stationary surveillance is sometimes,
11 especially when there is not a lot of every vehicles
12 parked in a particular area, you stand a big chance of
13 burning your surveillance.
14 Q  Why do you care if your surveillance gets burned?
15 A  Well, you know, the target of our investigation
16 observes a vehicle that's not familiar to him that is
17 sitting still for a long time, sees a face that's
18 unfamiliar to him or maybe recognizes that person as a
19 police officer, it could change the whole -- change
20 the whole scenario of how the event would happen.  It
21 could prevent the drugs not even coming into town.
22 Q  Now you heard Mr. Denton testify that he had
23 gotten a call from Charlotte Hensarling's husband
24 telling him that Charlotte Hensarling had been stopped
25 on the highway.  Do you remember that testimony?

**Page 212**

1 A  Yes.  As a matter of fact, while I was still out
2 on the highway watching the troopers involved in this
3 traffic stop, I got a call from Gary George who said
4 that he had spoken with Denton and advised that Denton
5 had heard from Hensarling's husband.  And Gary George
6 was panicked, because he was wanting to know what was
7 going on.  He was scared that the whole thing was
8 blown at that point.
9 Q  What, if anything, did you do after you all --
10 You're at your meeting, you're having surveillance
11 done, what, if anything, did you do next?
12 A  We later made application for a search warrant.
13 Q  Wait a minute.  You made application to whom for
14 a search warrant?
15 A  To a U. S. magistrate judge, Judge Coody.
16 Q  And where did you want to search?
17 A  The residence of Eight oh eight West Fleming
18 Road, which is Patrick Denton's residence.
19 Q  Eight oh eight West Fleming, Pat Denton, is that
20 right?
21 A  Yes.
22 Q  When did you make application for this search
23 warrant for Mr. Denton's house?
24 A  It was during the late evening hours.  I would
25 say probably around ten o'clock at night.  Ten-thirty

**Page 213**

1 at night.  I don't remember the exact time that we met
2 with Judge Coody.
3 Q  But what day was it?
4 A  This was on Sunday, November 16, 2003.
5 Q  Around what time of the evening?
6 A  Again, it was probably ten, ten-thirty, maybe
7 even eleven o'clock.  I'm not one hundred percent sure
8 of the time that we met with Judge Coody.
9 Q  Okay.  But late in the evening, anyway, on Sunday
10 the 16th?
11 A  Yes.
12 Q  Why did you want to search Pat Denton's house?
13 A  Well we already knew that Pat Denton, through
14 information we had received, that Pat Denton had
15 transferred marijuana from his house to Charlotte
16 Hensarling, and there was also the possibility that
17 some marijuana was left over there.  We also wanted to
18 go ahead and get the search warrant prepared for in
19 the event that this marijuana showed up, we would
20 already have the search warrant in hand and we could
21 go ahead and hit the location.
22 Q  In the event that what marijuana showed up?
23 A  The expected five hundred plus pounds of
24 marijuana that was supposed to coming from Leon
25 Carmichael.

Page 214

1  Q  And why were you expecting that there would be
2  five hundred fifty pounds coming from Leon Carmichael
3  that night?
4  A  Through information that was provided by Gary
5  George to me.
6  Q  So you now have a search warrant. Did the judge
7  give you one?
8  A  Yes, he did.
9  Q  Okay. You have your search warrant. What, if
10  anything, happened next?
11  A  Well after we had the search warrant and got
12  together with everybody, we briefed everybody
13  regarding the search warrant and where we were going
14  to hit.
15  Q  Okay. And what happened next?
16  A  After that the early morning hours of November
17  17th it was approximately twelve-fifty in the morning
18  we executed a search warrant at Patrick Denton's
19  residence and secured it.
20  Q  Okay. You said "we executed" it. Would you tell
21  the ladies and gentlemen of the jury who "we" was?
22  A  It was myself, other agents and task force
23  officers of the D. E. A. Montgomery district office.
24  Officers of the Alabama H. I. D. T. A., officers of
25  the Montgomery Police Department, officers of the

Page 215

1  Prattville Police Department, officers of the
2  Montgomery County and Chilton County Sheriff's
3  Department.
4  Q  And you said "execute". What do you mean when
5  you say you "executed the search warrant"?
6  A  We took the search warrant that was issued to us
7  and went to the residence, kicked down the door,
8  secured it and we presented Denton with a search
9  warrant that we were there to search his residence for
10  narcotics.
11  Q  And what happened next?
12  A  We began to search the residence. Other
13  officers, and agents began to search the residence
14  while I, myself and other agents, began to talk with
15  Robert Denton.
16  Q  Okay. Now while you were talking with Mr. Denton
17  — Well let me ask you, did he have a cell phone on
18  him when you all first went in? Did he have a cell
19  phone anywhere?
20  A  It wasn't on him. He was sleeping when we first
21  went in. It was located within the house and he
22  advised that it was his cell phone.
23  Q  While you were talking to him, did the cell phone
24  ring?
25  A  Yes.

Page 216

1  Q  What happened? Tell the ladies and gentlemen of
2  the jury where were you when this happened, where was
3  Denton, who else was around?
4  A  Well at this point Denton had already made the
5  decision to go ahead and talk with law enforcement
6  about his activities. He had already taken us around
7  to locations that was connected with Leon Carmichael.
8  He showed us the Carmichael Center. He had showed us
9  Leon Carmichael's residence. He showed us a residence
10  at twenty-seven thirty Argyle Road.
11  Q  If you would, just for me slow down just a
12  little.
13       You said before the phone rang these
14  activities took place?
15  A  Yes.
16  Q  What activities took place before the phone rang?
17  A  He -- Denton had taken us around to some
18  locations.
19  Q  What locations did he take you to?
20  A  He took us to the Carmichael Center.
21  Q  Okay. Now do you know the address for the
22  Carmichael Center?
23  A  Yes. It's One fifty East Fleming Road.
24  Q  That's the Carmichael Center?
25  A  Yes.

Page 217

1  Q  Okay. Where else did you guys go?
2  A  Just a little west of the Carmichael Center is a
3  lot where Leon Carmichael parks some of his trucks and
4  some old buses and some cars. He showed us that
5  location.
6  Q  So a truck lot, car lot?
7  A  Yes. It's just a fenced-in lot. It's got some
8  trucks and trailers and some old buses.
9  Q  When you say it's not far from the Carmichael
10  Center, would you tell the ladies and gentlemen of the
11  jury what you mean by "not far"?
12  A  Within sight. I would say within the property of
13  the Carmichael Center, I believe there is another
14  business that's in between, but another business or
15  two that's in between this lot and the Carmichael
16  Center. So it's well within sight and less than a
17  tenth of a mile.
18  Q  Okay. And when you said "he took us," who did he
19  take?
20  A  Myself and Special Agent Devin Whittle of the D.
21  E. A. Montgomery office.
22  Q  Devin Whittle?
23  A  Yes.
24  Q  Where, if anywhere else, did you guys go besides
25  to the Carmichael truck lot -- Excuse me, the

Multi-Page™

Page 218

1  Carmichael Center and the truck lot?
2  A  We went to Leon Carmichael's residence.
3  Q  Do you know the address for that?
4  A  I believe it's Thirty two twenty-six Brookwood
5  Drive.
6  Q  And that is Carmichael's residence?
7  A  Yes.
8  Q  Where, if anywhere else, did he take you?
9  A  He took us to twenty-seven thirty Argyle Road
10 here in Montgomery, Alabama.
11 Q  Twenty-seven thirty?
12 A  Yes.
13 Q  What is that?
14 A  That is the residence -- He advised us that that
15 is the residence of someone he described as being Leon
16 Carmichael's brother-in-law.  He called him "Montel".
17 We identified that subject as being Martel Watson.
18 Q  So "Montel" is Martel Watson?
19 A  Yes.
20 Q  Okay.  Where, if anywhere else, did he take you?
21 A  He took us by Freddie Williams' residence located
22 at Nine forty-nine Ridgecrest here in Montgomery.
23 Q  And whose residence is that?
24 A  Freddie Williams.  Of course he didn't know it
25 was Freddie Williams at the time, he just knew the

Page 219

1  individual as Freddie.  We later identified that
2  subject as Freddie Williams.
3  Q  Why did he take you by Nine forty-nine
4  Ridgecrest, the residence of this person named
5  Freddie?
6       MR. TEAGUE:  Your Honor, we would object.
7  It would call for a mental operation of another
8  person.
9       THE COURT:  If he knows, has personal
10 knowledge.
11      MR. TEAGUE:  Your Honor, it calls for
12 speculation.
13      THE COURT:  I'll sustain the objection.
14      MR. TEAGUE:  Thank you.
15 Q  Do you know why you were riding by Nine
16 forty-nine Ridgecrest?
17 A  Yes.  Patrick Denton advised that --
18      MR. TEAGUE:  Excuse me, Your Honor.  I
19 object.  It calls for hearsay.
20      THE COURT:  Well what -- Is this --
21      MR. FEAGA:  He's already testified to it.
22 I'm just offering it to show why he did what he did,
23 Your Honor.
24      THE COURT:  Overruled.  Go ahead.
25 A  Patrick Denton advised that because of some

Page 220

1  events that transpired, such as Charlotte Hensarling
2  being arrested, he had told Leon Carmichael that he
3  did not want to take possession of the marijuana.  So
4  we had asked him, "Well, if it's still coming into
5  town and you're not going to take possession of it,
6  where would it be?"
7       And he said if he had to guess, it would
8  probably go to Freddie.  He didn't know his last name
9  at the time, but later we determined it to be Freddie
10 Williams.  And that's why he showed us that residence
11 of Nine forty-nine Ridgecrest.
12 Q  Now where, if anywhere else, did he take you that
13 night?
14 A  He also showed us Leon Carmichael's nightclub,
15 which is located at Forty-six twenty-one Rosa Parks.
16 It's at the corner of Rosa Parks and Fleming Road.
17 Q  And do you know the name of that nightclub?
18 A  Unique Entertainment.
19 Q  Where, if anywhere else, did he take you?
20 A  Back to his residence.
21 Q  If you had a reason for having Mr. Denton do
22 this, would you share it with the ladies and gentlemen
23 of the jury.
24 A  Well, one is to corroborate the information that
25 he's given us.  I mean, some of these locations was

Page 221

1  locations that we were already aware of.  So we wanted
2  to find out exactly what does he know about Leon
3  Carmichael.  Is he going to, you know, tell us that
4  Leon Carmichael's house is somewhere else when we
5  actually know it's at Thirty-two twenty-six Brookwood.
6  And he showed us the exact location where it was at.
7       He also showed us the Carmichael Center,
8  which we knew.  He also showed us Unique
9  Entertainment, so we knew, but then again we were also
10 doing this so we could get some information on where
11 the marijuana could possibly be going to.
12 Q  Did you know that when he told you that he
13 thought his best guest would be this is where Leon
14 would take it if he wouldn't take it?  Did he tell you
15 Nine forty-nine Ridgecrest?
16 A  Yes.
17 Q  Did you know about that before Patrick Denton
18 started talking to you?
19 A  No, I did not.
20 Q  Okay.  And this all happened before -- Well where
21 were you all when he was showing you all these places?
22 I mean what, were you in a car?
23 A  Yes, we were in a car and driving us around when
24 he was showing us these locations.  Then he him
25 returned to this residence.

## Page 222

1 Q  Okay.  And after he got back to his residence,
2 did anything unusual happen?
3 A  Well, yes.
4 Q  Would you tell the ladies and gentlemen of the
5 jury what happened.
6 A  As we were sitting there talking to him I was
7 holding Patrick Denton's cell phone and it rang.  And
8 I looked down on it on the screen and it displayed the
9 name "Leon".
10 Q  What did you do?
11 A  I panicked.  I mean, it wasn't something that I
12 expected.
13 Q  What time of day was this?
14 A  It was night.  It was two-thirty in the morning.
15 Q  Dark out?
16 A  Yes.
17 Q  Before dawn?
18 A  Yes.
19 Q  Early morning?
20 A  Yes.
21 Q  What did you do after the phone rang and the
22 screen displayed the name "Leon"?
23 A  Well, I held it like it was a hot potato and I
24 turned towards Denton.  I held the phone up to him and
25 I said, "Who is this?"

## Page 223

1        And he said, "Leon Carmichael."
2        So I'm trying to hand him the phone and he
3 said, "What do you want me to do?"  And I'm like --
4 I'm telling him to answer it.  And he said, "Well,
5 what do you want me to tell him that, y'all are here?"
6        I said, "No, just answer it."  At that time
7 I heard somebody say something about a tape recorder.
8 I looked up and I saw Special Agent Tom Halasz walking
9 away from us going forwards his truck.  When I looked
10 back down, Patrick Denton had already answered the
11 phone, or was already on the phone.
12 Q  When you looked back down he was already on the
13 phone?
14 A  Yes.
15 Q  Did he answer that call?
16 A  I thought initially at the time that he had
17 answered the call.
18 Q  Have you had a chance to look at the phone
19 records for that night since then?
20 A  Yes.
21 Q  But that night you thought he answered that call?
22 A  Yes.  Because, again, I was looking way.  When I
23 looked back down he already had his ear up to the
24 phone and began to talk.
25 Q  So if the phone records reflect a call came in

## Page 224

1 and immediately one went back, then you wouldn't
2 dispute that.
3 A  No, I would not.
4 Q  But that night you thought it all happened in one
5 event.
6 A  Right.
7 Q  Okay.  What, if anything happened, when you
8 observed Mr. Denton now talking on the phone?  What
9 did you do?
10 A  Well, as he was sitting there and holding the
11 phone to his ear I put my head next to his head so I
12 could listen to what was going on.  When I did that he
13 moved the phone away from his ear a little bit more
14 and held it out.  I noticed there was a couple more
15 agents and officers gathered around so they could all
16 try to hear the conversation.
17 Q  Okay.  Did you hear anything that was said by the
18 individual, whoever it might have been, that was on
19 the other end of the line?
20 A  Yes.
21 Q  What did you hear?
22 A  I heard him explain that he was about five
23 minutes away and he needed to talk to him.
24 Q  Now you said "him".  Why do you say "him" and not
25 her?

## Page 225

1 A  Well, because this individual on the phone was
2 talking to Denton and he said specifically, "I need to
3 talk to you."
4 Q  Right.  Well, could you tell whether it was a
5 male or female?
6 A  Yes, it was a male on the phone.
7 Q  Okay.  And, if you would again, tell me what this
8 voice -- what you heard this voice on the other end
9 say.
10 A  Something to the effect of "I'm about five
11 minutes away.  I need to talk to you."  And during
12 that conversation Denton had tried to explain to him,
13 "Well I'm trying to sleep," and he said, "Well I'm
14 five minutes away.  I need to talk to you."
15 Q  Did the conversation terminate?
16 A  Yes.
17 Q  What, if anything, did you do next?
18 A  I immediately began to tell the approximate
19 fifteen to twenty officers and agents that was on the
20 scene to scatter.  "Everybody get out of here."  This
21 was a -- The location of Denton's residence was down a
22 dead end road, and we had to try to get everybody out
23 of that location and hopefully not run into him.
24        We were moving about fifteen to twenty cars
25 that night, at that time of night, you know, it's hard

Page 226

1 for somebody not to notice, especially if you're
2 coming into an area that's a dead end road.
3 Q Now I wanted to go back. We'll pick back up
4 there in a minute, but I want to do back to this phone
5 call, if I can, Investigator DeJohn.
6     Did you recognize the voice that you heard
7 that night on the phone call?
8 A No, not initially.
9 Q Did there come a point in time later that you
10 believe that you could identify the person whose voice
11 that was that you heard?
12 A Yes.
13 Q How did that happen?
14 A The day following Leon Carmichael's arrest I
15 picked up Leon Carmichael from the Montgomery City
16 Jail and was transferring him from the Montgomery City
17 Jail federal hold to the United States Marshal's
18 office so they could process him. During that time I
19 introduced myself to him. I advised him as to what he
20 was being charged with, and he had a conversation back
21 with me regarding that.
22 Q So you had an opportunity to hear his voice.
23 A Yes.
24 Q Did there come a point in time when you had
25 another opportunity to hear his voice?

Page 227

1 A Yes.
2 Q When was that?
3 A It was on December 4th, 2003.
4 Q Where did that happen?
5 A At the D. E. A. Montgomery district office.
6 Q Now having had an opportunity twice, we'll come
7 back to those, to hear his voice, did you form an
8 opinion about whose voice that was you heard on
9 Patrick Denton's cell phone in the early morning hours
10 of November the 17th, 2003?
11 A Yes.
12 Q Whose voice did you hear?
13 A Leon Carmichael's.
14 Q Now you were talking about this call came in.
15 You heard this information and you guys started to,
16 and I'll use the term scattered. What were y'all
17 doing?
18 A Well, we were trying to get everybody out of
19 there. We were trying to get into positions where
20 just a few officers remained behind in areas that we
21 could watch any vehicle moving and coming to Patrick
22 Denton's house.
23 Q Were you able to find places that were -- that
24 you guys liked? Were you able to find a place to go
25 around there that you felt comfortable was a good

Page 228

1 place to conduct surveillance from?
2 A Yes. I can't testify exactly where everybody
3 went, but where I went, it was the best possible place
4 that I felt I could get without possibly being seen.
5 Q Where did you go?
6 A I went in a direction west on Fleming Road where
7 it turns to a dirt road just past Patrick Denton's
8 house. I pulled my truck off partially of the
9 roadway. I was trying to get it as far into the woods
10 as I could, and I stood on the ground. I got out of
11 my vehicle and stood on foot. I could see the front
12 area of Denton's driveway.
13 Q Okay. Let's see if we can get this sorted for
14 the jury. I'm going to show you what's been admitted
15 into evidence as a picture Pat Denton's house.
16 Government's exhibit 7(c), do you recognize that?
17 A Yes, I do.
18 Q Okay. Now, if you would, would you -- I'm going
19 to show you two more photos because they might help
20 you explain to the jury what's going on out there. I
21 want to show you what's been marked for identification
22 purposes as government's exhibit 7(b) and government's
23 exhibit 7(a) and ask you if you would take a look at
24 those. Would you take a look at 7(a) and (b) and ask
25 I'd like to ask you, do you recognize what's depicted

Page 229

1 in those exhibits?
2 A Yes.
3 Q What are they?
4 A Those are two photos of a location on a dirt road
5 west on Fleming Road from Patrick Denton's residence.
6 Q Okay. Now holding that picture, are they both
7 taken from the same direction?
8 A Yes, it's from the west looking east.
9 Q What is the difference between these two photos,
10 if you would, please?
11 A One is further back, and one is closer to the
12 residence which is approximate my location pulled off
13 to the side of the road.
14 Q Which one is further back from the residence?
15 A The top one.
16 Q That would be government's exhibit 7(a)?
17 A Yes.
18 Q It's further back from 7(b)?
19 A Yes.
20 Q But they are both taken facing down the same
21 direction down the road?
22 A Yes.
23 Q Now where is Pat Denton's house in relation to
24 government's exhibit 7(a) and 7(b)?
25 A You have a chainlink fence right here.

Page 230

1 Q  Do you show that chainlink fence on the picture
2 of his house?
3 A  Yes.
4 Q  Is that the front of the house?
5 A  Yes, it is.
6 Q  The chainlink fence that's in the foreground on
7 government's exhibit -- which one is that, Detective
8 DeJohn?
9 A  7(c).
10 Q  On 7(c). That chainlink fence pictured in the
11 foreground, is that the chainlink fence that we see
12 depicted on government's exhibit 7(a) and (b)?
13 A  Yes.
14 Q  So it appears as though when you pull out of Mr.
15 Denton's house if you came straight out the front, if
16 you take a right turn you'd wind up on a dirt road
17 pretty quick, is that right?
18 A  Yes.
19 Q  If you took a left, would the road be dirt or
20 paved?
21 A  If you took a left turn coming out of his
22 residence it would be paved.
23 Q  Okay. Do you know what, if anything, is on down
24 this dirt road from Denton's house?
25 A  It goes down to a dead end that I believe there

Page 231

1 may be off to the -- if you're going down towards the
2 dead end there may be a farm there. It looks like a
3 farmhouse. And if you're going on the right-hand side
4 there's some wooded areas and I believe that's
5 adjacent to the Southern Boulevard in Montgomery,
6 close to I-65.
7 Q  But it's a dead end road?
8 A  Yes.
9 Q  So if you go down a dirt road you're going to
10 have to stop?
11 A  Yes.
12 Q  Now what about if you go in the other direction?
13 A  If you go the other direction, you have to go
14 straight out that road. There's a couple of roads
15 that go to your left as you're going out that go up
16 into a neighborhood, but you still have to keep going
17 out Fleming Road until you get to Rosa Parks which is
18 right there is Unique Entertainment, Leon Carmichael's
19 nightclub.
20 Q  About how far from Patrick Denton's house is that
21 nightclub?
22 A  I never measured it, but I would estimate maybe
23 half to three-quarters of a mile.
24 Q  All right. Now how about the Carmichael Center,
25 how far away is that from there?

Page 232

1 A  The Carmichael Center is probably another mile
2 straight down that road.
3 Q  If you had to drive, how would you do it?  You go
4 out of the front of Pat Denton's house, you get on
5 that road, you turn left, what do you do next to get
6 to the Carmichael Center?
7 A  Well you go across the railroad tracks, you go
8 across Rosa Parks where the Unique Entertainment is,
9 then you would go through a stop sign and you would go
10 all the way to Court Street or 331. And then you
11 would cross 331 or Court Street and at that time you
12 would be approaching the Carmichael Center. It would
13 be on your right-hand side as you're traveling east.
14 Q  Where were you that night?  You said you found a
15 place to try to hide out. Where were you?
16 A  I was off the side of the road at a distance that
17 was in between these two photos.
18 Q  Which side of the road were you on?
19 A  Almost in this ditch, right here.
20 Q  Can you point to it?
21 A  I was over in here trying to put my vehicle off
22 in the ditch, which I did put it in the ditch but I
23 was parked right here on the side and I got out. I
24 believe I may have been right in front of these bushes
25 right her.

Page 233

1 Q  Okay?
2 A  I was trying to observe what was going on.
3 Q  Now were you in a marked unit?
4 A  No.
5 Q  What kind of car were you in?
6 A  A was in a four wheel drive Toyota Tacoma.
7 Q  Okay. Now what, if anything, did you see having
8 gotten this call and having gone out there and pulled
9 off the road as far as you could, what did you see?
10 A  Approximately five minutes later I observed
11 headlights coming down Fleming Road traveling west
12 from an easterly direction, and the vehicle began to
13 get close. This was the first vehicle that we had
14 seen all night that was not a law enforcement vehicle
15 down this road, and it turned into the residence of
16 Patrick Denton.
17 Q  Now you said this was the first one you had seen
18 all night that wasn't a law enforcement vehicle.
19 A  In relation to that road and right there at
20 Denton's house.
21 Q  Okay. Now these other law enforcement vehicles
22 that you had seen in the area, were they marked units?
23 A  No.
24 Q  But you knew what they were, what type of car
25 they were?

Page 234

1 A  Yes.
2 Q  What happened to these headlights again?  You
3 said you saw them come down the road, what happened?
4 A  I saw the headlights, they came down the road and
5 the vehicle turned into the residence of Patrick
6 Denton.
7 Q  Okay.  Could you tell what type of vehicle it
8 was?
9 A  When it turned in, the headlights was no longer
10 shining in my direction.  I could tell it was a small
11 -- it looked like a four door Honda type vehicle.
12 Q  And what, if anything, did you do after the
13 vehicle turned into Pat Denton's driveway?
14 A  Well, we sat and waited.  It was probably about
15 five minutes.  Then the vehicle pulled back out, got
16 out to the roadway, turned left and traveled east on
17 Fleming Road away from Denton's residence.
18 Q  And what did you do next?
19 A  We -- A group of us returned to Denton's house to
20 find out what had happened.
21 Q  And what, if anything, did you do next?
22 A  We talked with Denton, and he advised -- we asked
23 who that was, and he said it was Leon Carmichael.  He
24 advised that Leon had wanted him to go to Freddie's
25 house in the morning at eight o'clock and help Freddie

Page 235

1 break down the marijuana.
2 Q  Okay.  And what, if anything, did you do next?
3 A  We talked with Denton for a while longer, about,
4 you know, what would happen, how was he going to
5 handle himself tomorrow and instructed him to meet
6 with us around seven o'clock in the morning to send
7 him to Freddie Williams' house.
8 Q  Okay.  And what, if anything, happened next?
9 A  We all departed the area.  By the time that
10 happened, I would say it was approximately
11 three-thirty, maybe twenty until four.  All law
12 enforcement agents involved in this operation we met
13 at a location.  I briefed them on what we expected to
14 do within just a few short hours.
15 Q  What location did y'all meet at?
16 A  We met in the area of Woodley and the boulevard
17 behind a shopping Center just east of Woodley.
18 Q  All right.  And you say you gave advice to all
19 law enforcement --
20 A  Excuse me, not Woodley, I believe it was Narrow
21 Lane.
22 Q  Okay.  And you said you gave advice to all the
23 law enforcement officers that were participating?
24 A  Well, we advised them of what we would be doing.
25 Q  And what, if anything, happened next?

Page 236

1 A  I instructed several agents to make some
2 drive-bys of the location -- different locations as we
3 were leaving our meeting location to check on Denton's
4 residence real quick, check on -- and which I was
5 going to check on Freddie Williams' residence to make
6 sure what type of activity was going on, and that we
7 would all meet back at D. E. A. around six-thirty in
8 the morning.
9 Q  And what, if anything, happened next?
10 A  We broke up from that meeting.  I traveled to
11 Freddie Williams' residence to see if there was any
12 type of activity was going on.  All the lights were
13 off.  There was no activity.
14 Q  Okay.  And what, if anything, happened next?
15 A  I traveled back to the D. E. A.
16 Q  What time of day, approximately, was it when you
17 finished looking at Freddie's and started back to the
18 D. E. A.?
19 A  It was almost five in the morning.  I went back
20 to the D. E. A. and began to look at an operations
21 plan.  Approximately an hour later I went back out,
22 again drive by Freddie Williams' residence to see if
23 there was any activity.  There was no activity, and I
24 went back to the D. E. A.
25 Q  I didn't hear you say anything about you going to

Page 237

1 bed.
2 A  No, I didn't.
3 Q  What, if anything, did you do after you got back
4 to the D. E. A.?
5 A  Got back to the D. E. A., tried to brief people
6 as to what was going on there, where I wanted certain
7 people to go.  As it got closer to seven, actually it
8 was probably just a little after seven, we met with
9 Patrick Denton at Bruno's on Perry Hill.
10 Q  What, if anything, happened there?
11 A  Myself, Sergeant David Williams and a couple of
12 other officers met with Denton at Bruno's, behind it.
13 We talked to him a little bit about what we wanted him
14 to do and he was searched.  His vehicle was searched.
15 Q  Why do you do that?
16 A  Well we wanted to ensure that he didn't have any
17 weapons, large amounts of currency on him or drugs on
18 him.
19 Q  Why?
20 A  To try to ensure the integrity of the case.  To
21 make sure that he's not taking evidence to that
22 location.
23 Q  Okay.  Did you find anything?
24 A  No.
25 Q  Okay.  What, if anything, happened next?

**Multi-Page™**

### Page 238

1 A He was provided with some audio and video
2 equipment, and he was then surveilled as he traveled
3 from Bruno's to Freddie Williams' residence.
4 Q Okay. Who surveilled him?
5 A Myself and Sergeant Williams, and we were in
6 separate vehicles.
7 Q Okay. And what, if anything, did you do next?
8 A I went to an area probably one block south of
9 Freddie Williams' residence and set up to try --
10 because I had a piece of equipment that I could try to
11 monitor the audio that Denton was transmitting.
12 Q Okay. And what, if anything, happened next?
13 A He was in there just a short time, and he began
14 to come out. And when he got out, we could hear him
15 advising that he needed to get baggies, that Freddie
16 needed baggies. So he called me on the phone, we
17 talked, and I instructed him "Well where do you go get
18 your baggies at?" He said, "Well let's go over to
19 Calhoun's." So myself and Dave Williams and a couple
20 of other agents met him over at Calhoun's.
21 Q Okay. And what happened then?
22 A He only had a little bit of cash on him, so we
23 had to real quick come up with our own money to
24 provide for him to purchase these bags.
25 Q All right. Did you do that?

### Page 239

1 A Yes.
2 Q Okay. And What happened then?
3 A He then purchased as many baggies as you could
4 from Calhoun's on West Fairview, and then the next
5 location that he said he could possibly get some more
6 baggies would be at the Winn-Dixie at South Lawn.
7 Q Now while he's buying these baggies, did you guys
8 do anything in regard to the recording equipment that
9 he was wired up with?
10 A Yes. I believe it was when we traveled to the
11 location on South Lawn, Winn-Dixie at South Lawn,
12 that's when we went ahead and switched tapes, both
13 audiotapes and videotapes that was in the video
14 recording device which was in the trunk of his
15 vehicle.
16 Q You were in here when I was offering these tapes
17 switching them back and forth, one, two, and three. We
18 god one, two, and three, audio, one, two, and three
19 video, do you remember that?
20 A Yes, I do.
21 Q Is that why we have more than one tape?
22 A Yes.
23 Q Because y'all switched them?
24 A Yes.
25 Q Would you tell the ladies and gentlemen of the

### Page 240

1 jury why you switched the tapes.
2 A Any opportunity that you go to go ahead and
3 switch tapes in any deal, if an individual, breaks
4 contact with the target of the investigation, you want
5 to go ahead switch out tapes, switch out batteries on
6 the device. Because you never know how long that
7 second meeting might last. It may last a lot longer
8 than what you expected and run out of battery time or
9 tape time.
10 Q So what happened after the baggies got purchased?
11 A After the baggies were purchased, Denton traveled
12 back to Freddie Williams' residence.
13 Q And what happened then?
14 A When he first arrived at Freddie Williams'
15 residence you can hear on the audio that he began
16 knocking on the door. And you can hear him calling
17 Freddie on the phone. He was advising us over the
18 audio that, you know, the best you could do make out
19 that Freddie wasn't there. That's the indication we
20 got from the audio. But he called him, and then I
21 believe at that time he informed us that Freddie had
22 gone down the street and would be back in five
23 minutes.
24 Q Did Freddie come back?
25 A Yes.

### Page 241

1 Q Did Denton go in the house?
2 A Yes.
3 Q What happened next?
4 A At that point when Denton went inside the house,
5 you could hear him on the audio start to count out how
6 many bags he can see. One through, eight, nine, ten,
7 eleven, eleven bags. At that point having the
8 indication that there were these bags there, I then
9 proceeded to --
10 Q You say you are listening. You can hear this
11 live?
12 A I can hear some of it. I mean there was a lot of
13 static. A lot of interference. But there were bits
14 and pieces that I could make out.
15 Q Did you go in that house after that search went
16 down of Freddie Williams' house? Did you get to go in
17 that house?
18 A Yes.
19 Q Let me show you what's been marked government's
20 exhibit 7(j) for identification purposes and ask you,
21 if you would, take a look at 7(j).
22    (Whereupon, the witness complied.)
23 Q Have you had a chance to look at it?
24 A Yes.
25 Q Do you recognize what it depicts?

Page 242

1  A  Yes.
2  Q  What does it depict?
3  A  It's a photo of a coffee table that's sitting in
4  Freddie Williams' residence located at Nine forty-nine
5  Ridgecrest.
6  Q  What are these objects all over the floor?
7  A  An abundance of electrical cords all over the
8  place.
9  Q  Okay.  Is that an accurate depiction of what you
10  saw when you went in that house?
11  A  Yes.
12  Q  You saw electrical cords all over the place?
13  A  Yes, and the house itself was in very poor
14  condition.
15  Q  Now based on your training and experience in law
16  enforcement -- You've listened to these tapes, is that
17  right?
18  A  Yes.
19  Q  Mr. Teague I think said all you hear is a lot of,
20  and certainly you hear a lot of --
21      (Whereupon, Mr. Feaga simulated a sound of
22  static.)
23  Q  Do you know, based on your training and
24  experience, anything about the inside of Freddie
25  (sic.) Carmichael's house that might have contributed

Page 243

1  to your inability to get clear audio signals out of
2  that house?
3  A  Yes.  Freddie Williams house, yes.
4  Q  Okay.  Did I say some other house?
5  A  Yes.  You said, "Freddie Carmichael."
6  Q  Excuse me, Freddie Williams' house.
7      Do you know anything about it?  If so, would
8  you share it with the ladies and gentlement of the
9  jury.
10  A  Through my training and experience, I've learned
11  that bad wiring in a house will interfere with your
12  audio transmitting devices.
13      MR. TEAGUE:  Excuse me, Your Honor, I'd like
14  to see a predicate be laid in order to get this kind
15  of testimony.
16      THE COURT:  Sustained.  Yes.
17  Q  What type of training have you had in the use of
18  electronic equipment?
19  A  In 1995 I began -- when I was working for the
20  Montgomery Police Department I was assigned to the
21  Special Ops, at that time it was just the Narcotics
22  Intelligence Bureau.  During that time I wired up
23  numerous individuals, or placed transmitters on
24  numerous individuals.  I also received training
25  through the National Intelligence Academy, which is a

Page 244

1  division of Audio Intelligence Devices in Ft.
2  Lauderdale, Florida.
3      I've received training in audio surveillance
4  and basic video surveillance.  And during that time it
5  was explained to us that, you know, things that cause
6  interference in your transmitting devices is one, bad
7  wiring.  A lot of electrical interference will, you
8  know, reduce or mess up your transmission.  A trailer
9  is one of our nightmares because when we send somebody
10  in wired up going into a trailer because all the metal
11  and the wiring that's involved inside the trailer, as
12  well as older houses.
13  Q  These extension cords and wires that are trailed
14  all over the floor in this picture, is this the room
15  that is depicted in the videotapes when you can see
16  Pat Denton and Freddie Williams in the room with the
17  marijuana?  Is this the same room or a different room?
18  A  It's a different room.
19  Q  Okay.  Did you see these cords all over the room
20  where the marijuana was?
21  A  I don't recall any there.  There was wires in the
22  living room going in the hallway towards the kitchen.
23  There may have been some going to the bathroom, but
24  there were wires all over the floor like that.
25      MR. FEAGA:  Your Honor, we'd like to offer

Page 245

1  into evidence what's previously been marked as
2  government's exhibit 7(a), 7(b) and 7(j).
3      THE COURT:  You'd like to have them
4  admitted?
5      MR. FEAGA:  Yes, sir.
6      THE COURT:  They're all admitted.
7  Q  You said that Pat Denton had gone back in.
8  You're listening live as best you can.  What happened
9  after he went back?  What, if anything, did you do
10  next after he went back in buying the baggies?
11  A  Once I heard him reference some black bags
12  counting them out, I proceeded to the U. S. Attorney's
13  Office and began the construction of the affidavit for
14  a search warrant for Freddie Williams' residence.
15  Q  Why did you want to get a search warrant to go
16  into Freddie Williams residence?
17  A  Because we wanted to be prepared that at a given
18  moment we could go ahead and seize that marijuana that
19  was there.  We didn't want to have to wait until later
20  to try to get the search warrant.
21  Q  Okay.  So you're not on -- at this point in time
22  you're not close to the scene?
23  A  No.  I've left, leaving Sergeant Williams.  And
24  there may have been a couple of other officers that
25  was relatively close, but not real close.

Multi-Page™

Page 246

1 Q Okay. What, if anything, happened next?
2 A I was at the U. S. Attorney's Office and I got --
3 Denton called me, actually. I heard -- David Williams
4 advised me that Denton was coming out of the residence
5 again. Something about some scales.
6     Denton then called me at that time, because
7 he had no idea that I was no longer in the area, and
8 he called me and advised that he needed some scales.
9 That Freddie didn't have the right scales so he needed
10 to go get them. So I instructed him to meet with
11 agents at the area of Fairview Court, which there is
12 an old Sears there and he met with agents over there
13 for some scales.
14 Q Okay. Now I haven't seen those scales come into
15 evidence in this trial. Where are those scales?
16 A They're probably in the Montgomery Police
17 Department. It was their scales that they use in
18 Narcotics when they weigh up drugs, when they arrest
19 somebody. It's just a set of individual scales.
20 Q So you didn't take those scales?
21 A No, we didn't.
22 Q You gave them back to the M. P. D.?
23 A Yes.
24 Q All right. But you gave them to Pat Denton that
25 day?

Page 247

1 A Yes.
2 Q Okay. What, if anything, happened next?
3 A He got the scales, went back. I'm getting
4 information passed on to me as they're hearing
5 something. But the next thing you know, I know, is I
6 get a call from Denton saying, "Y'all come on, Freddie
7 is leaving." I'm trying to find out what's
8 going on.
9     I called David Williams and asked him,
10 "What's going on?"
11     And he said, "Freddie's leaving." He can't
12 make out exactly what's going on, but "Freddie is
13 starting to leave." At that time I think there's --
14 you know, I have no idea what's going on. I'm
15 thinking that maybe the whole thing got burned. Maybe
16 Freddie was trying to get out of the house because of
17 maybe --
18     MR. TEAGUE: Your Honor, I would object to
19 speculation.
20     MR. FEAGA: It's not speculation. He's
21 telling them what his mental operations were at that
22 time.
23     MR. TEAGUE: Well it's speculation, Your
24 Honor.
25     THE COURT: What -- whose mental operations?

Page 248

1     MR. FEAGA: Detective DeJohn. He's
2 testifying what's going through his mind.
3     THE COURT: You mean his own mental
4 operation.
5     MR. FEAGA: Yes, sir.
6     THE COURT: Mr. Teague?
7     MR. TEAGUE: Your Honor, we submit that his
8 subjective speculation is not really -- it's the facts
9 that are important, not his speculation.
10     MR. FEAGA: Your Honor, we're offering it to
11 show why he did what he did next.
12     THE COURT: Overruled. Go ahead.
13 Q You get this call, "What's going on?" And in
14 your mind at this time --
15     THE COURT: Don't ask him what's going on.
16 Just ask him why he did the next thing.
17 Q Why did you do the next thing?
18 A I thought something had gone wrong to compromise
19 the operation. So I went ahead and called Agent
20 Gonzales and told them to move in. They weren't
21 prepared to move in at that time. They were waiting
22 for me to get the search warrant and said I had to
23 travel from Fairview to Court, but because of traffic
24 it took some time to get there. I instructed them to
25 take Freddie Williams into custody and secure the

Page 249

1 residence.
2 Q Agent DeJohn -- excuse me, Investigator DeJohn,
3 why didn't you have somebody sitting out in front of
4 this house that Denton went into? I'm going to show
5 you what's been marked and introduced into evidence as
6 government's exhibit 7(d). Do you recognize that?
7 A Yes.
8 Q Is that the house that Denton was going in and
9 out of that day?
10 A Yes.
11 Q Is that the house that he identified to you as
12 belonging to Freddie at Nine forty-nine Ridgecrest?
13 A Yes.
14 Q Is that the house with the wires all over the
15 floor?
16 A Yes.
17 Q How come you didn't have somebody setting right
18 out in front ready to bust the door down?
19 A Because you couldn't set up surveillance in that
20 manner.
21 Q Why not?
22 A You would get burned. Any vehicles that were
23 strange to the area, we didn't know if there was other
24 people that were cooperating with Leon Carmichael or
25 Freddie Williams that would tip them off if there was

**Page 250**

1  the same vehicle parked down the road watching the
2  house.
3  Q  Let's talk about that for a second.  Have you
4  subsequently learned of anyone that knows Leon
5  Carmichael that lives near here?
6  A  Yes.
7  Q  Would you tell the ladies and gentlemen of the
8  jury who that is?
9  A  It's a female by the name of Markeena (ph.)
10  Whisenant.
11  Q  Okay.  And do you know what her name that she
12  goes by?
13  A  She goes by Keena.
14  Q  Okay.  And how do you know that Keena Whisenant
15  lives near here?
16  A  Through information that was provided to me by
17  Patrick Denton, Sherry Pettus and also I went to speak
18  to her at her residence.
19  Q  Wait a minute.  Can you give me the address for
20  the house that's near here?
21  A  Yes.
22  Q  Hold on one second.  Let me find the marker.
23         Okay.  What's that address?
24  A  Nine seventy Ridgecrest.
25  Q  Is that the same the same Keena that Sherry

**Page 251**

1  Pettus testified called her and tipped her that Leon's
2  -- Freddie's place is being busted?
3         MS. WAYNE:  Judge, objection.  Hearsay.
4  Lack of foundation as to what Sherry Pettus thought.
5         MR. FEAGA:  He just testified that Sherry
6  Pettus just said that -- was one of the people that
7  identified Keena.
8         THE COURT:  Okay.  So what's the purpose of
9  introducing this?
10        MR. FEAGA:  I'll move on, Your Honor.
11        THE COURT:  All right.
12  Q  Did you go knock on the door of this Nine seventy
13  Ridgecrest?
14  A  Yes, I did.
15  Q  And who answered the door?
16  A  Markeena Whisenant.  Keena.
17  Q  And did you identify yourself to her?
18  A  Yes.
19  Q  Did she indicate that she was willing to make any
20  type of statement to you?
21  A  No.
22  Q  She did indicate that she was not willing?
23  A  Right, she was not willing.
24  Q  Now would you tell the ladies and gentlemen of
25  the jury where she lives physically in relation -- If

**Page 252**

1  you would step down here, sir?
2         MR. FEAGA:  Your Honor, permission from the
3  Court to allow him to step down here to stand in front
4  of the drawing for the jury?
5         (Whereupon, the witness approached the easel
6  before the jury box.)
7  Q  I wonder, if you would, just draw this Ridgecrest
8  Street, just enough of it, if you could, to show the
9  ladies and gentlemen of the jury where Keena's house
10  is at Nine seventy Ridgecrest in relation to Freddie's
11  house at Nine forty-nine Ridgecrest.  And I'm going to
12  flip the page.
13         (Whereupon the witness complied and drew a
14  diagram on the easel.)
15  A  What I've drawn here is, this would be roughly
16  going in the north direction.  To the north of
17  Ridgecrest.  Now there's a couple of streets in
18  between here, but I couldn't draw them all out and
19  they curve around some, but just basically north is
20  West Edgemont and there is an AMOCO right here.
21  There's an on ramp to I-65 and an off ramp that loops
22  around here that goes to Edgemont.  Ridgecrest right
23  here.  To the west of Ridgecrest it intersects
24  into --
25  Q  Could you give us the directions on the bottom of

**Page 253**

1  that, just which way is north, which way is west?
2  A  Right here.
3  Q  Okay, you did.  I'm sorry.  Okay.  So west is
4  what?
5  A  West of Freddie's residence or Mr. Williams'
6  residence, Nine forty-nine, the next road is Oak
7  Street.
8  Q  Okay.
9  A  Which runs through West Edgemont Avenue.
10  Q  Okay.
11  A  To the east, I can't recall the street right off
12  the top of my head, it might be April Street but I'm
13  not one hundred percent certain.  But then it runs all
14  the way to Rosa Parks Avenue.
15  Q  Could you just show the ladies and gentlemen of
16  the jury, if you would, on your little map what
17  direction, I realize they're not on there, but what
18  direction is it to get to the Carmichael Center from
19  there?
20  A  We come out here to Rosa Parks and you would go
21  down for a couple miles until you get to Southern
22  Boulevard.  You would cross Southern Boulevard, take
23  that all the way down to Fleming.  You would be right
24  there at the corner of Unique Entertainment, or you
25  would be right there at Rosa and Fleming, Unique

**Multi-Page™**

Page 254

1 Entertainment is right there. You make a left, go
2 straight on down across Court Street and then the
3 Carmichael Center would be on your right.
4 Q So what general direction?
5 A You would head south.
6 Q South from there?
7 A Right.
8 Q What about Leon Carmichael's house in Brookwood?
9 A That's going to be more east. It's to the south,
10 but it's more easterly.
11 Q What kind of direction would we be going in?
12 That's all I want to know.
13 A South all the way down to the Southern Boulevard.
14 Q Is what, what's south?
15 A Take Rosa Parks south.
16 Q To get where? I mean, which one are you talking
17 about, the Carmichael Center or are you talking about
18 his --
19 A I'm talking about Mr. Carmichael's house.
20 Q Okay. So it would be out this way somewhere.
21 A So it would be down this way.
22 Q Okay. And what about the Carmichael Center?
23 What direction do we have to go to get there?
24 A Southeast.
25 Q Same direction?

Page 255

1 A Yes.
2 Q Okay. How about Pat Denton's house?
3 A Pat Denton's hose would be south.
4 Q Same direction?
5 A Yes.
6 Q So they're all close to each other?
7 A Yes.
8 Q Is Leon's house --
9 A His house is the furthest out of them.
10 Q All right. Now show us where Keena's place is
11 and where Freddie Williams' place is.
12 A Freddie Williams' residence is a duplex, and he
13 had as you're looking at the duplex, it's on the
14 right-hand side. It's Nine forty-nine on the south
15 side of the street. Nine seventy Ridgecrest is on the
16 opposite side of the street, the north side of the
17 street, approximately three, maybe four houses down on
18 the opposite side of the road within eyesight of each
19 other.
20 Q Okay. Now you heard Agent Gonzales testify to be
21 sitting outside of Nine seventy Ridgecrest.
22 A No, she testified to be sitting outside of Nine
23 forty-nine.
24 Q Freddie. Nine forty-nine. Excuse me.
25    She said she was sitting outside of that.

Page 256

1 Q Do you know what direction Leon Carmichael was headed
2 when he came down that road and went by her?
3 A According to the information I received and
4 testimony in the courtroom --
5    MS. WAYNE: Judge, I'm objecting to lack of
6 foundation. He's testifying about what he heard in
7 the courtroom. Agent Gonzales already testified about
8 it.
9    MR. FEAGA: Judge, she said what direction
10 he was heading in. He just drew a map. He can say
11 from which direction she testified he was heading,
12 which way he was going on that street. The testimony
13 from Agent Gonzales was that Mr. Carmichael came down
14 the street heading in a certain direction, and she
15 named it. Now he can say having watched that which
16 direction that would be on his map.
17    THE COURT: He saw it himself?
18    MR. FEAGA: He didn't see it but he heard
19 her say what the direction was, so he can draw an
20 arrow as to what direction that would be on his map.
21    THE COURT: I'll sustain the objection.
22 He's just commenting on the evidence. I'll sustain
23 it.
24 Q All right. She said she was facing a particular
25 direction. Do you remember what direction she said

Page 257

1 she was facing?
2 A Yes. She said to the west.
3 Q Which direction is west on this map?
4 A This way.
5 Q Now if you would resume your seat.
6    THE COURT: We'll take a fifteen minute
7 recess.
8    How you we progressing?
9    MR. FEAGA: We're getting there, Your Honor.
10    (Whereupon, a recess was taken.)
11    THE COURT: Proceed.
12    MR. FEAGA: Yes, sir, Your Honor. I'd like
13 to offer what's been marked government's exhibit 59
14 for identification purposes, and the hand-drawn map by
15 Detective DeJohn as government's exhibit 59.
16    THE COURT: Very good. Admitted.
17 Q Now, Detective DeJohn, did I ask you before
18 coming into this courtroom today to get the United
19 States a copy of the map of the city of Montgomery?
20 A Yes.
21 Q Did you did that?
22 A Yes.
23 Q Okay.
24    MR. FEAGA: Your Honor, with the Court's
25 permission I'd like to ask Miss Morris if she would

Page 258

1 hold this map up to the easel from behind and let the
2 witness to come down and who circle on the map of
3 the city, various locations, and then write with the
4 Magic Marker what that is.
5        THE COURT: Yes.
6        JUROR: Is there any way we can bring it
7 closer?
8        THE COURT: It's really hard to see. Can
9 you put it on the screen? Well, I don't know --
10       MR. FEAGA: It might not fit, Your Honor.
11 But I'll offer it as an exhibit so they can look at it
12 if they want to. I just want them to know where these
13 things are.
14       THE COURT: Why don't you put it as close to
15 them as you can.
16       MR. FEAGA: Yes, sir.
17 Q What part of the city are we talking about, is
18 there a section of the city that all of this activity
19 happened in?
20 A Generally, it's going to be the south and west
21 side of the city.
22 Q All right. If you would, please, would you
23 circle the area where Pat Denton house is or put a dot
24 and then just draw a line away from it where it won't
25 interfere, because I'm going to ask you to show them

Page 259

1 where Pat Denton's house is, the Carmichael Center,
2 before you start just so you'll know, Freddie
3 Williams' house, Keena's house, the Unique
4 Entertainment, J. and L. Thrift and Mr. Carmichael's
5 home at Brookwood. Can you dot and draw an arrow away
6 and write what that is so the ladies and gentlemen of
7 the jury will know where these things are.
8        MR. FEAGA: And I've marked this for
9 identification purposes, Your Honor, as government's
10 exhibit 60.
11 Q Okay. That's Pat Denton's place.
12 A Can I utilize a smaller tipped pen?
13 Q Yes, you can?
14 A I can make a dot with the black pen, but --
15 Q Those may not be the best. Let me try this one
16 right here. No, this is blue.
17       Okay. Now you've just made a second dot and
18 you've drawn with a blue line and you've put "Unique
19 Entertainment" on it. All right.
20       You just now added a dot that says
21 "Carmichael Center." Now can you step back just a
22 second so we can say this.
23       This dot says "Pat Denton's place," is that
24 right.
25 A Yes.

Page 260

1 Q Then we see "Unique Entertainment" right here in
2 the Center of the Pat Denton dot, and a third dot most
3 recently put on it which says "Carmichael Center" with
4 a line.
5        Would you show us now -- Well, you pick the
6 next one. You know the list.
7        (Whereupon, the witness continued to draw on
8 the easel before the jury box.)
9 Q Okay. Now you've added a fourth dot that says
10 the "Multi-Investments building."
11 A The old --
12 Q The old Multi-Investment building. Is that where
13 the parking lot is where the Carmichael Center is now?
14 A Well it's a grass lot, but it's where the parking
15 lot ends and then there is a grass lot where the old
16 building used to sit.
17 Q Okay. And that's where you've indicated here.
18 A Yes.
19 Q Multi-investment building.
20 A Yes.
21       (Whereupon, the witness continued to draw on
22 the easel before the jury box.)
23 Q You've just made a fifth dot. Leon Carmichael's
24 house. That's Martel Watson's house. Could you step
25 back just one second.

Page 261

1        I see the dots appear to be running in this
2 direction right now, and I'm moving from the left side
3 of the map as you face it to the right side. And I'm
4 indicating that they're moving from left to right.
5        Where is the next location?
6        (Whereupon, the witness continued to draw on
7 the easel before the jury box.)
8 Q And it says "Freddie Williams' house"? All
9 right.
10       Where is Keena's house?
11       (Whereupon, the witness continued to draw on
12 the easel before the jury box.)
13 Q Now did you have a J. and L. Thrift location on
14 there?
15 A Not yet.
16 Q Okay. Now if you would, take your Magic Marker,
17 you've drawn a dot on this map of the city, you've
18 drawn a line away from it in blue ink and you've
19 written at the end of that line what the locations
20 are.
21       If you would, so there won't be any problem
22 finding them, if you will now circle the name and then
23 if you can stand back where the ladies and gentlemen
24 can see it, show them where each of these locations
25 are and circle it, if you would. Not the dot, but the

1 name. That way you won't interfere with people seeing
2 where it is. Is that right? Okay.
3     Circle it with the black Magic Marker, if
4 you would.
5     What are you circling now?
6 A  What I'm circling is the location on Second
7 Street off Bell Street in Montgomery. I believe the
8 address is Twenty-three Second Street. This is a
9 residence used by Patrick Denton and Gary George to
10 break down the marijuana on some occasions.
11 Q  Okay. What about this next one?
12 A  J. and L. Thrift or J. and L. Fashion and Thrift
13 is located at Sixteen twenty-three Mobile Road. This
14 is the location used in the mid nineties by Joseph
15 Lacey, Jimmy Timmons, Sandra Jones as a way to sell
16 Leon Carmichael's marijuana.
17 Q  All right. And What about this next one?
18 A  That's Keena's house or Markeena (ph.) Whisenant.
19 That's located at Nine seventy Ridgecrest. That's the
20 location where Patrick Denton had dropped off some --
21     MS. WAYNE: Judge, I'm going to object.
22 That testimony has not come out at all.
23     MR. FEAGA: We'll withdraw that, Your Honor.
24 Q  If you would, now, from Keena's house I want you
25 to draw a subsequent line from the circle of Keena's

1 house out here and write the address for Keena's house
2 on the map.
3     (Whereupon, the witness complied.)
4 Q  At the end of that line. That's great.
5     Okay. Now what's this one right here? And
6 that address, if you would? Draw that line right
7 there and give us that address.
8 A  It's Freddie Williams' house.
9 Q  And, if you would, the address for Leon
10 Carmichael's house.
11     (Whereupon, the witness complied and
12 continued to write on the easel before the jury box.)
13 Q  All right, sir, thank you. You can resume your
14 seat.
15     (Whereupon, the witness resumed the stand. )
16     MR. FEAGA: Your Honor, we'd like to offer
17 into evidence what's been marked as government's
18 exhibit 60 for identification purposes as government's
19 exhibit 60.
20     THE COURT: Admitted.
21 Q  Now, Agent DeJohn, I believe where we left off
22 from the testimony you had talked about Pat Denton
23 coming back out and getting some scales. I asked you
24 some questions from your map about where Agent
25 Gonzales was located.

1 A  Yes.
2 Q  You heard the testimony about folks going into
3 the house, is that right?
4 A  That's correct.
5 Q  You were not part of the initial party that
6 entered the house, were you?
7 A  No, I wasn't.
8 Q  But you came out later?
9 A  Yes.
10 Q  Now, you talked earlier about having had two
11 opportunities to hear Leon Carmichael speak. You said
12 one time was when you took him from -- well when was
13 the fist time?
14 A  The first time was November 18, 2003, the day
15 following his arrest when I was transporting him from
16 the Montgomery City Jail federal hold to turning over
17 to the custody of the United States Marshals Service.
18 Q  Okay. And that was an occasion when you actually
19 knew that you were talking to Leon Carmichael, is that
20 right?
21 A  Yes.
22 Q  Because he was right there.
23 A  Yes.
24 Q  Now you said there was another occasion when you
25 talked to Mr. Carmichael. What was that occasion?

1 A  That was the morning of December 4, 2003. It was
2 at the D. E. A. Montgomery district office.
3 Q  Okay. Would you tell the ladies and gentlemen of
4 the jury why it is that you saw Mr. Leon Carmichael at
5 the offices of the D. E. A. on December the 4th of
6 2003.
7 A  Mr. Carmichael had arrived at the office to
8 retrieve some property from us that we were not going
9 to continue to hold as evidence, or at least that we
10 were able to make copies of to preserve as part of our
11 evidence.
12 Q  Would you tell the ladies and gentlemen of the
13 jury what, if anything, transpired while Mr.
14 Carmichael was there?
15 A  While going to return his property to him, we had
16 sat down at a table and I was beginning to fill out
17 what's called a D. E. A. Twelve. But before I did
18 that I was walking back into the room and Mr.
19 Carmichael began to complain about the media's
20 representation of the way the marijuana was found.
21 Q  What, if anything, did he say?
22 A  He began to complain to say the media had
23 represented that we had found five hundred pounds of
24 marijuana inside the Carmichael Center. And I
25 commented to Mr. Carmichael that we knew that not to

**Page 266**

1  be the truth, and weren't representing anything to the
2  court that wasn't true.
3  Q  And what, if anything, did he say?
4  A  He said something to the effect that he had
5  already resigned himself to the fact that he was going
6  to prison for ten, fifteen, twenty years, and that's a
7  life sentence for him.
8  Q  What, if anything, did you say in response to
9  that?
10  A  Well I was thinking that, you know, why would you
11  say a ten year sentence is a life sentence?  Wondering
12  if he's sick, if he's got diabetes, cancer, some
13  illness that would prevent him from getting out of
14  prison being locked up that long.  And I asked him,
15  "Why do you say that?"
16  Q  What, if anything, did he say?
17  A  He replied, "You got me."
18  Q  Now did you give him some of his property back
19  that day?
20  A  Yes.
21  Q  Did you give him back the briefcase that is
22  pictured in government's exhibit 7(n)?  Did you give
23  him back the briefcase?
24  A  Yes, I did.
25  Q  Okay.  Now you didn't give him back everything,

**Page 267**

1  did you?
2  A  No.
3  Q  You didn't give him back the pistols that were
4  introduced into evidence that were found in his car?
5  A  No.
6  Q  Didn't give him back the ammo?
7  A  No.
8  Q  Did you keep some of the contents of the
9  briefcase?
10  A  Yes.
11  Q  Let me show you what's been marked for
12  identification purposes as government's exhibit 24(a)
13  and ask you if you recognize 24(a).
14  A  Yes, I do.
15  Q  Would you tell the ladies and gentlemen of the
16  jury how it is that you recognize government's exhibit
17  24(a).
18  A  While going through the contents of the
19  briefcase, it was an object that I found inside of it,
20  and it was saved as evidence.
21  Q  What's it say on it?
22  A  It says a yellow sheet of paper, and it says
23  "Pat" and it displays the number two nine four nine
24  four oh seven.
25  Q  Okay.  And do you know whose phone number that

**Page 268**

1  is?
2  A  Yes, I do.
3  Q  Whose phone number is it?
4  A  Robert Patrick Denton.
5  Q  Now let me show you what's been marked as
6  government's exhibit 24(c) for identification.
7      MR. FEAGA:  Your Honor, we'd like to offer
8  for admission into evidence 24(a).
9      THE COURT:  Admitted.
10  Q  Let me show you what's been marked as 24(c).  Is
11  that (c) you're holding right now?
12  A  Yes, it is.
13  Q  I'd ask you if you recognize that.
14  A  Yes.
15  Q  Would you tell the ladies and gentlemen of the
16  jury what that is.
17  A  It's a piece of notebook paper that I found
18  inside the briefcase belonging to Leon Carmichael and
19  it displays three phone numbers.
20  Q  All right.  Do you know whose phone numbers those
21  are?
22  A  Yes.
23  Q  Whose are they?
24  A  They belong to Robert Patrick Denton.
25  Q  All right.  And if I can, let me show you what's

**Page 269**

1  been marked as government's exhibit 24(b) for
2  identification purposes and ask you if you would
3  examine that.
4      MR. FEAGA:  Your Honor, we'd like to offer
5  24(c).
6      THE COURT:  Admitted.
7  Q  Do you recognize that?
8  A  Yes.
9  Q  Would you tell the ladies and gentlemen of the
10  jury what that is.
11  A  Yes.  It's a yellow piece of paper or piece of
12  Post-it pad that displays the name "Freddie Williams"
13  and a lot of his personal information on it.
14  Q  Okay.  Like what kind of personal information?
15  A  And if you've got a social on it, don't say the social
16  out loud.
17  A  It's got a Social Security number, a driver's
18  license number, a date of birth and Mr. Williams'
19  former address, or an address he had at one time.
20  Q  All right.
21      MR. FEAGA:  Your Honor, we'd like to offer
22  24(b).
23      THE COURT:  Admitted.
24  Q  Let me show you what's been marked as
25  government's exhibit 46 for identification purposes

Multi-Page™

1 and ask you if you recognize that.
2 A  Yes.
3 Q  Would you tell the ladies and gentlemen of the
4 jury what that is.
5 A  This is a D. E. A. heat sealed evidence bag that
6 contains an AmSouth Bank bag that was seized from Leon
7 Carmichael that contained seized U. S. currency.
8 Q  And how much U. S. currency was in there?
9 A  In this bag, five thousand dollars.
10    MR. FEAGA:  Your Honor, we'd like to offer
11 government's exhibit 46.
12    THE COURT:  Admitted.
13 Q  Sir, I'd like to show you what's been marked as
14 government's exhibit 58 for identification purposes, a
15 series of documents obtained from Mr. Carmichael.
16    (Whereupon, Mr. Feaga conferred with Ms.
17 Wayne off the record and out of the hearing of the
18 other courtroom participants.)
19    MS. WAYNE:  Judge, this is a pack of stuff
20 that I need to address with you.
21    THE COURT:  Outside the presence of the
22 jury?
23    MS. WAYNE:  Yes.
24    THE COURT:  Yes.  And I have some other
25 things I need to take up with you outside the presence

1 of the jury, as well.
2    MR. FEAGA:  Yes, sir.
3    (Whereupon, the jury was escorted out of the
4 courtroom, and the following colloquy ensued):
5    THE COURT:  Which agent testified about
6 meeting Sandra Jones in El Paso?
7    MR. FEAGA:  That was police officer now
8 Detective Robert Chavez from the El Paso P. D.
9    THE COURT:  That's right.
10    The second thing is, I believe it's at the
11 end of the case I have to make findings as to whether
12 you've established the conspiracy count by a
13 preponderance of the evidence.
14    MR. FEAGA:  Yes, sir.
15    THE COURT:  And then whether all the
16 statements that have been admitted meet the
17 requirements for admissibility.  Are you asking -- Do
18 I need to make the same findings with regard to the
19 laundering count?  That's a conspiracy count as well.
20 And I'm thinking I have to do that, as well.
21    MR. FEAGA:  Your Honor, I wasn't going to
22 argue that motion.  Can I defer to Ms. Morris?
23    THE COURT:  It's not a motion.  It's an
24 issue as to whether I need to decide what to do about
25 that count.

1    MR. FEAGA:  Yes, sir.  I want to defer to
2 co-counsel on that.
3    MS. MORRIS:  As I think about, and this is
4 just off the top of my head, Your Honor --
5    THE COURT:  Why don't you think about it for
6 a minute and then we'll take it up at the next break.
7 Both sides.
8    MS. MORRIS:  Let me make sure I understood
9 what the Court is asking.
10    THE COURT:  Count two is a conspiracy count,
11 if I remember correctly.
12    MS. MORRIS:  Correct.
13    THE COURT:  Are there any statements you're
14 asking, coconspirator statements you're asking that be
15 admitted as to that count?  And, if so, I need to know
16 what evidence of the conspiracy as to that count
17 exists and who the conspirators are.
18    MS. MORRIS:  You're talking about statements
19 under 801(d)(2)(e)?
20    THE COURT:  Just like on the first count,
21 same thing, except it would be a conspiracy count as
22 to money laundering.  Both sides can address that
23 after you've had a chance to think about it.
24    And there was another thing.  Oh, yes.  Mr.
25 Pigler.  I've researched that, and his testimony is

1 admissible and I'll cite two cases.  The first one is
2 Takses vs. Engle found at 768 F.2d 122.  It's a 1985
3 Sixth Circuit case.  And it says, and I'm quoting,
4 "Turning to the Sixth Amendment question, a defendant
5 counsel's prior representation of a government witness
6 can sometimes lead to ineffective assistance.  The
7 principal problem in such cases is that a counsel's
8 cross examination of his prior client may be inhibited
9 by his knowledge of privileged information.  In this
10 case, however, it is undisputed that Whody --" that's
11 the witness, "-- waived his privilege as to any
12 confidential communications.  Given this waiver,
13 Takacs' counsel had no ethical or legal reason to fail
14 to cross examine Takacs vigorously.  Accordingly,
15 prior representation did not operate to deny Takacs
16 his right to effective assistance of counsel."
17    Then more on point in United States versus
18 Lussier, a 1995 Second Circuit case found at 71 F.3d
19 456, the Court said that, "Even if you don't obtain a
20 waiver from the defendant on trial, the defendant
21 still has not suffered ineffective assistance of
22 counsel unless his attorney has either one, a
23 potential conflict of interest that resulted in
24 prejudice to the defendant; or, two, an actual
25 conflict of interest that adversely affected the

**Multi-Page™**

### Page 274

1 attorneys' performance. An attorney labors under an
2 actual, as opposed to a potential conflict, when
3 during the course of representation the attorney's and
4 defendant's interest diverge with respect to a
5 material fact or legal issue or to a course of
6 action."
7           And then the Court went on to say that here
8 "The defendant in this case labored under a potential
9 conflict, and the cause of the conflict was merely
10 potential." The government had the lesser burden of
11 demonstrating that the defendant Lussier was not
12 prejudiced by Langrock's alleged failure to cross
13 examine Gill --" that is the witness " --
14 effectively."
15           I've looked at this case, that is
16 Carmichael's and Williams's case, and the
17 representation made by Miss James, and there is
18 absolutely no evidence of conflict, assuming that Mr.
19 Pigler is going to waive his own conflict.
20       MR. FEAGA: Yes, sir.
21       THE COURT: So he can testify.
22       MR. FEAGA: Yes, sir.
23       THE COURT: But that's all I have. Now what
24 do you have?
25       MS. WAYNE: Thank you, Judge. There was the

### Page 275

1 admission of a packet of information that had been
2 supposedly taken from Mr. Carmichael -- no, excuse me,
3 this is a subpoena to Multi-Investments in 1998.
4       THE COURT: Right.
5       MS. WAYNE: Judge Hardwick represented Mr.
6 Carmichael at the time. I don't think they're going
7 to introduce the cover sheet of Judge Hardwick's
8 response; however, he provided as a result of his
9 representation a number of documents in terms of the
10 tractor-trailer and some other things.
11       I have a twofold argument. One is I think
12 they have to come through Judge Hardwick with a waiver
13 of privilege from the client. This is confidences and
14 information during his representation of Mr.
15 Carmichael that was disclosed in an investigation of
16 Mr. Carmichael.
17       Secondly, the documents that they want to
18 make a linkup to this tractor-trailer of the McGill
19 Sierra Leon arrest, that's what I'm calling it, that
20 go to show that those --
21       THE COURT: I don't think it was Sierra
22 Leon.
23       MR. FEAGA: Sierra Blanca.
24       THE COURT: Sierra Blanca, Yes.
25       MS. WAYNE: Where did I get that?

### Page 276

1       THE COURT: That's another question.
2       MS. WAYNE: That's right. That's where I
3 was. That Sierra Blanca that go to allegedly making a
4 connection to Mr. Carmichael in terms of things that
5 he owned, that's hearsay. It's double hearsay.
6       THE COURT: Where are the documents?
7       MR. FEAGA: Your Honor, again, and they're
8 right here in my hand, they were obtained by a federal
9 grand jury subpoena to Multi-Investments, Inc. And I
10 have the letter from Mr. Hardwick who represented
11 Multi-Investments saying these are the Bates stamped
12 documents that respond to your subpoena asking
13 basically -- specifically for this trip load records
14 from Multi-Investments to show that that truck that
15 got stopped out in Sierra Blanca was in fact a truck
16 being leased by Leon Carmichael. These are the
17 records that he gave us from the corporation.
18       THE COURT: Let me see those documents.
19       And this is when Judge Hardwick was the
20 attorney for Multi-Investments?
21       MR. FEAGA: Yes, sir. And I have a letter
22 from him that so states.
23       THE COURT: Multi-Investments, is that --
24 what's the relationship between Multi-Investments and
25 Mr. Carmichael?

### Page 277

1       MR. FEAGA: That is the trucking company
2 that he operated. We've introduced into evidence
3 trucks that have that logo on it and testimony about
4 trucks that have that logo on it.
5       THE COURT: Okay. Now you're saying that
6 Mr. Carmichael had to waive?
7       MS. WAYNE: Yes. First of all, there was no
8 identification of the truck in the Sierra Blanca.
9 There was never any testimony by the agents that the
10 two guys that were arrested indicated that they were
11 Mr. Carmichael's truck. Nothing taken from them
12 indicated it was Mr. Carmichael's truck, and no
13 statements by them indicating they were driving Mr.
14 Carmichael's truck. So we have the absence of any
15 linkup at this point.
16       This is and indication as a result of an
17 investigation to Mr. Carmichael's investments and
18 businesses by the I. R. S. and other agencies,
19 information that was disclosed pursuant to a subpoena.
20 Not to hook up, not to admit that the truck belonged
21 to him.
22       THE COURT: I want to take up each point
23 first.
24       MS. WAYNE: Okay.
25       THE COURT: You're saying the first point

Page 278

1  you were making is that they're not -- that you were
2  making some privilege argument.
3      MS. WAYNE: Judge, they were disclosed by
4  Judge Hardwick pursuant to subpoena, and only the
5  lawyer can I think say for the purpose of the
6  disclosure what was going on and waive the privilege
7  of those disclosures for any other purpose other than
8  the grand jury investigation. I think it goes outside
9  the scope.
10     THE COURT: Okay. So you're saying that
11 Judge Hardwick, then an attorney, gave these to the
12 grand jury and he did it only for the grand jury, and
13 he did not do it for any other reason and the
14 government can't use it for any other reason unless
15 there's been an additional waiver.
16     MS. WAYNE: That's correct.
17     THE COURT: What case law supports that
18 limited disclosure?
19     MS. WAYNE: Well, I can't give you case law
20 right now, Judge, because --
21     THE COURT: Okay. Well let's move on to
22 your second point, then, which is they're not relevant
23 because you said there's no connection.
24     MS. WAYNE: There has not been a connection
25 at all in terms of the Sierra Blanca arrest.

Page 279

1      THE COURT: Well aren't those the trailers
2  that were found in Sierra Blanca?
3      MS. WAYNE: But they're just numbers, Judge.
4      THE COURT: These documents have numbers.
5      MS. WAYNE: That's my point, is that you're
6  using a subpoena on something that's completely
7  separate to show an indication that there is a link to
8  Mr. Carmichael by now using this investigator to link
9  that up, and that's not the purpose. That's what I'm
10 saying, it goes outside the scope of the grand jury
11 subpoena.
12     THE COURT: Well that goes back to your
13 first questioning.
14     MR. FEAGA: It isn't just that, Judge. Just
15 so the Court will know, those records also contain,
16 and I might add we subpoenaed "Please provide log
17 records for all pickups and deliveries for the dates
18 of January 1, 1998 through January 15, 1998," a
19 fifteen day period. And we obtained not only the
20 records that have those V. I. N. and license tag
21 numbers on them from Multi-Investments, the
22 corporation, but also the employment records that show
23 Multi-Investments and that Leon Carmichael employed
24 those two drivers at the time that they were arrested
25 with that truck.

Page 280

1      THE COURT: Now these were the records that
2  came from Multi-Investments.
3      MR. FEAGA: Yes, sir. The Corporation.
4      THE COURT: Now two things, Miss Wayne.
5  First of all, since the documents were produced to the
6  grand jury without objection, that is was there any
7  court order that required their production or did they
8  just give them, that is Mr. Carmichael and
9  Multi-Investments?
10     MS. WAYNE: I think the subpoena is a court
11 order, Judge.
12     THE COURT: Well it could be, but he could
13 have objected to it. But I'm asking, was there any
14 court order, though?
15     MR. FEAGA: Your Honor, I'm not aware of
16 anything.
17     THE COURT: Did he file anything not to
18 disclose the documents? Did he assert any privilege
19 or anything?
20     MS. WAYNE: At the time the subpoena was
21 issued?
22     THE COURT: Yes. Did he assert a privilege.
23     And the second question is, if I remember
24 correctly, and I am shooting from the hip here, I
25 don't think there is any privilege as to documents.

Page 281

1      MR. FEAGA: Not for a corporation, Your
2  Honor. They have no Fifth Amendment right.
3      THE COURT: Yes, for a corporation. I don't
4  think Mr. Carmichael has a privilege, but I'll be
5  happy to look into that.
6      MS. WAYNE: Judge, I'm looking, and the
7  reason that I have this instinctual or gut reaction to
8  this is that I don't think there is, unless that later
9  -- this is 1998, okay? So unless later the scope of
10 that original intent to get these records for a
11 corporation is somehow now being able to be used
12 against him --
13     THE COURT: Neither one of us should be
14 acting instinctively or shooting from the hip. I'll
15 give you some time to look at this and reserve ruling
16 on this until we've had a chance to look at it. Okay?
17 We'll just move on to something else for right now.
18     MR. FEAGA: Yes, sir.
19     MS. JAMES: Judge, given the fact that you
20 have ruled that Mr. Pigler's testimony is admissible,
21 that would lead to the matter that we discussed
22 earlier this morning, and that was our request that
23 the government produce those files on Mr. Pigler and
24 Mr. Thomas for an in-camera review.
25     THE COURT: I told him to have that at eight

Page 282

1  o'clock tomorrow morning.
2      MS. JAMES:  Right.  I'm assuming then that
3  you won't have to examine them --
4      THE COURT:  Yeah.  You can reserve examining
5  them until I've seen those documents.
6      MS. JAMES:  Judge, my request would be that
7  you would not allow the government to call him in the
8  morning.  I was troubled by the fact that the jury was
9  left with Mr. Thomas's testimony.  We didn't say
10  anything, but I think it compounded with Pigler's
11  testimony sticking in the jury's mind without cross
12  examination overnight would be problematic.
13      THE COURT:  I don't think that's
14  problematic.  We often call witnesses later and
15  reserve them until later in the case.  Actually, your
16  cross examination will be the most recent testimony
17  anyway for the jury.  I see that as a problem.  We
18  need to keep the case moving, and Mr. Moorer is going
19  to have that stuff for me in the morning, so that
20  request is denied.
21      But anyway, can we move on to something else
22  with this witness while Ms. Wayne looks at this issue,
23  and while I look at it as well?
24      MR. FEAGA:  Yes, sir.
25      THE COURT:  Bring in the jury, and let's

Page 283

1  proceed.
2      (Whereupon, the jury was escorted into the
3  courtroom.)
4  Q  Sir, let me show you what's been marked as
5  government's exhibit 7(r) and ask you if you recognize
6  what's depicted in 7(r).
7  A  Yes, I do.
8  Q  And what is that?
9  A  That is Unique Entertainment.
10      MR. FEAGA:  Your Honor, we offer
11  government's exhibit 7(r).
12      THE COURT:  Admitted.
13  Q  Agent DeJohn, I find myself somewhat hamstrung
14  because you were back here handing me exhibits and now
15  you're up there.  Are there exhibits that you brought
16  to trial today that we have not yet offered?
17      MR. FEAGA:  And if there are, Your Honor, I
18  would like to ask permission for the witness to come
19  down and hand me any other exhibits that he brought to
20  this proceeding that have not yet been offered so that
21  I can then show them to him as the evidence custodian
22  and then I intend to offer the remaining things in
23  evidence, if in fact there is anything else.
24      THE COURT:  Yes, you may.
25  Q  Would you step down, Agent DeJohn.  Would you

Page 284

1  take that with you.  It's box number twenty -- Excuse
2  me, it's government's exhibit 20.  If you would, sir,
3  take that up and set it up on the rail next to the
4  witness chair and open it.
5      (Whereupon, the witness complied.)
6  Q  What's in government's exhibit 20 for
7  identification purposes, Agent DeJohn?
8  A  A whole bunch of assorted ammunition.
9  Q  Would you show just a representative sample of
10  what's in there to the jury and the Court so we can
11  make a record.
12  A  Ammo cans containing ammunition.
13  Q  What kind of ammunition are in those two ammo
14  cans?
15  A  This is going to be roughly a three oh eight
16  caliber ammunition from an assault rifle.  This ammo
17  can is full.  This is a small, possibly a ten round
18  magazine.
19  Q  Okay.  Now that ammo, does it go with any of
20  these firearms that have been previously admitted into
21  evidence?
22  A  It looks like it may go on one of them, yes.
23  Q  All right.  Three eight, is that what you said
24  it was?
25  A  Yes.

Page 285

1  Q  Is there a three oh eight back there?
2  A  It's either a caliber as a three oh eight or it's
3  going to be calibered in a Russian version of a three
4  oh eight, which is seven point six two by fifty-four,
5  I think.
6  Q  And the three oh eight will fit in it?
7  A  Yes.
8  Q  What's in the other box?
9      MS. WAYNE:  I'm going to ask for a point of
10  reference.  I'm not sure if Investigator DeJohn said
11  where it came from and what the significance of it
12  was.
13  Q  Where did it come from?
14  A  The search warrant of Freddie Williams'
15  residence.
16  Q  Okay.
17      THE COURT:  Go ahead.
18  Q  What's in that next box?
19  A  The next box is assorted ammunition.  Most of it
20  which is either from a thirty carbine or a thirty
21  thirty.
22  Q  And are there weapons in the back of this room
23  that will fire various types of rounds that are in
24  that box?
25  A  Yes.

Multi-Page™

**Page 286**

1 Q  Okay.  Is there just more ammo in the rest of
2 government's exhibit 20?
3 A  I have this bandolier full with three oh eight or
4 the seven point six two by fifty-four.
5 Q  What's a bandolier?
6 A  It's a magazine pouch used for holding
7 ammunition.
8 Q  And they're magazines?
9 A  Magazines or clips.
10 Q  What do you mean a pouch used for holding ammo in
11 a magazine?  What are you talking about?
12 A  Well, this is a military style -- old military
13 style pouch.
14 Q  And you're holding in your right hand a green
15 object that looks like it's got two flaps on it.
16 What's in your left hand?
17 A  These are magazines, or some people call them
18 clips, loaded with the same type of ammunition that's
19 in the large ammo can.
20 Q  So are you saying those clips would go in that
21 bandolier that you just had in your hand?
22 A  Possibly, but the bandoliers itself are filled
23 with that same type of ammunition loose.
24 Q  I see.  And that's the way you found them?
25 A  Yes.  There's also a bandolier with shotgun

**Page 287**

1 shells.  Numerous shotgun shells.
2 Q  All right.  One of these firearms back here is a
3 twelve gauge shotgun, is that right?
4 A  That is correct.
5 Q  Are those twelve gauge shotgun shells in that
6 box?
7 A  Yes.
8 Q  Now if you would, sir -- And you can have a seat,
9 please.
10     (Whereupon, the witness resumed the stand.)
11     MR. FEAGA:  Your Honor, we would like to
12 offer the contents of government's exhibit 20 for
13 identification as government's exhibit 20.
14     THE COURT: Admitted.
15 Q  Let me show you now what's been marked
16 government's exhibit 7(i) for identification purposes
17 and ask you if you would examine government's exhibit
18 7(i).
19 A  Yes.
20 Q  Have you seen government's exhibit 7(i) before?
21 A  Yes.
22 Q  And do you recognize what's depicted in
23 government's exhibit 7(i)?
24 A  Yes.
25 Q  How is it that you recognize the information

**Page 288**

1 depicted in government's exhibit 7(i)?
2 A  I observed them at Freddie Williams' residence
3 when I was at the scene of the search warrant.
4 Q  Okay.  And what is depicted in government's
5 exhibit 7(i)?
6 A  It's a piece of furniture, a piece of wood that
7 has pictures of magazines or clips loaded with that
8 assault rifle ammunition, and there's a bandolier
9 hanging from the edge of it with which looks like the
10 primer end of shotgun shells.
11 Q  Okay.  This is inside of Mr. Freddie Williams'
12 house?
13 A  Yes, in the back bedroom.
14 Q  Not the bedroom where the dope was found?
15 A  Right.
16     MR. FEAGA:  Your Honor, may he step down one
17 last time?
18     THE COURT:  Yes.
19 Q  Would you come to the back of the courtroom here,
20 sir, and I want you to take a look at these boxes that
21 are stacked back here.  Sir, I'd like for you, if you
22 would please, to count these boxes that say on their
23 face "D. E. A. Evidence" and contain initials all over
24 them.  Did you count them?
25 A  Yes, I did.

**Page 289**

1 Q  How many of them are there?
2 A  There's fifteen.
3 Q  All right, sir.  And one of them says
4 "government's exhibit 6(a)" on it.
5 A  Yes.
6 Q  Now, sir, for purposes of the record I would like
7 to ask you, and again for the record also, these
8 fifteen boxes are all marked government's exhibit
9 6(a), bulk exhibit.  Do you know what's contained in
10 each and every one of these boxes, sir?
11 A  Yes.
12 Q  What's contained in each and every one of those
13 exhibits?
14 A  It's the bulk evidence of the marijuana that was
15 seized at Nine forty-nine Ridgecrest, Freddie
16 Williams' residence.  This was evidence that was not
17 sent to the lab because it was bulk evidence.
18 Q  I'm holding in my hands two objects which have
19 been removed from one of the boxes, are each of those
20 boxes fully loaded with items similar to what I am
21 holding in my hand?
22 A  Yes, with the exception of one that's a little
23 bit lighter.
24     MR. FEAGA:  Your Honor, has 6(a) been
25 admitted into evidence?  The entire exhibit of fifteen

Multi-Page™

Page 290

1 boxes?

2    THE COURTROOM DEPUTY CLERK: Yes, it has.

3    MR. FEAGA: All right. And, Your Honor, if

4 I didn't offer it, I'd like to offer government's

5 exhibit 7(i) for identification purposes as

6 government's exhibit 7(i).

7    THE COURT: Admitted.

8    MR. FEAGA: If you'd resume your seat, sir.

9    (Whereupon, the witness resumed the stand.)

10    MR. FEAGA: If I could have just one moment,

11 Your Honor.

12    THE COURT: Yes.

13 Q The information that Gary George provided to you

14 on November the 13th, at the time that he provided

15 that information to you, was Charlotte Hensarling

16 there?

17 A No.

18 Q Was Patrick Denton there?

19 A No.

20 Q Was Steve Hensarling there?

21 A No.

22 Q At the time that Miss Hensarling was arrested and

23 debriefed, was Gary George there?

24 A No.

25 Q Was Patrick Denton there?

Page 291

1 A No.

2 Q Was Steve Hensarling there?

3 A No.

4 Q At the time that you guys confronted Pat Denton

5 in his house with that search warrant in the early

6 morning hours of November the 17th, 2003, was Gary

7 George there?

8 A No.

9 Q Was Charlotte Hensarling there?

10 A No.

11 Q Was Steve Hensarling there?

12 A No.

13 Q And each of these people were not present when

14 the others were spoken to if they were spoken to?

15 A They were not.

16 Q No one was present but those people?

17 A That's correct.

18 Q Now you said you went in that house, is that

19 right, Freddie Williams' house where the dope was

20 found?

21 A Yes.

22 Q You saw the extension cords all over the place?

23 A Yes.

24 Q Did you go back and look at the secret room?

25 A Yes, I did.

Page 292

1 Q And was there an exhaust fan in there?

2 A Yes, there was.

3 Q Tell the ladies and gentlemen of the jury where

4 it was.

5 A If you walk into the front bedroom from the

6 living room and you walk in towards as you're looking

7 at the house to the right of the house and you turn

8 into the bedroom, the wall was right there to your

9 right side almost level with your doorway when you

10 walk in. When I got there it was already propped open

11 because officers had already started their search, and

12 I looked inside to see what was inside the house and I

13 looked in this secret room, which went the whole

14 length of the room and it was probably about three

15 feet wide or three feet deep.

16    I looked in there, I looked around I saw an

17 exhaust fan like you might see in a bathroom attached

18 right up in the upper, as you're looking at the

19 doorway to the secret room, in the upper right-hand

20 side of the roof.

21 Q Sir, how long have you been involved in the

22 investigation of the illicit trafficking and

23 distribution of controlled substances?

24 A For over ten years.

25 Q Have you had an opportunity to be around in the

Page 293

1 past large quantities of marijuana?

2 A Yes, I have.

3 Q Have you been around it enough to know or have an

4 opinion about whether or not it gives off any type of

5 odor?

6 A Yes.

7 Q Does it?

8 A Yes.

9 Q Would it be advantageous if you were storing it

10 somewhere and you didn't want someone to know about

11 it, to have a means to duct out the smell of the

12 material?

13 A Oh, yeah. Yes.

14 Q Now I got one more question I think and then I'll

15 be through, Investigator DeJohn. When we were

16 watching those videotapes and Patrick Denton was

17 waving, trying to get everybody in and he's calling

18 you saying, "Come in, he's leaving," it seemed like

19 watching it that it took a long time.

20    MR. TEAGUE: Your Honor, we'll object to

21 what it seems to the prosecution.

22    MR. FEAGA: I'll withdraw that part of it,

23 Your Honor.

24 Q Would you tell the ladies and gentlemen of the

25 jury why there wasn't someone available as soon as he

Page 294

1  did this to bust that door down and go in that house?
2  A  The majority of the individuals that was going to
3  be involved in the search warrant once I obtained it
4  was several blocks away.  So when I called this for
5  everybody to move in unexpectedly, they were a great
6  distance away.  The closest other unit was David
7  Williams and Lieutenant Todd Townsend, and they would
8  not move in by themselves because they don't really
9  know what's going on.  It could be a dangerous
10  situation to them by moving in by themselves.
11  Q  What about the danger to Pat Denton?
12  A  As long as they could hear that he was okay,
13  there was no danger to him, he wasn't screaming for
14  help, you know, that's a decision that those officers
15  would have to make.
16       If they heard him scream for help, I mean
17  that was a decision as being on the scene or near the
18  area that you would have to make in order to go in and
19  rescue him.
20  Q  What does your training tell you about that?  How
21  do you do that?  Would it have been appropriate for
22  David Williams and Todd Townsend to go in alone, is
23  that consistent with your training?
24  A  No, it's not.
25  Q  What is your training?

Page 295

1  A  Your training is you go in as a team with enough
2  people to effectively secure a house and secure a
3  scene and secure any subjects that may be there.
4  Q  Why?
5  A  For officer safety.
6       MR. FEAGA:  We tender the witness to the
7  defense, Your Honor.
8       THE COURT:  Cross?
9            CROSS EXAMINATION
10       BY MS. WAYNE OF DAVID DEJOHN:
11  Q  Investigator DeJohn, you just testified that you
12  have been working in drug enforcement for
13  approximately ten years, is that correct?
14  A  That is correct.
15  Q  And in 2004 when you testified in front of the
16  grand jury on one of many occasions, you actually
17  characterized the investigation of Mr. Carmichael as
18  about a ten year investigation, correct?
19  A  It's not a ten year open investigation.
20  Q  That's not what I said, Investigator DeJohn.
21       MR. FEAGA:  Object to her interrupting the
22  witness.  She should allow him to answer the question
23  she asked.
24       THE COURT:  Well, if he was answering
25  something that she was not trying to elicit --

Page 296

1       But you're saying his answer was not in
2  response to your question?
3       MS. WAYNE:  My question to Investigator
4  DeJohn was not whether it was opened and closed in ten
5  years, I simply said you've testified in front of the
6  grand jury in characterizing this investigation
7  against Mr. Carmichael as being about a ten year
8  investigation.
9  A  I may have characterized it that way.  I don't
10  know.
11  Q  You weren't asked about opening and closings of
12  the investigation during your grand jury testimony.
13  A  No.
14  Q  Okay.  And it would be fair to say that's
15  correct, it's approximately a ten year investigation
16  of Mr. Carmichael.
17  A  If you add up the times that it was actually --
18  the investigations were being conducted in bits and
19  pieces, I don't know if you can call it a ten year
20  investigation, but you have bits and pieces of
21  investigations that span a time period of about ten
22  years.
23  Q  Well, again, Agent DeJohn or Investigator DeJohn,
24  you've had an opportunity to testify to the grand jury
25  approximately half a dozen times about this

Page 297

1  investigation, correct?
2  A  That's correct.
3  Q  And on June 8, 2004 when your testimony was being
4  taken before the grand jury, you indicated, and I
5  quote, "Roughly, approximately, the last ten years
6  various agencies in the area have been investigating
7  an individual by the name of Leon Carmichael."  Those
8  were your words, correct?
9  A  That's correct.
10  Q  All right.  It wasn't all this other stuff,
11  that's what you said, correct?
12  A  That's correct.
13  Q  And your involvement with the drug enforcement
14  agency has been about ten years, correct?
15  A  No.
16  Q  I thought that's what you said today.
17  A  I worked in drug enforcement, but not with the
18  Drug Enforcement Administration.
19  Q  All right.  I apologize.
20       So you've worked in drug enforcement for
21  approximately ten years?
22  A  Yes.
23  Q  Almost as long as the agencies have been
24  investigating my client, Mr. Carmichael.
25  A  Yes, during that time period.

Multi-Page™

Page 298

1  Q  A long time.  A decade, right?
2  A  Yes.
3  Q  That would be considered a fairly long
4  investigation by law enforcement of an individual.
5  A  Again, it's not investigation, it's multiple
6  investigations.  It's not one investigation.  What we
7  have here is a ten year conspiracy made up of several
8  different investigations.
9  Q  All right.  Well, Investigator DeJohn, I
10  understand your theory in terms of the conspiracy.
11  I'm asking you a fair question.  Your words were "a
12  ten year investigation."  That's what I'm trying to --
13  I don't want to argue semantics, it's been a ten year
14  investigation, correct?
15       MR. FEAGA:  Your Honor, we're going to
16  object.  I think he's characterized what it is.  It
17  does sort of seem like angels dancing on the head of a
18  pin here.  It is what it is, and he's described it.
19  Counsel can call it whatever she wants.
20       THE COURT:  I think the jury understands his
21  answer and your question.
22  Q  Investigator DeJohn, in terms of this
23  investigation, this ten year investigation, there have
24  been a number of different agencies looking at my
25  client, Mr. Carmichael, correct?

Page 299

1  A  Yes, in terms of this ten year conspiracy there
2  has been a number of different agencies that has been
3  investigating your client.
4  Q  And, Investigator DeJohn, again, in this
5  investigation it's been involved or the focus has been
6  gathering information to determine whether or not a
7  jury can find that there's a conspiracy, correct,
8  whether you can prove it?
9  A  That's correct.
10  Q  Okay.  Because you know as an investigator who
11  has testified numerous times before that the ultimate
12  decision lies with this jury, not with you.
13  A  That's correct.
14  Q  Okay.  Now in terms of the agencies that have
15  been looking and scrutinizing Mr. Carmichael, it's
16  been a drug enforcement agency, correct?
17  A  Yes.
18  Q  The Montgomery Police Department?
19  A  Yes.
20  Q  And the I. R. S.
21  A  Yes.
22  Q  All scrutinizing Mr. Carmichael under a
23  microscope.
24  A  They have been looking at him, yes.
25  Q  Okay.  Well let's talk about the tools that law

Page 300

1  enforcement can use in terms of scrutinizing somebody,
2  okay?  Because you've talked about your experience.
3       I want to first talk to you about some of
4  the tools that were used here.  And in terms of
5  investigations, specifically drug investigations, law
6  enforcement can use informants, correct?
7  A  That is correct.
8  Q  Sometimes we refer to them as confidential
9  informants?
10  A  Yes.
11  Q  Confidential sources?
12  A  Yes.
13  Q  People whose identity are kept secret in order to
14  undermine criminal activity.
15  A  Yes.
16  Q  You can also use what we've heard a lot about in
17  terms of surveillance, correct?
18  A  Yes.
19  Q  And you can also use what we call kind of
20  infiltrating with undercover buys or using someone
21  that you believe might be part of an organization to
22  do buys where you can get solid evidence.
23  A  Yes.
24  Q  And it sounds as if the situation involving Mr.
25  Timmons and Sandra Jones, that would be considered

Page 301

1  undercover buys.
2  A  Yes.
3  Q  Okay.  Or at least attempts at undercover buys.
4  A  Yes.
5  Q  Okay.  Now in terms of the use of informants, law
6  enforcement, specifically the D. E. A., is managed by
7  certain protocol and restrictions when you use
8  informants, correct?
9  A  Yes.
10  Q  Because the use of informants simply can't be the
11  subjective call of an officer, you actually have to
12  follow directions in terms of informants.
13  A  That is correct.
14  Q  All right.  And you're aware of, in your
15  experience working with the D. E. A., that there are
16  operations manuals that are put out to law enforcement
17  in regards to the use of informants.
18  A  That is correct.
19  Q  And informants can be essential to law
20  enforcement investigators because they can sometimes
21  infiltrate and find out information that a police
22  officer simply can't do without them.
23  A  That's correct.
24  Q  Now, in using an informant, it involves an
25  element of deception by the informant.

Page 302

1 A   Yes.
2 Q   It involves the better you are at being able to
3 deceive whoever your target is if you're an informant,
4 the more information you might get.
5 A   I don't know if you can say better deceive.
6 You're basically allowing them when they're working
7 with you to be in their environment doing something
8 they would normally do every day with these people,
9 except this time they're doing it for you.
10 Q   Right.  And you can't take the chance of
11 detection, though.  The informant, if they're
12 detected, then your cover is blown, right?
13 A   Right.
14 Q   So when I say the better deceiver you are, if I'm
15 an informant and I infiltrate an organization, I need
16 to make sure nobody is suspicious of me.
17 A   Right.
18 Q   So I'm kind doing two lives here.  I'm working
19 for law enforcement, but I'm pretending to still be
20 the same person I am in the organization.
21 A   Yes.
22 Q   So the more deceptive I am the better I am.
23 A   Yes.
24 Q   And law enforcement recognizes again that
25 deception is part of being an information?

Page 303

1 A   Yes.
2 Q   Now law enforcements is also very cognizant or
3 concerned about the fact that when you use informants,
4 that you sometimes may be invading people's personal
5 spaces.  So you're actually using these informants to
6 invade someone's home, their business, their house,
7 things like that.
8 A   I wouldn't classify or use the words "invade".
9 Q   Okay.
10 A   Number one, they're not going to go there and do
11 someone's home without them being there.  They're not
12 going to break into someone's home.
13 Q   Oh, okay.  And I don't mean to suggest that, in
14 fact this is a rule in law enforcement, you can't have
15 an informant who is independently involved in criminal
16 activity, correct?
17 A   That's correct.
18 Q   Okay.  In fact, that's a big deal for you all
19 because that goes to not only the reliability of the
20 informant, but it goes to kind of the credibility of
21 the agency, right?
22 A   That's right.
23 Q   You can't have informants out creating criminal
24 activity, right?
25 A   Right.

Page 304

1 Q   Okay.  So what I mean, and I apologize, but when
2 I say they may intrude on the privacy of individuals,
3 they may have to go in their homes and businesses and
4 things like that.
5 A   Yes.
6 Q   Okay.  Now when you have a cooperating
7 individual, as an agent you have to look at certain
8 factors in determining whether or not the informant
9 might be good for you, correct?
10 A   Yes.
11 Q   And there are some things that I believe are
12 terms of art within the agency, and that is whether or
13 not a couple of things that use the guidelines such as
14 suitability and pertinence in terms of an informant,
15 are you aware of those words?
16 A   Yes.
17 Q   Suitability and pertinence is something that an
18 agent makes a determination about suitability meaning
19 is this informant going to be good for me and credible
20 for me, correct?
21 A   Yes.
22 Q   Okay.  Now you also, in terms of looking at an
23 informant, you recognize as an agent that when you
24 have an individual that's cooperating, you got to look
25 at their motivation of why is this person wanting to

Page 305

1 cooperate with law enforcement.
2 A   Yes.
3 Q   Okay.  And it's something that you take special
4 care in, because you know that a lot of times when
5 someone comes to you and wants to be an informant,
6 it's because they want to save their own necks.
7 A   Sometimes, yes.
8 Q   Okay.  And many times, and particularly in this
9 case, you had people who had pending criminal cases
10 themselves who wanted some kind of leniency.
11 A   Yes.
12 Q   Okay.  Let's just talk about Gary Wayne George,
13 because I've seen the videotape where you're talking
14 to Mr. George.  Mr. George from the get-go is
15 concerned about making sure he can save himself, would
16 you agree with me on that?
17 A   Yes.
18 Q   Okay.  And he talks to you about it a lot in
19 terms of that first interview with him when he is
20 arrested, correct?
21 A   Yes.
22 Q   So as an agent you have to assess those things in
23 terms of, you know, do I have a clean individual here,
24 or do I have someone who is looking at getting some
25 preference from the government?

Multi-Page™

Page 306

1 A  Yes.
2 Q  That is a factor that you have to consider?
3 A  Yes.
4 Q  And in fact, there is a point when Mr. George is
5 actually asking you are you going to go to the
6 prosecutors, are you going to get me a deal, and you
7 say to them I have to check with them because I can't
8 make that call.
9 A  Right.
10 Q  Okay.  As a law enforcement officer, you don't
11 have the power to give anybody a deal in terms of
12 court.
13 A  That's correct.
14 Q  Only the prosecutors can do that.
15 A  Yeah, they can only make their suggestions to the
16 Court.
17 Q  Okay.  But, again, my question was only the
18 prosecutors have the power to give leniency or an
19 agreement to somebody, correct?
20 A  Right.  I don't have that authority.
21 Q  In fact, the defense doesn't have that power
22 either, only the government does, right?
23 A  No.  It depends on what level they're talking
24 about.  They can only suggest to the Court what
25 somebody has done.

Page 307

1 Q  All right.  Well let me give you this scenario.
2 I can't go out to an informant or a suspect and say
3 I'm Lisa Wayne, a criminal defense attorney, and I can
4 offer you some leniency.  I can't do that, right?
5 A  Right.
6 Q  Only the government can do that.
7 A  Right.
8     MR. FEAGA:  Your Honor, you know, I just
9 want to object to one thing, and that is he answered
10 the question, but the Court ultimately has to approve
11 any agreement the government may make.  The ultimate
12 authority is with the Court.
13     MS. WAYNE:  Judge, I don't know if that's an
14 objection.  He can get that out on rehabilitation.  He
15 can't testify.
16     THE COURT:  Sustained.
17     MR. FEAGA:  Okay, we'd like an instruction
18 from the Court to that effect, Your Honor.  I just
19 don't want there to be any confusion on the part of
20 the jury.
21     THE COURT:  Well go ahead.
22 Q  All right.  So we were talking about some of
23 these factors in terms of these informants and
24 leniency.  And, again, I talked about Gary Wayne
25 George, but Gary Wayne George was not the only person,

Page 308

1 and I don't know, informant, source, whatever you
2 might call them in this investigation, that talked to
3 you about their own pending criminal matter, correct?
4 A  That's correct.
5 Q  So, again, when we're talking about individuals
6 who you might use, and I think that this is where I
7 was talking with you, Investigator DeJohn, is that you
8 certainly take special care when you're dealing with
9 persons whose reliability or motivation can be open to
10 question, right?
11 A  Yes.
12 Q  Okay.  In fact, that's something that the agency
13 has protocol on and you are schooled in terms of that?
14 A  Yes.
15 Q  Okay.  Now in terms of investigations, operations
16 and guidelines and the use of an informant, the
17 factors that have been suggested or the protocol for
18 D. E. A. agents, one is that the nature and the matter
19 under investigation, you look at that in terms of if
20 you're going use an informant or not.
21 A  Would you say that again?
22 Q  The nature of the matter under investigation and
23 the importance of the information or assistance being
24 furnished, that's a faction that you look at when
25 you're looking at an informant.

Page 309

1 A  Yes.
2 Q  There may be some kind of investigations where
3 there is no use for an informant.
4 A  Correct.
5 Q  Okay.  Another thing that you also look at, a
6 factor that you consider, is the seriousness of past
7 and contemporaneous criminal activity in which the
8 informant or confidential source may be suspected.
9 That's a factor that you consider, correct?
10 A  Yes.
11 Q  Now in this case you have a number of witnesses
12 that you've seen testify that have pretty extensive
13 criminal history.  Starting with Gary Wayne George, he
14 says he's got fifteen felony convictions, right?
15 A  That's correct.
16 Q  Now I'm just wondering, is there a point,
17 Investigator DeJohn, where you say no, I'm not using
18 somebody who has fifteen felony convictions, they're
19 not reliable?
20 A  I wouldn't characterize fifteen felon convictions
21 as somebody who you may not use.
22 Q  Okay.  So in your experience, you don't have that
23 kind of cutoff, you don't have the, you know, three
24 strikes you're out, that does not -- that is something
25 that does not limit you in using an informant?

Multi-Page™

Page 310

1 A  No, because usually the people with the more
2 criminal convictions, one it makes them credible that
3 they know what they're talking a lot of times and it
4 puts them in that environment a lot of times with
5 people who they are going after.
6 Q  In fact, one of your theories within the agency
7 is that you don't have people like you and that can
8 infiltrate, it takes people who are actually in the
9 corporation, correct?
10 A  That's correct.
11 Q  Okay.  But, again, you have to assess the
12 credibility when someone not only has a criminal
13 history, but has a case pending over their head at the
14 time that they're giving you information, right?
15 A  Yes.
16 Q  Because there is an old saying, that when someone
17 tells you something you've got to look at it and
18 wonder why are giving me this information.
19 A  Yes.
20 Q  That's something that our mothers taught us,
21 right?
22 A  Yes.
23 Q  It may not be protocol of the F. B. I., but
24 that's just something we know in human experience,
25 right?

Page 311

1 A  It's human nature, yes.
2 Q  Okay.  Now when an informant is giving you
3 information in terms of how credible it is, we talked
4 about wanting to corroborate that information.  Let's
5 start with Gary Wayne George.  Gary Wayne George told
6 you that Patrick Denton would have ten pounds of
7 marijuana at his house, correct?
8 A  Yes, that's what he said.
9 Q  When you executed the search warrant, there was
10 not ten pounds of marijuana in the house, right?
11 A  No.
12 Q  Now, again, one of the other factors that the
13 agency talks about is the motivation of the informant
14 or confidential source, including any consideration
15 sought from the government for his or her cooperation.
16 That's a factor that you consider in terms of
17 assessing or not you'll use an informant.
18 A  Yes.
19 Q  Now when you are using these informants, and
20 specifically in a case like this where you've got all
21 these criminals, is there a way that you hook them up
22 so that you can tell whether they're telling the
23 truth?  Can you use any kind of forensic machine,
24 polygraphs, anything like that?
25 A  No.

Page 312

1 Q  Okay.  So when you say that they're telling the
2 truth, it depends on the cooperation that you can get
3 in terms of what they tell you, right?
4 A  Yes.
5 Q  And your subjective feeling based upon you
6 knowledge in the investigation.
7 A  Yes.
8 Q  You've got to make a call on the truthfulness.
9 A  Yes.
10 Q  Okay.  Now my understanding is in terms of when
11 you have an informant specifically in the D. E. A.,
12 that you have to determine whether or not the
13 informant is suitable within a hundred and twenty day
14 period of time, that that's what they ask you to do.
15 Are you aware of that?
16 A  Say that again.
17 Q  You have to determine the suitability of an
18 informant that you use in an investigation within a
19 hundred and twenty days, that the agency limits you in
20 terms of the time to make that determination.  Are you
21 aware of that?
22 A  No, I'm not aware of that.
23 Q  All right.  Are you aware of the fact that after
24 the hundred and twenty days, that every ninety days
25 that you're supposed to review the informant's

Page 313

1 suitability and pertinence in terms of their
2 usefulness in the investigation?
3 A  Again, there is nothing that's referenced in the
4 New Orleans field division.
5 Q  Okay.  Now when you talk about the New Orleans
6 field division, you certainly, though, are not limited
7 by a regional thing.  You're aware of the F. B. I.'s
8 overall guidelines with the Department of Justice,
9 right?
10 A  Well that would be the F. B. I.'s guidelines.
11 How the F. B. I. control informants, I have no idea.
12 Q  Okay.  When you use informants, Investigator
13 DeJohn, in terms of your experience, are you aware of
14 any supervisor having to review your call on who you
15 use as an informant?
16 A  Yes.
17 Q  Okay.  And who is that in this particular
18 investigation?
19 A  You're talking about the initial -- when you use
20 them?
21 Q  Yes.
22 A  It would be the group supervisor, Sherry
23 Gonzales.
24 Q  Now you've indicated to us that there was
25 testimony about the fact that, you know, the inference

Page 314

1 and I made a big deal in the opening and will at the
2 closing of the case so I want to talk to you about
3 that because that's important. You indicated to us,
4 and I believe it was Agent Halasz who testified about
5 the fact that the report that I referred to with him,
6 that the case had been closed as a result of, I think
7 you said inactivity. I don't know, what was it, the
8 reason you said that there was a closing on this March
9 3rd date?
10 A  I don't recall the exact words that it says, but
11 it's basically case closure. There's been usually in
12 general in a case say there is no information that's
13 been developed in the last period in this case, and
14 the case is recommended for closure.
15 Q  Okay. And you have actually seen what I had
16 already previously identified Agent Halasz as his
17 actual report that he did as a result of the case
18 closing.
19 A  Yes, I reviewed it at one time.
20 Q  Okay. Where it says, "There simply has not been
21 further information developed regarding this
22 investigation. There's been no drug or non-drug
23 exhibits collected. This investigative file is being
24 administratively closed." Do you remember me reading
25 that to the jury?

Page 315

1 A  Yes.
2 Q  Okay. Then there came up the suggestion that the
3 reason that the case was closed, was because this
4 informant, and I believe that -- well it was indicated
5 that an informant at the time, that it was because
6 they were afraid of Mr. Carmichael, but there had been
7 threats made and that he was afraid of Mr. Carmichael,
8 or something like that?
9 A  That's correct.
10 Q  Okay. Now I have gone over all these reports
11 again, and I don't see anything in any of the D. E. A.
12 Sixes that indicate that that's the reason on March 3,
13 2003 that this was administratively closed.
14 A  Say that again, now.
15 Q  Does the absence of that indication in any D. E.
16 A Six form that the reason this information was
17 closed was because this informant was afraid of Mr.
18 Carmichael?
19 A  Right. The D. E. A. Six that was referenced with
20 him being afraid of Mr. Carmichael would be in the
21 informant file. And that would be the D. E. A. Six
22 that would close out the use of that informant. It
23 doesn't necessarily mean that case is going to be
24 closed at that time.
25      Now I can't say what Agent Halasz did, but

Page 316

1 describing the situation, you know, the case may stay
2 open for just a little bit longer to see if any other
3 information was developed in reference to that
4 investigation and after a period of time then it's
5 closed.
6 Q  All right. Well let's talk about that, because
7 again, there is a reason that agents make reports of
8 investigations, correct?
9 A  That is correct.
10 Q  All right. And in fact, you have learned in your
11 years of experience that these D. E. A. Six forms or
12 these reports of investigation, this is a way for you
13 all to document equivocally for the future what's
14 going on in a case, correct?
15 A  Yes.
16 Q  Because like this case, it may be an ongoing
17 investigation over a long period of time, right?
18 A  Right.
19 Q  And the purpose of this is so there won't be any
20 questions. I mean, important stuff has to be
21 documented, right?
22 A  Yes.
23 Q  Okay. And supposedly if an informant who is
24 afraid of an alleged target of an investigation, it
25 seems to me that would be important information.

Page 317

1 A  Yes.
2 Q  But it's not reflected in the D. E. A. Six
3 talking about why the case was closed on March the
4 3rd.
5 A  Well that's not why the case was closed.
6 Q  It's not reflected anywhere in the D. E. A. Six
7 in terms of the closing of March 3rd, 2003 was because
8 it had anything to do whatsoever in an informant.
9 A  It's because he hadn't developed any further
10 information back which that D. E. A. Six was again written
11 period back which that D. E. A. Six was again written
12 and sent to the informant's informant file.
13 Q  All right. Well, again, it sounds like the
14 answer to my question is yes. It is not anywhere in
15 the D. E. A. Six as it references this closing.
16 A  No.
17 Q  Okay. Now in fact there has been an opportunity
18 for you to testify at the grand jury about this
19 informant who was supposedly afraid of Mr. Carmichael,
20 correct?
21 A  That's correct.
22 Q  And I think Agent Halasz actually testified about
23 this, that this informant came to y'all because he
24 wanted money. He wanted to be paid?
25 A  Yes.

Page 318

1 Q And my understanding actually from your previous
2 testimony was he indicated he wanted to be paid
3 fifteen thousand dollars. Do you recall that?
4 A I don't think that's exactly what was said.
5 Q All right. Well, I'm going to have, if I may,
6 let's see, it's -- it would be December 17th, 2003.
7 I'm looking at the report from that and I would refer
8 counsel to pages seventeen through nineteen.
9       Now my understanding of, and instead of
10 skirting around the issue I believe Agent Halasz came
11 out and told us that the informant was a person by the
12 name of Moses Williams.
13 A Yes.
14 Q Okay. Now Moses Williams, again you had an
15 opportunity to testify about Moses Williams and his
16 alleged involvement with Mr. Carmichael, correct?
17 A Yes.
18 Q Now you had some concerns about Moses Williams
19 coming to you because you knew that two people had
20 been arrested for marijuana that implicated Mr.
21 Williams.
22 A I had some concerns --
23 Q Yeah. He's coming to you because he knows he's
24 been implicated in dealing marijuana.
25 A I don't understand, I would have concerns? I

Page 319

1 mean, him cooperating? That makes him more credible
2 as far as the environment that he's in. If it backs
3 up he comes to us --
4 Q All right. Well, Investigator DeJohn, let me --
5 A I'm trying to finish, ma'am.
6 Q Well I haven't asked another question.
7 A I haven't finished my first answer.
8 Q Well I have a right to direct this.
9       MR. FEAGA: I'm going to object to that. He
10 has a right to answer her questions and he can't
11 because she cuts him off when she doesn't like what
12 he's saying.
13       MS. WAYNE: I wasn't cutting him off, he --
14       THE COURT: Ask your question again.
15       MS. WAYNE: All right.
16 Q When Mr. Williams came to you, you had specific
17 information that he had been implicated in selling
18 drugs.
19 A Right. And Mr. Williams did not come to me, he
20 came to Agent Halasz.
21 Q All right. Okay. Which was later you found out
22 about, correct?
23 A That's correct.
24 Q And in fact you testified specifically about
25 this, correct?

Page 320

1 A I believe I have, yes.
2 Q And you were aware -- you became aware through
3 Agent Halasz that two people had implicated Mr.
4 Williams in saying that they were getting their
5 marijuana from him.
6 A I think so, yes.
7 Q Okay. Now just like we just talked about in
8 terms of the agency protocol, the credibility of an
9 informant or someone who wants to cooperate you'll
10 look at if they're being implicated or they have their
11 own criminal trouble, right?
12 A Right.
13 Q Because it may give them a motive to lie about
14 what's really going on, right?
15 A It might.
16 Q Okay. Well not everybody that comes to you that
17 has a criminal case pending tells you the truth about
18 things.
19 A And not everybody lies. But yes, I would agree
20 with that.
21 Q Okay. So he comes to you and in fact you felt
22 that he was coming to the D. E. A. because he wanted
23 to start talking because he was the one supplying
24 them. That's what you previously testified about.
25 A Again, he didn't come to me.

Page 321

1 Q Okay. When I say "D. E. A.," I'm talking about
2 your agency.
3 A Okay. Well I really don't -- I can't answer the
4 questions exactly like that because if he didn't come
5 to me, then he came to somebody from the D. E. A. but
6 I can't --
7 Q Okay. And I appreciate that, Investigator
8 DeJohn. What I said to you was, and I quote, "We had
9 a feeling that that's why he came to the D. E. A. and
10 wanted to start talking because he was the one
11 supplying them," in reference to the people who had
12 been arrested. Correct? That's what you said.
13 A I'm about to answer.
14 Q Okay.
15 A Okay? Are you quoting from the grand jury
16 transcript?
17 Q I'm quoting from your statement from the grand
18 jury.
19 A Okay. Yes, that's what I was saying from what I
20 remembered about that incident when he had come in and
21 talked to the D. E. A. Again, I didn't initially talk
22 to him, but I read his statements.
23 Q All right. And, again, you've had an
24 opportunity, this isn't the first time anyone has
25 asked you questions about this. You testified in

## Page 322

1 front of the grand jury when asked specifically about
2 this, right?
3 A  Yes.
4 Q  Okay.  And there was, I believe it was Ms. Morris
5 who was asking you questions about whether or not Mr.
6 Williams was talking about what we previously heard
7 from Agent Halasz about a sum of money that he said he
8 owed Mr. Carmichael, do you recall that?
9 A  Yes.
10 Q  And you indicated that, and I quote, that "It was
11 part of his motivation that he told us was that he
12 owed Leon Carmichael approximately fifteen thousand
13 dollars."  Do you recall that?
14 A  I remember that.  That's what he said, yes.
15 Q  All right.  So when I asked about this question
16 about fifteen thousand dollars, that was the amount
17 that he indicated at the time.
18 A  Yes, but you had also had asked me if that's what
19 he wanted to be paid.
20 Q  Okay.  Well, the reason that he learned -- that
21 you learned about this fifteen thousand dollars was
22 that it came up in the context of him wanting to make
23 money by being an informant for the D. E. A.
24 A  I think he wanted to get paid a little bit, but
25 he was more concerned with the debt that he owed Mr.

## Page 323

1 Carmichael.
2 Q  Okay.  And this is a debt that he supposedly had
3 that he's telling you, right?
4 A  That he told Agent Halasz, yes.
5 Q  Because he didn't bring in any documentation or
6 receipts or anything to show that he has a debt with
7 Mr. Carmichael, right?
8 A  In the drug world you usually don't have a
9 receipt.
10 Q  And, Investigator DeJohn, it sounds like the
11 answer would be yes, he did not bring in a receipt.
12 A  He did not bring in a receipt.
13     MR. FEAGA:  I'd object to her arguing with the
14 witness.  I think his answer was a fair answer in
15 response to the question.
16     THE COURT:  Well she wanted to lead him and
17 he agreed.  Let's move on.
18 Q  Now in terms of this money, it never came to the
19 fact that you actually never paid Mr. Williams any
20 money because he ends up when you talk to him about
21 getting wired up he backs out, right?
22 A  Yes.
23 Q  All right.  And in fact what Mr. Williams tells
24 you is that when you say we're going to wire you up so
25 we can get actual conversations with Mr. Carmichael

## Page 324

1 and you, that was the purpose of the wire, right?
2 A  Yes.
3 Q  He says he backs out and tells you, makes a
4 statement of I can't do that because I know I can't
5 hear him doing anything.  Do you remember that?
6 A  I don't remember that offhand.  Again, I wasn't
7 right there when that was said.
8 Q  Now in terms of Mr. Denton, you were here and you
9 heard him testify and you talked today about him being
10 driven around actually and then going back to the
11 house and getting this phone call, is that correct?
12 A  Yes.
13 Q  Okay.  Now he testified, and you heard him, he
14 said that he hadn't decided to cooperate until about
15 right before this phone call comes supposedly from Mr.
16 Carmichael, do you remember that?
17 A  I don't recall whether he said that for you or
18 not.
19 Q  Well it sounds like to me, though, based upon
20 what you've told us, is that when you're taking him
21 around town and he's showing you these places, he had
22 decided to cooperate you with you at that point.
23 A  Yes.
24 Q  Okay.  So it sounds like he decided to cooperate
25 pretty early on when you came into the house and you

## Page 325

1 told him what goods you had on him from Gary Wayne
2 George.
3 A  Yes.
4 Q  And when you went to his house, you were aware of
5 the fact that not only what Gary Wayne George had told
6 you, but you knew that Patrick Denton had a pending
7 case in Huntsville, Alabama.
8 A  Yes.
9 Q  And you knew he had a pending case that was a
10 drug case.
11 A  Yes.
12 Q  And that he was looking at not only drugs having
13 been confiscated but also guns.
14 A  Yes.
15 Q  And when Mr. Denton is telling you about these
16 particular places that you point out, again, you've
17 indicated to us you knew where the Carmichael Center
18 was, so that wasn't unique.
19 A  Right.
20 Q  That's something pretty big here in town, right?
21 A  Right.
22 Q  You knew where Mr. Carmichael's house was because
23 his grandparents live right next door, right?
24 A  Right.
25 Q  So that that wasn't anything unique.  I mean, it

Multi-Page™

## Page 326

1  was clear that he would have known that, right?
2  A  Yes, that's correct.
3  Q  All right.  And he knew where Unique
4  Entertainment is, a business in town?
5  A  Yes.
6  Q  And I think that you also indicated that he
7  pointed out Mr. Williams' house, and then this Keena
8  person's house.
9  A  That evening he did not point out Keena's house.
10  Q  So in terms of pointing out houses and in terms
11  corroborating locations, it was Mr. Williams' house
12  that corroborated information you got from Gary Wayne
13  George and Mr. Denton because that's where marijuana
14  was eventually found, right?  So it kind of
15  corroborated -- He gave you Williams' location.
16  A  No.
17  Q  Okay.  I'm just wondering what the significance
18  of anything that he pointed out would have had to
19  cooperating and as to him being credible.
20  A  Well, I mean he talked about -- Not everybody in
21  Montgomery knows where the Carmichael center is.  Not
22  everybody in Montgomery knows where Unique
23  Entertainment is.  Not everybody in Montgomery knew
24  where Martel Watson lives.
25  Q  Okay.

## Page 327

1  A  Not everybody in Montgomery knows that Leon
2  Carmichael has a trucking company, which he indicated
3  to us.  Not everybody in Montgomery knew that Leon
4  Carmichael drove a white van with some red pin
5  stripes.  Not everybody --
6  Q  Investigator DeJohn --
7       MR. FEAGA:  Your Honor, he has a right to
8  answer this question.
9       MS. WAYNE:  Judge, he's going outside the
10  scope of my question.
11       MR. FEAGA:  Your Honor, he hasn't finished
12  making his answer.
13       THE COURT:  He's made his point.
14       MR. FEAGA:  He hasn't finished making his
15  point, and she keeps interrupting him.
16       THE COURT:  You can bring it up on cross.
17  Q  Investigator DeJohn, I simply was asking you the
18  location that he pointed out, not cars, not anything
19  else, the location.
20       MR. FEAGA:  No, sir, Your Honor, she did not
21  say that.  We object to this.  Her question was what
22  is it about what he knew that was any different from
23  what anybody else knew.  He was answering, and she
24  stopped him and we think he should be allowed to
25  finish that answer.

## Page 328

1       THE COURT:  You can complete the answer on
2  cross.  Go ahead.
3  Q  In terms of the locations, you were aware of the
4  fact that Mr. Denton's grandparents live next to Mr.
5  Carmichael, correct?
6  A  Yes.
7  Q  And that there had been a relationship in terms
8  of neighbors and living in the same community,
9  correct?
10  A  Yes.
11  Q  And in fact, Mr. Carmichael's house isn't very
12  far from his business, correct?
13  A  It's not a great distance away.
14  Q  A few miles?
15  A  Yes.
16  Q  Not anything unusual by itself?
17  A  No.
18  Q  And the Carmichael Center was built in his
19  community.  He built it in his community.
20  A  Yes.
21  Q  Okay.  And it appears from the location of Mr.
22  Denton's house, that Mr. Denton also, and I'm
23  characterizing this as a community, it looks like
24  everything is in a fairly close relationship to each
25  other, Mr. Denton's house, the Carmichael Center, Mr.

## Page 329

1  Carmichael's house, his grandparents' house, all the
2  same community in Montgomery.
3  A  It's not necessarily the same community, but it's
4  the same general region of town.
5  Q  All right.  Now, when you talk about the fact
6  that Mr. Carmichael supposedly comes to Mr. Denton's
7  house after this phone call on the cell phone, my
8  understanding is that, and you've testified about this
9  previously, is that you could see the car, Mr. Denton
10  had indicated that the Honda was Mr. Carmichael's
11  Honda but you couldn't actually see Mr. Carmichael
12  inside the car.
13  A  No, I didn't.
14  Q  Okay.  And your -- I don't know if you remember
15  Investigator DeJohn, but is your memory of anybody's
16  surveillance the ability to see someone actually
17  getting out of the car at one point in front of Mr.
18  Denton's home?
19  A  No.  I probably would have been closest to it,
20  and where I was seeing I couldn't see which car had
21  pulled all the way up to.
22  Q  So you can't testify that anybody actually got
23  out of the car?
24  A  No.
25  Q  Now when you all were doing this, Freddie

**Page 330**

1 Williams' house, the search of Freddie Williams'
2 house, you have pointed us all to these blocks of
3 marijuana that was retrieved, I believe it's
4 government's exhibit 6(a), correct?
5 A   Yes.
6 Q   And the packaging on all the plastic, I think
7 we've heard a lot of testimony, but this is how it was
8 packaged at the time you all retrieved it from the
9 house, with this kind of plastic round it.
10 A   Yes.   Well there is also some other packaging in
11 there.   There's two different types of packaging in
12 there.
13 Q   Okay.   And I want to talk to you a little bit
14 about printable surfaces.   I know you aren't a
15 fingerprint expert, but you have some working
16 knowledge in terms of what fingerprints can be lifted
17 from, correct?
18 A   Yes.
19 Q   Okay.   And the reason you've got to have working
20 knowledge is because when you secure a crime scene you
21 have to know what can be contaminated and what might
22 be able to be evidentiary down the line.
23 A   Yes.
24 Q   Okay.   Now in terms of Freddie Williams' house,
25 you would agree with me -- well, let's just talk about

**Page 331**

1 printable surfaces.   There are surfaces that are easy
2 to lift presents off and then there are those that
3 it's almost impossible, correct?
4 A   Yes.
5 Q   Now in terms of the prints, there's what's called
6 a latent print and a patent print.
7 A   I'm more familiar with the latent print.
8 Q   The Latent print is the one that we try to pick
9 up, but you may not be able to eyeball it and see it,
10 right?
11 A   Right.
12 Q   Sometimes if you leave a fingerprint on a window
13 you can see that just by eyeballing it, right?
14 A   Yes.
15 Q   You're much more concerned, obviously, usually in
16 crime scene investigation with attempting to find
17 latent prints.
18 A   Yes.
19 Q   Okay.   Now in terms of surfaces, we know that the
20 surface in front of the jury box here, the wood
21 surface may be a surface where I can leave a
22 fingerprint.   Sometimes I can see it, sometimes not,
23 right?   The wood is considered one of those surfaces.
24 A   Sometimes, yes.
25 Q   Okay.   Metal is also a great surface to attempt

**Page 332**

1 to get prints off.   It's something that you can get
2 prints off.
3 A   Sometimes, yes.
4 Q   Formica such as in government's exhibit 10(a)
5 that was taken out of Mr. Williams' house, that's a
6 surface because of the hard nature of it that you
7 might get a print from.
8 A   Yes.
9 Q   Okay.   Guns, because of the metal nature of guns,
10 you might be able to get prints from that.
11 A   Sometimes.
12 Q   Okay.   Exhibit 20, the ammunition box and the
13 metal boxes, sometimes you might be able to get a
14 print from that.
15 A   Sometimes.
16 Q   Now sometimes it's a little more difficult in
17 terms of drugs and the plastic that's covering them.
18 That's not always a surface that's so easy to lift
19 prints off it, correct?
20 A   That's correct.
21 Q   Now, again, it's the nature of it; it's not like
22 a piece of wood or glass where it may be easy to lift
23 prints, right?
24 A   Right.
25 Q   But you certainly in your experience over the

**Page 333**

1 last ten years, you have had cases or know of cases
2 where prints can come off the drugs.
3 A   I've never had a case where prints came off the
4 drugs.
5 Q   All right.   Well you're certainly aware, because
6 you're the lead investigator in this investigation,
7 where Mr. Timmons got busted and they found all that
8 marijuana at J. and L. Fashions that his fingerprints
9 were present and were actually lifted off the drugs.
10 A   Yes.
11 Q   Okay.   So it does happen.
12 A   It does happen.   My personal experience is that
13 the time I have submitted stuff to the lab, I haven't
14 gotten a response back where they got fingerprint
15 evidence off the packaging.
16 Q   All right.   But you certainly take precautions,
17 because when you're attempting to connect drugs or
18 drug paraphernalia to an individual in your
19 investigation, you exhaust everything that you can do
20 in terms of being able to make that link, right?
21 A   Right.
22 Q   Okay.   And in this particular investigation, it's
23 been made apparent that there was no forensic link to
24 Mr. Carmichael.   Forensic evidence.
25 A   No.

Multi-Page™

**Page 334**

1 Q Okay. There are no fingerprints, correct?
2 A Correct.
3 Q No audio, correct?
4 A There's audio.
5 Q Well, there's audio in terms of --
6 A You mean in terms of Mr. Carmichael?
7 Q Yes.
8 A No.
9 Q Okay. I know in terms of Mr. Williams, his
10 lawyer, but I have enough to do here. But in terms of
11 actually linking to my client, there is not an audio.
12 A No.
13 Q Not a video.
14 A No.
15 Q And there is sometimes what's called evidence,
16 transfer evidence like hair and fibers, so sometimes I
17 may be in the presence of something and something
18 comes off of me, my hair, something that I'm wearing,
19 and can transfer to evidence sometimes, right?
20 A Possibly, yes.
21 Q Okay. And in this world of D N A, it's great if
22 there is transfer evidence because I can even take a
23 piece of hair and now look at the D N A of that hair
24 and connect it to an individual, correct?
25 A That's what they say.

**Page 335**

1 Q Well you believe it, don't you? You know it
2 happens, right?
3 A Well, I mean in our experience we don't do D N A
4 evidence for drug cases. We don't go to that extreme.
5 The most I ever see that is on T V on C. S. I. and
6 that's not true.
7 Q All right. Well let's talk about the extreme,
8 Investigator DeJohn, because you don't want to leave
9 the impression with this jury that you wouldn't do
10 everything within the resources of the entire D. E. A.
11 to connect to a target individual in what sounds like
12 a major drug investigation, right?
13 A Yes.
14 Q You wouldn't leave any stone unturned if you
15 thought you could make that link, right?
16 A Right.
17 Q Okay. Now when Mr. Carmichael came to the D. E.
18 A., we've heard about -- excuse me. When he came to
19 the office on December the 4th, 2004, we've heard
20 about where he supposedly made this statement about
21 "You got me," right? That's what you and Agent Halasz
22 -- or excuse me, Agent Greenwood said he said,
23 correct?
24 A That is correct.
25 Q Now in terms of his tone of voice, Mr. Carmichael

**Page 336**

1 when he said that to you he was sarcastic, correct?
2 A I don't know if you'd classify it as sarcastic,
3 no. I mean it wasn't -- It was a matter of fact:
4 "You got me."
5 Q Well, you haven't had an opportunity to sit
6 around and talk with Mr. Carmichael on a daily basis,
7 have you?
8 A No.
9 Q You haven't had a chance to interact with him
10 ever on a social basis or any other basis before this
11 happened, correct?
12 A No.
13 Q So you're really not aware of what his tone of
14 voice is, or his demeanor on a daily basis, any of
15 those things, right?
16 A No, I don't.
17 Q Because you really don't know Mr. Carmichael.
18 A No, I don't.
19 Q Okay. Now before December 4th, and I'm looking
20 for the property sheet, and maybe you'll remember
21 without me finding it, but my understanding without
22 having gone through the evidence is that he actually
23 came to retrieve his keys and his billfold on November
24 25th right after get arrested. Do you remember that?
25 A That's my understanding, yes.

**Page 337**

1 Q Okay. And it wasn't -- You weren't present, it
2 was actually -- there was another agent that was at
3 the property bureau.
4 A Yes. I believe it was Task Force Agent Larry
5 Hubbard.
6 Q That's right. All right. And Agent Hubbard,
7 when Mr. Carmichael came to get his keys, you recall
8 that the keys that he got was a pretty big set of keys
9 with a lot of different keys on it. Do you remember
10 that?
11 A I remember a set of keys, but I wasn't there when
12 this occurred.
13 Q In order to release property after you had been
14 arrested, though, it has to be approved and okayed
15 before y'all are going to release it, right? You want
16 to make sure you're not releasing something that might
17 be significant down the line.
18 A Yes. Say approved and okayed, I mean we don't
19 have to get a signature approval or anything like
20 that, we just need to be able to evaluate whether
21 that's, you know, evidence we'll release or not.
22 Q Okay. And on November 25th when Mr. Carmichael
23 came and got this set of keys, was it you that
24 approved and evaluated it and said it was okay?
25 A No, I wasn't even in town.

Multi-Page™

Page 338

1 Q Okay. When they released the keys, I'm just
2 wondering because there was a set of keys, whether or
3 not in your investigation you all went through and
4 determined what the keys opened, what they locked,
5 whether they belonged to safety vault or anything like
6 that.
7 A No.
8 Q But in terms of his billfold, that was released
9 in terms of his identification and things like that?
10 A Identification, I believe some credit cards and
11 different things like that. Things you need on a
12 daily basis.
13 Q All right. And in order for you to keep track
14 for that and the reason we have this sheet is, Mr.
15 Carmichael had to actually sign his name when you
16 released it so that you all could show that you
17 released this property and it's no longer with us.
18 A That's correct.
19 Q Okay. Now when he came down there on November
20 the 25th, before this December 4th date obviously, he
21 was not put in a room or sat down in these chairs, no
22 other agents had to witness it, he just came, signed
23 for it, Agent Hubbard gave it to him, he was out of
24 there.
25 A I have no idea, I wasn't there.

Page 339

1 Q Agent Hubbard didn't report to you that he had
2 any kind of conversation with Mr. Carmichael when he
3 made any statements, did he?
4 A No, he didn't.
5 Q In terms of government's exhibit 24 and 24(a) and
6 (b), the little slips of paper that indicated Mr.
7 Williams -- All right. In terms of these slips of
8 paper and it is 24(a) and (b), in terms of these
9 particular numbers that were retrieved, there was a
10 lot of paperwork and documents that were taken from
11 Mr. Carmichael's car and from his house, right?
12 A Yes.
13 Q Okay. Lots of, I mean I saw packets of sealed
14 documents at the property bureau, a lot of paperwork,
15 right?
16 A Yes.
17 Q And you all were looking through that paperwork
18 to determine whether or not there was anything
19 significant to you in your investigation.
20 A Yes.
21 Q Okay. Now in terms of these pieces of paper that
22 you retrieved, the one that says "Pat" with a number,
23 and the one that says "Freddie Williams," there is
24 something in the agency called handwriting exemplars,
25 right?

Page 340

1 A Yes.
2 Q Handwriting exemplars are where you can request
3 that someone provide you handwriting to determine
4 whether you can link up the handwriting to the
5 questioned document that you might have, right?
6 A Yes. Now when you say within the agency --
7 Q Well, I shouldn't say within the agency, but
8 within your power of law enforcement there are people
9 that are called document examiners.
10 A Right.
11 Q Okay. A document examiner says it's my job in
12 law enforcement to look at documents, have someone
13 write them, question documents and compare to see if I
14 can determine if that person wrote the document,
15 right?
16 A Right.
17 Q Okay. And in this particular case you have not
18 been able to link up who wrote this document out or
19 anything like that, right?
20 A I mean the person that I think we would have
21 supplied us with a handwriting sample, in my
22 understanding we wouldn't have been able to because he
23 was already indicted so we could not pursue that.
24 Q All right. But you don't know the answer to
25 that. In fact, even after indictment you can request

Page 341

1 someone to give a handwriting exemplar.
2 A It's my understandings that you can't do that.
3 Q You didn't ask?
4 A No.
5 Q Okay. Just like you didn't ask in terms of voice
6 identification, you're aware of the fact that the F.
7 B. I. now has what's called voice identification
8 procedures where you can do an analysis of
9 individuals' voices. Are you aware of that?
10 A I'm sure they have something, but I don't know
11 what they have.
12 Q Okay. Well the bottom line again is,
13 Investigator DeJohn, is that you never made a request
14 for a voice identification analysis of Mr. Carmichael
15 in this case.
16 A You mean compare it -- I'm trying to understand.
17 Compare it to what?
18 Q I didn't ask what you could compare it to. I
19 asked --
20    MR. FEAGA: Your Honor, we object to her
21 arguing with him.
22 Q I asked whether or not you ever requested one.
23    THE COURT: Overruled.
24 Q You can answer that.
25 A No. And if I can explain my answer?

Multi-Page™

Page 342

1 Q I think they will ask you to do that.
2     THE COURT: No, you can explain. Go ahead.
3     MS. WAYNE: Judge, my question was did you
4 ever request one, yes or not is my question.
5     THE COURT: I'll allow him to explain.
6 A I didn't request to have his voice analyzed when
7 I have no base to compare it to. If I'm
8 understanding. I mean I don't understand how all that
9 works for sure, but in order for me to have requested
10 a particular analysis of his voice, I would have to
11 have something recorded that would have his voice on
12 it to analyze that. I just couldn't say hey, go
13 analyze his voice.
14 Q Investigator DeJohn, this is how it works. You
15 take a voice, a questioned voice, you get a recording
16 of it, and then you can ask other people, like Mr.
17 Denton, that you can ask them about that. Or you can
18 compare it to other analysis if you choose to do so.
19 And the bottom line in this case, that request was not
20 made, correct?
21 A No.
22 Q Okay.
23     MS. WAYNE: Judge, if I could have just one
24 moment?
25     THE COURT: Yes.

Page 343

1 Q Oh. And in terms of this address twenty-third
2 Second Street, and it's something you circled, were
3 you able to find out that that actually was Mr.
4 Denton's uncle's place?
5 A Yes.
6 Q Okay.
7     MS. WAYNE: Judge, I am almost complete, but
8 we had the other issue.
9     THE COURT: Right. Do you have something
10 for me?
11     MS. WAYNE: I don't, and that's why I wanted
12 to bring it up. But there is something else that
13 before -- I don't want to ask it before I get a
14 ruling.
15     THE COURT: Very good. So you want to wait
16 to resolve that other issue first? We can take it up
17 -- Let's finish him with everything else.
18     MS. WAYNE: I am. I'm finished with
19 everything else.
20     THE COURT: Great. We'll take that other
21 issue up over the evening. I'm ready now for
22 Mr. Teague. Are you through now?
23     MS. WAYNE: I just have one question that I
24 don't want to ask until I have a ruling.
25     THE COURT: That's fine. Okay. Mr. Teague?

Page 344

1     CROSS EXAMINATION
2     BY MR. TEAGUE OF DAVID DEJOHN:
3 Q Agent DeJohn, you have been here six days now.
4 You've heard all the testimony, have you not?
5 A Yes, sir.
6 Q And you've heard the testimony that after Robert
7 Patrick Denton was arrested in Huntsville and charged
8 with two different counts of trafficking, the police
9 wisely got a search warrant for his house down here in
10 Montgomery, is that correct?
11 A That's correct.
12 Q And they found cocaine in the house, found three
13 firearms and they also found a stash of money nearly
14 eight thousand dollars, is that correct?
15 A I don't recall whether or not there was cocaine
16 in the house.
17 Q Perhaps not.
18 A There was a white powder substance. I don't
19 think it was determined to be cocaine, no.
20 Q Okay. But they did find three firearms, correct?
21 A I believe so, yes. I heard testimony to that,
22 and I believe that to possibly be true.
23 Q Yes, sir. And if I found that in some of your D.
24 E. A. Sixes you would not dispute that, would you?
25 A I would not dispute it.

Page 345

1 Q Okay. And the nearly eight thousand dollars, you
2 know that was there because it's in police documents
3 in the Huntsville case.
4 A Yes.
5 Q And you've seen those.
6 A Yes.
7 Q Now when you went over to Freddie Williams'
8 house, y'all searched that place fairly thoroughly,
9 didn't you? You had a whole team of people ready to
10 do that, didn't you?
11 A Yes.
12 Q Did you find a stash of money over at Freddie's
13 house?
14 A No.
15 Q When we examine the places on the Montgomery map
16 here, now down here along Fleming Road we have seen in
17 a photograph what Mr. Denton's house looks like,
18 haven't we?
19 A Yes.
20 Q It's not a bad house, is it?
21 A It's okay.
22 Q It may be as good as the one you live in, hmm?
23 A Home is where the heart is. I mean, it's how you
24 feel about it.
25 Q Yeah. And where Freddie rented up here, that's

Multi-Page™

Page 346

1 more poor folks territory, isn't it?
2 A  It's a poverty area, yes, or low income.
3 Q  Yeah.  And he didn't own any interest in the
4 place, it was just month-to-month rent, wasn't it?
5 A  Yes.
6 Q  But Mr. Denton owned his, and I believe he
7 testified to these ladies and gentlemen he owned it
8 free and clear, didn't he?
9 A  I don't think he testified free and clear.
10 Q  You don't remember that?
11 A  I don't remember him saying that.
12 Q  But y'all decided you weren't going to take any
13 steps to take this obvious drug preparation house of a
14 trafficker and put it on the block and seize it; you
15 didn't try to do that, did you?
16 A  Not as of yet.
17 Q  Not as of yet.
18      Very shortly after you got there on the
19 evening of November the 17th, isn't that the early
20 morning hours you went into his house?
21 A  In Denton's house?
22 Q  Yes.
23 A  Yes.
24 Q  And that was at Eight oh eight West Fleming,
25 correct?

Page 347

1 A  Yes.
2 Q  And he fairly quickly had sized it up and had
3 already, based on what he wisely put together
4 concerning the information from Charlotte Hensarling
5 and others, that he better do some long thinking about
6 what he had been into, is that right?  And he decided
7 to cooperate?
8 A  He decided to cooperate, yes.
9 Q  And as a result -- Now as part of your duty to
10 the Court you have to make a return to the Court when
11 you execute a search warrant as to what, if anything,
12 you take out of a man's house, is that correct?
13 A  That is correct.
14 Q  Okay.  In his case you decided not to take
15 anything, is that correct?
16 A  That's correct.
17 Q  And did you leave a stash of money behind for him
18 to live on, so to speak?
19 A  No.
20 Q  You didn't?
21 A  No.
22 Q  Did you even search to see if there was a stash
23 of money?
24 A  The house had been fully searched.
25 Q  And you heard his testimony that it didn't

Page 348

1 matter, he had already sanitized the place.
2 Everything that was in there that could have been
3 seized he had out of there, didn't he?
4 A  Yes.
5 Q  He didn't tell you where he stashed any money,
6 did he?
7 A  No, he didn't.
8 Q  When you went into Freddie Williams' half of the
9 house and you found the -- you saw the bags of
10 marijuana that were there, is that correct?
11 A  Yes.
12 Q  Now they were not in the what everybody has
13 termed the secret room, were they?
14 A  No, they had already been moved out and --
15 Q  When you say "moved out," you have to make a
16 conclusion there based on somebody else's word, don't
17 you?
18 A  No, I'm going by on what I saw on the video and
19 then what I seen when I got there.
20 Q  Right.  Now you don't know how they got where you
21 saw them on the video or when you actually went in the
22 house and eyeballed them.
23 A  I know on one video there wasn't anything there.
24 Then another video, the bags are there.
25 Q  Well, is it not fair to say you look at one

Page 349

1 video, you don't see much other than somebody's
2 dashboard and the inside of somebody's pocket, right?
3 A  Right.  There's a lot of that.
4 Q  Yeah.  And if Denton was trying to help, he was
5 virtually no help at all on that first video, was he?
6 A  I think he was probably technically challenged on
7 that one.
8 Q  So you never saw any marijuana in the secret room
9 yourself, then, did you?  If we could call it that.
10 A  Once I got there, I believe, if there was bags
11 still in there when I got there, but they were already
12 searching, officers were already searching that
13 location --
14 Q  In this week you heard not one agent or anybody
15 on that search that you say there was even a smidgeon
16 or trace of marijuana found in the, quote, secret
17 bedroom?
18 A  No, but there was some items of evidence in that
19 particular hidden room.
20 Q  Right.  But not bags of marijuana.
21 A  Empty bags that had the odor of marijuana.
22 Q  Okay.  Now, did you -- You spent most of the
23 night -- most of the rest of the morning after you
24 went into the house riding around looking at places as
25 you've already testified, is that right, various and

Page 350

1 sundry places?
2 A  Yes.
3 Q  Before you went in there and you went into Eight
4 oh eight West Fleming, in your affidavit that you gave
5 to Judge Coody you made no mention of any Freddie last
6 name unknown or any Freddie Williams whatsoever, did
7 you?
8 A  On the Eight oh eight?
9 Q  On the Eight oh eight.
10 A  I don't think I did.  I'd have to review it to
11 make sure.
12 Q  Do you want to look at?  Would you believe me if
13 I tell you I've looked at it and it's not there?
14 A  I believe you.
15 Q  Thank you.
16        Now, so when you went over there and looked
17 at the place that is mentioned in here, and I'll
18 represent to you and go mention it, that Gary Wayne
19 George said look, we're breakdown men, we break down
20 these bags of marijuana into saleable quantities and
21 we do it either at Eight oh eight at Denton's place
22 West Fleming, or we do it over there next to the
23 factories Second Street area which turns out to be a
24 place owned by a kinsman of his?
25 A  Of Denton's, yes.

Page 351

1 Q  Of Denton's.  Okay.
2        But if Denton is sanitizing his house, he's
3 certainly not going to take it to a kinsman's place
4 and cause a kinsman trouble, a cousin or uncle or
5 whoever it is.
6 A  I have no idea.  What he indicated to me is
7 whatever he had left.  I mean, he said there was
8 nothing to clean up.
9 Q  Oh.  He's a low down criminal, but not that low
10 down.
11 A  I don't know where he would take it.
12 Q  He could have taken it over to Second Street.
13 Gary Wayne George said they had access to the place,
14 didn't he?
15 A  Well, being that most of Sunday there was a
16 surveillance set up on that location and no one came
17 to it --
18 Q  Right.  But you didn't know then that it actually
19 belonged to his cousin, did you, or to his uncle, did
20 you?
21 A  I think Gary George had indicated to me that it
22 belonged to a relative of Denton's, that it was an
23 empty house and it belonged to a relative of Denton's.
24 Q  Now, Agent DeJohn, you've been in a lot of drug
25 prosecutions, haven't you?

Page 352

1 A  Yes, sir.
2 Q  And this is not your first time to be cross
3 examined by Barry Teague, is it?
4 A  No, sir.
5 Q  You and I have talked many times privately and by
6 way of cross examination.
7 A  Yes, sir.
8 Q  Would you be fair with me and say that it's most
9 unusual for making an assumption if a businessman like
10 Leon Carmichael happens to be a drug dealer, that he
11 would keep one of his drug coconspirators' name and
12 neatly written out the man's Social Security number,
13 his date of birth and his address?  That's kind of
14 unusual in the drug business, isn't it?
15 A  In the drug business.
16 Q  Yeah.  Now if he's a legitimate businessman, and
17 if my client is somebody who is going to do, say, some
18 sheetrocking either at a business such as the
19 Carmichael Center or any other rental house that
20 somebody may own as a businessman, or even his own
21 house, it would be a good idea to -- in order to have
22 some record of who you paid to have some information
23 about the man and his address, wouldn't it?
24 A  That, and it could be used for other things.
25 Q  Sure.  But it's most unusual in drug dealing,

Page 353

1 isn't it?
2 A  In drug dealing, yes.
3        MR. TEAGUE:  Thank you.  That's all I have.
4        THE COURT:  Any further direct?
5        MR. FEAGA:  Yes, just a couple.
6            REDIRECT EXAMINATION
7        BY MR. FEAGA OF DAVID DEJOHN:
8 Q  Agent DeJohn, early on in your cross examination
9 you were asked a question about, and the question I
10 believe fairly inferred that basically you had been
11 asked what did Patrick Denton know or take you around,
12 he was taking you around and showing you the
13 Carmichael Center and showing you a nightclub and how
14 was that anything that anybody else would know, and
15 you started to say well, I think you were given a list
16 of things that he knew that you thought maybe just not
17 anybody would know.  And so would you complete that
18 answer?
19 A  Yes.  Again, not everybody knew the fact that
20 Leon Carmichael owned the Carmichael Center.  Not
21 everybody knows where Leon Carmichael lives.  Not
22 everybody knows where Martel Watson lives.  Not
23 everybody knows where Freddie Williams lives.  Not
24 everybody knows where -- that Leon Carmichael drives a
25 black Honda.  Not everybody knows that Leon Carmichael

Multi-Page™

Page 354

1 also drove a white van, commercial van.
2 Q  Miss Wayne asked you some questions about whether
3 or not you -- about fingerprints and drug evidence.
4 A  Yes.
5 Q  Did you, in fact, solicit some assistance in
6 determining whether or not fingerprints could be
7 lifted off of the marijuana that was seized from
8 Freddie Carmichael's (sic.) house and became -- excuse
9 me, Freddie Williams' house and is marked as a bulk
10 exhibit 6(a)?
11 A  Yes.
12 Q  What did you do?
13 A  We had F. B. I. fingerprint techs come from
14 Mobile and they examined the evidence and attempted to
15 see if they can get any prints off of it.
16 Q  And were they able to do any fingerprint testing
17 with that evidence?
18 A  No, they were not.
19 Q  Why not?
20 A  There was the strong odor of gasoline or diesel.
21 You could feel it on the packages itself.  And even to
22 this day can you smell it in the bags in which the
23 marijuana was packaged, the black bags.  You could
24 smell a strong odor of a type of fuel.  It was
25 indicated to me that --

Page 355

1       MS. WAYNE:  Judge, I'm going to object to
2 the lack of foundation and to hearsay.  He can say
3 they attempted to test it and nothing was on, it but
4 he can't go into the detail.
5       MR. FEAGA:  Your Honor, we're not offering
6 it to prove the truth of the matter asserted, merely
7 to show that he did do what it is that the defense has
8 been inferring was not in fact done throughout this
9 trial.
10       MS. WAYNE:  Judge, I don't have a problem
11 with that.  I simply am saying he can't go into the
12 foundation of the science of fingerprints and why they
13 couldn't get it.  He can simply say they didn't get
14 it.
15       THE COURT:  I thought you specifically asked
16 him those questions.
17       MS. WAYNE:  I asked him whether or not he
18 did it, but I didn't ask him about a scientific basis
19 for it.
20       THE COURT:  I thought you asked him, though,
21 if you can't get them off the plastic and off of glass
22 and --
23       MS. WAYNE:  That's correct, Judge, to no
24 objection.  But they're actually going into the depth
25 of the fingerprint analysis.

Page 356

1       THE COURT:  Well he can explain maybe why he
2 didn't seek fingerprints from those items.
3 Q  Why did you not actually then have all these
4 things sent to the lab after those fingerprint
5 specialists from the F. B. I. came up from Mobile and
6 examined the evidence?  Why wasn't it shipped off to
7 the lab to be tested for fingerprints?
8 A  Because that's what -- I mean they did it.  I
9 mean, they attempted to do it.  They were unable to
10 get any fingerprints.
11 Q  Because?
12 A  Because of the fact that it had a coating of
13 fuel, some sort of fuel on it.
14 Q  All right.  Now, Miss Wayne also asked you why
15 you didn't conduct any forensic analysis of Mr.
16 Carmichael's voice against some knowns.  Did you --
17 Were you guys able to record the phone call that Mr.
18 Carmichael made in to Mr. Pat Denton?
19 A  No.
20 Q  Early that morning?
21 A  No.
22 Q  Halasz had gone to get the equipment?
23 A  Yes.
24 Q  Did he make it back in time to record the call?
25 A  No.

Page 357

1 Q  So what recorded voice of Mr. Carmichael's did
2 you have to compare to any knowns that you might
3 acquire?
4 A  None.
5 Q  She asked you about forensic evidence.  Forensic
6 evidence is any evidence that tends to connect
7 somebody to a crime, isn't it?
8 A  Yes.
9 Q  Well I know they're not in yet, but have you
10 checked the phone records to see if Mr. Carmichael
11 called Patrick Denton?
12       MS. WAYNE:  Judge, I'm going to object.  He
13 just said they're not in yet, so he wants him to
14 testify about something --
15       MR. FEAGA:  Your Honor, she's asked these
16 questions about the lack -- trying to point out some
17 lack of evidence as regards to Mr. Carmichael.  I want
18 to go through what he did have now.  And I think since
19 she knows, they have already stipulated to the
20 authenticity of the records and they have them, I
21 should be allowed to ask him this question.  They know
22 those records showed that those calls came in --
23       MS. WAYNE:  Judge, I'm going to object to
24 his testifying.  My asking questions doesn't alleviate
25 his burden of doing it right.

**Page 358**

1 THE COURT: What is it you want to ask him?
2 What evidence does he have?
3 MR. FEAGA: Yes, sir, what evidence does he
4 have.
5 THE COURT: Why can't he ask that?
6 MS. WAYNE: Because his question was I know
7 they haven't been admitted yet but I want to talk to
8 you about them.
9 THE COURT: Okay. Well Just ask him about
10 what evidence does he have.
11 MR. FEAGA: Okay.
12 Q What evidence do you have that connects Mr.
13 Carmichael to the crime in the way of phone records?
14 A I have numerous phone records that have Leon
15 Carmichael making phone calls to Patrick Denton,
16 Patrick Denton making phone calls to Leon Carmichael,
17 Patrick Denton making phone calls to Freddie Williams,
18 phone calls going from Freddie Williams to Patrick
19 Denton, phone calls between Leon Carmichael and
20 Freddie Williams.
21 Q More specifically, in her opening statement
22 Miss Wayne said that the records were going to show
23 that Pat Denton was calling her client all day trying
24 to borrow some money from him the day before all this
25 started. Do you remember that?

**Page 359**

1 MS. WAYNE: Judge, I'm going to object to
2 the form of the question. It's leading and my opening
3 is not a basis for a leading question. He can ask him
4 what the evidence is.
5 Q Do the phone reflect Pat Denton making any phone
6 calls to Leon Carmichael the day before all these
7 events took place?
8 A I have to review those tolls to see which way it
9 goes, whether it's incoming or outgoing.
10 Q They will speak for themselves, though, won't
11 they?
12 A Yes.
13 Q Now did anybody else besides Leon Carmichael call
14 Pat Denton at two or three o'clock in the morning on
15 November the 17th and say, "I'm on my way over there
16 I'll be there in five minutes?"
17 A No.
18 Q Did anybody else have a person that is involved
19 in a drug distribution ring with them get caught with
20 forty-two thousand dollars in El Paso, Texas?
21 MS. WAYNE: Objection, Judge. That's
22 leading and has a conclusion and he's simply arguing
23 to the jury.
24 MR. FEAGA: A fair inference from the
25 evidence, Your Honor. I think it's a fair question.

**Page 360**

1 THE COURT: Well the jury is really supposed
2 to make its own independent assessment as to the
3 adequacy of the evidence.
4 MR. FEAGA: Yes, sir. But she asked him
5 what evidence did he have, and I think it's fair for
6 us to ask him what evidence he had, Judge.
7 MS. WAYNE: I agree. That wasn't the
8 question.
9 THE COURT: Okay. Ask him that question,
10 then.
11 MR. FEAGA: Your Honor --
12 THE COURT: What evidence does he have.
13 Q What evidence do you have, Investigator DeJohn?
14 A That connects Leon Carmichael --
15 Q Let me ask you this. You've heard the evidence
16 that's been introduced into this trial during the
17 course of the past six days, is that right?
18 A Yes.
19 Q Is that the evidence that you have?
20 A Yes.
21 Q Along with a few more things to come?
22 A Yes.
23 Q All right. Agent DeJohn, in the course of your
24 experience in investigating drug trafficking and
25 distribution, is it unusual that you don't find money

**Page 361**

1 at every location that's related to drug distribution?
2 A Not at all.
3 Q And Miss Wayne asked you a whole series of
4 questions about whether or not you found any forensic
5 evidence to indicate Mr. Carmichael had actually
6 touched the marijuana. Did your investigation give
7 you any reason to believe that Mr. Carmichael
8 physically handled the evidence himself?
9 A No.
10 Q What does the evidence reveal about who is
11 handling the dope, actually physically touching it?
12 A People that Leon Carmichael directs to do certain
13 things with the dope.
14 Q Did Moses Williams, who said he wouldn't
15 cooperate anymore because he was in fear of Mr.
16 Carmichael, did he ever tell you -- did he ever say I
17 can't buy anything from Leon Carmichael? I can't get
18 any dope from Leon Carmichael?
19 A That's my understanding, yes.
20 Q One final question. Do you know of anyone else
21 in this case whose wife told Sherry Pettus that he was
22 dealing drugs?
23 MS. WAYNE: Objection, Judge, leading.
24 THE COURT: Sustained.
25 Q Do you know of anyone else who opened an account

Page 362

1  in the name Sherry Pettus --
2      MS. WAYNE: Jude, I'm going to object. This
3  is leading, too. He's doing closing. He needs to ask
4  a question.
5      THE COURT: Okay. Let's move on to
6  something else.
7      MR. FEAGA: No further questions, Your
8  Honor.
9      THE COURT: Anything else?
10     MS. WAYNE: Just one follow-up judge.
11         RECROSS EXAMINATION
12     BY MS. WAYNE OF DAVID DEJOHN:
13 Q  Very quickly, Investigator DeJohn, in terms of
14 all of these phone calls that you've indicated are
15 between my client, Mr. Williams, and Mr. Denton, all
16 of these phone calls you have no recorded
17 conversations?
18 A  No.
19 Q  So the only person who can tell you supposedly
20 what my client said is Mr. Denton.
21 A  Yes.
22 Q  Okay. Nothing further.
23         FURTHER REDIRECT EXAMINATION
24     BY MR. FEAGA OF DAVID DEJOHN:
25 Q  Now, Miss Wayne just asked you a question, and

Page 363

1  the question she said you don't have anyone other
2  than Patrick Denton that can testify to what Leon
3  Carmichael said to him. Do you remember that
4  question?
5 A  Yes.
6 Q  Okay. In fact, you can testify as to what Leon
7  Carmichael said to Patrick Denton, can you not?
8 A  Yes.
9 Q  You heard the phone call.
10 A  Yes.
11 Q  And Tom Halasz and Sherry Gonzales heard the
12 phone call, is that right?
13 A  Yes.
14 Q  So they heard what the voice on the other end
15 said, right?
16 A  Yes.
17 Q  Okay. And after all of these events occurred,
18 did anyone else besides Leon Carmichael say to you,
19 "You got me"?
20 A  Nobody else.
21     MR. FEAGA: No further questions, Your
22 Honor.
23     THE COURT: Thank you. You may step down.
24     (Whereupon the witness, David DeJohn,
25 stepped down from the stand.)

Page 364

1      THE COURT: I'll let the jury go until
2  eight-thirty tomorrow morning.
3      Before you leave, how are we doing on the
4  government's case?
5      MR. FEAGA: Your Honor, I'm afraid to be the
6  one to say at this point, but I think we're very, very
7  close. Your Honor, I think we'll be through by lunch.
8      THE COURT: What witnesses do we have left?
9  Who are they, so we'll have an idea.
10     MR. FEAGA: Eric Pigler, Mr. Estes, the two
11 tellers from the bank, the Secretary of State
12 regarding the multistate (sic.) investment company
13 records and then an agent witness to talk about the
14 phone records.
15     THE COURT: So we should finish in the
16 morning, then.
17     MR. FEAGA: Yes, sir, I think so.
18     THE COURT: I think we'll finish the
19 government's case in the morning.
20     Okay, members of the jury. We'll start
21 promptly at eight-thirty. Try to finish the
22 government's case in the morning. Very good.
23     Counsel, if you will remain and we'll take
24 up some other matters.
25     (Whereupon, the jury was escorted out of the

Page 365

1  courtroom, and the following colloquy ensued):
2      THE COURT: Miss Wayne, do you have some law
3  to support your arguments with regard to these
4  documents?
5      MS. WAYNE: Judge, I did not find any.
6      THE COURT: If you will let me have it by
7  eight in the morning.
8      MS. WAYNE: I was just going to say I was
9  cross-examining --
10     THE COURT: I realize that. Let me have it
11 by eight in the morning.
12     MS. WAYNE: I will.
13     THE COURT: Thank you very much. I'll see
14 you all at eight-thirty.
15     MR. FEAGA: Your Honor, I apologize, but
16 what was the issue that we needed to take up that
17 she's talking about?
18     THE COURT: She's saying that the documents
19 that were submitted to the grand jury did not include
20 a waiver to allow them to be used in these
21 proceedings.
22     MR. FEAGA: Yes, sir. I'm assuming if the
23 Court allows us to use them you'll allow us to get
24 DeJohn back up.
25     THE COURT: Oh, definitely.

Page 366

1 MS. WAYNE: Because I still have one
2 question.
3 MR. FEAGA: What about their cross
4 examination of Mr. Thomas? Richmond Thomas? They
5 never did do it.
6 THE COURT: Right. Well, is that the one
7 I'm supposed to get materials on overnight?
8 MR. MOORER: Yes. And what I was going to
9 ask you was, as I understand it what you're looking
10 for is D. E. A. Sixes where they were interviewed
11 about their drug distribution activities.
12 THE COURT: Yes.
13 MR. MOORER: And you want those by eight
14 o'clock in the morning.
15 THE COURT: By eight o'clock.
16 MS. WAYNE: Your Honor, I think the one
17 question I wanted to ask in front of the jury to Agent
18 DeJohn, I think it should be a matter to be heard in
19 chambers.
20 THE COURT: You want the government there?
21 MS. WAYNE: Yes.
22 THE COURT: Very good.
23 We'll just do it with the court reporter
24 right now.
25 (Whereupon, a recess was taken.)

Page 367

1 IN-CHAMBERS CONFERENCE:
2 MS. WAYNE: In terms of Investigator DeJohn,
3 Judge, in the course of our investigation, we -- I
4 learned through our investigation through our prior
5 investigator, Mr. White, there was a personnel file
6 that I think has been of some contention, frankly.
7 And Investigator White, my understanding -- and
8 frankly I don't have firsthand knowledge because I
9 wasn't in the office and around -- took this file that
10 we had gotten, a personnel file of Investigator
11 DeJohn's, and took it back and gave it back to the
12 government. So we don't have it.
13 THE COURT: Whose personnel file?
14 MS. WAYNE: Investigator DeJohn. One of his
15 files. I'm not sure if it's the Prattville, or I'm
16 not really sure which.
17 THE COURT: What's the question you want to
18 ask?
19 MS. WAYNE: The question is, in the
20 employment application there is a question about have
21 you ever smoked marijuana. Have you ever used illegal
22 drugs. And Investigator DeJohn answers yes, that he
23 had smoked marijuana.
24 THE COURT: And you want to ask him that on
25 the stand?

Page 368

1 MS. WAYNE: And the reason for that is I
2 believe the door was opened because we talked about
3 the question was in your experience and the odor of
4 marijuana and so on and so forth. It clearly goes to
5 his experience and his credibility. But I obviously
6 did not want to do that in open court.
7 THE COURT: Did you ask him the
8 circumstances under which he smoked it?
9 MS. WAYNE: I have never asked him anything
10 about it.
11 THE COURT: It may be that he smoked it in
12 his professional capacity. I don't know.
13 MS. WAYNE: It was actually in application,
14 filling out an application. It was in the employment
15 file.
16 MS. MORRIS: Your Honor, if I may start, and
17 I know you don't want to tag-team here, but I think I
18 have part of the story and I think Mr. Feaga has the
19 other part. So if you'll forgive me.
20 First of all, I would say that the defense,
21 before Mr. Feaga got involved in this case, asked for
22 and actually requested of the Court to demand that we
23 provide the personnel files of Investigator DeJohn.
24 Judge Boyd ruled that we didn't have to provide them,
25 and we didn't provide them and that is the subject of

Page 369

1 another matter that I don't want to know anything
2 about. But then, apparently, they got ahold of the
3 personnel file. At that point Mr. Feaga -- Well, we
4 looked at the personnel file, or he looked at the
5 personnel file, I haven't looked at it and I'll defer
6 to him now.
7 MS. WAYNE: And just so the record is clear,
8 I've never seen the personnel file either. I simply
9 learned --
10 THE COURT: So you don't know how he
11 answered the question personally.
12 MS. WAYNE: Exactly, Judge. I've never seen
13 the file. I've never read it or anything else.
14 Unfortunately, because I was part of the defense team
15 at that point, I learned about it.
16 THE COURT: Okay. Yes?
17 MR. FEAGA: I can represent to the Court
18 that there is absolutely nothing in that report that
19 they should be entitled to. They have asked for it,
20 it's been denied to them.
21 THE COURT: I think she wants to know the
22 propriety of this question, is what it comes down to.
23 MR. FEAGA: Yes, sir.
24 THE COURT: She doesn't want to ask the
25 question not in open court implying something that

Page 370

```
1   he's going to say no to as if it were true.
2        MS. WAYNE:  Right.
3        MR. FEAGA:  I would like, and I think in all
4   honesty, Your Honor, in all fairness to the United
5   States and to Detective DeJohn that the Court should
6   take a look.
7        THE COURT:  Do you ever the personnel file?
8        MR. FEAGA:  We have it.  I don't think it's
9   here with us today.
10       THE COURT:  Give it to me at eight in the
11  morning.  Okay.
12       (Whereupon, the proceedings were concluded.)
13
14
15
16
17
18
19
20        * * * * * * * * * *
21
22
23
24
25
```

Page 371

```
1
2            COURT REPORTER'S CERTIFICATE
3
4        I certify that the foregoing is a correct
5   transcript from the record of proceedings in the
6   above-entitled matter as prepared by me to the best of
7   my ability.
8
9        I further certify that I am not related to
10  any of the parties hereto, nor their counsel, and I
11  have no interest in the outcome of said cause.
12
13        Dated this 25th day of August 2005.
14
15
16            MITCHELL P. REISNER,  CM, CRR,
                 Official US Dist. Court Reporter
                 Registered Professional Reporter
17               Certified  Real-Time  Reporter
18
19
20
21
22
23
24
25
```