IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LEON CARMICHAEL, SR., | ) | |
| | ) | |
| Movant/Defendant, | ) | |
| | ) | Civil Action No. 2:10cv1106-MHT-WC |
| v. | ) | (CR No. 2:03cr259-MHT-DRB) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**EXHIBITS TO**
**UNITED STATES'S RESPONSE TO § 2255 MOTION**

**VOLUME 5C OF 8**
**(Exhibits 5C-VII to 5C-VIII-B)**

**GEORGE L. BECK, JR.**
**UNITED STATES ATTORNEY**

**SANDRA J. STEWART**
**FIRST ASSISTANT UNITED STATES ATTORNEY**

**ATTORNEYS FOR RESPONDENT**
**UNITED STATES OF AMERICA**

**United States Attorney's Office**
**131 Clayton Street**
**Montgomery, AL  36104**
**(334) 223-7280**

# INDEX TO VOLUME 5C OF RESPONDENT'S EXHIBITS

|  | *Exhibit #  (Crim. Doc. #)* |
|---|---|
| Volume VII of Trial Transcript (June 14, 2005) | 5C-VII |
| Volume VIII of Trial Transcript (June 15, 2005) | 5C-VIII |
| Volume VIII-B of Trial Transcript (June 15, 2005) | 5C-VIII-B |

```
 1                IN THE UNITED STATES DISTRICT COURT
                                  FOR
 2                  THE MIDDLE DISTRICT OF ALABAMA

 3

 4

 5   THE UNITED STATES
        OF AMERICA
 6
            vs.                      CRIMINAL ACTION NO.
 7                                   2:03-cr-259-T
     LEON CARMICHAEL
 8

 9

10

11

12

13

14                     VOLUME VII OF XI
                          7th DAY OF:
15                   JURY TRIAL PROCEEDINGS

16

17                * * * * * * * * * *

18
     BEFORE:         The Hon. Myron H. Thompson
19
     HEARD AT:       Montgomery, Alabama
20
     HEARD ON:       June 14, 2005
21
     APPEARANCES:    Terry Moorer, Esq.
22                   Stephen Feaga, Esq.
                     Clark Morris, Esq.
23                   Matthew Miner, Esq.
                     Susan James, Esq.
24                   Marion Chartoff, Esq.
                     Lisa Monet Wayne, Esq.
25                   Ronald R. Brunson, Esq.
```

GOVERNMENT
EXHIBIT
5C-VII

PENGAD 800-631-6989

**Page 2**

TABLE OF CONTENTS

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Preliminary Discussion In Open Court (The Jury Is Not Present) | 5 |
| In-chambers Conference | 11 |
| Richmond Thomas - Cross Examination by Ms. Wayne | 36 |
| Richmond Thomas - Redirect Examination by Mr. Feaga | 50 |
| Richmond Thomas - Recross Examination by Ms. Wayne | 58 |
| Eric Peagler - Direct Examination by Mr. Feaga | 70 |
| Eric Peagler - Cross Examination by Ms. James | 87 |
| Eric Peagler - Cross Examinatin by Mr. Teague | 108 |
| Eric Peagler - Redirect Examination by Mr. Feaga | 116 |
| Eric Peagler - Recross Examination by Ms. James | 134 |
| Johnny Bardwick - Direct Examination by Mr. Feaga | 153 |
| Johnny Bardwick - Cross Examination by Mr. Brunson | 156 |
| Burt Estes - Direct Examination by Ms. Morris | 178 |

**Page 3**

TABLE OF CONTENTS

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Burt Estes - Cross Examination by Mr. Brunson | 206 |
| Priscilla Luster - Direct Examination by Mr. Brunson | 208 |
| Priscilla Luster - Cross Examination by Mr. Brunson | 213 |
| Alicia Oree - Direct Examination by Mr. Feaga | 215 |
| Alicia Oree - Cross Examination by Mr. Brunson | 219 |
| Alicia Oree - Redirect Examination by Mr. Feaga | 221 |
| Devin Whittle - Direct Examination by Mr. Moorer | 222 |
| Devin Whittle - Cross Examination by Ms. Wayne | 253 |
| Devin Whittle - Redirect Examination by Mr. Moorer | 260 |
| In-chambers Conference, Motion For Mistrial and Motion For Change of Venue | 262 |
| David DeJohn - Direct Examination by Mr. Feaga | 271 |
| David DeJohn - Cross Examination by Ms. Wayne | 280 |
| Government Rests - Motions In Open Court (The Jury Is Not Present) | 283 |
| Lisa George - Direct Examination by Ms. James | 303 |

**Page 4**

TABLE OF CONTENTS

| ITEM DESCRIPTION | PAGE NO. |
|---|---|
| Lisa George - Cross Examination by Mr. Feaga | 315 |
| Louie Wilson - Direct Examination by Mr. Brunson | 321 |
| In-chambers Conference Re: Motions for Mistrial, etc. | 342 |
| Court Reporter's Certification | 352 |

-oOo-

**Page 5**

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON JUNE 14, 2005 AT THE UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

PRELIMINARY DISCUSSION IN OPEN COURT

(THE JURY IS NOT PRESENT):

THE COURT:  Counsel, the first thing I'd like to take up is the Thomas and Peagler matters.  I have the two reports here.  Do you know of any reason why I shouldn't just give these to the defense and put this all behind us?

MS. MORRIS:  No, Your Honor.  If we could just redact the case numbers.  The D. E. A. policy is to redact --

THE COURT:  Why don't you redact and all of them will be furnished to defense counsel.  I'll get rid of any Brady problems post trial, at least as to that.

The second matter is this is Mr. DeJohn's file.  Is Agent DeJohn here?

MS. MORRIS:  He is, Your Honor.

THE COURT:  I can't -- It's like looking for a needle in a haystack.  I'll just need some help looking.  So what I thought I would do is do it with you in camera on the record.

MS. MORRIS:  Yes, Your Honor.

## Page 6

1 THE COURT: And we can see what's in here.
2 I think you're looking for what we discussed in
3 private, and I'll look for it and we'll do it in
4 private on the record.
5 MS. MORRIS: Yes, Your Honor. Are we going
6 to do that now?
7 THE COURT: Why don't you go ahead and
8 redact so they can be looking at that while we do this
9 in-camera.
10 MS. MORRIS: Yes, Your Honor.
11 THE COURT: By the way, while they're doing
12 that, do you have your case law on these documents?
13 MS. WAYNE: Yes. On the subpoenas. Yes, I
14 have one case. I'll tell the Court what I believe the
15 rule is. I've looked over all the cases. I think the
16 subpoena is appropriate in terms of the introduction
17 of evidence pursuant to a grand jury subpoena, but it
18 appears from a review of the case law that that
19 doesn't allow its automatic admissibility. That the
20 Rules of Evidence still apply to the admissibility of
21 the documents. So my other objection is that they're
22 hearsay documents.
23 THE COURT: So your grounds are really not
24 just hearsay?
25 MS. WAYNE: That's correct.

## Page 7

1 THE COURT: Do you have any case law on the
2 hearsay, then?
3 MS. WAYNE: Well, they're documents that --
4 THE COURT: No, I mean you said you had some
5 case law.
6 MS. WAYNE: Only on the subpoena issue. I
7 looked at the grand jury, the 17(c), I went through
8 all of that.
9 THE COURT: Right. So I should just decide
10 whether these are hearsay.
11 MS. WAYNE: That's what I would do.
12 THE COURT: I can do that.
13 Who was handling these documents, was it Mr.
14 Moorer or Mr. Feaga --
15 MS. MORRIS: Mr. Feaga.
16 THE COURT: I'll wait for him to take that
17 up.
18 And, Miss Carnes, the order on the mistrial
19 motion needs to be given to the attorneys.
20 COURTROOM DEPUTY CLERK: Yes, sir.
21 MS. WAYNE: And, Judge, just for the record,
22 because I'm looking at the case, I think that that's
23 what the proposition is in the case law. All the
24 cases I looked. At but I was looking at United States
25 of America vs. Hubbell, which is found at 530 U. S.

## Page 8

1 27. It's a Supreme Court case that was decided in
2 2000 and it went to subpoenas and that issue.
3 THE COURT: We'll look at that.
4 Are we ready to look at DeJohn's file? Have
5 you finished the redacting, Ms. Morris?
6 MS. MORRIS: Yes, Your Honor, we have but I
7 just sent them with our student to go get them copied.
8 THE COURT: Why don't we go back and start
9 looking at this DeJohn file with the court reporter.
10 MS. WAYNE: Judge, I don't have a problem
11 with Ms. Morris going back as she is an attorney, but
12 Mr. DeJohn is like a party, and his personnel record,
13 and she knows what it is --
14 MS. MORRIS: I've never seen the personnel
15 records.
16 MS. WAYNE: Oh, it was Mr. Feaga.
17 MS. MORRIS: Mr. Feaga has seen the
18 personnel records. He is the only attorney on the
19 prosecution team --
20 THE COURT: Well we can just wait for Mr.
21 Feaga. I just needed someone to help me.
22 MS. WAYNE: The other issue, Judge, was the
23 WestLaw because I think it just came to the Court's
24 attention that we can't get on.
25 THE COURT: That's a general proposition,

## Page 9

1 and I was going to check on that. I don't know if we
2 can do it in this case.
3 MS. WAYNE: What I would suggest to the
4 Court is, what happens is it's a security link and I'm
5 wondering if the Court would consider, because it has
6 been frustrating not being able to get on WestLaw,
7 your clerk typing in without us seeing it, the
8 security access to get on, and then turning it off at
9 the end of the day and us never knowing what that is.
10 THE COURT: What security access?
11 MS. WAYNE: There's a security access so
12 when you go up on wireless it says it's a secured
13 wireless. I'm not sure I know what that means.
14 THE COURT: I'll have to check with my
15 computer people to see if it's possible.
16 MS. WAYNE: Okay.
17 THE COURT: Because what I was asking about
18 was for future trials, though. I don't see why
19 lawyers shouldn't have access to WestLaw to speed
20 things up.
21 MS. WAYNE: I need to ask for Miss Chartoff
22 to be excused again, Judge.
23 THE COURT: That will be fine.
24 And I can check to see if there is the
25 possibility of getting on WestLaw at your table. I

Multi-Page™

Page 10

1 don't understand why you can't plug your computer in
2 and get in on WestLaw.
3          MS. WAYNE: Because it's wireless access.
4          THE COURT: Oh, it's wireless access.
5          MS. WAYNE: I don't know if there is a D. S.
6 L. line available in the courtroom.
7          THE COURT: Sheila, would you check on that,
8 with Karlene.
9          MS. MORRIS: Your Honor, just to clarify,
10 based on those Sixes is it the Court's ruling that
11 then there is no Brady or Giglio material --
12          THE COURT: I don't have to reach it. You
13 turned it over, so it's a moot issue so we don't have
14 to worry about it post trial or now. Kind of just
15 makes the issue go away. So no, I did not find it was
16 a Brady or Giglio matter.
17          MR. MOORER: Your Honor, one issue that I
18 don't know I have addressed is the cross examination
19 of Mr. Thomas.
20          THE COURT: I think they said they wanted to
21 make that decision after they looked at the redacted
22 material.
23          MR. MOORER: Oh.
24          MS. WAYNE: That's right.
25          THE COURT: Well we'll take a recess until

Page 11

1 Mr. Feaga gets here and they have had a chance to look
2 at the documents.
3          MS. WAYNE: Thank you, Judge.
4          (Whereupon, a recess was taken.)
5          IN-CHAMBERS CONFERENCE:
6          THE COURT: Mr. Feaga, you've looked at the
7 file?
8          MR. FEAGA: I have, Your Honor.
9          THE COURT: Okay, good. And Miss Carnes is
10 now bringing me the file.
11          As I said before, it's so voluminous here,
12 it will take me all day to probably --
13          MR. FEAGA: Yes, sir. Your Honor, my review
14 of the file, and I asked one other individual over at
15 D. E. A., a supervisor, to look at it and verify my
16 work, there was one place in here, when he hired on --
17 What you have here is two separate personnel records.
18 I have the personnel records from the Montgomery
19 Police Department. You also have his personnel
20 records from the Prattville Police Department where he
21 now works.
22          What you see in these records is that the
23 Prattville Police Department apparently did not ask
24 him any pre-employment question have to do with drug
25 use. If it did, I didn't see it. I looked through

Page 12

1 there. There is a form that was required to fill out
2 by the Montgomery Police Department when he hired on
3 with them. And I'm going to see if I can locate it
4 very quickly for the Court and give you the exact
5 quote for the record of the question that was asked.
6 But my recollection of it is something to the effect
7 of have you ever used any controlled substance or been
8 involved with it, and I think in the answer to the
9 question Investigator DeJohn says that when he was
10 sixteen he experimented with it twice.
11          THE COURT: Did he say what it was?
12          MR. FEAGA: Marijuana. Let me see if I can
13 flip through it quickly.
14          MS. MORRIS: I have the Prattville file
15 here, and you're saying it's not in the Prattville
16 file?
17          MR. FEAGA: It's not in the Prattville
18 file.
19          MS. MORRIS: Just give me another second.
20          Is it a microfiche document, like this one
21 is?
22          MR. FEAGA: They all are.
23          THE COURT: Do you think Mr. DeJohn was
24 alerted?
25          MR. FEAGA: I don't know, Judge. He might

Page 13

1 very well.
2          Those stacks right there are Prattville, I
3 just remember that. So it will be in one of these two
4 we're looking at right now.
5          Here it is, Judge. It's this question right
6 here. Drug use on his Montgomery Police Department
7 application, the question number twenty-six, "The
8 following list of drugs and substances are to be
9 examined by you to determine the extent of use, if
10 any, of each particular category. Please indicate by
11 checking the appropriate response to each question."
12          He checked off "yes" to marijuana, and then
13 he checked off "yes" on the codeine. And "If the
14 answer to the question is yes, please answer the
15 following: At what age did you first experiment with
16 the drug?"
17          THE COURT: He says sixteen.
18          MR. FEAGA: Sixteen.
19          "When was last time?"
20          "Sixteen" and, there is the codeine on there
21 too.
22          (Whereupon, the Court examined said
23 document.)
24          THE COURT: Okay, very good. Thank you.
25          Now, I think that I can take this up with

Multi-Page™

1 the attorneys for the defendants in-camera.
2     MR. FEAGA: Yes, sir.
3     THE COURT: But I'd need to hear your
4 arguments them. I'd like them to hear your arguments.
5     MR. FEAGA: Yes, sir. If I could make one
6 for the record now. This is Detective DeJohn's
7 personal record.
8     THE COURT: I'll hear that in a minute.
9     MR. FEAGA: But I want to put on the record,
10 see, I think that even letting them know what is in
11 there is not appropriate, not proper. The only reason
12 they have seen that response is because what is now
13 alleged to be illegal activity on the part of other
14 people that was associated with Mr. Carmichael. And
15 there is no reason whatsoever that they should be
16 allowed to ask him about something that --
17     THE COURT: Well whether they should ask him
18 is a totally different question.
19     MR. FEAGA: Yes, sir. I understand. So for
20 them to be informed of it and become aware of it where
21 they can now spread it out in the community and use it
22 in other --
23     THE COURT: Well I will put them under a gag
24 order about it, and I will tell their client if I hear
25 that he's done it, too. But I've got to reveal this.

1     MR. FEAGA: Yes, sir. I understand.
2     THE COURT: Bring in the attorneys.
3     (Whereupon, all defense counsel were
4 escorted into chambers.)
5     THE COURT: Come on in, counsel.
6     Counsel, I have reviewed Mr. DeJohn's
7 record, and he does indicate that he used marijuana
8 when he was sixteen years old, and he used only at the
9 age of sixteen. He also indicates that he used
10 codeine, but that was for a prescription. And that
11 was the only indication on his employment that he's
12 ever used any illegal drug.
13     How is this relevant?
14     MS. WAYNE: I don't think it is, Judge.
15     THE COURT: I don't either. I absolutely
16 don't think it's relevant. And you're to keep this
17 private, and that includes you, Mr. Carmichael and Mr.
18 Williams. You're under Court order not to reveal it.
19 And if you do, I will hold you in contempt.
20     Okay? Let's go.
21     (Whereupon, the in-chambers conference was
22 concluded.)
23     THE COURT: Mr. Feaga, Ms. Morris and
24 Mr. Moorer, you may want to take up with the judges
25 later today, maybe we can get wireless for the

1 courtroom so that you all, both sides in future cases,
2 can do research. And as local attorney, Miss James,
3 you may want to do the same.
4     MS. JAMES: Yes, Your Honor, assuming I know
5 how to use the computer.
6     THE COURT: The attorneys' fee fund might
7 pay for that. It might be helpful for you to have
8 access to that.
9     MR. FEAGA: Yes, sir.
10     THE COURT: I'd like to take up the
11 documents now, these subpoenas to testify before the
12 grand jury, and documents were subpoenaed for
13 Multi-Investments, Inc. Miss Wayne has said that her
14 objection now is basically that they're hearsay.
15     MR. FEAGA: Yes, sir.
16     THE COURT: Now let me hear how they're
17 hearsay, and then let me hear your arguments as to how
18 they're hearsay or not hearsay.
19     MS. WAYNE: I'm sorry, did you want to hear
20 from me?
21     THE COURT: Either way. Either side.
22     MS. WAYNE: I think the records are being
23 introduced to show the truth of the matter, and that
24 is that these records purport to be an indication that
25 the tractor-trailer and other things belong to

1 Multi-Investments, which would be Mr. Carmichael's.
2 Clearly, that link is being shown.
3     They don't speak for themselves. They're
4 not certified documents. They haven't been
5 authenticated. They're simply documents provided by a
6 lawyer -- or Judge Hardwick, now-Judge Hardwick
7 pursuant to a grand jury subpoena. So I believe that
8 the most appropriate way to do it is have -- who can
9 testify about what the documents actually mean. They
10 don't speak for themselves.
11     THE COURT: Okay. Now what rule do you see
12 to have the documents admitted on?
13     MR. FEAGA: Your Honor, Rule 803 subsection
14 6, records of regularly conducted activity. They are
15 business records of Multi-Investments Corporation.
16 The cover letter from the lawyer, as the Court knows
17 the corporation being an inanimate --
18     THE COURT: What does 803(6) say?
19     MR. FEAGA: It says that, "A memorandum,
20 report, record or other data compilation in any form
21 of acts, events, conditions made at or near the time
22 by or from information transmitted by a person with
23 knowledge if kept in the course of a regularly
24 conducted business activity, and if it was the regular
25 practice of that business activity to make the

**Multi-Page™**

Page 18

1  memorandum, report, record or data compilation, all as
2  shown as shown by the testimony of the custodian or
3  other qualified witness or by the certification that
4  complies with Rule 902(11), 902(12), or a statute
5  permitting certification unless the source of
6  information or the method or circumstances of
7  preparation indicating lack of trustworthiness."
8       THE COURT:  Okay.  So you meet the
9  requirements of subsection 6.
10      MR. FEAGA:  Your Honor, we subpoenaed the
11  record from Multi-Investments, which just happens to
12  be this defendant's corporation.  They're going to
13  stipulate that that is his corporation.  If they
14  don't, we know we're going to bring the Secretary of
15  State down here to say it is his corporation.
16      Now we can't put him on the stand, but we
17  have from his --
18      THE COURT:  All I'm asking you is what rule
19  does it come in under.
20      MR. FEAGA:  We're offering it as a business
21  record exception.
22      THE COURT:  Has it met those requirements?
23  Because it has to be a document that's kept in the
24  course of regularly conducted business activity, the
25  practice of that business activity to make the report

Page 19

1  and all of this must be shown by the testimony of the
2  custodian or other qualified witness.
3       MR. FEAGA:  Yes, sir.
4       THE COURT:  I don't know where I have any
5  custodian or other qualified witness here.
6       MR. FEAGA:  Yes, sir.  Your Honor, for
7  starters, we would argue that the cover letter that
8  accompanied those records, if the Court examines the
9  subpoena we subpoenaed Multi-Investments, Inc. for
10  trip logs for a very limited specified period of time,
11  January the 1st, 1998 through January the 15th, 1998.
12  And we received a letter back from a lawyer who
13  represented himself to be the spokesperson for that
14  company, that "These are the records of
15  Multi-Investments that you subpoenaed," and even Bates
16  stamped them.
17      THE COURT:  I understand that, but the
18  lawyer doesn't say anything about meeting these
19  requirements.  He doesn't say these records were kept
20  in the ordinary course of business, et cetera, et
21  cetera.
22      MR. FEAGA:  Your Honor, I think it can be
23  inferred from the circumstances, and I think it should
24  merely go to the weight of what is obviously an
25  exception to the hearsay rule.  In other words, this

Page 20

1  should be a function -- If they want an instruction to
2  the jury that it should go to the weight that no one
3  from Multi-Investments testified to that, then I would
4  -- So I follow on from that argument, Your Honor, that
5  if the Court is to determine that we don't meet the
6  exception for business records, and I would ask for
7  the Court to rule that under Rule 804 --
8       THE COURT:  What's 804?
9       MR. FEAGA:  804(a)(5), Your Honor, that we
10  have here an unavailable witness because we have a
11  defendant who we have no compulsory power to force to
12  testify who is the person who could answer the
13  questions that the Court is currently raising as to
14  whether or not they have been answered.  We think for
15  all intents and purposes --
16      THE COURT:  That just means they're
17  unavailable.  So what -- But how do they get in then,
18  though?  804(a)(5) just talks about when someone is
19  unavailable.
20      MR. FEAGA:  This is the declarant
21  unavailable exception to hearsay.  These records, if
22  the Court examines them --
23      THE COURT:  No, wait a minute now.  That's
24  just a definition of unavailability.  You still have
25  to get it in under one of the exceptions.  I assume

Page 21

1  under (b).  That just defines when they're
2  unavailable.
3       MR. FEAGA:  Yes, sir.  Then, Your Honor, we
4  would go to, if I can, the residual exception to the
5  hearsay rule.  "The statement not specifically covered
6  by Rule 803 or 804, but having equivalent
7  circumstantial guarantees of trustworthiness is not
8  excluded by the hearsay rule if the Court determines
9  that the statement is offered as evidence of a
10  material fact, the statement is more probative on the
11  point for which it is offered than any other evidence
12  for which the proponent can procure it through
13  reasonable means."
14      THE COURT:  Anything else?  Anything else
15  from the defendants?
16      MS. WAYNE:  Judge, I would simply indicate
17  to the Court that they know the rule, that's why we
18  brought in the custodian of records on other things or
19  had to stipulate about those records was because you
20  have to bring the custodian in.  All they had to do
21  was go to Mr. Carmichael's business, it has nothing to
22  do with him testifying, get the custodian of records
23  there --
24      THE COURT:  Who is the custodian of records?
25      MR. FEAGA:  Your Honor, I don't know that

Multi-Page™

**Page 22**

1 there is one, other than Mr. Carmichael.
2      MS. WAYNE: Well they never checked. There
3 is a custodian of records, just like any business. So
4 go get the records and bring the custodian in to talk
5 about the fact that these are kept in the regular
6 course of business during that period of time, just
7 like every other record that they've brought into the
8 court.
9      MR. FEAGA: Your Honor, they are gaming the
10 system here. This is clearly a residual exception to
11 the hearsay rule. They are --
12      THE COURT: Check to see if there is a
13 custodian of the records and so forth.
14      MR. FEAGA: If he is an officer of the
15 corporation, then we should be able to put him on the
16 witness stand and we ask the Court to --
17      THE COURT: No, you're not going to put Mr.
18 Carmichael on the witness stand. Why don't you find
19 out if there is a custodian of the records, just check
20 and see if there is such a person. I'm not going to
21 rule yet. I'm going look at this independently, but
22 go ahead and see if there is a custodian of the
23 records. Check and see. And if there is, get them
24 here.
25      MR. FEAGA: I don't know any other way to do

**Page 23**

1 it other than to ask of Mr. Hardwick.
2      THE COURT: Very good.
3      MR. FEAGA: I don't know of any other way to
4 do it. He's representing himself to being the
5 custodian in that letter.
6      MS. WAYNE: Judge, in terms of the Thomas
7 matter, just so we're clear, you've given us an
8 opportunity to review this.
9      THE COURT: Yes. Have you had a chance to
10 review it?
11      MS. WAYNE: I have, Judge, and I'll tell the
12 court that in all due respect I think the Court is
13 wrong in terms of Brady material. And I'll tell you
14 why.
15      THE COURT: I've given it to you.
16      MS. WAYNE: This is totally Brady material.
17 We should have had it in advance, and it's not cured
18 by getting it in the middle of trial and I'll tell you
19 why. This is clearly evidence suggesting an alternate
20 suspect or theory of the source of marijuana that
21 comes through Montgomery, Alabama. This witness
22 testified, and I believe Eric Peagler potentially --
23      THE COURT: Who are we talking about,
24 Peagler or Thomas?
25      MS. WAYNE: Both, because they're in

**Page 24**

1 conjunction with each other. Mr. Peagler hasn't
2 testified, but we know that he's going to and what
3 he's going to say. They talk specifically and a lot
4 about this alternate source of drugs coming into
5 Montgomery, the Mexicans. It's been referred to as
6 "the Mexicans". It's actually outlined in terms of
7 giving names, Maria Erma Lazano, Juan Ruiz and Cesar
8 Lazano.
9      So it gives names. And these are people
10 that we would have thoroughly investigated in terms of
11 giving us a very credible theory of the source of
12 drugs for Patrick Denton and everybody else because
13 there has been reference to going to Texas --
14      THE COURT: May I see the document itself?
15      MS. WAYNE: Yes. I'll tender it to the
16 Court, as to what's been tendered to me. If I may
17 approach?
18      THE COURT: Very good. Why don't we go
19 ahead and mark it as an exhibit.
20      MS. WAYNE: It's my only copy.
21      THE COURT: It won't go to the jury.
22      MS. WAYNE: Okay.
23      THE COURT: Why don't we just call it
24 court's exhibit 1. I'll just have Ms. Carnes mark it
25 right now.

**Page 25**

1      MS. JAMES: There's an additional person
2 referenced in here by the name of Johnny Hamilton.
3      THE COURT: Well let me take up Thomas
4 first. And I believe, Mr. Moorer, these are your
5 documents?
6      MR. MOORER: Yes, Your Honor.
7      THE COURT: I'll issue a response in just a
8 minute.
9      MR. TEAGUE: Your Honor, with regards to
10 Defendant Freddie Williams inasmuch as he's charged
11 with conspiracy with Mr. Carmichael, we adopt the
12 objection and we likewise adopt the arguments.
13      THE COURT: Very good.
14      Okay. Let's take up Thomas first. Now,
15 Miss Wayne, you're saying that there are some names
16 mentioned here?
17      MS. WAYNE: Yes, there are, in reference to
18 the Mexicans.
19      THE COURT: Where is that?
20      MS. WAYNE: I should say and quote Mexicans.
21 That's not my --
22      THE COURT: Oh, I see. That's Maria Erma
23 Lazano? Is that what you're talking about?
24      MS. WAYNE: That's correct.
25      THE COURT: Okay. Now?

Page 26

1    MR. MOORER: Your Honor, I really don't
2 quite -- It's a leap in logic that they are arguing to
3 the Court. What happened was the Lazanos brought a
4 load of drugs to --
5    MS. WAYNE: Judge, I'm going to object to
6 Mr. Moorer testifying about other facts that have not
7 been provided to --
8    THE COURT: He can make argument. This is
9 not for the jury, this is for me to resolve as to
10 whether it's prejudicing you.
11    Go ahead.
12    MR. MOORER: Yes, Your Honor.
13    And in the conversations that are documented
14 in the D. E. A. Six, the discussion about Miss Lazano
15 and all of those individuals who were involved in that
16 load, she's asking the Court to make a leap in logic
17 that they would somehow have done something different
18 or been able to do something different prior to now.
19 There have never been any testimony from this witness
20 stand, and there won't be, from Mr. Thomas or Mr.
21 Peagler that Mr. Carmichael met up with the Lazanos.
22    He was saying that they got drugs from the
23 Lazanos, and they used part of the drugs that they got
24 from the Lazanos to pay back the defendant, Mr.
25 Carmichael. That doesn't in any way indicate Giglio

Page 27

1 or Brady or any other --
2    THE COURT: Well let me ask you this. When
3 were you supposed to turn any Giglio or Brady or what
4 do you call these D. E. A. forms, Sixes, over to the
5 defendants, when was that supposed to be done if this
6 were such?
7    MR. MOORER: Brady material we would have
8 had to turn it over when we discovered it unless from
9 it's nature it wasn't readily apparent that it was
10 exculpatory. But if it's obviously exculpatory, you
11 have to turn it over as soon as practical.
12    If it had been Giglio material, it would
13 have been required to be turned over no later than
14 when the witness was testifying.
15    THE COURT: And what about D. E. A. form
16 Six?
17    MR. MOORER: Frankly, Your Honor, we don't
18 have an obligation under Rule 16 to turn those over.
19 We turn those over just as a matter of courtesy and
20 practice because it prevents delays like we've had
21 with these witnesses. We do that to try to facilitate
22 the cases moving along quickly. But we could, if we
23 chose to, turn over Sixes during trial just right
24 after the witness testified if we chose to. We tried
25 to turn them over ahead of time.

Page 28

1    If this had anything to do with Mr.
2 Carmichael, then I think they might have an argument
3 that maybe we should have done it with the delay that
4 we had. But they still wouldn't have any legal right
5 to have it before then.
6    THE COURT: Okay. Now I'll hear from
7 Miss James with regard to Peagler and court's exhibit
8 2. Do you need it back?
9    MS. JAMES: Please, Your Honor.
10    Judge, obviously I agree with the arguments
11 made by Miss Wayne. These two witnesses, Mr. Thomas
12 and Mr. Peagler are related because the government
13 offers both up in an effort to corroborate each other.
14 I think it's particularly noteworthy that both
15 individuals were debriefed by Agent DeJohn, the case
16 agent in this case, and Todd Townsend who has been
17 dismissed from the Prattville Police Department and
18 charged with misappropriation or stealing a weapon.
19 Something of that nature. We don't expect to see him
20 in this trial.
21    But in addition to the alternative sources
22 that Miss Wayne indicates we could have investigated,
23 there is a complete omission of any reference to Mr.
24 Carmichael in this case. They offer, and I'm saying
25 in the Peagler proffer, which was conducted on May the

Page 29

1 14th, 2002, and this was clearly a time that Agent
2 DeJohn was investigating Mr. Carmichael because it's
3 uncontroverted that he was looking at Mr. Carmichael
4 in his whole tenure of ten years with vice and
5 narcotics and all of these various capacities.
6    Mr. DeJohn in the interview of Mr. Peagler
7 specifically asked Mr. Peagler as to who else
8 participated in the organization by assisting him in
9 any way or who else did he sell drugs to. Mr.
10 Carmichael's name is omitted from anyplace in the
11 report. And to confirm that, in the index section
12 which we're told deals with people who are related to
13 the report, the D. E. A. Six, Mr. Carmichael's name is
14 omitted.
15    Additionally, there is Mr. Thomas who
16 testified yesterday as to a specific time frame
17 wherein this allegation is said to have occurred where
18 Mr. Carmichael loaned Mr. Peagler approximately fifty
19 pounds of marijuana. There is a reference in here
20 that deals with that same time frame where the Lazanos
21 were bringing drugs to Mr. Peagler. And certainly
22 because that fact specific as to what this man
23 testified to, we would have certainly made an effort
24 to speak with Mr. Lazano, look at any sort of
25 statements that he's made, any prior testimony that

Page 30

1 he's given or anything of that nature because what Mr.
2 Lazano would say about that could certainly be in
3 direct conflict to what Mr. Peagler is anticipated to
4 say and what Mr. Thomas has said.
5        MR. MOORER: Again, Your Honor, from my
6 involvement in the case, neither of the Lazanos were
7 participants in the transaction that Mr. Peagler and
8 Mr. Thomas are testifying about other than just
9 bringing the drugs here to Montgomery. The subsequent
10 interaction of people with the drugs after they
11 delivered them, they wouldn't have any way to know
12 about it.
13        Secondly, and most importantly, when these
14 D. E. A. Sixes were written, and Agent DeJohn is here
15 to correct me if I'm wrong, his primary focus at the
16 time these were written were the Lazanos and trying to
17 ferret out the people who were involved with the
18 Lazanos with that seizure of narcotics and not
19 everything that Mr. Peagler or Mr. Thomas might have
20 done in the course of their drug dealings. But those
21 specific individuals were the focus.
22        MS. JAMES: Judge, it really, and I guess
23 disingenuous might be a very strong term, but for the
24 government to suggest when an agent such as Agent
25 DeJohn sits down with a proffer, because I have been

Page 31

1 there, the Court may not have been, but I certainly
2 have been in many of them, they don't focus
3 specifically on a person. They focus on the
4 cooperating individual's entire drug history. They go
5 on and on and on and they want to know everyone that
6 they have been involved with.
7        I think even though the Court is going to
8 make this a court exhibit, the D. E. A. Six --
9        THE COURT: It's already been made an
10 exhibit.
11        MS. JAMES: All right. I think it's
12 important to reference for the record paragraph twenty
13 of Mr. Peagler's proffer conducted by Lieutenant Todd
14 Townsend and Agent DeJohn. They say, "Peagler stated
15 he could not remember the exact dates, but between May
16 2001 and December of 2001 Lazano bought six to eight
17 more shipments of marijuana to Montgomery, Alabama for
18 him. Each trip was small, only bringing in thirty to
19 forty pounds of marijuana per trip.
20        And they were hiding it in the gas tank and,
21 therefore, you know, there is evidence that came out
22 in this case that Agent DeJohn couldn't get any prints
23 off of the marijuana in this case seized from Mr.
24 Williams' house because it had the smell of fuel on
25 it, which is even more compelling as to why we needed

Page 32

1 these documents.
2        The government is on notice that if they
3 anticipate using a witness, Your Honor, that is in any
4 way connected to the charges against the defendant,
5 that they're supposed to turn this stuff over. And he
6 can say it's gratuitous or not, but I have been
7 practicing in this Court since 1987, it's their
8 obligation and the prosecutors have the obligation.
9 If this were some agent from Troy that didn't know
10 anything about this case their argument would be
11 better, but Agent DeJohn, he has asked just about
12 everybody, I submit, that he's interrogated over the
13 course of ten years what they know about Leon
14 Carmichael.
15        THE COURT: Anything else I haven't heard?
16        MR. MOORER: Yes, Your Honor. One thing I
17 would say is I know it for a fact, and Agent DeJohn
18 can correct me if I'm wrong, that the last load of
19 drugs which came from the Lazanos, that particular
20 load was not secreted in the gas tank because it was
21 too much to fit in the gas tank.
22        And also, she said that the focus is never
23 limited. I disagree, Your Honor. We were trying to
24 get ready for trial with the individuals who we had
25 caught with drugs, which was Mr. Peagler, Mr. Thomas,

Page 33

1 the Lazanos and I think another two individuals who
2 had a last name different than the Lazanos. And so we
3 were primarily focused in at this point in getting the
4 case done that we had before us. And that's why the
5 interviews only encompass the matters that are shown
6 here.
7        THE COURT: Okay. I think I've heard the
8 arguments.
9        Even assuming that the government failed to
10 turn these documents over -- and that's court's
11 exhibit 1 and 2 -- in a timely manner, I don't reach
12 that issue at this time. All I have is speculative
13 prejudice. This is clearly the type of matter that I
14 will take up on either post-trial or 2255 later. It's
15 not a basis for either declaring a mistrial or
16 anything else. It's just time to move on.
17        If the defendants can show later on that
18 they were prejudiced by whatever the hearing officer,
19 we'll hear it at that time.
20        MS. WAYNE: And, Judge, just in terms of the
21 record, and you're also denying our motion to continue
22 to investigate further?
23        THE COURT: Yes, the motion to continue is
24 denied as well.
25        MS. JAMES: Judge, the one thing that I

**Page 34**

1 would add that I did not say is that given the Court's
2 rulings, it's our position that this violates Mr.
3 Carmichael's Sixth Amendment right to confrontation
4 because of our inability to investigate thoroughly the
5 matters that are contained within both of these
6 reports, court's exhibits 1 and 2. Our cross
7 examination of both Mr. Thomas and Mr. Peagler will be
8 severely limited, and I believe this is a denial of
9 Mr. Carmichael's right to confrontation.
10     THE COURT: That objection is overruled,
11 too. Let's proceed.
12     MR. FEAGA: Your Honor, I might be able to
13 help the court along a little bit. I just received a
14 copy from the Secretary of State's office, Nancy L.
15 Whorley, state of Alabama, it's a self-authenticating
16 certified copy of the incorporation records for
17 Multi-Investments, Inc., and there is only one
18 incorporator, there is only one registered agent,
19 there is only one officer named in any of these
20 documents and it's Leon Carmichael.
21     THE COURT: Thank you very much. I'm
22 looking at the issue, and I'll let you know something
23 soon.
24     MS. WAYNE: And we stipulated to the
25 admission of that particular in terms of we're not

**Page 35**

1 conceding that. Just because you're an officer
2 doesn't mean you're the custodian of the records. It
3 doesn't have anything to do with it. But we have
4 stipulated to that.
5     THE COURT: Very good. I'll let you know
6 something on this later. I'm looking at it
7 independently.
8     MR. FEAGA: Yes, sir.
9     THE COURT: Let's move on to your first
10 witness for the morning.
11 Bring in the jury.
12     MR. FEAGA: There is one other thing I
13 wanted to put on the record very quickly.
14     THE COURT: Yes, go ahead.
15     MR. FEAGA: That is that I've just been
16 informed that if Mr. Johnny Hardwick is put on the
17 witness stand who gave us these records, he's going to
18 testify that he received them from Leon Carmichael, if
19 he's allowed to testify to that.
20     THE COURT: Okay. I'll consider that, too.
21 We'll just look at that when we reach that point.
22     MR. FEAGA: Yes, sir.
23     MS. JAMES: Judge, I apologize, but given
24 the Court's ruling yesterday with regard to Mr.
25 Peagler, before he testifies I would request the Court

**Page 36**

1 get his waiver on the record of the attorney-client
2 privilege in order for us to be able to cross examine
3 him.
4     THE COURT: That's fine.
5 Let's move with Mr. Thomas first.
6 Bring in the jury.
7     (Whereupon, the jury was escorted into the
8 courtroom.)
9     COURTROOM DEPUTY CLERK: Good morning, Mr.
10 Thomas, you're reminded you are still under oath.
11 Please have a seat.
12     THE COURT: You may proceed.
13     CROSS EXAMINATION
14     BY MS. WAYNE OF RICHMOND THOMAS:
15 Q Mr. Thomas, yesterday you were asked a number of
16 questions by the government. Do you recall that?
17 A Yes, ma'am.
18 Q And we took a bit of a break and I've had an
19 opportunity to talk to you here about your testimony?
20 A Yes, ma'am.
21 Q That was the first time you ever met me and had a
22 chance to talk to me, right?
23 A Yes.
24 Q Okay. In terms of what you testified about, you
25 and I spoke about the fact that Mr. Peagler, according

**Page 37**

1 to you, was using this warehouse of his to unload this
2 marijuana during this period of time.
3 A It was my warehouse.
4 Q It was your warehouse. Okay.
5     And he was using that warehouse in order to
6 get the marijuana from I think you characterized them
7 as "the Mexicans," right?
8 A Yes. Erma Lazano and Cesar Lazano.
9 Q Okay. And you've given us names of those
10 individuals, and those are names that you provided to
11 Officer Todd Townsend and Investigator DeJohn
12 previously, correct?
13 A Yes.
14 Q Okay. Now you told us that your recollection is
15 that these two, the Lazanos or who you referred to as
16 "the Mexicans" according to you, right?
17 A Yes, ma'am.
18 Q They actually brought the marijuana in a gas
19 tank.
20 A Yes. In a pickup truck.
21 Q Okay. And it was so this kind of concealed area
22 in order to hide the marijuana you put it in this gas
23 tank.
24 A Yes.
25 Q Okay. And when the marijuana was brought out

Page 38

1 from the gas tank it had the fumes or the odor of gas
2 from the gas tank.
3 A Yes, it was wrapped in plastic.
4 Q Okay. So it was wrapped in plastic, but dispute
5 that it still had the gas smell.
6 A Yes.
7 Q Okay. You've also indicated that -- well, let me
8 ask you this: Are you aware of where the Lazanos were
9 bringing in the marijuana from?
10 A Texas.
11 Q So it was from Texas. And you know that because
12 they told you?
13 A Yes, and they had Texas tags on the truck.
14 Q Okay. Now in terms of this particular day that
15 you talked about where you go by Mr. Carmichael's
16 shop, you said that Mr. Peagler actually had to get
17 out of the truck and knock on the door, that the door
18 was not opened.
19 A No.
20 Q All right. So your memory is that Mr.
21 Carmichael's shop, the door wasn't open, that you
22 actually had to knock to gain access?
23 A Yes.
24 Q Now you didn't go with Mr. Peagler into the shop.
25 A No, ma'am.

Page 39

1 Q And your memory is that he took this bag, dropped
2 it off and then came back?
3 A Took the bag, went inside, stayed a few minutes
4 and then came back.
5 Q And are you aware of other people that were
6 present inside when Mr. Peagler supposedly went in?
7 A No, I didn't see anyone else.
8 Q Okay. Did Mr. Peagler indicate to you that there
9 were other folks that were present inside the shop?
10 A No.
11 Q What do you remember -- Do you remember what time
12 of day this was?
13 A It was probably about seven-thirty, first dark.
14 Somewhere around there.
15 Q So it was in the early evening, seven-thirty?
16 A Yeah, later evening.
17 Q And you recall that there were other cars or
18 other vehicles parked around the building?
19 A Yes. Buses, trucks, that kind of thing.
20 Q Do you remember the color of Mr. Carmichael's
21 shop?
22 A It was blue and White.
23 Q And when you describe it as "blue and white,"
24 you're talking about the outside of it and the trim?
25 A Yes.

Page 40

1 Q Now when you talk about the fact that you had an
2 opportunity to talk to Investigator DeJohn, you and I
3 talked about how it is that you actually came into
4 contact with the government. Do you remember that
5 conversation?
6 A Yes.
7 Q All right. And I asked you about the fact that
8 how did you know to contact the D. E. A. Do you
9 recall that?
10 A Yes.
11 Q You told me that you knew that you should contact
12 the D. E. A. because based upon your own case and
13 dealings with the system on your own case, right?
14 A I talked to someone. They told me I needed to
15 talk to the same agent.
16 Q When you talk about the same agent, when you
17 talked to someone when you first contacted the D. E.
18 Ait was because you had heard in the jail the talk
19 was Mr. Carmichael had been arrested.
20 A No, I didn't hear it in jail, I saw it in the
21 paper.
22 Q You indicated to me it was kind of the rumor
23 mill, though, in the jail that Mr. Carmichael had been
24 arrested.
25 A Yeah. I told you it was going around, yeah.

Page 41

1 Q Okay. And you learned of that. And as a result
2 of that you contacted the D. E. A.
3 A I learned of it in the paper and I contacted the
4 D. E. A.
5 Q And you contacted the agent that had actually
6 been involved in your case. That was your first
7 contact.
8 A No, I contacted someone else and they told me I
9 needed to contact the agent that was on my case.
10 Q Okay. So eventually you contacted the agent on
11 your case, and then they turn you over and say you
12 need to talk to Investigator DeJohn?
13 A Yes.
14 Q Okay. And that was a result of specifically
15 letting them know hey, I read about this, I've heard
16 about it, I want to talk to you.
17 A Yes.
18 Q And you told me that the reason for doing that
19 was that you knew from being in jail that if you could
20 offer some kind of evidence or talk to the agent, that
21 that might give you leniency on your case.
22 A I didn't tell you that part.
23 Q All right. Well you said yesterday that you
24 didn't do it out of -- that you were being a good
25 citizen, you thought that ultimately it might help

Page 42

1 you, correct?
2 A Yes.
3 Q Okay. You were doing fifty-one months?
4 A Yes.
5 Q You indicated to us this is the first time you've
6 done jail time?
7 A Yes.
8 Q You're not doing jail time, you're actually doing
9 prison time.
10 A Yes.
11 Q And fifty-one months is a long time, right?
12 A Yes.
13 Q Okay. So you knew that by contacting the
14 government, that ultimately this might help you out.
15 A I was hoping it would, yes.
16 Q So you were hopeful.
17 A Yes.
18 Q Okay. And they haven't told you anything to date
19 that have dashed your hopes in terms of getting some
20 leniency?
21 A No, they haven't promised me anything.
22 Q I understand they haven't promised you anything,
23 but they also haven't said this won't be helpful to
24 you, correct?
25 A We didn't talk about that.

Page 43

1 Q Well you told me yesterday, sir, when I was
2 asking you about this, that you were hoping to get
3 back into court so you could get your sentence
4 reduced.
5 A No, I didn't tell you that. I said I was
6 hopeful, yes.
7 Q You're hopeful -- Again, just so we're on the
8 same page, you're hopeful as a result of testifying
9 here today, you can come back to court and tell the
10 judge how helpful you have been to get your sentence
11 reduced. That's what you're hopeful of.
12 A Yes.
13 Q Okay. Now my understanding from learning all of
14 this from you yesterday is that originally when you
15 were charged in your case, your original case, you
16 were looking at ten to life.
17 A Yeah.
18 Q Okay. So fifty-one months is a lot of time, but
19 life is far worse than fifty-one months, right?
20 A Yes.
21 Q And the reason that you didn't have to do a life
22 sentence on your case is because you cooperated
23 against Mr. Peagler on that case.
24 A No, I fell in the lower category.
25 Q You cooperated against Mr. Peagler on that case,

Page 44

1 correct?
2 A Yes.
3 Q Okay. Which means that you told the government
4 information about Mr. Peagler so that you would avoid
5 a life sentence, correct?
6 A No.
7 Q Well you have a plea agreement in that case,
8 right?
9 A Yes.
10 Q And that plea agreement is a document that was
11 given to the Court in terms of your cooperation on
12 your case, correct?
13 A Yes.
14 Q And in that plea agreement, and I quote, it
15 indicates, and I quote, "The government agrees that
16 the defendant --" that would be you, "-- will receive
17 a three level downward departure for his substantial
18 assistance to the United States in this case."
19 Correct?
20 A Yes.
21 Q So that means that the government -- It was
22 actually Mr. Moorer. He was the prosecutor on that
23 case, right?
24 A Yes.
25 Q So this prosecutor gave you a benefit as a result

Page 45

1 of talking about Mr. Peagler with them, correct?
2 A Yeah. I just told them whose drugs they was.
3 That's it.
4 Q Well, it also goes on because it doesn't restrict
5 it to just this case in terms of you getting a break
6 and you getting leniency. And in fact, in your plea
7 agreement that the Court has in their file, it
8 indicates, and I quote, "The United States will file a
9 further motion for downward departure under Rule 35
10 --" which is the rules in this courtroom, "-- if the
11 defendant provides substantial assistance to the
12 United States in any future case." You were aware of
13 that when you pled guilty, right?
14 A Yes.
15 Q So you went to jail, and you knew if you could
16 provide anything that the government might want to
17 listen to, it was going to continue to help your case
18 to reduce your sentence, right?
19 A I knew that I agreed with them that if they
20 needed my assistance I would help them.
21 Q Right. And you knew that. So when you told this
22 jury that you were hopeful, that's not really true,
23 you have it in a document, right?
24 A I'm still hopeful. You know.
25 Q Okay. You're hopeful because you got a plea

Page 46

1  agreement that says the government can use you in
2  terms of what they need and it will help your case.
3  A  Yes.
4  Q  So you aren't a defendant that went down to
5  prison without knowing that in the future you could
6  not contact the government.  You're not one of those
7  defendants, right?
8  A  No.
9  Q  You're a defendant who has an ongoing agreement
10 with the government to provide assistance on any
11 future cases, right?
12 A  Not necessarily.
13 Q  That's what your plea agreement says, would you
14 agree with that?
15 A  The ones I could be helpful on, yes.
16 Q  Okay.  So you're what they call a continuing
17 snitch, right?
18 A  No.
19 Q  You heard that before?
20 A  No.
21 Q  Now in terms of you talking to us about telling
22 the government the truth, and I think that was your
23 words, the truth, or maybe Mr. Moorer asked you about
24 the truth, but in terms of telling the truth, when you
25 told the government this story about Mr. Carmichael,

Page 47

1  did they hook you up to a polygraph machine?
2  A  No.
3  Q  So the truth was what they wanted to hear.
4  A  No, it was the truth of what happened.
5  Q  All right.  The truth is what you tell them and
6  they have to believe that, right?
7  A  No, it was what happened.
8  Q  Well the truth wasn't tested.  The truth wasn't
9  tested.  You didn't take a polygraph test, right?
10 A  No.
11 Q  Okay.  And you knew that when you went in in
12 terms of the plea agreement that you wouldn't have to
13 take those kind of tests.
14 A  No.
15 Q  Your lawyer told you that, didn't he?
16 A  No.
17 Q  Now it also talks about in your plea agreement
18 that if the government wanted you to, they could ask
19 you to make consensually monitored telephone calls to,
20 or otherwise contacting, persons known to be involved
21 in violations of the law.  You agreed to do that in
22 your plea agreement, right?
23 A  Yes.
24 Q  Now you know if you call people from prison, that
25 your phone calls are monitored, right?

Page 48

1  A  Yes.
2  Q  They're listening to what you've got to say,
3  right?
4  A  Yes.
5  Q  Now if you work for the government, your plea
6  agreement talks about if you want to get the
7  conversation of someone, you were consenting to do
8  that, right, according to the plea agreement?
9  A  Yes.
10 Q  You never called Mr. Carmichael, never had a
11 monitored conversation with him, right?
12 A  No.
13 Q  But you agreed to do that for the government,
14 right?
15 A  Yes.
16 Q  And when you went to them with this information
17 supposedly about what you and Mr. Peagler did,
18 Investigator DeJohn said to you hey, will you help us
19 out?  Call Mr. Carmichael, let's see if we can get him
20 saying something incriminating?  Do you remember that?
21 A  No.
22 Q  They never asked you that?
23 A  No.
24 Q  But you had consented to it, right?
25 A  Yes.

Page 49

1  Q  You talked about, to Lieutenant Todd Townsend in
2  your report, you talked about the fact that there was
3  this woman by the name of Dorothy Wesson who financed
4  Mr. Peagler's business venture.  Do you remember that?
5  A  Yes.
6  Q  Dorothy Wesson was someone that you knew and had
7  contact with.
8  A  Yes.
9  Q  And you knew that she was financing him.
10 A  Yes.
11 Q  And you talked about throughout this, and again
12 I'm looking at what appears to be about a four page
13 statement -- Have you had a chance to review this
14 statement?
15 A  No.
16 Q  Okay.  You haven't seen that since you gave it?
17 A  I looked over it before I left home, before I
18 self-surrendered to prison.
19 Q  In terms of testifying, though, today, when was
20 the last time that you saw this, approximately?
21 A  About two and-a-half, three years.
22 Q  In it, though, you talk about the fact that your
23 knowledge of the source of marijuana being brought
24 into Montgomery was these people that you've referred
25 to as "the Lazanos".

Page 50

1  A  Yes.
2  Q  From Texas?
3  A  Yes.
4     MS. WAYNE: I have no further questions.
5     THE COURT: Mr. Teague?
6     MR. TEAGUE: Your Honor, I don't have any
7  questions for Mr. Thomas.
8     THE COURT: Any redirect?
9     MR. FEAGA: Yes, sir.
10          REDIRECT EXAMINATION
11       BY MR. FEAGA OF RICHMOND THOMAS:
12  Q  Sir, would you tell a lie on somebody else?
13  A  No, sir.
14     MS. WAYNE: Judge, I'm going to object
15  because it's bolstering his credibility. The jury has
16  to determine who is lying and who is not.
17     MR. FEAGA: Your Honor, I think I'm entitled
18  to ask him --
19     THE COURT: I think he can ask him that
20  question. He couldn't ask somebody else that
21  question.
22        Go ahead.
23  A  No, sir.
24  Q  Would you tell a lie on somebody that would cause
25  them to go to prison potentially in order to keep

Page 51

1  yourself from doing time in prison for a crime you
2  committed?
3  A  No, sir.
4  Q  Would you do that to Mr. Carmichael?
5  A  No, sir.
6  Q  Do you know -- You testified on direct earlier in
7  this proceeding, you may recall it, it was yesterday,
8  is that right?
9  A  Yes, sir.
10  Q  Do you recall your testimony yesterday?
11  A  Yes.
12  Q  Tell the ladies and gentlemen of the jury again
13  do you know Leon Carmichael?
14  A  No, sir.
15  Q  How is it that you came to see Leon Carmichael on
16  the day that you talked about?
17  A  When I took Eric by the shop.
18  Q  Okay. Now you testified that you and Eric were
19  involved in the distribution of drugs, is that right?
20  A  Eric was involved. I just let him use my shop.
21  Hold the drugs.
22  Q  Okay. And that was the level of involvement that
23  you had, is that right?
24  A  Yes.
25  Q  And the only thing you know in regards to

Page 52

1  Mr. Carmichael is riding with Mr. Peagler to pay back
2  Mr. Carmichael fifty pounds of marijuana that Mr.
3  Peagler borrowed from him, is that right?
4  A  Yes.
5  Q  Now you were also asked about whether or not you
6  had called Mr. Carmichael from prison.
7  A  Yes.
8  Q  Well the question also asked you are prison calls
9  recorded, is that right?
10  A  Yes.
11  Q  Now is it common knowledge amongst people that
12  are involved in drugs and narcotics that people that
13  are in prison if they call you, their calls are being
14  recorded?
15  A  Yes.
16  Q  What do you think the chances are Mr. Carmichael
17  would have been willing to talk to you about drugs if
18  you called him from prison?
19     MS. WAYNE: Objection as to the speculation.
20     THE COURT: Sustained.
21     MR. FEAGA: Yes, sir.
22  Q  The day you were arrested and charged with this
23  offense, do you remember that day?
24  A  Yes.
25  Q  What happened to you?

Page 53

1  A  The investigators came in, arrested me and took
2  me over to the D. E. A. station.
3  Q  Okay?
4  A  They questioned me, took me out of town to jail.
5  Q  Okay. And did you have to come into court, in
6  open court, in public court, and be arraigned and
7  answer the charges?
8  A  Yes.
9  Q  And was it common knowledge amongst anybody that
10  wanted to know that you had been arrested?
11  A  Yes.
12     MS. WAYNE: Objection, speculation about
13  common knowledge.
14     THE COURT: Well you can ask him generally
15  how it was made public and so forth. But he doesn't
16  know whether it's common knowledge.
17     MR. FEAGA: Yes, sir.
18  Q  Sir, do you know whether or not a criminal
19  proceeding is open to the public?
20  A  Yes, it was in the newspaper and on the news.
21  Q  Yours was?
22  A  Yes.
23  Q  Now, Miss Wayne asked you a lot of questions
24  about your plea agreement. I want to cover some other
25  aspects of it with you.

Page 54

1   Sir, your plea agreement calls for you to do
2 some other things other than the things that she asked
3 you about, doesn't it?
4 A Yes.
5 Q I want to read subparagraph four, subparagraph
6 three. It says you should maintain contact with the
7 law enforcement agents with whom you are working. You
8 shall work under the direct supervision of law
9 enforcement agents. At no time are you authorized to
10 take any actions without first obtaining the direct
11 authorization of such agents. Any independent and
12 unauthorized actions will be deemed a violation of
13 this agreement.
14   Does it say that?
15 A Yes.
16 Q It says that you are to testify truthfully
17 against any such persons before any and all grand
18 juries and at any and all hearings and trials. Does
19 it say that?
20 A Yes.
21 Q It says that you agree to make a good faith
22 effort to assist law enforcement agencies in arranging
23 and making undercover contacts with other persons you
24 know to be involved in illegal activity. Does it say
25 that?

Page 55

1 A Yes.
2 Q Okay. It says you will cooperate fully and
3 truthfully with the government in this investigation
4 and in any other federal criminal investigation. Does
5 it say that?
6 A Yes.
7 Q It says, "You will respond completely, fully and
8 truthfully to all inquiries addressed to you by
9 representatives of the government. And you will
10 testify fully and truthfully at any and all reasonable
11 times and places before grand juries and against any
12 and all defendants at the trial of any and all cases
13 arising from this investigation." Does it not?
14 A Yes.
15 Q And it also says, "or any other investigation."
16 A Yes.
17 Q Now when you made contact with agents after
18 learning of the arrest of Mr. Carmichael, did you
19 consider that something that had been a part of your
20 investigation, or was it part of another investigation
21 that you now knew about?
22 A Another investigation.
23 Q And your plea agreement requires you to contact
24 agents and let them know when you hear about something
25 that you think you have information about, doesn't it?

Page 56

1 A Yes.
2   MR. FEAGA: Your Honor at this time we'd
3 like to offer into evidence what's been marked as
4 government's exhibit 56, which is the plea agreement
5 between the United States and Richmond Lee Thomas.
6   MS. WAYNE: Judge, I'm going to object.
7 It's hearsay. He's testified about the agreement.
8 It's not being offered to impeach him, so it's not
9 substantive evidence, it's irrelevant and
10 inadmissible. He's testified to it.
11   THE COURT: You want to put in the whole
12 plea agreement?
13   MR. FEAGA: Yes, sir. She asked him
14 questions about it. She's made an issue of the fact
15 that he has --
16   THE COURT: You can ask him questions. I
17 don't think the jury knows what the plea agreement is.
18 We don't need to put it in its entirety.
19   MR. FEAGA: All right. I'll leave it up
20 here.
21   It's offered but not admitted, then?
22   THE COURT: Right.
23 Q Mr. Thomas, the load of marijuana that the
24 Lazanos brought up to you that was -- that you were
25 busted with, do you remember that?

Page 57

1 A Yes.
2 Q Where did that load -- Where did they have that
3 lead when they brought it?
4 A We wasn't busted with marijuana. That was a load
5 of cocaine.
6 Q Okay. Where was that load?
7 A It was in the fender wall of the truck. They had
8 to take the front passenger side fender off the truck
9 and hid it down in the fender wall.
10 Q So it wasn't in the gas tank?
11 A No, not that one.
12 Q Okay. Now how about the marijuana that you said
13 they brought over and y'all unloaded and fifty pounds
14 of it you took to Mr. Carmichael, was that in the gas
15 tank?
16 A Yes, that was in the gas tank.
17 Q Now when the Lazanos would bring drugs up to you
18 guys, you and Mr. Peagler, you said they're bringing
19 them to Mr. Peagler?
20 A Yes.
21 Q And you would allow them to use your shop?
22 A Yes.
23 Q How would they deliver those drugs? I mean how
24 would they -- where would they be when they would get
25 there to your shop with them?

Page 58

1 A They would be in the gas tank.

2 Q Were they always in the gas tank?

3 A Yes.

4     MR. FEAGA: No further questions.

5     MS. WAYNE: Briefly.

6         RECROSS EXAMINATION

7     BY MS. WAYNE OF RICHMOND THOMAS:

8 Q Mr. Thomas, in terms of this plea agreement, THE

9 only signatures that appear on it are your signature,

10 right?

11 A Yes.

12 Q Your lawyer's signature?

13 A Yes.

14 Q The government's signature, Mr. Moorer?

15 A Yes.

16 Q And a person by the name of Louis Franklin.

17 A Yes.

18 Q The judge's signature doesn't appear on your plea

19 agreement, right?

20 A I guess not.

21 Q You want to look at it and see? This is an

22 agreement you entered into with the government, you

23 and your lawyer, right?

24 A Yes.

25     MS. WAYNE: I have no further questions.

Page 59

1     MR. FEAGA: No further questions, Your

2 Honor.

3     THE COURT: Thank you. You may step down.

4     (Whereupon the witness, Richmond Thomas,

5 stepped down from the stand.)

6     THE COURT: Mr. Peagler next?

7     MR. FEAGA: Yes.

8     THE COURT: I'll have to excuse the jury for

9 just a moment.

10     (Whereupon, the jury was escorted out of the

11 courtroom, and the following colloquy ensued):

12     MR. FEAGA: Your Honor, before we go into

13 that, just so I don't forget, we have issued a

14 subpoena for the only registered agent for service of

15 process for Multi-Investments that we can find

16 anywhere in any record that we know of, and that is

17 Leon Carmichael. And I want to ask one of our agents

18 to serve him with it. I don't know whether the Court

19 will let me call him or not. I don't think I should

20 have to. I think those records should can come in.

21     THE COURT: Okay. Well go ahead, then.

22     While Mr. Peagler is taking the stand, Ms.

23 Morris, on the money laundering count, you were

24 supposed to let us know something about the conspiracy

25 aspect of it?

Page 60

1     MS. MORRIS: Yes, Your Honor. As far as

2 statements that have come in, coconspirator statements

3 in furtherance and during in the furtherance of the

4 conspiracy that have come in to date, all of those

5 statements have pertained to the drug conspiracy. I

6 do anticipate that there will be at least one

7 statement that may come in to evidence that would be a

8 statement in furtherance of the money laundering

9 conspiracy.

10     THE COURT: From whom?

11     MS. MORRIS: From one of the tellers from

12 Compass Bank.

13     THE COURT: Okay. And the statement was

14 made by whom?

15     MS. MORRIS: Miss Pettus, Your Honor.

16     THE COURT: So you're contending that Pettus

17 is part of the money laundering conspiracy?

18     MS. MORRIS: That is correct.

19     THE COURT: We'll take that up later.

20     MS. JAMES: Judge, before we get started on

21 the matters related to Mr. Peagler, I'd like to take

22 one other D. E. A. Six and ask the Court to --

23     THE COURT: Is involving whom? Which

24 witness, Peagler, Thomas?

25     MS. JAMES: Peagler.

Page 61

1     THE COURT: Okay.

2     MS. JAMES: Well actually, Judge, the point

3 being this is a D. E. A. Six dated memorializing an

4 interview with Agent DeJohn and Agent William Martin

5 dated 4-8-2002, with apparently a person who was

6 confined in the Shelby County Jail with Mr. Peagler

7 and had knowledge of Mr. Peagler's drug organization.

8     I would note for the record that the

9 interview that is now in court's exhibit either 1 or

10 2, the interview of Mr. Peagler by Agent DeJohn on

11 3-14-02, this is less than one month between these two

12 interviews. This one, which I'm asking the Court to

13 mark as court's exhibit 3, contains inculpatory

14 information that Agent DeJohn memorialized in a D. E.

15 A Six.

16     THE COURT: Inculpatory --

17     MS. JAMES: As to Mr. Carmichael.

18     THE COURT: Oh, okay.

19     MS. JAMES: This inculpatory statement was

20 also severely redacted and was provided to us in

21 discovery. The exculpatory statement of Mr. Peagler's

22 with the omission was not. And if they are done with

23 the interview of Agent DeJohn and they're less than

24 one month apart, which I think supports our argument

25 which we should have been pride these documents. It

Page 62

1  wasn't like he wasn't like he wasn't in the loop in
2  terms of his investigation at that point in time.
3       May I hold this until I conduct my
4  examination?
5       THE COURT:  Oh, definitely.  I'd like the
6  clerk to mark it first, though.  And it's a part of
7  the Court record not to go to the jury.
8       MR. TEAGUE:  On behalf of Defendant
9  Williams, I also want to make the same objection, Your
10 Honor.
11      THE COURT:  Very good.
12      MR. TEAGUE:  We feel that there's
13 exculpatory material in here in this new D. E. A. Six
14 that would be beneficial to my client.
15      THE COURT:  Anything else you want to put on
16 the record, Mr. Moorer?
17      MR. MOORER:  No, Your Honor.
18      THE COURT:  Okay.  Again, the objections are
19 denied without prejudice.  The current record doesn't
20 show prejudice, but it may be that in collateral
21 proceedings in developing the record it may show
22 prejudice.  That's why I'm denying your objections
23 without prejudice.
24      MS. JAMES:  Thank you.
25      Judge, one other thing with regard to Mr.

Page 63

1  Peagler.  During the examination or cross examination
2  of Mr. Thomas, I requested that Mr. Moorer also
3  provide me with Mr. Peagler's proffer agreement, and
4  he's indicated to me that he would do that.  I do need
5  it prior to the cross examination of Mr. Peagler.
6       MR. MOORER:  Okay, Your Honor.  As I told
7  her, the Court had indicated we needed to stay right
8  here, so if I can go and make preparations to get
9  that.
10      THE COURT:  Can someone else go get it while
11 you --
12      MR. MOORER:  Yes, I'm just going to make a
13 call to get it and have it brought over.
14      THE COURT:  Do that right now and we'll keep
15 it moving.
16      Is Judge Hardwick on the way?
17      MS. MORRIS:  Your Honor, my understanding is
18 that when we served -- well we served Mr. Carmichael
19 as the custodian --
20      THE COURT:  My question is, is Judge
21 Hardwick on the way?
22      MS. MORRIS:  I don't know that he's on the
23 way right now, Your Honor.
24      THE COURT:  But he has been subpoenaed?
25      MS. MORRIS:  He has been subpoenaed earlier,

Page 64

1  but someone is speaking with him now.
2       THE COURT:  Very good.
3       Are we ready to proceed?  Oh, that's right,
4  he's making that call.
5       Anything else we need to take up outside the
6  presence of the jury while we're waiting?
7       MS. JAMES:  Three things, Judge.  First
8  would be Mr. Peagler's waiver of the attorney/client
9  relationship.
10      Second would be a motion in limine to
11 preclude Mr. Peagler from making any reference to my
12 prior representation.
13      THE COURT:  Is Mr. Moorer going to be the
14 one who examines this witness?
15      MR. FEAGA:  Yes, sir.
16      THE COURT:  We'll wait until he gets back.
17      MR. TEAGUE:  Your Honor, just so the Court
18 will know, we're going to request, inasmuch as I used
19 to represent Mr. Peagler, that he waive as well as to
20 me.
21      THE COURT:  Remind me that I will do both
22 you and Miss James.
23      MR. TEAGUE:  Yes, that's why I was asking.
24      THE COURT:  Very good.
25      THE COURT:  Mr. Peagler, do you see

Page 65

1  Miss James and Mr. Teague?
2  A  Yes, sir.
3       THE COURT:  I understand that both of them
4  represented you in a criminal case before, is that
5  correct?
6  A  Yes, sir.
7       THE COURT:  And they were your lawyers in
8  those criminal cases?
9  A  Yes, sir.
10      THE COURT:  Now you understand that they now
11 represent defendants in this case, the case against
12 Mr. Carmichael and Mr. Williams?
13 A  Yes, sir.
14      THE COURT:  And if I'll allow it they will
15 ask you questions and they may base their questions on
16 things they learned from you while they represented
17 you.  Do you understand that?
18 A  Yes, sir.
19      THE COURT:  As a result there could be a
20 conflict, a potential conflict.  In other words, it
21 may be something that you told them, it may be an
22 attitude that you expressed, it could just be an
23 emotion you expressed, they may be able to use that
24 against you in this case.  Do you understand that?
25 A  Yes.

Page 66

1    THE COURT: Now with that understanding, do
2 you waive your right -- do you waive any conflict that
3 you might have between them and you? That is, they
4 really can't use that information against you unless
5 you waive it. Do you understand that?
6 A  Yes.
7    THE COURT: And they cannot use something
8 that they learned against you from their prior
9 representations, do you understand that?
10 A  Yes.
11 Q  It's called conflict.
12 A  Yes.
13 Q  Now do you waive that conflict?
14 A  It's up to the prosecutor.
15 Q  No, it's up to you. The question is do you waive
16 it.
17    MR. FEAGA: Your Honor, I think it's fair to
18 say that we don't have any objection to him waving it.
19    THE COURT: That's not the issue.
20    It has to be something that you want to do.
21 The prosecutor can't make you do it.
22 A  Yes, I'll waive.
23    THE COURT: You'll waive it?
24 A  Yes.
25    THE COURT: Has anyone forced you to waive

Page 67

1 it?
2 A  No.
3    THE COURT: Has anyone promised you anything
4 to get you to waive it?
5 A  No.
6    THE COURT: Okay. Any other questions that
7 I need to ask?
8    MS. JAMES: Not with regard to his waiver.
9    THE COURT: Mr. Teague?
10    MR. TEAGUE: No, Your Honor.
11    MS. JAMES: Just so the record is clear, he
12 is waiving it with regard to my representation --
13    THE COURT: Are you waiving it with regard
14 to Miss James' representation?
15 A  Yes, sir.
16    THE COURT: Are you waiving any conflict
17 with regard to any representation by Mr. Teague?
18 A  Yes, sir.
19    THE COURT: Do you have any questions for
20 me?
21 A  No, sir.
22    THE COURT: Anything else from anyone?
23    MS. JAMES: Not with regard to that, Judge.
24    THE COURT: Now, you have a motion in
25 limine?

Page 68

1    MS. JAMES: Right, a motion in limine
2 precluding him from making any reference for my
3 representation of him in any matters.
4    THE COURT: You understand during the
5 examination by Mr. Feaga, who is right here, or any of
6 the other Assistant U. S. Attorneys, as well as the
7 examination by Miss James --
8    Will you be examining him, Ms. James?
9    MS. JAMES: Yes.
10    THE COURT: Or Mr. Teague, you cannot
11 mention that Miss James and Mr. Teague represented you
12 in a prior case. If you think you have to mention
13 that, you turn to me and say Judge, I need to take up
14 something with you outside the presence of the jury.
15 Can you remember that?
16 A  Yes, sir.
17    THE COURT: Okay.
18    MS. JAMES: The third thing, Judge, I know
19 you determined yesterday that Mr. Carmichael does not
20 have a privilege; however, I think it's important for
21 the record for Mr. Carmichael to indicate his
22 agreement for me as --
23    THE COURT: I'll let you ask him that.
24    MS. JAMES: Well okay. Now?
25    THE COURT: Yes, do it on the record now.

Page 69

1    MS. JAMES: Mr. Carmichael you understand
2 that Mr. Peagler has just waived his attorney/client
3 privilege in order for me to be able to question you.
4 Do you understand that?
5    DEFENDANT CARMICHAEL: Yes.
6    MS. JAMES: And although the Court
7 determined that you did not have a privilege, is it
8 your desire that I, as opposed to Miss Wayne or
9 Miss Chartoff or Mr. Brunson, do the examination of
10 Mr. Peagler?
11    DEFENDANT CARMICHAEL: Yes.
12    MS. JAMES: Okay. Judge, that's all.
13    MR. TEAGUE: Your Honor, I think I need to
14 do the very same thing with Mr. Williams.
15    THE COURT: Go ahead.
16    MR. TEAGUE: This is Freddie Williams, is
17 that correct?
18    DEFENDANT WILLIAMS: Yes.
19    MR. TEAGUE: And you understand you're still
20 under oath; since the day you were put under oath,
21 anything you say in here under oath, is that right?
22    MR. TEAGUE: Now, did you waive the fact
23 that, as you have indicated to me, have you not, that
24 you waive any potential conflict I may have in
25 questioning Mr. Peagler in that he used to be my

Page 70

1 client and I looked out for his interest the same way
2 I'm looking out for yours.
3      DEFENDANT WILLIAMS: Yeah.
4      MR. TEAGUE: I believe that's sufficient,
5 Your Honor.
6      THE COURT: Thank you very much.
7 Bring in the jury and let's begin.
8      (Whereupon, the jury was escorted into the
9 courtroom.)
10      E R I C     P E A G L E R,
11 the witness herein, having first been duly sworn or
12 affirmed to tell the truth, was examined and testified
13 as follows:
14           DIRECT EXAMINATION
15      BY MR. FEAGA OF ERIC PEAGLER:
16      THE COURT: Proceed.
17      MR. FEAGA: Yes, sir.
18 Q Sir, would you tell the ladies and gentlemen of
19 the jury your name.
20 A Eric Peagler.
21 Q And where do you currently live, Mr. Peagler?
22 A In Montgomery.
23 Q Okay. Now where are you currently residing?
24 A Williamsburg, South Carolina.
25 Q And where in Williamsburg, South Carolina are you

Page 71

1 residing?
2 A At the L. C. I.
3 Q Is that a federal correctional institution?
4 A Yes, sir.
5 Q Would you tell the ladies and gentlemen of the
6 jury why you are there?
7 A I got charged with conspiracy to distribute
8 cocaine and marijuana.
9 Q Now where are you from originally?
10 A Prattville, Alabama.
11 Q Were you born there?
12 A Yes, sir.
13 Q And how far did you go in school?
14 A Ninth grade.
15 Q Why did you leave school?
16 A It was rough back then.
17 Q How old were you?
18 A About sixteen. Fifteen.
19 Q What did you do after you left school?
20 A Started selling marijuana and milking cows at a
21 dairy.
22 Q What dairy did you work at?
23 A Polywausaw (ph.) in Prattville.
24 Q And what did you do at the dairy?
25 A Milk cows.

Page 72

1 Q You actually milked the cows?
2 A Yes, on a machine.
3 Q Okay. Now at some point in time did you get in
4 trouble with law enforcement before the current event
5 that you're doing time on?
6 A Yes, sir.
7 Q Tell the ladies and gentlemen of the jury what
8 happened to you.
9 A I got two years on possession of marijuana.
10 Q Did you do the two years?
11 A No, they gave me probation.
12 Q All right. What happened after that?
13 A In 1987 I got a federal charge for distribution
14 for cocaine.
15 Q And did you go to prison for that?
16 A Yes, sir. Gave me a nine year sentence.
17 Q How many years?
18 A A nine year sentencing.
19 Q All right. And did you do any time on that nine
20 year sentence?
21 A I did three years.
22 Q And what happened after that, did you get out of
23 prison?
24 A Yes, sir.
25 Q What did you do then?

Page 73

1 A I had a fitness center Prattville.
2 Q What was the name of your fitness center in
3 Prattville?
4 A E. and E. Training and Fitness Center.
5 Q Now what qualified you to operate a fitness
6 center?
7 A Because when I went to prison I studied for it
8 and I wrote a book. And I exercised all the time so I
9 decided to open up a fitness center.
10 Q Were you competing at that time?
11 A Yes, sir, competing for three years.
12 Q In what kind of competition?
13 A Power lift.
14 Q All right. Now when was it that you got out of
15 prison and opened up the fitness center?
16 A In 1992.
17 Q And how long did you run that fitness center?
18 A Until '94. I got pulled over and got charged
19 with possession of marijuana again.
20 Q Okay. And what happened to you?
21 A I got a twelve year sentence on that.
22 Q Okay. And do you remember how much marijuana you
23 got caught with?
24 A A pound.
25 Q And was that a federal or state sentence, that

Page 74

1 twelve years?
2 A  It was a state sentence.
3 Q  Did you go to prison?
4 A  Yes, sir.
5 Q  How long did you go?
6 A  I did a little over two years.
7 Q  Okay.  And when you got out, what did you do?
8 A  I tried to open up a car lot.  I was at work
9 release and then I worked at O'Charlie's restaurant on
10 the Eastern Bypass.  I was a cook.  In the process I
11 was opening up a car lot and a detail shop.
12 Q  Is this around 1996?
13 A  No, I was in prison in '96.
14 Q  When was this that you were working as a cook and
15 trying to open the car lot?
16 A  I was in Mobile work release in '97.  I was
17 working at O'Charlie's.  Then they transported me to
18 Montgomery work release and I was working at
19 Montgomery O'Charlie's.  Then I put my own SIR
20 program.
21 Q  SIR program?
22 A  That means you go home after being in the house
23 at the time.
24 Q  Supervised Intensive Restitution program, is that
25 what you're talking about?

Page 76

1 A  It mean whenever they come in, whatever truck
2 they bring it in, we go over there and we take it out.
3 Q  Okay.  And who is the "they" that would bring it
4 in?
5 A  Erma Lazano and Cesar Lazano, and the driver's
6 name was John.
7 Q  Okay.  And what would you do with the marijuana
8 that you got from them?
9 A  Distribute it.
10 Q  And when you say "distribute it," how would you
11 distribute it?
12 A  Weigh it all up in pounds and then I put it out
13 there on the street.
14 Q  Okay.  How do you put marijuana out on the
15 street?
16 A  I sell it to the next drug dealer, they sell it
17 to the next drug dealer.
18 Q  Do you know somebody named Leon Carmichael?
19 A  Yes, sir, I do.
20 Q  Okay.  Is he present in this courtroom?
21 A  Yes, he is.
22 Q  Would you point him out for the jury.
23         (Whereupon, the witness indicated.)
24 A  There in the almost gray suit.
25         MR. FEAGA:  Your Honor, can the record

Page 75

1 A  Yes.
2 Q  So what happened -- Where were you living when
3 you were on the SIR program?
4 A  I was in Laywood Trailer Park off the Birmingham
5 Highway.
6 Q  Where is that, what city?
7 A  Montgomery, Alabama.
8 Q  Okay.  And how long did you stay there?
9 A  I been there ever since -- I was there before I
10 left going to prison.
11 Q  Are you talking about before you left going to
12 prison on the charge that you're currently doing time
13 on?
14 A  Yes.
15 Q  Okay.  And what is the charge, again, that you're
16 currently doing time on?
17 A  Conspiracy of cocaine and marijuana.
18 Q  Do you know a fellow named Richmond Thomas?
19 A  Yes, sir, I do.
20 Q  Who is Richmond Thomas?
21 A  He a friend of mine.  He owned a construction
22 company and I used his shop to break down marijuana.
23 Q  When you say you "used his shop to break down
24 marijuana," what do you mean by "break down
25 marijuana"?

Page 77

1 reflect he's identified the defendant, Mr. Carmichael?
2         THE COURT:  Okay, proceed.
3 Q  Now you said, "Yes, sir, I do," when I asked you
4 if you knew Mr. Carmichael.  How is it that you know
5 Leon Carmichael?
6 A  I met him in 2000 at Big Al's Shop.
7 Q  What is Big Al's shop?
8 A  He bring in cars and then he opened a fish
9 market.
10 Q  Do you know Big Al's real name?
11 A  No, all I called him was Big Al.
12 Q  How is it that you came to meet Leon Carmichael
13 in the year 2000 at Big Al's Shop?
14 A  Big Al called me and told me --
15         MS. JAMES:  Objection, hearsay.
16         MR. FEAGA:  We may come back to that, Your
17 Honor, but we'll move forward.
18 Q  Just tell the ladies and gentlemen of the jury
19 how it is that you met Mr. Carmichael there, without
20 saying what Big Al told you.
21 A  I met him at Big Al's Shop off of Mobile Highway.
22 Q  Do you know where that shop is today?
23 A  Yes, sir.
24 Q  You say it's off the Mobile Highway?
25 A  Yes, sir.

Page 78

1 Q  What kind of shop is it?
2 A  You got a body shop on one side and he was
3 opening up the fish market on the other side.  Got a
4 fence around it.
5 Q  Okay.  And did Mr. Carmichael speak to you that
6 day?
7 A  Yes, he did.
8 Q  And did you speak to him?
9 A  Yes, I did.
10 Q  What did y'all talk about?
11 A  He asked me if I had on one of my logo shirts
12 from E. and P. Used Cars and Car Wash.  And then he
13 asked me where my car lot was.  I told him on
14 Birmingham Highway.  And then I hand him a business
15 card for the car lot and gym at the time.
16 Q  Okay.  Now is that the extent of your contact
17 with him in the year 2000?
18 A  Yes, sir.  And then when I got ready to leave he
19 told me if I need him, holler at him.
20 Q  Okay.  And what, if anything, did you say when he
21 said if you need him holler at him?
22 A  I told him "Okay."
23 Q  And what, if anything, happened after that?
24 A  In 2001 I went to Carmichael's shop, oh, around
25 four o'clock, and I told him I need a little help.

Page 79

1 And he asked me, "For what?"  And I told him could he
2 let me get fifty pounds of marijuana until mine come
3 in.  And he told me yes, get back with him in a couple
4 of hours.
5 Q  Now what had occurred from the time that you met
6 him in 2000 and y'all talked about your car shop and
7 he said if you need me help me, what, if anything, had
8 happened that caused you to think that you could go to
9 him and get fifty pounds of marijuana from him?
10 A  Because I know what he was doing and I know he
11 was a man of his word.
12 Q  I'm sorry.  You knew what he was doing and you
13 knew what?
14 A  He was a man of his word.  At the time I was
15 doing good.
16 Q  What do you mean when you sat "At that time --"
17 you were " doing good"?
18 A  I had my own marijuana.
19 Q  Okay.  And where were you getting your marijuana?
20 A  From Cesar Lazano and Erma Lazano.
21 Q  Okay.  And were you getting any marijuana from
22 Leon during most of this time?
23 A  No, sir.  That's the only dealing I had with him.
24 Q  You say that's the only dealing you had
25 with him.  What's the only dealing you had with him?

Page 80

1 A  To deliver -- To get fifty pounds from him and
2 deliver him fifty pounds back.
3 Q  Okay.  Now you said you were over there and you
4 asked him.  Why didn't you -- If you had your own
5 source of marijuana, why did you need to get marijuana
6 from Mr. Carmichael?
7 A  Because I was out of my connection.  Couldn't get
8 across the border at the time when I went to Leon
9 Carmichael.
10 Q  And your connection was the Lazanos?
11 A  Yes, sir.
12 Q  Now so what happened when you went over there and
13 you asked him if he could get you could fifty pounds
14 of marijuana?  What happened?
15 A  He told me to get back with him in two hours.  So
16 I closed my shop at five-thirty and I headed back over
17 there.
18 Q  Where is "over there"?  Where did you go to see
19 Mr. Carmichael?
20 A  Norman Bridge and Fleming Road at the shop.
21 Q  What kind of shop are you talking about?
22 A  He had a bunch of old cars and buses around the
23 shop at the time.
24 Q  Can you describe this shop for the ladies and
25 gentlemen of the jury?

Page 81

1 A  It just had a fence around it.  Then it had some
2 old buses and cars.  And then had gravel on the
3 ground.  And you drive in one gate and you come out
4 the other gate.
5 Q  Did it have a name?
6 A  No, it wasn't no name.  Business -- it was at the
7 time blue and white (sic.)
8 Q  Have you ever heard of something called the
9 Carmichael Center?
10 A  Yes, sir, since I been incarcerated.
11 Q  So you've never seen it?
12 A  No, sir.
13 Q  Do you know where it is?
14 A  They said it's in the same place, the car lot.
15 Q  But you don't know?
16 A  No, I don't know.
17 Q  Okay.  Now you said he told you to come back in
18 two hours.
19 A  Yes, sir.
20 Q  Did you come back?
21 A  Yes, sir.
22 Q  What happened then?
23 A  He gave me two bags, twenty-five pounds in one
24 bag and twenty-five pounds in another bag and I put
25 them in the trunk of my car and I left.  Told him when

Page 82

1 mine come in, I'd deliver his back.
2 Q  All right.  And what happened after that?  What
3 did you do with the marijuana that you got from him?
4 A  I took it home and then distributed it.
5 Q  Did you have your own distribution network for
6 marijuana?
7 A  Yes, sir.
8 Q  And based on anything you knew, Mr. Carmichael
9 had his own distribution network, is that right?
10 A  Yes, sir.  And I told him when I deliver his
11 marijuana back, I told him they were going to bring me
12 three hundred pounds in a van and then fifteen kilos
13 of cocaine.  So I told him he can get part of mine
14 when I get my price.
15 Q  And was that satisfactory to him?
16 A  Sir.
17 Q  Was that okay with him?
18 A  Yes, sir.
19 Q  Okay.  Well, did you pay him back?
20 A  Yes, sir, I did.
21 Q  How did that happen?
22 A  Cesar and his wife, Erma Lazano, they come in
23 town about three-thirty.  And I called Richmond,
24 Thomas and told them my sister was in town so I need
25 him to open his shop.  So he said, "I'll meet you in

Page 83

1 an hour."  So we met up in about, four twenty-five,
2 four-thirty.
3 Q  Who is "we" that met up?
4 A  Me, Richmond Thomas.  I met Richmond Thomas at
5 the shop.  I was with Erma Lazano and Cecil Lazano and
6 the driver followed us over there.
7 Q  The driver followed you over where?
8 A  To Richmond Thomas's shop.
9 Q  Okay.
10 A  And we went over there and he was over there.
11 Q  Who was over there?
12 A  Richmond Thomas.
13 Q  Okay.
14 A  And he let us in.  And then him and Cecil Lazano,
15 Richmond Thomas and the driver John, they took the bed
16 out of the truck and took the marijuana out of the gas
17 tank.
18 Q  All right.  And what happened then?
19 A  Then when they got the marijuana out of the gas
20 tank, we weighed it up.  Put fifty pounds in one bag
21 and twenty-five pounds to twenty-eight pounds in
22 another bag.  And then by the time we got it bagged,
23 weighed up and all that, I called Leon Carmichael
24 about seven-thirty to see where he was.  He said he
25 was at the shop.  So I told him I'd be by there in a

Page 84

1 minute.
2 Q  Did you always weigh up and break up the
3 marijuana that you got from the Lazanos?
4 A  Yes, sir.
5 Q  Did you always do it as Mr. Thomas's shop?
6 A  Not all.  What Thomas was doing, he would break
7 it, the marijuana down, and he would deliver it to my
8 house.
9 Q  Okay.  But it would be broken down in his shop?
10 A  Yeah.  He would deliver it to me and I would
11 weigh it up.
12 Q  Do you know Freddie Williams?
13 A  No, sir, I don't.
14 Q  Did you ever take any of the marijuana that you
15 got from the Lazanos to somebody named Freddie
16 Williams to put in his house?
17 A  Yes, sir, I didn't.
18 Q  Do you know somebody by the name of Patrick
19 Denton?
20 A  No, sir, I don't.
21 Q  Did you ever take any of the marijuana that you
22 got and give it to somebody named Patrick Denton to
23 break up and store for you?
24 A  No, sir, I didn't.
25 Q  Now you said that you had made contact with Mr.

Page 85

1 Carmichael about paying him back this marijuana that
2 you got?
3 A  Yes, sir.
4 Q  Would you tell the ladies and gentlemen of the
5 jury how that happened.
6 A  I called Leon Carmichael around seven-thirty,
7 told him I need to see him.  So he told me, "I'm at
8 the shop."  So I drove on by there.  It took me about
9 ten minutes.  I drove by there and then I went and I
10 knocked on the door.
11 Q  Was anybody with you?
12 A  Richmond Thomas, he was the driver.
13 Q  What happened?  Well let me ask you this.  Whose
14 car were you in?
15 A  We was a '69 Chevrolet truck.
16 Q  Whose truck was it?
17 A  Richmond Thomas.
18 Q  Do you remember what color it was?
19 A  Blue and White.
20 Q  And you said he was driving?
21 A  Yes, sir.
22 Q  And what happened?
23 A  I asked him did he knew where Leon Carmichael's
24 shop is, and he said, "Yes."
25     And I said, "We need to drop by there."  So

**Page 86**

1  we took two bags of marijuana on the back of the
2  truck, and then we got there, I went and knocked on
3  the door, told him I have that for him and he said,
4  "Okay." So I went back to the truck and got the
5  marijuana in a duffel bag and got it inside.
6  Q  What happened after you got it inside?
7  A  I told him this is fifty pounds. And then I
8  said, "Do you want to weigh it?"
9        And he said, "No, I trust you."
10       And so I told him I would holler at him
11  later.
12  Q  Now let me ask you something. He gave you fifty
13  pounds and you brought him back fifty pounds?
14  A  Yes, sir.
15  Q  What was in it for him? Don't you normally, when
16  you are distributing dope, want to make some money off
17  of it?
18       MS. JAMES: Objection, Your Honor. He's
19  just making a statement.
20       THE COURT: I'll allow that question.
21  A  Not all the time. If you want to get to know
22  somebody and trust somebody in the drug game, you do
23  favors like that. So he did me a favor and he was
24  looking for a favor back, because in the long run I
25  was going to benefit him and he was going to benefit

**Page 87**

1  me.
2        MR. FEAGA No further questions for this
3  witness, Your Honor.
4        THE COURT: Cross, Miss James?
5            CROSS EXAMINATION
6        BY MS. JAMES OF ERIC PEAGLER:
7  Q  Mr. Peagler, you and Mr. Thomas have known each
8  other for a long time, haven't you?
9  A  Yes, ma'am.
10  Q  Y'all were pretty good friends?
11  A  We played ball together.
12  Q  He was from Montgomery and you were from
13  Prattville, right?
14  A  Yes, ma'am.
15  Q  But all played ball together when y'all were
16  pretty young, right?
17  A  Yes, ma'am.
18  Q  And then after you got out of prison on one of
19  these occasions and decided to build your fitness shop
20  and have your detail shop, you decided to use Mr.
21  Thomas for some legitimate construction work, right?
22  A  Yes, ma'am.
23  Q  And you just decided that you could use that
24  friendship and get Mr. Thomas to also help you in the
25  drug business, right?

**Page 88**

1  A  No, he just wanted to make some extra money at
2  the time.
3  Q  Well he made a good bit of money, didn't he, Mr.
4  Peagler?
5  A  He did pretty good.
6  Q  Well, I mean the conspiracy that you were charged
7  with involving Mr. Thomas was involved with quite a
8  bit of marijuana and cocaine, would you agree?
9  A  Yes, ma'am.
10  Q  They brought you multi kilos, the Lazanos brought
11  you multi kilos of cocaine from Texas, didn't they?
12  A  Yes, ma'am.
13  Q  And you pled guilty to them bringing you over one
14  thousand kilos of marijuana.
15  A  Yes, ma'am.
16  Q  And Mr. Thomas, he was in it all the way because
17  that's where you actually took the stuff so you could
18  hide it so you could get it ready to distribute,
19  right?
20  A  Yes. We broke it down. I had my own place.
21  Q  Now Mr. Thomas cooperated with the government
22  against you, didn't he?
23  A  Yes, ma'am.
24  Q  And that bothered you a little bit, didn't it?
25  A  Not really because, you know, I was a drug dealer

**Page 89**

1  and he was a businessman and it was my fault to drive
2  him into the drug game.
3  Q  Okay. So you got him into the drug game. But
4  since y'all had been in prison, have y'all been
5  confined in the same federal prison?
6  A  No, ma'am.
7  Q  But certainly when the government brought you
8  here as a witness, you and Mr. Thomas had been
9  confined together, haven't you?
10  A  Yes, ma'am.
11  Q  You all had been up in Elmore County, right?
12  A  Yes, ma'am.
13  Q  And y'all had an opportunity -- well, let me back
14  up. How long have you all been up there together?
15  A  Going on two weeks.
16  Q  Okay. And every day that the government has
17  brought you down here for court, including today, they
18  picked you and Mr. Thomas up together, haven't they?
19  A  Yes, ma'am.
20  Q  They transported you down here together and they
21  feed you together, don't they?
22  A  Yes, ma'am.
23  Q  And they keep you in the same holding cell
24  together, don't they?
25  A  Yes, ma'am.

Page 90

1 Q  And at the end of the day they drive you back to
2 jail together?
3 A  Yes, ma'am.
4 Q  And you and Mr. Thomas have had plenty of time to
5 talk about what you were going to testify.  You talked
6 about old times, didn't you?
7 A  We didn't talk about old times.
8 Q  But y'all talked about this case.
9 A  No, we didn't talk about this case because he
10 feel upset with it so, you know, I would just let him
11 do his time and I'll do my time.
12 Q  All right.  Well tell me when it is, Mr. Peagler,
13 that you first heard from the United States government
14 about your testimony in this case?
15 A  2004.
16 Q  When in 2004?
17 A  Around April, May.
18 Q  Where were you in prison at the time?
19 A  I was transferred from federal prison to Bibb
20 County, state prison.
21 Q  Is that when you were being held for kidnapping
22 and attempted murder?
23 A  No, ma'am, I was.
24 Q  So what you're saying is that while you were in
25 custody in Bibb County as a state prisoner, that you

Page 91

1 talked to the government, right?
2 A  Yes.
3 Q  Was it Agent DeJohn that came up to see you?
4 A  No.  They called me up there.  They called, made
5 a phone call.
6 Q  Did you give them an interview?
7 A  No, ma'am.  They asked me did I know Leon
8 Carmichael.
9 Q  And they talked to Mr. Thomas at that time,
10 hadn't they?
11 A  I don't recall.  I don't know.
12 Q  Well, did they ever come to interview you about
13 what you knew about Mr. Carmichael at that point in
14 time?
15 A  No, ma'am.
16 Q  And when they brought you down here from South
17 Carolina at the federal prison and put you in Elmore
18 County, did one of these men come up and talk to you
19 about what you were going to say here today?
20 A  Yeah, they interviewed me.
21 Q  Okay.  And When they interviewing you, did they
22 take notes and write down what you were saying?
23 A  Yes, ma'am.
24 Q  Which one of them was writing notes?
25 A  Mr. --

Page 92

1 Q  Mr. Feaga?
2 A  Feaga.
3 Q  Now, so what you're saying -- Well let me back up
4 a minute.
5      You entered into a cooperation agreement
6 with the U. S. government back in 2002, did you not,
7 Mr. Peagler?
8 A  Yes, ma'am.
9 Q  And at that point in time you agreed to tell the
10 government about all of your criminal conduct, didn't
11 you?
12 A  Yes, ma'am.
13 Q  The government never said Eric Peagler, don't
14 tell us about everybody you deal with, we just want to
15 know about Mr. Thomas and the Lazanos; they didn't
16 tell you that, did they?
17 A  No, ma'am.
18 Q  The government said Eric Peagler, in order for
19 you to get any time credit off of this sentence and
20 what you've got hanging over here in the state if they
21 can help you is going to be dependent on you being
22 completely truthful in telling them everything you had
23 done involving drugs.
24 A  They didn't make that deal.
25 Q  Well did they say just tell us part of it, we

Page 93

1 don't want to know about everybody?
2 A  No, they just told me to come in and tell them
3 who all I dealt with.
4 Q  Right.  And you did do that in March of 2002,
5 didn't you?
6 A  Yes, ma'am.
7 Q  They gave you a proffer agreement and said what
8 you said couldn't be used against you unless you came
9 in and told something different in court, right?
10 A  Yes, ma'am.
11 Q  And you went with your lawyer, Mr. Duffy, and you
12 sat down with Agent DeJohn and you gave him a full and
13 complete statement about the people that you had been
14 involved with in illicit drugs, correct?
15 A  To my knowledge, you know, at the time I couldn't
16 remember all of them because the time I was facing and
17 the pressure I was under.
18 Q  Okay.  Well, do you remember during that
19 interview that specifically Agent DeJohn asked you who
20 else participated in the organization by assisting him
21 in any way, or who else did he sell drugs to?  Do you
22 remember being asked that question by Agent DeJohn
23 when your lawyer, Mr. Duffy, was there?
24 A  I don't recall, but he did ask certain things
25 about some drug dealings.

Page 94

1 Q  All right.  Well let me ask you this.  This fifty
2 pounds of marijuana that you say you got from Mr.
3 Carmichael back in June of 2001, you used that with
4 your customers, didn't you?
5 A  Yes, ma'am.
6 Q  And that would, if you're telling the truth, Mr.
7 Carmichael would have been someone that was involved
8 in helping you get drugs to distribute to your
9 customers, right?
10 A  Not really, because he wanted to know like I was
11 just dealing with them all the time.
12 Q  Well, would you agree with me, Mr. Peagler, that
13 during that interview when you agreed to be truthful
14 and tell the government what you knew about aspects of
15 your drug organization, that you never one time ever
16 mentioned the name Leon Carmichael.
17 A  No, I didn't mention the name.
18 Q  You didn't mention it, and you knew Agent DeJohn
19 had been investigating Mr. Carmichael for ten years,
20 didn't you?
21 A  No, I didn't.
22 Q  And you want us here today to believe your
23 testimony that you met Mr. Carmichael one time?
24 A  Yes, I met Leon.  Back then he had a ponytail.
25 Q  You met him one time?

Page 95

1 A  I met him three times.
2 Q  You just said you met him at Big Al's.
3 A  Just that one time.  But the two dealings --
4 Q  Oh, excuse me.  You said you met him one time at
5 Big Al's, and at that time someone introduces you to
6 Mr. Carmichael, right?
7 A  Yes, ma'am.
8 Q  And it was from there that you, as a total
9 stranger to this man, was able to get him to
10 personally give you fifty pounds of marijuana?
11 A  Drug dealers --
12 Q  That's not my question.
13      MR. FEAGA:  Your Honor, she's got to let him
14 answer the question.
15      THE COURT:  Yes.
16 A  Drug dealers are not strangers.  I've got a
17 well-known name and he's got a well-known name, so a
18 lot of times we can get up and hook up with another at
19 the time.  So really, sometimes it takes someone else,
20 someone under us, to bring us together.  And so that's
21 how it happened.
22 Q  Well based on what you're saying, your name was
23 extremely well known in this community and this state,
24 wasn't it?
25 A  Yes, ma'am.

Page 96

1 Q  Your name is well known throughout the entire
2 United States in federal prisons, because you've
3 served time for years in federal prisons, haven't you?
4 A  Yes.  I served three years the first time.
5 Q  Well, you went to federal prison, Judge Varner
6 gave you a nine year sentence, didn't he, for your
7 drug dealing, back in the early eighties?
8 A  '87.
9 Q  And you went to prison on that, right?
10 A  Yes, ma'am.
11 Q  And you promised the United States Parole Board
12 when you got out of jail that you would comply with
13 the law, didn't you?
14 A  I'm talking about -- They didn't ask me that
15 question.
16 Q  When you left the federal prison on parole,
17 Mr. Peagler, did they have you sign conditions of
18 parole?
19 A  Yes, ma'am.
20 Q  Did those conditions of parole say that you were
21 not to violate the law again?
22 A  Yes, ma'am.
23 Q  And you did violate the law again, didn't you?
24 A  Yes, I did.
25 Q  Because right on the heels of that you kept

Page 97

1 selling dope and you sold dope and you got busted and
2 you got a twelve year state sentence, right?
3 A  Yes, ma'am.
4 Q  So you went to the state penitentiary and you
5 made parole on that too, didn't you?
6 A  Yes, ma'am.
7 Q  When you left state custody and the Board of
8 Pardons and Parole in Alabama said we're going to
9 trust you, Eric Peagler, to do the right thing, and
10 you signed those conditions of parole, you lied to
11 them and you kept dealing drugs, didn't you?
12 A  Yes, ma'am.
13 Q  And then you caught another federal case, and
14 that's this one, right?
15 A  Yes, ma'am.
16 Q  So you know, because you're experienced now with
17 what federal law is because of all your time in jail
18 and your cases, aren't you?
19 A  Yes, ma'am.
20 Q  And you know that under the federal law you are
21 viewed as a career offender.
22 A  Yes, ma'am.
23 Q  And you know, because you have been sentenced
24 twice now under federal -- well once or twice under
25 federal guidelines, haven't you?

**Page 98**

1 A  Yes, ma'am.
2 Q  And federal guidelines mean that you go to
3 federal prison without parole, right?
4 A  Yes, ma'am.
5 Q  And they work out a system where they determine
6 your background based on your criminal conduct and the
7 crime, and they run up little numbers and they figure
8 out how much time you should do, right?
9 A  Yes, ma'am.
10 Q  And in your case with a career offender
11 application in this case, this case you're serving
12 time on, you had two prior qualifying felonies to
13 qualify you as a career offender, didn't you?
14 A  Yes, ma'am.
15 Q  To put you in the worst category, criminal six,
16 saying you're offer the back end, the worst end of
17 that scale of criminal history, right?
18 A  Yes, ma'am.
19 Q  And you also know, Mr. Peagler, that if
20 Mr. Moorer when he was prosecuting you, if he had
21 decided to he could have ignored those federal
22 sentencing guidelines and given you a statutory
23 enhancement under 21 U. S. C., Section 851 to make --
24     MR. FEAGA: Your Honor, we're going to
25 object to that.  She's asking him a legal question.

**Page 99**

1 She knows the Court imposes the sentence, not the
2 government.
3     MS. JAMES:  That's a charging matter, Judge.
4     THE COURT:  She asking whether he was
5 exposed to this.  She can go into it.
6     MR. FEAGA:  Yes, sir.
7 Q  They could have moved under the statute, to put
8 you in a life without of parole situation based on two
9 prior drug convictions.  You know that, don't you, Mr.
10 Peagler?
11 A  Yeah, they gave me a lesser sentence because at
12 the time I caught this sentence I was already
13 incarcerated.
14 Q  I understand that.  But my question to you,
15 though, is you knew that if they had decided to go
16 ahead with what you were really facing, Mr. Moorer
17 could have charged you under the statute and exposed
18 you to a life without parole sentence, right?
19 A  If they caught me red-handed.
20 Q  No, not if they caught you red-handed.  You know
21 enough that they didn't have to catch you red-handed,
22 don't you?
23     MR. FEAGA:  Your Honor, we don't mind her
24 asking the witness questions, but we do object to her
25 arguing with him.

**Page 100**

1     THE COURT:  Well he did say "red handed,"
2 and I think she is entitled to challenge that answer.
3     MR. FEAGA:  Yes, sir.  But she should ask him
4 questions and not argument, by saying no, you did
5 this, that and the other.
6     THE COURT:  She said that you know that that
7 is not required.
8     MR. FEAGA:  Yes, sir.
9 Q  You can answer that, Mr. Peagler.
10     THE COURT:  Why don't you ask your question
11 again so that you'll be clear.
12 Q  You know that you were in trouble whether they
13 caught you red-handed.
14 A  Oh yeah, I did.
15 Q  But based on your decision back in the day to
16 tell them everything about your drug activity except
17 Mr. Carmichael, Mr. Moorer was willing to agree that
18 your sentence wouldn't go over two hundred and forty
19 months, right?
20 A  Yeah, they gave me two hundred and forty months.
21 Q  And your plea agreement said if that judge didn't
22 do what they recommended, that you could withdraw it.
23 A  Yes, ma'am.
24 Q  But the judge went along with him and gave you
25 two hundred and forty months, right?

**Page 101**

1 A  Yes, ma'am.
2 Q  But based on the terms of your plea agreement,
3 other than being able to withdraw it if the judge
4 didn't go along, you waived your right to do an
5 appeal, didn't you?
6 A  I don't recall.
7     MS. JAMES:  Judge, may I approach the
8 witness?
9     THE COURT:  Yes.
10     MR. FEAGA:  Your Honor, if he waived his
11 appeal and she knows he did, and she makes that
12 representation to the Court, we'll stipulate to it.
13     MS. JAMES:  All right.
14 Q  You waived your right to appeal.  If I tell you
15 did, that it's in the plea agreement and the
16 government says that's true?
17 A  Yes, ma'am.
18 Q  And you also waived your right to do a 2255,
19 right?
20 A  Yes, ma'am.
21 Q  And you know a 2255 is something that prisoners
22 do after they get in custody to try to undo their
23 convictions, right?
24 A  Yeah, when their lawyers didn't represent you
25 right.

Page 102

1  Q  Right. And in this case, Mr. Peagler, unless you
2  assist the United States government in cooperating,
3  you're not going to going to challenge that sentence --
4  well you're not going to get to challenge that
5  sentence at all, are you?
6  A  I'm in court now with the same sentence with my
7  case.
8  Q  But you have a 2255 pending?
9  A  No, ma'am, they violated.
10  Q  The government violated this agreement?
11  A  The B. O. P.
12  Q  The B. O. P. violated -- How did they violate it?
13  A  They stopped my federal sentence, sent me to the
14  state sentence so when they looked to the whole
15  sentence --
16  Q  I understand. But what I'm saying is, you were
17  pretty much -- your fate on that two hundred and forty
18  month sentence lies in the hands of Mr. Moorer and his
19  office to let the Court know you cooperated, you agree
20  with that?
21  A  I was just there to do the time.
22  Q  Well, can Mr. Duffy file a motion with the judge
23  and ask that your sentence be reduced?
24  A  Yes, he can for the information I gave.
25  Q  You understand that only the government -- In

Page 103

1  your plea agreement it's clear, and the Court tells
2  you when you're sentenced, only the government can
3  move to reduce your sentence to ask that it be
4  reduced.
5  A  They can make a recommendation to the judge.
6  Q  Well in this case you know for your cooperation
7  here it's going to have to be Mr. Moorer or one of his
8  colleagues to ask the Court to reduce your sentence.
9  A  They can make a recommendation, but it's up to
10  the judge.
11  Q  Right. But you can't get to the judge without
12  their motion, can you?
13  A  I don't think so.
14  Q  All right. Now, on that two hundred and forty
15  month sentence, if you don't get a break for
16  testifying here today, you're going to serve two
17  hundred and forty months minus fifty four days a year
18  good time, correct?
19  A  I only have a hundred and eighty months.
20  Q  Oh, you got reduced already?
21  A  When my guideline was to one six eight to two
22  ten, so the judge gave me to the middle of it, one
23  eighty.
24  Q  So it couldn't go over two forty.
25  A  It was one sixty to two ten.

Page 104

1  Q  So you actually got, what did you say?
2  A  One eighty.
3  Q  So you got one eighty. So even still, that's
4  right at fifteen years, right?
5  A  Yes, ma'am.
6  Q  And it's still going to have to go through the
7  government to change it from one eighty to something
8  less, right?
9  A  Yes, ma'am.
10  Q  And on that one eighty you're not eligible for
11  parole, correct?
12  A  No ma'am.
13  Q  And you're not eligible for any more good time
14  than fifty-four days a year, right?
15  A  Forty-seven days a year now.
16  Q  So if something doesn't happened with further
17  credit from a recommendation from the government, you
18  still have a pile of time to serve, don't you, Mr.
19  Peagler?
20  A  I have nine years left.
21  Q  How old are you?
22  A  Forty-six.
23  Q  And how is Dorothy Wesson?
24  A  How is she?
25  Q  Yeah, how old is she? She's in her sixties isn't

Page 105

1  she?
2  A  She's around sixty.
3  Q  And her husband was Joe Wesson, correct?
4  A  Yes, ma'am.
5  Q  And Miss Wesson, she's retired, isn't she?
6  A  No, she supervises at Sam's warehouse.
7  Q  Right. And you told the government that she was
8  your girlfriend, didn't you?
9  A  Yeah, I used to mess with her.
10  Q  You used to mess with her?
11  A  Yeah.
12  Q  You know she was a widow, right?
13  A  Ma'am?
14  Q  She's a widow. Her husband died. Joe died.
15  A  Yes, ma'am.
16  Q  And so you say that Miss Wesson was your
17  girlfriend and that she gave you money to get involved
18  in the drug business, right?
19  A  No, I never said that.
20  Q  You never said that?
21  A  No, ma'am.
22  Q  That she financed your legitimate as well as your
23  illegal business ventures?
24  A  No, I never said that.
25  Q  So she was just a friend and somebody you messed

Page 106

1 with, but not involved in financing any of your
2 illegal activity.
3 A  She financed the gym, the fitness center.  It was
4 all legit money from her.
5 Q  And you never told Agent DeJohn when you borrowed
6 had money from her for the drug business that she knew
7 it?
8 A  No, I never told DeJohn that.
9 Q  Now, did you get charged on this Robert Frank
10 Woods situation?
11 A  No, ma'am.
12 Q  You were never prosecuted for anything relating
13 to him?
14 A  No, ma'am.  A possession charge.
15 Q  So the kidnapping and attempted murder was
16 dropped?
17 A  Yeah, that was dropped.
18 Q  Now your -- Well let me back up.
19      The Lazanos were actually bringing dope in
20 from El Paso, weren't they?
21 A  Yes, ma'am.
22 Q  And they were bringing it in hidden in various
23 type vehicles, including eighteen wheelers, weren't
24 they?
25 A  No, they ain't never brought me no eighteen

Page 107

1 wheeler.
2 Q  They bring it in Suburbans?
3 A  Suburbans.
4 Q  Pickup trucks?
5 A  Pickups.
6 Q  And that was a source that you developed
7 yourself, wasn't it?
8 A  I met them through a friend of mine.
9 Q  And the Lazanos -- Well let me back up.
10      Tell me when it is that you say you got this
11 fifty pounds of marijuana from Mr. Carmichael.
12 A  2001.
13 Q  June of 2001?
14 A  Yes, ma'am.
15 Q  All right.  Do you remember telling Agent DeJohn
16 on March the 13th -- excuse me, March the 14th of 2002
17 when you gave them all this information about your
18 drug endeavors, do you remember telling him that from
19 May of 2001 until December of 2001 the Lazanos, they
20 brought you marijuana on six to eight occasions?
21 A  Yes, ma'am.
22 Q  And do you remember that you said that during
23 that period of time they brought you between thirty to
24 forty-five pounds of marijuana per trip?
25 A  Yes, ma'am.

Page 108

1 Q  And so if we go with the low number, thirty times
2 -- I mean thirty pounds times seven during that period
3 of seven months would have been that you had access to
4 two hundred and ten pounds of marijuana.
5 A  Yes, ma'am.
6 Q  And if we go on the high side of forty-five
7 pounds over the course of those seven months, that
8 would have given you access to three hundred and
9 fifteen pounds of marijuana during that period of
10 time, correct?
11 A  Yes, ma'am.  It only take but one day to sell
12 three hundred pounds.
13      MS. JAMES:  Judge, may I have just a moment?
14      THE COURT:  Yes.
15      (Whereupon, Ms. James conferred with Ms.
16 Wayne off the record and out of the hearing of the
17 other courtroom participants.)
18      MS. JAMES:  That's all the questions I have.
19 Thank you.
20      THE COURT:  Mr. Teague?
21          CROSS EXAMINATION
22      BY MR. TEAGUE OF ERIC PEAGLER:
23 Q  Good morning, Mr. Peagler.
24 A  Good morning.
25 Q  You said that you were doing your federal time on

Page 109

1 your current sentence, and then the state stepped in
2 snatched you and took you away to Bibb County for
3 awhile?
4 A  Yeah.  The B. O. P. decided to send me back to do
5 my state time first.
6 Q  Well I'm just curious, did you get that straight
7 or are done with state time and are now just doing
8 federal?
9 A  I E. O. S. my state sentence.
10 Q  Okay.  Now, Mr. Peagler, you were born and raised
11 in Prattville, Alabama weren't you?
12 A  Yes, sir.
13 Q  And your family, they're still out there.  There
14 are Peaglers all over the place up there, aren't they?
15 A  Yeah.  Some of them there, some of them passed.
16 Some of them are still there.
17 Q  I understand.
18      Now, and I think you have already
19 acknowledged you were a pretty good sized dealer up in
20 that part of the area, is that right?
21 A  Really just to create a name.  I was a drug
22 dealer.  I was no John Gotti, but I was a drug dealer.
23 Q  No, I wasn't trying to make you into a John Gotti
24 type.  But you were known, I think you've already said
25 to Ms. James, pretty well-known all over this state.

Multi-Page™

Page 110

1  A  Yes, sir.
2  Q  Okay.  The marijuana -- In the marijuana business
3  it's wise to have more than one source, isn't it?
4  A  Yes, sir.
5  Q  I think you've already said when the Lazanos, the
6  Mexican folks, when they couldn't get across the
7  border with marijuana, then you'd be out of business
8  and you have to have some sort of backup source, don't
9  you?
10  A  Yes, sir.
11  Q  And you were a good smart businessman and you
12  kept yourself a good backup source, didn't you?
13  A  Yes, sir.
14  Q  And the marijuana I think you told Agent DeJohn
15  in your debriefing pursuant to your agreement, that
16  the Lazanos were bringing you marijuana contained down
17  within I guess a pretty large gas tank, I suppose.
18  A  Yes, sir.
19  Q  Okay.  And there was a variety of vehicles that
20  they brought this stuff up with over a period of time,
21  wasn't it?
22  A  Yes, sir.
23  Q  Okay.  Must have been pretty good sized trucks.
24  Were they S. U. V.s or trucks or what?
25  A  Suburbans.

Page 111

1  Q  Suburbans?
2  A  And one gas tank we'd  put gas in, and one gas
3  tank were drugs.  So two gas tanks but one of them was
4  a dummy.
5  Q  And they're carrying -- Did it they ever carry as
6  much as five hundred pounds?
7  A  No.
8  Q  Three hundred is about the max?
9  A  No, about a hundred the suburban carried.
10  Q  Would they bring more than one vehicle sometimes?
11  A  No, they would just bring one at a time and go
12  back and reload.
13  Q  Okay.
14  A  Sometimes it would take them two or three to get
15  back.  Whenever they can get back across the border.
16  Sometimes they come back in two weeks.
17  Q  Okay.  I don't want to put words in your mouth,
18  Mr. Peagler, but I just want to be sure I understood
19  what I thought I heard.  Didn't you answer in response
20  to one of Ms. James' questions that you had -- you
21  could distribute three hundred pounds in a day?
22  A  If I had it.
23  Q  Right.  But it was my understanding from reading
24  some of this that you had gotten as much as three
25  hundred pounds in one load at a time.

Page 112

1  A  I don't recall that.
2  Q  Okay.
3  A  I was going to get three hundred pounds and
4  fifteen kilos of cocaine, but they were going to bring
5  it in a van.
6  Q  Okay.
7  A  In the side walls.
8  Q  They didn't do that, though, did they?
9  A  When I went to jail on that traffic charge in
10  Shelby County, they just came with the marijuana and
11  tried to get me out, the cocaine.
12  Q  Oh, okay.
13      Now the -- You were not the only dope dealer
14  in the Prattville area, were you?
15  A  No.  There're drug dealers all over.
16  Q  Okay.  The jury here has heard testimony about a
17  rather prominent drug dealer or dope dealer over in
18  the Prattville area, one Gary Wayne George.  Did you
19  ever know that he was one of your competitors over
20  there?
21  A  No, sir.
22  Q  Okay.  Could he perhaps have come along and taken
23  over your turf after you went off to the penitentiary?
24  A  I couldn't recall because, you know, I don't know
25  him.

Page 113

1  Q  It's possible you knew him but maybe by some
2  street name?
3  A  No, sir.
4  Q  Okay.  Now the Lazanos, after you went to the
5  penitentiary, still had marijuana to sell, didn't
6  they?
7  A  Yes, they did.
8  Q  Okay.  It could be that Gary Wayne George, if he
9  had a source, could have been using these Mexicans,
10  couldn't he?
11  A  No, I'm the only one they dealt with.
12  Q  Right.  Now you're telling this jury that you're
13  the only man in the whole United States they would
14  have ever dealt with?
15  A  In Montgomery and Prattville.
16  Q  But after you were gone?
17  A  They had got caught up, too --
18      MR. FEAGA:  Your Honor he's not letting the
19  witness finish answering his question.  We object
20  again to Mr. Teague continually interrupting the
21  witnesses, Your Honor.
22      MR. TEAGUE:  Your Honor, All I was trying to
23  do was finish my question.
24      MR. FEAGA:  Your Honor, that's not all he
25  was doing.

Page 114

1  THE COURT: Just a minute. Just a minute.
2  Finish your question. What is the rest of
3 your question, Mr. Teague?
4  MR. FEAGA: Your Honor, the witness was
5 answering the question --
6  THE COURT: Just a minute.
7  I said, Mr. Teague, what is your question?
8 Finish your question.
9  MR. TEAGUE: Yes, thank you, Your Honor.
10 Q When you went off to the penitentiary, you said
11 the Lazanos already and still had marijuana to sell.
12 That was a pretty good business for them or they
13 wouldn't drive all the way to Prattville, Alabama
14 without it being a pretty good proposition for them,
15 would they?
16 A They went to prison too on this case here.
17 Q But it was sometime later, wasn't it?
18 A No, they was on -- they let them out on bond and
19 Caesar Lazano, he was in custody. So only somebody
20 went home is Erma Lazano and she was on leg bond.
21 Q Now you have been out on bond a lot of times in
22 your career, haven't you, sir?
23 A Yes, sir.
24 Q And you kept right on dealing, didn't you, sir?
25 A Yes, sir.

Page 115

1 Q And how much money were you having to pay when --
2 Let's say you bought three hundred pounds of marijuana
3 from the Lazanos.
4 A I never bought three hundred pounds.
5 Q Well let's just say if you had. How much would
6 you had to have paid for it?
7 A Different prices. Five hundred dollars a pound.
8 Six hundred dollars a pound. It all depends.
9 Q Okay. And you multiply six hundred dollars a
10 pound times three hundred --
11  MR. FEAGA: Your Honor, we object to this
12 question. It's not based on any evidence that the
13 witness has testified to. He said he never bought
14 three hundred pounds from them so why are we
15 multiplying times three hundred? We object to this
16 question. It's irrelevant.
17  MR. TEAGUE: Your Honor, he cut me off
18 before I could finish my question. I was giving him
19 the option of three hundred pounds at a certain price
20 or two hundred or one hundred.
21  THE COURT: Go ahead.
22 Q Whatever the poundage, that would be a lot of
23 money at five hundred or six hundred dollars a pound,
24 wouldn't it?
25 A You profit about anywhere from eight to ten

Page 116

1 thousand dollars off a hundred pounds.
2 Q But to them that's a lot of money, isn't it?
3 A To the Lazanos?
4 Q Yeah.
5 A I'm talking about what I profit. I don't know
6 what they was getting it for.
7 Q And for them to drive it all the way from Mexico,
8 it must have been a lot of money.
9 A Probably, but the only way they can make their
10 money in Alabama.
11 Q Okay. Thank you, Mr. Peagler.
12  THE COURT: Any redirect?
13  MR. FEAGA: Yes, sir, Your Honor.
14  REDIRECT EXAMINATION
15  BY MR. FEAGA OF ERIC PEAGLER:
16 Q You said that the gas tank that they brought the
17 marijuana up in that was in the Suburban was a dummy
18 gas tank, is that right?
19 A Yes, sir. They come in one -- at one-fifteen
20 hundred on this trip.
21 Q You said they had more than one vehicle they used
22 to bring it up?
23 A They had a Suburban with two gas tanks, one with
24 a dummy, one with gas in it.
25 Q All right. So one just had the dope in it, the

Page 117

1 other had gas in it in the Suburban.
2 A Yes, sir.
3 Q Now earlier Miss James was asking you some
4 questions. And I believe you answered her question
5 when she was talking about your relationship with Leon
6 Carmichael, and you said you had seen him three times.
7 A Yes, sir.
8 Q Once at Big Al's?
9 A Yes, sir.
10 Q And then when you picked up the dope from him and
11 when you gave him the dope back, right?
12 A Yes, sir.
13 Q You were answering the question and I don't think
14 you got to finish your answer. You said sometimes
15 when two people are sort of big dealers in the
16 community they need --
17  MS. JAMES: Objection, that's a
18 mischaracterization of the evidence.
19  MR. FEAGA: Your Honor, the jury can
20 remember his response, Your Honor. I'm just trying to
21 get him back where he was.
22  THE COURT: Overruled. Go ahead.
23 Q You said they needed someone they are both
24 dealing with to introduce them. Do you remember that?
25 A Yes, sir.

1 Q  Who was the someone that introduced you and Mr.
2 Carmichael that you were both dealing with?
3 A  Big Al, and a dude named Eric Evans.
4 Q  Okay.  And so let's talk about that.  What were
5 your dealings with Big Al?
6 A  Finding fronting him cocaine.
7 Q  Okay.  And what were Mr. Carmichael's dealings
8 with Big Al?
9 A  Marijuana.
10     MS. JAMES:  Your Honor, objection, unless he
11 knows.
12     THE COURT:  Unless he has personal
13 knowledge.  Something you observed.
14 A  I ain't never seen them, but he told me.
15     MS. JAMES:  Objection, "he told me."
16     THE COURT:  Who told you, Mr. Carmichael or
17 somebody else?
18     THE WITNESS:  Big Al.
19     THE COURT:  Sustained.
20     MR. FEAGA  Your Honor, it's the statement of
21 a coconspirator we're now going into.
22     THE COURT:  Big Al?
23     MR. FEAGA:  He said they both had dealings
24 with Big Al, and he's about to tell them how he knows
25 and it's going to be Big Al telling him about it.

1     MS. JAMES:  Judge, that's just an
2 unreasonable stretch.
3     THE COURT:  They brought it out on cross,
4 Judge.  I'll sustain that.  Let's move on.
5 Q  Describe Big Al, if you would, please, for the
6 ladies and gentlemen of the jury.
7 A  He about anywhere from six feet, a little over
8 six feet, six feet one, six feet two.
9 Q  Okay.  And is he black or white?
10 A  He black.
11 Q  And how is he built?
12 A  He don't have no, you know, good shape.  He just
13 tall.  Kind of a little big stomach.
14 Q  Got a little gut on him.  Okay.
15 A  Dark skin.
16 Q  Now, what was the reason that you met with Leon
17 that day with Big Al?
18 A  Big Al called me and told me I had --
19     MS. JAMES:  Objection, Your Honor.
20     MR. FEAGA:  Your Honor, this is clearly --
21     (Unintelligible; two speaking at once.)
22     THE COURT:  You are both speaking at the
23 same time.  You are interrupting other people.  You
24 can't hold yourself back, Mr. Feaga.
25     MR. FEAGA:  Yes, sir.

1     THE COURT:  Now what is it, Ms. James?
2     MS. JAMES:  Objection.  He's eliciting
3 hearsay again about what Big Al told him.
4     THE COURT:  Okay.  Now, Mr. Feaga?
5     MR. FEAGA:  It goes to show the reason for
6 their meeting on that occasion.
7     THE COURT:  What I'm going to do is excuse
8 the jury.  We'll take a fifteen minute recess.
9     (Whereupon the jury was escorted out of the
10 courtroom, and the following colloquy ensued):
11     THE COURT:  Now ask him about Big Al.
12        VOIR DIRE EXAMINATION
13        BY MR. FEAGA OF ERIC PEAGLER
14     (THE JURY IS NOT PRESENT):
15 Q  Sir, if you would, would you -- The day that you
16 met with Big Al and Leon Carmichael, what was the
17 reason that you guys came together?
18 A  Through Big Al he told me he had someone he
19 wanted me to meet and told me to stop by the shop.  I
20 told him I was on the way to Willie Darnett off of
21 Southern Boulevard to get me something to eat.  He
22 told me to stop by there for a minute.
23 Q  Did he tell you why he wanted you to meet this
24 person?
25 A  Not over the phone.

1 Q  When you got there, did he tell you?
2 A  He told me this was his connection, "so you and
3 him would be good pals."
4     THE COURT:  Did he tell you this in front of
5 Mr. Carmichael?
6     THE WITNESS:  No.  He didn't tell me this in
7 front of Carmichael.
8     THE COURT:  Where was Mr. Carmichael?
9     THE WITNESS:  He was standing back probably
10 from him to Mr. Feaga.
11 Q  So he told you while Mr. Carmichael was standing
12 approximately twenty feet away from you, what did he
13 tell you then?
14 A  He said, "This would be good for you and him to
15 hook up."  Then he tell me he deal with him, so he
16 trusted him.  "So I wanted to introduce you to him and
17 y'all go from there."
18     THE COURT:  Then what happened?
19     THE WITNESS:  He introduced me to
20 Carmichael, and Carmichael asked me, I had on my E.
21 and P. shirt, he asked me where my car lot was and I
22 told him on Birmingham Highway.  And then I handed him
23 an E. and P. card.  And then he wrote his beeper
24 number down and gave it to me.  He told me if I needed
25 him, to holler at him.

Multi-Page™

Page 122

1    THE COURT: Mr. Carmichael said that?
2    THE WITNESS: Yes, sir he did.
3    THE COURT: Did you and Mr. Carmichael
4 discuss drugs at all?
5    THE WITNESS: Not at the time.
6    THE COURT: Did you later discuss drugs?
7    THE WITNESS: When I went over there, over
8 to the shop.
9    THE COURT: And that's what you told us
10 about already?
11    THE WITNESS: Yes, sir.
12 Q Was this preliminary meeting that you had with
13 him, was it necessary to have that meeting before you
14 could go talk to him about actually getting drugs from
15 him?
16 A Yes, it was.
17 Q Why was that necessary?
18 A Because he didn't know me and I didn't know him.
19 Q Okay. And what is it about knowing each other
20 that would facilitate your ability to get drugs from
21 him?
22 A Because he's a known drug dealer and I'm a known
23 drug dealer. And Big, Al he know Big Al and me and
24 Big Al were good friends so him and Big Al were good
25 friends so Big Al were.

Page 123

1 Q So did Big Al's involvement in this enhance the
2 trust that would be necessary between you and Mr.
3 Carmichael to allow to you deal with one another?
4 A Yes, sir.
5 Q Is that something that happens normally in the
6 drug business?
7 A Yes, it do.
8    THE COURT: Okay. Now, Miss James?
9    MS. JAMES: There are a number of reasons
10 that that shouldn't come in. Number one, it's
11 hearsay.
12    THE COURT: What shouldn't come in?
13    MS. JAMES: That whole scenario that he just
14 described. Number one, they don't need it because
15 he's already said he saw Mr. Carmichael at Big Al's.
16 Mr. Carmichael introduces him, says if you need me
17 holler. He hollers at Carmichael, he gets fifty
18 pounds and that's how he's connected. It's hearsay.
19 Eliciting this from him at this point time is a
20 violation of Crawford. We don't have the capability
21 at this point to investigate Big Al, to even interview
22 Big Al. We're in the middle of a trial. And it
23 enhances our argument with regard to the Brady
24 violation.
25    Additionally, there is no reference

Page 124

1 whatsoever in his exhaustive interview about his drug
2 organization and the people with whom he dealt, bought
3 and sold, to Big Al. It's trial by ambush, just like
4 we said the entire time, and it's inherently unfair,
5 prejudicial, Fifth and Sixth Amendments right of Mr.
6 Carmichael based on where we are today right now. Due
7 process.
8    THE COURT: Want to throw in any other
9 amendment?
10    MS. JAMES: Probably.
11    (Laughter.)
12    THE COURT: I understand your claim. But go
13 ahead. Anything else, Mr. Feaga?
14    MR. FEAGA: No, sir, Your Honor.
15    THE COURT: We'll take a recess now and I'll
16 let you know something after the recess.
17    MS. JAMES: How long will it be, Judge? Can
18 we run out to the restroom?
19    THE COURT: Definitely. This is a fifteen
20 minute recess.
21    (Whereupon, a recess was taken.)
22       IN OPEN COURT
23    (THE JURY IS NOT PRESENT):
24    THE COURT: Counsel, I understand there is
25 something else you would like to take up with me

Page 125

1 before I bring in the jury?
2    MS. JAMES: Judge, without waving our
3 objection that we previously raised before the break,
4 in the alternative we would request that the trial be
5 continued in order to allow us to investigate this
6 matter of Big Al.
7    THE COURT: The motion is denied.
8    MR. BRUNSON: Your Honor, if I may bring up
9 another issue before the jury comes in?
10    THE COURT: Yes.
11    MR. BRUNSON: We have just received two
12 deliveries of discovery material. One involves the
13 very next witness that's going to be called in the
14 case. These materials are items of probate records
15 and such that we've not received before. We're going
16 to have probably about twenty minutes to review these
17 items. Certainly it's in violation of the Court's
18 standing order for Rule 16, and I --
19    THE COURT: Okay. Now what's in violation
20 of Rule 16?
21    MR. BRUNSON: The standing order of Rule 16
22 documents that should have been delivered to us eons
23 ago.
24    THE COURT: What Documents are these?
25    MR. BRUNSON: These are probate records that

| Page 126 | Page 128 |
|---|---|

**Page 126**

1 documents --

2 THE COURT: Could I see them so I can just

3 know what they are?

4 MR. BRUNSON: Yes, sir.

5 MS. JAMES: Your Honor, if I may respond to

6 the --

7 THE COURT: Just a minute.

8 (Whereupon, the Court examined said

9 document.)

10 MR. BRUNSON: And we ask they be suppressed.

11 THE COURT: For violation of Rule 16?

12 MR. BRUNSON: Yes, Your Honor.

13 THE COURT: Now who gave you these?

14 MR. BRUNSON: Ms. Morris.

15 THE COURT: When?

16 MS. MORRIS: Thirty minutes, Your Honor.

17 THE COURT: Okay. Now, Ms. Morris?

18 MS. MORRIS: Your Honor, they're not in

19 violation. They weren't in the possession of the

20 United States. In fact, we issued the custodian of

21 records from the Probate Court a trial subpoena

22 requesting that they bring certain records for certain

23 pieces of property with them. I haven't seen them.

24 No one on the defense team has seen them.

25 Mr. Estes showed up. He had the records

**Page 127**

1 with him. I then went to Mr. Brunson in this case and

2 said, "He's got them, I haven't seen them, do you want

3 me to go ahead and have our student make copies of

4 them both and we'll both take a look at them at the

5 same time?"

6 THE COURT: Okay.

7 MR. BRUNSON: Your Honor, simply by the

8 prosecutor shielding herself from these records --

9 THE COURT: What in Rule 16 says that these

10 documents should have been furnished to you?

11 MR. BRUNSON: Long ago.

12 THE COURT: No. Show me what in Rule 16 or

13 the standing order that says that. That's all I'm

14 asking.

15 MR. BRUNSON: Rule 16, Your Honor --

16 THE COURT: Let me get Rule 16. I stay

17 standing order, because I think that's what this Court

18 operates off. Typically our magistrate judges handle

19 these, so I'm not as familiar with this. So you'll

20 have to educate me a little bit on this, in particular

21 the standing order. But just direct me to the

22 language that you say requires it. Miss Carnes has

23 just given meet standing order. Direct me to the

24 language.

25 MR. BRUNSON: Particularly one subsection A

**Page 128**

1 that --

2 THE COURT: That just recites Rule 16.

3 MR. BRUNSON: Yes, Your Honor.

4 THE COURT: So show me in Rule 16, then.

5 MR. BRUNSON: Under Rule 16(a)(1)(e), Your

6 Honor, documents and objects --

7 THE COURT: Let me get to that. Rule

8 16(a)(1)(e). Okay. So you're saying that -- well

9 read to me what it says.

10 MR. BRUNSON: Your Honor, "Upon a

11 defendant's request, the government must permit the

12 defendant to inspect and to copy or photograph books,

13 papers, documents, et cetera, if the item is within

14 the government's possession, custody or control."

15 THE COURT: Okay. Now was there a request

16 here or was there no need for a request?

17 MR. BRUNSON: There was a request, Your

18 Honor.

19 THE COURT: Request for all documents, I

20 presume?

21 MR. BRUNSON: Yes, Your Honor.

22 THE COURT: Okay. And if I understood Ms.

23 Morris's response, she claims that they were not

24 within the government's possession, custody or

25 control.

**Page 129**

1 Is that what you're saying, Ms. Morris?

2 MS. MORRIS: That is correct. These are

3 records of Mr. Estes or of the Probate Court. They're

4 not in our possession. And when he came to court, we

5 turned them over.

6 Just so you know, Your Honor, I think you

7 have them up there, but these are pieces of property

8 owned by the defendant.

9 THE COURT: Right. This is just evidence of

10 his property?

11 MS. MORRIS: Yes, Your Honor, it's just

12 evidence of ownership of these pieces of property.

13 And we requested that Mr. Estes or a custodian of

14 records from the Probate Court, come to court with

15 paperwork dealing with these pieces of property. I

16 hadn't seen the paperwork.

17 THE COURT: Anything else, Mr. Brunson?

18 MR. BRUNSON: Your Honor, just that by the

19 prosecutor stating that she's not receiving documents

20 from a witness, particularly the Compass Bank witness

21 that came a few days ago, Your Honor, I had

22 specifically requested charts where the government was

23 going to summarize certain evidence. The chart at the

24 Compass Bank, that the Compass Bank witness of course

25 was not provided, and we've just received another

## Page 130

1 chart that I specifically asked for pretrial and that
2 is a chart of the phone records which summarize and
3 break down all of the phone calls.
4        THE COURT: Does the rule or does the
5 commentary to the rule talk about what's considered in
6 the custody of the government?
7        MR. BRUNSON: Your Honor, it talks in terms
8 of the evidence they expect to introduce in their
9 case-in-chief.
10       THE COURT: Oh, I saw that. But what's
11 considered in the custody of the government according
12 to the rule or the committee notes?
13       MR. BRUNSON: Well certainly --
14       THE COURT: No, what do the committee notes
15 say, if anything?
16       MR. BRUNSON: Your Honor, I do not know what
17 the committee notes say.
18       THE COURT: Well they usually tell us, or
19 me, but sometimes they enlighten us on what the
20 language in the rule says.
21       MR. BRUNSON: Well, Your Honor, if the
22 prosecutor is allowed not to turn over these discovery
23 materials to us simply because they request the
24 witness to hang on to them until they walk into court
25 the morning of the trial, then certainly Rule 16 would

## Page 131

1 not apply at all. And that's what's happened in this
2 particular case.
3        I must state one other thing to the Court.
4 It appears, in some document that I read last night,
5 that the government has already briefed the evidence
6 in a brief that we received. And certainly there was
7 contemplation of using the evidence if they've already
8 outlined it in their brief.
9        THE COURT: With whom do you expect to bring
10 these documents out? What witness?
11       MS. MORRIS: His name is Burt Estes. He's
12 the custodian of records from the Probate Court.
13       THE COURT: And he's here?
14       MS. MORRIS: Yes, Your Honor.
15       THE COURT: Okay, then. We'll take that up.
16 I'll let you know something on that.
17       Are we through with this witness?
18       MS. MORRIS: I'm not sure. But if I may be
19 heard just a moment on that?
20       THE COURT: Yes, go ahead.
21       MS. MORRIS: I mean these are records of
22 pieces of property owned by Mr. Carmichael.
23       THE COURT: I heard you.
24       MS. MORRIS: I don't know how the defense
25 can claim unfair surprise when he owns the property.

## Page 132

1        THE COURT: Right, I understand your
2 argument. I'm just asking what's defined as custody,
3 that's all, for purposes of the rule. But I'll look
4 into it.
5        MR. BRUNSON: Your Honor, we would just ask
6 these documents to be suppressed.
7        THE COURT: Well I'm not going to suppress
8 them right now, but first I want to find out if there
9 is anything else with regard to the witness that's now
10 on the stand.
11       MR. FEAGA: Your Honor, I think we were
12 waiting to see if the Court was going to give us a
13 decision on whether or not it was going to allow me to
14 go any further with him into Big Al and the statements
15 that were made.
16       THE COURT: Oh, that is correct. I forgot
17 about it. And you're contending that Big Al is part
18 of the conspiracy?
19       MR. FEAGA: Yes, sir. He just testified
20 that he was someone with whom they both dealt. He
21 testified that at the meeting --
22       THE COURT: I'll allow you to go into
23 everything except his comment that Big Al was a drug
24 dealer, or that Big Al's comment was that Carmichael
25 was a drug dealer.

## Page 133

1        MR. FEAGA: All right, sir.
2        THE COURT: But you can say that Big Al
3 introduced him to Carmichael and what happened between
4 him and Carmichael after that.
5        MR. FEAGA: Yes, sir.
6        MS. JAMES: Judge, the last point I would
7 make is that he is making him a coconspirator based on
8 just a random hearsay statement --
9        THE COURT: No, I don't think anything else
10 that comes in warrants a finding that he's a
11 coconspirator. These are just introductory comments;
12 they're not coming in for the purpose of the truth,
13 but just to show how he met Mr. Carmichael.
14       MS. JAMES: And he's already testified to
15 that on direct.
16       THE COURT: So why are we going into this
17 again?
18       MR. FEAGA: I thought the Court was going to
19 allow me to ask the next question which would be, did
20 this meeting facilitate your ability to engage in drug
21 dealing with Leon Carmichael.
22       THE COURT: I'll allow that question. Okay,
23 bring in the jury.
24       (Whereupon, the jury was escorted into the
25 courtroom.)

Page 134

1    MR. FEAGA: May it please the Court?
2    THE COURT: Yes.
3 Q Sir, did the meeting that Big Al arranged between
4 you and Leon Carmichael facilitate your ability to
5 engage in drug dealing with Leon Carmichael?
6 A Yes, sir.
7 Q Are meetings like that normal in the drug
8 distribution business?
9 A Yes, sir.
10 Q Was the meeting that took place between you and
11 Big Al and Leon Carmichael specifically for the
12 purpose of facilitating you and Leon Carmichael being
13 able to get together and deal drugs?
14 A Yes.
15    MS. JAMES: Objection. It's leading, Your
16 Honor, and he's telling him what the answer is.
17    THE COURT: I'll allow that question.
18 A Yes, sir.
19    MR. FEAGA: No further questions, Your
20 Honor.
21       RECROSS EXAMINATION
22    BY MS. JAMES OF ERIC PEAGLER:
23 Q Mr. Peagler, didn't I hear you just say on direct
24 examination that you stopped by the fish place and you
25 just happened to meet Mr. Carmichael there?

Page 135

1 A I said Big All called me, and he told me that he
2 had someone he wanted to meet.
3 Q Is Miss Wesson white or black?
4 A She's white.
5 Q Thank you.
6    MR. TEAGUE: No questions.
7    THE COURT: Anything else of this witness?
8    MR. FEAGA: Not from the United States, Your
9 Honor.
10    THE COURT: Okay. You're excused. You may
11 step down.
12    MS. JAMES: Judge, could this witness be
13 held?
14    THE COURT: Yes.
15    (Whereupon the witness, Eric Peagler,
16 stepped down from the stand.)
17    THE COURT: Who is your next witness, Your
18 Honor?
19    MR. FEAGA: Burt Estes, Your Honor.
20    THE COURT: Okay. The objection to the
21 exhibit is overruled.
22    MS. CHARTOFF: Your Honor, there is a record
23 we would like to make.
24    THE COURT: On that issue?
25    MS. CHARTOFF: Yes, Your Honor.

Page 136

1    I'll excuse the jury.
2    (Whereupon, the jury was escorted out of the
3 courtroom and the following colloquy ensued):
4    THE COURT: These seriatim objections are
5 disrupting the trial, and I'm making that as a
6 finding. I gave you an opportunity to make your
7 objections when you came back in. I heard your
8 arguments. Now you want to go back and make another
9 one.
10    This has been repeated throughout the trial.
11 It has to stop. I send the jury out, you make your
12 objections, I rule. Then we keep the trial going on.
13 We're not going to constantly have people saying I
14 want to make an additional objection. I want to make
15 additional argument.
16    Miss James, you have done it. You haven't
17 necessarily done it, Miss Wayne. And, Ms. Chartoff,
18 you've done it. It has to stop. The trial has to
19 moving smoothly. Now I'm going to say you make your
20 objections, those are the objections, I rule on them,
21 that's it. I'll hear it this time, but from now on
22 your objections have to be made, we don't just sit
23 back casually come up with additional objections and
24 then the Court hears them. It disrupts the progress
25 of the trial.

Page 137

1    I research things. I look at them. When
2 you come back with additional objections I have to go
3 back to the drawing board. I should be able to rule
4 on something and get it behind me. Now I'll hear your
5 objections, Miss Chartoff, but no more seriatim
6 objections. Now what is this objection?
7    MR. BRUNSON: If I may, that was my fault.
8    THE COURT: Well whose ever fault it is, I'm
9 tired of it. I've got to move this case along. I'm
10 working hard, but I can't -- it's like going after a
11 floating object out there in the never never land. I
12 never know what all else you people are going to come
13 up with. Now I can't rule on a case conduct a trial
14 like that.
15    But go ahead, Mr. Brunson.
16    MR. BRUNSON: Your Honor, and this is
17 something that just came to our attention, I thought
18 this was important enough to advise the Court on their
19 failure to provide us Rule 16 materials. I should
20 have also said at the time before the Court had ruled
21 that we felt this was highly prejudicial. We had no
22 opportunity to prepare for defending these particular
23 documents and now we've just got to wing it. I don't
24 think it's fair to Mr. Carmichael to do that. There
25 are lots of cases that --

Page 138

1    THE COURT: What are your cases?
2    MR. BRUNSON: Your Honor, Eleventh Circuit
3 case U. S. v. Noe.
4    THE COURT: Give mean the cite.
5    MR. BRUNSON: 821 F.2d 604. In that
6 particular case an item of discovery was provided
7 immediately before trial.
8    THE COURT: But the question here is, is
9 there a violation of Rule 16(a)(1)(e). I can
10 understand how discovery can be prejudicial, that's
11 not my concern. My concern is was the government
12 obligated to furnish the evidence under (a)(1)(e) of
13 Rule 16.
14    MR. BRUNSON: And my point again to the
15 Court --
16    THE COURT: And I ask you, what do your
17 committee notes say, what does your case law say with
18 regard to whether a person who is subpoenaed who has
19 documents that were not in the possession of the
20 government, does the government still have an
21 obligation to furnish you with those documents.
22 That's all I'm asking.
23    If you have something in the committee
24 notes, because that's the government's defense, they
25 said well we didn't have the documents. And I'm

Page 139

1 saying to you, well do your committee notes say they
2 still have an obligation even though they don't have
3 the documents?
4    MS. WAYNE: Judge, at this point I'm going
5 to interject as lead counsel. The Court has indicated
6 that I'm not one of the lawyers that have been doing
7 this, but let me tell you something, okay? Because
8 I'm just sitting here and I'm stewing. I understand
9 that this Court needs to get this case going. We have
10 done everything in our power in terms of what has been
11 disclosed to us to have it here, notebooked, organized
12 and ready to go. The government has continuously,
13 over our objection, and we're angry about it and the
14 Court seems to be blaming us --
15    THE COURT: I'm not blaming you for that,
16 but I am blaming you that I cannot handle four lawyers
17 making objections all the time. No judge can handle
18 that. And I've been very liberal about it.
19    MS. WAYNE: I agree, Judge.
20    THE COURT: You cannot conduct a trial with
21 four lawyers standing up and saying I object to this
22 on A, next lawyer says I object to it on B, the next
23 lawyer says I object to it on C and then I sometimes
24 even a fourth lawyer who will say I object to it on X.
25 And sometimes you even make objections that conflict

Page 140

1 with each other. That is the problem.
2    MS. WAYNE: I agree, Judge. And if this
3 Court would look at the government and say no more,
4 you're stopping now, if they don't have it, you're
5 stopping you can't --
6    THE COURT: I don't know whether the
7 government has violated any rule here, Miss Wayne.
8 There is nothing before me to show that they have done
9 anything wrong. I understand your sense of
10 unfairness. I understand that in a criminal case
11 you're not supposed to be ambushed. But the law says
12 that. If I were on the U. S. Supreme Court I will
13 tell you quite candidly I would change that law. I
14 would change it tomorrow. But I am not on the Supreme
15 Court and I cannot change it.
16    Now unless you have rules, you know -- In
17 fact, when it was within my discretion I turn over
18 everything that they gave me because I have strong
19 beliefs that the defense needs it. But I can only do
20 what the law allows me to do. And unless you can show
21 me a rule that says that the government has disobeyed
22 a particular provision, I follow the law and that's
23 it. Whether I think it's a proper law, whether I
24 think it's even a fair law. And I've already told
25 you.

Page 141

1    MS. WAYNE: Right.
2    THE COURT: I think the Supreme Court's
3 decision that says you don't get the same discovery
4 that you should get in civil cases is wrong. But
5 that's my private view, it's not my view as a judge.
6 And I have to comply. And that's why I keep asking
7 you, tie this to a provision. Let me know where they
8 have engaged in something wrong and I will give you
9 the full breadth of what the rule requires, because I
10 have strong beliefs that you should get as much
11 discovery before trial as possible.
12    MS. WAYNE: And what I would ask the Court,
13 based upon that, is that you've asked us to look at
14 the committee notes so that we can respond as one
15 lawyer. I'd ask that we be able to look at these
16 committee notes so that we can address this
17 effectively for Mr. Carmichael as one lawyer and be
18 able to look at this at this point. Because it was
19 new, we can't get WestLaw, we don't have access and we
20 need to be able to respond.
21    THE COURT: Very good.
22    What do you say, Mr. Feaga? They say they
23 need additional time to look at this.
24    MR. FEAGA: Your Honor, I think Miss Morris
25 is handling this for our side.

Page 142

1    THE COURT: Ms. Morris?
2        MS. MORRIS: Your Honor, you've made your
3  ruling, and --
4        THE COURT: Well they're saying to me,
5  though, that you've surprised them in the sense that
6  they didn't know this was coming up and they haven't
7  had a chance to look at the law.
8        MS. MORRIS: Your Honor, again, these are
9  his own property records. Property that he has or
10  does own. Has owned in the past or does own. I mean
11  this is not an unfair surprise. I mean obviously Mr.
12  Carmichael, one would assume, knows what property he
13  owns.
14        THE COURT: So you're arguing, then, that
15  even if you violated the rule, it's harmless
16  violation.
17        MS. MORRIS: No, I'm not arguing that we
18  violated the rule.
19        THE COURT: Well they claim you violated the
20  rule.
21        MS. MORRIS: Well I understand they claim
22  that, but under Rule 16, it wasn't in our possession,
23  it was in the possession of the Probate Court up until
24  today when I spoke with Mr. Brunson before ever even
25  thinking about taking possession of it. I mean, I

Page 143

1  spoke with him and said hey listen, they're here, you
2  want to look at them at the same time.
3        And as far as a fairness argument is
4  concerned, not only, you know, does Mr. Carmichael
5  know what's in these records or should because they're
6  his records, they're in the custody of the Probate
7  Court. But secondly, they have seem them at the same
8  time I have.
9        THE COURT: Who is your next witness?
10        MS. MORRIS: After Mr. Estes?
11        THE COURT: Yes.
12        MR. FEAGA: The tellers, Your Honor, two of
13  them. Priscilla Luster and Alicia Oree. And our last
14  witness I think at this juncture Devin Whittle.
15        MS. WAYNE: And we have a stipulation too,
16  Judge, that we've reached.
17        THE COURT: I can go ahead and dispose of
18  one evidentiary matter right now, and I will look at
19  this Rule 16 issue.
20        By the way, a couple of things. Mr.
21  Hardwick is here and he wants to be called "Mr.
22  Hardwick," by the way. And he's here to testify. We
23  can call him to ask him what he's going to say right
24  now outside the presence of the jury, and I am ready
25  to rule on that issue.

Page 144

1    MR. FEAGA: Yes, sir.
2        THE COURT: Depending upon what he says.
3        MS. WAYNE: I agree because I think we have
4  a concern about what attorney/client privilege there
5  can be.
6        THE COURT: Well, let's see what his concern
7  is. Let's just call him right now.
8        MS. WAYNE: Can we enter these stipulated
9  records as well?
10        THE COURT: Yes, definitely.
11        MR. FEAGA: Your Honor, for purposes of the
12  record --
13        THE COURT: Why don't we get Mr. Hardwick.
14        MR. FEAGA: Your Honor, is the court
15  bringing in Mr. Hardwick?
16        THE COURT: Yes. He wanted to talk with me
17  personally, but I can't do that.
18        MR. FEAGA: Yes, sir.
19        (Whereupon, the Hon. Johnny Hardwick was
20  escorted into the courtroom and duly sworn.)
21            VOIR DIRE EXAMINATION
22            OF JOHNNY HARDWICK
23            (THE JURY IS NOT PRESENT        ):
24    THE COURT: Now, you may --
25        MS. WAYNE: Judge, I was just asking Mr.

Page 145

1  Feaga because I thought the Court said you wanted us
2  to call the judge "Mister"?
3        THE COURT: Yes.
4        MS. WAYNE: We object. He's a judge.
5        THE COURT: He's the one who requested it.
6        MS. WAYNE: I don't think that the witness
7  has standing to be able to say that they should be
8  called something that they are not.
9        THE WITNESS: May I be heard?
10        THE COURT: Yes.
11        THE WITNESS: At the time that I was
12  involved in representing Multi-Investments, Inc., I
13  was not a judge. I was a lawyer.
14        MS. WAYNE: I understand.
15        THE WITNESS: And I think that I should be
16  referred to in those terms.
17        MS. WAYNE: Judge, I understand the
18  witness's response. I don't have a problem, I agree
19  with the judge that at the time he wasn't a judge and
20  we would never lead the jury to believe that, but
21  however he is a judge now and I don't think that that
22  should be concealed because it's not the truth. I
23  don't know if the door will even be --
24        THE COURT: What is the Government's
25  position on this?

**Multi-Page™**

Page 146

1    MR. FEAGA: Your Honor, we'll go along with
2  whatever the Court decides.
3    THE COURT: I think we'll have to call him
4  "Judge". I think they can bring out that he's a
5  judge.
6    MR. FEAGA: We just want to call him the
7  same thing they do.
8    THE COURT: He's a judge, and I think it
9  goes to his credibility.
10   So they can call you whatever the facts
11  dictate you are.
12   THE WITNESS: I accept your ruling, Your
13  Honor.
14   THE COURT: Okay. Now you wanted to ask him
15  about these documents?
16   MR. FEAGA: Yes, sir.
17   THE COURT: Okay. I think the only question
18  you have for his is whether he obtained them from Mr.
19  Carmichael?
20   MR. FEAGA: Yes, sir, pretty much.
21   THE COURT: Well ask him that.
22 Q Let me show you what's been previously marked for
23  government's exhibit 58 purposes, Judge Hardwick,
24  which is a copy of a subpoena, a federal grand jury
25  subpoena at -- to Multi-Investments, Inc. that says

Page 147

1  "Please provide log records for all pickups and
2  deliveries for the dates of January the 1st, 1998
3  through January the 15th, 1998." And it says "Bates
4  stamped zero zero zero zero zero one through zero zero
5  zero two nine four. Should you have any questions,
6  please call." And it says, "Sincerely, Johnny
7  Hardwick."
8    Attached to that are certain records, and I
9  would like to ask you, sir, if you would take a look
10  at those and ask you if you would examine them,
11  please.
12   THE COURT: Let me see those before you go
13  on.
14   (Whereupon the Court examined said
15  documents.)
16 A Mr. Feaga, it would seem that these records are
17  out of order in terms of the Bates stamp that I had
18  supplied to him.
19 Q That may very well be, Judge. I don't know if
20  they're in the same order that you provided them.
21 A So with that caveat, I do recognize the subpoena.
22  I do recognize my letterhead, my signature. I do
23  recognize the Bates stamps, but I cannot attest to the
24  fact that all pages are here.
25 Q Okay. And I'm not asking you if all the pages

Page 148

1  are there. In fact, Judge, I would represent to you
2  that that is only a portion of the records that you
3  provided because you can see from the Bates stamp
4  numbers that there are only a few of the pages. The
5  others are not relevant to the inquiry that we wanted
6  to ask you about today.
7    What I would ask you is, were you retained
8  by Multi-Investments, Inc., to handle compliance with
9  that federal grand jury subpoena?
10 A Yes, I was.
11 Q And did you agree to undertake such
12  representation?
13 A Yes, I did.
14 Q And did you in the course of your representation
15  respond to that federal grand jury subpoena on behalf
16  of Multi-Investments, Inc. with the records referenced
17  in your letter?
18 A Well I responded in this way, is that I got with
19  the chief executive officer of Multi-Investments, Inc.
20  and discussed the subpoena --
21   THE COURT: Don't tell us what you
22  discussed.
23   THE WITNESS: Well I'm just saying, and as a
24  result of that I did not have these records that --
25   THE COURT: Who gave you the records?

Page 149

1    THE WITNESS: Mr. Carmichael brought me the
2  records.
3    MR. FEAGA: Your Honor, I have no further
4  questions.
5    THE COURT: Then the records come in under a
6  number of cases as party admissions. I'll cite the
7  Eleventh Circuit cases that says that. You don't have
8  to get them in under the business record, this case
9  says they don't have to in under that, they can come
10  in as a party, United States vs. Williams, 837 F.2d
11  1009. It's a 1998 case by the Eleventh Circuit.
12   There are also cases from other circuits
13  that essentially say the documents that can be
14  connected to the defendant can come in as party
15  admissions. They are 964 F.2d, 193. Counsel, I don't
16  have the name of that case -- oh, here it is. I do
17  have it now. It's United States versus Pelullo. And
18  it basically says the same thing again, that the
19  documents come in as party admissions as long as you
20  can you show some connection with the defendant.
21   And the last case is United States versus
22  Lai, 61 F.3d 913. It's a Ninth Circuit case. Again,
23  party admissions. And not only do we have Judge
24  Hardwick's statement, but I believe you have the
25  document from the Secretary of State showing who the

Page 150

1  owner of the business is.
2       MR. FEAGA: We do, Your Honor.
3       THE COURT: That itself also shows that Mr.
4  Carmichael was connected with these records and they
5  can come in as party admissions against him.
6       Aside from that, the records also come in,
7  even though I think that's clearly enough, pursuant to
8  rule -- the residual hearsay rule -- pardon me, the
9  residual hearsay exception to Rule 807, and I won't go
10  into a lot of detail about that, but if you want to
11  read about it in detail you can look at Weinstein's
12  Federal Evidence, Section 803.088. And there's a host
13  of cases listed there.
14       Some of the records also come in as public
15  documents. And I believe even though, again, I don't
16  think it's necessary to go into that. Aren't there
17  some like licenses and -- oh, I have the wrong
18  documents here.
19       THE WITNESS: Here you go, Judge.
20       THE COURT: Yes, thank you.
21       MR. FEAGA: Yes, sir, they're vehicle
22  registration statements.
23       THE COURT: Yes, I think it's self-evident
24  as to which ones come in as public documents.
25       And I think for the residual exception I do

Page 151

1  have to find that they are sufficiently reliable as to
2  what they reflect, and the Court does make those
3  findings under the residual exception to the hearsay
4  rules.
5       Anyway, I think there are a host of reasons
6  as to why these records come in, so the objection is
7  overruled.
8       MS. WAYNE: And, Judge, just in response to
9  the court's ruling, I'm assuming we're talking about
10  your first part of your ruling is under 801(d)(2)(b).
11       THE COURT: Yes, party admission by Mr.
12  Carmichael.
13       MS. WAYNE: And I would just indicate that
14  there must be other evidence that the defendant
15  understood -- heard, understood and acquiesced to the
16  statement. And I'm citing an Eleventh Circuit case
17  United States versus Joshi found at 896 F.2d 1303. I
18  think that the record is absent of that because Mr.
19  Carmichael has not waived the privilege as to Judge
20  Hardwick's representation of him at the time;
21  therefore, there is no evidence --
22       THE COURT: Mr. Hardwick didn't represent
23  Mr. Carmichael, he represented the business. There is
24  no privilege as to Mr. Carmichael.
25       MS. WAYNE: Well the business that relates

Page 152

1  to Mr. Carmichael, as he is the only officer of the
2  business. So technically this is as to Mr.
3  Carmichael. As a result of this, Judge, he can't
4  waive that privilege. He can't tell whether or not my
5  client understood and acquiesced because they're
6  making them adoptions or admissions by him and I think
7  the record is absent of that and, therefore, it falls
8  under the reliability, self-authentication, that
9  they're certified and that they come under this
10  exception.
11       THE COURT: Okay. To go back, I think by
12  the Secretary of State's documents, as well as Judge
13  Hardwick, as well as the documents themselves which I
14  think I can consider, I think they clearly indicate
15  that Mr. Carmichael adopted them to the degree that's
16  even required. Because the documents themselves
17  reflect matters involving Mr. Carmichael and his
18  business.
19       So anyway, the objection is overruled.
20       Now, we'll moving on to -- Well let's take
21  care of this witness, and then I'll get back to you on
22  the Rule 16 issue.
23       Yes, Mr. Brunson?
24       MR. BRUNSON: Your Honor, this might be a
25  good time to break for lunch. I apologize. But this

Page 153

1  witness may be used in another manner in this trial.
2       THE COURT: Well I want to go ahead and get
3  him behind us on this issue. And then if you would
4  like to call him back you may do so.
5       MS. WAYNE: We have him subpoenaed.
6       THE COURT: Just let him know. He's a
7  judge, I understand he's busy, but let him know.
8       Now bring in the jury and let's take care of
9  this.
10       MR. FEAGA: May I retrieve the records, Your
11  Honor?
12       THE COURT: Yes.
13       (Whereupon, the jury was escorted into the
14  courtroom.)
15       JOHNNY   HARDWICK,
16  the witness herein, having first been duly sworn or
17  affirmed to tell the truth, was examined and testified
18  as follows:
19            DIRECT EXAMINATION
20       BY MR. FEAGA OF JOHNNY HARDWICK:
21  Q  Sir, would you tell the ladies and gentlemen of
22  the jury your name?
23  A  Johnny Hardwick.
24  Q  And, sir, what do you do for a living?
25  A  At the present time?

Page 154

1 Q Yes, sir.
2 A I'm a Circuit Court judge for the Fifteenth
3 Judicial Circuit which encompasses Montgomery County,
4 Alabama.
5 Q Judge, on January the 8th, 1999 what were you
6 doing for a living?
7 A I was in the private practice of law.
8 Q At that time, Judge, did you have an opportunity
9 to become engaged as the legal representative of a
10 company called Multi-Investments, Inc.?
11 A That's correct.
12 Q And was the purpose of your representation to
13 assist the company in responding to a grand jury
14 subpoena for business records?
15 A Yes, sir.
16 Q And did you prepare a response on behalf of the
17 company?
18 A As I recollect I did, yes, sir.
19 Q All right. I want to show you what's been marked
20 as government's exhibit 58 for identification purposes
21 and ask you, if you would, to take a look at it.
22    (Whereupon, the witness complied and
23 examined said documents.)
24 A Yes, sir, I've looked at them.
25 Q Judge, the subpoena that you got asked you --

Page 155

1 asked Multi-Investments whom you were representing, to
2 provide log records for all pickups and deliveries for
3 the dates of January the 1st, 1998 through January the
4 15th, 1998, is that correct?
5 A May I see it, sir?
6 Q Yes, sir.
7 A Yes, sir.
8 Q Now in your representation of Multi-Investments,
9 Judge, did you seek to acquire the records that were
10 called for in the subpoena?
11 A Yes, I did.
12 Q Now you've had a chance to look at government's
13 exhibit 58 immediately prior to testifying before this
14 jury today, is that right?
15 A That's correct.
16 Q Okay. Are these a portion of the records that
17 you provided in response to that subpoena?
18 A They appear to be.
19 Q And when you put these records together, did you
20 use the assistance of any individual who was a
21 corporate officer with Multi-Investments?
22 A Mr. Carmichael supplied me with the records.
23 Q And would that be -- Is the Mr. Carmichael that
24 gave you those records, is he present in the courtroom
25 today?

Page 156

1 A Yes, sir he is.
2 Q Would you point him out for the jury, please?
3 A He's the gentleman sitting between the young lady
4 and the male at the counsel table.
5    MR. FEAGA: Your Honor, may the record
6 reflect he's identified the defendant, Leon
7 Carmichael?
8    THE COURT: Yes.
9    MR. FEAGA: No further questions, Your
10 Honor.
11    THE COURT: Cross?
12       CROSS EXAMINATION
13    BY MR. BRUNSON OF JOHNNY HARDWICK:
14 Q Good morning, Your Honor.
15 A Good morning.
16 Q I'm Ronald Brunson. I'm one of Mr. Carmichael's
17 present attorneys.
18 A Yes.
19 Q And without getting into any conversations you
20 had with Mr. Carmichael during your representation of
21 him back in when, 1998? '99? Is that correct?
22 A That seems like the time frame, yes, sir.
23 Q Do you know the purpose of why he hired you back
24 in 1998 or '99?
25 A If my memory serves me correct, there was an

Page 157

1 investigation by the United States Government, I
2 believe the Internal Revenue Service.
3 Q And was your response to this letter and these
4 documents as a result of a subpoena that had been
5 issued to Multi-Investments back during that period?
6 A Yes, sir.
7 Q Do you know how long the I. R. S. had been
8 investigating Mr. Carmichael when he retained your
9 services?
10 A Not exactly. The only thing that I can relate to
11 the jury is that it had been a few years. But I can't
12 give you a definite amount of time.
13 Q And in fact had the Internal Revenue Service
14 through its agents contacted you on occasion to
15 receive certain records and information about Mr.
16 Carmichael?
17 A During that period of time, yes, sir.
18 Q And in fact, as his attorney you all were
19 cooperating with the I. R. S. to provide information
20 at that time.
21 A Yes, sir.
22 Q And do you know how long you were retained to
23 represent him before the I. R. S. back then, how long
24 this investigation took place?
25 A Well I never received anything definitive from

| Page 158 | Page 160 |
|---|---|

**Page 158**

1  the government or the Internal Revenue Service that
2  the investigation had concluded.
3  Q  So for what you know, the investigation is still
4  going on.
5  A  Well I couldn't say that, but I just never got
6  anything that said definitely that the investigation
7  had come to an end.
8  Q  They notified you when they began the
9  investigation by coming out and contacting you or Mr.
10  Carmichael, I assume.
11  A  Well, they didn't notify me.  I was retained by
12  Mr. Carmichael to handle the problem that he had.
13  Q  But when and if they finish their investigation,
14  y'all have never known that?
15  A  I was not made aware of it.  I went on to some
16  other things, but I never received a document that
17  said the investigation of Multi-Investments had
18  concluded.  We supplied the documents that were
19  requested.
20      As you mentioned, there may have been a
21  number of other occasions that they asked for more
22  information.  We supplied that to them, and I guess I
23  looked at them and I never heard anything else.
24  Q  They never told you that they had found some
25  additional tax due and owing for the period?

**Page 160**

1  lunch.
2      MR. FEAGA:  It's twelve o'clock, Your Honor.
3  When would lunch start?
4      THE COURT:  Twelve, but I'll go for a couple
5  more minutes if you have somebody like a custodian or
6  somebody we can go through very quickly.
7      MR. FEAGA:  No, sir.
8      THE COURT:  Who are your last three
9  witnesses?
10      MR. FEAGA:  There are four, Your Honor.
11  Burt Estes, the probate judge, then there is the two
12  tellers that took deposits from Sherry Pettus and
13  Devin Whittle, a D. E. A. agent.
14      THE COURT:  So we have four.
15      MR. FEAGA:  Yes, sir.
16      THE COURT:  We have five yesterday so we
17  only had one this morning?
18      MR. FEAGA:  Your Honor, I'm doing the best I
19  can with all the things that are going on in this
20  courtroom.
21      THE COURT:  As I've discovered, lawyers did
22  not take mathematics.
23      MR. FEAGA:  As you know too, Judge, we react
24  to what happens in the trial as we go.
25      THE COURT:  But go ahead.  Four more

| Page 159 | Page 161 |
|---|---|

**Page 159**

1  A  No, sir.  I wasn't made aware of any of that.
2  Q  And they never charged or indicted Mr. Carmichael
3  for anything relating to income tax evasion?
4  A  Not to my knowledge.
5  Q  No further questions.
6      MR. FEAGA:  Your Honor, we have no further
7  questions for Judge Hardwick.
8      THE COURT:  Mr. Teague?
9      MR. TEAGUE:  I will never cross examine
10  Judge Hardwick, if it please the Court.
11      THE COURT:  Thank you, Judge Hardwick.
12      (Whereupon the witness, Johnny Hardwick,
13  stepped down from the stand.)
14      MR. FEAGA:  Your Honor, we would offer the
15  records at this time as government's exhibit 58.
16      THE COURT:  Very good.
17      Now how are we going with the government's
18  case?
19      MR. FEAGA:  Your Honor, I think we're down
20  to --
21      THE COURT:  I know we have one matter that's
22  still outstanding that I need to take up.  I know it's
23  noon.  Is there any other brief witness we can take
24  up?
25      MR. MOORER:  No, Your Honor, not before

**Page 161**

1  witnesses and we'll start promptly at one o'clock.
2      MR. FEAGA:  One thing we could tend to while
3  they're here, Your Honor, very quickly because we have
4  received from the State of Alabama Secretary of State
5  authentic self-authenticating records, the defense
6  agrees that that's what they are, and we offer them
7  now as government's exhibits 63, 64, 65 and 66.  These
8  are the records at the Secretary of State's office for
9  the State of Alabama that shows who the incorporator
10  and officer and owner is of Multi-Investments, Inc.
11  and reflects that Leon Carmichael is that.
12      And also, a company called Unique
13  Entertainment Centers, Inc., and the documents that
14  show that he owns that and that it was changed, the
15  name was changed to Unique Entertainment to the
16  Carmichael Center.
17      THE COURT:  Very good.
18      MR. FEAGA:  And these are the records we
19  offer them as 63 through 66.
20      THE COURT:  Very good.
21      MR. FEAGA:  Are they admitted, Your Honor?
22      THE COURT:  They're admitted.
23      I'll let the jury go until one o'clock.
24      Counsel, I'd like to take up a couple of
25  other matters with you.

Page 162

1    (Whereupon, the jury was escorted out of the
2 courtroom, and the following colloquy ensued):
3    THE COURT: I don't know if Miss Wayne,
4 since she's your lead counsel, wants to be in here,
5 but at the end of the government's case do you intend
6 to make a motion for judgment of acquittal?
7    MS. JAMES: Yes, Your Honor.
8    THE COURT: Do you intend to make that in
9 writing or orally?
10    MS. JAMES: Orally.
11    THE COURT: Orally?
12    MS. JAMES: I mean we could follow up with a
13 written --
14    THE COURT: Oh, you don't need to. I'm not
15 saying you have to make it in writing. All I'm saying
16 is get ready so you can make it because I anticipate
17 that it will come sometime around two or three o'clock
18 and I want to keep the case moving.
19    MS. JAMES: All right. Judge, given that
20 there will be some defense evidence, we would request
21 leave of the Court to file a written brief at some
22 point. Obviously we can do it today --
23    THE COURT: Actually, you make your argument
24 at the end of the government's case, you get to repeat
25 it at the end of your own case.

Page 163

1    MS. JAMES: Right. By that point we'd
2 probably with leave of Court file a brief.
3    THE COURT: Okay.
4    MS. JAMES: We just don't have time to do it
5 right now.
6    THE COURT: Well you need to make your oral
7 argument on the record. And as you know, the
8 likelihood I'm going to grant that is slim. I usually
9 wait until after I've heard all of the evidence, but
10 you need to make it on the record, unless you can show
11 me something pretty compelling that warrants throwing
12 out this case right now.
13    But at the same time you make your argument
14 on the conspiracy charge, which I think would probably
15 go a lot to the motion for judgment of acquittal, I
16 can hear it all at the same time. I see Miss Chartoff
17 has filed a brief on the conspiracy charge, so the
18 government needs to read it and be prepared to respond
19 to it because we will have oral argument on it.
20    Anything else?
21    (Whereupon, there was no response.)
22    THE COURT: I believe Ms. Morris made clear
23 that the money laundering basically consists of
24 allegations of the conspiracy between Mr. Carmichael
25 and Miss Pettus.

Page 164

1    MS. MORRIS: That is correct, Your Honor.
2    THE COURT: And those are the only two. So
3 you all need to be prepared to respond to that.
4    MS. MORRIS: Well, that's not exactly quite
5 what --
6    THE COURT: Well that's what you told me
7 this morning.
8    MS. MORRIS: The statements.
9    THE COURT: Yes. Well, who is it -- I
10 thought you were saying those were the members of the
11 conspiracy because it's their statements that come in.
12 Is there someone else who is in the money laundering
13 conspiracy, according to you?
14    MS. MORRIS: Well, Your Honor, it would be
15 our position that, quite frankly, all of those in the
16 drug conspiracy -- I mean, the money laundering is
17 almost a subset, quite frankly -- so everyone in the
18 drug conspiracy, that money has to be laundered.
19    THE COURT: Well, you'll have to show me
20 that people in the drug conspiracy meet the
21 requirements of the money laundering conspiracy. For
22 instance, Mr. Keena Whisenant or Cadillac or all these
23 people, they're supposed to be a part of a money
24 laundering conspiracy?
25    MS. MORRIS: The actual launderers were Mr.

Page 165

1 Carmichael and Ms. Pettus. No question about that.
2 But the agreement to launder money may extend beyond
3 these two people.
4    THE COURT: I understand that, but you have
5 to show me that other people entered into that type of
6 agreement either explicitly or implicitly.
7    MS. MORRIS: Okay.
8    THE COURT: Because you've expanded your
9 money laundering theory now. I need to know it and
10 the defendants need to know it.
11    MS. MORRIS: I understand.
12    THE COURT: We'll take that up at one
13 o'clock. You've got to make that clear so they can
14 respond.
15    MS. MORRIS: Yes, Your Honor.
16    THE COURT: We don't float around here with
17 conspiracies. That's the bad thing about a conspiracy
18 is it gets so amorphous nobody knows what it is.
19 You've got to be concrete.
20    MS. MORRIS: Yes, Your Honor.
21    THE COURT: Court's in recess until one
22 o'clock.
23    (Whereupon, the luncheon recess was held.)
24    IN OPEN COURT
25    THE JURY IS NOT PRESENT:

Multi-Page™

**Page 166**

1    MS. JAMES:  Your Honor, may I be excused for
2  a few minutes to get some of our witnesses lined up?
3    THE COURT:  Yes, but remember I said we were
4  to reconvene at one o'clock.  It's after one.
5    MS. JAMES:  You mean have our witnesses?
6    THE COURT:  No.  You were supposed to be
7  here, I said, at one.  That we were reconvening at
8  one.
9    MS. WAYNE:  I was here, Judge.
10    THE COURT:  Well, you're supposed to be in
11  court and in place.
12    Anyway, I want to rule on the Rule 16 issue
13  with regard to these probate and other documents.
14    What exhibit number is that, by the way?
15    MS. MORRIS:  They're marked as exhibit 14,
16  15, 16, 17, 19 and 67.  And I've marked them
17  separately for each individual piece of property or
18  what have you.
19    THE COURT:  Right.  That objection is
20  overruled.  What I'll do is I'll just read from
21  Moore's Federal Practice and you can go there and find
22  all the citations.  But it says under Rule 16(a)(1),
23  "The government's obligation of disclosure and
24  production is limited to documents and tangible
25  objects that are in the actual possession, custody or

**Page 167**

1  control of the government."  Also it says "Paragraph
2  (e) contains no due diligence language requiring the
3  prosecutor to conduct an interagency search for
4  evidence.
5    "Thus, tangible objects will be considered
6  as being in the possession of the government only if
7  they are in actual possession of the prosecutor or if
8  the prosecutor has knowledge of and access to the
9  objects while they are in the possession of another
10  federal agency.  Objects in the possession of state
11  authorities --" et cetera, "are not discoverable.  The
12  defendant is not entitled to discovery of items that
13  the government does not actually have."
14    And that's a whole discussion about what the
15  position, custody or control possession of paragraph
16  (e) of Rule 16 is.  As I said, you can look at the
17  cases yourself.  I won't clutter the record with them.
18    Oh, and that is from Moore's Federal
19  Practice, section six one six point zero five bracket
20  one end of bracket E end of bracket.
21    So the objection is overruled.
22    Yes, Mr. Brunson?
23    MR. BRUNSON:  Your Honor, just understanding
24  the Court's ruling, it's obvious the situation could
25  exist where the prosecutor just simply tells the

**Page 168**

1  witness don't bring the records.  I don't want to
2  touch those records, you hang on to them.  And
3  therefore we don't have to give them to the defense.
4  I think that is an effort to skirt the rule --
5    THE COURT:  Do you have evidence that that
6  occurred here?
7    MR. BRUNSON:  Just, Your Honor, that the
8  numbering of these exhibits is a low number and,
9  therefore, they were probably anticipated, 14 through
10  19 in a case that's got huge --
11    THE COURT:  I think they probably were
12  anticipated, but do you have any evidence that they
13  consciously tried to not obtain possession so as to
14  skirt Rule 16(e)?
15    MR. BRUNSON:  No, but as to that phone chart
16  that I specifically made phone --
17    THE COURT:  What is the phone chart?
18    MR. BRUNSON:  It is a chart that will come
19  in through the last witness in this case.
20    THE COURT:  That's not as to these
21  documents?
22    MR. BRUNSON:  No.
23    THE COURT:  Let's take that up since the
24  issue is fresh in my mind.  What exhibit are we
25  talking about?

**Page 169**

1    MR. MOORER:  Your Honor, I have developed
2  yesterday as a matter of fact two charts which I
3  intend to use with my -- with what will be the final
4  witness for the United States.  The essence of this
5  document, these two charts is one, it shows numbers of
6  phone calls from numbers from Mr. Carmichael's number
7  to various individuals that have been mentioned during
8  the course of the case, and how many times he's called
9  and from which date to which date.
10    The other one, which will be 62,
11  government's exhibit 62, concerns telephone calls that
12  were made on the 17th of November which was the day of
13  the seizure of the marijuana from Mr. Williams's
14  house.
15    THE COURT:  These are just summary exhibits
16  you came up with?
17    MR. MOORER:  Yes, Your Honor, that I came up
18  with yesterday.
19    THE COURT:  Mr. Brunson?
20    MR. BRUNSON:  Your Honor, these exhibits
21  were derived --
22    THE COURT:  By the way, could I see them so
23  I know what we're talking about?
24    MR. MOORER:  Yes, Your Honor.  And if I may
25  say before Mr. Brunson begins, the documents that

**Page 170**

1 underlie those exhibits, they have had access to them
2 for quite some time.
3    THE COURT: Okay.
4    MR. BRUNSON: Your Honor, we do not deny
5 having access to the underlying documents. Once we
6 received those documents in a voluminous form, I
7 called Ms. Morris and said, "Ms. Morris, obviously
8 we're going to need to do a chart that outlines what
9 these documents mean. I would appreciate it if you
10 would provide that under our discovery request." And
11 she told me that no chart existed, and my drawing from
12 that conversation was that there would be no chart.
13    Obviously, the prosecutor says I'm going to
14 wait until the day before the end of the government's
15 case and prepare the chart from these voluminous
16 records, Your Honor, it would take hours, if not days,
17 to prepare that chart from thousands of pieces of
18 paper.
19    So my point is, that information had been
20 downloaded long before yesterday, and it's not
21 practicable.
22    THE COURT: Let me ask you this, Mr. Moorer:
23 How did you select the particular telephone calls to
24 put on the chart?
25    MR. MOORER: I told my agent when we were

**Page 171**

1 meeting yesterday, I said, "Let's look at the dates
2 that are pertinent to the way the defense has
3 structured its case." So we looked at the 17th, which
4 was the date of the search warrant at Mr. Williams's
5 house about which there has been quite a bit of
6 testimony that the Court has heard already. Then I
7 also said -- asked him, "What was the activity that
8 Saturday or that Sunday," because in opening
9 statements --
10    THE COURT: That's why you have like the
11 date of February 18, 2002 and you have five calls, you
12 tried to correlate the event that occurred on February
13 18, 2002 to five calls?
14    MR. MOORER: Yes, Your Honor. Events that
15 occurred -- If you would look at, I think it's
16 sixty-two, the other chart that I gave you, it broke
17 it down into the Friday -- I'm sorry, the Saturday,
18 Sunday and Monday.
19    THE COURT: This is Saturday and Sunday and
20 Monday of what event?
21    MR. MOORER: The first page, Your Honor, is
22 on the evening preceding the delivery, and then the
23 day of the search warrant at Mr. Williams's house
24 which was the 17th.
25    THE COURT: Why didn't you give the

**Page 172**

1 defendants these charts?
2    MR. MOORER: Because we made them up
3 yesterday, Your Honor, as we were going through them.
4    MR. BRUNSON: That was impossible to make
5 that up yesterday, Your Honor, from the voluminous
6 number of phone records that are out there.
7    MR. MOORER: Your Honor, I was sitting there
8 with my agent. I said, "What calls were made from the
9 17th?" He told me the calls that were made on the
10 17th. In fact, I constructed that chart myself that
11 you were just looking at.
12    THE COURT: How are they supposed to verify
13 the information on the chart when you give it to them
14 just minutes before you're ready to introduce the
15 charts?
16    MR. MOORER: I'm sorry, Your Honor, I
17 couldn't hear you.
18    THE COURT: How are they supposed to verify
19 the information on the charts when you give these
20 charts to them just minutes before?
21    MR. MOORER: I gave them to them this
22 morning.
23    THE COURT: We're in the middle of a trial.
24 How can they make sure, for instance, that there were
25 a hundred and ten calls on February 7, 2003 -- or a

**Page 173**

1 hundred and eleven calls on February 7, 2003, I guess
2 that's on Patrick Denton's Sprint phone?
3    MR. MOORER: Yes, Your Honor.
4    THE COURT: How can they verify that?
5    MR. MOORER: They can look through the
6 records that underlie that exhibit, Your Honor. And I
7 don't know --
8    THE COURT: Just to look through the records
9 here, you're talking about over a thousand calls, over
10 a thousand calls on this exhibit alone. How can they
11 verify that now?
12    MR. MOORER: I don't know how they would.
13 All I can say is that the agent, when he received the
14 information from the phone companies, put it into a
15 computer database so he would be able to pull out the
16 data as he needed to. When they received the
17 documents, they had the opportunity to put them in a
18 data form where they could retrieve them if they chose
19 to. If they didn't choose to, that's their choice.
20    THE COURT: Choose what?
21    MR. MOORER: If they didn't choose it to put
22 it in a database so that they could --
23    THE COURT: No. My question, though, is how
24 can they verify that your charts are accurate?
25    MR. MOORER: If they have a database, they