Multi-Page™

1 can access their database and run it against it.
2     THE COURT: What is this database? Do you
3 have it in a computer database?
4     MR. MOORER: I don't know if they have --
5     THE COURT: Do they have a computer
6 database?
7     MR. MOORER: What I'm saying, Your Honor, is
8 it was put into a spreadsheet, yes, Your Honor.
9     THE COURT: Where is the spreadsheet?
10    MR. MOORER: The agent has it, who will
11 testify.
12    THE COURT: I'm not going to allow these in
13 unless you make the spreadsheet available. And in
14 view of the fact that you want to allow them in, I'll
15 order you to make the spreadsheet available. This is
16 not fair. This is something that should have been
17 prepared before trial that they could verify. They
18 can't go through over a thousand telephone calls to
19 make sure the government's exhibit 61 is ready. I
20 can't even do that.
21     This is not evidence, unless you want to get
22 on the stand and testify, and if you do I'll
23 disqualify you as a lawyer and declare a mistrial.
24 Now there is just no way.
25     And, secondly, unless you have evidence that

1 these are accurate that they have had an opportunity
2 to examine, they're just not admissible and I'm not
3 going to take your word on it. You may have correctly
4 put them together, but people make errors and that's
5 why they examine them to find your errors. I would
6 make errors if I was dealing with a thousand telephone
7 calls.
8     Secondly, they should have the opportunity
9 to show that you put these in a context that is
10 improper. I'm not saying improper in the sense you've
11 done something wrong, but these documents speak as
12 evidence, even though they're not evidence, because
13 you're trying to connect certain phone calls with
14 certain dates. It may be that there were a hundred
15 and ten calls that occurred the day before and the day
16 after. It may be when put in their proper context,
17 these calls don't look that unusual. But they
18 couldn't do that now.
19     So you let them see your database and these
20 are not coming in until I make some determination that
21 you've revealed the information to them. But they're
22 not sufficiently reliable right now; and, secondly, I
23 agree with Mr. Brunson, it's something that should
24 have been furnished to them before trial. And don't
25 do this again. You've presented charts to this Court

1 before. They were made before trial. They were given
2 to the defendants. I know you've done it. If you
3 haven't done it other U.S. Attorneys did it. Don't
4 ever come back into my court again presenting charts
5 as summary exhibits that haven't been shared. It's
6 just not right.
7     Anything else, Mr. Brunson?
8     MR. BRUNSON: No, Your Honor. Thank you.
9     THE COURT: Let's proceed.
10    Now that's just obviously unfair. You don't
11 need a computer or a legal textbook to know how
12 grossly unfair those charts are.
13    MR. FEAGA: Your Honor, recognizing that
14 Mr. Moorer spoke to the Court on that motion, can I
15 just for the record say something?
16    THE COURT: Yes.
17    MR. FEAGA: They have had these phone
18 records for --
19    THE COURT: I don't care whether they have
20 had the phone records. The problem is you have
21 summarized those phone records in a way that supports
22 your case.
23    MR. FEAGA: Your Honor, they have known that
24 we intended to show how many times from these records
25 Mr. Denton called Mr. Williams --

1     THE COURT: But you should have let them see
2 the charts so that they can respond in kind. That's
3 why you present charts to the other side before trial.
4 In fact, I think the rules require that you disclose
5 charts.
6     I agree with Mr. Brunson, this is purely a
7 way to skirt around the rule. And I'm not going to
8 allow it and don't do it again in another case,
9 especially a case that's this big and complex. Just
10 don't do that.
11    MR. FEAGA: Yes, sir.
12    THE COURT: Would you like them to do that
13 to you? Would you like them to come to court, take a
14 thousand different things, put them in a chart, you
15 know nothing about it, you don't even know whether
16 it's accurate or not, you don't know whether it's been
17 sloppily put together, even done in good faith, you
18 would be jumping up and down the walls here. They're
19 entitled to do the same thing.
20    MR. FEAGA: Yes, sir. I understand that.
21 But what I wanted to ask is, it would still be our
22 intention to put on a witness who will say I have been
23 through these records --
24    THE COURT: You get to them your spread
25 exhibit so that we can find out what those things

Multi-Page™

Page 178

1 really show. Whether it's in a chart form or a
2 witness form. Let them see that spread exhibit and
3 let them see it now.
4       MR. FEAGA: Yes, sir.
5       THE COURT: Now, ready for the next witness?
6       MS. MORRIS: The government calls Burt Estes
7 -- Oh, we might need the jury.
8       COURTROOM DEPUTY CLERK: Ready for the jury,
9 sir?
10       THE COURT: Yes, bring in the jury.
11       (Whereupon, the jury was escorted into the
12 courtroom.)
13       MS. MORRIS: The government calls Burt
14 Estes.
15            B U R T   E S T E S,
16 the witness herein, having first been duly sworn or
17 affirmed to tell the truth, was examined and testified
18 as follows:
19            DIRECT EXAMINATION
20       BY MS. MORRIS OF BURT ESTES:
21 Q Would you state your name and spell your last
22 name, please.
23 A Burt Estes. E-s-t-e-s.
24 Q And, Mr. Estes, how are you employed?
25 A I'm the chief clerk of the probate judge,

Page 179

1 Montgomery County.
2 Q And how long have you been there?
3 A Sixteen years.
4 Q And through your employment as the chief clerk
5 with the probate judge, did you receive a subpoena
6 from the U. S. Attorney's Office?
7 A I did.
8 Q A subpoena to show up at trial today?
9 A Yes, ma'am.
10 Q And to bring certain records requested of you, is
11 that correct?
12 A That's correct.
13 Q Okay. And I wanted to take you through those
14 records, if you don't mind, Mr. Estes. I'm going to
15 start by showing you what I have previously marked as
16 government's exhibit 14. If you'll take a look at
17 that, if you don't mind.
18 A Yes.
19 Q Do you recognize it?
20 A Yes, it's a printout of a vehicle ownership.
21 Q And is that a copy of your records from your
22 office?
23 A Yes.
24 Q And are those records kept in the regular course
25 of y'all's every day business?

Page 180

1 A They are.
2 Q And has that record been changed or altered in
3 any way with the exception of the exhibit stamp on
4 there?
5 A No.
6       MS. MORRIS: At this time I'd move to admit
7 government's exhibit 14 into evidence, Your Honor.
8       THE COURT: Admitted.
9       MS. MORRIS: Permission to publish?
10       THE COURT: You may do so.
11 Q Mr. Estes, according to this document, this is a
12 document purporting to be what?
13 A This would be the ownership form for a 2001 Honda
14 Accord.
15 Q Okay. And what color, according to this
16 document, is the Honda Accord?
17 A It's black.
18 Q Okay. And who is the registered owner of this
19 black Honda Accord?
20 A Leon Carmichael, Senior.
21 Q And this Honda Accord owned by Mr. Leon
22 Carmichael, Senior, could you tell us what the V. I.
23 N. number for that black Honda is.
24 A It's zero zero nine four eight seven one seven
25 eight.

Page 181

1 Q I'm sorry, zero zero nine four --
2 A -- eight seven one seven eight.
3 Q Is that the whole V. I. N. number?
4 A Yes, that's on this form it is.
5 Q Okay. And what is the license plate for that
6 black Honda?
7 A It's three A three six nine one L.
8 Q Three A three six nine one L as in Larry?
9 A Right.
10 Q And according to this document, what address is
11 the vehicle information sent to?
12 A Thirty-two twenty-six Brookwood Drive in
13 Montgomery.
14 Q Okay. And could you point -- If you point on
15 your screen it will make a green mark. Could you
16 point on the screen where you see who the owner of
17 this vehicle is.
18       (Whereupon, the witness complied.)
19 Q It never seems to point where I want it to, but
20 that's close enough. Near that arrow.
21       And could you point on your screen where
22 this document shows that it's actually a black Honda
23 Accord?
24 A Here.
25 Q Mr. Estes, I'm showing you what's previously been

Multi-Page™

Page 182

1  marked admitted into evidence as government's exhibit
2  7(l).  Do you see this?
3  A  Mm-hmm.
4  Q  Could you state -- Well, let me see if I can do
5  this.  Could you just call out the license plate on
6  this vehicle.
7  A  Three A three six nine one L.
8  Q  Is that the same license plate that is on the
9  document?  The license plate in this picture, is that
10 the same license plate that's on this document that I
11 just wrote up on the board?
12 A  Yes.
13 Q  That's the same license plate and the document
14 that shows the black Honda is owned by Leon
15 Carmichael?
16 A  Yes.
17 Q  Okay.  It was just brought to my attention, Mr.
18 Estes, as we look over at this document, it looks as
19 though the V. I. N. number is located up here.  Can
20 you see my finger?
21 A  You're right.  I'm sorry.
22 Q  So is the V. I. N. number you gave me and I wrote
23 on the board incorrect?
24 A  That's correct.
25 Q  Okay.  Let's look and see if we can correct this

Page 183

1  mistake.  Can you give me the correct V. I. N. number
2  for the Honda?
3  A  One H G C G one six five two one A zero three
4  three three five four.
5  Q  Mr. Estes, did I also request that you obtain
6  some information on a van?
7  A  Yes.
8  Q  Okay.  I'm showing you what's been previously
9  marked as government's exhibit 67; do you recognize
10 that?
11 A  Yes.  It's a vehicle owner sheet of ours.
12 Q  Okay.  And is that a document that you, as the
13 chief clerk of the Probate Court, regularly keep in
14 the course of your everyday business?
15 A  Yes, it is.
16 Q  And has that document been changed or altered in
17 any way?
18 A  No.
19    MS. MORRIS:  At this time we'd move to admit
20 government's exhibit 67 into evidence.
21    THE COURT:  Admitted.
22    MS. MORRIS:  Permission to publish?
23    THE COURT:  Yes.
24 Q  Mr. Estes, this is a document for what type
25 vehicle?

Page 184

1  A  It's an Econoline van.
2  Q  Okay.  And this Econoline van is registered to
3  who?
4  A  Freddie Williams.
5  Q  What color is that Econoline van?
6  A  White.
7  Q  I'm going to go back and go ahead and put up here
8  "Leon Carmichael's".  And could you, based on that
9  document, tell us what the correct V. I. N. number is
10 for that van?
11 A  Yes, ma'am.  One F T --
12 Q  I'm sorry, can you start again?
13 A  One F --
14 Q  F as in Frank?
15 A  Mm-hmm.  T like in Tom, D like in delta, E one
16 four Y six G H A three one five nine five.
17 Q  One F T D E one four Y six G H A three fifteen
18 ninety-five?
19 A  Yes.
20 Q  And this white van that's registered to Freddie
21 Williams, where does the registration bills go to?
22 A  Thirty-six oh three Alsley Street in Montgomery.
23 Q  Okay.  And this white Econoline van, can you tell
24 me what the license plate on that is?
25 A  Three B like in boy, nine one nine two D delta.

Page 185

1  Q  Three B as in boy, nine nineteen two D?  Is that
2  right?
3  A  Yes.
4  Q  So this is the correct V. I. N. license plate for
5  the white Econoline van that's registered to Freddie
6  Williams, is that correct?
7  A  Yes.
8  Q  And what I wrote up there, the Honda, that's the
9  correct V. I. N. number and license plate for Mr. Leon
10 Carmichael's dark or black Honda Accord, is that
11 right?
12 A  Yes.
13 Q  Okay.  Now I also requested that you bring with
14 you some property records, is that correct?
15 A  Yes.
16 Q  I'm showing you what's been previously marked as
17 government's exhibit 16.  Do you recognize that?
18 A  Yes, I do.
19 Q  What is it?
20 A  This is a property display that we print on
21 property information.
22 Q  And is this property display a record that's
23 regularly kept in the course of your everyday
24 business?
25 A  Yes, it is.

## Page 186

1 Q  And has that been changed or altered in any way
2 since I received it from you?
3 A  No, ma'am.
4     MS. MORRIS: At this time we'd move to admit
5 government's exhibit 16 into evidence.
6     THE COURT: Admitted.
7     MR. BRUNSON: Your Honor, this most recent
8 exhibit contains some handwriting on it that doesn't
9 appear to have -- or it appears to have been added at
10 some point to this exhibit.
11     THE COURT: What is this, Mr. Brunson?
12     MR. BRUNSON: Exhibit 16, the one that has
13 just been admitted has some handwriting on it that
14 appears to have been added at some point.
15     THE COURT: Ms. Morris?
16     MS. MORRIS: I will ask the witness about
17 that, but it's not my handwriting.
18     THE COURT: All right, ask the witness.
19 Q  Mr. Estes, as counsel just mentioned there is
20 some handwriting at the bottom of this record.  Is
21 that your handwriting?
22 A  No, it's my secretary's handwriting.
23 Q  And is this part -- is this writing part of the
24 official record?
25 A  No, ma'am, it's not part of the official record.

## Page 187

1 When we were trying to gather these, in order to have
2 them in the proper sequence we weren't sure if we had
3 it in the right sequence and she wrote down these
4 figures and names that reflect what's on the other two
5 pages.
6 Q  Okay.  But these are notes from the other two
7 pages of this exhibit, is that correct?
8 A  That's right.
9     THE COURT: Do you want these notes taken
10 off, Mr. Brunson?
11     MR. BRUNSON: Yes, Your Honor.
12     THE COURT: Okay.  The exhibits should be
13 redacted to delete the notes.
14     Are these copies?
15     MS. MORRIS: The exhibits are copies.  I
16 think Mr. Estes probably has --
17     THE WITNESS: Yes.
18     THE COURT: Just snip them off of the
19 original exhibits, the official documents.
20     MS. MORRIS: I will do that upon obtaining
21 some scissors.
22     THE COURT: Here are some scissors.
23     MS. MORRIS: Yes, sir.
24     THE COURT: I'm sorry, I handed them to you
25 wrong.  I should have given them to you with the

## Page 188

1 handles facing you.
2 Q  Now, Mr. Estes, I am showing you what was to be
3 an administrative display.
4 A  Yes.
5 Q  And this is a record kept to show ownership of
6 what?
7 A  Property.
8 Q  Which piece of property?
9 A  In this case it's -- well, the address is
10 Nine-seventy Ridgecrest Street.  They have the block
11 and book and page number down there also.
12 Q  And according to those records -- Well, okay.
13 Who is the owner of Nine-seventy Ridgecrest Street or
14 Drive as we sit here today?
15 A  Leon Carmichael, Senior.
16 Q  And this house that's owned by Leon Carmichael,
17 Senior, can you tell from this bundle of records that
18 I just handed you how long Leon Carmichael has owned
19 Nine-seventy Ridgecrest Drive?
20 A  Yes, ma'am.  According to the second page, he
21 bought it in January of '03.
22 Q  In January of 2003?
23 A  Yes.
24 Q  Who did he buy Nine-seventy Ridgecrest Drive
25 from, Mr. Estes?

## Page 189

1 A  Freddie Williams.
2 Q  And he bought this Nine-seventy Ridgecrest from
3 Freddie Williams in January of 2003?
4 A  Correct.
5 Q  How much did he pay for it in January of 2003?
6 A  According to this document, he paid nine thousand
7 dollars for it.
8 Q  Okay.  Now how long had Freddie Williams owned
9 Nine-seventy Ridgecrest Drive prior to selling it to
10 Mr. Carmichael?
11 A  He had bought it on the twelfth day of April in
12 2002.
13 Q  And back on April 12th of 2002 when Freddie
14 Williams bought Nine-seventy Ridgecrest Drive, how
15 much did he pay for it?
16 A  Forty thousand dollars.
17 Q  So let me see if I've got this straight just to
18 get the time line correct.  Freddie Williams purchased
19 Nine-seventy Ridgecrest Drive on April 12th of 2002
20 and paid forty thousand dollars for it, is that
21 correct?
22 A  That's right.
23 Q  And then Mr. Carmichael less than a year later
24 purchased Nine-seventy Ridgecrest Drive from Freddie
25 Williams in January of '03 for nine thousand dollars.

Page 190

1 A Yes, ma'am.
2 Q And, Mr. Estes, how are you making the
3 determination as to how much Leon Carmichael -- Well
4 how are you making the determination that Leon
5 Carmichael paid nine thousand dollars for Nine-seventy
6 Ridgecrest Drive and Freddie Williams paid forty
7 thousand dollars for Nine-seventy Ridgecrest Drive?
8 A We have to go by the deed tax, and the deed tax
9 is one dollar per thousand of the purchase price. And
10 the deed tax where Mr. Carmichael bought it from Mr.
11 Williams is nine dollars, and the deed tax where Mr.
12 Williams bought it from Mr. and Mrs. Myers is forty
13 dollars.
14 Q So, Mr. Estes, I'm showing you a section of page
15 two of exhibit 16. I believe you can see that it
16 says, and if you'll point for the jury where it says
17 "deed tax".
18 A Here.
19 Q Okay. And then the nine dollars, right there
20 next to or across from it, is that correct?
21 A Yes.
22 Q And this is Freddie Williams' signature at the
23 bottom, is that correct?
24 A Yes, ma'am.
25 Q And I'm showing you, like I said, the second page

Page 191

1 of exhibit 16, which purports to be a warranty deed,
2 is that correct?
3 A That's right.
4 Q And this is a warranty deed for what?
5 A Conveying this property from one person to the
6 other.
7 Q From whom to whom?
8 A In this case from Freddie Williams to Leon
9 Carmichael.
10 Q Okay. Now I'm looking at page three of exhibit
11 16 which purports to be another warranty deed, is that
12 correct?
13 A Yes.
14 Q Do I need to blow this up for you?
15 A No.
16 Q Okay. I'm not sure that I can read it. But this
17 warranty deed conveys the property from whom to whom?
18 A It's from Jimmy and Loretta Myers to Freddie
19 Williams.
20 Q And according to the deed tax on this warranty
21 deed, how much did Freddie Williams pay for this?
22 A Forty thousand dollars.
23 Q And this was on what date?
24 A The twelfth day of April 2002.
25 Q Mr. Estes, I also requested that you bring in

Page 192

1 property records from Sixteen twenty-three Mobile
2 Road, is that correct?
3 A Yes.
4 Q And I'm showing you what's been previously marked
5 as government's exhibit 15. Do you recognize that?
6 A I do.
7 Q And what is it?
8 A It's the administrative display of the property
9 records.
10 Q You might need to flip through the pages and make
11 sure that they all pertain to Sixteen twenty-three
12 Mobile Road.
13 A Yes, they do. These on the back are
14 administrative displays as far as property taxes are
15 concerned.
16 Q Is it pertaining to Sixteen twenty-three Mobile
17 Road, though?
18 A Yes.
19 Q All of those documents in the packet, or the bulk
20 exhibit marked government's exhibit 15, are all of
21 those documents kept in the regular course of your
22 everyday business?
23 A Yes, they are.
24 Q As the chief clerk of the Probate Court?
25 A Yes.

Page 193

1 Q And as you flipped through those documents, had
2 any of those documents been changed or altered in any
3 way?
4 A No.
5     MS. MORRIS: Okay. At this time we'd move
6 to admit government's exhibit 15 into evidence.
7     THE COURT: Admitted.
8 Q Mr. Estes, I think I'm showing you another
9 administrative display from your office, is that
10 correct?
11 A Yes.
12 Q And this is for the property addressed Sixteen
13 twenty-three Mobile Road, is that correct?
14 A That's right.
15 Q Who is the purported owner of Sixteen
16 twenty-three Mobile Road?
17 A Leon Carmichael, Senior.
18 Q And what address or billing address do you have
19 for Sixteen twenty-three Mobile Road?
20 A Thirty-two twenty-six Brookwood Drive in
21 Montgomery.
22 Q I believe you just testified that the owner of
23 Sixteen twenty-three Mobile Road is whom?
24 A Leon Carmichael, Senior.
25 Q And the billing address or the address on here,

Page 194

1 the Thirty-two twenty-six Brookwood Drive, is that the
2 address that you send the property taxes and stuff to?
3 A  Yes, ma'am.
4 Q  Is that why that address is on there?
5 A  Right.
6 Q  So would you call that the billing address?
7 A  That's where the property tax notice goes.  We
8 call it "the billing address," yes.
9 Q  You do call it that?  So if I put up here the
10 billing address for the taxes for this, that would be
11 a correct statement?
12 A  Yes, ma'am.
13 Q  And that's here in Montgomery, is that correct?
14 A  Right.
15 Q  Mr. Estes, I am showing you what I'm referring to
16 as page two of exhibit 15 which purports to be a
17 warranty deed.
18 A  That's right.
19 Q  And what property is this -- Well, is this a
20 warranty deed for Sixteen twenty-three Mobile Road?
21 A  Yes, it is.
22 Q  And is it conveying the property from one person
23 to another?
24 A  Yes, it is.
25 Q  Who is it conveying the property to?

Page 195

1 A  Leon Carmichael, Senior.
2 Q  From whom?
3 A  Sandra Jones.
4 Q  So based on this warranty deed, Sandra Jones sold
5 Sixteen twenty-three Mobile Road to Leon Carmichael?
6 A  That's correct.
7 Q  When did that happen?
8 A  January the 5th of 1999.
9 Q  And can you tell from that document how much Leon
10 Carmichael bought that property for?
11 A  Eight thousand dollars.  It's not from that page,
12 it's from the second page that goes with it that has
13 the stamp on it.
14 Q  Okay.  So what I would refer to as the third page
15 of the document that I just handed you?
16 A  Well, I think it's actually the fourth page.  At
17 least mine.  It might have been more.
18 Q  I have it, for the record, as the third page of
19 document 15.
20 A  Okay.
21 Q  This is page two of that warranty deed, is that
22 correct?
23 A  Yes, it is.
24 Q  Okay.  So you're getting the information that
25 Sandra Jones sold Sixteen twenty-three Mobile Road to

Page 196

1 Leon Carmichael for eight thousand dollars based on,
2 again, this deed tax, is that correct?
3 A  Yes.
4 Q  And could you again point out the deed tax in
5 this little section.  Sometimes you have to hit that
6 screen hard.
7      Mr. Estes, I'm showing you what I have as
8 page four of government's exhibit 15 --
9 A  Right.
10 Q  -- which purports to be another warranty deed?
11 A  Yes.
12 Q  While it is not a fantastic copy, can you tell
13 from had warranty deed, I'm assuming it's someone
14 conveying property to someone else, is that correct?
15 A  It is.
16 Q  And who person is conveying another property to
17 another person?
18 A  Jeffrey Silverman is selling Sixteen twenty-three
19 Mobile Road to Sandra Jones.
20 Q  And when did Sandra Jones buy Sixteen
21 twenty-three Mobile Road?
22 A  February the 7th -- I believe it's the 7th -- of
23 1995.
24 Q  And how much did Ms. Jones pay for Sixteen
25 twenty-three Mobile Road when she bought it from Mr.

Page 197

1 Silverman?
2 A  This has a mortgage with it, but she paid thirty
3 thousand dollars.
4 Q  So just so I get the chronological --
5 chronologically correct, on February 7 Sandra Jones
6 bought Sixteen twenty-three Mobile Road for thirty
7 thousand dollars, is that correct?
8 A  That's correct.
9 Q  And then on approximately a little less than four
10 years later she sold Sixteen twenty-three Mobile Road
11 to Leon Carmichael for eight thousand dollars, is that
12 correct?
13 A  That's correct.
14 Q  Now, Mr. Estes, I'm showing you what's been
15 previously marked as government's exhibit 17.  Do you
16 recognize that?
17 A  Yes, it's an administrative display of property
18 words.
19 Q  For what property?
20 A  Forty-six twenty-one Rosa Parks Avenue.
21 Q  Okay.  And if you don't mind flipping through
22 that kind of bulk exhibit, are all of those documents
23 for the Rosa Parks address?
24 A  Yes, they are.
25 Q  And those are documents that are regularly kept

Multi-Page™

Page 198

1 in the course of your everyday business, is that
2 correct?
3 A That's right.
4 Q And have any of the documents been changed or
5 altered in any way, obviously with the exception of
6 that exhibit tag?
7 A No.
8     MS. MORRIS: At this time we'd move to admit
9 government's exhibit 17 into evidence, Your Honor.
10    THE COURT: Admitted.
11    MS. MORRIS: Permission to publish?
12    THE COURT: Yes.
13 Q According to this document, Mr. Estes, who is the
14 owner of Forty-six twenty-one Rosa Parks Drive?
15 A Leon Carmichael, Senior.
16 Q And according to these documents, can you tell
17 when Mr. Carmichael purchased Forty-six twenty-one
18 Rosa Parks Drive?
19 A No, I can't tell on this one.
20 Q Okay. Is it because there's no deed tax stamp?
21 A That's right.
22 Q Okay. Can you tell -- You can't tell when he
23 purchased it, can you tell from whom he purchased it?
24 A It appears he purchased it from Lane Clayton.
25 Q Okay. Mr. Estes, are you obtaining that

Page 199

1 information from this document that I'm showing you
2 right here?
3 A Yes.
4 Q Okay. And I'm flipping the pages to that same
5 document, and on that back page there purports to be a
6 signature of Leon Carmichael. Do you see that, sir?
7 A Yes.
8 Q And there's a date ahead of that, or on top of
9 that, before that.
10 A December the 13th of 1989.
11 Q And would that be the date that Mr. Carmichael
12 purchased this Forty-six twenty one Rosa Parks
13 property?
14 A Yes. According to these records, yes.
15 Q And what is that date again, sir?
16 A December the 13th of 1989.
17 Q And you don't have any records in this bulk
18 exhibit, or were you able to find any records that
19 show that Mr. Carmichael sold forty-six twenty-one
20 Rosa Parks Drive, were you?
21 A No.
22 Q So as far as you know, and according to your
23 records, Mr. Carmichael still owns the property
24 located at Forty-six twenty-one Rosa Parks Drive, is
25 that correct?

Page 200

1 A That's correct.
2 Q If you'll forgive me, Mr. Estes, I have to go
3 back a step here. I should have gone over this
4 earlier when we were talking about Sixteen
5 twenty-three Mobile Road, but as part of that exhibit
6 that I handed you with exhibit 15, you stated that
7 there were also some tax collection notices attached.
8 A That's correct.
9 Q Do you recall saying that?
10 A Yes.
11 Q Okay. I'm going to show you a series of tax
12 collection printouts for lack of a better word. Is
13 this one of the documents that you provided to me?
14 A It is.
15 Q Okay. And this is a tax collection printout, is
16 that what you would call it?
17 A Yes, for the tax year of 1999.
18 Q Okay. And this is for what piece of property?
19 A It's Sixteen twenty-three Mobile Road.
20 Q Okay. And who does it say is the owner in 1999
21 of Sixteen twenty-three Mobile Road?
22 A Sandra Jones.
23 Q Does it say on this tax collection printout who
24 is responsible for the taxes?
25 A Yes. Just below that the taxes are to be sent to

Page 201

1 Leon Carmichael, Senior.
2 Q Would you point like you have been pointing on
3 the screen where you say -- Okay. And I believe if
4 I'm correct, but it says, "care of Carmichael Leon,
5 Senior," then it says, "Thirty-two twenty-six B".
6 Would that be the first part of his address, Mr.
7 Estes?
8 A Yes.
9 Q The billing address?
10 A Yes.
11 Q For the tax collection notices.
12 A That's correct.
13 Q Okay. So based on this document, is this
14 document telling you, basically, that Mr. Carmichael
15 was paying taxes at Sixteen twenty-three Mobile Road?
16 A It's telling me that we sent the tax notices to
17 him at this address.
18 Q Okay. Now, Mr. Estes, I'm showing you another
19 one of these tax collection notices. For what year is
20 this tax collection notice?
21 A 2000.
22 Q And where are you seeing the tax year, or the
23 year that you're discussing?
24 A It's up here.
25 Q Okay, thank you.

**Page 202**

1 And, again, on this tax collection notice
2 who is the property owner?
3 A Sandra Jones.
4 Q But who is it in care of?
5 A The notice was sent to Leon Carmichael, Senior.
6 Q And at that same Thirty-two point six Brookwood
7 address?
8 A Yes.
9 Q And this is a tax collection notice for what
10 property?
11 A Mobile Road. Sixteen twenty-three Mobile Road.
12 Q So the taxes were sent to Leon Carmichael in
13 1999, is that correct?
14 A Yes.
15 Q And in 2000?
16 A That's correct.
17 Q Mr. Estes, I'm showing you what's been -- well,
18 another tax collection printout. And this is for what
19 year?
20 A 2001.
21 Q And this shows the property owner as whom?
22 A Leon Carmichael, Senior.
23 Q Okay. And the taxes are listed to his address in
24 care of him, is that correct?
25 A That's correct.

**Page 203**

1 Q Do the property collection notices reflect
2 through 2004, I'm going to skip to 2004 if you don't
3 mind, the property owner is Leon Carmichael, is that
4 correct?
5 A That's correct.
6 Q And that's the property owner of Sixteen
7 twenty-three Mobile Road?
8 A Right.
9 Q And according to your records, is Leon Carmichael
10 the property owner of Sixteen twenty-three Mobile Road
11 according to these tax printouts on the years 2001,
12 2002 and 2003?
13 A And 2004.
14 Q And 2004, as we have up here on the little
15 screen.
16 A Right.
17 Q Okay. Now, Mr. Estes, I also requested that you
18 spend or bring to court today information dealing with
19 Forty-three ten Norman Bridge Road.
20 A Yes.
21 Q And I'm showing you what's been previously marked
22 as government's exhibit 19. If you don't mind
23 flipping through that.
24 A Yes.
25 Q And are those records pertaining to the Norman

**Page 204**

1 Bridge Road address?
2 A They are.
3 Q For what address is that?
4 A Forty-three ten Norman Bridge Road.
5 Q And are those records normally kept in the
6 regular course of your everyday business as the chief
7 clerk of the Probate Court?
8 A Yes, they are.
9 Q And Have they been changed or altered in any way?
10 A No, they have not.
11 MS. MORRIS: At this time we'd move to admit
12 government's exhibit 19 into evidence.
13 THE COURT: Admitted.
14 MS. MORRIS: Permission to publish, Your
15 Honor?
16 THE COURT: You may do so.
17 Q Now, again, this is an administrative display or
18 an administrative printout, is that correct?
19 A That's right.
20 Q And that's for Forty-three ten Norman Bridge
21 Road?
22 A That's correct.
23 Q Forty-three ten Norman Bridge Road is owned by
24 whom?
25 A Leon Carmichael, Senior.

**Page 205**

1 Q Mr. Estes, the owner's name -- or the mailing
2 address for Forty-three ten Norman Bridge Road is
3 where?
4 A Thirty-two twenty-six Brookwood Drive in
5 Montgomery.
6 Q Mr. Estes, I'm showing you what purports to be a
7 corporation warranty deed. Do you see that?
8 A Yes.
9 Q And this is, I'm assuming, one entity selling a
10 piece of property to another, is that right?
11 A That's right.
12 Q Could you tell me who is selling to whom?
13 A Hudson Contracting Company is selling to Leon
14 Carmichael, Senior.
15 Q And when was this piece of property sold to Mr.
16 Carmichael?
17 A December the 15th, 1994.
18 Q 1994?
19 A Yes.
20 Q So according to your records Mr. Carmichael has
21 owned the property at Forty-three ten Norman Bridge
22 Road since December 15th, 1994?
23 A That's correct.
24 (Whereupon, Ms. Morris conferred with Mr. Feaga
25 and Mr. Moorer off the record and out of the hearing

Multi-Page™

| Page 206 | Page 208 |
|---|---|
| 1 of the other courtroom participants.) | 1 and that's it? |
| 2　　　THE COURT: Anything else, Miss Morris? | 2　　　MR. FEAGA: Your Honor, if you'll give me a |
| 3　　　MS. MORRIS: No, Your Honor. | 3 moment to consult with co-counsel. That would be |
| 4　　　THE COURT: Who for the defendants? | 4 correct except for one thing. Your Honor, we didn't |
| 5 Mr. Brunson? | 5 get to complete our direct examination of Agent |
| 6　　　MR. BRUNSON: Yes, Your Honor. | 6 DeJohn. |
| 7　　　CROSS EXAMINATION | 7　　　THE COURT: Correct. That is true. |
| 8　　　BY MR. BRUNSON OF BURT ESTES: | 8　　　PRISCILLA LUSTER, |
| 9 Q Good afternoon, Mr. Estes. I met you earlier. | 9 the witness herein, having first been duly sworn or |
| 10 My name is Ron Brunson. | 10 affirmed to tell the truth, was examined and testified |
| 11 A Yes. | 11 as follows: |
| 12 Q Sir, were you asked to bring any other property | 12　　　DIRECT EXAMINATION |
| 13 or deed or mortgage information on Mr. Leon Carmichael | 13　　　BY MR. FEAGA OF PRISCILLA LUSTER: |
| 14 today? | 14 Q Good morning, ma'am. How are you? |
| 15 A Besides the other property? | 15 A I'm fine. And you? |
| 16 Q Besides the ones you've shown me already. | 16 Q I'm fine. Thank you. |
| 17 A Yes. I was asked to bring one other. | 17　　　Ma'am, would you tell the ladies and |
| 18 Q Just one other? | 18 gentlemen of the jury your name? |
| 19 A Well, there may be two. I don't think we covered | 19 A Priscilla Luster. |
| 20 this one right here. | 20 Q And what do you do for a living, Miss Luster? |
| 21 Q All right. But were you asked to search the | 21 A Compass Bank teller. |
| 22 probate records of Montgomery County for any other | 22 Q How long have you been working in -- Where is |
| 23 properties that he may own? | 23 Compass Bank? |
| 24 A No, I was asked on specific locations to give the | 24 A In Normandale. |
| 25 information as to who owns that property. | 25 Q Here in Montgomery, Alabama? |

| Page 207 | Page 209 |
|---|---|
| 1 Q And if he were to own forty some-odd other pieces | 1 A Yes. |
| 2 of property in Montgomery County, you weren't asked to | 2 Q How long have you been working there? |
| 3 research that information? | 3 A Five years. |
| 4 A No, sir. | 4 Q And what are your duties and responsibilities at |
| 5 Q If he were to own another twenty or so motor | 5 the bank, Miss Luster? |
| 6 vehicles, you weren't asked to research that | 6 A Paying and receiving. |
| 7 information? | 7 Q And when you say "paying and receiving," would |
| 8 A No. | 8 you tell the ladies and gentlemen of the jury what |
| 9　　　MR. BRUNSON: No further questions. | 9 somebody that does paying and receiving does? |
| 10　　　THE COURT: Mr. Teague? | 10 A When someone comes in doing a deposit, or making |
| 11　　　MR. TEAGUE: No questions, Your Honor. | 11 payments on something, or trying to cash a check or |
| 12　　　THE COURT: Redirect? | 12 something like that. |
| 13　　　MS. MORRIS: No, Your Honor. | 13 Q Ma'am, I want to show you what's been marked for |
| 14　　　THE COURT: Thank you. You may step down. | 14 identification purposes as government's exhibit 45. |
| 15　　　(Whereupon the witness, Burt Estes, stepped | 15 This is a self-authenticating copy from the Department |
| 16 down from the stand.) | 16 of Public Safety of a driver's license. And I'd like |
| 17　　　THE COURT: Next witness. | 17 to ask you, if you would, to look at the picture |
| 18　　　MR. FEAGA: Priscilla Luster, Your Honor. | 18 depicted there. And I'd like to ask you if you |
| 19　　　THE COURT: Luster? | 19 recognize the person in that picture. |
| 20　　　MR. FEAGA: Yes, sir. | 20 A Yes, sir, I do. |
| 21　　　THE COURT: Is it Luster? | 21 Q Would you tell the ladies and gentlemen of the |
| 22　　　MR. FEAGA: L-u-s-t-e-r I believe, Your | 22 jury how it is that you recognize the person in the |
| 23 Honor. | 23 picture? |
| 24　　　THE COURT: Very good. | 24 A She came in and made a deposit as one of Compass' |
| 25　　　After Ms. Luster you have two more witnesses | 25 customers. |

Multi-Page™

Page 210

1 Q  You're saying she came they and made --
2 A  Deposits.
3 Q  Deposits?
4 A  Yes.
5 Q  More than one?
6 A  Yes.
7 Q  Was there anything unusual about the deposits
8 that this individual made?
9 A  Yes.
10 Q  What was that?
11 A  The money smelled real bad.
12 Q  Okay.  Now would you tell the ladies and
13 gentlemen of the jury what you mean when you say "the
14 money smelled real bad"?
15 A  It was just stinky money.  It just smelled real
16 sour to the point where when we took it in we had to
17 go wash our hands when we got finished with it.  And
18 we had to actually take it out of our drawer because
19 it still smelled.
20 Q  Now was the money that she was depositing cash or
21 checks?
22 A  Cash.
23 Q  Okay.  And in terms of the amount, were these
24 large deposits or small deposits that you remember
25 being made?

Page 211

1 A  Large.
2 Q  And there was more than one of them?
3 A  I remember taking at least one, and there was
4 more other deposits that other tellers took.
5 Q  All right.  Would you say that based on your
6 memory of the events that Miss Pettus came in there,
7 this person depicted in this photo, came into the bank
8 on many occasions with this money that smelled?
9 A  Yes.
10 Q  What was the reaction in the bank when you all
11 would see her coming?
12 A  Everybody would either get up and leave their
13 window or stall with the customer they had so they
14 wouldn't have to wait on her.
15 Q  Now do you remember the deposits that she was
16 making being in amounts of excess of five thousand
17 dollars?
18 A  Yes.
19 Q  And it happened on multiple occasions?
20     THE COURT:  Has the exhibit that's on the
21 screen been admitted?
22     MR. FEAGA:  I'll ask it be admitted now,
23 Your Honor.
24     THE COURT:  It's admitted.  You can't
25 publish an exhibit to the jury until first having it

Page 212

1 admitted.
2     MR. FEAGA:  I apologize, Your Honor.
3 Q  Was this something that happened on a regular
4 basis during the year 2002?
5 A  Yes.
6 Q  Did you ever have a chance to talk to Miss Pettus
7 when she was making a deposit?
8 A  Yes.
9 Q  Did you ever ask her why the money smelled so
10 bad?
11 A  Yes.
12 Q  What, if anything, did she say to you?
13 A  She said that she was a promotional concert --
14 she did promotional concerts and that they were
15 sweating on the money.
16 Q  So at the time that she was making these deposits
17 she told you they came from concerts?
18 A  Yes.
19 Q  And explained the money was stinking because
20 people had been sweating on it?
21 A  Yes.
22     MR. FEAGA:  No further questions for this
23 witness.
24     THE COURT:  Cross?
25     MR. BRUNSON:  Yes, Your Honor.

Page 213

1         CROSS EXAMINATION
2     BY MR. BRUNSON OF PRISCILLA LUSTER:
3 Q  Miss Luster, that money didn't smell like it had
4 been sweated on it, had it?
5 A  No.
6 Q  It smelled pretty bad?
7 A  Yes.
8 Q  You said it smelled real bad, it was sour money.
9 A  Yes.
10 Q  With that smell, and I know it's hard to recreate
11 a smell like that especially when you had to wash it
12 off your hands after you finished counting it, but
13 would that smell be a smell like it was mildewed or
14 molded or money that had been buried in some damp
15 location for a long time?
16 A  The only thing I can describe it as being is
17 sour.  I mean, A cloth like sour doesn't smell as sour
18 as this smelled.  It was real sour with a loud smell
19 and it had a damp feel to it.
20 Q  It didn't smell like, and I'm not even sure
21 whether you know what maybe marijuana smells like, it
22 didn't smell like a drug like marijuana, did it?
23 A  No.
24 Q  It smelled like it was mildewed and damp.  And in
25 fact, when you counted it it was still a little damp,

Page 214

1 wasn't it?
2 A  Yes.
3 Q  And you said it came in on more than one
4 occasion.  You only handled it one time?
5 A  Yes.
6 Q  And you said it was for over five thousand.  You
7 remember that being the case?
8 A  I remember it being six from when I did the
9 deposit.
10 Q  Okay.  Thank you ma'am.
11      THE COURT:  Mr. Teague?
12      MR. TEAGUE:  No, Your Honor.
13      THE COURT:  Any further direct?
14      MR. FEAGA:  No, Your Honor.
15      THE COURT:  Thank you.
16      (Whereupon the witness, Priscilla Luster,
17 stepped down from the stand.)
18      THE COURT:  Next witness.
19      MR. FEAGA:  Alicia Oree.
20           A L I C I A   O R E E,
21 the witness herein, having first been duly sworn or
22 affirmed to tell the truth, was examined and testified
23 as follows:
24      DIRECT EXAMINATION
25      BY MR. FEAGA OF ALICIA OREE:

Page 215

1      THE COURT:  Proceed.
2 Q  Ma'am, would you tell the ladies and gentlemen of
3 the jury of the jury your name?
4 A  Alicia Oree.
5 Q  And what do you do for a living?
6 A  I'm an office assistant.
7 Q  And where are you an office assistant?
8 A  Therapeutic Programs.
9 Q  And how long have you been employed in that
10 capacity, ma'am?
11 A  About ten months.
12 Q  And prior to that time where did you work?
13 A  Compass Bank.
14 Q  And how long did you work at Compass Bank?
15 A  Five and-a-half years.
16 Q  And where is Compass Bank?
17 A  On Five hundred East Patton Avenue.  Norman
18 Bridge Road.
19 Q  Is that here in Montgomery, Alabama?
20 A  Yes, it is.
21 Q  Okay.  Do you know somebody named Priscilla
22 Luster?
23 A  Yes, I do.
24 Q  Let me show you what's been admitted into
25 evidence in this case as government's exhibit 45.  I'd

Page 216

1 like to ask you if you recognize the person whose
2 picture is depicted in that exhibit.
3 A  Yes, I do.
4 Q  Okay.  And would you tell the ladies an gentlemen
5 of the jury how it is that you recognize this person?
6 A  She was a customer coming to the branch.
7 Q  Okay.  Now when this customer came to the bank,
8 do you have specific recollections of her coming to
9 the bank?
10 A  You mean the —
11 Q  The exact days no.  But do you remember her
12 coming?
13 A  Yes, I do remember her coming.
14 Q  Do you remember her coming more than one time?
15 A  Yes.
16 Q  Okay.  Would you say she came into the bank a lot
17 of times?
18 A  A lot, yes.
19 Q  And was this happening during the year 2002?
20 A  2001, 2002.  I'm really not sure of the exact
21 year.
22 Q  Okay.  The bank records would reflect when it was
23 happening, is that right?
24 A  Right.
25 Q  And when she came into the money, did she bring

Page 217

1 cash with her?
2 A  She did.
3 Q  And was there anything about that cash that you
4 particularly remember?
5 A  It had a distinctive odor to it.
6 Q  Tell the ladies and gentlemen of the jury when
7 you say distinctive odor.
8 A  It had a very bad smelling odor to it.  It
9 smelled really bad.
10 Q  Okay.  And what would be the reaction, if any, in
11 the bank when people would see Miss Pettus coming?
12 A  They would try to go the other way to keep from
13 waiting on her.
14 Q  Did you wait on her?
15 A  I did.
16 Q  Did you wait on her more than one time?
17 A  I did, yes.
18 Q  And did she deposit the cash into her account at
19 the bank?
20 A  Yes, she did.
21 Q  This was an account in her name?
22 A  Yes.
23 Q  And these deposits that she made, were they in
24 large amounts of money?
25 A  They were.

## Page 218

1 Q Were they oftentimes in amounts that were close
2 to ten thousand dollars?
3 A They were, yes.
4 Q And did you ever have a conversation with
5 Miss Pettus when she came in to make a deposit wherein
6 you told her that she needed to deposit less than ten
7 thousand dollars in order to keep from having to file
8 a cash transaction report?
9 A No.
10 Q You never told her not to do that?
11 A Not to file the report? No.
12 Q What is the bank's policy on people who come in
13 and put cash in the bank for more than ten thousand
14 dollars?
15 A Have to do a currency transaction report.
16 Q Okay. And were you ever instructed by anybody at
17 the bank to tell somebody that they didn't need to,
18 that if they would just deposit less money they
19 wouldn't have to do this?
20 A No.
21 Q In fact, if they came in and did more than that,
22 you were supposed to do the paperwork, right?
23 A We were supposed to let our manager know and the
24 manager does the paperwork, yes.
25 Q But you would never tell the customer oh, take

## Page 219

1 less money and put it in?
2       MR. BRUNSON: Your Honor, it's a leading
3 question.
4       THE COURT: I'll allow that question. Go
5 ahead.
6 Q If a customer came in with fifteen or twenty
7 thousand in cash, you wouldn't say oh, whoa, only put
8 ninety-eight hundred in or ninety-six hundred and then
9 we wouldn't have to do this paperwork, would you?
10 A No.
11 Q That would be against bank policy, would it?
12 A Right.
13 Q Do you know any other teller in the bank that
14 would do something like that?
15 A No.
16       MR. FEAGA: No further questions, Your
17 Honor.
18       THE COURT: Cross?
19           CROSS EXAMINATION
20       BY MR. BRUNSON OF ALICIA OREE:
21 Q Good morning, Miss Oree. I'm Ron Brunson.
22       You said that Miss Pettus came into the bank
23 very often. You were a part-time employee, is that
24 right?
25 A At that time, yes.

## Page 220

1 Q How often did you work?
2 A Three days a week.
3 Q And were you -- Of those three days a week, do
4 you recall seeing her come in very often, you said?
5 A Mm-hmm. Out of those three days, yes.
6 Q And about how many times were you the teller that
7 she brought the smelly money to?
8 A About twice. Twice a week.
9 Q And you had to count it and go through it. Each
10 time was the money similar in character, it smelled
11 about the same and felt a little moist each time?
12 A It was similar in character, yes.
13 Q Okay. And in describing the smell of the money,
14 would you say that's money that had been soured
15 somehow?
16 A Soured, yes.
17 Q Mildewed, molded?
18 A A lot of different odors combined.
19 Q Something you really can't describe?
20 A Yes.
21 Q Okay. No further questions.
22       THE COURT: Mr. Teague?
23       MR. TEAGUE: No, Your Honor.
24       THE COURT: Any redirect?
25           REDIRECT EXAMINATION

## Page 221

1       ON MR. FEAGA OF ALICIA OREE:
2 Q Mr. Brunson, in his cross examination, was asking
3 you some questions about how often. Did you say about
4 twice a week?
5 A I only worked three days out of the week, and
6 maybe about out of those three days it was twice a
7 week.
8 Q About twice a week during the time that she was
9 making deposits into this account?
10 A Mm-hmm.
11 Q Did you ever ask her why the money smelled so
12 bad?
13 A No, I didn't.
14       MR. FEAGA: No further questions.
15       THE COURT: Anything else?
16       MR. BRUNSON: No, Your Honor.
17       THE COURT: Thank you.
18       (Whereupon the witness, Alicia Oree, stepped
19 down from the stand.)
20       THE COURT: Next witness.
21       MR. FEAGA: We want to finish with
22 Investigator DeJohn, Your Honor.
23       THE COURT: This is your last witness?
24       MR. FEAGA: No, we have one more.
25       THE COURT: Who is that one more?

Multi-Page™

Page 222

1 MR. FEAGA: That would be Devin Whittle,
2 Your Honor, of the D. E. A.
3 THE COURT: How long will he take?
4 MR. FEAGA: Your Honor, I don't think he'll
5 take terribly long.
6 THE COURT: Let's take him, then, right now.
7 D E V I N   W H I T T L E,
8 the witness herein, having first been duly sworn or
9 affirmed to tell the truth, was examined and testified
10 as follows:
11 DIRECT EXAMINATION
12 BY MR. MOORER OF DEVIN WHITTLE:
13 Q Would you state your name, please.
14 A Devin Whittle.
15 Q What do you do for a living?
16 A I'm a special agent with the Drug Enforcement
17 Administration.
18 Q Would you briefly relate to the jury your
19 background and your training and experience that
20 qualifies you to serve as a D. E. A. agent?
21 A When I was hired by the D. E. A. I was sent to
22 Quantico, Virginia to the D. E. A. / F. B. I. academy
23 where I completed a course there and graduated. I've
24 had some ongoing training since then in various areas.
25 Q And have you actually worked as a Drug

Page 223

1 Enforcement Administration agent in narcotics law
2 enforcement?
3 A Yes, for nine years.
4 Q And prior to working in D. E. A. did you have
5 prior law enforcement experience?
6 A Yes, I was a Montgomery police officer for eight
7 years.
8 Q Agent Whittle, were you on duty on November the
9 17th of 2003?
10 A Yes, I was.
11 Q Would you tell the jury what you were doing on
12 that evening which has led to you being a witness here
13 in court today?
14 A I participated in a search warrant at Patrick
15 Denton's house.
16 Q And about what time did you begin to become
17 involved in executing the search warrant at Patrick
18 Denton's house on Fleming Road on November the 17th of
19 2003?
20 A I was not actually at the warrant when it was
21 executed, I was involved in some surveillance that was
22 taking place that night. We had been doing
23 surveillance.
24 Q Okay. Well let me move you forward from your
25 surveillance, then. Did you obtain certain records,

Page 224

1 or other agents obtain certain records related to the
2 search warrant that was done at Patrick Denton's house
3 on November 17, 2003?
4 A Yes, I did.
5 Q Now prior to coming into court today, did you
6 have occasion to look at what I have previously marked
7 as government's exhibit 27, 28, 29, 30, 25(a), 26(a)
8 and 26(c)? Did you have an opportunity to look at
9 those before you came into court -- oh, and
10 government's exhibit 25, did you have occasion to look
11 at those before you came into court today?
12 A Yes, I did.
13 Q And were these records that were subpoenaed by
14 your other agents?
15 A That's correct.
16 Q And what are these records in general that I have
17 just listed for the jury?
18 A They're either subscriber for cell phones or land
19 lines or tolls for cell phones and land lines.
20 Q Why would you as a D. E. A. agent gather such
21 records as the ones that I've mentioned in
22 government's exhibits 25, et cetera?
23 A There are several reasons we subpoena records,
24 phone records in these situations. One is
25 specifically around an event that happens to see what

Page 225

1 was transpiring on the telephone while these events
2 were happening.
3 In addition, another reason we do it is to
4 corroborate what some informants may have said to us
5 regarding their activities on telephones.
6 Q Now on November the 17th of 2003, while the
7 agents were executing the search warrant at Patrick
8 Denton's house did you try to gather some records
9 through these subpoenas for these records that we have
10 here related to a search warrant?
11 A Yes, I did.
12 Q And specifically, did you try to gather some
13 records related to any phone calls that Patrick Denton
14 might have received on that day?
15 A Yes, I did.
16 Q Would you tell the jurors what, if any telephone
17 contact was made by a phone registered to Leon
18 Carmichael on that day with any phones that might have
19 been registered to Patrick Denton on that day?
20 A At two thirty-eight a.m. in the morning, a
21 cellular telephone used by Leon Carmichael placed a
22 call to a cellular telephone used by Patrick Denton.
23 Q We'll see L. C., will that be Mr. Carmichael's
24 name? You said it was two thirty-eight a.m.?
25 A That's correct.

**Multi-Page™**

**Page 226**

1 Q To the phone registered to Patrick Denton?
2 A That's correct.
3 Q And were there any other calls at or near that
4 time of two thirty-eight a.m.?
5 A Yes. In fact, at two thirty-eight a.m. within
6 the same minute, a telephone call was placed from
7 Patrick Denton's cellular telephone to Leon
8 Carmichael's cellular telephone.
9 Q So that there was testimony from Mr. Denton about
10 a call to him and then a call back from him to Mr.
11 Carmichael as the search warrant was being executed,
12 you found records that corroborate that or are
13 consistent with that?
14 A That's correct.
15 Q Now, was there any further usage of Mr.
16 Carmichael's phone at or near two thirty-eight a.m.?
17 A Yes. At two forty-one a.m. a cellular telephone
18 used by Leon Carmichael placed a telephone call to a
19 land line subscribed to the name of Freddie Williams
20 at Nine-seventy Ridgecrest Drive.
21 Q You said it was two forty-one a.m.?
22 A That's correct, two forty-one.
23 Q How long did that phone call last?
24 A That phone call lasted approximately seven
25 minutes.

**Page 227**

1 Q Now were you at Mr. Denton's house when the
2 earlier two thirty-eight phone call occurred?
3 A Yes, I was.
4 Q And did you receive any information about the
5 need to leave that location and hide? Did you receive
6 any instructions to stop what you were doing during
7 the course of the search warrant and hide?
8 A Yes, I did.
9 Q Would you explain to the jury how that came about
10 as far as you were concerned.
11 A I was searching some vehicles out on the curb of
12 that residence out in the yard, and I received
13 information from other agents that a target was
14 arriving at the location where we were conducting the
15 search warrant, that we were to immediately leave and
16 hide our vehicles.
17 Q And did you do that?
18 A Yes, I did.
19 Q And where did you go?
20 A I went out of Mr. Denton's driveway and turned
21 right, which would have put me in a westerly
22 direction. I went west and that's where I parked my
23 vehicle.
24 Q From your vantage point, were you able to see
25 whether or not the person who you had been warned was

**Page 228**

1 coming did in fact show up?
2 A I did not see him, but I was monitoring radio
3 traffic and listening to that being relayed to agents
4 from someone who was watching.
5 Q And at some point did you have occasion to come
6 back to the area of Mr. Denton's house?
7 A Yes.
8 Q And approximately how long was it from the time
9 that you actually hid yourself to the point that it
10 was safe for you and other agents to come back out,
11 how long would you say that period of time lasted?
12 A I'd say approximately five minutes.
13 Q So the visit to Mr. Denton would have been about
14 five minutes by the person who was coming by?
15 A That's correct.
16 Q So the next phone call that you talked about, it
17 lasted seven minutes, so it would have been over at
18 two forty-eight?
19 A Yes.
20 Q Now what was the next usage of the phone that you
21 were referring to on this evening?
22 A At two fifty-four a.m. a cellular telephone being
23 used by Leon Carmichael again called the Knology land
24 line subscribed to by Freddie Williams at Nine-seventy
25 Ridgecrest Drive.

**Page 229**

1 Q And you say that was at what time?
2 A That was at two fifty-four a.m.
3 Q So this would have been approximately one minute
4 after Mr. Carmichael would have left Mr. Denton's
5 house?
6 A Approximately, yes.
7 Q And how long did this phone call last, did you
8 say?
9 A This phone call lasted eight minutes.
10 Q Now what was the next usage of the phone by Mr.
11 Carmichael?
12 A At three oh one a.m. the cellular telephone being
13 used by Leon Carmichael placed a'call to a cellular
14 telephone being used by Martel a/k/a Montel Watson.
15 Q And how long did that phone call last?
16 A That call lasted two minutes.

Multi-Page™

## Page 230

1 Q  Did the phone records show any usage of that
2 phone subsequent to that time and before dawn the next
3 day?
4 A  No.
5 Q  So this would have been the last call before
6 dawn?
7 A  That's correct.
8 Q  And this was the 17th of November?
9 A  Yes, that's correct.
10 Q  2003?
11 A  Yes.
12 Q  And what day was that, day of the week?
13 A  That was Monday.
14 Q  Now the next morning, did you notice any other
15 phone calls from that same phone of Mr. Carmichael's?
16 A  Yes.  At nine oh seven a.m. cellular telephone
17 being used by Leon Carmichael placed a call to a
18 cellular telephone being used by Patrick Denton.
19 Q  And how long was that telephone call?
20 A  Two minutes.
21 Q  And was this during the time that Mr. Denton was
22 out trying to locate the baggies?
23 A  That's correct.
24 Q  And then when was the usage of the phone on that
25 day?

## Page 231

1 A  The next usage of the phone was at eleven
2 thirty-two a.m.
3 Q  And what was that usage of the phone?
4 A  The phone being carried by Leon Carmichael
5 received a call from the phone being used by Martel
6 Watson.
7 Q  How long did that phone call last?
8 A  That phone call lasted one minute.
9 Q  You said it was what time?
10 A  Eleven thirty-two a.m.
11 Q  And what was going on right around the time of
12 this phone call?
13 A  The entry had been made into Freddie Williams's
14 house on Ridgecrest, and agents were ready with a
15 search warrant.
16 Q  Now, Agent Whittle, did you look at Saturday the
17 15th of November of 2003?
18 A  Yes, I did.
19 Q  If there were some allegations that Mr. Patrick
20 Denton was trying to make telephone contact with
21 Defendant Leon Carmichael, did you find any evidence
22 of that based on the phone records that you were able
23 to subpoena?
24 A  No, I did not.
25 Q  So on Saturday, were there any calls that you

## Page 232

1 could find from Patrick Denton to Leon Carmichael?
2 A  No.
3 Q  Now did you find any records that showed any
4 phone calls from Mr. Carmichael's phone to any phones
5 of Mr. Denton on that Saturday?
6 A  Yes, I did.
7 Q  How many calls, if any, did you find on that
8 Saturday from Mr. Carmichael's phone to Patrick
9 Denton's phone?
10 A  Last Saturday there was one call from the cell
11 phone being used by Mr. Carmichael.  That call
12 happened at nine oh three p.m.
13 Q  How long did it last?
14 A  One minute.
15 Q  Well what about Sunday the 16th, did you do some
16 checking on that day?
17 A  Yes.  On Sunday the 16th Mr. Denton made zero
18 calls to Mr. Carmichael.
19 Q  So that would not be consistent as far as those
20 phones go of any efforts by Mr. Denton to try to reach
21 Mr. Carmichael, at least as far as that Sunday is
22 concerned.
23 A  That's correct.
24 Q  And the same for that Saturday.
25 A  That's correct.

## Page 233

1 Q  Now what about the other one, did you find any
2 calls from Mr. Carmichael's phone to Mr. Denton's
3 phone?
4 A  Yes.  There were six calls from Mr. Carmichael's
5 phone to Mr. Denton's phone.
6       MR. MOORER:  Your Honor, I offer
7 government's exhibit 25.
8       THE COURT:  What's 25?
9       MR. MOORER:  Government's exhibit 25 are
10 telephone records from -- Your Honor, if I may have my
11 agent step down so he can just identify these records
12 quickly?
13       THE COURT:  Yes -- Well why don't you just
14 bring them up to him.
15       MR. MOORER:  I can did that, Your Honor.
16 Q  Which company are those records from, do you
17 know?
18 A  T-Mobile.
19 Q  Are those the records you received pursuant to
20 the subpoena?
21 A  Yes.
22       MR. MOORER:  We offer government's exhibit
23 25.
24       MS. WAYNE:  Objection.
25       THE COURT:  Okay.  What's the basis?

Multi-Page™

Page 238

1 from the period of February the 14th, 2002 do May
2 16th, 2002?
3 A  There were three calls from Mr. Denton to Mr.
4 Carmichael during that time period.
5 Q  Okay.  What about phone number three two two six
6 eight five eight, did you gather records related to
7 that?
8 A  Yes, I did.
9 Q  And what type of telephone is that number?
10 A  That's a Verizon cell phone that was used by Mr.
11 Freddie Williams.
12 Q  Mr. Freddie Williams was the subscriber?
13 A  Yes.
14 Q  Now were there any phone calls between the number
15 subscribed to by Mr. Carmichael of two two one
16 twenty-three hundred and the phone number subscribed
17 to by Mr. Williams at three two two six eight five
18 eight?
19 A  Yes.
20 Q  From the period of December the 31st, 2001 to
21 October the 29th of 2003?
22 A  Yes.  There were three hundred and one phone
23 calls.
24 Q  And what about the other way, from that phone to
25 Mr. Carmichael's phone?

Page 239

1 A  A hundred and forty-six calls.
2 Q  Now did you gather any records related to a phone
3 number three five six seven five eight six?
4 A  Yes, I did.
5 Q  And what type of phone is that?
6 A  That's a Knology land line subscribed to by
7 Freddie Williams at Nine-seventy Ridgecrest in
8 Montgomery, Alabama.
9 Q  Did you find from the period of October the 5th
10 of 2003 to November the 17th of 2003 any phone calls
11 that may have been made from that phone registered to
12 Mr. Williams at Nine-seventy Ridgecrest to the phone
13 number that you previously identified as being
14 registered to Mr. Carmichael at two two one
15 twenty-three hundred?
16 A  Yes, I did.  There were thirteen calls during
17 that time period.
18 Q  From Mr. Williams to that number -- I'm sorry
19 from Mr. Carmichael to that number?
20 A  That's correct.
21 Q  And what about the other way, from Mr. Williams's
22 phone to Mr. Carmichael's phone?
23 A  There were ninety-two calls.
24 Q  And we're talking about from the period October
25 the 3rd of 2003 to November the 16th of 2003 for calls

Page 240

1 from Mr. Williams's phone to Mr. Carmichael's?
2 A  That's correct.
3 Q  All right.  Did you gather any records pertaining
4 to a phone number two two one eight eight nine eight?
5 A  Yes, I did.
6 Q  And what type of telephone is that?
7 A  That's a T-Mobil cellular telephone that was
8 described to in the name of Marty Blank.
9 Q  And did you or other agents ever physically
10 encounter that phone?
11 A  Yes, we did.
12 Q  And from -- And who, if anyone, had that phone
13 number here?
14 A  Martel Watson was in possession of that cellular
15 phone.
16 Q  And from the period of February the 1st, 2003 to
17 November the 17th of 2003, was there any phone contact
18 between Mr. Blane's (ph.) phone from Martel Watson
19 with the number two one two twenty-three hundred which
20 you previously said was subscribed to by Leon
21 Carmichael?
22 A  Yes, there was.  There were six hundred and
23 fourteen calls.
24 Q  And what about the other way from that same
25 telephone that you and the other agents took from Mr.

Page 241

1 Watson to Mr. Carmichael, were there any phone calls
2 going in that direction?
3 A  Yes, there were three hundred and seventy-three
4 phone calls.
5 Q  And was that from February the 4th, 2003 to
6 November the 17th of 2003?
7 A  Yes.
8 Q  Now I want to go back to something that you
9 talked about at the beginning of your testimony but
10 you did not completely cover, and that was --
11       MR. MOORER:  Well, before I do that, Your
12 Honor, I'd offer government's exhibit 25, and 27 and
13 28 and 29 and 30 and 25(a), 26(a), 26(c), and I
14 believe there was a 25(a), if I didn't mention 25(a).
15       THE COURT:  They're all admitted.
16 Q  Now, you said earlier that evening you were doing
17 surveillances I believe and we moved on to talk about
18 the telephones.  I want to try to carry you back to
19 the surveillances.  Well, let me carry you back even
20 further.
21       Did you personally come into contact with
22 Miss Denton on or about the 17th of November 2003?
23 A  Yes, I did.
24 Q  And was this as you and other agents were
25 executing the search warrant?

Page 242

1 A  Yes, that's correct.
2 Q  Did you have occasion to do anything in
3 particular with them after you and other agents were
4 then doing the search?
5 A  Yes.  Myself and Agent DeJohn drove Mr. Denton
6 around, and he showed us several locations in
7 Montgomery associated with the people that he was
8 dealing drugs with.
9 Q  Now when you say you drove him around, would you
10 just list some of the places you went to with him?  Or
11 just the places you went with Mr. Denton.
12      MS. WAYNE:  Judge, I'm going to object.
13 This is cumulative, asked and answered.
14      MR. MOORER:  Your Honor, we're going into
15 something that has not been brought out before.
16      THE COURT:  Let's get to it, but go ahead.
17 Q  Where did you go with him?
18 A  We went by Mr. Carmichael's house, his residence.
19 We went by the Carmichael Center.  We went by Martel
20 Watson's house.  I believe that was on Argyle.  And we
21 went by a house on Ridgecrest.
22 Q  And did you list the Carmichael Center in there?
23 A  Yes.
24 Q  When you were going to the different places, who,
25 if anyone, gave the directions or told you how to get

Page 243

1 to wherever place you were going to next?
2 A  Mr. Denton.
3 Q  And you started from where to go look at these
4 different places?
5 A  Mr. Denton's residence.
6 Q  Did you or Agent DeJohn ever suggest to him in
7 any way how to get to here or there?
8 A  No.
9 Q  And in the course of going by the Carmichael
10 Center, do you recall about what time it was that you
11 went by the Carmichael Center?
12 A  I believe it was around one-thirty.  One-thirty
13 that morning.
14 Q  And what, if any activity, was going on around
15 the Carmichael Center that morning at about
16 one-thirty?
17 A  I didn't notice any activity.
18 Q  Did you see anything consistent with a concert if
19 it's been suggested to this jury that there was a
20 concert or something going on into the late evening
21 hours of that night?
22 A  No, I did not see any evidence of that.
23      MR. MOORER:  If I may have a moment, Your
24 Honor?
25      (Whereupon, Mr. Moorer conferred with Ms.

Page 244

1 Morris and Mr. Feaga off the record and out of the
2 hearing of the other courtroom participants.   )
3      MR. MOORER:  No further questions, Your
4 Honor.
5      THE COURT:  We'll take a fifteen minute
6 recess.
7      Will you have cross?
8      MS. WAYNE:  I will, Judge.
9      THE COURT:  Mr. Teague, do you anticipate
10 any right now?
11      MR. TEAGUE:  Not much, but I may.
12      THE COURT:  Then your last witness will be
13 Mr. DeJohn, right?
14      MR. FEAGA:  Yes, sir.
15      THE COURT:  Okay.
16      MR. FEAGA:  Assuming nothing happens between
17 now and then with cross examination, Your Honor.
18      THE COURT:  Very good.  We'll take a fifteen
19 minute recess now.
20      Counsel, if you'll remain I want to take
21 something up with you.
22      (Whereupon, the jury was escorted out of the
23 courtroom, and the following colloquy ensued):
24      THE COURT:  Miss James, do you want that
25 charge given, or not?

Page 245

1      MS. JAMES:  I'm trying to consult right now.
2      MR. MOORER:  Your Honor, what instruction
3 were you referring to?
4      THE COURT:  Why don't you go look.  It's one
5 that Miss James asked, and to be honest with you I've
6 forgotten which witness it pertains to.
7      MS. MORRIS:  Your Honor, while they're
8 looking at that, I think at the beginning of trial you
9 requested a special verdict form instruction.
10      THE COURT:  I have it on the drug amounts.
11 I have that.  I got it from the Clay and what's that
12 case --
13      MS. MORRIS:  I know what you're talking
14 about.
15      THE COURT:  Unless you remember the charge,
16 if you've seen it.  It's Moncrief, Clay and some
17 other.
18      MS. MORRIS:  I got one from the Fifth
19 Circuit pattern jury instructions.
20      THE COURT:  We can look at that.  Where did
21 you find it?
22      MS. MORRIS:  On the U. S. Attorney's
23 website.  But I'm sure it's in the Fifth Circuit
24 pattern jury instructions everywhere.  That's just the
25 way I went about working it out.

**Page 246**

1    MR. FEAGA: Your Honor, can Mr. Moorer be
2  excused to attend something in --
3    THE COURT: If this issue doesn't concern
4  Mr. Moorer, we can take up other things.
5    Do you all want this charge?
6    MS. JAMES: Judge, we're going to withdraw
7  the request.
8    THE COURT: Okay. What's it pertain to, so
9  the record is clear?
10    MS. JAMES: It was a request for -- We asked
11  for a mistrial with regard to Mr. Denton's spontaneous
12  reference to Mr. Carmichael's son having been
13  convicted of murder. We asked for a mistrial, and you
14  denied it. And in the alternative, we asked for a
15  curative instruction and you suggested at that point I
16  write one out.
17    I'm not sure where we stood at that point.
18  I think it was even after Denton's testimony when I
19  was cross-examining when I got it written out. I gave
20  it to the Court sometime later that day to just let
21  you know if we wanted it, and just kind of the way
22  things went with regard to other witnesses and other
23  things, I think we've been kind of touchy about when
24  we asked for it because we didn't want it to come
25  right on the heels of some other allegations of some

**Page 247**

1  sort of violence. So we just simply didn't do it, and
2  now we're concerned at this late hour that it would do
3  nothing but highlight something that may be, you know
4  further --
5    THE COURT: The next thing is you said you
6  wanted to file a brief in support of your motion for
7  judgment of acquittal, you wanted to keep Ms. Chartoff
8  busy in the next day or two. Is that right?
9    MS. JAMES: We just wanted leave to file
10  after the conclusion of all of this evidence.
11    THE COURT: Well if you want me to read it,
12  you have to have it before the conclusion of the
13  evidence.
14    MS. JAMES: Well I'm saying after the
15  conclusion of our case.
16    THE COURT: That's what I mean. If you want
17  me to read it, though, I'll give it to the jury and
18  then we have the charge, I won't have read your brief.
19    MS. JAMES: I'll defer to Miss Wayne on
20  that.
21    THE COURT: Now you can file it as a
22  post-trial motion, if that's what you're asking me.
23  That's a totally different matter. But if you want me
24  to see it before I rule, you have to give it to me at
25  the end of your case.

**Page 248**

1    So what do you want to do?
2    MS. WAYNE: We're going to do it orally,
3  Judge.
4    THE COURT: Just do it orally? Okay. Make
5  sure you get it down, every item you want to cover,
6  and I'll actually hear arguments at the end of your
7  case. Obviously, you want to make a motion at the end
8  of the government's case to preserve it.
9    MS. WAYNE: Right.
10    THE COURT: Then you need to renew it at the
11  end of your case.
12    MS. MORRIS: No arguments at the close of
13  the government's case.
14    THE COURT: No, I won't hear arguments.
15  They can put in the record what their motion is. So
16  you don't need to be prepared.
17    MS. MORRIS: Yes, sir.
18    THE COURT: On the conspiracy findings, I
19  have the defendant's brief and I have your brief, and
20  I'll hear that at the end of the government's case and
21  I would like to go over that.
22    MS. MORRIS: Yes, sir.
23    THE COURT: I have some questions about
24  that. Have you read the defendant's brief?
25    MS. MORRIS: I have not.

**Page 249**

1    THE COURT: I suggest you read it because I
2  will be asking you about what's in the defendant's
3  brief and I'll be asking the defendants about what's
4  in the government's brief.
5    MS. MORRIS: Yes, sir.
6    THE COURT: So you should both be totally
7  familiar with each other's briefs.
8    Anything else?
9    MS. WAYNE: Judge, we anticipate there's
10  going to be at the close of the case, Judge, and we
11  have witnesses lined up to go, but we're going to make
12  a motion for judgment of acquittal with no arguments,
13  go right into our case and we have a couple of issues
14  before you start our case.
15    THE COURT: Fine. I will send the jury out
16  to hear the motions for judgment of acquittal anyway.
17    MS. WAYNE: All right. But in terms of
18  timing, I just wanted to let you know we have some
19  motions we need to bring up.
20    THE COURT: I don't know if the defendants
21  are going to elect to testify, but if they do you'll
22  have to put that on the record.
23    MS. WAYNE: Well that's one of the motions I
24  wanted to take up.
25    THE COURT: Okay. Very good.

Page 250

1 (Whereupon, a recess was taken.)
2 MR. MOORER: Your Honor, before I tender the
3 witness for cross examination, may I ask some final
4 questions?
5 THE COURT: Yes.
6 Q Agent Whittle, did you -- you testified earlier
7 as we were making this chart over here about some
8 calls from Mr. Carmichael to a hard line number
9 registered to Mr. Freddie Williams. Did you also look
10 through the documents that have just been admitted as
11 the various telephone records that are there on the
12 stand now to determine if there were any telephone
13 contact between other numbers registered to Mr.
14 Freddie Williams and Mr. Denton?
15 A Yes, I did.
16 Q Specifically, are you familiar with the phone
17 number two nine four nine four zero seven?
18 A Yes.
19 Q And to whom is that phone registered?
20 A That's a cellular telephone that's registered to
21 Patrick Denton.
22 Q Now did you look at whether or not there were any
23 phone calls made between that number and a phone
24 number of three two two six eight five eight?
25 A Yes, I did.

Page 251

1 Q And to whom, if anyone, is that number
2 registered?
3 A That number is registered to Freddie Williams, a
4 Verizon cell.
5 Q And did I ask you specifically to look for any
6 particular contact that may have been made between
7 those two numbers prior to the day of the execution of
8 the search warrant of Mr. Denton's house?
9 A Yes.
10 Q And was there any contact between Mr. Denton's
11 cellular phone and Mr. Williams' cellular phone prior
12 to the search warrant at Mr. Denton's house?
13 A Yes, there was.
14 Q And approximately how many times did you find
15 phone records of evidence contact between Mr. Denton's
16 cellular phone and the cellular phone registered to
17 Mr. Williams?
18 A Twenty-two times on that particular number.
19 Q And do you know how far back those records go in
20 attempting to pull records pertaining to Mr.
21 Williams's phone number?
22 A The date range on that phone was November the
23 25th, 2002 to November the 5th, 2003.
24 Q And the phone number three one two zero one zero
25 nine, do those records that have just been admitted,

Page 252

1 the phone records show to whom that phone is
2 registered?
3 A Yes.
4 Q And to whom is that phone registered?
5 A To Freddie Williams.
6 Q Which one of the phones three one oh two -- three
7 one two zero one zero nine -- Which phone, three one
8 two zero one zero nine or three two two six eight five
9 eight was registered to Mr. Williams' latest in time?
10 A Zero one zero nine was the phone that Mr.
11 Williams was carrying when he was arrested.
12 Q And was there any contact between that phone and
13 Mr. Denton's cellular phone prior to the date that Mr.
14 Williams was arrested on the 17th of November?
15 A Yes.
16 Q Approximately how many times on the two phones
17 was there contact between the phone registered to Mr.
18 Williams and Mr. Denton?
19 A On the oh one oh nine phone, there were nine
20 contacts between November the 6th, 2003 and November
21 the 17th, 2003.
22 Q Okay. Now on the older number for Mr. Williams,
23 the three two two six eight five eight, was there any
24 calls out from that number to Mr. Denton's cellular
25 phone number that you said was two nine four nine four

Page 253

1 zero seven?
2 A I'm sorry, you said six eight five eight?
3 Q Yes.
4 A Yes, there were twenty-two calls.
5 Q Outgoing from that number?
6 A Yes.
7 Q To Mr. Denton's cellular telephone of two nine
8 four nine four zero seven?
9 A That's correct.
10 Q And have all the phone records that we've
11 introduced, are those all phone numbers of area code
12 three three four?
13 A Yes, that's correct.
14 MR. MOORER: No further questions. I tender
15 the witness.
16 THE COURT: Cross?
17 CROSS EXAMINATION
18 BY MS. WAYNE OF DEVIN WHITTLE:
19 Q Good afternoon, Agent Whittle.
20 A Hi.
21 Q Just for purposes of expediency, and I apologize,
22 but I was going through all the D. E. A. Sixes to try
23 to find this one that you were referencing, and that
24 was the fact that there had been some surveillance at
25 the Carmichael Center about one-thirty a.m. in the

Page 254

1 morning on the 17th. Is that your testimony? Or you
2 drove by.
3 A   Yes.
4 Q   Okay. And can you refer me to that D. E. A. Six
5 of your report where you talk about driving by and not
6 seeing a --
7 A   I did not write a D. E. A. Six on that event.
8 Q   All right. So when I was going back to look to
9 find it, there actually isn't one.
10 A   I don't know whether one exists or not. I know I
11 didn't write one.
12 Q   Okay. So it would be fair to say that you don't
13 have a documented report indicating that you
14 specifically drove by the Carmichael Center on the
15 17th to check whether or not there had been a concert
16 at one-thirty in the morning still going on?
17 A   That's correct.
18 Q   And there isn't a D. E. A. Six report or any kind
19 of documentation in terms of -- Well, did you go into
20 the Carmichael Center?
21 A   No.
22 Q   In terms of these phone records that you talked
23 about with us, it appears -- well, let me ask you
24 this. In terms of Mr. Carmichael's phone, the phones
25 that you had determined to be in his name, those were

Page 255

1 when you got the records, his name appeared on the
2 records, right?
3 A   That's correct.
4 Q   Didn't have it under anybody else's name but his
5 name?
6 A   That's correct.
7 Q   And you found out in your investigation in
8 looking at these phone records that Mr. Williams was
9 an employee of Mr. Carmichael's during this time.
10 A   From looking at the phone records?
11 Q   Yeah. When you're look at all these phone calls
12 to determine their significance, you found out that
13 Mr. Williams had been an employee of Mr. Carmichael's.
14 A   Not from examining the phone records.
15 Q   In your investigation were you able to determine
16 that?
17      MR. MOORER: Objection, Your Honor. I don't
18 know how this witness would have any personal
19 knowledge of that. And second of all, any knowledge
20 he would have would be hearsay.
21      THE COURT: What is it you asked him, now?
22      MS. WAYNE: In his investigation in this
23 case, the significance of the phone calls and whether
24 or not he found out whether Mr. Williams was an
25 employee of Mr. Carmichael's.

Page 256

1      THE COURT: Whether Mr. Williams was an
2 employee of -- You mean Freddie Williams?
3      MS. WAYNE: Yes, Freddie Williams.
4      THE COURT: You mean what he heard on the
5 phone calls?
6      MS. WAYNE: No, in his investigation he
7 indicated that he was --
8      THE COURT: If you open up this door, they
9 can ask him what he found out that could be hearsay,
10 too.
11      MS. WAYNE: Judge, I'm not asking him
12 hearsay. I'm asking of his personal knowledge in this
13 investigation.
14      THE COURT: What do you mean by "personal
15 knowledge"? It would have to be something somebody
16 told him because he didn't work for Mr. Carmichael. I
17 mean the witness.
18      MS. WAYNE: No, Judge, I'm not saying that.
19 I'm saying that he's testified on direct examination
20 he was involved in the search warrant. He was present
21 when those things happened. He was involved in this
22 investigation, and I'm asking him in that
23 investigation, in his involvement, was he able to make
24 that link.
25      THE COURT: As long as it's not based on

Page 257

1 hearsay.
2      MS. WAYNE: Right.
3      THE COURT: So it's something you observed,
4 your personal knowledge.
5 A   I have no knowledge of Freddie Williams working
6 for anybody.
7 Q   All right. So the answer to my question would be
8 you don't have that knowledge?
9 A   That's correct.
10 Q   Okay. And in determining or looking at these
11 phone records, were you able to determine that the
12 person that you've indicated was Martel Watson who was
13 in possession of this phone that was actually
14 registered to Marty Blane, I think you said?
15 A   Yes.
16 Q   You were able to determine Martin Watson is the
17 brother-in-law of Mr. Carmichael?
18 A   I have no direct knowledge, no proof that Martel
19 Watson is the brother-in-law of Leon Carmichael.
20 Q   So in terms of your investigation in looking at
21 these records, you simply went through all the phone
22 records and determined who was the owner of the phone
23 and who the phone calls were being made to.
24 A   No. Initially some of the phone information was
25 received from informants such as Mr. Denton. And

Page 258

1 that's one reason we subpoenaed these tolls, to
2 corroborate what Mr. Denton said.
3 Q  Okay.  In addition to that, again, you didn't go
4 any further in determining the relationship of these
5 parties because you said you didn't have personal
6 knowledge?
7 A  That's right.  Not me, no.
8 Q  And what I'm wondering about, Agent Whittle, in
9 terms of these records, they're absent of the content
10 of the phone conversations.
11 A  That's correct.
12 Q  So you have no idea what was being talked about?
13 A  That's correct.
14 Q  You don't know why they were talking to each
15 other?
16 A  That's correct.
17 Q  And what was being talked about at the time.
18 A  That's correct.
19 Q  In terms of the phone calls, you've indicated
20 there were a lot of different numbers that Mr. Denton
21 had. I believe that the records are contained four
22 different numbers of his, is that right?
23 A  Yes, that's correct.
24 Q  There's a land line and three cell phones?
25 A  Yes.

Page 259

1 Q  And they're all registered under his name?
2 A  Yes.
3 Q  And in terms of Mr. Carmichael, you have looked
4 up records belonging to his with the two two one
5 twenty-three hundred.
6 A  Yes.
7 Q  Just one phone.
8 A  Mr. Carmichael had other phones.  This phone was
9 significant to our investigation because it was the
10 number that was given to us by Mr. Denton, and he said
11 that's the number he contacted Mr. Carmichael at.
12 Q  So it was significant to you in your
13 investigation because that's what Mr. Denton said he
14 contacted Mr. Carmichael with, was that number.
15 A  Yes.
16 Q  Okay.  But you knew that Mr. Carmichael had a lot
17 of -- there were other phone numbers.
18 A  We determined that later, yes.
19 Q  Okay.  And they were phone numbers registered in
20 his name.
21 A  Yes.
22      MS. WAYNE:  Judge, if I may have one very
23 brief moment.
24      (Whereupon, Ms. Wayne conferred with Ms.
25 James off the record and out of the hearing of the

Page 260

1 other courtroom participants.)
2      MS. WAYNE:  I have no further questions of
3 Agent Whittle.
4      THE COURT:  Mr. Teague?
5      MR. TEAGUE:  Your Honor, I don't have any
6 questions for him.
7      THE COURT:  Any redirect?
8      MR. MOORER:  Yes, Your Honor.
9          REDIRECT EXAMINATION
10     BY MR. MOORER OF DEVIN WHITTLE:
11 Q  Counsel for Mr. Carmichael asked you about other
12 phone numbers that you did not look at.  Do you recall
13 those questions?
14 A  Yes.
15 Q  The number that you did look at that we discussed
16 earlier when we were making the chart over here which
17 is, I believe you said, it was two two one
18 twenty-three hundred?
19 A  Yes.
20 Q  Was Mr. Carmichael in possession of that phone
21 when he was arrested?
22 A  Yes, he was.
23 Q  And is that the same number that Mr. Denton gave
24 you as his means to contact Mr. Carmichael?
25 A  Yes, it is.

Page 261

1 Q  And did Mr. Denton give you any other numbers
2 other than the two two one twenty-three hundred number
3 by which he could reach Mr. Carmichael?
4 A  No.
5      MR. MOORER:  No further questions, Your
6 Honor.
7      THE COURT:  Any further cross, Ms. Wayne?
8      MS. WAYNE:  No, Your Honor.
9      THE COURT:  Mr. Teague?
10     MR. TEAGUE:  No, Your Honor.
11     THE COURT:  Thank you.  You may step down.
12     (Whereupon the witness, Kevin Whittle,
13 stepped down from the stand.)
14     THE COURT:  Do you have something to take up
15 with me now, or can we do it later?
16     MS. WAYNE:  We do.
17     THE COURT:  Okay, I'll have to excuse the
18 jury for a moment.
19     (Whereupon, the jury was escorted out of the
20 courtroom, and the following colloquy ensued):
21     THE COURT:  Yes, Ms. Wayne?
22     MS. WAYNE:  Judge, this is a matter that's
23 just come to our attention and, frankly, we don't
24 think it should be in open court.
25     THE COURT:  Okay, we'll take it up back

Page 262

1 here.
2        IN-CHAMBERS CONFERENCE
3        MOTIONS FOR MISTRIAL
4            AND
5      MOTION FOR CHANGE OF VENUE:
6   THE COURT: Yes?
7   MS. JAMES: Judge, at the last break Chris
8 Holmes motioned for Miss Wayne and I to come over.
9   THE COURT: Who is that?
10   MS. JAMES: He's the reporter who has been
11 covering this case for the past eighteen months for W.
12 S. F. A. And he motioned us over and we said we're
13 under a gag order. And he said it has nothing to do
14 with this case. He asked us as we approached, he said
15 do you know that you've been sued by Agent DeJohn?
16 And we said no, we didn't know. And he said yes.
17 What were you talking about? He said he's filed a
18 lawsuit against all the lawyers, you, Miss Chartoff,
19 Miss Wayne, Mr. Glassroth, I believe you were probably
20 included, Mr. Brunson, and Mr. Carmichael and I'm not
21 sure who else. I think they said they left Ron Wise
22 out because he disavowed the website, is what I got.
23   He said did we want to say something off
24 camera. He said he did not want us to do it in open
25 court because he didn't want the newspaper, he wanted

Page 263

1 to be the first on the story.
2   THE COURT: Is this in federal or state
3 court?
4   MS. JAMES: State court. Obviously, Judge,
5 the timing of this lawsuit is purposeful. It is for
6 no reason other than -- there can't be any statute of
7 limitations problem. The only point could be for
8 Agent DeJohn to try to further poison the jury in this
9 case either directly or indirectly. The whole website
10 scenario is going to be on Channel Twelve tonight, and
11 the fact that Mr. Carmichael's lawyers may have in
12 part done something improper as relates to Mr.
13 Carmichael and this case.
14   Number one, it denies Mr. Carmichael a
15 right, we believe, to a fair trial. We also believe
16 that it could arguably deny him a right to effective
17 assistance of counsel pursuant to his Sixth Amendment
18 right because at this point Agent DeJohn -- The
19 government has not even rested. Agent DeJohn is still
20 on the stand. Now you have four lawyers here that are
21 under a lawsuit that we've not even seen.
22   Now we have to cross examine Agent DeJohn
23 and/or not cross examine him depending upon how we
24 think our treatment of Agent DeJohn might impact this
25 lawsuit, which we would argue is a frivolous lawsuit

Page 264

1 without having even seen it. But the bottom line is,
2 with regard to I think Miss Wayne, Miss Chartoff,
3 Mr. Brunson and myself, the lawyers in this case, not
4 a one of us had anything to do with putting that
5 picture on the website. But nevertheless, that will
6 be litigated in another scenario. That is really of
7 no consequence. It's the impact that he has on Mr.
8 Carmichael.
9   Quite frankly, we think it creates a
10 conflict, and my thoughts independently without
11 consulting with the others is that at this point I'm
12 compelled, I believe, to move to withdraw as counsel
13 for Mr. Carmichael under these circumstances. I'm not
14 certain what the other lawyers will do.
15   Putting that aside, and I guess we can hear
16 from them, another problem is this: We're under a gag
17 order of this Court, and I would remind the Court that
18 the --
19   THE COURT: Wait a minute now. You're
20 actually not under a gag order.
21   MS. JAMES: I thought we were.
22   THE COURT: You agreed to not do it and I
23 ended up denying the motion as moot. But I'm not sure
24 that really makes any difference, but go ahead.
25   MS. JAMES: But let me say this to the

Page 265

1 Court. When the scenario came up about Mr. Glassroth
2 and Mr. Carmichael when Mr. Glassroth moved to
3 withdraw, I was not party to that conversation but I
4 had been party to other conversations about that very
5 matter that occurred with Judge Boyd along the way.
6 So I have some knowledge of what went on there.
7   But as I understood it, that matter was
8 sealed and was not to be revealed, about Mr.
9 Glassroth's withdrawal. It came on the six o'clock
10 news that night with all the details of what had
11 transpired. They didn't say how it had happened, but
12 it was Chris Holmes that had reported it, which caused
13 me grave concern at that time that it was either Agent
14 DeJohn or his lawyer who had that information and
15 leaked it to the press because it looked to me like
16 all the while it was setting up for a lawsuit.
17   THE COURT: Was Agent DeJohn on the call?
18   MS. JAMES: I don't know if he was in their
19 office or not.
20   THE COURT: I'll be honest with you, the
21 only person, non-lawyer, was Mr. Carmichael who was on
22 the call.
23   MS. JAMES: Well I don't think Mr.
24 Carmichael had any motivation to release --
25   THE COURT: That may have been before you

Page 266

1 all --
2     MS. MORRIS: Agent DeJohn was not on the
3 call.
4     THE COURT: I think the only non-lawyer was
5 Mr. Carmichael.
6     MS. JAMES: Well, let me just say this. I
7 think it defies logic to think that as desperately as
8 Mr. Carmichael wanted to keep Mr. Glassroth, that he
9 would have done anything to cause any adverse
10 attention to his case at that point in time. But I'm
11 bringing that to the Court's attention because of the
12 cumulative impact here.
13     Now if we are under -- Here's the deal.
14 It's coming out on Channel Twelve tonight that we've
15 all been sued. Naturally, not only in defense of
16 ourselves, but in defense of Mr. Carmichael we want to
17 be able to make comments and nip this thing in the bud
18 right now. I don't know about the rest of them, but I
19 do. And I think to do that --
20     THE COURT: What are you asking me?
21     MS. JAMES: I'm asking for a mistrial, first
22 of all, and a change of venue. Kick us off the case?
23     THE COURT: I'll hear from the government.
24     MR. MOORER: We are completely separated
25 from what -- I believe Miss Frith represents Dave

Page 267

1 DeJohn. We know -- I know nothing about the other
2 side of this case. I know nothing about the lawsuit
3 that she has filed. I did not know she was going to
4 file it.
5     THE COURT: Who is "she" she, now?
6     MR. MOORER: Ms. Frith.
7     MS. JAMES: Roianne Connor Frith. I haven't
8 seen that. He's saying it's probably Roianne.
9     THE COURT: Has anyone seen the lawsuit?
10     MR. MOORER: I have not.
11     MS. JAMES: Mr. Holmes said to me, and he's
12 happy to tell the Court what he knows, he just didn't
13 want to do it out there so the newspaper could get the
14 story, but he said he just heard it from somebody in
15 the courthouse, that it was filed on Friday.
16     Of course none of us have been served. But,
17 you know, it's just the timing of it.
18     MS. MORRIS: Are we sure -- I don't mean to
19 interrupt, but are we sure it has been filed?
20     MS. JAMES: Well I haven't had time. But
21 let's assume he's being straightforward about that.
22 The timing of it, Judge, I know you can't control
23 Miss Connor, but if in fact it is the way it was
24 represented by Chris Holmes, then I can't imagine that
25 the timing of the lawsuit, and I'll put the burden on

Page 268

1 Agent DeJohn because it's his lawsuit against us, it
2 could only be for the purpose that it's creating here,
3 and that is adverse publicity on this case about
4 matters that we tried to carefully keep outside the
5 media and outside the jury's concern.
6     MR. FEAGA: Your Honor, some day last week,
7 it was either Monday or Tuesday, as I was walking down
8 the stairwell of my office complex, the back
9 stairwell, I was down on the second level getting
10 ready to go out the door to come to this courthouse.
11 A secretary, who is not my secretary but in the
12 Criminal Division, named Carolyn Hudson hollered down
13 the stairwell at me Miss Roianne Frith is on the
14 phone. She wants to know if you care, you all, I
15 think she was talking about the United States, whether
16 or not she files a lawsuit involving this matter with
17 DeJohn. And it was that quick.
18     But I knew what she was talking about,
19 because I know there has been talk of it. And I said,
20 "I would prefer that she wait." And that was my
21 comment back and I went out and I gave it not another
22 thought. I did not -- you know, I was involved,
23 frankly, on other things. This comes as a complete
24 prosecute surprise to me and it's a disappointment to
25 me because I know it causes an issue for the Court.

Page 269

1     But, again, I think I echo the sentiments of
2 my co-counsel, I think we need to find out if she's
3 done it, and if she has and she's done it, I want the
4 Court to know, having heard that we did not want this
5 to happen.
6     MS. JAMES: Judge, I would just note for the
7 record, and you'd have to check with the other defense
8 lawyers, just to note that I have not been made aware of any such
9 similar call to my office about whether the defense
10 minded. If we're the subject to the lawsuit I guess
11 maybe she wouldn't have done that, but I just would
12 note that.
13     THE COURT: Sure.
14     MR. MOORER: Your Honor, I think since no
15 one actually knows whether or not there is a suit
16 filed, they have always known that the potential for a
17 suit existed. Not that one would necessarily be
18 filed, but that it is the nature --
19     THE COURT: I think you're all shooting from
20 the hip. Let's go back out. You put your request for
21 a series of motions on the record and we'll find out
22 what's going on and I'll take it up later. I can't
23 make a decision while I'm sitting here and hearing
24 this for the first time.
25     MS. WAYNE: He's on the stand, though,

**Multi-Page™**

**Page 270**

1 Judge.
2    THE COURT: You'll have to do the best you
3 can.
4    MS. WAYNE: Well --
5    THE COURT: Your request to withdraw --
6    MS. WAYNE: I am cross-examining him, and I
7 do have concerns, frankly and I don't live here and
8 I'm now a party to a lawsuit. To a limited purpose, I
9 mean he's left to just testify --
10    THE COURT: Well anyway, your request to
11 withdraw is denied, I'll say that, subject to my
12 reconsideration later. But all the other things we'll
13 take up after we know the facts and after we've looked
14 at the law.
15    MR. TEAGUE: Your Honor, I'd like to renew
16 my severance motion.
17    THE COURT: Mr. Teague, why don't you want
18 to be a part of this lawsuit?
19    (Laughter.)
20    (Whereupon, the in-chambers conference was
21 concluded.)
22    THE COURT: Okay, bring in the jury.
23    (Whereupon, the jury was escorted into the
24 courtroom.)
25    MR. FEAGA: We'd call Agent DeJohn.

**Page 271**

1    D A V I D   D e J O H N,
2 the witness herein, having first been duly sworn or
3 affirmed to tell the truth, was examined and testified
4 as follows:
5    DIRECT EXAMINATION
6    BY MR. FEAGA OF DAVID DEJOHN(CONTINUING):
7 Q Sir, are you the same Investigator DeJohn that
8 was testifying earlier in these proceedings?
9 A Yes, I am.
10 Q I want to show you what's been marked as
11 government's exhibit 58 for identification purposes
12 and ask you if you would, sir, and take a look at it.
13 In fact, it's been admitted into evidence as
14 government's exhibit 58. Have you had a chance to
15 look at it?
16 A Yes.
17 Q Are those the same records you saw us introduce
18 earlier in this trial when Judge Hardwick was
19 testifying?
20 A Yes.
21 Q May I take them from you? Well I tell you what,
22 I'm going to leave them with you.
23    Have you seen those before?
24 A Yes.
25 Q Would you tell the ladies and gentlemen of the

**Page 272**

1 jury what they are?
2 A They are records that was obtained from
3 Multi-Investments indicating employment records or
4 employment contracts and vehicle information or more
5 specific, semi tractor-trailer that was being utilized
6 by Multi-Investments under contract.
7 Q Okay. Were you in here earlier when Border
8 Patrol Agent Brett Pachciarz and Border Patrol Agent
9 Angel Gomez testified about stopping a truck driven by
10 two men at Sierra Blanca? Do you remember their
11 testimony?
12 A Yes, I do.
13 Q And do you remember them testifying about the
14 tractor vehicle identification number, the trailer
15 vehicle identification number and the license tags on
16 the tractor and the trailer?
17 A Yes.
18 Q Do the records that you're holding in your hand
19 right now provide any information as to under whose
20 authority and control this tractor and trailer was
21 being operated on January the 11th, 1998?
22    MS. WAYNE: Judge, I'm going to object to
23 the characterization. It's obviously not under
24 anybody's control except the driver's. So to ask
25 that, that's an improper question.

**Page 273**

1    THE COURT: Sustained.
2 Q Do the records tell you who the people that were
3 driving that truck and that tractor and that trailer,
4 and I'm going to call it a truck for purposes of the
5 record, do the records tell you who they were working
6 for on that date at that time?
7 A Yes.
8 Q And who is that?
9 A They were working for Multi-Investments.
10 Q Okay. Now, let me show you, if I can, the
11 document that is marked, it's got two Bates stamp
12 numbers on it, it's part of this exhibit 58, page
13 fifty-five eighty-eight, and then it's also got a
14 Bates stamp on it zero zero zero two seven. Now those
15 would be the Bates stamp numbers that we put on it
16 when we gave it to the defense, and the Bates stamp
17 numbers on it when the judge gave it to us back when
18 we subpoenaed it, is that right?
19 A That is correct.
20 Q And would you like at that page number fifty-five
21 eighty-eight and tell the ladies and gentlemen of the
22 jury what that is?
23 A It is a driver's application for employment, and
24 it's been filled out partially typed and partially
25 handwritten.

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**     Page 270 - Page 273
**Total Computerized Litigation Support**

Page 274

1 Q  Okay.  And who is applying with employment with
2 that record?
3 A  A Jerome McGill.
4 Q  Jerome McGill.  And who is he applying with
5 employment with?
6 A  With Multi-Investments, Inc.
7 Q  And when is he applying for employment with them?
8 A  The date of application was one five nineteen
9 ninety-seven.
10 Q  Now would you examine that document and see if
11 there are any other dates in it that would indicate
12 whether or not one five ninety-seven is the correct
13 date for the application?
14 A  I've looked at it.
15 Q  Okay.  Are there any other dates referenced on
16 that application?
17 A  Yes.  There's a -- On page Bates stamp five five
18 nine one there's a checklist for qualification of new
19 drivers, and it has a Jerome McGill.  And it says --
20 it's a checklist, I guess, of what they need for
21 employment.  And the number one item here is
22 application for employment.  And the date of request
23 forwarded is one five ninety-eight.
24 Q  All right.  So now we see that the application is
25 also dated one five ninety-eight, is that right?

Page 275

1 A  That is correct.
2 Q  Now do you see the date one five ninety-eight
3 elsewhere on that employment application?
4 A  Yes.  Item number two requests for check of
5 driving record, which also occurred on one five
6 ninety-eight.
7 Q  All right.  What else?
8 A  Request for information from previous employers
9 was conducted on one six of ninety-eight.
10 Q  Okay.  Now what about -- Let me show you, if I
11 can, another page in there.  Let me show you again the
12 same document, government's exhibit 58, the Bates
13 stamp numbers when we gave it to the defense
14 fifty-five seventy and the Bates stamp number when the
15 judge gave it to us is zero zero zero zero one one and
16 ask you if you would look at that page and tell me if
17 there is any other application for employment
18 contained in that exhibit?
19 A  Yes, there is.
20 Q  And would you tell the ladies and gentlemen of
21 the jury who is applying for employment on that page
22 of the exhibit?
23 A  Arby Lee Kincey.  Spelled K-i-n-c-e-y.
24 Q  And what's the date on that application?
25 A  The date is January 6, 1998.

Page 276

1 Q  Mr. Kincey applied for employment five days
2 before the truck was stopped in Sierra Blanca?
3 A  Yes.
4 Q  Now, Agent DeJohn, contained in those records,
5 are there any vehicle registration documents
6 containing a vehicle identification number and a plate
7 number for a trailer?  And I'm now going to refer you
8 to page fifty-five sixty-five and zero zero zero
9 zero six.  Would you examine that.  Is that for the
10 trailer that carried this load?
11 A  Yes, it is.
12 Q  And what is the -- Just one second.
13     Would you tell the ladies and gentlemen of
14 the jury what the trailer vehicle identification
15 number is.
16 A  The trailer vehicle identification number or V.
17 I. N. is, and I'll say the letters phonetically, one
18 uniform yankee victor Sierra two four eight eight Papa
19 Mike nine four four four two one zero.
20 Q  And how about the Alabama license tag on there,
21 would you read that to the ladies and gentlemen of
22 the jury for the trailer.
23 A  Yes.  The tag number is T as in tango, eight one
24 three zero three.
25 Q  All right.  And now, if you would, could you go

Page 277

1 to the page of the document that gives us that
2 information for the tractor itself.  And, if you
3 would, would you tell the ladies and gentlemen of the
4 jury what the tractor number is, the vehicle
5 identification number for the records obtained for
6 Multi-Investments pursuant to our subpoena.
7 A  The tractor, the V. I. N. number would be one
8 foxtrot uniform Papa Charlie x-ray yankee bravo six
9 tango hotel eight one three six one nine.
10 Q  And does it provide a license number for that
11 tractor?
12 A  Yes, it does, and it would be x-ray eight nine
13 one three nine one.
14 Q  All right, sir.  Now does the information
15 contained about that load subpoenaed from
16 Multi-Investments contain information that tells you
17 where that truck loaded up and where it was headed
18 when it was stopped on the 11th of January 1998,
19 A  I believe it does.  I just have to find it.
20 Q  May I take a look at it?
21 A  Yes.
22 Q  If you'll look at Bates stamp page zero zero zero
23 zero zero four and Bates number fifty-five
24 sixty-three, I'd like to direct your attention to the
25 information at the top where it says -- What is that?

Multi-Page™

**Page 278**

1 Q I'm pointing to right now, Agent DeJohn, the top of
2 the page and the center, what does that say?
3 A It says "contracts driver".
4 Q And what name is given?
5 A Walter Kincey.
6 Q Okay. And what does it show on the date January
7 6, the first date listed, what does it show the origin
8 of the truck is?
9 A Montgomery, Alabama.
10 Q And what is its destination?
11 A Springville, Utah.
12 Q Okay. And does it provide a gross amount of
13 dollars that will be paid and a truck dollar figure
14 also on the form?
15 A Yes, it does.
16 Q Okay. And what's the next entry? What's the
17 date of the next entry after January the 6th?
18 A One nine.
19 Q Okay. And that would be January the 9th?
20 A Yes.
21 Q And what is the origin of that load?
22 A Blackfoot, Idaho.
23 Q What is its destination?
24 A Deerfield, Florida.
25 Q Now the next entry on there, what's the date on

**Page 279**

1 it for an origin for the next trip this truck makes?
2 A January 15th.
3 Q So if this truck was stopped on January the 11th,
4 '98, according to these records it was stopped after
5 it left Blackfoot, Idaho on its way to Deerfield
6 Florida.
7 A That's correct.
8 Q And it was stopped in south Texas.
9 A Yes. Actually, it was stopped in west Texas.
10 Q Okay. I want to show you Bates page fifty-eight
11 fourteen and zero zero zero two five zero and ask you
12 if you would, please, sir, read at the very top of
13 that page of government's exhibit 58 what it purports
14 to be.
15 A A load and revenue confirmation.
16 Q And what's the next thing it says?
17 A "Please sign and return via fax A. S. A. P."
18 Q And who does it say on the "to"?
19 A Multi-Investments.
20 Q From?
21 A "Bob".
22 Q Loading location?
23 A "Blackfoot, Idaho".
24 Q Loading date?
25 A One nine of ninety-eight.

**Page 280**

1 Q Loading time?
2 A "A. S. A. P."
3 Q Commodity?
4 A "Potatoes."
5 Q Does it given you a case count?
6 A It says twenty-four bins, fifty plus cartons.
7 Q And where does it say it's to be delivered to?
8 A Deerfield Beach, Florida.
9 Q And the driver name is listed as?
10 A Arby Kincey.
11 Q The same Arby Kincey that is listed in these
12 records as having applied for employment with Leon
13 Carmichael and Multi-Investments on January the 6th,
14 '98, is that right?
15 A Yes.
16    MR. FEAGA: Your Honor, I'll tender the
17 witness.
18    THE COURT: Okay. Very good.
19    Cross?
20    CROSS EXAMINATION
21    BY MS. WAYNE OF DAVID DEJOHN:
22 Q In terms of exhibit 58, you've had an opportunity
23 to look at that and talk to us about Mr. Kincey and
24 Mr. McGill made these employment applications,
25 correct?

**Page 281**

1 A Yes, ma'am.
2 Q But it appears that Multi-Investments was doing
3 an employment background on both Mr. Kincey and Mr.
4 McGill?
5 A Yes.
6 Q There's paperwork that indicates that?
7 A Yes, ma'am.
8 Q There's paperwork indicating registration to the
9 tractor and to the trailer?
10 A Yes.
11 Q And there's an indication that it's
12 Multi-Investment, correct?
13 A Yes.
14 Q And in terms of whether or not Mr. McGill and Mr.
15 Kincey were actually employees, you read on the
16 document that they indicated they were contract
17 employees, do you remember that?
18 A Yes.
19 Q You were aware of the fact that Mr. Kincey and
20 Mr. McGill were actually considered what we call lease
21 operators, do you know what that is?
22 A Yes.
23 Q Were you aware of the fact that Mr. Kincey and
24 Mr. McGill had actually owned the truck and trailer
25 and were simply working as contractors for

Multi-Page™

Page 282

1 Multi-Investments?
2 A Yes.
3 Q So it was their tractor and their trailer, and
4 then they enter into a deal with Multi-Investments
5 where they haul things and get a percentage from the
6 business.
7 A I don't know how that exactly works out, but the
8 records indicate they are contract drivers.
9 Q Okay. So, then, in terms of if you were able to
10 confirm this, you were able to confirm that Mr.
11 McKincey (sic.) and Mr. McGill had their own
12 tractor-trailer?
13 A Yes.
14 Q Okay. And in terms of employment compliance, it
15 appears from the records that Multi-Investments was
16 attempting to get a background on both Mr. Kincey and
17 Mr. McGill.
18 A Yes.
19     MS. WAYNE: I have no further questions, and
20 I'll tender exhibit 58.
21     THE COURT: Mr. Teague?
22     MR. TEAGUE: No questions for Agent DeJohn.
23     MR. FEAGA: Nothing further for the United
24 States.
25     THE COURT: Does the government rest?

Page 283

1     MS. MORRIS: The government rests.
2     THE COURT: Very good. I'll excuse the jury
3 for about ten to fifteen minutes.
4     (Whereupon, the witness, David DeJohn,
5 stepped down from the stand.)
6     (Whereupon, the jury was escorted out of the
7 courtroom, and the following colloquy ensued):
8             MOTIONS IN OPEN COURT
9          (THE JURY IS NOT PRESENT):
10     THE COURT: Okay. I'll hear from the
11 defendants. The government has rested.
12     MS. WAYNE: We have a motion, but do you
13 want it before this other thing, Judge?
14     THE COURT: What other thing? Oh, you mean
15 the matter that was just given to me?
16     MS. WAYNE: Right.
17     THE COURT: Yes. Let's take up your motion
18 now on the government's case.
19     MS. WAYNE: All right. And just so I'm
20 right, Judge --
21     THE COURT: Is this your only copy?
22     MS. CHARTOFF: Yes, Your Honor.
23     THE COURT: Okay. I'll have my clerk make
24 you some copies.
25     MS. WAYNE: I think, Judge, based upon your

Page 284

1 ruling it's simply I'm moving for a --
2     THE COURT: You need to state your grounds.
3     MS. WAYNE: Okay.
4     THE COURT: Do you want to get with counsel
5 and make sure that you articulate them?
6     MS. WAYNE: I thought you didn't want to us
7 do anything --
8     THE COURT: No, the argument, but you do
9 need to state your grounds. I suggest you do that.
10 We'll take the other matter up in-camera.
11     (Whereupon, all defense counsel conferred
12 off the record and out of the hearing of the other
13 courtroom participants.)
14     MS. JAMES: Judge, on behalf of Leon
15 Carmichael we would move for judgment of acquittal as
16 to count one, the conspiracy count. It's our
17 contention that the government has failed to establish
18 a prima facie case and we believe that the count
19 should be -- that it should not go to the jury.
20     THE COURT: Okay. What about count two?
21     MS. JAMES: Mr. Brunson?
22     MR. BRUNSON: Your Honor, the same for count
23 two. If you would like me to repeat that.
24     THE COURT: Well it's you who are
25 establishing the record.

Page 285

1     MR. BRUNSON: Yes, Your Honor. We contend
2 that the government has not presented a prima facie
3 case as to count two and ask the Court to dismiss it.
4     THE COURT: Those motions are denied.
5     Now defendants -- Oh, I'm sorry, Mr. Teague.
6     MR. TEAGUE: I know I'm trying to stay out
7 of the way here.
8     Your Honor, pursuant to Rule 29 of the
9 Federal Rules of Criminal Procedure I move likewise on
10 behalf of Defendant Freddie Williams for judgment of
11 acquittal. We feel that they have not established --
12 we're only charged in count one, and as to count one
13 we do move for judgment based upon the fact that they
14 haven't made a prima facie case. They haven't proven
15 a conspiracy.
16     THE COURT: That motion is denied.
17     Now you want to take up the other matter?
18     MS. WAYNE: Please.
19     MS. CHARTOFF: Your Honor, I think there is
20 one more motion that I may need to make now in order
21 to preserve it.
22     THE COURT: Go ahead.
23     MS. CHARTOFF: We would move to dismiss on
24 the basis of prosecutorial misconduct, Your Honor.
25 The earlier testimony of Agent Halasz provided an

Page 286

1 inaccurate picture to the jury about a supposed threat
2 that Mr. Carmichael had made to Moses Williams. The
3 testimony that later came on said that there was no
4 threat. The government did not present that to the
5 jury.
6         Under Napue versus Illinois, Burger versus
7 the United States and a whole host of other cases that
8 I could get for the Court from the United States
9 Supreme Court, the government has an affirmative
10 obligation to present an accurate picture and to the
11 jury. And when it becomes aware that it has presented
12 inaccurate evidence, it has an affirmative obligation
13 to correct that.
14         THE COURT: Are you saying the government
15 should call Moses Williams?
16         MS. CHARTOFF: Yes, Your Honor.
17         THE COURT: I'll hear from the government.
18         MR. MOORER: Your Honor, first of all, if
19 you'll remember back, we did not even go toward the
20 issue that Mr. Williams initially ended up having to
21 be called about. The defense did. If they want him
22 called in to say that he said something different than
23 what the agent testified to, they're free to make that
24 call. But we stand by the truthfulness of what Agent
25 Halasz said, which was he was told by Mr. Williams at

Page 287

1 that time when he was going to use him that Mr.
2 Williams told him that he was afraid. And if they
3 want to call him back to say no, I never said that and
4 the reasons why, it's certainly an opportunity now for
5 them to do that.
6         We have no obligation to bring out that type
7 of evidence. As long as they know that he said what
8 he said, it's up to them to make whatever use of it
9 that they will.
10         THE COURT: Anything else?
11         MS. CHARTOFF: Yes, Your Honor. The
12 government has the burden of proof here. They're the
13 ones who have put forth this untrue evidence. They
14 have an obligation --
15         THE COURT: How is the evidence untrue?
16         MS. CHARTOFF: Because it's specifically
17 stated in a very dramatic and clear way that Mr.
18 Carmichael had threatened this man and it's simply not
19 true.
20         THE COURT: I think he said -- I thought
21 from the testimony he said, and let me get it, I have
22 the transcript, the agent said that he was afraid Leon
23 Carmichael would kill him. Those are quotes. In
24 fact, the exchange went Question: "And why was it
25 that he chose to discontinue cooperating with you?"

Page 288

1         Answer: "Because he was scared."
2         Question: "What was he afraid of?"
3         Answer: "He was afraid Carmichael would
4 kill him."
5         MS. CHARTOFF: Well, Your Honor, and I
6 understand I got the wording a little wrong, but my
7 point still remains the same. Mr. Williams came in
8 here, said he wasn't afraid that Leon would kill him
9 so there was still a false impression given by the
10 evidence.
11         THE COURT: But he did say, however, that he
12 perhaps did make the comment. He said, "I lied" to
13 the agent. So I don't think he said that he didn't
14 make the statement. I think he said, "I lied" when I
15 made the statement. So I don't know whether there is
16 any misrepresentation here insofar as Agent Halasz
17 claims the statement was made to him.
18         I think what's at issue is whether the
19 statement was true in the sense that Mr. Williams
20 believed that he's afraid. But that the statement was
21 made, which is the only reason it really comes in
22 pursuant to the order I issued this morning. I'm not
23 sure that's untrue.
24         MS. CHARTOFF: Well, Your Honor, we would
25 respectfully disagree in light of all the other

Page 289

1 evidence that's come in with regard to these alleged
2 threats. It certainly created the -- raises the
3 significant possibility that it created an impression
4 in the minds of the jury that Mr. Carmichael had
5 actually threatened this man, or that there was some
6 real threat.
7         The government now knows that there was not
8 a real threat. That this man was just saying that
9 because for who knows why, because he's a liar. And
10 the government now has an affirmative obligation to
11 correct the record.
12         MR. MOORER: Your Honor, if I might say --
13         THE COURT: Yes.
14         MR. MOORER: -- the government's position is
15 the same that it has always been. He told the truth
16 when he talked to Agent Carmichael (sic.) and the --
17 I'm sorry, Halasz, and the fact that he is willing to
18 go to the extent of lying under oath when he was
19 called in here ex parte goes to show exactly how
20 afraid he is of Mr. Carmichael. So that's our
21 position.
22         THE COURT: My only concern is that if
23 you're asking the government to call him to say that
24 he lied, I think it's a question as to whether he was
25 lying back then or he's lying now. That is a lie when

Page 290

1 he in testified in court outside the presence of the
2 jury. I'll be very frank with you, I think he was
3 lying when he testified in court outside the presence
4 of the jury.
5        I don't know if the government has an
6 obligation just to present to the jury conflicting
7 testimony. I think what it does have an obligation to
8 do is to make sure you, as Mr. Carmichael's attorney,
9 are fully aware of the conflict in the testimony. The
10 government can stick with whatever version it wants.
11 But now that you are aware, you have an obligation to
12 present it in any way and any light that you want it.
13        So you can either let it sit the way it is
14 or go another route. But I don't think the government
15 has an obligation to correct it in the way you want it
16 corrected. If the government adopts the version he
17 gave, that's fine, as long as you know there is a
18 contrary version. I think the cases talk about when
19 the government actually knows someone lied and can
20 tell that they were lying, and I don't think we have
21 that by any stretch.
22        MS. CHARTOFF: Well, we respectfully
23 disagree, Your Honor.
24        THE COURT: Okay. Anything else? Yes? So
25 the motion for prosecutorial abuse is denied. The

Page 291

1 motions otherwise are denied with leave to renew at
2 the end of the trial.
3        MS. WAYNE: We're going to take up this
4 other one?
5        THE COURT: Yes, we'll take up the other
6 matters. Actually, I'm getting copies made so that
7 you can see them. I suggest we take them up after
8 you've had a chance to digest them.
9        MS. WAYNE: That's what I'm wondering,
10 Judge, because I frankly feel like I need to call my
11 Bar Association on this.
12        THE COURT: I really do need -- well who is
13 your first witness?
14        MS. WAYNE: It depends on your ruling on
15 something else.
16        THE COURT: What's the other thing?
17        MS. WAYNE: Judge, I would like prior,
18 because I think the Court did, I'm used it to being
19 called a Curtis advisement, but advisement of the
20 defendant prior to our case.
21        THE COURT: Right.
22        MS. WAYNE: In terms of that, I would tell
23 the Court that I anticipate calling Mr. Carmichael,
24 however before that, and I would like for him to be
25 the first witness, I need a ruling from the Court on

Page 292

1 the prior felony conviction that was pardoned. We all
2 know that, it's been sanitized, kept out of this trial
3 at this point, but if Mr. Carmichael takes the stand I
4 obviously need to advise him of what this Court
5 believes would open the door to that coming out in
6 this testimony.
7        THE COURT: Yes. I have no idea when this
8 conviction occurred, what the circumstances were.
9 You've got to lay a foundation for me to even rule on
10 that issue.
11        MS. WAYNE: All right. I'll get the pardon
12 and the conviction for the Court.
13        THE COURT: Let me see it.
14        But let's quickly move to the core here.
15 Does the government intend, if Mr. Carmichael
16 testifies, to bring this out? If you don't, then it's
17 a moot issue.
18        MR. FEAGA: Your Honor, could we have a
19 moment to consult on that?
20        THE COURT: Yes.
21        Miss Wayne, the government may not want to
22 use it after they consult. It may be a moot issue.
23        (Whereupon, Mr. Feaga conferred with
24 Mr. Moorer and Ms. Morris off the record and out of
25 the hearing of the other courtroom participants.)

Page 293

1        THE COURT: Have you decided whether you're
2 going to question Mr. Carmichael on his conviction if
3 he's called, Mr. Feaga?
4        MR. FEAGA: Your Honor, I think it would go
5 this way potentially, and that is if I was to ask Mr.
6 Carmichael a question on cross examination wherein I
7 was to say you heard testimony that this particular
8 individual was afraid of you, do you know of any
9 reason he would have to be afraid of? What is he
10 going to say? If he says no then I think I'm going to
11 be allowed to ask him if he's been convicted for --
12        THE COURT: Do you intend to use it to
13 impeach him, though, you know, like you can any
14 witness who takes the stand? Do you intend to use it
15 for impeachment purposes.
16        MR. FEAGA: Can I have a moment, Your Honor?
17        THE COURT: Yes.
18        MR. FEAGA: Frankly, I've been so busy
19 putting my case on, I just need a moment, if I can
20 have it.
21        (Whereupon, Mr. Feaga continued to confer
22 with Ms. Morris and Mr. Moorer off the record and out
23 of the hearing of the other courtroom participants.)
24        THE COURT: Miss Wayne, have you found the
25 papers?

Page 294

1     MS. WAYNE: Judge, I know it's 1976 and he
2 was pardoned in 1988.
3     THE COURT: What does the rule say?
4     MS. WAYNE: Ten years.
5     THE COURT: Ten years?
6     MS. WAYNE: With the exception if it's for
7 impeachment purposes.
8     THE COURT: What does the rule say? I
9 always have to look at the rule. What rule is it?
10     MR. BRUNSON: 609, Your Honor.
11     THE COURT: 609?
12     MR. MOORER: Your Honor --
13     THE COURT: Yes?
14     MR. MOORER: -- 609 doesn't apply. It talks
15 about convictions other than of the accused. This
16 would be the accused testifying at trial. So 609 does
17 not limit us as to him.
18     THE COURT: So you're saying you're not
19 limited to ten years.
20     MR. MOORER: Because then once he takes the
21 stand, his motive to testify and the motives of others
22 to testify against him becomes an issue that the jury
23 has to consider. Because you're going to instruct the
24 jury at the end of the case. When you evaluate the
25 credibility of a witness you've got to look at their

Page 295

1 motives to testify.
2     THE COURT: Where do you see it's limited to
3 other than --
4     MR. MOORER: It says, "For the purpose of
5 attacking the credibility of a witness, evidence that
6 a witness other than an accused has been convicted of
7 a crime. So this is a rule that applies to people
8 who are testifying in a trial other than the accused.
9     THE COURT: Okay. Read the whole sentence,
10 though.
11     MR. MOORER: "Evidence that a witness other
12 than an accused has been convicted of a crime, if the
13 crime was punishable by death or imprisonment in
14 excess of one year --"
15     THE COURT: Okay, keep reading.
16     MR. MOORER: Okay, I'm sorry. I was talking
17 about the first prong of it, Your Honor. The second
18 prong --
19     THE COURT: You said 609 doesn't apply.
20     MR. MOORER: The first prong of it didn't
21 apply. You're absolutely right.
22     THE COURT: So what does 609 say?
23     MR. MOORER: It depends on whether or not
24 the probative value is outweighed by the prejudicial
25 effect to the accused.

Page 296

1     THE COURT: Right. So it says, "Evidence
2 that a witness other than an accused has been
3 convicted of a crime shall be admitted subject to Rule
4 403." What's 403?
5     MR. MOORER: The balancing test.
6     THE COURT: The balancing test? "If the
7 crime was punishable by death or imprisonment in
8 excess of one year, under the law under which the
9 witness was convicted and evidence that an accused has
10 been convicted of such a crime, shall be admitted if
11 the Court determines that the probative value
12 outweighs its prejudicial effect to the accused."
13     And then it has a time limit. "Evidence of
14 a conviction under this rule is not admissible if a
15 period more than ten years has elapsed since the date
16 of conviction or the release of the witness from
17 confinement, whichever is a later date. Unless the
18 Court determines in the interest of justice that the
19 probative value of the conviction supported by the
20 facts and circumstances substantially outweigh its
21 prejudicial effect."
22     And if it's more than ten years, you have to
23 give the adverse party sufficient advanced written
24 notice of intent to use it.
25     So if I'm reading this correctly, and you

Page 297

1 can correct me on making argument, for anything to be
2 used against the accused, first it has to be no more
3 than ten years old, and then I have to determine that
4 the probative value outweighs the prejudicial effect
5 to the accused. If it's more than ten years old, you
6 must have given notice that you were actually going to
7 use it.
8     Now where do we stand under Rule 609? Do
9 you have the documents?
10     MS. WAYNE: I do, Judge. I think notice was
11 provided. It was disclosed in discovery in terms of
12 the conviction by the prosecution. All of his
13 Department of Corrections records were disclosed to
14 us. I have --
15     THE COURT: They gave you notice of their
16 intent to use the conviction?
17     MS. WAYNE: No, Judge, they gave us notice
18 of the conviction itself.
19     THE COURT: Well it says notice of intent
20 for them to use it must be given if it's more than ten
21 years old.
22     MR. MOORER: Your Honor, of course our
23 reason to disclose it to them was because we would
24 intend to use it. But, Your Honor, it goes under
25 404(b) as well. Because it would also go to the

Page 298

1 motives of others as well.
2       THE COURT:  Pardon me?
3       MR. MOORER:  It would also go to the motives
4 of others, as well.
5       THE COURT:  404(b)?
6       MR. MOORER:  Yes, Your Honor.  It's our
7 contention that the intimidation of people was part
8 and parcel of the conspiracy.  In other words, the
9 first object of every criminal conspiracy, including
10 this one, would be to avoid detection by law
11 enforcement.  One way for the conspirators to avoid
12 detection is to intimidate other people.  You've had
13 testimony from like Mr. Denton about his partner --
14       THE COURT:  Before we get to 404(b), my
15 first question is does it come in under Rule 609?
16 I'll go rule by rule.  Do you contend it comes in
17 under 609?
18       MR. MOORER:  Yes, Your Honor.
19       THE COURT:  How does its come in under 609?
20       MR. MOORER:  It comes in under 609, Your
21 Honor, because it's a conviction --
22       THE COURT:  Could I see the conviction?  We
23 do know that it's more than ten years.
24       MS. WAYNE:  Judge, all I have is the date of
25 sentence, the jail papers.  It would be on the second

Page 299

1 page that is old.
2       THE COURT:  We do know that it's more than
3 ten years, so it falls under 609's provision where
4 something is more than ten years.
5       MS. WAYNE:  Here's the last sheet, Judge, if
6 that sheet explains more because in '76 he was
7 released on parole in '86 and pardoned in '88.
8       THE COURT:  Are you relying on the notice
9 provision?  You can read your head notes.
10       MS. WAYNE:  Of their intent to use it?
11       THE COURT:  Yes.
12       MS. WAYNE:  I can tell the Court that they
13 obviously have disclosed records --
14       THE COURT:  No, my question is are you
15 making any notice contention here?  Then you can tell
16 me why.  I just need to know what the contentions are.
17 Now was he pardoned?
18       MS. WAYNE:  Yes, he was, in 1988.  That's
19 why you have to look at (c).
20       THE COURT:  Right.  I'm looking at (c).  But
21 we'll get to that in a minute.  Are you contending you
22 had notice?
23       MS. WAYNE:  Judge, they have not given us
24 formal notice that we are going to use this against
25 him, but they certainly have argued it at a number of

Page 300

1 hearings.
2       THE COURT:  Very good, you've had notice.
3 So we are talking about something more than ten years
4 old, you've gotten the notice, so I have to find that
5 the probative value outweighs the prejudice to the
6 accused subject to (c).  Now let's turn to (c).
7       "Evidence of a conviction is not admissible
8 under this rule one, if the conviction has been the
9 subject of a pardon, and that person has not been
10 convicted of a subsequent crime punishable by death or
11 imprisonment in excess of one year; or, two, based on a
12 conviction has been the subject of a pardon based on a
13 finding of innocence."
14       So does the government not dispute that he's
15 been pardoned?
16       MR. MOORER:  There's no dispute about that.
17       THE COURT:  So it looks like 609 is out.
18       MR. FEAGA:  Yes, sir.
19       THE COURT:  So no 609 introduction.
20       So let's talk about 404(b), then.  Does it
21 come in under 404(b)?  How does it come in under
22 404(b)?
23       MR. MOORER:  Our argument under 404(b), Your
24 Honor, is that the fact that the defendant has been
25 pardoned does not erase the fact that the conduct

Page 301

1 underlying the conviction occurred.
2       THE COURT:  I understand that, but just tell
3 me what is it that you're trying to get in under
4 404(b)?
5       MR. MOORER:  Your Honor, what we would be
6 trying to get in is evidence as to why these witnesses
7 may have been afraid of Mr. Carmichael.  Because I go
8 back to what I started with Your Honor, which is that
9 the first object of a conspiracy is to --
10       THE COURT:  Well I have one fundamental
11 question.  If that's true, you could have put it in
12 your case-in-chief.  This doesn't go to the witness
13 admissibility, you're trying to present this as
14 substantive evidence of intimidation.  Why didn't you
15 just ask to put it in in general?  Your argument isn't
16 dependent on Mr. Carmichael testifying.
17       I don't see how what you're arguing has
18 anything to do with his testifying.  That seems to go
19 to with why everyone from the Hensarlings to jurors to
20 Denton to Watson, I mean all these people why they did
21 what they did, I don't see how your argument goes to
22 his testifying.
23       MR. MOORER:  Because, Your Honor, when he
24 testifies, we would expect to ask him on cross
25 examination if certain individuals would have had a

Page 302

1 reason to be afraid of him, such as Moses Williams and
2 others. And if he answers no, as I would presume that
3 he would, then --
4        THE COURT: Do you have evidence that they
5 knew of his conviction?
6        MR. MOORER: Well then, Your Honor, I think
7 that we are then able to bring back those witnesses
8 who we tried to introduce their fear because of his
9 previous conduct. We should at least be able to bring
10 that in for rebuttal.
11        THE COURT: Is this it? Is this the only
12 arguments that we have?
13        MR. FEAGA: I believe so.
14        THE COURT: Again, this has nothing to do
15 with this testimony. What you're trying to -- It's an
16 improper way to impeach him. I'll sustain the
17 objection. If he testifies, his conviction does not
18 come in. There is no basis in the record for it to
19 come in.
20        Furthermore, I find that its probative value
21 clearly outweighs any marginal advantage. If it's
22 going to come in, it should have come in under
23 substance. It has nothing to do with his testimony.
24 The prejudice outweighs any probative value.
25        Okay. Are we ready to proceed?

Page 303

1        MS. JAMES: Yes, Your Honor.
2        THE COURT: Why don't we take five minutes
3 and then we'll bring the jury in.
4        (Whereupon, a recess was taken.)
5        THE COURT: Is this your witness, Ms. James?
6        MS. JAMES: Yes, Your Honor.
7        THE COURT: Proceed.
8        MR. FEAGA: Your Honor, before we get
9 started again, given all the movement that we've had,
10 could the Court make sure that we're still invoking
11 the rule?
12        THE COURT: Yes, definitely invoking the
13 rule. Make sure your witnesses are not in the
14 courtroom.
15        L I S A   G E O R G E,
16 the witness herein, having first been duly sworn or
17 affirmed to tell the truth, was examined and testified
18 as follows:
19        DIRECT EXAMINATION
20        BY MS. JAMES OF LISA GEORGE:
21 Q State your name, please.
22 A Lisa Diane George.
23 Q Miss George, where do you work? Or what do you
24 do for work?
25 A I'm a hairdresser.

Page 304

1 Q And are you here today pursuant to subpoena?
2 A Yes.
3 Q Do you know Gary Wayne George?
4 A Yes.
5 Q How do you know him?
6 A He's my ex-husband.
7 Q How long have you been divorced?
8 A Over two years.
9 Q Do you know Patrick Denton?
10 A Yes.
11 Q And how do you know him?
12 A He's my cousin.
13 Q What degree?
14 A My first cousin.
15 Q Do you know Mr. Carmichael, the defendant in this
16 case?
17 A I've heard of him. I don't know him personally.
18 Q Do you know if he lives close to your
19 grandparents?
20 A Lives next door to them.
21 Q Now I'm going to direct your attention back to
22 June 13th of 2002. Does that date have any
23 significance to you?
24 A Yes.
25 Q And what is the significance of that date?

Page 305

1 A It's the day Pat got arrested.
2 Q You say "Pat," are you speaking of Pat Denton?
3 A Yes.
4 Q And where did Pat get arrested? If you know.
5 A In Huntsville.
6 Q How was it that you learned of this?
7 A Susan had called Gary on his cell phone and told
8 him that Pat had just gotten pulled over in front of
9 her.
10 Q Okay. And what, if anything, did you do as a
11 result of that phone call?
12 A Went to Pat and Trina's house to tell Trina.
13 Q Okay. Did you go alone?
14 A Me and Gary went.
15 Q And did you have occasion to stay there for any
16 period of time?
17 A We stayed there that night until the next night.
18 Q Okay. Now when you say you went to Pat and
19 Trina's house, is Trina related to Pat?
20 A His wife.
21 Q And where did you go? I mean what location, if
22 you recall, to see her?
23 A Fleming Road is where they live.
24 Q Did you go to their house?
25 A Yes.

**Page 306**

1  Q  Now, did you all do anything in regard to Pat
2  being in the jail?  I'm saying you, Trina and Gary,
3  your husband.  Did y'all try to do anything about Pat
4  being in jail?
5  A  Yes.
6  Q  What did you try to do?
7  A  That night we tried to call the jail several
8  times.  We couldn't get any information that night.
9  Q  Okay.  Did anything happen later?  Did you try to
10  help him get a bond or anything like that?
11  A  Yes.
12  Q  What did you do in relation to that?
13  A  Me and Trina went to Food World and talked to --
14  Trina talked to Leon and asked him for money for Pat,
15  but he didn't give her any.
16  Q  Okay.  Well after that happened what, if
17  anything, did y'all do to try to get Pat out of jail?
18  A  Trina had to get papers notarized to use her
19  house; and their friends, Ike and Erica, had to get
20  papers notarized to use their house; and Pat's Daddy,
21  to use his house.  And then we went to Huntsville to
22  get him out of jail.
23  Q  Prior to you going to Huntsville to get him out
24  of jail, did anything significant happen while you
25  were at the Dentons' residence?

**Page 307**

1  A  It got raided by the police.
2  Q  Did you have any kind of forewarning that -- you
3  or Mr. George have any forewarning that that raid
4  might happen?
5  A  There was a Suburban parked right down from their
6  house and somebody was sitting in it, and we thought
7  they were watching us.
8  Q  What, if anything, did Mr. -- well let me ask you
9  this:  At that time was there contraband, drugs in the
10  house?
11  A  In the garage.
12  Q  What kind of drug?
13  A  Marijuana.
14  Q  What, if anything, was done by you or Mr. George
15  or Trina with the drugs that were in the garage?
16  A  Gary crawled on the ground to the garage.  The
17  garage was not connected to their house.  He crawled
18  on the ground and got the, it was in a tote bag, and
19  put it beside the outside of the garage up against
20  some wood fence that they were putting up.  Wood fence
21  around the house.
22  Q  Do you have any idea how much marijuana it was?
23  A  No.
24  Q  Do you know what, if anything, happened with that
25  marijuana?

**Page 308**

1  A  I don't know what happened to it.
2  Q  Do you know if the police seized it that night?
3  A  No, they didn't.
4  Q  Were you present when the police seized money and
5  guns?
6  A  Yes.
7  Q  Now did the police actually search your person
8  and your belongings?
9  A  Yes.
10  Q  And did they retrieve anything out of your purse
11  of interest?
12  A  Yes, they got a letter out of my purse that I
13  wrote to Gary asking him to quit selling drugs.
14  Q  Okay.  And as a result of them getting that
15  letter out of your purse about you asking Gary to stop
16  selling drugs, did they question you about Gary's drug
17  activities?
18  A  Yes.
19  Q  And did you agree to talk with them that night
20  about Gary's drug activities?
21  A  No, not that night.
22  Q  Did you have occasion later to talk with Mr.
23  Herman with the Montgomery Police Department?
24  A  Yes.
25  Q  Did you tell him at that time who Gary and Pat

**Page 309**

1  were involved with drugs?
2  A  I told him about Gary, that I didn't know a lot
3  about Pat.  But what I knew about Gary.
4  Q  Okay.  Well let me ask you this.  After Pat got
5  out of jail, do you know whether or not he and Gary
6  agreed to try to get some drugs from someone in a
7  different city?
8  A  Yes.
9  Q  And tell us about that and where they were going.
10  A  Gary went to Mobile in my car to pick up
11  something from a guy he knew in prison.  It was his
12  brother or cousin or something.  I don't know who it
13  was.  But he went to pick up some drugs in Mobile.
14  Q  Okay.  And was that something that he and Pat
15  decided to do?
16  A  Yes.
17  Q  Okay.  And what kind of car did they travel in?
18  A  In my Blazer.
19  Q  And after -- Well let me back up.  Did Gary
20  return back to Montgomery with drugs?  If you know.
21  A  I didn't see the drugs when he came back.
22  Q  All you will know is that was his plan, to go to
23  Mobile to get drugs?
24  A  Yes.
25  Q  Do you know if Gary and Pat had ever used a

**Multi-Page™**

1 source in Mobile for drugs before?
2 A  Gary had been there once before I think.
3 Q  Okay.  Do you know, based on your own personal
4 knowledge, if Gary ever traveled to Texas to retrieve
5 drugs, marijuana?
6 A  Yes, Gary went to Texas with Ike one time.
7 Q  Would Ike be a black man that was a friend of
8 Gary's and Patrick's?
9 A  Yes.
10 Q  Do you know if Patrick and his brother Willie
11 ever traveled to Texas to get marijuana?
12 A  I don't know where they went, with Gary and Pat
13 and Willie went out of town one time.
14 Q  Did you have occasion to be present when they
15 talked about their drug involvement?
16 A  Sometimes.
17 Q  Well let me ask you this.  Did there come a time
18 prior to Pat's arrest that you had your suspicions
19 that your husband was having an affair?
20 A  Yes.
21 Q  And as a result of that, did you obtain a pass
22 code for his cell phone so that you could receive
23 phone messages, or retrieve phone messages?
24 A  Yes.
25 Q  And did you do that?

1 A  Yes.
2 Q  And how long did you do that prior to Pat's
3 arrest?
4 A  Probably a couple of months before.
5 Q  And how long did you actually conduct that sort
6 of investigation of your own?
7 A  Probably about two and-a-half, three months.
8 Q  Did you hear on those phone messages various
9 people discussing drug activity with your husband?
10 A  Yes.
11 Q  And did you happen to be in the presence of Pat
12 and Gary when they talked about drugs?
13 A  Sometimes.
14 Q  And did you ever hear them mention the name Leon
15 Carmichael as one that was involved with them in their
16 drug business?
17 A  No.
18 Q  Now, were you aware that Pat had a lawn business
19 called Extreme Lawn Care?
20 A  Yes.
21 Q  Did you know whether your husband worked there or
22 not?
23 A  He did.
24 Q  Do you know if they actually did work or if it
25 was just a front?

1 A  They did the first probably two or three months.
2 Q  How long did your husband purport to work there?
3 How long was he supposedly on Pat's payroll?
4 A  Probably about three months.
5 Q  And do you know if he used that as a job when he
6 was having to report to his Probation and Parole
7 people?
8 A  He wasn't on probation then.  He was already off.
9 Q  Okay.  Well, did he get a salary from Extreme
10 Lawn Care?
11 A  No -- Well, when he cut yards he got a certain
12 percent of it.
13 Q  Well based on your observation of the business,
14 did it appear to be a thriving business or not?
15 A  No.
16 Q  Now, have you ever had occasion to see drugs in
17 Pat's garage?
18 A  Yes.
19 Q  And whose drugs were those?  If you know.
20 A  I don't know.
21 Q  Have you ever had occasion to see Pat and Gary
22 count a large amount of money?
23 A  Yes.
24 Q  Based on your observations about the money they
25 were counting, did it look like it was small enough

1 for someone to -- Well let me ask you how many times
2 did you see him counting the money?
3 A  Probably a couple of times.
4 Q  On those two occasions when you saw the quantity
5 of money that they were counting, did it appear to be
6 small enough that it could be concealed within their
7 pants, one or the other of them?  That they could
8 actually put it in their pants without notice?
9 A  No.
10 Q  Did it appear to be a quantity that was small
11 enough to put in an envelope, even a legal sized
12 envelope?
13 A  No.
14 Q  Now how long were you married to Gary Wayne
15 George?
16 A  Ten years.
17 Q  Would Mr. George, was he incarcerated off and on
18 during your marriage?
19 A  Yes.
20 Q  Did he have run-ins with the law off and on
21 during your marriage?
22 A  Yes.
23 Q  Did Mr. George, based on your observations, ever
24 seek your assistance in manipulating or deceiving the
25 law?

**Page 314**

1 A Yes.

2 Q When did this occur? If you'll tell us.

3 A One time there was a rape case that happened in

4 our neighborhood and he came home with a cut on his

5 hand and told me to tell the police that he got it at

6 work. Different times he would tell me when police

7 were questioning him about things, to tell them he was

8 at home or he was at a different place.

9 Q Okay. Did you and Pat have a relative by the

10 name of Joe Denton?

11 A I don't, Pat does.

12 Q That's someone Pat's related to?

13 A Yes.

14 Q And does Mr. Denton, if you know, did he ever

15 allow Pat and Gary to store their drugs at his house?

16 A Yes.

17 Q And would that house be a house located off Bell

18 Street on Second Street?

19 A Yes.

20 Q And do you have knowledge that Gary and Pat on

21 occasion used storage buildings to store their

22 marijuana?

23 A Yes.

24     MS. JAMES: That's all the questions.

25     MR. TEAGUE: I don't have any questions.

**Page 315**

1     THE COURT: Government?

2          CROSS EXAMINATION

3          BY MR. FEAGA OF LISA GEORGE:

4 Q Ma'am, you said you in response to Ms. James

5 questions that you had heard of Leon Carmichael. Do

6 you remember that?

7 A Yes.

8 Q How did you know Leon Carmichael?

9 A He lived next door to my grandparents.

10 Q And how long had you known him?

11 A I didn't know him. I just knew of his name.

12 Q Okay. Did you say you were part of the group

13 that went over to see Leon Carmichael about getting

14 bond money for Pat?

15 A Yes.

16 Q Why did y'all go over to see Leon about that?

17 A I went with Trina. I didn't actually talk to

18 him. I stood to the side while she talked to him and

19 she told me that he wouldn't give her the money.

20 Q What made y'all think that Leon might be somebody

21 that might be interested in helping Pat get out of

22 jail?

23     MS. JAMES: Judge, object unless she knows.

24     THE COURT: Only if you know.

25 A I don't know.

**Page 316**

1 Q Okay. Now you testified also that back when Pat

2 Denton was arrested in Huntsville, do you remember you

3 said that you guys thought you were being surveilled?

4 A Yes.

5 Q Tell the ladies and gentlemen of the jury about

6 what alerted you to the idea that you might be getting

7 surveilled that day.

8 A We saw the Suburban parked right down from Pat's

9 house with someone sitting in it looking at his house.

10 Q Let me show you something. Ma'am, would you tell

11 the ladies and gentlemen of the jury -- I'm showing

12 you what's been introduced into evidence in the trial

13 as government's exhibit 7(c). Have you seen what's

14 depicted in that photo before?

15 A I think that's Pat's house.

16 Q Okay. And let me put that a little closer to

17 you.

18     Is this the location where you guys said you

19 made the surveillance on the place?

20 A Yes.

21 Q What is it about that Tahoe that made you think

22 that maybe there was law enforcement associated with

23 that?

24 A I don't know.

25 Q Well, did it look out of place in the

**Page 317**

1 neighborhood?

2 A Yes. It was parked right down from his house.

3 Q What about it made look out of place?

4 A I don't know.

5 Q Well you must have had some reason for telling

6 Ms. James that you thought because you saw it, and I

7 just wonder, if you would, would you share with the

8 jury why when you saw that you thought gee, that must

9 be the cops.

10 A Because Gary told us that we probably were going

11 to get raided.

12 Q Okay. But what was it about that car that made

13 you think that?

14 A That's what he was telling me and Trina because

15 we stayed outside the whole time.

16 Q Okay. Now, you said that there was some

17 marijuana in Pat's that day in a tote bag?

18 A Yes.

19 Q What did you mean by "tote bag"?

20 A It was in, like, what people put baseball bats

21 in, a bag.

22 Q Let me show you something. When you say "tote

23 bag," were you talking about a bag like this?

24 A It was bigger than that, longer than that.

25 Q Bigger and longer than that? What color was it?

1  A  It was either black or red, I can't remember.
2  Q  Okay.  But other than that, it was kind of a bag
3  like this?
4  A  Yes.
5  Q  Okay.  Now Miss James asked you a question about
6  seeing Pat and Gary counting money, and you said it
7  was lots of money they were counting.
8  A  Yes.
9  Q  You saw them do that a couple of different times?
10 A  Yes.
11 Q  Now have you ever conducted an experiment, has
12 Miss James ever conducted an experiment with you to
13 see how much money you can get in a legal sized or
14 manilla envelope?
15 A  No.
16 Q  Do you really know how much money you can get
17 into one?
18 A  No.
19 Q  Okay.  So if two witnesses in this trial
20 testified that you could get, you know, large sums --
21      MS. JAMES:  Objection to what other
22 witnesses testified about.  She wasn't here.  It's an
23 inappropriate question.
24      MR. FEAGA:  I just wanted to ask her if she
25 would quarrel with them.  Sherry Pettus said Pat

1  Denton both said --
2      THE COURT:  Quarrel about what?
3      MR. FEAGA:  Sherry Pettus said Pat Denton
4  brought legal sized manilla envelopes, so --
5      THE COURT:  She can't comment on another
6  witness's testimony.  What you can ask her is about
7  her own views about how much alleged money or how much
8  alleged drugs someone had.  The jury is the only
9  person who can decide whether a prior witness told the
10 truth.
11     MR. FEAGA:  Yes, sir.
12 Q  So you don't really know exactly how much money
13 you can get in a manilla size big manilla envelope?
14 A  No.
15 Q  Ma'am, I want to talk to you some more about Pat
16 Denton getting arrested up in Huntsville.  Do you know
17 why he got arrested up there?
18 A  Yes.
19 Q  What was he arrested for doing?
20 A  Carrying marijuana and pills and cocaine.
21 Q  And do you know where he was taking it to?
22 A  Yes.
23 Q  Where was he taking it to?
24 A  To a girl named Susan for a man named Steve.
25 Q  And when he got back, you said he eventually did

1  get out of jail?
2  A  Yes.
3  Q  You talked about how y'all went out and made his
4  bond.  When he got back, did he ever tell you about
5  how he got arrested?
6  A  He told us that he was surrounded on the
7  Interstate.
8  Q  Okay.  Surrounded by whom?
9  A  He said police with guns hanging out of their
10 cars.
11 Q  Okay.  Did you ever help Gary and Pat in the
12 distribution of any drugs?
13 A  No.
14 Q  Okay.  Did you ever have any opportunity to be
15 with either of them when they were distributing drugs?
16 A  No.
17      MR. FEAGA:  No further questions.
18      (Whereupon the witness, Lisa George, stepped
19 down from the stand.)
20      THE COURT:  Next witness.
21      MR. BRUNSON:  Louie Wilson.
22      THE COURT:  Louie Wilson?
23      MR. BRUNSON:  Yes, Your Honor.
24      Your Honor, there was this matter we were
25 going to take up.  I can direct this witness within

1  the time period until five-thirty.  I'm just saying
2  that it may take longer than --
3      THE COURT:  That's okay, we'll recess until
4  tomorrow.
5      MR. BRUNSON:  Thank you, Your Honor.
6      L O U I E   W I L S O N,
7  the witness herein, having first been duly sworn or
8  affirmed to tell the truth, was examined and testified
9  as follows:
10         DIRECT EXAMINATION
11      BY MR. BRUNSON OF LOUIE WILSON:
12 Q  Good afternoon, Mr. Wilson.
13 A  Mr. Brunson.
14 Q  Mr. Wilson, are you one of the case agents
15 assigned to this investigation?
16 A  Yes, sir.
17 Q  And you were assigned to the Drug Task Force
18 during this time period?
19 A  I was assigned to the H. I. D. T. A. Drug Task
20 Force, yes, sir.
21 Q  And tell the jury what your occupation is.
22 A  I'm a special agent with the Internal Revenue
23 Service, Criminal Investigation Division.
24 Q  And you've held that position for how many years?
25 A  Since 1991.

Page 322

1 Q Almost fifteen years?
2 A Yes, sir.
3 Q And how long have you been working in conjunction
4 with the task force via the I. R. S. relating to the
5 Leon Carmichael investigation?
6 A There are actually two separate investigations
7 that I was involved with.
8 Q Where you began one, ended one and then began
9 another?
10 A Yes, sir.
11 Q When did the original one that you were assigned
12 begin?
13 A I believe it began in late '97.
14 Q That's when you were assigned, in late '97, is
15 that right?
16 A Yes, that's when I was contacted.
17 Q Actually, the I. R. S. had begun an investigation
18 of Mr. Carmichael, though, earlier than late '97, had
19 they not?
20 A Well there was an administrative investigation of
21 Mr. Carmichael prior to that, that's correct.
22 Q Okay. And I'll probably want to talk to you a
23 little bit about an administrative investigation by
24 the I. R. S. Was that one that the I. R. S. had taken
25 up on their own, or had they combined with the U. S.

Page 323

1 Attorney or another agency to work on the case?
2 A I believe that was being worked on their own.
3 Q So the I. R. S. had just taken on their own to
4 investigate Mr. Carmichael purely for income tax
5 evasion?
6 A That's my understanding, yes, sir. I was not the
7 case agent, but that's my understanding.
8 Q All right. But that case agent had an ongoing
9 case going at the I. R. S. when you took over?
10 A Yes, sir.
11 Q All right. And when you took over, did the case
12 character change somewhat from an administrative case
13 where the I. R. S. looks at income tax evasion, to
14 some other type of case?
15 A Yes, sir, it became part of an organized crime
16 and task force investigation.
17 Q And that organized crime drug enforcement task
18 force is one comprised of a number of agencies, is it
19 not?
20 A Yes it is.
21 Q The I. R. S., the D. E. A. and the F. B. I.
22 participates sometime in that, do they not?
23 A In some places they probably do. Here, that's
24 not usually the case, but that's true in some places.
25 Q And also the task force brings in local agents

Page 324

1 such as Mr. DeJohn?
2 A Yes, sir.
3 Q And some other local agents to participate in a
4 group effort to investigate individuals.
5 A State, local and federal, yes, sir.
6 Q So come the end of 1997 you all had targeted Mr.
7 Carmichael as someone to investigate, is that right?
8 A Yes, sir. I wouldn't say I actually did the
9 targeting, but I was brought into the investigation,
10 yes, sir.
11 Q Okay. But the I. R. S. was simply continuing
12 their review of Mr. Carmichael's finances, is that
13 right?
14 A There was a meeting between myself, the agent who
15 was assigned the administrative case and my supervisor
16 at that time, and the determination was made that we
17 would terminate the administrative investigation and
18 the OSIDEF (sic.) investigation would proceed.
19 Q And relating to the OSIDEF (sic.) investigation,
20 was your focus still income tax evasion or was that
21 now opened up for another area that you were looking
22 at?
23 A My folks were looking at money laundering as far
24 as drug trafficking.
25 Q But as far as an I. R. S. agent goes, you

Page 325

1 generally have two areas of jurisdiction, and that's
2 money related jurisdiction, either income tax evasion
3 on the one hand as this case began, or money
4 laundering type investigations. And really you don't
5 have any other jurisdiction, is that right?
6 A Well we also have jurisdiction related to
7 structuring cases.
8 Q And that's kind of like a banking regulation, is
9 that right?
10 A Yes, sir.
11 Q Similar to the C. T. R. requirement that over ten
12 thousand in currency be reported by banks?
13 A Yes, sir, that's correct.
14 Q Now relating to this investigation, you came
15 along, I'm assuming, and obtained the Compass Bank
16 account through subpoenas, is that right?
17 A You talking about the current investigation?
18 Q Yes.
19 A Yes, sir, that's correct.
20 Q And you obtained the deposits and the checks and
21 all that make up the account?
22 A Yes, sir.
23    MR. FEAGA: Your Honor, I would note just
24 one thing. I'm not going to impose an objection yet,
25 but, and I know this is a government agent, but he is

Multi-Page™

Page 326

1  leading him with every question and we would just ask
2  if he would occasionally ask him a question and not
3  lead him.
4        THE COURT: Well I'm assuming that he's
5  going to reach a point where maybe there will be a
6  question that doesn't have an obvious answer. But I
7  think so far you probably don't have any issue, it's
8  just moving him along quickly.
9        MR. FEAGA: All right, sir.
10       MR. BRUNSON: Thank you, Your Honor.
11  Q  And I want to talk about the proceeds of the
12  money that went into the bank account. Now you
13  analyzed it and of course there have been charts that
14  have been submitted, I'm sure you're familiar with
15  those charts, relating to the account?
16  A  Yes, sir.
17  Q  Exhibits 48(a) and 48(b)?
18  A  Those are the charts created by Ms. George.
19  Q  Yes. Made by the banker, Miss George, is that
20  right?
21  A  Yes.
22  Q  And the deposits to this account are primarily
23  made up by cash, is that right?
24  A  Yes.
25  Q  But there are also some checks in there.

Page 327

1  A  Yes, sir, there are a few.
2  Q  And the contention relating to money laundering
3  is the fact that the money deposited into this account
4  was generated by the drug trade, is that right?
5  A  That's correct.
6  Q  All right. And are you saying that all of the
7  money deposited into the account was generated by the
8  drug trade?
9  A  I believe our allegation is the two hundred and
10  forty-nine thousand and some-odd dollars deposited in
11  cash.
12  Q  Just the currency part.
13  A  Correct.
14  Q  Not the check portion that was deposited.
15  A  That's correct.
16  Q  And you're saying, though, that a hundred percent
17  of the currency part is -- you contend is drug
18  proceeds, is that correct?
19  A  I believe that there may have been a few, and I'd
20  have to go back and look at the records to give you
21  the exact numbers, but I can't give you the exact
22  numbers without looking at the records. However, it's
23  my recollection that there may have been one or two
24  small deposits, say less than a thousand dollars,
25  which Miss Pettus may have told us she put into that

Page 328

1  account. They were her own money.
2  Q  I'm kind of looking at your analysis outside of
3  any other hearsay information. And what you're
4  saying, though, is you were able to decide that all of
5  the currency that went in this account came from the
6  drug trade. And outside of any hearsay information,
7  is there some method of determining whether that
8  currency came from one source or another source?
9  A  Without some information from another party?
10  Q  Yes.
11  A  No, sir. You're asking me can I tell you where
12  that particular dollar came from?
13  Q  That's correct.
14  A  No, sir, I cannot do that.
15  Q  And in fact cash is a very difficult item for the
16  I. R. S. to consider, is that right?
17  A  To consider or to trace?
18  Q  To trace.
19  A  To trace, yes, sir.
20  Q  Because of more than one thing, you can't tell
21  where it came from, number one.
22  A  That's correct. I think that's true of anybody
23  in cash.
24  Q  And number two, you can't tell when it came into
25  the possession of the last possessor.

Page 329

1  A  You can assume they had it as of the date of
2  whatever deposit they made, or whatever transaction
3  they did with it, but if you're talking about the date
4  that they made a deposit or withdrawal or some sort of
5  financial transaction with the money then you do. But
6  if you're talking about the date they acquired the
7  currency, then no, sir, you wouldn't be able to
8  without some third party information.
9  Q  But to the I. R. S. it's more important when they
10  receive the money than when they deposited the money
11  or spent the money, would you agree with that?
12  A  For tax purposes, yes, sir.
13  Q  Because you've got to determine for tax purposes,
14  since if somebody earned the money in 1994 for tax
15  purposes, just because they deposited it ten years
16  later doesn't mean that the deposit event was the
17  taxable event.
18  A  That's correct.
19  Q  So it's not only important to know where it came
20  from, but when they received it, for tax purposes.
21  A  For tax purposes.
22  Q  And that's almost impossible to determine when
23  they received the money, unless there's some witness
24  to say this is when they received it.
25  A  That's correct, or unless there is some paper

| Page 330 |
|---|

1 trail that can lead you there.
2 Q And that kind of lends itself to the cash hoard
3 issue. What is a cash hoard in I. R. S. terms?
4 A It's a pile of money that someone socks away, you
5 know, sticks under the mattress for lack of a better
6 term, to hide from the I. R. S. effectively.
7 Q Or buries the money.
8 A You could bury it, sure.
9 Q Whatever. To hide the money from the I. R. S.
10 And a cash hoard is also a very difficult thing for
11 the I. R. S., is it not?
12 A It can be a difficult defense to overcome in a
13 tax case, yes.
14 Q Because the I. R. S. has other methods of
15 determining a person's real income taxes. They can go
16 out, or you can go out and evaluate the asset picture
17 and the liability picture, is that right?
18 A That would be one method, yes.
19 Q But if this cash hoard money, money they earned
20 years earlier and put in a mattress is interjected
21 into that sort of computation, it skews your numbers.
22 It's not an effective computation, is that correct?
23 A It certainly makes us go do some additional
24 looking.
25 Q Now as far as the cash that went into the Compass

| Page 331 |
|---|

1 Bank account -- of course you never saw the cash?
2 A No, sir.
3 Q You saw deposit slips?
4 A Correct.
5 Q And we heard some evidence that part of this
6 money was smelly money.
7 A I've heard the same thing, yes, sir.
8 Q Potentially money that had been dug up or cash
9 that had been hoarded, like we just described.
10 A Cash that had been dug up is how it was described
11 to me.
12 Q Okay. And even though there might be some
13 evidence of when the cash was dug up, there is no
14 evidence of when the cash was buried.
15 A Not to my knowledge, no, sir.
16 Q I want to talk about the earlier investigation.
17 Oftentimes the I. R. S. opens in cases based on
18 information received or other reasons that gives some
19 indication that the person hadn't reported all his
20 income on his tax return, is that right?
21 A That would be one reason to start a case yes,
22 sir.
23 Q Do you know if the I. R. S. began an
24 investigation on Mr. Carmichael on that basis?
25 A I do not know the basis of that, of the original

| Page 332 |
|---|

1 investigation was.
2 Q And do you know if Mr. Carmichael had been
3 contacted by that previous agent in that investigation
4 of his income taxes?
5 A Not to my knowledge.
6 Q Were you the first I. R. S. representative that
7 contacted Mr. Carmichael indicating that you had a
8 case on him back then?
9 A From a criminal standpoint, yes, sir, I believe
10 that's correct.
11 Q And I think the record indicates that you
12 contacted him sometime about March of 1998. Do you
13 recall doing that?
14 A I won't quibble with the date. I don't remember
15 the exact date, but that sounds about right.
16 Q All right. And in contacting Mr. Carmichael, an
17 I. R. S. special agent will normally go out and read
18 the person their rights, is that normally how that's
19 done?
20 A In an administrative case that would typically
21 the process. In a drug case such as this, there is an
22 investigation that might not necessarily be what
23 happened.
24 Q Okay. But what the I. R. S. is trying to did do
25 is to indicate to the taxpayer that you're not the

| Page 333 |
|---|

1 regular I. R. S. type person, you're not the auditor
2 type, but you're the type that carries a gun and has
3 an intention of investigating criminal statutes, is
4 that right?
5 A In an administrative case we would read the
6 subject what we refer to as their non-custodial
7 rights.
8 Q But do you carry a firearm?
9 A Yes, sir.
10 Q And you do investigate criminal violations?
11 A That's correct.
12 Q When you interviewed Mr. Carmichael, is it your
13 observation that he was willing to cooperate with you
14 and provide information relating to your
15 investigation?
16 A As best I can recall, Mr. Carmichael actually
17 brought documents to the interview or provided them
18 prior to the time that I talked to him.
19 Q And at the time of your investigation you knew
20 that he had numerous business interests.
21 A I knew about the trucking company, I knew that he
22 had rental income, and I knew that he had some
23 association with Unique Entertainment Center, which
24 was a club.
25 Q Okay. So he had the trucking company and the

Multi-Page™

Page 334

1 Unique club which was a nightclub type place?
2 A Yes, sir.
3 Q They served alcohol, I'm assuming, and food, is
4 that right?
5 A That would be my assumption, yes.
6 Q They also had entertainment?
7 A I never went there, I couldn't tell you whether
8 they had entertainment or not.
9 Q Okay. And I think you said rental properties, is
10 that correct?
11 A Yes, sir, he had a number of rental properties.
12 Q Numerous rental properties, in fact.
13 A I don't remember the exact number, but I'd say
14 about twenty rental properties.
15 Q And these properties that he had invested in,
16 were they in depressed areas of the town?
17 A Yes.
18 Q Did you go by and review or see the properties?
19 A I've seen several of them. I can't say I've seen
20 all of them.
21 Q And some of these businesses that he had, though,
22 are businesses that predominantly receive cash or
23 currency in payment.
24 A I would say with regard to the nightclub, that
25 would be the case. With regard to the trucking

Page 335

1 business I do not believe that's a cash intensive
2 business.
3 Q And as to the rental properties?
4 A Some renters pay in checks, some renters pay in
5 cash.
6 Q But relating to the trucking company, Mr.
7 Carmichael had a certain type of income that he wanted
8 to make sure you recognized and knew about, did he
9 not? Cash income?
10 A Are you referring to the Comdata checks?
11 Q Yes. And he wanted to make sure that you knew
12 what those were, because there seemed to be an issue
13 about that in that investigation, is that right?
14 A He provided me with a videotape with his
15 assertion as to what those Comdata checks represented.
16 I don't necessarily agree.
17 Q Well the videotape was one where he went out and
18 prepared of him walking into a bank with some of these
19 Com checks and depositing these checks into his
20 trucking account, is that correct?
21      MR. FEAGA: Your Honor, we're going to
22 object to the testimony about this videotape that he's
23 talking about on the basis that it would be hearsay as
24 to this man's claim.
25      THE COURT: Yes. Where's the videotape?

Page 336

1      MR. BRUNSON: It's right here, Your Honor.
2      THE COURT: I think you should show it
3 rather than asking him.
4      MR. FEAGA: The videotape itself is hearsay.
5 It's just Mr. Carmichael on tape making a statement.
6      THE COURT: Mr. Brunson?
7      MR. BRUNSON: Yes, Your Honor. It's
8 probably the only tape in this trial that you'll see
9 Mr. Carmichael on. And it is one that he provided to
10 this agent --
11      THE COURT: Why isn't it hearsay?
12      MR. BRUNSON: I don't think it is hearsay,
13 Your Honor. I think it's just another statement --
14      THE COURT: Isn't it being introduced for
15 its truth? It's an out-of-court statement, why isn't
16 it just unadulterated hearsay?
17      MR. BRUNSON: In the converse, Your Honor,
18 these agents in their investigation are repeating what
19 Mr. Carmichael said.
20      THE COURT: Right, but there are rules that
21 allow that come to in. But cite your rule to me.
22 Show me under 801 or 803 or whatever.
23      MR. BRUNSON: I guess my position would be,
24 Your Honor, that I'm not offering it for the truth of
25 the matter.

Page 337

1      MR. FEAGA: Well then what is he offering it
2 for, Your Honor? That's exactly what he's offering it
3 for and it's hearsay.
4      THE COURT: Well, yes.
5      MR. BRUNSON: And, Your Honor, I cover this
6 with the agent. I had not planned on --
7      MR. FEAGA: We're going to object to him
8 bringing in hearsay statements of his client through
9 this statement.
10      THE COURT: Unless you can show me how the
11 statement comes in under one of the rules I'll sustain
12 the objection.
13      MR. BRUNSON: Thank you, Your Honor.
14      THE COURT: I'll sustain the objection.
15 Let's proceed.
16 Q Mr. Wilson, I want to ask you, though, about
17 Comdata checks. Is that how you referred to them,
18 these checks that truckers receive for produce
19 shipments?
20 A It's one way that money gets changed hands in the
21 trucking industry, yes, sir.
22 Q And actually, are those Comdata checks cash items
23 in the banking sense?
24 A No.
25 Q Can one who receives one of these checks take

Page 338

1 them to the bank and cash them if they have
2 authorization?
3 A  Yes.
4 Q  So why wouldn't they be cash items?
5 A  They are more -- When you say "cash items" I
6 think currency.
7 Q  Oh no, I meant cash items such as a money order
8 or cashier's check.
9 A  Money order or cashier's check is  what I would
10 compare it to.
11 Q  So they are instruments, though, that you would
12 agree that you could go to a bank and get currency for
13 them if you chose to.
14 A  Yes.
15 Q  And in fact, Mr. Carmichael could have received
16 Com checks from the trucking industry or business and
17 taken these Com checks and cashed them at any bank,
18 much like a money order.
19 A  Yes, sir.
20 Q  And when you were testifying about the fact that
21 the trucking business did not receive cash income,
22 that would be cash income that the trucking business
23 could have received.
24 A  Again, that's a difference of opinion on what's
25 cash.  Again, cash to me is currency that's more along

Page 339

1 the lines of a cashier's check.
2 Q  And more recently, of course, Mr. Carmichael in
3 this investigation you determined had other sources of
4 receiving cash or currency in his businesses, did he
5 not?
6 A  Again, the businesses that I'm aware of are the
7 rental business, trucking business and some
8 association possibly with Unique Entertainment or
9 Unique center, or whatever the name is.
10 Q  Well I was moving forward into the Carmichael
11 Center of course where concerts and such are held.
12 Tickets are sold.
13 A  Yeah.  I believe that the Carmichael Center
14 opened sometime around June of '03, so there may have
15 been a few months.
16 Q  Also, I'm sure you've heard some information
17 about it, a shoe liquidation that he had on a lot on a
18 corner where he could have generated a substantial
19 amount of currency right before this Compass Bank
20 account was opened.
21 A  I've heard that allegation or that story in the
22 last few days.
23 Q  It's nothing that you followed up on or
24 investigated?
25 A  Quite frankly, I wasn't aware of it until the

Page 340

1 last few days.
2 Q  But if that shoe sale did take place two months
3 prior to this Pettus account opening, how can you say
4 that all of the currency that went into that account
5 was drug money, assuming he had two hundred and
6 twenty-five thousand in currency from shoe sales?
7 A  That's a large assumption.
8 Q  I'm just asking, though.  How can you tell the
9 difference between shoe money and drug money?
10 A  Well, again, I think the information that was
11 obtained during the course of the investigation was
12 that the money had a smell to it that was deposited
13 into this Compass account.
14 Q  And you're saying all of the money was cash hoard
15 money?
16 A  You're saying it was cash hoard money.
17 Q  Well my question is, do you know if all of the
18 money had a smell to it that went into the Compass
19 account?
20 A  It was my understanding from the tellers that we
21 spoke with, that the money that got deposited had that
22 particular foul smell to it.
23 Q  But you didn't talk to all the tellers at the
24 Compass Bank, did you?
25 A  No, sir.

Page 341

1 Q  But that is nature of currency, you can't tell
2 beyond a reasonable doubt which money it was.
3 A  That's correct.
4      MR. BRUNSON:  Your Honor, would now be a
5 good time to break?
6      THE COURT:  Yes.
7      So that the jury has an idea, how long will
8 the defendants' case take?  Are we still looking at
9 maybe tomorrow?  Thursday?  What?
10      MS. WAYNE:  Can I speak with Mr. Teague?
11      THE COURT:  Yes.
12      (Whereupon, Ms. Wayne conferred with Mr.
13 Teague off the record and out of the hearing of the
14 other courtroom participants.)
15      MS. WAYNE:  Judge, we're looking at least
16 a dozen witnesses.
17      THE COURT:  Okay.
18      MS. WAYNE:  Obviously we don't know how long
19 the cross will take.  So about a dozen.
20      THE COURT:  Okay, then, very good.  I'll
21 excuse the jury, then, until eight-thirty tomorrow.
22      (Whereupon, the jury was escorted out of the
23 courtroom, and the following colloquy ensued):
24      THE COURT:  Miss Wayne, is Mr. Carmichael
25 going to testify or not?

| Page 342 |
|---|

1    MS. WAYNE: We anticipates it, Judge. I'm
2 including that in the twelve. It depends on how the
3 case goes.
4        THE COURT: I was just thinking because he
5 would take awhile, I would assume, if he does.
6        MS. WAYNE: I'm not including that.
7        THE COURT: Okay.
8        MS. WAYNE: And I obviously can't speak for
9 Mr. Williams.
10       THE COURT: Right. But all I want to say is
11 if you decide definitely that your client is not going
12 to testify, I need to put that on the record.
13       MS. JAMES: Can we take up another matter in
14 chambers?
15       THE COURT: Yes, we'll take that up
16 in-camera, yes.
17            IN-CHAMBERS CONFERENCE:
18       THE COURT: Go ahead.
19       MS. JAMES: Judge, just before, and I know
20 you want to have everything in mind before you make a
21 ruling, and when we left earlier in chambers when we
22 were here we requested among other things a mistrial,
23 permission to withdraw. Subsequently, we've obtained
24 a copy of the lawsuit which has the date stamp June
25 the 10th, 2005, ten-fourteen a.m. I don't think any

| Page 343 |
|---|

1 of us have been officially served.
2        THE COURT: Why don't you mark it as an
3 exhibit.
4        MS. JAMES: A court exhibit, please. I
5 think it would be court exhibit 4. It bears the case
6 number C V oh five fourteen thirty-four. And it's
7 titled R. David DeJohn, plaintiff versus City of
8 Montgomery; montgomery Police Department; George David
9 Salom, III; Shannon Youngblood; Leon Carmichael; Cuby
10 Ray Gilmore Haze; Ricky Moore; Johnny Q. White,
11 Junior; Steven R. Glassroth; Lisa Monet Wayne; Susan
12 James and the Westside Weekly and fictitious A. B. C.
13 D. E. F.
14       THE COURT: So I see Mr. Brunson and Mr.
15 Chartoff nor Mr. Teague are in there.
16       MS. JAMES: Having now had an opportunity
17 for a cursory review of this complaint, which I fully
18 anticipate before we get out of here will be all over
19 W. F. S. A., I would point out that we think that
20 Agent DeJohn's testimony first of all should be
21 stricken. In the alternative, and this is assuming
22 you don't grant all of our more drastic relief that
23 we've sought, clearly based on his seeking punitive
24 compensatory damages in this case from us individually
25 as attorneys of Mr. Carmichael as well as Mr.

| Page 344 |
|---|

1 Carmichael, gives him a financial interest in the
2 outcome of this case. It certainly goes to bias,
3 motivation for testifying in the manner in which he's
4 testifying.
5        Additionally, in his prayer for relief in
6 number two he seeks "award the plaintiff compensatory
7 damages for his physical and emotional suffering and
8 related medical and therapeutic expenses." Which
9 leaves us at first blush to think maybe Mr. DeJohn is
10 having some sort of psychological or psychiatric --
11       THE COURT: What does this complaint relate
12 to?
13       MS. JAMES: The website.
14       THE COURT: The website. Is this for his
15 putting his name on the web side?
16       MS. JAMES: Invasion of privacy. The facts,
17 however, I would point out are extremely damaging to
18 Mr. Carmichael and his defense because there are
19 allegations of impropriety not only of Mr. Carmichael,
20 Mr. Carmichael's former lawyer, Mr. Carmichael's
21 former investigators, spokesperson for the Carmichael
22 Center which appears to be someone associated with Mr.
23 Carmichael, and certainly suggests improper and
24 tortuous actions of Ms. Wayne, myself and Mr.
25 Glassroth.

| Page 345 |
|---|

1        And it's more than I would say just some
2 erroneous things in here because, quite frankly, I
3 don't think Miss Wayne was even an attorney in the
4 case when the website went up.
5        MS. WAYNE: I don't think I should be
6 talking about it, since I have been sued, frankly.
7        MS. JAMES: Right.
8        In addition to that, Judge, it creates for
9 at least the two of us certainly issues with the
10 Alabama State Bar. There's also a question of
11 Miss Wayne and her submission to the jurisdiction of
12 this Court and whether she's governed by the Colorado
13 Bar and the Alabama Bar, and it just has created a
14 mess. And, quite frankly, I think by design in order
15 to gain the publicity and the damage --
16       THE COURT: You mean Mr. DeJohn has?
17       MS. JAMES: Yes, Mr. DeJohn.
18       THE COURT: I'll read your law on it after
19 you give it to me tomorrow. Okay? There is law on
20 this. Get it to me and I'll look at it.
21       MS. JAMES: Well, Judge, I know you required
22 us to --
23       THE COURT: There is law about conflicts
24 when a lawyer gets sued in a case. There is stuff out
25 there. You can help me look at this. So get your law

**Page 346**

1 to me.
2     MS. JAMES: Well because the Alabama State
3 Bar, they don't open until eight in the morning, I
4 don't know if I can get anyone --
5     THE COURT: You can get your law, and also
6 you can check with the State Bar and so forth, too.
7 Get your law to me in the morning and we'll be looking
8 at it, too. I've already started looking at it.
9 We'll se where we are.
10     MS. WAYNE: And, Judge, just for the record,
11 this is obviously not your fault at all, but we're
12 also trying to put a case on. So now we're putting on
13 a case and attempting to determine whether we can
14 defend ourselves in a lawsuit. I mean it's ridiculous
15 and absurd.
16     THE COURT: Well, that's the way -- I'm
17 being distracted, too.
18     MS. WAYNE: We have a client's life at
19 stake.
20     THE COURT: Well, I care much about that,
21 too.
22     MS. WAYNE: I understand, but it's in our
23 hands, Judge and we could come back on a 2255.
24     THE COURT: Right. It just comes with the
25 turf.

**Page 347**

1     MR. FEAGA: Your Honor, can I say something
2 here?
3     THE COURT: Yes.
4     MR. FEAGA: Simply this: We have been
5 concerned since the day they did this unique and
6 unusual thing and put this website up and started all
7 of the controversy that surrounded it about how it can
8 potentially impact this case. This is one more of the
9 things that they I think should clearly should have
10 potentially contemplated could happen if they did what
11 they did.
12     So when you do something like, and the other
13 side is constantly arguing that it needs come down for
14 a litany of reasons, it's caused us so much trouble
15 getting ready for this case with witnesses going south
16 on us and with other problems, Judge, and here we are
17 in the middle of trial and it's the website that
18 created the problem. You know, I am disappointed that
19 this lawsuit has been filed and caused us and the
20 Court to have to take the distraction to look into it.
21 On behalf of the United States I can tell you this is
22 not something that we would have wanted to have happen
23 during this trial. But we do not think it should be
24 grounds for a mistrial. We will get the Court some
25 law on it.

**Page 348**

1     THE COURT: Let me get the law on it and
2 we'll see where we are and the cards will fall where
3 they fall. This website has been a part of this case.
4 It's been very difficult to handle. I've kept it out
5 of the case. I'll be very candid with you, about
6 halfway through it I thought it should not have been
7 kept out because I think that perhaps Mr. Carmichael
8 should just live with the consequences of having put
9 up the website. In light of this I'm kind of happy I
10 did keep it out.
11     But when the government first asked me to
12 keep out I was moving cautiously and I almost decided
13 to let it in because I really couldn't think of an
14 unfair reason to keep it out. It's just pure
15 evidence, and it is evidence of intimidation. I think
16 you have a constitutional right to put it up, which I
17 wrote about, but you have to live with those results,
18 too.
19     MS. JAMES: Judge, why is it any more
20 intimidation than the board right down in front of the
21 Clerk's Office where the government is seeking
22 information and leads and various things on other
23 people? I mean, it was an informational seeking
24 device.
25     THE COURT: I'm not saying that I

**Page 349**

1 necessarily would draw the conclusion that it's
2 intimidation, but I think it could come in to show he
3 put those agents up on it and the jury can draw its
4 own conclusions. I just think it's evidence, I didn't
5 say it was conclusive evidence.
6     But anyway, that's neither here nor there.
7 I have tried to keep the website out of this
8 litigation. As I said, fortunately I think I may have
9 made the right decision, it's almost as if I knew this
10 lawsuit was coming, but I didn't.
11     MS. JAMES: This leads to another problem,
12 and that is I think that I don't want to be bound by
13 any sort of prohibition or gag order or anything --
14     THE COURT: That's another matter which I
15 was going to bring you back here about also. A gag
16 order, do you want to respond to this lawsuit?
17     MS. JAMES: Well if the press asks me, I
18 don't want to go out there and say I can't say, which
19 could my -- you know, it could be taken as my silence
20 as a concession or anything. I want to be free to
21 discuss this and do whatever is necessary.
22     THE COURT: What's the government's position
23 if Miss James wants to respond to the lawsuit?
24     MR. FEAGA: You know, Your Honor, there is a
25 part of me as the government rep and a prosecutor that

Multi-Page™

Page 350

1 wants to tell the Court off the cuff that you know
2 what, I don't care what she says publicly about the
3 lawsuit. I want to try this case, I want to try it on
4 the facts. I think this website has diverted us from
5 that.
6     Ms. James asked us just a minute ago what
7 impact does this have. All you had to do is look at
8 the visceral reaction of Sherry Pettus when asked the
9 question that she responded to, she said, "I hated him
10 because of the website" to know how it's impacted our
11 ability to put our case on with our witnesses. And if
12 we keep coming back to this, they chose to do this.
13 This was an action that they --
14     THE COURT: The question, though, is what
15 about Ms. James's desire to comment about the lawsuit?
16 Which is essentially the comment about the website.
17 Which ironically is something you all have tried to
18 keep out of the press continually.
19     MS. JAMES: We didn't file the lawsuit.
20     THE COURT: I know that, but the irony of
21 now having to deal with it --
22     MR. FEAGA: Your Honor, it would be my
23 position that if Miss James wants to make a public
24 comment about the lawsuit itself and will refrain and
25 keep her comments limited to the lawsuit and her

Page 351

1 intention to fight it or whatever she's going to do,
2 my position is she should be allowed to do that. But
3 I would say this, Your Honor, I don't want to have her
4 back in here tomorrow after the publicity that she
5 generates by doing that is in the paper complaining
6 about it.
7     Because, again, Mr. Carmichael, they have
8 repeatedly said it was their client, not them, that
9 did this. And now he is going to stand to be the
10 potential beneficiary of something that he chose to do
11 knowing all of the potential problems that it could
12 cause. So in an effort --
13     THE COURT: No, no, no. I actually wrote in
14 an opinion when Mr. DeJohn tried to intervene in this
15 case that his remedy was to file another lawsuit
16 against Mr. Carmichael. I didn't say the attorneys.
17 I agree with the government, this website is a
18 constitutional First Amendment right. But I have to
19 admit that the results have been drawn on by Mr.
20 Carmichael and whoever did it with him.
21     I fully agree with you about it. But he had
22 a right to do it, and I will protect it. But he can't
23 avoid the consequences of his actions.
24     MS. WAYNE: We understand that, Judge. I
25 mean, the bottom line is if you're zealous in your

Page 352

1 defense you get zapped.
2     THE COURT: But anyway, I'll see your cases
3 tomorrow. And Ms. Carnes will mark this as court's
4 exhibit 4.
5     (Whereupon, the proceedings were concluded.)
6
7     *  *  *  *  *  *  *  *  *  *
8
9
10     COURT REPORTER'S CERTIFICATE
11
12     I certify that the foregoing is a correct
13 transcript from the record of proceedings in the
14 above-entitled matter as prepared by me to the best of
15 my ability.
16
17     I further certify that I am not related to
18 any of the parties hereto, nor their counsel, and I
19 have no interest in the outcome of said cause.
20
21     Dated this 3rd day of September 2005.
22
23
24     MITCHELL P. REISNER, CM, CRR,
      Official US Dist. Court Reporter
      Registered Professional Reporter
25     Certified Real-Time Reporter