1          IN THE UNITED STATES DISTRICT COURT
                          FOR
2            THE MIDDLE DISTRICT OF ALABAMA

3

4

5   THE UNITED STATES
       OF AMERICA
6
          vs.                    CRIMINAL ACTION NO.
7                                2:03-cr-259-T
    LEON CARMICHAEL
8

9

10

11

12

13
                   VOLUME VIII OF XI
14                     8th DAY OF:
                 JURY TRIAL PROCEEDINGS
15

16

17             * * * * * * * * * *

18
    BEFORE:        The Hon. Myron H. Thompson
19
    HEARD AT:      Montgomery, Alabama
20
    HEARD ON:      June 15, 2005
21
    APPEARANCES:   Terry Moorer, Esq.
22                 Stephen Feaga, Esq.
                   Clark Morris, Esq.
23                 Matthew Miner, Esq.
                   Susan James, Esq.
24                 Marion Chartoff, Esq.
                   Lisa Monet Wayne, Esq.
25                 Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
5C-VIII

Multi-Page™

Page 2

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Title Page ...................................        1

Table of Contents ............................        2

Preliminary Discussion In Open Court
(The Jury Is Not Present) ...............        4

In-chambers Conference Re:
Motion to Recuse, Motion for Mistrial,
Motion for Continuance ..................        5

Louie Wilson - Direct Examination
by Mr. Brunson .........................        44

Louie Wilson - Cross Examination
by Mr. Feaga ...........................        57

Louie Wilson - Redirect Examination
by Mr. Brunson .........................        78

Louie Wilson - Recross Examination
by Mr. Feaga ...........................        82

Bruce Maddox - Direct Examination
by Mr. Brunson .........................        95

Bruce Maddox - Cross Examination
by Mr. Moorer ..........................        103

Bruce Maddox - Redirect Examination
by Mr. Brunson .........................        116

Bruce Maddox - Recross Examination
by Mr. Moorer ..........................        117

Bruce Maddox - Further Redirect Examination
by Mr. Brunson .........................        117

Bruce Maddox - Further Recross Examination
by Mr. Moorer ..........................        118

In-chambers Conference ......................        121

Page 3

TABLE OF CONTENTS

ITEM DESCRIPTION                                    PAGE NO.

Alan Gunn - Direct Examination
by Mr. Brunson .....................        128

Alan Gunn - Cross Examination
by Mr. Feaga .......................        144

Pickett Reese - Direct Examination
by Mr. Brunson .....................        149

Pickett Reese - Cross Examination
by Mr. Teague ......................        157

Pickett Reese - Cross Examination
by Mr. Feaga .......................        158

Pickett Reese - Redirect Examination
by Mr. Brunson .....................        160

Pickett Reese - Recross Examination
by Mr. Feaga .......................        161

(Mr. Reisner's stenographic equipment failed at the
conclusion of Mr. Reese's testimony.  Official Court
Reporter Risa Entrekin entered the courtroom and
completed taking the record for the remainder of the
June 15, 2005 proceedings.)

Court Reporter's Certification ... 162

-oOo-

Page 4

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
1  THE HON. MYRON H. THOMPSON ON JUNE 15, 2005 AT THE

2  UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4          PRELIMINARY DISCUSSION IN OPEN COURT

5              (THE JURY IS NOT PRESENT):

6          MR. FEAGA:  Your Honor, Mr. Wilson was on

7  the stand when we recessed yesterday.

8          THE COURT:  Right.

9          MR. FEAGA:  Can he stay in the courtroom?

10          THE COURT:  Actually, there are a couple of

11  things I'd like to take up new in camera.

12          MS. WAYNE:  Right.

13          MR. FEAGA:  Your Honor, before that and so I

14  don't forget, can I ask the Court once Mr. Wilson

15  begins testifying, he's our financial expert, can we

16  keep him in the courtroom after he testifies so he can

17  help me prepare any rebuttal if I need to?  They have

18  had their financial expert in here the whole trial.

19          THE COURT:  Is there an objection?

20          MS. WAYNE:  We would object.  We designated

21  our financial expert, our advisory witness at the

22  beginning of the trial.

23          MR. FEAGA:  Since they're putting him up,

24  Judge, and they're going to be putting on --

25          (Unintelligible; two speaking at once)

Page 5

1          THE COURT:  We'll take it up a little bit

2  later.  Let's go back here.

3          IN-CHAMBERS CONFERENCE:

4          THE COURT:  Do we have everyone?  Okay.

5  Where is Mr. Brunson?

6          MR. FEAGA:  He was in the courtroom, Your

7  Honor.

8          (Whereupon, Mr. Brunson entered chambers.)

9          THE COURT:  A couple of things I'd like to

10  take up.  The first one is Mr. Brunson's examination

11  of this witness yesterday I found a little bit

12  disturbing.  You were asking him why he thought the

13  evidence was adequate of the money laundering and

14  things like that.  And if it's a trial strategy,

15  that's fine, but I'll just be very frank with you, to

16  me you're letting the witness essentially give the

17  government's closing argument while he's on the stand.

18          He says, you know, this is the evidence we

19  have here, this is the evidence we have there, and I'm

20  not sure what point you're trying to make.  But if you

21  want to do it, that's fine.  I just want to put it on

22  the record that this witness is just giving very

23  conclusory comments as to how the government's case is

24  adequate.  I don't know if you heard that yesterday or

25  not, but I did.  And I was just bringing it to your

Multi-Page™

Page 6

1 attention. If that's your strategy that's fine, but I
2 just want to make sure because to me this witness's
3 views about whether the government's evidence is
4 adequate is invading the province of the jury.
5     And, secondly, it's essentially he's
6 summarizing what Mr. Feaga is going to do in his
7 closing arguments. He did it several times. He said,
8 you know, the money smelled, and therefore it clearly
9 didn't come from the shoe sales, it came instead from
10 somewhere else. I mean, these were just comments to
11 me that he had no expertise greater than anybody else
12 to comment on.
13     MR. BRUNSON: Well, Your Honor, I appreciate
14 the Court's observation.
15     THE COURT: But if that's your strategy,
16 that's fine. But in my order I told you that's really
17 quite inappropriate, and I usually get a defense
18 objection when the Government tries to do that. And I
19 have gotten such objections when the government tries
20 to put an agent on to summarize the evidence. But if
21 that's your strategy that's fine. I just wanted to
22 make sure that's what you intended to do.
23     MR. FEAGA: Just in regards to that matter,
24 Your Honor, he did ask him a number of questions about
25 what third party -- and having opened that door he's

Page 7

1 left me no choice but to have me ask the witness about
2 some third party and how that relates to money
3 laundering. And so I share the Court's observation,
4 but I think it now is entirely appropriate for --
5     THE COURT: Before we get into that, you
6 need to take that up with me.
7     MR. FEAGA: Yes, sir.
8     THE COURT: Before you do that, you need to
9 let me know what you're going to go into.
10     MR. FEAGA: Yes, sir.
11     THE COURT: The order I issued yesterday set
12 forth what the law is on this, and I just didn't
13 understand. I wasn't concerned about his going into
14 it, but he just gave all of these conclusory comments
15 about his views on the Government's case.
16     MR. BRUNSON: I'm sorry, Your Honor, I did
17 not see your order.
18     THE COURT: Well, if it's something you want
19 to go into -- I just want to make sure this is an
20 avenue you want to go down. And I'm pretty certain
21 you asked him about the money and the smelly money and
22 stuff, and I'm saying why is this guy giving his views
23 about how the smelly money proves the government's
24 case.
25     MR. BRUNSON: Your Honor, I was mainly

Page 8

1 dealing with the source of the money.
2     THE COURT: That's what I'm saying. He gets
3 up and explains to the jury the Government's theory
4 that the money didn't come from the shoe sales because
5 it was smelly, and I don't know why his theory about
6 that makes any difference. But I'm not -- If that's
7 the road you want to go down -- If the Government had
8 put on that and there was an objection, I would have
9 sustained a strenuous objection to it. But you're
10 putting it in. I just want to make sure that's what
11 you want do.
12     Now the second matter is, I believe that Ms.
13 Morris has something to say?
14     MS. MORRIS: Yes, Your Honor. We have
15 furnished defense counsel with a copy of a filed
16 motion, which I don't think the Court has, a filed
17 motion to dismiss the complaint filed in this case.
18     THE COURT: You mean in the DeJohn case?
19     MS. MORRIS: Yes, Your Honor. I'm sorry.
20 In the DeJohn state court case.
21     THE COURT: He has filed a motion to dismiss
22 his state court case without prejudice.
23     MS. MORRIS: Yes, Your Honor, and therefore
24 it is out position that any conflicts that may or may
25 not have arisen, which we contend wouldn't have arisen

Page 9

1 anyway, but are now moot.
2     THE COURT: We'll just make this court's
3 exhibit 5, the motion to dismiss without prejudice.
4 And I understand you have attached it to some other
5 file that you made this morning, as well?
6     MS. MORRIS: Yes, Your Honor. That was
7 E-filed, which is what I think I'm supposed to do.
8     THE COURT: Right. Okay. Anything else?
9     MS. WAYNE: Yes, Judge. A huge other thing.
10 A couple of things, Judge. Frankly, I'm a little
11 concerned about the Court's comments to Mr. Brunson,
12 and I'll tell you why. I understand the Court's
13 ability to interject their opinion in the case, but
14 numerous times you've indicated to defense counsel
15 your feeling of us doing something wrong.
16     THE COURT: Well, I was not saying you were
17 doing something wrong. I was just saying that's the
18 type of evidence I would have sustained an objection
19 to.
20     MS. WAYNE: I understand that, Judge --
21     THE COURT: I just want to make sure on the
22 record that it is your trial strategy. I don't want
23 there to be a 2255 later on. So I want to make sure
24 that Mr. Brunson understands it.
25     I am not discouraging you from pursuing it.

Multi-Page™

**Page 10**

1 I think lawyers quite often pursue things that I would
2 consider detrimental to their case, but they have
3 their own private reasons for doing it. And when it
4 happens in a case, I just bring it up, put it on the
5 record, the lawyer says this is what I want to do, so
6 that we don't have the question it later on. And,
7 Mr. Brunson, you know, that's it. He can put on
8 anything he wants.
9      MS. WAYNE: We understand that, Judge, but
10 however that's not what's happened. You actually did
11 this with my opening statement. You were questioning
12 things about it.
13      THE COURT: Right.
14      MS. WAYNE: And the purpose of that is
15 twofold. One is I know it's been awhile since the
16 Court was in the position of being a trial lawyer, but
17 we have a big case here and frankly comments from the
18 Court undermining our effectiveness to our client,
19 because Mr. Carmichael is sitting here right now and
20 listening to this, he's nodding his head saying I
21 can't believe this. And it undermines our
22 effectiveness and our relationship with him because
23 he's now in a position he's second-guessing us because
24 he's clearly giving deference to the Court.
25      THE COURT: Well he doesn't give deference

**Page 11**

1 to the Court. But I have an independent obligation to
2 make sure that Mr. Carmichael gets a good trial.
3      Separate even from even your lawyers, Mr.
4 Carmichael. So, for instance, when there are things
5 that come to my attention, I will bring them to your
6 lawyers' attention. Now you can discuss it with your
7 lawyers, but I am not your lawyer.
8      But you mentioned yesterday that Mr.
9 Carmichael -- that you felt obligated because Mr.
10 Carmichael's life is at stake, and I want to make
11 clear to you that I feel that same heavy
12 responsibility.
13      MS. WAYNE: I understand.
14      THE COURT: And I think any judge in any
15 criminal case who thinks if he sits there or she sits
16 there without a firm responsibility to make sure the
17 defendant gets a fair trial, regardless of the
18 lawyers, if a lawyer does something to me that's
19 detrimental to the client, I feel fully obligated to
20 bring it to the client's attention and the lawyers'
21 attention.
22      I've cited the case law to you and I've put
23 it now in my order.
24      Now, Mr. Carmichael and Mr. Williams, I am
25 not your lawyers, but I have to bring these things up

**Page 12**

1 and I have to put them in the record outside the
2 presence of the jury.
3      And I am not telling you to change your
4 strategy or anything else. I just want to make clear
5 two things. Number one is, I was somewhat surprised
6 because it would have been the opposite if I had
7 gotten an objection from you; and, secondly, as Mr.
8 Feaga has aptly noted, and I think quite
9 appropriately, you may open the door for a lot of
10 hearsay. And before we go down that avenue I want to
11 make sure that you're aware of where you're going.
12      MR. BRUNSON: Your Honor, I feel obligated
13 to respond.
14      THE COURT: Very good.
15      MR. BRUNSON: I don't want to rehash the
16 question that took place yesterday afternoon --
17      THE COURT: Right, but even more importantly
18 is perhaps Mr. Feaga's representation now, which
19 actually I said in my order yesterday, that was a
20 specific point I made in my order is when you get into
21 this you open the door for a lot of what I would
22 consider inadmissible hearsay. And you should have
23 read my order yesterday because this is the very point
24 we're talking about now.
25      MS. CHARTOFF: We haven't seen it, Your

**Page 13**

1 Honor.
2      THE COURT: No, Sheila gave it to you.
3      Didn't you give it to them in the morning,
4 Sheila?
5      THE COURTROOM DEPUTY CLERK: Yes, I did.
6      MS. JAMES: I don't think anybody would have
7 time to read it, but I did get it.
8      THE COURT: She gave it to you first thing
9 yesterday morning. But that was the point of the
10 order. When you get into the adequacy of the
11 government's case, you open yourself up to hearsay and
12 to a lot of evidence that I consider personally to be
13 irrelevant. But now Mr. Feaga is telling me you're
14 doing this again.
15      And I've written to it once, and we may end
16 up back where we were with that earlier order where
17 Ms. Wayne asks Mr. Halasz, and I went into detail
18 about that. I cited all the circuit law that says
19 this is generally inappropriate in a criminal case.
20 But I said you opened it up. And it wasn't just
21 Eleventh Circuit, it was lot of circuit law.
22      Now Mr. Feaga is telling me as a result of
23 what you said he now wants to get into other what he
24 even admits might be hearsay. Why don't you go ahead
25 state that. Because I don't want the trial to get off

Multi-Page™

Page 14

1 on this. I have never been in a position where this
2 has really come in on this posture before.
3      MR. FEAGA: Yes, sir. Your Honor, yesterday
4 he asked Mr. Wilson questions about tracing cash and
5 how difficult it was to trace cash, and he asked him
6 then about third party information and how that
7 impacts your ability to trace cash. Then he asked him
8 the question, I believe, if all you have is cash going
9 into the account and no third party information, then
10 that could create a reasonable doubt about -- I
11 believe I heard this question asked -- about whether
12 or not there is any proof beyond a reasonable doubt
13 that cash was, in fact, the proceeds as specified as
14 unlawful activity or money laundering.
15      So what I want to now do is inquire of Mr.
16 Wilson what is third party information, what types of
17 things constitute third party information and is he
18 aware of third party information that relates to this
19 case that would impact on the ability to trace the
20 cash that he was questioned about by --
21      THE COURT: What third party information?
22      MR. FEAGA: This whole thing. He's asking
23 questions to define third party information, and does
24 the lack of third party information generate
25 reasonable doubt. I think he used the words in his

Page 15

1 question.
2      So what I want to do is go back and say is
3 all right, if you have third party information, and in
4 this case because he's questioning him about whether
5 or not he can trace this cash, and I want to go back
6 and ask him do you have third party information that
7 helps you trace this cash in regards to whether or not
8 it's connected with specified unlawful activity. And
9 then I want to ask you what third party information do
10 you have that helps you trace this cash to specified
11 unlawful activity.
12      Because his question clearly raise the
13 specter that Mr. Wilson is in here testifying today
14 about cash that he has no third party information to
15 support the contention of the Government that this is
16 specified unlawful activity.
17      MR. BRUNSON: Your Honor, the Government in
18 our Rule 29 motion yesterday, had we been able to
19 expand upon it, the Government has not proven that
20 this money came from drug sources. They are going to
21 be required to prove beyond a reasonable doubt that
22 this cash that went in this one bank account came from
23 drug proceeds. The point of my questioning Mr. Wilson
24 yesterday was that he, and nobody else, can tell
25 whether that money was cash, whether it smelled or --

Page 16

1 whether that money was drug proceeds. He or nobody
2 else can tell where that money came from, that it was
3 drug proceeds.
4      Whether it smelled or whether it glowed,
5 nobody knows whether that came from a bar, from a
6 trucking business, from concessions, from anything.
7 It could have been buried for fifteen years. He could
8 have earned it selling a truck.
9      MR. FEAGA: And that's my point. See he's
10 asked him all that, and now I can say okay, he's told
11 you you don't know, you don't have any third party
12 information, I'm now allowed to ask him what do you
13 know about third party information that allows you to
14 trace this.
15      THE COURT: What third party information are
16 you going to say he knows?
17      MR. FEAGA: Well, he knows about the fact
18 that you start with Sandra Jones getting a person who
19 worked for Leon Carmichael in a business that he was
20 paying the property taxes on. She got caught with
21 forty-two thousand dollars in cash that a drug dog
22 alerted on in El Paso, Texas.
23      He knows about Leon Carmichael's trucks
24 getting stopped with drugs on them. He knows that
25 Sherry Pettus told him that Leon Carmichael told her

Page 17

1 at this money came from drugs, that Sherry Pettus told
2 him from the denominations of the money that she knew
3 it came from drugs. He's going to be able to testify
4 about --
5      THE COURT: This is all -- Why are we
6 getting into a summary of the evidence that's already
7 before the jury?
8      MR. BRUNSON: I don't think that's relevant,
9 Judge. The count two is a --
10      THE COURT: Why don't you just ask him how
11 does he trace the funds? That there is just no mark
12 on them? But why do we have to go into the fact that
13 the money smelled or the money didn't smell? You
14 know, all that's for the jury. Why does this
15 witness's testimony about whether the money smelled or
16 not, or --
17      MR. BRUNSON: I didn't question him. I just
18 talked to him about cash hoards.
19      THE COURT: There is these open ended
20 questions and we got into all this stuff, and it's
21 just a summary of what's already in the record and it
22 sounds to me like closing argument. It sounds like
23 you all should be getting out there and saying these
24 are the weaknesses in the case, Mr. Feaga should be
25 saying these are my strengths -- And what's this

Multi-Page™

Page 18

1  witness's name?
2      MR. FEAGA: Louie Wilson.
3      THE COURT: Louie Wilson's thoughts about
4  this seems to have no relevance.
5      MR. BRUNSON: Your Honor, his last statement
6  before we ended yesterday is that he could not tell
7  beyond a reasonable doubt whether this cash was drug
8  proceeds or not.
9      THE COURT: What does his view about whether
10  he can tell --
11      MR. BRUNSON: If he can't tell, nobody can
12  tell. That's my point.
13      THE COURT: Okay, but then he came back and
14  told you all of the other stuff that backed it up.
15      MR. FEAGA: He didn't, Judge.
16      THE COURT: Yes, he did. We'll get Mitchell
17  to read it back. He came back and told you that the
18  money, that's true, he said he couldn't tell it
19  nakedly, but then he started backing up and giving you
20  information about the fact that the money smelled,
21  that it didn't come from the shoes and he was giving
22  his views on it. And I just don't see why we are
23  going down this avenue. I think it's a very dangerous
24  avenue. I don't know where to cut it off, and --
25      MR. BRUNSON: I respect the -- If I were the

Page 19

1  Court's --
2      THE COURT: You know, if everybody wants to
3  go down it, I'll try to see what about Mr. Feaga's
4  testimony is relevant or not, but this officer's
5  personal opinions about the adequacy of the evidence
6  to me is no better than my personal opinion or anybody
7  sitting in the courtroom's personal opinion.
8      MR. BRUNSON: He has just been announced as
9  an expert witness.
10      THE COURT: But he's not an expert on the
11  adequacy of the evidence.
12      MR. BRUNSON: Well, Judge, like I said,
13  there's two things they can't prove in count two, and
14  that this money was drug proceeds; and, secondly, they
15  got to prove that Sherry Pettus knew --
16      THE COURT: Well all I can say is, read my
17  order. I cite the circuit law that says that you're
18  not supposed to do this. Now if you want to do it,
19  that's fine. There is clear, abundant circuit law
20  that says you don't go into the adequacy of the
21  evidence. And that's where I think you're moving with
22  this witness again, just like you moved with Agent
23  Halasz. And when we get into it, we're going to get
24  into information that the Government has got to close
25  up those loopholes with hearsay. And I'm just --

Page 20

1      MR. FEAGA: Your Honor, he has just told the
2  Court, and I know I'm going to hear it in their
3  closing argument, that my own agent admitted this and
4  I have to go back and clear it up with him, that
5  that's not what he admitted at all.
6      THE COURT: Well let's get back to the
7  dismissal.
8      MS. WAYNE: Right, because that's important.
9  This is just inadequate, Judge. Just because they now
10  moved to dismiss a case without prejudice, that simply
11  means she's going to file after the case is finished.
12  That doesn't remove the taint in terms what's gone on
13  in the thought processes of a potential defendant like
14  myself and Miss James.
15      And I'll tell you what it is, Judge, because
16  this is a big deal. I went through the case law last
17  night. I called a number of my colleagues around the
18  country about it. I couldn't get ahold of my own bar
19  because we got out after they were closed and we
20  started this morning before we were open. But it's
21  not even the appearance of impropriety, it's an actual
22  conflict.
23      The reason it's an actual conflict is now I
24  have knowledge that I will be sued as a defendant
25  along with my client, Mr. Carmichael. The reason that

Page 21

1  that's important is that the actual conflict is that
2  there is not now a financial stake of a conflict
3  between Mr. Carmichael and myself. Number one, I
4  know that the person in this lawsuit, the potential
5  lawsuit, the individual with the deep pockets is Mr.
6  Carmichael. It's clear, and I can tell the Court, I
7  don't make as much money as he has alleged by the
8  government over the last ten years, period.
9      He's the deep pockets. If in fact Mr.
10  Carmichael is convicted in this case, it's my belief
11  they will never file this lawsuit because they're
12  going after the money. Agent DeJohn has expressed
13  whether they take away the lawsuit or not we know that
14  the basis is a financial vindictiveness against not
15  only Mr. Carmichael, but his attorneys. He intends to
16  get money from us, okay? It goes to his motive, Agent
17  DeJohn's motive, goes to his bias, his credibility,
18  that anybody who isn't named in this lawsuit should be
19  able to go after.
20      Also, it makes us second guess whether or
21  not the website should be part of this case because we
22  could cross-examine him now on it because when we now
23  know he has a reason to go after us, his lawyers, as
24  outlined very clearly in the lawsuit. So just because
25  now they want to dismiss it doesn't mean that the

Multi-Page™

1   taint isn't in our heads.  Mr. Carmichael knows that I
2   now feel that I'm going to be pointing the finger at
3   him possibly down the line in a civil suit saying I
4   have nothing do with this, it was Mr. Carmichael.
5        The other scenario Mr. Carmichael saying I
6   had nothing do with this, this was at the direction of
7   my lawyers.  It's a financial investment in the
8   outcome of this case that cannot be removed just
9   because you file a motion to dismiss.  They knew about
10  it.  She knew that she was doing this to the lawyer
11  for Investigator DeJohn.
12       Investigator DeJohn knows exactly what's
13  going on here.  He did this because he wants to cause
14  interference with the attorney/client relationship.
15  They want us off.  They wanted Mr. Glassroth off --
16       MR. FEAGA:  No we don't.
17       MS. WAYNE:  I'm not talking to you --
18       (Unintelligible; two speaking at once.)
19       THE COURT:  Just a minute.  Just a minute.
20  Go ahead.
21       MS. WAYNE:  And I would indicate for the
22  record that the government immediately responded.  I
23  didn't say the government, I said Investigator DeJohn.
24  If they want to make it implicit that they're part of
25  him, that's fine.  I didn't say the government.  It's

1   Investigator DeJohn.  It's interfering with the
2   attorney/client relationship.  I want a hearing on
3   this now.  I want to be able to call this lawyer
4   Roianne Houlton.  I want to call Investigator DeJohn
5   on this case.
6        Judge, I think it does go to the Strickland
7   standard of us being effective at this point.  Again,
8   I've talked to a number of esteemed lawyers around
9   this country that think it's appalling, it's egregious
10  and it's unbelievable that it could happen in this
11  kind of a trial where this Court has taken every step
12  to protect this case.
13       And it's at no -- I mean the government knew
14  about it.  And the problem I also have, Judge, is I
15  think despite what Mr. Feaga said yesterday about the
16  fact that he didn't encourage this, he knew about it
17  and he should have given notice to the Court.  He
18  should have let us know that this was going on, given
19  us notice so we could have stopped it or done
20  something.  But the taint cannot be removed, Judge.
21       THE COURT:  Well, I --
22       MS. JAMES:  May I be heard?
23       THE COURT:  Yes.
24       MS. JAMES:  Because we have separate
25  interests here.  I did speak with Robbie Lust of the

1   Alabama State Bar.  Robert Lust.  I caught him after
2   hours and I told him the scenario that I had moved for
3   a mistrial and that I had moved to withdraw and that
4   you had denied my motion to withdraw and I thought had
5   held a decision on the motion for mistrial.  He said
6   that this is an ethical nightmare.  The land mines are
7   just -- he said how would you journey through this?
8   We don't even know.  This has never happened before.
9        I adopt what Miss Wayne says.  Obviously, he
10  said, though, that the decision lies with the Court.
11  Whatever you order, I'm going to have to do.
12       THE COURT:  Certainly.
13       MS. JAMES:  But with regard to Agent DeJohn,
14  this whole scenario changes potentially what our
15  defense strategy is.  At this juncture because Agent
16  DeJohn has a financial interest in the outcome of this
17  case, he's better off in his lawsuit if he gets a
18  conviction.  Throughout all of the intervention
19  motions that I saw that Miss Connor filed, they
20  continued to say this has hurt his promotability.
21  This has hurt his ability to earn an income.
22       If he gets a conviction of Leon Carmichael,
23  that's going to help his promotability for a number of
24  reasons.  And at this juncture, although the Court has
25  painstakingly tried to keep out the website, as we

1   have, someone needs to question Agent DeJohn now.  And
2   I don't think either one of us can do it effectively
3   about his financial interest in the outcome of this
4   case.
5        You sent us lawyers.  You're trying to get
6   the money from Lisa Wayne.  You're trying to get money
7   from Susan James.  You're trying to get money from
8   Leon Carmichael.  It goes to his bias, it goes to his
9   credibility and everything else with regard to his
10  testimony in this case.  At this juncture I don't
11  think we can do that.  And so what do you do?  I mean
12  an alternative --
13       THE COURT:  Well, before Mr. Feaga speaks I
14  thought about this over the evening.  I handled the
15  website matter at the beginning of this case.  I think
16  the website is a very threatening Internet device.  I
17  held that it was protected by the First Amendment by
18  engaging in a balancing test.
19       Now Mr. Carmichael decided to put the names
20  of Mr. DeJohn and Miss Pettus on that website.  I
21  think that Mr. DeJohn and Miss Pettus are clearly
22  warranted in their anger against Mr. Carmichael.
23  Anybody who would do what Mr. Carmichael did, I think
24  has to bear the consequences.  He's protected by the
25  First Amendment, but as I said yesterday he has to

## Page 26

1  bear the consequences.
2       He did a pretty bad thing, protected
3  nonetheless. But he put an agent's picture on the
4  website. He put an employee's picture on the website.
5  If your picture were put on that website you would be
6  pretty angry as lawyer, especially with a wanted
7  poster on it. Now I balanced it and I said it's
8  protected by the First Amendment, but I think there is
9  a reasonable interpretation of that website that Mr.
10 Carmichael was trying to intimidate witnesses.
11      I've wrestled with that before this trial as
12 to whether the website should come in. I decided play
13 it safe. But to be very honest with you, I thought
14 that website was probably very much admissible, but
15 not only admissible, clearly admissible evidence to
16 show that your client was threatening not only Agent
17 DeJohn, but Miss Pettus and what's the other guy who
18 testified?
19      MR. FEAGA: Denton.
20      THE COURT: Denton. I thought that that was
21 clear evidence of an attempt to threaten witnesses.
22 Not conclusive, but I thought a jury could reach that
23 conclusion reasonably. Nonetheless, I kept the
24 website out. I kept it out during the jury selection
25 process. I kept it out during the trial. And as I

## Page 27

1  told you yesterday, I had some misgivings about that,
2  especially after what Miss Pettus testified.
3       I thought when Miss Pettus gritted her teeth
4  and got angry about that website I thought she was
5  totally and completely justified. I thought she was
6  angry at Mr. Carmichael about that website, and I
7  thought she had a right to be angry at him about it.
8       Now here we are. DeJohn has sued Mr.
9  Carmichael and his attorneys. I think that what Agent
10 DeJohn did is very appropriate. I wrote it in the
11 intervention order. I said what Carmichael did may be
12 wrong, but it's a private matter between Agent DeJohn
13 and Mr. Carmichael. It's not something that the
14 United States can get him to do. I think that Agent
15 DeJohn has a colorable claim against Mr. Carmichael
16 for invasion of privacy, for threatening him as a
17 witness.
18      I think those are all things that should be
19 determined by a state court judge, and I do think the
20 claims are colorable. I do not think that Agent
21 DeJohn's lawsuit is frivolous by any stretch of the
22 imagination. The only thing I can say is I am curious
23 as to why they waited so long to file it. Now Mr.
24 Carmichael is suddenly in this position because he put
25 up that website. He did it.

## Page 28

1       He did it by, as far as I'm concerned, the
2  government couldn't force him to take it down, but he
3  had no right, arguably under state law, to expose
4  Agent DeJohn to that type of exposure, to a threat to
5  his life. He had no right to do that to Miss Pettus.
6  I think when Miss Pettus left this town out of fear
7  she might be harmed, I heard her. I heard her. She
8  was severely and significantly threatened. She
9  actually thought that someone was going to come knock
10 her off and I believed her.
11      Nonetheless, I found the First Amendment
12 prevailed. I think that Miss Pettus has a right to
13 bring a similar lawsuit against Mr. Carmichael.
14      So I think these lawsuits have been brought
15 on by Mr. Carmichael himself. And for him to now come
16 to me and say that he is prejudiced by them, I think
17 is like a child who kills his parents complaining
18 about being an orphan. This man put that threatening
19 website up. He exposed those people to that danger.
20 Now he has to bear the consequences. If a lawsuit
21 gets filed against him, he should pay for it, and I
22 have no sympathy in that regard.
23      Now the problem is his client -- his lawyers
24 have been sued. Now that troubles me. But, again,
25 Mr. Carmichael did this. The bottom line is neither

## Page 29

1  Mr. Feaga nor Ms. Morris nor Mr. Moorer did anything
2  in this case, in fact except to protect Mr. Carmichael
3  by getting the website brought down. In fact, they
4  wanted the website brought down before the trial so as
5  to keep the website out of the trial. They did
6  everything to protect the integrity of this trial.
7  Mr. Carmichael and his attorneys, I'm not saying it
8  was you because you had so many, are the only ones who
9  have made this an issue in this case.
10      If anybody brought this lawsuit on, it is
11 Mr. Carmichael. Now for Mr. Carmichael to come in
12 here and complain about Agent DeJohn being angry at
13 him, I think is outrageous. I think Agent DeJohn
14 should be furious with him for putting that website up
15 with his name on it. Now that's my feeling. And now
16 that you all are caught in a web, I think it's a web
17 created by Mr. Carmichael.
18      Now if somebody would have put your three
19 names or your four names up on a website with a wanted
20 poster in connection with a drug deal and you're going
21 to back down the street and not expect someone to
22 knock you off, I don't believe it. Now if you tell me
23 that website isn't threatening, I don't believe it. I
24 think common sense says it was, and Mr. Carmichael
25 pays for it. He reaped this, he pays. He reaps what

Multi-Page™

Page 30

1 he did.
2       Now that is my view on the matter. And I've
3 put it on the record and I'm going to do a formal
4 opinion on this. I'm not going to let this sit.
5 Because Mr. Carmichael created this. Mr. Carmichael
6 has over and over again in this lawsuit created these
7 problems. Especially the problem about the website.
8 I have bent over backwards to protect him, and he has
9 used it to his advantage. The United States has done
10 everything it could to protect the integrity of this
11 lawsuit.
12      For Mr. Carmichael to now ask for a
13 mistrial, for his lawyers to be dismissed and for all
14 of this is simply unfair. He created this. Not
15 anybody in this room except Mr. Carmichael created
16 this scenario. And for you all to now complain about
17 it, that's between you and Mr. Carmichael. But I
18 don't think this Court is at any obligation to remedy
19 your problem. We have bent over backwards to make
20 sure this problem did not occur.
21      Now if you've got a problem with it, that's
22 your problem. That's the way I see this and I will
23 issue an opinion on it. I'm not going to have a
24 hearing, we're going to finish this trial. And that's
25 where it sits.

Page 31

1       MS. JAMES: May I just say this?
2       THE COURT: Yes.
3       MS. JAMES: In all due respect, Your Honor,
4 and I can see you're troubled by this --
5       THE COURT: I am deeply troubled by the fact
6 that Mr. Carmichael is creating error that he created
7 and asking me for relief from it. And it's something
8 I think there is arguable proof that he did it in
9 meanness and spite to affect Mr. DeJohn and to affect
10 Miss Pettus.
11      I ruled in his favor, but I'll tell you
12 this now, I far from approved of what he did. I very,
13 very far from approved it. I think his putting up that
14 website was a mean and malicious thing. But I think
15 it was protected by the First Amendment. And I think
16 he is bearing the fruit of it, and it's a fruit he has
17 to live with.
18      MS. JAMES: Judge, in all due respect, I
19 think what the Court, even in all due respect with
20 what the Court has just said, I think you have clearly
21 made yourself a witness in the civil case that will be
22 brought.
23      THE COURT: Well, whatever it is.
24      MS. JAMES: You cannot stay on this case.
25      THE COURT: No, I am going to stay on this

Page 32

1 case. Everything I have recited for you I have
2 learned only through this litigation. Those are my
3 findings of fact based on what has come before me.
4 Now if you want to file a motion for recusal you can
5 do so. That will be denied. But I'm telling you I
6 have nothing ex parte in this case.
7       These are all my findings. And I do not
8 appear in a civil case and I will not appear in a
9 civil case, but I can tell you now I am basing this on
10 what occurred in court, what you presented to me as
11 evidence, what the U.S. Attorneys presented to me as
12 evidence and that is where it sits.
13      MS. JAMES: Judge, I understand, but please
14 just let me make my record.
15      THE COURT: Yes.
16      MS. JAMES: I've dealt with you for twenty
17 years. I know you that you've tried to be as very
18 fair as you can be, and I understand you don't have
19 any ex parte information about this. I understand
20 that. But the recitation that you've just given and
21 the order you're going to enter is going to be used by
22 Mr. DeJohn and his lawyer against us in that lawsuit.
23      THE COURT: Well if it's against you in the
24 lawsuit, I render many decisions that are used against
25 other people in other lawsuits. Those are the way I

Page 33

1 find the facts. And when I find the facts, the facts
2 are found and they rest. And these are my thoughts.
3 Actually, I don't think I've said anything I haven't
4 said before in a prior order. When I did the order on
5 the website, I was very concerned about that website,
6 but I engaged in a balancing test.
7       The only thing that may have changed my
8 views on it, if I were hearing it again, is hearing
9 Miss Pettus and Agent DeJohn in court.
10      But I've only based it on what's been
11 presented and I'm hearing your motions now. And these
12 are my findings based on the evidence, based on what
13 has occurred in this case and my conclusion is that
14 Mr. Carmichael brought this on himself. That's the
15 bottom line.
16      I didn't do it, Mr. Feaga didn't do it, Ms.
17 Morris didn't do it, Mr. Moorer didn't do, nobody with
18 the federal government did it. He dug this hole
19 himself. If he didn't think he was going to be sued,
20 I think you're living in a fantasy world. That
21 motion, the order that I did denying intervention
22 specifically said he could sue.
23      MS. JAMES: I read it.
24      THE COURT: So I think this whole thing
25 about we didn't expect this case, or we didn't expect

**Page 34**

1 to be sued, I think you're in a fantasy world. It was
2 going to happen. I think Mr. DeJohn should -- you
3 know, I think it was inevitable.
4      MS. WAYNE: Judge, if I may just for the
5 record, because I want to clear this up. We are going
6 to file a motion to recuse. The Court has raised its
7 voice, you've turned red, your lips are trembling,
8 you're pointing your finger at Mr. Carmichael and you
9 clearly --
10      THE COURT: Now wait a minute now. I am not
11 turning red. If I put in the record every time you
12 raised your voice at me or did certain things -- Now I
13 want to say one thing here for sure. Now I am totally
14 neutral in this case. I have bent over backwards to
15 protect your client, and you're not going to get me
16 off the case by trying to make some spurious record.
17 I have issued neutral orders after a deliberative
18 process and I will do it again. Now I just want to
19 make that clear to you, Miss Lisa Wayne.
20      I want you to understand that is not going
21 to be a basis. If any appellate court looks at this,
22 it will be in an order that will be issued in a
23 neutral environment. I have had no ex parte contacts
24 in this case. Nothing. And the fact that I might get
25 concerned and so forth, that is true, but I just want

**Page 35**

1 to emphasize to you that it was based on Mr.
2 Carmichael's own actions.
3      MS. WAYNE: Judge, I think the record is
4 clear. My sense is, though, as his defense lawyer
5 you've expressed a clear enmity and bias toward this
6 defendant, period, and that's what I want on the
7 record. That's my opinion, and I think we have a
8 right to put that on the record.
9      THE COURT: You have a right to put it on
10 the record.
11      MS. WAYNE: And we'd ask that you remove
12 yourself.
13      THE COURT: I will not do it. I definitely
14 will not do it. And if anybody I have expressed a
15 bias against, I think it's been against the
16 government. I've done everything to keep that website
17 out of here. I've even brought you back here to make
18 sure that you were pursuing your defense appropriately
19 because you were going to go down an avenue that I
20 thought would result in the type of evidence that you
21 got up and asked for a mistrial on. And I wanted to
22 cut that off in the bud.
23      Now if anybody has been -- If I've ruled
24 against anybody, it's been against the government. I
25 put your black jurors back on that jury.

**Page 36**

1      MS. WAYNE: I think that's the law, Judge.
2      THE COURT: It's not the law. I made
3 findings on that, Miss Wayne.
4      MS. WAYNE: Well two cases have come down
5 supporting you this week.
6      THE COURT: Well they were after the fact,
7 too. They were after I did it. But I just want to
8 make that clear. Now I just want you to know, though,
9 that you all have to suffer through this.
10      MS. WAYNE: Judge, we have something else
11 that's --
12      MR. FEAGA: Before we leave that issue, can
13 I be on the record also, Your Honor? Because I want
14 to be on the record on behalf of the United States.
15      THE COURT: Yes.
16      MR. FEAGA: I want to say on behalf of the
17 United States saying that we very much disagree with
18 Miss Wayne and her comments that she made about the
19 Court's demeanor. The Court is telling the lawyers in
20 a forceful way what its position is, and the fact that
21 any belief expressed on the record I want us on the
22 record the record that the Court has done nothing to
23 indicate that the Court have to get off of this case
24 or has some bias against the defendant. And we want
25 to echo what the Court said to the defendant.

**Page 37**

1      THE COURT: Now I would like the record to
2 reflect that when you said the Court had no bias,
3 Miss Wayne did "Hmm" as if to show a smirking
4 disrespect to the Court.
5      MR. FEAGA: Yes, sir.
6      THE COURT: Go ahead.
7      MS. WAYNE: I was commenting on --
8      THE COURT: No, you were showing a smirking
9 disrespect to the Court when he said the Court had no
10 bias, Ms. Wayne. I heard it, and I heard it.
11      Now proceed.
12      And I will take that up with you later, Ms.
13 Wayne.
14      MR. FEAGA: I just wanted the record to be
15 clear on that point, that we do not agree with her
16 statement about that. She's made a number of
17 statements in this case about trial by ambush and
18 other comments that we have let go and we have moved
19 through this case.
20      We've been trying to try the criminal case
21 against Leon Carmichael and Freddie Williams and
22 that's all we're doing in this case, Your Honor. It
23 is our perspective that just as the Court said, if
24 there has been any -- it's been our uniform
25 perspective as we walked out of the court each day

Page 38

1  that boy, the judge, and it's been our view, that he
2  is really bending over backwards to make sure they get
3  a fair trial because we feel like some rulings that we
4  should have go with us went against us.
5      But we respect the court for that, and we
6  always said we know what the Court is trying to do.
7  And the idea that you're somehow biased against this
8  defendant, based on what we've seen happen in this
9  record is ridiculous.
10     MS. WAYNE: Judge, we need to make a motion
11 to continue in regards to our witnesses that are lined
12 up. This is a different subject, Judge.
13     THE COURT: Yes.
14     MS. WAYNE: We have witnesses lined up to go
15 that we're ready to go on this morning. However we
16 have a couple of witnesses that need to be put on the
17 record ex parte as a result of the late disclosures on
18 Mr. Peagler and Mr. Thomas, and there was another one
19 that we didn't get the D. E. A. Six forms on. We've
20 been out investigating in an attempt to remedy that,
21 however those witnesses will not be ready to go
22 because they weren't aware because we got late
23 disclosures on the information.
24     THE COURT: Who are the witnesses?
25     MS. WAYNE: We don't want to disclose that

Page 39

1  with the Government present, Judge, because we want to
2  make an offer of proof as to what they would say.
3  It's rebuttal.
4      THE COURT: How many witnesses are we
5  talking about?
6      MS. JAMES: Probably four.
7      THE COURT: Four witnesses.
8      MR. FEAGA: Can we hear again what she's
9  asking for, Judge?
10     THE COURT: She wants a continuance.
11     MS. WAYNE: To be able to get to those four
12 witnesses. I think we could possibly end today in
13 terms of the witnesses, and I'm alerting the Court
14 that these four witnesses aren't available today.
15 They won't be available until tomorrow morning.
16     THE COURT: Okay.
17     MR. FEAGA: Your Honor, again, in an effort
18 to be fair and balanced in terms of this trial, as
19 long as they finish with every other witness they have
20 got today, and they have four that can't get here for
21 some reason --
22     THE COURT: And they will be here in the
23 morning?
24     MS. WAYNE: Susan?
25     MS. JAMES: Yes.

Page 40

1      THE COURT: We have no problems with that.
2  You have them here in the morning.
3      MS. JAMES: Judge, is it possible, going
4  back to the other matter that we just dealt with, to
5  be perfectly honest with you this whole situation has
6  been upsetting.
7      THE COURT: I think it's rightfully so.
8      MS. JAMES: My point is, I would like a
9  little time to regroup this morning.
10     THE COURT: I think that what has happened
11 to you as lawyers, if I were in your situation I would
12 be very concerned. You notice I have never said that
13 you all did anything. It was only Mr. Carmichael. If
14 I was you as his lawyers, I would be very, very
15 concerned.
16     But as I said before, it's over what Mr.
17 Carmichael has done. But I'm agreeing with you, I
18 probably think you do need time to reassess your
19 strategy. If you want to go into the website, I think
20 that is a clear issue in this case now in light of
21 your -- of the lawsuit by Mr. DeJohn. You may want to
22 call him back.
23     You may want to go into does he hold a bias
24 against Mr. Carmichael because of this lawsuit. I
25 think he probably does, and I think that's probably

Page 41

1  something that's relevant just like Miss Pettus
2  spurted out a bias. In fact, it was her first
3  response when you asked her, you know, why was she
4  angry at Mr. Carmichael. So I think you're entitled
5  to that, yes. And I will give you an hour.
6      MS. JAMES: Thank you.
7      (Whereupon, the in-chambers conference was
8  concluded.)
9      THE COURT: Okay. Ms. Wayne?
10     MS. WAYNE: Judge, we appreciate the break.
11 I think we've had a chance to reflect on some things.
12 So I wanted to apologize to the Court personally for
13 what you perceived was something that was directed to
14 you which was really in response to Mr. Feaga. I was
15 -- you know, it was an emotional moment for all of us.
16     So we've had a chance to regroup and we want
17 to let you know that there will be a couple of
18 potential witnesses who there need to waive the privilege
19 outside the presence of the jury. And·we wanted to
20 put you on notice as to that.
21     I wanted to say one other thing.
22 I know it was in the heat of the moment, but I would
23 not want to be in your position today if I were a
24 lawyer. I will give you that much credit. I think
25 you have a very difficult decision to make, as I said

Multi-Page™

Page 42

1 when you were walking out. You and Miss James have
2 very difficult decisions.
3        MS. WAYNE: Right.
4        THE COURT: I still believe Mr. Carmichael
5 caused it, but I think you two -- and that's why I
6 gave you the hour, and I will accommodate your efforts
7 to resolve this because I don't think there is any
8 law. I think Miss James is absolutely right, and
9 we'll just do the best we can. But I don't blame
10 either of you. If I were a practicing lawyer, I would
11 not be want to be in your shoes.
12        DEFENDANT CARMICHAEL: Can I say something,
13 Judge?
14        THE COURT: No, you talk to your attorneys
15 first.
16        And your apology is accepted. I was told
17 you wanted to do it, but since that's a record I
18 wanted the appellate court, if there is an appeal, to
19 know you apologized.
20        MR. FEAGA: Your Honor, there was one other
21 thing we wanted to take up.
22        THE COURT: Yes?
23        MR. FEAGA: We'd ask the Court if we could
24 have Mr. Wilson, after he testifies, to remain in the
25 courtroom. He's testifying about, you know, about a

Page 43

1 lot of records and that sort of thing, and --
2        THE COURT: We'll take that up later. But
3 what I do want to take up after Mr. Brunson finishes,
4 if you're going to go into hearsay, I'd like to hear
5 that before the jury hears it.
6        MR. FEAGA: Yes, sir.
7        THE COURT: I don't want to have to go back
8 and having to clean up something that may not be due
9 to be cleaned.
10        Okay? Let's go outside.
11        (Whereupon, the in-chambers conference was
12 concluded.)
13              IN OPEN COURT
14        (THE JURY IS NOT PRESENT):
15        THE COURT: Mr. Brunson, there is one thing
16 I want to be clear now. You understand that Mr. Feaga
17 may go into those other areas that I haven't ruled on
18 that yet.
19        MR. BRUNSON: Yes, sir. I would simply ask
20 the Court to consider the areas that he goes into
21 within the confines of the direct.
22        THE COURT: Very good. Bring in the jury.
23        (Whereupon, the jury was escorted into
24 courtroom.)
25        THE COURT: Proceed, Mr. Brunson.

Page 44

1        MR. BRUNSON: Thank you, Your Honor.
2          L O U I E   W I L S O N,
3 the witness herein, having first been duly sworn or
4 affirmed to tell the truth, was examined and testified
5 as follows:
6            DIRECT EXAMINATION
7        BY MR. BRUNSON OF LOUIE WILSON
8 Q  Good morning, Mr. Wilson.
9 A  Good morning.
10 Q  We talked about yesterday the investigation that
11 you began, or that the I. R. S. began in early 1998.
12 Do you remember discussing that?
13 A  Yes, sir.
14 Q  That it began as an income tax investigation and
15 it kind of developed into a case assigned to you in
16 1998, is that right?
17 A  That's right.
18 Q  Do you know how long that investigation
19 continued?
20 A  I believe it continued until late '99 or early
21 2000.
22 Q  So just from the first time the I. R. S. began
23 until it ended, it actually lasted approximately three
24 years or near three years from early '97 to early
25 2000?

Page 45

1 A  Well, I can't speak to when the administrative
2 investigation began. I don't know that date. I know
3 I became involved in late '97.
4        THE COURT: Counsel, I hate to interrupt
5 you, but there is something. M. Williams wants to
6 know if you all will be calling him. He's been
7 waiting. I think you know who I'm talking about.
8        MS. WAYNE: Yes, Judge, and we had -- I'm
9 sorry, I thought we had excused him yesterday.
10        THE COURT: I just want to make sure.
11        Mr. Teague, you don't want to keep him?
12        MR. TEAGUE: No, Your Honor, he may be
13 excused.
14        THE COURT: Mr. Feaga?
15        MR. FEAGA: No, sir, you Your Honor.
16        THE COURT: Okay, then he's excused.
17        Go ahead.
18        MR. BRUNSON: Thank you.
19 Q  You had a three year investigation regarding Mr.
20 Carmichael?
21 A  I believe my portion of the investigation that I
22 can testify to was that I started sometime in late '97
23 and my closing report was written in either late '99
24 or early 2000. So two years.
25 Q  But a previous agent had the case prior to you.

Multi-Page™

Page 46

1 A  Yes, sir.  I can't testify as to how long he had
2 that particular portion of the case.
3 Q  And during the investigation, you did scrutinize
4 his income taxes, did you not, his financial picture?
5     (Whereupon, an electronic noise emitted from
6 Ms. Chartoff's equipment at counsel table.)
7     THE COURT: I understand, you just need to
8 turn it off.  I think you know how to.
9     MS. CHARTOFF: I just closed it up.  It was
10 an appointment announcement.
11     THE COURT: Oh, okay then.  I thought you
12 were doing research.
13     Go ahead.
14 Q  The I. R. S. scrutinized one's financial picture
15 during this time period, correct?
16 A  Yes.
17 Q  And the way you go about that is you do a lot of
18 things, investigative things.  You issue subpoenas to
19 banks or anybody that's ever done business with the
20 target, is that right?
21 A  Maybe not with everybody who has ever done
22 business, but yes, sir.  You try to find out who he is
23 doing business with, that's correct.
24 Q  A financial picture.
25 A  Yes, sir.

Page 47

1 Q  In fact, back during that evaluation you were
2 going -- you were looking at periods prior to 1997,
3 '98.  In other words, the I. R. S. looks backwards.
4 They look into the past, do they not?
5 A  That's correct.
6 Q  And all of the things you were looking at
7 included his bank accounts?
8 A  Bank accounts are included.
9 Q  The people he bought trucks from?
10 A  Yes, sir.
11 Q  The income received by his businesses?
12 A  Yes, sir.
13 Q  Whether it be cash from the bar, Com checks from
14 the trucking business or any other kind of income.
15 A  We were trying to determine income, yes, sir.
16 Q  Tracking his income to see how if it compared to
17 what he put on the income tax returns?
18 A  Well there were no income tax returns filed, it's
19 my recollection, for the years that we were looking
20 at.
21 Q  And the years you were looking at were '92
22 through the present?  Or '97?
23 A  I believe returns were subsequently filed for '92
24 through '97.  I believe my investigation actually
25 focused on '96 and '97.

Page 48

1 Q  So during the course of your investigation, tax
2 returns were filed on behalf of Mr. Carmichael.
3 A  They were presented to me by his attorneys at
4 that time, yes, sir.
5 Q  And his trucking business, you determined, was
6 made up of a lot of different income producing
7 businesses, is that Multi-Investments, Inc.?
8 A  He operated under several different names within
9 that umbrella, yes, sir.
10 Q  But he pooled all of his money into essentially
11 one bank account.
12 A  That's correct.
13 Q  And he told you that when you interviewed him.
14     MR. FEAGA: Your Honor, we're going to
15 object to them asking this witness what their client
16 said.  It's hearsay.
17     THE COURT: Why isn't it hearsay,
18 Mr. Brunson?
19     MR. BRUNSON: Your Honor, it's not going to
20 the truth of the matter, it's only showing the fact
21 that Mr. Carmichael cooperated in the investigation.
22     THE COURT: You just want to show he
23 cooperated?
24     MR. BRUNSON: Yes, Your Honor.
25     THE COURT: Well ask him that.

Page 49

1 Q  Mr. Wilson, you stated that you met with Mr.
2 Carmichael at the outset of your investigation?
3 A  Yes, sir.
4 Q  Did he talk to you when you met with him?
5 A  He did.
6 Q  Did he meet with you on later occasions providing
7 you certain information like that videotape?
8     MR. FEAGA: Your Honor, we object.  It's
9 hearsay.  I won't object -- I don't mind him asking
10 him questions did he provide things to you, but when
11 he starts asking him for things that are -- and, Your
12 Honor, it's difficult for me to make my objection
13 without violating --
14     THE COURT: I'm not quite sure what -- I
15 think he just wants to demonstrate his alleged
16 cooperation.  That's it.
17     MR. FEAGA: But, Your Honor, he's trying to
18 get testimony -- He's trying to get statements his
19 client made out through another witness.
20     THE COURT: I understand that, but I haven't
21 heard anything yet.  I think he just asked him did he
22 provide this, did he provide that.  And I'll allow
23 that, as long as it's conduct.
24     MR. BRUNSON: Thank you, Your Honor.
25 Q  And not only did Mr. Carmichael provide

## Page 50

1 information to you, but you went out and got your own
2 information from the banks and the other sources of
3 information, did you not?
4 A Yes, sir.
5 Q All in an effort to determine what the financial
6 picture is, is that correct?
7 A Essentially at that point we were looking for
8 excess cash.
9 Q Excess cash not reported on an income tax return?
10 A Sir, as I said, income tax returns had not been
11 filed at that point.
12 Q All right. So excess cash in the terms of excess
13 cash from the nightclub?
14 A From sources other than those that we had
15 determined that were his legitimate sources of income.
16 Q Okay. Excess cash in the form of -- What do you
17 mean by "excess"?
18 A Looking for money that he would not be able to
19 account for.
20 Q On an income tax return?
21 A Legitimately, yes, sir.
22 Q Okay. And during this two to three year period
23 you evaluated his financial picture, did you not?
24 A Yes, sir.
25 Q Very closely.

## Page 51

1 A Yes, sir.
2 Q To a high degree?
3 A Yes, sir.
4 Q A very thorough investigation.
5 A I investigated the case.
6 Q And you are an outstanding criminal investigator
7 for the I. R. S.?
8 A If that's your opinion, Mr. Brunson.
9 Q Well, Mr. Wilson I thought you were named agent
10 of the year for them --
11      MR. FEAGA: Your Honor, we'll stipulate that
12 he's an outstanding criminal investigator, if that
13 will help, from our perspective anyway.
14      THE COURT: Okay.
15 Q And were you able to find any missing money,
16 excess cash?
17 A We determined in reviewing the bank accounts as
18 best as can I recall without looking at my report that
19 there was approximately sixty thousand dollars in
20 currency deposits that had flowed through the
21 Multi-Investments account that could not be attributed
22 to the trucking business or to his rental properties.
23 Q And the reason you couldn't follow that sixty
24 thousand dollars is because it was in currency, is
25 that right?

## Page 52

1 A We were later given an explanation for those
2 funds.
3 Q Well, I'm just asking you. You couldn't follow
4 the currency trail, could you?
5 A Well at that point it was unexplained currency,
6 that's correct.
7 Q It's impossible to follow the currency trail.
8 A Absent third party information.
9 Q All right. But this sixty thousand dollars was
10 over a five year period, was it not?
11 A No, sir, it was over a two year period, '96 and
12 '97, which is where my investigation focused.
13 Q And the income Mr. Carmichael was earning through
14 his businesses during that time exceeded two million
15 dollars, did it not?
16 A Without looking at the return I couldn't tell you
17 exactly what the figures were. It was in the
18 neighborhood of a million, I don't know if it exceeded
19 two million.
20 Q You remember the sixty thousand but you don't
21 remember the two million figure?
22 A I specifically remember the sixty thousand dollar
23 figure because that was the income that we were trying
24 to pin down.
25 Q And it's impossible to pin it down, is it not?

## Page 53

1 A Again, absent third party information.
2 Q From an investigative standpoint it's impossible
3 to pin down.
4 A Absent third party information.
5 Q Okay. Now, did you ever send him a tax bill for
6 the additional sixty thousand dollars that you came up
7 with?
8 A I don't issue tax bills, Mr. Brunson.
9 Q Well, did your civil function of the I. R. S.
10 send him a tax bill that you know of for the sixty
11 thousand dollars?
12 A I do not know.
13 Q But assuming he made two million dollars in '96
14 and two million dollars in '97, almost four million
15 dollars, the sixty thousand you came up with was less
16 than one percent of all the monies he handled.
17 A Of all the money that we were able to locate at
18 that time.
19 Q But isn't it true that you attributed the sixty
20 thousand dollars that was missing to money that he had
21 learned at his club?
22 A I didn't personally attribute it to that. I was
23 informed by his accountant at the time, and Mr.
24 Carmichael, that that's where the money had come from.
25 Q But in your report you made that conclusion, did

**Multi-Page™**

Page 54

1 you not?
2 A  Sir, I'd like to review my report, but I believe
3 to the best of my recollection I said that that
4 information had been provided to me by Mr. Carmichael
5 and his accountant at the time.
6 Q  Now after working on a case for, in I. R. S.
7 terms, two and-a-half years, it's important that an I.
8 R. S. agent document and justify working on a case
9 where there's no tax collected or there's no
10 indictment issued, isn't that right, Mr. Wilson?
11 A  To justify my time?
12 Q  To you your boss.  To the Internal people.
13 A  My boss keeps a fairly close eye on what's going
14 on during the course of the investigation.  We have
15 periodic reviews, so he knows what's going on.
16 Q  But the goal is to indict people, and if you
17 don't after working two and-a-half years you have to
18 kind of justify what you have been doing for a couple
19 of years.
20 A  I beg to differ.  The goal of the investigation
21 is to determine the truth of the matter.
22 Q  But you did write a discontinued investigation
23 report, a rather lengthy report, that outlined the
24 reasons that the case had to be discontinued.
25 A  At that point in time, yes, sir, I did.

Page 55

1 Q  And among those reasons you wrote "A thorough
2 analysis of these records revealed approximately sixty
3 thousand dollars in unaccounted cash --"
4      MR. FEAGA:  Your Honor, objection.  He can
5 ask him what his reasons were, and then if he's not
6 satisfied with the reasons he gives then he can start
7 reading from the report.  But he should first ask the
8 witness what his reasons were.
9      THE COURT:  I guess he's going to ask him if
10 those are his reasons.  He can lead the witness.
11      MR. FEAGA:  All right.
12      MR. BRUNSON:  Thank you, Your Honor.
13 Q  I'll repeat, Mr. Wilson, a thorough analysis of
14 these records revealed approximately sixty thousand
15 dollars in unaccountable cash which was run through
16 the account during the period in question.  Do you
17 remember making that statement in your report?
18 A  I believe that's what I just testified to a few
19 minutes ago.
20 Q  Okay.  And you also made a conclusion that the
21 returns that were later filed included the sixty
22 thousand on the returns.
23 A  Again, that was based on statements provided by
24 Mr. Carmichael and his accountant.  That was not my
25 conclusion.

Page 56

1 Q  Do you know the approximate date of your
2 discontinued investigation report?
3 A  Again, I believe it was late '99 or early 2000.
4 Q  I want to move forward to the case, the current
5 investigation.
6 A  Yes, sir.
7 Q  When you were called before the grand jury to
8 testify about this case on January 21st, '04, you
9 talked about or were asked about the fact that cash is
10 something that is hard to track, were you not?
11 A  If you say I was.  I don't recall the question.
12 Q  And I'll quote you.  "You know, once it comes out
13 and becomes cash, then it's kind of hard to track back
14 to the same account."  Do you remember making that
15 statement?
16 A  Can you tell me what the question was prior to
17 that so that I know what I was answering?
18 Q  Well actually, Mr. Wilson, that was a question.
19 A  Then I'll assume that wasn't my response.
20 Q  And I'm not sure you did respond.  I'll admit
21 that.  But you would agree with that proposition,
22 would you not?
23 A  Could you read me the statement again?
24 Q  Just the cash is hard to track.
25 A  Once again, absent third party information.

Page 57

1      MR. BRUNSON:  No further questions.
2      THE COURT:  Mr. Teague?
3      MR. TEAGUE:  No questions, Your Honor.
4      MR. FEAGA:  Yes, sir, Your Honor.
5           CROSS EXAMINATION
6      BY MR. FEAGA OF LOUIE WILSON:
7      MR. FEAGA:  Your Honor, can the witness come
8 down for a second and retrieve these two boxes and
9 take them back up there where he is?
10      THE COURT:  Why don't you take them up to
11 him.
12      MR. FEAGA:  Yes, sir, I just wanted to set
13 my things down.  I was just trying to move things
14 along.
15 Q  Mr. Wilson, you were asked a number of questions
16 by defense counsel about having been involved in an
17 investigation of Leon Carmichael, is that right?
18 A  Yes, sir.
19 Q  As part of that investigation, did you try to
20 find any and all bank accounts that Mr. Carmichael
21 had?
22 A  Any and all accounts which Mr. Carmichael had
23 signatory authority, yes, sir.
24 Q  All right.  And in order to do that, did you
25 subpoena information from his business?

Multi-Page™

Page 58

1 A  Not from his business -- well, not from his
2 business in this current investigation.
3 Q  Okay.  But over the time that you have been
4 looking at him, has information been subpoenaed from
5 his business?
6 A  It has.
7 Q  Has information been subpoenaed from banks?
8 A  Yes, sir.
9 Q  And from examinations of those accounts has
10 information been developed that there are other
11 accounts and those accounts have been subpoenaed?
12 A  Yes, sir.
13 Q  In the course of doing that, sir, how many bank
14 accounts have you been able to find that are connected
15 to Leon Carmichael where he has some signature
16 authority on those accounts?
17      MR. BRUNSON:  Objection, Your Honor.
18 Connected?
19      THE COURT:  What do you mean "connected"?
20      MR. BRUNSON:  That's my objection, Your
21 Honor.
22      THE COURT:  I don't understand, "What do you
23 mean 'connected'"?  What's the point?
24      MR. BRUNSON:  Without some foundation as to
25 how these accounts are connected to Mr. Carmichael, I

Page 59

1 think it's an objectionable question.
2      MR. FEAGA:  Your Honor, we entered into a
3 stipulation, I thought, so we wouldn't have to bring
4 in the banker in here with the defense to the fact
5 that there are twelve accounts, and I think we have a
6 stipulation on this agreement as to the accounts.  I'm
7 going to mark it as a government exhibit.
8      MR. BRUNSON:  And, Your Honor, we agreed
9 with the stipulation as to authenticity.
10      THE COURT:  You're objecting to relevance?
11      MR. BRUNSON:  Yes, Your Honor.
12      THE COURT:  How is this relevant?
13      MR. FEAGA:  Your Honor, these are bank
14 accounts that Leon Carmichael has signature authority
15 over.  And the relevance of it is we're going to
16 establish that over the time period when the money
17 went into the account that's the subject of count two,
18 there was only nine thousand dollars in cash removed
19 from any of these twelve accounts.
20      THE COURT:  Overruled.
21      MR. BRUNSON:  Your Honor, our contention is
22 some of these accounts he dose not have signature
23 authority.
24      THE COURT:  Let me see what they can show,
25 then.

Page 60

1 Q  Sir, I'm going to show you what's been marked for
2 identification purposes as government's exhibit 70 and
3 ask you if you would take a look at that.  It's a two
4 page document.
5 A  Yes, sir.
6 Q  Have you seen that before?
7 A  Yes, sir, I created it.
8 Q  All right.  And for what purpose did you create
9 it?  Who asked you to do it?
10 A  I was asked by yourself and defense counsel to do
11 this.  It's a list of financial institution accounts
12 and credit card accounts that might be introduced as
13 part of this trial or part of our case.
14 Q  Okay.  And whose accounts are they?
15 A  Twelve of them, twelve of the twenty-three
16 accounts listed, financial institution accounts are
17 accounts on which Mr. Carmichael has signatory
18 authority.
19 Q  All right.  What about the other ones that are on
20 there?
21 A  There's one account that is the subject of count
22 two which is the Sherry Pettus account.  There has
23 already been testimony on the Compass Bank.
24 Q  All right.
25 A  There is also an account in the name of Valerie

Page 61

1 Carmichael, who is Mr. Carmichael's wife.  There are
2 two accounts of Regions Bank in the named of Shaletta
3 Davis Hester.
4 Q  Who is Shaletta Davis Hester?
5 A  Shaletta Davis Hester is one of the owners of a
6 group home in Lowndes County.
7      MR. BRUNSON:  I object to the line of
8 questioning.  My objection is we have no question
9 about the accounts that Mr. Carmichael has signature
10 authority on.
11      MR. FEAGA:  Well he objected when I started
12 to ask a question about them.  I don't know how I can
13 tie them up in the case unless I can ask questions
14 about them, Your Honor.
15      THE COURT:  Go ahead.
16 Q  Okay.  Let's talk about the twelve accounts that
17 Mr. Carmichael controls.
18 A  Yes, sir.
19 Q  Are they listed on that record?
20 A  They are.
21 Q  Would you tell the ladies and gentlemen of the
22 jury the identification data that's contained on that
23 exhibit for the twelve accounts?  Where are they,
24 what's the account number, what's the account title,
25 what's the start date and the end date?

Page 62

1 A AmSouth Bank, account number one seven nine eight
2 five seven seven three. The account is titled
3 Carmichael Center, Inc.
4 Q Okay. Let me stop you. We'll just do this one
5 at a time, then. On that account, what period of time
6 did you examine that account for?
7 A Nine twenty-seven oh two.
8 Q Would that be September 27, '02?
9 A Yes, sir, through October 31 of '03.
10 Q Okay. Now why did you examine that one for that
11 period?
12     MR. BRUNSON: Your Honor, no objection to
13 this account.
14 Q Well why did you examine that account for that
15 period?
16 A That was the length of time that that particular
17 account was open.
18 Q So when was it opened?
19 A Well let me back up. The account was opened 9-27
20 of '02. It may have continued after 10-23-03, but
21 that was the time I stopped looking at it.
22 Q Why did you stop looking at October 31st of 2003?
23 Why did you stop looking?
24 A When we subpoenaed the records, that's the period
25 I was provided and it's the one I chose to look at.

Page 63

1 Q Weren't you looking for the source of the money
2 that went into the Compass Bank account of Sherry
3 Pettus?
4 A I was.
5 Q So if that account didn't open until May 28, 2002
6 and it closed on May 21, 2003, it was open for
7 slightly less than a year, is that right?
8 A That's correct.
9 Q Okay. And you were looking for cash that was
10 deposited in that account coming out of these
11 accounts?
12 A I was trying to determine if cash from accounts
13 on which Mr. Carmichael had signatory authority, if
14 there had been cash withdrawals from those accounts
15 which could have accumulated or accounted for the
16 deposits into the Sherry Pettus account.
17 Q Okay. So you were looking for third party
18 information about the source of that money in the
19 Compass account, right?
20 A That's right.
21 Q All right. Now let's talk about the Compass
22 account just briefly, which has been admitted into
23 evidence. During what time -- You said that account
24 opened on May the 28th, 2003, is that right?
25 A Yes, sir.

Page 64

1 Q During what period of time in the life of that
2 account did the two hundred and forty-nine thousand
3 dollars that Miss George -- excuse me, the two hundred
4 and forty-nine thousand dollars in cash that was
5 deposited in that account, during what period of time
6 did those deposits take place?
7 A Between the May 28th of 2002 and January the 13th
8 of 2003.
9 Q How many months is that?
10 A Approximately eight.
11 Q Okay. So from the time it opened until January
12 the 13th of 2003, eight months, that two hundred and
13 forty-nine thousand in cash went into that account?
14 A Yes, sir.
15 Q All right. Now let's go back to the Leon
16 Carmichael account that you were just talking about.
17 I'm sorry I called it Leon Carmichael. What was the
18 name of the account?
19 A Carmichael Center.
20 Q Okay. Let's talk about that Carmichael Center,
21 Inc. account. When did it open?
22 A September the 27th of 2002.
23 Q And you say you examined it for what period of
24 time from the time that it opened in September of
25 2002?

Page 65

1 A The last record that I have on it is the period
2 ending 10-31-2003.
3 Q That would encompass the period of time from when
4 it opened well after the time when the cash went into
5 the Compass account, wouldn't it?
6 A It would.
7 Q Okay. How much cash came out of that account
8 during that time frame?
9 A I'll have to have my notes in front of me,
10 please, sir, to refresh my memory.
11     MR. BRUNSON: Your Honor, if he is
12 testifying from notes about this account, I think it
13 would be proper if the account is offered into
14 evidence.
15     MR. FEAGA: That's what I'm trying to do. I
16 thought we had a stipulation that these accounts were
17 already agreed to by both parties. I'm trying to
18 connect them so they won't object to me putting them
19 into evidence.
20     MR. BRUNSON: And I'm not objecting to any
21 account that's in Mr. Carmichael's name.
22     THE COURT: All you need to do is, why don't
23 you come here and tell him which accounts you agree to
24 and let's put those in right now.
25     MR. BRUNSON: Thank you, Your Honor.

**Page 66**

1  MR. FEAGA: Judge, if he's not objecting to
2  the twelve accounts from Carmichael, that's great.
3  Now what I want to do is ask the witness about the
4  twelve accounts from Carmichael so I can eliminate --
5  THE COURT: I understand that. Do you agree
6  to the twelve accounts? Let's resolve that first.
7  Q  Mr. Wilson, I think you're holding the same
8  exhibit Mr. Brunson is. Would you tell us for the
9  record on that exhibit which twelve accounts are the
10  twelve accounts that you're talking about were
11  controlled by Leon Carmichael and that we're going to
12  be asking you did any cash come out of them?
13  A  The twelve deposit accounts are either AmSouth
14  Bank account entitled Carmichael Center, Inc. --
15  Q  That would be the first one on the list?
16  A  Yes, sir.
17  Q  How about the second one on the list?
18  A  Yes, sir.
19  Q  All right. And the third?
20  A  The third one, the fourth one, the fifth one.
21  Q  Okay. Stop there so Mr. Brunson can keep up with
22  you.
23  Now after the fifth account in a row from
24  the top of the page there are search more. Which ones
25  are those?

**Page 67**

1  A  Next one would be the one labeled Colonial Bank.
2  Q  Count number eight oh three?
3  A  Middle of the page, yes, sir.
4  Q  Okay. So Colonial Bank, account eight oh three
5  -- let me get my glasses -- one one seven. Okay. We
6  got that one. What's that one, that's six?
7  A  The next four would be the Max F. C. U. accounts.
8  There are four accounts listed there.
9  Q  We've got ten.
10  A  Next one would be the first Regions Bank account.
11  Q  Eleven.
12  A  Just a minute. One, two three, four, five, six
13  seven, eight, nine, ten -- I count that as twelve,
14  sir.
15  Q  Let me see again. Maybe we missed one.
16  You've got you said the first five AmSouth
17  accounts.
18  A  First six.
19  Q  First six. There we go. Okay.
20  A  Those are the deposit accounts over which Mr.
21  Carmichael had signatory authority.
22  Q  Just hold that thought a second.
23  MR. BRUNSON: No objection to those
24  accounts.
25  MR. FEAGA: Your Honor, if I could just take

**Page 68**

1  a moment with Mr. Brunson?
2  THE COURT: Those twelve are in.
3  Do you have exhibit numbers, Miss Carnes?
4  COURTROOM DEPUTY CLERK: Government's
5  exhibit 70, is that correct?
6  Q  Government's 70, is that right?
7  A  Government's exhibit 70 is the list.
8  MR. FEAGA: Oh, the list.
9  COURTROOM DEPUTY CLERK: Thank you.
10  MR. FEAGA: Your Honor, I'm going to mark
11  the two boxes that are up there as government's
12  exhibit 71 containing multiple accounts. I'll mark
13  them as 71(a) and 71(b).
14  Q  Now, Mr. Wilson, if you would, you were starting
15  to testify about the twelve accounts that Mr.
16  Carmichael controlled, and you said you were trying to
17  identify in your investigation whether they were the
18  source of the cash that went in the Compass Bank
19  account.
20  A  Yes, sir.
21  Q  Now the reason you're doing that is that you're
22  trying to find out if the monies are the source of the
23  specified unlawful activity, is that right?
24  A  That's correct. I'm trying to verify or give
25  credibility to the statement that Miss Pettus had

**Page 69**

1  given us that the money that she put into the account
2  was her money.
3  Q  Okay. So if it came out of an account that Mr.
4  Carmichael controlled, then it wouldn't be, right?
5  A  If it was legitimate income that had gone into an
6  account and come out as cash, then obviously that
7  would not be drug proceeds.
8  Q  Okay. So you said no cash came out of that
9  account?
10  A  Again, you were going to give me my sheet.
11  Q  Oh, yes, sir.
12  MR. FEAGA: I'm requesting to mark this
13  three-page document as government's exhibit 72?
14  Q  Did you bring a copy of what you have provided me
15  with today? An additional copy of that?
16  A  I'm not sure if I brought an additional copy or
17  not this morning. I know I gave you a copy yesterday
18  afternoon and I had one. I may have it with me, I'm
19  not sure.
20  MR. FEAGA: Your Honor, all I'm trying to do
21  is get the witness to say that at the end of the day,
22  on these twelve accounts I could do it with one
23  question, how much cash came out of those twelve
24  accounts. I think we've tied them to Mr. Carmichael.
25  MR. BRUNSON: No objection.

Page 70

1    THE COURT: All right.
2  Q  With regard to the twelve accounts that your
3  investigation tied to Mr. Carmichael, do you know how
4  much cash in total came out of those accounts during
5  the time that you were examining to determine whether
6  or not the money that went in the Compass account came
7  out of any of his checking accounts or any other
8  account he had?
9  A  I began reviewing the accounts as of January 1,
10 2001. There were seven of those accounts that were
11 opened between January 1, 2001 and January the 13th
12 of --
13 Q  Well stop, hold on right there.
14    Now these are Mr. Carmichael's own bank
15 accounts, right?
16 A  Yes, sir.
17 Q  Okay. Now you said that the reason that you were
18 examining all known accounts of Mr. Carmichael's was
19 to see if you could determine whether any cash came
20 out of them that could be the source of the deposits
21 in the Compass account, right?
22 A  Yes, sir.
23 Q  Okay. Now, did you do that?
24 A  I did.
25 Q  Okay. Did you find any cash coming out of any of

Page 71

1  those accounts during the time that you looked at
2  them?
3  A  Two.
4  Q  Okay. Now let's talk about the period of time
5  that you looked at them, because I think what I want
6  you to make clear to the jury is that you went well
7  back beyond -- in an effort to make sure he didn't
8  take something out two months before or three months
9  before one of these deposits, is that right? You
10 wanted to cover a broader period of time than the
11 eight months.
12 A  That's right. I looked at a period of
13 approximately one and-a-half years prior to the
14 opening of Miss Pettus's account.
15 Q  Okay. One and-a-half years prior. And that
16 opening day was May 28th?
17 A  Yes, sir.
18 Q  2002?
19 A  Yes, sir.
20 Q  All right. And so with regard to all these
21 accounts you're going to testify to, you went back if
22 they were open a year and-a-half back?
23 A  I believe there were seven of those accounts that
24 were open at some point. Not all of them for the
25 entire time, but at some point during that time range.

Page 72

1  Seven of those twelve accounts were open.
2  Q  So if one of them opened up between the time that
3  the Compass Bank account opened and the one and-a-half
4  years back, you only went back as far back as when it
5  was opened?
6  A  That's correct.
7  Q  And did you come to a period beyond the time --
8  You said when was the date of the last deposits into
9  the Compass account, a cash deposit?
10 A  January the 13th of 2003.
11 Q  Now you were talking about one account that you
12 said where you looked past this date at that account
13 for cash, is that right?
14 A  I looked at all of them, but the analysis that I
15 was concerned with was only through January the 13th,
16 2003. I may have looked at the other records past
17 that, but it was not of concern to what I was trying
18 to do at this particular stage.
19 Q  Because cash coming out of one of those accounts
20 after this date couldn't be a deposit into this before
21 that date, right?
22 A  That's correct.
23 Q  Okay. Now, would you tell the ladies and
24 gentlemen of the jury what you found to be the case.
25 Did you find cash coming out of any of these twelve

Page 73

1  accounts that could have been the source of the two
2  hundred and forty-nine thousand that went into this
3  account?
4  A  Yes, sir. I found there were two accounts from
5  which cash had been withdrawn.
6  Q  And what were the two accounts from which cash
7  had been withdrawn?
8  A  One of them was one of the accounts in AmSouth
9  that was titled Fred Thomas, Junior and Leon
10 Carmichael, and a grand total of two hundred dollars
11 in cash came out of that account during that time
12 frame.
13 Q  Okay, hold on. Fred Thomas and Leon Carmichael?
14 A  Yes, sir.
15 Q  And how much came out of that one?
16 A  Two hundred dollars.
17 Q  Two hundred dollars. Did that account have cash
18 deposited into it?
19 A  That account had very minimal transactions.
20 Q  Okay. Now what was the other account that you
21 had cash coming out of?
22 A  The second account cash came out of was a Regions
23 Bank account that was titled Bernice Carmichael and
24 Leon Carmichael.
25 Q  Do you know who Bernice Carmichael is?

Multi-Page™

Page 74

1  A  I believe she's Mr. Carmichael's mother.
2  Q  Okay.  And Leon Carmichael?
3  A  Yes, sir.
4  Q  And how much cash was withdrawn from Mr.
5  Carmichael on his mother's account during that time?
6  A  Without being able to review my notes I can't
7  give you an exact amount, but it was approximately ten
8  thousand five hundred dollars.
9  Q  Ten thousand five hundred dollars.  And there was
10  no other cash taken out of any of these accounts
11  during the time that Miss Pettus put the stinky money
12  in the Compass account.
13  A  That's correct.
14  Q  I didn't ask you, and I think I should have.  You
15  said that Mr. Carmichael and his mother's account came
16  out of Regions, is that right?
17  A  That's correct.
18  Q  What was the bank account that Fred Thomas and
19  Leon Carmichael had, what bank was it at?
20  A  It was at AmSouth Bank.  There were actually two
21  accounts titled that way, and the account we're
22  talking about was a savings account, I believe it ends
23  in nine five four four.
24  Q  Okay.  What is the account number for the
25  AmSouth, Fred Thomas, Leon Carmichael account?

Page 75

1  A  The one that you're referring to there?
2  Q  Yes.
3  A  The full account number is one seven zero nine
4  nine five four four.
5  Q  All right.  Now Mr. Brunson repeatedly asked you
6  questions about tracing cash and whether it was
7  possible to trace cash.  Do you remember that?
8  A  I do.
9  Q  Okay.  And I recall, and the jury can recall for
10  itself, you saying repeatedly back to him "Absent
11  third party information it's difficult to trace cash."
12  Is that right?
13  A  Yes, sir.
14  Q  With third party information, is it possible to
15  trace cash?
16  A  Yes, sir.
17  Q  What kinds of things constitute third party
18  information?  Without reference to this specific case,
19  what kinds of things do you, as, I think they said and
20  we certainly agree, an outstanding criminal
21  investigator, what do you look at that tells you those
22  sorts of things?  What is third party information?
23  A  Statements from witnesses, actions by the subject
24  which could include straw purchases, nominee
25  purchases, the placing of accounts in nominee names.

Page 76

1     We would look for if the subject had been
2  linked to drugs, had been stopped with drugs.
3     If individuals related to the particular
4  subject had been found to be in possession of
5  narcotics or large sums of currency.
6     If there had been strange transactions
7  regarding real estate.
8     Those are the ones I can think of off the
9  top of my head.
10  Q  All right, sir.  What about if some other
11  individual is involved with them in making the
12  deposits, would the statement of that person be
13  important to you?
14  A  It would be crucial.
15  Q  Is that third party information?
16  A  Yes, it is.
17  Q  What about a statement from the individual that's
18  the target of your investigation, would that be
19  important?
20  A  That would be absolutely important, yes, sir.
21  Q  "You got me"?
22  A  "You got me," yes, that would be a critical
23  statement.
24  Q  What if the money that you thought was from drug
25  dealing had been buried in the ground, is that third

Page 77

1  party information if you can establish that?
2  A  Yes, sir.
3  Q  Was the information you got from Sherry Pettus
4  third party information?
5  A  Yes, sir, it was.
6  Q  How did you -- You had testified earlier that you
7  looked at the twelve accounts that were controlled by
8  Mr. Carmichael and you talked about how you found out
9  about them.
10  A  Yes, sir.
11  Q  How did you find out about the Compass account?
12  A  Ms. Pettus suggested --
13        MR. BRUNSON:  Objection, Your Honor.
14        THE COURT:  What's the basis of your
15  objection?
16        MR. BRUNSON:  It's hearsay.
17        THE COURT:  Why isn't this hearsay?
18        MR. FEAGA:  Your Honor, it is the statement
19  of a witness that's already testified before this
20  Court, Miss Pettus that I'm about to ask him about.
21  I'm merely asking him how he found out about -- he
22  testified about how he found out about these other
23  twelve accounts, I want to know how he learned of the
24  Compass account.
25        MR. BRUNSON:  I consider it hearsay, Your

Page 78

1 Honor.
2    THE COURT: What do the rules say,
3 Mr. Brunson?
4    MR. BRUNSON: This is not an exception.
5    THE COURT: How is this an exception to the
6 rules, the hearsay rules?
7    MR. FEAGA: Your Honor, I'll withdraw it.
8    THE COURT: Let's move on.
9    MR. FEAGA: We tender the witness.
10    REDIRECT EXAMINATION
11    BY MR. BRUNSON OF LOUIS WILSON:
12 Q  If all of this two hundred and forty-nine
13 thousand dollars, all of it was buried in the ground
14 in 1982, could you disagree with that?
15 A  I can disagree that it was buried -- I can't tell
16 you when it was buried, no, sir, if that's your
17 question.
18 Q  That's my question.
19 A  I can't tell you when it was buried.
20 Q  No idea. It could have been buried in 1982.
21 A  I wasn't there.
22 Q  It could have been buried in 1992. It could have
23 been buried any time. Don't you agree with that?
24 A  I agree that I don't know when the money was
25 buried.

Page 79

1 Q  All right. And that's the problem we talked
2 about yesterday, timing. You can't determine the
3 timing of when money, cash money comes into somebody's
4 possession.
5    THE COURT: I think we've gone over this
6 already.
7    MR. BRUNSON: I'm just following up, Your
8 Honor.
9    THE COURT: Just make sure it's something we
10 haven't heard. We don't need to just repeat it.
11    MR. BRUNSON: Yes, Your Honor.
12 A  I disagree with that assertion. Miss Pettus told
13 us when she came into possession of these funds. I
14 clearly know in this instant case where those funds
15 came from.
16 Q  You don't know when Mr. Carmichael came into
17 possession of those funds, do you?
18 A  When Mr. Carmichael came into possession, no,
19 sir, I can't say that for a fact. But I do know when
20 Miss Pettus did.
21 Q  It could have been in 1982?
22 A  When Mr. Carmichael came into possession of it?
23 Q  Well let me ask you about your investigation.
24 You said previously the early investigation lasted
25 until 2000. Apparently, you've investigated from

Page 80

1 about 1997 all the way through 2002, is that right?
2 A  No, sir, that's not correct.
3 Q  Well, combining the two investigations.
4 A  No, sir, that's not correct. I told you that my
5 original investigation focused on 1996 and 1997. When
6 I wrote my closing report is not the period of time
7 that I was investigating. So there would be a gap
8 from '97 until the current case began, until I became
9 involved in the current case.
10 Q  But you were asking for information historically
11 in the current case, and you said here you went back
12 to 2000 to gather the information. That's what's in
13 those boxes.
14 A  That's correct.
15 Q  So you've had all of his bank accounts for all of
16 this period, isn't that correct?
17 A  For all of what period?
18 Q  For the period of the early investigation and the
19 current investigation.
20 A  Yes.
21 Q  And you've evaluated them all.
22 A  Yes.
23 Q  And what this proves, the fact that money -- no
24 cash came out of any of these accounts, is simply
25 identifying that he didn't transfer money from these

Page 81

1 accounts to the Pettus account, does it?
2 A  It eliminates one potential source of what could
3 have been legal income.
4 Q  It proves where the money didn't come from. It
5 doesn't prove where it did come from, isn't that
6 correct?
7 A  That particular analysis proves that that money
8 did not come out of that account.
9 Q  You're proving a negative here.
10 A  I'm trying to show that those were not legitimate
11 funds earned through any of his businesses where the
12 cash or the monies were deposited into a business
13 account owned by Mr. Carmichael or maintained by Mr.
14 Carmichael and then withdrawn as cash proceeds.
15 Q  But if it were never deposited to any of these
16 accounts, you would have no idea, isn't that right?
17 A  That's not right.
18    MR. FEAGA: Your Honor -- never mind.
19 A  In this instant case we know from Miss Pettus's
20 statements to law enforcement and her --
21 Q  Excuse me. We --
22    MR. FEAGA: Your Honor, he interrupted the
23 witness and we would ask the Court to instruct counsel
24 to let the witness finish his answer.
25    THE COURT: Did you finish your answer?

Multi-Page™

Page 82

1    THE WITNESS: No, sir, I did not.
2    THE COURT: Go ahead.
3  A  In this case Miss Pettus clearly told us that she
4  received the funds from Mr. Carmichael and that they
5  were drug proceeds.
6  Q  And she didn't have any idea about those being
7  drug proceeds until you met with her, isn't that
8  right?
9  A  No, sir, that's not correct.
10    MR. BRUNSON: No further questions.
11    RECROSS-EXAMINATION
12    BY MR. FEAGA OF LOUIE WILSON:
13  Q  Mr. Brunson asked you whether or not Miss Pettus
14  had any idea whether those were drug proceeds, and you
15  said in answer to his question, you said that you
16  disagreed with that.  Do you know of reasons that
17  Miss Pettus would have, other than that have already
18  been --
19    MR. BRUNSON: Object, Your Honor.
20    MR. FEAGA: Your Honor, I'm going to
21  withdraw that.
22    THE COURT: Okay.
23  Q  After Miss Pettus gave you the third party
24  information, before Miss Pettus gave you the third
25  party information she gave you, did you know to check

Page 83

1  Compass Bank for an account in her name?
2  A  I did not.
3  Q  After she gave you the third party information,
4  did you know to check Compass Bank?
5  A  Yes, sir, I did.
6  Q  And did you do so?
7  A  I did.
8  Q  And you've testified about that account?
9  A  Yes, sir.
10  Q  And there's been other testimony during this
11  trial about that account, right?
12  A  Yes, sir.
13  Q  Do you know if there are other accounts like that
14  one, like the Compass Bank account?
15    MR. BRUNSON: Objection, Your Honor.
16    THE COURT: What's your basis?
17    MR. BRUNSON: Your Honor, there's been no
18  evidence about other accounts, no discovery about
19  other accounts.
20  Q  Do you know if there are other accounts like that
21  one out there?
22    THE COURT: He can answer that.
23  A  Yes, sir, I do.
24    THE COURT: Okay.  Now why don't you share
25  with Mr. Brunson where you're going and if I need to

Page 84

1  take it up, I'll take it up.
2    (Whereupon, Mr. Feaga conferred with
3  Mr. Brunson off the record and out of the hearing of
4  the other courtroom participants.)
5    MR. FEAGA: Your Honor, I'm not sure if the
6  witness understood my question or not.  Can I rephrase
7  it and make sure?
8    THE COURT: Yes.
9  Q  Mr. Wilson, you said that you did not know about
10  the Compass Bank account until Miss Pettus told you
11  about it.
12  A  That's correct.
13  Q  And that that's third party information.
14  A  Yes, sir.
15  Q  Do you know of any other accounts out there, I
16  think the question that I'm trying to ask you is, do
17  you know of other accounts like that one?  And I think
18  the question presupposes the answer, if you didn't
19  know about that one how would you know about any
20  others?
21  A  If you're asking if I received third party
22  information regarding a similar account, no, I have
23  not.
24  Q  All right, thank you.  No further questions.
25    MR. BRUNSON: No further questions.

Page 85

1    THE COURT: Mr. Teague?
2    MR. TEAGUE: None, Your Honor.
3    THE COURT: Thank you.  You may step down.
4    (Whereupon the witness, Louie Wilson,
5  stepped do I know from the stand.)
6    THE COURT: Next witness.
7    MR. BRUNSON: Bruce Maddox, Your Honor.
8  But, Your Honor, this may be something that we need to
9  take up outside the presence of the jury before the
10  witness testifies.
11    THE COURT: I'll excuse the jury for about
12  five minutes.
13    (Whereupon, the jury was escorted out of the
14  courtroom, and the following colloquy ensued):
15    MR. FEAGA: Your Honor, can we get a ruling
16  on Mr. Wilson?
17    THE COURT: Before we get to Mr. Wilson, who
18  is your next witness after Mr. Wilson in case we need
19  to take something up with that witness as well?
20    MR. BRUNSON: Your Honor, I don't think
21  there is anything to take up with the other witnesses,
22  except they can come in and all be sworn.
23    THE COURT: Are they all out there?
24    MR. BRUNSON: I do have a group out there.
25    THE COURT: Why don't we bring them all in

Page 86

1 and swear them all in.
2      Now what do we need to take up with regard
3 to Mr. Wilson, do you want to keep him in the
4 courtroom?
5      MR. FEAGA: Yes, sir, I do.
6      THE COURT: And you objected, I believe, Ms.
7 Wayne?
8      MS. WAYNE: I do, Judge.
9      THE COURT: And what's the basis of your
10 objection?
11      MS. WAYNE: Judge, he's a sequestered
12 witness. They didn't ask that he be designated as an
13 advisory witness at the beginning of the case. To now
14 have somebody else as an advisory witness, they have
15 Investigator DeJohn. They didn't call Agent Wilson as
16 an expert. If they had done that, he could actually
17 sit there and help them through expert testimony. We
18 called him in our case, so I believe at this point
19 it's too late, he's our witness under our subpoena.
20 We're asking that he remain under sequestration.
21      MR. FEAGA: Your Honor, as the Court knows,
22 the rule regarding --
23      THE COURT: What's the rule?
24      MR. FEAGA: Rule 615.
25      THE COURT: Let me turn to it.

Page 87

1      MR. FEAGA: Yes, sir.
2      THE COURT: Okay, I have it.
3      MR. FEAGA: Yes, sir. It says that "At the
4 request of a party, the Court shall order witnesses
5 excluded so that they cannot hear the testimony of
6 other witnesses. And it may make the order of its own
7 motion. This rule does not authorize exclusion of a
8 party who is a natural person or officer or employee
9 of a party which is not a natural person designated as
10 a representative; three, or a person whose presence is
11 shown by a party to be essential to the presentation
12 of the party's cause."
13      And that's what we're asking the Court to
14 do. In an abundance of fairness to the defense, we
15 left Mr. Wilson out of the case until such time as he
16 actually testified. But they're now getting ready to
17 put on their expert on the finances who has sat
18 through this entire trial listening to the testimony
19 of every witness. Mr. Wilson is our financial expert.
20 We think now that he's testified, they called --
21      THE COURT: Who is their expert on finances?
22      MR. FEAGA: Murray Argo.
23      THE COURT: I didn't know this. Where is
24 Mr. Argo.
25      MS. WAYNE: He's been here, Judge. I

Page 88

1 designated him at the very beginning during jury
2 selection.
3      THE COURT: I just didn't know he's your
4 expert. Will you have him stand?
5      MS. WAYNE: He's actually getting our
6 witnesses I think right now.
7      THE COURT: Is he the tall gentlemen seated
8 by Mr. Teague?
9      MS. WAYNE: Yes.
10      THE COURT: And he's been excluded from the
11 rule?
12      MR. FEAGA: Yes, sir, he has been excluded
13 from the rule. He's been sitting through the entire
14 trial and now he's about to testify. He heard Mr.
15 Wilson's testimony as well, and we would like now in
16 anticipation that we may have rebuttal, to have our
17 financial expert here to hear what's going on so that
18 he can help us --
19      THE COURT: Is there anything else on this
20 issue?
21      MR. FEAGA: No, sir.
22      THE COURT: I'll grant the exclusion for the
23 purpose of hearing the expert testimony since he's
24 already testified about fact issues. So the objection
25 is overruled.

Page 89

1      Okay. Let's swear in all witnesses.
2      MR. TEAGUE: Your Honor, do you want me to
3 bring mine that are here?
4      THE COURT: Yes, all of them that are here.
5      MR. TEAGUE: I'll need just a second, Your
6 Honor.
7      MR. FEAGA: Your Honor, since, and I'm not
8 complaining I'm just saying since we have no idea
9 where this witness is going, can I simply accept the
10 Court's ruling that Mr. Wilson is free to stay now?
11      THE COURT: Yes.
12      MR. FEAGA: Yes.
13      THE COURT: He's free to listen to the
14 expert testimony only. He doesn't need to listen to
15 anything that's just facts in the trial.
16      MR. FEAGA: What about other testimony
17 related to financial activities?
18      THE COURT: Other testimony related to
19 financial activity, yes.
20      MR. FEAGA: All right. Can we get some
21 proffer here, then, before we send him out? Is Mr.
22 Maddox going to be testifying about finances?
23      MR. BRUNSON: Finances? I think it could
24 fall under that category.
25      THE COURT: Very good. He may stay.

Multi-Page™

### Page 90

1    COURTROOM DEPUTY CLERK: All witnesses
2 please come forward for the oath.
3    (Whereupon, all prospective witnesses
4 currently present were duly sworn by the courtroom
5 deputy clerk.)
6    THE COURT: Bring in the jury.
7    (Whereupon, the jury was escorted into the
8 courtroom.)
9    COURTROOM DEPUTY CLERK: Judge, we're not
10 ready for the jurors. It's my understanding they have
11 a privilege matter.
12    THE COURT: Oh, I didn't realized that. I'm
13 sorry. Okay. Don't bring in the jury just yet.
14    What's the issue here with regard to Mr.
15 Maddox?
16    MS. WAYNE: Mr. Maddox was prior counsel for
17 Mr. Carmichael, Judge. Even though he is not present
18 counsel, we believe that it's appropriate and would
19 make Mr. Maddox I assume feel more comfortable along
20 with the client that he, Mr. Carmichael, actually will
21 waive the privilege as to his representation.
22    THE COURT: You ask the questions of Mr.
23 Carmichael.
24    MS. WAYNE: Thank you, Judge.
25    THE COURT: I believe he's already under

### Page 91

1 oath. He was sworn in the first day.
2    MS. WAYNE: Mr. Carmichael, as to this
3 witness, Mr. Maddox, Mr. Maddox was your prior
4 attorney, correct?
5    DEFENDANT CARMICHAEL: That's right.
6    MS. WAYNE: And have you discussed with
7 waiving the privilege as to communications that were
8 made with Mr. Maddox during this period of time that
9 we're calling him?
10    DEFENDANT CARMICHAEL: Yes.
11    MS. WAYNE: Do you waive that privilege as
12 to Mr. Maddox in terms of that?
13    DEFENDANT CARMICHAEL: I do.
14    MS. WAYNE: I don't know if Mr. Maddox would
15 want --
16    THE COURT: Do you have anything else you'd
17 like to --
18    MR. MADDOX: I just want to specifically be
19 sure that he's waiving the privilege as to any
20 communications he's made to me or anything I might
21 have said to him.
22    THE COURT: Why don't you ask him. I'll
23 allow you to ask him.
24    MR. MADDOX: All right, sir.
25    Mr. Carmichael, are you specifically waiving

### Page 92

1 any and all privileges you may have and releasing me
2 to discuss things that you and I have talked about in
3 the course of my various representations of you?
4    DEFENDANT CARMICHAEL: Yes, I am.
5    MR. MADDOX: Okay. And does that apply also
6 to any responses or advice I may have given to you
7 during the course of my representations of you?
8    DEFENDANT CARMICHAEL: That's correct.
9    MR. MADDOX: I'm satisfied.
10    THE COURT: Satisfied? Good. Bring in the
11 jury.
12    MR. MOORER: Your Honor, before we bring the
13 jury in --
14    THE COURT: And, Mr. Carmichael, your waiver
15 is voluntary?
16    DEFENDANT CARMICHAEL: Yes, sir.
17    THE COURT: No one has promised you
18 anything?
19    DEFENDANT CARMICHAEL: No.
20    MR. MOORER: Your Honor, one more thing --
21    MR. FEAGA: We wanted to make the Court
22 aware that Mr. Maddox, I think, has represented Sandra
23 Jones in the past in this matter, and I want to make
24 sure that we have a similar --
25    THE COURT: Well, she can waive that.

### Page 93

1    MR. FEAGA: I understand. I just want to
2 make sure we're not going to run afoul of that before
3 he starts testifying because I have no idea what he's
4 going to testify to.
5    MS. WAYNE: Well, Judge, we'll make an offer
6 of proof that we don't intend to get into anything to
7 do with anyone else other than his representation of
8 Mr. Carmichael.
9    THE COURT: Very good.
10    MR. MOORER: One final issue, Your Honor.
11 And I don't know, because this is the first we've seen
12 Mr. Maddox in this matter, and that is if he is going
13 to testify in such a way as to maybe allow them to
14 make a reliance upon counsel argument and defense, I
15 think, and I haven't had a chance to research the
16 rule, but I think there might be a requirement of
17 notice if that is going to be part of their defense.
18    THE COURT: Well you need to let me know. I
19 can't rule on it if notice is required. Where is it
20 in the rule?
21    MR. MOORER: I don't know what the witness
22 is going to say, Your Honor.
23    . THE COURT: Is the witness going to say
24 something about Mr. Carmichael relied on his advice in
25 engaging certain activity?

Page 98

1 Q Now did you and Mr. Carmichael, or did you
2 develop a strategy on dealing with the I. R. S.
3 investigation in 1996 or 1997?
4 A Yes. Basically I think Leon had developed the
5 strategy. He just wanted to make sure it was carried
6 out in the right way. The strategy was to, quite
7 simply, open up the books and let them ask any
8 question they wanted and hopefully make the problems
9 go away so there wouldn't be any question about
10 anything.
11 Q Did y'all agree and make an effort to cooperate
12 with the I. R. S. in their investigation during that
13 period?
14 A We did.
15 Q Now regarding Mr. Carmichael's conducting
16 business at the time, do you know what businesses he
17 was operating?
18 A In terms of formal names I know he had
19 Multi-Investments, which as I recall was primarily a
20 trucking company. He had a bar -- not a bar, kind of
21 a club that had entertainment and so forth. And I
22 think the name was Unique, or something like that.
23 And he also had considerable investments in rental
24 property that he had accumulated over a number of
25 years.

Page 99

1 Q And during that period was he receiving income
2 from all of those sources?
3 A Yes.
4 Q Mr. Maddox, did you make a recommendation to Mr.
5 Carmichael regarding the handling of the monies he
6 received from those businesses during that time?
7 A I made some recommendations. I would have to say
8 we met, and I recall two specific lengthy meetings
9 with agents, one of which was a meeting with I think
10 Louie Wilson and the accountant at the time, Ashley
11 Duncan. And I think Judge Hardwick was there and I
12 was there. And at the conclusion of that meeting we
13 did make certain recommendations to him about the
14 handling of money.
15 Q You and Judge Hardwick made those
16 recommendations?
17 A Yes.
18 Q What were those recommendations?
19 A Basically, because he dealt with cash, there
20 seemed to be particularly some cash flows from his
21 entertainment business, like people getting cash for
22 cover fees --
23     MR. MOORER: Objection, Your Honor. I don't
24 believe this answer is responsive. He asked him what
25 recommendations they made and he's going into Mr.

Page 100

1 Carmichael's --
2     THE COURT: I think what you need to do is
3 tell us first what the recommendation was. And if
4 you'd like, then to explain why you made the
5 recommendation. I'll allow to you do that.
6     THE WITNESS: All right, sir.
7 A I and Judge Hardwick both recommended to him that
8 he not put all of his cash into the bank. That would
9 be the recommendation. If you'd like to know why I
10 can tell you.
11 Q What was the basis of your recommendation?
12 A Okay. He had fairly significant cash flow. I
13 don't recall whether he was paid rent in cash by his
14 renters or not --
15     MR. MOORER: Objection, Your Honor, because
16 unless this witness has firsthand knowledge that
17 people were giving him cash, rental income or from a
18 nightclub, he would not be competent to testify to
19 that.
20     THE COURT: Whether Mr. Carmichael in fact
21 had this income is for the jury to decide. But he can
22 tell if the jury should conclude that Mr. Carmichael
23 had the income, what his advice is and so forth.
24 Overruled.
25 A My recollection is that my information was that

Page 101

1 he had some cash income from the payment of rent by
2 some of the renters. That he had sometimes
3 significant cash income from the entertainment
4 business.
5     He also had some dealings with cash in the
6 course of his trucking business because of something
7 called Com checks that I'm not certain I ever
8 understood entirely. But it worked better for his
9 employees sometimes to get cash. And some of them
10 would in fact insist on it. Because of the nature of
11 the investigation as it had seemed to develop because
12 no matter what we said the agents seemed really --
13     MR. MOORER: Objection, Your Honor.
14     THE COURT: I'll sustain that.
15 A Well at any rate, I had concerns, number one,
16 that if --
17     MR. MOORER: Your Honor, I'm objecting to
18 the narrative form now that the witness is testifying.
19 I would ask that he be asked some questions.
20     THE COURT: Yes, you need to ask questions
21 so that he'll know what the witness is going to say.
22 Q What other basis, if any, did you rely on, Mr.
23 Maddox?
24 A It was and is common practice when the
25 government, particularly the D. E. A., believes that

Page 102

1 your money is from illegal sources, they will seize it
2 all and ask questions later.
3       MR. MOORER: Objection, Your Honor, to the
4 characterization of that.
5       THE COURT: Well, whether it's true or not
6 is not the question. The thing is this, is this the
7 advice he gave.
8       Go ahead.
9 A  They will go ahead and clean out your bank
10 accounts without you having a chance to challenge it
11 in court. The money is then held and the Drug
12 Enforcement Administration will send you paperwork
13 saying that it's going to be forfeited without a court
14 hearing unless you file specific legal documents with
15 them within a certain amount of time.
16       Then, once you file that document, the U. S.
17 Attorney gets a chance to spend some months deciding
18 whether they will file an action to condemn your
19 property. Then they file the thing. That can be six,
20 search, or eight months and more depending on how they
21 go about doing it, that you don't have the money, you
22 don't have the ability to support yourself, you can't
23 hire a lawyer to protect you, nothing. And then they
24 may file a lawsuit that you can go to court and try to
25 get your money back. And then those cases sometimes

Page 103

1 go on for years.
2       So I recommended to him, based on that kind
3 of potential and the altitude I saw in law enforcement
4 at the time, that he not put all his money in banks so
5 that he do continue to operate his businesses and
6 defend himself if he needs to if they did what they
7 routinely do in so many cases.
8 Q  Now, Mr. Maddox, after you made that
9 recommendation to him based on your experience, did
10 there come a time when that investigation was
11 terminated?
12 A  I found out, I think, in 2004 that it had been
13 terminated. But they didn't notify us. When this
14 case came up I saw that Mr. Wilson had filed a
15 document I think in 1998 suggesting termination, and
16 this is the first I've known about it.
17 Q  Thank you very much.
18       THE COURT: Is that it?
19       MR. BRUNSON: Yes, Your Honor.
20       THE COURT: Mr. Teague?
21       MR. TEAGUE: No questions.
22       THE COURT: Cross?
23              CROSS EXAMINATION
24         BY MR. MOORER OF BRUCE MADDOX:
25 Q  Mr. Maddox, let me go back in time. Now today

Page 104

1 you've testified about your representation of Mr.
2 Carmichael, correct?
3 A  Yes, sir.
4 Q  And you're an attorney practicing in the state of
5 Alabama, correct?
6 A  Yes, sir.
7 Q  And there are certain rules that govern all
8 attorneys that practice in the state of Alabama,
9 correct?
10 A  There are.
11 Q  And one of the chief rules for people who are in
12 private practice is the rule of confidentiality, isn't
13 that correct?
14 A  That's correct.
15 Q  Which means that when you have a client who comes
16 to you or any other lawyer, that lawyer cannot
17 disclose the information about that conversation
18 without the client giving permission to do that,
19 correct?
20 A  Or without a specific court order that may
21 relieve him of that responsibility, yes.
22 Q  But without those two things, whatever a client
23 tells you, has to be kept in confidence, correct?
24 A  That's correct.
25 Q  And that's every lawyer, right?

Page 105

1 A  Yes.
2 Q  And --
3 A  Although I think there were some rulings that
4 government lawyers don't have to do that.
5 Q  Well I'm talking about private practitioners.
6 A  Okay.
7 Q  If you'll follow the questions. I'm asking you
8 some specific questions, and we're talking about
9 private practitioners such as yourself.
10 A  Okay.
11 Q  And so prior to you coming into court today I
12 would not have been able to talk with you and receive
13 information such as some of the information that you
14 have disclosed in court here today, would I?
15 A  Probably not.
16 Q  Without Mr. Carmichael consenting to it or a
17 court ordering you to give that information or
18 allowing to you give that information.
19 A  That's correct.
20 Q  So did you make a file when Mr. Carmichael came
21 to your office?
22 A  Yes.
23 Q  And did you bring that file with you today?
24 A  No.
25 Q  And I wouldn't have been able to see it prior to

Page 106

1 you getting on this stand anyway, would I?
2 A  Wouldn't be able to what?
3 Q  Your files are covered by the same
4 confidentiality as any conversation that anybody would
5 have had with you, isn't that so?
6 A  My files are covered by confidentiality but as to
7 the Carmichael file, you probably have everything
8 that's in it.
9 Q  Well my question is --
10      (Unintelligible; two speaking at once.)
11      THE COURT: Just a minute.  Just a minute.
12 The only question was -- he asked you a specific
13 question.  You shouldn't volunteer.
14      THE WITNESS: I'm sorry.
15 Q  Are your files that you have related to Mr.
16 Carmichael or any other client, they're confidential
17 to the same extent as to the conversations you might
18 have with them, correct?
19 A  That's correct.
20 Q  I would have had to have gone through that same
21 procedure if I was to obtain access to your file about
22 your representation of him, correct?
23 A  No, you wouldn't have had to do that.
24 Q  Now you said that Mr. Carmichael had developed
25 his strategy of just throwing open his books and

Page 107

1 letting the I. R. S. look at anything they wanted to.
2 That was your testimony on direct, is that right?
3 A  That's right.
4 Q  Did you know at that time, or any time subsequent
5 to meeting with Mr. Carmichael, that he had an account
6 or that Miss Sherry Pettus had an account at Compass
7 Bank?
8 A  In '96, '97?  I had no knowledge of Sherry Pettus
9 at that time.
10 Q  When did you meet with Mr. Carmichael?
11 A  '96, '97.
12 Q  And at that time did you know if he had an
13 account or that -- let me back up.  At that time when
14 you met with him in '96 or '97, did you know if
15 Miss Sherry Pettus had an account at Compass Bank?
16 A  No, I had no knowledge of that, except that
17 this --
18 Q  No, my question is did you know that.  If you'll
19 follow my questions, I'm asking you some specific
20 questions.
21 A  Do it again.
22 Q  Yes.  In '96 or '97 when you met with Mr.
23 Carmichael, did you know Sherry Pettus?
24 A  Yes.
25 Q  Did you know whether or not she had an account at

Page 108

1 the Compass Bank at that time?
2 A  I think she probably didn't.
3 Q  No, my question is did you know whether or not
4 she did?  Either you did or you didn't.
5 A  It is my belief --
6      MR. BRUNSON: I'm objecting.
7      THE COURT: Yes.  It is not a question of
8 what you believed or not.  Did you know whether or not
9 Miss Pettus had an account?
10      THE WITNESS: I think I did, Your Honor.
11      THE COURT: Okay, then.
12 Q  Now, you're familiar with the law called
13 structuring, aren't you?
14 A  Relatively.  I wouldn't you call myself an expert
15 in it.
16 Q  I asked you if you were familiar with it.  I
17 didn't ask you if you were an expert.
18 A  Yes.
19 Q  And by virtue of the definition you're an
20 attorney you have special training and experience in
21 the law, correct?
22 A  That's correct.
23 Q  And are expert enough to have passed the Bar
24 examination and be licensed to practice in the state
25 of Alabama, correct?

Page 109

1 A  Well, twenty-eight years ago I was at least.
2 Q  And you're practicing still today, aren't you?
3 A  Yes.
4 Q  And as an attorney -- and you practice federal
5 criminal defense, don't you?
6 A  I do.
7 Q  And you have had a number of cases where you've
8 defended and I've prosecuted.
9 A  That's right.
10 Q  And in the course of your tenure as a federal
11 practitioner you've become familiar with structuring,
12 haven't you?
13 A  Yes.
14 Q  And structuring is what occurs when an individual
15 takes a large sum of money and breaks the deposits
16 down into less than ten thousand dollar increments and
17 deposits them into bank accounts, isn't that so?
18 A  If it's done intentionally, yes.
19 Q  And if that money is intentionally broken down
20 and put into bank accounts to avoid that ten thousand
21 dollar reporting requirement, that's what's called
22 structuring, isn't it?
23 A  That's what the government calls structuring,
24 yes, sir.
25 Q  Well that's what the law calls structuring, isn't

## Page 110

1 it?
2 A  Well, I'm not sure I can answer that without
3 getting into my beliefs about the constitutionality of
4 it.
5 Q  I'm not asking you about your beliefs. I'm not
6 asking you about constitutionality. My question to
7 you, Mr. Maddox, is that is what's called structuring,
8 isn't it?
9 A  In most cases, yes.
10 Q  Well, you've represented individuals who have
11 been charged with doing that very thing and convicted
12 of that very thing, have you not?
13 A  Yes. Once.
14 Q  Now you never told Mr. Carmichael when you met
15 with him during your meeting in '96 or '97 to tell
16 Sherry Pettus to take money and put it in in such a
17 way as to avoid that ten thousand dollar reporting
18 requirement, did you?
19 A  No, I didn't him that.
20        MR. BRUNSON: Objection, Your Honor.
21        THE COURT: Overruled.
22 A  I didn't tell him that.
23 Q  And you didn't tell her that either, did you?
24 A  No, I never talked to her about Leon Carmichael.
25 Q  Well certainly if you had had a chance, you never

## Page 111

1 would have told her that, would you?
2        MR. BRUNSON: Objection, Your Honor.
3 A  Told her --
4        THE COURT: Just a minute now. What is your
5 question again?
6 Q  You wouldn't advise anybody to go out and
7 structure transactions, would you?
8        THE COURT: Wait a minute. He said he
9 didn't do it. He didn't make that advice. What's the
10 point here?
11        MR. MOORER: Your Honor, the point is there
12 has been allegations and inferences laid by the
13 defense that Miss Pettus may have been instructed to
14 do that. I'm simply trying to get this witness --
15        THE COURT: Well he said he didn't do it.
16 So let's move on.
17        MR. MOORER: Yes, Your Honor, I'll move on.
18 Q  Now you talked about certain advice that you gave
19 to Mr. Carmichael because of certain cash that he was
20 concerned about. Do you recall that testimony that
21 you gave just a moment ago?
22 A  I didn't say it was because he was concerned
23 about it, but I do recall the testimony you're talking
24 about.
25 Q  Isn't it a fair characterization to say that Mr.

## Page 112

1 Carmichael came to you because he had cash money that
2 he was concerned about protecting?
3 A  No.
4 Q  Well, in any event, you had discussions with him
5 about potential cash that he might have, did you not?
6 A  After meeting with the government agents twice
7 and seeing what they were saying and doing yes, I did
8 have discussions about that with him. I'm not sure
9 the scope of his question, but if -- I think it
10 answers it more fully to say --
11        MR. MOORER: Your Honor, I believe that he
12 had answered the question.
13        THE COURT: Well he said he wasn't sure
14 about his answer.
15        Did you want to add anything to your answer?
16        THE WITNESS: I did, Your Honor.
17        THE COURT: What is it?
18        THE WITNESS: It is that the concern about
19 cash only became significant after the government
20 agents indicated that they were going to be pursuing
21 him. And since we had no way of knowing when that
22 would be over one way or the other, that's why we gave
23 him the advice.
24 Q  And the advice concerned cash. You told him to
25 take his cash and not put it in a bank, according to

## Page 113

1 your testimony.
2 A  Well, that's not entirely accurate. What we told
3 him was that he should keep -- the law doesn't require
4 you to put your money in the bank; and, number two, he
5 should keep cash out of the bank to protect himself if
6 the government started a further attack on him.
7 Q  So the answer to my question is yes, you told him
8 not to keep all of his money in the bank.
9 A  That's right.
10 Q  So that presupposes that he would have money or
11 cash to try to protect in some way, isn't that so?
12 A  In the greater scheme, yes.
13 Q  And you were never present at, say, any of these
14 places such as the rental places to see people
15 actually paying rent to Mr. Carmichael, were you?
16 A  No.
17 Q  And you weren't present at the Carmichael Center
18 to see cash money being paid to Mr. Carmichael, were
19 you?
20 A  Well the Carmichael Center didn't exist then.
21 Q  That's not my question. Were you present to see
22 cash money paid to him through the Carmichael Center?
23 A  No.
24 Q  In fact, any cash that he might have had, the
25 only way you would have known about it would have been

Multi-Page™

## Page 114

1 through him telling you about it, correct?
2 A  Well, him and Mr. Duncan, his accountant.
3 Q  Well Mr. Duncan would have been in the same
4 position you would have been in, wouldn't he?
5 A  I don't know.
6 Q  Mr. Duncan is dead now, isn't he?
7 A  Sir.
8 Q  Mr. Duncan is dead now, isn't he?
9 A  Don't know.  I haven't seen him in seven or eight
10 years.
11 Q  And you made it a point in your direct
12 examination to talk about the procedures by which
13 money may be seized and forfeited from individuals who
14 are involved in illegal activity.  Do you recall your
15 testimony in that regard?
16 A  Yes, sir, I do, but I made it a point to --
17     MR. MOORER:  Your Honor, I object.  This is
18 not responsive.
19     THE COURT:  Just a minute.  It was a very
20 simple and direct question.  He said do you recall.
21     THE WITNESS:  My answer is yes.
22 Q  Now you as a practicing attorney know that there
23 are laws that allow for money to be taken from people
24 who are engaged in illegal enterprises such as drug
25 dealing, correct?  Are there laws to that effect?

## Page 115

1 A  Yes.
2 Q  And there are procedures by which when money is
3 taken from a person who is engaged in that type of
4 activity, where they can come to court and contest
5 that, correct?
6 A  Yes, sir.
7 Q  And those are statutes that are passed by
8 Congress of this United States, correct?
9 A  That's correct.
10 Q  It's not something that's just a decision made by
11 a prosecutor such as myself that that's the way things
12 will be done, is it?
13 A  In part it is.
14 Q  Well, I'm not saying -- And there are procedures
15 that govern how that should be done, correct?
16 A  Well they're not followed.
17 Q  No, that's not my question.  There are procedures
18 that in place to govern how that's done, correct?
19 A  There are procedures.
20     THE COURT:  Anything else?
21     MR. MOORER:  Your Honor, if I may review my
22 notes?
23     (Whereupon, Mr. Moorer examined various
24 documents at counsel table.)
25 Q  Did you ever advise Mr. Carmichael to place any

## Page 116

1 money in bank accounts which would have other people's
2 names on those bank accounts?
3 A  No, sir.
4     MR. MOORER:  No further questions, Your
5 Honor.
6     THE COURT:  Mr. Brunson?
7         REDIRECT EXAMINATION
8       BY MR. BRUNSON OF BRUCE MADDOX:
9 Q  Mr. Maddox, it's not against the law not to put
10 your money in the bank, is it?
11 A  No.
12 Q  And when you provided that advice to Mr.
13 Carmichael, were you relying on your experience both
14 as a prosecutor and a defense attorney relating to
15 that advice?
16 A  Yes.
17 Q  And was that in an effort to protect Mr.
18 Carmichael's assets from government seizure?
19 A  In part it was.  The complete answer, if I might,
20 it was in part to protect his assets from government
21 seizure, but more so to protect his assets from
22 wrongful government seizure because they tend to seize
23 everything and then you can't get it back.
24     MR. MOORER:  Objection.  He --
25     (Unintelligible; two speaking at once.)

## Page 117

1     THE COURT:  Just a minute.  Just a minute.
2 I think you've already told us this,
3 haven't?
4     THE WITNESS:  Perhaps I have, Your Honor.
5     THE COURT:  Unless it's something new, let's
6 move on.
7     MR. BRUNSON:  No further questions.
8         RECROSS EXAMINATION
9       BY MR. MOORER OF BRUCE MADDOX:
10 Q  It's against the law to deal drugs, is it not?
11 A  Yes.
12 Q  And it's against the law to take the profits from
13 dealing drugs and conduct financial transactions with
14 a bank, isn't it?
15 A  Yes.
16 Q  That's called money laundering, isn't it?
17 A  Assuming it's unlicensed drug dealing.
18 Q  Yes.  I'm talking about from the illegal dealing
19 of drugs?
20 A  Yes.
21     MR. MOORER:  No further questions.
22       FURTHER REDIRECT EXAMINATION
23     BY MR. BRUNSON OF BRUCE MADDOX:
24 Q  Mr. Maddox, it's not illegal to put money in the
25 bank in the name of someone else, is it?

Multi-Page™

| Page 118 |
| --- |

1 A I hope not. That's how my daughter pays for
2 college.
3   (Laughter.)
4   THE COURT: Mr. Teague?
5   MR. TEAGUE: No questions.
6      FURTHER RECROSS EXAMINATION
7      BY MR. MOORER OF BRUCE MADDOX:
8 Q It's against the law to put money that comes from
9 drug dealing in an account in somebody else's name,
10 isn't that so?
11 A I'm not sure it is.
12   MR. TEAGUE: Your Honor, we object to the
13 question. It's argumentative. It begs a question --
14   THE COURT: Well, I'll overrule you to the
15 extent that it's argumentative.
16 Q You're familiar with the term called "nominee
17 names," correct?
18 A Yes.
19 Q And nominee transactions are transactions that
20 occur with a financial institution like a bank where
21 someone uses another person to do something to hide
22 their involvement with the money; that's nominee names
23 in a nutshell, correct?
24 A Yes.
25 Q And it would be illegal for a nominee transaction

| Page 119 |
| --- |

1 with drug money to be done with a financial
2 institution, correct?
3 A It would be illegal for a person doing the
4 transaction to do that, yes. I don't think it would
5 be illegal for the bank if they had no knowledge or
6 the person in whose name the account was if they had
7 no knowledge.
8 Q But certainly the person who generated the money
9 from the drug dealing, that person would have criminal
10 liability. In other words, it would be against the
11 law?
12   THE COURT: Why are we going into this? I
13 will charge the jury on what constitutes criminal
14 liability, the law and the jury finds the facts. Mr.
15 Maddox is not the judge here, he's not the one who
16 determines criminal liability. I determine what the
17 law is. You determine the facts, and as a result you,
18 the jury, decide whether there is criminal liability.
19   MR. MOORER: Yes, Your Honor. No further
20 questions.
21   THE COURT: Okay.
22   MR. BRUNSON: No further questions.
23   THE COURT: Thank you. You may step down.
24   (Whereupon the witness, Bruce Maddox,
25 stepped down from the stand.)

| Page 120 |
| --- |

1   THE COURT: Next witness.
2   MR. BRUNSON: Your Honor, this witness may
3 be lengthy.
4   THE COURT: Who is it?
5   MR. BRUNSON: Mr. Gunn.
6   THE COURT: Okay. I'll excuse the jury,
7 then, until one o'clock. I think it's five of twelve
8 now. Counsel, please remain.
9   (Whereupon, the jury was escorted out of the
10 courtroom and the following colloquy ensued):
11   THE COURT: Who is this witness?
12   MR. BRUNSON: Your Honor, I failed to have
13 his first name, Mr. Gunn is the contractor that built
14 the Carmichael Center.
15   THE COURT: Okay. Very good.
16   Now how many more witnesses are we looking
17 at this afternoon?
18   MS. WAYNE: Twelve. And I think they're
19 pretty quick kind of, Judge.
20   THE COURT: Very good. Anything else we
21 need to take up before we reconvene at one o'clock?
22   MR. FEAGA: No, sir.
23   THE COURT: Okay. Now, Counsel, you were
24 supposed to have gotten briefs to me this morning, I
25 believe, and case law on the issue we discussed

| Page 121 |
| --- |

1 in-camera if I remember correctly. Weren't you? I
2 believe that the government filed its brief, but I
3 don't think I got anything from the defendants.
4   MS. WAYNE: Judge, in terms of the --
5   THE COURT: The matter we discussed
6 in-camera and its implications for you. The
7 government did file its brief, but I didn't get
8 anything from the defendants. I would like something
9 from you by tomorrow morning.
10   MS. WAYNE: I misunderstood, I thought you
11 just wanted case law from us.
12   THE COURT: No, I want a brief.
13   MS. WAYNE: All right.
14   THE COURT: Okay, thank you.
15   (Whereupon, the luncheon recess was
16 taken.)
17      IN-CHAMBERS CONFERENCE:
18   THE COURT: Counsel, something about this
19 morning. Unless Miss -- Where is Miss Chartoff?
20   MS. WAYNE: I sent her to --
21   THE COURT: Unless Ms. Chartoff can convince
22 me otherwise, my outcome is going to be the same.
23 However, Miss James said something that got me to
24 start thinking. I cannot be called as a witness in a
25 state court proceeding, but my findings can be used in

Page 122

1 a state court proceeding. So therefore, I would like
2 to be careful about what I say in ruling on the
3 request you have made to me. I have to rule on that
4 request.
5      MS. WAYNE: Right.
6      THE COURT: You've put it to me, so I have
7 to rule on it. But I want to choose my words
8 carefully. I told you that I was going to issue a
9 written opinion which will come out, but I want to
10 carefully think about what I'm going to say in that
11 opinion because I'm aware of what Miss James said. It
12 could have collateral consequences.
13      So, therefore, I'm putting everyone in this
14 room under order that what I said this morning is not
15 to be released to either Mr. DeJohn or his attorney.
16      MS. JAMES: Can these proceedings be sealed?
17      THE COURT: Oh, they're definitely sealed.
18 But I will issue a written order and that may have a
19 totally different wording. I don't know, I may adopt
20 what I said this morning, but of course how you say
21 something is just important as what you say and the
22 conclusions you reach. So I don't want the U. S.
23 Attorney or anybody else relating to Mr. DeJohn or his
24 attorney my findings yet.
25      I may recant those findings. While I don't

Page 123

1 think the result will be different, but I may say it
2 in a different way. You understand what I'm saying?
3      MS. WAYNE: Yes.
4      MR. FEAGA: Your Honor, I wasn't around but
5 I see my co-counsel looking at me. I know I had to go
6 to the bank so I missed the meeting afterwards, but I
7 think everybody from our group has gone downstairs.
8 To the extent that anything has been shared with him
9 already about what happened --
10      THE COURT: Well I want to know now. Has
11 anything been shared to Mr. DeJohn about my findings
12 this morning?
13      MR. MOORER: Yes, Your Honor. We shared
14 with him that we had a meeting back here, and that
15 part what we met about was the impact of the
16 dismissal.
17      THE COURT: What did you tell him?
18      MR. MOORER: We told him that that lawsuit
19 was dismissed -- or that we had told you that the
20 lawsuit was dismissed and that we thought that you
21 were going to allow him to be called back to the stand
22 if they chose.
23      THE COURT: But you never told him the
24 things about my comments about the merits of his case,
25 did you?

Page 124

1      MR. MOORER: We said that the Judge said
2 essentially what he had said earlier that you had said
3 in your order, that a lawsuit was proper and that you
4 were surprised that it wasn't filed sooner.
5      THE COURT: Okay. That's it?
6      MR. MOORER: I'm trying to count back.
7      THE COURT: I know you're trying count back.
8      MS. JAMES: I consulted legal counsel at
9 lunch, Jeff Duffy.
10      THE COURT: I want time to carefully choose
11 my words, is the bottom line. And I don't want Mr.
12 DeJohn coming here asking for my oral words. I want
13 my written words to count. As I told you, I was going
14 to reduce it to writing and those are the words I want
15 to use. So the findings this morning are not my final
16 findings. I want to put that on the record right now
17 and they should not be viewed by anybody or by any
18 court as my final findings. What I write will be my
19 final findings.
20      MS. WAYNE: So can we file, then -- So our
21 brief should not refer to --
22      THE COURT: Your brief can refer to things
23 this morning, but I just want to make sure that -- You
24 know, in civil cases lawyers will quite often say to
25 me Judge, would you mind taking back something because

Page 125

1 it could affect another case. Even though my findings
2 are totally appropriate it could have collateral
3 consequences. And I just thought about what Ms. James
4 said, and I said maybe I made findings that could have
5 collateral findings that unintended but are still
6 proper. And I want to make sure that what I write is
7 narrowly tailored to just the issue that's before me.
8      MS. WAYNE: Judge, do you mind if we file
9 that under seal?
10      THE COURT: File what under seal?
11      MS. WAYNE: The brief?
12      THE COURT: No, not at all. But what I
13 write -- I just want to put you all on notice that
14 what I write will be my findings, because I want to
15 make sure that I don't impinge on the state court
16 proceedings. Because you're entitled to a ruling.
17 Now I may have to, in ruling on it, I may have to do
18 something, but I want to make sure that I don't
19 impinge beyond the extent necessary.
20      So what I said this morning, as I said
21 before, should not be revealed to anybody else. You
22 tell Mr. DeJohn that as far as my comments about his
23 lawsuit, that I have recanted those.
24      MR. MOORER: Yes, sir.
25      MS. WAYNE: And, Judge, I can tell you that

Multi-Page™

Page 126

1 Mr. Carmichael has been insistent about this, and he
2 has communicated to both Miss James and I and he would
3 like to make a comment.
4        THE COURT: Okay, we'll take that up in a
5 minute. You tell him that I've recanted that and he
6 will get a written opinion from me and it's the
7 written that will count. And tell him I've totally
8 taken back what I said in chambers.
9        MS. WAYNE: Go ahead.
10       THE DEFENDANT: What I wanted to say, I take
11 full responsibility for the website, the results
12 whatever happened. I just hope it wouldn't have
13 nothing to do with the attorneys or anyone else
14 because it was my idea and I take full responsibility
15 for it.
16       THE COURT: Okay. Anything else?
17       MR. MOORER: Your Honor, one more
18 housekeeping matter. During the lunch break
19 Miss Pettus asked if she could be excused. I told
20 Miss Pettus that I was not going to tell her to be
21 excused or not, but I talked with Mr. Brunson and he
22 said as long as he had a phone number where he could
23 reach her, she gave me a phone number and I gave it to
24 Mr. Brunson and she promised me that she would keep it
25 on every day until five-thirty.

Page 127

1        MR. FEAGA: And that goes likewise for us.
2 We may have her back, too. But I don't mind her
3 leaving if we can get her back. But I don't want to
4 let her go if there is going to be some issue if she
5 takes some time to get back here, Terry.
6        MR. MOORER: She indicated that she was
7 going to be right here where she could be called back.
8        MS. MORRIS: I'm not sure that we should
9 rely upon Miss Pettus to keep --
10       MR. MOORER: When can call her back up.
11       THE COURT: I'll leave that up to you all.
12 Let's go to court.
13       (Whereupon, the in-chambers conference was
14 concluded.)
15            IN OPEN COURT
16       (THE JURY IS NOT PRESENT):
17       THE COURT: Are we ready to proceed,
18 Counsel?
19       MS. WAYNE: Yes.
20       THE COURT: Bring in the jury and let's
21 proceed.
22       (Whereupon, the jury was escorted into the
23 courtroom.)
24       THE COURT: Yes, Mr. Brunson?
25       MR. BRUNSON: Mr. Alan Gunn.

Page 128

1        THE COURT: Mr. Alan Gunn.
2            A L A N    G U N N,
3 the witness herein, having first been duly sworn or
4 affirmed to tell the truth, was examined and testified
5 as follows:
6            DIRECT EXAMINATION
7        BY MR. BRUNSON OF ALAN GUNN:
8 Q What's your name, sir?
9 A Alan Gunn.
10 Q Mr. Gunn, what do you do?
11 A I'm president of Scientific Engineering and
12 vice-president of Thrifty Portable Buildings.
13 Q What does Scientific Engineering do?
14 A Engineering work, of course, and have done design
15 and built construction work.
16 Q How long have you been doing that?
17 A Well, I started engineering in 1978, and been
18 doing construction work probably in the last twelve
19 years.
20 Q Are you a general contractor?
21 A Yes, sir.
22 Q And did there come a time when you came in
23 contact with Leon Carmichael?
24 A Yes, sir.
25 Q About when did that occur?

Page 129

1 A Sometime in the fall of 2001.
2 Q And why did that occur?
3 A Well, he had, I guess, heard about our company.
4 Seems like an architect friend of mine had maybe
5 recommended that he talked to us and he came by to see
6 me at one time.
7 Q Did that result in some understanding between you
8 and Mr. Carmichael?
9 A Yes, sir.
10 Q And how long did it take to come to an
11 understanding?
12 A As I remember, we met a couple every times and
13 talked about his desire, plans to build the Carmichael
14 Center, and then we came to an agreement that we would
15 do some engineering work, redesign if you will some
16 plans that he had developed earlier, and that would be
17 a beginning of the work with once those plans were
18 developed then we'd give him a proposal to construct
19 the Carmichael Center.
20 Q And did you in fact end up entering into a
21 contract with Mr. Carmichael to build the Carmichael
22 Center?
23 A Yes, sir, we did.
24 Q Do you know about when that occurred?
25 A In June of 2002. I believe the date on the

Page 130

1 contract was the 22nd of June.
2 Q And did you bring today, sir, the documents that
3 relate to your understanding with Mr. Carmichael?
4 A Yes, sir. I brought a copy of that particular
5 contract.
6     MR. BRUNSON: Your Honor, may I approach?
7     THE COURT: Yes.
8 Q Mr. Gunn, I'm showing you what's marked for
9 identification as defendant's exhibit 12. Do you
10 recognize that document?
11 A Yes, sir.
12 Q What is it?
13 A It is a copy of the contract between Leon
14 Carmichael, Senior and Scientific Engineering for the
15 purposes of constructing the Carmichael Center.
16 Q Does your signature appear on that contract?
17 A Yes, sir.
18 Q And where did you get the contract copy?
19 A It is a contract that my firm put together.
20     MR. BRUNSON: Your Honor, we offer
21 defendant's exhibit 12 into evidence.
22     MR. FEAGA: No objection, Your Honor.
23     THE COURT: Admitted.
24 Q Mr. Gunn, would you describe the terms of that
25 contract. What did you agree to do and for how much

Page 131

1 money?
2 A As I said earlier, we had helped in developing
3 the design documents, so we estimated, put together a
4 bid package if you will based on those design
5 documents and gave him a firm fixed price proposal, or
6 which resulted in the contract for a million seven
7 hundred and ninety-nine some odd thousand dollars to
8 construct the Carmichael Center. We would be paid,
9 like typical construction, a monthly draw based on the
10 progress that we completed.
11 Q And did you need or require any collateral or
12 financial backing from Mr. Carmichael in order to
13 begin construction on the Carmichael Center?
14 A Didn't require any collateral, but obviously as
15 with any project of this magnitude you would do a
16 little investigation to determine whether or not you
17 thought the client had the wherewithal to be able to
18 carry out that project.
19 Q And what did you do to determine that?
20 A Well there were a couple of things that I recall
21 that were of significance. One day I was in Mr.
22 Carmichael's office and we were discussing this very
23 subject, about whether or not he had sufficient
24 financial backing to --
25     MR. FEAGA: Your Honor, once again, I don't

Page 132

1 object to be this witness testifying about what he
2 said, but we do object to him testifying about what
3 the defendant, Leon Carmichael, said because it's
4 hearsay.
5     THE COURT: Well it depends on what he said
6 as to whether it's hearsay.
7     You need to lead the witness, so I'll allow
8 you to do that to make sure that you don't elicit
9 hearsay.
10     MR. BRUNSON: Yes, Your Honor.
11 Q Mr. Gunn, did you have to have some understanding
12 from Mr. Carmichael's banking connections that he had
13 enough money to fund this project?
14 A Yes, sir.
15 Q And how did you come about that understanding,
16 did you contact the bank?
17 A Yes, sir. I don't recall the gentleman's name.
18 I believe the bank at the time was AmSouth Bank.
19 Q I'm not going to ask you what he told you, but
20 did you satisfy yourself that Mr. Carmichael had
21 enough funds on deposit in June of '02 to begin this
22 project?
23 A Yes, sir.
24 Q And you said that you were paid on this project,
25 and that you were going to be paid on a monthly basis,

Page 133

1 is that correct?
2 A Yes, sir.
3 Q And how would you submit invoices for payment of
4 this construction project?
5 A At the end of each month our subcontractors would
6 obviously submit payment requests to us. We would
7 compile that with our own work portion, and we'd put
8 together what we call a progress payment request.
9 Generally that was done between the first and the
10 tenth of the month and submitted it to Mr. Carmichael.
11 Q And did I ask you to bring the information
12 relating to those invoices and the payments you
13 received for those progress payments to court today?
14 A Yes, sir, you did.
15 Q Did you in fact do that?
16 A Yes, sir, brought copies.
17     MR. BRUNSON: May I approach, Your Honor?
18     THE COURT: Yes.
19 Q Mr. Gunn, I show you what's been marked for
20 identification as defendant's exhibit 13 and ask if
21 you can identify that group of documents.
22 A Yes, sir.
23 Q And are those the invoices, checks and supporting
24 documents that make up these progress payments that
25 you were describing?

Multi-Page™

Page 134

1  A  Yes, sir.  There are the copy of the invoices,
2  and then our notes as to the check amount, the check
3  number and in some cases copies -- xerox copies of the
4  checks.
5  Q  On the front of that exhibit did you in fact make
6  a handwritten chart relating to what's contained in
7  the exhibit?
8  A  Yes, sir.  I summarized it last night.
9  Q  And what does the summary on the front reflect in
10 general?
11     MR. FEAGA:  Your Honor, we don't object to
12 the documents or the summary chart.  If they want to
13 show the jury what Mr. Carmichael paid him to build
14 this, they can do that.  No foundation necessary.
15     THE COURT:  Go ahead.
16     MR. BRUNSON:  We offer defendant's exhibit
17 13 into evidence, Your Honor.
18     THE COURT:  Admitted.
19 Q  Mr. Gunn, approximately how many monthly invoices
20 did you deliver to Mr. Carmichael for the construction
21 of the Carmichael Center?
22 A  Approximately twelve or thirteen.
23 Q  And did this construction period last for that
24 term, twelve or thirteen months?
25 A  The original construction was approximately

Page 135

1  twelve months, and then we did some minor things after
2  he occupied the building which would explain maybe the
3  thirteenth invoice.
4  Q  When did you begin construction?
5  A  Late June, early July of 2002.
6  Q  And when were you finished with construction?
7  A  I believe the certificate of occupancy was
8  somewhere around early June of 2003.
9  Q  And have you evaluated your records to determine
10 how Mr. Carmichael paid you for construction of the
11 Carmichael Center?
12 A  Yes, sir.
13 Q  How did he pay you?
14 A  By check.
15 Q  Did he ever pay you by cash?
16 A  No, sir.
17 Q  Now I want to ask you about the time period
18 toward the end of the construction.  And that would
19 have been, again, in June of '03, is that correct?
20 A  Yes, sir.
21 Q  Did there come a time in June of '03 that Mr.
22 Carmichael was not able to make progress payments?
23 A  Yes, sir.
24 Q  When did that occur?
25 A  I can't remember exactly whether it was June or

Page 136

1  maybe a month or two before that that he advised me
2  that he was getting into a little bit of a financial
3  bind as far as the cash flow.
4  Q  All right.  And did you come to some
5  understanding with him about the continuation of your
6  construction?
7  A  Yes, sir.
8  Q  Was it important that you continue your
9  construction at that time?
10 A  Yes, sir.
11 Q  And was it also important to you to get paid?
12 A  Yes, sir, it was.
13 Q  What understanding did you have at that point?
14 A  Well, we ultimately worked out a promissory note
15 agreement with Mr. Carmichael with collateral to be
16 able to back that up.
17 Q  And how far behind was he in owing you for this
18 construction at that point?
19 A  At the time of the promissory note it was
20 approximately the retainage.  With most contractors,
21 retainage is withheld until you complete the project,
22 and the retainage was approximately a hundred and
23 sixty-four thousand dollars.
24 Q  But wasn't he behind before you entered into the
25 promissory note?

Page 137

1  A  Yes, sir, he was.
2  Q  And at the original point that he became behind
3  in owing you, how much did he owe you?
4  A  It would have been a little over three hundred
5  thousand because the day of the promissory note, as I
6  recall, we received a payment of about a hundred and
7  fifty thousand.
8  Q  Was there also some financing that Mr. Carmichael
9  had to receive in order to pay some of the final
10 payments to you?
11 A  Yes, sir.  He was obtaining a loan.
12 Q  And what was your understanding about the fact
13 that he was obtaining a loan to pay you during that
14 time period?
15 A  My understanding was that he was obtaining a loan
16 for approximately four hundred thousand dollars, and
17 that the bank was not willing to grant that loan
18 unless I was willing to release the lien rights on the
19 building.
20 Q  And did you in fact do that in order to continue
21 construction?
22 A  Yes, sir.
23 Q  Did the loan in fact lend the four hundred
24 thousand in payment of your progress payments?
25 A  Yes, sir.

Page 138

1 Q  Did you receive one of those checks toward the
2 end from the bank or from an attorney that handled the
3 closing of the four hundred thousand dollar loan?
4 A  From the trust account of the attorney we did,
5 yes, sir.
6 Q  And do you know when that loan was based on your
7 records?
8 A  We received that hundred and fifty thousand
9 dollar check on September 24th of 2003, and I believe
10 that is the same date of the promissory note.
11 Q  So you're saying that on September -- in
12 September of '03 he owed you the four hundred thousand
13 plus the amount in the promissory note, at least that
14 much.
15 A  No, sir.  He owed us, as I recall, approximately
16 three hundred and ten, three hundred and twenty
17 thousand, and he in fact probably owed some other
18 contractors that were not under my contract.
19 Q  So did you receive all of the proceeds of the
20 financing money?
21 A  No, sir.  I received a hundred and fifty thousand
22 of the finance money, and then presumably some of the
23 other people that he had been directly responsible for
24 received the other.
25     MR. BRUNSON: May I approach, Your Honor?

Page 139

1     THE COURT:  Yes.
2 Q  Mr. Gunn, I'll show you what's marked for
3 identification as defendant's exhibit 14.  Do you
4 recognize that document?
5 A  Yes, sir, it's a copy of the promissory note.
6 Q  For how much?
7 A  One hundred and sixty-four thousand dollars.
8 Q  Does it bear your signature?
9 A  Actually, the copy that I had in my file does
10 not.  I'm sure that Knox Argo, who was the attorney,
11 has the original.
12 Q  Does it bear Mr. Carmichael's signature?
13 A  Yes, sir.
14     MR. BRUNSON: Your Honor, we offer
15 defendant's exhibit 14 into evidence.
16     THE COURT:  Admitted.
17 Q  Did you complete construction of the Carmichael
18 Center and did it open the doors?
19 A  Yes, sir, it did.
20 Q  Approximately when did that happen, prior to the
21 promissory note?
22 A  It actually opened prior to the promissory note,
23 yes, sir.  I believe the first event in the Carmichael
24 Center was early June of 2003.
25 Q  So at the time he still owed you money, the doors

Page 140

1 were open and he was conducting business there?
2 A  Yes, sir.
3 Q  Now, Mr. Gunn, you became aware at some point in
4 time the date that Mr. Carmichael got arrested.  Did
5 you become aware of that date?
6 A  Yes, sir, heard it in the news.
7 Q  And at that point in time did Mr. Carmichael
8 still owe you the outstanding balance in this
9 promissory note?
10 A  Yes, sir.  I believe at that time he probably
11 still owed a hundred and sixty-four thousand.
12 Q  That being the case, did you react or did
13 something happen that caused you to try and get in
14 touch with Mr. Carmichael?
15 A  Well not necessarily Mr. Carmichael, but the
16 following day as I remember, after it was in the news,
17 his arrest, I called the office at the Carmichael
18 Center.
19 Q  And why did you call the office at the Carmichael
20 Center?
21 A  Well obviously with some money still being owed
22 to my company I had a financial interest in knowing
23 what was going on.  But I also had gotten to know a
24 lot of the people who worked at the Carmichael Center
25 and just generally of interest wanted to know how were

Page 141

1 they doing and what was going on.
2 Q  And did you speak with someone when you called
3 there?
4 A  Yes, sir.
5 Q  With whom did you speak?
6 A  Sherry Pettus.
7 Q  As a result of that conversation, did you end up
8 meeting and talking to Sherry Pettus?
9 A  Yes, sir, I did.
10 Q  And where did you go to meet Sherry Pettus?  Now
11 you're saying this is the day after Mr. Carmichael, or
12 at least the news reported that he had been arrested?
13 A  Yes, sir.  I believe it was the day after the
14 news reported the arrest.
15 Q  And did you meet Sherry Pettus and have a
16 conversation with her?
17 A  Yes, sir, I did.
18 Q  Whose idea was that, your idea or her idea?
19 A  Well, again, I called and began to ask questions
20 and she suggested that we meet.
21 Q  And what did you do?  Where did you meet?
22 A  Met her at the Waffle House on Highway 31 and
23 Interstate 65 exit.
24 Q  And were you in the Waffle House or were you in
25 an automobile when you met?

**Multi-Page™**

Page 142

1  A  We were actually sitting in my vehicle.
2  Q  And when she got in your vehicle, what did she
3  say to you?  First of all, what was her demeanor when
4  she got in your vehicle?
5  A  She was clearly upset.  Based on the
6  conversation, that she was angry and afraid at the
7  same time.
8  Q  What was she angry about?
9  A  I'm not a psychologist.  I think she was angry in
10  the sense that her world had kind of been turned
11  upside down as a result of Mr. Carmichael's arrest.
12  Q  Did she express to you the fact that she didn't
13  know what was going on concerning his arrest?
14  A  She expressed to me that she personally had not
15  seen any drug related activity.
16  Q  And did she tell you that she didn't know
17  anything about --
18       MR. FEAGA:  Your Honor, we're going to
19  object to him leading his own witness.  He needs to
20  ask him what she said.
21       THE COURT:  Yes.  Sustained.
22  Q  Can you describe that, Mr. Gunn?  What did she
23  say to you?
24  A  During the course of this conversation she
25  conveyed to me that she had not personally seen any

Page 143

1  drug related activity.  I believe she even said to me
2  that she had not seen Mr. Freddie Williams before in
3  the office, because I had never heard his name before
4  myself and I had been at the Carmichael Center for the
5  last year.
6       She later conveyed to me that there was a
7  bank account that she had deposited money in, and she
8  seemed to have some concerns about that.
9  Q  All right.  Tell me what she said, told you about
10  the bank account.
11       MR. FEAGA:  Your Honor, object to that.
12  He's leading the witness.  He needs to ask him what,
13  if anything else, did she say --
14       THE COURT:  Well, he can say what did you
15  say about it.
16       MR. FEAGA:  Well no, because he didn't say
17  anything.  He's leading him, and clearly, Your Honor,
18  he needs to say what, if anything else, did she say
19  rather than suggesting an answer.
20       THE COURT:  Actually, I think he needs to do
21  that so we don't end up with something we don't want,
22  that the jury shouldn't hear.  So I'll allow that.
23       MR. FEAGA:  All right, sir.
24  Q  You may answer.
25  A  Will you repeat the question?

Page 144

1  Q  Yes.  What, if anything, did she say about the
2  bank account?
3  A  She said that she had deposited cash money into a
4  bank account in her name.
5  Q  Now you described her mental emotional state as
6  being --
7       MR. FEAGA:  Your Honor, he's leading him
8  again.
9       THE COURT:  I'll sustain that.  Don't tell
10  him what her emotional and mental state might have
11  been.
12       MR. BRUNSON:  Yes, Your Honor.
13       MR. BRUNSON:  No further questions, Your
14  Honor.
15       THE COURT:  Mr. Teague?
16       MR. TEAGUE:  No questions, Your Honor.
17            CROSS EXAMINATION
18          BY MR. FEAGA OF ALAN GUNN:
19  Q  Good morning, Mr. Gunn.
20  A  Good morning.
21  Q  Sir, you testified earlier that you had built, it
22  sounds like a large majority of the Carmichael Center,
23  is that right?
24  A  We were the general contractor on the building
25  itself.  A different firm did the majority of the site

Page 145

1  work, parking lot, et cetera.
2  Q  Okay.  In the actual construction of the
3  building, then, there were other people who worked on
4  the building besides you and your company?
5  A  Yes, sir.  There were, of course, our
6  subcontractors as well as some people that worked
7  directly for Mr. Carmichael.
8  Q  And so what you can testify to is that those
9  contractors who worked for you and yourself, you were
10  paid by check.
11  A  Yes, sir.
12  Q  Okay.  The people that did the site preparation
13  -- Well what is site preparation?
14  A  Well site prep of course is in some cases
15  building up dirt or moving dirt in a particular area
16  and getting the pad prepared for the building.  And
17  then usually after the fact you're doing a pad
18  preparation for the parking lot.
19  Q  All right.  And you didn't do any of that work?
20  A  My firm, the only contribution we had to the
21  construction of the pad for the building, the dirt
22  pad, is we rented some pieces of equipment that were
23  provided to Mr. Carmichael's men.
24  Q  Okay.  Like what kind of stuff?
25  A  Like a big packer that packs the dirt.

Multi-Page™

1 Q  Okay.  So he had people out there working that he
2 was paying and responsible for?
3 A  Yes, sir.
4 Q  Okay.  And are there any other phases or aspects
5 of the building that you didn't do besides site
6 preparation, the parking lot?  How about the fence?
7 A  No, we didn't do the fence.
8 Q  Okay.  And you wouldn't know how he paid for
9 that?
10 A  That's correct.
11 Q  What about the furnishings that went in the
12 building?
13 A  No, sir, he purchased those from another source.
14 Q  Okay.  Now you said that when you had your
15 conversation with Miss Pettus at that time she was
16 telling you about this account that Mr. Carmichael
17 had, she seemed excited and concerned about that
18 account at that time?
19 A  You said Mr. Carmichael had.  As I recall,
20 Miss Pettus said it was an account in her name.
21 Q  Okay.  This is the day after Mr. Carmichael has
22 been arrested and everyone on the -- well what did you
23 think he had been charged with at that time?
24 A  Sir, I would have thought only what I heard in
25 the news.

1        MR. BRUNSON:  Objection, Your Honor.
2        MR. FEAGA:  I'm offering it to show the
3 mental operation, not the truth of the matter.  The
4 jury knows what he's charged with.
5        THE COURT:  I'll allow it.  Go ahead.
6 Q  What did you think he was charged with when you
7 were having this conversation with him?
8        MS. WAYNE:  Judge, object.
9        THE COURT:  One lawyer per witness.
10       (Whereupon, Mr. Brunson conferred with Ms.
11 Wayne off the record and out of the hearing of the
12 other courtroom participants.)
13 Q  Well let me ask it this way.  Did you think he
14 had been charged with drug related offenses?
15 A  I believe that was in the news.
16 Q  Okay.  Well, and Miss Pettus thought that too,
17 right?
18 A  Presumably Miss Pettus had heard the same news I
19 had heard.
20 Q  And so your meeting with her at the Waffle House
21 and she's emotionally upset and disavowing any
22 knowledge of any drugs that day, the day after the
23 rest, is that right?
24 A  Yes, sir, she did say that.
25 Q  Now you weren't with her.  Did she tell you she

1 deposited cash into this account?
2 A  Yes, sir.
3 Q  Okay.  Did she tell that you Mr. Carmichael told
4 her to do that?
5 A  I think she said that she had gotten some cash
6 from Mr. Carmichael.
7 Q  Okay.  And did she tell you -- Are you familiar
8 with something called a cash transaction report?
9 A  No, sir.
10 Q  Do you have any familiarity with the idea that if
11 you put in more than ten thousand dollars in cash in a
12 bank, they will make you file a report that the
13 government gets?
14 A  I've heard that.  I have no firsthand knowledge
15 of it.
16 Q  Did she tell you anything about making a series
17 of deposits that are slightly under ten thousand
18 dollars in cash?
19 A  No, sir, she did not.
20 Q  Did she tell you that the money that she was
21 putting in the bank was stinky?
22 A  No, sir.
23 Q  Did she tell you that Mr. Carmichael had told her
24 he had dug it out of the ground?
25 A  No, sir, she did not.

1 Q  She was just disavowing any knowledge of -- the
2 day after this big arrest and any knowledge at that
3 time and in an emotional state I didn't know anything
4 about drugs, that's really what was going on, wasn't
5 it?
6 A  She said that.
7        THE COURT:  Anything else?
8        MR. FEAGA:  No, sir, Your Honor.
9        THE COURT:  Any further direct, Mr. Brunson?
10       MR. BRUNSON:  No, Your Honor.
11       THE COURT:  Mr. Teague?
12       MR. TEAGUE:  No, Your Honor.
13       THE COURT:  You may step down.
14       (Whereupon the witness, Alan Gunn, stepped
15 down from the stand.)
16       THE COURT:  Next witness, Mr. Brunson.
17       MR. BRUNSON:  Pickett Reese.
18       THE COURT:  Pickett Reese.
19       P I C K E T T   R E E S E,
20 the witness herein, having first been duly sworn or
21 affirmed to tell the truth, was examined and testified
22 as follows:
23            DIRECT EXAMINATION
24       BY MR. BRUNSON OF PICKETT REESE:
25 Q  Good afternoon, Mr. Reese.

Multi-Page™

Page 150

1 A  Good afternoon.
2 Q  Would you state your name, please, for the
3 record.
4 A  Picket R. Reese.
5 Q  And how are you employed?
6 A  I'm co-owner of Reese and Howell, Inc.
7 Q  What does Reese and Howell do?
8 A  Roadwork, site work, site utilities.
9 Q  Could you describe what site work is?
10 A  Site work is about like around a shopping center
11 or complex where we go in and make the land
12 improvements with storm drains, all the earth work,
13 concrete, gutters, grassing, anything pertaining to
14 the outside underground.
15 Q  How long have you been providing that service?
16 A  Thirteen years.
17 Q  Did there come a time when you came in contact
18 with Mr. Leon Carmichael?
19 A  Yes, we did.
20 Q  About when did that occur?
21 A  It was towards the end of '02.
22 Q  And why did you come into contact with Mr.
23 Carmichael?
24 A  Somebody had told us to get in touch with him
25 because he was interested in -- he had a lot of site

Page 151

1 work to do at the Carmichael Center, and we were
2 interested in getting him a price and seeing if we
3 could get the contract.
4 Q  Did you in fact enter into a contract with Mr.
5 Carmichael to provide site work at the Carmichael
6 Center?
7 A  Yes, we did.
8 Q  Do you know about when that occurred?
9 A  About the end of '02. I think it was sometime in
10 November we had the preliminary deal put together, but
11 I think due to the weather we waited until March of
12 '03 to really get going on it.
13     MR. BRUNSON: May I approach, Your Honor?
14     THE COURT: Yes.
15 Q  Mr. Reese, I show you what's been marked for
16 identification as defendant's exhibit number 15 and
17 ask if you can identify that series of documents.
18 A  This is a copy of our company contract. It's
19 dated or signed on December 4 between my partner Frank
20 Howell and Mr. Carmichael.
21 Q  And what did y'all agree to do? Just generally.
22 A  To finish up all the earth work on the perimeter
23 of the building. The building was already existing.
24 And the base and storm drain, grassing and concrete.
25     MR. FEAGA: Could we get a year? December

Page 152

1 of '02 or '03?
2     THE WITNESS: '02
3     MR. FEAGA: Thank you.
4     MR. BRUNSON: Your Honor, we offer
5 defendant's exhibit 15 into evidence.
6     MR. FEAGA: No objection, Your Honor.
7     THE COURT: Admitted.
8 Q  How much did Mr. Carmichael contract to pay you?
9 A  The initial contract was approximately five
10 hundred and eighty-five thousand dollars.
11 Q  Were there improvements along the way that caused
12 the contract amount to go higher?
13 A  Yes. They're called change orders, and additions
14 to quantities that raised it another couple of hundred
15 thousand, something like that.
16 Q  So what was the total contract amount, do you
17 know approximately?
18 A  I think approximately it was close to a million
19 dollars.
20 Q  Did you have some initial understanding with Mr.
21 Carmichael about financing or paying for the project?
22 A  Just we expected prompt payment upon presentation
23 of invoices.
24 Q  And how often were you presenting invoices?
25 A  At that time most of our work in Montgomery was

Page 153

1 at this facility, meaning we had all of our equipment
2 and employees there, so we were generating a lot of
3 money pretty quickly and we were getting paid either
4 weekly or every other week.
5 Q  And did I ask you and did you bring checks that
6 you received for payment of the invoices you submitted
7 to Mr. Carmichael?
8 A  Yes, I did.
9 Q  Were you able to find all the checks that you
10 received?
11 A  I was not able to find the first two, but I found
12 all the rest of them.
13     MR. BRUNSON: If I might approach, Your
14 Honor?
15     THE COURT: Yes.
16 Q  I'll show you what's marked for identification as
17 defendant's exhibit number 16 and ask you if you can
18 identify that series of documents.
19 A  Yes. These are I think it's seven checks that
20 Mr. Carmichael paid us for the work we had performed
21 at the Carmichael Center. However, the first two I
22 was unable to find but they were checks.
23 Q  About did you ever receive any cash in payment
24 for the work that you did there?
25 A  No, we did not.

**Multi-Page™**

## Page 154

1 Q Now, Mr. Reese, did there come a time in
2 servicing this contract that Mr. Carmichael got behind
3 in payments to you?
4 A I believe we submitted a total of nine invoices
5 to him, and payment was made on the first seven and we
6 were trying to get the payment on the last two. It
7 was invoice eight and invoice nine.
8 Q And approximately how much did he owe you on
9 those last two invoices?
10 A About a hundred and eighty-two thousand dollars.
11 Q Do you know approximately when that invoice
12 number eight went out?
13 A I think it was September of '03.
14 Q And have you been paid or were you paid for those
15 last two invoices in September of '03?
16 A No, we have not.
17 Q Did you attempt to remedy the situation by doing
18 something to protect your interest in the property or
19 in the project?
20 A Yes, I did.
21 Q What did you do?
22 A We filed a material and workmen's lien on the
23 Carmichael Center.
24 Q I want to show you defendant's exhibit 17 and ask
25 if you recognize this document.

## Page 155

1 A Yes. It's a verified copy of the statement of
2 lien.
3 Q Is that the draft, or is that the original lien
4 document?
5 A This is a draft.
6 Q And where did you find the draft?
7 A The draft was in my files in my office.
8 Q Do you have a signed copy of the document?
9 A My attorney has it.
10 Q Does that document represent all the facts
11 relating to the lien that you had to file against the
12 Carmichael Center in September of '03?
13 A Yes, it does.
14 Q And do you know when the negotiations about
15 filing that lien began?
16 A Sometimes around September. I'd say the end of
17 September of '03.
18 Q Have you been paid on that to date?
19 A No, sir.
20    MR. BRUNSON: Your Honor, we offer
21 defendant's exhibit 15, 16 and 17 into evidence at
22 this time.
23    MR. FEAGA: If we could see that real
24 quickly, Your Honor?
25    THE COURT: Yes.

## Page 156

1    (Whereupon, Mr. Feaga examined said document
2 and conferred with Mr. Brunson off the record.)
3    MR. FEAGA: Your Honor, if I could just have
4 some voir dire very quickly about some handwriting at
5 the bottom?
6    THE COURT: Yes.
7    MR. FEAGA: Sir, down here at the bottom I
8 can't read that. It looks like it began work at about
9 March of '03?
10    THE WITNESS: That's about right.
11    MR. FEAGA: Okay. And finished work about
12 September of '03?
13    THE WITNESS: That's right.
14    MR. FEAGA: And you were owed a hundred and
15 eighty-two thousand in September?
16    THE WITNESS: That's right.
17    MR. FEAGA: Never got your money?
18    THE COURT: You're going beyond voir dire.
19    MR. FEAGA: Yes, sir, Your Honor. I just
20 wanted to clarify what those comments were at the
21 bottom.
22    No objection.
23    MR. BRUNSON: Pass the witness, Your Honor.
24    THE COURT: Okay. Mr. Teague?
25    CROSS EXAMINATION

## Page 157

1    BY MR. TEAGUE OF PICKETT REESE:
2    MR. TEAGUE: If I could approach the
3 witness, please, Your Honor?
4    THE COURT: Certainly.
5 Q Mr. Reese, you were the general contractor?
6 A No, sir, I was I guess a sub working under Mr.
7 Carmichael just specifically to do the site work.
8 Q Okay. Now, so, then if there was a general, you
9 were a sub general and you worked directly for Mr.
10 Carmichael, then?
11 A Correct. I worked directly for Mr. Carmichael.
12 Q Okay. Now you've been in this business how long?
13 A Since 1992?
14 Q Okay. And exhibit 17 here is a lien, and is
15 that's what's called in the industry a workman's lien,
16 or a contractor's lien, or something like that?
17 A Correct, yes.
18 Q You take this and you file this where?
19 A My attorney does it at the courthouse.
20 Q Right. Now and, of course, your attorney has
21 advised you that then constitutes a lien and if you
22 put a lien on a place that you've supplied material
23 and labor to, that's the only way you've got of making
24 sure that you get paid some day, isn't it?
25 A Correct.

### Page 158

1 Q  And you do that so that, you know, say you were
2 just to, hypothetically, go to a house if you build
3 it, if you're remodeling a house or doing repairs to a
4 house, say you put, say, some drywall material in
5 there and you're a small contractor, you need to
6 resort to something like that in order to be real sure
7 you get paid, don't you?  Otherwise you lose what
8 you've paid somebody for your drywall, wouldn't you?
9 A  Correct.
10 Q  Okay.  And this is very common in the world of
11 building, whether it be small houses, rental
12 properties or whether it be big buildings like the
13 Carmichael Center, is that true?
14 A  Correct.
15 Q  Thank you, Mr. Reese.
16      THE COURT:  Mr. Feaga?
17      MR. FEAGA:  Yes, sir.
18         CROSS EXAMINATION
19      BY MR. FEAGA OF PICKETT REESE:
20 Q  Mr. Reese, the work that you're talking about
21 doing, you said the building itself had been
22 constructed?
23 A  It was under construction.
24 Q  Okay.  So you didn't do -- Isn't there some other
25 part of a project where you do site prep before you

### Page 159

1 start building the building?
2 A  Yes.
3 Q  Okay.  And you didn't do that?
4 A  We did not do the building pad.
5 Q  Okay.  And you said that Mr. Carmichael couldn't
6 pay you the last two invoices, is that right?
7 A  Right.
8 Q  Now, did he tell you he was in a financial
9 strait, in a financial tight?  I mean what did he tell
10 you about why he couldn't pay you?  I'm thinking you
11 guys wanted your money, didn't you?
12 A  Right.  We had been through so many change orders
13 and overruns, that his budget ran out.
14 Q  I'm assuming that when you submit an invoice and
15 he doesn't pay, at some point in time you call him and
16 say hey, it's late.  Did something like that happen?
17 A  Yes.
18 Q  Okay.  And what, if any explanation, did he give
19 you for not being able to pay you?
20 A  He was working on trying to get the money up.
21 Q  Okay.  Did he say anything about business being
22 bad or anything?  Nothing like that?
23 A  I believe he was trying to do some additional
24 things.
25 Q  Okay.

### Page 160

1      MR. FEAGA:  Your Honor, we have no further
2 questions.
3      THE COURT:  Mr. Brunson?
4      MR. BRUNSON:  Your Honor, just to follow up.
5         REDIRECT EXAMINATION
6      BY MR. BRUNSON OF PICKETT REESE:
7 Q  Mr. Reese, when these last two invoices became
8 due, was there some discussion about a loan that Mr.
9 Carmichael was attempting to obtain?
10 A  Yes.
11 Q  And did you or your company have to do something,
12 or waive some interest in order for Mr. Carmichael to
13 obtain a loan?
14 A  We had some very brief discussions about it, but
15 we never did have to sign anything.
16 Q  Where was he getting the loan, do you know?  Was
17 in an S. B. A. loan?
18 A  I believe so.
19 Q  And do you know --
20 A  I know they were involved.
21 Q  Did you finally end up getting some check as loan
22 proceeds that paid you on earlier invoices?
23 A  I don't think so.
24 Q  Thank you, sir, no more questions.
25      MR. FEAGA:  Just a couple of more, Your

### Page 161

1 Honor, I apologize.
2      RECROSS EXAMINATION
3      BY MR. FEAGA OF PICKETT REESE:
4 Q  Along that line, are you saying that there were
5 other occasions earlier where he didn't pay you on
6 time?
7 A  No, not that I recall.
8 Q  Okay.  So that questioning didn't jog any
9 memories with you at all?
10 A  No.
11 Q  All right.  No further questions.
12      THE COURT:  Anything else, Mr. Brunson?
13      MR. BRUNSON:  No, Your Honor.
14      THE COURT:  Mr. Teague?
15      MR. TEAGUE:  No questions, Your Honor.
16      THE COURT:  You may step down.
17      (Whereupon the witness, Pickett Reese, stepped
18 down from the stand.)
19      (Mr. Reisner's stenographic equipment failed, a
20 recess was taken, and Official Court Reporter Risa
21 Entrekin entered the courtroom to complete making the
22 record for the remainder of June 15, 2005.)
23
24         * * * * * * * * * *
25

Multi-Page™

Page 162

```
1
2              COURT REPORTER'S CERTIFICATE
3
4        I certify that the foregoing is a correct
5   transcript from the record of proceedings in the
6   above-entitled matter as prepared by me to the best of
7   my ability.
8
9        I further certify that I am not related to
10  any of the parties hereto, nor their counsel, and I
11  have no interest in the outcome of said cause.
12
13       Dated this 7th day of September 2005.
14
15               MITCHELL P. REISNER, CM, CRR,
16               Official US Dist. Court Reporter
                 Registered Professional Reporter
17               Certified  Real-Time  Reporter
18
19
20
21
22
23
24
25
```