Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      NORTHERN DIVISION
 4   UNITED STATES OF AMERICA
 5        vs.                    CASE NO:  2:03cr259-T
 6   LEON CARMICHAEL, SR.
     and FREDDIE WILLIAMS,
 7
              Defendants.
 8
                       VOLUME VIII-B
 9
              *  *  *  *  *  *  *  *  *  *
10
              JURY TRIAL PROCEEDINGS
11
              *  *  *  *  *  *  *  *  *  *
12
          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES
13
     DISTRICT JUDGE, and a jury, at Montgomery, Alabama, on
14
     Wednesday, June 15, 2005, commencing at 2:30 p.m.
15
     APPEARANCES:
16
     FOR THE GOVERNMENT:      Mr. Terry F. Moorer
17                            Mr. Stephen P. Feaga
                              Ms. A. Clark Morris
18                            Assistant United States Attorneys
                              OFFICE OF THE UNITED STATES ATTORNEY
19                            One Court Square, Suite 201
                              Montgomery, Alabama  36104
20
     FOR THE DEFENDANT        Ms. Lisa Monet Wayne, Attorney at Law
21   CARMICHAEL:              950 Seventeenth Street, Suite 1700
                              Denver, Colorado  80202
22
                              Ms. Marion D. Chartoff, Attorney at Law
23                            LAW OFFICE OF MARION CHARTOFF
                              505 South Perry Street
24                            Montgomery, Alabama  36104
25
```

GOVERNMENT
EXHIBIT
5C-VIII-B

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2005

Page 2

```
 1    APPEARANCES, Continued:
 2    FOR THE DEFENDANT          Mr. Ronald Ray Brunson, Attorney at Law
      CARMICHAEL:                McCORD and BRUNSON
 3                               2126 Morris Avenue
                                 Birmingham, Alabama  35203
 4
                                 Ms. Susan Graham James, Attorney at Law
 5                               SUSAN G. JAMES & ASSOCIATES
                                 600 South McDonough Street
 6                               Montgomery, Alabama  36104
 7    FOR THE DEFENDANT          Mr. Barry E. Teague, Attorney at Law
      WILLIAMS:                  138 Adams Avenue
 8                               Montgomery, Alabama  36104
 9           Proceedings reported stenographically;
                transcript produced by computer.
10
                     * * * * * * * * * *
11
                        VOLUME INDEX
12
```

```
      ALVIN ANDERSON
13         DIRECT BY MS. JAMES                     11
           CROSS BY MR. MOORER                     14
14
      CHARLES PHILIP KELSER
15         DIRECT BY MR. BRUNSON                   22
           CROSS BY MR. FEAGA                      26
16
      MURRAY ARGO
17         DIRECT BY MR. BRUNSON                   43
18    JOHNNY HARDWICK
           DIRECT BY MR. BRUNSON                   55
19         CROSS BY MR. MOORER                     61
20    MURRAY ARGO, Continued
           VOIR DIRE BY MR. BRUNSON (Jury not present)68
21         VOIR DIRE BY MR. FEAGA (Jury not present) 69
           DIRECT, Continued, BY MR. BRUNSON       70
22         CROSS BY MR. FEAGA                      80
           REDIRECT BY MR. BRUNSON                 99
23
      JAMES B. DeBARDELABEN
24         DIRECT BY MR. TEAGUE                    100
25
```

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2005

Page 3

```
 1                          VOLUME INDEX, Continued
 2   SHEFFIELD HENDERSON
          DIRECT BY MR. TEAGUE                           106
 3
     LELAND WATTS
 4        DIRECT BY MR. TEAGUE                           110
          CROSS BY MR. FEAGA                             113
 5
     TIMOTHY L. WILLIAMS
 6        DIRECT BY MR. TEAGUE                           115
          CROSS BY MS. WAYNE                             127
 7        CROSS BY MR. MOORER                            128
          REDIRECT BY MR. TEAGUE                         140
 8
     DEFENDANT WILLIAMS RESTS                            142
 9
                      * * * * * * * * * * *
10
11                        EXHIBIT INDEX
```

| | | OFFERED | ADMITTED |
|---|---|---|---|
| GOVERNMENT'S EXHIBIT NO.: | | | |
| 26-B | Phone records | 151 | 151 |
| -- 12 | Bank account records | 151 | 151 |
| DEFENDANT CARMICHAEL'S EXHIBIT NO.: | | | |
| 18 | Photograph | 21 | 21 |
| 20 | 2000 Form 1120 for Multi-Investments | 72 | 72 |
| 21 | 2001 Form 1120 for Multi-Investments | 72 | 72 |
| 22 | 2002 Form 1120 for Multi-Investments | 72 | 72 |
| 23 | 2003 Form 1120 for Multi-Investments | 72 | 72 |

```
12   GOVERNMENT'S EXHIBIT NO.:          OFFERED  ADMITTED
13   26-B Phone records                 151       151
14   -- 12 Bank account records         151       151
15   DEFENDANT CARMICHAEL'S EXHIBIT NO.:
16   18  Photograph                      21        21
17   20  2000 Form 1120 for              72        72
         Multi-Investments
18
     21  2001 Form 1120 for              72        72
19       Multi-Investments
20   22  2002 Form 1120 for              72        72
         Multi-Investments
21
     23  2003 Form 1120 for              72        72
22       Multi-Investments
23                   * * * * * * * * * * *
24
25
```

**4**

1  (The following proceedings were heard before the Honorable
2  Myron H. Thompson, United States District Judge, and a
3  jury, at Montgomery, Alabama, on Wednesday, June 15, 2005,
4  commencing at 2:30 p.m.:)
5  (Proceedings reconvened at 2:30 p.m. without the jury
6  present, as follows:)
7  (Defendants present)
8       THE CLERK:  Counsel, please remain seated.  Court is in
9  session.
10       THE COURT:  Now, you understand that Mitchell's machine
11  gave out completely, so we now have a new court reporter, Risa.
12  I'll explain that to the jury, and I'll explain to them why you
13  are having to ask the questions that you asked before again.
14       MS. JAMES:  Thank you, Judge.
15       THE COURT:  Bring in the jury.
16       MR. MOORER:  Your Honor, before the jury comes in --
17       THE COURT:  Yes.
18       MR. MOORER:  -- I just noticed that there are some
19  documents that are being given to the prosecution to look at
20  that the defense intends to use at trial.  I believe there is a
21  standing order on discovery, and there has been much ado made
22  about trial by ambush.  We are getting documents from them now.
23  And I believe these are tax returns, which, obviously, if they
24  were planning to introduce them at trial, they would have had
25  those things long before now and could have given them to us.  I

**5**

1  would ask first --
2       THE COURT:  Okay.  What obligation in the standing
3  order requires them to give these documents to you earlier?
4       MR. MOORER:  Your Honor, if you will note at the bottom
5  when we provide our discovery of the standing order, it says the
6  government is entitled to reciprocal discovery and it should be
7  provided as well to the United States.
8       THE COURT:  Okay.
9       MR. MOORER:  And these documents are being provided at
10  the last minute.  And I think considering the fact that we've
11  turned over voluminous documents and we're getting documents at
12  the last minute, that -- it goes to show their objections
13  earlier are unfounded, but also that they're trying to engage in
14  that kind of conduct, Your Honor.  And I think there may be
15  separate objections raised to the introduction of these
16  documents; but first, if they have other documents that they
17  intend to use, they should certainly know it by now, Your Honor,
18  and we are entitled to receive those.
19       THE COURT:  Now, Rule 16 does require reciprocal
20  discovery.  When you give -- they give the defendants discovery,
21  they're obligated to provide you with comparable discovery.
22       MR. MOORER:  Yes, sir.  And also the standing order
23  mentions that as well.
24       THE COURT:  Okay.  Now, what documents, specifically,
25  are we talking about?  Have you seen them?

**6**

1       MR. MOORER:  Right now, the only documents that I'm
2  aware of are some tax return documents.
3       THE COURT:  And when did you get those?
4       MR. MOORER:  Just now.
5       THE COURT:  And who will speak?  Mr. Brunson.
6       MR. BRUNSON:  Yes, Your Honor.  I just provided him
7  four copies of four of Mr. Carmichael's income tax returns for
8  the past four years.
9       THE COURT:  Yes.
10       MR. BRUNSON:  I mentioned that yesterday to the IRS
11  agent, had they received the copies of Mr. Carmichael's returns
12  for '01, '02, and '03.  Your Honor, they were filed on May --
13  around May 20th of last month, just of this year, and they were
14  filed with the Internal Revenue Service.  I anticipate because
15  there's an IRS agent on this case that the Internal Revenue
16  Service by this time would have had to have had the returns.  So
17  the bottom line is I'm -- I had copies made and I provided them
18  copies today just out of concern that the IRS agent indicated he
19  had not taken those returns from the IRS file as of yet.
20       THE COURT:  When did the agent tell you this?
21       MR. BRUNSON:  He told me yesterday.  I asked him if he
22  had the '01, '02, and '03 returns; and he said no, he hadn't
23  retrieved them or probably wasn't aware they had been filed.
24       THE COURT:  Okay.  Yes.
25       MR. MOORER:  Your Honor, he neglects to look at the

**7**

1  second part of Rule 16, though, which says that if they intend
2  to use the item in their case in chief at a trial, we're
3  entitled to that.  And in this instance, when they know that
4  they are going to use a document, that triggers their
5  obligation.  They may not have had an obligation to copy it for
6  us.  They might have been able to tell us --
7       THE COURT:  They just need to notify you of its use.
8       MR. MOORER:  And since they obviously would have
9  intended to use it before now, it's late for us to be getting
10  it.  And we're entitled to discovery as well, Your Honor.
11       THE COURT:  What about that, Mr. Brunson?  You should
12  have told them that you were going to be using Mr. Carmichael's
13  tax returns for any year.
14       MR. BRUNSON:  Well, as you might expect, Your Honor,
15  that's where the thing is changing every -- day to day.  It's
16  something that we had not fully decided on, depending on the
17  government's case.  And that's why I mentioned it to the agent
18  before today --
19       THE COURT:  But this is something you should have
20  furnished if you thought you were going to use them in your case
21  in chief.  You should have given them to the government.
22       MR. BRUNSON:  Yes, Your Honor.  At that point in time,
23  I should have given them to the government.  We probably didn't
24  make that decision until -- today is Wednesday -- until this
25  week.  And it might have been Monday that I mentioned this to

United States of America v. Leon Carmichael, Sr., and Freddie Williams    June 15, 2009

**8**

1  the agent. I'm not sure whether it was yesterday or Monday.
2       THE COURT:  So you're saying before Monday, you had not
3  thought that you might use these documents?
4       MR. BRUNSON:  We had not determined that we were going
5  to use these documents.
6       THE COURT:  No, I don't think the rule requires that
7  you make that determination and then provide the documents.  I
8  think as long as the documents could be part of your case in
9  chief, you should give them to the government.  Otherwise,
10  everybody would be waiting until the final decision is made
11  before they exchange any documents.
12       MR. BRUNSON:  Well, Your Honor, because of the fact
13  that these documents were filed with the IRS and an IRS agent is
14  assigned to this case, it was our belief, having worked there
15  before, that if they have controls on Mr. Carmichael's bank
16  account, they would have received them.
17       THE COURT:  That's not the issue, though.  They're
18  supposed to receive notice that you're thinking about using the
19  documents.  They -- you know, there are loads of documents out
20  there in the universe.  The question is did you give them notice
21  that you would be using these documents so they could prepare.
22       MR. BRUNSON:  Not until this week, Your Honor.
23       THE COURT:  I think you should have given them notice
24  earlier.
25       Now, how are you prejudiced?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams    June 15, 2009

**9**

1       MR. MOORER:  Your Honor, because, number one, we're
2  having to decide -- I don't know -- and I will let Mr. Feaga
3  deal with the separate matter of admissibility of these
4  documents.  But here we are in the midst of a witness that I
5  assume will soon be coming to offer testimony about these.
6  We're having to try to listen to the witnesses and look through
7  the documents at the same time.  In addition --
8       THE COURT:  What's the admissibility issue, Mr. Feaga?
9       MR. FEAGA:  Your Honor, they are -- what we're talking
10  about is the 2001, 2002, and 2003 tax returns that were never
11  filed.  He didn't file in those tax years until 20 days ago.
12  And I'm told by Mr. Wilson these probably aren't even in the
13  system yet.  We can go check, but we're just now finding out
14  that 20 days ago --
15       THE COURT:  Well, you're making a relevance argument.
16  Who else will be examining him, you or Mr. Franklin?
17       MR. FEAGA:  And this displays one other argument, Your
18  Honor.  It also -- there's no -- currently any way for us to
19  know where the information comes from.  I would suspect
20  strongly, based on my knowledge of other activities of this
21  defendant, that this is going to be information that is hearsay
22  as to anyone but him.
23       MR. MOORER:  Your Honor.
24       THE COURT:  Yes.
25       MR. MOORER:  And one of my issues is if they have other

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams    June 15, 2009

**10**

1  documents --
2       THE COURT:  I was going to get to that in a minute.
3       I'll allow the documents to come in even though there
4  was a Rule 16 violation.  The question of relevance is a totally
5  separate matter.  However, if you have other documents that
6  you're going to use, you need to give those to the government
7  now unless -- that you possibly could use.  You need to give
8  those to the government now.
9       MR. BRUNSON:  Your Honor, the witnesses that came with
10  documents this morning, obviously, similar to the defendant's
11  probate witness, I had not seen those documents or received
12  them.
13       THE COURT:  That's a different matter.  You're
14  absolutely right.  But documents that you have in your
15  possession that you think you may possibly use should be
16  furnished to the government.
17       MR. BRUNSON:  And I don't know of any others.
18       THE COURT:  Okay.  Very good.  Now, who will be
19  examining this witness so that I can determine relevance?
20       MR. MOORER:  I don't know the witness they're going to
21  introduce these through, Your Honor.
22       THE COURT:  Which witness are you going to introduce
23  these documents through?
24       MR. BRUNSON:  Mr. Argo, Your Honor.
25       THE COURT:  Well, we'll wait until we get to Mr. Argo,

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams    June 15, 2009

**11**

1  then.  Anything else?  Let's proceed.
2       Bring in the jury.
3       (Jury in at 2:38 p.m.)
4       THE COURT:  Do we have all 14 of our jurors?  Members
5  of the jury, as you can see, we have a new court reporter.  My
6  other court reporter's machine broke.  So what we're going to
7  have to do is Ms. James is going to have to ask those
8  preliminary questions again just so we can get them in the
9  record.  So unfortunately, you have to bear with us.  These
10  things happen.
11       MS. JAMES:  May I proceed?
12       THE COURT:  Yes.
13       ALVIN ANDERSON, the witness, having been duly sworn,
14  testified, as follows:
15            DIRECT EXAMINATION
16  BY MS. JAMES:
17  Q.  State your name, please.
18  A.  My name is Alvin Anderson.
19  Q.  Mr. Anderson, where do you live?
20  A.  3836 April Street, Montgomery.
21  Q.  How long have you lived there?
22  A.  About two years.
23  Q.  Do you presently work?
24  A.  No, I'm not working right now.  I had took sick with cancer.
25  Q.  And -- okay.  Have you previously worked?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**12**

1    A. Yes. I had a seafood business.
2    Q. And how long did you have that business?
3    A. I've been in the seafood business off and on ever since '84,
4    and this last seafood business been opened up about two years.
5    Q. Okay. What was the name of that business?
6    A. Anderson Seafood.
7    Q. Do you know the defendant in this case, Leon Carmichael?
8    A. Yes, I do.
9    Q. How do you know him?
10   A. I know him from leasing a club from him on Rosa Parks and
11   Fleming Road. I used to lease it on a Sunday evening for
12   entertainment.
13   Q. Okay. Do you presently have a business relationship with
14   Mr. Carmichael?
15   A. No, ma'am.
16   Q. Now, do you know a man by the name of Eric Peagler?
17   A. No, ma'am. I don't know Eric Peagler.
18   Q. Do you know a man that runs a shop or did in the past,
19   around 2001 -- ran a car detailing shop up on 31 going to
20   Prattville that called itself E&P?
21   A. No.
22   Q. Do you know a fellow that ran -- a black male that ran a gym
23   up in Prattville around the year 2001 called E&E Gym?
24   A. No.
25       MS. JAMES: Your Honor, may I approach the witness?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**13**

1        THE COURT: Yes.
2    Q. I'm going to show you what's been marked for identification
3    purposes as Carmichael's #18 and ask if you can look at that
4    photograph. Take a close look at it and tell us if you can
5    identify the person in the photo.
6    A. No. No.
7    Q. Now, I know you've indicated you don't know Mr. Peagler, but
8    I do need to ask you these questions. Did you ever on any
9    occasion introduce a person, either the person in that
10   photograph or someone telling you that they were Eric Peagler --
11   did you ever introduce them to Mr. Carmichael?
12   A. Never in my life.
13   Q. Did you ever introduce the person in that photograph and/or
14   anyone else to Mr. Carmichael in order to facilitate a drug
15   deal?
16   A. No.
17   Q. Now, are you and Mr. Carmichael presently friends?
18   A. Only friendship that we have was strictly business. I
19   rented his club, and that was -- that was it.
20       MS. JAMES: Okay. May I have just one moment, Judge?
21   Judge, may I have a moment?
22       THE COURT: Yes. Definitely.
23       (Brief pause)
24       MS. JAMES: That's all. Thank you so much. And if you
25   will, answer the prosecutor's questions, Mr. Anderson. I'm

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**14**

1    sorry. Mr. Teague. I keep forgetting.
2        MR. TEAGUE: I have no questions for Mr. Anderson.
3        THE COURT: Cross?
4        MR. MOORER: Yes, Your Honor.
5                CROSS-EXAMINATION
6    BY MR. MOORER:
7    Q. Mr. Anderson, you say you've never met the person that was
8    shown to you in the photograph.
9    A. Never met him in life.
10   Q. Now, and I gather from that that as far as you know, there
11   has never been any bad feelings between you and the person in
12   that photograph since you've never met them, right?
13   A. I don't know him.
14   Q. So the answer to my question is there is no prior
15   relationship or any kind of bad blood between the two of you.
16   A. Well, there can't be, because I don't know him.
17   Q. All right. Now, when you say you rented the club from Leon
18   Carmichael, how much did you pay him for rent?
19   A. I paid him approximately $500 on a Sunday.
20   Q. And did you pay in cash?
21   A. Yes.
22   Q. Did you get receipts?
23   A. Do I have a receipt?
24   Q. Yes. Did you get receipts for --
25   A. No. I didn't get a receipt.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**15**

1    Q. So y'all were good enough acquaintances, trusted each other
2    enough, that you would pay him and you didn't feel the need to
3    get a receipt?
4    A. The reason I didn't feel the need to get a receipt, I paid
5    him $500 and, see, I took the door. The door was mine. I made
6    my money off the door.
7    Q. My question to you is you had a close enough relationship
8    with him that when you paid your $500 to him, you didn't feel
9    any need to protect yourself in the event that he were to later
10   on claim that you didn't pay him.
11   A. No.
12   Q. Do you know Richmond Thomas?
13   A. No.
14   Q. Do you know -- and I say Richmond Thomas. The Richmond
15   Thomas I'm referring to would be a person from Montgomery,
16   Alabama.
17   A. I don't know of a Richmond Thomas.
18   Q. Do you know of a Richmond Thomas who lives in Montgomery who
19   had a small business where he did household work?
20   A. No.
21   Q. Do you know an individual by the name of Patrick Denton? Do
22   you know a person by the name of Patrick Denton?
23   A. Patrick Denton?
24   Q. Yes, sir.
25   A. No.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams — June 15, 2009

**16**

1  Q. And Patrick Denton that I'm referring to would be somebody
2  who lives out on Fleming Road.
3  A. No.
4  Q. A white guy, I'd say probably somewhere in the late twenties
5  or early thirties?
6  A. No.
7  Q. Are you familiar with a person by the name of Charlotte
8  Hensarling? She's from Huntsville.
9      MS. JAMES: Your Honor, objection. I mean he's going
10  way beyond the scope. There was nothing asked except about
11  Mr. Peagler.
12     THE COURT: Overruled.
13  A. Say --
14  Q. Do you know a Charlotte Hensarling? She's a lady from
15  Huntsville.
16  A. No.
17  Q. Gary George. Do you know him? He would be from maybe
18  Prattville, Montgomery area?
19  A. No.
20  Q. White guy, maybe mid thirties?
21  A. No.
22  Q. Do you know Freddie Williams?
23  A. Yes.
24  Q. Is he in the courtroom today?
25  A. Yes.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

**17**

1  Q. How long have you been knowing Mr. Williams?
2  A. I've been knowing Mr. Freddie Williams back in the
3  seventies. He used to buy fish from me years ago. When I first
4  started in the fish business, I used to go to Florida and get
5  fish on the back of my truck and come to Montgomery and peddle
6  it house to house, door to door. I met Freddie then, years ago
7  in the seventies.
8  Q. And so you've been knowing him for quite some time?
9  A. Yes, I have.
10  Q. And I don't know if you said this on direct examination, but
11  how long have you known the Defendant Leon Carmichael?
12  A. I think I met Mr. Carmichael in the nineties, probably about
13  '93, '92, '93.
14  Q. Have you ever been to his house?
15  A. Have I ever been to his house?
16  Q. Yes, sir.
17  A. Yes.
18  Q. Where does he live?
19  A. I don't know the name of the street.
20  Q. Do you know a person by the name of Samuel Baldwin?
21  A. Samuel Baldwin?
22  Q. Yes, sir.
23  A. Yes.
24  Q. How long have you known Mr. Baldwin?
25  A. I've been knowing him a few years too.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

**18**

1  Q. What about Edwin Fuller?
2  A. Say it again?
3  Q. Edwin Fuller.
4      MS. JAMES: Objection. None of these people appear to
5  have any connection with this case.
6      THE COURT: Yes. Where are we going now?
7      MR. MOORER: I'm about to get to where I'm trying --
8      THE COURT: Okay. Go ahead.
9  A. Who?
10  Q. Edwin Fuller.
11  A. No.
12  Q. Edmond -- I'm sorry -- Fuller.
13  A. Who?
14  Q. Edmond --
15     THE COURT: Edmond Fuller.
16  Q. I said Edwin, but I meant Edmond.
17  A. No.
18  Q. And you go by the nickname of Big Al, correct?
19  A. Yes.
20  Q. Have you ever been to Mr. Williams' house?
21  A. Mr. Williams' house, years ago, when I used to peddle fish
22  years ago, I used to stop by his house, because he used to buy
23  fish from me off my truck.
24  Q. Have you ever been to his house over on Ridgecrest?
25  A. No.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

**19**

1  Q. How often have you been to Mr. Carmichael's house?
2  A. I've been there only one time.
3  Q. And when was that?
4  A. It's been some years ago. I don't know exactly what year it
5  was.
6  Q. Now, I believe you said you rented the club from
7  Mr. Carmichael for about three months?
8  A. Yes.
9  Q. And I assume thereafter you stopped.
10  A. Yes.
11  Q. Why did you stop?
12  A. Well, I went back into the seafood business. I opened up
13  another fish market.
14  Q. Was that something you believed was going to be more
15  profitable than what you were making at the club?
16  A. Yes.
17  Q. How much profit did you make when you were working the club?
18  A. Well, I only rented it just like on a Sunday evening. And
19  sometime it used to make probably about 1100, $1200.
20  Q. And was that from the door?
21  A. Yes.
22  Q. So that would have been before you paid Mr. Carmichael his
23  $500 that you owed him.
24  A. Yes.
25  Q. And do you recall the time period where you did rent the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2009

**20**

1  club?
2  A. It was in ninety -- '93, I think. Around '93.
3      MR. MOORER: If I may have one moment.
4      THE COURT: Yes.
5  (Brief pause)
6  Q. A few parting questions there, Mr. Anderson. You said you
7  had a seafood business and you rented the club. Where was the
8  seafood business?
9  A. The seafood business I had was on -- when I -- where I'm at,
10 leaving the club, was on Davidson Street.
11 Q. Where is that?
12 A. That's in Montgomery, off of Day Street.
13 Q. Close to Second Street?
14 A. Sir?
15 Q. Is that close to Second Street?
16 A. No, it's not.
17 Q. Are you familiar with Faith Williams?
18 A. Say it again?
19 Q. Are you familiar with Faith Williams?
20 A. No.
21 Q. Also goes by the name of Faith Holley?
22 A. No.
23     MR. MOORER: I don't have any further questions, Your
24 Honor.
25     MS. JAMES: Nothing further.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2009

**21**

1      THE COURT: Mr. Teague?
2  You may step down.
3  Next witness, Ms. James.
4      MS. JAMES: May he be excused?
5      THE COURT: Yes. You're free to go.
6  Next witness, Ms. James.
7      MR. BRUNSON: Chuck Kelser.
8      THE COURT: Who?
9      MR. BRUNSON: Chuck Kelser.
10     THE COURT: Chuck Kelser.
11     THE CLERK: Witness Chuck Kelser, courtroom, please.
12 Chuck Kelser.
13     MS. JAMES: Your Honor, we have a stipulation with
14 regard to Carmichael's Exhibit #18. I'd move for admission
15 based on an agreement with the government that it is a
16 photograph of Eric Peagler that was provided by the U.S. Marshal
17 Service.
18     THE COURT: It's admitted.
19     THE CLERK: Mr. Kelser, were you here earlier for the
20 witness oath?
21     MR. KELSER: Yes, ma'am.
22     THE CLERK: Please have a seat here on the witness
23 stand.
24     THE COURT: Proceed.
25     MR. BRUNSON: Thank you, Your Honor.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2009

**22**

1      CHARLES PHILIP KELSER, the witness, having been
2  previously sworn, testified, as follows:
3      DIRECT EXAMINATION
4  BY MR. BRUNSON:
5  Q. What's your name, sir?
6  A. Charles Philip Kelser.
7  Q. Mr. Kelser, how are you currently employed?
8  A. I'm employed at the Carmichael Center as the director.
9  Q. What do you do as director?
10 A. Well, I negotiate contracts, collect fees for the
11 contracts. I coordinate all the events that happen between
12 getting the contracts and the actual event. For example,
13 concerts, I handle getting tickets, take care of the ticket
14 sales, getting the tickets into the different outlets, collect
15 the ticket money, coordinate events during events when they
16 happen. And make sure things go the way they're supposed to go,
17 make sure that all monies are taken care of, that everything
18 matches. For example, tickets, the amount of tickets -- ticket
19 prices versus total monies that come in.
20 Q. You have quite a few --
21 A. Pretty much --
22 Q. -- quite a few responsibilities.
23 A. Yes.
24 Q. How long have you been director of the Carmichael Center?
25 A. Been the director of the Carmichael Center for about a year

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2009

**23**

1  and a half.
2  Q. Prior to that, what did you do?
3  A. For the Carmichael Center?
4  Q. Did you work for the Carmichael Center prior to being
5  director?
6  A. Yes. I was the coordinating director prior to that and just
7  worked mainly in coordinating the things from the time the
8  contracts came until they -- the event actually happened. I
9  really didn't do anything with contracts at that point. Prior
10 to that in the Carmichael Center, I worked with a company called
11 Chase Mortgage and -- when I was working as a mortgage broker.
12 Q. Did Chase Mortgage have anything to do with the Carmichael
13 Center when you worked within the building?
14 A. We rented space from the Carmichael Center. As a matter of
15 fact, we rented space in the old building that was down on
16 Norman Bridge Road prior to building the Carmichael Center. So
17 I've -- I've been with -- with the Carmichael Center
18 organization before the center itself was built.
19 Q. And how long had you been with Chase?
20 A. I was with Chase for -- probably since about 2001 up until
21 2003.
22 Q. And how did you meet Leon Carmichael?
23 A. I met Leon through Chase Mortgage, since we were renting
24 space from him. And we -- I would help do some things for Leon
25 in his trucking business when he -- when he needed some

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**24**

1  contracts written, this sort of a thing.
2  Q. And you said you were in the first building that
3  Mr. Carmichael had?
4  A. Correct.
5  Q. And then when the Carmichael Center was built, did you move
6  your office at Chase from that building to the Carmichael
7  Center?
8  A. To the new building. Correct.
9  Q. Now, you talked about your current duties at the Carmichael
10  Center, collecting monies for ticket sales and so forth. As
11  director, do you come in contact with a lot of cash or currency
12  that's paid by people who come to events at the Carmichael
13  Center?
14  A. Certainly. In two ways. There's a lot of cash that is
15  collected just on ticket sales, advance ticket sales. And I
16  coordinate that with the different outlets, collect the money,
17  count the tickets, make sure that everything matches. So we can
18  have upwards of 40, $50,000 at one time just in advance ticket
19  sales. And I also work with the total monies that come in after
20  an event, and there can be -- there can be upwards of 75, 80,
21  possibly $100,000.
22  Q. And regarding this cash that you collect, do you also pay
23  some of the expenses of the concerts out of the currency you
24  receive from ticket sales?
25  A. Yes. The -- all of the expenses are really paid out of the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**26**

1              CROSS-EXAMINATION
2  BY MR. FEAGA:
3  Q. Mr. Kelser, when did the Carmichael Center open?
4  A. To my recollection, June of 2003.
5  Q. And when did it start earning cash?
6  A. In June of 2003 when we had our first concert, which was --
7  was a gospel concert, as I recall.
8  Q. Okay. And so any money, cash money, that Leon Carmichael
9  had before June of 2003 didn't come from the operation of the
10  Carmichael Center that you've been talking about, right?
11  A. Couldn't have come from that. It wasn't open.
12  Q. What was that question again?
13  Q. That any cash Mr. Carmichael had in his possession before
14  June of 2003 couldn't have come from the operation of the
15  Carmichael Center, because it wasn't open, right?
16  A. Well --
17  Q. Yes or no. Was it open?
18  A. No, it wasn't.
19  Q. So he couldn't have had cash generated from activities at
20  the Carmichael Center before it opened, right?
21  A. Well, could have been from his trucking business. I don't
22  know.
23  Q. Well, but I didn't --
24      THE COURT: No. The question was from the Carmichael
25  Center.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**25**

1  cash, because it's a cash business. The -- the entertainers,
2  for example, that come in, they'll get a deposit to bring them
3  in there, but then the balance is paid the day of the show. So
4  they're paid. All the workers, of course, are paid. You have
5  security that has to be paid. And then promoters bring in the
6  shows; and whatever their share is is paid out of the money, out
7  of the cash.
8  Q. Are you saying that many of these parties involved with the
9  concert are paid with the cash, including the security?
10  A. Absolutely. Because that's -- that's what we have is cash.
11  Q. And does there come a time where you have to handle the cash
12  or transport the cash or do something with the money?
13  A. Oh, yes. I have the cash in my office. I will also pull
14  the cash from -- from the ticket booth and bring it into the
15  office.
16  Q. And is that a security issue, the fact that you're handling
17  cash in the Carmichael Center?
18  A. Oh, yeah. It certainly is.
19      MR. BRUNSON: No further questions, Your Honor.
20      THE COURT: Mr. Teague?
21      MR. TEAGUE: No questions, Your Honor.
22      THE COURT: Mr. Feaga?
23      MR. FEAGA: Yes, sir.
24
25

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**27**

1      THE WITNESS: No.
2      THE COURT: Could it have been from the Carmichael
3  Center.
4  Q. You just talked about all this cash from the Carmichael
5  Center that didn't even open until June of 2003. And I asked
6  you a simple question. Did any of that --
7  A. If it was before it opened, obviously, no, there wouldn't
8  have been cash from there.
9  Q. Now, was there an event at the Carmichael Center on the
10  evening of November the 16th, 2003?
11  A. I would have to check back in the records. I can't answer.
12  Q. Nobody asked you to check the records to see if there was an
13  event that night?
14  A. Why would they?
15      THE COURT: Anything else, Mr. Feaga?
16  Q. Has Mr. Carmichael, since the Carmichael Center opened up
17  and started operating, ever asked you to deposit cash into an
18  account in your name?
19  A. No.
20  Q. Anyone else's name, to your knowledge?
21  A. No.
22  Q. The money that you raise when you conduct these events, is
23  there anything noteworthy about it?
24      THE COURT: Noteworthy about what?
25      MR. FEAGA: The money itself.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

28

1   Q. From your perspective. You say you've seen this cash,
2   right?
3   A. Uh-huh.
4   Q. Is there anything unusual about it?
5   A. It's cash.
6   Q. What are the denominations?
7   A. It's going to be every denomination from ones to hundreds.
8   Q. Ones to hundreds. Could be fives?
9   A. Of course.
10  Q. Could be tens?
11  A. Right.
12  Q. Could be twenties?
13  A. I said every denomination. Yes, sir.
14  Q. Okay. And is there anything else -- any -- you've described
15  it as being every denomination. Is there anything unusual about
16  it other than -- well, is there anything unusual about it at
17  all?
18  A. I don't really know where you're trying to get to, but no.
19  Q. Well, let's just ask a simple question.
20  A. Okay.
21  Q. Does it smell like drugs? Do you know what drugs smell
22  like?
23  A. I know that Mr. Carmichael is not a drug dealer, if that's
24  the question you're asking.
25      THE COURT: No, no, no. Just answer the question.

29

1   Q. Now, you -- you know Mr. Carmichael pretty well, don't you?
2   A. Yes, I do.
3   Q. Known him a long time, haven't you?
4   A. Yes, I have.
5   Q. Okay. Is he a friend of yours?
6   A. We've become friends, but we're business associates, mainly.
7   Q. Okay. Does the money that you raise from these concerts,
8   does it stink? Yes or no. You said you've been around it.
9       MR. BRUNSON: Your Honor, objection.
10      THE COURT: Overruled.
11  Q. Yes or no.
12  A. Does it stink of what?
13      MR. FEAGA: No further questions -- one moment.
14      (Brief pause)
15  Q. Tell me a little bit about Chase Mortgage, sir. What is it?
16      THE COURT: About what?
17      MR. FEAGA: Chase Mortgage. It's a company he said he
18  operated out there at the old trucking building.
19  A. Chase Mortgage is a company that gets loans for refinancing
20  houses or purchasing of homes.
21  Q. Whose company is it?
22  A. It belongs to Lucius Trimble.
23  Q. Lucius Trimble. And who is Lucius Trimble?
24  A. Lucius Trimble is the -- is the owner of Chase Mortgage.
25  Q. Okay. How long has Lucius Trimble been the owner of Chase

30

1   Mortgage?
2   A. Probably since -- I would guess about 1998, '99.
3   Q. Okay. So you worked for Lucius Trimble?
4   A. Correct.
5   Q. Now, how do you pay rent to Mr. Carmichael? Do you pay the
6   rent?
7   A. No. Lucius paid the rent to Mr. Carmichael.
8   Q. Okay. You said you know that he pays the rent. How does he
9   pay the rent?
10  A. I guess you'd have to ask Lucius. I don't know.
11  Q. Well, you said you knew he paid the rent. I was just asking
12  you how you know. How do you know he paid the rent? Let me go
13  back to that. How do you know he paid the rent?
14  A. Maybe he didn't pay the rent. I don't know.
15  Q. You don't know whether he's paying Mr. Carmichael anything
16  or not?
17  A. That's not my concern and wasn't my concern. I know that
18  we --
19  Q. Well, let me ask you something.
20  A. I know that we remained at the Carmichael Center, so I would
21  assume that, yes, he paid the rent.
22  Q. Well, you said you're familiar with the financial operations
23  of the Carmichael Center. Sounds like you're a businessman.
24  A. Uh-huh.
25  Q. When you pay the bills of the Carmichael Center, how do you

31

1   pay them?
2   A. I don't pay the bills.
3   Q. Chase Mortgage. When you pay the bills at Chase Mortgage,
4   how do you pay them?
5   A. I didn't pay the bills.
6   Q. When you get a check from Chase Mortgage -- well, let me ask
7   you this. When Chase Mortgage gives you money -- I guess they
8   pay you for working for them, right?
9   A. Uh-huh.
10  Q. How do they pay you?
11  A. They paid me in cash.
12  Q. And who pays you in cash?
13  A. Lucius -- Lucius Trimble. At the time that we -- that he
14  cashed the checks -- I worked on a commission basis. We would
15  get checks in, he would cash the checks, and I would get my --
16  my commission, my percentage of the checks.
17  Q. So you're always paid in cash whenever you work?
18  A. I was in this particular case.
19  Q. Well, how long did you work for Chase?
20  A. Probably about two years, two, two and a half years.
21  Q. What did you do before that?
22  A. Before Chase, I worked for Validata Computer Company.
23  Q. Okay. And how did they pay you?
24  A. By check.
25  Q. Okay. Other jobs you've had in the past, have you had a

**32**

1  history of being paid by cash?

2  A. I have at times, and I've been paid by check at times.

3  Q. Are you telling this jury that it's normal for a person who

4  works for a business to be paid in cash?

5  A. If it's a cash business, I guess, yes, it's normal.

6  Q. And are you telling this jury that a mortgage business is

7  normally a cash business? Yes or no.

8  A. No.

9  Q. You seem to be hesitating, sir. Why is that? It seems to

10  me it's a simple question.

11  A. Because you're asking me questions. You don't mind if I

12  stop and think about them, do you, sir?

13  Q. Not at all.

14      THE COURT: Take your time, and then you can answer the

15  question.

16      THE WITNESS: All right.

17  A. In the mortgage business, when I would -- when I would sell

18  a particular client on a refi or a purchase, when you go to

19  closing, checks are made out by the lawyers, so much to Chase

20  Mortgage, so much to whomever. So when Chase Mortgage got the

21  check, then Lucius would cash the check; and he would give me my

22  portion of the -- whatever my commission was, which was by cash.

23  Q. I understand that's what Mr. Trimble was doing. What I

24  asked you was are you telling this jury that it's normal for a

25  business to conduct its operations with cash?

---

**33**

1      THE COURT: You said a mortgage business.

2  Q. A mortgage business to operate with cash.

3  A. I don't know what other mortgage businesses do, so I can't

4  answer that question.

5  Q. Well, let me ask you this. When you go to a closing and

6  there are -- I assume that there are -- the buyer's there; is

7  that right?

8  A. Correct.

9  Q. You're there?

10  A. Uh-huh.

11  Q. The seller is there?

12  A. Right.

13  Q. There is somebody representing the closing company there?

14  A. Uh-huh.

15  Q. Maybe a lawyer?

16  A. Yes.

17  Q. Are you telling me that at that table, at that business,

18  when that business is being transacted, are you telling this

19  jury that cash is being passed across the table?

20  A. No. As I told you before, a check is given out at that

21  time.

22  Q. But even in spite of that fact that you're sitting there and

23  you're watching checks being passed in the conduct of that

24  business, you're telling this jury that Chase Mortgage is a cash

25  business?

---

**34**

1  A. I'm telling you that Chase Mortgage paid me in cash.

2  Q. Is Chase Mortgage a cash business?

3  A. Chase Mortgage got checks from closing, paid me in cash.

4  Does that make them a cash business?

5  Q. Well, you're in the mortgage business, sir.

6      MR. BRUNSON: Your Honor, I object. This is far

7  outside the scope of direct.

8      MR. FEAGA: Your Honor --

9      THE COURT: What's your next question?

10      MR. FEAGA: My next question to him is how much

11  familiarity does he have with the mortgage business, because

12  I'm --

13      THE COURT: Overruled.

14  Q. How much familiarity do you have with the mortgage

15  business? Let me ask you another question. Do you hold

16  yourself out to people that you do business with as someone who

17  has familiarity with the way mortgage businesses are transacted?

18  A. Yes, I do.

19  Q. All right, sir. And I want to ask you again. Are they

20  normally check businesses or are they normally cash businesses?

21  A. I would have to see what other mortgage businesses do.

22  Q. How are you paid by Carmichael Center?

23  A. I'm paid with cash.

24  Q. How much do they pay you?

25  A. $300 a week.

---

**35**

1  Q. Now, you're not in any position to tell this jury how the

2  defendant in this case, Leon Carmichael, gets all of the money

3  that he comes into contact with, are you?

4  A. How he gets all the money he comes into contact with?

5  Q. Yes, sir.

6  A. I have nothing to do with the trucking business.

7  Q. All right. And how long did you actually -- have you

8  actually been working for him?

9  A. I actually started working for him at the time that he was

10  arrested, because somebody had to go over and keep the

11  Carmichael Center going. And I knew that -- that he was

12  innocent, and I went there to help him out.

13  Q. Well, now, if you didn't start working for him until he was

14  arrested, sir -- let me ask you this. You say he's innocent.

15  What's he charged with?

16  A. What's he charged with?

17  Q. Yes, sir. What's he charged with?

18  A. He's charged with trafficking of -- of dope and of money

19  laundering.

20  Q. Okay. And since you seem to know that he's innocent, why

21  don't you tell us, if you would, what -- what those offenses

22  constitute. What do those offenses legally mean?

23  A. Well, I would guess that trafficking of dope would be

24  moving -- moving some sort of dope from one place to another.

25  Q. Okay.

**36**

1   A.   Money laundering, I guess, would be taking money that is
2   construed —
3           MR. BRUNSON:   Your Honor, I object to this.
4           THE COURT:   Yes.
5           MR. FEAGA:   All right.
6           MR. BRUNSON:   This is, again, something for the jury —
7           THE COURT:   I think we've gone beyond what's relevant
8   here.
9           MR. FEAGA:   All right.
10  Q.   (Mr. Feaga, continuing:)   Well, do you have any familiarity
11  with an individual named Sandra Jones?
12  A.   I've met Sandra Jones.   Yes.
13  Q.   Okay.   And who do you know Sandra Jones to be?
14  A.   A truck driver.
15  Q.   Okay.   And who is she a truck driver for?
16  A.   For the Carmichael Center.
17  Q.   Okay.   And what's the nature of her relationship with the
18  Defendant Leon Carmichael?
19  A.   She's a driver for him.
20  Q.   Okay.   Well, do you know whether or not she has children by
21  him?
22          MR. BRUNSON:   Objection, Your Honor.
23          THE COURT:   Overruled.
24  A.   Do I know if she has children by him?
25  Q.   Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**37**

1   A.   I'm not real sure about that, no.
2   Q.   Well, have you ever talked to Leon Carmichael about Sandra
3   Jones?
4   A.   No.
5   Q.   Have you ever talked to Sandra about Leon?
6   A.   No.   I've talked to Sandra when she's been in the — in the
7   center, but I've never talked to either one of them —
8   Q.   So you know Leon so well that you can tell this jury that
9   you know he's innocent, but you don't know him well enough to
10  know whether or not he and Sandra Jones have children together?
11  A.   I really don't know the relevancy, but no —
12          THE COURT:   No, no, no.   The question of relevancy is
13  for me to decide.   Just answer the question.
14  Q.   Do they have children together?
15          THE COURT:   No.   He answered that question.
16  A.   I don't know.
17  Q.   You don't know him that well.   Or you —
18  A.   I don't know if he's had children with Sandra.
19  Q.   Or is it that you just don't want to say?
20  A.   I have never questioned him on that, I've never questioned
21  her on that, so I really don't know.   I'm not trying to evade
22  the question.
23  Q.   Do you know that Sandra Jones got caught in El Paso, Texas,
24  with $42,000 in cash that was taken away from her by the El Paso
25  police as drug contraband?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**38**

1   A.   I read that, yes.
2   Q.   Never talked to Leon about that?
3   A.   No.
4   Q.   How about Sandra?
5   A.   No.
6   Q.   Okay.   Do you know she also got pulled over driving one of
7   Leon's trucks in Mississippi with 150 pounds of marijuana in the
8   back of it?
9   A.   I read that also.
10  Q.   Do you know somebody named — have you ever heard of
11  somebody named Big Al?
12  A.   I've heard — I've heard that name.   I don't know Big Al,
13  no.
14  Q.   Okay.   Ever see Big Al around the truck shop?
15  A.   I don't — I've heard the name.   I don't know the guy.
16  Q.   Okay.   Where did you hear Big Al's name?
17  A.   I'm sure I heard it someplace, probably around the
18  Carmichael Center.   I don't know.
19  Q.   Okay.   What about William Bolden?
20  A.   Sure.   I know William Bolden.
21  Q.   Okay.   Who's William Bolden?
22  A.   He's a dispatcher for the trucking company.
23  Q.   Has he got a nickname?
24  A.   Cadillac.
25  Q.   Okay.   Do you know somebody named Joseph Lacey?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**39**

1   A.   Not — not by that name.
2   Q.   Okay.   What do you know him by?
3   A.   I don't know.   You're saying Joseph Lacey —
4   Q.   Okay.   Have you ever heard of —
5   A.   He could be — he could be a truck driver.   They use a lot
6   of nicknames.   I don't know a Joseph Lacey.
7   Q.   How about Pie?
8   A.   Pie?
9   Q.   Pie.
10  A.   No.
11  Q.   Okay.   Did you ever meet — well, you didn't start working
12  for him until he got arrested, right?
13  A.   Correct.
14  Q.   Tell me about that shop.   Does it — that you said that
15  Chase Mortgage was in before the Carmichael Center got built.
16  A.   Uh-huh.
17  Q.   Is that still there?
18  A.   No.
19  Q.   What happened to it?
20  A.   Well, it was torn down.
21  Q.   When you drive up — what did it look like?   Describe it,
22  please.
23  A.   It was blue with black trim, as I recall.   It was rather
24  small.   You had — you had a little small entranceway with a —
25  as you came in, you had an office to the right.   And then there

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**40**

1   was my office, the office Lucius was in, and then Leon's office
2   at the end.
3   Q.  Okay.  And where would you park when you would pull up to
4   it?
5   A.  Right out in front of it.
6   Q.  Okay.  And could you, from the parking lot, go straight up
7   to the door that went into the Multi-Investments side of the
8   building?  What was this trucking company called?
9   A.  Multi-Investments.
10  Q.  Okay.  And was there a sign on your side of it that
11  identified you as being different from Multi-Investments?
12  A.  There was a sign up there that said Chase Mortgage.
13  Q.  Okay.  And what about on the other side?
14  A.  You're asking me to go back.  I'm trying to think.  I don't
15  recall -- I guess Multi-Investments' was -- sign was up there.
16  Q.  Okay.  And what kind of parking lot had this old building --
17  did it have?  What kind of parking surface did it have?
18  A.  Gravel.
19  Q.  Okay.  Let me ask you something.  Do you know somebody that
20  knows Mr. Carmichael named Keena?  Did you ever meet Keena?
21  A.  No, I haven't.
22  Q.  Markeena Watson?  Never met her?
23  A.  Markeena Watson?  No.
24  Q.  Whisenant.  Markeena Whisenant.
25  A.  No.

**42**

1   A.  I don't know Fred Thomas, so I really don't know.
2        MR. BRUNSON:  Objection, Your Honor.
3        THE COURT:  Overruled.
4   Q.  How about Romeo?  Do you know Romeo?  Did you ever meet
5   Romeo?
6   A.  Yes.
7   Q.  Okay.  Who is Romeo?
8   A.  One of the truck drivers.
9   Q.  Okay.  And Lisa?  Did you ever meet anybody named Lisa?
10  A.  Yes.
11  Q.  Who's Lisa?
12  A.  One of the truck drivers.
13  Q.  And is she related to Sandra?
14  A.  I don't know.
15  Q.  What's -- do you know Lisa's last name?
16  A.  No.
17  Q.  Do you know Calvin Dudley?
18  A.  No.
19  Q.  Have you ever heard the name Jimmy Timmons?  Never heard
20  that name?
21  A.  Only in the -- again, I think in the newspaper I read it.
22  Q.  That's the only place you ever heard that name?
23  A.  That is correct.
24  Q.  Have you ever seen it written down anywhere?
25  A.  No, I haven't.

**41**

1   Q.  Did you ever meet Mr. Carmichael's wife, Val?
2   A.  Certainly.
3   Q.  Did she ever come out to the shop?
4   A.  Yes.
5   Q.  Out there at the trucking center?
6   A.  Uh-huh.
7   Q.  How about Sherry Pettus, did Sherry Pettus ever come out
8   there?
9   A.  Yes.
10  Q.  Okay.  What about somebody named Montel?  Did you ever hear
11  of anybody named Montel?
12  A.  Montel?
13  Q.  Montel.  Right.
14  A.  No.
15  Q.  Did you ever hear anybody with a name similar to that?
16  A.  Martel.
17  Q.  Martel?  What's his last name?
18  A.  Watson.
19  Q.  Martel ever come out there?
20  A.  Yes.
21  Q.  Okay.  How about Fred Thomas?  Did you ever meet Fred
22  Thomas?
23  A.  Fred Thomas.  No.
24  Q.  Do you have any idea why Mr. Carmichael would have a bank
25  account with somebody named Fred Thomas?

**43**

1        MR. FEAGA:  No further questions, Your Honor.
2        THE COURT:  Mr. Brunson?
3        MR. BRUNSON:  No further questions, Your Honor, of this
4   witness.
5        THE COURT:  Mr. Teague?
6        MR. TEAGUE:  No, Your Honor.
7        THE COURT:  Thank you.  You may step down.
8   Next witness, Mr. Brunson.
9        MR. BRUNSON:  Murray Argo, Your Honor.
10       THE COURT:  Murray Argo.
11       MR. BRUNSON:  He's in the hall.
12       THE COURT:  Okay.
13  (Brief pause)
14       THE COURT:  Have you been sworn, Mr. Argo?
15       MR. ARGO:  Yes, sir.
16       THE COURT:  Need water?
17       MR. ARGO:  It's gotten cold in here.
18       MURRAY ARGO, the witness, having been previously
19  sworn, testified, as follows:
20           DIRECT EXAMINATION
21  BY MR. BRUNSON:
22  Q.  State your name, please, sir.
23  A.  Murray Argo.
24  Q.  How are you employed?
25  A.  I am self-employed at the present time.  I'm an income tax

44

1   consultant, and I have a used — I have a wholesale automobile
2   dealer license.
3   Q. Where do you live?
4   A. Live in Birmingham, Alabama.
5   Q. And prior to being self-employed, what did you do?
6   A. I was a special agent with the Internal Revenue Service for
7   about 28 years.
8   Q. Is that the same job description as Mr. Louie Wilson, who
9   testified earlier?
10  A. Yes, sir. Same job.
11  Q. And where were you stationed for that time period?
12  A. I was stationed in Birmingham, Alabama, my whole career.
13  Q. Now, what did you do as an IRS special agent? What were
14  some of your duties?
15  A. We would plan and conduct investigations of alleged criminal
16  violations of the Internal Revenue Code. That would be Title 26
17  violations. We also had some Title 18, United States Code, laws
18  that we would enforce or try to investigate, money laundering
19  and there was a conspiracy law that we would use sometimes.
20  Q. And Mr. Argo, you were hired by my office to assist in this
21  case to review records that were received in discovery in this
22  case; is that correct?
23  A. Yes, sir.
24  Q. Now, among the evidence or documents you reviewed, can you
25  give the jury an overview of things that you reviewed in

45

1   preparation for your testimony today?
2   A. Mr. Carmichael's corporation, his Multi-Investments. I
3   reviewed his bank accounts. It consisted of bank statements,
4   cancelled checks, deposit tickets, and the items that made up
5   deposits, personal checking accounts, various credit card
6   accounts Mr. Carmichael had, deeds, mortgages, loan accounts.
7   Just voluminous financial-type records that stretch back over —
8   some of them stretch back ten years.
9   Q. Did you also review tax returns that you received from the
10  government?
11  A. Yes, sir, I did.
12  Q. And do you know what tax periods that included?
13  A. We got tax returns back from 1992 until the year 2000 on
14  Multi-Investments and about that same period for the 1040s for
15  Mr. Carmichael, give or take a year on the 1040s. I'm not —
16  I'm not sure.
17  Q. Now, there have been some other tax returns filed recently,
18  have there not?
19  A. Yes, sir.
20  Q. And were you involved in the filing of those most recent tax
21  returns?
22  A. Yes, I was.
23  Q. What periods do they consist of?
24  A. That was the 2001, 2002, and 2003 corporation Form 1120 of
25  Multi-Investments for Mr. Carmichael.

46

1   Q. Did you prepare those returns?
2   A. No, sir, I didn't.
3   Q. Did you prepare any tax returns for Mr. Carmichael?
4   A. No.
5   Q. What did you do in regard to the '01, '02, and '03 returns?
6   A. Mr. Carmichael employed an accountant, a certified public
7   accountant in Birmingham. I worked with that certified public
8   accountant in the reviewing of the returns. He would prepare
9   drafts. We would go over the returns. He would explain to me
10  what he had done. I wanted to —
11      THE COURT: "He," here, is the other accountant.
12      THE WITNESS: "He," here —
13      THE COURT: "He," here, the word "he," is the other
14  accountant.
15      THE WITNESS: Yes, sir.
16      THE COURT: Not Mr. Carmichael.
17      THE WITNESS: Not Mr. Carmichael. The other
18  accountant, Mr. Foster.
19      MR. FEAGA: Your Honor, before we go further, I want to
20  interpose just an objection that I think is — I don't mind any
21  testimony about what this witness did to — with an accountant
22  in terms of interacting with him. But if he's going to testify
23  about information provided by Mr. Carmichael to the accountant,
24  that's hearsay, and it's inadmissible.
25      MR. BRUNSON: I'm not going to elicit —

47

1       THE COURT: Very good. Go ahead.
2       MR. BRUNSON: -- those sorts of things, Your Honor.
3   Q. (Mr. Brunson, continuing:) And did you perform a role in
4   filing the '01, '02, and '03 income tax returns for Multi?
5   A. Yes, sir, after all the reviews and we had two or three
6   drafts returned. When we were — when we had the returns
7   prepared, they were delivered to -- your office; and I
8   personally filed those returns.
9   Q. But as counsel stated, you didn't evaluate the information
10  received to prepare the returns?
11  A. No.
12  Q. You didn't place the numbers on the tax returns.
13  A. No, sir.
14  Q. But are you aware that they have been filed with the IRS?
15  A. They have been. Yes, sir.
16  Q. Now, are you also aware that the earlier returns were filed
17  for the years 1992 through 2000?
18  A. Yes, sir. They had been.
19  Q. Relating to all of those tax returns, were you able to
20  determine generally an estimate of how much income
21  Mr. Carmichael received over that period of time?
22      MR. FEAGA: Your Honor, we're going to object again
23  because the income tax returns that he's testifying about,
24  again, contain hearsay information that was provided on those
25  returns. He doesn't have any firsthand or personal knowledge

United States of America v. Leon Carmichael, Sr., and Freddie Williams     June 15, 2009

**48**

1  about the matters that were in those tax returns.
2      THE COURT: Mr. Brunson?
3      MR. BRUNSON: Your Honor, we don't claim to have any
4  firsthand personal knowledge. They were returns that were filed
5  on behalf of Mr. Carmichael --
6      THE COURT: Why aren't they hearsay? Why isn't at
7  least what he's saying hearsay?
8      MR. BRUNSON: Your Honor, I could probably answer that
9  more precisely outside the presence of the jury, but in a short
10  answer --
11      THE COURT: What rule should I be looking at?
12      MR. BRUNSON: In a short answer, the rule is --
13      THE COURT: What rule number should I be looking at?
14      MR. BRUNSON: 705. 705.
15      THE COURT: 705? 703 or 705?
16      MR. BRUNSON: Both, Your Honor.
17      THE COURT: Okay. Let me check.
18  (Brief pause)
19      THE COURT: And 705?
20      MR. BRUNSON: Yes, Your Honor.
21      THE COURT: Have you read those rules, Mr. Feaga?
22      MR. FEAGA: Your Honor, I have. And I think that it
23  wouldn't be a problem if the information was properly before the
24  Court that he's going to render an opinion --
25      THE COURT: Does 703 require that?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams     June 15, 2009

**49**

1      MR. FEAGA: Yes, sir, I think it does.
2      THE COURT: Where does it say that?
3      MR. FEAGA: Well, Your Honor, I think it's inferred
4  that he wouldn't be able to offer an opinion about something
5  that the Court had determined was inadmissible before the
6  Court. So I think before he can render an opinion about
7  something, that something has to be admissible evidence in the
8  trial. Otherwise, they're getting it in through the back door.
9      THE COURT: What does the rule say?
10      MR. FEAGA: It says the facts or data in the particular
11  case upon which an expert bases an opinion or inference may be
12  those perceived by or made known to the expert at or before the
13  hearing if of a type reasonably relied upon by experts in the
14  particular field in forming opinions or
15      THE COURT: You need to slow down.
16      MR. FEAGA: Yes, sir. If of a type reasonably relied
17  upon by experts in the particular field in forming opinions or
18  inferences upon the subject. It says the facts or data need not
19  be admissible in evidence in order for the opinion or inference
20  to be admitted. But Your Honor, I don't think that goes to the
21  issue here. I think that the facts --
22      THE COURT: What does the last sentence say?
23      MR. FEAGA: Facts or data that are otherwise
24  inadmissible shall not be disclosed --
25      THE COURT: Slow down. Read it slowly.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams     June 15, 2009

**50**

1      MR. FEAGA: Yes, sir. Facts or data that are otherwise
2  inadmissible shall not be disclosed to the jury by the proponent
3  of the opinion or inference unless the Court determines that
4  their probative value in assisting the jury outweighs their
5  prejudicial effect.
6      THE COURT: So it says facts otherwise inadmissible can
7  be disclosed to the jury as long as the expert bases his opinion
8  upon the type of information that is typically used by experts
9  in forming their opinions.
10      MR. FEAGA: Yes, sir. But if you go to 705, it says
11  that, you know, that -- he can render these opinions unless the
12  Court requires otherwise. And what we're saying is that if
13  they're going to put evidence before the Court for the jury
14  through the back door, which is basically --
15      MR. BRUNSON: Your Honor --
16      MR. FEAGA: If he's allowed to render an opinion about
17  something that's not admissible before the jury, Your Honor,
18  which -- you know, basically, what we want is we want the
19  proponent of these facts that he's allegedly going to render
20  this opinion on -- we want the proponent of those facts to put
21  those facts forward first before he's allowed to render an
22  opinion so that we can determine whether the underlying
23  facts are reliable.
24      THE COURT: I'll excuse the jury for just a minute
25  while we discuss this.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams     June 15, 2009

**51**

1  (Jury out at 3:30 p.m.)
2      THE COURT: Okay. Do you want to take Mr. Hardwick out
3  of turn?
4      MS. WAYNE: I'm sorry, Judge. He let me know.
5  Apparently he has this calendar. He's here now. He would like
6  us to call him --
7      THE COURT: Is there any problem with taking
8  Mr. Hardwick out of turn?
9      MR. FEAGA: Don't know what he's going to testify to.
10      THE COURT: Why don't you summarize his testimony.
11      MS. WAYNE: He's going to testify that he's -- very
12  much like Maddox's testimony. It's a little different in terms
13  of, obviously, the direction. He's the attorney that Mr. Maddox
14  talked about. They were the lawyers together. And it
15  corroborates that kind of stuff to negate the prosecution's
16  theory.
17      THE COURT: And I will explain to the jury he's coming
18  out of turn.
19      MR. FEAGA: Your Honor, we don't have a problem with
20  him going out of turn. We object to it on the basis that it's
21  cumulative.
22      THE COURT: Okay. Overruled.
23      Now, you may step down.
24      While we call him out of turn, I want to look at this
25  issue.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**52**

1 · , · MR. FEAGA: Yes, sir. Would you look at Rule 702,
2 also, Your Honor?
3 THE COURT: Okay. Why don't look at your committee
4 notes, too, and let's just see what's there. We'll take Judge
5 Hardwick, and we can all look at our committee notes.
6 · MR. BRUNSON: Your Honor, may I be heard on this issue
7 first?
8 THE COURT: Yes. Very quickly.
9 MR. BRUNSON: There are probably about 15 tax returns
10 in question here. Eleven or so of those were provided to us in
11 discovery from the government. The government would have
12 introduced those tax returns had they thought they were relevant
13 in this case without any question of whether they were hearsay
14 or not because they were a statement of the defendant. Now,
15 we're not attempting to determine the truthfulness of these
16 documents, and certainly Mr. Feaga --
17 THE COURT: Well, statements can come in against his
18 interests, but the statements can't come in for his interests.
19 The hearsay rules are quite different when it's against your
20 interests rather than for your interests and you're a party.
21 But anyway, I want to look at this.
22 MR. BRUNSON: Thank you, Your Honor.
23 THE COURT: You look at your rules. Look at your
24 committee notes. We'll take Judge Hardwick, and then I'll have
25 a chance to review it some more.

**53**

1 MR. FEAGA: Yes, sir. I have a case for the Court.
2 THE COURT: Great. What's your case?
3 MR. FEAGA: It's United States versus Floyd, 281 F.3d
4 1346, Eleventh Circuit.
5 THE COURT: We'll try to download it, and we'll share
6 it with everybody.
7 MR. FEAGA: This is what it says, Your Honor. It says
8 the expert accountant may not relate facts about the defendant's
9 available cash and net-worth tax case based on statements made
10 by the defendant.
11 THE COURT: Okay. Well, let me read the case first.
12 You're just reading a summary of the case. Let's take up Judge
13 Hardwick right now.
14 (Brief pause)
15 MS. WAYNE: Judge.
16 THE COURT: Yes.
17 MS. WAYNE: We're going to do that waiver thing on the
18 record, too, before the jury comes in.
19 THE COURT: Very good. Let's do it now.
20 MS. WAYNE: All right.
21 THE CLERK: Good evening, sir. Having been previously
22 sworn, you're reminded that you're still under oath.
23 JUDGE HARDWICK: Yes, ma'am. Thank you.
24 Good afternoon, Your Honor.
25 THE COURT: How are you doing?

**54**

1 JUDGE HARDWICK: I'm fine, sir.
2 THE COURT: Why don't you ask the questions, Ms. Wayne.
3 MS. WAYNE: Thank you, Judge.
4 Mr. Carmichael, Judge Hardwick is taking the stand, and
5 I want to ask you some questions about that. In terms of
6 waiving your privilege as to -- well, did Judge Hardwick
7 previously represent you as an officer and the only officer of
8 Multi-Investments?
9 DEFENDANT CARMICHAEL: Yes, he did.
10 MS. WAYNE: Okay. Are you willing to waive the
11 privilege as to your corporation, Multi-Investments, in terms of
12 your prior representation by Judge Hardwick?
13 DEFENDANT CARMICHAEL: Yes, I am.
14 MS. WAYNE: Have you been -- has anyone made you do
15 this, or is this a voluntary waiver on your part?
16 DEFENDANT CARMICHAEL: Voluntary.
17 THE COURT: She asked you about the corporation. I
18 know he represented the corporation; but just in case someone
19 could interpret that as a personal waiver too, as for yourself,
20 do you waive that too?
21 DEFENDANT CARMICHAEL: Yes, sir.
22 THE COURT: Do you have any questions for him, Judge
23 Hardwick?
24 JUDGE HARDWICK: No, sir.
25 THE COURT: Very good. Let's proceed. Bring in the

**55**

1 jury.
2 (Jury in at 3:35 p.m.)
3 THE COURT: Members of the jury, we're taking a witness
4 out of turn. Judge Hardwick has some other obligations, so
5 we're going to hear from him. And then we'll go back to that
6 last witness.
7 JUDGE HARDWICK: Thank you, Judge.
8 THE COURT: Thank you.
9 MR. BRUNSON: Good afternoon.
10 THE COURT: Go ahead.
11 MR. BRUNSON: Thank you, Your Honor.
12 JOHNNY HARDWICK, the witness, having been previously
13 sworn, resumed the stand and testified further, as follows:
14 DIRECT EXAMINATION
15 BY MR. BRUNSON:
16 Q. Good afternoon.
17 A. Good afternoon.
18 Q. How are you, Judge Hardwick?
19 A. I'm fine. How are you, sir?
20 Q. Good. Thank you. Now, you testified yesterday, was it, or
21 was it the day before?
22 A. I believe it was yesterday.
23 Q. Okay. Thanks. And the jury's, of course, aware of who you
24 are. And you testified about the fact that you had met
25 Mr. Carmichael in a relationship where you represented him in

June 15, 2005

**56**

1   about what year?

2   A.  Well, I represented a business concern of his.

3   Q.  I see.

4   A.  Multi-Investments, Inc.

5   Q.  All right.

6   A.  And I believe that was around '98, '99, somewhere in that

7   time frame.

8   Q.  And do you know why you were retained to represent the

9   corporation?

10  A.  At that time, I believe Mr. Carmichael and the business were

11  under investigation by the federal government.  I'm not quite

12  sure at the initial engagement whether or not -- I think some

13  subpoenas had been issued, so in that respect.

14  Q.  And do you know which agency of the federal government was

15  issuing subpoenas?

16  A.  Well, I think it was the United States Attorney's Office.

17  Q.  Because they have the authority to do that.  Do you know --

18  A.  And I think it was a grand jury subpoena, federal grand jury

19  subpoena.

20  Q.  Related to that, there was another attorney representing

21  Mr. Carmichael personally.  Is that often done where each entity

22  needs representation?

23  A.  Yes, sir.  I think in Alabama the law is that the

24  corporation is entitled to have legal -- legal representation,

25  treated as a person.  In this particular instance, I think

June 15, 2005

**57**

1   Mr. Carmichael individually already had counsel, and perhaps

2   someone -- I didn't advise him, but someone advised him that

3   perhaps the business also needed counsel.

4   Q.  And who was the other attorney?

5   A.  Mr. Bruce Maddox, if I remember correctly.

6   Q.  In your meetings with Mr. Maddox and Mr. Carmichael, did

7   y'all develop a strategy of how to defend yourselves -- the

8   company and Mr. Carmichael -- against the government and their

9   investigation?

10  A.  Well, I take exception to the way you phrased that

11  question.  We were not defending ourselves.  We were

12  representing Mr. Carmichael.

13  Q.  Okay.

14  A.  Now, in that respect, we did devise a strategy to respond to

15  the grand jury subpoenas that had been issued.

16  Q.  And what was your strategy in that respect?

17  A.  Well, supply the government with the documents.

18  Q.  Okay.  And was there some discussion among you about

19  cooperating in providing whatever information the government

20  sought?

21  A.  Well, my advice to Mr. Carmichael as the chief operating

22  officer of Multi-Investments, Inc., in my opinion, that he

23  should, as an officer of the corporation, provide the government

24  with the documents that they were asking for.

25  Q.  And did y'all in fact do that?

June 15, 2005

**58**

1   A.  Yes, sir.  We did supply the government with several

2   documents.

3   Q.  Now, Mr. Carmichael had ongoing business concerns at the

4   time.  Did y'all also determine a strategy to keep the

5   businesses going during the investigation period?

6   A.  If I recall correctly, there were some discussions about

7   whether or not Mr. Carmichael would have the cash flow to meet

8   his business obligations.  I remember this discussion partly

9   because I was introduced to a new concept that I did not know

10  of.  One of Mr. Carmichael's concerns was a trucking company.

11  And he was being paid, so to speak, with a document called a com

12  check.  And I was not familiar with that concept, and he

13  explained that concept to me.  And I think the discussion

14  further developed as to whether or not he had to deposit these

15  com checks into a banking institution.

16  Q.  And what was suggested about the handling of those com

17  checks?

18  A.  Well, as he explained it to me, he told me that you could

19  take the com checks to the bank --

20           MR. MOORER:  Objection, Your Honor.  Objection about

21  any statements about what Mr. Carmichael might have told Judge

22  Hardwick.  Hearsay.

23           THE COURT:  Mr. Brunson, why isn't this hearsay?

24           MR. BRUNSON:  I'll rephrase the question, Your Honor.

25  A.  All right.  Well --

June 15, 2005

**59**

1           THE COURT:  Just a minute.  Just a minute.  Go ahead.

2   Rephrase your question.

3   Q.  Judge Hardwick, did you learn how these com checks were

4   used?

5   A.  That you could take them to the bank and cash them.

6   Q.  And was there some discussion with Mr. Carmichael or

7   recommendation from you or Mr. Maddox regarding whether he

8   should be depositing his cash items?

9   A.  Well, I told him that I knew of no law that required you to

10  use a banking institution and that if he could cash the com

11  checks, then, in my opinion, my legal opinion, he was free to do

12  so.

13  Q.  Did you -- were you also aware of other cash businesses that

14  he had at the time?

15  A.  Yes, sir.  And I became aware of that in my initial

16  engagement.  Mr. Carmichael presented the name of

17  Multi-Investments, Inc., which led me to ask the question why

18  that name.  He explained to me because he had several different

19  kinds of --

20           MR. MOORER:  Objection.  Objection.

21           THE COURT:  Just a minute.  Yes.  Actually, that wasn't

22  the question either.

23           THE WITNESS:  Well, I'm trying to get to it.

24           THE COURT:  Go ahead.  Ask your next question.

25  Q.  Did he have other income sources?

60

1  A. Yes, he did.

2  Q. And what were those other income sources?

3  A. I think he had rental property and some commercial property.

4  Q. Do you know if he received cash or currency in payment

5  for --

6      MR. MOORER: Your Honor, and I'm going to object unless

7  he's --

8      THE COURT: Unless he has personal knowledge. Yes.

9  A. I have no personal knowledge of that.

10      THE COURT: Then you can't testify about it.

11  Q. Why did you and Mr. Maddox suggest to Mr. Carmichael that he

12  shouldn't put his money in the bank?

13  A. Well, for one, he was concerned -- that is,

14  Mr. Carmichael -- whether or not he would have the cash flow to

15  operate his businesses. And so, you know, in the banking

16  business, your money's only secured up to $100,000. So we just

17  suggested to him that if he had these com checks, he could go to

18  the bank and cash them.

19  Q. Now, after those suggestions, did you ever receive any word

20  from the IRS that they were done looking at Multi-Investments?

21  A. No, sir, I did not.

22  Q. Never heard that they had finished their investigation?

23  A. No, sir, I did not.

24      MR. BRUNSON: No further questions.

25      THE COURT: Mr. Teague?

---

62

1  Q. And at the time that you represented him --

2  A. No, I didn't represent him.

3  Q. -- Mr. Carmichael -- oh, I'm sorry -- Multi-Investments --

4  A. Yes.

5  Q. -- this was before he was subsequently indicted in this case

6  and the search warrants and all of the other things were done.

7  A. Yes, sir, I think so. Yes, sir.

8  Q. And as you pointed out to him, it wasn't against the law to

9  not use the banks during your representation of

10  Multi-Investments, Inc.

11  A. Yes, sir.

12  Q. But, of course, you did know and would have advised him that

13  it would be unlawful to use drug proceeds, to launder those

14  through any accounts?

15  A. If the conversation had come up.

16  Q. And you, of course, would never have advised him to do

17  something that you would have felt violated the law.

18  A. No, sir. I think the law is to the effect that as long as

19  you have legitimate earnings and you report those earnings on

20  your income tax, there's no law against that. But I -- in my

21  professional opinion, in my experience, you cannot use

22  ill-gotten funds.

23  Q. And, of course, you were trying to tell him how to do things

24  in a lawful and a correct way.

25  A. I was trying to give him my best professional advice.

---

61

1      MR. TEAGUE: No questions, Your Honor.

2      THE COURT: Mr. Moorer?

3          CROSS-EXAMINATION

4  BY MR. MOORER:

5  Q. Judge Hardwick, I know you have to go back to court and do

6  things, so I'm going to be as brief as I can.

7  A. Thank you, sir.

8  Q. Now, during your representation of Mr. Carmichael, this was

9  approximately what time period, sir?

10  A. I'm thinking -- my recollection was refreshed yesterday with

11  the letter Mr. Feaga read that I wrote in '99. So somewhere in

12  '98, '99, that time frame.

13  Q. And at that point, you had been hired to represent the

14  corporation to respond to the subpoena.

15  A. Yes, sir.

16  Q. And you were not present at Multi-Investments on a

17  day-to-day basis to see them doing their business, were you?

18  A. Oh, no, sir.

19  Q. And you weren't at any of his rental properties to see the

20  actual rents being paid, did you?

21  A. No, sir. I saw no collection of rents.

22  Q. And any other business ventures that he might have had, you

23  didn't have any day-to-day knowledge of how they worked, did

24  you?

25  A. That's correct, sir.

---

63

1  Q. Multi-Investments, Inc.

2  A. Multi-Investments. Yes, sir.

3  Q. At the time that you represented Multi-Investments, Inc.,

4  did you know Sherry Pettus?

5  A. I met her later.

6  Q. But not at the time that you represented him.

7  A. No, sir.

8  Q. Represented Multi-Investments, Inc. I'm sorry.

9  A. No, sir.

10  Q. And did you know that she had an account at Compass Bank?

11  A. I would have no reason to know that, sir. To answer your

12  question bluntly, though, no, I didn't.

13      MR. MOORER: If I may have one moment, Your Honor.

14      (Brief pause)

15  Q. Did you ever, during that meeting with Mr. Carmichael,

16  advise him to put money in the bank in the names of other

17  people?

18  A. No, sir.

19  Q. Or Multi-Investments, Inc.? And I apologize for saying him

20  when you were representing Multi-Investments, Inc.

21  A. Right.

22  Q. Was that --

23  A. No, sir, I did not.

24      MR. MOORER: Okay. No further questions.

25      MR. BRUNSON: No further questions, Your Honor.

64

1      THE COURT:  Thank you.

2      THE WITNESS:  Thank you, Judge.

3      THE COURT:  Now, is he free to go?

4      MR. BRUNSON:  Yes, Your Honor.

5      THE COURT:  Mr. Teague?

6      MR. TEAGUE:  Yes, Your Honor.

7      THE COURT:  Mr. Moorer?

8      MR. MOORER:  No further questions.  Thank you, Your

9  Honor.

10      THE COURT:  You are free to go.  No more subpoenas.

11      THE WITNESS:  Thank you.  Well, if you need to, I'll

12  honor the Court's order.

13      THE COURT:  Okay.  Now, can we move on to — well, I

14  guess we need to take up this other matter.  Can you move on to

15  something else right now, or do you have to deal with the matter

16  that I'm researching right now?

17      MR. BRUNSON:  I only need to deal with this matter,

18  Your Honor.

19      THE COURT:  You do?

20      MR. BRUNSON:  Yes.

21      THE COURT:  You don't have another witness we can take

22  up?

23      MR. BRUNSON:  No, Your Honor.

24      THE COURT:  Well, I apologize to the jury, but I'll

25  have to excuse you.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

66

1      MR. FEAGA:  Eleventh Circuit Handbook.  Yes, sir.

2      THE COURT:  Okay.  Well, that's not enough.  We'll take

3  a recess while I look at this.

4      MR. TEAGUE:  Your Honor.

5      THE COURT:  Yes.

6      MR. TEAGUE:  May I step out in the hall?

7      THE COURT:  Yes.

8      (Recess at 3:50 p.m. until 3:59 p.m., at which time

9      proceedings reconvened without the jury present, as

10      follows:)

11      THE COURT:  Counsel, I'm ready.  Anything else before I

12  rule?

13      MR. FEAGA:  No, sir, Your Honor.

14      THE COURT:  I read your case — oh, Mr. Carmichael

15  isn't here.  Mr. Carmichael.

16      (Brief pause)

17      (Defendants present)

18      THE COURT:  Is Mr. Carmichael here?

19      DEFENDANT CARMICHAEL:  (Nods head)

20      THE COURT:  Counsel, I've read your case suggested by

21  Mr. Feaga.  And Mr. Feaga, it actually stands against you.

22      MR. FEAGA:  The head note, Your Honor —

23      THE COURT:  It says, Floyd, being the defendant, next

24  contends that the Court erred by permitting the government to

25  offer Miller's hearsay testimony in order to establish

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

65

1      (Jury out at 3:48 p.m.)

2      THE COURT:  Okay.  Counsel, have you had a chance to

3  look at this issue, Mr. Brunson?

4      MR. BRUNSON:  Your Honor, I'm just reading Rule 703.

5      THE COURT:  Okay.  We're looking at it too.  Have you

6  had a chance — which U.S. attorney is handling it?

7      MR. FEAGA:  Me, Your Honor.

8      THE COURT:  Okay.  Have you had a chance to look at it

9  other than that case you cited?

10      MR. FEAGA:  No, I mean other than the rules I've cited

11  to the Court.  I mean it's Rule 702.

12      THE COURT:  Well, we need to go beyond the rules.  Do

13  you have anything other than the case?

14      MR. FEAGA:  Just this, Your Honor, because I'm not sure

15  it's clear that my problem with this information is that I know

16  that the only place that this witness could have gotten this

17  information that was put on these tax returns —

18      THE COURT:  I understand your argument.  I understand

19  your argument.  I just want law now.

20      MR. FEAGA:  Yes, sir.  Other than what I've given —

21      THE COURT:  You've cited a case that I don't think

22  you've read; is that correct?

23      MR. FEAGA:  I've not read the entire case, Your Honor.

24  I got it from —

25      THE COURT:  You read a citation to it in the —

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

67

1  interstate nexus required by section — of the code.  I won't

2  mention that.  Hearsay testimony by experts is permitted if it

3  is based upon the type of evidence reasonably relied upon by the

4  experts in the particular field.  The witness, according to this

5  case, testified that the information gathered was the type

6  reasonably relied upon by experts.  That's the case from the

7  Eleventh Circuit.

8      Then there's a case from the Tenth Circuit, United

9  States versus Affleck, A-F-F-L-E-C-K, 776 F.2d 1451, which

10  stands or holds that expert witness's recitation during

11  testimony laying groundwork for opinion of his recollection of

12  out-of-court conversations with others during course of review

13  of defendant's financial records was proper because information

14  expert obtained in that manner was obtained in a manner —

15  basically reciting the rule.

16      So the sole question for this witness is, is it the

17  type of information that experts reasonably rely on in forming

18  the type of opinion that he's talking about.  And I'd like to

19  hear that.  If it is, it comes in.  If it's not, it stays out.

20      MR. FEAGA:  Could we ask one more thing, Your Honor?

21      THE COURT:  Yes.

22      MR. FEAGA:  And that is that there be some basis for

23  establishing at least some basis for the information he's

24  testifying about.  And we've heard is he got it from an

25  accountant.  We don't know where the accountant got it.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**68**

1       THE COURT:  You can take him, if you'd like to, on voir
2   dire right now.  But as long as it's that type of information
3   and it's the type of information experts reasonably rely upon,
4   it comes in.  You can then cross-examine him, you know, do
5   whatever you want with it, show that it's totally fallacious,
6   show whatever you want to show, but it comes in.
7       MR. FEAGA:  All right, sir.
8       THE COURT:  Ask him the questions that meet the rule,
9   Mr. Brunson.  Do that outside the presence of the jury, and then
10  I'll bring in the jury.
11      MR. BRUNSON:  Yes, Your Honor.
12      MR. FEAGA:  Your Honor, if it's all the same to the
13  Court, I would prefer — well, no, I take that back.  We'll do
14  it out of the presence of the jury.
15      THE COURT:  Okay.  Yes.  Go ahead and ask your
16  question, Mr. Brunson.
17      MURRAY ARGO, the witness, having been previously
18  sworn, testified without the jury present, as follows:
19              VOIR DIRE EXAMINATION
20  BY MR. BRUNSON:
21  Q.  Mr. Argo, these income tax returns that you're relying upon,
22  are they documents or items that are normally relied upon to get
23  a picture or view of a person's financial income, expenses, and
24  such?
25  A.  Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**69**

1   Q.  And are these things that you have relied upon in your
2   experience at the IRS for that purpose?
3   A.  Yes, sir.
4   Q.  And you're not in a position to verify the correctness of
5   these documents, but they are documents that have been submitted
6   to the Internal Revenue Service for reporting of income.
7   A.  Yes, sir, they have been.
8   Q.  And your evaluation of these documents is one where you have
9   simply taken a calculator and added up items and not necessarily
10  gone behind the item to investigate it.
11  A.  Yes, sir.  Just as you said.
12      THE COURT:  Okay.  Do you have anything on voir dire?
13      MR. FEAGA:  Yes, sir.  Just one.
14              VOIR DIRE EXAMINATION
15  BY MR. FEAGA:
16  Q.  Where did the information that you're going to be offering
17  these opinions on come from?
18  A.  The '92 through 2000 tax returns were provided in discovery.
19  Q.  No.  But I mean the information that's in them.  Where did
20  it come from?
21  A.  That are on the tax returns?
22  Q.  Yes, sir.  You know, the tax return says — it reports the
23  income that's on there.  Who gave you the information that
24  establishes the income in that document?
25  A.  Nobody gave me that information.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**70**

1   Q.  Okay.  And what about the expenses that are there?  Who
2   verified the accuracy of the expenses that are listed on that
3   tax return?
4   A.  I don't know.
5   Q.  So you don't have any idea where the data that's reflected
6   on those returns came from.
7   A.  No firsthand knowledge.  No.
8       MR. FEAGA:  Your Honor, we would submit he should not
9   be allowed to testify about this stuff.
10      THE COURT:  The rule is clear.
11      MR. FEAGA:  All right, sir.
12      THE COURT:  Bring in the jury.  Objection overruled.
13  I'll say this.  I have suspicions, too, but I follow the rule.
14      (Jury in at 4:05 p.m.)
15      THE COURT:  Proceed.
16      MR. BRUNSON:  Thank you, Your Honor.
17      MURRAY ARGO, the witness, having been previously
18  sworn, resumed the stand and testified further, as follows:
19              DIRECT EXAMINATION, Continued
20  BY MR. BRUNSON:
21  Q.  Mr. Argo, I had asked you the question in evaluating the
22  income tax returns for Multi-Investments since 1992, were you
23  able to estimate — well, you probably could have calculated
24  exactly how much gross income was reported, but can you give a
25  general round figure as to how much gross income was reported by

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**71**

1   Mr. Carmichael for those tax returns that you're aware of?
2   A.  From 1992 to —
3   Q.  2003.
4   A.  — 2003, approximately $18 million in gross income.
5   Q.  Were you missing one of those tax years when you made that
6   estimate?  Are all those tax years included in that estimate?
7   A.  There may have been one year in — back in the mid nineties
8   that I didn't have.
9   Q.  But approximately 18 million is what you say?
10  A.  Yes, sir.
11      MR. BRUNSON:  May I approach, Your Honor?
12      THE COURT:  Yes.
13  Q.  I show you what's marked as Government's —
14      THE CLERK:  Carmichael's.
15  Q.  — Carmichael's — Defendant Carmichael's Exhibits #20, #21,
16  #22, and #23.  I ask if you can identify those documents,
17  please.
18  A.  Yes, sir.
19  Q.  And what are they, beginning with — well, what are they
20  generally?
21  A.  They're the 2000, 2001, 2002, and 2003 U.S. corporation
22  income tax returns for Multi-Investments, Incorporated, Form
23  1120.
24  Q.  And those — each of those returns — were you involved in
25  filing any of those returns?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

72

1   A. Yes, sir.  The 2001, 2002, and 2003.

2   Q. Now, the 2000 return, does that have an indicator on it

3   indicating that it was also filed with the Internal Revenue

4   Service?

5   A. Yes, sir.  It -- it has in the upper right-hand corner a

6   document locator number that the Internal Revenue Service stamps

7   on it when they received it so they can retrieve it, and it also

8   has a received stamp on it from the Memphis, Tennessee, Service

9   Center.

10  Q. Do you know who prepared each those tax returns?

11  A. On the 2000 return, the preparer's signature is T. Ashley

12  Duncan.  And for the 2001, 2002, and 2003, C. Benjamin Foster

13  prepared those three.

14  Q. So were those accountants that prepared each of those tax

15  returns?

16  A. Yes, sir.

17        MR. BRUNSON:  Your Honor, we offer Government's --

18  Defendants' Exhibit #20, #21, #22, and #23 into evidence.

19        THE COURT:  Admitted.

20  Q. Mr. Argo --

21        MR. BRUNSON:  If I may approach again, Your Honor.

22        THE COURT:  Yes.

23  (Brief pause)

24        MR. BRUNSON:  Your Honor, with permission to publish

25  these?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

73

1        THE COURT:  Yes.

2   Q. Mr. Argo, I'm showing you what is marked as Government's

3   (sic) Exhibit #20.  And is that the 2000 tax return for

4   Multi-Investments?

5   A. Yes, it is.

6   Q. Can you tell me how much gross income was earned from

7   Multi-Investments in the year 2000?

8   A. It's on line one there, gross receipts, $1,060,468.

9   Q. Now, above the gross receipts figure in the right column is

10  also an entry for total assets.  Can you tell me what the total

11  assets was for 2000 for this company?

12  A. $1,422,075.

13  Q. And is that a matter that must be divulged on a year-to-year

14  basis, the total assets, not only the income, but the assets and

15  liabilities of a corporation?

16  A. Yes.

17  Q. And I'm showing you Defendants' Exhibit #21 for 2001.  First

18  of all, I'll ask you how much gross receipts were received for

19  that particular tax year.

20  A. For Multi-Investments, 2001, the gross receipts was

21  $1,281,071.

22  Q. Now, on the back page of this tax return, there are a series

23  of entries that break down the income items for

24  Multi-Investments, is there not?

25  A. Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

74

1   Q. And those entries include what?

2   A. There's trucking income, Club Unique, Club 334, Club Gs,

3   check cashing, flea market, merchandise, Chase Mortgage, and

4   Fresh Look Barber & Style.

5   Q. Are those businesses that fall under the umbrella of

6   Multi-Investments, Inc.?

7   A. Yes, sir.

8   Q. And those figures contained in the column also deal with the

9   amount of income attributable to each; is that correct?

10  A. Yes.

11  Q. Now, there's a column there called cash.  Do you know if

12  that means green money or just checks?  Do you have any idea

13  what that means, specifically?

14  A. Not in this particular situation.  I do not know.

15  Q. But relating to the clubs, are those businesses that

16  normally generate cash?

17  A. Yes, they are.

18  Q. And are you aware of Mr. Carmichael having an interest in a

19  flea market?

20  A. Yes, sir.

21  Q. And I show you what's marked as government -- as Defendants'

22  Exhibit #22 and ask if you can identify how much gross income

23  was received by Multi-Investments in '02.

24  A. Yes, sir.  It would have been $2,169,398.

25  Q. And again, a breakdown of that income reported on the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

75

1   return, is that -- is that what's in front of you there?

2   A. Yes, sir.  It's a description of those receipts.

3   Q. There's a reference to lot sales included in this particular

4   breakdown.  Do you know what that cash receipt is?

5   A. Yes, sir.

6   Q. What is that?

7   A. That's from the sale of tennis shoes that Mr. Carmichael

8   purchased, and that's how it was characterized on this document.

9        MR. FEAGA:  Your Honor, we're going to object to any

10  further testimony about that unless he can testify to how he

11  knows.  He says he knows where it came from.  Foundation.

12        THE COURT:  Are you objecting to these returns?

13        MR. FEAGA:  No, sir.  Just to his comments about where

14  that lot sales income matter came from, if he knows where it

15  came from.

16        THE COURT:  I sustain that objection unless you have

17  personal knowledge of the income that is on there.

18        THE WITNESS:  I saw some documents.

19        THE COURT:  If he has personal knowledge.

20        MR. BRUNSON:  Yes, Your Honor.  I'll withdraw that.

21  Q. Showing you, Mr. Argo, the 2003 tax return that's

22  Defendants' Exhibit #23.  How much gross income did

23  Multi-Investments receive for 2003, Mr. Argo?

24  A. $2,033,427.

25  Q. And what is -- what is that document relating to Defendants'

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

76

1   Exhibit #23?
2   A. That's the breakdown of the $2,033,427 in receipts. That's
3   the breakdown of how that money was received by the corporation.
4   Q. Mr. Argo, did you also evaluate the deposits that went into
5   the Multi-Investments checking account?
6   A. Yes, sir, I did.
7   Q. And is that the checking account found in Government's
8   Exhibit #72?
9   A. Yes, sir.
10  Q. Relating to the deposits to that particular checking
11  account, were you able to evaluate how much check deposits and
12  how much currency deposits was made?
13  A. For the years 2001, 2002, and 2003, I was.
14  Q. And do you have a general estimate of how much check versus
15  cash that was deposited to the Multi-Investment account?
16  A. Of approximately the $4 million of deposits into that
17  account, all I could determine was $132,000 in currency into
18  that account.
19  Q. Mr. Argo, each of these tax returns that you've looked at
20  contain the gross income and end up containing a net income
21  figure. How do you get from gross down to net?
22  A. On these particular returns, you would have the gross
23  receipts, like I talked about, and you would have a
24  cost-of-goods-sold figure to come to another gross income
25  figure. Then you would take -- there's expenses that you would

78

1   evaluating the -- the depreciation and the profits that
2   Mr. Carmichael generated out of that corporation.
3   Q. And approximately how much profit would be available to
4   Mr. Carmichael personally?
5   A. About a million dollars.
6   Q. Now, why didn't you evaluate 2003 in that regard?
7   A. Well, the money that we're having questioned, the two
8   hundred something thousand dollars in the Compass Account, was
9   deposited mainly in 2002. So I only did 2000, 2001, and 2002,
10  up until then.
11  Q. Have you also evaluated these tax returns in relationship to
12  Mr. Carmichael's construction of the Carmichael Center?
13  A. Yes, sir, I have.
14  Q. And have you been able to determine based on the income and
15  assets that appear on the tax returns whether he was
16  legitimately capable to construct the Carmichael Center?
17          MR. FEAGA:  Your Honor, we may not object to this if he
18  lays a proper foundation. We know he's looked at the tax
19  returns that Mr. Carmichael gave him. What we don't know is
20  whether he's examined the books to determine whether and how
21  much the Carmichael Center cost to build. So if he lays a
22  proper foundation, he might be able to ask this question.
23          MR. BRUNSON:  Thank you, Your Honor.
24  Q. Mr. Argo, you heard the testimony of the witnesses that
25  constructed the Carmichael Center, the earlier witnesses,

77

1   have -- overhead, fuel, wages, and so forth -- to come down to a
2   net income figure at the -- at the bottom of the -- of the tax
3   return on the front page there before taxes.
4   Q. And tell me how depreciation works in deductions on a
5   corporate income tax return.
6   A. A business, a corporation, could have certain assets called
7   depreciable assets. It could be a building. It could be
8   trucks. It could be automobiles, office furniture, computers,
9   just anything like that, of that type nature. And the tax laws
10  allow you to deduct from your income a certain amount of the
11  cost of those items each year as it relates to maybe the
12  expenses associated with producing that income.
13  Q. Is that an example of a noncash deduction?
14  A. Yes, it is.
15  Q. Does the taxpayer or owner of the business still have the
16  opportunity to spend the money that is being deducted for
17  depreciation expense?
18  A. Yes, sir. It's a noncash item, so those gross receipts
19  would be in addition to whatever profits he made.
20  Q. Have you been able to evaluate generally how much money
21  would have been available to Mr. Carmichael for a period of
22  time?
23  A. Yes, sir.
24  Q. And what period did you evaluate?
25  A. The 2000, 2001, and 2002 Multi-Investments tax returns

79

1   Mr. Reese and Mr. Gunn, did you not?
2   A. Yes, sir. I heard that.
3   Q. And do you know about how much they estimated that the
4   Carmichael Center cost to construct?
5   A. It seems like after there was a couple of additions and
6   subtractions, according to them, two and a half to two and
7   three-quarter million dollars.
8   Q. And have you been able to determine whether Mr. Carmichael
9   had that amount of money based on what you know about the cost,
10  the tax returns, and any debts that he still owes those people
11  or any loans that he made?
12  A. Based on the cash flow he generated on the 2000, 2001, and
13  2002 returns plus the monies that he was earning during 2003
14  when the Carmichael Center was being -- being built, according
15  to that testimony -- and then there was a loan at the end to
16  help pay for that. And then I also heard testimony about he
17  still owed a little bit on that. It all was just within very
18  close proximity of what was spent on constructing the Carmichael
19  Center and that site work, the parking and what not.
20  Q. And you spoke about the Compass Bank account. Of course,
21  you know which account that is, and you were able to evaluate
22  the deposits and checks that went into that account.
23  A. Yes, sir.
24  Q. And there's no belaboring the point of how much went in and
25  in what form.

80

1  A. No, sir.
2  Q. During your years with the IRS, did you have occasion to run
3  across people that had cash hoards or had put money aside and
4  away?
5  A. Yes, I have.
6  Q. And on those occasions, were these individuals ones who were
7  necessarily drug dealers?
8  A. No, sir, they were not.
9  Q. Did you also have occasion to run across individuals in your
10 years of investigative work who had opened bank accounts in the
11 names of others?
12 A. Yes, I have.
13 Q. And were those individuals necessarily drug dealers?
14 A. No, sir.
15     MR. BRUNSON: No further questions of this witness at
16 this time, Your Honor.
17     THE COURT: Mr. Teague?
18     MR. TEAGUE: None, Your Honor.
19     THE COURT: Mr. Feaga?
20     MR. FEAGA: Yes, sir.
21           CROSS-EXAMINATION
22 BY MR. FEAGA:
23 Q. Mr. Argo, let's get something out real quick, straight
24 here. These tax returns that you're testifying about, you have
25 no personal knowledge whatsoever of the accuracy of the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

81

1  information in them, do you?
2  A. I have some accuracy — some knowledge.
3  Q. Well, let's — tell us, what knowledge do you have of the
4  accuracy of the information that's contained in those returns?
5  A. Based on the analysis of the bank accounts that I've gone
6  through and — and my talking with the accountants to clear up
7  certain matters on the returns, to remove some income items off
8  the returns that shouldn't have been on there and to add some.
9  Q. Well, are you telling me that you can look at somebody's
10 bank accounts and determine whether or not their tax returns are
11 accurate?
12 A. No, sir, I'm not.
13 Q. You need a lot of other information, don't you?
14 A. Yes, sir.
15 Q. You need to know how much in fact they received from any
16 particular business enterprise they're involved in, right?
17 A. Yes, sir.
18 Q. You need to know what the expenses associated with
19 generating that income are, don't you?
20 A. Yes, sir.
21 Q. If they report that they received cash, you are relying on
22 the word of the person that told you about it, right?
23 A. Yes, sir.
24 Q. Okay. For instance, you've got listed in these tax
25 returns — and we'll talk about some — them in a little more

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

82

1  detail in a minute. But you've got listed in these 2001, 2002,
2  and 2003 tax returns -- you've got a lot of cash reported in
3  there, don't you?
4  A. Yes, sir.
5  Q. Okay. And the information that you're relying on for
6  whether or not those facts and figures are true, that came from
7  Mr. Carmichael, didn't it?
8  A. Yes, sir.
9  Q. So you don't know whether it's accurate or not, do you, from
10 your own independent review?
11 A. No, sir.
12 Q. We're strictly relying on what Mr. Carmichael gave you.
13 A. Yes, sir.
14 Q. Now, if anything in those facts and figures is not true,
15 then everything that you've calculated in those returns is
16 false, isn't it?
17 A. Yes, sir.
18 Q. Now, let's talk about 2001, 2002, and 2003, these three tax
19 returns that you've just been testifying to about, this income
20 that Mr. Carmichael has on there.
21 A. Yes, sir.
22 Q. Those tax returns were filed 20 days ago, weren't they?
23 A. Twenty-five, 30 days ago.
24 Q. Twenty-five or 30 days ago. They weren't filed when they
25 were due, were they?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

83

1  A. No, sir.
2  Q. 2001 was filed 20 days ago.
3  A. Yes, sir.
4  Q. Twenty-five days ago.  I'll -- we'll go with that.  2002, 25
5  days -- when was 2001 due?
6  A. It was due -- if there was not an extension filed, it was
7  due March 15th of 2002.
8      THE COURT: March 15th?
9      THE WITNESS: Yes, sir. Corporation tax returns --
10 Q. And you've sat in here and you've listened --
11     THE COURT: If it's a corporation, it's a different
12 date?
13     THE WITNESS: Yes, sir. It's the 15th day of the third
14 month after the end of the fiscal year.
15 Q. Now, do you know when the government provided the discovery
16 in this case to the defendant?
17 A. Yes, sir.
18     MR. BRUNSON: Objection, Your Honor.
19     MR. FEAGA: I think it's highly relevant, Your Honor.
20     THE COURT: Overruled.
21 Q. Do you know when we provided to Mr. Carmichael all of the
22 evidence that we intended to introduce in this trial?
23 A. No, sir, I don't.
24 Q. It was well before those tax returns were filed, wasn't it?
25 A. Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

**84**

1   Q. So he knew what was coming into this courtroom when he gave
2   you the data to put on 2001, 2002, and 2003.
3   A. I can't testify to what he knew at the time.
4   Q. Well, if he — are you — are you suggesting to this jury
5   that you don't know that his lawyers had that information and
6   shared it with him? When did you get hired?
7   A. Pardon me?
8   Q. When did you get hired to work on this case?
9   A. Last July.
10  Q. Well, when did you start working on this case?
11  A. Last July.
12  Q. Did you get provided with the information that the
13  government has turned over?
14  A. The discovery documents?
15  Q. Yes, sir.
16  A. Yes, sir.
17  Q. So you had our discovery in this case when you prepared
18  those tax returns for Mr. Carmichael.
19  A. I had discovery. I didn't prepare the returns.
20  Q. So you didn't even prepare these returns.
21  A. No, sir.
22  Q. But whoever did got the information from Mr. Carmichael.
23  A. As far as I know.
24  Q. After he knew everything we were going to put in evidence in
25  this case.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**85**

1   A. I can't — I don't know about that.
2   Q. Well, you knew about it before, didn't you, before you
3   prepared the tax returns? You had the information.
4         THE COURT: He said he didn't prepare the tax returns.
5         MR. FEAGA: All right.
6   Q. You were exposed to the tax returns, weren't you?
7   A. Well, yes.
8   Q. Well, you filed them, right?
9   A. Yes, sir.
10  Q. You said you filed them.
11  A. Yes, sir. I filed them.
12  Q. Okay. Well, you wouldn't file a tax return without checking
13  with somebody to find out if there was any authenticity
14  associated with it, would you?
15  A. No, sir. I couldn't.
16  Q. Okay. So then these tax returns were prepared by someone
17  else, filed by you, and you looked — well, you've been
18  testifying about them. Are you telling me you didn't even look
19  at them?
20  A. Oh, I looked at them. Yes, sir.
21  Q. Okay. So you looked at the tax returns. And are you
22  telling me you didn't make any effort to compare them to the
23  information that we turned over to you before you prepared
24  them — excuse me — before they were prepared and given to you?
25  A. I looked at the bank records. I looked at the records.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**86**

1   What I had had been turned over.
2   Q. I just want to make one thing — let me —
3         MR. FEAGA: What I want is irrelevant, Your Honor. I
4   apologize and withdraw that.
5   Q. You don't have any personal knowledge about whether the
6   information in there is true and correct or not, do you?
7   A. No, sir.
8   Q. Okay. And if any part of it's false, then it's all false,
9   right?
10  A. No, sir.
11  Q. The whole figures are off, aren't they?
12  A. No, sir.
13  Q. Well, let me just ask you. If there's income reported in
14  here that isn't accurate, then doesn't that make the return
15  inaccurate?
16  A. Yes, sir. Yes, sir.
17  Q. Okay. And that makes it kind of difficult for anybody that
18  wants to rely on it to rely on it, doesn't it?
19  A. Yes, sir.
20  Q. I mean you're — you testified — how long were you with the
21  IRS?
22  A. Twenty-eight years plus.
23  Q. Let me ask you. Are people expected to file their tax
24  returns on time by the IRS?
25  A. Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**87**

1   Q. Okay. And do most people do that?
2   A. Yes, sir, I would think so.
3   Q. And are people required to put accurate information on their
4   tax returns?
5   A. Yes, sir. By law, they are.
6   Q. Okay. And have you been involved in cases and situations
7   where people were investigated by the IRS for failing to file
8   tax returns?
9   A. Yes, sir.
10  Q. For putting false information on tax returns?
11  A. Yes, sir.
12  Q. Those would be serious matters, as far as you're concerned,
13  wouldn't they?
14  A. Very serious.
15      (Brief pause)
16  Q. Now, you have had an opportunity to review Mr. Wilson's
17  work, have you not, in terms of preparing for this case? You've
18  had an opportunity to look at — you heard him testify earlier,
19  right?
20  A. Yes, sir.
21  Q. You had an opportunity to review the work that he did in
22  terms of when he told the jury here about how much cash came out
23  of these 12 bank accounts of Mr. Carmichael's?
24  A. Yes. I heard.
25  Q. Okay. Was he right when he said these were all of Mr. —

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2009

88

1    excuse me. Was he right when he said that these are all of
2    Mr. Carmichael's accounts?
3    A. I don't think he testified to that.
4    Q. Well, was he right when he said that these were all the
5    accounts that Mr. Carmichael had signature authority over?
6    A. Yes, sir. He was correct in saying that.
7    Q. Okay. And so was he right when he said that only $10,000 in
8    cash came out of those accounts -- during the time frame that he
9    testified about, that only $10,000 in cash was withdrawn from
10   those accounts? Was he right about that?
11   A. I have not reviewed every one of those accounts as regards
12   to deposit tickets and deposit items that Mr. Wilson testified
13   about.
14   Q. Well, your own team said he was an outstanding criminal
15   investigator. Would you agree?
16   A. Yes, sir.
17   Q. Would you have any reason to question what he would testify
18   to in this trial?
19   A. No, sir, not under oath, I wouldn't.
20   Q. All right. Now, so if -- let me ask you. Did you look at
21   Leon Carmichael's mother's account?
22   A. Yes, I did.
23   Q. Okay. And was he right when he said that about 9,000 of the
24   10,000 came out of that account?
25   A. It has been so long since I've looked at that account -- I

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2009

89

1    have looked at it a couple of times. And if Mr. Wilson said
2    that, I would rely on that.
3    Q. Now, you testified earlier that you had some personal
4    knowledge that Mr. Carmichael owned a flea market. Would you
5    share with us what personal knowledge you have that
6    Mr. Carmichael owns a flea market?
7    A. Mr. Carmichael told me he had an interest in a flea market.
8    Q. Well, that's not personal knowledge, is it? Have you
9    testified in criminal trials before?
10   A. Oh, oh, personal knowledge. Excuse me. I'm sorry. Well,
11   no, no personal knowledge.
12   Q. So you don't know whether he owned one or not, do you?
13   A. Well, no.
14   Q. So if you told the jury or represented to the jury that he
15   did, you weren't exactly being up front with them, were you?
16   A. No, sir.
17   Q. Now, you sat in here while Mr. Wilson testified and all --
18   in fact, all the witnesses, right?
19   A. Except just for a minute part. I had to be called out. But
20   I've heard -- I've heard the vast majority.
21   Q. Well, sir, I'd like you to put that IRS CID hat back on for
22   me for just a minute, and I want to show you this Compass Bank
23   account that was introduced into evidence I think originally by
24   Ms. Mona George of Compass Bank --
25   A. Okay.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2009

90

1    Q. -- and ask you, if you would, just to take a look at it.
2        (Brief pause)
3    A. This appears to be all that account. Yes, sir.
4    Q. Yes, sir. And you've had a chance to look at that, just
5    like you did the tax returns, a long time before coming in here
6    today, right?
7    A. Yes, sir.
8    Q. Okay. And all the government's -- all the rest of the
9    government's discovery. You saw all that and you've seen that
10   too, right there, right?
11   A. Yes, sir.
12   Q. Okay. Now, you heard Ms. Mona George, who works at Compass
13   Bank, testify before this jury that that was a very unusual
14   account. Did you -- do you remember that testimony?
15   A. Yes.
16   Q. Would you agree with it?
17   A. No.
18   Q. Well, would you agree that it is unusual for someone to
19   deposit cash deposits of money that smells odd in a bank account
20   that belongs to someone else?
21   A. That -- that would be unusual.
22   Q. Okay. You don't find it unusual that a woman who works as a
23   secretary or whatever it is she's doing in some capacity for
24   Mr. Carmichael has access to that kind of cash to go into an
25   account in her name?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2009

91

1    A. Not in this case, I do not.
2    Q. Not in this case, you do not.
3    A. No, sir.
4    Q. Well, let me ask you this. In any other case -- have you
5    ever seen anything like that before?
6    A. Like --
7    Q. Have you ever seen in your twenty- -- how many years as an
8    IRS CID agent?
9    A. Twenty-eight.
10   Q. In your 28 years as an IRS CID agent, have you ever seen an
11   account -- knowing the facts of this case, have you ever
12   examined an account where a woman takes money that smells loud,
13   sour, awful, stinks, and makes 48 cash deposits, many of which
14   are just under the $10,000 CTR limit, into an account on behalf
15   of someone else? Have you ever seen anything like that before?
16   A. I've never had a case with stinky money before.
17   Q. So in other words, the answer is no, you haven't.
18   A. No.
19   Q. And you've had a lot of cases, haven't you?
20   A. Yes.
21   Q. But you wouldn't say that's unusual?
22   A. Not in this case. No, sir.
23   Q. Now, let me add a fact to it. Suppose the person that is
24   asking this woman to deposit that stinky money in the account is
25   a person who has a woman who works in some capacity for him who

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

92

1  gets caught in El Paso, Texas, with $42,000 strapped under her
2  blouse. Would that make it become unusual from your
3  perspective?
4  A. I'm -- really, I don't understand exactly how you were
5  piecing that together, sir.
6  Q. Okay. What I'm -- you said that in this case you didn't
7  think that that was an unusual account. So I want to add some
8  more facts so we can evaluate the credibility of your opinions,
9  because you've been offering opinions in here, haven't you?
10 A. Yes, sir.
11 Q. Okay. So let's evaluate the credibility of them, and let me
12 add some more facts. You're saying that the stinky money, the
13 large -- the large amount of cash being deposited by somebody in
14 someone else's name, and the facts in this case, you don't find
15 unusual. So I want to ask you --
16       MR. FEAGA: I'm sorry. I know I'm going too fast,
17 aren't I?
18 Q. I want to ask you some more about the facts in this case and
19 see if we can get you to a point where you can say, you know
20 what, that is a little unusual, even in light of the facts of
21 this case. So let me ask you, how about that? Could --
22 you know it's Leon Carmichael who had Sandra Jones down in El
23 Paso, Texas, with $42,000 strapped around her --
24       MR. BRUNSON: Your Honor.
25       THE COURT: Yes.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

93

1       MR. BRUNSON: -- object to this. There's nothing in
2  evidence that indicates --
3       MR. FEAGA: Your Honor, the jury can --
4       THE COURT: Just a minute. Yes.
5       MR. BRUNSON: -- that indicates Mr. Carmichael had
6  anything to do with Ms. Jones and the cash.
7       THE COURT: Okay. You have to rephrase your question.
8       MR. FEAGA: Okay.
9  Q. Add to it the fact that there is a woman who was employed in
10 some capacity as a truck driver -- let's just say she was
11 employed as a truck driver by this person -- who buys a ticket
12 with cash, one way, to go to El Paso and meets up with a Mexican
13 in El Paso and then denies, after being observed by law
14 enforcement, that she knows this guy, and then they find his
15 number in her pager, okay? Would that additional fact that this
16 person who provided this stinky money to this person who put it
17 in a bank account in her name and then spent it all on the
18 individual who gave her the money -- add that fact to it. Does
19 that, in your -- make this unusual? In other words, can we now
20 say this case is also unusual?
21       MR. BRUNSON: Objection, Your Honor. That's not the
22 facts of this case.
23       THE COURT: Well, if the jury were to conclude that
24 those are the facts, would that be unusual?
25       MR. FEAGA: Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

94

1  Q. If the jury were to conclude that those were the facts,
2  would that make this an unusual account?
3  A. That was a lengthy question.
4  Q. Yes, sir. Well, you heard the facts about Sandra Jones'
5  trip down to El Paso, right? You know the facts. So without
6  making me regurgitate all of them, does that, added to what you
7  know about this, make this unusual?
8  A. Are you saying that Jones would be the owner of this
9  account? Is that what you're trying to say?
10 Q. No. I'm suggesting that the person who really owns the
11 account is not the person whose name is on it, who is Sherry
12 Pettus.
13 A. Okay.
14 Q. So I'm asking you if the person who gave the stinky money to
15 Sherry Pettus to open this account that's got these really
16 strange deposits in it, if that person also has a truck driver
17 who got caught with forty-two -- you heard the facts.
18 A. Okay.
19 Q. Just add that to it. Does that make this unusual -- an
20 unusual account, in your view?
21 A. Yes, sir, it could.
22 Q. Okay. Now, if we add to that the fact that this same Sandra
23 Jones got busted in Mississippi with 150 pounds of dope in the
24 back of one of this man who give her the money's trucks --
25       MR. BRUNSON: Objection, Your Honor. He's referring to

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

95

1  giving the money to her. There's no evidence to that effect.
2       MR. FEAGA: Your Honor, there is evidence. Ms. Pettus
3  testified that she got the money from Leon Carmichael.
4       MR. BRUNSON: He's talking about Sandra Jones, Your
5  Honor.
6       MR. FEAGA: No. I'm talking about him being the one
7  that gave the money to Sherry Pettus to put it into the account
8  that is the subject of money laundering.
9       THE COURT: Ask your question again. I think there is
10 some confusion about what you want.
11      MR. FEAGA: Okay. Yes, sir.
12 Q. Add now -- you said, yeah, you know, you're beginning to
13 come with me here in saying, you know, that could be --
14      THE COURT: No, no. Ask the question.
15      MR. FEAGA: Yes, sir.
16 Q. Add to it -- add to it the bust in Mississippi of the truck
17 driver. The same woman who got caught down there, who's working
18 for the defendant, who is the individual -- add to it those
19 facts, that this person who really is the owner of this money
20 that's in this account -- add that to it. Does -- are we now to
21 a point where you say, you know, that's beginning to get --
22 yeah, that's -- I can tell you, Mr. Feaga, that's unusual.
23 A. Again, I -- Mr. Feaga, I don't know. I don't know if it is
24 or not.
25 Q. All right. Well, let's add the Idaho potato run. You heard

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams          June 15, 2005

**96**

1  about that one, too, right?  How about the truck that went all
2  the way to the Texas border from Idaho to get to Florida and got
3  caught with a hundred pounds of marijuana in the back of it,
4  again, being driven on behalf of this defendant, who is also the
5  person -- does that matter?  Are we there?
6       MR. BRUNSON:  Objection, Your Honor.  That's a leased
7  truck.  It has not been --
8       THE COURT:  Okay.  I think the jury can draw its own
9  conclusions from the evidence.  Let's get to something where
10  this witness can rely on the evidence that he reviewed.  We
11  don't need to go through all the evidence that was presented at
12  trial and what inferences should or should not be drawn from
13  them.
14       That's up to you, members of the jury.
15       MR. FEAGA:  Yes, sir.  Yes, sir.  All right.
16  Q.  Sir, I want to show you this back page again.  Now I'm on
17  Government (sic) Exhibit #23.  2003.
18  A.  Excuse me.  What -- what year?
19  Q.  This is the 2003 tax return.
20  A.  Okay.  Okay.
21       MR. FEAGA:  And we'll see if I can get it focused in
22  here.  You know what my problem is?  I'm not used to wearing --
23  let me try that.  Can you both make sure that's focused up
24  there?  I'm having trouble with the bifocals.  Can they see it?
25  Q.  On this 2003 tax return, sir, do you see where it says Club

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams          June 15, 2005

**98**

1       (Brief pause)
2  Q.  Sir, were you paid money to come in here and testify today?
3  A.  Yes, sir.
4  Q.  Okay.  And how much were you paid?
5  A.  I've been paid a total of $12,500.
6  Q.  Okay.  Now, would that be an hourly rate, or was that a flat
7  fee?
8  A.  Some of both.
9  Q.  Okay.  Now, is it your testimony that all of the profit
10  available to Mr. Carmichael during 2000, 2001, and 2002 was used
11  to build the Carmichael Center?
12  A.  No, sir.
13  Q.  And based on your 27 years of experience as an IRS agent
14  that you talked about earlier, do persons with a cash hoard
15  typically borrow money from financial institutions?
16  A.  Typically not.  No, sir.
17  Q.  Now, would your opinion regarding Mr. Carmichael's financial
18  picture that you rendered in here change if you were made aware
19  that the numbers on the returns that he gave you were
20  inaccurate?
21  A.  Yes, they would.
22       MR. FEAGA:  No further questions for this witness, Your
23  Honor.
24       THE COURT:  Mr. Brunson.
25       MR. BRUNSON:  Thank you, Your Honor.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams          June 15, 2005

**97**

1  Unique, cash?  How much cash did Mr. Carmichael tell whoever
2  prepared this he got from Club Unique in 2003?
3  A.  The amount listed under Club Unique is $268,500.
4  Q.  Okay.  Now, let's just go to the 2002 tax return.  How much
5  cash did Mr. Carmichael tell whoever prepared this document he
6  got from Club Unique in 2002?
7  A.  $270,500.
8  Q.  How about in 2001?
9  A.  Two hundred --
10  Q.  Oops.  It wants to float on me.  I'm sorry.
11  A.  $258,500.
12  Q.  Okay.  Now, given the nature of the defense that you've
13  helped mount in this case, Mr. Carmichael convincing this jury
14  that he's generated lots of cash is important, isn't it?
15  A.  Yes, sir.
16  Q.  So if he were to lie about how much cash he generated, that
17  would be a significant issue, wouldn't it?
18  A.  Yes, sir.
19       (Brief pause)
20       THE COURT:  Mr. Feaga.
21       MR. FEAGA:  If I can have just a moment, Your Honor.
22  As you know, we were not aware of this --
23       THE COURT:  Go ahead.  Go ahead.
24       MR. FEAGA:  -- until very shortly ago.
25       MS. WAYNE:  Judge.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams          June 15, 2005

**99**

1       REDIRECT EXAMINATION
2  BY MR. BRUNSON:
3  Q.  Mr. Argo, have you ever testified in court for someone other
4  than the government?
5  A.  Yes.
6  Q.  Have you ever testified for the defense in a criminal case?
7  A.  No, I have not.
8  Q.  Now, when you had these tax returns and you had the bank
9  accounts, did you make some attempt to reconcile the income in
10  the bank accounts to the income on the tax returns?
11  A.  Yes, I did.
12  Q.  Mr. Feaga asked you a different question than I asked you
13  about the flea market.  I asked you simply what that said on the
14  tax return.  He asked you if you had personal knowledge about
15  that incident.  You never were asked whether you had personal
16  knowledge or not, did you -- did I, Mr. Argo?
17  A.  You didn't.
18       MR. BRUNSON:  No further questions.
19       THE COURT:  Anything else, Mr. Feaga, or Mr. Teague?
20       MR. FEAGA:  No, Your Honor.
21       THE COURT:  You may step down.
22       Next witness.
23       MS. WAYNE:  Judge, if we may approach, just between the
24  lawyers, just to tell you something.  It doesn't need to be on
25  the record.  Mr. Teague?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

100

1   (Bench conference held off the record)
2       THE COURT: We're going to hear some witnesses
3   Mr. Teague has now, even though the witnesses called so far have
4   been called by Mr. Carmichael. Then we'll go back to
5   Mr. Carmichael's witnesses tomorrow morning.
6       Proceed, Mr. Teague.
7       Mr. Feaga, can I ask you one question? Based on the
8   evidence that's been presented so far, do you anticipate
9   rebuttal? Just so far.
10      MR. FEAGA: Yes, sir.
11      THE COURT: Okay. I just wanted to know.
12      THE CLERK: Witness James DeBardelaben, courtroom,
13  please. James DeBardelaben.
14      THE COURT: Has Mr. DeBardelaben been sworn?
15      MR. TEAGUE: He -- all the witnesses I'm calling, Your
16  Honor, have been here and they've been placed under oath.
17      Come forward, please, sir. The witness stand is up
18  there next to the Judge. Just go have a seat.
19      MR. DeBARDELABEN: All right.
20      THE COURT: Have a seat, Mr. DeBardelaben.
21      JAMES B. DeBARDELABEN, the witness, having been
22  previously sworn, testified, as follows:
23              DIRECT EXAMINATION
24  BY MR. TEAGUE:
25  Q. Tell the jury your name.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

101

1   A. James B. DeBardelaben.
2       THE COURT: Speak over there.
3   A. James B. DeBardelaben.
4   Q. Now, I'm going to ask you to scoot that chair forward and
5   get about as close to that microphone as I am to this
6   microphone.
7   A. Okay. All right.
8   Q. That's better. Have you ever testified in court before?
9   A. No. No, I haven't.
10  Q. Take a big, deep breath, then, and just relax.
11  A. Okay.
12  Q. We're just going to be folks and ask you some questions.
13  A. Good.
14  Q. Do you know -- okay. Where do you live, Mr. DeBardelaben?
15  A. 3552 Clearview Street.
16  Q. Okay. Do you know the defendant in this case, Freddie
17  Williams, here?
18  A. Yes. I've been knowing him about 45 years.
19  Q. Okay. Now, again, you said your address is what street?
20  A. 3552 Clearview.
21  Q. Clearview?
22  A. Clearview. C-L-E-A-R-V-I-E-W.
23  Q. Okay. Tell the jury, how did you get to know Freddie
24  Williams?
25  A. When me and my wife moved there 46 years ago, Freddie was

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

102

1   living next door.
2   Q. Okay.
3   A. So we was neighbors.
4   Q. Now, you live on Clearview.
5   A. Yeah.
6   Q. I've got a document here.
7       MR. TEAGUE: Your Honor, I'm going to show my copy of
8   it.
9   Q. It is marked as Government's Exhibit -- that's what that GX
10  is over there --
11      THE COURT: Look on the monitor there, sir.
12  Q. -- #67. Can you see that TV screen there?
13  A. Yeah.
14  Q. I want to call your attention to this area right over --
15  let's see. Can you -- let's see. I think maybe do it like
16  that. Now it may come in a little clearer. Can you see where
17  I'm pointing here, to where it says Freddie Williams?
18  A. Yes.
19  Q. And it shows Ousley Street.
20  A. That comes right into Clearview.
21  Q. All right. You said he was your next-door neighbor, right?
22  A. Yeah. He used to live next door, the next house to me, but
23  he moved across from Ousley Street from Clearview. He lived there
24  about 30 years and moved across the street to Ousley. Ousley
25  runs right into Clearview.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

103

1   Q. In other words, while your --
2   A. They're close together.
3   Q. Okay. Let me ask the question, now. In other words, even
4   though you live on Clearview, your immediately next-door
5   neighbor lives -- their address would be Ousley, as shown here.
6   A. That's later, Ousley, where Freddie was. He was living 729
7   Clearview Street for 30 -- over 30 years, right next door to me.
8   Q. Okay. And that's how you got to know him, right?
9   A. Right.
10  Q. Okay. And do you know what he does for a living, sir?
11  A. Well, he went to Haynes Drywall. When I first -- when I
12  first knowed him, he was working at this M&M Block. And he left
13  and went to drywalling, hanging sheetrock.
14      THE COURT: What?
15      THE WITNESS: Drywalling. Hanging --
16      THE COURT: Oh, drywall.
17  A. Drywall. Hanging sheetrock.
18      MR. TEAGUE: I think he said drywalling.
19  A. Because I was -- I was working in town at the dairy. And I
20  was expected to go to work around 12:30, one o'clock in the
21  morning, and Freddie would be working then. I'd say, man, you
22  got to get some rest.
23      THE COURT: Just a minute. Now, just listen to his
24  questions and answer the question.
25      MR. TEAGUE: Judge, we'll get it done a lot quicker if

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2005

104

```
1    we just let him go.
2         THE COURT: I'm not so sure it would be quicker.
3    Q. Now -- okay. I think what you're telling us is that he
4    lived on Ousley. He was your across-the-street neighbor for a
5    part of that time, and then he moved right next door to you for
6    a good many years.
7    A. At the first, next door to me, for about 30 years.
8    Q. Yes.
9    A. And across the street -- he moved across the street after 30
10   years as a next-door neighbor to me. And then they was across
11   the street, about the difference between there and the street.
12   Q. Okay. And he worked in carpentry, drywall, that kind of
13   thing, all the years you've known him.
14   A. Right. Right.
15   Q. Okay. Now, did you -- do you know his son, Timothy
16   Williams?
17   A. Yeah, from when he was born.
18   Q. Well, let me back up. Was there a point at which Freddie
19   went into -- he started out working for others as a drywaller,
20   didn't he?
21   A. Right.
22   Q. And then he started his own company at some point? Were you
23   aware of that?
24   A. Oh, yeah. Sure.
25   Q. And you --
```

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2005

106

```
1         THE COURT: Next witness, Mr. Teague.
2         MR. TEAGUE: It will be Reverend Sheffield Henderson.
3         THE COURT: Reverend Henderson.
4         THE CLERK: Reverend Henderson, courtroom, please.
5    Reverend Henderson.
6         THE COURT: Mr. Teague, would you escort Mr. Henderson
7    to the witness stand?
8         MR. TEAGUE: I will. I think he knows where to go.
9         THE COURT: Reverend Henderson.
10   (Brief pause)
11        THE COURT: Are you okay on those steps?
12   REV. HENDERSON: Yeah.
13        THE COURT: Have you been sworn, Reverend Henderson?
14   REV. HENDERSON: Yes, sir, Judge.
15        THE COURT: Okay. Go ahead, Mr. Teague.
16        SHEFFIELD HENDERSON, the witness, having been
17   previously sworn, testified, as follows:
18             DIRECT EXAMINATION
19   BY MR. TEAGUE:
20   Q. You are Reverend Sheffield Henderson?
21   A. Yeah.
22   Q. Now, if you would, what is your status, work wise, at this
23   point?
24   A. Retired.
25   Q. Okay. Do you live here in Montgomery?
```

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2005

105

```
1    (Brief pause)
2         THE COURT: Yes, Mr. Teague?
3         MR. TEAGUE: Give me just a second, Your Honor.
4    Q. And he lived there either in one of those two places on
5    Ousley Street -- I mean the two places you're talking about are
6    immediately --
7         THE COURT: We've been over this several times. Can't
8    we --
9    Q. Okay. What I'm trying to get at, at whichever location, how
10   many years did he live there on Ousley Street?
11   A. Better than 44 years. Better than 44.
12   Q. And that was up until how recently?
13   A. Let's see. He moved a few years -- I don't know where else,
14   but 44, 45 years, I think.
15   Q. He doesn't live there right now, does he?
16   A. No, he's not there right now.
17        MR. TEAGUE: Okay. All right. I believe that's all.
18   Thank you, sir. Please answer --
19        THE COURT: Anything else, Ms. Wayne?
20        MS. WAYNE: Nothing, Judge. Thank you.
21        THE COURT: Mr. Feaga?
22        MR. FEAGA: Nothing from the United States, sir.
23        THE COURT: Thank you very much, sir. You may step
24   down.
25        THE WITNESS: Thank you.
```

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                June 15, 2005

107

```
1    A. Right.
2    Q. And how many years have you been living here in Montgomery?
3    A. About 32 years.
4    Q. Okay. And what -- what did you do for a living -- you're
5    currently retired?
6    A. Yeah. I'm retired.
7    Q. Okay. Tell the jury here, if you would, what you did for a
8    living when you were working.
9    A. I worked in a steel mill in Michigan. In a steel mill in
10   Michigan.
11   Q. Okay. That was before you moved down here to Alabama?
12   A. Yeah.
13   Q. Okay. If you would, tell the jury what you've been doing
14   during the years you've lived here in Alabama, here in
15   Montgomery.
16   A. I've been pastoring and also in the building of churches,
17   the church I pastored, that type of thing.
18   Q. What denomination pastor were you, Reverend?
19   A. AME Zion church.
20   Q. AME Zion?
21   A. Uh-huh.
22   Q. Okay. And you had some construction business you did on the
23   side?
24   A. Well, I only did it for the church that we worked with.
25   Renovated buildings, that type of thing.
```

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

108

1  Q. Okay. Now, was that a business you were engaged in, or did
2  you just do it on behalf of the churches you were pastoring?
3  A. I just mostly did it for churches I was pastoring, yeah.
4  Q. Okay. And do you know the defendant here, this gentleman
5  right here, Freddie Williams?
6  A. Yes, I do.
7  Q. And how many years you've been knowing him?
8  A. About 30 years.
9  Q. And how did you get to know him, Reverend?
10 A. Mostly by in the type of business he was in, sheetrock work.
11 Q. Did you ever utilize his services?
12 A. Yeah.
13 Q. And he had a company, did he not?
14 A. Yeah.
15 Q. Okay. Did you find him to be a good -- a good carpenter, a
16 good sheetrocker?
17 A. A real good.
18 Q. Okay. And how often would you use him, Reverend?
19 A. We used him probably some four or five times a year.
20 Q. Okay. Now, you have built churches, have you not?
21 A. Right.
22 Q. Okay. And you have founded more than one church, haven't
23 you?
24 A. Right.
25 Q. And who would you use when you were building those churches

110

1      MR. WATTS: Here?
2      THE COURT: Yes. Right here, sir.
3      MR. WATTS: Thank you.
4      LELAND WATTS, the witness, having been previously
5  sworn, testified, as follows:
6          DIRECT EXAMINATION
7  BY MR. TEAGUE:
8  Q. Tell us your name, please, sir.
9  A. My name is Leland Watts.
10 Q. And Mr. Watts, you live here in Montgomery?
11 A. Montgomery, Alabama. All my life.
12 Q. How long have you been -- how long have you been living
13 here?
14 A. I think my mother moved from Dallas County here when was six
15 years old. I'm now 68, and I've been here ever since.
16 Q. Okay. Do you know -- do you know the defendant here,
17 Freddie Williams?
18 A. Yes, I do.
19 Q. Tell the jury, if you would, how you came to know Freddie
20 Williams.
21 A. Freddie Williams moved to Montgomery from --
22 Q. Do you know where he came here from?
23 A. -- Evergreen. Huh?
24 Q. Do you know where he came here from?
25 A. He came here from Evergreen.

109

1  as some of your subcontractors with regard to, say, carpentry
2  and sheetrocking?
3  A. Sheetrock, mostly Mr. Freddie Williams.
4  Q. And his company?
5  A. Yeah.
6      MR. TEAGUE: Okay. I believe that's all.
7      THE COURT: Any cross?
8      MR. FEAGA: None from the United States, Your Honor.
9      THE COURT: Can I have the security officer? I want
10 you to help Reverend Henderson down those steps so he doesn't
11 fall.
12     COURT SECURITY OFFICER: Yes, sir.
13     THE CLERK: Next witness?
14     THE COURT: Next witness.
15     MR. TEAGUE: Leland Watts. I may change my mind. Yes.
16 Leland Watts.
17     THE COURT: Who's your next witness?
18     MR. TEAGUE: Leland Watts.
19     THE COURT: Watson?
20     MR. TEAGUE: My mind is made up. Watts.
21     THE COURT: Watts. Okay. Mr. Watts.
22     THE CLERK: Witness Leland Watts, courtroom, please.
23 Leland Watts.
24     MR. TEAGUE: Your Honor, this witness is under oath.
25     THE COURT: Okay.

111

1  Q. Evergreen?
2  A. At least that's what I was told.
3  Q. How many years ago was it when he came here, wherever it was
4  from?
5  A. Good Lord. That been about -- I'm not good with numbers,
6  but it's been about 50 years I've been knowing him.
7  Q. Okay. And tell us how you got to know him.
8  A. I was going to work one morning; and I was working for the
9  City of Montgomery, sanitation department. And I was sort of
10 running, speeding, trying to make sure I got to the job. And he
11 was going to M&M Brick Company. That's where he was working at
12 at the time. It's a concrete block company over there on --
13 almost to Bell Street. He was working over there. And on that
14 morning, I was trying -- I was running a little bit late, and I
15 was trying to run and get to work. And I reckon he probably had
16 already known me, and he says -- he had a little automobile.
17 And he says, hey, man, you're going to be late this morning. I
18 said, yeah, I sure am. He says, well, since you're going to be
19 late, you can drive my car and drop me off at work and come back
20 this afternoon and pick me up. And I said, well, hey, okay, I
21 appreciate it, you know. And we got to be good buddies. I knew
22 him before he had any children.
23 Q. Okay. Now, did there ever come a time when you and he came
24 to work at the same place?
25 A. Sure was. I got a job working --

112

1   Q.  Okay.  Tell us about that.
2   A.  I got a job working for Henry & Dean Drywall Company.
3   Q.  Henry & Dean, now, they've been around a long time, haven't
4   they?
5   A.  They were about the first drywall company I know in
6   Montgomery.
7   Q.  Okay.  I mean they're still in business --
8   A.  They are still in business today.
9   Q.  Yes, sir.  Okay.  And you went to work for Henry & Dean?
10  A.  Right.  And --
11  Q.  What did that have to do with Freddie Williams?
12  A.  And I got him a job working with Henry & Dean also.
13  Q.  Because you and he had become buddies, y'all started working
14  together?
15  A.  We started working together.
16  Q.  Okay.  And how was Freddie at picking up on how to drywall
17  and that kind of thing?
18  A.  He was a good man on drywalling.  He wasn't hard to learn.
19  He learned pretty easily.
20  Q.  Okay.  Do you recall at some point his leaving Henry & Dean?
21  A.  He did.
22  Q.  And what did he do?
23  A.  We both left Henry & Dean at a certain point.
24  Q.  Say what, now?
25  A.  We both left Henry & Dean at a certain point.

113

1   Q.  And what did you do?
2   A.  He started his own company.
3   Q.  Did you work for him?
4   A.  And I started working with him.
5   Q.  All right.  So -- and how long would you estimate for the
6   jury that you worked for him with Williams Drywall?
7   A.  With Williams?  Off and on, we did about -- I'd say about 30
8   years.
9   Q.  About 30 years?
10  A.  Right.
11  Q.  Okay.  Do you get along well with him?
12  A.  Every day.
13  Q.  Okay.  Hard-working man.
14  A.  A hard-working man.
15      MR. TEAGUE:  Okay.  I believe that's all.
16      THE COURT:  Any cross?  Mr. Carmichael?
17      MS. WAYNE:  None, Your Honor.
18      THE COURT:  Any cross from the government?
19      MR. FEAGA:  Just a couple, Your Honor.
20          CROSS-EXAMINATION
21  BY MR. FEAGA:
22  Q.  Sir, when did you -- are you retired now?
23  A.  I'm retired.
24  Q.  When did you retire?
25  A.  Like I said, I'm not good with numbers.  I think I retired

114

1   at the age of 62, I think it was.
2   Q.  Yes, sir.  And how long ago would that have been?
3   A.  That would have been -- let's see, I'm 68 now.  Sixty-two,
4   that been six years ago.
5   Q.  So you've been out of the active drywall business for the
6   last six years?
7   A.  I've been out of it.
8   Q.  Yes, sir.
9   A.  Every now and then I might go and help Freddie if he get in
10  a tight.  If he need someone to help him --
11  Q.  Yes, sir.
12  A.  -- I'm the first man on the job to give him a hand.
13  Q.  All right, sir.
14  A.  When Freddie start -- if I may, when Freddie started working
15  for Habitat for Humanity, he volunteered a lot of time for
16  himself.  But he also had to have help.  And he volunteered me
17  as well, because I was going to help him.  And so we put in a
18  lot of sweat equity for Habitat for Humanity.
19  Q.  Yes, sir.  Yes, sir.  So when he needed help, you would
20  volunteer and help him?
21  A.  I help him.
22      MR. FEAGA:  Okay.  Thank you.
23      THE COURT:  Anything else?  Anything else?
24      MR. TEAGUE:  Nothing further for this witness, Your
25  Honor.

115

1       THE COURT:  Anything else, Ms. Wayne?
2   Thank you very much.
3       THE WITNESS:  Thank you.
4       THE COURT:  Next witness, Mr. Teague?
5       MR. TEAGUE:  Next witness would be Timothy Williams.
6       THE COURT:  Timothy Williams.
7       THE CLERK:  Witness Timothy Williams, courtroom,
8   please.  Timothy Williams.
9       (Brief pause)
10      THE COURT:  Timothy Williams?
11      MR. TEAGUE:  Yes, Your Honor.
12      THE COURT:  What's the name?
13      MR. TEAGUE:  Timothy Williams.
14      THE COURT:  Timothy Williams.
15      MR. TEAGUE:  Yes, Your Honor.
16      THE COURT:  Have you been sworn, Mr. Williams?
17      MR. WILLIAMS:  Yes, sir.
18  TIMOTHY L. WILLIAMS, the witness, having been
19  previously sworn, testified, as follows:
20          DIRECT EXAMINATION
21  BY MR. TEAGUE:
22  Q.  Tell us your name, please, sir.
23  A.  Timothy L. Williams.
24  Q.  Mr. Williams, you have a very low voice, and we'll all go to
25  sleep if you --

116

1   A. Excuse me.
2   Q. -- sit back in that chair. Lean forward and get in that
3   microphone, about that far away.
4   A. All right.
5   Q. Okay?
6   A. Timothy L. Williams.
7   Q. Hey, that's better. Okay. Now, you live here in
8   Montgomery, Mr. Williams?
9   A. Yes, sir.
10  Q. Are you -- do you know this gentleman right here, Defendant
11  Freddie Williams?
12  A. Yes, sir. That's my dad.
13  Q. Your daddy? Okay. Now, when you were born, where were
14  y'all living?
15  A. 729 Clearview Street, and then eventually we moved to
16  another location.
17  Q. At Ousley Street?
18  A. Ousley Street, right.
19  Q. And y'all were all living right there bouncing from one side
20  or the other by James DeBardelaben?
21  A. Yes, sir. It was all close together.
22  Q. Your neighbor? Okay. Now, what do you do for a living now,
23  today?
24  A. Drywall subcontractor.
25  Q. You're a drywall subcontractor?

117

1   A. Yes, sir.
2   Q. And for whom do you work?
3   A. We work for several contractors, general contractors and
4   other subs.
5   Q. Well, I mean who owns the company you work for?
6   A. I do.
7   Q. You do. Okay. Who owned the company before you did?
8   A. My dad did.
9   Q. Okay. So you now own the company that was known as -- that
10  was Freddie Williams Drywall, you now own as Williams Drywall.
11  A. Yes, sir.
12  Q. Okay. Now, the -- do you know the defendant -- a
13  codefendant in this case, this gentleman over here, Leon
14  Carmichael?
15  A. Yes, sir.
16  Q. Okay. Now, let me back up and ask you a few questions. I'm
17  going to assume -- and you correct me if I'm wrong -- that at
18  some point you started working for your daddy in the drywall
19  business.
20  A. Yes, sir. I started when I was about nine years old and --
21  Q. Nine years old?
22  A. Yes, sir.
23  Q. And that's essentially all you've ever done, isn't it?
24  A. I growed up in the business, and then I took it over. So
25  that's about it.

118

1   Q. Okay. Now, does your daddy -- except for these past two
2   weeks when we've been in trial, does your daddy work for you?
3   A. Yes, sir.
4   Q. Okay. Now, when did you first -- tell the jury -- you said
5   you know Mr. Carmichael over here. Tell the jury the
6   circumstances under which you first met Mr. Carmichael.
7   A. I met Mr. Carmichael approximately -- probably about 20
8   years ago. We was doing some repair work on his house and --
9   Q. And where was his house located?
10  A. It's over off of Brookwood.
11  Q. Okay. You're estimating. You don't know precisely how many
12  years ago, but --
13  A. It was approximately that time.
14  Q. Yeah. What were y'all doing over there at his house?
15  A. Total reconstruction, construction of his house.
16  Q. Okay.
17  A. Just maintenance repair work and, you know, different stuff,
18  painting, drywall.
19  Q. Did you become aware of who the neighbors were or at least
20  one of the neighbors that lived next door to Mr. --
21  Mr. Carmichael at that time?
22  A. Yes, sir. Mr. Denton's grandparents.
23  Q. Okay. Now, you're aware that Patrick Denton has testified
24  last week before this jury; is that correct?
25  A. Yes, sir.

119

1   Q. Okay. And tell us about where -- when you were doing that
2   work however many years ago at Mr. Carmichael's house, how you
3   got to know the Dentons. What were the circumstances, just the
4   fact they were next door or what?
5   A. We had to go to them on a few occasions to use their water
6   and power supply to deal with the construction of the house.
7   Q. Okay. When you're getting ready to cut sheetrock, you've
8   got to plug saws in somewhere, haven't you?
9   A. And electrical cords.
10  Q. Even then, what would you have to do if, say, a neighbor
11  says -- well, did you go to other neighbors other than the
12  Dentons trying to get a source of either water or power?
13  A. No, sir. No, sir.
14  Q. And -- well, in other job sites, was it unusual if somebody
15  says, no, you're not going to use my power, you're not going to
16  use my water?
17  A. Yes, sir.
18  Q. You say that is unusual or that's usually what they do?
19  Which is it?
20  A. It's not unusual for them to say no.
21  Q. Okay. But you're telling the jury that the Dentons said you
22  can use the power and the water.
23  A. Yes, sir.
24  Q. All right. Now, there has been some discussion in -- well,
25  let me ask you this. How extensive work does Williams Drywall

United States of America v. Leon Carmichael, Sr., and Freddie Williams                                June 15, 2009

120

1   do?  Is it strictly drywall only?
2   A.  No, sir.  We deal with different aspects of building,
3   painting, carpentry, tile, roofing.  Just pretty much
4   everything.
5   Q.  Okay.  Now, the jury has heard testimony from our agent,
6   Louie Wilson, from various -- some of the other experts who have
7   come in here and testified that Mr. Carmichael owns a good
8   number of rental properties.  Have you found that to be the
9   case?
10  A.  Yes, sir.
11  Q.  How do you know that?
12  A.  We've been working on Mr. Carmichael's rental properties for
13  the last few years, approximately -- I can't really say how
14  many, but it was quite a few.
15  Q.  Okay.  Now, the government has introduced a bunch of phone
16  records that indicate there would have been many phone calls
17  over an 18-month, two-year period between phones attributed to
18  Mr. Carmichael and phones attributed to your daddy going back
19  and forth.  Would you know anything about how those phone calls
20  could arise?
21  A.  Yes, sir.  Basically, in a business like this, you know, the
22  cell phone is a -- is a basic means of communications.  So there
23  was a lot of conversations between the three of us, as far as
24  getting work done, just different aspects.  And I also used the
25  phone also to talk to him.  So there was a lot of communication

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                                June 15, 2009

122

1   A.  Fourteen years.
2   Q.  Fourteen years?  And if you go just making some change order
3   yourself, what have you experienced with regard to getting paid
4   by the owner of the property?
5   A.  You said experienced?
6   Q.  Yes.  I mean do they just pay you just because you decided,
7   well, this needs to be done, I'll just do it; or do you have to
8   communicate with them to make sure you're going to get paid?
9   A.  We have to communicate, like I said, from the work aspect
10  and also the -- for us getting a draw request to get paid, as
11  far as what time.  And, of course, we get together and basically
12  just come to agreement on -- on how we're going to get paid
13  on -- in a timely manner.
14  Q.  All right.  Now, if you run in -- well, let me ask -- talk
15  to you about the nature of rental properties.  Is it not fair to
16  say that most of the rental properties that Mr. Carmichael owns
17  are in the poorer sections of town?
18  A.  Yes, sir.
19  Q.  And even when you have rental properties in more fashionable
20  areas of town, when people move out a lot of times they've
21  trashed the place, have they not?
22  A.  Yes, sir.  There will be quite a bit of damage.  Holes in
23  the walls and just different stuff.
24  Q.  Okay.  Well, would it be fair to say, then, that you have to
25  do a lot of work for Mr. Carmichael concerning his rental

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                                June 15, 2009

121

1   between the three of us as far as the work on the rental
2   property.
3   Q.  You're telling us that some of the phone calls attributed to
4   your daddy were phone calls that you might have made.
5   A.  Right.
6   Q.  Okay.  Now, tell me this.  Whenever you -- well, if
7   Mr. Carmichael were to call you or your daddy, you know, about a
8   job you're working on or a job he wants you to go to or
9   whatever, would he be able to -- would he get you every time on
10  the very first call?
11  A.  No, sir.  He'll call several times and we'll a lot of times
12  play phone tag, call each other, until we talk about what needs
13  to be done and come to agreement on it.
14  Q.  Okay.  Now, when you're doing work for him on a rental
15  property, do you come up with circumstances where you need to
16  talk to him about what to do?
17  A.  Yes, sir.
18  Q.  Well, give us -- give the jury some examples, for instance.
19  A.  Basically, like if there's some tile work needs to be done
20  in the bathroom, we might have -- we might have a difference of
21  opinion or need to find where the tile needs to stop, start, or
22  what we need to prep with or did we need to go any further with
23  the -- the renovation process.
24  Q.  How long have you been owning and running Williams, would
25  you say?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                                June 15, 2009

123

1   properties?
2   A.  Yes, sir.  We do quite a bit.
3   Q.  Okay.  He owns commercial properties as well, doesn't he?
4   A.  Yes, sir.
5   Q.  Have you done some work on some of his commercial
6   properties?
7   A.  Yes, sir.
8   Q.  Okay.  Now, if you're there and you can't get
9   Mr. Carmichael, say, for instance, do you keep trying him until
10  you do get him?
11  A.  Yes, sir.
12  Q.  Okay.  So would it be fair to say you can end up with a lot
13  of phone calls all in one day just trying to get one man to get
14  one question answered?
15  A.  That's right.
16  Q.  Now, I was asking Robert -- okay.  Tell me this.  You say
17  you've done his -- his work for the past several years?
18  A.  Yes, sir.
19  Q.  Okay.  Let's talk about another person the jury has met in
20  this case, a guy by the name of Robert Patrick Denton.  Now, he
21  would be -- he's testified that he was the grandson of the man
22  who was -- lived next door to Mr. Carmichael and was kind enough
23  to let you use the water and the electricity when you were
24  working over there.
25  A.  Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2005

124

1  Q. Do you know who we're talking about?

2  A. Yes, sir.

3  Q. Okay. Now, do you know anything about whether or not

4  Mr. Denton had ever approached your company about your doing

5  some work at Denton's house?

6  A. Me and my dad talked about some folks doing work for

7  him.

8  Q. Okay. You didn't do that directly, then.

9  A. No, sir.

10  Q. Okay. And --

11      MR. MOORER: Your Honor, I would ask that his answer,

12  then, be stricken since he wasn't party to that conversation,

13  and the jury totally disregard it.

14      THE COURT: Mr. Teague?

15      MR. TEAGUE: Your Honor, that's -- there's no problem

16  with that.

17      THE COURT: Disregard that.

18  Proceed, Mr. Teague.

19      MR. TEAGUE: All right.

20  Q. The -- now, there is -- do you know a person by the name of

21  Faith?

22  A. Yes, sir.

23  Q. Okay. And I take it that's your daddy's girlfriend at the

24  time he got arrested?

25  A. Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2005

125

1  Q. Okay. Faith Holley, I believe is her name; is that right?

2      THE COURT: Faith Holley?

3      MR. TEAGUE: Faith Holley, Your Honor. Excuse me.

4  Q. Holley. You know who I'm talking about, don't you?

5  A. Yes, sir.

6  Q. You've met her and know her, don't you?

7  A. Yes, sir.

8  Q. Okay. Now, are you aware of -- you're aware of where your

9  daddy and Faith were staying back at the time your daddy got

10  arrested in this case over at 929 Ridgecrest?

11  A. Yes, sir.

12  Q. Okay. Now, do you know anything about any problems with the

13  keys to the house or anything over there that arose anytime

14  before the arrest of Mr. Williams?

15      MR. MOORER: Objection unless this witness has personal

16  knowledge, Your Honor.

17      MR. TEAGUE: That's all I want him to testify to, is

18  what he knows.

19      THE COURT: Yes. Only if you were there and you have

20  personal knowledge.

21  A. Yes, sir.

22  Q. Okay. Tell the jury what you know about any situation with

23  a problem with keys. Just describe what the problem was.

24  A. Around the early part of November, around a Saturday, the

25  keys came up missing.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2005

126

1      MR. MOORER: Your Honor -- Your Honor, if I may

2  interrupt, he said early part of November. I need to know a

3  year.

4      THE COURT: What year are we talking about, this last

5  year?

6      THE WITNESS: November 2003.

7      THE COURT: 2003. Go ahead.

8  Q. You're talking about just sometime not long before your

9  daddy got arrested, right?

10  A. Yes, sir.

11  Q. Okay. Go ahead. Tell the jury about it.

12  A. Car keys, house keys, basically just about all his keys came

13  up missing.

14  Q. Okay. Who lost them? Do you know?

15  A. I think dad misplaced them or they came up missing in the

16  house.

17  Q. Okay. Now, what was done about that, if anything?

18  A. He had a guy come over to change the locks and the cylinders

19  on the cars. And Mr. Denton accompanied that guy that was doing

20  the work.

21  Q. Okay. The man who -- the man who was there to change out

22  car locks --

23  A. The door locks and the car -- car cylinders, changing the

24  locks to the entry to the car.

25  Q. Okay. And you say Mr. Denton happened to be with him?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Leon Carmichael, Sr., and Freddie Williams                    June 15, 2005

127

1  A. Yes, sir.

2  Q. All right. And you saw this? You were there while he --

3  while this was going on?

4  A. Yes, sir.

5      MR. TEAGUE: Okay. I believe that's all I have.

6      THE COURT: Okay.

7      MR. TEAGUE: Let me confer with my notes just a moment,

8  Your Honor.

9      THE COURT: Yes.

10      MR. TEAGUE: I believe that's all, Your Honor.

11      THE COURT: Ms. Wayne?

12      MS. WAYNE: Very briefly.

13          CROSS-EXAMINATION

14  BY MS. WAYNE:

15  Q. Good afternoon, Mr. Williams. I'm Mr. Carmichael's lawyer,

16  and I just have a couple questions for you.

17  A. Yes, ma'am.

18  Q. It sounds from what you said that your father and

19  Mr. Carmichael are business associates.

20  A. Yes, ma'am.

21  Q. Friends? They're friends as well?

22  A. Yes, ma'am.

23  Q. Okay. And just so the jury's clear in terms of you and your

24  father having worked for Mr. Carmichael, specifically, were you

25  doing work for him in 2002, 2003?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405