IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LEON CARMICHAEL, SR., )
)
     Movant/Defendant, )
) Civil Action No. 2:10cv1106-MHT-WC
   v. )    (CR No. 2:03cr259-MHT-DRB)
)
UNITED STATES OF AMERICA, )
)
    Respondent. )

## EXHIBITS TO
## UNITED STATES'S RESPONSE TO § 2255 MOTION

**VOLUME 5D OF 8**
**(Exhibits 5D-IX to 5D-XI)**

**GEORGE L. BECK, JR.**
**UNITED STATES ATTORNEY**

**SANDRA J. STEWART**
**FIRST ASSISTANT UNITED STATES ATTORNEY**

**ATTORNEYS FOR RESPONDENT**
**UNITED STATES OF AMERICA**

**United States Attorney's Office**
**131 Clayton Street**
**Montgomery, AL 36104**
**(334) 223-7280**

# INDEX TO VOLUME 5D OF RESPONDENT'S EXHIBITS

*Exhibit #  (Crim. Doc. #)*

| | |
|---|---|
| Volume IX of Trial Transcript (June 16, 2005) | 5D-IX |
| Volume X of Trial Transcript (June 17, 2005) | 5D-X |
| Volume XI of Trial Transcript (June 20, 2005) | 5D-XI |

1    IN THE UNITED STATES DISTRICT COURT
     FOR
2    THE MIDDLE DISTRICT OF ALABAMA

3

4

5    THE UNITED STATES
        OF AMERICA
6
            vs.                          CRIMINAL ACTION NO.
7                                        2:03-cr-259-T

     LEON CARMICHAEL
8

9

10

11

12

13                     VOLUME IX OF XI
14                        9th DAY OF:
                     JURY TRIAL PROCEEDINGS
15

16

17              *  *  *  *  *  *  *  *  *

18
     BEFORE:        The Hon. Myron H. Thompson
19
     HEARD AT:      Montgomery, Alabama
20
     HEARD ON:      June 16, 2005
21
     APPEARANCES:   Terry Moorer, Esq.
22                  Stephen Feaga, Esq.
                    Clark Morris, Esq.
23                  Matthew Miner, Esq.
                    Susan James, Esq.
24                  Marion Chartoff, Esq.
                    Lisa Monet Wayne, Esq.
25                  Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
50-IX

Multi-Page™

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA


THE UNITED STATES
  OF AMERICA

        vs.                          CRIMINAL ACTION NO.
                                     2:03-CR-259-T
LEON CARMICHAEL




VOLUME IX OF XI
9th DAY OF:
JURY TRIAL PROCEEDINGS



* * * * * * * * * *


BEFORE:        The Hon. Myron H. Thompson

HEARD AT:      Montgomery, Alabama

HEARD ON:      June 16, 2005

APPEARANCES:   Terry Moorer, Esq.
               Stephen Feaga, Esq.
               Clark Morris, Esq.
               Matthew Miner, Esq.
               Susan James, Esq.
               Marion Chartoff, Esq.
               Lisa Monet Wayne, Esq.
               Ronald R. Brunson, Esq.

Page 2

TABLE OF CONTENTS

ITEM DESCRIPTION                                    PAGE NO.

Title Page .................................... 1

Table of Contents .................................... 2

In-Chambers Conference .................................... 4

Knox Argo - Direct Examination
   by Mr. Brunson .................................... 11

Knox Argo - Cross Examination
   by Mr. Feaga .................................... 17

Lloyd Prescott - Direct Examination
   by Mr. Brunson .................................... 19

Lloyd Prescott - Cross Examination
   by Mr. Feaga .................................... 26

Joe Lapinsky - Direct Examination
   by Ms. James .................................... 27

Joe Lapinsky - Cross Examination
   by Mr. Feaga .................................... 37

Tommy Moore - Direct Examination
   by Ms. Wayne .................................... 48

Terry Grace - Direct Examination
   by Mr. Feaga .................................... 59

Georgia Wise - Rebuttal Direct Examination
   by Mr. Feaga .................................... 67

George Ingals -- Rebuttal Direct Examination
   by Mr. Feaga .................................... 88

Louie Wilson - Rebuttal Direct Examination
   by Mr. Feaga .................................... 94

Louie Wilson - Rebuttal Cross Examination
   by Mr. Brunson .................................... 101

Page 3

TABLE OF CONTENTS

ITEM DESCRIPTION                          PAGE NO.

Louie Wilson - Rebuttal Redirect Examination
   by Mr. Feaga ................... 106

George Ingals - Rebuttal Cross Examination
   by Ms. Wayne ................... 108

Georgia Wise - Rebuttal Cross Examination
   by Mr. Brunson ................... 111

Motions In Open Court
   (The Jury Is Not Present) ................... 120

Charge Conference ................... 170

Closing Arguments
   by Mr. Feaga ................... 185

Closing Arguments
   by Mr. Teague ................... 220

Closing Arguments
   by Ms. Wayne ................... 250

Rebuttal Closing Arguments
   by Mr. Moorer ................... 284

Motion For Mistrial In Open Court
   (The Jury Is Not Present) ................... 308

Court Reporter's Certification ................... 311

Page 4

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
THE HON. MYRON H. THOMPSON ON JUNE 16, 2005 AT THE

UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

              IN-CHAMBERS CONFERENCE:

          THE COURT: This will just take a minute.

          I quickly glanced at Miss Chartoff's brief,
and I'm not going to write to this until after the
trial is over if there's a conviction.  But she
doesn't address one thing that I did want her to
address, which is my comments that I think only the
defendant should be held accountable.  She doesn't
address that.  Unless you do it here.  I didn't see
that.

          MS. CHARTOFF: I didn't address that with
case law because I couldn't find any.

          THE COURT: Well you need to do it with case
law.  You couldn't find any?  Okay.  Well I just
wanted to -- I'll be researching it, so if you can
find any -- I know you only had the evening.  And I
assume the government may want to respond.

          MS. MORRIS: Yes, sir.

          MR. FEAGA: Yes.

          THE COURT: Okay.  I think that's it.

          Oh, one other thing.  What's her name,
Sandra Jones?  I do think that the defendants may have

Page 5

at least a serious issue that Sandra Jones' comments
raises a Crawford issue.  It is clearly -- I've got
one stream of Supreme Court cases that say that
Crawford covers statements made that are testimonial.
The same case says, however, that non-conspirator --
coconspirator statements are not testimonial.  But
here we have one that was clearly to a police officer.
And so my view is, I think I want to err on the side
of caution, and I'm willing to give a limiting
instruction on that and have the jury ignore
Miss Jones' comments to the effect of, I believe she
said that I don't want to say something or --

          MS. MORRIS: I'm afraid to tell you who the
real owner of the money is.

          THE COURT: I'm afraid to tell you -- I'll
tell the jury to ignore that.  Because as I said -- I
will write to this later, but I think that it's
something that's first impression.  And I would be
happy to do that if the defendants want me to give
that limiting instruction.

          MS. WAYNE: Judge, I think under the law we
have to ask you, but the problem we have is
timeliness.  I think it should be a contemporaneous
instruction.

          THE COURT: Right.

Page 6

1    MS. WAYNE: And I think that was our request
2 if it came in. And I'll tell I'm concerned because
3 there had been a lot of argument by the government in
4 these statements to the jury about Sandra Jones being
5 connected to the defendant and at the direction of the
6 defendant. And we'd be objecting to that.
7    THE COURT: I anticipate that you will make
8 an argument that it can't be cured, but I haven't even
9 concluded yet that it needs to be cured, but I am
10 going to give the curative instruction and I will
11 write to it later.
12    MS. WAYNE: All right.
13    THE COURT: I think rightly so you would
14 argue that it can't be cured.
15    MS. JAMES: Judge, one question. You said
16 several times that if we anticipate --
17    THE COURT: But you have no problems with me
18 giving the curative instruction?
19    MS. WAYNE: No, not at all.
20    MS. JAMES: You indicated several times if
21 the defendant is convicted and we anticipate
22 requesting a release during the pendency of sentencing
23 and appeal, that we should file a brief.
24    THE COURT: Well, I said that you should be
25 prepared.

Page 7

1    MS. JAMES: Right. My question to you is,
2 under 18 U. S. C., Section 3145(c), that that very
3 issue might -- a close call on an appeal could be a
4 basis for allowing the defendants to remain at
5 liberty.
6    THE COURT: Oh, I'm aware of that.
7    MS. JAMES: Do we need to brief that?
8    THE COURT: Yes, you'll need to address that
9 with me. Definitely. There are loads of issues that
10 I have to engage in a complete balancing of all
11 issues, and I'm sure you will raise that. No question
12 about it.
13    MS. WAYNE: But in terms of a brief, we
14 don't have to do a brief --
15    THE COURT: You don't have to do a brief. I
16 just wanted you to be prepared that that is a serious
17 issue. He will be standing there, Mr. Carmichael and
18 Mr. Williams, and the issue right after, if there is a
19 conviction, before we go into the forfeiture hearing I
20 have to decide whether to incarcerate him or not. And
21 I didn't want you saying well, Judge, we're not
22 prepared.
23    MS. JAMES: Right. But we don't have to do
24 a brief.
25    THE COURT: You don't have to do a brief.

Page 8

1    MS. WAYNE: Judge, in terms of scheduling
2 today, because I anticipate we could be getting easily
3 into closing argument, and I'm wondering if the jury
4 hasn't reached any kind of verdict testimony if they
5 deliberate all day do you do a Saturday or Sunday?
6    THE COURT: No, unless you all want me to
7 but I prefer not to.
8    MS. WAYNE: We prefer not to. The defense
9 prefers not to. I don't know about the prosecution.
10    MR. FEAGA: No, sir.
11    THE COURT: I don't see any real need for
12 them to work Saturday and Sunday on deliberations.
13    Now going back to the Jones charge, would
14 you all like to draft it, or -- I think it's pretty
15 straightforward.
16    MS. WAYNE: Judge, the one that you have
17 used in the past is appropriate.
18    THE COURT: I'll need to get her full
19 comment that I need to exclude. My clerk will clear
20 that with you all before you do that. And you've
21 preserved your objection both to the Crawford issue
22 and to the fact that any curative instruction would be
23 inadequate.
24    MR. TEAGUE: Your Honor, may I bring up one?
25    THE COURT: Yes.

Page 9

1    MR. TEAGUE: A little problem I have, Judge
2 Reese is expecting me to be in his court Monday
3 morning. If the jury gets this case tomorrow and they
4 don't --
5    THE COURT: Well, if they don't convict,
6 you'll have to be here Monday morning for the
7 forfeiture proceedings, I can assure you of that.
8    Are you a part of the forfeiture?
9    MR. TEAGUE: I don't think we are. And I
10 would ask to be excused.
11    THE COURT: I just want to make sure you're
12 not a part of the forfeiture.
13    MR. TEAGUE: If the government has something
14 of Freddie's they want to seize, I have not yet
15 figured out what it could be.
16    THE COURT: Okay. Anything else we need to
17 take up?
18
19    THE COURT: Very good. Anything else we
20 need to take up?
21    MS. JAMES: May I have permission to go in
22 and out? Because we have witnesses that we are trying
23 to keep going.
24    THE COURT: Yes.
25    MR. TEAGUE: Your Honor, if the jury is

Page 10

1 deliberating and I need to attend a docket call for
2 Judge Reese --
3     THE COURT: I will take that up with you
4 when we see how it progresses.
5     MR. TEAGUE: Okay.
6     MS. CHARTOFF: Your Honor, I have one more
7 question. Did Your Honor want to address the
8 admissibility of the coconspirator statements, or have
9 you already done that?
10     THE COURT: Oh I haven't. We need to talk
11 about that in general. I think your Crawford argument
12 is not going to fly in the sense of all the
13 coconspirator statements except for Sandra Jones. As
14 I said, I have tentatively concluded that I should
15 probably keep it out, or at least give a limiting
16 instruction.
17         Whether they come in as coconspirator
18 statements otherwise, I'll hear argument on that. You
19 know, was there a conspiracy? Who was a part of it?
20 Were the statements made in furtherance? I may have
21 some more issues after that.
22     MS. MORRIS: When do you want to hear that?
23     THE COURT: I'll hear that at the end of all
24 the evidence.
25     Okay, let's go out. I just wanted to get

Page 11

1 the Crawford issue behind me.
2     (Whereupon, the in-chambers conference was
3 concluded.)
4         IN OPEN COURT
5         (THE JURY IS PRESENT):
6     THE COURT: Ready to proceed, Mr. Brunson?
7     MR. BRUNSON: Yes, Your Honor. Knox Argo,
8 please.
9     THE COURT: Knox Argo.
10         K N O X   A R G O,
11 the witness herein, having first been duly sworn or
12 affirmed to tell the truth, was examined and testified
13 as follows:
14         DIRECT EXAMINATION
15     BY MR. BRUNSON OF KNOX ARGO:
16     THE WITNESS: Good morning, Judge.
17     THE COURT: Good morning, Mr. Argo.
18     Proceed, Mr. Brunson.
19     MR. BRUNSON: Thank you, Your Honor.
20 Q  Good morning, Mr. Argo.
21 A  Good morning.
22 Q  Mr. Argo, what do you do for a living?
23 A  I'm a lawyer here in Montgomery.
24 Q  Do you have a certain specialty that you practice
25 in?

Page 12

1 A  Well, Montgomery is not big enough to have a lot
2 of specialties. About forty percent of my practice is
3 probably real estate, and the rest of it is civil
4 litigation.
5 Q  In the real estate practice do you do closings on
6 loans and such?
7 A  Surely do.
8 Q  Did there come a time in 1999 when you handled
9 some loan closings for Leon Carmichael?
10 A  There was some loan closings in which he was a
11 borrow. The lender was AmSouth.
12 Q  And who, technically, do you represent in a
13 closing of a loan such as that?
14 A  Well the primary obligation is to the lender.
15 It's the lawyer's job to make sure that the lender
16 ends up, when the day is done, with a good first
17 mortgage securing the loan. In fact, most lenders
18 will have a piece of paper that the lawyer signs that
19 says something to that effect.
20 Q  Did you bring documents to court this morning
21 that represent loan closings that you made for Leon
22 Carmichael or his business Multi-Investments?
23 A  Yes, I did.
24     MR. BRUNSON: If I may approach, Your Honor?
25     THE COURT: Yes.

Page 13

1 Q  Mr. Argo, I'm going to show you what's marked for
2 identification as defendant's exhibit 24, 25, 26 and
3 27. I'll ask you first to refer to exhibits 24 and
4 25. Are those loan closings you made for Leon
5 Carmichael or Multi-Investments?
6 A  Yes. These are settlement statements. This is a
7 document, a uniform statement prepared by the federal
8 government to be used in real estate transactions. It
9 references loans by AmSouth Bank, that would be the
10 lender, to one Leon Carmichael and the other one is
11 Multi-Investments, Inc.
12 Q  And referring to them by number, which one is
13 Leon Carmichael?
14 A  Defendant's exhibit 24 is the one to Leon
15 Carmichael. It's a two-page document. The second
16 page lists the pieces of property which were secured
17 to AmSouth Bank by a mortgage.
18 Q  And when were those loans taken out?
19 A  Well this one has on here as a closing date
20 September the 3rd, 1999. I would feel certain that is
21 correct. And the defense exhibit 25 has the same
22 date. My recollection is they were all done at the
23 same time. And it also lists in this case about six
24 pieces of property which secured the Multi-Investment
25 loan.

Multi-Page™

Page 14

1 Q And are those documents that you've kept in a
2 file that reflect the transaction that occurred on
3 September the 3rd, 1999?
4 A Yes, they do.
5     MR. BRUNSON: Your Honor, we move for the
6 admission of defendant's exhibit 24 and 25.
7     MR. FEAGA: No objection, Your Honor.
8     THE COURT: Admitted.
9 Q Now, Mr. Argo, you said that the documents
10 contain references to properties, is that correct?
11 A That is correct.
12 Q Were the loans made in exhibit 24 and 25 made as
13 a mortgage on property? Can you tell whether property
14 was mortgaged based on those loans?
15 A My recollection is that is correct. Defendant's
16 exhibit 24 lists seven parcels which were put under a
17 mortgage and AmSouth Bank was to secure that loan.
18     And defendant's exhibit 25 lists, it looks
19 like six parcels that were put under a mortgage to
20 AmSouth Bank to secure that loan.
21 Q And how much was the loan in exhibit 24?
22 A The loan amount shown on here is two hundred and
23 forty-five thousand three hundred and eighty-nine
24 dollars and thirty-four cents.
25 Q How much was the loan amount in exhibit 25?

Page 15

1 A Is two hundred and forty-seven thousand three
2 hundred and twenty-three dollars and sixty-six cents.
3 Q Do you have any information at your disposal as
4 to whether these loans have been paid or serviced, or
5 any other information relating to those loans?
6 A None whatsoever.
7 Q Now I want to turn your attention to defendant's
8 exhibit for identification number 26 and 27 and ask if
9 you can identify those documents.
10 A Defendant's exhibit 26 is another settlement
11 statement. Again, AmSouth Bank made the loan, and
12 this was to Leon Carmichael, Senior. The loan amount
13 four hundred and five thousand nine hundred and
14 ninety-seven dollars and fifty cents. And this loan
15 was for what has been generally referred to as the
16 Carmichael Center.
17 Q And what was the date of the loan in exhibit 26?
18 A September the 11th, 2003.
19 Q And without expressing the contents of the
20 document, what is exhibit 27 for identification?
21 A Defendant's exhibit 27 is a copy of the recorded
22 mortgage from Leon Carmichael, Senior to Scientific
23 Engineering, Inc. in the amount of a hundred and
24 sixty-four thousand dollars.
25 Q And does that mortgage document on 27 relate to

Page 16

1 the loan in exhibit 26?
2 A In a manner it does. Scientific Engineering,
3 Inc. did some construction work on the Carmichael
4 Center, and in order to satisfy the lien that they
5 would normally have, I think the gentleman's name is
6 Alan Gunn who signed for Scientific Engineering, in
7 order to satisfy that lien they released the lien and
8 took this mortgage, "this mortgage" being defendant's
9 exhibit 27.
10     The bank, AmSouth Bank, is shown by exhibit
11 26. It took a mortgage on what is locally referred to
12 as the Carmichael Center. And Scientific Engineering
13 took a mortgage on the rest of the property that was
14 there in that location.
15     MR. BRUNSON: Your Honor, we offer
16 defendant's exhibit 26 and 27.
17     THE COURT: Admitted.
18 Q Now, Mr. Argo, relating to 26 and 27, was Mr.
19 Carmichael liable for both the note to AmSouth in the
20 amount of four hundred thousand and the note to
21 Scientific Engineering in the amount of a hundred and
22 sixty-four thousand dollars?
23 A Yes, he's personally on both those notes.
24 Q Do you have any information that, at your
25 disposal, to determine whether those notes had been

Page 17

1 serviced or paid at any time?
2 A I have no information. I've had no contact with
3 AmSouth Bank or Scientific Engineering to indicate
4 anything one way or the other.
5     MR. BRUNSON: No further questions, Your
6 Honor.
7     THE COURT: Mr. Teague?
8     MR. TEAGUE: Nothing, Your Honor.
9     THE COURT: Cross by the government?
10     MR. FEAGA: Just a couple of questions.
11     CROSS EXAMINATION
12     BY MR. FEAGA OF KNOX ARGO:
13 Q Mr. Argo, are these four different loans, the two
14 forty-five in exhibit 24 and the two hundred and forty
15 seven in exhibit 25, and the four hundred and five
16 thousand dollar mortgage in exhibit 26, and then in
17 exhibit 27 I think you mentioned a figure of a hundred
18 and sixty-four thousand dollars, are those four
19 separate loans from the bank to Mr. Carmichael?
20 A There are three. Defendant's exhibit 24, 25 and
21 26 are loans by AmSouth Bank.
22 Q Okay. So the two forty-five, the two
23 forty-seven, and I'm talking thousand, and the four oh
24 five are loans to Mr. Carmichael?
25 A Well, yes. The reason I'm hesitating is because

Page 18

1 one of them technically is to Multi-Investments.
2 Although understand, that the bank doesn't lend
3 Multi-Investments, Mr. Carmichael had to sign a
4 guarantee for that amount so he's personally on that
5 too.
6 Q I understand. Okay. I just wanted to make sure
7 I got it straight.
8        Now what about that hundred and sixty-four
9 thousand on exhibit 27, what's that?
10 A As I understand it, that's the amount remaining
11 owed to Scientific Engineering for the work that they
12 had done on the Carmichael Center. If you'll notice
13 in exhibit 26 it shows a disbursement to the borrower
14 of four hundred thousand, but actually about a hundred
15 and fifty thousand, I think went to Scientific
16 Engineering for the amount that they had been owed for
17 doing that work. And then this is the balance.
18 Q So the balance -- And the reason that's part of
19 these documents is they agreed to waive their lien on
20 the property so the bank would be willing to loan him
21 the money.
22 A That's exactly right.
23 Q The bank wouldn't loan the money if they had a
24 lien on the property?
25 A That's exactly right.

Page 19

1        MR. FEAGA: Thank you. No further
2 questions, Your Honor.
3        MR. BRUNSON: No further questions of this
4 witness, Your Honor.
5        THE COURT: Anything else, Mr. Teague?
6        MR. TEAGUE: No, Your Honor.
7        THE COURT: Thank you. You may step down.
8        (Whereupon the witness, Knox Argo, stepped
9 down from the stand.)
10        THE COURT: Next witness.
11        MR. BRUNSON: Mr. Lloyd Prescott.
12        L L O Y D   P R E S C O T T,
13 the witness herein, having first been duly sworn or
14 affirmed to tell the truth, was examined and testified
15 as follows:
16        DIRECT EXAMINATION
17        BY MR. BRUNSON OF LLOYD PRESCOTT:
18 Q Good morning, Mr. Prescott.
19 A Good morning.
20 Q What's your full name?
21 A Lloyd Ferrell Prescott.
22 Q And, Mr. Prescott, what do you go by?
23 A Ferrell.
24 Q Ferrell Prescott. How are you employed, Mr.
25 Prescott?

Page 20

1 A In the tire business as a commercial salesman,
2 Moody Tire Service.
3 Q How long have you been doing that?
4 A Fifty years.
5 Q What type of tires do you sell for Moody Tire
6 Company?
7 A All kinds. Basically truck tires and
8 off-the-road tires, earth moving tires.
9 Q Truck tires, does that include tires for eighteen
10 wheelers?
11 A That's correct.
12 Q And is Moody Tire Company in the business for
13 selling commercial tires?
14 A Yes, we are.
15 Q How long have they been in the business of
16 selling commercial tires?
17 A Since 1946.
18 Q Mr. Prescott, did there come a time when you
19 began to do business with Leon Carmichael?
20 A Yes.
21 Q Do you know about when that occurred?
22 A About 1992.
23 Q And why did that occur?
24 A He was looking for some truck tires and looking
25 for somebody to service him to fix his flats and to

Page 21

1 align his front end on his trucks and balance them.
2 That kind of thing.
3 Q Talk to me about truck tires. How much -- What's
4 the going rate on an eighteen wheeler tire these days?
5 A Including tax about four hundred dollars.
6 Q And tell me how many tires does an eighteen
7 wheeler need or use at any given time?
8 A It depends. From two to eight to ten. It's very
9 seldom that you would need to replace all eighteen at
10 one time.
11 Q And is that an expensive proposition relating to
12 the operation of an over-the-road tractor-trailer
13 truck?
14 A It is. Next to gas and oil, it's the biggest
15 expense.
16 Q Now you said you began dealing with Leon
17 Carmichael in 1992 or so. Is that what you recall?
18 A That's right.
19 Q And where was his business in 1992, do you know
20 that?
21 A It was located on Norman Bridge Road.
22 Q Tell me how you provide a service for selling
23 tires. Are you the type of person that sells tires in
24 a shop or in a showroom?
25 A No. What we do is to go out, once we get a

## Page 22

1 client, then we go by and check his fleet on a regular
2 basis. We find out pretty much when they're going to
3 be in, but in his case they were always different
4 times so you just have to try and catch them if you
5 could.
6         And I would go by and look at them and see
7 what was needed, and I could look at the tractors and
8 see if the front end was out of line or if the tire
9 was getting out of balance, if it was cupping out.
10 Check for worn parts in the back in the full wheels of
11 it. Just stuff that would cause a tire to wear.
12 Anything having to do with tires, tire wear.
13 Q So not only were you a tire salesman, you did
14 inspections on his -- on any tractor-trailer from time
15 to time?
16 A Yes, I did.
17 Q Did you do those inspections on your schedule or
18 on the client's schedule?
19 A I did it on his schedule as they would come in,
20 of course. I would go by, you know, to check and see
21 if there was any vehicles on the lot, and if there
22 were, then that's when I would go to work.
23 Q And back in 1992 do you have a recollection of
24 about how many tractor-trailers Leon Carmichael
25 operated?

## Page 23

1 A He had three to five, I'd say, tractors and
2 trailers, because there is always one of them that was
3 breaking down so as far as what was running at the
4 time it was either three, four or five.
5 Q Through the years have you had other
6 tractor-trailers belonging to Mr. Carmichael or
7 Multi-Investments that you have inspected?
8 A Yeah. Of course he grew. He got up to between
9 twelve and fifteen tractors and trailers.
10 Q Now relating to your inspections, did you have
11 full access to the lot where these tractor-trailers
12 were stored or parked?
13 A If I went by and it was unlocked, then of course
14 I could go in and check them. Or if I needed to look
15 at something, then I could go get a key and open up
16 and go in.
17 Q And then what would happen if you suggested some
18 service?
19 A I would go in after looking. If it was deemed
20 that he needed tires, then I would go see him and tell
21 him what the situation was and he would tell me to go
22 ahead and put them on. I would then radio back to the
23 store and tell them to send me the tires and send a
24 man out there and we'd do the work right there on the
25 lot.

## Page 24

1         Now if he was in a real big hurry then he
2 might tell me well, I'll just send it around there to
3 you because I need to get this truck rolling.
4 Q Have you, as a result of your service over the
5 years, invoiced Mr. Carmichael for your services?
6 A Do what now?
7 Q Have you caused invoices to be sent to Mr.
8 Carmichael for your services?
9 A Oh, yes.
10 Q Do you have any recollection of approximately how
11 much money he's paid you over the years for tire
12 services?
13 A No, not a bottom line figure, no.
14 Q Would it be a substantial amount of money that
15 he's paid you over the years?
16 A He's owed me as much as thirty-seven thousand
17 dollars at one time.
18 Q Relating to his payments to you, do you know
19 whether he's paid your company for these services in
20 check or in cash?
21 A Primarily in check.
22 Q You say "primarily in check." Over the last
23 thirteen or so years, did you ever receive cash in
24 payment for tires?
25 A Yes, I have.

## Page 25

1 Q And what's the largest amount of cash you
2 received from Mr. Carmichael for tires?
3 A Approximately thirty-two hundred dollars.
4 Q Thirty-two hundred. Was that in full payment of
5 an invoice, or do you recall that event?
6 A Yes. That paid his account up at the time.
7 Q Do you know about when that occurred?
8 A In the last ninety days.
9 Q And do you know if Mr. Carmichael had a concert
10 or an event at the Carmichael Center in relation to
11 being paid in cash or the tire service?
12 A He -- At the time he didn't have his checkbook
13 with him, but he said I knew that there was, had some
14 kind of concert the night before and he said, "I'm
15 just going to pay you in cash."
16         MR. FEAGA: Your Honor, I want to object on
17 the ground of relevance. We're talking about an event
18 that happened after June of 2003, which is not the
19 period of time covered by the money laundering, if
20 that's where he's going. It seems to be irrelevant to
21 be talking about payments made after the account
22 closed, the events that occurred after that.
23         THE COURT: Mr. Brunson?
24         MR. BRUNSON: Your Honor, I think it's
25 relevant to their conducting business over the years.

Multi-Page™

Page 26

1    THE COURT: I guess he can get into pattern
2  and things. Overruled.
3  Q  You said you were aware of Mr. Carmichael having
4  some event the night before he paid you that cash?
5  A  Right. He had some kind of big event the night
6  before.
7    MR. BRUNSON: No further questions of this
8  witness, Your Honor.
9        CROSS EXAMINATION
10      BY MR. FEAGA OF LLOYD PRESCOTT:
11  Q  Sir, you said that Mr. Carmichael had owed you as
12  much as thirty-seven thousand dollars at one time on
13  his account. Can you remember him falling in arrears?
14  Was he ever late in paying?
15  A  Yes.
16  Q  Let me direct your attention, if I can, to that
17  time frame, 2003. Did you become aware at sometime in
18  2002 or 2003 that your customer, Mr. Carmichael, was
19  building a facility called the Carmichael Center?
20  A  Yes, I was.
21  Q  Was he at any period of time during that time
22  when he was building that facility, would that be the
23  period of time that he was having difficulty paying on
24  time?
25  A  Yes.

Page 27

1    MR. FEAGA: Thank you, sir. No further
2  questions.
3    THE COURT: Anything else?
4    MR. BRUNSON: No, Your Honor.
5    THE COURT: You may step down.
6    (Whereupon the witness, Lloyd Prescott,
7  stepped down from the stand.)
8    THE COURT: Next witness.
9    MS. JAMES: Joseph Lapinski, Your Honor.
10     J O S E P H   L A P I N S K Y,
11  the witness herein, having first been duly sworn or
12  affirmed to tell the truth, was examined and testified
13  as follows:
14        DIRECT EXAMINATION
15      BY MS. JAMES OF JOE LAPINSKY:
16  Q  State your name, please.
17  A  Joseph Lapinski.
18  Q  Mr. Lapinsky, in what city do you reside?
19  A  Montgomery, Alabama.
20  Q  And what do you do for work?
21  A  I'm manager of a trucking company.
22  Q  And how long have you been so employed?
23  A  Since October of '85.
24  Q  And what's the name of your company?
25  A  It's Eagle Motor Freight.

Page 28

1  Q  And explain to the jury what kind of business
2  that is.
3  A  It's a locally based long haul trucking company.
4  We transport product from various manufacturers in the
5  Montgomery area, and actually out of Selma, Alabama,
6  to various points in the United States and Canada.
7  Q  Do you know the defendant, Leon Carmichael, in
8  this case?
9  A  Yes. I met Leon back in 1985 or '86 I guess,
10  with a company called T. and G. Express.
11  Q  Let me stop you there. What was T. and G.
12  Express, a company that you were involved with?
13  A  Yes. When we moved to Montgomery, Alabama I went
14  to work for a company called T. and G. Express, which
15  is now defunct. It went out of business in '92 or
16  '91, something like that. A similar company to what
17  we're doing now, and he was involved in refrigerator
18  freight, used to haul meat and stuff like that.
19  Q  Okay. Now did Mr. Carmichael have any
20  involvement with you in your capacity with T. and G.
21  Express back in the '80s?
22  A  Yes. He was what was called an owner/operator.
23  He had tractors that he supplied to T. and G. Express
24  on a regular basis, a tractor and driver. And then we
25  would provide them with loads that would go to various

Page 29

1  places. They would get a percentage of the gross
2  rate.
3  Q  Now just so we understand, because not all of us
4  may understand trucking like you do, but who has the
5  liability and how does that whole relationship work
6  when you've actually got an owner/operator that's
7  leasing on with your company?
8  A  It hasn't changed much since then. An
9  owner/operator would provide you a tractor that you
10  would deem suitable for your operation. You don't
11  want a truck that's like ten or fifteen years old, you
12  want a truck that's fairly new. The driver that they
13  provide has to meet your insurance requirements.
14  You have to submit the driver to the insurance company
15  and they say yeah, the insurance company will provide
16  coverage with this driver or no they won't.
17    If the driver is adequate and the truck is
18  adequate, then you would give them loads like a
19  company truck. You would just say you're picking up
20  trailer number whatever it is, it's going from here in
21  Montgomery to New York, Chicago, wherever it's going.
22  Then you would provide them with a load back. The
23  owner operators are paid different than company
24  drivers in that if a load pays six thousand dollars,
25  they, the owner/operator gets eighty percent of

Page 30

1 whatever that pays and then they pay their driver out
2 of that eighty percent.
3     They pay fuel and all expenses, basically,
4 except for the trailer.  And we provide liability
5 insurance while they're under dispatch.  The
6 owner/operator provides their own bobtail physical
7 damage insurance.
8 Q  Well let me ask you this:  If a driver leases on,
9 let's say with your company Eagle, do you have that
10 going on at the present where people actually lease
11 on, contract drivers?
12 A  Yes, we do.
13 Q  So that's an analogous situation if you have a
14 driver that leases on to the same situation you've
15 just described?
16 A  Well it's not the driver inasmuch as it's the
17 tractor.  Whoever owns the tractor typically leases
18 the tractor on.  They will either drive it themselves,
19 or they will have somebody who works for them, the
20 owner of the tractor, to drive the tractor.
21 Q  Okay.  Now as I guess someone involved in the
22 trucking industry, are you all under requirements to
23 do any sort of investigation of drivers and drug
24 testing?
25 A  We do a slight background check.  You contact the

Page 31

1 previous employers.  Typically the insurance company
2 requires that a driver would have two and-a-half years
3 verifiable over-the-road experience, and you don't
4 want to actually put anybody on that really doesn't
5 have that much experience because it's an expensive
6 piece of equipment they're taking out and the cargo.
7     So in addition to the insurance
8 requirements, typically the federal government
9 requires that you have what's called D. O. T.
10 requirements that have to be satisfied.  They have to
11 have a valid C. D. L. or commercial driver's license.
12 They have to pass a physical.  They have to have a
13 recent drug test.  And then they're subject to random
14 drug tests throughout their term of employment.  They
15 have to maintain logs, and they have to provide their
16 previous employer so you can contact them and ask them
17 how their performance was at their other jobs.
18 Q  You mentioned logs.  Is that a mechanism whereby
19 you, as the owner, and the authorities, transportation
20 authorities can keep up with the drivers, where they
21 go and when they stop?
22 A  Right.  The driver is required to log on a daily
23 basis every hour of their time, where they are, where
24 they buy fuel.  If they're stopped for any reason, if
25 that's supposed to be reflected on the logs.  If they

Page 32

1 take a break, if they check their equipment, all that
2 is supposed to be noted on the log by the driver.
3 Q  The information that's placed on that log, is
4 that actually -- are you having to rely on the driver
5 for that information?
6 A  Yes.  The drivers complete the log themselves and
7 turn it in.  They're not allowed to have more than
8 thirteen days worth of logs in their possession at any
9 one time.  They're supposed to turn it in to us so we
10 can review their logs and their on duty status and
11 that type of thing.
12 Q  Is there presently underway a mechanism or means
13 by which people like you and the transportation
14 authorities can keep closer tabs on drivers?
15 A  There has been, and I'm not sure how long it's
16 been around, G. P. S., global positioning satellite
17 where you can keep track of the tractor or trailer.
18 You can get them for either one.  And there are some
19 movement in the industry, and I guess through the
20 regulations that they're going to have like black
21 boxes installed in the trucks so that when a driver
22 pulls on a scale or a port of entry, rather than
23 relying on the driver's logs that information on the
24 computer on the black box would download to the scale
25 house and then they would determine from there whether

Page 33

1 or not he's in compliance with the logging
2 requirements.
3 Q  To your knowledge is that presently a
4 requirement?
5 A  Oh no, it's not a requirement yet.  If I said
6 that I'm sorry.  It's something that they're looking
7 at.  When I say "they," I guess the D. O. T. is
8 looking at, but it's not in force yet.
9 Q  Would it be your position that that type
10 mechanism would help make it your driver information
11 more reliable?
12 A  It lets you know exactly where the truck is
13 within a hundred feet at any one time, yes.
14 Q  Okay.  Now when you send a driver, I guess I'll
15 use the term dispatch a driver to go to Texas or
16 California, somewhere like that, when they leave the
17 gate what do you know?  I mean, what can you say for
18 sure that they are going to do?
19 A  Well, I guess for sure you don't know what
20 anybody is going to do.  They're employees, and
21 hopefully they're going to go where they're supposed
22 to be and do what they're supposed to do, but you
23 don't really have any hands-on control on the road
24 other than drivers checking in, calling in, being
25 where they're supposed to be at the time they're

Page 34

1 supposed to be there.
2 Q When you send a driver, let's say -- You don't do
3 refrigeration loads any more do you?
4 A No, not since '92.
5 Q But you have done them?
6 A In the past, yes.
7 Q Let's say you send a driver to California, Texas
8 or somewhere like that to I guess you're trying to
9 haul a load out and a load back, right?
10 A Typically in our setup, and I don't know about
11 anybody else's operation, but in our setup you would
12 leave our outbound accounts where we generate our
13 business from, we go out to wherever the shipper wants
14 us to go from here. Coming back we're always trying
15 to find a load in that area where if we end up in
16 Chicago or Los Angeles, we're trying to find a load in
17 that area coming back as close to Montgomery as you
18 can to repeat the process, to go back out again.
19 Q Okay. So assume you send out a load to
20 California and your driver gets a load back of
21 cantaloupes, if that driver is to come from California
22 back to Montgomery and they decide that they have got
23 a little room on the truck and they want to stop in
24 Texas and pick up oranges, is that something that you
25 can always control?

Page 35

1 A No. You wouldn't have any control. You wouldn't
2 know if there would be room unless the driver told you
3 if there was room on the truck. But that's something
4 you wouldn't know about either way.
5 Q But I'm assuming if it was disposed of or taken
6 off the truck before it got to you, that you wouldn't
7 necessarily have any knowledge of that, would you?
8 A No, not unless by some fluke we found out about
9 it.
10 Q Let me ask you this. In your experience, I'm
11 assuming you've dealt with a lot of truck drivers in
12 the course of the past twenty years?
13 A Probably, yes.
14 Q Has it been your practice to try to allow your
15 drivers to get home if possible when they're hauling a
16 load and they have to be gone several days?
17 A Yes. One of our big things, at Eagle Motor
18 Freight, I don't know about anybody else's operation,
19 but with ours we try to get our drivers back during
20 the week once or maybe two trips. They would go out
21 somewhere, come back, go out again and be back for the
22 weekend and then leave out on the weekend.
23     It's real hard. Drivers like anybody else
24 have families and they don't want to leave their
25 families. There is as much home time as you can get a

Page 36

1 person. You have a happier more satisfied employee.
2 So we're trying to get the people out and back as
3 quickly as we can, even on weekends. If we had a guy
4 in Chicago we would not take a load to Atlanta because
5 typically the guy would go to Montgomery and then
6 Atlanta, but it's just too far out, it's too expensive
7 to do something like that. It's too far around.
8 Q Is it unusual or would it be unusual in your
9 business if a driver is anywhere close to home on
10 their route to a place other than home that they would
11 try to stop by?
12 A Oh, not at all. It's the same situation. If we
13 had a load on a Friday from Chicago to Atlanta, I
14 would almost bet my house that the person is going to
15 be in Montgomery on Saturday and be back in Atlanta on
16 Monday morning.
17     MS. JAMES: May I consult co-counsel?
18     THE COURT: Yes.
19     (Whereupon, Ms. James conferred with Ms.
20 Wayne and Mr. Brunson off the record and out of the
21 hearing of the other courtroom participants.)
22 Q Just one more question, Mr. Lapinsky. Would it
23 be fair to say that in the trucking business there are
24 routes that you all try to use for particular loads?
25 In other words, if you're coming from California, that

Page 37

1 you'll take a particular route, the driver, most
2 direct?
3 A We try to go the most direct route for just
4 simply economic reasons. And drivers should try --
5 well it depends on the setup. I guess our driver is
6 paid by the mile, it's like piecework, so there is no
7 incentive for them to really go out of route. You
8 should go from point A to point B in the most direct
9 route as possible.
10 Q Would you know if the route, if you come from
11 California to Florida using Interstate 10, if the
12 mileage would varied much at all, if you came from
13 California to Florida through Montgomery?
14 A No, that's not that far out. I don't know how
15 far out around it is, but we would route our driver,
16 depending on when the delivery time was and that type
17 thing, probably to the house so they could be home.
18     MS. JAMES: Thank you. No further
19 questions.
20     CROSS EXAMINATION
21     BY MR. FEAGA OF JOE LAPINSKY:
22 Q Sir, you said you're the manager of a trucking
23 company called Eagle Motor Freight?
24 A Yes, that's right.
25 Q How many trucks do you folks operate?

Multi-Page™

Page 38

1  A  Sixty-seven or sixty-eight.
2  Q  And how long have you been with Eagle Motor
3  Freight?
4  A  Since '92, that's when we started.
5  Q  So that would be about thirteen years?
6  A  Yes.
7  Q  Did your company grow to the point where it is
8  now, or was it that size in '92 when it started up?
9  A  No, when we started out we actually had two
10 tractors and we've been adding over the course of
11 time.
12 Q  Okay.  During the course of the time that you've
13 been running the trucking company Eagle Motor Freight,
14 has there ever come an occasion when one of your
15 trucks got pulled over with a hundred fifty pounds of
16 marijuana in the back of it?
17 A  No, sir.
18 Q  Has there ever come an occasion when another one
19 of your trucks got pulled over with a hundred pounds
20 of marijuana in it?
21 A  No, sir.
22 Q  Miss James was asking you about truck routes.
23 She said if you were coming from California and going
24 to Florida, you might be close and come through
25 Montgomery and you talked about the worker benefit.  I

Page 39

1  want to ask you, if I can, do you ever have occasion
2  to have any trucks go to Idaho?
3  A  Maybe once a year in Idaho.  We don't go into the
4  northwest that often.
5  Q  If a truck was going to Idaho and it was -- I'm
6  looking for a government exhibit here.  Let's see
7  where those are --
8      MS. MORRIS:  58.
9      MR. FEAGA:  No, that's one of them, though.
10 Where's the one from Mississippi?  I'll take that one
11 for now.
12     Sir, if a truck is picking up a load in
13 Black Foot, Idaho going to Deerfield, Florida, can you
14 think of any reason that it would travel down to El
15 Paso, Texas to get there?
16 A  It takes us the wrong way.  Without looking on
17 the computer to see what the routing is, unless there
18 was a weather related thing or another pickup, if it's
19 out of route I would say not.
20 Q  That would be significantly out of the way,
21 wouldn't it?
22 A  I'd have to run the miles, sir.  I'm not trying
23 to be smart with you, I just don't know what the miles
24 are.  You'd have to look and see.
25 Q  But there wouldn't be any of this morale based

Page 40

1  reason for a Montgomery based or Alabama based truck
2  driver to travel well out of their way to get
3  somewhere, would there, on their way to another place?
4      MS. JAMES:  Objection, Your Honor.  I think
5  he's really calling him to speculate on this.
6      THE COURT:  Overruled.
7  A  No.
8  Q  You talked about the fact that if somebody is
9  coming near their home, that the company might say
10 hey, yeah, sure, you can stop in there and keep going.
11 Minimal expense to the company and good for employee
12 morale, correct?
13 A  Yes.
14 Q  It makes sense.  But if somebody drives
15 significantly out of their way, if one of your drivers
16 were to drive hundreds of miles out of his way to go
17 through El Paso, Texas on his way from Idaho, let's
18 just say and they're on their way to Deerfield,
19 Florida, would that be something that as a trucking
20 company you would want your driver to do?
21 A  No.
22 Q  And what are the reasons why you wouldn't want if
23 you were a legitimate trucking company, you wouldn't
24 want your driver to do that?
25 A  Well, we are a legitimate trucking company.

Page 41

1      (Laughter.)
2  Q  Yes, sir.  Let me rephrase that.  Why wouldn't
3  you want your driver to do that as a legitimate
4  trucking company?
5  A  Don't take it the wrong way, just cost.  You have
6  wear and tear on the equipment, cost of fuel as
7  everybody knows is through the roof right now.
8  There's no benefit for doing it.  There is no benefit
9  time ways for the driver.  There is no benefit for us
10 getting the load where it needs to be on time.
11 Q  Now if you as the owner of the truck had
12 something you wanted picked up down there, then you
13 would want your employee to go down there, right?
14 A  It's a multiple pickup or multiple drop type
15 situation then yes.  You would route the guy to the
16 most expeditious way to cover the pickups and the
17 drops.
18 Q  Now if one of your employees were to drive a
19 truck like I've just described to you, and then that
20 truck would get pulled over and be found by law
21 enforcement to have a hundred pounds of marijuana in
22 it, would that be a highly unusual event in your
23 thirteen year life of your trucking company?
24 A  Yeah.  We've never had a situation like that
25 before in the past, so I would say yes.

Multi-Page™

**Page 42**

1 Q  Now would you allow somebody to drive your truck
2 that had been stopped in El Paso, Texas by narcotics
3 interdiction law enforcement personnel with forty-two
4 thousand dollars in cash strapped around their waist
5 and had it taken away from them, confiscated?  If you
6 knew that about one of your employees, would you let
7 them drive one of your trucks?
8 A  You mean the truck was stopped with --
9 Q  Yeah.  You were talking earlier about doing
10 background checks on employees.  If you had an
11 employee that you knew before you hired him had been
12 stopped by narcotics intersection law enforcement
13 personnel in an airport meeting with a Hispanic male
14 and then got stopped by law enforcement and basically
15 had forty-two thousand dollars strapped to their waist
16 in seven different envelopes -- excuse me, five
17 different envelopes and that money was confiscated as
18 drug proceeds, would you let somebody like that drive
19 one of your trucks?
20 A  If we were aware of it we probably would not.
21 Q  One more question, sir.  As the owner and
22 operator of a trucking company, have you ever had
23 occasion to call a friend of yours or an acquaintance
24 of yours at two-thirty in the morning --
25       MS. JAMES:  Objection, Judge.  This somebody

**Page 43**

1 is absolutely unrelated.
2       THE COURT:  We don't need to go over alleged
3 evidence in this case.  You can ask him about his
4 business practices, but I don't --
5       MR. FEAGA:  I was just asking him a
6 hypothetical, Judge.
7       THE COURT:  Yes, but make sure it has to do
8 with his business practices, not just general comments
9 like if he got a call at two-thirty in the morning.
10       MR. FEAGA:  Your Honor, it's clear that the
11 import of this testimony, and several before it, have
12 been to legitimize --
13       MS. JAMES:  Your Honor, my objection is
14 this:  All he wants to do with those questions is to
15 go over somebody else's testimony in this case to try
16 to highlight it for the jury.  It has no relevance
17 whatsoever.
18       THE COURT:  I'll sustain that.  Go over his
19 practices, what he would do.
20       MR. FEAGA:  Yes, sir.
21 Q  Now you were talking about contract drivers, I
22 think, give me the correct terminology, with
23 Miss James.  She was asking you about situations where
24 you lease a truck or a tractor from somebody and you
25 use it to haul loads that you basically are

**Page 44**

1 contracting for?
2 A  Right.  They're owner operators.  This is the
3 person that would approach us and say. I have a tractor
4 and a driver, I'd like to lease them on with your
5 company.  Typically the person that comes with the
6 truck is the person that actually drives it.  He owns
7 the tractor and he may own -- For example, we have one
8 that works for us now that actually owns two trucks.
9 He drives one and his brother-in-law drives the second
10 one.
11 Q  I see.  Now you talked about doing a little bit
12 of a background check for anybody that would be
13 driving a truck like that on behalf of your company,
14 is that right?  You'd want to check into him a little
15 bit before you would let him drive for you?
16 A  Yes, sir, that's correct.
17 Q  These are people that own their own truck,
18 basically, but they're going to go pick up a load that
19 you've contracted let's say with a potato company or
20 an orange company or, you know, anything they might be
21 shipping.  You have a contract with that company to
22 haul, right?
23 A  Right.  We do dry freight though, yes, sir.
24 Q  And they pay you a certain amount that you all
25 negotiate to do that.

**Page 45**

1 A  That's correct, yes, sir.
2 Q  And you'll bring this contract driver in, or this
3 owner/operator or somebody that owns their own vehicle
4 to haul that load for you, and you'll get paid by the
5 people that are doing the load and then you'll pay
6 them whatever you've agreed to pay the driver, right?
7 A  Yes, that's correct.  We're responsible for the
8 collections and we take the risk of bad debt and we
9 pay the driver whatever the load is supposed to pay
10 us.
11 Q  But these people are not employees of your
12 company, is that right?
13 A  That's correct.
14 Q  Now let me show you what's been marked as
15 government's exhibit 58 -- excuse me, been introduced
16 into evidence.  I want to show you page fifty-five,
17 eighty-eight (sic.) of it and ask you if you would
18 just read the very top of that in the bold print.
19 A  "Driver Application for Employment".
20 Q  Okay.  Now if you were doing what we were just
21 talking about and what Miss James was asking you
22 about, would you have this, driver this owner/operator
23 fill out an application for employment with your
24 company?
25 A  Yes, actually we do.  That's a standard form that

Page 46

1 everybody uses.
2 Q  Okay.  And in that form would you have -- You
3 were talking about you did limited amounts of
4 background checking.  Would you have them fill out a
5 lengthy employment history?
6 A  Yes.  They fill out that form.  Then I think
7 there is a release on the very last page.  And then I
8 think there is also another form for a Fair Credit
9 Reporting Act that has to be signed in order to
10 release that information.
11 Q  Okay.  So in addition to the urine screen you
12 talked about and checking with their immediate prior
13 employer, you'd actually have them fill out this form?
14 A  Yeah.  You don't know who they worked for in the
15 past, so it's filled out.
16 Q  Okay.  But in this circumstance, as I asked you
17 with the other one with your trucks that are owned by
18 your company, have you ever had one of these trucks
19 that was under hire for you pulled over and found with
20 a hundred pounds of marijuana?
21     MS. JAMES:  Objection, Your Honor, asked and
22 answered.
23     THE COURT:  You have asked him that.
24     MR. FEAGA:  That was about trucks that
25 actually were owned and operated by him.  Now we're

Page 47

1 talking about the contract trucks.  And they've made a
2 point of trying to differentiate that, Your Honor.
3     THE COURT:  Overruled.  Go ahead.
4 A  No, sir.
5 Q  Never had one pulled over with a hundred pounds
6 of marijuana in the back of it?
7 A  No, sir.
8 Q  Would that be a significant and unusual event in
9 the life of your company if that were to happen?
10 A  Yes, sure would.
11     MR. FEAGA:  No further questions, Your
12 Honor.
13     MS. JAMES:  Nothing further of this witness,
14 Judge.
15     THE COURT:  Thank you.  You may step down.
16     (Whereupon the witness, Joe Lapinsky,
17 stepped down from the stand.)
18     THE COURT:  Next witness.
19     MS. WAYNE:  Judge, if we may approach
20 briefly?
21     THE COURT:  Do you need this on the record?
22     MS. WAYNE:  I don't think so.  It's a
23 housekeeping matter.
24     THE COURT:  Okay.
25     (Whereupon, an off-the-record bench

Page 48

1 conference was held between all counsel and the
2 Court.)
3     THE COURT:  Members of the jury we're going
4 to take a ten minute recess at this time.
5     (Whereupon, a recess was taken.)
6         T O M M Y   M O O R E,
7 the witness herein, having first been duly sworn or
8 affirmed to tell the truth, was examined and testified
9 as follows:
10         DIRECT EXAMINATION
11     BY MS. WAYNE OF TOMMY MOORE:
12 Q  Mr. Moore, good morning.
13 A  Good morning.
14 Q  Mr. Moore, I'd like to ask you a couple of
15 questions this morning if I may, sir.  You'll going to
16 have to speak up so that we can hear you.  That should
17 be fine.
18 A  Okay.  Can you hear me now?
19 Q  We can.
20     Mr. Moore, please, your name is Mr. Thomas
21 Moore, is that correct?
22 A  James Thomas Moore.
23 Q  And, Mr. Moore, what do you do?
24 A  I'm an insurance agent.
25 Q  And how long have you been an insurance agent?

Page 49

1 A  Forty-two years.
2 Q  Where do you live?
3 A  One ninety James Drive, Millbrook, Alabama.
4 Q  And how long have you lived here in Montgomery?
5 A  I came here in '69 and moved to Millbrook two
6 years ago.
7 Q  And have you been an insurance agent that entire
8 time?
9 A  Yes, I have.
10 Q  Do you know a person by the name of Leon
11 Carmichael, Senior?
12 A  Yes, I do.
13 Q  Do you see Mr. Carmichael in the courtroom?
14 A  Yes, I do.
15 Q  Can you point him out for us?
16 A  Over at the far table.
17 Q  You're talking about the black individual sitting
18 there?
19 A  Yes.
20 Q  Okay.  And how long have you known Mr.
21 Carmichael?
22 A  Probably fifteen years.
23 Q  And do you have a business relationship with him
24 in terms of you being his insurance agent?
25 A  I do.

Multi-Page™

Page 50

1 Q  Mr. Moore, did you bring some documents to me
2 this morning in terms of life insurance and I. R. A.
3 policies that Mr. Carmichael had in 2003 and 2004?
4 A  Yes, I did.
5        MS. WAYNE:  If I may, Judge, and I'm going
6 to mark these for purposes of identification as
7 Defendant Carmichael's exhibit 28, 29 and 30,
8 individually marking them.  I've shown those to the
9 Government previously.
10        THE COURT:  Does the government have any
11 objection?
12        MR. FEAGA:  We don't object to them being
13 shown to the witness.
14        THE COURT:  They're all admitted.
15        MS. WAYNE:  May I approach the witness, Your
16 Honor?
17        THE COURT:  Yes.
18 Q  Mr. Moore, I'm handing you what has been marked
19 as Defendant Carmichael's exhibit 28, 29 and 30.  And
20 if you could just take a look at the first one,
21 Defendant Carmichael's exhibit 28, what is that in
22 reference to?
23 A  This is in reference to a loan that we related to
24 an insurance company.
25 Q  And when you say "we" who are you referring to,

Page 51

1 who is "we"?
2 A  This is -- That's the insurance company.
3 Q  Okay.  And who took that loan?
4 A  Who made the loan?
5 Q  Yes.
6 A  Carmichael.  Leon Carmichael.
7 Q  And how much was that for?
8 A  Three thousand three hundred and fifty-two
9 dollars and sixteen cents.
10 Q  Thank you, sir.
11        If you would look at exhibit 29 for us.  And
12 what is that in reference to?  And I'm sorry, when was
13 that time period on that first exhibit, 28?
14 A  The loan was made on June the 9th of 2003.
15 Q  Okay.  Thank you, sir.
16        If you would now go to exhibit 29.
17 A  Pardon?
18 Q  If you would go to the next exhibit, number 29.
19 A  Okay.
20 Q  And what's that about?
21 A  This is an I. R. A. policy.
22 Q  And who does the I. R. A. policy belong to?
23 A  Leon Carmichael.
24 Q  And what's that in reference to?
25 A  This is where we cashed -- we surrendered this I.

Page 52

1 R. A. policy in the amount of five thousand seven
2 hundred and sixty-four dollars and sixty-four cents.
3 Q  And when you say you "surrendered" it, does that
4 mean Mr. Carmichael cashed it out?
5 A  That's correct.
6 Q  Okay.  And when was that time period?
7 A  May the 22nd of 2003.
8 Q  Okay.  Let me go to the last exhibit there.  What
9 is that in reference to?
10 A  This is in reference to another life insurance
11 policy that he obtained a loan from.
12 Q  Okay.  And how much was that loan that he
13 obtained from the life insurance policy?
14 A  Sixty-four thousand nine hundred and thirty-one
15 dollars and seventy-three cents.
16 Q  Now when we talk about obtaining a loan, in your
17 experience does that mean I'm borrowing against my
18 life insurance policy?
19 A  That's correct.
20 Q  Okay.  And that is a legitimate thing to be able
21 to do?
22 A  That is correct.
23 Q  All right.  Thank you, sir.
24        MS. WAYNE:  Judge if I may have admitted
25 into evidence --

Page 53

1        THE COURT:  I think I've already admitted
2 all of them.
3        MS. WAYNE:  Oh, okay.
4 Q  Oh, I'm sorry, I didn't ask you about what date
5 was that in relation to?
6 A  This loan was taken out on May the 16th of 2003.
7 Q  Thank you very much, Mr. Moore in terms of those
8 exhibits.
9        I'd like to ask you something else.  You
10 know a person by the name of Ashley Duncan?
11 A  Yes, I do.
12 Q  Okay.  And my understanding is that he was your
13 son-in-law?
14 A  That's correct.
15 Q  And I'm sorry, I know that it's emotional for
16 you.  My understanding is that Mr. Duncan recently
17 passed.
18 A  Pardon?
19 Q  My understanding is that Mr. Duncan recently
20 died.
21 A  That's true.
22 Q  And that he had a long-standing bout with cancer.
23 A  That is correct.
24 Q  Do you know whether or not Mr. Duncan had been,
25 during your business relationship with Mr. Carmichael,

Multi-Page™

Page 54

1  was Mr. Duncan Mr. Carmichael's C. P. A., his
2  accountant?
3  A  Would you ask that again, please?
4  Q  Yes.  Was Mr. Duncan Mr. Carmichael's accountant?
5  A  Yes, he was.
6  Q  And you're aware that in terms of your own
7  personal knowledge because of your business
8  relationship with Mr. Carmichael?
9  A  That's correct.
10  Q  And Mr. Duncan, I understand, died of cancer but
11  my understanding was that he still was attempting to
12  run his business despite his cancer.
13        (Whereupon the witness paused and became
14  emotional.)
15        THE COURT: Did you hear her?
16        THE WITNESS: Yes, I did.
17  A  He was not in his office at all as far as working
18  during this whole last tax season.
19  Q  Okay.  But my understanding is that the business
20  did not close down until he died.
21  A  No, that's true.
22  Q  Okay.  And you're aware in terms of your personal
23  dealings with Mr. Carmichael as a result of Mr.
24  Duncan's illness, that Mr. Carmichael had to go and
25  employ a different accountant.

Page 55

1  A  That is correct.
2  Q  And you're aware that during the period of time
3  that -- Well, can you tell us how long Mr. Duncan had
4  been sick?  If you can.
5  A  Would you give me that brown folder that this was
6  in?
7  Q  Yes, I will.
8        MS. WAYNE: Judge, if I may approach him?
9        THE COURT: Yes.
10  Q  Do you have a notation in there?
11  A  I have a notation in there.
12  Q  All right.  Thank you, sir.
13  A  On May the 5th of 2004 he took his first
14  treatment.  He lost -- He completely lost use of his
15  left arm, which he was left-handed, in 12 of 2004.
16  December of 2004.
17  Q  Did you have discussions, and without telling me
18  what Mr. Carmichael may have said to you, but did
19  you have discussions with Mr. Carmichael about going
20  and hiring a new accountant, getting somebody else
21  other than Mr. Duncan?
22  A  Yes.
23  Q  Do you remember about what period of time that
24  actually happened?  If you can.
25  A  This was sometime, I don't remember the month,

Page 56

1  but it was sometime beginning this last tax season
2  that he was going to necessarily hire someone else
3  because Ashley wasn't able to do that.
4  Q  Okay.
5        MS. WAYNE: If I may have just one moment,
6  Judge?
7        (Whereupon, Ms. Wayne conferred with Mr.
8  Brunson and Ms. James off the record and out of the
9  hearing of the other courtroom participants.)
10        MS. WAYNE: I have no further questions of
11  Mr. Moore.  Thank you.  Mr. Teague or Mr. Feaga might.
12        THE COURT: Mr. Teague?
13        MR. TEAGUE: Nothing, Your Honor.
14        MR. FEAGA: None from the United States,
15  Your Honor.
16        THE COURT: Okay, thank you very much.  You
17  may step down.
18        (Whereupon the witness, Tommy Moore, stepped
19  down from the stand.)
20        THE COURT: Okay.  Plaintiff, what's next?
21        MS. WAYNE: Judge, at this time Mr.
22  Carmichael would rest.
23        THE COURT: Okay.  Rebuttal?
24        MR. FEAGA: I'm sorry, Your Honor, I was
25  talking to the witness on his way out.

Page 57

1        THE COURT: Mr. Carmichael has rested.
2  Rebuttal?
3        MR. FEAGA: Yes, sir, Your Honor.  Can I
4  have just a minute?
5        THE COURT: Yes.  If you have any rebuttal.
6        MR. FEAGA: Terry Grace.
7        THE COURT: Before we do this, I'm going to
8  have to excuse the jury for just a moment.
9        (Whereupon, the jury was escorted out of the
10  courtroom, and the following colloquy ensued):
11        THE COURT: Miss Wayne, would you ask Mr.
12  Carmichael the appropriate questions explaining to him
13  his right to testify, and that none of his lawyers
14  have coerced him?  Although you may have advised him
15  already.
16        MS. WAYNE: Okay.  Judge, I'm wondering if
17  Miss James will do it.  I've never done this practice.
18        THE COURT: That's fine.  Go ahead.
19        MS. JAMES: State your name, please.
20        DEFENDANT CARMICHAEL: Leon Carmichael,
21  Senior.
22        MS. JAMES: Are you a defendant in this
23  case, Mr. Carmichael?
24        DEFENDANT CARMICHAEL: Have you made a
25  decision as to whether you choose to testify or not?

Page 58

1   DEFENDANT CARMICHAEL: Yes, I have.
2   MS. JAMES: What is that decision?
3   DEFENDANT CARMICHAEL: Not to testify.
4   MS. JAMES: Have you made that decision
5   voluntarily and based on your belief as well as
6   consultation with your lawyers?
7   DEFENDANT CARMICHAEL: Yes, I have.
8   MS. JAMES: Have you been coerced in any way
9   to make that decision?
10   DEFENDANT CARMICHAEL: No, I haven't.
11   MS. JAMES: Judge, I think that will
12   suffice.
13   THE COURT: That's fine.
14   Yes, Mr. Teague?
15   MR. TEAGUE: Your Honor, in an abundance of
16   caution on behalf of Freddie Williams at the close of
17   the defense's respective cases, I'd like to renew my
18   motion for judgment --
19   THE COURT: You really don't have to do it
20   until the close of the rebuttal, but if you want to go
21   ahead, you can do it as well, Ms. James. You can just
22   reassert your earlier motion, unless you have
23   something to add.
24   MR. TEAGUE: Yes, sir, in an abundance of
25   caution.

Page 59

1   MS. JAMES: And, Judge, we would do the
2   staple. We would renew our motion for judgment of
3   acquittal based on the government's failure to prove a
4   prima facie case.
5   THE COURT: Same grounds you gave before.
6   MS. JAMES: Yes.
7   THE COURT: Both motions for judgment of
8   acquittal are denied.
9   Now, how long is your rebuttal going to
10   take?
11   MR. FEAGA: Your Honor, I don't think it
12   will take but maybe an hour.
13   THE COURT: How many witnesses are we
14   talking about?
15   MR. FEAGA: Four. Possibly one more, five.
16   THE COURT: Okay. Bring in the jury.
17   (Whereupon, the jury was escorted into the
18   courtroom.)
19   T E R R Y   G R A C E,
20   the witness herein, having first been duly sworn or
21   affirmed to tell the truth, was examined and testified
22   as follows:
23   REBUTTAL DIRECT EXAMINATION
24   BY MR. FEAGA OF TERRY GRACE:
25   Q Sir, would you tell the ladies and gentlemen of

Page 60

1   the jury your name.
2   A Terry Grace.
3   Q All right, sir. And I'm going to ask, if you
4   would, to lean up and speak into that microphone, Mr.
5   Grace, just so we can make sure everybody hears you.
6   A Okay.
7   Q What do you do for a living, sir?
8   A I work for the Department of Revenue in the motor
9   vehicle division. I'm the supervisor of the
10   administrative and records unit.
11   Q I'm going to show you what I'm going to mark as
12   government's exhibit 75 for identification purposes
13   and ask you if you would take a look at it. Have you
14   seen what's been marked government's exhibit 75
15   before, Mr. Grace?
16   A Yes, sir.
17   Q Would you tell the ladies and gentlemen of the
18   jury what it is.
19   A This is a registration record for a vehicle.
20   It's a 1996 Chevrolet Express van.
21   Q It's a 1996 Express van?
22   A Yes, sir.
23   Q Do the documents indicate what color it is?
24   A It indicates it as being white.
25   Q Okay. And do the documents indicate who owns

Page 61

1   that white van?
2   A Yes, sir. Multi-Investments, Inc.
3   Q All right. And do the documents indicate a time
4   frame that they owned that white van?
5   A As far as the registration, it shows that it was
6   registered twelve thirteen two thousand four with an
7   expression date of nine-thirty two thousand and five.
8   Q All right. And does it show that it was
9   registered at prior times in the same name?
10   A Yes, sir, it does.
11   Q Okay. And what's the earliest record?
12   A The earliest record goes back to 2001. It would
13   be April of 2001.
14   Q All right. From April 2001 to the present, those
15   records show that Multi-Investments owned a white --
16   MS. WAYNE: Judge, I'm going to object,
17   because it goes outside the scope of rebuttal. They
18   forgot stuff and now they're doing it.
19   THE COURT: It's supposed to be rebuttal.
20   How is this rebuttal?
21   MR. FEAGA: I think it's rebuttal because
22   the defense put on, you know, evidence in the case
23   Your Honor, they attempted to deflect, for instance in
24   one instance they called a witness who testified about
25   one of our witnesses saying he didn't know one of our

Page 62

1 witnesses introduced to the defendant.
2 MS. WAYNE: Judge, I object. That's not
3 rebuttal. He has to rebut the allegation of a van.
4 Our case wasn't an attempt to deflect anything, it was
5 evidence.
6 THE COURT: Just a minute. Just a minute,
7 counsel.
8 I hate to excuse the jury for just a minute,
9 but I have to.
10 (Whereupon, the jury was escorted out of the
11 courtroom, and the following colloquy ensued):
12 THE COURT: Now let me ask you this. What
13 evidence in the defendant's case are you rebutting?
14 MR. FEAGA: They put on a witness, Your
15 Honor --
16 THE COURT: Which witness?
17 MR. FEAGA: That would be Big Al Anderson.
18 And when he was asked if he knew various people by us
19 that were connected to him, such as Gary Wayne George,
20 he said that he did not. He said, "Not in my life."
21 That tends to, from their perspective, be evidence
22 that would cast aspersions on Mr. George's testimony.
23 So we're entitled to bolster that testimony by showing
24 -- because part of his testimony was that he saw the
25 defendant driving a white Express van. So we're

Page 63

1 entitled to put that record in now to come back in on
2 that. Now that's the only time we're going to be
3 doing anything like that.
4 THE COURT: You're saying that, if I
5 understand your argument correctly, because they gave
6 contrary evidence about George's testimony, you want
7 to now bolster George's testimony again.
8 MR. FEAGA: Yes, sir.
9 THE COURT: Did their testimony go to the
10 issue that this witness is now testifying, though,
11 about?
12 MR. FEAGA: It went to the issue of whether
13 or not Mr. George would have known Mr. Carmichael to
14 have their witness say that he had never met him, he
15 didn't know anything about him. Peagler.
16 THE COURT: How does had this -- How does
17 this go to rebut that Big Al had knew Mr. Peagler?
18 MR. FEAGA: It was my recollection, Your
19 Honor, that there was more than one witness was asked
20 questions. And I'm hearing Mr. Peagler. I thought it
21 was Big Al was asked.
22 THE COURT: He did. Big Al was asked if he
23 knew Mr. Peagler, he was asked if he knew George and a
24 few other people and he said no.
25 MR. FEAGA: Yes, sir. And my point is this:

Page 64

1 If he is being asked does he know these people, these
2 people have testified that they know Leon. The
3 inference is that if this guy who knows Leon does not
4 know them, then perhaps they don't know Leon. Okay?
5 So to put on evidence that when Mr. George said he
6 knew that Mr. Carmichael drove a white van and
7 actually saw him driving it, to show that he owns one
8 bolsters his testimony and is rebuttal of the fact
9 that he may not know Mr. Carmichael at all.
10 THE COURT: So by bolstering his testimony
11 it supports his prior testimony that he knew Mr.
12 Carmichael.
13 MR. FEAGA: Yes, sir, and they attacked
14 whether or not he really did by bringing in people
15 that would say that.
16 THE COURT: Now I'll hear from you.
17 MS. WAYNE: All right, Judge. My
18 understanding of rebuttal is it's very strict and very
19 narrowly focused.
20 THE COURT: What does the rule say? What
21 rule are we looking at?
22 MS. WAYNE: I think it's, um, let me try to
23 find it here.
24 MR. FEAGA: Moreover, Your Honor, in their
25 cross examination of Mr. George, they attacked his

Page 65

1 credibility about what he testified to. And so for
2 on something that shows he knew that and was telling
3 the truth clearly is rebuttal to what they have done.
4 THE COURT: Right. Anything else, counsel?
5 MS. WAYNE: Judge, I'm looking for the rule
6 for you.
7 THE COURT: I don't need the rule.
8 MS. WAYNE: I don't think it's actually a
9 federal rule.
10 THE COURT: I think there is a rule but I
11 don't know where it is. This is not a rebuttal to
12 George's testimony because had George. You called
13 George. All you had to do was call this witness in
14 your case-in-chief --
15 MR. FEAGA: Your Honor, we weren't prepared
16 to do it in our case-in-chief. We couldn't locate the
17 record. We just found it, that's why we're doing it
18 in rebuttal.
19 THE COURT: You should have asked me for
20 additional time to find the record. And this is not
21 rebuttal to Big Al. This is very, very off point.
22 Rebuttal is supposed to be like this.
23 (Indicating.)
24 THE COURT: Narrow. You're reopening
25 credibility of Big Al and all the others. I'll

Multi-Page™

Page 66

1 sustain the objection.
2      MR. FEAGA: Your Honor, what about the other
3 basis, that they attacked Mr. George's credibility?
4      THE COURT: You're not going to call a whole
5 series of witnesses just to rehabilitate the
6 credibility of yours. We are narrowing the case down.
7 A specific issue the defendants have brought up, you
8 then respond to that specific issue. We're not
9 retrying this case.
10      I sustain the objection. Let's move on.
11 The case is over, unless you have something to respond
12 with something raised by the defendant.
13      MR. FEAGA: Yes, sir.
14      THE COURT: A specific issue.
15      MR. FEAGA: Yes, sir, we do.
16      THE COURT: Very short, to the point, one
17 issue raised, you respond to it. We don't have to go
18 into this sort of out in the air universal response to
19 something that may be at issue.
20      What's next?
21      MS. WAYNE: I'd just ask that the testimony
22 be struck.
23      THE COURT: The testimony is struck.
24      Let's move on. What's next?
25      (Whereupon the witness, Terry Grace, stepped

Page 67

1 down from the stand.)
2      THE COURT: Bring in the jury.
3      (Whereupon, the jury escorted into the
4 courtroom.)
5      MS. WAYNE: Judge, I'd ask the motion be --
6      THE COURT: Oh, yes.
7      The last testimony should not be considered
8 by the jury.
9      Who is your next witness?
10      MR. FEAGA: Georgia Wise.
11      THE COURT: Georgia Wise.
12          G E O R G I A   W I S E,
13 the witness herein, having first been duly sworn or
14 affirmed to tell the truth, was examined and testified
15 as follows:
16      REBUTTAL DIRECT EXAMINATION
17      BY MR. FEAGA OF GEORGIA WISE:
18 Q Ma'am, would you tell the ladies and gentlemen of
19 the jury who you are.
20 A My name is Georgia Wise.
21 Q And what do you do for a living, Miss Wise?
22 A I'm a revenue examiner with the City of
23 Montgomery.
24 Q And what are your duties and responsibilities as
25 a revenue examiner?

Page 68

1 A We enforce the laws as relates to business
2 licenses and tax.
3 Q All right. I'm going to show you what I'm
4 marking as government's exhibit 76 for identification
5 purposes. And I'll show it to Mr. Brunson. Ma'am,
6 while Mr. Brunson is looking at those, did you get a
7 subpoena to come over to this trial?
8 A Yes, sir.
9 Q And did the subpoena ask you to bring records
10 with you?
11 A Yes, sir.
12 Q And did you bring records with you?
13 A Yes, sir.
14 Q Okay. I want to ask you if you brought records
15 related to a company called Unique Entertainment.
16 A Not today I didn't bring those records.
17 Q Okay. I'm going to show you some in just a
18 minute.
19      (Whereupon, Mr. Brunson examined said
20 documents.)
21      MR. BRUNSON: Your Honor, we've just
22 received about thirty pages of information that we've
23 not looked at or reviewed. We object to any
24 admittance or testimony about these documents until we
25 have a chance to look at them and digest them.

Page 69

1      MR. FEAGA: It's rebuttal, Your Honor, to
2 evidence they put on.
3      THE COURT: Go ahead and ask your question
4 and I may give you a chance to look at them.
5 Q Ma'am, the records that you brought related to an
6 outfit called Unique Entertainment. What type of
7 records are they?
8 A They are the business license records and the
9 sales tax.
10 Q Okay. Now the business license records, will
11 they reflect who owns the business?
12 A Yes, sir.
13 Q Okay. And will they reflect when the person or
14 business first got a license?
15 A Yes, sir.
16 Q And will they reflect the report that the
17 business made to the City of Montgomery about how much
18 money they were earning and paying sales tax on?
19 A Yes, sir.
20 Q So if I show you these records, you'll be able to
21 tell the jury how much money Unique Entertainment
22 reported to the City of Montgomery it earned in
23 various years.
24 A Yes, sir.
25 Q Okay.

Multi-Page™

Page 70

1    MR. FEAGA: Your Honor, I'd like to show her
2 the records so she can say what the club was reporting
3 to them.
4    THE COURT: Mr. Brunson?
5    MR. BRUNSON: I'm through the third page of
6 thirty. There's a lot of records here and it's hard
7 for me to --
8    MR. FEAGA: Your Honor, they have had a
9 year. They have got these returns in that have the
10 income --
11    MR. BRUNSON: Your Honor, I object to
12 counsel --
13    THE COURT: I'm going to admit the
14 documents, but I may gave you a break before you have
15 to examine her about the documents.
16    You can examine her about the documents, Mr.
17 Feaga.
18    You don't have copies so they can be looking
19 at them?
20    MR. FEAGA: No, sir, I don't.
21    THE COURT: Mr. Brunson, you can stand up
22 here with them and then I may give you another
23 opportunity to look at the documents too.
24    MR. BRUNSON: Thank you, Your Honor.
25    THE COURT: So that you can see what he's

Page 71

1 referring to.
2 Q  Ma'am, I'm going to show you what's been marked
3 as government's exhibit 76 for identification purposes
4 and ask you, if you would, would you examine
5 government's exhibit 76.
6    (Whereupon, the witness complied.)
7 Q  Are those records of the City of Montgomery of
8 the State of Alabama?
9 A  Yes, sir, they are.
10 Q  And are they records that you maintain in the
11 normal and ordinary course of business?
12 A  Yes, sir.
13 Q  And is the information that's recorded on them
14 recorded by the City of Montgomery at or near the time
15 it receives that information?
16 A  Yes, sir, it is.
17 Q  And are you a custodian of those records?
18 A  I'm a representative of the custodian of records.
19 Q  All right, ma'am. Now, would you tell the ladies
20 and gentlemen of the jury what those records that
21 you're holding in front of you are?
22 A  This is the annual business license and the sales
23 tax from the day they started business.
24 Q  Okay. And when does it show that they started
25 business?

Page 72

1 A  January 1st, 2003.
2 Q  Okay. Now if I can, I want to show you -- Well
3 what is this date right here?
4    THE COURT: Why don't you come up here,
5 Mr. Brunson, so that you can know what he's talking
6 about.
7    MR. BRUNSON: Thank you, Your Honor.
8 Q  What is this date right here, "date applied"?
9 A  That was the date that they applied for the sales
10 tax.
11 Q  Okay. That's the date they applied for a sales
12 tax --
13 A  Number.
14 Q  Okay. And that would be July the 8th, 1994?
15 A  Right.
16 Q  And from that date forward, how much income did
17 the Club Unique Entertainment report to the City of
18 Montgomery that it received?
19 A  Well this is by the month. It doesn't give me a
20 total and I'm not real good at adding that much in my
21 head.
22 Q  Would you do it by the month and just tell the
23 ladies and gentlemen of the jury how much income from
24 1994 -- Well I tell you what, can you start in the
25 year 2000?

Page 73

1 A  The year 2000?
2 Q  Yeah. Don't worry about the earlier years right
3 now. If you'll just start in the year 2000, how much
4 did the --
5    THE COURT: Does anyone have a calculator?
6    (Whereupon, an unidentified spectator
7 indicated.)
8    THE COURT: Would you mind taking the
9 numbers down, sir?
10    UNIDENTIFIED SPECTATOR: Sure.
11    THE COURT: Great. Thank you.
12    MR. FEAGA: Your Honor, as you know I've got
13 the objection --
14    THE COURT: I understand. I'm just asking
15 him to take the numbers down.
16    MR. FEAGA: Yes, sir.
17    THE COURT: All the lawyers can add and
18 subtract.
19    (Laughter.)
20    MR. FEAGA: Yes, sir.
21 Q  Would you start with -- And if you could, would
22 you call the dates out the way we normally speak them
23 instead of like two twenty oh three, would you call it
24 February twentieth oh three?
25 A  That date was the 20th for January.

Page 74

1 Q  Okay.  So for January of '03, much gross sales
2 did Unique Entertainment report?
3 A  Ten thousand eight sixty-eight ninety-nine.
4 Q  Okay.  And for February of -- Oh wait a minute,
5 we're going forward now.  Okay.  So that would be
6 forward into 2003.  Let's back up from January of 2003
7 to --
8        THE COURT:  Do you want to include that
9 figure?
10       MR. FEAGA:  Yes, sir, I do.  Can I ask Mr.
11 Moorer to help me by writing it down on the easel,
12 Judge?  Because I'm having to stand up here.
13       THE COURT:  Yes.  Go ahead.
14 Q  So for January of 2003, unique Entertainment
15 reported that it had gross sales receipts of how much?
16 A  Ten thousand eight sixty-eight ninety-nine.
17 Q  Okay.  Now would you go to the month prior to
18 that, December of 2002?
19 A  I don't have a record for that.
20 Q  Okay.
21 A  Not on their sales tax.
22 Q  Does that mean that they didn't report anything?
23 A  It means they didn't report anything or I
24 couldn't find any records, sales tax records.
25 Q  Okay.  So when you say you couldn't find any

Page 75

1 sales tax records, did you research the records of the
2 City of Montgomery?
3 A  Yes, sir.
4 Q  And when you can't find those records, does that
5 mean there aren't any?
6 A  It means they are not under this name, if there
7 are any.
8 Q  Okay.
9 A  And I couldn't find any.  I looked every way we
10 have available.
11 Q  Okay.  You looked for any report by Unique
12 Entertainment of any sales revenue to the City of
13 Montgomery and you didn't find anything.
14 A  No, sir.
15 Q  Okay.  Did you look for the name Unique?
16 A  Yes, sir.
17 Q  You looked in every database and didn't find
18 Unique reporting any income until January of 2003?
19 A  That's correct.
20 Q  Now if they had reported income prior to January
21 of 2003, would you have found a record for that?
22 A  Yes, sir.
23       MR. FEAGA:  If I may, Your Honor, we would
24 offer what's been marked as government's exhibit --
25       THE COURT:  I've already admitted the

Page 76

1 exhibits.
2       MR. FEAGA:  Okay.
3 Q  Ma'am, can you tell from looking at the business
4 license of this government's exhibit 76 what the name
5 -- what name the business license is in?
6 A  It's in Unique Entertainment Center.  It's in a
7 corporate name doing business as Unique Entertainment
8 Center.
9 Q  Okay.  And what is the corporation?
10 A  Multi-Investments, Inc.
11 Q  Okay.  And you searched your database for the
12 name Unique and had no report --
13       THE COURT:  You've asked that question.
14       MR. FEAGA:  Yes, sir.  All right.
15 Q  Now, I want to show you what I'm going to mark
16 government's exhibit 77 for identification purposes
17 and ask you, if you would, to take a look at
18 government's exhibit 77.
19       MR. FEAGA:  Your Honor, with the Court's
20 permission I'd like to just display the back page of
21 defendant's exhibit 21 while this witness is
22 testifying.
23       THE COURT:  I have no idea what that is.
24       MR. FEAGA:  That is the year 2001 income tax
25 return that was offered yesterday through their

Page 77

1 witness for Multi-Investments.
2       THE COURT:  Yes, go ahead.
3 Q  Now the records that you're looking at now,
4 government's exhibit 77, what are those records?  I'm
5 sorry, they're not on the screen, ma'am, the ones I
6 handed to you.
7 A  Oh, these?
8 Q  Yes, ma'am.
9 A  Sales tax and business license for Club Gs.
10 Q  Club what?
11 A  Club Gs.
12 Q  Okay.  And what do the records of the City of
13 Montgomery show as to the ownership of an outfit
14 called Club Gs?
15 A  Darren Gaskin.
16 Q  Okay.  And is there anywhere on those records in
17 any indication that someone named Leon Carmichael owns
18 Club Gs?
19 A  No.
20 Q  Okay.  Now would you examine those records,
21 ma'am, and tell me what the date applied is for those
22 records?
23 A  We don't have a date applied.
24 Q  Okay.  What date do you have a date begun?
25 A  6-1-2001.

**Page 78**

1 Q  Would that be June 1st, 2001?

2 A  Yes, sir.

3 Q  And from June 1st of 2001 to the present -- There

4 is no entry prior to June 1, 2001?

5 A  No, sir.

6 Q  Okay.  Does that mean that the City of Montgomery

7 did not receive any report of income from Club Gs

8 prior to that time?

9 A  That's what that means.

10 Q  All right.  Now from June 1, 2001 to the present,

11 did Club Gs report receiving any gross sales receipts?

12 A  Yes, sir.

13 Q  Okay.  Would you tell the ladies and gentlemen of

14 the jury, if you would by month, how much they

15 reported.

16 A  June 2001, zero.  July 2001, zero.  August 2001,

17 a hundred and fifty dollars.  September 2001, three

18 hundred dollars.  October 2001 --

19       THE COURT:  You can fill in the rest later.

20 What is September?

21       THE WITNESS:  Three hundred.

22       THE COURT:  Go ahead.

23 A  October is three hundred.  November is nine

24 hundred.  December, nine hundred.  January 2002, one

25 hundred.

**Page 79**

1 Q  Hold on right there if you would, ma'am.

2       MR. FEAGA:  Your Honor, I want to display

3 the back page of the defendant's recently filed tax

4 return for 2002.

5       THE COURT:  The back page for the tax return

6 for what, now?

7       MR. FEAGA:  For 2002.  We're moving into

8 2002, Your Honor.

9       THE COURT:  Could I see the other exhibit

10 just a second?

11       MR. FEAGA:  Yes, sir.

12       (Whereupon, the Court examined said

13 document.)

14       THE COURT:  Okay.  Go ahead.

15       MR. FEAGA:  That's 2001, Your Honor.  We're

16 now putting up 2002 to show what the defendant

17 represented his income from Club Gs was reported in

18 cash for 2002.

19 Q  Can you start with January of 2002, Miss Wise?

20 A  January is one hundred dollars.  February, three

21 hundred.  March, three seventy-five.  April, four oh

22 five.  May, five hundred.  June, nine hundred.  July,

23 five hundred.  August, five hundred.  September, three

24 hundred.  October is two hundred.  November, four

25 hundred.  December, three sixty-six eighty-two.

**Page 80**

1 January '03 --

2 Q  Okay.  Would you stop there ma'am.  And the

3 numbers you just read off for the year 2002, I know

4 you don't have a calculator, but could you say just

5 from having --

6       THE COURT:  Just a minute.  Can anyone add

7 those up?  Can you add 2002 up?

8       MR. MOORER:  Yes, sir.

9       UNIDENTIFIED SPECTATOR:  Four thousand eight

10 forty-six eighty-two.

11       MR. FEAGA:  Your Honor, with your permission

12 I'd like to be able to write that on the --

13       THE COURT:  You can do that later.  We can

14 verify that later.  Do you have the figures for 2001?

15 Did you add those up?

16       UNIDENTIFIED SPECTATOR:  What was the first

17 one?

18       MR. FEAGA:  I mean the one he just did for

19 2002?

20       MR. FEAGA:  What was the first one, the one

21 he first did?

22       MR. MOORER:  Four thousand eight hundred and

23 forty-six dollars.

24       THE COURT:  What about for 2001, did anyone

25 add those up?

**Page 81**

1       MR. BRUNSON:  Mr. Feaga, I object to you

2 writing on the exhibit.

3       MR. FEAGA:  I just asked the Court for

4 permission to do that.

5       THE COURT:  No, I said you can write it on

6 the easel.  But someone can add those up.  Let's keep

7 moving.

8 Q  Ma'am, they don't appear to add up for 2002 a

9 hundred and fourteen thousand dollars, do they?

10 A  No, sir.

11 Q  Can you go to 2003, ma'am?

12 A  Yes, sir.  January 2003, nine ninety-one oh four.

13 February, one thousand seven ninety-two oh four.

14 March, one thousand seven forty-two oh four.  April is

15 one eight nine two oh one.  May is one eight oh two oh

16 one.  June, two nine eight two oh one.  July, two

17 eight eight nine oh one.  August, three one five one

18 oh three.  September, three four nine nine oh one.

19 October, four six four nine oh eight.  November, four

20 four one six oh one.

21       THE COURT:  Could you give us August again?

22 A  August is three one five one oh three.

23       THE COURT:  And what's September?

24       THE WITNESS:  September is three four nine

25 nine oh one.

**Multi-Page™**

1    THE COURT:  And what is October?
2    THE WITNESS:  October, four six four nine oh
3 eight.
4    THE COURT:  And November?
5    THE WITNESS:  November, four four one six oh
6 one.
7    THE COURT:  And December?
8    THE WITNESS:  Five one one nine oh two.
9    THE COURT:  Were you able to add those up,
10 sir?
11    UNIDENTIFIED SPECTATOR:  Thirty-four
12 thousand nine hundred twenty-four dollars thirty-one
13 cents.
14    THE COURT:  Is that it, Mr. Feaga?
15    MR. FEAGA:  If I may, Your Honor?
16 Q  Now, ma'am, I want to show you what's been marked
17 government's exhibit 78 for identification purposes.
18    MR. FEAGA:  Your Honor, I want to publish a
19 page on -- the last page of defendant's exhibit 22,
20 the 2002 tax return.
21 Q  Ma'am, do you see a figure on that return right
22 above where my finger is pointing there that says "lot
23 sales"?
24 A  Yes, sir.
25 Q  Okay.  And it shows this is -- I'm sorry.  It

1 shows two hundred and fifty-five thousand dollars from
2 lot sales?
3 A  Yes, sir.
4 Q  Okay.  I want to show you what's been marked
5 government's exhibit 78 for identification purposes
6 and ask you if you would take a look at government's
7 exhibit 78.
8    MR. FEAGA:  Your Honor, is 77 admitted?
9    THE COURT:  Yes.
10 Q  Have you had a chance to examine it?
11 A  Yes, sir.
12 Q  Okay.  Is that also a record of the City of
13 Montgomery?
14 A  Yes, sir.
15 Q  And what record is that?
16 A  Multi-Investments.
17 Q  Okay.  And does it show on that document who the
18 individual is that owns Multi-Investments?
19 A  Yes, sir, Leon Carmichael.
20 Q  And does that have a date at which that business
21 first applied for a license?
22 A  That was in 1996.
23 Q  Okay.  And would that, then, contain a report of
24 the records of the City of Montgomery for all gross
25 receipts from sales reported to the City of Montgomery

1 by Multi-Investments, Inc. from that time forward?
2 A  Multi-Investments was a trucking company,
3 according to our records.  They would not have sales
4 tax.
5 Q  You wouldn't expect a trucking company to pay
6 sales tax, is that right?
7 A  No, sir.
8 Q  The revenue they get from hauling loads is not
9 subject to sales tax.
10 A  Right, it's not.
11 Q  But things that are sold in a nightclub or bar
12 like food or booze, those things are subject to sales
13 tax.
14 A  Yes, Sir.
15 Q  And companies are required to report their
16 revenues to the City of Montgomery to pay tax, right?
17 A  That's right.
18 Q  Now with regard to that Multi-Investments, is
19 there a month when it reports having received gross
20 receipts from sales?
21 A  Yes, sir.
22 Q  And what month is that?
23 A  Three thousand -- I mean March of 2002.
24 Q  March of 2002?
25 A  Yes, sir.

1 Q  Any other time when Multi-Investments reported
2 receiving any revenue that was subject to sales tax?
3 A  We've got February of 2005.
4 Q  All right.  Let's forget February of 2005.  Let's
5 stay with March of 2002.  How much revenue did
6 Multi-Investments report to the City of Montgomery it
7 received in March of 2002?
8 A  A hundred and twenty thousand dollars in gross.
9 Q  One hundred and twenty thousand?
10 A  Yes, sir.
11 Q  Gross.  Okay.
12    MR. FEAGA:  Your Honor, I'd like to offer
13 government's exhibit 78.
14    THE COURT:  Admitted.
15 Q  Now, ma'am, I'm going to show you what's been
16 marked as government's exhibit 79 for identification
17 purposes and ask you if you would take a look at that.
18    (Witness complied.)
19 Q  Do you recognize that, ma'am?
20 A  Yes, sir.
21 Q  Would you tell the ladies and gentlemen of the
22 jury what that is, government's exhibit 79?
23 A  It's sales tax files and business license.
24 Q  For what entity?
25 A  For the Carmichael Center.

Multi-Page™

<table>
<tr><td>

Page 86

1 Q  When did the Carmichael Center first apply for a
2 business license with the City of Montgomery?
3 A  2003.
4 Q  When?
5 A  In June.
6 Q  June of 2003?
7 A  Yes, sir.
8 Q  All right, ma'am.  And do those records reflect
9 who the -- Is there an individual reflected as the
10 owner or operator of the Carmichael Center?
11 A  Yes, sir.
12 Q  Who is that?
13 A  Leon Carmichael.
14    MR. FEAGA:  Your Honor, I would like to
15 offer into evidence government's exhibit 79.
16    THE COURT:  Admitted.
17    MR. FEAGA:  No further questions for this
18 witness, Your Honor.
19    THE COURT:  How much time do you need,
20 Mr. Brunson?
21    MR. BRUNSON:  Your Honor, if I may just have
22 a moment?
23    THE COURT:  Okay.
24    MR. BRUNSON:  Your Honor, could we have ten
25 minutes or so?

</td><td>

Page 88

1        DIRECT EXAMINATION
2    BY MR. FEAGA OF GEORGE INGALS:
3 Q  Sir, would you tell the ladies and gentlemen of
4 the jury your name?
5 A  George Ingals.
6 Q  And would you tell them what you do for a living?
7 A  I'm an agent with the Alcohol Beverage Control
8 Board for the State of Alabama.
9 Q  Okay.  And how long have you been doing that job,
10 sir?
11 A  Eighteen and-a-half years.
12 Q  All right.  Sir, I want to ask you a question.
13 Have you ever heard --
14    MR. FEAGA:  Your Honor, I'm putting on, for
15 the record, the defendant's exhibit 22, the 2002 tax
16 return that they offered into evidence yesterday.
17 Q  Sir, I'd like to ask you if you have ever heard
18 of a nightclub or business establishment called Club
19 Gs?
20 A  Yes, I have.
21 Q  And how is it that you've heard of Club Gs?
22 A  It's a lounge establishment in Montgomery at the
23 intersection of Mobile Highway and South Boulevard in
24 the Peddlers Inn Motel.
25 Q  In the Peddlers Inn Motel.  Okay.

</td></tr>
<tr><td>

Page 87

1    THE COURT:  Ten minutes you have.
2        How many more witnesses do you have, Mr.
3 Feaga?
4    MR. FEAGA:  I believe two, Your Honor.
5 Fairly brief.
6    THE COURT:  Okay.  Let's take up these two
7 witnesses while you look at those records.
8    MR. BRUNSON:  Thank you, Your Honor.
9    MS. WAYNE:  Judge, objection.  We can't do
10 that.  He needs to be able to confer with my client so
11 we need to be able to confer.
12    THE COURT:  Well, let's take up the two
13 witnesses and I'll still give you your ten minutes.
14 But we'll take the ten minutes after these two
15 witnesses.
16    MS. WAYNE:  All right.
17    (Whereupon the witness, Georgia Wise,
18 stepped down from the stand.)
19    THE COURT:  Next witness.
20    MR. FEAGA:  George Ingals, Your Honor.
21    THE COURT:  George Ingals.
22    G E O R G E   I N G A L S,
23 the witness herein, having first been duly sworn or
24 affirmed to tell the truth, was examined and testified
25 as follows:

</td><td>

Page 89

1        And are you familiar with that
2 establishment?
3 A  Yes, I am.
4 Q  And how is it that you are familiar with it?
5 A  In the course of my duties as an enforcement
6 agent I make inspections in that area, renew the
7 license and interact with the licensee and the
8 employees there.
9 Q  Do you know who owns Club Gs?
10 A  The license issued to car Darren Gaskin.
11 Q  Do you know Darren Gaskin?
12 A  I've talked to him on a couple of occasions, yes.
13 Q  All right.  And do you know whether or not an
14 individual named Leon Carmichael has any ownership
15 interest in Club Gs?
16 A  There is none on the A. B. C. paperwork that I'm
17 aware of.
18 Q  Okay.  Let me show you what's been marked as
19 government's exhibit 80 for identification purposes
20 and ask if you would take a look at government's
21 exhibit 80.  And before I go to government's exhibit
22 80, let me ask you, is the paperwork you're talking
23 about, what paperwork is it that you said the name is
24 not listed on it?
25 A  The A. B. C. license application.

</td></tr>
</table>

Multi-Page™

1  Q  Is it a requirement that a person who is
2  purchasing alcohol in the state of Alabama to sell in
3  a nightclub, is it a requirement that they register
4  with you guys?
5  A  Yes, it is.
6  Q  Okay.  And is it a requirement that they honestly
7  and accurately report the ownership of the
8  establishment?
9  A  Yes, it is.  There's a question on the A. B. C.
10  application that specifically states are there any
11  other persons that are financially interested in this
12  business, and they have to answer that yes or no.
13  Q  And on those records there is no reflection of
14  any ownership interest other than that of Mr. Gaskin?
15  A  That's correct.
16  Q  Now, if you would take a look at the exhibit I
17  just handed you, sir, that is government's exhibit 80,
18  I'd like to ask you, do you recognize it?
19  A  Yes, I do.
20  Q  And how is it that you recognize it?
21  A  I was requested to obtain the record of liquor
22  purchases for Unique Entertainment, a restaurant
23  liquor license for an establishment in Montgomery for
24  as far back as the A. B. C. Board had records.
25  Q  All right.  Would you tell the ladies and

1  gentlemen of the jury how far back records go on this
2  establishment?
3  A  I was able to get a document from the A. B. C.
4  information systems personnel that started in 2001
5  fiscal year in October, and it related the amount of
6  liquor purchased by that establishment.
7  Q  All right, sir.
8      MR. FEAGA:  Your Honor, I'm going to put up
9  on the Elmow the tax return entered into evidence by
10  the defendant yesterday for the year -- that's
11  defendant's exhibit 21 for the year 2001.
12      THE COURT:  Go ahead.
13  Q  Sir, would you tell the ladies and gentlemen of
14  the jury how much booze Unique Entertainment bought
15  from the State of Alabama in the year 2001?
16  A  The three months shown in 2001, October,
17  November, and December show no purchases whatsoever.
18  Q  No purchases of alcohol at all in 2001?
19  A  That's correct.
20  Q  All right.
21      MR. FEAGA:  Your Honor, I'm going to put up
22  defendant's exhibit 22, the 2002 return.
23  Q  And, sir, would you tell the ladies and gentlemen
24  of the jury how much alcohol Unique Entertainment
25  bought in 2002?

1  A  I have the full year listed on the document from
2  January 2002 to December 2002, and it reflects
3  absolutely no purchases from the A. B. C. Board.
4  Q  No booze in 2002 by this nightclub.
5  A  That's correct.
6      MR. FEAGA:  Your Honor, I am going to post
7  what has now been introduced into evidence as
8  defendant's exhibit 23, the 2003 tax return introduced
9  into evidence by the defendant yesterday.
10  Q  Sir, are there any purchases of booze reflected
11  by Unique Entertainment in 2003?
12  A  Yes, there is.  They're showing purchases in
13  January, February, March, May, June, August,
14  September, October.
15  Q  Would you tell the ladies and gentlemen of the
16  jury, if you would just list them in the order that
17  you just stated them how much.
18  A  January 2003, three thousand four hundred and
19  nine dollars and thirty-eight cents.  February 2003,
20  three thousand three hundred and sixty-six dollars and
21  ninety-seven cents.  March 2003, three thousand one
22  hundred and sixty-five dollars and thirty-five cents.
23  April, no purchase.  May 2003, four hundred and nine
24  dollars and eighty-eight cents.
25  Q  All right, sir, you can stop there.  Because the

1  bottom line is, that in 2003, through January of 2003
2  there was three thousand dollars.  We'll go ahead and
3  finish the list, if you would.
4  A  Okay.  July 2003 -- I'm sorry, June 2003, seven
5  ninety-one fourteen.  July 2003, no purchase.  August
6  2003, eight hundred and thirty dollars and seventy-one
7  cents.  September 2003, eight hundred and ten dollars
8  and fifty cents.  October 2003, one thousand four
9  hundred and forty-nine dollars and thirty cents.
10  November 2003, no purchase.  December 2003, no
11  purchase.
12  Q  All right, sir.
13      MR. FEAGA:  Your Honor, we'd like to offer
14  government's exhibit 80 into evidence as government's
15  exhibit 80.
16      MS. WAYNE:  Judge, if I may see it?  I've
17  never seen it before.
18      THE COURT:  Yes.
19      (Whereupon, Ms. Wayne examined said
20  document.)
21      MS. WAYNE:  Judge, my objection would simply
22  be that the witness testified to the numbers.  This is
23  simply a chart highlighting that testimony.
24      THE COURT:  That objection is overruled.
25      MS. WAYNE:  And may I get a copy of it,

Page 94

1 Judge?

2 THE COURT: Oh, definitely.

3 Miss Carnes, would you make a copy for

4 Miss Wayne.

5 THE COURT: Anything else for this witness?

6 MR. FEAGA: No, Your Honor.

7 THE COURT: Miss Wayne?

8 MS. WAYNE: Judge, the same request. If we

9 may have a moment to confer because we've never seen

10 the chart.

11 THE COURT: Very good. Why don't we call

12 the next witness. He'll step down and still be

13 subject to cross.

14 MS. WAYNE: Thank you.

15 (Whereupon the witness, George Ingals,

16 stepped down from the stand.)

17 THE COURT: Who is your next witness?

18 MR. FEAGA: Louie Wilson.

19 THE COURT: Louie Wilson.

20 You're still under oath.

21 MR. WILSON: Yes, Your Honor.

22 THE COURT: Proceed, Mr. Feaga.

23 MR. FEAGA: Yes, sir, Your Honor

24 REBUTTAL DIRECT EXAMINATION

25 BY MR. FEAGA OF LOUIE WILSON:

Page 95

1 Q Mr. Wilson, I want to hand you defendant's

2 exhibits 21, 22 and 23, the tax returns they offered

3 into evidence yesterday that were filed twenty-five

4 days ago.

5 A Yes, sir.

6 Q When was the first time you saw those?

7 A In court yesterday.

8 Q Now would you tell the ladies and gentlemen of

9 the jury based on the report that the defendant

10 submitted for 2001, what did he state was his taxable

11 income? Or if I can, I need to point on the form.

12 What did he say was his gross receipts or sales for

13 Multi-Investments, Inc.?

14 A One million two hundred eighty-one thousand

15 seventy-one dollars.

16 Q Now does that figure include the receipts

17 reported on the last page from the Club Gs and Unique

18 Entertainment?

19 A It does.

20 Q Okay. But using the figure provided by the

21 defendant, would you tell the ladies and gentlemen of

22 the jury how much tax he paid on that return, on that

23 income?

24 A Zero.

25 Q Now how about 2002, would you take a look at 2002

Page 96

1 and tell them how much he reported on that one as

2 gross receipts.

3 A Gross receipts on the 2002 form eleven twenty

4 were reported as two million one hundred sixty-nine

5 thousand three hundred and ninety-eight dollars.

6 Q And how much tax did he pay on that one?

7 A Zero.

8 Q And how about the 2003 one, what was the gross

9 receipts reported on that one?

10 A Two million thirty-three thousand four hundred

11 twenty-seven dollars.

12 Q And did he pay any tax on that one?

13 A No, sir, the taxable income again is zero.

14 Q All three of those returns conclude substantial

15 in the neighborhood of two hundred and fifty thousand

16 dollars in alleged cash income received from this

17 Unique Entertainment or Club Unique, is that right?

18 A They're all in excess of two hundred and fifty

19 thousand dollars reported as cash received from Club

20 Unique.

21 Q Now did you have an opportunity to talk with

22 Miss Wise briefly before she came in here with these

23 records that we just introduced to her, government's

24 exhibit 75, 76, 77 and 78?

25 A Yes, sir, I did.

Page 97

1 Q Based on your examination of those documents --

2 '76 through '79, I'm corrected.

3 A Yes, sir.

4 Q Based on your examination of those documents, do

5 you find a discrepancy between the amount reported in

6 cash income and the amount reported to the City of

7 Montgomery in their official records?

8 A As it relates to Unique Entertainment, yes, sir.

9 Q Okay. Now you heard Mr. Ingals testify also, did

10 you not?

11 A I did.

12 Q Do you find a discrepancy in the amounts reported

13 by the defendant from Club Gs on his Multi-Investments

14 income tax return and the figures reflected in the

15 records brought over by Miss Wise?

16 A In the difference between -- I'm sorry?

17 Q Do you find a discrepancy in the amount reported

18 to the City of Montgomery as gross receipts and sales

19 and the amount reported as income in cash from that

20 club by the defendant on those tax returns?

21 A Yes, sir.

22 Q Now did you find any other discrepancy related to

23 Club Gs besides the amounts being inconsistent?

24 A Yes, sir. Mr. Ingals I believe testified that to

25 his knowledge Mr. Carmichael has no ownership interest

Multi-Page™

Page 98

1 in Club Gs.
2 Q Is a taxpayer allowed to or supposed to report
3 income that is not their income?
4 A No, sir.
5 Q Sir, I want to direct your attention to
6 government's exhibit 48 for identification -- that's
7 actually admitted into evidence. That's the Compass
8 Bank account of Sherry Pettus.
9 A Yes, sir.
10 Q And ask you, when did you learn of the existence
11 of that account?
12    MR. BRUNSON: Objection, Your Honor, this is
13 not rebuttal. This has been covered before numerous
14 times.
15    MR. FEAGA: It is rebuttal, Your Honor.
16 They put a witness on named -- the executive director
17 -- I'm trying to remember which one it was, but it was
18 an individual that testified about having a
19 conversation -- oh, it was the guy that built the
20 Carmichael Center. I can't think of his name. Alan
21 Gunn. Who testified that he had a conversation with
22 Miss Pettus the day after the arrest of Mr. Carmichael
23 where she talked to him about that account.
24    THE COURT: What do you want to ask?
25    MR. FEAGA: I want to ask him when he

Page 99

1 learned from Miss Pettus about the account.
2    THE COURT: Overruled.
3    MR. BRUNSON: Your Honor, those questions
4 were asked during direct examination.
5    THE COURT: Well we don't need to repeat
6 evidence.
7    MR. FEAGA: I want to know when he first
8 learned of the account.
9    THE COURT: You're saying did you bring this
10 out earlier?
11    MR. FEAGA: I don't remember doing it.
12    THE COURT: Go ahead. I'll allow it.
13 Q When did you first learn of the account?
14    MR. FEAGA: Your Honor, I want to say he did
15 testify that he learned of it from Miss Pettus, third
16 party information. But I don't remember asking him
17 when.
18    THE COURT: Okay, go ahead.
19 A It would have been late November or early
20 December I believe of 2003.
21 Q So it would have been well after this
22 conversation she had with the general contractor out
23 there at the Carmichael Center.
24 A Yes, sir. It would have been weeks after the
25 conversation with Mr. Gunn.

Page 100

1 Q Prior to that time you didn't know about that
2 account.
3 A Had no knowledge.
4    THE COURT: Anything else?
5    MR. FEAGA: Your Honor, if I may, Your
6 Honor, with the Court's indulgence this has happened
7 rather quickly. Can I ask this? They're taking ten
8 minutes anyway, can I have just a brief moment with my
9 expert witness to consult with him before I answer the
10 Court as to whether I have any further questions for
11 him?
12    THE COURT: Why don't we take a recess now
13 for ten minutes.
14    (Whereupon, the jury was escorted out of the
15 courtroom and the following colloquy ensued):
16    THE COURT: Go ahead.
17    Do you think you're going to have more?
18    MR. FEAGA: I think it's going to be just
19 one or two questions, Your Honor.
20    THE COURT: Okay. We'll take a ten minute
21 recess while you confer with your client.
22    (Whereupon, a recess was taken.)
23    THE COURT: Proceed.
24    MR. FEAGA: Your Honor, we have no further
25 questions of Mr. Wilson and that's our rebuttal.

Page 101

1    THE COURT: Okay. Cross of Mr. Wilson?
2    MR. BRUNSON: Thank you, Your Honor.
3    REBUTTAL CROSS EXAMINATION
4    BY MR. BRUNSON OF LOUIE WILSON:
5 Q Mr. Wilson, counsel reviewed the income tax
6 returns that are reflected in defendant's exhibit 21,
7 22 and 23, the three tax returns. And you testified
8 that there was no tax due on those tax returns. Did
9 you review them to recognize the fact that there was
10 net loss, net operating loss carried forward from
11 previous periods that negated the income tax on those
12 returns?
13 A That's correct, there is net operating losses
14 reflected on all three returns.
15 Q And a net operating loss is a loss that occurred
16 in a previous year that is allowed under the tax laws
17 to be carried forward and offset income in later
18 years, is that right?
19 A That's correct.
20 Q And there were substantial net operating losses
21 that were carried forward for those particular tax
22 years, was there not?
23 A Yes, sir.
24 Q And those kind of offsets to income are kind of
25 like depreciation. They're non-cash kind of

Page 102

1 deductions that the I. R. S. allows legally, do they
2 not?
3 A I would agree.
4 Q Mr. Wilson, you're also aware, based on those
5 returns, that Mr. Carmichael changed accountants in
6 order to get someone else to prepare the later
7 returns, is that right?
8 A I was made aware of that by the testimony that
9 we've heard today, and I knew there was a different
10 accountant's name on it yesterday.
11 Q And also at the bottom of each of those returns
12 there is the name of the person who prepared each of
13 those documents, is that correct?
14 A That's correct.
15 Q And in your previous investigation you had dealt
16 with Mr. Carmichael's previous accountant, the person
17 who died a couple of weeks ago of cancer, is that
18 right?
19 A Mr. Duncan, that's correct.
20 Q And you realized in your previous investigation
21 of Mr. Carmichael that Mr. Duncan probably wasn't as
22 sharp an accountant as you normally see out there, is
23 that right? Didn't you make that observation, Mr.
24 Duncan (sic.)
25 A I'm Mr. Wilson.

Page 103

1        But Without being rude, to say that Mr.
2 Duncan was not the most topnotch accountant I've ever
3 met --
4 Q Well he was not a certified accountant?
5 A He was not a certified public accountant.
6 Q And these returns are prepared by a certified
7 public accountant, are they not?
8 A I do not know this gentleman, but his signature
9 bears this C. P. A. stamp.
10 Q And a certified public accountant has some high
11 obligation to do things correctly based on a
12 certification and a license, wouldn't you agree with
13 that?
14 A I would agree with that, and I would also say
15 that any accountant who hangs a shingle out has the
16 same responsibility. A C. P. A. may have more
17 training and more responsibilities within an
18 organization, but they all have the same
19 responsibility.
20 Q But the I. R. S. kind of looks at a C. P. A. as
21 someone more respectable in general than just a
22 regular public accountant.
23 A I don't know more respectable is the term. Maybe
24 someone with more training.
25 Q Now you were asked about the discrepancy between

Page 104

1 the sales tax forms and the income tax forms. There
2 are often discrepancies between those forms due to
3 many differing scenarios, are there not?
4 A I fail to see how there could be the amount of
5 discrepancy that's listed here.
6 Q Well, for instance, an individual may — any
7 monies an individual receives is income according to
8 the Internal Revenue laws. Any money they receive is
9 income except for certain exceptions like loans and
10 inheritances.
11 A With very few exceptions.
12 Q And you knew Mr. Carmichael from your first
13 investigation was not the hands-on managing partner of
14 any of these nightclubs, didn't you?
15 A In the first investigation the only club that I
16 was aware of was the Unique Entertainment Center.
17 Q But you knew he was not the day-to-day operator
18 of those clubs, didn't you?
19 A It was my understanding that he ran the trucking
20 business on a day-to-day basis.
21 Q And had some financial interest in these clubs
22 where he was drawing income that he placed on his tax
23 return even in those earlier years, not just these
24 latter years that we've discussed.
25 A Well as I testified yesterday, I believe the time

Page 105

1 that my investigation was initiated, the returns for
2 Multi-Investments had not been filed. It was Mr.
3 Carmichael and Mr. Duncan's assertion that when those
4 returns were subsequently filed that the income from
5 Unique Entertainment had been included on those
6 returns. Again, that's their assertion, not my
7 conclusion.
8 Q And he filed those returns during your open and
9 active investigation, did he not?
10 A That's correct.
11 Q Did he actually give those returns to you
12 personally?
13 A Mr. Hardwick and Mr. Maddox provided those to me.
14 Q Met with you and provided them to you?
15 A That's correct.
16 Q Partly because they thought that was the crux of
17 your investigation, overviewing tax years and auditing
18 tax returns.
19 A I'm not sure what they assumed the crux of my
20 investigation was.
21 Q Well, being that you're from the I. R. S.
22 A I think Mr. Maddox testified yesterday that he
23 was aware of the money laundering laws as well, and
24 I'm fairly certain that Mr. Maddox knows that we have
25 jurisdiction over those charges as well.

Multi-Page™

## Page 106

1 Q  But it's kind of unusual for an individual to
2 offer an I. R. S. agent tax returns during an active
3 investigation, is it not?
4 A  No, sir, I've had that happen on multiple
5 occasions.
6 Q  But it's important if they're going to offer
7 those tax returns to the I. R. S. agent that they be
8 correct.
9 A  In my mind, I would think that that would be
10 their hope is that those returns would be correct.
11 However, I have seen situations where they were
12 offered during the course of the case where they were
13 not correct.
14 Q  I'm not asking about other situations.  If
15 they're going to hand you tax returns, it's pretty
16 important that you're handed it right to the horse's
17 mouth that those tax returns pass your scrutiny.
18 A  I'm not sure how to answer that.  But yes, sir, I
19 guess that would be what they would hope.
20    MR. BRUNSON:  No further questions, Your
21 Honor.
22    REBUTTAL REDIRECT EXAMINATION
23    BY MR. FEAGA OF LOUIE WILSON:
24 Q  Mr. Wilson, an accountant or a lawyer who is
25 supplying you with a copy of a tax return that they

## Page 107

1 had prepared, they rely on the client, correct, for
2 accurate information?
3 A  Yes, sir.
4 Q  And that's the way it it's done in the business,
5 right?
6 A  Clients have to provide their C. P. A. or their
7 accountant, whoever prepared their return with the
8 information, yes.
9 Q  And then they fill out the for?
10 A  Based on that information, that's correct.
11    MR. FEAGA:  No further questions, Your
12 Honor.
13    THE COURT:  Anything else?
14    MR. BRUNSON:  No, Your Honor.
15    THE COURT:  Anything else of this witness?
16    MR. FEAGA:  Can I have just one minute, Your
17 Honor?
18    (Whereupon, Mr. Feaga conferred with Ms.
19 Morris and Mr. Moorer off the record and out of the
20 hearing of the other courtroom participants.)
21    MR. FEAGA:  Your Honor, no, I have no
22 further questions.
23    THE COURT:  You may step down.
24    (Whereupon the witness, Louie Wilson,
25 stepped down from the stand.)

## Page 108

1    THE COURT:  Now we have possible cross,
2 would you like to use your cross?
3    MS. WAYNE:  Please.
4    THE COURT:  Who are the witnesses?
5    MS. WAYNE:  Mr. Ingals, I believe was his
6 name.
7    THE COURT:  Very good.  Mr. Ingals.
8    REBUTTAL CROSS EXAMINATION
9    BY MS. WAYNE OF GEORGE INGALS:
10 Q  Good morning, Mr. Ingals.  I have a few questions
11 of you, if I may.
12    I'm looking at what has been marked as
13 government's exhibit 80 and admitted, and this is the
14 exhibit that you were reading from that you prepared
15 at the direction of the government, correct?
16 A  Yes, ma'am.
17 Q  And that was at the request in terms of looking
18 at the liquor license for Unique Entertainment.
19 A  Correct.
20 Q  For these particular years?
21 A  That's correct.
22 Q  Now when you talk about liquor sales and the sale
23 of liquor, your job is focused or concerned about
24 those sales as it has only to do with liquor in a
25 business such as Unique Entertainment.

## Page 109

1 A  Say that again.
2 Q  You're focused on sales of liquor.
3 A  My particular job?
4 Q  Yeah.
5 A  I focus on enforcement of violations of the
6 liquor sales.
7 Q  Okay.  That has to do with alcohol.
8 A  Yes.
9 Q  Okay.  Now, and it's against the law to sell
10 alcohol to people who are underage in Montgomery.
11 A  That's correct.
12 Q  So when you have a business that operates to
13 teenagers or underage people, you don't expect to see
14 a liquor license.
15 A  No.
16 Q  And in terms of door purchases, or people
17 purchasing entry into an entertainment club, that has
18 nothing to do with liquor licensing.
19 A  If they have a liquor license, no.
20 Q  Because you don't look at the profit that's taken
21 in by a nightclub in terms of the door sales and all
22 of that, you're concerned with who is buying and
23 selling liquor and how much is being bought and sold.
24 A  That's correct.  I don't deal with the overall
25 picture of how much money they make.

Multi-Page™

1 Q And in terms of your particular focus, you have
2 no idea about why liquor is being bought and sold in
3 certain months as opposed to other months. You have
4 no idea why a business might sell liquor one month and
5 might not the next month.
6 A No, ma'am.
7 Q And in terms of Unique Entertainment, it's clear
8 that they did report sales of liquor in the year 2003,
9 according to your chart.
10 A They did.
11 Q Okay. And in April 2003 and July 2003, November
12 2003, December 2003, there is an indication that there
13 is no purchase of liquor during those months.
14 A That's correct.
15 Q And you didn't do an independent investigation of
16 Unique Entertainment as to why liquor was not being
17 bought and sold during those months?
18 A No, I did not.
19     MS. WAYNE: Judge, if I may have just a
20 moment?
21     THE COURT: Yes.
22     (Whereupon, Ms. Wayne conferred with Mr.
23 Brunson and Ms. James off the record and out of the
24 hearing of the other courtroom participants.)
25     MS. WAYNE: Mr. Ingals, I have no further

1 questions.
2     THE COURT: Anything else?
3     MR. FEAGA: No, Your Honor.
4     THE COURT: You may step down.
5     (Whereupon the witness, George Ingals,
6 stepped down from the stand.)
7     THE COURT: Is it Ms. Wise?
8     MR. BRUNSON: Yes, Your Honor.
9     THE COURT: Ms. Wise.
10     REBUTTAL CROSS EXAMINATION
11     BY MR. BRUNSON OF GEORGIA WISE:
12     THE COURT: Proceed.
13     MR. BRUNSON: Thank you, Your Honor
14 Q Miss Wise, I'm Ron Brunson. I met with you prior
15 to your direct testimony outside. Do you remember
16 meeting me?
17 A Yes, sir.
18 Q And, Ms. Wise, when we met I asked you what
19 information you were bringing from the City of
20 Montgomery, and you told me information about sales
21 tax for Club Gs, did you not?
22 A Right.
23 Q I asked you if you had any other information for
24 any other businesses and you told me you did not, is
25 that right?

1 A That's correct.
2 Q Was there some reason you told me you did not
3 have other information when in fact you had at least
4 information about three other businesses today?
5 A I only had that Club Gs. I had previously given
6 them the other information.
7 Q But you weren't --
8 A Not today.
9 Q But you weren't trying to deceive me in the fact
10 that that was the only thing that you were bringing --
11 A Oh, no, sir. I thought you asked me what I had
12 brought with me.
13 Q And when they asked you to look up information,
14 they asked you to look up information for
15 Multi-Investments, Club Gs, Unique Entertainment and
16 the Carmichael Center, is that right?
17 A Yes, sir. There were some other businesses on
18 the subpoena, but we didn't have those.
19 Q And you got a trial subpoena to come here with
20 those records today?
21 A Yes, sir.
22 Q And you said that you were an investigator. Are
23 you in fact a person who goes out, an examiner, do you
24 go out to businesses and try to check up on them to
25 see if they're paying their proper sales tax?

1 A Yes, sir, I do.
2 Q In relating to any of those businesses have you,
3 or has anyone else from the department, been out to
4 check up on these businesses since their inception?
5 A I have been out to the Carmichael Center.
6 Q The other businesses, the Unique Club or Club Gs,
7 have you been out to any of those?
8 A No, sir.
9 Q Now exhibit 76 relates to Unique Entertainment.
10     MR. BRUNSON: May I approach, Your Honor?
11     THE COURT: Yes.
12 Q Can you see that information on the screen,
13 Miss Wise?
14 A Yes, sir.
15 Q Now I want to ask you, the items listed on the
16 screen I assume are items that are in the business
17 license for which this business, Unique Entertainment,
18 may operate and serve the public?
19 A Yes, sir.
20 Q Do they have to announce to the City exactly what
21 areas they are interested in making sales?
22 A Yes, sir, they do.
23 Q And they in fact announce these particular areas
24 and you log them in on your computer I suppose.
25 A That's correct.

Page 114

1  Q  Now about hall rental. That happens to be the
2  very first item on your list. Is the list made in
3  primary and secondary order?
4  A  Not necessarily.
5  Q  Not necessarily. But hall rental is the first
6  thing on this list.
7  A  Yes, sir.
8  Q  Relating to hall rental, do you know what that
9  means in sales tax terms?
10 A  As far as sales tax I'm not sure. I mean why
11 would we have -- They wouldn't be paying sales tax on
12 hall rental.
13 Q  All right. So if an individual happens to own a
14 business and receive income from, let's say, a
15 promoter or a lessee, a person who leases property
16 either on a nightly basis, daily basis or weekly
17 basis, that income would not be subject to sales tax
18 to that person, would it?
19 A  That's correct.
20 Q  And the person that leased the property, whether
21 it be a promoter or any other tenant, would be the
22 person who paid the sales tax, is that right?
23 A  Correct.
24 Q  The burden would be on them and not to the
25 landlord and/or the person who brings in the promoter,

Page 115

1  the promoter paying this person a set fee to come in.
2  A  That's correct.
3  Q  Would you agree with that?
4  A  Mm-hmm.
5  Q  And, ma'am, relating to government's exhibit 77,
6  that's in the name of Darren Gaskin. If Darren Gaskin
7  were a person who were leasing the property from the
8  owner, would Darren Gaskin be responsible for
9  preparing, submitting and paying sales tax on whatever
10 was sold at that business?
11 A  He would be.
12 Q  And, ma'am, if you're familiar with accounting
13 methods, a person who manages the business is the
14 person who is responsible for coming up with sales tax
15 numbers, don't you agree with that?
16 A  With the owner. The owner of the business.
17 Q  But isn't there often an accountant involved
18 where the manager may provide the information to the
19 accountant for submission to your office?
20 A  Yes, sir.
21 Q  Now I'm referring you to government's exhibit 78.
22 This is a document that you bought from
23 Multi-Investments, Inc. dated for multiple years, but
24 you testified that there was some filing for
25 Multi-Investments for July 9th of '02, is that what

Page 116

1  this document reflects?
2  A  Well, March of '02. It was filed in July.
3  Q  So there appears to be some unusual business
4  activity for Multi-Investments in March of '02, is
5  that correct?
6  A  Yes, sir.
7  Q  Because you said Multi-Investments, according to
8  your business license, is a trucking company?
9  A  That's correct.
10 Q  Yet having not filed previous sales tax forms,
11 all of a sudden they're filing one based on income
12 they must have received in March of '02, is that what
13 this document reflects?
14 A  Yes, sir.
15 Q  Now one other scenario I'd like to ask you about.
16 If an individual sells goods to the public, must they
17 obtain a business license for that purpose?
18 A  They must.
19 Q  Must they pay sales tax for that purpose?
20 A  They must.
21 Q  If an individual sells things to another retailer
22 for their ultimate sale to the public, must they pay
23 sales tax on that sale?
24 A  Not if it's going to be resold.
25 Q  And the last documents you brought, Ms. Wise,

Page 117

1  were relating to the Carmichael Center. And again the
2  first item on there is hall rental service. If
3  promoters, and I'll ask this again in relation to the
4  Carmichael Center, if a promotor came in and paid the
5  Carmichael Center money for a local promotion, would
6  that money that they paid the Carmichael Center be
7  taxable for sales tax?
8        MR. FEAGA: Your Honor, we're going to
9  object to the relevance. The Carmichael Center wasn't
10 open when the money went into this account that is the
11 subject of this case. Of what relevance can cash
12 coming in after the account was closed be pertinent to
13 the question if it was form drug proceeds?
14       THE COURT: Mr. Brunson?
15       MR. BRUNSON: Your Honor, it's their
16 exhibit.
17       THE COURT: Overruled. Go ahead.
18 Q  Did you understood my question, ma'am?
19 A  Yes, I did. And no, tax would not be required.
20 Q  Thank you, ma'am.
21       THE COURT: Anything else?
22       MR. BRUNSON: No, Your Honor.
23       THE COURT: Any further direct?
24       MR. FEAGA: No, Your Honor.
25       THE COURT: Thank you. You may step down.

Page 118

1    (Whereupon the witness, Georgia Wise,
2 stepped down from the stand.)
3    THE COURT:  Do you rest on your rebuttal?
4    MR. FEAGA:  We do, Your Honor.
5    THE COURT:  Any surrebuttal?
6    MS. WAYNE:  No, Your Honor, we rest.
7    THE COURT:  Any surrebuttal, Mr. Teague?
8    MR. TEAGUE:  No, Your Honor.
9    THE COURT:  Okay.  Now members of the jury,
10 before I recess for lunch let me give you some
11 additional instructions.  I allowed some testimony in
12 by Robert Chavez.  I believe that was an agent.  And
13 he testified about statements that Miss Jones made to
14 him.  The first statement was, "Miss Jones told me she
15 was a truck driver for a G. E. D. Trucking Company."
16 The second statement was, "Miss Jones told me she did
17 not know Hernandez."  And the third statement that he
18 said was that, "Miss Jones told me that she was afraid
19 to tell me who the owner of the currency was."
20    You should ignore those statements and not
21 consider them in your deliberations.  I should not
22 have allowed them in and you must not let them play
23 any role in your decision in this case.  Now I assume
24 -- can you do that?  Just by nodding your head yes?
25 Does everyone know the three statements I talked

Page 119

1 about?  Very good.  Do not consider them.
2    We're now at the close of all the evidence.
3 So it's now one o'clock.  I have some things to take
4 up with the lawyers which will take me about twenty or
5 thirty minutes.  I'd like to do that after lunch.  I'd
6 like to eat my lunch as well.  So when we come back
7 we'll have the closing arguments of the lawyers
8 promptly at one-thirty.  And I believe the government
9 will go first, and then the defendants will go and
10 then we will have my charge to you as to the law.
11    Now that will put us probably pretty close
12 to five o'clock.  If you would like to deliberate
13 briefly this evening, perhaps just to discuss how you
14 would like to proceed, I'll allow you to do that.  But
15 of course you have the right to deliberate at leisure
16 from then on, including Friday and Monday and so
17 forth.
18    So now I'm going to let you go to lunch.  Do
19 not discuss the case, obviously.  When you come back
20 at one-thirty we'll have the closing arguments and
21 hopefully after that my instructions on the law.
22    See you back here at one-thirty.
23    (Whereupon, the jury was escorted out of the
24 courtroom.)
25    THE COURT:  Counsel, I will see you back

Page 120

1 here at approximately ten of one.  We will then take
2 up the motions, any findings I need to make, and I
3 would like to start the closing arguments promptly at
4 one-thirty.  Now you're asking for an hour?
5    MR. FEAGA:  And then thirty minutes in
6 rebuttal.
7    THE COURT:  Each of you is asking for an
8 hour?  I'm going to give the government an hour and
9 fifteen minutes rather than an hour and-a-half.  Each
10 defendant has fifty minutes.  Okay?
11    Thank you.
12    (Whereupon, the luncheon recess was taken.)
13        MOTIONS IN OPEN COURT
14        (THE JURY IS NOT PRESENT):
15    MR. TEAGUE:  Your Honor, are you going to be
16 having a charge conference?
17    THE COURT:  Oh yes, definitely.
18    By the way, did you get those two requests
19 to charge?
20    MS. WAYNE:  That's what I'm doing right now,
21 Judge.
22    THE COURT:  Okay.  Please try to get those
23 to my law clerk as quickly as you can.  I think you're
24 entitled to know what the charge is before you begin
25 your closing arguments.

Page 121

1    Who is going to argue for the defendant
2 Carmichael on the conspiracy issue as well as the
3 motions for judgment of acquittal?
4    MS. JAMES:  Judge, I anticipate that the
5 motion for judgment of acquittal would be shorter if
6 you want to do it first.
7    THE COURT:  Yes, let's do that first.
8    MS. JAMES:  I'll argue as to count one, and
9 Mr. Brunson as to count two.
10    THE COURT:  I will just state this.  The two
11 matters I will deny now, but I will write to them
12 later.  The first one is the Crawford issue as to the
13 whole conspiracy, which Miss Chartoff has filed a
14 brief on and you've responded.  I've already told you
15 about Miss Jones's aspect of it, but I'll write to the
16 whole thing so you don't need to argue that any more.
17    The second matter which I've denied is the
18 lawsuit matter, and I will write to that fully too,
19 unless you want to get some more briefs to me, and I'm
20 denying that as well.
21    The final matter is the conspiracy, which I
22 will hear now, and your motions for judgment of
23 acquittal.  Now there was one other thing that
24 Miss Chartoff mentioned.  She said she wanted to make
25 an argument about cumulative prejudice, and I told you

**Multi-Page™**

## Page 122

1  you could make it at the end of the case.  If you want
2  to make that now you need to put that in the record
3  right now so I'll know what you want to argue.
4       MS. JAMES:  You want us to do the J. O. A.
5  first?
6       THE COURT:  Let's do the J. O. A. first.
7  She wanted to go through a litany of things that
8  occurred during the trial, to take up cumulatively
9  thinking that the defendants have been prejudiced, and
10  I stopped you and I said, "Well make that argument at
11  the end of the whole case."  If you still want to
12  pursue that, you may do it now.
13       MS. JAMES:  Thank you, Your Honor.  At this
14  time on behalf of Defendant Leon Carmichael we move
15  for judgment of acquittal as to count one of the
16  indictment, the conspiracy count.  The government's
17  evidence with regard to the drug conspiracy rests in
18  large part --
19       THE COURT:  You know I really can't make
20  this determination until I determine the conspiracy.
21       MS. JAMES:  Okay, then I'll withdraw that.
22       THE COURT:  If I conclude that aspects of
23  the conspiracy are insufficient, then that affects the
24  arguments.  So who will argue the conspiracy?
25       MS. JAMES:  Miss Chartoff.

## Page 123

1       THE COURT:  Okay.  I'm going to ask the
2  government to go first because Miss Chartoff will be
3  poking holes at their case, so it's better for them to
4  go first so you'll know how to respond.
5       MS. CHARTOFF:  Thank you.
6       THE COURT:  Who will argue for the
7  government?
8       MS. MORRIS:  I will, Your Honor.
9       THE COURT:  Okay.  Come forward.
10       MS. MORRIS:  Yes, Your Honor.
11       THE COURT:  Now I assume the conspiracy that
12  you claim here is between George, Denton and the two
13  defendants, Carmichael and Williams, and others.
14       MS. MORRIS:  And others.
15       THE COURT:  I want to focus on those four to
16  begin with.
17       MS. MORRIS:  Okay.
18       THE COURT:  I agree with you that there is a
19  conspiracy between those four.  Let's talk about the
20  others now.
21       MS. JAMES:  Who were those four, judge?
22       THE COURT:  George, Denton and the two
23  defendants.  The first person is Keena Whizinant.
24       MS. MORRIS:  Yes, Your Honor.
25  Miss Whizinant, as the evidence showed or as Mr.

## Page 124

1  Denton testified, Mr. Denton has taken money to her
2  house, drug proceeds to her house to give to Mr.
3  Carmichael.
4       Secondly, Miss Whizinant lives in a house
5  that was once owned by Mr. Freddie Williams and is now
6  owned by Mr. Carmichael.  Now I understand at this
7  point the Court could say well, there's a merely
8  present argument at that point, that she is not
9  involved but has just been there.  However, as the
10  Court is aware the Court can take her statements in
11  conjunction with other evidence to determine whether
12  she's a member of this conspiracy.
13       Her statement to Sherry Pettus on the phone
14  when she was calling, looking for Mr. Carmichael after
15  the search warrant was executed right down the street
16  at Mr. Williams' house, that "The stuff," and I quote,
17  "inside the house was Mr. Carmichael's" is evidence
18  which combined with the fact that she's living in his
19  house that's been owned by both defendants, which
20  combined with the proceeds --
21       THE COURT:  Is this the same house that has
22  the questionable transaction, too?
23       MS. MORRIS:  Yes, sir.
24       THE COURT:  You remember you asked Mr.
25  Williams' son, if I remember correctly, about how his

## Page 125

1  father could afford to own -- Why don't you summarize
2  it.  Is that the same house?
3       MS. MORRIS:  Yes, Your Honor.  We wrote the
4  dates up, and if I could refer to the easel --
5       THE COURT:  Right.  I don't believe you have
6  that in your brief.
7       MS. MORRIS:  I don't.  It hadn't come out,
8  at that time, quite frankly.
9       THE COURT:  Why don't you summarize the
10  house matter.
11       MS. MORRIS:  The house matter, Your Honor,
12  without having the dates in front of me, and I'll look
13  for those if you'll give me one moment, Mr. Williams
14  purchased the house I believe in 2002 from a third
15  party not involved in the case for forty thousand
16  dollars.  He purchased the house in April of 2002 for
17  forty thousand dollars.
18       THE COURT:  Who did?
19       MS. MORRIS:  Mr. Williams.
20       And as the Court recalled, his son obviously
21  said that Mr. Williams was not of a financial means to
22  his knowledge to purchase that.  One year later in
23  January of '03, less than a year later, Mr. Carmichael
24  purchased this same house from Mr. Williams for nine
25  thousand dollars for a thirty-one thousand dollar