1  loss. This is the house that Ms. Whizinant lives in.
2     THE COURT: And the house supposedly where
3  drugs were delivered.
4     MS. MORRIS: Drug proceeds were delivered
5  according to Mr. Denton, and in the house that from
6  the land line at the location of that house called
7  Miss Pettus and made that statement.
8     THE COURT: Now "the stuff" statement. Did
9  she say it was marijuana? Did Miss Whizinant actually
10 say marijuana or just stuff?
11    MS. MORRIS: She didn't, but Miss Pettus I
12 believe testified that she took that to mean marijuana
13 in the context of the conversation.
14    THE COURT: Right.
15    MS. MORRIS: She said that the police were
16 at the house, that they had executed a search warrant
17 and found marijuana and that "the stuff" was Leon's.
18    THE COURT: Okay. Now, one final question
19 and then I'll get to Miss Chartoff. Is this
20 Miss Whizinant -- How old is she?
21    MS. MORRIS: Eighteen. Well, she was
22 eighteen at the time of this.
23    THE COURT: She was eighteen at the time of
24 what?
25    MS. MORRIS: At the time on November 17th of

1  2003, my understanding is she was eighteen years old.
2  Now that didn't come out in evidence, but --
3     THE COURT: I know that.
4     Is there any evidence as to when the drug
5  money was allegedly delivered to her house, how old
6  was she?
7     MS. MORRIS: Well she could have been
8  eighteen or she could have been younger than eighteen.
9  I don't know. I don't recall the exact date that Mr.
10 Denton testified that the drug proceeds were delivered
11 to her house.
12    THE COURT: Okay. Counsel, Ms. Chartoff and
13 Miss James, I think I should give you notice of this.
14 If Mr. Carmichael is convicted, and I said if, I will
15 be very concerned about the age of Miss Whizinant when
16 these things happened. And the government is on
17 notice of that too. If there is a conviction, I want
18 to know her age. I want to know in particular, I want
19 to know whether she was under age, whether she was
20 under eighteen. And you can present that to me later.
21    That's why I'm a little ahead of myself, but
22 I just wanted to put you all on notice if there is a
23 conviction I want to know whether Miss Whizinant,
24 while allegedly engaged depending on what the jury
25 finds, was under age.

1     MS. JAMES: Judge --
2     THE COURT: But that's neither here nor
3  there. We can take that up later.
4     MS. JAMES: Well I was just going to say as
5  to that specific question, Judge, I don't recall Mr.
6  Denton having said when he allegedly --
7     THE COURT: Well that's what I'm saying. If
8  there is a conviction, I will want this all cleared
9  up. I'm not going to consider this in the conspiracy
10 part, but you all need to do your research. And if
11 there is a conviction I want to know whether there is
12 any evidence that any relationship between Mr.
13 Carmichael and Miss Whizinant that involved drugs
14 allegedly was when she was under age. And I'm also
15 putting you on notice.
16    Now, getting back to Ms. Chartoff, I want to
17 go person by person. Let's talk about Whizinant.
18 This is your chance to poke holes.
19    MS. CHARTOFF: Well, Your Honor, I believe
20 first of all on the testimony that Mr. Denton took
21 money to Miss Whizinant's house, it was my impression
22 that he took it to Leon Carmichael at Miss Whizinant's
23 house.
24    THE COURT: Okay.
25    MS. CHARTOFF: Now we didn't hear testimony

1  about who else lives at Miss Whizinant's house, but I
2  think the evidence was that Mr. Carmichael is friends
3  with if not Keena then someone else that lives at that
4  house and he spends time there, if Mr. Denton took
5  money to him at the house that really doesn't have
6  much to say about Keena's involvement.
7     THE COURT: Let me ask you this. Maybe I
8  should have asked Miss Morris this. When, according
9  to the evidence, and assuming I believe it by a
10 preponderance of the evidence, Keena Whizinant called
11 Miss Pettus and said, you know, that Williams' house
12 was -- that's right, it was Williams's house that was
13 raided, it wasn't her house.
14    MS. CHARTOFF: Right.
15    THE COURT: But the stuff that she was
16 talking about, was that stuff in her house or stuff
17 somewhere else?
18    MS. CHARTOFF: I believe that was supposed
19 to be what was at Freddie Williams' house.
20    THE COURT: When she used the phrase
21 "stuff," was she talking about stuff in Freddie
22 Williams's house or was she supposedly talking about
23 stuff in her own house? Or do we know?
24    MS. CHARTOFF: Well --
25    MS. MORRIS: Your Honor, I can represent and

Page 130

1 probably clear this up with respect to counsel, she
2 was referring to the stuff in Freddie Williams' house
3 who lived four doors down and across the street and
4 she could see his house and the fact that it was
5 raided.
6      THE COURT: So we weren't talking about
7 stuff coming out of her house.
8      MS. MORRIS: No, Your Honor.
9      MS. JAMES: Judge, I hope we don't get
10 confused, because some of her explanation is not in
11 evidence.
12      THE COURT: Well I don't want to get into
13 anything that isn't in evidence. It has to be in
14 evidence.
15      MS. JAMES: Well that's what I'm saying.
16 Like we have addresses --
17      THE COURT: It has to be in evidence.
18      MS. MORRIS: Your Honor, if I may, actually
19 I think there was a diagram drawn as to how many
20 houses down Mr. Williams' house was to Keena's house
21 or Miss Whizinant's house.
22      THE COURT: Right.
23      MS. MORRIS: So, I mean, that is in
24 evidence.
25      THE COURT: Okay. But go ahead,

Page 131

1 Miss Chartoff.
2      MS. CHARTOFF: Now with regard to those
3 alleged statements, I believe that Miss Pettus
4 testified on cross examination that Keena was
5 reporting to her rumors that she had heard in the
6 neighborhood about the bust and what had gone on there
7 and that it was Leon's stuff. So to the extent she's
8 reporting rumors, that doesn't indicate that she's
9 involved in the conspiracy.
10      THE COURT: When they said there was stuff,
11 what were Pettus and Whizinant going to do? Were they
12 trying to get rid of the stuff or what?
13      MS. CHARTOFF: No, they were just talking.
14      THE COURT: Just talking. Was there any
15 effort to move the stuff, or to get to something
16 before the police got there?
17      MS. MORRIS: If I may, Your Honor,
18 Miss Whizinant called Miss Pettus at the Carmichael
19 Center looking for Mr. Carmichael first.
20      THE COURT: Right.
21      MS. MORRIS: And when she couldn't find Mr.
22 Carmichael to let him know, the inference can be drawn
23 to let him know about the stuff, or the marijuana,
24 that's when she told Miss Pettus about it. And our
25 contention would be it was in order to elicit her help

Page 132

1 to find Mr. Carmichael before law enforcement got to
2 him and such.
3      THE COURT: Okay.
4      MS. CHARTOFF: Now, Your Honor, even if
5 assuming the government's version is correct, even if
6 she was doing this because she had some idea that Mr.
7 Carmichael might get in trouble, I've cited case law
8 in my brief that stands for the proposition that
9 knowing that there is a conspiracy going on doesn't
10 mean you're a member of the conspiracy. So if she had
11 reason to believe that Mr. Carmichael was involved in
12 a drug conspiracy and she wanted to call him and talk
13 to him as a result of the rumors she heard, that
14 doesn't mean that she is a member of the conspiracy.
15 She just may have knowledge of it.
16      THE COURT: How many times did Denton bring
17 money to her house?
18      MS. CHARTOFF: I only remember one time. I
19 don't think it was clear.
20      MS. MORRIS: I don't think he ever said the
21 number, but I think he said he has brought, and then
22 plural, money as in more than once.
23      THE COURT: Okay.
24      MS. JAMES: Judge, would you be willing to,
25 since this is going to be helpful to the Court, would

Page 133

1 you be willing to let us both speak?
2      THE COURT: I'll let you speak after Mr.
3 Chartoff finishes.
4      MS. JAMES: Right. I didn't want to lose
5 continuity.
6      THE COURT: Why don't you write the notes
7 down. But if you go back and forth, then I'll lose
8 the meaning of it.
9      MS. MORRIS: Your Honor, if I may?
10      THE COURT: Go ahead.
11      MS. MORRIS: There is one other issue, or
12 one other point of fact that came out in court that I
13 wanted to bring to the Court's attention.
14      THE COURT: Regarding Whizinant?
15      MS. MORRIS: Yes, sir.
16      THE COURT: Go ahead.
17      MS. MORRIS: If the Court will recall, the
18 testimony was that around two-thirty a.m. in the
19 morning Mr. Carmichael called Mr. Denton with the
20 agents around and overhearing the conversation.
21 Approximately, I believe it was seven or eleven
22 minutes after that phone call, which is two
23 thirty-eight in the morning which was the original
24 phone call and we can actually pull up the times here,
25 but very few minutes later, after Mr. Carmichael has

---

1 gone to see Mr. Denton and told him that the stuff is
2 at Freddie's, Mr. Carmichael immediately calls the
3 number at the Nine-seventy Ridgecrest Drive address,
4 Miss Whizinant's address. Calls that phone. He's
5 calling this phone in the middle of the night --
6     THE COURT: After what, now?
7     MS. MORRIS: After Mr. Carmichael goes to --
8 Well, after the evidence shows that Mr. Carmichael
9 went to Mr. Denton's house, met with Mr. Denton at two
10 forty-five in the morning, he leaves Mr. Denton's
11 house and immediately calls Ms. Whizinant at the
12 Nine-seventy Ridgecrest Drive. In fact, I think he
13 called her twice.
14     THE COURT: Okay. Now, anything else,
15 Miss Chartoff.
16     MS. CHARTOFF: Yes. We don't have evidence
17 of who else may have been living in that house at that
18 time. The government has not provided that evidence.
19 We know Ms. Whizinant --
20     THE COURT: Which house?
21     MS. CHARTOFF: The Nine-seventy Ridgecrest
22 Drive.
23     THE COURT: Is this Whizinant's house?
24     MR. CHARTOFF: Yes.
25     Furthermore, the fact that she is living in

---

1 a house that Mr. Carmichael owns is not really very
2 remarkable at all. She's a friend of his, obviously,
3 and he's the landlord.
4     THE COURT: What about Timothy Williams's
5 testimony that the financing of that house was very,
6 to say the least, was curious? Here's a man who
7 doesn't have the financial means, that is Mr.
8 Williams, buys a house for her, then sells that house
9 under extremely mysterious circumstances to Mr.
10 Carmichael at a very big loss. Why doesn't that raise
11 the specter of -- You know you can be present at
12 something but after awhile, you know, you have to be
13 involved.
14     MS. CHARTOFF: Your Honor, there is no
15 evidence whatsoever that Miss Whizinant had any
16 knowledge of that deal, or that she is anything other
17 than a tenant. I mean, that may --
18     THE COURT: Oh, you mean the house didn't
19 belong to her?
20     MS. CHARTOFF: No, she's a tenant, Your
21 Honor.
22     THE COURT: Okay.
23     MS. CHARTOFF: There is no indicating she
24 was involved in that deal.
25     THE COURT: Why would Mr. Carmichael buy a

---

1 house for a tenant like that, for Mr. Williams, for at
2 a loss of thirty-one thousand dollars?
3     MS. CHARTOFF: Well there could have been
4 other tenants in there for one thing. There is no
5 indication --
6     THE COURT: But the only evidence we have is
7 there was one tenant.
8     MS. CHARTOFF: That's the government's
9 burden, Your Honor.
10     THE COURT: I understand that. But --
11     MS. CHARTOFF: Furthermore, there is no
12 indication that he bought it for her. I mean, you
13 don't buy a house for your tenant, you buy a house to
14 rent it out and then you have a tenant there.
15     THE COURT: Right.
16     MS. CHARTOFF: There is no indication he
17 gave her the house or anything like that. And there
18 are many possible reasons that he may have structured
19 this transaction this way. For instance, if he wanted
20 to have a house and not have his wife know about it --
21     THE COURT: But I thought your evidence was
22 that their relationship was not proven in the record,
23 and I kept out their alleged relationship.
24     MS. CHARTOFF: And there is no relationship,
25 Your Honor.

---

1     THE COURT: So why would someone have a
2 relationship with this person engaged in all of these
3 mysterious conduct with no reasons like, you know,
4 that she was his lover or something like that as a
5 possible explanation?
6     MS. CHARTOFF: Well, Your Honor, there are
7 many possible explanations, none of which the
8 government has proved. He could have been involved
9 with her mother, her sister, her friend. He could
10 have just been friends with them.
11     THE COURT: Or he could have been using her
12 as a drugger.
13     MS. CHARTOFF: There is no evidence of that,
14 Your Honor.
15     THE COURT: I think there's evidence of
16 that. I think the government has carried its burden
17 of showing that Whizinant was involved.
18     Let's move on to -- You had something else?
19 I'm sorry.
20     MS. JAMES: Judge, that's my point, because
21 if we don't do it --
22     THE COURT: Yes, I fully agree.
23     MR. TEAGUE: And Mr. Williams would like to
24 be heard.
25     THE COURT: This affects him, too. But go

---

Page 138

1 ahead.
2      MS. JAMES: Judge, I think the Court should
3 also consider the testimony of Alan Gunn, who was a
4 defense witness, who testified about a conversation
5 that he had with Miss Pettus subsequent to Mr.
6 Carmichael's arrest at which time she told him that
7 she was surprised, or something of that nature, the
8 Court will remember the testimony, about the
9 allegations of drugs.
10      THE COURT: Who was surprised?
11      MS. JAMES: Miss Pettus. Mr. Gunn testified
12 about his post Carmichael arrest.
13      THE COURT: Right. I remember that very
14 well.
15      MS. JAMES: And my concern there is, that
16 the conversation that Keena purportedly had with
17 Miss Pettus is contradictory to the facts as
18 established through the testimony of Mr. Gunn.
19      THE COURT: Right. I'll be very frank with
20 you. I don't believe that Mr. Gunn -- Well actually,
21 I think Mr. Gunn probably told the truth, but I
22 believe that Miss Pettus when she was talking to him
23 was not telling him the truth. I think Miss Pettus
24 knew exactly that there were drugs. I think
25 Miss Pettus knew exactly what she was going on, and I

Page 139

1 think she was just saying that to Mr. Gunn, oh, I
2 don't know what's going on, but she was deeply into
3 this. She knew exactly.
4      So I don't find that as contradictory, only
5 because I don't believe what Miss Pettus told Mr. Gunn
6 is true.
7      But do you have anything else to add,
8 Mr. Teague?
9      MR. TEAGUE: Your Honor, I'd like to submit
10 that, first of all, that Keena Whizinant's statement
11 was --
12      THE COURT: You mean "the stuff"?
13      MR. TEAGUE: Yeah, the alleged statement of
14 "stuff". First of all, it was double hearsay, as I
15 recall the way the testimony came in.
16      THE COURT: How is it double hearsay?
17      MR. TEAGUE: Well, she is supposed to have
18 expressed that to another person, and then that person
19 told Sherry Pettus, is the way I recall it.
20      We submit that what she said would not have
21 been in furtherance of a conspiracy, Your Honor, and
22 that's supposed to be the key point as to whether or
23 not --
24      THE COURT: Well, I think that that I am
25 certain about, assuming everything else supports it, I

Page 140

1 think she was out to protect Mr. Carmichael and to
2 make sure that the government didn't uncover those
3 drugs, or what she aptly called "stuff". And I think
4 she knew what "stuff" was, and it was marijuana.
5      But let's move on to Valerie Carmichael.
6 What evidence do I have as to Valerie Carmichael?
7      MS. MORRIS: Your Honor, the first piece of
8 evidence that came out was that Mr. Denton testified
9 that, and I can't recall if it was the first time or
10 one of the first times that he purchased marijuana
11 from Mr. Carmichael, or he obtained marijuana from Mr.
12 Carmichael, Mr. Carmichael sent or directed his wife,
13 Valerie Carmichael, to obtain the marijuana. She then
14 brought him two pounds of marijuana and he then handed
15 it to Mr. Denton.
16      THE COURT: Right.
17      MS. MORRIS: That's first. So that in and
18 of itself --
19      THE COURT: You have evidence showing that
20 she actually handled drugs.
21      MS. MORRIS: Absolutely.
22      THE COURT: Assuming I believe Mr. Denton.
23      MS. MORRIS: Correct.
24      THE COURT: Okay.
25      MS. MORRIS: But on top of that, you have

Page 141

1 Miss Pettus's testimony that she, on two occasions,
2 went to Mr. Carmichael's house and counted out drug
3 proceeds with Miss Carmichael. On two separate
4 occasions counted drug proceeds, and that this was the
5 money that was supposedly dug up from the ground.
6      THE COURT: Okay.
7      MS. MORRIS: And on one of those occasions
8 they physically had to wash this money because it
9 smelled so bad in an attempt to get the stench out of
10 it.
11      THE COURT: Okay. Miss Chartoff, what about
12 Mrs. Carmichael, Valerie Carmichael?
13      MS. CHARTOFF: Well first of all, Your
14 Honor, we would submit that Patrick Denton's testimony
15 is not believable.
16      THE COURT: Why isn't it believable?
17      MS. CHARTOFF: Because he has a great motive
18 to lie. He's avoiding prosecution for a major drug
19 conspiracy that he has admitted to himself, which
20 would send him to prison for who knows how many years.
21 He's in two state life sentences that he's looking at
22 right now for trafficking drugs. His demeanor showed
23 that he had an axe to grind, that he was very nasty.
24 I just thought, and I would hope the Court would share
25 my assessment, that he did not appear to be an

Multi-Page™

Page 142

1  uninterested witness. He seemed very interested.
2      THE COURT: Well that's true. I mean
3  typically when you have someone who is an alleged
4  co-offender in a drug transaction they're not going to
5  be the best people. But how old was he?
6      MS. MORRIS: How old?
7      THE COURT: Yes.
8      MS. JAMES: Thirty-one.
9      THE COURT: Thirty-one. And when did he
10  first meet Mr. Carmichael? He said he met him and
11  they first had the discussions about drugs, how old
12  was he then?
13      MS. MORRIS: It was in 1999, so he would
14  have been in his early to mid twenties.
15      THE COURT: Early to mid twenties. And
16  that's when he claims that he met Mr. Carmichael and
17  they first started talking about drugs?
18      MS. MORRIS: Your Honor, first of all I
19  think Mr. Carmichael when he was a teenager.
20      THE COURT: That's right.
21      MS. MORRIS: But the drug activity started
22  in 1999.
23      MS. CHARTOFF: And, Your Honor, I would add
24  that he gave some very not credible testimony about
25  how Mr. Carmichael supposedly asked him how much does

Page 143

1  a pound of marijuana cost, and he just off the top of
2  his head, you know, just a wild guess came up with the
3  accurate figure of six hundred pounds of marijuana
4  during that first -- six hundred for a pound of
5  marijuana during that very first conversation with Mr.
6  Carmichael where he was trying to present the
7  impression that if Mr. Carmichael hadn't started up
8  with him he never would have known anything about
9  drugs.
10      THE COURT: If this case was totally based
11  on whether I believed Patrick Denton because he has an
12  axe to grind --
13      MS. JAMES: Well there is more than that.
14      THE COURT: But we have all of these people.
15  We have Denton. We have George. We have even a
16  statement by Whizinant about "the stuff". You know,
17  are you saying that all of these people got together
18  in some back room and suddenly said we're going to
19  come out against this innocent man known as Leon
20  Carmichael? I mean, is this sort of this grand
21  conspiracy that there is somebody in the community
22  called Leon Carmichael who we don't like, he's an
23  innocent man, he's a respectable businessman but for
24  reasons we're just going to bring him down and make up
25  all kinds of lies about him? Does that make sense?

Page 144

1      MS. JAMES: Well, Judge, I think that
2  clearly there is some of that. But I would point out
3  for the Court --
4      THE COURT: Where would they have this
5  grandiose meeting where all these people suddenly
6  decided to go after Mr. Carmichael? And even so, why
7  Mr. Carmichael? I mean, did he do anything to them?
8  Why not me? Why didn't they make up lies about all
9  other kinds of people in the community? What is it
10  that would make them make up a lie against Mr.
11  Carmichael, assuming he was innocent?
12      MS. JAMES: Judge, in all due respect, the
13  Court would be reminded that this was a ten year
14  investigation.
15      THE COURT: Right.
16      MS. JAMES: It started in early 1994. There
17  is evidence that law enforcement was surveiling Mr.
18  Carmichael for a number of years. They opened an I.
19  R. S. file and a U. S. Attorney file. Much of the
20  information -- Mr. Timmons, for instance, he gave that
21  same information back in the early nineties. It
22  wasn't enough at that point in time. Mr. Denton and
23  Mr. George are, quite frankly, the new people on the
24  scene with regard to this incident. And it culminates
25  in the seizure of this five hundred plus pounds of

Page 145

1  marijuana at Mr. Williams' house. Why would it be
2  Leon Carmichael?
3      THE COURT: Where did all this dirty cash
4  come from, the one that was dug up? Where do you
5  think it came from?
6      MS. JAMES: Well, I don't think --
7      THE COURT: "Stinky cash," as they called
8  it.
9      MS. JAMES: Well, Judge, you have evidence.
10  But let me just say, and then I'll get to that
11  question, the common thread in all of this is David
12  DeJohn. I mean he is the investigator and I'm not
13  certain that it came out in evidence but it would
14  stand to reason that if law enforcement are are
15  interested in a person of interest would ask people
16  that they come into contact with that they think might
17  know or have some association because it's clearly
18  true that they suspected Mr. Carmichael after the
19  Sandra Jones incident that happened in Texas.
20      THE COURT: Well let's just focus on Mr.
21  DeJohn a minute. Are you telling me Mr. DeJohn went
22  to the women at Compass Bank, these tellers, and got
23  them to lie, that the money was stinky?
24      MS. JAMES: Judge, I didn't say the money
25  wasn't stinky.

Page 146

1   THE COURT: Well where does the stinky money
2 coming from? That was the question I asked.
3   MS. JAMES: Well, Judge, quite frankly I
4 don't think that that -- I mean it's not in evidence
5 and I don't think I should speculate on where the
6 money came from. But we didn't contradict the fact
7 that the money was stinky. We never put on evidence
8 to contradict that.
9   But my point is, and what I'm saying about
10 Agent DeJohn or Agent Whittle or whomever, it would
11 stand to reason that they would have questioned people
12 that they thought might have some connection with Mr.
13 Carmichael.
14   THE COURT: Well where do you think the
15 stinky money came from? You know, one of the ways you
16 prove a drug charge is to show money that comes from
17 sources that are unexplained. You know, that's one of
18 the -- I'm sure it may not be enough, but one thing
19 you may want to show if you have these unexplained
20 sources of money. So where does the stinky money
21 come from?
22   MS. JAMES: Judge, you have to also consider
23 the testimony of Mr. Maddox who I say was a credible
24 witness in that he was a former prosecutor and former
25 assistant attorney general and a now-circuit court

Page 147

1 judge, Johnny Hardwick, who both, they weren't some
2 fly-by-night people that Mr. Carmichael sought out.
3 These were both reputable attorneys at the time Mr.
4 Carmichael hired them.
5   Mr. Carmichael didn't try to go get somebody
6 that was, you know, just would give him what answers
7 he wanted, he went and sought competent legal advice,
8 not from one lawyer but from two. Mr. Carmichael was
9 told by both of them don't put your money in the bank.
10   THE COURT: Instead, put your money in
11 someone who works for you, their account, under their
12 name, under the mysterious circumstances of never
13 putting more than ten thousand dollars in because you
14 don't want the federal government to be on notice that
15 you have all of this cash.
16   MS. JAMES: Judge, they didn't tell him
17 that.
18   THE COURT: I'm not saying they did. That's
19 my point.
20   MS. JAMES: There is no evidence that they
21 told him that.
22   THE COURT: That's my point. They didn't
23 tell him that. They told him to keep cash. What he
24 did, though, was to go and put it in the account under
25 Miss Pettus's name. And also, as the bank teller

Page 148

1 said, a private account. Why would you put all that
2 money into a private account that's related to your
3 business, in an employee's account and mysteriously
4 keep it just under ten thousand dollars so the feds
5 never get notice of it?
6   MS. JAMES: Judge, I would submit that that
7 in and of itself is a fact that they weren't trying to
8 hide it. And furthermore, every check that I saw
9 presented up here had "For Leon Carmichael." "For
10 Leon Carmichael."
11   Let me say this, Judge. There is no crime,
12 and I know we're getting far afield here, but there is
13 no crime if Mr. Carmichael wanted to take that money
14 and bury it, if he wanted to take it and put it in his
15 attic, or if he wanted to put it in a fishing boat
16 under his lures, that was his business if he wanted to
17 do it.
18   I don't recall any evidence to suggest that
19 Mr. Carmichael told Miss Pettus take this money, go to
20 the bank and deposit in nine thousand dollar amounts.
21 Sherry Pettus said it was the bank teller that
22 suggested to her if you put in ten thousand you're
23 going to have a lot of paperwork to do. Now whether
24 that's true or not, I'm not making a judgment call on
25 that.

Page 149

1   THE COURT: But didn't Mr. Hardwick or Mr.
2 Maddox talk about structuring? Which I've tried cases
3 involving that, too. Don't you think there is some
4 pretty clear evidence here of structuring? I don't
5 think a bank teller would tell someone to structure.
6   MS. JAMES: Well I'm not saying that. I'm
7 just saying what the evidence was.
8   But let me back up one minute. You sayd why
9 would all these people come in and lie. If you assume
10 that as the investigation continued and they had the
11 seizure of the marijuana at Mr. Williams' house, that
12 that even heightened the interest in Mr. Carmichael
13 because if you will recall he was arrested on a
14 firearms violation that was proven unfounded and then
15 the government went to the grand jury the next couple
16 of days. And I would submit that much of the
17 government's investigation, putting aside all the old
18 stale stuff that wasn't enough in the 1990s, they
19 began to question people about Leon Carmichael.
20   If you'll recall, Mr. Thomas said it was all
21 over the prison about the Leon Carmichael case. And I
22 submit this Court knows from having heard cooperating
23 defendants over twenty years testify, those guys in
24 prison know exactly what it takes to get out pursuant
25 to a Rule 35.

Page 150

1  THE COURT: Why would they target Mr.
2  Carmichael?
3  MS. JAMES: Because he was the person of
4  interest, Judge. What do you know on Leon Carmichael?
5  Oh gee, I know him. And you take someone like Eric
6  Peagler, they do a statement on him in 2004, a
7  proffer, all the criminal conduct that he's supposedly
8  involved in, and he never once mentions Leon
9  Carmichael and he comes in out of the blue now and
10  says he borrowed fifty pounds from Leon Carmichael.
11  THE COURT: This is just one other little
12  thing and then we'll get back perhaps to some more
13  specifics that I really want to know. How do you
14  explain, Miss James, all of this money that Mr.
15  Carmichael put on his income tax returns that were not
16  reflected on the statements that he filed with the
17  City of Montgomery?
18  MS. JAMES: Judge, I think, and I know you
19  try to carefully listen, but in regard to that
20  question I think you just didn't hear the cross
21  examination.
22  THE COURT: Okay. Why don't you tell me.
23  MS. JAMES: The government was obviously
24  trying to establish that Mr. Carmichael had reported,
25  and I'm assuming this is their theory, that Mr.

Page 151

1  Carmichael had overstated income on his income tax
2  returns with regard to various businesses so that he
3  can hide cash.
4  THE COURT: So he could come to court today
5  and try to put that money under a business umbrella
6  rather than -- and make it look legitimate. So that's
7  why he's filed a tax return just twenty-four days or
8  whatever it is, twenty-five days before the case
9  starts.
10  MS. JAMES: I don't agree with that, but let
11  me just say --
12  THE COURT: Well whether you agree with it
13  or not, I think that's a theory and that's their
14  argument.
15  MS. JAMES: Whether I agree or not, let's
16  just say it's their theory. If you compare the
17  numbers, as they did today, you show what the City
18  has, or the A. B. C. Board has, and it's inconsistent
19  and grossly understates what's on the income tax
20  return.
21  THE COURT: Yes.
22  MS. JAMES: But what was important here and
23  was the most critical thing was the hall license. If
24  you heard that, in each of the business licenses that
25  were discussed here, there is not only the license to

Page 152

1  sell liquor and do this and do that, restaurant and
2  beverage, but there is also a hall license where you
3  can rent or lease. Both Miss Wise from the City
4  acknowledged that if Mr. Carmichael, if you have been
5  to the Carmichael Center you know --
6  THE COURT: Never been there.
7  MS. JAMES: It's a place people rent. The
8  Bar exam was held there. The Phantom Host ball was
9  held there, all kinds of things. If he leases that
10  place to Little Ricky, or someone like that, he gets
11  money that is reportable on his income tax.
12  THE COURT: What was that, Club Gs?
13  MS. JAMES: Club Gs. Okay. Well let me
14  take them one at a time. The Carmichael Center --
15  THE COURT: The Carmichael Center I'm not so
16  worried about. What about Club Gs?
17  MS. JAMES: Club Unique, for instance --
18  THE COURT: The Club Gs matter arose even
19  before the Carmichael Center was in operation, if I
20  remember correctly.
21  MS. JAMES: But she said if Mr. Carmichael
22  or someone else is -- she said that Mr. Gaskin is the
23  person responsible for the sales tax. If Mr.
24  Carmichael, there is evidence that he is involved with
25  entertainment and promotions, if he leases one of his

Page 153

1  buildings to someone, the people that are selling the
2  goods and those kinds of things are responsible for
3  the sales tax. And so we're comparing apples and
4  oranges here. He is reporting on his income tax
5  return the money that he earned.
6  It's unfair to say that the sales tax has to
7  match up with that when we have an explanation for the
8  hall rentals and things on which he was not to pay
9  sales tax.
10  THE COURT: Let's cut to the quick. I think
11  there is enough information about Valerie Carmichael,
12  and I think there is clearly enough information about
13  Miss Jones. What I am concerned about is Santiago
14  Hernandez.
15  MS. CHARTOFF: Yes, Your Honor, and I wanted
16  to withdraw what I put in my brief about that.
17  THE COURT: What did you say? I'm trying to
18  remember.
19  MS. CHARTOFF: I think I said that it wasn't
20  offered for the truth of the matter asserted. It was
21  just a tired moment.
22  (Laughter.)
23  THE COURT: If I could rely on tired moments
24  during the trial, we would have hours of tired
25  moments.

Page 154

1    MS. CHARTOFF: We would like to challenge
2 the admissibility of that statement.
3    THE COURT: Okay. Well let me hear from the
4 government with regard to Santiago Hernandez.
5    MS. MORRIS: Your Honor, Santiago Hernandez
6 told what we -- well, what I think was proven, told
7 law enforcement that he did not know Miss Jones.
8    THE COURT: Right.
9    MS. MORRIS: He then handed law enforcement
10 a business card. On that business card was a phone
11 number.
12    THE COURT: What is it exactly that you're
13 trying to introduce that falls under a coconspirator
14 statement by Hernandez?
15    MS. MORRIS: Well I think the fact that Mr.
16 Hernandez' phone number was in Ms. Pettus's --
17    THE COURT: I've already ruled on the phone
18 number part. I thought I had. Well maybe that was in
19 the address book I'm talking about, that it's not
20 hearsay.
21    MS. MORRIS: That I do believe you did rule
22 on. I don't recall any ruling on the phone number and
23 the pager.
24    THE COURT: The phone number and what pager?
25    MS. MORRIS: And the pager.

Page 155

1    THE COURT: Well I didn't say that it comes
2 in for the same reason. An address book phone number
3 comes in for the same reason a pager number comes in
4 and I cited a number of cases. What are you trying to
5 introduce by Santiago Hernandez, other than the pager
6 number?
7    MS. MORRIS: Your Honor, I think an
8 inference can be made that by his saying that he
9 doesn't know Miss Jones --
10    THE COURT: Who did he say that to?
11    MS. MORRIS: To Detective Chavez.
12    THE COURT: He just said I don't know
13 Miss Jones?
14    MS. MORRIS: He said do you all know each
15 other? He said no and he walks off and that's it.
16 That is the only statement that we're trying to
17 introduce, that we have tried to introduce.
18    THE COURT: That you just said I don't know
19 her.
20    MS. MORRIS: Right. Because the inference
21 can be drawn from --
22    THE COURT: For what purpose are you trying
23 to introduce that statement?
24    MS. MORRIS: Well it would be not actually
25 for the truth of the matter asserted, just to show

Page 156

1 that actually he was lying for the opposite.
2    THE COURT: Okay. Now I'll hear from you,
3 Miss Chartoff. Can this statement come in to show
4 that he was lying?
5    MS. CHARTOFF: Well, Your Honor, we would
6 submit that the entire episode is not relevant because
7 it's not been linked to Mr. Carmichael in any way.
8 There is no evidence that --
9    THE COURT: He was with Miss Jones.
10    MS. CHARTOFF: No, he was not.
11    THE COURT: Who was he with?
12    MS. MORRIS: Yes, Your Honor. They were
13 walking through the airport together.
14    MS. CHARTOFF: I thought you meant Mr.
15 Carmichael.
16    THE COURT: No, no, Mr. Hernandez.
17    Okay. I think this statement comes in for
18 several reasons. One of which I'm not even sure it's
19 hearsay to begin with, but anyway, I think the
20 statement comes in.
21    The Court finds by a preponderance of the
22 evidence, indeed beyond a reasonable doubt --
23    MR. TEAGUE: Excuse me, Your Honor.
24    THE COURT: Yes, do you have anything to
25 add, Mr. Teague?

Page 157

1    MR. TEAGUE: No, but on behalf of Freddie
2 Williams, I make the same argument and adopt their
3 argument rather than repeat all of it.
4    THE COURT: Certainly.
5    The Court finds by a preponderance of the
6 evidence, and indeed beyond a reasonable doubt, that a
7 conspiracy to distribute marijuana existed. That both
8 defendants were members of the conspiracy. The both
9 defendants knew their actions were illegal, and that
10 they willfully joined the conspiracy. The Court is of
11 the opinion that the persons who gave statements that
12 would otherwise be inadmissible except for there being
13 coconspirator statements were all members of the
14 conspiracy. For example, I think I've already
15 repeated them, Jones, Valerie Carmichael, Keena
16 Whizinant and the Court had already stated George
17 Denton and the defendants.
18    I think there is even a colorable claim that
19 Hernandez was a member of the conspiracy, but I'm not
20 sure that finding is necessary but I'll go ahead and
21 make that finding.
22    Let's move on to the money laundering
23 account. What evidence do I have of a money
24 laundering conspiracy and who are the members?
25    MS. MORRIS: The members of the money

1 laundering conspiracy -- Well let me start off by
2 saying I think because in order to prove money
3 laundering, the United States has to prove a specified
4 unlawful activity. You almost have to look at the
5 money laundering as a subset of the drug conspiracy.
6 If there's a big umbrella and --
7     THE COURT: Who are the members?
8     MS. MORRIS: The members would be first of
9 all Mr. Carmichael and Miss Pettus.
10     THE COURT: Did Miss Pettus ever say that
11 she knew that that account was for drugs?
12     MS. MORRIS: Yes, she did, Your Honor.
13     THE COURT: When did she say that? Who said
14 she said that?
15     MS. MORRIS: Under questioning -- She said
16 it in front of the grand jury, first of all. And then
17 under questioning of Mr. Moorer she admitted that she
18 knew it --
19     THE COURT: Where is it in the grand jury
20 testimony, can you find that, Mr. Moorer?
21     MR. MOORER: I'm flipping to it now, Your
22 Honor. Your Honor, it's on page eight of the grand
23 jury testimony. Would you like for me to read it to
24 you?
25     THE COURT: Yes.

1     MR. MOORER: The question is asked by
2 Miss Morris to Miss Pettus: "All right. Did you ever
3 think that this might be drug money?"
4     "Yes, ma'am."
5     "Why did you think that?"
6     "Due to the denominations of the money. I
7 knew something about drugs and because I knew where
8 that money had come from." And then she says -- she
9 asks her some questions about the denominations of the
10 money.
11     She asks her a series of questions, Ms.
12 Morris asks Ms. Pettus a series of questions about the
13 denominations of the money where Miss Pettus sayd she
14 knew about drug dealing and that was consistent with
15 it.
16     And then she says, the question was, "So the
17 facts that he was giving you smaller denominations
18 made you think this might be drug money?"
19     Answer: "One of the factors, yes, ma'am."
20     "What were some of the other factors?"
21     "Well, the money that I knew that I was
22 depositing, I knew where the money -- where he told me
23 the money --" and the "he" she was referring to there
24 was Mr. Carmichael --
25     THE COURT: Okay, I've heard enough. Okay.

1 What's your response, Mr. Brunson?
2     MR. BRUNSON: Your Honor, the Court must
3 consider the timing of this conspiracy in
4 understanding Miss Pettus's attitude toward where the
5 money came from, number one.
6     This is a narrowly charged conspiracy
7 regarding the deposits to the Compass Bank account.
8 The critical things for the judge to consider are that
9 the government must prove that the money was from drug
10 dealing. That's number one. Even before they prove
11 that Pettus knew it was from drug dealing, they have
12 to prove it came from drug dealing.
13     Now Pettus testified that she took various
14 types of money to the bank. Not just stinky money,
15 she only got stinky money one time. And she took
16 money on other occasions to the bank. And she made
17 the deposits. At the time of the conspiracy, Judge,
18 she -- First of all there --
19     THE COURT: How do you explain her grand
20 jury testimony away?
21     MR. BRUNSON: Well number one, it is six
22 months after the conspiracy ended.
23     THE COURT: That doesn't mean that it can't
24 be reflective of what was occurring during the alleged
25 conspiracy.

1     MR. BRUNSON: And I'm certain the Court
2 should consider her grand jury testimony, Judge. I'm
3 just telling the Court that she had been educated in a
4 lot of ways since that conspiracy ended, including all
5 the things that happened the day after the arrest.
6 And that's what's so critical in her mind.
7     Number one, she asked "Freddie who" when
8 somebody told her that this drug bust has happened.
9 She also gets information from Keena, who is calling
10 on the phone going "Oh, it's his stuff." And somebody
11 got shot. And of course the Court knows there is no
12 information about anybody getting shot.
13     And then the third thing is, if this
14 conversation happened, she said something about she
15 had been inquired of Valerie what was going on here.
16 And then you throw that in context with Mr. Gunn's
17 question. She had to do a lot of investigating
18 between the end of the conspiracy and the time she
19 testified at the grand jury. And understand, Judge,
20 she's meeting with the prosecutor and the agent
21 regarding what drug money looks like.
22     Now the Court said earlier that that stinky
23 money is very suspect. Where did the stinky money
24 come from.
25     THE COURT: Where did it come from?

Multi-Page™

Page 162

1    MR. BRUNSON: The only proof of anything
2  where it came from, Your Honor, was that it was dug
3  up. Now you've got to take that a step further.
4  Where did it come from before it was buried? There is
5  no proof about that. And I recognize the Court can
6  take inferences that in most cases drug dealers don't
7  have other sources of income. Mr. Carmichael has got
8  a dozen cash sources of income. It could have come
9  form anywhere else. And the Court has to consider
10 that the lack of proof in view of the fact that he's
11 got other sources should weigh in your decision on
12 this count.
13    THE COURT: Okay. The Court finds not only
14 by a preponderance of the evidence but beyond a
15 reasonable doubt that a conspiracy to money laundering
16 existed. That Mr. Carmichael and Miss Pettus were
17 members of the conspiracy. The evidence shows that
18 the defendants knew their actions, that is Mr.
19 Carmichael and Miss Pettus knew their actions were
20 illegal, and yet they both willfully joined the plan.
21 So I think there is enough to go to the jury on both
22 counts of the indictment.
23    Now --
24    MS. JAMES: Judge, we still have our
25 cumulative argument.

Page 163

1    THE COURT: Right. Let's do those now.
2    MS. JAMES: Judge, at some point during the
3  trial Miss Chartoff requested that she be allowed to
4  make an argument that the case should be dismissed or
5  mistried as a result of the cumulative effect of the
6  prejudice.
7    THE COURT: Right.
8    MS. JAMES: And to just kind of highlight or
9  direct the Court's attention to those matters, the
10 issue of pretrial publicity, which we've well
11 documented pretrial as well as during the voir dire,
12 the pretrial publicity connected with what some of the
13 jurors had heard we think prejudiced our ability to
14 get a fair jury.
15    Then shortly thereafter we had what we
16 contend was juror misconduct. And without going into
17 the exact facts and details, I would ask --
18    THE COURT: That's on the record already.
19    MS. JAMES: Right. And I would ask that
20 that in-chambers record be made part of my argument
21 here, and that the Court consider that as well.
22    THE COURT: Right.
23    MS. JAMES: We also believe that the partial
24 sequestration of the jury, combined with all the other
25 matters that I'm about to address, has prevented us

Page 164

1  from obtaining a fair trial and a fair and impartial
2  jury, in part because the jury was treated differently
3  than they're treated in most cases. And I submit that
4  what happened with regard to our alleged juror
5  misconduct highlights the fact that they knew they
6  were being treated differently. And without going
7  into those matters I think you know that.
8    In addition, we brought to the Court's
9  attention that during the first day or two of the
10 trial there were armed and uniformed police officers.
11 There were some on motorcycles on the sidewalks.
12 People not involved in this trial questioned had there
13 been a bomb scare down here or what, and the jurors
14 were coming and going in those early days.
15    THE COURT: I'm not aware of the question
16 about a bomb scare.
17    MS. JAMES: Well I'm just telling you --
18 That's not in the record, but I'm just telling you
19 that people, not the jury, but people in the community
20 were concerned because they saw the cars. They said
21 "What's going on down there?"
22    Also, throughout the case there have been
23 spontaneous statements by various witnesses that
24 address acts of violence that we believe have been
25 imputed to Mr. Carmichael. For instance, Mr. Denton

Page 165

1  voluntarily said, just simply in response to my
2  question, "Did you play with the Carmichael children?"
3  And his response in substance was, "Well yeah, until
4  his son got convicted of murder."
5    Although we made a motion for mistrial and
6  asked for a curative instruction, we did not get the
7  instruction actually to the Court in a time that we
8  thought would be appropriate and we ultimately
9  withdrew that. But our position would be that even if
10 we had submitted a curative instruction, it would have
11 been inadequate.
12    THE COURT: You actually got the instruction
13 to me pretty quickly.
14    MS. JAMES: But, Judge, we were getting hit
15 with so many things, we didn't want to follow a threat
16 with another threat or curing a threat.
17    THE COURT: Right.
18    MS. JAMES: That again, Mr. Denton's friend
19 Ike, we made a mistrial, I believe, motion with regard
20 to that where he said his buddy got killed about all
21 of this. Which clearly gave the impression that it
22 had something to do with Mr. Carmichael. And we know,
23 based on your questions I think to Mr. Denton, that it
24 did not. The Court I think on its own gave a curative
25 instruction, but when you add these things together

Page 166

1  the cumulative effect.
2      THE COURT: Right.
3      MS. JAMES: Additionally, during the
4  testimony of Agent Halasz, and I know the Court has
5  its own view of how that happened, but nevertheless it
6  happened, that Mr. Halasz said that the informant quit
7  cooperating because he was fearful of Mr. Carmichael.
8  And our position, of course, was that we were not put
9  on notice that was at issue because it wasn't
10  contained in any of the discovery that we had gotten.
11      Additionally, during Agent Halasz's
12  testimony I think that we moved for a mistrial based
13  on what we deemed his comment on the defendant's
14  failure to testify. You may recall that, Judge, where
15  there was a question about hardened criminals and he
16  was asked if Mr. Gary Wayne George with fifteen felony
17  convictions was a hardened criminal. And I'm saying
18  the substance because I don't have the testimony, but
19  in substance I think Agent Halasz responded no,
20  hardened criminals don't cooperate and work with us,
21  or something to that effect. Which gave and very
22  possibly left the jury with the appearance of well, if
23  Mr. Carmichael is on trial, he's not cooperating he
24  must be a hardened criminal.
25      And then, Judge, the Sandra Jones matter,

Page 167

1  which has been the subject of numerous motions,
2  numerous briefs.
3      THE COURT: You mean the matter that I gave
4  the curative instruction on? Or are we talking about
5  something else?
6      MS. JAMES: On Sandra Jones? You gave them
7  a curative instruction that they should disregard
8  certain portions of her testimony. But quite frankly,
9  we think that there is no way to unring that bell.
10      THE COURT: Right. Well Miss Wayne already
11  made that argument. But you can just refer to it and
12  adopt her argument. We don't need to go through it
13  again.
14      MS. JAMES: Right. And that's really the
15  last part. And I think when you add all of those
16  things together, I think there is clearly a violation
17  of Mr. Carmichael's Sixth Amendment right to a fair
18  trial, and also to have a fair and impartial jury.
19      THE COURT: That motion is denied.
20      Now I'll hear you on the motions for
21  judgment of acquittal, to the extent that I haven't
22  heard it already.
23      MS. JAMES: Well, Judge, all I would do with
24  the Court's permission at this time would move for
25  judgment of acquittal on behalf of Mr. Carmichael as

Page 168

1  to count one of the indictment.
2      THE COURT: What about count two?
3      MS. JAMES: He's going to do it, because he
4  has a little bit of a different argument.
5      MR. BRUNSON: I've already done it.
6      MS. JAMES: Okay. Well, then I'll do it as
7  to both counts. And I would ask that the Court
8  incorporate by reference all of the arguments that
9  you've heard with regard to our cumulative prejudice
10  mistrial argument.
11      THE COURT: Right. Everything in-camera.
12      MS. JAMES: Right. As well as what we
13  argued on our motion with regard to the alleged
14  conspiracy, what Miss Chartoff and I just argued.
15  Because essentially that is the evidence and/or lack
16  of evidence we would rely on.
17      THE COURT: Certainly.
18      MS. JAMES: And that the government has
19  failed to prove prima facie case as to each and every
20  count.
21      THE COURT: I'll hear form Mr. Teague.
22      MR. TEAGUE: As to count one, Your Honor, we
23  likewise --
24      THE COURT: You adopt everything?
25      MR. TEAGUE: We do, and ask the Court to

Page 169

1  grant a judgment of acquittal.
2      THE COURT: Anything I haven't heard, Ms.
3  Morris?
4      MS. MORRIS: Without reciting the evidence
5  that you've heard for two weeks now, Judge, I think
6  that, I mean unless the Court has any questions --
7      THE COURT: I have no questions.
8      The motions for judgment of acquittal are
9  denied.
10      Now I have my charge ready. Subject to I
11  believe Miss Wayne wanted to add something that we
12  were not aware of. And subject to your looking at the
13  charge and seeing if you have any problems with it.
14      Miss Wayne, I need whatever you wish to add,
15  and I need to find out from the parties -- if the
16  charge is okay.
17      One other little part on the charge. I had
18  put the section dealing with the amount of drugs in
19  pounds. Is that what you want, pounds of marijuana?
20      MR. FEAGA: Yes, sir, pounds is fine.
21      THE COURT: Why don't you all take time now
22  and look at the charge and let me know whether there
23  is any changes I need to make, additions I need to
24  make, deletions I need to make.
25      We'll take five minutes and let you do that

**Multi-Page™**

1  so we can get started on the closing arguments.
2      (Whereupon, a recess was taken.)
3          CHARGE CONFERENCE
4      (THE JURY IS NOT PRESENT):
5      THE COURT: Okay. The government -- Pardon
6  me. The defendant has requested a charge. "If you
7  find that Sherry Pettus did not agree or combine with
8  Leon Carmichael to commit the money laundering in
9  count two, you must find Leon Carmichael not guilty of
10 count two." Now I understand the government contends
11 that because the jury could find that Leon Carmichael
12 combined with someone other than Pettus, this charge
13 is inaccurate. Who would be the someone other than
14 Pettus?
15     MR. FEAGA: Your Honor, the evidence fairly
16 infers that Mrs. Pettus, Val, was involved in the
17 conspiracy and she helped count the money.
18 Miss Pettus's testimony --
19     THE COURT: How does that involve money
20 laundering?
21     MR. FEAGA: Well, Miss Pettus says they took
22 the money over to the house to count it as a part and
23 parcel of putting it in the bank. We think the
24 evidence fairly infers that.
25     THE COURT: I'll hear from the defendants.

1      MR. BRUNSON: Your Honor, again, there is no
2  proof that she or either one of them knew that it was
3  drug proceeds.
4      THE COURT: Right. I think the money
5  laundering count only goes to Pettus and Carmichael.
6  You should have brought in a substantive count on the
7  money laundering account and you didn't.
8      MR. FEAGA: Yes, sir.
9      THE COURT: I will give this charge.
10 Anything else from the defendants?
11     MS. WAYNE: I do, Judge. We've had an
12 opportunity to go over the Court's instructions.
13     THE COURT: Why don't you tell me what page.
14     MS. WAYNE: Page three, Judge, paragraph one
15 of the Court's charge. I'm not sure, I've just never
16 heard this in any language, "and this presumption of
17 innocence remains with the defendant during the trial
18 until overthrown by evidence which --" I've never
19 heard the "overthrown".
20     THE COURT: Well, to be honest with you I'm
21 not wedded to anything particular. This actual phrase
22 is not part of our pattern jury instruction. A lot of
23 defense lawyers want it about staying with the
24 defendant and all that. I'm willing to strike it. I
25 think Miss James is probably one of those who might

1  request it periodically, but I give it because defense
2  lawyers want it and I'm willing to strike that phrase.
3      MS. JAMES: Judge, I don't have a problem
4  with -- if she doesn't -- with --
5      THE COURT: You can say overcome, if you'd
6  like.
7      MS. JAMES: The "overthrown" is a little
8  strong.
9      THE COURT: Well, you all need to make up
10 your minds. I'm willing to take the sentence out.
11 It's all up to you.
12     MS. WAYNE: Judge, we'll leave it in. I
13 just didn't know if it was a typo because I had never
14 seen it. So that's fine.
15     THE COURT: It's just something defense
16 lawyers gave me, and if they don't like it I'm ready
17 to let it go.
18 Anything else?
19     MS. WAYNE: Yes, Judge. In terms of page
20 five in assessing the credibility of a witness, the
21 last paragraph. I'm just asking that the Court add to
22 that that also in terms of assessing the credibility
23 of that, that the jurors consider the demeanor and
24 manner in which the witness testified.
25     THE COURT: Where would you put that in?

1      MS. WAYNE: It can go after -- it could be
2  the last sentence, "Did the witness's testimony differ
3  from other testimony or other evidence?" Just another
4  factor.
5      THE COURT: What line would you like to add?
6  Why don't we say -- Let's do it with the first
7  sentence. "In deciding whether you believe or do not
8  believe any witness, I suggest that you consider the
9  demeanor" and what?
10     MS. WAYNE: "-- and the manner in which the
11 witness testified."
12     THE COURT: "-- the demeanor and manner in
13 which the witness testified and you ask yourself
14 certain questions."
15     MS. WAYNE: Sure.
16     MR. FEAGA: No problem with that, Your
17 Honor.
18     THE COURT: Great. What's next?
19     MS. WAYNE: I'd also add to this, one of my
20 other suggestions, Judge, is that in terms --
21     THE COURT: What page?
22     MS. WAYNE: Same thing, credibility of the
23 witness. "Consider which side has called the
24 witness."
25     THE COURT: That's fine with me.

Page 174

1   MR. FEAGA: Where are you?
2   MS. WAYNE: I'm just adding.
3   THE COURT: So you just want to say which
4   side called the witness?
5   MS. WAYNE: Yes.
6   THE COURT: Okay, add "which side called the
7   witness." Just anywhere along those questions, just
8   put "which side called the witness." That's fine, so
9   you can show whether you called them or the government
10  called them. I'm sure the jury knows that, but that's
11  fine.
12      Go ahead, what's next?
13  MS. WAYNE: Page seven, Judge, in terms of
14  "the defendant has a right not to testify," the
15  defendant would request that "a defendant has a
16  constitutional right not to testify." And then the
17  other language is surplus because he didn't testify
18  and I don't want to go into if the defendant does
19  testify.
20  THE COURT: You know, you're right. We had
21  this in here because we thought one might testify and
22  the other might not. Don't I say that earlier about
23  the defendant has a right not to testify? This is
24  usually added when a defendant testifies. I should
25  drop that whole paragraph.

Page 175

1       I think early on I talk about -- here it is.
2   Page two, it says, "Indeed, every defendant is
3   presumed by the law to be innocent. The law does not
4   require a defendant to testify," et cetera, et cetera,
5   "and if a defendant elects not to testify you should
6   not consider that in any way." This sentence should
7   be out completely. I think I thought one of the
8   defendants would testify and one was not, but since
9   they both didn't, that's unnecessary. That's on the
10  bottom of page seven.
11      What's next?
12  MR. FEAGA: Your Honor, when the Court is
13  ready we have something.
14  THE COURT: Okay.
15  MS. JAMES: Judge, we have one more. I
16  didn't note anywhere in here that the Court referenced
17  that you cannot convict on speculation and conjecture,
18  and I think that's one when we ask the Court will
19  usually give.
20  THE COURT: Yes, but you need to give it to
21  me.
22  MS. JAMES: Okay, I'll do that right now.
23  MR. TEAGUE: Your Honor, that was one of my
24  requested charges.
25  THE COURT: Show me where it is and my law

Page 176

1   clerk where it is.
2   MR. TEAGUE: I put it back in probably
3   nearly a year ago.
4   MS. JAMES: I'll write something out.
5   THE COURT: There is a boilerplate one on
6   that and I would rather go with the boilerplate. I'll
7   see if we can find it.
8       You gave it to us, Mr. Teague?
9   MR. TEAGUE: I gave it to you.
10  THE COURT: I'll look at your charge.
11      Now, what do you have?
12  MR. FEAGA: Your Honor, in regards to the
13  instructions on the elements of the offense money
14  laundering on page thirteen, Your Honor we think that
15  the first element should be changed to add the
16  following language and I'll read it. "That the
17  defendant knowingly conducted or attempted to conduct
18  a financial transaction affecting interstate commerce
19  as hereinafter defined."
20  THE COURT: Oh, I left out "interstate
21  commerce".
22  MR. FEAGA: Yes, sir. You referred to it
23  over in the definitions, but you don't have it in the
24  elements.
25  THE COURT: You're absolutely right, it has

Page 177

1   to be an element.
2   MR. FEAGA: And, Your Honor, we're going to
3   ask the Court based on precedent and past experience
4   with this very subject in this courthouse, to instruct
5   the jury that "laundering drug money always affects
6   interstate commerce." We cite the Court to the cases
7   of United States versus Gallow, 927 F.2d 815. United
8   States versus Westbrook, 119 F.3d 1176. Those are
9   both Fifth Circuit cases, a 1991 and 1997. And, Your
10  Honor --
11  THE COURT: Well let me put it this way.
12  You don't have any evidence of affecting interstate
13  commerce, do you?
14  MR. FEAGA: Other than the fact that we've
15  been relying on the fact that the law is --
16  THE COURT: All I'm saying is you don't have
17  any evidence. So it's purely a legal argument you're
18  making to me now.
19  MR. FEAGA: Well we do have some evidence
20  that shows that the drugs that were part of this
21  conspiracy were brought in from out of state.
22  THE COURT: Okay. This is something we can
23  take up later.
24  MR. FEAGA: All right, sir.
25  THE COURT: Oh, you wanted it in the charge,

Multi-Page™

Page 178

1 though.
2      MR. FEAGA: Yes, sir. I want it over where
3 you say, when you're defining you say, that "the term
4 'financial transaction,'" and I'm reading from page
5 fourteen, the third full paragraph, "the term
6 'financial transaction' means a transaction involving
7 the use of a financial institution which is engaged in
8 or the activities of which affect interstate or
9 foreign commerce in any way or degree." Okay?
10      And then I want you to add the words
11 "Laundering drug proceeds always affects interstate
12 commerce."
13      THE COURT: I have not read your cases. I
14 really don't know whether that's the law.
15      MS. JAMES: Well we would certainly object
16 to that. First, it invades the province of the jury.
17 It gives special attention --
18      THE COURT: Well let me read the cases.
19 Just say you object.
20      MS. JAMES: All right. I object.
21      THE COURT: And I want to look at the law on
22 it.
23      Are you going to be making this argument?
24      MR. FEAGA: Yes, sir. I'm making it now.
25      THE COURT: No, are you going to be making

Page 179

1 it to the jury?
2      MR. FEAGA: Very briefly, Your Honor, just
3 to say, "The Court will be instructing you that if you
4 find that the proceeds that were laundered through the
5 bank were proceeds of drug activity, then he'll be
6 instructing you that that is an effect on interstate
7 commerce by law." That would be the words I would
8 intend to use. Your Honor, I believe --
9      THE COURT: I'm going to say you can't make
10 that argument yet until I can read these cases.
11      MR. FEAGA: Yes, sir.
12      THE COURT: We'll get to that later, even if
13 you have to come back and make the argument, but I
14 need to read these cases first.
15      MR. FEAGA: Yes, sir.
16      MR. TEAGUE: Your Honor?
17      THE COURT: Yes.
18      MR. TEAGUE: I filed my jury charges with
19 the Court --
20      THE COURT: Do you have it there?
21      MR. TEAGUE: Oh, yeah.
22      THE COURT: Let me have it.
23      MR. TEAGUE: I put it in since October of
24 2004.
25      THE COURT: That's fine. Thank you,

Page 180

1 Mr. Teague.
2      MR. TEAGUE: And I also wanted to ask the
3 Court to give this charge. This is my number five.
4 "You may also consider --"
5      THE COURT: Just give me your speculation
6 charge.
7      (Whereupon, the Court examined said
8 document.)
9      MR. TEAGUE: The one without the fact that
10 "if someone is a law enforcement officer should not
11 give extra credence --". So numbers one and three is
12 what we're requesting, Your Honor.
13      THE COURT: Okay. "You should not give
14 extra credence to a person's testimony because that
15 person is a law enforcement officer. You must
16 consider him or her as any other witness."
17      Any problems with that?
18      MR. FEAGA: Your Honor, I'd have to confess
19 I missed the --
20      THE COURT: In other words, you have to
21 treat law enforcement witnesses just like anybody
22 else. Any other witness.
23      MR. FEAGA: We don't have a problem with
24 that.
25      THE COURT: Good. I'll give that charge.

Page 181

1      Let me see, what is it, one?
2      MR. TEAGUE: "Speculation and conjecture."
3      THE COURT: Which number was your
4 speculation charge?
5      MR. TEAGUE: Number one. It would be the
6 second page in, I think.
7      THE COURT: Oh. Okay. I'll give that.
8 Okay.
9      MR. BRUNSON: Your Honor, page thirteen
10 relating to the money laundering conspiracy --
11      THE COURT: Yes?
12      MR. BRUNSON: -- element number four, the
13 Court has listed in the alternative two different
14 objects of that conspiracy that's "promote, carry on
15 or disguise." The indictment only charges one of
16 those prongs. And we object to the first prong, that
17 is the first portion of the fourth.
18      THE COURT: So you object to the first part
19 of the fourth, not the second.
20      MR. BRUNSON: Yes, sir.
21      THE COURT: It is in the alternative.
22      What does the government say?
23      MR. FEAGA: Your Honor, I apologize, I
24 missed the argument again and I apologize.
25      THE COURT: Look at that. Look on page

Multi-Page™

Page 182

1 thirteen.
2        MR. FEAGA: Yes, sir.
3        THE COURT: Fourth element of the money
4 laundering count.
5        MR. FEAGA: Yes, sir.
6        THE COURT: They said you did not charge the
7 first part is numbered the fourth, but rather the
8 second. So it should be that the only thing I should
9 charge is the second one.
10        MR. FEAGA: I agree with that.
11        THE COURT: Okay.
12        MR. BRUNSON: Your Honor, a couple of other
13 comments.
14        THE COURT: Yes?
15        MR. BRUNSON: Page nine and page twelve
16 where the Court outlines what the indictment charges.
17 There is an "a/k/a" in there regarding Beaver Leon
18 Cunningham. There's been no reference or evidence in
19 this case about an a/k/a.
20        THE COURT: Does the indictment go back with
21 the jury?
22        MR. FEAGA: Your Honor, we would like for a
23 copy to go back with them, and we don't have a problem
24 redacting that.
25        THE COURT: It does sound a little spurious

Page 183

1 like he's done something bad, and I don't usually use
2 a/k/a's. I'll just put -- I'll just drop it and we
3 will redact the indictment. You make sure it's
4 redacted not to call Mr. Carmichael Beaver Leon.
5        MR. BRUNSON: Thank you.
6        THE COURT: And that would include also the
7 laundering account. Take out "Beaver Leon."
8        MR. TEAGUE: Judge Thompson, with regard to
9 the indictment going back, in this case I wanted the
10 jury to have the indictment so they could actually
11 read count one.
12        THE COURT: Yes, the indictment goes back.
13        MR. TEAGUE: It's my understanding you have
14 set forth count one and count two in whole in the
15 charge. It's my understanding you're going to pass
16 that out and give it to the jury.
17        THE COURT: Yes.
18        MR. TEAGUE: In that case I would prefer the
19 indictment itself not go back because it's got all
20 that forfeiture --
21        THE COURT: No, the forfeiture doesn't go
22 back.
23        MR. TEAGUE: What I'm saying is he or she
24 substantially has the indictment before them.
25        THE COURT: I just always send the

Page 184

1 indictment back with the jury with the redacted
2 a/k/as.
3        MR. TEAGUE: That will be all right.
4        Your Honor, there was also in this, the
5 August 17th indictment is the one we're in trial on.
6        THE COURT: Superseding indictment. The
7 only one we're talking about with all that information
8 redacted that you asked to be deleted.
9        MR. TEAGUE: There were some additional
10 factors, is what I'm trying to say.
11        THE COURT: We'll delete it. Motion was
12 granted deleted that. Only the two counts go.
13        Anything else, counsel?
14        MR. FEAGA: Yes, sir, Your Honor. Although
15 we wanted the instruction we asked for in regards to
16 laundering of drug proceeds, I just checked the bank
17 records, Your Honor, and we do have in the bank
18 records that Compass Bank is a member of the Federal
19 Deposit Insurance Corporation.
20        THE COURT: Very good. But I'm still going
21 to read your law. Before I give that charge, I'm
22 going to read your law.
23        Okay. Closing arguments. Bring in the
24 jury.
25        (Whereupon, the jury was escorted into the

Page 185

1 courtroom.)
2        THE COURT: Members of the jury, I guess you
3 thought we had forgotten you, hmm? I bet you think I
4 count as poorly as lawyers. I told you we were
5 talking about starting at one-thirty and it's now
6 two-thirty. Well, I was once a lawyer. That's why.
7        (Laughter.)
8        THE COURT: It's now two-thirty, and as I
9 said the closing arguments will take about three
10 hours. So what we'll do is we'll take five minutes
11 after the government's opening argument, then we'll go
12 with Mr. Carmichael -- or we'll go with Mr. Williams,
13 then we'll take five minutes, and we'll then Mr.
14 Carmichael. So we'll take three five minute recesses
15 so you won't have to sit here for three hours.
16        Government first. Proceed.
17        CLOSING ARGUMENTS:
18        MR. FEAGA: Good afternoon, ladies and
19 gentlemen.
20        Thank you for your attention in this case.
21 We know it's been a long case. Two weeks, and we
22 appreciate very much your attention.
23        You may recall at the beginning of this
24 trial two weeks ago I made a statement to you about
25 what we expected the evidence to show. I also talked

Page 186

1 to you about what the offenses were and what the
2 elements of those were, and I want to briefly mention
3 those offenses again.
4     We have two counts before you. One of them,
5 the first count, alleges that these defendants, Leon
6 Carmichael and Freddie Williams, conspired with each
7 other and other people known and unknown to the grand
8 jury. And we gave you a lengthy list throughout this
9 trial of all of the persons that engaged in this
10 conspiracy with them that may have been others known
11 and unknown to the grand jury. So we wanted to point
12 that out to you.
13     But we told you that we believe that you
14 would find from the evidence that they had engaged in
15 a conspiracy to possess with the intent to distribute
16 and to distribute a controlled substance. And we
17 would urge you to, and I think the Court is going to
18 instruct you, that in order to find that two people
19 conspired to possess with the intent to distribute or
20 to distribute a controlled substance, that all you
21 need to find is that two or more people, these two and
22 these others, in some way or manner came to a mutual
23 understanding to try to accomplish a common and
24 unlawful plan as charged in the indictment, and the
25 indictment alleges the distribution of that unlawful

Page 187

1 plan being the distribution of controlled substances.
2     Second, that each of these defendants,
3 knowing the unlawful purpose of the plan, that is to
4 distribute drugs, willfully joined in it. Okay?
5     We would submit to you that the evidence
6 establishes that and I'm going to argue to you and
7 remind you as though -- well maybe you don't need
8 reminding, but I'm going to tell you about some of the
9 things we think establish some of those elements in
10 just a minute.
11     The second count alleges a conspiracy to
12 commit had money laundering. And the same thing would
13 apply, that two or more persons entered into this
14 agreement to violate the money laundering statute.
15 Now in this instance, in the second count Mr. Williams
16 is not charged. Okay? Mr. Carmichael is. And we
17 believe that the evidence fairly establishes that the
18 other person that he entered into an agreement to
19 launder the proceeds of drug activity with is Sherry
20 Pettus. Miss Pettus testified. Mr. Moorer read her
21 grand jury testimony to you where she admitted that
22 she knew that the money that she was putting in the
23 bank in her name belonged to Mr. Carmichael, and that
24 it was the proceeds of drug activity from the
25 denominations and that he had told her that.

Page 188

1     So we would urge you to find that there was
2 an agreement between Leon Carmichael and Sherry Pettus
3 to launder the proceeds of drug activity.
4     Now what are the other elements? That's the
5 conspiracy part of it. They agreed to do that. You
6 have to find, and the judge is going to instruct you,
7 that the defendant knowingly conducted or attempted to
8 conduct a financial transaction. And you'll be
9 instructed that a financial transaction includes
10 making a deposit into a bank. Okay? So when the cash
11 was deposited into the bank by her, she was conducting
12 a financial transaction.
13     Second, that the defendant knew that the
14 funds or property involved in the financial
15 transaction represented the proceeds of some form of
16 unlawful activity. So we believe the evidence
17 establishes fairly that both Mr. Carmichael and Miss
18 Pettus knew that this money was the proceeds of drug
19 trafficking, drug distribution.
20     Third, that the funds or property involved
21 in the financial transaction did, in fact, represent
22 the proceeds as specified unlawful activity. In this
23 case the proceeds of the conspiracy to distribute and
24 to possess with the intent to distribute marijuana.
25 So if you find that the conspiracy to distribute

Page 189

1 marijuana existed, then that would be the specified
2 unlawful activity that they are agreeing to engage a
3 financial transaction in.
4     And then this gets us to the fourth element
5 which is that they have to have done it with the idea
6 in mind of concealing the true ownership or source or
7 control of the money. And that would be, the judge
8 will instruct you, that the defendant, Leon
9 Carmichael, having conspired with Miss Pettus engaged
10 in the financial transaction knowing that the
11 transaction was designed in whole in or part to
12 conceal or disguise the nature, location, source,
13 ownership or control of the proceeds.
14     Now those are the charges. You'll remember
15 that one of the things that we talked to you about at
16 the beginning of this case was what we expected the
17 evidence to show. I think I went through a laundry
18 list of the people we would call. We would submit to
19 you that we have done exactly what we told you we
20 would do at the beginning of this trial. And I
21 believe after you heard that opening statement, that
22 you agreed with the government, that if in fact we've
23 proved all of those things that you would be convinced
24 not only beyond a reasonable doubt but to a certainty
25 that these individuals are guilty of the offenses that

Page 190

1 they're charged with.
2      Let's talk about the evidence. Gary George
3 testified, just like we said he would, about the
4 events that began to unravel in regards to these
5 defendants on November the 13th, 2003. When he was
6 arrested, picked up and brought down for questioning
7 and at that time asked if he could speak with a member
8 of the drug enforcement task force. And he was
9 allowed to speak with one. David DeJohn came in, and
10 Mr. George outlined to him his involvement with a
11 fellow named Pat Denton and Leon Carmichael in drug
12 distribution.
13      Now at this time Pat Denton doesn't know
14 anything about what's going on. Gary George tells you
15 what happened. Then he also, within a day or so,
16 calls DeJohn back because he's making an effort to
17 show him that in fact I know what I'm talking about.
18 And he calls him back and he says, "Me and Denton are
19 getting ready to deliver marijuana to Charlotte
20 Hensarling," another member of this conspiracy "to
21 distribute these drugs." And Investigator DeJohn,
22 acting on that information, sets up on the highway,
23 waits for the car to come by.
24      And you heard the testimony from Deputy
25 Brock that he pulled the car over and they found

Page 191

1 Miss Hensarling with drugs. And that Miss Hensarling
2 then told him, "Yup, I'm involved in the distribution
3 of marijuana," and now we've got a second person who
4 realistically has no idea what's happened in terms Mr.
5 George. But she's telling the same story that he is.
6 They're corroborating one another.
7      So then they go and they start figuring out
8 what are we going to do, how are we going to do this.
9 And they go to get a search warrant. Detective DeJohn
10 went to get a search warrant from the federal
11 magistrate judge for Denton's house. Now the
12 information that he had gotten form Gary George was
13 that the delivery was going to happen sometime the
14 evening -- Sunday evening, Sunday late at night. And
15 so they made a plan to go in and raid Denton's house
16 after midnight, around two-thirty in the morning
17 hoping, obviously, to find the drugs there. But they
18 didn't find them there.
19      What they did find was found Pat Denton who
20 had been arrested two years earlier -- and that's
21 going to become important in something I'm going to
22 talk to you about later -- in June of 2002. Mr.
23 Denton agreed to cooperate with them, and while
24 they're standing there the phone rings.
25      Now mind you all three of these people have

Page 192

1 now separately and apart from one another identified
2 Leon Carmichael as being involved in the distribution
3 of marijuana on a massive scale. Denton has now
4 implicated somebody named Freddie, and we now know
5 that Freddie is this Freddie, Mr. Freddie Williams.
6      So what happens, though, to corroborate what
7 Pat Denton, immediately corroborates him when he tells
8 them what's going on? His phone rings and it's Leon.
9 How do we know it's Leon? Well we've had the
10 testimony now from the phone records that Leon did in
11 fact call Pat Denton at that time that morning. So
12 you know he did. When Pat Denton told the police,
13 "That was Leon," you know now it was. He couldn't
14 have been making that up, and that corroborated what
15 he told them, because when they got the phone records
16 later on it was in fact Leon.
17      Detective DeJohn, and several of the other
18 detectives, could hear his voice on the other end of
19 the phone. And Detective DeJohn told you that later,
20 when he had a chance to talk to Leon Carmichael, that
21 he could recognize the voice as being the one on the
22 phone. And what did it say? Just like Denton said,
23 "I'm on my way over." And what happens? You see the
24 black Honda automobile pull into the driveway, it
25 leaves a little later and Denton says, "The dope's

Page 193

1 going to be at Freddie Williams' house."
2      Around three or four in the morning the
3 police leave, they get back together at seven-thirty
4 in the morning and they wire up Mr. Denton and he goes
5 into that house and guess what, just like he told
6 them, there are the drugs. And they're in a room in
7 Freddie Williams' house that has a fake wall in it
8 where you can't see that there's a hidden compartment
9 or room compartment behind it, and that room, you know
10 now, has an exhaust fan in it.
11      So what you have at that point in time,
12 ladies and gentlemen, is proof right there -- when
13 they find that marijuana in that house -- of a drug
14 distribution conspiracy that's going on between Leon
15 Carmichael, Freddie Williams, Pat Denton and Gary
16 Wayne George and possibly others that may have been
17 mentioned in there. But that's four people. And
18 that's more than two. And that's what we're talking
19 about here, two or more people. Both the ones named
20 and others known and unknown.
21      We submit to you that that right there would
22 be enough. Now something that's important for us
23 because the indictment alleges a quantity of
24 marijuana. It alleges over three thousand kilograms.
25 One of the reasons we went through all of this

Multi-Page™

**Page 194**

1 testimony with Mr. Denton about the amount of drugs
2 that he was distributing was so that you would have a
3 sheet, basically that you would have the ability to
4 know how much drugs were involved in this
5 distribution.
6      Now you know right away from the facts in
7 this case that we start out with five hundred and --
8 Let me just get this out. That you started out with a
9 drug weight that was seized that day which is, if I
10 can find it on here, well it's roughly five hundred
11 and fifty pounds of marijuana. And you know that
12 there's two point two pounds per kilo. So you can do
13 the mouth math. It's two point two pounds per kilo.
14 There is testimony about that.
15      But the bottom line is you start out with
16 that figure. Then you also have, and I'll get to
17 those in a minute, you also have the drugs that were
18 found on the truck in Mississippi and the truck that
19 did the Idaho potato run. You remember that? That
20 was another hundred and forty-seven and another
21 ninety-seven pounds of drugs that were found on those.
22 And then you have the dope that was distributed by
23 Charlotte Hensarling, which is another twenty-five
24 pounds. So you add those up and you're talking about
25 somewhere in the neighborhood of eight hundred and

**Page 195**

1 eighteen pounds of marijuana at that point, or roughly
2 three hundred and seventy-one kilograms.
3      But then you go to the amount that's being
4 distributed over time through Mr. Denton. We'll
5 submit to you that if you listen to the testimony of
6 Mr. Denton, you'll find that based upon his testimony,
7 if you add up the numbers, and you can do it either by
8 using the amount of dollars that he said he was
9 delivering per week during these time frames, February
10 to June of 2000, it was twenty five pounds after June
11 of 2000, it was fifty pounds, and then starting in
12 December of 2000 seventy-five pounds, and he gives you
13 the amount of money, that what you're going to find is
14 if you total up that money, that you're talking about
15 roughly five million nine hundred and forty-four
16 thousand dollars over the time frame that Denton was
17 dealing with Leon Carmichael.
18      You divide that by two -- and the reason I
19 say "divide it by two" is because remember, this is
20 the gross amount of the proceeds he's talking about.
21 His testimony was that Mr. Carmichael had to pay three
22 hundred dollars per pound for it. So if he's giving
23 him six hundred a pound, and we'll just give him a low
24 ball figure here, then half of that is Mr.
25 Carmichael's profit and Mr. Williams' profit from the

**Page 196**

1 sale of this.
2      Now we would submit the evidence fairly
3 establishes that most of the profit was going to this
4 man right here. We don't know exactly what he was
5 paying Mr. Williams, but we know Mr. Williams was
6 involved in the drug distribution conspiracy with him.
7 So if you take that amount of money and you divide it
8 by three hundred, you're going to come up with
9 nineteen thousand eight hundred and thirteen pounds of
10 marijuana, which is nine thousand five kilograms. Now
11 the indictment says "over three thousand kilograms."
12 We would submit to you that the evidence fairly
13 establishes that that's an accurate quantity.
14      Ladies and gentlemen, as I said, you could
15 find just from that evidence that there is no other
16 rational explanation for it than that these people
17 were engaged in drug distribution. But that isn't all
18 the evidence that you have. You know, it may have
19 taken ten years for the truth to come out in this
20 case, but the truth did come out.
21      Remember, we asked you at the beginning of
22 this case to listen to what the witnesses said from
23 the witness stand, to examine their demeanor, to
24 listen to the things that they would tell you about
25 how they knew people and how they had an opportunity

**Page 197**

1 to be where they were. We asked you to examine them.
2 We would submit to you that the people we put on the
3 stand were credible in what they testified to you
4 about.
5      MS. WAYNE: Judge, I'm going to object.
6 It's improper for the government to vouch for their
7 own witnesses.
8      THE COURT: He can't say that I personally
9 think, but he can say we submit to you that. He can
10 make an argument about their credibility. But his
11 personal views, you're absolutely right.
12      MR. FEAGA: Can you take the truth and you
13 can lock it up in a chest, you can put a padlock on
14 that chest, you can put it in a steel box. I would
15 submit to you that you can take that steel box and you
16 can wrap it in chains, and you can drop it in the
17 deepest hole in the deepest part of the ocean on the
18 planet, and sooner or later that truth is going to
19 come out.
20      Now this man started distributing marijuana.
21 The evidence in this case fairly establishes ten years
22 ago. And was the tough for law enforcement to catch
23 him? You now know it was. It was tough, but bit by
24 bit and piece by piece the evidence began to come
25 forward. Bit by bit and piece by piece the box began

Page 198

1 to rust that was down there. The chains began to
2 weaken, and at the end of the case you guys know what
3 the truth is because it busted out of that box and now
4 it's out for everybody to see exactly what happened
5 over the last ten years in the life of Leon Carmichael
6 and how this man helped him. Okay?
7         And what now do you have to bolster what Mr.
8 Denton and Mr. George and the other people told you
9 and the law enforcement officers that went into that
10 house and seized that marijuana? You have other
11 evidence that independently bolsters them. Not just
12 the phone records, you also have these other events
13 that occurred. Okay?
14        You have the forty-two thousand dollars that
15 Sandra Jones got caught with down by El Paso, Texas by
16 Officer Chavez. Now where do you suppose this truck
17 driver that works for Leon Carmichael got forty-two
18 thousand dollars? And what was she doing in a source
19 city if it wasn't to buy drugs? Well you know it was
20 to buy drugs. See, you don't have to just look at
21 that and go, you know, we know that Mr. Carmichael
22 distributes drugs, we're very much aware of that, now
23 we know that a truck driver of his got caught with
24 forty-two thousand dollars. And not just any truck
25 driver --

Page 199

1        MS. WAYNE: Judge, I'm going to object to
2 that. It's a mischaracterization of the evidence.
3 The evidence by the prosecution was not anything about
4 Sandra Jones being a truck driver for Mr. Carmichael.
5        MR. FEAGA: You guys can weigh their
6 evidence. The fact of the matter is --
7        THE COURT: I'll leave it up to you to
8 decide what the evidence was.
9        MR. FEAGA: The fact of the matter is, that
10 in July of '97, about eighteen months after she got
11 caught down there in El Paso with that forty-two
12 thousand dollars of what we believe the evidence
13 fairly infers was his money, she got caught driving
14 one of his trucks on the wrong road. Now maybe it was
15 just to get home.
16        We'd submit to you that even though that
17 very legitimate gentleman came in here to talk to you
18 about how a legitimate trucking company operates, that
19 she wasn't coming to Montgomery to get home, she was
20 coming to Montgomery to drop that dope off. And was
21 on the wrong interstate. You remember the testimony
22 of the police officers? She should have been down on
23 I-10 if she was going to Florida, but she was coming
24 to bring that hundred and forty-seven pounds of
25 marijuana that was in the back of that truck for Leon

Page 200

1 Carmichael so that he could distribute it and get
2 money.
3        But you don't have to just look at that one
4 either. You also have the truck run involving another
5 truck of his that ran from Blackfoot, Idaho, it was on
6 its way down to Florida, and for some reason or
7 another it saw fit to detour to down to the border
8 down near El Paso at Sierra Blanca. And, once again,
9 another Carmichael truck caught with ninety-seven
10 pounds of marijuana in the back. You heard the
11 gentleman who is a legitimate trucking businessman.
12 You know, they would have you to believe that all of
13 this is just bad luck. He just had people getting on
14 his truck. This --
15        MS. WAYNE: I'm going to object again. It's
16 improper. The defense didn't have them believing
17 anything. It's the evidence that came from the stand
18 here, not his inference for them to be drawing about
19 what he believes the defense did. That's improper
20 comment during closing.
21        MR. FEAGA: Now, what we would --
22        MS. WAYNE: Judge, I would ask for a ruling.
23        MR. FEAGA: Your Honor --
24        THE COURT: Okay. Just a minute. Just a
25 minute.

Page 201

1        What do you want, though?
2        MS. WAYNE: Judge, it is improper for him to
3 be drawing inferences about what he believes the
4 defense did. That's improper comment.
5        MR. FEAGA: That's what closing argument is
6 for, is to argue the inferences from the evidence,
7 Your Honor.
8        THE COURT: Well just argue the inferences,
9 what you contend they are.
10       MR. FEAGA: Okay. Right.
11       So now you have another truck operating
12 under the control of this gentleman caught with this
13 ninety-seven pounds of marijuana on it and the
14 legitimate trucking company executive that came in
15 here and told you that he ran sixty-two trucks in his
16 company at this point, had been in the business for
17 thirteen years and had never had anything like this
18 happen to him before. We would submit to you that
19 when you couple that with the other evidence that you
20 have in this case, you know for a fact that Leon
21 Carmichael is a drug dealer. And that's what he is.
22       But, again, you don't have to rely on just
23 that because you also know what happened in regards to
24 him taking money that was buried in the ground.
25 Sherry Pettus told you what happened. He took money

Multi-Page™

Page 202

1 that was buried in the ground, dug it up, it stunk and
2 he had her go open up an account in her name and put
3 that money in there.
4      In fact, I'll show you know.  We think that
5 the evidence fairly infers that there was a reason why
6 that happened when it happened.  Remember I told you
7 earlier that Pat Denton had been busted in June of
8 2002?  Do you remember the testimony about that?  He
9 got arrested in Huntsville in June of 2002.  Remember,
10 Mr. Carmichael opened up this account in late May.
11 May 28th.  You can look at the records of 2002.  Just
12 about ten days before Mr. Denton got busted.  He opens
13 that account up.
14      Mr. Denton testified to you that after he
15 got busted he stopped doing dope.  Remember he was
16 basically shut down for a while?  Leon didn't want to
17 deal with him initially and then later Leon came back
18 to him and later they began to pick back up.  He said
19 in November and December, but it wasn't until March
20 that they really got rolling again, March of 2003.
21 Well you know that Mr. Carmichael had started building
22 this Carmichael Center.  Okay?  He needed money.
23      The guy that was dealing the dope for him
24 was off line.  So he had to go dig drug money back up
25 out of the ground.  This was the money that he and

Page 203

1 Denton had been raising earlier.  As long as the money
2 train was rolling along he was fine.  He could fund
3 whatever he needed to fund to finance his operations
4 and he was okay.  But once Denton got busted and he
5 didn't have the money coming in any more, then he had
6 to go into the hole and get the money out and then he
7 had to go into the hole and get the money out and then
8 he had to figure out how in the world am I going to
9 put this in to float.  And that's when he got Sherry
10 Pettus to open that account.
11      Now another fact ties in quite nicely with
12 that, and that was something that Miss Wayne was
13 pointing out when she had Investigator Halasz on the
14 stand.  You may recall he talked about them doing
15 surveillance in May of 2002, and the last surveillance
16 was May 28 of 2002.  The same time that account got
17 opened up and just a few weeks before Denton gets
18 busted.  And all of a sudden in late June and
19 thereafter in late July and late August, you remember
20 the evidence?  They're seeing no activity.  Why are
21 they seeing no activity?  Because Pat Denton has been
22 busted and he's out of commission just like he told
23 you.
24      And now what he's doing is he's laundering
25 money, so they're not seeing the physical activity any

Page 204

1 more.  But lo and behold when he and Pat Denton
2 cranked back up in February or March, the deposits in
3 the money laundering account stopped.  Why did they
4 stop?  That's in 2003.  Because Pat Denton tells you
5 he's funneling sixty thousand dollars a week to him
6 again.  He doesn't have to go to the hole any more.
7 Okay?  We think that that is beyond coincidence, that
8 those events took place.  And we think that from those
9 you can again infer and be convinced that these people
10 were engaged in drug trafficking.
11      Now what has the defense done?  You know,
12 one of the things they have done in this case, we
13 would argue to you, the evidence can infer and the
14 actions that took place in terms of the questioning of
15 the witnesses, was to deflect attention from the
16 defendants.
17      MS. WAYNE:  Judge, I'm going to object.
18 That's improper argument about what he thinks we're
19 trying to do as if we're doing something wrong by
20 cross-examining and the things that they have done in
21 this trial exactly the same.
22      THE COURT:  You can argue that they asked
23 certain questions and things like that.
24      MR. FEAGA:  Right.  They put the witnesses
25 on trial.  They were asking them questions about

Page 205

1 questioning their motives.  And just look at what they
2 did.  First they tried the cons, okay?
3      MS. WAYNE:  Judge, I'm going to object to
4 this.  He's acting as if we've done something
5 improper.
6      THE COURT:  There is nothing you did
7 improper, but I think he can argue that the answers
8 you elicited were either credible or not credible.
9      MS. WAYNE:  Judge, he said that we've put
10 the witnesses on trial and that's improper.
11      MR. FEAGA:  Your Honor, I believe she's just
12 trying to interrupt my argument.  She's done it
13 repeatedly.  I think she's trying to disrupt my
14 argument to the jury --
15      THE COURT:  I really don't remember what he
16 said.
17      MS. WAYNE:  That's what he said, Judge.
18 That the defense put the witnesses on trial.
19      MR. FEAGA:  They did, Your Honor, and I'm
20 going to start out and point out that with the
21 questions they asked trying to attack --
22      MS. WAYNE:  Judge, I'm objecting to that.
23      THE COURT:  Overruled.
24      MR. FEAGA:  You saw what happened when Gary
25 Wayne George and Charlotte Hensarling and Pat Denton

Page 206

1 and Peagler and Timmons and Thomas testified, they
2 went ad nauseam after their criminal records. Now I
3 told you at the beginning of this case that we were
4 going to have to call some people in here that were
5 unsavory characters.
6       The fact of the matter is, and one of the
7 witnesses, I think it was Mr. Timmons, said, "I ain't
8 trying to hold myself out as no angel" in response to
9 one of the multiple questions asked to him about his
10 background and record, they're arguing about how much
11 time he had done. Ladies and gentlemen of the jury,
12 deals that have their origins in hell are not very
13 often witnessed by angels. We take our witnesses as
14 this man gives them to us. And this man gives them to
15 us.
16       These were people they were associating
17 with. We found out about them, we prosecuted them and
18 we flipped them and we got information that backed up
19 what they were telling us and now you know that there
20 are other people that are just like them involved in
21 this thing. Okay? And if you don't like those
22 witnesses on a personal level, if you wouldn't invite
23 them over to your house, don't think that I would
24 invite them to my house either.
25       But we take the witnesses the way we get

Page 207

1 them, the way Leon Carmichael brought them to us. And
2 if you want to be mad at somebody about those
3 witnesses, we suggest to you that you should be mad at
4 him because these are people that he brought to you.
5 Okay?
6       But we would submit to you that the evidence
7 that they testified to was backed up by the facts in
8 this case and that you can believe them. You watched
9 them testify and they told you about how they knew
10 what they knew and how they've been where they've
11 been, and we think their testimony was credible and
12 backed up by the facts.
13       Then you've got all of the questioning of
14 the cops about what they were doing. Tom Halasz, when
15 they were talking to him about why did you close the
16 case out, do you remember that? That was an
17 interesting moment in the life of the case because
18 after being pressed by the defense to say that he
19 closed the case because he couldn't find anything, he
20 said no, I closed the case because the informant told
21 me that he was afraid that Leon Carmichael would kill
22 him. Okay? But they're questioning of him about that.
23       Their question to Mr. Greenwood -- excuse
24 me, Agent Greenwood when they were making him put the
25 chairs up And then the sentence about when Mr.

Page 208

1 Carmichael said, "You got me." Boy, isn't that a
2 strong piece of evidence. The man admitted that they
3 had him for what they were charging him with. "You
4 got me." But they attacked Greenwood for it and
5 accused him of some underhanded business when all he
6 was doing was allowing the man to come over and pick
7 up his property as was set up by the lawyer who
8 represented him.
9       DeJohn, the same thing. Mr. Teague talked
10 about how the tapes are bad. You heard Detective
11 DeJohn testify to you about why it might be that those
12 tapes are bad. Look, we take the evidence the way we
13 get it. I think that some of these things, some of
14 these deficiencies that you see should show you that
15 the very things they're accusing the police and the
16 government of doing, trying somehow, and I think
17 that's the fair inference here, that somehow we all
18 got together and we went out of our way to go pick
19 this legitimate businessman off the street and try to
20 tell you he's a drug criminal.
21       How can the defense believe, or expect you
22 to believe that Patrick Denton, think about these
23 people, that all had to come together to make you
24 realize and know that these two people are drug
25 dealers? Pat Denton, Sherry Pettus, Gary Wayne

Page 209

1 George, Keena Whizinant -- Remember Keena Whizinant
2 said "That's Leon's stuff in the house" when she
3 called Sherry. "Get ahold of Leon, he needs to know
4 the house has been raided." Okay?
5       Sherry telling you that she knows, because
6 Leon told her they're drug proceeds and he's asking
7 her to -- How in the world did they get together with
8 Gary Wayne George and Patrick Denton? What about Val,
9 the man's only wife? She told Sherry Pettus that Leon
10 is back to drug dealing. Do you really think she's
11 conspiring with them and these detectives and the
12 United States' Attorney's office to take this
13 legitimate businessman off the street? It's just not
14 believable.
15       It's just not believable and it's a
16 smokescreen. It's called putting everybody else on
17 trial so that the jury will forget that the people who
18 are on trial in this case are Mr. Williams and Mr.
19 Carmichael, the defendants in this case, who are
20 guilty with what they are charged with.
21       Let's examine some more facts. We know that
22 Sherry Pettus opened the account that she opened up.
23 We know that Leon Carmichael said it was drug money.
24 She says she knows it's drug money when she's putting
25 it in there and she structures it. She take it and

1 puts it in at ninety-eight hundred, ninety-five
2 hundred ninety-six hundred. You have the account, you
3 can look at it.
4     You remember when Ms. Mona George testified
5 before you. She said the money stunk like it had been
6 dug out of the ground. Leon said it had gotten wet in
7 the sewer system. What kind of person or businessman
8 takes legitimate money and buries it in the ground and
9 then has somebody else take that money and put it in
10 an account? Miss George -- in somebody else's name?
11 That just doesn't happen. That is outside the realm
12 of what you know based on your experience in life is
13 reality. And that's what you're here to do, is to
14 take the experiences that you have in life and apply
15 them to the facts of this case. And that is just not
16 normal and you even have witnesses that say that.
17     Miss George told you that account was very
18 unusual. Mr. Argo, their own expert, under cross
19 examination finally admitted yeah, this is an unusual
20 account. This is strange. Never seen one like it in
21 his twenty-seven years. We'd submit to you that you
22 can infer from that that it is a money laundering
23 account being used to launder the proceeds of drug
24 activity.
25     How about Miss Pettus when she was

1 laundering the money when she was participating in the
2 conspiracy with Mr. Carmichael? She told the bank
3 tellers that the money had come from concert
4 promotions. Now the defense has come in here today,
5 and actually earlier this week, and told you that they
6 were going to show you that the money had come from
7 some truckload of shoes that he bought. Where is that
8 evidence?
9     The only thing you have is Carmichael's
10 self-serving statement on some tax returns that were
11 filed twenty-five days ago, three years later after he
12 had an opportunity to view all the evidence in this
13 case, he sticks a number on a paper and you're
14 supposed to believe it. Well you know you shouldn't
15 believe it because you know he lied about other
16 numbers on there. We brought the facts in here from
17 the City of Montgomery to show you that he's making up
18 numbers on those returns. He even claimed to own a
19 business that he doesn't own on his tax return.
20     We would submit to you that just like Mr.
21 Murray Argo said when I asked him if there are lies on
22 there and we can prove it would you agree that your
23 conclusions are wrong? And he said yes.
24     Keena? "Leon's stuff," the girl that lives
25 in his house. Isn't that interesting? How about that

1 house? Don't you think it's strange that Mr. Williams
2 would have forty thousand dollars, this man whose son
3 says he is not a man of means, and I don't belittle
4 him for that, but the point is where did he get forty
5 thousand dollars to buy a house that he could then
6 turn around and sell to Leon Carmichael for nine
7 thousand dollars? I would submit to you that that's
8 another forty-nine thousand dollars in drug money that
9 Mr. Carmichael was putting into play.
10     What do you think happened there? You can
11 infer from the evidence that Mr. Carmichael took that
12 forty thousand and gave it to Freddie Williams so that
13 he could buy that house. Okay? Now he has a house
14 worth forty thousand dollars. Then later he turns
15 around and he has Mr. Carmichael execute a deed to him
16 saying he gave him nine thousand dollars for it. And
17 he may have, but that puts forty-nine thousand dollars
18 in play and makes it look like legitimate money. Now
19 that's what happened here and you know it.
20     And it happened again on the J. and L.
21 Thrift Store. Remember that one, when Sandra Jones
22 did the same exact thing? She went and bought J. and
23 L. Thrift for thirty thousand dollars and then turns
24 around and sells it to Leon for eight thousand.
25 Remember when Mr. Estes came in and told you about

1 these are not transactions that happen unless there is
2 underlying unlawful activity? And you guys know what
3 the underlying unlawful activity is now.
4     She said that the money dug up was one point
5 two million and one million. I think one million the
6 first time and then the one point two, and it was the
7 one point two that was the stinky money. Also you
8 know that none of this cash, you know for a fact that
9 none of this cash came out of a bank. We identified
10 all of his bank accounts for you just like we promised
11 we'd do, and guess what? Only ten thousand dollars
12 came out of all twelve of his accounts during the time
13 frame in a year and-a-half prior to the time that that
14 account was getting those deposits. And nine thousand
15 came out of his mother's account.
16     We would submit to you that you can put your
17 knowledge of every day affairs in place and GOD bless
18 his mother, I mean her no disrespect, but I bet you
19 the money that came out of her account was used to
20 support her and take care for her needs. It wasn't
21 money that went into Leon's money laundering account,
22 because you know where that money came from, it came
23 out of the ground and it had been buried there to hide
24 it because it was drug proceeds.
25     COURTROOM DEPUTY CLERK: Thirty minutes.

**Page 214**

1    MR. FEAGA: Okay, thank you.
2       Now let's look at some of the rest of what
3  the defense did. As I said, they promised you -- in
4  opening statement you were promised by Miss Wayne that
5  there was going to be proof that a truckload of shoes
6  had been bought. There's no proof. Smokescreen. She
7  told you that there would be proof that Leon
8  Carmichael was leaving the Carmichael Center the night
9  that he dropped in over at Pat's. No proof of that.
10 I asked the center director when he was on the witness
11 stand if there had been an event that night and he
12 said he didn't know, which indicates to me nobody had
13 bothered to ask --
14    MS. WAYNE: Judge, again I object to what it
15 indicates to him. He cannot assert himself into the
16 case. His opinion doesn't matter.
17    MR. FEAGA: Your Honor, I'm just arguing
18 inferences from the evidence.
19    THE COURT: But you can't -- She's right.
20 What your views are are immaterial. You can submit to
21 the jury that they can reach this conclusion or that
22 conclusion, but your personal beliefs are irrelevant.
23    MR. FEAGA: Yes, sir.
24       You can reach the conclusion from the fact
25 that it was promised to you and not delivered that the

**Page 215**

1  fact doesn't exist. So he wasn't going over there
2  just for some reason after he left the Carmichael
3  Center, he had a reason for going over there and you
4  know what it was.
5       You were also promised in opening statement
6  that there would be proof that Patrick Denton was
7  calling Leon Carmichael all day Saturday and Sunday
8  before the delivery. And obviously if such evidence
9  had been introduced, it would be so that you could
10 infer from it somehow or another that Pat Denton was
11 setting up Leon Carmichael. But the phone records
12 belie that.
13      What does the actual evidence that's before
14 you show? The evidence before you shows that Leon
15 Carmichael called Pat Denton all day Saturday and
16 Sunday. Pat Denton didn't call Freddie Williams or
17 Leon Carmichael during that time frame. So three
18 things they promised to you they didn't deliver on.
19 Three things that we would submit to you should have
20 delivered on if they expected you to buy the defense
21 in this case.
22      They also -- I talked about Murray Argo. He
23 just had the wrong information. He admitted I got
24 this information from Leon and it was wrong, it was
25 wrong. Look at the nature under which it came to you

**Page 216**

1  again. We would submit to you that it's very telling
2  that these three tax returns with what you know as
3  bogus information on them that came from the
4  defendant, Leon Carmichael, weren't filed until
5  twenty-five days before this trial and they were three
6  years late, two years late and -- excuse me, four
7  years late, three years late and two years late. Look
8  at the dates and ask yourself why did that happen and
9  why were there lies on the faces of those tax rushes.
10      Then we had Chuck Kelser and Alan Gunn
11 testify, and they talked about the fact that some of
12 the Carmichael Center was paid for, and the
13 construction of it, we're not sure exactly what that
14 accomplished or what it does. One thing that was
15 interesting about their testimony was that they talked
16 about the fact that in like September 2003, that time
17 frame, October 2003 that Mr. Carmichael was having
18 problems meeting his bills.
19      They were getting ready to take out liens on
20 him. In fact they had liens on him. They wanted to
21 be paid and he couldn't pay them. I think it gives you
22 an insight into Mr. Mr. Carmichael's mind at that time
23 as to why he would be so insistent in calling Pat
24 Denton, you've got to take the dope, I want you to
25 take the dope, don't worry about the fact that

**Page 217**

1  Hensarling got busted, he needed Denton to distribute
2  that dope because he needed the money. Okay?
3       So we would submit to you that the fact that
4  he's having to borrow money gives you some indication
5  of the desperate straits he was in at that time and
6  why he would have been pushing Denton so hard to take
7  that dope.
8       And then there's Mr. Maddox and Judge
9  Hardwick. And I would just say that in regards to
10 Judge Hardwick, Judge Hardwick told you that he told
11 him that if you have some cash that you can set aside
12 and don't put in the bank and the I. R. S. is looking
13 at you, that's fine. That's a good thing. But Judge
14 Hardwick was careful to make sure that you knew that
15 he didn't tell anybody to put the money into an
16 account in somebody else's name, and that he would
17 have told somebody you can't take drug proceeds and
18 launder it through a bank.
19      So we think them putting them in here was
20 nothing but a smokescreen. Judge Hardwick didn't do
21 anything wrong.
22      Now Mr. Maddox, I don't know. I think you
23 can evaluate his demeanor. But what called to my mind
24 when I was listening to testify to you gratuitously
25 talking about the government attacking people, and

Multi-Page™

Page 218

1 where is the evidence that we froze any of his
2 accounts or any of these horrible things that Mr.
3 Maddox was accusing us of wanting to do to him. There
4 was no evidence that any of that happened in this
5 case. Euripides said two thousand years before the
6 birth of Christ, "The gods themselves are moved by
7 gifts, and gold moves men more than words." And I
8 think that characterizes Mr. Maddox's testimony and
9 I'll leave it at that.
10       Ladies and gentlemen of the jury, there were
11 three other things that I want to point out to you
12 that happened that I think were key events in the life
13 of this trial. One of them was that they told you
14 that you Sherry Pettus, when she testified they
15 crossed her and they said you were in charge of the
16 shoe thing. You did the flea market sales of the
17 shoes. Whatever that might be been. And she said
18 yeah, I was.
19       But then they asked her this question. You
20 may recall Mr. Brunson asking her, because remember
21 the money that was laundered, the money that went into
22 that account stunk. And he asked her, "Did the money
23 that came from those shoes stink?" And she said,
24 "No." So the money that they told you at the
25 beginning of this trial was going to be what went into

Page 219

1 that account. One, the only word of that that you
2 have is the word of a man that you know lied to you
3 already. Okay? And then you have Sherry Pettus
4 telling you that wasn't the money. That's the
5 defense. So we think that that was a very telling
6 moment in the life of this case.
7       I know when I heard her say, "No, that money
8 didn't stink," I was thinking well, —
9       MS. WAYNE: Judge, again --
10       MR. FEAGA: I apologize for that, Your
11 Honor.
12       We would submit to you that when you heard
13 that testimony you had to be wondering well where was
14 that defense. And the evidence would fairly allow you
15 to make that inference.
16       Then there was Halasz and the question that
17 was asked of him about why you closed down your
18 investigation, and he said, "Because the informant was
19 afraid that Carmichael would kill him."
20       And then there's the three things that I
21 pointed out to you that all came together while this
22 evidence was coming out. Denton getting busted, the
23 account opening up and the money beginning to pour
24 into it after Denton is busted and he isn't dealing
25 dope anymore, and the fact that the investigators

Page 220

1 aren't seeing any more drug distribution activity
2 during that time frame. And I think that points to
3 you to the fact that we have what we have here. We
4 have a ten year conspiracy by this individual to
5 distribute drugs.
6       Ladies and gentlemen of the jury, the chains
7 are off of the box that had the truth in it for so
8 long, that has been basically sitting down there
9 waiting to come out for the last ten years, and it
10 came out in this courtroom in these last two weeks.
11 We would submit to you that you now know what the
12 truth is. And we ask that you go back and in your
13 deliberations, you review these facts and that you
14 come back and that you conclude that these defendants
15 are guilty as charged and that you return a verdict of
16 guilty.
17       Thank you.
18       THE COURT: Why don't we just take five
19 minutes. Then we'll come back and have Mr. Teague's
20 argument.
21       (Whereupon, a recess was taken.)
22       THE COURT: Proceed, Mr. Teague.
23       CLOSING ARGUMENTS:
24       MR. TEAGUE: May it please the Court,
25 counsel, ladies and gentlemen of the jury.

Page 221

1       I want to, on behalf of Freddie Williams,
2 express our gratitude for your close attention to the
3 evidence. And the judge will tell you that what Mr.
4 Feaga has had to say is not evidence. It's not
5 binding upon you. And as has been pointed out by
6 objections, merely opinions. And of course you're to
7 take my argument in very much the same way. But what
8 I want to do is talk to you about what are the
9 charges? What do they say about Freddie Williams, and
10 what is it that has been proven, or what is it that
11 Mr. Feaga may think has been proven? And I want to
12 appeal to your common sense. How can you prove what
13 it is they claim the evidence shows?
14       And of course the first thing you must do,
15 and you're under oath, is you must listen closely to
16 the evidence. And as you've seen, I've sat with my
17 chair cocked at a forty-five degree angle just about
18 the entire two weeks. I've watched you. You have
19 been good, attentive jurors and I appreciate that
20 because you now are well qualified to determine what
21 are the facts. What did we hear and what does it
22 mean?
23       The other very important thing the judge
24 will give you that you must consider is the law. And
25 the first thing in the law is Freddie is presumed

Page 222

1 innocent. The judge will tell you even right now
2 you're to presume him innocent. And the only way that
3 that piece of jurisprudence will ever live and really
4 mean anything in this country is for you in your heart
5 to say he's not guilty. And you may not find him
6 guilty unless and until all of you have unanimously,
7 that means every one of you, have determined yes, I
8 believe beyond a reasonable doubt that Freddie
9 Williams is guilty.
10        Now what is it he's charged with? The judge
11 will give you a copy of his charge. And count one
12 will be set out in it. Now the draft I have been
13 given will have it on page nine. Please make a note
14 of that and remember in your deliberations to hold
15 Freddie to what is it that they have alleged. That's
16 an important legal term, alleged. And what is it they
17 have proven. I think first of all the indictment
18 tells you an awful lot in and of itself.
19        The judge is going to tell you that the
20 indictment says, among other things, and it will all
21 be set out on page nine or I think there are going to
22 be some revisions, it may be page eight or maybe page
23 ten but somewhere along in there you'll find it, it
24 says that Freddie agreed with Leon Carmichael to
25 distribute, to possess with intent to distribute three

Page 223

1 thousand pounds of marijuana. The only incident they
2 have any proof of here is allegedly some five hundred
3 and fifty pounds that were found in a place where he
4 stays.
5        I submit to you we don't argue, yeah, five
6 hundred and fifty pounds were found there, but I
7 submit to you the judge will tell you right after
8 that, and follow his instructions closely, he'll say
9 at the end of it it will say that it was all, all in
10 violation of Title 21 United States Code, Section 846.
11 846 charges conspiracy with intent to possess, with
12 intent to distribute it. But if you possess it,
13 you're guilty of another crime.
14        And the judge will tell you these words, I
15 submit, or substantially these words. Title 21 of the
16 United States Code makes it a separate federal crime
17 or offense for anyone to conspire or agree with
18 someone else to do something which if actually carried
19 out would be a violation of '841(a)(1). He's not
20 charged with 841(a)(1), he's charged with conspiring
21 to violate that. The judge will tell you, and listen
22 to this, you'll have it in black and white, or yellow
23 and white maybe I should say, Section 841(a)(1) makes
24 it a federal crime or offense for anyone to possess a
25 controlled substance such as marijuana with the intent

Page 224

1 to distribute it. It's a separate crime. Could have
2 been count two, but it's not.
3        They started talking with the grand jury
4 shortly after my client was arrested a year and-a-half
5 ago, two years ago, whatever it is. November of 2003.
6 They have been investigating. You heard Agent DeJohn
7 yesterday forthrightly acknowledge yeah, I think I
8 have been before the grand jury maybe eight times
9 talking about what their evidence shows and doesn't
10 show. Guess what? The grand jury doesn't even go so
11 far as to say Freddie possessed marijuana. He's not
12 charged with violating 841, merely agreeing. Well
13 that calls for a lot of speculation and surmise. Well
14 that calls for a lot of speculation and surmise. A
15 lot of guesswork.
16        Judge Thompson will also charge you in his
17 charge, and you'll find it in there, that you are not
18 to indulge in speculation and guesswork. I submit to
19 you the grand jury didn't even charge him with
20 possessing it. Oh, it was found in a house where he
21 stays, but they didn't charge him with possessing it.
22 And I submit they got a lack of evidence, and that's
23 why the grand jury didn't even return a second count.
24        Now I'll come back and talk to you more
25 about what the judge will tell you about the law. The

Page 225

1 judge will tell you that they must overcome the
2 presumption of innocence with evidence beyond a
3 reasonable doubt. And that reasonable doubt is so
4 important that a very famous jurist, a Supreme Court
5 justice many years back in talking about how important
6 the criminal justice system is once said, "It's far
7 better that one hundred guilty men go free, than a
8 jury should ever convict one innocent man." I submit
9 to you the grand jury had some question as to exactly
10 what is it this man did. Did he possess the
11 marijuana? I don't think so.
12        Faith Holly. I think you've heard on the
13 videotape version, and of course you know you couldn't
14 hear anything on these, but on the videotape version I
15 think you heard what I told you in the opening
16 statement. "Hey, darling, how you doing today?" See,
17 the burden of proof is on the government. I wonder
18 why they didn't bring Faith Holly over here if she's
19 right there? Interesting question, isn't it? The
20 burden is on them. Look at here, I see a whole host
21 of people who work for the U. S. Attorney's office.
22 Agents with the D. E. A., agents with other federal
23 agencies. They worked on a case nearly two years and
24 they don't even bring you Faith Holly to testify about
25 Faith, how did the drugs get there?

1     How did they get put in there? Well do you
2 think Patrick Denton is going to tell us the truth
3 about that? Now we can't prove, you know, we submit,
4 that your common could tell you somebody put it in
5 there and Faith could have told about it but no, we
6 don't think Faith is credible either.
7     Now you listen to this. The judge will tell
8 you that, and Mr. Feaga has suggested that, we put
9 witnesses on trial. The judge will tell you in this
10 jury charge that you are to put them on trial.
11 Indeed, you are judges. Just as he's the judge of the
12 law in this case, you are the judges of the facts.
13 Guess what? Law enforcement, D. E. A., policemen, all
14 of those people back there with all their might and
15 authority cannot put somebody in jail. There is no
16 presumption that anything they have done is right.
17     In fact, the judge will tell you just
18 because they're law enforcement people and may have
19 testified in here you don't necessarily take their
20 word over somebody's else's if there is indications to
21 the contrary. That's up to you. The U. S. Attorney,
22 a mighty powerful office, they can do many things.
23 They can ask a judge to bring a grand jury, get all
24 their evidence and then they get their indictments,
25 such as it is in this case. But they can't put

1 Freddie Williams in jail.
2     A federal judge, this honorable learned
3 judge who has endeavored to give us a fair trial here,
4 not even he can make a determination of guilt. Thanks
5 be to GOD that's unlike virtually many, many countries
6 around this world, and some highly civilized. And in
7 this case I submit to you, you are to put all those
8 witnesses on trial.
9     Now let me help you put them on trial. Now
10 you have been called into a place and my function here
11 is to reason with you as to what the evidence has
12 shown. You will make that decision. Only you
13 determine whether or not Freddie is even guilty of a
14 conspiracy, whatever that is. The judge will tell you
15 what it's supposed to be.
16     Now what do we know about what we've learned
17 from the witnesses as they have testified from this
18 witness stand? Virtually every one of them have told
19 you under cross examination yeah, I'm going right back
20 to the same business I was in. Let's start out with
21 the first one, Gary Wayne George. Fifteen felonies.
22 Now did he tell the truth? You remember Mr. Denton
23 when he took the witness stand the second one said, I
24 said hey, your buddy Ike that got killed, was he
25 perhaps your source? Oh, no. I was his source.

1     But then you remember Mrs. Denton -- not
2 Mrs. Denton, Gary Wayne George's wife, a cousin to Mr.
3 Denton is the way I recall the evidence and I believe
4 that's the way you'll find it to be, guess what she
5 said. I hope as many of you were taking notes, I hope
6 you took notes because I heard it and I submit you
7 heard it too, she said Ike was one of their suppliers.
8 I was one of their suppliers. All these guys come
9 right back to the business. Gary Wayne George
10 indicated yeah, I got busted for this. Yeah, I came
11 right back and got right back in it again. Why?
12 Because the money is so big.
13     Patrick Denton grew up, had the wits about
14 him to become a manager of major grocery stores here.
15 You heard his testimony. He got busted in Huntsville.
16 You remember Mr. Denton said oh yeah, we had a
17 statewide network. And I asked him also, do you
18 remember I said well, tell us where all you were
19 dealing. Oh yeah, we dealt in Huntsville. Did you
20 have in your distribution network, did you have any
21 connections with various and sundry places? Do you
22 remember I wrote them all out? They're all over there
23 somewhere in that fifty thousand pages of notepaper
24 that we flipped back and forth.
25     And do you remember I asked George, I said

1 well what about Mobile? Yeah, yeah. And of course
2 you understand Eric Peagler you remember, the body
3 building guy, the one who had the E. and E. Fitness
4 Center? He told you oh yeah, I have been to prison.
5 I come right back out, I get back in. They make so
6 much money.
7     Denton gets busted in November of 2002. Oh
8 he didn't learn enough. And we figured it up on the
9 low end. You remember from that point until they came
10 to his house on November the 17th, 2003, over a year
11 later? Guess what, he's right back in it up to here.
12 Dealing drugs. Knowing well that if anybody finds out
13 about it potentially he'd get his bond revoked.
14 Pretty smart kid, though. He knows all he has to do
15 is use some magic words and it will all work out.
16     I'm not worried about this case. You heard
17 that. He stated that under oath. I don't have to
18 worry about this case. All I have to do is worry
19 about the two cases in Huntsville, Alabama. Just tie
20 him into law enforcement and man, you got it made.
21 Folks, I submit to you if you sound your verdict on
22 the testimony of people like Patrick Denton and Gary
23 Wayne George and liars like that who get right back in
24 the business, who will tell you -- you remember I
25 asked Denton, I said well what about down there in

**Multi-Page™**

Page 230

1 Mobile, that port city?  He said oh no, I didn't have
2 nothing to do with it.  What about Ike?  He has
3 nothing to do with it.  His own cousin tells us Ike
4 was a supplier.
5 　　　Gary Wayne George said oh yeah, we had
6 connections with Mobile.  Asked him about it.  And of
7 course you'd never ask Eric Peagler do you give away
8 the source.  Because when you get out you're coming
9 right back to it again.  You've seen men, all these
10 men, Jimmy Lee Timmons, all these guys, they go to
11 prison, they come right back out, they get in it
12 again.  Therefore the judge's direction to you as
13 jurors to put these people on trial consider what is
14 it they have to say and determine, well, what is it
15 that, you know, we should put our evidence, you know,
16 what shall we sound our evidence on?
17 　　　I submit to you they don't have what I would
18 call proof beyond a reasonable doubt.  The judge will
19 tell you that when it comes to conspiracy, it says
20 here Freddie of course, and you'll hear this, listen
21 for these words, "Mere presence at the scene of a
22 transaction or event, or the mere fact that certain
23 persons may have associated with each other," and I
24 submit to you all Freddie has done is do sheetrock
25 work and other repair work with his son Tim Williams

Page 231

1 who testified yesterday, "they may have assembled
2 together and discussed some common aims and interests
3 does not necessarily establish proof of a conspiracy."
4 That's the law.
5 　　　Barry Teague didn't make that up, that's the
6 law.  And the judge will tell you that.  It says he
7 doesn't even become a member of the conspiracy, even
8 if he might have been involved in something else that
9 might have been questionable.  Some other separate
10 conspiracy.  They have chosen, the grand jury has
11 brought only a charge of conspiracy to possess.  They
12 didn't even see Freddie possessed it.
13 　　　The judge will tell you in your charge that
14 you are judges of the facts, as I've already told you.
15 And he will tell you that when you are considering
16 what these witnesses say, you consider, you're bound
17 to consider what is it they have to gain?  Well stop
18 and consider the first witness they called.  Gary
19 Wayne George.  What does he deserve now after fifteen
20 felony convictions?  You remember I asked him?  You
21 really deserve life without parole.  You deserve a
22 life sentence.  You've demonstrated you can't behave.
23 　　　You're not going to be truthful.  When you
24 have been on parole you've lied to your parole
25 officers and look what you do.  And he says well,

Page 232

1 Mr. Teague, that's your opinion.  Well, Mr. Feaga,
2 that is my opinion.  He deserves life without parole.
3 But he tells you that oh, the game plan now is oh,
4 Freddie is involved.
5 　　　Do you remember in my cross examination of
6 Agent DeJohn a day or two ago when he was recalled to
7 the stand a second time?  Do you remember I asked him
8 Agent DeJohn, when you went to get this search warrant
9 from a federal judge in this courthouse for Eight oh
10 eight West Fleming Road, which was Mr. Denton's house,
11 did you not state in there that the men who would
12 break down marijuana for resale were Gary Wayne George
13 and Patrick Denton?  Yes, was his answer.
14 　　　And did you even mention anywhere in here,
15 do I have to show it to you?  He said no, Mr. Teague,
16 you know, I didn't mention Freddie anywhere as a
17 breakdown man.  You've become experts, I submit, by
18 hearing all of these criminals that they brought in
19 here.  Timmons, Thomas, testimony about others.
20 Peagler.  You remember particularly Jimmy Lee Timmons
21 said yeah, Sandra Jones and I said yeah, when we get
22 over there we'll get our stuff and we just break it
23 down ourselves.  What was it, J. and L. clothing or
24 Fashions or whatever it was?  Yeah, we just bring it
25 down right there.  What was it the affidavit that he

Page 233

1 got from the federal court, Agent DeJohn?  Oh, they
2 are breakdown men.
3 　　　Now let's come back to speculation and
4 surmise.  Let's put the government's evidence on
5 trial.  What does it show?  I'm going to show you
6 government's exhibit 16.  You've seen it, you'll have
7 it back there to look at.  And they claim that this
8 house at Nine seventy Ridgecrest, Keena -- By the way,
9 it's interesting Keena is not here to testify.  Did
10 she say thus and thus and who really owned that house?
11 Well they claim that the probate records, and believe
12 me poor folks like Freddie, they don't go down and
13 check the probate records to see what's there.
14 　　　Now I want you to notice here this document.
15 Please take a close look at it.  I'm going to point to
16 the lower left-hand corner.  This deed that you see
17 right here, it says Nine seventy Ridgecrest Avenue,
18 said that that was deeded to Freddie Williams by a
19 couple of people down here, you call the previous
20 owners, Jimmy Lee Myers and Loretta Myers, and the
21 closing this deed and the closing done was done by G.
22 Barton Crumb.  Guess what?  Barton Crumb practices law
23 about three and-a-half blocks from right here.
24 　　　Now I submit to you if I were a prosecutor
25 in this case, I would want to call in the Myerses and

Page 234

1 say at that closing did you see the likes of Freddie
2 William sporting around with forty Gs to pay you for
3 that? I don't think you'd believe that. And I submit
4 to you that they didn't do that because they can't
5 prove it. They didn't bring Barton Crumb in here to
6 say oh yeah, Freddie brought a certified check or he
7 brought in a stack full of stinky money or clean money
8 or whatever. They can't prove that.
9       We know who Freddie is. You know who
10 Freddie is, his neighbors told you. The men who
11 worked with him and for him through the years. His
12 son, you remember we proved that Freddie early in the
13 morning when his next door neighbor, Mr. Debardeleben,
14 do you remember, said yeah, I work for Flavor Rich
15 Dairy. I get up early in the morning. See he works
16 back in the days of that route, do you remember that?
17 I wish they would still do that. He said I'd look
18 across the street and there is Freddie over there
19 getting ready to go to work.
20       The man who got him into dry wall. He
21 stopped and he gave the man a ride. And you remember
22 they worked some forty some-odd years together. The
23 Reverend said he's helping to build churches, do all
24 kinds of things. Well he's a poor man, and he's got
25 the kind of money to buy this? And I submit to you

Page 235

1 they haven't proven anything.
2       Now the federal government with all of its
3 might and resources, guess what they can do? They can
4 compel Freddie Williams to come before the grand jury
5 and give them a handwriting sample. And here's the
6 way they do it. They say write your name about forty,
7 fifty, sixty a hundred times. And then they've got
8 handwriting examiners. Every agency around, state
9 agencies, federal agencies, and then they can make the
10 second deed which happens six or eight months later
11 and they can say yeah, this is Freddie Williams's
12 handwriting.
13       How many experts did they bring in here to
14 you? People from toxicology, people -- forensic
15 people, but not one word. It's just a total lack of
16 the kinds of evidence you would expect.
17       Now I submit to you the evidence is just as
18 much, and you understand I'm here telling you that
19 they have not proven, and my client is not even
20 charged with, possessing that marijuana. The best the
21 grand jury could figure is well, maybe, maybe it's a
22 conspiracy. That's up for you to decide, see. It
23 simply brings it here. The grand jury hasn't decided
24 guilt or innocence. That's for you.
25       But I submit to you they want you to

Page 236

1 speculate and surmise that Freddie and Leon Carmichael
2 got something going on other than exactly what Timothy
3 Williams told you is all that's going on. And that is
4 we work hard. I got folks. Daddy will take a crew,
5 you know, maybe to someplace in the Ridgecrest
6 neighborhood and work. I'll have a couple of men up
7 at Emerald Mountain. You know, he's got a lot of
8 customers.
9       And, by the way, you know well that in poor
10 parts of town rental properties that Mr. Carmichael
11 may own, lots of times you don't get people that may
12 have the financial wherewithal that you and I might
13 have. Most of the time it's like a month to month
14 rental. Or even if they do sign a lease, and they run
15 out of money in one month, two months and they just up
16 and leave. You come in and you look at your place and
17 you say holy cow, look what they did. You know,
18 later, then you get those crews over there. And
19 you've got telephone calls going back and forth.
20       And that coincides with your common sense.
21 What they're doing is they're putting two here and two
22 here and two here and you and I know it's only going
23 to make six. But the government is asking you to jump
24 on out there and make it into eighteen. It won't
25 wash. You can't make Freddie into a big trafficker.

Page 237

1 He just isn't that.
2       Now Patrick Denton. This case is about
3 Patrick Denton. That's the only way they ever got my
4 client into this case. Patrick Denton tells you yes,
5 I knew for more than a day, see he sold Charlotte
6 Hensarling the dope, and of course his honorable
7 partner in crime because he's in trouble, his bacon is
8 in the fire, he gets pulled out, he tells them other
9 things like oh yeah, guess what, Agent DeJohn, there's
10 going to be five hundred pounds coming in. By the
11 way, how is it going to come in? Well how could it
12 have come in, by the way?
13       They say there was some kind of petroleum
14 smell all over it. Well Eric Peagler told you yeah.
15 I've dealt marijuana in the very same town, in
16 Prattville, Alabama, where I was born and raised in
17 the very same town in which Gary Wayne George was
18 dealing drugs and got busted and this case all got
19 started. And how has it all got up here? Well it
20 comes in tanks of a truck that is driven by Mexicans
21 across the border. And you have all of that petroleum
22 stuff swirling around under cars for what? More than
23 a thousand miles, I submit, if it's coming across El
24 Paso or wherever, and it's coming to Prattville,
25 Alabama.

Page 238

1    Do you not see, ladies and gentlemen of the
2  jury, one drug dealer will tell you, you don't have to
3  have just one source, and you don't give away that
4  source because as you've seen no matter when they say
5  it in these words or not, they're all coming back to
6  it.  After Denton gets his deal, and after Patrick
7  Denton and Gary Wayne George get their deal, if they
8  ever get back out there with you and me, law abiding
9  citizens, guess what?  Oh, of course they're not going
10  to get back in it.
11    And guess what?  I'm the emperor of Siam.  I
12  was born to the Rockfellers.  There was a big mistake
13  on the day of my birth.  I'm made from the Rockefeller
14  line.  My Mama was Mrs. Rockefeller.  The Teague baby
15  was taken home to the Rockville (sic.) house and I've
16  been resentful ever since.  Speculation and surmise,
17  the judge will tell you, don't do it.  Don't do it.
18    All right.  Now let me just pick out some
19  random thoughts that I have about the quality of this
20  case.  I've written so many notes, and as you can tell
21  my voice is breaking, I'm nervous, I'm upset.  I have
22  Freddie's life in my hands because you've heard three
23  of the most capable prosecutors that you'll find in
24  this state present a case.  They're very good, and
25  that's why they're here.  And I submit to you you have

Page 239

1  to stop and say now wait just a minute, let's question
2  that.  Don't take everything at face value.
3    Now what was the timing that Mr. Denton just
4  sort of seemed to fall into?  Well Tim told you look,
5  I can't say Denton has keys, but I do know this, we
6  lost keys and Faith, or whoever got the guy to come,
7  he rekeyed her car and also the doors to the house.
8  And I don't know, I'm not going to ask you to
9  speculate or surmise.  But I'll tell you this, the
10  judge will tell you there is no burden of proof on
11  Freddie Williams.  He has read the indictment.  The
12  judge at arraignment said how do you plead?  Not
13  guilty.  And he is not guilty.
14    Now isn't it interesting that they talk
15  about three thousand pounds, and all they have proven
16  is though boxes back there and at best they say well,
17  maybe five hundred and fifth pounds.  That's another
18  problem.  What were Denton's motives?  George's
19  motives?  Well they wanted a deal, that's obvious.
20    Now think about -- You remember I told you
21  this is going to be a case of contrast.  Let me reason
22  with you a little bit on that.  Do you remember when
23  Patrick Denton, who went and got busted in June of
24  2002 on two counts of trafficking up in Huntsville,
25  Alabama, you remember they were smart enough to come

Page 240

1  running down here when they had him in jail, they get
2  a search warrant, they go to his house and guess what
3  they find?  A bunch of cash.  Nearly eight thousand
4  dollars.
5    What else?  Three firearms.  Guess what?
6  You've got to have firearms if you're going to be a
7  drug dealer, don't you?  And if you're going to be a
8  drug dealer and somebody comes to steal that stuff,
9  and you see that marijuana is a sinister thing, people
10  will steal from you to get it.  And guess what?
11  Patrick Denton, he's got the ability to call up the
12  police and say oh, somebody is breaking into my house?
13  No, he has to help himself so he had a gun.
14    But you see, a year later he finds out oh my
15  GOD, I've sold to Charlotte Hensarling.  She called
16  her husband, the guy that Gary Wayne George spent time
17  in prison with?  See, they come back to it too, don't
18  they?  Am I telling you the truth?  Hensarling calls
19  his buddy, his supplier.  Mr. Denton says,
20  "Charlotte's has been pulled over."  Oh, my goodness.
21  He has the rest of that night and all that night and
22  the next day and into the wee hours of the next day.
23  Seventy-two hours.
24    You remember I asked him on cross
25  examination, you had time to sanitize?  Well wherever

Page 241

1  he took his gun, because still right in the same
2  business, he can't call the police if somebody decides
3  to mess with him and steal it, or rob him, no, he's
4  got to deal with it himself.  Did he have guns?  Well
5  there are guns that Agent DeJohn say that they found
6  and took out of Freddie's house.  Well just if he has
7  a key, do you think he's going to leave his guns over
8  there?  I don't think so.  Do you?
9    Now law enforcement.  We tried to make a big
10  deal.  Go back there to the jury room.  Now there's's
11  fingerprint.  It's patent.  And if you can't see it,
12  then it's latent.  And, you know, the problem is they
13  don't even try to lift fingerprints.  They don't even
14  try.  But you remember I stood up and I asked one of
15  the witnesses, I forget which agent I asked but you'll
16  recall, you have the ability, I believe it was
17  Sergeant Williams, you have the ability to trace these
18  firearms and tell us where was it manufactured, what
19  wholesaler it went to, what retailer it may have been
20  sold to, because there is a paper trail on all these
21  things.
22    I mean, you could even trace it down to who
23  bought it, and if that person give it to somebody
24  else, you could pull them in the grand jury and say
25  now you bought it back from Joe's pawnshop in such and

Multi-Page™

1 such a year. Who did you give it to, or, you know.
2 Freddie Williams is no where in any of this. It's a
3 big hole.
4       How did the marijuana get over there at
5 Freddie's house? Well Patrick Denton -- Well isn't it
6 interesting Agent DeJohn in the search warrant didn't
7 even mention Freddie. You see, what are the places
8 where they do the chopping? Eight oh eight -- well,
9 you've seen the house enough. Yeah, this nice right
10 there. They do the chopping right there. They're the
11 breakdown men.
12       He doesn't have his chopping devices or
13 anything when the police come, do they? Well he says
14 well, I don't know where it would be but I'm going to
15 take you around to some places where it might be. And
16 he just happens to take him by Freddie's place. And
17 of course he goes over there. He's got a key, I would
18 submit, but he can't let himself in. Because why?
19 Freddie is not even there.
20       It's an interesting circumstance. Freddie's
21 wife has been on life support, and they have
22 determined they are going to turn off the machine.
23 And Timothy told you yesterday, he said yes, my mother
24 died on the 18th. And Freddie is in the midst of all
25 this. You can hear that frantic phone call. "Come

1 on, get your brother. Well just come on down and
2 bring some money." You see, when they come in to
3 Freddie's place, this humble abode in po folks
4 territory, they don't find a cash hoard. Oh now,
5 that's not part of Freddie. It just isn't Freddie.
6       Gary Wayne Denton (sic.) quit the honest
7 job, Family Mart and all of those places. But
8 Freddie, he's still working every day. No, I submit
9 to you he doesn't own Nine-seventy. And I don't think
10 any of you believe he owns Nine-seventy. I don't
11 think you believe he slapped down forty thousand
12 dollars. I don't think you believe he could pull off
13 anything like that and get it from the Myerses.
14       Well guess what, an honorable lawyer, Bart
15 Crumb, could. Look at all that, too. And as good as
16 prosecutors that we've got here, the grand jury didn't
17 get any of that, did they? No wonder all they did was
18 think, well, let's see how a trial on conspiracy might
19 go. You've got a lot of circumstances here.
20 Unfortunately Freddie, you know he's trying to get all
21 his kids together. When Patrick Denton went over
22 there, you know, what was the situation?
23       Now later when Agent DeJohn and all of these
24 other agents when they come in to do the search, they
25 don't find a bunch of money. But what is the

1 circumstance? Well, I hope you heard it. I heard it.
2 Patrick Denton says, there's a drug dealer over here.
3 This conspirator over here, this breakdown man over
4 here, ain't even got any bags. Agent DeJohn, whip me
5 up some money, I think we're going to need about fifty
6 bucks worth of bags.
7       It gets comical, doesn't it? Guess what?
8 He leaves Agent DeJohn, being a good agent he does the
9 job, they get together fifty bucks and he goes and
10 buys a bunch of bags. And he finds them and he says
11 hah, you're guilty, Freddie. You remember we asked
12 questions about how long was it before Mr. Denton, Mr.
13 Denton had to leave again. It ain't hardly ten,
14 twelve, fifteen minutes at the most. And I hope
15 you'll play the tape again, the videotape. I think
16 you'll hear it. Denton says I forgot my scale.
17 That's a Freudian slip if I've ever heard one.
18       What does this tell you? That's right out
19 of his own mouth. On that tape, I for got my scales.
20 Oh. Oh. Well we found some scales over there. Look,
21 folks, you can find latents and patents on there. And
22 so the scales they do find in there, guess what, came
23 right out of the D. E. A. offices or whoever it was.
24 You know, you heard the testimony. There is an awful
25 lot of stuff that I submit had this case been handled

1 properly, should have been done but was not done. And
2 they want you to speculate which is something the
3 judge will tell you not do. And, you know, try to
4 surmise, and it is just not proper in a court of law.
5       Now, ladies and gentlemen, please bear with
6 me. I have been living with this case for nearly a
7 couple of years now, and I've written down a lot of
8 things that I want to share with you and that I think
9 is important for you to consider. And as I look over
10 my notes please forgive me for being halting, but I'm
11 getting old enough now that I have to look at what I
12 used to think about. And what I thought was a
13 previous thought last night, I can't remember it right
14 now. You've got me nervous and upset. I've got
15 fourteen sets of eyes looking at me, so -- It looks
16 like I've covered an awful lot, haven't I.
17       Oh yes. Polygraphs. That's something else
18 they got, isn't it? Hey, we all know, don't we? I
19 read a lot of your juror questionnaires. You know.
20 We like crime scenes and law and order. I think
21 they're really exciting too, although I hate to think
22 a busman's holiday I'd do this all day and I'd hate to
23 go home and indulge myself in all the same things.
24 But you know what? They never polygraphed any of
25 these people that they want you to believe. Oh, we're

Page 246

1  going to bolster their credibility. I submit to you
2  they don't do anything to bolster the credibility.
3      You know I hate it when the law enforcement
4  looks at things and says well, I think Leon
5  Carmichael is a drug dealer. And I understand, you've
6  got to have somewhere to begin. But, you know what I
7  think is a big problem is? Quite often they work from
8  conclusions rather than coming to conclusions. Is
9  that the way it should be? Stop and think about that.
10     You make your conclusion and then try to get
11 your proof in order to support it? But Bart Crumb is
12 not here, is he? The Myerses aren't here, are they?
13 We haven't touched any firearms, have we? We haven't
14 done fingerprints, have we? We haven't done a lot of
15 things we should have. You're going to mess up my
16 conclusion if I start having to polygraph my snitches,
17 because they come from hell. I think that was the way
18 he put it, wasn't it?
19     COURTROOM DEPUTY CLERK: Five minutes.
20     MR. TEAGUE: Thank you.
21     Oh yeah. You see, Freddie lives in the poor
22 part of town and they said well, you know, in that
23 secret room, talking about working from the conclusion
24 -- A secret room in the poor part of town, you see,
25 now just take a look at Freddie. He's a sheetrocker.

Page 247

1  Now does he deal in things like curtains like my wife
2  would do? Believe me, if my wife ever would leave me
3  or if I would ever leave her or she unfortunately
4  passes and dies, believe me if I move somewhere else
5  there are probably going to be some blankets up to
6  kind of cut that cold wind coming in on a cold
7  winter's night in November, or trying to pay bills for
8  air conditioning.
9      You know, there is just a lot things here.
10 Even in the room they didn't find the marijuana when
11 they came in, Agent DeJohn said. Well we didn't find
12 the marijuana that we found it in the main bedroom.
13 And you can see it. Watch the video again. In fact,
14 look at these pictures. There's a blanket up in that
15 room, too. You can see there's a side window, it's
16 got a blanket over it. And there's another window in
17 the secret room where there is not even any marijuana
18 but they want you to work from a conclusion as they
19 have, though. I don't think you will.
20     Ladies and gentlemen, my time is passing by
21 very quickly. You will be given a verdict form and
22 you will look at, of course, two different counts. My
23 client isn't even charged with money laundering. Boy,
24 what a joke. Can you imagine? They couldn't even
25 convince the grand jury that my client even could

Page 248

1  touch money laundering. There is nothing there.
2  There never was, there isn't now, even after
3  speculation and surmise. Freddie is a poor man.
4      Now you should consider the counts
5  separately. The charge is not possession. He didn't
6  get charged with that. The charge is just conspiracy.
7  And I submit to you that when you get through using
8  your common sense, you're only going to find that
9  Freddie might have been in the mere presence. Now
10 Freddie you should have done this when you found that
11 marijuana in the house.
12     Well, yeah, if he hadn't been frantically,
13 and the proof is right there on the table, trying to
14 get his children together, bring money, come on we've
15 to get over to the hospital now. We've got to get
16 over there now. GOD forbid that we should be harsh
17 and judgmental of Freddie whom we have proven has been
18 nothing but a good man all his life. Has done work
19 for Habitat for Humanity. Has given people rides and
20 formed friendships that last forty-five years.
21 Neighbors who say yeah, I've lived next door to
22 Freddie for forty-five years. His honorable son, a
23 man who works hard, runs a sheetrocking business. You
24 see, he doesn't know anything about Nine seventy.
25 Until this trial came along neither did Freddie nor

Page 249

1  me, I submit. We don't have any answers. And believe
2  me, a good cross examiner like Steve Feaga can make
3  any uneducated person, a man who works with his hands,
4  look at that. You see, Steve Feaga probably couldn't
5  nail a piece of sheetrock up without nailing nails. I
6  know Barry Teague certainly couldn't, and I went to
7  law school.
8      COURTROOM DEPUTY CLERK: Fifty minutes.
9      MR. TEAGUE: Okay.
10     But don't hold everyone to the standard of
11 being a man with four years of education in college
12 and three more years of education in law. They're
13 skilled cross examiners, and I submit to you Timothy
14 tried to tell you exactly what the situation was.
15 It's all circumstantial evidence. I don't think
16 you're going to go as far and work from the conclusion
17 the government has tried to put forth in this case.
18     You've been good. Thank you for listening
19 to me. And Lord bless you as you do your
20 deliberations. May He guide you.
21     THE COURT: Five minutes and then we'll hear
22 from Miss Wayne.
23     (Whereupon, a recess was taken.)
24     THE COURT: Miss Wayne?
25     MS. WAYNE: Thank you, Judge.

Page 250

1    CLOSING ARGUMENTS:
2        MS. WAYNE: "We dare defend our rights."
3    That's the Alabama State motto. "We dare defend our
4    rights." Something that this country is founded on,
5    something that this state is founded on. Defending
6    the Constitutional rights of individuals. Those
7    individuals are people like Leon Carmichael. The
8    Constitution and the individual rights are something
9    that this state is about and that this country is
10   about.
11       What that means is that when the government
12   points their finger at a citizen of this country, of
13   this state, that means they have to do the proving.
14   It doesn't mean that the government can say because if
15   you don't sit and take it, if you don't cross examine
16   witnesses, if you don't question the accusing, that
17   something is wrong with you as an individual. This
18   country is founded on defending our rights.
19       It doesn't mean if you're successful in this
20   country and in this state, that you're protected
21   somehow and should be treated differently. It means
22   that there's a shield between you and the government.
23   It's called the Constitution. There's a shield
24   between the overreaching and an overzealous
25   prosecution. It's called the jury. You stand between

Page 251

1    the government, and when they're wrong and when
2    they're right.
3        The government's thrown out a lot with their
4    witnesses during this trial about the truth. Their
5    truth may not be your truth and that's the reason that
6    we have a jury. You're individuals. You can think
7    independently than what your government may want you
8    to believe. And we know in this country and the
9    history of our country there are many times the
10   government has been dead wrong. And they're dead
11   wrong in this case. They're dead wrong, because you
12   know what? You can say it over and over again, the
13   same things, you can have the government pointing
14   their finger at Mr. Carmichael, you can say things
15   about his lawyers and jump up and down, but that
16   doesn't make it true.
17       What makes it true is the evidence. Being
18   successful doesn't mean you can be a target in this
19   country and that you can't scrutinize what they want
20   to accuse you of. That's not what it means. Being
21   successful can mean you are a target. Being
22   successful can mean you're unpopular. Being
23   successful can mean the government can keep going
24   after you time and time again, and that's what they
25   have done for ten long years in this man's life.

Page 252

1        What Mr. Feaga is telling you though,
2    however, if the government says it must be true, you
3    shouldn't question it. You should just lay down and
4    let them steamroll over you. The war on drugs has
5    made for some strange bedfellows. Some strange
6    bedfellows. We have liars, we have the government
7    entering into agreement with convicted felons, sex
8    offenders, whoever they want to bring in here they
9    have the power to reach agreements with. They have
10   the power to strike deals.
11       He's telling you these people that when
12   their criminal activity occurs in hell, you don't have
13   angels? Guess what? You have the power to say that's
14   not good enough. The quality of the evidence is proof
15   beyond a reasonable doubt, and you can send them a
16   message. You can say you need to bring me a lot more.
17   If you're accusing a citizen in this community, you
18   need to bring me a lot more.
19       But who did they bring you? Well they
20   started out with the convicted sex offender. And the
21   reason that's important in this case is not because I
22   asked ad nauseam, according to Mr. Feaga, or that the
23   defense scrutinized those witnesses, that's not why
24   it's important, it's important because you have to
25   rely upon that testimony. They chose to bring it to

Page 253

1    you, and you get to look at it to determine whether
2    it's reliable. You know why that's important?
3    Because if it's not reliable, you can't bet on it.
4    You can't rely upon it in things important to
5    yourself.
6        Gary Wayne George. He comes in here and he
7    tells you, because he knew he was in big trouble, that
8    he was going to turn in his buddy, Patrick Denton, the
9    other guy that he dealt drugs with. Now they want to
10   tell you maybe we shouldn't have brought Gary Wayne
11   George's wife in, his ex-wife to tell you about the
12   other crimes he hasn't pled guilty to. Because he
13   admitted that he's had fifteen times felony
14   convictions. Fifteen. That's our fault? We made
15   them bring him in? They couldn't get real evidence so
16   they wanted you to believe this guy?
17       I asked the agent, I said is there a cutoff
18   line where you say that's too many felony convictions?
19   Do you scrutinize it? Do you assess it? Do you
20   factor it in in terms of their credibility? What did
21   they tell you? We got to use whatever we got. We got
22   to use whatever we got because we've got to get him.
23   We don't need to assess that. We don't care. Sounds
24   like our truth, fits into our theory, let's go with
25   Gary Wayne George. You can reject that totally. You

Case 2:10-cv-01106-MHT-WC    Document 89-12    Filed 11/28/11    Page 33 of 47 .

Multi-Page™

Page 254

1 don't have to believe it. No one mandates you to do
2 that in this case.
3     So Gary Wayne George who comes in here and
4 he tells you he's the reason that all this began, even
5 though you know that this investigation with Mr.
6 Carmichael began a long, long time ago. So don't let
7 them fool you in terms of Gary Wayne George started
8 this. Okay? That's not what happened here. And the
9 government says to you that you shouldn't really pay
10 attention to the fact that I brought attention to the
11 fact that he's been under scrutiny, my client, for all
12 these years and they close cases and they open cases
13 and the reason that they must have done that was
14 because of this informant who was supposedly afraid of
15 Mr. Carmichael.
16     Except the problem with that theory is that
17 you heard it was going on for years and years and
18 years. And Agent Halasz told you that despite the
19 fact that they documented this case with volumes and
20 volumes of paperwork, when it came to the real close
21 questions that I asked -- remember the question that
22 Mr. Feaga now tells you oh, it was interesting because
23 the defense opened the door to that, I opened the door
24 because we're not afraid of the truth. And when we
25 open the door to it, Agent Halasz said no, it wasn't

Page 255

1 in a report, Miss Wayne. Forgot that. There were
2 informants afraid of your client, but we didn't
3 document that.
4     You've got to wonder why the absence of
5 evidence goes to the quality and proof beyond a
6 reasonable doubt.
7     Let's go back to Gary Wayne George. Now
8 interestingly enough Gary Wayne George is also the one
9 who says, you know, I have marijuana in my house, the
10 authorities are coming out to search my house so I
11 have drugs there, I know I'm in trouble and I'm a
12 convicted sex offender. So I have some real problems.
13 And he tells them supposedly about what's going to
14 happen. Well you know what? He was pretty good at
15 duping them because they believe him. They need to
16 believe these witnesses in order for their own theory
17 to be true. They have got to do that. So they
18 believe Gary Wayne George because some of what he
19 tells them is the truth.
20     He has drug connections with the
21 Hensarlings, with Patrick Denton. He knows the drug
22 trade. He got up and told you how much drugs cost,
23 how much he was making. Now interestingly enough he
24 left out the fact of the girlfriend that he was
25 actually selling the drugs to. I believe it was Mr.

Page 256

1 Denton who kind of busted him on that.
2     But, you know, you have to look at what he
3 said and scrutinize does it add up and remember when
4 he said it. He's at the police department with
5 Investigator DeJohn. They do that videotaped
6 statement, remember? And he's saying to him he
7 doesn't care about who can I turn in, let me tell you
8 about the drug trade. He tells Investigator DeJohn,
9 what can you do for me. The reason he asked that is
10 because he's been in the business a long time. He's
11 been in and out of jail a lot. He knows how the
12 system works, and he knows who can give him leniency
13 and who can give him a deal.
14     He knows it isn't the defense. We don't
15 have that kind of power. They have all the power and
16 they give him a deal.
17     Now they have told you a lot about all these
18 unindicted coconspirators. Everybody they brought up
19 was a coconspirator in this case. They didn't charge
20 any of them, but they're just a bunch of people who
21 are supposedly in a criminal conspiracy that are not
22 charged with crimes. And they told you all these
23 names. But you know what? Who is charged with
24 anything? Hensarling? No. Her husband? No. Gary
25 Wayne George? No.

Page 257

1     Patrick Denton, remember him? Not only does
2 he have what he says is his involvement in this case,
3 his huge involvement in this case, but he has another
4 pending case that he gets popped for almost a year
5 and-a-half before, the 2002 case. And what does he
6 tell you about that? He says it's still pending.
7 This is a guy who can just get cases, never has to go
8 to court and apparently never has to face the
9 consequences. You know why? Because he has them in
10 his back pocket. That's what happens when you deal
11 with the government.
12     Patrick Denton tells you that he's not
13 really going --
14     MR. MOORER: Your Honor, I object to counsel
15 writing on our demonstrative aids that we wrote. If
16 she wants to write a chart of her own, that's
17 something she's free to do.
18     MS. WAYNE: Judge, it's an illustrative aid.
19 It's not been admitted.
20     THE COURT: It's really their chart.
21     MS. WAYNE: Judge, my writing is on their
22 chart.
23     THE COURT: Pardon me?
24     MS. WAYNE: This is my writing.
25     THE COURT: Oh, that's your writing?

Multi-Page™

Page 258

1    MS. WAYNE: Yes.
2    MR. TEAGUE: And a good half of it is my
3 writing.
4    THE COURT: Just a minute. Just a minute.
5 I can only hear one person at a time.
6    MR. MOORER: Your Honor, we constructed the
7 chart. We're asking --
8    THE COURT: She can strike through her own
9 writing, even if it's on your chart.
10    Let's proceed.
11    MS. WAYNE: You gotta wonder what matters.
12 You gotta wonder what matters in this case. And you
13 saw who they wanted to put in this case as unindicted
14 coconspirators. Okay? You get it? Okay, I won't use
15 their chart, but you know what it is, all right?
16 These were illustrative aids. We went through these
17 and we named individuals. I started that chart
18 because I wanted you to see who in fact the government
19 chose not to indict and not to point the finger at.
20    There are a lot of them supposedly out
21 there. Every time you heard an alleged statement that
22 either Mr. Carmichael made or somebody else, it was
23 under this guise or this veil, this large umbrella of
24 being a coconspirator. You know what's so great about
25 that? Is that the government has the power to say

Page 259

1 anybody could say anything about Leon Carmichael and
2 you don't have to bring them in here. You don't have
3 to hear from them. You don't get to scrutinize them.
4 You don't get to assess their credibility. They just
5 get to throw anybody they want to out. Because that's
6 what they did in this case, and they want you to
7 believe that.
8    When you look at Patrick Denton, okay?
9 Patrick Denton. He tells you that Mr. Carmichael is
10 greedy. He got that out there because he wanted you
11 to know about that. He said that he could not --
12 After he got his 2002 case, he was really mad and had
13 an axe to combined against Mr. Carmichael. He had a
14 grudge. And I talked about that with you on opening
15 statement. And why? Because Mr. Carmichael wouldn't
16 get him out of jail.
17    This is what we want you to do. We want you
18 to use your common sense. If Mr. Carmichael is this
19 huge drug dealer, according to the government, why
20 would you leave one of your main distributors in jail,
21 let him get mad, think that he might be going to
22 somebody because he has a grudge and he might snitch
23 you off? Why would you do that? Mr. Carmichael, the
24 drug dealer, that's what he did? Patrick Denton sits
25 in jail until his family gets him out and he tells you

Page 260

1 he's mad about it.
2    And then he's mad because you know, Mr.
3 Carmichael just didn't give him enough breaks. He
4 didn't help him out enough, even though he told about
5 the times that he did help him out. Now interestingly
6 enough Patrick Denton told you something that was so
7 telling. I said to him -- or excuse me, it was
8 Miss James, my co-counsel said to him what did you do
9 when you got out in 2002? You didn't go back to
10 dealing drugs, did you? And he looked at her.
11    It was so weird, he said well, yeah. So
12 you're on bond, you know you're looking at a huge
13 sentence and you go back to dealing drugs. And you
14 know what he said to her? What else was I supposed to
15 do? How about get a job? How about go out and earn
16 minimum wage? How about work hard like Mr. Carmichael
17 who you've heard is out there hussling and doing the
18 deals, entertainment, he owns the entertainment club,
19 he has the flea market, he's working day and night.
20 How about that, Patrick Denton?
21    Well I guess he didn't need to do that
22 because he has the government. He had the government
23 helping him out.
24    Charlotte Hensarling came in here and she
25 told you she basically confirmed what Patrick Denton

Page 261

1 told you. She said that she knew they were dealing
2 drugs. She had her own customers. She had other own
3 supply. She told you all of that.
4    She also said to you she got busted on the
5 highway. She didn't give you much more information
6 than that, except that she and her husband were
7 dealing a lot of drugs. You knew that. Okay? She
8 admitted that. She's never been arrested for it. She
9 said she got arrested, she never had to go back to
10 court. Have you ever heard of such a thing?
11    They said they took that big old container
12 out of the back of her car, this big old container
13 that Agent Wilson is sitting behind. That's a lot of
14 marijuana. That woman has never had to go back to
15 court and answer for that? What kind of government
16 are we talking about? What kind of deals are you
17 giving people? How do you choose the person that
18 you're going to decide to deal with? Do you say you
19 know what, it's the guy we don't like? It's the guy
20 we really want to get? It's the one that we want to
21 make an example of, so we'll leave all the rest of
22 them out there in our community? That's how they make
23 that call?
24    You get to determine whether that's good
25 enough. You've got to look at the other guys that

Multi-Page™

Page 262

1 they brought in here. They brought in Mr. Timmons,
2 they brought in Mr. Thomas, the guys that were in
3 jail, Mr. Peagler who says to you that he and Mr.
4 Thomas had been codefendants in a prior case.
5 Marijuana dealers. Okay? They come in here in chains
6 and you know what they want. They're at the same
7 jail, they have been codefendants, they have known
8 each other for a long time. Miss James brought out
9 the fact they have been playing basketball together
10 for years and years and years.
11      And Mr. Thomas tells you, it's the talk of
12 the jail. Mr. Carmichael gets busted. They know.
13 The government wants him. So what do they do? They
14 start getting on the phone. They get on the phone to
15 the Government because they know the government can
16 give them a deal.
17      Now Mr. Thomas wants you to believe that
18 somehow he's hoping that there's going to be some
19 benefit. All you had to do is look at Patrick Denton
20 and you know there is some benefit. He knows. The
21 word is out. The fastest one to get to the Government
22 to get over to their building and talk, that's the one
23 who gets to be out, who gets to wander the halls of
24 justice. You got to cut your deal fast. You've got
25 to give it to them, and that's what Mr. Thomas did.

Page 263

1 The reason that that's important is because it goes to
2 the quality of the evidence.
3      You get to assess that. Proof beyond a
4 reasonable doubt. A reasonable doubt is something
5 that would make you, each one of you hesitate in
6 matters of importance to yourselves. To your lives,
7 to your children, to your families. A reasonable
8 doubt can be this big, or it can be as big as a -- big
9 a hole that a Mack truck can drive right through it.
10 It can be different to each of you. You may differ in
11 your reasonable doubts. The law doesn't dictate that
12 they have to be the same reasonable doubts. You may
13 have different reasonable doubts. You may only have
14 one. You may have a dozen.
15      But what it does say is, it has to be a
16 matter that you would hesitate in matters of
17 importance to yourself. Look at the people that they
18 brought in to you. Look at Mr. Timmons. Look at Mr.
19 Denton. Look at Gary Wayne George. Look at them all
20 together. Take something of importance to yourself.
21 If you put an ad in the paper and you said you needed
22 someone to take care of your children, to take care of
23 an elderly parent, to take care of your dog.
24      If Gary Wayne George or Mr. Denton, Mr.
25 Timmons, Mr. Thomas, Eric Peagler showed up at your

Page 264

1 door and knocked and they said I'm answering the ad,
2 I'm here to take care of your children, your elderly
3 parents, would you hesitate? Would you slam the door
4 and run out the other side of the house? Would you
5 get out of there? If you did, if you hesitate, that
6 means you have a reasonable doubt. If you went to
7 Eric Peagler and he was your doctor, or Mr. Denton,
8 and he told you you have cancer, would you seek
9 another opinion or would you rely upon his opinion?
10 That means his word. If you would hesitate, that
11 means you have a reasonable doubt. That's what the
12 law is about.
13      You got to take it. You've got to consider
14 all of those. We didn't bring those witnesses in.
15 Now I'm assuming the government is going to jump up
16 and they're going to say well, you know, they could
17 have done certain things. That's called shifting the
18 burden of proof. Because the government has the
19 burden here. We didn't have to do anything, but we
20 chose to. We chose to bring in the whole picture to
21 show you the whole story. Mr. Carmichael didn't have
22 to do anything. Could have hired lawyers who just sat
23 there, who just let it go by.
24      What would you do if you had been accused
25 wrongly of a crime? You bring in the people to

Page 265

1 explain the things they don't want you to hear about.
2 The things that matter and that should be considered
3 in determining whether or not their charges, their
4 accusations are credible.
5      Now we brought in people in terms of the
6 trucking business. And why is that important?
7 Because they have thrown out a lot of stuff here that
8 they want you to jump to conclusions. What the
9 government had is called circumstantial evidence. Now
10 there's an instruction in the law that says when you
11 look at circumstantial evidence, it can be the same as
12 direct evidence. It's admissible in a court of law,
13 but you'll be able to give it the weight that you
14 think it should have in this case, because it's a lot
15 of circumstantial stuff.
16      They want you to believe that Sandra Jones,
17 who you never heard from, okay? Now he can't tell you
18 that's up to us. We didn't do any accusing here. We
19 didn't bring in Sandra Jones. But they kept bringing
20 up Sandra Jones. The woman who got arrested at the
21 airport with the money around her. They said
22 forty-two thousand dollars. There was never, ever,
23 ever any evidence connecting Sandra Jones at that
24 point in time to Mr. Carmichael, period. Nothing.
25 She could have come in here and told you. They can

Multi-Page™

Page 266

1 make people do whatever they want. Subpoena her or
2 bring her in. You didn't hear from Sandra Jones.
3 That's a question that sits out there. You can't
4 infer. You can't speculate about that.
5        Then you hear about Sandra Jones and the
6 truck in Mississippi. There is no question that that
7 happened. Okay? She got popped with a bunch of
8 marijuana. Didn't get to hear from Sandra Jones. You
9 didn't hear any evidence suggesting that Mr.
10 Carmichael directed that. That he approved it in any
11 way. In fact, we brought in evidence to tell you
12 about what the trucking business is about. They told
13 you when those trucks leave that gate, we have no
14 control. Should he have known? Could he? That's
15 speculation. They didn't prove it. They didn't prove
16 that Mr. Carmichael controlled or directed that
17 truckload, period.
18        Now what they want to say is well you know,
19 he bonded her out so that shows some kind of guilty
20 connection. That's not the law. That's simply not
21 the law. You heard why he bonded her out, because we
22 asked those questions. He bonded her out because the
23 law in Mississippi requires that he bond her out in
24 order to be able to get his truck, and there is no
25 question he was running a trucking business. That was

Page 267

1 his business. He had perishable items on that truck.
2 You heard about it, and the judge said if you want
3 your truck you've got to get Sandra Jones out.
4        Does that mean he's guilty of a crime?
5 That's not a crime. Does it mean he should have had
6 better truck drivers? Maybe, but that's not a crime.
7 You're not implicated for what your employees may do.
8 That's not a crime. But they want you to believe that
9 because if Sandra Jones is bad, then Leon Carmichael
10 must be bad. That's the inference that they want you
11 to draw. Period.
12        They say it's a smokescreen because the
13 defense has said there needs to be some physical
14 evidence to link Mr. Carmichael up to the drugs. And
15 if there isn't, it's because he's so smart or, you
16 know, drug activity wasn't going on at the times we
17 were looking. Come on, give me a break. In ten years
18 you can't tell them they can't have an agent to come
19 in here and say there was foot traffic coming back and
20 forth from Unique Entertainment, from wherever Mr.
21 Carmichael might have been? That we can't even tell
22 you that?
23        Because you had an agent talk about the
24 fact, or I think it was actually one of the drug
25 dealers themselves said, when you're dealing drugs

Page 268

1 it's like a mini mall. You don't have anybody being
2 able to say anything like that about Mr. Carmichael.
3        - The excuse is they want to get out from
4 under their obligation. Because if you don't hold
5 them to that standard, if you don't say to them you've
6 got to bring me some physical link, then it's easy.
7 It's easy because then you can just keep pointing the
8 finger. The reason physical evidence is so important
9 in this kind of case, and I'm talking about
10 surveillance tapes, I'm talking about some kind of
11 audiotape, I'm talking about a fingerprint, a hair,
12 whatever, the reason that that's important is because
13 you don't have to then question the credibility of
14 informants.
15        Physical evidence does not lie. Physical
16 evidence doesn't have a bias, doesn't have a motive to
17 change its story. Physical evidence is what it is.
18 And they know it. You can't change it. So when you
19 have the absence of physical evidence, you've got to
20 ask yourself why. Why? Nothing. I mean come on,
21 Patrick Denton says I'm the close associate of Leon
22 Carmichael. They couldn't put a wire on him to have
23 him call within that time period of three o'clock in
24 the morning until the next morning and get him on the
25 phone saying something damaging? Nothing? That's too

Page 269

1 easy. You can't let them do that. That's too easy.
2        Now what they want to also tell you, and I'm
3 just going to touch the charts, I'm not going to mark
4 it up, they made this money a big issue here. And
5 they're saying to you that, you know, there was an
6 awful lot of money being made here by Gary Wayne
7 George and Patrick Denton, and we don't know what
8 Patrick Denton did with all of his money but Mr.
9 Carmichael must have been taking that -- it must be
10 drug money that he buried and there must be some
11 reason and let's just infer that that's what it's all
12 about.
13        Now if you are a drug dealer, this is what
14 they're going to tell you, that the reason that Mr.
15 Carmichael is claiming the kind of money that he's
16 claiming is that he has to somehow justify that he's
17 making a lot of money. That must be what they're
18 going to tell you. Because otherwise drug dealers
19 file their income taxes and they say they make
20 millions of dollars because they don't want the
21 government to scrutinize them. I mean come on. Use
22 common sense.
23        Now this is what they're also telling you,
24 is that Mr. Carmichael is between a rock and a hard
25 place. I got it right this time, okay? This is why.

Multi-Page™

Page 270

1  If he files his income tax in preparation for trial,
2  which that's not a crime because they know that
3  they're going to talk about his income taxes, and if
4  he does that right before the trial then there is
5  something wrong with that.  But if he didn't do it,
6  you know what you would have been hearing, that he
7  hadn't filed his income taxes and there is something
8  wrong with that.
9        Now don't let them throw a red herring at
10 you about that because he hasn't committed a crime of
11 tax evasion.  They have been trying to catch him on
12 that for years and years and years.  He hasn't
13 committed a crime in preparation for his trial, which
14 there is nothing wrong with that.  He filed his income
15 tax and he gave them over and now they have them.  And
16 now they want to say there is something wrong with
17 them?
18       Now when you look at those income tax
19 reports and some of the questions got a little
20 convoluted, I think, with some of the witnesses, but
21 the most important thing is they're trying to say he's
22 now lied on his income tax reports.  And if he lied
23 he's a bad person, so even though that's not a crime
24 we haven't charged him with it, we need you to believe
25 that.  The problem with it is this, she told you if

Page 271

1  you look at those discrepancies, he reported his
2  income.
3        What it doesn't show is that the difference
4  between this tax if you're a promoter and you have a
5  license and you're giving events, the tax is
6  different.  Completely different.  And if you think
7  that you're going to be scrutinized, which Mr.
8  Carmichael knows, why would you report the
9  discrepancy?  Why report anything at all?  Why say you
10 make millions of dollars and then attach a sheet
11 showing different things?  What is he afraid of?
12 Nothing.  He's given everything to them.
13       Now this is interesting too because we bring
14 in lawyers to tell you that this is a man who is such
15 a drug dealer, who is so evasive, that he's going to
16 get advice from prestigious people in this community
17 because that makes sense.  Okay?  So he goes to a
18 lawyer who is now a judge, and he relies on the advice
19 of this judge, who was then his lawyer, for his
20 investments.  Doesn't sound like someone who is hiding
21 the ball.  And Bruce Maddox, an esteemed attorney in
22 this town who used to be a prosecutor longer than he's
23 been a defense lawyer.  But somehow something is wrong
24 with him because he gave my client the advice don't
25 put your money in the bank.

Page 272

1        And you know what he said to you that was
2  very, very telling of the mind-set of what was going
3  on not only with Bruce Maddox but what he was telling
4  Leon Carmichael?  And he said he was under the
5  attention of law enforcement and the government.  They
6  would not leave this man alone.  He told you when he's
7  under that scrutiny what does he do?  Does he run?
8  Does he hide?  Does he flee to another country?  Does
9  he take his millions of dollars and go someplace else?
10 No, he opens his books.  He gives them what they want.
11 And what happens?  They don't find anything.  They
12 close their case.
13       Louie Wilson, the I. R. S. guy, he didn't
14 say they close their case because of some informant
15 who was scared of Mr. Carmichael, they closed their
16 case because they didn't have anything.  And why
17 that's important is that because those lawyers told
18 Mr. Carmichael to keep his cash, to hoard his cash and
19 to deal in cash, he didn't know the I. R. S., that he
20 wasn't under their scrutiny.  The lawyer told you it
21 wasn't until 2004 that he knew that.
22       They never gave him notice, so he continued
23 to deal in the way that he was advised.  That's not a
24 crime.  He took the advice of others.  He sought out
25 and relied upon reliable people in this community to

Page 273

1  do what he thought was right.
2        Sherry Pettus, another government witness
3  who was brought in to say that supposedly she is a
4  coconspirator with Mr. Carmichael in terms of
5  laundering this stinky money.  Okay?  Now Sherry
6  Pettus was all over the board.  She said, you know,
7  certain things in her testimony under oath today.  You
8  heard when she was in front of a prior hearing in a
9  grand jury under oath what she told them because they
10 kept reading her testimony.  And then she said
11 something different today, that she didn't know now
12 that it was drug money, that she didn't know this and
13 she didn't know that.
14       Now the only reason that's important is
15 because you also heard Sherry Pettus testify under
16 oath after the grand jury testimony that she didn't
17 think that Mr. Carmichael was a drug dealer and that
18 this money came from drugs, that she had no reason to
19 believe that.  So now we have Sherry Pettus testifying
20 under oath as to one thing, testifying under oath in
21 front of this judge as to another, and now telling you
22 something different.  How do you assess her
23 credibility?  Her demeanor.  By the party that called
24 her.  What was she telling you that was consistent.
25       She told you she opened up this account, she

Multi-Page™

**Page 274**

1  agreed with that. What she said to you, though, was
2  she backtracked and she said wasn't true was at the
3  time that she told anybody that she knew it was drug
4  money. Because that's important, because if you
5  believe that, if you believe that it's drug money,
6  then you have to buy into their theory. But what she
7  told you was before the grand jury she had met with
8  the government. She knew that she was under scrutiny
9  and she was scared for herself, because she knew that
10 Mr. Carmichael had been arrested and she knew he was
11 in trouble. And therefore if he was in trouble, it
12 might mean she's in trouble. Even though she really
13 didn't understand what was going on.
14       Because you know what? When you have law
15 enforcement breathing down your neck, telling you that
16 your boss is in trouble, telling you that your boss is
17 in big trouble, it's in the paper, he's been arrested,
18 you get scared. And that's what she told you. Now
19 she tells you she works back at the Carmichael Center,
20 but she didn't tell you that she was coming in here
21 and lying for Mr. Carmichael at all. She came in here
22 and she testified.
23       Now they may not want to believe everything
24 that she says because it doesn't fit their theory, you
25 have to assess her credibility. You have to determine

**Page 275**

1  whether or not Sherry Pettus was conspiring and was
2  money laundering what she knew to be drug money
3  through this bank account.
4       What you have to ask about this account --
5  which is, you know, is mind-boggling, and this is why
6  we have you, is because of your common sense -- if Mr.
7  Carmichael is attempting to make sure you can't trace
8  his money, and you heard about all the accounts in his
9  name, all of the things that he was doing as a part of
10 his legitimate business, why are you having your
11 employee write checks to you? I mean that's not very
12 good in terms of hiding and disguising and masking
13 yourself from the government. But that's what he's
14 doing.
15       Sherry Pettus said she did not every time
16 she came into the bank, she did not bring the stinky
17 money. She told you she brought different types and
18 that she got it from Mr. Carmichael, that one at the
19 bank told her not to do the C. T. R. reporting, or not
20 the ten thousand dollar thing. Not Mr. Carmichael.
21 She never told you that. She's writing checks to Leon
22 Carmichael. They're on the memo line. It's all
23 there. It's easy to trace. It's easy to show who
24 she's giving it to. There is no hiding. There is no
25 secrecy. They just don't like it. But it wasn't

**Page 276**

1  against the law.
2       Now interestingly enough, too, it's now, you
3  know, now that we're in a courtroom they want you to
4  scrutinize this under a microscope in hindsight. But
5  think about the bank's obligation when this was going
6  on. If they're bringing in the stinky money every
7  other day in these ten thousand dollar deposits, and
8  you can report it, they told you about a suspicious
9  activity report, why didn't one person call somebody?
10 Tell their manager? Call the police? I mean this is
11 not that far after nine eleven when we know about
12 security. This woman is bringing in this awful money
13 on a daily basis and not reporting it as ten thousand
14 dollars? You're telling me there isn't a bank teller
15 there that thinks this is suspicious.
16       Nobody. Nothing. Nobody. You know why
17 that's important? Because now, three years later,
18 they want you to believe it's involved in some
19 criminal activity. They didn't know the theory then.
20 The bank tellers didn't know anything about it.
21 They're unbiased. They don't know anything about any
22 of this other than what they came in and testified
23 about the report. They didn't do that. You got to
24 wonder why. Because it wasn't suspicious. Nothing
25 was going on.

**Page 277**

1       You heard from Mr. Lapinsky about, and I'm
2  going back to the trucking business because you know
3  that Mr. Carmichael has this trucking business, and
4  you heard about her routes and what you do with your
5  truck drivers and such. And you remember this, Mr.
6  Feaga really tried to make a big deal out of this but
7  I think he got caught because he was trying to say
8  that somehow that Mr. Carmichael wasn't scrupulous and
9  somehow that you didn't check the names of your
10 drivers or that's not normal, you wouldn't do that,
11 right?
12       Because somehow he's masking something? And
13 you learn that Mr. Carmichael, not only did he take
14 the names of his employees, but he did background
15 checks. He did everything in compliance. There is no
16 hiding. There is no hiding the trucks. His name M.
17 and L. Investments are on the sides of his trucks.
18 None of that is masked, okay? He has all the
19 registration, the D. O. T. paperwork. You heard about
20 all of that. He's never masked and pretended to be
21 anything other than what he is. They want him to be
22 something else, but you can't make it that way just
23 because you keep saying it.
24       You look at the hard evidence. Look at the
25 hard evidence in this case. When they go and look at

Page 278

1 the truck, you heard about this Mr. Kincey and Mr.
2 McGill, you remember they're the guys that got busted
3 in Sierra Blanca. Remember them? We didn't hear from
4 them. What do they have to do with Mr. Carmichael?
5 They were lease operators. You remember that?
6 Because I brought that evidence out. They were lease
7 operators. They had been there a week. They owned
8 their own tractor, they owned their own trailer, and
9 they had gone into a percentage business with Mr.
10 Carmichael.
11      They're obviously doing something else.
12 They get busted with drugs. Do they ever say it's Mr.
13 Carmichael's? Did you ever hear from them saying it's
14 Mr. Carmichael's, he made us do it? Where are Mr.
15 Kincey and Mr. McGill? Who cares? Why do they want
16 you to care? Because it's dirty. If we can dirty it
17 up, if we can muddy up the waters then you have to
18 believe it's true. Look at the evidence.
19      You also heard a lot of, you know, these
20 inferences about Mr. Carmichael must have girlfriends
21 and all this other stuff. Okay? I mean why did you
22 hear that? They kept trying to slip that in, if you
23 noticed. Why? Because if he has a girlfriend, he
24 must be a drug dealer. If he has more than a couple
25 of kids he must be a bad guy. That's the purpose of

Page 279

1 that. Because we didn't hear from any girlfriends.
2 We didn't hear anybody implicating him as a girlfriend
3 saying that he was involved in criminal activity and,
4 by the way, I'm his girlfriend.
5      They did it because they don't want you to
6 like him. If you don't like him, if you can't look at
7 him, then they want you to say then I can find him
8 guilty. If you can't bond with him, if you don't feel
9 that way, then you must find him guilty. That's why
10 they're doing it. They wanted to dehumanize my client
11 so it makes it easier for you. That's not evidence,
12 and that's not right.
13      Lots of evidence. Look at this. The bags.
14 Nobody came in here to tell that you this is a unique
15 for drug dealers to deal their drugs, but apparently
16 because they all look the same, I guess, except this
17 green bag, there must be some inference. Nothing to
18 do with Mr. Carmichael. Lots of drugs. They kept
19 piling on these drugs because if you look at these
20 drugs and you look at Mr. Carmichael you must make
21 that inference because we don't have anything else
22 except we have a lot of drugs. And I told you that.
23      They brought the guns in. You heard about
24 the gun that was in front, in the front seat of Mr.
25 Carmichael's car. You heard about that. You also

Page 280

1 heard from his employee who said we handled a ton of
2 cash. And guess what? In this country you can have a
3 gun for self-protection. As long as you have a
4 permit, you're allowed to have a gun. You can have as
5 many guns as you want. That's not against the law.
6 But if you shake them and we waive them and we pull
7 them out, you might be scared. And if you're fearful,
8 then you might convict Mr. Carmichael, even if we
9 don't have any evidence to suggest that.
10      But that's why they did it. If you bring
11 out enough, you bring out the pictures, you bring out
12 the guns, you bring out the bank records, even if we
13 can't make a link, if we just throw it all at you and
14 overwhelm you it must be enough. Because you know
15 what the saying is, right? They're going to say this
16 to you. Where there is smoke there is fire, right?
17 You can't have all this and not have a source. You
18 can't have all this and not have a connection. We're
19 bringing you a lot. Where there's smoke there's fire.
20 That's not the law. That's not the law.
21      Like Mr. Teague, we've been living with this
22 case a long time. My colleagues and I, we've had this
23 case a long time with Mr. Carmichael's life in our
24 hands. And this is about his liberty and his life.
25 Don't make any mistake about it. There are times

Page 281

1 during this trial where we've laughed, we've smiled at
2 each other, there have been funny things, but this is
3 about his life. It's serious, and they made a serious
4 accusation against someone in this community who is
5 well known. The taint will never go away from this
6 accusation.
7      I've thought about all the things I should
8 say to you and I can tell, I mean I know you're tired,
9 we've been here a long time, but I hope that your
10 tiredness and the fact that you may be saying we don't
11 need to keep hearing it, Miss Wayne, you can sit down.
12 But I hope you recognize that the significance of the
13 decision that you make in this case will be forever.
14 That's it. You can't take it back. You can't come
15 back next week and say I made a mistake. You can't go
16 home and say I thought about it a little bit more and
17 I thought about that reasonable doubt and I've changed
18 my mind.
19      If you believe there is a doubt, you have an
20 obligation, a moral obligation to stick to your guns.
21 You have to do that. You promised us that you would
22 do that.
23      I keep thinking that this is the part that's
24 so difficult for lawyers because I got to hand it over
25 to you, I have to entrust you with his life. And I

**Multi-Page™**

Page 282

1  keep thinking if I can go back into the jury room and
2  deliberate with you that would be perfect, but that's
3  not the law. You've got to go back without me. And
4  you may have questions and I want to answer them, but
5  remember this, if you have any question at all about
6  the evidence, that is a reasonable doubt. I can say
7  it other and over again, and I know you have heard
8  that word, but there is a reason in our country that
9  makes us different from the world is that reasonable
10  doubt.
11       When you came in here Judge Thompson talked
12  to you about the presumption of innocence. That
13  presumption of innocence stays with Mr. Carmichael and
14  until and unless, just like Mr. Teague says, they can
15  prove it beyond a reasonable doubt. That presumption
16  of innocence is in the law because when you looked at
17  Mr. Carmichael, when you first heard that accusation
18  you had to have a gut or a visceral reaction to it.
19  It's as if I'm pointing the finger at you and accusing
20  you of something or someone you know. What's the
21  reaction if your mother, your daughter, your sister,
22  your husband were accused of a crime? You would
23  presume them innocent. That presumption stays
24  throughout this trial unless somehow they can change
25  that.

Page 283

1       Now they're moving around a lot. They're
2  uncomfortable as I'm talking to you during this
3  closing.
4       MR. MOORER: I object, that's not evidence
5  and frankly I am not uncomfortable.
6       THE COURT: I'll sustain that. What the
7  attorneys personally think or the attorneys' demeanor
8  is not evidence. It's the witnesses who count.
9       MS. WAYNE: The evidence in this case has
10  been over eight days at this point and two days from
11  us. Again, the witnesses that we brought you were so
12  you could hear the whole picture in this case. Mr.
13  Carmichael has nothing to hide. He brought you his
14  witnesses, he put out his tax reports, and you heard
15  about his finances. Nothing to hide.
16       Defending yourself vigorously against the
17  government is not a crime, and you don't hold that
18  against Mr. Carmichael when you're an innocent man.
19  Please take your time. Go through all this evidence,
20  please, go through it all. Talk to each other. But
21  stand next to your convictions. You know what's
22  right. Each one of you knows what's right. I know, I
23  can tell. And if you do that, you'll find Leon
24  Carmichael not guilty. Innocent.
25       THE COURT: Government?

Page 284

1       REBUTTAL CLOSING ARGUMENTS:
2       MR. MOORER: May it please the Court,
3  opposing counsel. Good evening, jurors.
4       Before I go into the final part of my
5  closing I want to say again on behalf of the United
6  States thank you for the time and attention you've
7  given to this case.
8       Now I wish I had a quote from somebody like
9  Euripides, but having grown up in south Alabama the
10  only thing I can tell you is what I have learned from
11  my time on this Earth; which is, as you know, human
12  beings are the one group of creatures under this sun
13  who have a better nature created in Heaven which can
14  become tools of the devil. That is to say, in the
15  course of this trial we have not had the burden to
16  show, and we gladly shoulder the burden, that
17  everything that Leon Carmichael did was against the
18  law.
19       There are things that he did that were
20  perfectly legitimate. What His Honor is going to tell
21  you, though, when he reads the instructions to you is
22  that if he became part of this conspiracy on one
23  occasion, that's enough and that is sufficient
24  evidence to convict him. And I submit to you that you
25  will do your duty and convict him because that's what

Page 285

1  the evidence shows. He was involved in this drug
2  conspiracy. Involving Freddie Williams, himself and
3  other people. Both known and unknown to the grand
4  jury.
5       Now let's talk about some of the evidence,
6  because that's what this time and this case is about.
7  And that's what it's going to be about when you go
8  into the back to deliberate. And what it's about is
9  you'll see that video again if you choose to look at
10  it where the defendant, Freddie Williams, has this
11  cutting board in his house.
12       Now you'll see on that video that Patrick
13  Denton doesn't take it over there and put it in
14  Freddie's hands and say smile for the camera, Freddie
15  Williams gets this to assist Patrick Denton. They
16  don't want to talk about that in their closing and
17  they ran away from that evidence. But I submit to you
18  this evidence follows you in that deliberation room
19  and it convicts that man right there. He was part and
20  parcel of this conspiracy.
21       Now this conspiracy involved Patrick Denton.
22  They want to run from it, but they chose him. You
23  stick to them on that because that's the evidence
24  in this case. Patrick Denton was separate and apart
25  from Mr. George when he was interviewed. Mr. George

Multi-Page™

Page 286

1 told the officers, when they told him what they had on
2 him, I'm guilty. I'm involved in it, and Leon
3 Carmichael is involved in it. Patrick Denton is
4 involved in it. Charlotte Hensarling is involved in
5 it. And they came in here and they told you that
6 because that was the truth. All of them said these
7 things separately. Separately.
8       They weren't sitting there cooking up a
9 story. And of all the thousands of people in
10 Montgomery, Alabama that they picked out and told
11 about their activities, these gentlemen on trial.
12 That's not a coincidence, that's not a conspiracy what
13 they told you, the officers, it's the criminal
14 activities that these gentlemen did that is the
15 conspiracy.
16       Now don't lose sight of the fact that this
17 conspiracy is about what drug conspiracies are about.
18 Drugs. And you've got bunches like it here. Drugs.
19 But you know for a person like Mr. Carmichael and Mr.
20 Williams, this to them is meaningless. This is what
21 it's really all about. And once you get money, money
22 for a drug dealer is just a pile of paper until you
23 can put it in a way that you can get to it and use it.
24 And unfortunately for those in the drug trade, when
25 you put it into banks and start using it, hiding it in

Page 287

1 plain view as they did, that's called money
2 laundering. Pure and simple.
3       Now let's talk about some of the evidence in
4 a little bit more detail, because they tried to run
5 from some things, particularly during their closing,
6 particularly during their opening and particularly
7 during the course of this case. Why? Because they
8 are afraid of the truth. And the truth of the matter
9 is, Leon Carmichael says when he goes out there to
10 pick up his billfold you know, I can't do time in
11 prison, not with the kind of time that is required
12 because of the things that I did in this drug
13 conspiracy. I can't do that, because that is a life
14 sentence.
15       And then when he's asked by the D. E. A.
16 agents what he's talking about, he says, "You got me."
17 "You got me." Why did he say that? Because he knew
18 what the evidence was. He knew what he had done.
19 Miss Wayne said to you, you know there is no proof
20 beyond a reasonable doubt. Well I submit to you
21 that's why Leon Carmichael said what he said, was
22 because he knew what the evidence was. He knew what
23 we had. He knew that was sufficient. And for him,
24 that was proof enough for him beyond a reasonable
25 doubt.

Page 288

1       Now, jurors, a confession to one's criminal
2 involvement is the strongest form of proof known to
3 the law. People don't go around confessing to things,
4 particularly when you've got corroborating evidence.
5 It doesn't get any better than that in the vernacular.
6       Now during the course of this trial, during
7 the course of these closing statements counsel have
8 tried to make some efforts to show that these
9 witnesses were not credible because of deals that they
10 made. The judge will tell you that plea bargaining is
11 appropriate. Witnesses such as that can be believed.
12 We corroborated these witnesses.
13       And you know the corroboration comes in some
14 ways that they cannot escape. You know the evening of
15 the delivery to the defendant Freddie Williams' house?
16 Remember the sequence of phone calls? The first call
17 comes in, Patrick Denton, they're playing hot potato
18 with the phone, Patrick calls back to Leon Carmichael.
19 Carmichael says, "Be there in five minutes."
20 Everybody scatters. Gets covered.
21       The defendant stays for about five minutes.
22 He's on the phone to Freddie Williams' house,
23 Nine-seventy Ridgecrest. Why is that important? I
24 submit to you that's important because all of these
25 calls are to people involved in the conspiracy.

Page 289

1 They're setting up ready for the delivery --
2       MR. TEAGUE: Excuse me, Your Honor, I must
3 object. There's been no testimony that my client
4 lives at Nine-seventy Ridgecrest. Not any of his
5 evidence anywhere shows that my client lives at Nine
6 seventy Ridgecrest.
7       MR. MOORER: I misspoke.
8       There are calls to this house, to this phone
9 that's in Freddie Williams's name at Nine-seventy
10 Ridgecrest. And I submit to you that the reason for
11 these calls was the setting up for the delivery. He
12 was getting ready for business the next day.
13       And remember the last thing he tells Patrick
14 Denton? He tells him, "I need you to get up early in
15 the morning and go over to Freddie Williams's house."
16       Now there's been argument made by these
17 attorneys that you know, Freddie Williams wasn't there
18 to cut up drugs, he wasn't the cutup man. But you
19 know what? Remember the testimony of Denton. The
20 Hensarlings had gotten popped, he had his problems up
21 in Huntsville and so he didn't want to take the drugs
22 as he normally would. So they were going to do it at
23 the stash house.
24       That's the difference. And that's why this
25 happened the way it did when the officers went in and

**Page 290**

1 did the search warrant. It all happened at Freddie
2 Williams's house because remember the testimony of
3 Denton and George? Normally it was the stash house
4 that Freddie Williams ran. He would sometimes bring
5 the drugs to them to be cut up and broke down for
6 distribution on the streets. So in a stash house it
7 would be different.
8      And they have tried to make the ridiculous
9 argument, I submit to you, that somehow Mr. Denton
10 tried to frame up Freddie Williams. Well you know
11 what? Did Denton have time to go over there and make
12 that secret room? No. Use your common sense. No.
13 When you look at that video, you'll see Freddie
14 Williams on that phone talking, and it's unfortunate
15 that his wife passed away, my condolences, but you
16 know what? That didn't matter to him. He kept on
17 about his business. His business is running that
18 stash house. That's why you find weapons like that
19 that they took out of his house and brought here to
20 you as evidence.
21      Now I also want to point out to you that
22 there has been argument ad nauseam about what there
23 isn't here. Like a simple thing that Mr. Teague
24 argued to you just a moment ago was there weren't any
25 fingerprints. I believe counsel for Mr. Carmichael

**Page 291**

1 argued he didn't get any prints off of the dope of Mr.
2 Carmichael's.
3      You know, I like to read some famous judges,
4 too. And a famous judge that I know and I like to
5 read said, "There are two things that are never
6 satisfied, a woman who can't have children, and the
7 grave." Now I'm surprised that Solomon being the
8 world's greatest judge ever that he didn't add defense
9 lawyers to that list because they're never satisfied.
10 And here's how that goes. If we had found, say,
11 prints on a bag, then the argument would be well you
12 know, when he touched it he could have touched it
13 before whatever was in the bag that was illegal was
14 put in it.
15      You know, they want to say, you know, you
16 didn't record some things. Well if you get a tape
17 recording of something, well, you may have beat him
18 up. You probably beat him up and somehow forced him
19 to say something. You could have videotaped it and
20 audiotaped it so that we could see that. Well if you
21 get them videotapes or something like that, and then
22 they would say well you know, you can be standing off
23 camera holding a gun. A good lawyer worth his salt
24 can argue anything. But you've got to look at what is
25 reasonable under the circumstances. What makes sense.

**Page 292**

1      Use your judgment. Use your common sense.
2 What do officers do when they're investigating crimes?
3 They get the best evidence they can, but they have got
4 to get the evidence in such a way that they don't tip
5 off the defendants or the people that they're looking
6 at who are involved in the criminal activity. It's a
7 tough job. Everything doesn't go the way you would
8 like it to, and sometimes when things go really good
9 for you, it's unexpected, like that phone call that
10 they tried to run and get the tape recorder for but
11 didn't have time to get.
12      Now there are some other things for you to
13 consider that they have not wanted to address because,
14 frankly, you can't address it. Why did the man lie
15 about his income? He lied about his income, Leon
16 Carmichael lied about his income because he knows he's
17 got to come up with some kind of an explanation for
18 you to believe that his money was legitimate. Let's
19 cut to the chase on all the money. Not only in our
20 rebuttal case did we show that he was not reporting it
21 at the times that he was actually earning income,
22 these figures are more consistent with what he was
23 earning, because those were reported at and near the
24 time that they were generating whatever few sales they
25 did.

**Page 293**

1      Now of course remember one of the clubs he
2 didn't even have an interest in that he claimed income
3 from. But I submit those figures would be more close
4 to accurate than what he said on his tax returns. He
5 just simply lied to the people who take the forms to
6 the I. R. S., and he lied when he gave the information
7 to whomever prepared it. That's just a simple matter
8 of it.
9      And even among all the evidence, even the
10 witness they called in, their expert who sat here
11 through the days of testimony, he said something that
12 I leaned over to one of my colleagues and I said, "Did
13 I hear what I just heard?" Which is that he basically
14 said if every nickel the defendant had earned in 2001,
15 2002, 2003 had all been applied toward the Carmichael
16 Center, then he would have been able to build it. Now
17 he wouldn't have had any money for anything else, but
18 all of that money that he earned from other ways,
19 that's a red herring designed to throw you off. It's
20 the money that went into the account that Sherry
21 Pettus had.
22      Sherry Pettus told the truth when she
23 testified at the grand jury, because we had a window
24 of opportunity to look inside the criminal enterprise
25 that Mr. Carmichael was running. You see, Mr.

Multi-Page™

Page 294

1 Carmichael is up the chain. Mr. Carmichael is not
2 going to handle the dope directly. He's smart enough
3 to know he's got to distance himself from the drugs.
4 So he works through other people to avoid law
5 enforcement being able to detect his involvement. To
6 be able to throw a rock and hide his hands, so to
7 speak.
8       So you're not going to find him directly
9 holding a brick of dope. He's smart enough to have
10 people like Patrick Denton, and George and the
11 defendant Freddie Williams do that. And incidentally,
12 you'll notice there were bags that the drugs were
13 found in. And I'll show for you some of the bags.
14 And why are these bags here? Not all these bags at
15 Freddie Williams's house had marijuana in them. Why?
16 Because there were previous stashes of marijuana at
17 that house, which is consistent with what Patrick
18 Denton said. There are boxes of evidence that screams
19 for a guilty verdict.
20       Now when he put that money into the account
21 through Miss Pettus, again, he was following the same
22 M. O. that people in Mr. Carmichael's position in a
23 drug conspiracy follow, which is to distance
24 themselves. He puts it in nominee names. And
25 incidentally, the reason they had to bring in Judge

Page 295

1 Hardwick and just had to tell you that he's a judge,
2 is because they wanted to add some legitimacy to Mr.
3 Carmichael. They wanted to bootstrap into that.
4       But you know what? Judge Hardwick told you
5 what he told Defendant Carmichael. Yeah, you don't
6 have to put your money in the bank, but Judge Hardwick
7 would never have told Carmichael to go out and violate
8 the law, which is what he did when he had Miss Pettus
9 take his money which came from drug proceeds and put
10 it into that account and then structure those
11 transactions where the money comes in so that the I.
12 R. S. doesn't look at it.
13       You see, putting together a case is
14 sometimes like looking at a puzzle. When you've got a
15 puzzle and you open up the box, it's just a bunch of
16 pieces of cardboard. And until you get them all put
17 together and fit together, it doesn't complete the
18 picture. In criminal activity some things happen that
19 law enforcement finds out about, and they find out
20 about it on one occasion, like the stop of the truck
21 that went through the Sierra Blanca checkpoint. Or
22 Miss Sonia (sic.) being caught in the El Paso airport
23 with the forty-two thousand dollars. Different things
24 happen on different dates.
25       Sometimes it's not until other things happen

Page 296

1 that law enforcement is able to look back and see that
2 no, these were not separate and isolated events, they
3 were part of an overall conspiracy, part of an overall
4 criminal enterprise that was taking place. And in
5 addition to the people that we knew about it at the
6 time when these individual acts took place, there were
7 others behind the scenes. People such as defendant
8 Leon Carmichael. People such as defendant Freddie
9 Williams. People whom we submit to you should be
10 convicted, because that's what the evidence demands.
11       Now the money, and their own expert
12 basically said if all of his money had been used he
13 could have built that Carmichael Center. But you know
14 what? He wouldn't have had money to do the other
15 things that he was doing. That's not the way things
16 went. The sums of money that were on the tax forms
17 just were not accurate. They can try to cover it up
18 with words, they can try to cover it up with writing,
19 but we have here a conspiracy.
20       Miss Wayne mentioned to you in her closing a
21 Latin phrase which means "We dare to defend our
22 rights." I ask you to remember another Latin phrase,
23 "Always faithful." Be faithful to the evidence. Do
24 your duty when you go back there and come out with a
25 guilty verdict. Why? Because that's what the

Page 297

1 evidence demands. This is a conspiracy. We don't
2 have to show they sat down and wrote it out and said
3 okay, Freddie, you're going to go ahead and run the
4 stash house. Patrick Denton, you're going to be our
5 man out on the street. No, it's an understanding.
6 They're working together to move drugs. They're
7 working together to move drugs that belong ultimately
8 to Leon Carmichael.
9       Be faithful to the evidence. You know, it's
10 just as wrong for those whom we've proven to be guilty
11 to be set free by you, as anything that could be done
12 in this courtroom. We've met our burden and we gladly
13 shoulder it. We do it day in and day out, week in and
14 week out, month in and month out, year in and year out
15 right here. People from the Middle District just such
16 as you are the kind of people that we rely upon to do
17 that.
18       And we have to rely upon the kind of people
19 that people like Freddie Williams and Leon Carmichael
20 choose to associate themselves with to prove that. I
21 would love to be able to bring in the Protestant Pope,
22 Billy Graham, to be able to testify about witnessing
23 drug transactions between people like Freddie
24 Williams, Patrick Denton and others. But it just
25 doesn't happen that way. You have to bring in the

**Multi-Page™**

1 people whom these people involve themselves with.
2     No doubt some of you go fishing. You know
3 when you're trying to bring in a catfish, you put
4 stuff on the end of that hook that you don't
5 necessarily want to have in your own hands. But you
6 know what? You're giving the catfish what they want.
7 That's what you're out to catch. People like Mr.
8 Carmichael, those are the kind of people they want to
9 associate with and do. Why? Why did Leon Carmichael
10 show up at Patrick Denton's house?
11     And remember in opening statements
12 Miss Wayne said to you she showed up there because he
13 had some business to talk to, there was the end of a
14 function there at the Carmichael Center? She just
15 happened to forget the facts. Everything would have
16 been okay with that except for the facts. And the
17 fact was they had gone by the Carmichael Center.
18 Devin Whittle talked about he went by the Carmichael
19 Center earlier that even prior to doing the search
20 warrant at Patrick Denton's house. There wasn't
21 anything going on out there.
22     Now there was some ridiculous cross
23 examination about well, did you go inside? My
24 goodness, what were they going to do, hide inside?
25 Come on, use your common sense. This is a place where

1 people come to have a good time. They drive there.
2 It's a big parking lot. No cars in it. Nothing
3 happening at the Carmichael Center that night.
4     Now, jurors, when you weigh up all the
5 evidence, and all of you get together and use your
6 common sense and your collective judgment, it becomes
7 abundantly clear that they are guilty as they are
8 charged. The argument was made by Miss Wayne, would
9 you trust your children with Patrick Denton because,
10 she says, you know you've got to trust the evidence
11 like you would in your own affairs.
12     Well I submit to you there are people that
13 you know, don't know personally, like maybe the mayor
14 of Montgomery if you're from Montgomery, that if he
15 were to show up at your house and say you know, I'll
16 watch the kids while you and your wife or you and your
17 husband go out, you'd say, you know, thanks, but no
18 thanks. I don't know you. You wouldn't do that.
19     But you know what? There are people that
20 you probably know in your day-to-day life whom I may
21 never know and whom others may never know who have
22 their flaws but you trust them in certain areas. The
23 defendants trust people like the Dentons, Patrick
24 Dentons of this world, and the Charlotte Hensarlings
25 of this world. And the people who trust people like

1 that are people like Freddie Williams and Leon
2 Carmichael, because they're all engaged in the same
3 type of activities. They trust each other. They
4 trust each other to know what is going on and to help
5 each other out.
6     And we trust that you will find that that is
7 criminal association. That is being part of a
8 conspiracy. That is working toward a common interest
9 or goal, the goal being to possess marijuana so that
10 it can be distributed. Certain things they might have
11 been charged with, sure. We're asking you to be
12 faithful to the charge that they have been charged
13 with, which is what the evidence shows that they did.
14 They got together to try to move marijuana. They got
15 together to try to violate the federal narcotics law.
16     And you know, Miss Wayne would have you
17 believe that because it took such a long time to bring
18 all of this evidence together, that there was
19 something wrong or there is something lacking. You
20 know, part of the reason that we took such a long time
21 was because we had to have the opportunities to gather
22 the information necessary to bring a case for you to
23 convict. We've done that. It took awhile. We wish
24 that we could have gotten it done sooner, but we've
25 gotten it done in time for you to consider it and to

1 deliberate and to pass judgment upon it.
2     And I take pride and pleasure in asking you
3 to return a verdict of guilty as to Leon Carmichael,
4 and to return a verdict of guilty as to Freddie
5 Williams. Because we have met and shouldered our
6 burden. We have to act when the opportunity arises.
7 And we did that. When we got the opportunity to flip
8 Patrick Denton, we did, and we don't apologize for
9 that. Sometimes we have to make deals with people
10 that we don't like. But you know what? When you can
11 stop somebody like Leon Carmichael's involvement in
12 the drug trade, then you're able --
13     MR. TEAGUE: Your Honor, he's arguing
14 evidence. The government said they didn't make any
15 deal and Denton says he doesn't have a deal, but now
16 he says we made a deal with Mr. Denton.
17     MR. MOORER: What I am saying to you, maybe
18 inartfully --
19     MR. TEAGUE: I object, Your Honor. There is
20 no evidence to support what he's saying.
21     THE COURT: I'll let the jury remember what
22 the evidence was.
23     MR. MOORER: Maybe inartfully, but what I am
24 saying is that we've done what we've done with Mr.
25 Denton because we needed to make our case and he has

Multi-Page™

Page 302

1 his own charges to deal with in the state system. He
2 is not going to go scot-free. He will be handled.
3 But when you take out somebody like Leon Carmichael
4 who is at the center of this conspiracy with Patrick
5 Denton, Freddie Williams, Gary George, Charlotte and
6 Steve Hensarling, Cadillac, Sandra Jones, Sherry
7 Pettus, then you disable the whole conspiracy.
8         It took a while to bring it. I took a while
9 for us to get it, but we've gotten it and presented it
10 to you.
11         We appreciate the time and the effort and
12 the attention that you're going to give to this case
13 when you go into the back, but your job won't be done,
14 fully done until you return a guilty verdict as to
15 both defendants as to the counts in this indictment.
16         I thank you on behalf of the United States.
17         THE COURT: Now I'm going to excuse you for
18 about well, we'll make it five minutes, and then I'll
19 instruct you what the next steps will be.
20         Do not discuss the case.
21         (Whereupon, the jury was escorted out of the
22 courtroom.)
23         THE COURT: Counsel, we'll take up a few
24 matters right now.
25         You may be seated, counsel.

Page 303

1         It's now twenty of six. I think the charge
2 is going to take me approximately twenty to
3 twenty-five minutes to read. That would put the jury
4 getting the case sometime between six oh five and
5 six-thirty by the time we take care of all the little
6 housekeeping things like excusing the alternates and
7 stuff like that. I'm willing to read the charge
8 tomorrow morning at eight-thirty, unless you all want
9 to do it this evening. I have no preference. I'll
10 just hear suggestions, really. I'll make the ultimate
11 decision, but I'll hear suggestions.
12         MS. MORRIS: These people don't necessarily
13 live in Montgomery, they have to go home. I mean some
14 of them are from Eufaula and a long way away.
15         MR. FEAGA: I think what Ms. Morris is
16 saying whatever the Court wants to do.
17         MS. MORRIS: I mean I hate to keep them here
18 until six-thirty and then have them drive home and --
19         THE COURT: Well I don't think they're going
20 to deliberate tonight. In fact, there is circuit law
21 that says they can't deliberate like at seven, because
22 that would be a forced verdict. They have to
23 deliberate at leisure. I would just like your
24 suggestions as to whether we can bring them back in
25 the morning and let them hear the charge, which is

Page 304

1 really only going to take about twenty or twenty-five
2 minutes. It's not a long charge. And then they can
3 deliberate at leisure in the morning.
4         MS. WAYNE: Judge, that's fine.
5         THE COURT: That's fine with everyone?
6         The second matter is the alternates.
7         MR. TEAGUE: It's okay with us too, Judge.
8         THE COURT: Okay, good.
9         The second matter is the alternates. Who
10 are our alternates, Miss Carnes?
11         COURTROOM DEPUTY CLERK: Charles Siggers and
12 Anne Freeman, sir.
13         MS. MORRIS: I thought that you changed out
14 and made Mr. Mills --
15         MS. WAYNE: Yes, you did.
16         THE COURT: Yes, I did make Mr. Mills an
17 alternate because he's from Montgomery.
18         And who was the first alternate, he would
19 take the place of whom?
20         COURTROOM DEPUTY CLERK: Mr. Siggers would
21 then be on.
22         THE COURT: Mr. Siggers would then be on and
23 Mr. Mills would then be off.
24         Now we had one juror who did seem to close
25 her eyes. I saw her a few times, but it seems like

Page 305

1 she only did that at the beginning. Does anyone want
2 to make any comments about that? Anybody have a
3 problem with that?
4         MS. WAYNE: No.
5         THE COURT: Anyone want to make that an
6 issue?
7         MS. WAYNE: No.
8         THE COURT: Then she'll stay on the jury.
9         Oh, yes. Before I release the two
10 alternates, how long, if there is a conviction, do you
11 think that the forfeiture proceedings will take? I
12 want to make sure that our jurors, if there is a
13 conviction, can meet next Monday. I'm not going to
14 tell them that, I'm just going to ask them if the
15 trial should go next Monday would that pose a problem.
16         MR. FEAGA: Your Honor, did you say you're
17 not going to release the alternates until tomorrow?
18         THE COURT: No. I'm going to release the
19 alternates tomorrow, but if one juror would say Judge
20 next Monday I'm taking off for New York, then that's
21 going to affect who becomes the alternate because we
22 have our forfeiture proceedings if there is a
23 conviction. So I'm asking you now how long do you
24 think the forfeiture proceedings will take if there is
25 a conviction.

Multi-Page™

Page 306

1  MR. FEAGA: Your Honor, I think this is one
2  instance where we really should hear from the defense
3  first because they have been indicating for the past
4  two weeks they have a lot of evidence to put on.
5  THE COURT: Okay. Do you think you do?
6  MS. WAYNE: I do, Judge, because I think
7  there's a lot of property involved. I think probably
8  at least two days.
9  THE COURT: Okay, very good. That's all I
10  needed to know. I just wanted to put the jury on
11  notice not to say if this case should go into next
12  Monday and Tuesday, does that pose a problem. Because
13  I don't want the jury suddenly saying there is a
14  problem.
15  MS. WAYNE: I understand.
16  THE COURT: Okay. So we're at least looking
17  at Monday, Tuesday, Wednesday if not even Thursday.
18  We'll just have to wait and see.
19  Bring the jury back in.
20  MS. WAYNE: Judge, I'm sorry, I have a
21  motion after the closings and I think it has to be
22  made in a timely fashion.
23  THE COURT: Can I let the jury go?
24  MS. WAYNE: That's fine.
25  THE COURT: Bring the jury back in.

Page 307

1  (Whereupon, the jury was escorted into the
2  courtroom.)
3  THE COURT: Do we have all fourteen?
4  Members of the jury, I have actually some
5  instructions to give you and I need to ask you a
6  question.
7  First of all, we're going to recess for the
8  evening, come back tomorrow morning at eight-thirty.
9  My charge to you on the law will take anywhere between
10  twenty-five to thirty minutes, if not even twenty
11  minutes. It's not a very long charge on the law. So
12  if we start at eight-thirty we should be able to allow
13  you to begin your deliberations around nine. So try
14  to be here promptly at eight-thirty.
15  The second thing is, if the case should go
16  into Monday or Tuesday or Wednesday for some reason,
17  would that pose a problem for any of you?
18  (Whereupon, there was no response.)
19  THE COURT: It won't? Good. I just wanted
20  to make sure.
21  I'll see you back here tomorrow at
22  eight-thirty.
23  Again, do not discuss the case. Stay away
24  from television, you know, and stay away from
25  newspapers.

Page 308

1  See you tomorrow at eight-thirty.
2  (Whereupon, the jury was escorted out of the
3  courtroom, and the following colloquy ensued):
4  MOTION FOR MISTRIAL:
5  THE COURT: Miss Wayne, you wanted to make a
6  motion?
7  MS. WAYNE: I did, Judge, and I apologize.
8  And I know under the law I have to make a motion for
9  mistrial in terms of the closing arguments, so I'm
10  making that objection, Judge. And I had some law for
11  you, now I closed it, but I had objected to the
12  government vouching for their witnesses and the
13  insertion continuously of "we," which is the same as
14  I. "We think," "we believe," which is I because it's
15  a group of them and that's improper comment.
16  I objected a couple of times and you
17  sustained it, Judge, and frankly it's different
18  because I know when I'm objecting and objecting --
19  THE COURT: It starts to hurt your case.
20  MS. WAYNE: I think I wanted to preserve it,
21  but I and I just wanted to make sure.
22  THE COURT: Well two things. I think the
23  jury understood in light of my instructions that what
24  the lawyers say is not evidence, and I think we have
25  to look at the closing argument as a whole and I don't

Page 309

1  think there is a problem with the closing argument
2  when the totality is considered. So the motion is
3  denied.
4  Anything else?
5  MR. TEAGUE: I want to renew my motion for
6  judgment of acquittal.
7  THE COURT: You want to make that again?
8  MR. TEAGUE: Yes.
9  THE COURT: You don't need to make it, but
10  go ahead and make it again.
11  MR. TEAGUE: I'd like to be able to point
12  out that I never fail to mention it. Even when it's
13  not required.
14  THE COURT: As Miss James knows sometimes
15  you can make motions and things, then you find out
16  five years later that you were right.
17  MS. JAMES: Thank you. I'll make it again,
18  but I don't think this is necessary.
19  But there is one matter I need to bring up.
20  After hearing the arguments, I realized that we didn't
21  request a charge regarding this alleged confession. I
22  think there is a pattern charge on that, and --
23  THE COURT: Oh, there actually is.
24  MS. JAMES: I think we need to look at that.
25  THE COURT: I know there is something about

Page 310

1 it. Let's look at it right now.
2        (Whereupon, the Court examined various
3 documents.)
4        THE COURT:  Yes, it's in there.  That's when
5 the government offers testimony, the defendant made a
6 statement or admission?
7        MS. JAMES.  Okay.  I guess -- Is that
8 straight from the pattern?
9        THE COURT:  As far as I know it is.
10        MS. JAMES:  We didn't ask for it.  I thought
11 there was some additional language, or maybe if I
12 could ask for something additional, the circumstances
13 under which it was given because this is one of those
14 things --
15        THE COURT:  Well I need it now.  I have my
16 charge ready for the jury.  I don't want to delay the
17 trial any more.  If you've got something for me, give
18 it to me.
19        The last motions for judgment of acquittal
20 are denied.
21        MS. JAMES:  That works, Judge.
22        THE COURT:  Everything is okay?
23        Okay.  I'll see you all here no later than
24 eight twenty-five tomorrow, so if there are any issues
25 you want to raise, you can raise them before I charge

Page 311

1 the jury at eight-thirty.
2        (Whereupon, the proceedings were concluded.)
3
4              * * * * * * * * * *
5
6        COURT REPORTER'S CERTIFICATE
7
8        I certify that the foregoing is a correct
9 transcript from the record of proceedings in the
10 above-entitled matter as prepared by me to the best of
11 my ability.
12
13        I further certify that I am not related to
14 any of the parties hereto, nor their counsel, and I
15 have no interest in the outcome of said cause.
16
17        Dated this 15th day of September 2005.
18
19
20        MITCHELL P. REISNER, CM, CRR,
        Official US Dist. Court Reporter
        Registered Professional Reporter
21        Certified  Real-Time  Reporter
22
23
24
25