1          IN THE UNITED STATES DISTRICT COURT
                            FOR
2            THE MIDDLE DISTRICT OF ALABAMA

3

4

5   THE UNITED STATES
        OF AMERICA
6
             vs.                    CRIMINAL ACTION NO.
7                                   2:03-cr-259-T
    LEON CARMICHAEL
8

9

10

11

12

13
                    VOLUME X OF XI
14                  10th DAY OF:
                JURY TRIAL PROCEEDINGS
15

16

17              *  *  *  *  *  *  *  *  *  *

18
    BEFORE:        The Hon. Myron H. Thompson
19
    HEARD AT:      Montgomery, Alabama
20
    HEARD ON:      June 17, 2005
21
    APPEARANCES:   Terry Moorer, Esq.
22                 Stephen Feaga, Esq.
                   Clark Morris, Esq.
23                 Matthew Miner, Esq.
                   Susan James, Esq.
24                 Marion Chartoff, Esq.
                   Lisa Monet Wayne, Esq.
25                 Ronald R. Brunson, Esq.

GOVERNMENT
EXHIBIT
50-X

## Page 2

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                   PAGE NO.

Title Page ..................................      1

Table of Contents ..........................      2

Charge to the Jury
    by the Court ...........................      4

Verdict of the Jury
    (at 2:05 p.m.) .........................     33

Detention Hearing ..........................     41

R. David DeJohn - Direct Examination
    by Ms. Morris
    on the issue of Danger to Society .......     53

Court Reporter's Certification ..............    137

—oOo—

## Page 3

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
   THE HON. MYRON H. THOMPSON ON JUNE 17, 2005 AT THE

2  UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4        THE COURT:  Is the jury in the jury room?

5        COURTROOM DEPUTY CLERK:  They are, sir.

6        THE COURT:  Counsel we're ready for the

7  Court's instructions to the jury.  Is there anything

8  else?  I think you received a copy.

9        Bring in the jury.

10       MR. FEAGA:  Your Honor, before you do, you

11 never did rule yesterday on our requested instruction

12 regarding the --

13       THE COURT:  Well you were going to make that

14 argument, and I looked at the law and it's not in the

15 pattern jury instructions and I'm not going to go down

16 that avenue.  So your objection is overruled.  I read

17 your case law and it doesn't stand for what you say it

18 does.  It stands for the proposition that the evidence

19 supported it, but I can't say that it stands for it as

20 a matter of law.

21       MR. FEAGA:  Your Honor, well I may have

22 misunderstood the Court yesterday, but I thought you

23 told us we couldn't argue on the interstate commerce

24 element because --

25       THE COURT:  I said you couldn't argue the

## Page 4

1  interstate commerce as a matter of law.  Is there a

2  problem?

3        MR. FEAGA:  Well, we just didn't talk about

4  it.  But okay.

5        THE COURT:  Anything else?

6        MR. TEAGUE:  Your Honor, I don't think we

7  have a copy of the --

8        THE COURT:  Of the Court's charge?

9        MR. TEAGUE:  We don't.

10       MS. WAYNE:  We don't.

11       COURTROOM DEPUTY CLERK:  I'll give them

12 copies, Your Honor.

13       THE COURT:  Okay.  Bring in the jury.

14       (Whereupon, the jury was escorted into the

15 courtroom.)

16            CHARGE TO THE JURY:

17       THE COURT:  Okay.  Do we now have all

18 jurors?

19       Members of the jury, the courtroom deputy is

20 now handing out to you copies of my instructions on

21 the law.  You will carry these instructions back with

22 you during your deliberations.  However, I'm going to

23 ask at this time that you read these instructions

24 along with me.

25       Does everyone have a copy now?

## Page 5

1        Members of the jury, it is now my duty to

2  instruct you on the rules of law that you must follow

3  and apply in deciding this case.  When I have

4  finished, you will go to the jury room and begin your

5  discussions, what we call your deliberations.  It will

6  be your duty to decide whether the government has

7  proved beyond a reasonable doubt the specific facts

8  necessary to find each defendant guilty of the crimes

9  charged in the indictment.

10       You must make your decision only on the

11 basis of the testimony and other evidence presented

12 here during the trial, and you must not be influenced

13 in any way by public opinion, or by sympathy or

14 prejudice for or against the defendants or the

15 government.  Both the defendants and the government

16 expect a fair trial at your hands, and that you will

17 carefully and impartially consider this case without

18 prejudice or sympathy.

19       You must also follow the law as I explain it

20 to you, whether you agree with that law or not.  And

21 you must follow all of my instructions as a whole.

22 You may not single out or disregard any of the Court's

23 instructions on the law.

24       The indictment or formal charge against any

25 defendant is not evidence of guilt.  Indeed, every

**Page 6**

1 defendant is presumed by the law to be innocent. The
2 law does not require a defendant to prove innocence or
3 to produce any evidence at all. And if a defendant
4 elects not to testify, you should not consider that in
5 any way during your deliberations. The government has
6 the burden of proving a defendant guilty beyond a
7 reasonable doubt, and if it fails to do so you must
8 find that defendant not guilty.
9        When a defendant is placed on trial charged
10 with the commission of a public offense, the law says
11 that he is presumed to be innocent of the offense. A
12 defendant enters this trial with a presumption of
13 innocence in his favor, and it is a fact which is to
14 be considered as evidence and should not be
15 disregarded. And this presumption of innocence
16 remains with a defendant during the trial until
17 overthrown by evidence which convinces the jury of a
18 defendant's guilt beyond a reasonable doubt.
19        A defendant is never to be convicted upon
20 mere suspicion or conjecture. So if the jury, after
21 careful and impartial consideration of all the
22 evidence in the case, has a reasonable doubt that a
23 defendant is guilty of the charge, it must acquit that
24 defendant. While the government's burden of proof is
25 a strict or heavy burden, it is not necessary that a

**Page 7**

1 defendant's guilt be proved beyond all possible doubt.
2 It is only required that the government's proof
3 exclude any reasonable doubt concerning the
4 defendant's guilt.
5        A "reasonable doubt" is a real doubt based
6 upon reason and common sense after careful and
7 impartial consideration of all the evidence in the
8 case. "Proof beyond a reasonable doubt," therefore,
9 is proof of such a convincing character that you would
10 be willing to rely and act upon it without hesitation
11 in the most important of your own affairs. If you are
12 convinced that the defendant has been proved guilty
13 beyond a reasonable doubt, say so. If you are not so
14 convinced, say so.
15        As stated earlier you must consider only the
16 evidence that I have admitted in the case. The term
17 "evidence" includes the testimony of the witnesses and
18 the exhibits admitted in the record. Remember that
19 anything the lawyers say is not evidence in the case.
20 It is your own recollection and interpretation of the
21 evidence that controls. What the lawyers have said is
22 not binding upon you.
23        Also, you should not assume from anything I
24 may have said that I have any opinion concerning any
25 of the issues in this case. Except for my

**Page 8**

1 instructions to you on the law, you should disregard
2 anything I may have said during the trial in arriving
3 at your own decision concerning the facts.
4        Also, in certain instances evidence may be
5 admitted only for a particular purpose and not for all
6 purposes. For the limited purpose for which such
7 evidence has been received, you must give it such
8 weight as you feel it deserves. You may not, however,
9 use this evidence for any other purpose. In
10 considering the evidence you may make deductions and
11 reach conclusions which reason and common sense lead
12 you to make.
13        And you should not necessarily be concerned
14 about whether the evidence is direct or
15 circumstantial. "Direct evidence" is the testimony of
16 one who asserts actual knowledge of a fact, such as an
17 eyewitness. "Circumstantial evidence" is proof of a
18 chain of facts and circumstances tending to prove or
19 disprove any fact in issue. The law makes no
20 distinction between the weight you may give to either
21 direct or circumstantial evidence.
22        Now in saying that you must consider all of
23 the evidence, I do not mean that you must accept all
24 of the evidence as true or accurate. You should
25 decide whether you believe what each witness had to

**Page 9**

1 say and how important that testimony was. In making
2 that decision you may believe or disbelieve any
3 witness in whole or in part.
4        Also, the number of witnesses testifying
5 concerning any particular dispute is not necessarily
6 controlling. You may decide that the testimony of a
7 smaller number of witnesses concerning any fact in
8 dispute is more believable than the testimony of a
9 larger number of witnesses to the contrary. In
10 deciding whether you believe or do not believe any
11 witness, I suggest that you consider which side called
12 the witness, as well as the demeanor and manner in
13 which the witness testified. And that you should ask
14 yourself a few questions.
15        Did the witness impress you as one who was
16 telling the truth?
17        Did the witness have any particular reason
18 not to tell the truth?
19        Did the witness have a personal interest in
20 the outcome of the case?
21        Did the witness seem to have a good memory?
22        Did the witness have the opportunity and
23 ability to observe accurately the things he or she
24 testified about?
25        Did the witness appear to understand the

Page 10

1 questions clearly and answer them directly?
2      Did the witness's testimony differ from
3 other testimony or other evidence?
4      You should also ask yourself whether there
5 was evidence tending to prove that a witness testified
6 falsely concerning some important fact or whether
7 there was evidence that at some other time a witness
8 said or did something, or failed to say or do
9 something, which was different from the testimony the
10 witness gave before you during the trial.
11      The fact that a witness has been convicted
12 of a felony offense, or a crime involving dishonesty
13 or false statement, is another factor you may consider
14 in deciding whether you believe that witness.
15      You should keep in mind of course that a
16 simple mistake by a witness does not necessarily mean
17 that the witness was not telling the truth as he or
18 she remembers it, because people naturally tend to
19 forget some things or remember other things
20 inaccurately. So if a witness has made a
21 misstatement, you need to consider whether it was
22 simply an innocent lapse of memory or an intentional
23 falsehood. And the significance of that may depend
24 upon whether it has to do with an important fact or
25 with only an unimportant detail.

Page 11

1      Now when knowledge of a technical subject
2 matter might be helpful to the jury, a person having
3 special training or experience in that technical field
4 is permitted to state an opinion concerning those
5 technical matters. Merely because such a witness has
6 expressed an opinion, however, does not mean that you
7 must accept that opinion. The same as with any other
8 witness; it is up to you to decide whether to rely
9 upon it.
10      You should not give extra credence to a
11 person's testimony just because of his or her status
12 as a law enforcement officer. You must consider him
13 or her as any other witness. Under the laws of the
14 United States, witnesses, including law enforcement
15 officers, are the same. Feelings of support for law
16 enforcement officers, right or wrong, have no place
17 under our system of justice.
18      The testimony of some witnesses must be
19 considered with more caution than the testimony of
20 other witnesses. For example, a paid informant or a
21 witness who has been promised that he or she will not
22 be charged or prosecuted, or a witness who hopes to
23 gain more favorable treatment in his or her own case
24 may have a reason to make a false statement because
25 the witness wants to strike a good bargain with the

Page 12

1 government. So while a witness of that kind may be
2 entirely truthful when testifying, you should consider
3 that testimony with more caution than the testimony of
4 other witnesses.
5      Also, when the government offers testimony
6 or evidence that a defendant made a statement or
7 admission to someone after being arrested or detained,
8 the jury should consider the evidence concerning such
9 an alleged statement with caution and great care. It
10 is for you to decide first whether the defendant made
11 the statement; and, second, if so, how much weight to
12 give it. In making these decisions you should
13 consider all of the evidence about the alleged
14 statement, including the circumstances under which the
15 defendant may have made it. Of course any such
16 statement should not be considered in any way whatever
17 as evidence with respect to the other defendant in
18 trial.
19      Now the defendants in this case are Leon
20 Carmichael, Senior and Freddie Williams. Both
21 Carmichael and Williams are charged in one count of
22 the indictment. Only Carmichael is charged in count
23 two of the indictment. I should have said count one
24 of the indictment in that first sentence. I will now
25 explain to you what the counts are in the indictment,

Page 13

1 and what the law says with respect to the offenses
2 charged in each count.
3      Count one, conspiracy to distribute
4 marijuana. This count of the indictment alleges in
5 relevant part that from in or about 1993, a more
6 specific dating unknown to the grand jury, but
7 continuing up to on or about the 17th day of November
8 2003 in Montgomery within the Middle District of
9 Alabama and elsewhere, the defendants, Leon
10 Carmichael, Senior and Freddie Williams, did knowingly
11 and intentionally conspire, combine and agree with
12 each other and with other persons both known and
13 unknown to the grand jury, to possess with intent to
14 distribute and distribute more than three thousand
15 kilograms of marijuana, a Schedule I controlled
16 substance in violation of Title 21 United States Code,
17 Section 841(a)(1), all in violation of Title 21 United
18 States Code, Section 846.
19      Title 21 United States Code, Section 846
20 makes it a separate federal crime or offense for
21 anyone to conspire or agree with someone else to do
22 something which, if after actually carried out, would
23 be a violation of section 841(a)(1). Section
24 841(a)(1) makes it a federal crime or offense for
25 anyone to possess a controlled substance, such as

Page 14

1 marijuana, with intent to distribute it. Under the
2 law, a conspiracy is an agreement or a kind of
3 partnership in criminal purposes in which each member
4 becomes the agent or partner of every other member.
5       In order to establish a conspiracy offense
6 it is not necessary for the government to prove that
7 all of the people named in the indictment were members
8 of the scheme, or that those who were members had
9 entered into any type of formal agreement. What the
10 evidence in the case must show beyond a reasonable
11 doubt is first, that two or more persons in some way
12 or manner came to a mutual understanding to try to
13 accomplish a common and unlawful plan as charged in
14 the indictment. And, second, that the defendant
15 knowing the unlawful purpose of the plan willfully
16 joined it.
17       A person may be a member of a conspiracy
18 without full knowledge of all of the details of the
19 unlawful scheme or the names and identities of all of
20 the alleged conspirators. So if a defendant has a
21 general understanding of the unlawful purpose of the
22 plan, and knowingly and willfully joins in that plan
23 on one occasion, that is sufficient to convict that
24 defendant for a conspiracy, even though the defendant
25 did not participate before and even though the

Page 15

1 defendant played only a minor part.
2       Of course, mere presence at the scene of a
3 transaction or event, or the mere fact that certain
4 persons may have associated with each other and may
5 have assembled together and discussed common aims and
6 interests, does not necessarily establish proof of a
7 conspiracy. Also, a person who has no knowledge of a
8 conspiracy, but who happens to act in a way which
9 advances some purpose of one, does not thereby become
10 a conspirator.
11       To find a defendant guilty you must
12 unanimously find that the defendant was a member of
13 the conspiracy charged in the indictment and not a
14 member of some other separate conspiracy.
15       If you find that the government has proved
16 the above two elements beyond a reasonable doubt as to
17 a defendant, then you must also determine as to that
18 defendant what net amount of controlled substance the
19 government has proved beyond a reasonable doubt for
20 which that defendant can be held accountable. The
21 defendant can be held accountable for all quantities
22 of a controlled substance with which the government
23 has established beyond a reasonable doubt he or she
24 was directly involved, and all quantities of a
25 controlled substance that were reasonably foreseeable

Page 16

1 to the defendant to be in the scope of the conspiracy
2 as you find it to exist beyond a reasonable doubt from
3 the evidence.
4       For any defendant you find guilty beyond a
5 reasonable doubt of count one, you must indicate this
6 amount on your verdict form.
7       Count two, conspiracy to commit money
8 laundering. This count of the indictment alleges in
9 relevant part that from on or about the 28th day of
10 May 2002, and continuing to on or about the 24th day
11 of February 2003 in the Middle District of Alabama the
12 defendant, Leon Carmichael, Senior, did knowingly and
13 willfully combine, conspire and confederate with other
14 persons both known and unknown to the grand jury, to
15 knowingly conduct, attempt to conduct and cause to be
16 conducted financial transactions affecting interstate
17 commerce; to wit, directing that money be placed in a
18 Compass Bank account in a nominee name; said money
19 being the proceeds of a specified unlawful activity;
20 that is, the conspiracy to possess with intent to
21 distribute and distribute a controlled substance as
22 charged in count one herein knowing that the
23 transactions were designed in whole or in part to
24 conceal and disguise the nature, location, source,
25 ownership and control of the proceeds of the specified

Page 17

1 unlawful activity, all in violation of Title 18 United
2 States Code, Section 1956(h).
3       Title 18 United States Code, Section 1956(h)
4 makes it a separate federal crime or offense for
5 anyone to conspire or agree with someone else to
6 commit the offense of money laundering in violation of
7 Title 18 United States Code, Section 1956. It is a
8 violation of Title 18 United States Code, Section 1956
9 to knowingly engage in certain kinds of financial
10 transactions commonly known as money laundering.
11       The elements of money laundering are first,
12 that the defendant knowingly conducted or attempted to
13 conduct a financial transaction affecting interstate
14 commerce as hereinafter defined.
15       Second, that the defendant knew that the
16 funds or property involved in the financial
17 transaction represented the proceeds of some form of
18 unlawful activity.
19       Third, that the funds or property involved
20 in the financial transaction did in fact represent the
21 proceeds of specified unlawful activity, in this case
22 the proceeds of the conspiracy to distribute and to
23 possess with intent to distribute marijuana as alleged
24 in count one of the indictment.
25       And, fourth, that the defendant engaged in

Page 18

1 the financial transaction knowing that the transaction
2 was designed in whole or in part to conceal or
3 disguise the nature, location, source, ownership or
4 the control of the proceeds of such specified unlawful
5 activity.
6      Now the term "conduct" means initiating,
7 concluding or participating in initiating or
8 concluding a transaction.
9      The term "transaction" with respect to a
10 financial institution includes a deposit, withdrawal
11 or transfer between accounts.
12      The term "financial transaction" means a
13 transaction involving the use of a financial
14 institution which is engaged in or the activities of
15 which affect interstate or foreign commerce in any way
16 or degree.
17      The term "financial institution" includes an
18 insured bank and a commercial bank or trust company.
19      The term "interstate or foreign commerce"
20 includes any commercial activity that involves
21 transportation or communication between places in two
22 or more states, between someplace in the United States
23 and someplace outside the United States.
24      The term "knowing that the funds or property
25 involved in the financial transaction represented the

Page 19

1 proceeds of some form of unlawful activity," means
2 that the defendant knew that such funds or property
3 represented proceeds from some form, though not
4 necessarily which form, of a felony offense under
5 state or federal law.
6      Now Defendant Carmichael is charged with
7 conspiring to commit the offense of money laundering.
8 The elements of which I have just explained to you.
9 As I have stated previously, under the law a
10 conspiracy is an agreement or a kind of partnership in
11 criminal purpose in which each member becomes the
12 agent or partner of every other member. In order to
13 establish a money laundering conspiracy offense, it is
14 not necessary for the government to prove that all of
15 the people named in the indictment were members of the
16 scheme, or that those who were members had engaged
17 into or had entered into any formal type of agreement.
18      Also, because the essence of a conspiracy
19 offense is the making of the scheme itself, it is not
20 necessary for the government to prove that the
21 conspirators actually succeeded in accomplishing their
22 unlawful plan. What the evidence in the case must
23 show beyond a reasonable doubt before a defendant may
24 be found guilty of a money laundering conspiracy
25 offense is first, that two or more persons in some way

Page 20

1 or manner came to a mutual understanding to try to
2 accomplish a common and unlawful plan to violate 18
3 United States Code, Section 1956; and, second, that
4 the defendant knowing the unlawful purpose of the plan
5 willfully joined it.
6      Again, a person may become a member of a
7 conspiracy without full knowledge of all the details
8 of the unlawful scheme, or the names and identities of
9 all the other alleged conspirators. So if a defendant
10 has a general understanding of the unlawful purpose of
11 the plan, and knowingly and willfully joins in that
12 plan on one occasion, that is sufficient to convict
13 that defendant for conspiracy, even though the
14 defendant did not participate before, and even though
15 the defendant played only a minor part.
16      As I stated previously, of course mere
17 presence at the scene of a transaction or event, or
18 the mere fact that certain persons may have associated
19 with each other and may have assembled together, and
20 discussed common aims and interests, does not
21 necessarily establish proof of a conspiracy.
22      Also, a person who has no knowledge of a
23 conspiracy but who happens to act in a way which
24 advances some purpose of one, does not thereby become
25 a conspirator. If you find that Sherry Pettus did not

Page 21

1 agree or combine with Mr. Carmichael to commit the
2 money laundering referenced in count two, you must
3 find Mr. Carmichael not guilty of count two.
4      Now the guilt of a defendant in a criminal
5 case may be proved without evidence that the defendant
6 personally did every act involved in the commission of
7 the crime charged. The law recognizes that ordinarily
8 anything a person can do for oneself may also be
9 accomplished through the direction of another person
10 as an agent, or by acting together with or under the
11 direction of another person or persons in a joint
12 effort.
13      So if the act or conduct of an agent,
14 employee or other associate of the defendant are
15 willfully directed or authorized by the defendant, or
16 if the defendant aids and abets another person by
17 willfully joining together with that person in the
18 commission of a crime, then the law holds the
19 defendant responsible for the conduct of that other
20 person just as though the defendant had personally
21 engaged in such conduct. However, before any
22 defendant can be held criminally responsible for the
23 conduct of others, it is necessary that the defendant
24 willfully associate in some way with the crime and
25 willfully participate in it.

Page 22

1  Mere presence at the scene of a crime, and
2  even knowledge that a crime is being committed, are
3  not sufficient to establish that a defendant either
4  directed or aided and abetted the crime.  You must
5  find beyond a reasonable doubt that the defendant was
6  a willful participant and not merely a knowing
7  spectator.
8      Now you will note that the indictment
9  charges that the offense was committed on or about a
10  certain date.  The government does not have to prove
11  with certainty the exact date of the alleged offense.
12  It is sufficient if the government proves beyond a
13  reasonable doubt that the offense was committed on a
14  date reasonably near the date alleged in the
15  indictment.
16      The word "willfully" as that term is used in
17  the indictment and these instructions means that the
18  act was done voluntarily and intentionally, and not
19  because of mistake or accident.  The word "willfully"
20  as that term is used in the indictment and or in these
21  instructions means that the acted was committed
22  voluntarily and purposely with the specific intent to
23  do something the law forbids.  That is, with bad
24  purpose either to disobey or disregard the law.
25      Now a separate crime or offense is charged

Page 23

1  against one or both of the defendants in each count of
2  the indictment.  Each charge and the evidence
3  pertaining to it should be considered separately.
4      Also, the case of each defendant should be
5  considered separately and individually.  The fact that
6  you may find one or both of the defendants guilty or
7  not guilty on any of the offenses charged should not
8  affect your verdict as to the other offense or the
9  other defendant.  I caution you, members of the jury,
10  that you are here to determine from the evidence in
11  the case whether each defendant is guilty or not
12  guilty.  Each defendant is on trial only for the
13  specific offense alleged in the indictment.
14      Also, the question of punishment should
15  never be considered by the jury in any way in deciding
16  the case.  If a defendant is convicted, the matter of
17  punishment is for the judge alone to determine later.
18      Any verdict you reach in the jury room,
19  whether guilty or not guilty, must be unanimous.  In
20  other words, to return a verdict you must all agree.
21  Your deliberations will be secret, you will never have
22  to explain your verdict to anyone.  It is your duty as
23  jurors to discuss the case with one another in an
24  effort to reach agreement if you can do so.  Each of
25  you must decide the case for yourself, but only after

Page 24

1  full consideration of the evidence with the other
2  members of the jury.
3      While you are discussing the case do not
4  hesitate to reexamine your own opinion and change your
5  mind if you become convinced that you were wrong.  But
6  do not give up your honest beliefs solely because the
7  others think differently or merely to get the case
8  over with.  Remember, that in a very real way you are
9  judges, judges of the facts.  Your only interest is to
10  seek the truth from the evidence in the case.
11      Now when you go to the jury room you should
12  first select one of your members to act as your
13  foreperson.  The foreperson will preside over you've
14  deliberations and will speak for you here in court.
15  Now verdict forms have been prepared for your
16  convenience.  You will take the verdict forms to the
17  jury room, and when you have reached unanimous
18  agreement, you will have your foreperson fill in the
19  appropriate verdict forms, date and sign them and then
20  you will return to the courtroom.
21      If you should desire to communicate with me
22  at any time, please write down your message or
23  question and pass the note to the marshal who will
24  bring it to my attention.  I will then respond as
25  promptly as possible either in writing or by having

Page 25

1  you return to the courtroom so that I can address you
2  orally.  I caution you, however, with regard to any
3  message or question you might send, that you should
4  not tell me your numerical division at that time.
5      Now, members of the jury, there are two
6  verdict forms.  There is one verdict form for Mr.
7  Carmichael and there is one verdict form for Mr.
8  Williams.  Now the verdict form is actually on cream
9  colored paper.  I'm going to ask the clerk at this
10  time to hand out to you white copies of the verdict
11  form.  And then I'm going to go over the verdict form
12  with you.
13      Does everyone have a copy of a verdict form?
14  Are we missing someone?
15      Now we'll go over Mr. Carmichael's verdict
16  form first.  Mr. Carmichael's verdict form essentially
17  has two parts to it, and those two parts correspond to
18  the two counts in the indictment.  And part one says
19  "As to the charge in count one of the indictment we,
20  the jury, find the defendant, Leon Carmichael, Senior"
21  and then it has a place for you to check either "not
22  guilty" or "guilty," depending upon what you find
23  based on my instructions on the law.
24      If you find Mr. Carmichael guilty of count
25  one, the verdict form -- essentially says that again,

## Page 26

1 "If you find Defendant Carmichael guilty of count one,
2 please indicate the net amount of controlled
3 substances that you find him accountable for according
4 to the instructions you were given." And you would
5 indicate in pounds the amount of marijuana if you find
6 beyond a reasonable doubt that Mr. Carmichael is
7 guilty, and if you further find based on my
8 instructions and beyond a reasonable doubt what drug
9 amount he should be held accountable for and you would
10 indicate that in pounds.
11       And as I said the verdict form contains two
12 parts. Part two corresponds to count two of the
13 indictment and it says, "As to the charge contained in
14 count two of the indictment we, the jury, find the
15 Defendant Leon Carmichael, Senior" and then it has a
16 place for you to check either "not guilty" or
17 "guilty," and you would check the appropriate one
18 depending upon how you find the evidence based on the
19 law as I have given it to you. And then after you've
20 completed the verdict form you will have your
21 foreperson date the verdict form and sign it.
22       Now the other verdict form is for Mr.
23 Williams. And because he's charged in only one count
24 in the indictment, that is count one, this verdict
25 form basically only has questions as to count one and

## Page 27

1 it is essentially identical to count one of the
2 verdict form for Mr. Carmichael. That is, as to Mr.
3 Williams it basically asks for you to check whether
4 you either find him guilty or not guilty based on the
5 evidence and the law, and if you find him guilty how
6 much he held be accountable for as to the drugs
7 or marijuana in pounds, again based upon the evidence
8 as you find it and based on the law as I gave it to
9 you. And then after completing this verdict form you
10 would have your foreperson date it and sign it.
11       Now obviously on both Mr. Williams's and Mr.
12 Carmichael's verdict form as to count one, if you find
13 them not guilty, then you would not fill out that
14 second part about the amount of drugs. But as to Mr.
15 Carmichael, even if you find him not guilty on count
16 one, you still have to determine as to count two
17 whether he is either not guilty or guilty.
18       Now this is the verdict form that is your
19 official verdict form. As you can see it's sort of
20 cream colored, so you will return only one verdict
21 form from your foreperson and it will be this cream
22 colored form. The others, the white copies I've given
23 you is just as working copies. Your foreperson will
24 fill out only this one.
25       Now at this time I'm going to ask that you

## Page 28

1 take all of your personal belongings with you,
2 including even your notes this time. Don't leave them
3 in your chairs. If you have any personal items, take
4 them with you. I'm going to excuse you for about
5 fifteen seconds. You won't even have time to go to
6 the restroom. But when you come back out, you will
7 stand across the back of the courtroom facing me
8 behind the attorneys. That's why it's very important
9 that you take everything with you now because you
10 won't be coming back into the jury box.
11       Please step outside.
12       Do not discuss the case.
13       (Whereupon, the jury was escorted out of the
14 courtroom, and the following colloquy ensued):
15       THE COURT: The government?
16       MS. MORRIS: No objections, Your Honor.
17       THE COURT: Mr. Carmichael, as to the
18 Court's charge?
19       MS. WAYNE: No objection.
20       THE COURT: Mr. Williams?
21       MR. TEAGUE: Your Honor, we have no
22 objections.
23       THE COURT: Very good. Bring in the jury.
24       Before I bring in the jury, Miss Wayne is
25 probably not familiar with my procedure over lunch, so

## Page 29

1 I will explain it to her now. What I will do,
2 Miss Wayne, is tell the jury that if they would like
3 to break for lunch they may break from twelve until
4 one. I will, however, not bring them back into the
5 courtroom. But if for some reason they're divided,
6 they cannot resume their deliberations after lunch
7 until all twelve of them are back in the jury room.
8       I do know that while the marshal is with
9 them sometimes they go outside and smoke. So while if
10 there are eight jurors in that room and three of them
11 are out smoking, they can't discuss the case. They
12 cannot discuss the case either on a break or while
13 they're at lunch unless all twelve of them are in the
14 jury room.
15       Also, because the marshal is with them, I
16 will tell them that if they take breaks, that is when
17 some of them leave the jury room to go outside and
18 smoke, and I think that's generally what happens as
19 I've seen them out there, or if they go to lunch and
20 it ends up that they're not totally together in the
21 jury room, they'll let us know so that we know when
22 they take a break and we know when they're at lunch.
23 If they are at lunch that's when we go to lunch;
24 otherwise, I expect a representative for each party to
25 be here in case they have a question primarily, and of

**Multi-Page™**

Page 30

1 course if we should get a verdict I'll need someone
2 here on that as well.
3 Now, any problems with that? That's the
4 general procedure.
5 (Whereupon, there was no response.     )
6 THE COURT: Bring the jury back in and I
7 will excuse Ms. Freeman and Mr. Mills.
8 (Whereupon, the jury was escorted into the
9 courtroom, and the following colloquy ensued):
10 THE COURT: That's fine, sir, right there.
11 Now who is Ms. Freeman?
12 (Juror Freeman indicated.)
13 THE COURT: Ms. Freeman and Mr. Mills -- Who
14 is Mr. Mills?
15 (Juror Mills indicated.)
16 THE COURT: Ms. Freeman and Mr. Mills, you
17 are alternates and you would have served in case one
18 of the other twelve jurors could not have served. So
19 you are excused at this time. I'd like to thank you
20 for your service. I know it's been an inconvenience
21 not to be able to deliberate, and it's probably
22 somewhat a letdown for you not being able to
23 deliberate, but it's very important to appear for jury
24 service. You are excused at this time, and thank you
25 very much. You're free to go.

Page 31

1 For the remaining twelve jurors, you may now
2 begin your deliberations. However you're under these
3 additional instructions. It's now almost nine-thirty.
4 If you decide to take a break, which you may do for
5 fifteen minutes, I know that some of you like to go
6 outside and have a smoke, if you decide to do that you
7 should tell the marshal or the security officer who
8 will in turn tell us that you are taking a fifteen
9 minute break. But during that break you may not
10 discuss the case.
11 For instance, if three of you decide to go
12 outside and have a break and that would leave what,
13 nine of you in the jury room, those nine of you can't
14 talk about the case. If one of you steps outside for
15 any reason and there are eleven of you left, you
16 cannot talk about the case. Only when that twelfth
17 juror is present in the jury room may you at any time
18 deliberate and discuss the case.
19 Now also, if you decide to have lunch, and
20 that would be between twelve and one, again, you
21 should tell the marshal or the security officer that
22 you would now like to have lunch. He will then tell
23 us, because we're not going to go to lunch until you
24 go to lunch. If you don't go to lunch, we don't have
25 lunch. So when you tell us you want to go to lunch

Page 32

1 then we will go to lunch.
2 But while you are having your lunch, you
3 cannot discuss the case unless all twelve of you are
4 in that jury room. If one of you decides, you know,
5 to step outside for whatever reason, to get a breath
6 of fresh air, you cannot discuss the case. Only when
7 that twelfth juror is sitting there with you may you
8 at any time discuss the case. And, again, let us know
9 if you want to take a break so the marshal can tell
10 us, or the security officer can tell us.
11 Also, if you decide to take an hour and have
12 lunch and not discuss the case, tell us again because
13 we need to know it and also that's when we will go to
14 lunch as well.
15 Thank you very much. You may now begin your
16 deliberations.
17 (Whereupon the jury was escorted out of the
18 courtroom to enter into its deliberations at nine
19 twenty-seven a.m.)
20 THE COURT: Anything else, Counsel?
21 MS. MORRIS: No, Your Honor.
22 MS. JAMES: No.
23 THE COURT: Very good.
24 We're in recess until we have a verdict from
25 the jury.

Page 33

1 VERDICT OF THE JURY
2 (AT 2:08 P.M.):
3 THE COURT: Counsel, I understand the jury
4 has reached its verdicts.
5 Will you bring in the jury.
6 Miss Carnes, will you direct the jury where
7 to stand.
8 COURTROOM DEPUTY CLERK: Certainly.
9 (Whereupon, the jury was escorted into the
10 courtroom.)
11 THE COURT: Do we have all twelve?
12 Now, sir, I understand you've reached
13 verdicts?
14 THE FOREPERSON: Yes, sir.
15 THE COURT: Would you hand those verdicts to
16 the Clerk of the Court.
17 (Whereupon, the Court examined said
18 documents.)
19 THE COURT: The Clerk of the Court will file
20 the verdicts and read them.
21 COURTROOM DEPUTY CLERK: United States of
22 America v. Leon Carmichael, Senior. Verdict: As to
23 the charge in count one of the indictment we, the
24 jury, find the defendant, Leon Carmichael, Senior,
25 guilty.

**Page 34**

1     If you find Defendant Carmichael guilty of
2 count one please indicate the net amount of controlled
3 substances that you find him accountable for according
4 to the instructions you were given. Seven thousand
5 pounds of marijuana.
6     As to the charge in count two of the
7 indictment we, the jury, find the defendant, Leon
8 Carmichael, Senior, guilty.
9     So say we all, signed by the foreperson
10 Charles Segers, this 17th day of June, 2005.
11     United States of America v. Freddie
12 Williams. Verdict. As to the charge in count one of
13 the indictment we, the jury, find the defendant,
14 Freddie Williams, guilty. If you find Defendant
15 Williams guilty please indicate the net amount of
16 controlled substances that you find him accountable
17 for according to the instructions you were given.
18 Seven thousand pounds of marijuana. So say we all,
19 foreperson Charles A. Segers. Dated June 17th, 2005.
20     THE COURT: The clerk will file the
21 verdicts.
22     Now, Mr. Feaga, or Ms. Morris, or
23 Mr. Moorer, do you wish anything else from the jury as
24 to this matter?
25     MS. MORRIS: No, Your Honor.

**Page 35**

1     THE COURT: Ms. Wayne, do you wish anything
2 further? For example, do you wish to have the jury
3 polled?
4     MS. WAYNE: Yes, Judge, please.
5     THE COURT: The clerk will call the initials
6 of the jury, each juror number. As your initials are
7 called if the verdict is yours answer yes. If the
8 verdict is not yours answer no.
9     (Whereupon the jury was polled, and each and
10 every juror confirmed the verdicts as read by the
11 courtroom deputy clerk.)
12     THE COURT: Now, members of the jury, this
13 case is not over yet. You will have to make an
14 additional determination later. I'm going to ask that
15 you go back into the jury room. Do not discuss the
16 case. And I will call you back out later with the
17 additional instructions.
18     Please go to the jury room. Do not discuss
19 the case.
20     (Whereupon, the jury was escorted out of the
21 courtroom, and the following colloquy ensued):
22     THE COURT: Will the defendants come
23 forward.
24     Mr. Carmichael and Mr. Williams, Mr.
25 Carmichael, based upon the verdict of the jury it is

**Page 36**

1 the order, judgment and decree of the Court that you
2 are guilty of both counts one and two of the
3 indictment. You are now in the custody of the
4 marshal.
5     (Whereupon, a spectator became emotional and
6 was escorted out of the courtroom.)
7     THE COURT: Mr. Williams, based upon the
8 verdict of the jury, it is the order, judgment and
9 decree of the Court that you are guilty. You're in
10 the custody of the marshal.
11     We'll take the post-trial motions after I
12 take up what to do with the jury. So, counsel, you
13 may have a seat.
14     Counsel how do you suggest we proceed as to
15 the forfeiture proceedings?
16     MR. FEAGA: Your Honor, can we hear from the
17 defense on that first?
18     THE COURT: What would you like, Miss Wayne?
19 Mr. Teague?
20     MS. WAYNE: Judge, my understanding is that
21 we were going to commence on Monday.
22     THE COURT: Yes.
23     MS. WAYNE: We have been talking, and we can
24 now maybe continue that in terms --
25     THE COURT: As of now you don't have a

**Page 37**

1 resolution?
2     MS. WAYNE: That's correct.
3     THE COURT: And, Mr. Teague, you wanted to
4 put something on the record?
5     MR. TEAGUE: I do, Your Honor.
6     THE COURT: Have your client stand with you.
7 Now he's been sworn already. You may want to ask him
8 about waiving any interest in property he has.
9     MR. TEAGUE: Do you understand, Mr.
10 Williams, you're still under oath as you were
11 previously placed under oath, is that correct?
12     DEFENDANT WILLIAMS: Yes, sir.
13     MR. TEAGUE: Now, you understand that after
14 the guilt phase there will be a forfeiture phase in
15 this trial. And there are various things that the
16 government seeks to forfeit. There is the property at
17 Three two two six Brookwood Drive, which is as I
18 understand it the home of Mr. Carmichael. Do you wish
19 to make any claim as you having any interest or any
20 ownership interest in that property?
21     DEFENDANT WILLIAMS: No, sir.
22     MR. TEAGUE: Now, then the second property,
23 I don't have the exact address unless you --
24     MR. HARMON: It's the Carmichael Center.
25     MR. TEAGUE: The Carmichael Center. Do you

Page 38

1  make any claim against the Carmichael Center as you
2  having any ownership interest in it?
3       DEFENDANT WILLIAMS: No.
4       MR. TEAGUE: It's my understanding that Club
5  Unique, do you make any ownership claim to any
6  interest in Club Unique?
7       DEFENDANT WILLIAMS: No.
8       MR. TEAGUE: What's the next?
9       MR. HARMON: There's five thousand dollars
10 in United States currency.
11      MR. TEAGUE: Do you understand they seek to
12 seize five thousand dollars in U. S. currency?  Do you
13 make any claim to that money?
14      DEFENDANT WILLIAMS: No, sir.
15      MR. HARMON: The other item, Your Honor, is
16 one thousand seven hundred and eighty-one dollars.
17      MR. TEAGUE: And you make no claims to that
18 currency either?
19      DEFENDANT WILLIAMS: No, sir.
20      MR. HARMON: And the last item is 2001 Honda
21 Accord vehicle.
22      MR. TEAGUE: Do you make any claim to the
23 Honda Accord vehicle?
24      DEFENDANT WILLIAMS: No, sir.
25      THE COURT: Is that it?

Page 39

1       MR. HARMON: The United States will not seek
2  a money judgment against this defendant.
3       THE COURT: Mr. Williams?
4       MR. HARMON: Mr. Williams only.
5       THE COURT: Okay.  Now, Mr. Williams, you'll
6  have to remain in the courtroom.
7       Now, Mr. Teague if you'll have a seat we'll
8  move on to the forfeiture.
9       MR. TEAGUE: Yes, Your Honor.
10      THE COURT: How long do you think the
11 forfeiture proceeding will take, Mr. Harmon?
12      MR. HARMON: Your Honor, we will ask the
13 Court to instruct the jury that they are allowed to
14 consider all prior heard evidence and the guilt
15 innocence phase.  I would anticipate that we might
16 have a few witnesses in our case-in-chief, but would
17 be no --
18      THE COURT: How many are we talking about?
19      MR. HARMON: I would say no more than three,
20 your Honor, and more than likely two.  And at that
21 point, Your Honor, depending on what the defense puts
22 on we might have to call some rebuttal witnesses.
23      THE COURT: What type of witness will you be
24 calling?
25      MR. HARMON: Your Honor, to clear up some

Page 40

1  items, for example, regarding money that was spent,
2  for example on the Carmichael Center.  I think there's
3  a witness regarding certain amounts coming out of that
4  bank account, that sort of thing.
5       THE COURT: So you're talking about maybe
6  half a day?
7       MR. HARMON: Yes, half a day at the most.
8       THE COURT: Now, Miss Wayne?
9       MS. WAYNE: And, Judge, I believe that we
10 would have Mr. Argo I know is going to go through a
11 lot of those financial matters.  So I know we have Mr.
12 Argo and maybe one other witness.  It really shouldn't
13 be that long, so maybe complete together would be a
14 day, maybe a day and-a-half.
15      THE COURT: Day and-a-half.  Then of course
16 we have to charge the jury and then deliberations.  So
17 we're talking about two days.
18      MS. WAYNE: Maximum, yes.
19      THE COURT: Very good.  Now, counsel, before
20 I move to the issue of detention, would you like a
21 recess to regroup, or are you ready to do it right
22 now?
23      MS. WAYNE: No.
24      MS. JAMES: No, sir.
25      MR. TEAGUE: We're ready, Your Honor.

Page 41

1       DETENTION HEARING:
2       THE COURT: First I'll hear from the
3  government as to whether they wish to retain the
4  defendants.
5       MS. MORRIS: Your Honor, as the Court is
6  well aware --
7       THE COURT: I think you have filed a motion.
8       MS. MORRIS: Yes.  And I have served copies
9  of that motion upon defendants' counsel.  Quite
10 frankly, the law is outlined in the motion.
11      THE COURT: Okay.
12      MS. MORRIS: Furthermore --
13      THE COURT: Where do I have discretion, if I
14 have discretion at all?
15      MS. MORRIS: In theory I suppose if there
16 are exceptional circumstances the Court has some
17 discretion.  However --
18      THE COURT: So do you contend, number one,
19 what are the two preliminaries, whether they're likely
20 to escape or pose a danger before we reach the
21 exceptional circumstances?
22      MS. MORRIS: True, Your Honor.
23      THE COURT: Do you contend they are likely
24 to escape?
25      MS. MORRIS: Absolutely.  Escape the

Multi-Page™

Page 42

1 jurisdiction? Yes. Flee.
2        THE COURT: So you don't concede that?
3        MS. MORRIS: No.
4        THE COURT: So you are contending they're
5 likely to escape.
6        MS. MORRIS: That is correct.
7        THE COURT: Are you conceding whether they
8 are a danger to society?
9        MS. MORRIS: No, I'm not. I'm not conceding
10 it. We are contending that they are a danger to the
11 community as well as a risk of flight from the
12 jurisdiction.
13       THE COURT: And you contend there are no
14 exceptional circumstances?
15       MS. MORRIS: Correct.
16       THE COURT: Do you have any evidence to put
17 on?
18       MS. MORRIS: Evidence as in testimony? No,
19 Your Honor, just argument.
20       THE COURT: Very good.
21       Now we'll get to the defendants.
22       MS. JAMES: May I approach the podium?
23       THE COURT: Yes.
24       MS. JAMES: You want me to address the first
25 two --

Page 43

1        THE COURT: Since she's challenging
2 everything, it's really up to you now.
3        MS. JAMES: Judge, this case has been
4 pending I think for over eighteen months. The Court,
5 the magistrate judge --
6        THE COURT: Let's do it this way, now that I
7 think about it. Let's start with how they are a
8 flight risk. Then I'll hear from the government and
9 then I'll hear back from you. Let's do it point by
10 point.
11       MS. JAMES: Okay. Well certainly it's our
12 position that, well I'm speaking to Mr. Carmichael
13 only, that he is certainly not a flight risk as
14 evidenced by his compliance with all court orders
15 since his arrest. He was released from custody a
16 couple of days after he was arrested.
17       He's complied with conditions that were set
18 by the magistrate judge. The government has
19 superseded the indictment in this case several times.
20 And I'm not certain, but I suspect that the Court
21 possibly on each of those occasions at least made a
22 cursory review of his status on release.
23       There is no evidence whatsoever that there
24 is anything different today than there was November
25 the 19th of 2003 when he was released from custody

Page 44

1 with regard to flight.
2        THE COURT: Has he failed to comply with any
3 condition of bond since he was arrested?
4        MS. JAMES: None whatsoever.
5        THE COURT: Is Supervised Release here? Is
6 that true?
7        THE PROBATION OFFICER: That is correct,
8 Your Honor. Mr. Rodney Comer, United States probation
9 officer, is supervising Mr. Carmichael and he relays
10 to the Court that there have been no supervisory
11 difficulties.
12       MS. JAMES: And, Judge, I would just note
13 for the record if the Court wants to consider it at
14 all, Mr. Carmichael has had contact with one or some
15 of his lawyers every day several times a day. So, I
16 mean he's certainly available and I can't comprehend
17 that he --
18       THE COURT: By the way, I hate to interrupt
19 you. I have to let this jury go.
20       MS. JAMES: Oh, that's right.
21       THE COURT: I forgot about that. We'll come
22 back.
23       Counsel, what would you suggest I tell the
24 jury? I don't just want them to show up. I think, if
25 you don't mind, I think I'll say to them that the

Page 45

1 second aspect of this case is whether or not certain
2 property belonging to -- allegedly belonging to Mr.
3 Carmichael should be forfeited. And that will be the
4 hearing on Monday and they're not to discuss the case.
5        Does anyone have any objection to that?
6        MR. FEAGA: Your Honor, I think you might
7 also tell them that you anticipate taking up more than
8 two days.
9        THE COURT: Yes.
10       MR. HARMON: Your Honor, one thing I would
11 ask the Court, it's not to direct any type of question
12 to them regarding ownership. That would not be a
13 question for them, I think that would be a question
14 for the Court.
15       THE COURT: Well I just said alleged
16 ownership. Until I look at the law I'm not going to
17 make any --
18       MR. HARMON: Yes, sir.
19       MR. FEAGA: I think the Court will probably
20 need to renew their instructions about not talking to
21 each other or anyone else.
22       THE COURT: Without question.
23       Any problems with that, Ms. Wayne?
24       MS. WAYNE: No, Your Honor, I think that's
25 proper.

Page 46

1    THE COURT: Let's bring the jury out and
2 we'll let them go.
3    (Whereupon, the jury was escorted into the
4 courtroom.)
5    THE COURT: Members of the jury, as I said
6 before you left there is another proceeding that you
7 will have to participate in. And that will be whether
8 certain property allegedly owned by Mr. Carmichael
9 should be forfeited to the United States. That
10 proceeding will take about two days, we hope. We will
11 start on Monday morning, and I'll have you here at
12 nine o'clock because I have some things to take up
13 with the lawyers earlier.
14    Again, you are not to discuss the case among
15 yourselves or with anyone else, nor should you allow
16 anyone to discuss the case in your presence. Again,
17 I'm going to ask that you not read any newspapers.
18 I'm going to ask that you not read them at all. And
19 also, do not listen to any broadcast because there may
20 just be a chance that something is mentioned about
21 this case. Again, this will take about two days.
22    I'll see you back here Monday morning.
23 We'll start promptly at nine. You should meet
24 downstairs about ten minutes before. See you then.
25    Thank you very much, and you are excused.

Page 47

1    (Whereupon, the jury was escorted out of the
2 courtroom, and the following colloquy ensued):
3    THE COURT: And, counsel, the partial
4 sequestration will continue.
5    Now, where did we leave off with Miss James?
6    MS. JAMES: Judge, you were questioning the
7 probation officer. I believe we were dealing with the
8 Government's contention --
9    THE COURT: Yes, first factor.
10    MS. JAMES: It's simply our contention based
11 on what the probation officer has said, as well as the
12 arguments previously raised, that there is absolutely
13 no evidence of flight. Mr. Carmichael knew what the
14 potential ranges of punishment were for the past
15 eighteen months. He knew the potential of going into
16 custody if convicted. So there is no surprise. There
17 is nothing different.
18    THE COURT: Now with the jury having found
19 seven thousand pounds, what is the minimum and maximum
20 penalty? To be honest with you I can't convert that.
21 Can someone help me there?
22    MS. MORRIS: Yes, Your Honor. It's over a
23 thousand kilograms, so it would be a mandatory minimum
24 of ten up to life.
25    THE COURT: So Mr. Carmichael is looking at

Page 48

1 a mandatory minimum of ten years up to life.
2    MS. MORRIS: Correct.
3    THE COURT: And Mr. Williams is looking at
4 the same.
5    MS. MORRIS: Yes, Your Honor.
6    THE COURT: Very good. Go ahead.
7    MS. JAMES: Unless the Court wants more,
8 that's what we've got on the argument about flight.
9    THE COURT: Okay. Now I'll hear from the
10 Government.
11    MS. MORRIS: As the Court heard during the
12 course of this trial, there was a series of large
13 amounts, million dollar amounts of money that was dug
14 up in the course of this conspiracy. There is no one
15 to say out there that there is not more money out
16 there that we don't know about.
17    Throughout this trial, as the Court was
18 shown, they made millions upon millions upon millions
19 of dollars in this marijuana conspiracy. We haven't
20 found all of that money. Now I understand that Mr.
21 Carmichael owns some property, so we've been told, but
22 this money gives him especially, and Mr. Williams
23 because we don't know what Mr. Williams has in terms
24 of the amount of money he's made in the marijuana
25 business, but gives them the freedom to flee, the

Page 49

1 freedom to disappear.
2    THE COURT: Why isn't that true for just
3 about any defendant who comes before me who is out
4 under the circumstances they're under? Actually,
5 couldn't the argument be that he owns all of this
6 property and it indicates that he is less likely to
7 flee because he has so much to give up?
8    MS. MORRIS: One could say it's a double
9 edged sword, Your Honor, but we would contend that he
10 also has all of this currency that's unaccounted for.
11 While Miss James said he has been here the whole time
12 knowing what he may face, quite frankly the stakes are
13 higher now. He has been convicted. And the motive to
14 flee has increased. Also, he made the statement to
15 Agent DeJohn --
16    THE COURT: What statement?
17    MS. MORRIS: That a ten to fifteen year
18 sentence was a life sentence to him.
19    THE COURT: Well he is looking at a life
20 sentence.
21    MS. MORRIS: He is, but he could be looking
22 at less than a life sentence as well. But that, in
23 and of itself, gives him incentive to flee.
24    THE COURT: Anything else, Miss James, on
25 that element?

Page 50

1    MS. JAMES: I'm not going to belabor it.
2  But obviously there is no evidence that there is
3  millions of dollars buried. There is just -- and
4  there is no motivation to leave. He has family here,
5  he has a number of children here. His ties are in
6  this community. He has church ties, community ties.
7  There is every reason in the world for him to stay.
8  And quite frankly, Judge, he also has some very viable
9  issues on appeal.
10    THE COURT: Well we'll get to that in a
11  minute. All I want to talk about the flight.
12    MS. JAMES: But my point is he knows that.
13  It's a factor that you can consider with regard to
14  flight.
15    And you know the situation with his mother,
16  as well.
17    THE COURT: Yes, why don't you put that in
18  the record.
19    MS. JAMES: His mother is seventy-six years
20  old, she's presently in intensive care at Baptist
21  South. The Court was kind enough to allow Mr.
22  Carmichael to go visit her while the jury was
23  deliberating.
24    THE COURT: What is his mother's condition?
25  We discussed that off the record, but I really did not

Page 51

1  get a full appreciation of that. But you might want
2  to put something in that enlightens me completely. I
3  don't know how long has she been in the hospital. I
4  don't know what her condition is. I don't know what
5  his relationship is to her.
6    MS. JAMES: Well, Judge, I really would
7  prefer if you would hear from him, because he's had
8  direct contact with the doctors and I have not. I can
9  proffer what he's told me.
10    THE COURT: It's up to you.
11    MS. JAMES: I'd like for you to hear from
12  him.
13    THE COURT: Okay.
14    DEFENDANT CARMICHAEL: Your Honor, the
15  doctors say that my mother is near death. They say
16  she's not getting anything better. She had tubes put
17  in her heart. She's not responding.
18    The chaplain came in and spoke with me and
19  my daughters, my wife. She's not getting any better.
20  I have the name of the chaplain and the doctor and the
21  numbers.
22    She's been in the hospital three weeks now.
23  She had the surgery Monday. She was responding when
24  she had the surgery, but then she --
25    THE COURT: You say you think she's passing.

Page 52

1  What do you base that on?
2    DEFENDANT CARMICHAEL: The doctor. They
3  asked me did I want to leave her on life support.
4    THE COURT: Oh, you've reached that point?
5    THE DEFENDANT: Yes, sir.
6    MS. JAMES: And, Judge, just so you know for
7  are the record, he has been very instrumental in her
8  care and that prior to her hospitalization, and we
9  would anticipate if she were to make some recovery his
10  continued involvement with her -- We realize at some
11  point if and when he has to go into custody he has to
12  get someone else, but these circumstances are just
13  what we're faced with at present.
14    DEFENDANT CARMICHAEL: Judge, I will not
15  flee. Whenever I'm supposed to come back, I will come
16  back.
17    THE COURT: I'll hear from the government on
18  the flee issue. Just on the flee. Do you wish to
19  respond?
20    MS. MORRIS: Just not any more than what the
21  Court has already heard.
22    THE COURT: What about the fact that his
23  mother is near death? Doesn't that sort of indicate
24  that he's not likely to flee?
25    MS. MORRIS: It really could indicate that,

Page 53

1  however, you know, I don't know exactly. And I do
2  feel sympathy for him because of that, but I don't
3  know, given the fact that the rest of his life is at
4  stake, if that is enough to keep him in the
5  jurisdiction.
6    THE COURT: Okay. Why don't we move to the
7  next issue, which is danger to society. I'll hear
8  from the government first and then I'll hear from
9  Miss James.
10    MS. MORRIS: Your Honor, on this issue I do
11  believe that the government would call Agent DeJohn to
12  the stand.
13    THE COURT: Okay.
14    R.  DAVID  DEJOHN,
15  the witness herein, having first been duly sworn or
16  affirmed to tell the truth, was examined and testified
17  as follows:
18    DIRECT EXAMINATION
19    BY MS. MORRIS OF R. DAVID DEJOHN:
20  Q  Could you state your name for the record, please.
21  A  Task Force Agent Raymond David DeJohn.
22  Q  When you say you're a task force agent, you're a
23  task force agent with whom?
24  A  With the United States Drug Enforcement
25  Administration, Montgomery district office.

Page 54

1 Q And, Agent DeJohn, you're actually the case agent
2 in this case, is that correct?
3 A Yes, I am.
4 Q And through the course of your investigation did
5 you discover that Mr. Carmichael has a prior
6 conviction?
7 A Yes.
8 Q Could you tell the Court about that conviction
9 and the circumstances surrounding it, if you know.
10    MS. JAMES: Judge, we would stipulate to his
11 prior conviction and the facts. This is no secret.
12 Everyone in this courtroom and the community knows it.
13 He was pardoned. This is just an attempt to rehash
14 something that's unnecessary and a waste of time.
15    MS. MORRIS: Your Honor, this is going
16 directly to the danger to the community.
17    THE COURT: I do already know about his
18 conviction for murder, because we went into that when
19 the question came up if he were to testify. Is there
20 something else you wish to bring out?
21    MS. MORRIS: Your Honor, there are two other
22 things, Your Honor, but I was under the impression
23 that if it didn't come out at trial that you needed
24 evidence --
25    THE COURT: No. As for purposes of this

Page 55

1 hearing, I can consider everything that has occurred
2 in this case.
3    MS. MORRIS: Then I can proffer everything,
4 Your Honor, because I think the Court is aware --
5    THE COURT: I am not limited to what the
6 jury heard, I can consider anything.
7    MS. MORRIS: Then, with the Court's
8 permission --
9    THE COURT: Including things that were heard
10 before the magistrate judges. All you have to do is
11 point me to it and let the parties know that you're
12 relying on it so they can respond.
13    MS. MORRIS: I will do that, Your Honor.
14    THE COURT: Okay. So there is no need to
15 call him?
16    MS. MORRIS: No, Your Honor.
17    THE COURT: Very good.
18    (Whereupon the witness, R. David DeJohn,
19 stepped down from the stand.)
20    MS. MORRIS: I would just point out to the
21 Court, Your Honor, that Mr. Carmichael was convicted
22 of murder. It did involve a shooting. He was later
23 pardoned after serving I'm not sure, somewhere between
24 eight and eleven years in jail. I'm not exactly sure
25 how --

Page 56

1    THE COURT: Do you know what the
2 circumstances of the shooting were?
3    MS. MORRIS: I do not, Your Honor.
4    Secondly, I would bring to the Court's
5 attention that there are two young ladies, the first
6 of which is Miss Keena Whizinant that at least at the
7 time of Mr. Carmichael's arrest we know was eighteen,
8 and our information through the investigation was that
9 he had children with her. That would insinuate that
10 obviously she was under eighteen at the time that the
11 children were conceived.
12    The fact that Mr. Carmichael may be having
13 some sexual relations with children, or a female under
14 the age of eighteen, thereby makes him a danger to the
15 community.
16    There is also Miss Latoya Davis, who did not
17 testify in court. However, I think the Court is aware
18 that she has -- through the investigation we have
19 learned, that Miss Davis also began a relationship, a
20 sexual relationship with Mr. Carmichael --
21    THE COURT: I don't remember. You need to
22 enlighten me about Miss Davis now.
23    MS. MORRIS: Okay. Latoya Davis is Keena
24 Whizinant's sister, who is incarcerated now under a
25 murder charge, quite frankly, unrelated to this case.

Page 57

1 I have no allegations that her charges in any way stem
2 from Mr. Carmichael. However, through interviews with
3 Miss Davis she told us that she began a sexual
4 relationship with Mr. Carmichael at the age of
5 fourteen. That, again, makes him a danger to the
6 community.
7    THE COURT: Do you have any evidence that
8 Mr. Carmichael was exposing either or both of these
9 minors to drugs while they were minors?
10    MS. MORRIS: Yes, Your Honor.
11    THE COURT: What evidence do you have of
12 that?
13    MS. MORRIS: Mrs. Davis first of all told us
14 in interviews that she sold some marijuana out of J.
15 and L. Thrift, which I think the Court heard J. and L.
16 Thrift where Mr. Timmons worked for Mr. Carmichael,
17 that she would make deposits in certain bank accounts
18 for Mr. Carmichael and that she would take money and
19 go with Mr. Carmichael to deliver drugs.
20    THE COURT: This is while she was a minor?
21    MS. MORRIS: Yes. Miss Whizinant, as the
22 Court heard through the course of testimony, you know,
23 lives in a house that has at very least a curious
24 financial history. She lives in a house where Mr.
25 Denton testified that he took drug proceeds to Mr.

Multi-Page™

Page 58

1 Carmichael at this house, and she called Sherry Pettus
2 upon the day of Mr. Carmichael's arrest and said hey,
3 the stuff inside Freddie Williams' house is Mr.
4 Carmichael's.
5      All of that lends credence to the fact that
6 he is associating himself in an inappropriate manner
7 with these young girls. That alone makes him a danger
8 to the community. But if you set that aside, the fact
9 that he has been convicted of a conspiracy to
10 distribute seven thousand pounds of marijuana alone
11 makes him a danger to the community.
12      THE COURT: Do you have those forms, what
13 are they called -- I think we used to call them Jenks
14 forms -- on Miss Davis, that relates to what you told
15 me?
16      MS. MORRIS: Like reports?
17      THE COURT: Yes.
18      MS. MORRIS: Yes, Your Honor. If you'll
19 give us a moment --
20      MS. JAMES: Judge, may I address that before
21 you start looking at what they're proffering?
22      THE COURT: Yes.
23      MS. JAMES: I will tell you in no uncertain
24 terms that both Keena Whizinant and Latoya Davis, who
25 are sisters, have told the United States Government to

Page 59

1 go directly to hell. They do not want to be involved
2 in this case. They refused to testify. They told
3 Agent DeJohn, "Keena, to get off the porch" when they
4 came to interview her. And Latoya Davis was led to
5 the Montgomery Police Department by agents of the
6 United States Government to file a complaint against
7 Leon Carmichael for second degree rape.
8      That case was sitting at the Montgomery
9 Police Department for one year. The Montgomery Police
10 Department found that it was unfounded but sent it to
11 the Montgomery County grand jury as required. The
12 Montgomery Count grand jury, and this woman said --
13 There are tape recordings that have been done
14 apparently with this woman that I've been told of
15 where she said that she didn't say that had happened.
16 But nevertheless --
17      THE COURT: Well aside from that, I have
18 some problems relying on that part of Ms. Morris's
19 presentation. I would like to focus on is there
20 evidence that Mr. Carmichael used Miss Davis while she
21 was a minor to promote his drug enterprise? That's
22 what I'm really concerned about.
23      MS. JAMES: Well just so you're clear,
24 Judge, and I will move on, that was no billed by the
25 Montgomery County grand jury.

Page 60

1      THE COURT: I realize that.
2      MS. JAMES: But let me say this. Given the
3 contentious nature of this case, and some witnesses
4 saying I didn't say that, those words were put in my
5 mouth, there is a flip side to that. The government
6 will say Leon Carmichael got to them and they changed
7 their story.
8      But with regard to Latoya Davis, if she were
9 compelled to come into court, she would tell this
10 Court that the things that are contained within that
11 D. E. A. Six, now I'm not saying every single but for
12 the most part, were things that she did not say. And
13 I can represent to the Court because I have
14 interviewed her. With regard to Miss Keena Whizinant
15 I have not interviewed her. But I would suggest to
16 the Court if she were compelled to come here and
17 testify, that she would also say that she did not say
18 the things that are on the D. E. A. Six.
19      But I have some real concern given that
20 scenario with the Court relying on a D. E. A. Six
21 prepared by an agent of the government, they didn't
22 bring her to trial obviously, either one of them, and
23 if they want the Court to rely on that evidence then
24 we at least need to be able to cross examine these
25 people.

Page 61

1      THE COURT: If I decide to include it, you
2 can definitely make an objection. But let me see it
3 first.
4      MS. MORRIS: Your Honor, if I also may add,
5 that Miss Latoya Davis did testify in front of the
6 grand jury. I don't have her grand jury transcript
7 here with me in court today. She also had -- we
8 intended to call her as a witness. Mr. Moorer went
9 and spoke with her the week before trial, and she
10 basically said my sister is still out there, being
11 Keena Whizinant, that being her sister, I'm in jail,
12 with everything going on surrounding this trial, which
13 I think Mr. Moorer took to mean the website and some
14 other stuff, it is hard for me -- I'm sorry, Your
15 Honor, I do have the grand jury transcript.
16      THE COURT: Great. Okay.
17      Why don't you find the part you're talking
18 about.
19      MR. MOORER: Your Honor, while she's looking
20 at that may I chime in? Because I did talk with her.
21      THE COURT: Go ahead.
22      MR. MOORER: Your Honor, I talked to
23 Miss Davis because we did have the grand jury
24 testimony. Her grand jury testimony against Mr.
25 Carmichael was very damaging.

Page 62

1    THE COURT: Whose?
2    MR. MOORER: Miss Davis.
3    THE COURT: How old is she today?
4    MR. MOORER: I believe she is nineteen,
5  maybe twenty.
6    MS. JAMES: She's twenty-one.
7    MR. MOORER: But as I talked to Miss Davis,
8  she had her attorney there, Miss Valerie Smith, and
9  she explained to me in no uncertain terms that she
10  said, you know, the website went up, her face is out
11  there --
12    THE COURT: Who is this, Miss Davis's?
13    MR. MOORER: Miss Davis.
14    THE COURT: She's on the website?
15    MS. MORRIS: She's not.
16    MR. MOORER: Oh, I'm sorry. It was not on
17  the website, I'm sorry. But she told me that it was
18  common knowledge that she had been to the grand jury,
19  that she was facing some adverse problems in jail
20  which she attributed to Mr. Carmichael. She said she
21  would not testify. She said if I called her to the
22  stand, she would refuse to answer questions.
23    She said -- And I explained to her, "If you
24  refuse to answer questions, the Court can hold you in
25  contempt" and all of that.

Page 63

1    And she said, "I understand." She said, "I
2  don't have any hard feelings toward y'all, but I just
3  cannot testify at a trial against Mr. Carmichael."
4  She had her sister who is still out who is in close
5  contact with Mr. Carmichael, and she said, "I just
6  can't, with my day-to-day life" she's in jail serving
7  a murder charge, she says "with the problems I am
8  going to encounter and have encountered already
9  because of him," she said "if that adds to my time, I
10  just have to do that time as well. But I can't come
11  into court."
12    THE COURT: Where is the grand jury?
13    MS. MORRIS: Your Honor, it's kind of hard
14  for me to direct you to one particular place because
15  there is a lot of conversation about drugs in this
16  grand jury transcript. I'm starting the Court on page
17  twelve, for the record.
18    THE COURT: I think we need to mark these as
19  exhibits so the record is clear. I haven't admitted
20  the D. E. A. Six form, but we'll go ahead and mark
21  them.
22    MS. MORRIS: Your Honor, we do have a
23  problem in the D. E. A. Six in that it is an original.
24  THE COURT: No. What you can do is, we'll
25  mark it and then you can substitute it and you may

Page 64

1  need to redact the numbers.
2    MS. MORRIS: Yes, Your Honor.
3    I would also point the Court's attention to
4  page five in the transcript that shows the age of
5  Miss Whizinant -- I'm sorry, I mean Miss Davis.
6    THE COURT: We'll call these government's
7  exhibits.
8    MS. MORRIS: And page four where it talks
9  about the age and the relationship between Ms.
10  Whizinant and Mr. Carmichael.
11    THE COURT: What's the next exhibit in mine?
12    THE COURTROOM DEPUTY CLERK: 81.
13    THE COURT: The government's exhibit 81 will
14  be the D. E. A. statements.
15    Now you were telling me just a moment ago
16  about the age of Ms. Whizinant?
17    MS. MORRIS: Yes, Your Honor. In the grand
18  jury transcript on page four, Miss Latoya Davis talks
19  about her sister Keena Whizinant's relationship with
20  Mr. Carmichael and the age that such relationship
21  started and the children that they have together.
22    THE COURT: What does she say? Is this it
23  here on page four?
24    MS. MORRIS: Yes, Your Honor.
25    THE COURT: What does she say?

Page 65

1    MS. MORRIS: She basically says that Ms.
2  Whizinant is at the time eighteen, and she has three
3  children with Mr. Carmichael.
4    THE COURT: Does Miss Davis have any
5  children by him?
6    MS. MORRIS: No, Your Honor.
7    And on page five, which is highlighted
8  because we did put in our working copy, it does say, I
9  think the question was asked, "What age were you when
10  you started a relationship with Mr. Carmichael?" And
11  it says, "Fourteen." To which she responds
12  "Fourteen."
13    THE COURT: Does this grand jury testimony
14  have anything in it about Miss Davis engaging in any
15  drug transactions for Mr. Carmichael?
16    MS. MORRIS: Yes, Your Honor. If I could
17  point the Court's attention to page twelve, there is a
18  discussion about Ms. Davis going to the trucking
19  company and watching people unload bags of cornmeal.
20  And when they looked inside of these bags of cornmeal
21  there were large bags or bales of marijuana.
22    There is also discussions in the grand jury
23  transcript about Miss Davis and Mr. Fred Thomas
24  selling marijuana at the J. and L. Thrift store. And
25  Mr. Carmichael bringing down this marijuana to the

Multi-Page™

Page 66

1 basement of this residence in a pizza box, I believe.
2 THE COURT: Okay. Now anything else about
3 either Miss Davis or Miss Whizinant that you wish to
4 put on? And then I'll hear from Miss James.
5 MS. MORRIS: Not at this time.
6 THE COURT: Okay. Now, Miss James?
7 MS. JAMES: Judge --
8 THE COURT: First you can argue about the
9 admissibility of these, and why don't you go ahead and
10 argue about the merits --
11 MS. JAMES: I realize the Court has vast
12 discretion in what you can consider in a scenario like
13 this, but, again, given the contentious nature of this
14 case as well as my personal interview with Latoya
15 Davis with her lawyer present, Valerie Smedley, and
16 our investigator, Mike Callahan, a former F. B. I.
17 agent of twenty-eight years who was there, as to any
18 -- what she told me and what she told Mr. Moorer were
19 like opposite ends of the spectrum. And so, you know,
20 I got the true feeling that she --
21 THE COURT: Who is this, Mr. Davis?
22 MS. JAMES: Latoya Davis. And I got the
23 feeling that she just basically didn't want to be
24 involved. And I had a difficult time even trying to
25 set up an interview with her. And I finally did

Page 67

1 accomplish that, and I think Mr. Moorer had an equally
2 difficult time setting up an interview with her
3 because I think she didn't want to be involved.
4 There's a history with her family because
5 her mother I think rented property from Mr.
6 Carmichael, and she and Ms. Whizinant, as I
7 understand, have different fathers so they weren't
8 raised together. So there is not a real close bond
9 there. But I would submit to the Court that even
10 though the Court has the discretion to consider those
11 things, that because of the highly prejudicial nature
12 of what is contained therein, and given inconsistent
13 stories she's given both sides, I think the Court
14 should not rely -- And I understand this Court is
15 extremely sensitive --
16 THE COURT: I have to admit that I think
17 they're both admissible for these proceedings. I was
18 going to tell you that. But you can argue the merits.
19 One other thing before we move any further.
20 Is Mr. Williams' son in court?
21 MR. TEAGUE: No.
22 THE COURT: Would you get him here. Is
23 there any way you can get him here?
24 MR. TEAGUE: Mr. Williams advised me that
25 he's out of town, Your Honor.

Page 68

1 THE COURT: Where is he?
2 MR. TEAGUE: He advises he thinks he's
3 working a job at Lake Martin today.
4 THE COURT: Lake Martin. There's no way you
5 can reach him?
6 MR. TEAGUE: We can endeavor to call a cell
7 phone.
8 THE COURT: Why don't you try to reach him.
9 Is there anyone who can help you reach him? I know
10 you have to be here in court.
11 MR. TEAGUE: You want me to have someone
12 call him?
13 THE COURT: Get him here, yes. I was going
14 to tell Mr. Williams if there is one thing in all of
15 these things that he did right was giving birth to
16 that son. And I want him here and I want to ask him
17 some questions.
18 We'll take a recess because it's very
19 important that I speak to Timothy here. If you expect
20 to have any chance of getting your client out, it will
21 be based on that son.
22 MR. TEAGUE: In that case, I'll even drive
23 up there if you let me, Judge.
24 THE COURT: We'll take a three minute recess
25 while you do it.

Page 69

1 Counsel, actually we're going to have to
2 recess for fifteen minutes because I have a three
3 o'clock hearing on a case I'm supposed to hear on
4 Monday.
5 MR. FEAGA: Your Honor, before you recess
6 can I say something?
7 THE COURT: Yes.
8 MR. FEAGA: I spoke with Miss Latoya Davis
9 -- I'll get to it later. I've got to go take this
10 phone call and I want Mr. Teague to go do that.
11 MR. FEAGA: I think if the Court were to
12 call her before the Court, she would tell the Court
13 what happened.
14 (Whereupon, a recess was taken.)
15 ════════ BEGIN 061705 B ════════
16 THE COURT: Counsel, my case for Monday has
17 been reset so let's proceed where we left off. Where
18 did we leave off?
19 MS. JAMES: Judge, you were considering or
20 indicated that you were going to consider or admit the
21 D. E. A. Sixes and that testimony.
22 THE COURT: Yes.
23 MS. JAMES: I've already made my point with
24 regard to what I think is the discrepancies with
25 regard to what she's told the government, what she's

Multi-Page™

## Page 70

1 told us.
2 THE COURT: Well I have to say I do think
3 that Mr. Carmichael had some relationship with these
4 young women. If it didn't involve drugs, what did it
5 involve?
6 MS. JAMES: Well I'm not certain of that. I
7 know what the reports say, Judge, but let me just
8 point this out and I'll conclude my argument on the
9 danger. I realize the Court can consider them. But
10 this information has been in the government's hands
11 since way, way long ago, early in this case. Mr.
12 Carmichael -- Latoya Davis is serving a life sentence
13 for a very heinous murder. She's going to be in
14 custody for some time.
15 THE COURT: What's the murder about?
16 MS. JAMES: Well, she was involved with two
17 men and they beat this fellow to death and --
18 THE COURT: When was this?
19 MS. JAMES: Judge, I've got excerpts of the
20 transcript. It's a heinous crime. They beat him,
21 they shot him and then they urinated on him. I mean
22 it's a really nasty case. But she testified in her
23 trial and she said that she wasn't involved. The jury
24 convicted her nevertheless.
25 But my point is this: With regard to Latoya

## Page 71

1 Davis and Keena Whizinant, that information is old.
2 If it were that Mr. Carmichael is a danger because of
3 some concern of an ongoing or continued relationship
4 with either of these women, number one it's not going
5 to happen with Latoya Davis. It's stale information.
6 If the Court has some concern at all that there would
7 be -- that Mr. Carmichael might engage this other
8 woman, this Keena Whizinant --
9 THE COURT: Well it's not so much that I
10 would be concerned that he would go out this evening,
11 or even until sentencing, and have either sex or lure
12 these two young women into drugs. It's just that this
13 evidence reflects a certain character of a person who
14 -- as you know my feelings, I do think that Mr.
15 Carmichael is guilty, I think the jury reached the
16 only verdict they could reach, if you want to know the
17 truth -- but it reflects a character of someone who
18 would engage in drugs and would use the most
19 vulnerable citizens in our society, or some of the
20 most vulnerable citizens of our society.
21 These young women who are impressionable,
22 who are young, who if anything would view Mr.
23 Carmichael as a respectable businessman, as a man with
24 money. And here are these young girls who are being
25 lured into drug dealing. That type of character is

## Page 72

1 what I'm concerned about. Why should I allow someone
2 who reflects that judgment, that character, back out
3 in society?
4 MS. JAMES: Well, Judge, again, we're not
5 dealing with a full testing of the adversarial process
6 with either of these women. And I think that the
7 Court is going to give it much credit, that it's the
8 character we should do that. But let me say this --
9 THE COURT: You know, I'll be honest with
10 you, I've had a lot of drug dealers come before me,
11 you know, but they were dealing with equals. It was
12 men and other men, and they said they're not going to
13 do anything. I think the Court has a responsibility
14 to assess this case as to the people that Mr.
15 Carmichael in many ways was exploiting.
16 Here I have girls who are fifteen, fourteen,
17 sixteen, perhaps even seventeen, and my question is
18 should I allow him to remain at large having reflected
19 that type of insensitivity to those girls? You want
20 me to feel for Mr. Carmichael, and I know you do, but
21 my heart, I really feel for those girls.
22 And you've told me about Latoya and this
23 murder. You know, you may want to clear this up
24 because there is a question in the back of my mind,
25 but my initial gut reaction is with Mr. Carmichael

## Page 73

1 dealing her in drugs, is it any surprise that she gets
2 involved in murder when he's the one who sets the
3 stage for these women? If I send him out tomorrow,
4 you know, there will be other young girls and other
5 young boys who will get involved in murder. Those
6 kids are impressionable, and I have a responsibility
7 to make sure that society is protected from such
8 people, if Mr. Carmichael is the type of person that
9 I'm concerned that he might be.
10 MS. JAMES: Well, Judge, let me say this.
11 That would presume and assume that it were true. As
12 an officer of the Court I want you to know this,
13 because I've always been candid with the Court --
14 THE COURT: You certainly have.
15 MS. JAMES: -- I will tell you when I
16 interviewed Latoya Davis, she was -- I will assure you
17 she was out there and -- I would not say in open court
18 with my young son in this courtroom the conversation
19 that I had with her.
20 THE COURT: But don't you see, Miss James --
21 MS. JAMES: But my point is she made it very
22 clear to me that she was out there in the streets and
23 that type of girl before her mother ever even -- she
24 didn't live with her family, but before her and Leon
25 Carmichael even had any connection --

Page 74

1    THE COURT: Does that excuse his conduct?
2    MS. JAMES: But it doesn't mean he created
3 her as to what she is.
4    THE COURT: Well that might be true, but
5 that's like saying just because a fourteen year old
6 woman is lose, any thirty year old man can go out and
7 have sex with her.
8    MS. JAMES: She was loose at heart, and I'm
9 not conceding that he had sex with her. What I'm
10 saying --
11    THE COURT: What I'm saying not the sex, but
12 I'm saying it's like saying just because the child is
13 like that, it's like saying an adult who knows better
14 can do anything he wants with her, or she wants. And
15 I don't think that's true.
16    MS. JAMES: Judge, I know that the Court,
17 and I have been before this Court before too many
18 times --
19    THE COURT: You know I have very deep
20 concerns about children. And that's why during the
21 trial I asked the government, because you know my
22 feelings about anybody who exploits children. I
23 really have a thing, if you want to call it, a thing
24 about people who exploit children.
25    MS. JAMES: And I understand that, and I

Page 75

1 know that the government couldn't have pushed a
2 touchier button.
3    THE COURT: You're just about right there.
4    MS. JAMES: And I know that. But, Judge,
5 what I'm saying to you is this: There is nothing
6 different today that the government knows about these
7 allegations or the Court knows at least some of this
8 from pretrial motions and things of that nature. What
9 I'm saying to the Court is this, that this evidence
10 did not come out in this Court and wasn't determined
11 by the jury beyond a reasonable doubt. I know that's
12 not your standard. But I'm saying to you that because
13 of the sketchy information, and I know the Court wants
14 to protect these girls, but --
15    THE COURT: Well it's not the girls. As I
16 said, it's character. I'm just concerned that I
17 should allow someone out who is a proven drug dealer,
18 who perhaps exploits children. Should I allow someone
19 out there who exploits children in the sense of drug
20 dealing? Should I allow someone out there who does
21 that?
22    MS. JAMES: Well let me say assuming that
23 were true, I see the Court's concern.
24    But let me say this, and I was not involved
25 with Mr. Carmichael's case when his detention hearing

Page 76

1 happened, the government made very strong arguments
2 that Mr. Carmichael was a flight risk and a danger,
3 and I will submit to the Court that --
4    THE COURT: I'll be frank with you, I'm not
5 that concerned about a flight risk.
6    MS. JAMES: Okay. But the people in this
7 community that came forward, I'm talking about
8 respectable people in the community, not people that
9 work for Mr. Carmichael, although some of those did,
10 but they came forward and they talked about a good
11 person, a man who has done a lot for the community.
12 And I know the government can say well, we have a
13 Jeckle and Hyde here, but nevertheless he has done a
14 tremendous amount of good for his community.
15    Food giveaways, even recently he's given
16 away food and charity and things like that. So there
17 is a good side. There is still a good work that can
18 be done. While he's out he can continue to employ the
19 people that he gives jobs, he can continue to
20 contribute to the community in the charitable things
21 that he does. But there is that side of him, which I
22 think is a balance, Judge.
23    THE COURT: I want to bring up something
24 else, and I think it's important that you be able to
25 respond to all of my thoughts, because when I make the

Page 77

1 decision, I don't want to surprise you with these
2 thoughts.
3    Mr. Williams, as I said about getting his
4 son here, I really don't know what to do with him. I
5 have very mixed feelings about Mr. Williams. And I
6 was truly impressed with the testimony of his son. I
7 was most impressed when his son gave testimony that
8 hurt his father. You remember about the house and not
9 having the money?
10    MS. JAMES: Right.
11    THE COURT: I could see from his testimony
12 that that son was hurting. You know how slowly he
13 testified. And I could just feel his pain. You could
14 see that this is a son who had some very strong
15 feelings that a son would have towards a father. Now
16 I don't know what their real relationship is, but I
17 could really feel that he would not want to hurt his
18 father if he didn't have to.
19    The other feeling that I got was, here was
20 someone who despite his desire not to hurt his father
21 still told the truth when it came down to the wire.
22 And that actually helped Mr. Williams, depending on
23 their relationship, because I got the feeling that
24 here was a young man who was so good and so settled,
25 that even though he knew it would hurt his father he

Page 78

1 had to tell the truth. And if Mr. Williams was in any
2 way responsible for that, I was going to, as they say,
3 chalk that up as a big X in favor of him. That he
4 could raise a son that anybody would be proud to have
5 as his or her son.
6        Now how does this relate to Mr. Carmichael?
7 The evidence, as far as I remember, reflects that Mr.
8 Williams had all these drugs. And I think he did.
9 And the jury found seven thousand pounds. I'm not
10 sure I would have found that much but they found that
11 much for Mr. Williams. Mr. Williams spent most of his
12 life as a hard worker. A dry board worker. And I was
13 impressed with that. Mr. Teague did a superb job for
14 developing that for me. I don't think he convinced
15 the jury, but he presented him as a man who spent most
16 of his life as a hard worker.
17        I also got the impression that but for this
18 drug dealing, Mr. Williams would probably not be in
19 that chair right now. I have a feeling that this is a
20 man who spent most of his life doing good things. I
21 think he worked for, what is it, Humanity?
22        MR. TEAGUE: The testimony was that even now
23 he's doing work for Habitat Humanity.
24        THE COURT: Habitat Humanity. But aside
25 from that, here's a man who works hard. Even while

Page 79

1 he's engaging in all of this drug activity he's been
2 working hard.
3        Another thing I haven't seen in the case,
4 and of course the government can show me differently,
5 I really haven't seen where Mr. Williams reaped any
6 benefit. I don't see as Mr. Denton testified, you
7 know, where you get the money and you go out and you
8 spend it on women, you spend it on cars and so forth.
9 I didn't get that impression from Mr. Williams. Now
10 the jury will decide whether Mr. Carmichael spent that
11 money on the Carmichael Center, that's a different
12 matter.
13        I have a suspicion, and I'll hear from you
14 all because I want to know what the evidence supports,
15 that but for Mr. Carmichael Mr. Williams would not be
16 here. And I am concerned that Mr. Williams in many
17 ways is a victim of Mr. Carmichael. A victim in many
18 ways. First, that here is a man who spent most of his
19 life as a hard worker who is what, he's sixty what?
20        MR. TEAGUE: He was born the same year I
21 was, he's sixty-one.
22        THE COURT: Sixty-one. A hard worker. No
23 criminal record at all. Little to nothing to show the
24 results of this drug activity, which I think there
25 was. The only person who figures in this and who

Page 80

1 explains perhaps why this man who otherwise I think at
2 least appears to be a decent man, I haven't had the
3 probation report yet and I don't know clearly what his
4 relationship is with his son, is Mr. Carmichael. And
5 I have some concerns that it's Mr. Carmichael who is
6 responsible for Mr. Williams being where he is today.
7        Now Mr. Williams is responsible too, and
8 he's going to get his just desserts, but I have a
9 feeling that it's Mr. Carmichael who has in many ways
10 exploited this man, exploited him in all dimensions.
11 And I'd like to hear you respond to that.
12        MR. FEAGA: Judge, before she does, can we
13 respond to one part of that?
14        THE COURT: Yes.
15        MR. FEAGA: We would like to say on behalf
16 of the United States that we echo the Court's
17 sentiments about Mr. Williams' son, and to let the
18 Court know that the Court saw early on in this process was
19 trying to persuade Mr. Williams to cooperate with the
20 government and was unable to persuade him to do so,
21 obviously.
22        We share the Court's sentiments about the
23 son. We believe he testified truthfully also. I just
24 want that on the record.
25        THE COURT: And to be honest with you also,

Page 81

1 Miss James, I don't think Mr. Williams could do this
2 on his own. I don't think, and I don't want to say
3 that your client doesn't have the mental capability,
4 but I don't think that he could do what he did unless
5 he was under the thumb of someone else. And the only
6 thumb that I see here is Mr. Carmichael.
7        So I have two girls. I have a sixty-one
8 year old man who sometimes dodders. And I'm aware of
9 that. This man can't engage in any mass drug
10 conspiracy on his own. And the only person that I can
11 think who put him there is Mr. Carmichael. So I, in
12 some ways -- That's why I said I sit up here and I
13 really wonder what am I going to do with Mr. Williams.
14 I have some real concerns about putting him in jail
15 right now. I really do. But I also have some real
16 concerns that the only reason this sixty-one year old
17 man is here is because of Mr. Carmichael. And that
18 reflects character, too.
19 .       Now I'd like you to respond to that.
20        MS. JAMES: Well, Judge, obviously we
21 disagree, and in all due respect the Court apparently
22 has ignored the testimony of Mr. Denton as well as
23 Mr. Teague's defense. Mr. Teague's defense of Mr.
24 Williams, and I think he did an outstanding job as
25 well, but his defense of Mr. Williams was pointing a

Page 82

1 finger at Patrick Denton. Now I realize Mr. Denton
2 testified --
3     THE COURT: Oh, I think Mr. Williams is
4 guilty. Don't get me wrong.
5     MS. JAMES: But my point being, Mr. Teague's
6 defense was Patrick Denton had taken advantage of Mr.
7 Williams. And of course without the opportunity to
8 discuss with Mr. Williams --
9     THE COURT: Well let's put it this way, I
10 did not buy that argument and I don't buy it today.
11 My concern is that Mr. Carmichael. I'll be very
12 honest with you, I don't see Mr. Denton taking
13 advantage of Mr. Williams. I just can't buy that. I
14 can buy that Mr. Carmichael is taking advantage.
15     Their relationship, the nature of it, the
16 only person to me who could do this is Mr. Carmichael.
17 And that, again, is a reflection of character. And so
18 to me I'm just getting this feeling that I have
19 someone who takes advantage of weak people. And I
20 think Mr. Williams in many ways is a weak person. And
21 a vulnerable person.
22     MS. JAMES: And I understand what you're
23 saying, and --
24     THE COURT: And in that sense, while that
25 testimony helped Mr. Williams and has put me in a very

Page 83

1 difficult position, and that's why you have two
2 different lawyers, it is hurting Mr. Carmichael.
3     MS. JAMES: I understand that and we
4 obviously disagree with the Court. But with regard to
5 responding to that, Judge, the only thing that I can
6 say, and certainly if Mr. Williams can get out of jail
7 that's wonderful, because I'm all for that, but --
8     THE COURT: What about my concern that one
9 of the things that I could achieve by putting Mr.
10 Carmichael in jail and letting Mr. Williams out of
11 jail is to make sure that Mr. Carmichael never has
12 anything to do with Mr. Williams again? In other
13 words, I severed that cord. I severed that tie and
14 give Mr. Williams a chance perhaps to think for
15 himself, especially under what I would consider to be
16 the very wise counseling of his son.
17     I haven't said I'm going to do that yet, but
18 that is a thought.
19     MS. MORRIS: Judge, just for the record,
20 that also can be done with a separation request to the
21 marshals that they keep them in different facilities.
22     THE COURT: I know that too. I realize
23 that. But that's just the way I'm thinking.
24     MS. JAMES: Right, Judge, and you're giving
25 me a difficult job because I'm having to argue about a

Page 84

1 relationship that I don't have knowledge of. I mean,
2 you know, Mr. Williams, obviously I've never
3 interviewed him, I've never talked to him. But I will
4 say this, and I don't want to argue against him and I
5 don't want to argue against Mr. Carmichael, but you
6 say what was in it for him. I don't remember the D.
7 E. A. Six and I'm not saying it were true, but there
8 was some reference in one of those that at least there
9 was an allegation that at least Mr. Williams was
10 receiving some compensation for his alleged
11 involvement in --
12     THE COURT: Do we know, is there anything
13 about how much?
14     MS. JAMES: It was twelve hundred dollars, I
15 think. Wasn't it twelve hundred dollars a time or
16 something like that? And I'm not conceding that, by
17 the way, but I'm just saying that that was something I
18 did see.
19     MS. MORRIS: According to Agent DeJohn, who
20 is just kind of feeding me information about this,
21 Your Honor, I think the Court is correct in the sense
22 that I don't think Mr. Williams was getting rich, per
23 se.
24     THE COURT: For some reason I think he
25 remained poor in many ways. I don't know why.

Page 85

1     MS. MORRIS: As far as we know. Now I'm not
2 saying that --
3     THE COURT: He may have money buried
4 somewhere too.
5     MS. MORRIS: He very well may, and I'm not
6 conceding that he doesn't.
7     THE COURT: I hate to say it, but I wouldn't
8 be surprised if he buried it he might not remember
9 where it is. But go ahead.
10     MS. JAMES: Mr. Teague has done a good job,
11 and that's why you're so convinced that -- you know,
12 whether Mr. Teague has told him to act like he's
13 acting, I don't know. I've never spoken to the man.
14     THE COURT: I don't believe it's Mr. Teague.
15 I don't believe he's acted in court. I really don't.
16     MS. JAMES: I mean I don't know. He's
17 spoken to me every day when we came in, and that's the
18 extent of it. But nevertheless, Judge, I mean I know
19 this theme that you're weaving here is consistent with
20 the case that the government put on, and that's that
21 the --
22     THE COURT: Well not in all ways.
23     MS. JAMES: If Leon Carmichael was even
24 close to something with all the things that have been
25 said about him, I mean he probably did it. Everybody

Page 86

1  thinks that because that's the way this case has gone,
2  and I don't see him as this evil person that --
3      THE COURT: What about the shooting?
4      MS. JAMES: The Sandra Jones shooting?
5      THE COURT: Yeah.  Who did she shoot?
6      MS. MORRIS: Jimmy Timmons, Your Honor.
7      THE COURT: Right.  Let me hear you on that
8  one.
9      MS. JAMES: I have such strong feelings
10  about that.  You know, I could probably stand here and
11  do my closing argument.
12      THE COURT: Why don't you summarize to me
13  what the evidence was on that.  You all didn't really
14  touch on it.  Maybe you can correct me from what I
15  recall.
16      MS. JAMES: Well, on May 9th Mr. Timmons
17  says that he had this relationship -- well number one
18  I submit to the Court that Jimmy Timmons, he cannot be
19  believed.
20      THE COURT: Just summarize what the evidence
21  is and then tell me why he can't be believe.
22      MS. JAMES: Okay.  The evidence with regard
23  to the, quote, alleged shooting was that on May the
24  9th of 1995 that he took a trip to Tuskegee with
25  Sandra Jones to pick up some drugs.  Now he did talk

Page 87

1  about the shooting in the case, Judge.  He never said
2  it was at Mr. Carmichael's direction.  However, the
3  Court has that at the back of its mind because at
4  pretrial Mr. Feaga said that would be the evidence,
5  that it was at Mr. Carmichael's direction.
6      THE COURT: Did he say who or why he shot --
7      MR. FEAGA: Your Honor, I want to correct
8  the record on that.  I did not say that.  I did talk
9  to Mr. Timmons, and Mr. Timmons says that Sandra Jones
10  shot him in the back of the head just as I said, after
11  she said, "Lord, forgive me for what I'm about to do."
12  And that he believed that Mr. Carmichael was
13  responsible for it and was afraid of him.
14      THE COURT: Do you have any evidence as to
15  who told Sandra Jones to do this?
16      MR. FEAGA: No, sir, other than inferences
17  from the evidence, and that would be this: We know
18  that his partner that he was dealing with, Joseph Pie
19  Lacey, was arrested and ultimately sentenced about two
20  months before Mr. Timmons got shot.  And I think in
21  discussing this with Mr. Timmons his fear was that Mr.
22  Carmichael thought that now that Mr. Lacey was facing
23  real prison time in prison, that Timmons and he might
24  get together and their decided to flip on him.  And
25  that's what he thought.

Page 88

1      He even said Mr. Carmichael came to see him
2  in the hospital to tell him that I wasn't responsible
3  for it.  But I do know within six weeks of that time
4  he was cooperating with law enforcement back then
5  making buys.
6      Now Mr. Timmons told us in the jail he was
7  afraid of Mr. Carmichael.  No, sir, we can't prove,
8  and I don't think we'll ever be able to prove that Mr.
9  Carmichael told Miss Jones that unless she changes her
10  position.  At one time, Your Honor, she was
11  cooperating with us, told us a lot of things that we
12  thought we'd be able to use at this trial, and after
13  she got two visits in the jail from William Cadillac,
14  she wasn't talking anymore.
15      Latoya Davis was cooperating with us, and
16  after somebody hired her a lawyer she wouldn't
17  cooperating anymore.  And witnesses have made -- and
18  may have gone away, and other witnesses have expressed
19  fear.  Mr. Williams himself expressed fear for his
20  children if he was to cooperate.
21      THE COURT: Yeah, what about that?
22      MS. JAMES: Well Mr. Williams didn't
23  testify, Judge.
24      THE COURT: I have a statement, though, that
25  he was afraid.

Page 89

1      MS. JAMES: Right, and they were very
2  dramatic on the stand to make it look to the jury like
3  oh, he heard Mr. Carmichael's voice and he looked
4  around and he said, you know, I'm not going to talk or
5  whatever.
6      Gary Wayne George, if you want to be
7  concerned about somebody, and I'm glad I have this
8  opportunity to speak to the Court because I am so
9  concerned that when this trial was over I was going to
10  the United States Government with this information on
11  this Gary Wayne George it is chilling.  And if the
12  government does anything to help him get out of jail,
13  somebody ought to --
14      THE COURT: Why don't you tell me what it
15  is.
16      MS. JAMES: Gary Wayne George, when Ms.
17  Wayne asked him about his sexual misconduct or
18  whatever, Gary Wayne George said -- or Mr. Feaga said
19  you had a sex case, and he said, "Yeah, I
20  inappropriately touched a woman's breast." Well the
21  police report said he picked up a student from Alabama
22  State while he was lurking around the Greyhound Bus
23  station and he gave her a ride.  He took her to an
24  area, and I can show the Court the report, but it's
25  extremely graphic.

Page 90

1 He jerked her shirt off, he starts sucking
2 on her breasts, and she finally breaks loose to him,
3 gets to Sturbridge and calls for help. She was a complete
4 prosecuted, charged with attempted rape. He gets
5 prosecuted for some sex abuse case.
6 So I had an opportunity to interview this
7 Diane George who came to testify. She was a complete
8 basket case. This man, and this part -- And I believe
9 it, Judge. You have what you believe and I have what
10 I believe. She said that when Gary Wayne George began
11 to believe that she was cooperating with the
12 government as a result of Denton's arrest when she was
13 there when the seizure happened, that he brought a
14 strange man into their home, had him rape her and then
15 he had sex with the man. So I'm saying okay, well
16 this is a little outlandish, maybe not so.
17 I interviewed her mother, a Miss Fluker.
18 They filed a police report and had a prosecution
19 against Gary Wayne George for raping Diane George's
20 sister. I have the sworn statement to the detectives.
21 They finally went in --
22 MR. FEAGA: Your Honor, can I interpose an
23 objection at this point? We've been listening to
24 this, and this is not what we're here to talk about.
25 We are not here to vouch for Mr. George. We told the

Page 91

1 jury that. We know he is a criminal, we know his
2 record. But the fact is but for --
3 THE COURT: I want to hear Miss James
4 through.
5 MS. JAMES: And I'm serious. This has
6 nothing to do with Mr. Carmichael. We're talking
7 here, and I thank you for the opportunity.
8 THE COURT: This is a very serious hearing.
9 MS. JAMES: But I'm just saying, and they
10 may not know this, I was going to go to them after
11 this because I got the paperwork from the mother. And
12 I was so concerned about it, Judge, that with the
13 little testimony, there was an elderly woman raped in
14 Woodland Hills Trailer Park, they lived out there off
15 the Troy Highway. It was their next door neighbor.
16 She told the police she recognized Gary Wayne George's
17 voice.
18 Her husband was disabled and couldn't get to
19 her to help her. She was elderly. But she was a
20 customer of the beauty shop where Gary and his wife
21 Diane cut hair. And he had a cut on his hand and he
22 told Diane if the police questioned him about this
23 incident, or questioned her, that he cut it doing
24 something there at the house.
25 Now, you know, I'm talking about a bunch of

Page 92

1 other stuff that I don't have any proof of, I'm just
2 going on what they told me. But I do have the
3 Montgomery court file. They declined prosecution
4 finally because it was going to destroy the family for
5 the daughter to have to go in there and her sister had
6 been raped by him.
7 So my concern is this: When he was called a
8 sexual predator, I have some serious concerns about
9 that. And this woman swallowed and cried and said she
10 needed protection. And people had offered her
11 protection before and they hadn't given her any. And
12 I know these people have some integrity here, and I
13 thought that if I took them that information, that
14 they might -- certainly they wouldn't try to reward
15 him for his credit and give him credit for what he
16 did, or anything to shorten his time in jail because
17 he could be out in three years.
18 She didn't even use her name, Judge, for
19 fear. Because she lives in a different town, she
20 didn't use her present married name. And anyway,
21 that's not even an issue here. But I'm concerned and
22 I knew that you would be concerned as they will be
23 concerned about that.
24 But anyway, Gary Wayne George, he could have
25 been scared of him as well. Do you see what I'm

Page 93

1 saying?
2 THE COURT: Yes.
3 MS. JAMES: Because this is a man that is
4 extremely dangerous. And when he said that there are
5 other possibilities of people that he could have been
6 afraid of, but we don't know who he was afraid of.
7 But that's how I got off on Gary Wayne George.
8 THE COURT: Do you have anything to add on
9 danger to community? Either side?
10 MR. MORRIS: Yes, Your Honor. I would just
11 point out to the Court there were four firearms found
12 in Mr. Carmichael's car when he was arrested. I would
13 also point out that Moses Williams made the statement
14 that he was not going to cooperate any more because he
15 was afraid of Mr. Carmichael. Sandra Jones made the
16 statement to law enforcement that she wouldn't tell
17 them who the forty-two thousand dollars belonged to or
18 who the real owner of the forty-two thousand dollars
19 was because she was afraid. And then, again, Mr.
20 Williams making the statement that his children would
21 be killed.
22 THE COURT: You have all these people saying
23 they're afraid.
24 MS. MORRIS: Yes, Your Honor. All these
25 people have told us, and a lot of it came out at

Page 94

1 trial.
2      MS. JAMES: Judge, my only response to that
3 would be Mr. Williams, believable or not believable,
4 he's very questionable, he gets on the stand and he
5 said, "I lied to him."
6      THE COURT: I'll be very frank with you, I
7 think he lied on the stand. I think what he said --
8 The jury didn't hear that, but I did.
9      MS. JAMES: It is what it is. We know what
10 the state of the evidence is. With regard to Sandra
11 Jones --
12      THE COURT: Right. And I think it could be
13 read that the reason he said he lied on the stand was
14 because he was afraid to admit that he had told the
15 truth before.
16      MS. JAMES: Well, let me say this. We
17 interviewed Sandra Jones. However this unfolds,
18 Sandra Jones said when you go over the D. E. A. Six I
19 didn't say that, I didn't say that, I didn't say that.
20 So we still have this debate here.
21      THE COURT: Well let's move on to special
22 circumstances, unless you have something else that I
23 haven't heard.
24      MS. JAMES: No. But special circumstances,
25 Judge, and this is a very unusual case. Special

Page 95

1 circumstances would go to the things that I've already
2 addressed in part with regard to --
3      THE COURT: What about his mother?
4      MS. JAMES: His mother? She could pass
5 tonight. She might recover. I mean I've not spoken
6 to the doctor.
7      THE COURT: Should I keep him away from his
8 mother?
9      MR. FEAGA: Your Honor, may I speak to that?
10 I spoke to the United States' Attorney and the chief
11 of our criminal division. If the Court is inclined to
12 find that that's a special circumstance we're not
13 going to argue with the Court about that. But we
14 would urge the Court, if the Court goes there, that it
15 be done under the most strict, limited circumstances
16 of electronic monitoring --
17      THE COURT: This is only pending his mother.
18 In other words, if she were to die and perhaps the
19 funeral, then it would cease.
20      MR. FEAGA: Yes, sir. And we're doing that
21 more than any other reason out of concern for his
22 mother herself.
23      THE COURT: If I were to create that, I
24 still would want him under some monitoring.
25      MR. FEAGA: The strictest of monitoring,

Page 96

1 Your Honor.
2      THE COURT: And assuming that his mother
3 either got better or worse, then that would cease
4 subject to any type of funeral.
5      MR. FEAGA: Yes, sir. And we have a hearing
6 giving us an opportunity to actually check on it,
7 verify it and maybe have a hearing in a week. But
8 only if the Court is inclined to go there.
9      THE COURT: I understand what you're saying.
10      MR. FEAGA: Yes, sir.
11      THE COURT: I'll hear your response to that.
12      MS. JAMES: Judge, obviously we are very
13 happy to take on any conditions that the Court might
14 want to impose with regard to any release, whether it
15 be short-term or long-term.
16      THE COURT: If I were to go down that path,
17 it would definitely be very short-term. We're talking
18 about -- It would have to be if his mother got better,
19 then that would cease.
20      MS. JAMES: Let me tell you what's the more
21 compelling reason, Judge, to leave him out and to
22 leave him out for the long-term. The last thing I'll
23 say about the other two things is that's really --
24 there is nothing new. If the government felt so
25 strongly about Mr. Carmichael, they had plenty of

Page 97

1 these issues that they raised. They had plenty of
2 opportunity to come to the Court and just say, you
3 know, he's just too dangerous to leave out, and that
4 didn't happen. So nothing has really changed from
5 this week to last week.
6      THE COURT: Why is he any more dangerous
7 today than he was yesterday?
8      MR. FEAGA: Your Honor, we have always
9 believed that he should have been locked up pretrial
10 but we have always believed that we would be unable to
11 persuade the Court to do it and so we have not wasted
12 the Court's time with it. But I want you to know that
13 Investigator David DeJohn has been, and is, afraid for
14 his family and their safety as a result of his
15 involvement in this case, and he sits in this
16 courtroom today still very concerned about that.
17 We believe that this man is potentially
18 violent and potentially dangerous, and we are very
19 concerned about him remaining out. There is a lot of
20 concern on a lot of people that have been involved in
21 our case. This is a very weighty decision for this
22 Court. We trust this Court, and we will leave it in
23 your hands what to do, but we are very concerned about
24 this subject. But we'll leave it with the Court.
25      MS. JAMES: But, Judge, even in the face of

1 that, if they said they had that feeling from the
2 beginning, if they truly believed that, they could --
3 successful or not, they could have continued to
4 petition the Court. They could have gone to the
5 Eleventh Circuit.
6      THE COURT: What about Agent DeJohn?
7      MS. JAMES: Judge, you know, I don't really
8 feel I'm at liberty to speak about that.
9      THE COURT: I think you should. I have some
10 concerns.
11      MS. JAMES: Well my point is, I'm party to a
12 lawsuit that he's filed and I just don't want to get
13 into a battle with him --
14      THE COURT: Maybe Miss Chartoff can speak to
15 it. I thought the lawsuit had been dismissed.
16      MS. JAMES: Well they said they're going to
17 refile. And, you know, I don't have any real concerns
18 about that lawsuit, but I don't want to do anything in
19 this Court with regard to Agent DeJohn that could in
20 any way appear it's as a result of this lawsuit,
21 either for or against.
22      THE COURT: Maybe Miss Chartoff can address
23 the issue.
24      MS. CHARTOFF: Your Honor, I fully expect
25 he's going to add me to the lawsuit when it's refiled.

1      MS. MORRIS: Your Honor, if I may just add
2 for the record, Agent DeJohn has even moved his
3 children out of town during the course of this trial,
4 and that Mr. Denton has been under twenty-four hour
5 police surveillance during the course of this trial as
6 well because he's scared to death. So, I mean all of
7 these factors together show the fear of going around
8 the community.
9      THE COURT: Well I will say this, I have
10 some concerns about Agent DeJohn, too. And I really
11 do think he's been unfairly maligned, and I am
12 concerned about his safety. He's been a principal in
13 many ways, a principal person against Mr. Carmichael
14 and the other people who said they were afraid of him.
15 I have some real concerns about that.
16      MS. JAMES: Judge, without going into -- and
17 I'm telling you this is in part and parcel part of our
18 problem with our continued representation in this
19 case, as we've clearly articulated to the Court, I
20 would say this generally, those concerns, I can't
21 speak for Agent DeJohn, but those very issues that the
22 Court has identified have also been ongoing since the
23 early stages of this case. Those matters were brought
24 to the Court's attention with regard to the website.
25 Those matters -- There's nothing, quite frankly, new

1 and different other than Mr. Carmichael has been
2 convicted.
3      And let me point this out. Mr. Carmichael
4 continues to be the next door neighbor of Patrick
5 Denton's grandparents. Mr. Carmichael has shared with
6 me that Mr. Denton still visits there and they have
7 waved at each other during the pendency of this
8 litigation. So, I mean, it's just one of those --
9      And I will tell you this also: Miss Fluker,
10 the mother of Diane George, she came and sat in the
11 courtroom as a spectator, she did not testify, she did
12 tell me that Leon Carmichael has been, and she is
13 Patrick Denton's aunt, she said, "Leon Carmichael has
14 been a superb neighbor and person to help my parents."
15 They have lived there for all these years, and I mean
16 this is his Patrick Denton's aunt.
17      But anyway, let me move on to our issues,
18 Judge, if I may. I would direct the Court for
19 precedent to United States versus Clarence Clay,
20 District Court case number 99-137-N.
21      THE COURT: Which is my own case.
22      MS. JAMES: Which is my own case, because I
23 represented --
24      THE COURT: You won that one. You didn't
25 win it ultimately, but you won it on several

1 procedural matters.
2      MS. JAMES: Well, personal vindication for a
3 lot of reasons. But nevertheless, I have represented
4 Mr. Clay postconviction, and I represented
5 Miss Moncrief many, many times. But the Court held in
6 that case that pretrial release pending appeal, and I
7 guess we never reached the issue I don't think on
8 sentencing, but both of them were released ultimately
9 pursuant to 18 U. S. C., Section 3145(c).
10      And the Court made a finding that there was
11 a close question that could result in a reversal on
12 appeal. In fact, the Court's language was, and I
13 contend that we have not only an analogous situation
14 but a more persuasive situation in this case because I
15 think that our questions, our legal questions in this
16 case are more important and more compelling than we
17 had in that case.
18      You may recall in that case we had a grand
19 jury issue. We contended that Mr. Moorer had acted
20 improperly before the grand jury, we're learned it
21 during the course of the trial, for having told the
22 grand jurors that Moncrief, Clay and Brown had been
23 convicted in a previous proceeding and this was just a
24 technicality. We contended that was improper before
25 the grand jury and the Court, without any clear

Page 102

1 precedent from the Eleventh Circuit, ruled in the
2 government's favor.
3        The Court's language in that case in your
4 opinion or your order of October 22nd, 2003 in
5 releasing Miss Moncrief from custody said "The Court
6 resolved this issue in the government's favor without
7 the benefit of clear Eleventh Circuit precedent.
8 Therefore, this issue on appeal presents a,
9 substantial question as it could be decided the other
10 way" close quote. And the Court cited Giancola 754
11 F.2d at 901, which is an Eleventh Circuit case, Judge,
12 1985, and said, "Further, if this issue were decided
13 in Moncrief's favor, it would result in her sentencing
14 vacated."
15       And I contend that we have a similar
16 situation in this case because we've got a lot of
17 legal issues. But the two most compelling in our
18 research and our efforts to provide the Court with
19 information, are cases of first impression. First,
20 there is the issue of the attorney conflict that we
21 have taken up in-camera, and I would just ask the
22 Court to incorporate that by reference.
23       THE COURT: Certainly. I fully appreciate
24 your argument.
25       MS. JAMES: Right. That clearly, we

Page 103

1 believe, is a case of first impression.
2        We also believe that our Crawford issue as
3 relates to the testimony of Sandra Jones which this
4 Court itself has expressed some concern about, even to
5 the extent sua sponte given the jury a curative
6 instruction with regard to that testimony, we believe
7 that that, too, is a case of first impression with the
8 Eleventh Circuit.
9        I see my cocounsel is standing, and she's
10 our legal scholar.
11       (Whereupon, Ms. Chartoff conferred with Ms.
12 James off the record and out of the hearing of the
13 other courtroom participant.)
14       MR. FEAGA: Your Honor, I thought we -- well
15 I know we've done a little bit of it over here in
16 expounding on the facts, but I was hoping that we
17 weren't going to tag team anymore.
18       THE COURT: Well, she can -- Ms. Chartoff
19 can tell Ms. James.
20       MS. JAMES: Anyway, Judge, if we were
21 successful, and I know you have very strong feelings
22 about Mr. Carmichael, but I also know that this Court
23 has an extreme sense of fairness. And I know putting
24 aside your personal feelings about what you think
25 about Mr. Carmichael, should his conviction be

Page 104

1 vacated, I know that this Court would not want any
2 person to have to spend a day in jail that could not
3 be repaid. And I know that. And so I know that
4 you're fully capable of putting those feelings aside.
5 And if we remove all of these issues --
6        THE COURT: You've raised a very important
7 issue for me. What if I really think there are
8 substantial issues on appeal, but what if I think the
9 defendant poses a danger? How do I resolve that?
10       MS. JAMES: There are ways to resolve that,
11 Judge.
12       THE COURT: How do it resolve it as a matter
13 of law? Do I have to find both that there are
14 substantial issues and that he does not pose a danger,
15 or do I find -- if I find for instance there are
16 substantial issues but he poses a danger, then I let
17 him out? Which is it?
18       MR. FEAGA: Your Honor, if you find that
19 he's a danger to the community, you shall confine him.
20       THE COURT: Even if I think there is
21 substantially --
22       MR. FEAGA: Yes, sir, I think that's a clear
23 reading of the statute.
24       MS. JAMES: Judge, without researching it
25 that's probably true. I mean I think you have to

Page 105

1 reach the two threshold questions and then go. But
2 I'm not certain. I mean I probably need to look at
3 that.
4        MR. FEAGA: It's 3143(a)(2), Your Honor.
5        THE COURT: You've put your finger as you
6 usually do, Miss James, on a very important issue, so
7 I'd like an answer to it.
8        MS. JAMES: Judge, we think it's an and
9 also. I think you have to find both.
10       THE COURT: With that understanding, I mean
11 does the government contend there are no substantial
12 issues on appeal?
13       MR. FEAGA: We do, Your Honor. We don't
14 think there are any substantial issues on appeal. We
15 know there will be appeal.
16       THE COURT: Oh, I think there will be
17 ineffective assistance of counsel if there were going
18 to appeal, but aside from that you think there are no
19 substantial issues on appeal?
20       MR. FEAGA: We do not, Your Honor.
21       THE COURT: Okay. Go ahead, Ms. James.
22       MS. JAMES: The only thing I can do is
23 analogize this. There are many instances where we've
24 got the rebuttable presumption when we're trying to
25 get pretrial release, and that is if you're convicted

**Multi-Page™**

## Page 106

1  of this particular statute you're presumed a danger to
2  the community and we have to rebut that. So the Court
3  frequently allows people to be released despite the
4  fact that they are convicted of this. I realize we
5  have additional factors that the Court is weighing.
6      But there is a solution to the problem.
7  Assuming that the Court must find that he's not a
8  danger, and that he is not a flight risk, and that
9  there are substantial questions --
10     MR. FEAGA: Your Honor, can I correct one
11 thing? I think the Court has the wrong standard
12 there. It says you find there is a substantial
13 likelihood that a motion for acquittal or new trial
14 will be granted, not that there are substantial issues
15 for appeal.
16     MS. JAMES: Well your language that I read,
17 Judge, answers that, and that is if there are
18 substantial questions that could result in vacation of
19 the sentence and conviction --
20     THE COURT: Well, I'll be very frank with
21 you, I think what we're down to, and this argument has
22 been helpful, is whether he's a danger to society and
23 whether there are special circumstances. I think I'd
24 like everybody to focus on that. The danger to
25 society is a danger we've talked about. The special

## Page 107

1  circumstances that might involve his mother or
2  something else you want to bring up.
3      MS. JAMES: Well let me add to that if I
4  might, and co-counsel just advised me that I realize
5  the government cited in their brief that the fact that
6  we have work and things of that are really not
7  exceptional circumstances. And I know I have been
8  before this Court many times and I know that if we
9  stand up and say well, you know, he needs to wind down
10 his business the Court is going to say you've had
11 eighteen months to do that. And I've told Mr.
12 Carmichael that.
13     THE COURT: Yes. It's even less compelling
14 because I gave you notice that he might be
15 incarcerated today.
16     MS. JAMES: Right. And I'm not making that
17 argument. But I do point out that because of the vast
18 nature -- There are legitimate businesses here, and I
19 think that's uncontroverted. I know the government
20 has its position about how and when and why these
21 things have happened, but there are a lot of people,
22 regardless of what Mr. Carmichael's position is, there
23 are a lot of people that are dependent upon those
24 businesses for their livelihood now.
25     It's not so easy to, I guess, relinquish the

## Page 108

1  control of all those things. So I think if nothing
2  else there is a community out there of people that are
3  dependent upon these Carmichael related businesses.
4      THE COURT: I think that people could lose
5  their jobs. I've thought about that.
6      MS. JAMES: Right. And ultimately that can
7  happen, Judge, because I know for a fact that Mr.
8  Carmichael, if he's sentenced, is going to prison. He
9  knows that. But I think that even though the Court
10 says be ready to go to jail and all that, just the
11 mechanism of shutting down those businesses and
12 passing the control when you don't know for certain
13 that you have to because it stops the ability to get
14 loans and various things like that to make those
15 transitions. And I think that's a consideration.
16     Mr. Carmichael has some young children that
17 his present wife --
18     THE COURT: Is this Valerie?
19     MS. JAMES: Yes, Valerie. She is here today
20 and would probably, if the Court would like to hear
21 from her --
22     THE COURT: If she wants to speak, that's
23 fine with me. I'd welcome as much information as I
24 can get.
25     MR. FEAGA: Your Honor, while we're waiting,

## Page 109

1  can I just say Mr. Carmichael stands in a very
2  position than he did in a day ago. He is now
3  convicted and the burden is on him.
4      THE COURT: Oh, I'm aware of the legal
5  standards.
6      MR. FEAGA: Yes, sir.
7      THE COURT: Go ahead, Ms. Carmichael.
8  Do you want her sworn?
9      MR. FEAGA: Yes, sir.
10     THE COURT: The clerk will swear her in.
11     V A L E R I E   C A R M I C H A E L,
12 the witness herein, having first been duly sworn or
13 affirmed to tell the truth, was examined and testified
14 as follows:
15     VALERIE CARMICHAEL: Judge, I only wanted to
16 say the reason I think my husband should be let go is
17 we have six kids at home now. They didn't see their
18 father this morning before he left. And I don't know
19 how I'm going to tell them when I get home without him
20 that he's not coming back.
21     I have a twelve year old, a ten year old,
22 two eight year olds and a seven year old and a three
23 year old. And I think that I will ask that y'all show
24 some kind of compassion and let him come home to see
25 his kids.

## Page 110

1    THE COURT: Thank you very much,
2 Miss Carmichael.
3    Could I just have one other person that I
4 want to call myself? That's the marshal. The U. S.
5 Marshal. Or someone from his office who can tell me
6 what kind of conditions Mr. Carmichael could be under
7 if I were to release him to visit his mother while
8 she's ill. And if you want to, we can swear the
9 marshal in. It's up to you all.
10    Yes, sir?
11    U. S. MARSHAL: Yes, sir, Judge. If he was
12 released, if he was in our custody --
13    THE COURT: If he's in your custody, is
14 there any arrangement that could be made whereby he
15 could visit his mother? If you want to consult with
16 Pam back there, I know she may have some information
17 on this as well. Or if in order to visit his mother
18 would I have to release him completely, or I could
19 incarcerate him to be able to visit his mother? What
20 are my alternatives?
21    U. S. MARSHAL: Judge, you know, I'm very
22 sympathetic to Mr. Carmichael and his family and his
23 mother at this time, but the only case if it was a
24 deathbed visit with his mother. Of course he would be
25 accompanied by deputies at that time. But I know there would be

## Page 111

1 limitation and costs would be inferred by the family
2 for the deputies to be present.
3    THE COURT: If it's deathbed visit, how long
4 would it last?
5    U. S. MARSHAL: Basically a short period of
6 time, Judge.
7    THE COURT: Would it last a day? A couple
8 of hours?
9    U. S. MARSHAL: A couple of hours.
10    THE COURT: So he would have to get notice
11 that his mother was literally dying at that time.
12    U. S. MARSHAL: Yes, sir. And he would only
13 be allowed only to be in there by himself and no other
14 family members.
15    THE COURT: With a marshal too, I would
16 assume.
17    U. S. MARSHAL: Yes, sir.
18    THE COURT: So he couldn't have like his
19 wife and his children in there.
20    U. S. MARSHAL: No, sir.
21    THE COURT: He could only be in there with
22 his mother.
23    U. S. MARSHAL: That's correct.
24    THE COURT: And that would be if I put him
25 in custody and those would be the arrangements.

## Page 112

1    U. S. DEPUTY MARSHAL: Yes, sir.
2    THE COURT: Okay. Do you have any questions
3 for the marshal?
4    MS. JAMES: No, sir.
5    THE COURT: I just wanted to know what my
6 alternatives are.
7    MS. JAMES: Judge, I would like to have Mr.
8 Dillon speak. Could I ask him a couple of questions?
9    THE COURT: Certainly. Definitely.
10    MS. JAMES: And we don't need him sworn,
11 unless the government wants him sworn.
12    MR. FEAGA: Not necessary, Your Honor.
13    MS. JAMES: Would you state your name for
14 the record?
15    MR. DILLON: Jason Dillon.
16    MS. JAMES: You are with the Pretrial
17 Services Department?
18    MR. DILLON: With U. S. Probation, including
19 Pretrial, yes, ma'am.
20    MS. JAMES: Does Probation have available
21 electronic monitoring and strict supervision that you
22 all use in cases that you have concerns about?
23    MR. DILLON: Yes.
24    MS. JAMES: Is there anything more
25 restrictive than electronic monitoring that you have

## Page 113

1 available?
2    MR. DILLON: Not that I'm aware of, other
3 than incarceration.
4    MS. JAMES: Okay. Is there an opportunity,
5 or have you all done this before where you actually
6 have a person on electronic monitoring and home
7 confinement at the same time?
8    MR. DILLON: Correct.
9    MS. JAMES: And do you also have situations
10 where you require pretrial or post-trial releasees to
11 have daily contact with the U. S. Probation Service?
12    MR. DILLON: Yes.
13    MS. JAMES: And do you have the opportunity
14 to do on-site inspections of both their homes and
15 their businesses?
16    MR. DILLON: Yes.
17    MS. JAMES: Based on the report that's been
18 prepared by Mr. Comer in this case, is there any
19 indication that Mr. Carmichael would not be a
20 compliant post-trial releasee based on what y'all know
21 about him with your office?
22 A  Based on his compliance before, I would see no
23 reason why -- I have no information that would sway me
24 in the opposite direction that Mr. Carmichael having
25 been fully compliant.

Page 114

1  MS. JAMES: That's all. Thank you.
2  THE COURT: Do you have anything?
3  MS. MORRIS: Your Honor, Not for Mr. Dillon.
4  I would just like to speak to the possibility of
5  electronic monitoring.
6  THE COURT: Yes, go ahead.
7  MS. MORRIS: The testimony at trial was that
8  Mr. Carmichael didn't necessarily physically handle
9  the dope himself, but directed others to do that. His
10  being at home on twenty-four hour lockdown even with
11  an ankle bracelet is not going to inhibit him from
12  directing any drug dealing activities. He was the
13  director. He didn't physically go out and break down
14  the marijuana and such, but that's not going to
15  inhibit him in any way.
16  As Mr. Moorer pointed out, we have no idea,
17  the government or I mean probably no one except for
18  Mr. Carmichael has any idea who his source of supply
19  for the marijuana was. And they can physically bring
20  the marijuana to his house if necessary. I mean, it
21  could be distributed that way. Now I would doubt that
22  Mr. Carmichael would take possession of marijuana
23  while on release on electronic monitoring, but like I
24  said, he is the director, the leader, the manager.
25  He's not the worker bee. And any electronic

Page 115

1  monitoring is not going to stop that conduct.
2  THE COURT: Anything else that I haven't
3  heard?
4  MS. JAMES: Judge, just a brief response to
5  that and I'll sit down. And that is, you know, we
6  have the wisdom of eighteen months of Mr. Carmichael
7  being under government scrutiny. As close as he's
8  been watched and as much intelligence as they have
9  done, if Mr. Carmichael had continued, and we're not
10  conceding that he was involved, but if there was any
11  evidence that he was engaging in any conduct such as
12  that, I suspect the Court would have known about it
13  well before today.
14  So unless the Court has questions --
15  THE COURT: I don't have any more questions.
16  I think all my questions have been answered. The
17  decision is difficult as it always is in such
18  instances.
19  I'd like to move to Mr. Williams, though.
20  Now, are you conceding any of the factors as to Mr.
21  Williams?
22  MS. MORRIS: I don't know that I can make --
23  I'm not conceding that he's not a risk of flight, Your
24  Honor, but I would say the argument is much stronger
25  that he's a danger to the community.

Page 116

1  THE COURT: Okay. How is he a danger to the
2  community?
3  MS. MORRIS: Your Honor, when he was
4  arrested, and I asked if he wanted to cooperate, his
5  statement to Agent Halasz was that, "If y'all let me
6  out, then you'll really have something to arrest me
7  for."
8  THE COURT: What?
9  MS. MORRIS: Yes, Your Honor. "If I get
10  out, you'll really have something to arrest me for."
11  Now this was on November 17th of 2003.
12  THE COURT: What's the context in which this
13  was said? This didn't come out at trial, did it?
14  MR. FEAGA: Yes, it did.
15  THE COURT: For some reason I didn't
16  remember it.
17  MS. MORRIS: The context that they were
18  fingerprinting him and booking him in, and at that
19  point he made the statement.
20  I will also note for the Court that all of
21  the firearms that were found in his house. Now I'm
22  not saying that he's a convicted felon or a prohibited
23  person, but that number of firearms combined with the
24  amount of marijuana, I submit to the Court, that in
25  and of itself makes him a danger to the community.

Page 117

1  THE COURT: Okay. Mr. Teague?
2  MR. TEAGUE: Your Honor, I would ask the
3  Court to recall also that the context of my client's
4  arrest was when he had just come out of the hospital
5  with his entire family. All of his children. His
6  wife had life support turned off and, indeed, as
7  Timothy Williams testified, would die the next day.
8  It was not the best of times for Freddie Williams, I
9  submit.
10  I have endeavored to show, and I'm delighted
11  to hear the Court say the things it has said, who
12  Freddie Williams is. And that --
13  THE COURT: He had all these drugs.
14  MR. TEAGUE: Your Honor, the jury has spoken
15  and I'm not here to in this context argue those
16  things. He's been found guilty by a jury.
17  THE COURT: What special circumstances do I
18  have with regard to Mr. Williams?
19  MR. TEAGUE: Well, Your Honor, we feel that
20  first of all that one thing you should look at is, is
21  he a flight risk.
22  THE COURT: Let's just assume he's not.
23  MR. TEAGUE: Okay. Then a danger to the
24  community? Okay.
25  THE COURT: Let's talk about special

**Multi-Page™**

Page 118

1 circumstances. Do I have any special circumstances?
2 Let's just assume he's not a flight risk, other than
3 being a major drug dealer, no danger to the community,
4 do I have any special circumstances?
5      MR. TEAGUE: Your Honor, he does have a
6 household. He is a part of his son's company. I
7 think the things --
8      THE COURT: What's his relationship with his
9 son?
10      MR. TEAGUE: He works for his son.
11      THE COURT: Why wasn't his son here today
12 for his verdict?
13      MR. TEAGUE: I don't know, you would have to
14 ask him that, Your Honor.
15      THE COURT: I was concerned that his son
16 didn't even know where he lived. He didn't recognize
17 the furniture on the front porch.
18      Are they estranged?
19      MR. TEAGUE: I don't think so. He came to
20 my office and discussed with me very forthrightly all
21 the things about his father. The things I had
22 concerns about, he discussed those with me. He and I
23 had some periodic conversations early on, later on
24 until we got, you know ready for trial prep.
25      THE COURT: But are there really any

Page 119

1 exceptional circumstances with regard to Mr. Williams,
2 special circumstances?
3      MR. TEAGUE: Well I think that when it comes
4 to the statute here, you will recall, and the record
5 is clear that I have consistently adopted many of the
6 appellate issues that have been expressed. Everything
7 that splashed Mr. Carmichael also splashed Mr.
8 Williams.
9      THE COURT: No. Are there any special or
10 exceptional circumstances surrounding Mr. Williams?
11 You know, like does he have a dying mother? Does he
12 have something that lifts him out that says even
13 though I told him several days ago he might go to
14 jail, but nonetheless warrant his being put out or
15 released on bond pending his conviction and
16 sentencing? Does he have any health problems?
17      MR. TEAGUE: He does have health problems.
18      THE COURT: What are his health problems?
19      MR. TEAGUE: Your Honor, he has taken
20 medication. He stays in constant pain. He has some
21 problems in his jaw that requires him to take
22 medication first to alleviate the pain. He does not
23 sleep very well at night.
24      THE COURT: He doesn't have cancer or
25 anything, does he?

Page 120

1      MR. TEAGUE: No.
2      MR. FEAGA: Your Honor, can Mr. Moorer be
3 excused? He has somewhere he needs to go.
4      THE COURT: Yes.
5      Does he have any mental health problems?
6      MR. TEAGUE: Your Honor, he has high blood
7 pressure. He is an asthmatic. It got better as the
8 week went on, but the first day I couldn't hear the
9 jurors for his hacking cough. It just stayed
10 continuously.
11      THE COURT: Is his son here?
12      MR. TEAGUE: Yes, he's here, Your Honor.
13      THE COURT: I'd like to hear from him.
14      MR. TEAGUE: Yes. Timothy Williams, please
15 come forward.
16      Your Honor, we apologize for his dress and
17 appearance.
18      THE COURT: That's fine. I know he's a
19 laborer. He's one of the highly respected people in
20 our society. He's a hard worker. You can't do any
21 better than that.
22      MR. TEAGUE: I would say this as an officer
23 of the Court, when I called him he told me -- I think
24 he is very interested in his Daddy's problems. We
25 didn't know how long this could take. He is not the

Page 121

1 wealthiest of men. I think he needs to work, and --
2      THE COURT: Was he raised by his dad, or
3 just by his mother?
4      DEFENDANT WILLIAMS' SON: By both parents,
5 Your Honor.
6      THE COURT: Both of them were at home?
7      DEFENDANT WILLIAMS' SON: Yes, Your Honor.
8      THE COURT: Why doesn't your dad live with
9 you now?
10      DEFENDANT WILLIAMS' SON: All his kids are
11 grown.
12      THE COURT: All of them are grown? How many
13 did he have?
14      DEFENDANT WILLIAMS' SON: Four kids, Your
15 Honor.
16      THE COURT: Four kids.
17      If he were to be released, can he move in
18 with you?
19      DEFENDANT WILLIAMS' SON: Yes, sir, Your
20 Honor.
21      THE COURT: Do you have room for him?
22      DEFENDANT WILLIAMS' SON: Yes, sir, Your
23 Honor.
24      THE COURT: Would you take him?
25      DEFENDANT WILLIAMS' SON: Yes, sir, Your

Multi-Page™

**Page 122**

1 Honor.

2        THE COURT: Could you supervise him?

3        DEFENDANT WILLIAMS' SON: Yes, sir, Your

4 Honor.

5        THE COURT: Could you counsel him?

6        DEFENDANT WILLIAMS' SON: Yes, sir, Your

7 Honor.

8        THE COURT: Could you make sure he did the

9 right thing?

10        DEFENDANT WILLIAMS' SON: Yes, sir.

11        THE COURT: Could you keep him away from

12 Leon Carmichael?

13        DEFENDANT WILLIAMS' SON: Yes, sir.

14        MR. TEAGUE: Your Honor, may I add a few

15 things?

16        THE COURT: Yes.

17        MR. TEAGUE: I think the Court found --

18        THE COURT: Mr. Teague, my concern here is

19 the law says absent special circumstances I can't

20 release him. That's just the law. Where have you

21 articulated any special circumstances? I might want

22 to release him, but I can't do it unless you give me

23 something under the law. And you haven't articulated,

24 to be very honest with you, any special circumstance.

25        MR. TEAGUE: Your Honor, I have articulated

**Page 123**

1 what --

2        THE COURT: Name the special circumstance.

3        MR. TEAGUE: Health issues.

4        THE COURT: All of that can be taken care of

5 in jail.

6        MR. TEAGUE: Your Honor, as an officer of

7 this Court, I can't just make issues that aren't

8 there. The man has health issues --

9        THE COURT: Does the government have any

10 desire, typically you want to keep a person out

11 because they would cooperate with you. Do we have any

12 of that here?

13        MR. FEAGA: We have no reason to believe

14 that would happen if he were to remain out, Your

15 Honor. Probably be more likely to happen if he was

16 incarcerated.

17        THE COURT: Does you have anything else to

18 say? Is your last name Carmichael too?

19        MR. TEAGUE: Williams.

20        THE COURT: I'm sorry. I knew your first

21 name was Timothy. Do you have anything else you would

22 like to say, Mr. Williams?

23        DEFENDANT WILLIAMS' SON: Yes, Your Honor.

24 I just want to let the Court know my Dad is a very

25 hard working man, and we all need him. The family and

**Page 124**

1 business, everybody. He's got two young grandkids.

2 He takes them to softball practice. Baby-sitting

3 also. He's a very important part of my business. He

4 taught me a lot about how to handle business.

5        A lot of times he's on me about letting

6 certain things slide, so losing my Dad would be a big

7 blow. And to the family it would be devastating. So

8 I don't think he's a risk. I don't think he's a

9 criminal, and I just hope the Court has mercy on him.

10        Thank you, sir.

11        THE COURT: Thank you, Mr. Williams.

12        I want you to know something, too. I

13 respect you a lot. I think anybody would be proud to

14 have you as a son.

15        DEFENDANT WILLIAMS' SON: Thank you, sir.

16        THE COURT: Anything else, Mr. Teague? Have

17 you given me a reason, though? Got to have one under

18 the law. I can't do this without complying with the

19 law. It wouldn't even stand up on appeal. Even if I

20 wanted to.

21        MR. TEAGUE: Your Honor, I have read 3143,

22 and I see that it says if the attorneys for the

23 government do not agree -- I would say this, when it

24 comes to 2(b) under 3143, I don't think my client is a

25 danger to anyone.

**Page 125**

1        THE COURT: I'm not concerned about that. I

2 said where are my special circumstances? Have you

3 gotten any? Doesn't the statute require special

4 circumstances? Let's assume all the other factors are

5 met, you have to show me special circumstances.

6        MR. TEAGUE: Well, we have talked about the

7 issues on appeal.

8        THE COURT: We talked about that. Let's

9 assume all the other factors are met, where is my

10 special circumstance? Let's reduce it to one.

11        MR. TEAGUE: Well if you're taking away the

12 issues on appeal --

13        THE COURT: Yes, let's assume you win all of

14 that.

15        MR. TEAGUE: Okay. As to special

16 circumstances, Your Honor, as much as from the bottom

17 of my heart I would like to tell you that I truly do

18 believe that his health issues are special

19 circumstances.

20        He does have things that he owns that he

21 does need to make some arrangement concerning. He has

22 household goods and other matters that need --

23        THE COURT: Well that might mean putting him

24 out for a week or two.

25        What does the government say about special

Multi-Page™

**Page 126**

1  circumstances?
2      MR. FEAGA: There aren't any, Your Honor.
3      THE COURT: Thank you very much, Mr. Teague.
4  I'll try to let you all know something shortly. I'll
5  take a recess for at least fifteen minutes.
6      (Whereupon, a recess was taken.)
7      THE COURT: I understand somebody wanted to
8  make some more representations to the Court?
9      MR. FEAGA: No, Your Honor, I don't. I had
10  something come up and Miss James told me why that was
11  not an issue and I agreed.
12      THE COURT: Okay, very good.
13      MS. JAMES: Judge, there is an individual in
14  the courtroom, a Jesse Tomkins who told me that he
15  would like to make known to the Court that he has
16  property and various things that he would put up.
17  That he's a schoolteacher and he's kind of a character
18  reference for Mr. Carmichael. I don't know if the
19  Court is interested in hearing from him, but I did not
20  know that until the break. Do you want to hear from
21  him?
22      THE COURT: If you want me to hear
23  something, I'll hear it.
24      MS. JAMES: I apologize, but I didn't know
25  it while we were on break.

**Page 127**

1      THE COURT: Yes, sir?
2      MR. TOMKINS: My name is Jessie Tomkins.
3  I'm a teacher.
4      MR. MOORER: Excuse me for interrupting, but
5  we would ask that he be placed under oath.
6      THE COURT: Okay, certainly.
7      J E S S I E   T O M K I N S,
8  the witness herein, having first been duly sworn or
9  affirmed to tell the truth, was examined and testified
10  as follows:
11  A  My name is Jessie Tomkins.
12      THE COURT: Go ahead, Mr. Tomkins.
13  A  Yes, sir. I come here today to speak on behalf
14  of Mr. Carmichael. I have talked with my former wife,
15  but I know he's not a flight risk but the mere state
16  of allowing him to go and be free for the time he
17  needs with his mother, I have at least a quarter of a
18  million dollars in assets that I'm willing to put up
19  because I know he's not going to hurt anyone.
20      I have been knowing him since 2000. The
21  things I heard and they say took place, it never took
22  place. I have never known him to do anything like
23  that. For me it's out of character because it's not
24  for me that would do something or even being in the
25  company because I have a license as a teacher. I have

**Page 128**

1  never known that. And I'm willing to do that. And I
2  talked with my wife and she said she would take hers
3  also and put it up.
4      THE COURT: Thank you very much, Mr.
5  Tomkins.
6      Anything else, Counsel?
7      Will Mr. Carmichael come forward?
8      And can I ask the marshal one more thing?
9  Over the weekend, if I were to incarcerate Mr.
10  Carmichael, if I issued an order directing that he be
11  allowed to see his mother on Monday and Tuesday and
12  I'll reconsider it on Monday for at least an hour,
13  each of those days, would that pose a problem for you?
14      U. S. MARSHAL: No, sir, Your Honor, I'd
15  have to work it out with the supervisors but I could
16  make arrangements to have that happen.
17      THE COURT: Mr. Carmichael?
18      DEFENDANT CARMICHAEL: Yes, sir.
19      THE COURT: The Court finds there are no
20  special circumstances, and I further find that you are
21  a danger to society. I will issue a formal more
22  lengthy order. You are in the custody of the marshal
23  pending sentencing.
24      Now I'm going to make arrangements for you
25  to see your mother tomorrow for an hour at a time to

**Page 129**

1  be arranged by the marshal and an hour on Monday. I
2  will reconsider that order -- or Sunday, and I'll
3  reconsider it on Monday. I will leave it up to the
4  marshal. The marshal is so ordered. If that poses a
5  problem for the marshal, get with me over the weekend.
6      U. S. MARSHAL: Yes, sir.
7      THE COURT: You're in the custody of the
8  marshal.
9      Sentencing is set for August 22, 2005 at ten
10  a.m.
11      Now, Mr. Williams, will you come forward?
12      MS. JAMES: Judge, may I make one more
13  comment for the record?
14      THE COURT: Yes.
15      MS. JAMES: And are we excused after this?
16      THE COURT: No. Why don't you stay just in
17  case something else comes up.
18      MS. JAMES: Okay. Well, then I can take it
19  up after.
20      THE COURT: Mr. Williams, where is your son?
21      MR. TEAGUE: He's right here on the front
22  row, Your Honor. Would you like him to come inside
23  the bar?
24      THE COURT: Yes.
25      MR. TEAGUE: Come around, Mr. Williams.

Multi-Page™

1   THE COURT: Mr. Williams, I can't decide
2   right now whether to let you go or to release you.
3   I'm going to set a hearing for a week or two and then
4   I'll decide. I think your sentencing isn't until
5   August 22, which is about two months. I may
6   reconsider it in about a week or two. And then we'll
7   have another hearing and I'll see how things are.
8   Okay?
9       I'm seriously considering, if I release you,
10  putting you in the custody of your son.
11      How often can you visit your father where he
12  is? I know you're a hard worker.
13      DEFENDANT WILLIAMS' SON: As many times as
14  possible.
15      THE COURT: You're going to stay in touch
16  with him?
17      DEFENDANT WILLIAMS' SON: Yes, Your Honor.
18      THE COURT: You talk to him. You make sure
19  he does the right thing.
20      DEFENDANT WILLIAMS' SON: Yes, sir.
21      THE COURT: And, Mr. Williams, I think I
22  told you earlier you've done a lot of bad things with
23  this drug stuff, but I've done some good things, one
24  of which is you're a hard worker. The second thing is
25  you've got an incredible son. Listen to him. Do you

1   hear me?
2       DEFENDANT WILLIAMS: Yes, sir.
3       THE COURT: Now you visit him in two weeks
4   and I may consider releasing you. We'll just see. I
5   can't make up my mind right now. So, Mr. Williams,
6   you're in the custody of the marshal and I'll set a
7   new hearing date.
8       And sentencing is set for August 22.
9       Do you think that's a realistic sentencing
10  date, counsel? Well I'll give you time to reconsider
11  that. I know you may have a lot involved here.
12      MR. FEAGA: I think it's realistic, Your
13  Honor.
14      THE COURT: Oh, one other requirement. Mr.
15  Marshal, I do not want any contact between Mr.
16  Williams and Mr. Carmichael. As much as possible, I
17  would like them not to be able to communicate, and I
18  know it's hard but if you could put them in totally
19  separate facilities I'd very much appreciate it.
20      U. S. MARSHAL: We will, Your Honor.
21      MS. JAMES: Judge, in light of that, we
22  would ask that the marshals not do anything to put Mr.
23  Carmichael in a segregated situation within the
24  confines of the facility.
25      THE COURT: I'm going to leave that up to

1   the marshal.
2       MS. JAMES: But you're not asking that.
3       THE COURT: I'm not asking that. That's up
4   to the marshal. But I am asking that he have no
5   contact with Mr. Williams.
6       Mr. Williams, I'm going to do everything I
7   can to help you, but you've got to make part of this
8   journey yourself, do you understand that?
9       DEFENDANT WILLIAMS: Yes, sir.
10      THE COURT: Okay.
11      MS. JAMES: Judge, we have a couple more
12  things. One is I don't know what the marshals are
13  planning on doing, but with your request to put him in
14  a separate facility, we would ask that he be allowed
15  to stay in a facility in the area.
16      THE COURT: Who is this?
17      MS. JAMES: Mr. Carmichael.
18      THE COURT: I'll leave that up to the
19  marshal. If it requires that Mr. Carmichael be put in
20  a facility outside the area to accommodate Mr.
21  Williams, so be it. I am going to make sure there is
22  no contact between Mr. Williams and Mr. Carmichael.
23  And if Mr. Carmichael must suffer as a result, so be
24  it.
25      MS. CHARTOFF: Your Honor, the basis for

1   this request is his right to counsel. We need to be
2   able to consult with him in preparation for his
3   sentencing proceeding.
4       THE COURT: That is true. Check with the
5   marshal. If you have a problem, if it ends up that
6   you don't have a right to counsel, I'll hear it. But
7   I don't want him to have any contact with Mr.
8   Williams.
9       MS. JAMES: Judge, two things. The first
10  thing is I wanted to simply note for the record, and
11  this could be considered in conjunction with our
12  motion with regard to the partial sequestration and
13  the juror misconduct, that at the time the Court
14  brought the jury back in for the reading of the
15  verdict, that the jury was brought up to the deputy
16  clerk's desk and they were polled by initial.
17      THE COURT: Yes.
18      MS. JAMES: The Court may have done that in
19  another case, but I have not had that experience. My
20  concern is, and I want this to be added as part of the
21  record and also for the Court to reconsider our motion
22  for mistrial on that basis, is that given the totality
23  of the circumstances involving this jury and all the
24  situations that we've previously described which I
25  will not rearticulate, is that that just heightens the

## Page 134

1 concern that this is an unusual case. This heightens
2 any concern that they may have for their safety.
3         And in addition to that, Judge, and you
4 normally consult with counsel but you didn't consult
5 with counsel as to that matter, and I don't know if it
6 would have made any difference --
7         THE COURT: It would not have made any
8 difference. I think you're entitled to an
9 explanation. I do sometimes ask that the clerk only
10 read the last names, and sometimes I ask to protect
11 the integrity of the jury. I will state at this time
12 that I am concerned about Mr. Carmichael retaliating
13 against the jury. And for that reason I decided to
14 use initials. I thought about that at length.
15         I decided that I would use initials rather
16 than numbers. I checked and other courts use numbers.
17 They give the jurors numbers. I thought that this
18 would be the least intrusive, because I thought if I
19 used numbers, that that would signal to the jury that
20 I was concerned. Whereas using initials, as far as I
21 know this jury, I've never seen any of these jurors in
22 this court before. I think that was totally
23 innocuous. But I will tell you, because I think
24 you're entitled to know, I was concerned that your
25 client, if he had the names of these jurors, might go

## Page 135

1 after them. And I'm finding that as a matter of law
2 -- I mean I'm finding that as a factual matter.
3         MS. JAMES: Obviously, Judge --
4         THE COURT: And your objection is noted and
5 I think you are right to bring it up because the
6 record should reflect it.
7         MS. JAMES: All right, Judge. The last
8 question, and I know the question has been posed to
9 you, we have been under a gag order, and --
10         THE COURT: It really isn't a gag order.
11 You all agreed not to do it and I said fine, but I
12 understand you want to modify it anyway.
13         MS. JAMES: Right. Well we would like
14 permission to speak with the press if we choose to.
15 We may not, but we'd like to be able to.
16         THE COURT: What does the government say?
17         MR. FEAGA: Your Honor, I understand what
18 they're saying. If they're not going to come back in
19 on Monday and say oh look at the media over the
20 weekend and complain.
21         THE COURT: Yes.
22         MR. FEAGA: So if they're willing to waive
23 the complaint that may come from whatever may be
24 generated as a result of contact with the media, then
25 we don't object to it.

## Page 136

1         MS. JAMES: Judge, the only thing I would
2 say in that regard, it's already all over the news
3 that they were convicted.
4         THE COURT: I think your client is entitled
5 to have someone say something in his behalf.
6         MR. FEAGA: Your Honor, when we speak to the
7 media we just don't want to be accused of trying to
8 put it in the media.
9         THE COURT: Let's make sure, now, though,
10 it's got to be a two way street.
11         MS. JAMES: Oh, I'm not saying they
12 shouldn't be allowed to.
13         THE COURT: So the gag order is lifted.
14 However, it's lifted but you're still under ethical
15 responsibilities outside the gag order.
16         MS. JAMES: Well what does that mean?
17         THE COURT: That means that the State Bar
18 has certain things lawyers can say to the public and
19 can't. You can't say something unethical.
20         MS. JAMES: Well do you think we would?
21         THE COURT: No. I'm just reminding you,
22 though, Miss James that for me to say the gag order is
23 lifted and you can now go talk to the press, you might
24 want to consult your ethics. And, Miss James, I would
25 never want to insinuate that you would ever do

## Page 137

1 anything unethical. In fact, one thing I'm confident
2 of is that you won't.
3         MS. JAMES: Thank you. May we be excused?
4         THE COURT: Yes.
5         MR. FEAGA: May the United States be
6 excused, Your Honor?
7         THE COURT: Yes. Court's in recess.
8         (Whereupon, the proceedings were concluded.)
9                 * * * * * * * * *
10                 COURT REPORTER'S CERTIFICATE
11         I certify that the foregoing is a correct
12 transcript from the record of proceedings in the
13 above-entitled matter as prepared by me to the best of
14 my ability.
15         I further certify that I am not related to
16 any of the parties hereto, nor their counsel, and I
17 have no interest in the outcome of said cause.
18         Dated this 9th day of September 2005.
19
20
21         MITCHELL P. REISNER, CM, CRR,
         Official US Dist. Court Reporter
22         Registered Professional Reporter
         Certified Real-Time Reporter
23
24
25