IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


UNITED STATES OF AMERICA      )
                              )
        v.                    )    CRIM. ACTION NO.
                              )      2:03cr259-T
LEON CARMICHAEL, SR.          )        (WO)
                              )
                              )


ORDER

     After an eight-day jury trial, defendant Leon
Carmichael, Sr. was convicted of conspiring to distribute
marijuana and conspiring to commit money laundering.  In an
in camera proceeding during the second week of trial,
counsel for Carmichael informed the court that Drug
Enforcement Administration Agent David R. DeJohn had filed
a civil lawsuit in state court against Carmichael and others
(including two of Carmichael's four attorneys, Lisa Wayne
and Susan James) for their alleged involvement in posting
several photographs of DeJohn on a website related to
Carmichael's criminal case.  Attorney James subsequently
moved to withdraw from the case, and Attorney Wayne made
motions for a mistrial and a change of venue.  The court



orally denied all motions.  This written order memorializes the court's oral order and further sets forth the reasons for the court's conclusion that neither a mistrial nor any other curative measure was warranted in light of DeJohn's civil suit.

I.

In December 2003, shortly after his arrest, Carmichael set up a website, www.carmichaelcase.com, allegedly as an information-gathering device and investigative tool for his criminal case.  In April 2004, it was altered to display the names of four "informants" and four "agents," including DeJohn, as well as photographs of the four "informants," several of whom ultimately testified at Carmichael's trial.[1] In addition to the website itself, Carmichael ran an exact reproduction of the website as an advertisement in the Montgomery Westside Weekly, a local weekly newspaper. Shortly after the website was altered to include these

_____

1.  At that time, DeJohn's name appeared on the website, but not his photograph.

2

photographs, the government renewed an earlier motion for a protective order directing Carmichael to remove his website from the Internet and to cease publication of the reproduction of the website in the newspaper.

On July 20, 2004, following an evidentiary hearing and after careful consideration of the issues involved, this court denied the government's motion, reasoning that such an order would impermissibly infringe Carmichael's First, Fifth, and Sixth Amendment rights. United States v. Carmichael, 326 F.Supp.2d 1267 (M.D. Ala. 2004); United States v. Carmichael, 326 F.Supp.2d 1303 (M.D. Ala. 2004).

At some point in early August 2004, the website was further altered to include photographs of DeJohn, formerly a police officer with the Montgomery Police Department. As it then appeared (and continued to appear until the close of Carmichael's criminal trial), the top of the website contained the word "Wanted" in large red letters, beneath which were the words "Information on these Informants and Agents." Underneath this header were photographs of four

3

"informants," as well as three photos of DeJohn.  Under each of these photographs DeJohn's full name and the word "Agent" appeared.  Below the photographs was written: "If you have any information about these informants and agents, regardless of how insignificant you may feel it is, please contact the listed attorneys."  The site then listed contact information for Attorneys Susan James and Lisa Monet Wayne.[2] At the bottom of the page, a disclaimer stated that the purpose of the website is "definitely not ... to intimidate or harass any informants or agents, but is simply an attempt to seek information."

Clearly and understandably upset by the appearance of his photographs on the website, DeJohn filed motions to intervene in Carmichael's criminal case and to remove his photographs from the website in November 2004, alleging that the website not only interfered with his ability to pursue

_____

2.  The site originally listed contact information for Attorney Stephen Glassroth, Carmichael's former lead counsel.  Attorney James's name was substituted for Glassroth's some time after Glassroth withdrew from the case in November 2004.

4

his profession as an undercover agent, it put him in danger.
This court denied the motions, holding that intervention in
a criminal case was not the appropriate channel for DeJohn,
a nonparty, to resolve his collateral civil dispute with
Carmichael. United States v. Carmichael, 342 F.Supp.2d 1070
(M.D. Ala. 2004). In that order, the court concluded by
noting that the appropriate forum, if any, for DeJohn to
seek redress against Carmichael was state court, rather than
Carmichael's federal criminal case. Id. at 1072-73.

In the meantime, a collateral investigation was launched
by the United States Attorney's Office into how Carmichael
obtained the photographs of DeJohn, which were the same
photographs contained in DeJohn's personnel file at the
Montgomery Police Department. This investigation was
eventually referred to the United States Attorney's Office
for the Northern District of Florida, which issued a press
release shortly before the commencement of Carmichael's
trial announcing the indictment of former Montgomery Police

Department Lieutenant George David Salum III for his alleged role in helping Carmichael obtain DeJohn's photographs.[3]

Also prior to trial, Carmichael filed a motion in limine to exclude any reference to the website during the trial. In his brief, Carmichael argued that evidence concerning the website was irrelevant and therefore inadmissible under Fed. R. Evid. 402, as were "the reactions of the government and various witnesses to the website, the unsubstantiated claims and rumors that the website is a 'hit list' or an intimidation tactic, [and] the claim that a photograph posted on the website was improperly obtained."[4] He further argued that, even if the website were relevant evidence, it should be excluded under Fed. R. Evid. 403, because any

────────────────

[3]. As a result of the publicity generated by the indictment of Salum, Carmichael and co-defendant Freddie Williams moved to continue their trial or, in the alternative, for a change of venue. The court denied that motion because the defendants failed to show the requisite actual or presumed prejudice resulting from the negative pretrial publicity. See, e.g., Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000).

[4]. Defendant Carmichael's motion in limine regarding website and alleged intimidation (Doc. No. 280), p. 2.

probative value was substantially outweighed by the strong likelihood of unfair and substantial prejudice.  In support of this argument, Carmichael reasoned that, "Introduction of the government's and witnesses' views about the website and their reactions to it would communicate to the jury the idea that the accused is a dangerous man who has attempted to intimidate witnesses ...."[5] Carmichael concluded that, "The result would be substantial and undue prejudice to the accused, and a substantial risk that the jury would be influenced to decide the case on emotion or another improper basis, rather than on the evidence."[6]  The government responded that it did not intend to introduce evidence of the website into the case unless Carmichael made it an issue.[7]

At the pretrial hearing on motions in limine, the court agreed that the potential prejudicial effect of the website

_____

5.  Id.

6.  Id.

7.  Government's response to motion in limine regarding website (Doc. No. 314), p. 1.

outweighed any probative value, and ordered the government to instruct its witnesses not to mention the website in the presence of the jury.[8]

On the afternoon of June 14, 2005, during the second week of trial, the Carmichael defense team was informed by a television reporter that DeJohn had filed a civil suit

---

8. Evidence of the website was successfully kept out of the trial, with one exception. On cross-examination, Carmichael Attorney Ron Brunson unwittingly elicited the following from government witness Sherry Pettus:

> "Q: Did you have some sort of falling out with [Carmichael] [prior to testifying before the grand jury in January 2004]?
>
> "A: I hated him.
>
> "Q: And would you describe why you hated him at that time in your life?
>
> "A: Yes, sir. Because he had put up a website and I was on the website."

The court immediately excused the jury, and Brunson explained that he was not expecting Pettus to refer to the website in response to his question. The government argued that Pettus should be allowed to complete her response to the question in the presence of the jury, but the court disagreed, stating, "I've considered the argument [that evidence of the website should be kept out of the trial] and I do think that the prejudice outweighs the probative value."

against Carmichael, two of his current attorneys (Wayne and James), and others, seeking money damages for alleged financial and emotional injuries caused by the placement of his photographs on the website.[9]  The defense immediately informed the court and the government of this development during an in camera proceeding, at which time Attorney James moved to withdraw, and Attorney Wayne moved for a mistrial and a change of venue.[10]

The following morning, the government informed the court and the defense that DeJohn had filed a motion to dismiss his civil suit without prejudice, and argued that as a result, the issue was moot.  Attorneys James and Wayne

---

9.  The complaint, filed in the Circuit Court of Montgomery County on June 10, 2005, alleged negligence, invasion of privacy, the infliction of emotional and mental distress, and economic damages.

10.  At that time, United States Attorney Stephen Feaga also informed the court that DeJohn's attorney had left a message for him some time during the previous week inquiring whether the government cared if she filed a civil lawsuit against Carmichael and others over the website.  Feaga stated that he relayed a message to the attorney, through a secretary, that the government preferred if she waited to file the civil suit until after Carmichael's criminal trial was over.

responded that DeJohn's temporary dismissal of the lawsuit
did not obviate the problems its filing had created.  They
then renewed their motions.[11]  In addition, Carmichael
himself addressed the court to clarify and confirm his
attorneys' earlier representation that the website had been
his idea alone, and that his attorneys had nothing to do
with its creation, content, or maintenance.


                              II.

    Carmichael has essentially framed his conflict-of-
interest argument in two distinct ways.  First, during the
in camera proceeding, he alleged that he was denied his
Sixth Amendment right to <u>effective assistance of counsel</u>
because DeJohn's filing of the civil lawsuit, or the
prospect thereof, created an incurable conflict of interest
between him and his attorneys.  Second, in his ensuing
written brief, he argued that the filing of the civil suit
implicated his Sixth Amendment right to <u>conflict-free</u>

_____

    11.

                              10

<u>counsel</u> by creating what he deemed an "actual" conflict of
interest in the midst of the trial.  Given that he objected
to the conflict at the earliest possible opportunity, he
argued that the court was obliged to remedy the situation by
granting a mistrial and allowing Attorneys James and Wayne
to withdraw.[12]  Because Carmichael appears to have asserted
two distinct bases for relief, the court will address each
of them in turn.

                              A.

    During the in camera proceeding, Carmichael argued that
the filing of DeJohn's civil suit deprived him of his Sixth
Amendment right to the effective assistance of counsel
pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668, 104

_____

    12.  Attorney Wayne does not explicitly argue in support
of her motion for a mistrial that disqualification of
counsel is an unacceptable remedy in this case.  Moreover,
while Attorney James was the only attorney who formally
moved to withdraw from the case, the court assumes that
Attorney Wayne moved for a mistrial for the purpose of
allowing Carmichael to replace her as well.  If not for that
reason, the court is unsure what purpose a declaration of a
mistrial based on an alleged conflict of interest would
serve.

                              11

S.Ct. 2052 (1984), by creating a conflict of interest between him and his attorneys.[13]   By citing <u>Strickland</u>, Carmichael also implicitly invoked <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 100 S.Ct. 1708 (1980), a precursor to <u>Strickland</u> in which the Supreme Court examined the specific issue of whether a defendant's Sixth Amendment right can be violated if his attorney labors under what appears to be a conflict of interest at trial.   In <u>Cuyler</u>, the Court held that a defendant's right to the effective assistance of counsel is in fact violated, and prejudice presumed, <u>only</u> if an actual conflict of interest "adversely affected" his lawyer's performance.[14]

---

13.   The specific reasons why Carmichael perceived the presence of an actual conflict of interest will be more fully discussed in the next section of this order.

14.   Four years later, the <u>Strickland</u> Court reaffirmed its holding in <u>Cuyler</u>, noting that the presumption of prejudice in cases where an attorney labors under the presence of an actual conflict of interest presents a limited exception to the general rule that a defendant must affirmatively prove prejudice to prevail on ineffective assistance of counsel claims.   466 U.S. at 692-93, 104 S.Ct. at 2067.

To the extent that Carmichael has asserted an ineffective-assistance-of-counsel claim, it fails because it is premature.[15] As the court noted in a recent order in this case, ineffective-assistance-of-counsel claims in criminal cases can generally be raised only when collaterally attacking a conviction pursuant to 28 U.S.C.A. § 2255. United States v. Carmichael, 372 F.Supp.2d 1331 (M.D. Ala. 2005); see also United States v. Teague, 953 F.2d 1525, 1535, n.11 (11th Cir. 1992). Indeed, the standard articulated in Cuyler, like the more generalized Strickland standard itself, is clearly applicable to only the post-conviction setting. Cuyler, 446 U.S. at 348, 100 S.Ct. at 1718 ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely

---

15. Carmichael later acknowledged in his written brief that the Cuyler standard does not apply to the present situation. However, because Carmichael explicitly made a Strickland/Cuyler argument during the in camera proceeding that predated the filing of his brief, as well as for the sake of analytical clarity and completeness, the court finds it necessary to address the argument here.

13

affected his lawyer's performance") (emphasis added).  In short, Carmichael may choose to pursue his ineffective-assistance-of-counsel argument on a § 2255 habeas petition, but may not prevail on such a claim in the middle of his criminal trial.

## B.

Although Carmichael is not yet in a procedural posture properly to allege a violation of his Sixth Amendment right to the effective assistance of counsel, he argued in his brief that he nevertheless has a corollary Sixth Amendment right to conflict-free counsel, which he may assert even during his trial.[16]  Relying on a Second Circuit case, United States v. Rogers, 209 F.3d 139, 143 (2d Cir. 2000), Carmichael reasoned that the trial court has two distinct obligations to ensure that this right is not abridged during trial.  First, he argued that the court must "initiate an inquiry whenever it is sufficiently apprised of even the

_____

16.  Carmichael's brief in support of motions for withdrawal and mistrial (Doc. No. 420), p. 2.

possibility of a conflict of interest." Second, it must "disqualify counsel or seek a waiver from the defendant whenever the inquiry reveals that there is an actual or potential conflict." Id.; see also, United States v. Levy, 25 F.3d 146, 152-54 (2d Cir. 1994). Carmichael then claimed that an actual conflict is present in this case.

### i. Standard

The court agrees that Carmichael has a Sixth Amendment right to conflict-free counsel and that he may obtain relief for a violation of that right in the middle of his trial. See Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103 (1981) (holding that the Sixth Amendment right to counsel entails "a correlative right to representation that is free from conflicts of interest") (citing Cuyler, 446 U.S. 335, 100 S.Ct. 1708 (1980)). The court further agrees that it has an independent obligation to protect that right by conducting an inquiry when it is made aware of an alleged conflict, as required by the Supreme Court. See Wood, 450

15

U.S. at 272, 101 S.Ct. at 1104 (the possibility of a
conflict of interest that is apparent to the court imposes
upon the court a duty to inquire further); <u>Cuyler</u>, 446 U.S.
at 347, 100 S.Ct. at 1717-18 (if a trial court knows or
reasonably should know that a particular conflict exists, it
has a duty to conduct an inquiry); <u>Wheat v. United States</u>,
486 U.S. 153, 161, 108 S.Ct. 1692, 1698 (1988) (trial courts
have an "independent duty to ensure that criminal defendants
receive a trial that is fair and does not contravene the
Sixth Amendment").  Therefore, the court adopts the first
prong of the Second Circuit standard cited by Carmichael.
<u>Rogers</u>, 209 F.3d at 143.

The court was unable to locate any case outside of the
Second Circuit holding that it is <u>required</u> either to
disqualify counsel or to obtain a waiver from a defendant
when it determines that even the possibility of a conflict
of interest exists, although it did find support  for the
notion that it has the <u>discretion</u> to impose such remedies in
those situations if appropriate.  <u>See</u> <u>Wheat</u>, 486 U.S. at

16

163, 108 S.Ct. at 1699 (1988) (holding that the trial court has broad latitude in determining whether to accept a defendant's waiver of a conflict of interest where conflict arises mid-trial, and has discretion to reject such a waiver). However, in this case, the court need not determine whether to adopt or reject this more rigid second prong of the Second Circuit's standard for addressing conflicts of interest; after conducting the requisite inquiry, the court has determined that no conflict of interest, either actual or potential, exists between Carmichael and his attorneys. Put simply, because the court finds no violation of Carmichael's Sixth Amendment right, it need not impose any remedy, be it mandatory or discretionary.

### ii. Existence or absence of a conflict

An actual conflict of interest exists when the attorney's and the defendant's interests "diverge with respect to a material factual or legal issue or to a course

17

of action," or when the attorney's representation of a
defendant is impaired by loyalty owed to a prior client.
Cuyler, 446 U.S. at 356; United States v. Feyrer, 333 F.3d
110, 116 (2d Cir. 2003); see also Ala. R. Prof'l Conduct
1.7(b) (2004) ("A lawyer shall not represent a client if the
representation of that client may be materially limited by
the lawyer's responsibilities to another client or to a
third person, or by the lawyer's own interests, unless: (1)
the lawyer reasonably believes the representation will not
be adversely affected; and (2) the client consents after
consultation").  An attorney has a potential conflict of
interest if the interests of the defendant could place the
attorney under inconsistent duties at some point during the
course of his representation.  United States v. Jones, 381
F.3d 114, 119 (2d Cir. 2004) (citing United States v. Kliti,
156 F.3d 150, 153 n. 3 (2d Cir.1998)).

     During the court's inquiry into the matter, Carmichael
made three primary arguments as to why the filing of

DeJohn's civil lawsuit, or the prospect thereof, created a conflict of interest between him and his attorneys.

First, Carmichael alleged that the filing of the lawsuit, or the future prospect of its refiling, was evidence of DeJohn's "financial vindictiveness" and provided a strong basis or motivation for DeJohn to lie under oath. Carmichael contended that a conflict existed for his attorneys because it was impossible for them to cross-examine DeJohn effectively about the lawsuit without also eliciting the fact that they had been named as defendants in the civil suit, which would cause the jury to question their own character and involvement in the website ordeal.

Second, Carmichael argued that the lawsuit pitted his attorneys' interests against his own and vice versa, because they may be forced to point fingers at each other to defend themselves later on in the civil suit.[17]

_____

17. However, Carmichael also acknowledged and agreed that the website had been his idea alone, and that his attorneys had nothing to do with its creation, content, or maintenance.

Finally, Carmichael argued that DeJohn was primarily interested in suing him, rather than his attorneys, because he was the "deepest pocket" of the named parties in the civil suit.  He therefore reasoned that the threat of the lawsuit created a personal interest in his conviction for his attorneys, because DeJohn would be less likely to re-file the suit if Carmichael were convicted and his assets forfeited.

None of these arguments persuade the court that an actual or potential conflict exists in this case.  First, even if it is true that "the lawsuit clearly is evidence of DeJohn's bias and motive to lie,"[18] Carmichael neglects one important fact: any bias against Carmichael and motive to lie on DeJohn's part arose when Carmichael posted DeJohn's photographs on the website, not when DeJohn filed his civil lawsuit.  DeJohn's interest in exacting revenge upon Carmichael for posting his photograph on the website was neither substantially strengthened nor weakened by the

_____

18.  Carmichael's brief in support of motions for withdrawal and mistrial (Doc. No. 420), p. 3.

20

actual filing of his civil suit.  If anything, the civil suit is simply a manifestation of DeJohn's anger, of which Carmichael was well aware prior to its filing, as evidenced by DeJohn's attempt to intervene in Carmichael's criminal case last November to seek redress.

Thus, Carmichael was free and able to cross-examine DeJohn about this motive or bias well before he became aware of the existence of the lawsuit; the lawsuit itself did not create this opportunity.[19]  However, Carmichael not only elected not to do so, he made this decision of trial strategy well in advance, when he affirmatively moved in limine to exclude all evidence of the website from the case. This court agreed with Carmichael's argument that the prejudicial impact of the website evidence outweighed its probative value, and granted the motion.  Indeed, in the context of the trial as it unfolded, the marginal value of cross-examining DeJohn about the filing or potential re-

_____

19.  Agent DeJohn had already completed the bulk of his testimony, including cross-examination, at the time the defense learned of the lawsuit.

filing of the lawsuit would have been vastly outweighed by the prejudice caused to Carmichael by the introduction of the website evidence.[20]

The court further notes that, by extension of Carmichael's argument regarding DeJohn, Sherry Pettus, another government witness whose photograph was posted on Carmichael's website, had a similar motive to lie; indeed, in an unexpected response to a question by one of Carmichael's attorneys, she said that she "hated" Carmichael because he had put her name and picture on the website.[21] Nevertheless, despite Pettus's unabashed bias, Carmichael chose not to cross-examine her about the website either, presumably for the same reasons he chose not to cross-

-----

20. Although the court is still persuaded that it correctly decided to exclude the website evidence based on the information available to it at the time, the court also acknowledges that the decision was a close one. In retrospect, having now had the benefit of watching the trial unfold, the court feels compelled to note that although it does not regret its ruling, the website was likely admissible evidence of witness intimidation on Carmichael's part.

21. See supra note 8.

22

examine DeJohn.   Carmichael's argument that a mistrial should be declared so that he can cross-examine DeJohn about his motive in bringing his lawsuit is purely pretextual.

Second, Carmichael's argument that a conflict exists because he and his attorneys may have adverse positions and interests at some later point in time due to a civil suit in which they are both named as defendants also fails.  This situation is distinguishable from those where trial counsel is actually implicated in the same wrongful conduct for which his or her own client is on trial.  See, e.g., United States v. Fulton, 5 F.3d 605 (2d Cir. 1993) (per se Sixth Amendment violation occurred during heroin trafficking trial where testifying government witness indicated that he had once imported heroin for petitioner's trial counsel); United States v. Cancilla, 725 F.2d 867 (2d Cir. 1984) (Sixth Amendment violation occurred where, unbeknownst to the defendant at the time of trial, his counsel had conspired in the same mail fraud scheme for which he was tried and convicted).

In cases where defense counsel is implicated in a related crime, "the resultant conflict so permeates the defense that no meaningful waiver can be obtained ... counsel's [self-interest in avoiding] criminal charges or even the reputational damage from an unfounded but ostensibly plausible accusation will affect virtually every aspect of his or her representation of the defendant." Fulton, 5 F.3d at 613.   Thus, such a conflict, if established, constitutes a per se violation of the Sixth Amendment.   However, courts have been equally clear that "the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised."   Id. at 611.

The fact that Carmichael and his attorneys are (or will be) co-defendants in a civil lawsuit that is clearly collateral and, frankly, unrelated to the substantive charges in Carmichael's criminal trial does not create a similar per se conflict.   Obviously, a conflict would exist

in the civil suit brought by DeJohn if Carmichael's criminal
defense attorneys were to serve as his attorneys in that
proceeding, while simultaneously attempting to defend
themselves in the same suit. However, the civil wrongdoing
alleged by DeJohn is entirely distinct from the criminal
drug-trafficking and money-laundering conduct for which
Carmichael was recently on trial. The fact that Carmichael
may have different and adverse interests from his criminal
defense attorneys at some later point in time in no way
suggests that their interests in the outcome of the recent
criminal trial were in any way divergent.[22]

In fact, on a related note, the court rejects
Carmichael's contention that DeJohn's lawsuit, or the
prospect thereof, caused his attorneys to develop an
interest in his conviction. If anything, the filing of the

---

22. Furthermore, Carmichael himself admitted to the
court during an in camera proceeding that the website was
his own idea, and that his attorneys had nothing to do with
it. This admission further undercuts Carmichael's argument
that he and his attorneys will have opposing or conflicting
interests at some point in the future with respect to the
civil suit.

25

lawsuit heightened Carmichael's attorneys' interest in his acquittal for the simple reason that Carmichael's conviction strengthened the merits of DeJohn's case; a jury evaluating DeJohn's argument will be far more likely to believe that Carmichael intended to inflict emotional distress by posting DeJohn's photographs on the website if they are aware that he is a convicted drug dealer than if he is an innocent man.

In addition, Carmichael's own arguments highlight and support the court's conclusion that the future and potentially divergent interests of an attorney and client in a civil suit do not, and cannot, lead to the conclusion that their interests are automatically divergent in a present criminal trial. One of the essential difficulties with Carmichael's conflict-of-interest arguments is that the website, by its very definition and existence, creates the alleged conflict. Given that Carmichael allegedly created the website as an investigative tool, he would presumably desire to continue to list his attorneys' contact information on the website even if Attorneys Wayne and James

26

were permitted to withdraw due to a conflict of interest. DeJohn presumably would then elect to sue any substitute attorneys whose names subsequently appeared on the website. According to Carmichael's logic, such a suit would create a conflict with these new attorneys as well. Thus, this purported conflict would exist for any attorney who endeavored to represent Carmichael whose name appeared on the website, and would not disappear even if two of his current attorneys were permitted to withdraw or a mistrial were granted.

Indeed, two of Carmichael's attorneys themselves argued that the conflict would also extend to attorneys representing Carmichael whose names were not listed on the website. At trial, Carmichael's other attorneys, Marion Chartoff and Ronald Brunson, who were not named in the lawsuit, and whose names and contact information did not appear on the website itself, argued that DeJohn's suit created just as much of a conflict for them as for Attorneys Wayne and James, because they expected DeJohn to add them as

defendants to his suit at any moment.  On a practical level, if the court were to hold as such, DeJohn (or any other witness) could create an automatic conflict for <u>any</u> attorney who endeavored to represent Carmichael, whether or not his or her name appeared on the website, simply by naming everyone who joined his defense team as a party to the suit. This nonsensical result would effectively prevent Carmichael from exercising his right to conflict-free representation altogether.

Moreover, a categorical holding that a conflict exists any time a government witness sues a criminal defendant's attorney in a separate civil suit would provide opportunities for witnesses and others to create automatic conflicts of interest at their whim by bringing suits themselves (by instructing someone else to do so) against defense attorneys in an effort to disqualify counsel of the defendant's choosing.  The Supreme Court has explicitly cautioned trial courts to be aware of this possibility and to guard against it.  <u>See</u> <u>Wheat</u>, 486 U.S. at 163, 108 S.Ct.

28

at 1699 ("Petitioner ... rightly points out that the
government may seek to 'manufacture' a conflict in order to
prevent a defendant from having a particularly able defense
counsel at his side; but trial courts are undoubtedly aware
of this possibility, and must take it into consideration
along with all of the other factors which inform this sort
of a decision").[23]

Finally, and perhaps most significantly, even if a
conflict does exist, Carmichael not only created but invited
the conflict.  By his own admission, Carmichael himself
chose to create the website as a so-called investigative
tool.  Carmichael himself made the decision to place the

---

23.   Somewhat similarly, the Ninth Circuit has also
cautioned against finding the existence of a conflict in
situations where a defendant threatens to sue his own
attorney, reasoning that such a holding would allow a
defendant an easy means of manufacturing a conflict when it
worked to his advantage.  See United States v. Moore 159
F.3d 1154, 1158 (9th Cir. 1998) ("Although a lawsuit between
defendant and counsel can potentially create an actual
conflict of interest, we do not find that [the defendant's]
threat actually resulted in a conflict in this case ...
Despite [the defendant's] assurances that he had a valid
claim for malpractice, finding an actual conflict from a
mere threat would allow defendants to manufacture a conflict
in any case").

names of two of his attorneys and DeJohn's photographs on
his website.   Carmichael <u>himself</u> decided to leave the
photographs on the site even after he was fully aware that
DeJohn and other witnesses were angry with him and feared
for their safety.   In fact, Carmichael insisted on
maintaining DeJohn's photographs on the website even after
the government unsuccessfully moved for a protective order
instructing him to take down the website; after DeJohn filed
a motion to intervene in his criminal case; and after this
court issued an order denying DeJohn's motion but suggesting
that DeJohn might well have a viable tort claim against
Carmichael in state court.[24]   Carmichael had full knowledge
that DeJohn was rightfully disgruntled over the website and
wanted redress, and yet Carmichael chose to continue to post
DeJohn's photographs on the internet despite the myriad
problems those pictures created.   Therefore, Carmichael
clearly brought this lawsuit upon himself.   He cannot now

---

        24.   The court notes that it has expressed no opinion
whatsoever on the merits of a civil suit by DeJohn against
Carmichael's <u>attorneys</u>.

use the suit to his advantage and claim he is prejudiced by it due to an alleged conflict of interest, even if one existed.  See, e.g., United States v. John Doe No. 1, 272 F.3d 116 (2d Cir. 2001) (defendant cannot create conflict of interest by threatening defense attorney and his family; defendant was not entitled to substitute counsel where he "substantially and unjustifiably contributed to the conflict between himself and [his attorney]").

In short, by actually creating and inviting any conflict that might exist, Carmichael has effectively waived his Sixth Amendment right to conflict-free counsel.  He must now live with his actions.[25]

### III.

Carmichael's request for a change of venue is also meritless.  A change of venue would not remedy the purported conflict of interest, and, to the extent Carmichael moved

---

25.  In addition, holding otherwise could potentially encourage defendants to create conflicts of interest in the hopes of obtaining relief in the form of a mistrial or subsequent reversal.  Doe, 272 F.3d at 126.

for a change of venue because of concerns that DeJohn's lawsuit created negative publicity to which the jury could have been exposed, there is no evidence that the jury was subjected to such exposure.

\* \* \*

Carmichael vigorously, and successfully, opposed the government's effort to shut down his website, with the result that the "informants" and the "agents" whose names and photographs appeared on the site have had to live with the consequences of his actions, that is, with the fear, intimidation, and even job jeopardy allegedly caused by the site.   As it ends up, he may now have to live with some adverse consequences as well.  As the old cautionary adage goes, "Be careful what you pray for.  You may get it."

For the foregoing reasons, it is ORDERED that Attorney Lisa Wayne's oral motions for a mistrial and change venue,

32

and Attorney Susan James's oral motion to withdraw are denied.

Done, this the 8th day of August, 2005.


                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE