## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA,    *
   *
    PLAINTIFF,    *
   *
v.    * CASE NO.  2:03-cr-259-T
   *
LEON CARMICHAEL, SR.,    *
    DEFENDANT.    *

## MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE MOTION FOR NEW TRIAL

Comes now Leon Carmichael by and through undersigned Counsel and files this his

Motion for Judgment of Acquittal pursuant to F.R.Cr.P. 29 or in the Alternative Motion for New

Trial pursuant to F.R.Cr.P. 33 and in support thereof states the following:

### I. INTRODUCTION

Carmichael was charged in a one count indictment with conspiracy to distribute marijuana.

The indictment was later superseded to add the additional count of conspiracy to commit money

laundering.

The procedural history of this case is complex and this court should  take judicial notice of

the many unforeseen events that created a vast number of legal issues.  All of these issues were

argued, fully briefed, and preserved.  For purposes of this motion for new trial, these issues will

not be restated.

Carmichael in this motion argues three separate issues addressed at trial, objected to, and

now further supported by additional facts and legal arguments impossible to raise and exhaust

FILED
U.S. DISTRICT COURT
DEBRA P. HACKETT, CLK.

2005 AUG 15  P 4 36

RECEIVED



GOVERNMENT
EXHIBIT
6 L

during the heated and contentious eight day trial.

Carmichael, prior to trial, had successfully litigated the constitutionality of a controversial and novel website wherein he posted information about government witnesses in hopes of obtaining additional information as a result of the website.

Lead case agent David DeJohn, through his civil counsel Roianne Carter, unsuccessfully attempted to intervene in the website issue in federal court. The website was active for many months prior to trial and up through the trials termination on June 17, 2005.

Carmichael's counsel were successful in keeping any reference to the website away from the jury through a motion in liminie. Carmichael's concern was that the existence of the website was not relevant to the issues at trial and could have become a side issue. Government witnesses were admonished by the Court that they should make no reference to the website. Carmichael's position on exclusion of the website from the trial was based on a strategy decision after a complete and thorough review of the discovery and an independent investigation by counsel.

Carmichael and Williams were both convicted after an eight day jury trial. Carmichael was convicted on both counts. He was remanded to the custody that day where he remains to date.

## II. TIMELINESS

**THIS COURT HAD AUTHORITY TO GRANT MR. CARMICHAEL'S SECOND MOTION FOR EXTENSION OF TIME TO FILE HIS MOTION FOR NEW TRIAL AND ACCORDINGLY MAY RULE ON THE MOTION FOR NEW TRIAL**

The Court has asked Mr. Carmichael to address whether the Court had authority to grant a second extension of time in which to file his motion for new trial. The Eleventh Circuit has not answered this precise question. In a published opinion on this issue, the appellate court indicated

that the District Court may have authority to grant a second extension of time on a motion for

new trial. The Eleventh Circuit also expressed doubts about the Seventh Circuit's opinion in

*United States v. Hocking*, 841 F.2d 735 (7th Cir. 1988), a case which this Court brought to the

parties' attention.

Fed. R. Crim. P. 33(b) states that "any motion for a new trial grounded on any reason

other than newly discovered evidence must be filed within 7 days after the verdict or finding of

guilty, or within such further time as the court sets during the 7-day period." Fed. R. Crim. P.

45(b) provides that "the court may not extend the time to take any action under Rules 29, 33, 34,

and 35, except as stated in those rules."

The Eleventh Circuit has not decided the precise issue now before the Court: whether a

district court properly may grant a second extension to file a motion for new trial more than 7

days after the verdict but within the time period granted upon a motion for extension of time filed

within 7 days of the verdict. This Court has brought to the parties' attention the Seventh Circuit

Court of Appeals decision in *United States v. Hocking*, 841 F.2d 735 (7th Cir. 1988). *Hocking*

holds that, under Federal Rules of Criminal Procedure 45 and 33, a district court is without

authority to grant a second extension of time in which to file a motion for new trial more than 7

days after the jury's verdict. *Hocking* is not binding on this Court as it is not an Eleventh Circuit

opinion. Moreover, in *United States v. DiBernardo*, 880 F. 2d 1216 (11th Cir. 1989), the Court

questioned the holding in *Hocking* and indicated that a district court may have discretion to grant

a second extension of the time for filing a motion for new trial.

*DiBernardo* was an appeal from a District Court decision granting motions for new trial

for two defendants. One of the motions for new trial was filed after a 30-day extension granted to

3

the defendants within seven days of the verdict, but within the time limits of subsequent

extensions granted by the trial court.  The Court ultimately did not decide whether this motion

was timely, as it did not need to.  However, the Court did indicate its opinion that a District Court

has discretion to continue an extension to file a motion for new trial before an earlier extension

expires:

> Under similar circumstances, the Seventh Circuit has held that the Rule 33 motion was untimely after the initial extension, and the District Court was without jurisdiction to consider it. *See United States v. Hocking*, 841 F.2d 735, 737 (7th Cir. 1988). *It would appear that the trial court is in the best position to consider the need for the extension, and to perhaps continue an extension if done before it expires*. The rule seems to contemplate unlimited discretion in the trial judge, since no outside time limitation is fixed for the extension.

*DiBernardo*, 880 F.2d at 1224 n. 3.

Other courts have followed the Eleventh Circuit's reasoning and held that a District Court

does have authority to grant a subsequent extension of time to increase an extension that initially

was granted within the 7 days after the verdict.  For example, in *United States v. Reinhold*,  20 F.

Supp. 2d 541 (S.D.N.Y. 1998), the District Court held that it had jurisdiction to rule on post-trial

motions filed within the time allowed by subsequent extensions that were granted outside the

initial 7-day period specified in Rule 33, when an initial extension had been granted within the 7-

day period.  In so holding, the District Court relied upon the above-quoted language in

*DiBernardo. Id.* at 548. The Court also quoted the Seventh Circuit's decision in *Hocking*, which

stated that the purpose of the time limitations contained in the relevant rules "is to ensure that the

motion comes promptly after the verdict, in order to avoid ... imposition of sentence in advance of

resolution of dispositive motions." 20 F. Supp. 2d at 548 (quoting *Hocking*, 841 F.2d at 736).

The court noted that all requests for extensions subsequent to the original extension were made

within the relevant deadlines and with the consent of the Government and that the motions were

fully submitted approximately one month in advance of the scheduled sentencing date for the

defendant.  20 F. Supp. 2d at 548.  Based on all of these factors, the Court decided to address

the merits of the motions, and explained that to reject the motions on the procedural grounds

urged by the Government would "elevate form over substance."  *Id.*  at 548 (citing *United States*

*v. Glagano*, 281 F.2d 908, 912 (2d Cir. 1960), for the proposition that in applying Federal Rules

of Criminal Procedure, Courts should not "exalt form over substance").  *See also United States v.*

*Robinson*, 303 F. Supp. 2d 231, 234-5 (N.D.N.Y. 2004).

Similarly, in this case, the government has not opposed the requests for extension of time,

and the first and subsequent motion for extension of time was filed within the relevant deadlines,

and the motion is being submitted more than one month in advance of the currently scheduled

sentencing date.  This Court could have granted the time requested in the second motion for

extension of time when it granted the first extension.  "When a litigant is subject to the continuing

coercive power of the Government in the form of imprisonment, our legal traditions reflect a

certain solicitude for his rights, to which the important public interests in judicial efficiency and

finality must occasionally be accommodated."  *Stutson v. United States*, 516 U.S. 193, 196

(1996).  This Court should follow the lead of the other Courts that have held a subsequent

extension of time proper under the circumstances presented here.

### III.  LEGAL STANDARDS

### (A)  Rule 29, Federal Rule of Criminal Procedure provides in pertinent part;

The Court on motion of a Defendant or of its own motion shall order the entry of
judgment of acquittal of one or more offenses charged in the indictment or information after the
evidence on either side is disclosed, if the evidence is insufficient to sustain a conviction of such

5

offense or offenses.

The Court in deciding a motion pursuant to Rule 29 for a Judgment of Acquittal must "determine whether the relevant evidence viewed in the light most favorable to the Government, could be accepted by a jury as adequate and sufficient to support the conclusion of Defendant's guilt beyond a reasonable doubt." *United States v. Darkonyi*, 611 F.2d 84, 85 (5th Cir. 1980). See *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997). The District Court must accept all reasonable inferences tending to support the Government's case, and any conflicts in the evidence must be resolved in the Government's favor. *United States v. Taylor*, 972 F.2d 1247, 1250, (11th Cir. 1992); *United States v. Burns*, 597 F.2d, 939, 941 (5th Cir. 1979).

### (B) Rule 33, Federal Rule of Criminal Procedure

Rule 33 of the Federal Rules of Criminal Procedure states "[t]he Court on motion of a Defendant may grant a new trial to that defendant if required in the interest of justice." The decision whether to grant a new trial is within the sound discretion of the trial judge. *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987); *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1995). The defendant must establish the grounds for a new trial. *United States v. Geders*, 625 F.2d 31, 32 (5th Cir. 1980).

### IV.  RULE 29 ARGUMENT

Defendant Carmichael requests the granting of Judgment of Acquittal as to  Counts I and II of the superceding indictment  due to insufficiency of the evidence and conflicting evidence.

### FACTS[1]

---

[1] Counsel has ordered the trial record and it is being prepared.  The recitation of any facts are based on counsel's recollection of the trial evidence.

6

## COUNTS I and II

Count I was the marijuana conspiracy count. The only direct conspiracy testimony came from Patrick Denton who was thoroughly discredited on cross examination. Denton had motivation to lie as his testimony will assure his continued freedom. He has a drug trafficking charge in Huntsville that will be favorably impacted as a result of his testimony against Carmichael. He testified at trial he was not worried about the Middle District of Alabama as well he should not be. He has never even been charged. Denton was facing two life sentences, one without parole. He suffered no financial loss or forfeitures unlike Carmichael.

It is well established that "credibility determinations are the exclusive province of the jury." *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990). A judgment of acquittal is not required "because the Government's case includes testimony by an array of scoundrels, liars and brigands." *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997). However, in the instant case, Timmons, Denton, and George's testimony was incredible *as a matter of law*, therefore a determination by the jury must not be accepted. *United States v. Reveres*, 775 F.2d 1559, 1561 (11th Cir. 1985). For testimony to be incredible as a matter of law, it must be unbelievable on its face; for example, it must be testimony as to the facts that the witness, physically, could not possibly have observed or events that could not have occurred under the laws of nature. *Reveres*, 775 F.2d at 1561.

Government witness Gary Wayne George testified as to what Denton had told him. He was unable to provide information regarding direct dealing with Carmichael. His career criminal status requires non-reliance on his testimony.

7

Carmichael was not found in possession of drugs or on the scene at Freddie Williams

house at the time of the arrest. Despite the numerous opportunities law enforcement had to

record a conversation between Carmichael and Denton none occurred.

In fact the testimony of Diane George, Gary George's ex-wife and Patrick Denton's

cousin, revealed that Denton and George had their own drug organization and received drugs

from Texas and Mobile. Leon Carmichael refused to assist Patrick Denton's release from the

Madison County Jail despite Carmichael's alleged close and illicit involvement with Denton.

These are not actions of a co-conspirator.

The evidence was insufficient to establish a conspiracy. See *United States v. Mercer*, 165

F.3d 1331 (11th Cir. 1999). There simply was no evidence of an agreement. As quoted in

*Mercer*, "Justice Jackson, 50 years ago, in discussing the development of the law of conspiracy,

referred to Justice Cardozo's maxim on "the tendency of a principle to expand itself to the limits

of its logic". (See *Krulewitch v. United States*, 336 U.S. 440, 445, 69 S. Ct. 716, 719, 93 L.Ed

790 (1949). In this case, the Government's position "stretches the boundaries of conspiracy law

to the breaking point." *United States v. Townsend*, 924 F.2d 1385, 2391 (7th Cir. 1991).

As to Count II, Money Laundering, the government's evidence considered in the light

most favorable, hinges on the credibility of Sherri Pettis. Ms. Pettis gave conflicting testimony

regarding the "source of the money". She admitted that her motivation to say anything about

Carmichael was that she was mad with him over her picture being on the  website. Pettis gave

testimony at another Carmichael hearing before this Court where she stated she did not know of

Carmichael doing anything illegal.

8

The Appellate Court reviews de novo whether the evidence adduced is sufficient to sustain a conviction. *United States v. Harris*, 20 F.3d at 445 (11th Cir. 1994).

Although the Appellate Court conducts its review without special deference to the District Court, the evidence is viewed in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. *United States v. Calderone*, 127 F.3d at 1324. The verdict must stand if there is substantial evidence to support it; that is, unless no trier of the fact could have found guilt beyond a reasonable doubt. *United States v. Witek*, 61 F.3d 819 (11th Cir. 1995); *United States v. Battle*, 892 F.2d 992, 998 (11th Cir. 1990). If, however, the record reveals a lack of substantial evidence from which a fact finder could find guilt beyond a reasonable doubt, the Appellate Court must reverse the defendant's conviction. *United State v. Pantoja-Sota*, 739 F.2d 1520, 1525 (11th Cir. 1984). Such is the case at bar.

The jury convicted Carmichael because they were afraid of him based on all of the prejudicial hints of violence that had no place in this trial.

## V. RULE 33 ARGUMENT

## I. CARMICHAEL WAS DENIED A FAIR TRIAL BASED ON A *GIGLIO* VIOLATION AND AN ACTUAL CONFLICT OF INTEREST WITH HIS ATTORNEYS.

### A. INTRODUCTION

The Carmichael trial began on June 6, 2005. Lead case agent David DeJohn sat through the entire trial. He testified for the government on June 14, 2005. Unbeknownst to the defense

team, DeJohn had been assisting his counsel in preparing a lawsuit to file against Carmichael and his lawyers on the day he testified.[2]

Undersigned counsel was approached by Chris Holmes, Reporter for WSFA television during a brief recess in the trial while Agent DeJohn was on the stand under cross examination. He advised counsel that Case Agent David DeJohn had filed suit against Carmichael , attorney James, and attorney Wayne. A record was immediately made. The government, through AUSA Steve Feaga, acknowledged that he was aware of the suit. If counsel remembers correctly, Feaga indicated this has been in the works for some time. Obviously Agent DeJohn, as the plaintiff was aware of the impending lawsuit, its contents, and the timing of the filing of the suit. He had clearly consulted with his counsel and directed the filing of the lawsuit prior to trial.[3]

Carmichael's attorney Marion Chartoff immediately departed the Federal Courthouse and traveled to Montgomery County Circuit Court and retrieved a copy of the original lawsuit. (Exhibit C) The undated lawsuit had been signed by DeJohn and filed with the Clerk on June 10, 2005, the first Friday of the first  trial week.

Counsel for Carmichael, Susan G. James and Lisa Wayne, consulted their respective state bar ethics divisions and were told an actual conflict of interest existed and that they should immediately withdraw from representation.  This was done.  The Court denied the request.

_____

[2] A copy of the Clerk's witness list and minutes of the trial is included for the Court's review as Exhibit A.

[3] The government in its response regarding the lawsuit filed June 15,2 005 states DeJohn had no idea the lawsuit was being filed.  (Exhibit B) That statement strains logic given the high profile nature of this case.  In the same pleading the government acknowledges that it encouraged the subsequent temporary withdrawal of the suit.  Further, the response reveals that DeJohn signed the suit well in advance of the trial for later use.

That evening WSFA Reporter Chris Holmes made no news report of the lawsuit as he had obviously planned. The government, on June 15, 2005, the following morning, provided Carmichael's defense team a copy of a Motion to Dismiss (CV-050-1434) without prejudice. (Exhibit D)  Telling of the conflict created by this lawsuit and a tacit admission, the motion states as follows:

"Comes now the Plaintiff, by and through his attorney of record, and moves this Honorable Court to dismiss the above styled cause Without Prejudice due to **the ongoing criminal case currently in progress in the United States District Court for the Middle District of Alabama against the defendant, Leon Carmichael and involving his current counsel.**" (emphasis added)

DeJohn and his counsel were aware of the trial as evidenced by DeJohn's presence at the government counsel table from the opening to the closing of court each day.

As will be further explained this temporary dismissal action did nothing to cure the constitutional deprivation Carmichael suffered at the hands of Agent DeJohn.

*B. Giglio Violation*

As previously stated the government knew of DeJohn's plan to sue Carmichael and his lawyers alleging invasion of privacy regarding a website that has been controversial from the beginning.  AUSA Steve Feaga, when faced with the news of the lawsuit filing, advised the Court in chambers that counsel for DeJohn, Roianne Conner, had called the U. S. Attorney's office several days earlier to inquire if the government had a problem with the lawsuit filing.  AUSA Feaga stated that he responded the government wished they would not.

11

There is absolutely no doubt Agent DeJohn, the lead case agent and present throughout the entire trial, knew he would file the lawsuit. It is clear the lawsuit was in the works long before the Carmichael trial in June 2005. DeJohn, six days after the verdict, filed the exact same lawsuit June 23, 2005. (Exhibit E)

Agent DeJohn, as noted in his civil complaint, is seeking money damages in an unspecified amount from Carmichael, two of his present lawyers, one previous lawyer, and others.

DeJohn had and does have a financial interest in the outcome of the criminal litigation against Carmichael. The impeachment of DeJohn was critical in this case because of his testimony that Carmichael had confessed to him shortly after his November 2003 arrest. Agent DeJohn's motivation to testify a certain way was relevant and the subject of impeachment. Knowledge of the DeJohn lawsuit was discoverable pursuant to *Giglio v. United States*, 405 U. S. 150 (1972).

The Eleventh Circuit has emphasized that the thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness to testify. *Alderman v. Zant*, 22 F.3d 1541 (11th Cir. 1994); *Brown v. Wainwright*, 785 F.2d 1457 (11th Cir. 1986); *McCleskey v. Kemp*, 753 F.2d 877 (11th Cir. 1985).

Timely disclosure of this *Giglio* evidence was not made. Carmichael was prejudiced to his detriment as it came too late to be effectively used. *United States v. Bueno-Sierra*, 99 F.Ed 375 (11th Cir. 1996); *United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997); *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991).

Independent evidence should be disclosed in time to permit defense counsel to use it effectively in cross examining the witness. *United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003).

Disclosure of the DeJohn lawsuit would have completely changed the Carmichael defense. Agent DeJohn's credibility would have become the primary focus. DeJohn's financial interest in the outcome of the Carmichael criminal prosecution is analogous to a witness testifying who would later seek a reward. No one would question that the "reward" information would be *Giglio* because it might motivate the witness to testify a certain way. Agent DeJohn's lawsuit, wherein he seeks monetary damages from the very criminal defendant against whom he is testifying, was clearly *Giglio*. The government was duty bound to disclose the lawsuit. The government cannot be heard to argue that it too learned of the lawsuit during the trial of Carmichael. This defense has no merit. The lawsuit idea could not have been hatched overnight. DeJohn's counsel even called the government to give them a heads-up it would be filed. More telling of the government's disclosure obligation is that Agent DeJohn, the lead case agent, knew he was filing the suit. After all he signed the pleading.

The timing of the filing is compelling evidence that Agent DeJohn was attempting to posture himself in his best position for success on the civil action. At the time of the filing of the lawsuit, the website had been in existence for months. There could be no concern over the statute of limitations expiring prior to or during Carmichael's trial as it would continue to run as long as the web site was active.

The media attention to the DeJohn civil lawsuit, the exact day he testified and while he was being cross examined, is revealing of his financial interest in the outcome of Carmichael's criminal trial.

One conceivable reason for the suspicious timing of the filing of the lawsuit was to counter any damage done to DeJohn during cross examination which would later have been

13

reported by the media because of his troubled employment history as a Montgomery Police

Officer. The other was for a media blitz during the highly publicized Carmichael trial to gain

momentum for the DeJohn civil lawsuit. It is highly suspicious that it was Chris Holmes[4], a

WSFA TV Reporter, who first approached Carmichael's attorneys with news of the lawsuit.

In the case at bar, disclosure was too late and there was no remedy. The theory of defense

would have definitely changed if the lawsuit had been disclosed. (Exhibit F)  Upon disclosure

during the second week of trial there was no way to incorporate the impeachment without

addressing the website that Carmichael had zealously and successfully fought to keep out. At the

late juncture of disclosure Carmichael had already cross examined the bulk of the government

witnesses, none of whom were asked about the website. Carmichael had been successful in

preventing the jury from hearing  any information relating to the website. Timely disclosure of

DeJohn's frivolous lawsuit would have enabled the defense to expose Agent DeJohn's bias which

was financially motivated. In order to do this, however, the website would have necessarily been

made part of the trial.

Defense counsel would have been able to present admissible evidence of DeJohn's prior

litigation history. (Exhibit G) and his  employment conduct with the Montgomery Police

Department which was the subject of investigations. (Exhibit H)

In 1994 Agent DeJohn filed suit against Montgomery City Councilman Richard Moncus

for slander.  (See Exhibit G) The action stemmed from comments made by Moncus to the media

---

[4]Holmes has frequently reported on the Carmichael case.  The most troubling story was
reported by Holmes on the day former counsel Glassroth withdrew and all parties were under a
gag order with regard to the hearing.  Holmes news report that day revealed news matters that
had been privately discussed during the November 2004 hearing and subject of the gag order.

after DeJohn had been involved as a Montgomery Police Officer in two separate shooting incidents 20 days apart.  Both caused injury.  (Exhibit G)

Additionally, the specific facts of these shootings would have become relevant once his litigious history was exposed.  The facts were further relevant to show that DeJohn's specious lawsuit, against Carmichael and his lawyers wherein he claimed damages, was false and to explore his employment history.

Post 1994 DeJohn was involved in another incident involving injury to a Montgomery citizen, Reginald Jones,  while he was on duty as a Montgomery Police Officer.  (Exhibit I)  DeJohn's employment history would certainly have become relevant after disclosure of the lawsuit since DeJohn claims in the civil action against Carmichael and his present attorneys that his employability had been damaged by Carmichael and his counsel as a result of the website.  This, too, is also false.  Moncus's counsel in defending the 1994 lawsuit made a compelling argument in opposition.  (Exhibit J)  Further DeJohn's claim that he is a private person is belied by his testimony  in countless federal[5] and state trials.

DeJohn's civil complaint alleges he can no longer work undercover.  This, too, would have been fodder for cross examination and an attack on his credibility since he does not and has not for a very long time worked undercover.

Clearly Carmichael's jury should have known that DeJohn was suing Carmichael and his lawyers as such should  have impacted the way in which he was testifying.

---

[5]DeJohn as case agent was in part responsible for a mistrial in *United States v. Kennedy, et al*, 01cr172-N, United States District Court, Middle District of Alabama over discovery problems.

15

Carmichael's pretrial investigation revealed that numerous witnesses who had been interviewed by Agent DeJohn had disavowed the contents of the DEA Form 6's completed by DeJohn to memorialize the interviews. (See Exhibit F) Despite the fact that this information and witnesses were available, Carmichael made a strategy decision not to use them. Prior to the filing of the lawsuit Agent DeJohn was not the focal point of the defense. With the proper disclosures of the lawsuit he would have been.

The credibility of the lead case agent in a case with substantial (albeit) questionable evidence became very clear in the O. J. Simpson trial as relates to Detective Mark Furman. Agent DeJohn put this case together beginning with his interview of cooperating witness Gary Wayne George. Flaws in his credibility would have tainted the prosecution to the point the jury could easily have discarded all the government's evidence.

DeJohn had full knowledge he would seek money damages from the defendant and his lawyers. Regardless of when the government learned this information it was still discoverable. In *Kyles v. Whitley*, 514 U. S. 419 (1995), the Court held that information known to the police is attributed to the prosecutor and therefore exculpatory information withheld by the police may constitute a *Brady* violation. *Strickler v. Greene*, 527 U. S. 263 (1999); *Breedlove v. Moore*, 279 F.3d 9652, 961 (11th Cir. 2002).

The DeJohn lawsuit was suppressed until such time as it was too late to be used by the defense. The lawsuit evidence was favorable to the defense. The evidence was material. It is not required that disclosure of the suppressed evidence (in this case DeJohn's motivation to testify and proceed a certain way) would have ultimately resulted in the defendants acquittal. *Kyles*, supra. See also *United States v. Bagley*, 473 U. S. 667 (1985).

16

Carmichael is due a new trial regardless of whether a jury seeing the new evidence would have still convicted. Carmichael has shown that the withholding of the DeJohn lawsuit as a financial motive for his testimony and the manner in which he handled the case undermined the confidence in the outcome of the trial.

Agent DeJohn's tumultuous service as a Montgomery Police Officer, the subject of much criticism and legal action, was not exposed during the trial. Counsel for Carmichael made a strategic decision that exposing this would be offensive to some of the jurors. However, his desire to become financially enriched by filing a specious and frivolous lawsuit against the defendant and his counsel would have been the defense if it had been known in time to use it. The value outweighed the initial concerns over offending the jury.

The lawsuit raised the DeJohn credibility issue from his just being challenged as a liar to being challenged as having a motive to be a liar.

Proper disclosure would have allowed the defense lawyers to use the erroneous information in the DeJohn lawsuit to discredit him for purposes of the criminal trial.

## C. DEJOHN LAWSUIT CREATED ACTUAL CONFLICT BETWEEN CARMICHAEL AND ATTORNEYS JAMES AND WAYNE.

Agent DeJohn's mid trial lawsuit against Carmichael trial attorneys James and Wayne created an actual conflict of interest that could not be cured.

Early disclosure would have allowed Carmichael to seek new unconflicted counsel or afforded conflicted counsel an opportunity to adequately prepare a defense that would have been conflict free. As it was Carmichael and counsel were into the second week of his trial before the

17

lawsuit was filed.  There was inadequate time to regroup after the lawsuit on the problems created

by the filing of the lawsuit.

It should be noted from the outset that as long as the website was active  and Carmichael

lawyers were listed as contacts, any potential replacement lawyer would have been faced with the

same conflict.  A perpetual actual conflict existed.

Without any advance notice or disclosure of the lawsuit, Carmichael's counsel were

constrained to know what, if anything, would or should have been asked of David DeJohn.

Questioning on this point would have destroyed the continuity of the defense and incongruently

revealed the website Carmichael had successfully fought to exclude.

The lawsuit was a serious distraction from counsels attention to the trial.  Prior notice of

the lawsuit would have afforded Carmichael and his attorneys time to seek an injunction against

DeJohn to stop the lawsuit until conclusion of Carmichael's trial.

The problem with conflicts is not only what the lawyer does, but what he or she does not

do.  In the instant case the DeJohn lawsuit, notice of which was given while Agent DeJohn was

being cross examined, created an actual conflict of interest between  Carmichael and attorneys

James and Wayne.  The cross examination was promptly terminated with word of the lawsuit

because counsel were unsure of their ethical duties.  After consultation with their respective state

bar ethics advisors, both attorneys James and Wayne moved to withdraw.  The Court would not

allow withdrawal.  As such Carmichael was forced to proceed to trial with lawyers that had an

actual conflict with him.  Agent DeJohn sued based on allegations of harm resulting from a

website bearing his photograph.  Attorneys Wayne and James had nothing to do with creating or

maintaining the website.

In order to place the defendant attorneys in the best posture to defend against the civil lawsuit, blame for any problems claimed by DeJohn should have been directed to Carmichael.

Carmichael's attorneys faced with a lawsuit in the middle of a highly contentious criminal trial with less than 10 minutes to digest the existence of, and none to digest the contents of the lawsuit, were ill prepared to fashion further questions for Agent DeJohn.

As for attorney James, there was certainly some reluctance to engage DeJohn in any other communications and to recall him during the defense case because of the existence of the lawsuit. DeJohn, through the lawsuit, opened a can of worms and defense counsel was traveling uncharted waters with only a "good luck" from the state bar.

The actual conflict in this case was so serious that it was impossible to effectively represent Carmichael. The Eleventh Circuit has routinely held that actual conflicts of interest require disqualification of defense counsel. *Wheat v. United States*, 486 U.S. 153 (1988); *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994).

The cases generally involve multi-defendant representation or representation of a former client with interests adverse to the current client. This reasoning should be no less appropriate in a case where the lawyers duty to protect himself competes with his or her duty to protect the client.

The conflict of interest created by Agent DeJohn filing a lawsuit against Carmichael and his two primary trial attorneys during defendant's trial and while DeJohn was being cross examined, precluded defense counsel from being zealous advocates in attacking DeJohn's credibility. The lawyers were left to ponder if their future questions of Agent DeJohn would negatively impact their respective positions in the DeJohn civil litigation.

19

"The Constitution assures a defendant effective representation by counsel whether the attorney is one of his choosing or Court appointed. Such representation is lacking, however, if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents - as a vigorous advocate having the single aim of acquittal by all means fair and honorable - - are hobbled or fettered or restrained by commitments to others". *Glasser v. United States*, 315 U.S. 60, 75, 62, S. Ct. 457, 86 L.Ed. 680 (1942).

In *United States v. Alvarez*, 580 F.2d 1251 (5th Cir. 1978)[6] the Court held: "As the law has recognized for quite some time, though, the Sixth Amendment right to counsel implies much more than a minimal level of professional competence; even otherwise competent trial lawyers may sometimes find themselves in a position in which they are unable to render effective assistance of counsel. Thus, where defense counsel in a criminal trial represents one of several clients with conflicting interests, his effectiveness as a vigorous advocate for a particular defendant may be impaired by his commitment to other clients." This is even more true when the lawyers seek to protect their own interest rather than the clients.

A defendant must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. *Schultz*, 481 So.2d at 459 (quoting) *Barham v. United States*, 724 F.2d 1529, 1532 (11th Cir.) cert denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984). This is exactly what happened in the case at bar except the competing interest was between Carmichael and counsel.

---

[6]This 5th Circuit law is binding precedent in the 11th Circuit.

As the United States Supreme Court held in *Glasser*, supra, noting that the Sixth Amendment demands that an attorney's loyalty to his client be undivided and unimpaired by competing or conflicting considerations or loyalties.

"[we are] clear that the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a Court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to counsel means less than this, a valued constitutional safeguard is substantially impaired."

If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

Where the conflict is real, as it is here, a denial of the right to effective representation exists, without a showing of specific prejudice. *Castillo*.

In a slightly different yet similar context the conflict at bar involves divided loyalty between defense counsel and the defendant. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client. *Zuck v. Alabama*, 588 F.2d 436 (5th Cir. 1979).[7]

In *Zuck*, supra, the Court held: Rather, the basis of these decisions is our belief that the Sixth Amendment requires that a defendant may not be represented by counsel who might be tempted to damper the ardor of his defense in order to placate his other client. The Court went

---

[7]*Zuck* was an Alabama case where relief was granted in Federal Court.

21

further: "For this reason, the mere existence of a temptation in the abstract is sufficient to preclude duality of representation.  A defense attorney must be free to use all his skills to provide the best possible defense for his client.  Despite the noblest of intentions, the defense attorney's here may have been in the presentation of *Zuck's* case, this possibility is sufficient to constitute an actual conflict of interest as a matter of law."

...In the case at bar as in *Porter*,[8] supra, "...such things as this should not happen, and the place to stop it is the professional conscience of the advocate involved.  A Court may not countenance it and must on the contrary, take effective action just as we are certain the careful Judge below would have done had the facts been known at or before the commencement of the criminal trial.  But where this has been allowed to occur, either through a calloused conscience of the attorney, or ignorance of the true facts, by the Judge, the trial is not the fair one demanded by the Constitution..."

Based on this actual conflict the only remedy is a new trial.

The government cannot be heard to argue that the actual conflict was resolved through the voluntary dismissal of the DeJohn lawsuit the morning after it was filed.  The lawsuit was dismissed without prejudice and would clearly be filed later.   It was six days after the verdict. Attorneys James and Wayne were on notice that they would be defendants in a DeJohn lawsuit. This knowledge was confirmed with the second filing when DeJohn refiled the exact same lawsuit against Carmichael and attorneys James and Wayne.

---

[8]*Porter v. United States*, 298 F.2d 461 (5th Cir. 1962).

## 2. CARMICHAEL WAS DENIED A FAIR TRIAL DUE TO THE COURTS FAILURE TO GRANT A CHANGE OF VENUE OR MISTRIAL AFTER JUROR MISCONDUCT WAS REVEALED

Leon Carmichael pretrial was the subject of substantial and negative publicity.  In close proximity to the June 2005 trial, a Montgomery Police Officer David Salum was indicted by a federal grand jury in the Middle District of Alabama for alleged conduct involving Carmichael, a former private investigator, and  former Carmichael lawyer, Steve Glassroth.  The timing of the indictment was suspicious since there was no apparent statute of limitations issues and the indictment was filed and publicized shortly before Carmichael's June trial.

As expected this story was extensively covered by the local media which reaches the surrounding and other counties which comprize the jury venire for the Middle District of Alabama.

Carmichael renewed a motion for a change of venue or delay in the trial based on concern that it would be impossible for him to receive a fair trial anywhere within the Middle District of Alabama.  The District Court denied the motion.  Carmichael's defense team argued that the Salum indictment reference to, and the media reporting of, alleged misconduct of one of Carmichael's former lawyers could be inappropriately attributed to current counsel.

This Court after being approached by the U. S. Marshal Service over trial security and risk of improper contact with prospective and actual Carmichael jurors, entered an order requiring partial sequestration of the jury.  This, too, was objected to by Carmichael and denied by the court.  The basis for the defense argument was that the partial sequestration would send the wrong message to jurors that this case created safety issues for them.

23

The Marshal Service answered that its concern was over potential improper contact with jurors as they entered and exited the Courthouse and during their travels within the Courthouse during trial.

The court agreed with the Marshal Service that Carmichael jurors would be escorted in and out of the Courthouse, while in the Courthouse, and would remain together during recess and lunch breaks. The Court advised that it would reconsider this order after the trial was underway and dependent upon the number of spectators in attendance.

Despite the limited number of spectators during the two week trial, the Court never revisited the issue of partial sequestration of the Carmichael jurors. They remained under U. S. Marshal supervision the entire trial.

Carmichael's predicted venue concerns actually came to light during the trial as revealed through comments of sitting jurors. During the second day of trial, (June 8, 2005) (C.M.)[9] a juror notified Court personnel of a concern she had over a random telephone call to her cellular telephone the prior evening. The juror, C.M., a Montgomery resident voiced concerns that the unknown number was in someway related to this case and she was concerned.

Under questioning by the court, the juror became very emotional and revealed that she had discussed her concern with other jurors and particularly juror, J.M., another Montgomery resident.

Juror J.M. was also questioned by the Court and confirmed his discussion with juror C.M. about the phone call and some concern over the fact that he and juror C.M. were Montgomery

---

[9]In an abundance of caution and out of respect to the Court, the jurors will be referenced by initial. This is not done at all to suggest there was any evidence Carmichael would cause harm to them.

24

residents. Juror J.M. added that after having been selected to sit on the Carmichael jury he had received telephone calls from his two daughters, also Montgomery residents, voicing some concern to him that he was on "that jury".[10]

The court after discussion with jurors C.M. and J.M. posed a few questions to the other jurors collectively (not individually) about their having heard the discussions of jurors C.M. and J.M.[11] Only one or two other jurors raised their hands affirmatively in response to those questions. The court then made further inquiry of only those jurors. Even though they were the only ones to raise their hands, J.M. had indicated the discussions were in a room where all jurors were present and passed by.

Carmichael's defense team suggested that the court should further question all of the jurors individually about this improper juror discussion of outside contact and apparent concern over the safety of the Montgomery seated jurors. The Court, however, declined in satisfaction that the issue had been properly investigated. Carmichael disagrees. (See *United States v. Camacho*, 865 F.Supp. 1527, So.FL (1994).

Adding to the entire venue and juror mistrial problems pretrial, the partial sequestration of jurors, and the safety concerns the jurors were obviously discussing, was significant police presence outside and around the Federal Courthouse immediately prior to and during trial. (See Exhibit F)

---

[10]Damaging publicity of violence and threats excluded from the jurors consideration during trial was reported in the news. (Exhibit K) It is highly possible J.M.'s daughters or other non-jurors communicated these facts to already spooked jurors.

[11]Juror C.M. was excused and juror J.M. made an alternate.

On June 6, 2005 as prospective jurors arrived at the Courthouse parked Montgomery City Police units were visible surrounding the Courthouse. A motorcycle police officer actually positioned himself on the sidewalk in front of the Courthouse. Evidence of this was not previously placed in the record. For purposes of this motion for new trial, affidavits confirming observation of the police outside the Courthouse during the Carmichael trial are provided . (See also Exhibit L)

All of the foregoing certainly set the stage for the Carmichael jurors, some of whom had served on other juries without special security measures, to have a heightened sense that they were in some personal danger.

The course of the trial as will be later explained, only added fuel to Carmichael's Sixth Amendment claim of denial of a fair and impartial jury. Even though this was a marijuana conspiracy, it was ladened with uncharged, and sometimes unsolicited, references to violence that the jury naturally imputed to Carmichael.

Examples of these are as follows:

| Government Witness | Comments |
|---|---|
| Patrick Denton | Carmichael's son was in prison for murder |
| Patrick Denton | His friend "Ike" who was involved in the drug business was murdered |
| Robert Greenwood | Co–defendant Freddie Williams after arrest and upon hearing Carmichael's voice told law enforcement he could not talk or his children would be killed. |
| Jimmie Timmons | Testified he was involved with Carmichael and Sandra Jones in the illegal drug business and while on a Carmichael related drug endeavor was shot in the head by Jones. |

| Patrick Denton | Government witness Gary Wayne George after starting his cooperation alleged he was beat up on the west side of town near Denton's residence. Denton lived near the Carmichael Center. |
|---|---|
| Tom Halasz | Cooperating individual Mose Williams had ceased cooperating with the Government over fear that he would be killed by Carmichael. |
| Sherri Pettis | She was upset that her picture had been placed on a "website". |

All efforts to obtain a mistrial and/or limit the above prejudicial statements heightening the jurors already existent fear were denied by the Court. Carmichael's renewed motion to change venue during the trial was also denied.

Carmichael's motion for change of venue pretrial and during trial should have been granted. Also it became apparent that the jurors were discussing safety issues among themselves, based on extrinsic matters and outside contact, the court should have granted the mistrial request.

The culmination of the fear aspect of the jurors was evident when the Court, on its own motion, had the clerk use initials when addressing and polling the jury post verdict. This procedure was not discussed with defense counsel in advance. There was simply no reason to treat this jury differently than others. This Court's reference in its June 21, 2005 Order, footnote 1, may also be used in support of Carmichael's jury fear and impartiality claim wherein it was stated:

"Because the evidence was so overwhelming, it was not surprising that the jury took only three hours to reach its verdicts after eight long days of trial (in general, from 8;30 a.m. to 5:30 p.m. each day) on these somewhat legally and factually complex counts." Carmichael submits the jury rushed to judgement out of fear.

Pretrial the jurors names were used. The matter of initials being used came after the verdict and resulted from the culmination of prejudicial events referencing violence throughout the trial. Generally the reason for not using jurors names is the Courts belief that the jurors need protection or feel they do.

In *Turner v. Louisiana*, 379 U. S. 466 (1965), the Supreme Court wrote, "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public Courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Id. At 472-473.

Once a defendant establishes that the jury had an extrinsic contact the burden shifts to the government to demonstrate that the consideration of the extrinsic evidence was harmless. *United States v. Pessefall*, 27 F.3d 511 (11th Cir. 1994). Prejudice is presumed the moment the defendant establishes that extrinsic contact with the jury did in fact occur. *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994); *United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986).

Juror misconduct concerning outside influences must be fully investigated to determine if any misconduct actually occurred and whether or not it was prejudicial. *United States v. Brantley*, 733 F.2d 1429 (11th Cir. 1984).

Where there is evidence of a contact being made with a juror the court should investigate whether other jurors were influenced. In some circumstances it is permissible to make this inquiry after the verdict. *United States v. Adams*, 799 F.2d 665 (11th Cir. 1986).

The jury's consideration of extrinsic evidence requires a new trial if the evidence poses a reasonable possibility of prejudice to the defendant. *United States v. Awan*, 966 F.2d 1415 (11th Cir. 1992); *United States v. Rowe*, 906 F.2d 654 (11th Cir. 1990).

The Court should have allowed more extensive questioning of the jurors after jurors C.M. and J.M. admitted the existence of this conversation and J.M. having extrinsic contact about the case with his daughters. Carmichael's Sixth Amendment right to a fair and impartial jury was denied as a result of the unraveling of the jury. Carmichael was entitled to further inquiry of the jurors and a new untainted jury. All could have and should have been accomplished with a change of venue after the grant of repeated and requested motions for mistrial.

## VI. CONCLUSION

Wherefore Carmichael prays this Honorable Court will grant JOA to each and every count or at the least order a new trial.

Respectfully submitted this 15th day of August 2005.

Susan G. James

Address of Counsel:
Law Office of
Susan G. James and Associates
600 South McDonough Street
Montgomery, Alabama 36104
334-269-3330
Fax: 334-263-4888

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served upon Steve Feaga, AUSA, P. O. Box 197, Montgomery, AL 36101, this _15th_ day of August 2005.,

The above instrument was served via:

( ) personal service
(✓) first class mail
( ) certified mail, return receipt requested
( ) facsimile
( ) overnight courier

of Counsel

# EXHIBIT B

Case 2:10-cv-01106-MHT-WC   Document 89-26   Filed 11/28/11   Page 32 of 44
Case 2:03-cr-00259-MHT -WC   Document 504-2   Filed 08/16/05   Page 2 of 6
Case 2:03-cr-00259-MHT-DRB   Document 416   Filed 06/15/2005   Page 1 of 3

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:03-cr-259-T |
| | ) | |
| LEON CARMICHAEL, SR., | ) | |
| also known as, BEAVER LEON | ) | |
| CARMICHAEL, et al. | ) | |

## RESPONSE TO COURT REGARDING LAWSUIT FILED 6/10/05

Comes now the United States of America, by and through its counsel Leura

Garrett Canary, United States Attorney for the Middle District of Alabama and responds

to the Courts as follows:

1. On June 10, 2005, Drug Enforcement Agent Task Force Agent David

DeJohn, by and through his attorney, filed a lawsuit naming the defendant, Carmichael,

and two of the defendant's four attorneys as defendants in said lawsuit.[1]

2. No conflict of interest exists between the defendant Carmichael and his

counsel, Lisa Monet Wayne and Susan James. A conflict of interest will rise to the level

of reversible constitutional error only if the defendant has demonstrated that an actual

conflict of interest adversely affected his lawyer's performance, and that counsel

actively represented conflicting interest. Cuyler v. Sullivan, 446 U.S. 335 (1980). A

civil proceeding taken by someone associated with the case-at-bar does not

automatically create a conflict of interest.

2. However, in an effort to prevent any possibility of a perceived conflict and

maintain the integrity of this trial, Agent Dejohn and his attorney have agreed to dismiss

---

[1] According to Agent DeJohn, he had no knowledge that the complaint was filed on June 10, 2005 until
after the issue was brought before the Court. In fact, Agent DeJohn first learned that the complaint was
filed from the undersigned.

Case 2:10-cv-01106-MHT-WC  Document 89-26  Filed 11/28/11  Page 33 of 44
Case 2:03-cr-00259-MHT -WC  Document 504-2  Filed 08/16/05  Page 3 of 6
Case 2:03-cr-00259-MHT-DRB  Document 416  Filed 06/15/2005  Page 2 of 3

the civil action filed on June 10, 2005.[2] Therefore, there is no longer any potential, actual or perceived conflict. The issue is moot.

3. On November 12, 2004, this Court issued an opinion denying DeJohn's motion to intervene and remove his photograph from the defendant, Carmichael's website. In said Order, the Court stated that "intervening in Carmichael's federal criminal case is not an appropriate manner in which to seek redress for his perceived wrong; DeJohn's appropriate forum is, if anywhere, in state court." Based on the Court's statement in said Order as well as upon the fact that the defendant and his attorney's knew that Agent DeJohn had retained counsel regarding their website, the defendant and his attorneys were on notice of the potential of a lawsuit regarding their website.

4. By DeJohn dismissing the complaint, the defendant and the defendant's attorneys are in the same position as on June 9, 2005, the day before the filing of the complaint.

5. Therefore, the issue is moot, there is no basis for a mistrial and the defendant's attorneys have no potential, actual or perceived conflict.

Respectfully submitted this the 15th day of June, 2005.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

s/ A. Clark Morris
A. CLARK MORRIS
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104
Telephone: (334) 223-7280
Fax: (334) 223-7135
E-mail: clark.morris@usdoj.gov

---

[2] Attached is a unfiled, signed copy of the motion to dismiss the complaint. This motion was drafted after hours on June 14, 2005 and is to be filed this morning, June 15, 2005.

Case 2:10-cv-01106-MHT-WC   Document 89-26   Filed 11/28/11   Page 34 of 44
Case 2:03-cr-00259-MHT -WC   Document 504-2   Filed 08/16/05   Page 4 of 6
Case 2:03-cr-00259-MHT-DRB   Document 416   Filed 06/15/2005   Page 3 of 3

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:03-cr-259-T |
| | ) | |
| LEON CARMICHAEL, SR., | ) | |
| also known as, BEAVER LEON | ) | |
| CARMICHAEL, et al. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2005, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following: Ronald R. Brunson, Marion D. Chartoff, Susan G. James, Barry E.

Teague, and Lisa Monet Wayne.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

s/ A. Clark Morris
A. CLARK MORRIS
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104
Telephone: (334) 223-7280
Fax: (334) 223-7135
E-mail: clark.morris@usdoj.gov

IN THE CIRCUIT COURT
FOR THE 15TH JUDICIAL CIRCUIT
FOR THE STATE OF ALABAMA

| | |
|---|---|
| R. DAVID DEJOHN, | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | )    CASE NO._____ |
| | ) |
| CITY OF MONTGOMERY (MONTGOMERY | ) |
| POLICE DEPARTMENT); GEORGE DAVID | ) |
| SALUM, III; SHANNON YOUNGBLOOD; | ) |
| LEON CARMICHAEL; CUBIE RAE | ) |
| GILMORE HAYES; RICKY MOORE; | ) |
| JOHNNY G. WHITE, JR.; STEPHEN R. | ) |
| GLASSROTH; LISA MONET WAYNE; | ) |
| SUSAN JAMES; MONTGOMERY | ) |
| WESTSIDE WEEKLY; and Fictitious | ) |
| Defendants "A"; "B"; "C"; "D"; "E"; "F"; | ) |
| "G"; "H"; and "I"; | ) |
| whether singular or plural, those | ) |
| other persons, corporations, firms, | ) |
| or other entities whose wrongful | ) |
| conduct caused or contributed to | ) |
| cause the injuries and damages to | ) |
| the Plaintiff, all of whose true and | ) |
| correct names are unknown to | ) |
| Plaintiff at this time, but will be | ) |
| substituted by amendment when | ) |
| ascertained, | ) |
| | ) |
| Defendants. | ) |

MOTION TO DISMISS WITHOUT PREJUDICE

Comes now, the Plaintiff, by and through his attorney of record, and moves this

Honorable Court to dismiss the above styled cause WITHOUT PREJUDICE due to the

ongoing criminal case currently in progress in the United States District Court for the

Middle District of Alabama against the Defendant, Leon Carmichael and involving his

Attachment A

current counsel.

Done this the 15th day of June, 2005.

R. DAVID DELOEN

ROIANNE HOULTON CONNER (FRI021)
ATTORNEY FOR PLAINTIFF

OF COUNSEL:
ROIANNE HOULTON CONNER (FRI021)
LAW OFFICE OF ROIANNE HOULTON CONNER
P.O. BOX 240458
250 WINTON BLOUNT LOOP
MONTGOMERY, AL 36117
(334)215-1988 OFFICE PHONE
(334)215-7778 FACSIMILE

# EXHIBIT C

IN THE CIRCUIT COURT
FOR THE 15TH JUDICIAL CIRCUIT
FOR THE STATE OF ALABAMA

R. DAVID DEJOHN,                                    )
                                                   )
        PLAINTIFF,                                 )
                                                   )
v.                                                 )        CASE NO. CV-05-1434
                                                   )
CITY OF MONTGOMERY (MONTGOMERY                     )
POLICE DEPARTMENT); GEORGE DAVID                   )
SALUM, III; SHANNON YOUNGBLOOD;                    )
LEON CARMICHAEL; CUBIE RAE                         )
GILMORE HAYES; RICKY MOORE;                        )
JOHNNY G. WHITE, JR.; STEPHEN R.                   )
GLASSROTH; LISA MONET WAYNE;                       )
 SUSAN JAMES; MONTGOMERY                           )
WESTSIDE WEEKLY; and Fictitious                    )
Defendants "A"; "B"; "C"; "D"; "E"; "F";           )
"G"; "H"; and "I";                                 )
whether singular or plural, those                  )
other persons, corporations, firms,                )
or other entities whose wrongful                   )
conduct caused or contributed to                   )
cause the injuries and damages to                  )
the Plaintiff, all of whose true and               )
correct names are unknown to                       )
Plaintiff at this time, but will be                )
substituted by amendment when                      )
ascertained,                                       )
                                                   )
        Defendants.                                )

FILED
IN CIRCUIT COURT OF
MONTGOMERY COUNTY
2005 JUN 10  AM 10: 14

## COMPLAINT

**COMES NOW**, the Plaintiff, R. David DeJohn, by and through his attorney, and for a

complaint against the Defendants, state and allege as follows:

### I. JURISDICTION AND VENUE

1.  This court has jurisdiction over the Plaintiff's claim as the tortious actions complained of

are causes of actions pursuant to state law.

2. Venue herein is proper in Montgomery County, State of Alabama, as the removal of the photograph and personnel file from the unsecured files of the City of Montgomery, Montgomery Police Department as well as the posting of the photograph in the internet allegedly occurred in Montgomery County, Alabama.

## II. PARTIES

3. The Plaintiff, R. David DeJohn is an individual and has resided in the State of Alabama, at all times pertinent hereto.  Prior to working with the Prattville Police Department, R. David DeJohn was employed with the Montgomery Police Department. R. David DeJohn was detailed by the Prattville Police Department to the United States Drug Enforcement Administration (DEA) as a Task Force Officer(TFO) assigned to investigate the case against Leon Carmichael.

4. The Defendant, the City of Montgomery is a municipality located in the State of Alabama, Montgomery County, of which the Montgomery Police Department is an entity under the said supervision of the City of Montgomery which was responsible for the security of the photographs, personnel files of former employees, as well for the security of the "Alabama Criminal Justice Information System" and the "National Crime Information Center which houses nationwide criminal records.

5. The Defendant, George David Salum, III was an employee of the City of Montgomery working in the Montgomery Police Department as a Lieutenant at all times during which the said personnel file and photograph was removed from the files and records of the Montgomery Police Department.

-2-

6. The Defendant, Sergeant Shannon Youngblood was an employee of the City of
   Montgomery working in the Montgomery Police Department as a Sergeant at all times
   during which the said personnel file and photograph was removed from the files and
   records of the Montgomery Police Department.

7. The Defendant, Leon Carmichael, is an individual who resides in the City of
   Montgomery, Alabama, and has been charged with conspiracy to possess with intent to
   distribute and distributed more than 3,000 kilograms of marijuana. Carmichael employed
   Stephen R. Glassroth, as well as Lisa Monet Wayne as his attorneys and agents at all
   times relevant to this complaint.

8. The Defendant, Cubie Rae Gilmore Hayes, is an individual who resides in the City of
   Montgomery, Alabama and has been identified as the author of the website containing the
   stolen photograph of the Plaintiff, R. David DeJohn.

9. The Defendant, Ricky Moore, is a former member of the Montgomery Police Department,
   and was a private investigator, whose business is located in or near the City of
   Montgomery and was working with the Defendant Johnny G. White, Jr. at all times
   relevant thereto.

10. The Defendant, Johnny G. White, Jr., was a private investigator, whose business is
    located in or near the City of Montgomery, Alabama.

11. The Defendant, Stephen R. Glassroth was an attorney practicing law in the City of
    Montgomery, State of Alabama and represented Leon Carmichael from on or about
    November 19, 2003 until November 4, 2004. Stephen R. Glassroth's name appeared in
    the Carmichael website as a person to contact for information regarding any of the

-3-

individuals named or later displayed on the said website. Glassroth was an agent of Carmichael and directed his agents or employees during the time relevant to this complaint.

12. Susan James is an attorney practicing law in Montgomery County, State of Alabama and is currently representing Leon Carmichael. Susan James's name now appears on the Carmichael website as a person to contact for information regarding any of the individual names or now displayed on the said website. James is now an agent of Carmichael who has recently updated the said website to include not only the stolen photograph of DeJohn but two other photographs of the said Plaintiff.

13. The Defendant, Lisa Monet Wayne, is an attorney practicing law in the City of Denver, Colorado, and represents the Defendant, Leon Carmichael. Lisa Monet Wayne's name appears on the Carmichael website as a person to contact for information regarding any of the individuals named or later displayed on the said website.

14. Montgomery Westside Weekly, is a newspaper published in the City of Montgomery, State of Alabama which edition Volume 12, Number 39 published August 12-18, 2004, contained a full page depicting the said website containing the stolen photograph of DeJohn.

15. Fictitious Defendants "A", "B", "C", "D", "E", "F", "G", "H" and "I" whether singular or plural, are those other persons, firms, corporations, or other entities whose wrongful conduct caused or contributed to cause the injuries and damages to the Plaintiff, all of whose true and correct names are unknown to Plaintiff at this time, but will be substituted by amendment when ascertained.

## III. FACTS

16. On November 17, 2003, Leon Carmichael was arrested on weapons charges and was

    under investigation for his connection to a seizure of 574 pounds of marijuana seized on

    the same day.  Mr. Carmichael was subsequently charged by indictment on November 19,

    2003, with conspiracy to possess marijuana with the intent to distribute as well as

    conspiracy to commit money laundering.

17. Shortly after his arrest Carmichael, by and through his agents, Hayes, Glassroth and

    Wayne set up a website related to this case.  The author was identified as Cubie Rae

    Gilmer Hayes and was later found to be registered under the name of "An Eye for an

    Eye".  The site came to the attention of law enforcement in January, 2004.  The site has at

    the time of the filing of this complaint undergone several versions and revisions. Cubie

    Rae Gilmore Hayes is also the spokesperson for the Carmichael Center, which is owned

    by the Defendant, Leon Carmichael.

18. On or about August 9, 2004, DeJohn became aware that the website now contains his

    photograph or image along with four of the alleged informants in the case.   DeJohn

    recognized the image as his identification photograph from his former employer,

    Montgomery Police Department.

19. On August 12, 2004, DeJohn met with Sergeant N.W. McMahon, Sergeant J. Bolton and

    Lieutenant P. Fleming of the Montgomery Police Department's Internal Affairs Bureau.

    At that time, the members of the Internal Affairs Bureau confirmed that the photograph

    on the website; and the old identification photograph, were in fact the same image.

    DeJohn requested an investigation at that time and was told that someone would contact

him regarding the same.

20. On August 19, 2004, DeJohn learned that the copy of the photograph identification card was now being disseminated on a second website: www.whosarat.com authored by Sean Bucci. Bucci is currently charged with trafficking in marijuana in the United States District Court for the State of Massachusetts.

21. After waiting several weeks and hearing nothing from the Montgomery Police Department, on August 27, 2004, Counsel for DeJohn wrote the Honorable Walter Byars, Jr., the Attorney for the City of Montgomery and again requested a formal investigation as to how the photograph was taken from the Montgomery Police Department and given to someone with the Carmichael defense team for posting on the website.

22. The request for an investigation was received by the City of Montgomery on Monday, August 30, 2004 and DeJohn gave his formal statement to Internal Affairs Investigators on Tuesday, August 31, 2004.

23. On Wednesday, September 1, 2004, the Honorable Walter Byers contacted Counsel for DeJohn and informed said Counsel that in fact someone within the Montgomery Police Department had released the photograph without permission. Byers further informed Counsel that there would be a news conference on Thursday, September 2, 2004 at which time Mayor Bright would reveal the identify of the said individual. Byers further informed Counsel that the person would be placed on Administrative Leave without pay.

24. On Thursday, September 2, 2004, Mayor Bright identified Lieutenant George David Salum, III as the individual who had been placed on Administrative Leave. Mayor Bright also stated that Lieutenant Salum would be disciplined by the City of Montgomery for

-6-

releasing the said photograph to an unauthorized individual.

25. On that same day, the Honorable Julian McPhillips, Counsel for Lieutenant Salum held a news conference in which he stated that Lieutenant Salum had released the photograph to Ricky Moore, a former Montgomery Police Officer, who is now working as a private investigator for Carmichael. It was also released during the news conference learned by Lieutenant Salum was assisted in the removal of the photograph by Sergeant Youngblood of the Montgomery Police Department. Salum retired from the Montgomery Police Department prior to being disciplined by the City of Montgomery for his illegal actions.

26. Later that night, two other fuzzy photographs of DeJohn appeared on the said website.

27. It was subsequently learned that the microfilm and/or a computerized copy containing the personnel file of the Plaintiff, David DeJohn was also removed from the Montgomery Police Department System by Salum. Salum allegedly turned the photograph over to Ricky Moore and/or Johnny G. White, Jr. This information was then turned over to Stephen R. Glassroth and/or Lisa Monet Wayne the attorneys and agents for the Defendant, Leon Carmichael.

28. Due to the lack of security as well as the negligence of the City of Montgomery the said Lieutenant George Salum with the assistance of Sergeant Shannon Youngblood was able to access not only the photograph, but also the microfilm or computerized copy containing the personnel file of David DeJohn.

29. The said stolen photograph was then published in the Montgomery Westside Weekly, in Volume 12, Number 39, dated August 12-18, 2004. The Montgomery Westside Weekly published said photograph without the said permission of the Plaintiff thereby invading

-7-