his right to privacy.

30. On May 25, 2005, a federal indictment was issued from the Middle District of Alabama, Northern Division, charging George David Salum, III with obstruction of justice as well as the unauthorized utilization of the NCIC/ACJIS information obtained from the Montgomery Police Department terminals on request or demand, in exchange for payment of United States currency.

31. It was also learned from the said indictment that in 2004, Glassroth as an agent of Carmichael, hired White to obtain information about DeJohn, to include a photograph of DeJohn and the Montgomery Police Department personnel file of DeJohn. As per the said indictment, Glassroth, as an agent of Carmichael, further directed White to obtain criminal histories of the said witnesses including DeJohn, if any from the unsecured NCIC/ACJIS computers housed within the Montgomery Police Department. Glassroth, as an agent of Carmichael allegedly paid White, who allegedly paid Moore and Salum for their services in the said illegal enterprise.

32. The Defendants, Lisa Monet Wayne and Steven Glassroth and presently Susan James further acted as agents or employees of Carmichael and have actively solicited information regarding R. David DeJohn utilizing the stolen photograph on the website authored by Cubie Rae Gilmore Hayes. As of the date of the filing of this complaint, the said website as again been revised to display not only the photograph stolen from the Montgomery Police Department but also two other photographs of the Plaintiff.

33. David DeJohn has been damaged by his inability to now work in an undercover capacity which has and will affect his livelihood. Further, due to the lack of security and the

actions of the personnel of the City of Montgomery, specifically the Montgomery Police
Department, the life and welfare of David DeJohn as well as his family has been placed in
danger causing physical, mental and emotional stress not only for David DeJohn but also
his family.

## IV.  COUNT ONE: NEGLIGENCE

34. The Plaintiff incorporates and realleges paragraphs one through thirty-three, as if fully set
forth herein.

35. The Defendant, City of Montgomery, and particularly the Montgomery Police
Department, has been negligent in the securing the photographs and personnel files of
former employees allowing the same to be accessed,  stolen and /or utilized without
authorization from the files, microfiche,  and/or computerized systems of the said
Montgomery Police Department.

36. Due to the negligence of the City of Montgomery and particularly, the Montgomery
Police Department the Plaintiff has been damaged as is set forth in paragraph thirty-two
set forth hereinabove and incorporated herein by reference.

**WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment
against the Defendant for a sum to include both compensatory and punitive damages, together
with interest, costs and expenses of this action.

## V. COUNT TWO: INVASION OF PRIVACY

37. The Plaintiff incorporates and realleges paragraphs one through thirty-six as if fully set
forth herein.

38. The Defendants, as is listed above, misappropriated the likeness of the Plaintiff, and has

allowed the likeness of the said Plaintiff to be published by the Defendant on two

websites, as well as the publication by the Montgomery Westside Weekly, and has caused

the misappropriation of the personnel file of the Plaintiff. Said information has been

placed in public view without the permission of the Plaintiff.

39. This wrongful intrusion into the Plaintiff's private activities was done in a manner to

outrage, intimidate or cause mental suffering, shame, and humiliation.

40. The mental suffering, shame, and humiliation were the proximate result of such wrongful

conduct by the Defendants in the procurement and publishing of the said photograph and

the utilization of the said information which is contained in the misappropriated

personnel file.

41. The violation of the plaintiff's privacy was accompanied by insult and malice.

   **WHEREFORE THE PREMISES CONSIDERED,** the Plaintiff demands judgment

against the Defendant for a sum to include both compensatory and punitive damages, together

with interest, costs and expenses of this action.

## VI.  COUNT THREE: INFLICTION OF EMOTIONAL AND MENTAL DISTRESS

42. The Plaintiff incorporates and realleges paragraphs one through forty-one as fully set

forth herein.

43. All the Defendants,  did as a proximate consequence of their intentional actions caused

the Plaintiff to suffer severe emotional distress due to the actions of the Defendants as is

set forth in paragraphs fifteen through thirty-three set forth herein above.

   **WHEREFORE THE PREMISES CONSIDERED,** the Plaintiff demands judgment

against the Defendants for a sum to include both compensatory and punitive damages, together

-10-

with interest, costs and expenses of this action.

## VII.  COUNT FOUR: NEGLIGENT INFLICTION OF

## EMOTIONAL AND MENTAL DISTRESS

44. The Plaintiff incorporates and realleges paragraphs one through forty-three as fully set

    forth herein.

45. All of the Defendants, as a proximate consequence of their negligent and or intentional

    actions, have caused the Plaintiff to suffer severe emotional distress.

    **WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment

against the Defendant for a sum to include both compensatory and punitive damages, together

with interest, costs, and expenses of this action.

## VIII. COUNT FIVE: ECONOMIC INJURY

46. The Plaintiff incorporates and realleges paragraphs one through forty-five as fully set

    forth herein.

47. The aforementioned conduct of the Defendants were done intentionally, recklessly,

    wantonly, and negligently and has caused an economic injury to the Plaintiff as is set

    forth hereinabove.

48. As a proximate consequence of the Defendants' actions, the Plaintiff was injured and

    damaged as set forth in paragraphs fifteen through thirty-three as set forth herein above.

    **WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment

against the Defendant for a sum to include both compensatory and punitive damages, together

with interest, costs, and expenses of this action.

## IX.  REQUESTED RELIEF

-11-

The Plaintiff requests from this Honorable Court the following relief:

1. To award the Plaintiff compensatory damages for all of the economic injuries caused by the actions of the Defendant either through their neglect and/or intentional actions.

2. Award the Plaintiff compensatory damages for his physical and emotional suffering and related medical and therapeutic expenses.

3. Award the Plaintiff punitive damages.

4. Award the Plaintiff all expenses accrued as was necessary to litigate this matter, which includes and is not limited to attorney's fees, expert witness fees, and etc.

5. Award the Plaintiff costs, expenses, interest and such other relief as this Honorable Court may deem proper.

**Done and Dated** this the_____ day of June, 2005.

R. David DeJohn

## VERIFICATION

**BEFORE ME,** the undersigned Notary Public, appeared R. David DeJohn, who is known to me after being duly sworn, did sign his name as attestation that the foregoing allegations contained in this complaint are true and correct to the best of his knowledge, information and belief, on this the ____ day of June, 2005.

R. David DeJohn

**SWORN TO** and subscribed before me on this the _____ day of June 2005.

_____
NOTARY PUBLIC
My Commission Expires:_____

-12-

_(signature)_

**ROIANNE HOULTON CONNER (FRI021)**
**ATTORNEY FOR PLAINTIFF**

**OF COUNSEL:**
**ROIANNE HOULTON CONNER (FRI021)**
**LAW OFFICE OF ROIANNE HOULTON CONNER**
**P.O. BOX 240458**
**250 WINTON BLOUNT LOOP**
**MONTGOMERY, AL 36117**
**(334) 215-1988 OFFICE PHONE**
**(334) 215-7778 FACSIMILE**

### JURY DEMAND

Plaintiff hereby demands trial by Jury of all issues of this cause.

_(signature)_

ROIANNE HOULTON CONNER

# EXHIBIT D

IN THE CIRCUIT COURT
FOR THE 15TH JUDICIAL CIRCUIT
FOR THE STATE OF ALABAMA

R. DAVID DEJOHN,                                      )
                                                     )
        PLAINTIFF,                                   )
                                                     )
                                                     )          CASE NO._____
v.                                                   )
                                                     )
CITY OF MONTGOMERY (MONTGOMERY )
POLICE DEPARTMENT); GEORGE DAVID )
SALUM, III; SHANNON YOUNGBLOOD;        )
LEON CARMICHAEL; CUBIE RAE            )
GILMORE HAYES; RICKY MOORE;           )
JOHNNY G. WHITE, JR.; STEPHEN R.      )
GLASSROTH; LISA MONET WAYNE;          )
SUSAN JAMES; MONTGOMERY               )
WESTSIDE WEEKLY; and Fictitious       )
Defendants "A"; "B"; "C"; "D"; "E"; "F";   )
"G"; "H"; and "I";                    )
whether singular or plural, those     )
other persons, corporations, firms,   )
or other entities whose wrongful      )
conduct caused or contributed to      )
cause the injuries and damages to     )
the Plaintiff, all of whose true and  )
correct names are unknown to          )
Plaintiff at this time, but will be   )
substituted by amendment when         )
ascertained,                          )
                                      )
        Defendants.                   )

## MOTION TO DISMISS WITHOUT PREJUDICE

    **Comes now,** the Plaintiff, by and through his attorney of record, and moves this

Honorable Court to dismiss the above styled cause WITHOUT PREJUDICE due to the

ongoing criminal case currently in progress in the United States District Court for the

Middle District of Alabama against the Defendant, Leon Carmichael and involving his

current counsel.

Done this the 15th day of June, 2005.

R. DAVID DEJOHN

ROIANNE HOULTON CONNER (FRI021)
ATTORNEY FOR PLAINTIFF

**OF COUNSEL:**
ROIANNE HOULTON CONNER (FRI021)
LAW OFFICE OF ROIANNE HOULTON CONNER
P.O. BOX 240458
250 WINTON BLOUNT LOOP
MONTGOMERY, AL 36117
(334)215-1988 OFFICE PHONE
(334)215-7778 FACSIMILE

# EXHIBIT E

## IN THE CIRCUIT COURT
## FOR THE 15ᵀᴴ JUDICIAL CIRCUIT
## FOR THE STATE OF ALABAMA

R. DAVID DEJOHN,                 )

                            )

     PLAINTIFF,             )

                            )

v.                            )     CASE NO. CV05 1562

                            )

CITY OF MONTGOMERY (MONTGOMERY )
POLICE DEPARTMENT);  GEORGE DAVID )
SALUM, III; SHANNON YOUNGBLOOD;  )
LEON CARMICHAEL; CUBIE RAE      )
GILMORE HAYES; RICKY MOORE;     )
JOHNNY G. WHITE, JR.; STEPHEN R.  )
GLASSROTH; LISA MONET WAYNE;   )
 SUSAN JAMES; MONTGOMERY      )
WESTSIDE WEEKLY; and Fictitious    )
Defendants "A"; "B"; "C"; "D"; "E"; "F"; )
"G"; "H"; and "I";               )
whether singular or plural, those     )
other persons, corporations, firms,   )
or other entities whose wrongful    )
conduct caused or contributed to    )
cause the injuries and damages to   )
the Plaintiff, all of whose true and   )
correct names are unknown to      )
Plaintiff at this time, but will be    )
substituted by amendment when    )
ascertained,                  )

                            )

     Defendants.            )

2005 JUN 23  AM 9: 25

### SUMMONS

To any Sheriff or any person authorized by Rule 4.1 (B) of the <u>Alabama Rules of Civil Procedure</u> to effect service in the State of Alabama:

You are hereby commanded to serve this summons and a copy of the Complaint in this action upon Defendant:

**SUSAN JAMES**
**600 S. MCDONOUGH STREET**
**MONTGOMERY, AL 36104**

The Complaint, which is attached to this summons, is important and you must take immediate action to protect your rights.  You are required to mail or hand-deliver a copy of a written Answer either admitting or denying each allegation in this Complaint to:

**HONORABLE ROIANNE HOULTON CONNER**
**LAW OFFICE OF ROIANNE HOULTON CONNER**
**250 Winton M. Blount Loop**
**Montgomery, Alabama 36117**
**or:**
**P.O. Box 240458**
**Montgomery, Alabama 36124-0458**

The attorney for the Plaintiff.  **THIS ANSWER MUST BE FILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCE BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER**

**THINGS DEMANDED IN THE COMPLAINT.**  You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

**CIRCUIT CLERK**

DATED: 6-28-05

**Return of Service**

I certify that I have served a copy of the above and foregoing summons and attached complaint to Shannon Ippolito on this the 18 day of July, 2005.

Rebecca Moore-Process Server
P O Box 240458
Montgomery, AL  36124

IN THE CIRCUIT COURT
FOR THE 15TH JUDICIAL CIRCUIT
FOR THE STATE OF ALABAMA

| | |
|---|---|
| R. DAVID DEJOHN, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | )     CASE NO: CV05-1562 |
| | ) |
| CITY OF MONTGOMERY (MONTGOMERY | ) |
| POLICE DEPARTMENT); GEORGE DAVID | ) |
| SALUM, III; SHANNON YOUNGBLOOD; | ) |
| LEON CARMICHAEL; CUBIE RAE | ) |
| GILMORE HAYES; RICKY MOORE; | ) |
| JOHNNY G. WHITE, JR.; STEPHEN R. | ) |
| GLASSROTH; LISA MONET WAYNE; | ) |
| SUSAN JAMES; MONTGOMERY | ) |
| WESTSIDE WEEKLY; and Fictitious | ) |
| Defendants "A"; "B"; "C"; "D"; "E"; "F"; | ) |
| "G"; "H"; and "I"; | ) |
| whether singular or plural, those | ) |
| other persons, corporations, firms, | ) |
| or other entities whose wrongful | ) |
| conduct caused or contributed to | ) |
| cause the injuries and damages to | ) |
| the Plaintiff, all of whose true and | ) |
| correct names are unknown to | ) |
| Plaintiff at this time, but will be | ) |
| substituted by amendment when | ) |
| ascertained, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW, the Plaintiff, R. David DeJohn, by and through his attorney, and for a

complaint against the Defendants, state and allege as follows:

### I. JURISDICTION AND VENUE

1. This court has jurisdiction over the Plaintiff's claim as the tortious actions complained of

-1-

are causes of actions pursuant to state law.

2.  Venue herein is proper in Montgomery County, State of Alabama, as the removal of the

    photograph and personnel file from the unsecured files of the City of Montgomery,

    Montgomery Police Department as well as the posting of the photograph in the internet

    allegedly occurred in Montgomery County, Alabama.

## II. PARTIES

3.  The Plaintiff, R. David DeJohn is an individual and has resided in the State of Alabama, at

    all times pertinent hereto.  Prior to working with the Prattville Police Department, R.

    David DeJohn was employed with the Montgomery Police Department. R. David DeJohn

    was detailed by the Prattville Police Department to the United States Drug Enforcement

    Administration (DEA) as a Task Force Officer(TFO) assigned to investigate the case

    against Leon Carmichael.

4.  The Defendant, the City of Montgomery is a municipality located in the State of Alabama,

    Montgomery County, of which the Montgomery Police Department is an entity under the

    said supervision of the City of Montgomery which was responsible for the security of the

    photographs, personnel files of former employees, as well for the security of the "Alabama

    Criminal Justice Information System" and the "National Crime Information Center which

    houses nationwide criminal records.

5.  The Defendant, George David Salum, III was an employee of the City of Montgomery

    working in the Montgomery Police Department as a Lieutenant at all times during which

    the said personnel file and photograph was removed from the files and records of the

    Montgomery Police Department.

-2-

6.  The Defendant, Sergeant Shannon Youngblood was an employee of the City of
    Montgomery working in the Montgomery Police Department as a Sergeant at all times
    during which the said personnel file and photograph was removed from the files and
    records of the Montgomery Police Department.

7.  The Defendant, Leon Carmichael, is an individual who resides in the City of Montgomery,
    Alabama, and has been charged with conspiracy to possess with intent to distribute and
    distributed more than 3,000 kilograms of marijuana.  Carmichael employed Stephen R.
    Glassroth, as well as Lisa Monet Wayne as his attorneys and agents at all times relevant to
    this complaint.

8.  The Defendant, Cubie Rae Gilmore Hayes, is an individual who resides in the City of
    Montgomery, Alabama and has been identified as the author of the website containing the
    stolen photograph of the Plaintiff, R. David DeJohn.

9.  The Defendant, Ricky Moore, is a former member of the Montgomery Police Department,
    and was a private investigator, whose business is located in or near the City of
    Montgomery and was working with the Defendant Johnny G. White, Jr. at all times
    relevant thereto.

10. The Defendant, Johnny G. White, Jr., was a private investigator, whose business is located
    in or near the City of Montgomery, Alabama.

11. The Defendant, Stephen R. Glassroth was an attorney practicing law in the City of
    Montgomery, State of Alabama and represented Leon Carmichael from on or about
    November 19, 2003 until November 4, 2004.  Stephen R. Glassroth's name appeared in
    the Carmichael website as a person to contact for information regarding any of the

-3-

individuals named or later displayed on the said website.  Glassroth was an agent of

Carmichael and directed his agents or employees during the time relevant to this

complaint.

12. Susan James is an attorney practicing law in Montgomery County, State of Alabama and is

currently representing Leon Carmichael.  Susan James's name now appears on the

Carmichael website as a person to contact for information regarding any of the individual

names or now displayed on the said website.  James is now an agent of Carmichael who

has recently updated the said website to include not only the stolen photograph of DeJohn

but two other photographs of the said Plaintiff.

13. The Defendant, Lisa Monet Wayne, is an attorney practicing law in the City of Denver,

Colorado, and represents the Defendant, Leon Carmichael.  Lisa Monet Wayne's name

appears on the Carmichael website as a person to contact for information regarding any of

the individuals named or later displayed on the said website.

14. Montgomery Westside Weekly, is a newspaper published in the City of Montgomery,

State of Alabama which edition Volume 12, Number 39 published August 12-18, 2004,

contained a full page depicting the said website containing the stolen photograph of

DeJohn.

15. Fictitious Defendants "A", "B", "C", "D", "E", "F", "G", "H" and "I" whether singular or

plural, are those other persons, firms, corporations, or other entities whose wrongful

conduct caused or contributed to cause the injuries and damages to the Plaintiff, all of

whose true and correct names are unknown to Plaintiff at this time, but will be substituted

by amendment when ascertained.

## III. FACTS

16. On November 17, 2003, Leon Carmichael was arrested on weapons charges and was under investigation for his connection to a seizure of 574 pounds of marijuana seized on the same day. Mr. Carmichael was subsequently charged by indictment on November 19, 2003, with conspiracy to possess marijuana with the intent to distribute as well as conspiracy to commit money laundering.

17. Shortly after his arrest Carmichael, by and through his agents, Hayes, Glassroth and Wayne set up a website related to this case. The author was identified as Cubie Rae Gilmer Hayes and was later found to be registered under the name of "An Eye for an Eye". The site came to the attention of law enforcement in January, 2004. The site has at the time of the filing of this complaint undergone several versions and revisions. Cubie Rae Gilmore Hayes is also the spokesperson for the Carmichael Center, which is owned by the Defendant, Leon Carmichael.

18. On or about August 9, 2004, DeJohn became aware that the website now contains his photograph or image along with four of the alleged informants in the case. DeJohn recognized the image as his identification photograph from his former employer, Montgomery Police Department.

19. On August 12, 2004, DeJohn met with Sergeant N.W. McMahon, Sergeant J. Bolton and Lieutenant P. Fleming of the Montgomery Police Department's Internal Affairs Bureau. At that time, the members of the Internal Affairs Bureau confirmed that the photograph on the website; and the old identification photograph, were in fact the same image. DeJohn requested an investigation at that time and was told that someone would contact him

regarding the same.

20. On August 19, 2004, DeJohn learned that the copy of the photograph identification card
was now being disseminated on a second website: www.whosarat.com authored by Sean
Bucci. Bucci is currently charged with trafficking in marijuana in the United States
District Court for the State of Massachusetts.

21. After waiting several weeks and hearing nothing from the Montgomery Police
Department, on August 27, 2004, Counsel for DeJohn wrote the Honorable Walter Byars,
Jr., the Attorney for the City of Montgomery and again requested a formal investigation as
to how the photograph was taken from the Montgomery Police Department and given to
someone with the Carmichael defense team for posting on the website.

22. The request for an investigation was received by the City of Montgomery on Monday,
August 30, 2004 and DeJohn gave his formal statement to Internal Affairs Investigators
on Tuesday, August 31, 2004.

23. On Wednesday, September 1, 2004, the Honorable Walter Byers contacted Counsel for
DeJohn and informed said Counsel that in fact someone within the Montgomery Police
Department had released the photograph without permission. Byers further informed
Counsel that there would be a news conference on Thursday, September 2, 2004 at which
time Mayor Bright would reveal the identify of the said individual. Byers further informed
Counsel that the person would be placed on Administrative Leave without pay.

24. On Thursday, September 2, 2004, Mayor Bright identified Lieutenant George David
Salum, III as the individual who had been placed on Administrative Leave. Mayor Bright
also stated that Lieutenant Salum would be disciplined by the City of Montgomery for

-6-

releasing the said photograph to an unauthorized individual.

25. On that same day, the Honorable Julian McPhillips, Counsel for Lieutenant Salum held a news conference in which he stated that Lieutenant Salum had released the photograph to Ricky Moore, a former Montgomery Police Officer, who is now working as a private investigator for Carmichael. It was also released during the news conference learned by Lieutenant Salum was assisted in the removal of the photograph by Sergeant Youngblood of the Montgomery Police Department. Salum retired from the Montgomery Police Department prior to being disciplined by the City of Montgomery for his illegal actions.

26. Later that night, two other fuzzy photographs of DeJohn appeared on the said website.

27. It was subsequently learned that the microfilm and/or a computerized copy containing the personnel file of the Plaintiff, David DeJohn was also removed from the Montgomery Police Department System by Salum. Salum allegedly turned the photograph over to Ricky Moore and/or Johnny G. White, Jr. This information was then turned over to Stephen R. Glassroth and/or Lisa Monet Wayne the attorneys and agents for the Defendant, Leon Carmichael.

28. Due to the lack of security as well as the negligence of the City of Montgomery the said Lieutenant George Salum with the assistance of Sergeant Shannon Youngblood was able to access not only the photograph, but also the microfilm or computerized copy containing the personnel file of David DeJohn.

29. The said stolen photograph was then published in the Montgomery Westside Weekly, in Volume 12, Number 39, dated August 12-18, 2004. The Montgomery Westside Weekly published said photograph without the said permission of the Plaintiff thereby invading his

-7-

right to privacy.

30. On May 25, 2005, a federal indictment was issued from the Middle District of Alabama, Northern Division, charging George David Salum, III with obstruction of justice as well as the unauthorized utilization of the NCIC/ACJIS information obtained from the Montgomery Police Department terminals on request or demand, in exchange for payment of United States currency.

31. It was also learned from the said indictment that in 2004, Glassroth as an agent of Carmichael, hired White to obtain information about DeJohn, to include a photograph of DeJohn and the Montgomery Police Department personnel file of DeJohn. As per the said indictment, Glassroth, as an agent of Carmichael, further directed White to obtain criminal histories of the said witnesses including DeJohn, if any from the unsecured NCIC/ACJIS computes housed within the Montgomery Police Department. Glassroth, as an agent of Carmichael allegedly paid White, who allegedly paid Moore and Salum for their services in the said illegal enterprise.

32. The Defendants, Lisa Monet Wayne and Steven Glassroth and presently Susan James further acted as agents or employees of Carmichael and have actively solicited information regarding R. David DeJohn utilizing the stolen photograph on the website authored by Cubie Rae Gilmore Hayes. As of the date of the filing of this complaint, the said website as again been revised to display not only the photograph stolen from the Montgomery Police Department but also two other photographs of the Plaintiff.

33. David DeJohn has been damaged by his inability to now work in an undercover capacity which has and will affect his livelihood. Further, due to the lack of security and the

-8-

actions of the personnel of the City of Montgomery, specifically the Montgomery Police

Department, the life and welfare of David DeJohn as well as his family has been placed in

danger causing physical, mental and emotional stress not only for David DeJohn but also

his family.

34. On Friday, June 17, 2005, Leon Carmichael and his co-defendant, Freddie Williams were

convicted of all of the charges by a jury in the United States District Court for the Middle

District of Alabama.  Mr. Carmichael is due to be sentenced in August 22, 2005 and is

currently in the custody of the United States Marshal Service.

## IV.  COUNT ONE: NEGLIGENCE

35. The Plaintiff incorporates and realleges paragraphs one through thirty-four, as if fully set

forth herein.

36. The Defendant, City of Montgomery, and particularly the Montgomery Police

Department, has been negligent in the securing the photographs and personnel files of

former employees allowing the same to be accessed, stolen and /or utilized without

authorization from the files, microfiche, and/or computerized systems of the said

Montgomery Police Department.

37. Due to the negligence of the City of Montgomery and particularly, the Montgomery Police

Department the Plaintiff has been damaged as is set forth in paragraph thirty-two set forth

hereinabove and incorporated herein by reference.

**WHEREFORE THE PREMISES CONSIDERED,** the Plaintiff demands judgment

against the Defendant for a sum to include both compensatory and punitive damages, together

with interest, costs and expenses of this action.

## V. COUNT TWO: INVASION OF PRIVACY

38. The Plaintiff incorporates and realleges paragraphs one through thirty-seven as if fully set forth herein.

39. The Defendants, as is listed above, misappropriated the likeness of the Plaintiff, and has allowed the likeness of the said Plaintiff to be published by the Defendant on two websites, as well as the publication by the Montgomery Westside Weekly, and has caused the misappropriation of the personnel file of the Plaintiff. Said information has been placed in public view without the permission of the Plaintiff.

40. This wrongful intrusion into the Plaintiff's private activities was done in a manner to outrage, intimidate or cause mental suffering, shame, and humiliation.

41. The mental suffering, shame, and humiliation were the proximate result of such wrongful conduct by the Defendants in the procurement and publishing of the said photograph and the utilization of the said information which is contained in the misappropriated personnel file.

42. The violation of the plaintiff's privacy was accompanied by insult and malice.

**WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment against the Defendant for a sum to include both compensatory and punitive damages, together with interest, costs and expenses of this action.

## VI. COUNT THREE: INFLICTION OF EMOTIONAL AND MENTAL DISTRESS

43. The Plaintiff incorporates and realleges paragraphs one through forty-two as fully set forth herein.

44. All the Defendants, did as a proximate consequence of their intentional actions caused the

-10-

Plaintiff to suffer severe emotional distress due to the actions of the Defendants as is set forth in paragraphs fifteen through thirty-three set forth herein above.

**WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment against the Defendants for a sum to include both compensatory and punitive damages, together with interest, costs and expenses of this action.

## VII. COUNT FOUR: NEGLIGENT INFLICTION OF
## EMOTIONAL AND MENTAL DISTRESS

45. The Plaintiff incorporates and realleges paragraphs one through forty-four as fully set forth herein.

46. All of the Defendants, as a proximate consequence of their negligent and or intentional actions, have caused the Plaintiff to suffer severe emotional distress.

**WHEREFORE THE PREMISES CONSIDERED**, the Plaintiff demands judgment against the Defendant for a sum to include both compensatory and punitive damages, together with interest, costs, and expenses of this action.

## VIII. COUNT FIVE: ECONOMIC INJURY

47. The Plaintiff incorporates and realleges paragraphs one through forty-six as fully set forth herein.

48. The aforementioned conduct of the Defendants were done intentionally, recklessly, wantonly, and negligently and has caused an economic injury to the Plaintiff as is set forth hereinabove.

49. As a proximate consequence of the Defendants' actions, the Plaintiff was injured and damaged as set forth in paragraphs fifteen through thirty-three as set forth herein above.

**WHEREFORE THE PREMISES CONSIDERED,** the Plaintiff demands judgment against the Defendant for a sum to include both compensatory and punitive damages, together with interest, costs, and expenses of this action.

## IX. REQUESTED RELIEF

The Plaintiff requests from this Honorable Court the following relief:

1. To award the Plaintiff compensatory damages for all of the economic injuries caused by the actions of the Defendant either through their neglect and/or intentional actions.

2. Award the Plaintiff compensatory damages for his physical and emotional suffering and related medical and therapeutic expenses.

3. Award the Plaintiff punitive damages.

4. Award the Plaintiff all expenses accrued as was necessary to litigate this matter, which includes and is not limited to attorney's fees, expert witness fees, and etc.

5. Award the Plaintiff costs, expenses, interest and such other relief as this Honorable Court may deem proper.

**Done and Dated** this the _21_ day of June, 2005.

_____
R. David DeJohn

## VERIFICATION

**BEFORE ME,** the undersigned Notary Public, appeared R. David DeJohn, who is known to me after being duly sworn, did sign his name as attestation that the foregoing allegations contained in this complaint are true and correct to the best of his knowledge, information and belief, on this the _21_ day of June, 2005.

_____
R. David DeJohn

-12-

**SWORN TO** and subscribed before me on this the ___21___ day of June 2005.

_Rebecca H Moore_
NOTARY PUBLIC
My Commission Expires: 05 17 06

_Roianne Houlton Conner_
ROIANNE HOULTON CONNER (FRI021)
ATTORNEY FOR PLAINTIFF

**OF COUNSEL:**
ROIANNE HOULTON CONNER (FRI021)
LAW OFFICE OF ROIANNE HOULTON CONNER
P.O. BOX 240458
250 WINTON BLOUNT LOOP
MONTGOMERY, AL 36117
(334)215-1988 OFFICE PHONE
(334)215-7778 FACSIMILE

## JURY DEMAND

Plaintiff hereby demands trial by Jury of all issues of this cause.

_Roianne Houlton Conner_
ROIANNE HOULTON CONNER

-13-

# EXHIBIT F

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

### AFFIDAVIT OF SUSAN G. JAMES, ATTORNEY AT LAW

I, Susan G. James am over the age of 21 years and a legal resident of Montgomery County, Alabama.   I served as one of four trial attorneys on behalf of Leon Carmichael, United States v. Carmichael, Case No. 2:03-cr-259-T.

The trial of this case began on June 6, 2005 and lasted through June 17, 2005.

Prior to my involvement in the case Carmichael had already secured the services of Bruce Maddox, Ron Wise, Steve Glassroth, and Lisa Wayne.  Shortly after Mr. Glassroth's withdrawal as a Carmichael attorney, the undersigned was retained to assist Carmichael in the trial of this case.  This occurred in November, 2004.

Endless hours were spent in preparation of the Carmichael defense.  The defense was developed after a complete and thorough review of the discovery in this case provided by the United States Government as well an independent investigation conducted by Carmichael, his attorneys, and private investigators.

During the course of this investigation and in preparation of this trial, evidence was revealed that Agent Raymond DeJohn had been involved in two shooting incidents involving Montgomery residents while he served as a Montgomery Police Officer and another incident injuring a suspect by driving over him in a Police vehicle.  Other matters regarding DeJohn's employment history in law enforcement were developed during the pretrial stages of this case.

Agent DeJohn's testimony was anticipated to be detrimental to the defense as he would provide evidence, albeit believed to be false, that Carmichael had confessed to him of his involvement in the illicit drug trade.  However, after much thought and deliberation it was determined that the focus of the defense would not be on Agent DeJohn's employment and credibility issues  as it was believed that this might be offensive to the jury.

Pretrial the Carmichael attorneys, through their investigation and interviewing witnesses, determined that numerous witnesses were interviewed by Agent DeJohn and DEA 6's were prepared and provided during discovery.  When these DEA 6's were discussed with the witnesses, it was reported that numerous of the witnesses whom DeJohn had interviewed disavowed much,

if not all, of the contents of the DEA 6's.

A strategic decision was made not to use any of this information in the trial and instead simply question the circumstances under which the alleged confession was purportedly given.

A controversial pretrial issue in this case was the development of a website at Carmichael's direction and to obtain information regarding government witnesses. The government sought a protective order to take down the website. Agent DeJohn, through his current attorney Roianne Conner, sought to intervene in this action alleging invasion of privacy and danger as a result of his photograph being on the website.

Agent DeJohn then and currently has argued that this website has hindered his ability to work as an undercover law enforcement officer.

The undersigned attorney had no involvement whatsoever in establishing, monitoring, or updating the website. This had been in motion for many months prior to the undersigned's involvement in this case almost a year after Carmichael's arrest. This Court had determined that the website was constitutional and the undersigned had absolutely no reason to believe that there was any problem with her name having been placed on the website as a contact person for those with information about the government witnesses.

Unbeknownst to Carmichael or any of his four trial attorneys, David DeJohn and his attorney Roianne Conner, were working behind the scenes well in advance of the Carmichael trial to prepare a lawsuit for filing during the Carmichael trial. It was learned during the course of Carmichael's trial that the government was privy to this information to the extent that Roianne Conner contacted the U. S. Attorney's office a day or so prior to filing the June 10, 2005 lawsuit inquiring if the government had any problems with the filing of the lawsuit. While AUSA Feaga articulated as an officer of the court, generally, he wished that they wouldn't, the lawsuit was still filed during the course of the trial and notice was given to the undersigned by WSFA Reporter Chris Holmes while Agent DeJohn was on the stand under cross examination.

Verification of this lawsuit was obtained and oral motions were made to permit trial attorneys Wayne and James to withdraw from representation of Carmichael. It was obvious that at first blush this created substantial and actual conflict issues as well as other legal issues regarding denial of Carmichael's Fifth and Sixth Amendment rights to due process, effective

2

counsel, and a fair and impartial jury.

Subsequent to leaning of this problem, and during the evening recess, the undersigned contacted Robert Lusk, Ethics Division, Alabama State Bar, and advised him of the scenario. Mr. Lusk advised counsel that she must seek to withdraw from representation of Carmichael and that it was in the Court's hands with regard to approval or disapproval of this request. Lusk indicated that this was a virtual mine field and that counsel should navigate at her own risk and very carefully.

The next morning the undersigned advised the Court of the legal advise given by the Ethics Division of the Alabama State Bar and the Court continued to deny the requests to withdraw. Further, on the morning after the revelation of the DeJohn lawsuit and after an opportunity to review the lawsuit, the government provided defense counsel for Carmichael a motion to dismiss the lawsuit without prejudice filed by DeJohn attorney Roianne Conner. This was obviously based on comments made by the Court, defense counsel, and the government which were relayed to Agent DeJohn. It was clear and obvious that the lawsuit would be refiled at the conclusion of the trial. The fact of the dismissal did nothing to cure the actual conflict of interest that resulted from the filing of the DeJohn lawsuit at the time of the trial.

There were no statute of limitation problems as the website was up during the trial bearing Attorney Wayne and Attorney James names. The DeJohn camp could have certainly withheld the filing of the lawsuit until after the trial. Nevertheless they were duty bound, as lead agent DeJohn's knowledge was imputed to the government and the prosecutors admission they knew of the lawsuit, to at least disclose the lawsuit to the defense team so that the defense strategy could be adjusted accordingly.

It was virtually impossible to do anything further with DeJohn on cross examination after learning of the lawsuit because of the duty attorneys Wayne and James owed to themselves which were contrary to the interest of Carmichael.

If Carmichael's attorneys had prior knowledge through discovery of the potential lawsuit wherein DeJohn had a financial interest in the outcome of the criminal case in order to bolster his efforts of financial recovery in his civil case, the entire defense strategy would have changed. DeJohn would have become the focal point of the defense. His financial motivation to testify

3

would have been centerpiece. Carmichael's attorneys would have made much of the fact that he was trying to gain monetary compensation from Carmichael, two of his present attorneys, and one former attorney, as well as a list of other individuals. This would have been exposed during his cross examination. Additionally, the benefit of the impeachment of the financial motive far outweighed any concern over the website that counsel for Carmichael had zealously and successfully had excluded from the jury trial. The frivolous lawsuit that DeJohn has filed during the trial and has now refiled six days after the verdict, could easily have been discredited further exposing his financial motivation to exploit his involvement as an agent in a criminal trial.

In addition, DeJohn's claim in the lawsuit that his employment has been negatively affected as a result of the lawsuit would have been totally discredited based on the pretrial evidence discovered independently by Carmichael's defense team that DeJohn had been involved in at least two questionable shootings as an employee of the Montgomery Police Department and another injury to a criminal suspect by the use of a police vehicle. DeJohn's employment status as well as his prior litigation against City Councilman Richard Moncus would have been fully and thoroughly used as impeachment in the trial of this case. Additionally, the evidence of the disavowment of comments purportedly made and contained in and DEA 6's prepared by DeJohn by the actual individuals that were interviewed would have also been included in the trial. DeJohn would have been questioned about the DEA 6's. Torrah Whisenant, Sandra Jones and others would have been called to testify and expose the inconsistencies in what Agent DeJohn wrote in the DEA 6's and what the witnesses contend were their actual statements to DeJohn during those interviews.

Based on the discovery and a thorough review of the discovery the defense team elected not to use this impeachment of DeJohn. If this information had been revealed, i.e., presence of the lawsuit, and used during the course of the trial, it is clear that the credibility of the government's entire case would have fallen. It was DeJohn that began the case, it was DeJohn that received the alleged confession, and it was DeJohn who interviewed the bulk of the witnesses. If it were established to the jury that DeJohn had a financial motive to testify, as he did in this case, the jury would not only have to considered defense counsel's allegations that he lied, they would have a clear understanding of the motive for this officer to lie.

4

Evidence of a cooperating witnesses desire for a reward is particularly relevant and *Giglio* material discoverable prior to trial. The Agent DeJohn pot of gold at the end of the rainbow lawsuit is of no less significance.

Without question DeJohn's employment history in law enforcement would have become highly relevant to the defense theory. The unsubstantiated allegations in his lawsuit would have been easily refuted to show that he was making frivolous claims in order to gain financial compensation.

Although counsel did learn of the DeJohn lawsuit during his cross examination, the actual conflict that existed prevented counsel from exploring further any possibility to weave this into the defense of the case. The disclosure was obviously too little too late and precluded counsel for Carmichael from backtracking. Almost all of the government's witnesses who testified and all had been precluded from mentioning the website. Counsel had deliberately not examined any them about the website. The posture of the case at the time of the revelation of the lawsuit was such that there was no way to repair the damage done by the failure of the government, either on its own or by and through imputed knowledge of Agent DeJohn's to disclose the lawsuit to the attorneys that were representing Carmichael at the trial.

Counsel has been unable to find any case directly on point where the lead case agent sued the defendant and his two lawyers during his cross examination.

Additionally, counsel for Carmichael objected to the partial sequestration of jurors and the fact that alone would heighten the jurors concern that there was something different about this case and possibly concern over their safety. Counsel did not have placed on the record during the course of the trial, but raises it now, because of the cumulative effect the same had on the jurors in this case. On the first day of trial there was noticeable law enforcement presence on and around the courthouse property. Specifically, a uniformed motorcycle police officer positioned himself on the sidewalk outside the courthouse during most of the first day of jury selection and there was an increased black and white patrol presence in and around the courthouse area that very same day. This extensive law enforcement presence coupled with the sequestration of the jurors set the stage to heighten their concern over their safety and special issues that might arise from this trial.

5

It is clear that the nondisclosure of the *Giglio* material (i.e., the DeJohn lawsuit) completely denied Carmichael a fair trial.

This information is provided freely and voluntarily and is true to the best of my knowledge, information and belief.

Susan G.  James

**NOTARY PUBLIC**

Sworn and subscribed before me this 15th day of August 2005.

Sharion S.  Mims

My commission expires 03/28/07

6

# EXHIBIT G

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

RAYMOND DAVID DEJOHN and    )
TAMMY DeJOHN,             )
                        )
      Plaintiffs        )
                        )
vs.                      )    CIVIL ACTION NO. CV-94-1596-PR
                        )
RICHARD MONCUS         )
                        )
      Defendant.       )

## STATEMENT OF UNDISPUTED FACTS

COMES NOW Defendant Richard Moncus, by and through his attorney, and submits the following statement of undisputed facts in support of his Motion For Summary Judgment filed herein:

1. At the time of the incident which gives rise to this case, Defendant Richard Moncus was a member of the Montgomery City Council duly elected by the citizens of District 1 (See Moncus depo. p. 40).

2. At the time of the incident which gives rise to this case, Plaintiff Raymond DeJohn was a police officer employed by the City of Montgomery.

3. Plaintiff Raymond DeJohn was involved in a shooting incident with Gary Frank Kelly on April 6, 1994. (See ABI report)

4. Plaintiff Raymond DeJohn discharged his service weapon at least eleven times at a vehicle driven by Gary Frank Kelly striking Kelly in the right arm (See ABI report).

5. Plaintiff Raymond DeJohn was involved in a shooting incident on April 26, 1994 wherein he shot and wounded J. W. Bradberry (See ABI report).

6.  Defendant Richard Moncus held a press conference on April 27, 1994 discussing the two shooting incidents.

7.  Attorney Buster Russell, on behalf of Raymond DeJohn, by letter dated July 20, 1994, demanded a retraction from Mr. Moncus pursuant to § 6-5-186 <u>Code of Alabama</u> (Complaint Exhibit A).

8.  By letter dated July 22, 1994 Defendant Richard Moncus responded to the letter from Mr. Russell (Complaint Exhibit B).

9.  The Montgomery Police Department changed its policy regarding shootings involving police officers requiring mandatory counseling and placement on administrative lease pending investigation (Sec. 1.420, Police Department Policy and Procedures, Exhibit C).


                    E. HAMILTON WILSON, JR. (WIL070)
                    Attorney for Defendant,
                    Richard Moncus

OF COUNSEL:

BALL, BALL, MATTHEWS & NOVAK, P. A.
P. O. Drawer 2148
Montgomery, AL 36102-2148
(334) 834-7680

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that I have served a copy of the foregoing document upon Robert J. Russell, Jr., by hand delivery on this <u>10th</u> day of <u>October</u>, 1995.

OF COUNSEL

Robert J. Russell, Jr., Esq.
P. O. 2189
Montgomery, Alabama 36102-2189

# EXHIBIT H

JOSEPH I. DICKERSON, III
MRS. ALICE D. REYNOLDS, Pres. Pro tem
E.T. (BUD) CHAMBERS
MARK GILMORE, JR.
LEO HAMMONDS

RICK ARMSTRONG
RICHARD MONCUS
JOE L. REED
BILLY M. TURNER

**City of**
**Montgomery Alabama**

July 22, 1994

Mr. Robert J. Russell, Jr., Attorney
Parnell, Crum, and Anderson, P.A.
Post Office Box 2189
Montgomery, AL  36102-2189

Dear Mr. Russell:

Reference is made to your letter of July 20, 1994 concerning
City of Montgomery police officer Raymond D. DeJohn.  Your letter
was delivered to my home, certified mail, on Thursday, July 21, 1994
by the U.S. Postal Service (my 12-year old son, Matthew, signed for
the document).

You stated in your letter that <u>on or about</u> April 27, 1994
that I made certain remarks in reference to police officer DeJohn's
mental health status.  I did not see the television news broadcast
that you cited in your letter (or any T.V. broadcast in reference
to the news conference that I conducted on April 27, 1994).

As a duly elected representative of the people of City
Council District One, I held the news conference to bring to the
citizen's attention the fact the Police Department's policy pertain-
ing to an officer firing (shooting) his/her weapon was inadequate
for the protection of both the police officer and the citizens of
Montgomery.

It was my intention to focus on the Police Department's
"shooting" policy in general with specific reference to the way the
Police Department handled the shooting incident involving officer
DeJohn and Mr. Gary Frank Kelly on April 5, 1994.  After the inci-
dent on April 5, I believed that officer DeJohn should have been
placed on administrative leave (with pay, of course) or placed on
administrative duty until an investigation had been completed by
the Alabama Bureau of Investigation (ABI) and the incident reviewed
by the Montgomery Grand Jury.  I stated this belief that when <u>any</u>
police officer fires his/her weapon and injures or kills someone,
that officer should be psychologically evaluated by competent mental
health specialists to determine if the officer is mentally fit for
"line duty" again.  This practice makes sure that the officer is
ready to go back to regular line duty.

The policy of removing the officer from line duty and
requiring psychological evaluation prior to returning to duty will

---

**EXHIBIT**

B

Mr. Russell
July 22, 1994

greatly aid in the removal of unfit officers, particularly those
officers that are considered "trigger-happy," or sadistic, or "rogue-
cop" types. Most large metro police departments require psycological
counselling in these shooting incidents.  Fact is, the Montgomery
Police Department has now implemented a mandatory psychological
counselling/evaluation policy on this matter.

I have received much training in counselling and have almost
eight years of volunteer mental health, crisis-intervention, counsell-
ing experience with a local mental health organization.  It was my
intention--based upon my training and experience--to disclose  at the
July 27 news conference that I believed that any police officer that
would fire his/her weapon eleven or more times, in a highly populated
neighborhood at an individual that is, possibly, guilty of only minor
traffic violations may be suffering from some psychosis (or may be
psychotic).  I may have, also, said that officer DeJohn does not need
to be "on-the-streets."  However, I believe that I would have clari-
fied the remarks in the previous sentence by saying that he does not
need to be "on the streets" until he has been cleared by the ABI and
the Grand Jury as well as being psychologically evaluated to determine
if officer is mentally ready to be placed back on line duty.

If the media has taken my words out of context, I can do
nothing about that and can not retract something I am not responsible
for in the beginning.  However, if during this impromptu, extemporan-
eous, and juxtapositional news conference I made any remarks that may
cause police officer Raymond DeJohn, his wife, and his two children
to suffer emotional and mental anguish and humiliation, ridicule, or
embarrassment, in the past, in the present, and in the future, then
I, hereby, retract those remarks publically.

I will take this opportunity to inform you and your clients
that I am forwarding a copy of this letter in its entirety to the
following news agencies asking them to publish/announce the contents
of this letter  fully, or partially at their discretion, and as soon
as possible:

The Montgomery Advertiser Newspaper
WAKA-TV Station (Channel 8 News)
WHOA-TV Station (Channel 32 News)
WSFA-TV Station (Channel 12 News)

Sincerely,

RICHARD H. MONCUS, Councillor
City Council District One

RHM/m

1.420       DUTY TO ATTEND MANDATORY COUNSELING:

Any member/employee will be required to attend counseling if they are involved in any police shooting. Said member/employee will be placed on administrative leave with pay pending the results of counseling. Upon review of the results of counseling, a determination will be made by the Chief of Police as to any future assignment and pay status.

The notification of the appropriate independent law enforcement investigating agency will be made any time any member/employee is involved in any shooting incident that results in injury of any degree. Pursuant to an agreement made on February 3, 1986, the highest ranking Detective supervisor on the scene will notify the Alabama Bureau of Investigation. Notification of ABI will be discretionary in those incidents that result from accidental discharges or any other shooting incidents not involving injury. Traffic accidents resulting in extremely serious, critical, or fatal injuries, or any other traumatic incidents may require mandatory counseling at the direction of the Chief of Police. Evaluation results, comments, and recommendations made therein shall be considered by the Chief of Police before allowing the officer to return to active enforcement duties. In all incidents involving the discharge of a firearm, when an injury of any kind is involved, the case will be presented to the Montgomery County Grand Jury.

Page: 48



DEFENDANT'S EXHIBIT
C

# EXHIBIT I

1

1   IN THE CIRCUIT COURT FOR THE

2   COUNTY OF MONTGOMERY

3   STATE OF ALABAMA

4

5   REGINALD LAMAR JONES

6        Plaintiffs,

7                              CIVIL ACTION

        vs.
8                              FILE NO. CV-99-1209M

9

10  RAYMOND DAVID DEJOHN, individually,
    and as a police officer of the City
11  of Montgomery, and THE CITY OF
    MONTGOMERY, ALABAMA, A Municipal
12  Corporation,

13       Defendants.            **COPY**

14            *        *        *

15

16   ..  DEPOSITION OF CORPORAL RAYMOND DEJOHN,

17  taken on behalf of the Plaintiff, pursuant to the

18  stipulations set forth herein, before Jeana S.

19  Boggs, Certified Court Reporter and Notary Public,

20  at the law offices of Edward B. Parker, III, 235

21  South Court Street, Montgomery, Alabama,

22  commencing at approximately 10:50 a.m., Wednesday,

23  September 22, 1999.

Boggs Reporting & Video Services
(334) 264-6227/800-397-5590/www.BoggsReporters.com

24

1      something criminal charge himself?

2   A.   Yes.

3   Q.   What was it, if you know?

4   A.   Resisting arrest, assault either second or

5      third degree, and interfering with a police

6      officer.

7   Q.   Okay.  Was he convicted of all of those?

8   A.   Yeah.  To my knowledge, yes.

9   Q.   Did he spend any time in jail?

10  A.   I don't know the extent.

11  Q.   Who is his lawyer, if you know?

12  A.   Edward Howard (phonetic).

13  Q.   Now, are Gary Frank Kelly and J. W. Bradbury

14     the only two citizens in Montgomery that you

15     have ever hit with bullets from your gun?

16  A.   Yes.

17  Q.   Okay.  Have you had occasion to use your gun at

18     other times for shooting but not hit -- but not

19     hit anybody?

20  A.   No.

21  Q.   Okay.  Have you had other occasions to chase in

22     a Suburban vehicle or a regular Montgomery

23     patrol vehicle any fleeing suspects?

25

```
1              MR. PARKER:  Object to the form.
2      A.    Yes.
3      Q.    Other than Reggie Jones, tell me how many times
4            you've done that.
5              MR. PARKER:  Object to the form.
6      A.    I --
7      Q.    And when?
8      A.    I really couldn't tell you.  There's a
9            difference --
10             MR. PARKER:  Object to the form.
11     A.    If you can clarify chase, what exactly do you
12           mean, chase?
13     Q.    Well, that you saw somebody either walking down
14           the street or in the projects or wherever and
15           they saw you and that person took off running.
16           Have you pursued any such fleeing suspects
17           before?
18             MR. PARKER:  Object to the form.
19     A.    On foot and in a vehicle, yes.
20     Q.    All right.  When you've chased them in a
21           vehicle, have you generally turned on your
22           siren lights or -- siren or blue lights?
23     A.    Usually when they are on foot, I'm not chasing
```

26

1       them.  I'm following them to get to a point

2       where I could chase them.  But, no, I have not

3       used my lights.

4   Q.  You've chased suspects before in your vehicle?

5   A.  Yes.

6   Q.  Without using your siren or your lights?

7   A.  Again, it depends on what you call chase.

8   Q.  Well, pursue?

9   A.  If I am in pursuit of them, the lights are on

10      and the siren is on.

11  Q.  Well, certainly you were in pursuit of Reggie

12      Jones that day trying to help Corporal Steelman

13      and the others apprehend him, weren't you?

14          MR. PARKER:  Object to the form.

15  A.  I was not in pursuit of him when -- in the

16      vehicle.

17  Q.  Well, you don't deny you jumped the curb in the

18      Suburban vehicle, do you?

19  A.  I don't deny that.

20  Q.  Why didn't you just leave the vehicle where it

21      was and just hop out and help?  I mean, the

22      others were chasing him.  Why didn't you just

23      do that?

27

1    A.   Well, generally, if somebody takes off running

2    and one person leaves on foot, they were

3    already way ahead of me.  I was going to get in

4    my vehicle.  I had no idea which way they were

5    going to be running, so I was going to go try

6    to go to the area in which they were running.

7    Q.   Well, you had your weapon on you that day,

8    didn't you?

9    A.   Yes.

10    Q.   And you saw nothing about Reggie Jones that

11    showed that he had a weapon on him, did you?

12    A.   I couldn't confirm or deny that.

13    Q.   And you never found any drugs on him or around

14    him, did you?

15    A.   No.

16    Q.   Do you claim that you saw the same motion that

17    Officer Steelman said he saw from a hundred and

18    fifty yards away when you first saw him?

19       MR. PARKER:  Object to the form.

20    A.   No, I didn't.

21    Q.   You didn't see any motion?

22    A.   No.

23    Q.   Did Officer Steelman tell you he saw what

# EXHIBIT J

IN THE CIRCUIT COURT
OF
MONTGOMERY COUNTY, ALABAMA

RAYMOND DAVID DeJOHN and )
TAMMY DeJOHN, )
)
Plaintiffs, )
) CIVIL ACTION NO.
V. ) CV 94-1956-PR
)
RICHARD MONCUS, )
)
Defendant. )

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Richard Moncus, ("Councilman Moncus"), and submits the following Brief in Support of his Motion for Summary Judgment.

### I. Facts

Defendant Richard Moncus was elected to the Montgomery City Council in October 1991, and at the time of the incident referred to in the Plaintiffs' complaint, represented District One. (Depo. of Moncus p. 40). Plaintiff Raymond DeJohn is a police officer employed by the City of Montgomery. (Depo. of DeJohn p. 5). Tammy DeJohn is the wife of Officer DeJohn. (Depo. of DeJohn p. 7).

On April 6, 1994, Officer DeJohn was involved in a shooting incident with an individual named Gary Frank Kelly. (ABI Report; Depo. of DeJohn p. 33). Although the facts and circumstances surrounding the shooting of Mr. Kelly and his vehicle are in

(Depo. of DeJohn, pp. 76, 149.)

**B.**   **_There is no Clear and Convincing Evidence of Actual Malice, which must exist since DeJohn is a Public Figure._**

The threshold question in a defamation action for the trial judge is the status of the allegedly defamed person as a public official, public figure, or a private individual.   Rudder v. Universal Communications Corporation, 507 So.2d 411, 416 (Ala. 1987); Fulton v. Advertiser Company, 388 So.2d 533, 537 (Ala. 1980).  This determination is a question of law and must be made by the court so that the proper elements of proof may be determined. Rudder, 507 So.2d at 416; Fulton, 388 So.2d at 537.

In this case, Officer DeJohn is a public figure.  Public figures are those individuals who gain notoriety due to their actions or achievements, or those individuals who draw the public's attention.  Mead Corp. v. Hicks, 448 So.2d 308, 311 (Ala. 1984). A public figure may be so famous and notorious that he is a public figure for all purposes.  Id.  Or, the public figure may be known for being in some controversy and become a limited purpose public figure. Id.

In White v. Mobile Press Register, Inc., 514 So.2d 902, 904 (Ala. 1987), the court addressed the limited purpose figure doctrine.  It held that an individual who was previously associated with the Environmental Protection Agency, and had placed himself in high level executive positions in a controversial industry where there was a likelihood of public controversy was a limited purpose

7

public figure.

Officer DeJohn is employed by the City of Montgomery as a police officer. Employment as a police officer, in and of itself, places Officer DeJohn in high profile and public position. Further, while employed as a police officer, Officer DeJohn was involved in two shooting incidents in a twenty day period, one of which involved an unarmed individual. The mere fact that a police officer shot an unarmed individual would place the officer in a public controversy, but the fact that Officer DeJohn was involved in two shootings in such a short period of time made the events even more controversial because of public concern. Both shootings were covered by the newspaper and local news stations. (Depo. of Moncus, p. 77.) The <u>Montgomery Advertiser</u> ran articles on the shootings on April 7, 8, and 27, 1994, all before the press conference held by Moncus. (See attached Exhibits "D," "E," and "F.") Although Officer DeJohn may state that he did not invite the public attention, he nevertheless became a limited purpose public figure because of his involvement in the two shootings.

Once it is determined that an individual is a public figure, the plaintiffs must prove that the alleged slanderous statements have been made with actual malice. <u>White v. Mobile Press Register, Inc.</u>, 514 So.2d 902, 904 (Ala. 1987). The Plaintiffs must present clear and convincing evidence of actual malice in order to withstand summary judgment. <u>Camp v. Yeager</u>, 601 so.2d 924, 927 (Ala. 1992); <u>Deutsch v. Birmingham Post Co.</u>, 603 So.2d 910, 911 (Ala. 1992) ; <u>Barnett v. Mobile County Personnel Board</u>, 536 So.2d

8

46, 54 (Ala. 1988).

Actual malice is found only where the defendant made the statement with knowledge that it is false or with reckless disregard as to whether it is false or not. <u>Deutsch v. Birmingham Post Co.</u>, 603 So.2d 910, 911 ( Ala. 1992).

> " '[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' "

<u>Id.</u>, (<u>citing</u> <u>Pemberton v. Birmingham News Co.</u>, 482 So.2d 257, 264 (Ala. 1985) and others).

> "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection . . . 'Imaginative expression' and 'the rhetorical hyperbole' traditionally used in public debate are protected."

<u>Deutsch</u>, 603 So.2d at 911-912 (<u>citing</u> <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 110 S. Ct. 2695, 111 L.Ed.2d 1 (1990) and others). Mere criticism alone will not support a finding of defamation. <u>Deutsch</u>, 603 So.2d at 912.

In this case, there is no clear and convincing evidence of actual malice. There is no evidence of previous hostility or ill will by Councilman Moncus toward Officer DeJohn and his family. Councilman Moncus has indicated that rather than making personal attacks on Officer DeJohn, his intent in calling the press conference was to draw attention to the City of Montgomery Police

9

Department's shooting policy. Councilman Moncus' comments regarding that fact that Officer DeJohn should have been put in an administrative position were merely criticism of the Police Department's policy. At best, Councilman Moncus' statements can be considered public debate or hyperbole. Because there is no evidence of actual malice, summary judgment is due to be entered in favor of Councilman Moncus on the Plaintiffs' claim for slander.

Even if the court determines that Officer DeJohn is a private figure, Plaintiffs must still prove that Moncus' conduct "created an unreasonable risk of harm to the Plaintiff." Mead Corp. v. Hicks, 448 So.2d 308 (Ala. 1983). In determining whether the defendant acted as a reasonably prudent person, the nature of the interests the defendant was seeking to promote in publishing the statement and the extent of damage which the statement caused the Plaintiff's reputation may be taken into account. Id.

In this case, the press conference was called to draw attention to the Montgomery City Police Department's shooting policy. Shortly thereafter, the policy was changed, and the new policy requires mandatory counseling and placement on administrative leave for the officer involved in the shootings until an investigation is completed. (Exhibit "C.") In addition, there has been no damage to Officer DeJohn's reputation. No statements imputing dishonesty or corruption were made. Officer DeJohn was awarded the transfer he requested, and he has not been disciplined or suspended, and has received all pay raises.

10

Tammy DeJohn has not stated a claim for defamation and there is no evidence that any alleged defamatory statement has been made concerning her.

For all of the reasons stated above, summary judgment is due to be entered in favor of Defendant Richard Moncus and against Raymond and Tammy DeJohn on their claim for slander.

Respectfully submitted,

_____
ALLISON L. ALFORD                ALF005

_____
E. HAMILTON WILSON, JR.          WIL070
Attorneys for Defendant

OF COUNSEL:

BALL, BALL, MATTHEWS & NOVAK, P. A.
1100 Union Bank Tower
60 Commerce St.
P. O. Drawer 2148
Montgomery, Alabama  36102
Phone: (334) 834-7680

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served on all counsel of record in the above matter, properly addressed, as listed below, by first class United States mail, postage prepaid, this 10th day of October, 1995.

_____
OF COUNSEL

cc:

Robert J. Russell, Jr., Esq.
Parnell, Crum & Anderson
641 So. Lawrence St.
Montgomery, AL  36104

16

# EXHIBIT K

 

78°F
Cloudy
Forecast »

▶ Proudly Serving Central Alal

News Entertainment Sports Classifieds Cars Homes Jobs Shopping Custor

June 10, 2005

# Agent: Informant feared for life

**By William F. West**
*Montgomery Advertiser*

Lawyers for accused drug trafficker Leon Carmichael called for a mistrial Thursday when a government agent said in federal court that his investigation was hampered because an informant feared for his life.

District Judge Myron Thompson dismissed the jury and heard arguments from both sides before ordering U.S. marshals to find the informant, Moses Williams. He denied the motion for a mistrial.

 

CARMICHAEL     WILLIAMS

Carmichael is charged with distributing marijuana and money laundering, while co-defendant Freddie Williams is charged with conspiracy. The two were arrested in November 2003 after agents seized more than 500 pounds of the drug from Williams' residence.

Under questioning by defense attorney Lisa Wayne, agent Tom Halasz said he conducted surveillance of Carmichael and his businesses in 2002 but acknowledged he didn't have enough evidence for a case.

When prosecutor Terry Moorer asked Halasz why his efforts failed, he said Moses Williams "was afraid Leon Carmichael would kill him."

Wayne immediately moved for a mistrial, and Freddie Williams' lawyer, Barry Teague, called for a separate trial for his client. Both motions were denied.

After being located by the marshals, Moses Williams testified outside the jury's presence.

Thompson asked Williams whether he might have told Halasz that Carmichael threatened him. "It's a possibility," Williams said.

But Williams told the judge and attorneys he lied to the agent.

The judge dismissed Williams but told him to be at the courthouse for the rest of the trial if he is needed to testify in front of the jury.

Halasz and another agent, Robert Greenwood, testified that Freddie Williams refused to cooperate with prosecutors for fear of revenge on his children. Greenwood also testified that in December 2003, Carmichael told him and another agent, "You got me."



Subscribe Now!
AND GET A FREE $20 Gift Card.
Learn More

montgomeryadvertiser.com

The government wrapped up the day with testimony from Mona George, an official with Compass Bank.

She went into detail about what the prosecution contends is a bank account Carmichael used through another person, Sherry Pettis, to channel illegal drug money.

George said that more than $249,000 cash was deposited into the account in an eight-month period.

She said what was suspicious to her was that the deposits never exceeded $10,000, which would have required filling out income tax paperwork. She also said it was unusual to see so many deposits being made into a personal account.

However, she couldn't provide details about the sources of the cash.

The trial resumes at 8:30 a.m. today and is expected to continue into next week.



**Talk Alabama Forums**
**Click here** to start or read a forum about this story, politics, sports, food, movies, music, religion or anything that concerns you.

**Choose to know**
Click here to subscribe.          **Montgomery Advertiser**

PEACE
Email t
Print th
Bookm
Save t
Make

montgomeryadvertiser.com
Case 2:10-cv-02559-MHT-WC Document 89-27 Filed 11/28/11 Page 57 of 60
Case 2:03-cr-00259-MHT-WC Document 504-11 Filed 08/16/05 Page 4 of 5 Page 3 of 3



Home | News | Entertainment | Sports | Classifieds | Cars | Homes | Jobs | Shopping | Customer S

Our Partners:

Copyright © 1997-2005 The Advertiser Co. Use of this site signifies your agreement to the Terms of Service (Updated 12/18/2002)

**Keep it cool**

A.J. Armstrong, 11, of Prattville plays in the water flowing from a refill nozzle Wednesday at the Pratt Park Pool.

David Bundy Advertiser

► MONTGOMERY

# Agent says Williams feared revenge

By William F. West
Montgomery Advertiser
bwest1@gannett.com

 

Carmichael      Williams

The federal drug trial of a pair of men is in a jam over whether an agent can testify he heard one of the two refuse to help the government for fear of revenge.

The agent, Robert Greenwood, was on the witness stand Wednesday afternoon recalling a November 2003 scene at the Drug Enforcement Agency Office, where Freddie Williams and Leon Carmichael were being detained.

Authorities had seized more than 500 pounds of marijuana from Williams' residence, and Greenwood said Williams was in a DEA room with the door slightly open. Greenwood told the jurors Williams lifted his head when he heard Carmichael's voice from a nearby holding cell.

Carmichael attorney Lisa Wayne objected, and U.S. District Judge Myron Thompson sent the jury out of the courtroom.

Greenwood told the judge a fellow agent asked Williams about cooperating and that Williams replied, "If I name names, my children will be killed."

Greenwood said Carmichael's name wasn't mentioned. After Thompson overruled Wayne, the lawyer also asked the judge to delete what Greenwood allegedly heard Williams say.

Thompson decided to recess and hear from attorneys at 8 a.m. today. The trial is set to resume at 8:30 a.m. and is expected to last into next week.

Carmichael is accused of drug trafficking and money laundering, while Williams is accused of conspiracy. The two have maintained their innocence, but they and attorneys for both sides are under court order not to comment on the case.

The trial began Tuesday, and much of the testimony came from a government informant, Patrick Denton.

Denton gave a detailed account of allegedly being in a lucrative drug trade with Carmichael and Williams.

Though Denton spoke calmly, he portrayed Carmichael as a cheapskate who failed to appreciate the business he generated.

Denton claimed Carmichael wouldn't help him

*"If I name names, my children will be killed."*

— what DEA agent Robert Greenwood said he heard Freddie Williams say when asked to cooperate with the investigation

with debts after Denton was arrested on drug charges in Huntsville, yet later abruptly asked him to resume selling marijuana.

The reason for the change, Denton alleged, was because Carmichael needed cash to help build the Carmichael Center, the 3,000-seat entertainment venue that opened in west Montgomery in the summer of 2003.

The defense tried to counter by raising questions about Denton's sincerity.

Agents entered Denton's home in a November 2003 raid, and he responded by becoming the source for them discovering the marijuana at the Williams residence.

Denton said he had decided Carmichael wasn't worth the prison time. He added that he hopes he won't have to worry about being behind bars in exchange for testifying as a government witness.

Carmichael attorney Susan James believed otherwise.

"I get the sense that maybe you're a little jealous of Mr. Carmichael," she told Denton while he was on the stand.

Denton denied the claim. Williams' attorney, Barry Teague, also asked Denton whether he would have continued in the drug business if the agents hadn't shown up.

"Possibly," he replied.

or the other needs to make a decision on who is going to take care of it and resurface it and quit patching it," Marks said. "It is probably the worst road in this neighborhood, no doubt about it."

Neighborhoods throughout the city were annexed in 1980 through the Greater Montgomery Act, which was intended to square up the city's boundaries. The act states that once those people begin to receive all seven city services, which include public safety, lights, water, and sewer, the city can take control of those roads.

Jeff Downes, executive assistant to the mayor, said it would cost the city $3.8 million to pave all of those roads and bring them up to city standards. He said the cost does not include the rights of way, signs, painting stripes or other necessary work.

The county spends about $500,000 a year to maintain those roads within the city limits.

City and county officials have been negotiating the streets. Downes said he does not know if they will be able to reach a resolution, but discussions continue.

"The city and county both made a commitment to try to resolve that issue in the Prattville portion of Elmore County each receive a total city responsibility as opposed to a split responsi-

Roads Page 2C

► PRATTVILLE

# Bass Pro deal kept secret from Autauga County

By Mike Linn
Montgomery Advertiser
mlinn@gannett.com

Elmore County Commission Chairman Joe Faulk found out about the coming of Bass Pro Shops in his district after reading about it in the newspaper three weeks ago.

Because of that, he said it would be more of a challenge to pony up financial incentives for the upcoming project, which is slated for construction in the Prattville portion of the county, near Old Farm Lane.

"Our policy is stated to

all municipal leaders that if there is something we would be asked to participate in, that we be brought in on the front end and not on the back end," he said. "We're more than willing to work with Prattville on these projects, but there's more willingness on the front end than the back end."

Prattville City Council President Dean Argo said due to a confidentiality agreement with Bass Pro, city officials didn't inform Elmore County officials of the national hunting and fishing business's desire to come to Prattville.

Breaking that confidentiality agreement would be unethical and possibly jeopardize the deal, Argo said.

"It's imperative to have as much confidentiality as you can," he said. "We met with (Elmore County officials) last week and told them everything about that project."

Bass Pro, a national hunting and fishing retail outlet, initially contacted the Prattville Area Chamber of Commerce, city officials said. Prattville city officials joined the chamber's recruitment efforts by developing an incentive package to help hook the company,

Argo said.

Faulk said Wednesday the Elmore County Commission is a professional group and wouldn't try to reroute — or break a secret — about a proposed Prattville project.

He added that Prattville had yet to request any financial help for the project from Elmore County.

"They talked about different ways they could meet their commitments, but didn't mention anything specific they would be asking us to do," he said.

Argo said the city would now welcome Elmore County's help financing the in-

centive package.

"Partnerships work both ways; they are primed to collect a huge windfall from Bass Pro Shops," he said.

Told of the comments late Wednesday, Faulk said he would have to talk with Argo about that.

Businesses in the Prattville portion of Elmore County pay a 1-percent economic development sales tax. Elmore County and Prattville each receive 40 percent of the tax, with the remaining 20 percent earmarked for infrastructure projects.

SURFACING PROBLEMS

People who live along Thach Road want the city or county to accept responsibility for doing more than patching their street.



Advertiser

# EXHIBIT L

STATE OF ALABAMA

COUNTY OF MONTGOMERY

## AFFIDAVIT OF DENISE A. SIMMONS, ATTORNEY AT LAW

I, Denise A. Simmons, am a licensed attorney in the State of Alabama, the United States District Court for the Northern, and Middle Districts of Alabama, and the Eleventh Circuit Court of Appeals.  I am an employee of Susan G. James, Attorney at Law.  I was giving her transportation to and from the Carmichael trial on a fairly frequent basis in order to avoid parking problems.

I also was available during lunch period on occasion to prevent her from having to leave the courthouse.

On the first day of trial in my travels to the courthouse, I was very surprised to see a police presence not normally seen in the area.  There was at least one motorcycle officer parked in the front of or on the corner by the courthouse each day.

I did observe people pass by, enter and exit the courthouse that appeared to be jurors. Given the conspicuous presence of these additional law enforcement personnel, it is my opinion that it was unavoidable for these individual who appeared to be jurors not to see the excessive law enforcement presence.

This information is provided freely and voluntarily and is true to the best of my knowledge, information and belief.

_____
Denise A. Simmons

**NOTARY PUBLIC**

Sworn and subscribed before me this 15th day of August 2005.

_____
Sharion S.  Mims

My commission expires 03/28/07