IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
v. )
)          CR NO 2:03-cr-259-MHT
LEON CARMICHAEL, SR. )

## SENTENCING MEMORANDUM

COMES NOW the United States of America, by and through Leura G. Canary,

United States Attorney for the Middle District of Alabama, and hereby files its

Sentencing Memorandum in the above-styled case as follows:

I.   There Existed One, Single Conspiracy as Charge in the Indictment

Defendant alleges in his objections letter to David Connolly dated April 10, 2006

that the evidence shows multiple conspiracies involving the Defendant instead of a

single conspiracy as charged in the Indictment.  This Court has previously addressed

this issue in the Court's Order dated June 22, 2005.  (Doc. 443)  In such order, the

Court tackled the issue of whether the hearsay statements of the conspirators were

admissible against both Defendants.  In assessing this issue, the Court examined the

drug conspiracy alleged in Count One of the Indictment.  (See Doc. 443).  The Court

found that "[t]he statements were made after 1993, when the conspiracy began, and

before or on November 17, 2003, when the conspiracy ended..." (Doc. 443)  Thus, this

Court has resolved the issue of whether there existed one conspiracy in this case.

Further, the Court has already determined when the conspiracy began and when the

conspiracy ended.

1


GOVERNMENT
EXHIBIT
6T

However, if the Court sees fit to reexamine this issue, the Government maintains that there existed one conspiracy.  The essential element of a drug conspiracy is an agreement by two or more persons to violate the narcotics laws.  *United States v. Parrado,* 911 F.2d 1567, 1570 (11th Cir.1990). The question of whether evidence supports a finding of a single conspiracy is a question of fact for the jury.  *United States v. Champion*, 813 F.2d 1154 (11th Cir. 1987).  In the instant case, the jury was instructed that "[t]o find a Defendant guilty you must unanimously find that the Defendant was a member of the conspiracy charged in the Indictment and not a member of some other separate conspiracy."  (Doc. 423, p. 11) The jury came back with a verdict of guilty as to the conspiracy charged, not an uncharged sub-conspiracy.

Moreover, a conspirator need not know all of the members or details of a conspiracy to be held responsible as a co-conspirator.  *United States v. Jones*, 913 F.2d 1552 (11th Cir. 1990); *United States v. Toler,* 144 F.3d 1423, 1427-28 (11th Cir. 1998)("[N]otwithstanding that there may be a large number of co-conspirators, a Defendant's guilt can be established if his or her contact extends to only a few or even one of the co-conspirators so long as the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy and the Defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt.").  The Government need only prove the existence of a conspiracy and a participatory link with the Defendant.  *United States v. Reed*, 980 F.2d 1568 (11th Cir. 1992).

A single conspiracy may be found where there is a "key man," who directs the illegal activities, while various combinations of other people exert individual efforts towards the common goal.  *United States v. Taylor*, 17 F.3d 333 (11th Cir. 1994); *United*

2

*States v. Champion*, 813 F.2d 1154 (11th Cir. 1987)(Defendant was the "hub" in one conspiracy which involved different groups of co-conspirators involved in eighteen separate importations of marijuana over a three-year period). Thus, "[i]t is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements. This does not, however, mean that more than one conspiracy exists. The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." *United States v. Calderon,* 127 F.3d 1314, 1329 (11th Cir. 1997)(internal quotation marks omitted).

This case exhibits the typical "hub" or "key man" theory of conspiracy. The Defendant was the hub and all of those who distributed marijuana, transported marijuana, broke-down the marijuana and helped unload the trucks of marijuana were the spokes. The fact that one marijuana distributor was not acquainted with a different marijuana distributor does not create different conspiracies. Further, because one marijuana distributor goes to jail or decides to cease selling and thus, another distributor takes the first distributor's place does not create a separate conspiracy. That conspiracy would be ongoing.

There were different cells or "spokes" in the Carmichael organization. While the cells of the Carmichael organization may have been distinct from one another, each cell is part of the same overall agreement or conspiracy. The most important link between the cells was Carmichael.

There are abundant similarities or links between the Jimmy Timmons' cell and

3

the Patrick Denton cell.[1]  Those similarities demonstrate that there is only one

continuous conspiracy.  Both Timmons and Denton testified that the marijuana came

into Alabama on Carmichael's tractor-trailer trucks.  (T-III, p. 74, lines 1-10; T-VI, p.116,

lines 10-22)  Both testified that Carmichael rarely handled the marijuana and normally

had someone else transport, break-down and distribute the marijuana.   (T-VI, p. 110,

lines 4-13; p. 111, lines 18-23)  Both knew Carmichael had other distributors working for

him, but did not know the other distributors.  (T-III, p. 31, lines 1-9)  Both took the drug

proceeds to Carmichael or sometimes to his girlfriends. (T-III, p. 41, lines 19-23)  Both

testified that "Cadillac" was involved with Carmichael.  (T-III, p. 75, lines 8-21; T-VI, p.

111, lines 18-23)  Clearly, Carmichael is within the "hub," each of these cells is a

"spoke," and the rim is the agreement to distribute marijuana.  Thus, there is one, single

conspiracy.


## II.  The Base Offense Level was Correctly Calculated

During the sentencing hearing, the Court is tasked with determining the drug

quantity attributable to the Defendant.  The jury in this case found that Carmichael had

conspired to distribute 7000 pounds of marijuana.  The Court instructed the jury to use

the standard of beyond a reasonable doubt in making their determination. However, at

sentencing, the Government must only meet the preponderance standard.

During the course of the trial, the Government put forth mounds of evidence

---

1 Defendant alleges that there exist at least two sub-conspiracies; the Jimmy Timmons and Joseph Lacey
sub-conspiracy and the Patrick Denton and Gary George sub-conspiracy.  (See letter dated April 10,
2006)

4

regarding the amount of marijuana that the Carmichael organization distributed during the course of the conspiracy. The evidence elicited by the Government totaled far more than the 7,000 pounds found by the jury. Obviously, the jury did not deem some of the testimony credible.

At trial, Denton testified that he obtained 25 pounds of marijuana a week from the Carmichael organization from November of 1999 to June of 2000. (T-II, p. 283, lines 6-16) Thus, from November, 1999 until June, 2000, Denton distributed approximately 600 pounds of marijuana for the Carmichael organization. From June, 2000, until late in the year of 2000, Denton sold 50 pounds of marijuana a week for Carmichael or a total of 1200 pounds. (T-II, p. 283, lines 15-17; and p. 285, lines 14-18)  From January of 2001 until September of 2001, Denton sold at least 100 pounds a week or at least 3600 pounds of marijuana. (T-III, p. 30, lines 9-16; p. 31, lines 10-14)  Shortly after Denton started selling 100 pounds a week for Carmichael, Carmichael asked Denton to start "cutting up" or "breaking down" the marijuana. (T-II, p. 288, lines 407)  From February of 2001 until September of 2001, Denton  "cut up" between 200-400 pounds of marijuana. (T-III, p. 31, p. 1-7). Assuming, *arguendo*, that Denton only "cut up" 200 pounds of marijuana per week, that totals 5600 pounds of marijuana.  In September of 2001, Carmichael was unable to obtain marijuana due to the events of September 11, 2001. (T-III, p. 31, lines 15-22)  However, in late October or early November of 2001, Carmichael brought Denton 300-350 pounds of marijuana to break down. (T-III, p. 33, lines 4-13)  From January of 2002 to June of 2002, Carmichael brought Denton between 200-300 pounds a week to "break-down"  (T-III, p. 40, lines 9-21) Again, assuming, *arguendo*, that Denton was only "breaking-down" 200 pounds of marijuana a

5

week during this time, that is a total of 4000 pounds. In June of 2002, Denton was arrested and ceased dealing with Carmichael until November or December of 2002. (T-III, p. 52, lines 11-15; p. 53, lines 11-21) In February of 2003, Denton started selling approximately 100 pounds of marijuana a week until November of 2003, when Carmichael was arrested. (T-III, p. 57, lines 5-11) During that time period, Denton sold approximately 4000 pounds for Carmichael.

Other witnesses, including Eric Peagler, Jimmy Timmons, Richmond Thomas and Gary George all testified that they had obtained marijuana from the Defendant. Moreover, Sherry Pettis testified that she had seen Carmichael in possession of over two million dollars in cash that Carmichael had previously buried in the ground. Taking all of this evidence into account it is clear that there is ample evidence to determine that 7,000 pounds of marijuana is attributable to the Defendant.

III. Defendant Should be Sentenced at the High-End of the Guideline Range

According to the preliminary Presentence Report, the Defendant has a base offense level of 42, which combined with a criminal history category of III, creates a sentencing guideline range of 360 months to life. It is the Government's contention that the Defendant should be sentenced to the high-end of such sentencing guideline range to a sentence of life imprisonment.

When considering what sentence to give a Defendant, the Court must correctly interpret and apply the Sentencing Guidelines to calculate the appropriate advisory Guideline range. *United States v. McVay*, 447 F.3d 1348, 1353 (11th Cir. 2006). The Court is then to consider the statutory sentencing factors in determining a particular

6

sentence to be imposed. Title 18, U.S.C., § 3553(a). The Court can take into consideration numerous elements when evaluating the factors enumerated in § 3553(a). In the case at bar, to meet the standards enumerated in § 3553(a), the Court should impose a life sentence.

The Defendant has previously been convicted for two very serious crimes and Defendant's punishment did not reflect the seriousness of such crimes. The Defendant shot someone in the chest and killed them. Defendant was convicted of the murder and, in 1976, was sentenced to life imprisonment for such murder. While in prison serving the sentence for murder, the Defendant sold drugs and was convicted of promotion of prison contraband. Defendant was paroled in 1986. Therefore, Defendant received a total of ten years for a murder conviction and a conviction for selling drugs. The seriousness of Defendant's past crimes and the lack of serious punishment for such violent crimes is justification for sentencing Defendant at the high-end of the guideline range. Further, Defendant was arrested for violation of State Narcotics Act in 1972, Assault in 1996 and Harassment in 1999. Each of those charges was nolle prossed. Thus, the Defendant was not punished for those acts.

The crimes for which the Defendant is presently facing sentencing are dangerous crimes for which a life sentence is warranted. Defendant has been convicted of conspiracy to possess with the intent to distribute and distribution of marijuana and conspiracy to money launder. Despite defense counsel's musing about the benign nature of marijuana, this is a serious crime. This Defendant was not a user, he was a pusher, a extremely large-scale pusher. Defendant made a fortune promoting other person's addictions. He was in the business of ruining lives. Carmichael was not an

7

ounce or even a pound dealer.  Carmichael sold hundreds of pounds of marijuana per week, thereby addicting many, many people to this dangerous drug.  To give Carmichael any sentence other than high-end of the guidelines, is ignoring the numerous victims that Carmichael has infected with his marijuana poison.

The Defendant is dangerous.  Throughout the trial there was testimony regarding Carmichael's dangerous nature.  There was testimony he threatened possible witnesses.  Witnesses told the Government that they were afraid of Carmichael and therefore would not cooperate.  More than one witness who was cooperating with the Government, suddenly ceased cooperation.  The Government expects to present the Court with substantial evidence that because of the Defendant's dangerous nature, he should be sentenced to a term of life in prison.

IV  Because Carmichael was Found in Possession of Firearms, His Sentence Should be Enhanced by Two-Points

Defendant is subject to a two-point enhancement in his guideline range for possessing a firearm.  U.S.S.G. § 2K1.1(b)(1).  Pursuant to Commentary Note 3 to U.S.S.G. § 2K1.1(b)(1), the [firearm] adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. At present, there is no evidence that would make it clearly improbable that the weapon was connected with the offense.  However, there is ample evidence that the firearm was connected to the offense.

When Leon Carmichael was arrested, agents found four firearms in his vehicle he was driving.  Three of the firearms were found in the trunk and one handgun was discovered on the passenger seat, next to Carmichael.  (T-IV, p. 220, lines 2-4; p. 164,

8

lines 23-25; p. 165, line 1)  Carmichael had approximately $6,000 in the vehicle at the time of his arrest.  (T-IV, p. 220, lines 11-14, 25; p. 221, lines 1-2)  Moreover, just prior to his arrest, Agents saw Carmichael driving by Freddie Williams' residence.2  (T-IV, p. 156, lines 20-25; p. 157, line 1)  When Carmichael saw law enforcement outside of Williams' residence, he immediately increased his speed.  (T-IV, p. 159, lines 2-8)  DEA Agent Sherry Gonzalez attempted to follow Carmichael, but Carmichael evaded her.  (T-IV, p. 160, lines 7-11)  Carmichael was obviously driving by the marijuana stash house to check on his marijuana load.  Because there is no evidence showing it clearly improbable that the possession of the firearm was connected to the offense, the two points should be added.

V.  Carmichael Should Receive the Two-Level Enhancement Due to the Firearms Located at His Co-Defendant's Residence.

        A second justification for the two-point firearm enhancement is based on firearms found at Freddie Williams, Carmichael's co-Defendant's residence.  "[F]or a § 2D1.1(b)(1) firearms enhancement for co-conspirator possession to be applied to a convicted Defendant, the Government must prove by a preponderance of the evidence: (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the Defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the Defendant."  *United States v. Gallo*, 195 F.3d 1278, 1284(11th Cir. 1999).  Elements one and three were decided by the jury.

2 Agents securing the residence while awaiting a search warrant.  Upon execution of the search warrant, agents

9

The firearms were possessed by Williams in furtherance of the conspiracy. This Court has held that the presence of the weapon at [the co-conspirator's] home is sufficient evidence that his possession of it was in furtherance of the conspiracy. *United States v. Trammell*, 385 F.Supp.2d 1215 (M.D. Ala. 2005); s*ee United States v. Hall*, 46 F.3d 62, 64 (11th Cir. 1995) (handgun seized from dresser drawer of bedroom in house where drug activity took place justified two-level enhancement for possession of dangerous weapon). Moreover, Williams lived in the stash house that was equipped with a secret room where the marijuana was stored. (T-III, p. 98, lines 19-25; p. 99, lines 1-13) Clearly, as the keeper of the stash house, part of Williams' duties was to protect the marijuana. (T-II, p. 289, lines 3-12) This protection was accomplished through with the use of firearms. To establish the last element, the possession must have been reasonably foreseeable. Further, on the day of Carmichael and Williams' arrest, Williams told Patrick Denton that Carmichael had been to Williams' house the night before to count the marijuana bundles. (T-III, p. 96, lines 18-25; p. 97, lines 1-2) If Carmichael was at Williams' residence, then he presumably saw the firearms. Moreover, as the keeper of the "stash house" it is reasonably foreseeable that Williams would employ the use of firearms to protect Carmichael's marijuana. This Court has previously ruled that "an act is reasonably foreseeable if it is a 'necessary or natural consequence of the unlawful agreement.'" *United States v. Trammell*, 385 F.Supp.2d 1215 (M.D. Ala. 2005); *quoting*, *United States v. Cover*, 199 F.3d 1270, 1275 (11th Cir. 2000). Co-conspirator possession of firearms is a natural consequence of narcotics conspiracies because "[i]t is uniformly recognized that weapons are often as much 'tools

---

found over 500 pounds of marijuana

10

of the trade' as the most commonly recognized narcotics paraphernalia." *Id; quoting, United States v. Terzado-Madruga*, 897 F.2d 1099, 1119 (11th Cir. 1990). Based on the forgoing, Carmichael should receive a two-point enhancement for possession of a firearm.

VI. <u>Defendant Should Receive a Two-Point Enhancement for Obstruction</u>

A two-point enhancement for obstruction is permitted if: 1) the Defendant obstructed or impeded justice, or attempted to with the requisite intent to "willfully" obstruct or impede justice during a prosecution; and 2) the obstruction, or attempted obstruction, related to the conviction offense or relevant conduct. *See*, U.S.S.G. §3C1.1. According to the Commentary, one type of conduct to which the adjustment applies is "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." *See,* U.S.S.G. 3C1.1, Application Note 4(c).

Until around May 20, 2005, Carmichael had not filed tax returns for the years 2001, 2002, and 2003. On May 20, 2005, approximately twenty-five days prior to Carmichael's trial, he filed those missing tax returns. (T-VIIIB, p. 9, lines 10-14) After Carmichael offered the tax returns into evidence and they were admitted, the Government proved that the tax returns contained false information. Carmichael lied on his return regarding the amount of money that Unique Entertainment earned. (T-IX, p. 69, lines 20-23; p. 74, lines 14-16). Carmichael claimed ownership of Club G, when in reality it is owned by Darren Gaskin. (T-IX, p. 77, lines 12-15)

The Defendant contends that because these were actual tax returns they were not false document. That is contrary to law. *See, United States v. Shannahan*, 135 Fed.

11

Appx. 253 (11th Cir. 2005)(affirming the obstruction enhancement for a Defendant who
faxed a false document to the ATF)  One can surmise that these falsities were made in
an attempt to disguise the mass amounts of drug proceeds that, through discovery,
Carmichael knew the Government would use in trial to prove he was a drug dealer.
Carmichael needed some vehicle with which to show legitimate funds.  Because he had
no such vehicle, he fabricated one in the form of false tax returns.


VII.   Defendant Should Not Receive a Downward Departure Based on His Age

    While the Defendant has filed no motion for downward departure with the Court,
Defendant makes reference to a downward departure based on age.3  According to the
sentencing guidelines, age is not ordinarily relevant in determining whether a departure
is warranted.  See, U.S.S.G. § 5H1.1.  While other Circuit and District Courts have
allowed a departure based on age, the Eleventh Circuit has yet to discard this particular
guideline.  *United States v. Medrano*, 166 Fed. Appx. 472 (11th Cir. 2006)(rejecting
Defendant's argument that age 60 with a life expectancy as a Columbian citizen of 66
warranted a lesser sentence); *United States v. Dowd*, No. 05-15067, 2006 U.S. App.
LEXIS 14409 (11th Cir. June 13, 2006)(explicitly cited section 5H1.1 to reject the 65
years old Defendant's request for a downward departure under section 3553(a)(1));
*United States v. Stumpner*, No. 05-15411, 2006 U.S. App. LEXIS 8281 (11th Cir. Apr. 5,
2006)(affirming the district Court's rejection of the Defendant's argument that his
sentence should be reduced because he was 74 years old and the guideline range
"would practically impose a life sentence,")

---

3 See, Defendant's letter to David Conolly dated May 26, 2006.

12

VIII.   Conclusion

Based on the forgoing, the Court should overrule the Defendant's objections and

sentence him to a life term of imprisonment.

Respectfully submitted this the 14th day of July, 2006.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ A. Clark Morris
A. CLARK MORRIS
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: clark.morris@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )
    )    CR NO 2:03-cr-259-MHT
LEON CARMICHAEL, SR.    )

CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to

all attorneys of record.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ A. Clark Morris
A. CLARK MORRIS
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104
Telephone: (334) 223-7280
Fax: (334) 223-7135
clark.morris@usdoj.gov